UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LUKE WAID AND MICHELLE RODRIGUEZ,
individually and as next friends of one minor
child, SOPHIA RODRIGUEZ-WAID;

*Plaintiffs,*

v.

GOVERNOR RICHARD DALE SNYDER, in his
official capacity, and the STATE OF MICHIGAN
for prospective relief only; DANIEL WYANT,
LIANE SHEKTER SMITH, ADAM
ROSENTHAL, STEPHEN BUSCH, PATRICK
COOK, MICHAEL PRYSBY, BRADLEY
WURFEL all in their individual capacities;
DARNELL EARLEY, GERALD AMBROSE,
DAYNE WALLING, HOWARD CROFT,
MICHAEL GLASGOW and DAUGHERTY
JOHNSON in their individual and official
capacities, and the CITY OF FLINT, a municipal
corporation, jointly and severally,

*Defendants.*

CASE NO. 16 –

HON.

---

**NAPOLI SHKOLNIK PLLC**
By:   /s/ Paul J. Napoli
Paul J. Napoli, *Admission Pending*
Hunter Shkolnik, *Admission Pending*
1301 Avenue of the Americas, Tenth Floor
New York, NY, 10019
(212) 397-1000
pnapoli@napolilaw.com
hunter@napolilaw.com

**MCKEEN & ASSOCIATES, P.C.**
By:   /s/ Brian J. Mckeen
Brian J. Mckeen, #P34123
McKeen & Associates, P.C.
645 Griswold Street
Detroit, MI, 48226
(313) 961-4400
bjmckeen@mckeenassociates.com

**SLATER SLATER SCHULMAN LLP**

By:___/s/ Adam Slater
Adam P. Slater, *Admission Pending*
Jonathan E. Schulman, *Admission Pending*
909 Third Avenue, Twenty Eighth Floor
New York, NY, 10022
(212) 922-0906
aslater@sssfirm.com
jschulman@sssfirm.com

## COMPLAINT FOR MONEY DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF WITH RELIANCE ON JURY DEMAND FOR VIOLATIONS OF THE SAFE DRINKING WATER ACT

### INTRODUCTION

> "No safe blood level in children has been identified. Lead exposure can affect nearly every system in the body."

National Cancer for Environmental Health, Division of Emergency and Environmental Health Services

1.     Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a result of exposure to the introduction of lead and other toxic substances from Defendants' ownership, use, management, supervision, storage, maintenance, disposal and release of highly corrosive water from the Flint River into the drinking water of Flint, Michigan.  At critical times including during gestation and her developmental years, the minor plaintiff has been exposed to damaging levels of lead and other toxic substances. Plaintiffs' damages and losses include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, weight loss, stunted

2

growth, anemia, headaches, abdominal and other pain, mental anguish, emotional distress, the cost of medical, educational, and rehabilitation expenses, and other expenses of training and assistance, and loss of income and earning capacity.

2.      Plaintiffs, at the time of sustaining the injuries complained of herein, have been the owners, lessees and/or occupants of certain real property located in Flint, Michigan, that received highly corrosive and contaminated water pumped from the Flint, River.

3.      In 2014, Defendants discovered that dangerous levels of lead were leaching into Flint's drinking water.  Not only did Defendants fail to take any measures to eliminate this danger, as required by federal law, but they actually took affirmative steps to downplay the severity of the contamination from its citizens.  In so doing, Defendants negligently and recklessly exposed the entire population of Flint, including Plaintiffs, to devastating and irreversible health problems.

4.      Due to the negligent, willful, and/or wanton actions of Defendants, an unknown quantities of toxic chemicals, including but not limited to lead particles, have been released into the public drinking water supply relied upon by the entire City of Flint, and, most importantly, the Plaintiffs herein.

5.      Upon information and belief, Defendants, who were acting under the color of law, deprived Plaintiffs of their rights under the 14th Amendment to the United States Constitution.  Specifically, Defendants deprived Plaintiffs of life, liberty and property without due process of law when the decision to switch to the Flint River

was made, thus providing Plaintiffs with toxic and unsafe water.

6.     The health effects of lead poisoning are well known.  The CDC has noted that: "No safe blood level in children has been identified.  Even low levels in blood have been shown to affect IQ, ability to pay attention, and academic achievement." Lead impacts nearly every organ and system in the human body.  Lead causes multitudinous and serious injuries to the nervous system, which can lead to convulsions, coma and brain death.  It causes learning and behavioral disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia. Moreover, children under the age of 6 years old are more susceptible to the toxic effects of lead than are adults since the brain and central nervous system are not completely developed.

7.     Defendants failure to remediate the lead crisis they caused by switching to the Flint River violated the constitutional rights of Plaintiffs by acting in a manner that shocks the conscience of the Plaintiffs.

8.     Plaintiffs allege that, as a direct result of Defendants' reckless, negligent, and grossly negligent conduct, they were exposed to hazardous and toxic substances from the Flint River that were released by Defendants into the environment.  Plaintiffs further allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, Plaintiffs have inhaled, ingested or otherwise absorbed such hazardous and toxic substances into their bodies, and that this exposure to these substances directly and proximately caused Plaintiffs' injuries.

4

9.     Plaintiffs allege that, as a direct result of Defendants' reckless, negligent and grossly negligent conduct, Plaintiffs were directly exposed to hazardous and toxic substances known to cause disease, and that this exposure caused or contributed to Plaintiffs' injuries. Therefore, the doctrine of joint and several liability should be extended to apply to each Defendant herein.

10.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered injuries and currently suffer and will continue to suffer damages and losses which include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, pain, mental anguish, emotional distress, the loss of household services, the cost of medical, educational and rehabilitation expenses and other expenses of training and assistance, and loss of earnings, income, and earning capacity.  Such injuries, damages and loses are reasonably likely to continue to occur in the future.

## THE PARTIES: PLAINTIFFS

11.     Plaintiff Luke Waid, individually and as next of friend to one minor child, has resided at 4306 Ogema Avenue in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014, Plaintiff Waid, Plaintiff Rodriguez, and the minor child living with him continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

5

12.     Plaintiff Michelle Rodriguez, individually and as next of friend to one minor child, has resided at 4306 Ogema Avenue in the city of Flint, in the county of Genesee, in the state of Michigan at all relevant times.  Since April 25, 2014, Plaintiff Rodriguez and the minor child living with her continue to be exposed to highly dangerous conditions created by Defendants' decision to switch to the Flint River, and Defendants' continued failure to remediate these harmful and toxic conditions.

13.     Plaintiff Waid and Plaintiff Rodriguez are parents and next of friend of one minor child "Sophia Rodriguez-Waid", age 2.

14.     The Waid/Rodriguez family, at all relevant times, lived in a single family home at 4306 Ogema Avenue, Flint, Michigan.

15.     At all relevant times, members of the Waid/Rodriguez family, unaware of toxicity of their water, regularly used the water for drinking and other household necessities such as bathing, cooking, and cleaning.  Defendants continuously led Plaintiffs to believe that there was nothing wrong with Flint's water, and that it was safe for consumption.  As a result of Defendants' assurances, Plaintiffs continued to use and rely upon Flint's water.

16.     As a proximate result of Defendants' actions, as set forth herein, Plaintiffs have experienced serious physical and emotional injury due to their exposure to the toxic water, including but not limited to:

    a. Psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder, physical manifestations of emotional distress, and an inability to cope with normal stress.

6

17.    As a proximate result of Defendants' actions, as set forth herein, Sophia Rodriguez-Waid has experienced serious physical and emotional injury due to her exposure to the toxic water, including but not limited to:

  a.  heightened levels of lead in her blood;
  b.  inability to sleep at night; and
  c.  excessive crying and irritability
  b.  high levels of lead and copper in their bloodstreams, brains,  bones and other organs;
  c.  skin rashes and other skin problems;
  d.  digestive problems;
  e.  infections;
  f.  sleeping disorders;
  g.  neurological disorders such as "brain fog", seizure like convulsions, vison loss, memory loss; and
  d.  psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder, physical manifestations of emotional distress, and an inability to cope with normal stress;

18.     Plaintiff Luke Waid and Plaintiff Michelle Rodriguez have experienced property damage from Flint's use of corrosive Flint River water including but not limited to destruction of service pipe lines and loss in property value.

## THE PARTIES: DEFENDANTS

19.    All individually named Defendants are sued in their individual and/or official capacities as indicated below.

20.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while

7

engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

21.    The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

22.    Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

23.    Defendant RICHARD DALE SNYDER is sued in his official capacity as Governor of the State of Michigan.  At all times relevant hereto, Defendant Snyder was acting individually and in his official capacity as State Governor and top policymaker for the State of Michigan.

24.    Defendant STATE OF MICHIGAN is sued in its capacity of operating the Michigan Department of Environmental Quality ("MDEQ").  At all times relevant hereto, Defendant State of Michigan is sued in its capacity as manager of the environmental agency tasked with protecting the environment and the residents of Michigan from environmental dangers.

25.      Defendant DANIEL WYANT ("Wyant") is sued in his official capacity as Director of MDEQ.  At all times relevant hereto, Defendant Wyant was acting individually and in his official capacity of Director of MDEQ and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

26.      Defendant LIANE SHEKTER SMITH ("Smith") is sued in her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ.  At all time relevant hereto, Defendant Smith was acting individually and in her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, and is sued for her participation in causing the Flint water crisis that continues to harm Plaintiffs.

27.      Defendant ADAM ROSENTHAL ("Rosenthal") is sued in his official capacity as a Water Quality Analyst assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Rosenthal was acting individually and in his official capacity as a Water Quality Analyst, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

28.      Defendant STEPHEN BUSCH ("Busch") is sued in his official capacity as District Supervisor assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Busch was acting individually and in his official capacity as District Supervisor, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

29.      Defendant PATRICK COOK ("Cook") is sued in his official capacity as

a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. At all times relevant hereto, Defendant Cook was acting individually and in his official capacity as a Water Treatment Specialist, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

30.   Defendant MICHAEL PRYSBY ("Prysby") is sued in his official capacity as the Engineer assigned to District 11 (Genesee County) of the MDEQ. At all times relevant hereto, Defendant Prysby was acting individually and in his official capacity as Engineer, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

31.   Defendant BRADLEY WURFEL ("Wurfel) is sued in his official capacity as Director of Communications for MDEQ. At all times relevant hereto, Defendant Wurfel was acting individually and in his official capacity as a Director of Communications for MDEQ, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

32.   Defendant DARNELL EARLEY ("Earley") is sued in his official capacity as the Emergency Financial Manager. Defendant Early was appointed by Defendant Snyder, and served as Emergency Manager to the City of Flint from November 1, 2013 until January 12, 2015. At all times relevant hereto, Defendant Earley was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

33.    Defendant GERALD AMBROSE ("Ambrose") is sued in his official capacity as the Emergency Financial Manager.  Defendant Ambrose was appointed by Defendant Snyder, and served as Emergency Manager t o the City of Flint from January 13, 2015 until April 28, 2015.  At all times relevant hereto, Defendant Ambrose was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

34.    Defendant DAYNE WALLING ("Walling") is sued in his official capacity as the Mayor of Flint.  Defendant Walling served as Mayor from August 4, 2009 until November 9, 2015.  At all times relevant hereto, Defendant Walling was acting individually and in his official capacity as a Mayor of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

35.    Defendant HOWARD CROFT ("Croft") is sued in his official capacity as Director of Public Works for the City of Flint.  At all times relevant hereto, Defendant Croft was acting individually and in his official capacity as a Director of Public Works for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

36.    Defendant MICHAEL GLASGOW ("Glasgow") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant hereto, Defendant Glasgow was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint

11

water crisis that continues to harm Plaintiffs.

37.     Defendant DAUGHERTY JOHNSON ("Johnson") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant hereto, Defendant Johnson was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs.

38.     Defendant CITY OF FLINT is sued as the owner and operator of the public water system that provides potable water to the residents of Flint.  At all times relevant hereto, Defendant City of Flint is sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs.

## JURISDICTION AND VENUE

39.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against Defendants for violation of the Fourteenth Amendment of the United States Constitution.

40.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, for cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), for civil rights actions; and 28 U.S.C. § 2201, the Declaratory Judgment Act.

41.     Venue is proper in this Court because Plaintiffs' claims arose in this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. §§ 102, 1391(b).

## RELEVANT FACTS

42.     The City of Flint is the largest city in Genesee County Michigan, and is

12

located 66 miles northwest of Detroit.  There are approximately 100,000 residents in Flint, making it the one of the largest cities in Michigan.

43.     Flint has experienced several financial emergencies over the past two decades, and recorded a total debt of nearly $30 million during its first declared financial emergency 2002.

44.     In the fall of 2011, Defendant Snyder declared a second financial emergency in Flint and appointed Michael Brown as emergency manager to control its financial situation, pursuant to Public Act 436.  Pursuant to Public Act 436, after a financial emergency is declared, the city is placed in state receivership, and the appointed emergency manager temporarily supplants the governing body and elected officials of the city.

45.     While in state receivership and under the control of emergency manager Michael Brown, Defendant City of Flint faced crucial decisions about the future of its drinking water supply.

46.     For over five decades, Flint purchased treated drinking water from the Detroit Water and Sewerage Department ("DWSD").

47.     In response to rising water rates and a financial crisis, on March 25, 2013, the Flint City Council approved a resolution to leave the DWSD, and became a partner with the Karegnondi Water Authority ("KWA"), which was scheduled to become operational in 2016.

48.     The KWA is a newly formed municipal water supply system, which

13

planned on constructing a direct water distribution pipeline (the "Huron Pipeline") from Lake Huron to several Michigan counties, including Genesee County, the county Flint is located.

49.     With the City of Flint's water supply contract set to expire in April 2014, the City faced a nearly two year gap in providing water to its residents.

50.     The Emergency Manager refused to negotiate a short-term contract with DWSD, and alternatively selected the Flint River as the interim primary drinking water source to be used until the Huron Pipeline was set to be completed.

51.     The use of the Flint River as a source of primary drinking water had been contemplated by the City, but a 2011 study rejected use of the Flint River due to costs associated with updating the Flint Water Treatment Plant that would bring Flint River water into compliance with federal and state drinking water standards, which was estimated to be in the tens of millions of dollars.

52.     Despite this study, the decision was made to provide Flint residents with insufficiently treated water from the Flint River. The switch was set to begin by spring 2014.

53.     On April 16, 2013, the Emergency Manager signed the contract to make the move to the KWA, and the DWSD provided notice of termination the next day.

54.     Before the City of Flint began pumping Flint River water into resident's systems, the MDEQ was required under the Safe Drinking Water Act's Lead and Copper Rule, 40 CFR Part 141, Subpart I §§ 141.80-91 (the "Lead and Copper Rule"

14

or "LCR"), to approve use of the Flint River as a new source of water for Flint's nearly 100,000 residents.

55.    Despite their knowledge of the corrosiveness of Flint River water, and the lack of corrosion controls and treatment in place, the switch was approved by MDEQ in April, 2014.

56.    Thereafter, on April 25, 2014, the City of Flint officially turned off the DWSD line and began pumping Flint River water into the Flint system

57.    Upon information and belief, Defendants knew of the 2011 feasibility report for the Flint River when the switch was made.

58.    Upon information and belief, Defendants knew that the necessary anti-corrosion controls (such as the use of phosphate) were not in place to treat the water at the Flint Water Treatment Plant.

59.    In the weeks and months after the switch to the Flint River was made, Flint water users, accustomed to decades of safe, clean and fresh water via DWSD, began noticing the water had at times been cloudy, discolored, and foul smelling.

60.    Dozens of residents reported unusual side effects such as hair loss, nausea, and skin rashes, after drinking or otherwise using the water in any residential capacity.

61.    After water samples tested positive for fecal coliform bacteria ("E.coli") in August and September 2014, Defendants issued three boil water advisories, urging residents to boil water not just for drinking, but for making ice, brushing teeth,

15

washing dishes, and preparing food.

62.    In an attempt to combat the sudden presence of E.coli, Defendants began treating the Flint water supply with trihalomethanes ("TTHM"), a chlorine disinfectant byproduct that is intended to kill dangerous pathogens, but can also cause deadly health problems.

63.    The use of TTHM caused the City of Flint to violate federal standards under the Safe Drinking Water Act ("SDWA") for nearly eight months - from January 2015 until August 2015.  As a result of the violations, the City of Flint was required as a matter of federal law to send residents warning notices regarding the illegal TTHM levels.

64.    In an attempt to reduce TTHM levels, the City of Flint began adding ferric chloride, a coagulant used to improve the removal of organic matter.

65.    Within a few weeks of the issuance of the TTHM notice, Flint City Council members approached Emergency Manager Defendant Earley, demanding a reasonable response to the health risks, namely that the City of Flint should reconnect with Detroit water.  Defendant Earley refused to act as requested by members of the City Council.

66.    Despite these early warning signs of a potential water crisis, in October 2014, the MDEQ minimized the issue and blamed cold weather, aging pipes, and a declining population for the poor water quality Flint's residents were reporting.

67.    During the first half of 2015, Flint residents continuously expressed their

concerns about water quality to Flint and MDEQ officials.

68.     Between July and December 2014, the City conducted the first of two rounds of six month lead sampling under the Lead and Copper Rule.

69.     The City conducted the second of two rounds of six month lead sampling under the Lead and Copper Rule between January and June 2015.  The two rounds of sampling showed that the levels of lead in the City's public water supply were rapidly rising.

70.     In January 2015, representatives of the DWSD offered to waive the $4 million reconnection fee in an effort to bring safe water to Flint's residents again. However, Defendant Early rejected this proposal.

71.     On January 13, 2015, Defendant Earley was replaced as Emergency Manager by Defendant Ambrose.  On January 29, 2015, DWSD again offered to reconnect Flint to the Detroit system.   However, Emergency Manager Ambrose rejected this offer, and continued to offer false assurances regarding the safety of Flint's water to the residents of Flint.

72.     In a February 3, 2015 internal memo prepared for Defendant Snyder, Defendants attempted to downplay the severity of the water crisis, stating - "It's clear the nature of the threat was communicated poorly.  It's also clear that folks in Flint are concerned about other aspects of their water – taste, smell, and color being among the top complaints."

73.     On or about April 24, 2015, MDEQ notified Region 5 of the

Environmental Protection Agency ("EPA") that the City did not have appropriate corrosion control treatment in place at the Flint Water Treatment Plant.

### *Lead Contamination in Flint's Water Supply*

74.     As a result of the corrosivity of Flint River water, the lack of corrosion controls in place, and the decisions by Defendants, Plaintiffs have been exposed to deadly levels of lead in their water.

75.     The Center for Disease Control and Prevention has stated that "No safe blood level has been identified."

76.     Lead is introduced into drinking water when highly corrosive water is pumped through aging supply pipes, causing lead to be released from the pipes and into the faucets of users.

77.     In an effort to protect the drinking water supply, the EPA published the Lead and Copper Rule in 1991, setting operational standards for pipes, plumbing fittings, fixtures, and solder.

78.     Under the Lead and Copper Rule, water systems are required to monitor drinking water at customer taps.  If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion, including treatment, monitoring the water, and educating the public about the presence of lead, the adverse health effects posed by lead, the measures being taken to ameliorate the problem, and what consumers can do to minimize their exposure to the lead.

18

79.    Defendants did not consider how to control the corrosive water from the Flint River before making the switch in 2014, despite having ample knowledge of the potential dangers from the 2011 Flint River Feasibility Report.

80.    At the time when the City of Flint began using Flint River water, there was no form of treatment to control corrosion.  Instead, Defendants waited until residents began complaining of water quality issues before any form of treatment control was implemented.

81.    Pursuant to the Lead and Copper Rule, the City of Flint was to conduct two six-month monitoring periods to test resident's tap water for the presence of lead. The first period ran from June 2014 – December 2014, with the second covering January 2015 – June 2015.

82.    The purpose of this testing under the Lead and Copper Rule is to measure lead levels from a sample set of residential homes, to determine the corrosivity of the City of Flint's water, in an effort to limit exposure to the residents of Flint.

83.    Upon information and belief, improper testing methods were used in an attempt to ensure the average results of the 10% of tested homes remained below the 15 ppb federal action level enumerated under the Lead and Copper Rule.

84.    For example, the City of Flint instructed residents to "pre-flush" their taps before collecting the samples for the two six-month monitoring period.

85.    The practice of pre-flushing a tap minimizes the lead captured in the sample, and does not provide an accurate measurement of lead levels in the public

drinking water.

86.    Upon information and belief, Defendants knew that Flint residents were being exposed to elevated levels of lead.  Moreover, Defendants knew that misleading and improperly conducted tests were providing false results and assurances to Flint's residents.

87.    On March 25, 2015, the Flint City Council voted to re-connect to DWSD, but Defendant Ambrose rejected this decision, and instead continued to provide toxic water to Flint's residents.

88.    In June of 2015, EPA representative Miguel A. Del Toral ("Toral") wrote an internal memo expressing his concerns with issues with water coming from the Flint River, and the lack of corrosion controls in place at the Flint Water Treatment Plant.  According to Toral's report, the absence of corrosion control treatment for mitigating lead and copper in the City of Flint's water system was a major public health concern.

89.    Pursuant to the Lead and Copper Rule, large water systems (i.e., those serving greater than 50,000 residents) such as those in the City of Flint, are required to install such corrosion control treatment.

90.    Independent investigations of the Flint water crisis were commenced by Professor Marc Edwards ("Professor Edwards") and other experts from Virginia Tech in 2015.

91.    During the summer of 2015, Professor Edwards and his team collected

20

277 water samples from the faucets of Flint residents, and found that 10% of the samples had lead levels of 25 parts per billion (ppb) - in excess of the federal action level of 15 ppb under the Lead and Copper Rule.

92.     Furthermore, independent investigations determined that the Flint River water was nearly 19 times more corrosive than the DWSD water Flint had been purchasing before the switch in April 2014.

93.     Despite the mounting evidence of a severe lead contamination problem as a result of the lack of corrosion control measures, Defendants continued to tell residents that Flint's water was safe for consumption.

94.     In August of 2015, Dr. Mona Hanna-Attisha MD ("Dr. Mona Hanna-Attisha") of Hurley Hospital released a report which showed a dramatic increase in Flint children with elevated lead levels in the blood. The timing of this spike directly correlated with the time of exposure to the highly corrosive Flint River water beginning April 2014.

95.     According to Dr. Hanna-Attisha's findings, the number of Flint children under the age of 5 with elevated lead levels in their blood doubled after the switch, rising from 2.1% to 4.0%.  Moreover, blood test results of infants (15 months or less) showed an increase from 1.0% to 2.5%, post-switch.

96.     On October 1, 2015, Genesee County Health Officials issued a public health emergency urging Flint residents not to drink the tap water.

97.     On October 2, 2015, State officials announced that the State of Michigan

would provide water filters to Flint water users in an attempt to minimize the water crisis.

98.   Flint's Technical Advisory Committee, a blue ribbon committee appointed to make recommendations aimed at improving the quality of Flint's water, recommended on October 7, 2015 that the City of Flint should make the switch back to the DWSD.

99.   On October 8, 2015, Defendant ordered the City of Flint to re-connect with the DWSD.

100.   On October 19, 2015, Defendant Wyant issued a statement regarding MDEQ's handling of the Flint water crisis:

> It recently has become clear that our drinking water program staff made a mistake while working with the City of Flint. Simply stated, staff employed a federal protocol they believed was appropriate, and it was not. The water testing steps followed would have been correct for a city less than 50,000 people, but not for a city of nearly 100,000.

101.   Defendant City of Flint attempted to rebuild the protective coating inside water transmission lines on December 9, 2015, by adding supplemental phosphate to the water.

102.   The failure to implement these additional corrosion controls, as required by the Lead and Copper Rule, contaminated Flint's public water supply with deadly amounts of lead, now damaging Plaintiffs.

22

103.   On December 14, 2015, Flint Mayor Karen W. Weaver declared a State of Emergency, pursuant to Michigan Emergency Act 390 of 1976.

104.   In her Declaration, Mayor Weaver stated "the City of Flint has experienced a Manmade disaster by switching to the use of the Flint River before connecting to KWA…" and "the city of Flint children have experienced increased blood lead levels since the switch to the Flint River."

105.   The Flint Water Advisory Task Force, a team appointed by Defendant Snyder to review the Flint water crisis, released a report on December 29, 2015, placing the primary responsibility on what happened in Flint with MDEQ.  Shortly thereafter, Defendants Wyant and Wurfel resigned from their positions at MDEQ as Director and Department Spokesman, respectively.

106.   On January 5, 2016, Defendant Snyder declared a State of Emergency, stating "the damaged water infrastructure and leaching of lead into the city's water caused damage to public and private water infrastructure, and has either caused or threatened to cause elevated blood lead levels, especially in the population of children and pregnant women…"

107.   President Barack Obama declared a federal State of Emergency in the city of Flint on January 16, 2016, freeing up $5 million in federal aid to immediately assist with the public health crisis.

108.   Plaintiffs continue to be exposed to unsafe water, and will continue to be exposed, until the pipes and services lines that were damaged by the corrosive Flint

23

River water are replaced.

109.   The presence of the contaminants in Plaintiffs' environment and on Plaintiffs' properties has resulted in permanent and continuing harm to Plaintiffs' persons and properties.

110.   Due to the Defendants' negligent decisions explained of herein, Defendants' failure to avoid the release of contaminants into Plaintiffs' water supply, Defendants' failure to adequately warn Plaintiffs of the condition damaging their properties and impacting their health, and Defendants' failure to act reasonably in eliminating, correcting, and/or remediating the condition, Defendants, and each of them individually, were and are obligated to institute reasonable care and compensation plans to halt, prevent and correct injuries to all Plaintiffs, their physical and mental well-being, their real and personal property, and their economic interests.

111.   As residents of the City of Flint, Plaintiffs would be, and are foreseeably and unnecessarily injured by the Defendants' failure to warn and failure to exercise reasonable care to eliminate, correct, and/or remediate the dangerous condition created and/or maintained by Defendants.

112.   Defendants knowingly and negligently released or allowed to be released toxic contaminants into the environment, and/or continue to allow the migration of toxic chemicals into the environment on and around Plaintiffs' properties.

113.   Defendants intentionally and/or negligently failed to adequately warn or advise Plaintiffs and other members of the public as to the nature, extent, composition,

effects, and location of the contamination, the fact that Plaintiffs and their property were being exposed to the contamination, the nature of the contaminants and risks that could change over time, and that exposure to the contamination could likely cause life threatening and permanent adverse health effects.

114.   The numerous egregious actions and incidents occurring in the City of Flint caused by Defendants constitute an intentional and/or negligent breach of their duty of reasonable care, and blatant violations of federal and Michigan State law.

115.   Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each and every Plaintiffs' right to possession and undisturbed occupancy of their residences, and have repeatedly trespassed by causing migration of toxic contaminants onto Plaintiffs' real properties.

116.   Defendants, through their negligent and/or reckless acts, have caused continuing damage to Plaintiffs' persons, as well as real and personal properties, and have caused continuous injury to the land values of those Plaintiffs holding real property due to devaluation resulting from negative publicity that has unfairly injured their competitive status in home equity and re-sale value in relation to real property owners similarly situated in areas outside of areas affected by the contamination.

117.   Plaintiffs have suffered and continue to suffer various types of injuries due to the acts of the Defendants as hereinbefore alleged.  Plaintiffs have, due to the acts of all the Defendants, suffered and continue to suffer sudden, repeated and continual invasions of their rights of possession and to undisturbed occupancy of their

25

residences and living areas.

118.   Due to the acts of the Defendants, Plaintiffs suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property.  This injury has resulted, in part, from the numerous public interest reports in the printed press concerning the contamination.

119.   Plaintiffs have, due to the destructive acts of each of the Defendants, suffered and continue to suffer from the general diminution in the aesthetic qualities of their homes and the area in which they reside, caused by the total compounded effect of all of the above-described circumstances.

120.   In order to compensate Plaintiffs for damages suffered due to Defendants' acts, each Plaintiff requires, among other things, that Defendants, and each of them, pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of injuries suffered due to the contamination emanated from the contamination, with Plaintiffs retaining freedom of choice relative to choosing their experts.  Many of these costs would not be covered by Plaintiffs' health care insurers, and, even if covered, may unfairly result in increased premiums.

121.   Furthermore, Plaintiffs seek compensation for: the diminution in the economic value of their personal and real property; residential water testing and

26

monitoring; cleanup, removal and remediation of any and all contamination of Plaintiffs' properties, including the costs of investigation and testing of Plaintiffs' properties; repairs to real property damaged by Defendants; other damages; and attorneys' fees and costs as allowed by law, and any other compensation this court deems just.

122.   Furthermore, Plaintiffs seek injunctive relief as allowed by law and required by justice, including, but not limited to, an order compelling Defendants to take specific actions to cleanup, remediate, and/or correct the contamination, and any other action this court deems just.

### *Fear of Cancer*

123.   Plaintiffs have a justifiable and actual fear of developing cancer as a result of said exposure.  With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

124.   Plaintiffs will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

125.   The degree of probability that the Plaintiffs will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling plaintiffs to recover from Defendants for apprehended consequences that are not presently manifested.

126.   A rational basis exists between Plaintiffs' exposure to the above-

described toxins and contaminants, and Plaintiffs' currently manifested fear of developing cancer in the future.

### *Medical Monitoring*

127.   As a direct and proximate result of the Defendants' acts, omissions, and conduct as set forth in this Complaint, Plaintiffs have suffered and continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress.  This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of the Plaintiffs' health and to monitor their status for changes and progressions in their injuries and their sequelae.

128.   Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death.  Furthermore, these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

129.   Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible and beneficial.  For example, administration of these readily available non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory

ailments, and heart dysfunction, even in asymptomatic individuals.  Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these Plaintiffs would suffer if diagnosis and/or treatment were delayed until their conditions became overtly symptomatic.

130.   The recommended testing procedures will be subject to expert testimony at the time of trial.

131.   Plaintiffs are at a high risk for latent and progressive respiratory injuries and therefore need to undergo testing.  Plaintiffs also need the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of latent injuries, which will result in even more grave injuries and consequences.

132.   Plaintiffs' increased susceptibility to certain injuries and the irreparable threat to the their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes, schools, businesses and other public places in the City of Flint can only be mitigated and/or addressed by the creation of a medical program including but not limited to:

    a.  Notifying Plaintiffs of the potential harm from exposure to the contamination described herein;

    b.  Funding further studies of the long-term effects of exposure;

    c.  Funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants

29

present in the City of Flint as a result of the acts and omissions alleged herein;

d. Gathering and forwarding to Plaintiffs' treating physicians information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around the City of Flint;

e. Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Plaintiffs.

132. To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into Plaintiffs' drinking water, thereby entering and injuring Plaintiffs' physical and mental well-being, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case.

**AS AND FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF SAFE DRINKING WATER ACT'S**
**NOTIFICATION REQUIREMENTS, 40 C.F.R. § 141.85**

133. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 132 as if fully restated herein.

134. Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015.

135. Since April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to comply with the requirement that water systems notify customers of the individual results of tap water samples collected and tested for lead within thirty days after the water system receives the results. 40 C.F.R. § 141.85(d)(1), (d)(2).

30

136.   For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs and those residing at each sampling site of the presence of elevate lead levels in the public water supply.

## AS AND FOR A SECOND CAUSE OF ACTION:
## VIOLATION OF SAFE DRINKING WATER ACT'S
## REQUIREMENT TO OPERATE OPTIMAL CORROISON
## CONTROL TREATMENT, 40 C.F.R. § 141.81-.82

137.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 136 as if fully restated herein.

138.   Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015.

139.   Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment.   40 C.F.R. § 141.82(g).

140.   Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

141.   The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs.

## AS AND FOR A THIRD CAUSE OF ACTION:
## VIOLATION OF 42 U.S.C. § 1983
## SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
### (as against all Defendants)

142.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 141 as if fully restated herein.

143.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

144.   Plaintiffs in this action are citizens of the United States and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

145.   All Defendants, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

146.   Plaintiffs herein, at all times relevant hereto, have a clearly established Constitutional right under the Fourteenth Amendment, such that the state may not deprive a person of life, liberty or property without due process of law.

147.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were objectively unreasonable in light of the facts and

32

circumstances confronting them, and therefore violated the Fourteenth Amendment rights of Plaintiffs.

148.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.  These actions and omissions shock the conscience and violated the Fourteenth Amendment rights of Plaintiffs.

149.   Defendants engaged in the conduct described herein, willfully, maliciously, in bad faith, and in reckless disregard to Plaintiffs' protected constitutional rights.

150.   They did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Plaintiffs severe physical and emotional injuries.

151.   As proximate result of Defendants' unlawful conduct, Plaintiffs has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial. As a further result of Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

152.   Plaintiffs are entitled to an award of non-economic damages in the nature

33

of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms such as sleepiness, gastro-intestinal discomfort, neuropathy and similar symptoms.

153.   Plaintiffs have experienced property damage to their homes in the nature of lost property value and seek damages to remediate the permanent damage caused by the use of corrosive water without proper anti-corrosive treatment.

154.   In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

### AS AND FOR A FOURTH CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY (as against all Defendants)

155.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 154 as if fully restated herein.

156.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

157.   Plaintiffs in this action are citizens of the United States and all of the

Defendants are persons for purposes of 42 U.S.C. § 1983.

158.   All Defendants, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

159.   Plaintiffs herein, at all times relevant hereto, have a clearly established Constitutional right under the Fourteenth Amendment, such that a person has a right to bodily integrity.

160.   Defendants violated Plaintiffs' right to bodily integrity, insofar as Defendants failed to protect Plaintiffs from a foreseeable risk of harm from the lead contaminated water.

161.   Defendants knew of the deadly and irreversible medical consequences associated with lead contamination, and their duty to ensure that lead levels in the public water supply remained below the action level enumerated in the Lead and Copper Rule.

162.   As a result of Defendants failure to protect Plaintiffs and the Flint drinking water supply from the lead contamination, Plaintiffs suffered bodily harm from their exposure to contaminated water.

163.   Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.  These actions and

omissions shock the conscience and violated the Fourteenth Amendment rights of Plaintiffs.

164. Defendants engaged in the conduct described herein, willfully, maliciously, in bad faith, and in reckless disregard to Plaintiffs' protected constitutional rights.

165. They did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Plaintiffs severe physical and emotional injuries.

166. As proximate result of Defendants' unlawful conduct, Plaintiffs has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial. As a further result of Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

167. Plaintiffs are entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms such as sleepiness, gastro-intestinal discomfort, neuropathy and similar symptoms.

168. Plaintiffs have experienced property damage to their homes in the nature of lost property value and seek damages to remediate the permanent damage caused

by the use of corrosive water without proper anti-corrosive treatment.

169.   In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

### AS AND FOR A FIFTH CAUSE OF ACTION:
### NEGLIGENCE
### (as against all Defendants)

170.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 169 as if fully restated herein.

171.   Defendants, and each of them, breached their duty of reasonable care which a reasonably prudent person should use under the circumstances, by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

172.   Defendants, and each of them, as owner and operator of a Flint water supply that provided its residents with usable water, owed Plaintiffs a cognizable duty to exercise reasonable care in providing Plaintiffs with safe drinking water and the maintenance of their tools and equipment used for such acts.

173.   Defendants, and each of them, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing contamination of drinking water in and around Plaintiffs' real property.

174.   Upon learning of the release of the contaminants, Defendants owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

175.   Defendants breached that duty by failing to act reasonably in providing Plaintiffs usable water.  Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

176.   Defendants breached that duty by failing to timely notify the Plaintiffs of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in Plaintiffs' homes and rental properties.

177.   As a result of Defendants' breaches of their duty to timely notify the Plaintiffs, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

178.   Defendants negligently breached their duties to the Plaintiffs to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, Plaintiffs' homes and rental properties.

179.   Defendants willfully and wantonly breached their legal duty to properly

remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

180. Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' damages and the imminent, substantial and impending harm to Plaintiffs' homes, rental properties and health.

181. Defendants owed each and every one of these Plaintiffs a duty to warn Plaintiffs that the aforementioned contamination of Flint's water supply might occur.

182. Defendants breached that duty by failing to warn the Plaintiffs of the likelihood of lead and other toxic chemicals contaminating the Flint water supply, and, consequently, Plaintiffs' homes and rental properties.

183. As a result of Defendants' breaches of their duty to warn the Plaintiffs, the Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

184. Plaintiffs suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs to be protected against such actions or inactions.

185. Accordingly, Plaintiffs seek damages from Defendants, in an amount to

be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION:**
**NUISANCE**
 **(as against all Defendants)**

186.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 186 as if fully restated herein.

187.  Defendants' wrongful actions in the creation of the contamination, maintenance of their land and water facilities, and failure to reasonably abate, minimize and/or remediate the contamination resulted in the presence of the contaminants in Plaintiffs' persons and/or on Plaintiffs' properties, the creation of noxious odors, and the risk of injuries, and/or annoys Plaintiffs in their enjoyment of their legal rights and quality of life.  Such conditions constitute an ongoing specific, particular and unique burden on the Plaintiffs' persons and their property.

188.   Such wrongful acts by Defendants in the maintenance and use of their land and the failure to remediate the contamination was and is a foreseeable and proximate cause of injury, discomfort, annoyance, inconvenience, and/or damage to

40

Plaintiffs themselves and their property.

189.   Defendants' conduct is the legal cause of the intentional, unreasonable, negligent, and/or reckless invasion of Plaintiffs' interests in the private use and enjoyment of their land.  Such actions' tendency is to create danger and inflict injury upon person and property.

190.   Defendants' conduct in performing acts or failing to act has caused one or more substantial, unreasonable, and intentional interference with Plaintiffs' right to use and enjoy their property as discussed above.

191.   Accordingly, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION:
## TRESPASS
### (as against all Defendants)

192.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 191 as if fully restated herein.

193.   Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of contaminants to be released into the drinking water for the City of Flint.

194.   Defendants' willful, wanton, and intentional failure to act and/or their affirmative choice of action and following course of action caused the contaminants to enter and trespass upon the land and realty of the Plaintiffs and cause an injury to their possession and/or right of possession.

195.   Upon information and belief, Defendants had exclusive control over the facilities providing Plaintiffs water at all relevant times.

196.   Defendants took affirmative, voluntary, and intentional actions to provide water to Plaintiffs in an unsafe manner and/or intentionally to release contaminants into Flint's water supply.  Further, after such acts, Defendants undertook affirmative, voluntary, and intentional acts that were insufficient to remedy the condition caused by the release of the contaminants into the water supply.

197.   At the time that the above described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that highly corrosive water would cause large quantities of contaminants to

42

be introduced into Plaintiffs' persons and properties.

198.  The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the contaminants to be disbursed through the water onto the land and property of Plaintiffs.

199.  These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their property and their right of possession of their property.

200.  Further, Defendants' actions in directing the contaminated water into Plaintiffs' persons and properties were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

201.  Additionally and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the water supply after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

202.  Further, Defendants' actions that were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

203.  Based upon the above, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a

43

sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

**AS AND FOR AN EIGHTH CAUSE OF ACTION:**
**STRICT LIABILITY**
 **(as against Defendant CITY OF FLINT)**

204.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 203 as if fully restated herein.

205.   The drinking water provided by Defendant City of Flint was, at all relevant times, an unreasonably dangerous and defective product when used for its advertised and intended purpose.

206.   Defendant City of Flint knew, or should have known, that Plaintiffs could not realize and could not detect the dangerous and harmful nature of Flint's drinking water, and were in no position to implement any form of corrosion control measures.

207.   Defendant City of Flint should have, but did not, provide clear warnings as to the dangers associated with its drinking water.

208.   As a result of Defendant City of Flint's marketing and promotion of said

defective and unreasonably dangerous drinking water, Plaintiffs were unreasonably exposed to toxic drinking water and have suffered injuries, losses and damages.

209.   By reason of having marketed and promoted its drinking water in its defective and unreasonably dangerous condition, Defendant City of Flint is strictly liable to Plaintiffs.

## AS AND FOR A NINTH CAUSE OF ACTION:
## MEDICAL MONITORING
### (as against all Defendants)

210.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 though 209 as if fully restated herein.

211.   At all relevant times herein, Defendants owed a duty to Plaintiffs to ensure the adequate processing, transportation, and storage of potable drinking water to the residents of the City of Flint.

212.   The significantly increased risks associated with exposure to these hazardous and toxic contaminants, including but not limited to lead, make periodic diagnostic medical examinations reasonable and necessary.

213.   Easily administered, cost effective tests are in existence, such that an available medical monitoring program is reasonable and necessary for continued monitoring of diagnosed conditions as well as for early detection of yet to be diagnosed injuries.

214.   The reasonableness and necessity of a medical monitoring program is supported by scientific principles, medical literature, and expert opinion.

45

215.    As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication.    This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.    Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

## AS AND FOR A TENTH CAUSE OF ACTION:
## GROSS NEGLIGENCE
### (as against all Defendants)

216.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 through 215.

217.    At relevant times, Defendants engaged in providing governmental functions to Plaintiffs.

218.    Defendants demonstrated substantial lack of concern as to whether injury would result to Plaintiffs by allowing contaminates to be released into the drinking water of the City of Flint, including, but not limited to, lead.

219.    Defendants, and each of them, as owner and operator of a Flint water supply that provided its residents with usable water, owed Plaintiffs a cognizable duty to exercise reasonable care in providing and selling Plaintiffs with safe drinking water and the maintenance of their tools and equipment used for such acts.

220.   Defendants, and each of them, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally created the immediate and continuing contamination of drinking water in and around Plaintiffs' real property.

221.   Upon learning of the release of the contaminants, Defendants owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

222.   Defendants breached that duty by failing to act reasonably in providing and selling Plaintiffs usable water.  Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

223.   Defendants breached that duty by failing to timely notify the Plaintiffs of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in Plaintiffs' homes and rental properties.

224.   As a result of Defendants' breaches of their duty to timely notify the Plaintiffs, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

225.   Defendants breached their duties in a grossly negligent manner to the Plaintiffs to ensure that the Flint water supply was safe and sufficiently secure as to

prevent the release of the contaminants into the water facilities and, consequently, Plaintiffs' homes and rental properties.

226.    Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

227.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' damages and the imminent, substantial and impending harm to Plaintiffs' homes, rental properties and health.

228.    Defendants owed each and every one of these Plaintiffs a duty to warn Plaintiffs that the aforementioned contamination of Flint's water supply might occur.

229.    Defendants breached that duty by failing to warn the Plaintiffs of the likelihood of lead and other toxic chemicals contaminating the Flint water supply, and, consequently, Plaintiffs' homes and rental properties.

230.    Defendants demonstrated deliberate and/or intentional indifference to the public safety needs of Plaintiffs in violation of their rights under the U.S. Constitution, Michigan Constitutions, and Michigan Statutory and Common Law.

231.    Defendants' actions constituted a willful disregard of precautions and/or measures to attend to safety and a singular disregard for substantial risks.

232.    As a result of Defendants' breaches of their duty to warn the Plaintiffs of the contaminated water supply, the Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will

be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' gross negligence for many years into the future.

233.    Plaintiffs suffered foreseeable injuries and damages as a proximate result of said Defendants' grossly negligent breach of their duties as set forth above.  At the time Defendants breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs to be protected against such actions or inactions.

234.  The aforementioned conduct of Defendants constituted "gross negligence" in avoidance of governmental immunity.

235.  The performance of governmental functions constituting gross negligence falls within the exceptions of governmental immunity pursuant to MCL MCL 691.1407.

236.    This Complaint is being plead in avoidance of governmental immunity.

237.    The Defendants defense of governmental immunity is voidable due to the gross negligence exception and all other relevant exceptions.

238.    As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.  Easily administered, cost effective

monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

239.   Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION:
## PROPRIETARY FUNCTION
### (as against all Defendants)

240.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the paragraphs numbered 1 through 215.

241.   At relevant times, Defendants engaged in proprietary functions, specifically, the sale of potable water to Plaintiffs.

242.   Defendants' primary purpose in the aforementioned facts was to produce a pecuniary profit for the governmental agency.

243.   The relevant activities are not normally supported by taxes and fees.

244.   The conduct of Defendants constituted "proprietary function" in

avoidance of governmental immunity.

245.   The performance of governmental functions constituting proprietary function falls within the exceptions of governmental immunity pursuant to MCL 691.1413.

246.   Defendants demonstrated deliberate and/or intentional indifference to the public safety needs of Plaintiffs in violation of their rights under the U.S. Constitution, Michigan Constitutions, and Michigan Statutory and Common Law during the exercise of proprietary functions.

247.   This Complaint is being plead in avoidance of governmental immunity.

248.   The Defendants defense of governmental immunity is voidable due to the proprietary function exception and all other relevant exceptions.

249.   As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complications.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.   Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

## PUNITIVE DAMAGES

250.   Plaintiffs hereby repeat, reallege, and reiterate each and every allegation

in the paragraphs numbered 1 though 215 as if fully restated herein.

251.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' persons and properties, disregarding the rights of Plaintiffs.

252.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

   a. failure to provide safe drinking water to the residents of Flint;
   b. failure to implement adequate corrosion controls for Flint River water; and
   c. underestimating the seriousness of the lead contamination in Flint's water system.

253.   Defendants have caused great harm to Plaintiffs' property and water supplies and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, this Complaint is being plead in avoidance of governmental immunity and the Defendants defense of governmental immunity is voidable due to the proprietary function and gross negligence exceptions as well as all other relevant exceptions and Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.      An order declaring the conduct of defendants unconstitutional;

B.      An order of equitable relief to remediate the harm caused by defendants

52

unconstitutional conduct including repairs or property, establishment of a medical monitoring fund, and appointing a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the court;

C.      An award for general damages;

D.      An order for an award of compensatory damages;

E.      An order for an award of punitive damages;

F.      An order for an award of actual reasonable attorney fees and litigation expenses;

G.      An order for all such other relief the court deems equitable.

Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**                    **MCKEEN & ASSOCIATES, P.C.**

By:   /s/ Paul J. Napoli                              By:   /s/ Brian J. Mckeen
Paul J. Napoli, *Admission Pending*          Brian J. McKeen, #P34123
Hunter Shkolnik, *Admission Pending*        Penobscot Building
1301 Avenue of the Americas, Tenth Floor    645 Griswold Street
New York, NY, 10019                          Detroit, MI, 48226
(212) 397-1000                               (313) 447-0634
pnapoli@napolilaw.com                        bjmckeen@mckeenassociates.com
hunter@napolilaw.com


**SLATER SLATER SCHULMAN LLP**

By:   /s/ Adam Slater
Adam P. Slater, *Admission Pending*
Jonathan E. Schulman, *Admission Pending*
909 Third Avenue, Twenty Eighth Floor
New York, NY, 10022
(212) 922-0906
aslater@sssfirm.com
jschulman@sssfirm.com

Dated: February 8, 2016

53