UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LUKE WAID and MICHELLE RODRIGUEZ,
individually and as next friends of one minor
child,

                              *Plaintiffs,*              **DEMAND FOR JURY
            v.                                           TRIAL**

GOVERNOR RICHARD DALE SNYDER, in his
official capacity, and the STATE OF MICHIGAN
for prospective relief only; THE MICHIGAN
DEPARTMENT OF ENVIRONMENTAL
QUALITY; DANIEL WYANT, LIANE
SHEKTER SMITH, ADAM ROSENTHAL,                           **No. 2:16 –cv-10444**
STEPHEN BUSCH, PATRICK COOK,
MICHAEL PRYSBY, BRADLEY WURFEL all
in their individual capacities; DARNELL
EARLEY, GERALD AMBROSE, EDWARD                           **FIRST AMENDED
KURTZ, DAYNE WALLING, HOWARD                             CLASS ACTION
CROFT, MICHAEL GLASGOW and                               COMPLAINT**
DAUGHERTY JOHNSON in their individual and
official capacities, CITY OF FLINT, a municipal
corporation, jointly and severally, LOCKWOOD,
ANDREWS & NEWNAM, P.C.; LAN INC.;
LEO A.  DALY COMPANY; VEOLIA NORTH
AMERICA, INC., VEOLIA NORTH AMERICA,
LLC; VEOLIA WATER NORTH AMERICA
OPERATING SERVICES, LLC; VEOLIA
ENVIRONNEMENT S.A.;
                              *Defendants*.

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES, INJUNCTIVE
AND DECLARATORY RELIEF WITH RELIANCE ON JURY DEMAND
FOR VIOLATIONS OF THE SAFE DRINKING WATER ACT 42 U.S.C.
§300f et seq., AND THE LEAD AND COPPER RULE 40 C.F.R.  §§141.80-.91**

## INTRODUCTION

"No safe blood level in children has been identified.  Lead exposure can affect nearly every system in the body."

National Cancer for Environmental Health, Division of Emergency and Environmental Health Services

Plaintiffs, individually and on behalf of a class of all others similarly situated, bring this action for damages and injunctive relief and demand a jury trial. Unless stated otherwise, all allegations contained herein are made on information and belief.  In support of their claims, Plaintiffs allege as follows:

## I.    NATURE OF THE CASE

1.    Plaintiffs seek recovery from Defendants individually and on behalf of the tens of thousands of Flint residents (the "Class" or "Class Members") for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a result of exposure to the introduction of lead from Defendants' ownership, use, management, supervision, storage, maintenance, disposal and release of highly corrosive water from the Flint River into the drinking water of Flint, Michigan.

2.    For nearly five years, the City of Flint has existed in a state of financial emergency pursuant to which the City is controlled by a Governor appointed Emergency Financial Manager.  In 2014, in an effort to save money, the

Emergency Financial Manager authorized a switch to the Flint River as the City's sole water source.

3.     In making this switch, the State of Michigan, the Michigan Department of Environmental Quality (MDEQ), the Governor-appointed Emergency Financial Managers, the City of Flint, and various other named employees of those agencies (collectively Government Defendants), failed to implement a corrosion control protocol as required by the Safe Drinking Water Act, and otherwise failed to exercise reasonable care with regard to Flint's water system.  Absent mandatory corrosion controls, the acidic water of the Flint River coursed through unprotected pipes to residents – leaching lead and other harmful chemicals into the water along the way.

4.     Flint engaged and relied upon the professional services and expertise of two engineering firms- Defendants Lockwood, Andrews & Newman, Inc. (LAN) and Veolia North America (Veolia)- to review its water distribution system, ensure compliance with federal and state environmental regulations, and provide expert engineering advice to the City and its Emergency Financial Managers.  By taking on this assignment, LAN and Veolia assumed the responsibility to satisfy the standard of a reasonable engineer.

5.     In conducting their engineering services, however, LAN's and Veolia's conduct fell well below the standard for a reasonable engineer in several

3

critical respects.  First, LAN and Veolia failed to conduct a root cause analysis to determine the cause of Flint's initial water problem.  Had either LAN or Veolia performed such an analysis, it would have quickly revealed that Flint River water was contaminated by corrosive salt accumulated from de-icing operations over decades of Michigan winters, and had caused extensive pipe corrosion and an extreme risk of lead contamination absent the implementation of a plan to prevent such contamination.  Moreover, a root cause analysis would have revealed that the City of Flint had not adopted a corrosion control protocol as mandated by the federal Safe Drinking Water Act and related Lead and Copper Rule.

6.     Not only did LAN and Veolia fail to perform the routine root cause analysis that would have revealed the City of Flint's lead problems, but they also ignored a series of red flags that should have led them to suspect corrosion problems in Flint's water system.  LAN and Veolia should have anticipated widespread corrosion problems in light of the switch to a highly saline water source; the ineffectiveness of Flint's attempts to address coliform bacteria, which would have signaled corroded pipes to any reasonably competent engineer; the summer 2015 outbreak of Legionnaires Disease, which also should have alerted these companies to corrosion problems; and the very *color* of Flint's tap water, which was rusty and brown precisely because it was leaching metal from Flint's pipes.  Any of these warnings should have warned LAN and Veolia to a

4

widespread corrosion problem and led these companies to implement effective corrosion controls.

7.     Additionally, LAN and Veolia affirmatively recommended that Flint double the ferric chloride in its water.  A reasonable professional engineer would have known that ferric chloride is highly acidic and when used without alkaline buffering agents to raise the pH and phosphates or other corrosion control elements to coat the pipes, causes corrosion.  This is exactly what happened in Flint's water system.

8.     As a direct and foreseeable result of LAN's and Veolia's recommendations, Flint increased the ferric chloride in its water with grave consequences.  The salinity of the Flint River was the metaphorical gasoline in this particular tragedy.  The addition of ferric chloride, as recommended by the professional engineers at LAN and Veolia upon whom the City relied, was the match.  The added ferric chloride dramatically increased the corrosion of Flint's pipes and, as a direct and foreseeable result, the leaching of various chemicals into Flint's drinking water- including lead.

9.     Despite failing to fulfill their professional duties in a reasonable manner, both LAN and Veolia deemed Flint's water compliant with governing environmental statutes and regulations.  In doing so, LAN and Veolia provided

false assurances of safety to Plaintiffs and the Class, further exacerbating the extent of the damage caused by their conduct.

10.     As concerns began to emerge that Flint's water was contaminated with lead and other hazardous materials, the Government Defendants engaged in various activities designed to deny or minimize the existence or extent of Flint's corrosion and lead problem.  For example, the MDEQ misrepresented its water samples as being compliant with federal regulations when, in fact, the samples were drawn from locations that were less likely to show lead contamination. Moreover, various MDEQ officials "scrubbed" test results to remove certain results that showed high levels of lead in the water.  Additionally, when the EPA inquired as to what corrosion control treatment Flint was using, Defendant Stephen Busch of the MDEQ unequivocally and falsely assured the EPA that Flint was adding phosphates to its water to control corrosion.  Other MDEQ officials similarly misled the public by falsely stating that Flint's water system had a corrosion control protocol.  MDEQ officials also baselessly informed the EPA that the first resident's water had tested positive for lead due to sources within the home- a statement that was later proved entirely incorrect when the EPA visited the resident's home and discovered it had plastic pipes.

11.     After Flint switched its water source to the Flint River, the City also suffered an outbreak of Legionnaires' disease, a severe form of bacterial

pneumonia caused by toxins in the contaminated water.  According to Michigan health officials, this outbreak was one of the worst in U.S.  history: 87 confirmed cases and 9 Legionnaires' -associated deaths.  Yet, the Government Defendants did not even disclose that the outbreak had occurred until January 2016 -months after it began.  The Government Defendants thus failed to warn Flint residents of the threat posed by *Legionella* in the City's water supply and failed to take reasonable steps to contain the outbreak once it began.

12.     All the while- despite public assurances of safety- government offices in Flint quietly switched to bottled water while the citizens and business of Flint continued to drink dangerously contaminated water.

13.     Indeed, it was not until a memorandum from an EPA official regarding the frightening existence of lead in Flint's drinking water was leaked to the American Civil Liberties Union that any of the Government Defendants acknowledged the problem.

14.     Unfortunately, these acknowledgments came too late.  Since the Government Defendants implemented LAN's and Veolia's recommendations, more than 40% of the homes tested revealed lead contamination above the federal threshold and a study from a pediatrician at the Hurley Medical Center showed that elevated blood levels in children had more than doubled following the switch to the Flint River as Flint's water source.

15.     The consequences of lead exposure are both catastrophic and permanent.  Lead poisoning can cause serious damage to a child's central and peripheral nervous system, stunt growth, impair hearing, and impair the formation and function of blood cells.  The effect of lead poisoning on children's brain development is particularly alarming, causing reduced IQ and serious behavioral problems.  While lead's worst effects are borne by children, lead exposure can be seriously harmful to adults as well causing serious cardiac and reproductive problems.

16.     Plaintiffs and the Class have sustained substantial personal injuries as a result of Defendants' conduct and the child-members of the Class have additionally suffered lost economic earnings.

17.     Plaintiffs and the Class have also suffered significant property damage as a direct result of Defendants' conduct.  The acidic and corrosive water that Defendants caused to flow through Flint's pipes and appliances has irreparably damaged residents' and businesses' pipes and appliances.  Moreover, the stigma associated with the water crisis has resulted in, and will continue to result in, a reduction in residential and commercial property values in the City of Flint and substantial financial harm to Plaintiffs and the Class.  Despite Flint having switched back to its prior water source, corroded pipes and appliances in residents' homes and local commercial properties remain corroded.  The only option for

8

Plaintiffs and the Class to truly be safe is to entirely replace their pipes and corroded appliances.

18.    In addition to injunctive relief under the Safe Water Drinking Act, Plaintiffs and the Class also seek damages and other relief under theories of Professional Malpractice, Proprietary Function, Gross Negligence, Negligence, Strict Liability, Intentional and Negligent Infliction of Emotional Distress, Inverse Condemnation, Trespass, Nuisance, Unjust Enrichment, Procedural Due Process, and the Declaratory Judgment Act.

19.    Given the devastating, permanent effects of lead exposure, and the severe health risks that would be presented by the continued presence of *Legionella* in the Flint water supply, it is imperative that Defendants' conduct related to the Flint Water Crisis be fully investigated and Defendants be held accountable to the extent they caused Plaintiffs and the Class injury.  That is exactly what this suit seeks to do.

20.    At critical times including during gestation and their developmental years, the minor plaintiffs have been exposed to damaging levels of lead.

21.    Plaintiffs' damages and losses include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, weight loss, stunted growth, anemia, headaches, abdominal and other pain, mental anguish, emotional distress, the cost of medical, educational, and rehabilitation expenses,

other expenses of training and assistance, loss of income and earning capacity,

property damage, destruction of water service lines, and devaluation in property

damages.

22.    The health effects of lead poisoning are well known.  The CDC has

noted that: "No safe blood level in children has been identified.  Even low levels in

blood have been shown to affect IQ, ability to pay attention, and academic

achievement."  Lead impacts nearly every organ and system in the human body.

Lead causes multitudinous and serious injuries to the nervous system, which can

lead to convulsions, coma and brain death.  It causes learning and behavioral

disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension,

and myalgia.  Moreover, children under the age of 6 years old are more susceptible

to the toxic effects of lead than are adults since the brain and central nervous

system are not completely developed.

## II.    THE PARTIES: PLAINTIFFS

23.    Plaintiffs Luke Waid and Michelle Rodriguez, individually and as

next of friend to one minor child, has resided at 4306 Ogema Avenue, Flint, in the

city of Flint, in the county of Genesee, in the state of Michigan at all relevant

times.  Since April 25, 2014, Plaintiffs Waid and Rodriguez and the one minor

child living with them continue to be exposed to highly dangerous conditions

created by Defendants' decision to switch to the Flint River, and Defendants'
continued failure to remediate these harmful and toxic conditions.

24.    Plaintiff Waid is the father and next of friend of one minor child,
S.R.V.W., age 3.

25.    Plaintiff Rodriguez is the mother and next of friend of one minor
child, S.R.V.W., age 3.

26.    At all relevant times, members of the Waid family, unaware of the
toxicity of their water, regularly used the water for drinking and other household
necessities such as bathing, cooking, and cleaning.  Defendants continuously led
the Waid family to believe that there was nothing wrong with Flint's water, and
that it was safe for consumption.  As a result of Defendants' assurances, the Waid
family continued to use and rely upon Flint's water.

27.    As a proximate result of Defendants' actions, as set forth herein, the
Waid family has suffered damages as a direct and proximate result of Defendants'
conduct described herein.

28.    As a proximate result of Defendants' actions, as set forth herein,
minor Plaintiffs S.R.V.W. has experienced heightened levels of lead in her blood.

29.    As a proximate result of Defendants' actions, as set forth herein,
Plaintiffs Luke Waid and Michelle Rodriguez have experienced property damage

11

from Flint's use of corrosive Flint River water including but not limited to the destruction of service pipe lines and loss in property value.

## DEFENDANTS

30.     All individually named Defendants are sued in their individual and/or official capacities as indicated below.

31.     When reference is made in this Amended Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

32.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.  The term "Governmental Defendants" refers to those individuals or entities associated with the State of Michigan, City of Flint, or Michigan Department of Environmental Quality.  The term "Engineering Defendants" refers to Lockwood, Andrews & Newman, Inc.  (LAN), LAN INC., Leo A.  Daly Company, Veolia North America LLC(Veolia) and Veolia Environnement S.A.

12

33.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs and the Class, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

34.     Defendant RICHARD DALE SNYDER is sued in his official capacity as Governor of the State of Michigan.  At all times relevant hereto, Defendant Snyder was acting individually and in his official capacity as State Governor and top policymaker for the State of Michigan.

35.     Defendant STATE OF MICHIGAN is sued in its capacity of operating the Michigan Department of Environmental Quality ("MDEQ").  At all times relevant hereto, Defendant State of Michigan is sued in its capacity as manager of the environmental agency tasked with protecting the environment and the residents of Michigan from environmental dangers.

36.     The Michigan Department of Environmental Quality ("MDEQ") is the state agency responsible for implementing and enforcing safe drinking water laws, rules, and regulations in Michigan, and Flint specifically.  MDEQ's headquarters are located at 525 West Allegan Street, Lansing, Michigan 48909.

13

37.     The State of Michigan is the operating entity of MDEQ.  At all times relevant hereto, State of Michigan was acting in its capacity as manager of the environmental agency tasked with protecting the environment and the residents of Michigan from environmental dangers.

38.     Defendant DANIEL WYANT ("Wyant") is sued in his official capacity as Director of MDEQ.  At all times relevant hereto, Defendant Wyant was acting individually and in his official capacity of Director of MDEQ and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

39.     Defendant LIANE SHEKTER SMITH ("Smith") is sued in her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ.  At all times relevant hereto, Defendant Smith was acting individually and in her official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, and is sued for her participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

40.     Defendant ADAM ROSENTHAL ("Rosenthal") is sued in his official capacity as a Water Quality Analyst assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Rosenthal was acting individually and in his official capacity as a Water Quality Analyst, and is sued for his

participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

41.     Defendant STEPHEN BUSCH ("Busch") is sued in his official capacity as District Supervisor assigned to the Lansing District Office of the MDEQ.  At all times relevant hereto, Defendant Busch was acting individually and in his official capacity as District Supervisor, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

42.     Defendant PATRICK COOK ("Cook") is sued in his official capacity as a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ.  At all times relevant hereto, Defendant Cook was acting individually and in his official capacity as a Water Treatment Specialist, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

43.     Defendant MICHAEL PRYSBY ("Prysby") is sued in his official capacity as the Engineer assigned to District 11 (Genesee County) of the MDEQ. At all times relevant hereto, Defendant Prysby was acting individually and in his official capacity as Engineer, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

44.     Defendant BRADLEY WURFEL ("Wurfel) is sued in his official capacity as Director of Communications for MDEQ.  At all times relevant hereto,

Defendant Wurfel was acting individually and in his official capacity as a Director of Communications for MDEQ, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

45.     Defendant DARNELL EARLEY ("Earley") is sued in his official capacity as the Emergency Financial Manager.  Defendant Early was appointed by Defendant Snyder, and served as Emergency Manager to the City of Flint from November 1, 2013 until January 12, 2015.  At all times relevant hereto, Defendant Earley was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

46.     Defendant GERALD AMBROSE ("Ambrose") is sued in his official capacity as the Emergency Financial Manager.  Defendant Ambrose was appointed by Defendant Snyder, and served as Emergency Manager to the City of Flint from January 13, 2015 until April 28, 2015.  At all times relevant hereto, Defendant Ambrose was acting individually and in his official capacity as Emergency Manager, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

47.     Edward Kurtz ("Kurtz") was the Emergency City Manager for the City of Flint between August 8, 2012 and May 20, 2013.  Kurtz made the decision to cancel the City's water contract with the City of Detroit, decided to

16

use the Flint River as the source of Flint's water during the transition to a newly constructed water treatment plant sourced from Lake Huron, and retained LAN to advise him and the City on how to implement the transition.

48.     Defendant DAYNE WALLING ("Walling") is sued in his official capacity as the Mayor of Flint.  Defendant Walling served as Mayor from August 4, 2009 until November 9, 2015.  At all times relevant hereto, Defendant Walling was acting individually and in his official capacity as a Mayor of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

49.     Defendant HOWARD CROFT ("Croft") is sued in his official capacity as Director of Public Works for the City of Flint.  At all times relevant hereto, Defendant Croft was acting individually and in his official capacity as a Director of Public Works for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

50.     Defendant MICHAEL GLASGOW ("Glasgow") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant hereto, Defendant Glasgow was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

17

51.    Defendant DAUGHERTY JOHNSON ("Johnson") is sued in his official capacity as Utilities Administrator for the City of Flint.  At all times relevant hereto, Defendant Johnson was acting individually and in his official capacity as Utilities Administrator for the City of Flint, and is sued for his participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

52.    Defendant CITY OF FLINT is sued as the owner and operator of the public water system that provides potable water to the residents of Flint.  At all times relevant hereto, Defendant City of Flint is sued for its participation in causing the Flint water crisis that continues to harm Plaintiffs and the Class.

53.    Lockwood, Andrews & Newnam, P.C. ("LAN P.C.") is a Michigan professional corporation with its principal place of business at 1311 S. Linden Road, Suite B, Flint, Michigan 48532.  At all times relevant hereto, LAN P.C. held itself out to the world as a Lockwood, Andrews & Newnam, Inc. ("LAN Inc.") company.  Upon information and belief, LAN P.C. was incorporated in 2008 by LAN Inc. after it was retained by Defendants to conduct studies and reports of the feasibility of a new water supply for the City of Flint.  Upon information and belief, work and services provided by LAN P.C. were conducted at LAN Inc.'s Chicago, Illinois location.

18

54.    LAN Inc. is a Texas corporation with its principal place of business at 2925 Briarpark Drive, Suite 400, Houston, Texas 77042.  At all relevant times hereto, LAN Inc. conducted business in Genesee County through Defendant LAN P.C., at 1311 S. Linden Road, Suite B, Flint, Michigan 48532.  LAN Inc. is a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

55.    Leo A. Daly Company ("LAD") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. LAD is an international architecture/engineering firm, with nearly 800 professionals in 31 offices worldwide and projects in more than 87 countries and all 50 US states.  Upon information and belief, LAD is the parent company of LAN Inc. and LAN P.C.

56.    Defendants LAN P.C., LAN Inc., and LAD are referred to collectively herein as, "LAN."

57.    Veolia North America, Inc. is a Delaware corporation with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

58.    Veolia North America, LLC ("Veolia N.A.") is a Delaware corporation with its principal place of business at 200 E Randolph Drive, Suite

7900, Chicago, Illinois 60601.  Veolia N.A.  designs and provides water, waste and energy management solutions to communities and industries across the country.

59.     Veolia Water North American Operating Services, LLC is a Delaware Limited Liability Company with its principal place of business at 101 West Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

60.     Veolia Environnement S.A.  ("Veolia S.A.") is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France.  Veolia S.A.  is a leading global provider of environmental management services, which include the supply of water, the treatment and recovery of municipal or industrial effluent, waste collection, processing and recycling, the supply of heating and cooling services and the optimization of industrial processes.  Upon information and belief, Veolia S.A.  is the parent corporation of Veolia N.A

61.     The four above named Defendants shall be collectively referred to herein as "Veolia."  Veolia maintains multiple offices in Michigan, regularly conducts business in Michigan, and has committed torts in Michigan, which are among the bases for personal jurisdiction.

## III.   **JURISDICTION AND VENUE**

62.     This Court has subject matter jurisdiction over this civil action pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a) and the Lead and Copper Rule, 40 C.F.R. §§ 141.80-.91.

63.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, for cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), for civil rights actions; and 28 U.S.C. §§ 2201-2202, the Declaratory Judgment Act.

64.     Venue is proper in this Court because Plaintiffs' and Class Members' claims arose in this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. §§ 102, 1391(b).

## IV.    FACTUAL ALLEGATIONS

### A.    The City of Flint and Its Residents

65.     The City of Flint, Michigan is located along the Flint River, approximately 60 miles northwest of Detroit.  Flint sits in Genesee County and is the largest city in the county.  According to the 2015 census, Flint is home to 99,002 residents, 27.3% (approximately 27,000) of whom are under 18 years of age and 8% (approximately 8,000) of whom are under 5 years of age.  More than half of Flint's residents are African American.  There are more than 50,000 housing units in Flint, Michigan and approximately 55% of those units are owner-occupied.

66.     The City of Flint is the largest city in Genesee County Michigan, and is located 66 miles northwest of Detroit.  There are approximately 100,000 residents in Flint, making it the one of the largest cities in Michigan.

67.     Like the residents of any American city, residents of Flint rely on a steady supply of safe and clean water to go about their daily lives.  Flint also has thousands of commercial and other non-residential properties whose owners rely upon clean and safe water.

68.     Flint's relative prosperity has paralleled that of the American automotive industry, growing exponentially during the first half of the twentieth century but experiencing catastrophic downturns in the last forty years as domestic car companies shuttered some plants and moved others.  Flint's fate has been particularly tied that of its largest employer, General Motors.  When General Motors downsized in the 1980s, closing facilities and laying off workers, Flint similarly witnessed substantial economic turmoil that continues to date.

69.     According to the most recent census, 41.6% of Flint's citizens-Plaintiffs here – live at or below the poverty level.  The median household income in Flint is just $24,679 - 7% lower than the median income in Michigan and 54% lower than the national median income.

70.     In 2011, Flint's finances reached a critical place:  an audit estimated a $25 million deficit overall and Flint's water supply fund showed a $9 million

22

deficit.  In 2011, Governor Snyder declared Flint to be in a financial emergency and the City entered receivership, with responsibility for governance of the City and operation of its utilities and other services, including its water supply, under the direction of Emergency City Governors who were appointed by the Governor and employed by the State.

71.    Governor Snyder appointed Michael Brown as the Emergency Financial Manager in Flint effective December 1, 2011.  The democratically elected offices of Flint were subordinate to Brown.  According to state Congressman Dan Kildee, Brown was appointed to "simply do one thing and one thing only, and that's cut the budget- at any cost."

72.    Flint has experienced several financial emergencies over the past two decades, and recorded a total debt of nearly $30 million during its first declared financial emergency 2002.

73.    In 2011, Defendant Snyder declared a second financial emergency in Flint and appointed Michael Brown as emergency manager to control its financial situation, pursuant to Public Act 436.  Pursuant to Public Act 436, after a financial emergency is declared, the city is placed in state receivership, and the appointed emergency manager temporarily supplants the governing body and elected officials of the city.

74.     While in state receivership and under the control of emergency manager Michael Brown, Defendant City of Flint faced crucial decisions about the future of its drinking water supply.

## B.     The City Switches Water Sources

75.     Many decades ago, the City of Flint drew its water from the Flint River.  This changed in 1967 when the City began purchasing its water through the Detroit Water and Sewerage Department ("DWSD") as its principal water supply, with the Flint River serving as a backup source in the event of water shortage or interruption of service from the principal source.

76.     As part of its receivership, Flint began exploring ways to decrease costs associated with its water and sewer system.  Water and sewer costs were the single largest expenditures in Flint's budget, rendering them obvious targets for cuts to address Flint's financial crisis.  According to a September 2011 report by Rowe Professional Services, Flint could save money if it purchased its water from Karegnondi Water Authority (KWA) rather than the Detroit Water and Sewerage Department.  However, because the KWA would require substantial new construction work, an immediate switch away from DWSD water would require Flint to reopen its shuttered municipal water treatment plant, which sourced its water from the Flint River.

77.     In August 2012, Governor Snyder appointed Kurtz as Flint's new Emergency Manager. Four months later, Michigan Treasury officials met with Flint leaders to discuss alternative sources for Flint's drinking water, including the Flint River. The officials agreed to study two potential options for water sources: remaining with the Detroit Water and Sewer Department or switching to Genesee County's KWA.

78.     In February 2013, Tucker, Young, Jackson & Tull, Inc. ("TYJT"), an engineering consulting firm retained by the State of Michigan, issued a report assessing the water supply alternatives for the City of Flint. According to its report, TYJT was retained "to provide an analysis of the water supply options to assist the Treasurer [of the State of Michigan] to provide an analysis of the water supply options to assist the Treasurer in determining any potential risk and the best course going forward for supplying potable water to the City of Flint."

79.    The TYJT assessment concluded that the cost of continuing to obtain water from Detroit likely would be lower than the costs of transitioning to the proposed KWA treatment plant. However, the report also noted that Flint had an interest in obtaining water "autonomy" vis-a-vis Detroit, and that transitioning to the KWA would serve that interest.

80.     Although TYJT's report specifically noted that its assignment included advising the State on how to supply *"potable water to the City of Flint,"* the words "safe" and "safety" do not appear in the report.  Additionally, while the report noted that questions had been asked as to whether there was a "transition plan" in place for the period during which the new KWA plant was under construction, and water was to be supplied from the Flint River, the report failed to identify the need to consider the health and safety issues that should have been considered in developing any such transition report, and did not include any assessment of those health and safety issues.  Instead, the assessment in the report included only a discussion of financial considerations associated with the transition to the KWA, as well as the so-called "autonomy" interest that ultimately overrode the relatively cost effective alternative of remaining with the Detroit water supply.

81.     On March 25, 2013, the Flint City Council voted to join KWA.  The vote had no legal effect because, due to the receivership, the Emergency Manager had sole authority to authorize such a change.

82.     The day after the City Council's vote, on March 26, 2013, Busch, the District Supervisor of the MDEQ emailed Wyant regarding the proposal to rely on the Flint River for Flint's water.  In that email, Busch outlined concerns regarding the health risks posed by switching to the Flint River as a water source.

26

Specifically, he noted that use of the Flint River would, "[p]ose an increased microbial risk to public health," and "[p]ose an increased risk of disinfection by-product."  Despite this feedback, Wyant, the Director of the MDEQ, wrote Andy Dillon, Michigan's Treasurer to report that "[a]ll indications are that we are supportive" of joining KWA and using Flint's water as opposed to the DWSD.

83.     Three days after Director Busch outlined his concerns, Emergency Manager Kurtz signed a resolution authorizing Flint to enter a contract with KWA. Treasurer Dillon approved that decision in April, 2013.  In doing so, Dillion expressly noted that he was relying in part on the MDEQ's support of the project as well as Emergency Manager Kurtz's "representations that this deal will lead to substantial savings for the City over the coming decades.

84.     In or around June 2013, Emergency Manager Kurtz hired LAN to advise the City with respect to using the Flint River as the City's water source during the construction of the new KWA treatment plan, which was projected to take approximately two years.  LAN, which according to a January 15, 2015 City of Flint document entitled "Water System Questions and Answers," had previously advised the City regarding the design of an upgrade to the Flint Water Plant and that "quality control could be addressed."

85.     In deciding to proceed with the transition to the Flint River, the City of Flint noted LAN's "extensive experience in this field," and relied upon LAN's

identification of the "engineering, procurement, and construction needs" for the project.  Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water.  *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015), available at http://mediad.publicbroadcasting.net/p/ michigan/files/201512/CoF-Water-System- FAQ-1-16-2015.pdf.  LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services.  City officials, including then-Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

86.     In October 2013, Defendant Earley stepped in as the Emergency Manager for Flint.  Emergency Manager Earley rejected an offer by DWSD to continue purchasing water from Detroit until the KWA pipeline could be completed and the City prepared to switch to the Flint River in April, 2014.

87.     On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

88.     According to the official Michigan website, the MDEQ, "has primary enforcement authority in Michigan for the Federal Safe Drinking Water

Act under the legislative authority of the Michigan Safe Drinking Water Act. As such, the division has regulatory oversight for all public water supplies, including approximately 1,500 community water supplies and 10,000 non-community water supplies. The program regulates the water well drilling industry. Michigan has nearly (1.12 million) households served by private wells, with approximately 15,000 domestic wells drilled each year. The DEQ also investigates drinking water well contamination, and oversees remedial activities at sites of groundwater contamination affecting drinking water wells."

89.     Despite receiving these permits, the water system was not ready to become operational. According to an email from Flint's Laboratory & Water Quality Supervisor Glasgow on April 14, 2014,

> I have people above me making plans to distribute water ASAP .... I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon . . . .  If water is distributed from this plant in the next couple weeks, it will be against my direction.... I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

90.     Glasgow's fears were well founded. The Flint water system was not prepared for the switch to Flint River water. The Flint River, it turned out, was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are

29

highly corrosive, and must be neutralized with anticorrosive agents before entering public water systems.

91.     Eleven days after this email was sent, on April 25, 2014, Flint's water system officially switched to the Flint River without implementing a necessary corrosion control protocol or otherwise addressing the concerns raised in Defendant Glasgow's email.

## C.     Use of Flint River Water Immediately Causes Serious Problems Including Bacteria Growth, Buildup of Dangerous Chemicals

92.     Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

93.     Despite these complaints, then-Mayor Dayne Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."

94.     His assurances of safety provided little comfort to residents who began to report that the water was making them ill.  These concerns proved accurate when, on August 14, 2014, Flint's water tested above legal limits for total coliform and *E. coli* bacteria.  The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response.

95.     To address the bacteria problem, the City treated the water with additional chlorine.  However, as has been well known for decades, that in corroded pipes, chlorine preferentially reacts with the bare metal, instead of

30

attacking solely bacteria.  The addition of substantial amounts of chlorine to a water supply is thus ineffective in treating bacteria.

96.    The use of chlorine to disinfect water produces various disinfection byproducts, including trihalomethanes (often referred to as Total Trihalomethanes or "TTHM").  In the presence of bare pipes not protected by a corrosion control protocol, more chlorine yields more TTHM.  In low dosages, TTHM is harmless.  High dosages pose serious health risks, however.  For this reason, the EPA and various state agencies regulate TTHM levels.

97.    Almost immediately following Flint's bacterial problems, it became apparent that Flint's TTHM levels were alarmingly high.  This should have been a red flag.  It is well known in the scientific community that high TTHM levels can be a symptom of unprotected and corroding pipes

98.    According to the World Health Organization (emphasis added):

 Chlorine . . . acts as a potent oxidizing agent and often dissipates inside reactions so rapidly that little disinfection is accomplished until amounts in excess of the chlorine demand have been added.  As an oxidizing agent, chlorine reacts with a wide variety of compounds, in particular those that are considered reducing agents (hydrogen sulfide [H2S], manganese(II), iron(II), sulfite [S0 2 Br-, iodide [I-], nitrite).  From the point of view of DBP [disinfectant by-product] formation and disinfection, these reactions may be important because they may be *fast and result in the consumption of chlorine*.

99.    That is exactly what happened in Flint's water distribution system.  To Flint, it seemed that the initial dosages of chlorine were not effective in

treating bacteria, so they added more chlorine.  Unfortunately, the problem was not that the dosage of chlorine was too low to treat the bacteria; rather, the chlorine was preferentially reacting with the bare pipes instead of solely attacking the bacteria.  The pipes were bare because the Flint River's corrosive water had stripped away the pipe's protective coating.   Now Flint had a second problem: the excess chlorine generated high levels of TTHM.  On December 16, 2014, Flint's water tests revealed TTHM levels in excess of federal limits.

100.   Soon thereafter on December 31,2014, the first round of lead monitoring results showed 90th percentile lead level result of 6 parts per billion with two samples above action levels for lead (15 parts per billion).  Importantly, however, these samples were not necessarily drawn from the highest risk homes as required by various environmental regulations.

101.   None of the Governmental Defendants notified the public of these initial test results.  However, on January 12, 2015, in response to water quality concerns, the state installed water coolers in state offices in Flint and gave state employees the option to use bottled water and provide bottled water to visitors.  Unfortunately, the people of Flint were not given these options, resources, or information.

      **D.**    **Concerns Regarding Flint's Water Multiply Exponentially as Michigan Experiences an Outbreak of Legionnaires Disease and Initial Lead Concerns Emerge**

102.   As City and State officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014 - the Michigan Department of Health and Human Services (MDHHS) reported an outbreak of Legionnaires' disease.

103.   Legionnaires' disease, or legionellosis, is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the mortality rate rises to 80%. Infection in humans occurs when water droplets contaminated with *Legionella* bacteria are inhaled or when water containing *Legionella* enters the trachea. *Legionella* has been extensively studied and the conditions for likely outbreaks of the disease are well understood.

104.   Critically, Michigan and the MDEQ *knew* at least as early as October 1, 2014, that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system. According to a briefing statement prepared by MDEQ and sent to Governor Snyder:

> Most of the city's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

105.   In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in

33

September 2014. According to an internal memo not circulated to the public until much later, MDHHS warned that lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

106.    Despite this knowledge, the Government Defendants took no steps to address the City's corrosion control problems. To the contrary, officials took affirmative steps to avoid publicly recognizing the role of corrosion in Flint's water problems.

107.    On October 13, 2014, General Motors announced that it would stop using water from the Flint River at its engineering plant due to fears that it would cause corrosion. In response, Defendant Prysby wrote to Defendants Busch, Smith and others that the Flint River water had elevated chloride levels. He stated that "although not optimal[,]" the water was "satisfactory." He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

108.    Despite the MDEQ's report that Flint's water tests revealed TTHM levels *in excess of federal law,* on January 6, 2015, Flint's former mayor, Dayne Walling, told Flint's residents the water was safe, assuring them that his family used it.

109.   Three days later, on January 9, 2015, University of Michigan-Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

110.   Despite the well-known problems with bacteria and TTHMs and the slowly emerging concerns regarding lead contamination and Legionnaires' disease, Emergency Manager Earley rejected pleas by City Council members to stop using Flint River water and return to DWSD. Earley stated it would be too expensive to switch back to DWSD as Flint's water source; however, some reports indicate that Earley rejected an offer from DWSD to waive the $4 million reconnection fee if Flint wished to switch back to Detroit water.

111.   Instead of switching back to the DWSD, additional assurances of the water's safety were relayed to residents. On January 13, 2014, Flint's Department of Public Works published a letter regarding Flint's water and the City's response. The letter was signed by Defendants Croft, Walling, and Ambrose and purported to assure concerned citizens that the City was taking steps to address the bacteria and TTHM problems with Flint's water. Critically absent from this letter was any mention of the role of corrosion in causing Flint's problems — despite internal documentation that they knew corrosion was involved or any warnings related to lead exposure or the presence of Legionella contamination.

35

**E.** **LAN and Veolia – Retained to Render Flint's Water System Safe – Do Just the Opposite, Worsening Flint's Corrosion and Lead Problems**

112. In the midst of growing concerns about the safety of its water, Flint engaged two engineering companies to provide their professional opinion regarding the necessary changes to render the water compliant with state and federal laws.

113. First, the City engaged LAN. LAN had previously advised the City in connection with an upgrade to the Flint Water Plant and was not required to submit a bid for the new job. Rather, its services were retained by resolution. On June 26, 2013, it was resolved by Emergency Manager Kurtz, that the City would "enter into a Professional Engineering Services contract with Lockwood, Andrews & Newnam, Inc. for the administration of placing the Flint Water Plant into operation using the Flint River as a primary drinking water source at a cost of $171,000.00." In addition to Kurtz's signature, the resolution was also approved by Peter M. Bade, the Chief Legal Officer and Defendant Ambrose who was acting as the Finance Director at the time.

114. Initially, the City hired LAN to complete an "Operational Evaluation Rep01t 'OER' in conformance with EPA guidelines with the goal to determine the cause(s) of high levels of TTHM and evaluate possible solutions." The U.S. EPA.'s guidelines for completing an OER include examining whether

36

there has been a change in water source or quality which includes an examination into the pH of the water. Additionally, the guidelines require an examination into whether there has been any change in chemical applications including changing dosage or chemicals.

115. The scope of LAN's assignment expanded overtime and LAN ultimately was paid approximately $3.8 million for work it performed in connection with the Flint water system between 2013 and 2015. As recently as November 2015, LAN was retained pursuant to a $907,000 "add-on" to its existing contract to advise the City regarding the transition to the new KWA plant. Throughout the relevant time period, City officials relied on LAN to use its professional expertise to properly advise them on how to maintain the safety, quality and reliability of the City's water supply.

116. In addition to its reliance upon the professional services provided by LAN, Flint also issued an Invitation to Bid for Professional Water Consultant Engineering Services. No other firm submitted a bid. Despite the extensive nature of the services requested, the price of Veolia's bid was only $40,000. The City sought to engage an engineering company with a broad scope of work to "review and evaluate the water treatment process and distribution system, provide recommendations to maintain compliance with both state and federal agencies, and assist in implementing accepted recommendations." The

37

Invitation to Bid further specified that the engineering firm would be asked to provide an "[e]valuation of the City's processes and procedures to maintain and improve water quality/' and a "[r]eport that outlines recommendations that will improve the water treatment and distribution system."

117.     In response, Veolia submitted a bid and the City engaged Veolia's services. On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would essentially be evaluating all of the City's water treatment processes.

118.     The press release contained no limitation on Veolia's scope of work. David Gadis, the Vice President of Veolia North America's Municipal & Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on Veolia's subsequent representations of safety.

119.     LAN's and Veolia's performance of their professional duties fell far short of the appropriate standard of care employed by an engineer of ordinary

learning, judgment, or skill.  Specifically, LAN's and Veolia's professional negligence took two forms:  (1) a failure to conduct a root-cause analysis that would have identified the need for corrosion control, and (2) the recommendation to add ferric chloride which rapidly increased the rate of corrosion in Flint and, correspondingly, the amount of lead that leached into Flint's drinking water.

### 1.    LAN and Veolia Fail to Conduct a Proper Root Cause Analysis or Recommend Corrosion Control.

120.    Both LAN and Veolia were hired to ensure Flint's water system was compliant with federal and state environmental statutes after tests revealed TTHM concentrations in excess of federal limits.  In February 2015, LAN issued its report "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report."  Critically absent from either report was a root cause analysis identifying corrosion as a cause of Flint's high TTHM levels.  LAN's and Veolia's failure to perform a root cause analysis constituted professional negligence.

121.    A root cause analysis is a process designed for use in investigating and categorizing the root causes of events with safety, health, environmental, quality, reliability, and production impacts.  The purpose of a root cause analysis is to identify why a given event occurred in addition to describing what occurred.  Understanding why an event occurred is critical to developing effective recommendations for dealing with an event.

39

122.     Providing engineering recommendations for addressing an event (such as high TTHM levels) without performing a proper root cause analysis to understand *why* the event occurred is the equivalent of a doctor performing heart surgery after a patient complains of chest pains – certainly surgery *may* be necessary to address the underlying cause of the patient's chest pains, but one cannot know without investigating the cause of the patient's symptoms.

123.     LAN and Veolia should have done a proper root cause analysis to determine the cause of the high TTHM concentrations, but they negligently did not. Had they done so, LAN and Veolia would have discovered that the Flint River, like many urban rivers, was highly contaminated with salt from road de-icing operations that was likely corroding Flint's pipes. Salt is composed of sodium and chloride. Chloride is known to be very corrosive to iron pipes.

124.     Having identified the root cause, they would have prompted the City to address the root issue - a course of action which would have prevented almost all of the tragic consequences that actually followed. Instead, both LAN and Veolia myopically focused on what they believed to be the sole cause of TTHM - poor disinfection effectiveness.

125.     LAN's and Veolia's failure to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable. Indeed, several characteristics of Flint's water system and related problems

40

should have placed LAN and Veolia on high alert that pipe corrosion was a likely cause. The most rudimentary analysis would have confirmed this. Indeed, LAN and Veolia ignored several red flags that should have alerted them to the extensive corrosion and pH problems with Flint's water system.

126.    For example, it should have been obvious to LAN and Veolia- as professed experts on water quality and treatment issues — that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters. It is well known that chloride concentrations in northern U.S. rivers have increased dramatically over time with average concentrations approximately doubling between 1990 and 2011. This phenomenon is particularly evident in cold, urban settings, such as Flint, Michigan, where there is both significant snowfall and dense roadways requiring de-icing. Chloride contamination should have been obvious to water-engineering specialists such as LAN and Veolia given these characteristics.

127.    Indeed, in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources. City of Flint, *City of Flint*

41

*2014 Annual Water Quality Report* (2014), https://www.cityofflint.com/wp-content/uploads/CCR-2014.pdf.

128.     Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, would have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight-times more chloride than the DWSD-supplied water.

129.     The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMRn") of 1.6.  Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern.  Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

130.     The City's inability to effectively treat *E. coli* with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion.  **It** is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping.  According to a study published by the U.S. EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine was caused by corroded pipes.  Flint's inability to treat *E. coli* with

42

chlorine – and the resulting TTHM problem- should have placed LAN and
Veolia on notice that Flint's pipes were corroding and releasing lead and other
materials into the drinking water supply.

131.   The uptick in reported cases of Legionnaires' disease, reported during
a press conference prior to LAN's and Veolia's retention, should have similarly put
LAN and Veolia on notice that Flint's water system exhibited signs of corrosion.
*Legionella*, the bacteria that causes Legionnaires' disease, grows on the film on the
inside of pipes and is found in potable water.  *Legionella* can exist in water
distribution systems, including homes, hospitals, hotels, and any other building
supplied with water.  *Legionella* is transmitted into the air by plumbing equipment
such as faucets, showerheads, hot water tanks, humidifiers, respiratory therapy
equipment, and whirlpool baths where it is then inhaled, resulting in infection.

132.   One of the most common causes of Legionnaires' disease is exposure
to impacted potable water.  While *Legionella* is found widely throughout the
environment, it is fairly rare that an outbreak occurs.  Outbreaks are related to
environmental factors, not person-to-person exposure.  Flint's outbreak of
Legionnaires Disease indicated the presence of *Legionella* bacteria in Flint's pipes
and, relatedly, the likely presence of pipe corrosion.

133.   *Legionella* exhibits several properties that allow them to persist in
extreme environmental conditions such as low and high temperatures, presence of

43

disinfectants, low pH, low nutrients and high salinity.  Ideal growth conditions are in warm water between 35° and 46° Celsius (C) (95°–114.8° Fahrenheit (F)). These environmental conditions promote and protect *Legionella* growth due to the association between *Legionella* and biofilms, as well as their symbiotic and parasitic interactions with other microorganisms.  They are also ideal conditions for pipe corrosion.

134.   Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH in the range of 5.0 to 8.5.  All of these conditions were present in the Flint water supply, yet neither LAN nor Veolia made any recommendations to treat the water to prevent or abate an outbreak. LAN and Veolia should have known that the outbreak of Legionnaires' disease was related to corroding pipes, and should have recommended steps to abate the corroded pipe and conditions causing corrosion.

135.   Moreover, in constructing and maintaining drinking water systems, operational and procedural efforts must be taken to prevent the growth of *Legionella*, including an assessment of the quality of the source water and the installation, operation, and maintenance of systems to protect the installations from sludging, lime scale deposits, and corrosion.  Neither LAN nor Veolia recommended any of these steps.

136.   Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded.  The source of Flint's water discoloration was rust, a product of corrosion.  The presence of rust in the water should have suggested to LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

137.   Had LAN and Veolia conducted a proper root cause analysis, or even simply paid attention to any of the myriad warning signs presented to them, they would have been alerted to the significant corrosion problem and the lack of a proper corrosion control protocol.

138.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply.  As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated: "Lead concentrations in tap water are strongly influenced by distribution system water chemistry.  In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem. . .  Lead corrosion products observed on lead pipes include lead(II) carbonates and phosphates and, more recently, lead(IV) oxide ($PbO_2(s)$). Solubility and dissolution rates of corrosion products are affected by water

45

chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual."

139.    To address systems such as Flint's that still incorporate lead pipes, the federal government mandates corrosion control protocols in order to protect the public against the possibility of lead entering the drinking water due to corroding pipes.  Concern over lead concentrations in drinking water motivated the passage of the Lead and Copper Rule (LCR) in 1991.  The LCR requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L.  *See* 40 C.F.R.  pt.  141, subpts.  E and I.

140.    Flint's lack of a corrosion control protocol constituted a clear violation of the EPA's Lead and Copper Rule.  Given this violation, Veolia's conclusion in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations" was clearly false.

141.    Veolia suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing water discoloration.  Veolia's report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of discolored water."  The report explains that, "Polyphosphate addition will not make discolored water issues go away."  Thus, rather than recognizing that

46

corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia *knew* Flint did not have a corrosion control protocol and undermined the importance of installing one by stating that it was unlikely to be effective in addressing discoloration (without the slightest mention of the urgent need to implement this to address the severe lead contamination in the water). Even Veolia's *suggested* dosage, 0.5 mg/L was far too low. The City is now adding four to eight times as much phosphate, 2 to 4 mg/L.

142. Veolia knew or should have known that the Flint water system was in violation of federal safe drinking water standards. Its affirmance that Flint was in compliance with federal environmental standards – a false assurance that Flint's water was safe – wrongly instilled confidence in Flint's water on behalf of both the City and its residents. As a direct and proximate result, Flint did not take further steps to resolve its water problems and the City's residents continued to drink the water.

143. LAN, too, knew or should have known that Flint's water was in violation of federal regulations. It should have immediately alerted Flint and its citizens to the corrosive blight eating away at Flint's pipes and poisoning its residents; instead, it produced a bland report that implicitly endorsed Flint's policy of neglect.

47

144.   "Lead has been a challenge and a bane for water suppliers since historical times. . . .  The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history.  These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births."  Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr.  Colin Hayes ed.  2010) (hereinafter, "IWA Guide").

145.   LAN and Veolia should have quickly realized that the pipes were corroding and releasing lead and other elements into Flint's water, and that the corrosive water was coursing through resident's homes and businesses.  LAN and Veolia negligently failed to make these basic observations and, as a direct and proximate result, pipes throughout Flint corroded.  Had LAN and Veolia conducted any proper root cause analysis, they would have known that corrosion was causing Flint's TTHM levels as well as a related lead problem.  Their failure to conduct the proper analysis constituted professional malpractice.

## 2.    LAN and Veolia Recommend Adding Ferric Chloride to Flint's Water

146.   Not only did LAN and Veolia fail to conduct any proper root cause analysis, they affirmatively made Flint's corrosion problem worse by recommending the addition of ferric chloride – a very potent, corrosive acid –

without the addition of an alkaline buffer to raise the pH.  This exacerbated the

problems with Flint's water by *rapidly increasing* the rate of pipe corrosion and the

amount of lead in the water.

147.   Ferric chloride is a coagulant that is added at the water treatment plant

to bind water impurities together so that they settle out of the water at the treatment

plant.  Ferric chloride is highly acidic and corrosive and, if unbuffered by an

alkaline substance, will attack the pipes throughout the distribution system causing

lead and other materials from the pipes to be released into the drinking water.

Accordingly, it is universally agreed that to reduce corrosion, some form of

phosphate or other corrosion control must be added to coat the pipes.  This industry

practice applies to minimizing the impact of ferric chloride, and indeed, chloride

from other sources (*e.g.*, the Flint River).  And, as discussed above, the

requirement to add a corrosion control is mandated by the Federal Safe Drinking

Water Act.

148.   Veolia's March 2015 report states that prior to arriving at its

conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent

ferric chloride dosages are too low and dosages of 100 mg/L or more are

recommended."  Veolia acknowledged that its recommended increase was

significant:  "This increase to 100 mg/L is twice what is currently being fed and

much higher than what had previously been fed last year."

149.   Specifically, Veolia's report states:

Increase of Ferric Chloride – Four coagulants *were tested* by Veolia - ferric chloride, ferric sulfate, polyaluminum chloride (PACl) and aluminum chlorohydrate (ACH).  Ferric chloride and ACH were found to be the best choice of product for effectiveness in removing TOC, a precursor to TTHM formation.  *Current ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended.*  Again, please note, that the amount of chemical needed changes with the nature of the river and as such, water must be tested multiple times a day with corresponding changes in chemical dosages.  *This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year.*  The increase in chemical costs could be up to $1,000,000 per year.  This change in dosage (using ferric chloride) can be made immediately without state permit review.  (Emphasis added.)

150.   At the same time that Veolia gave the unqualified opinion that the current dosage is "too low," and should be doubled, Veolia knew that the City had no corrosion control protocol and knew (or should have known) that corrosion was already a significant problem in Flint.  Veolia's directive that the City double its dosage of ferric chloride was unqualified and in no way warned that ferric chloride could increase corrosion.  Moreover, Veolia failed to inform the City that in order to increase the dosage of ferric chloride (or indeed to use any chloride at all) it must also raise the water's pH and use phosphate to protect the pipes from corrosion.

151.   In August, 2015, LAN made the same recommendation to increase the dose of ferric chloride:

50

Increasing the dose rate of ferric chloride is an operational change that can easily be implemented without the need for any additional equipment.  Test results show that over 40% THMFP removal can be obtained with a dosage of 60 mg/L $Fe^{3+}$ or higher.  Increased dosing of ferric chloride would be most ideal coupled with regular raw water TOC monitoring so that TOC levels would dictate the appropriate ferric chloride feed rate.

152.    LAN and Veolia should have told the City that the addition of phosphate and a pH buffer was *mandatory* to prevent the leaching of lead from pipes – especially if the ferric chloride concentration was increased.  No such recommendation was made.

153.    As a direct and foreseeable result of LAN's and Veolia's recommendations, Flint increased the ferric chloride dosage without adding corrosion controls.

154.    The ferric chloride added to Flint's water system at LAN's and Veolia's suggestion caused substantially greater amounts of lead to leach into Flint's water supply.

155.    The impact of acid on metal, which would include the pipes and appliances in Flint, is well known to water experts.  As indicated by the Centers for Disease Control and Prevention:

Chemical additives are added to water during the water treatment process.  More than 40 chemical additives can be used to treat drinking water.  Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . .  These acidic water treatment additives can interfere with corrosion protection. . . .

51

Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers.  Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home.  .  .  .   The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system.  .  .  .   The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of Pipes in Distribution Systems Fact Sheet*, http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10, 2013).

156.   A graph prepared by the Flint Water Study Group from Virginia Tech University shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



157.   The graph above shows that the Flint River had a pH at or above 8.0

S.U.  for all of 2015, and steadily increased after June.  By comparison, the graph

shows that the pH in Flint's municipal water supply started dropping steadily from

7.9 S.U.  in March (just after Veolia made its recommendation to double the ferric

chloride concentration) to 7.3 S.U.  in August.  This difference is significant.  pH is

measured on a logarithmic scale, which means that a pH of one whole number,

such as 7.0 S.U., is ten times more corrosive than a pH of another whole number,

such as  8.0 S.U.  The drop in pH from 7.9 to 7.3 indicates a dramatic increase in

the corrosivity of Flint's water.

158.   The graph above is punctuated with quotes from Defendants' emails

and other documents that illustrate the contradictory information provided by State

officials regarding the existence of corrosion control measures and lead in Flint's

drinking water.

159.   On June 24, 2015, the U.S.  EPA reached a similar conclusion about

the City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint
> began adding *ferric chloride*, a coagulant used to improve the removal of
> organic matter, as part of the strategy to reduce the TTHM levels.  Studies
> have shown that an increase in the *chloride-to-sulfate* mass ratio in the water
> can adversely affect lead levels by *increasing the galvanic corrosion of lead
> in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel

A.  Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to

Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (emphasis added).

160.   The corrosivity of ferric chloride is well known.  Ferric chloride is highly acidic, and has a pH < 1, which is equivalent to battery acid.  *See* James DeWolfe, *Guidance Manual for Coagulant Changeover* at 52, (AWWA Research Foundation, 2003).

161.   The method for addressing the impact of ferric chloride is also well known.  Because ferric chloride lowers the drinking water pH to corrosive levels, the standard procedure is to raise the pH to the neutral or even alkali ranges.  "The water quality parameters that can impact the corrosion of distribution system and domestic piping systems include pH, alkalinity, TOC, aluminum, sulfate, chloride, hardness, oxygen levels, and disinfectant residual.  Corrosion of lead and copper pipes has been described by various researchers. . .  "  U.S.  EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999) (hereinafter, "U.S.  EPA Guidance").

162.   The EPA has further explained that, "[c]ontrolling corrosion in the distribution and domestic piping systems is dependent on multiple water quality parameters (listed above), all of which can change when enhanced coagulation or enhanced softening is implemented."  *Id.*

163.   This is true because, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided.  Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation."  *Id*.

164.   "Enhanced coagulation and enhanced softening may change the chemistry of the water entering the distribution system.  Before enhanced coagulation or enhanced softening is implemented, the current corrosion control strategy should be reviewed.  .  .  .  If the recommended mitigation actions represent a major change in corrosion control, the utility can conduct pilot-scale (pipe loop) studies to confirm that the mitigation actions will meet the existing corrosion control goals."  *Id.*

165.   "The vast majority of U.S.  utilities were able to comply with [U.S. EPA' s] lead and copper rule by: 1) pH and alkalinity adjustment, most frequently to the pH range of 9.0->9.5 for systems with extensive lead piping; 2) dosing of orthophosphate in the pH range of approximately 7.2 to 8.0 S.U.; or 3) the formation of insoluble $PbO_3$ deposits through chlorination to high ORP [and sometimes concurrent adjustment to > 9 S.U."  IWA Guide at 46.

166.   Fresh water can have widely ranging pH values depending on the geology of the drainage basin or aquifer and the influence of contaminant inputs.

If the water is acidic, lime, soda ash, or sodium hydroxide can be added to raise the pH during water purification processes.  LAN and Veolia should have recommended adding a stronger buffering agent such as sodium hydroxide or sodium carbonate to raise the pH in the water treatment system.

167.   Both LAN and Veolia analyzed the pH in Flint's water.  Both made recommendations about the addition of chemicals that affect pH.  Both were negligent in their analysis of the pH and their recommendations.  Had the City started adding polyphosphate or otherwise controlled for corrosion, or avoided increasing the dosage of ferric chloride, Flint's water would have been less corrosive and, relatedly, less lead would have leached into Flint's water.

### 3.   Veolia and LAN Mislead the Public, Falsely Assuring Them the Water Was Safe.

168.   LAN and Veolia were hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal regulations.

169.   LAN and Veolia entirely failed to satisfy the reasonable professional standard by conducting a root cause analysis which would have revealed that corrosion played a significant role in Flint's TTHM levels and, relatedly, caused lead and other materials leaching into Flint's water supply.  Moreover, a proper

root cause analysis would have revealed the complete absence of any corrosion control protocol as required by federal environmental statutes.

170.   Despite recognizing that Flint did not have a corrosion control protocol as required by the Lead and Copper rule, LAN and Veolia's reports implicitly and explicitly deemed Flint's water system compliant with federal regulations.  By doing so, LAN and Veolia wrongly accorded Flint's water the imprimatur of safety.

171.   Accordingly, not only did the City of Flint fail to take the proper steps to render its water system compliant, but Plaintiffs and the Class were wrongly assured they could continue to drink Flint's water.  These false assurances had catastrophic results.

## F.   The Poisoning of Flint's Water & Cover-Ups at Every Level

172.   On February 26, 2015, the City of Flint tested LeeAnn Walters's water for lead and the results were dangerously high.  According to that test, the water at Ms.  Walters's home contained 104 parts per billion (ppb) of lead – nearly *seven times the EPA's 15 ppb limit*.  The City official who conducted the test, Defendant Glasgow, characterized the result as "very high."  Mr.  Glasgow informed Ms.  Walters, a mother of four, that he was, "[s]orry for this news," but otherwise provided no guidance regarding the relative safety of the water, what

was being done to solve the problem, or whether Ms.  Walters and her family should continue drinking the water.

173.   Ms.  Walters turned to the EPA for guidance, forwarding the test results to the EPA.  Jennifer Crooks of the EPA's Region 5 office immediately reached out to Defendants Busch and Prysby at the MDEQ, "to alert you to the high lead levels reported to a citizen yesterday by Flint Water Dept. . . .  Mike Glasgow at the plant . . .  did test it to find that the iron levels were greater than his test would go; GT 3.3.  But, because the iron levels were so high, he suggested testing for lead and copper.  WOW!!!!  Did he find the LEAD!  104 ppb.  She has 2 children under the age of 3… Big worries here."

174.   Ms.  Crooks further explained in her email, "[t]hat the different chemistry water is leaching out contaminants from the insides of the biofilms inside the pipes.  I think Lead is a good indication that other contaminants are also present in the tap water, that obviously were not present in the compliance samples taken at the plant."

175.   Despite these "Big worries" and the risks to at least two small children, MDEQ still did *nothing* except advise Ms.  Crooks that Ms.  Walters' home should be re-tested for lead, "after flushing the tap to demonstrate that flushing the tap will reduce the lead concentration."

58

176.   Ms.  Crooks was quick to point out that flushing in advance of sampling *would not solve the problem*.  She wrote, "The City can't just flush in advance of taking the compliance samples, they have to flush the lines on a regular schedule."

177.   The Regulations Manager of the Ground Water and Drinking Water Branch of the EPA, Region 5, Miguel Del Toral, followed up with another question for MDEQ, which he asked Ms.  Crooks to pass along.  Ms.  Crooks emailed Mr.  Busch and Mr.  Prysby the following on February 26, 2015:  "Miguel was wondering if Flint is feeding Phosphates.  Flint must have Optimal Corrosion Control Treatment-is it Phosphates?"

178.   On February 27, 2015, MDEQ's Stephen Busch *unequivocally and falsely* informed the EPA that, "The City of Flint .  .  .  Has an Optimized Corrosion Control Program [and] Conducts quarterly Water Quality Parameter monitoring at 25 sites and has not had any unusual results."

179.   On March 3, 2015 – after the City increased its ferric chloride dosage to address TTHM levels – Ms.  Walters's home was retested and showed lead levels of 397, more than *twenty-six times the legal limit*.  Again, Michigan, MDEQ, and the professional engineers retained to advise Flint regarding its water system, did nothing to investigate, ameliorate, or inform the public regarding the extreme hazard posed by the City's water supply.

59

180.   This result again prompted the EPA to contact MDEQ via telephone. MDEQ responded to the EPA in a voicemail, falsely stating, "that the high lead levels at the Walters' home are due to lead sources in the homeowner's plumbing." A subsequent inspection by the EPA revealed this statement to be false.  The internal pipes at the Walters' house were all plastic and approved for drinking water use.

181.   Ms.  Walters first took her son to a local healthcare facility to have his blood tested for lead.  The local facility reported blood levels of 3 µg/dL.  Fearing that the local health department had a conflict of interest, Ms.  Walters took her son to another facility to have his blood re-tested for lead on March 27, 2015.  This test reported a blood lead level of 6.5 µg/dL – higher than the CDC's 5 µg/dL threshold.

182.   Ms.  Walters brought this information to the attention of local health officials.  Far from recognizing the danger posed by this result, Ms.  Walters's concerns were casually dismissed and even belittled.  "He is barely lead poisoned," Ms.  Walters was told by a state nurse, "If CDC had not changed their lead poisoning standard from 10 down to 5, we would not be having this conversation." The same nurse continued, "I am working with kids in their 40's and 50's.  It is just a few IQ points .  .  .  it is not the end of the world."

183.    Ms. Walters's water was again re-tested on April 28, 2015. Those tests showed extremely high lead levels between 200 ppb and 13,200 ppb, with an average of 2,429 ppb. The legal limit is 15 ppb – accordingly, at the high-end, *the lead in Ms. Walters' home was 880 times the legal limit*. These tests were conducted by scientists at Virginia Tech University, which reported a correlation between lead and phosphate that was consistent with the dislodging of the pipe scale from the service line. Virginia Tech assembled a volunteer group of scientists to investigate the Flint water system. That team, lead by Dr. Marc Edwards, a professor of civil engineering, created the Flint Water Study which has sought to compile information related to the Flint water crisis. In response to Virginia Tech's results, the City, State, and MDEQ remained silent.

184.    In May 2015, the City tested two additional sites and both tested above the legal limit. Moreover, these results likely *underestimated* the full extent of the lead problem because the sampling protocol used by the City involved "pre-flushing" before collecting samples. According to Mr. Del Toral, "pre-flushing before collecting compliance samples has been shown to result in the minimization of lead capture and significant underestimation of lead levels in the drinking water." Pre-flushing, while not expressly prohibited, "negates the intent of the rule to collect compliance samples under 'worst-case' conditions." No public

announcements were made regarding the existence of lead in Flint's drinking water.

185.     Having seen no action from Michigan, MDEQ, or the City in response to its prior letter regarding the Walters' high lead tests, Mr. Del Toral drafted and sent a memorandum to the EPA and several officials within MDEQ including Defendants Smith, Cook, Busch, and Prysby on June 24, 2015. In that memorandum, Mr. Del Toral stated that the EPA's "major concern from a public health standpoint" was "the absence of corrosion control treatment in the City of Flint for mitigating lead and copper levels in the drinking water."

186.     Mr. Del Toral specifically noted that the extent of the corrosion and corresponding lead in Flint's water was directly related to the City's use of ferric chloride to remove bacteria and reduce TTHM levels. Mr. Toral explained what *any reasonable engineer* should have already known, "[s]tudies have shown that an increase in the chloride-to-sulfate mass ratio in the water can adversely affect lead levels by increasing the galvanic corrosion of lead in the plumbing network."

187.     The importance of collecting samples that accurately depicted real world scenarios – in other words, scenarios where people did not allow their water to run for several minutes before drinking it – was incredibly important because, "compliance sampling results which are reported by the City of Flint to residents

could provide a false sense of security to the residents of Flint regarding lead levels in the water and may result in residents not taking necessary precautions to protect their families from lead in the drinking water."

188.     It also has come to light that Michigan's and the MDEQ's initial tests for lead were not done in compliance with federal regulations.  Specifically, water samples tested for lead during the first six months of 2015 were incorrectly labeled as having come from homes with lead service lines when, in truth, the samples had been taken from homes with underground plumbing made of copper, galvanized steel, or other materials that pose lower risks of corrosion, according to the City's own documents.

189.   The City's and MDEQ's failure to correctly identify its water samples as coming from homes facing lower risks of corrosion not only gave the City and the public a false sense of security regarding the presence of lead in Flint's drinking water, this failure also constituted a violation of federal environmental laws which require water sampling be done at "high-risk" locations to ensure that high levels of lead or copper are detected as soon as possible.  Lead service lines are most likely to leach lead into water and the American Water Works Association has stated that cities like Flint should have been collecting 50 percent of samples from such high-risk homes.

190.     Defendant Glasgow has admitted that the City did not comply with required protocols in selecting samples.  Michigan Live has reported that, in response to questioning, Defendant Glasgow claimed the City struggled to collect the number of samples required following the water source switch and, as a result, had to rely on samples from lower-risk households.  He explained that Flint never assembled the proper records regarding the location of lead service lines and instead, was forced to rely on a hodgepodge of scattered records, which failed to accurately identify at-risk homes.

191.     Accordingly, Defendant Glasgow and the MDEQ violated federal environmental regulations by failing to properly collect samples from at-risk homes and, as a result, failed to promptly and fully identify the presence of lead in Flint's drinking water.  These failures both delayed corrective action and wrongly induced a belief among Flint's citizens that the water was safe.  Flint's water crisis did not begin to get the attention it needed until Mr.  Del Toral's memorandum was leaked to the ACLU and the press, prompting lawsuits and investigations.

192.     But even this memorandum failed to prompt the City, State, or MDEQ to action.  Instead, and despite being in receipt of information to the contrary, public officials continued to maintain that the water was safe.  On July 10, 2015, Defendant Wurfel of MDEQ stated in an interview with Michigan Public Radio, "anyone who is concerned about lead in the drinking water in Flint can

64

relax.  It does not look like there is any broad problem with the water supply freeing up lead as it goes to homes."

193.     According to internal emails and reports from MDEQ, on July 27, 2015, the MDEQ "scrubbed" Flint's Lead and Copper Rule Report to remove two high lead results before releasing the report to the public – affirmatively misleading the public regarding the health threat posed by Flint's water.

194.     Concerns regarding corrosion of Flint's pipes and corresponding lead levels continued to rise.  In August 2015, a Virginia Tech study confirmed what many had long suspected:  the Flint River was substantially more corrosive than Flint's prior water source with about eight times the amount of chloride.  In September, Virginia Tech's analysis of water samples from 300 homes around Flint revealed many tests in excess of federal limits including a number of samples approaching levels considered "hazardous waste."  The problem was widespread: according to this report, 40% of the homes that were tested had elevated lead levels.

195.     As evidence of a massive lead problem mounted in the fall of 2015, MDEQ officials continued to deny any concerns about the water.  Defendant Wurfel tried to cast doubt on Virginia Tech's test results and Defendant Wyant, the Director of MDEQ, falsely told reporters that the City's use of lime controlled the corrosion and leaching of lead.

196.     On September 24, 2015, Dr.  Mona Hanna-Attisha, a pediatrician at Hurley Medical Center, released a study showing that the levels of lead in children tested after the City of Flint started using Flint River water were much higher than before the switch.

197.     Specifically, Dr.  Hanna-Attisha studied data from blood levels processed at Hurley Medical Center for children under 5 years of age residing in zip codes 48501-48507 and compared Elevated Blood Level (EBL) percentages for the period January 1, 2013 to September 15, 2013 with the period January 1, 2015 to September 15, 2015.  An EBL result was defined as a blood level in excess of 5 g/dL.  This corresponds with the CDC's recognized blood lead limits.  According to her report, 2.1% of blood samples reported EBLs during the pre-switch 2013 period compared to 4% EBLs after the switch.  In other words, the incidence of blood poisoning *doubled* after Flint switched water sources and LAN and Veolia recommended the addition of ferric chloride.

198.     Tragically, Dr.  Hanna-Attisha's study revealed especially high incidence of EBLs for children 15 months of age and under.  For those children residing in homes where drinking water tested high for lead, the rate of EBL is *three times* the pre-switch period.  But no children in Flint are safe – even among those children who resided in areas of Flint that did not report high lead levels in the water, the incidence of lead poisoning nearly doubled.  Moreover, the lead that

66

was released from pipes now exists in sediment throughout the system and in the pipes and appliances in resident's homes and businesses, and can become remobilized into the drinking water at any time.  This demonstrates the significant impact of the water switch on the entire community:  no matter where one resides in Flint, the risk of lead poisoning cannot be escaped.

199.    Despite evidence that the Michigan Department of Health and Human Services was aware of EBLs as early as September 2014, Michigan's HHSD spokesperson, Angela Minicuci, initially reported that blood lead levels in Flint had remained steady since the switch to Flint River.  MHHSD later acknowledged that lead levels were increasing consistent with Dr.  Hanna-Attisha's findings.

### G.    Despite Admissions of Wrongdoing, Problems Continue Unabated

200.    On October 16, 2015 – at least eight months after being notified of illegally high lead levels in the water and more than a year after public officials recognized that corroding pipes were causing contamination of the community's water, the City switched back to using water from the Detroit Water and Sewer Authority.

201.    In an email dated October 18, 2015, from MDEQ Director Wyant to Governor Snyder and other officials, Wyant admitted that Flint and the other governmental agencies had violated federal law by failing to implement optimized

corrosion control.  He wrote, "I believe now we made a mistake.  For communities with a population above 50,000, optimized corrosion control should have been required from the beginning."

202.     It was not until these mistakes came to light that Defendants took the steps necessary to begin to bring Flint into compliance with federal environmental laws.  On October 30, 2015, Defendant Prysby emailed Defendant Glasgow, instructing him to institute the requisite corrosion control.

203.     By this point, however, the damage was done.  The City acknowledged that it would take at least three weeks for water from the Flint River to flush out of the pipes.  But even after that, the pipes were corroded to a point where the only viable means for ensuring the transportation of safe water into the homes and businesses of Flint's residents was replacing the pipes.

204.     Since the crisis first came to light, various entities have initiated investigations into the persons and entities that caused the crisis.  The state-sponsored Flint Water Advisory Task Force issued its final report in March, 2016.  That report recognized that, "[u]ltimate accountability for Michigan executive branch decisions rests with the Governor," but found misconduct on behalf of several persons and government entities.

205.     Likewise, Congress has held hearings related to the Flint crisis, calling several individuals, including Governor Snyder to testify before the

Committee.  Critically, however, neither the state-sponsored Task Force nor the Congressional hearings have resulted in any compensation being awarded to Plaintiffs or the Class, nor have any of these investigations fully examined the role of LAN and Veolia in causing this crisis.

### H.    Personal and Property Damages Suffered by the Class

206.    As a direct, proximate and foreseeable cause of Defendants' conduct, Plaintiffs and the Class have suffered  extensive personal and property damage.

#### 1. Lead's Devastating Health Effects and Other Personal Injuries Caused by Flint's Water Crisis.

207.   Lead's catastrophic effects are indisputable.  According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults.  A dose of lead that would have little effect on an adult can have a significant effect on a child.  In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

208.   According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and

69

reduced educational attainment.  Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs.  The neurological and behavioral effects of lead are believed to be irreversible."

209.   The behavioral effects of lead poisoning in children cannot be overstated.  According to many of the leading researchers on lead, increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors and arrests, including arrests involving violent offenses.

210.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

211.   The effects of lead exposure are long lasting.  The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium.  During pregnancy, lead is released from bones as maternal calcium and is used to help form the bones of the fetus.  This is particularly true if a woman does not have enough dietary calcium.  Lead can also cross the placental barrier exposing the fetus to lead.  This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

212.   Lead is also harmful to adults.  The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure

and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

213.    The costs of lead poisoning are real and substantial.  It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment.  Leonardo Trasande and Yinghua Liu, *Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008*, Health Affairs, 30, no.5 (2011): 863-870.

214.    The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning – typically chelation therapy – as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

215.    Given the long-lasting risks of lead exposure, and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs and the Class will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

216.    Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease.  As explained above, the presence of *Legionella* was a direct and proximate result of the switch to the Flint River as a water source and related conduct.  At least 87 members of the Class

contracted Legionnaires' and at least nine died.  Those members of the Class who

became infected with Legionnaires' disease suffered death, and for those who

lived, incurred pain and suffering as well as substantial medical costs due to

Defendants' conduct.

217.     Finally, as a direct and proximate result of Defendants'

conduct, Plaintiffs and the Class have suffered extreme emotional distress.

## 2.     Flint's Children: Catastrophic Lifetime Losses

218.     Flint's most vulnerable – its children – have suffered the most

disastrous consequences from lead exposure – diminished potential over the entire

course of their lives.  The World Health Organization states, "[t]hese costs are

sometimes referred to as *lost opportunity costs*.  Using a conservative estimate, the

decrease in intelligence attractable to each 1 µg/dl increase in blood lead level is

0.25 IQ points, and the decrement in lifetime economic productivity associated

with lost IQ point is 2.4%.  When exposure to lead is widespread in a society, the

aggregate loss of intelligence (and thus economic productivity) can be substantial."

219.     Notably, this estimate is conservative as it relates solely to lost

earning potential and does not include costs related to special educational, medical,

sociological, disability and occupational services, or long-term monitoring and

treatment costs.

220.     According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5 year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings."  Michigan Network for Children's Environmental Health, *The Price of Pollution:  Cost Estimates of Environment-Related Childhood Diseases in Michigan* (June 2010).  This report, of course, does not include estimates of the fallout from Flint's lead crisis.

221.     Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.  *See supra*, Trasande & Liu.

222.     As a direct and proximate result of Defendants' conduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential.  They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

### 3.     Property Damages Caused by Defendants' Conduct

223.   In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendants' conduct, as described above, has caused significant property damage.

224.   The property damages sustained by Plaintiffs and the Class fall into three basic categories.  First, the Plaintiff- and Class-owned pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break.  Second, the corroded pipes and appliances remain a continuing source of lead and potentially Legionella – thus, pipes and appliances must be replaced or else remain a continuing source of harmful exposure.  Finally, the value of Plaintiffs' and the Class's real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

225.   Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

226.   The residents' homes have been affected in the same fashion.  Even with the addition of phosphate, their pipes and appliances will remain corroded

until replaced, and continue to be a source of lead and potentially Legionella. Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

227.   The effect of corrosive water on residential and commercial piping and appliances is well understood.  For example, a 2014 study by the Water Research Watershed Center stated:  "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

228.   The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive.  Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

229.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater."  Moreover, residents have already reported

damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

230.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household.  Other estimates of those replacement costs are far higher.

231.   Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

232.   Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe.  Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised.  "The corrosion is not going away.  It's still there."

233.   Plaintiffs and the Class have been left to pay for the damage caused by Defendants.  This has proven nearly impossible as many of the City's residents survive on very little money.  To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could

76

free up money to pay for the retrofitting, and that the costs are not covered by insurance.  The crisis has created a perfect storm to strip their houses of their remaining value, they say."

234.   Replacing the piping and affected appliances in each home and business is the only way to guarantee that a home or business will be unaffected by corrosion and lead.  The cost of such replacements will range into the tens of thousands, if not more, per structure.

235.   Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and rental rates in the City.  As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

236.   Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable.  A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P.  Morgan similarly have acknowledged requiring verification of potable water to provide financing to

Flint's residents.  Lenders claim their hands are tied.  As the Federal Housing

Administration, which backs loans to less-creditworthy borrowers, explained,

government regulations require "a continuing and sufficient supply of safe and

potable water" to provide home financing.

237.   This creates a true catch-22.  Despite having switched back to

receiving its water from DWSD, the current extent of corrosion in Flint renders the

water unsafe because the pipes and appliances will remain corroded and sources of

lead until they are replaced.  However, residents cannot obtain financing to replace

their pipes and appliances until the water is deemed safe.

## V.   CLASS ACTION ALLEGATIONS

238.   Plaintiffs bring this action and seek to certify and maintain it as a class

action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of

Civil Procedure on behalf of themselves and similarly situated individuals in the

City of Flint, Michigan, subject to amendment and additional discovery as follows:

a.   All persons and entities that have resided in, or owned or rented
property in, the City of Flint, Michigan since April 25, 2014.

239.   Excluded from the Class is:

a.   Defendants, including any entity or division in which Defendants have
a controlling interest, along with their legal representative, employees,
officers, directors, assigns, heirs, successors, and wholly or partly
owned subsidiaries or affiliates;

b.   the Judge to whom this case is assigned, the Judge's staff, and the
Judge's immediate family; and

c.  all governmental entities.

240.   Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

## NUMEROSITY AND ASCERTAINABILITY

241.   This action meets the numerosity requirement of Fed.  R.  Civ.  P. 23(a)(1), given that the amount of affected Flint residents and property owners, upon information and belief, has reached the tens of thousands, making individual joinder of class members' respective claims impracticable.  While the precise number of class members is not yet known, the precise number can be ascertained from U.S.  Federal Census records, State of Michigan and City of Flint public records, and through other discovery.  Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

## TYPICALITY

242.   Pursuant to Federal Rules of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants.  Plaintiffs' persons and real property, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred damages and losses related to the introduction of highly corrosive water from the Flint River into the public water supply, causing lead contamination and personal

injury damages, destroying the lead supply pipes, and causing the ongoing water crisis in Flint.  Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

## ADEQUACY OF REPRESENTATION

243.   Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.  Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

244.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.

## PREDOMINANCE OF COMMON ISSUES

245.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include the following:

a.   whether Defendants engaged in the conduct alleged herein;
b.   whether LAN and Veolia committed professional malpractice when they failed to conduct a root cause analysis and recommended Flint double its dosage of ferric chloride without adding a buffering agent and sufficient corrosion control;

c.     whether Defendants' conduct violates the Safe Drinking Water Act, the Constitution of the United States, and other laws as set forth herein; and

d.     the extent to which Defendants know about the lead contamination of the Flint water supply after April 2014 and before notifying Plaintiffs and Class Members;

e.     whether Defendants knew or should have known that Flint's water supply indicated the presence of legionella;

f.     whether Defendants took steps to conceal the presence of lead in Flint's water supply or otherwise falsely assured Plaintiffs and the Class that Flint's water was safe;

g.     whether Defendants' conduct violates the Safe Drinking Water Act, the Constitution of the United States, and other laws as set forth herein;

h.     whether Defendants made unlawful and misleading representations or material omissions with respect to the safety of Flint's water supply; and

i.     whether Plaintiff and Class Members are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

## **SUPERIORITY**

246.   The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Further, no unusual difficulties are likely to be encountered in the management of this class action.  Given the great amount of Flint residents impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct.  To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system.  Therefore, the class action mechanism presents considerably less

81

management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

### *Medical Monitoring*

247.   As a direct and proximate result of the Defendants' acts, omissions, and conduct as set forth in this Amended Complaint, Plaintiffs and the Class have suffered and continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress.  This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of their health and to monitor their status for changes and progressions in their injuries and their sequelae.

248.   Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death. Furthermore, these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

249.   Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible and beneficial.  For example, administration of these readily available

non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory ailments, and heart dysfunction, even in asymptomatic individuals. Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these Plaintiffs and the Class would suffer if diagnosis and/or treatment were delayed until their conditions became overtly symptomatic.

250.   The recommended testing procedures will be subject to expert testimony at the time of trial.

251.   Plaintiffs and the Class are at a high risk for latent and progressive respiratory injuries and therefore need to undergo testing.  Plaintiffs and the Class also need the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of latent injuries, which will result in even more grave injuries and consequences.

252.   The Plaintiffs and Class Members increased susceptibility to certain injuries and the irreparable threat to the their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes, schools, businesses and other public places in the City of Flint can only be mitigated and/or addressed by the creation of a medical program including but not limited to:

> a.  notifying Plaintiffs and the Class of the potential harm from exposure to the contamination described herein;

b.  funding further studies of the long-term effects of exposure;

c.  funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the City of Flint as a result of the acts and omissions alleged herein;

d.  gathering and forwarding to their treating physicians information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around the City of Flint; and

e.  aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Plaintiffs and the Class.

253.   To the extent that Defendants' actions resulted in the discharge and/or release of lead into Flint's drinking water, thereby entering and injuring the physical and mental well-being of Plaintiffs and the Class, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case.

## DECLARATORY AND INJUNCTIVE RELIEF

254.   Since Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and Class Members, final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

### VI.   CAUSES OF ACTION

**AS AND FOR A FIRST CAUSE OF ACTION:
VIOLATION OF SAFE DRINKING WATER ACT'S
NOTIFICATION REQUIREMENTS, 40 C.F.R. § 141.85
(As against the Governmental Defendants)**

206.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

207.    The Safe Drinking Water Act ("SDWA") was passed by Congress in 1974, with subsequent amendments in 1986 and 1996, to ensure and protect the quality of Americans' drinking water.  Under SDWA, the United States Environmental Protection Agency ("U.S. EPA") is given authority to set the standards for drinking water quality and oversee states, localities, and water suppliers who implement those standards.

208.    Through the SDWA, all public water systems in the United States need to follow the standards and regulations set by the EPA.  U.S.EPA has set maximum contaminant levels and/or treatment technique requirements for over 90 different contaminants in public drinking water, including microorganisms, disinfectants, disinfections by-products, inorganic chemicals, organic chemicals, and radionuclides.

209.    Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

210.    The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. §141.2.

211.     Regulations established under the SDWA require that, ". . .all water systems must provide a consumer notice of lead tap water monitoring results to persons served at the sites (taps) that are tested. Any system exceeding the lead action level shall implement the public education requirements."  40 C.F.R, §141.80(g).

212.     Since April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to comply with the requirement that water systems notify customers of the individual results of tap water samples collected and tested for lead within thirty days after the water system receives the results.  40 C.F.R. §§ 141.85(d)(1),(d)(2).

213.     For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs, the Class and those residing at each sampling site of the presence of elevated lead levels in the public water supply.

**AS AND FOR A SECOND CAUSE OF ACTION:
VIOLATION OF SAFE DRINKING WATER ACT'S
REQUIREMENT TO OPERATE OPTIMAL CORROISON
CONTROL TREATMENT, 40 C.F.R.  § 141.81-.82
(As against the Governmental Defendants)**

214.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

215.    Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

216.    The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act.   42 U.S.C. § 300(f); 40 C.F.R. § 141.2.

217.    To address corrosion of lead and copper into drinking water, U.S. EPA issued the Lead and Copper Rule (LCR) under the authority of the SDWA. 42 U.S.C §§ 300(f) to 300j-26; 40 C.F.R. § 141.80-141.91.  One requirement of the LCR is corrosion control treatment to prevent lead and copper from contaminating drinking water. Corrosion control treatment means utilities must make drinking water less corrosive to the materials it comes into contact with on its way to consumers' taps.  The regulations implementing the LCR, 40 C.F.R. § 141.80-141.91, "constitute the national primary drinking water regulations for lead and copper.  Unless otherwise indicated, each of the provisions of this subpart applies to community water systems and non-transient, non-community water systems (hereinafter referred to as "water systems" or "systems")."  40 C.F.R. § 141.80(a).

218.    The LCR establishes a treatment technique that includes requirements for corrosion control treatment, source water treatment, lead service line replacement, and public education.  "These requirements are triggered, in

87

some cases, by lead and copper action levels measured in samples collected at consumers' taps."  40 C.F.R. § 141.80(b).

219.     The LCR requires systems to monitor drinking water at customer taps.  If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion.

220.     As described more fully herein, the lead levels in Flint's water exceeded the thresholds established under the LCR.

221.     Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment.  40 C.F.R. § 141.82(g).

222.     Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

223.     The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs and the Class.

224.     Additionally, the LCR provides that "[a]ny system exceeding the lead action level after implementation of applicable corrosion control and source water treatment requirements shall complete the lead service line replacement requirements contained in § 141.84." 40 C.F.R. § 141.80(f).  A water system must replace annually, at least 7 percent of the initial number of lead service lines in its distribution system.  The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins.  The system must identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under § 141.86(a) and relevant legal authorities (*e.g.*, contracts, local ordinances) regarding the portion owned by the system.  The Government Defendants have yet to comply with these requirements.

## AS AND FOR A THIRD CAUSE OF ACTION:
## VIOLATION OF 42 U.S.C. § 1983
### Procedural Due Process (as against all Defendants)

225.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

226.     In the alternative to the state-law tort claims set forth in this complaint:  the Defendants, acting under color of state law, deprived Plaintiffs of their liberty and property without providing an adequate post-deprivation remedy, in violation of 42 U.S.C. § 1983.

227. At all times relevant to this Complaint, Defendants acted under the color of state law.

228. The Due Process Clause of the Fourteenth Amendment to the United States Constitution says that no state shall "deprive any person of life, liberty, or property, without due process of law."  The Due Process Clause establishes Plaintiffs' constitutional rights to be free from (a) deprivations of their liberty interest in bodily integrity; and (b) deprivations of state-created property interests, without due process of law.

229. The Defendants, in their actions and omissions, intentionally and/or with deliberate indifference to an unreasonable risk of harm, injured Plaintiffs and deprived them of their constitutionally guaranteed liberty and property interests by providing and selling Plaintiffs and the Class unusable water that they knew or should have known was contaminated with lead; failing to take remedial measures they knew or should have known would prevent further harm; and failing to warn Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties, despite Defendants' actual or constructive knowledge that this failure to warn would cause harm.

230. At all times relevant to this Complaint, it was clearly established in the laws of this jurisdiction that no person may, acting under color of state law,

deprive citizens of the United States or persons within the territorial jurisdiction thereof of liberty or property without due process of law.

231.     Defendants Earley and Ambrose were officials with final policy-making authority for the City of Flint.  Their decisions not to remedy known contamination, and to misinform the public about the safety of Flint water, represented the official policy of the City of Flint.

232.     The Defendants had a custom or practice of providing contaminated water to Flint residents, of not remediating known contamination, and of misinforming the public about the safety of its water systems.

233.     The Defendants had a policy of deliberate indifference to potential harm with respect to the training and supervision of the staff responsible for providing safe drinking water to Flint residents.  In the alternative to the state-law tort claims set forth in this Complaint, there exists under Michigan law no meaningful post-deprivation remedy for Defendants' deprivations of Plaintiffs' liberty and property interests.

234.     The unlawful acts complained of in this Count proximately caused Plaintiffs to suffer actual physical and emotional damages, as well as other damages and losses.  Moreover, the unlawful acts complained of in this Count continue to deprive Plaintiffs of their constitutional rights, and to proximately cause damages, on an ongoing basis.

235.     With respect to the Defendants, Plaintiffs are entitled to compensatory and special damages in an amount to be determined at trial as well as punitive damages.  With respect to all Defendants, including Defendants in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### Negligence
### (as against all Defendants)

255.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

256.   Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.

257.   Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

258.   Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs, the Class and their property.

259.   Defendants breached that duty by failing to act reasonably in providing Plaintiffs and the Class usable water.  Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

260.   Defendants further breached that duty by failing to timely notify the Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the homes, businesses and rental properties of Plaintiffs and Class Members.

261.   As a result of Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

262.   Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

263.   Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

93

264.    LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations.  As professional engineers, LAN and Veolia had a duty to act as an engineer of ordinary learning, judgment, or skill would.  As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.  As a direct and proximate result of LAN and Veolia's negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

265.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

## AS AND FOR A FIFTH CAUSE OF ACTION:
### Intentional Infliction of Emotional Distress
### (as against all Defendants)

266.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

267.    Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.  As alleged herein, Defendants intentionally and/or recklessly engaged in conduct that had the direct and foreseeable result of causing Plaintiffs and the Class serious emotional distress.  Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.  Defendants knew that

94

Plaintiffs' distress was certain, or substantially certain to result from their conduct, or Defendants acted in deliberate disregard of a high degree of probability that the Plaintiffs and the putative class would suffer emotional distress as a result.

268.   Defendants' outrageous conduct caused severe distress to Plaintiffs and the Class and was the proximate cause of Plaintiffs' injuries.

269.   As such, Defendants breached their duty to exercise reasonable care towards Plaintiffs and the Class.

270.   Plaintiffs and the Class suffered serious emotional distress as a direct and foreseeable result of Defendants' conduct.

## AS AND FOR A SIXTH CAUSE OF ACTION:
### Negligent Infliction of Emotional Distress
### (as against all Defendants)

271.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

272.   Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.

273.   As alleged herein, Defendants failed to exercise reasonable care which had the direct and foreseeable result of causing Plaintiffs and the Class severe emotional distress.

## AS AND FOR AN SEVENTH CAUSE OF ACTION:
### Inverse Condemnation
### (as against the Governmental Defendants)

274.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

275.   The actions of the Government Defendants, in switching the Flint water system from water provided by the DWSD to water sourced from the Flint River, constitute an unconstitutional taking of Plaintiffs' property without due process of law and without just compensation under Michigan law.

276.   Article 10, § 2 of the Michigan Constitution of 1963 provides that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law."

277.   The Government Defendants caused Plaintiffs' property (including, but not limited to, underground and interior pipes, plumbing fixtures, and appliances) to be actually and physically invaded by water containing corrosive chemicals.  These chemicals permanently corroded and rendered useless and valueless Plaintiffs' property, diminished the value of Plaintiffs' real property, and otherwise encroached on Plaintiffs' use and enjoyment of their property.

278.   The Government Defendants proximately and substantially caused the damage to Plaintiffs' property set forth in this Count through one or more affirmative acts of introducing water containing corrosive chemicals into pipes connected with and flowing into Plaintiffs' property.

96

279.   The Government Defendants undertook the affirmative acts set forth in this Count for a public purpose – namely, to reduce the cost to the City and its residents of providing water to the residents of Flint.

280.   Under Michigan law, there is no governmental immunity for violations of state constitutional rights, including the right to due process and just compensation for takings of property for public use.

281.   Plaintiffs are entitled to just compensation for the diminution in the value of their property caused by the Government Defendants' affirmative acts, in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION:
NUISANCE
(as against all Defendants)**

282.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

283.   Defendants' wrongful actions in the creation of the contamination, maintenance of their land and water facilities, and failure to reasonably abate, minimize and/or remediate the contamination resulted in the presence of the contaminants in the persons and/or on properties of Plaintiffs and the Class, the creation of noxious odors, and the risk of injuries, and/or annoys Plaintiffs and the Class in their enjoyment of their legal rights and quality of life.  Such conditions

constitute an ongoing specific, particular and unique burden on the persons of

Plaintiffs and Class Members and their property.

284.   Such wrongful acts by Defendants in the maintenance and use of their

land and water facilities and the failure to remediate the contamination was and is a

foreseeable and proximate cause of injury, discomfort, annoyance, inconvenience,

and/or damage to Plaintiffs, the Class and their property.

285.   Defendants' conduct is the legal cause of the intentional,

unreasonable, negligent, and/or reckless invasion of Plaintiffs' and Class Members'

interests in the private use and enjoyment of their land.  Such actions' tendency is

to create danger and inflict injury upon person and property.

286.   Defendants' conduct in performing acts or failing to act has caused

one or more substantial, unreasonable, and intentional interferences with the right

of Plaintiffs and Class Members to use and enjoy their property as discussed

above.

287.   Accordingly, Plaintiffs and the Class seek general damages from

Defendants, in an amount to be determined at trial, directly resulting from the their

injuries in a sufficient amount to compensate them for the injuries and losses and

to restore Plaintiffs and the Class to their original position, including, but not

limited to the difference between the current value of their properties and such

value if the harm had not been done, the cost of repair or restoration, the value of

the use of the continuous trespass, injury to persons, and direct and consequential

damages flowing from the nuisance and trespass which are the natural and

proximate result of Defendants' conduct in an amount to be proved at trial.

### AS AND FOR A NINTH CAUSE OF ACTION:
### TRESPASS
### (as against the Governmental Defendants)

288.    Plaintiffs incorporate and re-allege each allegation set forth in the

preceding paragraphs of this Amended Complaint.

289.    Defendants' negligent, willful, and/or wanton actions and/or

intentional failures to act caused an unknown quantity of lead and bacteria to be

released into the drinking water for the City of Flint.

290.    Defendants' willful, wanton, and intentional failure to act and/or their

affirmative choice of action and following course of action caused lead and bacteria

to enter and trespass upon the land and realty of the Plaintiffs and the Class and

cause an injury to their possession and/or right of possession.

291.    Upon information and belief, Defendants had exclusive control over

the facilities providing Plaintiffs and the Class water at all relevant times.

292.    Defendants took affirmative, voluntary, and intentional actions to

provide water to Plaintiffs and the Class in an unsafe manner and/or intentionally

to release lead and bacteria into Flint's water supply.  Further, after such acts,

Defendants undertook affirmative, voluntary, and intentional acts that were

insufficient to remedy the condition caused by the release of lead and bacteria into the water supply.

293.   At the time that the above described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that highly corrosive water would cause large quantities of lead and bacteria to be introduced into the persons and properties of Plaintiffs and Class Members.

294.   The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause lead and bacteria to be disbursed through the water onto the land and property of Plaintiffs and the Class.

295.   These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs and the Class, their property and their right of possession of their property.

296.   Further, Defendants' actions in directing the contaminated water into the persons and properties of Plaintiffs and the Class were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

297.   Additionally and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the water supply after having knowledge and notice

of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

298.   Further, Defendants' actions that were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

299.   Based upon the above, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses, and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct, and exemplary or punitive damages.

## AS AND FOR AN TENTH CAUSE OF ACTION:
### Unjust Enrichment
### (as against all Defendants)

300.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

301.   Plaintiffs and the Class were sold toxic drinking water that was unfit for human consumption instead of receiving clean, safe drinking water, as promised.

302.   The Governmental Defendants unjustly received the benefits of payments from Plaintiffs and the Class in exchange for contaminated water that was unfit for human consumption, and used those payments for the operation of the City of Flint.

303.   LAN and Veolia unjustly received compensation for providing engineering services that did not satisfy their duties of professional responsibility.

304.   Accordingly, Defendants should be ordered to disgorge their unjustly retained benefits.

**AS AND FOR A ELEVENTH CAUSE OF ACTION:**
**GROSS NEGLIGENCE**
**(as against All Defendants)**

305.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

306.   Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.  Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and

eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to their property.

307.   Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and legionella, to be provided to Plaintiffs and the Class in contravention of federal environmental statutes and guidelines.  As such, Defendants gross negligently, recklessly, willfully, wantonly, and/or intentionally contaminated drinking water in and around the real property of Plaintiffs and the Class.

308.   The Government Defendants breached their duty by providing and selling Plaintiffs and the Class unusable water that they knew or should have known was contaminated with lead; failing to take remedial measures they knew or should have known would prevent further harm; and failing to warn Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties, despite Governmental Defendants' actual or constructive knowledge that this failure to warn would cause harm.

309.   LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations.  As professional engineers, LAN and Veolia had a duty to act as an engineer of ordinary learning, judgment, or skill would.  As more fully described herein, LAN and Veolia breached their duties of

care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.  As a direct and proximate result of LAN's and Veolia's gross negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

310.   Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class.

## AS AND FOR A TWELFTH CAUSE OF ACTION: PROPRIETARY FUNCTION
### (as against the Governmental Defendants)

311.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

312.   At relevant times, Defendants engaged in proprietary functions, specifically, the sale of potable water to Plaintiffs and the Class.

313.   Defendants' primary purpose in the aforementioned facts was to produce a pecuniary profit for the governmental agency.

314.   The relevant activities are not normally supported by taxes and fees.

315.   The conduct of Defendants constituted "proprietary function" in avoidance of governmental immunity.

316.   The performance of governmental functions constituting proprietary function falls within the exceptions of governmental immunity pursuant to MCL 691.1413.

317.   Defendants demonstrated deliberate and/or intentional indifference to the public safety needs of Plaintiffs and the Class in violation of their rights under the U.S.  Constitution, Michigan Constitutions, and Michigan Statutory and Common Law during the exercise of proprietary functions.

318.   This Amended Complaint is being plead in avoidance of governmental immunity.

319.   The Defendants' defense of governmental immunity is voidable due to the proprietary function exception and all other relevant exceptions.

320.   As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs and the Class have been exposed to potentially lethal doses of lead, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complications.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.  Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION:**
**PROFESSIONAL NEGLIGENCE**
**(as against the Engineering Defendants)**

321.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

322.   LAN and Veolia undertook, for substantial consideration, to render services for the City of Flint which each should have recognized as necessary for the protection of Plaintiffs, the putative class, and their property, and reasonably could and should have foreseen that the failure to satisfy the standard of reasonable engineering professionals in performing those services would endanger Plaintiffs, the putative class, and their property.

323.   As a result, LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations.  As professional engineers, LAN and Veolia had duties to act as engineers of ordinary learning, judgment, or skill would.

324.   As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.

325.   As a direct and proximate result of LAN and Veolia's negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

## AS AND FOR A FOURTEENTH Cause of Action
## DECLARATORY JUDGMENT ACT
### (as against all Defendants)

326.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

327.     Plaintiffs are entitled to a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

328.     An actual controversy exists between the parties as alleged herein and will continue to exist unless and until it is resolved by this Court.

329.     Plaintiffs are entitled to a declaratory judgment that the Government Defendants have operated and continue to operate a Water System that is not in compliance with the SDWA and LCR.

## DAMAGES SOUGHT BY THE CLASS

330.   Plaintiffs and the Class incorporate by reference the preceding paragraphs as if fully set forth herein.

331.   At all relevant times herein, Defendants owed a duty to Plaintiffs and the Class to ensure the adequate processing, transportation, and storage of potable drinking water to the residents of the City of Flint.

332.   The significantly increased risks associated with exposure to lead make periodic diagnostic medical examinations reasonable and necessary.

333.   As a direct and proximate result of Defendants' reckless, negligent and grossly negligent operations and actions, as set forth herein, Plaintiffs and the Class have been exposed to potentially lethal doses of hazardous and toxic contaminants, and, as a result, suffer a significantly increased risk of death, further surgery, or other serious health complication.  This increased risk makes periodic diagnostic and medical examinations reasonable and necessary.  Easily administered, cost effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

334.   In order to compensate Plaintiffs and the Class for damages suffered due to Defendants' acts, each and every Plaintiff and Class Member requires, among other things, that Defendants collectively pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination, with Plaintiffs and the Class retaining freedom of choice relative to choosing their experts.  Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

335.   Each and every one of these Plaintiffs' and Class Members' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to lead in Flint can only be mitigated

108

and/or addressed by the creation of a medical program (the "Flint Program") including but not limited to:

a.     Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the Program, meetings with potentially eligible populations, development and dissemination of outreach materials informing Flint residents about the program, and the establishment of phone information services;

b.     Funding further studies of the long-term effects of exposure;

c.     Funding medical surveillance for those individuals exposed to lead;

d.     Gathering and forwarding to each and every one of these Plaintiffs' and Class Members' treating physicians information related to the diagnosis and treatment of injuries which result from their exposure(s) to lead;

e.     Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs and the Class.

336.   Establishment of a medical monitoring program for the Plaintiffs and the Class is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

337.   Accordingly, Plaintiffs and the Class are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs and the Class for conditions caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

338.   Plaintiffs and the Class have sustained and will continue to sustain damages to their property as a result of Defendants' actions.  As a result, Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Fifteenth Claims for Relief.  In particular, Plaintiffs and the Class seek damages, including but not limited to: (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

339.   Plaintiffs and the Class also seek consequential damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks of the contaminants, including but not limited to lead.

340.   Each and every one of these Plaintiffs and Class Members will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

## PUNITIVE DAMAGES

341.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Amended Complaint.

342.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

343.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

a. failure to provide safe drinking water to the residents of Flint;
b. failure to implement adequate corrosion controls for Flint River water;
c. underestimating the seriousness of the lead contamination in Flint's water system;
d. failure to warn Plaintiffs and the Class about the unsafe levels of lead in Flint's water system;
e. failure to act to limit exposure of the lead contamination in Flint's water system;
f. concealing the presence of lead in Flint's water supply or otherwise falsely assuring Plaintiffs and the Class that Flint's water was safe; and
g. making unlawful and misleading representations or material omissions with respect to the safety of Flint's water supply.

344.   Defendants have caused great harm to the property and water supplies of Plaintiffs and the Class and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## VI.   THE GOVERNMENTAL DEFENDANTS ARE NOT PROTECTED BY SOVERIGN IMMUNITY

345.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

### A.   Federal Claims

346.   This Amended Complaint brings no federal claims for damages against the State of Michigan or its agencies.

347.   With respect to employees and officers of the State of Michigan and its agencies, sued in their official capacities, this Amended Complaint seeks only prospective injunctive relief.

348.   No other Defendant is entitled to sovereign or governmental immunity from suit for the federal causes of action alleged in this Amended Complaint.

### B.   Michigan State Constitutional Claims

349.   The State of Michigan recognizes a cause of action for a de facto taking (sometimes referred to as an "inverse condemnation" suit).

350.   An action for inverse condemnation is brought under the Constitution of the State of Michigan.

351.   Under Michigan law, there exists no sovereign or governmental immunity from suit to enforce rights guaranteed by the Michigan Constitution. The State of Michigan, its agencies, political subdivisions, and their agencies are all subject to suit for an unconstitutional taking as alleged in this Amended Complaint.

### C.    Michigan State Tort Claims – Direct Liability of State and Local Entities

352.   With respect to each state law tort alleged in this Amended Complaint against the State of Michigan and MDEQ, these Defendants are not entitled to sovereign or governmental immunity from suit because the tortious acts complained of occurred outside the scope of each Defendant's governmental functions, as alleged specifically in each Count.  The actions complained of were neither expressly, nor impliedly, mandated or authorized by constitution, statute, local charter or ordinance, or other law.

353.   Moreover, with respect to each state law tort alleged in this Amended Complaint against the State of Michigan and MDEQ, and regardless of whether the tortious acts complained of constituted an exercise or discharge of a governmental function, these Defendants are not immune from suit or liability because the actions complained of occurred during the exercise of a proprietary function, in that the act was undertaken primarily for the purpose of producing a pecuniary profit for the relevant governmental agency.

113

**D.**     **Vicarious Liability of State and Local Entities**

354.   With respect to each state law tort alleged in this Amended Complaint against the State of Michigan and MDEQ, these entities are not immune from vicariously liability for the actions of their employees and officers under a theory of *respondeat superior*, because their employees and officers committed tortious acts during the course of their employment, within the scope of their authority, and in the exercise of nongovernmental and proprietary functions, as alleged specifically in each Count.

**E.**     **Liability of Individual Governmental Employees**

355.   With respect to each state non-intentional tort claim against the Individual Defendants, state and local employees sued in their individual capacities, each of these Defendants is not immune from liability because, as alleged specifically in each Count, (1) the Defendant did not act or reasonably believe he or she was acting within the scope of his or her authority; (2) the governmental agency at issue was not engaged in the exercise or discharge of a governmental function; and/or (3) the employee's grossly negligent conduct was the proximate cause of the injuries or damages alleged.

356.   With respect to each state intentional tort claim against the Individual Defendants, state and local employees sued in their individual capacities, each of these Defendants is not immune from liability because (1) the tort did not occur

114

during the course of the employee's employment; (2) the employee was not acting, nor reasonably believed he or she was acting, within the scope of his or her authority; (3) the act complained of was not undertaken in good faith; and/or (4) the act was ministerial rather than discretionary.

## VII.   <u>DEMAND FOR A JURY TRIAL</u>

357.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, this Amended Complaint is being plead in avoidance of governmental immunity and the Defendants' defense of governmental immunity is voidable due to the proprietary function and gross negligence exceptions as well as all other relevant exceptions and Plaintiffs and the Class demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

a.  an order declaring the conduct of defendants unconstitutional;

b.  an order of equitable relief to remediate the harm caused by Defendants unconstitutional conduct including repairs or property, establishment of a medical monitoring fund, and appointing a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the court;

c.  an award for general damages;

d.  an order for an award of compensatory damages;

e.  an order for an award of punitive damages;

115

f.  an order for an award of actual reasonable attorney fees and litigation expenses; and

g.  an order for all such other relief the court deems equitable.


Respectfully submitted,


Dated: September 12, 2016            **NAPOLI SHKOLNIK PLLC**

By:   /s/ Hunter Shkolnik
Hunter Shkolnik, ##2031458NY
Paul J.  Napoli, #2513141NY
360 Lexington Avenue, 11th Floor
New York, NY, 10017
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com


116