EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In Re* Flint Water Cases

No. 5:16-cv-10444

HON. JUDITH E. LEVY

MAG. MONA K. MAJZOUB

---

## SCHEDULE A TO SUBPOENA TO PRODUCE DOCUMENTS

To:   Environmental Protection Agency
      Scott Pruitt, Administrator
      Office of the Administrator 1101A
      1200 Pennsylvania Avenue, N.W.
      Washington, DC 20460

## ABBREVIATIONS

The following abbreviations are used herein:

1.   EPA means the United States Environmental Protection Agency, including its central office as well as all its regional offices.
2.   OECA means the EPA Office of Enforcement and Compliance Assurance.
3.   MDEQ means the Michigan Department of Environmental Quality.
4.   GCHD means the Genesee County (Michigan) Health Department.
5.   MDHHS means the Michigan Department of Health and Human Services.
6.   CDC means the United States Centers for Disease Control and Prevention.
7.   LCR means the Lead and Copper Rule, 40 CFR Part 141 Subpart I.
8.   All references to the City of Flint are to Flint, Michigan.
9.   SWTR means the Surface Water Treatment Rule, 40 CFR 141.17-141.175, and/or any equivalent state regulation.
10.  TCR means the Total Coliform Rule, 54 FR 27544-27568, and/or any equivalent state regulation.

11.     RTCR meansthe Revised Total Coliform Rule, 78 FR 10269, and/or any equivalent state regulation.

12.     DBPR (Stage 1) meansthe Stage 1 Disinfectants and Disinfection Byproducts Rule, 63 FR 69390, and/or any equivalent state regulation.

13.     DBPR (Stage 2) meansthe Stage 2 Disinfectants and Disinfection Byproducts Rule, 71 FR 388,and/or any equivalent state regulation.

## DEFINITIONS

1.     The term "document" or "documents" is used in the broadest sense permitted by the Federal Rules of Civil Procedure and means documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

2.     The term "communication" means each manner or means of disclosure, transmittal, or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, email (desktop or mobile device), text message, instant message, MMS or SMS message, regular mail, releases, or otherwise.

3.      "Relating to" as used herein means, directly or indirectly, referring to, reflecting, mentioning, describing, pertaining to, arising out of or in connection with the matter discussed.

4.     "Electronically Stored Information" shall mean the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by you into a reasonably usable form.  This includes, but is not limited to, electronic mail, instant messaging, videoconferencing, and other electronic correspondence (whether active, archived, or in a deleted items folder), word processing files, spreadsheets, databases, and video and sound recordings, whether stored on: cards; magnetic or electronic tapes; disks; computer hard drives, network shares or servers, or other drives; cloud-based platforms; cell phones, PDAs, computer tablets, or other mobile devices; or other storage media.

5.     The terms "all," "any," "each," or "every" mean all, any, each, and every.

6.     The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neutral genders.

3

7.     The terms "person" or "persons" mean natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units thereof.

8.     The term "employee" means agent, borrowed employee, casual employee, consultant, contractor, de facto employee, independent contractor, joint adventurer, loaned employee, part-time employee, permanent employee, provisional employee, subcontractor, or any other type of service provider.

9.     References to the 2016 Review of the MDEQ Drinking Water Program are to the Final Report dated October 24, 2017, of the Review of the Michigan Department of Environmental Quality Drinking Water Program 2016.

## INSTRUCTIONS

1.     In complying with this subpoena, EPA is required to produce all responsive documents and physical evidence that are in its possession, custody, or control, whether held by EPA or its agents, employees, or representatives.   EPA should also produce documents and physical evidence that it has a legal right to obtain or copy, as well as documents and physical evidence it has placed in the temporary possession, custody, or control of any other person.   Requested records,

documents, data, information, or physical evidence should not be destroyed, modified, removed, transferred or otherwise made inaccessible.

2.     In the event that any entity, organization or individual denoted in this subpoena has been, or is also known by, any other name than that herein denoted, the subpoena shall be read also to include that alternative identification.

3.     Electronically Stored Information is to be produced in native format.

4.     It is therequestors preference to receive documents in electronic form (i.e., CD, memory stick, or thumb drive) in lieu of paper productions.

5.     It is the requestors' preference that documents produced in electronic format be organized, identified, and indexed electronically.

6.     It is the requestors' preference that electronic document productions be prepared according to the standards set forth in the Document Production Protocol that has been accepted by the Court in this litigation.  The relevant portions of the Document Protocol that contain the technical specifications for electronic document productions are attached hereto as Attachment 1.

7.     It is the requestors' preference that documents produced include an index describing the contents of the production.  It is the requestors' preference that, to the extent more than one CD, hard drive, memory stick, thumb drive, box or folder is produced, each CD, hard drive, memory stick, thumb drive, box or folder contain an index describing its contents.

8.    Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when the subpoena was served.

9.    It is the requestors' preference that when EPA produces documents, it identify the paragraph or paragraphs in this Schedule A to which the documents respond.

10.   It is not a basis for refusal to produce documents that some other person or entity also possesses non-identical or identical copies of the same documents.

11.   Production of Physical Evidence:  If it is inconvenient for the EPA to produce requested items of physical evidence on the date and at the place specified in this subpoena, the requesters will be pleased to negotiate with the EPA for their production on one or more different reasonable dates, at one or more different reasonable locations, and subject to appropriate provisions to preserve the evidence without alterations that would be prejudicial to you or to parties to the Flint Water Cases.  Should you wish to discuss these matters, please contact one or more of the attorneys who have signed the subpoena.

12.   If EPA expects to be unable, despite its exercise of due diligence, to produce the documents and tangible things described in this Schedule A bythe production date specified in the subpoena, EPA should within 10 days after being

served with the subpoena contact one or more of the attorneys who signed the subpoena to discuss a reasonable enlargement of time for producing some or all of the requested documents and things.

13.    In the event that documents are withheld on the basis of privilege or the work product immunity, provide a privilege log no later than the date of compliance with the subpoena that, in accordance with Fed. R. Civ. P. 45(e)(2).  It is the requestors' preference that the privilege logcontain the following information concerning any such document: (a) the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author and addressee, including identification of the employment and title of each such person; (e) the relationship of the author and addressee to each other; and (e) the number of pages, attachments, and appendices.

14.    If a date or other descriptive detail set forth in this Schedule A referring to a document is inaccurate, but the actual date or other descriptive detail is known to EPA or is otherwise apparent from the description of the documentEPA is required to produce all documents which would be responsive as if the stated date or other descriptive detail were correct.

15.    Unless otherwise indicated, thedocuments described in this Schedule A are those created or dated between January 1, 2009 to the present.

16.    It is the requestors' preference that all documents be Bates-stamped sequentially and that the Bates-stamps' naming convention identify that the document was produced by the EPA.

## REQUESTED DOCUMENTS AND THINGS

1.    All documents and communicationsregarding or related to the alleged contamination of Flint's drinking water following decisions to switch Flint away from a contract with the Detroit Water and Sewerage Department to a newly-created water authority, and to rely during the transition on water drawn from the Flint Riverbetween officials or employees of EPA, including *without limitation*, Miguel Del Toral, Jennifer Crooks,Peter Grevatt, Michael Schock, Darren Lytle, Rita Bair, Nicholas Damato, Heather Shoven, Andrea Porter, Thomas Poy, Tinka Hyde, Robert Kaplan, Arthur A. Elkins, Jr.,  Anne Rowan, Jeff Kelley, Peter Cassell, Phillippa Cannon, Edward Moriarty, Janet Kuefler, Ronald Bergman, Cary McElhinney, Maria Lopez-Carbo, Jeffrey Kempic, Timothy Henry, Thomas Speth, Susan Hedman, Jeffrey Kelly, Joel Beauvais, Mark Pollins, Jonathan Pressman, Brian Kelly, Mark Rupp, Michael Wright, Peggy Donnelly, Nicholas Damato, Joseph Damato, and Timothy Donlan.

2.    All  e-mail and paper correspondenceregarding or related to the alleged contamination of Flint's drinking water following the decisions to switch Flint away from a contract with the Detroit Water and Sewerage Department to a newly-created water authority, and to rely during the transition on water drawn from the Flint River between officials or employees of EPA, including *without limitation*the EPA officials and employees identified in Request #1, and any of the following persons:

    a) Current and former City of Flint employees, including *without limitation* Howard Croft, Michael Glasgow, Daugherty Johnson and Dayne Walling;

    b) Current and former employees of the MDEQ, including *without limitation* James Sygo, Maggie Pallone,Liane Shekter-Smith, Patrick Cook, Stephen Busch, Adam Rosenthal, Michael Prysby, Daniel Wyant, Bradley Wurfel;

c) Current and former employees of the MDHHS, including *without limitation* Nick Lyon, Eden Wells, and Nancy Peeler. Dr. Eden Wells, Nick Lyon, MDHHS;

d) Current and former employees of Michigan Governor's Office, including *without limitation* Dennis Muchmore;

e) Professor Marc Edwards of Virginia Polytechnic Institute and State University, limited however to correspondence concerning Professor Edwards's activities or the activities of others related to alleged water contamination in the City of Flint or to his or others' activities related to Legionnaire's Disease or legionella in the City of Flint or elsewhere in Genesee County, Michigan;

f) Dr. Mona Hanna-Attisha of Hurley Medical Center in the City of Flint;

g) Residents of the City of Flint, Michigan, including *without limitation* Ms. Lee-Anne Walters and residents of 4526 Bryant Street, Flint, Michigan, 4614 Bryant Street, Flint, Michigan, 216 Browning Avenue, Flint, Michigan, and 631 Alvord Avenue, Flint, Michigan;

h) Any officer, employee, or representative of Lockwood, Andrews & Newnam, P.C., Lockwood, Andrews & Newnam, Inc., or Leo A. Daly Company, limited however to correspondence concerning the Flint River or the City of Flint municipal water system;

i) Any officer, employee, or representative of Veolia Water North America Operating Services, LLC, Veolia North America, LLC, Veolia North America, Inc., of Veolia Environnement, S.A., limited however to correspondence concerning the Flint River or the City of Flint municipal water system;

j) Any officer, employee or representative of Rowe Professional Services limited however, to correspondence concerning the Flint River or the City of Flint municipal water system;

k) Gerald Ambrose, formerly an Emergency Manager in the City of Flint;

l) Darnell Earley, formerly an Emergency Manager in the City of Flint;

m) Michael Brown, formerly an Emergency Manager in the City of Flint;

n) Ed Kurtz, formerly an Emergency Manager in the City of Flint; and

o) Any officer, employee or representative of the CDC.

3.   With respect to the Technical Advisory Committee convened by the City of Flint, and any meetings or proceedings thereof held on or about March 5, 2015, or at any other time, provide:

a) All memoranda, summaries, and reports prepared by EPA employees concerning, in whole or in part, such meetings or proceedings;

b) All notes, memoranda, and audio recordings prepared by EPA employees concerning, in whole or in part, events and discussions that occurred during such meetings or proceedings;

c) All agendas, reports, data, memoranda, summaries, and other documents that EPA employees who attended such meetings or proceedings received in preparation for, during, or otherwise in connection with the meetings.

d) All e-mails sent or received by EPA employees concerning such meetings or proceedings.

4.   All photographs, videotapes, and audio recordings that were taken, and all notes, memoranda, and sketches that were made by Miguel Del Toral, Jennifer Crooks, Rita Bair, or any other EPA employee or contractor during visits at any time to the home of the Flint resident referenced in the second paragraph of the section entitled Background Information of Miguel Del Toral's Final Report dated October 21, 2015, concerning high lead levels in the City of Flint.   [Prints or digital copies, not just black-and-white photocopies, of the photographs and videotapes should be provided.]

5.   All physical evidence, including *without limitation* environmental sampling, including but not limited to water samples and swab samples, pipe sections, valves, water filters, water filter cartridges, scale or debris from pipes or plumbing fixtures, and particles or other debris from water heaters, plumbing fixtures, pipes, filters, filter cartridges, or aerators, that was collected by Miguel Del Toral, Jennifer Crooks, Rita Bair, or any other EPA employee or contractor during visits at any time to the home of the Flint resident referenced in the second paragraph of the section entitled Background Information of Miguel Del Toral's Final Report dated October 21, 2015, concerning high lead levels in the City of Flint.

6.    All photographs, videotapes, and audio recordings that were taken, and all notes, memoranda, and sketches that were made by Miguel Del Toral, Jennifer Crooks, Rita Bair or any other EPA employee or contractor during visits at any time to the "two homes on Bryant Street" referenced in the first paragraph on page 5 of 25 of Miguel Del Toral's Final Report dated October 21, 2015, concerning high lead levels in the City of Flint. [Prints or digital copies, not just black-and-white photocopies, of the photographs and videotapes should be provided.]

7.    All physical evidence, including *without limitation* environmental sampling, including but not limited water samples and swab samples, pipe sections, valves, water filters, water filter cartridges, scale or debris from pipes or plumbing fixtures, and particles or other debris from water heaters, plumbing fixtures, pipes, filters, filter cartridges, or aerators, that was collected by Miguel Del Toral, Jennifer Crooks, Rita Bair or any other EPA employee or contractor during visits at any time to the "two homes on Bryant Street" referenced in the first paragraph on page 5 of 25 of Miguel Del Toral's Final Report dated October 21, 2015, concerning high lead levels in the City of Flint.

8.    All photographs, videotapes, and audio recordings that were taken, and all notes, memoranda, and sketches that were made by Miguel Del Toral, Jennifer Crooks, or any other EPA employee or contractor during visits to the City of Flint at any time between April 1, 2014, and December 31, 2016, for the purpose of evaluating possible contamination of or regulatory non-compliance of the City of Flint municipal water supply. [Prints or digital copies, not just black-and-white photocopies, of the photographs and videotapes should be provided.]

9.    All physical evidence, including *without limitation* environmental sampling, including but not limited to water samples and swab samples, pipe sections, valves, water filters, water filter cartridges, scale or debris from pipes or plumbing fixtures, and particles or other debris from water heaters, plumbing fixtures, pipes, filters, filter cartridges, or aerators, that was collected by Miguel Del Toral, Jennifer Crooks, or any other EPA employee or contractor during visits they made to the City of Flint for the purpose of evaluating possible contamination of or regulatory non-compliance of the City of Flint municipal water supply.

10.   All recordings, notes, summaries, and transcripts of the March 19, 2015 telephone conversation between EPA and a resident of the City of Flint that

11

is referenced in the paragraph that begins at the bottom of the first page of Miguel Del Toral's Final Report dated October 21, 2015, concerning high lead levels in the City of Flint.

11.   With respect to Miguel Del Toral's June 24, 2015, Memorandum on the subject of "High Lead Levels in Flint, Michigan -- Interim Report", provide:

a)   The medical reports referenced in the second-to-last paragraph on page 3 of 5 of the Memorandum;

b)   The reports of the blood lead level testing referenced in ¶¶2.a., 14.a., and 21.a. of the Timeline of Events that was attached to the Memorandum;

c)   The "instructions provided by the City of Flint to residents" referenced at the end of the third full paragraph on page 2 of 5 of the Memorandum;

d)   The MDEQ lead compliance sampling guidance to which reference is made near the end of the last full paragraph on page 2 of 5 of the Memorandum;

e)   All paper and electronic communications generated before January 1, 2016, in which (as stated in the last full paragraph on page 2 of 5 of the Memorandum)EPA raised with MDEQ EPA's concerns "regarding the inclusion of 'pre-flushing' in sampling instructions used by the public water systems in Michigan";

f)   All paper and electronic communications generated before January 1, 2016, in which (as stated in the last full paragraph on page 2 of 5 of the Memorandum)MDEQ indicated to EPA that it was continuing to include a "pre-flushing"recommendation in its lead compliance sampling guidance;

g)   The U.S. EPA memorandum signed on December 23, 2004, to which reference is made in numbered ¶3 on page 5 of 5 of the Memorandum;

h)   All reports and memoranda generated in the course of any "review of the compliance status of the City of Flint" conducted by EPA as recommended in the first sentence of numbered ¶2 on page 5 of 5 of the Memorandum;

i)   All reports and memoranda generated in the course of any review by EPA of "whether relevant resident-requested samples are being included

12

by the City of Flint in calculating the 90th percentile compliance value for lead" as recommended in the first sentence of numbered ¶3 on page 5 of 5 of the memorandum;

j) Any video referenced in ¶10.a. of the Timeline of Events that was attached to the Memorandum; and

k) The voicemail referenced in the first sentence of ¶19.a. of the Timeline of Events that was attached to the Memorandum.

12. With respect to Report No. 17-P-0004, "Management Alert: Drinking Water Contamination in Flint Michigan,Demonstratesa Need to Clarify EPA Authority to Issue Emergency Orders to Protect the Public," issued on or about October 20, 2016 by the EPA Office of Inspector General, provide:

a) All notes, memoranda, reports, summaries, transcripts, and recordings of the interviews of "staff and officials in EPA Region 5" to which reference is made in the section entitled "Scope and Methodology" of Report No. 17-P-0004;

b) All notes, memoranda, reports, summaries, transcripts, and recordings of the interviews of "staff from the Michigan Department of Environmental Quality (MDEQ), former and current employees of the city of Flint, and Flint residents" to which reference is made in the section entitled "Scope and Methodology" of Report No. 17-P-0004;

c) The criteria documents to which reference is made in the section entitled "Scope and Methodology" of Report No. 17-P-0004;

d) The "many documented complaints from Flint residents" to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review"in Report No. 17-P-0004;

e) All data, notes, memoranda, studies, reports, and sources of the "additional data in August and September 2015," that "demonstrated lead contamination was widespread, and also demonstrated an increase in the blood lead levels of children living in Flint," to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

13

f) All notes, memoranda, reports, and summaries of, and all e-mail communications reflecting, EPA's discussion of "the issue with the state" or EPA's offer to the state of "technical assistance" to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

g) All notes, memoranda, reports, minutes, and summaries of, and all e-mail communications reflecting, EPA Region 5's formal briefing of OECA to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

h) All notes, memoranda, reports, minutes, correspondence, emails, studies, any and all documentary sources of the conclusions communicated by Region 5 to OECA that emergency action could not be taken "on the basis that the ongoing state actions constituted a jurisdictional bar," to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

i) All paper and electronic correspondence and memoranda between employees in EPA's OECA and employees at EPA Region 5 concerning OECA's recommendation, which is referenced in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

j) All notes, memoranda, reports, minutes, and summaries of, and all e-mail communications reflecting, the continued discussion between OECA and EPA Region 5 leadership "as these events unfolded" to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004;

k) All notes, memoranda, reports, minutes, and summaries of, and all e-mail communications upon which EPA Region 5 leadership relied in

determining "that the state was acting," in their communications to OECA as the reason for not initiating SDWA 1431 action, to which reference is made in the subpart entitled "EPA Region 5 Had Sufficient Information and the Authority to Issue an Emergency Order in June 2015, but Did Not" of the section entitled "Results and Review" in Report No. 17-P-0004.

13. All primacy agreements between EPA and the State of Michigan related to enforcement of the federal Safe Drinking Water Act or of standards and regulations issued pursuant to that statute.

14. All National Pollutant Discharge Elimination System data in EPA's possession, custody, or control related to water distributed through the City of Flint's municipal water distribution system since January 1, 2013.

15. All data in EPA's possession, custody, or control generated since January 1, 1992, by LCR testing of drinking water in the City of Flint.

16. All documents, communications, notes, memoranda, reports, and correspondence concerning the invalidation of LCR compliance samples collected from residences in the City of Flint since 1992.

17. All Freedom of Information Act requests related to contamination of water, air, or soil in the City of Flint that EPA has received since January 1, 2014.

18. All formal notices issued by EPA to the City of Flint or MDEQ of violations by the City of Flint of any provisions of the Lead and Copper Rule.

19. All noncompliance letters issued by EPA to the City of Flint or to MDEQ with respect to any violations by either of them of provisions of the federal Safe Drinking Water Act.

20. All complaints and reports of complaints received by EPA before April 25, 2014, concerning water in the City of Flint.

21. All paper and electronic communications, between EPA and MDEQ generated before April 25, 2014, concerning the City of Flint's intended switch to the Flint River as the source for its municipal water supply.

22. All paper and electronic communications, between EPA and MDEQ generated before April 25, 2014, concerning upgrades or proposed upgrades to the City of Flint Water Treatment Plant.

23. All paper and electronic communications, between EPA and MDEQ concerning corrosion control measures instituted, or to be instituted, or recommended to be instituted, at the City of Flint Water Treatment Plant.

24. All paper and electronic communications, between EPA and Virginia Polytechnic Institute and State University's Professor Marc Edwards, or persons working with him, concerning research and investigations conducted by Professor Edwards and his team in the City of Flint on or after April 25, 2014.

25. All photographs and videotapes provided to EPA by Virginia Polytechnic Institute and State University's Professor Marc Edwards, or persons working with him, concerning research and investigations conducted by Professor Edwards and his team in the City of Flint on or after April 25, 2014. [Prints or digital copies, not just black-and-white photocopies, of the photographs and videotapes should be provided.]

26. All physical evidence provided to EPA by Virginia Polytechnic Institute and State University's Professor Marc Edwards, or persons working with him, concerning research and investigations conducted by Professor Edwards and his team in the City of Flint on or after April 25, 2014.

27. All data, analyses, reports of interviews, and test results provided to EPA by Virginia Polytechnic Institute and State University's Professor Marc Edwards, or persons working with him, concerning research and investigations conducted by Professor Edwards and his team in the City of Flint on or after April 25, 2014.

28. All memoranda, minutes, and summaries of meetings between EPA and Virginia Polytechnic Institute and State University's Professor Marc Edwards, or persons working with him, concerning contamination of the municipal water supply in the City of Flint.

29. Documents sufficient to identify all toxic waste sites within the City of Flint known to EPA to be contaminated, at least in part, with lead.

30. All reports received by EPA between January 1, 1992, and January 1, 2017, from the City of Flint or from MDEQ concerning site selection plans for LCR testing in the City of Flint.

31.   All reports and memoranda prepared by EPA between January 1, 1992, and January 1, 2017, concerning site selection plans for LCR testing in the City of Flint.

32.   All notices, orders, and other documents issued by EPA to MDEQ or to the City of Flint between January 1, 1992, and January 1, 2017, approving or disapproving site selection plans for LCR testing in the City of Flint.

33.   All notices, orders, and other documents issued by EPA to MDEQ or to the City of Flint between January 1, 1992, and January 1, 2017, requesting or requiring amendments to site selection plans for LCR testing in the City of Flint.

34.   With respect to EPA's Review of the Michigan Department of Environmental Quality Drinking Water Program 2016, Final Report, dated October 24, 2017, provide:

    a) All documents collected by EPA or its contractors from MDEQ in connection with its File Review that is referenced in and under the heading "Chapter 1: Drinking Water Program File Review (FR)" at numbered page 2 of the Report;

    b) All recordings, notes, memoranda, and summaries of interviews of MDEQ staff that are referenced in the first two lines on page 3 of the Report;

    c) All notes, memoranda, summaries, and data, prepared by EPA employees or contractors in connection with their work on the Report;

    d) All drafts of the report that waspublished as the Review of the Michigan Department of Environmental Quality Drinking Water Program 2016, Final Report, dated October 24, 2017;

    e) All comments that EPA received from MDEQ employees or other State of Michigan officers or employees with respect to drafts of the report that was published as the Review of the Michigan Department of Environmental Quality Drinking Water Program 2016, Final Report, dated October 24, 2017;

    f) All correspondence, documents and data supplied by MDEQ to EPA after April 8, 2016, for EPA's use in completing the Review.

35. All documents,correspondence, reports, memoranda, drafts and communications relating to public notification, public pronouncements, press releases, testimony, or interviews pertaining to water quality concerns with City of Flint drinking water, to City of Flint compliance with the LCR, or to cases of known or suspected Legionnaire's Disease or legionella in the City of Flint and elsewhere in Genesee County, Michigan, since January 1, 2013.

36. All documents, correspondence, reports, memoranda, drafts and communications related to requests for funding by EPA to the United States Congress pertaining to water quality concerns with City of Flint drinking water, to City of Flint compliance with the LCR, or to cases of suspected or confirmed Legionnaire's Disease or legionella in the City of Flint or elsewhere in Genesee County, Michigan, since January 1, 2013.

37. All documents, memoranda, reports, and communications authored by or on behalf of EPA or its contractors relating to study, analysis, or investigations of reports of lead in the City of Flint's municipal water supply, or reports of illness or injury allegedly caused by lead exposure in the City of Flint, or of alleged misapplication of the LCR in the City of Flint, or of cases of suspected or confirmed cases of Legionnaire's Disease or legionella in the City of Flint or elsewhere in Genesee County, Michigan, since January 1, 2013.

38. All written testimony and transcribed or recorded oral testimony by EPA employees or by others acting on behalf of EPA relating to study, analysis, or investigations of reports of lead in the City of Flint's municipal water supply, or reports of illness or injury allegedly caused by lead exposure in the City of Flint, or of alleged misapplication of the LCR in the City of Flint, or of cases of suspected or confirmed cases of Legionnaire's Disease in the City of Flint or elsewhere in Genesee County, Michigan, since January 1, 2013.

39. All reports, analysis, and data generated in connection with analysis or testing of paint chips, paint dust, or paint samples collected from residences in the City of Flint since January 1, 2009.

40. All data and reports regarding equipment calibration generated in connection with analysis or testing of paint chips, paint dust, or paint samples collected from residences in the City of Flint since January 1, 2009.

18

41.  All reports, analysis, and data generated in connection with analysis or testing of soil samples collected in the City of Flint since January 1, 2009, limited, however, to analysis and testing of types that would detect lead.

42.  All data and reports regarding equipment calibration generated in connection with analysis or testing of soil samples in the City of Flint since January 1, 2009, limited, however, to analysis and testing of types that would detect lead.

43.  All reports, analysis, and data generated in connection with analysis or testing of water collected from residences, businesses, schools, hospitals, government buildings, and other institutions in the City of Flint.

44.  All data and reports regarding equipment calibration data and reports generated in connection with analysis or testing of water collected from residences, businesses, schools, hospitals, government buildings, and other institutions in the City of Flint.

45.  All documents and communications collected by or for EPA or its contractors concerning water quality or the application of the LCR in the City of Flint.

46.  The complete contents of all files kept by EPA concerning lead paint assessments, lead-in-soil investigations and assessments, and lead-in-dust investigations and assessments concerning residential properties, playgrounds, schools, parks, and churches in the City of Flint.

47.  All reports, field notes, and data generated in connection with work by EPA employees or contractors related to study, analysis, or investigation of lead levels in the City of Flint's municipal water supply, claims of illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires'Disease in Genesee County, Michigan (including the City of Flint).

48.  The complete contents of all files generated or maintained by EPA related to study, analysis, or investigation of lead levels in the City of Flint's municipal water supply, claims of illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires' Disease in Genesee County, Michigan (including the City of Flint).

49.    All photographs and videotapes taken or obtained by or for EPA related to study, analysis, or investigation of lead levels in the City of Flint's municipal water supply, claims of illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires' Disease in Genesee County, Michigan (including the City of Flint).

50.    All samples collected by or for EPA from water pipes, plumbing fixtures, water filters, aerators, water heaters, and water fountains in connectionwith studies, analyses, or investigations of lead levels in the City of Flint's municipal water supply,claimsof illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires' Disease in Genesee County, Michigan (including the City of Flint).

51.    All environmental sampling, including but not limited to water samplesand swab samples, collected or received by or for EPA in connection with studies, analyses, or investigations of lead levels in the City of Flint's municipal water supply, claims of illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires' Disease in Genesee County, Michigan (including the City of Flint).

52.    All reports, field notes, and data generated in connection with work by EPA or its contractors in connection with study, analysis, or investigation of reports of lead in the City of Flint municipal water supply, claims of illness or injury allegedly caused by ingestion of or other exposures to City of Flint municipal water, application of the LCR to the City of Flint, all cases of suspected or confirmed Legionnaires' Disease in Genesee County, Michigan (including the City of Flint).

53.    All paper and electronic communications, between EPA employees and Brent Wright, Richard Benzie, or YannaLambrinidou concerning the City of Flint municipal water supply.

54.    All notes, memoranda, or audio recordings prepared by EPA employees related to the July 21, 2015 conference call with MDEQ officials regarding MDEQ guidance and the City of Flint's implementation of the LCR.

55.  All PowerPoints, handouts, white papers, and presentations prepared by or for EPA employees concerning the City of Flint's municipal water supply.

56.  Full and complete copies of all e-mails, text messages, memoranda and other communications sent or received on or after January 1, 2013, by or between officials or employees of EPA concerning or related to Flint's drinking water, including but not limited to the source of Flint's drinking water, Flint's Water Treatment Plant, and/or investigations related to Flint's drinking water.

57.  All documents and communications relating to alleged contamination of the City of Flint municipal water supply provided by the EPA to, or received by EPA from, the following:

    a)  The Flint Water Advisory Task Force;

    b)  The Michigan Governor's Office;

    c)  The Office of the Michigan Attorney General;

    d)  The U.S. Office of Inspector General;

    e)  The Michigan's Joint Select Committee on the Flint Water Emergency;

    f)  The Michigan Department of Health and Human Services;

    g)  The Michigan Department of Environmental Quality;

    h)  The City of Flint Public Works Department;

    i)  The City of Flint Water Treatment Plant;

    j)  Any Committee or Sub-Committee of the United States Congress, including, but not limited to, The U.S. House Committee on Oversight and Government Reform;

    k)  MonaHanna-Attisha, MD;

    l)  Michigan Special Prosecutor Todd Flood.

58.  All documents, memoranda, notes, emails, text messages, reports, and communications authored by any employees, agents, and or contractors of the U.S. Center for Disease Control(CDC) and in the custody, possession, and/or control of and employees, agents, and/or employees of the EPA

referencing and/or reporting conversations, discussions with, and/or disclosures by, April Cook-Hawkins during 2015 and 2016 concerning blood lead levels of children in Flint after April 25, 2014.

59.   All documents, memoranda, notes, emails, text messages, reports, and communications authored by or on behalf of EPA or its contractors, including but not limited to Rita Bair, Tinka Hyde, Tom Poy, Jennifer Crooks, Debbie Baltazar, Heather Shoven, Andrea Porter, Nicholas Damato, and/or Robert Kaplan relating to Miguel Del Toral's fitness for performing the duties of his job, including but not limited to performance reviews, evaluations, or email communications.

60.   All documents and communications, including paper and electronic communications, associated with meetings Jennifer Crooks and any other EPA representative/employee had with the FBI related to allegedcontamination of the City of Flint municipal water supply.

61.   All documents and communications, including paper and electronic communications, related to meetings Jennifer Crooks and any other EPA representative/employee had with the U.S. Attorneys Office related to alleged contamination of the City of Flint municipal water supply.

62.   All documents and communications, including paper and electronic communications, related to meetings Jennifer Crooks and any other EPA representative/employee had with the EPA Inspector General related to alleged contamination of the City of Flint municipal water supply.

63.   All documents and communications, including paper and electronic communications, related to citizen complaints/inquiries/requests received by Jennifer Crooks regarding Flint water at any time from April 25, 2014 to December 30, 2016, including responses thereto.

64.   A copy of the databased intake sheet created in 2017 to record citizen complaints/inquiries/requests and maintained by Jennifer Crooks.

65.   All documents and communications, including paper and electronic communications, related to responses provided by Information Specialist(s) hired by the EPA to respond to citizen complaints/inquires/requests about the Flint water.

66.   The file folders from 2014, 2015 and 2016 that Jennifer Crooks maintained which included all citizen complaints/inquiries/requests that she received

22

during thoseyears regarding drinking water issues.   These documents include, but are not limited to, all handwritten notes made by Jennifer Crooks related to the complaint/inquiries/requests.

67.   All notes, documents and communications, including paper and electronic communications, between the EPA and the MDEQ and/or any individuals who were employed or associated with same related to the Flint Water Treatment Plant's readiness to distribute water in 2014, including but not limited to, any documents or communications related to any   loop test performed on the Plant at any time from 2013 to 2016.

68.   All notes, documents and communications, including paper and electronic communications, associated with the training and licensing of Flint Water Treatment Plant employees and operators who were employed or assigned to work on the Flint Water Treatment Plant from 2014 to 2016.

69.   All document and communications relating to or regarding the November 3, 2016 memorandum from Peter C. Grevatt, Director of the EPA's Office of Ground Water and Drinking Water to EPA Regional Water Division Directors, Regions I-X, the subject of which is "Lead and Copper Rule Requirements for Optimal Corrosion Control Treatment for Large Drinking Water Systems."

70.   All documents and communications regarding or related to environmental sampling forLegionella conducted in Genesee County, MI, by or on behalf of the EPA, during the period ofApril 1, 2014 through December 31, 2016, including but not limited to sampling protocols orguidelines and chain of custody documentation.

71.   All documents and communications regarding or related to the laboratory analysis ofenvironmental samples for Legionella conducted by or on behalf of the EPA, including but notlimited to laboratory policies and procedures relating to Legionella, testing protocols orprocedures relating to Legionella, analytical protocols or procedures relating to Legionella, andreports or other records reflecting the results of any such laboratory analysis.

72.   All documents and communications regarding or related to Boil Water Advisories issued in theCity of Flint during the period of April 1, 2014 to December 31, 2016.

73.   All documents and communications regarding or related to corrective actions taken by or onbehalf of the City of Flint in response to Boil Water

23

Advisories issued during the period of April1, 2014 to December 31, 2016, including but not limited to modifications of water treatment protocols at the Flint Water Treatment Plant.

74. All documents regarding related to actual or suspected violations by the City of Flint of the Total Coliform Rule during the period of April 1, 2014 to December 31, 2016.

75. All documents regarding or related to actual or suspected violations by the City of Flint of theSWTR during the period of April 1, 2014 to December 31, 2016.

76. All documents regarding or related to actual or suspected violations by the City of Flint of the TCR and/or RTCR during the period of April 1, 2014 to December 31, 2016.

77. All documents regarding or related to actual or suspected violations by the City of Flint of the DBPR (Stage 1) and/or DBPR (Stage 2).

78. All documents and communications regarding or related to the EPA's investigation, study or analysis of the levels of disinfectant (chlorine) residual in the City of Flint municipal water supply during the period of April 1, 2014 to December 31, 2016, including *without limitation*, reports, data, data compilations, diagrams, maps, sampling protocols, and sampling chain of custody forms.

79. All documents and communications regarding or related to the increased incidence of Legionnaires' disease in Genesee County, Michigan (including the City of Flint) during the period of April 2014 to October 2015.

80. All documents and communications regarding or related to the EPA's investigation, study or analysis of the relationship between the increased incidence of Legionnaires' disease in Genesee County, Michigan in 2014 and 2015 and the City of Flint's municipal water supply.

81. All documents and communications related to the requests in paragraphs 4, 6, 8, 10, 11(i), 21-24, 35-36, and 53.

82. All hard copy and electronic communications between the EPA and lawyers (or employees of such lawyers) representing parties to lawsuits arising out of the alleged contamination of the City of Flint municipal water supply, including *without limitation:*

24

a.   Napoli Shkolnik, PLLC,
b.   Levy Konigsberg, LLP,
c.   Cohen Milstein Sellers & Toll PLLC,
d.   Pitt McGehee Palmer & Rivers, P.C.,
e.   Weitz & Luxenberg, P.C.,
f.   Susman Godfrey, LLP,
g.   Bronstein Gewirtz & Grossman, LLC,
h.   Berezofsky Law Group, LLC,
i.   McKeen & Associates, PC,
j.   Goodman and Hurwitz, P.C.,
k.   McAlpine, P.C.,
l.   1-800-LAW-FIRM,
m.   Katz & Kern, LLP,
n.   Bern Ripka LLP,
o.   EXCOLO LAW, PLLC,
p.   Barris, Sott, Denn & Driker, P.L.L.C.,
q.   Michigan Department of Attorney General,
r.   Clark Hill PLC,
s.   Fraser Trebilcock,
t.   Foster, Swift, Collins & Smith, P.C.,
u.   Burdick Law, P.C.,
v.   Kotz Sangster Wysocki P.C.,
w.   City of Flint Law Dept.,
x.   Barry A. Wolf, Attorney at Law, PLLC
y.   White Law PLLC,
z.   O'Neill, Wallace & Doyle, P.C.,
aa.   Law Office of Edwar A. Zeineh, PLLC,
bb.   Butzel Long,
cc.   Bush, Seyferth& Paige, PLLC,
dd.   Campbell Campbell Edwards & Conroy PC,
ee.   Drinker Biddle Reath LLP,
ff.   Plunkett Cooney, PC,
gg.   Michael S. Cafferty & Assoc.
hh.   Sullivan, Ward, Asher & Patton, PC,
ii.   Foley & Mansfield, PLLP,
jj.   McGraw Morris P.C.,
kk.   Mayer Brown, and
ll.   Goldberg Segalla LLP and Cline, Cline & Griffin, PC,
mm.   Fieger Law.

## IV.   TECHNICAL SPECIFICATIONS

### A.   Image Files

All Documents are to be produced as black and white images, unless otherwise addressed herein.

Black and white images are to be produced as Group IV, black and white  single page TIFF images with the file extension, .TIFF.

To the extent a Party requests that any ESI be produced in color, as opposed to black and white, the Parties shall meet and confer as to whether reproduction in color is necessary and appropriate.

Each image file is to be named with its corresponding production bates number.

### B.   Image File Formats

Microsoft Word documents will be imaged showing track changes and comments.

Microsoft PowerPoint files will be imaged showing notes in Notes Pages.

### C.   Native Files

When producing Documents in Native Format, the files are to be named with the bates number assigned to the Document and the confidentiality legend, if applicable.  For Example: Bates123456 – Confidential.XLSX

For each Native Format file produced, a TIFF image placeholder should be included.  The placeholder is to state, "This document has been produced in native format" and it should be endorsed with the confidentiality legend, if applicable, and bates number.

A text file must be provided for each native file. If extracted text is not available, the text file should include a machine generated OCR.

Both the image and text file must be named with the bates number.

Documents that cannot be accurately TIFF-imaged must be produced in their Native Formats, unless otherwise agreed to between the Parties, or as required by this Order. Such files include video and audio recording and database files.

All spreadsheets should be produced in their Native Format, except those that require redaction (the requirements of which are detailed below).

The Parties agree to work out a future protocol governing the use and format of Documents produced pursuant to this paragraph at trial, depositions, and hearings.

**D.   Hard Copy Paper Documents**

Hard copy paper documents shall be produced as images files, and, to the extent reasonably practicable, produced in the manner in which those documents were kept in the ordinary course of business. Where hard copy paper documents have "post-it notes," tabs, or other labels, such information shall be produced to the extent reasonably practicable. The Producing Party will utilize reasonable best efforts to ensure that hard copy paper documents are produced in a manner that maintains the physical unitization of documents.

**E.   Proprietary Files**

To the extent that Documents produced cannot be rendered or viewed without the use of proprietary third-party software, the Parties shall meet and confer to minimize any expense or burden associated with the production of such Documents in a reasonably usable format, including issues as may arise

with respect to obtaining access to any such software and operating manuals which are the property of a third-party.

F.    **Extracted Text/OCR**

Each produced Document will have a single text file, named for the production bates number. The text files will delivered as multi-page ASCII. The location the text file for a document will be captured in the TextFileLink field.

For native files, extracted text is to be produced.

For any redacted Documents, a machine generated OCR text file from the redacted image is it to be provided, except that information which is redacted.

For any hard copy paper documents, a machine generated OCR text file is it to be provided.

G.    **Metadata**

Metadata fields associated with all Documents will be produced, as set forth below, except for Documents that do not include metadata, or the metadata is not machine extractable. For Redacted Documents, metadata fields must be produced, except those that disclose redacted information

Metadata should be provided in a .DAT file. The first line of the load file must include the field names. Each subsequent line will contain the fielded information for the Document. All .DAT files produced in this Litigation should contain the same fields in a consistent order.

This Order shall not be construed to affect whether information contained in the metadata produced shall be admissible evidence about the corresponding Document; rather, the Parties' positions with regard to admissibility shall be preserved.

## H.   Load File Specifications – Delimiters

The .DAT file will use the following delimiters for all Documents produced:

| Delimiter | Character | Function | ASCII Code |
|-----------|-----------|----------|------------|
| þ | Default | The field delimiter separates the load file columns | 254 |
| "\|" | Pipe | The text qualifier. Marks the beginning and end of each load file field. | 124 |
| ® | Newline | The delimiter that marks the end of a line of extracted or long text. Concordance replaces all carriage returns or carriage return linefeed combinations with the newline code. | 174 |

Sample Concordance (.DAT) load file:
þProdBegBatesþþProdEndBatesþþProdBegAttachþþPr
odEndAttachþ
þGP0000001þþGP0000002þþþþ
þGP0000003þþGP0000057þþþþ

## I.   Load File Specifications – Production Fields

The following fields will be provided for all Documents produced.

| Field Name | Description | Applies To |
|---|---|---|
| ProdBegBates | Beginning bates number of all produced document | All Documents |
| ProdEndBates | Ending bates number of all produced documents | All Documents |
| ProdBegAttach | Beginning attachment number | All Documents |
| ProdEndAttach | Ending attachment number | All Documents |
| Confidential | Confidentiality designation | All Documents |
| NativeFileLink | Production path to native file | All Documents |
| TextFileLink | Production path to extracted text or OCR file | All Documents |

**J.     Load File Specifications – Metadata Fields**

A Producing Party shall produce the following metadata fields for Documents, all Microsoft Word documents ("EDOC") and/or all email ("Email"), to the extent the information is available, as specified below:

| Field Name | Description | Applies To |
|---|---|---|
| Author | Native file author | EDOC |
| File Name | Name of the application file | EDOC |
| DateCreated | Date file was created | EDOC |
| TimeCreated | Time file was created | EDOC |
| DateMod | Date file was last modified | EDOC |

| Field Name | Description | Applies To |
|---|---|---|
| TimeLastMod | Time file was modified | EDOC |
| To | Recipient(s) | Email |
| From | Sender | Email |
| CC | Carbon copy recipient(s) | Email |
| BCC | Blind carbon copy recipient(s) | Email |
| Subject | Subject line of the email | Email |
| Date Sent | Email sent date | Email |
| TimeSent | Email sent time | Email |
| Date Rec | Email received date | Email |
| TimeRcvd | Email received time | Email |
| Custodian | Individual in possession of the document or Mailbox. | All Documents |
| Other Custodian or dup custodian | ***In the event cross custodian de-duplication is employed | All Documents |
| Source | Physical location, computer or server from which the data was collected | All Documents |
| DocType | Type of file (Word, Excel, email, etc) | All Documents |
| DocExt | File extension of document | All Documents |
| Native File Size | Size of file in bytes | All Documents |
| Hash Value | MD5 Hash Value | All Documents |
| Confidentiality Designation | | All Documents |

| Field Name | Description | Applies To |
|---|---|---|
| Redacted | | All Documents |
| Withheld | Identifies any Family Member of a Document that is omitted from production | All Documents |
| Email Folder Path | | All Documents |
| Page Count | | All Documents |
| Conversation Index | | All Documents |

## K.  Deduplication

ESI will be deduplicated globally following industry-standard global deduplication algorithms.  An acceptable method, such as the MD5 hash format, shall be used for any deduplication. Additional custodians who had a copy prior to deduplication, such as email recipients, copyees, or blind copyees, will be populated in the "DupCustodia" or "Other Custodian" metadata fields.

## L.  Document Families

Whenever a Document is produced, the entire corresponding family of Documents (i.e. parent and all children, the "Document Family," and individually a "Family Member") will be also produced.   If a Family Member is withheld for any reason, then that Document should be replaced by a placeholder identifying that it has been withheld. Document Families will be produced with a continuous bates range.  The Parties agree to meet and confer regarding any challenges to documents that are withheld from a document family as non-responsive.

Withholding non-responsive attachments cannot be used as a basis to challenge the completeness of a document for evidentiary purposes under FRE 106.

## M.   Email Threading

For emails, in addition to de-duplication, email threading may be utilized. Threading allows emails that are wholly contained in a later, surviving email, with all of the recipients and attachments contained, to be identified and suppressed from production.  An email is only suppressed from production if 100% of the message body is contained, all addresses are included, and all attachments are included in a later email that is produced.

## N.   Voicemails, Text Messages and Smart Phone ESI

For production of these forms of ESI, the Parties shall meet and confer regarding the scope of said production and the applicable custodians for whom an obligation to search and produce exists. Production requests for these forms of ESI shall identify the custodian, search terms, and timeframe. Indiscriminate terms, such as the Party's name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.  The Parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe.

## O.   Redactions and Logs

A Producing Party shall disclose and describe the basis for every redaction in a Redacted Document.

The basis for all redactions shall be specified in the appropriate metadata field that corresponds to the Redacted Document.

In addition, for each redaction, a Producing Party must also: (a) include a text box describing the basis for the redaction

("Text Box Redactions") on the Redacted Document; or (b) produce a corresponding log that identifies and describes the basis for the redaction.

If a Party opts to utilize Text Box Redactions, the redactions on images shall be made with white boxes with black borders, and shall contain black text that describes the basis for the redaction, for example, "Attorney-Client Privilege," "Work Product Privilege," "PPI" (Protected Personal Information), "PHI" (Protected Health Information, or "NRI" (Non-Responsive Information). If a Party has more than one basis for a redaction, then the Text Box Redaction need only identify one basis, but all basis must be identified in the metadata.

Where some or all of the e-mail string is privileged, the Parties need only include one entry on the privilege log for the entire e-mail string and need not log each e-mail contained in the chain separately.

Documents that are to be produced in Native Format, but that require redactions, may be produced as TIFF images (as to spreadsheets, imaged unhiding hidden cells, rows, columns, or sheets),  with extracted text, with the relevant portions redacted, or in Native Format using a commercially available "native redaction" tool, or by producing a copy of the Native Format file with the relevant portions replaced with the mark "[REDACTED]"or a similar mark.  If modification of a Native Format file is required for redaction purposes, metadata information associated with that file should remain unchanged unless it also requires redaction.

## P.   De-Nisting of ESI

The Parties may remove operating system files and program files with the assistance of their respective information technology vendors or agents prior to conducting searches of data in accordance with the National Software Reference Library De-Nisting Process.

**Q.    Replacement Images**

In the event that an already produced Document or set of Documents has to be re-produced or a new load file or "overlay" is produced for any production, the new production shall always maintain the same bates number for any re-produced Documents, with the addition of the suffix "-R" at the end of the bates number.

**R.    Production of Databases and Other Structured Data**

Generally, databases should be produced in a mutually agreeable data exchange format, which may include production of reports generated from database rather than producing the entire database. To determine the data that is relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

    i.      Database Name
    ii.     Type of Database
    iii.    Software Platform
    iv.    Software Version
    v.      Business Purpose
    vi.     Users
    vii.    Size in Records
    viii.   Size in Gigabytes
    ix.     A List of Standard Reports
    x.      Database Owner or Administrator's Name

Upon review of the list, the Parties agree to meet and confer regarding the data to be produced from each source, if any, and the form(s) of the production thereof.