# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Carthan v. Snyder*
Case No. 16-cv-10444

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART BUSCH, COOK, PRYSBY, ROSENTHAL, SHEKTER-SMITH, AMBROSE, CROFT, EARLEY, FLINT, GLASGOW, JOHNSON, WALLING, WRIGHT, DILLON, LYON, MDHHS, GOVERNOR SNYDER, THE STATE OF MICHIGAN, AND WURFEL'S MOTIONS TO DISMISS [273, 276, 277, 279, 282], GRANTING IN PART AND DENYING IN PART VEOLIA'S PARTIAL MOTION TO DISMISS [274], GRANTING LAN'S PARTIAL MOTIONS TO DISMISS [278, 283], DENYING LAN'S MOTION FOR A MORE DEFINITE STATEMENT [283], AND GRANTING WYANT AND PEELER'S MOTIONS TO DISMISS [281, 294]**

On April 25, 2014, Flint, Michigan's water switched from the supply provided by the Detroit Water and Sewer Department ("DWSD") to water from the Flint River, treated by the Flint Water Treatment Plant ("FWTP"). As set forth in the complaint, from that switch came the Flint

water contamination crisis. The water was not treated properly for human consumption, and the residents of Flint did not know that.

Flint's new water supply flowed brown and full of bacteria and lead. In many homes, lead levels in the water rose dramatically, far past the levels the United States Environmental Protection Agency ("EPA") indicates require action to remediate. Between April 25, 2014, and October 16, 2015, people who lived and worked in Flint drank this water and now bring this lawsuit seeking damages in response to the injuries they, their property, and their businesses suffered as a result. During this period, some government officials disregarded the risk the water posed, denied the increasingly clear threat the public faced, protected themselves with bottled water, and rejected solutions that would have ended this crisis sooner.

To date, the crisis remains unresolved. Lawsuits are now pending in at least seven different state and federal courts in Michigan. Litigation is prolonged, fact-dependent, and constrained by legal precedent that may be ill-suited to deal with the consequences of approximately one hundred thousand people drinking contaminated water. But however imperfect it may be, litigation is a tool made available by the Constitution

of the United States and the laws of the state of Michigan, and what follows is this Court's effort to fairly evaluate the thirteen claims brought in this case by these twelve individuals and three businesses against these twenty-seven defendants.

## I. Factual Background

The plaintiffs in this putative class action are:

- Elnora Carthan, a 72-year-old widow who lives in Flint and who had elevated lead levels in her water as determined by Virginia Polytechnic Institute in August 2015, and claims personal injury and property damage;

- Rhonda Kelso and her daughter K.E.K., who bathed, washed, and cooked with Flint water until at least January 2015, and claim personal injuries and property damage;

- Darrell and Barbara Davis, who own and live in a home in Flint, and claim personal injuries and property damage;

- Michael Snyder, as personal representative of the Estate of John Snyder, who passed away on June 30, 2015, at Flint's McLaren Hospital of *legionella*-related pneumonia, and who claims personal injuries;

- Marilyn Bryson, who has lived in a house in Flint for at least 40 years, and who claims personal injuries and property damage;

- David Munoz, who has lived in Flint for his entire life and owned a home there for over twenty years, and who claims personal injuries and property damage;

- Tiantha Williams and her daughter T.W., who live in Flint, and used the water until at least December 2015, and claim personal injury;

- Amber Brown and her daughter K.L.D., who was born on November 28, 2014, and claim personal injury;

- Frances Gilcreast, on behalf of her partnership FG&S Investments, which owns multiple properties in Flint, and claims property damage, lost income, and diminution in property value;

- EPCO Sales, LLC, a hardware products company located in Flint, which claims property damage and diminution in the value of its property; and

- Angelo's Coney Island Palace, Inc., a restaurant chain that has done business in Flint since 1949, which claims property damages and lost revenue.

The defendants in this putative class action are:

- Lockwood, Andrews & Newnam PC, Lockwood, Andrews & Newnam Inc., and the Leo A. Daly Company (collectively "LAN"), who performed engineering work in Flint related to the water supply transition;

- Veolia LLC, Veolia Inc., and Veolia Water (collectively "Veolia"), who performed engineering work in Flint following the water supply transition, beginning in February 2015;

- Rick Snyder, Governor of Michigan;

- The State of Michigan;

- Daniel Wyant, Director of the Michigan Department of Environmental Quality ("MDEQ");

- Andy Dillon, Treasurer for the State of Michigan;

- Nick Lyon, former Director of the Michigan Department of Health and Human Services ("MDHHS");

- Nancy Peeler, former MDHHS Director for the Program for Maternal, Infant, and Early Childhood Home Visiting;

- Liane Shekter-Smith, MDEQ Chief of the Office of Drinking Water and Municipal Assistance;

- Adam Rosenthal, an MDEQ Water Quality Analyst based in the Lansing District Office;

- Stephen Busch, an MDEQ District Supervisor based in the Lansing District Office;

- Patrick Cook, an MDEQ Water Treatment Specialist based in the Lansing District Office;

- Michael Prysby, an MDEQ Engineer assigned to MDEQ District 11 (Genesee County, in which Flint is located);

- Bradley Wurfel, the MDEQ Director of Communications;

- Jeff Wright, the Genesee County Drain Commissioner;

- Edward Kurtz, the Emergency Manager of Flint from August 2012 through July 2013;

- Darnell Earley, Emergency Manager of Flint from September 2013 through January 12, 2015;

- Gerald Ambrose, Emergency Manager of Flint from January 13, 2015 through April 28, 2015;

- Dayne Walling, Mayor of Flint from August 4, 2009 through November 9, 2015;

- Howard Croft, Flint's former Director of Public Works;

- Michael Glasgow, Flint's former Utilities Administrator;

- Daugherty Johnson, Flint's former Utilities Administrator; and

- The City of Flint.

The following facts are asserted in plaintiffs' complaint, and taken as true for the purposes of these motions to dismiss.

An 1897 city ordinance required that all water pipes in Flint be made of lead. (Dkt. 349 at 38.) In 1917, the Flint Water Treatment Plant

("FWTP") was constructed, and drew water from the Flint River as Flint's primary water source until 1964, when it went dormant. (*Id.*) From 1964 through 2014, users of municipal water in Flint, Michigan received their water through the Detroit Water and Sewerage Department ("DWSD"). (*Id.* at 38.) In 2014, Flint's water supply switched back to the Flint River, and the water was treated at the FWTP. (*Id.* at 54.) This case concerns the decision to return to the Flint River as Flint's primary water source in 2014, and the alleged injuries that arose from that switch.

Beginning in the 1990s, Flint, along with other local governments relying on the DWSD water supply, had concerns about the cost of that supply, and began studying the viability of alternative water supplies. (*Id.* at 38.) In 2001, Michigan's Department of Natural Resources noted that businesses along the Flint River had permits to discharge industrial and mining runoff, as well as petroleum and gasoline cleanups. (*Id.* at 39.) In 2004, a study by the United States Geological Survey, the MDEQ, and the Flint Water Utilities Department determined that the Flint River was a highly sensitive drinking water source susceptible to contamination. (*Id.*) In 2006 and 2009, Flint and other local governments commissioned a study from LAN regarding the viability of continuing to

purchase water from the DWSD or constructing a new pipeline, which would be administered by what would later be known as the Karegnondi Water Authority ("KWA"). (*Id.*)

In 2011, Flint commissioned a study by Rowe Engineering and LAN to determine if the Flint River could be safely used as a water supply. (*Id.*) The study determined that water from the Flint River would require more treatment than water from Lake Huron, and that proper treatment for Flint River water would require upgrades to the FWTP. (*Id.*) The report included an addendum that set forth over sixty-nine million dollars in improvements that would be necessary to use Flint River water through the FWTP, including the use of corrosion control chemicals. (*Id.* at 40.)

In August 2012, Michigan Governor Rick Snyder appointed Edward Kurtz as Flint's Emergency Manager, following the declaration of a financial emergency in Flint. (*Id.* at 40.) Emergency managers may be appointed by the governor of Michigan "to address a financial emergency within" a local government, subject to the limitations in Michigan Public Act 436 of 2012. M.C.L. § 141.1549(1).

> Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of

chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.

M.C.L. § 141.1549(2).

In November 2012, Kurtz suggested to State of Michigan Treasurer Andy Dillon that Flint join the proposed KWA under the belief that doing so would save money over continuing to purchase water from the DWSD. (Dkt. 349 at 40.) The KWA was to be an administrative body overseeing a pipeline that would use Lake Huron water for the areas it serviced. (*Id.* at 39.) Genesee County Drain Commissioner Jeff Wright had encouraged the formation of the KWA in 2009. (*Id.* at 40.)

DWSD argued throughout 2012 that Flint should not join the KWA based on cost and reliability projections. (*Id.*) It made these arguments to Governor, Wright, Kurtz, Dillon, and then-Mayor of Flint Dayne

Walling. (*Id*.) During that period, Wright consistently argued to Kurtz, Dillon, and Governor Snyder that the DWSD studies were wrong. (*Id*. at 41.) In late 2012, Dillon requested that an independent engineering firm assess the cost effectiveness of joining the KWA. (*Id*.) The firm concluded that remaining with DWSD was more cost-effective both in the short and long term. (*Id*.) On March 17, 2013, Dillon e-mailed Governor Snyder and stated that the KWA advocates were misrepresenting the benefits of a switch, and that the "[r]eport I got is that Flint should stay w DWSD." (*Id*.)

On March 26, 2013, MDEQ District Supervisor Stephen Busch sent an e-mail to MDEQ Director Daniel Wyant and MDEQ Chief of the Office of Drinking Water and Municipal Assistance Liane Shekter-Smith setting forth risks associated with using the Flint River as Flint's drinking water source. (*Id*.) The e-mail stated that the water posed increased health risks, including a microbial risk, a risk of trihalomethane (known as "Total Trihalomethanes" or "TTHM") exposure, and would come with additional regulatory requirements, including significant upgrades to the FWTP. (*Id*. at 41-42.)

On March 27, 2013, MDEQ officials acknowledged that the decision to stay with the DWSD or switch to the Flint River was not based on the scientifically determined suitability of the water, but instead that it was "entirely possible that they will be making decisions relative to cost," in the words of MDEQ Deputy Director Jim Sygo. (*Id*. at 42.)

On March 28, 2013, Dillon e-mailed Governor Snyder and other officials, and recommended that the state "support the City of Flint's decision to join the KWA," and that all relevant officials supported the move. (*Id*. at 42-43.) During this period, Governor Snyder was personally involved in the decision-making process. (*Id*. at 43.) On April 4, 2013, Governor Snyder's Chief of Staff Dennis Muchmore informed Governor Snyder that "[a]s you know, the Flint people have requested Dillon's ok to break away from the DWSD." (*Id*.) Governor Snyder then instructed his Chief of Staff, Dillon, the Emergency Manager of Detroit Kevin Orr, DWSD, and Kurtz to solicit an additional offer from the DWSD before permitting the transition away from the DWSD. (*Id*.)

DWSD submitted its final proposal later in April. (*Id*.) Kurtz and Orr, according to an e-mail from a Senior Policy Advisor in the Michigan Department of Treasury, determined that Flint would not accept the

DWSD offer. (*Id*. at 44.) Governor Snyder's Executive Director forwarded the e-mail to Governor Snyder on April 29, 2013, and stated that it "[l]ooks like they adhered to the plan." (*Id*.)

Following this communication, Governor Snyder authorized Kurtz to enter into a contractual relationship with the KWA beginning in mid-2016. (*Id*.) At the time Governor Snyder authorized the switch, he did so knowing the Flint River would be used as an interim source. (*Id*.) In June 2013, Dillon, Kurtz, Wright, and Walling developed an interim plan to govern the provision of water to Flint between April 25, 2014, and October 2016. (*Id*.)

On June 10, 2013, LAN submitted a proposal to Flint for upgrading the FWTP. (*Id*. at 48.) The proposal included a "Scope of Services" section that proposed upgrades to the FWTP that would permit "use of the Flint River as a water supply," and a "Standards of Performance" section that promised LAN would "exercise independent judgment" and "perform its duties under this contract in accordance with sound professional practices." (*Id*. at 49.) Flint retained LAN to advise it on the water source transition through 2015. (*Id*. at 49-50.)

On June 29, 2013, LAN met with representatives from Flint, the Genesee County Drain Commissioner's Office, and MDEQ to discuss logistics related to the transition to the Flint River as Flint's primary water source. (*Id*. at 50.) At that meeting, the participants determined that the Flint River was a viable water source, if more difficult to treat, and that upgrades could be made to the FWTP to properly treat the water. (*Id*.) The parties also determined that it was possible to conduct proper quality control with LAN's assistance, the FWTP did not have the capacity to meet the needs of both Flint and Genesee County, and the transition could occur by April or May of 2014. (*Id*. at 51.) LAN agreed to present a comprehensive project proposal with cost estimates. (*Id*.) LAN ultimately provided engineering services for the transition from July 2013 until the transition occurred on April 25, 2014, including creating the plans and specification for the transition. (*Id*. at 53-54.)

Kurtz resigned from his Emergency Manager position effective July 2013. (*Id*. at 45.) Following Michael Brown serving as Emergency Manager for two months, Darnell Earley was appointed as Emergency Manager for Flint in September 2013. (*Id*.) Part of Earley's job included

making sure Flint was in compliance with state and federal laws governing safe drinking water. (*Id*.)

The transition to the Flint River continued. On March 14, 2014, Brian Larkin, then associate director of the Governor's Office of Urban and Metropolitan Initiatives, sent an e-mail to others in the Governor's office stating that the timeframe for switching water supplies was "less than ideal and could lead to some big potential disasters down the road." (*Id*. at 45-46.)

On March 20, 2014, MDEQ Chief of the Office of Drinking Water and Municipal Assistance Liane Shekter-Smith ensured that the City of Flint received an Administrative Consent Order requiring use of the FWTP, mandating Flint take steps to continue use of Flint River water or take steps to join the KWA, and attempting to prevent Flint's return to use of the DWSD. (*Id*. at 46.) Shekter-Smith had been warned nearly a year earlier about the potential dangers of switching Flint's water supply to the Flint River. (*Id*.)

In April 2014, LAN, Flint, and MDEQ officials discussed optimization for lead in the water supply, and decided to seek more data before implementing an optimization method. (*Id*. at 52.)

On April 16, 2014, former Flint Utility Administrator Michael Glasgow had informed MDEQ Water Analyst Adam Rosenthal that he would like additional time to ensure the FWTP was meeting requirements before giving the okay to distribute water from it. (*Id.* at 46.) On April 17, 2014, Glasgow informed MDEQ that the FWTP was not fit to begin operation, and that "management" refused to listen to his warnings. (*Id.*) On April 18, 2014, Glasgow wrote to Busch and MDEQ Engineer Michael Prysby and informed them that although he was receiving pressure to begin distributing water, he would not give the okay to do so, because he did not feel that staff was trained or proper monitoring was in place. (*Id.* at 46-47.) Glasgow felt that "management" had its "own agenda." (*Id.* at 47.) Glasgow later told investigators that former Flint Director of Public Works Howard Croft and former Flint Utilities Administrator Daugherty Johnson pressured Glasgow to approve and begin the switch to Flint River water. (*Id.*)

At some point in 2014, MDEQ Water Treatment Specialist Patrick Cook signed the final permit necessary to restart use of the FWTP with the Flint River as the city's primary water source. (*Id.* at 48.) The FWTP

officially went into service and began delivering Flint River water to Flint water users on April 25, 2014. (*Id.*)

When the transition occurred, Flint's water treatment system was not prepared to safely deliver Flint River water to users. The river was contaminated with rock-salt chlorides from treatment of roads in and around Flint during past winters. (*Id.* at 52.) Chlorides are corrosive, and water must be treated to neutralize their corrosive properties. (*Id.*) This is particularly true in a city like Flint, where most of Flint's water mains are over seventy-five years old and made of cast iron, leaving them subject to internal corrosion called "tuberculation." (*Id.* at 57.) Tuberculation leads to the development of "biofilms," which are layers of bacteria attached to the interior pipe wall. (*Id.*) Although LAN provided professional engineering services related to the transition, and those services included ensuring the safety of the water from the Flint River, it did not recommend treatment of the water to prevent corrosion of the pipes. (*Id.* at 53.)

Within weeks of the transition to Flint River water, residents of Flint began complaining about the smell, taste, and color of the drinking water. (*Id.* at 54.) Shekter-Smith received many of those complaints,

including one forwarded from an Environmental Protection Agency ("EPA") employee regarding rashes linked to the Flint River water. (*Id*.) Complaints and symptoms related to consumption of the water continued, and on August 14, 2014, Flint water tested above legal limits for coliform and *E. coli* bacteria. (*Id*. at 55.) Flint issued boil water advisories on August 16, 2014, and September 5, 2014. (*Id*.)

In response to these issues, Flint treated the water with additional chlorine. (*Id*.) However, because Flint's old water lines were corroded, chlorine attacked the bare metal, rather than the bacteria, leading to further corrosion and the release of TTHM into the water supply. (*Id*.) A PowerPoint presentation circulated among MDEQ officials in March and April 2015, including Busch, Prysby, and Rosenthal, showed that MDEQ officials knew as early as May 2014 that Flint water contained elevated levels of TTHM. (*Id*.)

In the summer of 2014, MDHHS reported an outbreak of Legionnaires' disease in Flint. (*Id*. at 56.) Legionnaires' disease infects humans when water droplets containing *legionella* bacteria are inhaled or *legionella*-contaminated water is consumed. (*Id*.) *Legionella* can enter a water supply when the biofilm attached to a water pipe is stripped

away, as happened when the Flint River water entered the city's pipes, and more chlorine was added to treat the water. (*Id.*)

On October 3, 2014, Flint's Public Information Officer informed Earley and Ambrose about the spike in Legionnaires' cases via e-mail. (*Id.*) Earley responded by denying any connection between Flint water and the outbreak, and stated that the city's message should be that the outbreak was an internal issue at McLaren Hospital. (*Id.*) MDHHS personnel did not agree with Earley's message. (*Id.* at 57.)

In September 2014, elevated blood lead levels were beginning to be noted in children under the age of sixteen who were living in Flint. (*Id.*) By October 1, 2014, it was known that the iron pipes making up most of Flint's water distribution system was one of the causes of the contamination of the water. (*Id.*)

On October 13, 2014, General Motors stopped the use of Flint River water at its engine plant due to the corrosive nature of the water. (*Id.*) Governor Snyder's executive staff was immediately aware of the problem, and on October 14, 2014, Governor Snyder's Deputy Legal Counsel and Senior Policy Advisor Valerie Brader wrote an e-mail in which she suggested asking Earley to "consider coming back to the [DWSD] in full

or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing." (*Id.*) Brader intentionally did not distribute this message to MDEQ officials so that it would be exempted from the Freedom of Information Act, but she did coordinate discussions with Earley and officials at MDEQ. (*Id.* at 58.) In response to this e-mail, Earley rejected the idea of returning to the DWSD on October 14, 2014. (*Id.*) On October 15, 2014, Governor Snyder's Legal Counsel, Michael Gadola, stated that use of the Flint River as a water source was "downright scary," and that Flint "should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control." (*Id.* at 59.)

By November 2014, LAN knew of the need to analyze the cause of the high TTHM levels in Flint water. (*Id.* at 60.) On November 26, 2014, LAN issued a twenty-page Operational Evaluation Report regarding the transition, which addressed compliance with EPA and MDEQ regulations, but did not address the potential for lead contamination resulting from the corrosive water flowing through the lead pipes in Flint's water system. (*Id.*)

By December 31, 2014, lead monitoring showed water testing results exceeding the federal Lead and Copper Rule's action level for lead, which is 15 parts per billion ("ppb"). (*Id.* at 59.) On January 9, 2015, University of Michigan – Flint water tests revealed elevated lead levels in two locations on campus, which led the University to turn off certain water fountains. (*Id.*) On January 9, 2015, Earley again refused to return Flint to the DWSD. (*Id.*)

On January 13, 2015 Earley resigned as Emergency Manager for Flint, and was replaced by Gerald Ambrose. (*Id.* at 78.) On January 29, 2015, DWSD offered Ambrose an opportunity to reconnect to the DWSD water supply, with the re-connection fee waived. Ambrose rejected the offer. (*Id.* at 79.)

In January 2015, LeeAnn Walters, a Flint homeowner, contacted the EPA regarding complaints that Flint River water was making her and her family physically ill. (*Id.*) On January 21, 2015, the State of Michigan ordered water coolers to be installed in state buildings operating in Flint, but did not share this information with the public. (*Id.* at 78.) On January 27, 2015, Flint received notice from the Genesee County Health Department that it believed the spike in Legionnaires'

disease cases was linked to the switch to Flint River water. (*Id.*) On January 28, 2015, MDHHS Director Nick Lyon received materials from an MDHHS epidemiologist showing the 2014 outbreak of Legionnaires' disease in Genesee County. (*Id.*)

On February 26, 2015, Jennifer Crooks, an EPA employee, e-mailed MDEQ and EPA employees regarding Walters' complaints of black sediment in her water. (*Id.* at 80.) The e-mail noted very high testing results for iron contamination, and noted that Glasgow suggested testing for lead and copper, which resulted in test findings of 104 ppb, well over the federal action levels of 15 ppb. (*Id.*) The e-mail also noted that the high presence of lead was a sign that there were other contaminants in the water, as well. (*Id.*) That day, Crooks also sent an e-mail to MDEQ and EPA representatives, opining that the black sediment from Walters' water was actually lead, and questioning whether the issue was more widespread. (*Id.* at 80-81.) Crooks also wondered if Flint was using optimal corrosion control. (*Id.* at 81.) On February 27, 2015, Busch told Del Toral that Flint was using corrosion control, which was false. (*Id.*)

At some point, Flint issued a request for proposals for engineering companies to serve as a water quality consultant to the city. (*Id.* at 60-

61.) Flint sought a consultant who could review and evaluate the City's water treatment process and its procedures to maintain and improve water quality, to recommend ways to maintain compliance with state and federal agencies, and to assist Flint in implementing those recommendations. (*Id.* at 61.) In February 2015, Veolia was hired to be Flint's water quality consultant. (*Id.*) The contract retaining Veolia stated that Flint would rely on the "professional reputation, experience, certification, and ability" of Veolia. (*Id.* at 62.)

On February 10, 2015, Veolia and Flint issued a joint press release that touted Veolia's expertise in "handling challenging river water sources," and notifying the public of Veolia's role in evaluating Flint's water treatment processes. (*Id.*) On February 10 and 12, 2015, executives at Veolia made statements professing the expertise of the companies and promising to address the issues with Flint's water. (*Id.* at 62-63.)

On February 18, 2015, Veolia made an interim report to Flint's City Council. (*Id.* at 63.) The report indicated that Flint's water was "in compliance with drinking water standards," but that the discoloration of the water "raises questions." (*Id.*) The report also stated that medical issues arising from consumption of the water were explained by the fact

that "[s]ome people may be sensitive to any water." (*Id.* at 64.) LAN also released a report addressing TTHM concerns, but that report did not analyze the causes of the high TTHM levels. (*Id.* at 66.)

On March 12, 2015, Veolia issued a final Water Quality Report. (*Id.* at 64.) That report was based on a 160-hour assessment of the FWTP, Flint's distribution system, and related administrative and financial aspects of Flint's water system. (*Id.*) The report found that Flint water was in compliance with state and federal water quality regulations, despite public concerns about the color and quality of the water. (*Id.*) The report also recommended that Flint add polyphosphates to the water supply to minimize the discoloration from iron in the pipes, but that discoloration might happen because of regular breaks and maintenance on the pipes. (*Id.* at 64-65.) Polyphosphates only addressed issues with the iron pipes, and were not a solution to the issues with the lead pipes. (*Id.* at 65.)

Meanwhile, Cook told the EPA that Flint was using corrosion control with Flint River water, and forwarded information he knew to be false to the EPA to back up the contention. (*Id.* at 81.)

On January 27, 2015, James Henry, Environmental Health Supervisor at the Genesee County Health Department, filed a Freedom of Information Act ("FOIA") request with Flint to obtain information about Flint's water supply. (*Id.*) Johnson stated on February 5, 2015, that he had not received the request, but would fulfill it as soon as possible, but had not done so by March 2015. (*Id.* at 82.) On March 10, 2015, Henry expressed public concern that Flint and the State of Michigan were stonewalling his requests for information. (*Id.*)

On March 12, 2015, Shekter-Smith e-mailed Wurfel and MDEQ employees Jim Sygo and Sarah Howes to discuss a FOIA request related to *legionella* and stated that although the switch to the Flint River may have created conditions that supported *legionella* growth, there was no evidence that *legionella* was coming directly from the FWTP or Flint's water distribution system at the time. (*Id.* at 83.) On March 13, 2015, Busch made statements that denied any provable connection between the switch to Flint River water and the presence of *legionella* bacteria in that water supply, and Shekter-Smith approved them. (*Id.*) During March, members of Governor Snyder's office were aware of mobilization by Flint-

area pastors focused on the odor and appearance of Flint water, and of a request by those pastors for water filters. (*Id.* at 84.)

On March 25, 2015, the Flint City Council voted to reconnect to the DWSD, but Ambrose rejected that vote. (*Id.*) On April 24, 2015, almost exactly one year after the switch to Flint River water, Cook e-mailed Miguel Del Toral at the EPA and informed him, in contradiction of Cook's earlier representations, that Flint was not practicing corrosion control at the FWTP. (*Id.*) On June 24, 2015, Del Toral issued a report noting high lead levels in Flint and the State of Michigan's complicity in both the high lead levels and the failure to inform users of Flint's water supply. (*Id.* at 84-85.) The report was shared with Shekter-Smith, Cook, Busch, and Prysby, but neither they nor any other public official named as a defendant in this lawsuit took measures to effectively address any danger identified in the report. (*Id.* at 85.)

Between June 30, 2015, and July 2, 2015, Walling and EPA Region 5 Director Dr. Susan Hedman discussed the report, and Hedman stated that it was a preliminary draft from which it would be premature to draw any conclusions. (*Id.*)

On July 9, 2015, Glasgow sent an e-mail to Rosenthal describing the clear and undeniable issues that Flint's lead- and bacteria-tainted water was causing. (*Id.* at 86.) On July 10, 2015, Wurfel appeared on public radio and made knowingly false statements asserting that Flint River water was safe and causing no "broad problem[s]" with elevated lead levels in the water. (*Id.* at 85-86.) On July 22, 2015, Governor Snyder's Chief of Staff wrote to Lyon and stated that the concerns of Flint water users were being "blown off" by the defendants. (*Id.* at 87.) On July 24, 2015, Wurfel again falsely stated that there were no worries about lead or copper contamination in Flint's water supply. (*Id.*)

In that July 24, 2015 statement, Wurfel referenced sampling of the water supply by MDEQ, but that sampling was skewed, and did not resample most lower-lead homes between 2014 and 2015, or any high-lead homes between 2014 and 2015. (*Id.*) The sampling actually covered up high-lead samples. (*Id.* at 88.) Glasgow ultimately pleaded no contest to willful neglect of duty after being accused of distorting the water test results by asking residents of Flint to run or flush their water before testing, and of failing to obtain water samples from certain houses. (*Id.*)

During this time period, Glasgow also stated that Busch and Prysby directed him to alter water quality reports to remove the highest lead levels. (*Id*.) Rosenthal also allegedly manipulated test results, including a July 28, 2015 report from which Rosenthal excluded high lead-level tests. (*Id*. at 88-89.)

In August 2015, Professor Marc Edwards of Virginia Tech, who had been testing Flint River water, announced that he believed there was serious lead contamination of the Flint water system, which constituted a major public health emergency. (*Id*. at 89.) In response, Wurfel attempted to discredit Edwards' statements by calling the testing "quick" and implying that it was irresponsible. (*Id*.)

By late 2014 or early 2015, Lyon also knew about the increase in children with elevated blood lead levels and Legionnaires' disease cases, but did not report these findings to the public or other government officials, or take any steps to otherwise intervene. (*Id*. at 89-90.) In the summer of 2015, Dr. Mona Hanna-Attisha used data from Hurley Hospital in Flint to note a rise in the number of Flint children with elevated blood lead levels in the second and third quarters of 2014 to publish a study, the purpose of which was to alert Flint water users about

the health risks associated with the water. (*Id.* at 90.) The governmental defendants immediately accused Dr. Hanna-Attisha of providing false information to the public. (*Id.*) On September 28, 2015, Lyon directed his staff to provide an analysis rebutting Dr. Hanna-Attisha's findings and portraying the rise in elevated blood lead levels as normal results corresponding to seasonal fluctuations. (*Id.* at 90-91.) Throughout September 2015, Wurfel and the MDEQ continued to issue false statements claiming the water in Flint was safe, and that the people sounding alarms about Flint's water quality were mistaken or "rogue." (*Id.* at 91-92.)

On October 2, 2015, the State of Michigan announced that it would create a Flint Water Advisory Task Force and provide water filters to Flint water users. (*Id.* at 92.) On October 8, 2015, Governor Snyder ordered Flint to reconnect to the DWSD, and that reconnection took place on October 16, 2015. (*Id.*) On October 18, 2015, Wyant e-mailed Governor Snyder and admitted that MDEQ made a mistake in not implementing optimized corrosion control from the beginning. (*Id.* at 93.) On October 19, 2015, the City of Flint Technical Advisory committee listed LAN as the "owner" of the "corrosion control" issue. (*Id.*)

Current Flint Mayor Karen Weaver declared a state of emergency in Flint on December 14, 2015. (*Id.* at 94.) On January 4, 2016, the Genesee County Commissioners likewise declared a state of emergency; Governor Snyder did so on January 5, 2016, and activated the Michigan National Guard to assist Flint on January 13, 2016. (*Id.*)

## II.    Procedural History

On July 27, 2017, this case was consolidated with eight other class actions. (Dkt. 173.) On August 14, 2017, Case No. 17-cv-10996 was also consolidated with this case. (Dkt. 185.) On September 29, 2017, the first amended consolidated class action complaint was filed. (Dkt. 214.) Then, on October 25, 2017, Case No. 17-10941 was also consolidated with this case. (Dkt. 232.)

On October 27, 2017, plaintiffs filed a second amended consolidated class action complaint, adding defendant Nancy Peeler to the case caption. (Dkt. 238.) On December 1, 2017, defendants filed motions to dismiss the complaint. (Dkts. 273, 274, 276-279, 281-283.) Peeler filed her motion to dismiss on December 8, 2017. (Dkt. 294.) On January 25, 2018, plaintiffs filed a third amended consolidated class action complaint, removing references to pending criminal charges against certain

defendants. (Dkt. 349.) On April 6, 2018, Case No. 15-cv-14002 was consolidated with this case. (Dkt. 441.) On April 17, 2018, Case No. 16-cv-10323 was consolidated with this case. (Dkt. 453.)

The final amended complaint asserts the following causes of action against the following parties:

| Count | Defendants |
| --- | --- |
| I: Substantive Due Process – State Created Danger | Governor Snyder, State of Michigan, Wyant, Dillon, Lyon, Peeler, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Walling, Croft, Glasgow, Johnson, Flint |
| II: Substantive Due Process – Bodily Integrity | Governor Snyder, State of Michigan, Wyant, Dillon, Lyon, Peeler, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Walling, Croft, Glasgow, Johnson, Flint |
| III: Equal Protection – Race | Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley |
| IV. Equal Protection – Wealth | Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley |
| V. 42 U.S.C. § 1985(3) – Invidious Racial Animus | Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley |
| VI. M.C.L. § 37.2302 (ELCRA) – Violation of Public Services Provisions | Governor Snyder, State of Michigan, Dillon, Wright, |

| | Walling, Ambrose, Kurtz, Earley, Flint |
|---|---|
| VII. *Monell* Liability | Flint |
| VIII. Professional Negligence | LAN |
| IX. Professional Negligence | Veolia |
| X. Fraud | Veolia |
| XI. NIED | LAN, Veolia |
| XII. Negligence | LAN, Veolia |
| XIII. Gross Negligence | LAN, Veolia |

Oral argument was held on these motions on July 11, 2018. (*See* Dkt. 532.)

## III.   Standard of Review

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV. Analysis

### A. Prior Flint Water Precedent

The Court is bound by the Sixth Circuit's rulings in two other cases, *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017) and *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), which were originally handled at the district court level by the Honorable John Corbett O'Meara. Although specific portions of those cases will govern specific analysis of subsequent portions of this opinion, there are general holdings in these two cases that govern the entirety of this opinion. These two cases were also consolidated with this case following remand. (Dkts. 441, 453.)

In relevant part, the Safe Drinking Water Act ("SDWA") does not preclude plaintiffs' claims brought under 42 U.S.C. § 1983. *Boler*, 865 F.3d at 409. The State of Michigan is entitled to sovereign immunity as to all claims asserted against it, and is dismissed from this case. *Id*. at 413. Flint is a municipality, and is not entitled to Eleventh Amendment immunity. *Id*. at 414. Finally, the MDEQ defendants were not acting as federal officials during the events at issue in these cases, and are not entitled to any form of immunity based on their purported status as federal officials. *Mays*, 871 F.3d at 444-49.

## B. LAN's Motion for a More Definite Statement

As part of its motion to dismiss, LAN also seeks to have plaintiffs provide a more definite statement of their claims pursuant to Fed. R. Civ. P. 12(e). (Dkt. 283 at 24.) Motions for more definite statements are disfavored, and should be granted "only if there is a major ambiguity or omission in the complaint that renders it unanswerable." *Farah v. Martin*, 122 F.R.D. 24, 25 (E.D. Mich. 1988).

LAN argues that the complaint does not distinguish between the Leo A. Daly Company ("LAD"), Lockwood, Andrews & Newnam, P.C. ("LAN P.C."), and Lockwood, Andrews & Newnam, Inc. ("LAN, Inc."), making it impossible to tell what each entity did. The Court has addressed the relationship between LAD, LAN P.C., and LAN, Inc. in a prior opinion. (Dkt. 437.) LAD is the parent company of LAN, Inc.; LAN P.C. is a corporation established to satisfy licensing requirements for LAN, Inc. to operate in the state of Michigan. (*Id.* at 4.) An agreement between LAD and LAN, Inc. establishes a relationship between the two companies in which all LAN, Inc. employees are LAD employees and all LAN, Inc. revenues go to a joint bank account over which LAD had full control. (*Id.* at 10-11.)

Because LAN P.C. was a legal entity created solely to permit LAN, Inc. to perform work in Michigan, all work LAN, Inc. performed can be attributed to LAN P.C. Because all employees of LAN, Inc. were actually employees of LAD, all work those employees performed, including the work at issue in this case, can be attributed to LAD. The complaint treats all three companies as a single entity for pleading purposes because, based on the corporate structure of the companies, they are indistinguishable for the purposes of this lawsuit.

LAN also objects to being "lumped in" with Veolia with regard to some allegations. (Dkt. 283 at 26.) The complaint clearly specifies the actions LAN and Veolia each took with respect to Flint's water supply, and sometimes refers to them jointly because either both sets of defendants had similar duties, if at different times, or because plaintiffs are asserting similar claims against both sets of defendants.

LAN's motion for a more definite statement is denied.

### C. Substantive Due Process – State Created Danger

Plaintiffs assert a substantive due process claim under the Fourteenth Amendment for a state created danger against the State of Michigan, Governor Snyder, Wyant, Dillon, Lyon, Peeler, Shekter-Smith,

Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Walling, Croft, Glasgow, Johnson, and the city of Flint.

> To bring a state created danger claim, the individual must show: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citing *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003)) (internal quote marks omitted).

### i. Threat of Violence From a Third Party

Plaintiffs do not allege that any defendant created or increased the risk that they would be exposed to an act of violence by a third party. They argue, however, that they do not need to, based on *Schneider v. Franklin Cty.*, 288 F. Appx. 247 (6th Cir. 2008). In that case, the Sixth Circuit analyzed a state-created danger claim without referencing the third-party requirement of the test. *Id.* at 252.

However, it is clear that *Schneider* applied an incomplete version of this circuit's test for a state-created danger claim. The *Schneider* court

cited *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir. 1998) in setting forth the state-created danger standard. In doing so, however, the *Schneider* court omitted *Kallstrom's* reference to the threat of violence by a private third party, and then proceeded to analyze the claim without that requirement.

In support of the argument that the *Schneider* standard is good law in the Sixth Circuit, plaintiffs cite *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834 (6th Cir. 2016) and *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006), two cases that also analyzed state-created danger claims.

*Stiles* involved a state-created danger claim arising from the brutal emotional, psychological, and physical bullying of a junior high school student by other students. *Id.* at 840-46. The *Stiles* court stated:

> As a general rule, the State has no obligation to protect the life, liberty, of property of its citizens against invasion *by private actors.* Two exceptions to this rule exist: 1) where the State enters into a "special relationship" with an individual by taking that person into its custody, and 2) where the State creates or increases the risk of harm to an individual. Because DS was harmed by students rather than school or government officials, there is no constitutional violation unless one of these two exceptions applies.

*Id*. at 853 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)) (internal citations omitted) (emphasis added). The court then cited *McQueen*, *supra*, for the legal standard for a state-created danger claim. *Id*. at 854. The standard set forth was: "(1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state culpability." *Id*. at 854 (citing *McQueen*, 433 F.3d at 464).

In *McQueen*, the Sixth Circuit considered whether a grant of summary judgment on a state-created danger claim was proper where a first-grader shot and killed his classmate, and the deceased child's parent sued the teacher, principal, and school district. *McQueen*, 433 F.3d at 462-63. The plaintiff brought a variety of claims, among them a state-created danger claim for failing to protect her daughter from her classmate. *Id*. at 463.

Quoting *Kallstrom*, the *McQueen* court stated that "[l]iability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id*. at 464 (quoting *Kallstrom*, 136

F.3d at 1066). The court also noted that a state-created danger claim is traditionally rejected where the act "did not create or increase the risk of private violence to the plaintiff." *Id.* at 465 (collecting cases).

In most other circuits, the third-party requirement is also consistently applied. *See Rivera v. Rhode Island*, 402 F.3d 27, 34-35 (1st Cir. 2005); *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995); *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 857 (5th Cir. 2012); *Fields v. Abbott*, 652 F.3d 886, 889 (8th Cir. 2011); *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 917 (10th Cir. 2012); *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1233-34 (11th Cir. 2013); *Butera v. Dist. of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001); *but see Doe v. Village of Arlington Heights*, 782 F.3d 911, 916-17 (7th Cir. 2015) (omitting third-party requirement).

In *Kneipp v. Tedder*, 95 F.3d 1199, 1204-11 (3d Cir. 1996) the Third Circuit analyzed the third-party requirement for a state-created danger claim and declined to apply it to the claim in front of it, instead opting to apply a standard requiring only that an individual be placed in danger. However, the Third Circuit has inconsistently applied the third-party

requirement to state-created danger claims since *Kneipp. See, e.g., LaGuardia v. Ross Twp.*, 705 F. Appx. 130, 133 (3d Cir. 2017) (applying the requirement); *but see Henry v. City of Erie* 728 F.3d 275 (3d Cir. 2013) (omitting the requirement).

Because all events related to plaintiffs' claims occurred in Michigan, the Court must apply the clearly established state-created danger test set forth in *Kallstrom*, *McQueen*, *Stiles*, and *Jones*. The complaint does not plead that any act taken by any state actor created or increased the risk of private violence to the plaintiffs.

At oral argument, plaintiffs' counsel argued that the third-party requirement could be satisfied by, for instance, a situation where a mother fed her child formula mixed with tainted Flint water. The mother would be the private actor, and the child would be the individual harmed under the state-created danger theory. (Dkt. 532 at 212.)

The Court rejects this theory in its entirety. The residents of Flint were all made to use contaminated water that leached lead and bacteria from old lines. Parents, many of them struggling to even pay for the water the city provided, whether from the DWSD or the Flint River, used what resources they had available to them. For much of the time the Flint

River was used as Flint's primary water source, residents did not and could not have known the danger the water posed to them or their families. To entertain plaintiffs' counsel's theory of harm, the Court would have to find that a loving parent, seeking only to provide their child with food or water, committed an intentional or at least negligent act of violence against his or her own child. According to counsel, every person who showered or washed their hands or made coffee or boiled pasta with bacteria-infected, lead-tainted water provided to them by their government committed repeated acts of violence against themselves, their families, their friends, and their guests. This is not what the state-created danger theory was developed to address.

Plaintiffs have failed to plead that the actions of the governmental actors named in this claim created or increased the risk of harm from a third party, and for this reason, this particular claim must be dismissed.

### ii. Specific Endangerment of Plaintiffs

Even if the Court could determine that the third-party harm requirement of plaintiffs' state-created danger claim had been met, such a claim will stand only where "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim

or victims." *Reynolds*, 438 F.3d at 696. The state-created danger must be a "special danger" to a "discrete class of individuals." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005). It is not sufficient for the purposes of this claim if the specific danger is "no more a danger to [the plaintiff] than to any other citizen on the City streets." *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993). The danger may not be one that "affects the public at large." *Kallstrom*, 136 F.3d at 1066.

Plaintiffs argue that the entire population of Flint constitutes a discrete class of individuals. (Dkt. 379 at 82-84.) They argue that the "government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims," *Reynolds*, 438 F.3d at 696, because "identifying those at risk would have been as simple as looking up the names and addresses of residents and businesses serviced by Flint's water." (Dkt. 379 at 83.)

The Sixth Circuit has routinely held that threats to any person on the street or to the public at large do not constitute risks that are specific enough for the purposes of a state-created danger claim. *See, e.g., City of Carlisle*, 3 F.3d at 950 (the city permitting an epileptic individual to maintain a driver's license posed a danger to any citizen on the streets);

*Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (a parolee's release endangered plaintiff as a member of the public at large); *Schroeder*, 412 F.3d at 729 (government's creation of a street, and management of traffic conditions, posed a general risk to the public).

The largest groups the Sixth Circuit has determined were able to pursue a state-created danger claim were in *Kallstrom*, where a city's release of private information from the personnel files of three undercover officers "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy," *id.*, 136 F.3d at 1067, and in *McQueen*, where the risk of a shooter in a school posed a risk to the five students in the room with him and even those in the school building, but all those outside the school building constituted "the general public." *Id.*, 433 F.3d at 468.

An entire city, plus all those who visit, work, or pass through that city is, by definition, "the general public." Plaintiffs set the bar for the general public at "the general public of Michigan residents." (Dkt. 379 at 84.) However, there is no case that supports this definition.

This claim must also be dismissed for failure to satisfy this element of the state-created danger test.

## D. Substantive Due Process – Bodily Integrity

Plaintiffs assert a substantive due process claim for bodily integrity, virtually identical to the claim asserted in *Guertin v. Michigan*, Case No. 16-cv-12412, where the Court found plaintiffs had properly pleaded such a claim against certain defendants.

Numerous plaintiffs in this matter are not individuals, but instead businesses. Bodily integrity claims are premised on "the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). The Court can find no case that extends the fundamental right of bodily integrity to a business or business relationship, or to the property owned or used in a business's operations. Accordingly, this claim is dismissed as to Frances Gilcreast, Epco Sales, LLC, and Angelo's Coney Island Palace, Inc.

### i. *Guertin v. Michigan*

The Court analyzed the bodily integrity claim in *Guertin* as follows, and will adopt the same substantive analysis here, subject to fact-specific

inquiry as to the liability of each named governmental defendant as

alleged in the complaint:

> In Count 4, plaintiffs bring a § 1983 substantive due process claim, alleging that all defendants except Veolia and Lockwood unlawfully violated their fundamental interest in bodily integrity. Defendants argue that only a forcible physical intrusion into a person's body against the person's will without a compelling state interest will suffice, and also that plaintiffs fail to plead that defendants were motivated by malice or sadism.

> [...]

> "The touchstone of due process is protection of the individual against arbitrary action of the government," and the Supreme Court has defined such a violation as "executive abuse of power as that which shocks the conscience" in the "constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). To plead this claim against each executive official in this case, "plaintiffs must show[ ] not only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause." *See Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (citing cases).

> It has long been held that one's right to bodily integrity is a fundamental interest under the Constitution. *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); *see Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). As to

the first prong of the qualified immunity analysis, plaintiffs' "allegations give rise to a constitutional violation." *Shreve*, 743 F.3d at 134. They have a fundamental interest in bodily integrity under the Constitution, and, as set forth below, defendants violated plaintiffs' fundamental interest by taking conscience-shocking, arbitrary executive action, without plaintiffs' consent, that directly interfered with their fundamental right to bodily integrity. *Lewis*, 523 U.S. at 845-46; *Cui*, 608 F.3d at 64; *see generally Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). As to the second prong of the qualified immunity analysis, a series of Supreme Court cases over the last seventy-five years makes clear that defendants violated plaintiffs' clearly established rights.

The Court may consider decisions by the United States Supreme Court, the Sixth Circuit, and district courts within the Sixth Circuit to determine whether the law has been clearly established. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). Decisions from other circuits may be considered "if they 'point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.' " *Barrett v. Stubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir. 1988)) (alterations in original).

In 1990, the Court held that the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990); *see*

*also Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."). Whether such intrusion is consensual has been a key consideration in determining the constitutionality of such invasion of an individual's person since at least 1942, when the Supreme Court held that the forced sterilization of adults is unconstitutional. *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *see also Winston v. Lee*, 470 U.S. 753, 766-67 (1985) (the potentially harmful, nonconsensual surgical intrusion into a suspect's chest to recover a bullet without a compelling need is unconstitutional).

That defendants here violated plaintiffs' clearly established right to be free from conscience-shocking, arbitrary executive action that invades their bodily integrity without their consent is further exemplified by courts of appeals' decisions interpreting these Supreme Court cases. *See, e.g.*, *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986) (no qualified immunity, because actions of defendants violated New York law by administering a "dangerous drug to human subjects without adequate warning or notice of the risk involved," and thus defendants "could be held responsible in damages for the consequences"); *Lojuk v. Quandt*, 706 F.2d 1456, 1465-66 (7th Cir. 1983) (noting that "compulsory treatment with anti-psychotic drugs may invade a patient's interest in bodily integrity, personal security and personal dignity...., [and] compulsory treatment may invade a patient's interest in making certain kinds of personal decisions with potentially significant consequences," in holding that these fundamental interests are implicated by compulsory electro shock therapy—"It should be obvious in light of this liberty interest that the state cannot simply seize a person and administer [electro shock therapy] to him without his consent"); *Rogers v. Okin*, 634 F.2d 650, 653 (1st Cir. 1980) ("[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is

represented by the administration of antipsychotic drugs."), *vacated and remanded Mills v. Rogers*, 457 U.S. 291, 303 (1982) (only applies to *involuntarily* admitted patients).

It would be readily apparent to any reasonable executive official, given this landscape, that a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into such individuals without their consent, especially when such substances have zero therapeutic benefit. *Cf. Harper*, 494 U.S. at 229 (noting that although "therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects"). This is not a case in which there are only a "few admittedly novel opinions from other circuit or district courts," which would be insufficient "to form the basis for a clearly established constitutional right." *Barrett*, 388 F.3d at 972. The breadth and depth of the case law "point[s] unmistakably to the unconstitutionality of the conduct complained of" here, which was "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Id.* (quoting *Seiter,* 858 F.2d at 1177).

[…]

Plaintiffs plead (with particularity as to which defendant did what) that these defendants were the decision makers responsible for knowingly causing plaintiffs to ingest water tainted with dangerous levels of lead, which has no therapeutic benefits, and hiding the danger from them. The emergency managers and individual state employees switched the source of Flint's water from the Detroit River to the Flint River, then knowingly took deliberate action that violated federal and state, civil and possibly even criminal law, which caused the lead levels in Flint's water to rise to dangerous levels. They knew that their actions were exposing

the residents of Flint, including plaintiffs, to dangerous levels of lead. Lead poisoning caused plaintiffs to suffer from severe medical problems with their hair, skin, digestive system, and organs, as well as brain and other developmental injuries including cognitive deficits, among other issues. (Dkt. 1 at 65.)

And when the evidence confirmed that, in fact, the lead levels in the water and in residents' blood were rising, these defendants worked to discredit the evidence and knowingly and proactively made false statements to the public to persuade residents that the water was safe to consume. They did so, even though their own testing revealed the opposite. Many residents, plaintiffs included, continued to consume the water in reliance on defendants' false assurances.

It cannot be that such actions are not "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *See Lewis*, 523 U.S. at 847 n.8. Nor can it be said that reasonable officials would not have had fair notice that such actions would violate the Constitution, *i.e.*, that defendants were violating plaintiffs' clearly established right to bodily integrity and to be free from arbitrary, conscience shocking executive action. As recently reiterated by the Sixth Circuit, immunity does not extend to "the plainly incompetent or those who knowingly violate the law." *Arrington-Bey v. City of Bedford Heights*, No. 16-3317, 2017 U.S. App. LEXIS 3429, at *8, 2017 WL 2432389 (6th Cir. Feb. 24, 2017) (quoting *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 551 (2017)). And particularly with respect to the individual governmental defendants who are facing felony and misdemeanor criminal charges pursuant to the Michigan Attorney General's Flint Water Investigation, qualified immunity cannot and should not protect them from civil liability for the constitutional violations that are pleaded against them. *Id.*; *see Barrett*, 798 F.2d at 575 (no qualified

immunity for defendants who knowingly violated state criminal law).

Again, plaintiffs' involuntariness here is key. *See Riggins v. Nevada*, 504 U.S. 127, 137-38 (1992) (forced administration of antipsychotic medication during trial violated Fourteenth Amendment); *Harper*, 494 U.S. at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Cruzan*, 497 U.S. at 278 ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."); *Rochin v. California*, 342 U.S. 165, 172 (1952) ("Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents.... This is conduct that shocks the conscience."). Plaintiffs' exposure to dangerous levels of lead was involuntary on two levels.

First, it was involuntary because these defendants hid from plaintiffs that Flint's water contained dangerous levels of lead. Misleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the "forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." *See Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313-14 (D. Mass. 1999) (utilizing false pretenses to engage patients in participating in radiation treatments with no therapeutic value no different than "forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional"). Second, it was involuntary because under state and municipal law, plaintiffs were not permitted to receive water in any other way. *See* Flint Code of Ord. §§ 46-25, 46-26, 46-50(b). The city defendants themselves make this

argument. (*See* Dkt. 52 at 37.) Even had plaintiffs wanted to receive water from a different source, they would not have been permitted to.

Defendants claim they had a legitimate state interest in lowering the cost of Flint's water services. Accepting that as true, any such cost-cutting measure cannot justify the harm that was knowingly inflicted on plaintiffs without their consent. This is especially so given that Michigan law "forbids the price [of any water sold] to exceed[ ] 'the actual cost of service as determined under the utility basis of rate-making.'" *Davis v. City of Detroit*, 269 Mich. App. 376, 379 (2006) (quoting MICH. COMP. LAWS § 123.141).

*Guertin v. Michigan*, Case No. 16-CV-12412, 2017 U.S. Dist. LEXIS 85544, at *62–72 (E.D. Mich. June 5, 2017).

The Court also collected a variety of cases supporting the holding that plaintiffs' right to bodily integrity was clearly established in this context:

> *See also Wright v. City of Phila.*, No. 10-1102, 2015 U.S. Dist. LEXIS 25278, at *37-38, 2015 WL 894237 (E.D. Pa. Mar. 2, 2015) (it is clearly established that the substantive due process right to bodily integrity is violated when the state allows individuals to suffer from prolonged asbestos exposure in part because "[t]he health effects associated with asbestos exposure have been within the public's knowledge for years"); *Athans v. Starbucks Coffee Co.*, No. CV-06-1841-PHX-DGC, 2007 U.S. Dist. LEXIS 21412, at *9, 2007 WL 899130 (D. Ariz. Mar. 23, 2007) (citing Supreme Court, Ninth Circuit, and Fourth Circuit cases to find that a pro se plaintiff states a claim by alleging "intentional poisoning" by a government

official); *Bounds v. Hanneman*, No. 13-266 (JRT/FLN), 2014 U.S. Dist. LEXIS 43947, at *27-29, 2014 WL 1303715 (D. Minn. Mar. 31, 2014) (denying qualified immunity because "a reasonable officer should have known that providing an illicit drug to a citizen, where such provision was not required by the officer's legitimate duties, violates clearly established law"); *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 818 (S.D. Ohio 1995) ("[B]etween 1960 and 1972 the right to due process as enunciated in *Rochin [v. California*, 342 U.S. 165 (1952) ] was sufficiently clear to lead a reasonable government official to the conclusion that forcing unwitting subjects to receive massive doses of radiation was a violation of due process."); *Thegpen v. Dillon*, No. 88 C 20187, 1990 U.S. Dist. LEXIS 3132, at *9-11, 1990 WL 32656 (N.D. Ill. Feb. 1, 1990) (clearly established that "compulsory treatment with anti-psychotic drugs may invade a patient's interest in bodily integrity"); *Osgood v. District of Columbia*, 567 F. Supp. 1026, 1033 (D.D.C. 1983) ("[t]here is no serious dispute" that administering psychotropic drugs against an inmate's will violated the Due Process Clause of the Fifth Amendment).

*Id.* at *67 n.7.

### ii.   *Branch v. Christie*

Many of the defendants rely on *Branch v. Christie*, No. 16-2467, 2018 U.S. Dist. LEXIS 3381 (D. N.J. Jan. 8, 2018), an unpublished District of New Jersey decision, to argue that the Court's decision in *Guertin* was wrongly decided.

In *Branch*, parents of children who attended Newark, New Jersey public schools sued various state and local officials, including the school district, for exposing their children to lead through the school system's

water supply. *Id.* at *2. Plaintiffs alleged that defendants became aware of the lead contamination in March 2011, failed to disclose the contamination, and failed to do basic monitoring or maintenance of the water fountains, including changing lead filters. *Id.* at *3. Plaintiffs also alleged that during this period, the government officials routinely misled them about the safety of the water. *Id.* at *3-4.

Among other claims, plaintiffs asserted substantive due process claims for both state-created danger and bodily integrity. *Id.* at *4. That Court dismissed the claims for several reasons.

First, the *Branch* court noted that the complaint did not allege "which public schools the children attended, when the children attended the schools, how often the children were exposed to the water, whether the children drank from the 'several' faucets that had outdated filters, when the children's alleged symptoms started, or when the children were tested for lead poisoning." *Id.* at *4. Here, each plaintiff has pleaded use of contaminated water from a citywide source for personal or business use, and suffering of personal injury or property damage as a result. The *Branch* plaintiffs did not plausibly plead that their children were exposed to lead-contaminated water, particularly as they did not allege injury on

a system-wide basis, but instead cited a test that measured elevated lead levels in fifteen percent of Newark schools. *Id.* at *4.

Second, the *Branch* court's analysis of the plaintiffs' constitutional claims is either inapplicable or unclear in relation to the bodily integrity claim asserted here. In a section entitled "Section 1983," that court analyzed plaintiffs' state-created danger claim under the Third Circuit's test, which as set forth above, differs substantially from the Sixth Circuit's test. *Id.* at *17-18. The *Branch* court then determined that "the state-created danger theory is essentially based on the same allegations as the bodily integrity theory," *id.* at *19, and proceeded to continue to analyze the state-created danger claim. *Id.* at *19-20 (analyzing *Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) (successful state-created danger claim) and *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235 (3d Cir. 2016) (unsuccessful state-created danger claim)). In other words, that court collapsed the analysis of the bodily integrity claim into the state-created danger claim without differentiation.

To the extent the *Branch* court considered the bodily integrity claim at all, it cited two cases in support of the proposition that "substantive due process has been found *not* to guarantee a safe working environment

or a right to minimum levels of safety in certain arenas." *Id.* at *20 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992) and *Searles v. S.E. Penn. Transp. Auth.*, 990 F.2d 789 (3d Cir. 1993)) (emphasis in original). Plaintiffs' bodily integrity claim in this case does not rest on a right to a safe working environment or minimum levels of safety during public transportation, but instead on the affirmative acts of government officials that knowingly and/or intentionally introduced health- and life-threatening substances into the bodies of individuals without their consent, and without any therapeutic benefit.

### iii.    Facts Alleged as to Each Defendant

Next, the Court must determine whether the allegations in the complaint give rise to liability for each defendant under this legal theory. The Court takes the allegations in the complaint as true, and bases its evaluation of the sufficiency of the pleadings on the assumed truth of those allegations.

At this stage of the case, a plaintiff's claims need only be plausible, not probable. *Iqbal*, 556 U.S. at 678. Multiple plausible interpretations of a set of facts may exist, but what matters is the Court's ability to "draw

the reasonable inference that the defendant is liable for the misconduct alleged" from the facts as set forth in the complaint. *Id.*

*Governor Rick Snyder*

In August 2012, Governor Snyder appointed Kurtz as Flint's first Emergency Manager, following a declaration of financial emergency in Flint. As various officials investigated the possibility of Flint joining the KWA throughout 2012, Governor Snyder was part of the group considering whether doing so would be cost-effective. Throughout 2013, Snyder was personally involved in the KWA decision-making process. In late April or early May of 2013, Governor Snyder authorized Kurtz to enter into a contractual relationship with the KWA, which would use the Flint River as an interim water source.

After the switch, Governor Snyder's staff routinely discussed the issues with Flint's water, and internally recommended that Flint go back to the DWSD. It is not alleged that Governor Snyder was personally a part of these communications. However, on October 8, 2015, Governor Snyder ordered Flint to reconnect to the DWSD.

Plaintiffs allege that Governor Snyder was a critical part of Flint's switch from the DWSD to the Flint River. But plaintiffs do not allege that

Governor Snyder was aware of the dangers of the Flint River when that decision was made. The right to bodily integrity, as set forth above, protects people from being intentionally exposed to toxic substances by the government, including later deceptions or acts designed to conceal or prolong the harm. But each act giving rise to such a claim requires that plaintiffs plead intent or knowledge, and plaintiffs do not plead that Governor Snyder knew of the dangers of Flint River water when authorizing the switch. The substantive due process right to bodily integrity is not a constitutional tort for negligence. *See Lewellen v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 34 F.3d 345, 348 (6th Cir. 1994) (stating that negligence does not constitute a deprivation of a constitutionally protected interest).

Further, a supervisor may only be held constitutionally liable where "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it, or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner,* 349 F.3d 888, 903 (6th Cir. 2003) (citations and internal quotation marks omitted). Plaintiffs do not plead that Governor Snyder was either

included on or aware of the e-mail chains between members of his staff sent after the switch, when his staff called water from the Flint River "downright scary" and stated a desire to get Flint "back on the Detroit system as a stopgap ASAP[.]" (Dkt. 349 at 59.)

Plaintiffs base their bodily integrity claim related to the decision to switch to the Flint River on the fact that defendants did so "knowing that the switch would injure Flint residents." (Dkt. 379 at 72.) Plaintiffs cite numerous studies detailing the risks of Flint River water prior to 2012. (Dkt. 349 at 39-40.) They also cite communications in 2013 involving MDEQ and MDHHS officials that raised serious concerns about the health risks the Flint River posed. (*Id*. at 41-42.) But plaintiffs allege only that in June 2013, Governor Snyder "knew that Flint River water would be used as an interim source of water." (*Id*. at 45.) In contrast, plaintiffs allege that prior to the switch, "Dillon, Kurtz, Wright, and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source," (*id*.) which refers to a 2011 analysis done by LAN and non-party Rowe Engineering that "cautioned against the use of the Flint River" and stated that water would only be safe to use if properly treated following improvements to the FWTP. (*Id*. at 39.)

Plaintiffs have alleged that other defendants involved in the top-level decisions surrounding the switch to the Flint River knew of and disregarded risks to the health and safety of Flint's water users. But they have not made those same allegations with regard to Governor Snyder. For these reasons, plaintiffs have failed to plausibly assert a bodily integrity claim against Governor Snyder, and he is dismissed from this case.

*Andy Dillon*

Dillon, Michigan's State Treasurer, was involved in the decision to switch Flint to Flint River water. After conversations in 2012 with Kurtz and DWSD, Dillon ordered a cost effectiveness analysis by an independent engineering firm that studied Flint potentially joining the KWA. On March 17, 2013, following receipt of the firm's report, Dillon argued to Governor Snyder that KWA advocates were misrepresenting the benefits of the switch, and that the "[r]eport I got is that Flint should stay w DWSD." (*Id.* at 41.)

However, on March 28, 2013, Dillon e-mailed Governor Snyder and other officials, and recommended that Flint join the KWA. Communications from Governor Snyder's office indicate that Dillon was

the one who would give approval to terminate Flint's relationship with DWSD and switch to Flint River water. Dillon was part of a group that solicited a final (and ultimately rejected) bid from the DWSD.

Dillon was also part of the group, which included Kurtz, Wright, and Walling, that developed an interim plan to govern provision of water for Flint between April 25, 2014, and October 2016. At the time this group met, they were aware of a 2011 analysis that cautioned against using the Flint River unless the water was properly treated following extensive improvements to the FWTP.

Dillon, like Governor Snyder, played a critical role in Flint's switch to the Flint River. But unlike Governor Snyder, Dillon is plausibly alleged to have been aware of the risks that the Flint River posed to potential users, yet still developed and approved a plan that would expose those users to contaminated water due to lack of proper treatment, and maintained control over or input into Flint's choice of water supply through the April 25, 2014 switch. Because plaintiffs have alleged that Dillon took affirmative – and decisive – steps to expose Flint water users to contaminated water, plaintiffs have alleged arbitrary action that

shocks the conscience, and have plausibly asserted a bodily integrity claim against Dillon.

*Daniel Wyant*

Wyant, who is the Director of MDEQ, is alleged to have received a March 26, 2013 e-mail from Busch setting forth the risks of the Flint River as a water supply. On October 18, 2015, Wyant e-mailed Governor Snyder and admitted that MDEQ made a mistake in not implementing optimized corrosion control from the outset of Flint's switch to the Flint River.

Neither of these allegations gives rise to a plausible bodily integrity claim, because they do not allege intentional or knowing acts on the part of Wyant that either exposed Flint water users to contaminated water, or deceived those users about the risks the water posed. Instead, plaintiffs allege only that Wyant received information in March 2013 and took no action, and admitted a grave error on the part of MDEQ after Flint's water supply switched back to DWSD. Plaintiffs have not plausibly asserted a bodily integrity claim against Wyant, and he is dismissed from this case.

*Nick Lyon*

Lyon, former Director of MDHHS, received materials on January 28, 2015, from an MDHHS epidemiologist detailing the 2014 Legionnaires' disease outbreak in Genesee County. On September 28, 2015, Lyon directed his staff to rebut findings by Dr. Mona Hanna-Attisha that there was a rise in the number of Flint children with elevated blood levels in the second and third quarters of 2014. The rebuttal involved falsely portraying the rise in elevated blood lead levels as normal and corresponding to seasonal fluctuations.

Flint was reconnected to the DWSD on October 16, 2015. Lyon's alleged deceptions related to a water supply that was in use for only eighteen days after the statements began to be made. But what is relevant is that Flint's water users were exposed to that contaminated water while those statements were being made, and Lyon made those affirmative efforts to deceive the users of Flint water months after elevated lead levels in Flint's water were undeniably known. That deception, even if only for a period of eighteen days, plausibly led to more Flint water users being exposed to contaminated water. Further, as alleged in the complaint, the remediation efforts since October 2015 have

been insufficient. A government official's intentional deception about the safety of a mandatory water supply that posed a danger after the switch back to DWSD would have clear consequences for users of Flint water.

Deception may not always give rise to a bodily integrity claim, but it does here, where the clear outcome of the deception is to continue the harm to those involuntarily ingesting a substance contaminated as a result of the government's own actions. Plaintiffs plead the essence of arbitrary government action that shocks the conscience, and have plausibly asserted a bodily integrity claim against Lyon.

*Liane Shekter-Smith*

Shekter-Smith, MDEQ's Chief of the Office of Drinking Water and Municipal Assistance, received Busch's March 26, 2013 e-mail setting forth the health risks of using the Flint River as Flint's water source, as well as the need for costly upgrades to the FWTP in order for Flint Water to be safely used. On March 20, 2014, Shekter-Smith ensured that Flint received an Administrative Consent Order requiring use of the FWTP and pushing Flint toward the KWA, which would prevent Flint from returning to the DWSD.

Weeks after the transition, Shekter-Smith received many complaints about the smell, taste, and color of the drinking water. On March 12, 2015, Shekter-Smith e-mailed Wurfel and two other MDEQ employees to discuss a FOIA request related to *legionella*, and stated that there was no evidence at the time that *legionella* was coming directly from the FWTP of Flint's water distribution system. On March 13, 2015, Shekter-Smith approved public statements issued by Busch reiterating her statements about the lack of evidence linking Flint's water with *legionella*. On June 24, 2015, an EPA regulator issued a report noting Flint's high lead levels and the government's complicity in creating the issue and failing to notify the public, which Shekter-Smith received, but did not act on.

Plaintiffs do not allege that Shekter-Smith's statements regarding *legionella* were deceptive, only that they were wrong. Those statements, along with Shekter-Smith's failure to act on the EPA report or the complaints she received, are not grounds for a bodily integrity claim, because they are not acts of intention or deception.

Shekter-Smith's March 20, 2014 issuance or approval of the Administrative Consent Order that permitted the switch to the Flint

River, however, is grounds for a bodily integrity claim. Shekter-Smith had been made aware a year prior of the health risks the Flint River posed to potential users, yet took affirmative steps to ensure that Flint's water users were made to consume water from that dangerous source. She was also aware that for Flint River water to be safe for Flint's water users, a number of costly upgrades would have to be made to the FWTP, and it is plausibly alleged that she knew no such upgrades had been or would be made at the time of the switch she approved. This is arbitrary, conscience-shocking action, and plaintiffs have plausibly asserted a bodily integrity claim against Shekter-Smith.

*Adam Rosenthal*

Rosenthal, an MDEQ Water Quality Analyst based in the Lansing District Office, is alleged to have been asked by Glasgow on April 16, 2014, for more time to ensure the FWTP was meeting requirements before approving water distribution from the plant. In March or April of 2015, Rosenthal received a PowerPoint presentation that showed MDEQ officials knew as early as May 2014 that Flint River water contained elevated levels of TTHM. On July 9, 2015, Rosenthal received an e-mail from Glasgow describing the numerous serious issues arising from Flint's

contaminated water. During this time, Rosenthal is also alleged to have manipulated test results for lead levels to deceive Flint water users, including a July 28, 2015 report from which he excluded high lead-level tests. Plaintiffs have alleged that Rosenthal took actions that shock the conscience.

Rosenthal took affirmative acts to deceive the public about the risks they faced from Flint's water by altering test results, which contributed to Flint water users' continued use of Flint River water. But the remainder of the allegations against him do not give rise to a bodily integrity claim, because they consist either of conversations or information provided to Rosenthal that did not result in an affirmative act or deception on his part. Plaintiffs have plausibly asserted a bodily integrity claim against Rosenthal.

*Stephen Busch*

Busch, an MDEQ District Supervisor, is alleged to have sent a March 26, 2013 e-mail to Wyant and Shekter-Smith setting forth risks associated with using the Flint River as Flint's drinking water source, including microbial and TTHM risks. On April 18, 2014, Glasgow sent Busch an e-mail regarding his concerns over the switch to the Flint River.

In March and April 2015, Busch was among a group that received a PowerPoint showing that some MDEQ officials knew of the TTHM risk in Flint as early as May 2014.

On February 27, 2015, Busch falsely represented to the EPA that Flint was using corrosion control. On March 13, 2015, Busch made statements that denied any provable connection between the switch to Flint River water and the presence of *legionella* in that supply. On June 24, 2015, Busch received a report from an EPA official regarding the high levels of lead in Flint's water supply, but failed to take measures to address the issues set forth in the report.

Finally, Busch, at some point or points during the time Flint was using Flint River water, directed Glasgow to alter water quality reports to remove the highest lead levels.

The majority of claims against Busch relate to e-mails and presentations he saw, but did nothing about. In this context, Busch's inaction does not show that he intended to either introduce a tainted water supply into Flint, or to deceive Flint's population about the safety of the water. However, the other allegations describe deceptive

statements by Busch both to the EPA and to, the Court infers, the public at large.

Statements intended to deceive the public about the safety of the tainted water they were using clearly give rise to a bodily integrity claim, because knowing deceptions to the involuntary users of a tainted water supply are inherently designed to convince those users to keep consuming the water. However, in the case of Busch, the Court must determine whether deceptive statements to federal regulatory agencies also give rise to a bodily integrity claim.

By February 2015, EPA regulators were investigating Flint's water supply. The allegations in the complaint are clear that by this point, no defendant would have been unaware of the threat Flint River water posed. However, Busch falsely represented to a regulator that Flint was using corrosion control. If believed, Busch's misrepresentation would ensure both that the public would be misled by whatever findings the EPA ultimately made, and that the threat to the health of Flint's water users would continue unnecessarily. Busch's claim, while not directly made to the public, was made to a third party in an effort to ultimately deceive or harm the public.

The Court takes these allegations as true, and they shock the conscience. Both of Busch's false statements support plaintiffs' bodily integrity claims. Plaintiffs have plausibly asserted a bodily integrity claim against Busch.

*Patrick Cook*

Cook, an MDEQ Water Treatment Specialist, signed the final permit necessary to restart use of the FWTP with the Flint River as the city's primary water source. Cook is also alleged to have misled the EPA in or around March 2015 about Flint's use of corrosion control in their water system after the switch, and to have sent false information to support the misrepresentation.

Cook signing the permit to authorize use of the FWTP, based on the allegations in the complaint, does not give rise to a bodily integrity claim. The complaint does not allege that at the time Cook signed the permit, he was aware of the risk Flint River water distributed through the FWTP posed, so that act could not have intentionally exposed Flint's water uses to the tainted water supply.

However, for the same reason that Busch's false statement to the EPA gives rise to a bodily integrity claim against him, Cook's false

statement to the EPA does the same. Plaintiffs have asserted a plausible bodily integrity claim against Cook.

*Michael Prysby*

Prysby, an MDEQ Engineer assigned to MDEQ District 11, which includes Genesee County and Flint, is alleged to have received an April 18, 2014 e-mail from Glasgow stating that Glasgow did not feel it was safe to go forward with distribution of water from the FWTP. Prysby also received the previously mentioned MDEQ PowerPoint presentation showing that some MDEQ officials had knowledge of Flint's elevated TTHM levels as early as May 2014. Prysby also received the June 24, 2015 EPA report describing Flint's elevated lead levels and the deficiencies in the government's processes that led to and exacerbated the problems. Finally, Prysby allegedly directed Glasgow to alter water quality reports to remove the highest lead levels.

The various communications that Prysby received to not give rise to a bodily integrity claim, because they show no affirmative act or deception on Prysby's part. However, Prysby directing Glasgow to deceive the public by removing the highest lead levels from water quality reports does give rise to a bodily integrity claim. Prysby engaged in an

affirmative act designed to deceive the public about the quality of Flint's water and, as a result, keep Flint's water users consuming tainted water, which is an arbitrary action that shocks the conscience. Plaintiffs have plausibly alleged a bodily integrity claim against Prysby.

*Bradley Wurfel*

Wurfel, the MDEQ Director of Communications, is alleged to have received a March 12, 2015 e-mail from Shekter-Smith regarding a *legionella*-related FOIA request. On July 10, 2015, Wurfel appeared on public radio and made false statements regarding the safety of Flint River water and denying any link to elevated lead levels in the water. On July 24, 2015, Wurfel again made false statements denying any lead or copper contamination in Flint's water supply. In August 2015, Wurfel attempted to discredit the findings of Professor Marc Edwards of Virginia Tech regarding elevated lead levels in Flint's water supply by calling the testing quick and irresponsible. Throughout September 2015, Wurfel continued to issue false statements claiming the water in Flint was safe and discrediting those who attempted to raise concerns about Flint's water supply.

The e-mail that Wurfel received and Wurfel's attempts to discredit Edwards do not give rise to a bodily integrity claim. As set forth above, receipt of information alone does not constitute an affirmative or deceptive act giving rise to a bodily integrity claim. And criticizing testing methods is not inherently deceptive, particularly as plaintiffs do not allege that Wurfel's intent in doing so was to deceive.

However, Wurfel's other statements do give rise to a bodily integrity claim, because he affirmatively and knowingly shared false statements with the public that were designed to conceal the threat Flint's water supply posed and, as a result, continue the harm Flint's water users faced. Plaintiffs have plausibly alleged actions that shock the conscience, and as a result, have pleaded a plausible bodily integrity claim against Wurfel.

*Jeff Wright*

Wright, the Genesee County Drain Commissioner, had encouraged the formation of the KWA since 2009. Wright was part of the previously described discussions regarding the cost effectiveness of switching to the KWA, and consistently argued that any study showing the DWSD was more cost effective was wrong. Wright was also part of the group that

developed the interim plan to use Flint River water between April 25, 2014, and October 2016, and was aware of the dangers Flint River water posed without proper treatment.

Wright's role in the debate over cost effectiveness between the KWA and the DWSD and in forming the KWA do not give rise to a bodily integrity claim. Generally, the bodily integrity claim arises from the defendants' knowledge of serious risks prior to the switch to the Flint River water supply, and the subsequent efforts to deceive the public about the safety of the water and continue the public's exposure to the water. It does not arise from the creation of the KWA itself, which could have obtained water from a different source than the Flint River.

Wright's role in the interim plan does, however, give rise to a bodily integrity claim, because he is alleged to have knowingly exposed all Flint water users to the contaminated water from the Flint River, as Dillon did. Plaintiffs have plausibly alleged a bodily integrity claim against Wright.

*Edward Kurtz*

Kurtz, the Emergency Manager of Flint from August 2012 through July 2013, suggested to Dillon in November 2012 that Flint join the

KWA. Kurtz was also a part of the 2012 conversations with DWSD about the comparative cost effectiveness of the DWSD and the KWA. Kurtz was a part of conversations in 2013 with Detroit's Emergency Manager regarding DWSD's final efforts to keep Flint as a customer.

Kurtz was the Emergency Manager who entered into the contractual relationship with the KWA. He was also a part of the June 2013 group that developed the interim plan to use the Flint River as an interim water source, despite knowledge of the risks the Flint River posed without proper treatment. Kurtz resigned from his position effective July 2013, nine months prior to the switch to the Flint River.

The steps Kurtz took to join the KWA and to attempt to negotiate with the DWSD do not give rise to a bodily integrity claim, because neither on their own resulted in the exposure of Flint's water users to contaminated water. Kurtz did play a role in developing the interim plan that led to the use of the Flint River as a water source for Flint. However, Kurtz was not Flint's Emergency Manager when the switch was made. Dillon and Wright maintained their positions of authority from the development of the interim plan through the execution of that plan, and could have stepped in at any point before April 25, 2014, to halt or alter

the plan and prevent foreseeable harms to Flint's water users. Kurtz, because he stepped down in July 2013, did not see the plan through and did not oversee the switch to the Flint River.

Because Kurtz did not aid in executing the interim plan on April 25, 2014, plaintiffs have failed to plausibly allege a bodily integrity claim against him. He is dismissed from this case.

*Darnell Earley*

Earley, the Emergency Manager of Flint from September 2013 until January 13, 2015, is alleged to have heard about the spike in Legionnaires' cases via an October 3, 2014 e-mail from Flint's Public Information Officer. In response, Earley denied any connection between Flint water and the outbreak, and stated that the city's "message" should be that the outbreak was an internal issue at McLaren Hospital, which MDHHS personnel did not agree with.

In October 2014, Governor Snyder's Deputy Legal Counsel and Senior Policy Advisor Valerie Brader coordinated discussions between Earley and MDEQ regarding a return to the DWSD water supply. Earley rejected the idea on October 14, 2014. On January 9, 2015, Earley again

refused to return Flint to the DWSD. Earley resigned on January 13, 2015, and Ambrose immediately replaced him.

As a threshold matter, Earley was in charge of Flint's governance before, during, and after the April 25, 2014 switch. Earley was also in charge of ensuring Flint's compliance with state and federal water safety regulations. This alone is enough to give rise to a plausible bodily integrity claim, because Earley oversaw the switch and would have known about Flint's lack of compliance with water safety regulations. The Court may also infer that as Flint's Emergency Manager, Earley played a role in obtaining the necessary permits issued by MDEQ and MDHHS officials, which would constitute another affirmative act or set of acts that led to the delivery of contaminated water to Flint's water users.

Earley's initial denial of the connection between Flint's water and the Legionnaires' disease outbreak is insufficient to state a bodily integrity claim. The complaint does not allege that Earley knew of the connection and misled anyone about it, but instead states that he wanted to convey a message regarding fault that MDHHS personnel disagreed with.

Earley's October 14, 2014 refusal to return Flint to the DWSD also gives rise to a bodily integrity claim. Despite overseeing the switch to the Flint River and having been made aware of the serious concerns MDEQ had about Flint River water, Earley still made the decision to continue exposing Flint's water users to contaminated water.

The complaint also generally alleges that Earley refused to return Flint to the DWSD on January 9, 2015. A bodily integrity claim requires an affirmative act on the part of a defendant that creates or prolongs the harm to a plaintiff. This allegation alone does not give rise to a bodily integrity claim.

Plaintiffs have alleged numerous arbitrary actions that shock the conscience, and have plausibly alleged a bodily integrity claim against Earley.

*Gerald Ambrose*

Ambrose, Flint's Emergency Manager from January 13, 2015 through April 28, 2015, is alleged to have rejected a January 29, 2015 offer from DWSD to reconnect Flint to the DWSD with the connection fee waived. On March 25, 2015, Ambrose also rejected the Flint City Council's vote to reconnect to the DWSD. Ambrose became aware of the

link between Flint River water and the Legionnaires' disease outbreak on October 3, 2014, via the same e-mail Earley received.

Ambrose took at least one affirmative step to prolong the harm experienced by Flint's water users. Ambrose's rejection of a concrete offer to return to the DWSD, particularly at a cost savings to Flint, constitutes arbitrary governmental action that shocks the conscience, and pleads a plausible bodily integrity claim. It was more than a failure to act – Ambrose had the opportunity to cease the flow of contaminated water to Flint, and prevented it from occurring. Ambrose's rejection of the Flint City Council vote presents a closer question of whether Ambrose took an affirmative step that prolonged the harm to Flint water users. The operation of Michigan's emergency manager statute removes virtually all of the power of local elected officials. And a rejection of what appears to have been a nonbinding vote requiring a government official to find a solution differs in quality from an affirmative statement by a government official that he is refusing to adopt the concrete steps necessary to end the poisoning of a population.

Ambrose's rejection of the DWSD offer to supply fresh, clean water to the city of Flint prolonged Flint water users' exposure to the toxic

water, and is sufficient to state a bodily integrity claim. Accordingly, plaintiffs have plausibly alleged a bodily integrity claim against Ambrose.

*Dayne Walling*

Walling, the Mayor of Flint from August 4, 2009, through November 9, 2015, is alleged to have been a part of the same events leading up to the switch to the Flint River as Governor Snyder, Wright, Kurtz, and Dillon. In relevant part, Walling was also part of the group that created the interim plan to use Flint River water, and Walling was aware of the dangers outlined in the 2011 study setting forth the problems the Flint River posed as a water source.

Walling, like Flint's city council, was stripped of virtually all, if not all, of his power when emergency management was imposed on Flint. Without some indication that Walling possessed authority as a governmental actor to impose the interim plan on Flint, knowledge of the plan's dangers alone is insufficient to state a bodily integrity claim against Walling. Unlike Dillon and Wright, Walling is not plausibly alleged to have had authority to influence, impose, or execute the interim plan, because all such power was stripped from him under Michigan law.

Plaintiffs have failed to plead a plausible bodily integrity claim against Walling.

*Michael Glasgow*

On April 16, 2014, Glasgow, one of Flint's former Utility Administrators, informed Rosenthal that he wanted more time to ensure the FWTP was meeting requirements before giving the okay to distribute water from it. On April 17, 2014, Glasgow informed MDEQ that the FWTP was not fit to begin operation. On April 18, 2014, Glasgow wrote to Busch and Prysby to state that he would not give the okay to begin using Flint River water despite pressure to do so, because he did not feel that staff was trained or that proper monitoring was in place. To the extent Glasgow did anything to cause the switch, plaintiffs plead that he was pressured to do so by Croft and Johnson.

By February 26, 2015, Glasgow had suggested testing for lead and copper to the EPA. On July 9, 2015, Glasgow sent an e-mail to Rosenthal describing the issues with Flint's water. However, during the period where Flint was using the Flint River water, Glasgow altered water quality reports to remove the highest lead levels, as directed by Busch and Prysby. Glasgow ultimately pleaded no contest to willful neglect of

duty as a result of his asking Flint residents to run or flush their water before testing, and his failing to obtain water samples from certain houses.

Glasgow tried to prevent the switch to the Flint River on April 25, 2014, and attempted to raise awareness of the issues with the supply with various officials after the switch. But Glasgow is also alleged to have taken numerous affirmative steps to hide the extent of the elevated lead levels in Flint's water after the switch from the public. Those actions included asking Flint residents to take actions that, unbeknownst to those residents, would artificially lower the levels of contaminants in their homes before testing, and neglecting to get water samples for testing from certain houses that the Court infers would have had higher levels of lead than those houses that were tested.

Glasgow is alleged to have taken multiple actions that were intended to deceive the public about the safety of the water they were consuming, and to have played a critical role in the switch to the Flint River on April 25, 2014. Despite Glasgow's effort to prevent or remediate the effects of his actions, this complaint, unlike in *Guertin*, alleges that he took actions that created, increased, or hid the risk of Flint residents

using tainted water. Plaintiffs have asserted a plausible bodily integrity claim against Glasgow.

*Daugherty Johnson*

Johnson, another former Flint Utility Administrator, is alleged to have pressured Glasgow to approve and begin the switch to Flint River water, and to have responded too slowly or not at all to a January 27, 2015 FOIA request from the Environmental Health Supervisor at the Genesee County Health Department.

The Court infers that Johnson allegedly required Glasgow to approve and begin the Flint River switch because he had the professional capacity to do so, knowing the dangers of this water supply, which was not properly treated for corrosion control. That arbitrary, conscience-shocking action gives rise to a plausible bodily integrity claim, because Johnson acted in a context where Glasgow clearly expressed both his resistance to the switch and the reasons for his resistance – namely, dangers to the people who would be using the water based on the lack of staff and ability to monitor the water supply. Johnson ignored these risks and pressured Glasgow to make the switch regardless.

Johnson's allegedly late response to the FOIA request is not a basis for a bodily integrity claim, as pleaded. The complaint does not allege that Johnson violated a rule, statute, or custom regarding timely responses to FOIA requests. As such, this allegation does not give rise to an inference that a six-week delay in responding to a FOIA request rises to a constitutional violation of plaintiffs' bodily integrity.

Plaintiffs have plausibly asserted a bodily integrity claim against Glasgow.

*Howard Croft*

Croft, Flint's former Director of Public Works, is also alleged to have pressured Glasgow to approve and begin the switch to Flint River water. The Court infers that Croft, like Johnson, had the professional capacity to require Glasgow to approve the switch despite Glasgow's clearly expressed reservations about the safety of the water. For the same reasons as those set forth above for Johnson, plaintiffs have plausibly asserted bodily integrity claim against Croft.

## E. Equal Protection Clause – Race and Wealth

Plaintiffs assert two Equal Protection claims under the Fourteenth Amendment of the Constitution: one based on race discrimination, the other based on wealth discrimination. These claims are asserted against Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley. The suspect classes plaintiffs base their Equal Protection claims on consist of "the water users of predominantly African American Flint" (Dkt. 349 at 121) and "the predominately impoverished water users of Flint." (*Id.* at 125.)

The Fourteenth Amendment sets forth the requirement that no governmental actor or unit shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle. Only when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction does the question whether this principle is violated arise." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587–88 (1979).

The concept of "jurisdiction" in the context of an Equal Protection claim is expansive, and governmental actors and units may not define persons as being outside of their jurisdiction for the purpose of escaping liability under the Fourteenth Amendment. *See Plyler v. Doe*, 457 U.S. 202, 213 (1982) (holding that a state could not define undocumented immigrants as beyond the state's jurisdiction when the state's law applied equally to all within the state's borders, regardless of immigration status.) "[T]he protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a [governmental unit], and reaches into every corner of a [governmental unit's] territory." *Id.* at 215 (emphasis in original).

Plaintiffs allege that Governor Snyder, Dillon, Kurtz, Earley, Ambrose, Walling, and Wright treated those who live in the city of Flint differently from those who live in Genesee County by switching Flint's water supply from the DWSD to the Flint River, while Genesee County remained on the DWSD. Governor Snyder and Dillon, as the Governor and Treasurer of the state of Michigan, exercised control and discretion over the choices Flint made because the city was under emergency management. Kurtz, Earley, and Ambrose were each appointed by

Governor Snyder and Dillon to manage Flint's affairs, and Walling was the Mayor of Flint during the relevant period. Wright was the Genesee County Drain Commissioner, and was pressuring the other defendants to join the KWA between 2012 and 2014. However, it is not clear from the complaint what authority Wright had over the water supply choices of either Genesee County or Flint during this time period.

Plaintiffs' Equal Protection claims for race-based and wealth-based discrimination require that both Flint and Genesee County have been within the jurisdiction of the named defendants. Because of the unique nature of Michigan's emergency manager laws, the Governor and Treasurer may, through an appointed emergency manager, exercise some control over the day-to-day operations of municipalities in financial emergencies. The emergency managers themselves have jurisdiction over the municipality where a financial emergency has been declared. The mayor of Flint has jurisdiction over the city of Flint (although when under control of an emergency manager, it is unclear what, if any, power an elected official has in a municipality). The Genesee County Drain Commissioner, the Court must assume, has control over some aspect of Genesee County's drainage system.

It is not clear from the complaint that anyone in charge of Flint's water supply had control over Genesee County or its water supply, or that anyone in charge of any aspect of Genesee County's water supply had control over Flint or its water supply. There are ample allegations of Wright weighing in on the choice that Governor Snyder, Dillon, Walling, and the emergency managers made for Flint in the run up to the April 25, 2014 switch to the Flint River. However, the complaint contains no allegation that the water systems of both Flint and Genesee County were within the jurisdiction of any named defendant.

Here, the law or action being challenged is not the imposition of the emergency manager, which arises from a law that applies to every municipal unit in Michigan, whether city or county. The law or action that is being challenged is the switch of Flint's water supply from the DWSD to the FWTP and the Flint River. The authority that Governor Snyder, Dillon, Walling, and the emergency managers had to authorize this switch came either from the emergency manager law, which granted Governor Snyder, Dillon, and the emergency managers the power to make decisions on behalf of Flint, or from Flint's own electoral process, which granted Walling the power to make decisions regarding issues

within Flint's borders (at least until the imposition of an emergency manager on Flint).

Because the complaint does not describe what Wright's duties were as the Genesee County Drain Commissioner, the Court must determine whether it can be inferred that Flint, or at least the determination regarding the source of the city's water supply, was within Wright's jurisdiction. Under Michigan's Drain Code of 1956, a drain commissioner "ha[s] jurisdiction over all drains within his county[.]" M.C.L. § 280.23. A "drain" includes:

> the main stream or trunk and all tributaries or branches of any creek or river, any watercourse or ditch, either open or closed, any covered drain, any sanitary or any combined sanitary and storm sewer or storm sewer or conduit composed of tile, brick, concrete, or other material, any structures or mechanical devices, that will properly purify the flow of such drains, any pumping equipment necessary to assist or relieve the flow of such drains and any levee, dike, barrier, or a combination of any or all of same constructed, or proposed to be constructed, for the purpose of drainage or for the purification of the flow of such drains, but shall not include any dam and flowage rights used in connection therewith which is used for the generation of power by a public utility subject to regulation by the public service commission.

M.C.L. § 280.3.

If a drain commissioner performs functions beyond acting as a drain commissioner, "including, but not limited to, operating sewers, lake level and soil erosion enforcement, and facilitating compliance with federal clean water act mandates," a county may change the name of the office from drain commissioner to water resources commissioner. M.C.L. § 280.21(8).

Under Michigan law, drain commissioners have limited power over drainage systems within their counties. State law contemplates that numerous functions related to water and water supplies are outside the control of drain commissioners, to the extent that even assuring compliance with federal clean water act mandates in the operation of a county's drainage system may result in a county changing the title of the drain commissioner. Unless state law or a county ordinance explicitly establishes that the designation of water sources for municipalities within a county is among the powers granted to the drain commissioner, the Court must assume that such power was not within Wright's authority unless some facts are pleaded demonstrating otherwise. No such facts have been pleaded here.

Likewise, the complaint does not allege that Flint and Genesee County had a relationship prior to Flint's water supply switch that would allow the Court to infer that Flint exercised some form of jurisdiction over Genesee County's water supply, or vice versa. Instead, the complaint alleges that the DWSD served both Flint and Genesee County separately.

At oral argument, plaintiffs stated that the jurisdictional element of their Equal Protection claims rests on the following two paragraphs of their complaint (Dkt. 532 at 72-76):

> 120. On June 29, 2013, LAN met with representatives of Flint, representatives of the Genesee County Drain Commissioners Office and the MDEQ to discuss:
>
> > a. Using the Flint River as a water source;
> >
> > b. The ability to perform the necessary upgrades to the FWTP;
> >
> > c. The ability to perform quality control;
> >
> > d. The ability for Flint to provide water to Genesee County;
> >
> > e. The ability to meet an April or May 2014 timeline; and
> >
> > f. Developing a cost analysis.

121. According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the following determinations were made:

    a. The Flint River would be more difficult to treat, but was viable as a source;

    b. It was possible to engineer and construct the upgrades needed for the treatment process;

    c. It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed[;]"

    d. FWTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

    e. There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and

    f. The next steps were for the LAN Defendants to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

(Dkt. 349 at 50-51.)

Assuming that the representatives of Flint and the representatives of the Genesee County Drain Commissioner's Office were the defendants

named in this count, these paragraphs do not allege facts sufficient to infer that the defendants had jurisdiction over both Flint and Genesee County. First, the outcome of the meeting was a conclusion that the FWTP could not distribute water to both Flint and Genesee County. At no other point does the complaint allege that Flint was providing or should have been able to provide water to Genesee County.

Second, the fact that a meeting took place between the representatives of three different governmental entities – Flint, Genesee County, and the MDEQ, a state agency – does not imply that one entity had jurisdiction over any other for purposes of this decision. Without some further allegation regarding the exercise of control by one or more defendants over both Flint and Genesee County, the Court cannot find that jurisdiction for the purposes of an Equal Protection claim has been plausibly alleged.

Although not pleaded in plaintiffs' complaint, during oral argument plaintiffs' counsel referenced an agreement between Flint and Genesee County that existed before Flint's switch to the Flint River. (Dkt. 532 at 64.) It is not clear what the agreement was, but it appears that Genesee

County may have received its water through Flint's DWSD supply, and paid Flint to receive that water.

If that were the case, then Flint (and those who governed Flint) may have had jurisdiction for Equal Protection purposes over Genesee County's water supply, because Flint as a governmental unit supplied Genesee County's water. The decision to switch to the Flint River while that pre-switch agreement was still effective would have been a decision to treat the water users of Flint differently from the water users of Genesee County while all residents were, for the purposes of their water supplies, under Flint's jurisdiction. Those facts, however, were not pleaded, and were not set forth with specificity at oral argument.

Many defendants argued that the FWTP did not have the capacity to deliver contaminated water to both Flint and Genesee County, and therefore no Equal Protection claim could stand regardless of jurisdiction. However, this argument fails. An Equal Protection claim, whatever the level of scrutiny applied, concerns the "disparity of treatment" between two groups. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Here, a series of decisions were made that altered a status quo where Flint and Genesee County received the same clean water. Those

decisions resulted in Flint receiving contaminated water that Genesee County did not receive. The issue in an Equal Protection claim is not whether Flint and Genesee County could have experienced the same harm, the issue is why Flint's African American and impoverished residents received worse treatment than predominantly white and wealthier Genesee County residents, when that disparate treatment, according the allegations of this complaint, was not required.

Further, a community devoting limited resources to unequal treatment of certain groups cannot defend itself by saying that it only had the resources to treat those groups unequally. For example, a police department that exclusively arrests African Americans without probable cause could not defend itself by saying it only had enough officers to unlawfully arrest black residents, and therefore did not discriminate on the basis of race.

Plaintiffs' counsel summarized the Equal Protection claims as follows: "[T]he reason the people of Flint got the inferior water was because they were black and they were poor." (Dkt. 532 at 87.) But at this stage of the case, the Court is not ruling on whether this statement is true or false. Rather, because plaintiffs have not set forth the

jurisdictional requirements for an Equal Protection claim, this opinion does not reach that question.

For the reasons set forth above, plaintiffs have not pleaded the core jurisdictional requirements to state a claim under the Equal Protection Clause, and their Equal Protection claims must be dismissed.

### F. 42 U.S.C. § 1985(3) – Invidious Racial Animus

Plaintiffs assert a claim under 42 U.S.C. § 1985(3), alleging that Governor Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley engaged in a conspiracy to deprive the "water users in the predominately African American community of Flint" of their civil rights. (Dkt. 349 at 128-29.) A § 1985(3) claim requires a plaintiff to show: "(1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States." *Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir. 1994). The plaintiff must allege that "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson,* 167 F.3d 1041, 1050 (6th Cir.

1999). The class must be a suspect class subject to heightened protection under the Equal Protection Clause. *Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980).

Although plaintiffs allege that these defendants conspired, and that the conspiracy was motivated by racial animus, the class that plaintiffs identify is not a suspect class subject to heightened scrutiny under the Equal Protection Clause. The purported suspect class that plaintiffs identify is all water users of Flint, which is a majority-African American city. A suspect class based on race would traditionally consist of the African American residents of Flint. If this were the case, and this traditional class of plaintiffs prevailed, the white Flint water users also affected by the switch to the Flint River, while not a part of the suspect class, would be aided by any remedy that class achieved for the community at large.

For instance, in *Hawkins v. Town of Shaw*, 437 F.2d 1286 (5th Cir. 1971), African American residents of a town sued, alleging that various municipal services, including sewer lines, water drainage, and water delivery services were systematically denied to African American residents based on the proportion of African American neighborhoods

that lacked those services. *Id*. Although statistics showed that black residents overwhelmingly and disproportionately faced these problems, scattered white residents of varying numbers who lived in these same neighborhoods also faced the same problems. *Id*. at 1289-90. The *Hawkins* court determined that through these disparities, the African American plaintiffs demonstrated an Equal Protection violation. *Id*. at 1293.

At oral argument, the Court asked plaintiffs whether they could identify any case in which an Equal Protection class subject to heightened scrutiny consisted both of members of a suspect class and members outside that class – particularly where the class as a whole consisted of the entire population of a municipality, unlike the class of African Americans in *Hawkins*, and where every member of the class was subject to the same or similar treatment. Plaintiffs identified two cases: *Adickes v. S.H. Kress & Co.* and *Phillips v. Snyder*.

In *Adickes v. S.H. Kress & Co.*, a white teacher in the company of six African American students went to a store on August 14, 1964 to eat lunch after being denied entry into the Hattiesburg Public Library. *Adickes*, 398 U.S. 144, 149 (1970). When the group sat down to eat, a

policeman noticed their presence. *Id*. The six African American students were served, but the teacher was not served, because she "was a white person 'in the company of Negroes.'" *Id*. When the white teacher was denied service, the group left, and when they reached the sidewalk, the teacher was arrested on a charge of vagrancy. *Id*.

The teacher sued, claiming that the store and the police conspired to, among other things, violate her Equal Protection rights by denying her service and arresting her on the basis of her race. *Id*. at 149-50. Notably, the suit was not on behalf of both the teacher and the students, but the teacher only. The basis of the claims in *Adickes* was that the teacher would not have been treated in the manner she was if she were not white. The *Adickes* plaintiff belonged to a suspect class subject to heightened scrutiny because she was discriminated against on the basis of her race, not because the group as a whole was discriminated against on the basis of the students' race.

In *Phillips v. Snyder*, Case No. 13-cv-11370, 2014 U.S. Dist. LEXIS (E.D. Mich. Nov. 19, 2014), where some of plaintiffs' counsel in this case were also counsel, those plaintiffs challenged Michigan's emergency manager law under the Equal Protection Clause. There, however, the

Equal Protection claim alleged that the law had "a discriminatory impact on African American populations." *Id.* at *18-19. This claim was dismissed by stipulation of the parties in order to expedite an appeal of the case, and that dismissal was upheld on appeal. *Phillips v. Snyder*, 836 F.3d 707, 718-20 (6th Cir. 2016). As set forth in the trial court's thorough opinion, the Equal Protection race discrimination claim in *Phillips* squarely focused on the impact of the challenged law on "Michigan's African American population," as opposed to "Michigan's white citizens." *Phillips*, 2014 U.S. Dist. Lexis 162097, at *30.

Unlike in *Phillips*, plaintiffs' claim in this case is not brought on behalf of the African American population of Flint. It is instead brought on behalf of all residents of Flint, regardless of race, because all residents were adversely impacted due to the presence of an African American majority. The white residents who are members of the Equal Protection class are not claiming they were discriminated against on the basis of their race. Rather, they are claiming they were discriminated against because they were members of a group containing other people who were of a different race, and every member of that group was treated in a

discriminatory fashion. In short, the common thread of the plaintiffs' proposed equal protection class is not race, but association.

In *Adickes*, a white teacher who was in the company of African American students was denied service and arrested because of laws and customs that treated white and black people differently. Her unequal punishment was targeted and driven by explicitly racist prohibitions on her behavior. Here, a class of people are alleging that, regardless of race, they were equally punished based on animus toward the African American members of the class.

Despite undertaking significant research, the Court can find no case asserting claims for race discrimination under the Equal Protection Clause by a class of individuals where at least 34% are not members of the protected class. (*See* Dkt. 379 at 91 (citing the population of Flint as 65.4% non-white and approximately 57% black).) There are many cases where non-targeted people benefit from litigation brought on behalf of a protected class, but this is not what plaintiffs seek to do in this case. The Court also cannot assess the sufficiency of this claim as applied to African American plaintiffs, because the complaint does not specify the races of the plaintiffs.

Because the suspect class identified as the subject of the § 1985(3) conspiracy is not a class based on race, which is subject to heightened scrutiny, but instead association, which is not, applicable Supreme Court precedent does not permit this claim to go forward, and it must be dismissed.

### G. Elliot Larsen Civil Rights Act – Public Service Provisions

Plaintiffs assert a claim under the Elliot Larsen Civil Rights Act ("ELCRA") for violation of that statute's public service provisions, M.C.L. 37.2302. Under these provisions, a person may not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." M.C.L. 37.2302(a).

"In order to state a claim under MCL 37.2302(a), plaintiff must establish four elements: (1) discrimination based on a protected characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation." *Haynes v. Neshewat*, 477 Mich. 29, 35 (2007). A plaintiff may prove race

discrimination under the ELCRA's public service provisions either by intentional discrimination or disparate treatment. *Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 538 (1991). Under either theory, the plaintiff must show that he or she is a member of the protected class. *Id.*

Plaintiffs' allegations largely rest on the same contentions that drive their Equal Protection and Section 1985(3) claims, except that the State of Michigan and City of Flint are also named as defendants. (Dkt. 349 at 131-134.) The protected class alleged here is "water users of the only predominantly non-white municipality through which the Flint River flows." (Dkt. 379 at 104.) The protected classes set forth in the ELCRA are religion, race, color, national origin, age, sex, or marital status. The ELCRA does not permit an associational class consisting of all who live, work, or travel through a predominantly African American city, including those who are not members of the targeted racial group.

As set forth above, the complaint also does not set forth the race of any named plaintiff. Accordingly, the Court cannot assess the viability of this claim as to an African American plaintiff. This claim is dismissed.

## H. Fraud

Unlike other claims at the motion to dismiss stage, fraud claims are subject to a higher pleading standard. The elements of fraud must be pleaded with particularity, except that malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

In Michigan, a claim for common law fraud requires a plaintiff to plead:

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi–Way Motor Co. v. Intl. Harvester Co.,* 398 Mich. 330, 336 (1976) (internal citations and quotation marks omitted).

All plaintiffs allege that Veolia defrauded them, based on three statements in Veolia's 2015 Interim Report. Those statements are: 1) that Flint's water was "safe" and "in compliance with drinking water standards"; 2) that the observed discoloration was merely aesthetic and not indicative of water quality or health problems; and 3) that medical

problems arose in Flint because "[s]ome people may be sensitive to any water." (Dkt. 349 at 146.) Plaintiffs' complaint references no other specific statements made by Veolia, so these are the only three statements the Court may consider in evaluating the sufficiency of their pleadings. *See Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (holding that fraudulent statements must be specifically alleged, including the time and place the statements were made).

Veolia raises several arguments regarding the sufficiency of the fraud claim. Chief among those argument are that the specific statements set forth above are inaccurately quoted, that plaintiffs fail to plead Veolia's intent and knowledge properly, and that plaintiffs fail to plead their own reliance properly.

At Veolia's request, the Court has reviewed the quoted statements in their full context in Veolia's 2015 Interim Report. The Court may review documents incorporated into the complaint by reference, such as documents relied on for the specific statements supporting a fraud claim. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The statements Veolia challenges are, for the purposes of the assertion

of a fraud claim at the motion to dismiss stage, accurate and properly pleaded.

Further, the entirety of the pleading sets forth the basis for the plaintiffs' claim that these statements were false. The complaint alleges the tainted water in Flint in February 2015 was *not* safe, in compliance with drinking water standards, or merely aesthetically displeasing; that the tainted water *did* specifically cause medical problems apart from the standard problems that might be associated with a population's sensitivity to a clean water supply; and that this information was generally known absent Veolia's representations to the contrary.

Plaintiffs allege that "[u]pon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity" and that the representations were made "with the intention that Plaintiffs would act and rely on them." (Dkt. 349 at 147.) Allegations of fraud "cannot be based upon information and belief, except where the relevant facts lie exclusively within knowledge and control of the opposing party, and even then, the plaintiff must plead a particular statement of facts upon which his belief is based." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir. 1990).

At the motion to dismiss stage for a fraud claim, "the plaintiff . . . must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." *Republic Bank & Trust Co.*, 683 F.3d at 247 (internal quotation marks and citation omitted). Veolia argues that plaintiffs' allegation of recklessness is insufficiently pleaded. However, the allegation meets the fraud pleading standard. Information about Veolia's recklessness in 2015 is solely within the knowledge of Veolia's decision-makers. On a theory of recklessness and ignorance about the veracity of a statement in a fraud claim, the plaintiffs' voluminous factual background about the information known to Flint, which retained Veolia, and to the public at large in 2015, satisfies this pleading requirement. To require further pleading regarding Veolia's alleged recklessness would be to ask the plaintiffs to plead facts they could not possibly know at this stage.

To sustain a fraud claim in Michigan, "the party claiming fraud must *reasonably* rely on the material representation." *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 39 (2008) (emphasis in original). As set forth above, this information cannot be pleaded based

upon information and belief, because this information is solely within the knowledge of the plaintiffs, not the defendants.

Plaintiffs' complaint alleges only that "[u]pon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act and rely on them, which Plaintiffs did." (Dkt. 349 at 147.) The phrase "which Plaintiffs did" is the sole factual allegation in the complaint stating that any plaintiff specifically relied on these statements in continuing to drink Flint River water after February 2015. That statement lacks any specificity as to when or how any plaintiff heard the allegedly fraudulent statements, which were set forth in a report purportedly on the city's website.

At oral argument, plaintiffs argued that specific reliance was pleaded with regard to at least one plaintiff: Tiantha Williams. The portion of the complaint introducing Williams states that "[p]rior to [December 2015], the family trusted previous reports that the condition of the water was not an immediate health emergency. They also relied on statements about the safety of the water that were made in public forums." (*Id*. at 17.) These general allegations are insufficient to specifically plead that Williams heard and relied on Veolia's statements.

Between April 2014 and December 2015, numerous parties, including Earley in October 2014, Busch and Shekter-Smith on March 13, 2015, and Wurfel on July 10 and July 24, 2015, issued allegedly false statements to the public. The general reference to "statements" may include any or all of these other false statements, and do not specifically implicate Veolia's 2015 Interim Report.

In the alternative, plaintiffs argue that reliance may be inferred because Veolia's report was available on Flint's public website. (Dkt. 379 at 123 n.47.) Plaintiffs failed to plead this information in the complaint, and the Court cannot rely on it to determine if reliance was properly pleaded. Even if the Court considers this additional information, the particular plaintiffs in this case do not plead that they specifically became aware of and relied on Veolia's statements in continuing to use Flint water after February 2015.

Plaintiffs argue that they need not show direct reliance on a fraudulent misrepresentation to assert a fraud claim, citing *Nernberg v. Pearce*, 35 F.3d 247 (6th Cir. 1994). In *Nernberg*, a plaintiff properly asserted a fraud claim where fraudulent misrepresentations were made to a third party, and the misrepresentations were repeated by that third

party to induce the plaintiff's reliance. *Id.* at 251. However, the plaintiff still specifically demonstrated that he actually heard and relied on the misrepresentations. *Nernberg* does not mean that a plaintiff may allege a fraud claim where a third party heard and relied on a false statement, but the plaintiff does not allege with particularity that he or she *also* did so.

Finally, plaintiffs argue that questions as to reliance "pertain[s] to questions of fact, not sufficiency of the pleadings." (Dkt. 379 at 124 (citing *State Farm Mut. Ins. Co. v. Elite Health Ctrs., Inc.*, Case No. 16-cv-13040, 2017 U.S. Dist. LEXIS 82736, at *25 (E.D. Mich. May 31, 2017).) *Elite Health* does not stand for the rule that a plaintiff does not need to plead reliance with particularity. That case did not concern a defendant's argument that the pleadings were insufficient as to reliance. Instead, the defendant in *Elite Health* argued that the plaintiff's allegations were "contradictory and/or self serving," and *that* contention pertained to questions of fact rather than sufficiency of the pleadings. *Id.* The *Elite Health* complaint contained a "116-page description of how the alleged scheme to defraud" worked, *id.* at *23, and determined that the plaintiff

had properly "alleged that it justifiably relied on Defendants' misrepresentations." *Id.* at *26.

This analysis does not foreclose a fraud claim against Veolia by other plaintiffs. However, those plaintiffs *must* plead the necessary elements of their fraud claim with particularity, including their reliance on Veolia's allegedly fraudulent statements. Because these plaintiffs did not plead the reliance element of their fraud claim with sufficient particularity, their fraud claim must be dismissed.

## I. Negligent Infliction of Emotional Distress

Plaintiffs assert what they term a negligent infliction of emotional distress ("NIED") claim against LAN and Veolia. (Dkt. 349 at 148.) The elements of a claim for negligent infliction of emotional distress under Michigan law are:

> (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock "fairly contemporaneous" with the accident.

*Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 34 (2002).

Plaintiffs argue that they are bringing a "direct negligent infliction of emotional distress" claim, different from the NIED claim set forth in *Hesse*. Plaintiffs rely on *Daley v. LaCroix*, 384 Mich. 4 (1970), to argue that NIED does not require an injury to a third party for a plaintiff to pursue the claim. In *Daley*, the Michigan Supreme Court considered whether a plaintiff alleging "a definite and objective physical injury [] produced as a result of emotional distress proximately caused by defendant's negligent conduct . . . may recover in damages for such physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock." *Id.* at 12-13 (1970).

*Daley* did not create a cause of action for negligent infliction of emotional distress absent an injury to a closely related third party. "[R]ather than create a cause of action, [*Daley* and cases following it] merely allow damages for emotional distress when the plaintiff has prevailed on a negligence cause of action." *McNeil ex rel. McNeil v. Metinko*, Nos. 194595, 194596, 1998 Mich. App. LEXIS 2506, at *7-8 (Mich. Ct. App. Mar. 13, 1998).

Plaintiffs rely on two other cases, *Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897, 900 (W.D. Mich. 1983) and *Maldonado v. Nat. Acme Co.*, 73 F.3d 642, 645-46 (6th Cir. 1996), to argue that *Daley* did establish a tort of negligent infliction of emotional distress that did not require an injury to a third party. First, both cases predate *Hesse*, in which the Michigan Supreme Court limited the tort as set forth above. Second, *Hesse* explicitly stated that "[t]he common-law cause of action for negligent infliction of emotional distress has been recognized and applied in Michigan, although this Court has never ruled on the issue." *Hesse*, 466 Mich. at 34. It is impossible to read *Daley*, a Michigan Supreme Court decision, to create a type of NIED claim when Michigan courts have stated that *Daley* did not do so, and when as of 2002, the Michigan Supreme Court had not recognized NIED at all.

Further, an NIED claim "clearly contemplates a sudden, brief, and inherently shocking accidental event which causes the injury . . . , which contemporaneously, and by its very nature, results in emotional and physical injury to the plaintiff." *Brennan v. Chippewa Cty. War Mem'l Hosp., Inc.*, Nos. 315795, 318452, 318594, 2014 Mich. App. LEXIS 1912, at *25 (Mich. Ct. App. Oct. 16, 2014) (further citation omitted). Plaintiffs

do not allege that either LAN or Veolia committed an act that was sudden or brief, but instead allege that over a period of months for Veolia and even years for LAN, these defendants repeatedly failed to properly evaluate or treat Flint's water, resulting in prolonged injury to all who used Flint River water after April 25, 2014.

On review of plaintiff's complaint, this claim is a request for emotional distress damages arising from the negligence claims asserted against LAN and Veolia. Because the claim is presented as one for NIED, it is dismissed on the grounds that it fails to plead an NIED claim under Michigan law. However, this ruling does not preclude plaintiffs' from seeking emotional distress damages arising from their surviving negligence claims.

### J. *Monell* Liability

Plaintiffs have asserted a standalone claim against Flint for liability under *Monell v. Dep't' of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *Monell* states that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or

decision officially adopted and promulgated by that body's officers." *Id.* at 690 (1978). A municipality may only be liable under *Monell* if there is an underlying constitutional violation by a municipal employee or official. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).

Flint argues that this claim should be dismissed for two reasons: first, that a plaintiff may not assert a standalone *Monell* claim independent of unconstitutional behavior by city officials or employees, and second, that the imposition of the emergency manager on Flint means that any unconstitutional actions taken by an official or employee of Flint was pursuant to a policy or decision adopted and promulgated by the State of Michigan rather than the city of Flint.

As set forth above, plaintiffs have stated a claim that Earley, Ambrose, Croft, Glasgow, and Johnson violated their constitutional right to bodily integrity. They have also pleaded that Flint had a policy of providing tainted water to the users of its municipal water supply. To the extent that Flint argues that plaintiffs' municipal liability claim under *Monell* should have been pleaded as a part of the bodily integrity claim rather than as a separate claim, there is no requirement that a *Monell*

claim be presented in either fashion if it is clear from the face of the pleading that the elements of that claim have been asserted.

Flint's argument regarding whether a state-appointed emergency manager is a final decision-maker for Flint appears to be a matter of first impression. However, it is not a difficult question.

A municipality is liable under § 1983 where the unconstitutional policy or decision may be said to have been promulgated by a final decision-maker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485 (1986). There is no requirement that the final decision-maker be elected or appointed in any particular fashion, so long as one exists and created or enforced the policy. Flint argues that because the emergency manager was acting on behalf of the state, any policy or decision made by the emergency manager is, by definition, a state policy rather than a city policy.

As set forth previously, an emergency manager "act[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). "Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief

administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager." *Id.*

When an emergency manager is appointed to run a municipality, he or she becomes a final decision-maker for that municipality with respect to the areas in which he or she has assumed power. To hold otherwise would require a holding that the imposition of a different kind of government under the emergency manager statute meant that municipalities had, in effect, no government at all for constitutional purposes. The imposition of an emergency manager would completely block municipal liability for the unconstitutional acts of city officials or employees.

Flint does not otherwise challenge plaintiffs' *Monell* claim. Because the emergency managers imposed by the State of Michigan were officials whose edicts or acts may fairly be said to represent official policy for Flint, the claim survives with respect to plaintiffs' bodily integrity claim, but is dismissed as to plaintiffs' other constitutional claims.

## K. Negligence Claims

Plaintiffs assert claims for negligence, professional negligence, and gross negligence against LAN and Veolia. LAN and Veolia move to dismiss the negligence and gross negligence claims, on the grounds that the negligence claims are preempted by the professional negligence claims, and the gross negligence claims do not exist under Michigan law. Veolia also moves to dismiss certain defendants based on deficiencies in the pleading.

In *Guertin*, the Court analyzed these same negligence claims and ultimately held as LAN and Veolia now argue. First, the common-law negligence claims against these defendants were dismissed, as claims against professional engineering companies requiring expert testimony as to the required professional standard of care sound in professional, rather than common-law negligence. (Case No. 16-cv-12412, Dkt. 191 at 4-5.) Second, the gross negligence claims were dismissed, as gross negligence does not exist as an independent tort in Michigan. (Case No. 16-cv-12412, Dkt. 151 at 94-97.)

### i.    Common-Law Negligence

Plaintiffs argue that claims for both negligence and professional negligence can be asserted against LAN and Veolia, because the complaint alleges that these defendants failed both to act as reasonable people would, and as reasonable professionals would. (Dkt. 379 at 107-08.) Plaintiffs rely chiefly on *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411 (2004), a medical malpractice case in which claims for medical malpractice and common-law negligence were allowed to proceed.

In Michigan, "[t]he determination whether a claim will be held to the standards of proof and procedural requirements of a medical malpractice claim as opposed to an ordinary negligence claim depends on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment." *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 46 (1999).

*Bryant* concerned claims arising from the death of a nursing home resident who slipped between the rails of her bed and the mattress after wedges failed to keep her in place, was unable to free herself, and asphyxiated, after she had previously been observed slipping out of bed

and nearly asphyxiating herself the previous day. *Bryant*, 471 Mich. at 416-17. Even though there were medical malpractice claims asserted, the plaintiff was permitted to proceed with a common-law negligence claim because the complaint alleged that the decedent's risk of slipping and falling was known to defendant, and defendant did nothing to prevent future harm. "No expert testimony [was] necessary to show that the defendant acted negligently by failing to take any corrective action after learning of the problem. A fact-finder relying only on common knowledge and experience [could] readily determine whether the defendant's response was sufficient." *Id.* at 431.

Plaintiffs likewise rely on other medical malpractice cases to support the existence of an independent cause of action for negligence in this case. *See, e.g., Trowell v. Providence Hosp. & Med. Ctrs., Inc.*, 316 Mich. App. 680, 693-94 (2016) (analyzing medical malpractice cases). The critical issue in these cases is whether an ordinary layperson "lacks knowledge regarding the appropriate methods and techniques for" performing the duties at the core of the negligence claim. *Wiley v. Henry Ford Cottage Hosp.*, 257 Mich. App. 488, 510 (2003).

Plaintiffs' common-law negligence claim states that LAN and Veolia, "[u]pon learning of the release of the contaminants . . . owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class, and their property and/or to act reasonably to minimize the damage to Plaintiffs, the Class, and their property." (Dkt. 349 at 149.) An ordinary layperson would have little to no knowledge about the appropriate methods and techniques for remediating, containing, and eliminating lead and bacteria in a municipal water supply, and plaintiffs do not argue otherwise.

In *Bryant*, the duty to prevent an elderly woman from falling out of bed and choking to death involved methods and techniques that were obvious to any person, and required no specific medical knowledge – the defendant needed to put something in place that would stop the patient from slipping out of bed. Here, the duty to remediate, contain, and eliminate water contamination on a citywide basis necessarily implicates methods and techniques beyond those of a layperson. As plaintiffs plead in their complaint, proper treatment of the water by LAN and Veolia required scientific knowledge related to corrosion inhibition, whether

mandating use of certain chemicals was likely to solve or exacerbate the contamination, and monitoring the acidity levels of the water flowing throughout the city of Flint. (Dkt. 349 at 6-7.) Plaintiffs' negligence claim is dismissed.

## ii. Gross Negligence

Plaintiffs also argue that gross negligence is an independent cause of action in Michigan. Gross negligence is not an independent cause of action in Michigan, but instead a standard used to determine liability in certain tort and contract-based claims. *Xu v. Gay*, 257 Mich. App. 263, 268-69 (2003).

"[I]n *Jennings v. Southwood*, 446 Mich. 125 (1994), the Michigan Supreme Court barred all claims of common-law gross negligence under Michigan law except in certain contexts in which Michigan law exculpates actors for mere negligent conduct." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 377 (6th Cir. 2009); *see also Johnson v. Williams*, Case No. 15-cv-13856, 2017 U.S. Dist. LEXIS 156149, at *48 (E.D. Mich. Sept. 25, 2017) (noting that "there is no independent cause of action for gross negligence" in Michigan).

Because gross negligence does not exist as an independent claim in Michigan, plaintiffs' gross negligence claim is dismissed.

### iii.    Pleading Deficiencies

Veolia argues that certain named defendants should be dismissed in part or in whole based on pleading deficiencies.

First, Veolia argues that Rhonda Kelso and her daughter K.E.K.'s claims must be dismissed, because Kelso and her daughter allege that they "bathed, washed, and cooked with the water until at least January 2015." (Dkt. 349 at 13.) The complaint alleges that Veolia became involved in the Flint water contamination crisis in February 2015. Plaintiffs argue that the Court may infer that "at least" means that it is plausible that Kelso and her daughter bathed, washed, and cooked with Flint River water after January 2015.

The complaint sets forth specific allegations about the manner in which each plaintiff used Flint River water after April 25, 2014, and in select cases, mentions specific dates through which the plaintiffs used the water. Other plaintiffs, however, allege that they used Flint River water for the entirety of "the relevant time period," or mention no limitation on the time period. (*See, e.g.,* Dkt. 349 at 14-15 (alleging claims on behalf of

Marilyn Bryson).) If Kelso and K.E.K. allege that they used Flint River water through "at least January 2015," and other plaintiffs either specifically allege that they used Flint River water for the entire time period or do not mention any potential limitation on their period of use, the Court must infer that Kelso and K.E.K. have not plausibly alleged use of Flint River water after January 2015. Their claims against Veolia are dismissed.

Second, Veolia argues that David Munoz's claims against it should be dismissed because there is no allegation that Munoz's home, which is located in Flint, was "serviced by City of Flint municipal water at any time after February 10, 2015." (Dkt. 274 at 29.) However, the complaint states that Munoz owned a home in Flint, and places no limitation on the time period in which he owned his home. The Court may plausibly infer that all homes in Flint were serviced by City of Flint municipal water, because the point of a municipal water supply is to provide water to the residents of the city. Munoz's claim against Veolia is not dismissed.

Third, Veolia argues that Amber Brown and K.L.D.'s claims as to Veolia must be dismissed, because their claims arise from harm K.L.D. experienced in utero and was realized at her birth on November 18, 2014.

The complaint specifically references Brown and K.L.D.'s use of Flint Water up to K.L.D.'s birth, but then makes no allegation about any use of the water after that date. Because Brown and K.L.D.'s allegations of harm end at the date of K.L.D.'s birth, months before Veolia became involved in this crisis, Brown and K.L.D.'s claims against Veolia are dismissed.

Fourth, Veolia argues that Gilcreast's claims against it should be dismissed because Gilcreast has not designated herself as a partner litigating on behalf of the partnership. (*Id.* at 32 (citing *Ragnone v. Charter Twp. of Fenton*, No. 267530, 2006 Mich. App. LEXIS 3273, at *8 (Mich. Ct. App. Nov. 2, 2006)).) However, the complaint states that she is a member of a partnership, and states that the harms she has experienced are to the properties the partnership owns. (Dkt. 349 at 19.) Gilcreast has "brought the instant action in [her] capacity as [a] partner[]," and her claims will not be dismissed. *George Morris Cruises v. Irwin Yacht & Marine Corp.*, 191 Mich. App. 409, 415 (1991).

Finally, Veolia argues that EPCO and Angelo's Coney Island Palace's claims against it must be dismissed, because, like Munoz, they fail to specifically allege damages after February 10, 2015, when Veolia

became involved in the Flint water crisis. Because neither plaintiff places a limitation on when it used or was affected by Flint River water, the Court plausibly infers that they are alleging harm throughout the entire time period at issue in this case. Their claims are not dismissed.

Kelso, K.E.K., Brown, and K.L.D.'s claims against Veolia are all dismissed. Because no other defendant moved to dismiss any individual plaintiff's claim based on any particular pleading deficiency, the Court will not address any argument Veolia made with regard to any claim asserted against any other defendant.

### L. Nancy Peeler

Plaintiffs' complaint names Nancy Peeler as a defendant, and describes her role as the MDHHS Director for the Program for Maternal, Infant and Early Childhood Home Visiting, and as the person in charge of MDHHS's childhood lead poisoning program. (Dkt. 349 at 31.) The complaint does not contain any allegation about what Peeler did or did not do in relation to the Flint water contamination crisis.

At oral argument, Peeler's counsel noted that the complaint contained no specific allegations regarding Peeler. Plaintiff's counsel stated that allegations regarding Peeler were left out of the complaint,

but also stated that the omission arose from an order of the Court following the October 25, 2017 global status conference for all Flint water cases. In plaintiffs' counsel's view, the Court permitted plaintiffs to amend their complaint to add Peeler to the case caption, but refused leave for plaintiffs to amend their complaint to add substantive allegations against Peeler.

At the October 25, 2017 status conference, Michael Pitt, counsel for class plaintiffs, brought up "one housekeeping matter." (Dkt. 259 at 108.) Plaintiffs had "agreed now to file a new consolidated complaint by the end of this week." (*Id.*) Pitt noted "an oversight," which was that Peeler "was left off of the complaint" – namely, "[t]he case caption. She's mentioned in the body of the complaint." (*Id.* at 108-09.) The Court then granted plaintiffs' counsel's request to amend the complaint to correct the deficiency. (*Id.* at 109.) The amended complaint was filed on October 27, 2017. (Dkt. 238.) Another amended complaint was filed on January 25, 2018, to remove certain allegations about criminal charges against certain defendants. (Dkt. 349.)

The Court did not deny plaintiffs an opportunity to amend their complaint to include allegations against Peeler, because plaintiffs made

no such request. They merely requested leave to amend the case caption. Because the complaint contains no allegations that Peeler engaged in any activity that could give rise to liability for any claim in which she was named, all claims against Peeler are dismissed.

## V.    Conclusion

For the reasons set forth above, it is hereby ordered that:

Busch, Cook, Prysby, Rosenthal, and Shekter-Smith's motion to dismiss the complaint (Dkt. 273) is GRANTED IN PART AND DENIED IN PART;

Veolia's partial motion to dismiss the complaint (Dkt. 274) is GRANTED IN PART AND DENIED IN PART;

Ambrose, Croft, Earley, Flint, Glasgow, Johnson, and Walling's motion to dismiss (Dkt. 276) is GRANTED IN PART AND DENIED IN PART;

Wright's motion to dismiss (Dkt. 277) is GRANTED IN PART AND DENIED IN PART;

The LAN partial motions to dismiss (Dkts. 278, 283) are GRANTED;

LAN's motion for a more definite statement (Dkt. 283) is DENIED;

Dillon, Lyon, MDHHS, Governor Snyder, and the State of Michigan's motion to dismiss (Dkt. 279) is GRANTED IN PART AND DENIED IN PART;

Wyant's motion to dismiss (Dkt. 281) is GRANTED;

Wurfel's motion to dismiss (Dkt. 282) is GRANTED IN PART AND DENIED IN PART; and

Peeler's motion to dismiss (Dkt. 294) is GRANTED.

The State of Michigan, Governor Snyder, Wyant, Kurtz, Walling, and Peeler are DISMISSED from this case.

Plaintiffs' state-created danger, Equal Protection, § 1985(3), ELCRA, fraud, NIED, negligence, and gross negligence claims are DISMISSED.

Kelso, K.E.K., Brown, and K.L.D.'s professional negligence claims against Veolia are DISMISSED.

Frances Gilcreast, Epco Sales, LLC, and Angelo's Coney Island Palace, Inc.'s bodily integrity claims are DISMISSED.

IT IS SO ORDERED.

Dated: August 1, 2018          s/Judith E. Levy
Ann Arbor, Michigan           JUDITH E. LEVY
                              United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 1, 2018.

s/Shawna Burns
SHAWNA BURNS
Case Manager