# EXHIBIT A

# SETTLEMENT AGREEMENT

## TABLE OF CONTENTS

RECITALS.................................................................................................1

I.  Definitions ......................................................................................4

II.  Duration .........................................................................................11

III.  Compliance ....................................................................................11

IV.  Service Line Replacement .............................................................13

    A.  Replacement of Service Line; Replacement Eligible Households .....13

    B.  Timeline and Milestones ....................................................18

    C.  Funding.................................................................................19

    D.  Process..................................................................................28

    E.  Faucet Filter Maintenance after Service Line Replacement ..............29

    F.  Monitoring in Connection with Service Line Replacements.............30

    G.  Completion of Service Line Replacement ..........................................32

V.  Tap Water Monitoring ...................................................................32

    A.  Tap Water Monitoring During Consecutive 6-month Periods...........32

    B.  Independent Monitoring Program ......................................................33

    C.  Sample Collection .................................................................36

    D.  Voluntary Residential Monitoring ......................................................37

    E.  Notification of Tap Water Monitoring Results ...................................38

VI.  Filter Installation, Maintenance, and Education............................39

|   | A. | CORE Staff | 39 |
|   | B. | Initial Visits | 40 |
|   | C. | Follow-Up Visits | 47 |
|   | D. | Opt-out Option for Eligible Households | 50 |
|   | E. | New Flint Water System Customers | 51 |
|   | F. | Appointment for CORE Team Visits | 51 |
|   | G. | Priority CORE Team Visits | 52 |
|   | H. | Publicity for CORE Program | 52 |
| VII. | Bottled Water Distribution | | 54 |
|   | A. | Community Water Resources Sites | 54 |
|   | B. | 2-1-1 Services | 57 |
|   | C. | Access and Functional Needs List | 58 |
| VIII. | Health Programs | | 59 |
| IX. | Release of Liability | | 60 |
| X. | Reporting and Disclosures | | 63 |
| XI. | Notices | | 69 |
| XII. | Attorney Fees and Costs | | 70 |
| XIII. | Dispute Resolution and Judicial Enforcement | | 71 |
| XIV. | Force Majeure | | 72 |
| XV. | Modification | | 74 |

iii

XVI.  Dismissal and Waiver of Appeal .................................................................. 75

XVII. Signatories and Counterparts ........................................................................ 76

XVIII. Integration Clause ........................................................................................ 76

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into, by, and between Plaintiffs Concerned Pastors for Social Action, Melissa Mays, Natural Resources Defense Council, Inc., and American Civil Liberties Union of Michigan; Defendants Nick A. Khouri, in his official capacity as Treasurer for the State of Michigan; Frederick Headen, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Michael Finney, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Mike Townsend, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Joel Ferguson, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; the City of Flint; and Sylvester Jones, in his official capacity as City Administrator for the City of Flint; and third parties Michigan Department of Environmental Quality and the State of Michigan, hereafter referred to individually as "Party" and collectively as "Parties."

## RECITALS

WHEREAS, on January 27, 2016, Plaintiffs filed a Complaint in the U.S. District Court for the Eastern District of Michigan, entitled *Concerned Pastors for Social Action, et al. v. Khouri, et al.*, Case No. 2:16-cv-10277. The Complaint, ECF No. 1, seeks declaratory and injunctive relief under the citizen-suit provision of the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a);

1

WHEREAS, Plaintiffs alleged in their Complaint that the Flint Water System is in violation of the Lead and Copper Rule's requirements for corrosion control treatment, tap water monitoring, notification, and reporting, Compl. ¶¶ 168-75; and that each named Defendant is liable for the alleged violations of the Lead and Copper Rule as an owner and/or operator of the Flint Water System within the meaning of the Safe Drinking Water Act, Compl. ¶¶ 29-30;

WHEREAS, Defendants answered Plaintiffs' Complaint, denied liability, and denied that any violation of the Lead and Copper Rule has taken or continues to take place; and Defendants Michigan State Treasurer and Members of the Flint Receivership Transition Advisory Board denied they were operators of the Flint Water System within the meaning of the Safe Drinking Water Act, *see* ECF Nos. 65, 69;

WHEREAS, on November 10, 2016, the Court issued an opinion and order granting Plaintiffs' motion for a preliminary injunction, ECF No. 96;

WHEREAS, on November 21, 2016, State Defendants filed a notice of appeal from the order granting a preliminary injunction, ECF No. 99;

WHEREAS, on December 13, 2016, State Defendants filed a motion to dissolve the preliminary injunction, ECF No. 110, and on December 20, 2016, Plaintiffs filed a motion to enforce the preliminary injunction, ECF No. 116;

WHEREAS, on December 19, 2016, counsel for Governor Rick Snyder

2

wrote to the Court requesting the appointment of a mediator to facilitate resolution of the Case;

WHEREAS, on December 28, 2016, the Court appointed a mediator to facilitate settlement discussions among the Parties to this Agreement, ECF No. 122, and the Parties have since engaged in arm's-length settlement discussions;

WHEREAS, all Parties agree that replacing all lead and galvanized steel water service lines in the City of Flint with copper water service lines will help reduce lead contamination in the City's drinking water;

WHEREAS, the Parties have agreed to resolve this Case on the terms set forth in this Agreement without admission of any issue of fact or law;

WHEREAS, the Parties' entry into this Agreement is contingent upon the Court's incorporation of the Agreement into a judicial order over which the Court will retain jurisdiction to enforce the Agreement's terms;

WHEREAS, the third parties, the State of Michigan and the Michigan Department of Environmental Quality, enter into this Agreement for the sole purpose of aiding the Defendants in resolving this Case, and do not waive their Eleventh Amendment immunity to the Court's jurisdiction except as explicitly indicated herein;

WHEREAS, the State Defendants have been named as Defendants in the Case in their official government capacities, and the State Defendants are relying

3

on the State of Michigan, Michigan Department of Environmental Quality, and the City to provide the relief described in this Agreement;

WHEREAS, the Parties agree that resolution of this Case without the delay, expense, risk, and uncertainties of further litigation, including trials and appeals, is in the best interest of the Parties, the public, and judicial economy;

WHEREAS, after the voluntary exchange of information, the Parties consider this Agreement to be a fair, reasonable, and equitable resolution of all claims in this Case;

**BASED ON THE FOREGOING RECITALS AND THE TERMS AND CONDITIONS STATED HEREIN**, the Parties agree as follows:

## I.   Definitions

1.     Unless otherwise expressly defined in this Agreement, terms used in this Agreement that are defined in the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, or in regulations promulgated under the Safe Drinking Water Act, shall have the meaning assigned to them in the statute or the U.S. Environmental Protection Agency (EPA) regulations thereunder.

2.     Whenever the terms listed below are used in this Agreement, the following definitions apply:

a.     "active water account" means any account registered with the City through which the City legally provides drinking water at

4

2:16-cv-10277-JEL-MKM  Doc # 164-1  Filed 06/27/17  Pg 10 of 93  Pg ID 5352

the address associated with that account. A water account is "active" regardless of whether the account owner's payments are up to date or past due;

b.    "Agreement" means this Settlement Agreement and any attachments or exhibits expressly incorporated by reference into this Settlement Agreement;

c.    "Case" means *Concerned Pastors for Social Action, et al. v. Nick A. Khouri, et al.*, No. 2:16-cv-10277 (E.D. Mich. Jan. 27, 2016), and appeals arising out of that matter, including Case No. 16-2628 in the United States Court of Appeals for the Sixth Circuit;

d.    "City" means the City of Flint, Michigan;

e.    "City Defendants" means the City of Flint, and Sylvester Jones, in his official capacity as City Administrator for the City of Flint;

f.    "Community Water Resources Site" means one of nine points of distribution (PODs) where the State of Michigan presently makes bottled water, faucet filters, faucet filter cartridges, and household tap water testing kits available free of charge to Flint residents;

5

g.    "Completion of Service Line Replacement" means the date the City of Flint materially completes its obligations under Paragraphs 8-20, 28-30, 33, and 38 of this Agreement;

h.    "Day" means a calendar day. In computing any period of time under this Agreement, where the last day would fall on a Saturday, Sunday, or State of Michigan or federal holiday, the period shall run until the close of business of the next working day;

i.    "Defendants" means Nick A. Khouri, in his official capacity as Treasurer for the State of Michigan; Frederick Headen, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Michael Finney, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Mike Townsend, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; Joel Ferguson, in his official capacity as a Member of the Flint Receivership Transition Advisory Board; the City of Flint; and Sylvester Jones, in his official capacity as City Administrator for the City of Flint;

j.    "Effective Date" of this Agreement means the date the U.S.

6

District Court enters an order incorporating the terms of this Agreement, retaining jurisdiction to enforce this Agreement, and dismissing the Case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2);

k.  "EPA Order" means the Emergency Administrative Order dated January 21, 2016, amended on November 17, 2016, *In re: City of Flint, Michigan; Michigan Department of Environmental Quality; and the State of Michigan*, incorporated by reference in this Agreement and attached as Exhibits A and B;

l.  "excavations" means digging a hole or channel through a method approved by the City at the location of a curb stop and box and exposing several inches of the service line in each direction, for the purpose of identifying the material of a buried service line;

m.  "Faucet Filter" means a point-of-use faucet-mounted filter certified by the National Sanitation Foundation to remove lead up to 150 ppb, such as the Brita faucet filter, model SAFF-100, or a PUR Faucet Mount, model number FM-3700B;

n.  "Flint Water System" means the public water system owned by the City of Flint, Michigan;

7

o.   "Government Parties" means Defendants, the State of Michigan, and the Michigan Department of Environmental Quality, collectively;

p.   "household" means a dwelling unit with plumbing that connects to the Flint Water System;

q.   "Lead Action Level" means the applicable "action level" for lead in the Michigan Administrative Code, as promulgated pursuant to the Michigan Safe Drinking Water Act, 1976 PA 399. As of the Effective Date, the lead action level is identified in Michigan Administrative Code Section R 325.10604f;

r.   "Lead and Copper Rule" means the regulations set forth at 40 C.F.R. §§ 141.80 to .91;

s.   "Paragraph" means a portion of this Agreement identified by a non-Roman numeral or a lowercase letter;

t.   "Plaintiffs" means Concerned Pastors for Social Action, Melissa Mays, Natural Resources Defense Council, Inc., and American Civil Liberties Union of Michigan;

u.   "property owner" means a person or entity who has legal authority to grant permission for excavation or service line replacement on a property beneath which all or part of a service

8

line lies;

v.    "Reporting Period" means, for purposes of Section X, the period of time between the due date of the last status report and the current status report, except that the first Reporting Period is the period of time between the Effective Date and the due date of the first status report;

w.    "resident" means a person eighteen years of age or older who resides in a household in Flint, Michigan;

x.    "Respondents to the EPA Order" or "Respondents" means the Michigan Department of Environmental Quality, the State of Michigan, and the City of Flint, collectively;

y.    "Section" means a portion of this Agreement identified by a capitalized Roman numeral or a capitalized letter;

z.    "service line" means a water pipe connecting household plumbing to the main distribution pipe running beneath the street;

aa.   "State Defendants" means Nick A. Khouri, in his official capacity as Treasurer for the State of Michigan; and Frederick Headen, Michael Finney, Mike Townsend, and Joel Ferguson in their official capacities as Members of the Flint Receivership

9

Transition Advisory Board;

bb.    "State Matching Funds" means the $20,000,000 appropriated

by the State of Michigan that was required from the State in

order to obtain the additional $100,000,000 of WIIN Monies for

the City of Flint;

cc.    "State Parties" means State Defendants, the State of Michigan,

and the Michigan Department of Environmental Quality,

collectively;

dd.    "tap water testing kit" means a wide-mouth plastic bottle or

bottles that allow for a flow rate during sample collection that is

representative of the flow that a consumer may use to fill up a

glass of water, attached to the Request for Water Analysis form

and Sampling Instructions, attached as Exhibit C to this

Agreement;

ee.    "Termination Date" of this Agreement means either the date on

which Government Parties complete their obligations under

Section VIII of this Agreement, or one year after Completion of

Service Line Replacement, whichever occurs later;

ff.    "WIIN Monies" means the $100,000,000 authorized and

appropriated by the U.S. Congress through section 2201(d)(1)

10

of the Water Infrastructure Improvements for the Nation (WIIN) Act of 2016, Pub. Law No. 114-322, and section 196 of the Further Continuing and Security Assistance Appropriations Act, 2017, Pub. Law No. 114-254. WIIN Monies do not include any State Matching Funds appropriated by the State of Michigan related to the WIIN Act; and

gg.   "Year 3 Cutoff Date" means the date 16 months before the Year 3 milestone described in Paragraph 20.c.

## II.   Duration

3.   This Agreement shall remain in effect from the Effective Date until the Termination Date. No obligations under this Agreement shall continue after the Termination Date.

## III.   Compliance

4.   Respondents to the EPA Order will comply with the terms of the EPA Order subject to Paragraphs 6-7.

5.   Plaintiffs may request in writing to meet and confer with Respondents to the EPA Order about whether the actions planned or taken to comply with the EPA Order will ensure compliance with the Lead and Copper Rule's requirements set forth in 40 C.F.R. §§ 141.80, .81, .82, .85, .86, and .90. Within 30 days of receiving a request under this Paragraph, Respondents to the EPA Order will meet

11

and confer with Plaintiffs and will consider in good faith any reasonable recommendations from Plaintiffs. Plaintiffs may not initiate the dispute resolution process described in Section XIII to address disputes about whether the actions planned or taken to comply with the EPA Order will ensure compliance with the Lead and Copper Rule's requirements set forth in 40 C.F.R. §§ 141.80, .81, .82, .85, .86, and .90. Nothing in this Paragraph shall limit Plaintiffs' ability to initiate the dispute resolution process to address disputes about whether actions planned or undertaken by Respondents to the EPA Order constitute compliance with the terms of the EPA Order as set forth in Paragraph 4.

6.      In the event that the EPA Order is amended prior to the Termination Date, Respondents to the EPA Order shall comply with the terms of the EPA Order as amended, unless the amendment imposes obligations or restrictions on Respondents to the EPA Order that are materially less stringent than the terms of the EPA Order as it existed as of the Effective Date. If an amendment results in such materially less stringent obligations or restrictions, Respondents shall comply with the terms of the EPA Order as it existed as of the Effective Date, unless doing so would violate the amended EPA Order.

7.      In the event that the EPA Order is dissolved, vacated, or otherwise loses its legal effect prior to the Termination Date, Respondents to the EPA Order shall continue to comply with the terms of the EPA Order as it existed as of the

Effective Date, and as may be amended, subject to the requirements of Paragraph 6.

## IV.   Service Line Replacement

### A.   Replacement of Service Lines; Replacement Eligible Households

8.   The City shall replace lead and galvanized steel service lines at households served by the Flint Water System as described in this Section of the Agreement (Section IV).

9.   The City shall conduct excavations to identify the material of the service line running from the main line to the curb box and from the curb box to the household water meter at a minimum of 18,000 households legally served by the Flint Water System.

10.   For each replacement eligible household (as defined in Paragraph 11) at which the City conducts an excavation under Paragraph 9, if all or part of the service line from the main line to the household water meter is discovered to be lead or galvanized steel, the City shall replace the portion(s) of the service line that are lead or galvanized steel with a copper service line at no cost to the resident or the property owner, subject to Paragraphs 15 and 17.

11.   *Households eligible for service line replacement.* For purposes of this Section (Section IV) only, a "replacement eligible household" is a household that has an active water account as of the Effective Date, irrespective of any water shut-

13

offs that may occur after the Effective Date.

12.     Replacement eligible households shall not include abandoned

households. A household is abandoned for purposes of this Agreement if it meets

the definition of "Abandoned Property" set forth in section 24-109 of the Flint,

Michigan Code of Ordinances, as of the Effective Date.

13.     The City shall maintain a list of households it determines are

abandoned and that would otherwise be eligible for service line replacement

("Abandoned Homes List"). If a resident activates a new water account at any time

within 18 months of the Effective Date or prior to the Year 3 Cutoff Date,

whichever is later, the City shall determine whether the address is on the

Abandoned Homes List. If the address is on the Abandoned Homes list, the City

shall undertake reasonable efforts to obtain permission from the account holder to

replace the service line. Reasonable efforts shall include sending at least two

written requests. If permission is granted, the City shall replace the service line at

no cost to the new property owner within the timeline described in Paragraph 20.

14.     *New water account at formerly abandoned household.* If a new water

account is activated at an address on the Abandoned Homes List within 18 months

of the Effective Date or prior to the Year 3 Cutoff Date, whichever is later, the City

shall undertake reasonable efforts to obtain permission from the account holder to

replace the service line. Reasonable efforts shall include sending at least two

14

written requests. If permission is granted, the City shall replace the service line at no cost to the new property owner within the timeline described in Paragraph 20. If a new water account is activated more than 18 months after the Effective Date or after the Year 3 Cutoff Date, whichever is later, the City must send a written notice to the new account holder, informing the account holder that the household's service line material was not verified during City-wide service line excavation and replacement in 2017 through 2020, and that the service line may contain lead or galvanized steel.

15.  *Efforts to obtain permission for replacement at eligible households.* The City shall undertake reasonable efforts to contact property owners of properties upon which replacement eligible households are located to obtain permission to replace the portions of service lines that lie beneath private property. To the extent that the resident of a replacement eligible household is a different person from the property owner, and if access to the household is necessary to conduct excavation or replacement, then the City shall also undertake reasonable efforts to contact the resident to obtain permission to replace the service line.

a.  For purposes of Paragraph 15, reasonable efforts shall include, for those replacement eligible households at which an initial attempt to obtain permission by making in-person contact with the property owner at the household was unsuccessful, sending

15

at least 2 written requests, by U.S. mail, to property owners at the most recent mailing address identified through city records, for permission to replace the service line at that household. The City shall keep records that show the dates on which such written requests were sent, the address of the replacement eligible household, and the address of the property owner of such household (if different).

b.    A property owner who refuses permission to replace the portion of the service line lying beneath his or her property shall have 3 months from the date he or she initially declines replacement to grant the City permission to replace the portion of the service line lying beneath his or her property. To ensure that there is sufficient time to replace the service lines of property owners and residents whose permission is sought in the last year of the 3-year period set forth in Paragraph 20, the City shall contact the property owners and residents at all replacement eligible households to seek permission to conduct excavation and replacement within 18 months of the Effective Date or prior to the Year 3 Cutoff Date, whichever is later.

16.    *New water account at replacement eligible households.* The City shall

16

maintain records of the addresses of all replacement eligible households at which the property owner refuses permission to replace a service line ("Refusal List"). When a resident activates a new water account at any time within 18 months of the Effective Date or prior to the Year 3 Cutoff Date, whichever is later, the City shall determine whether the address is on the Refusal List. If the address is on the Refusal List, the City shall undertake reasonable efforts to obtain permission from the account holder to replace the service line. Reasonable efforts shall include sending at least two written requests. If permission is granted, the City shall replace the service line at no cost to the new property owner within the timeline described in Paragraph 20. If a new water account is activated more than 18 months after the Effective Date or after the Year 3 Cutoff Date, whichever is later, the City must send a written notice to the new account holder that the household's service line material was not verified during City-wide service line excavation and replacement in 2017 through 2020, and that the service line may contain lead or galvanized steel.

17.     *Prohibition on Partial Service Line Replacements.* Because partial lead service line replacement is frequently associated with short-term elevated lead levels in drinking water, if the City discovers that the entire length of a service line (from the main line to the curb box to the household water meter) is composed of lead or galvanized steel or a combination thereof, but the property owner refuses to

17

grant the City permission to replace the portion of the service line lying beneath private property, the City shall not replace any portion of the service line. The City shall maintain a list of such households where a lead or galvanized steel service line is discovered but not replaced, and shall record the known existence of a lead or galvanized steel service line in the City records for each such household.

18.    *Ability to opt in.* The Parties agree that there may be some households in the City that are currently unoccupied and do not have an active water account, but at which the property owner may want to have the service line replaced. To facilitate replacement of service lines at these households, the City shall make available on its website a form permitting property owners to opt in to the service line replacement program under this Section (Section IV.A). Property owners may opt in to the replacement program under this Paragraph at any time within 18 months of the Effective Date or prior to the Year 3 Cutoff Date, whichever is later. The City shall maintain a list of all property owners who have completed the form, and shall undertake reasonable efforts to contact those property owners to seek permission to replace the service lines at those households. The City may require property owners that seek to opt in under this Paragraph to create an active water account.

B.    Timeline and Milestones

19.    The City shall complete the obligations in Paragraphs 8-18 within 3

18

years of the Effective Date.

20.     The City shall replace lead and galvanized steel service lines on the following schedule:

a.      Year 1: By January 1, 2018, the City shall have conducted excavations at a minimum of 6,000 households, and completed replacements at those households where lead and/or galvanized steel service lines are discovered.

b.      Year 2: By January 1, 2019, the City shall have conducted excavations at a minimum of 12,000 households total, and completed replacements at those households where lead and/or galvanized steel service lines are discovered.

c.      Year 3: By January 1, 2020, the City shall have conducted excavations at a minimum of 18,000 households total, plus excavations at any additional households pursuant to Paragraphs 27, 29, 30, and 33, and completed replacements at those households where lead and/or galvanized steel service lines are discovered.

C.      Funding

21.     *State Monies for Service Line Replacement.* Subject to the terms of this Section (Section IV.C), the State of Michigan will allocate and disburse

19

monies to reimburse or pay on behalf of the City for costs related to identifying

service line materials and replacing lead and galvanized steel service lines in the

City pursuant to Paragraphs 8-20.

22.    *Allocated Monies.* The State of Michigan shall allocate $87,000,000

(the "Allocated Monies") for the purposes identified in Paragraph 21. To fulfill the

obligations under this Paragraph, the State of Michigan may use money from any

source including, without limitation, direct appropriations from the State

Legislature, federal appropriations or grants for which the State of Michigan acts

as an administrator, or any state or federal forgivable loan program. Of the

$87,000,000 Allocated Monies, $47,000,000 will be funds allocated by the State of

Michigan from sources other than the WIIN Monies and the State Matching

Funds. Of the $87,000,000 Allocated Monies, $20,000,000 will be the State

Matching Funds appropriated by the State of Michigan related to the WIIN Act. Of

the $87,000,000 Allocated Monies, no more than $20,000,000 will be WIIN

Monies.

23.    *Reimbursements.* State Parties shall use the Allocated Monies to pay

on behalf of or to reimburse the City for costs incurred in fulfilling the obligations

in Paragraphs 8-20, including but not limited to service line replacements,

installation of copper service lines, extension of service lines into the interior of

households, pavement and yard restoration, Faucet Filter installation following

service line replacement, and excavations related to identification of service line material, subject to the following:

a.  Reimbursements or payments under Paragraph 23 shall be sent within 30 days of the City's submission of any payment request for costs under this Paragraph;

b.  Reimbursements or payments under Paragraph 23 will not exceed $5,000 per address at which a service line is replaced, without prior authorization by the Michigan Department of Environmental Quality. Michigan Department of Environmental Quality shall not unreasonably withhold reimbursements or payments under this Paragraph. For a given period for which reimbursement or payment is sought, the cost per address shall be the average cost of the service line replacements in the payment request submitted by the City for that period. For the purposes of this Paragraph, service line replacements shall be included in the calculation of the average cost per address regardless of whether all or part of the service line from the main line to the household water meter is replaced;

c.  If, at the time of reimbursement or payment under Paragraph

21

23, the Allocated Monies available for disbursement include funds other than those appropriated by the U.S. Congress or Michigan State Legislature pursuant to the WIIN Act (including the $100,000,000 federal appropriation and the $20,000,000 State Matching Funds), best efforts will be undertaken to first disburse those funds, subject to applicable state and federal law;

d.   Any reimbursements provided to or payments made on behalf of the City under Paragraph 23 shall take the form of a grant, or a loan with 100% forgiveness of the loan amount, or any other mechanism designed to provide funds to the City that do not have to be paid back by the City;

e.   Any separate grant or loan agreement(s) entered into between State Parties and the City of Flint related to reimbursements or payments under this Paragraph from the Allocated Monies or the Reserve Monies shall not be inconsistent with this Agreement, and State Parties and City of Flint must comply with this Agreement notwithstanding the provision of any separate grant or loan agreement(s);

f.   Any separate grant or loan agreement(s) entered into between State Parties and the City of Flint related to reimbursements or

22

payments under this Paragraph shall not result in the City's
inability to perform its obligations under Paragraphs 8-20; and

g.     State Parties will make best efforts to provide Plaintiffs with a
copy of any separate grant or loan agreement(s) entered into
between State Parties and the City of Flint related to
reimbursements or payments under this Paragraph at least 7
days before the execution of any such agreement. In any event,
State Parties shall provide a copy to Plaintiffs of any such
agreement(s) as soon as reasonably possible after execution.

24.     *Denials of Reimbursement or Payments.* State Parties shall provide
written notice to all Parties of denials of reimbursement or payments, as described
in Paragraph 23.b. If, within 14 days of receiving such a notice, any Party disputes
the reasonableness of any denial of reimbursement or payment in that notice, that
Party may initiate the dispute resolution process described in Section XIII.

25.     *Audit request.* The State of Michigan shall request the Office of
Auditor General to conduct annual financial and performance audits of the
Michigan Department of Environmental Quality's administration of the
reimbursements or payments described in Paragraph 23.

26.     *Residue.* After the Completion of Service Line Replacement, any
remaining Allocated Monies may be used by State Parties for purposes other than

23

5:16-cv-10277-DML-MKM    Doc # 166-1    Filed 06/26/17    Pg 28 of 92    Pg ID 6336

those identified in Paragraph 21, in accordance with state and federal law. Any remaining Allocated Monies appropriated as part of the WIIN Act, including any State Matching Funds, shall be distributed to the City in accordance with that Act.

27.    *Reserve Monies*. In addition to any monies allocated pursuant to Paragraph 21, State Parties shall retain an additional $10,000,000 (the "Reserve Monies") of the WIIN Monies. In the event that it is determined under Paragraph 29 that the Allocated Monies cannot reasonably be expected to cover the costs of completing the excavations and replacements required by Paragraphs 8-20, State Parties shall disburse the Reserve Monies pursuant to Paragraph 23. After the Completion of Service Line Replacement, any portion of the Reserve Monies remaining shall be distributed to the City in accordance with the WIIN Act.

28.    In the event that the Allocated and Reserve Monies made available for reimbursement or payment by State Parties pursuant to Paragraphs 23 and 27 are insufficient to reimburse or pay on behalf of the City for replacements required under this Section, the City shall complete excavations and replacements of lead and galvanized steel service lines at replacement eligible households until no Allocated or Reserve Monies remain available for reimbursement or payment.

29.    *Updating cost and service line estimates.* After completion of excavations and service line replacements at replacement eligible households identified in Zones 1 through 10 in Proposal Nos. 17-560, 2017 Replacement of

24

Water Service Lines (Zones 1-10) and 17-564, 2017 Replacement of Water Service

Lines (Zones 1-9) (attached to this Agreement as Exhibits D and E), the City shall

conduct an evaluation as to whether the data and information available to them

support any of the following conclusions: (i) it is reasonably likely that there were

more than 18,000 lead and galvanized steel service lines at replacement eligible

households as of the Effective Date; (ii) that the Allocated Monies and the Reserve

Monies can reasonably be expected to cover the costs of completing the 18,000

excavations and replacements identified in Paragraphs 8-18 and the total number of

any additional lead and galvanized steel service lines anticipated in light of the

evaluation of (i) in this Paragraph; and/or (iii) that the Allocated Monies can

reasonably be expected to cover the costs of completing the 18,000 excavations

and service line replacements identified in Paragraphs 8-18 and the total number of

any additional replacements of lead and galvanized steel service lines anticipated

in light of the evaluation of conclusion (i) in this Paragraph. In making this

determination, the City shall consider all relevant information available to them,

including without limitation information obtained through completion of service

line replacement under Proposal No. 17-560; any additional excavations (through

hydro vacuum or other methods) completed after the Effective Date; and any

additional investigation of service line material at households conducted in

connection with tap water monitoring under this Agreement.

25

30.     Within 30 days after the completion of excavations and service line replacements at replacement eligible households identified in Zones 1 through 10 in Proposal Nos. 17-560, 2017 Replacement of Water Service Lines (Zones 1-10), and 17-564, 2017 Replacement of Water Service Lines (Zones 1-9), the City shall provide a written statement to all other Parties summarizing the data and information used in the evaluation outlined in Paragraph 29, and the City's relevant conclusions regarding (i)-(iii) in Paragraph 29. Within 14 days of receiving the written statement under this Paragraph, any other Party shall notify the City of whether they concur with the findings in the written statement. To the extent any Party does not concur with the findings in the City's statement, any Party may initiate the dispute resolution process described in Section XIII. No monies will be released pursuant to Paragraph 31 until the resolution of any dispute arising under this Paragraph.

31.     *Release of Reserve Monies.* If the Allocated Monies will be sufficient to complete the excavations and service line replacements of all lead and galvanized steel service lines in the City, based on the evaluation conducted under Paragraph 29, then the Reserve Monies must no longer be retained as required under Paragraph 27 and will be distributed to the City for the purposes identified in section 2201(b) of, and in accordance with, the WIIN Act.

32.     *Obligation to seek additional funds.* If, based on the evaluation

26

conducted pursuant to Paragraph 29, it is reasonably likely that the Allocated Monies and Reserve Monies will be insufficient to complete the 18,000 excavations and replacements identified in Paragraphs 8-18 plus any additional excavations and replacements identified, State Parties shall undertake all reasonable efforts to secure additional monies (including, if necessary, seeking appropriations from the Michigan State Legislature) sufficient to reimburse the City for costs related to the excavations and replacements described in Paragraphs 8-20 at replacement eligible households. Any additional monies secured by State Parties under this Paragraph shall be made available for reimbursement or payment under Paragraph 23. State Parties shall undertake the reasonable efforts required under this Paragraph and shall provide Plaintiffs with a written report documenting such efforts and the results within 90 days of Plaintiffs' concurrence or the resolution of any disputes under Paragraph 30.

33.     *Obligation to replace additional service lines.* If, based on the evaluation conducted pursuant to Paragraph 29, it is reasonably likely that there were more than 18,000 lead and galvanized steel service lines at replacement eligible households in the City as of the Effective Date, then the milestones in Paragraph 20 shall be modified and the City shall complete excavation and replacement of the updated total number of estimated lead and galvanized steel service lines in the City within 3 years of the Effective Date. If additional monies

27

are necessary to conduct excavations and service line replacements under this Paragraph, the City will conduct those excavations and service line replacements only if State Parties secure additional monies for reimbursement or payment under Paragraph 23, as described in Paragraph 32. In the event that additional monies State Parties secure as described in Paragraph 32 are insufficient to complete the City's obligations under this Paragraph, the City shall nonetheless complete as many replacements of lead and galvanized steel service lines at replacement eligible households as the additional monies allow.

D.    Process

34.    *Flushing protocol.* The City shall ensure that, after replacement of a service line at a household, flushing is conducted for at least 15 minutes at the hose bib outside the house, and that the resident is instructed to flush the taps inside the house for at least 15 minutes by opening the taps as wide as possible and flushing the water at the highest velocity possible after removing and cleaning any aerators and Faucet Filters.

35.    *Notice of lead or galvanized steel premise plumbing.* If the City discovers that a household has premise plumbing made of lead or galvanized steel, the City shall provide notice to the property owner and residents of the household of the premise plumbing material, and that the premise plumbing in the household may be a source of lead in drinking water.

28

36.     *Contract management and recordkeeping.* The City shall maintain records sufficient to comply with the reporting and disclosure requirements under this Agreement.

37.     *Oversight.* Plaintiffs or State Parties may request in writing to meet and confer with the City about whether the actions planned or taken under this Section will ensure compliance with the timeline and milestones in Paragraphs 19-20. Within 30 days of receiving a request to meet and confer under this Paragraph, the City will meet and confer with the requesting Parties and will consider in good faith any reasonable recommendations from those Parties.

E.     Faucet Filter Maintenance after Service Line Replacement

38.     Government Parties shall ensure that at each household where a service line is replaced, residents are instructed to use filtered water for at least 6 months following the service line replacement. Unless the resident refuses, Government Parties will make a good faith effort to ensure that each household has a properly installed Faucet Filter immediately after its service line replacement is complete and a sufficient number of replacement cartridges for 6 months of use. A good faith effort shall include three attempts to obtain access to a household to properly install a Faucet Filter. For the excavations and replacements undertaken by the City with respect to the first 6,000 service lines under Paragraph 20.a, State Parties will fulfill the obligations under this Paragraph. Thereafter, the City shall

29

fulfill the obligations under this Paragraph. Government Parties will document any refusal by a resident for a filter installation under this Paragraph and provide that documentation to Plaintiffs upon request, within 14 days of such request.

39.   *Replacement cartridges.* State Parties will provide the City with filter replacement cartridges for the City to make available to residents free of charge at City Hall, or another location designated by the City, until one year after the Completion of Service Line Replacement. The replacement cartridges shall be compatible with the Faucet Filters distributed and installed through the Community Outreach and Resident Education (CORE) Program in Section VI.

F.   Monitoring in Connection with Service Line Replacements

40.   *Confirming Lead Elimination After Replacement (CLEAR) Program.* State Parties shall recruit at least 200 households to participate in tap water monitoring as part of the CLEAR program. State Parties shall make reasonable efforts to include a geographically diverse set of eligible households in the CLEAR program. At each household participating in the CLEAR program tap water monitoring, State Parties shall direct the resident to, using procedures that comply with the Lead and Copper Rule, 40 C.F.R. § 141.86, and at no cost to the resident:

a.   collect a tap water sample within 90 days prior to replacement of the lead or galvanized steel service line serving that household (round 1); and

30

   b.  collect a tap water sample monthly for 6 months following

      replacement of the lead or galvanized steel service line serving

      the household (rounds 2 through 7).

 41. State Parties shall make reasonable efforts to pick up resident-collected samples as part of the CLEAR program, including at least 3 attempted pick-ups for each sample collected.

 42. If, during a round described in Paragraphs 40.a and 40.b, the total number of households recruited for the CLEAR program that successfully collect samples for that round falls below 100, State Parties will continue to recruit additional households to participate in the CLEAR program until a minimum of 100 participating households have collected samples for each round described in Paragraphs 40.a and 40.b.

 43. If the household otherwise qualifies as a Tier 1 sampling site pursuant to 40 C.F.R. § 141.86(a)(3), Government Parties may use the tap water samples collected under Paragraph 40 to count towards the minimum required number of tap water samples to be collected during a 6-month monitoring period under Paragraph 46.

 44. State Parties shall make the results of tap water testing conducted as part of the CLEAR Program publicly available by posting the results on a website controlled by some or all State Parties. State Parties shall update the results posted

online within 7 days of receiving each round of complete data from the laboratory. Any monitoring results posted online pursuant to this Paragraph shall remain publicly available and posted online until the Termination Date.

G.     Completion of Service Line Replacement

45.     If the City determines that it has materially complied with all of its obligations under Paragraphs 8-20, 28-30, 33, and 38 of this Agreement, it shall provide a written statement to all Parties stating the specific date upon which the City believes it completed such obligations and explaining the basis for its conclusion. Within 14 days of receiving the written statement under this Paragraph, all Parties shall notify the City whether they concur with the conclusions in the written statement. If all Parties concur with the City's conclusion in the written statement, the City's obligations under Paragraphs 8-20, 28-30, 33, and 38 of this Agreement shall be deemed to be completed as of the date indicated in the City's statement. This date will constitute the "Completion of Service Line Replacement." To the extent any Party does not concur with the conclusions in the City's statement, any Party may initiate the dispute resolution process described in Section XIII.

**V.     Tap Water Monitoring**

A.     Tap Water Monitoring During Consecutive 6-month Periods

46.     Government Parties shall monitor the tap water distributed through

32

Flint's Water System for lead in compliance with the Lead and Copper Rule, 40 C.F.R. § 141.86, during consecutive 6-month periods, including the period beginning January 1, 2017, and continuing thereafter.

47.    Government Parties shall not seek, and the Michigan Department of Environmental Quality shall not permit, reduced monitoring for the Flint Water System under 40 C.F.R. § 141.86(d)(4) until one year after Completion of Service Line Replacement.

48.    Tap water monitoring conducted under Paragraph 46 shall include, for each 6-month monitoring period, the collection of tap water samples from at least the minimum number of sites specified in the first column ("standard monitoring") of the table in 40 C.F.R. § 141.86(c). All sites at which tap water monitoring is conducted under Paragraph 46 shall be Tier 1 sampling sites, as defined in 40 C.F.R. § 141.86(a)(3).

49.    For tap water monitoring conducted under Paragraph 46, during each 6-month monitoring period, at least half of the minimum number of required samples specified in Paragraph 48 shall be collected during May-June or July-August.

B.    Independent Monitoring Program

50.    An independent program shall be established to conduct additional tap water monitoring for the Flint Water System.

33

51.     The Parties shall meet and confer to agree on a third-party
Independent Monitor to conduct tap water monitoring pursuant to this Section
(Section V.B). The Independent Monitor shall be a person with expertise in
collecting and processing tap water samples for lead, and must not have been
employed by or provided consulting services to any Party relating to drinking
water in Flint, Michigan during the 5 years prior to the Effective Date. If a Party
suggests a potential Independent Monitor who has served as a consultant or expert
for that Party during the last 5 years concerning a matter other than drinking water
in Flint, Michigan, then that Party shall disclose that fact and the nature of the prior
consulting or expert work to the other Parties at the time the name is suggested. If,
after 30 days from the Effective Date, the Parties cannot agree on an Independent
Monitor, Plaintiffs and Government Parties shall each submit one nomination to
the Court (one nomination for Plaintiffs, collectively, and one nomination for
Government Parties, collectively) within 35 days from the Effective Date. The
Parties shall jointly request that the Court select the Independent Monitor to
conduct the monitoring described in this Section (Section V.B) within 45 days
from the Effective Date.

52.     The Independent Monitor shall conduct household tap water
monitoring for lead in compliance with the Lead and Copper Rule at a minimum of
100 Tier 1 sampling sites during consecutive 6-month monitoring periods, for 3

34

years following the Effective Date. These 100 sampling sites shall be distinct from the sites used for tap water monitoring conducted under Paragraph 46. The first 6-month monitoring period will begin on July 1, 2017, or on another date agreed upon by the Independent Monitor and Plaintiffs. The Independent Monitor may conduct monitoring at fewer than 100 Tier 1 sampling sites only if Plaintiffs approve.

53.     The Independent Monitor shall identify the sampling sites used for monitoring under this Section (Section V.B). Plaintiffs may assist the Independent Monitor with identifying the sampling sites. At the Independent Monitor's or Plaintiffs' request, Government Parties will provide any records and other information in their custody or control to facilitate confirmation that the sites identified by the Independent Monitor (i) are Tier 1 sampling sites, and (ii) are not being used as sites for tap water monitoring under Paragraph 46 for a particular 6-month monitoring period.

54.     Plaintiffs shall execute a contract with the Independent Monitor to conduct the tap water monitoring described in Paragraphs 50-53 and 55-56. State Parties shall timely reimburse Plaintiffs for reasonable costs incurred under that contract, excluding any overhead or oversight costs incurred by Plaintiffs and up to a maximum of $25,000 per 6-month monitoring period.

55.     If the 90th percentile lead level of the samples collected as part of the

Independent Monitoring Program under this Section is below the Lead Action Level for two consecutive 6-month monitoring periods, State Parties shall discontinue funding for the Independent Monitoring Program.

56.     The Independent Monitor shall provide the results from the tap water monitoring conducted under Paragraph 52 to the Parties within 14 days after the end of the 6-month monitoring period. Within 30 days after the end of the 6-month monitoring period, State Parties shall make those results publicly available through a website controlled by some or all of State Parties. Any monitoring results posted online pursuant to this Paragraph shall remain publicly available and posted online until the Termination Date.

C.     Sample Collection

57.     All household tap water samples collected for the purposes of implementing this Agreement shall be collected using wide-mouth sample bottles as described in Paragraph 2.dd.

58.     All household tap water samples collected for the purpose of implementing this Agreement shall be collected without the practice of pre-stagnation flushing, as described in a Memorandum from Peter C. Grevatt, Director, Office of Ground Water & Drinking Water, U.S. EPA, to Water Division Directors, Regions I – X, U.S. EPA, dated February 29, 2016, regarding *Clarification of Recommended Tap Sampling Procedures for Purposes of the Lead*

36

*and Copper Rule*, attached to this Agreement as Exhibit F. No tap water sampling instructions provided to residents for the purposes of collecting tap water samples under this Agreement shall include an instruction to conduct pre-stagnation flushing prior to collecting the sample.

     D.    <u>Voluntary Residential Monitoring</u>

    59.    Until one year after the Completion of Service Line Replacement, Government Parties shall continue to provide household tap water testing kits to residents who want to test their tap water for lead. Government Parties shall provide these testing kits and the testing free of charge to residents. Government Parties shall make household tap water testing kits available for residents to pick up at City Hall, and may make tap water testing kits available at other locations. State Parties will cover the costs of the tap water testing kits.

    60.    Government Parties may charge a reasonable fee to cover costs of testing a resident's tap water for lead if the resident has already submitted more than two testing kits for the purpose of testing his or her tap water during the preceding 6 months.

    61.    State Parties shall ensure that each household that submits a tap water testing kit pursuant to Paragraph 59 is notified of the tap water monitoring results for that individual household no later than 30 days after the Flint Water System learns of those results. This notification shall be provided by mail and otherwise

comply with the requirements in 40 C.F.R. § 141.85(d).

62.     State Parties shall make the results of tap water monitoring conducted under this Section publicly available on a website controlled by some or all of State Parties. The results posted on such a website shall be updated at least every 30 days. Any monitoring results posted online pursuant to this Paragraph shall remain publicly available and posted online until the Termination Date.

E.     Notification of Tap Water Monitoring Results

63.     Government Parties shall implement an information check and log system at all locations where residents can drop off household tap water testing kits, to help ensure residents promptly receive their testing results.

64.     A staff person at each such location shall make best efforts to verify that a name and address are present and legible on each testing kit at the time of submission.

65.     Staff at each such location shall also maintain a log that identifies each testing kit that is dropped off by any identifying number on the sample bottle and provide written receipts to the resident upon drop-off that contain any identifying number. POD or City staff receiving the testing kit shall record in the log the date and time that the testing kit was received and that the staff person has completed the information check described in Paragraph 64.

38

## VI.    Filter Installation, Maintenance, and Education

66.    State Parties shall maintain and expand the CORE program on filter education, installation, and maintenance as described in this Section.

67.    For purposes of this Section only (Section VI), a "CORE eligible household" is any household that has an active water account, but does not include households that are abandoned, as defined in Paragraph 12.

### A.    CORE Staff

68.    State Parties shall ensure that CORE teams are dispersed throughout Flint for 8 hours per day, Monday through Saturday. By March 1, 2017, State Parties will make best efforts to disperse at least 90 education specialists daily for 8 hours per day on Mondays through Saturdays. CORE education specialists will be dispersed on Sundays for up to 8 hours to conduct scheduled appointments with CORE eligible households and Initial and Follow-up Visits. The number of CORE education specialists dispersed on Sundays may vary depending on demand and staff availability.

69.    Starting March 1, 2017, State Parties will make a good-faith effort to maintain 160 education specialists, including 16 coordinators, as part of the CORE staff. In the event that the number of CORE education specialists available to conduct Initial and Follow-Up Visits drops to or below 150, State Parties will, within 7 days, request that GST Michigan Works! hire the number of education

39

specialists necessary to reach 165 total education specialists. State Parties will make best efforts to ensure that, within 45 days of such a request to GST Michigan Works!, such additional education specialists are hired and trained to conduct Initial and Follow-Up Visits.

70.     Before any permanent decrease in CORE staff, State Parties shall provide written notice to Plaintiffs at least 30 days before the planned staff decrease and shall meet and confer with Plaintiffs concerning such a decrease upon request, within 14 days of such a request. Plaintiffs may not initiate the dispute resolution process described in Section XIII to address disputes arising under this Paragraph.

71.     Within 14 days of the Effective Date, State Parties will make available to Plaintiffs for review and comment any materials used to train CORE staff. All training materials used for CORE staff and written materials distributed during CORE visits shall be consistent with the Filter Education described in Paragraph 77.c. State Parties shall inform Plaintiffs by written notice every 30 days, beginning 30 days after the Effective Date, of any changes to these materials.

B.     Initial Visits

72.     Except as provided in Paragraph 74, by March 23, 2017, CORE teams shall make all reasonable efforts to complete an Initial Visit with every CORE eligible household. An Initial Visit for a CORE eligible household is

deemed completed if one of the following is true:

a.  *There is a successful filter inspection*: A CORE team has made a successful filter inspection if the CORE team makes personal contact with a resident of the household and conducts the Filter Inspection and Education set forth in Paragraph 77; or

b.  *A resident refuses inspection*: A resident refuses inspection when the CORE team makes personal contact with a resident of the household, and upon an attempt by the CORE team to conduct the Filter Inspection and Education set forth in Paragraph 77, the resident refuses CORE staff entry into the household. In such circumstances, the CORE team shall attempt to leave with the resident a door hanger as described in Paragraph 75 and any written educational information as described in Paragraph 77.c.iv, and shall document whether a Follow-up Visit is appropriate. A Follow-Up Visit is appropriate unless the CORE team determines, based on personal contact with the resident, that a Follow-up Visit to that household would be rejected by the resident. In such circumstances, the CORE team shall document the reasons for that determination, and the household is no longer a CORE

41

eligible household.

73.     CORE teams will have made all reasonable efforts to complete an Initial Visit at a CORE eligible household as required in Paragraph 72 if, after two attempted Initial Visits, they have been unable to make personal contact with a resident of the household.

74.     No Initial Visit is required for any CORE eligible household for which a CORE team conducted a Filter Inspection and Education set forth in Paragraph 77, or its substantial equivalent, prior to the Effective Date.

75.     CORE teams shall leave a door hanger at a CORE eligible household where they are unable to make personal contact during any attempted Initial Visit or Follow-Up Visit. The door hangers shall include information on the purpose of the CORE program; how to schedule an appointment for a visit from a CORE team; and how to get information about water-related services. A copy of the door hanger is attached as Exhibit G. By April 15, 2017, the door hanger shall include Spanish language information on the purpose of the CORE program and how to schedule an appointment for a visit from the CORE team.

76.     CORE teams dispersed on Saturdays will be instructed to attempt to visit CORE eligible households where attempted Initial Visits on weekdays had resulted in no personal contact with a resident.

77.     The "Filter Inspection and Education" conducted by CORE teams

during an Initial Visit must, at a minimum, include the following elements:

    a.    Engagement

        i.    The CORE team will explain to a resident of the household that they are visiting to inspect the household's Faucet Filter to ensure it is properly installed and working and to provide information and training related to Faucet Filters.

    b.    Inspection

        i.    The CORE team will inspect the household's kitchen faucet to determine whether a Faucet Filter has been installed.

        ii.    If a Faucet Filter has been installed on a kitchen faucet, the CORE team will determine whether that filter is properly installed and is operating properly. If the CORE team determines that the Faucet Filter is properly installed and is operating properly, the Inspection is complete.

        iii.    If no Faucet Filter has been installed on a kitchen faucet, or if the CORE team discovers that a Faucet Filter is installed improperly or is not operating properly, the CORE team will attempt to provide and install, at no cost to the household, a new Faucet Filter and/or appropriate filter cartridge on a kitchen faucet. If the CORE team installs a Faucet Filter

43

and/or filter cartridge, and determines that the Faucet Filter is properly installed and operating properly, the Inspection is complete.

iv.  In the event that a CORE team is unable to install a new Faucet Filter because the household's faucet is not working or is not compatible with the Faucet Filters, the CORE team shall (a) provide the household with a qualifying Pitcher Filter; and (b) offer to add the household to the State of Michigan's list of households that qualify for the Faucet Fixture Replacement Program (which is currently scheduled to expire on September 30, 2017), and, if the resident accepts the offer, add the household to the Program as long as capacity remains in that Program. A qualifying Pitcher Filter is the ZeroWater 23-Cup Dispenser, model number ZD-018. The Faucet Fixture Replacement Program is a program sponsored by the Michigan Department of Environmental Quality and the Michigan Department of Health and Human Services that will replace approximately 4,000 faucet fixtures in households in Flint, Michigan, at no cost to residents.

44

c.  Education

   i.  During the Inspection described in Paragraph 77.b, the
       CORE team will train the resident, through demonstration if
       possible, how to properly install a Faucet Filter and how to
       properly install a filter cartridge. The CORE team shall
       provide manufacturer's instructions for any Faucet Filter or
       filter cartridge provided to the household.

   ii. The CORE team will educate the resident about the
       following topics relating to filter maintenance: (a) how to
       maintain the filter assembly; (b) how to identify if the filter
       cartridge for the installed Faucet Filter needs replacement;
       (c) how to install the appropriate replacement filter
       cartridges; (d) how and why to flush the filter following
       installation of a new filter cartridge; and (e) how to remove,
       inspect, and clean an aerator.

   iii. The CORE team will educate the resident about the
        following topics relating to filter use: (a) that unfiltered
        water should not be used for cooking or drinking; (b) how to
        operate the "bypass" valve of the Faucet Filter to switch
        between filtered and unfiltered water flowing through the

filter assembly; (c) that hot water should never be run through the filter unless the "bypass" valve is turned on because hot water can ruin the filter cartridge; (d) to check before running cold water through the filter assembly to ensure that the "bypass" valve is turned off; and (e) to stop using, remove, and replace the Faucet Filter if the "bypass" valve, or any other part of the filter, breaks or begins leaking water.

iv. The CORE team will also provide the following information to the resident: (a) the telephone number to call to get replacement filter cartridges at no cost to the household, if such delivery is available when the Visit occurs; (b) the locations where replacement filter cartridges are available for pick-up; (c) a set of written instructions, including images, for filter and replacement cartridge installation (attached as Exhibit H); and (d) written instructions regarding proper use of filtered water (attached as Exhibit I); and (e) the telephone number to schedule an appointment for a visit by a CORE team for filter inspection and education services. These materials shall be available in English,

46

> Spanish, Chinese, Arabic, and Hmong, and shall be provided in whichever of those languages the residents of that household speak.
>
> v.   If, during the provision of the Education elements in Paragraph 77.c.i-iv, a resident refuses any element, the provision of the refused Education element will be deemed complete.
>
> vi.  If, during the provision of the Education in Paragraph 77.c.i-iv, a resident requests termination of the Visit, the Education requirements of the Initial Visit will be deemed complete.

78.   Before any changes in the text of the door hangers distributed to residents by CORE teams, State Parties shall provide written notice to Plaintiffs at least 14 days before implementation of such changes and shall meet and confer with Plaintiffs about the proposed changes within 14 days of such a request.

C.   Follow-Up Visits

79.   CORE teams shall make all reasonable efforts to complete Follow-up Visits to each CORE eligible household monthly for 3 months beginning March 23, 2017; every other month thereafter through December 31, 2017; and then once every 6 months through December 31, 2018.

47

80.     For purposes of Paragraph 79, a Follow-Up Visit for a CORE eligible household is deemed completed if one of the following is true:

a.      *There is a successful follow-up filter inspection*: A CORE team has made a successful follow-up filter inspection if the CORE team makes personal contact with a resident of the household and conducts the Follow-up Filter Inspection and Education set forth in Paragraph 82; or

b.      *A resident refuses inspection*: A resident refuses inspection when the CORE team makes personal contact with a resident of the household, and upon an attempt by the CORE team to conduct the Follow-up Filter Inspection and Education set forth in Paragraph 82, the resident refuses CORE staff entry into the household. In such circumstances, the CORE team shall attempt to leave with the resident a door hanger as described in Paragraph 75 and any written educational information as described in Paragraph 77.c.iv, and document whether an additional Follow-up Visit is appropriate. A Follow-Up Visit is appropriate unless the CORE team determines, based on personal contact with the resident, that an additional Follow-up Visit to that household would be rejected by the resident. In

48

such circumstances, the CORE team shall document the reasons for that determination, and the household is no longer a CORE eligible household.

81.    CORE teams will have made all reasonable efforts to complete a Follow-up Visit at a CORE eligible household as required in Paragraph 79 if, after at least one attempted Follow-up Visit, CORE teams are unable to make personal contact with a resident of that household.

82.    The "Follow-up Filter Inspection and Education" conducted by CORE teams during a Follow-up Visit must include the following elements:

a.    The CORE team will explain to a resident of the household that they are visiting to inspect the household's Faucet Filter to ensure it is properly installed and working and to provide information and training related to Faucet Filters;

b.    The CORE team will conduct a Filter Inspection, as described in Paragraph 77.b;

c.    The CORE team will offer to provide Filter Education, as described in Paragraph 77.c.i-iii, and will provide such education upon request; and

d.    The CORE team will provide Filter Education, as described in Paragraph 77.c.iv.

49

  e. If, during the provision of the Education elements in Paragraph 82.c-d, a resident refuses any element, the provision of the refused Education element will be deemed complete.

  f. If, during the provision of the Education in Paragraph 82.c-d, a resident requests termination of the Visit, the Education requirements of the Follow-up Visit will be deemed complete.

83. Through December 31, 2017, the CORE team will provide, at no cost to the CORE eligible household, enough replacement Faucet Filter cartridges for the brand and model of Faucet Filter installed on the kitchen faucet (or the qualifying Pitcher Filter if Paragraph 77.b.iv applies) to last until the next anticipated Follow-up Visit. After December 31, 2017, the CORE team will provide at no cost to the CORE eligible household at least two such replacement Faucet Filter cartridges during each Initial or Follow-up Visit, unless the household refuses to accept some or all of the replacement filters, in which case, the refusal will be documented by the CORE team.

  D. Opt-out Option for CORE Eligible Households

84. A resident of a CORE eligible household may opt out his or her household from future Follow-up Visits by CORE teams. If a resident indicates to a CORE team that he or she would like to opt out his or her household from future Follow-up Visits, the CORE team shall provide the resident with written

information about how to obtain additional filter cartridges. By March 23, 2017, the CORE team shall be able to and shall document through a field other than a comment box in the CORE Program's recordkeeping application (app) that the previously CORE eligible household has opted out from future Follow-up Visits. Prior to March 23, 2017, the CORE team shall document in the comments box of the app that the previously CORE eligible household has opted out from Future Follow-up Visits and the reason why, if any is provided. After such documentation, the household will no longer qualify as a CORE eligible household.

### E.     New Flint Water System Customers

85.     The City shall notify CORE staff of any new Flint Water System customer within 30 days after activation of a new water account for the customer's household. CORE staff shall make all reasonable efforts to complete an Initial Visit to any such household (as defined in Paragraphs 72-73) within 14 days of receiving such notice.

### F.     Appointments for CORE Team Visits

86.     By March 1, 2017, State Parties shall ensure that CORE teams are made available for visits by appointment on weekends. By March 23, 2017, State Parties shall ensure that CORE teams are made available on at least two weekday evenings each week.

87.     Once evening and weekend appointments are available for CORE

51

team visits, State Parties shall ensure that Michigan 2-1-1 helpline operators will inform residents who call to schedule an appointment with a CORE team that appointments can be scheduled on weekends and at least two weekday evenings per week.

### G.    Priority CORE Team Visits

88.    State Parties will notify CORE teams of the address of any household with a tap water sample collected pursuant to Section V that reveals a lead concentration above 100 parts per billion in a 1-liter sample or a 1-liter calculated value, within 5 days of receiving those sampling results.

89.    Within 3 days of receiving notification under Paragraph 88, CORE teams shall attempt a Visit to any CORE eligible household identified in that notice to provide Filter Inspection and Education as described in Paragraph 77, unless a CORE team has previously completed a Filter Inspection and Education as described in Paragraph 77 or a Follow-up Filter Inspection and Education pursuant to Paragraph 82 for that household.

### H.    Publicity for CORE Program

90.    State Parties shall make available $100,000 to fund efforts to publicize the CORE program. State Parties shall undertake reasonable efforts to use this funding to publicize the CORE program both between March 15 and April 15, 2017, and between July 15 and August 15, 2017.

52

91.     State Parties will use the funds described in Paragraph 90 to publicize the CORE program by at least the following means: (i) a television commercial to air regularly during the time periods identified in Paragraph 90; (ii) a radio announcement to be aired regularly during the time periods identified in Paragraph 90; (iii) at least one Spanish-language advertisement (which may be an advertisement in a Spanish-language newspaper or on a Spanish-language radio station, or a billboard in a Spanish-speaking neighborhood); and (iv) a webpage accessible through both www.cityofflint.com and www.michigan.gov/flintwater. Each advertisement referenced in this Paragraph shall state that CORE teams provide filter inspection, installation, and education free of charge and how to schedule an appointment for a visit from a CORE team.

92.     Within 14 days of the Effective Date, Plaintiffs will make reasonable efforts to assist in community outreach to educate residents about the CORE program, including by convening a meeting of interested local groups with CORE staff representatives. As part of this assistance, Plaintiffs shall meet and confer with Government Parties concerning effective ways to conduct outreach to Spanish-speaking and other non-English-speaking residents. Government Parties shall cooperate with Plaintiffs in good faith to identify and effectuate reasonable outreach efforts to those residents.

## VII.   Bottled Water Distribution

A.     Community Water Resources Sites

93.     State Parties shall continue to operate at least nine Community Water Resources Sites, also known as points of distribution (PODs), at their current hours of operation (Monday through Saturday, 12:00 pm to 6:00 pm).

94.     State Parties shall continue to make filters, filter cartridges, bottled water, and water testing kits available to residents free of charge at each of the PODs.

95.     Beginning May 1, 2017, State Parties may discontinue the services provided at the PODs as set forth below, but only if otherwise expressly permitted under Paragraphs 96 to 98:

     a.     State Parties shall track daily the number of bottled water pick-ups at each POD;

     b.     For purposes of this Section (Section VII), a "bottled water pick-up" is a visit to a POD by a pedestrian or a vehicle for the purpose of, or that results in, the provision of bottled water;

     c.     If the average number of daily bottled water pick-ups at a POD is less than or equal to 20 for the first 3 weeks of the previous month, State Parties may close that POD beginning the first day of the following month (e.g., if the average number of daily

54

bottled water pick-ups at a POD is less than or equal to 20 during the three-week period from April 1 through April 21, 2017, then State Parties may close that POD starting May 1, 2017);

d.    For at least 7 days prior to the closure of any POD, State Parties must: (i) post visible signs notifying visitors of the POD's closure; and (ii) provide each visitor with a written notice that includes the date of the POD's closure, the addresses and hours of operation of PODs that remain open, and the availability of bottled water delivery through the Michigan 2-1-1 helpline (unless bottled water delivery through the Michigan 2-1-1 helpline has been discontinued pursuant to Paragraph 103);

e.    At least 7 days prior to the closure of any POD, State Parties must (i) notify Plaintiffs and the City of the locations of the POD to be closed and the date of expected closure; and (ii) provide Plaintiffs with documentation of the number of bottled water pick-ups per day at the POD to be closed in the month prior to its closure; and

f.    On the day of, or within 2 days before, the closure of any POD under this Section, Government Parties shall update the

information available on their websites to reflect such closure.

96.     From May 1, 2017, to June 1, 2017, State Parties may close up to 3 PODs as set forth in Paragraph 95. If more than 3 PODs have an average number of daily bottled water pick-ups of less than or equal to 20, State Parties may close only the 3 PODs with the lowest average numbers of such bottled water pick-ups.

97.     From June 1, 2017, to July 1, 2017, State Parties may close up to 2 additional PODs as set forth in Paragraph 95. If more than 2 PODs have an average number of daily bottled water pick-ups of less than or equal to 20, State Parties may close only the 2 PODs with the lowest average numbers of such bottled water pick-ups.

98.     If the 90th percentile lead level of the tap water samples collected pursuant to Paragraph 46 for the 6-month monitoring period beginning January 1, 2017, and ending on June 30, 2017, is below the Lead Action Level, State Parties may close the remaining PODs as set forth in Paragraph 95.d-f, but State Parties must maintain at least 2 PODs at their current hours until September 1, 2017. The PODs remaining open between July 1, 2017, and September 1, 2017, shall be the 2 PODs with the largest average number of daily bottled water pick-ups. State Parties shall have no obligation to operate any POD after September 1, 2017, if the 90th percentile of the tap water samples collected pursuant to Paragraph 46 for the 6-month monitoring period beginning January 1, 2017, and ending on June 30,

56

2017, is below the Lead Action Level.

### B.    2-1-1 Services

99.    Residents may request delivery of bottled water through the Michigan 2-1-1 helpline. State Parties shall deliver the amount of bottled water requested free of charge within 24 hours.

100.    State Parties may require that a resident be present at a household to receive a bottled water delivery. The resident must be informed of this requirement by 2-1-1 staff when a delivery request is made.

101.    If State Parties require that a resident be present at a household to receive bottled water deliveries, State Parties will make available the option to schedule an appointment for a delivery. Such appointments must be available on weekends and during at least two weekday evenings each week.

102.    State Parties may send a CORE team to a household that requests bottled water delivery for the purpose of Filter Inspection and Education, as described in Paragraphs 77 and 82.

103.    If the 90th percentile lead level of the samples collected pursuant to Paragraph 46 for the 6-month monitoring period beginning January 1, 2017 and ending on June 30, 2017, is below the Lead Action Level, State Parties may discontinue the services required under Paragraph 99. Otherwise State Parties must continue the services required under Paragraph 99 until the 90th percentile lead

57

level collected pursuant to Paragraph 46 is below the Lead Action Level for a subsequent 6-month monitoring period.

### C. Access and Functional Needs List

104. State Parties shall maintain an "Access and Functional Needs" List of households with homebound residents that receive bottled water deliveries. State Parties shall continue to provide weekly deliveries of bottled water free of charge to households on the Access and Functional Needs List.

105. If Plaintiffs become aware of a resident who, because of access or functional needs, cannot travel to PODs or City Hall to pick up bottled water, filters, or filter cartridges, and seeks those resources, they shall inform State Parties of the resident's name, address, and telephone number, if known to Plaintiffs. Within 3 days of receiving the resident's name, address, and telephone number pursuant to this Paragraph, State Parties shall (i) add that resident to the Access and Functional Needs List; (ii) call the resident to schedule a time for a CORE team to visit the household; and (iii) send a CORE team to the resident's household at a time agreed upon by the CORE staff and the resident to conduct Filter Inspection and Education as described in Paragraphs 77 and 82, and to provide bottled water, filters, or filter replacement cartridges at the resident's request.

106. State Parties may send a CORE team to a household on the Access and Functional Needs list when delivering bottled water to that household for the

58

purpose of Filter Inspection and Education, as described in Paragraphs 77 and 82.

107.   If the 90th percentile lead level of the samples collected pursuant to Paragraph 46 for the 6-month monitoring period beginning January 1, 2017, and ending on June 30, 2017, is below the Lead Action Level, State Parties may discontinue the services required under Paragraphs 104-105. Otherwise State Parties must continue the services required under Paragraphs 104-105 until the 90th percentile lead level collected pursuant to Paragraph 46 is below the Lead Action Level for a subsequent 6-month monitoring period.

108.   Until one year after the Completion of Service Line Replacement, State Parties shall provide delivery of a sufficient number of Faucet Filter replacement cartridges to households on the Access and Functional Needs List to ensure those households have sufficient replacement cartridges for Faucet Filter maintenance.

## VIII. Health Programs

109.   State Parties shall operate and maintain funding at current levels for the programs listed below, until the dates listed below, subject to applicable federal laws, necessary approvals from the Centers for Medicare & Medicaid Services, and availability of necessary federal monies:

        a.      The Medicaid expansion for pregnant women and children under twenty-one years of age up to 400% of the federal

poverty level (as defined by the U.S. Department of Health and
Human Services), through March 2021;

b.  Elevated Blood Lead Level Case Management services for
children with elevated blood lead levels, through September
2018;

c.  Family Supports Coordination target case management
services, through March 2021;

d.  The Michigan Child Collaborate Care expansion, through
September 2018;

e.  The Child and Adolescent Health Center expansion, through
September 2018;

f.  The Michigan Nurse Professional Fund, through September
2018;

g.  The Mobile Food Pantry expansion, through September 2018;

h.  The Double Up Food Bucks expansion, through September
2018; and

i.  The Summer Electronic Benefit Transfer for Children program
expansion, through September 2018.

## IX.  Release of Liability

110.  This Agreement resolves and Plaintiffs hereby fully and finally

release and discharge any and all of the claims that were alleged by Plaintiffs in their Complaint in the Case or that could have been resolved by Plaintiffs as of the Effective Date against Government Parties with respect to the Flint Water System's compliance with the Lead and Copper Rule's requirements as set forth in 40 C.F.R. §§ 141.80, .81, .82, .85, .86, .87, and .90. For purposes of this paragraph, the phrase "could have been resolved" means not only claims already litigated in the Case, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.

111. This Agreement resolves and Plaintiffs hereby fully and finally release and discharge any and all of the claims against Government Parties that may arise until the Termination Date with respect to the Flint Water System's compliance with the Lead and Copper Rule's requirements as set forth in 40 C.F.R. §§ 141.80, .81, .82, .85, .86, .87, and .90, so long as the Water System continues to procure all of its drinking water from the Great Lakes Water Authority.

112. This Agreement resolves and Government Parties hereby fully and finally release and discharge any and all claims that they may have against Plaintiffs arising out of this litigation, including any claims they may now have or have in the future for attorney fees or costs relating to this Case.

113. Except as otherwise provided in this Agreement, Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Agreement,

and Government Parties reserve all legal and equitable defenses to such

enforcement.

114.   Plaintiffs do not release any claim or remedy arising under any law

other than the Safe Drinking Water Act or any claim or remedy currently pending

in any other civil case including but not limited to: *Mays et al. v. Snyder et al.*,

Case No. 15-cv-14002 (E.D. Mich. Nov. 13, 2015); *Mays et al. v. City of Flint et*

*al.*, Case No. 16-106112 (Genesee Cty. Cir. Ct. Jan. 19, 2016); *Mays et al. v.*

*Snyder et al.*, Case No. 16-000017 (Mich. Ct. Cl. Jan. 15, 2016); and any other

case against Government Parties in which one or more Plaintiffs may be

determined to be a class member.

115.   Plaintiffs and Government Parties do not waive or limit any claim,

remedy, or defense, on any grounds, related to the Flint Water System's

compliance with the Lead and Copper Rule after the Termination Date. Nothing in

this Agreement absolves Government Parties from any obligation to comply with

the Safe Drinking Water Act and the regulations enacted thereunder.

116.   For purposes of this Section IX (Release of Liability) and Section

XVII (Signatories and Counterparts), the term "Plaintiffs" shall include each

named plaintiff in the Case and each of their respective officers, directors, agents,

representatives, attorneys, heirs, executors, and assigns.

## X.    Reporting and Disclosures

117.    One month and two months after the Effective Date, and then every three months thereafter, Government Parties shall submit to Plaintiffs a status report documenting their implementation of this Agreement. The status reports shall include the following information, unless this Agreement expressly provides otherwise, including any underlying documentation or records:

    a.    <u>CORE Program</u>:

        i.    The total number of households for which CORE staff have verified a properly installed and working Faucet Filter;

        ii.    The total number of households that have refused to allow a CORE team to install a Faucet Filter, including, for each such household, the number, dates, and times of attempted visits to the household, and a description of the response to each attempted visit;

        iii.    The number of Initial Visits conducted during the Reporting Period;

        iv.    The number of Follow-up Visits conducted during the Reporting Period;

        v.    The number of residents who called the 2-1-1 helpline to make an appointment for a Visit from a CORE team during

the Reporting Period, and the number of CORE team visits completed as scheduled appointments during the Reporting Period;

vi.   The total number of CORE education specialists and management staff employed during the Reporting Period;

vii.   For each week during the Reporting Period, the average number of CORE education specialists dispersed daily Monday through Saturday;

viii.   In excel format, an export of the complete set of data collected through the CORE application (app), except for the names of residents and CORE employees, documenting the CORE team's attempted Visits to households.

b.   <u>Water Delivery</u>:

i.   The number of requests for bottled water delivery made each week through the Michigan 2-1-1 helpline during the Reporting Period;

ii.   The addresses of those residents who requested bottled water delivery through the Michigan 2-1-1 helpline during the Reporting Period;

iii.   The number of bottled water deliveries completed by State

Parties during each week of the Reporting Period;

iv.   The number of bottled water deliveries during the Reporting Period for which 2-1-1 failed to complete a delivery within 24 hours of receiving a request (excluding any deliveries for which an appointment was made for a later time);

v.   The number of households on the Access and Functional Needs list, including the number of households added to and removed from the Access and Functional Needs list during the Reporting Period; and

vi.   The addresses of those residents on the Access and Functional Needs list who received bottled water deliveries during the Reporting Period.

c.   <u>Service Line Replacement</u>:

i.   The total number of households for which a service line has been replaced since the Effective Date;

ii.   The number of households for which excavation was conducted or a service line was replaced, as described in Paragraph 10, during the Reporting Period, and for each household: (1) the address; (2) the material(s) of the service line confirmed or discovered; (3) whether any portion of the

65

service line was replaced; (4) if any portion of the service line was replaced, a description of which portion was replaced (i.e., both, public only, or private only); and (5) if any portion of the service line was replaced, whether proper installation of a Faucet Filter after replacement was verified;

   iii.   The number of households for which a service line replacement was refused, as described in Paragraph 15.b, during the Reporting Period, the addresses of those households, and the service line material(s) confirmed or discovered at those households; and

   iv.   The total amount of monies reimbursed to or paid on behalf of the City pursuant to Paragraph 23 as of the last day of the Reporting Period in the following categories: (1) WIIN monies and related State Matching Funds and (2) monies other than in (1).

   v.   A list of all requests for reimbursement or payment on behalf of the City under Paragraph 23 that have been denied in part or in full by the Michigan Department of Environmental Quality during the Reporting Period, including the amount requested, the amount denied, and the

reason for each denial.

    vi.    Copies of any financial or performance auditing results

obtained pursuant to Paragraph 25 or relating to the City's

use of the Allocated or Reserve Monies.

    d.    <u>Tap Water Monitoring</u>:

    i.    The results of all tap water monitoring conducted at

households served by the Flint Water System during the

Reporting Period, including the address of each sampling

site, the service line material at each sampling site (if

known), and whether the sampling site otherwise is known

to qualify as a Tier 1 sampling site under 40 C.F.R.

§ 141.86(a)(3).

    e.    <u>Other</u>:

    i.    The results of any water quality parameter monitoring

conducted for the Flint Water System during the Reporting

Period;

    ii.    Any formal communications Government Parties submitted

to or received from EPA pursuant to the EPA Order during

the Reporting Period.

118.  Government Parties will also provide additional information,

documents, or records related to implementation of this Agreement to Plaintiffs upon such reasonable and specific request, within 14 days of the request. This additional information may include, but is not limited to:

    a.    Copies of any notifications, announcements, or public advertisements related to the CORE program, service line replacement, or any requirement in this Agreement;

    b.    Additional, non-confidential data collected by CORE staff during household visits;

    c.    Addresses of any households added or removed from the Access and Functional Needs List during a Reporting Period, including the basis on which each household was added or removed; and

    d.    Any non-privileged documents related to a specific formal communication Government Parties submitted to or received from EPA pursuant to the EPA Order during the Reporting Period.

119.   The reporting and disclosures in this Section (Section X) are in addition to, and do not supplant, the other provisions in this Agreement requiring the disclosure of information among the Parties.

## XI.  Notices

120.   All notices, reports, disclosures, or other communications required by this Agreement shall reference the title, caption, and case number of this Case, and shall be sent via certified U.S. Mail, overnight express delivery service, or electronic means to the recipients and addresses below.

a.   For Plaintiffs:

Natural Resources Defense Council
ATTN: Dimple Chaudhary
1152 15th St. NW, Suite 300
Washington, DC 20005
dchaudhary@nrdc.org

Natural Resources Defense Council
ATTN: Sarah Tallman
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
stallman@nrdc.org

American Civil Liberties Union Fund of Michigan
ATTN: Michael Steinberg
2966 Woodward Avenue
Detroit, MI 48201
msteinberg@aclumich.org

b.   For State Parties:

Michigan Department of Attorney General
ATTN: Richard S. Kuhl
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
kuhlr@michigan.gov

69

> Michigan Department of Environmental Quality
> ATTN: George Krisztian
> 525 West Allegan Street
> P.O. Box 30473
> Lansing, MI 48909-7973

c.   For City Defendants:

> City of Flint
> ATTN: City Administrator Sylvester Jones
> 1st Floor, City Hall
> 1101 S. Saginaw Street
> Flint, MI 48502

> City of Flint Department of Law
> ATTN: William Y. Kim
> 1101 S. Saginaw St.
> Flint, MI 48502
> wkim@cityofflint.com

121.   Any Party may change its designated recipient(s) and/or address(es) by providing written notice of such change to all other Parties.

122.   Unless otherwise provided by this Agreement, any notices, reports, disclosures, or other communications required by this Agreement shall be deemed submitted upon deposit with an overnight express delivery service, e-mailing, or mailing.

## XII.   Attorney Fees and Costs

123.   Within 60 days of the Effective Date, State Parties will pay Plaintiffs eight hundred ninety five thousand dollars ($895,000) in litigation costs (including attorneys' fees and expert costs), in accord with instructions provided by Plaintiffs'

counsel.

124.    This payment shall fully and finally release, discharge, and satisfy any claim by Plaintiffs to litigation costs (including attorneys' fees and expert costs) incurred in this Case and incurred in enforcing this Agreement through the Termination Date.

### XIII.  Dispute Resolution and Judicial Enforcement

125.    This Agreement provides for dispute resolution, which is the sole and exclusive mechanism to resolve disputes and disagreements arising under this Agreement, except where specifically stated otherwise. Except as provided for in this Agreement, the Parties may not otherwise petition the Court for relief for violations of this Agreement, or bring a new action for breach of this Agreement.

126.    The Parties stipulate that the Court has jurisdiction to enforce the terms of this Agreement.

127.    The Parties will make all reasonable efforts to resolve disputes and disagreements regarding the meaning of, compliance with, and/or implementation of this Agreement informally and in good faith prior to seeking any relief from the Court.

128.    If a Party has a dispute concerning the meaning of, compliance with, and/or implementation of this Agreement, that Party will send written notice to all other Parties specifying the nature of the dispute.

71

129.   Within 14 days of the date of the transmission of written notice under Paragraph 128, the Parties will meet and confer in a good faith attempt to resolve the dispute without soliciting the Court's involvement. As part of the meet and confer, the Parties will comply with reasonable requests from another Party or Parties for information and documents related to the dispute, and will, upon request by another Party or Parties, provide reasonable access to client representatives with knowledge related to the dispute.

130.   If the Parties are unable to resolve any dispute or disagreement pursuant to Paragraphs 125-129, any Party or Parties may file a motion with the Court to enforce this Agreement. Any Party that intends to file a motion to enforce the Agreement must provide all other Parties with written notice of such intent at least 7 days prior to filing any such motion.

## XIV.  Force Majeure

131.   A Party's obligation to comply with one or more provisions of this Agreement will be deferred for the duration of a delay in compliance caused by force majeure or impossibility. For purposes of this Agreement, "force majeure" includes any war, fire, earthquake, flood, or other natural disaster, any restraint by court order, or public authority, or any labor strike, work stoppage, contractor delay, or lack of availability of services that could not have been reasonably foreseen and prevented by the Party's exercise of due diligence. "Impossibility"

means an event or circumstances beyond the Party's reasonable control that precludes timely compliance with one or more provisions of the Agreement and that could not have been reasonably foreseen and prevented by the Party's exercise of due diligence. "Due diligence" includes anticipating and/or addressing the effects of any force majeure or impossibility to prevent or minimize any resulting delay or non-compliance.

132.    Any delay in compliance caused by a Party's failure to make all reasonable efforts to comply with the terms of this Agreement will not be considered to be circumstances beyond that Party's control.

133.    Any delay in a Party's compliance with a specific provision of this Agreement due to force majeure or impossibility will not excuse or delay compliance with any other terms of this Agreement that are unaffected by the force majeure or impossibility.

134.    A Party that seeks to claim force majeure or impossibility (a "Claiming Party") will provide written notice to all other Parties ("Notified Parties") within 14 days of the date that the Claiming Party first knew, or by the exercise of due diligence should have known, that an event or circumstance caused or will cause a delay in compliance with this Agreement. For purposes of the obligations under Paragraphs 19-20 only, the City must provide such written notice within 45 days. The notice will describe the reason for the anticipated non-

73

compliance and specifically refer to this Section of the Agreement. The notice will also describe, to the extent known, the anticipated length of time the delay is expected to persist, the cause or causes of the delay, the measures taken or to be taken by the Claiming Party to prevent or minimize delay, the schedule by which those measures will be implemented, and the anticipated date of compliance.

135.   Each Notified Party will provide written notice to all Parties of its position regarding the Claiming Party's assertion of force majeure or impossibility within 14 days of receipt of written notice under Paragraph 134.

136.   If the Notified Parties agree that any delay or impediment to performance has been or will be caused by force majeure, the Parties will agree in writing to a reasonable modification of all requirements affected by the force majeure or impossibility.

137.   If any Notified Party disagrees with any notice served by a Claiming Party under Paragraph 134 or the explanation of force majeure or impossibility therein, or if the Parties cannot agree on new terms for compliance, any Party may invoke the dispute resolution procedures described in Section XIII.

## XV.   Modification

138.   The Parties may, subject to Court approval, modify the terms of this Agreement by written agreement. The Parties shall file a joint stipulation and notice to the Court for any such modification. Upon the reasonable request of any

Party, the Parties will jointly request expedited consideration of such joint stipulation and notice from the Court. No modification of this Agreement may be made absent joint stipulation of all the Parties and a Court order.

## XVI.  Dismissal and Waiver of Appeal

139.   The Parties agree that the Court has jurisdiction over this Case pursuant to 42 U.S.C. § 300j-8 and 28 U.S.C. § 1331. The Parties will submit a stipulation of dismissal with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), in the form attached as Exhibit J. The Parties' stipulation is contingent on the Court's entry of an order first incorporating the terms of this Agreement and retaining jurisdiction to enforce the terms of this Agreement until the Termination Date. If the Court declines to incorporate the terms of this Agreement or retain such jurisdiction, this Agreement is not effective and any stipulation of dismissal is null and void.

140.   All Parties to this Agreement consent to enforcement of this Agreement in the Court and under the terms set forth in the Agreement. All Parties waive any jurisdictional challenges to the Court's exercise of jurisdiction to enforce the Agreement. Notwithstanding this paragraph, State Parties only waive any applicable Eleventh Amendment immunity to the extent necessary to enforce this Agreement.

141.   All Parties agree that the Court's incorporation of this Agreement into

an order dismissing this Case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) shall supersede the relief ordered in the Court's preliminary injunction order of November 10, 2016, ECF No. 96, and supersede all relief previously ordered in this Case.

142. No appeal shall be taken from the Court's incorporation of this Agreement into an order dismissing this Case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). This provision does not preclude any Party from appealing a subsequent order of the Court.

143. Within 3 business days of the Effective Date, State Defendants will file a motion pursuant to Federal Rule of Appellate Procedure 42(b) to dismiss their appeal currently pending before the U.S. Court of Appeals for the Sixth Circuit, Case No. 16-2628. Plaintiffs and City Defendants agree not to oppose that motion.

## XVII. Signatories and Counterparts

144. Each signatory to this Agreement certifies that he or she is fully authorized to enter into this Agreement, to agree to its terms and conditions, and to execute and legally bind the Party he or she represents.

145. This Agreement may be executed in counterparts.

## XVIII. Integration Clause

146. This Agreement constitutes the final, complete, and exhaustive

76

agreement and understanding between the Parties, and supersedes all prior agreements and understandings, whether oral or written, with respect to this Case. No other document, nor any representation, agreement, understanding, or promise is part of this Agreement, nor may such be used in construing the terms of this Agreement.

147.   This Agreement was jointly drafted by the Parties. The Parties accordingly agree that any and all rules of construction to the effect that ambiguity is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Agreement.

[signature pages to follow]

*For Plaintiffs:*

Date: 23 March 2017

_____
Pastor Allen C. Overton
Concerned Pastors for Social Action
2200 Forrest Hill
Flint, MI 48504

*Plaintiff Representative*


Date: 3-23-17

_____
Pastor Alfred L. Harris
*Concerned Pastors for Social Action*
2200 Forrest Hill
Flint, MI 48504

*Plaintiff Representative*


Date: _____

_____
Melissa Mays
3714 Beecher Road
Flint, MI 48503

*Plaintiff*


Date: _____

_____
Rhea Suh
*President*
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2415

*Plaintiff Representative*

78

*For Plaintiffs:*

Date: _____

        _____

Pastor Allen C. Overton
Concerned Pastors for Social Action
2200 Forrest Hill
Flint, MI 48504

*Plaintiff Representative*

Date: _____

        _____

Pastor Alfred L. Harris
Concerned Pastors for Social Action
2200 Forrest Hill
Flint, MI 48504

*Plaintiff Representative*

Date: _5/23/ 2017_

        _____

Melissa Mays
3714 Beecher Road
Flint, MI 48503

*Plaintiff*

Date: _____

        _____

Rhea Suh
President
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2415

*Plaintiff Representative*

78

*For Plaintiffs:*

Date: _____        _____
                             Pastor Allen C. Overton
                             Concerned Pastors for Social Action
                             2200 Forrest Hill
                             Flint, MI 48504

                             *Plaintiff Representative*


Date: _____        _____
                             Pastor Alfred L. Harris
                             Concerned Pastors for Social Action
                             2200 Forrest Hill
                             Flint, MI 48504

                             *Plaintiff Representative*


Date: _____        _____
                             Melissa Mays
                             3714 Beecher Road
                             Flint, MI 48503

                             *Plaintiff*


Date: 03/23/2017             _____
                             Rhea Suh
                             President
                             Natural Resources Defense Council
                             1152 15th Street, NW, Suite 300
                             Washington, DC 20005
                             (202) 289-2415

                             *Plaintiff Representative*

78

Date: 3/24/17

Kary Moss
Executive Director
American Civil Liberties Union of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800

*Plaintiff Representative*

Approved as to form:

Date: _____

Dimple Chaudhary
Jared E. Knicley
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2385
dchaudhary@nrdc.org
jknicley@nrdc.org

Sarah C. Tallman
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7918
stallman@nrdc.org

Michael E. Wall
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org

*Counsel for Plaintiffs Concerned Pastors for
Social Action, Melissa Mays, and Natural
Resources Defense Council*

79

Date: _____

Kary Moss
Executive Director
American Civil Liberties Union of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6800

*Plaintiff Representative*

Approved as to form:

Date: 3/23/17

Dimple Chaudhary
Jared E. Knicley
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2385
dchaudhary@nrdc.org
jknicley@nrdc.org

Sarah C. Tallman
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7918
stallman@nrdc.org

Michael E. Wall
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org

*Counsel for Plaintiffs Concerned Pastors for
Social Action, Melissa Mays, and Natural
Resources Defense Council*

79

Date: 3/24/17

_____
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org

*Counsel for American Civil Liberties Union of Michigan*

Date: _____

_____
Glenn M. Simmington (P33626)
Law Office of Glenn M. Simmington, PLLC
Mott Foundation Building
503 South Saginaw Street, Suite 1000
Flint, MI 48502
(810) 600-4211
gsimmington@gmail.com

*Counsel for Melissa Mays*

80

Date: _____

Michael J. Steinberg (P43085)
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org

*Counsel for American Civil Liberties Union of Michigan*

Date: 3/24/17

Glenn M. Simmington (P33626)
Law Office of Glenn M. Simmington, PLLC
Mott Foundation Building
503 South Saginaw Street, Suite 1000
Flint, MI 48502
(810) 600-4211
gsimmington@gmail.com

*Counsel for Melissa Mays*

80

*For State Defendants:*

Date: 3/17/17

Nick A. Khouri
State Treasurer
Austin Building
430 W. Allegan Street
Lansing, MI 48922
(517) 373-3223

Date: 3-27-2017

Frederick Headen
Chairperson, Flint Receivership Transition
Authority
Austin Building
430 W. Allegan Street
Lansing, MI 48922
(517) 373-3223

Approved as to form:

Date: 3-23-2017

Richard S. Kuhl
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
kuhlr@michigan.gov

81

*For City Defendants:*

Date: 3/24/17

Dr. Karen W. Weaver
Mayor of City of Flint
1101 South Saginaw Street
Flint, MI 48502

*Defendant Representative for City of Flint*

Date: 3/24/17

Sylvester Jones
City Administrator for the City of Flint
1101 S. Saginaw Street
Flint, MI 48502

*Defendant and Defendant Representative for City of Flint*

Approved as to form:

Date: 3/24/17

Angela Wheeler
Chief Legal Officer
City of Flint Department of Law
1101 S. Saginaw Street, 3rd Floor
Flint, MI 48502
(810) 766-7146
awheeler@cityofflint.com

*Counsel for City Defendants*

82

*For the State of Michigan:*

Date: 3/27/17 ___

Governor Rick Snyder
George W. Romney Building
111 South Capitol Avenue
Lansing, MI 48909

Approved as to form:

Date: 3/27/17 ___

Eugene Driker
Todd R. Mendel
Special Assistant Attorneys General
For Governor Rick Snyder
Barris, Sott, Denn & Driker, PLLC
333 W. Fort Street, Ste. 1200
Detroit, MI 48226
(313) 965-9725
EDriker@bsdd.com
TMendel@bsdd.com

83

*For the Michigan Department of Environmental Quality:*

Date: 3. 23. 17 _____

C. Heidi Grether
Director, Michigan Department of Environmental
Quality
Constitution Hall, 6th Floor
525 West Allegan Street
P.O. Box 30473
Lansing, MI 48909
(800) 662-9278


Approved as to form:

Date: 3-23-2017 _____

Richard S. Kuhl
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
khuhlr@michigan.gov