# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Elnora Carthan; Rhonda Kelso, individually and as next of friend of K.E.K, a minor child; Darrell and Barbara Davis; Michael Snyder, as personal representative of the Estate of John Snyder, deceased; Marilyn Bryson; David Munoz; Tiantha Williams, individually and as next of friend of T.W., a minor child; Amber Brown, as next of friend of K.L.D, a minor child; Frances Gilcreast; EPCO Sales, LLC; Angelo's Coney Island Palace, Inc., on behalf of themselves and all others similarly situated,

                          Plaintiffs,

          -v-

Governor Rick Snyder, in his individual and official capacities; the State of Michigan; the City of Flint; Daniel Wyant, in his individual capacity; Andy Dillon, in his individual capacity; Nick Lyon, in his individual capacity; Nancy Peeler, in her individual capacity; Liane Shekter-Smith, in her individual capacity; Adam Rosenthal, in his individual capacity; Stephen Busch, in his individual capacity; Patrick Cook, in his individual capacity; Michael Prysby, in his individual capacity; Bradley Wurfel,

Case No.: 5:16-cv-10444-JEL-MKM

Hon. Judith E. Levy
Magistrate Judge Mona K. Majzoub

in his individual capacity; Jeff
Wright, in his individual capacity;
Edward Kurtz, in his individual
capacity; Darnell Earley, in his
individual capacity; Gerald Ambrose,
in his individual capacity; Dayne
Walling, in his individual and official
capacities; Howard Croft, in his
individual capacity; Michael
Glasgow, in his individual capacity;
Daugherty Johnson, in his individual
capacity; Lockwood, Andrews &
Newnam, P.C.; Lockwood, Andrews
& Newnam, Inc.; Leo A. Daly
Company; Veolia North America,
LLC; Veolia North America, Inc.;
Veolia Water North America
Operating Services, LLC,

Defendants.

## FOURTH CONSOLIDATED AMENDED CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONEY DAMAGES, AND JURY DEMAND

# **TABLE OF CONTENTS**

INTRODUCTORY STATEMENT ..........................................................................1

JURISDICTION AND VENUE.........................................................................5

PARTIES ..................................................................................................................7

     A.    Plaintiffs ..................................................................................................7

     B.    Engineering Defendants ....................................................................17

     C.    Government Defendants ....................................................................25

STATEMENT OF FACTS...................................................................................33

     A.    Dangers From the Flint River Water Have Been Well-Known for
           Decades ................................................................................................33

     B.    Despite These Well-Known Dangers, Defendants Decided to Use
           Flint River Water as the Primary Water Source for the City of
           Flint ......................................................................................................37

     C.    The LAN Defendants Failed to Meet Their Duties of Care and
           Competence as Design Engineers for the Flint Water Treatment
           Plant ......................................................................................................51

     D.    Numerous Signs of the Public Health Crisis Caused By the
           Contaminated Water Were Evident Within Weeks of the Switch.....57

     E.    The LAN and Veolia Defendants Were Asked to Evaluate the
           Problems, But Failed to Do So Properly............................................62

     F.    The LAN and Veolia Defendants Fail to Conduct a Root Cause
           Analysis................................................................................................68

     G.    The LAN and Veolia Defendants' Conclusions Made the Crisis
           Worse ...................................................................................................73

     H.    Despite the Numerous Signs of the Growing Crisis, the Government
           Defendants Failed to Act, and Concealed Known Dangers From the
           Plaintiffs ...............................................................................................80

i

I.      Defendants' Misconduct Has Caused the Plaintiffs to Suffer Devastating Health Effects and Other Personal Injuries.................104

J.      Defendants' Misconduct Has Also Caused the Plaintiffs to Suffer Extensive Property Damage and Monetary Losses. ........................108

K.      Defendants' Miscount Has Resulted in Criminal Charges and Other Government Investigations .............................................................116

L.      Efforts to Remediate the Harms Alleged Herein Are Inadequate. ..119

M.      Governor Snyder and MDEQ Treated Flint's Predominantly African American Citizens Differently than Other Communities in Flint. ..120

CLASS ALLEGATIONS ....................................................................162

PRAYER FOR RELIEF ....................................................................214

DEMAND FOR TRIAL BY JURY ...................................................215

## INTRODUCTORY STATEMENT

1.      This class action is pursued on behalf of about **100,000** residents and other Flint water users—adults, children, workers, students, business owners, homeowners, multi-unit property owners, and all other victims of Defendants' unconstitutional and unlawful conduct—who from April 25, 2014 to the present (the "Class Period"), have experienced and will continue to experience serious personal injury and property damage caused by Defendants' deliberate, reckless, and negligent misconduct. Defendants caused a public health crisis by exposing Plaintiffs to contaminated water. Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct.

2.      Two groups of Defendants are responsible for the severe harm suffered by the Plaintiffs. A group of engineering companies, including Lockwood, Andrews & Newnam, P.C. ("LAN PC"), Lockwood, Andrews & Newnam, Inc. ("LAN Inc."), Leo A. Daly Company ("LAD"), Veolia North America, LLC ("Veolia LLC"), Veolia North America, Inc. ("Veolia Inc."), and Veolia Water North America Operating Services, LLC ("Veolia Water") are referred to collectively herein as the "Engineering Defendants." A group of government officials and bodies, including Governor Rick Snyder, the State of Michigan, Daniel Wyant, Nick Lyon, Nancy Peeler, Andy Dillon, Liane Shekter-Smith, Adam Rosenthal, Stephen Busch,

1

Patrick Cook, Michael Prysby, Bradley Wurfel, Jeff Wright, Edward Kurtz, Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, Daugherty Johnson, and the City of Flint are collectively herein referred to as the "Government Defendants."

## <u>SUMMARY OF THE ENGINEERING DEFENDANTS' MISCONDUCT</u>

i. *Professional and Common Law Negligence in Engineering Services Related to Distribution of Water From Flint River*: Plaintiffs have sustained serious injuries as a result of the Engineering Defendants' professional negligence in their duties relating to the distribution of water from the Flint River using the Flint Water Treatment Plant ("FWTP"), and in failing to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of water.

ii. *Professional and Common Law Negligence and Fraud in Declaring Flint Water Safe and Potable*: Plaintiffs have sustained serious injuries as a result of the Engineering Defendants' professional negligence in failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable. The Engineering Defendants failed to conduct a root cause analysis, which would have revealed that the pipes were corroding and causing lead, *legionella*, and other contaminates to enter residents' homes. The Engineering Defendants also failed to mention that the addition of a corrosion inhibitor was necessary to

2

prevent these serious and well-known health issues, and mandated the usage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased. The Engineering Defendants also were professionally negligent and committed fraud in their effort to cover up their mistakes by knowingly or recklessly misinforming the public about the existence and extent of the public health crisis.

## SUMMARY OF THE CONSTITUTIONAL AND CIVIL RIGHTS VIOLATIONS AND INJURIES CAUSED BY THE GOVERNMENTAL DEFENDANTS

iii.    *Due process based on state created danger doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have the state create, inflict, and/or exacerbate dangers through the culpable actions of public officials;

iv.    *Due process based on bodily integrity doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have their bodily integrity violated;

v.    *Equal protection, race*: African American Plaintiffs have sustained serious injuries as a result of some of the Government Defendants' decision to ignore the environmental laws they were charged with enforcing and deviate from established procedures with respect to the people of Flint—a community that is predominantly African American—while enforcing those laws in areas of the State with predominantly white populations, and their decision to deliver

3

a superior water product to the water users in the remainder of Genesee County because that community was predominately white, while at the same time delivering a grossly inferior water product to water users in Flint because that community was predominately African American;

vi.   *Equal protection, wealth*: Plaintiffs have sustained serious injuries as a result of some of the Government Defendants' decision to ignore the environmental laws they were charged with enforcing and deviate from established procedures with respect to the people of Flint—a community whose citizens are poorer as compared to the rest of the State—while enforcing those laws in more affluent areas of the State, and their decision to protect the health of the water users in the remainder of Genesee County because that community was predominately more affluent and at the same time disregard the health of water users in Flint because that community was predominately poor;

vii.   *Monell Claim*: Plaintiffs have sustained violations of their fundamental substantive due process rights, including their right to bodily integrity, their right to be protected from state created danger, and their right to equal protection of the laws, all pursuant to the customs, policies, and/or practices of Defendant City of Flint;

viii.   *Violation of 42 U.S.C. § 1985(3)*: African American Plaintiffs have sustained serious injuries as a result of the conspiracy of two or more of the

4

Government Defendants to directly or indirectly conspire to violate Plaintiffs' constitutional rights, said conspiracy being based on invidious racial animus; and

ix.   *Violation of Elliot Larsen Civil Rights Act ("ELCRA")*: African American Plaintiffs have sustained serious injuries as a result of their denial of the full and equal enjoyment of services provided by some of the Defendants because they were residents of a predominately African American community;

3.   Plaintiffs sustained personal injury, property damage, economic damage, and emotional injury as a result of Defendants' conduct, as described herein, and set forth in more detail below.

## JURISDICTION AND VENUE

4.   This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against the Government Defendants for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq*.

5.   The Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.      The Court also has diversity jurisdiction under 28 U.S.C. § 1332(d). The matter in controversy in this suit exceeds $5,000,000, exclusive of interest and costs. This is a class action in which at least one plaintiff is a citizen of the State of Michigan, and at least one defendant is a citizen of a different state—in particular, Defendant LAN, Inc. is a citizen of the State of Texas and Defendant Veolia is a citizen of the States of Delaware and Illinois.

7.      The Court has personal jurisdiction over the Engineering Defendants because each of them have personally availed themselves of the benefits and protections of the State of Michigan. Each of the Engineering Defendants conducted business and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused Plaintiffs to suffer severe personal and property injuries in Michigan. As such, the Court has personal jurisdiction over the Engineering Defendants pursuant to MCL 600.705 and MCL 600.715.

8.      The Court has personal jurisdiction over the Government Defendants named herein as public officials of the State of Michigan, including the Emergency Managers, sued in their individual capacities; and public officials and employees of the City of Flint, sued in their official and individual capacities; the Genesee County Drain Commissioner, sued in his official and individual capacity; and the City of Flint for its customs, policies, or practices which affirmatively caused and/or contributed to the violations of Plaintiffs' Constitutional rights.

9.      Similarly, this Court has personal jurisdiction over the Governor of the State of Michigan, in his individual and official capacity, and the State of Michigan for prospective relief.

10.     Venue is proper in this Court because the original injury and damage occurred in the Eastern District of Michigan, Defendants reside or conduct business in the Eastern District of Michigan, Plaintiffs reside in the Eastern District of Michigan and/or own property located in the Eastern District of Michigan that was damaged, and many of the occurrences described herein occurred in the Eastern District of Michigan.

## PARTIES

### A.      Plaintiffs

11.     **Plaintiff Elnora Carthan** is a 72 year old African American widow who lives alone at a home she owns in Flint, Michigan where she has lived since 1976. Throughout the Class Period, Ms. Carthan received water serviced from the City of Flint at her home. In April 2014, Ms. Carthan began to boil her water but also continued to cook with it and to wash and bathe with it. In August 2015, Virginia Polytechnic Institute and State University ("Virginia Tech") tested her water for lead and other metals; that test revealed that the lead levels in her water vastly exceeded the maximum levels allowed under standards set forth by the federal Environmental Protection Agency ("EPA"), and were, in fact, extremely dangerous.

12.     As a direct and proximate result of Defendants' conduct, as set forth

herein, Ms. Carthan has suffered property damage as well as a diminution in the value of her property. Additionally, as a direct and proximate cause of Defendants' conduct, she experienced and continues to experience serious physical and emotional injury due to her exposure to toxic water, including but not limited to: skin lesions and dermatologic pathology; neurological disorders, including but not limited to constant exhaustion and memory loss; chronic and acute respiratory disorders including, but not limited to, chronic rhinitis; other significant medical injuries; and psychological disorders such as depression, chronic anxiety, posttraumatic stress disorder, and an inability to cope with normal stress. Finally, as a direct and proximate result of Defendants' actions, as set forth herein, Ms. Cathan has further experienced property damages, as well as a diminution in the value of her property.

13.    **Plaintiff Rhonda Kelso**, individually and on behalf of her minor child, "K.E.K," suffered the following injuries. Ms. Kelso is a 54 year old African American woman who suffers from several disabilities including the results of a stroke, spastic paraparesis, and bi-polar disorder. She owns her home located in Flint, Michigan. She and her family have lived in that home since 1993. As a direct and proximate result of Defendants' conduct, Ms. Keslo has suffered property damages including damages to her water pipes and a diminution in the value of her property. Ms. Keslo has also suffered extreme disruption, inconvenience,

8

discomfort, and emotional distress. Ms. Kelso lives at the aforementioned home with her minor daughter K.E.K. who is 14 years old. K.E.K. is a special needs student in school and suffers from a number of disabilities including, but not limited to hearing impairment, cardiac problems, and developmental delays involving speech and language. Both Rhonda Kelso and K.E.K. drank the toxic water from April 2014 until the autumn of 2014. They bathed, washed, and cooked with the water until at least November 2015.

14. **Plaintiffs Darrell and Barbara Davis**, both African American, live in and own a home in Flint, Michigan. Plaintiffs Barbara and Darryl Davis have suffered from skin problems including rashes and other medical issues, as a direct and proximate cause of Defendants' conduct as alleged herein. From 2014 through the present, Plaintiff Barbara Davis has been employed by Flint Community Schools, a school district headquartered in Flint, Michigan, and has worked in schools with high lead levels. As a direct and proximate result of Defendants' conduct, while working at Holmes STEM Academy, located at 6602 Oxley Drive, Flint, Michigan and Eisenhower Elementary School, 1235 Pershing Street Flint, Michigan, two Flint Community Schools, Plaintiff Barbara Davis developed skin rashes from contact with contaminated water.

15. As a direct and proximate result of Defendants' conduct, Plaintiff Barbara Davis has been forced to move out of her home in Flint on several

9

occasions beginning in approximately August 2015 and ending in approximately April 2016. Thus, the family was separated with Plaintiff Darryl Davis remaining in Flint and his wife living in either Nevada or Louisiana. After having abated while away from her home, each time she returned to Flint, Ms. Davis's skin rashes recurred. Plaintiffs Barbara and Darrell Davis also endured pain, suffering, and profound emotional distress as a result of the water contamination.

16.    Finally, as a direct and proximate result of Defendants' conduct, the Davises have sustained damage to their property, including, but not limited to, costs associated with remediating the water service lines and plumbing as well as in the diminution of the value of the property. The contamination of their water supply has unreasonably interfered with all aspects of daily living, quality of life, and the use and enjoyment of the property; as a result, Mr. and Mrs. Davis have incurred substantial expense in coping with the inconvenience and disruption to their lives, including, but not limited to, the cost of bottled water, transportation, and medical care.

17.    **Plaintiff Michael Snyder**, son of John Snyder, was appointed **Personal Representative of the Estate of John Snyder** by a Genesee County Probate Court Judge on August 15, 2015. John Snyder died at the age of 83 on June 30, 2015 while at McLaren Hospital in Flint. Mr. Snyder was admitted to McLaren Hospital because of right shoulder swelling on June 16, 2015. He was discharged

10

on June 25, 2015 to the home of his daughter Mary-Anne Tribble. Ms. Tribble's home is located on Secluded Lane, Flint. Two days later, Mr. Snyder was transported by ambulance from his daughter's home to the Linden, Michigan Caretel Inns for assisted living care. Mr. Snyder went to Caretel because his health was deteriorating. At approximately 3:45AM on June 30, 2015, Mr. Snyder was taken by ambulance from Caretel to the emergency room at McLaren in Flint because of acute respiratory failure "most likely secondary due to healthcare-associated pneumonia." He passed away soon thereafter. McLaren Hospital records establish that Mr. Snyder had the *legionella* antigen in his urine. Mr. Snyder died because of pneumonia caused by exposure to *legionella* bacteria which he acquired through exposure to contaminated Flint River water flowing through Flint's water supply.

18.   Mr. Snyder is survived by daughter Mary-Anne Tribble (DOB: July 1951), son Michael Snyder (DOB: May 1950), son John Snyder (DOB: August 1952), and six grandchildren. Defendants' deliberately indifferent wrongful conduct as alleged in this Complaint caused the death of Mr. Snyder. The Estate of John Snyder and his survivors seek compensation for lost earnings and other economic losses such as funeral expenses and uninsured medical expenses; pain and suffering of the decent prior to his death, mortification, loss of society and companionship, and other damages flowing from Mr. Snyder's wrongful death.

11

19.   **Plaintiff Marilyn Bryson** is a 58 year old African American woman who has lived at the same home in Flint, Michigan for 40 years. Mrs. Bryson's home has lead plumbing. During the relevant time period, Mrs. Bryson used the toxic water in her home for purposes that included, but were not limited to, cooking and bathing. Mrs. Bryson took frequent baths during the relevant time period due to symptoms from menopause, and noticed a strong odor in her water that would change from time to time. At first, her water smelled like rotten eggs and then the smell changed to a strong bleach-like odor. Mrs. Bryson was admitted to the emergency room in July 2015 with vomiting and diarrhea that had lasted for several weeks. During this time, Mrs. Bryson lost more than 20 pounds. She was subsequently diagnosed with a urinary tract infection and testing revealed E. coli.

20.   As a direct and proximate result of Defendants' actions, as set forth herein, Mrs. Bryson has experienced serious physical and emotional injury due to her exposure to the toxic water, including but not limited to E. coli and urinary tract infections. Also as a direct and proximate result of Defendants' actions, as set forth herein, Mrs. Bryson has suffered property damage, as well as a diminution in the value of her property.

21.   **Plaintiff David Munoz** is Hispanic and has lived in Flint, Michigan his entire life and has owned a home there for over 20 years. As a direct and proximate result of Defendants' conduct, Mr. Munoz suffered personal and property damages

12

as well as a diminution in the value of his property.

22.   **Plaintiff Tiantha Williams**, individually and on behalf of her minor child, "T.W.," are both suffered the following injuries. Ms. Williams, age 40, is African American and the daughter of VanNessa Taylor, age 62 and the mother T.W., age 22 months. The Williams/Taylor family at all relevant times lived in a single-family home on West Genesee in Flint. Since April 25, 2014, the Williams/Taylor family continues to be exposed to highly dangerous conditions created by Defendants' use of the Flint River as a water source, and Defendants' continued failure to remediate these harmful and toxic conditions. From April 25, 2014 until approximately December 2015, members of the Williams/Taylor family, unaware of the toxic nature of the tap water supplied by Flint, regularly used the water for drinking, cooking, bathing/showering, and clothes washing. The Williams/Taylor family continued to consume, wash, bathe, and wash dishes and clothing in the water until December 2015, when the family became aware of the highly toxic and harmful nature of the supplied water. Prior to that time, the family trusted previous reports that the condition of the water was not an immediate health emergency. They also relied on statements about the safety of the water that were made in public forums.

23.   It was not until December 2015, when the city of Flint declared a State of Emergency, that the Williams/Taylor family stopped drinking the water;

13

however, Tiantha Williams and VanNessa Taylor have consistently bathed and showered in the water. T.W. was born on December 15, 2015, preterm, during the 28th week of gestation. Upon birth, he stopped breathing 3 times and was revived. Following his birth, T.W. remained in the hospital for 1 month and 2 weeks in the Hurley Medical Center Neonatal Intensive Care Unite (NICU), being sustained by a heart monitor and oxygen therapy. After giving birth to T.W. on December 15, 2015, Tiantha Williams was diagnosed with listeria-infected amniotic fluid.

24.   As a direct and proximate result of Defendants' actions, as set forth herein, Tiantha Williams has experienced serious physical and emotional injury due to her exposure to the toxic water, including but not limited to listeria-infected amniotic fluid; hair loss, skin rashes and other skin problems; sleeping disorders; and psychological disorders such as depression, chronic anxiety, post-traumatic stress disorder, and a difficulty coping with normal stress.

25.   As a direct and proximate result of Defendants' actions, as set forth herein, T.W. has experienced serious physical and emotional injury due to his exposure to the toxic water, including but not limited to premature birth at 28 weeks gestation; excessive crying and irritability; sleeping disorders; delayed physical development; and expressive language delay.

26.   **Plaintiff Amber Brown**, on behalf of her minor child, "K.L.D.," suffered the following injuries. Ms. Brown is a 33 year old woman residing in Flint,

Michigan. Ms. Brown's minor daughter, K.L.D., was born on November 28, 2014. During her pregnancy, Ms. Brown resided in Flint, Michigan, and used the tap water for drinking, cooking, and washing. As a direct and proximate result of Defendants' conduct, K.L.D. has experienced serious physical injury due to her exposure to the toxic water, including, but not limited to, heightened levels of lead in her blood.

27.    Plaintiffs Elnora Carthan, Rhonda Kelso, individually and on behalf of her minor child, K.E.K., Darrell and Barbara Davis, Michael Snyder, Marilyn Bryson, David Munoz, Tiantha Williams, individually and on behalf of her minor child, T.W., and Amber Brown, on behalf of her minor child, K.L.D., are referred to collectively herein as, "Individual Plaintiffs."

28.    **Plaintiff Frances Gilcreast** resides in Mt. Morris, Michigan. FG&S Investments, located at 4322 E. Mt. Morris Road, Mt. Morris, Michigan 48458, is a partnership owned and operated by Ms. Gilcreast and her husband, Aonie Gilcreast. Ms. Gilcreast, through FG&S Investments, owns multiple properties in Flint, Michigan that are serviced by water provided by the City of Flint. As a direct and proximate result of Defendants' conduct described herein, Ms. Gilcreast has suffered property damage, lost rental and business income, and diminution in the value of her properties.

29.    **Plaintiff EPCO Sales, LLC ("EPCO")** is a domestic limited liability company located at 601 Kelso Street, Flint, Michigan 48506. EPCO is a family

15

owned and operated company that engineers and makes architectural and functional hardware products for commercial and residential buildings, and has resided at its current location in Flint since 1965. EPCO provides services to the residents of Flint at all times relevant to this Complaint. Plaintiff EPCO received its water from the City of Flint and paid its water bill to the City in accordance with its contract. In exchange, EPCO received toxic and contaminated water not fit for human use and consumption. As a direct and proximate result of Defendants' conduct described herein, EPCO has suffered property damage as well as a diminution in the value of its property.

30.   **Plaintiff Angelo's Coney Island Palace Inc.,** ("Angelo's Coney Island") is a Michigan Corporation located at 1807 N. Franklin Avenue, Flint, Michigan 48506. Angelo's Coney Island is a restaurant chain doing business in Flint, Michigan since 1949. Angelo's Coney Island has been significantly injured in its business and property as a direct and proximate result of Defendants' conduct, as set forth herein. Customer traffic at Angelo's Coney Island and similarly situated restaurants dropped considerably once the issues with Flint's water became known, leading to a substantial drop in revenue and profits thereby also impairing the value of the business. Additionally, Angelo's Coney Island has suffered property damages.

31.   Plaintiffs Frances Gilcreast, EPCO, and Angelo's Coney Island are

referred to collectively herein as, "Business Plaintiffs." The Business Plaintiffs and Individual Plaintiffs are referred to collectively as, "Plaintiffs."

32.   Plaintiff representatives have at all times relevant been residents of Flint, Michigan and citizens of the State of Michigan who have suffered personal injuries as a result of exposure to the City of Flint's drinking water, and/or property owners who have had property located in Flint damaged from exposure to the City of Flint's drinking water, and/or have suffered or continue to suffer economic harm caused by the City of Flint's drinking water.

33.   Plaintiff representatives bring this action on behalf of themselves and a Class of individuals and entities who were injured in their persons or their property after April 25, 2014.

34.   Unless otherwise noted, the term "Plaintiffs," as used in this Consolidated Amended Complaint, shall mean Plaintiffs and all members of the Class they purport to represent.

### B. Engineering Defendants

35.   Defendant LAN PC is a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint, Genesee County, Michigan 48532. In 2008, LAN PC was incorporated by LAN Inc., after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County. At this Flint location, LAN PC held itself out

to the world as a LAD company. Upon information and belief, substantial amount of work and services provided by LAN PC were conducted at LAN Inc.'s Chicago, Illinois location.

36.     Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County, Michigan through LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering, and program management services, including civil infrastructure engineering and municipal water treatment and design. At all relevant times, LAN Inc. held itself out to be a LAD company.

37.     Defendant LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]." LAD's website advertises that it has "experience, creativity and technical experience . . . in every service we offer[,]" which includes "[p]lanning, architecture, engineering and interior design, and program management [] delivered by multidisciplinary teams hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD's website indicates: "[a]s a multi-disciplinary firm, engineering is an integral part of our process from the beginning of each project. Our engineers work closely with

18

planners, architects and interior designers . . . . Our in-house engineers also provide

services for engineering projects independent of architectural design services."

38.     The corporate structure of LAD and LAN Inc. is such that LAD exerts

nearly unfettered control over its subsidiary. The top executives between Defendants

are identical—Leo A. Daly, III serves as Chairman and CEO of both LAD and LAN

Inc., and Dennis W. Petersen is the President of both. Three of LAN Inc.'s seven

directors are high ranking LAD executives, including Mr. Daly, Mr. Petersen, and

James B. Brader, the CFO of LAD. While LAN Inc. does not appear to retain a CFO,

LAD's CFO is one of LAN Inc.'s seven board members. On information and belief,

Mr. Brader serves as the *de facto* CFO of LAN Inc. and controls LAN Inc.'s finances.

LAD and LAN Inc. share offices in Houston (LAN's principal place of business),

Los Angeles, and Miami. The relationship between these entities is exemplified by

the footer on the bottom of the "Final Operational Report, Trihalomethane

Formation Concern," which lists the author as "LAN, Lockwood, Andrews &

Newnam, Inc. A Leo A Daly Company." Both this document and the LAN Inc.

website, http://www.lan-inc.com/, include the logo:



Similarly, LAN's Flint office boasts the following sign clearly describing it as, "A

Leo A Daly Company":



39.    Defendants LAN PC, LAN Inc., and LAD (collectively "LAN" or "LAN Defendants") are defendants in this action based on their collective failure to properly place the Flint Water Treatment Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public; failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public; and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water. The LAN Defendants worked in concert in negligently advising the government and thereby causing the damage alleged herein. In addition to the alter ego allegations above, the entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

40.    Defendant Veolia LLC is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

20

41.     Defendant Veolia Inc. is a Delaware Limited Liability Company with
its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago,
Illinois 60601.

42.     Defendant Veolia Water is a Delaware Limited Liability Company with
its principal place of business at 101 W. Washington Street, Suite 1400 East,
Indianapolis, Indiana 46204.

43.     Veolia LLC, Veolia Inc., and Veolia Water design and provide water
solutions for communities and industries across North America under the banner
"Veolia North America."

44.     Non-party Veolia Environment S.A. is a French transnational
corporation with its principal place of business at 36-38 Avenue Kleber, 75116,
Paris, France. Veolia Environment S.A. provides its services through, and thus
derives its revenues from, its four global divisions—water management, waste
management, public transport, and energy services. The divisions provide its
services across the globe, and in North America, those services are provided under
the aforementioned moniker "Veolia North America."

45.     In or around 2005, Veolia Environment S.A. united these four global
divisions under a single umbrella, and since then, has held out itself and all other
Veolia entities to the world simply as one "Veolia." Indeed,  Veolia Environment
S.A. adopted this simple "Veolia" branding across all of its businesses, which is

21

evidenced on its website and press releases.

46.    The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia Environment S.A.

47.    Veolia Environment S.A. and its divisions also underwent a restructuring beginning around 2011. As described by Veolia Environment S.A. Chair and CEO Antoine Frerot, "[o]ur new organization is based on some simple principles—operating as an integrated company, establishing a single Veolia in each country, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10. In other words, "[t]he new Veolia is one Veolia." *Id.* at 14.

48.    As a result, the corporate structure of Veolia Environment S.A., Veolia LLC, Veolia Inc., and Veolia Water (the latter three collectively, "Veolia" or "Veolia Defendants") is such that Veolia Environment S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain. For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively presenting themselves to the world as "Veolia." When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively. And Veolia markets itself as "Veolia, which is the world's largest

22

water services and technology company."

    49.    In Flint, Michigan specifically, a February 10, 2015 joint press release stated:

> The City of Flint has retained a team of urban water experts from Veolia North America to conduct an analysis of the city's water system. Veolia, which is the world's largest water services and technology company, will assess how Flint's water is tested and distributed, including reviewing water treatment processes and operations, laboratory testing and analysis, and engineering reports that detail the city's treatment and distribution systems.

    50.    And, in a February 2015 Veolia Water Quality Report, which forms part of the basis of Plaintiffs' claims and has caused plaintiffs severe injuries, the Veolia Defendants refer to themselves simply as "Veolia."

    51.    Upon information and belief, the Veolia Defendants are controlled by the same top executives and revenues are commingled and reported as one. As such, the Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

    52.    The Veolia Defendants have abused the corporate form to avoid liability in this matter. Indeed, while it appears Veolia Water may have executed the subject contract with the City of Flint, the Veolia Defendants, together, as indistinguishable entities, performed services, and presented their conclusions as "Veolia." At all times relevant, the Veolia Defendants have represented to the world that they are not distinct legal entities but rather one and the same.

53.   The Veolia Defendants collectively maintain several offices in Michigan, including Westland, Livonia, and Grand Rapids, where they regularly conduct business.

54.   The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink. The Veolia Defendants worked in concert in negligently advising the government and thereby causing the damage alleged herein. In addition to the alter ego allegations herein, the entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

55.   Additionally, both the Veolia and LAN Defendants are parties to this action because, among other reasons, they were professionally negligent in several ways: These defendants (1) failed to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the residents' homes; (2) failed to recognize at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measures; (3) failed to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule; (4) failed to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' disease; and (5) advised the City to use or even increase the dosage of highly acidic ferric chloride, rather than advising that the pH

of the water should be increased.

### C.   <u>Government Defendants</u>

56.   All individual Defendants are sued in their individual and/or official capacities as indicated below.

57.   Defendant Rick Snyder is the Governor of the State of Michigan ("Governor") and is vested with executive power pursuant to Art. V, Section 1 of the Michigan Constitution. The Governor is responsible for the management of state government for the health and welfare of its citizens and residents and is sued by Plaintiffs and the Class in both his individual capacity for compensation for the Plaintiffs, insofar as his deliberate conduct constituted an abuse and/or misuse of his authority, and, in his official capacity, for prospective equitable relief to correct the harm caused and prolonged by state government and to prevent future injury. The Governor is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights.

58.   Defendant State of Michigan ("the State") operates its Department of Environmental Quality ("MDEQ"), which is the state department primarily responsible for the environmental safety and health of Michigan citizens and residents. The State is sued for injunctive and/or prospective relief, because, acting through MDEQ and its employees, it caused the public health crisis at issue in this

case, concealed the harm that it caused, and has exacerbated and prolonged the injuries to Plaintiffs by failing to effectively remediate the harm it caused and concealed.

59.    Daniel Wyant ("Wyant") was Director of MDEQ and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm.

60.    Andy Dillon ("Dillon") was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because he, along with the Governor, Jeff Wright, Dayne Walling, and Edward Kurtz, caused harm to Plaintiffs when he participated in the development of an interim water delivery plan in June 2013 which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

61.    Nick Lyon ("Lyon") was Director of the Michigan Department of Health and Human Services ("MDHSS") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

62.    Nancy Peeler ("Peeler") was the MDHHS Director for the Program for Maternal, Infant and Early Childhood Home Visiting, and was the individual in

charge of MDHHS's childhood lead poisoning program. Peeler is sued in her individual capacity because during her term as an MDHHS employee, she participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm her department caused Plaintiffs.

63.     Liane Shekter-Smith ("Smith") was Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, holding that position until October 19, 2015 when she was removed from her position. Smith is sued in her individual capacity because during her term as Chief of Drinking Water for MDEQ, she approved and participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm her department caused Plaintiffs.

64.     Adam Rosenthal ("Rosenthal") was a Water Quality Analyst assigned to the Lansing District Office of the MDEQ. Rosenthal is sued in his individual capacity because, as Water Quality Analyst for MDEQ, he approved and participated in, the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

65.     Stephen Busch ("Busch") was District Supervisor assigned to the Lansing District Office of the MDEQ. Busch is sued in his individual capacity

because, as District Office Supervisor of MDEQ, he deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

66.   Patrick Cook ("Cook") was at all relevant times a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is sued in his individual capacity because, as Water Treatment Specialist District of MDEQ, he approved of, and thereby participated in, the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

67.   Michael Prysby ("Prysby") was an Engineer assigned to District 11 (Genesee County) of the MDEQ. Prysby is sued in his individual capacity because, as Engineer assigned to District 11, he approved of, and thereby participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of harm his department caused Plaintiffs.

68.   Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ. Wurfel is sued in his individual capacity because, as Director of Communications for MDEQ, he was responsible for the deliberately misleading and inaccurate communications that increased and prolonged the public health crisis at

issue in this case and for making false statements and providing false assurances which caused harm to Plaintiffs.

69.     Jeff Wright ("Wright") has been the Genesee County Drain Commissioner since 2001. Wright is sued in his individual capacity because, as the Genesee Country Drain Commissioner, he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment to the United States Constitution.

70.     Edward Kurtz ("Kurtz") was the Emergency Manager of Flint appointed by the Governor in August 2012 and served in this capacity until July 2013. Kurtz is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Kurtz is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in or aided and/or abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment to the United States

Constitution.

71.     Darnell Earley ("Earley") was the Emergency Manager of the City of Flint appointed by the Governor on November 1, 2013 and served in this capacity until January 12, 2015. Earley is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Earley is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment to the United States Constitution.

72.     Gerald Ambrose ("Ambrose") was the Emergency Manager of the City of Flint appointed by the Governor on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Ambrose is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and

equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment to the United States Constitution.

73.    Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 until November 9, 2015 when he was unseated by Karen Weaver. Walling is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Walling is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment to the United States Constitution. Additionally, as Mayor, he was a policymaker for the Defendant City of Flint and as such his actions constituted customs, policies, and/or practices of the Defendant City of Flint, within the meaning of *Monell*.

74.    Howard Croft ("Croft") was Director of Public Works for the City of Flint. Croft is sued in his individual capacity because, as Director of Public Works, he approved of, and thereby participated in, the decisions that deliberately created,

increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

75.    Michael Glasgow ("Glasgow") was Utilities Administrator for the City of Flint. Glasgow is sued in his individual capacity because as Utilities Administrator, he deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

76.    Daugherty Johnson ("Johnson") was the Utilities Administrator for the City of Flint. Johnson is sued in his individual capacity because, as Utilities Administrator, he approved of, and thereby participated in the decisions that deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

77.    The City of Flint ("Flint") is a municipal corporation, so authorized by the laws of the State of Michigan that operates Department of Public Works and provides water to its residents and property owners as part of its responsibilities and services. Flint is a Defendant because, despite the protests of a number of elected and appointed officials within the organization, the municipal corporation itself, through its policies, customs, and practices deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm it caused Plaintiffs. Flint is also sued because it deprived

32

Plaintiffs of their civil and constitutional rights by violating Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA.

78.     Defendants Kurtz, Earley and Ambrose as Emergency Managers, acted in both their individual capacities and as agents of the State of Michigan, and their official capacities as policy makers for Defendant City of Flint and as such their actions constituted customs, policies, and/or practices of Defendant City of Flint, within the meaning of *Monell*.

79.     At all relevant times hereto, the conduct of Defendants Walling, Croft, Glasgow, and Johnson was pursuant to the customs, policies, and/or practices of Defendant City of Flint.

## STATEMENT OF FACTS

80.     This case arises from the tragic and preventable poisoning of the City of Flint. The outrageous acts and omissions of the Defendants have caused immeasurable and irreparable harm to Plaintiffs.

### A.     Dangers From the Flint River Water Have Been Well-Known for Decades

81.     On July 8, 1897, the City of Flint passed an ordinance requiring that all connections with any water mains shall be made with lead pipe.

82.     The Flint Water Treatment Plant ("FWTP") was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

83.     Historically, the water in the Flint River downstream of Flint has been of poor quality, and was severely degraded due to the presence of fecal coliform bacteria, low dissolved oxygen, plant nutrients, oils, and toxic substances.

84.     As early as 1964, the U.S. Geological Survey noted high levels of chloride in the Flint River. Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers.

85.     On June 9, 1964, Detroit and Flint signed an initial water service agreement. This agreement stated that Detroit would provide water from its Lake Huron Intake when it completed its pipeline to Flint and that Flint would buy its drinking water from Detroit. This Agreement also gave Flint exclusive rights to distribute Detroit water throughout the rest of Genesee County. Flint did not receive water under this agreement until the pipeline was completed in 1967.

86.     On December 20, 1965, Flint "mothballed" the WTP and contracted with the DWSD for treated water pumped along a 70-mile pipeline extending from Lake Huron west to Flint.  Flint resold the water to the Genesee County Drain Commission ("GCDC"), which then resold the water to many of its wholesale and retail customers.

87.     On June 28, 1973, Genesee County, acting through the County Agent, GCDC, agreed to "accept water as delivered from the water system of the City

34

provided said water meets all requirements of the various State regulatory Agencies." The 1973 water supply contract did not require Flint to supply the County with DWSD water.

88.    The County water system mains were connected to the City system "to provide an adequate water supply from the City system to the County's system…." In addition, the City agreed that it "shall provide water to the County system at such points as may be mutually agreed upon and in amounts generally sufficient to supply the County's system use."

89.    In October 2003, the 1973 City/County water agreement was supplemented. The "City agree[d] to sell water to the County Agency in such quantities as will meet the demands of the County Agency's customers" and "the County Agency agree[d]to purchase water exclusively from the City through the term of this Agreement or the date it may be earlier terminated …"

90.    Until 2014, Flint water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the FWTP.

91.    During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals, and other places of public services.

92.    However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water

supply. Amidst these growing concerns, Flint and the other local governmental entities commissioned studies for alternative water supplies:

- A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups.

- In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water. One of the key points from the technical assessment, entitled "Source Water Assessment Report for the City of Flint Water Supply—Flint River Emergency Intake," prepared by the U.S. Geological Survey, the MDEQ, and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

- In 2006 and 2009, Flint and the local governmental entities completed additional studies for alternative water supplies. The 2009 study, prepared by the LAN Defendants and others, evaluated two alternatives for water supply—continue to purchase from DWSD, or construct a new pipeline (later known as the Karegnondi Water Authority ("KWA") pipeline) from Lake Huron.

- In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as the primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Rowe Engineering and the LAN Defendants, cautioned against the use of the Flint River water and the dormant FWTP. The report concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water . . . . Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron." The study further concluded that such treatments to Flint

36

River water could be done if improvements were made to the FWTP. However, if used as a water supply, the study noted that "a source water protection management plan should be developed to . . . identify potential sources of contamination . . . ."

- The LAN Defendants also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to ring the FWTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

93.    In 2001, the state ordered the monitoring and cleanup of 134 polluted sites within the Flint River watershed, including industrial complexes, landfills, and farms laden with pesticides and fertilizer.

94.    Use of the Flint River as a primary drinking source was rejected in 2011.

**B.    Despite These Well-Known Dangers, Defendants Decided to Use Flint River Water as the Primary Water Source for the City of Flint**

95.    Motivated principally by the actions and political and lobbying pressure of Wright, in 2009, the communities of Flint, Genesee County, Sanilac County, Lapeer County, and City of Lapeer, formed the Karegnondi Water Authority ("KWA") to explore the development of a pipeline and water delivery system which would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.  Former Flint Mayor Dayne Walling ("Walling") was elected KWA's Chair and Wright was selected as its CEO.

37

96.     Wright, in testimony to the Michigan Department of Civil Rights, said
that he was motivated to develop an alternative water source for the County because,
in his opinion and in the opinion of others, the DWSD operation was "the poster
child for Detroit corruption."

97.     The projected construction cost of building the KWA water system was
approximately $300 million based on the sale of 60 million gallons per day.

98.     Flint's share of this cost was about $85 million. The GCDC promised
to buy 42 million gallons per day of water from KWA and ultimately Flint agreed to
buy 18 million gallons per day with the GCDC being responsible for 65.8 % of the
debt service and Flint responsible for 34.2% of the debt service.

99.     To supply Lake Huron water to its contracting members, the KWA
would be required to construct a lake water intake, 63 miles of pipe from the intake
plant to Flint and 2 pump stations. The intake facility was financed from a $35
million bond sale consummated in October of 2013.  The KWA is authorized to draw
up to 85 million gallons per day from Lake Huron.

100.    Unlike the finished water from DWSD, the water to be delivered to
Flint through the KWA system would be raw, requiring considerable treatment at
the Flint WTP.

101.    In August 2012, the Governor appointed Edward Kurtz as Flint's
Emergency Manager.  Kurtz, who had the authority to obligate Flint to the KWA,

was allied with Wright in presenting arguments for approval to state Treasurer Andy Dillon ("Dillon") and Governor Snyder. Opposing Wright and Kurtz was the DWSD which had a strong financial interest in maintaining Flint and the GCDC as customers.

102.   In November of 2012, Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs, and consistent with political pressure from Genesee County Drain Commissioner Jeff Wright, who had encouraged the formation of the KWA in 2009.

103.   Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling, and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint should reject Wright's pressure to join KWA and continue to receive water from DWSD. Most of the discourse about Flint joining KWA or continuing with DWSD included Wright who consistently raised arguments designed to persuade Kurtz, Dillon, and the Governor that the DWSD cost studies were wrong.

104.   In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") to assess whether it would be cost- effective for Flint to switch from water supplied by DWSD and join the KWA water

delivery system. In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD. In an email from Treasurer Dillon to Governor Snyder dated March 17, 2013, Dillon noted that the KWA representatives were misrepresenting the benefits of the deal and that the "(r)eport that I got is that Flint should stay w DWSD."

105.   Likewise, on March 26, 2013, Busch sent an email to Wyant, copying Shekter-Smith, discussing the risks associated with using the Flint River as a drinking water source for the City of Flint.  Indeed, Busch stated  that the use of Flint River water would pose increased health risks to the public, including a microbial risk, an increased risk of disinfection by-product [trihalomethanes often referred to as "Total Trihalomethanes" or "TTHM"] exposure, the triggering of additional regulatory requirements, and significant upgrades to the Flint Water Treatment Plant.

106.   On March 27, 2013, MDEQ officials, sensing that Kurtz, Wright, Walling, and Dillon (in spite of his earlier email suggesting that Flint should "stay w DWSD") were pushing the Governor to approve the KWA deal, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water. In the words of MDEQ Deputy Director Jim Sygo, "[a]s you might guess we are in a

situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost."

107.   On March 28, 2013, in an email from Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize KWA going forward, even though the independent firm he hired to perform a cost evaluation said staying with DWSD made the most economic sense. Dillon wrote the Governor, explaining that, "based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor, and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."

108.   By the spring of 2013, Wright had secured 30-year commitments from KWA member communities—except for Flint—to purchase millions of gallons of water. These commitments were necessary in order to sell $280 million worth of bonds to finance the project.

109.   In what became known in the media as "Michigan's Water War," Wright, in March and April of 2013, turned his attention to securing Flint's commitment to purchase millions of gallons of water from the KWA.

110.   Without Flint's participation in the KWA project, Wright knew that it

41

was doubtful that the KWA would be able to finance the project through the sale of $280 million worth of bonds.

111.    It was anticipated that if the financing for the KWA project was secured by April of 2014, the project could be completed by the end of 2016.

112.    In order to "win the war," Wright took on the role as Flint's surrogate. For example, after the TYJT report recommended that he not authorize Flint EM Kurtz to sign up with KWA because staying with DWSD was a better deal for the people of Flint, Wright aggressively argued Flint's case in communicating with Dillon and in the media.

113.    All state and local officials involved in the decision-making process knew that if Flint stayed with the DWSD as its source of drinking water, the Flint Water Treatment Plant ("FWTP" or "WTP") would not have to be upgraded. On the other hand, they all knew that if Flint went with KWA, the Flint WTP would have to be upgraded to treat the raw water coming from Lake Huron.

114.    Governor Snyder was personally involved in the decisional process which led to the transition from DWSD to the KWA. Indeed, because both the City of Flint and the City of Detroit were under State of Michigan emergency management at the time, Snyder was briefed on reports from *both* Flint's and Detroit's emergency managers and issued directions to both managers as it related to the transition.

115.   On April 4, 2013, Governor Snyder's Chief of Staff Dennis Muchmore emailed Governor Snyder and stated that "(a)s you know, the Flint people have requested Dillon's ok to break away from the DWSD." Snyder instructed Muchmore, Dillon, Detroit's Emergency Manager Kevin Orr, DWSD personnel, and Flint Emergency Manager Ed Kurtz to require DWSD to submit an additional offer to continue as Flint's water provider before allowing Dillon to authorize the transition away from DWSD.

116.   Later in April, DWSD submitted a final proposal to Flint's Emergency Manager Ed Kurtz and the proposal, detailed background, and financial information were all forwarded to Governor Snyder by his Executive Director, Allison Scott, with an email stating "looks like they were following your instructions."

117.   Shortly thereafter, Brom Stiblitz, a Senior Policy Advisor in the Michigan Department of Treasury emailed Snyder's Executive Director, Ms. Scott, and informed her that Flint's Emergency Manager Kurtz and Detroit's Emergency Manager Orr had spoken and that "Flint will not accept the last offer from DWSD." Again, Ms. Scott forwarded the information to Governor Snyder in an email dated April 29, 2013 and stated "(l)ooks like they adhered to the plan."

118.   Governor Snyder authorized Kurtz, through Department of Treasury officials, to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016 or 2017.

119.   Governor Snyder participated in discussions between his appointed Emergency Manager of Flint, Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr. At the time the Governor authorized Kurtz to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River would be used as an interim source and that the use of the interim source had the backing of Snyder, Andy Dillon, and MDEQ Director Wyant.

120.   In June 2013, Dillon, Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately December 2016).

121.   Dillon, Kurtz, Wright, and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the FWTP would cost millions.

122.   A critical part of the of the interim water plan was to shift funds that would have gone to DWSD to purchase finished water to the WTP upgrades which would enable the WTP to treat the Flint River water and then later treat the raw Lake Huron water delivered when KWA became operational.

123.   The Governor, in a timeline prepared by his office, confirmed  that in June 2013, he knew that Flint River water would be used as an interim source of water.

44

124.   In July of 2013, Governor Snyder reappointed Michael Brown as Flint's Emergency Manager.

125.   In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

126.   As Emergency Manager, Earley was, by his own admission, responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. In his testimony to the United States House Committee on Oversight and Government Reform on March 15, 2016, he stated "the [e]mergency [m]anager obviously is the person responsible for making sure that those things get done, and I've always accepted that."

127.   On March 14, 2014, Brian Larkin, then associate director of the Michigan Governor's Office of Urban and Metropolitan Initiatives, foretold of the crisis in an email to several others in the governor's office stating, "The expedited timeframe," of switching Flint's water sources, "is less than ideal and could lead to some big potential disasters down the road."

128.   Despite having been copied on an email alerting her to the potential dangers of switching Flint 's water source nearly a year earlier, on March 20, 2014 Shekter-Smith played an integral role in ensuring that the City of Flint received an Administrative Consent Order that (i) required Flint to make use of the Flint Water Treatment Plant, (ii) attempted to prevent Flint from ever returning

45

to the DWSD and (iii) mandated Flint to "undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional Flint Water Treatment Plant public improvements, source water protection public improvements, and public improvements to obtain a back-up water supply, in order to comply with Act 399."

129.   Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 17, 2014, that the FWTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda." Glasgow had told Rosenthal the day before, in the same e-mail chain, ". . . it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . . I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote Prysby and Busch of the MDEQ, that ". . . I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

130.   Glasgow later told State investigators that he received pressure from superiors—particularly Defendants Johnson and Croft—to begin the switch to the Flint River.

131.   On April 18, 2014, Joshua Spencer, who was responsible for handling public relations for the City of Flint, urged the City to issue a press release stating, "The Tests are in. The Water is Good!;" "In an effort to dispel myths and promote the truth about the Flint River and its viability as a residential water resource, there have been numerous studies and tests conducted on its water by several different independent organizations;" and "For nearly 10 years Mike Glasgow has worked in the laboratory at the City of Flint Water Service Center. He has run countless tests on our drinking water to ensure its safety for public use. Mike has not only conducted tests on water provided to us by Detroit, but also on local water from nearby rivers, lakes and streams including the Flint River. When asked if over the last decade of he has seen any abnormalities of major concern in the water, his response was an emphatic, 'No.'" Johnson told early that as an MDEQ Official, he was "comfortable releasing the ad."

132.   MDEQ's Cook signed a permit in 2014 that was the last approval necessary for the use of the Flint Water Treatment Plant.

133.   Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it

and Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the FWTP was not ready.

134.   For at least a year prior thereto, the State knew that using the Flint River water was dangerous and could cause serious public health issues.

135.   In addition, recognizing that WTP could not process water for both Flint and Genesee County, a group of people including Wright, Dillon, and Walling decided that the people of Flint would receive its drinking water from the Flint River and that the out-county residents would continue to receive water directly from DWSD.

136.   At the time that this decision was made, the County and City water systems were physically connected so that the WTP could have processed drinking water from the Flint River and delivered to the County customers.

137.   The City and County operated their water systems jointly. Wright was in control of the County side of the jointly operated water systems and Walling, Kurtz, Ambrose, and Earley, together with the Governor and Treasure Dillon exercised control over the Flint side of the combined water systems during the relevant time. Moreover, the two water systems were operated for decades as a unified system. Because the two systems were physically connected, the County could have been the recipient of the Flint River water output from the WTP. And because of the joint operation of the combined water systems, each of these officials

played a role in the decision to provide the predominately African American Flint community with the high risk water and provide the predominately white customers of the County with the safe water from DWSD.

138. Wright had apparent contractual authority over the water supply choices that were made in 2013 and 2014. Wright, in a April 1, 2014 Official Statement to prospective bond purchasers stated, "[i]nasmuch as the County Agency has a valid contract with Flint for the supply of water via DWSD, Flint is contractually obligated to continue to purchase water from DWSD in order to supply water to the County Agency. This may be accomplished, notwithstanding Flint utilizing the Flint River for a water source, by Flint continuing to purchase water from DWSD and directing the water to be transmitted directly to the County Agency by isolation valves currently installed in the Flint System."

139. In the same Official Statement, Wright noted that the County entered into contract negotiations with DWSD to secure water directly from DWSD. Wright noted that during the interim period DWSD had agreed to supply water to the County via Flint without a contract being in place.

140. Despite Wright's statement, the 1973 water supply contract between the City and County required the City to supply drinking water to the County which met regulatory standards. The contract did *not* require the City to sell to the County DWSD water.

141.   In his Official Statement, Wright points out that Flint negotiated an administrative consent order ("ACO") with MDEQ—discussed further below—that permitted the temporary use of the Flint River and that the ACO required Flint to upgrade the WTP and eventually become part of the KWA.

142.   Wright believed the KWA project, as he envisioned it, would not materialize without Flint's participation. The Home Rule debt limit prohibited Flint's participation in the bond sale unless an "emergency" could be created.

143.   Wright, with the assistance of Emergency Manger's Earley and Ambrose, created an "emergency" which required a "sweetheart" ACO to be developed.

144.   The State of Michigan has alleged in criminal indictments that the ACO process was a fraudulent scheme designed to move Flint into Wright's KWA project and to permit the issuance of bonds to cover Flint's share of the debt service.

145.   According to the criminal indictment of Emergency Manager's Darnell Early and Gerald Ambrose, they allegedly participated in a process that allowed the use of bonds to fund the construction of the KWA pipeline despite Flint's problem with its high debt level.

146.   The City of Flint, with MDEQ approval, used an exception to state law by claiming the bonds were needed to fund an emergency cleanup of a retention pond, when in fact the funds were intended to pay for Wright's KWA project.

147.   During that time, Early and others actively worked in various fashions to discourage a return to using water produced by the Detroit Water and Sewer Department, required the use of Flint River water through a Flint Water Treatment Plant, that was deemed unready for service by several people involved with its management, and to ensure the construction of the KWA.

**C.   The LAN Defendants Failed to Meet Their Duties of Care and Competence as Design Engineers for the Flint Water Treatment Plant**

148.   On June 10, 2013, the LAN Defendants submitted a proposal to Flint for upgrading the FWTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

149.   The LAN Defendants claimed in their proposal that their "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

150.   The proposal included the following relevant sections:

a.   A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

51

b.      A "Standards of Performance" section where the LAN Defendants "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of the LAN Defendants.

151.    In or around June 2013, Flint formally retained the LAN Defendants as the design engineer for improvements and upgrades to the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted the LAN Defendants' "extensive experience in this field," and relied upon the LAN Defendants' identification of the "engineering, procurement, and construction needs" for the project. Although the City recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water. LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services.

152.    Upon information and belief, there were no bids submitted by the LAN Defendants or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

153.    On June 29, 2013, LAN met with representatives of Flint,

representatives of the Genesee County Drain Commissioners Office and the MDEQ to discuss:

    a.    Using the Flint River as a water source;

    b.    The ability to perform the necessary upgrades to the FWTP;

    c.    The ability to perform quality control;

    d.    The ability for Flint to provide water to Genesee County;

    e.    The ability to meet an April or May 2014 timeline; and

    f.    Developing a cost analysis.

154. According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the following determinations were made:

    a.    The Flint River would be more difficult to treat, but was viable as a source;

    b.    It was possible to engineer and construct the upgrades needed for the treatment process;

    c.    It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed[;]"

    d.    FWTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;

    e.    There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and

f.  The next steps were for the LAN Defendants to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

155.  LAN was directly involved in conversations about the potential for lead contamination following the switch. According to a September 3, 2015 email with the subject "Flint Water," sent to Warren Green and Samir Matta of LAN, along with various city and state officials, Public Works Director Howard Croft addressed concerns about the amount of lead found in the water, stating, "[a]t the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the DEQ."

156.  Since 1965, the FWTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short-term operation such as providing the average daily demand for only a few days.

157.  Upon information and belief, the FWTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately 6 weeks) because of a perceived high risk that the DWSD supply would fail and remain out of service for an extended duration.

158.  Due to the aforementioned 2013 agreement, the FWTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide

54

the citizens of Flint with sufficient quantities of water.

159.   In April of 2014, the LAN Defendants, Flint, and MDEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

160.   On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

161.   Despite receiving these permits, the Flint water system was not prepared for the switch to Flint River water. The Flint River was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents, such as phosphates, before entering public water systems. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.

162.   The LAN Defendants knew, if not recommended, that the FWTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures. Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water

from the Flint River as the primary source were or should have been well-known and foreseeable to the LAN Defendants, engineering firms that, according to their website, were a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

163.   From July of 2013 through April of 2014, the LAN Defendants provided professional engineering services associated with the switch from the DWSD to the FWTP, but failed to meet their duty of care and competence. The LAN Defendants were responsible for providing engineering services to ensure that the FWTP was equipped to treat water from each of its new sources. The LAN Defendants' actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the FWTP were approved by MDEQ in April of 2014 pursuant to plans and specifications signed and sealed by the LAN Defendants. Further, the LAN Defendants, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water. Moreover, the LAN Defendants did not require water

quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

### D. Numerous Signs of the Public Health Crisis Caused By the Contaminated Water Were Evident Within Weeks of the Switch

164.   On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and Glasgow had warned that the FWTP was not ready.

165.   Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

166.   Indeed, as early as May 15, 2014, within two weeks of the switch to Flint River water, Shekter-Smith had received numerous citizen complaints, including one forwarded from the EPA's Jennifer Crooks regarding rashes caused by the new water.

167.   In June 2014, citizen complaints about contaminated water continued without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill.

168.   On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response.

169.   To address the bacteria problem, the water was treated with additional chlorine. However, as has been well known for decades, in corroded pipes, chlorine

preferentially reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria—so more chlorine was added.

170.   The use of chlorine to disinfect water produced various disinfection byproducts, including trihalomethanes ("TTHM"). When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

171.   Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high. This should have been a red flag that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

172.   Moreover, PowerPoint slides circulated among MDEQ officials— including Busch, Prysby, and Rosenthal—in March and April 2015 showed that MDEQ officials knew as early as May 2014 that the water contained TTHM levels above the EPA's maximum contaminant level. According to the presentation, the City and MDEQ had also been receiving complaints about the water for some time, including about the water's taste, odor, color, and that it was causing rashes but this failed to prompt any action.

173.   As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014—the Michigan Department of Health and Human Services (MDHHS) reported an outbreak of

Legionnaires' disease—another red flag.

174.   Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with *legionella* bacteria are inhaled or when water-containing *legionella* enters the trachea. Extensive studies of *legionella* have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away—which is exactly what happened when the River's corrosive water entered the City's pipes.

175.   In October 3, 2014, an email from Jason Lorenz, the Public Information Officer for the City of Flint, informed Ambrose and later Earley about the spike in cases of Legionnaires' disease. Earley responded to the email chain disclaiming any connection between the outbreak and Flint's water, writing that the City's "message" should be that the outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve." Statements made to the Michigan Attorney General's Office as part of its investigation into the crisis show that "MDHHS personnel were not in agreement with Earley['s] 'message.'"

176.   In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in September 2014—lead poisoning rates "were higher than usual for children under age 16 living

in the City of Flint during the months of July, August and September, 2014."

177.   As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

178.   Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

179.   On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

180.   Governor Snyder's senior executive staff was immediately aware of the ramifications of GM's decision and the adverse health effects confronting the citizenry of Flint. In an email written only the day after GM's decision to withdraw from Flint River-sourced water, Deputy Legal Counsel and Senior Policy Advisor to the Governor Valerie Brader wrote:

> Now we are getting comments about being lab rats in the media, which are going to be exacerbated when it comes out that after the boil water order, there were chemicals in the water that exceeded health-based water quality standards. I think we should ask the EM to consider coming back to the Detroit system in full or in part as an interim solution to both the quality, and now the financial, problems that the

current solution is causing.

Brader's email was addressed to Dennis Muchmore, Governor Snyder's Chief of Staff, Michael Gadola, the Governor's Legal Counsel and Jarrod Agen, the Governor's Communications Director. Brader also noted that she intentionally did not distribute her email to officials at MDEQ to keep the communication secret and hidden under the Freedom of Information Act. But she noted that she had been in touch with MDEQ officials to brief Flint's Emergency Manager "directly on the water quality issues."

181.   Richard Baird, Governor Snyder's "Transformation Manager" and close confidant, who also received a copy of Brader's email, was then present for a conference call with Earley during which Earley rejected the idea of returning to the Detroit Water & Sewer Department.

182.   The following day, Governor Snyder's Legal Counsel Michael Gadola issued a more frank assessment of the health issues associated with using the Flint River as the drinking water source for the population of Flint calling its use "downright scary." Gadola advised that, "[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control."

183.   On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion. Worse yet, these samples were not drawn from the highest risk homes as

required by the Lead and Copper Rule.

184.   In January 2015, David Murray, Governor Snyder's deputy press secretary, saw an email from Wurfel stating, "I don't want my director to say publicly that the water in Flint is safe until we get back the results of some county health department of epidemiological trace-back work on 41 cases of Legionnaires' disease in Genesee County since last May."

185.   On January 9, 2015, University of Michigan-Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

186.   That same day, Earley refused to return to DWSD water, according to the Attorney General's investigation into the crisis.

187.   In addition to these events, the City conducted six (6) sampling events on the corrosivity of the "treated" drinking water that occurred either before or concurrently with the creation of reports by the Engineering Defendants. The sampling events were in May 2014, August 2014, October 2014, February 2015, May 2015, and August 2015. The sampling results all showed that the drinking water was very corrosive, and yet none of the reports produced by the Engineering Defendants mentioned these sampling results.

### E.   The LAN and Veolia Defendants Were Asked to Evaluate the Problems, But Failed to Do So Properly

188.   In November of 2014, the LAN Defendants were on actual notice of

the need to assess the factors contributing to high TTHM levels following the water source change because the LAN Defendants were engaged to evaluate this issue by Flint and provide a report of its findings, which they did in August of 2015.

189.   The LAN Defendants issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and regulations. The LAN Defendants entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

190.   The Veolia Defendants submitted to Flint their "Response to Invitation to Bid for Water Quality Consultant," Proposal No. 15-573. The Veolia Defendants proposed to provide a "complete solution to address the immediate reliability and operational needs" of Flint's water system.

191.   Flint had requested engineering services:

    a.   To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

    b.   To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

    c.   To assist the City in implementing the recommendations.

192.   The Veolia Defendants, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability

63

is much more complex than the recommendations study and advisory services outlined [in City of Flint's request]." The Veolia Defendants proposed to respond to Flint's requested scope of work by:

      a.    Calibrating "daily water quality samples with the City's hydraulic model";

      b.    Refining "the operational strategies for the plant and distribution system";

      c.    Coordinating "daily efforts across plant, operations and maintenance staff"; and

      d.    Alleviating "continued concerns from the public communications process."

193.   In February of 2015, the Veolia Defendants were hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

194.   The Veolia Defendants' task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. As water treatment professionals, the Veolia Defendants had an opportunity to catch what the LAN Defendants had missed or refused to warn about—corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

195.   On February 10, 2015, the Veolia Defendants and the City issued a

64

joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

196.   The press release contained no limitation on the Veolia Defendants' scope of work. David Gadis, the Vice President of Veolia North America's Municipal & Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on the Veolia Defendants' subsequent representations of safety.

197.   On February 12, 2015, Rob Nicholas, Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

198.   Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City

Council on February 18, 2015. Per the interim report, the only issue not in the Veolia Defendants' scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility."

199.   In the interim report, the Veolia Defendants indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." The Veolia Defendants effectively declared publicly that Flint's water was safe.

200.   The Veolia Defendants' interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among the Veolia Defendants' "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

201.   In response to potential questions about "[m]edical problems," the Veolia Defendants' interim report dismissively claimed that "[s]ome people may be sensitive to any water."

202.   Veolia issued its final "Water Quality Report" dated March 12, 2015.

203.   In the final report, the Veolia Defendants noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under

our study indicates compliance with State and Federal water quality regulations."

204.   The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

205.   Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

206.   Therefore, in addition to missing the connection between the lack of corrosion control and lead contamination, the Veolia Defendants made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

207.   In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

208.   As a result of the LAN and Veolia Defendants' actions, the residents of Flint, including Plaintiffs, were exposed to much greater amounts of poisonous water, and for a much longer time.

## F.   The LAN and Veolia Defendants Fail to Conduct a Root Cause Analysis

209.   Both the LAN and Veolia Defendants were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, the LAN Defendants issued their report "Trihalomethane Formation Concern," and on March 12, 2015, the Veolia Defendants issued their report, "Flint Michigan Water Quality Report." Critically absent from both reports was a root cause analysis of why the high TTHM levels existed. A root cause analysis is the standard process used by engineers to determine the origin, case and interrelationship of events. It is a standard practice used by environmental, health, safety, and infrastructure engineers whenever an adverse event occurs. Understanding why an event occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had

68

such an analysis been done, the consultants would have discovered the corrosion of the pipes, and the presence of lead and *legionella* in the water system.

210. The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

- Road salt from decades of deicing contaminates northern rivers such as the Flint River;

- Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;

- Chloride strips pipes of protective surfaces which frees *legionella* and lead;

- Urban rivers contain high levels of E. coli;

- While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;

- The need to add excessive chlorine is indicates that bare metal has been exposed, and that corrosion is occurring; and

- Excessive chlorination causes high TTHM levels.

211. The failure of the LAN and Veolia Defendants to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because as detailed above all of these events had been highly publicized before they issued their report:

- The Flint River had been highly impacted by road salt for decades—the river had eight times more salt than water

69

supplied by the DWSD;

- Lead and steel pipes are ubiquitous in the United States, Michigan and Flint;

- In the summer of 2014, Flint suffered one of the worst outbreaks of Legionnaires' disease in U.S. history;

- On October 14, 2014, as widely reported by the press the next day, GM stopped using the City's water because of corrosivity;

- On January 9, 2015, UM Flint shut its water fountains because lead exceed federal standards; and

- In February 2015, if not before, lead in drinking water in other locations also exceed the standards.

212. Any of these red flags, and indeed the general knowledge in the scientific community, should have alerted the LAN and Veolia Defendants to the extensive corrosion and resultant release of lead and *legionella* in the City's drinking water system.

213. For example, it should have been obvious to the LAN and Veolia Defendants—as professed experts on water quality and treatment issues—that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters. Indeed, in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to

potential contamination sources. Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN and Veolia to potentially serious corrosion issues as the Flint River contains about eight-times more chloride than the DWSD-supplied water. The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had the LAN or Veolia Defendants investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

214. The City's inability to effectively treat *E. coli* with chlorine should have likewise alerted the LAN and Veolia Defendants to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping. According to a study published by the U.S. EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine is caused by corroded pipes. Flint's inability to treat *E. coli* with moderate amounts of chlorine—and the resulting high TTHM concentrations— should have placed the LAN and Veolia Defendants on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply. Moreover, the uptick in reported

71

cases of Legionnaires' disease, reported during a press conference prior to the LAN and Veolia Defendants' retention, should have put both on notice that Flint's water system exhibited signs of corrosion. *Legionella*, the bacteria that causes Legionnaires' disease, grows on the film on the inside of pipes, which when stripped away by corrosion frees the *legionella* into the drinking water system. Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water— which is exactly what exists in the Flint River and water supply. Yet neither the LAN Defendants nor the Veolia Defendants drew a connection between the outbreak and the cause of the outbreak. Nor for that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

215.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply. "Lead has been a challenge and a bane for water suppliers since historical times . . . The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births." Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in

Drinking Water, Foreword (Dr. Colin Hayes ed. 2010). As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated: "Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem . . . Solubility and dissolution rates of corrosion products are affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply.

216.   Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded. The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

### G.   The LAN and Veolia Defendants' Conclusions Made the Crisis Worse

217.   Concern over lead concentrations in drinking water motivated the passage of the Lead and Copper Rule (LCR) in 1991, which requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, sub. E and I. Flint's

own sampling analysis indicated that its system violated the LCR standards. Nevertheless, the Veolia Defendants, while failing to conduct any analysis, knowingly made the false statement in their March 12, 2015 report that their "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations."

218.   Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

219.   It is also well known to water quality engineers that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to U.S. EPA, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation."

220.   The Veolia Defendants should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride—a very potent, corrosive acid, rather than advising that the pH of the water should be

increased.

221.   According to the Centers for Disease Control and Prevention:

> Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . . These acidic water treatment additives can interfere with corrosion protection. . . . Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home. . . . The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system. . . . The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

222.   Yet the Veolia Defendants did not recommend that the City take steps to institute corrosion control to prevent lead and *legionella* from spreading throughout the City's water supply. The Veolia Defendants merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing *water discoloration*. There was no mention of the need to add corrosion control to prevent the release of lead and *legionella*. The Veolia Defendants' report states, "The water system *could* add a polyphosphate to the water as a way to minimize the

amount of *discolored water*." (Emphasis added). The report explains that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added). Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, the Veolia Defendants merely suggested adding phosphate to address water discoloration. Even the Veolia Defendants' *suggested* dosage to address discoloration, 0.5 mg/L was far too low. In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

223.   Even worse, the Veolia Defendants presented their conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply as a scientific certainty. Their March 2015 report stated that prior to arriving at their conclusions, the Veolia Defendants undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." The Veolia Defendants acknowledged that their recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year." Instead, the Veolia Defendants should have advised that the pH of the water should be increased.

224.   At the same time that the Veolia Defendants gave the unqualified opinion that the current dosage is "too low," and should be doubled, the Veolia Defendants knew that the City had no corrosion control protocol and knew (or

should have known) that significant corrosion was already occurring. The Veolia Defendants' directive that the City double its dosage of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion. Instead, it should have advised that the pH of the water should be increased.

225.   In August 2015, the LAN Defendants made the same recommendation to increase the dose of ferric chloride, rather than advising that the pH of the water should be increased.

226.   The LAN and Veolia Defendants should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*. No such recommendation was made, and as a result, the lead and *legionella* courses through the City's water supply to this day.

227.   A graph prepared by the Flint Water Study Group from Virginia Tech University shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



228.   The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June. By comparison, the graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after the Veolia Defendants made their recommendation to double the ferric chloride concentration) to 7.3 in August. This difference is significant. pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0 is ten times more corrosive than a pH of another whole number, such as 8.0. The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

229.   The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

230.   On June 24, 2015, the U.S. EPA reached a similar conclusion about the

City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (hereinafter "Del Toral Report") (emphasis added).

231. In December 2016, Dr. Susan Masten, American Water Works Journal, published "*Flint Water Crisis: What happened and Why?*" Dr. Masten conducted a detailed analysis of the chemistry and engineering behind what happened to Flint's water and examined why the water was corrosive. Dr. Maston concluded that the ferric chloride caused chloride (i.e., salt) levels in the drinking water to be 28-100% higher than Flint River water. Based on these results, it is apparent that the LAN and Veolia Defendants should have advised the City to reduce the levels of ferric chloride, which neither firm did.

232. Both the LAN and Veolia Defendants analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were reckless and negligent in their analysis of the pH and their recommendations.

79

Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and *legionella* would have been released into Flint's water supply.

**H.** **Despite the Numerous Signs of the Growing Crisis, the Government Defendants Failed to Act, and Concealed Known Dangers From the Plaintiffs**

233.   In January 2015, State officials met to discuss the ongoing threat to public health posed by the *legionella* bacteria in the Flint River water. The Governor and his staff, the Genesee Co. Health Department, and the MDHHS had already been aware for at least three months of the ongoing public health threat to the people of Flint, including the threat of Legionnaires' disease resulting from the use of the Flint River water, yet they had done nothing. The public health crisis was not addressed in any serious and/or non-frivolous way.

234.   On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

235.   On January 21, 2105, State officials ordered water coolers to be installed in State buildings operating in Flint. State officials were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was  safe to drink the tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.

236.   Nick Lyon, the director of the MDHHS, received materials on or about January 28, 2015 from a departmental epidemiologist showing an outbreak of Legionnaires' disease in Genesee County in 2014.

237.   On January 27, 2015, Flint was placed on notice that the Genesee County Health Department ("GCHD") believed there was an association between the spike in Legionnaires' disease reports and the onset of the use of Flint River water. Again, Defendants did nothing about the impending health catastrophe.

238.   By January 29, 2015, State officials understood that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system. Yet no action was taken to warn the public of the health crisis or to correct the harm caused by the State's decision to switch from DWSD water to Flint River water.

239.   On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the re-connection fee. This offer was rejected by Ambrose.

240.   In January 2015, a Flint home owner, LeeAnn Walters, called the EPA regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

241.   By the end of January 2015, the Governor's office was fully aware of the public health emergency caused by the rise in *legionella* bacteria found in the Flint River and launched a cover-up of the public health crisis.

242.   By February 1, 2015, the Governor was aware of the health crisis in Flint. Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting, and making them visibly sick, the Governor knew that there was an imminent threat to the people of Flint. Yet, neither the Governor, nor State and local public officials, took corrective action.

243.   On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with DWSD. Once again Ambrose refused to restore Detroit water for Flint water users. State and local public officials falsely insisted that the water was acceptable for use and took no action.

244.   On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." She noted that the iron contamination was so high that the testing instrumentation could not measure it. Crooks wrote, "But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! **104 ppb.** She has 2 children under the age of 3….Big worries here….I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not

present in the compliance samples taken at the plant…We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee--would want to dive further into this…she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

245.   In a second email on February 26, 2015, Crooks stated that Miguel Del Toral of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead. She continued, "Miguel is wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates? From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

246.   On February 27, 2015, Stephen Busch advised Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.

247.   Defendant Cook similarly misled the EPA regarding the necessity of using corrosion control in Flint after the switch when he allegedly forwarded information he knew to be false to the EPA in response to its inquiry.

248.   Likewise, Defendant Johnson inhibited efforts by Genessee County Health Department ("GCHD") to obtain information about Flint's water through the Freedom of Information Act ("FOIA"). On January 27, 2015, James Henry, Environmental Health Supervisor at the GCHD, sent a FOIA request to the City of

Flint requesting "testing locations and laboratory results within the City of Flint public water system for Coliform, E-Coli, Heterotrophic Bacteria and Trihalomethanes from January 1, 2010 to January 27, 2015. . . [and] a map or list of locations, detailing dead ends, pooling, [and] low pressure . . . areas." A week later, on February 5, 2015, Flint Utilities Administrator Johnson responded that he had not received Mr. Henry's FOIA request but would "fulfill [the] request as soon as possible." Despite Johnson's assurances, by March 2015, GCHD still had not received the information they requested by FOIA.

249.   On March 5, 2015, the Governor and officials in the Governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users. Yet these public officials took no action to warn or otherwise protect Plaintiffs and the Class, and continued to conceal from them and the public the true nature, extent, and severity of the public health crisis.

250.   By March 10, 2015, James Henry of the GCHD raised concerns that he was being stonewalled by the State and City in accessing public health information about the Legionnaires' disease outbreak in Genesee County. The concealment of the public health emergency by City and State  officials—Defendants herein—was shocking and unconscionable.

251.   As of March 10, 2015, the Defendants knew that the extreme public health emergency involved lead poisoning, deadly *legionella* bacteria and a host of other ailments.

252.   Indeed, Defendant Shekter-Smith acknowledged as much on March 12, 2015 when, in connection with a FOIA request from the Genesee County Health Department regarding the outbreak of *legionella*, she emailed MDEQ employees Brad Wurfel, Jim Sygo, and Sarah Howes that "[w]hile the change in source *may have created water quality conditions that could provide additional organic nutrient source to support legionella growth*, there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time" (emphasis added).

253.   Despite acknowledging internally that the switch could have caused the *legionella* outbreak, the very next day, on March 13, 2015, Shekter-Smith approved and praised Stephen Busch on his on his response to the Genesee County Health Department wherein Defendant Busch stated, among other things, that:

- "conclusions that legionella is coming from the public water system without the presentations of any substantiating evidence from your epidemiologic investigations appears premature and prejudice toward that end;

- "[i]t is highly unlikely that legionella would be present in treated water coming from the City of Flint water treatment

85

plan given the treatment plant's use of ozone along with complete treatment and chlorine disinfect contact time to comply with federal surface water treatment rules for potable water;" and

- "there is no direct correlation that can be made to the presence of legionella."

254.  That same day, Wurfel wrote in an email to Snyder administration officials, "Political flank cover out of the City of Flint today regarding the spike in Legionnaire cases. . . . Also, area ministers put a shot over the bow last night … with a call for Snyder to declare a state of emergency there and somehow 'fix' the water situation …"

255.  On March 25, 2015, the Flint City Council voted to re-connect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.

256.  In March 2015, Jarrod Agen, Governor Snyder's Director of Communications and later Chief of Staff, participated in conference calls with Harvey Hollins, an aide to the Governor, and others in which Hollins stated that he was hearing from Flint-area pastors that people were complaining about the odor and the look of the water and that they had requested water filters.

257.  On April 24, 2015, Patrick Cook of the MDEQ emailed Miguel Del Toral at the U. S. EPA and in referring to Flint's Water Treatment Plant ("WTP")

86

stated: "Flint is currently not practicing corrosion control at the WTP."

258. On April 28, 2015, Governor Snyder's Chief of Staff Dennis Muchmore emailed Governor Snyder, his Executive Director Allison Scott, his Director of Communications Jarrod Agen, his Chief Legal Counsel Elizabeth Clement, Lieutenant Governor Calley to propose announcing that "Flint is ready to take its city under its own control…" The email warned as follows: "Outside of the issues over the water we feel pretty confident going forward. ***The water issue continues to be a danger flag.***" (emphasis added).

259. On June 24, 2015, the aforementioned Del Toral Report warned of "High Lead Levels in Flint Michigan." On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed.

260. Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

261. The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), and Michael Prysby.

262.   Nonetheless, State and local public officials failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by Del Toral.

263.   On June 30, 2015, Mayor Walling notified EPA Region 5 Director, Dr. Susan Hedman ("Hedman") that Del Toral was speaking publicly about the Flint environmental crisis.

264.   On July 2, 2015, Hedman advised Walling that she was given a preliminary draft and that it would be premature to draw any conclusions.

265.   On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water. Parents, worried about the lead poisoning of their children, demanded answers from Wurfel. He told the concerned parents, "[l]et me start here-anyone who is concerned about lead in the drinking water can relax." Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

266.   By July 2015, multiple agencies within the State of Michigan, including the Governor, the Governor's Office, and MDEQ, had actual notice of high lead exposure and other dangers, including Legionnaires' disease, associated with Flint water.

267.   But there is no doubt that the Government Defendants were well aware of the dangers facing Flint's residents. On July 9, 2015—nearly three months before the City first issued a lead advisory to the public—Mike Glasgow sent an email to MDEQ's Adam Rosenthal with the following "Key Points" listed in all caps:

1)  Flint has lots of lead pipe, no corrosion control treatment, and has had no legitimate LCR testing for at least a year.

2)  Amongst low income infants, breast feeding rates are lower, and formula use is higher. Many Flint[] residents cannot afford to flush due to higher water rates. They cannot afford bottled water. This is an unprecedented situation and EPA needs to take this seriously. Now.

3)  We have one child with an elevated blood lead already…In fact, that is the only reason we know about any of the above.

4)  MDEQ is still publicly insisting Flint water has tested safe, is safe, and that flint has no violations of any sort.

268.   On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Muchmore, wrote to MDHHS Director Lyon and stated that the Plaintiffs' concerns (and those of the Class) regarding lead poisoning and other dangers were being "blown off" by the Defendants.

269.   Also in the Summer of 2015, Harvey Hollins, Governor Snyder's Director of Urban Initiatives, spoke directly to Governor Snyder and advised him of the growing concerns among Flint residents that they were being exposed to toxic levels of lead.

270.   On July 24, 2015, Wurfel continued to promote the cover-up of the

health crisis. In response to the recognition that the Defendants were blatantly ignoring the concerns of Flint residents, he stated, "[i]n terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

271.   But the State's sampling did not comply with regulations. Rather, the sampling purposefully skewed results to minimize the crisis. According to an email from Professor Marc Edwards of Virginia Tech that was forwarded to Shekter-Smith and Stephen Busch, among others, on September 21, 2015, the State did, "not have an approved lead sampling pool. Only 13 of the lowest lead sampled homes from 2014, were resampled in 2015. The homes sampling high in 2014, were not asked to be resampled." Professor Edwards continues on to describe a video available on the ACLU website in which, "Mike Glasgow (Flint LCR program) notes what is perfectly obvious from looking at the MDEQ FOIA materials. 'we threw out bottles everywhere just to collect as many as we can,  just to hit our number, and we just turn in every result we get in.'" Professor Edwards then proceeds to note several instances in which the MDEQ covered up high samples.

272.   Indeed, Michael Glasgow essentially admitted that the City's testing procedures were inadequate when he pleaded no contest to willful neglect of duty and agreed to cooperate with the Attorney General's investigation after being

accused of distorting the City's water test results by instructing residents to run their water—or "flush" it—before testing, and failing to obtain water from certain houses. These inaccurate results were reported in a February 27, 2015 report entitled, Lead and Copper Report and Consumer Notice of Lead Result."

273.    Several MDEQ officials—including Defendants Busch, Rosenthal, and Prysby—similarly deceived the public about the water's quality. Glasgow has stated publicly that Defendants Busch and Prysby directed him to alter water quality reports and remove the highest lead levels. And following an investigation involving numerous witness interviews and reviewing thousands of documents, the Michigan Attorney General's office charged both Busch and Prysby for their involvement in the crisis. The Attorney General's investigation similarly led to criminal charges against Rosenthal, including for his willful participation in the manipulation of lead testing results and falsely reported that the 90th percentile of the results for lead water testing was below the federal action level. Eventually, a July 28, 2015 report was altered to exclude some high lead tests and Rosenthal forwarded the altered report on.

274.    After months of trying to notify City and State officials of the problems with Flint's water, in August 2015, Professor Edwards publicly announced that there was serious lead contamination of the Flint water system and stated that the people of Flint face a major public health emergency**.**

91

275.   Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

276.   By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time. Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs, their Class or the public.

277.   Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

278.   The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the

Flint community. His concealment of this critical information increased the risk and exacerbated the danger.

279.    Dr. Mona Hanna-Attisha, in the summer of 2015, using data available to her from Hurley Hospital, observed a similar spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014. She published her study in an effort to alert the community about the health risks associated with drinking Flint River water.

280.    The Government Defendants and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

281.    No genuine effort was made to investigate Dr. Hanna-Attisha's findings. To the contrary, on September 28, 2015, in response to Dr. Hanna-Attisha's testing results, Defendant Lyon directed his staff to provide "an analysis of the Vtech/Hurley data and their conclusions," in addition to demanding a "strong statement with a demonstration of proof that the lead blood levels seen are not of the ordinary and are attributable to seasonal fluctuations."

282.    In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand. For example, a MDEQ document entitled, "DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September, 2015" which stated: "Are there other ways the city monitors for lead exposure? The County Health

Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities. The *leading cause of lead poisoning is exposure to lead paint*. Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the pattern of blood lead levels in Flint, compared to the previous three years. This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community." (emphasis added).

283.   On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have re-examined its blood lead level data and the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

284.   On September 28, 2015, Wurfel stated publicly that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report. He said that he wouldn't call her reports "irresponsible. I would call them unfortunate." Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

285.   On September 29, 2015, Wurfel referred Del Toral to the EPA as a "rogue employee."

286.   By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users.

Yet the State deliberately chose not to proceed in this fashion. Instead, on or about October 2, 2015, State officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

287.  On October 8, 2015, the Governor recognized that he could no longer pretend that the water from the Flint River was safe. He finally ordered Flint to re-connect with the Detroit water system which contained corrosion control chemicals.

288.  The re-connect to DWSD took place on or about October 16, 2015.

289.  Throughout the period of time between April 2014 (when Flint's water source changed to the Flint River) through October 16, 2015 (when Flint 's water source switched back to the DWSD) MDEQ officials either:

- Falsely represented that Flint was using optimized corrosion control chemicals to treat the water for purposes of preventing lead poisoning, when in fact, they were not; or

- Adhered to the faulty regulatory position that Flint could poison its citizens with lead contaminated water for two six-month monitoring intervals and then decide if corrosion control chemicals were necessary.

290.  On October 18, 2015, MDEQ Director Wyant emailed Governor Snyder and admitted that the delayed implementation of optimized corrosion control for two six-month intervals while Flint's citizens were being lead poisoned was improper. Wyant wrote:

Simply said, our staff believed that they were constrained by two consecutive six-month tests. We followed and defended that protocol. I believe now we made a mistake. **For communities with a population above 50,000, optimized corrosion control should have been required from the beginning,** (emphasis added).

291.   The next day, on October 19, 2015, City of Flint Technical Advisory Committee meeting, LAN was listed as the "owner" of the "corrosion control" issue.

292.   Starting in approximately November of 2015, the State of Michigan Department of Health and Human Services began publicly reporting blood lead level test results for "Flint Zip Codes 48501-48507." However, the use of zip code level data for these reports is misleading and significantly underreports the prevalence of lead contamination in blood for Flint residents. Academics studying the data have noted that the zip codes relied upon by MDHHS (48501-48507) include both people who receive their water from the City of Flint and large geographic areas outside of the City of Flint where people receive their water from safe sources. In spite of these noted inaccuracies in the data, MDHHS officials (and their attorneys in court) continue to misleadingly rely upon this inaccurate data to downplay the severity of the crisis.

293.   In December of 2015, Governor Snyder was advised by Harvey Hollins that in addition to the elevated levels of lead in Flint water, there was also a public health threat from potential exposure to *legionella*.

294.   Flint is currently in a state of crisis: Mayor Karen Weaver declared a

96

State of Emergency on December 14, 2015 and on January 4, 2016, the Genesee County Commissioners declared a State of Emergency.

295. On January 5, 2016, Governor Snyder declared a State of Emergency. In spite of his direct knowledge that Flint water exposed its residents to *legionella*, Governor Snyder did not disclose this in his State of Emergency Declaration.

296. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint and disclosed, for the first time, that the Flint water also contained *legionella* bacteria. On January 14, 2016, the Governor asked then-President Barack Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

297. Governor Snyder was directly aware of potential exposure of Flint's residents to *legionella* bacteria and, for a period of at least three weeks, failed to disclose those risks to the citizens of Flint. Governor Snyder was also aware by the Summer of 2015 that lead contaminants in Flint Water posed a significant public health threat to the citizens of Flint. In spite of this knowledge, Governor Snyder's Administration continued to issue statements that misleadingly, and dangerously, downplayed the public health threat of consuming Flint Water until January 5, 2016 (for lead) and January 13 (for *legionella*).

298.   Governor Snyder has entered into a joint defense agreement with other State Defendants, including several who have been criminally charged for their participation in the Flint Water crisis, which provides that they will coordinate their defense of this action.

299.   Governor Snyder testified to the House Oversight and Governmental Reform Committee that he did not know that Flint's water contained dangerous levels of lead until October 1, 2015.

300.   But on September 25, 2015, Mr. Muchmore wrote Governor Snyder, (at what appears to be his personal email address because it is redacted as "PPI"), "The issue of Flint water and its quality continues to be a challenging topic.  The switch over to use Flint river water has spurred most of the controversy and contention.  The DEQ and DCH feel that some in Flint are taking the very sensitive *issue of children's exposure to lead* and trying to turn it into a political football claiming the departments are underestimating the impacts on the populations and particularly are trying to shift responsibility to the state" (emphasis added). So at least five days before Governor Snyder admits knowing that Flint's children were exposed to lead, he was trading emails with his Chief of Staff about the political implications of that exposure.

301.   Mr. Muchmore continued, "We have put an incredible amount of time and effort into this issue because of the impacted neighbors and their children, and

98

the KWA/DWSD controversy and Dillon's involvement in the final decision. Kildee is asking for a call with you. That's tricky because he's sure to use it publicly, but if you don't talk with him it will just fan the narrative that the state is ducking responsibility. I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject." Mr. Muchmore further states, "the real responsibility rests with the County, city and KWA."

302.   But of course, Mr. Muchmore knew exactly what he and the Governor had done to contribute to the problems in Flint—they had actively ignored them and undermined them. Mr. Muchmore came close to admitting as much in a partially redacted email to Wayne Workman at treasury where he stated, "I have a lot of complaints about myself and this Flint thing. If I had acted more quickly on some of my minister's complaints we at least would have had a more robust discussion." But rather than act quickly on those complaints, he dismissed them as simply a product of "old-time negative racial experiences" to use his own words.

303.   Several facts suggest that Governor Snyder knew about the serious safety concerns involving Flint's water long before he admits having known that the "state's experts were wrong" on October 1, 2015 or received Mr. Muchmore's September 25, 2015 email.

304.   At least as early as February 18, 2015 Governor Snyder's right-hand

99

man, Dennis Muchmore was putting the pieces in place to evade responsibility for the Flint water crisis.  In response to his office's efforts to try and negotiate an arrangement that would allow Flint to resume purchasing water from DWSD he stated, "[t]his train is leaving and we'll be holding the bag if we don't work out a deal on DWSD for Flint."

305.   In fact, for many months before Governor Snyder admits having become aware of the existence of toxic lead in Flint's water several of his most senior advisors—including Dennis Muchmore his chief of staff; Harvey Hollins, his director of Urban Initiatives; Treasury officials Thomas Saxton and Wayne Workman; and Stacie Clayton. Indeed, one of the Governor's spokespersons—Sara Wurfel—was *married* to the MDEQ employee who is alleged to have knowingly lead the disinformation campaign designed to wrongly assure Flint citizens that the water was safe.

306.   Moreover, for at least the month of September 2015, and possibly longer, MDEQ officials were working with EPA to devise a plan for addressing lead in Flint's water and the attendant need for corrosion control.  Additionally, emails from that time reflect planning for a press conference regarding the lead issues that occurred in late September—prior to the conference in early October 2015.  It is highly unlikely that the MDEQ devised a plan for addressing lead issues in conjunction with the EPA and scheduled a press conference without the Governor

100

being informed about the situation.

307. For Governor Snyder's testimony before the House Committee to be accurate, he would have had to disbelieve months of news articles regarding lead in Flint's drinking water and have been shielded from the issue by his Chief of Staff, at least four other senior officials in the Governor's office, the MDEQ, the EPA, and the communications preparing for the press conference. This is especially so in light of Mr. Muchmore's April 28, 2015 email to Governor Snyder accurately warning that, "[t]he water issue" in Flint "continues to be a danger flag."

308. Plaintiffs allege, pursuant to Federal Rule of Civil Procedure 11(b)(3), that after a reasonable opportunity for further investigation or discovery, there will likely be evidentiary support that Governor Snyder personally knew:

- by, at the latest, the Summer of 2015, that there were imminent public health hazards posed by Flint Water and its role in causing lead poisoning;

- by, at the latest, January of 2015, that there were imminent public health hazards posed by Flint Water and its role in causing *legionella* outbreaks; and

- that public assurances provided by members of his Administration that Flint's water was "safe" were recklessly false, and caused or contributed to the poisoning of Flint's citizenry.

309. The likelihood of evidentiary support alleged pursuant to Federal Rule of Civil Procedure 11(b)(3) is based upon, among other things, the breadth of knowledge of the danger associated with Flint Water within high levels of Governor

Snyder's cabinet and Executive Office and the multiple staffers who reported to the Governor, his cabinet members, and Executive Office staff about the problems associated with Flint Water, including *inter alia*, the following:

- Communications within the Governor's Executive Office in March of 2014 that the expedited timeframe for transition to Flint River water "could lead to some big potential disasters down the road";

- Communications among officials within the MDHHS in the Summer of 2014 identifying an outbreak in Legionnaires disease;

- Public communications in October 2014 that General Motors was switching off of Flint water, and the internal communications within multiple members of Governor Snyder's cabinet and Executive Office staff, including the recommendation of the Governor's legal counsel that Flint's water was "downright scary" and that "[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control";

- January 2015 communications within the MDHHS and between MDHHS Director Nick Lyon, the Governor and his cabinet regarding the existence of *legionella* contamination in Flint water;

- Communications in March 2015 from (i) the Governor's Director of Urban Initiatives Harvey Hollins identifying lead poisoning in Flint, (ii) communications from Defendant Wurfel that they cover their "political flank" regarding *legionella* contamination; and (iii) the email from Governor Snyder's Chief of Staff Muchmore to the Governor stating that Flint water continued to be a "danger flag";

- Public reports in the Summer of 2015 from EPA officials

102

> identifying that State of Michigan actions related to Flint water "bordered on criminal neglect"; and

- Communications between Harvey Hollins and Governor Snyder in the Summer of 2015 that identified the existence of lead contamination in Flint Water.

310. The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

311. Moreover, the reaction of many of the Defendants to this wholly preventable crisis has been cold to say the least. For example, when Wurfel was forwarded a response from Bob Wheaton (Manager of Communications for MDHHS), in which ABC News asked about Head start programs giving bottled water to children in Flint after a DHS report talked about the risks of lead. Wheaton had responded to ABC News saying that the bottled water report "was a recommendation – not an order." Wurfel forwarded it to his wife and David Murray, saying only: "Laughing so hard I'm crying right now."

312. Likewise, rather than immediately providing real information to Flint residents facing this crisis, the State promoted the following poster (which it later took down) which minimizes the serious health risks associated with contaminated water:

103



## I.    Defendants' Misconduct Has Caused the Plaintiffs to Suffer Devastating Health Effects and Other Personal Injuries

313.    As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The water predictably corroded metal pipes, causing them to leach lead into the water. An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead. The exact number is presently unknown.

314.    Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter

stature, impaired hearing, and impaired formation and function of blood cells."

315.   According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

316.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

317.   The effects of lead exposure are long lasting. The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help from the bones of the fetus. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

318.   Tragically, the damage from lead exposure to Flint's children includes diminished potential over the entire course of their lives. The World Health Organization states, "[t]hese costs are sometimes referred to as *lost opportunity costs.* Using a conservative estimate, the decrease in intelligence attractable to each

1 µg/dl increase in blood lead level is 0.25 IQ points, and the decrement in lifetime economic productivity associated with lost IQ point is 2.4%. When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

319.   Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

320.   According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5 year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings."

321.   Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.

322.   As a direct and proximate result of Defendants' misconduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special

106

educational, medical, sociological, occupational and disability services, and related education assistance programs.

323. Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)." The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning—typically chelation therapy—as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

324. These effects are far from hypothetical. According to a recent study from health economists Daniel Grossman of West Virginia University and David Slusky of Kansas University, the fertility rate in Flint, Mich., dropped precipitously after the city decided to switch to lead-poisoned Flint River water in 2014. Grossman and Slusky's working paper estimates that among the babies conceived from November 2013 through March 2015, "between 198 and 276 more children would have been born had Flint not enacted the switch in water."

325. Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

326.   Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease. As explained above, the presence of *legionella* was a direct and proximate result of the switch to the Flint River as a water source and related conduct. At least 87 members of the Class contracted Legionnaires' disease and at least nine died. Those members of the Class who became infected with Legionnaires' disease suffered death, and for those who lived, incurred pain and suffering as well as substantial medical costs due to Defendants' conduct. At least one case of Legionnaires' Disease occurred in 2016, even after the City's water supply was switched back to the DWDS, indicated that the disease still poses a risk to the community.

327.   In October 2016, Flint and Michigan authorities determined that Flint was experiencing an outbreak of the infectious bacterial disease called Shigellosis, which can cause bloody diarrhea and fever. Shigellosis is caused by the *shigella* bacteria, and its symptoms include fever, abdominal pain and diarrhea, which can lead to dehydration. Since the water crisis, there has been a steady increase of cases, especially in children. The youngest person diagnosed was 17 months old.

328.   Finally, as a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

**J.**   **Defendants' Misconduct Has Also Caused the Plaintiffs to Suffer Extensive Property Damage and Monetary Losses.**

329.   In addition to the devastating health effects and lost economic

productivity caused by lead exposure, Defendants' misconduct has caused significant property damage and monetary losses.

330.   The property damages sustained by Plaintiffs fall into three basic categories. First, the Plaintiffs' pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break. Second, the corroded pipes and appliances remain a continuing source of lead and potentially *legionella*—thus, pipes and appliances must be replaced or else remain a continuing source of harmful exposure. Finally, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

331.   Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

332.   Plaintiffs' homes and properties have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially *legionella*. Solubilized and particulate lead and *legionella* remain in portions of the piping system and appliances, and can become remobilized at any time, causing further

damage and health effects.

333.   The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated: "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

334.   The Water Research Watershed Center has further explained that, "[t]he cost of corrosion can be expensive. Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

335.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater."

336.   On January 10, 2017, Marc Edwards, the principal scientist who discovered the high lead concentration in Flint water, published "*Flint Water Crisis Caused By Interrupted Corrosion Control: Investigating "Ground Zero Home*" in which he concluded that the lead in the homes originated in part from rust stripped

by the corrosive water from galvanized pipes. Galvanized pipes are in people's homes. Although galvanized (zinc-coated) pipe is still considered to be a safe transport material for drinking water, there are some potential health concerns if the water supply is corrosive due to its acidic condition (low pH). These results establish that the pipes in the pipes and appliances in Flint homes and businesses need to be replaced.

337.   Moreover, residents and property owners have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

338.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household. Other estimates of those replacement costs are far higher. Obviously, the cost to replace pipes in a residential building with multiple units will be far higher, costing tens and hundreds of thousands of dollars.

339.   Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

340.   Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe. Sergio Kapusta,

111

a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised. "The corrosion is not going away. It's still there."

341.  Plaintiffs have been left to pay for the damage caused by the Engineering and Governmental Defendants. This has proven nearly impossible as many of the City's residents survive on very little money. To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance. The crisis has created a perfect storm to strip their houses of their remaining value, they say."

342.  According to a study by University of Michigan that analyzed the cross-section samples of 10 service pipes in Flint's water system, the average Flint pipe released 18 grams of lead during the 17 months that untreated, corrosive water ran through the system. "This is the amount of lead that would have entered a single home," lead study author Terese Olson, an associate professor of civil and environmental engineering at Michigan, said in a news release. "If we average that release over the entire period the city received Flint River water, it would suggest that on average, the lead concentration would be at least twice the EPA action level

of 15 parts per billion." Critically, however, the report also concluded that not all of the leached lead was consumed by drinkers. Some was washed down the drains *and some likely remains in private plumbing systems*.

343.   Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and rental rates in the City. As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

344.   Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable. A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint residents. Lenders claim their hands are tied. As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

345.   This creates a catch-22. Despite having switched back to receiving its

113

water from DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, Plaintiffs, including residents and property owners, cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

346.   The water crisis also caused extensive economic damage to property owners who paid water bills for several years in exchange for clean water for themselves and their tenants. Instead, they were provided toxic water. Besides losing the benefit of the bargain, this also hurt the landlords' relationship and goodwill with tenants, both real and financial.

347.   As a result of the water crisis, many tenants refused to pay rent or simply left the premises. Some tenants paid less than the full rent amount. And it is difficult to find new tenants to rent units. Even if found, the rental value is now much lower. Landlords in the Class have been forced to offer lower rent to entice renters. This results in lower revenue. As a result, the Class has experienced a lower occupancy level than before the water crisis and receives lower revenue.

348.   The ordeal also damaged property owners because the crisis caused property values to plummet. Moreover, it is difficult to sell property, even at severely depressed prices, because buyers are scared of investing in the area. Even if a buyer could be found, that buyer cannot secure a loan from banks and other institutional lenders that are understandably uninterested in securing a loan with damaged

property or accepting the unusually high risk of securing a loan with property in Flint, Michigan.

349.    For the same reasons, it is difficult or impossible to refinance properties.

350.    As a result of all the above, it is difficult to find new tenants, receive a fair rental amount, or even sell the property at any price.

351.    As a result of the above, some members of the Class had difficulty making mortgage payments for their property because they rely on a steady cash flow from tenants to make such payments.

352.    Class members paid to install water filters in their properties for their tenants' benefit. These heavy filters naturally damaged the sinks, which had to be repaired and/or replaced at Class members' expense. They also supplied bottled water at their own expense.

353.    In February of 2016, Governor Snyder signed a $30 million package to refund all Flint residents' water bills for the period of April 2014 to April 2016. Under this system, residents would receive a 100% refund for the water use portion of their bills. However, the state has and is discriminating against multi-unit property owners by providing them with only a 20% refund of their bills. Class members rented out their properties with water included at the owner's expense. This was a significant amount of money.

115

354.   There are tens of thousands of housing units in Flint, Michigan. Currently property owners are renting about 45% of those units to residents.

**K.   Defendants' Miscount Has Resulted in Criminal Charges and Other Government Investigations**

355.   As the events that gave rise to this lawsuit emerged, multiple government investigations were launched including congressional hearings.

356.   One such investigation has been spearheaded by the Michigan Attorney General's Flint legal team which interviewed over 180 witnesses, reviewed hundreds of thousands of documents, and ultimately filed criminal charges against several current and former City and State officials, many of whom are Defendants in this case. The Attorney General' s investigation resulted in the following charges:[1]

| Defendant | Criminal Charges |
|---|---|
| **City Officials** | |
| Darnell Earley - Emergency Manager | <ul><li>False Pretenses, Felony</li><li>Conspiracy to Commit False Pretenses, Felony</li><li>Misconduct in Office, Felony</li><li>Willful Neglect of Duty in Office, Misdemeanor</li></ul> |
| Gerald Ambrose - Emergency Manager | <ul><li>False Pretenses, Felony</li><li>Conspiracy to Commit False Pretenses, Felony</li><li>Misconduct in Office, Felony</li></ul> |

---

[1] Corinne Miller, MDHHS Former Director of the Bureau of Epidemiology and State Epidemiologist, was also charged as part of the Attorney General's investigation. As part of a plea agreement, Miller pleaded no contest to willful neglect of duty and must cooperate with the Attorney General' s investigation into the Flint Water Crisis.

| | |
|---|---|
| | • Willful Neglect of Duty, Misdemeanor[2] |
| Michael Glasgow - City of Flint Laboratory and Water Quality Supervisor | • Willful Neglect of Duty, Misdemeanor (pleaded no contest)<br>• Tampering with Evidence, Felony (charged dismissed as part of plea) |
| Howard Croft – City of Flint Director of the Department of Public Works | • False Pretenses, Felony<br>• Conspiracy to Commit False Pretenses, Felony |
| Daugherty Johnson – City of Flint Utilities Director for the Department of Public Works | • False Pretenses, Felony (charge dismissed as part of plea agreement)<br>• Conspiracy to Commit False Pretenses, Felony (charged dismissed as part of plea agreement)<br>• Pled no contest to one added misdemeanor public records charge as part of plea agreement |
| **MDEQ Officials** | |
| Stephen Busch - MDEQ District 8 Water Supervisor | • Misconduct in Office, Felony<br>• Conspiracy – Tampering with Evidence, Felony<br>• Tampering with Evidence, Felony<br>• Treatment Violation, Michigan Safe Drinking Water Act, Misdemeanor<br>• Monitoring Violation, Michigan Safe Drinking Water Act, Misdemeanor |
| Michael Prysby – MDEQ District 8 Water Engineer | • Two counts of Misconduct in Office, Felony<br>• Conspiracy – Tampering with Evidence, Felony<br>• Tampering with Evidence, Felony |

---

[2] In September 2018, it was reported that Ambrose and attorneys for the State are working toward a plea agreement, and that Special Prosecutor Todd Flood stated that a plea agreement would not involve dismissing the charges against Ambrose.

| | |
|---|---|
| | ▪ Treatment Violation, Michigan Safe Drinking Water Act, Misdemeanor<br>▪ Monitoring Violation, Michigan Safe Drinking Water Act, Misdemeanor |
| Liane Shekter-Smith - MDEQ Former Chief of Drinking Water and Municipal Assistance | ▪ Misconduct in Office, Felony<br>▪ Willful Neglect of Duty, Misdemeanor |
| Adam Rosenthal - MDEQ Water Quality Analyst | ▪ Misconduct in Office, Felony<br>▪ Willful Neglect of Duty, Misdemeanor<br>▪ Tampering with Evidence, Felony<br>▪ Conspiracy – Tampering with Evidence, Felony[3] |
| Patrick Cook - MDEQ Specialist for Community Drinking Water Unit | ▪ Willful Neglect of Duty, Misdemeanor<br>▪ Misconduct in Office, Felony<br>▪ Conspiracy, Felony |
| **MDHHS Officials** | |
| Nick Lyon - MDHHS Director | ▪ Involuntary Manslaughter, Felony<br>▪ Misconduct in Office, Felony |
| Eden Wells - MDHHS Chief Medical Executive | ▪ Obstruction of Justice, Felony<br>▪ Lying to a Peace Officer, Misdemeanor |
| Nancy Peeler - MDHHS Director, Program for Maternal, Infant, and Early Childhood Home Visiting | ▪ Misconduct in Office, Felony<br>▪ Conspiracy, Felony<br>▪ Willful Neglect of Duty, Misdemeanor |
| Robert Scott - MDHHS Data Manager for the Healthy Homes and Lead Prevention Program | ▪ Misconduct in Office, Felony<br>▪ Conspiracy, Felony<br>▪ Willful Neglect of Duty, Misdemeanor |

---

[3] In December 2017, Adam Rosenthal agreed to plead no contest to a public records charge, resulting in dismissal of all previous charges. The public records charge was later dismissed in September 2018.

### L.   **Efforts to Remediate the Harms Alleged Herein Are Inadequate.**

357.   In March 2017, a settlement was reached in *Concerned Pastors for Social Action v. Khouri,* Case No. 2:16-cv-10277 (E.D. Mich. filed Jan. 27, 2016). That suit was brought by citizens of Flint, Michigan against the State of Michigan and related entities for their failure to comply with the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a). The settlement provides that the State of Michigan will provide $97 million for service line replacement, tap water monitoring, filter installation, bottled water distribution, and health programs.

358.   The prospective relief provided for in the *Concerned Pastors* settlement fails to adequately fund service line pipe replacement or necessary health programs. Moreover, it does not even attempt to remediate the harm caused by the Government Defendants' unconstitutional conduct.

359.   For example, corroded private service lines and appliances present an ongoing public health concern as these stripped pipes are a breeding ground for potentially life-threatening bacteria. The *Concerned Pastors* settlement fails to impose an ongoing obligation for the Government Defendants to repair this private property.

360.   Moreover, the health effects of lead poisoning often go undetected for some time—the *Concerned Pastors* settlement does not provide for ongoing medical monitoring nor does it provide for educational programs or other remedial programs

119

necessary to remediate the broad societal impact resulting from the Government Defendants' unconstitutional conduct.

### M. Governor Snyder and MDEQ Treated Flint's Predominantly African American Citizens Differently than Other Communities in Flint.

361.   The preceding paragraphs describe in detail how the legal protections that exist to prevent tragedies of this magnitude were not afforded to the citizens of Flint.  As described in more detail in the following section, key MDEQ officials including Defendants Dan Wyant, Liane Shekter-Smith, Michael Prysby, and Stephen Busch blatantly and unjustifiably ignored and transgressed the very environmental laws they were charged with enforcing.  No rational basis exists for MDEQs failure to apply the law to the Citizens of Flint. Moreover, the number and significance of these transgressions, their disproportionate effect on African Americans and persons of color, MDEQ's serious and unexplained deviations from its existing procedures, internal correspondence demonstrating a callousness toward the people of Flint, and MDEQ's history of discrimination toward African Americans and willful refusal to enact a satisfactory nondiscrimination policy warrant an inference of discriminatory intent.

362.   State law grants MDEQ the, "power and control over public water supplies and suppliers of water."[4]   Thus throughout the course of the events

---

[4] MCLA 325.1003.

described in this complaint, MDEQ had jurisdiction and authority to regulate the public water supplies in Flint and throughout the state.

363.   MDEQ officials failed to comply with the law and their own internal policies in the following respects: (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

364.   The misconduct described herein was exacerbated by Governor Snyder's refusal to acknowledge the unfolding crisis in Flint and declare a state of emergency. Article V, Section 1 of the Michigan Constitution provides that, "[t]he executive power is vested in the governor." Additionally, pursuant to the Michigan Emergency Management Act, the Governor may declare a "state of emergency" or "state of disaster" and "activate applicable relief forces if an emergency or disaster or imminent threat thereof exists."[5] Therefore, throughout Governor Snyder's tenure

---

[5] Michigan State Police, *Disaster Declaration Process*, https://www.michigan.gov/msp/0,4643,7-123-72297_60152_68994-318833-- ,00.html.

as Governor, he has had the authority to declare a state of emergency for any city, state, or other community within the State of Michigan.

365.   Governor Snyder's decision to wait months before formally recognizing the public health emergency facing Flint denied citizens' access to key State resources, unnecessarily prolonging citizens' exposure to toxic substances including lead.   Governor Snyder's delay deviated from his swift response to disasters in white and/or affluent communities and lacked any rational basis.

366.   Flint as it exists today is a product of racial discrimination and segregation. The Michigan Civil Rights Commission's Report entitled, "The Flint Water Crisis: Systemic Racism Through the Lens of Flint" (February 17, 2017), explains that because of discriminatory (and now illegal) zoning restrictions and hiring practices, Flint was originally home to a majority-white population.   When the City's largest employer—GM—required additional workers to help it respond to increased demand from World War II and changed its hiring practices to allow African Americans to occupy a larger number of positions, Flint's African American population quickly grew, more than quadrupling between 1940 and 1960. Subsequent policies aimed at promoting homeownership in certain neighborhoods resulted an exodus of Flint's white citizens.[6]

---

[6] *See The Flint Water Crisis: Systemic Racism Through the Lens of Flint* at 23-85, Michigan Civil Rights Commission (Feb. 17, 2017),

367.    Today Flint's 102,290 citizens are 54.3% African American or Black and 59.6% minority/non-white.[7]   By comparison, the State of Michigan is only 14.1% African American or Black and only 20.6% minority/non-white.[8] This places Flint in the top ten cities with 100,000 or more total population and the highest percentages of Blacks or African Americans, alone or with other races.[9]   Flint's citizens are also poor as compared the rest of the State.  In Flint, the median income is only $25,650[10] as compared to $50,803 in the rest of the state[11]—a difference of nearly 200%.

368.    The Michigan Civil Rights Commission asked, "Would the Flint water crisis have been allowed to happen in Birmingham, Ann Arbor or East Grand Rapids?" and concluded, "We believe the answer is no[.]"[12]  The allegations set forth herein provide context and support for the Commission's conclusion.

---

https://www.michigan.gov/documents/mdcr/VFlintCrisisRep-F-Edited3-13-17_554317_7.pdf.

[7] *QuickFacts – Flint City, Michigan*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/flintcitymichigan/PST045217.

[8] *QuickFacts – Michigan*, U.S. Census Bureau, https://www.census.gov/quickfacts/mi.

[9] *The Black Population: 2010* at Table 7, U.S. Census Bureau (Sept. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf.

[10] U.S. Census Bureau, *QuickFacts – Flint City, Michigan*, *supra* note 7.

[11] U.S. Census Bureau, *QuickFacts – Michigan*, *supra* note 8.

[12] Michigan Civil Rights Commission, *supra* note 6, at 4.

1.    **MDEQ Officials Deviated From The Law and Their Own Internal Policies in Issuing a Fraudulent Administrative Consent Order.**

369.   As discussed herein, the switch to the Flint River as a drinking source followed from the decision of Flint to join the KWA.   However, subsequent investigation has revealed that Flint was only able to fund its portion of the KWA because of a fraudulent ACO issued by MDEQ officials and premised on the use of the Flint River as a water source.

370.   When Flint and MDEQ initially considered interim sources of water in the event Flint chose to join the KWA, use of the Flint River as a sole water source was rejected.   According to notes from a March 20, 2012 meeting between officials from the KWA, City of Flint, and MDEQ, it was recognized that the Flint Water Treatment Plant ("Flint WTP") could not safely treat water from the Flint River.   The meeting minutes provide that, "Rehabilitation of the Flint WTP, for daily operation using Flint River water, is not an option."   The minutes further explain that, "high bacteria and high carbon concentrations are present in Flint River water and fluctuate depending on rain events."   Accordingly, "[t]here was strong opinion expressed that Flint River water is a difficult water to treat due to temperature, flow variability and water quality changes in general!"   Participants further noted that use of the Flint River "could require tertiary treatment at both [waste water treatment plant]

facilities, if the WTP withdraws too much water, even in the interim period.  Truly a concern for both the County and City!"

371.   Because of the difficulties presented in treating the Flint River and concerns regarding whether it could supply sufficient yields, the minutes reflect that the participants affirmatively rejected using the Flint River as the primary source of water, instead choosing to explore whether Flint's WTP could adequately treat blended water from Lake Huron and the Flint River or DWSD and Lake Huron.  The notes state that it was, "agreed that Flint City would draft a proposal, soon, ON BLENDING, and give to MDEQ for review and approval."

372.   Throughout 2012 and into 2013, City and State officials continued to explore the financial advantages of joining the KWA versus negotiating a new contract with DWSD. On January 8, 2013, Eric Kline from the Department of Treasury called Mike Prysby as part of Treasury's investigation into whether it was in Flint's financial interest to stay with DWSD or join the KWA project.  According to Prysby's notes from the call, Flint was still only exploring the option of using Flint's WTP for blended water.  He wrote, "The city of Flint may elect to utilize their WTP for the blending of treated water from the Flint River with water purchased from DWSD or KWA provided that all applicable drinking water standards are maintained."

125

373.    On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch emailed MDEQ Director Dan Wyant, deputy director Jim Sygo, Liane Shekter-Smith, and other MDEQ officials raising concerns about using the Flint River as the City's water source.  Specifically, he noted that continuous use of Flint River water to supply the City of Flint would "[p]ose an increased microbial risk to public health[;]" "[p]ose an increased risk of disinfection by-product (carcinogen) exposure[;]" "[t]rigger additional regulatory requirements under the Michigan Safe Drinking Water Act . . . ;" and "[r]equire significant enhancements to treatment at the Flint WTP, beyond those identified in the TYJT report . . . ." Busch further explained that using the Flint River would impose substantial costs and upgrades to the Flint Water Treatment Plant due to the need to provide softening, limitations on disposal options for lime sludge, increased ozone capacity, and additional backup power.

374.    During this time, Flint continued to negotiate with DWSD to determine whether participation in the KWA or purchasing water from DWSD provided greater financial benefits for the City in the short and long term. On April 16, 2013, DWSD presented Flint/Genesee County with a proposal that purported to save Flint/Genesee 50% immediately and 20% compared to KWA over the following 30 years. Regardless, Flint rejected DWSD's offer.  In response, Dennis Muchmore, Governor Snyder's then chief of staff asked, "if the last DWSD proposal saves so much money,

126

why are we moving ahead with KWA?  I take it that Flint doesn't trust them and is just fed up?  Does Kurtz have his head on straight here?"  In response, Andy Dillon replied, "That is the $64,000 question.  DEQ is firm that KWA is better.  ***Are they an honest broker?***" (emphasis added).  Unfortunately, that question was soon to be answered in the negative when MDEQ played a key role in helping Flint obtain a fraudulent ACO.

375.   EM Kurtz ultimately rejected DWSD's final offer, choosing instead to join KWA.  Dillon subsequently approved this decision.  However, the decision to participate in KWA raised a key question: how would Flint, pay for such a substantial financial undertaking?  Flint's share of the $220.5 million project was 34.2%--more than $70 million.

376.   Because Flint was in receivership at the time, the Home Rule City Act limited the City's ability to borrow funds. The Home Rule City Act contained an exception, however, that would allow the City to borrow additional funds only under the following circumstances: "[i]n case of fire, flood, or other calamity, the legislative body may borrow for the relief of the inhabitants of the city and for the preservation of municipal property . . . ."  Taking advantage of this provision, however, required the City to obtain an Administrative Consent Order ("ACO") from a State Agency attesting to some sort of "calamity."

377.   On December 19, 2013 Nicole Zacharda of MDEQ's Water Resource Division emailed several other MDEQ employees including Liane Shekter-Smith and Stephen Busch.  She wrote that she had recently, "received a call form Mike Robinson (he'd initially contacted Barry) seeking what [she'd] characterize as a 'sweetheart' ACO intended to ease the City's ability to access bond funding for their possible new water intake from Lake Huron.  As a trade of sorts, Mike was suggesting that his client would resolve Part 31 issues at their water treatment residual lagoon.  I told Mike that while I understood the Part 31 angle, this really seems like a Drinking Water program lead."  Mike Robison was a lawyer for Warner Norcross who handled environmental issues for the City of Flint.

378.   Ms. Zachardo then wrote, "Having met with Steve Busch [of the DEQ drinking water section] and others ... my suspicions have been confirmed and this really does not strike me as our issue in the WRD (Water Resources Division)."  She continued, "[p]rovided that you & Liane concur, my recommendation at this point is that I check back in with Mike Robinson and suggest that he work through Steve and his staff . . . ."

379.   Liane Shekter-Smith's initial reaction was hesitant, stating that she, "need[ed] more information" because her division did not "have an enforcement action" with the City.  She then stated she would, "need to speak to Stephen Busch

to understand what the 'ask' is . . . ."  Indeed, it is believed that Shekter-Smith's initial hesitancy regarding the inappropriateness of this request was shared by others.

380.    MDEQ's hesitancy was short-lived, however, and they soon became an active participant in helping push through the bogus ACO.  On February 10, 2014, Michael Robinson, an attorney assisting the City of Flint with environmental, emailed Stephen Busch dictating the language that the City's bond counsel required in the consent order so that the City could move forward with obtaining bonds to pursue the KWA.  That language stated, "The respondent plans to use the Flint River as its temporary source of untreated water supply until KWA water is available.  The respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional water treatment plant improvements, source water protection public improvements and public improvements to obtain back-up water supply, in order to comply with Act 399."

381.    On February 14, 2014, Busch responded that, "[t]he language you provided in relation to the bond counsel's needs appears to be acceptable and should be added to the final version."  Eight days later, on February 18, 2014, Stephen Busch emailed Richard Brim, John Craig, and Jim Arduin—all of the MDEQ— asking them to insert the exact language in the ACO that Mr. Robinson had said the City's bond counsel required.

129

382. When the process slowed, KWA's bond attorney, David Massaron, emailed to Flint-finance director Gerald Ambrose and EM Early to emphasize the urgency of obtaining the ACO. He explained that KWA was ready to proceed with a $220-million bond issue so it could continue pipeline construction. "However, we cannot take that step until the DEQ Administrative Consent Order . . . is effective," Massaron wrote, and "the City needs the ACO in place by the end of this week. . . . In order to ensure that the entire project can be financed . . . and that the City will have some debt capacity in the future, the ACO is a condition precedent to proceeding . . . ." Unless the MDEQ and City moved quickly to get the ACO, Massaron continued, "the KWA will have expended its initial resources and be forced to stop construction and the project will be delayed for at least one construction cycle."

383. Not wanting to risk KWA's ability to push forward with the bond offering on its desired schedule, officials from the department of Treasury intervened to ensure MDEQ's cooperation. On March 18, 2014, Gerald Ambrose forwarded Massaron's email to Wayne Workman of the Department of Treasury, and stated the following: "We greatly appreciate the call made after our last meeting to [M]DEQ by Eric Cline regarding the pending ACO. It has moved along, but still in process. Any additional assistance you an [sic] give would be greatly appreciated."

384.   MDEQ received the message and quickly finalized efforts to push the ACO through.   The ACO was executed on March 20, 2014.   Pursuant to the aforementioned ACO, the City of Flint was bound to the use of the Flint River as its interim water source.   After obtaining the ACO, Flint entered a Bond Purchase Agreement allowing it to borrow funds despite being in receivership so that the KWA could move on to the next phase of construction.   Unfortunately, the Flint Water Treatment Plant was nowhere near ready to begin distributing water.

### 2.   MDEQ Officials Deviated from the Law and MDEQ's Own Internal Practices and Procedures in Issuing the April 9, 2014 Permit for the Flint Water Treatment Plant.

385.   With the ACO executed, KWA moved forward with the bond issuance and City and MDEQ officials were left to fulfill the requirements of the ACO: namely obtaining a permit to upgrade the Flint Water Treatment Plant such that it would treat and distribute Flint River water.

386.   The Lead and Copper Rule requires states to "review and approve the addition of a new source or long-term change in water treatment before it is implemented by the water system." 40 C.F.R. 141.81(b)(3)(iii).   The Michigan Safe Drinking Water Act regulates the MDEQ's authority over Michigan's water systems as well as its authority for issuing permits impacting the state's water systems. Section 325.1004 of the Michigan SDWA details the requirements for evaluating and issuing permits for proposed water systems.   It provides that, "The department

131

shall provide public notice that it is conducting an evaluation under subsection (3) and shall provide a public comment period of not less than 45 days before making a determination on that evaluation." MCL 325.1004(4).  Subsection 3 outlines the types of water systems subject to this requirement to include water systems that would, "[p]rovide new total designed withdrawal capacity of more than 2,000,000 gallons of water per day from the waters of the state."  MCL 325.1004(3).

387.    The Flint Water Treatment Plant was intended to withdraw more than 14,000,000 gallons of water per day from the Flint River[13] and thus would have been subject to the Michigan SDWA's requirement for public comment.

388.    As of March 28, 2014, three weeks before the City planned to start using the Flint River as its primary water source, the City had not even submitted an application to the State for approval to make the change. Stephen Busch is quoted in the article as stating, "[i]n regards to the actual application, we haven't received one. . . . We've received preliminary design plans and preliminary specifications and we've commented on those.  They may be waiting until they have the comments worked out before they submit the application."[14]

---

[13] *City of Flint Water Reliability Study* at 26, Rowe Professional Services Company & Potter Consulting (Dec. 2013), https://www.michigan.gov/documents/snyder/Rowe_2013_Reliablity_Study_compressed_515343_7.pdf.
[14] Dominic Adams, *State says Flint hasn't applied for permit to use river as drinking water source*, Michigan Live (Mar. 28, 2014),

389.   According to an article in Michigan Live, Busch explained that, "If the state hasn't approved Flint's use of river water by April 18, Busch said, the city would just continue to buy water from Detroit on a non-contract price until Flint has state [sic] OK to begin using the river."[15]   The article also stated, "[Howard] Croft said there will be a series of public forums where residents can ask questions about the city's water transition, what that will mean for rates and others."[16]

390.   According to the issued permit, the City of Flint submitted its application for a permit three days later on March 31, 2014.   The application proposed various, "[i]mprovements to the City of Flint Lime Sludge Lagoons . . . to allow lime sludge form the Flint WTP to be stored during the interim period when the plant [would] be treating Flint River water."   The application further provided for, "[p]lugging and abandonment of 8" inlet piping; construction of 306 LF of new 10" inlet piping; installation of bulkhead on existing outlet structure to prevent discharge to surface water."   Additionally, the application proposed to construct a, "new decant tower structure, 8" gravity sewer, and decant pump station" and other changes.

_____

http://www.mlive.com/news/flint/index.ssf/2014/03/state_says_flint_hasnt_applied_1.html.
[15] *Id.*
[16] *Id.*

133

391.   On April 9, 2014—just nine days after the application was submitted – the MDEQ issued the permit.  It was signed by Defendant Cook who writes in the line designated, "Reviewed by," "Patrick Cook for MFP for Mike Prysby."

392.   MDEQ's Public Involvement Handbook provides that, "[p]ublic involvement in decision-making and in policy formation is an essential element of environmental programs."[17]  The Handbook further provides that, "The DEQ is a regulatory agency.  It's charge of environmental protection is often facilitated through the use of permits, which are issued to prevent adverse effects to the environment. . . . Many of the DEQ permit programs inform the public about pending permit decisions through newspaper legal ads, the DEQ Calendar, bulletins, online permit tracking systems, and mailing lists.  Often these public notices provide a time period (usually a 30 day public comment period) for interested persons to send comments to the DEQ on a permit before it is issued or denied."[18]

393.   When MDEQ issued the April 9th FWTP permit, it not only failed to comply with Michigan laws by ignoring the mandatory 45-day notice and comment period, it also failed to adhere to its own policies as articulated in the Public Involvement Handbook which seek public involvement in decision-making.

---

[17] *Public Involvement Handbook* at i, Michigan Department of Environmental Quality (Jan. 2014), https://www.michigan.gov/documents/deq/deq-oea-cau-publicinvolvementhandbook_415012_7.pdf.
[18] *Id.* at 6.

134

According to MDEQ calendars from that year it does not appear that there was *any* notice of the permit application.

394. The permit issued by MDEQ would not have fallen under the State SDWA's provision for expedited permits because that provision expressly excludes permits "involving water treatment processes, ground or elevated storage tanks, chemical feed systems, wells, booster stations, pumps, new proposed water works systems subject to a capacity assessment, or projects funded under the state drinking water revolving fund established under section 16b of the shared credit rating act, 1985 PA 227, MCL 141.1066b." MCLA 325.1004a(7). The permit application expressly involved several of these matters.

395. The April 9, 2014 FWTP permit was a *construction* permit that provided for the construction of several different plant components. Many water treatment components are not "off the shelf" and instead must be manufactured specifically for the plant they're intended for. Given the scope of work described in the April 9, 2014 FWTP permit, completion of the identified projects would likely have taken at least 60 days. Regardless, the FWTP began distributing water just 16 days later.

3.     **MDEQ Officials Abdicated Their Responsibility to Enforce Michigan's Safe Drinking Water Act, the Lead and Copper Rule, and MDEQ Internal Procedures.**

396.   As discussed in more detail herein MDEQ officials failed to correctly apply LCR sampling protocols as well as the LCR's rule requiring optimized corrosion control.

397.   MDEQ subsequently claimed to have "misinterpreted" the Safe Drinking Water Act's requirements that water systems such as Flint's include optimized corrosion control.  But documents from MDEQ's files belie their lack of knowledge.  Specifically, on April 21, 2004 then-director of the MDEQ Steven Chester wrote the U.S. EPA regarding MDEQ's obligations under the Lead and Copper Rule (LCR) pertaining to schools and day care facilities.  In that letter, he specifically acknowledged that in "schools and day care centers connected to CPWS [community public water systems] serving more than 50,000 residents" those "water systems have had to demonstrate and maintain optimal corrosion control."  Jim Sygo, then Deputy Director of MDEQ, was copied on the letter and continued to work at MDEQ throughout the Flint Water Crisis.

398.   There is also evidence that disputes MDEQ's claim that it lacked knowledge that samples taken to assess compliance with the LCR should be done after flushing.  As early has 1990, MDEQ documentation states, "Samples should be taken from cold water fixtures only.  <u>The fixture must not have received prior use</u>

136

the day of sampling.  Capture the first flow out of the fixture and fill the sample container." (handwritten underlining in the original; this paragraph is also surrounded by two handwritten stars).

399.   Unfortunately, these were not the only ways in which MDEQ failed to enforce Michigan's SDWA.  For example, the Michigan Safe Drinking Water Act required the MDEQ to notify the public if, "a public water supply is found not to be in compliance with the state drinking water standards." MCLA 325.1019(1). As recounted above, the first warning signs regarding the safety of Flint having switched to the Flint River as its drinking source were spikes in the levels that triggered a boil water advisory.

400.   Defendant Prysby admitted in an email to Stephen Busch and Adam Rosenthal dated August 19, 2014 that the press release issued by the City accompanying the advisory falsely attributed the reason for the boil water advisory to an "abnormal test."  Specifically, he wrote, "the statement defers to an 'abnormal test' due to sampling error over the most recent 48 hours as the trigger for the BWA. This is false as the BWA was in effect for over 72 hours at the time of the press release and was issued because of the fecal coliform result and the number of total coliform results obtained from the affected area between the 12th and the 14th. Also, while sampling error could be possible…other potential causes (LOP, mainbreak, Xconn, improper connects, etc.) should have been discussed in the press release."

137

401.    Additionally, on March 10, 2015, James Henry of the Genesee County Health Department wrote Howard Croft, Mike Prysby, Jerry Ambrose, Mayor Walling, and other city and other officials from GCHD regarding the "significant increase of confirmed Legionella illnesses relative to previous years" and explaining that, "Legionella can be a deadly, waterborne disease that typically affects the respiratory system." He expressly noted that, "[t]he increase of the illnesses closely corresponds with the timeframe of the switch to Flint River water. The majority of the cases reside or have an association with the City. Also, McLaren Hospital identified and mitigated Legionella in their water system. This is rather glaring information and it needs to be looked into now . . . ." Importantly, he noted that, "In the past, I have requested to meet with the water plant staff and MDEQ regarding Legionella concerns. I did not receive a response from the water plant staff *and MDEQ declined*." (emphasis added).

402.    In response, Stephen Busch acknowledged that, "the change in [water] source may have created water quality conditions that could provide additional organic nutrient source to support legionella growth," but deflects blame, explaining that, "there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time." Notably, despite *admitting* that the change in source could be the problem,

he made no efforts to actually *investigate* that issue. In this way, MDEQ deviated from its response to other assertions of unsafe environmental conditions.

403.   No other city or county in Michigan has experienced the total disregard MDEQ showed Flint. Indeed, over the last five years, there have been dozens of new water projects that MDEQ oversaw. Several of these projects took place in cities or counties with known lead pipes. Notably, each of these cities is predominately white and in none of these instances did MDEQ turn the other way in the face of blatant violations.

### 4.   The EPA Civil Rights Office Found MDEQ's Nondiscrimination Procedures Insufficient Under Federal Law and MDEQ's Prior Notice and Comment Procedures Discriminatory Towards African Americans.

404.   The crisis in Flint is not the first time MDEQ has demonstrated its unwillingness to provide African Americans the same level of protection from the environmental laws as Michigan's white citizens. Indeed, Flint is home to more hazardous sites than other, affluent and white areas of the State.

405.   Even more relevant, on January 19, 2017, the United States Environmental Protection Agency's ("EPA") External Civil Rights Compliance Office (ECRCO) issued a letter providing its conclusions following an investigation into whether the MDEQ had violated Title VI of the Civil Rights Act of 1964, as

amended, 52 U.S.C. §§ 2000d *et seq.*, (Title VI) and the EPA's nondiscrimination regulations found at 40 C.F.R. Part 7.[19]

406.   That letter addressed a complaint submitted on December 15, 1992 that alleged the MDEQ[20] discriminated against the citizens of Flint in relation to granting a permit to the Genesee Power Station.  In granting the permit, the EPA found, "that the preponderance of evidence supports a finding of discriminatory treatment of African Americans by MDEQ in the public participation process for the GPS permit considered and issued from 1992 to 1994."[21]  The letter noted that, "Flint was and continues to be predominately African American." (footnote omitted). Additionally, while the EPA explained that during the relevant time period the, "MDEQ had written no formalized operating procedures for conducting its meetings or hearings. . . . [T]here were a series of unwritten standard operating procedures that EPA was told existed or that could be discerned from hearing records."  The EPA concluded that the MAPCC, "deviated from those standard operating procedures on more than one occasion to the detriment of African Americans."[22]

---

[19] *2017 EPA Civil Rights Letter to MDEQ*, Environmental Protection Agency (Jan. 17, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/final-genesee-complaint-letter-to-director-grether-1-19-2017.pdf.
[20] Formerly referred to as the Michigan Department of Natural Resources (MDNR) and later becoming the MDEQ.
[21] *2017 EPA Civil Rights Letter to MDEQ*, *supra* note 19, at 3.
[22] *Id.* at 16.

407. Given the deviations, the EPA found that, "[t]he totality of the circumstances described above supported by a preponderance of the evidence in the EPA's record would lead a reasonable person to conclude that race discrimination was more likely than not the reason why African Americans were treated less favorably than non-African Americans during the 1992-1994 public participation for the GPS permit."[23]

408. The letter also stated that EPA had, "concerns that MDEQs current policies are insufficient to address the potential for discrimination given the deficiencies in MDEQ's public participation program."[24]

409. More specifically, the "EPA determined that MDEQ had not been in compliance with its longstanding obligation to establish procedural safeguards required by EPA's regulations implementing the federal non-discrimination statutes. For almost 30 years, MDEQ failed to provide the foundational nondiscriminatory program as required by non-discrimination regulations to: provide a continuing notice of non-discrimination; adopt grievance procedures that assure the prompt and fair resolution of complaints alleging violations of the non-discrimination statutes and EPA's implementing regulations, and designate at least one person to coordinate

---

[23] *Id.* at 17.
[24] *Id.* at 3.

its efforts to comply with its obligations under the federal non-discrimination statutes and EPA's implementing regulations." [25]

410.  In July 2014 the EPA informed MDEQ that it was not in compliance with the EPA's requirement that it have in place a non-discrimination policy; the EPA followed up with MDEQ again on this issue in a phone call on August 20, 2015 during which it informed MDEQ regarding how to remedy the agency's nearly 30 years of non-compliance.  On November 6, 2015, MDEQ provided EPA with a copy of its October 28, 2015 "Policy and Procedure Number: 09-024, Subject: Non Discrimination in Programs Receiving Federal Assistance from the U.S. Environmental Protection Agency." That policy was signed by then-Director of the MDEQ, Dan Wyant.

411.  On December 3, 2015, the EPA informed MDEQ that its policy was still insufficient in several respects outlined in the table below.  Critically, however, despite having been informed of these deficiencies nearly three years ago by the EPA, MDEQ has taken no steps to remedy these deficiencies and the same defective policy remains in place.

---

[25] *Id.*

| EPA's Identified Deficiencies in MDEQ's Nondiscrimination Policy (Jan. 2017) | Current Status of MDEQ's Nondiscrimination Policy (October 2018)[26] |
| --- | --- |
| Does not list the Federal nondiscrimination statutes to inform people about the statutes that protect them and on what bases complaints may be filed through MDEQ's grievance procedure. | Same. |
| The notice is not prominently displayed on MDEQ's home page. | The nondiscrimination policy is nearly impossible to find – one has to click on the "DEQ policies" in the bottom, right-hand corner of MDEQ's homepage and then click on the first "Department" link in the list of DEQ policies and procedures (there are two) and then read through the policies to find the nondiscrimination policy. |
| Searching MDEQ's website for "race," "title VI," "discrimination," and "disability" does not lead to the notice. | Same. |
| The Notice is in English only with a note informing those with limited English proficiency that they can requires the notice in other languages. | Same. |
| While the notice states that MDEQ will accommodate those with impaired vision or hearing, there is no evidence on MDEQ's website that those services are available or how to access them. | Same.  Their home page has a link for "ADA" but this only links users to Michigan's general disability resources center – there is no information about how those with impaired vision or hearing could access MDEQ services. |

---

[26] *Nondiscrimination in Programs Receiving Federal Assistance from the U.S. Environmental Protection Agency*, Michigan Department of Environmental Quality (Oct. 28. 2015), https://www.michigan.gov/documents/deq/deq-Final-_DEQ-_Procedure_09-024_10-28-15_505494_7.pdf.

| | |
|---|---|
| The Notice provides that the Nondiscrimination Compliance Coordinator was responsible for coordinating MDEQ's compliance with federal nondiscrimination statutes and EPA's implementing regulations but does not identify this person by name. | Same. |
| The grievance procedure fails to identify the type of discrimination prohibited or the applicable Federal nondiscrimination statutes. | Same. |
| The policy fails to contain assurances that retaliation is prohibited and that claims of retaliation will be handled promptly. | Same. |
| The policy fails to provide for periodic assessments of the efficacy of MDEQ's effort to maintain compliance with federal nondiscrimination statutes. | Same. |
| The policy fails to provide for conduct reviews of formal or informal discrimination complaints filed with the MDEQ to identify and address any patterns or systemic problems. | Same. |
| The policy fails to provide for appropriate training for persons involved in informal resolution of discrimination complaints filed with DEQ under federal nondiscrimination statutes. | Same. |
| The policy fails to address informal resolution processes for addressing complaints or identify how complainants might engage in these processes. | Same. |

412.   The EPA concluded that at the time of issuing the letter in 2017, "EPA ha[d] significant concerns about MDEQ's current public participation program and whether MDEQ can ensure that discriminatory treatment would not occur today. Similarly, EPA . . . is deeply concerned that MDEQ does not take seriously its responsibility to implement a properly functioning non-discrimination program as required under EPA regulations."

413.   Those concerns are well-founded.  Despite *years* having passed since the EPA issued its initial set of concerns regarding MDEQ's nondiscrimination policy and MDEQ failing to take *any* steps to remedy those concerns, in regard to the Flint Water Crisis, MDEQ flagrantly ignored Michigan law as well as its own internal procedures to the detriment of Flint's predominantly Black/African American citizens.  With regard to the Flint Water crisis, the EPA stated that it has, "informed MDEQ that it will conduct an investigation into MDEQ's procedures for public notification and involvement as well as compliance with its non-discrimination requirements."  To date, nothing has been made public as to the results of that investigation, however the minority populations in Flint continue to suffer as a result of MDEQ's failure to abide by and enforce Michigan's environmental laws and regulations as well as federal nondiscrimination statutes.

5.     **The Governor's Unreasonable Delay in Declaring a State of Emergency in Flint Deviated Substantially from His Response to Emergencies in White and Affluent Communities.**

414.   Governor Snyder's response to the public health crisis in Flint unnecessarily prolonged the crisis, depriving Flint of key state resources that could have hastened efforts to provide Flint with safe water.

415.   While the sheer number of individuals in Governor Snyder's administration with knowledge of the lead levels in Flint suggests that the Governor became aware of this crisis far earlier than he has admitted, by his own admission he learned "On October 1st, 2015 . . . that our state experts were wrong.  Flint's water had dangerous levels of lead.  On that day, I took immediate action.  First, we quickly reconnected to the Detroit water supply to begin sealing the damages pipes.  Second, I ordered the immediate distribution of water filters and extensive blood level testing in schools and homes to identify those at the highest risk so they received healthcare, nutrition and additional support."

416.   Thus, even if Governor Snyder is to be believed that he did not learn about the heightened lead levels until October 15, 2015, he still waited *months* to impose a State of Emergency in Flint – a declaration that would provide key resources to the residents of Flint.

417.  Critically, Governor Snyder did not demonstrate this type of delay in recognizing and responding to various emergencies in other cities and counties where the population was predominately white:[27]

| Declaration | Date of Emergency Declaration | Date Emergency Noted in News | Time from Emergency to Governor's Declaration | Cause | Location | Demographics (Census Bureau - 2017 est.) |
|---|---|---|---|---|---|---|
| State of Emergency | 5/14/2012 | 5/3/2012 to 5/4/2012 | 10-11 days | Flooding | Genesee County | 75.4% White; 20.3% African American |
| State of Disaster | 5/25/2012 | 5/21/2012 | 4 days | Wildfire | Luce County | 79.1% White; 11.7% African American |
| State of Disaster | 5/25/2012 | 5/21/2012 | 4 days | Wildfire | Schoolcraft County | 86.3% White; 0.5% African American |
| State of Disaster | 5/9/2013 | 4/12/2013 to 4/25/2013 | 14-27 days | Flooding | Kent County | 82.5% White; 10.5% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Wayne County | 54.6% White; 39.0% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Oakland County | 75.7% White; 14.2% African American |
| State of Emergency | 8/13/2014 | 8/11/2014 | 2 days | Flooding | Washtenaw County | 74.2% White; 12.4% African American |
| State of Emergency | 1/5/2016 | Gov. Snyder testified he knew as of Oct. 1, 2015; news articles discussed lead in Flint water for many months before that date. | 3 months 10 days - more than 6 months | Water Contamination | Genesee County | Declaration declared for entire County; toxic water supplied only to the City of Flint 54.3% African American; 59.6% Minority/Non-White; 40.4% White |
| State of Emergency | 1/6/2017 | 12/24/2016 | 13 days | Sewer Line Collapse; Sinkhole | Macomb County | 81.4% White; 12.0% African American |
| State of Emergency | 6/26/2017 | 6/23/2017 | 3 days | Flooding | Isabella County | 88.2% White; 2.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Allegan County | 95.0% White; 1.5% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Arenac County | 96.5% White; 0.4% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Barry County | 97.0% White; 0.6% African American |

---

[27] Governor Snyder also declared a "State of Emergency" for Detroit during his tenure as Governor.  Because that declaration related to Detroit's financial status— rather than some type of disaster—and because it was in response to an "emergency" that evolved over a long period of time, it is not included in the current chart.

| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Berrien County | 79.7% White; 15.1% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Cass County | 89.5% White; 5.3% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Clare County | 96.5% White; 0.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Eaton County | 87.6% White; 7.0% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ingham County | 76.1% White; 12.1% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ionia County | 92.5% White; 4.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Kalamazoo County | 81.5% White; 11.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Kent County | 82.5% White; 10.5% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Mecosta County | 93.1% White; 2.9% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Newaygo County | 95.8% White; 1.2% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ogemaw County | 96.5% White; 0.4% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Oscoda County | 96.8% White; 0.4% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | Ottawa County | 92.6% White; 1.8% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | St. Joseph County | 93.6% White; 2.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | City of Grand Rapids | 68.3% White; 19.7% African American |
| State of Disaster | 3/13/2018 | 2/19/2018 to 2/23/2018 | 18-22 days | Flooding | City of Lansing | 61.2% White; 21.7% African American |
| State of Disaster | 6/18/2018 | 6/17/2018 | 1 day | Flooding | Houghton County | 93.6% White; 0.9% African American |
| State of Disaster | 6/18/2018 | 6/17/2018 | 1 day | Flooding | Menominee County | 94.4% White; 0.7% African American |
| State of Disaster | 7/25/2018 | 7/12/2018 | 1 day | Flooding | Houghton County | 93.6% White; 0.9% African American |
| State of Emergency | 7/29/2018 | 7/26/2016 | 3 days | Water Contamination | Kalamazoo County | 81.5% White; 11.7% African American |

418. The most analogous crisis involves the July 2018 declaration of emergency by Lt. Gov. Brian Calley (at Governor Snyder's request because Snyder was out of the State) for Kalamazoo County due to health and safety concerns related

148

to per- and polyfluoralkyl (PFAs) contamination in the drinking water for Kalamazoo County.  According to Lt. Gov. Calley, declaring a state of emergency was important because, "[t]his declaration will allow the state to supply additional resources to help with response efforts and ensure the health and safety of residents in Parchment and Cooper Township." Indeed, by declaring a state of emergency, many state resources become available and the Michigan State Police, Emergency management and Homeland Security Division is authorized to coordinate state relief efforts.  Critically, the declaration was made exactly *three days* after test results revealed unacceptable levels of PFAs.

419.    In contrast, the State of Michigan affirmatively lied to Flint residents for *months*, denying and dismissing their fears regarding the water quality.  Indeed, even after the Governor's office acknowledged that Flint's water was dangerous, their talking points contained several knowing lies including:

- The falsely state that Flint used lime as a corrosion control and that "Flint was within federal protocols when it chose to use lime, and this is consistent with what every other community was required to do."  In truth, MDEQ and other State officials were aware by this point that Flint's lack of optimized corrosion control was in violation of federal and state law.  Indeed the very talking points that suggest that lime softening is sufficient includes the statement that, "[o]perators of large systems are required to implement corrosion control measures, and Flint is doing that on a very abbreviated schedule" – a clear recognition that (a) corrosion control was necessary and (b) Flint did not have corrosion control measures at the time.

149

- The talking points continued to falsely assert that Flint, "system [was] in compliance with federal lead and copper rules, based on testing."

- The talking points misleadingly assert that, "[t]he state was opposed to Flint leaving DWSD – not because of concerns about water quality, but because at the time the city was working through its bankruptcy and the state felt the move would incur more expenses for both cities.  Flint made the case it could save money in the period that KWA was constructing its pipe, and the state leaders – including the Emergency Financial Manager – eventually granted the city its request."  In truth, Emergency Manager Kurtz advocated for joining the KWA which State officials, including Defendant Dillon, affirmatively signed off on.

420.  The Governor's own task force concluded that, ***"[n]either the Governor*** nor the Governor's office took steps to reverse poor decisions by MDEQ and state-appointed emergency managers until October 2015, in spite of mounting problems and suggestions to do so by senior staff members in the Governor's office, in part because of continued reassurances from MDEQ that the water was safe." (emphasis added).[28]

421.  The Flint Water Advisory Task force concluded that, "The suggestion made by members of the Governor's executive staff in October 2014 to switch back to DWSD should have resulted, at a minimum, in a full and comprehensive review

---

[28] *Flint Water Advisory Task Force Final Report* at 1, Flint Water Advisory Task Force (Mar. 2016), https://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_517805_7.pdf.

of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA.  It was disregarded, however, because of cost considerations and repeated assurances that the water was safe."[29]

> **6.** **Internal Correspondence From MDEQ, the City of Flint, and Senior Officials in the Governor's Office Evidence a Callousness Toward Flint's Citizens.**

422.   Thus far, the only documents provided in this litigation have been those selected for distribution *by defendants*. However, even this incomplete production paints a troubling picture of government officials callously dismissing the desperate pleas of Flint citizens. Some of the correspondence produced contains racially charged language while other documents bluntly explain how Flint's concerns were easily dismissed as simply the product of "old time negative racial experiences."

423.   In one example of such racially charged language, EM Mike Brown emailed Gerald Ambrose with a draft memorandum he intended to send to Governor Snyder regarding his administration. He wrote, "In my opinion, the group making the noise about civil unrest, violence, MSP shootings and an EM, are the naysayers in the community.  Too many of them have their handout and their voices raised but do very little to contribute to solutions in Flint."  EM Brown explained, "I have offered them many ways to contribute to improving conditions for Flint citizens since I became Emergency manager.  I have not offered them money, or simply

---

[29] *Id.* at 7.

caved into their demands.  This type of submission to their demands has helped create an unhealthy culture in Flint.  Past administrations have bowed to the demands of this group.  It is part of the reason Flint has been placed in receivership twice in the past decade."

424.    EM Brown attempted to dismiss any improper motives for his attitude toward the citizens of Flint by explaining that, "I have spent 35 years in Flint.  My credibility permeates every sector of the community.  I grew up on the North end in one of the few integrated Flint neighborhoods."  But then he continued his tirade against Flint's "culture" explaining how he had, "challenged the culture at city hall since we arrived.  It is difficult to understand that culture unless you are there everyday confronting it.  My team has challenged that culture on a daily basis.  It is an entitlement mentality.  It is a mentality that goes beyond city hall.  There are individuals and groups in the community who simply expect certain things from city hall.  If they don't get 'their perceived share' of the pie, they scream to anyone who will listen."

425.    In response, Jerry Ambrose encouraged EM Brown, stating that his memo is a "great start."  He agreed with EM Brown's assessment, stating that EM Brown had, "also taken great pains to develop Flint based emerging leaders who are NOT from the same mold as the old leaders.  While this approach has meant that many things have taken longer to achieve than it might otherwise take, it has been

with the realization that CHANGING THE CULTURE OF CITY HALL IS IMPERATIVE IF HISTORY IS NOT TO REPEAT ITSELF.  Turn Flint back to the same old groups without change and history WILL repeat itself" (capitalization in original).

426.  In March of 2015, as concerns regarding lead in the water grew, Arlington Dumas wrote an email to Mayor Walling and several news outlets and city officials stating that, "the water is dangerous to our health!  GM will not use the water at its Engine Plant in Flint to wash engines parts!  We need your help to guide us to the profession people that know about 'Bad Drinking Water and Environmental Racism'  I truly believe it's 'Environmental Racism' at its worst or I should say best! . . . I have challenged our elected officials to step up to the plate and fix this water problem!"

427.  Mayor Walling forwarded the message to additional Flint officials including then EM Ambrose whose response to the charge of environmental racism and seriously dangerous water conditions was to forward the message to the City's outside public relations firm stating simply, "Welcome to Monday."

428.  Having failed to get the MDEQ, City, or State to take their concerns regarding Flint's water safety issues seriously, in early April 2015, a group of Concerned Pastors from the City of Flint warned they might have to seek judicial intervention.  Once again, government officials' response to the City's desperate

153

pleas for help are callously dismissed. Indeed, Governor Snyder's Chief of Staff wrote simply, "[w]hy not, we haven't anything else to do except spend our time chasing our tail. This issue isn't going to go away until we do some serious comms work in the city."

429.  Instead of using State resources to provide Flint safe drinking water, Mr. Muchmore instead urged senior treasury officials, "[w]e need to up our comms efforts in Flint area. How would we ever afford this now?" In response, Harvey Hollins suggested that the City use its scant resources not to investigate the safety of the drinking water or provide bottled water to the people of Flint, but rather to hire "a good firm for several months to help weather this."

430.  Meanwhile, MDEQ employees were actively and knowingly concealing the extent of the problem. In response to an email from EPA Program Manager Jennifer Crooks on May 7, 2015 reiterating serious concerns regarding lead poisoning in Flint, Mike Prysby wrote to Adam Rosenthal, "[j]ust a heads up. . . . EPA Region V is really delving into the Flint lead issue…..only thing is…..there isn't an issue…..yet[.]"

431.  On July 22, 2015, Dennis Muchmore wrote Dan Wyant of the MDEQ, "I'm frustrated by the water issue in Flint. I really don't think people are getting the benefit of the doubt. Now they are concerned and rightfully so about the lead level studies they are receiving from the DEQ samples. . . . These folks are scared and

worried about the health impacts and they are basically getting blown off by us (as a state, we're just not sympathizing with their plight)."  That same day, it appears that Flint's water system and shift to the KWA was placed on the Governor's calendar for a meeting with senior staff.

432.   In response, Defendant Wyant forwarded the message to Brad Wurfel and several other MDEQ employees.  Wurfel's response demonstrates a total lack of concern for the people of Flint.  First, he suggested that those citizens with lead poisoning deserve what they got because, "[w]e aren't talking about lead in the water supply here.  We are talking about people with lead in their premise plumbing . . . ."  He then continued, "[w]hat of the folks who test high?  The city contacts them to let them know they have elevated levels and should get a plumber to check and replace their lead transmission hardware."  He ended his rant by attacking one of the entities that tried to bring this tragedy to light, stating, "[t]he ACLU's fear campaign on this issue is an embarrassment."

433.   Eventually, MDEQ did respond to Muchmore's request for information, falsely stating that, "[b]y the tenants of the federal statute, the city is in compliance for lead and copper" but admitting as early as July 24, 2015 that, "they have not optimized their water treatment (for the most part, this means adding phosphates to minimize the degree that the water Ph mobilizes lead and copper in people's home plumbing)."  Mr. Muchmore also emailed Wayne Workman of

155

treasury, acknowledging that, "The people there [in Flint] just seem to be getting a raw deal from the city particularly in terms of the information they are getting."

434.    In early August 2015, Dennis Muchmore met with various leaders from Flint regarding issues with the water quality.  Following the meeting, Mr. Muchmore emailed Harvey Hollins and Stacie Clayton—senior officials within the Governor's office, dismissing Flint's concerns with the water's safety.  He wrote, "We can't do too many more of these.  The three activists in the room just want to be right, they don't want answers.  No matter what we say they'll always want something else to be the answer."  He then dismissed these concerns, stating that one of the women who tended to "lecture[]" just expressing, "some of the old time negative racial experiences she's had."   But these leaders' concerns were not just a product of their "old time negative racial experiences"—as we now know, their concerns were entirely valid.

435.    In response, Harvey Hollins wrote, "I agree.  It's hard to get to yes or satisfaction with certain types of community advocates because no matter what you do, they will always grind an ax on something."  He then stated, "I agree, I think one more meeting with the pastors and maybe the professor from kettering (who I think is reasonable) to put closure on the outstanding questions is warranted.  The other women who were there to argue for the sake of arguing should not be apart [sic] of that meeting."

156

436.  As described above, Flint issued a Lead Advisory Release on September 26, 2015.  Dennis Muchmore forwarded that release to Governor Snyder (once again, apparently at his personal email address given that part of the address is redacted as, "PPI") and several other high-ranking officials in the Governor's office.  Despite the mounting evidence of a serious problem, Muchmore continued to dismiss Flint's concerns, lamenting that, "[n]ow we have the anti-everything group turning to the lead content . . . ."  He wrote, "some of the Flint people respond by looking for someone to blame instead of working to reduce anxiety." But the people of Flint had every reason to want to get to the bottom of who was responsible for the situation.

### 7.  MDEQ Officials Rewarded for Failing to Protect Citizens of Flint from Dangerous Drinking Water.

437.  Two days before the Governor finally acknowledged the existence of lead poisoning in a press conference, Richard Benzie, the Chief of the Field Operations Section of the Office of Drinking Water and Municipal Assistance of the MDEQ emailed Defendants Busch, Prysby, Rosenthal, Shekter-Smith, and Cook, as well as a few other MDEQ employees, about how to further mislead Flint residents who called regarding concerns about their drinking water.  Benzie emphasized the importance of keeping their "message" consistent and provided that callers be informed that, "the drinking water distributed to city customers currently meets all drinking water standards and is considered safe.  However, there is no safe level for

157

lead." But at this point MDEQ – including specifically the Defendants who received this email – was keenly aware that its failure to have optimized corrosion control qualified as noncompliance with federal and state drinking water requirements.

438. Despite MDEQ's total failure to adhere to, and enforce, its own policies and procedures as well as State and Federal environmental laws, Benzie then stated, "I also want to thank you for the effort you have made to respond to this issue. It is noticed and appreciated. ***In recognition of your performance, I have arranged for you to receive a 2 percent merit increase starting tomorrow***." (emphasis added). This likely amounted to more than $1000 per employee, per year of taxpayer dollars for allowing tragedy to unfold upon the people of Flint, staying quiet about the events that caused that tragedy, or both.

439. Were there any doubt that the actions of the MDEQ Defendants reflected a culture within MDEQ that not only tolerated but *rewarded* conduct that negatively impacted African Americans, MDEQ's decision to reward several of the individuals who played key roles in causing this crisis – many of whom are currently facing criminal charges – dispels those doubts.

### 8. MDEQ's and Governor Snyder's Deviation from Prior Practice and Existing Law Disproportionately Injured African Americans in Flint.

440. MDEQ's flagrant violation of Michigan and Federal law with regard to its issuance of the ACO, approval of the FWTP construction permit, noncompliance

with Michigan SDWA notice requirements, refusal to implement nondiscrimination policies, refusal to require Flint to utilize corrosion control, noncompliance with LCR sampling requirements, refusal to coordinate with other departments to investigate the Legionnaires outbreak, and subsequent cover-up of the crisis disproportionately impacted African Americans.

441.   Leading scholars agree that race played a critical role in the events that caused the Flint Water Crisis.  For example, Robert D. Bullard, Dean of the School of Public Affairs at Texas Southern University and a pioneering scholar in the field of environmental justice explained, *"*What happened in Flint is a blatant example of environmental injustice. The more information comes out, the clearer it is that this community was not treated according to the usual protocols. It was almost as if regulators didn't believe them and thought their health wasn't important.  In studying the history of environmental justice, you see over and over that it generally takes longer for poor communities to be heard when they make complaints. Government officials received complaints in April 2014 expressing that something was wrong with the water in Flint. If regulators at the Michigan Department of Environmental Quality had had to drink that water, or serve it to their children, their response would have been different."[30]

---

[30] *Flint's Water Crisis Is A Blatant Example Of Environmental Injustice*, IFLScience, https://www.iflscience.com/environment/flint-s-water-crisis-blatant-example-environmental-injustice/.

442.   Moreover, the Commission concluded, "Environmental Justice requires that all people and communities receive the equal protection of environmental and public health laws, and should have an equal and meaningful voice in decisions related to their environment. . . . The people of Flint did not enjoy the equal protection of environmental or public health laws, nor did they have a meaningful voice in the decisions leading up to the Flint Water Crisis.  Many argue they had *no* voice." (emphasis in original)[31]   As described above, the people of Flint were deprived of an opportunity to have a voice in this process when MDEQ issued a permit for the FWTP without observing the statutorily required 45-day notice and comment period.

443.   Most definitively, the Report provides, "The Commission believes we have answered our initial question, 'was race a factor in the Flint Water Crisis?' Our answer is an unreserved and undeniable -- 'yes'."[32]

444.   Similarly, the Flint Water Advisory Task Force found that, "Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities.  Moreover, by virtue of their being subject to emergency management,

---

[31] Michigan Civil Rights Commission, *supra* note 6, at 4.
[32] *Id.* at 6.

Flint residents were not provided equal access to, and meaningful involvement in, the government decision-making process."[33]

445.   The task force further found that "MDEQ, specifically its Office of Drinking Water and Municipal Assistance (ODWMA), suffers from cultural shortcomings that prevent it from adequately serving and protecting the public health of Michigan residents."[34]

446.   Regardless of Defendants' motivations in entirely failing to adhere to and enforce state and federal environmental laws, no rational basis exists for issuing a fraudulent ACO allowing Flint to borrow funds, issuing a construction permit under the Michigan Safe Drinking Water Act without observing the mandatory 45-day notice and comment period, failing enforce sampling protocols and optimized corrosion control requirements mandated by state and federal law, and refusing to implement a nondiscrimination policy that informs persons of color of their rights and provides them with a viable basis for raising complaints related to discrimination.   These laws, regulations, and policies exist for a reason: to prevent exactly the type of crisis that unfolded in Flint and provide some basis of protection for historically disempowered minorities.   The MDEQ Defendants' blatant disregard

---

[33] *Flint Water Advisory Task Force Final Report*, *supra* note 28, at 54.
[34] *Id.* at 6.

for enforcing these laws to protect the predominantly African American and poor citizens of Flint deprived them of their right to equal protection of the law.

447.   Likewise, no rational basis exists that justifies Governor Snyder's refusal to issue a declaration of emergency for at least three months after he *admits* having become aware of the crisis unfolding in Flint (and likely much longer) in light of his prompt response to emergencies in affluent, predominantly white cities and counties throughout Michigan.  This refusal denied Flint citizens access to key resources, unnecessarily prolonging their exposure to toxic chemicals including lead.

## CLASS ALLEGATIONS

448.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(3) on behalf of a proposed damages class defined as follows: all individuals and entities who from April 25, 2014 to present were exposed to toxic Flint water or who owned property within the City of Flint and experienced injuries and damages to their person or property.  Plaintiffs also request certification of a subclass consisting of: all African American individuals who from April 25, 2014 to present were exposed to Flint water or who owned or rented property within, or resided, worked, or attended school within the City of Flint and experienced injuries to their person or damages to their property ("African American Subclass").

449.   In the alternative to the above Class and Subclass, Plaintiffs request

162

certification pursuant to Fed. R. Civ. P 23(b)(3) on behalf of a proposed damages class defined as follows: All persons and entities who, from April 25, 2014 to present, owned property within the City of Flint ("Property Damage Class").

450.   Plaintiffs also request certification pursuant to Fed. R. Civ. P 23(b)(2) and (b)(3) of a subclass consisting of: all African American individuals who from April 25, 2014 to present were exposed to Flint water or who owned or rented property within, or resided, worked, or attended school within the City of Flint and experienced injuries to their person or damages to their property ("African American Subclass").

451.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of proposed injunctive relief classes defined as follows: all individuals and entities who from April 25, 2014 to present were exposed to toxic Flint water or who owned property within the City of Flint and experienced injuries and damages to their person or property.

452.   In the alternative, Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of proposed injunctive relief classes defined as follows: All persons and entities who own or rent property within, or reside, or attend school within the City of Flint.

453.   Plaintiffs request certification, consistent with Rule 23(c)(4), of common issues related to the following class: All persons who, from April 25, 2014

to present, resided or attended school within the City of Flint ("Personal Injury Issue Class").

454.   The issues common to the Personal Injury Issue Class include:

- Whether the conduct of the Government Defendants endangered or threatened Plaintiffs' fundamental liberty interest in bodily integrity;

- Whether the Government Defendants were aware that their conduct could result in the deprivation of Individual Plaintiffs' rights to bodily integrity;

- Whether the Government Defendants deliberately and knowingly violated the bodily integrity of Individual Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm;

- Whether the Government Defendants had the opportunity to reflect and deliberate before they acted or failed to act;

- Whether the conduct of the Government Defendants directly and proximately caused the Flint water system to be contaminated with corrosive water, lead, and dangerous bacteria, and/or increased the risk of harm to one or more of the Classes;

- Whether the violation of Plaintiffs' fundamental liberty interest in bodily integrity was the implementation or execution of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the City of Flint;

- Whether the Engineering Defendants owed one or more duties to Plaintiffs, and the extent of those duties;

- Whether the Engineering Defendants breached their duty or

164

duties owed to Plaintiffs and whether any such breach was malicious, willful, and wanton as to disregard the Plaintiffs' rights;

- Whether the Engineering Defendants were so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result;

- Whether the Engineering Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs;

- Whether the Engineering Defendants' professional negligence directly and proximately caused the Flint water system to be contaminated with corrosive water, lead, and dangerous bacteria, and/or increased the risk of harm to one or more of the Classes; and

- Whether the conduct of Defendants warrants an award of punitive and/or exemplary damages.

455.   Excluded from these classes are (1) the Defendants in this action (and their officers, directors, agents, employees, and members of their immediate families), and any entity in which the defendants have a controlling interest, and the legal representatives, heirs, successors and assigns of defendants, and (2) the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

456.   The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

457.   There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es).

458.   The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

459.   Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal and property damage.

460.   Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

461.   The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to

individual members of the Class and/or one or more of the Defendants.

462.   Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

### COUNT I—CAUSE OF ACTION
### 42 U.S.C. § 1983—14th AMENDMENT
### SUBSTANTIVE DUE PROCESS—BODILY INTEGRITY: BY INDIVIDUAL PLAINTIFFS AGAINST GOVERNMENT DEFENDANTS

463.   Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

464.   Individual Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

465.   The conduct of the Government Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

466.   The Government Defendants were aware that their conduct could result in the deprivation of Individual Plaintiffs' fundamental due process rights to bodily integrity.

467.   The Government Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Individual Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate

indifference to the known risks of harm which said exposure would, and did, cause to Individual Plaintiffs.

468.   The Government Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

469.   As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated Individual Plaintiffs' fundamental property and/or liberty rights to bodily integrity, as alleged in this Consolidated Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

470.   The conduct of the Government Defendants was both reckless and outrageous, entitling Individual Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C.

§ 1988.

## COUNT II—CAUSE OF ACTION
## 42 U.S.C. § 1983—5th AND 14th AMENDMENTS
## EQUAL PROTECTION OF THE LAW: RACE-BASED: BY
## AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON,
## WRIGHT, AMBROSE, KURTZ, EARLEY, WYANT, SHEKTER-SMITH,
## PRYSBY & BUSCH

471.   This claim is brought on behalf of Class Representatives Elnora Carthan, Rhonda Kelso, Barbara and Darrell Davis, Marilyn Bryson, and Tiantha Williams ("African American Plaintiffs") on behalf of a proposed subclass of African Americans defined above in paragraphs 448, 450.

472.   African American Plaintiffs and the African American Subclass incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

473.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, Wyant, Shekter-Smith, Prysby, and Busch acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated African American Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution

474.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

475.   The Equal Protection Clause prohibits laws and the application of laws

169

that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

476.   Defendants' conduct deliberately exposed or prolonged African American Plaintiffs' exposure to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

477.   In 2013, Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

478.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

479.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley knew that the raw water from the Flint River would have to be processed at the Flint WTP which would have required millions of dollars of upgrades.

480.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

481.   Recognizing these facts, Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley devised an Interim Plan that caused the predominately

170

white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

482.   As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

483.   Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

484.   Governor Snyder additionally prolonged African American Plaintiffs' exposure to toxic Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous.  Governor Snyder responded to similar emergencies affecting predominantly white communities substantially faster—often declaring a state of emergency or state of disaster in a matter of days.

485.   There was no rational economic or fiscal justification for treating the predominately African American citizens of Flint differently than the white citizens of the rest of the State.  Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied access to key resources as a direct result of Governor Snyder's delay, this unjustified delay can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

486.   Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch— all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly African American citizens of Flint by (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

487.   Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the

requirements of the Michigan Safe Drinking Water Act for other cities and counties in the predominantly white areas of the State.  Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas with lead pipes—and those projects adhered to the notice requirements and did not result in the serious disaster that occurred in Flint.

488.   There was no rational economic or fiscal justification for treating the predominately white citizens in Michigan different than the citizens in Flint with regard to the enforcement of federal and state environmental regulations.  Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied protection from the environmental laws as a direct result of the conduct of Defendants Wyant, Shekter-Smith, Prysby, and Busch, their conduct can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

489.   If African American Plaintiffs' community had been predominately white, African American Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County and throughout the State and they too would have received DWSD water as part of the Interim Plan, enjoyed the protection of Michigan's environmental statutes and regulations, and, should an

173

emergency have occurred, received a prompt declaration of emergency by the Governor and the attendant resources such a declaration provides.

490.   Because African American Plaintiffs and their Class were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit, or inconsequential. If African American Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

491.   Both Governor Snyder's Task Force and the Michigan Civil Rights Commission have acknowledged that the residents of Flint were denied equal protection of the laws. Governor Snyder's Task Force found that Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities. And the Michigan Civil Rights Commission found that the people of Flint did not enjoy the equal protection of environmental or public health laws, nor did they have a meaningful voice in the decisions leading up to the Flint Water Crisis.

492.   As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated African American Plaintiffs' fundamental property and/ or liberty rights to equal protection of the laws based on

174

race, as alleged in this Consolidated Amended Complaint, African American Plaintiffs suffered extensive damages, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

493.   The conduct of Defendants was reckless and outrageous, entitling African American Plaintiffs and the African American Subclass members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

**COUNT III—CAUSE OF ACTION**
**42 U.S.C. § 1983—5th AND 14th AMENDMENTS EQUAL PROTECTION OF THE LAW: WEALTH-BASED: BY ALL PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, AMBROSE, KURTZ, EARLEY, WYANT, SHEKTER-SMITH, PRYSBY & BUSCH**

494.   Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

495.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley, Wyant, Shekter-Smith, Prysby, and Busch, acting under color of law, and in their

respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

496. Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

497. The Equal Protection Clause prohibits laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

498. Defendants' conduct deliberately exposed or prolonged Plaintiffs' exposure to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

499. In 2013, Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

500. These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

176

501.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

502.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

503.   Recognizing these facts, Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley devised an Interim Plan that allowed the predominately—more affluent water users of Genesee County to receive the safe superior water from DWSD and the predominately impoverished water users of Flint would have to accept during the interim period grossly inferior, previously rejected and dangerous Flint River water.

504.   There was no rational economic or fiscal justification for treating the predominately more affluent water users of Genesee County differently than the predominately impoverished water users of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

505.  Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which received the grossly inferior and dangerous water product, the

177

deliberate decisions and actions of these Defendants in devising the Interim Plan can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

506.   Governor Snyder additionally prolonged Plaintiffs' exposure to toxic Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous.   Governor Snyder responded to similar emergencies affecting predominantly affluent communities substantially faster— often declaring a state of emergency or state of disaster in a matter of days.

507.   There was no rational economic or fiscal justification for treating the predominately poor citizens of Flint differently than the affluent citizens of the rest of the State.   Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied access to key resources as a direct result of Governor Snyder's delay, this unjustified delay can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

508.   Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch— all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly poor citizens of Flint by (1) granting a fraudulent

Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

509. Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the requirements of the Michigan Safe Drinking Water Act for other cities and counties in more affluent areas of the State. Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas with lead pipes —and those projects adhered to the notice requirements and did not result in the serious disaster that occurred in Flint.

510. There was no rational economic or fiscal justification for treating the more affluent in Michigan different than the citizens in Flint with regard to the enforcement of federal and state environmental regulations. Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied protection from the environmental laws as a direct result of the conduct of Defendants Wyant,

179

Shekter-Smith, Prysby, and Busch, their conduct can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

511.   If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated just like their more affluent neighbors in Genesee County and throughout the State, and they too would have received DWSD water as part of the Interim Plan, enjoyed the protection of Michigan's environmental statutes and regulations, and, should an emergency have occurred, received a prompt declaration of emergency by the Governor and the attendant resources such a declaration provides.

512.   Because Plaintiffs were in a predominately impoverished community, their complaints were dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately more affluent, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

513.   As a direct and proximate result of the aforementioned unconstitutional acts of these Defendants, which violated Plaintiffs' fundamental property and/ or liberty rights to equal protection of the laws based on wealth, as alleged in this Consolidated Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

180

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

514.   The conduct of Defendants was reckless and outrageous, entitling Plaintiffs and Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

### COUNT IV—CAUSE OF ACTION
### 42 U.S.C. § 1985(3) INVIDIOUS RACIAL ANIMUS: BY AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, AMBROSE, KURTZ & EARLEY

515.   This claim is brought on behalf of Class Representatives Elnora Carthan, Rhonda Kelso, Barbara and Darrell Davis, Marilyn Bryson, and Tiantha Williams ("African American Plaintiffs") on behalf of a proposed subclass of African Americans defined above in paragraphs 448, 450.

516.   African American Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

517.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official

capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Thirteenth Amendment to the United States Constitution.

518. 42 U.S.C § 1985(3) secures the rights of the African American Plaintiffs and the African American Subclass to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

519. The Equal Protection Clause prohibits laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

520. Defendants' conduct deliberately exposed African American Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

521. In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

522. These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

182

523.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

524.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

525.   Recognizing these facts, Defendants conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

526.   There was no rational economic or fiscal justification for treating the predominately white water users of those parts of Genesee County outside of Flint differently than the water users in the predominately African American community of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

527.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the

deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in violation of the Thirteenth Amendment. The provision of unhealthy and dangerous food and water is a badge, vestige, and symbol of slavery abolished and prohibited by the Thirteenth Amendment.

528.  If African American Plaintiffs' community had been predominately white, African American Plaintiffs would have been treated the same as their white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

529.  Because African American Plaintiffs were water users in a predominately African American community, their complaints were disrespected and dismissed as exaggerated, without merit or inconsequential. If African American Plaintiffs' community had been predominately white, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns. This disrespect and dismissive response arose directly from the conspiracy between these Defendants founded on invidious racial animus.

530.  As a direct and proximate result of the aforementioned conspiracy founded on racial animus as alleged in this Consolidated Amended Complaint, African American Plaintiffs suffered extensive damages, including, but not limited

to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

531. The conduct of Defendants was reckless and outrageous, entitling African American Plaintiffs and African American Subclass members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

<u>**COUNT V—CAUSE OF ACTION**</u>
<u>**MCL 37. 2302 - VIOLATION OF PUBLIC SERVICE PROVISIONS OF ELCRA-DISPARATE TREATMENT AND DISPARATE IMPACT AFRICAN AMERICAN PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, AMBROSE, KURTZ, EARLEY, THE CITY OF FLINT, WYANT, SHEKTER-SMITH, PRYSBY & BUSCH**</u>

532. This claim is brought on behalf of Class Representatives Elnora Carthan, Rhonda Kelso, Barbara and Darrell Davis, Marilyn Bryson, and Tiantha Williams ("African American Plaintiffs") on behalf of a proposed subclass of African Americans defined above in paragraphs 448, 450.

533. African American Plaintiffs and the African American Subclass

incorporate by reference all preceding allegations set forth above as if fully stated herein.

534. Flint and Walling and Emergency Managers Kurtz, Ambrose, and Earley represent a public facility, agency, board owned and operated by a political subdivision of the state established to provide public service to the public within the meaning of MCL 37.2301(b).

535. If not "provider[s]" of a public service, Wright, Walling, Ambrose, Kurtz, Earley are liable under MCL 37.2701(b) because they aided or abetted the "provider" to violate MCL 37.2302(a).

536. Snyder, State of Michigan, Dillon, Wyant, Shekter-Smith, Prysby, and Busch are liable under MCL 37.2701(b) because they aided the "provider" of water services to African American Plaintiffs in the acts which denied African American Plaintiffs of the full and equal enjoyment of water services because of race.

537. The Defendants identified in this Count shall be referred to as the "ELCRA Defendants."

538. The ELCRA Defendants were under a statutory duty to either provide water services to African American Plaintiffs so that they would not be denied the full and equal enjoyment of public water service on account of race, or they aided and abetted the public service provider to deny African American Plaintiffs full and equal enjoyment of public water service an account of race.

539.   In 2013, Defendants Flint, Walling, Kurtz, Ambrose, Earley, Snyder, State of Michigan, and Dillon were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

540.   Defendants Flint, Walling, Kurtz, Ambrose, Earley, Snyder, State of Michigan, and Dillon knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

541.   Defendants Flint, Walling, Kurtz, Ambrose, Earley, Snyder, State of Michigan, and Dillon knew that the water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

542.   Defendants Flint, Walling, Kurtz, Ambrose, Earley, Snyder, State of Michigan, and Dillon knew that using the raw water from the Flint River had been rejected as recently as 2011.

543.   Recognizing these facts, Defendants Flint, Walling, Kurtz, Ambrose, Earley, Snyder, State of Michigan, and Dillon devised or acquiesced to an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected

and potentially unsafe Flint River water.

544.   There was no rational economic justification for treating the predominately white water users from those areas of Genesee County outside of Flint differently than the users of water from Flint, a predominately African American community. This is so because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process (assuming this was possible) the raw Flint River water.

545.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

546.   Governor Snyder additionally prolonged African American Plaintiffs' exposure to toxic Flint Water, and limited their access to state resources, by failing to declare a state of emergency in Flint until several months after he acknowledges becoming aware that Flint's water was dangerous.  Governor Snyder responded to similar emergencies affecting predominantly white communities substantially

faster—often declaring a state of emergency or state of disaster in a matter of days.

547.   There was no rational economic or fiscal justification for treating the predominately African American citizens of Flint differently than the white citizens of the rest of the State.  Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied access to key resources as a direct result of Governor Snyder's delay, this unjustified delay can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

548.   Additionally, Defendants Wyant, Shekter-Smith, Prysby, and Busch— all MDEQ officials—refused to enforce environmental and nondiscrimination laws to protect the predominantly African American minority citizens of Flint by (1) granting a fraudulent Administrative Consent Order to allow Flint to borrow funds to participate in the KWA; (2) issuing the Flint Water Treatment Plant a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

549.   Defendants Wyant, Shekter-Smith, Prysby, and Busch adhered to the

requirements of the Michigan Safe Drinking Water Act for other cities and counties in the predominantly white areas of the State. Specifically, multiple water projects went forth during the time of the Flint Water crisis—including several in areas with lead pipes—and those projects adhered to the notice requirements and did not result in the serious disaster that occurred in Flint.

550.   There was no rational economic or fiscal justification for treating the predominately more affluent and white citizens in Michigan different than the citizens in Flint with regard to the enforcement of federal and state environmental regulations. Given the unexplained difference in treatment between these groups of similarly groups of individuals, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which was denied protection from the environmental laws as a direct result of the conduct of Defendants Wyant, Shekter-Smith, Prysby, and Busch, their conduct can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

551.   If African American Plaintiffs' community had been predominately white, African American Plaintiffs would have been treated just like their neighbors from the predominantly white neighbors in Genesee County and throughout the State, and they too would have received DWSD water as part of the Interim Plan, enjoyed the protection of Michigan's environmental statutes and regulations, and,

190

should an emergency have occurred, received a prompt declaration of emergency by the Governor and the attendant resources such a declaration provides.

552.   Assuming that the policy to supply different quality water to the water users of Flint and the surrounding communities was race neutral, the ELCRA Defendants are liable under the MCL 37.2302(a) because the impact of that policy had a grossly disparate negative impact on the predominately African American and poor water users in the City of Flint.

553.   As a direct and proximate result of the aforementioned violation of African American Plaintiffs' rights under MCL 37.2302(a) by the ELCRA Defendants, African American Plaintiffs suffered extensive damages, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

554.   African American Plaintiffs and the African American Subclass are further entitled to an award costs and reasonable attorney fees, pursuant to MCL 37.2802.

191

## COUNT VI—CAUSE OF ACTION
## *MONELL* CLAIM: BY ALL PLAINTIFFS
## AGAINST THE CITY OF FLINT

555.    At all times herein, Defendant City of Flint, acting through its official

policymakers identified above, established and/or maintained the following

customs, usages, policies and/or practices:

- Undertaking, making and/or approving decisions with regard to the public water system of the City, while at all times knowing that these decisions would likely result in the creation and prolongation of a public health crisis to its residents, including the infliction of harm and injury to Plaintiffs herein;

- Participating in the concealment of the above-described acts, injuries, and harms of which it was aware, through its supervisors and official policymakers;

- Approving, encouraging, authorizing, condoning, and acquiescing in the decisions and acts of concealment that were committed by its employees, agents, supervisors and policymakers, all under color of law and all in violation of Plaintiffs' rights under the Constitution;

- Failure to train, supervise, and/or discipline agents, employees, and officials of the City of Flint to:

    i.   Determine whether the water supplied to the public has received adequate corrosion control;

    ii.  Never provide the users of public water in Flint with water, the source of which has not received adequate corrosion control;

    iii. When water which has not received adequate corrosion control is supplied to the public, to immediately take steps and measures to end the supply

192

of such water to the public;

    iv. When water which has not received adequate corrosion control is supplied to the public, to immediately take steps and measures to warn and instruct the public of the dangers and hazards of such water and how to protect from harm and injury arising therefrom; and

    v. When water which has not received adequate corrosion control is supplied to the public, to immediately take all other necessary steps and measures to protect the public.

556. Each of the aforementioned customs, policies, and/or practices, i.e. the affirmative decisions made by the official policymakers, the failure to train, supervise, and/or discipline the individually named Defendants, was known to Defendant City, as highly likely and probable to cause violations of the constitutional rights of members of the public, including but not limited to Plaintiffs herein.

557. The conduct of the individually named Defendants Walling, Croft, Glasgow, and Johnson was committed pursuant to the customs, policies, and/or practices of Defendant City.

558. Each such custom, policy and/or practice, referenced above, was a moving force in the violations of Plaintiffs' constitutional rights, as set forth herein.

559. As a direct and proximate result of the aforementioned violations of Plaintiffs' constitutional rights pursuant to Defendant City of Flint's customs,

policies and/or practices, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

560.    Plaintiffs and Plaintiff Class members are further entitled to  an award costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## COUNT VII—CAUSE OF ACTION
## PROFESSIONAL NEGLIGENCE: BY ALL
## PLAINTIFFS AGAINST LAN PC, LAN INC. & LAD

561.    Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

562.    The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs and their property.

563.    The LAN Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan. Additionally, the LAN Defendants, in undertaking to perform services related to the Flint water supply and in making

public statements about the safety of the Flint water supply, assumed a duty directly to the Plaintiffs and the Class.

564.   Based on their undertaking, the LAN Defendants had a duty to Plaintiffs, as residents and property owners in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

565.   The LAN Defendants also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

566.   The LAN Defendants' duties to Plaintiffs included, but were not limited to, a duty to properly administer the placing of the FWTP into operation using the Flint River as a primary source, a duty to do so in such a manner that would not endanger the health and property of Plaintiffs, a duty to take other actions consistent with the greater degree of knowledge and skill possessed by design professionals, and/or the duty to report to public authorities the dangers posed to public health and

property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

567. Plaintiffs relied on the LAN Defendants to perform their duties.

568. The LAN Defendants failed to exercise reasonable care in performing their duties, including in preparing for and executing the transition from treated DWSD water to untreated Flint River water, which was unsafe, toxic and unsuitable for human use.

569. The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

570. The LAN Defendants failed to exercise reasonable care when they did not ensure that corrosion control measures were implemented in a water supply system containing lead pipes that was being transitioned to a highly corrosive water source.

571. The LAN Defendants failed to exercise reasonable care when they failed to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes, which also would cause the release of lead and *legionella*.

572. The LAN Defendants failed to exercise reasonable care when they did not forcefully recommend the addition of phosphates to the water.

573. The LAN Defendants failed to exercise reasonable care when they

196

failed to recommend that the City use a coagulant other than ferric chloride.

574. The LAN Defendants failed to exercise reasonable care for other reasons alleged throughout this complaint, including ignoring at least several red flags that should have alerted them to the relevant problems.

575. The LAN Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result.

576. The LAN Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

577. The LAN Defendants' conduct was malicious, willful, and wanton as to disregard the Plaintiffs' rights, for the following reasons:

- The LAN Defendants knew that Plaintiffs were relying upon them to provide Flint with safe water;

- The LAN Defendants knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

- The LAN Defendants knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

578. Plaintiffs suffered harm resulting from the LAN Defendants' failures to exercise reasonable care.

197

579.   The LAN Defendants' failure(s) to exercise reasonable care was direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

580.   The LAN Defendants are liable to Plaintiffs for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

581.   As a direct and proximate result of the LAN Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

582.   As a result of the foregoing, in addition to compensatory damages, Plaintiffs seek an award of exemplary damages from the LAN Defendants so as to deter such morally reprehensible conduct by the LAN Defendants and similarly situated corporations in the future.

## COUNT VIII—CAUSE OF ACTION
## PROFESSIONAL NEGLIGENCE: BY ALL
## PLAINTIFFS AGAINST THE VEOLIA DEFENDANTS

583.   Plaintiffs and Plaintiff Class incorporate by reference the allegations set

forth in all foregoing paragraphs, as if fully set forth herein.

584.  Plaintiffs bring this cause of action against the Veolia Defendants.

585.  The Veolia Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

586.  The Veolia Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan. Additionally, the Veolia Defendants, in undertaking to perform services related to the Flint water supply and in making public statements about the safety of the Flint water supply, assumed a duty directly to the Plaintiffs and the Class.

587.  Based on their undertaking, the Veolia Defendants had a duty to Plaintiffs to exercise reasonable care.

588.  Plaintiffs relied on the Veolia Defendants to perform the duty to inspect the City's water supply to make sure that it was safe.

589.  The Veolia Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

590.  The Veolia Defendants failed to exercise reasonable care in inspecting the city's water system and issuing their interim and final reports.

591.  The Veolia Defendants failed to exercise reasonable care when they declared that Flint's drinking water met federal and/or state and/or all applicable

requirements.

592.   The Veolia Defendants failed to exercise reasonable care when they represented that Flint's drinking water was safe.

593.   The Veolia Defendants failed to exercise reasonable care when they discounted the possibility that problems unique to Flint's water supply were causing medical harm and property and monetary damage.

594.   The Veolia Defendants failed to exercise reasonable care when they failed to warn about the dangers of lead leaching into Flint's water system.

595.   The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

596.   The Veolia Defendants failed to exercise reasonable care when they failed to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes, which also would cause the release of lead and *legionella*.

597.   The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the addition of phosphates to the water.

598.   The Veolia Defendants failed to exercise reasonable care when they failed to recommend that the City use a coagulant other than ferric chloride.

599.   The Veolia Defendants failed to exercise reasonable care through other

conduct described in this complaint.

600.    The Veolia Defendants' conduct and/or failure(s) to act constitute gross negligence because it was so reckless that it demonstrated a substantial lack of concern for whether an injury or harm would result.

601.    The Veolia Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

602.    The Veolia Defendants' conduct was malicious, willful, and wanton as to disregard the Plaintiffs' rights for the following reasons:

- The Veolia Defendants knew or should have known that Plaintiffs were relying upon them to provide Flint with safe water;

- The Veolia Defendants knew or should have known that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

- The Veolia Defendants knew or should have known that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

603.    Plaintiffs suffered harm resulting from the Veolia Defendants' failures to exercise reasonable care to protect its undertaking.

604.    The Veolia Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

605.   The Veolia Defendants are liable to Plaintiffs for all harms resulting to them from the Veolia Defendants' failures to exercise reasonable care.

606.   As a direct and proximate result of the violations of the Veolia Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

607.   Further, as a direct and proximate cause of the Veolia Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution in property values, and other property and monetary damages.

608.   As a result of the foregoing, in addition to compensatory damages, Plaintiffs seek an award of exemplary damages from the Veolia Defendants.

## COUNT IX—CAUSE OF ACTION
## 42 U.S.C. § 1983—14TH AMENDMENT SUBSTANTIVE DUE PROCESS— STATE CREATED DANGER: BY ALL PLAINTIFFS AGAINST GOVERNMENT DEFENDANTS

609.   Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

610.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

611.   The Government Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and the Government Defendants did so with an extreme degree of culpability.

612.   The Government Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm, and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited, and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

613.   The Government Defendants were aware that their conduct could result

203

in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

614. This conduct was reckless, deliberately indifferent, and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the Government Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

615. The dangers and risks of harm were discreet and special to Plaintiffs, as Flint water users and property owners in particular, and not risks affecting the public at large.

616. The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by the Government Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

617. These actions of the Government Defendants, all under color of law, constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Plaintiffs.

618. As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which through the creation of state created danger, violated Plaintiffs' fundamental property and/or liberty rights, as alleged in

this Consolidated Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

619.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

## COUNT X—CAUSE OF ACTION
## FRAUD: BY ALL PLAINTIFFS
## AGAINST THE VEOLIA DEFENDANTS

620.    Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

621.    Upon information and belief, and as further set forth above, the Veolia Defendants made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the risks to

205

public health and property damage.

622.   Upon information and belief, the false and material representations include, but are not limited to, statements in the Veolia Defendants' 2015 Interim Report that:

- Flint's water was "safe" and "in compliance with drinking water standards[.]"

- The observed discoloration was merely aesthetic and not indicative of water quality or health problem, and

- Medical problems are because "[s]ome people may be sensitive to any water.

623.   Upon information and belief, the material representations and other acts and omissions of the Veolia Defendants constitute fraud.

624.   Upon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity.

625.   Upon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act and rely on them, which Plaintiffs did.

626.   As a direct and proximate result of the Veolia Defendants' fraudulent representations, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

206

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

## COUNT XI—CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS: BY
## INDIVIDUAL PLAINTIFFS AGAINST ENGINEERING DEFENDANTS

627. Individual Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

628. The Engineering Defendants owed Individual Plaintiffs and the Class a duty to exercise reasonable care.

629. As alleged herein, the Engineering Defendants failed to exercise reasonable care, which had the direct and foreseeable result of causing Individual Plaintiffs and the Class severe emotional distress, embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

## COUNT XII—CAUSE OF ACTION
## NEGLIGENCE: BY ALL PLAINTIFFS AGAINST
## ENGINEERING DEFENDANTS

630. Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

207

631.   The Engineering Defendants owed Plaintiffs and the Class a duty to exercise reasonable care.

632.   As alleged herein, the Engineering Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

633.   Upon learning of the release of the contaminants, the Engineering Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class, and their property and/or to act reasonably to minimize the damage to Plaintiffs, the Class, and their property.

634.   The Engineering Defendants breached that duty by failing to act reasonably in providing Plaintiffs and the Class usable water. Furthermore, the Engineering Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy any contamination after it occurred.

635.   The Engineering Defendants further breached that duty by failing to timely notify the Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the homes, businesses, and rental properties of Plaintiffs and the Class.

636.   As a result of the Engineering Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective

208

and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of the Engineering Defendants' negligence for many years into the future.

637. The Engineering Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

638. The Engineering Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

639. As a direct and proximate result of the Engineering Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

209

## COUNT XIII—CAUSE OF ACTION
## GROSS NEGLIGENCE: BY ALL PLAINTIFFS AGAINST THE
## ENGINEERING DEFENDANTS

640.  Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

641.  The Engineering Defendants owed Plaintiffs and the Class a duty to exercise reasonable care. Upon learning of the release of the contaminants, the Engineering Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property.

642.  As alleged herein, the Engineering Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and *legionella*, to be provided to Plaintiffs and the Class in contravention of federal environmental statutes and guidelines. As such, the Engineering Defendants gross negligently, recklessly, willfully, wantonly, and/or intentionally contaminated drinking water in and around the real property of Plaintiffs and the Class.

643.  The Engineering Defendants owed Plaintiffs and the Class a duty to act with reasonable care in undertaking their obligations. As professional engineers, the Engineering Defendants had a duty to act as an engineer of ordinary learning, judgment, or skill would. As more fully described herein, the Engineering

210

Defendants breached their duties of care by (1) failing to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the residents' homes; (2) failing to recognize at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measures; (3) failing to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule; (4) failing to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' disease; and (5) advising the City to use or even increase the dosage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased.

644.  Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class.

645.  As a direct and proximate result of the Engineering Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

211

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

## COUNT XIV—CAUSE OF ACTION
## GROSS NEGLIGENCE: BY ALL PLAINTIFFS AGAINST DEFENDANTS SNYDER, DILLON, LYON, SHEKTER-SMITH, ROSENTHAL, BUSCH, COOK, PRYSBY, WURFEL, WRIGHT, KURTZ, EARLEY, AMBROSE, CROFT, JOHNSON, & GLASGOW

646. Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

647. Defendants Snyder, Dillon, Lyon, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow ("Governmental Gross Negligence Defendants") had a duty to avoid reckless conduct in carrying out their duties as public employees.

648. The Governmental Gross Negligence Defendants engaged in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

649. The reckless nature of the negligent conduct of these Defendants deprives them of a governmental immunity defense. MCL 691.1407(c).

650. This conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury occurred because these Defendants:

- Participated in decisions to substitute safe DWSD water with Flint River Water that they knew was unsafe and dangerous;

212

- Misrepresented to the public and governmental agencies through drinking water tests or epidemiolocal reports that the water was safe when the test results or reports indicated that this was not true;

- Concealed from the public information about the dangerous qualities of the drinking water;

- Informed the public that the water was safe to use knowing that this was false information which could result in serious injury to the consumer;

- Exacerbated the seriousness of the harm by concealing the true nature of the unsafe condition of the drinking water;

- Engaged in criminal conduct which was designed to conceal from the public and governmental agencies the true nature of the harm caused by their reckless conduct.

651. The Governmental Gross Negligence Defendants' conduct was reckless after the re-connection to City of Detroit water in October 2015 because Defendants continued to knowingly permit Flint water users to be exposed to dangerous water when they knew that the DWSD was still not safe to use because of the damage to the infrastructure.

652. As a direct and proximate result of the Governmental Gross Negligence Defendants' actions and/or omissions, as alleged in this Consolidated Amended Complaint, Plaintiffs have suffered extensive damages, past, present and future, including, but not limited to:

- Serious and in some cases life threatening and irreversible bodily injury;

213

- Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiffs request the following relief from the Court:

a.  An order certifying damages classes pursuant to Fed. R. Civ. P 23(b)(3), injunctive relief classes pursuant to Fed. R. Civ. P. 23(b)(2), and an issue class pursuant to Fed. R. Civ. P. 23(c)(4);

b.  An order declaring the conduct of the Government Defendants unconstitutional;

c.  An injunctive order to remediate the harm caused by the Government Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Class members for a period of time deemed appropriate by the Court;

d.  Appointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, criminal and juvenile justice evaluations;

e.  An order for an award of compensatory damages;

f.  An order for an award of punitive damages;

g.  An order for an award of exemplary damages;

214

h. An order for equitable relief;

i. An order for pre-judgment and post-judgment interest;

j. An order for an award of reasonable attorney's fees and litigation expenses; and

k. An order for all such other relief the court deems equitable.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiffs demand a trial by jury as to all those issues triable as of right.

Dated: October 5, 2018

Respectfully submitted,

/s/ Theodore J. Leopold
Theodore J. Leopold
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard
Suite 220
Palm Beach Gardens, FL 33410
(561) 515-1400 Telephone
tleopold@cohenmilstein.com

Kit A. Pierson
Joseph M. Sellers
Emmy L. Levens
Jessica Weiner
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
kpierson@cohenmilstein.com
jsellers@cohenmilstein.com
elevens@cohenmilstein.com
jweiner@cohenmilstein.com

Vineet Bhatia
Shawn Raymond
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street
Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

/s/ Michael L. Pitt
Michael L. Pitt
Cary S. McGehee
**PITT MCGEHEE PALMER & RIVERS, P.C.**
117 West 4th Street
Suite 200
Royal Oak, MI 48067
(248) 398-9800 Telephone
mpitt@pittlawpc.com
cmcgehee@pittlawpc.com

Paul Novak (P39524)
Diana Gjonaj (P74637)
Gregory Stamatopoulos (P74199)
**WEITZ & LUXENBERG, P.C.**
3011 West Grand Boulevard
Suite 2150
Detroit, MI 48226
(313) 800-4170 Telephone
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Robin L. Greenwald
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
(212) 558-5500 Telephone
rgreenwald@weitzlux.com

216

Stephen Morrissey
Jordan Connors
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave.
Suite 3800
Seattle, WA 98101
(206) 516-3880 Telephone
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com

Peretz Bronstein
Shimon Yiftach
**BRONSTEIN, GEWIRTZ &
  GROSSMAN, LLC**
60 East 42nd Street
Suite 4600
New York, NY 10165
(212) 697-6484 Telephone
peretz@bgandg.com
shimony@bgandg.com

Bradford M. Berry
Khyla D. Craine
Anson C. Asaka
**NAACP**
4805 Mt. Hope Dr.
Baltimore, MD 21215
(410) 580-5777 Telephone
bberry@naacpnet.org
kcraine@naacpnet.org
aasaka@naacpnet.org

Kathryn P. Hoek
**SUSMAN GODFREY, L.L.P.**
1901 Avenue of the Stars
Suite 950
Los Angeles, CA 90067
(310) 789-3100 Telephone
khoek@susmangodfrey.com

Esther E. Berezofsky
**BEREZOFSKY LAW GROUP, LLC**
Woodland Falls Corporate Center
210 Lake Drive East
Suite 101
Cherry Hill, NJ 08002
(856) 667-0500 Telephone
eberezofsky@eblawllc.com

Teresa Caine Bingman (P56807)
**THE LAW OFFICES OF TERESA
A. BINGMAN, PLLC**
4131 Okemos Road
Suite 12
Okemos, MI 48864
(877) 957-7077 Telephone
tbingman@tbingmanlaw.com

William Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
**GOODMAN & HURWITZ PC**
1394 E. Jefferson Ave
Detroit, MI 48207
(313) 567-6170 Telephone
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com

Deborah A. LaBelle (P31595)
**LAW OFFICES OF DEBORAH A.
LABELLE**
221 N. Main St.
Suite 300
Ann Arbor, MI 48104
(734) 996-5620 Telephone
deblabelle@aol.com

217

Neal H. Weinfield
**THE DEDENDUM GROUP**
(312) 613-0800 Telephone
nhw@dedendumgroup.com

Cirilo Martinez (P65074)
**LAW OFFICE OF CIRILO MARTINEZ, PLLC**
3010 Lovers Lane
Kalamazoo, MI 49001
(269) 342-1112 Telephone
martinez_cirilo@hotmail.com

David J. Shea
**SHEA AIELLO, PLLC**
26100 American Drive
2nd Floor
Southfield, MI  48034
(248) 354-0224 Telephone
david.shea@sadplaw.com

Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
**MCALPINE PC**
3201 University Drive
Suite 100
Auburn Hills, MI  48326
(248) 373-3700 Telephone
mlmcalpine@mcalpinelawfirm.com
jeblake@mcalpinelawfirm.com

Trachelle C. Young (P63330)
**TRACHELLE C. YOUNG & ASSOCIATES PLLC**
2501 N. Saginaw St.
Flint, MI 48505
(810) 239-6302 Telephone
trachelleyoung@gmail.com

Brian McKeen (P34123)
Claire Vergara (P77654)
**McKEEN & ASSOCIATES, PC**
645 Griswold Street
Suite 4200
Detroit, MI 48226
(313) 961-4400 Telephone
bjmckeen@mckeenassociates.com
cvergara@mckeenassociates.com

Cynthia M. Lindsey (P37575)
Shermane T. Sealey (P32851)
**CYNTHIA M. LINDSEY & ASSOCIATES, PLLC**
8900 E. Jefferson Avenue
Suite 612
Detroit, MI 48214
(248) 766-0797 Telephone
cynthia@cmlindseylaw.com
shermane@cmlindseylaw.com

Andrew P. Abood (P43366)
**ABOOD LAW FIRM**
246 East Saginaw Street
Suite One
East Lansing, Michigan 48823
(517) 332-5900 Telephone
andrew@aboodlaw.com

218

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above case were served via the ECF filing system on October 5, 2018.


Dated: October 5, 2018            */s/ Emmy L. Levens*
                                  Emmy L. Levens
                                  **COHEN MILSTEIN SELLERS
                                  & TOLL PLLC**
                                  1100 New York Ave. NW
                                  Suite 500
                                  Washington, DC 20005
                                  (202) 408-4600 Telephone
                                  elevens@cohenmilstein.com