# EXHIBIT F



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



RICK SNYDER
GOVERNOR

DAN WYANT
DIRECTOR

March 20, 2014

<u>VIA E-MAIL</u>

Mr. Peter Bade, Chief legal Officer
City of Flint
1101 South Saginaw Street
Flint, Michigan 48502-1757

Dear Mr. Bade:

SUBJECT:   Consent Order (Order); City of Flint; 5200 Bray Road, Flint, Michigan;
Waste Data System Number 468691

Enclosed please find a fully executed original of the Consent Order between the City of
Flint and the Department of Environmental Quality (DEQ).  The Consent Order became
effective on March 20, 2014, the date it was signed by the Chief of the Office of Waste
Management and Radiological Protection.  Please note that the civil penalty required by
Paragraph 9.1 of the Consent Order is due by April 30, 2014.

Thank you for your cooperation in resolving this matter.

Sincerely,

John Craig, Chief
Enforcement Section
Office of Waste Management and
  Radiological Protection
517-284-6546

Enclosure
cc/enc:  Mr. Michael Robinson, Warner Norcross & Judd, LLP
Mr. Robert Reichel, Department of Attorney General
Mr. Steven Busch, DEQ
Mr. Lawrence Bean/Mr. Jim Arduin, DEQ
Mr. Richard Brim, DEQ

STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
OFFICE OF WASTE MANAGEMENT AND RADIOLOGICAL PROTECTION

In the matter of the
administrative proceedings against
City of Flint, doing business at
5200 Bray Road, Genesee Township,
Genesee County, Michigan

OWMRP Order No. 115-O1-14

_____/

## CONSENT ORDER

This proceeding results from unresolved allegations specified in the Letters of Warning, (LOWs) issued on April 9, 2001, and February 14, 2002, and Compliance Communications, dated April 15, 1997, April 19, 2002, September 8, 2003, October 28, 2003 and January 18, 2011, by the Department of Environmental Quality ("DEQ") (Attachment 1). The DEQ, Office of Waste Management and Radiological Protection ("OWMRP") alleges that the city of Flint ("Respondent") at 5200 Bray Road, Genesee Township, Genesee County, Michigan (the "Site"), placed or allowed the placement of solid waste in an Open Dump at the Site, or otherwise violated Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, Michigan Compiled Laws ("MCL") 324.101 *et seq.* ("NREPA"), and the administrative rules promulgated under Part 115. The Respondent and the DEQ agree to resolve the alleged violations set forth in the above-referenced LOWs and Compliance Communications by entry of this Consent Order.

## STATEMENT OF PURPOSE

In entering into this Consent Order, the mutual objectives of the Respondent and the DEQ are to address the Open Dump created at the Site, eliminate any surface water discharge from the Site to the Cornwell Drain, and allow the Respondent to reconstruct the system used to manage drinking water treatment plant ("WTP") residuals so that Respondent may resume dewatering lime sludge at the site.

To accomplish these objectives, the Respondent agrees to determine the horizontal and vertical extent and character of any solid waste historically disposed of at the Site including, but not

-1-

limited to, the WTP residuals and any solid wastes identified as being disposed of in the above-referenced LOWs and Compliance Communications. Consistent with the waste characterization and other investigation data, the Respondent agrees to either remove and dispose of some or all of the solid waste to be taken to a disposal area that is licensed by the DEQ or, alternatively, in lieu of complete removal of all solid waste, all solid waste that is left in place will receive final cover over it in accordance with the requirements of Part 115 and this Consent Order. In addition, the Respondent agrees to determine, by conducting a remedial investigation, whether any response activities must be taken to address contamination caused by the unauthorized disposal of solid waste at the Site. The Respondent also agrees to manage the historically accumulated lime sludge at the Site as solid waste and dispose of it in accordance with Part 115 requirements, unless it is determined by proper characterization that the historically accumulated lime sludge is not solid waste or that it can be authorized for use on farmland applied at appropriate agronomic rates or for some other beneficial reuse, or that it can be left in place. The Respondent agrees to include a plan for the removal of the historically accumulated lime sludge at the Site as a condition of this Consent Order.

Finally, if the Respondent proposes to reconstruct the system for the dewatering of WTP residuals at the Site, then the Respondent agrees to submit plans and specifications and secure from the DEQ, Office of Drinking Water and Municipal Assistance ("ODWMA"), a public water supply construction permit issued under Section 4 of the Safe Drinking Water Act, 1976 PA 399, as amended ("Act 399"), MCL 325.1001 *et seq.*, and the administrative rules under Act 399 prior to initiating any construction, alteration, addition, or improvement to such system. If it is determined that the historically disposed WTP lime sludge and other residuals are not solid wastes, then an acceptable residuals management plan for the historically disposed of lime sludge and other WTP residuals, as well as lime sludge and any other WTP residuals generated in the future, must also be included as part of the construction permit application. The Respondent plans to participate in the Karegnondi Water Authority ("KWA") to receive source water from Lake Huron for its drinking water supply and the use of its WTP to meet treatment requirements under Act 399. It will be approximately four years before the KWA infrastructure is built and water is available to the Respondent from KWA. The Respondent plans to use the Flint River as its source water supply for its WTP until KWA water is fully available. However, the Respondent may continue to use water from the Flint River (i) as a supplement to KWA water and (ii) as a back up to KWA water if the need arises. Public improvement projects under Act 399 are required to be completed for the Respondent to

receive water from the KWA.  The Respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional WTP public improvements, source water protection public improvements, and public improvements to obtain a back-up water supply, in order to comply with Act 399.

## I.  DEFINTIONS

1.1   "Act 399" means the Safe Drinking Water Act, 1976 PA 399, as amended, MCL 325.1001 *et seq.*

1.2   "FAM" means the financial assurance mechanism acceptable to the DEQ to assure payment for monitoring, operation and maintenance, oversight, and other costs determined by the DEQ to be necessary to ensure the effectiveness and integrity of the remedial action.  The FAM is a component of the Remedial Action Plan.

1.3   "NREPA" means the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, MCL 324.101 *et seq.*

1.4   "Open Dump" means any area, place, or property where solid waste has been illegally disposed of or abandoned in place of other disposal.  For the purposes of this Consent Order, the Open Dump includes any solid waste historically disposed of at the Site.

1.5   "Part 115" means Part 115, Solid Waste Management, of the NREPA, MCL 324.11501 *et seq.*, and the Part 115 Administrative Rules.

1.6   "Part 115 Rules" means the administrative rules promulgated under Part 115.

1.7   "Part 201" means Part 201, Environmental Remediation, of the NREPA, MCL 324.20101 *et seq.*, and the Part 201 Administrative Rules.

1.8   "Residuals Management Plan" means a DEQ-approved plan to address both historical and future accumulations of lime sludge and other WTP residuals from the Site.

1.9    "Site" means the property located at 5200 Bray Road, Genesee Township, Genesee County, Michigan. The Site occupies approximately 76 acres of land adjacent to the Cornwell Drain on its northern boundary. The Cornwell Drain is a tributary to the Flint River.

1.10   "Solid Waste" as used in this Consent Order means "solid waste" as defined in Part 115 of the NREPA, MCL 324.11506(1), including any solid waste that has been disposed of at the Site and the lime sludge from WTP operations conducted by the Respondent.

## II. STIPULATIONS

The Respondent and the DEQ stipulate as follows:

2.1    Pursuant to its authority under Part 115, the DEQ promulgated administrative rules necessary to implement Part 115. These rules are set forth in the 2005 *Annual Administrative Code Supplement* (AACS), R 299.4101 *et seq.* ("Part 115 Rules").

2.2    Pursuant to its authority under Act 399, the DEQ promulgated administrative rules necessary to implement Act 399. These rules are set are set forth in the 2009 AACS, R 325.10101 *et seq.* ("Act 399 Rules").

2.3    Pursuant to the NREPA and Executive Order No. 2011-1, the Director of the DEQ ("Director") is the state official and the DEQ is the state agency charged with the administration and enforcement of Part 115 and Act 399. This Consent Order is authorized under MCL 324.11519(2) and MCL 325.1022.

2.4    The Respondent is a "person" as defined by MCL 324.301(g) and MCL 325.1002(m).

2.5    The Respondent owns and operates the Site. The Respondent is a municipality in the state of Michigan.

2.6    The Site consists of a WTP residuals area and contains various water level control structures and discharge points to the Cornwell Drain, and an area where solid waste has been disposed of in the Open Dump. Attachment 2 is an aerial schematic of the

-4-

Site and shows the approximate boundaries of the WTP residuals area and the Open Dump.

2.7     The Respondent stipulates that the issuance and entry of this Consent Order is proper and acceptable. This Consent Order shall be considered a final order of the DEQ and shall become effective on the date it is signed by the Chief of the OWMRP ("Office Chief"), designee of the Director, pursuant to MCL 324.301(b) of the NREPA.

2.8     The Respondent agrees to fully and strictly comply with all provisions of Part 115 and Act 399, the Part 115 Rules, the Act 399 Rules, and all other applicable state and federal statutes.

2.9     The Respondent and the DEQ agree that the signing of this Consent Order is for settlement purposes only and does not constitute an admission by the Respondent of the allegations contained in the above-referenced LOWs and Compliance Communications or that the law has been violated.

## II.   COMPLIANCE PROGRAM

In order to resolve the violations alleged in the above-referenced LOWs and Compliance Communications, and this Consent Order, the Respondent shall achieve and maintain compliance with the requirements specified below in accordance with the following schedule:

3.1     On and after the effective date of this Consent Order, the Respondent shall use best efforts to ensure that the Site is secure and that, pursuant to R 299.4128(1), illegal dumping does not occur at the Site.

3.2     Within sixty (60) days after the effective date of this Consent Order, the Respondent shall plug or cap the outlet tower identified in Attachment 2 and take all necessary actions to terminate any surface water discharge to the Cornwell Drain. The Respondent will not place the outlet tower back into service unless proper permits are acquired.

3.3     Within ninety (90) days after the effective date of this Consent Order, the Respondent shall submit to the ODWMA, for review and approval, an administratively complete Act 399 construction permit application for the reconstruction of the non-mechanical dewatering system for WTP residuals at the Site, including provisions and a schedule for the construction of a physical barrier that will separate the area proposed for the reconstructed dewatering system from the area where the other solid waste is located on the Site.  The permit application will clearly identify any areas that will not be used as part of the reconstructed non-mechanical dewatering system and identify any slurry inlet points located outside the system footprint so such inlet points can be permanently capped by the Respondent.  The permit application will also include a basis of design for the management of WTP residuals within the system.

3.4     Within ninety (90) days after the effective date of this Consent Order, the Respondent shall submit to the OWMRP, for review and approval, any portion of the dewatering system residuals management plan submitted to the ODWMA that is required to comply with Part 115.

3.5     Within two hundred and forty (240) days of the effective date of this Consent Order, the Respondent shall submit to the DEQ, for review and approval, a report that summarizes the current conditions at the Site ("Site Conditions Summary Report") " or ("SCSR"). The SCSR shall include, at a minimum, the following:

    a.  Identification of the horizontal and vertical extent of solid waste at the Site;

    b.  Estimates, in cubic yards, of the volumes of un-impacted concrete, lime, and other solid waste at the Site;

    c.  Characterization of the solid wastes at the Site including data to support the characterizations;

    d.  Identification, characterization, and delineation of any environmental contamination that is found at the Site;

e.  Identification of the general geologic and hydrogeologic conditions at the Site; and

f.  Copies of any DEQ-approved inertness, other designations, and/or DEQ-approved "other beneficial reuse" authorizations obtained by the Respondent.

3.6   If the SCSR fails to delineate the horizontal and vertical extent of solid waste, or fails to delineate any contamination identified at the Site, or fails to support conclusions identified in the report, or is disapproved for other specified deficiencies, the Respondent shall develop and implement a remedial investigation.  A complete and technically adequate work plan for a remedial investigation ("Remedial Investigation Work Plan") shall be submitted to the DEQ within sixty (60) days of the DEQ's notification that the Remedial Investigation Work Plan is necessary.  Upon approval by the DEQ, the Respondent shall implement the Remedial Investigation Work Plan in accordance with the schedule contained therein.  The Respondent shall submit, for review and approval by DEQ, final results and conclusions of the remedial investigation in the form of a written report ("Remedial Investigation Report") within thirty (30) days of completion of the remedial investigation.

3.7   If the DEQ-approved SCSR or Remedial Investigation Report identifies no environmental contamination above applicable criteria at the Site and the only issue to address is the presence of solid waste identified at the Site, the Respondent may elect to remove and properly dispose of the solid waste identified at the Site by completing the following requirements:

a.  Within thirty (30) days of receipt of written approval of the SCSR or Remedial Investigation Report by the DEQ, the Respondent shall submit to the DEQ for review and approval, a Solid Waste Removal Plan "(SWRP)" for the Site.  This plan will provide details regarding the proposed removal and legal disposal of the solid waste identified at the Site.  In addition, the plan shall include a proposed schedule for the waste removal and disposal and a proposed waste removal confirmation plan.

b.   Within sixty (60) days of completion of the SWRP, the Respondent shall submit to
the DEQ, for review and approval, a Solid Waste Removal Report for the Site.
This report will contain summaries of waste volumes, final disposition of wastes,
copies of landfill receipts, copies of paperwork required by "other beneficial reuse"
authorizations, and waste removal confirmation sampling results.

3.8    If the Respondent identifies environmental contamination above applicable criteria
and/or elects to leave the solid waste in place at the Site, then the Respondent shall
complete the requirements of Paragraphs 3.9 through 3.12, as follows:

3.9    The Respondent shall submit to the DEQ, for review and approval, an Assessment of
Corrective Measures ("ACM") that is in accordance with R 299.4443 of the Part 115
Rules within ninety (90) days of written approval by the DEQ of the Remedial
Investigation Report.  The ACM shall include an analysis of each potential remedy
considered, identify the final remedial action proposed by the Respondent, and provide
an explanation of how that proposed remedial action will meet applicable cleanup criteria
of Part 201 and be in compliance with Part 115 and the Part 115 Rules.

3.10   The Respondent shall submit to the DEQ, for review and approval, a complete and
technically adequate Remedial Action Plan ("RAP") for the Open Dump that is in
compliance with the requirements of R 299.4444 of the Part 115 Rules within one
hundred twenty (120) days of receipt of written approval by the DEQ of the ACM.  The
RAP shall include a detailed schedule for implementation and a FAM, if required.  The
RAP shall be consistent with the results of the remedial investigation and any other
monitoring data collected, reports submitted, and/or investigations conducted prior to
submittal of the RAP.  The RAP, when implemented, shall comply with the applicable
cleanup criteria of Part 201 and, upon approval of the plan by the DEQ, the Respondent
shall implement the approved RAP in accordance with the schedule contained therein.

3.11   If, in accordance with the approved ACM, the Respondent elects to cap and close
in-place the solid waste identified at the Site, the Respondent shall, as part of the RAP,
submit to the DEQ, for review and approval, a Capping and Closure Plan and schedule
for implementation ("CCP") and a Postclosure Plan and schedule for implementation
("PCP") for the Site that are in compliance with the requirements of R 299.4425 and

-8-

R 299.4447, respectively, of the Part 115 Rules and Part 115 to the extent required. Upon DEQ approval of the CCP and the PCP, the Respondent shall implement the plans in accordance with the schedules contained therein.  If the Respondent lacks the expertise and/or manpower to conduct the work in accordance with the DEQ-approved CCP, the PCP, and the Part 115 Rules, the Respondent shall contract the work to be performed by a qualified contractor.

3.12    If, in accordance with an approved ACM, the Respondent elects to cap and close in-place the solid waste identified at the Site, the Respondent shall, as part of the RAP, submit to the DEQ, for review and approval, a Hydrogeologic Monitoring Plan and monitoring schedule ("HMP") for the Site that complies with R 299.4904, R 299.4905, R 299.4906, R 299.4907, and R 299.4908 of the Part 115 Rules, if required.  Upon approval by the DEQ, the Respondent shall implement the HMP in accordance with the schedule contained therein. In addition, the Respondent may be required to provide appropriate financial assurance as required by Part 115.

3.13    The Respondent has chosen to use its WTP to supply water to its customers and discontinue using the city of Detroit Water and Sewerage Department ("DWSD") after receipt of a notice of termination of service from DWSD.  In order for the Respondent to continue to use the WTP, the Respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional WTP public improvements, source water protection public improvements, and public improvements to obtain a back-up water supply, in order to comply with Act 399.

IV.  DEQ APPROVAL OF SUBMITTALS

4.1    For any work plan, proposal, or other document, excluding applications for permits or licenses, that are required by this Consent Order to be submitted to the DEQ by the Respondent, the following process and terms of approval shall apply.

4.2    To be approved by the DEQ, any work plan, proposal, or other document required to be submitted by this Consent Order shall include all of the information required by the

applicable statute and/or rule and all of the information required by the applicable paragraph(s) of this Consent Order.

4.3    Upon DEQ approval, or approval with modifications, of a work plan, proposal, or other document, such work plan, proposal, or other document shall be incorporated by reference into this Consent Order and shall be enforceable in accordance with the provisions of this Consent Order.

4.4    In the event the DEQ disapproves a work plan, proposal, or other document, it shall notify the Respondent, in writing, of the specific reasons for such disapproval. The Respondent shall submit, within sixty (60) days of receipt of such disapproval, a revised work plan, proposal, or other document that adequately addresses the reasons for the DEQ's disapproval.

4.5    In the event the DEQ approves with specific modifications, a work plan, proposal, or other document, it shall notify the Respondent, in writing, of the specific modifications required to be made to such work plan, proposal, or other document prior to its implementation and the specific reasons for such modifications. The DEQ may require the Respondent to submit, prior to implementation and within sixty (60) days of receipt of such approval with specific modifications, a revised work plan, proposal, or other document that adequately addresses such modifications.

4.6    A finding of approval or approval with modification of a submission shall not be construed to mean that the DEQ concurs with any of the conclusions, methods, or statements in the submission or warrants that the submission comports with law.

4.7    Failure by the Respondent to submit an approvable work plan, proposal, or other document within the applicable time period specified above shall subject the Respondent to the enforcement provisions of this Consent Order including, but not limited to, the stipulated penalty provisions commencing on the date the revised work plan, proposal, or other document was due and accumulating until an approvable work plan, proposal, or other document is submitted.

4.8    Any delays caused by the Respondent's failure to submit an approvable work plan, proposal, or other document when due shall in no way affect or alter the Respondent's responsibility to comply with any other deadline(s) specified in this Consent Order.

4.9    No informal advice, guidance, suggestions, or comments by staff of the DEQ regarding reports, work plans, proposals, plans, specifications, schedules, or any other writing submitted by the Respondent will be construed as relieving the Respondent of its obligation to obtain written approval of the DEQ if and when required by this Consent Order.

## V. <u>MODIFICATIONS AND EXTENSIONS</u>

5.1    At the request of the Respondent, a work plan, proposal, or other document approved or approved with specific modifications by the DEQ, with the exclusion of the specified deadlines set forth in Section III, Compliance Program, of this Consent Order, may be modified by the OWMRP Lansing District Supervisor.  Any modifications or extensions in regard to the Act 399 construction permit must be approved by the ODWMA Lansing District Supervisor

5.2    The Respondent and the DEQ agree that the Office Chief may, but in no circumstances is obligated to, grant the Respondent an extension of the specified deadlines set forth in this Consent Order.  Any extension shall be preceded by a timely written request, received by the DEQ no later than ten (10) business days prior to the pertinent deadline, which shall include:

a.    An identification of the specific deadline(s) of this Consent Order that will not be met.

b.    A detailed description of what will prevent the Respondent from meeting the deadline(s).

c.    A description of the measures the Respondent has taken and/or intends to take to meet the required deadline(s).

d.   The length of the extension requested and the specific date(s) on which the
obligation(s) will be met.

5.3   The Office Chief shall respond promptly to such requests and shall not unreasonably
withhold approval for such requests.

5.4   Any extension of the specified deadlines or other modifications and amendments of this
Consent Order shall require a formal written amendment of this Consent Order, shall be
signed by the Respondent and the DEQ ("Parties"), shall have as their effective date the
date on which they are signed by the Office Chief, and shall be incorporated into and
become an enforceable part of this Consent Order.

## VI.  REPORTING

6.1   With the exception of the Act 399 construction permit application required by
Paragraph 3.3 of this Consent Order, the Respondent shall submit all items required in
Section III, Compliance Program, to the Lansing District Supervisor, OWMRP, DEQ,
P.O. Box 30242, Lansing, Michigan 48909-7742, unless specifically directed otherwise
within this Consent Order.  The Respondent shall submit the Act 399 construction permit
application required by Paragraph 3.3 of this Consent Order and any documents that
pertain to, or are required by, the Act 339 application or permit to the Lansing District
Supervisor, ODWMA, DEQ, P.O. Box 30242, Lansing, Michigan 48909-7742. The cover
letter with each submittal shall identify the specific paragraph and requirement of this
Consent Order that the submittal is intended to satisfy.  If the address of a District
Supervisor changes, the Respondent will be notified and shall make all subsequent
submittals to any new address of which they are notified.

6.2   The Respondent shall verbally report any violation(s) of the terms and conditions of this
Consent Order to the OWMRP District Supervisor by no later than the close of the next
business day following detection of such violation(s) and shall follow such notification
with a written report within five (5) business days following detection of such violation(s).
The written report shall include a detailed description of the violation(s), the precise
cause or causes of the violation(s), a detailed description of any action(s) taken or
proposed to correct the violation(s), and a schedule for the implementation of any

-12-

proposed corrective action(s). The Respondent shall report any anticipated violation(s) of this Consent Order to the OWMRP District Supervisor in advance of the relevant deadlines, whenever possible.

## VII. RETENTION OF RECORDS

7.1 Upon request by an authorized representative of the DEQ, the Respondent shall make available to the DEQ all records, plans, logs, and other documents required to be maintained under this Consent Order, or pursuant to Part 115, the Part 115 Rules, Act 399, or the Act 399 Rules. Within 30 days of the effective date of this Consent Order, the Respondent shall designate, in writing, a location for retention of all such documents that is accessible to DEQ staff within normal business hours. All such documents shall be retained at the designated location for at least a period of three (3) years from the date of generation of the record unless a longer period of record retention is required by Part 115, the Part 115 Rules, Act 399, or the Act 399 Rules. If the designated location changes, the Respondent shall provide written notice of such to the DEQ.

## VIII. RIGHT OF ENTRY

8.2 The Respondent shall allow any authorized representative or contractor of the DEQ, upon presentation of proper credentials, to enter upon the premises of the Site at all reasonable times for the purpose of monitoring compliance with the provisions of this Consent Order. This paragraph in no way limits the authority of the DEQ to conduct tests and inspections pursuant to the NREPA and its rules or any other applicable statutory provision.

## IX. FINES, COSTS, AND PENALTIES

9.1 Within thirty (30) days of the effective date of this Consent Order, the Respondent shall pay the sum of $2,500 to the State of Michigan in settlement of the DEQ's claim for civil fines arising from the violations alleged in the above-referenced LOWs and Compliance Communications.

-13-

9.2 For each failure to comply with the provisions of Section III, Compliance Program, of this Consent Order, the Respondent shall pay to the State of Michigan stipulated penalties in an amount of $100 per violation per day for one (1) through seven (7) days of violation; $250 per violation per day for eight (8) through fourteen (14) days of violation; and $500 per violation per day for each day of violation thereafter. Stipulated penalties shall be paid within thirty (30) days after receiving a written demand made by the DEQ.

9.3 To ensure timely payment of any civil fines, penalties, and costs due under this Consent Order, the Respondent shall pay an interest penalty to the State of Michigan each time the Respondent fails to make a complete or timely payment. This interest penalty shall be based on the rate set forth at Section 6013(6) of the Revised Judicature Act, 1961 PA 236, as amended, MCL 600.6013(6), using the full increment of amount due as principal, and calculated from the due date for the payment until the delinquent payment is finally made in full.

9.4 The Respondent shall make all payments due under this Consent Order by certified or cashier's check made payable to the "State of Michigan" and mailed to the DEQ, Revenue Control Unit, P.O. Box 30657, Lansing, Michigan 48909-8157, or hand delivered to the DEQ, Revenue Control Unit, 1st Floor, Van Wagoner Building, 425 West Ottawa Street, Lansing, Michigan 48933. To ensure proper credit, all payments made pursuant to this Consent Order must include Payment Identification Number RMD40016 on the front of the check and/or in the cover letter with the payment.

9.5 The Respondent agrees not to contest the legality of the civil fine or the costs of surveillance and enforcement paid pursuant to this section. The Respondent further agrees not to contest the legality of any stipulated penalties or interest penalties assessed pursuant to this section but reserves the right to dispute the factual basis upon which a demand by the DEQ for stipulated penalties or interest penalties is made.

9.6 Liability for or payment of stipulated penalties pursuant to this Consent Order shall not preclude the State of Michigan from seeking injunctive relief or other relief for the Respondent's failure to comply with the requirements of this Consent Order and/or any permit(s) or license(s) required to comply with this Consent Order.

-14-

## X. DISPUTE RESOLUTION

10.1   Unless otherwise provided in this Consent Order, the dispute resolution procedures of this section shall be the exclusive mechanism to resolve disputes arising under, or with respect to, this Consent Order and shall apply to all provisions of this Consent Order. However, the procedures set forth in this section shall not apply to actions by the state of Michigan to enforce obligations of the Respondent that have not been disputed in accordance with this section.  Engagement of a dispute resolution between the Parties shall not be cause for the Respondent to delay the performance of any compliance requirements or response activity.  Any dispute that arises under this Consent Order shall in the first instance be the subject of informal negotiations between the Parties. The period of negotiations shall not exceed twenty (20) days from the date of written notice by any Party that a dispute has arisen, unless the time period for negotiations is modified by written agreement between the Parties.  The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute.  If agreement cannot be reached on any issue within this twenty- (20-) day period, the DEQ shall provide a written statement of its decision to the Respondent and, in the absence of initiation of formal dispute resolution by the Respondent under Paragraph 10.2, the DEQ position, as outlined in its written statement of decision, shall be binding on the Parties.

10.2   If the Respondent and DEQ cannot informally resolve a dispute under Paragraph 10.1, the Respondent may initiate formal dispute resolution by requesting a review of the disputed issues by the Office Chief. This written request must be filed with the Office Chief within fifteen (15) days of the Respondent's receipt of the DEQ's statement of decision that is issued at the conclusion of the informal dispute resolution procedure set forth in Paragraph 10.1. The Respondent's request shall state the issues in dispute; the relevant facts upon which the dispute is based; any factual data, analysis, or opinion supporting its position; and all supporting documentation upon which the Respondent bases its position.  Within fourteen (14) days of the Office Chief's receipt of the Respondent's request for a review of disputed issues, the Office Chief will provide a written statement of decision to the Respondent, which will include a statement of his/her understanding of the issues in dispute; the relevant facts upon which the dispute is based; any factual data, analysis, or opinion supporting her/his position; and all

-15-

supporting documentation relied upon by the Office Chief's review of the disputed issues. The Office Chief's review of the disputed issues may be extended by written agreement of the Parties.

10.3 The written statement of the Office Chief issued under Paragraph 10.2 shall be binding on the Parties unless, within fifteen (15) days after receipt of the DEQ's written statement of decision, the Respondent files a petition for judicial review in a court of competent jurisdiction that shall set forth a description of the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Order. Nothing in this Consent Order affects the limitations on the timing of judicial review of the DEQ decision regarding the selection, extent, or adequacy of any response activity.

10.4 An administrative record of the dispute shall be maintained by the DEQ. The administrative record shall include all of the information provided by the Respondent pursuant to Paragraph 10.1, as well as any other documents relied upon by the DEQ in making its final decision pursuant to Paragraph 10.2. Where appropriate, the DEQ shall allow submission of supplemental statements of position by the Parties to the dispute.

10.5 In proceeding on any dispute, the Respondent shall have the burden of demonstrating on the administrative record that the position of the DEQ is arbitrary and capricious or otherwise not in accordance with law. In proceedings on any dispute initiated by the Respondent, the Respondent shall bear the burden of persuasion on factual issues.

10.6 Notwithstanding the invocation of dispute resolution proceedings, stipulated penalties shall accrue from the first day of any failure or refusal to comply with any term or condition of this Consent Order, but payment shall be stayed pending resolution of the dispute. Stipulated penalties shall be paid within thirty (30) days after the resolution of the dispute. The Respondent shall pay that portion of a demand for payment of stipulated penalties that is not subject to dispute resolution procedures in accordance with and in the manner provided in Section IX, Fines, Costs, and Penalties, of this Consent Order.

## XI.  FORCE MAJEURE

11.1   The Respondent shall perform the requirements of this Consent Order within the time limits established herein unless performance is prevented or delayed by events that constitute a "Force Majeure." Any delay in the performance attributable to a "Force Majeure" shall not be deemed a violation of the Respondent's obligations under this Consent Order in accordance with this section.

11.2   For the purpose of this Consent Order, "Force Majeure" means an occurrence or nonoccurrence arising from causes not foreseeable, beyond the control of, and without the fault of the Respondent, such as:  an Act of God, untimely review of permit applications or submissions by the DEQ or other applicable authority, and acts or omissions of third parties that could not have been avoided or overcome by the Respondent's diligence and that delay the performance of an obligation under this Consent Order. "Force Majeure" does not include, among other things, unanticipated or increased costs, changed financial circumstances, or failure to obtain a permit or license as a result of the Respondent's actions or omissions.

11.3   The Respondent shall notify the DEQ, by telephone, within forty-eight (48) hours of discovering any event that causes a delay in its compliance with any provision of this Consent Order.  Verbal notice shall be followed by written notice within ten (10) calendar days and shall describe, in detail, the anticipated length of delay, the precise cause or causes of delay, the measures taken by the Respondent to prevent or minimize the delay, and the timetable by which those measures shall be implemented.  The Respondent shall adopt all reasonable measures to avoid or minimize any such delay.

11.4   Failure of the Respondent to comply with the notice requirements of Paragraph 11.3, above, shall render this section void and of no force and effect as to the particular incident involved.  The DEQ may, at its sole discretion and in appropriate circumstances, waive the notice requirements of Paragraph 11.3.

11.5   If the Parties to this Consent Order agree that the delay or anticipated delay was beyond the control of the Respondent, this may be so stipulated and the Parties to this Consent Order may agree upon an appropriate modification of this Consent Order.  If the Parties

to this Consent Order are unable to reach such agreement, the dispute shall be resolved in accordance with Section X, Dispute Resolution.  The burden of proving that any delay was beyond the reasonable control of the Respondent, and that all the requirements of this section have been met by the Respondent, is on the Respondent.

11.6  An extension of any given compliance date based upon a particular incident does not necessarily mean that the Respondent qualifies for an extension of a subsequent compliance date without providing proof regarding each incremental step or other requirement for which an extension is sought.

## XII.  GENERAL PROVISIONS

12.1  With respect to any violations not specifically addressed and resolved by this Consent Order, the DEQ reserves the right to pursue any other remedies to which it is entitled for any failure on the part of the Respondent to comply with the requirements of any state or federal law, including the NREPA and its rules.

12.2  Execution of the schedule contained in this Consent Order shall not be construed to waive, estop, or otherwise diminish the DEQ's right to seek or impose civil liability upon, and seek appropriate relief from, the Respondent for degradation of waters of the State and the designated uses thereof arising out of the failure of the Respondent to achieve a proper cleanup pursuant to this Consent Order.

12.3  This Consent Order does not constitute a warranty or representation of any kind by the DEQ that the response activities performed in accordance with this Consent Order or DEQ-approved work plans will result in the achievement of the remedial criteria established by law, or that the response activities will ensure protection of public health, safety, or the environment.

12.4  This Consent Order in no way affects the Respondent's responsibility to comply with any other applicable local, state, or federal laws or regulations including, without limitation, any corrective action or similar requirements applicable to the Site pursuant to the NREPA and its rules.

12.5    Nothing in this Consent Order is or shall be considered to affect any liability the Respondent may have for natural resources damages caused by the Respondent's ownership and/or operation of the Site.  The State of Michigan does not waive any rights to bring an appropriate action to recover such damages to the natural resources.

12.6    The Parties agree that the terms and conditions of this Consent Order will be enforceable in circuit court.  The Parties further agree that the appropriate venue for the enforcement of this Consent Order shall be the Circuit Court for Genesee County or the Circuit Court for Ingham County, State of Michigan, which courts shall also be appropriate for dispute resolution.

12.7    If any provision or authority of this Consent Order or the application of this Consent Order to any Party or circumstances is held by any judicial or administrative authority to be invalid, the application of such provisions to other Parties or circumstances and the remainder of the Consent Order shall remain in force and shall not be affected thereby.

12.8    The provisions of this Consent Order shall be binding on the Respondent, the DEQ, and their successors and assigns.  The Respondent shall give notice of this Consent Order to any prospective successor in interest prior to transfer of ownership of the Site property or any portion thereof and shall notify the DEQ of such proposed sale or transfer.

## XIII.  TERMINATION

13.1    This Consent Order shall remain in full force and effect until expressly terminated by a written Notice of Termination issued by the Office Chief.  The Respondent may request that the Office Chief issue a written Notice of Termination at any time after achieving full compliance with this Consent Order.  Such a request shall consist of a written certification that the Respondent has fully complied with all of the requirements of this Consent Order and has made payment of any fines, penalties, and costs required under this Consent Order.  Specifically, this certification shall include:

a.   The date of compliance with each provision of the Compliance Program in Section III of this Consent Order and the date any fines, penalties, or costs were paid;

b.   a statement that all required information has been reported to the District Supervisor;

c.   confirmation that all records required to be maintained pursuant to this Consent Order are being maintained by the City at the location designated pursuant to Paragraph 7.1 of this Consent Order; and

d.   additional relevant information requested by the Office Chief.

13.2   The Office Chief shall issue a written Notice of Termination unless the DEQ determines that the Respondent has not submitted the certification required under this section, has failed to submit the information specifically requested by the Office Chief, or has failed to comply with, or complete, all of the requirements of this Consent Order.

## XIV. SIGNATORIES

The undersigned CERTIFY they are fully authorized by the party they represent to enter into this Consent Order to comply by consent and to EXECUTE and LEGALLY BIND that party to it.

CITY OF FLINT

By: _____
    Peter Bade, Chief Legal Officer
    City of Flint

Date: __3. 20. 14__

DEPARTMENT OF ENVIRONMENTAL QUALITY

Dan Wyant
Director

By: _____
    Bryce Feighner, Chief
    Office of Waste Management and
    Radiological Protection

Date: __3 - 20 - 2014__


APPROVED AS TO FORM:

Bill Schuette
Attorney General

_____
Robert P. Reichel (P31878)
Assistant Attorney General
Environment, Natural Resources, and
   Agriculture Division
Department of Attorney General
P.O. Box 30755
Lansing, Michigan 48909

Date: __3/20/14__