# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

_____/

This Order Relates To:

Carthan v. Snyder
Case No. 16-10444

_____/

Judith E. Levy
United States District Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PUTATIVE CLASS PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT [620] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

This is a class action lawsuit that is part of the litigation collectively referred to as the Flint Water Cases. To those following these cases, the facts are by now well known. Plaintiffs, residents and property owners in Flint, Michigan, were exposed to lead, legionella, and other contaminants within the municipal water supply. They allege that defendants, a collection of government officials and private parties, caused or prolonged this exposure, injuring them and damaging their property. In this opinion and order, the Court will address the following: plaintiffs' motion

for leave to file a fourth amended complaint and defendants' motions to

dismiss the entire case.

## Table of Contents

I.   Procedural History .......................................................... 3

II.  Motion for Leave to Amend the Complaint ................................ 7

a.   Background .................................................................. 7

b.   Standard of Review ....................................................... 34

c.   Threshold Issues .......................................................... 36

d.   Main Analysis ............................................................. 38

1.   Bodily Integrity .......................................................... 39

2.   Equal Protection ......................................................... 49

3.   Elliott Larsen Civil Rights Act ....................................... 68

4.   Conspiracy ................................................................ 72

5.   Gross Negligence ........................................................ 76

6.   Res Judicata and Statute of Limitations ............................. 81

e.   Conclusion ................................................................ 81

III. Motions to Dismiss ........................................................ 82

a.   Background ................................................................ 82

b.   Standard of Review ....................................................... 83

c.   Threshold Issues .......................................................... 84

d.   Main Analysis ............................................................. 88

i.   Federal Claims ............................................................ 88

1.   Bodily Integrity .......................................................... 88

2.   Equal Protection ........................................................ 100

3.   Conspiracy ............................................................... 101

4.   State-Created Danger ................................................... 101

5. *Monell* Liability.................................................................108

ii. State Claims......................................................................109

1. ELCRA............................................................................109

2. Professional Negligence ................................................110

3. Fraud..............................................................................111

4. Negligent Infliction of Emotional Distress................117

5. Negligence......................................................................119

6. Gross Negligence ..........................................................121

7. Exemplary Damages ....................................................123

e. Conclusion and Order ....................................................127

## I.    Procedural History

Although this lawsuit is still in its early phases, its procedural history is complicated. This case was consolidated with eight other Flint water class action complaints on July 27, 2017. (Dkt. 173.)[1] In September 2017, plaintiffs filed their first amended consolidated class action complaint. (Dkt. 214.) A second amended complaint followed less than a month later. (Dkt. 238.) Then, plaintiffs filed a third amended complaint on January 25, 2018. (Dkt. 349.)

Defendants filed motions to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). (Dkts. 273, 274, 276–79, 281–

---

[1] Other cases were subsequently added to the consolidated docket. (Dkts. 185, 232, 441, 453.)

83, 294.) On August 1, 2018, after hearing oral argument on the motions to dismiss, the Court issued an opinion and order granting defendants' motions in part and denying them in part. *Carthan v. Snyder (In re Flint Water Cases)*, 329 F. Supp. 3d 369 (E.D. Mich. 2018), *vacated*, No. 16-cv-10444, 2018 U.S. Dist. LEXIS 192371 (E.D. Mich. Nov. 9, 2018). Several defendants appealed part of the ruling to the Sixth Circuit Court of Appeals (Dkts. 570, 573, 575, 579, 589); others filed motions for reconsideration. (Dkts. 560–61.) And under the prevailing rules, the Sixth Circuit awaited the resolution of the motions for reconsideration prior to taking jurisdiction. *Carthan v. Snyder*, No. 18-1967 (6th Cir. Aug. 28, 2018).

Plaintiffs filed a motion for leave to amend the complaint for a fourth time before the Court had resolved the pending motions for reconsideration. (Dkt. 620.) The Court granted leave for plaintiffs in other Flint water lawsuits to file similar motions,[2] and, as a result, there was a significant risk that the Flint Water Cases would proceed in a piecemeal fashion. (Dkt. 670.) The Court was managing filings from more

---

[2] This includes *Walters v. Flint*, No. 17-cv-10164, and *Sirls v. Michigan*, No. 17-cv-10342. Neither of these cases are consolidated with the present case.

4

than 150 lawyers and coordinating with related federal and state cases. Having different lawsuits proceed on divergent allegations and differing claims would further complicate the case. Such a scenario would also burden defendants, who would be unable to wage consistent defenses. In the interest of handling the cases in a consistent manner, the Court interpreted plaintiffs' motion as a joint motion for relief from judgment and a motion for leave to file an amended complaint. Finding just cause, the Court vacated its August 1 decision on November 9, 2018, so that it could consider plaintiffs' motion for leave to amend. (*Id.*)[3]

To fulfill its duty to ensure that the litigation proceeds efficiently, the Court adopted an unorthodox but necessary plan. Noting that there was significant overlap between the proposed fourth amended complaint and the third amended complaint, and that a motion for leave to amend and a motion to dismiss turn on substantively the same standard, the Court determined that it would treat defendants' responses to the motion for leave to amend as addenda to their previously filed motions to dismiss. (Dkt. 714.) The Court would then issue an omnibus opinion and

---

[3] Some defendants challenged the Court's authority to do so, but the Sixth Circuit upheld this decision. *Carthan v. Snyder*, No. 18-1967 (6th Cir. Feb. 19, 2019).

order, adjudicating plaintiffs' motion for leave to file a fourth amended complaint, and, if successful, defendants' motions to dismiss it in a single decision. Mindful of the parties' rights, the Court also gave plaintiffs and defendants the opportunity to file supplemental briefing. (*Id.*)

The Court now addresses plaintiffs' motion for leave to amend the complaint and defendants' motions to dismiss. Accordingly, this opinion and order will proceed as follows: Part II will address plaintiffs' motion for leave to file a fourth amended complaint, and, for the reasons set forth below, the Court will grant it in part and deny it in part. In Part III, rather than wait for plaintiffs to file their amended complaint, the Court will adopt the fourth amended complaint as the operative complaint and rule on defendants' motions to dismiss it. The Court's ruling in Part II will be preclusive, so any claim found lacking there will not be addressed separately in Part III. The result will be that the fourth amended complaint, to the extent permitted below, will become the operative complaint for the purposes of this litigation.

## II.    Motion for Leave to Amend the Complaint

### a. Background

#### i. The Parties

There are three types of named plaintiffs. First, the following Flint residents claim personal injury and property damage: Elnora Carthan, a seventy-two year old African American woman; Rhonda Kelso, a fifty-four year old African American woman who also represents the interests of her minor child; Darrell and Barbara Davis, both African Americans; Marilyn Bryson, a fifty-eight year old African American woman; and David Munoz, a Hispanic man.

Next, the following Flint residents only claim personal injury: Michael Snyder, the personal representative of the estate of John Snyder, who received medical treatment in Flint before his death; Tiantha Williams, a forty-year old African American woman and her minor child; and Amber Brown and her minor child.

Finally, the following individuals only claim property damage: Frances Gilcreast, on behalf of her Flint real estate partnership FG&S Investments; EPCO Sales, a domestic limited liability company located

in Flint; and Angelo's Coney Island Palace, a Michigan corporation located in Flint.

The named defendants can be separated into two groups: government and private defendants. First, the government defendants include the state defendants Rick Snyder, the former Governor of Michigan;[4] the State of Michigan; Andy Dillon, then-Treasurer for the State of Michigan; Nick Lyon, the previous Director of the Michigan Department of Health and Human Services (MDHHS); and Nancy Peeler, former MDHHS Director for the Program for Maternal, Infant, and Early Childhood Home Visiting.

The government defendants also include the Michigan Department of Environmental Quality (MDEQ) defendants Daniel Wyant, Director of the MDEQ; Liane Shekter-Smith, MDEQ Chief of the Office of Drinking Water and Municipal Assistance; Adam Rosenthal, an MDEQ Water Quality Analyst; Stephen Busch, an MDEQ District Supervisor; Patrick

---

[4] Plaintiffs sue former Governor Snyder in his official and individual capacities. For the sake of consistency with earlier Flint water decisions, former Governor Snyder will simply be referred to as Governor Snyder or the Governor where the claim is against him is in his individual capacity. Where the claim is against him in his official capacity, the count is now against Governor Gretchen Whitmer. *See* Fed. R. Civ. P. 25(d). But, again, for consistency, the Court will still refer to Governor Snyder.

Cook, an MDEQ Water Treatment Specialist; Michael Prysby, an MDEQ Engineer assigned to MDEQ District 11 (where Flint is located); and Bradley Wurfel, the MDEQ Director of Communications.

Additionally, the government defendants include the city defendants Edward Kurtz, Flint's Emergency Manager from August 2012 to July 2013; Darnell Early, Emergency Manager from September 2013 to January 2015; Gerald Ambrose, Emergency Manager from January 2015 to April 2015; Dayne Walling, Mayor of Flint from August 2009 to November 2015; Howard Croft, Flint's former Director of Public Works; Michael Glasgow, Flint's former Utilities Administrator; Daugherty Johnson, another former Utilities Administrator; and the City of Flint.

Finally, Jeffrey Wright is also a government defendant. Wright is the Genesee County Drain Commissioner and current Chief Executive Officer of the Karegnondi Water Authority (KWA).

The private defendants include Lockwood, Andrews & Newman, PC, Lockwood Andrews & Newman, Inc., and the Leo. A. Daly Company (collectively "LAN"); and Veolia, LLC, Veolia, Inc., and Veolia Water (collectively "Veolia"). LAN performed consultancy work in Flint related to the water supply transition to the Flint River, whereas Veolia

performed consultancy work in Flint after the transition, in February and March 2015.

### ii. Facts As Pleaded in the Third Amended Complaint

What follows is a summary of the facts set forth in the third amendment complaint, as summarized in the Court's vacated August 1, 2018, opinion and order:

> An 1897 city ordinance required that all water pipes in Flint be made of lead. (Dkt. 349 at 38.) In 1917, the Flint Water Treatment Plant (FWTP) was constructed, and drew water from the Flint River as Flint's primary water source until 1964, when it went dormant. (*Id.*) From 1964 through 2014, users of municipal water in Flint, Michigan received their water through the Detroit Water and Sewerage Department (DWSD). (*Id.* at 38.) In 2014, Flint's water supply switched back to the Flint River, and the water was treated at the FWTP. (*Id.* at 54.) This case concerns the decision to return to the Flint River as Flint's primary water source in 2014, and the alleged injuries that arose from that switch.

> Beginning in the 1990s, Flint, along with other local governments relying on the DWSD water supply, had concerns about the cost of that supply, and began studying the viability of alternative water supplies. (*Id.* at 38.) In 2001, Michigan's Department of Natural Resources noted that businesses along the Flint River had permits to discharge industrial and mining runoff, as well as petroleum and gasoline cleanups. (*Id.* at 39.) In 2004, a study by the United States Geological Survey, the [MDEQ], and the Flint Water Utilities Department determined that the Flint River was a highly sensitive drinking water source susceptible to contamination. (*Id.*) In 2006 and 2009, Flint and other local

10

governments commissioned a study from LAN regarding the viability of continuing to purchase water from the DWSD or constructing a new pipeline, which would be administered by what would later be known as the [KWA]. (*Id.*)

In 2011, Flint commissioned a study by Rowe Engineering and LAN to determine if the Flint River could be safely used as a water supply. (*Id.*) The study determined that water from the Flint River would require more treatment than water from Lake Huron, and that proper treatment for Flint River water would require upgrades to the FWTP. (*Id.*) The report included an addendum that set forth over sixty-nine million dollars in improvements that would be necessary to use Flint River water through the FWTP, including the use of corrosion control chemicals. (*Id.* at 40.)

In August 2012, Michigan Governor Rick Snyder appointed Edward Kurtz as Flint's Emergency Manager, following the declaration of a financial emergency in Flint. (*Id.* at 40.) Emergency managers may be appointed by the governor of Michigan "to address a financial emergency within" a local government, subject to the limitations in Michigan Public Act 436 of 2012. M.C.L. § 141.1549(1).

> Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise

11

any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.

M.C.L. § 141.1549(2).

In November 2012, Kurtz suggested to State of Michigan Treasurer Andy Dillon that Flint join the proposed KWA under the belief that doing so would save money over continuing to purchase water from the DWSD. (Dkt. 349 at 40.) The KWA was to be an administrative body overseeing a pipeline that would use Lake Huron water for the areas it serviced. (*Id.* at 39.) Genesee County Drain Commissioner Jeff Wright had encouraged the formation of the KWA in 2009. (*Id.* at 40.)

DWSD argued throughout 2012 that Flint should not join the KWA based on cost and reliability projections. (*Id.*) It made these arguments to Governor [Snyder], Wright, Kurtz, Dillon, and then-Mayor of Flint Dayne Walling. (*Id.*) During that period, Wright consistently argued to Kurtz, Dillon, and Governor Snyder that the DWSD studies were wrong. (*Id.* at 41.) In late 2012, Dillon requested that an independent engineering firm assess the cost effectiveness of joining the KWA. (*Id.*) The firm concluded that remaining with DWSD was more cost-effective both in the short and long term. (*Id.*) On March 17, 2013, Dillon e-mailed Governor Snyder and stated that the KWA advocates were misrepresenting the benefits of a switch, and that the "[r]eport I got is that Flint should stay w [sic] DWSD." (*Id.*)

On March 26, 2013, MDEQ District Supervisor Stephen Busch sent an e-mail to MDEQ Director Daniel Wyant and MDEQ Chief of the Office of Drinking Water and Municipal Assistance Liane Shekter-Smith setting forth risks associated with using the Flint River as Flint's drinking water source.

(*Id.*) The e-mail stated that the water posed increased health risks, including a microbial risk, a risk of trihalomethane (known as "Total Trihalomethanes" or "TTHM") exposure, and would come with additional regulatory requirements, including significant upgrades to the FWTP. (*Id.* at 41–42.)

On March 27, 2013, MDEQ officials acknowledged that the decision to stay with the DWSD or switch to the Flint River was not based on the scientifically determined suitability of the water, but instead that it was "entirely possible that they will be making decisions relative to cost," in the words of MDEQ Deputy Director Jim Sygo. (*Id.* at 42.)

On March 28, 2013, Dillon e-mailed Governor Snyder and other officials, and recommended that the state "support the City of Flint's decision to join the KWA," and that all relevant officials supported the move. (*Id.* at 42–43.) During this period, Governor Snyder was personally involved in the decision-making process. (*Id.* at 43.) On April 4, 2013, Governor Snyder's Chief of Staff Dennis Muchmore informed Governor Snyder that "[a]s you know, the Flint people have requested Dillon's ok to break away from the DWSD." (*Id.*) Governor Snyder then instructed his Chief of Staff, Dillon, the Emergency Manager of Detroit Kevin Orr, DWSD, and Kurtz to solicit an additional offer from the DWSD before permitting the transition away from the DWSD. (*Id.*)

DWSD submitted its final proposal later in April. (*Id.*) Kurtz and Orr, according to an e-mail from a Senior Policy Advisor in the Michigan Department of Treasury, determined that Flint would not accept the DWSD offer. (*Id.* at 44.) Governor Snyder's Executive Director forwarded the e-mail to Governor Snyder on April 29, 2013, and stated that it "[l]ooks like they adhered to the plan." (*Id.*)

Following this communication, Governor Snyder authorized Kurtz to enter into a contractual relationship with the KWA beginning in mid-2016. (*Id.*) At the time Governor

Snyder authorized the switch, he did so knowing the Flint River would be used as an interim source. (*Id.*) In June 2013, Dillon, Kurtz, Wright, and Walling developed an interim plan to govern the provision of water to Flint between April 25, 2014, and October 2016. (*Id.*)

On June 10, 2013, LAN submitted a proposal to Flint for upgrading the FWTP. (*Id.* at 48.) The proposal included a "Scope of Services" section that proposed upgrades to the FWTP that would permit "use of the Flint River as a water supply," and a "Standards of Performance" section that promised LAN would "exercise independent judgment" and "perform its duties under this contract in accordance with sound professional practices." (*Id.* at 49.) Flint retained LAN to advise it on the water source transition through 2015. (*Id.* at 49–50.)

On June 29, 2013, LAN met with representatives from Flint, the Genesee County Drain Commissioner's Office, and MDEQ to discuss logistics related to the transition to the Flint River as Flint's primary water source. (*Id.* at 50.) At that meeting, the participants determined that the Flint River was a viable water source, if more difficult to treat, and that upgrades could be made to the FWTP to properly treat the water. (*Id.*) The parties also determined that it was possible to conduct proper quality control with LAN's assistance, the FWTP did not have the capacity to meet the needs of both Flint and Genesee County, and the transition could occur by April or May of 2014. (*Id.* at 51.) LAN agreed to present a comprehensive project proposal with cost estimates. (*Id.*) LAN ultimately provided engineering services for the transition from July 2013 until the transition occurred on April 25, 2014, including creating the plans and specification for the transition. (*Id.* at 53–54.)

Kurtz resigned from his Emergency Manager position effective July 2013. (*Id.* at 45.) Following Michael Brown serving as Emergency Manager for two months, Darnell

14

Earley was appointed as Emergency Manager for Flint in September 2013. (*Id.*) Part of Earley's job included making sure Flint was in compliance with state and federal laws governing safe drinking water. (*Id.*)

The transition to the Flint River continued. On March 14, 2014, Brian Larkin, then associate director of the Governor's Office of Urban and Metropolitan Initiatives, sent an e-mail to others in the Governor's office stating that the timeframe for switching water supplies was "less than ideal and could lead to some big potential disasters down the road." (*Id.* at 45–46.)

On March 20, 2014, MDEQ Chief of the Office of Drinking Water and Municipal Assistance Liane Shekter-Smith ensured that the City of Flint received an Administrative Consent Order requiring use of the FWTP, mandating Flint take steps to continue use of Flint River water or take steps to join the KWA, and attempting to prevent Flint's return to use of the DWSD. (*Id.* at 46.) Shekter-Smith had been warned nearly a year earlier about the potential dangers of switching Flint's water supply to the Flint River. (*Id.*)

In April 2014, LAN, Flint, and MDEQ officials discussed optimization for lead in the water supply, and decided to seek more data before implementing an optimization method. (*Id.* at 52.)

On April 16, 2014, former Flint Utility Administrator Michael Glasgow had informed MDEQ Water Analyst Adam Rosenthal that he would like additional time to ensure the FWTP was meeting requirements before giving the okay to distribute water from it. (*Id.* at 46.) On April 17, 2014, Glasgow informed MDEQ that the FWTP was not fit to begin operation, and that "management" refused to listen to his warnings. (*Id.*) On April 18, 2014, Glasgow wrote to Busch and MDEQ Engineer Michael Prysby and informed them that

15

although he was receiving pressure to begin distributing water, he would not give the okay to do so, because he did not feel that staff was trained or proper monitoring was in place. (*Id.* at 46–47.) Glasgow felt that "management" had its "own agenda." (*Id.* at 47.) Glasgow later told investigators that former Flint Director of Public Works Howard Croft and former Flint Utilities Administrator Daugherty Johnson pressured Glasgow to approve and begin the switch to Flint River water. (*Id.*)

At some point in 2014, MDEQ Water Treatment Specialist Patrick Cook signed the final permit necessary to restart use of the FWTP with the Flint River as the city's primary water source. (*Id.* at 48.) The FWTP officially went into service and began delivering Flint River water to Flint water users on April 25, 2014. (*Id.*)

When the transition occurred, Flint's water treatment system was not prepared to safely deliver Flint River water to users. The river was contaminated with rock-salt chlorides from treatment of roads in and around Flint during past winters. (*Id.* at 52.) Chlorides are corrosive, and water must be treated to neutralize their corrosive properties. (*Id.*) This is particularly true in a city like Flint, where most of Flint's water mains are over seventy-five years old and made of cast iron, leaving them subject to internal corrosion called "tuberculation." (*Id.* at 57.) Tuberculation leads to the development of "biofilms," which are layers of bacteria attached to the interior pipe wall. (*Id.*) Although LAN provided professional engineering services related to the transition, and those services included ensuring the safety of the water from the Flint River, it did not recommend treatment of the water to prevent corrosion of the pipes. (*Id.* at 53.)

Within weeks of the transition to Flint River water, residents of Flint began complaining about the smell, taste, and color of the drinking water. (*Id.* at 54.) Shekter-Smith

received many of those complaints, including one forwarded from an Environmental Protection Agency (EPA) employee regarding rashes linked to the Flint River water. (*Id.*) Complaints and symptoms related to consumption of the water continued, and, on August 14, 2014, Flint water tested above legal limits for coliform and E. coli bacteria. (*Id.* at 55.) Flint issued boil water advisories on August 16, 2014, and September 5, 2014. (*Id.*)

In response to these issues, Flint treated the water with additional chlorine. (*Id.*) However, because Flint's old water lines were corroded, chlorine attacked the bare metal, rather than the bacteria, leading to further corrosion and the release of TTHM into the water supply. (*Id.*) A PowerPoint presentation circulated among MDEQ officials in March and April 2015, including Busch, Prysby, and Rosenthal, showed that MDEQ officials knew as early as May 2014 that Flint water contained elevated levels of TTHM. (*Id.*)

In the summer of 2014, MDHHS reported an outbreak of Legionnaires' disease in Flint. (*Id.* at 56.) Legionnaires' disease infects humans when water droplets containing legionella bacteria are inhaled or legionella-contaminated water is consumed. (*Id.*) Legionella can enter a water supply when the biofilm attached to a water pipe is stripped away, as happened when the Flint River water entered the city's pipes, and more chlorine was added to treat the water. (*Id.*)

On October 3, 2014, Flint's Public Information Officer informed Earley and Ambrose about the spike in Legionnaires' cases via e-mail. (*Id.*) Earley responded by denying any connection between Flint water and the outbreak, and stated that the city's message should be that the outbreak was an internal issue at McLaren Hospital. (*Id.*) MDHHS personnel did not agree with Earley's message. (*Id.* at 57.)

In September 2014, elevated blood lead levels were beginning to be noted in children under the age of sixteen who were living in Flint. (*Id.*) By October 1, 2014, it was known that the iron pipes making up most of Flint's water distribution system [were] one of the causes of the contamination of the water. (*Id.*)

On October 13, 2014, General Motors stopped the use of Flint River water at its engine plant due to the corrosive nature of the water. (*Id.*) Governor Snyder's executive staff was immediately aware of the problem, and on October 14, 2014, Governor Snyder's Deputy Legal Counsel and Senior Policy Advisor Valerie Brader wrote an e-mail in which she suggested asking Earley to "consider coming back to the [DWSD] in full or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing." (*Id.*) Brader intentionally did not distribute this message to MDEQ officials so that it would be exempted from the Freedom of Information Act [(FOIA)], but she did coordinate discussions with Earley and officials at MDEQ. (*Id.* at 58.) In response to this e-mail, Earley rejected the idea of returning to the DWSD on October 14, 2014. (*Id.*) On October 15, 2014, Governor Snyder's Legal Counsel, Michael Gadola, stated that use of the Flint River as a water source was "downright scary," and that Flint "should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control." (*Id.* at 59.)

By November 2014, LAN knew of the need to analyze the cause of the high TTHM levels in Flint water. (*Id.* at 60.) On November 26, 2014, LAN issued a twenty-page Operational Evaluation Report regarding the transition, which addressed compliance with EPA and MDEQ regulations, but did not address the potential for lead contamination resulting from the corrosive water flowing through the lead pipes in Flint's water system. (*Id.*)

18

By December 31, 2014, lead monitoring showed water testing results exceeding the federal Lead and Copper Rule's action level for lead, which is 15 parts per billion (ppb). (*Id.* at 59.) On January 9, 2015, University of Michigan – Flint water tests revealed elevated lead levels in two locations on campus, which led the University to turn off certain water fountains. (*Id.*) On January 9, 2015, Earley again refused to return Flint to the DWSD. (*Id.*)

On January 13, 2015 Earley resigned as Emergency Manager for Flint, and was replaced by Gerald Ambrose. (*Id.* at 78.) On January 29, 2015, DWSD offered Ambrose an opportunity to reconnect to the DWSD water supply, with the re-connection fee waived. Ambrose rejected the offer. (*Id.* at 79.)

In January 2015, LeeAnn Walters, a Flint homeowner, contacted the EPA regarding complaints that Flint River water was making her and her family physically ill. (*Id.*) On January 21, 2015, the State of Michigan ordered water coolers to be installed in state buildings operating in Flint, but did not share this information with the public. (*Id.* at 78.) On January 27, 2015, Flint received notice from the Genesee County Health Department that it believed the spike in Legionnaires' disease cases was linked to the switch to Flint River water. (*Id.*) On January 28, 2015, MDHHS Director Nick Lyon received materials from an MDHHS epidemiologist showing the 2014 outbreak of Legionnaires' disease in Genesee County. (*Id.*)

On February 26, 2015, Jennifer Crooks, an EPA employee, e-mailed MDEQ and EPA employees regarding Walters' complaints of black sediment in her water. (*Id.* at 80.) The e-mail noted very high testing results for iron contamination, and noted that Glasgow suggested testing for lead and copper, which resulted in test findings of 104 ppb, well over the federal action levels of 15 ppb. (*Id.*) The e-mail also noted that the high presence of lead was a sign that there

19

were other contaminants in the water, as well. (*Id.*) That day, Crooks also sent an e-mail to MDEQ and EPA representatives, opining that the black sediment from Walters' water was actually lead, and questioning whether the issue was more widespread. (*Id.* at 80–81.) Crooks also wondered if Flint was using optimal corrosion control. (*Id.* at 81.) On February 27, 2015, Busch told [Miguel] Del Toral [at the EPA] that Flint was using corrosion control, which was false. (*Id.*)

At some point, Flint issued a request for proposals for engineering companies to serve as a water quality consultant to the city. (*Id.* at 60–61.) Flint sought a consultant who could review and evaluate the City's water treatment process and its procedures to maintain and improve water quality, to recommend ways to maintain compliance with state and federal agencies, and to assist Flint in implementing those recommendations. (*Id.* at 61.) In February 2015, Veolia was hired to be Flint's water quality consultant. (*Id.*) The contract retaining Veolia stated that Flint would rely on the "professional reputation, experience, certification, and ability" of Veolia. (*Id.* at 62.)

On February 10, 2015, Veolia and Flint issued a joint press release that touted Veolia's expertise in "handling challenging river water sources," and notifying the public of Veolia's role in evaluating Flint's water treatment processes. (*Id.*) On February 10 and 12, 2015, executives at Veolia made statements professing the expertise of the companies and promising to address the issues with Flint's water. (*Id.* at 62–63.)

On February 18, 2015, Veolia made an interim report to Flint's City Council. (*Id.* at 63.) The report indicated that Flint's water was "in compliance with drinking water standards," but that the discoloration of the water "raises questions." (*Id.*) The report also stated that medical issues arising from consumption of the water were explained by the

fact that "[s]ome people may be sensitive to any water." (*Id.* at 64.) LAN also released a report addressing TTHM concerns, but that report did not analyze the causes of the high TTHM levels. (*Id.* at 66.)

On March 12, 2015, Veolia issued a final Water Quality Report. (*Id.* at 64.) That report was based on a 160-hour assessment of the FWTP, Flint's distribution system, and related administrative and financial aspects of Flint's water system. (*Id.*) The report found that Flint water was in compliance with state and federal water quality regulations, despite public concerns about the color and quality of the water. (*Id.*) The report also recommended that Flint add polyphosphates to the water supply to minimize the discoloration from iron in the pipes, but that discoloration might happen because of regular breaks and maintenance on the pipes. (*Id.* at 64–65.) But polyphosphates only addressed issues with the iron pipes, and were not a solution to the issues with the lead pipes. (*Id.* at 65.)

Meanwhile, Cook told the EPA that Flint was using corrosion control with Flint River water, and forwarded information he knew to be false to the EPA to back up the contention. (*Id.* at 81.) On January 27, 2015, James Henry, Environmental Health Supervisor at the Genesee County Health Department, filed a [FOIA] request with Flint to obtain information about Flint's water supply. (*Id.*) Johnson stated on February 5, 2015, that he had not received the request and would fulfill it as soon as possible. However, he had not done so by March 2015. (*Id.* at 82.) On March 10, 2015, Henry expressed public concern that Flint and the State of Michigan were stonewalling his requests for information. (*Id.*)

On March 12, 2015, Shekter-Smith e-mailed Wurfel and MDEQ employees Jim Sygo and Sarah Howes to discuss a FOIA request related to legionella and stated that although the switch to the Flint River may have created conditions that supported legionella growth, there was no evidence that

legionella was coming directly from the FWTP or Flint's water distribution system at the time. (*Id.* at 83.) On March 13, 2015, Busch made statements that denied any provable connection between the switch to Flint River water and the presence of legionella bacteria in that water supply, and Shekter-Smith approved them. (*Id.*) During March, members of Governor Snyder's office were aware of mobilization by Flint area pastors focused on the odor and appearance of Flint water, and of a request by those pastors for water filters. (*Id.* at 84.)

On March 25, 2015, the Flint City Council voted to reconnect to the DWSD, but Ambrose rejected that vote. (*Id.*) On April 24, 2015, almost exactly one year after the switch to Flint River water, Cook e-mailed . . . Del Toral . . . and informed him, in contradiction of Cook's earlier representations, that Flint was not practicing corrosion control at the FWTP. (*Id.*) On June 24, 2015, Del Toral issued a report noting high lead levels in Flint and the State of Michigan's complicity in both the high lead levels and the failure to inform users of Flint's water supply. (*Id.* at 84–85.) The report was shared with Shekter-Smith, Cook, Busch, and Prysby, but neither they nor any other public official named as a defendant in this lawsuit took measures to effectively address any danger identified in the report. (*Id.* at 85.)

Between June 30, 2015, and July 2, 2015, Walling and EPA Region 5 Director Dr. Susan Hedman discussed the report, and Hedman stated that it was a preliminary draft from which it would be premature to draw any conclusions. (*Id.*)

On July 9, 2015, Glasgow sent an e-mail to Rosenthal describing the clear and undeniable issues that Flint's lead- and bacteria-tainted water was causing. (*Id.* at 86.) On July 10, 2015, Wurfel appeared on public radio and made knowingly false statements asserting that Flint River water was safe and causing no "broad problem[s]" with elevated lead

levels in the water. (*Id.* at 85–86.) On July 22, 2015, Governor Snyder's Chief of Staff wrote to Lyon and stated that the concerns of Flint water users were being "blown off" by the defendants. (*Id.* at 87.) On July 24, 2015, Wurfel again falsely stated that there were no worries about lead or copper contamination in Flint's water supply. (*Id.*)

In that July 24, 2015 statement, Wurfel referenced sampling of the water supply by MDEQ, but that sampling was skewed, and did not resample most lower-lead homes between 2014 and 2015, or any high-lead homes between 2014 and 2015. (*Id.*) The sampling actually covered up high-lead samples. (*Id.* at 88.) Glasgow ultimately pleaded no contest to willful neglect of duty after being accused of distorting the water test results by asking residents of Flint to run or flush their water before testing, and of failing to obtain water samples from certain houses. (*Id.*)

During this time period, Glasgow also stated that Busch and Prysby directed him to alter water quality reports to remove the highest lead levels. (*Id.*) Rosenthal also allegedly manipulated test results, including a July 28, 2015 report from which Rosenthal excluded high lead-level tests. (*Id.* at 88–89.)

In August 2015, Professor Marc Edwards of Virginia Tech, who had been testing Flint River water, announced that he believed there was serious lead contamination of the Flint water system, which constituted a major public health emergency. (*Id.* at 89.) In response, Wurfel attempted to discredit Edwards' statements by calling the testing "quick" and implying that it was irresponsible. (*Id.*)

By late 2014 or early 2015, Lyon also knew about the increase in children with elevated blood lead levels and Legionnaires' disease cases, but did not report these findings to the public or other government officials, or take any steps to otherwise intervene. (*Id.* at 89–90.) In the summer of 2015,

23

Dr. Mona Hanna-Attisha used data from Hurley Hospital in Flint to note a rise in the number of Flint children with elevated blood lead levels in the second and third quarters of 2014 to publish a study, the purpose of which was to alert Flint water users about the health risks associated with the water. (*Id.* at 90.) The governmental defendants immediately accused Dr. Hanna-Attisha of providing false information to the public. (*Id.*) On September 28, 2015, Lyon directed his staff to provide an analysis rebutting Dr. Hanna-Attisha's findings and portraying the rise in elevated blood lead levels as normal results corresponding to seasonal fluctuations. (*Id.* at 90–91.) Throughout September 2015, Wurfel and the MDEQ continued to issue false statements claiming the water in Flint was safe, and that the people sounding alarms about Flint's water quality were mistaken or "rogue." (*Id.* at 91–92.)

On October 2, 2015, the State of Michigan announced that it would create a Flint Water Advisory Task Force and provide water filters to Flint water users. (*Id.* at 92.) On October 8, 2015, Governor Snyder ordered Flint to reconnect to the DWSD, and that reconnection took place on October 16, 2015. (*Id.*) On October 18, 2015, Wyant e-mailed Governor Snyder and admitted that MDEQ made a mistake in not implementing optimized corrosion control from the beginning. (*Id.* at 93.) On October 19, 2015, the City of Flint Technical Advisory committee listed LAN as the "owner" of the "corrosion control" issue. (*Id.*)

Current Flint Mayor Karen Weaver declared a state of emergency in Flint on December 14, 2015. (*Id.* at 94.) On January 4, 2016, the Genesee County Commissioners likewise declared a state of emergency; Governor Snyder did so on January 5, 2016, and activated the Michigan National Guard to assist Flint on January 13, 2016. (*Id.*)

*Carthan*, 329 F. Supp. 3d at 382–89.

### iii.  Additional Allegations in the Proposed Fourth Amended Complaint

The proposed fourth amended complaint adds new factual allegations as follows. During the middle of the twentieth century, Flint's water supply was taken from the Flint River and was of poor quality due to the presence of fecal coliform bacteria and contaminants. (Dkt. 620-3 at 38–39.) Because of these environmental concerns, Flint began evaluating different water sources in the 1960s. (*Id.*) Flint eventually mothballed the FWTP around 1965, and entered into an agreement to receive its water from DWSD. (*Id.*) This agreement gave Flint the exclusive right to sell DWSD water to the remainder of Genesee County. (*Id.*) And the Genesee County Drain Commission (GCDC) contracted with Flint to buy DWSD water in order to resell it to local customers. (*Id.*)

In 1973, the GCDC updated its contract with Flint. (*Id.* at 39.) The GCDC had to accept water from Flint as delivered, so long as it met "all requirements of the various State Regulatory Agencies." (*Id.* at 39–40.) In return, Flint was required to sell water "generally sufficient to supply the County's system use." (*Id.* at 40.) In 2003, the contract was again updated. (*Id.*) It similarly required the "City . . . to sell water to the [GCDC] in such quantities as will meet the demands of the County

25

Agency's customers" and "the [GCDC] agree[d] to purchase water exclusively from the City[.]" (*Id.*) This was the situation until 2014, when Flint transitioned back to the Flint River as its source of water. (*Id.* at 52–53.)

Flint was not the only municipality looking to switch its water supply in the early 2000s. Various communities in the same region had formed the KWA in 2009 to explore this possibility. (*Id.* at 42.) Specifically, the KWA was aiming to construct a new water pipeline connected to Lake Huron. (*Id.*) Walling was elected as the KWA's chair, and Wright was elected its Chief Executive Officer. (*Id.*) Wright later stated that he was motivated to establish the KWA at least in part because DWSD was "the poster child for Detroit corruption." (*Id.* at 43.)

To be viable, the KWA would have to construct a water intake at Lake Huron and sixty-three miles of pipeline. (*Id.*) The system would have to supply sixty million gallons of water each day. (*Id.*) It was estimated that Genesee County would require forty-two million gallons a day and Flint eighteen. (*Id.*) The projected capital cost ran to approximately $300 million, of which Flint would shoulder eighty-five million and serve 34.2% of the debt. (*Id.*) Unlike the treated water

26

supplied by DWSD, the KWA water would be raw and would require considerable treatment before use. (*Id.*)

By 2013, Wright had secured long-term commitments from most of its members to purchase their future water from the KWA. (*Id.* at 46.) The commitments were necessary to fund the bonds required to finance the project. (*Id.*) However, at that time, Flint had not committed to the KWA. (*Id.*) And Wright knew that it was doubtful the financing would be successful without Flint's backing. (*Id.* at 46–47.) So beginning in March and April of that year, Wright aggressively argued the case for Flint joining the KWA. (*Id.*) All officials involved in the decision knew that the FWTP would have to be upgraded to process the future supply of raw water. (*Id.* at 47.)

Yet there was a problem with Flint's participation in the KWA: how would it pay for its share of the costs? Under state law, Flint could not issue new bonds because it was in financial receivership. (*Id.* at 55.) An Administrative Consent Order (ACO) would permit Flint to circumvent this problem. (*Id.* at 129–32.) But the only way Flint could obtain an ACO was from a state agency as a result of an emergency. (*Id.* at 132.) Accordingly, Flint began pursuing an ACO from the MDEQ. (*Id.* at 133.)

And although initially hesitant, the MDEQ began to help with the ACO even though there was no prerequisite emergency. (*Id.* at 133–34.) The MDEQ executed the ACO on March 20, 2014. (*Id.* at 136.) Pursuant to its terms, Flint was bound to adopt the interim plan to use the Flint River as its water source. (*Id.*) The bond issue that followed allowed the KWA project to move forward. (*Id.*)

When developing the interim plan, a group of people including defendants Wright, Dillon, and Walling recognized that the FWTP could not process enough water for all of Genesee County. (*Id.* at 53.) So together with other officials, these defendants eventually planned for Flint to receive Flint River water while Genesee County would continue to receive DWSD water. (*Id.*) This was despite evidence that the use of the Flint River would "[p]ose an increased microbial risk to public health," "an increased risk of disinfection by-product (carcinogen) exposure," and "[r]equire significant enhancements to treatment [sic] at the [FWTP.]" (*Id.* at 131.)

As a necessary part of the interim plan, MDEQ officials issued an operating permit for the FWTP in April 2014. (*Id.* at 52.) However, they did so without following the required procedures. (*Id.* at 126.) Federal

28

law requires states to "review and approve the addition of a new source or long-term change in water treatment[.]" (*Id.* at 136.) In turn, Michigan law regulates the MDEQ's authority to issue permits that impact the State's water systems. Before issuing a permit for certain water sources, the MDEQ is required to provide a public comment period of "not less than 45 days." (*Id.* at 136–37.) This regulation applied to the FWTP permitting process. (*Id.* at 137.) Publicly, the MDEQ stated that "the city would just continue to buy water from [DWSD]" if no permit was issued in time. (*Id.* at 138.) And Flint officials assured people that there would be a series of open forums to permit public questions. (*Id.*) But when Flint eventually submitted its permit application on March 31, 2013, it was approved in a matter of days, without an opportunity for public comment. (*Id.* at 138–39.)

Flint transitioned to the Flint River on April 25, 2014. (*Id.* at 62.) And in the months that followed, members of Governor Snyder's senior staff began to discuss the possibility of lead contamination. (*Id.* at 104–05.) In March 2015, a Flint resident wrote an open letter to Walling stating that "the water is dangerous to our health!" (*Id.* at 158.) Ambrose eventually received the letter, forwarding it to Flint's public relations

firm simply stating, "[w]elcome to Monday." (*Id.*) Civic groups tried to get the government defendants to take the issue seriously. (*Id.* at 158–59.) But officials dismissed their concerns as unwarranted. (*Id.*)

Even as the EPA continued to uncover evidence of lead contamination and some senior members of Governor Snyder's administration voiced the view that the problem was not being taken seriously (*id.* at 159–60), many officials continued to deny that anything was wrong. (*Id.* at 160–62.) Instead, they put it down to "old time negative racial experiences." (*Id.* at 161.) Several officials recommended that more money be spent on public relations to combat the issue, rather than looking to resolve the underlying problem. (*Id.* at 159.)

On April 28, 2015, Governor Snyder received an e-mail from his chief of staff advising him that the water issue in Flint continued to be a "danger flag" for the administration. (*Id.* at 92.) Later that summer, the Governor's Director of Urban Initiatives discussed with him the growing concerns among Flint residents that they were being exposed to contaminated water. (*Id.* at 94.) And on September 25, the Governor's chief of staff again e-mailed the Governor to discuss the issue of lead exposure and the potential political implications. (*Id.* at 103.) In the same

30

communication, the chief of staff opined that the residents of Flint were having their concerns about water quality inappropriately dismissed. (*Id.* at 104.) The Governor received this e-mail almost a week before he publicly acknowledged in October 2015 that Flint's water was contaminated with lead. (*Id.* 103.) In the meantime, MDEQ officials continued to tell the public that "the drinking water distributed to city customers currently meets all drinking water standards[.]" (*Id.* at 162.)

Following his public acknowledgment of the crisis in October 2015, the Governor was told in December that in addition to elevated lead levels, Flint residents were also at risk of legionella exposure. (*Id.* at 101.) Despite all this knowledge, Governor Snyder did not disclose this risk when he declared a state of emergency on January 5, 2016. (*Id.* at 102.) It was not until January 13 that he publicly admitted that Flint's water contained legionella bacteria. (*Id.*) He did this while activating the Michigan National Guard to assist the people of Flint. (*Id.*) On January 14, Governor Snyder asked the federal government to issue an emergency declaration. (*Id.*) The federal government did so two days later. (*Id.*)

In the aftermath of the crisis, facts about how the MDEQ dealt with the disaster came to light. For example, the MDEQ failed to comply with

31

various rules and regulations. (*Id.* at 126.) State law requires the MDEQ to notify the public if a source of water is found to be out of compliance. (*Id.* at 142.) In August 2014, MDEQ officials discussed whether a Flint boil water advisory was caused by a sampling error in a test or a high fecal coliform result. (*Id.*) It was far from certain that sampling error was the culprit. (*Id.*) And although the MDEQ suspected that the water was contaminated, no one made an effort to investigate the issue or notify the public. (*Id.* at 143–44.)

Additionally, the MDEQ lacked a nondiscrimination policy required by federal law. (*Id.* at 126.) In 1992, the EPA found that the MDEQ had discriminated against Flint's majority African American population in the public participation processes for a power station permit. (*Id.* at 145–46.) In conducting its investigation, the EPA concluded that the MDEQ had insufficient formalized safeguards to protect against operational discrimination as required by federal regulations. (*Id.* at 146.) In 2014, the EPA informed the MDEQ that it was still not in compliance and needed to have in place a non-discrimination policy. (*Id.* at 147.) And even when the MDEQ provided the EPA with a written policy, the EPA

determined that it was legally insufficient. (*Id.*) The same defective policy remains in place. (*Id.*)

Throughout the crisis and its aftermath, the concerns and fears of the people of Flint were not taken seriously. In the opinion of some government officials, residents "making noise about civil unrest, violence, [Michigan State Police] shootings and an [emergency manager], [were] the naysayers[.]" (*Id.* at 156.) These officials believed that too many of them had "their handout [sic] and their voices raised," and caving to their demands was part of the reason that Flint had been "placed in receivership twice in the past decade." (*Id.* at 156–57.) In the view of these officials, the problem an "entitlement mentality." (*Id.* at 157.) Ultimately, the Task Force charged with investigating the causes of the crisis summed it up: "Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities." [5] (*Id.* at 165.)

---

[5] According to the fourth amended complaint, Flint's population is 54.3% African American. (Dkt. 620-3 at 152.)

### iv.  Prior Flint Water Cases

Litigation from the Flint Water Cases has already resulted in several opinions from the Sixth Circuit. The Court must follow these as they are binding precedent, including *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019); *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017); and *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017).[6] Other decisions have been issued by this Court, which will be adhered to where appropriate. This includes *Guertin v. Michigan*, No. 16-cv-12412, 2017 U.S. Dist. LEXIS 85544, (E.D. Mich. June 5, 2017), and the Court's vacated August 1, 2018 opinion in the present case. 329 F. Supp. 3d 369.

### b. Standard of Review

Plaintiffs seek leave to amend the complaint under Federal Rule of Civil Procedure 15(a)(2). Rule 15(a)(2) states that "a party may amend its pleading only with . . . the court's leave."[7] However, "court[s] should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also*

---

[6] On remand from the Sixth Circuit, *Boler* was consolidated with the present case. (Dkt. 453.)

[7] Where, as here, leave is sought following a dispositive ruling, the moving party must normally have the ruling set aside. *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002). But in this case, the ruling has already been vacated. (Dkt. 670.)

*Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (noting that Rule 15(a) requests are normally liberally granted). And when evaluating the interests of justice, courts consider various factors. These include "'[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, [and] undue prejudice to the opposing party[.]'" *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir.1989)). Mere delay on its own is insufficient to warrant denial. *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001). Instead, courts examine the competing interests of the litigants and the likelihood of prejudice to the non-moving party. *See Morse*, 290 F.3d at 799.

Yet regardless of the equities, leave must be denied if an amendment would be futile. *Parchman v. SLM Corp.*, 896 F.3d 728, 736, 738 (6th Cir. 2018) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). And a "proposed amendment is futile if [it] could not withstand a Rule 12(b)(6) motion[.]" *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017). Under Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v.*

*Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ultimately, a claim is only facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### c. Threshold Issues

#### i. Jurisdiction

Several parties question the Court's jurisdiction to rule on plaintiffs' motion. (Dkt. 635 at 4–5; Dkt. 650 at 1–2; Dkt. 653 at 12–13; Dkt. 655 at 12–14; Dkt. 657 at 11–12.) They argue that the Court was divested of jurisdiction by appeals filed in response to its August 1, 2018 opinion and order. (*Id.*) However, as explained in its November 9, 2018 order, the Court retained jurisdiction. (Dkt. 670.) And the Sixth Circuit recently affirmed this position, dismissing defendants' appeals in the

process. *Carthan v. Snyder*, No. 18-1967 (6th Cir. Feb. 19, 2019). As such, the Court retains the authority to rule on the present motion.

## ii. Class Definitions

Plaintiffs seek leave to amend the class definitions. The third amended complaint broadly defined the class as including all individuals and entities who were exposed to Flint's contaminated water and who experienced injuries or damages to their persons or property. (Dkt. 349 at 112–13.) The fourth amended complaint keeps this general definition but adds a subclass of African Americans. (Dkt. 620-3 at 167–68.) Plaintiffs also further divide the proposed classes into a series of even smaller subclasses based on property damage, personal injury, injunctive relief, and a set of common issues relating to liability and causation. (*Id.* at 167–72.)

Class certification should occur "at an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). The Court is currently preparing a comprehensive case management order that will set forth the timeframe for consideration of class definitions and certification. Therefore, plaintiffs may amend the complaint to include the amended class definitions with the understanding that this issue will be revisited.

### d. Main Analysis

Plaintiffs seek leave to amend the following six counts:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | 42 U.S.C. § 1983 - Bodily Integrity | All government defendants |
| II-III | 42 U.S.C. § 1983 - Equal Protection | Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, Wyant, Shekter-Smith, Prysby, and Busch |
| IV | 42 U.S.C. § 1985(3) - Conspiracy | Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley |
| V | Elliott-Larsen Civil Rights Act | Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, The City of Flint, Wyant, Shekter-Smith, Prysby, and Busch |
| XIV | Gross Negligence | Snyder, Dillon, Lyon, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow. |

### i. Competing Interests and Likelihood of Prejudice

Some of the defendants argue that leave to amend the complaint should be denied because plaintiffs' request is unduly delayed. (Dkt. 651 at 19–20; Dkt. 653 at 33–34). The Court disagrees.

It is true that the present case has been pending for several years. This is now plaintiffs' fourth amended complaint, and if this were a routine case, their attempt to amend the pleadings again might be unusual. But this litigation is far from routine. The harm alleged and the

38

number of parties involved are extraordinary. What started out as a series of individual suits has become a large consolidated action. And the complex nature of the claims coupled with less than straightforward procedure must be considered. This weighs in plaintiffs' favor.

Conversely, defendants do not explain how they will be prejudiced. Having resisted the start of discovery, they cannot claim that they will be subject to duplicative discovery. *See Morse*, 290 F.3d at 800–01. Plaintiffs have not changed their allegations so much that defendants will need to completely overhaul their strategy. *See Prather v. Dayton Power & Light Co.*, 918 F.2d 1255, 1259 (6th Cir. 1990). And the fourth amended complaint does not contain new claims so far outside the scope of the third amended complaint such that granting leave to amend may later lead to confusion. *See Lover v. D.C.*, 248 F.R.D. 319, 323 (D.D.C. 2008). As a result, leave to amend will not be denied on the basis of prejudice. Instead, the Court will examine each count for futility.

### ii. Futility of Amendments

### 1. Bodily Integrity

Plaintiffs first seek leave to amend their bodily integrity claim brought under § 1983 against defendant Governor Snyder. (Dkt. 620-1 at

13.) In their view, the newly pleaded allegations establish that the Governor was aware of the significant risks posed by the Flint River water as early as April 2015, but he did nothing to inform Flint's residents until the crisis could no longer be denied many months later. (*Id.* at 14–15.) Additionally, Governor Snyder not only denied the crisis in the intervening period, but later played down the risks for months after having publicly acknowledged the disaster. (*Id.*) Because plaintiffs' state a plausible bodily integrity claim against Governor Snyder, granting leave to include it would not be futile.

### a. Constitutional Violation

The right to bodily integrity is a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment. *Guertin*, 912 F.3d at 918–19; *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (citing *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). And although violations of the right to bodily integrity usually arise in the context of physical punishment, the scope of the right is not limited to that context. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062–63 (6th Cir. 1998). For instance, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's

liberty[.]" *Guertin*, 912 F.3d at 919 (citing *Washington v. Harper*, 494 U.S. 210, 229 (1990)). And "compulsory treatment with anti-psychotic drugs may [also] invade a patient's interest in bodily integrity[.]" *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *66 (citing *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983)). The key is whether the intrusion is consensual. *See Guertin*, 912 F.3d at 920. There is no difference between the forced invasion of a person's body and misleading that person into consuming a substance involuntarily. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71 (citing *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313–14 (D. Mass. 1999)). As such, officials can violate an individual's bodily integrity by introducing life-threatening substances into that person's body without their consent. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *65 (citing *Washington*, 494 U.S. at 229).

However, to state a claim, plaintiffs must do more than point to the violation of a protected interest; they must also demonstrate that it was infringed arbitrarily. *Guertin*, 912 F.3d at 922. *But see Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (observing that in some contexts government action may violate substantive due process without a liberty interest at stake). And with executive action, as here, only the most

41

egregious conduct can be classified as unconstitutionally arbitrary. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In legal terms, the conduct must "shock[ ] the conscience." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (quoting *Lewis*, 523 U.S. at 846).

Whether government action shocks the conscience depends on the situation. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Where unforeseen circumstances demand the immediate judgment of an executive official, liability turns on whether decisions were made "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 852–53 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). But where an executive official has time for deliberation before acting, conduct taken with "deliberate indifference" to the rights of others "shocks the conscience." *See Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). This case involves the latter of these two situations. And as a result, plaintiffs must demonstrate that (1) officials knew of facts from which they could infer a "substantial risk of serious harm," (2) that they did infer it, and (3) that they nonetheless acted with indifference, *Range*, 763 F.3d at 591 (citing *Ewolski*, 287 F.3d at 513), demonstrating a callous disregard towards the rights of those affected,

*Guertin*, 912 F.3d at 924 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005)).

As a preliminary matter, plaintiffs point to a bodily integrity violation. This is not a case about the right to a contaminant-free environment or clean water. *But see Guertin*, 912 F.3d at 955–57 (McKeague, J., dissenting). Rather, this case implicates the consumption of life-threatening substances. Indeed, neither side disagrees that lead and legionella are life threatening, nor that plaintiffs ingested these contaminants and others through the water supply. This intrusion was also involuntary. "[I]t was involuntary because defendants hid from plaintiffs that Flint's water contained dangerous levels of lead," *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71, and, "because under state and municipal law, plaintiffs were not permitted to receive water in any other way[,]" *id.* (citing Flint Code of Ord. §§ 46-25, 46-26, 46-50(b)). Plaintiffs' claim therefore implicates the right to bodily integrity.

Plaintiffs also plead facts which, when taken as true, show that Governor Snyder was deliberately indifferent. First, plaintiffs plausibly allege that Governor Snyder knew of facts from which he could infer that plaintiffs faced a substantial risk of serious harm. As early as March

43

2014, members of the Governor's administration were warning that transitioning to the Flint River could lead to a potential disaster. Initial warning signs included an outbreak of Legionnaires' disease in the Flint area. And by October 2014, senior staff, including the Governor's Chief of Staff, were discussing the need to return to DWSD water because of a growing awareness that the treated Flint River water did not meet established quality standards. In July 2015, this clamor continued to build when the Governor's Chief of Staff wrote that concerns over lead contamination were being inappropriately dismissed. There was also a public outcry. Concerned religious leaders informed the administration of problems with the Flint River. News articles discussed lead in Flint's drinking water. And General Motors stopped using Flint water because it was corroding machinery. Considering the seriousness of the potential problem, the widespread reports, and the seniority of the government staff involved, it is reasonable to infer from plaintiffs' allegations that Governor Snyder was aware of this information. As a result, the Governor possessed sufficient facts from which he could have deduced that plaintiffs faced a substantial risk of serious harm from the Flint River.

Second, plaintiffs successfully claim that Governor Snyder did in fact infer that plaintiffs faced such a risk of harm. In January 2015, the Governor met with other government officials to discuss the ongoing threat to public health posed by legionella bacteria in the Flint River water. A couple of months later, the Governor and his staff discussed whether to distribute water filters to Flint residents as a form of mitigation against possible contamination. At the same time, the Governor's Chief of Staff informed the Governor that the water issue in Flint continued to be "a danger flag" and was something that needed addressing sooner rather than later. (*Id.* at 92.) And in the summer, a senior member of the administration spoke with Governor Snyder about the fear that Flint's residents were being exposed to toxic levels of lead through the Flint River water. So when plaintiffs state that by February 2015, the Governor was fully aware of a public health threat posed by the water supply in Flint, and that by July 2015, at the very latest, the Governor knew that the water supply was contaminated, these conclusions are supported by well-pleaded factual allegations. It is reasonable to infer that Governor Snyder knew that the residents of Flint faced a substantial risk of serious harm emanating from the water.

45

Third, plaintiffs plausibly state that the Governor acted indifferently to the risk of harm they faced, demonstrating a callous disregard for their right to bodily integrity. This indifference manifested itself in two ways. Initially, the Governor was indifferent because instead of mitigating the risk of harm caused by the contaminated water, he covered it up. In private, he worried about the need to return Flint to DWSD water and the political implications of the crisis. But in public, he denied all knowledge, despite being aware of the developing crisis. As a result, plaintiffs were lured into a false sense of security. They could have taken protective measures, if only they had known what the Governor knew. Instead, the Governor misled them into assuming that nothing was wrong. Governor Snyder's administration even encouraged them to continue to drink and bathe in the water.

Subsequently, the Governor continued to show indifference to the risk of harm plaintiffs faced. Even once he acknowledged the crisis, he downplayed the risks that plaintiffs faced. By October 2015, the Governor had publicly admitted that the water was contaminated and Flint had returned to DWSD water. Yet the Governor still waited many months to declare a state of emergency. This was despite local area leaders

requesting such a declaration as far back as March 2015. Without a state of emergency, plaintiffs were denied valuable resources that could have helped abate the harm that they were still suffering. It is reasonable to infer that the rationale for the delay was in part because the Governor wanted to act as if the issue was resolved. But by downplaying the continuing risk of harm, the Governor undermined efforts to enact protective measures. And as with his initial form of indifference, this led to plaintiffs involuntarily ingesting lead and other contaminants, violating their bodily integrity.

These two ways of showing indifference represent a continuum of actions, more powerful combined than when viewed in isolation. They depict indifference in the form of deception, from the Governor's unwillingness to admit the crisis, to his downplaying of its severity once it became public knowledge. Viewed as a whole, the allegations plausibly describe "conscience shocking" conduct. Governor Snyder's actions were deliberately indifference and exhibited a callous disregard for plaintiffs' right to bodily integrity.[8]

---

[8] In response, Governor Snyder points out that the new allegations do not indicate that he knew of the risks posed by the Flint River prior to the decision to switch water sources. (Dkt. 654 at 19.) And because, in his view, the right to bodily

### b. Qualified Immunity

Although plaintiffs plausibly plead that Governor Snyder violated their right to bodily integrity, qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides protection to government officials who make reasonable yet mistaken decisions that involve open questions of law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). But an official cannot avail herself of qualified immunity if the right violated was "clearly established at the time of the challenged conduct." *Guertin*, 912 F.3d at 917 (quoting *al-Kidd*, 563 U.S. at 741–42). If controlling caselaw or a body of persuasive authority has put the constitutional question beyond debate, government

---

integrity only limits the State's power to take affirmative action, Governor Snyder argues that what he knew after the switch is irrelevant information. (*Id.* at 20.) Moreover, according to the Governor, the Constitution does not guarantee that the State will remedy local water contamination issues. (*Id.*)

However, the Governor misunderstands the nature of plaintiffs' claim. Plaintiffs do not argue that Governor Snyder violated their right to bodily integrity by authorizing the switch to the Flint River. Nor do they assert that Governor Snyder should have remediated a polluted water source. Rather, plaintiffs contend that the Governor was indifferent to their rights by concealing the risk of harm posed by Flint's contaminated water.

officials are on notice that their conduct must conform to an established legal standard. *Id*. at 932.

As the Sixth Circuit recently held, the right to bodily integrity was clearly established at the time of the challenged conduct. *Id.* at 932–35. "Knowing the Flint River water was unsafe for public use," failing to take "steps to counter its problems, and assuring the public in the meantime that it was safe" was "'conduct that would alert a reasonable person to the likelihood of personal liability." *Id.* at 933 (quoting *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003)). In other words, any reasonable official should have known that "contaminat[ing] a community through its public water supply with deliberate indifference is a government invasion of the highest magnitude." *Id*. As a result, the Governor is not entitled to qualified immunity.

## 2. Equal Protection

Plaintiffs also seek leave to revise their equal protection claims under § 1983. Plaintiffs' third amended complaint included two equal protection counts, one alleging discrimination on the basis of race and the other on wealth. (Dkt. 349 at 119, 123.) Under both counts, plaintiffs alleged that defendants Snyder, Dillon, Wright, Walling, Ambrose,

49

Kurtz, and Earley developed and executed an interim plan to deliver contaminated water to the predominantly poor African American residents of Flint, while providing the mostly white higher income residents of Genesee County with safe water. (*Id.* at 120–21, 124–25.)

The fourth amended complaint makes two important changes. First, only those plaintiffs who are African American allege race discrimination. (Dkt. 620-3 at 174, 180.) Second, both counts are broken into three theories of liability: (1) like in the third amended complaint, defendants Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley violated their right to equal protection by providing Flint with contaminated water while supplying the remainder of Genesee County with clean water (*id.* at 174–76, 181–83);[9] (2) Governor Snyder violated their right to equal protection by delaying his decision to declare a state of emergency in Flint while promptly doing so in other emergency situations (*id.* at 177–78, 183–84); and (3) MDEQ defendants Wyant, Shekter-Smith, Prysby, and Busch violated their right to equal protection by not enforcing certain

---

[9] This theory is identical to that stated in the third amended complaint, with the omission of Dayne Walling as a named defendant. However, the proposed complaint is somewhat inconsistent on this point. Walling is omitted as a named defendant but is still referred to in subsequent allegations. (Dkt. 620-3 at 174–86.) The Court assumes that plaintiffs intended to omit Walling.

50

laws and regulations in Flint. (*Id.*) For the reasons that follow, the fourth amended complaint fails to state an equal protection claim under any of these theories, and so granting leave to amend the complaint to include these claims would be futile.

*

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws[.]'" *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Broadly speaking, it requires that state officials treat all persons alike, under like circumstances and like conditions. *Cleburne*, 473 U.S. at 439; *see also Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). When officials treat similar individuals differently, the Equal Protection Clause demands a justification. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008). But because all state action tends to disfavor some more than others, courts take this practical reality into account by evaluating state action under differing levels of scrutiny. *See Breck v. Michigan*, 203 F.3d 392, 395 (6th Cir. 2000). If official conduct "neither burdens a fundamental right nor targets a suspect class," courts

51

will uphold it "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).

### a. Wealth-Based Discrimination

Plaintiffs fail to state a claim that defendants violated their right to equal protection on the basis of wealth discrimination. A class of less wealthy persons is not a protected class for the purposes of equal protection. *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008). The challenged conduct will therefore be upheld if it satisfies a rational basis. *Romer*, 517 U.S. at 631.

Under rational basis review, official decisions are afforded a strong presumption of validity. *See Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001). And even at the motion to dismiss stage, this presents a formidable bar for plaintiffs to surmount. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018). To plausibly allege that state action fails under rational basis review, plaintiffs must negate "every conceivable basis" which might support the challenged conduct. *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012). Courts do not consider the wisdom of the

challenged action. *Theile*, 891 F.3d at 244 (citing *Breck*, 203 F.3d at 395). And defendants do not need to offer any justification. *Walker*, 257 F.3d at 668. It is enough that the reviewing court can fairly conceive of one existing. *Id.*

As outlined above, plaintiffs' first theory is that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley created an interim plan to supply Flint with Flint River water, while continuing to provide the remainder of Genesee County with DWSD water. (Dkt. 620-3 at 181–82.) In plaintiffs' view, there was no rational basis for this decision. (*Id.* at 182–83.)

Even assuming that Flint and the remainder of Genesee County were similarly situated for equal protection purposes, there are many rational reasons that could justify providing only Flint with Flint River water. The KWA could not proceed without Flint's participation. Flint's participation was contingent on the FWTP's ability to process the raw water that the KWA pipeline would provide, and upgrading the FWTP would cost millions. One key way defendants could accomplish this was to stop paying for the relatively expensive DWSD water and to start

53

taking water from the Flint River. Indeed, even plaintiffs allege that this was a critical part of the interim plan.

In hindsight, this was a terrible decision. It placed financial interests above the health and safety of Flint's residents. Assuming the allegations are true, defendants harmed plaintiffs in the pursuit of fiscal expedience. But the Court cannot consider the wisdom of the decision. And it does not matter that defendants may have had other options available to them. It only matters that there is a rational basis for the decision. As such, plaintiffs' first theory fails to state a claim.

Plaintiffs' second theory fails for a similar reason. They draw a comparison between Flint and other communities with respect to emergencies across the state. Governor Snyder allegedly waited several months to declare a state of emergency in Flint from the date he publicly acknowledged the seriousness of the problem. (Dkt. 620-3 at 102). With other disasters, he typically acted within days. (*Id.* at 152–53.) Plaintiffs again argue that there was no rational basis for this difference in treatment. (*Id.* at 183.)

Again, even assuming that Flint and these other disaster-struck communities were similarly situated for equal protection purposes, there

is a conceivable rational basis for treating them differently. In part, plaintiffs were harmed by the Governor's delay in declaring a state of emergency because it limited their access to state resources to remedy the problem. It is thus conceivable that the Governor initially decided not to expend these resources, believing that the Flint Water Crisis could be addressed without them. In retrospect, this was objectively the wrong decision. And the Governor undoubtedly was within his authority to declare a state of emergency at an earlier time. But the Court cannot inquire further under rational basis review. As a result, plaintiffs' second theory also fails to state a claim.

Plaintiffs' third theory runs into a different problem. Plaintiffs allege that the MDEQ defendants Wyant, Shekter-Smith, Prysby, and Busch treated them differently by:

> (1) granting a fraudulent [ACO] to allow Flint to borrow funds to participate in the KWA; (2) issuing the [FWTP] a permit pursuant to the Michigan Safe Drinking Water Act without observing the statutorily mandated 45-day notice and comment period; (3) failing to comply with sampling and optimized corrosion control protocols as required under the State and Federal Lead and Copper Rule; and (4) lacking any nondiscrimination policy for more than 30 years and ignoring EPA requirements to update its policy for years.

(*Id.* at 183–84.) However, they fail to explain how this treatment differed from that of a similarly situated class of persons.

Class-based discrimination is the essence of an equal protection claim. *See Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000) (citing cases). In limited situations, a plaintiff does not need to identify a specific group of persons who were treated differently. For instance, if government conduct was premised on a protected classification such as race or gender, a showing of discriminatory purpose may suffice. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977) (explaining that a single act, if motivated by a desire to treat persons differently on the basis of race, can result in a violation of the Equal Protection Clause). However, outside of that narrow range of cases, plaintiffs must plead sufficient facts from which it can be inferred that defendants treated similarly situated individuals differently. *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574–75 (6th Cir. 2008); *see also Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.").

56

Here, plaintiffs highlight several instances in which defendants failed to enforce either a law or a policy, but the allegations do not explain in anything but conclusory terms how defendants acted differently in other situations. For example, to the extent that defendants failed to observe the statutory forty-five day notice and comment period before issuing the FWTP an operating permit, it may be that they normally dispensed with this requirement. Likewise, although plaintiffs plead that defendants did not comply with state and federal lead and copper testing requirements, the complaint reveals nothing about the possibility that defendants failed to enforce these laws on a statewide basis. Accordingly, plaintiffs' third and final theory also fails to state a claim.

In some of their briefing, plaintiffs argue that rational basis review should not apply to their wealth-based equal protection claim because the claim should be construed as one involving discrimination implicating the fundamental right to bodily integrity. (Dkt. 379 at 88.) However, plaintiffs have not pleaded the claim this way in the fourth amended complaint. And in fact, plaintiffs do not raise this argument in their most recent briefing. The Court therefore continues to view the claim as one

involving discrimination on the basis of wealth. For these reasons, leave to amend the complaint to include this claim would be futile.

### b. Race-Based Discrimination

Plaintiffs also fail to state a claim that defendants violated their right to equal protection on the basis of race discrimination. When state action is premised on a racial classification, courts strictly scrutinize the challenged conduct. *Cleburne*, 473 U.S. at 440; *Mass. Bd. of Ret.*, 427 U.S. at 312; *see also United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938) (noting that courts act with greater vigilance when equal protection claims affect the politically powerless). Conduct subject to strict scrutiny is presumptively invalid; only official action that is narrowly tailored to meet a compelling state interest will survive. *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 276 F.3d 876, 879 (6th Cir. 2002).

Yet "'proof of . . . discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause" on the basis of race discrimination. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights*, 429 U.S. at 265); *Washington v. Davis*, 426 U.S. 229, 239–41 (1976). If discriminatory

58

intent is missing, claims are analyzed under rational basis. *See Radvansky*, 395 F.3d at 312. And the facts must offer more than "intent as volition or intent as awareness of consequences." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). Rather, they must demonstrate that a decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon a particular racial group." *Id.*; *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *King v. City of Eastpointe*, 86 F. App'x 790, 802 (6th Cir. 2003)).

At this stage in the case, plaintiffs need only raise an inference of discriminatory purpose. To do so, they must demonstrate that the application of a facially neutral law or policy had a discriminatory impact, and sufficient evidence exists to suggest an invidious motive. *Arlington Heights*, 429 U.S. at 265–66; *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636–37 (6th Cir. 2016).[10] The challenged conduct does not need to rest "solely on racially discriminatory purposes," but this must have been a "motivating factor." *Arlington Heights*, 429 U.S. at 265.

---

[10] Alternatively, plaintiffs can show that a law or policy explicitly classifies on the basis of race. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). But plaintiffs agree that this case involves a facially neutral policy. (Dkt. 620-1 at 18, 19; Dkt. 663 at 37.)

And although discriminatory impact is an important starting point, it is rarely enough on its own. *Id.* Instead, courts must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Discriminatory impact alone is only sufficient in the rarest case where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action[.]" *Id.* at 266 (citations omitted).

Several non-exhaustive factors guide this inquiry: (1) "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267; (2) "the specific sequence of events leading up to the challenged decision . . . may shed . . . light on the decisionmaker's purposes," *id.*; (3) "[d]epartures from the normal procedural sequence . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *id.*; and (4) "[t]he legislative or administrative history . . . especially where

there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *id.* at 268.[11]

As a starting point, plaintiffs plead discriminatory impact for all three theories. Under each theory, they allege that defendants' conduct negatively impacted Flint. And Flint is majority African American. However, this is not the "rarest case" where the discriminatory impact is so stark as to immediately warrant an inference of discriminatory purpose. *See Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (invalidating state action where redrawing of city boundaries disenfranchised all but four or five of the municipality's 400 African American voters); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (finding a violation of equal protection where an ordinance was exclusively applied against Chinese-owned laundries). After all, Flint is 40.4% white. (Dkt. 620-3 at 128.)

Plaintiffs also point to the historical background for all three theories. They identify a long history of race discrimination and segregation and argue that this should factor into the Court's analysis.

---

[11] The Sixth Circuit has repeatedly relied on the *Arlington Heights* factors when addressing equal protection claims involving facially neutral laws or policies. *E.g.*, *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 636–37 (6th Cir. 2016); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790–91 (6th Cir. 1996).

(Dkt. 620-1 at 18.) But plaintiffs do not connect Flint's history of systemic racism to defendants' conduct. They imply that the legacy effects of historical racism should be imputed to defendants because they were state actors carrying out official business. But this alone is not enough to warrant an inference of discriminatory purpose. It will be considered with the other evidence.

Plaintiffs' first theory, the decision to switch Flint's water supply to the Flint River while providing DWSD water to the remainder of Genesee County, lacks sufficient facts to warrant an inference of discriminatory purpose. Little about the sequence of events indicates that a racial bias was driving defendants. In the months leading up to the switch, cost studies suggested that DWSD water was the more economic mid-term option. But the KWA would only be viable if the Flint River was used as an interim water source. And defendants were concerned that DWSD water would become increasingly expensive.

Likewise, defendants' contemporary statements do not change the outcome. Defendant Wright expressed the view that DWSD is a corrupt

entity.[12] But this does not indicate racial animus and the fourth amended complaint offers nothing further. Therefore, when all the facts are taken into consideration, the allegations fail to show that race motivated defendants' decision. At most they show that defendants acted in spite of the risk of harm that plaintiffs faced, not that they were driven by it. Plaintiffs' first theory thus fails to state a claim.

With their second theory that the Governor treated the emergency situation in Flint differently, plaintiffs also fail to allege sufficient facts to warrant an inference of discriminatory purpose. Governor Snyder allegedly knew that Flint's water supply was contaminated months before publicly acknowledging it, but he did not alert the public until October 2015, when it was impossible to deny. The Governor also took many months more to declare a state of emergency. And presumably the conditions that gave rise to the eventual emergency declaration existed the whole time. Similarly, a departure from past practice works in

---

[12] In fact, DWSD was at the center of highly publicized public corruption charges. In March of 2013, former Mayor of Detroit, Kwame Kilpatrick was found guilty of twenty-four of thirty counts brought against him, including conspiracy charges related to the DWSD. *United States v. Kilpatrick*, et al,No. 10-cr-20403). Former DWSD Director Victor Mercado had previously pled guilty in November of 2012.

plaintiffs' favor. Governor Snyder's conduct in Flint differed from that in some majority white communities, where he promptly issued states of emergency.

Nonetheless, these facts taken as a whole do not support an inference of discriminatory intent. The comparative states of emergency identified in the fourth amended complaint involved drastically different situations, such as several wildfires and floods, meaning plaintiffs' comparison is less apples-to-apples than it initially appears. And in the one instance where plaintiffs cite to an emergency involving water contamination, they identify an incident that occurred several years after the facts pertinent to this present case. Accordingly, it is hard to know whether the Governor's prompt response was a reaction to the criticism about his handling of Flint, rather than evidence of a desire to harm African Americans. Moreover, plaintiffs do not point to a clear pattern of discrimination where Governor Snyder consistently delayed declaring states of emergency in mostly African American areas. In fact, a close inspection of the analogous emergencies suggests the opposite was almost true. During a flood in Wayne County, which is 45.4% non-white,

the Governor declared an emergency within two days. (Dkt. 620-3 at 152.)[13] The departure from practice is less salient.

Plaintiffs point to no other facts sufficient to support a finding of discriminatory purpose. During the crisis, a senior member of the Governor's administration dismissed complaints from Flint activists as the product of "old time negative racial experiences." (*Id.* at 161.) But even if the same thoughts are attributed to Governor Snyder, it only shows that he acted in spite of the fact that Flint was majority African American, not because of this fact. When the allegations are collectively considered, they do not warrant an inference of invidious intent. And as such, plaintiffs' second theory fails to state a claim.

Finally, plaintiffs' third theory that the MDEQ defendants failed to enforce certain laws and policies also fails to allege sufficient facts to warrant an inference of discriminatory purpose. As discussed above, plaintiffs generally point to Flint's history of racial discrimination, and this alone is insufficient to show invidious intent. However, here,

---

[13] Plaintiffs detail the Governor's response to emergencies in majority white communities. (Dkt. 620-3 at 152–53.) However, this only tells half the story. Without knowing how the Governor reacted to emergencies in majority African American communities, it is difficult to assess his motive in Flint. The flood in Wayne County is the closest non majority white jurisdiction that plaintiffs provide.

plaintiffs also note that the EPA had concluded earlier that the MDEQ had discriminated against Flint's African Americans when issuing an operating permit for a local power station. In particular, the EPA found that the MDEQ did not have a sufficient non-discrimination policy in place. And this lack of policy persisted during the Flint Water Crisis. As recently as 2017, the EPA was still raising concerns that the MDEQ did not take its non-discrimination obligations seriously.

However, the MDEQ's failure to develop a sufficient non-discrimination policy does not demonstrate discriminatory intent. Plaintiffs do not allege that Shekter-Smith, Prysby, and Busch were responsible for the MDEQ's internal policies. Nor is there any sign that they obstructed or otherwise hindered the development of other procedural safeguards. Defendant Wyant, as MDEQ director, was presumably ultimately responsible for the non-discrimination policy, but plaintiffs do not plead facts that suggest his failure to develop such a policy was motivated by a nefarious purpose.

Neither the specific sequence of events nor any departure from standard procedures suggest a race-based motive. Defendants Shekter-Smith and Busch were allegedly involved in helping Flint secure a

66

fraudulent ACO. Yet there is no suggestion that a desire to harm African Americans motivated their conduct. The same is true of the decision to grant the FWTP an operating permit without sufficient public participation, and the MDEQ's failure to enforce lead and copper testing requirements. The allegations do not provide any way to link these decisions to a discriminatory intent. Plaintiffs allege that these types of nonconformities with law and policy never occurred in majority white communities, but these are conclusory accusations. These defendants also made no contemporary statements indicating that race motivated their actions. And there is nothing else to connect their conduct to a discriminatory purpose. As such, when the facts are considered together, plaintiffs' third theory fails to state a claim.

*

Plaintiffs' equal protection allegations fail to state a claim upon which relief can be granted. The wealth-based claim fails on grounds that rational justifications conceivably exist that explain the challenged conduct. And the race-based claim fails because plaintiffs plead insufficient facts to infer that a discriminatory purpose motivated defendants' decisions. That is not to say that race and poverty did not

67

play a role in the Flint Water Crisis. As plaintiffs explain, multiple sources indicate that historical patterns of discrimination created the conditions for what happened. But under current caselaw, the Equal Protection Clause does not provide redress for the harms as alleged. Granting plaintiffs' leave to amend the complaint to include them would be futile.

### 3. Elliott Larsen Civil Rights Act

Plaintiffs next seek to revise their claim under Article 3 of Michigan's Elliott Larsen Civil Rights Act (ELCRA), which addresses discrimination in public services and accommodations. Mich. Comp. Laws §§ 37.2301–37.2304 (2017). Plaintiffs' ELCRA allegations mirror their equal protection claims. Only the African American plaintiffs bring the claim on behalf of an African American class. (Dkt. 620-3 at 190.) And plaintiffs advance similar theories of liability: that (1) defendants Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, and the City of Flint provided Flint's predominantly African American residents with inferior water when compared to the mostly white residents of Genesee County (*id.* at 192–93); (2) Governor Snyder failed to promptly declare a state of emergency in Flint compared to other emergencies in predominantly

white communities, (*id.* at 193–94); and (3) the MDEQ defendants Wyant, Shekter-Smith, Prysby, and Busch failed to enforce certain laws and regulations. (*Id.* at 194–95.) For the following reasons, plaintiffs' ELCRA claim could not withstand a motion to dismiss if leave to amend were granted, and so granting leave would be futile.

\*

The ELCRA "is aimed at 'the prejudices and biases' borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Radtke v. Everett*, 442 Mich. 368, 379 (1993) (quoting *Miller v. C.A. Muer Corp.*, 420 Mich. 355, 363 (1984)). To state a claim under Article 3, plaintiffs must allege: "(1) discrimination based on a protected characteristic (2) by a person, (3) resulting in denial of the full and equal enjoyment of [a public service]." *See Haynes v. Neshewat*, 477 Mich. 29, 35 (2007); *Clarke v. K Mart Corp.*, 197 Mich. App. 541, 545 (1992). The ELCRA defines public service as "a public facility . . . owned, operated, or managed by or on behalf of . . . a political subdivision . . . established to provide service to the public." § 37.2301. For the purposes of this analysis,

69

the Court assumes that Flint's municipal water supply is a public service under the ELCRA.

The public service provision of the ELCRA uses the same framework to establish discrimination as that used generally under other provisions of the ELCRA. *See Schellenberg v. Rochester Mich. Lodge No. 2225 of the Benev. & Prot. Order of Elks*, 228 Mich. App. 20, 32 (1998); *Clarke*, 197 Mich. App. at 545. Plaintiffs must show either intentional discrimination directly or raise an inference of discrimination based on a disparate treatment theory. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462–63 (2001); *Clarke*, 197 Mich. App. at 545. In a case like this involving allegations of race-based discrimination, plaintiffs can plead intentional discrimination by pointing to direct evidence that defendants were pre-disposed to discriminate against African Americans, and that they acted on that pre-disposition. *See Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 538 (1991). Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in [defendants'] actions." *Hazle*, 464 Mich. at 462 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Alternatively, plaintiffs can raise an

inference of discrimination by pleading that defendants treated them differently from non-protected individuals under the same or similar circumstances. *See Reisman*, 188 Mich. App. at 538 (citing *Singal v. Gen. Motors Corp.*, 179 Mich. App. 497, 502–03 (1989)); *Schellenberg*, 228 Mich. App. at 33. But here, they must also point to sufficient indirect evidence from which it can be inferred that race was a motivating factor, even if not "the sole factor." *See Reisman*, 188 Mich. App. at 539; *see also* Mich. M Civ JI 108.04 (2018) (identifying intentional discrimination as an element in an Article 3 ECLRA claim).

It is unclear whether plaintiffs are relying on direct evidence or evidence of disparate treatment to prove this claim. Plaintiffs do not offer direct evidence to show defendants were predisposed to discriminate on the basis of race, nor that they acted on that predisposition. However, they have pleaded facts consistent with a disparate treatment theory and so the Court proceeds on this basis.

Under a disparate treatment approach, plaintiffs fail to plead sufficient facts to raise an inference of racial discrimination. This is for the same reasons as set forth above with respect to plaintiffs' equal protection claims. *See supra* Section II.d.ii.2.b. Plaintiffs have not

explained why their ELCRA claim should be evaluated under a different standard. Therefore, plaintiffs' ELCRA claim could not survive a motion to dismiss, and so granting leave to amend the complaint to include it would be futile.

### 4. Conspiracy

Plaintiffs next seek leave to amend their conspiracy claim under § 1985(3). (Dkt. 620-3 at 186–90.) This claim is also only brought by the African American plaintiffs on behalf of an African American class. (*Id.* at 186.) Plaintiffs argue that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley conspired to expose them to contaminated water from the Flint River (*id.* at 186–87),[14] and the means by which they did this is familiar: defendants developed an interim plan to provide safe water to the predominately white population of Genesee County while supplying unsafe water to Flint residents. (*Id.* at 187–88.) In plaintiffs' view, there was no rational reason to treat these two groups differently. (*Id.* at 188.) Defendants' conduct was based on invidious discrimination,

---

[14] As with the proposed equal protection and ELCRA claims, plaintiffs inconsistently name defendants in the Count. The conspiracy Count lists the defendants mentioned here, but subsequent briefing includes additional individuals.

akin to imposing a badge, vestige, or symbol of slavery, as prohibited by the Thirteenth Amendment. (*Id.* at 188–89.)[15]

In the context of § 1985(3), plaintiffs shoulder a heavy pleading burden. "Conspiracy claims must be pled with some degree of specificity[.]" *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim[.]" *Id.* To state a claim under § 1985(3), plaintiffs must plead facts consistent with (1) a conspiracy between two or more persons, (2) conceived for the purpose of depriving a person or class of people of the equal protection of the laws, (3) an act committed in furtherance of the conspiracy, and (4) that a person was either injured in his or her person or property, or deprived of a right guaranteed by the Constitution. *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839

---

[15] There are two ways to construe plaintiffs' § 1985(3) argument. First, it could be understood as stating a claim based on the theory that defendants' actions burdened plaintiffs' rights under the Thirteenth Amendment, denying them equal protection of the laws. Or it could be read as articulating a violation of the Equal Protection Clause on the basis of racial discrimination, where defendants acted with racial animus similar to a badge of slavery. Because in plaintiffs' briefing they argue in support of the latter interpretation, the Court will analyze the claim under that theory.

(6th Cir. 1994)).[16] In so doing, plaintiffs must demonstrate that the conspiracy was motivated by racial or other constitutionally suspect class-based animus. *Bartell v. Lohiser*, 215 F.3d 550, 559–60 (6th Cir. 2000) (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983)).

Pleading invidious class-based animus is important. Section 1985(3) is not a "general federal tort law," providing a federal cause of action for every assault and battery. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 299 (1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). The intent requirement ensures that only those conspiracies that "aim at a deprivation of the equal enjoyment of rights secured by the law to all" are actionable under the statute. *Griffin*, 403 U.S. at 102.

Plaintiffs fail to plausibly allege that defendants were motivated by racial or any other invidious class-based animus. Plaintiffs possibly show

---

[16] In pertinent part, § 1985(3) states: "If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . [and] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

that the impact of historical race discrimination played a role in the Flint Water Crisis, but not that it was a motivating factor. For example, plaintiffs repeatedly assert that the interim plan provided safe water to predominantly white Genesee County residents and unsafe water to the mostly African American Flint residents. But this only demonstrates a disparate impact resulting from defendants' decisions. It does not show that they were motivated by the kind of discriminatory animus necessary to state a § 1985(3) claim. Similarly, plaintiffs contend that early complaints from Flint residents would have been taken into account faster had they been affluent and predominantly white. This allegation suffers from the same flaw.

Many of the facts contained in the fourth amended complaint set forth the historic impact of racism in Flint, but not specific instances of racially motivated conduct by the defendants. This history is important to understanding patterns of segregation, poverty, and other conditions that may have left plaintiffs vulnerable to the Flint Water Crisis. Yet such theories do not show invidious class-based animus by the named defendants.

Plaintiffs raise many serious and challenging issues, but they fail to plausibly allege that race discrimination animated defendants' conduct. This is especially so considering the heightened pleading standard. Therefore, their revised § 1985(3) claim could not withstand a motion to dismiss. As such, granting leave to amend the complaint to include it would be futile.

### 5. Gross Negligence

Finally, plaintiffs seek leave to add a gross negligence claim against defendants Snyder, Dillon, Lyon, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow. (Dkt. 620-3 at 217.) Plaintiffs allege that these government defendants owed them a duty not to conduct their official responsibilities recklessly (*id.*), but that they did so by playing a role in Flint's transition to the Flint River and downplaying the resulting harm. (*Id.* at 217–18.) Plaintiffs argue that defendants' conduct was grossly negligent and caused their injuries, and that defendants are not entitled to immunity under Michigan's Government Tort Liability Act (GTLA), Mich. Comp. Laws. § 691.1401–1419 (2014). (Dkt. 620-3 at 218.) However, this claim

also could not withstand a motion to dismiss and amending the complaint to include it would be futile.

*

Defendants are immune from tort liability. The GTLA premises immunity on various theories. Pertinently, "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority." § 691.1407(5). Under this theory, defendants Snyder, Dillon, and Lyon are absolutely immune. *See Guertin*, 2017 U.S. Dist. LEXIS 85544, at *77–78. The same is true of defendants Kurtz, Earley, Ambrose, and Croft, and defendants Shekter-Smith and Wurfel. *See id.*

This leaves the remaining defendants, lower-level government employees. Lower-level employees are "immune from tort liability for an injury to a person or damage to property caused by the . . . employee . . . while in the course of employment" if the employee is "acting or reasonably believes he or she is acting within the scope of his or her authority," unless the employees' conduct amounts to "gross negligence that is the proximate cause of the injury or damage." § 691.1407(2)(a)–

77

(c). To identify whether a lower-level employee was the proximate cause of an injury, courts must first evaluate "the conduct and any legal responsibility" of the various parties to an accident, *Ray v. Swager*, 501 Mich. 52, 74 (2017), where legal responsibility is assessed by determining whether the accident was a foreseeable consequence of an individual's actions, *see id.* at 69. And second, courts must jointly consider the actions of those legally responsible to determine whose conduct was the "one most immediate, efficient, and direct cause" of any injury. *Id.* at 83 (quoting *Robinson v. City of Detroit*, 462 Mich. 439, 462 (2000)). If the answer is anyone but the employee, the employee can claim immunity.

Plaintiffs do not address *Ray*'s causation requirement. The fourth amended complaint states that defendants' conduct was a direct and proximate cause of plaintiffs' injuries, but fails to explain, first, why they were legally responsible for this harm in anything but conclusory terms, and second, why such conduct was the "one most immediate, efficient, and direct cause" preceding plaintiffs' injuries. Instead, plaintiffs argue that they need only demonstrate that "it was foreseeable that the defendant's conduct could result in harm to the victim." (Dkt. 620-1 at 22 (quoting *Ray*, 501 Mich. at 65).) But this is a misinterpretation of *Ray*, a

78

case this Court is bound to follow. And because plaintiffs ask the Court to do something it cannot, amending the fourth amended complaint to include this claim would be futile.

Plaintiffs raise several counter arguments, but none are persuasive. First, plaintiffs argue that defendants were not acting within the scope of their authority, and, as such, they cannot claim immunity. (Dkt. 663 at 50–52.) For instance, plaintiffs contend that Governor Snyder did not have the power to discriminate against African American communities in his handling of emergencies. (*Id.* at 51.) Similarly, plaintiffs argue that Lyon and Wurfel did not have the authority to downplay the risks of harm posed by the contaminated water. (*Id.* at 52.) But these arguments are circular. Under plaintiffs' view, tortious conduct is sufficient to deprive a government defendant of immunity because tortious conduct is not within the defendant's scope of authority. This is not how the GTLA functions.

Second, plaintiffs claim that even if their interpretation of caselaw is wrong, they have adequately pleaded that defendants were the "most immediate, efficient, and direct cause" of plaintiffs' injuries, because each defendants' conduct served as "the proximate cause" for some discrete

79

harm that, taken in the aggregate, forms a piece of the Flint Water Crisis. (*Id.* at 54–55.) For example, defendant Busch falsely informed an EPA official that Flint was using corrosion control, which proximately caused the State to slowly address the dangers of lead in the water. (*Id.* at 55.) However, the focus is on the injury claimed. *See Robinson*, 462 Mich. at 462. In other words, it is not enough that plaintiffs are able to point to some cause and effect relationship within the Flint Water Crisis. They must demonstrate how a defendant's action was the "one most immediate, efficient, and direct cause" of their injuries. For this reason, this argument also fails.

The sheer size and scale of the Flint Water Crisis makes it difficult for plaintiffs—or anyone—to identify any defendant most legally responsible for the resulting injuries. As such, "the more governmental actors that are involved in causing a massive tort in Michigan, the less likely it is that state tort claims can proceed against the individual government actors[.]" *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *81. Ultimately, the Court is required to apply the GTLA as interpreted by the Michigan Supreme Court. It would therefore be futile to amend the complaint to include plaintiffs' gross negligence claim.

80

### 6. Res Judicata and Statute of Limitations

Defendants Wyant and Wurfel argue that the doctrine of res judicata or, alternatively, the relevant statutes of limitations prohibit plaintiffs from amending the complaint. (Dkt. 653 at 29–34; Dkt. 657 at 26–28.) Because the Court found plaintiffs' amended claims with respect to defendants Wyant and Wurfel futile, these issues need not be addressed.

### e. Conclusion

Plaintiffs' motion for leave to amend the complaint regarding the bodily integrity claim against Governor Snyder is granted, and plaintiffs' motion regarding the remaining claims is denied. Furthermore, the Court finds no reason to deny leave to amend to include the fourth amended complaint's new factual allegations, including the proposed class definitions, the certification of which will be addressed at a later date. Plaintiffs' motion as it relates to these facts is therefore also granted. These conclusions will again be summarized at the end of Part III, *infra*.

### III. Motions to Dismiss

As previously stated in Part I, *supra*, the Court adopts the fourth amended complaint as the operative complaint for the purpose of adjudicating defendants' motions to dismiss. If the Court denied leave to amend the complaint to include a particular claim in Part II, that claim will be dismissed with no further discussion.

### a. Background

The facts, parties, and proposed classes remain unchanged from those set forth above in Part II. The fourth amended complaint contains the following counts:

| Count | Claim | Defendants |
|---|---|---|
| I | § 1983 Bodily Integrity | All government defendants |
| II-III | § 1983 - Equal Protection | Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, Wyant, Shekter-Smith, Prysby, and Busch |
| IV | § 1985(3) - Conspiracy | Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley |
| V | ELCRA | Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, The City of Flint, Wyant, Shekter-Smith, Prysby, and Busch |
| VI | *Monell* Liability | The City of Flint |
| VII-VIII | Professional Negligence | LAN and Veolia |
| IX | § 1983 – State-Created Danger | All government defendants |
| X | Fraud | Veolia |
| XI | Negligent Infliction of Emotional Distress | LAN and Veolia |

| XII | Negligence | LAN and Veolia |
|---|---|---|
| XIII-XIV | Gross Negligence | LAN, Veolia, Snyder, Dillon, Lyon, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow. |

## b. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. When ruling on a Rule 12(b)(1) motion "the court must take the material allegations of the [complaint] as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Plaintiffs need only show "that the complaint alleges a claim under federal law, and that the claim is substantial." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996) (citing *Transcon. Leasing, Inc. v. Mich. Nat'l Bank*, 738 F.2d 163, 166 (6th Cir.1984)). This is a relatively light burden. *Id.* "Dismissal for lack of subject-matter jurisdiction . . . is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89

(1998) (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

A motion that challenges the legal sufficiency of a complaint is instead properly brought under Federal Rule of Civil Procedure 12(b)(6). *See supra* Section II.b (setting forth the motion to dismiss standard).

### c. Threshold Issues

#### i. Sovereign Immunity

The state and city defendants argue that sovereign immunity deprives the Court of subject matter jurisdiction to adjudicate certain claims. They therefore move to dismiss under Rule 12(b)(1). The Court grants the state defendants' motion in part as it relates to the State of Michigan, but denies the motions in all other respects.

First, the state defendants argue that sovereign immunity bars plaintiffs' claims against the State of Michigan and their claim for injunctive relief against the Governor in his official capacity. (Dkt. 279 at 29–32; Dkt. 739 at 16–18.) The state defendants are correct that sovereign immunity bars claims against the State of Michigan. *Boler v. Earley*, 865 F.3d 391, 413 (6th Cir. 2017). But for the following reasons,

the Court has subject matter jurisdiction over claims against Governor Snyder in his official capacity.

In *Boler*, the Sixth Circuit explained that there are three exceptions to sovereign immunity, the relevant one here being "when the doctrine set forth in *Ex Parte Young* applies."[17] 865 F.3d at 410 (citations omitted). "*Ex Parte Young* allows plaintiffs to bring claims for prospective [injunctive] relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Id.* at 412. In this case, plaintiffs only seek injunctive relief against Governor Snyder in his official capacity.

*Boler* is a Sixth Circuit decision that forms part of the Flint Water Cases litigation. It held that the *Ex Parte Young* exception applied to the injunctive relief sought by the plaintiffs against Governor Snyder in his official capacity. There, the plaintiffs sought an "injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and

---

[17] Another exception is "when the state has waived immunity by consenting to the suit." *Boler*, 865 F.3d at 410. However, this exception is not at issue here. Although the State of Michigan has participated in the proceedings to some extent, it has carefully and consistently appeared reluctantly, and without waiving immunity.

establishment of medical monitoring to provide healthcare and other appropriate services to Class members for a period of time deemed appropriate by the Court." *Id.* at 413. (quotations omitted). They also requested a "monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, [and] criminal and juvenile justice evaluations." *Id.* (quotations omitted).

Here, plaintiffs similarly seek an order "to remediate the harm caused by the Government Defendants' unconstitutional conduct." (Dkt. 620-3 at 219.) And this includes the exact same relief as that set forth in *Boler*. *Boler* therefore controls and requires the same outcome. The claim for injunctive relief against Governor Snyder in his official capacity may go forward.

Second, the city defendants argue that sovereign immunity deprives the Court of jurisdiction to adjudicate plaintiffs' claims against the City of Flint because it was an arm of the State in the period leading up to and including the Flint Water Crisis. (Dkt. 276 at 43–55.) According to the city defendants, Flint is therefore entitled to the same cloak of sovereign immunity as that afforded the State. (*Id.*) However, the Sixth

Circuit recently rejected this argument in *Guertin v. Michigan*, 912 F.3d 907, 941 (6th Cir. 2019). This argument is therefore denied.

In sum, although immunity with regards to the State of Michigan is granted, it is denied as to Governor Snyder in his official capacity and the City of Flint. The Court has subject matter jurisdiction to adjudicate claims against these latter defendants.

### ii. Absolute Immunity

Defendants Wyant and Wurfel claim absolute immunity from plaintiffs' lawsuit. They rely on the immunity awarded to federal officials carrying out discretionary prosecutorial actions, arguing that they were functionally acting as federal officials despite working for a state agency. (Dkt. 281 at 38–40; Dkt. 282 at 33–34.) However, the Sixth Circuit rejected this argument in *Mays v. City of Flint*, 871 F.3d 437, 444–47 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1557 (2018). Moreover, defendants do not explain how their claim of immunity interacts with plaintiffs' allegations against them, instead speculating that absolute immunity would apply if "[p]laintiffs' claims . . . ultimately prove to be an alleged failure . . . to sufficiently enforce the [Safe Drinking Water Act] and/or

initiate enforcement proceedings against Flint." (Dkt. 281 at 39; Dkt. 282 at 34.) For both reasons, defendants' claims are denied.

### iii.  Preemption

Several defendants argue that plaintiffs' § 1983 claims are preempted by the Safe Drinking Water Act, 42 U.S.C. § 300f–300j (2016). But this Court and the Sixth Circuit has rejected this argument. *Boler*, 865 F.3d at 409.

### d. Main Analysis

### i.  Federal Claims

### 1. Bodily Integrity

In Count I, plaintiffs allege that the government defendants violated their substantive due process right to bodily integrity under the Fourteenth Amendment. (Dkt. 620-3 at 172.) According to plaintiffs, they did this by acting with deliberate indifference to the risk of harm plaintiffs faced, creating and perpetuating their exposure to contaminated water. (*Id.* at 172–73.) Defendants move to dismiss. (Dkt. 294 at 3–10; Dkt. 282 at 17–23; Dkt. 281 at 17–28; Dkt. 279 at 37–43; Dkt. 277 at 18–22; Dkt. 276 at 20–23; Dkt. 273 at 32–42.)

As set forth earlier in this opinion, plaintiffs unknowingly drank and bathed in contaminated water, encroaching upon their right to bodily integrity. *See supra* Section II.d.ii.1. Therefore, to state a bodily integrity claim, plaintiffs must demonstrate that (1) the government defendants knew of facts from which they could infer a substantial risk of serious harm, (2) they did infer it, and (3) they nonetheless acted with indifference, demonstrating a callous disregard towards the rights of those affected. *See supra* Section II.d.ii.1.a.

The Court will address the allegations against each group of government defendants in turn. Because the right to bodily integrity is clearly established, defendants cannot rely on qualified immunity if plaintiffs state a valid claim against them. *See supra* Section II.d.ii.1.b.

### a. Property Owners

In its August 1, 2018 opinion and order, the Court stated that:

> Numerous plaintiffs in this matter are not individuals, but instead businesses. Bodily integrity claims are premised on "the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." The Court can find no case that extends the fundamental right of bodily integrity to a business or business relationship, or to the property owned or used in a business's operations.

329 F. Supp. 3d at 395 (citations omitted). For the same reason, plaintiffs Frances Gilcreast, Epco Sales, LLC, and Angelo's Coney Island Palace, Inc. fail to state a bodily integrity claim.

### b. State Defendants

The remaining plaintiffs allege that defendants Governor Snyder, Andrew Dillon, Nick Lyon, and Nancy Peeler violated their right to bodily integrity. For the following reasons, plaintiffs state a claim against defendants Governor Snyder and Dillon, but not against Lyon or Peeler.

*

Plaintiffs state a bodily integrity claim against Dillon. He allegedly knew that the Flint River had been rejected as a water source as recently as 2011, and that the FWTP would require substantial improvements to safely process the river's water. From this, it is reasonable to believe that Dillon was aware of the risks associated with using the Flint River as a water source. Yet despite this knowledge, Dillon helped to develop an interim plan that saw Flint transition to the Flint River. And importantly, he rejected a final bid from DWSD that could have obviated the need to use water from the Flint River until the FWTP had the capacity to treat it safely. This demonstrated an indifference to the risk

90

of serious harm plaintiffs faced, made all the more inexplicable given that he knew DWSD presented the most cost effective mid-term option.[18]

Conversely, plaintiffs do not state a bodily integrity claim against Lyon. It is reasonable to conclude that Lyon was aware of the risk of harm plaintiffs faced. As the crisis unfolded, he received materials showing an outbreak of Legionnaires' disease in Flint. He also received emails from senior government officials raising concerns about possible lead contamination in Flint's water. Moreover, he was surely aware that these incidents coincided with the transition to the Flint River. However, plaintiffs fail to show how Lyon was deliberately indifferent. It is true that he did not make the information he received public, nor did he alert other government departments. But he directed his team to investigate the reports and emails, which shows his concern. And plaintiffs do not plead that Lyon attempted to cover up what was happening. Therefore,

---

[18] In his motion to reconsider the now vacated August 1, 2018 opinion and order, Dillon argued that he resigned his position as State Treasurer in 2013, before Flint transitioned to the Flint River in early 2014. In his view, he therefore lacked authority over the Flint water system and could not have caused the harm that resulted. (Dkt. 561 at 16–17.) If true, the Court concedes that plaintiffs' claim against Dillon may ultimately fail. However, plaintiffs dispute whether he truly left the State's employment. (Dkt. 601 at 9–12.) Discovery will resolve this disagreement. For now, the Court must read the allegations in a light favorable to plaintiffs.

without more, the claim against Lyon does not rise to the level of deliberate indifference.[19]

Finally, plaintiffs' claim against Governor Snyder is successful for the reasons set forth in Section II.d.ii.1. On the other hand, plaintiffs' claim against Peeler fails because the complaint contains no factual allegations against her.

### c. MDEQ Defendants

Plaintiffs next allege that defendants Bradley Wurfel, Daniel Wyant, Liane Shekter-Smith, Adam Rosenthal, Stephen Busch, Patrick Cook, and Michael Prysby violated their right to bodily integrity. For the following reasons, plaintiffs state a bodily integrity claim against Wurfel, Shekter-Smith, Rosenthal, Busch, Cook, and Prysby. They do not state a claim against Wyant.

---

[19] In its vacated August 1, 2018 opinion and order, the Court denied defendant Lyon's motion to dismiss this count. 329 F. Supp. 3d at 403–04. In supplemental briefing, the state defendants argue that the Sixth Circuit's decision in *Guertin* precludes the same result here. (Dkt. 739 at 15–16.) The Court agrees, as now reflected in this decision. Plaintiffs argue that the factual allegations against Lyon in this case are more substantial than in *Guertin*, but they are not so substantial as to warrant a different outcome.

\*

Plaintiffs state a bodily integrity claim against Wurfel. He knew of ample facts from which to infer that plaintiffs were facing a substantial risk of harm, and it is reasonable to conclude that he did infer it. For example, Wurfel knew about the outbreak of Legionnaires' disease. And he was also well aware that something was wrong with Flint's water. Moreover, plaintiffs demonstrate that Wurfel acted with deliberate indifference. On several occasions as the crisis unfolded, he publicly denied that there was a problem with Flint's water. He appeared on radio and television to advise listeners that the water was safe to consume and bathe in, and he discredited others who suggested that lead was leaching into Flint's water. Such indifference showed a callous disregard for plaintiffs' right to bodily integrity.

Plaintiffs also state a claim against Shekter-Smith, Rosenthal, Busch, Cook, and Prysby. It is reasonable to assume that they were aware of the substantial risk of harm plaintiffs faced. Before Flint's transition to the Flint River, Shekter-Smith and Busch knew of the risks associated with the Flint River. In addition, Busch, Rosenthal, and Prysby recognized that the FWTP was not ready to begin operations.

93

After the transition, Rosenthal learned that the FWTP was not practicing corrosion control, and he and Shekter-Smith both knew that no legitimate lead and copper testing was occurring. Moreover, Busch, Shekter-Smith, and Prysby also knew that the transition had created the conditions for legionella bacteria to flourish. Not to mention the fact that the EPA and civic leaders were raising concerns about the quality of Flint's water.

Yet despite knowing of these serious risks, these defendants were indifferent to them. Shekter-Smith ensured that Flint received the ACO that allowed it to transition to the Flint River; Cook signed the final permit necessary for the FWTP to begin operations; and Busch resolved the regulatory hurdles associated with Flint's use of the Flint River. Furthermore, these defendants took steps to deceive Flint's residents into continuing to drink and bathe in the contaminated water. Busch and Cook misled the EPA by falsely suggesting that the proper corrosion control was in use at the FWTP;[20] and Busch, Rosenthal, and Prysby

---

[20] Defendant Cook argues that he never misled the EPA. (Dkt. 735 at 24.) According to Cook, he informed the EPA that there was no corrosion control as soon as he was asked by the Agency. (*Id.*) That may be so, but the Court must take plaintiffs' allegations as true at this stage in the litigation.

directly or indirectly altered reports to remove results showing high lead concentrations in Flint's water. These actions exhibited a callous disregard for plaintiffs' right to bodily integrity.

In contrast, plaintiffs do not state a claim against Wyant because the allegations do not demonstrate deliberate indifference. Wyant was likely aware of the health risks posed by using the Flint River as a water source. There is also some indication that he knew the FWTP was not utilizing the proper corrosion control techniques and that Flint's water was contaminated. However, the fourth amended complaint contains nothing to suggest that Wyant either publicly denied there was a problem with Flint's water, or that he otherwise encouraged Flint residents to use the contaminated water. Plaintiffs therefore do not plead that Wyant was deliberately indifferent.

### d. City Defendants and Defendant Wright

Finally, plaintiffs allege that defendants Darnell Earley, Gerald Ambrose, Howard Croft, Daugherty Johnson, Michael Glasgow, Jeffrey Wright, Edward Kurtz, and Dayne Walling violated their right to bodily

integrity.[21] For the following reasons, plaintiffs state a claim against Earley, Ambrose, Croft, Johnson, and Glasgow. They fail to state a claim against Wright, Kurtz, and Walling.

*

Plaintiffs state a bodily integrity claim against Earley and Ambrose. It is reasonable to infer that Earley and Ambrose were aware of the substantial risk of harm plaintiffs faced. After Flint transitioned to the Flint River, they knew about the outbreak of Legionnaires' disease; General Motors stopped using Flint water at its Flint factory because of its corrosive nature; and test results revealed high lead levels in two locations on the University of Michigan-Flint's campus. There were even growing calls from senior government officials that Flint "should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control." (Dkt. 630-3 at 66.) Additionally, plaintiffs plead that Earley and Ambrose were indifferent to this risk. Earley publicly

---

[21] Because it is important to the following analysis, the Court again notes that Kurtz, Early, and Ambrose were all at one time Flint's Emergency Manager. Edward Kurtz was the Emergency Manager from August 2012 through July 2013, Darnell Earley from September 2013 until January 13, 2015, and Ambrose from January 13, 2015 through April 28, 2015. Ambrose was also Flint's Finance Director before he became Emergency Manager.

denied any connection between the Legionnaires' disease outbreak and Flint's water, despite knowing that other branches of government concluded that there was a link. And he repeatedly refused to consider returning to DWSD water. Having replaced Earley as the Emergency Manager, Ambrose also refused to return to DWSD. He even went so far as rejecting a Flint City Council vote to reconnect to DWSD. In both cases, Earley and Ambrose's conduct thus showed a callous disregard for plaintiffs' right to bodily integrity.

Similarly, plaintiffs state a claim against Croft, Glasgow, and Johnson. As with Early and Ambrose, it is reasonable to conclude that these defendants were aware of the substantial risk of harm facing plaintiffs. As the transition to the Flint River loomed, all three knew that the FWTP was not ready to process the raw water. And Croft, in particular, was aware of the lead and Legionnaires' disease issues that followed the transition. Glasgow tested for and found high concentrations of lead in the water. He also recognized that Flint was not using corrosion control treatment and had no legitimate lead and copper testing in place. Moreover, these defendants acted with a callous disregard for plaintiffs' right to bodily integrity. Despite knowing that the FWTP was not ready

97

to process the Flint River water, Croft and Johnson pressured Glasgow to give the green light to the transition. Johnson later blocked the Genesee County Health Department from scrutinizing Flint's water testing process. And Glasgow altered reports to hide high lead concentrations in Flint's water. Croft, Glasgow, and Johnson were thus deliberately indifferent by deceiving plaintiffs into thinking that there was no problem with Flint's water.

In contrast, plaintiffs fail to state a claim against Wright because they do not show how he either caused or prolonged their exposure to the contaminated water. First, plaintiffs do not plausibly allege that Wright caused their exposure because he had no oversight over Flint's transition to the Flint River. Plaintiffs argue that Flint and Genesee County's water systems were unified, suggesting that Wright's position as Genesee County's Drain Commissioner gave him the means to affect the choice of Flint's water. (*Id.* at 53–54 ("[B]ecause of the joint operation of the combined water systems, each of [the defendants] played a role in the decision to provide . . . Flint . . . with the high risk water[.]").) But the fourth amended complaint reveals that the arrangement between Flint and Genesee County was a standard contractual relationship. Those in

98

charge of Flint's system purchased water and then sold it to Genesee County. And although Genesee County was required to buy it, the County had no say in where it came from. (*Id.* at 39–40 ("[GCDC] agreed to 'accept water as delivered from the water system of the City [of Flint.]'").) In other words, Wright was in charge of Genesee County's water system, but not Flint's. (*Id.* at 53 ("Wright was in control of the County side of the jointly operated water systems[.]").)

Second, Wright did not prolong plaintiffs' exposure to the contaminated water. Plaintiffs do not plead that Wright took steps to deceive Flint residents about the safety of Flint's water following the transition, or that he otherwise played a role in any coverup. Although Wright may have been aware of the risk of harm plaintiffs faced, he did not cause their injuries.[22]

The same goes for Kurtz and Walling. Here too, plaintiffs fail to state a claim against these defendants because they do not show how they caused or prolonged plaintiffs' exposure to the contaminated water.

---

[22] In its vacated August 1, 2018 opinion and order, the Court denied defendant Wrights' motion to dismiss plaintiffs' bodily integrity claim. 329 F. Supp. 3d at 407. Having reviewed that analysis, the Court reverses its earlier decision.

Although Kurtz may have set in motion the chain of events that led to the transition to the Flint River, he resigned as Flint's Emergency Manager before the transition and therefore lacked control over the final decision. Additionally, Walling was involved in the decision to use the Flint River as an interim source of water but he was stripped of virtually all authority over Flint's operations during emergency management. Plaintiffs also do not allege that either of these defendants deceived plaintiffs about the safety of Flint's water or that defendants helped coverup the crisis. Thus, plaintiffs have failed to state a claim against these defendants.[23]

In summary, plaintiffs state a claim against Earley, Ambrose, Croft, Glasgow, and Johnson. Plaintiffs do not state a claim against Wright, Kurtz, and Walling.

## 2. Equal Protection

In Counts II and III, the African American plaintiffs allege that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, Wyant,

---

[23] Defendant Kurtz did not file a motion to dismiss prior to the Court's vacated August 1, 2018 opinion and order. However, the city defendants' supplemental brief argues that he should be dismissed from the case because plaintiffs have failed to state a claim against him. (Dkt. 738 at 11–12). The Court treats these arguments as Kurtz's motion to dismiss.

Shekter-Smith, Prysby, and Busch violated their right to equal protection under the Fourteenth Amendment. For the reasons set forth above, plaintiffs fail to state a claim. *See supra* Section II.d.ii.2.

### 3. Conspiracy

In Count IV, plaintiffs bring suit under § 1985(3) alleging that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, and Earley conspired to violate their rights. For the reasons set forth above, plaintiffs fail to state a claim. *See supra* Section II.d.ii.4.

### 4. State-Created Danger

In Count IX, plaintiffs allege that the government defendants violated their right to be free from a state-created danger. (Dkt. 620-3 at 208.) Plaintiffs plead that the government defendants created the conditions that led to the Flint Water Crisis and then attempted to cover up the resulting risk of harm. (*Id.*) In their view, because the government defendants knew or should have known of the danger they created, they violated the Due Process Clause of the Fourteenth Amendment. (*Id.* at 208–09.) Defendants move to dismiss. (Dkt. 294 at 13–16; Dkt. 282 at 23–25; Dkt. 281 at 28–30; Dkt. 279 at 35–37; Dkt. 277 at 18–22; Dkt. 276 at 19–20; Dkt. 273 at 24–32.)

101

In its vacated August 1, 2018 opinion and order, the Court granted defendants' motions to dismiss an identical count. Nothing in the fourth amended complaint affects the Court's earlier analysis. Moreover, plaintiffs have not subsequently challenged this part of the August 1 ruling.[24] There, the Court stated that:

> To bring a state[-]created danger claim, the individual must show: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

329 F. Supp. 3d at 392 (quoting *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006)). With respect to (1), the Court explained that:

> Plaintiffs do not allege that any defendant created or increased the risk that they would be exposed to an act of violence by a third party. They argue, however, that they do not need to, based on *Schneider v. Franklin Cty.*, 288 F. App'x. 247 (6th Cir. 2008). In that case, the Sixth Circuit analyzed a state-created danger claim without referencing the third-party requirement of the test. *Id.* at 252.

> However, it is clear that *Schneider* applied an incomplete version of this circuit's test for a state-created

---

[24] Plaintiffs have not waived the right to appeal this issue. In their original response to defendants' motions to dismiss, plaintiffs argued at length that their state-created danger claim should proceed. (Dkt. 379 at 78–86.)

danger claim. The *Schneider* court cited *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) in setting forth the state-created danger standard. In doing so, however, the *Schneider* court omitted *Kallstrom*'s reference to the threat of violence by a private third party, and then proceeded to analyze the claim without that requirement.

In support of the argument that the *Schneider* standard is good law in the Sixth Circuit, plaintiffs cite *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834 (6th Cir. 2016) and *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006), two cases that also analyzed state-created danger claims.

*Stiles* involved a state-created danger claim arising from the brutal emotional, psychological, and physical bullying of a junior high school student by other students. *Id.* at 840–46. The *Stiles* court stated:

> As a general rule, the State has no obligation to protect the life, liberty, of property of its citizens against invasion by private actors. Two exceptions to this rule exist: 1) where the State enters into a "special relationship" with an individual by taking that person into its custody, and 2) where the State creates or increases the risk of harm to an individual. Because DS was harmed by students rather than school or government officials, there is no constitutional violation unless one of these two exceptions applies.

*Id.* at 853 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)) (internal citations omitted) (emphasis added). The court then cited *McQueen, supra*, for the legal standard for a state-created danger claim. *Id.* at 854. The standard set forth was: "(1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at

large, and (3) the requisite degree of state culpability." *Id.* at 854 (citing *McQueen*, 433 F.3d at 464).

In *McQueen*, the Sixth Circuit considered whether a grant of summary judgment on a state-created danger claim was proper where a first-grader shot and killed his classmate, and the deceased child's parent sued the teacher, principal, and school district. *McQueen*, 433 F.3d at 462–63. The plaintiff brought a variety of claims, among them a state-created danger claim for failing to protect her daughter from her classmate. *Id.* at 463.

Quoting *Kallstrom*, the *McQueen* court stated that "[l]iability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* at 464 (quoting *Kallstrom*, 136 F.3d at 1066). The court also noted that a state-created danger claim is traditionally rejected where the act "did not create or increase the risk of private violence to the plaintiff." *Id.* at 465 (collecting cases).

In most other circuits, the third-party requirement is also consistently applied. *See Rivera v. Rhode Island*, 402 F.3d 27, 34–35 (1st Cir. 2005); *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995); *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 857 (5th Cir. 2012); *Fields v. Abbott*, 652 F.3d 886, 889 (8th Cir. 2011); *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 917 (10th Cir. 2012); *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1233–34 (11th Cir. 2013); *Butera v. Dist. Of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001); *but see Doe v. Village of Arlington Heights*, 782 F.3d 911, 916–17 (7th Cir. 2015) (omitting third-party requirement).

In *Kneipp v. Tedder*, 95 F.3d 1199, 1204–11 (3d Cir. 1996) the Third Circuit analyzed the third-party requirement

for a state-created danger claim and declined to apply it to the claim in front of it, instead opting to apply a standard requiring only that an individual be placed in danger. However, the Third Circuit has inconsistently applied the third-party requirement to state-created danger claims since *Kneipp. See, e.g.*, *LaGuardia v. Ross Twp.*, 705 F. App'x. 130, 133 (3d Cir. 2017) (applying the requirement); *but see Henry v. City of Erie* 728 F.3d 275 (3d Cir. 2013) (omitting the requirement).

Because all events related to plaintiffs' claims occurred in Michigan, the Court must apply the clearly established state-created danger test set forth in *Kallstrom*, *McQueen*, *Stiles*, and *Jones*. The complaint does not plead that any act taken by any state actor created or increased the risk of private violence to the plaintiffs.

At oral argument, plaintiffs' counsel argued that the third-party requirement could be satisfied by, for instance, a situation where a mother fed her child formula mixed with tainted Flint water. The mother would be the private actor, and the child would be the individual harmed under the state-created danger theory. (Dkt. 532 at 212.)

The Court rejects this theory in its entirety. The residents of Flint were all made to use contaminated water that leached lead and bacteria from old lines. Parents, many of them struggling to even pay for the water the city provided, whether from the DWSD or the Flint River, used what resources they had available to them. For much of the time the Flint River was used as Flint's primary water source, residents did not and could not have known the danger the water posed to them or their families. To entertain plaintiffs' counsel's theory of harm, the Court would have to find that a loving parent, seeking only to provide their child with food or water, committed an intentional or at least negligent act of violence against his or her own child. According to counsel, every person who showered or washed their hands or made

105

coffee or boiled pasta with bacteria-infected, lead-tainted water provided to them by their government committed repeated acts of violence against themselves, their families, their friends, and their guests. This is not what the state-created danger theory was developed to address.

Plaintiffs have failed to plead that the actions of the governmental actors named in this claim created or increased the risk of harm from a third party, and for this reason, this particular claim must be dismissed.

*Id.* at 392–94. And with respect to (2), the Court stated that:

Even if the Court could determine that the third-party harm requirement of plaintiffs' state-created danger claim had been met, such a claim will stand only where "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Reynolds*, 438 F.3d at 696. The state-created danger must be a "special danger" to a "discrete class of individuals." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005). It is not sufficient for the purposes of this claim if the specific danger is "no more a danger to [the plaintiff] than to any other citizen on the City streets." *Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir. 1993). The danger may not be one that "affects the public at large." *Kallstrom*, 136 F.3d at 1066.

Plaintiffs argue that the entire population of Flint constitutes a discrete class of individuals. (Dkt. 379 at 82–84.) They argue that the "government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims," *Reynolds*, 438 F.3d at 696, because "identifying those at risk would have been as simple as looking up the names and addresses of residents and businesses serviced by Flint's water." (Dkt. 379 at 83.)

The Sixth Circuit has routinely held that threats to any person on the street or to the public at large do not constitute

106

risks that are specific enough for the purposes of a state-created danger claim. *See, e.g.*, *City of Carlisle*, 3 F.3d at 950 (the city permitting an epileptic individual to maintain a driver's license posed a danger to any citizen on the streets); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (a parolee's release endangered plaintiff as a member of the public at large); *Schroeder*, 412 F.3d at 729 (government's creation of a street, and management of traffic conditions, posed a general risk to the public).

The largest groups the Sixth Circuit has determined were able to pursue a state-created danger claim were in *Kallstrom*, where a city's release of private information from the personnel files of three undercover officers "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy," *id.*; 136 F.3d at 1067, and in *McQueen*, where the risk of a shooter in a school posed a risk to the five students in the room with him and even those in the school building, but all those outside the school building constituted "the general public." *Id.*; 433 F.3d at 468.

An entire city, plus all those who visit, work, or pass through that city is, by definition, "the general public." Plaintiffs set the bar for the general public at "the general public of Michigan residents." (Dkt. 379 at 84.) However, there is no case that supports this definition.

This claim must also be dismissed for failure to satisfy this element of the state-created danger test.

*Id.* at 394–95. The Court adopts this reasoning in full. Defendants motions to dismiss the state-created danger Count are therefore granted.

## 5. *Monell* Liability

In Count VI, plaintiffs plead a standalone claim against the City of Flint under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Plaintiffs allege that Flint is responsible for the unconstitutional conduct of its employees because they committed unlawful acts pursuant to Flint's custom or policy. As set forth above, plaintiffs state a claim that the city defendants Earley, Ambrose, Croft, Glasgow, and Johnson violated their right to bodily integrity. *See supra* Section III.d.i.1.d. And their *Monell* claim can rely on these underlying constitutional violations. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). Flint moves to dismiss. (Dkt. 276 at 34–35.)

Under *Monell*, a plaintiff can bring a § 1983 claim against a city for the unconstitutional conduct of its employees if the employees' conduct implemented an unofficial custom, or "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. In its vacated August 1, 2018 opinion and order, this Court held that the state-appointed emergency managers were final decisionmakers for Flint with respect to the decision to provide residents with contaminated water. 329 F. Supp. 3d at 421–22. As such, their

108

actions represented official policy and Flint could be held liable for their conduct insofar as it violated plaintiffs' rights. (*Id.* at 422.)

Following the Court's August 1 ruling, Flint challenged the decision and requested that the Court certify the issue for interlocutory appeal. (Dkt. 565.) The Court denied that request, explaining that "well-established precedent" controlled its decision. (Dkt. 659). And the Court now adopts the reasoning from its August 1, 2018 opinion and order and its subsequent order denying Flint's request to certify the question of *Monell* liability for interlocutory appeal. Because the emergency managers were state officials whose edicts or acts may fairly be said to represent official city policy, plaintiffs have stated a *Monell* claim with respect to the alleged bodily integrity violations. But plaintiffs fail to state a *Monell* claim for any other type of constitutional violation.

### ii. State Claims

### 1. ELCRA

In Count V, plaintiffs allege that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, the City of Flint, Wyant, Shekter-Smith, Prysby, and Busch violated the rights guaranteed them under

Michigan's ELCRA. For the reasons set forth above, plaintiffs fail to state an ELCRA claim. *See supra* Section II.d.ii.3.

## 2. Professional Negligence

In Counts VII and VIII, plaintiffs allege that defendants LAN and Veolia committed professional negligence. (Dkt. 620-3 at 199–207.) Neither LAN nor Veolia have moved to dismiss these counts in their entirety. However, Veolia asks the Court to dismiss the claims of several named plaintiffs based on alleged pleading deficiencies. (Dkt. 274 at 26–35.) This includes Rhonda Kelso, individually and on behalf of her minor child; David Munoz; Amber Brown, on behalf of her minor child; Frances Gilcreast; EPCO Sales, LLC; and, Angelo's Coney Island Palace, Inc. (*Id.*)

In its vacated August 1, 2018 opinion and order, the Court rejected all but one of Veolia's requested dismissals. 329 F. Supp. 3d at 424–25. The third amended complaint alleged that Veolia became involved in the Flint Water Crisis in February 2015. However, Kelso stated only that they "bathed, washed, and cooked with the water until at least January 2015." (Dkt. 349 at 12–13.) Because other plaintiffs specifically pleaded that they used Flint River water for the entire time or did not otherwise mention a limited period of use, the Court inferred that Kelso and her

minor child did not use the water after February 2015 and dismissed their claims against Veolia. 329 F. Supp. 3d at 424.

In the fourth amended complaint, Kelso revises her allegations. She and her daughter now allege that they "bathed, washed, and cooked with the water until at least *November* 2015." (Dkt. 620-3 at 14 (emphasis added).) As a result, Veolia's motion to dismiss as to Kelso must be denied. And since the fourth amended complaint makes no changes with respect to the other plaintiffs, the Court adopts the remainder of its August 1 decision.

### 3. Fraud

In Count X, plaintiffs allege that defendant Veolia committed fraud by intentionally making false representations about the safety of Flint's water. (*Id.* at 210–12.) Veolia moves to dismiss, arguing that plaintiffs' complaint fails to identify any false representations (Dkt. 274 at 17–19), plaintiffs do not adequately plead intent (*id.* at 19–20), and plaintiffs fail to explain how they detrimentally relied on any falsity. (*Id.* at 20–21.)

In its vacated August 1, 2018 opinion and order, the Court granted defendants' motions to dismiss an identical count. As with plaintiffs' state-created danger claim, nothing in the fourth amended complaint

affects the Court's earlier analysis. Moreover, plaintiffs have not subsequently challenged this aspect of the August 1 ruling.[25]

There, the Court explained that:

> Unlike other claims at the motion to dismiss stage, fraud claims are subject to a higher pleading standard. The elements of fraud must be pleaded with particularity, except that malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

> In Michigan, a claim for common law fraud requires a plaintiff to plead:

>> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi–Way Motor Co. v. Intl. Harvester Co.,* 398 Mich. 330, 336 (1976) (internal citations and quotation marks omitted).

All plaintiffs allege that Veolia defrauded them, based on three statements in Veolia's 2015 Interim Report. Those statements are: 1) that Flint's water was "safe" and "in compliance with drinking water standards"; 2) that the observed discoloration was merely aesthetic and not indicative of water quality or health problems; and 3) that medical problems arose in Flint because "[s]ome people may be sensitive to any water." (Dkt. 349 at 146.) Plaintiffs' complaint references no other specific statements made by

---

[25] Again, plaintiffs have not waived the right to appeal this issue.

Veolia, so these are the only three statements the Court may consider in evaluating the sufficiency of their pleadings. *See Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (holding that fraudulent statements must be specifically alleged, including the time and place the statements were made).

Veolia raises several arguments regarding the sufficiency of the fraud claim. Chief among those argument are that the specific statements set forth above are inaccurately quoted, that plaintiffs fail to plead Veolia's intent and knowledge properly, and that plaintiffs fail to plead their own reliance properly.

At Veolia's request, the Court has reviewed the quoted statements in their full context in Veolia's 2015 Interim Report. The Court may review documents incorporated into the complaint by reference, such as documents relied on for the specific statements supporting a fraud claim. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The statements Veolia challenges are, for the purposes of the assertion of a fraud claim at the motion to dismiss stage, accurate and properly pleaded.

Further, the entirety of the pleading sets forth the basis for the plaintiffs' claim that these statements were false. The complaint alleges the tainted water in Flint in February 2015 was not safe, in compliance with drinking water standards, or merely aesthetically displeasing; that the tainted water did specifically cause medical problems apart from the standard problems that might be associated with a population's sensitivity to a clean water supply; and that this information was generally known absent Veolia's representations to the contrary.

Plaintiffs allege that "[u]pon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity" and

that the representations were made "with the intention that Plaintiffs would act and rely on them." (Dkt. 349 at 147.) Allegations of fraud "cannot be based upon information and belief, except where the relevant facts lie exclusively within knowledge and control of the opposing party, and even then, the plaintiff must plead a particular statement of facts upon which his belief is based." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir. 1990).

At the motion to dismiss stage for a fraud claim, "the plaintiff . . . must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." *Republic Bank & Trust Co.*, 683 F.3d at 247 (internal quotation marks and citation omitted). Veolia argues that plaintiffs' allegation of recklessness is insufficiently pleaded. However, the allegation meets the fraud pleading standard. Information about Veolia's recklessness in 2015 is solely within the knowledge of Veolia's decision-makers. On a theory of recklessness and ignorance about the veracity of a statement in a fraud claim, the plaintiffs' voluminous factual background about the information known to Flint, which retained Veolia, and to the public at large in 2015, satisfies this pleading requirement. To require further pleading regarding Veolia's alleged recklessness would be to ask the plaintiffs to plead facts they could not possibly know at this stage.

To sustain a fraud claim in Michigan, "the party claiming fraud must reasonably rely on the material representation." *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 39 (2008) (emphasis in original). As set forth above, this information cannot be pleaded based upon information and belief, because this information is solely within the knowledge of the plaintiffs, not the defendants.

Plaintiffs' complaint alleges only that "[u]pon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act

114

and rely on them, which Plaintiffs did." (Dkt. 349 at 147.) The phrase "which Plaintiffs did" is the sole factual allegation in the complaint stating that any plaintiff specifically relied on these statements in continuing to drink Flint River water after February 2015. That statement lacks any specificity as to when or how any plaintiff heard the allegedly fraudulent statements, which were set forth in a report purportedly on the city's website.

At oral argument, plaintiffs argued that specific reliance was pleaded with regard to at least one plaintiff: Tiantha Williams. The portion of the complaint introducing Williams states that "[p]rior to [December 2015], the family trusted previous reports that the condition of the water was not an immediate health emergency. They also relied on statements about the safety of the water that were made in public forums." (*Id.* at 17.) These general allegations are insufficient to specifically plead that Williams heard and relied on Veolia's statements. Between April 2014 and December 2015, numerous parties, including Earley in October 2014, Busch and Shekter-Smith on March 13, 2015, and Wurfel on July 10 and July 24, 2015, issued allegedly false statements to the public. The general reference to "statements" may include any or all of these other false statements, and do not specifically implicate Veolia's 2015 Interim Report.

In the alternative, plaintiffs argue that reliance may be inferred because Veolia's report was available on Flint's public website. (Dkt. 379 at 123 n.47.) Plaintiffs failed to plead this information in the complaint, and the Court cannot rely on it to determine if reliance was properly pleaded. Even if the Court considers this additional information, the particular plaintiffs in this case do not plead that they specifically became aware of and relied on Veolia's statements in continuing to use Flint water after February 2015.

Plaintiffs argue that they need not show direct reliance on a fraudulent misrepresentation to assert a fraud claim,

citing *Nernberg v. Pearce*, 35 F.3d 247 (6th Cir. 1994). In *Nernberg*, a plaintiff properly asserted a fraud claim where fraudulent misrepresentations were made to a third party, and the misrepresentations were repeated by that third party to induce the plaintiff's reliance. *Id.* at 251. However, the plaintiff still specifically demonstrated that he actually heard and relied on the misrepresentations. *Nernberg* does not mean that a plaintiff may allege a fraud claim where a third party heard and relied on a false statement, but the plaintiff does not allege with particularity that he or she also did so.

Finally, plaintiffs argue that questions as to reliance "pertain[s] to questions of fact, not sufficiency of the pleadings." (Dkt. 379 at 124 (citing *State Farm Mut. Ins. Co. v. Elite Health Ctrs., Inc.*, No. 16-cv-13040, 2017 U.S. Dist. LEXIS 82736, at *25 (E.D. Mich. May 31, 2017)). *Elite Health* does not stand for the rule that a plaintiff does not need to plead reliance with particularity. That case did not concern a defendant's argument that the pleadings were insufficient as to reliance. Instead, the defendant in *Elite Health* argued that the plaintiff's allegations were "contradictory and/or self[-]serving," and that contention pertained to questions of fact rather than sufficiency of the pleadings. *Id.* The *Elite Health* complaint contained a "116-page description of how the alleged scheme to defraud" worked, *id.* at *23, and determined that the plaintiff had properly "alleged that it justifiably relied on Defendants' misrepresentations," *id.* at *26.

This analysis does not foreclose a fraud claim against Veolia by other plaintiffs. However, those plaintiffs *must* plead the necessary elements of their fraud claim with particularity, including their reliance on Veolia's allegedly fraudulent statements. Because these plaintiffs did not plead the reliance element of their fraud claim with sufficient particularity, their fraud claim must be dismissed.

329 F. Supp. 3d at 417–20. The Court adopts this reasoning in full. Therefore, plaintiffs fail to state a fraud claim.

### 4. Negligent Infliction of Emotional Distress

In Count XI, plaintiffs allege that LAN and Veolia negligently caused them emotional distress. (Dkt. 620-3 at 212.) In its vacated August 1, 2018 opinion and order, the Court addressed the identical claim and decided that it was actually "a request for emotional distress damages arising from the negligence claims asserted against LAN and Veolia." 329 F. Supp. 3d at 421. Nothing in the fourth amended complaint affects the Court's earlier analysis, and again plaintiffs have not subsequently challenged this aspect of the August 1 ruling. Specifically, the Court stated that:

> Plaintiffs assert what they term a negligent infliction of emotional distress ("NIED") claim against LAN and Veolia. (Dkt. 349 at 148.) The elements of a claim for [NIED] under Michigan law are:
>
> > (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or,

117

if not presence, at least shock "fairly contemporaneous" with the accident.

*Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 34 (2002).

Plaintiffs argue that they are bringing a "direct negligent infliction of emotional distress" claim, different from the NIED claim set forth in *Hesse*. Plaintiffs rely on *Daley v. LaCroix*, 384 Mich. 4 (1970), to argue that NIED does not require an injury to a third party for a plaintiff to pursue the claim. In *Daley*, the Michigan Supreme Court considered whether a plaintiff alleging "a definite and objective physical injury [ ] produced as a result of emotional distress proximately caused by defendant's negligent conduct . . . may recover in damages for such physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock." *Id.* at 12–13[.]

*Daley* did not create a cause of action for [NIED] absent an injury to a closely related third party. "[R]ather than create a cause of action, [*Daley* and cases following it] merely allow damages for emotional distress when the plaintiff has prevailed on a negligence cause of action." *McNeil ex rel. McNeil v. Metinko*, Nos. 194595, 194596, 1998 Mich. App. LEXIS 2506, at *7 –8 (Mich. Ct. App. Mar. 13, 1998).

Plaintiffs rely on two other cases, *Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897, 900 (W.D. Mich. 1983) and *Maldonado v. Nat. Acme Co.*, 73 F.3d 642, 645–46 (6th Cir. 1996), to argue that *Daley* did establish a tort of negligent infliction of emotional distress that did not require an injury to a third party. First, both cases predate *Hesse*, in which the Michigan Supreme Court limited the tort as set forth above. Second, *Hesse* explicitly stated that "[t]he common-law cause of action for negligent infliction of emotional distress has been recognized and applied in Michigan, although this Court has never ruled on the issue." *Hesse*, 466 Mich. at 34. It is impossible to read *Daley*, a Michigan Supreme Court decision,

118

to create a type of NIED claim when Michigan courts have stated that *Daley* did not do so, and when as of 2002, the Michigan Supreme Court had not recognized NIED at all.

Further, an NIED claim "clearly contemplates a sudden, brief, and inherently shocking accidental event which causes the injury . . . , which contemporaneously, and by its very nature, results in emotional and physical injury to the plaintiff." *Brennan v. Chippewa Cty. War Mem'l Hosp., Inc.*, Nos. 315795, 318452, 318594, 2014 Mich. App. LEXIS 1912, at *25 (Oct. 16, 2014) (further citation omitted). Plaintiffs do not allege that either LAN or Veolia committed an act that was sudden or brief, but instead allege that over a period of months for Veolia and even years for LAN, these defendants repeatedly failed to properly evaluate or treat Flint's water, resulting in prolonged injury to all who used Flint River water after April 25, 2014.

On review of plaintiff's complaint, this claim is a request for emotional distress damages arising from the negligence claims asserted against LAN and Veolia. Because the claim is presented as one for NIED, it is dismissed on the grounds that it fails to plead an NIED claim under Michigan law. However, this ruling does not preclude plaintiffs from seeking emotional distress damages arising from their surviving negligence claims.

*Id.* at 420-21. The Court adopts this reasoning in full. Plaintiffs may still pursue damages for emotional suffering, where permitted.

## 5. Negligence

In Count XII, plaintiffs allege that defendants LAN and Veolia were negligent with respect to their conduct in Flint, causing plaintiffs injury. (Dkt. 620-3 at 212–14.) LAN and Veolia move to dismiss on the ground

119

that plaintiffs' negligence claim is preempted by plaintiffs' claim for professional negligence.

In the context of the Flint Water Cases, the Court has twice held that negligence claims against LAN and Veolia may only be brought as professional negligence claims. First, in *Guertin*, the Court held that the professional negligence claims against LAN and Veolia could proceed, but the ordinary negligence claims had to be dismissed. 2017 U.S. Dist. LEXIS 85544, at *90–93. Second, in its vacated August 1, 2018 opinion and order, the Court determined that since "[a]n ordinary layperson would have little to no knowledge about the appropriate methods and techniques for remediating, containing, and eliminating lead and bacteria in a municipal water supply," the claim was properly brought as a professional negligence claim and it dismissed the ordinary negligence claim. 329 F. Supp. 3d at 423–24.

What was true in *Guertin* and the Court's August 1 decision is true here. Plaintiffs have thus failed to state a claim to ordinary negligence.

## 6. Gross Negligence

In Count XIII plaintiffs allege that defendants LAN and Veolia committed gross negligence. (Dkt. 620-3 at 215–17.) In Count IV, plaintiffs allege the same against defendants Snyder, Dillon, Lyon, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow. (*Id.* at 217–19.) For the reasons set forth above in Section II.d.ii.5, plaintiffs fail to state a claim with respect to Count IV. And for the following reasons, plaintiffs also fail to state a claim with respect to Count XIII.

*

Gross negligence is not an independent cause of action in Michigan. *See Xu v. Gay*, 257 Mich. App. 263, 268–69 (2003). At common law in Michigan, gross negligence was not a higher degree of negligence; it was a device to escape contributory negligence. *Gibbard v. Cursan*, 225 Mich. 311, 319 (1923), *overruled by Jennings v. Southwood*, 446 Mich. 125, 131–132 (1994), *abrogated on other grounds*. However, Michigan replaced the rule of contributory negligence with comparative negligence. *Placek v. Sterling Heights*, 405 Mich. 638, 650 (1979). And the Michigan Supreme Court therefore discarded the doctrine of common law gross negligence,

121

recognizing that it had outlived its practical usefulness. *Jennings*, 446 Mich. at 129.

Gross negligence has since received a new life in the statutory context. *See supra* Section II.d.ii.5. The GTLA confers various degrees of immunity on tortious government actors. § 691.1407. This includes lower-level government officials, unless their conduct amounted to *gross negligence* that was the proximate cause of a plaintiff's injuries. § 691.1407(2).

But despite its reference to gross negligence, neither the GTLA nor any other immunity statute created a new tort. *See Rakowski v. Sarb*, 269 Mich. App. 619, 627 (2006); *Beaudrie v. Henderson*, 465 Mich. 124, 139 n.12 (2001). Statutory gross negligence is instead an affirmative defense to be raised by a defendant. *Odom v. Wayne Cty.*, 482 Mich. 459, 479 (2008). And plaintiffs bringing a tort claim must still plead the common law elements of ordinary negligence. *Rakowski*, 269 Mich. App. at 627.[26]

---

[26] Perhaps because a plaintiff must sometimes show gross negligence to overcome immunity, courts have permitted claims styled as gross negligence to go forward under ordinary tort principles. *See, e.g.*, *Holland v. City of Highland Park*, No. 324312, 2016 Mich. App. LEXIS 555 (Mar. 17, 2016); *FOLTS v. CIGNA Ins. Co.*, No. 210163, 1999 Mich. App. LEXIS 740, at *1 (Aug. 6, 1999).

With this in mind, although plaintiffs style their proposed claim as one of gross negligence, the Court must treat it as one of ordinary negligence. And for the reasons set forth in Section III.d.ii.5., plaintiffs' claims of ordinary negligence against LAN and Veolia must be brought as claims of professional negligence. Thus, plaintiffs fail to state a claim to gross negligence.

### 7. Exemplary Damages

Plaintiffs seek exemplary damages against defendants Veolia and LAN, solely in connection with their alleged professional negligence. (Dkt. 620-3 at 199–207, 219.) In response, Veolia and LAN move to dismiss the requested relief. (Dkt. 283 22–23; Dkt. 274 at 22–26.)[27] In *Guertin*, under similar circumstances, this Court stated that "plaintiffs may be entitled to exemplary damages." 2017 U.S. Dist. LEXIS 85544, at *94. And the Court therefore permitted "[t]heir request for exemplary damages [to] proceed." *Id.* However, for the reasons stated below, *Guertin* was at odds with Michigan precedent. And because Michigan law controls

---

[27] The fourth amended complaint also seeks punitive damages. However, plaintiffs' claims against Veolia and LAN sound in Michigan law, and plaintiffs concede that Michigan law prevents them from seeking such relief in this case. (Dkt. 379 at 136 n.54.) As such, plaintiffs fail to state a claim to punitive damages.

the question of damages in counts involving professional negligence, plaintiffs fail to state a claim to exemplary damages.

\*

In Michigan, exemplary damages are a special class of compensatory damages. They are available under limited circumstances to reimburse for a non-economic harm. *Veselenak v. Smith*, 414 Mich. 567, 573–74 (1982); *Unibar Maint. Servs., Inc. v. Saigh*, 283 Mich. App. 609, 630 (2009). And in the context of exemplary damages, this only includes losses for the "humiliation, sense of outrage, and indignity" that results from malicious, willful, and wanton conduct. *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 419 (1980); *B & B Inv. Grp. v. Gitler*, 229 Mich. App. 1, 9–10 (1998).

The malicious, willful, and wanton element is equivalent to malice. *See Peisner v. Detroit Free Press, Inc.*, 421 Mich. 125, 136 (1984). Because damages for mental pain and anxiety are normally included under actual damages, only intentional actions that show a reckless disregard for a plaintiff's rights will suffice. *See Veselenak*, 414 Mich. at 574–75; *McPeak v. McPeak*, 233 Mich. App. 483, 487–88 (1999). In other words, mere

negligence is insufficient. A defendant's conduct must amount to more than a lack of care. *See Veselenak*, 414 Mich. at 574–75.

Here, the fact that professional negligence is the only claim plaintiffs raise to support exemplary damages against LAN and Veolia negates the mental element required for the award. It is the reprehensibility of a defendant's conduct that intensifies the emotional injury and justifies exemplary damages not the magnitude of the harm caused. *See McPeak*, 233 Mich. App. at 488; *Gitler*, 229 Mich. App. at 10. Plaintiffs do not state a claim for allegedly malicious, willful, and wanton conduct. In fact, they do not state a claim involving exemplary damages for any intentional tort. Rather, they argue that LAN and Veolia were professionally negligent and that their negligence caused the Flint Water Crisis. As such, plaintiffs fail to state a claim for exemplary damages.

### iii.  LAN's Motion for a More Definite Statement

Defendant LAN argues that plaintiffs must provide a more definite statement in their complaint. (Dkt. 283 at 24.) The Court addressed this identical motion in its August 1, 2018 opinion and order, and sees no reason to deviate from this prior ruling. Accordingly, for the reasons set forth below, the Court denies LAN's motion.

Motions for more definite statements are disfavored, and should be granted "only if there is a major ambiguity or omission in the complaint that renders it unanswerable." *Farah v. Martin*, 122 F.R.D. 24, 25 (E.D. Mich. 1988).

LAN argues that the complaint does not distinguish between the Leo A. Daly Company ("LAD"), Lockwood, Andrews & Newnam, P.C. ("LAN P.C."), and Lockwood, Andrews & Newnam, Inc. ("LAN, Inc."), making it impossible to tell what each entity did. The Court has addressed the relationship between LAD, LAN P.C., and LAN, Inc. in a prior opinion. (Dkt. 437.) LAD is the parent company of LAN, Inc.; LAN P.C. is a corporation established to satisfy licensing requirements for LAN, Inc. to operate in the state of Michigan. (Id. at 4.) An agreement between LAD and LAN, Inc. establishes a relationship between the two companies in which all LAN, Inc. employees are LAD employees and all LAN, Inc. revenues go to a joint bank account over which LAD had full control. (Id. at 10–11.)

Because LAN P.C. was a legal entity created solely to permit LAN, Inc. to perform work in Michigan, all work LAN, Inc. performed can be attributed to LAN P.C. Because all employees of LAN, Inc. were actually employees of LAD, all work those employees performed, including the work at issue in this case, can be attributed to LAD. The complaint treats all three companies as a single entity for pleading purposes because, based on the corporate structure of the companies, they are indistinguishable for the purposes of this lawsuit.

LAN also objects to being "lumped in" with Veolia with regard to some allegations. (Dkt. 283 at 26.) The complaint clearly specifies the actions LAN and Veolia each took with respect to Flint's water supply, and sometimes refers to them jointly because either both sets of defendants had similar duties, if at different times, or because plaintiffs are asserting similar claims against both sets of defendants.

329 F. Supp. 3d at 391–92.

### e. Conclusion and Order

IT IS ORDERD THAT,

Plaintiffs' motion for leave to amend the complaint (Dkt. 620) regarding the bodily integrity claim against Governor Snyder is **GRANTED**. Plaintiffs may include the fourth amended complaint's new factual allegations, including the proposed class definitions. Plaintiffs' motion as it relates to these facts is therefore **GRANTED**. In all other respects, the motion is denied.

Having adopted the fourth amended complaint in part, IT IS FURTHER ORDERED THAT,

Defendants' motions to dismiss count I (bodily integrity) are **DENIED** with respect to defendants Snyder, Dillon, Wurfel, Shekter-Smith, Rosenthal, Busch, Cook, Prysby, Earley, Ambrose, Croft, Glasgow, and Johnson, with the exception of claims relating to property damage. Additionally, the city defendants' motion to dismiss count VI (*Monell* liability) is **DENIED**. LAN and Veolia's motions to dismiss counts VII and VIII (professional negligence) are **DENIED**. And LAN's motion for a more definite statement is also **DENIED**.

IT IS FURTHER ORDERED THAT,

All remaining counts are dismissed for failure to state a claim. Specifically, defendants' motions to dismiss count I (bodily integrity) with respect to defendants Lyon, Peeler, Wyant, Kurtz, Wright, and Walling are **GRANTED**. And defendants' motions to dismiss counts II, III, IV, V, IX, X, XI, XII, XIII, and XIV are also **GRANTED** in their entirety. Additionally, LAN and Veolia's motions to dismiss plaintiffs' claim for exemplary and punitive damages are **GRANTED**.

IT IS SO ORDERED.

Dated: April 1, 2019          s/Judith E. Levy                    
      Ann Arbor, Michigan     JUDITH E. LEVY
                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 1, 2019.

                                    s/Shawna Burns        
                                    SHAWNA BURNS
                                    Case Manager