# EXHIBIT A

# OFFICE OF SPECIAL COUNSEL
## Investigator's Report



**Attorney General Case No. <u>16-0003</u>**

**DATE: December 19, 2016**

| Custody | DEFENDANT'S NAME | Age | Sex | Race | D.O.B. | SID |
|---|---|---|---|---|---|---|
| NIC | DEF (01) – EARLEY, DARNELL<br>5636 WOODSTOCK DRIVE, LANSING, MI 48917 | 65 | M | B | 11/01/51 | 3689019<br>W |
| NIC | DEF (02) – AMBROSE, GERALD WINFIELD<br>1693 TUTTLE ROAD, MASON, MI 49519 | 72 | M | W | 02/22/44 | N/A |
| NIC | DEF (03) – CROFT, HOWARD DONELL<br>12652 GREENHILL DRIVE, GRAND BLANC, MI 48503 | 51 | M | B | 06/24/65 | 2230419<br>T |
| NIC | DEF (04) - JOHNSON, DAUGHERTY ANDREW<br>307 CHAMBERLAIN STREET, FLUSHING, MI 48433 | 47 | M | W | 01/01/69 | N/A |

**Offenses**

COUNT 1 – FALSE PRETENSES – DEFENDANTS (01) (02) (03) (04)
did, with the intent to defraud or cheat, make or use a false pretense to cause a person to grant, convey, assign, demise, lease, or mortgage any interest in land, and/or to obtain from a person money, personal property, or the use of an instrument, facility, article, or other valuable thing or service having a value of $100,000.00 or more; contrary to MCL 750.218(7)(a). [750.2187A]
FELONY: 20 Years and/or $35,000.00, or 3 times the value of the money or property involved, whichever is greater.

COUNT 2 – CONSPIRACY TO COMMIT FALSE PRETENSES - DEFENDANTS (01) (02) (03) (04)
did unlawfully conspire, combine, confederate and agree together and with others, both known and unknown to the Office of Special Counsel, to commit the following listed offense; contrary to MCL 750.157a: false pretenses over $100,000.00, prohibited by MCL 750.218(7)a. [750.2187A[C]]
FELONY: 20 Years and/or $45,000.00, or 3 times the value of the money or property involved, whichever is greater.

COUNT 3 – COMMON LAW OFFENSES – MISCONDUCT IN OFFICE – DEFENDANT (01)
did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed emergency manager for the City of Flint, by intentionally misleading the citizens of Flint by falsely stating the Flint Water Treatment Plant was equipped to produce safe water, allowing the Flint Water Treatment plant to produce water to the public despite knowledge that the plant was not ready for use, allowing the City of Flint to enter into a contract that required interim use of the Flint Water treatment plant for 30 months with knowledge that the plant was not ready to produce safe water, authorizing dissemination of information to the general public that was false and misleading in regards to the safety and potability of the Flint River water; contrary to MCL 750.505. [750.505]
FELONY: 5 Years and/or $10,000.00

COUNT 4 – COMMON LAW OFFENSES – MISCONDUCT IN OFFICE – DEFENDANT (02)
did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed emergency manager for the City of Flint, by obstructing and hindering a healthcare investigation conducted by the Genesee County Health Department with regard to the Legionnaires' Disease outbreak; contrary to MCL 750.505. [750.505]
FELONY: 5 Years and/or $10,000.00

COUNT 5 – WILLFUL NEGLECT OF DUTY IN OFFICE – DEFENDANTS (01) (02)
did willfully neglect to assure the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare pursuant to the powers granted to them by Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1549(2); contrary to MCL 750.478. [750.478]
MISDEMEANOR: 1 Year and/or $1,000.00

| Place of Offense:<br>**CITY OF FLINT, MICHIGAN** | | **Date:**<br>**OCTOBER 2013 TO**<br>**APRIL 2015** | | | Date of<br>Complaint<br>12-19-2016 |
|---|---|---|---|---|---|
| **Complainant's Name**     **Full Address** | | **Age** | **Sex** | **Race** | **Phone No.** |
| Person to Sign Complaint<br>INFORMATION AND BELIEF | Reviewing Attorney & Bar No.<br>**SPECIAL ASSISTANT ATTORNEY GENERAL**<br>**TODD FLOOD, P58555** | | | | |
| _____<br>**SPECIAL AGENT JEFFREY SEIPENKO**<br>**MICHIGAN ATTORNEY GENERAL** | _____ _12/19/16_<br>**SPECIAL ASSISTANT ATTORNEY GENERAL**<br>**TODD FLOOD, P# 58555** | | | | |

# REQUEST FOR WARRANT
Page 1

### DETAILS OF INVESTIGATION (CONTINUED)

## PROBABLE CAUSE STATEMENT

I, Jeff Seipenko, a Special Agent assigned to the OFFICE OF SPECIAL COUNSEL, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, in support of this probable cause statement, state the following:

## INTRODUCTION

1.　　The statements contained in this request for warrant are based on my investigation of the Flint Water Crisis, the investigative work of other investigators, conferences with other law enforcement officers, interviews of approximately 60 witnesses, reviews of thousands of pages of emails and other documents and reports, upon my own extensive experience, training, and background in the investigation of criminal conduct, and, where stated, upon information and belief.  I have not included all the facts known about the case, only those necessary to establish probable cause to believe that DARNELL EARLEY ("Defendant EARLEY"), an appointed emergency manager for the City of Flint, violated, MCL 750.218(7)(a) and/or (c) (False Pretenses), MCL 750.157a (Conspiracy), MCL 750.505 (Misconduct in Office), and MCL 750.478 (Willful Neglect of Duty); that GERALD AMBROSE ("Defendant AMBROSE"), an appointed emergency manager for the City of Flint, violated MCL 750.218(7)(a) and/or (c) (False Pretenses), MCL 750.157a (Conspiracy), MCL 750.505 (Misconduct in Office), and MCL 750.478 (Willful Neglect of Duty); that HOWARD CROFT ("Defendant CROFT") violated MCL 750.218(7)(a) and/or (c) (False Pretenses) and MCL 750.157a (Conspiracy); and, that DAUGHERTY JOHNSON ("Defendant JOHNSON") violated MCL 750.218(7)(a) and/or (c) (False Pretenses) and MCL 750.157a (Conspiracy). Overall, and in summary, Defendant EARLEY breached his duties by violating Michigan law by committing false pretenses. He also conspired with Defendants' AMBROSE, CROFT and JOHNSON to enter into a contract based upon false pretenses in the form of an Administrative Consent Order ("ACO") that bound the City of Flint to utilize the Flint River as its drinking water source knowing that the Flint Water Treatment Plant ("FWTP") was unable to produce safe water. Defendants

# REQUEST FOR WARRANT
### Page 2

---

### DETAILS OF INVESTIGATION (CONTINUED)

EARLEY and AMBROSE had knowledge of several failings of the FWTP including the plant's inability to produce safe water. After being advised to switch back to treated water supplied by the Detroit Water and Sewerage Department ("DWSD"), Defendants EARLEY and AMBROSE failed to reconnect to DWSD, which caused the Flint citizens' prolonged exposure to lead and Legionella bacteria. Defendant AMBROSE also breached his duties by obstructing and hindering a healthcare investigation conducted by the Genesee County Health Department into the Legionnaires' Disease outbreak in Genesee County. Defendants CROFT (then Director of the City of Flint Department of Public Works) and JOHNSON (then the Utilities Director for the Department of Public Works) conspired with Defendants AMBROSE and EARLEY to commit false pretenses when they knowingly aided and abetted Defendants AMBROSE and EARLEY in entering into a contract based upon false pretenses in the form of an ACO that bound the City of Flint to the FWTP, which was unable to produce safe water to the citizens of Flint.

## THE EMERGENCY MANAGER AND THE DUTIES OF THE OFFICE

2.     Pursuant to Public Act 436 of 2012, MCL 141.1549(2), "Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare."

3.     On November 11, 2013, Defendant EARLEY took an oath of office as the City of Flint's emergency manager to uphold the Constitutions of the United States and the State of Michigan. As part of this oath, Defendant EARLEY swore to faithfully discharge the duties of his office. Defendant AMBROSE took the same oath on January 7, 2015.

## REQUEST FOR WARRANT
Page 3

### DETAILS OF INVESTIGATION (CONTINUED)

4.      By his own admission, Defendant EARLEY was responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. Specifically, when he testified in front of the United States House Committee on Oversight and Government Reform on March 15, 2016, he stated "the [e]mergency [m]anager obviously is the person responsible for making sure that those things get done, and I've always accepted that." U.S. House Committee on Oversight and Govt. Reform March 15, 2016 Transcript, p. 32.

### **BACKGROUND**

5.      In November 2011, Governor Rick Snyder declared the City of Flint a "local government financial emergency." In an effort to remedy the City's $25.7 million deficit, Governor Snyder appointed Michael Brown to be the first of Flint's four emergency financial managers. Brown took office on November 29, 2011. While under emergency financial manager control, Flint's elected officials lacked the power to effect change or engage in decision-making if those actions had the potential to financially impact the municipality.

6.      From 2011 until 2015, Governor Snyder appointed four emergency managers in the City of Flint. Michael Brown served from December 2011 until August 2012, Ed Kurtz from August 2012 until July 2013, Michael Brown (a second term) from July 2013 until October 2013, and Defendant EARLEY from October 2013 until January 2015. Defendant EARLEY was replaced by Defendant AMBROSE, who served as Flint's last emergency manager from January 2015 until the end of April that same year.

7.      Emergency managers temporarily supplant the governing bodies of the local government and have the authority to remove any of the unit's elected officials should they refuse to provide any information or assistance. Emergency managers have complete financial control over the local unit with the ability to reduce pay, outsource work, reorganize departments and modify employee contracts. MCL 141.1549(2). During Flint's time under emergency manager control, Flint's contract to purchase water from the DWSD came under review and alternative water providers were considered.

# REQUEST FOR WARRANT
**Page 4**

### DETAILS OF INVESTIGATION (CONTINUED)

8.    On February 13, 2012, Michael Brown sent a letter of "Commitment to Purchase Raw Water from the Karegnondi Water Authority" to Jeff Wright, Genesee County Drain Commissioner and Chief Executive Officer of the Karegnondi Water Authority ("KWA"). This letter conveyed Flint's intent to participate in the KWA.

9.    On February 17, 2012, Defendant CROFT met with Jeff Wright and Duane Miller, the Executive Vice President and Chief Operating Officer of the Genesee Chamber of Commerce, to discuss Flint's involvement in the KWA pipeline. During the meeting, they discussed the use of the Flint River as an interim water source. In an email that Defendant CROFT sent to Michael Brown summarizing the topics discussed at the meeting, Defendant CROFT noted the meeting's attendees believed that use of the Flint River had merit under a "best case scenario," but the Michigan Department of Environmental Quality ("MDEQ") would have to allow the City of Flint to perform a twelve-month water study while simultaneously performing engineering and construction updates.

10.    Defendant CROFT stated that although the City of Flint always intended to join the KWA pipeline, during Mr. Brown's tenure as Flint's emergency manager, brief consideration was given to using the Flint River as a primary source of drinking water. However, he explained that using the Flint River was not a permanent solution. Defendant AMBROSE stated that the emergency management team, along with the MDEQ, determined that the Flint River was not a viable, long-term source for safe water.

11.    On November 26, 2012, Michigan's Department of Treasury commissioned Tucker, Young, Jackson, Tull, Inc. ("TYJT"), a consulting engineering firm, to study Flint's water sourcing options and compare their costs. TYJT issued a final report in February 2013, raising concerns about KWA cost estimates and system governance including the higher initial costs of switching to KWA, potential construction cost overruns and delays, KWA's inaccurate cost estimates for the pipeline construction, no backup power with KWA's plan, and less overall redundancy in Flint's water supply systems.

# REQUEST FOR WARRANT
Page 5

## DETAILS OF INVESTIGATION (CONTINUED)

12.     Despite these concerns, the idea of switching to KWA continued to garner support.  On March 25, 2013, the Flint City Council voted in favor (7-1) of switching from purchasing water from the DWSD to the KWA. However, since the City of Flint was under emergency manager control pursuant to Public Act 436, the City Council's vote had no binding effect. The choice to switch from DWSD to KWA still required emergency manager and Department of Treasury approval in order to be made effective.

13.     On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch, District Supervisor of the MDEQ's Office of Drinking Water and Municipal Assistance ("ODWMA"), emailed MDEQ Director Dan Wyant, MDEQ Deputy Director Jim Sygo, ODWMA Director Liane Shekter Smith and other MDEQ officials to address the concerns flagged in the TYJT report. Mr. Busch provided his colleagues with notice of the potential problems with using the Flint River as the City's water source. In his email, he stated that continuous use of the Flint River at such demand rates would:

      a.  Pose an increased microbial risk to public health (Flint River vs. Lake Huron source water)[;]
      b.  Pose an increased risk of disinfection by-product (carcinogen) exposure to public health (Flint River vs Lake Huron source water)[;]
      c.  Trigger additional regulatory requirements under the Michigan Safe Drinking Water Act . . . [;]
      d.  Require significant enhancements to treatment at the [FWTP] beyond those identified in the TYJT report[.]

Busch also identified increased requirements and costs associated with using the Flint River that included:

      a.  The need to provide softening treatment[;]
      b.  Limitations on disposal options for lime softening sludge[;]
      c.  Increased ozone capacity, UV disinfection[;]
      d.  Additional backup power, more power required for Flint River operation[.]

14.     On March 27, 2013, Jim Sygo emailed Stephen Busch regarding the Flint River water source switch, wherein he stated, "As you might guess we are in a situation with [e]mergency [f]inancial [m]anagers so it's entirely possible that they will be making decisions relative to cost."

# REQUEST FOR WARRANT
### Page 6

---

## DETAILS OF INVESTIGATION (CONTINUED)

15.     On March 29, 2013, the City of Flint enacted a resolution signed by Mr. Kurtz, Flint's City Attorney Peter Bade, and Flint's Finance Director Defendant AMBROSE to purchase raw water from KWA and submitted the resolution to State Treasurer Andy Dillon for approval. Under Public Act 436 of 2012, the State Treasurer's concurrence is required for an emergency manger to authorize a contract in excess of $50,000.00 that is not subject to competitive bidding. Thus, the agreement between the City of Flint and KWA required state approval. On April 11, 2013, Andy Dillon provided the requisite authorization to Mr. Kurtz allowing Flint to contract with KWA.

16.     The City Council vote and the resolution were limited to the City of Flint's decision to join the KWA once the pipeline was complete.  Neither the vote nor the resolution contemplated the use of the Flint River as an interim drinking water source. Then-Mayor Dayne Walling noted, "The (2013) resolution makes no mention of the river and the financial projections provided to myself and the City Council (at that time) clearly show the city paying for Detroit water until connecting to the new pipeline." Mr. Walling will testify that Mr. Kurtz ultimately decided to use the Flint River as an interim water source without providing the City Council an opportunity to vote on the issue.

17.     Defendant AMBROSE testified that he was involved in analyzing the cost benefit to the City of participating in the KWA as compared to continuing to purchase water from the DWSD. Defendant AMBROSE emphasized that the Flint River was not a long-term solution.

18.     Plans to use the Flint River for a 30-month period continued to develop.  The evidence will show that on May 22, 2013, City of Flint officials met with personnel from the engineering firm Lockwood, Andrews and Newman ("LAN") to discuss plans needed for the City to implement the use of the Flint River.  On June 26, 2013, the City of Flint, through Emergency Manager Kurtz, requested approval from the MDEQ to use the Flint River as an interim water source until the KWA pipeline was completed. Also on June 26, 2013, the Department of Treasury adopted a resolution signed by Mr. Kurtz that authorized the City of Flint to enter into a

# REQUEST FOR WARRANT
### Page 7

---

### DETAILS OF INVESTIGATION (CONTINUED)

contract with LAN for the purpose of preparing the FWTP for operation prior to the City's use of the Flint River as its primary source of water until the KWA pipeline's completion. Pursuant to that contract, LAN prepared plans and specifications for improvements for the FWTP ("Plans"). The Plans required the City of Flint to take several mandatory action steps to make the FWTP operational. Specifically, the Plans provided that the City needed to: 1) fix the clarifiers to distribute disinfectants; 2) fix the ozone system to ensure safe water; 3) ensure that the plant's monitoring system (SCADA) was properly functioning; 4) run an initial test of over 30 days; and 5) run a final test of over 60-90 days prior to distributing water to Flint's citizens. However, the FWTP was not even provided the opportunity to run for the initial 30-day test period before water distribution from the FWTP began on April 25, 2014.

19.    According to Public Act 436 of 2012, emergency managers are required to submit financial operating plans for approval by the Department of Treasury. On June 28, 2013, Mr. Kurtz submitted *Update 3* for the City of Flint's Financial Operating Plan. As it concerned the City of Flint's water supply, this update included a change from Kurtz's original *Financial and Operating Plan – Fiscal Year 2013*, which contemplated blending Flint River water with water provided by the DWSD. In *Update 3*, Mr. Kurtz stated that rather than proceeding with the original blending option, "(h)igh consideration is being given to utilizing the Flint River." Defendant EARLEY assumed the role of Flint's emergency manager in November 2013. Shortly thereafter, he submitted his own update to the City of Flint's Financial Operating Plan, titled *Update 4*. In Defendant EARLEY's update, provided to the Department of Treasury on November 21, 2013, he stated that "upgrades to the [FWTP] are required prior to the transition to the KWA water source and any temporary use of the Flint River." Further evidencing Defendant EARLEY's knowledge of the necessity of the treatment plant upgrades, on November 14, 2013, Defendant EARLEY submitted a resolution for Department of Treasury approval requesting authorization to increase the contract amount to be paid to LAN. The Department of Treasury

# REQUEST FOR WARRANT
Page 8

## DETAILS OF INVESTIGATION (CONTINUED)

approved this resolution to perform work necessary "to operate the Water Plant off the river until the KWA water source is completed."

20.     Construction commenced on the KWA pipeline at the end of June 2013. In order for KWA to fund the projected construction costs, KWA needed to issue an estimated $220.5 million in municipal bonds. Defendant AMBROSE testified that "the [KWA was] actually the issuer of the bonds with revenues pledged from primarily the County. The County and the City with the County obligated to make the City's payment should the City default, not make its payments." Documentation collected throughout the investigation showed that the City of Flint pledged a 34.2-percent share of the revenues, which was intended to reimburse the KWA for the debt accumulated from the pipeline construction. Genesee County agreed to pay a 65.8-percent share. As a city in state receivership, Flint did not have the funds available to finance its portion up front. Furthermore, the City of Flint was prohibited from borrowing the funds it had pledged because of the debt limit imposed by the Home Rule City Act.   On two occasions, Defendant EARLEY applied for authorization from the Department of Treasury to allow the City to borrow funds to satisfy its portion of the KWA costs. However, the Department of Treasury denied Defendant EARLEY's requests on February 21, 2014. Defendant AMBROSE testified that, at that time, the City of Flint had no borrowing capacity.

21.     On February 12, 2014, with Flint's DWSD water service scheduled to terminate in April of 2014, DWSD Director Sue McCormick, who was unaware of Flint's intention to switch to the Flint River as an interim water source, sent a letter to Defendant EARLEY expressing her concern about Flint's future water supply.

22.     On March 7, 2014, Defendant EARLEY responded to Sue McCormick, stating that after the contract between DWSD and the City of Flint expired, the City had "actively pursued using the Flint River as a temporary water source while the KWA pipeline is being constructed." Acknowledging the chance that the FWTP would not be ready by the scheduled switch-date, Defendant EARLEY added:

# REQUEST FOR WARRANT
### Page 9

---

### DETAILS OF INVESTIGATION (CONTINUED)

However, in the very unlikely event that the City of Flint is not able to draw water from the Flint River no later than April 17, 2014, then the City would like the option of continuing to purchase water from the DWSD, for a period of time, up to the time water is available from KWA.

23. On March 18, 2014, KWA's bond counsel emailed Defendant AMBROSE and Defendant EARLEY regarding Flint's portion of the pledged funds. After stating that KWA was "far along in the process of issuing the first series of bonds (approximately $220,000,000) for the construction of the pipeline," he stated that KWA could close on its bond issue within two weeks. He then discussed an ACO:

> However, we cannot take that step until the DEQ Administrative Consent Order ("ACO") is effective. The DEQ order is necessary for two reasons: 1) There is extensive disclosure on the water treatment plant, ACO and Flint's ability to use that plant in the POS [Preliminary Official Statement] and 2) More importantly, if the KWA project is done to comply with an ACO, the debt associated with the project would not "count" towards the City's debt limit. As you know, the City of Flint has lived through a dramatic decline in property values and state revenue sharing. These declines have dramatically reduced its debt capacity under the Home Rule City Act. In order to ensure that the entire project can be financed (1st and 2nd series of bonds) and that the City will have some debt capacity in the future, the ACO is a condition precedent to proceeding with transaction (sic). Put another way, we will cannot (sic) continue with the transaction without the ACO. If there is much more of a delay, the KWA will have expended its initial resources and be forced to stop construction and the project will be delayed for at least one construction cycle. Assuming the ratings come in as planned, the City needs the ACO in place by the end of the week.

24. In accord with bond counsel's email, Defendants conspired to manufacture a "calamity," allowing them to obtain an ACO to borrow funds outside and in excess of the debt-limit parameters mandated by the Home Rule City Act. MCL 117.4a. The Home Rule City Act orders that a municipality may not carry more debt than the total value of its property. However, the ACO allowed the City of Flint to borrow money that would not count toward the City's debt limit if the ACO was used to remedy a "calamity." The Home Rule City Act states:

> In case of fire, flood, or other calamity, the legislative body may borrow for the relief of the inhabitants of the city and for the preservation of municipal property, a sum not to exceed 3/8 of 1% of the assessed value of all the real and personal

### DETAILS OF INVESTIGATION (CONTINUED)

property of the city, due in not more than 5 years, even if the loan would cause the indebtedness of the city to exceed the limit established by this section.

25.   The ACO's Statement of Purpose stated:

> In entering into this Consent Order, the mutual objectives of the Respondent [City of Flint] and the [M]DEQ are to address the Open Dump created at the Site [5200 Bray Road, Genesee Township, Genesee County, Michigan], eliminate any surface water discharged from the Site to the Cornwell Drain, and allow the Respondent to reconstruct the system used to manage drinking water treatment plant ("WTP") residuals so that Respondent may resume dewatering lime sludge at the site.

The Statement of Purpose did not address the use of the Flint River or the KWA as a source of drinking water for the City. However, one paragraph contained in the 15-page document stated, "In order for the Respondent to continue to use the WTP, the Respondent must undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River, such as additional WTP public improvements, source water protection public improvements, and public improvements to obtain a back-up water supply, in order to comply with Act 399."

26.   Defendant AMBROSE forwarded bond counsel's email to Wayne Workman of the Department of Treasury, and stated the following: "We greatly appreciate the call made after our last meeting to [M]DEQ by Eric Cline regarding the pending ACO. It has moved along, but still in process. Any additional assistance you an (sic) give would be greatly appreciated." Defendant AMBROSE's email went on to state that formal approval of the ACO was required in order for the bond sale to proceed.

27.   Jim Sygo indicated that the execution of the ACO with the condition ordering the City to use a particular source of drinking water was not a normal condition with which the MDEQ would be involved. Further, he stated that this is not a decision that the MDEQ would make. Following up on the status of the ACO's approval, Wayne Workman of the Department of Treasury emailed other Department of Treasury staff on March 19, 2014, and asked, "Can we get a call into the Director [Dan Wyant] to push this through? No one appears to be doubting the need but they can't get to the market without [M]DEQ approving the ACO."

# REQUEST FOR WARRANT
### Page 11

---

### DETAILS OF INVESTIGATION (CONTINUED)

28.     The ACO was executed on March 20, 2014.  Pursuant to the aforementioned ACO, the City of Flint was bound to the use of the Flint River as its interim water source.  Dayne Walling will testify that an additional aspect of the bond issue was the effect any default on its obligations under the KWA contract would have on real property owned by the City.  Mr. Walling will testify that any default on the City's payments would result in the loss of the FWTP to the KWA.

29.     Prior to the execution of the ACO, Defendant EARLEY received a March 14, 2014, memo that included a list of minimum requirements in need of completion prior to the FWTP being ready to distribute untreated water taken from the Flint River. This list included, among other items, upgrading aspects of the FWTP needed for the disposal of softening residuals and disposal of process water and backwash.  The memo outlined the need for additional staff required for full-time operation and maintenance, additional electrical costs, treatment chemical costs and costs for the performance of additional chemical tests.  The memo also identified that "[f]luctuating water temperatures will impact treatment costs and lead to taste and odor complaints" and noted "[c]ontaminated sediments in pools at Hamilton Dam and Thread Lake."

30.     On April 1, 2014, Defendant EARLEY executed a document entitled "Letter of Representation – City of Flint."  This document is listed as Exhibit B to the "Bond Purchase Agreement" entered into between the KWA and a group of underwriters: J.P. Morgan Securities, LLC, Wells Fargo Bank, N.A., and Stifel, Nicolaus & Company, Incorporated.  The Letter of Representation stated in Section 1, paragraph (j):

> Flint's obligations incurred under the Contract [between KWA and Flint] to pay Contractual Payments [principal and interest payments on the bonds] to the Issuer [KWA] with respect to the Bonds are necessary for Flint to comply with an administrative consent order dated March 20, 2014, between the Flint and the Michigan Department of Environmental Quality, the successor to the Michigan Water Resources Commission, and as such, are excluded when computing Flint's statutory debt limitation set forth in Section 4a of the Home Rule Cities Act (Act 279, Public Acts of Michigan, 1909, as amended), being MCL 117.4a

## REQUEST FOR WARRANT
### Page 12

---

### DETAILS OF INVESTIGATION (CONTINUED)

31.     Defendant AMBROSE testified about additional financial aspects of the Flint water switch. He stated that it was the same decision processes that the emergency management team had made for the 2013, 2014, and 2015 fiscal years.  These decision processes involved the choices to increase revenues, decrease expense, or do a mix of both in order to have a credible spending plan, one in which the expenses of the City do not exceed the revenues.  Further, Defendant AMBROSE stated that such considerations were particularly important when a City, such as Flint, had a $13 million deficit.  Defendant AMBROSE stated that the revenues associated with the general fund included property taxes, income taxes, state-shared revenue and other miscellaneous revenues.

32.     Defendant AMBROSE, who at the time of the ACO, was the City's financial advisor, further stated that at the time the ACO was executed, the City had no autonomous financial borrowing ability.  As a City in receivership, the City of Flint did not have a credit rating. Rather, to borrow money the City was required to obtain approval of the Department of Treasury.  Defendant AMBROSE stated that he and his colleagues had no reason to believe that the Department of Treasury would authorize any borrowing given the City's financial situation at the time.  Ultimately, FWTP's lime sludge disposal facility was used as a premise for obtaining the funds needed to finance the City of Flint's contribution to the KWA pipeline. Factually, this was a sham transaction designed under false pretenses to obtain money for the KWA.

33.     James Redding, Vice-President – Director of Engineering at Rowe Engineering, will testify regarding that his company had already performed engineering survey work on the Bray Road lime sludge lagoon at the end of 2013 or early 2014 that was intended to address the issue of lime sludge disposal. Additionally, he will testify that the solution agreed upon by the MDEQ and the City of Flint was prior to the timing of the approved ACO.  Mr. Redding will testify that this agreement was reached in 2013.

# REQUEST FOR WARRANT
### Page 13

---

34.    A few days before the FTWP was set to go online, on April 17, 2014, Michael Glasgow, Laboratory and Water Quality Supervisor at the plant, sent an email to Adam Rosenthal, Mike Prysby, and Stephen Busch, all of the MDEQ, which stated:

> I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

35.    Michael Glasgow will testify that on April 16, 2014, he was of the opinion that the FWTP was not ready to start the switch to the Flint River. He will also testify that on April 21, 2014, he was receiving pressure from above, specifically from Defendant JOHNSON and Defendant CROFT. Defendant CROFT told investigators that Defendant JOHNSON wanted Mr. Kurtz to sign off on a resolution to use the Flint River as a temporary source of supply for the water.

36.    Michael Glasgow was not the only person involved in the Flint River switch harboring concern about the FWTP's unpreparedness for the water source switch.

37.    John O'Brien, an employee of the Genesee County Drain Commission, will testify that when walking through the FWTP just before the switch, a chlorination system and insulation room were in the process of being built. Thus, Mr. O'Brien explained that at that time, the City was not ready to run the FWTP. In his opinion, based upon his walk through the FWTP, the City of Flint was approximately 90 days out from being ready to produce water for the public's consumption.

38.    Warren Green, Vice President and Chief Technical Officer of LAN, stated that the he told FWTP Supervisor Brent Wright, Defendant JOHNSON and others that in order for the FWTP to be ready for the switch to the Flint River, the plant needed to conduct a test run for a 60- to 90-day period. Test runs were started on a couple of occasions in 2013, but were never completed because of problems with the plant.

### DETAILS OF INVESTIGATION (CONTINUED)

39.    Brent Wright told investigators that he agreed with Michael Glasgow in April 2014 that the FWTP was not ready to begin full time operations.  He spoke to Mr. Glasgow before Mr. Glasgow sent the April 16 and 17, 2014, emails, and agreed with Mr. Glasgow's assessment.  Mr. Wright stated, "None of us wanted to do this."

40.    Defendant CROFT stated that KWA did not want to wait another construction season to start the pipeline project.  He also admitted that the FWTP was a redundant plant used for emergencies only and was not ready to go to full-time operational status.  He also stated that prior to the switch, Defendant JOHNSON stated that they would be "heroes" if they switched to the Flint River and saved the City money.  Defendant CROFT also admitted being made aware of manpower issues at the plant from Defendant JOHNSON. Since the Flint Department of Public Works received no response from the Flint Human Resources Department about needing additional manpower, Defendant CROFT and Defendant JOHNSON decided to let the existing personnel work overtime to get the FWTP ready.

41.    Nicole Alexander, a FWTP Lab Specialist, will testify that she and Michael Glasgow were against the switch to the Flint River, because they had not perfected the softening treatment process. She stated that FWTP personnel were learning "on the fly" and that Defendant CROFT "demanded" that the water be softened.  In her opinion, at the time of the switch, the FWTP needed at least six weeks to run before sending any water out.

42.    David Jansen, the Senior Assistant Director at the Genesee County Drain Commission, will testify that he was familiar with the FWTP operations in 2014.  He told investigators that the FWTP had entered into a multi-year renovation project at the time of the switch to the Flint River, and that "they were just entering into phase two of a three or four-phased renovation process."  When asked whether the FWTP was ready for full-time service for the production of water, Mr. Jansen answered, "No."

# REQUEST FOR WARRANT
## Page 15

---

### DETAILS OF INVESTIGATION (CONTINUED)

43.     On April 18, 2014, Joshua Spencer of Spencer Enterprises, Inc., was the public relations person responsible for handling public relations for the City of Flint.  On that date, Mr. Spencer sent an email to Jason Lorenz, the Public Information Officer for the City of Flint.   Therein, Mr. Spencer urged the release of a statement for the press addressing the upcoming switch to the Flint River.  He stated, "Here is the story we wrote for release immediately….I recommend posting the story ASAP and copy and pasting the story into a city press release to also go out first thing this morning."  The press release contained the following statements:

    a.    The Tests are in. The Water is Good!

    b.    In an effort to dispel myths and promote the truth about the Flint River and its viability as a residential water resource, there have been numerous studies and tests conducted on its water by several different independent organizations.

    c.    For nearly 10 years Mike Glasgow has worked in the laboratory at the City of Flint Water Service Center.  He has run countless tests on our drinking water to ensure its safety for public use.  Mike has not only conducted tests on water provided to us by Detroit, but also on local water from nearby rivers, lakes and streams including the Flint River.  When asked if over the last decade of he has seen any abnormalities of major concern in the water, his response was an emphatic, "No."

44.     Mr. Lorenz then forwarded the email and the press release to Defendant EARLEY.  Defendant EARLEY initially argued in favor of waiting for MDEQ approval before running the release.  However, Defendant JOHNSON told Defendant EARLEY, "I'm with [M]DEQ now.  They are comfortable with the upgrades so far.  It is actually our Water Quality Supervisor that will determine it meets the Drinking Water Standards.  I'll get that info to you at that time *and you can direct us to introduce our water to the system.*  That will be as early as possible next week.  I'm comfortable releasing the ad."  Defendant EARLEY replied, "Well, I take that as your administrative stamp of approval.  If that is the case, *then move forward knowing that the accountability rests with you.*" (Emphasis supplied.)

45.     Despite the aforementioned concerns, on April 25, 2014, the source of the drinking water for the citizens of the City of Flint was switched from pretreated water provided by the DWSD, to raw, untreated water

# REQUEST FOR WARRANT
Page 16

---

## DETAILS OF INVESTIGATION (CONTINUED)

obtained from the Flint River.  The Flint River water was being treated and distributed by the FWTP.[1]  Soon

after the switch, public officials at the MDEQ, the City of Flint and the United States Environmental Protection

Agency ("EPA") began receiving complaints from various Flint residents concerning quality issues with the

new drinking water supply.  The complaints generally related to rust- or brown-colored water, a rotten egg

smell, and poor taste.  Residents also complained about their children suffering from skin rashes and hair loss

after bathing in the water.  The Michigan Department of Health and Human Services ("MDHHS") also became

aware of numerous reports concerning the quality of the City of Flint's drinking water supply.

46.     Scientific studies showed that after the water source was switched, many residents were exposed

to dangerous levels of lead. The failure to use appropriate corrosion control when the City of Flint switched its

water supply from DWSD to the Flint River in April of 2014 caused the integrity of water distribution pipes to,

over time, become compromised.  The damage to the City of Flint's water distribution system caused by the

lack of corrosion control resulted in the release of lead from the pipes into Flint's water supply.

47.     Dr. Victor Yu, Professor of Medicine at the University of Pittsburgh, will testify that the water's

corrosiveness dislodged the biofilm that had previously lined the pipes used to distribute water throughout the

City, exposing Legionella bacteria to the water and leaching mineral substances into the water, including iron

from older iron pipes.  Iron is a known micronutrient that boosts the level of Legionella bacteria.  The metal

also reacts with and inactivates any chlorine disinfectant found in treated water that would have killed the

Legionella bacteria.

48.     Soon after the switch in its water source to the Flint River, Genesee County experienced an

outbreak of Legionnaires' disease.  The first outbreak of the disease, which began in June 2014, was followed

by a second outbreak of the disease that began in May 2015.

---

[1] For approximately 50 years before the switch occurred, the FWTP had only been in limited service as an emergency backup treatment facility, with DWSD water held in reservoirs that could supply the City for several days if need be.

### DETAILS OF INVESTIGATION (CONTINUED)

49.     As issues with the Flint River water persisted and complaints from the citizens grew, Governor Snyder asked MDEQ Director Dan Wyant to compile information regarding the City of Flint drinking water situation, to draft a briefing paper summarizing the MDEQ's findings and to submit the paper to the Governor's Office.

50.     On October 1, 2014, Governor Snyder, Dennis Muchmore and Valerie Brader of the Governor's office received the completed Governor's Office Briefing Paper ("Briefing Paper"), which Stephen Busch drafted.  The Briefing Paper detailed the reason for the Boil Water Advisory ("BWA") issued for August 2014 as "Bacteria Monitoring Detections" and "Bacteria Standards Violations."  Additionally, the Briefing Paper stated that "Waterborne Disease Outbreaks" may also trigger a BWA.

51.     Furthermore, the Briefing Paper indicated that "[c]urrent regulations regarding monitoring and standards for bacteria in water distribution systems were developed by the U.S. Environmental Protection Agency, have been in effect since 1990, and were incorporated into the Michigan Safe Drinking Water Act, 1976 PA 399, as amended.  There are a variety of bacteria, parasites, and viruses that can potentially cause health problems if humans ingest them in drinking water."  Further, "the presence of total coliform in drinking water indicates there may be a pathway for pathogens or other contaminants to enter the system . . . . *E.coli* is itself a pathogen, and its detection would be direct evidence of a health risk."

52.     In the Briefing Paper, Stephen Busch also asserted:

> A BWA was issued for August 15-20, 2014, for a portion of the city of Flint due to localized detections of total coliform and *E.coli* bacteria.  Another BWA was issued for September 5-9, 2014, due to localized detections of total coliform bacteria in the same and adjacent portions of the city of Flint.  The advisory covered an area of approximately six square miles.  The city of Flint has a total land area of just over 34 square miles.

Thus, the outbreak covered over 17% of the total square miles of the City.

53.     On October 3rd, 2014, in the midst of the first Legionnaires' disease outbreak, the spike of cases was brought to Defendant EARLEY's and Defendant AMBROSE's attention.  Defendant AMBROSE received

# REQUEST FOR WARRANT
Page 18

## DETAILS OF INVESTIGATION (CONTINUED)

an email from Jason Lorenz, the Public Information Officer for the City of Flint.  In his email, Mr. Lorenz informed Defendant AMBROSE that he received an email from ABC12 reporter Jessica Dupnack regarding an internal memo she received from McLaren Hospital's public relations team informing her that the Genesee County Health Department issued a warning about Legionella contaminants in the water in Flint and Genesee County. McLaren informed Ms. Dupnack that the hospital was working with the City of Flint Water Department to continue testing to make sure the water was safe.  Mr. Lorenz informed Defendant AMBROSE that after receiving this information from Ms. Dupnack, he followed up with Michael Glasgow of the FWTP, who confirmed that he helped the hospital test for bacteria.

54.      After receiving this information, Defendant AMBROSE responded, "Why would Mike Glasgow not immediately advise his supervisors that he was working on such a project? Once again we are on the defensive......."

55.      Elizabeth Murphy, Assistant to the Emergency Manager, replied to Defendant AMBROSE's questions to inform him that, "Mike's supervisors did know about this."  She explained that she received a call from the president of McLaren the previous week.  She added, "I immediately called Howard, who was with the Mayor, and asked him to have Mike contact McLaren's head of engineering.  They determined that there was no issue with the Flint water coming into the hospital, they had an internal issue."  In response to Ms. Murphy's email, Defendant AMBROSE inquired, "So is there something we could have done proactively to avoid the instant connection of the problem to Flint Water?"  Subsequently, Defendant EARLEY responded to the email chain, "Therein lies our message...an internal issue at McLaren that they are working on with our assistance, not a Flint water problem that we are trying to resolve."

56.      Testimony will show that MDHHS personnel were not in agreement with Defendant EARLEY's "message."

# REQUEST FOR WARRANT
Page 19

---

## DETAILS OF INVESTIGATION (CONTINUED)

57.　　On October 14, 2014, Valerie Brader, State Deputy Legal Counsel and Senior Policy Advisor, sent an email to Governor Snyder's Chief of Staff, Dennis Muchmore, and other top aides arguing for a return to DWSD because of water quality problems. Michael Gadola, then Governor Synder's Legal Counsel, responded agreeing with Brader. Brader and Richard Baird, senior aide to Governor Snyder, discussed the idea with Defendant EARLEY, who maintained that the water quality problems could be solved and that returning to DWSD would be cost-prohibitive.

58.　　On January 9, 2015, Defendant EARLEY refused to return to DWSD water. In a press release discussing his decision, Defendant EARLEY stated:

> Suggestions have been made that the City of Flint should return to using water purchased through the Detroit Water and Sewerage Department. For many reasons financial and otherwise the City of Flint can ill-afford to switch courses at this point. Thus, we will continue following the guidelines and directives of the Michigan DEQ in the implementation of our water quality plan and operational report until the KWA water source is available. The estimated cost to go back to the water provided by DWSD is approximately $1 million per month and the City expects to be using the [KWA] Lake Huron water within the next eighteen months. It is not financially prudent to spent $18 million to purchase water that meets the same DEQ standards as the water now available from the Flint River.

59.　　On January 12, 2015, DWSD Director Sue McCormick sent a letter to Defendant EARLEY and Dayne Walling. In her letter, Ms. McCormick acknowledged the water quality issues in Flint and stated that "many of the difficulties stem from the limited access to source water." Ms. McCormick then offered the City an immediate reconnection "to the DWSD system at no additional charge to the City and at the same 'expired contract' rate that the City was paying in April, 2014."

60.　　In response to McCormick's January 12, 2015, letter, Defendant AMBROSE declined the offer to reconnect to the DWSD since "the plan of action articulated by former Emergency Manager Darnell Earley remains in place."

61.　　In Defendant EARLEY'S prepared statement for the United States Congress Committee on Oversight and Government Reform, he wrote that he never actually received McCormick's January 12, 2015

# REQUEST FOR WARRANT
## Page 20

### DETAILS OF INVESTIGATION (CONTINUED)

letter.  This was a misrepresentation.  Defendant EARLEY not only received Sue McCormick's letter, but discussed the offer in an email to Dayne Walling on January 12, 2015.  In the email, Defendant EARLEY commented that the "Sweetheart Deal" Ms. McCormick offered was only effective until June.

62.    On January 21, 2015, Jason Lorenz circulated a draft response to Sue McCormick's offer to reconnect the City of Flint to DWSD water via email to Defendant AMBROSE, Defendant CROFT, Defendant JOHNSON, and other City of Flint personnel. The draft, reading as if written by Defendant AMBROSE, Dayne Walling, and Defendant CROFT, read as follows:

> The City of Flint acknowledges receipt of your letter and thanks you for the offer therein; however, the City of Flint is maintaining its course of action with regard to its drinking water. This consists of treating water from the Flint River as an intermediate water source ahead of connection to the KWA pipeline in 2016. During this interim period, we will seek consultation from external firms with experience in the treatment of river water as a drinking water source to ensure the best practices with regard to safety and quality are followed. The City of Flint will keep the letter you have sent on file should there be a need to revisit the water source needs of our drinking water operation.

63.    Defendant JOHNSON and Defendant AMBROSE responded to the circulated draft. Defendant JOHNSON stated, "I would keep i[t] short and simple. Thanks…but no thanks. I assume this is just a letter to DWSD and not a press release[.]" Mr. Lorenz thanked Defendant JOHNSON for his feedback, shortened the body of the letter, and recirculated the second draft. Defendant AMBROSE made his own edits and asked for the final form to be prepared for his signature. The final letter sent by Defendant AMBROSE to DWSD Director Sue McCormick stated:

> Thank you for your letter of January 12, 2015, offering the City the option to reconnect to DWSD, should we be interested in a long term arrangement. At this time, however, the plan of action articulated by former Emergency Manager Darnell Earley remains in place.

> Should circumstances change, we may contact you for discussion of possible terms.

> Sincerely,

# REQUEST FOR WARRANT
### Page 21

---

DETAILS OF INVESTIGATION (CONTINUED)

Gerald Ambrose, Emergency Manager

64.     On January 27, 2015 James Henry, Environmental Health Supervisor at the Genesee County Health Department ("GCHD"), sent a FOIA request to the City of Flint Freedom of Information Act ("FOIA") Coordinator requesting "testing locations and laboratory results within the City of Flint public water system for Coliform, E-Coli, Heterotrophic Bacteria and Trihalomethanes from January 1, 2010 to January 27, 2015. . . [and] a map or list of locations, detailing dead ends, pooling, [and] low pressure . . . areas." A week later, on February 5, 2015, Flint Utilities Administrator Defendant JOHNSON responded that he had not received Mr. Henry's FOIA request but would "fulfill [the] request as soon as possible."

65.     By March 2015, GCHD still had not received the information they requested by FOIA. Former Flint Mayor Dayne Walling will testify that he was made aware of the FOIA request in March when GCHD Health Officer Mark Valacak requested a meeting with Defendant AMBROSE and Mayor Walling to discuss the lack of response from the City. It was at this meeting that Defendant AMBROSE learned that citizens had died of Legionella.

66.     On February 26, 2015, City of Flint Councilman Joshua Freeman forwarded Sue McCormick's previous January 12, 2015 letter to Defendant AMBROSE. After learning that the letter was the same as the one he had previously received, Defendant AMBROSE replied, stating "No [matter] how many times you send it to me, it doesn't change the cost (or my mind:))." Mr. Freeman replied, "I'm trying to use Jedi mind tricks. You'll come around eventually."

67.     Throughout 2015, the City of Flint experienced a second phase of the Legionella outbreak from which dozens of Flint and Genesee County residents contracted Legionnaires' Disease. Several of those Legionnaires' victims died as a result of contracting the illness.

## OFFICE OF SPECIAL COUNSEL



## RECOMMENDATIONS

| IN CUSTODY:<br>NO | FLINT WATER INVESTIGATION | Date:<br>12-19-2016 | ☐ Further Investigation Ordered<br>☐ Further Investigation Completed | | | | |
|---|---|---|---|---|---|---|---|
| I RECOMMEND THE ISSUING OF A WARRANT AGAINST: | | | MISDEMEANOR € | | FELONY € | | |
| DEFENDANT'S NAME | | Age | Sex | Race | D.O.B | SID NO | |
| EARLEY, DARNELL<br>5636 WOODSTOCK DRIVE, LANSING, MI 48917 | | 65 | M | B | 11/01/51 | 3689019W | |
| AMBROSE, GERALD WINFIELD<br>1693 TUTTLE ROAD, MASON, MI 49519 | | 72 | M | W | 02/22/44 | N/A | |
| CROFT, HOWARD DONELL<br>12652 GREENHILL DRIVE, GRAND BLANC, MI 48503 | | 51 | M | B | 06/24/65 | 2230419T | |
| JOHNSON, DAUGHERTY ANDREW<br>307 CHAMBERLAIN STREET, FLUSHING, MI 48433 | | 47 | M | W | 01/01/69 | N/A | |

COUNT 1 – FALSE PRETENSES – DEFENDANTS (01) (02) (03) (04)

did, with the intent to defraud or cheat, make or use a false pretense to cause a person to grant, convey, assign, demise, lease, or mortgage any interest in land, and/or to obtain from a person money, personal property, or the use of an instrument, facility, article, or other valuable thing or service having a value of $100,000.00 or more; contrary to MCL 750.218(7)(a). [750.2187A]

FELONY: 20 Years and/or $35,000.00, or 3 times the value of the money or property involved, whichever is greater.

COUNT 2 – CONSPIRACY TO COMMIT FALSE PRETENSES - DEFENDANTS (01) (02) (03) (04)

did unlawfully conspire, combine, confederate and agree together and with others, both known and unknown to the Office of Special Counsel, to commit the following listed offense; contrary to MCL 750.157a: false pretenses over $100,000.00, prohibited by MCL 750.218(7)a. [750.2187A[C]]

FELONY: 20 Years and/or $45,000.00, or 3 times the value of the money or property involved, whichever is greater.

COUNT 3 – COMMON LAW OFFENSES – MISCONDUCT IN OFFICE – DEFENDANT (01)

did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed Emergency Manager for the City of Flint, by intentionally misleading the citizens of Flint by falsely stating the Flint Water Treatment Plant was equipped to produce safe water, allowing the Flint Water Treatment plant to produce water to the public despite knowledge that the plant was not ready for use, allowing the City of Flint to enter into a contract that required interim use of the Flint Water treatment plant for 30 months with knowledge that the plant was not ready to produce safe water, authorizing dissemination of information to the general public that was false and misleading in regards to the safety and potability of the Flint River water; contrary to MCL 750.505. [750.505]

FELONY: 5 Years and/or $10,000.00

COUNT 4 – COMMON LAW OFFENSES – MISCONDUCT IN OFFICE – DEFENDANT (02)
did commit misconduct in office, an indictable offense at common law, during his tenure as the state-appointed Emergency Manager for the City of Flint, by obstructing and hindering a healthcare investigation conducted by the Genesee County Health Department with regard to the Legionnaires' Disease outbreak; contrary to MCL 750.505. [750.505]
FELONY: 5 Years and/or $10,000.00

COUNT 5 – WILLFUL NEGLECT OF DUTY IN OFFICE – DEFENDANTS (01) (02)
Did willfully neglect to assure the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health safety, and welfare pursuant to the powers granted to them by Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1549(2); contrary to MCL 750.478. [750.478]
MISDEMEANOR: 1 Year and/or $1,000.00

| Date Completed: | Signed: _____ 12/17/16 |
| | SPECIAL ASSISTANT ATTORNEY GENERAL |
| | TODD FLOOD, P#58555 |

## WITNESS LIST

**OFFICE OF SPECIAL COUNSEL**

**THE PEOPLE OF THE STATE OF MICHIGAN,**

<table>
<tr><td>                  **Plaintiff,**</td><td></td></tr>
</table>

                                        **Case No.**

**v.**                                     **Hon.**

DARNELL EARLEY
GERALD AMBROSE
HOWARD CROFT
DAUGHERTY JOHNSON

                    **Defendant(s).**

_____/

**The names and residences of the witnesses for the People in the above-entitled cause are listed below. The witnesses the people intend to produce at trial, pursuant to MCLA 767.40a(3), are designated by an "X" in the boxes to the left.**

| | **Last Name** | **First Name** | **RESIDENCES**<br>(List next leave/furlough dates for all police witness)<br>(List phone numbers for all civilian witness) |
|---|---|---|---|
| | Alexander | Nicole | |
| | Green | Warren | |
| | Jansen | David | |
| | O'Brien | John | |
| | Redding | James | |
| | Walling | Dayne | |
| | Wright | Brent | |
| | Yu | Victor | |
| | | | |

**Officer in charge of case**
OIC Telephone Number
SAAG

_____ Date: _____    _____ Date: _____
**SAAG**                                     **Trial SAAG**



**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
ATTORNEY GENERAL BILL SCHUETTE

## FLINT INVESTIGATION

Todd F. Flood
Special Counsel

Andrew G. Arena
Chief Investigator

OFFICES
Flint / Lansing / Detroit

Email: info@crisisflint.com
Website: www.crisisflint.com

## NOTICE OF INTENT TO SEEK BINDOVER ON ADDITIONAL CHARGE(S) AT PRELIMINARY EXAMINATION

CASE NAME:   PEOPLE v.  HOWARD CROFT
DISTRICT COURT NO.:  16TC2850
PRELIMINARY EXAMINATION DATE:  TBD
CHARGE(S):   False Pretenses, Conspiracy to Commit False Pretenses

Attorney for Defendant:    James White

Please take notice that the People of the State of Michigan intend to seek a bindover on the additional charge(s) of:

Involuntary Manslaughter

following the close of proofs of the preliminary examination in the above referenced case, pursuant to *People v Hunt*, 442 Mich 359 (1993).

Special Assistant Attorney General
Office of the Special Counsel
Flint Water Investigation

Date: June 14, 2017



**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
ATTORNEY GENERAL BILL SCHUETTE

## FLINT INVESTIGATION

Todd F. Flood
Special Counsel

Andrew G. Arena
Chief Investigator

OFFICES
Flint / Lansing / Detroit

Email: info@crisisflint.com
Website:  www.crisisflint.com

### NOTICE OF INTENT TO SEEK BINDOVER ON ADDITIONAL CHARGE(S) AT PRELIMINARY EXAMINATION

CASE NAME:   PEOPLE v.  DARNELL EARLEY

DISTRICT COURT NO.: 16TB2850

PRELIMINARY EXAMINATION DATE:  TBD

CHARGE(S):   False Pretenses, Conspiracy to Commit False Pretenses, Misconduct in Office, Willful Neglect of Duty in Office

Attorney for Defendant:    Todd Perkins

Please take notice that the People of the State of Michigan intend to seek a bindover on the additional charge(s) of:

   Involuntary Manslaughter

following the close of proofs of the preliminary examination in the above referenced case, pursuant to *People v Hunt*, 442 Mich 359 (1993).

Special Assistant Attorney General
Office of the Special Counsel
Flint Water Investigation

Date: June 14, 2017