# EXHIBIT B

| Criminal Complaint | | Civil Complaint |
|---|---|---|
| 4. By his own admission, Defendant EARLEY was responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. Specifically, when he testified in front of the United States House Committee on Oversight and Government Reform on March 15, 2016, he stated "the [e]mergency [m]anager obviously is the person responsible for making sure that those things get done, and I've always accepted that." U.S. House Committee on Oversight and Govt. Reform March 15, 2016 Transcript, p. 32. | | 126. As Emergency Manager, Earley was, by his own admission, responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. In his testimony to the United States House Committee on Oversight and Government Reform on March 15, 2016, he stated "the [e]mergency [m]anager obviously is the person responsible for making sure that those things get done, and I've always accepted that." |
| 13. On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch, District Supervisor of the MDEQ's Office of Drinking Water and Municipal Assistance ("ODWMA"), emailed MDEQ Director Dan Wyant, MDEQ Deputy Director Jim Sygo, ODWMA Director Liane Shekter Smith and other MDEQ officials to address the concerns flagged in the TYJT report. Mr. Busch provided his colleagues with notice of the potential problems with using the Flint River as the City's water source. In his email, he stated that continuous use of the Flint River at such demand rates would: | | 373. On March 26, 2013, in preparation for a conference call between MDEQ and the Department of Treasury personnel, Stephen Busch emailed MDEQ Director Dan Wyant, deputy director Jim Sygo, Liane Shekter-Smith, and other MDEQ officials raising concerns about using the Flint River as the City's water source. Specifically, he noted that continuous use of Flint River water to supply the City of Flint would "[p]ose an increased microbial risk to public health[;]" "[p]ose an increased risk of disinfection by-product (carcinogen) exposure[;]" "[t]rigger additional regulatory requirements under the Michigan Safe Drinking Water Act . . .;" and "[r]equire significant enhancements to treatment at the Flint WTP, beyond those identified in the TYJT report . . . ." Busch further explained that using the Flint River would impose substantial costs and upgrades to the Flint Water Treatment Plant due to the need to provide softening, limitations on disposal options for lime sludge, increased ozone capacity, and additional backup power. |
| 13 (cont.) a. Pose an increased microbial risk to public health (Flint River vs. Lake Huron source water)[;]<br>b. Pose an increased risk of disinfection by-product (carcinogen) exposure to public health (Flint River vs Lake Huron source water)[;]<br>c. Trigger additional regulatory requirements under the Michigan Safe Drinking Water Act . . . [;]<br>d. Require significant enhancements to treatment at the [FWTP] beyond those identified in the TYJT report[.]<br>Busch also identified increased requirements and costs associated with using the Flint River that included:<br>a. The need to provide softening treatment[;]<br>b. Limitations on disposal options for lime softening sludge[;]<br>c. Increased ozone capacity, UV disinfection[;]<br>d. Additional backup power, more power required for Flint River operation[.] | | |

| | |
|---|---|
| 26. Defendant AMBROSE forwarded bond counsel's email to Wayne Workman of the Department of Treasury, and stated the following: "We greatly appreciate the call made after our last meeting to [M]DEQ by Eric Cline regarding the pending ACO. It has moved along, but still in process. Any additional assistance you an (sic) give would be greatly appreciated." Defendant AMBROSE's email went on to state that formal approval of the ACO was required in order for the bond sale to proceed. | 383. Not wanting to risk KWA's ability to push forward with the bond offering on its desired schedule, officials from the department of Treasury intervened to ensure MDEQ's cooperation. On March 18, 2014, Gerald Ambrose forwarded Massaron's email to Wayne Workman of the Department of Treasury, and stated the following: "We greatly appreciate the call made after our last meeting to [M]DEQ by Eric Cline regarding the pending ACO. It has moved along, but still in process. Any additional assistance you an [sic] give would be greatly appreciated." |
| 34. A few days before the FTWP was set to go online, on April 17, 2014, Michael Glasgow, Laboratory and Water Quality Supervisor at the plant, sent an email to Adam Rosenthal, Mike Prysby, and Stephen Busch, all of the MDEQ, which stated: I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda. | 129. Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 17, 2014, that the FWTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda." Glasgow had told Rosenthal the day before, in the same e-mail chain, ". . . it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . . I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote Prysby and Busch of the MDEQ, that ". . . I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda." |

| | | |
|---|---|---|
| 53, 55. On October 3rd, 2014, in the midst of the first Legionnaires' disease outbreak, the spike of cases was brought to Defendant EARLEY's and Defendant AMBROSE's attention. Defendant AMBROSE received an email from Jason Lorenz, the Public Information Officer for the City of Flint. In his email, Mr. Lorenz informed Defendant AMBROSE that he received an email from ABC12 reporter Jessica Dupnack regarding an internal memo she received from McLaren Hospital's public relations team informing her that the Genesee County Health Department issued a warning about Legionella contaminants in the water in Flint and Genesee County. McLaren informed Ms. Dupnack that the hospital was working with the City of Flint Water Department to continue testing to make sure the water was safe. Mr. Lorenz informed Defendant AMBROSE that after receiving this information from Ms. Dupnack, he followed up with Michael Glasgow of the FWTP, who confirmed that he helped the hospital test for bacteria. Elizabeth Murphy, Assistant to the Emergency Manager, replied to Defendant AMBROSE's questions to inform him that, "Mike's supervisors did know about this." She explained that she received a call from the president of McLaren the previous week. She added, "I immediately called Howard, who was with the Mayor, and asked him to have Mike contact McLaren's head | | 175. In October 3, 2014, an email from Jason Lorenz, the Public Information Officer for the City of Flint, informed Ambrose and later Earley about the spike in cases of Legionnaires' disease. Earley responded to the email chain disclaiming any connection between the outbreak and Flint's water, writing that the City's "message" should be that the outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve." Statements made to the Michigan Attorney General's Office as part of its investigation into the crisis show that "MDHHS personnel were not in agreement with Earley['s] 'message.'" |
| 59-60. On January 12, 2015, DWSD Director Sue McCormick sent a letter to Defendant EARLEY and Dayne Walling. In her letter, Ms. McCormick acknowledged the water quality issues in Flint and stated that "many of the difficulties stem from the limited access to source water." Ms. McCormick then offered the City an immediate reconnection "to the DWSD system at no additional charge to the City and at the same 'expired contract' rate that the City was paying in April, 2014." In response to McCormick's January 12, 2015, letter, Defendant AMBROSE declined the offer to reconnect to the DWSD since "the plan of action articulated by former Emergency Manager Darnell Earley remains in place." | | 239. On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the re-connection fee. This offer was rejected by Ambrose. |