UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

In re FLINT WATER CASES

Hon. Judith E. Levy
Mag. Mona K. Majzoub

_____

Elnora Carthan, et al. v. Governor
Rick Snyder, et al.

Civil Action No. 5:16-cv
10444-JEL-MKM (consolidated)

_____

## NOTICE OF NONPARTIES AT FAULT BY DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC

The Defendants, Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, Inc. (collectively "the VNA Defendants"), hereby file their *Notice of Nonparties at Fault* in this matter in compliance with substantive Michigan law governing the tort law claims for money damages arising out of personal injuries and property damages the various plaintiffs allege they have sustained as a consequence of the acts and omissions of federal, state, county, and city officials in changing the source of drinking water from Lake Huron to the Flint River in 2014. *See* MCR 2.112(K).

The VNA Defendants have repeatedly told the Court—as well as putative class counsel, attorneys representing individual claimants, and counsel for the

1

various state and local government defendants, engineering defendants, and

McLaren Hospital in the Flint Water Cases—that:

- None of the VNA Defendants arrived on scene until nine-and-a-half months after the City's water contamination began;

- The VNA Defendants' involvement in the City of Flint spanned a month and a half (beginning in January 2015 and ending in March 2015);

- The City of Flint did not implement the VNA Defendants' recommendations, particularly as to use of ferric chloride; and

- Legal responsibility for any particular claimant's injuries and damages reposes entirely with other persons and entities, including (without limitation) each defendant sued by plaintiffs in this or other Flint Water Litigation in this or other courts.

The VNA defendants add the following facts to those recited immediately above:

- The VNA defendants did not manufacture or distribute lead or lead containing products, such as lead paint, tetraethyl lead, lead gasoline, or toys or furniture containing lead;

- The VNA defendants did not operate manufacturing facilities in Flint, Michigan or its surrounding communities, such as smelters, metal processing plants, motor vehicle assembly plants, or motor vehicle paint shops;

- The VNA defendants did not operate power generating plants in Flint, Michigan or its surrounding communities or any other facilities that produced plumes of ash and smoke from the products of combustion, including lead particles;

- The VNA defendants did not cause or contribute to the extensive background of lead contamination of Flint, Michigan soils; and

2

- The VNA defendants did not construct, own, or lease residential or commercial properties in Flint, Michigan burdened with lead paint or lead contaminated soils and dust.

Through this Notice of Nonparties at Fault, the VNA Defendants state their intent (and preserve their right) to have the jury allocate fault on the verdict form to each listed entity or person who caused or contributed to the harm or damages proven by the Plaintiffs, including, without limitation, each entity or person sued by each and every plaintiff in each lawsuit in state and federal court, collectively referenced as the Flint Water Litigation (or the "Flint Water Cases"). Further, the VNA defendants state their intent to amend and modify this Notice prior to trial as the litigation develops. The VNA defendants have been unable to date to conduct substantive discovery from the parties to the litigation and have participated in nominal document discovery from non-parties through court approved document only subpoenas. The plaintiffs individually and collectively have produced virtually nothing by way of information and documents to date. Non-parties at fault, such as the plaintiffs' various federal, state, and local government, commercial, and residential landlords who provided substandard housing contaminated with lead painted surfaces, pipes, and soils have yet to be identified. The VNA defendants will add to the Notice those non-parties at fault who are identified during the discovery process.

1.    **THE UNITED STATES OF AMERICA**

   **A. Environmental Protection Agency**
      1200 Pennsylvania Avenue, N.W.
      Washington, DC 20460

   The Environmental Protection Agency ("EPA") is an independent agency of the federal government charged with the establishment and enforcement of environmental protection standards and providing support and technical assistance to the states for the protection of human health and the environment.[1] The EPA is charged by Congress with implementing and enforcing drinking water standards under the Safe Drinking Water Act ("SWDA"), including standards applicable to lead. The SWDA was established to protect the quality of drinking water in the United States, including in Flint, Michigan.

   Under the SWDA, the EPA granted the State of Michigan the authority to implement and enforce SDWA regulations in an arrangement referred to as "primacy." Where states are granted primacy, the EPA retains the duty to ensure that public drinking water systems comply with health-based federal standards for contaminants.[2] The EPA has the duty to monitor and oversee state primacy for compliance with the SWDA.[3]

---

[1] 40 C.F.R. § 1.1; Reorganization Plan No. 3 of 1970.
[2] 42 U.S.C. § 300g-3(a); 300j-4.
[3] *Id.*

4

EPA's headquarters maintains overall planning, coordination and control of EPA programs.[4] EPA Regional Offices have a duty to execute EPA's programs within the boundaries of their regions.[5] EPA Region 5 Office of Drinking Water program staff and managers have a duty to oversee SDWA implementation in regional primacy states, including Michigan, through enforcement actions and by providing guidance and technical information to state agencies and local utilities.[6] EPA has a duty to notify state officials and a public water system if it determines that a water system is out of compliance with the SWDA, including the Lead and Copper Rule ("LCR"). In such situations, the EPA has a duty to provide technical assistance to the state and public water system to bring the system into compliance "by the earliest feasible time."[7] If compliance is not achieved and the State has not commenced an enforcement action after thirty days, the EPA has a duty to issue a compliance order or commence a civil action.[8] Additionally, treatment technique violations, including failure to install corrosion control treatment, require public notification.[9]

---

[4] 40 C.F.R. § 1.5.
[5] 40 C.F.R. § 1.5.
[6] 40 C.F.R. § 1.49(d).
[7] 42 U.S.C. §300g-3 (a)(1)(A).
[8] 42 U.S.C. §300g-3 (a)(1)(B).
[9] 42 U.S.C. §300g-3(c).

The EPA possesses emergency powers if a contaminant in drinking water poses an imminent threat or danger to the public health.[10] Though the EPA ultimately found exactly such circumstances to exist in Flint, it did not take action to address them until late January 2016, when it issued an emergency administrative order. Although the EPA was aware of the City's non-compliance with relevant standards, including the Lead and Copper Rule ("LCR"), at least as early as April 2015, it did nothing until January 21, 2016. And as it sat by idly, the EPA allowed Flint residents to consume lead contaminated water knowing that serious, long term physical injuries could come about, including specifically to small children.

Appearing before Congress, EPA Administrator Gina McCarthy acknowledged that her agency should have been more aggressive in testing the water and requiring changes, colorfully testifying that she "wished we had yelled from the tree tops." Instead, the EPA, with actual knowledge of Flint's non- compliance, remained silent, refusing to inform the public for a substantial period of time. Without EPA intervention, "the conditions in Flint persisted, and the state continued to delay taking action to require corrosion control or provide alternative drinking water supplies."[11]

---

[10] 42 U.S.C.§ 300j-1.

[11] EPA OIG, *Management Weaknesses Delayed Response to Flint Water Crisis*, Report No. 18-P-0221 (July 19, 2018) ("OIG Report").

*EPA's Office of Inspector General*

The EPA's Office of Inspector General is a part of the EPA, although Congress separately funds it from the agency so as to ensure its independence. The EPA's Office of Inspector General was created pursuant to the Inspector General Act of 1978, as amended. In its capacity as independent office within the EPA, the Office of Inspector General helps the agency protect the environment, in part, through its audits and investigations of the EPA to promote economy and efficiency and to prevent and detect fraud, waste and abuse.[12]

Pursuant to its statutory and regulatory authority, the Office of the Inspector General conducted a comprehensive "performance" audit of the Flint Water Crisis from February 2016 through April 2018 in accordance with generally accepted government auditing standards. Those standards require that it plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for its findings and conclusions based on its audit objectives. In its performance audit, the Office of the Inspector General concluded that the evidence obtained provided it with a reasonable basis for its findings and conclusions based on its audit objectives.

Prior to reaching its conclusions, the Office of the Inspector General reviewed the laws, regulations, policies, procedures and guidance related to the

---

[12] U.S. EPA, *EPA's Office of Inspector General*, https://www.epa.gov/office-inspector-general (last visited on July 12, 2019).

SDWA program. At EPA headquarters, it interviewed the former EPA Administrator; the former EPA Deputy Administrator; and staff and officials from the EPA's Office of General Counsel, the Office of Water, and the Office of Enforcement and Compliance Assurance. It also interviewed EPA Region 5 staff and officials, including the former Regional Administrator (who served until January 2016), and the former acting Regional Administrator (who served from January 2016 through January 2018). Further, it interviewed the Michigan Department of Environmental Quality ("MDEQ") Office of Drinking Water and Municipal Assistance personnel, former and current employees of the city of Flint, residents of Flint, and external experts. It also reviewed documents from the EPA and the MDEQ.[13]

The Office of the Inspector General issued its official report No. 18-P-0221 entitled "Management Weaknesses Delayed Response to Flint Water Crisis" on July 19, 2018 ("OIG Report").[14] In the OIG Report, the Office of the Inspector General established the EPA's duties, failures to meet those duties, and causal relationship to the injuries and damages that the plaintiffs allege they have sustained.[15]

---

[13] OIG Report at 11-12.

[14] The OIG report is admissible evidence under federal and state law.

[15] The OIG findings, including the enumeration of duties and responsibilities under the LCR, are definitive and put to rest any "disagreement" between the State of Michigan (MDEQ) and the EPA over the proper "interpretation" of the regulations.

**EPA's Duties and Responsibilities.** Although the EPA chose to assign "primary" enforcement responsibility under the SDWA to the State of Michigan, the EPA remained at all times the governmental agency with ultimate authority for compliance with the SWDA. The EPA duties were non-delegable as a matter of law.[16] EPA Region 5 drinking water program staff and managers  primarily oversee SDWA implementation in regional primacy states, including Michigan. Two headquarters offices help EPA regions implement the SDWA: the Office of Water ("OW") provides programmatic and implementation guidance; and the Office of Enforcement and Compliance Assurance ("OECA") advises EPA regions about enforcing SDWA provisions.[17] The Office of Drinking Water ("ODW"), a program within the Office of Water and under the supervision of the Director, has a  duty  to develop  regulations  and  guidelines  to  protect  drinking  water  quality,

---

[16] "The law assigns the EPA Administrator the ultimate authority to protect public health by setting and enforcing drinking water quality standards. However, the SDWA allows the EPA to grant states the authority to implement and enforce SDWA regulations in an arrangement referred to as 'primacy.' …When states are granted primacy, the EPA retains the responsibility for overseeing state implementation and federal enforcement authority. … Guidance from the EPA's Office of Enforcement and Compliance Assurance (OECA) instructs EPA regional offices to 'ensure that primacy agencies fulfill the enforcement conditions of their primacy agreements.' ... Specifically, the SDWA authorizes the EPA to request information, take independent enforcement actions, and revoke state primacy when states do not implement the SDWA with the stringency required by federal law." OIG Report at 2.

[17] OIG Report at 11.

9

evaluate compliance with the regulations, and provide program policy direction for technical assistance and training activities in the water supply area.[18]

**The Lead and Copper Rule.** In the OIG Report, the Office of the Inspector General definitively relates the obligations imparted by the Lead and Copper Rule ("LCR").[19]

> …[T]he LCR established the treatment technique requirements to minimize exposure. These requirements compel drinking water systems to conduct tap sampling for lead and copper to determine the treatment techniques and other steps systems must take to reduce exposure. To adhere to the LCR, utilities must conduct monitoring for lead and copper in water systems, and demonstrate that they comply with monitoring and treatment technique requirements.
>
> ***
>
> Some LCR requirements vary based on the water system size and type. … Flint is a large community system … serving more than 50,000.
>
> In 1986, Congress amended the SDWA to prohibit the use of pipes, solder or flux that are not 'lead free' in public water systems, or in plumbing where facilities provide water for human consumption. In 1996, Congress further amended the SDWA by prohibiting the sale of any pipe or plumbing fixture that was not lead free, except for a pipe used in manufacturing or industrial processing. In 2000, the EPA published revisions to the LCR to address implementation issues arising from legal challenges to the 1991 rule. The revisions also streamlined and reduced the monitoring and reporting burden. In 2007, the EPA revised the LCR to enhance implementation in the areas of monitoring, treatment, customer awareness and lead service line replacement.

---

[18] 40 C.F.R. § 1.49(d)

[19] In 1991, the EPA issued the LCR, 40 CFR § 141.80 et seq., to minimize lead and copper in drinking water.

***

The LCR requires community water systems to optimize corrosion control. Utilities have optimized corrosion control when the treatment method that they use has minimized the potential for corrosion in the distribution system, thus minimizing lead contamination.

***

The LCR required large water systems to install optimal corrosion control treatment by January 1, 1997, unless they qualified for certain exemptions.[20]

***

According to the LCR, if a water system has optimized its corrosion control treatment and plans to change water sources or drinking water treatment methods, the state must review and approve plans before the change can be implemented.

The LCR requires states to review and approve the optimized corrosion control treatment for all systems. The LCR also requires states to designate optimal water quality parameters intended to represent the conditions under which systems must operate their corrosion control treatment. The rule requires that water systems measure against those parameters, which are typically set as ranges or minimums. Without set water quality parameters, a state does not have a reliable method for gauging the adequacy of corrosion control treatment or determining compliance.

***

After a system has optimized corrosion control, the LCR requires water systems to monitor for changes in lead concentration on a regular basis. These tests verify that when drinking water reaches the consumer, lead concentrations do not exceed the federal action level of 15 ppb in more than 10 percent of homes.

To conduct the monitoring, the LCR requires utilities to identify the highest-priority sampling sites, such as single-family homes served by lead service

---

[20] None of the exemptions applied to Flint.

11

lines. The highest-priority sampling sites are identified as "tier 1" locations and, for Flint, constitute the entire sampling pool for regular testing.

The LCR instructs water systems to regularly report tap water sample results from tier 1 sites. Water systems monitor tap water on a semiannual, annual or triennial basis to verify lead contamination does not exceed the federal action level. When a large water system exceeds that level in more than 10 percent of home tap water samples, the water system must provide public education on lead, remove a percentage of lead service lines, and conduct source water monitoring.

The LCR requires systemwide public education when tap-monitoring results show that a system exceeds the federal action level for lead. There are also supplemental lead-monitoring requirements for all water systems to provide consumer notices to those whose taps were tested. The purpose of public education is to inform consumers about lead results, the health effects of lead, and steps the public can take to reduce exposure.

Water systems must submit all written public education materials to the state prior to releasing the information to the public.

In the event of a lead action level exceedance, the LCR requires water systems to identify the number of lead service lines present in the distribution system, and requires water systems to meet the minimum 7 percent replacement rate through either physically replacing lead service lines or individually testing them to demonstrate their lead concentrations are below 15 ppb. … In addition, if a system is in violation of 40 CFR §
141.81 for failure to install corrosion control treatment, the state can require the system to commence lead service line replacement until the system is below the lead action level for two consecutive monitoring periods.[21]

**OIG Findings:**   The Office of the Inspector General determined the facts

and circumstances causing the contamination of Flint's drinking water.

---

[21] Lead Contamination and SDWA, OIG Report at 3-7, n.4-5.

<u>With regard to the MDEQ and the city of Flint, the OIG found</u>:

- Under the MDEQ's oversight, the Flint water treatment plant did not adhere to two LCR requirements: (1) identify and maintain a pool of tier 1 sampling sites, and (2) install and maintain corrosion control treatment throughout the system. State and local decisions to not adhere to these LCR requirements led to the corrosion of the Flint distribution system, which exposed residents to lead in their drinking water.

- The city of Flint did not develop or maintain accurate records of lead service line locations to identify tier 1 sampling sites. Primacy states like Michigan must require water systems to collect and maintain lead service line information, in accordance with the LCR. Without this information, Flint could not prioritize its sampling efforts to collect water samples where higher levels of lead contamination were most likely to occur, as required by the LCR.

- Corrosion control treatment was not maintained.

- The MDEQ did not require Flint's water system to maintain corrosion control treatment when Flint changed water sources in April 2014. According to EPA Region 5, the MDEQ concluded that Flint's change in source water would require Flint to revert to the LCR provision that required the water system to conduct tests to determine whether corrosion control treatment was necessary. To do this, MDEQ personnel instructed Flint system staff to conduct monitoring during two consecutive 6-month periods to determine whether corrosion control treatment was necessary.

- EPA Region 5 disagreed with the MDEQ's interpretation. The LCR treats systems (such as Flint's) that change their source water or treatment as an existing system. As a result, Region 5 concluded that Flint's system was an existing system with a new source. Therefore, under the LCR, the city needed to maintain continuous corrosion control treatment.

- In January 2015, results from Flint's first round of testing found a 90th percentile lead concentration of 6 ppb. However, the MDEQ did

13

not instruct Flint to install corrosion control treatment (per the LCR) but instead required an additional 6-month round of sampling. In July 2015, results from the second round of 6-month tests showed 90th percentile lead concentrations had increased to 11 ppb.

- In October 2015, instead of installing corrosion control treatment, Flint's water system returned to purchasing drinking water from the Great Lakes Water Authority (formerly called the Detroit Water and Sewerage Department), which already included corrosion control treatment. At the time of this change, almost a year-and-a-half of exposure to improperly treated water had damaged the city's drinking water infrastructure, and lead concentrations continued to rise. In December 2015, the MDEQ reported that Flint began supplementing Detroit water with additional corrosion control treatment. However, due to the damage done to the Flint distribution system, the lead levels in drinking water did not fall below the federal action level until late 2016.

The MDEQ did not enforce LCR provisions that require Flint's water system to keep an accurate and complete inventory of tier 1 sample site locations, or maintain corrosion control treatment. As a primacy agency, the MDEQ bore responsibility for advising Flint's water system staff about the drinking water source change and meeting SDWA standards. However, MDEQ personnel misinterpreted the law, which led them to provide incorrect advice to Flint on corrosion control treatment requirements. This resulted in infrastructure damage and the prolonged exposure of Flint residents to lead in their drinking water.[22]

With regard to the EPA, the OIG found:

- Despite its authority and responsibility to oversee states with primacy over their drinking water programs, the EPA Region 5 staff and managers did not establish clear roles and responsibilities needed to foster a constructive federal-state relationship with the MDEQ's drinking water program staff. … [T]he EPA's National Program

---

[22]Circumstances Leading to Flint Drinking Water Contamination and EPA Emergency Administrative Order, OIG Report, Chapter 2 at 13 -15.

Manager Guidance directs EPA regions to "ensure that primacy agencies fulfill the enforcement conditions of their primacy agreements" under the SDWA.

- As early as 2010, the EPA reviewed the MDEQ's drinking water program and identified MDEQ implementation deficiencies. The EPA knew that the MDEQ disinvested from 10 SDWA requirements, which Michigan designated as "temporary and non-health related."

- The EPA knew that the MDEQ continued these disinvestments through 2015, and the OIG concluded that the disinvestments did in fact have potential public health effects. However, EPA Region 5 did not intervene to ensure that the MDEQ's drinking water program met minimum federal standards. It was not until 2016, while under the emergency order, that the MDEQ discontinued the majority of the disinvestments.

- MDEQ personnel falsely informed Region 5 regarding corrosion control treatment in Flint. In February 2015, when EPA Region 5 staff asked about corrosion control, MDEQ personnel told them that Flint had an optimized corrosion control program in place, that the city conducted quarterly water quality parameter monitoring and did not have any unusual results, and that Flint continued to meet all applicable plant tap standards and treatment technique requirements. However, no later than April 2015, the EPA knew that Flint was not using corrosion control treatment.

- In April 2015, EPA Region 5 managers, instructed the MDEQ that the LCR required Flint to maintain consistent corrosion control treatment but nonetheless did not advise them to initiate corrosion control at that point.

- In 2016, EPA Region 5 knew that MDEQ personnel did not establish water quality parameters required by the LCR.

- Despite known economic challenges in the city, EPA Region 5 staff did not identify Flint's source water switch as an event that could impact the city's ability to comply with the SDWA. As early as May 2014, problems emerged that informed the EPA about the risk.

15

Between May 2014 and the issuance of the EPA Emergency Administrative Order in January 2016, EPA Region 5 staff received 87 citizen complaints about drinking water conditions in Flint. The complaints described distress about water quality (color and odor), more specific concerns about total trihalomethanes, total coliform and *E. coli*, *Legionella* and, ultimately, lead. Of the complaints received before the order, 30 (34.5 percent) included concerns about lead. EPA Region 5 ignored the volume of complaints and responded with form letters that recommended citizens resolve their concerns by contacting the MDEQ or Flint's water system staff. In six cases, Region 5's response came more than a year after the citizen made the complaint. In 11 cases, EPA Region 5 did not respond at all.

- Staff and managers in Region 5 did not have a system for cataloguing and responding to citizen complaints, nor did they use citizen complaints or the volume of calls as indicators of problems with Flint's water system. As a result, Region 5 did not assess the severity of the situation, and did not alert management to an emerging incident.

- [T]he volume of complaints should have alerted Region 5 to a developing drinking water risk in Flint. A more proactive approach would have enabled the region to respond more swiftly to the contamination incident.

- [T]he EPA … regional staff knew of the source switch soon after it happened. When the region was informed—a year after the switch—that Flint did not have corrosion control treatment, the region should have intervened earlier to verify the changes occurred in accordance with SDWA regulations.

- Sampling results from two 6-month tests indicated the 90th percentile of the results exceeded the 5 ppb limit at which optimized corrosion control treatment is required, and lead concentrations increased over the course of testing. According to Region 5 officials, these results did not alert the region to widespread problems in Flint's water system. However, if the results of these tests were combined with other issues identified in Flint, this could have signaled problems in Flint's water system and the region could have intervened more forcefully. For example, Region 5 could have done the following: Taken enforcement action under SDWA § 1414, which would have required Flint to

16

install corrosion control treatment after notifying the state. Issued an order under SDWA § 1431 when the region had evidence there was "imminent and substantial endangerment" to human health, and when the region knew the state did not act. Alerted Flint residents about the potential harm to public health (although not required under the SDWA).

- The Flint water crisis demonstrates that public health is not protected when EPA regional staff—with multiple warning signs—do not use the agency's SDWA authorities in conjunction with EPA oversight tools.

- Conclusion. During the Flint water crisis, Region 5 leadership did not employ many of its SDWA authorities, as the state continued to debate LCR requirements and residents continued to drink potentially contaminated water. Flint drinking water contamination continued, in part, because the public health protection authorities of the SDWA were not used effectively.[23]

**The EPA Senior Staff: Susan Hedman (Region 5 Administrator); Tinka Hyde (Region 5 Director of the Water Division); Thomas Poy (Region 5 Chief Ground Water Drinking Water Branch and Member of the Flint Safe Drinking Water Task Force); Jennifer Crooks (Region 5 Michigan Program Manager Ground Water and Drinking Water Branch); Andrea Porter (Region 5 Employee); Miguel Del Toral (Regulations Manager, Ground Water and Drinking Water Branch)**

    1. <u>Miguel Del Toral</u>
       US EPA Region 5
       Ralph Metcalfe Federal Building
       77 West Jackson Blvd.
       Chicago, IL 60604-3590

Miguel Del Toral ("Del Toral") has been employed by the EPA since 1987.

For the past 29 years, he has worked exclusively for Region 5's Groundwater and

---

[23] EPA Region 5's Management Weaknesses Delayed Federal Intervention, OIG Report, Chapter 3 at 17 -27.

Drinking Water Program.[24] In his current position as Regulations Manager, Del Toral works within the EPA to develop proposed regulations, promulgate final rules, and provide instruction and guidance to both state and EPA officials on implementation of those rules, including developing technical guidance documents, training, webinars, and fact sheets. Mr. Del Toral was employed in the Ground and Drinking Water Program in 1991 when the Lead and Copper Rule ("LCR") was promulgated; he worked directly on the 2007 revisions to the Rule. Mr. Del Toral was responsible for providing education, training, technical assistance, and guidance to EPA officials and to the State of Michigan (among other Region 5 states) regarding LCR compliance for public water systems. Mr. Del Toral was the most knowledgeable individual within EPA Region 5 on issues dealing with lead in drinking water.

---

[24] Mr. Del Toral was interviewed by the Office of the Inspector General as part of its investigation and performance audit. On information and belief, he is one of the persons identified in the OIG Report, Attachment A, Timeline of Key Events, as the Region 5 "staff member" or "scientist" or "Region 5" for events occurring in 2014 on February, 26 and 27, April 7, 24, 25, and 27, May 6 and 13, and June 10 and 14. Mr. Del Toral testified on multiple days in the criminal court preliminary hearings involving the MDEQ officials Liane Shekter-Smith, Stephen Busch, Patrick Cook, and Michael Prysby. He also gave deposition testimony in the federal tort claims act cases brought against the EPA for its handling of the Flint drinking water matters. The VNA defendants rely on all of his statements and testimony.

On or before February 26, 2015, Mr. Del Toral, Jennifer Crooks, and Thomas Poy[25] (and therefore the EPA) knew that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children. Mr. Del Toral, Jennifer Crooks, and Thomas Poy[26] (and therefore the EPA) knew that high levels of iron meant high levels of lead and that the black sediment likely meant particulate lead (with lead concentrations reaching 95%).[27] Mr. Del Toral, Jennifer Crooks, and Thomas Poy[28] (and therefore the EPA) knew that pinpointing the root cause and scope of the problem required an immediate investigation and that the nature of the City of Flint's use of phosphates for corrosion control was an essential part of the inquiry. Mr. Del Toral personally interviewed the Flint resident and inspected her home in Flint and had discussions directly with the MDEQ officials regarding LCR compliance issues, including corrosion control and sampling and treatment requirements.

By April 2015, Mr. Del Toral (and therefore the EPA) learned that the Flint Water Treatment Plant's monthly operating reports demonstrated that Flint was <u>not</u> using phosphates for corrosion control. As a consequence of learning that

---

[25] No later than February 27, 2015, Andrea Porter also gained such knowledge.

[26] *Id.*

[27] "This no surprise. lead lines + no treatment = high lead in water = lead poisoned children." Del Toral email to Thomas Poy, Rita Bair, Nicholas Damato with copies to Joanna Glowacki, Andrea Porter, and Heather Shoven, sent on September 22, 2015 at 7:06:37.

[28] *Id.*

information, on April 23, 2015 Mr. Del Toral made direct inquiry of Patrick Cook, whom Mr. Del Toral knew to be "the LCR contact in the central office of the MDEQ," of the method and materials used in Flint for corrosion control. On April 24, 2015, Mr. Del Toral (and therefore the EPA) were told unequivocally by Mr. Cook and the MDEQ that Flint was not using corrosion control. As a result, no later than April 24, 2015, Mr. Del Toral (and therefore the EPA) knew that the high lead levels found in the Flint residence in February 2015 were not an isolated incident and that in all probability the high lead levels evidenced a system-wide problem with lead in drinking water.

On April 29, 2015, Mr. Del Toral and Thomas Poy, Chief of the Region 5 Ground and Drinking Water Program, specifically directed MDEQ's Drinking Water Director, Liane Shekter-Smith, that the LCR mandated the use of corrosion control at the Flint system. But, Ms. Shekter-Smith (and therefore the MDEQ) stated that it was MDEQ "policy" to forego corrosion control until two 6-month monitoring periods were completed. In a June 10, 2015 a conference call, the MDEQ repeated its refusal to perform corrosion control treatment.

Four months after learning about the problem, Mr. Del Toral memorialized the LCR violations in a June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." Mr. Del Toral reported: "In accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are

20

required to install and maintain corrosion control treatment for lead and copper."[29] Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems"[30] Further, Mr. Del Toral recommended that the EPA review whether relevant resident-requested samples were being included by the City of Flint in calculating the 90s percentile compliance value for lead.[31]

On June 26, 2015, Mr. Del Toral wrote to Rita Bair, the EPA Section Chief of Ground Water and Drinking Water, describing the situation in Flint and MDEQ's actions as "bordering on criminal neglect," informing her that the state was "complicit" and that "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed."

Restated, no later than the end of June 2015, Mr. Del Toral and the EPA knew the following facts:

- The Flint Water Treatment Plant was not using corrosion control despite the requirements of the LCR;

---

[29] Miguel Del Toral, US EPA, *High Lead Levels in Flint, Michigan-Interim Report* (June 24, 2015) ("Del Toral Memo").
[30] *Id.* at 5.
[31] *Id.*

- The high lead levels from the Flint residence likely evidenced a system-wide problem with lead in drinking water;

- The "primacy" agency in Michigan responsible in the first instance to comply with the LCR law had no intention of doing so; and

- The residents of Flint confronted a significant health hazard from drinking water that was very probably contaminated with lead.

The EPA did nothing to carry forth its non-delegable duty to protect the residents of Flint and enforce the SWDA until January 21, 2016, when it issued its first Emergency Administrative Order to the State of Michigan and City of Flint.

    2. Susan Hedman
       Clean Wisconsin
       634 W. Main St. #300
       Madison, WI 53703

Susan Hedman ("Hedman") is a career environmentalist from Illinois who joined the EPA in 2010 and occupied the highest position within EPA Region 5, Administrator (the equivalent of a corporate division CEO) directing EPA operations in the six-state Great Lakes region until she resigned in January 2016.[32] Ms. Hedman is a licensed attorney who also holds a PhD. in environmental studies. Prior to taking a position with the EPA, Ms. Hedman served as an environmental lawyer and policy adviser to state agencies and non-governmental organizations.

As Region 5 Administrator, she held herself out as a leader among those working in the environmental field, highlighted common environmental dangers

---

[32] Ms. Hedman "offered her resignation" and EPA Administrator Gina McCarthy "accepted" it.

that threaten women's health, and discussed EPA efforts to protect women and children from unnecessary chemical poisoning. Ms. Hedman once pronounced that "[a] child born today will be exposed to more chemicals than a child from any other generation," and that chemicals affect women's endocrine system, pre-natal development, and contaminate breast milk.[33] Ms. Hedman issued numerous written and oral statements after June 2015 and gave testimony on the Flint drinking water problem before Congress. She also responded to an interview by the EPA's Office of the Inspector General.[34]

As the Region 5 Administrator, Ms. Hedman was directly responsible for the execution of the EPA's programs within the boundaries of her region,[35] including conducting effective regional enforcement and compliance programs, exercising approval authority for proposed state standards and implementation plans, and providing for overall and specific evaluations of regional programs and state activities.[36] Under the SDWA and the LCR, the Regional Administrator is duty bound to determine if a state's corrosion control activities are appropriate.[37] As Regional Administrator, Ms. Hedman had the statutory and regulatory power to

---

[33] Keynote Speech, Western Michigan Environmental Action Council, April 3, 2012 (Susan Hedman Fights for Women's Health)

[34] The VNA defendants rely on all of her statements made before and after her discharge.

[35] 40 C.F.R. § 1.5

[36] 40 C.F.R. § 1.61(d), (f)-(g).

[37] 40 C.F.R. § 142.19(a)

23

issue corrosion control treatment orders to the state so as to achieve the LCR requirements.[38]

Susan Hedman claimed in her testimony before Congress that she learned of Flint's lack of corrosion control treatment on June 30, 2015.[39] At that time, she was also aware that high lead levels had been discovered in some Flint residents' tap water. But, despite her April 2012 professed commitment to protecting women and children from environmental dangers (and specifically from unnecessary chemical poisoning) she decided that exposure to lead in drinking water was not a serious issue. At that time, she had before her Mr. Del Toral's June 24, 2015 memorandum entitled "High Lead Levels in Flint, Michigan." She knew that her Region 5 expert on the LCR reported unequivocally that "[i]n accordance with the Lead and Copper Rule (LCR), all large systems (serving greater than 50,000 persons) are required to install and maintain corrosion control treatment for lead and copper."[40] She knew that Mr. Del Toral recommended that "U.S. EPA should review the compliance status of the City of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal

---

[38] 40 C.F.R. § 141.82(i).

[39] Ms. Hedman certainly knew long before June 30, 2015 that Flint had changed the source of its drinking water from Lake Huron to the Flint River, that the change brought about discolored and foul smelling water, that boil water advisories had been issued as a result of fecal contamination of the water, that chlorination of the water led to TTHM exceedances, and that Flint residents were vehemently protesting against these conditions.

[40] Del Toral Memo at 2.

corrosion control and whether the MDEQ is properly implementing the LCR provisions regarding optimal corrosion control treatment requirements for large systems"[41] She knew that on June 26, 2015, Mr. Del Toral described the situation in Flint and MDEQ's actions in the most dire terms as "bordering on criminal neglect" and that the "public has a right to know what they [MDEQ] are doing because it is their children that are being harmed."

Instead, Ms. Hedman chose to ignore Mr. Del Toral's warnings, shun him because he had the audacity to speak out, and downplay the seriousness of his work and findings.[42] On July 2, 2015, she wrote to Flint Mayor Dayne Walling that Del Toral's report was "a preliminary draft and that it would be premature to draw any conclusions based on that draft." On September 27, 2015, while now acknowledging a potential health crisis, she chose the path of least resistance by offering technical assistance to the MDEQ on corrosion control optimization and water quality testing protocols.[43] On September 29, 2017, Ms. Hedman circulated a

---

[41] *Id.* at 5.

[42] In a July 8, 2015 email to his superior, Mr. Del Toral commented on this shunning: "It almost sounds like I'm to be stuck in a corner holding up a potted plant because of Flint. One mis-step in 27+ years here and people lose their minds."

[43] Mr. Del Toral properly described the policy and practice of EPA Region 5: "At every stage of this process, it seems that we spend more time trying to maintain State/local relationships than we do trying to protect the children." Del Toral email to Thomas Poy, Rita Bair, Nicholas Damato with copies to Joanna Glowacki, Andrea Porter, and Heather Shoven, sent on September 22, 2015 at 7:06:37.

"ten point plan" which included a proposed start date for corrosion control treatment of January 16, 2016.

Ms. Hedman failed to enforce LCR requirements until an emergency order was issued by the agency in January 2016, downplayed concerns about the safety of the Flint drinking water, and failed to protect the health of Flint residents when she knew that some of them were in serious danger. Ms. Hedman's attitude toward the Flint drinking water problems was characterized by Professor Marc Edwards in his testimony before Congress as "willful blindness." Professor Edwards also accused the EPA of silencing Del Toral following the publication of his memo. "Even before Del Toral wrote that memo, he told me he had to protect Flint's children while minimizing the possibility that he would be retaliated against." Professor Edwards also testified that "I don't think Ms. Hedman understands the climate she created." The Hedman climate at Region 5 is perhaps best exemplified by Debbie Baltazar, Chief of the Region 5 Water Division's State and Tribal Programs Branch, in a September 24, 2015 internal memo regarding funding for residential drinking water devices: "We've included information on Flint's financial practices, as we think Susan needs to be aware. … Perhaps she already

knows all this, but I'm not so sure Flint is the community we want to go out on a limb for."[44]

      3.  <u>Tinka Hyde</u>
         EPA Region 5
         Ralph Metcalfe Federal Building
         77 West Jackson Blvd.
         Chicago, IL 60604-3590

Tinka Hyde ("Hyde") was the EPA Region 5 Director of the Water Division overseeing approximately 180-200 staff members. Ms. Hyde previously served as EPA Region 5's Director of the Office of Enforcement and Compliance Assurance for approximately 10-12 years. She had substantial education, training, and experience with the SWDA in the years leading up to the Flint drinking water crisis. In 2014 – 2016, Ms. Hyde reported directly to the EPA Region 5 Administrator, Susan Hedman. In Region 5's management hierarchy with regard to the SWDA, she was second in command. Ms. Hyde met weekly with Ms. Hedman and was directly responsible for bringing matters of consequence within her department to Ms. Hedman's attention. Ms. Hyde also had ultimate responsibility within Region 5 for responding directly to citizen complaints, including complaints directed to Region 5 from Members of Congress or the White House.

---

[44] EPA-R5-2015-01129900007197-00002, disclosed by the EPA as "an Internal Deliberative Document" to the Congress only for use in its oversight.

On or before May 15, 2014 (i.e., less than one month after Flint changed its drinking water source from Lake Huron to the Flint River), Ms. Hyde knew that drinking water quality and Flint residents' physical health was a matter of grave concern when a resident complained of a rash as a result of drinking the Flint water.[45] At that time, Jennifer Crooks told her bosses, Ms. Hyde and Tom Poy, and other EPA employees that "Flint River quality is not great … ." On February 26, 2015, Ms. Hyde received an email from her direct subordinate Tom Poy regarding the high levels of lead that were found in a Flint resident's drinking water: "[o]ne resident in Flint had sediment in her water and the water plant tested it and found high iron and lead."[46] Mr. Poy was relating Mr. Del Toral's report that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children, that high levels of iron meant high levels of lead and that the black sediment likely meant particulate lead (with lead concentrations reaching 95%), that that pinpointing the root cause and scope of the problem required an immediate investigation, and the City of Flint's use of phosphates for corrosion control was an essential part of the inquiry. On and after June 24, 2015, Ms. Hyde knew that there was no corrosion control being utilized

---

[45] May 15, 2014- Jennifer Crooks/EPA e-mails colleagues Mindy Eisenberg, Thomas Poy and Tinka Hyde/EPA re: concerns about Flint drinking water expressed by resident Lathan Jefferson.

[46] February 26, 2015, 4:25 PM Tom Poy Email to Tinka Hyde and Timothy Henry ("FW: HIGH LEAD: FLINT Water testing Results")

for the water in Flint, that lead service lines were ubiquitous throughout the City, and that the City was improperly pre-flushing pipes so that samples would minimize the levels of lead in the water. On June 30, Ms. Hyde communicated that Region 5 was "concerned about the lead situation in Flint" to MDEQ officials.

On and before February 2015, Ms. Hyde oversaw the response to Flint citizens' expressed concerns over water quality issues, including requests to return to Detroit water. From March 2015 through January 2016, Ms. Hyde chose to respond to Flint residents with evasion and jargon, falsely asserting that she had no power to help them.[47] The OIG spoke directly to Ms. Hyde's incompetence in its findings on Region 5's myriad failures to listen to Flint residents and to use the information learned from doing so to resolve serious problems related to their health and safety.[48]

---

[47] "Some citizens have suggested that the source of drinking water would be switched back to Detroit drinking water which comes from Lake Huron. EPA does not have the authority to require Flint to change its source of drinking water back to Detroit drinking water. The decision to change the source of Flint's drinking water was a local decision, and continues to be a local decision only. However, Flint is obligated to take actions to meet drinking water standards." *See also,* March 2, 2015 and May 27, 2015 Tinka Hyde Letters to Flint Residents.

[48] *See, infra* at 13-14. Between May 2014 and January 2016, EPA Region 5 staff received 87 citizen complaints about drinking water quality in Flint. More than 34% included concerns about lead. Region 5 responded with form letters. In six cases, Region took more than a year to respond. In 11 cases, Region 5 did not respond at all. Region 5 did not use citizen complaints or the volume of calls as indicators of problems with Flint's water system. Region 5 did not assess the severity of the situation and did not alert management to an emerging incident.

Ms. Hyde, under the direction of her superior Ms. Hedman, actively denigrated Mr. Del Toral and the seriousness of his findings and recommendations to Region 5. On June 30, after Mr. Del Toral's report was made public, Ms. Hyde told the MDEQ that Region 5 was "still being briefed on the lead issues" and that Mr. Del Toral's report would not be shared with the MDEQ until "Miguel addresses our comments." On July 21, 2015, Ms. Hyde managed a conference call between Region 5 and the MDEQ regarding LCR compliance. In that conference call, Ms. Hyde effectively disparaged Mr. Del Toral, calling his report "his own research" that was "not reviewed by management."

Ms. Hyde consistently and pathetically failed at her most important duty of ensuring safe drinking water by elevating the need for Flint to utilize corrosion control to the highest authorities within EPA. If she acted when she should have, the damage caused to some of the people of Flint would have been mitigated.

    4.  <u>Thomas Poy</u>
        US EPA Region 5
        Ralph Metcalfe Federal Building
        77 West Jackson Blvd.
        Chicago, IL 60604-3590

Thomas Poy ("Poy") was the Chief of EPA Region 5's Ground Water and Drinking Water Branch.[49] He has worked for Region 5 for over 30 years and served as Chief of the Ground Water and Drinking Water Branch for 12 years. In

---

[49] The Ground Water and Drinking Water Branch is a department within the Water Division (which is one of eight divisions in Region 5).

2014 – 2016, Mr. Poy reported directly to Tinka Hyde, then the Director of the Water Division. Mr. Poy also served as a member of the EPA's "Flint Safe Drinking Water Task Force"[50] and the Chair of the "Flint Drinking Water Technical Support Team." The Ground Water and Drinking Water Branch is responsible for implementing the drinking water program in Region 5. As Chief of the Branch, Mr. Poy was responsible for overseeing primacy states, including Michigan, and their compliance with the SWDA and LCR. Jennifer Crooks and Rita Bair report directly to Mr. Poy. Miguel Del Toral is the Region 5 Ground Water and Drinking Water Branch Regulations Manager and also reports directly to Mr. Poy. Mr. Poy recognized Mr. Del Toral as the Region 5 expert in drinking water regulations and the "go to" person on LCR implementation.

At least as early as 2012-2013, Mr. Poy (in a report co-authored by the MDEQ) recognized the need to "plan for circumstances where [financial] resources are inadequate to implement the entire drinking water protection

---

[50] The Task Force was a Fall 2015 effort by the EPA to correct the problems caused by the change in water source from Lake Huron to the Flint River. The EPA charged the Task Force with providing "technical assistance to the MDEQ and the City of Flint to reconnect the Flint system to a new source of drinking water (to be supplied by the Great Lakes Water Authority) and to optimize corrosion control for the Flint system, starting in October 2015. The Task Force was also charged with providing "technical assistance to the MDEQ and the City of Flint, as needed, in advance of and following connection of the Flint water system to a new source of drinking water (to be supplied by the Karegnondi Water Authority) and to optimize corrosion control for the Flint system, starting in 2016."

program." By September 2014 (and with knowledge of Flint's fiscal problems), Mr.

Poy expressed concern about the quality of the Flint River as a source of drinking

water. Mr. Poy knew that Flint was experiencing significant problems with the

quality of its drinking water, including public health problems (like rashes). He knew

that his subordinate, Jennifer Crooks, had been "inundated" with complaints related

to the water, including health concerns. But, Mr. Poy but had  no idea how many

complaints she had received and failed to take any steps to implement a system to

track and evaluate these complaints. On September 14, 2014, Mr. Poy knew that

Savannah Young, a concerned Flint resident, had tap water that was "disgusting"

and not "possibly safe to drink." Mr. Poy knew that Ms. Young explicitly

complained that the EPA, City and State were not adequately addressing the

problem: "[no] person is available to discuss this issue with me… This has not been

addressed or even acknowledged by the city… [T]hey are not even informing the

citizens that it is happening."[51] Mr. Poy did not assign any staff or scientists at the

EPA to investigate the drinking water problems at that time.

On the February 26, 2015 and February 27, 2015, Mr. Poy knew that high

concentrations of lead were found in a Flint resident's home.[52] Mr. Poy knew that

---

[51] September 14, 2014, 4:15 PM Savannah Young Complaint to EPA; FWD to Poy
on September  16, 2014 at 3:01  PM ("FWD: (SDWA  –  FY14-121728-3715-CV)
Referred to Region – Michigan").
[52] February 27, 2015, 4:58 AM Miguel Del Toral Email to EPA and MDEQ
Employees ("Re: HIGH LEAD: FLINT Water testing Results").

lead was entering the water as part of the corrosion process. Mr. Del Toral told him that "where you find Pb values that high, it is usually due to particulate lead. Not always, but generally. Particulate lead is released sporadically from lead service lines, leaded solder and leaded brass in a number of ways and folks tend to discount these values as anomalies, but particulate lead is a normal part of the corrosion process and it is universal (common) in all systems." Mr. Del Toral expressed concern about Flint's optimized corrosion control treatment: "I was wondering what their OCCT was. They are required to have OCCT in place which is why I was asking what they are using." Mr. Poy has since testified that he should have recommended to citizens of Flint with lead in their water, such as Ms. Walters, that they use a filter or alternative water; but that he never made that recommendation (or any other health and safety warning) to the Flint community.

On April 24, 2015, Mr. Poy knew that that Flint was not practicing corrosion control and that the MDEQ was condoning the City's and its failure to comply with the SDWA with the LCR. While acknowledging that the MDEQ lied to the EPA and that the MDEQ was, in fact, required to utilize corrosion control, Mr. Poy chose to do nothing and, by his failure to act, to expose Flint residents to dangerous levels of lead. His justification for his malfeasance or nonfeasance (or both) despite his concern about potential harm to human health from Flint drinking water

and despite Region 5's belief that state and local authorities were not acting quickly to protect human health is quintessential make-nice politics: "Region 5 was going through its process of working with the State to deal with the issue."

As of July 2015, despite internal EPA discussion (including discussion at EPA headquarters) about whether a LCR violation under the Safe Drinking Water Act and public notice should be issued, Mr. Poy (and the EPA) decided to "work with the state, stressing the need to have Flint implement corrosion control." When no action had been taken by August 2015, rather than act to protect the public, Mr. Poy chose a path of least resistance with the MDEQ asking Liane Shekter-Smith: "[a]ny news on Flint since our call a couple of weeks ago? Has the letter been sent to inform them that they are not optimized for lead based on their monitoring? Have they been approached about starting corrosion control sooner rather than later?" Despite EPA recognition as early as February 2015 that the LCR required corrosion control treatment, Mr. Poy also played an integral role in pursing further delay by shunting the problem off to EPA lawyers for a legal opinion on the interpretation of the LCR.[53]

---

[53] The LCR required large water systems to install optimal corrosion control treatment by January 1, 1997, unless they qualified for certain exemptions. *Lead Contamination and SDWA,* OIG Report at 3-7, including Notes 4 and 5; *see infra* at 8.

Mr. Poy actively participated in the Region 5 disparagement of Miguel Del Toral (after disclosure of his report on system-wide lead release in Flint). Mr. Poy called Mr. Del Toral's recommendations "personal opinions" and rejected Mr. Del Toral's statement that the EPA was obligated to review Flint's corrosion control compliance status in June 2015. Mr. Poy did not order additional testing as Mr. Del Toral requested until 2016. Mr. Poy breached his duty of care to the residents of Flint.

> 5. <u>Jennifer Crooks</u>
>    US EPA Region 5
>    Ralph Metcalfe Federal Building
>    77 West Jackson Blvd.
>    Chicago, IL 60604-3590

Jennifer Crooks ("Crooks") was employed by the EPA Region 5 Water Division, Ground Water and Drinking Water Branch as its Michigan Program Manager. She has held that position for more than twenty years. She reports to Mr. Poy, the Chief of the Ground Water and Drinking Water Branch. As the Michigan Program Manager, she was responsible for communicating directly with the residents of Flint through the EPA's State Drinking Water Hotline and otherwise. The flow of communications and consequent information ran between her, Mr. Poy, and ultimately Ms. Hyde. In carrying out her assigned duties to investigate complaints about Michigan's public water supplies, Ms. Crooks was supposed to interact with state officials at the MDEQ. As a result, Ms. Crooks communicated

directly with MDEQ officers and employees regarding Flint's drinking water quality, including Michael Prysby, Stephen Busch, and Richard Benzie. In testimony and statements pertaining to the Flint drinking water crisis, Ms. Crooks admitted that she was required to do a thorough investigation in response to residents 'complaints and to provide residents with accurate and truthful information. In her 20 years as Program Manager, she never confronted more resident complaints from an affected community than she did over the quality of Flint's drinking water.

By May 15, 2014, less than one month after the water switch,[54] Crooks informed Ms. Hyde and other EPA employees that, with regard to SDWA standards "Flint River quality is not great … ." By September 17, 2014, Crooks was already dismissive about resident complaints over Flint's drinking water quality; when she was charged with investigating a Flint resident's concern about her brown tap water, Crooks informed MDEQ officials by stating: "[y]ep, have another Flint complaint."[55]

---

[54] , 2014- Jennifer Crooks/EPA e-mails colleagues Mindy Eisenberg, Thomas Poy and Tinka Hyde/EPA re: concerns about Flint drinking water expressed by resident Lathan Jefferson

[55] September 17, 2014, 11:04 AM Jennifer Crooks Email to MDEQ ("FW: (SDWA – FY14-121728-3715-CV) Referred to Region – Michigan)").

On or before February 26, 2015, Mr. Del Toral, Ms. Crooks, and Mr. Poy[56] (and therefore the EPA) knew that extraordinary high levels of iron were found in black sediment in drinking water in the home of a Flint resident with two minor children. Ms. Crooks inquired of MDEQ officials whether Flint was practicing corrosion control treatment and expressed her belief at that time that such treatment was required. On March 10, 2015, Ms. Crooks told the MDEQ that she was being "inundated" with controlled correspondence emails referred to her by the White House. Nonetheless, Ms. Crooks testified that she did not consider tracking these communications and complaints, despite the fact that many of them explicitly questioned the health effects of the water.

Through Mr. Del Toral's report, Ms. Crooks knew by July 2015 that blood levels in Flint children were elevated since the Flint River became the source of the City's drinking water and that exposure to the Flint River drinking water was causing skin rashes. Ms. Crooks had also heard from residents that the drinking water was causing hair to fall out in clumps. Ms. Crooks testified that despite assuring numerous Flint residents about the safety of their drinking water, she never followed up with any of the residents about their health concerns.

---

[56] February 26, 2015 – February 27, 2015 MDEQ and EPA Email Correspondence ("HIGH LEAD: FLINT Water testing Results"). And no later than February 27, 2015, Andrea Porter also gained such knowledge.

While Ms. Crooks testified that she was "shocked" by the actions of the MDEQ in lying about having corrosion control treatment in place, and despite her knowledge of the health concerns raised by Flint residents and her duty to properly investigate and respond to residents' complaints, Ms. Crooks chose to follow the path set by Region 5 Administrator Hedman and Water Division Director Hyde by downplaying the significance of Del Toral's report and the potential health effects of Flint Residents. On July 9, 2015, Ms. Crooks told her colleagues Rita Bair and Andrea Porter that it was "apparent that Flint may have violated the LCR by not maintaining corrosion control" but added her belief that the MDEQ officials would "take this personally" and "they may get VERY defensive." Ms. Crooks proffered the perfect bureaucratic solution that the EPA and State move forward together "holistically" to correct the problem and that Region 5 avoid "rubbing their [MDEQ] nose" in EPA's LCR interpretations. In their July 10, 2015 conference, Region 5 and the MDEQ agreed to a lack of urgency to MDEQ's LCR violations and to the MDEQ contention that "the source of drinking water will be changing again in 2016, so to start a Corrosion Control Study now doesn't make sense." On July 15, 2015, Miguel Del Toral sent an email to EPA officials, including Ms. Crooks, Ms. Bair, and Ms. Porter, urging Region 5 to issue a treatment technique violation and synchronous public notice. Ms. Crooks, however "did not see what the benefit would be" from such actions despite acknowledging the utility of

38

informing the citizens that there was a likelihood that lead was leaching into lead service lines. State and federal appeasement politics trumped human health concerns.

As the Flint drinking water problems became more fraught and nationally significant, Ms. Crooks took steps to protect the bureaucracies at Region 5 and the MDEQ by denigrating Mr. Del Toral and plausibly denying receipt of his critical report.[57] Throughout all of the relevant time period, Ms. Crooks knew that Flint had significant numbers of lead service lines, that it was not performing optimized corrosion control, and the lead was leaching into the drinking water. In her callous disregard of her duties and the ongoing public health problems, Ms. Crooks exacerbated the injuries and damages sustained by Flint residents.

6. Rita Bair
   US EPA Region 5
   Ralph Metcalfe Federal Building
   77 West Jackson Blvd.
   Chicago, IL 60604-3590

Rita Bair ("Bair") is a 30-year employee at Region 5's Groundwater and Drinking Water Branch who served as Mr. Del Toral's supervisor from 2014 to 2016. From mid-June to mid-July 2015, Ms. Bair served as the acting Chief of

---

[57] On September 11, 2015, in an email to Mr. Poy and MDEQ officials, Ms. Crooks proposed her orchestration plan: "I wanted to remind you that Miguel's report has DEQ cc.d. So if the Legislature or who ever might say you all were cc.d, you can truthfully respond that it was EPA's request that the report not be sent to the cc.s. Consequently, you all never received the report from Miguel."

the Ground Water and Drinking Branch. Ms. Bair is responsible for supervising the implementation, regulation, and enforcement of the SDWA by her staff members. While disclaiming knowledge of the correlation between exposure to lead contaminated water and adverse health effects, Ms. Bair admittedly knew that a drinking water containing lead was a concern for a city.

While serving as the acting Chief of EPA Region 5's Groundwater and Drinking Water Branch, Ms. Bair was orchestrated Region 5's public disparagement and denigration of Mr. Del Toral following his publication of his report of MDEQ's failure to meet the requirements of the SDWA and LCR. Ms. Bair dismissed Mr. Del Toral's report as "his opinions" and merely "scientific statements." She professed a lack of concern or, indeed, having any reaction to his reports of high lead levels in Flint's drinking water. On June 25, 2015, Ms. Bair challenged Mr. Del Toral's characterization of Flint's drinking water lead problem as "widespread." In response, Mr. Del Toral asked that a team be sent out to collect samples to prove that the problem was widespread. Mr. Del Toral accused the state of being "complicit," highlighted that children were being harmed, and championed the public's right to know the facts and the truth. Ms. Bair ignored Mr. Del Toral's requests and adjudged "his opinions" as outside the requirements of the regulations. Ms. Bair characterized Mr. Del Toral in jaundiced terms, stating

40

that he was not presenting "logical, clear statements" and was being overly "dramatic."

When Ms. Crooks sent an email to EPA leaders including Andrea Porter and Rita Bair on July 9, 2015 stating that it was "apparent that Flint may have violated the LCR by not maintaining corrosion control" and that the state would "take this personally" and "they may get VERY defensive," Ms. Bair instructed Ms. Crooks not to contact any of the MDEQ engineers directly about Mr. Del Toral's report. Ms. Bair participated in the "management level" conference call on July 10, 2015 among EPA and MDEQ officials, where Mr. Del Toral's findings were again downplayed and dismissed. Ms. Bair repeated her disparagement of Mr. Del Toral, calling his opinions on corrosion control "above and beyond their regulatory process." She falsely asserted that LCR compliance for a large city like Flint was based on the 90th percentile range of the samples collected.

      7. <u>Andrea Porter</u>
         US EPA Region 5
         Ralph Metcalfe Federal Building
         77 West Jackson Blvd.
         Chicago, IL 60604-3590

Andrea Porter ("Porter") is a long term employee of EPA Region 5 Ground Water and Drinking Water Branch with extensive education, training, and

experience with the LCR.[58] In July 2013, Ms. Porter published a field study with Miguel Del Toral (EPA) and Michael Schock (EPA) regarding elevated lead release from lead service lines and assessing lead levels in the Chicago public water supply.[59] Ms. Porter reported that "the existing regulatory sampling protocol under the U.S. Lead and Copper Rule systematically misses the high lead levels and potential human exposure." Ms. Porter knew that "[m]ost lead in drinking water comes from premise plumbing materials and lead service lines. She knew that lead service lines are generally the largest source of lead in drinking water when they are present in public water systems."[60] She knew that "a legacy of millions of partial or whole LSLs remains in many public water systems.[61] She knew that "lead corrosion" referred to the corrosion of lead plumbing materials and "result[ed] in the transfer of dissolved or particulate lead into the drinking water."

Ms. Porter was a party to the many communications exchanged between MDEQ and EPA on February 26, 2015 and February 27, 2015.   Ms. Porter

---

[58] *See, e.g.,* Porter, A., *Handy Tools for the Lead and Copper Rule*,15[th] Annual EPA Drinking Water Workshop, September 28, 2018.

[59] Del Toral M. A., Porter A., Schock M. R., *Detection and Evaluation of Elevated Lead Release from Service Lines: A Field Study, Environmental Science & Technology*, July, 2013, 47, 9300−9307.

[60] Sandvig, A.; Kwan, P.; Kirmeyer, G.; Maynard, B.; Mast, D.; Trussell, R. R.; Trussell, S.; Cantor, A. F.; Prescott, A. *Contribution of Service Line and Plumbing Fixtures to Lead and Copper Rule Compliance Issues*; Research Report 91229; American Water Works Association Research Foundation: Denver, CO, 2008.

[61]Triantafyllidou, S.; Edwards, M., *Lead (Pb) in tap water and in blood: Implications for lead exposure in the United States*, Crit. Rev. Environ. Sci. Technol. 2012, 42, 1297−1352.

participated in discussions on April 24, 2015 when it became inarguable that Flint was not practicing corrosion control. On June 25, 2015, after the release of Mr. Del Toral's report which harkened back to his previous field studies with Porter and Schock, Mr. Del Toral responded by email to questions by other EPA officials about his work in part by seeking Ms. Porter's support. Mr. Del Toral stated that "the fact that their sampling is designed not to capture lead (everything is fine) does not negate our scientific understanding of what is going on." Del Toral goes on to state:

> "I am really tired of the bad actors being defended, the bad actions being ignored, and people trying to do the right thing are constantly being subjected to intense scrutiny as if we were doing something wrong. It's all of this 'don't find anything bad' crap at EPA that is the reason I desperately want to leave. I am not happy to find bad things. It is completely stressful because it means children are being damaged and I have to put up with all of the political crap, but where these problems exist I will not ignore them."

Porter chose to join the road block and never responded to Mr. Del Toral's email.

On July 15, 2015, Miguel Del Toral sent an email to EPA officials, including Crooks, Bair, and Porter, acknowledging that it was a "tough situation" but urging officials to take action by issuing a treatment technique violation which would have provided for public notice. Porter sat idly, refusing to defend or concur with  Del Toral while EPA officials dismissed his work and recommendations.

When the MDEQ and EPA finally decided to act on the information they had in

43

February, Porter was present at a meeting on August 31, 2015, where it was acknowledged "that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's approximately 15,000 lead service lines are continuously in contact with corrosive water."

Just like other MDEQ and EPA employees, Porter was aware that Flint was not practicing corrosion control, which exposed some of its citizens to dangerous levels of lead, and she failed to act. Because of her lack of action, Flint residents were subjected to high levels of lead in their drinking water for much longer than they would have if not for the unreasonable delay.

2.      **THE STATE OF MICHIGAN**
        Michigan Department of Attorney General
        P.O. Box 30755
        Lansing, MI 48909

The State of Michigan is a sovereign body politic that acts through its executive branch, departments, agencies, officers, and employees. Consequently, the acts (and omissions) of its departments, agencies, officers, and employees, undertaken within the scope of their employment, constitute the acts (and omissions) of the State. Likewise, knowledge acquired by its departments, agencies, officers, and employees acquired within the scope of their employment is imputed to the State. In consequence, the State cannot plead innocence by asserting that  the information obtained by several departments, agencies, officers, and employees was not acquired by any one individual employee who then

44

comprehended its full import. Rather, the State is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly.[62]

On October 21, 2015, in conformity with his power and authority as the chief executive of the State of Michigan, former Governor Rick Snyder officially formed, and commissioned, the Flint Water Advisory Task Force to undertake "an independent review of the contamination of the Flint water supply: what happened, why it occurred, and what is needed to prevent a reoccurrence in Flint or elsewhere in the state." On March 21, 2016, the Flint Water Advisory Task Force issued its final report and established the duties, failures to meet those duties, and causal relationship to the injuries and damages that the plaintiffs allege they have sustained.[63] In the Executive Summary of its 62-page report, the Flint Water Advisory Task Force gives an overview of its investigation and conclusions:

> The Flint water crisis is a story of government failure, intransigence, unpreparedness, delay, inaction, and environmental injustice. The Michigan Department of Environmental Quality (MDEQ) failed in its fundamental responsibility to effectively enforce drinking water regulations. The Michigan Department of Health and Human Services (MDHHS) failed to adequately and promptly act to protect public health. Both agencies, but principally the MDEQ, stubbornly worked to discredit and dismiss others' attempts to bring the issues of unsafe water, lead contamination, and increased  cases of Legionellosis (Legionnaires' disease)  to  light. With the

---

[62] *In re NM Holdings Co., LLC*, 622 F.3d 613, 620 (6th Cir. 2010) (*citing Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 76 N.W.2d 392 (1991)).

[63] See Flint Water Advisory Task Force Report, March 2016. The Report is admissible evidence under federal and state law.

City of Flint under emergency management, the Flint Water Department rushed unprepared into fulltime operation of the Flint Water Treatment Plant, drawing water from a highly corrosive source without the use of corrosion control. Though MDEQ was delegated primacy (authority to enforce federal law), the United States Environmental Protection Agency (EPA) delayed enforcement of the Safe Drinking Water Act (SDWA) and Lead and Copper Rule (LCR), thereby prolonging the calamity.[64] Neither the Governor nor the Governor's office took steps to reverse poor decisions by MDEQ and state-appointed emergency managers until October 2015, in spite of mounting problems and suggestions to do so by senior staff members in the Governor's office, in part because of continued reassurances from MDEQ that the water was safe.

The specific events that led to the water quality debacle, lead exposure, heightened *Legionella* susceptibility, and infrastructure damage are a litany of questionable decisions and failures related to several issues and events, including, but not limited to:

- Decisions related to the use of the Flint River as an interim water supply source.
- Inadequate preparation (for example, staffing, training and plant upgrades) for the switch to full-time use of the Flint Water Treatment Plant using the Flint River as the primary water supply source.
- Inadequate and improper sampling of distribution system water quality, potentially in violation of the Safe Drinking Water Act.
- Intransigent disregard of compelling evidence of water quality problems and associated health effects.
- Callous and dismissive responses to citizens' expressed concerns.
- Persistent delays in coordinating appropriate responses to the resultant public health crises once irrefutable evidence of exposure and poisoning was presented.

---

[64] The Environmental Protection Agency's duties, breaches of duties, and causal relationship to the plaintiffs' alleged injuries and damages are set out in detail in the OIG Report and *infra* at pages 4-43. The OIG Report also establishes the fault of the State of Michigan and its executive branch department, the MDEQ.

We cannot begin to explain and learn from these events—our charge—without also highlighting that the framework for this decision-making was Michigan's Emergency Manager Law. This law replaces the decision-making authority of locally elected officials with that of a state-appointed emergency manager. While one must acknowledge that emergency management is a mechanism to address severe financial distress, it is important to emphasize that the role of the emergency manager in Flint places accountability for what happened with state government.

Separate and apart from the Governor's Flint Water Advisory Task Force, the evidence establishing the duties and breach of duties of numerous government entities, officers and employees and the causal relationship of those breaches of duties to the plaintiffs alleged injuries and damages is found in the plaintiffs' manifold and manifest admissions in their complaints, in numerous pleadings and briefs presented to the Court, and in representations made by their lawyers during arguments to the Court.

### A. The Governor's Office

    1. <u>Former Governor Rick Snyder</u>
       Attorney Eugene Driker
       Barris, Sott, Denn & Driker, PLLC
       333 W. Fort Street
       Suite 1200
       Detroit, MI 48226-328

Mr. Snyder took office as the elected Governor of Michigan on January 1, 2011. As Governor of Michigan, Snyder had executive power and the duty to supervise the faithful execution of laws by state agencies.[65] The governor has the

---

[65] Mich. Const. Article V, §§ 1, 8.

power and duty to investigate the acts of any public office or public officer, elective, or appointee and may remove or suspend a public official from office.[66] Moreover, the governor is "responsible for coping with dangers to [the] state or the people of [the] state presented by a disaster or emergency" including natural or human-made water contamination, and may issue an emergency declaration accordingly.[67]

Through his first executive order, Governor Snyder divided the Department of Natural Resources and Environment into two distinct departments as they were configured a few years beforehand: the Department of Natural Resources and the Department of Environmental Quality. Governor Snyder appointed Andy Dillon  as the State Treasurer, Nick Lyon as Director of MDHHS, and Dan Wyant as Director of MDEQ and had duty to supervise their execution of law. On March 16, 2011 (and again in December, 2012), he signed bills into law that increased the powers of Emergency Managers of local municipalities to resolve financial matters. Governor Snyder also appointed the Emergency Managers who ran the City of Flint during the time periods relevant to the City of Flint's water contamination. Flint's Emergency Managers reported to Governor Snyder through the Department of the Treasury and its executive, the State Treasurer. Simply put, Governor Snyder and his subordinate, the State Treasurer, had complete power and

---

[66] Mich. Const. Article V, § 10.
[67] M.C.L. § 30.403; 30.402(h).

authority to direct the Flint Emergency Managers to undertake actions that were necessary and proper to protect the health and safety of Flint residents.

Governor Snyder was informed of the Flint water switch in April, 2014. In October, 2014, after reports of water quality concerns and violation notices, the MDEQ sent Governor Snyder a "briefing paper" discussing various water quality issues and infrastructure problem in the City of Flint affecting their ability to distribute safe water. That same month, Governor Snyder's senior staff referred to the water contamination situation as an "urgent matter to fix" yet the Governor took no action.

By July 2015, Governor Snyder knew of reports of elevated lead levels found in homes throughout the city. On September 5, 2015, Governor Snyder knew that 1,500 kitchen water filters had been distributed to Flint residents in 4 hours "as a way of providing added comfort amid concerns about Flint's water quality." Lacking urgency and concerned about public perception, Governor Snyder stated his main concern as "how did it go over with the residents?" On September 25, 2015, in a written communication to Governor Snyder, his Chief of Staff reported: "I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject" and warned that Governor Snyder should not "fan the narrative that the state is ducking responsibility." On October 8, 2015, a full year after his staff made the recommendation, Governor

Snyder ordered the return to Lake Huron for drinking water by reconnecting to the Detroit Water and Sewer Department.

Governor Snyder had complete authority over the key state agencies responsible for implementing state and federal safe drinking water regulations, including the power to intervene, demand additional information or action, or reorganize resources or departments to ensure the public health. Governor Snyder failed adequately to supervise the acts of his state agencies and their department directors, including Nick Lyon and Dan Wyant. Governor Snyder failed to intervene appropriately or to take emergency action to prevent further harm to the general public caused by contaminated drinking water.

2. <u>The Governor's Senior Staff: Dennis Muchmore (Chief of Staff); Harvey Hollins III (Director of Urban Initiatives); Richard Baird (Senior Advisor and Transformation Manager); Valerie Brader, (Senior Policy Advisor and Deputy Legal Counsel); Jarrod Agen (Communications Director); Sara Wurfel (Press Secretary); David Murray (Communications Director).</u>
George W. Romney Building
111 S Capitol Ave
Lansing, MI 48933

Assistant Attorney General Zachary C. Larsen
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

Prior to the switch to the Flint River water as an interim drinking water source, Harvey Hollins III, Director of Urban Initiatives in Governor Snyder's administration and the point person for the state's response to the Flint water

50

issues, served as a liaison between the city, Detroit Water and Sewage Department ("DWSD"), Department of Treasury, and consultants working for the city regarding the potential cost implications of the various drinking water sources. After the switch, Mr. Hollins was intimately involved in coordinating the water quality concerns of Flint residents and activists, including communicating water quality concerns to the emergency manager. Mr. Hollins was aware early on of the lack of response from city officials and state agencies over growing health concerns.

In October 2014, nearly six months after Flint had begun using the Flint River water to save money, and four to five months before the VNA defendants conducted their approximate 30 day engagement for the City of Flint, Valerie Brader, Governor Snyder's senior policy adviser and deputy legal counsel, and his chief legal counsel, Michael Gadola, raised concerns to him about Flint's drinking water. Ms. Brader had considerable education, training, and experience in environmental matters. A Rhodes Scholar, Ms. Brader received her undergraduate degree, *magna cum laude*, from Harvard, a master's degree from the University of Oxford (environmental change and historical studies), and a law degree, *magna cum laude*, from Georgetown University. She clerked for a federal judge in the Eastern District of Michigan and served as a special master in the federal court overseeing environmental compliance of a large public utility. She was a partner

51

at Bodman PLC practicing environmental law, and had been an environmental and business process consultant for the EPA and the Department of Defense. Through her past work experience, she was familiar with the environmental issues of communities (like Flint) serviced the by Detroit Water and Sewer Department.

On October 14, 2014, Ms. Brader, in her capacity as a Senior Advisor to Governor Snyder, sent the following communication to "the members of the senior staff team", calling the situation an "urgent matter to fix" and recommending that Flint reconnect to or blend with DWSD (i.e., Lake Huron water):

**From:** Brader, Valerie (GOV)
**Sent:** Tuesday, October 14, 2014 3:30 PM
**To:** Muchmore, Dennis (GOV); Gadola, Michael (GOV); Agen, Jarrod (GOV); Clement, Elizabeth (GOV)
**Subject:** Flint water

As you know there have been problems with the Flint water quality since they left the DWSD system, which was a decision by the emergency manager there.  Specifically, there has been a boil water order due to bacterial contamination.  What is not yet broadly known is that attempts to fix that have led to some levels of chlorine-related chemicals that can cause long-term damage if not remedied (though we believe they will remedy them before any damage would occur in the population).  Now apparently the reduced quality is causing GM to leave due to rusted parts.

I am fairly sure that GM's departure now means the economic rationale for Flint leaving DWSD in the interim while the new intake is constructed has just been eliminated.  Moreover, our DEQ has been working with Flint's team to try to address the technical problem, but doing a blend of DWSD water and Flint water, or going back altogether for a year or two while the new lake intake is constructed, have not really been solutions on the table.

Now we are getting comments about being lab rats in the media, which are going to be exacerbated when it comes out that after the boil water order, there were chemicals in the water that exceeded health-based water quality standards.  I think we should ask the EM to consider coming back to the Detroit system in full or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing.  That additional revenue would also help DWSD, obviously, and the infrastructure is already in place, so this could be implemented quickly.  I am not sure who is the best person to initiate that conversation with the EM, but I see this as an urgent matter to fix.

--Valerie

P.S.  Note:I have not copied DEQ on this message for FOIA reasons.  I have sent them the below message from the Senator's office and had conversations with them re making sure to brief the EM directly on the water quality issues.

The Chief Legal Counsel provided a full throated warning in response:

**From:** Gadola, Michael (GOV)
**Sent:** Tuesday, October 14, 2014 3:42 PM
**To:** Brader, Valerie (GOV); Muchmore, Dennis (GOV); Agen, Jarrod (GOV); Clement, Elizabeth (GOV)
**Subject:** RE: Flint water

Good gravy.  First, just to clarify, when Valerie says GM is leaving, she means leaving the Flint water system, not abandoning the City altogether.

Second, to anyone who grew up in Flint as I did, the notion that I would be getting my drinking water from the Flint River is downright scary.  Too bad the EM didn't ask me what I thought, though I'm sure he heard it from plenty of others.  My Mom is a City resident.  Nice to know she's drinking water with elevated chlorine levels and fecal coliform.

I agree with Valerie.  They should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control.

Ms. Brader testified that a few days later, Richard Baird, Transformation Manager in Governor Snyder's Executive Office, contacted her about setting up a call with the Flint Emergency Manager to discuss the concerns expressed in her October 14 email. She recalls that she went down to Mr. Baird's office yet a few days later still and that together they called Flint's Emergency Manager, Darnell Earley, from Baird's office. Ms. Brader testified that Emergency Manager Earley told them that he had recently spoken with MDEQ staff about the health violations, but that the problems could be fixed and that the switch back to Lake Huron water would be too expensive. Despite Flint Emergency Manager Earley's statements, Ms. Brader did not change her recommendation to switch back to Lake Huron water to or blend water with DWSD. The switch back to Lake Huron did not take place until one year later in October, 2015.

Early in 2015, Governor Snyder's staff knew of a potential Legionnaires' disease outbreak. On July 22, 2015, Governor Snyder's Chief of Staff Dennis Muchmore sent MDHHS Director Nick Lyon a written communication requesting

that he look into Flint's water issues, but public notification was not made until over a year later, in January 2016. By July 2015, the Governor Snyder knew of reports of high levels of lead in the water supply. The Governor's staff held two meetings at the Governor's office with Flint residents and community activists in July and August 2015 to appease them and to dispel concerns over drinking water quality.

In September 2015, in an effort to dodge responsibility, the Governor's office attempted to place blame for the problem on others: "[t]he real responsibility rests with the county, city and KWA" and that "it's really the city's water system that needs to deal with it." On November 26, 2015, Richard Baird, a senior advisor to Governor Snyder, instructed the Michigan state police: "…boss [Snyder] wants us to work through this without a disaster declaration if possible. Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it." The Governor, directly and through his senior staff, failed properly to advise or to take action to protect the general public from health hazards caused by contaminated water.

### B. Michigan Department of Treasury
Austin Building
430 W. Allegan Street
Lansing, MI 48922

The State Treasurer of Michigan is an unelected officer appointed by the Governor, operates the Department of Treasury within the executive branch, and functions as the chief financial officer for the State. The State Treasurer oversees

the collection, investment, and disbursement of all state monies, and also administers major tax laws, safeguards the credit of the state, and distributes revenue sharing monies to local units of government. As part of its responsibility to safeguard the credit of the state, the Department of the Treasury oversees the Emergency Managers appointed by the Governor, including the delivery of services essential to the public health, safety, and welfare of residents.

The Michigan Department of Treasury approved the 2013 decision for Flint to switch to the Karegnondi Water Authority ("KWA")[68] but abdicated its responsibility to assess the economic implications of entering the KWA. Instead of undertaking that assessment itself, it looked to the Michigan Department of Environmental Quality ("MDEQ") for guidance, even though MDEQ is not an agency equipped to make economic-focused decisions like these.[69] The Department of Treasury also independently approved contracts for the City of Flint that exceeded $50,000, including contracts for treatment upgrades and similar activities that have now been demonstrated as woefully inadequate. In addition, the Department of Treasury worked with others to secure the Administrative Consent Order ("ACO") that was necessary to secure financing for the KWA, even though

---

[68] March 28, 2013 Flint Resolution to Purchase Capacity from Karegnondi Water Authority.

[69] August 6, 2016 Detroit Free Press Article: "Professor: Blame Treasury, not just DEQ, in Flint water mess."

the ostensible purpose of the ACO was to clean a lagoon at the Flint Water

Treatment Plant's lime-sludge facility.

>    1. Andy Dillon
>       Assistant Attorney General Zachary C. Larsen
>       Michigan Department of Attorney General
>       P.O. Box 30755
>       Lansing, MI 48909

Governor Snyder appointed Andy Dillon as State Treasurer in 2011. He held

that position through October 11, 2013 but continued to be employed at the same

salary as "Senior Advisor" to his successor State Treasurer. In his capacity as an

employee of the Department of Treasury, Mr. Dillon had a duty to oversee the

Emergency Manager's activities, including the delivery of services essential to the

public health, safety, and welfare of Flint residents. Mr. Dillon played a pivotal role

in the decision-making by Flint's Emergency Managers resulting in the change of

the source of Flint's drinking water from Lake Huron to the Flint River. On March

28, 2013, Mr. Dillon communicated to Governor Snyder that "based upon today's

presentations to the DEQ by the City of Flint, KWA and the engineering firm

(Tucker Young) Treasury hired to vet the options as to whether Flint should stay

with DWSD or join KWA. I am recommending we support the City of Flint's

decision to join KWA. The City's EM, Mayor and City Council all support this

decision. Dan Wyant likewise concurs and will confirm via email."[70]

---

[70] March 28, 2013, 6:18 PM Andy Dillon Email to Governor Snyder ("KWA").

A few weeks later, on April 11, 2013, in a letter to Flint Emergency Manager Ed Kurtz, Mr. Dillon listed off the reasons that leaving the DWSD and joining the KWA was the right move for Flint:

> First, there is widespread support in the city for this move, including the support of the Mayor, the City Council, and the Emergency Manager. Second, this move will provide a unique opportunity for the City and County to partner on an important project, which will hopefully lead to future regional collaboration. Third, the Department of Environmental Quality is supportive of the City participating in the KWA project. Finally, your representations that this deal will lead to substantial savings for the City over the coming decades, savings that are desperately needed to help with the turnaround of the City of Flint.[71]

Continuing, Mr. Dillon acknowledged that regardless of what the DWSD's final best offer was, Flint was joining the KWA: "[i]t is my understanding that the Detroit Water and Sewer Department is making a final best offer to Genesee County and the City of Flint next Monday, April 15, 2013. As such, this approval will be effective at 5 pm on April 16, 2013 after receiving written notice from the City that either no such offer was presented to the county and the City or that an offer was received and was rejected in good faith based upon specified objections."[72] Despite the statements he made in March and April 2013, Mr. Dillon <u>never</u> actually expected Flint to use the Flint River as an interim source of water: "I

---

[71] April 11, 2013 Andy Dillon Letter to Ed Kurtz.
[72] *Id.*

57

assumed they would work something out with Detroit."[73] Joining the KWA was the first move Flint made that led to its public health crisis. Without Mr. Dillon's facilitation at the highest levels of Michigan state government, Flint may have never left the DWSD, and this crisis may have been averted.

      2. <u>R. Kevin Clinton</u>
         Assistant Attorney General Zachary C. Larsen
         Michigan Department of Attorney General
         P.O. Box 30755
         Lansing, MI 48909

Mr. Clinton served as State Treasurer from October 11, 2013 until April, 2015 and, as such, was directly responsible for decision-making related to the switch of Flint's drinking water source from Lake Huron to the Flint River. Mr. Clinton was the State Treasurer in October 2014, when the Governor's control group raised the need to return the City of Flint to Lake Huron as the source of its drinking water.

      3. <u>Wayne Workman</u>
         Assistant Attorney General Zachary C. Larsen
         Michigan Department of Attorney General
         P.O. Box 30755
         Lansing, MI 48909

Wayne Workman was a Department of Treasury Official during the 2012 – 2016 time period. In his capacity as an employee of the Department of Treasury, Mr. Workman had a duty to oversee the Emergency Manager's activities, including

---

[73] Fonger, Ron, *Former state treasurer assumed Flint wouldn't use river for drinking water*, Mlive (January 21, 2016), *available at* https://www.mlive.com/news/flint/index.ssf/2016/01/former_michigan_state_treas ure.html (last visited July 12, 2019).

the delivery of services essential to the public health, safety, and welfare of Flint residents. Mr. Workman played a critical role on behalf of the treasury and in conjunction with Mr. Dillon in obtaining approval for the KWA and securing Flint's participation in it. Despite the fact neither Mr. Workman nor the Department of Treasury had any authority to initiate an Administrative Consent Order on behalf of the City of Flint, on March 19, 2014, Mr. Workman instructed his department to "get a call into the Director [of the MDEQ] to push this [ACO] through." Knowing that the ACO required interim use of the Flint River, Mr. Workman used his authority and political clout at the expensive of public health to secure approval and financing for the KWA.

### C. Michigan Department of Environmental Quality
Presently the Michigan Department of Environment, Great Lakes, and Energy
525 West Allegan Street
Lansing, MI 48909-7973

Assistant Attorney General Zachary C. Larsen
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

The Department of Environmental Quality ("MDEQ") was created in 1995 by Executive Order No. 1995-18, which transferred environmental regulatory functions from the Michigan Department of Natural Resources to the newly created department. In 1996, Executive Order No. 1996-1 transferred oversight of environmental health programs "relating to drinking water and radiological

protection" from the Michigan Department of Public Health to the MDEQ. In his first-ever executive order, Executive Order 2011-1, Governor Rick Snyder reversed a prior action by his predecessor, Governor Jennifer Granholm, split the Department of Natural Resources and Environment that she created, and returned the MDEQ its status as a separate department of the executive branch of the state government. Governor Snyder's stated purpose for the reorganization  was allowing the MDEQ to focus on its core mission: "promot[ing] wise management of Michigan's air, land, and water resources to support a sustainable environment, healthy communities, and vibrant economy." MDEQ set its "guiding principles"  as being a leader in environmental stewardship, a partner in economic development, and a provider of excellent customer service. The MDEQ  established as its strategic goals protecting public health, improving the quality of air, land and water resources, and implementing Michigan's water strategy.

The MDEQ was charged with the primary duty to enforce both the state and federal Safe Drinking Water Act and has primary legal authority and responsibility for safe drinking water monitoring and enforcement in Michigan with oversight authority from the EPA. The MDEQ also had a duty to serve as the environmental health agency for the state and is required to advise the governor and other state agencies "on matters of the environment as those matters affect the health of  the

people of the state." The MDEQ was required to monitor and evaluate conditions which represent potential or actual environmental health hazards.

MDEQ had the duty to maintain power and control over public water supplies and is required to evaluate the adequacy of proposed waterworks systems and proposed surface water sources to protect the public health. The MDEQ had a duty to notify the supplier of water of necessary changes to the treatment, operations or capacity of a system in compliance with state drinking water standards. Additionally, the MDEQ had a duty to require proper testing and sampling in accordance with lead and copper standards and is required to determine the appropriate corrosion control treatment methods. If the system is found not to be in compliance with state or federal drinking water standards, the MDEQ has a duty to require that a supplier notify its users.

As early as 2004, the MDEQ was aware of potential concerns about using the Flint River as a source of drinking water. A technical assessment completed that year noted that "the Flint River was a highly sensitive drinking water source that was susceptible to contamination." A 2011 report from LAN detailed over $69 million in improvements that would be needed to the Flint Water Treatment Plant to bring the system up to current standards. In January 2013, MDEQ officials discussed the feasibility of using the Flint River, acknowledging that they "agree that the city should have concerns of fully using the Flint River…"

After the Flint City Council approved the resolution to buy water from the KWA on March 25, 2013, MDEQ officials, including the Director himself, continued to discuss the risks associated with using the Flint River, including that the use of Flint River water would pose increased health risks to the public. As the prospect of the KWA deal and use of the Flint River as an interim water source became apparent, MDEQ Deputy Director Jim Sygo acknowledged that "[a]s you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." From March 2013 to April 2014, MDEQ staff visited the Flint Water Treatment Plant on several occasions and were aware that the plant was not yet ready to distribute safe water in accordance with state and federal standards. Nonetheless, in April 2014, MDEQ issued the necessary permits to permit the city to draw from Flint River water.

The MDEQ also played a central role in the development and success of KWA. In August 2009, the MDEQ issued a permit to the Genesee County Drain Commission to withdraw large quantities of water from Lake Huron for the KWA. The MDEQ was apprised of the efforts to transfer the vote on the KWA back to local government "to approve the KWA agreement and not be challenged in court." When Flint's financial troubles threatened their ability to join the KWA, the MDEQ also put together a "sweetheart deal" in the form of an administrative consent order to exempt Flint's portion of the costs from being counted against

Flint's debt limits by requiring Flint to fix lagoons at the water treatment plant and tying the project to KWA development.

After the switch to Flint River water, resident complaints began, and the city was forced to issue several containment violations. The MDEQ, with knowledge of the growing dangers to the public health, failed to adequately respond and undertook efforts to downplay any correlation between the Flint River and both the Legionnaires' disease outbreak or the lead issues, choosing politics over public health. Additionally, the MDEQ was aware that Flint's sampling protocols did not comply with the regulations and misapplied the lead and copper rule, causing corrosion to the lead service lines immediately after the switch and covering up a potential danger to public health by lying to the EPA. MDEQ officials instructed Flint water treatment staff to manipulate test results through targeted flushing and altering of water quality reports. The MDEQ continued to assure residents that the water was safe despite their explicit knowledge to the contrary and their duties to protect the public health.

The State of Michigan charged the following MDEQ officials with committing significant crimes in relation to the Flint drinking water crisis: Liane Shekter-Smith (Chief, Office of Drinking Water and Municipal Assistance); Adam Rosenthal (Water Quality Analyst, Lansing District Office); Stephen Busch (District Supervisor, Lansing District Office); Patrick Cook (Water Treatment

Specialist, Lansing Community Drinking Water Unit); and Michael Prysby (Engineer, District 11).

The plaintiffs admit that MDEQ and the officials referenced above as well as MDEQ Director of Communications Bradley Wurfel intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDEQ officials Wyant, Wurfel, Shekter-Smith, Rosenthal, Busch, Cook, and Prysby intentionally caused them bodily harm (in the nature of invading their bodily integrity).[74] MDEQ proximately caused further exposure, personal injuries, and damages to the plaintiffs.

**MDEQ Director Wyant and the Relevant Senior Staff including: Liane Shekter-Smith (Chief, Division of Drinking Water and Municipal Assistance); Bradley Wurfel (Communications Director); Eric Oswald (Director, Division Drinking Water and Municipal Assistance); Richard Benzie (Assistant Division Director, Division Drinking Water and Municipal Assistance); Stephen Busch (District Supervisor, Lansing Office, Division Drinking Water and Municipal Assistance); Adam Rosenthal (Water Quality Analyst, Lansing District Office, Division Drinking Water and Municipal Assistance); Patrick Cook (Water Treatment Specialist, Lansing Office, Division Drinking Water and Municipal Assistance ); Michael Prysby (Engineer, District 11 [Genesee County] Division Drinking Water and Municipal Assistance); Jim Sygo (Deputy Director); Keith Creagh (MDEQ Director).**

1. <u>Director Dan Wyant</u>
   Attorney Michael J. Pattwell
   Clark Hill, PLC
   212 E. Cesar E. Chavez Avenue
   Lansing, MI 48906

---

[74] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

Dan Wyant ("Wyant") was the Director of the MDEQ during the relevant time frame. Governor Snyder appointed Mr. Wyant to the position of Director of the MDEQ in 2011; he held the position until December 29, 2015. Director Wyant "resigned," after "reassigning" Liane Shekter-Smith's employment as Chief of the Office of Drinking Water and Municipal Assistance, appointed his Deputy James Sygo as her replacement. MDEQ Communications Director Bradley Wurfel also "resigned." In conjunction with these personnel changes, Director Wyant admitted that the MDEQ failed to enforce the EPA lead and copper rule mandate for corrosion control in its oversight of the Flint Water Treatment Plant's delivery of drinking water to residents of Flint. The federal Environmental Protection Agency delegated to MDQE "primary" responsibility for enforcement of safe water drinking act requirements, including its lead and copper regulation. Under Director Wyant, the MDEQ ignored its core mission by failing to manage wisely Michigan's drinking water sources in support of healthy communities.

Instead, Director Wyant advanced a drinking water source that was "downright scary" to some of the highest-ranking state officials, maintained that drinking water source in the face of flagrant health problems, and produced a demonstrably unhealthy City for Flint residents. Likewise, Director Wyant abandoned the MDEQ's "guiding principle" of being a leader in environmental stewardship and a provider of excellent customer service. The MDEQ did not

provide any service to its customers in Flint, hiding behind an impenetrable bureaucratic wall when confronted with serious problems regarding the quality of Flint's drinking water. The fundamental core of "stewardship" is the ethical and responsible management of public resources. Under Mr. Wyant, the MDEQ demonstrated a complete lack of ethics and irresponsible management of Flint's drinking water. Public health was secondary to political expediency and self-preservation of the bureaucracy.

> 2. Liane Shekter-Smith
> Attorney Thaddeus E. Morgan
> Attorney Brian P. Morley
> Fraser Trebilcock
> 124 W. Allegan Street
> Suite 1000
> Lansing, MI 48933

Liane Shekter-Smith ("Shekter-Smith") was the Chief of the Division of Drinking Water at the MDEQ until October 19, 2015. Ms. Shekter-Smith has worked in environmental agencies for the State of Michigan for over 30 years. As Chief, Shekter-Smith's coordinated drinking water compliance efforts with state and local agencies (among other tasks), including supervision of water supply operations for the provision of safe drinking water. In her position at MDEQ, Ms. Shekter-Smith was responsible for having (and developing) knowledge of contaminants and their impact on public health and, as well, for collecting and analyzing environmental data. During the period of 2011 to 2015, Shekter-Smith

consistently promoted a practice of minimalist or "technical" compliance with environmental laws and regulations, choosing politics and self-preservation over protection of the public health, in direct violation of her duties and the spirit of the regulations she was responsible for enforcing.

Ms. Shekter-Smith was involved in the discussions and planning between the KWA and the City of Flint as early as 2011, three years after KWA had been issued the necessary withdrawal permit by the MDEQ. In December 2012, Ms. Shekter-Smith was involved in conversations involving the City of Flint accepting an offer to join the KWA. In January 2013, Ms. Shekter-Smith became involved in discussions about potential water treatment options for the City of Flint with the Department of Treasury. By March 2013, Ms. Shekter-Smith was well aware of the potential risks involved in using the Flint River, including concerns about public health and exposure to harmful contaminants. Nonetheless, Ms. Shekter-Smith played in integral role in securing an Administrative Consent Order for the City of Flint to allow for funding of the KWA project and the use of the Flint River as an interim water source. Less than one month prior to the change in drinking water from Lake Huron to the Flint River, Ms. Shekter-Smith advocated the existence of an ambiguity (a "very grey area") about the LCR requirements for full time operation of the Flint water treatment plant. Ms. Shekter-Smith advanced the

assertion that Flint was not required implement corrosion control treatment under the LCR prior to delivering drinking water to its residents.

After the switch in water source, Ms. Shekter-Smith repeatedly downplayed water quality issues and resident complaints, including complaints about lead contamination and legionella, insisting at all times that the water was safe to drink. In October 2014, after Ms. Shekter-Smith was informed of a potential Legionnaires' disease outbreak, she relayed to MDHHS that she was "concerned that [MDHHS] were going to be making some sort of announcement" and warned MDHHS officials:

> There have been numerous complaints about Flint water, that the Governor's Office had been involved, and that any announcement by public health about the quality of the water would certainly inflame the situation.

As the Genesee County Health Department began closely investigating the Legionnaires' disease outbreak in the spring of 2015, Ms. Shekter-Smith stressed a clear message to MDEQ officials, including spokesman Brad Wurfel:

> While the change in source may have created water quality conditions that could provide additional organic nutrient source to support legionella growth, there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system at this time.

The next day, Ms. Shekter-Smith approved MDEQ's response to the Genesee County Health Department asserting that Legionnaires' disease was not regulated under the Safe Drinking Water Act adding:

68

It is highly unlikely that legionella would be present in treated water coming from the City of Flint water treatment plan given the treatment plant's use of ozone along with complete treatment and chlorine disinfect contact time to comply with federal surface water treatment rules for potable water."

When Ms. Shekter-Smith discovered violations of the drinking water regulations she had a duty to enforce, she failed to take corrective action. Ms. Shekter Smith went to great lengths repeatedly to downplay concerns regarding corrosion and lead, meanwhile acknowledging her concerns internally. For example, she stated her concern for the optics of "[t]he decision to provide bottled water [to state employees] when the public notice was not a 'do not drink'" and the possibility of a "distribution system problem" in Flint. Nonetheless, on January 21, 2015, Ms. Shekter-Smith reiterated MDEQ's minimalist position on the Flint drinking water problems to her colleagues:

Our position has always been that we do not dictate which acceptable option(s) a water supply may choose. Our responsibility is to see that operations are managed properly, regulations are met, and safe water is delivered. For example, when Flint decided to leave Detroit and operate using the River, our role wasn't to tell them our opinion; only what steps would be necessary to make the switch.

Upon reports of high levels of lead in one Flint home, on February 26, 2015, Ms. Shekter-Smith wrote to MDEQ's Richard Benzie stating that "the city is meeting 90th percentile. Not sure why region 5 [EPA] sees this one sample as such a big deal." A day later, MDEQ officials, with Ms. Shekter-Smith on the distribution, lied in writing to the EPA informing them that Flint had an "optimized

69

corrosion control program." After it became known to the EPA that Flint was not practicing corrosion control, Ms. Shekter-Smith worked with EPA officials to disparage and discredit Mr. Del Toral's analysis and report, explicitly refused to mandate corrosion control despite the readily apparent risks and faulty sampling protocols, and maintained that the water was safe to drink. In August 2015, two months before the switch back to Lake Huron water, Ms. Shekter-Smith met directly with Flint residents, assured them that the water was safe to drink, refused to acknowledge the importance and accuracy of Mr. Del Toral's findings, and further delayed the implementation of corrosion control.

3. <u>Bradley Wurfel</u>
Attorney Michael J. Pattwell
Clark Hill, PLC
212 E. Cesar E. Chavez Avenue
Lansing, MI 48906

Bradley Wurfel ("Wurfel") was the Director of Communications for MDEQ during the 2014 to 2016 time period. As spokesperson for the state's environmental agency responsible for regulating drinking water, Mr. Wurfel held a position of public trust intended to have the general public and other state and local agencies to rely on his statements regarding environmental health matters. Contrary to Mr. Wurfel's duties within the department, he intentionally disseminated deliberately misleading and inaccurate communications and unleashed a campaign to discredit

residents and community representatives and to spread false messages about the safety of the drinking water.

By January 2015, Mr. Wurfel was aware of the issues with Flint water quality, including reports of an uptick in Legionnaires' disease. On January 30, 2015, Mr. Wurfel acknowledged to the governor's office that he didn't want MDEQ's Director "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May." Despite his concerns, on March 13, 2015, Mr. Wurfel assured the governor's office that the local health department's efforts to attribute the increase in Legionnaires' disease to the Flint water was "beyond irresponsible." That same day, Mr. Wurfel communicated with the governor's office about coordinating communications on Legionnaires' disease, stating: "Political flank cover out of the City of Flint today regarding the spike in Legionnaires' disease cases. See enclosed. Also, area ministers put a shot over the bow last night… with a call for Snyder to declare state of emergency there and somehow 'fix' the water situation."

By February 2015, Mr. Wurfel had been included on communications regarding reports of high lead levels at a home in Flint. On July 9, Mr. Wurfel emailed Del Toral's now-public interim memo about violations of the Safe Drinking Water Act and potential widespread lead issues to several MDEQ

officials, noting: "Miguel apparently asserts that the DEQ and EPA are at odds on proper protocol. Which seems weird." Four days later, Mr. Wurfel gave a comment to Michigan Radio that "anyone who is concerned about lead in the drinking water in Flint can relax." Mr. Wurfel later referred to Del Toral as a "rogue employee" and consistently reported to the governor's office that "the city is in compliance for lead and copper" and that "Flint residents do not need to worry about lead in their water supply."

Over the course of the next three months, Mr. Wurfel continued on a quest to downplay resident concerns both in the public and with the governor's office in an effort to protect his agency and the governor. On July 25, Mr. Wurfel urged his colleagues to produce an update on the January/June lead testing results after Flint Ministers met with the Governor's office producing 80 water tests in Flint that show high lead levels. Shortly thereafter, Mr. Wurfel went on attack against Dr. Mona Hanna-Attisha and Professor Edwards—Mr. Wurfel referred to Dr. Mona Hanna-Attisha's work as "unfortunate" and a "very emotional approach" and that Professor Edwards' team "specializes in looking for high lead problems… they pull that rabbit out of that hat everywhere they go" and that they were fanning political flames irresponsibly." The Governor's Task Force report cites the "substance and tone" of the MDEQ's communications as one of the department's key failures. Mr. Wurfel resigned from his position in December 2015,

72

acknowledging a dereliction of his duties, including that "the human element got lost in the press account."

    4.  <u>Richard Benzie</u>
         525 West Allegan Street
         P.O. Box 30473
         Lansing, MI 48909-7973

Richard Benzie ("Benzie") was the Assistant Division Director, Division Drinking Water and Municipal Assistance at the MDEQ during the relevant time frame. Benzie continues his employment as an official at the MDEQ and was Stephen Busch's ("Busch") direct supervisor. By June 12, 2014 Mr. Benzie was aware that some Flint residents were experiencing significant problems with their drinking water.[75] Nevertheless, he failed to do anything about the problem. On February 26, 2015 and February 27, 2015, Mr. Benzie received the communications constituting discussions among EPA and MDEQ employees regarding the high lead levels found in some Flint drinking water.[76] While Mr. Benzie knew about the importance of corrosion control generally, he also observed that Mr. Del Toral stressed its importance in these February 26, 2015 and February 27, 2015 communications.[77] When Mr. Del Toral inquired about the nature and type of corrosion control that Flint was using, Mr. Benzie's subordinate, Mr.

---

[75] June 12, 2014, 1:16 PM Stephen Busch Email to MDEQ ("Media Contact – Flint WTP")

[76] February 26, 2015 – February 27, 2015 MDEQ and EPA Email Correspondence ("HIGH LEAD: FLINT Water testing Results").

[77] *Id.*

Busch, falsely represented that Flint "[h]as an Optimized Corrosion Control Program."[78] Mr. Benzie did nothing to correct the false information given to the EPA or to implement corrosion control at the Flint Water Treatment Plant.

Months later, on April 24, 2015, MDEQ employee Patrick Cook finally informed Mr. Del Toral that "Flint is not currently practicing corrosion control at the [Water Treatment Plant]."[79] After this revelation, on April 25, 2015, Mr. Del Toral expressly warned Mr. Cook of the dangerous levels of lead exposure that can occur when a city has lead service lines and does not practice corrosion control. Yet, Mr. Cook responded to Mr. Del Toral, with Mr. Benzie's apparent approval as a participant in the communication, with total disregard for the gravity of the situation. Instead of solving Flint's contaminated drinking water problems, the MDEQ including Mr. Benzie instead chose to promote the false narrative that Flint met "all current state and federal [drinking water] requirements even with a lack of corrosion control" and that controlling the "chronic contaminants" would be "of little to no value in the long term" because Flint would eventually get its water supply from KWA. In other words, the MDEQ including Mr. Benzie consistently marginalized the health and safety of Flint residents. Mr. Benzie was aware of the

---

[78] February 27, 2015, 1:48 PM Stephen Busch Email to EPA and MDEQ Employees ("RE: HIGH LEAD: FLINT Water testing Results").
[79] April 24, 2015, 10:43 AM Pat Cook Email to EPA Employees ("RE: Flint Corrosion Control?"). May 1, 2015.

abhorrent drinking water conditions in Flint; he was aware that the City lacked optimized corrosion control; and he was aware that most City residents had lead service lines connecting their residences to water mains. He knew lead was a "chronic contaminant" of Flint's drinking water and he failed to take any action.

> 5.  Stephen Busch
>     Philip A. Grashoff, Jr.
>     Smith Haughey Rice & Roegge
>     100 Monroe Center, NW
>     Grand Rapids, MI 48304
>
>     Attorney Mark J. Kriger
>     LaRene & Kriger
>     645 Griswold Street, Suite 1717
>     Detroit, MI 48226

Stephen Busch ("Busch") was the District 8 (Lansing) Water Supervisor at the MDEQ during 2012-2016 time period. Mr. Busch reported to Ms. Liane Shekter-Smith and oversaw the work of District Engineers Michael Prysby and Patrick Cook. Mr. Busch's duties included advising and consulting with water systems and state and local agencies regarding regulatory compliance and water quality issues for the purposes of providing safe drinking water to communities. Mr. Busch was intimately involved with both the decision to use the Flint River as a drinking water source in both 2013 and 2014, assisted water treatment plant staff with treatment and compliance issues, and met directly with Flint residents to discuss various water quality issues. In violation of his duties as an employee at the

75

MDEQ and to the citizens of Flint, Mr. Busch made false and misleading statements regarding water quality and requirements for the Flint water treatment plant and caused an unnecessary and prolonged exposure to potential public health hazards.

As early as 2012, Busch was aware that the Flint River was contaminated and highly corrosive not meeting standards even for fish consumption. On March 26, 2013, Busch himself acknowledged the risks associated with using the Flint River as an interim water source. In a communication to MDEQ colleagues, including Director Wyant, Mr. Busch warned that substantial updates would be needed to the treatment plant and that use of the river water would pose increased health risks to the public, including a microbial risk, an increased risk of disinfection by-product ("TTHM") exposure.

Despite these known risks, Mr. Busch actively participated in the series of events from 2013-2014 that resulted in distribution of contaminated water from the treatment plant, including coordinating with Flint attorneys to achieve the Administrative Consent Order in February 2014 and coordinating with treatment plant staff to move the plant into full time use despite glaringly obvious operational and staffing issues. On March 24, 2014, just one month prior to the switch, Mr. Busch wrote to MDEQ colleagues acknowledging these operational shortcomings and regulatory issues, stating "starting [the plant] up for continuous operation will

carry significant changes in the regulatory requirements so there is a very gray area as to what we consider for start up." Mr. Busch also had discussions with the Genesee County Drain Commissioner's Office after formal announcement of the use of the Flint River as a primary water source during which Mr. Busch acknowledged that the plant was not ready but that he nonetheless authorized the city to activate the water plant "because he was directed to." Mr. Busch provided Mr. Wurfel various talking points in April 2014, including that "[w]hile the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

After the water switch, Mr. Busch actively sought to downplay concerns over water quality in direct violation of his duties, including concerns over lead and legionella. Mr. Busch played in integral role in failing to require corrosion control treatment at the water treatment plant, and on February 27, 2015, after reports of elevated lead levels, Mr. Busch lied to the EPA by stating that the city was, in fact, using corrosion control. In March 2015, Mr. Busch was aware that the EPA had been "inundated" with citizen complaints over water quality, yet he failed to act. In April 2015, Mr. Busch began the process of denigrating and disparaging Mr. Del Toral by advising his MDEQ colleagues that it may be necessary to alert

the EPA to Del Toral's "over-reaches" in investigating elevated lead levels and advising on corrosion control.

Despite knowledge of faulty sampling procedures, on June 10, 2015, Mr. Busch falsely assured the EPA that "almost all of the lead sample sites are lead service lines and the State is not seeing large increases in lead levels at the tap." Mr. Busch vigorously defended an incorrect application of the lead and copper rule even after evidence of elevated lead levels and falsely assured Flint residents and activists that the water was safe at a meeting at the governor's office in August 2015. Mr. Busch also provided deceptive and misleading advice to the MDEQ and both state and local health agencies during the spring and summer of 2015 that "there is no evidence or confirmation of legionella coming directly from the Water Treatment Plant or in the community water supply distribution system" and called these conclusions "premature." Mr. Busch was criminally charged for his acts and omissions related to the operation and management of the Flint water treatment plant and for violations of the Safe Drinking Water Act. His conduct caused the plaintiffs alleged injuries and damages.

6. Adam Rosenthal
   Attorney James W. Burdick
   Burdick Law, P.C.
   1760 S. Telegraph Road
   Suite 300
   Bloomfield Hills, MI 48302-0183

Adam Rosenthal ("Rosenthal") is a former Environmental Quality Analyst at the MDEQ. On April 17, 2014, a week before Flint began using the Flint River as its source for drinking water, Mr. Rosenthal was made aware that the Flint Water Treatment Plant was not prepared to begin processing drinking water for Flint residents. On that date, Mr. Rosenthal received an email from Michael Glasgow, the highest ranking technically qualified employee at the Flint Water Treatment Plant stating that: "[i]f water is distributed from this plant in the next couple weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."[80]

Mr. Rosenthal also received the February 26, 2015 and February 27, 2015 memoranda setting forth the discussions among MDEQ and EPA employees regarding Flint's drinking water lead problem.[81] At the same time, Flint officials were far behind in their testing responsibilities, and Mr. Del Toral's communications forced Mr. Rosenthal to finally reach out to Mr. Glasgow about the lead and copper certification form that was six weeks delinquent: "I need your

---

[80] April 17, 2014, 11:05 AM Mike Glasgow Email to Adam Rosenthal and Mike Glasgow ("Re: Proposed Water Monitoring – City of Flint").

[81] February 26, 2015 – February 27, 2015 MDEQ and EPA Email Correspondence ("HIGH LEAD: FLINT Water testing Results").

lead/copper cert form - it was due by 1/10/15. I also need your WQPs for 2014.

EPA is asking due to your 104 hit on lead. If you can, I need them today."[82]

Further, when Glasgow and Brent Wright once again failed in their water testing duties, Rosenthal reached out to them and let them know what he would like them to find: "[w]e hope you have 61 more lead/copper samples collected and sent to the lab by 6/30/15, and that they are will be below the AL for lead. As of now with 39 results, Flint's 90th percentile is over the AL for lead."[83] Despite the fact that Mr. Rosenthal was aware that the Flint Water Treatment Plant was not prepared to treat Flint River water, that Flint had a serious lead problem, that Flint was not capable of adequately performing its water testing responsibility, he took no action to help the residents of Flint. Instead, Mr. Rosenthal chose to "hope"[84] that Mr. Glasgow and Brent Wright would not find actionable levels of lead in Flint's water.

On August 3, 2016, Mr. Rosenthal was charged with  misconduct in office, tampering with evidence, and conspiracy to tamper with evidence, and a misdemeanor charge of willful neglect of duty. The charges stem

---

[82] February 27, 2015, 9:13 AM Adam Rosenthal Email to Mike Glasgow ("Lead Copper Cert form").

[83] June 26, 2015, 12:00 PM Adam Rosenthal Email to Mike Glasgow and Brent Wright ("Re: 6/30 & 7/1/15 deadlines")

[84] *Id.*

from Rosenthal's participation in, and falsification of, Flint's drinking water lead test results.

    7. <u>Patrick Cook</u>
       Attorney Allison M. Collins
       Foster, Swift, Collins & Smith, P.C.
       313 S. Washington Square
       Lansing, MI 48933

       John Smietanka
       Smietanka, Buckleitner, Steffes & Gezon
       4250 Chicago Dr., S.W.
       Suite B
       Grandville, MI 49418

Patrick Cook ("Cook") was a Water Treatment Specialist with the Division of Drinking Water and Municipal Assistance at the Lansing office of the MDEQ. A professional engineer with extensive experience at the MDEQ, Mr. Cook was extensively trained in the SDWA and EPA rules and regulations; he was considered a specialist in the Safe Drinking Water Act Lead and Copper Rule at the MDEQ. Mr. Cook regularly consulted on water treatment development and plans and attended training sessions at the EPA regarding corrosion control. As part of his duties, Mr. Cook was responsible for the interpretation and implementation of the legal requirements of the Lead and Copper rule at the Flint Water Treatment Plant. Mr. Cook failed at his essential duties to the plaintiffs by failing to insist on corrosion control when the City changed its drinking water source from Lake Huron to the Flint River in April 2014, and by acquiescing to

department politics and advancing a false interpretation of the Lead and Copper rule resulting in distribution of corrosive water hazardous to the public health.

Without requiring implementation of corrosion control treatment, on April 9, 2014, Cook signed the last permit required by the MDEQ to allow the City to make the change in the drinking water source to go forward. It was not until approximately one year later, on April 23, 2015, that Mr. Cook first inquired of other DEQ staff "what is Flint doing now (post Detroit) for corrosion control treatment?" Mr. Cook, aware of MDEQ's false interpretation of the lead and copper rule, forwarded MDEQ's position to Del Toral in an effort to further mislead the EPA and delay treatment. On May 1, 2015, Mr. Cook, advancing the MDEQ party line and its false interpretation of the rules, informed the EPA that the MDEQ would not require any corrosion control decisions until after June 30, 2015 and that "requiring a [corrosion control] study at the current time will be of little to no value in the long term control of these chronic contaminants." Mr. Cook was criminally charged as a result of his efforts to mislead the EPA and in violation of his duties to implement the lead and copper rule. His conduct caused the plaintiffs alleged injuries and damages.

        8. <u>Michael Prysby</u>
           Attorney Allison M. Collins
           Attorney Richard Hillman
           Foster, Swift, Collins & Smith, P.C.
           313 S. Washington Square
           Lansing, MI 48933

Michael Prysby ("Prysby") was an Engineer in the Division of Drinking Water and Municipal Assistance for District 11 (Genesee County) in the MDEQ's Lansing office. Mr. Prysby's duties included advising and assisting in water treatment plant operations, development, and treatment plans. A professional engineer, Prysby was intimately involved in the decision to use the Flint River as an interim water source, assisting the treatment plant into full time operation, and consulting on water quality issues after the switch from Lake Huron water to the Flint River water. Mr. Prysby failed at his duties to Flint residents by approving use of a contaminated water source, manipulating test results to achieve technical compliance with knowledge of potential public health consequences, and falsely assuring state and local agencies and the public about the safety of the Flint River water.

By 2012, Prysby was involved early on in the approval and development of the KWA, including achieving Flint's participation. Secretly, Mr. Prysby told his colleagues that "the city should have concerns of fully utilizing the Flint River (100%) for the following: the need to soften, the potential for more advanced treatment after next round of crypto monitoring, available capacity in Flint River at 100-year low flow, residuals management (disposal of lime sludge)." Over the course of 2013-2014, Mr. Prysby met regularly with Flint treatment plant staff and had direct knowledge of the plant's inability to distribute safe water and staffing

83

issues. Mr. Prysby was a recipient of Michael Glasgow's April 17, 2014 email warning: "If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready." Mr. Prysby was aware and approved of the decision to forego implement corrosion control. Mr. Prysby failed to act or provide the requested assistance to Flint treatment plant staff.

One month after the switch, according to EPA notes, Mr. Prysby falsely assured EPA officials that "Flint River quality is not great, but there is a surface water treatment plan producing water that is currently meeting SDWA standards." In August, after violations of the SDWA were apparent, Mr. Prysby instructed the Flint water treatment plant staff "off the record" to improve TTHM results through targeted flushing of hydrants near sampling sites. After receiving news of General Motors Corporation abandoning Flint's distribution system due to corrosive water, Mr. Prysby "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

In January 2015, Mr. Prysby repeatedly assured local health officials that "the municipal water system is in compliance with the Safe Water Drinking Act" and declined the health department's requests to meet to discuss the potential

Legionnaires' disease outbreak. Upon receiving reports of a potential lead issue in February 2015, Mr. Prysby took no action and acquiesced to MDEQ's lies to the EPA regarding Flint's corrosion control, even after Mr. Cook informed him that "high levels of iron usually bring high levels of lead." By early 2015, Mr. Prysby was explicitly informed by Flint water treatment plant officials that the lead sampling protocols were faulty and that the City wasn't aware of where the lead service lines and Tier 1 sampling sites were located in violation of the lead and copper rule. Mr. Prysby also played an integral role in "scrubbing" the June 2015 lead and copper reports to achieve compliance, all the while assuring the public of the water's safety and dismissing reports to the contrary, prolonging the distribution of contaminated water. Mr. Prysby was criminally charged for his role and his failure to fulfill his duties and responsibilities under the Safe Drinking Water Act and within the MDEQ causing harm to the public. His conduct caused the plaintiffs' alleged injuries and damages.

9. <u>Jim Sygo</u>
   Formerly of Saginaw, MI

Jim Sygo ("Sygo") was the former Deputy Director of the MDEQ during the relevant time frame. Mr. Sygo's duties included oversight over implementation of the state's drinking water program. Prior to the switch to Flint River water, Mr. Sygo was aware of the river water quality issues expressed by his own staff. Mr Sygo acknowledged internally that "[a]s you might guess we are in a situation with

Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." In early 2015, Mr. Sygo was aware that the Legionnaires' disease outbreak and its correlation to the Flint River water was a "mounting problem." Despite Director Wyant's admission that the MDEQ violated the LCR in April 2014, Mr. Sygo vigorously defended the MDEQ's faulty interpretation.

10. <u>Keith Creagh</u>
Michigan Department of Natural Resources
4166 Legacy Pkwy
Lansing, MI 48911

Keith Creagh ("Creagh") is the former Director of the Department of Natural Resources ("DNR") and served as interim Director of the MDEQ from December 2015 to June 2016. Mr. Creagh has been in state government service since 1974 and has extensive experience in policy development and environmental stewardship.

Creagh has openly admitted that the acts of MDEQ officials during the relevant time period were a "mistake." Specifically, Mr. Creagh has stated that state officials, in applying both state and federal safe drinking water regulations, "relied on technical compliance instead of assuring safe drinking water." Mr. Creagh has also blamed the EPA for lack of urgency and a failure to elevate legitimate concerns over water quality issues.

### D.  Michigan Department of Health and Human Services

333 S. Grand Ave
P.O. Box 30195
Lansing, Michigan 48909

Assistant Attorney General Zachary C. Larsen
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909

The Michigan Department of Health and Human Services ("MDHHS") is a principal department of the State of Michigan, headquartered in Lansing, that provides public assistance, child and family welfare services, and oversees health policy and management. Governor Rick Snyder merged the Department of Human Services ("DHS") and the Department of Community Health in his 2015 State of the State address. MDHHS oversees The Bureau of Epidemiology and Population Health and the Childhood Lead Poisoning Prevention Program, a section responsible for protecting, detecting, and monitoring childhood lead poisoning from a variety of sources, including exposure to lead contamination in dwellings and adjacent surroundings, in compliance with state and federal laws.

Pursuant to Section 51 of Article 4 of the state constitution of 1963 and state Public Health Code, MDHHS is commanded to "continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs."[85] These duties include "prevention and control of

---

[85] M.C.L. 333.2221.

environmental health hazards, prevention and control of diseases, prevention and control of health problems of particularly vulnerable population groups, development of health care facilities and agencies and health services delivery systems, and regulation of health care facilities and agencies and health services delivery systems to the extent provided by law."[86] MDHHS has broad powers and duties under the public health code, including:

(a) general supervision of the interests of the health and life of the people of the state;

(b) the implementation and enforcement of laws within the area of its vested responsibility;

(c) the collection and utilization of vital and health statistics and the conduct of epidemiological and other research studies for the purpose of protecting the public health;

(d) the conduct of investigations and inquiries as to:
(i) the causes of disease and especially of epidemics;
(ii) the causes of morbidity and mortality; and
(iii)  the causes, prevention, and control of environmental health hazards, nuisances, and sources of illness;

(e) planning, implementing, and evaluating health education by the provision of expert technical assistance and financial support;

(f) undertaking appropriate affirmative action to promote equal employment opportunity within the department and local health departments and promoting equal access to governmental financed health services to all individuals in the state in need of service;

(g) exercising the powers necessary or appropriate to perform its duties and which are not otherwise prohibited by law; and

---

[86] *Id.*

(h) planning, implementing, and evaluating nutrition services by the provision of expert technical assistance and financial support.[87]

Further, MDHHS has a duty to promote local health services through the coordination and integration of public health activities, including effectively cooperating with local health departments so as to provide a unified system of statewide healthcare.[88] MDHHS' broad investigatory powers ensure compliance with the laws and regulations set forth by the department and animate its obligation to report periodically to the governor and the legislature regarding matters of public health.[89]

Lead contamination of Flint's residential dwellings and soils was a longstanding problem dating back several decades. Lead-based paint (banned in 1978) and lead service lines connecting water mains to residential dwellings (initially subjected to mandatory replacement by the 1991 EPA lead and copper rule) were ubiquitous throughout the City of Flint. According to the Genesee County Community Action Resource Department, 82.9% of the housing structures in Flint were built before 1969 (91.8% before 1980).[90] Soils, long contaminated by combustion of leaded gasoline, were made worse by the use of lead coated wood

---

[87] *Id.*

[88] M.C.L. 333.2224.

[89] M.C.L. 333.2231, 2241.

[90] The number of vacant homes (most of which are undoubtedly encrusted in lead paint) has increased 74% since 2000.

construction debris as fuel by the Genesee Power Station in Flint's North End.[91] MDHHS, through its officials and employees and in accordance with such funded programs as the Childhood Lead Poisoning Prevention Program, failed to carry out its duties to prevent and minimize residential lead exposure in the Flint community, including from paint, lead service lines, soil, and dust. MDHHS, through its officials and employees, did not meet its most basic duties in failing effectively to respond either to spikes in elevated blood lead levels among Flint children or to the Legionnaires' disease outbreak in the Flint area following on the heels of the change in the source of Flint's drinking water from Lake Huron to the Flint River. Worse yet, MDHHS engaged in efforts to conceal the public health problems, to prevent public notification about them, and to coordinate local public health efforts to address them, including taking steps to downplay scientific and public health data.

The State of Michigan charged the following MDHSS officials with committing significant crimes in relation to the Flint drinking water crisis: Nick Lyon (Director); Corinne Miller (Director, Bureau of Epidemiology); Eden Wells

_____

[91] Flint's NAACP, an activist group called United for Action, and Flint residents filed a lawsuit challenging the Genesee Power Station because its plume of lead- laden smoke and ash contaminated the City and exposed residents to physical injuries and diseases associated with lead (e.g., brain injury, premature births, and learning disabilities). Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015) at 254.

(Chief Medical Officer); Nancy Peeler (Director, Maternal, Infant, and Early Childhood Home Visiting Program); and Robert Scott (Data Manager, Healthy Homes and Lead Prevention Program). The plaintiffs admit that MDHSS and the officials referenced above intentionally deceived them, keeping from them critically important information about the hazardous conditions they confronted. The plaintiffs also admit that MDHSS Director Nick Lyon and MDHSS Director, Maternal, Infant, and Early Childhood Home Visiting Program, Nancy Peeler intentionally caused them bodily harm (in the nature of invading their bodily integrity).[92] MDHSS proximately caused further exposure, personal injuries, and damages to the plaintiffs.

**MDHSS Director Lyon and the Relevant Senior Staff including: Sue Moran (Deputy Director for Public Health) Corinne Miller (Director Bureau of Epidemiology); Lynda Dykema (Director, Division of Environmental Health); Eden V. Wells (Chief Medical Executive); Nancy Peeler (Director, Maternal, Infant and Early Childhood Home Visiting Program); Robert Scott (Data Manager, Healthy Homes and Lead Prevention Program); Jim Collins (Director of the Communicable Disease Division); Dr. Matthew Davis (Chief Medical Executive); Jay Fiedler (Section Manager, Infectious Diseases Surveillance Section); Susan Bohn (Unit Manager, Respiratory Disease Section); Tim Bolen (Regional Epidemiologist); Jim Rudrik, Ph.D. (Director, Infectious Disease Division)**

---

[92] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

1. <u>Director Nicolas Lyon</u>
   Assistant Attorney General Zachary C. Larsen
   Michigan Department of Attorney General
   P.O. Box 30755
   Lansing, MI 48909

   Attorney John Bursch
   Busch Law PLCC
   9339 Cherry Valley Ave SE, #78
   Caledonia, Michigan 4931

Nicolas Lyon was the Director of the Department of Health and Human Services and held that position since September 2014. Prior to that, Mr. Lyon served as the agency's Chief Deputy Director since 2011. In his role as Director, Lyon exercises all powers and duties vested in the Department as well as overseeing the daily departmental operations.[93] As Director, Mr. Lyon was required to "continually and diligently endeavor to prevent disease" and to "[c]ollect and utilize vital and health statistics . . . for the purpose of protecting the public health."[94]

As early as September 2014, Mr. Lyon through his subordinates learned that McLaren Hospital experienced a significant outbreak in Legionnaires' disease. On October 13, 2014, an MDHHS epidemiologist identified a potential correlation between the outbreak and Flint's change of its water source from Lake Huron to the Flint River:

---

[93] M.C.L. 333.2205(1).
[94] M.C.L. 333.2221(2)(c).

I spoke with Tim [Bolen, MDHHS] late last week about the ongoing Legionnaire's [sic] increase in Genesee County. They've had 30 cases of Legionnaire's [sic] Disease reported into the [Michigan Disease Surveillance System] from June to present this year, where in previous years (2009-2013) they've had a range from 2- 9 cases reported during this same time frame. Genesee initially thought the increase was associated with McLaren Flint Hospital as a source, but after Tim and I both reviewed the preliminary data it was pretty clear that many of the cases did not fit with this hypothesis. In addition, the picture has been clouded by the fact that most cases being reported did not have onset dates recorded. The current hypothesis is that the source of the outbreak may be the Flint municipal water.

Mr. Lyon learned on January 28, 2015, that there was an outbreak of Legionnaires' disease in Genesee County and that the initial outbreak coincided with the change in water source from Lake Huron to the Flint River. State Epidemiologist Corrine Miller met with Mr. Lyon and presented him with data and graphs on the monthly case counts of Legionnaires' disease between January 1, 2009 and January 2015 and pointed out the relationship in time with the Flint water switch. That same day, Deputy Director Sue Moran forwarded Mr. Lyon a summary from a call held between MDHHS, MDEQ and Flint area hospitals. According to Ms. Miller, "MDEQ expressed concern that this issue might reach the Governor's office and I indicated it already had (and that [DHHS] would be assisting the locals in the investigation)."

While cases of Legionnaires' disease continued to be reported, on May 29, 2015, MDHHS officials mailed a letter to McLaren Hospital declaring the outbreak of Legionnaire's Disease over.  McLaren Hospital officials "found it very strange

that [the outbreak] was declared as over because it was never declared to begin with and we were still seeing cases." On July 22, 2015, Governor Snyder's Chief of Staff Dennis Muchmore sent Mr. Lyon an email requesting that he look into Flint's water issues. With the assistance of his staff, Mr. Lyon falsely responded to Mr. Muchmore's inquiry by stating that 73% of the cases involved individuals who were not consumers of Flint drinking water. MDHHS staff testified in preliminary criminal hearings involving Mr. Lyon that in early January 2016, he was presented with substantially similar information that Corrine Miller had presented Mr. Lyon nearly a year earlier, yet he acted as though he had never seen the information before. Despite his extensive knowledge of the outbreak, Mr. Lyon failed to act or inform the public until January 13, 2016, during a news conference with Governor Snyder and Dr. Eden Wells.

Moreover, Lyon treated reports of elevated blood lead levels among Flint children with a similar "glib and dismissive" approach. In July 2015, MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of use of the Flint River water as a drinking water source. Despite Mr. Lyon's obligations to investigate public health concerns, in September 28, 2015, after the blood lead level issue had garnered media attention, Mr. Lyon sought assistance from MDHSS staff to disprove any correlation to the Flint water:

> I need an analysis of the Virginia Tech/Hurley data and their
> conclusions. I would like to make a strong statement with a

demonstration of proof that the blood lead levels seen are not out of the ordinary and are attributable to seasonal fluctuations.

Mr. Lyon also actively participated in the political cover-up from the Governor's office. On November 26, 2015 Richard Baird, a top advisor to Governor Snyder, advising the Michigan state police: "…boss wants us to work through this without a disaster declaration if possible. Dan [Wyant, MDEQ] and Nick [Lyon] and I are working on it."

Mr. Lyon actively minimized the drinking water problems and their potential effect on public health. MDHHS, with Lyon at the helm, disregarded scientific data and engaged in a scheme to undermine and obscure the truth at the expense of the public.

2. <u>Sue Moran</u>
   333 S. Grand Ave
   Lansing, Michigan 48909

Sue Moran ("Moran") was the Deputy Director for Public Health at MDHHS. Ms. Moran reported to Deputy Director, Timothy Becker, who reported directly to MDHHS Director Nick Lyon. Ms. Moran's duties included consulting the Director's office on public health issues, including communicable disease outbreaks. Ms. Moran failed at her essential duties to investigate and prevent disease and promote the public health, including failing to urgently and properly respond to both reports of elevated blood lead levels and the Legionnaires' disease outbreak.

95

Ms. Moran became aware of the Legionnaires' disease outbreak in January 2015. Despite this, Ms. Moran failed to adequately respond and assist the local health department in accessing information and informing the public throughout 2015. Notably, eleven months later, in December 2015, Ms. Moran and Dr. Eden Wells criticized the Genesee County Health Department for "going behind their back" and not being a "team player" in drafting a press release regarding the outbreak.

In September 2015, Director Lyon contacted Ms. Moran directly stating that he wanted to make a "strong statement" that the elevated blood lead levels reported in the media were merely seasonal variation. In line with department politics, that same month, Ms. Moran had emailed MDHHS staff informing them that the "front office" was asking about Flint water and stressing that "while this is a public health concern, this is largely DEQ/local jurisdiction." Ms. Moran declined to accept that any issues related to water quality were the responsibility of the MDHHS, in direct contradiction to her duties to protect the public health.

3. <u>Corrine Miller</u>
   Attorney Kristen E. Guinn
   Smith Haughey Rice & Roegge
   100 Monroe Center, NW
   Grand Rapids, MI 49503

Corrine Miller ("Miller") was the Director of the Bureau of Epidemiology at MDHHS. Ms. Miller reported to Sue Moran. Ms. Miller's duties as Director

96

included providing review of data reports and feedback, consultation, and crisis management for public health investigations, including communicable diseases. Ms. Miller's duties also included oversight over the legionella investigation.

Ms. Miller became aware of the Legionnaires' disease outbreak by January 2015 and had discussions with Linda Dykema about the correlation between the water switch and the increase in the cases of Legionnaires' disease. Ms. Miller has admitted that notice could have been released to the public as early as January 2015, but that there were "political overtones" and that news of a Flint water related disease outbreak could have been "embarrassing" or "cause a difficult situation" for the governor because that decision had been made under emergency management. By March 2015, Ms. Miller was aware of the challenges the Genesee County Health Department (GCHD) faced in investigating the Legionnaires' disease outbreak. Ms. Miller had the power and ability to provide additional assistance or request epidemiologic assistance from the CDC but she failed to do so until after public notification was made, even when GCHD themselves requested CDC's assistance.

In July 2015, Ms. Miller was aware that one of her epidemiologists, Cristin Larder, had determined that the blood lead levels in Flint children in the summer of 2014 were higher than previous years and that it warranted further investigation. However, Ms. Miller chose to play politics by instructing others not to take action

and to delete emails pertaining to Ms. Larder's report. Despite knowledge and access to data evidencing elevated blood lead levels from her own staff, on September 17, 2015, Ms. Miller reminded MDHHS staff that "[p]er the MDEQ, the compliance monitoring for lead within the city has never exceeded the EPA action level for lead." Worse yet, after the blood lead level issues became public, Ms. Miller pressured MDHHS staff to provide false statements to the media regarding reports of elevated blood lead levels. Ms. Miller was criminally charged for her involvement.

    4.  <u>Linda Dykema</u>
        Assistant Attorney General Zachary C. Larsen
        Michigan Department of Attorney General
        P.O. Box 30755
        Lansing, MI 48909

Linda Dykema ("Dykema") was the Director of the Division of Environmental Health at MDHHS from May 2014 to October 2016. Her duties included serving as a liaison to the MDEQ, managing the toxicology and response section, and conducting public health assessments of environmental contamination. Ms. Dykema also oversaw the Lead Hazard Remediation Program, responsible for assessing and cleaning up lead contaminated housing.

Ms. Dykema became aware of the Legionnaires' disease outbreak in January 2015 and had discussions with Corrine Miller about the correlation between the water switch and the increase in the cases of Legionnaires' disease. In effort to

protect her department and the Governor from an "embarrassing" and "difficult situation," Ms. Dykema instructed MDHHS employees to refer calls from the public complaining about the water to her attention, warning that "there is a political situation that we don't want to stumble into should we get hotline calls."

Ms. Dykema also worked with the MDEQ beginning in and about July 2015 to downplay the seriousness of the lead issues and other health concerns related to the water and to diminish and disparage Mr. Del Toral. On July 23, 2015, Ms. Dykema reiterated to several MDHHS officials, including Corrine Miller, Nancy Peeler, and the "front office," that the city is in compliance with the lead and copper rule and that Mr. Del Toral's report was "issued as a result of his own research and …not reviewed or approved by EPA management. He has essentially acted outside his authority."[95] On September 29, 2015, after Dr. Mona Hanna- Attisha's work became public, Ms. Dykema expressed to other MDHHS officials the need for the department to have a unified response: "It's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." Ms. Dykema has since expressed her frustration that the department did not share the lead concerns with the public sooner. Ms. Dykema, in her role as the Director of

---

[95] July 23, 2015, 10:07 AM Linda Dykema Email to DCH Employees ("RE: Director's Office Assignment – Flint – need update asap").

the Division of Environmental Health, failed in her duties to investigate, prevent, and control environmental health hazards. By her conduct, she exacerbated the plaintiffs' injuries and damages.

5. Eden Wells
   Assistant Attorney General Zachary C. Larsen
   Michigan Department of Attorney General
   P.O. Box 30755
   Lansing, MI 48909

   Attorney Steven Ramontin
   24 Frank Lloyd Wright Dr Ste D2000
   Ann Arbor, MI 48105

Dr. Eden Wells ("Wells") was the Chief Medical Executive for MDHHS and held that position since May 1, 2015. Prior to that, Dr. Wells served as the Associate Chief Medical Executive from January 1, 2015 to May 1, 2015. Pursuant to M.C.L. 333.2202, if the Director of MDHHS is not a physician, the director "shall designate a physician as chief medical executive of the department. The chief medical executive shall be a full-time employee and shall be responsible to the director for the medical content of policies and programs." Dr. Wells' duties included assisting with disease outbreak coordination and investigation and to provide the department with professional medical guidance.

Dr. Wells was aware of the Legionnaires' disease outbreak as early as May 2015. She was consistently informed and updated on the nature and scope of the outbreak during 2015. However, she and MDHSS did not inform the public about

the outbreak until January 16, 2016. Dr. Wells failed to take steps to investigate the source of the outbreak or notify the public. Moreover, Dr. Wells actively participated in efforts to undermine the Genesee County Health Department's ("GCHD") attempts to investigate the outbreak and notify the public, accusing GCHD officials of "going behind [MDHSS'] back" and not being a "team player." Dr. Wells was aware of the report of elevated blood lead levels as early as August 2015 and took steps to limit scientific access to data and downplay the reports in the media. Despite her duty to protect the public from health outbreaks and alert the public of known dangers, Dr. Wells failed to act accordingly and was charged criminally for her conduct.

6. <u>Nancy Peeler</u>
   Attorney Michael S. Cafferty
   Michael S. Cafferty & Assoc.
   333 W. Fort Street
   Suite 1400
   Detroit, MI 48226

   Attorney Harold Z. Gurewitz
   Gurewitz & Raben, PLC
   333 W. Fort Street, Suite 1400
   Detroit, MI 48226

Nancy Peeler ("Peeler") was Director of the Maternal, Infant and Early Childhood Home Visiting Program ("MIECHV") at MDHHS during the relevant time frame. MIECHV program is designed to promote maternal, infant and early childhood health, development and safety. This program includes the State's

childhood lead poisoning prevention program, which provides education and outreach regarding lead hazards and the impact of lead poisoning and maintains a registry of blood lead levels throughout the state. Ms. Peeler was specifically assigned the task of responding to an inquiry from the MDHHS Director's office regarding elevated lead levels and the potential impact on public health.

By July 2015, the MDHHS knew that there was a spike in elevated blood lead levels among Flint's children. Prior to July 2015, MDHHS had the necessary data to analyze the issue of elevated blood lead levels but failed to do so. Ms. Peeler, who is not an epidemiologist herself, assigned MDHHS' epidemiologists to evaluate any increase in child blood lead levels in the summer of 2014 that may be attributable to the change in drinking water from Lake Huron to the Flint River. On July 28, 2015 MDHHS epidemiologist Cristin Larder found and reported to Ms. Peeler that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." Despite this, Ms. Peeler falsely reported that there was no significant jump in lead levels other than the normal, seasonal variation. Ms. Peeler's report was brought to the Director and ultimately to the Governor's office. When Ms. Larder again reported that, based on additional data provided to her, there was still "a higher proportion of EBLL last summer than usual," Ms. Peeler took no steps to correct her report to the Director and Governor or to conduct a

102

further analysis. Ms. Peeler effectively buried Ms. Larder's work, choosing politics over public health.

Further, Ms. Peeler took steps in line with her department to disparage Dr. Mona Hanna-Attisha's work and further to mislead the public regarding any correlation between elevated blood lead levels and the change in the source of the drinking water. On September 23, 2015 Ms. Peeler sent an email internally to MDHHS staff stressing the "seasonal impact associated with lead poisoning" and insisting that staff hold forth with the talking point that "[w]e do NOT see a different pattern of results for the 2014-2015 year, right after the change in the water source." On September 24, 2015, Ms. Peeler proofread a response drafted by Robert Scott to Professor Marc Edward's request for data on blood lead levels and expressing his frustration about the state's lack of response. Ms. Peeler instructed Mr. Scott to "apologize less" and explicitly warned: "The email you received could be read as an intent to escalate and spin things, and I don't think you need to get caught up in that."

On September 25, 2015, a day before Dr. Mona Hanna-Attisha's work became public, Ms. Peeler communicated with MDHSS leaders stating:

> Based on questions coming through, I do think we need to run our Flint charts for the same population group that the Flint docs ran (as close as we can approximate the sample) but I'd look at it across the five years again. Depending on what our charts show, we may want to consider having (state epidemiologists) help us run an analysis more

like the docs ran – but let's look at the revised charts as a starting point.

That same day, Ms. Peeler assigned Mr. Scott to respond to a Detroit Free Press article about lead increases in Flint and expressed her "secret hope…that we can work in the fact that this pattern is similar to the recent past." The next         day, despite her knowledge of elevated childhood blood lead levels nearly two months prior, Ms. Peeler acquiesced to Director Lyon's mandate to send a strong message of "season variation." Specifically, Ms. Peeler coordinated with Robert Scott and MDHHS's Deputy Director for External Relations and Communications Geralyn Lasher to "put[] together talking points about this 'study' that the physicians will be discussing that claims an increase in elevated blood levels in children since the change to the water system source." Ms. Peeler was criminally charged for her deception and failure to act in accordance with her duties.

       7.  <u>Robert Scott</u>
          Attorney Mary Chartier-Mittendorf
          1905 Abbot Road, Suite 1
          East Lansing, MI 48823

Robert Scott ("Scott") was the Data Manager for the Healthy Homes and Lead Prevention program Childhood Lead Prevention Program. Mr. Scott, who is not an epidemiologist, was responsible for tracking and organizing child blood lead level data for the program. In July 2015, Mr. Scott was asked by Nancy Peeler to assist  in providing  a  limited  data  set  to  MDHHS  epidemiologists  to  determine

whether there was an increase in child blood lead levels in Flint related to the change in the source of drinking water from Lake Huron to the Flint River. After MDHHS epidemiologist Cristin Larder reported on the morning of July 28, 2015 that there was, in fact, an increase in child blood lead levels in the summer of 2014, Mr. Scott took it upon himself to also analyze state data. Before receiving the final report from Ms. Larder, Scott wrote to Ms. Peeler:

> I said this morning I'd look to see if the distribution of (elevated blood lead levels) in the July-September 2014 'spike' was any different from the typical distribution of (elevated blood lead levels) in Flint. I compared totals by zip code vs. totals by zip code from 2010. The pattern is very similar and is further evidence, I think, that the water was not a major factor here.

Scott chose to ignore the experts in his own department and his obligation to protect the public health by advancing efforts to ignore and to bury Ms. Larder's work.

Upon receipt of a September 11, 2015 email from Professor Marc Edwards describing "severe chemical/biological health risks for Flint residents" related to corrosion of pipes, Mr. Scott forwarded the information to several MDHHS colleagues, including Nancy Peeler, writing: "[s]ounds like there might be more to this than what we learned previously. Yikes!" Mr. Scott also participated in efforts to discredit Dr. Mona Hanna-Attisha's work. On September 24, 2015, Mr. Scott attempted to recreate Dr. Hanna-Attisha's work, and, ignoring the work of MDHHS epidemiologists and despite a lack expertise in the field, informed Ms.

105

Peeler that he saw a difference between the two years, but not as significant as Dr. Hanna-Attisha's. The following day, Mr. Scott instructed MDHHS staff to inform the Detroit Free Press that "[w]hile the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall." Mr. Scott was criminally charged for his deception and failure to meet his duties to the public.

8. <u>Jim Collins</u>
333 S. Grand Ave
Lansing, Michigan 48909

Jim Collins ("Collins") was the Director of the Communicable Disease Division at MDHHS. As Director of the department, his duties included oversight and responsibility for providing support and consultation to local health departments closely monitor and track disease outbreaks. Additionally, the division was responsible for collecting and analyzing data on communicable diseases, assist in strategies to control disease, and, when necessary, partner with the Centers for Disease Control ("CDC") on issues related to communicable diseases. Mr. Collins division also includes oversight of the emergency notification network and Michigan Disease Surveillance System ("MDSS"), including "surveillance and control of respiratory infections, such as influenza and legionellosis."

In October 2014, Collins was informed of an "ongoing Legionnaires' increase in Genesee County" including 30 cases reported into the MDSS since June 2014, and a potential correlation with the Flint River water as nearly all of the cases had been mapped in Flint. Collins was aware at that time of conversations between his staff and the DEQ, including that the governor's office had been involved with complaints about the Flint water and that "any announcement by public health about the quality of the water would certainly inflame the situation." MDHHS assured MDEQ staff that they would work with Genesee County to coordinate water testing.

By January, Collins had concerns about GCHD's progress in investigating the Legionaries' disease outbreak, noting that "we believe that this increase warrants additional evaluation on the part of public health" and acknowledging the "pressures on [GCHD] of late from the public and media alike about the water quality questions in Flint." GCHD responded by requiring MDHHS' assistance with additional testing of clinical and environmental samples and obtaining information from MDEQ. Despite this request, from September 2014 to May 2015, MDHHS provided GCHD with no information related to the status of the Legionella outbreak, and never sent any staff members to assist GCHD's efforts including obtaining environmental or clinical samples.

107

After the GCHD requested assistance from the CDC in February and April 2015, Collins subsequently issued a memorandum in June 4, 2015, CC'ing the CDC, declaring the Legionella outbreak despite the fact that two new cases were reported on June 1 and June 2 in MDHHS' surveillance reporting system. Collins also harshly criticized GCHD's efforts to contact the CDC: "Relative to communications around the investigation, I believe that CDC is in agreement that their involvement really should be at the request of the state, rather than the local health department. To be clear, we do value the skills and resources of our CDC colleagues, but we also recognize that their involvement needs to have some structure. I want to reinforce the necessity that investigation communications from the Genesee County Health Department need to be directed to staff at the MDHHS."

   9. Dr. Matthew Davis
      300 North Ingalls, 6A18
      Ann Arbor, MI 48109-5456

Matthew M. Davis ("Davis") was the Chief Medical Executive from March 2013 to April 2015. Pursuant to M.C.L. 333.2202, the chief medical executive is responsible to the director of MDHHS for the medical content of policies and programs. Dr. Davis' duties included assisting with disease outbreak coordination and investigation and to provide the department with professional medical guidance. Dr. Davis was notified of the Legionnaires' disease outbreak and the

potential correlation to the change in water source by January 2015. Dr. Davis failed to investigate or assess the degree of the public health risk, failed to effectively cooperate with other state agencies in the interest of public health, and failed to properly advise his own department or the director of the need to investigate and respond. Dr. Davis' actions resulted in a lack of public notification and harm to the plaintiffs.

10. Jay Fiedler
   333 S. Grand Ave
   Lansing, Michigan 48909

Jay Fiedler ("Fiedler") was the Section Manager for the Infectious Diseases Surveillance Epidemiology Section at MDHHS during the relevant time frame. Fiedler's duties at MDHHS include monitoring disease outbreaks and coordinating with the local health departments. By October 2014, Mr. Fiedler was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Mr. Fiedler knew of the frustrations by local health officials in investigating the Legionnaires' disease outbreak. Mr. Fiedler failed to provide the necessary information to assist in the effective coordination of data for the protection of public health and was openly critical of the Genesee County Health Department's efforts. Mr. Fiedler has admitted that public notice of the outbreak should have been provided by MDHHS early in 2015.

109

11. <u>Susan Bohm</u>
    333 S. Grand Ave
    Lansing, Michigan 48909

Susan Bohn ("Bohn") was the Unit Manager for the Respiratory Disease Epidemiology Section at MDHHS during the relevant time frame. Ms. Bohn's duties included monitoring and investigating respiratory disease outbreaks, including Legionnaire's disease. By October 2014, Ms. Bohn was aware of a potential correlation between an uptick in Legionnaires' disease and the switch to Flint River water. Despite her knowledge and duties, Ms. Bohn coordinated with MDEQ officials to downplay any correlation, stating that "the Flint water was at this point just a hypothesis." Ms. Bohn also communicated to other MDHHS staff members MDEQ's concern that "any announcement by public health about the quality of the water would certainly inflame the situation."

12. <u>Tim Bolen</u>
    333 S. Grand Ave
    Lansing, Michigan 48909

Tim Bolen ("Bolen") was an epidemiologist at MDHHS during the relevant time frame. Mr. Bolen had direct communications with staff at McLaren Hospital in June and September 2014 about a Legionnaire's disease outbreak. By October 2014, Mr. Bolen knew that the source of the outbreak was likely correlated to the Flint municipal water. Mr. Bolen failed to act accordingly to protect the public health and ensure public notification.

13. James Rudrik
   333 S. Grand Ave
   Lansing, Michigan 48909

James Rudrik ("Rudrik") was the Director of the Infectious Disease Division at MDHHS during the relevant time frame. By October 2014, Mr. Rudrik knew that the source of the outbreak was likely correlated to the Flint municipal water. Mr. Rudrik participated in the lack of urgency displayed by MDHHS in failing to properly investigate or notify the public of a disease outbreak.

**E. Flint Emergency Managers.**

As part of its responsibility to safeguard the credit of the state, the Department of the Treasury oversaw the Emergency Managers appointed by the Governor. The Emergency Manager law, promulgated by the Legislature through Public Act 72 of 1990,[96] authorized the state to intervene in units of local government that experience financial emergencies. According to a public communication by the Governor, State Treasurer Andy Dillon was charged with "leading the administration's effort to ensure emergency managers that may be necessary in the future are properly trained." In the same communication, the

---

[96] The financial emergency status, along with the Emergency Financial Manager (EFM) position, was first created in Public Act 101 of 1988 for the specific emergency in Hamtramck. Public Act 101 was amended by Public Act 72 of 1990, allowing an Emergency Financial Manager to be appointed for any local governmental unit. PA 72 in turn was replaced by Public Act 4 of 2011, which renamed the position to Emergency Manager (EM) and gave the Manager additional authority.

Governor declared that "Emergency managers are accountable to both the  governor and the Legislature. …"[97] An Emergency Manager stands in the place of the governing body, chief executive officer, or chief administrative officer of the local government and has the authority to remove any of the unit's elected officials should they refuse to provide any information or  assistance.  The  Flint  Emergency Managers had complete control over the municipality with the ability to reduce pay, outsource work, reorganize departments, modify employee contracts, and determine municipal business activities, including the sale and delivery of drinking water to Flint residents and operation of the Flint Water Treatment Plant.[98]

Emergency managers have broad authority and powers to "rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." Because the Emergency Managers were appointed by, and accountable to, the Governor and Legislature and because they were trained by, and reported directly to the State

---

[97]    State    of    Michigan,    *Emergency    Manager    Fact    Sheet*, https://www.michigan.gov/documents/snyder/EMF_Fact_Sheet2_347889_7.pdf (last visited July 12, 2019).
[98] Longley, Kristin, *Other emergency managers provide glimpse of what Flint can expect under state takeover,* Flint Journal (November 18, 2011), *available at* http://www.mlive.com/news/flint/index.ssf/2011/11/other_emergency_managers_p rovi.html (last visited July 12, 2019).

Treasurer, the State of Michigan is charged with knowledge of all facts and circumstances known by them and with responsibility for their acts and omissions. In addition, because the sale and delivery of drinking water is deemed a municipal business activity under Michigan decisional law, the City of Flint is responsible for their acts and omissions related to drinking water as well.

The identity of each of Flint's Emergency Managers, his time in office, and the Governor who appointed him is set forth in this chart:

| Jul 2002 - Jun 2004 | Ed Kurtz | John Engler |
|---|---|---|
| Dec 2011 - Aug 2012 | Michael Brown | Rick Snyder |
| Aug 2012 - July 2013 | Ed Kurtz | Rick Snyder |
| July 2013 - October 2013 | Michael Brown | Rick Snyder |
| October 2013 - January 2015 | Darnell Earley | Rick Snyder |
| January 2015–April 30, 2015 | Jerry Ambrose | Rick Snyder |

The State of Michigan charged Darnell Earley and Gerald Ambrose with serious crimes arising from their acts and omissions while serving as Emergency Managers for the City of Flint.  The plaintiffs admit that Darnell Earley, Gerald

Ambrose, and Ed Kurtz intentionally caused them bodily harm (in the form of invasion of their bodily integrity).[99]

> 1. Darnell Earley
>    Attorney Todd Russell Perkins
>    615 Griswold
>    Suite 400
>    Detroit, MI 48226

Darnell Early ("Earley") was appointed Emergency Manager for the City of Flint from October 2013 to January 2015. Early readily admits that he was responsible for ensuring that the City of Flint was in compliance with state and federal laws regarding safe drinking water. Mr. Early played an integral role in authorizing and coordinating full-time operation of the Flint Water Treatment plant and the use of the Flint River as its drinking water source despite known public health hazards. In March 2014, one month prior to the change from Lake Huron to the Flint River, Mr. Earley was aware that the Flint water treatment plant did not have the appropriate resources, upgrades, or regulatory requirements to distribute drinking water safely. In a letter to the Detroit Water and Sewer Department, Mr. Earley acknowledged: "in the very unlikely event that the City of Flint is not able to draw water from the Flint River no later than April 17, 2014, then the City would like the option of continuing to purchase water from the DWSD, for a

---

[99] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

period of time, up to the time water is available from KWA." Mr. Earley intentionally mislead the public by falsely stating that the plant was capable of producing safe drinking water and by authorizing its distribution.

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Earley consistently refused to acknowledge water quality issues.  In October 2014, after learning of a spike in cases of Legionnaires' disease, Mr. Early obstructed and hindered the local health department's investigation into the disease outbreak. Specifically, Mr. Early insisted that the City's "message" should be that the outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve." After boil-water advisories and TTHM violations were issued by the City and General Motors Corporation's exit from the Flint water distribution, Mr. Early was contacted by the governor's office regarding public health concerns and a request to return to the DWSD "as an interim solution to both the quality, and now the financial, problems that the current solution is causing." However, Mr. Early refused, placing financial obligations over public health.

On January 9, 2015, after the University of Michigan-Flint water tests revealed high lead levels in two separate campus locations elevating water quality concerns, Mr. Earley again refused the opportunity to return to DWSD. In a press release, Mr. Early stated:

Suggestions have been made that the City of Flint should return to using water purchased through the Detroit Water and Sewerage Department. For many reasons financial and otherwise the City of Flint can ill-afford to switch courses at this point. Thus, we will continue following the guidelines and directives of the Michigan DEQ in the implementation of our water quality plan and operational report until the KWA water source is available. The estimated cost to go back to the water provided by DWSD is approximately $1 million per month and the City expects to be using the [KWA] Lake Huron water within the next eighteen months. It is not financially prudent to spent $18 million to purchase water that meets the same DEQ standards as the water now available from the Flint River.

Mr. Earley refused overtures on the DWSD for a third time on January 12, 2015 when DWSD Director offered Mr. Earley immediate reconnection "to the DWSD system at no additional charge to the City and at the same 'expired contract' rate that the City was paying in April, 2014." Mr. Early violated his duties by failing to provide necessary governmental services essential to the public health, safety, and welfare through his deliberate indifference to state and federal safe drinking water regulations, water quality, and the public health. Mr. Earley  was criminally charged for his acts and omissions. His conduct caused the plaintiffs' alleged injuries and damages.

> 2. <u>Gerald Ambrose</u>
>    Attorney Barry A. Wolf
>    Barry A. Wolf, Attorney at Law, PLLC
>    503 S. Saginaw Street, Suite 1410
>    Flint, MI 48502

Gerald Ambrose ("Ambrose") was the Emergency Manager for the City of Flint from January 2015 to April 2015. Mr. Ambrose previously served as  a

financial advisor to the city, responsible for analyzing the cost benefit to the City of participating in the KWA as compared to continuing to purchase water from the DWSD. Prior to his tenure as Emergency Manager, Mr. Ambrose played an integral role in assuring the success of the KWA through Flint's participation, including involvement in the Administrative Consent Order and use of the Flint River as an interim source.

In October 2014, Ambrose expressed frustration with the "instant connection" between the uptick in Legionnaires' disease and Flint Water, criticizing Michael Glasgow's assistance in testing for bacteria. In January 2015, Mr. Ambrose assisted Mr. Early in crafting a response to the DWSD, rejecting the offer to return despite water quality concerns. In February 2015, city councilman Joshua Freeman requested that Mr. Ambrose revisit DWSD's invitation to rejoin, however, Mr. Ambrose responded by stressing the importance of cost over public health, stating "[n]o [matter] how many times you send it to me, it doesn't change the cost (or my mind)." In his role as Emergency Manager, Mr. Ambrose knew of increasing public health concerns and water quality problems. Despite his knowledge, on March 25, 2015, after Flint City Council voted to reconnect to DWSD, Mr. Ambrose rejected the decision and falsely stated: "[i]t is incomprehensible to me that... Flint City Council would want to send more than

$12 million a year to the system serving Southeast Michigan, even if Flint rate

payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint." Despite his duty to provide services necessary for the public health, Mr. Ambrose consistently placed financial concerns over the health of the citizens and, despite his power to do so, repeatedly declined officers to reconnect to DWSD. Mr. Ambrose was criminally charged for his acts and omissions. His conduct caused the plaintiffs' alleged injuries and damages.

3. Ed Kurtz
   Attorney Michael J. Gildner
   Simen, Figura and Parker, PLC
   5206 Gateway Centre
   Suite 200
   Flint, MI 48507

Ed Kurtz ("Kurtz") served as Flint's Emergency Manager from August 2012 to July 2013. Mr. Kurtz was instrumental in Flint's decision to leave the DWSD and join the KWA and ignored compelling arguments from both an engineer and economics standpoint that Flint should reject the pressures to join the KWA. When the option was being considered, on January 7, 2013, Mr. Kurtz received an Assessment and Cost Analysis from Rowe Professional Services.[100] That engineering study was one of the key first steps in switching to the Flint River as a drinking water source. Mr. Kurtz knew that "[w]ater from the river will require greater effort to treat than water from Lake Huron (more chemicals, power, and

---

[100] January 7, 2013 Rowe Professional Services Company Letter to Ed Kurtz ("Review of TYJT December 21, 2012 Presentation – City of Flint Water Supply Assessment").

118

residuals)."[101] At this time, one of the main considerations was a blending of Flint River water with DWSD water, and even then it was acknowledged that "there is a potential for challenges with chemistry and treatment."[102] With this knowledge, Mr. Kurtz signed off on the March 28, 2013 Resolution to Purchase Capacity from the KWA that described it as being "in the long term best interests of the City of Flint to enter into a contract with the KWA." Kurtz enabled this disaster; with his powers as Emergency Manager he led Flint down this perilous path. His conduct caused or contributed to the plaintiffs' alleged injuries and damages.

4.  Michael Brown
    Attorney William Young Kim
    City of Flint
    1101 S. Saginaw Street
    Third Floor
    Flint, MI 48502

Michael Brown ("Brown") served as the Emergency Manager for the City of Flint from December 1, 2011 to August 5, 2012. At a February 10, 2011 meeting, Mr. Brown participated in discussions regarding the options for Flint's future water supply sources. At that time, the discussion included "continued service from Detroit, establishing a new surface water source from Lake Huron – Karegnondi project (as a joint venture with other communities), or utilization of Flint's existing resources." Brown was also Flint's Emergency Manager from July 2013 to

---

[101] *Id.*
[102] *Id.*

October 2013. In September 2013, Mr. Brown "approved an order for a contract among Flint, Genesee County and the KWA." This contract was a precipitating event of the Flint water crisis. Mr. Brown, in his role as Emergency Manager, was a key factor in these early decisions that ultimately led to Flint leaving the DWSD and joining the KWA.

### F.  City of Flint

Attorney William Kim
City of Flint Law Dept.
1101 S. Saginaw St.
Flint, MI 48502

The City of Flint is a body politic incorporated in 1855. Like the State of Michigan, the City of Flint is a body politic that acts through its executive branch (including specifically the various Emergency Managers appointed by the Governor), departments and boards, officers, and employees. Consequently, the acts and omissions of its Emergency Managers, departments and boards, officers, and employees undertaken within the scope of their employment, constitute the acts and omissions of the City. Likewise, knowledge acquired by its Emergency Managers, departments and boards, officers, and employees acquired within the scope of their employment is imputed to the City. In consequence, the City cannot plead innocence by asserting that the information obtained by different Emergency Managers, several departments and boards, officers, and employees was not acquired by any one individual employee who then would have comprehended its

full import. Rather, the City is considered to have acquired the collective knowledge of its Emergency Managers, departments and boards, officers, and employees and is held responsible for their failure to act accordingly.[103]

Flint is the largest city in, and seat of, Genesee County and currently has a population of approximately 102,000. From the late 19th century to the mid-20th century, the city (known as "Vehicle City") was the site for leading manufacturers of carriages and later automobiles. General Motors Corporation was founded in Flint in 1908 and grew into the largest automobile manufacturer in the world. General Motors Corporation housed its Buick and Chevrolet divisions in Flint until the 1970s. General Motors Corporation significantly downsized its workforce in the Flint area from a 1978 high of 80,000 to under 8,000 by 2010. Flint's population declined dramatically from 196,940 in 1960 to 102,434 in 2010. Flint's historical population data follows.

---

[103] *In re NM Holdings Co., LLC*, 622 F.3d 613, 620 (6th Cir. 2010) (*citing Upjohn Co. v. N.H. Ins. Co.*, 438 Mich. 197, 76 N.W.2d 392 (1991)).

| Historical population | | |
|---|---|---|
| **Census** | **Pop.** | **%±** |
| **1850** | 1,670 | — |
| **1860** | 2,950 | 76.6% |
| **1870** | 5,386 | 82.6% |
| **1880** | 8,409 | 56.1% |
| **1890** | 9,803 | 16.6% |
| **1900** | 13,103 | 33.7% |
| **1910** | 38,550 | 194.2% |
| **1920** | 91,599 | 137.6% |
| **1930** | 156,492 | 70.8% |
| **1940** | 151,543 | −3.2% |
| **1950** | 163,143 | 7.7% |
| **1960** | 196,940 | 20.7% |
| **1970** | 193,317 | −1.8% |
| **1980** | 159,611 | −17.4% |
| **1990** | 140,761 | −11.8% |
| **2000** | 124,943 | −11.2% |
| **2010** | 102,434 | −18.0% |
| **Est. 2017** | 96,448 [5] | −5.8% |

According to the 2010 census, the racial makeup of the city was 56.6% African American, 37.4% White, Hispanic or Latino of any race 3.9%, Native American, 0.5% Asian, 1.1% from other races, and 3.9% from two or more races. Non-Hispanic Whites were 35.7% of the population in 2010, compared to 70.1% in 1970.

Flint's various neighborhoods historically have been divided along racial lines with the population density and the quality of housing stock following suit.[104] Many (if not most) of Flint's neighborhoods were comprised of poorly constructed wood frame structures sealed or coated in lead paint.[105] According to Realty Trac,  a real estate information company and an online marketplace for foreclosed and defaulted properties, by January 2016, 9,800 homes were empty in Flint, constituting 16.5 percent of all residential properties. By the mid-2000s, Flint became known for its high crime rates and has repeatedly been ranked among the most dangerous cities in the United States. Danielle Lewinski, vice president and director of Michigan initiatives at the Center for Community Progress, explained the implications of industrial disinvestment, declining population, and property abandonment on cities like Flint:

---

[104] Indeed, Flint was one of the first "red-lined" cities in the nation.

[105] Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015).

Distressed cities like Flint struggle to generate enough revenue locally to reinvest back into critical infrastructure, such as water systems. Decades of disinvestment and job and population loss have led to a phenomenal erosion of the tax base, both in terms of the number of taxpayers and in terms of the value of the land. As a result, cities with high levels of abandonment, like Flint, are faced with the financial challenge of needing to maintain and reinvest in a scale of infrastructure that was once supported by a tax base more than twice its current size.[106]

**The City of Flint's Relevant Departments and Boards and Senior Staff: Mayor Dayne Walling; Flint Department of Public Works; Flint Water Treatment Department; Daugherty Johnston (Utilities Manager); Brent Wright Water Plant Supervisor); Howard Croft (Director of Flint Department of Public Works); Michael Glasgow (Water Quality Specialist); Natasha Henderson (City Administrator).**

1. Dayne Walling
   Attorney William Kim
   City of Flint Law Dept.
   1101 S. Saginaw St.
   Flint, MI 48502

Dayne Walling ("Walling") is the former mayor of the City of Flint and Chairman of the KWA Board. He was in office from August 6, 2009 through November 3, 2015. In part for his own personal political gain, Mayor Walling was a strong proponent of the KWA, actively participating in the success of the project and the development and use of the Flint River as an interim drinking water source. Despite emergency management, Walling was a critical public advisor during the

---

[106]Kate Abbey-Lambertz, *There Are The American Cities With The Most Abandoned Homes*, Huffington Post (February 13, 2016), *available at* https://www.huffingtonpost.com/entry/cities-with-most-abandoned-houses-flint_us_56be4e9ae4b0c3c5505171e7 (last visited July 12, 2019).

time period of the change in the source of drinking water from Lake Huron to the Flint River and was a pivotal advocate in communications with residents, the city council, and local agencies on matters related to the Flint River and implications on the city's finances and public health.

Prior to the change in the source of drinking water from Lake Huron to the Flint River in April 2014, Mayor Walling was aware of the required upgrades to the Flint water treatment plant to service the residents of Flint, the lack of financial resources to do the work properly, and the potential dangers of using the Flint River as an interim drinking water source. After the change in the source of drinking water from Lake Huron to the Flint River, Mayor Walling repeatedly sought to reassure the public that the water was safe, even though he knew of reports of Legionnaires' disease and lead contamination. Indeed, Mayor Walling publicly declared that the Flint River water was "regular, good, pure drinking water, and it's right in our backyard." In response to complaints about the water two months after the change in the source of drinking water from Lake Huron to the Flint River, Mayor Walling remarked that he thought "people [were] wasting their precious money buying bottled water."

In April 2015, after the city's financial emergency was declared over, Mayor Walling regained control of his elected office. That same month, he assured the public that his family "drink and use the Flint water every day, at home, work,

and schools" and stated that the water was comparable to Lake Huron water. Mayor Walling communicated with EPA Region 5 Director Susan Hedman regarding Mr. Del Toral's interim report, advising her that Mr. Del Toral was speaking publicly about a potential crisis. With knowledge of the interim report and a potential widespread lead contamination, Mayor Walling boastfully drank Flint water in a television broadcast in Jul 2015, for the specific purpose of giving Flint residents a sense of safety.

### 2. Flint Department of Public Works
   1101 Saginaw St # 105
   Flint, MI 48502

Flint's Department of Public Works (DPW) had the primary duty to operate, maintain, and manage the water supply on a day-to-day basis, to comply with state and federal law to assure the safety of the public drinking water supply, and to coordinate with the MDEQ on issues of staffing, engineering, corrosion control, and sampling protocols. The DPW failed in its duties by knowingly permitting contaminated water to be provided to the public despite lack of necessary upgrades, prepared staff, and water treatment. Additionally, the DPW failed to establish an appropriate sampling pool under the LCR and worked with the MDEQ to collect improperly water samples for testing and falsified test results to achieve technical compliance under the SWDA. These acts and omissions resulted in a

significant underreporting of water contaminants and a prolonging of the distribution of contaminated water to the citizens of Flint.

> 3. Daugherty Johnson
> Attorney Edwar A. Zeineh
> Law Office of Edwar A. Zeineh, PLLC
> 2800 E. Grand River Ave.
> Suite B
> Lansing, MI 48912

Daugherty Johnson ("Johnson") served as the Utilities Administrator for the City of Flint had held that position since 2012. Johnson worked for the City of Flint for over 30 years and answered to Howard Croft during 2012 – 2016 time period. As Utilities Administrator, he had a duty to oversee the operations of the Flint Water Treatment Plant, including, specifically, its compliance with state and federal standards.

Mr. Johnson actively participated in the decision to join the KWA and use the Flint River as an interim water source. Mr. Johnson was present and participated in discussions on May 1, 2012, when Flint's future drinking water options were being decided. Mr. Johnson knew from these discussions (as memorialized by MDEQ's Mike Prysby), that changing the source of drinking water from Lake Huron to the Flint River would necessarily mean its lead and copper monitoring program would change. From 2013-2014, Mr. Johnson worked with Flint Water Treatment Plant staff and the MDEQ to determine the necessary

upgrades, drinking water treatment requirements, and additional staffing needed to

127

bring the plant into full time operation. Throughout the process of transitioning the change in the source of drinking water from Lake Huron to the Flint River, Mr. Johnson actively took steps to discourage a return to Lake Huron water while pressuring employees to get the Flint Water Plant operational at any cost, stating that they would be "heroes" if they changed the source of drinking water from Lake Huron to the Flint River and saved the City money.

Mr. Johnson knew in March 2013 that the Flint Water Treatment Plant was not ready to distribute drinking water because it had not completed the necessary upgrades and was not adequately staffed with qualified, competent engineers and technicians. In April 2014, in callous defiance of the warnings from the Flint Water Treatment Plant employees, Mr. Johnson gave his "administrative stamp of approval" permitting and pressuring the Flint Water Treatment Plant employees to release contaminated water to the public. Mr. Johnson falsely praised the system after the change in the source of drinking water from Lake Huron to the Flint River, calling it a "great system" and a "great asset" for the City. Mr. Johnson dug in and refused to acknowledge that Flint had a serious health problem. Mr. Johnson worked with Emergency Manager Ambrose to draft a "thanks…but no thanks" response to DWSD's January 21, 2015 offer to reconnect to Lake Huron drinking water.

Mr. Johnson undertook other efforts to minimize and conceal the public health risks, including GCHD's investigation into the Legionnaires' disease outbreak. After the city refused to respond to the health department's FOIA request for water test results, on February 5, 2015, Mr. Johnson responded the he would "fulfill [the] request as soon as possible" but took no action to provide the results or to cooperate with the investigation. Mr. Johnson was criminally charged for conspiracy to commit false pretenses by intentionally misleading the public about the safety of the water and for violating his duties, including failing to ensure that the Flint Water Treatment plant was capable of producing safe water. The plaintiffs admit that Mr. Johnson intentionally caused them bodily harm (in the nature of interference with their bodily integrity).

4. <u>Howard Croft</u>
Attorney Alexander S. Rusek
White Law PLLC
2549 Jolly Road
Suite 340
Okemos, MI 48864

Howard Croft ("Croft") was the Director of the Flint Department of Public Works during through November 2015. As Director of DPW, Mr. Croft was responsible for overseeing the Utilities Department for the City of Flint, including the provision of safe drinking water to residents. Mr. Croft was involved in the decision to use the Flint River as an interim drinking water source and a strong advocate of the KWA. By February 2012, Mr. Croft had met with KWA

129

representatives to discuss Flint's involvement in it and the use of the Flint River as an interim source for drinking water, reporting to then Emergency Manager Michael Brown his belief that under a "best case scenario" Flint River could be used as a temporary solution with the approval of the MDEQ.

Mr. Croft was aware that, for decades, the Flint Water Treatment Plant had been used for emergencies only and lacked the manpower and operational capabilities to be fully operational as the primary supplier of safe drinking water. Several city and county individuals, including Robert Bincsik, Water Distribution Supervisor, and Michael Glasgow, Flint's Laboratory and Water Quality Supervisor, repeatedly warned Mr. Croft, about the plant's lack of staffing and resources and its inability to produce safe water. Despite these explicit warnings, Mr. Croft participated with Mr. Johnson to pressure the Flint Water Treatment Plant employees to distribute drinking water to City residents. In June 2014, after the change in the source of drinking water from Lake Huron to the Flint River, Mr. Bincsik brought Mr. Croft a pipe from the City's distribution system that was bare inside, having lost all of its inner diameter protection from the corrosivity of the water. Despite knowledge of the water's corrosivity and the destruction of protective scale on pipes' inner surfaces, Mr. Croft failed to act and continued falsely to assure the public that the water was "high quality" and in compliance with all state and federal standards.

By March 2015, Mr. Croft knew that Legionnaires' disease had increased in the City of Flint and that the City's employees were not cooperating with County health officials. Mr. Croft participated in Flint's Technical Advisory Committee and worked directly with residents regarding water quality concerns. Mr. Croft knew that residents and professionals were concerned about health issues regarding TTHMs in the water supply and that public believed that he was "in charge not just of the water but of the public trust." Mr. Croft consistently responded to resident concerns dismissively, on one occasion by rolling his eyes and stating, "[N]ow we are going to hear more complaints from residents about their rashes." During this time period, Mr. Croft falsely assured the public of the safety of the drinking water distributed from the treatment plant. Mr. Croft was criminally charged for conspiracy to commit false pretenses by intentionally misleading the public about the safety of the water. He was also charged with involuntary manslaughter in causing the death of a person who contracted legionella disease. The plaintiffs admit that Mr. Croft intentionally caused them bodily harm (in the nature of interference with their bodily integrity).

     5.  <u>Brent Wright</u>
         4500 Dort Hwy
         Flint, MI 48505

Brent Wright ("Wright") was the Water Plant Supervisor for the City of Flint. His duties included day-to-day oversight and operation of water distribution

system for the supply of water safe for human consumption and in compliance with state and federal drinking water regulations. Mr. Wright was involved in the decision to use the Flint River as an interim drinking water source and was aware of the necessary upgrades to the treatment plant in order to safety distribute water. By April 2014, Mr. Wright knew that the Flint Water Treatment Plant was not ready to begin full-time operations to safely distribute Flint River water but failed to act accordingly.

As the Water Plant Supervisor for Flint, Mr. Wright had a duty to ensure proper sampling protocols under the LCR. Mr. Wright was actively involved in the treatment of Flint drinking water and in the collection and testing of Flint drinking water samples. Mr. Wright knew that the Flint Water Treatment Plant was unable to collect proper compliance samples because it did not know where the "Tier 1" sampling sites were located. On March 17, 2015, Mr. Busch informed Mr. Wright that "the City should be taking action to optimize water quality in the City's distribution system" and that "[a]ny optimized corrosion control plan practices regarding pH levels must be taken into consideration." Further, having received a letter from Mr. Rosenthal on March 30, 2015, Mr. Wright knew that:

> Ninety percent of the sites [FWTP] tested are within action levels under the administrative rules promulgated under the Michigan Safe Drinking Water Act, 1976 PA 399, as amended. These results must be reported on your 2014 Consumer Confidence Report (CCR) due to our office, your customers, and the local health department, by July 1, 2015.

132

As Marc Edwards described in a September 20, 2015 email to the EPA, Flint's sampling methods, of which Wright was directly responsible, were improper:

> [t]hey do not have an approved lead sampling pool. Only 13 of the lowest lead sampled homes from 2014, were resampled in 2015. The homes sampling high in 2014, were not asked to be resampled. At best, their program is sending out sampling bottles at random across the city.

Despite his active involvement in the treatment of Flint water and the collection and testing of drinking water samples, and his knowledge that Flint should be using optimized corrosion control, Mr. Wright took no action to remedy the situation. If Mr. Wright had done his job properly, the citizens of Flint would have been protected from dangerous levels of lead exposure.

6. <u>Michael Glasgow</u>
   Attorney Brett T. Meyer
   Attorney Christopher James Marker
   O'Neill, Wallace,
   300 St. Andrews Road
   Suite 302
   Saginaw, MI 48605-1966

Michael Glasgow ("Glasgow") was the Laboratory and Water Quality Specialist at the Flint Water Treatment Plant during the 2012–2016 time period. Mr. Glasgow had an F1 Operator's License, making him the highest technically qualified individual at the plant. Mr. Glasgow was responsible for overseeing the operations of the plant, including water quality monitoring, reporting, and

collection of compliance samples under the state and federal safe drinking water regulations.

During 2013-2014, Mr. Glasgow met with MDEQ officials regarding necessary improvements and regulatory requirements to the water treatment plant before distributing water. Mr. Glasgow knew that the Flint Water Treatment Plant did not implement corrosion control treatment after the change in the source of drinking water from Lake Huron to the Flint River. Prior to the change in the drinking water source, Mr. Glasgow knew that the Flint Water Treatment Plant did not have the necessary, qualified, and competent staff, the time, or the procedures to produce safe drinking water. On April 18, 2014, Mr. Glasgow contacted the MDEQ to voice his concerns:

> I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

Nonetheless, Glasgow permitted drinking water to be distributed to Flint residents in violation of his duties.

After the change in the source of drinking water from Lake Huron to the Flint River, Mr. Glasgow actively distorted the City's water test results. Mr. Glasgow was involved in lead testing at the Walters home in February 2015 and, as

a result, knew that very high lead levels were found. Mr. Glasgow knew that Flint's sampling procedures were not capturing the highest lead levels from the higher risk "Tier 1" locations, admitting that "we threw out bottles everywhere just to collect as many as we can, just to hit our number, and we just turn in every  result we get in." Further, Mr. Glasgow agreed to MDEQ's instructions to alter the June 2015 water quality reports and remove the highest lead levels. Mr. Glasgow was criminally charged for willful neglect of his duties and intentional manipulation of water quality reports. The plaintiffs admit that Mr. Glasgow intentionally caused them bodily harm (in the nature of interference with their bodily integrity).

7. <u>Natasha Henderson</u>
   Attorney Katherine Smith Kennedy
   Pinsky Smith Fayette & Kennedy
   146 Monroe Center St NW # 805
   Grand Rapids, MI 49503

Natasha Henderson ("Henderson") was appointed City Administrator for the City of Flint in December 2014 by Emergency Manager Darnell Earley. Ms. Henderson began serving in her position in February 2015 and was actively involved in the Flint water quality concerns, including early knowledge of research regarding elevated blood lead levels. During 2015, Ms. Henderson, along with other city officials, downplayed the seriousness of growing public health concerns,

expressing her hesitancy over declaring a state of emergency in the city given the potential impact on the state and the governor.

### G. Genesee County Health Department
630 Saginaw St #4
Flint, MI 48503

The Genesee County Health Department ("GCHD") is responsible for all government public health functions for residents of Genesee County, including the City of Flint. GCHD's duties include the prevention, investigation, and control of environmental health hazards. GCHD has broad authority to investigate potential public health threats and has the power to take emergency actions (including public health notices). GCHD, in conjunction with MDHHS, had a duty to conduct in- home assessments to determine sources of contamination for those with elevated blood lead levels.

Here, however, GCHD did not satisfy its duties and obligations. As of January 2016, only about 20% of these in-home assessments had been completed. Further, although GCHD was aware of outbreaks of Legionella related illness in the City of Flint, it did not advise the public about it. GCHD's failure to undertake expeditious, affirmative emergency actions to protect public health exacerbated the plaintiffs' alleged injuries and damages

.

### H. Genesee County Drain Commissioner's Office
4608 Beecher Rd
Flint, MI 48532

The Genesee County Drain Commissioner's Office ("GCDC"), through its elected Commissioner, is the County Agency for water supply, wastewater collection, and treatment.[107] The GCDC has a duty to administer the state's Drain Code. The GCDC has broad duties and powers to sue and be sued, contract, levy taxes, borrow money, acquire interests in real or personal properly, acquire and grant easements, condemn or dispose of property, and may locate, establish, and alter existing drains, creeks, rivers and watercourses "whenever the same shall be conducive to the public health, convenience, and welfare."[108]

The GCDC through its commissioner and agents, were deeply involved in the development and funding of the KWA, including Flint's participation and the use of the Flint River as an interim source of drinking water to achieve and finalize KWA's development. In June 2013, GCDC staff met with state and local officials to discuss the evaluation of the river as a drinking water source and necessary upgrades to the water treatment plant. In April 2014, GCDC officials with extensive experience in water treatment toured the Flint treatment plant spoke directly to MDEQ officials about the plant's preparedness and operation and had direct knowledge that the plant was incapable of producing safe water. The GCDC

---

[107] Act 342 Michigan P.A. of 1939.
[108] M.C.L.A. § 280.2.

office, in the interest of preserving the KWA deal, neglected its duties and broad authority by permitting contaminated water to be distributed to the citizens of Flint.

    1. <u>Jeffrey Wright</u>
       Attorney Matthew Wise
       Foley & Mansfield, PLLP
       130 E. 9 Mile Rd.
       Ferndale, MI 48220

Jeffery Wright ("Wright") was the Genesee County Drain Commissioner during the 2012-2016 time period. The Commissioner has a duty to cooperate with state and federal agencies to enforce pollution laws, and assist in coordinating federal, state, and regional flood control and water quality plans. The duties of the Drain Commissioner include the construction and maintenance of drains, apportioning costs of drains among property owners, and awarding contracts for drain construction. As Commissioner, Mr. Wright had broad authority and power to impose his plans for the KWA upon a municipality such as the City of Flint.

Using his political prowess as County Drain Commission, Mr. Wright engaged and funded private consultants and local and state officials to orchestrate, manipulate, and carry out the development and funding for the KWA, of which Mr. Wright was the CEO. In 2013, Mr. Wright, in his role as GCDC, twice spoke directly to Flint citizens and city councilman providing false advice on the advantages of the KWA for the City of Flint and misleading both citizens and officials about the required upgrades to the Flint water treatment plant. Mr. Wright

recklessly disregarded the public's health and wellbeing by placing money and politics over the provision of safe drinking water. Mr. Wright and his office knew that Flint did not have the resources or capabilities of making the necessary upgrades to the treatment plant and was aware at the time of the switch from Lake Huron as the source of drinking water that the plant was not prepared to go into full time operation. Nonetheless, using his political power both through the Drain Commissioner's Office and through the KWA, Mr. Wright took advantage of Flint's lack of options and resources at the expense of the public health. The plaintiffs admit that Jeff Wright intentionally caused them bodily harm (in the form of invasion of their bodily integrity) because, like Treasurer Dillon, he knowingly exposed all Flint water users to the contaminated water from the Flint River.[109]

### 3.   ROWE PROFESSIONAL SERVICES COMPANY
Attorney Craig S. Thompson
Sullivan, Ward, Asher & Patton, PC
25800 Northwestern Highway
Suite 1000
Southfield, MI 48075-1000

Starting in 2007, Rowe provided professional engineering services as City Engineer to Flint for a five-year period. In July 2011, Rowe Professional Services Company ("Rowe" formally known as Rowe Engineering, Inc.) conducted an "Analysis of the Flint River as a Permanent Water Supply." In a portion of the

---

[109] The plaintiffs' admissions made in their complaints are incorporated by reference. The admissions are too voluminous to incorporate into the body of the Notice.

report titled "Source Water Quality," Rowe opined that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron water." The analysis noted that treatments to the Flint River water could be done if improvements to the Flint WTP were made and recommended "a source water protection management plan should be developed to …identify potential sources of contamination…". In 2013, Rowe renewed its contract with the City of Flint to aid in its transition to the Flint River as source water, serving as Acting City Engineer.

### 4.   HOSPITAL AND ASSISTED LIVING ENTITIES

#### A. McLaren Hospital
401 S. Ballenger Hwy
Flint, MI48532

McLaren Hospital ("McLaren"), a major hospital in Genesee County, was a common source of exposure for the Legionnaires' disease outbreak, including 51 cases in the 2014-2015 timeframe. McLaren had a duty to prevent Legionella from growing and spreading, including through an effective water management program. By January 2015, McLaren Hospital knew of the potential legionella risks associated with the Flint River water. McLaren failed to inform its patients of the risks associated with exposure to legionella and failed to properly address or investigate the increased number of cases within the hospital itself.

**B. Caretel Inns**
202 S. Bridge St.
Linden, MI 48451

Caretel Inns is an assisted living facility located in Linden, MI. Caratel Inns treated patient John Snyder, father of named plaintiff Michael Snyder, prior to his death. Caretel Inns failed to properly monitor and assess the seriousness of Mr. Snyder's health conditions leading to his death.

**5.   BUSINESS ENTITIES AND INDIVIDUALS THAT CAUSED OR CONTRIBUTED TO THE PRESENCE OF LEAD IN FLINT SOILS, WATER, AND OTHER MATERIALS**

The plaintiffs claim that they are (or were) residents of the City of Flint or regular visitors to the City as workers, students or faculty members, or consumers. A common assertion among the various plaintiffs is exposure to lead after the governmental officials brought about the change in the source for drinking water from Lake Huron to the Flint River. The incontrovertible fact, however, is that residents and visitors to the City of Flint have been exposed to lead for decades in quantities measurably greater than any lead found in Flint drinking water after the change in water source.  Lead exposure in the City of Flint came about "from  many sources, such as older housing containing lead-contaminated paint, water, dust,  or soil."[110]   "Flint  is  a 'rust-belt'  community  with  a  high  percentage  of

---

[110] Gómez, H. F., MD, Borgialli, D.A., DO, MPH, Sharman, M, MD, Shah, K.K., BA, Anthony J. Scolpino, A.J., BS, Oleske, J.M., MD, MPH, and John D.  Bogden,

Medicaid recipients matching the socioeconomic profile of a city with children at greater risk for lead exposure from multiple sources."[111]

Flint soils are primarily contaminated by lead deposits over decades from internal combustion engines fueled by tetraethyl lead gasoline (TEL), a product manufactured by the now defunct Ethyl Corporation, in order to address engine knock.[112] Flint housing stock is also contaminated by lead paint applied to its historically wood frame residential structures.

## A. Genesee Power Station Limited Partnership
5310 Dort Hwy
Flint, MI 48505

Contamination of Flint soils from lead paint came about, in part, by degradation of wood frame residential structures over decades but also, in part, by the Genesee Power Station Limited Partnership's (owner and licensee of the Genesee Power Station) use of combustible wood frame housing construction

---

J.D., PhD, *Blood Lead Levels of Children in Flint, Michigan: 2006-2016,* Journal of Pediatrics, accepted for publication Dec. 20, 2017.

[111] *Id.*

[112] Clark, A., *The Poisoned City: Flint's Water and the American Urban Tragedy*, chapter 5 (*Alchemy*) at 86 – 90 ; Dentworth, L., *Toxic Truth* at 58. Charles Kettering (along with Thomas Midgley Jr) identified tetraethyllead (TEL) in December 1921 as an additive that would eliminate engine knocking at a dilution of one thousand to one. Robert A. Kehoe, later proclaimed as the foremost  medical apologist for TEL and the architect of intentionally false research, promoted the use of tetraethyllead as an additive in gasoline and even proclaimed that leaded gasoline was safe for humans. That its use was an ecological disaster leading to a global lead contamination was not acknowledged until many decades later. In 2004, Ethyl Corporation became a subsidiary of NewMarket Corporation.

debris as fuel for its power plant. The Genesee Power Station is located within the Dort-Carpenter Industrial Center on Flint's northeast side and near I-475. Describing the "irony and indignity" of Flint residents sequentially enduring foundry pollution, the City's disinvestment program, and loss of homes to urban renewal, "only to be poisoned by the burning of some of those same toxic structures," University of California Irvine Professor Andrew R. Highsmith documented the Genesee Power Station's contribution to Flint's contaminated soils.

> The freeway and urban renewal projects did enable several new business openings in and around the North End, but the resulting job creation was minimal. … One such venture was the Genesee Power Station, an eighty-million-dollar waste incinerator and electric power-generating facility that opened in 1992 in an area just north of the demolished St. John neighborhood. Hoping to make a profit from the mountains of demolition waste created annually by urban renewal and other activities in the Flint region, the operators of the facility designed it to run entirely on wood fuel. The burning of the demolition wood also created a substantial amount of electric power, which the operators sold to Consumers Power Company, the Flint area's primary energy provider. Much of the wood burned at the Genesee Power Station was coated in lead-based paint, however, which resulted in the release of dangerous toxins into the air. Although local residents and activists were quick to point out the many dangers associated with lead exposure – which include high blood pressure, kidney and brain damage, premature birth, and learning disabilities – officials from the Michigan Department of Environmental Quality, unwilling to block a job-creating venture in the midst of a long-term economic slump, ultimately approved the plant's operations.[113]

---

[113] Highsmith, A.R., *Demolition Means Progress*, University of Chicago Press (2015) at 254.

As Genesee Power Limited Partnership deposited substantial quantities of lead on the Flint community and its soils, it bears substantial responsibility for any personal injuries or damages caused by lead exposure.

## B. Flint Governmental, Commercial, and Residential Property Owners and Landlords

In a comprehensive study of Flint blood lead levels by a team of physicians, public health professionals, and toxicologists from the University of Michigan, Michigan State University (Hurley Medical Center), and Rutgers New Jersey Medical School, "annual [blood lead level] changes in children in Flint, Michigan, over the last decade [2006 to 2016], including the months of exposure to Flint River water [were analyzed and placed in historical context… thus, [providing] a complete assessment of their lead exposure."[114] The researchers established that blood lead levels "during the Flint River water exposure did not exceed values found before 2013."[115] Indeed, the data published by the researchers (see the chart below) show that children living in Flint during the calendar years 2006, 2007, 2008, 2009, 2010, 2011, and 2012 had higher blood lead levels (and, therefore, exposure to greater concentrations of lead) than children living in Flint when the Flint River was the City's source for drinking water.[116]

---

[114] *Id.*

[115] *Id.*

[116] *Id.,* Figure 2.

144



Children born before the April 2014 were exposed throughout their lives to lead from sources unconnected to the Flint Water Treatment Plant and the switch from Lake Huron to the Flint River for Flint's drinking water. Restated, lead exposure attributable to the switch was at best a fractional addition to the background lead exposure already present in their lives and to the lead physically in their bodies. Similarly, children born after the April 2014 switch from Lake Huron to the Flint River for Flint's drinking water were likewise exposed to Flint's background lead levels from sources other than Flint Water Treatment Plant. That is to say, these newborns were bought into an existing lead contaminated environment.

145

The problems with Flint's drinking water were manifest after the April 2014 change in source to the Flint River, and the public discord over it was continuous, robust, and dominant in Flint (if not the State of Michigan and the nation). By late Spring or early Summer 2015, the general public was aware that a significant health hazard tied to the presence of lead present in Flint's drinking water. Public awareness of the presence of lead in Flint soils, in wood frame houses, and in the plume of ash and smoke from the Genesee Power Station, however, dates back to at least 1992. Flint's property owners (whether government owned or sponsored entities, commercial businesses, or individuals) knew of the presence of lead on their properties and the public health hazards attributed lead. Property owners had legal duties to remediate those hazards, arising by statute, regulation, and the common law.

In 1991, the EPA lead and copper rule mandated utility companies to replace a percentage of all service lines containing lead, and after revising the rule in 1993, made homeowners responsible for replacing service lines containing lead from their property line to the discharge tap within the dwelling. Lead-based paint was outlawed in 1978. Since 82.9% of the residential housing structures in Flint were built before 1969, most homes in Flint are contaminated with lead paint. Congress enacted the Residential Lead-Based Paint Hazard Reduction Act in 1992. EPA regulations implementing Title X of the act apply to rental property built before

146

1978 and require that before the sale or lease of a home, a landlord or homeowner must execute a written disclosure identifying any known lead-based paint or hazards.

U.S. Housing and Urban Development associated housing (including housing vouchers) have heightened duties under the Lead Safe Housing Rule, 24 CFR 35. The Lead Safe Housing Rule applies to all "target housing" (generally meaning any housing constructed before 1978) that is federally owned or receiving federal assistance. Similarly, under the Michigan Lead Abatement Act, owners of "target housing" offered for rent or lease (again meaning generally any housing constructed before 1978) must register the property with the MDCH (now MDHHS).[117] Michigan landlord-tenant law imposes a duty on landlords to provide safe, habitable, and fit premises in compliance with state health and safety codes.[118] The Michigan state building code makes it unlawful for any owner or agent to maintain a dwelling which qualifies as a "dangerous building."[119] A dangerous building includes the grounds and the buildings, or portions thereof, that are "unsanitary or unfit for human habitation" or in a condition that is likely "to injure the health, safety, or general welfare of people living in the dwelling." The common law imparts premises liability for failure to give notice of the presence of

---

[117] M.C.L. § 333.5474b[1](5).
[118] M.C.L §554.139.
[119] M.C.L. § 125.538.

lead in a dwelling or for leasing a unit with known lead hazards. Landlords who leased or rented dwellings (1) contaminated by lead paint or by lead laden soils and dust or (2) connected to water mains by lead service lines caused the plaintiffs alleged injuries and damages. The VNA Defendants identify non-parties at fault to include government, commercial, and residential landlords, including, but not limited to, FG&S Investments, and other potential landlords who provided substandard housing contaminated with lead painted surfaces, pipes, and soils who have yet to be identified in discovery.

## 6.   ADDITIONAL PARTIES

The VNA defendants have herein named all the nonparties at fault that, at this time, they can ascertain with the exercise of reasonable diligence. The VNA defendants reserve the right, as new facts present themselves, to amend this notice to include additional parties that, at this time, were not and could not have been known to The VNA defendants through the exercise of reasonable diligence, including but not limited to agents, servants and employees of: the EPA; the State of Michigan; the MDEQ; the MDHHS; the City of Flint (including the Flint Housing Commission and Flint City Building and Safety Inspections Department); the Flint WTP; the Michigan Department of Treasury; the DWSD; the Genesee County Health Department; the Genesee County Drain Commissioner's Office; Tucker Young Jackson Tull; and unidentified homeowners and landlords.

Dated: July 12, 2019

                                                      *Respectfully submitted,*

CAMPBELL CONROY & O'NEIL, P.C.     BUSH SEYFERTH & PAIGE PLLC


/s/ James M. Campbell               /s/ Michael R. Williams
James M. Campbell                  Cheryl A. Bush (P37031)
Alaina N. Devine                   Michael R. Williams (P79827)
One Constitution Wharf, Suite 310    3001 W. Big Beaver Road, Suite 600
Boston, MA  02129                Troy, MI  48084
(617) 241-3000                    (248) 822-7800
jmcampbell@campbell-trial-lawyers.com  bush@bsplaw.com
adevine@campbell-trial-lawyers.com    williams@bsplaw.com

*Attorneys for Veolia Water North America Operating Services, LLC*
*Veolia North America, LLC, and Veolia North America, Inc.*

149

<u>CERTIFICATE OF SERVICE</u>

I, Alaina N. Devine, one of the counsel of record for the defendants Veolia Water North America Operating Services, LLC, Veolia North America, LLC, and Veolia North America, Inc., certify that on July 12, 2019, I caused the within opposition to be filed electronically with the Clerk of Courts through the Court's ECF filing system which will cause it to be served automatically by electronic means to counsel of record for all parties.

/s/ Alaina N. Devine
Alaina N. Devine
adevine@campbell-trial-lawyers.com