FILED
Filed - David Combs
- 3/29/2019 David
Combs 3/29/2019
2:27:56 PM
County Clerk
Genesee County

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE**

*In re* Flint Water Litigation                     Case No. 17-108646-NO

## Expert Declaration of Robert E. Hirshon

### I.     Background

1.    My name is Robert E. Hirshon. I am the Frank G. Millard Professor from Practice and Special Counsel on Developments in the Legal Profession, at the University of Michigan Law School ("Law School"). At the Law School, I teach both basic and advanced courses on ethics and professional responsibility. I also teach a seminar focusing on the practice of law in larger law firms and a course on business development for associates. Further, I am the Law School's "Co-Director" of the State Bar of Michigan's Professionalism in Action Program, presented at the Law School. The Professionalism in Action Program is a half day seminar developed by the Michigan State Bar. First year law students at the Law School discuss hypotheticals based upon the Michigan Rules of Professional Conduct ("MRPC") with experienced practitioners and judges. As co-director, I assist in the drafting of these hypotheticals and attend to various administrative details.

2.    For the past nine years I have volunteered my time to the Michigan Supreme Court Board of Law Examiners and, when requested, have provided the Board with my comments and suggestions to the proposed ethics and professional responsibility questions and model answers for the Michigan Bar Examination.

3.    In addition to my responsibilities at the Law School, I am an Adjunct Professor at Peking University's School of Transnational Law in Shenzhen, China, and a Visiting Professor at Haim Striks School of Law in Israel. In both countries I teach courses on ethical dilemmas confronted by practitioners. Also, I am a consultant to a law firm located in New England where I advise the firm on ethical and law practice management issues.

4.    My legal experience includes thirty years of practice in the Portland, Maine law firm of Drummond, Woodsum & MacMahon. My management responsibilities at the firm included my advising the firm's lawyers on their ethical responsibilities as described in the Maine Code, and, subsequently, the Maine Rules of Professional Responsibility. The Maine Rules are based upon the Model Rules adopted by the American Bar Association's House of Delegates.

5.    Additionally, I served as the CEO of a 75 lawyer law firm and the COO of a 370 lawyer regional law firm, both headquartered in Portland, Oregon. In these firms, I confronted and assisted in the resolution of numerous ethical issues.

6. During the period of time that I was a practicing lawyer, I was the President of the Maine State Bar Association, the Maine Bar Foundation, and the American Bar Association ("ABA"). Prior to assuming the Presidency of the ABA, I chaired the ABA's Pro Bono Committee and had primary responsibility for drafting and persuading the House of Delegates to adopt Model Rule of Professional Conduct 6.1 on Voluntary Pro Bono Public Service. Rule 6.1 encompasses *pro bono publico* representation and service to the Bar and community. As committee chair, I conducted several meetings across the country and solicited comments on proposed Model Rule 6.1. I was intimately involved in drafting and negotiating both the text of the rule and its comments. At the House of Delegates, I was the floor manager of the resolution which sought approval of Model Rule 6.1.

7. As a former ABA president, I am a life-long member of the ABA's House of Delegates. I personally participated in the debates which amended the Model Rules. The Model Rules supplanted the Model Code which had previously supplanted the Canons. The Model Rules are precise rules and were adapted by the House of Delegates in part to eliminate the ambiguities and generalizations contained in the Canons and Code.

8. Currently I am a member of the ABA's Standing Committee on Ethics and Professional Responsibility. As a member of that committee, I assist in the drafting of ethical opinions and suggest, as well as discuss, proposed changes to the Model Rules of Professional Conduct.

9. I have participated in several CLE panels and delivered numerous presentations focused on legal ethics and professional responsibility.

10. I received a B.A. from the University of Michigan in 1970 as well as a J.D. in 1973, before returning to my home state of Maine to practice law. A copy of my complete resume is attached to this Declaration as Exhibit A.

## II. Request for Services and Opinion

11. I was asked by Attorney Corey Stern to provide an opinion as to whether Assistant Attorneys General, Richard Kuhl, Zachary Larsen, Margaret Bettenhausen and Nathan Gambill, have a conflict of interest as a result of their representation of both defendants and plaintiffs in the Flint Water Litigation.

12. Corey Stern is the Lead Counsel on behalf of all plaintiffs maintaining claims in the Circuit Court of Genesee County for personal injury and property damage sustained as a result of the Flint Water Crisis.

13. He was also appointed *Liaison Counsel* by the Honorable Judith E. Levy on July 27, 2017 for all individual personal injury and property damage cases pending before the United States District Court for the Eastern District of Michigan.

14. I am being compensated for my work in this matter. My compensation is based upon the time I have spent in reviewing various documents, in researching and formulating my opinions, and in drafting this Declaration.

### III. Factual Basis for Opinions

15. My opinions are based on the Michigan Rules of Professional Conduct. It is important to note that not all of the Model Rules adopted by the ABA's House of Delegates have been adopted *in toto* by the State of Michigan.

16. Rather than make factual assertions or advocate a position regarding the particular facts implicated in these cases, I have based my opinion on certain assumptions spelled out in this Declaration, in addition to relying upon the documents listed in Exhibit B.

### IV. Expert Opinion

17. For the reasons discussed in this Declaration, it is my opinion that the Attorney General's Office has created a conflict of interest under Rule 1.7 of the Michigan Rules of Professional Conduct (MRPC) by its substitution of the four assistant attorneys general mentioned in paragraph 11 to replace Special Assistant Attorney General Noah Hall in the *parens patriae* case brought on behalf of *The People of the State of Michigan*.

18. The Attorney General's Office, by a letter dated March 01, 2019 from the Ethics Officer, Frank Monticello ("letter"), correctly points out that conflicts of interest must be "examined carefully to ensure [the] duty of loyalty is not compromised."

19. The letter fails to appreciate, however, that "confidentiality," not loyalty, is the primary driver of Michigan's conflict of interest rules. Indeed, under certain circumstances, the MRPC allows for attorneys to be adverse to clients to whom they may have previously owed a duty of loyalty. See, MRPC 1.9.

20. In the Flint Water Litigation, the four assistant attorneys general have, for more than three years, provided a defense in federal and state courts against thousands of civil claims brought by Michigan citizens. In addition to the various immunity defenses they have raised, these same assistant attorneys general have also emphasized that most plaintiffs were not injured, or if they were injured, they were not injured in a meaningful way, or injured in any way more than citizens of other cities in Michigan. They have continuously articulated that individual residents have overstated whatever "minor" injuries they may have sustained, if indeed the plaintiffs sustained any injuries at all. Although these assertions presented themselves during meetings between counsel and were alluded to during previous legal proceedings, they could and likely will be pled in the answers to one or more of the various cases filed, if/when the governmental defendants are required to answer the complaints.

21. Pursuant to MRPC 1.7(b), even a potential conflict that likely might arise over the course of the litigation is grounds for disqualification. Because attorneys Kuhl, Gambill, Bettenhausen and Larsen represent defendants in both state and federal court, it is likely that

3

3/27/2019

conflict of interest issues will arise in both venues. For instance, if the claims in state court brought by the Mays plaintiffs survive one or more dispositive motions, it is difficult to imagine a scenario where the answering defendants ever concede that plaintiffs were harmed, or concede an entire putative class of plaintiffs was harmed, and thus, base their entire defense upon that harm being caused by third party private entities. The same is true for the individual cases filed in federal court. This is an example not only of the "confidentiality" issues that went unappreciated by Mr. Monticello in his evaluation and letter, but also of how competing loyalties cause conflicts. Are attorneys Kuhl, Gambill, Bettenhausen and Larsen really prepared to argue in the *parens patriae* case that their citizen clients were not harmed? They have already taken that position in the civil litigation.

22. The Attorney General's Office has referred to the existence of a "Chinese Wall" that separates these matters, since Mr. Kuhl and his team are defending former and current state employees, in pending criminal and civil cases. By replacing special counsel with the same attorneys who are representing various defendants, the Attorney General's Office has destroyed the very wall it deemed necessary to create. Even if these assistant attorneys general were to argue that the necessity of a wall was/is only required between the criminal and civil cases, that position is also rife with inconsistencies. As an initial matter, it begs the question as to why, until February 11, 2019, the *parens patriae* case was assigned to outside counsel. If, as it appears, the Attorney General's Office felt it was **improper** to assign the *parens patriae* case to said assistant attorneys general when it was originally filed in August 2016, or even to other assistant attorneys general, then the Attorney General's Office should explain what could possibly have occurred to now eliminate the need for a wall. Furthermore, because the original civil case filed in state court was on behalf of the State of Michigan, but was substituted with a case on behalf of *The People of the State of Michigan*, the distinction clearly seems to matter to the Attorney General. This suggests to me an intent to prosecute a claim for all Michiganders, including Flint residents, many of whom have sued the defendants that these same assistant attorneys general represent in both state and federal court. I see no way in which the same attorneys can continue to represent the civil defendants in state and federal court, while also representing *The People*. This is another example of the "Confidentiality" issues that went unappreciated by Mr. Monticello in his evaluation and letter.

23. The February 13, 2019 email from Attorney Nathan Gambill to Attorney Corey Stern et al. also illustrates the clear conflict of interest created by the Attorney General's Office. Mr. Stern was tasked with apprising and conferencing with other plaintiffs' counsel. In that email, Attorney Gambill states that because Attorney Stern is the appointed plaintiff representative, Attorneys Kuhl, Gambill, Bettenhausen and Larsen (who represent various defendants) expect to receive from Attorney Stern updates and other information Attorney Stern has "from the plaintiff's perspective." The email underscores a brazenness on the part of Mr. Gambill that on its face evidences a conflict. Having litigated cases against Mr. Stern for at least three years, it is clear to me that Mr. Gambill and his colleagues, who were copied on the email, intend to walk on both sides of the proverbial conflict line, with one foot on the side of plaintiffs, and the other on the side of defendants. Although I anticipate that the assistant attorneys general will claim that their *parens patriae* case is nothing more than what amounts to a third party claim against private defendants, Mr. Gambill's email quite pointedly states something altogether different. The same attorneys are attempting to caucus with both plaintiffs and defense counsel.

4

3/27/2019

Even if they were now to walk back their <u>request</u> for confidential information, their conflict is obvious.

24. Additionally, according to Attorney Stern's affirmation, one of his clients, Lee Anne Walters, was called by the Attorney General's Office to testify that she and her family were substantially injured by drinking Flint's contaminated water. Attorneys Kuhl, Gambill, Bettenhausen and Larsen have claimed, and will likely continue to claim, that individuals similarly situated to Lee Anne Walters and her family were either not injured, or at least not substantially injured, as a result of the contamination of Flint's water supply.

25. There is no doubt in my mind that the four assistant attorneys general referred to in this declaration have a conflict of interest under MRPC 1.7, which will lead to breaches of MRPC 1.6 (Confidentiality of Information) as more fully discussed in the Affirmation of Corey Stern. It is also likely that this is one of those situations in which the entire Attorney General's Office must be disqualified in order to avoid a conflict or even the appearance of a conflict, given the high visibility of the litigation involving the Flint Water Crisis. Accordingly, it is my opinion that the Attorney General would be best served by replacing Special Counsel Noah Hall with an attorney outside of her office. This is the very appropriate approach the Attorney General took when she appointed the Wayne County Prosecutor's Office – and not lawyers from her own office – to assist Special Counsel Todd Flood.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This _27th_ day of March, 2019.

_____
Robert E. Hirshon

3/27/2019

5