# EXHIBIT 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=/

*IN RE* FLINT WATER LITIGATION               Case No. 17-108646-NO

=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=.=/

## **AFFIRMATION OF COREY M. STERN**

1.      I was appointed *Lead Counsel* by the Honorable Richard B. Yuille on November 15, 2016 on behalf of all plaintiffs maintaining claims in the Circuit Court of Genesee County for personal injuries and property damage sustained as a result of the Flint Water Crisis.

2.      I was subsequently appointed *Liaison Counsel* by the Honorable Judith E. Levy on July 27, 2017 for all individual personal injury and property damage cases pending before the United States District Court for the Eastern District of Michigan.

3.      I personally represent more than 2,500 children who were lead-poisoned during the crisis.

4.      One of my roles as Lead and Liaison Counsel is to apprise and coordinate with attorneys representing individual plaintiffs in both the state and federal Flint Litigations.

5.      Over the course of both litigations, in my capacities as Lead and Liaison Counsel, I have often conferred with plaintiffs' counsel regarding litigation strategies.

6.      For more than three years, assistant attorneys general Richard Kuhl, Nathan Gambill, Margaret Bettenhausen, and Zachary Larsen have represented individual state defendants in the federal litigation, and former Governor Snyder, former Treasurer Andy Dillon, and the State of Michigan in various state litigations.

1

7.      Mr. Kuhl, Mr. Gambill, Ms. Bettenhausen and Mr. Larsen have, for three years, raised immunity defenses for their various governmental clients.

8.      Mr. Kuhl has, at various times, made statements in my presence indicating his belief that most plaintiffs, in the various litigations, were either not injured, not injured in a meaningful way, not injured in a way that justifies lawsuits, or not injured more than citizens of other cities in Michigan who he has claimed were exposed to higher levels of lead than citizens of Flint.

9.      Mr. Kuhl, Mr. Gambill, Ms. Bettenhausen and Mr. Larsen have vigorously opposed bottled water service, despite Flint citizens' overwhelming desire for it to continue, rooted in their distrust of the governmental entities and individual defendants Mr. Kuhl and his team continue to represent as defendants.

10.     Prior to February 11, 2019, Mr. Kuhl and other Assistant Attorneys General were only involved in the civil defense of state defendants.

11.     Todd Flood, at all relevant times, was hired by and has served as Special Counsel for the Attorney General, to criminally prosecute individuals for their alleged roles in the Flint Water Crisis.

12.     Some of the criminal defendants being prosecuted by Mr. Flood have been represented in the civil litigation by one or more of Mr. Kuhl, Ms. Bettenhausen, Mr. Gambill and Mr. Larsen, including Eden Wells and Nick Lyon. In addition to Wells and Lyon, Mr. Kuhl or members of his team have, and in many instances continue to represent Andy Dillon, Richard Snyder, the State of Michigan, the Michigan Department of Health and Human Services, the Michigan Department of Environmental Quality, and the Receivership Transition Advisory Board.

13.     Mr. Flood put my client – LeeAnne Walters – on the witness stand as a victim and a witness in the Attorney General's prosecution of state defendants.

14.     Prior to February 11, 2019, Noah Hall, a law professor at Wayne State University, was hired by and served as Special Counsel for the Attorney General, to represent the interests of Michiganders in civil litigation against various private entities.

15.     On June 22, 2019, Mr. Hall filed a case on behalf of *The State of Michigan*, against various private entities in the Circuit Court of Genesee County (case no. 16-07175). *See* Complaint, attached hereto as Exhibit A, and incorporated by reference as if fully stated herein.

16.     A Notice of Dismissal, without prejudice, was executed on September 26, 2016 as to case no. 16-07175. *See* Notice of Dismissal, attached hereto as Exhibit B, and incorporated by reference as if fully stated herein.

17.     An eerily similar *parens patriae* case was filed by Mr. Hall on behalf of The People of the State of Michigan, against the same private defendants, on August 17, 2016 (case no. 16-107576). *See* Docket, attached hereto as Exhibit C, and incorporated by reference as if fully stated herein; *see also* Complaint, attached hereto as Exhibit D, and incorporated by reference as if fully stated herein.

18.     A *parens patriae* case is one brought by the government, or any other authority, regarded as the legal protector of citizens unable to protect themselves.

19.     It is clear when juxtaposing the June 22, 2016 pleading with the August 17, 2016 pleading, that the Attorney General intended to pursue a case on behalf of Michigan citizens, including residents of Flint.

3

20.     Mr. Kuhl has, at various times, made representations in my presence regarding the existence of a "Chinese Wall" between the various litigations undertaken by the Attorney General.

21.     Mr. Kuhl and Ms. Bettenhausen have been active participants in court ordered mediation, on behalf of the state defendants in the civil cases.

22.     I strongly believe that Mr. Kuhl and his team are presently and personally counseling the Governor of the State of Michigan, Gretchen Whitmer, regarding settlement negotiations.

23.     On February 5, 2019, the Honorable Richard B. Yuille, held a status conference, which included Lead Counsel for Plaintiffs, Lead Counsel for Defendants, and Plaintiffs' and Defendants' Liaison Counsel for the putative class action cases pending in Genesee County.

24.     On February 11, 2019, Mr. Kuhl, Mr. Gambill, Ms. Bettenhausen and Mr. Larsen were substituted for Noah Hall as counsel in the *parens patriae* case on behalf of plaintiffs – *The People of the State of Michigan*. *See* Exhibit C.

25.     On February 13, 2019, Mr. Gambill sent me an email, which states as follows:

> *You are our plaintiff representative counsel for the Flint water litigation consolidated in Genesee County. Richard, Margaret, Zach, and I have replaced Noah Hall as the attorneys handling the People's suit against Veolia and LAN in that litigation.* **We have not received any required updates from you regarding your meetings with Judge Yuille. Could you please provide an update of your latest meeting with the judge on February 5, 2018? What did you talk about? What should we be aware of from a plaintiff's perspective?** *What should we focus on in the draft CMO submitted on Feb 11? What is your sense of when and how the judge will handle all of the pending dispositive motions?*

*See* Gambill Email, attached hereto as Exhibit E, and incorporated by reference as if fully stated herein.

4

26.     I reached out to Mr. Kuhl by phone on the morning of February 15, 2018, and expressed what I strongly believe to be a material conflict for him and his team, based on their dual roles representing state defendants in the various civil litigations, and *The People of the State of Michigan* as Plaintiffs in the state litigation.

27.     I also expressed to Mr. Kuhl that I was uncomfortable communicating with his team in my role as Lead and Liaison Counsel, and that the email from Mr. Gambill was highly inappropriate and highlighted the conflict.

28.     My perception during that call was that Mr. Kuhl believed there was no conflict, and that this was the first time anyone had raised the issue with him or the Attorney General's office generally.

29.     I found Mr. Kuhl's response to be very odd, considering his prior representations of the existence of a "Chinese Wall" within the Attorney General's Office.

30.     I do not believe that my raising the issue of a conflict on February 15, 2018 was the first time the issue had been brought to the Attorney General's or Mr. Kuhl's attention, despite what appeared to me to be Mr. Kuhl's utter surprise that I raised it.

31.     Despite raising the issue with Mr. Kuhl on the morning of February 15, 2018, later that same day, Mr. Kuhl and his team filed one, single pleading, in the Circuit Court of Genesee County, on behalf of both the state defendants, and *The People of the State of Michigan*, as plaintiffs. *See* Corrected Objections by both State Defendants in the *Mays* Putative Class Action and *The People* in the *Parens Patriae* Action against the Veolia and LAN Defendants, attached hereto as Exhibit F, and incorporated by reference as if fully stated herein.

32.     The Corrected Objections, filed by Mr. Kuhl and his team, request that Judge Yuille order the *parens patriae* trial to commence at the same time, and proceed concurrently

with, the first bellwether trial. In essence, counsel for defendants in many of my cases, is seeking to try a case concurrently with me, in some form or fashion, against other defendants.

33.     On February 18, 2019, I wrote directly to Attorney General Dana Nessel regarding the conflict, and asked that Mr. Kuhl, Mr. Gambill, Ms. Bettenhausen and Mr. Larsen be removed as counsel in the cases they had appeared, in all of the various Flint litigations. *See* 2/18/19 Correspondence, attached hereto as Exhibit G, and incorporated by reference as if fully stated herein.

34.     On February 20, 2019, I wrote directly to Attorney General Dana Nessel, and provided supplemental materials that I felt were pertinent to her analysis. *See* 2/20/19 Correspondence, attached hereto as Exhibit H, and incorporated by reference as if fully stated herein.

35.     On March 1, 2019, I received correspondence from Frank Monticello, on behalf of the Attorney General, wherein he provided his assessment that the conflicts I raised and my concerns were without merit. *See* 3/1/19 Correspondence, attached hereto as Exhibit I, and incorporated by reference as if fully stated herein.

36.     Mr. Monticello appears to be an in-house ethics officer for the Attorney General.

37.     It is my belief that Mr. Kuhl's, and his team's various representative capacities are compromised.

38.     I believe it is untenable for Mr. Kuhl and his team to try the *parens patriae* case with the first bellwether case, side by side with counsel against whom they are litigating in other cases, arising out of the same set of facts.

6

39.     I believe it is a disservice to the litigation, at this point, to have Mr. Kuhl and his team playing any role whatsoever in settlement negotiations, in light of their dual representation and what I believe to be a conflict, let alone advising Governor Whitmer directly in that regard.

40.     It is my opinion that in a litigation as public as this one, where tax payers' dollars are funding criminal prosecutions, civil defense costs, and a *parens patriae* case, the importance of a "Chinese Wall" is profound.

41.     It is my opinion that because Mr. Kuhl and his team have so brazenly torn the wall down, there is no way to undo what has been done, and the entire Attorney General's office should be disqualified from all of the litigations.

42.     Mr. Kuhl and his team have placed Plaintiffs in the most precarious position, by requesting that their counsel confer with them, as plaintiffs, while they simultaneously defend against those very plaintiffs' lawsuits, as defense counsel.

Dated: March 27, 2019                     Respectfully submitted,

                                          **LEVY KONIGSBERG, LLP**

                                          By: _____
                                          Corey M. Stern, Esq.
                                          800 Third Avenue, Suite 11th Floor
                                          New York, NY, 10022
                                          (212) 605-6200
                                          cstern@levylaw.com
                                          *Counsel for Plaintiffs*



PLAINTIFF'S
EXHIBIT
A

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT OF THE COUNTY OF GENESEE

STATE OF MICHIGAN,

      Plaintiff,

v.

VEOLIA NORTH AMERICA, INC.,
a Delaware Corporation,
VEOLIA NORTH AMERICA, LLC,
a Delaware Limited Liability Company,
VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC,
a Delaware Limited Liability Company,
VEOLIA ENVIRONNEMENT, S.A.,
a French transnational corporation,
LOCKWOOD, ANDREWS & NEWNAM, P.C.,
a Michigan Corporation,
LOCKWOOD, ANDREWS & NEWNAM, INC.,
a Texas Corporation, and
LEO A. DALY COMPANY, a Nebraska Corporation

      Defendants.

_____/

Case No.  16-  **16 107 175** -NM **5**

RICHARD B. YUILLE
P-22664

| | |
|---|---|
| Bill Schuette<br>Attorney General<br>State of Michigan<br><br>Todd Flood<br>Special Assistant Attorney General<br>Office of Special Counsel | Noah D. Hall (P66735)<br>Special Assistant Attorney General<br>Office of Special Counsel<br>nhall@crisisflint.com<br>(517) 930-6258<br>*Counsel of Record*<br><br>Gary D. Reeves (P35902)<br>Donald R. Sheff, II (P78262)<br>155 W. Congress St., Suite 603<br>Detroit, MI 48226 |

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## STATEMENT REGARDING ASSIGNMENT OF RELATED CASES

There are numerous related cases that have been previously filed in this Court, assigned to Hon. Archie L. Hayman and Hon. Richard B. Yuille.

## COMPLAINT FOR DAMAGES

The State of Michigan, by and through its Attorney General, Bill Schuette, brings this Complaint for Damages for harm to public health, destruction of public property, and cost to public resources.

## INTRODUCTION

1.      Plaintiff State of Michigan files this civil action against the named Defendant corporations for their roles in the events known as the Flint Water Crisis, including the corrosion of lead pipes, the leaching of lead into the water supply, and the lead poisoning of residents. Their acts and omissions constitute professional negligence, fraud, and public nuisance. They violated their legal duties and caused the Flint Water Crisis to occur, continue, and worsen. As a result, the State of Michigan suffered damages for past, ongoing, and future harm to public health, destruction of public property, and cost to public resources.

2.      The City of Flint, the State of Michigan, and the citizenry relied heavily upon the hired expertise of the Defendant corporations to provide residents with safe water. The Defendant corporations, self-proclaimed leaders and experts in water supply, totally failed the citizens of Flint and the State of Michigan. As a direct result of the Defendant corporations' acts and omissions, Flint's lead pipes corroded, leaching lead into residents' drinking water, ultimately poisoning the residents themselves.

3.      The Defendant corporations committed professional negligence and fraud, breaching the duties they owed to the public. The conduct of the Defendant corporations

2

constitutes a public nuisance, as it has produced a significant effect, long lasting and sometimes permanent, upon public rights including health, safety, peace, comfort, and convenience.

4.      The acts and omissions of the Defendant corporations have caused past, ongoing, and future harm to public health, destruction of public property, and cost to public resources. The State of Michigan has standing to bring this action on behalf of its quasi-sovereign interests and the interests of its citizens, in *parens patriae*, to recover damages accordingly. The State of Michigan seeks to protect the interests of the public in health and well-being, and recover damages for harms to those interests. It seeks relief in this honorable Court in Flint, where the harms to citizens and costs to the public have been and will be the greatest. The State of Michigan requests a jury of Genesee County residents to render judgment against the Defendant corporations on the claims stated below.

## PARTIES, JURISDICTION AND VENUE

5.      Plaintiff State of Michigan has long-established interests in the health and well-being, both physical and economic, of its residents in general (known as 'quasi-sovereign' interests). To protect these quasi-sovereign interests and recover damages for past, ongoing, and future harms to them, the State of Michigan has standing to bring this *parens patriae* action. The State of Michigan is uniquely suited to bring a civil action on behalf of the interests of the public in health and well-being. The State of Michigan's quasi-sovereign interests at issue in this *parens patriae* action are distinct and apart from the interests of particular private parties at issue in other civil actions.

6.      Defendant Veolia North America, Inc. is a Delaware corporation with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

3

7.     Defendant Veolia North America, LLC is a Delaware Limited Liability Company with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

8.     Defendant Veolia Water North America Operating Services, LLC is a Delaware Limited Liability Company with its principal place of business at 101 West Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

9.     Defendant Veolia Environnement, S.A. is a transnational corporation incorporated in the Republic of France with its principal place of business at 36/38 avenue Kléber, 75116 Paris, France.

10.     The four above named Defendants (individually and collectively Veolia) performed professional engineering services and/or engaged in other conduct in Flint in 2015. Veolia holds itself out as a "leading water services provider in [the] North American market, with more projects, operations, resources, expertise and demonstrated success than any other services provider."

11.     Veolia maintains multiple offices in Michigan, regularly conducts business in Michigan, and has committed torts in Michigan, which are among the bases for personal jurisdiction under MCL 600.705.

12.     Defendant Lockwood, Andrews & Newnam, P.C. is a Michigan professional corporation with its principal place of business located at 1311 South Linden Road, Suite B, Flint, Michigan 48532. Lockwood, Andrews & Newnam, P.C. held itself out to the world as a Leo A. Daly Company. In 2008 Lockwood, Andrews & Newnam, P.C. was incorporated by Lockwood, Andrews & Newnam, Inc., in connection with work to be performed in Flint.

4

13.     Defendant Lockwood, Andrews & Newnam, Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, Lockwood, Andrews & Newnam, Inc. conducted business in Genesee County, Michigan, with offices at 1311 South Linden Road, Suite B, Flint, Michigan 48532.

14.     Defendant Leo A. Daly Company is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. According to its website, Leo A. Daly Company's "[s]ervices are extended through Lockwood, Andrews & Newnam, Inc."

15.     The three above named Defendants (individually and collectively LAN) performed professional engineering services and/or engaged in other conduct in Flint from 2011 through 2016. LAN holds itself out as "a full-service consulting firm offering planning, engineering and program management services" with "firsthand knowledge of the Flint Water Treatment Plant" and its operations.

16.     LAN maintains an office in Flint, Genesee County, Michigan, regularly conducts business in Michigan, and has committed torts in Michigan, which are among the bases for personal jurisdiction under MCL 600.705.

17.     Venue is proper in this Court because the original injury and damage occurred in Genesee County; Defendant corporations reside and/or conduct business in Genesee County; the State of Michigan and its citizens have suffered harms and incurred costs in Genesee County; and many of the occurrences described herein occurred in Genesee County.

18.     The amount in dispute is in excess of $25,000.00, exclusive of costs and attorney fees, and all of the parties have transacted business in Genesee County, Michigan at all times relevant herein such that jurisdiction is properly with this Court.

5

## STATEMENT OF FACTS

19.     The City of Flint's Water Treatment Plant was constructed in 1917. It used the Flint River as the primary water supply for Flint customers for drinking and industrial uses for approximately 50 years. Because of continued concerns regarding the adequacy of the Flint River for meeting the future water supply needs of the area, the City of Flint evaluated alternatives for a new water supply. It ultimately contracted with the City of Detroit in 1967 to receive treated water via a pipeline from Lake Huron. Nearly 50 years later, the City of Flint was considering updating and upgrading its water treatment plant to again provide Flint River water to serve its residents. And it would rely heavily on the professional services of the Defendant corporations from planning to operation to evaluation.

20.     In 2011, Flint Mayor Dayne Walling commissioned LAN (in cooperation with Rowe Engineering, Inc., a local firm) to conduct a feasibility study with respect to whether the Flint Water Treatment Plant could once again use the Flint River as a primary water supply for Flint, consistent with modern "rules and regulations for the treatment of surface water." LAN (again jointly with Rowe) ultimately produced in July 2011 a report for Flint titled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint" (LAN's 2011 Report[1]).

21.     According to LAN's 2011 Report, "This study evaluates the feasibility of utilizing the City of Flint's Water Treatment Plant and Flint River as the primary water supply for the City of Flint. The study evaluates whether the Flint River is an adequate source of water for the City of Flint and identifies upgrades needed to reliably supply water on a continuous basis."

---

[1] Available at http://www.greatlakeslaw.org/Flint/LAN_2011_Report.pdf.

22.     LAN's 2011 Report recognizes: "There have been many new rules and regulations for treatment of surface water since 1967 when Flint's [Water Treatment Plant] was last used as a primary water supply."

23.     LAN's 2011 Report continues: "Available records provide a good understanding of the characteristics of the raw water and ranges of variances, and will be helpful to design water treatment processes and estimate operating costs."

24.     LAN's 2011 Report ultimately concludes: "Preliminary analysis indicates that water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron water. ... Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron."

25.     LAN also prepared an additional analysis, attached to LAN's 2011 Report as an Appendix ("Technical Memorandum Cost of Service Study Flint Water Treatment Plant"), that details over $69,000,000 in capital improvements that would have to be made to bring the Flint Water Treatment Plant up to current standards. LAN's Technical Memorandum specifically projected costs for corrosion control chemicals ("phosphate") that would be required.

26.     LAN eventually offered and provided its professional engineering services to the City of Flint to design and implement improvements to the Flint Water Treatment Plant to treat Flint River water and deliver it to residents.

27.     On June 10, 2013 LAN submitted a Proposal to the City of Flint for "Flint Water Treatment Plant Rehabilitation – Phase II" (LAN's 2013 Proposal[2]). The proposal was to make "improvements ... intended to help the City operate[] the plant on a full time basis using the

---

[2] Available at http://www.greatlakeslaw.org/Flint/LAN_2013_Proposal.pdf.

Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director), and Samir F. Matta, Professional Engineer (Senior Project Manager).

28.     LAN's 2013 Proposal stated: "LAN's staff has the knowledge, expertise and the technical professionals to handle all aspects of the project. Our staff has firsthand knowledge of the Flint Water Treatment Plant...."

29.     LAN's 2013 Proposal includes a "Scope of Services" that acknowledges that the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River for water supply.

30.     LAN's 2013 Proposal states that "the estimated construction cost to prepare the water plant for continuous operation using Flint River water for the interim period is on the order of $33 to $34 million."

31.     LAN's 2013 Proposal establishes "Standards of Performance": "Engineer [LAN] agrees to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices."

32.     On June 26, 2013, the City of Flint engaged the professional services of LAN through a "Resolution Authorizing Approval to Enter into a Professional Engineering Services Contract for the Implementation of Placing the Flint Water Plant into Operation." Pursuant to the resolution, the City would "enter into a Professional Engineering Services contract with Lockwood, Andrews & Newnam, Inc. for the administration of placing the Flint Water Plant into operation using the Flint River as a primary drinking water source at a cost of $171,000.00."

33.     From July 2013 through April 2014, LAN provided the above described professional services, but failed to meet its duty of care and competence at a professional

8

standard. When the Flint Water Treatment Plant, with upgrades designed and implemented by LAN, began distributing Flint River water on April 25, 2014, it did so without implementing a corrosion control program. LAN's failure to design and implement corrosion control breaches the duty of a professional engineer in this field and falls far short of the standard of care and practices of a professional engineer of ordinary learning, judgment and skill given the circumstances. Further, the failure to implement optimal corrosion control violated the Safe Drinking Water Act, M.C.L. § 325.1001 *et seq*. These failures and breaches directly caused the Flint Water Crisis.

34.    LAN continued to provide engineering services to Flint after the re-start of the Flint Water Treatment Plant and switch to the Flint River for water supply. Problems with the Flint Water Treatment Plant's supply of Flint River water were soon evident and public.

35.    In August 2014, Flint's water first violated the Safe Drinking Water Act's acute coliform Maximum Contaminant Level due to the presence of fecal coliform bacteria, or E.coli, in the water. The Maximum Contaminant Level is defined as "the maximum permissible level of a contaminant in water that is delivered to any user of a public water supply" under the Safe Drinking Water Act, Rule 325.10106(c).

36.    In August and September 2014, Flint's water violated the Safe Drinking Water Act's monthly coliform Maximum Contaminant Level, and boil water advisories were issued due to the presence of fecal coliform bacteria, or E.coli, in the water.

37.    On September 10, 2014, the Michigan Department of Environmental Quality issued a Compliance Communication to Flint. The Compliance Communication notified Flint that it had exceeded safe levels for trihalomethane, a byproduct of disinfection that poses health risks. Further, as stated in the Compliance Communication, exceedance of trihalomethane "is an

indicator of operational performance." Due to the exceedance of trihalomethane, the Michigan Department of Environmental Quality requested that Flint complete an operational evaluation and submit a report pursuant to the Safe Drinking Water Act (Rule 325.10719l). Flint would hire LAN to conduct this operational evaluation and prepare and submit the report.

38.      On October 13, 2014, it was publicly reported that General Motors announced it would no longer use Flint River water at its Flint Engine Operations plant due to high levels of chlorine in Flint's water, which had begun to corrode its products. General Motors arranged to buy Lake Huron water from Flint Township, rather than rely on the Flint Water Treatment Plant and the Flint River for its water supply. This news was reported in the media, and the City of Flint responded with an official statement.

39.      In November 2014, LAN issued a Draft Operational Evaluation Report for the City of Flint, titled "Trihalomethane Formation Concern" (LAN's 2014 Report[3]). LAN's 2014 Report was prepared in response to the September 10, 2014 request by Michigan Department of Environmental Quality due to the exceedance of trihalomethane and the operational performance problems that indicates.

40.      LAN's 2014 Report should have identified the likely causes of increased trihalomethane levels and provided appropriate recommendations to lower the trihalomethane to safe levels. However, LAN failed to identify the root cause of the trihalomethane problem and its recommendations would cause continued and worsened harm.

41.      Violations of trihalomethane levels are not only a health risk on their own, but are also an indicator of more serious problems with water treatment and supply. A professional engineer of ordinary learning, judgment and skill in this community would view the high trihalomethane levels, along with all other publicly known and available information at the time

---

[3] Available at http://www.greatlakeslaw.org/Flint/LAN_2014_Report.pdf.

(including but not limited to media reports of corrosive water), as reason for concern about the corrosivity of the water, the likely corrosion of pipes (including lead pipes), and resulting lead poisoning of the water supply and related health risks. However, LAN's 2014 Report completely failed to do this.

42.   On January 9, 2015, the University of Michigan's Flint campus announced it found high levels of lead in its campus drinking fountains.

43.   On January 21, 2015, over one hundred residents gathered for a public meeting with state and local officials at Flint City Hall to express concerns with reported violations, observed drinking water quality, and health risks. Media reports include photographs of jugs of brown water.

44.   In January 2015, in response to the repeated violations of Safe Drinking Water Act standards, the public problems with corrosivity at the General Motors factory, the high lead levels at the University of Michigan Flint campus, visually discolored water coming out of residents' taps, and growing public concerns over water quality and public health, the City of Flint solicited a proposal for a water quality consultant.

45.   On January 29, 2015, Veolia, acting as Veolia Water North America Operating Services, LLC, through Mr. David Gadis, its Senior Vice President, Sales, Municipal and Commercial Development, submitted to the City of Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No.: 15-573 (Veolia's 2015 Bid[4]). Veolia proposed "to address the immediate reliability and operational needs" of the City's water system.

46.   The City of Flint had requested professional engineering services (1) to review and evaluate "the City's water treatment process…and procedures to maintain and improve water quality;" (2) to develop a report with recommendations "to maintain compliance with both State

---

[4] Available at http://www.greatlakeslaw.org/Flint/Veolia_2015_Bid.pdf.

11

of Michigan and federal agencies;" and (3) to assist the City in implementing the recommendations. Veolia, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services approach outlined in [the City of Flint's request]." Veolia proposed to respond to the City's requested scope of work by (1) calibrating "daily water quality samples with the City's hydraulic model;" (2) refining "the operational strategies for the plant and distribution system;" (3) coordinating "daily efforts across plant, operations and maintenance staff;" and (4) alleviating "continued concerns from the public through the public communications process."

47.     On February 4, 2015, the City of Flint engaged the professional services of Veolia through a "Resolution to Veolia Water for Water Quality Consultant." The resolution incorporates a standard of performance clause: "The city is relying upon the professional reputation, experience, certification, and ability of Contractor [Veolia]."

48.     On February 10, 2015, the City of Flint announced publicly that it would be retaining Veolia's water experts. Veolia Vice President David Gadis stated: "We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." Mr. Gadis further stated that Veolia has "extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water."

49.     On February 12, 2015, Veolia's Vice President Rob Nicholas stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's

12

getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

50.     On February 18, 2015, Veolia presented its "Interim Water Quality Report" (Veolia's 2015 Interim Report[5]) to the Flint City Council Public Works Committee. Veolia's 2015 Interim Report was made public and was reported in the media.

51.     According to Veolia's 2015 Interim Report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline] or the history of the utility."

52.     Veolia's 2015 Interim Report began with the headline: "Everybody is Checking the Safety of Water." It further states: "Safe = compliance with state and federal standards and required testing. Latest tests show water is in compliance with drinking water standards."

53.     Veolia's 2015 Interim Report then explains that residents are seeing discolored water because of "old cast iron pipes." Veolia again states that there is no health or safety problem, as discoloration "[d]oesn't mean the water is unsafe but it is not appealing and raises questions." Veolia provided a map of reported water quality complaints over the past 12 months with the statement "fewer than you think."

54.     Veolia's 2015 Interim Report responded to questions about "[m]edical problems" by stating that "[s]ome people may be sensitive to any water."

55.     Veolia's representations made in its 2015 Interim Report and public presentation regarding the nature and cause of the water quality problems in Flint, the safety of Flint's water, and the public health risks were false and material. Veolia knew the representations were false, or were made recklessly without any knowledge of the potential truth. Veolia made the representations with the intention that the public would act and rely on them, which it did. As a

---

[5] Available at www.greatlakeslaw.org/Flint/Veolia_2015_Interim_Report.pdf.

direct result of Veolia's fraudulent statements, the public and the State of Michigan suffered terribly.

56.     Veolia's 2015 Interim Report encouraged residents to contact the City of Flint to have the water in their home tested. Flint resident Leanne Walters did just that. Michael Glasgow, Flint's water treatment plant manager, visited the resident's home at 212 Browning Avenue and tested the water. On February 18, 2015 (the same day that Veolia issued its Interim Report discounting residents' complaints about discolored water and concerns about medical problems), Mr. Glasgow suspected and tested for lead at 212 Browning Avenue based on discoloration and high levels of iron.

57.     On February 20, 2015, the Michigan Department of Environmental Quality Drinking Water Laboratory tested the 212 Browning Avenue sample (LF54945) and detected lead at 104 parts per billon (ppb). The Maximum Contaminant Level and related Action Level for lead is 15 ppb. A follow-up sample collected March 3, 2016 found lead at 397 ppb.

58.     In February 2015, based on the exceedance of the Maximum Contaminant Level and related Action Level for lead at 212 Browning Avenue, the City of Flint issued a Consumer Notice of Lead & Copper Results in Drinking Water. The notice contained the following warning: "Lead can cause serious health problem [sic] if too much enters your body from drinking water or other sources. It can cause damage to the brain and kidneys, and it can interfere with the production of red blood cells that carry oxygen to all parts of your body. The greatest risk of lead exposure is to infants, young children, and pregnant women. Scientists have linked the effects on the brain with lower IQ in children. Adults with kidney problems and high blood pressure can be affected by low levels of lead more than healthy adults. Lead is stored in the

bones, and can be released later in life. During pregnancy, the child receives lead from the mother's bones, which may affect brain development."

59.     On February 27, 2015, LAN prepared a Final Operational Evaluation Report titled, "Trihalomethane Formation Concern" (LAN's February 2015 Report[6]). Trihalomethane levels continued to violate the Safe Drinking Water Act. LAN recommended additional ferric chloride to address the water quality problems, as adding ferric chloride could "easily be implemented without the need for additional equipment." However, as is widely known in the profession, ferric chloride is highly acidic and would increase the corrosivity of Flint's water, worsening the corrosion of lead pipes, the resulting leaching of lead into the water supply, and the poisoning of Flint residents.

60.     Unlike the Defendant corporations, whose reports were completely ignoring the warning signs of corrosion, several public officials correctly identified the corrosion problem and implications for lead poisoning.

61.     The publicly available Consumer Notice of Lead & Copper Results in Drinking Water February for the residence at 212 Browning Avenue was a clear warning sign for staff at the U.S. Environmental Protection Agency's Chicago, Illinois office.

62.     On February 26, 2015, EPA's Jennifer Crooks stated in an email that the lead testing results in a home with "2 children under the age of 3" were cause for "[b]ig worries here." In a simple email, Ms. Crooks diagnosed the Flint water problems more accurately and effectively than the numerous Defendant corporations' studies and reports. She stated: "the different chemistry water is leaching out contaminants from the insides of the biofilms inside the pipes" and that "[l]ead is a good indication that other contaminants are also present in the tap water."

---

[6] Available at http://www.greatlakeslaw.org/Flint/LAN_February_2015_Report.pdf.

63.     The EPA's Miguel Del Toral followed-up in an email the next day (February 27, 2015), stating that "where you find [lead] values [as high as 104 ppb], it is usually due to particulate lead" and that the leaching of particulate lead in the water supply "is a normal part of the corrosion process." Mr. Del Toral went on to emphasize that a "particulate can contain very high concentrations of lead (hundreds to thousands [parts per billion of lead]) which is a much higher concentration than lead paint, so even small particles can result in high lead values."

64.     In the February 27, 2015 email, Mr. Del Toral pointed out that high levels of orthophosphates (a method of corrosion control) "seem to reduce the amount of particulate [lead] that is released in the absence of physical disturbances to the lead lines." Mr. Del Toral then correctly diagnosed the root cause of Flint's water supply problems – lack of corrosion control: "If I remember correctly, Detroit is feeding [orthophosphate] for [compliance with] the [Safe Drinking Water Act's Lead and Copper Rule], but since Flint is no longer part of that interconnection, I was wondering what their [optimized corrosion control technique] was. They are required to have [optimized corrosion control technique] in place which is why I was asking what they were using."

65.     With far more limited information than was available to the Defendant corporations (which were in Flint as paid consultants that same week), and working from his office in Chicago with no additional resources, Mr. Del Toral spotted the emerging lead crisis in Flint, diagnosed the root cause, and questioned why the appropriate engineering response was not being implemented.

66.     On March 12, 2015, Veolia (through Veolia North America) submitted to Flint its Water Quality Report (Veolia's 2015 Report[7]). By this time, EPA officials such as Mr. Del Toral had correctly identified the problem, the root cause, and the solution to the Flint lead crisis.

---

[7] Available at www.greatlakeslaw.org/Flint/Veolia_2015_Report.pdf.

16

However, while Veolia had conducted a "160-hour assessment of the water treatment plant, distribution system, customer service and communication programs, and capital plans and annual budget," it totally failed to identify the problem, made no effort to understand the root cause, and recommended measures that made the situation far worse.

67.     Veolia's 2015 Report also again made fraudulent statements regarding the safety of Flint's water supply: "[t]he review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and, based on those standards, the water is considered to meet drinking water requirements."

68.     Veolia's 2015 Report only considered phosphate corrosion control to address discoloration, with no mention of the far more serious lead problem: "Many people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water."

69.     Veolia's 2015 Report not only missed the problem, its root cause, and the public health implications, it also offered recommendations that made the problem worse: "Current ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended. ... The increase in chemical costs could be up to $1,000,000 per year. This change in dosage (using ferric chloride) can be made immediately without state permit review."

70.     Veolia knew or should have known that Flint had no corrosion control protocol and that corrosion was already a significant problem. Veolia's recommendation that Flint double its dosage of ferric chloride, a powerful acid, was unqualified and in no way warned that ferric chloride could increase corrosion. Moreover, Veolia failed to inform Flint that in order to

increase the dosage of ferric chloride (or indeed to use any chloride at all) it must also raise the water's pH (making the water less acidic) and use phosphates to protect the pipes from corrosion.

71.     The mistake of adding ferric chloride to already corrosive water was soon evident with objective data. Dr. Marc Edwards' Flint Water Study demonstrated that Flint's treated water became more acidic even as the Flint River's became less acidic. The Flint River had a pH (a measure of acidity) at or above 8.0 prior to June of 2015, and its pH steadily increased (meaning it became less acidic) after June. The pH in Flint's treated water, however, became steadily more acidic immediately after Veolia's recommendation to double the ferric chloride concentration. The pH dropped from 7.9 in March of 2015 to 7.3 by August. This is a dramatic difference because pH is measured on a logarithmic scale, meaning that a pH decrease by one whole number equates to a water supply that is ten times more corrosive. So despite the Flint River water supply becoming less acidic, the treated water became significantly and dangerously more acidic after and due to Veolia's and LAN's direction to add more ferric chloride.

72.     On August 27, 2015, LAN issued another Operational Evaluation Report on the Trihalomethane Formation Concern (LAN's August 2015 Report). Again, LAN should have recognized the root cause of the trihalomethane levels. Again, LAN should have seen the trihalomethane levels along with the now overwhelming evidence of water quality issues as an indicator of a corrosion problem. Again, LAN should have been aware of the resulting leaching of lead into the water supply and harm to public health. And again, LAN failed to meet its duty of professional care and standards.

73.     Instead, LAN's August 2015 Report continued to recommend additional ferric chloride, which again would make the water more corrosive and further the lead crisis: "Increasing the dose rate of ferric chloride is an operational change that can easily be

implemented without the need for any additional equipment. ... Increased dosing of ferric chloride would be most ideal" with regular monitoring to determine "the appropriate ferric chloride feed rate."

74.    On October 16, 2015, Flint stopped using the Flint River for its water supply and resumed use of Lake Huron water through the Detroit system. However, the damage had been done and lead has continued to leach from pipes into the water.

75.    On January 5, 2016, Michigan Governor Rick Snyder issued a Declaration of Emergency for Flint, stating, "the damaged water infrastructure and leaching of lead into the city's water caused damage to public and private water infrastructure, and has either caused or threatened to cause elevated blood lead levels, especially in the population of children and pregnant women, and causing a potential immediate threat to public health and safety and disrupting vital community services."

76.    On January 21, 2016, the United State Environmental Protection Agency issued an Emergency Administrative Order stating that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river's water was corrosive and removed protective coatings in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized." The Emergency Administrative Order further stated: "water provided by the City to residents poses an imminent and substantial endangerment to the health of those persons ... by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

## COUNT I – PROFESSIONAL NEGLIGENCE
### All Defendants

77.     The State of Michigan incorporates by reference all preceding allegations set forth above as if fully stated herein.

78.     The acts and omissions of the Defendant corporations constitute professional negligence. Defendant corporations failed to address the problem of corrosion and resulting lead poisoning, which a professional engineer of ordinary learning, judgment or skill in this community would do. Defendant corporations failed to recognize the root cause of the observed water quality problems and further recommended actions that made the problems worse.

79.     The Defendant corporations owed the State of Michigan and its citizens a duty of care and competence at a professional standard. The Defendant corporations' acts and omissions breached that duty. As a direct result, the State of Michigan and its citizens have been injured (and continue to be injured). These injuries were caused by the Defendant corporations' breaches of duty.

80.     The Defendant corporations knew or should have known that high chloride levels in the Flint River would make the water corrosive without significant treatment, and that the corrosion would result in dangerous levels of lead for residents served by the City's many lead pipes. The Defendant corporations ignored information that a professional engineer would recognize as cause for concern and further investigation. Further, the Defendant corporations recommended increasing the use of ferric chloride, which made the water even more corrosive, accelerating and worsening the corrosion of lead pipes and resulting lead poisoning of drinking water.

20

81.     The State of Michigan and its citizens relied on the professional expertise and paid work of the Defendant corporations to provide safe drinking water, and this reliance was based on assertions and statements by the Defendant corporations.

## COUNT II – FRAUD
### Veolia

82.     The State of Michigan incorporates by reference all preceding allegations set forth above as if fully stated herein.

83.     Veolia made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the public health risks. The false and material representations include but are not limited to statements in Veolia's 2015 Interim Report that (a) Flint's water was "safe" and "in compliance with drinking water standards," (b) the observed discoloration was merely aesthetic and not indicative of a water quality of health problem, and (c) medical problems are because "[s]ome people may be sensitive to any water." These false and material representations were repeated in Veolia's 2015 Report and other public statements.

84.     The material representations and other acts and omissions of Veolia constitute fraud. Veolia knew the representations were false, or Veolia's representations were made recklessly without any knowledge of the potential truth. Veolia made the representations with the intention that the public and the State of Michigan would act and rely on them, which they did. As a direct result, the State of Michigan and its citizens suffered and continue suffer injuries.

## COUNT III – PUBLIC NUISANCE
### All Defendants

85.     The State of Michigan incorporates by reference all preceding allegations set forth above as if fully stated herein.

86.     The acts and omissions of the Defendant corporations constitute a public nuisance, as an unreasonable interference with a right common to the general public – the right to safe, reliable public drinking water. The conduct of the Defendant corporations involves a significant interference with the public health, the public safety, the public peace, the public comfort and the public convenience. Some of the acts and omissions of the Defendant corporations violate state safe drinking water laws. The conduct of the Defendant corporations has in part continued, and has produced permanent and long-lasting effects upon the public right. One potential measure to prevent future public harms and abate the nuisance is the replacement of lead service lines and pipes.

**WHEREFORE,** the State of Michigan demands judgment in excess of $25,000.00 for damages and such other relief as this Court may deem just and proper.

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

Dated June 22, 2016

## JURY TRIAL DEMAND

Plaintiff State of Michigan hereby demands a trial by jury for all claims so triable.

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

Dated June 22, 2016

24

ossbauer
/15/2016 Cindy
ossbauer
/15/2016 8:45:10
unty Clerk
nesee County

**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
ATTORNEY GENERAL BILL SCHUETTE

**FLINT INVESTIGATION**



**OFFICES**
Flint / Lansing / Detroit

Email: info@crisisflint.com
Website: www.crisisflint.com

Todd F. Flood
Special Counsel

Andrew G. Arena
Chief Investigator

October 12, 2016

Genesee County Circuit Court Clerk
900 South Saginaw St
Flint, MI 48502

Re: *Notice of Dismissal Without Prejudice* – Case No. 16-107175-NM

Dear Clerk of the Court:

Enclosed please find Attorney General Bill Schuette on Behalf of the State of Michigan's *Notice of Dismissal Without Prejudice* for filing.

Thank you,

*Donald Sheff*
*with permission* SNB

Donald R. Sheff, II
155 W. Congress St., Suite 603
Detroit, MI 48226

Enclosure:
Notice of Dismissal Without Prejudice for filing

STATE OF MICHIGAN
IN THE CIRCUIT COURT OF THE COUNTY OF GENESEE

STATE OF MICHIGAN,

      Plaintiff,

v.

Case No.  16-107175-NM

VEOLIA NORTH AMERICA, INC.,
a Delaware Corporation,
VEOLIA NORTH AMERICA, LLC,
a Delaware Limited Liability Company,
VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC,
a Delaware Limited Liability Company,
VEOLIA ENVIRONNEMENT, S.A.,
a French transnational corporation,
LOCKWOOD, ANDREWS & NEWNAM, P.C.,
a Michigan Corporation,
LOCKWOOD, ANDREWS & NEWNAM, INC.,
a Texas Corporation, and
LEO A. DALY COMPANY, a Nebraska Corporation

      Defendants.

_____/

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

_____/

## NOTICE OF DISMISSAL WITHOUT PREJUDICE

PLEASE TAKE NOTICE that Plaintiff hereby dismisses this action without prejudice pursuant to MCR 2.504(A)(1)(a).

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

Dated: September 26, 2016

2

Case 5:16-cv-10444-JEL-EAS    ECF No. 1026-5, PageID.26363    Filed 12/30/19    Page 36 of 107



PLAINTIFF'S
EXHIBIT

Register of Action

Enter New Search   Nxt Action

```
OPEN                    CASE REGISTER OF ACTIONS        03/28/19  PAGE   1
16-107576-NM JUDGE YUILLE        FILE 08/17/16
         GENESEE COUNTY                  JDF
                                                      ARC# H2O
P 001 PEOPLE OF THE STATE OF MI,,    VS D 001 VEOLIA NORTH AMERICA INC,,
                                       C/O-THE CORPORATION TRUST CO,,
                                         THE CORPORATION TRUST CENTER
                                         1209 ORANGE ST
                                         WILMINGTON DE 19801

      ATY:NESSEL,DANA M.,
        P-51346    517-335-7625

                                   D 002 VEOLIA NORTH AMERICA LLC,,
                                     C/O-THE CORPORATION TRUST CO,,
                                       THE CORPORATION TRUST CENTER
                                       1209 ORANGE ST
                                       WILMINGTON DE 19801
                                   D 003 VEOLIA WATER NORTH AMERICA,,
                                     C/O-THE CORPORATION TRUST CO,,
                                       THE CORPORATION TRUST CENTER
                                       1209 ORANGE ST
                                       WILMINGTON DE 19801
                                   D 004 VEOLIA ENVIRONNEMENT SA,,
                                       36/38 AVENUE KLEBER
                                       PARIS FRANCE 75116
                                       ATY:PANOFF,THOMAS V
                                       P-68416    312-701-8821
                                       DISPOSITION 09/14/16  DIS  MAJ
                                   D 005 LOCKWOOD ANDREWS & NEWNAM PC,,
                                     C/O-NATIONAL REGISTERED AGENTS,,
                                       30600 TELEGRAPH ROAD
                                       SUIT 2345
                                       BINGHAM FARMS MI 48025
                                       ATY:ERICKSON,PHILIP
                                       P-37081    517-324-5608
                                   D 006 LOCKWOOD ANDREWS & NEWNAM,,
                                     C/O-NATIONAL REGISTERED AGENTS,,
                                       1999 BRYAN STREET
                                       STE 900
                                       DALLAS TX 75201
                                       ATY:ERICKSON,PHILIP
                                       P-37081    517-324-5608
                                   D 007 LEO A DALY COMPANY,,
                                       RES-DALY,LEO,A,III
```

```
                                              8600 INDIAN HILLS DR
                                              OMAHA NE 68114
                                              ATY:ERICKSON,PHILIP
                                              P-37081    517-324-5608

     IP001 KUHL,RICHARD,S
           -ASSISTANT ATTORNEY GENERAL,,
            ATY:KUHL,RICHARD S.    02/11/19
            P-42042    517-335-0696
     IP002 BETTENHAUSEN,MARGARET,A
           -ASSISTANT ATTORNEY GENERAL,,
            ATY:BETTENHAUSEN,MA    02/11/19
            P-75046    517-373-7540
     IP003 GAMBILL,NATHAN,A
           -ASSISTANT ATTORNEY GENERAL,,
            ATY:GAMBILL,NATHAN,    02/11/19
            P-75506    517-373-7540
     IP004 LARSEN,ZACHARY,C
           -ASSISTANT ATTORNEY GENERAL,,
            ATY:LARSEN,ZACHARY     02/11/19
            P-72189    517-373-7540
```

```
                        Actions, Judgments, Case Notes
     ----------------------------------------------------------------
     Num   Date   Judge    Chg/Pty  Event Description/Comments
     ----  ------ -------  -------  -------------------------------
       1 08/17/16 FARAH             SUMMONS AND COMPLAINT FILED
                                    RECEIPT# 00437253 AMT    $260.00
       2 08/19/16          P 001    JURY DEMAND FILED
                                    COMPLAINT FOR DAMAGES AND
                                    DEMAND FOR JURY TRIAL FILED
       3                            ORDER REASSIGNING CASE FILED
                                    (DUE TO JUDICIAL ECONOMY)
       4          YUILLE            CASE REASSIGNMENT
                                      FROM: FARAH,JOSEPH J.,
                                      TO: YUILLE,RICHARD B.,
       5 09/09/16          D 005    APPEARANCE
                                      ATTORNEY: P-37081 ERICKSON
                                    APPEARANCE ON BEHALF OF DEFTS'
                                    LOCKWOOD, ANDREWS & NEWNAM
                                    PC AND LOCKWOOD ANDREWS &
                                    NEWNAM INC AND LIMITED
                                    APPEARANCE ON BEHALF OF LEO
                                    A. DALY CO. AND PROOF OF
                                    SERVICE OF SAME UPON ATTYS OF
                                    RECORD ON 09/06/16 FILED
       6                   D 006    APPEARANCE
                                      ATTORNEY: P-37081 ERICKSON
       7                   D 007    APPEARANCE
                                      ATTORNEY: P-37081 ERICKSON
       8 09/12/16                   STIPULATION AND ORDER FOR
                                    EXTENSION OF TIME TO FILE
                                    RESPONSIVE PLEADINGS FOR
                                    DEFTS LOCKWOOD, ANDREWS &
                                    NEWNAM INC, LOCKWOOD ANDREWS
                                    & NEWNAM PC AND LEO A DALY
                                    CO. FILED (EXTENDED TO
                                    11/15/16)
       9 09/13/16          D 004    APPEARANCE
                                      ATTORNEY: P-68416 PANOFF
                                    SPECIAL APPEARANCE FILED
      10 09/14/16                   STIPULATION OF VOLUNTARY
```

|  |  |  |  |
|---|---|---|---|
|  |  |  | DISMISSAL W/O PREJUDICE AS TO DEFT. VEOLIA ENVIRONMENT S.A. ONLY AND ORDER FILED |
| 11 |  | D 004 | MISCELLANEOUS ACTION BY JUDGE DISMISSED |
| 12 | 11/15/16 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME FOR DEFT. VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC, VEOLIA NORTH AMERICA INC AND VEOLIA NORTH AMERICA LLC TO FILE RESPONSE TO COMPLAINT FILED |
| 13 |  |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS FOR DEFTS. LOCKWOOD ANDREWS & NEWNAM INC AND LOCKWOOD ANDREWS & NEWNAM PC AND LEO A DALY CO FILED |
| 14 |  |  | CASE MANAGEMENT ORDER FILED |
| 15 | 11/17/16 |  | LIST OF CASES AS OF 11/17/16 CORRECTED EXHIBIT "A" FILED |
| 16 | 01/10/17 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS AS TO ALL DEFTS. FILED (EXTENDED UNTIL 05/4/17) |
| 17 | 04/27/17 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS AS TO ALL DEFTS. FILED (UNTIL 9/15/17) |
| 18 | 10/25/17 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS AS TO ALL DEFTS. FILED (EXTENDED UNTIL 03/15/18) |
| 19 | 02/15/18 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS AS TO ALL DEFTS. FILED (EXTENDED TO 06/15/18) |
| 20 | 01/03/19 |  | STIPULATION AND ORDER FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS AS TO ALL DEFTS. AND CERTIFICATE OF SERVICE OF SAME UPON ALL PARTIES ON 01/02/18 FILED (EXTENDED TO: 03/15/19) |
| 21 | 02/11/19 | P 001 | APPEARANCE ATTORNEY: P-51346 NESSEL SUBSTITUTION OF COUNSEL FOR STATE OF MICHIGAN FILED (FROM SCHUETTE TO DANA NESSEL) |
| 22 |  | P 001 | FROM: SCHUETTE,BILL, TO: NESSEL,DANA M., SUBSTITUTION OF COUNSEL FOR STATE OF MICHIGAN FILED (FROM SCHUETTE TO DANA NESSEL) |
| 23 |  |  | SUBSTITUTION OF COUNSEL FOR STATE OF MICHIGAN FILED (FROM SCHUETTE TO DANA NESSEL) |
| 24 |  |  | SUBSTITUTION OF COUNSEL FOR STATE OF MICHIGAN FILED (FROM |

3/28/2019

25   SCHUETTE TO DANA NESSEL)
     SUBSTITUTION OF COUNSEL FOR
     STATE OF MICHIGAN FILED (FROM
     SCHUETTE TO DANA NESSEL)

· · · · · · · · · · · · · · · · · · · · · · · · · · · END OF SUMMARY · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**Enter New Search**

Disclaimer



PLAINTIFF'S
EXHIBIT

D

### STATE OF MICHIGAN
### IN THE CIRCUIT COURT OF THE COUNTY OF GENESEE

ATTORNEY GENERAL BILL SCHUETTE
ON BEHALF OF THE
PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff,

v.

VEOLIA NORTH AMERICA, INC.,
a Delaware Corporation,
VEOLIA NORTH AMERICA, LLC,
a Delaware Limited Liability Company,
VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC,
a Delaware Limited Liability Company,
VEOLIA ENVIRONNEMENT, S.A.,
a French transnational corporation,
LOCKWOOD, ANDREWS & NEWNAM, P.C.,
a Michigan Corporation,
LOCKWOOD, ANDREWS & NEWNAM, INC.,
a Texas Corporation, and
LEO A. DALY COMPANY, a Nebraska Corporation

       Defendants.

_____/

Hon. Richard B. Yuille

Case No.   16-                    -NM

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

_____/

### COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**THERE ARE NUMEROUS RELATED CASES THAT HAVE BEEN PREVIOUSLY FILED IN THIS COURT ASSIGNED TO THE HONORABLE RICHARD B. YUILLE.**

**COMPLAINT FOR DAMAGES**

Attorney General Bill Schuette, on behalf of the People of the State of Michigan, brings this Complaint for Damages for harm to the public health and general welfare of the People of the State of Michigan arising from the Flint Water Crisis.

**INTRODUCTION**

1. Attorney General Bill Schuette, on behalf of the People of the State of Michigan, files this civil action against the named Defendants for their roles in the events known as the Flint Water Crisis, including but not limited to the corrosion of lead pipes, the leaching of lead into the water supply, and the lead poisoning of residents.

2. The People of the State of Michigan relied heavily upon the hired professional expertise of the Defendant engineering firms to provide residents with safe water.

3. The Defendant engineering firms, self-proclaimed leaders and experts in water treatment and supply, totally failed the citizens of Flint and the People of the State of Michigan.

4. The Defendants violated their legal duties and caused the Flint Water Crisis to occur, continue, and worsen. Their conduct has produced a significant effect, long lasting and sometimes permanent, upon public rights including health, safety, peace, comfort, and convenience. As a result, the People of the State of Michigan suffered damages for past, ongoing, and future harm to public health and general welfare.

5. Veolia's acts and omissions constitute professional negligence, fraud, and public nuisance.

6. LAN's acts and omissions constitute professional negligence and public nuisance.

7.      Attorney General Bill Schuette, on behalf of the People of the State of Michigan, seeks to protect the People's interests in public health and general welfare, and recover damages for harms to those interests.

8.      Attorney General Bill Schuette, on behalf of the People of the State of Michigan, has *parens patriae* standing to bring this action to protect, and recover damages to, the quasi-sovereign interests of the People of the State of Michigan.

9.      Attorney General Bill Schuette, on behalf of the People of the State of Michigan, seeks relief in this honorable Court in Flint, where the harms to citizens and costs to the People have been and will be the greatest.

10.     Attorney General Bill Schuette, on behalf of the People of the State of Michigan, requests a jury of Genesee County residents to render judgment against the Defendants on the claims stated below.

## PARTIES, JURISDICTION, AND VENUE

11.     Attorney General Bill Schuette, on behalf of the People of the State of Michigan, is the Plaintiff in this action.[1]

12.     "The attorney general ... may, when in his own judgment the interests of the state require it, ... appear for the people of this state in any ... court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested." MCL 14.28.

13.     The Michigan Constitution, Art. IV, Section 51, provides: "The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern."

---

[1] A similar complaint, previously filed in this court on behalf of Plaintiff State of Michigan, will be voluntarily dismissed without service. The State of Michigan is not a party to this action and is not represented by the Attorney General's Office of Special Counsel and the Special Assistant Attorneys General on this complaint.

14.     The Flint Water Crisis, and the acts and omissions of the Defendants, are a grave harm and threat to the public health and general welfare of the People of the State of Michigan, including but not limited to the substantial portion of the population exposed to the unsafe public water supply in Flint.

15.     To protect the quasi-sovereign interests in public health and general welfare of the People of the State of Michigan, and recover damages for past, ongoing, and future harms to these interests, Attorney General Bill Schuette, on behalf of the People of the State of Michigan, has standing to bring this action as *parens patriae*.

16.     Attorney General Bill Schuette, on behalf of the People of the State of Michigan, is uniquely suited to bring a civil action on behalf of the quasi-sovereign interests in public health and general welfare of the People of the State of Michigan. The interests at issue in this *parens patriae* action are distinct and apart from the interests of particular private parties (whether represented individually or in a named class) at issue in other civil actions.

17.     Defendant Veolia North America, Inc. is a Delaware corporation with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

18.     Defendant Veolia North America, LLC is a Delaware Limited Liability Company with its principal place of business at 200 East Randolph Drive, Suite 7900, Chicago, Illinois 60601.

19.     Defendant Veolia Water North America Operating Services, LLC is a Delaware Limited Liability Company with its principal place of business at 101 West Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

3

20.     Defendant Veolia Environnement, S.A. is a transnational corporation incorporated in the Republic of France with its principal place of business at 36/38 avenue Kléber, 75116 Paris, France.

21.     The four above named Defendants (individually and collectively Veolia) performed professional engineering services and/or engaged in other relevant conduct in Flint in 2015.

22.     Veolia holds itself out as a "leading water services provider in [the] North American market, with more projects, operations, resources, expertise and demonstrated success than any other services provider."

23.     Veolia maintains multiple offices in Michigan, regularly conducts business in Michigan, and has committed torts in Michigan, which are among the bases for personal jurisdiction under MCL 600.711, 600.715, 600.721, and 600.725.

24.     Defendant Lockwood, Andrews & Newnam, P.C. is a Michigan professional corporation with its principal place of business located at 1311 South Linden Road, Suite B, Flint, Michigan 48532. Lockwood, Andrews & Newnam, P.C. held itself out to the world as a Leo A. Daly Company. In 2008 Lockwood, Andrews & Newnam, P.C. was incorporated by Lockwood, Andrews & Newnam, Inc., in connection with work to be performed in Flint.

25.     Defendant Lockwood, Andrews & Newnam, Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, Lockwood, Andrews & Newnam, Inc. conducted business in Genesee County, Michigan, with offices at 1311 South Linden Road, Suite B, Flint, Michigan 48532.

26.     Defendant Leo A. Daly Company is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. According to its website,

4

Leo A. Daly Company's "[s]ervices are extended through Lockwood, Andrews & Newnam, Inc."

27.    The three above named Defendants (individually and collectively LAN) performed professional engineering services and/or engaged in other conduct in Flint from 2011 through 2016.

28.    LAN holds itself out as "a full-service consulting firm offering planning, engineering and program management services" with "firsthand knowledge of the Flint Water Treatment Plant" and its operations.

29.    LAN maintains an office in Flint, Genesee County, Michigan, regularly conducts business in Michigan, and has committed torts in Michigan, which are among the bases for personal jurisdiction under MCL 600.711, 600.715, 600.721, and 600.725.

30.    Venue is proper in this Court because the original injury and damage occurred in Genesee County; Defendants reside and/or conduct business in Genesee County; the People of the State of Michigan have suffered harms and incurred costs in Genesee County; and many of the occurrences described herein occurred in Genesee County.

31.    The amount in dispute is in excess of $25,000.00, exclusive of costs and attorney fees, and all of the parties have transacted business in Genesee County, Michigan at all times relevant herein such that jurisdiction is properly with this Court.

## STATEMENT OF FACTS

32.    The City of Flint's Water Treatment Plant was constructed in 1917.

33.    The City of Flint used its Water Treatment Plant to serve Flint River water as the primary water supply for Flint customers for drinking and industrial uses for approximately 50 years.

34.     In the 1960's, because of continued concerns regarding the adequacy of the Flint River for meeting the future water supply needs of the area, the City of Flint evaluated alternatives for a new water supply.

35.     In 1965, the City of Flint contracted with the City of Detroit to purchase treated water that originated from Lake Huron.

36.     From 1967 to 2014, the Flint Water Treatment Plant distributed treated water via a Detroit system pipeline from Lake Huron.

37.     Since 1990, Flint distributed water from the Detroit system that had been treated for optimized corrosion control of the Flint water supply system..

38.     In 2011, Flint Mayor Dayne Walling commissioned LAN (in cooperation with Rowe Engineering, Inc.) to conduct a feasibility study with respect to whether the Flint Water Treatment Plant could once again use the Flint River as a primary water supply for Flint, consistent with modern "rules and regulations for the treatment of surface water."

39.     LAN (again jointly with Rowe) ultimately produced a July 2011  report for Flint titled "Analysis of the Flint River as a Permanent Water Supply for the City of Flint" (LAN's 2011 Report, Exhibit A).

40.     According to LAN's 2011 Report, "This study evaluates the feasibility of utilizing the City of Flint's Water Treatment Plant and Flint River as the primary water supply for the City of Flint. The study evaluates whether the Flint River is an adequate source of water for the City of Flint and identifies upgrades needed to reliably supply water on a continuous basis."

41.     LAN's 2011 Report recognizes: "There have been many new rules and regulations for treatment of surface water since 1967 when Flint's [Water Treatment Plant] was last used as a primary water supply."

6

42. LAN's 2011 Report continues: "Available records provide a good understanding of the characteristics of the raw water and ranges of variances, and will be helpful to design water treatment processes and estimate operating costs."

43. LAN's 2011 Report ultimately concludes: "Preliminary analysis indicates that water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron water. ... Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron."

44. LAN also prepared an additional analysis, attached to LAN's 2011 Report as an Appendix, titled "Technical Memorandum Cost of Service Study Flint Water Treatment Plant" (LAN's 2011 Technical Memorandum, Exhibit B).

45. LAN's 2011 Technical Memorandum details over $49,000,000 in upgrades and improvements that would have to be made to bring the Flint Water Treatment Plant up to current standards.

46. LAN's 2011 Technical Memorandum specifically projected costs for corrosion control chemicals ("phosphate") that would be required.

47. LAN eventually offered and provided (for fees), its professional engineering services to the City of Flint to design and implement improvements to the Flint Water Treatment Plant to treat Flint River water and deliver it to residents.

48. On June 10, 2013 LAN submitted a Proposal to the City of Flint for "Flint Water Treatment Plant Rehabilitation – Phase II" (LAN's 2013 Proposal, Exhibit C).

49. LAN's 2013 Proposal was signed by J. Warren Green, Professional Engineer (Project Director), and Samir F. Matta, Professional Engineer (Senior Project Manager).

7

50.     LAN's 2013 Proposal was to make "improvements ... intended to help the City operate[] the plant on a full time basis using the Flint River."

51.     LAN's 2013 Proposal stated: "LAN's staff has the knowledge, expertise and the technical professionals to handle all aspects of the project. Our staff has firsthand knowledge of the Flint Water Treatment Plant...."

52.     LAN's 2013 Proposal includes a "Scope of Services" stating the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River for water supply.

53.     LAN's 2013 Proposal establishes "Standards of Performance" stating "Engineer [LAN] agrees to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices."

54.     LAN's 2013 Proposal states "the estimated construction cost to prepare the water plant for continuous operation using Flint River water for the interim period is on the order of $33 to $34 million."

55.     On or about June 26, 2013, the City of Flint engaged the professional services of LAN through a "Resolution Authorizing Approval to Enter into a Professional Engineering Services Contract for the Implementation of Placing the Flint Water Plant into Operation" (2013 LAN Resolution, Exhibit D).

56.     Pursuant to the 2013 LAN Resolution, the City would "enter into a Professional Engineering Services contract with Lockwood, Andrews & Newnam, Inc. for the administration of placing the Flint Water Plant into operation using the Flint River as a primary drinking water source at a cost of $171,000.00."

8

57.      On June 29, 2013 a meeting was held at the Flint Water Treatment Plant between City of Flint officials, Genesee County Drain Commissioners Office representatives, the Michigan Department of Environmental Quality, and design engineers from LAN (City of Flint Responses to Citizens' Water Questions, Exhibit E). The agenda for the meeting was to determine the feasibility of: "(1) [u]sing the Flint River as a Water Source; (2) [t]he ability to perform the necessary upgrades to the Treatment Plant; (3) [t]he ability to perform quality control; (4) [t]he ability for Flint to provide water to Genesee County; (5) [t]he ability to meet an April/May 2014 timeline; [and] (6) [d]evelopment of a cost analysis."

58.      As a result of the meeting, the following determinations were made: (1) although the Flint River would be more difficult to treat, it was identified as a viable source of water; (2) it would be "possible to engineer and construct the upgrades needed for the treatment process;" (3) "with support from LAN engineering which works with several water systems around the state, quality control could be addressed;" (4) the Flint Water Treatment Plant "would not have the capacity needed to treat and distribute sufficient water to meet the documented needs of Flint and Genesee County;" (5) "many obstacles needed to be overcome but completion by the April/May 2014 target was reachable;" and (6) "[n]ext steps from the meeting were for LAN to present the City with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates."

59.      From July 2013 through April 2014, LAN was the primary design engineering firm for the Flint Water Treatment Plant but LAN failed to meet its duty of care and competence at a professional standard.

60.      In April 2014, LAN signed and sealed the improvement and upgrade plans to the Flint Water Treatment Plant as the professional engineer for the project.

9

61.     The Flint Water Treatment Plant, with upgrades designed and implemented by LAN, began distributing Flint River water on or about April 25, 2014.

62.     Prior to April 2014, and since approximately 1990, Flint had been using corrosion control by distributing pre-treated water (water treated for corrosion control) from the Detroit system.

63.     When the Flint Water Treatment Plant began distributing Flint River water on or about April 25, 2014, it did so without treating the new water supply for corrosion control.

64.     LAN was aware of the need for corrosion control at the Flint Water Treatment Plant, and had previously recommended corrosion control, but failed to include or implement corrosion control in its final designed upgrades to the Flint Water Treatment Plant.

65.     LAN's failure to design and implement corrosion control breaches the duty of a professional engineer in this field and falls far short of the standard of care and practices of a professional engineer of ordinary learning, judgment and skill given the circumstances.

66.     The danger to the public health and welfare in not using corrosion control, especially given the known condition of the Flint River as a water supply source, was known or should have been known by LAN.

67.     The danger to the public health and welfare in not using corrosion control was not adequately addressed or raised by LAN.

68.     LAN's failure to design and implement corrosion control and its breach of duty as a professional engineer directly caused the Flint Water Crisis.

69.     Problems with the Flint Water Treatment Plant's supply of Flint River water were evident and public soon after April 2014.

10

70.    LAN continued to provide engineering services to Flint after the re-start of the Flint Water Treatment Plant and switch to the Flint River for the City's water supply in April 2014.

71.    In August 2014, Flint's water from the Flint River first violated the Safe Drinking Water Act's acute coliform Maximum Contaminant Level due to the presence of fecal coliform bacteria, or E.coli, in the water.

72.    The Maximum Contaminant Level is defined as "the maximum permissible level of a contaminant in water that is delivered to any user of a public water supply" under the Michigan Safe Drinking Water Act, Rule 325.10106(c).

73.    In August and September 2014, Flint's water from the Flint River violated the Safe Drinking Water Act's monthly coliform Maximum Contaminant Level, and boil water advisories were issued due to the presence of fecal coliform bacteria, or E.coli, in the water.

74.    On September 10, 2014, the Michigan Department of Environmental Quality issued a Compliance Communication to Flint (2014 Compliance Communication, Exhibit F).

75.    The 2014 Compliance Communication notified Flint that it had exceeded safe levels for trihalomethane, a byproduct of disinfection that poses health risks.

76.    The 2014 Compliance Communication further states that exceedance of trihalomethane "is an indicator of operational performance" problems with a public water supply.

77.    Due to the exceedance of trihalomethane, the 2014 Compliance Communication requested that Flint complete an operational evaluation and submit a report pursuant to the Safe Drinking Water Act (Rule 325.10719l).

11

78.     Flint hired LAN to conduct the operational evaluation and prepare and submit the report required by the 2014 Compliance Communication.

79.     The Defendants had actual notice of the 2014 Compliance Communication regarding trihalomethane exceedance as "an indicator of operational performance" problems with the Flint Water Treatment Plant.

80.     A *Flint Journal*/MLive article, "General Motors shutting off Flint River water at engine plant over corrosion worries," dated October 13, 2014 (2014 General Motors Corrosion Article, Exhibit G) reported that General Motors announced it would no longer use Flint River water at its Flint Engine Operations plant due to high levels of chlorides in Flint's water, which had begun to corrode its products. The article reported that General Motors arranged to buy Lake Huron water from Flint Township (via the Detroit system pipeline), rather than rely on the Flint Water Treatment Plant and the Flint River for its water supply.

81.     The 2014 GM Corrosion Article included a statement by GM spokesman Tom Wickham: "Because of all the metal ... you don't want the higher chloride water (to result in) corrosion." GM spokesman Tom Wickham further stated: "We noticed it [the corrosion] some time ago (and) the discussions [with Flint] have been going on for some time."

82.     The City of Flint responded with an official statement regarding General Motors leaving the Flint water system due to problems with corrosion.

83.     The Defendants had actual and/or constructive notice of the water quality problems reported in the 2014 General Motors Corrosion Article.

84.     In November 2014, LAN issued a Draft Operational Evaluation Report for the City of Flint, titled "Trihalomethane Formation Concern" (LAN's 2014 Report, Exhibit H).

85.     LAN's 2014 Report was prepared in response to the 2014 Compliance Communication regarding the exceedance of trihalomethane and the operational performance problems it indicates.

86.     LAN's 2014 Report should have identified the likely causes of increased trihalomethane levels and provided appropriate recommendations to lower the trihalomethane to safe levels, in compliance with state drinking water standards and professional engineering standards.

87.     LAN's 2014 Report failed to identify the root cause of the trihalomethane problem or the implications of this issue with regard to corrosive water.

88.     LAN's 2014 Report recommendations worsened the Flint Water Crisis.

89.     High trihalomethane levels are not only a health risk on their own, but are also an indicator of more serious problems with water treatment and supply.

90.     A professional engineer of ordinary learning, judgment and skill in this community would view the high trihalomethane levels, along with all other publicly known and available information at the time (including but not limited to media reports of corrosive water), as reason for concern about the corrosivity of the water, the likely corrosion of pipes (including lead pipes), and resulting lead poisoning of the water supply and related health risks.

91.     A *Flint Journal*/MLive article, "Officials say Flint water is getting better, but many residents unsatisfied," dated January 21, 2015 (2015 Residents Unsatisfied Article, Exhibit I) reported that over one hundred residents gathered for a public meeting on January 21, 2015 with state and local officials at Flint City Hall to express concerns with reported Safe Drinking Water Act violations, observed problems with drinking water quality, and concerns regarding health risks.

13

92.     The 2015 Residents Unsatisfied Article included photographs of jugs of visibly discolored water.

93.     The Defendants had actual and/or constructive notice of the observed problems with drinking water quality and concerns regarding health risks reported in the 2015 Residents Unsatisfied Article.

94.     In January 2015, in response to the repeated violations of Safe Drinking Water Act standards, the problems with corrosivity at the General Motors factory, the visually discolored water coming out of residents' taps, and growing public concerns over water quality and public health, the City of Flint solicited a proposal for a water quality consultant.

95.     On January 29, 2015, Veolia Water North America Operating Services, LLC, submitted to the City of Flint its "Response to Invitation to Bid for Water Quality Consultant," Proposal No.: 15-573 (Veolia's 2015 Bid, Exhibit J).

96.     Veolia's 2015 Bid was submitted by David Gadis, identified as Senior Vice President, Sales, Municipal and Commercial Development, Veolia North America.

97.     Veolia's 2015 Bid proposed "to address the immediate reliability and operational needs" of Flint's water system.

98.     The City of Flint had requested professional engineering services (1) to review and evaluate "the City's water treatment process…and procedures to maintain and improve water quality;" (2) to develop a report with recommendations "to maintain compliance with both State of Michigan and federal agencies;" and (3) to assist the City in implementing the recommendations.

99. Veolia's 2015 Bid, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services approach outlined in [the City of Flint's request]."

100. Veolia's 2015 Bid responded to the City's requested scope of work by proposing (1) calibrating "daily water quality samples with the City's hydraulic model;" (2) refining "the operational strategies for the plant and distribution system;" (3) coordinating "daily efforts across plant, operations and maintenance staff;" and (4) alleviating "continued concerns from the public through the public communications process."

101. Veolia's 2015 Bid states that to perform the proposed work in Flint, "Veolia would mobilize a team of experts, including our two prominent water SMEs [Subject Matter Experts], from our corporate technical services group (an in-house team of technical and management experts that support the company's project and operations throughout North America)."

102. The "two prominent water subject matter experts" provided by Veolia were identified in Veolia's 2015 Bid as: (1) Marvin Gnagy, P.E., "Water Process and Quality Manager," a "certified Water Operator in Ohio and a registered Professional Engineer [in Ohio]" and (2) Theping Chen, P.E., "Process and Operations Optimization Manager," a "water consulting engineer in Michigan" and "a registered Professional Engineer in the State of Michigan."

103. Veolia's 2015 Bid, in "Attachment 1, Resumes for Key Staff" states that Marvin Gnagy, P.E., is the "Water Process Manager with the Engineering and Optimization group of Veolia Environnement North America (Veolia)'s Municipal and Commercial Technical Support Group." It further states that prior to his current role with the Veolia entity described as "Veolia

15

Environnement North America (Veolia)," Mr. Gnagy was a manager with another Veolia entity, described as "Veolia Water North America Operating Services, LLC (Veolia Water)'s Technical Direction Group."

104.    Veolia's 2015 Bid, in "Attachment 1, Resumes for Key Staff" states that Theping Chen, P.E., is a "Process and Operations Optimization Manager with the Engineering and Optimization group of Veolia Environnement North America (Veolia)'s Municipal and Commercial Technical Support Group."

105.    On or about February 4, 2015, the City of Flint engaged the professional services of Veolia through a "Resolution to Veolia Water for Water Quality Consultant" (2015 Veolia Resolution, Exhibit K).

106.    The 2015 Veolia Resolution includes a standard of performance clause: "The city is relying upon the professional reputation, experience, certification, and ability of Contractor [Veolia]."

107.    Just a few days after Veolia was hired by Flint, there were public reports of lead problems.

108.    A *Flint Journal*/MLive article, "University of Michigan-Flint reveals water quality test results to campus," dated February 9, 2015 (2015 University of Michigan Lead Test Article, Exhibit L) reported that University of Michigan-Flint announced to the "campus community" that two drinking water sources in two different buildings were being shut down due to unsafe lead levels.

109.    Based on information reported in the 2015 University of Michigan Lead Test Article, the University of Michigan-Flint tested for lead levels after being notified by the City of Flint of the high trihalomethane levels in Flint's water.

16

110.    The Defendants had actual and/or constructive notice of the unsafe lead levels reported in the 2015 University of Michigan Lead Test Article.

111.    On February 10, 2015 (one day after the University of Michigan-Flint announced that two drinking water sources were being shut down due to unsafe lead levels), the City of Flint issued a public announcement titled "Flint Hires International Urban Water Experts of Veolia North America to Assess City's Water Issues" (2015 Veolia Announcement, Exhibit M).

112.    In the 2015 Veolia Announcement, Veolia Vice President David Gadis stated: "We understand the frustration and urgency in Flint. We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." Mr. Gadis further stated that Veolia has "extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water."

113.    On February 12, 2015, Veolia's Vice President Rob Nicholas made a public statement regarding the work Veolia would perform in Flint: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

114.    On February 18, 2015, Veolia presented its "Interim Water Quality Report" (Veolia's 2015 Interim Report, Exhibit N) to the Flint City Council Public Works Committee.

115.    Veolia's 2015 Interim Report was made public and was reported in the media.

116.    According to Veolia's 2015 Interim Report, the only issue not in Veolia's scope of study was "why the change from [Lake Huron water via the Detroit system pipeline] or the history of the utility."

17

117.   Veolia's 2015 Interim Report began with the headline: "Everybody is Checking the Safety of Water."

118.   Veolia's 2015 Interim Report stated to the public that Flint's water was safe: "Safe = compliance with state and federal standards and required testing. Latest tests show water is in compliance with drinking water standards."

119.   Veolia's 2015 Interim Report then explains that residents are seeing discolored water because of "old cast iron pipes." Veolia again states that there are no health or safety problems, as discoloration "[d]oesn't mean the water is unsafe."

120.   Veolia's 2015 Interim Report provided a map of reported water quality complaints over the past 12 months with the statement "fewer than you think."

121.   Veolia's 2015 Interim Report responded to questions about "[m]edical problems" by stating that "[s]ome people may be sensitive to any water."

122.   Veolia's 2015 Interim Report encouraged residents to contact the City of Flint to have the water in their home tested.

123.   Flint resident Leanne Walters had in fact already contacted the City of Flint to have the water in her home tested. Michael Glasgow, the Flint Water Treatment Plant manager, visited the Ms. Walters' home at 212 Browning Avenue and tested the water.

124.   On February 18, 2015 (the same day as Veolia's 2015 Interim Report), Mr. Glasgow tested for lead at 212 Browning Avenue. Mr. Glasgow tested for lead because of discoloration and high levels of iron.

125.   On February 20, 2015, the Michigan Department of Environmental Quality Drinking Water Laboratory tested the 212 Browning Avenue sample (LF54945) and detected

lead at 104 parts per billon (ppb). A follow-up sample collected March 3, 2016 found lead at 397 ppb.

126.    The Action Level for lead under the Safe Drinking Water Act is 15 ppb.

127.    The Action Level is defined as "the concentration of lead or copper in water as specified in R 325.10604f(1)(c) that determines, in some cases, the treatment requirements that a water supply is required to complete" under the Michigan Safe Drinking Water Act, Rule 325.10102(b).

128.    In February 2015, based on the exceedance of the Action Level for lead at 212 Browning Avenue, the City of Flint issued a Consumer Notice of Lead & Copper Results in Drinking Water (2015 Consumer Notice of Lead, Exhibit O).

129.    The 2015 Consumer Notice of Lead contained the following warning: "Lead can cause serious health problem [sic] if too much enters your body from drinking water or other sources. It can cause damage to the brain and kidneys, and it can interfere with the production of red blood cells that carry oxygen to all parts of your body. The greatest risk of lead exposure is to infants, young children, and pregnant women. Scientists have linked the effects on the brain with lower IQ in children. Adults with kidney problems and high blood pressure can be affected by low levels of lead more than healthy adults. Lead is stored in the bones, and can be released later in life. During pregnancy, the child receives lead from the mother's bones, which may affect brain development."

130.    On February 27, 2015, LAN prepared a Final Operational Evaluation Report titled, "Trihalomethane Formation Concern" (LAN's February 2015 Report, Exhibit P).

131.    LAN's February 2015 Report recommended additional ferric chloride to address the ongoing water quality problems, stating that ferric chloride could "easily be implemented without the need for additional equipment."

132.    It is widely known in the relevant engineering profession that ferric chloride is highly acidic and would increase the corrosivity of Flint's water, worsening the corrosion of lead pipes, the resulting leaching of lead into the water supply, and the poisoning of Flint residents.

133.    The Defendants knew or should have known that adding acidic ferric chloride to Flint's water would continue and worsen the Flint Water Crisis.

134.    Unlike the Defendant engineering firms, whose reports were completely ignoring the warning signs of corrosion, several public officials correctly identified the corrosion problem and implications for lead poisoning.

135.    The publicly available 2015 Consumer Notice of Lead was a clear warning sign for staff at the U.S. Environmental Protection Agency's Chicago, Illinois office.

136.    On February 26, 2015, EPA's Jennifer Crooks, Program Manager for EPA's Drinking Water State Revolving Fund in Michigan, sent an email to other EPA staff regarding lead in Flint's water (February 2015 EPA Email Correspondence, Exhibit Q).

137.    In the February 2015 EPA Email Correspondence, Ms. Crooks stated that the lead testing results in a home with "2 children under the age of 3" were cause for "[b]ig worries here." She continued, "the different chemistry water is leaching out contaminants from the insides of the biofilms inside the pipes" and "[l]ead is a good indication that other contaminants are also present in the tap water."

20

138.    In the February 2015 EPA Email Correspondence, Miguel Del Toral, EPA's Ground Water and Drinking Water Branch's Regulations Manager, responded to Ms. Crooks' stated concerns on February 27, 2015.

139.    Mr. Del Toral stated in the February 2015 EPA Email Correspondence: "where you find [lead] values [as high as 104 ppb], it is usually due to particulate lead" and that the leaching of particulate lead in the water supply "is a normal part of the corrosion process."

140.    Mr. Del Toral further stated in the February 2015 EPA Email Correspondence that high levels of orthophosphates (a method of corrosion control) "seem to reduce the amount of particulate [lead] that is released in the absence of physical disturbances to the lead lines."

141.    Mr. Del Toral, again in the February 2015 EPA Email Correspondence, then correctly diagnosed the root cause of Flint's water supply problems – lack of corrosion control: "If I remember correctly, Detroit is feeding [orthophosphate] for [compliance with] the [Safe Drinking Water Act's Lead and Copper Rule], but since Flint is no longer part of that interconnection, I was wondering what their [optimized corrosion control technique] was. They are required to have [optimized corrosion control technique] in place which is why I was asking what they were using."

142.    With far more limited information than was available to the Defendant engineering firms (which were in Flint as paid consultants during the exact same time period as the February 2015 EPA Email Correspondence), and working from his office in Chicago with no additional resources, Mr. Del Toral spotted the emerging Flint Water Crisis, diagnosed the root cause, and questioned why the appropriate engineering response was not being implemented.

143.    On March 12, 2015, Veolia (as an entity self-described as "Veolia North America") submitted to Flint its Water Quality Report (Veolia's 2015 Report, Exhibit R).

21

144.    Veolia's 2015 Report states that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer service and communication programs, and capital plans and annual budget."

145.    Veolia's 2015 Report again made fraudulent statements regarding the safety of Flint's water supply: "[t]he review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and, based on those standards, the water is considered to meet drinking water requirements."

146.    Veolia's 2015 Report only considered phosphate corrosion control to address discoloration, with no mention of the far more serious lead problem: "Many people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water."

147.    Veolia's 2015 Report recommended adding more ferric chloride: "Current ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended. … The increase in chemical costs could be up to $1,000,000 per year. This change in dosage (using ferric chloride) can be made immediately without state permit review."

148.    Veolia knew or should have known that Flint had no corrosion control protocol and that corrosion was already a significant problem.

149.    Veolia knew or should have know of the effects of adding more ferric chloride, an acid, to already corrosive water moving through lead pipes into homes.

150.    Veolia's recommendation that Flint double its dosage of ferric chloride, a powerful acid, was unqualified and in no way warned that ferric chloride could increase corrosion.

22

151. Veolia failed to inform Flint that in order to increase the dosage of ferric chloride (or indeed to use any chloride at all) it must also raise the water's pH (making the water less acidic) and use phosphates to protect the pipes from corrosion.

152. Flint followed the Defendants' professional advice and added ferric chloride to the water supply. As a direct result, the Flint Water Crisis continued and worsened.

153. The catastrophic error of adding ferric chloride to already corrosive water soon came to the public's attention with objective data.

154. Dr. Marc Edwards' Flint Water Study demonstrated that Flint's treated water became more acidic even as the Flint River became less acidic. The Flint River had a pH (a measure of acidity) at or above 8.0 prior to June of 2015, and its pH steadily increased (meaning it became less acidic) after June. The pH in Flint's treated water, however, became steadily more acidic immediately after Veolia's recommendation to double the ferric chloride concentration. The pH dropped from 7.9 in March 2015 to 7.3 by August. This is a dramatic difference because pH is measured on a logarithmic scale, meaning that a pH decrease by one whole number equates to a water supply that is ten times more corrosive.

155. Despite the Flint River water supply becoming less acidic, the treated water became significantly and dangerously more acidic after and due to Defendants' direction to add more ferric chloride.

156. On August 27, 2015, LAN issued another Operational Evaluation Report on the Trihalomethane Formation Concern (LAN's August 2015 Report, Exhibit S).

157. Again, LAN should have recognized the root cause of the high trihalomethane levels. Again, LAN should have seen the trihalomethane levels along with the now overwhelming evidence of water quality issues as an indicator of a corrosion problem. Again,

LAN should have been aware of the resulting leaching of lead into the water supply and harm to public health. Instead, LAN's August 2015 Report continued to recommend additional ferric chloride, which again would actually make the water more corrosive and intensify and worsen the Flint Water Crisis. And again, LAN failed to meet its duty of professional care and standards.

158.   LAN's August 2015 Report stated: "Increasing the dose rate of ferric chloride is an operational change that can easily be implemented without the need for any additional equipment. ... Increased dosing of ferric chloride would be most ideal" with regular monitoring to determine "the appropriate ferric chloride feed rate."

159.   The acts and omissions of the Defendants caused the Flint Water Crisis to occur, continue, and worsen over a period of approximately 18 months. The Defendants' acts and omissions resulted in corrosive water being delivered through lead pipes into homes and other drinking water sources. Subsequent acts and omissions, including but not limited to Defendant Veolia's fraudulent statements, caused widespread exposure to lead and resulting lead poisoning.

160.   Lead poisoning is a terrible harm to public health and welfare. The 2015 Consumer Notice of Lead describes some (but not all) of the "serious" health problems from lead exposure: most notably damage to the brain and kidneys, as well as interference with the production of red blood cells that carry oxygen to all parts of the human body. As stated in the 2015 Consumer Notice of Lead, infants, young children, and pregnant women are most at risk. And the harm to public health and welfare will continue in subsequent generations, as lead is stored in mothers' bones and then released during pregnancy to her unborn children.

161.   The costs and damages that result from addressing widespread lead poisoning include but are not limited to health monitoring and treatment costs, mental health services, educational services, and social services.

24

162.   Additional exemplary damages are warranted to compensate the People of the State of Michigan for the humiliation, sense of outrage, and indignity resulting from harm to public health and welfare maliciously, willfully and wantonly inflicted by the Defendants.

163.   Further, the acts and omissions of the Defendants in the Flint Water Crisis, including but not limited to making the water supply more corrosive, caused widespread damage to public property and infrastructure

164.   On October 16, 2015, Flint stopped using the Flint River for its water supply and resumed use of Lake Huron water through the Detroit system. However, the damage had been done and lead has continued to leach from pipes into the water.

165.   On January 5, 2016, Michigan Governor Rick Snyder issued a Declaration of Emergency for Genesee County (2016 Snyder Declaration of Emergency, Exhibit T) stating, "the damaged water infrastructure and leaching of lead into the city's water caused damage to public and private water infrastructure, and has either caused or threatened to cause elevated blood lead levels, especially in the population of children and pregnant women, and causing a potential immediate threat to public health and safety and disrupting vital community services."

166.   On January 21, 2016, the United State Environmental Protection Agency issued an Emergency Administrative Order (2016 EPA Emergency Administrative Order, Exhibit U) stating that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river's water was corrosive and removed protective coatings in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

25

167.    The 2016 EPA Emergency Administrative Order further stated: "water provided by the City to residents poses an imminent and substantial endangerment to the health of those persons ... by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

## COUNT I – PROFESSIONAL NEGLIGENCE
### All Defendants

168.    Plaintiff incorporates by reference all preceding allegations set forth above as if fully stated herein.

169.    The Defendants undertook, for consideration, to render professional services for the City of Flint and the benefit and protection of the public at large, including the People of the State of Michigan.

170.    The Defendants undertook to perform professional services with a duty and standard of care independent of contractual obligations or statutory requirements.

171.    The acts and omissions of the Defendants constitute professional negligence.

172.    The Defendants failed to address the problem of corrosion and resulting lead poisoning, which a professional engineer of ordinary learning, judgment or skill in this community would do. The Defendants failed to recognize the root cause of the observed water quality problems and further recommended actions that made the problems worse.

173.    The Defendants owed the People of the State of Michigan a duty of care and competence at a professional standard. This duty applies to the design of the Flint Water Treatment Plant, the decision to put the Flint Water Treatment Plant into operation in April 2014, the subsequent responses to the violations of the Safe Drinking Water Act, statements to the public, and all studies and reports regarding Flint's water supply.

174. The Defendants' acts and omissions breached their duty. As a direct result, the People of the State of Michigan have been injured and continue to be injured. These injuries were caused by the Defendants' breaches and professional negligence.

175. The Defendants knew or should have known that high chloride levels in the Flint River would make the water corrosive without significant treatment, and that the corrosion would result in dangerous levels of lead for residents served by the City's many lead pipes.

176. The Defendants breached their ethical duty to notify the public and other authorities of the dangerous situation and unsafe water in Flint resulting from the lack of corrosion control.

177. The Defendants ignored information that a professional engineer would recognize as cause for concern and further investigation. Further, the Defendants recommended increasing the use of ferric chloride, which made the water even more corrosive, accelerating and worsening the corrosion of lead pipes and resulting in lead poisoning of drinking water.

178. The People of the State of Michigan relied on the professional expertise and the paid work of the Defendants to provide safe drinking water, and this reliance was based, in part, on assertions and statements made by the Defendants.

179. WHEREFORE, Plaintiff respectfully requests that the trier of fact award damages, jointly and severally against all Defendants, including exemplary damages, which will fully, fairly and completely compensate the people of the State of Michigan for harm to their interests in public health and welfare.

## COUNT II – FRAUD
**Veolia**

180.     Plaintiff incorporates by reference all preceding allegations set forth above as if fully stated herein.

181.     Veolia made representations in Veolia's 2015 Interim Report, Veolia's public presentation to the Flint City Council Public Works Committee on February 18, 2015, Veolia's 2015 Interim Report, and other public statements and reports in February and March 2015 regarding the nature and cause of the water quality problems in Flint, the safety of Flint's water, and the public health risks that were false and material.

182.     The false and material representations include but are not limited to statements in Veolia's 2015 Interim Report that (a) Flint's water was "safe" and "in compliance with drinking water standards," (b) the observed discoloration was merely aesthetic and not indicative of a water quality or health problem, and (c) medical problems are because "[s]ome people may be sensitive to any water."

183.     Further, Veolia has a legal and equitable duty to disclose information regarding public health risks based on its representations and the inquiries made to it. Veolia knew or should have known that its failure to disclose was misleading.

184.     Veolia knew the representations it made were false, or the representations were made recklessly without any knowledge of the potential truth.

185.     Veolia made the representations with the express intention that the general public and the People of the State of Michigan would act and rely on them. Specifically, Veolia sought to alleviate public concerns about the quality of Flint's water and related health risks through its communication process, as stated in Veolia's 2015 Bid.

28

186.    The general public and the People of the State of Michigan did actually rely on Veolia's false representations regarding Flint's water. The general public and the People of the State of Michigan continued to drink water with unsafe lead levels after February and March 2015 based on Veolia's false representations. Reliance on Veolia's statements increased the quantity, intensity, and duration of the public's lead exposure and poisoning.

187.    In reliance on Veolia's false representations made in February and March 2015, the public continued to use Flint's corrosive water, coming through lead pipes, until the water supply was finally switched back to the Detroit system in October 2015.

188.    As a direct result of Veolia's fraudulent statements, the People of the State of Michigan have suffered, and will continue to suffer, severe economic damages.

189.    The People of the State of Michigan and its citizens were in a relation of trust and confidence with Veolia when Veolia made its false and material representations.

190.    WHEREFORE, Plaintiff respectfully requests that the trier of fact award damages, jointly and severally against all of the Veolia Defendants, including exemplary damages, which will fully, fairly and completely compensate the People of the State of Michigan for harm to their interests in public health and welfare.

### COUNT III – PUBLIC NUISANCE
### All Defendants

191.    Plaintiff incorporates by reference all preceding allegations set forth above as if fully stated herein.

192.    The Defendants' acts and omissions constitute a public nuisance because they unreasonably interfered with a right common to the general public: the right to safe, reliable public drinking water.

193.    The Defendants' conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort and the public convenience.

194.    Some of the acts and omissions of Defendants violate state safe drinking water laws.

195.    The Defendants knew or should have known that their acts were of a continuing nature and will produce permanent or long-lasting effects upon these public rights.

196.    One potential measure to prevent future public harms and abate the nuisance is the replacement of lead service lines and pipes.

197.    WHEREFORE, Plaintiff respectfully requests that the trier of fact award damages, jointly and severally against all Defendants, including exemplary damages, which will fully, fairly and completely compensate the People of the State of Michigan for harm to their interests in public health and welfare.

30

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff Attorney General Bill Schuette, on behalf of the People of the

State of Michigan, demand judgment in excess of $25,000.00 for damages and such other relief

as this Court may deem just and proper.

Bill Schuette
Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

_____

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

Dated August 16, 2016

31

## JURY TRIAL DEMAND

Plaintiff Attorney General Bill Schuette, on behalf of the People of the State of Michigan, hereby demands a trial by jury for all claims so triable.

                                                   Bill Schuette
                                                   Attorney General
State of Michigan

Todd Flood
Special Assistant Attorney General
Office of Special Counsel

_____

Noah D. Hall (P66735)
Special Assistant Attorney General
Office of Special Counsel
nhall@crisisflint.com
(517) 930-6258
*Counsel of Record*

Gary D. Reeves (P35902)
Donald R. Sheff, II (P78262)
155 W. Congress St., Suite 603
Detroit, MI 48226

Dated August 16, 2016

32

# Exhibit List

A. LAN (with Rowe Engineering, Inc.), "Analysis of the Flint River as a Permanent Water Supply for the City of Flint," July 2011 (LAN's 2011 Report) - available at http://www.greatlakeslaw.org/Flint/LAN_2011_Report_with_Appendices.pdf

B. LAN (with Rowe Engineering, Inc.), "Technical Memorandum Cost of Service Study Flint Water Treatment Plant," July 2011 (LAN's 2011 Technical Memorandum) - http://www.greatlakeslaw.org/Flint/LAN_2011_Report_with_Appendices.pdf

C. LAN, Proposal to the City of Flint for "Flint Water Treatment Plant Rehabilitation – Phase II," June 10, 2013 (LAN's 2013 Proposal) - available at http://www.greatlakeslaw.org/Flint/LAN_2013_Proposal.pdf

D. City of Flint, "Resolution Authorizing Approval to Enter into a Professional Engineering Services Contract for the Implementation of Placing the Flint Water Plant into Operation," June 26, 2013 (2013 LAN Resolution) – available at http://www.greatlakeslaw.org/Flint/Kurtz_Resolution_FWTP.PDF

E. City of Flint, Responses to City of Flint Residents' Water Questions, January 13, 2015 (City of Flint Responses to Citizens' Water Questions) – available at http://www.greatlakeslaw.org/Flint/City_of_Flint_Water_Questions.pdf

F. MDEQ, "Compliance Communication Total Trihalomethane Operational Evaluation Requested," September 10, 2014 (2014 Compliance Communication) – available at http://www.greatlakeslaw.org/Flint/MDEQ_THM_Compliance_Communication_September_10_2014.pdf

G. *Flint Journal*/MLive, "General Motors shutting off Flint River water at engine plant over corrosion worries," October 13, 2014 (2014 General Motors Corrosion Article) – available at http://www.greatlakeslaw.org/Flint/2014_General_Motors_Corrosion_Article.pdf

H. LAN, Draft Operational Evaluation Report for the City of Flint, "Trihalomethane Formation Concern," November 2014 (LAN's 2014 Report) - available at http://www.greatlakeslaw.org/Flint/LAN_2014_Report.pdf

I. *Flint Journal*/MLive, "Officials say Flint water is getting better, but many residents unsatisfied," January 21, 2015 (2015 Residents Unsatisfied Article) – available at http://www.greatlakeslaw.org/Flint/2015_Residents_Unsatisfied_MLive_Article.pdf

J.  Veolia, "Response to Invitation to Bid for Water Quality Consultant," Flint Proposal No.: 15-573, January 29, 2015 (Veolia's 2015 Bid) - available at http://www.greatlakeslaw.org/Flint/Veolia_2015_Bid.pdf

K.  City of Flint, "Resolution to Veolia Water for Water Quality Consultant," February 4, 2015 (2015 Veolia Resolution) – available at http://www.greatlakeslaw.org/Flint/Veolia_Flint_Contract.pdf

L.  *Flint Journal*/MLive, "University of Michigan-Flint reveals water quality test results to campus," February 9, 2015 (2015 University of Michigan Lead Test Article) – available at http://www.greatlakeslaw.org/Flint/2015_University_of_Michigan_Lead_Test_Article.pdf

M.  City of Flint, "Flint Hires International Urban Water Experts of Veolia North America to Assess City's Water Issues," February 10, 2015 (2015 Veolia Announcement) – available at https://www.cityofflint.com/2015/02/10/flint-hires-international-urban-water-experts-of-veolia-north-america-to-assess-citys-water-issues/

N.  Veolia, "Interim Water Quality Report," February 18, 2015 (Veolia's 2015 Interim Report) - available at www.greatlakeslaw.org/Flint/Veolia_2015_Interim_Report.pdf

O.  City of Flint, "Consumer Notice of Lead & Copper Results in Drinking Water," February 2015 (2015 Consumer Notice of Lead) – available at http://www.greatlakeslaw.org/Flint/City_of_Flint_Lead_Copper_Consumer_Notice.pdf

P.  LAN, Final Operational Evaluation Report, "Trihalomethane Formation Concern," February 27, 2015 (LAN's February 2015 Report) - available at http://www.greatlakeslaw.org/Flint/LAN_February_2015_Report.pdf

Q.  Jennifer Crooks and Miguel Del Toral Emails with MDEQ employees, February 26-27, 2015 (February 2015 EPA Email Correspondence) – available at http://www.greatlakeslaw.org/Flint/Crooks_Del_toral_February_26_2015_Email.pdf

R.  Veolia, Flint Water Quality Report, March 12, 2015 (Veolia's 2015 Report) - available at www.greatlakeslaw.org/Flint/Veolia_2015_Report.pdf

S.  LAN, Final Operational Evaluation Report, "Trihalomethane Formation Concern," August 27, 2015 (LAN's August 2015 Report) – available at http://www.greatlakeslaw.org/Flint/LAN_August_2015_Report.pdf

T. Governor Rick Snyder, "Declaration of Emergency for Flint," January 5, 2016 (2016 Snyder Declaration of Emergency) – available at http://www.greatlakeslaw.org/Flint/Snyder_Declaration_of_Emergency.pdf

U. EPA, "Emergency Administrative Order," January 21, 2016 (2016 EPA Emergency Administrative Order) – available at http://www.greatlakeslaw.org/Flint/EPA_Emergency_Administrative_Order.pdf

**Stern, Corey**

PLAINTIFF'S EXHIBIT

E

| | |
|---|---|
| **From:** | Gambill, Nathan (AG) <GambillN@michigan.gov> |
| **Sent:** | Wednesday, February 13, 2019 11:36 AM |
| **To:** | mlmcalpine@mcalpinepc.com; Stern, Corey; Jayson Blake |
| **Cc:** | Bettenhausen, Margaret (AG); Larsen, Zachary (AG); Kuhl, Richard (AG) |
| **Subject:** | Genesee County Flint Water Litigation - Update Request |

Mark and Corey,

You are our plaintiff representative counsel for the Flint water litigation consolidated in Genesee County. Richard, Margaret, Zach, and I have replaced Noah Hall as the attorneys handling the People's suit against Veolia and LAN in that litigation. We have not received any required updates from you regarding your meetings with Judge Yuille. Could you please provide an update of your latest meeting with the judge on February 5, 2018? What did you talk about? What should we be aware of from a plaintiff's perspective? What should we focus on in the draft CMO submitted on Feb 11? What is your sense of when and how the judge will handle all of the pending dispositive motions?

Thanks,

Nate Gambill
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources, and Agriculture Division
525 West Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Phone: 517-335-7664
Fax: 517-241-3473

PLAINTIFF'S
EXHIBIT
F

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 7TH JUDICIAL CIRCUIT
GENESEE COUNTY

IN RE:  FLINT WATER LITIGATION          No. 17-108646-NO

HON. RICHARD B. YUILLE

_____/

**CORRECTED OBJECTIONS BY BOTH THE STATE DEFENDANTS IN THE**
***MAYS* PUTATIVE CLASS ACTION AND THE PEOPLE IN THE *PARENS PATRIAE* ACTION AGAINST THE VEOLIA AND LAN DEFENDANTS**

These objections are raised by former Governor Snyder, the State of Michigan, and former Treasurer Andy Dillon in case no. 16-106112 (State Defendants) and the People in case no. 16-107576.

That both of these parties (State Defendants and the People) have the same counsel and are involved in this complex litigation in some respects both on the plaintiffs' and defendants' sides further emphasizes the need for the Court to allow counsel for these parties to participate in regularly monthly status conferences and otherwise be exempt from the "lead counsel" arrangement.  Otherwise, the same counsel must seek updates from both the plaintiffs' and defendants' side of this litigation.  If counsel for the State Defendants and the People were full participants, they would not have to depend on the counsel for adverse parties for information. The Court must rule promptly, ideally before entering a Discovery and Scheduling Order, on State Defendants' pending August 24, 2018 motion to be exempted from the lead counsel arrangement and extend its ruling to the People.

I.      **Objections of State Defendants.**

State Defendants' fundamental objection is that no discovery should proceed until after the Court has ruled on State Defendants' August 22, 2018 dispositive motion.  The dispositive motion is purely legal, very straightforward, and is an efficient way for the Court to be free from the unnecessary complications[1] the *Mays* case brings to this litigation.  Indeed, the Court must rule on it before allowing discovery to proceed.  Burdening State Defendants, whose costs are paid by the taxpayers, with expensive discovery and expert witness obligations will severely prejudice them if it turns out Plaintiffs had not even satisfied the legal threshold to file suit.

Moreover, the plaintiffs in *Mays* have indicated that they plan to try and amend their complaint again rather than respond to the August 22, 2018 dispositive motion.  If so, and the Court allows an amendment, the State Defendants will file a dispositive motion to dismiss the *Mays* plaintiffs' amended complaint.  No discovery should proceed in *Mays* unless the Court denies that future dispositive motion should it be necessary.  Not only that, but as a practical matter, discovery should not commence until it is clear what the operative complaint is.  It would not make sense for discovery in *Mays* to be based on an obsolete pleading.

State Defendants also object to every provision of the draft Discovery and Scheduling Order that gives any entity other than the named plaintiffs in the *Mays*

---

[1] The *Mays* and *Carthan* plaintiffs' February 15, 2019 objections to the draft Discovery and Scheduling Order are just some of the complications presented by the *Mays* case.

action the authority to issues discovery requests to State Defendants apart from ordinary non-party requests. These cases are consolidated, not merged. The interim lead class counsel and lead individual plaintiffs' counsel have deliberately chosen not to sue State Defendants in Genesee County. It would not be lawful for them to submit party discovery requests to a non-party.

To implement these and other objections by State Defendants, State Defendants request that the following language either be added to or removed from the draft submitted on February 11, 2018:

### A.   Language that should be added.

#### 1.   Section 3

A third and fourth paragraph at the end of that section that states: "Notwithstanding any other provision of this Discovery and Scheduling Order, the plaintiffs in the *Mays* putative class action case may not serve any discovery request on any State Defendant in that case unless the Court denies the State Defendants' August 22, 2018 dispositive motion (or, if the Court allows the plaintiffs to amend their complaint, a later filed dispositive motion that seeks to dismiss that amended complaint)."

"Notwithstanding any other provision of this Discovery and Scheduling Order, no party in any lawsuit consolidated in these proceeding may submit party discovery requests to State Defendants except the named plaintiffs in the *Mays* putative class action, which is the only lawsuit to which State Defendants are

parties.  This paragraph does not affect ordinary non-party discovery available under the Court Rules."

### 2.    Section 6(a)

A sentence at the end of that paragraph that states:  "Notwithstanding any other language in this section, State Defendants can only be served with party requests under this section by the named plaintiffs in *Mays*, and the plaintiffs in *Mays* can only be served with party requests under this section by the named defendants in *Mays*."

### 3.    Section 9(a)

A sentence at the end of that paragraph that states:  "Notwithstanding any other language in this section, State Defendants can only be served with party requests under this section by the named plaintiffs in *Mays*, and the plaintiffs in *Mays* can only be served with party requests under this section by the named defendants in *Mays*."

### 4.    Section 12(a)

A sentence at the end of that paragraph that states:  "Notwithstanding any other language in this section, State Defendants can only be served with party requests under this section by the named plaintiffs in *Mays*, and the plaintiffs in *Mays* can only be served with party requests under this section by the named defendants in *Mays*."

4

5.    **Section 19**

A sentence at the end of that introductory paragraph that states:

"Notwithstanding any other language in this section, State Defendants can only be served with party requests under this section by the named plaintiffs in *Mays*, and the plaintiffs in *Mays* can only be served with party requests under this section by the named defendants in *Mays*."

6.    **Section 27**

An introductory paragraph preceding paragraph (a) that states:

"Notwithstanding any other language in this section, State Defendants in the *Mays* action are only obligated to provide expert witness reports and disclosures to the named plaintiffs in *Mays*, and the named plaintiffs in *Mays* are only obligated to provide expert witness reports and disclosures to State Defendants in the *Mays* action."

B.    **Items that should be deleted.**

1.    **Section 5(b)(F) must be deleted.  No individual plaintiff has sued State Defendants.**

2.    **Section 5(f) should be deleted.**

3.    **Section 8(a)(F) must be deleted.  No individual plaintiff has sued State Defendants.**

4.    **Section8(e) should be deleted.**

5.    **Section 11(a)(F) must be deleted.  No individual plaintiff has sued State Defendants.**

6.      **Section 11(e) should be deleted.**

C.      **Class Certification.**

State Defendants do not support either version of Section 31 in its entirety.

## II.     Objections of the People.

The People's overriding objection is that the draft Discovery and Scheduling Order does not address the People's lawsuit.  The People's suit is neither an individual nor a class action—it is a *parens patrie* action that seeks compensation from the VNA and LAN defendants for the harm they caused the People's interest in public health and welfare.

The *parens patrie* trial will commence at the same time, and proceed concurrently with, the first bellwether trial.  It does not require the detailed bellwether selection process and can move forward at a relatively accelerated pace.  Additionally, as it is currently drafted, no section of the draft Discovery and Scheduling Order provides for the People to take discovery.

To implement these and other objections by the People, they request that the following language either be added to or removed from the draft submitted on February 11, 2018:

### A.      Language that should be added.

1.      **Section 32**

Add a Section 32 at the end of the order titled "Discovery in the *Parens Patrie* action (Case No. 16-107576)" that includes the following language:  "Discovery in

6

the *parens patrie* action will proceed as follows:  MCR 2.310 requests will follow the same schedule and numerical limits as outlined in Section 6; interrogatories will follow the same schedule and numerical limits as outlined in Section 9; requests for admission will follow the same schedule and numerical limits as outlined in Section 12; testimonial depositions of fact witnesses (party and non-party) will follow the same schedule, numerical limits, and time allocation as outlined in Section 19; and expert discovery will follow the same schedule and numerical limits as outlined in Section 27.  Other types of discovery will proceed in accordance with the schedule and numerical limits listed in the relevant section.  But under no condition will the People's discovery requests be required to go through Plaintiffs' Lead Counsel and Plaintiffs' Interim Liaison Class Counsel."

"Further regarding testimonial depositions of fact witnesses (party and non-party):  the People's time will be allocated on the plaintiffs' side by the People in coordination with, but not subject to, the preferences of Plaintiffs' Lead Counsel and Plaintiffs' Interim Liaison Class Counsel."

"Pretrial motions and filings for the trial in the *parens patrie* action will follow the same schedule as outlined in Section 30.  The *parens patrie* trial will commence at the same time, and proceed concurrently with, the first bellwether trial."

## III.   Objections of both the State Defendants and the People.

Both parties object to, and do not stipulate, to any expansion of the duty to produce information from expert witnesses in Section 29 or any other provision beyond those required by the Federal Rules of Civil Procedure.

Additionally, both parties join in the objection raised both by the putative class plaintiffs in *Mays* and the City Defendants: if this draft Discovery and Scheduling Order is to be entered, it should be coordinated with the federal case management schedule that is currently being drafted in the federal litigation consolidated before Judge Levy. There is no sense in further complicating an already complicated case by entering divergent discovery orders that deal with the same body of information.

## CONCLUSION AND RELIEF REQUESTED

Both State Defendants and the People request that the Court not enter the draft Discovery and Scheduling Order. In the alternative, both parties request that the Court hold a hearing on the draft Discovery and Scheduling Order, and not enter the order without first making the changes contained in these objections.

Respectfully submitted,

/s/ Nathan A. Gambill
Richard S. Kuhl (P42042)
Margaret A. Bettenhausen (P75046)
Nathan A. Gambill (P75506)
Zachary C. Larsen (P72189)
Assistant Attorneys General
Attorneys for State Defendants and
Plaintiff the People of the State of
Michigan
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755

8

Lansing, MI 48909
(517) 335-7664
kuhlr@michigan.gov
bettenhausenm@michigan.gov
gambilln@michigan.gov
larsenz@michigan.gov

Dated:  February 15, 2019

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 7TH JUDICIAL CIRCUIT
GENESEE COUNTY

IN RE:  FLINT WATER LITIGATION

No. 17-108646-NO

HON. RICHARD B. YUILLE

_____/

### PROOF OF SERVICE

On February 15, 2019, I sent by e-mail the Corrected Objections by Both the

State Defendants in the *Mays* Putative Class Action and the People in the *Parens*

*Patriae* Action Against the Veolia and LAN Defendants to the following parties:

cstern@levylaw.com; vinsonfcarter@gmail.com; eva.rcclawgroup@gmail.com;
attybrw821@gmail.com; jimgraves@sinasdramis.com;
georgesinas@sinasdramis.com; stevesinas@sinasdramis.com;
stacyharkness@sinasdramis.com; fletcherwolfjc@msn.com; lfletcherj@aol.com;
michaelvizard@gmail.com; trachelleyoung@gmail.com; mpitt@pittlawpc.com;
cmcgehee@pittlawpc.com; brivers@pittlawpc.com;
bgoodman@goodmanhurwitz.com; jhurwitz@goodmanhurwitz.com;
kjames@goodmanhurwitz.com; pnovak@weitzlux.com; jbroaddus@weitzlux.com;
gstamatopoulos@weitzlux.com; hunter@napolilaw.com; pnapoli@napolilaw.com;
mlmcalpine@mcalpinepc.com; jeblake@mcalpinepc.com;
jweiner@cohenmilstein.com; tleopold@cohenmilstein.com;
elevens@cohenmilstein.com; nhall@crisisflint.com; aoliver@oliverlg.com;
Wayne.Mason@dbr.com; travis.gamble@dbr.com; david.kent@dbr.com;
perickson@plunkettcooney.com; bush@bsplaw.com; williams@bsplaw.com;
cthompson@swappc.com; jmoran@swappc.com; jmcampbell@Campbell-trial-
lawyers.com; bmcelvaine@campbell-trial-lawyers.com; cparkerson@campbell-trial-
lawyers.com; jgrunert@campbell-trial-lawyers.com; crenaud@campbell-trial-
lawyers.com; wkim@cityofflint.com; berg@butzel.com; Klein@butzel.com;
cbarbieri@fosterswift.com; acollins@fosterswift.com;
bvandevusse@fosterswift.com; rlittleton@fosterswift.com;
mpattwell@clarkhill.com; jberger@clarkhill.com; cclare@clarkhill.com;
jbolton@clarkhill.com; tmorgan@fraserlawfirm.com; mperry@fraserlawfirm.com;
pgrashoff@kotzsangster.com; degan@kotzsangster.com; cciullo@kotzsangster.com;
kjackson@kotzsangster.com; mgildner@sfplaw.com; Bwolf718@msn.com;
bmeyer@owdpc.com; tperkins@perkinslawgroup.net;
nbranch@perkinslawgroup.net; alexrusek@whitelawpllc.com;

Jsawin@sawinlawyers.com; vlwlegal@aol.com; deblabelle@aol.com;
Cynthia@cmlindseylaw.com; shermane@cmlindseylaw.com; Stsea403@gmail.com;
tbingman@tbingmanlaw.com; bjmckeen@mckeenassociates.com;
mary@cndefenders.com; mwise@foleymansfield.com; gmeihn@folcymansfield.com;
EDriker@bsdd.com; mwitus@bsdd.com; TMendel@bsdd.com;
reriksson@cityofflint.com; jgalvin@gcdcwws.com; mcaffe@aol.com;
KuhlR@michigan.gov; BettenhausenM@michigan.gov; GambillN@michigan.gov;
LarsenZ@michigan.gov; tpanoff@mayerbrown.com

I declare that the above statement is true to the best of my knowledge,

information, and belief.

/s/ Amy M. Mitosinka
Amy M. Mitosinka
Paralegal
Michigan Department of Attorney
General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
mitosinkaa@michigan.gov

S:\CEPB3\ENRA_FlintWater\GCC-Mays v State of Michigan 16-106112-CZ (AG# 2016-0129715-D)\Pleadings\Final (Word
Versions Only)\Proof of Service - to Objections by State Defs in Mays and People 2019-02-15.docx

2

PLAINTIFF'S
EXHIBIT
G

**LEVY KONIGSBERG LLP**
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N.Y. 10022

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE OFFICE
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

**(212) 605-6200**
**FAX: (212) 605-6290**
**WWW.LEVYLAW.COM**

ATLANTA OFFICE
1800 PEACHTREE ST, NW
ATLANTA, GEORGIA 30309
TELEPHONE: (404) 748-1600
FAX: (404) 745-8624

WRITER'S DIRECT EMAIL: CSTERN@LEVYLAW.COM

FEBRUARY 18, 2019

**_VIA CERTIFIED MAIL (RRR) & EMAIL (NesselD@michigan.gov)_**
Attorney General Dana Nessel
G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30212
Lansing, Michigan

### RE:     _FLINT WATER LITIGATION – DISQUALIFICATION OF COUNSEL_

Attorney General Nessel:

My name is Corey Stern. I was appointed _Lead Counsel_ by the Honorable Richard B. Yuille on November 15, 2016 on behalf of all plaintiffs maintaining claims in the Circuit Court of Genesee County for personal injuries and property damage sustained as a result of the Flint Water Crisis. I was subsequently appointed _Liaison Counsel_ by the Honorable Judith E. Levy for all individual personal injury and property damage cases pending before the United States District Court for the Eastern District of Michigan. I personally represent more than 2,500 children who were lead-poisoned during the crisis.

I write, respectfully and regretfully, to seek the removal of four Assistant Attorneys General from all Flint matters to which they are presently assigned. Specifically, I believe that Richard Kuhl, Nathan Gambill, Margaret Bettenhausen, and Zachary Larsen, who are currently counsel in an array of cases involving the water crisis, should be immediately replaced as a result of irreparable conflicts of interest and because each of their various representative capacities has been compromised.

For more than three years, Mr. Kuhl, Mr. Gambill, Ms. Bettenhausen, and Mr. Larsen have passionately provided a defense in federal and state court against thousands of civil claims brought by Michigan citizens. In addition to the various immunity defenses they have raised, one constant theme emphasized by Mr. Kuhl and his team has been that most claimants simply were **not** injured, or were **not** injured in a meaningful way, or were **not** injured in a way that justifies lawsuits, or were **not** injured any more than citizens of other cities in Michigan. They have vehemently opposed the continuation of bottled water service. They have, on the whole, created a consistent narrative that individual Flint residents have overstated whatever "minor" injuries they may have sustained, if they sustained any at all.

Further, at various times, Mr. Kuhl has represented the existence of a "Chinese Wall," separating the civil cases, where his team is defending former and current state employees – from criminal cases, wherein your office is prosecuting the same individuals that Mr. Kuhl's team is defending – from yet another civil case, which was brought in Genesee County Circuit Court by the former Attorney General Schuette on behalf of "The People of the State of Michigan" (as a plaintiff) against private defendants, for the same harm Mr. Kuhl claims did not occur (and which Todd Flood asserts is a basis for manslaughter charges).

In light of these competing theories, defenses, and prosecutions, I was shocked earlier this month when Mr. Kuhl and his team were substituted as plaintiffs' counsel on behalf of "The People" in the Genesee County case, which alleges that the folks Mr. Kuhl and his team consistently claim were **not** harmed – **were** harmed. Clear, inherent and irreconcilable conflicts of interest now exist, and there is a distinct appearance of impropriety on the part of what is supposed to be an office that protects and serves Michiganders. It is abundantly clear that the "wall" previously described by Mr. Kuhl has been torn down, and worse yet, he and members of his team each has a foot on both sides of where it used to stand, if it ever actually existed.

My best guess is that Mr. Kuhl and his team might now try to explain that a "wall" is not necessary. But what has changed? If, as Mr. Kuhl previously stated, a "wall" was essential in order to keep his team from Todd Flood's, Mr. Flood's from his, his from Noah Hall's, Mr. Hall's from his, and Mr. Flood's and Mr. Hall's from each other's, what exactly has happened to obviate the need?

While I have consistently admired Mr. Kuhl's and his team's advocacy, the affection and professional respect I have for them pales in comparison to the level of skepticism my clients and I now have for the legal process and the space your office occupies in it, because of Mr. Kuhl's and his team's increasingly conflicting roles. It is difficult for me to imagine how any one of their opposing pursuits does not materially limit the others. Not only do I have a duty to my own clients and to those individuals for whom I am tasked with representing by way of my appointments as *Lead* and *Liaison Counsel*, I also have an ethical obligation to bring this to your attention. I see no way in which Mr. Kuhl and his team can remain on any single case, or sets of cases, as they have taken such entirely contradictory positions, and none can be undone as a result of the other.

And to compound matters, Mr. Kuhl and members of his team have been part of the small group tasked with trying to globally resolve the civil litigations. So while consistently claiming on the one hand that Flint residents were **not** harmed, now, on the other, Mr. Kuhl and his team claim they **were**. Trying to negotiate from that position or with the party taking it makes progress in that regard untenable.

It has always been a legal conundrum for me as to how the Attorney General's office is simultaneously able to prosecute present and former officials, while defending those officials in civil litigations regarding the very conduct for which they are being prosecuted, and also pursuing claims against private entities, on behalf of those Michigan citizens against whom it is also defending civil cases. But at least previously, no single attorney was involved in more than one of these incongruent pursuits or represented such materially adverse interests. Clearly, that is no longer the case.

2

Worse yet, it is the citizenry of Michigan that is paying for each of these activities. But if Michiganders must pay the legal bills for lawyers who are fighting diligently to defeat their lawsuits, while simultaneously paying the same office to prosecute its own clients criminally, then, at a minimum, they should not be forced to pay those same attorneys to pursue a case on their behalf, for harm their new attorneys claim did **not** occur.

I understand that sometimes politics and the ambitions of politicians dictate why decisions are made in the context of a crisis. But regardless of your predecessor's motivations in his criminal prosecution of state officials, or what appears to be his lack of foresight as to one day having to justify the maintenance of what are clearly competing and diametrically opposite claims and defenses, you have the opportunity to do so much better. This is the situation he created and the one you inherited. My hope is that you will do what is necessary, as painful as it may be, to ensure that these conflicts and the appearance they present are immediately resolved. The decision to assign Mr. Kuhl and his team to represent "The People" was wrong. As a result, they simply cannot maintain any of their various representative capacities, as each has been fatally compromised by way of the other.

Prior to writing to you, I reached out directly to Mr. Kuhl and his team to express my concerns and to ascertain whether they had sought guidance from ethics counsel or had obtained an ethics opinion before entering appearances for "The People." Mr. Kuhl reacted to my queries with surprise, which was and remains hard for me to understand, considering his prior representations regarding the existence of a "wall." What is even more bewildering is that within hours of receiving my correspondence, Mr. Kuhl and his team seemingly doubled-down, by filing a **single** pleading in Genesee County on behalf of both "The People" as plaintiffs, and former Governor Snyder, Andy Dillon and the State of Michigan as defendants.

I take absolutely no pleasure or pride in this communication. I personally like the individuals I have identified and I have often admired their representation of their clients. I certainly have no ill will toward them, or at all toward you. I recognize that by sending this letter I risk offending you, them, and your office in a way that is sincerely unintended. But the idea that Mr. Kuhl and his team should or could maintain a claim on behalf of even one citizen of the State of Michigan in the context of the water crisis, let alone all of them, is preposterous in light of how hard they have fought against the same claims, made by the same citizens, for more than three years.

It is my desire for you to resolve this issue quickly. And while I would prefer not to, I am prepared to file the appropriate motions in Genesee County and the Eastern District seeking their disqualification.

Thank you for your time and attention. I am always available to discuss these issues, or any others, at your convenience.

Sincerely,

**LEVY KONIGSBERG, LLP**

Corey M. Stern

3

CC (By Email Only):

Richard Kuhl, Nathan Gambill, Margaret Bettenhausen,
Zachary Larsen, Peter Manning, Kelly Keenan and
Fadwa A. Hammoud

4

PLAINTIFF'S
EXHIBIT

H

**LEVY KONIGSBERG LLP**
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N.Y. 10022

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE OFFICE
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

**(212) 605-6200**
FAX: (212) 605-6290
WWW.LEVYLAW.COM

ATLANTA OFFICE
1800 PEACHTREE ST, NW
ATLANTA, GEORGIA 30309
TELEPHONE: (404) 748-1600
FAX: (404) 745-8624

WRITER'S DIRECT EMAIL: CSTERN@LEVYLAW.COM

FEBRUARY 20, 2019

*VIA CERTIFIED MAIL (RRR) & EMAIL (NesselD@michigan.gov)*
Attorney General Dana Nessel
G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30212
Lansing, Michigan

RE:   *FLINT WATER LITIGATION – DISQUALIFICATION OF COUNSEL*
       *FOLLOW UP COMMUNICATION WITH AUTHORITY*

Attorney General Nessel:

I am following up on my correspondence dated February 18, 2019. I would like to bring to your attention a January 23, 2017 order from the Honorable David M. Lawson of the Eastern District of Michigan, in another case arising out of the Flint Water Crisis – *Concerned Pastors for Social Action, et al. v. The City of Flint, et al.*, 2:16-cv-10277-DML-SDD (ECF No. 139). I have attached the order to this communication for your convenience.

The order addresses former Attorney General Schuette's motion for leave to file a friend of the court brief, related to a pending motion to dissolve a preliminary injunction. The Court had previously entered the preliminary injunction on November 10, 2016, ordering the State defendants and the Flint defendants to ensure that Flint residents had properly installed and maintained faucet water filters, and, failing that, to deliver bottled water to households. The State defendants and the Flint defendants moved to dissolve the injunction on several grounds.

Mr. Schuette's proposed friend of the court brief took a position at odds with that advanced by his other deputies and assistants. Citing *People v. Doyle*, 159 Mich. App 632; 406 N.W.2d 893 (1987), Judge Lawson held that allowing him to do so "likely would create an ethical conflict that could delay the ultimate disposition of [the] case, because it would raise the specter of disqualification of his entire office from participating on behalf of any party in the case." To that end, the Court stated:

> *[Schuette] wants to advocate a position that is "directly adverse" to that taken by his clients – the State defendants – who brought the motion to dissolve the injunction. It is true that an assistant different than [Assistant Attorney General] Michael Murphy is the one who wants to file the friend of*

*the court brief, and that it came from the [A]ttorney [G]eneral's "office of
special counsel," but that does not matter. Another well-known tenet of
attorney ethics states that "[w]hile lawyers are associated in a firm, none of
them shall knowingly represent a client when any one of them practicing
alone would be prohibited from doing so by Rule[] 1.7."*

The Court went on, clarifying that "reference to a 'firm' in Rule 1.10(a) is not limited to private
law firms. Under the Michigan ethics rules, a government law department is treated as a single
firm."

Judge Lawson cited the *Manual on Professional Conduct* § 1.7(a) cmt. 2, when asserting:
"In addition to the actual conflict, the proposed filing creates a positional conflict. As a general
matter, a positional conflict may arise when a lawyer's advocacy of a legal position in one case
could have negative consequences for a second client in an unrelated matter." Furthermore, the
Court stated that Rule 1.7(a) has particular salience when the attorney is representing both sides
in the same conflict."

Having reviewed the order, I am even more perplexed now as to how Mr. Kuhl was
surprised when I initially addressed the conflict issue with him directly. He and Mr. Gambill
**were counsel of record** in *Concerned Pastors*. They were squarely in the middle of Mr.
Schuette's request and Judge Lawson's order regarding it. They lived it, in real time.

Please get back to me before 5:00 pm tomorrow, February 20, 2019. If I do not hear from
you, I will proceed accordingly.

Sincerely,

**LEVY KONIGSBERG, LLP**

Corey M. Stern

CC (By Email Only):

Richard Kuhl, Nathan Gambill, Margaret Bettenhausen,
Zachary Larsen, Peter Manning, Kelly Keenan and
Fadwa A. Hammoud

2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                    Plaintiffs,

v.

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, DAVID
MCGHEE, MICHAEL A. FINNEY,
BEVERLY WALKER-GRIFFEA, NATASHA
HENDERSON, and CITY OF FLINT,

                    Defendants.

Case Number 16-10277
Honorable David M. Lawson

_____/

## OPINION AND ORDER DENYING MOTION BY ATTORNEY GENERAL BILL SCHUETTE TO FILE *AMICUS CURIAE* BRIEF

Michigan attorney general Bill Schuette has filed a motion for leave to file a friend of the

court brief addressing a pending motion to dissolve a preliminary injunction. The Court had entered

the preliminary injunction on November 10, 2016 ordering the State defendants (the Michigan state

treasurer and the members of the Flint Receivership Transition Advisory Board (RTAB)) and the

Flint defendants (the City of Flint and its city administrator) to ensure that Flint residents had

properly installed and maintained faucet water filters, and, failing that, to deliver bottled water to

households. The State defendants and the Flint defendants have moved to dissolve the injunction

on several grounds.

-1-

General Schuette's motion is problematic for several reasons. *First*, he cites as authority for filing the motion a Michigan statute that authorizes the attorney general, "when requested by the governor," a "branch of the legislature," or on his own initiative, to "appear for the people of the state" in a court case "in which the people of this state may be . . . interested." Mich. Comp. Laws § 14.28. The problem with relying on that statute is that the attorney general, in the persons of assistant attorneys general Michael Murphy, Richard Kuhl, and others, has already appeared in this case on behalf of the state defendants. *Second*, General Schuette's proposed friend of the court brief takes a position diametrically opposed to that advanced by his other deputies and assistants. Allowing him to do so likely would create an ethical conflict that could delay the ultimate disposition of this case, because it would raise the specter of disqualification of his entire office from participating on behalf of any party in the case. *See People v. Doyle*, 159 Mich. App. 632, 406 N.W.2d 893 (1987). *Third*, the proposed brief does not raise any arguments that have not been addressed by the parties presently before the Court. *Fourth*, there is a technical fault with the motion, as it violates Rule 11 of the Court's electronic filing rules. The Court finds no good reason to permit the filing.

I.

In the motion to dissolve the injunction filed by the attorney general's office on behalf of the state defendants, those parties argue that the Court should vacate its preliminary injunction because there are no ongoing violations of the monitoring or treatment requirements of the Safe Drinking Water Act (SDWA), and they repeat their argument that delivery of bottled water will harm the Flint water system recovery by slowing the distribution of orthophosphate in the service lines. The proposed friend of the court brief that the same attorney general wants to file urges the Court to

maintain the injunction in place, because the Flint water system still is in violation of the SDWA's Lead and Copper Rule, and distribution of bottled water is necessary to protect the Flint residents. These arguments parrot many of the points already made by the plaintiffs on this record. And they are obviously adverse to the State defendants' position.

A well-known and fundamental tenet of attorney ethics states that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client." Mich. R. Prof. Cond. §1.7(a). There are exceptions to this rule, such as when "the lawyer reasonably believes the representation will not adversely affect the relationship with the other client," or when "each client consents after consultation." *Ibid.* Neither applies here.

As the attorney general, Mr. Schuette has the duty to "to prosecute and defend all suits relating to matters connected with" the various departments of state, including, as in this case, "the treasurer or the auditor general." Mich. Comp. Laws Ann. § 14.29. Discharging that duty, the attorney general appeared on behalf of the State defendants — the state treasurer and the members of the RTAB — to defend the present lawsuit. As part of that defense, the attorney general opposed the plaintiffs' motion for a preliminary injunction, and after it was granted, filed a notice of appeal, and moved to stay the injunction in this Court and the court of appeals. After both stay motions were denied, the attorney general moved in this Court to dissolve the injunction.

It is that very motion — the one to dissolve the preliminary injunction — that Mr. Schuette seeks to address with his friend of the court brief. And in that brief he wants to advocate a position that is "directly adverse" to that taken by his clients — the State defendants — who brought the motion to dissolve the injunction. It is true that an assistant different than Michael Murphy is the one who wants to file the friend of the court brief, and that it came from the attorney general's

"office of special counsel," but that does not matter. Another well-known tenet of attorney ethics states that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7." Mich R. Prof. Cond. § 1.10(a).

The reference to a "firm" in Rule 1.10(a) is not limited to private law firms. Under the Michigan ethics rules, a government law department is treated as a single firm. *Barkley v. City of Detroit*, 204 Mich. App. 194, 208, 514 N.W.2d 242, 248 (1994) (referencing Rule 1.10(a), and stating that "[w]hile government lawyers are not mentioned in the rule, it appears that, at least in some circumstances, this rule applies to them"); *see also* State of Bar Mich. Standing Comm. on Prof'l Ethics, Informal Op. RI-43 (1990) (stating that a "prosecutor's office does constitute a 'firm' for the purposes of these Rules"). That principle applies with special force when the conflict originates with a government lawyer in a supervisory capacity, such as Mr. Schuette. *See Doyle*, 159 Mich. App. at 645, 406 N.W.2d at 899.

It is also noteworthy, perhaps, that the motion for leave to file the friend of the court brief was filed by the attorney general's "office of special counsel." Although the status of that office is not readily apparent, it is clear that the lawyers assigned to it report directly to the attorney general. They are not "independent special assistant attorney[s] general," a position recognized by the state legislature. *See* Mich. Comp. Laws § 333.16237(2). The important feature of the latter position is that "[o]nce appointed, an independent special assistant attorney general is not subject to the control and direction of the Attorney General." *Attorney Gen. v. Michigan Pub. Serv. Comm'n*, 243 Mich. App. 487, 491, 625 N.W.2d 16, 20 (2000).

It is beyond debate that "the rules of professional conduct do apply to the office of attorney general." *Id.* at 516, 625 N.W.2d at 33; *see also People v. Waterstone*, 486 Mich. 942, 942, 783 N.W.2d 314 (2010) (order) ("recognizing that the Attorney General is subject to the rules of professional conduct"). Several courts have recognized that state attorneys general occasionally are called upon to represent different divisions of government in the same action, and such dual representation is not necessarily conflict-provoking. *See Attorney Gen.* at 509-16, 625 N.W.2d at 29-33 (collecting cases). However, "the rules do recognize a clear conflict of interest when the Attorney General acts as a party litigant in opposition to an agency or department that she also represents in the same cause of action." *Id.* at 516, 625 N.W.2d at 33.

It is not clear who it is that Mr. Scheutte purports to represent through his friend of the court filing. It may be "the people of this state," *see* Mich. Comp. Laws § 14.28, or it may be himself. It is clear that he seeks to appear in his own name and office. He has, of course, no official stake in the matter (except, of course, arising from his duty to represent the State defendants), although perhaps he has a personal one. Either way, there is an obvious conflict, and if it is the latter, the conflict is more egregious, as he means to take a position adverse to his clients in the same lawsuit while advancing his own, personal position.

## II.

In addition to the actual conflict, the proposed filing creates a positional conflict. As a general matter, a positional conflict "may arise when a lawyer's advocacy of a legal position in one case could have negative consequences for a second client in an unrelated matter." *ABA/BNA Laws. Man. on Prof. Conduct* § 51:117. Positional conflicts also are prohibited by Rule 1.7(a), *see* ABA Model R. Prof. Cond. §1.7(a) cmt. 24 (noting that a conflict of interest exists when "there is a

-5-

significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case."), and by Rule 1.7(b) (which prohibits a lawyer from representing a client where "the representation of that client may be materially limited by . . . the lawyer's own interests . . . unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation."). The general rule is that "a lawyer 'ordinarily may take inconsistent legal positions in different courts at different times,' but that a conflict is presented when there is a substantial risk that a lawyer's action in one case will materially and adversely affect another client in a different case." *ABA/BNA Laws. Man. on Prof. Conduct* § 51:118 (quoting *Restatement (Third) of the Law Governing Lawyers*) § 128, cmt. f (2000)).

Here, the positions taken by the attorney general manifestly are inconsistent, and the positional circumstances are aggravated because he has asserted them *in the same case*.

III.

The conflict introduced in this case by General Schuette potentially presents new complications. The State defendants understandably may have reason to doubt the loyalty they have a right to expect from their attorneys. *See Barkley*, 204 Mich. App. at 204, 514 N.W.2d at 246 (reaffirming the fundament that "[a]n attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute") (citing *Olitkowski v. St. Casimir's Savings & Loan Ass'n,* 302 Mich. 303, 309-10, 325-26, 4 N.W.2d 664, 668 (1942)); *CenTra, Inc. v. Estrin,* 538 F.3d 402, 413 (6th Cir. 2008) (stating that Rule 1.7(a) "has particular salience when the attorney is representing both sides in the same conflict"). That discomfiture has been exhibited in this case by

-6-

the State defendants' filing, which withdraws their initial concurrence in the motion for leave to file a friend of the court brief.

General Schuette's filing may be a cause for angst among the Flint defendants as well. The Michigan Supreme Court has held that "the Attorney General has broad authority to sue and settle with regard to matters of state interest, including the power to settle such litigation *with binding effect on Michigan's political subdivisions." In re Certified Question from U.S. Dist. Court for E. Dist. of Michigan*, 465 Mich. 537, 546-47, 638 N.W.2d 409, 414 (2002) (emphasis added). The proposed friend of the court brief is opposed to Flint's position on the pending motion.

Normally, when a lawyer is burdened with a conflict of interest, the lawyer is removed from the law suit. Mich R. Prof. Cond. §1.7(a); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Alticor, Inc.*, 472 F.3d 436, 439 (6th Cir. 2007) (on reh). Under Rule 1.10(a), that sanction may extend to an entire firm. *Barkley*, 204 Mich App 194; 514 NW2d 242 (1994). And when the "attorney concerned in the conflict of interest has supervisory authority over other attorneys in the office, or has policy-making authority, then recusal of the entire office is likely to be necessary." *Doyle*, 159 Mich. App. at 645, 406 N.W.2d at 899.

Removal of the entire attorney general's office from representing its clients in this case would be disruptive and cause substantial delay. Outside counsel would have to be retained (at considerable expense), and they would have to familiarize themselves with the complex legal, technical, and health issues that this lawsuit presents.

Such delay is not in the interest of the parties before the Court. The State defendants, in the person of Michigan's Governor, recently contacted the Court with a request to appoint a mediator, with the intention of exploring practical solutions to this water crisis that would be in the mutual

interests of all the parties, and expedite a resolution that will address the welfare of Flint's citizens. The Court agreed and appointed a mediator.

Of course, if the attorney general wants to weigh in with a sensible resolution, he has the authority to do so. Michigan's highest court has observed: "It is said that the Attorney General 'may control and manage all litigation in behalf of the state and is empowered to make any disposition of the state's litigation which [the Attorney General] deems for its best interests.'" *In re Certified Question*, 465 Mich. at 546-47, 638 N.W.2d at 414. However, as this Court noted in its injunction ruling, addressing the citizen's "best interests" requires a careful balancing of the safety, human, and budgetary interests and concerns that the parties have legitimately identified and have been struggling with throughout this litigation. Superficial posturing does not contribute to the search for an equitable solution.

It is not clear that the conflict created by General Schuette's filing is a bell that is easily unrung. The answer to that question may have to await another day, and the parties before the Court no doubt may want to address the question. Denying the motion for leave to file the friend of the court brief, however, is a good first step.

There are other remedies available for dealing with a conflict of interest. In addition to disqualification, *Barkley*, 204 Mich. App. at 208-09, 514 N.W.2d at 248, an attorney may be liable for damages in a malpractice action, *Lipton v. Boesky*, 110 Mich. App. 589, 598, 313 N.W.2d 163, 167 (1981) (holding that "a violation of the Code [of Professional Responsibility] is rebuttable evidence of malpractice") (citing *Zeni v. Anderson*, 397 Mich. 117, 129, 243 N.W.2d 270 (1976)), and disciplinary actions by the Attorney Grievance Commission have been upheld by the Michigan Supreme Court, *In re Estes*, 392 Mich. 645, 651, 221 N.W.2d 322, 324 (1974) ("Although named

and appointed coexecutor of the estate, respondent represented a client whose claim was contrary to the provisions of the will and was antithetical to the best interests of the estate and beneficiaries. This is a self-evident basis for discipline."). Once again, though, those actions are beyond the purview of the present motion.

## IV.

As noted earlier, the arguments advanced in the proposed friend of the court brief are not novel, and they have been addressed in the plaintiffs' filings and the Court's prior orders. The most that can be said of the proposed brief is that it outlines the attorney general's personal position. However, as demonstrated above, that causes more problems than it solves. Advance consideration of the utility of such a filing would have been prudent.

## V.

There also is a technical problem with General Schuette's motion. He originally docketed his motion as an "amicus brief," although no leave has been granted to allow that filing as such. And he appended a proposed order to the filing. Counsel is obliged to be aware of and follow the CM/ECF procedures. "Proposed orders must be submitted to the judge to whom the case is assigned . . . via the link located under the Utilities section of CM/ECF." E.D. Mich. Electronic Filing Policies and Procedures R11(a). If a proposed order is accepted, the Court will then docket it with the judge's electronic signature. "Proposed" orders should *never* be e-filed and docketed by a party. The motion will be denied, therefore, for the additional reason that it fails to comply with the electronic filing policies and procedures.

Case 5:16-cv-10444-JEL-MKM ECF No. 2639 filed 01/23/17 PageID.27079 Page 103 of
107
Case 2:16-cv-10277-DML-SDD ECF No. 136 filed 01/23/17 PageID.1530 Page 10 of 10

VI.

The proposed amicus brief has not introduced any new arguments or offered a perspective that has not been presented by the parties already. Instead, the attorney general has taken a position aligned with the plaintiffs and at odds with other attorneys in his own office. In doing so, he has managed to inject a troubling ethical issue into this lawsuit, potentially complicating adjudication of the serious legal questions before the Court, without adding anything of substance.

Accordingly, the motion by attorney general Bill Schuette for leave to file a friend of the court brief [dkt. #136] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 23, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 23, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI



PLAINTIFF'S
EXHIBIT

J

STATE OF MICHIGAN
DEPARTMENT OF ATTORNEY GENERAL



P.O. BOX 30754
LANSING, MICHIGAN 48909

**DANA NESSEL**
ATTORNEY GENERAL

March 1, 2019

Corey Stern
Levy Konigsberg
Attorneys At Law
800 Third Avenue
New York, New York 10022

      Re:   *Flint Water Litigation – Claim of Conflict of Interest*

Dear Mr. Stern:

By way of introduction, my name is Frank Monticello. I am the Ethics Officer for the Michigan Department of Attorney General and have served in this capacity since 2006, when the position was created by then Attorney General Mike Cox. Although I retired from the office in 2018, I continued handling ethics issues for the office as a Special Assistant Attorney General (SAAG) for former Attorney General Bill Schuette and currently for Attorney General Dana Nessel. At Attorney General Nessel's request, I have reviewed your correspondence dated February 18th and 20th.

Let me begin by thanking you for bringing your concerns to our attention. The Attorney General takes our ethical obligations very seriously and is committed to providing effective representation to the citizens of Michigan within the principles underlying the Rules of Professional Conduct. Allegations of a conflict of interest are examined carefully to ensure our duty of loyalty is not compromised. Such a review must acknowledge, however, that the rules and the courts have recognized the uniqueness of the office and "the Attorney General's unique status *requires accommodation, not exemption, under the rules of professional conduct.*"[1]

The Office of Special Counsel (OSC) was formed because department attorneys were engaged in defending the state in civil actions arising from the Flint water matter. For that reason, former Attorney General Schuette hired attorneys outside the department, referred to as SAAGs, to conduct a *criminal* investigation into the crisis, including a review of actions by state agencies and their employees.

---

[1] See *AG v PSC*, 243 Mich App 487, 506 (2000).

Letter to Corey Stern
Page 2
March 1, 2019

Separating this criminal investigation from department attorneys obligated to defend the state from civil actions was consistent with the Michigan Rules of Professional Conduct.[2]

Noah Hall's decision to file a *civil action* on behalf of former Attorney General Bill Schuette while also serving with the OSC was unexpected. Such a *civil action* could have been handled by department attorneys defending the state in other Flint water litigation. In fact, those defense attorneys could have filed a third-party complaint under MCR 2.204, to prosecute related civil claims against the engineering firms. But, regardless, the fact that Noah Hall originally filed the complaint from the OSC does not violate or ignore the wall separating the criminal the criminal investigation from department attorneys defending the state in the Flint litigation.

Over the years I have examined a variety of unusual situations this office has been involved in because of the unique role of the Attorney General – a role that has been described by the courts as *sui generis*, in large part due to her diverse role.[3]

Under our scheme of laws, the attorney general has the duty as a constitutional officer possessed with common law as well as statutory powers and duties to represent or furnish legal counsel to many interests – the State, its agencies, the public interest and others designated by statute.

Paramount to all of the Attorney General's duties, of course, is the duty to protect the interest of the general public."[4]

The *Veolia* complaint, brought by former Attorney General Bill Schuette, is a good example of the unique role the Attorney General, as a constitutional officer, plays in state government. The civil action was brought to protect the interests of the general public in the Attorney General's role as "*parens patriae*" on behalf of the People of the State of Michigan and seeks to recover damages incurred because the

---

[2] https://courts.michigan.gov/courts/michigansupremecourt/rules/documents/michigan%20rules%20of%20professional%20conduct.pdf

[3] See *AG v PSC*, 243 Mich App 487, 507 (2000) quoting from *Connecticut Comm. On Special Revenue v Connecticut Freedom of Information Comm*, 174 Conn. 308, 387 A 2d 533, 537-538 (1978) "We do conclude, however, that in examining his conduct as a member of the bar due consideration must also be given to his responsibilities and duties as the constitutional civil legal officer of the state and the organization and operation of his office."

[4] *AG v PSC*, 243 Mich at 508.

Letter to Corey Stern
Page 3
March 1, 2019

defendant firms' actions allegedly threatened the health, safety and welfare of the state's citizenry. Such an action is brought to vindicate the *state's interests* and recover costs or damages incurred by the state. "[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breath pure air." *Georgia v Tennessee Cooper Co.*, 206 US 230, 236 (1937).[5]

The *Veolia* file has now been assigned to Environment, Natural Resources, and Agriculture Division (ENRA) attorneys who are defending various civil complaints brought against the state and its employees. At first blush, it is not surprising that this scenario would raise the specter of a conflict of interest. The civil complaint against Veolia was originally filed by attorneys working on the criminal investigation side of the Flint water matter, which were separated from the civil attorneys that will now be handling that case. But the rules of professional conduct do not preclude this uncommon arrangement.

The Michigan Rules of Professional Conduct (MRPC) prohibit representation of a client when representation would be directly adverse to another client or would be materially limited by the lawyers responsibility to another client, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents to the representation.[6]

While pursuing damages against the engineering firms, the ENRA attorneys would also be defending the state from paying damages to those who claim injuries by the state's failure to prevent unsafe drinking water in Flint. In both instances, the attorneys would be representing the state's interests, either its quasi-sovereign interests in the health, safety, and welfare of its citizens or its proprietary interest of protecting the state treasury. These interests are not directly adverse but advance the state's interest in both actions. Further, the ENRA attorneys are not materially limited when pursuing claims on behalf of their respective client, the State of Michigan. As noted earlier, this arrangement is not significantly different than the ENRA attorneys filing a third-party complaint in one of the files they are defending.

Finally, there is no factual basis to conflate this discussion regarding *Veolia* with the January 23, 2017 decision issued by United States District Judge David

---

[5] For a comprehensive discussion of the *parens patria* doctrine see 74 Tul. L. Rev. 1859, *State Attorney General Actions, The Tobacco Litigation, and the Doctrine of Parens Patriae.*

[6] Rule 1.7 of the Michigan Rules of Professional Conduct.

Letter to Corey Stern
Page 4
March 1, 2019

Lawson in *Concerned Pastors, et al v. Nick A. Khouri, et al.*[7]  In *Concerned Pastors,* the court denied former Attorney General Bill Schuette's motion for leave to file a friend of the court brief because, among other reasons, the motion was "diametrically opposed to" a pending motion filed by the state defendants to dissolve a preliminary injunction.[8]  The court had previously issued the preliminary injunction ordering the state to take certain actions to ensure safe drinking water for Flint residents.  However, unlike the contrary positions taken by former Attorney General Bill Schuette and the state defendants in *Concerned Pastors,* the state's interests in *Veolia* are aligned, as noted above. Thus, the *Concerned Pastors* decision is of no consequence to this discussion.

Again, thank you for bringing your concerns to our attention.

Sincerely,

Frank Monticello
Ethics Officer
Michigan Department of Attorney General

FM/skf

---

[7] https://www.mied.uscourts.gov/PDFFIles/16-10277OpnDeny.pdf

[8] *Id.*, p. 1.