```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4   In Re:  FLINT WATER CASES        Case No.  16-10444

 5   _____/

 6
                          STATUS CONFERENCE
 7            BEFORE THE HONORABLE JUDITH E. LEVY
                  UNITED STATES DISTRICT JUDGE
 8                            and
              THE HONORABLE JOSEPH J. FARAH
 9           GENESEE COUNTY CIRCUIT COURT JUDGE
         Detroit, Michigan - Wednesday, January 22, 2020
10

11                APPEARANCES IN ALPHABETICAL ORDER:

12                Charles E. Barbieri
                  Foster, Swift, Collins & Smith, P.C.
13                313 South Washington Square
                  Lansing, MI 48933
14
                  Frederick A. Berg
15                Butzel Long
                  150 West Jefferson, Suite 100
16                Detroit, MI 48226

17                Jay M. Berger
                  Clark Hill
18                500 Woodward Ave., Suite 3500
                  Detroit, MI 48226
19
                  Margaret A. Bettenhausen
20                Michigan Department of Attorney General
                  525 West Ottawa Street, P.O. Box 30755
21                Lansing, MI 48909

22                Teresa Ann Caine Bingman
                  Law Offices of Teresa A. Bingman
23                1425 Ambassador Drive
                  Okemos, MI 48864
24

25
```

```
 1 ‖ APPEARANCES (Continued):

 2                         Jayson E. Blake
                           McAlpine PC
 3                         3201 University Drive, Suite 100
                           Auburn Hills, MI 48326
 4
                           James W. Burdick
 5                         Burdick Law P.C.
                           1760 S. Telegraph Road, Suite 300
 6                         Bloomfield Hills, MI 48302

 7                         James M. Campbell
                           Campbell, Campbell, Edwards & Conroy
 8                         One Constitution Plaza, Suite 300
                           Boston, MA 02129-2025
 9
                           Donald Dawson, JR.
10                         Fieger & Fieger
                           19390 W. 10 Mile Road
11                         Southfield, Michigan 48075

12                         Alaina Devine
                           Campbell Conroy & O'Neil PC
13                         1 Constitution Wharf, Suite 310
                           Boston, MA 02129
14
                           Philip A. Erickson
15                         Plunkett & Cooney
                           325 East Grand River Avenue, Suite 250
16                         East Lansing, MI 48823

17                         James A. Fajen
                           Fajen & Miller, PLLC
18                         3646 West Liberty Road
                           Ann Arbor, MI 48103
19
                           Alastair J.M. Findeis
20                         Napoli Shkolnik, PLLC
                           360 Lexington Avenue, 11th Floor
21                         New York, New York 10017

22                         Joseph F. Galvin
                           Genesee County Drain Commissioners
23                         4610 Beecher Road
                           Flint, MI 48532
24

25
```

1   APPEARANCES (Continued):

2                              William H. Goodman
                               Goodman and Hurwitz, P.C.
3                              1394 East Jefferson Avenue
                               Detroit, MI 48207
4
                               Philip A. Grashoff, Jr.
5                              Smith Haughey Rice & Roegge
                               213 South Ashley, Suite 400
6                              Ann Arbor, MI 48104

7                              Deborah E. Greenspan
                               Special Master
8                              Blank Rome, LLP
                               1825 Eye Street, N.W.
9                              Washington, DC 20006

10                             David Hart
                               Maddin, Hauser, Roth & Heller, PC
11                             28400 Northwestern Highway
                               Southfield, MI 48034-1839
12
                               Larry R. Jensen
13                             Hall Render Killian Heath & Lyman, PLLC
                               201 West Big Beaver Road, Suite 1200
14                             Troy, MI 48084

15                             William Young Kim
                               City of Flint
16                             1101 South Saginaw Street, Third Floor
                               Flint, MI 48502
17
                               Sheldon H. Klein
18                             Butzel Long, P.C.
                               Stoneridge West, 41000 Woodward Avenue
19                             Bloomfield Hills, MI 48304

20                             Richard S. Kuhl
                               Michigan Department of Attorney General
21                             ENRA Division, P.O. Box 30755
                               Lansing, MI 48909
22
                               Kevin Laidler
23                             Laidler Law Office, PLLC
                               400 S. Broadway Street, Suite 203
24                             Lake Orion, Michigan 48362

25

```
 1   APPEARANCES (Continued):

 2                        Theodore J. Leopold
                          Cohen Milstein Sellers and Toll PLLC
 3                        2925 PGA Boulevard, Suite 200
                          Palm Beach Gardens, FL 33410
 4
                          J. Brian MacDonald
 5                        Cline, Cline
                          1000 Mott Foundation Building
 6                        503 South Saginaw Street
                          Flint, MI 48502
 7
                          Christopher J. Marker
 8                        O'Neill, Wallace & Doyle P.C.
                          300 Saint Andrews Road, Suite 302
 9                        Saginaw, MI 48638

10                        Cirilo Martinez
                          Law Office of Cirilo Martinez, PLLC
11                        3010 Lovers Lane
                          Kalamazoo, MI 49001
12
                          James Mason
13                        Marc J. Bern & Partners, LLP
                          225 West Washington Street, Suite 2200
14                        Chicago, Illinois 60606

15                        Wayne Brian Mason
                          Drinker Biddle & Reath LLP
16                        1717 Main Street, Suite 5400
                          Dallas, TX 75201
17
                          T. Santino Mateo
18                        Perkins Law Group, PLLC
                          615 Griswold, Suite 400
19                        Detroit, MI 48226

20                        Thaddeus E. Morgan
                          Fraser, Trebilcock
21                        124 West Allegan Street, Suite 1000
                          Lansing, MI 48933
22
                          Michael L. Pitt
23                        Pitt, McGehee, Palmer & Rivers, PC
                          117 West Fourth Street, Suite 200
24                        Royal Oak, MI 48067-3804

25
```

```
 1   APPEARANCES (Continued):

 2                      Alexander S. Rusek
                        White Law PLLC
 3                      2400 Science Parkway, Suite 201
                        Okemos, MI 48864
 4
                        Corey M. Stern
 5                      Levy Konigsberg, LLP
                        800 Third Avenue, Suite 11th Floor
 6                      New York, NY 10022

 7                      Christopher A. Stritmatter
                        Simen, Figura & Parker
 8                      5206 Gateway Centre, Suite 200
                        Flint, Michigan 48507
 9
                        Cindy Tsai
10                      Loevy & Loevy
                        311 N. Aberdeen Street
11                      Chicago, Illinois 60602

12                      Valdemar L. Washington
                        718 Beach Street, P.O. Box 187
13                      Flint, MI 48501

14                      Todd Weglarz
                        Fieger, Fieger, Kenney & Harrington, PC
15                      19390 West 10 Mile Road
                        Southfield, MI 48075
16
                        Matthew Wise
17                      Foley & Mansfield, PLLP
                        130 East Nine Mile Road
18                      Ferndale, MI 48220

19                      Barry A. Wolf
                        Barry A. Wolf, Attorney at Law, PLLC
20                      503 South Saginaw Street, Suite 1410
                        Flint, MI 48502
21
                        Edwar A. Zeineh
22                      Law Office of Edwar A. Zeineh, PLLC
                        2800 East Grand River Avenue, Suite B
23                      Lansing, MI 48912

24
     REPORTED BY:       Darlene K. May, CSR, RPR, CRR, RMR
25                      (313) 234-2605
```

1                          TABLE OF CONTENTS

2     PROCEEDINGS:                                              PAGE:

3        Appearances                                               6

4        Proceedings                                              10

5        Court Reporter's Certificate                            131

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Wednesday, January 22, 2020

2              2:13 p.m.

3                       -- --- --

4              THE CLERK OF THE COURT:  Please rise.  The United

5    States District Court for the Eastern District of Michigan is

6    now in session.  The Honorable Judith E. Levy presiding.

7              Calling the Flint Water Cases.

8              And also joining us is the Honorable Joseph J. Farah.

9              THE COURT:  Well, please be seated.

10             And welcome to Judge Farah and his law clerk, Samantha

11   Weinstein.  As well as two interns Dan Campbell and Elizabeth

12   Meyers.

13             So I'm pleased that they could join us today, and I'll

14   say more about that in just a moment.  But why don't we start

15   with appearances for the record.

16             MR. WASHINGTON:  May it please the Court, Val

17   Washington appearing on behalf of the Anderson plaintiffs and

18   on behalf of Joel Lee, individual.

19             THE COURT:  Thank you.

20             Good afternoon, Your Honors.  Teresa Bingham

21   representing punitive class plaintiffs.

22             MR. BLAKE:  Good afternoon, Your Honor, Jason Blake

23   liaison counsel to the state court plaintiffs class action.

24             MR. HART:  Good afternoon, Your Honor.  David Hart on

25   behalf of the Durkin plaintiffs.

1      MR. BURDICK:  Good afternoon, Your Honor, James
2  Burdick on behalf of Adam Rosenthal.
3      MR. FAJEN:  James Fajen on behalf of Adam Rosenthal.
4      MS. TSAI:  Good afternoon, Your Honor.  Cindy Tsai on
5  behalf of the Marble plaintiffs.
6      MR. GOODMAN:  Phil Goodman on behalf of the class
7  plaintiffs and on behalf of Marble plaintiffs, local counsel.
8      MS. GREENSPAN:  Deborah Greenspan, Special Master.
9      MR. STERN:  Your Honor, Cory Stern as co-liaison
10  counsel for individual plaintiffs.
11      MR. LEOPOLD:  Ted Leopold co-lead counsel for punitive
12  class.  And Michael Pitt is outside, but he is here as well.
13      THE COURT:  Okay.  Thank you.
14      MR. RUSEK:  Good afternoon, Your Honors.  Alexander
15  Rusek on behalf of defendant, Howard Croft.
16      MR. KUHL:  And good afternoon.  Assistant attorney
17  general Richard Kuhl for the defendants.
18      MR. KIM:  Good afternoon, Your Honors.  William Kim on
19  behalf of the City of Flint and former mayor, Dayne Walling.
20      MR. BERG:  Good afternoon.  Rick Berg on behalf of the
21  city of Flint.
22      THE COURT:  Thank you.
23      MS. DEVINE:  Good afternoon, Your Honor.  Alaina
24  Devine on behalf of the VNA defendants.
25      MR. CAMPBELL:  Good afternoon again, Your Honors.

1   James Campbell, I also represent the three Veolia North America
2   defendants.
3           MR. MASON:  Wayne Mason representing the LAN
4   defendants.
5           MR. ERICKSON:  Good afternoon.  Philip Erickson also
6   on behalf of the LAN defendants.
7           MR. FINDEIS:  Good afternoon.  Alastair Findeis from
8   Napoli Shkolnik on behalf of the individual defendants.
9           THE COURT:  Thank you.
10          MR. MacDONALD:  Good afternoon, Your Honor.  Brian
11  MacDonald on behalf of McLaren.
12          MS. BETTENHAUSEN:  Margaret Bettenhausen on behalf of
13  state defendants.
14          MR. MASON:  Good afternoon, Your Honor.  James Mason
15  on behalf of Washington plaintiffs.
16          MR. KLEIN:  Good afternoon.  Sheldon Klein for the
17  city of Flint.
18          MR. ZEINEH:  Good afternoon, Your Honor.  Edwar Zeineh
19  on behalf of Daugherty Johnson.
20          MR. MARKER:  Good afternoon, Your Honors.  Christopher
21  Marker here on behalf of Michael Glasgow.
22          MR. BARBIERI:  Charles Barbieri for Defendants Michael
23  Prysby and Patrick Cook.
24          MR. GRASHOFF:  Philip Grashoff on behalf of Stephen
25  Busch, Your Honor.

1          MR. MATEO:  T. Santino Mateo on behalf of Defendant

2    Darnell Earley.

3          MR. MARTINEZ:  Good afternoon, Your Honors.  Cirilo

4    Martinez on behalf of the class.

5          MR. WEGLARZ:  Your Honor, Todd Weglarz and Don Dawson

6    on behalf of plaintiffs, Cholyanda Brown and Gradine Rogers.

7          MR. MORGAN:  Thaddeus Morgan for Liane Shekter Smith.

8          MR. GALVIN: Good afternoon, Your Honor.  Joseph Galvin

9    for Jeff Wright.

10          MR. WOLF:  Good afternoon, Your Honor.  Barry Wolf for

11    Gerald Ambrose.

12          MR. WISE:  Good afternoon, Your Honor.  Matt Wise on

13    behalf of Jeffrey Wright.

14          MR. STRITMATTER:  Chris Stritmatter on behalf of

15    Edward Kurtz.

16          MR. JENSEN:  Larry Jensen on behalf of Hurley Medical

17    Center, Ann Newell and Nora Birchmeier.

18          MR. BERGER:  Good afternoon.  Jay Berger on behalf of

19    the defendants Daniel Wyant and Brad Wurfel.

20          MR. LAIDLER:  Good morning, Your Honor.  Kevin Laidler

21    on behalf of the Alexander plaintiffs.

22          THE COURT:  Okay.  Well, welcome.  I see we have some

23    empty seats for the first time.  So somehow that feels like

24    we're making progress.

25          There was an agenda issued for the status conference

1  and I'm going to change the order and handle the Marble and
2  Brown oral argument at the end of the agenda instead of at the
3  beginning.

4        Judge Farah has a flight to catch and I want to make
5  sure that we get through as much of the agenda before he has to
6  leave.  So we'll return to that.

7        But the first issue here is the Flint Water Case
8  discovery coordination.  And I have this here, specifically,
9  regarding a proposed protective order on Defendant Patrick
10 Cook.  But I want to substitute in introducing Judge Farah and
11 indicating, sort of, how he came to be sitting here with me
12 today.

13       As most of you know, Judge Ewell, Richard Ewell, was
14 the judge that was handling the majority of the civil Flint
15 Water slitgation in state court, but not all of it.  There, of
16 course, is some that is traveling through the Michigan Court of
17 Claims and I understand from Mr. Pitt, I think, has an oral
18 argument at the Michigan Supreme Court coming up.

19       But the vast bulk of the cases were in Genesee County
20 Circuit Court.  Many of them with Judge Ewell and he has
21 retired.  Upon his retirement, Judge Farah was available and
22 made himself available to handle the cases.  So they've now all
23 been reassigned from all of the judges who had any portion of
24 the civil docket in Genesee County to Judge Joseph Farah.

25       And as those of you have been litigating this case

1   know that, we have always been working hard to coordinate

2   effectively and efficiently with the state court throughout the

3   litigation so that there are not duplicative depositions and

4   things of that nature.

5          The manual on complex litigation recommends that the

6   federal judge in any of these complex cases that have state

7   cases invite the state court judge to sit on the bench together

8   if there are issues that need to be decided here, the argument,

9   if we each have to make the decision.  And, of course, I assure

10  you we will each make our own decisions using our own

11  independent authority to do that.  But it was in that spirit

12  that I invited Judge Farah to be here today and I'm extremely

13  pleased that he is able to be here.

14         JUDGE FARAH:  Thank you, Judge.  Pleasure to be here.

15         THE COURT:  So we have a remarkable sound system so

16  feel free to use it.

17         JUDGE FARAH:  Thanks to all of you.  I'll look forward

18  to working with you.  I think coordination is going to be

19  crucial here.  This is probably one of, if not the biggest,

20  case to travel through the Genesee County Circuit Court.  And

21  we have plenty of assistance for me that -- in the form of

22  interns and law clerks.

23         And we will be working with Judge Levy's staff as well

24  who have been immensely helpful.  Abigail has been immensely

25  helpful.  So we have an open door.  We will be happy to hear

1  any motions and different things that you have.  We talked

2  about scheduling in a smaller group.  We're here to help move

3  the case along at a pace that is conducive to its resolution.

4       THE COURT:  Thank you.  Thank you very, very much.

5  And so we'll get to a little bit more one of the issues,

6  specific issues, coming up on Judge Farah's docket in a moment.

7       But there may be -- we have Deborah Greenspan's in the

8  courtroom here.  She's our special master.  And it may be

9  things as simple as having a parallel order in the state court

10 that requires the census -- Ms. Greenspan to be given all of

11 the census data of cases pending in the state court.  She has

12 the vast majority of that information now, but there hasn't

13 been an order entered requiring it.

14      So things as sort of perfunctory seeming as that could

15 be done to coordinate the cases and handle them efficiently and

16 other things as well.

17      So I wanted to mention a couple -- I always mention

18 here that at one o'clock we convened in chambers with the

19 co-liaison and co-lead plaintiff's counsel as well as

20 representative defense counsel to just discuss, generally, some

21 of the same things we're discussing here.  But one or two other

22 issues came up there that I want to discuss here.

23      So why I don't I address those first.  And the first

24 is that Mr. Leopold, on behalf of the class, mentioned that

25 there may be some depositions that will need to be moved up

1   because of the cutoff for filing the motion for class
2   certification.
3           And so to the extent that happens, you would be
4   raising that on one of the regular discovery coordination
5   calls, if it can't be resolved.
6           MR. LEOPOLD:   (Nods.)
7           THE COURT:   But in the meantime co-counsel class will
8   be identifying those depositions that they believe they need to
9   have to properly prepare their motion for class certification.
10  They'll be reaching out to defense counsel and seeking your
11  cooperation in changing the deposition schedule, which I know
12  is a very complicated document.   So that those depositions can
13  take place prior to the cutoff for class certification motions
14  to be filed.
15          If that can't be done -- if you can't come up with an
16  agreement, it will be brought to my attention.   If it needs to
17  be in the form of a motion to adjourn the date, then that would
18  be filed as a motion, but I understand from Mr. Leopold and
19  Mr. Pitt that is not what they're seeking.   They're just
20  seeking to change the dates of that.
21          Then another issue had been circulating or has come to
22  my attention.   And that is regarding the length of the
23  deposition of Mr. Busch and whether it needs to be expanded.
24  And Ms. Jackson actually submitted this, but is it Mr. Grashoff
25  who will speak ...

1        MR. GRASHOFF:  Yes, Your Honor.

2        THE COURT:  Be representing Mr. Busch on this.

3        And let me tell you what I plan to do on this and then

4   we'll see if there is any need for any further discussion of

5   it.  Which is that I read through -- now we are in the tiny,

6   tiny blades of grass so bear with me.  We are not even in the

7   weeds.  We're in the blades.  But the blades of grass matter in

8   this case and I take them very seriously.

9        And it came to my attention that issues came up in the

10  course of taking Mr. Busch's deposition and the LAN defendants

11  were -- are seeking some additional time.  So as a result of

12  the issues, I want to address those so that they don't repeat

13  themselves in the next round of depositions and then go to what

14  we're going to do with Mr. Busch.

15       And the first thing is that I'm going to amend the

16  amended case management order to set a few more parameters

17  regarding the taking of these depositions.  And the first is

18  that there would be a written order of questioning prior to the

19  deposition being taken.  The order in which the lawyers will be

20  asking questions, along with the time allocation that you

21  believe you're entitled to under the case management order.

22       If in the course of that a lawyer wishes to seed time

23  another party, you can certainly do that, but you need to put

24  that in your initial written out order of allocation.

25       Then, if you wish to reserve time at the conclusion,

1    some of your time for sort of followup questioning, you need to

2    indicate that as well and indicate how much time you're

3    reserving.  If you reserve your time, you will get your time

4    with that witness.

5          And if you get to the time that you've reserved, you

6    don't wish to use it after all because questions have been

7    asked by other lawyers, you can indicate that and that will

8    become reserve time that can be divide up among those who are

9    present to question the witness, if they need the time.

10          And in chambers, Mr. Mason for the LAN defendants,

11   provided me with the deposition transcript from Mr. Busch's

12   deposition, Mr. Grashoff.  And what I intend to do is read it

13   and make a determination as to whether he should sit for some

14   additional hours or whether LAN would be limited to submitting

15   five additional interrogatories to Mr. Busch.

16          So I want to read the deposition transcript first.  I

17   haven't done that yet.  It is not terribly -- oh, they don't

18   have page numbers on here.

19          Anyway, it's not terribly long.  So I'll be able to

20   through it.

21          Mr. Mason?

22          MR. MASON:  Your Honor?

23          THE COURT:  Mr. Mason?  State your name.

24          MR. MASON:  Sure.  It's Wayne Mason on behalf of LAN.

25          At the Court's request, I did provide a transcript to

1  you that I had brought with me.  That was of the examination of

2  the lawyer that was at issue and the dialogue between the

3  lawyers, not the full transcript.

4          THE COURT:  I see.  I was trying to figure that out.

5  I thought it would be a mini if it was the whole ...

6          MR. MASON:  So I'm happy to provide you with that

7  quickly, the whole transcript if you'd like.  But, really, the

8  whole issue that was raised came out of that examination and

9  the dialogue of the lawyers wanting more time and reserving it.

10  So whatever the Court wishes, I'd be happy to provide.

11          THE COURT:  Let me start with this.  And if I need

12  more, I'll let you know and then I will decide this issue on

13  Wednesday, February 5th at the two o'clock discovery call.

14          Mr. Grashoff?

15          MR. GRASHOFF:  Yes, Your Honor.

16          THE COURT:  Philip Grashoff on behalf of Steven Busch.

17          MR. GRASHOFF:  Philip Grashoff on behalf of Steven

18  Busch.

19          Your Honor, to have this discussed in chambers outside

20  of my presence and I have no idea what was stated --

21          THE COURT:  I just repeated everything that was

22  stated.

23          MR. GRASHOFF:  I object to that.

24          THE COURT:  Your objection is received, but it's not

25  well placed for the following reason:  I understand you making

1   the objection because you don't know what was discussed.  And
2   trust me, your co-counsel said that to me and I said that makes
3   good sense.  We're going to address it here.
4           So you have missed nothing.  Your client has missed
5   nothing.
6           MR. GRASHOFF:  The posit of a partial transcript in
7   court, I also find objectionable.
8           THE COURT:  Okay.  Then your request is granted to
9   submit the entire transcript.
10          MR. GRASHOFF:  Thank you.
11          THE COURT:  Okay.  And Then I would ask that you be
12  present on Wednesday, February 5th at 2 p.m. when it will be on
13  the agenda for decision.
14          MR. GRASHOFF:  I will not miss it, Your Honor.
15          THE COURT:  Okay.  Thank you.  And I apologize for
16  even beginning the discuss upstairs.  I agree with you that it
17  would have been better served here.
18          MR. GRASHOFF:  Thank you very much.
19          THE COURT:  Sure.
20          So those are essentially -- there will be some
21  additional work -- well, we'll get to that.  All the rest of
22  this is all on the agenda.
23          So the next issue that is here is there is a proposed
24  protective order regarding the deposition of Patrick Cook.  And
25  I have the proposed protective order that was submitted.  It

1   has simply the three sentences that were ultimately the

2   decision of the Court with regard to other individuals who are

3   potentially facing criminal charges.

4          And so far as I can tell, it simply includes him in

5   the earlier order.  So it's my intention to enter it unless

6   anyone here, Mr. Barbieri, Mr. Campbell, have agreed upon this.

7          But if there is any other party who has not reviewed

8   this who has an objection to it, I would want to know.  And all

9   it simply says that Patrick Cook, that any written discovery

10  responses and deposition transcripts regarding Mr. Cook would

11  be temporarily sealed until further order of the Court.  That

12  attendance at his deposition would be limited to counsel of

13  record in the case and his criminal counsel.

14         And that Mr. Cook has the right to invoke the Fifth

15  Amendment privilege to specific questions presented in any

16  written discovery or deposition.

17         So I'll enter that at the conclusion of our hearing

18  today if there is no other party that somehow thinks he has a

19  different situation than the others.

20         Okay.  Great.

21         So, well, the next thing is general discovery

22  coordination with the state and federal cases.  So, as you can

23  tell, that's what the goal is here.  And I think there were

24  initially some discovery coordination orders with Judge Ewell

25  that have -- were the same as my orders but they have -- we

1   have charged on ahead and amended it a good number of times.

2          So do you want to say anything else about that?

3          JUDGE FARAH:  Only that because we're a little bit

4   behind in the state court cases than you are here in the

5   federal court, we certainly would be open to any suggestions

6   you might have about discovery schedules.  I appreciate this is

7   not going to be the typical 180 days for discovery or 90 days

8   for discovery.  So communicate with our office with my law

9   clerk, Sam Weinstein, so that we can be on the same wavelength

10  as far as what you're thinking about discovery.

11         As far as depositions are concerned, this was

12  mentioned in chambers.  Should it become helpful, if you would

13  like to take depositions in our courtroom -- I'll get that

14  checked out to make sure it's okay.

15         But we do have a DVD courtroom.  You'll have a DVD of

16  your deposition within 24 hours after it's done.  And we'll

17  have a court reporter there to swear the witness.  If need be,

18  I'll swear the witness.  I'll be 25 yards away.  So if that is

19  helpful to you, we make that offer to you and if you want take

20  us up on that.  If it's not going to be helpful, then forget I

21  brought it up.  But in any event we want to coordinate so that

22  we don't have any duplication and cross efforts at discovery.

23         THE COURT:  Good.  Thank you.  You can tell that it's

24  hard enough to schedule even another status conference so I

25  think that will assist everyone a great deal.

1          The next two telephone discovery call dates are
2    Wednesday, February 5th at 2 p.m. and Wednesday, February 19th
3    at 2 p.m.  So there's already a couple of issues brewing here
4    for the February 5th call that we will make sure everyone has
5    notice of ahead of time.
6          And the next issue is the bellwether selection
7    process.  And a committee of lawyers met and elected
8    Mr. Erickson to E-mail the Court and Mr. Mason can speak on
9    this as well or Mr. Stern, who has many of the bellwether cases
10   as clients.
11         And I had asked this group to come up with the next
12   round of individual bellwether cases that would be where
13   discovery would get started and the names would begin to be
14   narrowed down.  The first group, as you know, were children
15   ages six and under or under six?
16              MR. STERN:  Six and under.
17              THE COURT:  Six and under.
18              MR. STERN:  Cory Stern.
19              THE COURT:  Yeah.  With lead allegations.
20         So the proposal came forward that the Court should
21   have the next set of bellwether plaintiffs to be adult
22   claimants.  And that is likely to include lead, personal injury
23   claims related to lead as well as property damage claims, but
24   that's not a hundred percent determined.  So the group by the
25   time of the submission of agenda items for the next status

1   conference, this group will make a proposal that I will be able
2   to consider and make a decision at the status conference.  And
3   if oral argument is needed or requested, let me know that as,
4   well if an agreement cannot be reached.  But it's my
5   expectation an agreement would be reached and that I would be
6   able to consider it and then I may have my own ideas as well
7   that I would let you know.
8           Mr. Campbell.
9           MR. CAMPBELL:  Thank you, Your Honor.  James Campbell,
10  I represent the VNA defendants.  And only because we're on the
11  record, Your Honor.  I think that what we discussed both in
12  chambers and on the call was we're looking for a group of adult
13  plaintiffs that not only have lead as an alleged injury, but,
14  you know, there's myriad of personal injuries.
15          THE COURT:  Right.
16          MR. CAMPBELL:  You only focused on the being an adult
17  with different types of personal injuries and problems.
18          THE COURT:  That's what I was hoping that I just said.
19  But apparently I didn't.
20          MR. CAMPBELL:  You just said "lead."
21          THE COURT:  Oh, I see.  And when I said "lead," I
22  meant every kind of damage that someone has alleged took place
23  as a result of exposure to lead.  So thank you because I
24  certainly didn't say it.
25          So that's what we are looking at for the next

1  bellwether process.  And when that proposal is submitted in

2  February, it should be submitted along with the dates by which

3  each of the groups would be winnowed down and handled.

4           So that is what we'll do.

5           Next on this agenda is --

6           MR. KLEIN:  I'm sorry, Your Honor.

7           THE COURT:  Oh, yeah?

8           MR. KLEIN:  Before we move own -- sheldon Klein.  I

9  just don't want to, unless I be accused sandbagging.  I have

10 concerns about the next bellwether group that was just

11 described.  This is not the time to argue it out, but I don't

12 want to leave the impression that there's near consensus in all

13 the details.  Hopefully, that will be resolved through the

14 discovery process.

15          THE COURT:  Okay.  And I could tell because there was

16 a request to expend the time for submitting it to me that the

17 committee -- that there was undoubtedly a difficult

18 conversation trying to sort this out.

19          And it's not that there's a right or wrong answer to

20 something like this.  What we're trying to use the bellwether

21 plaintiffs to do is to test the validity of the claims and if a

22 jury finds liability, the damages.

23          So that the rest of the plaintiff's counsel and

24 defendants can evaluate their cases.

25          So there's not necessarily a right or wrong answer.

1    It's a process to try to move the whole lot of these cases

2    forward.  But I appreciate you informing us of the disagreement

3    or different view.

4         Judge Farah has before him -- and I had filed before

5    me as an exhibit, a motion to disqualify the Michigan Attorney

6    General's Office from all of the state court litigation, all

7    the state court Flint Water litigation and Judge Farah is going

8    to say a couple of words on that.  It's not an oral argument.

9    Don't get worried about that.

10        JUDGE FARAH:  Yes.  No oral argument today.  We will

11   schedule that when counsel believe it would be most conducive.

12   It was scheduled for earlier this month and we had set aside a

13   couple of days, actually, for it to be heard.  But we will let

14   things play out and those who are involved or interested in

15   that that want it heard, can just let our office know when they

16   would like that motion to be heard in the context of other

17   ongoing developments.

18        My motion day is typically Monday at 10 'clock.

19   There's nothing typical about this case.  So the motion will

20   not be heard on Monday at 10 o'clock.  We'll find a date during

21   the week in the afternoon, Whatever fits with people's

22   schedules.  Just keep us apprised on when you would like it and

23   what days work best for you.  I know many of you come from out

24   of state.  So we'll be happy to make the scheduling of all the

25   motions that we have in state court on these cases at a time

1   that is convenient for the travelers as well.

2          MR. KIM:   Judge Farah, I want to request little

3   clarification on the other motions that are pending.  Have you

4   given any thought to how you intend to proceed with those or

5   what kind of schedule for addressing those that you're

6   contemplating?

7          JUDGE FARAH:   We divide them, really, into two

8   categories.  One those that we received since we've received

9   the case mid-November of last year and I believe there are a

10  couple of those.  Then we have 16 other pending motions that

11  were filed but I believe not yet decided by former Chief judge

12  Ewell.

13         We will probably try to get to those -- not that I

14  would cal it dispositive, but, for example, the attorney

15  general disqualification motion, it would probably be a good

16  idea to decide if they're in the case before we start hearing

17  arguments they might have on other motions.  So we will give

18  some sort of priority to those, but we have not forgot about

19  the other motions, any one of the 16 that we believe are

20  pending.  So there will be a step order of consideration that

21  we'll establish.

22         THE COURT:   Thank you.

23         So the next thing before we get to the oral argument

24  on Marble and Brown is for Ms. Greenspan to provide any update

25  or report that she has.

1          MS. GREENSPAN:   Thank you, Your Honor.   I'm going to

2    give a fairly brief report because I am going to be submitting

3    a written report within the next week or so that everyone will

4    be able to study and read and ask questions about.   But let me

5    give a quick overview for everybody's benefit right now.

6          I was here -- we had a status conference on December

7    10.   Just to note, that since that time we've received about

8    375 additional new claims from law firms that have submitted

9    data.   But we've received close to 3,000 updates.   Meaning

10   updates for claims -- 3,000 claims that we've already had in

11   the system, we received updated data for the last month for

12   close to 3,000 of those.   So there's new information.   So when

13   I produce the report, you'll see some changes in some of the

14   numbers and some of the breakdown in claims.

15         There are 14 firms that have been providing data to

16   us.   There's a total number of records in our system is 33,400.

17   Some of those are what we call contacts.   These are people who

18   have contacted lawyers.   The lawyers have maintained

19   information about them in their database, but they have not

20   signed a formal retainer agreement.   About 21,000 have signed a

21   formal retainer agreement.

22         I think its important to note that, as I've reported

23   in the past, we have some overlapping claims.   Meaning we have

24   the same individual who is reported by more than one law firm.

25   We have worked through some of those particular instances to

1    determine where the claim belongs.  But I think we have on the
2    order of about 1,600 disputed representations that we are going
3    to start working our way through.  Now that we've got some new
4    data, some of those people have changed statuses.  So we're now
5    at a point where we can start working through the disputes and
6    figure out really what's happened to that particular claimant
7    and where they actually belong.
8              We have out of the total numbers that we've got, we've
9    got about 7,580 in this database who are children.  We're
10   defining children to mean under 18 in 2014.
11             So we've got, you know, a fairly substantial number of
12   children in this group.  And then I think it's important for
13   people to know we have -- again, out of this group, close to
14   7,500 of these individuals have filed cases.  Not all of them
15   actually filed as yet, but we do have 7,500 hundred cases
16   listed in our database.
17             I think I'll defer -- I have other numbers I can give
18   you.  I can give -- you know, as I've reported in the past,
19   when we've asked for information about the injuries that are
20   being alleged by the individual claimants, the largest category
21   is just a generic category called lead exposure.  We do have
22   about 14,000 representative clients that are in that -- are
23   listed in that category.  But there are very substantial
24   numbers of people who have claimed cognitive impairment, skin
25   rashes and skin irritation issues.

1          We have a substantial number of claims of claims of

2     neurological conditions, which is a broad category.  It's not

3     been broken down into subsets but sort of lumping them

4     together.

5          Thousands of people with gastrointestinal and

6     digestive issues.  I have a complete list of all of those

7     different types of conditions that we can circulate when the

8     report is ready.

9          So that is the update.  We do continue to get new

10    information, as is obvious from what I said at the beginning,

11    about the updates that we received just since December 10th,

12    which was also during a holiday break when nobody did anything

13    for about two weeks.  At least I didn't get anything.

14         So it continues to grow and we continue to get refined

15    from counsel and everybody's been very cooperative and

16    responding to questions and to clarifying their information.

17              THE COURT:  Good.

18              MS. GREENSPAN:  Thank you.

19              THE COURT:  Yeah.  Thank you very much.  Let me

20    mention that on the agenda it indicates that the next status

21    conference is going to be Wednesday, February 26th.  That will

22    be changing because the parties informed me that they have a

23    deposition scheduled that day that was very difficult to get

24    agreement on and availability for handling.  So I will -- I'm

25    anticipating an E-mail letting me know a couple of available

1   dates for scheduling the next status conference.  So we'll get
2   that done and, of course, it will be on the docket as soon as
3   we schedule it.  And it will set forth the cutoff for
4   submitting proposed agenda items.
5              So that concludes everything except the oral argument
6   on the many motions to dismiss in Brown and Marble.
7              What I would like to do is begin with Brown.  And who
8   will be arguing Brown for plaintiffs?  Plaintiff?
9              MR. WEGLARZ:  Your Honor, I will be doing most of
10  those and Don Dawson --
11             THE COURT:  Wait.  Mr. Weglarz, you didn't say who you
12  are.  You're Todd Weglarz.
13             MR. WEGLARZ:  Yes.  I'm Todd Weglarz.  And Don Dawson.
14             THE COURT:  Who else?
15             MR. DAWSON:  Don Dawson, Your Honor.
16             THE COURT:  And earlier, I thought that was you.
17             MR. WEGLARZ:  Thank you.
18             THE COURT:  For plaintiff and Brown.
19             MR. DAWSON:  It would be a response.
20             THE COURT:  Okay.  Terrific.  And then who were for
21  Defendants and Brown.
22             MR. KUHL:  Richard Kuhl for the State defendants and I
23  intend to present argument on a handful of issues with respect
24  to the State defendants.
25             THE COURT:  Okay.

1          MR. KIM:  William Kim on behalf of the City.  I just

2  want to make sure that I understood the additional claims

3  against the City were being dismissed.  If that's the case, I

4  would have no further oral argument.

5          THE COURT:  Okay.  Mr. Weglarz.

6          MR. WEGLARZ:  I'm sorry.  I did not hear.

7          THE COURT:  Are you asking whether any pending claims

8  against the city --

9          MR. KIM:  Whether the additional claims asserted under

10  Count, I believe, 13 or 14, that being gross negligence and the

11  access to the courts, whether those are -- should all be

12  considered dismissed.  If that's the case, I would have no

13  further argument to offer, Your Honor.

14          MR. WEGLARZ:  Your Honor, we're just asking that you

15  follow your decisions as applied in Sirls and Walters.

16          THE COURT:  But those claims were not -- well, the

17  access to the Court's claim was not raised in Walters and

18  Sirls.

19          Are you still asserting it in Brown?

20          MR. WEGLARZ:  We are not.

21          THE COURT:  Okay.  That's helpful.

22          MR. KIM:  In that case, I would have no argument, Your

23  Honor.

24          THE COURT:  Okay.

25          MR. GRASHOFF:  Your Honor, Philip Grashoff.  On behalf

1   of the MDEQ employee defendants, I'll be making the argument in

2   both Brown and Marble, Your Honor.

3             THE COURT:  Thank you.

4             MR. GRASHOFF:  I also have a housekeeping issue with

5   respect to some claims that I would like to get off the table

6   first, if I may?

7             THE COURT:  You mean, like, right now?

8             MR. GRASHOFF:  Right now.

9             THE COURT:  Okay.  Let's do it.

10            MR. GRASHOFF:  Your Honor has ordered by February 10

11  that we look for various cases with unique claims.

12            THE COURT:  But is this in Brown?  I want to limit --

13            MR. GRASHOFF:  No, this is not in Brown.  This is just

14  our housekeeping.

15            THE COURT:  Let's do that later.  I want to focus on

16  Brown and Marble and get through that material as efficiently

17  as we can.

18            MR. ERICKSON:  Your Honor, Philip Erickson for the LAN

19  defendants.  I would be arguing on whatever of LAN.

20            THE COURT:  Thank you.

21            MR. ERICKSON:  Our argument will be quite brief.

22            THE COURT:  Okay.

23            MR. JENSEN:  Your Honor, Larry Jensen on behalf of the

24  Hurley defendants.

25            THE COURT:  Thank you.  And McLaren answered.

1          MR. WISE:  Your Honor, just very briefly.  Mat Wise on

2    behalf of Mr. Wright.  We did file a motion and reply in the

3    Brown matter.  I agree with what Mr. Weglarz said.  I filed a

4    response merely to reserve the issues for appeal.

5          THE COURT:  Terrific.

6          MR. WISE:  Which if that is the case, which it sounds

7    like it is, I don't have any further argument.

8          THE COURT:  Okay.  Good.

9          MR. MacDONALD:  Your Honor, you mentioned McLaren.

10         Brian MacDonald for McLaren.  We filed an answer.

11         THE COURT:  Right.  So you won't be arguing on this

12   motion?

13         MR. MacDONALD:  That's correct.

14         MR. BERGER:  Your Honor, Jay Berger for Dan Wyant and

15   Brad Wurfel.  Mr. Wyant has submitted to Mr. Brown a stipulated

16   order and just today we submitted the stipulated order for

17   Mr. Wurfel as well.

18         THE COURT:  I saw that and if you hadn't done that, I

19   would have taken care of it today, but I'm happy that you got

20   it that done.

21         MR. BERGER:  Thanks for everything.  We'll just

22   reserve the right to argue.

23         THE COURT:  Okay.  Here in terms of Brown, obviously,

24   these are defendants, various defendants motions to dismiss,

25   which plaintiff files thorough response brief to.  But then of

1   coarse the defendants got the reply brief.  So what I have

2   ended up with is questions that I want to begin asking of

3   plaintiffs's counsel and then give defendants an opportunity to

4   respond to that.

5           So Mr. Weglarz and Mr. Dawson, if needed.

6           MR. STERN:  Your Honor, may I be excused for a moment

7   to USE the bathroom?

8           THE COURT:  Certainly.

9           MR. STERN:  Thank you so much.

10          THE COURT:  Okay.  Mr. Weglarz, let me ask.  You have

11  a claim for punitive damages for alleged 1983 injuries.  And my

12  question is, I want you to explain how you can continue with

13  that particular claim, which is not against LAN and Veolia

14  North America on the state law professional negligence claims.

15          Just a minute.  You're requesting punitive damages

16  against LAN and Veolia which has already been determined is not

17  available.  Are you still pursuing that?

18          MR. WEGLARZ:  Northern.

19          THE COURT:  Okay.  That's done.

20          MR. WEGLARZ:  Your Honor, I'm sorry.  I don't mean to

21  interrupt and I understand your rulings.

22          THE COURT:  Yes.

23          MR. WEGLARZ:  That has been ruled on and we just want

24  to ride the coattails.  So I'm not stipping to abandon that.  I

25  just still want to preserve that issue for appeal and invoke

1    the same arguments that liaison counsel invoked when arguing

2    these previously on the other cases.  That's all.

3              THE COURT:  Okay.

4              MR. WEGLARZ:  Thank you.

5              THE COURT:  Thank you.

6              Then, let me ask counsel for Mr. Rosenthal a quick

7    question neck.  These are sort of general, housekeeping about

8    the arguments that were made.  Mr. Rosenthal filed an answer in

9    the case on October 4th of 2019.  Then filed a joinder in

10   MDEQ's motion to dismiss.  And once you filed an answer that is

11   in lieu of a motion to dismiss.

12             In the answer, you did assert the affirmative defense

13   that Brown had failed to state a claim, but you cited rule

14   12(b)(2), which is the personal jurisdiction rule.

15             So I'm quite confident that there is personal

16   jurisdiction over Adam Rosenthal in this court.

17             MALE SPEAKER:  Yes.

18             THE COURT:  And you filed an answer, so what is your

19   intention here?

20             MR. FAJEN:  James Fajen on behalf of Rosenthal.  I'm

21   going to see how this plays out.

22             THE COURT:  Okay.  But I'm not going to write an

23   opinion on a -- I mean, you filed and answer and I don't think

24   it's permissible to file an answer and a 12(b)(6).  In fact, I

25   know it's not.

1           MR. CAMPBELL:  I think you're correct.

2           THE COURT:  So I appreciate you're going to watch how

3   it plays out, but I will not consider that it's own independent

4   12(b)(6) motion to dismiss for failure to state a claim.

5           MR. FAJEN:  I understand that.

6           THE COURT:  And I certainly do think there's personal

7   jurisdiction.

8           So another big picture thing -- back to Mr. Weglarz.

9           You allege that all of the defendants are jointly and

10  severally liable and Michigan has replaced joint and several

11  liability with fair share liability.  How should I address

12  that?

13          MR. WEGLARZ:  Well, I think you already did, Your

14  Honor.  I think we acknowledged that in our responses as well.

15          THE COURT:  Okay.

16          MR. WEGLARZ:  So we will be abandoning that today and

17  we understand your ruling on that issue.

18          THE COURT:  Okay.  Good.

19          All right.  Then I want to move to the issue of gross

20  negligence.  Now, in this case, turning to you, again,

21  Mr. Weglarz, I think both sides, although, perhaps, Mr. Jensen,

22  I'm pretty sure I'm confident of this.  That both sides

23  agree -- where is Mr. Jensen?

24          Could you step forward.

25          Both sides agree that Hurley Medical Center is a

1   governmental agency.  Is that the case, Mr. Jensen?

2          MR. JENSEN:  Yes, Your Honor.  And I believe that was

3   admitted --

4          THE COURT:  That's in all of your ...

5          MR. JENSEN:  -- in our briefs.

6          MR. WEGLARZ:  Your Honor.

7          THE COURT:  So then I ask you how is Hurley Medical

8   Center not subsumed by absolute governmental immunity under

9   Michigan MCL section 691.1407(1).

10          MR. WEGLARZ:  Your Honor, we argue that they would be

11   liable for a *Monell* claim, for the actions of defendants Newell

12   and Birchmeier.

13          And that's it.

14          THE COURT:  Okay.

15          MR. WEGLARZ:  I agree.  There's no state law claim

16   against Hurley because it is a governmental agency.

17          THE COURT:  Okay.  So you're suggesting that the MCL

18   691 would permit a *Monell* claim but not the direct claim.

19          Mr. Jensen, anything.

20          MR. JENSEN:  I think you understand, Your Honor.

21          THE COURT:  Okay.  All right.

22          Then one more thing I would like you to know,

23   Mr. Weglarz, is under the Ray case, causation with regard to

24   Defendant Newell and Birchmeier -- am I saying that right?

25          MR. JENSEN:  Yes, Your Honor.

1             THE COURT: Requires that they be the one most

2 immediate efficient and direct cause of plaintiff's injuries.

3 And in my view, as I read your complaint -- and I have read all

4 of these complaints, the allegation begins with the government

5 defendants, essentially, beginning the process, perhaps with

6 LAN at the earlier on, but generally the government defendants

7 making the decisions that caused the water to contain lead and

8 other toxins and Legionella, in this case.

9             And your allegation about Hurley is a negligence

10 failure -- or it is a failure to warn or treat the water.

11             So how can Newell and Birchmeier be the one most

12 immediate and efficient and direct cause.

13             MR. WEGLARZ: Well, Your Honor, as you know, there are

14 many different views, many different positions being alleged on

15 these cases. You have the hospital saying this is all the

16 fault of the state, the municipal. The county defendants we

17 have the governmental defendants, saying, you know what, at

18 least as it pertains to Legionella, it's all the fault of the

19 hospital.

20             THE COURT: But what I have to look at for a motion to

21 dismiss is what you allege, not what they say. You have

22 alleged that other entities are responsible for introducing

23 this problem, for creating this problem and furthering it. And

24 that at the tail end of all of that, Ms. Brown ends up at

25 both Flint Hurley and McLaren and she dies ultimately of

1   Legionella.

2         So how can these two who are at the tail end of this

3   whole thing end up the most proximate cause.  The most direct

4   and efficient cause of her death?

5         MR. WEGLARZ:  Sure.  And, Your Honor, I do plead in

6   the alternative, by the way.  I mean, I certainly can't tell

7   the whole story at the very beginning of the litigation and

8   conclusively tell you exactly you what everyone did.  It's

9   going to be a question of factor for the jury to sort out.  But

10  you're right, I do have counts against various different

11  defendants.  But, Your Honor --

12        THE COURT:  But this is a question of law.  This is

13  not a question of fact now.  It's a question of law as to how

14  you pled the case.

15        MR. WEGLARZ:  I agree to a point, but proximate

16  causation and who is the most directly responsible and at fault

17  can be a question of fact for the jury.  Your Honor, it could

18  come down to it.  It could.

19        After hearing all the evidence, the jury may say, "You

20  know what, we don't believe the Legionella was caused by the

21  state defendants.  We don't think it was the transition in

22  water so much as it was the stagnant water once it reached the

23  hospital and they knew they had problems with it."

24        Birchmeier and Newell are actually in control of the

25  water supply.  They sit over the water supply.  They have the

1   responsibility to make sure that the hospital's water supply is
2   clean and safe and they have to be proactive, do things to make
3   sure they're checking on it.  So that's claim.

4           Are there other contributors?  Yes, of course.  I also
5   have a claim against the state defendants.  I have a claim
6   against the county defendants.  Right now that's how it's pled,
7   but it is in the alternative.  I don't know -- when the dust
8   settles, we don't know exactly who is going to be responsible
9   for what percentages.  But at this stage in the litigation,
10  Your Honor, I think I'd plead it.  I have just two individuals,
11  at least in that count.

12          Under my count for Hurley, I allege these two
13  individuals engaged in gross negligence and that gross
14  negligence was the proximate cause of the injury.

15          For that count.  I understand you've ruled on gross
16  negligence in the other cases.  And I think I pointed this out
17  in my brief.

18          But those other cases, to be fair, they did allege 16
19  governmental defendants who contributed to the injury and
20  that's kind of a mess.  How can you say which one of those 16
21  ever the proximate cause.  There are 16 governmental defendants
22  from four or five different governmental entities.  Here I have
23  two people both in charge of the hospital water supply from the
24  same employer and I say they are the proximate cause --

25          THE COURT:  But you are also suing governmental

1  defendants, correct?

2          MR. WEGLARZ:  I am.

3          THE COURT:  Yeah.  And you're also suing them for

4  Legionella for related to Ms. Odie Brown's death.

5          MR. WEGLARZ:  Correct.

6          THE COURT:  And I didn't make up this theory of

7  liability.  And -- but I am bound to live by it and it requires

8  that for gross negligence that we find the one most immediate,

9  efficient and direct cause and that -- this case requires --

10  the Michigan Supreme Court requires that the -- that the

11  plaintiff identify which defendant is most legally responsible.

12          And as I read your complaint, you have not -- you have

13  not -- you would have to limit your claims to these two

14  individuals.

15          MR. WEGLARZ:  I understand, Your Honor, and I

16  appreciate that.

17          THE COURT:  Okay.  Mr. Jensen, anything you wish to

18  add on that?

19          MR. JENSEN:  Not at this time.  Not until argument,

20  Your Honor.

21          THE COURT:  Okay.  Well, what I would like to do now

22  is under bodily integrity, which many of the defendants are

23  sued for, is to handle that along with Marble when we get to

24  that in Marble.

25          So the next thing that I want to do is move to Marble,

```
1   the motions with respect to whether LAN and VNA are state
2   actors.
3           So let me move to that.
4           Okay, Mr. Weglarz, as I understand it, you've got
5   two -- I'm sorry.  Ms. ...
6           MS. TSAI:  Tsai.
7           THE COURT:  Tsai.  Okay, Ms. Tsai.
8           I'm sorry, Mr. Weglarz.
9           You have two theories for state -- do you want to come
10  down to counsel table.  For state actor liability.  There are
11  three factors, but they're sort of two ways you argue it.  But
12  the three factors being that these private actors engaged in a
13  public function, compelled by the state and that there's a
14  close nexus between the public actors and the private actors
15  and indeed there's a conspiracy.
16          MS. TSAI:  Correct, Your Honor.
17          THE COURT:  Okay.  So in order to have -- to find a
18  conspiracy, there has to be an overt act in furtherance of the
19  conspiracy.  We can agree on that?
20          MS. TSAI:  Yes.
21          THE COURT:  Okay.  So point to me in your complaint
22  what the overt acts are that the private plaintiffs took.
23          MS. TSAI:  So, first as to Veolia defendants --
24          THE COURT:  Can you move the microphone?
25          MS. TSAI:  Is this better?  Thank you.
```

1          As to the Veolia defendants, they took steps to

2     communicate to the public about their intent of doing a

3     comprehensive review of the water.

4          THE COURT:  But how is that an overt act in

5     furtherance of a conspiracy?

6          MS. TSAI:  Because they -- I think it can be inferred

7     from the allegations in the complaint that they never had any

8     intentions of conducting a thorough investigation.  The amount

9     of time it took for them to issue a report to say that there

10    aren't any issues with the water, also goes to show that they

11    were simply just doing the government defendants's deeds.  And

12    that they were hired, basically, to be as part of a public

13    relations firm.

14         THE COURT:  So the overt act in furtherance of the

15    conspiracy is agreeing to take -- undertake a thorough

16    examination of the water issues.

17         MS. TSAI:  It's to communicate to the public that they

18    are under contract to do a thorough investigation; however,

19    they never had any intentions to actually do that but instead

20    to, you know, misrepresent to the public that the water -- they

21    have conducted a thorough investigation and that the water was

22    safe.

23         THE COURT:  Okay.  Are there any other overt acts?

24    And is that LAN that --

25         Ms. TSAI:  That was -- that's Veolia.

1          THE COURT:  That's Veolia.

2          MS. TSAI:  Uh-huh.

3          THE COURT:  Okay.

4          MS. TSAI:  As to LAN, their relationship with the

5     government defendants goes back to 2011.  There are multiple

6     reports issued by LAN during the time of 2011 to say that there

7     were safety concerns regarding --

8          THE COURT:  That's not an overt act in furtherance of

9     a conspiracy to kill your client.

10          MS. TSAI:  It's not.  However, their actions

11     afterwards says a lot.  So they issued this report in 2011

12     saying the water is not safe.  The water is not safe.

13          THE COURT:  Slow down a little bit.

14          MS. TSAI:  Sure.  Then in 2013, they are brought back

15     to reevaluate.  They backtrack, basically, essentially

16     everything that they said in 2011.  Gives an okay to have Flint

17     distribute the water.  They knew that none of their

18     recommendations from 2011 were implemented and yet they went

19     ahead under the guidance of the city to give the okay and

20     that's essentially how the water was transferred -- the

21     contract was moved forward.

22          THE COURT:  Okay.  Because the complaint says that

23     evidence of this conspiracy is, quote, is powerfully attested

24     and evidenced by the mutual silence amongst all the defendants.

25          So is it their silence that you consider an overt act?

1    And if it is, I have a different set of questions about that.
2    Or is it specific actions?
3          MS. TSAI:  It's specific actions.  But their silence
4    is also representative of the conspiracy because their failure
5    to communicate issues to the public to warn the -- to warn the
6    public about water safety, public health hazards was in
7    furtherance of the conspiracy.  This is -- and the silence is
8    the cover-up aspect.
9          THE COURT:  Okay.  And do you have cases that can show
10   me that silence can be considered an overt act in furtherance
11   of a conspiracy?
12         MS. TSAI:  I don't have that in front of me, but I'm
13   happy to supply that.
14         THE COURT:  Did you look for the -- we looked for
15   those cases and didn't find them.
16         MS. TSAI:  To be perfectly candid, it was a while
17   since I prepared the response and I'm not sure if I did do that
18   research.
19         THE COURT:  Okay.  So -- so, I mean, I didn't find
20   cases that said that mutual silence is enough to show that
21   overt acts have been taken.  I mean, when we think about a
22   conspiracy, we're thinking about people getting together to
23   accomplish a common goal.  And individuals in order to be held
24   liable have to take actions towards doing that.  And taking no
25   action at all is difficult to determine is an action.  So ...

1          MS. TSAI:  Sure.  And I understand that.  However,

2  what we're -- our conspiracy is based on, first, the conspiracy

3  to engage in this contract so that -- for financial gains.

4  Then when we move --

5          THE COURT:  Whoa.  Whoa.  Whoa.  Whoa.

6          So the conspiracy is that -- that LAN and Veolia at

7  different times were hired to do consult -- water consultancy

8  work?

9          MS. TSAI:  Correct.  Well, no.  The conspiracy is that

10 there was going all the way back to 2011 to switch the water

11 over from the Detroit water system to KWA and then later on to

12 the Flint water.

13         Now, once they realized that there was issues with the

14 Flint water, there was conspiracy to hide the public health

15 hazard in order to essentially cover -- it was a CYA so that --

16 for their personal employment and also financial stability.

17         THE COURT:  Okay.  I think I hear your argument.

18         So you also argued that these defendants entered into

19 an agreement to hide the Legionella outbreak, right?

20         MS. TSAI:  Correct.

21         THE COURT:  Okay.  So can you tell me where that

22 allegation is in your complaint?  What are the facts that

23 support that argument?

24         MS. TSAI:  That is stated in the short form complaint.

25         THE COURT:  Did they discuss hiding the Legionella

1  outbreak?

2        MS. TSAI:  Your Honor, the complaint does not specify

3  whether there was a meeting, what was discussed at this

4  meeting.  I think our response indicated that there's case law

5  that shows that, you know, essentially the essence of a

6  conspiracy is that there isn't going to be concrete evidence

7  that we can point to, especially at a motion to dismiss phase.

8  You know --

9        THE COURT:  But there has to be a plausible

10  allegation.  That's what I'm looking for is whether that

11  exists.  And when you say there was an agreement among the

12  plaintiffs, I need to know something about how that agreement

13  was formed or even if it was in a series of phone calls or a

14  series of messages or covert meetings or something.  I need

15  some factual allegation to say that it's plausible that all of

16  these defendants got together to hide -- well, first of all, to

17  develop the Legionella outbreak and then to hide it.

18        MS. TSAI:  And so as we explained in the response for

19  the conspiracy, not all of the defendants need to be in the

20  room or have a phone conversation.  There could be two that are

21  in --

22        THE COURT:  I understand that.

23        MS. TSAI:  -- that conversation and then there's a

24  linear connection.  And so the complaint does make allegations

25  relating to conversations with McLaren and that they were aware

1  of the Legionella in their water system and had conversations

2  with the state and then afterwards, there was no public

3  announcement about the Legionella that was found in the water.

4        There are discussions about -- there are allegations

5  in the complaint relating to E-mails that was sent back and

6  forth between MDEQ defendants, as well with the state and city

7  officials talking about the issue of Legionella and then at

8  first expressing concerns but then downplaying the actual

9  concerns saying it's -- there's no connection.

10        And then going to January of 2015, then there's --

11  actually, sorry, in March of 2015, there is a public statement

12  made to say that there are no correlation between the Flint

13  water and Legionella, which at that point as we allege in the

14  complaint, defendants knew was not true.

15        THE COURT:  Okay.  Do you -- do you agree that

16  conspiracy claims have to be pled with specificity?  Because

17  it's -- it's very appealing to say there are a lot of

18  defendants.  They all each one had a role in the -- in what we

19  now call the Flint water crisis.  But alleging a conspiracy, a

20  concerted effort that they have shared a general objective

21  that -- to deprive plaintiffs of rights and to expose them to

22  Legionella leading to, in this case Ms. Brown's death, that

23  they each engaged in overt acts in furtherance.  They don't

24  have to be the same overt act but at least different acts.

25        And that there's some agreement to do this.

1          And so it's an appealing thought which is why the

2    Court -- why the Sixth Circuit, the Supreme Court, in all

3    conspiracy cases requires specificity.

4          MS. TSAI:  Right.

5          THE COURT:  So as -- I have to just be frank that as I

6    read your complaints, your conspiracy allegation, it was very

7    broad.  For example, you refer to VNA and LAN and McLaren

8    generally as entities that entered into this conspiracy, but I

9    don't see allegations about who did this.  Who -- who at

10   McLaren entered into the conspiracy.

11         MS. TSAI:  Your Honor is correct that in our complaint

12   as it stands there are no individuals named related to McLaren,

13   LAN and Veolia.  However, I think -- and your -- and I don't

14   dispute that the Sixth Circuit has said that in 1983 conspiracy

15   claims that there is a higher pleading standard and we have to

16   plead more specifically.

17         However, you know, in the allegations that talk about

18   everyone's specific action and then the failure to communicate

19   the public health hazard, it does show a conspiracy that --

20   that they have talked to each other.  If we -- we're fast

21   forwarding now to 2020 and everyone's pointing the finger at

22   each other.  They were -- they did not do that back in 2015

23   because there was an agreement to just hide the issue of

24   Legionella all together.

25         THE COURT:  Okay.  Have -- do you have any Sixth

1    Circuit cases that allow a conspiracy count to go forward
2    against entire entities without some specificity at who or when
3    and where these -- the agreement was made, the objectives were
4    formed and later overt acts undertaken?

5         MS. TSAI:  Not at this time, Your Honor.  But I'm
6    happy to supplement as well.

7         THE COURT:  But, I mean, now is your -- I'm just
8    saying now is our oral argument on this case.  And I didn't
9    find those cases.  I found the contrary, interestingly.  *Boxill*
10   *versus O'Grady*.  B-o-x-i-l-l.  Where the Sixth Circuit
11   determined that a plaintiff's claims fell short because she
12   couldn't get facts relevant to individuals liability in the
13   conspiracy that she was alleging.

14        And instead they said as a result of that, it was --
15   the plaintiff had not pled a plausible nonconclusory set of
16   facts to -- to demonstrate that the defendant's actually joined
17   the conspiracy, shared its objectives, and committed specific
18   acts to further it.

19        And what I see here is that you've got a big picture
20   story of what happened here by -- with the long form and all
21   the addendums and so on, but I don't see where you've connected
22   how VNA, LAN and McLaren entered into a specific plan to
23   deprive the plaintiff of her rights which is -- and your
24   conspiracy is to hide the Legionella outbreak; is that it?  Or
25   was it to create the Legionella outbreak?

1          MS. TSAI:  Well, certainly with LAN it was to create

2    as well as to hide.  With Veolia, it was just to hide.

3          And I want to -- I misspoke earlier about the fact

4    that the complaint does not specifically name any individuals

5    within, at least Veolia.  I don't recall individuals names but

6    in the complaint, it does name two individuals.  Once the

7    contract was entered in 2015, where they made public

8    statements, was stood side by side with the city to say that

9    they were going to do a thorough investigation.

10         THE COURT:  But so your allegation is the thorough

11   investigation was an agreement to enter into a conspiracy with

12   the objective of creating conditions that allowed Legionella

13   and later to hide it.

14         But when they stood there side by side and said we're

15   contracting with this company to do a thorough investigation,

16   that really they had already entered into a secret agreement --

17         MS. TSAI:  That --

18         THE COURT:  -- to poison.

19         MS. TSAI:  Well, not to poison.  Not to affect the

20   water.  By 2015 the water had already been contaminated.  But

21   to hide the fact that the water was contaminated.  You know,

22   so --

23         THE COURT:  And that -- and VNA knew that they were

24   going to hide it when they entered into that contract?

25         MS. TSAI:  Correct.

1          THE COURT:  And tell me that allegation.  How do you

2    know that?

3          MS. TSAI:  Sure.  So as alleged in the complaint, they

4    enter into this contract.  They say -- they make a public

5    announcement that they are going to thoroughly investigate and

6    then they issue a --

7          THE COURT:  I hear that part.  We've already heard

8    that.  I want to know what I haven't been able to find.

9          When did they agree before getting up on the stage to

10   hide the Legionella?

11         MS. TSAI:  So we don't have -- we don't know when,

12   right?  We know it was sometime --

13         THE COURT:  Well, if I -- when you say right, if I

14   knew, I wouldn't -- I wouldn't be asking.

15         MS. TSAI:  And if we knew specifically when that

16   conversation, argument came about, that would be in our

17   complaint.  However, we can look at the actions that are taken

18   afterwards to infer and at this stage --

19         THE COURT:  Do you suggest that when VNA got hired to

20   do this thorough investigation they already knew that -- Flint

21   said there's Legionella in the water.  We'd like you to come in

22   here and help us hide it.  That's what you're alleging?

23         MS. TSAI:  Right.  Exactly.

24         THE COURT:  Okay.  So I need to know how did Flint --

25   when did Flint know that there was Legionella before they hired

1  VNA.

2          MS. TSAI:  So as early -- as alleged in the complaint,

3  as early of October of 2014, government officials knew that

4  there was Legionella issues with the water.  There was a

5  Legionella outbreak --

6          THE COURT:  How do you know they communicated to VNA

7  that your purpose is to come in here and hide it?

8          MS. TSAI:  Because once they stood side by side, six

9  days later, Veolia -- VNA issued the report to say that the

10 water was safe, that people's -- the public's concern about

11 discoloration, the smell, was just, you know, cosmetic in

12 sense.

13         THE COURT:  Okay.

14         MS. TSAI:  And if they were going to do a thorough

15 investigation, it would take more than six days to issue an

16 interim report.

17         THE COURT:  And so that's how you conclude that before

18 they entered into the contract, the plan was in place to hide

19 this.

20         You've also alleged in your complaint that McLaren and

21 the government defendants -- and here I'm quoting, participated

22 in Birdie Marble to come into Flint for treatment at McLaren.

23         So are you -- you're suggesting here that someone

24 at -- who at McLaren did this?  Who at McLaren somehow maybe

25 did an ambulance chasing situation and said to Ms. Marble,

53

1   we're going to take you to the hospital where you will be

2   poisoned and die?  I mean, it's a horrible thing to even talk

3   about, but this is your allegation and so I need to know who

4   participated in forcing or getting Ms. Marble to go to

5   McLaren.

6           MS. TSAI:  So it -- it's not so direct in the sense

7   that an ambulance showed up and decided to take her to McLaren.

8           Ms. Marble did not reside within the Flint city

9   limits.  But if she was aware, if -- if the defendants did not

10  hide the fact that McLaren Hospital was contaminated with

11  Legionella water, she had a choice to go to other hospitals.

12  She chose to go there --

13          THE COURT:  But you -- but see, civil conspiracy is

14  different from negligence and so -- we have to the agreement,

15  the objectives and the overt acts.  We have to have all three.

16  And you're suggesting here that these people conspired to get

17  her to go -- affirmatively get her to go to that hospital.  Not

18  that they were negligent in failure to warn.  We'll get to

19  that.

20          Show me the agreement to -- how -- how this is true

21  what you -- how you're going to possibly prove this.  Or how

22  did you -- what is the basis for this allegation?  You have to

23  have done a due diligence and good faith investigation to show

24  that McLaren conspired with the government defendants to get

25  her there.

1    I mean, did they infuse her with illness so that she
2  would first have to go to the hospital?  Did they -- what did
3  they do to get her there?

4    MS. TSAI:  Well, I mean she was there for dialysis
5  initially.  And it was because she was at the hospital that
6  caused --

7    THE COURT:  That's not your allegation.  Your
8  allegation is that they conspired to get her there.  Also, the
9  dialysis, is that in your complaint?

10    MS. TSAI:  That is in the short form complaint.

11    But if they had told -- once Ms. Marble was at the
12  hospital in early March for her dialysis, if either the
13  government and/or McLaren gave her and her family the warning
14  that there may be Legionella in the water.  Dialysis is heavy
15  water based --

16    THE COURT:  But that's different.  You got the overt
17  act -- okay.  So we'll move on because that's very different
18  from alleging that some defendants participated in getting her
19  into that hospital to poison her with Legionella and cover it
20  up.

21    MS. TSAI:  Your Honor, if it's okay, Mr. Goodman has a
22  response to that.

23    THE COURT:  Certainly.

24    MR. GOODMAN:  Your Honor, the only thing that I would
25  add to -- Ms. Tsai has done an excellent job articulating our

1   position here.  The only thing I would add to that is, when
2   someone is let's say coughing or choking, which in by analogy
3   Ms. Marble was, and someone else holds out a glass of water to
4   them which contains poison in which they know contains poison
5   and says, "here, have some of this," and they then drink that
6   and then get sick as a result of it, that's an intentional act.
7   Holding that -- and McLaren is holding open its hospital and
8   saying come here.  We'll heal you.  No.  They're going to
9   poison her.

10          THE COURT:  But this allegation is that the government
11  defendants.  How did any of the government defendants engage in
12  this part of the conspiracy?  This is that McLaren agreed with
13  the government defendants to get her to the hospital.

14          MR. GOODMAN:  Well, I think we've alleged -- I don't
15  have a copy of the complaint in front of me.  Ms. Tsai does.
16  But I think we have alleged that the government spoke with
17  McLaren Hospital before all of this and was --

18          THE COURT:  About Ms. Marble?

19          MS. GOODMAN:  Not about Ms. Marble, but about the
20  presence of Legionnaires -- Legionella in the water and they
21  said keep it to yourself.  Do not broadcast this.

22          THE COURT:  Okay.  Okay.  Thank you.

23          Well, in terms of any response before I get to the
24  public function which we'll move through very quickly, do any
25  of the defendants wish to respond on this issue?  Mr. Erickson?

```
1              MR. ERICKSON:  Yes, Your Honor.  Thank you.

2              THE COURT:  For LAN.  Just briefly, Mr. Erickson.

3              And, Ms. Tsai, why don't you stay there because I'll

4    have more questions.

5              MS. TSAI:  Sure.

6              MR. ERICKSON:  Thank you, Your Honor.  Philip Erickson

7    for the LAN defendants.

8              Your Honor, I had prepared ahead of time to go through

9    essentially the entire short form complaint and the 89-page

10   attachment or however many pages it is.  68-page attachment.

11   But I'm not going to do that given the Court has asked me to be

12   brief.  But I am going to highlight a couple of significant

13   things.

14             The way this is pled, there really are no concrete

15   factual allegations of conspiracy against LAN whatsoever.

16   There are conclusory allegations that we somehow participated

17   in a conspiracy.  In the attachment to the short form

18   complaint, there is the standard corporate allegations against

19   LAN.  And right after those there are a couple of conclusory

20   paragraphs.  But then I want to emphasize the statement of

21   facts.  And the statement of facts begins at page 25 of the

22   Exhibit A attachment.

23             And then the section relevant to LAN and Veolia begins

24   at page 29 at paragraph 26.

25             THE COURT:  Uh-huh.
```

1    MR. ERICKSON:  And there is exactly one paragraph that
2 relates to LAN which is paragraph 86.  When you get to
3 paragraph 87, they immediately start talking about Veolia.  And
4 there's only, I think, three paragraphs that relate to Veolia.
5 So there's almost nothing in the statement of facts with regard
6 to either defendant.  But with respect to LAN, the only
7 allegation is paragraph 86.  And it says, "In November of 2014,
8 the LAN defendants were on actual notice of the need to assess
9 factors contributing to high TTHM levels.  The high TTHM levels
10 were induced because of a failed attempt to address increased
11 bacteria in the Flint River water by the use of chlorine."
12    There's not anything there whatsoever that would
13 suggest any act of conspiracy.  And obviously, there's no
14 identification of any act or that was employed by LAN.  So --
15    THE COURT:  And are you aware of any cases in the
16 Sixth Circuit that has permitted a conspiracy claim to go
17 forward against an entire entity without identifying who at the
18 agency, entity, defendant?
19    MR. ERICKSON:  No, Your Honor.  And we've cited and
20 Veolia has also cited contrary cases that stand for the
21 proposition that these 1983 claims, and in particular
22 conspiracy claims, must be pled with specificity.
23    THE COURT:  Okay.
24    MR. ERICKSON:  The other thing that I want to add and
25 then I'll sit down.

1           THE COURT:  Okay.

2           MR. ERICKSON:  Is that there really is no civil

3    conspiracy claim at all in the papers.

4           THE COURT:  No.

5           MR. ERICKSON:  There is no --

6           THE COURT:  I didn't find it personally.

7           MR. ERICKSON:  There's no civil conspiracy claim in

8    the master complaint.

9           THE COURT:  Right.

10          MR. ERICKSON:  And there is no civil conspiracy claim

11   in the short form complaint or the Exhibit A.  All there is are

12   some -- a few paragraphs where the words conspiracy is used in

13   the same sentence with LAN but there's no -- those are the

14   conclusory allegations that follow the corporate pleadings.

15   And there's no -- there is no civil conspiracy allegation or

16   count.

17          THE COURT:  And let me just ask Ms. Tsai.  Where is

18   your count?  I think that's a good point.  I found the same

19   thing.

20          MS. TSAI:  So --

21          THE COURT:  What count number is it?  Let's talk about

22   that.

23          MS. TSAI:  So for -- and I recognize that we're

24   talking about the --

25          THE COURT:  Speak into the microphone, please.

1      MS. TSAI:  All right.  That we're talking about the

2  engineering defendants right now.  But since I have it in front

3  of me.  In the short form complaint in paragraph 13 it does

4  specifically allege McLaren Hospital relating to the

5  conspiracy.  And then --

6      THE COURT:  But where's your count that sets forth the

7  objective, the agreement, and the overt acts?  I mean, do you

8  have a civil conspiracy count that you've added?  It's not in

9  the master long form.  We know that.

10      Okay.  Well, let's move on.  In terms of we -- the

11  state actor -- your theories for why the private entities of

12  McLaren, LAN and VNA would be state actors.  You suggest that

13  they're engaging in a public function and yet we know that the

14  United States Supreme Court has said in *Jackson versus Metro*

15  *Edison Company* or Metropolitan Edison Company that, quote, the

16  supplying of utility service is not traditionally the exclusive

17  prerogative the state.

18      We also know that LAN and -- well, this is with

19  respect to LAN and Veolia, were not supplying the utility.

20  That's just a side point.  But were contracted with to do that.

21  So how do you get around that?

22      MS. TSAI:  So as discussed in our response, a

23  government contractor when they are tied hand in hand with

24  government officials, then they become state actors.  And so we

25  point to the fact that they have unfettered access to the Flint

60

1    water treatment plant.  The fact that they were --

2         THE COURT:  The fact that they can go into the Flint

3    water treatment plant and do tests, what do you mean that gives

4    them unfettered access?  They weren't running the treatment

5    plant, were they, or do you allege they were?

6         MS. TSAI:  We don't allege that they were running the

7    treatment plant, but they had access to the plant, the

8    officials, to a level that's higher than a typical government

9    contractor.

10        THE COURT:  How do you know?  What do you mean?  If

11   I -- if I'm the government and I want somebody to come in and

12   test the water in this building.  I mean, I think I am the

13   government, and I actually did ask them because there was weird

14   water coming out of the sink.  And they came in and they tested

15   it and it was rusty.  But I'm happy to say that's all it was.

16   But and I gave them total access to my chambers, to everything.

17        MS. TSAI:  And so in that type of situation.  There's

18   more coordination involved.  What we -- what's seen in the

19   evidence in this case alleged in the complaint is that they had

20   access to high government officials.  We got E-mail to have

21   discussions as to what they were finding in their water, how to

22   report it.  And so they were essentially working in

23   conjunction, hand in hand with these government officials.

24        THE COURT:  Okay.  So the best allegation you can

25   provide for me, let's start with LAN, is that they had a

1   contract that permitted them access to the Flint water

2   treatment plant and permitted them access to sending and

3   receiving E-mails?

4          MS. TSAI:  Well, and the communication that was

5   involved in that, right?  So, yes, anyone can send an E-mail

6   back and forth, but the amount of communication between LAN and

7   high government officials is an indication that this is not

8   just your typical government contractor.

9          THE COURT:  How?  How?  Why?  Why isn't it your

10  typical contractor that's coming in to do water consultancy

11  work, then get out?

12         MS. TSAI:  So your typical government contractor is

13  not having regular communication with high level officials,

14  right?  And --

15         THE COURT:  I don't know.  That's why I'm asking you.

16         MS. TSAI:  And that is essentially the essence of our

17  complaint, right?  The amount of correspondence between all --

18  and communication between LAN, VNA and Flint --

19         THE COURT:  Okay.  So long as I understand that the

20  basis of your belief that I should view VNA and LAN as state

21  actors is because they had access to the Flint water treatment

22  plant and they sent and received high level messages with

23  government officials.

24         MS. TSAI:  And the fact that they stood -- at least

25  with respect to VNA, stood up to the public next to the city of

1  Flint representatives and said that we are going to be working

2  hand in hand with the city to ensure that there is -- that you

3  will have safe water, which was just as we allege not what

4  their intentions were.

5          THE COURT:  Right.  I -- we're just trying to figure

6  out if they are engaging in a public function by being hired

7  and signing a contract to come in and do this work at this

8  point.  Okay.

9          Okay.

10         MS. TSAI:  And so, Your Honor, just that I had a

11  chance to skim through both the short form and the exhibit.  I

12  don't see the conspiracy 1983 claim as a stand-alone count.  I

13  just want -- I'm sure you're aware, 17 amendments in the short

14  form complaint does provide specific allegations as to the

15  conspiracy.

16         THE COURT:  Well, you -- you have to allege a

17  conspiracy and then provide the specific allegations.  And

18  you're saying you didn't allege the conspiracy, but you did

19  provide the specific allegations?

20         MS. TSAI:  As I stand here today, I don't see a

21  specific count for 1983 conspiracy and that is just an error on

22  our end in terms of --

23         THE COURT:  Okay.

24         MS. TSAI:  -- drafting the complaint.

25         THE COURT:  Okay.  All right.  Well, the last issue is

1    the public func- -- well, yeah, we're already discussing that.

2    Right.

3              Oh, the state compulsion.  You can sweep these private

4    entities into becoming state actors if you can show that they

5    were coerced by a government official to do what they did.  Are

6    you arguing that VNA and LAN were coerced?

7              MS. TSAI:  Not coerced but perhaps they were -- well,

8    not overtly coerced I should say.  They were covertly coerced

9    by the contract and asking them --

10             THE COURT:  What do you mean "overtly coerced by a

11   contract"?

12             MS. TSAI:  Covertly.

13             THE COURT:  We have to -- you have to just tell me

14   what your theory is.  And there are many ways to do it, but if

15   it doesn't apply, then you shouldn't argue it.

16             MS. TSAI:  Sure.  And so they enter into the contract

17   with the city.  And they were told, this is what you need to

18   do.  And if I don't do it, we'll void the contract.  In the

19   case of the VNA --

20             THE COURT:  Well -- so they enter into a contract,

21   each of them a different one, but to engage in water consulting

22   work.  And in any contract it's going to say if you don't

23   perform, we're going to terminate the contract and sue you or

24   something or arbitrate or do something.

25             That's the coercion?

1    MS. TSAI:  No.  The coercion is not written anywhere,

2   right?  So --

3    THE COURT:  Well, I -- okay.  I'll stop responding

4   when you ask me.

5    MS. TSAI:  I'm sorry.

6    THE COURT:  But --

7    MS. TSAI:  Bad habit.

8    In the case of VNA, they enter into a contract with

9   the city and as we've alleged, that discussion of what you will

10  do occurred before the contract was entered.  And there was

11  no --

12    THE COURT:  Where's the coercion, the compulsion?

13    MS. TSAI:  So there was no RFP as we allege that to --

14  VNA was just given the contract.  And so it can be inferred

15  from the allegations that there was a discussion --

16    THE COURT:  Is that in the allegations that there was

17  no RFP?

18    MS. TSAI:  Yes.

19    THE COURT:  Okay.  I remember.

20    MS. TSAI:  And that that was the discussion.  If you

21  want our contract, if you want the compensation, you have to do

22  X.

23    THE COURT:  What is X?  Where is that in your

24  complaint?

25    MS. TSAI:  So --

1           THE COURT:  You have to lie to the public --

2           MS. TSAI:  You have to -- you have to engage in the

3    conspiracy to cover up relating to the public --

4           THE COURT:  Okay.  Where is that in your complaint

5    that that agreement was raised?

6           MS. TSAI:  So in the master complaint, paragraphs 318,

7    where it begins at 318 talks about how VNA came about to become

8    a water consultant.

9           And in response, one of the things that VNA proposed

10   in terms of the scope of work was not only to develop

11   strategies for, you know, proper water distribution and testing

12   efforts, but also to alleviate continued concerns from the

13   public communications process.  And I think it can be inferred

14   from that allegation that there was discussion about how we are

15   going to manage the public in terms of this water crisis,

16   meaning that they -- how they were going to cover up the --

17          THE COURT:  Well, communicating with the public about

18   the water crisis and how we're going to cover it up are two

19   very different things.

20          MS. TSAI:  Sure.  And in order --

21          THE COURT:  So have you -- do you have evidence, a

22   factual basis to allege that those kinds of conversations took

23   place where the -- it wasn't just communicate, but we are

24   together going to lie to the public?

25          MS. TSAI:  I think if you look at the allegation as a

1  whole, that there's a statement in the proposal, the scope,

2  that says we're going to take care of this PR disaster.

3  Then them standing --

4          THE COURT:  But PR firms get hired for every kind of

5  disaster.

6          MS. TSAI:  Sure.

7          THE COURT:  And they are not in a conspiracy --

8          MS. TSAI:  But --

9          THE COURT:  -- just because they got hired to address

10 a -- that's their purpose.  That's why they're in business.

11         MS. TSAI:  Well, so first off, VNA is not a PR firm,

12 right?  So the fact that they --

13         THE COURT:  Well, I don't know -- I don't know.  When

14 you ask me, are they --

15         MS. TSAI:  They're -- it's engineering -- they're

16 engineering water specialists.

17         THE COURT:  Okay.  I don't know whether they also have

18 public relations.

19         MS. TSAI:  Not to my knowledge.

20         THE COURT:  Okay.

21         MS. TSAI:  So the fact that in water testing expert

22 capacity they are talking about how to control the public

23 communication.  How to -- how to message to the public about

24 the water.  Plus you couple that with the allegations that

25 we've already talked about which is that they stood side by

1  side with the city saying that they would do a thorough search
2  and then in turn enter a -- issue a report six days later to
3  say that it was safe.  I think looking at the totality of those
4  allegations --
5              THE COURT:  Okay.  Thank you.
6              What I would like to do next.  I will say that I
7  appreciate your argument.  You have a great deal of information
8  that you have to incorporate in to responding to these
9  questions.  I don't mean to be giving you a hard time.  I think
10  this is a very serious allegation that you've raised.  It is
11  terribly serious to accuse people of doing this willfully,
12  consciously, thinking ahead of time to do this in the way that
13  you're saying that they all came to an agreement with VNA and
14  LAN and to permit the poisoning with Legionella and then cover
15  it up.
16             And I certainly will not shy away from finding that
17  claims can go forward when I believe they can, which I have
18  done in *Gurton* (ph), in *Walters*, *Sirls* and *Carthan*.  And
19  holding individuals responsible for answering further
20  allegations as the litigation progresses.  But I think this is
21  not a strong claim.  That specifically because we know that
22  conspiracy has to be pled with specificity and not general
23  allegations.  So the conspiracy part I think is -- is -- I'll
24  take another look at it.  I'll listen to -- reread what you've
25  argued here later.

1            But the civil conspiracy, I think on the one hand as

2    Mr. Erickson pointed out wasn't a count.  It's a theory of how

3    they became state actors.  I think perhaps I'm not totally --

4    anyway.

5            But the state actor, I think is a very hard stretch

6    and I don't think you've gotten to the finish line on that, but

7    I'll consider it carefully and issue a written decision on

8    that.

9            And the reason I wanted to take that ahead of time is

10   to figure out who could -- who might be liable under bodily

11   integrity in both cases.  So I want to move to that next.

12           And here I have a couple of big picture problems which

13   I just want to know your position on, which is Ms. -- let me

14   get ...

15           Ms. Brown -- is it the date that each of the -- well,

16   you're Marble so -- let's discuss Ms. Marble.

17           Should I be looking at the date she contracted

18   Legionella or the date she died to determine if a defendant was

19   involved prior to that date or not?

20           MS. TSAI:  It should be the date that she was decease.

21   However, I will say as a caveat because the defendants have

22   pointed to their activities afterwards to say, well, we can't

23   be responsible because I -- they didn't do anything public

24   until after she deceased.

25           THE COURT:  But conspiracy -- let's assume for the

1   sake of argument that the conspiracy is not a viable claim.

2           MS. TSAI:  Right.

3           THE COURT:  So you can't have people responsible for

4   things in the conspiracy --

5           MS. TSAI:  Sure.  And I'm just saying that to pose,

6   you know, E-mails and communications became public after Ms.

7   Marble's death.  However, when you're looking at a content of

8   those E-mails even if they're post her death, it does provide

9   some guidance as to whether that individual became aware of the

10  Legionella issue on that date or sometime before.  And so --

11          THE COURT:  But then you'll have to read that E-mail

12  and tell me what in the E-mail tells me that this -- that

13  Governor Snyder, for instance, knew before Ms. Marble was

14  infected with Legionella.

15          MS. TSAI:  Sure.  So --

16          THE COURT:  But let's not go there quite get.

17          MS. TSAI:  Okay.

18          THE COURT:  So you're telling me it's the date of her

19  death for bodily integrity.  And why is that?  When what the

20  issue is you're alleging under bodily integrity is that this --

21  each individual defendant's actions led to Ms. Marble

22  contracting Legionella.

23          MS. TSAI:  Right.  So part of our allegations and

24  complaint is that the -- the defendant's failure to inform the

25  public is part of their wrongdoing that caused Ms. Marble's

1   death.  And so if these defendants came forward even, you know,

2   five days before her death or ten days before her death,

3   there's a possibility that they could have been -- she could

4   have been treated for the disease.  It's because --

5          THE COURT:  But that's the cover-up.  The bodily

6   integrity is not -- you have the failure to warn negligence

7   against McLaren.  So you're saying that the bodily integrity

8   count isn't laying the conditions for the invasion of her body

9   with this lethal bacteria?

10          MS. TSAI:  It is.  But Ms. Marble stayed at the

11  hospital until the day of her death.  If the information about

12  the water contamination at the hospital was released any

13  earlier than it was, her family would have taken her out of

14  that hospital immediately.

15          THE COURT:  Okay.  All right.  So let -- I hear you

16  and we'll use -- for the sake of our argument, I understand

17  what you're saying.

18          So we use the date of her death.  Which was?

19          MS. TSAI:  March 20th.

20          THE COURT:  March 20th of 2015.

21          MS. TSAI:  Correct.

22          THE COURT:  Okay.  All right.  So your argument --

23  what I think we have to do here is go through each of the

24  defendants.  And what I would do is -- and try to do this as

25  quickly as we can.  I would start with Governor Snyder, Mr.

1   Kuhl.  And perhaps if you want to make a four or five sentence
2   argument on why Governor Snyder should not be held liable in
3   the case of Ms. Marble.
4            MR. KUHL:  Thank you, Your Honor.  Richard Kuhl for
5   Governor Whitmer, Governor Snyder, Treasurer Dillon, Nick Lyon
6   director of DHHS.
7            THE COURT:  Okay.
8            MR. KUHL:  And solely named in the Marble complaint,
9   former chief medical executive, Eden Wells.
10           The short answer is, there is no allegation in the
11  complaint that prior to March 20th, Governor Snyder knew that
12  the drinking water was being inadequately treated such that
13  there was an increased level of Legionnaires' disease in it.
14  There's none.  At most, they allege that there was a
15  correlation between the outbreak and --
16           THE COURT:  Okay.  Don't reargue *Carthan* but tell me
17  specifically when we have Ms. Brown passing away in January of
18  2015 and Marble in March -- Ms. Marble in March of 2015.
19           MR. KUHL:  Absolutely.  And --
20           THE COURT:  Distinguish those dates.
21           MR. KUHL:  I am focused solely on the allegations in
22  this complaint.
23           THE COURT:  Okay.
24           MR. KUHL:  That's what makes this different.  That's
25  why --

1          THE COURT: Okay.

2          MR. KUHL: -- the ruling in *Carthan* and *Walter, Sirls*

3   do not apply. Because in the Legionnaires' disease context as

4   alleged in these complaints it's different. They make no

5   allegation in the entirety of the complaint, that master

6   complaint, or in the short form complaint that Governor Snyder

7   knew the water was being inadequately treated, such that

8   Legionnaires' disease was at an increased level. At most they

9   say correlation. Correlation is not causation as we all know

10  since our first days of law school. There is no specific

11  allegation. What they do allege, what is alleged in this

12  complaint however, is that Governor Snyder was being told that

13  DHHS was ordering Genesee County to conduct an evaluation.

14  That was in January of 2005 as paragraph --

15          THE COURT: 2015.

16          MR. KUHL: 2015, sorry.

17          THE COURT: And that's when Ms. Brown died.

18          MR. KUHL: That's when he started -- that DHHS ordered

19  Genesee County to start the evaluation. To conduct an

20  evaluation to find the cause. That's paragraph 154 of the

21  master complaint.

22          Well, he was also told under paragraph 174 of the

23  master complaint is that DEQ did not believe that there was any

24  Legionnaires' disease in the water. After it was being treated

25  and exiting into the system, they said there was none according

1   to their testing.  In fact, they continued on that the water
2   was being treated.  Chlorine was being added.  It was being
3   treated with ozone to kill bacteria which is why they did not
4   believe there was any -- it was the source of the outbreak.

5           And of course we have Veolia who was brought in
6   February or March of 2015.  The international expert on water
7   that was brought in by the city to try to diagnose the
8   problems.  And we all know what they found.  They said the
9   water was safe.  They said the water met all the standards of
10  the Safe Drinking Water Act which are designed to protect
11  public health.

12          So there is no specific allegation that the governor
13  knew there was increased levels of Legionella in the drinking
14  water.  And, in fact, their allegations are that the governor
15  had conflicting information at best at this point.

16          And of course that cannot give rise to the level of
17  intent and knowledge that's required.

18          It's even worse as to Ms. Brown.  She contracted
19  Legionella in December of 2014.  There is no allegation even
20  close to that.

21          So we submit a different outcome is required under the
22  specific allegations made by these plaintiffs as to Governor
23  Snyder.

24          THE COURT:  Okay.

25          Is there anything you want to clarify about -- and the

1  problem here is that the -- my decisions in *Carthan, Walters*
2  and *Sirls* were based largely on litigation about lead.  And so
3  what I need from you is where in your -- what in your complaint
4  specifically to respond to Mr. Kuhl alleges knowledge by the
5  governor about either Legionella or the potential for deadly
6  bacteria.

7          MS. TSAI:  Sure, Your Honor.  On the broader picture I
8  recognize that the opinions in *Walters* and the -- relate to
9  lead.  However, we have to look at this as a whole.  The lead
10  contamination and Legionella contamination happened because
11  there was no treatment of the water --

12          THE COURT:  Well, they happened for very different
13  reasons.  They -- I mean, it's a different chemical process or
14  different causation that --

15          MS. TSAI:  So --

16          THE COURT:  All right.  The lead leaching and the
17  Legionella is a very different thing.

18          MS. TSAI:  So what we've alleged in the complaint is
19  the fact that there was no treatment for the water on the
20  corrosion.  That caused the pipes to corrode and to contaminate
21  the water.  That applies to both the lead and the Legionella
22  because in -- and it's also alleged that when you have
23  untreated pipes and, you know, we specify --

24          THE COURT:  Okay.  So you're suggesting that if the
25  governor knew that there was a lead problem, he also should

1   have known the chemical process and he should have discerned

2   that deadly bacteria, including Legionella?

3          MS. TSAI:  Exactly.  And that --

4          THE COURT:  And what is the standard where I would

5   determine whether somebody should know that if there's a lead

6   problem, there would also be a bacterial infection problem?

7          MS. TSAI:  So certainly with the engineering

8   defendants, these are water experts.  It's --

9          THE COURT:  I'm asking you right now.  They're out on

10  bodily integrity as my thinking goes right now so let's focus

11  on Governor Snyder.  As the governor of the State of Michigan,

12  he would know that if there's a lead problem, there's also a

13  bacteria problem?

14         MS. TSAI:  Through consultation with their consultant.

15         THE COURT:  But then that's where I need the

16  allegation.

17         MS. TSAI:  And so specific allegation.  You know,

18  paragraphs 175 through 176 on March 13, 2015, Warfield E-mails

19  Snyder talking about the --

20         THE COURT:  March what?

21         MS. TSAI:  March 13, 2015.

22         THE COURT:  Okay.  And we have Ms. Brown has passed

23  away by January 2015 and Ms. Marble in March 2015.  So I need

24  the allegations before Ms. Marble passed away.

25         MS. TSAI:  Right.  So Ms. Marble passed on March 20th,

1   2015.

2               THE COURT:  Okay.  So you're saying in those seven

3   days -- and what did he learn on March -- on -- seven days

4   earlier?

5               MS. TSAI:  And so, specifically, on -- for paragraph

6   176, Warfield writes an E-mail to the Snyder administration

7   officials, "political plank cover out of the city of Flint

8   today regarding the spike in Legionella cases.  Also, area

9   ministers" -- well --

10              THE COURT:  Okay.

11              MS. TSAI:  -- the rest is not relevant.

12              In other words, this is not the first -- and you look

13  at the content of that E-mail, this is the not first time that

14  someone has notified the Snyder administration about Legionella

15  because there would be further explanation.  Also, in

16  paragraphs 172, March -- March 10, 2015, James Henry sends an

17  E-mail stating that he's been stonewalled by the state and city

18  for --

19              THE COURT:  And he sent that to the governor?

20              MS. TSAI:  He sent that -- the E-mail was sent to

21  several --

22              THE COURT:  I just want to acknowledge that Judge

23  Farah has to go to the airport.  He delayed a flight already to

24  be here today.  So thank you very much.  Please rise for Judge

25  Farah.  And we'll see him again I'm sure.

1          JUDGE FARAH:  Thank you, Judge.

2          THE COURT:  You're welcome.

3          Please be seated.

4          MS. TSAI:  So paragraph 70 -- 172, does not

5    specifically say that it was sent to Governor Snyder.  It does

6    state that it was sent to the city and state officials

7    alerting -- and in that E-mail, Mr. Henry mentions that he's

8    been stonewalled by the state and city in accessing public

9    health information about the Legionella outbreak.

10         THE COURT:  Okay.  And if that happened, if Governor

11   Snyder learned in mid-March 2015 from the earlier communication

12   you mentioned, you still have to show to me that he was

13   deliberately indifferent and exhibited a callous disregard.  So

14   tell me where -- first he's got to have knowledge, but then

15   he's got to have callous disregard.  And so what is your

16   allegation regarding callous disregard that would constitute

17   deliberate indifference?

18         MS. TSAI:  Sure.  The fact that he did not make the

19   public announcement that there was an issue with Legionella in

20   the water until nearly -- until January -- actually, December

21   of 2015.

22         And, Your Honor, I just want to point back, that

23   knowledge does not start at March.  I don't know why I actually

24   went backwards.  But, you know, as early as October of 2014, if

25   you look at paragraphs 145, 146, they talk about the city was

1  aware of the public health threats, as well as -- and then in

2  paragraph 146, that Legionnaires' was added to the public

3  health hazard.  So there's an inference there that the governor

4  was aware of this in October.

5          Then in January of 2015 -- and I'm looking at

6  paragraphs 154, 162, of the master complaint, there is

7  allegations that state officials met to talk about Legionella.

8  It doesn't specifically mention the governor; however, at this

9  stage we could infer that any state official would be

10  communicating these public concerns to the governor.

11          THE COURT:  Okay.  All right.  Well, I think this is a

12  tough -- very tough issue.  And I don't -- I will take a close

13  look at how you've pled the case to determine whether somebody

14  would know that because there's a lead issue that there needs

15  to be a public warning on Legionella.  And I'll sort out the

16  timing.  But I'm just saying I think that these are very hard

17  questions.  And I think with Ms. -- with respect to Ms. Brown,

18  most of the information you've pled about Governor Snyder took

19  place after January of 2015.

20          MS. TSAI:  And I don't know --

21          MR. DAWSON:  If I may be heard on that, Judge?

22          THE COURT:  Yes.  Just going to take a short recess.

23  We're going to take a five-minute recess.

24          (Momentarily off the record.)

25          THE CLERK OF THE COURT:  All rise.  The court is back

1   in session.

2           THE COURT:  Okay.  Please be seated.

3           Mr. Weglarz, are you still here?

4           MR. DAWSON:  I'm here, Judge.  Dawson.

5           THE COURT:  Oh, okay.  Mr. Dawson.

6           MR. DAWSON:  I know I'm a minor player here, but it's

7   all right.

8           THE COURT:  No, please.  How --

9           MR. DAWSON:  Always harder to get the crowd at the end

10  of the day.

11          THE COURT:  No.  That -- I'm refreshed after that

12  break.

13          Because -- Ms. Tsai, I apologize about my patience

14  level.  I work -- it's not hard to be patient usually and I

15  apologize if I appear impatient.  And I'll explain why which is

16  that I want to understand the allegations.  So the harder the

17  time I'm giving you, means the harder I want to understand your

18  allegations to make good sense of them.

19          And that goes for everybody in the room.  So I'm not

20  trying to pick on you.  I will say that I have a hard time when

21  people ask me questions about things I have just asked them

22  because I'm only asking because I don't know the answer or I

23  want to point out that there isn't an answer or something.

24  So ...

25          But that's just a little tip about what -- why I

1  couldn't answer your questions.

2  So go ahead, Mr. Dawson.

3  MR. DAWSON:  Thank you, Your Honor.

4  THE COURT:  What are you going to talk about?

5  MR. DAWSON:  Well, I'm going to try and regurgitate

6  what the Court has said in past opinions as to why it is that

7  there is some finding here of the body -- bodily integrity

8  claim that's righteous against Governor Snyder.

9  THE COURT:  Okay.

10  MR. DAWSON:  This Court in past decisions has written

11  that, "Plaintiffs plead facts, which when taken as true, show

12  that Governor Snyder was deliberately indifferent."

13  This is from the *Carthan* opinion, Your Honor.

14  "First, the plaintiffs possibly alleged that Governor

15  Snyder knew of facts from which he could infer that plaintiffs

16  risked substantial risk of serious harm.  As early as March

17  2014, members of the governor's administration were warning

18  that transitioning to the Flint River could lead to potential

19  disaster.  Initial warning signs included an outbreak of

20  Legionnaires' disease."

21  THE COURT:  Okay.  When?  See, I don't -- I wasn't

22  focused --

23  MR. DAWSON:  In the summer -- in the summer of 2014.

24  THE COURT:  Okay.

25  MR. DAWSON:  Judge, what the facts were is that

1   McLaren Hospital contacted the Genesee County Health Authority
2   and they started talking about cases they had as early as the
3   summer of '14.  And they were wondering whether or not it was
4   related to this particular change in the water.

5            In any event, Judge, your opinion goes on to talk
6   about:  "As by October of 2014, senior staff including the
7   governor's chief of staff were discussing the need to return to
8   DWSD water because of the growing awareness that the treated
9   Flint water did not meet established quality standards."

10           And, Judge, I know you said that your opinions in the
11   other *Sirls* and *Walters* and so forth were predicated on lead,
12   but I want you to also --

13           THE COURT:  Not exclusively.  I mean, the word
14   Legionella shows up a handful of times.  But in terms of -- I
15   have -- the law requires me and the Sixth Circuit affirmed that
16   in their decision in *Gurton*, I have to look at the defendant's
17   individually.  What they knew, when they knew it, and -- and
18   then were they callously indifferent.

19           MR. DAWSON:  I'm just reading from Your Honor's
20   opinion, Your Honor.  It's --

21           THE COURT:  Right.

22           MR. DAWSON:  -- it's cited on page 14 of our
23   responsive brief.  And then in the MDEQ at page eight and nine
24   of our responsive brief it goes on to quote the Court where the
25   Court says, "The complaints continue to grow such that by

1   October 2014, Flint's water problems were under serious

2   discussion in the governor's office.  In addition, the MDHHS

3   was notified of the outbreak of Legionnaires' disease, a deadly

4   illness caused by Legionella bacteria, which can enter the

5   water supply when biofilms are stripped from old metal piping."

6          And that's a direct result when you are trying to

7   change the water chemistry you can cause the -- it flakes off

8   and then the microbiology get in these little hidden areas and

9   can make you sick.

10         But this is the Court's finding --

11         THE COURT:  No.

12         MR. DAWSON:  -- from -- what the Court read before in

13  other cases in dealing with this.

14         And so I'm not trying to quibble with the Court, what

15  I'm trying to say is, Your Honor, our confusion is that we

16  think the Court has already come to the right --

17         THE COURT:  And the reason -- I want to make sure it's

18  clear.  The reason I think I have not decided these issues for

19  all of the defendants is because Ms. Brown died in January

20  2015.  I can't look at everything that happened -- at anything

21  that happened after January 2015 for determining liability for

22  anyone or any entity that did not -- was not a part of it

23  before her death.  And Ms. Marble in March of 2015.

24         MR. DAWSON:  And I --

25         THE COURT:  And I can't -- I'm not yet convinced, but

1   I might get convinced.  I listened to Ms. Tsai.  I'm going to

2   go back to the complaint.  That anyone who knew about a lead

3   problem also knew about a Legionella or a dangerous bacteria

4   problem.

5           MR. DAWSON:  I think in that regards, Judge, what you

6   have to realize, one creates the other.

7           THE COURT:  I know.  You've told me that.  You've

8   educated me on that.  But I'm going back in time to 2014 and

9   '15 about what the governor knew about lead and Legionella.

10          MR. DAWSON:  Right.  And I -- and I think if you show

11  that the governor knew about the lead, the converse is true, it

12  different make any difference if he didn't know about

13  Legionella.  If he knew about lead and did nothing about it,

14  that's what led to the Legionella, Your Honor.  And it's

15  combined.  And that's -- and --

16          THE COURT:  Okay.

17          MR. DAWSON:  -- and on top of that, Judge, if you

18  think about it, what about all the plaintiffs that are just

19  claiming lead --

20          THE COURT:  Well, we're not on those plaintiffs.

21          MR. DAWSON:  I understand.  But that's -- I'm just

22  trying to point out the -- the seriousness of this.  I know --

23          THE COURT:  No, no.  I understood -- I understand the

24  seriousness of the case --

25          MR. DAWSON:  I know you do, Judge.

84

1     THE COURT:  -- we have before all of us.  So I'm not
2  questioning that.  I'm digging in to understand the
3  plaintiff's -- Ms. Brown's allegations and Ms. Marble's
4  allegations.
5     So tell me, when you go to -- let's go to Mr. Cook.
6  He signed -- the allegation is he signed a permit in 2014 that
7  permitted the use of the Flint water treatment plant.  He
8  misled EPA regarding corrosion control.  He E-mailed EPA in
9  April of 2015 so that's --
10     MR. DAWSON:  After.
11     THE COURT:  -- after the death.  And -- and the
12  altered reports pertain to lead levels.  Tell me how -- how
13  he's liable for Ms. Brown's death in 20 -- January 2015.
14     MR. DAWSON:  If those are -- predate her death, then
15  obviously the lead knowledge as I've explained to the Court
16  would be germane to it, Judge.
17     And so I think the Court's going down that road.  If
18  it's going down that road, there's certainly information that
19  shows that he had information that lead was a problem --
20     THE COURT:  So when I go back into the chambers and
21  think this through, I am to -- there are allegations in the
22  complaint that will explain that any person who has knowledge
23  of lead has equal knowledge of Legionella.
24     MR. DAWSON:  I wish I had that good a memory, Judge.
25  I can't --

1           THE COURT:  But I'm going to have to have that.

2           MR. DAWSON:  I hear you, Your Honor.  I hear exactly

3  what you're saying.

4           THE COURT:  Rosenthal, tell me how Rosenthal is going

5  to stay in this.

6           MR. DAWSON:  Same --

7           THE COURT:  The allegation is that he had PowerPoint

8  slides circulated among MDEQ officials in March and April 2015.

9           MR. DAWSON:  Right.  And Mr. Weglarz is supposed to be

10  the -- do the MDEQ.  But I'm not trying to --

11           THE COURT:  Oh, okay.

12           MR. DAWSON:  That's okay.  I'll let him struggle,

13  Judge.

14           MR. WEGLARZ:  I'm more than happy to address that,

15  Your Honor, if you permit that.  I don't want to --

16           THE COURT:  Go ahead, Mr. Weglarz.

17           MR. WEGLARZ:  Sure.  Your Honor, defendant Rosenthal,

18  the allegations are not only in the long form complaint but

19  even in your opinion and order with your *Walters* and *Sirls*

20  analysis.  You cite that, hey, in May of 2014, MDEQ defendants

21  Busch, Prysby and Rosenthal knew that elevated TTHM levels were

22  a red flag for the proliferation of bacteria including

23  Legionella.  That's a lead -- that's in the opinion that's

24  offered in --

25           THE COURT:  That's in April -- oh, that was in May of

1   2014.

2           MR. WEGLARZ:  Yes, Your Honor.  And I believe all the

3   MDEQ defendants, there's allegations that, look, they knew that

4   if you switched --

5           THE COURT:  Okay.  But we can't use my complaint.  We

6   have to use your -- I mean, my decision.  We have to use your

7   complaint.

8           MR. WEGLARZ:  Well, my complaint is the same long form

9   complaint that was used in *Walters* and *Sirls*.

10          I mean, I --

11          THE COURT:  Okay.

12          MR. WEGLARZ:  -- have the attachment where I have my

13  specific allegations against McLaren and Hurley, but I

14  incorporate everything else against the state defendants and

15  municipal defendants and the engineering defendants as in the

16  long form complaint.

17          THE COURT:  Okay.

18          MR. WEGLARZ:  And I -- and we put it in our brief,

19  Your Honor.  But same thing with Prysby, same thing with Busch,

20  Cook, Rosenthal.  They all knew at the very beginning, look, if

21  you switch and you have Flint River water now being your

22  source, this is a breeding ground.  We know this is going to

23  create the environment for Legionella.

24          THE COURT:  I recall that.

25          MR. WEGLARZ:  Legionella is really a byproduct of the

1   lead, the metal contamination.

2           THE COURT:  Yeah.  I --

3           MR. WEGLARZ:  That's all it is.

4           THE COURT:  -- I understand your allegations with

5   regard to Cook and Prysby.  I -- I'd like -- I guess Rosenthal

6   I think I need a little more information.  But I've -- I've

7   heard what has been said.

8           What I'm thinking in terms of time and that it is

9   4:25, I'd like to -- I hear what the general arguments are.

10  And I will go back and look at each.  I just want to make sure

11  that the plaintiff's counsel understands that I -- I can't

12  simply import the decision from *Walters* and *Sirls* unless I have

13  the connector to Legionella or deadly bacteria or dangerous

14  bacteria.  So I just want to make sure that that's clear and

15  that the timing for each individual shows their knowledge and

16  their callous disregard prior to the date of the individuals

17  deaths.

18          So --

19          MR. GOODMAN:  May I address that one small point on

20  that, Your Honor?

21          THE COURT:  Certainly.

22          MR. GOODMAN:  William Goodman for the Marble

23  plaintiffs here.

24          I think with all due respect that the Court may be

25  attempting to put two fine a point on it.  Clearly there's a

1  mechanical and dynamic connection between lead poisoning and

2  Legionella poisoning.  And I think Ms. Tsai explained it to

3  some extent and the other attorneys have as well.  And they're

4  closely interlocked and interrelated.  But on a broader level

5  and it's not -- this is not putting too fine a point on it.  I

6  think this is putting the appropriate point on it.  What the

7  governor knew, what the other defendants knew is that by

8  participating in the decision to switch the water to Flint

9  River water, they were going to be poisoning people.

10          And that is the bodily integrity violation.  Whether

11  that poisoning process dynamically ends up in a Legionnaires'

12  death or brain damage to a young child, I think is evades the

13  question of whether or not this then becomes a violation -- a

14  substantive due process violation in the sense of bodily

15  integrity.  And I think the portions of this court's opinion in

16  *Gurton* and *Carthan* and other -- other opinions that the Court

17  has written that were referenced earlier in the argument I

18  think are appropriate and correct.

19          THE COURT:  Okay.  Thank you.

20          MR. KUHL:  Your Honor, can I briefly, very briefly

21  respond?

22          THE COURT:  Very briefly, yes.

23          MR. KUHL:  Again, Richard Kuhl for state defendants

24  including Governor Snyder.  There's no allegation in the

25  complaint and none was cited that Governor Snyder knew when

1   they made the water switch that they were not going to be able

2   to properly treat the water.  In fact, the allegations are that

3   they were being told that they could treat the water.  Those

4   are the allegations in their complaint.  So now to come out and

5   make a broad allegation without any support demonstrates the

6   lack of merit in this claim.  They make some broad allegations

7   about what the governor's office knew.  They make broad

8   allegations about what the governor knew, but none of those

9   broad conclusory statements suffice.  *Twombly, Iqbal* not be

10  use.  The specific allegations that they, that they assert in

11  their complaint that MDEQ was saying it's not a problem.

12          That was March 2015.  DHHS hadn't completed its

13  analysis.  Veolia was telling everybody the water was safe.

14  Their own allegations show the opposite of what they are

15  saying.

16          It cannot stand as a count for bodily integrity

17  against the governor.

18          THE COURT:  Okay.  Thank you.

19          Mr. Mason?

20          MR. MASON:  Very briefly, Your Honor.  William Mason

21  for LAN.  I think we've gotten way far afield late this

22  afternoon with respect to the record or lack thereof.  Lawyers

23  talking about the connection of lead all of a sudden in

24  knowledge base of Legionella is not appropriate with respect to

25  a record.  And the fact of the matter is, there are many

1   Legionella cases that are not involving lead --

2            THE COURT:  Absolutely.  Yeah.

3            MR. MASON:  Some suggestion that somehow one is

4   prerequisite to the other or so inextricably intertwined is not

5   my understanding of the medicine and I'm not here to

6   pontificate about it.  But I think it's important that we

7   recognize that.  And the second point is just the knowledge

8   base of any connection like that at the time is also a void in

9   the record.  And so I would just point that out to Your Honor.

10           THE COURT:  Thank you.  I'm aware -- I'm aware of

11  that.

12           Just one second.

13           (Pause in record.)

14           THE COURT:  Okay.  And so what I have to do is rigidly

15  adhere to the Supreme Court and Sixth Circuit precedent that

16  requires that I look at each individual defendant and that I

17  look only to the complaint and the allegations set forth that

18  are plausible.  And so that's what I'm going to do.

19           Let's turn -- I see Mr. Klein, but I want to turn to

20  state created danger against all defendants.

21           MR. KLEIN:  Your Honor, if I --

22           THE COURT:  Yes.

23           MR. KLEIN:  My official purpose was to get some road

24  map as to where --

25           THE COURT:  Okay.  I'll tell you the road map.

1          MR. KLEIN:  -- we're going to get this afternoon.

2          THE COURT:  Okay.  Because it's getting really -- it's

3     getting late.  And I'm sure everybody has a deposition to

4     prepare for in the morning.

5          We're going to go -- we are going to tear through

6     state created danger, intentional infliction of emotional

7     distress, that we will tear through.  We're going to look at

8     negligence against McLaren and then access to the courts in

9     that order.

10          MR. KLEIN:  Okay.  Be quite a tear.

11          THE COURT:  We are going -- okay.  So, Ms. Tsai,

12     here's the situation, you have pled state created danger

13     against all the defendants, correct?

14          MS. TSAI:  Against the government defendants.

15          THE COURT:  Yes.

16          MS. TSAI:  The government and engineering defendants.

17          THE COURT:  But remember, just -- just answer me this,

18     do you remember that a state created danger is where you don't

19     have a remedy against the defendants?  In fact, the

20     governmental defendants set up a situation for someone else to

21     come in and cause harm to a plaintiff.  It's not where you're

22     suing -- you're suing the governmental defendants.  But here

23     you -- we just went through this bodily integrity claim and

24     what's evident.  Because the order we're doing this in is you

25     are suing directly the government defendants for the conduct

1   you're saying they just set up a situation for someone else to

2   cause the harm.

3           MS. TSAI:  So the two counts I'm pleading in the

4   alternative.

5           THE COURT:  Okay.  But you still have to be able to

6   plead and so -- tell me how you can plead this in the

7   alternative.

8           MS. TSAI:  Sure.  So, Your Honor, the causation issue

9   is where the differentiation between the bodily integrity claim

10  and the state created danger.  Certainly a jury can find that

11  the government defendants and the engineering defendants

12  started the process by contaminating the water and making the

13  water unsafe, but it was essentially McLaren at the other end

14  who actually was approximate cause of --

15          THE COURT:  But that's a different question.  Your --

16  you have to be able to say under state created danger that the

17  government set up the conditions for a third party to harm

18  someone.

19          MS. TSAI:  And they have set up a condition by

20  allowing the water to be contaminated throughout the entire

21  Flint water system.

22          THE COURT:  So they contaminated the water and the

23  contaminated water is what injured Ms. Marble?

24          MS. TSAI:  Correct.

25          THE COURT:  Okay.  So their act of contaminating the

1    water is the act that injured Ms. Marble.

2           Okay.  Thank you.

3           And -- all right.  You're also suing VNA and LAN, but

4    you're making the allegations that they participated with --

5    you have your conspiracy allegations at least and your state

6    actor allegations that they participated with -- that everybody

7    had their role and that the state actors worked with these

8    defendants to achieve this outcome, not that the state actors

9    set up a situation whereby somebody else hurt the defend -- the

10   plaintiff.

11          MS. TSAI:  That's correct.

12          THE COURT:  Okay.  And then you cite *Hootstein*,

13   H-o-o-t-s-t-e-i-n, but it came out the other way.  And

14   *Hootstein*, it cuts in -- from my perspective, directly against

15   your argument, but you cite it in favor of your argument so I

16   would like to know how you see that.

17          There the plaintiff alleged a state created danger

18   because lead contaminated water was provided to students and

19   parents despite a school knowing of high levels of lead.  And

20   the Court said that state created danger clearly does not apply

21   under these facts because the defendant directly caused the

22   harm by falsely claiming after high lead levels were discovered

23   in the drinking water that the water was, nevertheless, safe.

24          Which supported bodily intent, claim for bodily

25   integrity.  How is that supporting your argument?  They

1    found -- the *Hootstein* court cuts directly against your

2    argument, I believe.

3            MS. TSAI:  We cite to *Hootstein* for the proposition

4    that by falsely claiming the safety of the water that that act

5    itself can be considered by creating a situation.

6            THE COURT:  But the Court found the opposite.

7            MS. TSAI:  So the --

8            THE COURT:  For state created danger.  They said,

9    okay, bodily integrity.  But they found the opposite that

10   that's not how a state created danger claim works.  Not where

11   the people who you're claiming set up a situation for someone

12   else to hurt you are actually the ones who you are alleging

13   hurt you.

14           But also in your -- you know, we know that for state

15   created danger you have to have allegations that a discreet

16   population -- identifiable discreet population is the one that

17   was targeted or harmed.  And your complaint says it's the

18   entire population of Flint is the discreet class of

19   individuals.

20           Your response brief argues something else, which is

21   that it's the patients admitted to McLaren after the Legionella

22   outbreak, but you can't amend a complaint by putting an

23   argument in a response brief.

24           MS. TSAI:  So, um ...

25           THE COURT:  So how do you not have the very same

1  problem that *Carthan* and the others had?

2  MS. TSAI:  Well, Your Honor, it does need to be a more

3  discreet population and not a general public.  I recognize that

4  you have already ruled on that.  And so in -- as expressed in

5  the response is that discreet group, which is patients in the

6  hospital.  I'm looking at -- I'm trying to find the spot in the

7  short form complaint.

8  THE COURT:  Also, you -- you know, I mean, that's sort

9  of a conceptual issue I guess that we've been talking about,

10  which is that you're alleging that the private defendants did

11  this and that's not what -- I mean, you're alleging state

12  created danger against the private defendants.

13  MS. TSAI:  Against the engineering defendants and not

14  McLaren.

15  THE COURT:  Right.

16  MS. TSAI:  So McLaren is a private actor that --

17  that --

18  THE COURT:  But we already -- but I guess you have to

19  come along with me because I'm saying as of now I'm not -- is

20  that because you were looking at VNA and LAN as --

21  MS. TSAI:  State actors.

22  THE COURT:  State actors.  Oh, okay.  Okay.  So

23  they're not going to -- you know, very unlikely that they're

24  going to be state actors.  I get it.  Okay.

25  All right.  So you're still -- you wish to still go

1  ahead with your state created danger against all defendants?

2          MS. TSAI:  Against the government and engineering

3  defendants.

4          THE COURT:  Okay.  Just wanted to be sure that you

5  still after seeing the briefing and so on.

6          Okay.  Thank you.

7          Then where are we now?  Now we're at intentional

8  infliction of emotional distress.

9          Okay.  Here it is.  Okay.

10          Okay.  Here we've got to show that the defendant we're

11  discussing had extreme and outrageous conduct that with an

12  intent of recklessness causation and plaintiff's severe

13  emotional distress.

14          Let me ask you first, your complaint says that the

15  claim is being brought on behalf of all plaintiffs.  And

16  that's -- you've got the estate and the various family members.

17          In your response brief, I think you're saying that the

18  complaint -- or this claim is only on behalf of the family

19  members.

20          MS. TSAI:  That's correct, Your Honor.

21          THE COURT:  Okay.  So I don't need to write an opinion

22  on the estate.

23          Okay.  Then -- tell me about, you allege that McLaren

24  prevented Ms. Marble's family from seeking an autopsy and from

25  finding out the cause of her death.  How did they do that?

1          MS. TSAI:  Well, Your Honor, my clients are not

2   medical experts.  And so they -- while they knew to try to test

3   Ms. Marble for --

4          THE COURT:  They knew what?

5          MS. TSAI:  The -- McLaren attempted to test Ms. Marble

6   while she was still alive for Legionella but wasn't able to get

7   proper sampling.  And so they knew that that was a potential

8   cause of death.  However, when they spoke --

9          THE COURT:  Wait.  They attempted to test her for

10  Legionella?

11         MS. TSAI:  Correct.

12         THE COURT:  Is that -- that's in your complaint --

13  your lawsuit that they attempted by getting sputum or what?

14  How do you test for Legionella?

15         MS. TSAI:  Urine sample.

16         THE COURT:  A urine?  Okay.  And -- and so they

17  couldn't get it.  Okay.

18         MS. TSAI:  Right.  Given her state at that point.

19         So they knew -- so McLaren knew that there was a

20  possibility because of her symptoms that Ms. Marble was

21  actually suffering -- is suffering from the Legionella disease.

22  When they spoke to the family member after her passing, they

23  did not indicate to them this possible concern.  They told them

24  it was pneumonia and that there was no need to do any further

25  autopsy and none was done because of it.

1        THE COURT:  Okay.  And so they prevented her from --

2   they prevented the family from getting an autopsy because they

3   didn't tell the family that they had tried to get a urine

4   sample and couldn't get one.

5        MS. TSAI:  That they had suspected that it was

6   possibly Legionella and not just pneumonia.

7        THE COURT:  When did they try to get the urine sample?

8   And go to the complaint and not just what you know generally.

9        MS. TSAI:  The complaint does not give a specific

10  date.  However, in paragraph seven of the exhibit short form,

11  it does discuss McLaren's communication with the family and not

12  communicating that she was possibly exposed to Legionella

13  bacteria.

14       THE COURT:  Okay.  And I think there's some mention

15  about a sample or something, but it doesn't -- I didn't know it

16  was a urine sample.

17       So that is the extreme and outrageous conduct was not

18  being able to -- not getting that urine sample?

19       MS. TSAI:  Not getting the -- well, no, not that --

20  because they attempted to get the urine sample and wasn't able

21  to do it.  We're not -- we don't have a complaint as to like a

22  medical malpractice complaint.  What we're --

23       THE COURT:  No.

24       MS. TSAI:  -- complaining is that even though they

25  suspected that there possibly could have been a Legionella

1   problem, they didn't communicate that to the family when she
2   passed and that no autopsy was done to confirm whether or not
3   what was a true cause of death for Ms. Marble.
4           THE COURT:  Okay.  Now, they did -- we do know that
5   the cause of death was indicated to the family on the death
6   certificate as cardiopulmonary arrest, septic shock and
7   pneumonia.  And we know that Legionella leads to Legionnaires'
8   disease which is pneumonia.
9           MS. TSAI:  Correct.
10          THE COURT:  Okay.  So they were informed that it was
11  pneumonia and they were not informed that it was Legionella.
12  And that is what you're saying is extreme and outrageous and
13  reveals the defendant's intent to cause severe emotional
14  distress?
15          MS. TSAI:  Yes, Your Honor.  Because, you know, given
16  Ms. Marble's health condition at the time and that she had just
17  gone in for the dialysis, the response for the -- for my
18  clients as to their mother and wife passing due to pneumonia is
19  a very different response for if she was actually -- she
20  actually caught Legionnaires' at the hospital that caused
21  pneumonia which caused her death.  So that is where we just
22  conduct an emotional distress.
23          THE COURT:  So did they tell her that she -- is it
24  your suspicion that she caught -- well, it is your suspicion
25  that she caught pneumonia at the hospital.

1          MS. TSAI:  Right.

2          THE COURT:  And so if it was not Legionella pneumonia

3     but it was a different variety of pneumonia, which they put on

4     here pneumonia.  So it's the not knowing the word Legionella

5     and that -- I mean, she may have caught it at the hospital.

6     I -- it sure seems likely, but I don't know.

7          MS. TSAI:  Right.  We don't know and that is part of

8     the emotional distress.  They have -- the family will never

9     find out what truly caused her death.

10          THE COURT:  But we know it's pneumonia.  That's on the

11     death certificate.

12          MS. TSAI:  We know some level of pneumonia.  We don't

13     know what caused the pneumonia.  And whether it was something

14     that they -- she contracted at the hospital, whether it's

15     Legionella pneumonia or something else.  But that unsettling

16     aspect that they will have to live with is the emotional

17     distress claim.

18          THE COURT:  Okay.  And you cite the *Barnes* case as

19     support for McLaren's conduct rising to the level -- or of

20     extreme and outrageous.  But in *Barnes*, the plaintiff's son was

21     loading glass onto a cart when the glass slipped, crushed his

22     skull, tore his major arteries.  Then the defendants it's

23     alleged failed to render timely medical assistance.  And

24     instead of calling an ambulance, they drive him to the hospital

25     in the back of a pickup truck.  Then they withheld his name

1   from the hospital and told the personnel there that they found

2   him on the side of the road to hide the fact that it was

3   loading glass at the workplace that caused it.  So -- and then

4   when the employees returned to the workplace, they cleaned the

5   accident site to preclude an accurate police investigation.

6           And in *Barnes* they didn't -- they determine that

7   the -- that was about whether the worker's comp was going to be

8   an exclusive remedy and they said no, it's not an exclusive

9   remedy.

10          So you're suggesting that indicating on the death

11  certificate pneumonia, septic shock and heart attack is

12  equivalent to what happened in *Barnes*?

13          MS. TSAI:  That and the fact that they had suspected

14  Legionella, that they had knew that the water was contaminated

15  with Legionella and that essentially they were covering up.

16  That they were giving their patients contaminated water.  That

17  is the egregious conduct.

18          THE COURT:  Okay.

19          MR. KUHL:  Your Honor?

20          THE COURT:  Yes?

21          MR. KUHL:  Could I -- I think we've heard something

22  very important.  Again, Richard Kuhl, for state defendants,

23  specifically Governor Snyder.

24          As I just heard the argument, they don't have evidence

25  that Ms. Marble died of --

1          THE COURT:  I know that.

2          MR. KUHL:  -- Legionnaires' disease.

3          MR. GOODMAN:  That's not true.

4          THE COURT:  I know.

5          MR. GOODMAN:  That's not true.

6          THE COURT:  Well, it's not in the complaint.

7          MR. KUHL:  Well, then bodily integrity claims has to

8   go away.  And if they don't have that proof --

9          THE COURT:  It's a -- okay.

10         But we're going to -- that's a difficult -- there's an

11  allegation that she has it.  It's in the complaint -- had it.

12  It's in the complaint.

13         MR. KUHL:  But that's fair, but we just had an

14  argument of counsel saying they don't have it.

15         THE COURT:  I know.

16         MS. TSAI:  We don't have definitive evidence.  We

17  have -- we strongly suspect that and we also have consulted

18  medical examiners who will say that the symptoms that she had

19  was consistent with Legionnaires' disease.

20         THE COURT:  Is that in your -- that's in your -- is

21  that in your complaint?

22         MS. TSAI:  About the expert?

23         THE COURT:  Yeah.

24         MS. TSAI:  No.

25         MR. GOODMAN:  No, Your Honor.  That's --

1          THE COURT:  Okay.  See, I can't --

2          MR. GOODMAN:  That's our evidence.  That's the proof

3    of the evidence.

4          THE COURT:  I know, but I need -- okay.  But I'm not

5    at that point.  You have alleged that she had it and I'm -- I

6    understand what you're saying, Mr. Kuhl.  I'm going to try to

7    work through this.

8          MR. GOODMAN:  Just so we can clarify the record here,

9    Your Honor.  There is evidence and we have the evidence that

10   this -- that the deceased Birdie Marble died of Legionnaires'

11   disease.

12         THE COURT:  Okay.

13         MR. GOODMAN:  The fact is, the best evidence would

14   have been an autopsy which they concealed and hid from the

15   family.  Caused a lot of pain.

16         THE COURT:  Okay.

17         MR. MACDONALD:  Your Honor, may I respond?

18         THE COURT:  Certainly.

19         MR. MACDONALD:  Put Brian MacDonald on behalf of

20   McLaren.  Mr. Kuhl stole some of my thunder, but he's want to

21   do that.  But we'll deal with that --

22         THE COURT:  Mr. MacDonald on behalf of McLaren.

23         MR. MACDONALD:  As to the intentional infliction

24   aspect.  Don't want to deal with the negligence issues.  I do

25   take issue with what Mr. Goodman just said as far that they

1    pled that there was Legionella.  They've pled that.  They could

2    not determine if this was Legionella.  That's what they pled.

3    They've pled that the urine test was done too late and

4    therefore couldn't show whether it was.  They've now argued

5    here in court and pled that they couldn't do an autopsy to

6    determine if she had in fact had Legionnaires' disease.

7              THE COURT:  Right.

8              MR. MACDONALD:  Okay.  We're dealing with Legionella

9    bacteria which is a whole different animal than Legionnaires'

10   disease.  Okay.  So we're throwing these terms around.  But the

11   fact is, is that as they admit, McLaren attempted to do a test,

12   a urine test to investigate multiple reasons as to why she's

13   had -- what is going on.  You do a urine test for pneumonia and

14   a lot of different things.  Not specifically to it, but if

15   Legionella bacteria is found in the system, then you can

16   diagnosis that's what it is.  They couldn't do it.  There was

17   no test.  They admit, we tried to do that test.

18              They then gave a death certificate as to the

19   reasonable cause of death on that.  They never, ever -- there's

20   no allegation that McLaren -- anyone at McLaren said you cannot

21   have an autopsy.  And that's what the allegation is, that we

22   prevented an autopsy.

23              Their allegation is that McLaren didn't tell them the

24   cause of death when they admit here today they don't even know

25   what the cause of death was.  So as far as an intentional overt

1  act on McLaren, there was none.

2          I'll reserve issues regarding negligence and the

3  diagnosis for when you get to that, Judge.

4          THE COURT:  Thank you.  All right.

5          MR. ERICKSON:  Your Honor, I just wanted to make a few

6  comments regarding intentional infliction.

7          THE COURT:  Okay.  Mr. Erickson.

8          MR. ERICKSON:  Philip Erickson on behalf of the LAN

9  defendants.

10          Again, I want to go back to the way this is pled

11  because I think it's quite significant, especially with respect

12  to this count.

13          The intentional infliction of emotional distress was

14  initially pled in one of the earlier versions of the master

15  complaint.

16          THE COURT:  Right.

17          MR. ERICKSON:  But then when the master complaint was

18  most recently amended, on December 3rd of 2018, that count,

19  which was formerly count 13 was stricken.  It is abandoned in

20  the master complaint.

21          And so the only count that we have for intentional

22  infliction of emotional distress in the Marble case is count 12

23  that begins at page 66 of Exhibit A.

24          And count 12 has paragraph 222 which incorporates by

25  reference prior allegations.  And then it has additional

1 paragraphs 223, 224, 225 and 226.

2 There are only four substantive paragraphs in the

3 intentional infliction of -- of emotional distress count. And

4 none of them allege any specific conduct by any specific

5 defendants.

6 So it must be that the plaintiff is asserting that

7 prior allegations in the master complaint or elsewhere in

8 Exhibit A somehow constitute the allegations of intentional

9 infliction of emotional distress. But in the master complaint,

10 the allegations against LAN are allegations of professional

11 negligence.

12 THE COURT: Right.

13 MR. ERICKSON: And so what plaintiff is trying to do

14 is as to LAN is to take allegations of negligence and make a

15 conclusory pleading and try to turn them into allegations of --

16 THE COURT: Right.

17 MR. ERICKSON: -- intentional infliction of emotional

18 distress. And we have cited to the Court in our brief the

19 *Rosenberg* case that stands for what the standard is for extreme

20 and outrageous conduct --

21 THE COURT: Right.

22 MR. ERICKSON: -- that the plaintiff has to meet. And

23 I'm not going to read it because it's in the brief and it's

24 extraordinarily high --

25 THE COURT: It's a very high standard.

1            MR. ERICKSON:  There's just nothing in any of the

2    briefing or the pleadings which would support a claim of

3    intentional infliction against our client.

4            And at least as to count 12 itself, there's no

5    specific pleading as to any defendant.

6            THE COURT:  Okay.  Thank you.

7            All right.  Well, I think I have -- I understand your

8    argument and I will be able to take it under advisement and

9    include that in the written decision.

10           MR. KLEIN:  Your Honor, may I be heard very briefly --

11           THE COURT:  Sure.

12           MR. KLEIN:  -- on intentional infliction?

13           And it's --

14           THE COURT:  Sheldon Klein on behalf of?

15           MR. KLEIN:  Yes.  I'm sorry.  You want me to introduce

16   myself or --

17           THE COURT:  Yes.

18           MR. KLEIN:  -- will you do it for me?

19           Sheldon Klein for the city of Flint.

20           It somewhat dovetails what Mr. Erickson just said

21   which is, not only is it not in the most -- the current master

22   complaint that is intentional infliction, but this court

23   ordered that the defendants needn't respond to any claim that

24   was omitted from the master -- was in the earlier master

25   complaint and in the amended master complaint --

1            THE COURT:  Right.

2            MR. KLEIN:  -- unless it was separately pled.

3            THE COURT:  Right.

4            MR. KLEIN:  And I think, you know, the best

5    perfunctory effort to do so I think realistically it has been

6    abandoned.  But beyond that, we understood it to be abandoned.

7    We did not address it in our brief.  The Court --

8            THE COURT:  That's fine.

9            MR. KLEIN:  If it's --

10           THE COURT:  No.  I --

11           MR. KLEIN:  We would welcome the opportunity to do

12   so.

13           THE COURT:  I would let you know if I were to reach

14   that conclusion which I have not.

15           Okay.  So let's move on to the negligence claim

16   against McLaren.  And here as I understand it, in your lawsuit,

17   in your complaint you are -- you're alleging -- you don't call

18   it premises liability, but by the time of your response brief,

19   you identified that as the claim.  Do I understand that?

20           MS. TSAI:  Yes.  So it's ordinary negligence, not

21   professional negligence as --

22           THE COURT:  Okay.

23           MS. TSAI:  -- the McLaren has briefed.  And it's

24   analogous to a premises negli- -- liability claim.

25           THE COURT:  Okay.  And the issue is failure to warn.

1   What is -- what is the issue from your perspective?

2         MS. TSAI:  Right.  So is the failure to warn people

3   who are coming in to the hospital the danger of the building,

4   the water, specifically that it is contaminated and not safe

5   for consumption.

6         THE COURT:  Okay.  Okay.  Thank you.  I just wanted to

7   make sure because the premises liability was not in your

8   complaint but it is a type of a negligence claim and I

9   understood it from your response brief that that's what you're

10  alleging.

11        THE COURT:  So is it Mr. MacDonald?  Oh, there you

12  are.

13        MR. MACDONALD:  Yes.

14        THE COURT:  Okay.  All right.  Well, you argued that

15  this was really a medical malpractice claim.  And I'm prepared.

16  You know, the first element is that it takes place at a

17  hospital.  Well, we know that.  But -- and that expert

18  testimony would be needed to determine whether medical

19  professionals made the right -- met the standard of care or

20  not.

21        And from my perspective what I understand plaintiffs

22  to be saying, is that McLaren had a known pathogen coursing

23  through its water that was able to be vaporized into such that

24  it could infect people with the Legionella bacteria and failed

25  to warn.

1           And so it could be similar to a cruise ship.  If

2    people are getting on the cruise ship ready to disembark or

3    embark, whichever you do at the beginning, and they already

4    know they have rotavirus on there but all over the place this

5    rotavirus and they let everybody go in and fail to warn them.

6    How is this any different from one of those cruise ship cases?

7           MR. MACDONALD:  It's different in the way that it's

8    pled in this case, Your Honor.  It is -- that it is not pled in

9    this complaint.  It is not pled as a premise liability.  They

10   are now responding in the motion -- our motion that this is

11   professional negligence.

12          Now, creating that as a response in their pleading --

13   in their responsive pleading.  It was not pled that way as a

14   premise liability claim.  However, it's difference --

15          THE COURT:  Well, it -- they say that it's pled as a

16   ordinary negligence claim.

17          MR. MACDONALD:  Right.  We get that in malpractice

18   cases all the time that they will claim in the alternative

19   medical malpractice or that it's so outrageous that it is

20   ordinary negligence and they plead it as an ordinary

21   negligence.

22          In this case, Your Honor, in their responsive pleading

23   what they say is, they say despite strong signs that she had

24   contracted Legionnaires' disease, McLaren never properly

25   treated her for the disease.  That's treatment.  That's

1   professional --

2          THE COURT:  Yeah.  I don't know why they put that in

3   there.  That's --

4          MR. MACDONALD:  Well --

5          THE COURT:  Are you alleging a failure to treat her

6   for --

7          MS. TSAI:  No, Your Honor.  That allegation actually

8   goes to our other claim like access to court, right?  So we

9   have {brought that allegation to mean to file a medical

10  malpractice claim because of the fact of McLaren's conduct,

11  right?  So we don't have the autopsy that confirms one way or

12  another our client didn't know of the possibility of a

13  Legionella so give notice that they had intent to sue for

14  medical malpractice.  But those statements are separate from

15  what we're alleging is damage of the ordinary negligence.

16         THE COURT:  Okay.  Let's set aside the access to the

17  courts because you're here in the court with a negligence

18  claim.  Which is what I thought you were saying you couldn't

19  get access to the courts on is this negligence claim.

20         MS. TSAI:  Yup.

21         THE COURT:  But let's set that -- so let's not talk

22  about that for a minute.

23         So, Mr. MacDonald, let's assume that there's an

24  ordinary negligence claim or that I'm viewing -- I'm

25  understanding what they were trying to do was a premises

1    liability claim, a failure, a duty to warn that caused the

2    harm.  And the harm is not that she -- what is -- okay.

3              MR. MACDONALD:  Judge, if I could interject.

4              THE COURT:  Yes.

5              MR. MACDONALD:  I know where you're going.

6              THE COURT:  Right.

7              MR. MACDONALD:  One of the problems I have is, is that

8    we're hearing alternate arguments here from plaintiff on the

9    different theories.  For example, I have the intentional

10   infliction of emotional distress.  We're hearing from

11   plaintiff, well, we didn't do a proper test to run to determine

12   a diagnosis.  We didn't do an autopsy --

13             THE COURT:  No.  The proper tests has nothing to do

14   with this.  That's their intentional infliction.  Am I correct,

15   Ms. Tsai?  The testing doesn't have to do with this because

16   that's a medical malpractice claim.

17             MS. TSAI:  Right.

18             THE COURT:  Okay.

19             MR. MACDONALD:  But in the response, Judge, they --

20   they point that out in the response that this is where our

21   shortcomings are.  That we didn't do these things.  And as far

22   as this case being peculiar, not every patient or not every

23   person in Genesee County was exposed to Legionella bacteria is

24   at risk.  Certain patients can be at risk, therefore, it is a

25   you can't as you sit there on the bench make a judicial

1   determination as to which patients are at risk.  That's a

2   medical decision as to who's at risk.

3          THE COURT:  Well, if we know on the cruise ship that

4   there's Legionella or there's rotavirus, then, you know, I

5   think what they're alleging is that there was a duty to warn of

6   that.

7          MR. MACDONALD:  Well, I'm not -- they have not pointed

8   out any duty, Judge, whether it's state law or whatever because

9   the fact is --

10         THE COURT:  And that the duty doesn't flow from it

11  being Legionella.  The duty flows from a pathogen being present

12  at the hospital.

13         MR. MACDONALD:  If I could give an example of being

14  the absurd, though, Judge.  This is a hospital.  That would

15  mean that McLaren would need to station someone at the front

16  door of their hospital to tell them, we have meningitis on the

17  fifth floor, we have influenza on the third floor, we have

18  strep bacteria.

19         THE COURT:  Right.

20         MR. MACDONALD:  This is a hospital that has exposure.

21  That's why --

22         THE COURT:  Off course.  And -- but in those

23  instances, for certain patients they put them in isolation if

24  that is going to make it into the general flow of the hospital.

25  And what I understand them to saying -- to be saying is that

1   the risk of contracting Legionella was all throughout the

2   hospital because it started in its water source.

3           MR. MACDONALD:  And I agree with you 100 percent,

4   Judge.

5           THE COURT:  And that it was equally possible that a

6   patient would get it as a visitor or a janitor or somebody.

7           MR. MACDONALD:  But that's not the case, Judge.  In

8   fact, that would need medical testimony as to whether or not

9   it's equally.  Because the fact is, Judge, as you just said,

10  you would make a determination as to who should be put in

11  isolation.  That calls for medical judgment.  Should Ms. Marble

12  had been placed in isolation because of her underlying

13  condition, that's a medical judgment.  And that is what they're

14  saying that we did not isolate her.  We did not prevent her

15  from catching this disease in the hospital.

16          THE COURT:  But if you -- let's take something else.

17  If you knew that the air at McLaren Hospital had radiation -- I

18  don't know how radiation works.  That's a bad one.

19          Had something toxic in the air and everybody walking

20  in there was going to be breathing that air, some might be hurt

21  more than others.  Because I can tolerate a lot of strange

22  things but somebody else can't.  That's what I understand their

23  argument to be is that there was a pathogen in the hospital,

24  you knew about it, failed to warn and it caused their

25  plaintiffs' harm.

1          MR. MACDONALD:  Okay.  Go to the last comment.

2          THE COURT:  Yeah.

3          MR. MACDONALD:  I understand that's a question --

4          THE COURT:  Yeah.

5          MR. MACDONALD:  Okay.  I'll skip through the first

6   three and I'll give you -- the Court that all those three

7   things are valid.  The last point is not valid, caused harm.

8   This is speculation at its best.  They have pled that she was

9   exposed to Legionella, and that reading from their complaint,

10  exposed to Legionella and that she developed a condition and

11  that they cannot tell if she ever contracted Legionella.  And

12  so to say, well, no, she said she had Legionella.  We've heard

13  admissions here in argument here today that the family will

14  never know.

15          THE COURT:  Well, I'm going to have to grapple with

16  that later.  For now I'm just -- they've alleged it.  I'm going

17  to deal with that later.

18          MR. MACDONALD:  All right.  I appreciate --

19          THE COURT:  And is the difference in Brown where you

20  answered, is the difference because they pled premises

21  liability and Ms. Odie Brown had Legionnaires'?

22          MR. MACDONALD:  The last part.

23          THE COURT:  Okay.

24          MR. MACDONALD:  You know, I will take issue with Mr.

25  Weglarz all day long on a lot of things.

```
1                  THE COURT:  Right.
2                  MR. MACDONALD:  But the fact is, he pled premise
3     liability and in fact Odie Brown was diagnosed with --
4                  THE COURT:  Okay.
5                  MR. MACDONALD:  -- Legionella.
6                  THE COURT:  I just wanted to make sure I understood.
7                  MR. MACDONALD:  We answered on that basis.
8                  THE COURT:  Okay.  All right.
9                  MR. MACDONALD:  If the Court doesn't have any other
10    questions on that issue.
11                 THE COURT:  No.  I have a lot of questions, but I
12    think we're starting to run out of time.
13                 MR. MACDONALD:  I've run out of answers too, so ...
14                 THE COURT:  Okay.  Okay.  So let's assume for the sake
15    of argument only that the negligence claim goes forward against
16    McLaren.  Then you have a right of access to the courts where
17    you're saying you don't have access to sue McLaren.  You're
18    suing McLaren.
19                 MS. TSAI:  Right.
20                 THE COURT:  You might not -- you might win.  You might
21    not win.  You might get dismissed.  You might not.  But you're
22    here.  And so tell me how we have to have these elements, the
23    existence of a nonfrivolous underlying claim.  The state actors
24    took obstructive actions that substantial prejudice to the
25    underlying claim cannot be remedied by a court and a request
```

1    for relief which the plaintiff would have sought on the

2    underlying claim that is now otherwise unattainable.

3           MS. TSAI:  So assuming that we have the ordinary

4    negligence claim against McLaren, then we do have access to

5    court, right?  And we are here.

6           THE COURT:  Yes, you're here.

7           MS. TSAI:  But what we talk about in the complaint --

8    in our response is that that is not -- we don't know for sure,

9    right?  And if --

10          THE COURT:  Well, I don't know what you know.

11          MS. TSAI:  Well, no.  We don't know where this claim

12   is going to land.  Whether we will be able to move forward --

13          THE COURT:  But you can't -- okay.  So do you have any

14   cases that say you can plead in the alternative?  You can

15   actually plead your case and alternatively say you can't plead

16   your case and succeed on that second count.

17          MS. TSAI:  So we have cited cases where a plaintiff is

18   able to be in court but they're saying now the evidence is

19   tainted as such that their possible -- their likelihood of

20   being successful has diminished.  And here, without the

21   autopsy, McLaren stated just now, his counsel just stated now

22   that's the difference between Marble and Brown.  They did not

23   answer our complaint because there is not a confirmed

24   diagnosis.

25          THE COURT:  Okay.

1          MS. TSAI:  And so that is where our argument with

2     access to court lies.

3          THE COURT:  Because you didn't get an answer?

4          MS. TSAI:  Well, no.  Because our likelihood of being

5     successful in our claim is diminished.  And an example of that

6     is what we can see here today with the { treatment between the

7     Marble case and the Brown case.  If we had gotten the

8     diagnosis, we would be moving forward with McLaren on the

9     negligent --

10          THE COURT:  Can you -- let me just ask you this:  Can

11    you do an autop- -- can a forensic pathological exam be

12    undertaken now?

13          MS. TSAI:  Mr. Goodman can answer that.

14          MR. GOODMAN:  We have consulted with experts about

15    that.  The answer is that by the time the Marble family

16    consulted with their attorneys it was too late to do a

17    definitive autopsy.

18          THE COURT:  Okay.  Tell me what the state actors did

19    to prevent the autopsy.

20          MS. TSAI:  It goes towards the conspiracy claim that

21    the state actors and McLaren conspired to cover up --

22          THE COURT:  No, we're not -- we don't have the

23    conspiracy claim.  Let's assume for the sake of this

24    argument -- I know it's actually difficult because you prepared

25    differently.

1          But I'm telling you now, let's assume the conspiracy

2    is not there.  Tell me what the state actors did to prevent the

3    autopsy.

4          MS. TSAI:  I don't believe there are any allegations

5    in the complaint that --

6          THE COURT:  So that -- so this access to courts can

7    only progress -- proceed from your perspective if there's a

8    conspiracy?

9          MS. TSAI:  For the state actors, correct.

10         THE COURT:  For the state actors.

11         Okay.  And were you alleging a separate conspiracy to

12   prevent the autopsy or it's all one conspiracy?

13         MS. TSAI:  It's all in the same, correct.

14         THE COURT:  Okay.

15         MS. TSAI:  Just covering up the contaminated water

16   with the Legionella bacteria.

17         THE COURT:  And this is only being brought on behalf

18   of Ms. Marble, correct, this access to the courts?

19         MS. TSAI:  By the state, correct.

20         THE COURT:  Okay.

21         THE COURT:  Okay.  Mr. MacDonald?

22         MR. MACDONALD:  Yes.

23         THE COURT:  Okay.  So Ms. Tsai is telling that -- I

24   mean, we have this issue of the obstructive actions and whether

25   that can be shown for the state actors.  But -- oh, right.

1    Okay.

2          Well, my thought is she says, well, probably we can't

3    proceed, we won't be able to show our negligence case because

4    we didn't get the autopsy or the tests ahead of time.  So maybe

5    they really will be denied access to the courts.  But in the

6    other cases where these access to courts go through, there is

7    an actual knowledge of a cause of action that finally becomes

8    available to a plaintiff.  But why shouldn't I dismiss the

9    case -- dismiss this count without prejudice and see how the

10   case comes out on the negligence?

11         MR. MACDONALD:  Your Honor, you can do that if you

12   choose to, but my argument would be is that that would be the

13   argument in every losing plaintiff.

14         THE COURT:  Right.

15         MR. MACDONALD:  In every case where someone says I

16   didn't have enough evidence to win my case.  In this case

17   there's nothing -- they never pled anything that McLaren in any

18   way prevented them from having an autopsy.  That's never pled.

19   There's no factual basis for that.  They're saying that McLaren

20   didn't come up with a diagnosis.  They couldn't reach a

21   diagnosis of what may be suspected.  You can't have this type

22   of claim on a mere suspicion that we --

23         THE COURT:  Right.

24         MR. MACDONALD:  -- had.  It would be a differential

25   diagnosis and that we didn't prove every differential

1   diagnosis.  The fact of the matter is, they're here in court.

2   Whether they have enough evidence to sustain and prove the

3   condition they've alleged, that doesn't go to a lack of access

4   to court.  That goes to a lack of evidence.

5          THE COURT:  Okay.  All right.  Let me ...

6          Well, this is a tough one, Ms. Tsai, because you -- we

7   don't know what she died of.  But I'm going to try to sort it

8   out.  In your complaint I'm going to see what you allege --

9          MR. MACDONALD:  I apologize, Your Honor.

10         THE COURT:  Uh-huh.  That's all right.

11         MR. MACDONALD:  I forgot.  Mr. Kim pointed it out,

12  too.  Earlier today when we were talking about state actors and

13  who was state actors, the paragraph you read incorporated the

14  multiple state players, Veolia and LAN and McLaren.

15         THE COURT:  Right.

16         MR. MACDONALD:  They said McLaren was a state actor.

17  We never discussed whether they were.

18         THE COURT:  Oh.

19         MR. MACDONALD:  They never in their response showed

20  any proof that McLaren was a state actor.  And in fact, in --

21         THE COURT:  Right.

22         MR. MACDONALD:  -- this access to court, it cannot be

23  against a person that is not a state actor.

24         THE COURT:  Right.  Do you agree with that, Ms. Tsai?

25         MR. MACDONALD:  So you can't have { if we're not a

```
1   state actor.
2           THE COURT:  Right.  Do you agree with that?
3           MS. TSAI:  Um ...
4           THE COURT:  I mean, you gain credibility and authority
5   with the Court when you concede what the law is and that your
6   particular facts don't --
7           MS. TSAI:  I think without the conspiracy, then
8   McLaren would not fall into the state actor.  So our response
9   is and our pleading is based on the conjunction of the
10  conspiracy claim.  And that's where I think right now we're
11  kind of going in different --
12          THE COURT:  Yes.  Okay.  I appreciate that.  Thank
13  you.
14          All right.  Well, I appreciate everyone -- well,
15  we're -- okay.
16          MR. KUHL:  Your Honor, I would like to speak about the
17  11th Amendment which is important to my client the governor.
18          THE COURT:  Okay.
19          MR. KUHL:  I'll be very brief.
20          THE COURT:  Very brief.
21          MR. KUHL:  All the responses -- again, Richard Kuhl,
22  state defendants, specifically with respect to Governor
23  Whitmer.
24          All the responses to our motion refer to the fact that
25  the Court adopted in the prior Wade, Carthan, Sirls opinion,
```

1    Sixth Circuit's ruling in *Bowler* on this issue.

2              THE COURT:  Right.

3              MR. KUHL:  And we contend that in fact *Bowler* is

4    irrelevant based upon the specific facts of this case.

5              THE COURT:  Okay.

6              MR. KUHL:  And the specific facts of this case are

7    that Ms. Marble died in 2015.  March 2015.

8              THE COURT:  Right.

9              MR. KUHL:  Ms. Brown died in December 2014.  Or five

10   years ago.  The fact of the matter is, with all due respect,

11   they're dead.  There is no ongoing harm.  There is no ongoing

12   violation and there is no perspective injunctive relief that

13   could be ordered by this court to cure the fact that they are

14   deceased.  And as such, we do not believe that the *Bowler*

15   opinion apply and we would ask the Court to find that the

16   ex-parte young exception (ph) does not apply and therefore

17   dismiss the claims against Governor Whitmer.

18             THE COURT:  Okay.  I appreciate that.  I found the

19   *Bowler* decision difficult to follow in a certain sense.

20             MR. KUHL:  Yep.

21             THE COURT:  And I don't even know if they knew all

22   about the case.

23             MR. KUHL:  It's a difficult read at that point.

24             THE COURT:  Yeah.

25             MR. KUHL:  I think it's fair to say.

1          THE COURT:  Yeah.  So -- okay.  Mr. Grashoff had some

2     housekeeping issues he wanted to raise much earlier and he's

3     going to raise them again.

4          MR. GRASHOFF:  I do, Your Honor.  But I want to make

5     two points if I may on behalf of the MDEQ defendants.

6          I had a long laundry list and I'm down to two points

7     and I want to make them very fast.

8          THE COURT:  Okay.

9          MR. GRASHOFF:  Phil Grashoff on behalf of Stephen

10    Busch.

11         The first point, Your Honor, is that there was a test

12    of the city water during the period of time that Mrs. Brown was

13    in Hurley Hospital where she apparently contracted Legionella.

14         And this is an exclamation point to Mr. Kuhls'

15    argument.  You can take a look at our Exhibit D and there is a

16    Michigan Department of Human Health and Services notice.  And

17    in that notice, they identify a test that was run in November

18    and December of 2014 on the city water coming into -- at that

19    point, McLaren Hospital, but it's the same water going into

20    Hurley Hospital, and it was nondetect for Legionella.

21         THE COURT:  Okay.

22         MR. GRASHOFF:  There was not there.  Same period of

23    time, a few months earlier than Mrs. Marble.

24         The second point --

25         THE COURT:  And is that in the complaint?

1           MR. GRASHOFF:  I'm sorry?

2           THE COURT:  Is that in the complaint?

3           MR. GRASHOFF:  It's in Exhibit -- no.  It is not in

4   the complaint.  It's in --

5           THE COURT:  Okay.  And remember, we're at the 12(b)(6)

6   stage, failure to state a claim.  And I'm -- I can't take into

7   consideration opposing evidence, but ...

8           MR. GRASHOFF:  It was --

9           THE COURT:  But it's -- I'm learning along the way and

10  I appreciate learning.

11          MR. GRASHOFF:  And the other point I want to make

12  quickly is to all the MDEQ employee defendants.  We didn't have

13  jurisdiction over Legionella.  We weren't looking for

14  Legionella.  We were operating under the Clean Water Act.  It

15  doesn't govern Legionella.  Surface water treatment rules by

16  EPA govern Legionella.  So our people weren't looking for it.

17  It wasn't tested for.  We had nothing do with it.  There were

18  other agencies, Michigan Department of Human Health and

19  Services, the Genesee County Health Department.  They were all

20  focused on Legionella.  We were not.  We had no jurisdiction

21  over it.  Therefore, I move that all these charges as to the

22  defendants on Legionella be dismissed.

23          THE COURT:  Okay.  Thank you for your argument.

24          MR. GRASHOFF:  Can you ask -- go to my housekeeping?

25          THE COURT:  Yeah.  Ms. Tsai?

1    MS. TSAI:  Just one quick thing as it relates to the
2  state's argument about an expert.  We do agree and will dismiss
3  the claim against Governor Whitmer --
4    THE COURT:  Okay.  Thank you.
5    MS. TSAI:  -- because there is no ongoing.
6    THE COURT:  All right.
7    MR. GRASHOFF:  You've entered -- you've entered an
8  order requiring the defendants to look for unique claims --
9    THE COURT:  Right.
10    MR. GRASHOFF:  -- and file motions by the 10th of
11  February.  The Shkolnik firm who's represented here by Alastair
12  Findeis had a CERCLA claim in their complaint, but they
13  withdrew that.
14    THE COURT:  Yes.
15    MR. GRASHOFF:  And we contacted the Shkolnik firm and
16  asked them whether that withdraw applied to all of their
17  individual cases.  And they came back today with an E-mail that
18  I've shared with Mr. Findeis from one of his colleagues,
19  indicating that they are withdrawing --
20    THE COURT:  Good.
21    MR. GRASHOFF:  -- the Clean Water Act counts from all
22  of their individual cases.  So we need not worry about that.
23    THE COURT:  Okay.  Thank you.
24    MR. FINDEIS:  The CERCLA claim.
25    MR. GRASHOFF:  The CERCLA claim.

1          THE COURT:  Good.  Okay.

2          MR. FINDEIS:  This way we didn't have to do a {.

3          THE COURT:  All right.  Thank you.

4          MR. GRASHOFF:  Thank you very much, Your Honor.

5          THE COURT:  Okay.  I think we've worn ourselves out.

6          MR. WEGLARZ:  Your Honor, I'm so sorry to have to even

7     say anything because I know we all want to get out of here.

8     May I just take up 45 seconds of your time?

9          THE COURT:  Go ahead.

10          MR. WEGLARZ:  Thank you.  I just wanted the Court to

11     note.  We were talking about the violations of bodily integrity

12     claims and I just wanted to underscore for the Court that in

13     your prior decisions and analysis, every time the Court upheld

14     such a claim, the Court found an intrusion for both lead and

15     Legionella.  You pointed that out each and every time.

16          And the other thing I wanted to emphasize with it was

17     that --

18          THE COURT:  And what I'm looking at is timing.

19          MR. WEGLARZ:  I understand.

20          THE COURT:  Okay.

21          MR. WEGLARZ:  And that was addressed previously.

22          THE COURT:  And it could be that there were five ways

23     in which somebody -- I mean, I have to show callous disregard.

24     I can't just show that they knew about it.  They had to

25     callously disregard it.  And so I have to -- I just have to

1    analyze it that way.  But go ahead.

2         MR. WEGLARZ:  Understood.  And it actually leads to

3    the other point I wanted to bring up.  The elements for the

4    violation of bodily integrity really it's -- you're right, a

5    callous disregard for a known risk.

6         But -- and there are a lot references though to a

7    finding of being deceptive or concealing or hiding a defect.

8    And that's where I was somewhat confused about.  I don't

9    know -- I know the case relied on by the Court, this *Schroeder*

10   *versus Forest Thomas* ...

11        THE COURT:  Go ahead.  That's okay.  Yeah.

12        MR. WEGLARZ:  That does not say you must show deceit.

13   I think you can still have callous disregard simply by knowing

14   the risk and really just turning away from it.

15        Similar to our deliberate indifference standard when

16   we find an 8th or 14th Amendment violation on 1983 claims for

17   prisoners --

18        THE COURT:  Okay.  I'll take a look at it.

19        MR. WEGLARZ:  That's it.  That's all I wanted to say.

20        THE COURT:  Good.

21        MR. JOHNSON:  Your Honor, if I may.  Larry Johnson on

22   behalf of Hurley defendants.  I feel a little bit robbed only

23   because we have -- the Hurley defendants are only in two

24   Legionella cases so this would be the first decision that you

25   would be making on our behalf.  So I haven't had a chance to

1  argue any of that.

2          THE COURT:  Okay.

3          MR. JOHNSON:  I trust that you are well versed in

4  all --

5          THE COURT:  I'm --

6          MR. JOHNSON:  And I'm not going to go through it

7  considering where you are in the day.  But there is one thing

8  specific to our case that I do need to bring up.  In

9  plaintiff's reply brief, they detach an Exhibit A.

10         THE COURT:  Uh-huh.

11         MR. JOHNSON:  You're aware?

12         THE COURT:  Yes.

13         MR. JOHNSON:  Okay.  And that of course was not --

14         THE COURT:  And they can't bring new allegations in a

15  reply brief.

16         MR. JOHNSON:  As I think --

17         THE COURT:  Yeah.

18         MR. JOHNSON:  -- you mentioned or said previously

19  that --

20         THE COURT:  Yeah.

21         MR. JOHNSON:  -- you can't amend your complaint by

22  your response.

23         THE COURT:  Exactly.

24         MR. JOHNSON:  I would just ask that be stricken and

25  all references to it.  So that's unique to our motion.  Of

1 course I think you've --

2          THE COURT:  And I'll try to sort out whether that is

3 new information or not.  So Mr. Weglarz doesn't have to worry

4 about that right now.  I'm just going to try to sort that out.

5          MR. WEGLARZ:  Thank you.  It was attached to the

6 response, not a reply.

7          MR. JOHNSON:  I'm sorry.

8          THE COURT:  Right.

9          MR. JOHNSON:  Plaintiff's response.  So, yeah, it's

10 not in any way referenced in the master or the short form.

11          THE COURT:  Okay.

12          MR. JOHNSON:  I have tons more, but I will let the

13 Court go.

14          THE COURT:  Okay.  No.  I appreciate that you have

15 that and if as I start to work through all of this, if there

16 are areas that we weren't able to cover, I'll ask for

17 supplemental briefing or set up a supplemental argument.

18          MR. JOHNSON:  I'd appreciate that, Your Honor.

19          THE COURT:  Okay.  Good.  Thank you all very much and

20 we will be adjourned.

21          THE CLERK OF THE COURT:  All rise.  Court is now

22 adjourned.

23      (At 5:25 p.m., matter concluded.)

24                          -   -   -

25

1          C E R T I F I C A T E

2

3          I, Darlene K. May, Official Court Reporter for the

4    United States District Court, Eastern District of Michigan, do

5    hereby certify that the foregoing is a true and correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.  I further certify

8    that the transcript fees and format comply with those

9    prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   February 3, 2020          /s/ Darlene K. May
     Date                      Darlene K. May, CSR, RPR, CRR, RMR
13                             Federal Official Court Reporter
                               Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25