```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
    In Re:  FLINT WATER CASES         Case No.  16-10444
 4
    _____/
 5

 6          IN CHAMBERS TELEPHONIC STATUS CONFERENCE
           BEFORE THE HONORABLE JUDITH E. LEVY
 7              UNITED STATES DISTRICT JUDGE
        Ann Arbor, Michigan - Wednesday, February 5, 2020
 8

 9                    APPEARANCES IN ALPHABETICAL ORDER:

10                    Charles E. Barbieri
                      Foster, Swift, Collins & Smith, P.C.
11                    313 South Washington Square
                      Lansing, MI 48933
12
                      Margaret A. Bettenhausen
13                    Michigan Department of Attorney General
                      525 West Ottawa Street, P.O. Box 30755
14                    Lansing, MI 48909

15                    Mark R. Cuker
                      Cuker Law Firm, LLC
16                    One Commerce Square, 2005 Market Street
                      Philadelphia, PA 19103
17
                      Donald Dawson, JR.
18                    Fieger & Fieger
                      19390 W. 10 Mile Road
19                    Southfield, Michigan 48075

20                    Alaina Devine
                      Campbell Conroy & O'Neil PC
21                    1 Constitution Wharf, Suite 310
                      Boston, MA 02129
22
                      Philip A. Erickson
23                    Plunkett & Cooney
                      325 East Grand River Avenue, Suite 250
24                    East Lansing, MI 48823

25
```

```
 1   APPEARANCES (Continued):

 2                       James A. Fajen
                         Fajen & Miller, PLLC
 3                       3646 West Liberty Road
                         Ann Arbor, MI 48103
 4
                         Travis S. Gamble
 5                       Drinker Biddle & Reath LLP
                         1717 Main Street, Suite 5400
 6                       Dallas, TX 75201

 7                       Philip A. Grashoff, Jr.
                         Smith Haughey Rice & Roegge
 8                       213 South Ashley, Suite 400
                         Ann Arbor, MI 48104
 9
                         Krista A. Jackson
10                       Kotz Sangster Wysocki P.C.
                         40 Pearl Street, Northwest, Suite 400
11                       Grand Rapids, MI 49503

12                       William Young Kim
                         City of Flint
13                       1101 South Saginaw Street, Third Floor
                         Flint, MI 48502
14
                         Sheldon H. Klein
15                       Butzel Long, P.C.
                         Stoneridge West, 41000 Woodward Avenue
16                       Bloomfield Hills, MI 48304

17                       Richard S. Kuhl
                         Michigan Department of Attorney General
18                       ENRA Division, P.O. Box 30755
                         Lansing, MI 48909
19
                         Patrick J. Lanciotti
20                       Napoli Shkolnik Law PLLC
                         360 Lexington Avenue, 11th Floor
21                       New York, NY 10017

22                       Christopher J. Marker
                         O'Neill, Wallace & Doyle P.C.
23                       300 Saint Andrews Road, Suite 302
                         Saginaw, MI 48638
24

25
```

```
 1    APPEARANCES (Continued):

 2                      T. Santino Mateo
                        Perkins Law Group, PLLC
 3                      615 Griswold, Suite 400
                        Detroit, MI 48226
 4
                        Michael J. Pattwell
 5                      Clark Hill, PLC
                        212 East Cesar E. Chavez Avenue
 6                      Lansing, MI 48906

 7                      David M. Rogers
                        1 Constitution Wharf, Suite 310
 8                      Boston, Massachusetts 02129

 9                      Alexander S. Rusek
                        White Law PLLC
10                      2400 Science Parkway, Suite 201
                        Okemos, MI 48864
11
                        Susan Elizabeth Smith
12                      Goldberg Segalla LLP
                        One North Charles Street, Suite 2500
13                      Baltimore, MD 21201

14                      Gregory Stamatopoulos
                        Weitz & Luxenberg, P.C.
15                      719 Griswold, Suite 620
                        Detroit, MI 48226
16
                        Corey M. Stern
17                      Levy Konigsberg, LLP
                        800 Third Avenue, Suite 11th Floor
18                      New York, NY 10022

19                      Craig S. Thompson
                        Sullivan, Ward
20                      25800 Northwestern Highway, Suite 1000
                        Southfield, MI 48075
21
                        Jessica B. Weiner
22                      Cohen Milstein Sellers and Toll PLLC
                        1100 New York Avenue, NW, Suite 500
23                      Washington, DC 20005

24

25
```

```
 1   APPEARANCES (Continued):

 2                              Edwar A. Zeineh
                               Law Office of Edwar A. Zeineh, PLLC
 3                             2800 East Grand River Avenue, Suite B
                               Lansing, MI 48912
 4

 5   ALSO PRESENT:            John Counts, Editor, Flint Journal
                               Troy Alexander, 14321
 6                             Winter Kiefer

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   REPORTED BY:            Darlene K. May, CSR, RPR, CRR, RMR
                               231 W. Lafayette Boulevard
24                             Detroit, Michigan 48226
                               (313) 234-2605
25
```

1

## TABLE OF CONTENTS

2   PROCEEDINGS:                                          PAGE:

3       Appearances                                          6

4       Proceedings                                          9

5       Court Reporter's Certificate                        52

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              Wednesday, February 5, 2020

 2              2:30 p.m.

 3                        -   -   -

 4              THE COURT:  Counsel, good afternoon.

 5              I'm calling the Flint Water cases.  And we're on the

 6    record.  I've decided it seems to make sense to do the best we

 7    can to have a record of these conferences.  When you're not

 8    speaking, be sure to put us on mute.  Because right now I can

 9    hear papers rustling and that's very difficult for the court

10    reporter to hear through.

11              So why don't we have appearances for the record.  If

12    class plaintiffs have a representative, who would that be?

13              MR. STAMATOPOULOS:  Good afternoon, Your Honor.  This

14    is Gregory Stamatopoulos on behalf of class plaintiffs.

15              THE COURT:  Okay.

16              MS. WEINER:  This is Jessica Weiner at Cohen Milstein,

17    also on behalf of class plaintiffs.

18              THE COURT:  Great.  Anyone else for putative class

19    plaintiffs?

20              MR. BLAKELY:  Jason Blakely liaison counsel for the

21    State court class.

22              THE COURT:  Oh, great.  Okay.  How about individual

23    liaison counsel?

24              MR. STERN:  Good afternoon, Your Honor.  This is

25    Corey Stern as liaison counsel.
```

```
 1                THE COURT:  Great.  Thank you very much.

 2                Anyone else?

 3                MR. LANCIOTTI:  Good afternoon, Your Honor.  This is

 4    Patrick Lanciotti for individual plaintiffs.

 5                THE COURT:  Okay.

 6                MR. DAWSON:  Good afternoon, Your Honor.  This is

 7    Don Dawson on behalf of Brown and Rogers.

 8                THE COURT:  Okay.  Anyone else on the plaintiff's side

 9    of the V?

10                MR. CUKER:  I'm liaison counsel Mark Cuker for the

11    Chatman plaintiffs.

12                THE COURT:  Great.

13                Wait a minute.  My pen just gave out.  I'm going to

14    get another one.

15         (Pause.)

16                THE COURT:  Okay.  Any other plaintiff's counsel?

17         (No response.)

18                THE COURT:  Then let's hear from State of Michigan.

19                MR. KUHL:  Good afternoon, Your Honor.  Richard Kuhl

20    and Margaret Bettenhausen.

21                THE COURT:  Great.  Then, MDEQ?

22                MR. BARBIERI:  Chuck Barbieri for Defendant Prysby and

23    Defendant Cook.

24                THE COURT:  Great.  Thank you.

25                MR. PATWELL:  Mike Patwell on behalf of Dan Wyant and
```

```
 1   Brad Wurfel.  Good afternoon, Your Honor.

 2             THE COURT:  Good afternoon.

 3             MS. JACKSON:  Krista Jackson and Phil Grashoff on

 4   behalf of Stephen Busch.

 5             James Fajen on behalf of Adam Rosenthal.

 6             THE COURT:  Okay.  And then let's move to City of

 7   Flint.

 8             MR. KIM:  Yes, Your Honor.  William Kim for the City

 9   of Flint.

10             THE COURT:  Thank you, Mr. Kim.

11             MR. KLEIN:  Sheldon Klein for the City also.

12             THE COURT:  Okay.  Thank you.

13             MR. ZEINEH:  Edward Zeineh for Daugherty Johnson.

14             THE COURT:  Great.

15             MR. MARKER:  Chris Marker on behalf of Michael

16   Glasgow.

17             THE COURT:  Marker on behalf of Glasgow.  Great.

18             MR. RUSEK:  And good afternoon, Your Honor.  This is

19   Alexander Rusek for Mr. Croft.

20             THE COURT:  Good.  Thank you.

21             MR. MATEO:  Santino Mateo on behalf of Darnell Earley.

22             THE COURT:  Okay.  All right.  Shall we move to VNA.

23             MR. ROGERS:  Good afternoon, Your Honor.  David Rogers

24   for the VNA defendants.

25             THE COURT:  Okay.
```

1            MS. DEVINE:  Alaina Devine as well for the VNA

2    defendants, Your Honor.

3            THE COURT:  Okay.  And LAN?

4            MR. ERICKSON:  Good afternoon, Your Honor.  Philip

5    Erickson for the LAN defendants and I believe my colleague,

6    Travis Gamble, is joining as well.

7            MR. GAMBLE:  That's correct.

8            THE COURT:  Okay.  Let's see.  Is there anyone on for

9    McLaren?

10           MS. SMITH:  Susan Smith for McLaren.

11           THE COURT:  Okay.  Ms. Smith.  Thank you.

12           And anyone else on the phone?

13           MR. WISE:  Your Honor, Matt Wise on behalf of

14    Jeff Wright.

15           THE COURT:  Oh, Jeff Wright.  Okay.

16           MR. THOMPSON:  Craig Thompson for Rowe, Your Honor.

17           THE COURT:  Yes.

18           MR. COUNTS:  Good afternoon, Your Honor.  We're here

19    from the Flint Journal also on the phone call.

20           THE COURT:  Yes.  And is that Mr. Fonger?

21           MR. COUNTS:  Mr. Fonger couldn't make it.  My name is

22    John Counts.  I'm the editor here and we have another reporter,

23    Winter Kiefer, that's listening in.

24           THE COURT:  Okay.  I couldn't hear your last name.

25    You're breaking up.  John who?

1           MR. COUNTS:  John Counts, C-o-u-n-t-s.

2           THE COURT:  Oh, okay.  I hear it clearly now all of a

3    sudden.

4           And this is a matter of public record so you're very

5    welcome to listen in.

6           I ask that all of counsel and anyone else listening in

7    put us on mute when you're not speaking so we don't end up

8    hearing papers rustling and people typing and so on.  Or in my

9    case, a dog barking or something like that.

10          So what I'd like to do is just work our way through

11   the agenda.  And the first issue is VNA, McLaren and LAN

12   defendants request to have a third day of testimony from

13   Mr. Prysby.  And with respect to that, I received two one-page

14   summaries, which I appreciated and I have read.

15          And having read those, what I'd like to do with

16   Mr. Prysby is I understand from particularly reading the

17   submission from VNA, LAN and McLaren, the amount of information

18   that is being sought from Mr. Prysby.  And it does seem to me

19   to be an exceptional -- an exceptionally high volume of

20   material that he would potentially know about.  And it's

21   documented in here how many -- there's at least a dozen topics.

22   There are a number of times he's been referred to in other

23   depositions that need to be explored.

24          So in light of that -- and I do understand the

25   sensitivity that his lawyers have presented, Mr. Barbieri, that

1   his time is valuable.  His exposure is your responsibility to

2   protect and so on.  But I think in light of that, it is -- I'm

3   going to order -- or I don't just think, I am.

4          Ordering that there be six additional hours of

5   test- -- up to six additional hours of testimony divided among

6   VNA, LAN and McLaren.  And at the start of those -- at the

7   start of those six hours, those defendants would need to say on

8   the record how much time, if one is giving time to the other.

9   Just as we've set up in another depositions, you'll get that

10  clarified on the record.

11         And now, I've limited it to VNA, LAN and McLaren

12  because they're the ones requesting it.  But are there other

13  counsel on the phone who would wish to take -- have further

14  questions with Mr. Prysby, just so I know?

15         MR. STERN:  Your Honor, this is Corey Stern on behalf

16  of individual plaintiffs.  Depending on what the answers are

17  that are elicited from the questions of those defendants, I

18  could imagine a scenario where some followup would be

19  appropriate for individual plaintiffs.

20         MS. WEINER:  This is Jessica Weiner on behalf of the

21  class plaintiffs and we have the same position as Mr. Stern.

22         THE COURT:  Then, is there anyone else?

23         MR. KLEIN:  Your Honor, Sheldon Klein for the City.

24  And we're in the same position.  I would be lying if I told you

25  I had specific questions or the like for a dep that hasn't

1   taken place, but we certainly would like to reserve the right

2   if three days are allowed.

3          THE COURT:  Okay.  Then what I'll do is have five

4   hours divided among VNA, LAN and McLaren.  One hour followup

5   divided among plaintiffs' counsel and City of Flint.  And if

6   there is no followup in that one hour and there are remaining

7   questions from VNA, LAN and McLaren, you can ask them during

8   that remaining hour.

9          MR. BARBIERI:  Your Honor, just so it's clear -- this

10  is Mr. Barbieri on behalf of Defendant Prysby.  I, frankly,

11  think That depending on what has been ordered for anybody else

12  in this -- for example, in the case of in Glasgow, who has to

13  have more information than my client ever had, who only was in

14  the responsibility in a supervisory manner, that he is only

15  subjected to two and a half days.  And here my client in a very

16  supervisory role is being asked to submit to three days of

17  examination.  I just think that's beyond what is proportional

18  and what is reasonable for the set of circumstances here.

19          It seems to me that you ought to allow the two days to

20  go and then see if there is that additional time needed.  I

21  will, for a matter of fact, make him available, if that is

22  indeed the case.  But I believe you're really inviting, you

23  know, exceptional questioning that isn't warranted.

24          THE COURT:  And you raise a good point.  That if the

25  time is not needed, it certainly will not be used.  He does not

1    have to just sit there and answer questions about family

2    vacations and so on to just soak up time or anything of that

3    nature.  So I think you raise a very good point.  And what I

4    would ask -- modify my decision that at the conclusion of the

5    second day, all of the counsel who wish to have follow-up

6    questions for Mr. Prysby consult as to whether you really need

7    that time or not.  But it sure sounds like it from the

8    documentation that he has a great deal of material that has

9    been produced, a good number of references to him in other

10   depositions that need follow-up.  So if the third day is not

11   needed, it certainly won't be used.

12            MR. BARBIERI:  Thank you, Your Honor.

13            THE COURT:  You're welcome.

14            On the request with regard to Mr. Stephen Busch ...

15            MR. ERICKSON:  Yes, Your Honor.  This is Philip

16   Erickson for the LAN defendants.

17            THE COURT:  Yes.

18            MR. ERICKSON:  I'm in Union Station in Chicago, so if

19   you hear some background noise, that's why.

20            THE COURT:  Okay.

21            MR. ERICKSON:  So I'll make my remarks brief.

22            THE COURT:  Well, you don't have to make too many

23   remarks.  I read the transcripts that were submitted to me of

24   the deposition of Mr. Busch.  And I'm going to order three

25   additional hours divided by the parties as set forth in the

1    case management order.

2              MR. ERICKSON:  Thank you, Your Honor.  I'm going to

3    put my phone back on mute now.

4              THE COURT:  Okay.  Thank you.

5              I'd like to move now to the State defendants pending

6    motion for a protective order.

7              MR. GRASHOFF:  Your Honor, this is Phil Grashoff.

8              THE COURT:  Yes.

9              MR. GRASHOFF:  I'm a little troubled by that order.

10   At the most, according to following your CMO at the time

11   arguably -- and I'm not sure that we agree with it, there

12   was ...

13             How much time was left over for the defendants,

14   Krista?

15             MS. JACKSON:  32.5 minutes.

16             MR. GRASHOFF:  32.5 minutes.  That's all we're talking

17   about.  To allow three hours for additional testimony goes far

18   beyond the CMO that was in effect at the time this deposition

19   was taken.

20             THE COURT:  The case management order is subject to

21   exceptions if good cause has been shown.

22             And there's a request for this time.  And if it's not

23   needed, we'll do the same thing as with Mr. Prysby.  But I've

24   told everybody in the case that discovery is just that.  It's

25   an opportunity to explore potential liability and potential

1  defenses for both sides.  And to the extent some additional

2  time in a case is complicated and multi-faceted as this case,

3  it's simply going to happen from time to time.  And this is one

4  of those times where I'm convinced that up to three hours

5  should be divided among the parties as set forth in the case

6  management order.

7         So moving -- and I appreciate that --

8         MS. JACKSON:  Your Honor, if I can get some

9  clarification on that?

10        THE COURT:  Who's speaking?

11        MS. JACKSON:  This is Krista Jackson on behalf of

12  Stephen Busch.

13        THE COURT:  Okay.

14        MS. JACKSON:  There was some discrepancy at the

15  Mr. Busch's deposition as to how the 45 minutes allocated to

16  the MDEQ defendants should be calculated into that time.  You

17  know, the way we perceived it was that that would be taken off

18  the top of the seven hours and then the 16.6 percent would then

19  be divided and everyone would get that from the remaining

20  amount.  And also, I'm just curious, does that mean you're

21  dividing it between anyone who wants to use it or just parties

22  with their time?

23        THE COURT:  I think because I don't have the capacity

24  for math that you all -- that would be required.  And certainly

25  I could have that capacity if I spent the amount of time needed

1    to parse each and every E-mail that was submitted on this.   So

2    what I've decided to do is that that's not worth the time that

3    it would take, to be perfectly frank.   We need to make

4    decisions, move on, live with it.   And, as I've said, I'll make

5    some of these decisions will seem eschewed in one way and some

6    in another way and it will all balance out.   I promise you.

7           But we do need clarification and so my proposal and

8    order with respect to Mr. Busch was three hours divided as set

9    forth in the CMO as if they were fresh to everybody.   Because

10   I -- to follow along the excruciating detail of tenths of a

11   minute of questioning is going to have diminishing returns for

12   all of us at this point.

13          Does that answer your question?

14          MS. JACKSON:   It does with respect to the allocation

15   of the three hours.   It does not with respect to how the 45

16   minutes work.   And this applies to all depositions.   How that

17   45 minutes allocated to the MDEQ defendants is that, you know,

18   taken off the top of the seven hours that the defendants get

19   and then the allocation is made?

20          THE COURT:   Okay.   I understand.   Hold on just a

21   minute and I want to look back.

22      (Momentarily off the record.)

23          THE COURT:   Ms. Jackson, I've pulled up the case

24   management order.   Tell me what you propose to do to resolve

25   this question.

1      MS. JACKSON:  Well, you know, in Section II, you know,

2  the defendants are given 45 minutes.  It seems to me that that

3  should be deleted from the total seven hours, first.  So

4  there's six hours and 15 minutes remaining and then the groups

5  in subsection D would each get 16.6  percent of that six hours

6  and 15 minutes.

7      THE COURT:  Although it says, "When MDEQ defendants

8  wish to depose certain parties, the time allocation is to be

9  split so that MDEQ gets up to 45 minutes per deposition."

10      So I guess you have to first announce that you do wish

11  to depose someone and then you would -- I think you're right.

12  You would subtract that 45 minutes.

13      MR. ERICKSON:  Your Honor, this is Philip Erickson.

14  Can I jump in?

15      THE COURT:  Yes.

16      MR. ERICKSON:  I think the Court is right and

17  Ms. Jackson is right with respect to how the order has worked

18  in the past.

19      THE COURT:  Uh-huh.

20      MR. ERICKSON:  But it is confusing because we don't

21  know in advance sometimes if the MDEQ employees are going to

22  want to have questions.  And, in fact, they may not know until

23  they get to the deposition and they hear some of the other

24  questions.  I think it would be much less confusing if the

25  45 minutes allocated to the MDEQ defendants were in addition to

1  the time for the other defendants and in that way our time

2  would always be the same and we wouldn't have to be trying to

3  figure out every time how much time we have.  So that would be

4  my suggestion.

5           THE COURT:  Thank you.

6           MR. ERICKSON:  And I'll put my phone on mute again.

7           THE COURT:  Ms. Jackson, do you have any objection to

8  that because that does seem like a way that everybody can plan

9  ahead and know what they're doing?  You would still get your

10  45 minutes that are set forth in the case management order.

11           MS. JACKSON:  And defendants would be subject to an

12  additional 45 minutes of questioning?

13           THE COURT:  Yes.

14           MS. JACKSON:  Above the 16 hours?

15           THE COURT:  I guess so.

16           If MDEQ has those questions to ask, up to those 45

17  minutes.  So that's the way.  It just seems a clean approach to

18  it.

19           MS. JACKSON:  Yeah.  I don't have a preference one way

20  or the other, Your Honor.  I just wanted clarification.

21           THE COURT:  Fair enough.

22           MS. JACKSON:  Because there was that discrepancy

23  between my time calculations and Mr. Erickson's.

24           THE COURT:  Exactly.  So let's just from here on out

25  we'll add the 45 minutes.

1          MS. WEINER:  Your Honor, this is Jessica Weiner on

2    behalf of class plaintiffs.  In those situations, would

3    plaintiffs also have additional 45 minutes?

4          THE COURT:  No.

5          MS. WEINER:  The CMO was premised on having in certain

6    situations equal time between plaintiffs and defendants.

7          THE COURT:  No.  I mean, it's so close.  We just can't

8    keep going adding and adding all the time.  So I know I've just

9    added to Mr. Busch and Mr. Prysby, but I think there's -- if

10   there's not adequate time in a particular case and there's a

11   compelling reason to extend, let me know and we'll be back

12   together to sort it out.

13         So let's move to the third item, which is the State --

14         Mr. ERICKSON:  Your Honor, this is Phil Erickson

15   again.  Just briefly.  I just wanted to let you know that I'm

16   traveling and I'm going to sign off and Mr. Gamble remains on

17   the phone to address any issues that LAN may be interested in.

18         THE COURT:  Okay.  Thank you.  Safe travels.

19         MR. ERICKSON:  Thank you.

20         THE COURT:  So on the State defendant's pending motion

21   for protective order, this was filed by Mr. Gambill.  But we've

22   got Mr. Kuhl and Ms. Bettenhausen on the phone.

23         And here's the issue that I have.  And I think it's

24   pretty squarely set forth in the response brief that was filed

25   by Veolia North America, which is that I've already addressed

1   this issue.  And I'm not unsympathetic to your request that

2   Governor Snyder, Nick Lyon, Eden Wells and Andy Dillon not be

3   subjected to depositions in this case until the issue of

4   qualified immunity has been resolved by the Sixth Circuit and

5   potentially the United States Supreme Court.

6          The problem with that is the very same thing that I've

7   already addressed in their motion for a stay.  Which is that

8   this case is going forward with respect to the other plaintiffs

9   and defendants, or the other defendants in the case.  We just

10  had the Supreme Court deny certiorari for the city of Flint in

11  the other MDEQ appeal.  So we know for sure that we are, at

12  least in the *Gurton* case, and there are many cases like it.  So

13  Carthan as well with respect to the defendants that were

14  addressed in *Gurton*.

15         We know the case is proceeding.  We know we have trial

16  dates for bellwether plaintiffs.  And those trials simply

17  cannot take place without these individuals as witnesses.

18  Because they've been identified as nonparties at fault or -- I

19  mean, they're either going to be parties or nonparties, one or

20  the other.

21         And so even though I respect entirely the doctrine of

22  qualified immunity, I appreciate it, understand it and respect

23  it, we still can't stop the existing cases to wait until the

24  Carthan and Walters and Sirls appeals are heard at the Sixth

25  Circuit.

1        With respect to *Gurton*, there was then an en banc

2    request that took months and months from the Court of Appeals

3    and the cert request from the Supreme Court that took many,

4    many more months.

5        So I don't even think -- you know, I did mention that

6    we would have some oral argument on this, but I can't see what

7    more could be said than what was said in the Court's decision

8    denying the motion for stay.  It's the very same issue.

9        And I do understand that qualified immunity protects

10   someone from suit but those cases by and large are cases where

11   all of the defendants are -- potentially, have qualified

12   immunity.

13       And it's also not an absolute bar to discovery.  It's

14   unwarranted discovery that's barred.  And in this case, these

15   individuals are part of the story that is going to be told.

16   And so I simply can't see how this question differs from the

17   motion for stay.

18       But let me ask Mr. Kuhl or Ms. Bettenhausen.  Now that

19   you read Veolia's response, you didn't have an opportunity for

20   a reply brief on this, is there something further you want to

21   say on that subject matter that would distinguish the issue

22   that I've already decided in the motion to stay?

23       MR. KUHL:  Yes, Your Honor.  This is Richard Kuhl.

24   And I do think the issues are distinguishable.  Obviously, we

25   have our position on qualified immunity and whether or not the

1  discovery should be stayed.  But with respect to this Court's

2  order on the issue, the Court said, "Well, okay.  We'll treat

3  you as a nonparty and any necessary discovery can take place."

4          And I guess we're at a loss.  And Veolia has failed to

5  explain as to why they think discovery of the governor or chief

6  medical executive is necessary.  It has nothing to do with

7  Veolia's defenses.  It has nothing to do with the claims

8  against Veolia.  Veolia is being sued for professional

9  negligence.  The governor and chief medical executive, the

10  directors, had no involvement in Veolia's processes.  They

11  didn't offer any information to Veolia.  They didn't

12  participate in the review.  The claims are completely distinct.

13  They can't provide any evidence relevant to Veolia's --

14  the claims against Veolia.  They filed notices of a nonparty

15  fault, but frankly, those should be struck.

16          THE COURT:  Well, there was no motion to strike.

17          MR. KUHL:  Because right now the governor, all those

18  State defendants are parties so they're irrelevant.  So it

19  should not have been filed at this point.  And regardless,

20  they're inappropriate.  Even if they were nonparties, they're

21  inappropriate because Veolia has been sued for professional

22  negligence.  None of the State defendants have been sued for

23  professional negligence.

24          Andy Dillon wasn't even around at the time Veolia came

25  in and announced to the world that the water is safe, it meets

1    all the standards.

2            THE COURT:  Let me -- is Mr. --

3            MR. KUHL:  Eden Wells wasn't even an employee of the

4    State at that time.  All of these notices of nonparty fault

5    should be struck because they can't serve as a basis for the

6    discovery.  The only discovery they want is on the bodily

7    integrity issues.  This Court said already in its May 2019

8    order it wasn't going to allow discovery on those issues.

9            THE COURT:  Let me ask, is it Mr. Rogers or Ms. Devine

10   who will be speaking on behalf of Veolia?

11           MS. DEVINE:  Ms. Devine.

12           THE COURT:  Okay.  Ms. Devine, what is your response

13   to Mr. Kuhl with respect to Dillon and Wells?

14           MS. DEVINE:  Well, I would say, first of all, that

15   Nick Lyon and Eden Wells were criminally charged for their

16   involvement in the Flint Water Cases.  So to suggest that they

17   have no testimony or information that may bear on the events

18   that caused the Flint water crisis that are now being

19   attributed to the VNA is not a good point in my opinion.

20           THE COURT:  Well, that's not my question, though.  My

21   question is what's your response about VNA's professional

22   negligence, the counts for professional negligence and how

23   Dillon and Wells could be relevant to that if they were not

24   employed at the time of VNA's contract?

25           MS. DEVINE:  They're named as co-defendants in the

1  complaint against the VNA defendants.  I think we're entitled

2  to explore any information they may have.  I believe Ms. Wells

3  was still employed with the State through 2015 during VNA's

4  time frame and was involved in the legionella investigation in

5  2015.  There's allegations about the quality of the drinking

6  water source that Andy Dillon's involvement, both predating VNA

7  as treasurer was involved in the decisions about whether or not

8  Flint should go to the Flint River or should stay with DWSD,

9  decisions that are now also being placed blame on the VNA

10 defendants for those exact two water sources that Dillon

11 himself evaluated.

12         So I think there's obvious direct links in addition to

13 the nonparty at-fault allegations that we set forth that went

14 in our filings in this case.

15         THE COURT:  And have dates been set aside?

16         Ms. Devine, have you proposed dates for these

17 depositions yet?

18         MS. DEVINE:  We did, yes.

19         THE COURT:  When are those dates?

20         MS. DEVINE:  I believe --

21         THE COURT:  Just roughly.  I don't need to know the

22 exact date.  I just want to know roughly.

23         MS. DEVINE:  I think Dillon's may have already passed

24 but Snyder is in May, I believe.  I don't have it in front of

25 me.  I apologize.

1           THE COURT:  Because what occurs to me is that the

2    Sixth Circuit is holding oral argument in Carthan.  I

3    believe -- did somebody tell me March 17th?

4           MR. KUHL:  That's correct, Your Honor.

5           THE COURT:  That's Mr. Kuhl who said that.

6           MR. KUHL:  Yes.

7           THE COURT:  Why don't we adjourn this subject until

8    after that argument?  I'm going to listen to the argument and

9    get a little bit of a sense.  You can't always read the tea

10   leaves, but sometimes the tea leaves spell something very

11   clearly.

12          But the issue, I guess, you know, why this is sort of

13   a circular discussion I'm having with myself, is sooner or

14   later these individuals would be deposed in this case whether

15   or not they're parties, but it may go to the scope of the

16   depositions and so on.  So I'm going to hold this off until

17   after the March 17th oral argument and we'll put it on the very

18   next agenda after that.

19          So ...

20          Because the depositions aren't going to be between now

21   and March 17th.  And no one else had weighed in on this issue

22   so, apparently, they're not needed for class certification and

23   so on anyway.

24          MS. SMITH:  Your Honor, if I may?  This is Susan Smith

25   from McLaren.  Actually, we did join in the opposition for

1   protective order.

2          THE COURT:  Oh, okay.

3          MS. SMITH:  And it has not been the practice for

4   everyone to cross note the depositions.  I think there was a

5   discussion about avoiding the multitude of deposition notices.

6          THE COURT:  Exactly.

7          MS. SMITH:  For the record, we did join in the

8   opposition for the motion for protective order.  We filed an

9   opposition enjoinder on Monday and I respect your decision to

10  hold the -- until after the March 17th Sixth Circuit hearing.

11  But I want it to be noted that McLaren joins in the opposition.

12         THE COURT:  Thank you.

13         MS. SMITH:  And the role as well for the Snyder and

14  Lyon is a particular issue for McLaren and the legionella

15  issues.

16         THE COURT:  Yes.  I can see that it is.  So thank you

17  for reminding me of that.

18         MS. SMITH:  Thank you, Your Honor.

19         THE COURT:  So that's what we'll do with that issue

20  and whatever comes first after March 17 -- I'm not looking at

21  the calendar.  It might be the next status conference.

22         March 11th.  It's before.  So it will probably be one

23  of these phone calls.  I'm thinking on the 25th of March, but

24  we don't have it set aside right now.

25         So now we have the issue between the VNA defendants

1    and co-liaison counsel regarding scheduling of bellwether

2    depositions and home inspections as well as the recent

3    deposition of Plaintiff Verlesa, V-e-r-l-e-s-a, Berry.  And

4    I've read -- I think Mr. Stern's response got in a little bit

5    late, but I know there's a lot going on.  I've had a chance to

6    read both the VNA's submission as well as Mr. Stern.

7            Just going to the deposition of Ms. Berry.  The one

8    thing I didn't understand from your response, Mr. Stern, is

9    that you say you're attempting to contact Ms. Berry.  I had a

10   chance to read the transcript and to watch the video

11   deposition.  And the way I saw what happened with her is that

12   she just doesn't -- if I were her, I might have done the same

13   thank.  I hope I wouldn't.  I probably wouldn't.

14           But for somebody who is not steeped in the law,

15   questions can seem so ridiculous to them that they just don't

16   know why you're asking the -- you know, somebody may be asking

17   the same question in a couple of different ways.  I know why

18   those questions were asked.  I don't fault the person asking

19   her the questions, but I can see that for someone just

20   inexperienced who is simply a plaintiff in the case it would

21   seem like why are you on my case like this.

22           So can we get a date to reschedule the continuation of

23   her deposition?  Did you agree with that, Mr. Stern?

24           MR. STERN:  Your Honor, I agree with everything you

25   said and I would like to get a date to continue her deposition.

 1          Mr. Alex Latanision, L-a-t-a-n-i-s-i-o-n, for the

 2   court reporter, was the attorney from my office who was

 3   defending her deposition.  Without going into anything, you

 4   know, privileged, I know for certain that during breaks of the

 5   deposition I was on the phone with Mr. Latanision.  I was in

 6   Michigan myself for another matter related to this litigation

 7   and we tried to get her to explain, you know, what -- why these

 8   questions were being asked and how important the deposition was

 9   and it was just a very difficult -- it was just a very

10   difficult situation.  I respect the attorneys that were asking

11   the questions and, frankly, while in some instances in certain

12   depositions I found some questions to be, you know, less

13   appreciated than these, I didn't see anything wrong with the

14   questions that were being asked.  But sometimes there's

15   plaintiffs that just -- I don't know what their triggers are or

16   what she had for breakfast that day, but I do think she needs

17   to come back.  Unfortunately, since that time she has not

18   responded to any of us.

19          We have folks who work for us on the ground in Flint

20   who have been to her residence and have been unable to locate

21   her or talk to her.  I've personally tried to call her both

22   from my cell phone and my work phone as well as from like a

23   blocked number hoping she would answer.  Mr. Latanision who

24   prepped her the day before and spent time with her that morning

25   has reached out to her.

1          So that's a long way to say, yes, she should be

2    deposed and her deposition should continue.  I wish that I

3    could state on the record that I have a date or could get a

4    date from her.  But presently she has made herself unavailable.

5    I've considered -- just so the Court knows, I haven't stopped

6    trying to get her.  I've considered moving for the appointment

7    of someone else to stand in her shoes.  She was, obviously,

8    being deposed as the person bringing the lawsuit on behalf of

9    her child.  I don't think that it would be appropriate to take

10   action against the actual plaintiff in the case, which is a

11   minor, but if she can't be gotten a hold of and in other ways

12   refuses to continue the deposition that was rightfully

13   scheduled, I don't really know what my options are as counsel

14   other than finding someone else to represent the interest of

15   the child who might be able to sit in her stay.  But we're

16   working on it.

17          THE COURT:  Well, how about you report back in two

18   weeks as to whether you either are going to continue with

19   Ms. Berry or seek the appointment of somebody else for the

20   minor child.

21          MR. STERN:  No problem.

22          THE COURT:  And then -- I'm curious because I -- just

23   so I have more of a understanding of this.  The home

24   inspections that are being scheduled, what specifically is

25   being inspected?  Is it the indoor utilities that are in the

1    house or what?

2           MR. ROGERS:  Your Honor, Dave Rogers for VNA

3    defendants on that subject.  I wanted to -- I'll answer your

4    question, but I wanted to alert the Court that Mr. Stern and I

5    resolved that issue about 15 minutes before the call began and

6    we've -- he's agreed that of the 21 plaintiffs that he

7    represents that still live in the same residences that they did

8    in 2014 and '15, he'll provide dates for the inspections

9    pursuant to an agreed upon protocol that the parties have

10   worked out in between February 17 and March 14th, I believe.

11   So that issue is resolved.

12          THE COURT:  That's great.  Thank you.

13          MR. ROGERS:  Yes, thank you, Your Honor.  We just

14   worked that out, as I said, a little bit before the call.  The

15   intent is, Your Honor, we're going to do several things.  And

16   as I said, the protocol is hashed out between the parties and

17   agreed upon.  But it will include an examination of the service

18   lines going into the house, the soil outside the house for lead

19   content.  Dust samples will be taken in various locations

20   inside the house to determine if there is lead in the dust and

21   along with paint samples through a variety of different

22   sampling techniques.  So for all of those reasons there is the

23   potential -- you got some of the plaintiffs who have positive

24   blood level tests for lead, there's alternative exposure in the

25   existing premises besides the water.  That's the reason for it.

```
 1              THE COURT:  Okay.

 2              MR. ROGERS:  But there's no dispute about the

 3   protocol.  That is all worked out.

 4              THE COURT:  Good.  Thank you very much.  So there's

 5   nothing further on item four, then, Mr. Stern from your

 6   perspective?

 7              MR. STERN:  No, Your Honor.

 8              THE COURT:  Item five, this is getting way in the

 9   weeds for just a minute, as if we have not already been there.

10   The State of Michigan counsel provided with me a very helpful

11   guide, "State Defendants' Notice Regarding Outstanding Claims

12   in Individual Cases."

13              Hold on.  Let me put you on hold and make sure I have

14   got a grip on this.

15              Just a second.

16              MR. ROGERS:  Your Honor --

17              THE COURT:  Excuse me?  I started to put you on hold.

18   Who is this?

19              MR. ROGERS:  I'm sorry, Your Honor.  Dave Rogers.

20   Before we move on to that subject, we didn't resolve the issue

21   of the bellwether deposition schedule.

22              THE COURT:  Oh, I thought you were telling me that you

23   did get that also resolved in addition.

24              MR. ROGERS:  No.  Just the inspections part of it.

25              THE COURT:  I see.  Well, here's what reading this
```

1    caused me to think about is whether we've selected too many

2    cases in this round of bellwether selection.  Because there's

3    just going to be diminishing returns for everybody on this.

4    Because we're certainly not going to try all of those cases at

5    one time.  So we could potentially phase it further.  But go

6    ahead, Mr. Stern.

7          MR. STERN:  Thank you, Your Honor.  I would love to be

8    able to provide four bellwether plaintiffs per week to be

9    deposed.  It's physically impossible.  I mean, we have between

10   the bellwether depositions, the fact witnesses and defendants

11   sometimes five or six deposition per week.  In addition to

12   that, as the Court knows, there's ongoing mediation that some

13   of us are required to attend.

14          There's a case before Judge Parker involving the ETA

15   that defendants and the plaintiffs -- I believe the defendants

16   in that case are seeking to consolidate my EPA case with

17   their's.  Meaning, that they want to create a new CMO for those

18   cases where simultaneous to the CMO that Your Honor has entered

19   is another CMO in that case.

20          In addition to all of that, we're having our clients

21   evaluated as much as we can by experts in advance of the dates

22   that are required for us to provide expert reports and

23   identification of experts, which is in April.  I just don't

24   know how to do it.  And I'm not complaining.  I have taken on

25   the role.  But, literally, half of my firm is dedicated to this

1  process.  And if I could put two more people at depositions

2  every week, I would do it.  I don't know how it would prejudice

3  anybody to either continue to do two at a time or to limit the

4  number of bellwethers for this first round, as Your Honor

5  alluded to.  But everybody on the call knows that, you know,

6  I'm not one to try and shy away from the work, but it's just

7  too much.  It's generally too much.

8         And of the 60 bellwether cases that are presently

9  existing -- again, I'm not blaming anybody -- 53 of them are

10 mine.  And, perhaps, I'm the idiot for filing my cases and not

11 just storing them or, you know, putting them as a claim in the

12 census but having actually filed them.  But I'm also going to

13 be responsible for responding to the motions for summary

14 judgment when they come.  I'm going to be responsible for

15 responding to the *Daubert* motions to the extent they come when

16 the experts are identified.  I'm responsible for either

17 assigning or attending the depositions that are taking place of

18 defendants and witnesses and I just think that it's a lot to

19 ask to depose four bellwether deponents per week in this

20 litigation.

21         THE COURT:  I tend to think so as well.

22         And I'm not faulting VNA.  I mean, this is the

23 protocol that we set up.  Tell me what you think, Mr. Rogers,

24 about either changing the total number or do -- I just don't

25 know what else can be done besides shrinking the group.

1          MR. ROGERS:  Well, Your Honor, a couple of things.  As

2     you may recall --

3          THE COURT:  That's Mr. Rogers?  Make sure we know he

4     is speaking.

5          MR. ROGERS:  Yes, Your Honor.  Dave Rogers for VNA.

6     Sorry about that.

7          Yes.  As you will recall, it's been VNA's position

8     from the outset in terms of bellwethers that it's really

9     critical for us to know as much as we possibly can about each

10    of these plaintiffs in terms of the initial narrowing down or

11    winnowing to the pool of bellwethers to get them down to 60,

12    but certainly even more important now in going forward to

13    ultimately make the decision or have input into the decision as

14    to which of the cases are tried in October.

15         So with respect to the potential for reducing the

16    number from 60 down to some smaller number, you know, taking

17    the discovery and taking the depositions is very important to

18    allowing us to have the information to make informed judgments

19    about the candidates that we would want in the reduced pool.

20         THE COURT:  I understand that.

21         MR. ROGERS:  That is why we have been since -- when

22    the pool was established at the end of the October, we

23    immediately noticed all 60 depositions as of November 8th and

24    as of now, with respect to Mr. Stern's plaintiffs, you know,

25    we've only had five completed thus far including, as you

1  mentioned, Ms. Berry whose wasn't completed.

2          But in any event, I would be hesitant to agree or

3  consent to a plan to reduce them from 60 down to some smaller

4  number without consulting with my colleagues a little bit more

5  about it.  But I think our position would be that, you know, we

6  need the information and need the depositions in order to make

7  those decisions.  That's the way I'm thinking of it now, Your

8  Honor.

9          THE COURT:  That makes sense to me and I wasn't going

10 to just chop it in half right now or something like that.  What

11 I want to do is carefully consider shrinking it because in

12 light of the vast quantity of work that is going on, plaintiffs

13 and defendants in this case, it just -- we may have

14 overestimated being able to get that done and keep to a

15 reasonable trial schedule.

16          Which I'm sure does not even seem reasonable in some

17 ways to people who are not involved in the case.  Many people

18 think the trial should have been three years ago and we're

19 still working day in, day out, evenings and weekends to keep

20 things on track.

21          So I think what I'd like to do is set up a process --

22 a meet and confer about reducing the number 60.  And I could

23 ask that Deborah Greenspan get involved in this, if that seems

24 like it -- if Mr. Rogers, Mr. Stern, Mr. Shkolnik, who's -- I

25 know he's not on the own phone right now.  But we could set

1  that process up.  I think we need -- I just don't see how this

2  is going to get done under the best of circumstances.  I'm not

3  faulting anyone.  So how about we in the same next two weeks,

4  that two weeks from today, you report back to me.

5          But who should be involved in that?  Certainly

6  Mr. Stern and Mr. Shkolnik and, you, Mr. Rogers and Ms. Devine.

7          MR. GAMBILL:  This is Travis Gambill on behalf of the

8  LAN defendants.  And I think we would want to be involved as

9  well.

10         THE COURT:  Certainly.

11         MR. KLEIN:  Your Honor, Sheldon Klein.  This affects

12 all of us, I think, realistically.

13         THE COURT:  I think it does.

14         So let's do that.  Is there a time right now that can

15 be set aside for the meet and confer?

16         MR. STERN:  I can make myself available.  Anytime next

17 week Tuesday through Thursday.

18         This is Corey Stern.  I apologize to the court

19 reporter.

20         THE COURT:  Well, let's -- if you can circulate dates,

21 Mr. Stern.

22         MR. STERN:  Sure.  No problem.

23         THE COURT:  And times.  And then circulate it to,

24 essentially --

25         MR. STERN:  I'll send it to the group.

1          THE COURT:  The group.

2          MR. STERN:  Yeah.  I'll send it to the group.

3          THE COURT:  Thank you.  And my request is that serious

4    consideration be given by everyone involved to shrink the pool.

5    And that could be done randomly.  It could be done -- I mean,

6    we want to keep -- the depositions that have already taken

7    place, let's not throw those out.  Or it can be done in some

8    other method.  I just think we need to rethink that.

9          And I think that could help everybody get the work

10   done that needs to be done.

11         So today is the 5th.  We have a Flint -- we have a

12   telephone call on the 19th.  And so I would ask that -- I'll

13   put this on the agenda and that you report to me on it before

14   the call.

15         MR. STERN:  No problem.  Thank you.

16         THE COURT:  All right.  Mr. Rogers is that agreeable

17   to you?

18         MR. ROGERS:  It is.  And I would just ask Mr. Stern,

19   let's keep the depositions of plaintiffs that we have on the

20   schedule where they are so that we can get two more before then

21   and keep that schedule in place, okay?

22         MR. STERN:  We plan on it.  There's two taking place

23   right now.

24         THE COURT:  And I was going to say the same thing,

25   Mr. Rogers, exactly.  So I appreciate that.

1          MR. ROGERS:   Okay.   Thank you, Your Honor.

2          THE COURT:   Now, this docket management on outstanding

3    claims, one of the things that we spend our time on here at the

4    court in addition to deciding substantive motions is just

5    making sure nothing is slipping through the cracks and I have

6    to tell you it keeps us going.   So in the *Chapman* case

7    18-10679, that's the case where the State of Michigan was not

8    named as a party in the prior amended complaint, but was sued

9    under this Michigan NREPA count.

10          And Mr. Cuker, are you still on the line?

11          MR. CUKER:   Yes, I am, ma'am.

12          THE COURT:   I think the State of Michigan said there

13   was going to be a stipulation between you and the state of

14   Michigan that they understood they were defendants in that?

15          Mr. CUKER:   Yes.   We were just waiting.   I had

16   communicated with the counsel for the State and, yeah, they

17   were willing to accept that premise and then they would intend

18   to file a motion to dismiss the count, I believe, under the

19   Eleventh Amendment.   But I was waiting for some direction from

20   Your Honor before we filed the stipulation.   Your clerk told

21   me, basically, don't do it yet.   Wait until after the status

22   conference.   Because you wanted to do this in a uniform

23   fashion.

24          THE COURT:   Yes.   I had asked Mr. Stern to let you

25   know that I wanted that by Friday, January 24th.

 1          MR. CUKER:  Oh, no one told me that.  You wanted the

 2   stipulation by January 24th?

 3          THE COURT:  Yes.  I'm just trying to keep things on a

 4   number of.

 5          MR. CUKER:  That's fine.  It was a really bad

 6   miscommunication.  Because your clerk told me not to do

 7   anything until we heard again.

 8          THE COURT:  Oh, okay.

 9          MR. CUKER:  We can certainly do that.  I believe

10   counsel for the state, if I recall correctly, we have agreed

11   upon the language in the stipulation, have we not?

12          MR. KUHL:  This is Richard Kuhl.  That's correct.

13          THE COURT:  Okay.  Mr. Cuker, just out of curiosity,

14   do you think that Mr. Kuhl's motion for Eleventh Amendment

15   immunity would apply?

16          MR. CUKER:  Honestly, I haven't seen their brief.

17   I've only researched the issue very superficially.  And from

18   what I saw in research, no.  But, you know, they could

19   certainly educate me.

20          THE COURT:  Okay.

21          MR. CUKER:  It's a State law claim.  It's not a

22   federal law claim.

23          THE COURT:  No.  I understand that.

24          MR. CUKER:  If it does, it does.  I mean, I'm

25   certainly happy to read their brief.

1              THE COURT:  All right.

2              MR. CUKER:  And after having reviewed it, then I might

3      have a little time to file --

4              THE COURT:  Good.  You'll get that stipulation to me

5      by the close of business this Friday the 7th.

6              MR. CUKER:  Sure.  Sure.

7              THE COURT:  And on the Bacon case, 18-10348, the

8      operative complaint is docket entry number 14 asserts an

9      assault and battery claim against various defendants.  And I

10     think what we need to do is set a briefing schedule to begin

11     addressing that issue.  Because the assault and battery is not

12     in Walters and Sirls, Carthan, Gurton or Brown and Marble.

13             So before --

14             MR. KIM:  Your Honor, this is Bill Kim for the State.

15             THE COURT:  Yes.

16             MR. KIM:  In regards to that case and that claim, my

17     current understanding is that I discussed that with Bacon's

18     counsel last week.  They're reviewing a stipulation I proposed

19     we dismiss those claims against the City, against the three

20     defendant's.

21             And I believe I'm not sure if anybody from there is on

22     this call.  I notice their lead counsel is currently working

23     remotely from Florida.

24             THE COURT:  Mr. Kim?

25             MR. KIM:  So he's not been as responsive as he would

1   have been otherwise.

2           THE COURT:  Who is the lead counsel on Bacon?

3           MR. KIM:  Graves, James Graves.

4           THE COURT:  Graves.  Okay.  Well, if you could reach

5   out on behalf of the Court, Mr. Kim, and just let him know that

6   I need to -- well, first of all, we need get that stipulation.

7   How much time do you need?

8           MR. KIM:  In talking with Mr. Graves' associate we

9   needed to have --

10          THE COURT:  Mr. Kim, we can't -- something's -- can

11  you talk maybe a little softer.

12          MR. KIM:  Sorry.  My last conversation with

13  Mr. Graves' associate I told him about the February 10th

14  deadline that we were operating under at that time.  Given that

15  was when we were supposed to either have filed motions to

16  dismiss with any initial claims.

17          THE COURT:  Yes.

18          MR. KIM:  And my last -- I sent in the proposed stip

19  this Monday and I haven't heard back from him yet.  So ...

20          THE COURT:  All right.  Well, I suppose what will

21  happen is if we don't get a stipulation by the 10th, then I'll

22  get your motion.

23          MS. JACKSON:  Your Honor, this is Krista Jackson.  The

24  MDEQ defendants have a similar agreement with Mr. Graves'

25  office to have that assault and battery claim as well as the

1  CERCLA claim.

2         THE COURT:  Okay.  Well, I would just urge everybody

3  to impress upon Mr. Graves that we don't want to do work we

4  don't -- we have enough work to do on these cases without doing

5  work we don't need to do.  And I know that no one on this call

6  is -- I'm not saying that to any of you.

7         And then, is that the same with the Anderson case,

8  17-13890, that the negligence tortious interference with

9  contract and conspiracy claims are also going to be subject to

10  stipulations to dismiss?

11         I don't know who I'm even asking this of.

12         MS. JACKSON:  Your Honor, with respect to the MDEQ

13  defendants, that stipulation has already been submitted.

14         THE COURT:  And who is speaking?

15         MS. JACKSON:  This is Krista Jackson.

16         THE COURT:  Thank you.

17         MS. JACKSON:  I apologize.

18         THE COURT:  Oh, it has been submitted?

19         MS. JACKSON:  And entered by the Court.

20         THE COURT:  Oh, terrific.  I got behind myself, then.

21         MR. KIM:  Your Honor, this is William Kim again.  I

22  believe that the same sort of stipulation was already submitted

23  and entered by the Court with regard to Anderson.

24         THE COURT:  Is there anything else to note with regard

25  to Anderson, then?  Is it now conforming to the rest of the

1   cases as far as Mr. Stern or anybody who might be following?

2        (No response.)

3        MR. KUHL:  I'm sorry, Your Honor.  I wish I had more

4   information about it.

5        THE COURT:  Okay.  And I think that Mr. Grashoff has

6   informed the Court and the parties at the last conference that

7   there is still some CERCLA counts in some of Mr. Shkolnik's

8   cases that I don't believe he intends to pursue.

9        MR. STERN:  Patrick Lanciotti is on the phone, Your

10  Honor.  I'm sorry.  This is Corey Stern.

11       THE COURT:  Oh, okay.

12       MR. GRASHOFF:  Your Honor, Phil Grashoff with

13  Mr. Lanciotti on the phone.  His office through Mr.

14  Lanciotti -- and I put this on the record -- has agreed that

15  they're not pursuing the CERCLA claims in any of their cases

16  that are pending.  So they're gone.

17       THE COURT:  So how do you think I should deal with

18  that?

19       MR. GRASHOFF:  We can provide a stipulation between

20  Mr. Lanciotti and our office with the cases and file it with

21  the Court indicating that if it's agreeable to Mr. Lanciotti

22  that they're waiving or withdrawing those claims.

23       THE COURT:  Terrific.  That's what I was looking for.

24       MR. GRASHOFF:  Yes.  We'll do that.

25       Is that all right, Mr. Lanciotti?

1      MR. LANCIOTTI:  Yes.  That's fine.  Thank you.

2          THE COURT:  Okay.  Great.  Then I think that's all I

3  have on that sort of thing.  Now, we have this slightly --

4          MS. JACKSON:  Your Honor?

5          THE COURT:  Yes?

6          MS. JACKSON:  This is Krista Jackson.  Just to sort of

7  close the loop on that.  There is also a CERCLA claim in the

8  Alexander case that was filed by --

9          MR. ALEXANDER:  Herb Sanders.

10         MS. JACKSON:  I understand there are two Alexander

11 cases and, unfortunately, I don't have the ...

12         MR. ALEXANDER:  This is Troy Alexander, 13421.

13         MS. JACKSON:  We've also obtained an agreement with

14 Mr. Sanders to have that claim dismissed against the MDEQ

15 defendants.

16         THE COURT:  Okay.  Thank you.  I would ask any other

17 defendants sued under CERCLA with Mr. Herb Alexander in the

18 Troy Alexander case let us -- see if you can do the same.

19 Because I don't think he intends to bring that.

20         MR. ALEXANDER:  He is agreeing, Your Honor, to

21 withdraw it without prejudice and we're fine with that.

22         THE COURT:  Okay.

23         MR. STERN:  Yes.  Your Honor, just to close the loop.

24 This is Corey Stern.  During the pendency of this call I

25 received an E-mail from Mr. Sanders at 2:19 p.m. and he stated

 1  in the call, "I agree to dismiss without prejudice the CERCLA

 2  matter."

 3          So to the extent anybody is curious about the

 4  voracity of the statements made, that's all accurate according

 5  to Mr. Sanders.

 6          THE COURT:  Okay.  Just one second.

 7      (Momentarily off the record.)

 8          THE COURT:  Counsel, I have another case that was to

 9  start at 3:00 p.m. on the telephone, Petro --

10          MALE SPEAKER:  Yeah, Judge.  I'm here.

11          THE COURT:  Well, if you could just sit tight.

12          MALE SPEAKER:  I haven't heard Mr. Hughes come on yet

13  so I have no problem holding if you want to handle those other

14  cases.

15          THE COURT:  Okay.  Terrific.

16          So we have this last issue which is that one of the

17  tremendous benefits of having Judge Farah and his staff join me

18  on the bench at the last conference is as a result of that I

19  received copies of the protective orders that were entered in

20  the state court criminal cases by Judge Jennifer Manley,

21  M-a-n-l-e-y, for the 67th District Court.

22          And I have protective orders for Mr. Stephen Busch,

23  Mr. Prysby and Leann Shekter-Smith and Adam Rosenthal.  And

24  what they all say is that if they only last for the pendency of

25  this case.  It says, "The Court orders that during the pendency

1    of this case, this protective order and all discovery material,

2    regardless of which party produced it, will be protected."

3            And it has transcripts and all the things that we

4    thought might be helpful in this case so that you don't have to

5    engage in duplicative questioning.  So it appears that those

6    protective orders are no longer in effect in those cases

7    because they are no longer pending.

8            So I think we can pursue getting those transcripts.

9            MR. GRASHOFF:  Phil Grashoff.  Your Honor, Phil

10   Grashoff.

11           THE COURT:  Yes.

12           MR. GRASHOFF:  I had conversations with criminal

13   counsel for Mr. Busch and he doesn't share that view of the

14   protective order; that they're still in effect and have not

15   been lifted.  I believe the one regarding Mr. Rosenthal has

16   been lifted, but not the ones with Prysby, Busch or any of the

17   other individuals you have indicated.

18           THE COURT:  Why does counsel for Rosenthal think they

19   have not been lifted?

20           MR. GRASHOFF:  Because they have not been.  There's

21   been filing.  No document filed by anybody.  The State has a

22   continuing criminal investigation ongoing.  They have not filed

23   for lifting of those protective orders.

24           MR. BARBIERI:  Your Honor, this is Charles Barbieri

25   for Defendant Prysby.

1           THE COURT:  Yes.

2           MR. BARBIERI:  I have a similar understanding and I

3  feel ill-equipped to respond to your inquiry on this because

4  I'm not the criminal counsel on that case.

5           THE COURT:  Yeah.

6           MR. BARBIERI:  I suppose if you're seeking more than,

7  you know, the general statement here, I'd have to refer to him

8  for a response.  And, quite frankly, I assume it's more a

9  prerogative of what the solicitor general who is the criminal

10  prosecutor at this point in time believes as well.

11          MR. STERN:  Your Honor, this is Corey Stern.

12          THE COURT:  Yes.

13          MR. STERN:  I've read these orders and I agree.  I

14  appreciate that counsel may feel a certain way, but I think the

15  orders speak for themselves.  I'm not even certain that these

16  orders would have protected this information from the folks in

17  this litigation getting it when they were in place.  There's

18  plenty of language in here that would indicate to me that it's

19  possible for us to have gotten it during the time when the

20  protective order was actually in place.  And if Your Honor is

21  inclined to hear argument on it or have a brief, I think the

22  fastest way to do that might be to issue a show cause order as

23  to why these documents should not be provided to the parties in

24  this litigation.

25          THE COURT:  Okay.  I'll take that into consideration.

1          MR. RUSEK:  Your Honor, this is Alex Rusek.

2          THE COURT:  Yes.

3          MR. RUSEK:  I represent Mr. Croft on both his civil

4  and criminal matters.

5          THE COURT:  Okay.

6          MR. RUSEK:  We never entered into a protective order

7  and there was never a protective order in our criminal case in

8  the district court in Genesee County.  However, just another

9  issue to make the Court aware of.  It's my understanding that

10  many, if not most, of the documents and testimony obtained by

11  the prior criminal investigation led by Mr. Flood was through

12  the use of investigative subpoenas which will introduce other

13  issues of privilege and who can and cannot disclose certain

14  documents based under those investigative subpoena statutes.

15          THE COURT:  Okay.

16          MR. ZEINEH:  This is Edwar Zeineh on behalf of

17  Daugherty Johnson.  I would agree with Mr. Rusek.  And the

18  statute carries criminal consequences with them so we have to

19  be mindful of that.

20          THE COURT:  Certainly.  Well, it does seem that

21  briefing on the subject so that we know what is there, what

22  kinds of protections the material might have and whether these

23  protective orders are still in effect.  I certainly believe

24  you, those counsel who have said that they remain in effect

25  even though the cases were dismissed.

1          So I'll work out a method of whether it's a show cause

2    or just a request for briefing prior to the March 11th hearing.

3          MS. SMITH:  Your Honor?

4          THE COURT:  Yes?

5          MS. SMITH:  Your Honor, this is Susan Smith with a

6    related question for clarification.  It's been agreed that the

7    transcripts of the testimony obtained in the preliminary

8    examination proceeding is a matter of public record.  Following

9    our last status conference where we discussed the efforts to

10   streamline depositions by examining prior testimony that's

11   publicly available, so as to not repeat lines of questions, I

12   have attempted to -- I have reached out to counsel who

13   represents the countersued (ph) depositions and confirmed that

14   they did testify in this proceeding.

15          Several have shared transcripts and so far only one

16   party, the City of Flint, declined to share the transcripts

17   citing some deference to the court reporter.  It would be

18   helpful if Your Honor provided some clarification as to

19   protocol for that; sharing his prior testimonial transcripts so

20   that we can do that efficiently.

21          THE COURT:  I see.

22          MR. KIM:  Your Honor, this is William Kim for the

23   City.  I want to clarify one thing to Ms. Smith's statement.

24   The deference that I mentioned to her was, essentially, that

25   the City of Flint can't be passing out transcripts that, you

1  know, essentially that the court reporters are paying for.

2       THE COURT:  Right.

3       MR. KIM:  I mean, that they would normally charge for.

4  Especially, you know, for courts that we appear in regularly,

5  and it raises all sorts of issues that way as well.

6       THE COURT:  No.  Of course.  Of course.  And I

7  appreciate that, but that's a very different reason than

8  somebody would be prosecuted for sharing it.

9       So I'm much happier with that reason.

10       MR. KIM:  And you're right.  I did provide Ms. Smith

11  with the names of all the court reporters that I knew of that

12  had transcribed those things so she can contact them and make

13  her arrangements for ordering those transcripts.

14       MS. SMITH:  Correct.  The subject of prior testimony

15  was on the table so I felt it was appropriate to raise it and

16  because it is all in the spirit of trying to streamline the

17  depositions.  I was looking for the Court's guidance with

18  respect to this cost issue because it has been inconsistently

19  invoked by people who have those transcripts.

20       But if it's Your Honor's position that we should go

21  through the court reporter to obtain those transcripts, then

22  that's fine.  I'm not disputing that.  I just would like to

23  know how Your Honor would like us to proceed.

24       THE COURT:  Yes.  I think until you hear something

25  further, that's what you should do.  I think there are -- I

1    need to talk with my court reporter to get a better

2    understanding of -- you know, if there are 18 parties in a

3    case, just how many transcripts have to be ordered originally.

4    So for now let's assume you go through the court reporter and

5    order it in the traditional manner.

6              MS. SMITH:  Okay.

7              THE COURT:  And If I learn something else, I will

8    definitely let everybody know.

9              MS. SMITH:  Thank you.  If there is a production time

10   that gets in the way of the confirmed scheduled depositions, I

11   may reach out through the discovery process, the discovery

12   pursuit process.

13             THE COURT:  Okay.  Sure.

14             Well, I think that there was another issue that was

15   requested that did not get on this agenda because we're already

16   over the time allotted.  So we'll just keep going at our next

17   conference.  But, of course, we'll go through this same process

18   setting it up.

19             So that will conclude today's conference.  And thank

20   you all very much.

21        (At 3:21 p.m., matter concluded.)

22                              -   -   -

23

24

25

1    C E R T I F I C A T E

2

3        I, Darlene K. May, Official Court Reporter for the

4  United States District Court, Eastern District of Michigan, do

5  hereby certify that the foregoing is a true and correct

6  transcript, to the best of my ability, from the record of

7  proceedings in the above-entitled matter.  I further certify

8  that the transcript fees and format comply with those

9  prescribed by the Court and the Judicial Conference of the

10  United States.

11

12  February 13, 2020          /s/ Darlene K. May
    Date                       Darlene K. May, CSR, RPR, CRR, RMR
13                             Federal Official Court Reporter
                               Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25