```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3

 4   In Re:  FLINT WATER CASES       Case No.  16-10444

 5   _____/

 6

               IN CHAMBERS TELEPHONIC STATUS CONFERENCE
 7             BEFORE THE HONORABLE JUDITH E. LEVY
                  UNITED STATES DISTRICT JUDGE
 8        Detroit, Michigan - Wednesday, February 19, 2020

 9                    APPEARANCES IN ALPHABETICAL ORDER:

10                    James M. Campbell
                      Campbell, Campbell, Edwards & Conroy
11                    One Constitution Plaza, Suite 300
                      Boston, MA 02129-2025
12
                      Christopher B. Clare
13                    Clark Hill, PLC
                      601 Pennyslvania Avenue, N.W.,
14                    North Building, Suite 1000
                      Washington, DC 20004
15
                      Jordan W. Connors
16                    Susman Godfrey L.L.P.
                      1201 Third Avenue, Suite 3800
17                    Seattle, WA 98101

18                    Alaina Devine
                      Campbell Conroy & O'Neil PC
19                    1 Constitution Wharf, Suite 310
                      Boston, MA 02129
20
                      Danielle L. Dezbor
21                    Fieger, Fieger, Kenney & Harrington, PC
                      19390 West 10 Mile Road
22                    Southfield, MI 48075

23                    Kristin Michele Dupre
                      Campbell Conroy and O'Neil PC
24                    1 Constitution Wharf
                      Suite 310
25                    Boston, MA 02129
```

```
 1   APPEARANCES (Continued):

 2                   Philip A. Erickson
                     Plunkett & Cooney
 3                   325 East Grand River Avenue, Suite 250
                     East Lansing, MI 48823
 4
                     William H. Goodman
 5                   Goodman and Hurwitz, P.C.
                     1394 East Jefferson Avenue
 6                   Detroit, MI 48207

 7                   Larry R. Jensen
                     Hall Render Killian Heath & Lyman, PLLC
 8                   201 West Big Beaver Road, Suite 1200
                     Troy, MI 48084
 9
                     Sheldon H. Klein
10                   Butzel Long, P.C.
                     Stoneridge West, 41000 Woodward Avenue
11                   Bloomfield Hills, MI 48304

12                   Richard S. Kuhl
                     Michigan Department of Attorney General
13                   ENRA Division, P.O. Box 30755
                     Lansing, MI 48909
14
                     Patrick J. Lanciotti
15                   Napoli Shkolnik Law PLLC
                     360 Lexington Avenue, 11th Floor
16                   New York, NY 10017

17                   Emmy L. Levens
                     Cohen Milstein Sellers and Toll PLLC
18                   1100 New York Avenue, NW,
                     Suite 500, West Tower
19                   Washington, DC 20005

20                   T. Santino Mateo
                     Perkins Law Group, PLLC
21                   615 Griswold, Suite 400
                     Detroit, MI 48226
22
                     Bryan David McElvaine
23                   Campbell Campbell dwards & Conroy, P.C.
                     3000 Atrium Way,Suite 200
24                   Mt. Laurel, NJ 08054

25
```

```
 1   APPEARANCES (Continued):

 2                   Thaddeus E. Morgan
                     Fraser, Trebilcock
 3                   124 West Allegan Street, Suite 1000
                     Lansing, MI 48933
 4
                     Stephen E. Morrissey
 5                   Susman Godfrey L.L.P
                     1201 Third Avenue, Suite 3800
 6                   Seattle, WA 98101

 7                   Megan R. Mulder
                     Cline, Cline & Griffin, P.C.
 8                   1000 Mott Foundation Building
                     503 South Saginaw Street
 9                   Flint, MI 48502

10                   Todd Russell Perkins
                     Perkins Law Group, PLLC
11                   615 Griswold, Suite 400
                     Detroit, MI 48226
12
                     Katherine M. Peaslee
13                   Susman Godfrey L.L.P.
                     1201 Third Avenue
14                   Suite 3800
                     Seattle, WA 98101
15
                     David M. Rogers
16                   Campbell Conroy & O'Neil, PC
                     1 Constitution Wharf
17                   Suite 310
                     Boston, MA 02129
18
                     Alexander S. Rusek
19                   White Law PLLC
                     2400 Science Parkway, Suite 201
20                   Okemos, MI 48864

21                   Adam T. Scnatz
                     McAlpine, P.C.
22                   3201 University Drive Suite 200
                     Auburn Hills, Michigan 48326
23
                     Corey M. Stern
24                   Levy Konigsberg, LLP
                     800 Third Avenue, Suite 11th Floor
25                   New York, NY 10022
```

4

```
1    APPEARANCES (Contintued):

2                        Craig S. Thompson
                         Sullivan, Ward
3                        25800 Northwestern Highway, Suite 1000
                         Southfield, MI 48075
4
                         Edwar A. Zeineh
5                        Law Office of Edwar A. Zeineh, PLLC
                         2800 East Grand River Avenue, Suite B
6                        Lansing, MI 48912

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   REPORTED BY:        Darlene K. May, CSR, RPR, CRR, RMR
                         231 W. Lafayette Boulevard
23                       Detroit, Michigan 48226
                         (313) 234-2605
24

25
```

1                           TABLE OF CONTENTS

2    PROCEEDINGS:                                            PAGE:

3      Appearances                                              6

4      Proceedings                                             10

5      Court Reporter's Certificate                            57

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Wednesday, February 19, 2020

2          2:05 p.m.

3                          -- --- --

4          THE COURT:  Hello.  Good afternoon.  I'm calling In Re

5     Flint Water Cases.  And this is the date and time for a

6     telephonic status conference.  So why don't we have appearances

7     for the record.  We are on the record.  Beginning with

8     plaintiffs co-liaison, if you're on the call.

9          MR. STERN:  Good afternoon, Your Honor.  This is Corey

10    Stern as co-liaison counsel for individual plaintiffs.

11         THE COURT:  Thank you.

12         MR. LANCIOTTI:  Good afternoon, Your Honor.  This is

13    Patrick Lanciotti for the individual plaintiffs.

14         THE COURT:  Okay.

15         MR. SCHNATZ:  Good afternoon, Your Honor.  Adam

16    Schnatz stepping in for Jayson Blake, liaison counsel for the

17    Mason, state court, plaintiffs.

18         THE COURT:  Okay.  Thank you.  Could you spell your

19    last name?

20         MR. SCHNATZ:  Yes, Your Honor.  S, as in Sam.  C, as

21    in Charlie.  H, as in Harry.  N, as Nancy.  A, as in apple.  T,

22    as in Thomas.  Z, as in Zebra.

23         THE COURT:  Have you filed an appearance on the

24    docket?

25         MR. SCHNATZ:  I'm not a hundred percent certain that

1  myself has filed an appearance on the docket.  I know I've
2  received all the docket notices.
3         THE COURT:  Okay.  Could you check that.  And if you
4  have not filed an appearance, please do so so we know that your
5  presence is authorized.
6         MR. SCHNATZ:  Of course, Your Honor.
7         THE COURT:  I don't doubt it, but it just makes it a
8  little cleaner.
9         MR. SCHNATZ:  I understand that, Your Honor.  And
10  Mr. Blake apologizes.  He is attending a funeral this
11  afternoon.  So he asked me to step on.
12         THE COURT:  Absolutely.  And I'm sorry to hear that
13  he's had a loss.
14         MR. SCHNATZ:  I will send your condolences to him.
15         THE COURT:  Thank you.  Any other plaintiff's counsel?
16         MR. GOODMAN:  Yes, Your Honor.  Bill Goodman on behalf
17  of the Marble plaintiffs.
18         THE COURT:  Okay.
19         MR. CONNORS:  And good afternoon, Your Honor.  This is
20  Jordan Connors and Katherine Peaslee for the class plaintiffs.
21         THE COURT:  Thank you.
22         MS. LEVENS:  Emmy Levens for the class plaintiffs is
23  also on.
24         THE COURT:  All right.
25         MS. DEZBOR:  And, Your Honor, Danielle Dezbor

1    appearing on behalf of individual plaintiffs, Brown and Rogers.

2              THE COURT:  How do you spell your last name?

3              MS. DEZBOR:  Dezbor, D-e-z-b-o-r.

4              THE COURT:  Okay.  All right.  Well, let's move to

5    state of Michigan.

6              MR. KUHL:  Good afternoon, Your Honor.  Richard Kuhl

7    for the state defendants.

8              THE COURT:  Thank you.

9              MDEQ?

10             MR. MORGAN:  Good afternoon, Your Honor.  This is

11   Thaddeus Morgan for Liane Shekter Smith.

12             THE COURT:  Okay.  Good.

13             MR. CLARE:  Christopher Clare is also on for Bradley

14   Wurfel.

15             THE COURT:  Okay.  And City of Flint?

16             MR. KLEIN:  Sheldon Klein, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             MR. RUSEK:  Good afternoon, Your Honor.  Alexander

19   Rusek.

20             MR. ZEINEH:  Good afternoon, Your Honor.  Edward

21   Zeineh on behalf of Daugherty Johnson.

22             THE COURT:  Okay.

23             MR. MATEO:  Santino Mateo on behalf of Darnell Earley.

24             MR. PERKINS:  Todd Russell Perkins on behalf of

25   Darnell Earley.

```
 1              THE COURT:  Okay.  All right.  Let's move on to -- is
 2   Rowe on the call?
 3        (No response.)
 4              THE COURT:  Anyone for Rowe?
 5              LAN?
 6              MR. ERICKSON:  Yes, Your Honor Philip Erickson for
 7   LAN.
 8              THE COURT:  Thank you.  VNA defendants?
 9              MS. DEVINE:  Good afternoon, Your Honor, Alaina Devine
10   for the VNA defendants.
11              THE COURT:  All right.
12              MR. ROGERS:  And David Rogers, Your Honor.
13              THE COURT:  All right.  Thank you, Mr. Roger.
14              MR. CAMPBELL:  Your Honor, James Campbell is on as
15   well.
16              THE COURT:  All right.
17              MS. DUPRE:  Kristen Dupre.
18              MR. McELVAINE:  And Bryan McElvaine.
19              THE COURT:  Mr. McElvaine, can you spell your last
20   name.
21              MR. McELVAINE:  Certainly.  M-C Capital E-l-v, as in
22   Victor, A-i-n-e.
23              THE COURT:  And have you filed an appearance?
24              MR. McELVAINE:  I believe I have, but we'll double
25   check on that, Your Honor.
```

1      THE COURT:  Okay.  Thank you.

2      All right.  Who are we missing?

3      MR. THOMPSON:  Your Honor, Craig Thompson for Rowe.  I

4  think I was on mute when I responded earlier.  Sorry.

5      THE COURT:  Oh, good.  Okay.

6      MR. THOMPSON:  Thank you.

7      THE COURT:  Do we have anyone from McLaren?

8      I don't think there are issues directly related,

9  but ...

10      Or Hurley?

11      Okay.

12      MR. JENSEN:  This is Larry Jensen from Hurley.

13      THE COURT:  Hi, Mr. Jensen.

14      All right.  Anybody I missed?  Is anybody else on the

15  call who has not identified themselves whether you're appearing

16  as counsel, member of the press, anything like that?

17      MR. KILBY:  Kevin Kilby, Your Honor, on behalf of

18  Jeff Wright.

19      THE COURT:  Okay.

20      All right.  Well, let's get going.  The first issue is

21  the dispute over recently produced documents from VNA and the

22  privileged designate.  And because I extended the page limit to

23  three pages, I've had an opportunity to read all of those pages

24  and all of the attachments.  And the way that I look at this

25  issue, I sort of lived through it with you to a certain extent

1  and I understand the class plaintiffs' frustration and concern.

2          But as I read through things and watched it evolve, I

3  don't think that the Veolia's counsel's conduct in this issue

4  was in any way intentionally designed to withhold documents or

5  to sandbag plaintiffs or to make the process more difficult

6  than it needs to be.

7          That said, it has resulted in a good number of

8  documents that are recently -- recently released and some that

9  are -- continue to be identified as privileged.  And what I

10 will do, I don't know whether you have been able to come to

11 terms with this, I don't think that any of the documents that

12 are identified as privileged as a sanction need to be released

13 to plaintiffs.

14          But I do think that it may warrant reopening

15 depositions.  Now that these documents are available, it is

16 late in the game.  Some of the depositions have taken place and

17 I think it's very reasonable for class plaintiffs to be able to

18 have a moment to review those documents that have been released

19 and redepose, reopen the depositions of relevant individuals at

20 Veolia.  Now, that issue of reopening depositions, I think was

21 still under consideration between the parties.

22          Mr. Connor, has that been resolved to the plaintiff's

23 satisfaction?

24          MR. CONNOR:  No, Your Honor.  It has not.  I will say

25 we sent Veolia last week another set of documents.  Maybe last

1  Tuesday or Wednesday, documents that we believed were relevant

2  were late produced and were further grounds to re-open

3  depositions.  And they have not yet responded to that E-mail.

4  I will also say I believe this issue has expanded,

5  unfortunately, with the production on February 11th of this

6  latest privilege log.

7         We have been reviewing the log and it is clear to

8  class plaintiffs that there are many, I would say in the

9  thousands of documents, that have been identified on that log

10 that we believe are not privileged and should be released.  And

11 we are -- we have identified some of those and identified the

12 issues for Veolia.  And we've asked them to respond to our

13 E-mail on that by tomorrow, but that might result in additional

14 documents that will be released and will be relevant to those

15 depositions.  So to answer your question, no, it has not been

16 resolved and we believe the problem is expanding.

17        THE COURT:  Okay.  Now, I'm quite sensitive challenges

18 that, you know, either side has been overly broad in

19 designating something either privilege or work product.  So I

20 just ask that Veolia take very seriously what Mr. Connors is

21 saying about these objections.  I don't know what they are.

22 But take a look at that and then I recommend that these

23 depositions be reopened.  That you agree to that.  Because

24 there are additional documents through this arduous process

25 that was undertaken.  Plaintiffs say, of course, that it was

1   intentional and so on.  And I just don't think I need to rule

2   on -- I mean, I don't think it was intentional from what I can

3   tell, but I don't want to belabor or argue that.

4         I want the depositions to be reopened.  But they

5   should only be done after this recent -- recently produced

6   documents are reviewed and this issue of what is privileged is

7   resolved.

8         MS. DEVINE:  Your Honor, Alaina Devine for the VNA

9   defendants.  If I may?

10         THE COURT:  Yes.

11         MS. DEVINE:  I would ask if there's going to be a

12   reopening of depositions, again, subject to our conferring on

13   issues and reviewing the specific documents that they cited,

14   that any reopening be limited to those documents, not a general

15   reopening of depositions.

16         THE COURT:  Yes.

17         MS. DEVINE:  Without any specific purpose.

18         THE COURT:  Yes.  Absolutely.

19         MS. DEVINE:  Thank you.  And then with respect to the

20   challenges to privilege logs, those were identified in an

21   E-mail last night at 9:00 p.m. so we have not thoroughly gone

22   through the specific demands.  I believe there's 55 01 entries

23   on the privilege log.  So I'm happy to work through those with

24   class plaintiff's counsel and see if we can't resolve those

25   issues before moving forward after that.

1         THE COURT:  Okay.  So what kind of time frame?  Why

2  don't you let me know if this needs to be on the agenda in two

3  weeks, but I hope that it won't need to be.

4         Do we have a conference call in two weeks?  Let me

5  look.

6         No.  I'm out of town in meetings the first week of

7  March.  So the next time that we'll be together is on the

8  11th.  But I'm willing to rule on it at that time if it

9  hasn't -- maybe I can find another date.

10         There's no date for another call.  So I'll deal with

11  it on the 11th, if I need to, but I hope I won't need to.

12         MR. CONNORS:  Your Honor, this is Jordan Connors.

13  Just one more point on this issue, if I may?

14         THE COURT:  Yes.

15         MR. CONNORS:  We have asked -- so, obviously, these

16  depositions, they're a lot of parties and they have been very

17  expensive in costs and fees.  Our issue with the way this has

18  unfolded, whether intentional or not, Veolia did not provide

19  any notice that all of these documents were outstanding and

20  that there were withheld documents, hadn't been identified when

21  we went into the depositions and we in good faith took those

22  depositions believing we had the documents, we believe for that

23  reason that the costs and fees associated with reopening these

24  depositions should be borne by Veolia and ask for that as well.

25  I don't know if you have thoughts on that, we should address

1    that now or postpone it.

2            THE COURT:  I did think about that and at this point,

3    I'm not willing to order costs and fees.  I can revisit that at

4    a later date but at this point, I don't think that from what

5    I've read in the submissions that that's warranted.

6            I think -- you know, everybody's keeping track of

7    their time and their fees and expenses and it's my hope that at

8    the conclusion of the case all of that will be accounted for.

9    But I'm not willing to order costs and fees at this time.

10           So let's move on to the second issue where, again,

11   class plaintiffs are requesting that LAN defendants add more

12   document custodians to your searches and produce additional

13   documents.

14           And --

15           MR. ERICKSON:  Your Honor?

16           THE COURT:  Yes?

17           MR. ERICKSON:  This is Phil Erickson.  I didn't think

18   of these as two separate issues when I submitted my one pager

19   for both issues.  And I have a number of general comments that

20   I want to make.  I'm not trying to preempt the plaintiffs.  I

21   understand it's their motion and we'll let them go forward.

22   But I was going to suggest we address two and three together.

23           THE COURT:  Let's do that.

24           Let's do two and three together.  But what I wanted to

25   do was start with the Answers to the Interrogatories, that

1    issue first.  Interrogatories -- well, I want to start with

2    Interrogatory Nine where class plaintiffs request the

3    identification -- let me make sure I have this.

4         In Interrogatory Number 9:  "Of each and every

5    regulatory reprimand that LAN has received over the past 10

6    years."

7         And, Mr. Erickson, I understand that you're objecting

8    to that as overly broad and burdensome and not proportional to

9    the needs of the litigation.  That leads a lay observer, such

10   as myself, to believe that there are enormous number of

11   reprimands that LAN has received and that to put those into an

12   excel spreadsheet to identify would take hours and hours and

13   day and days.  If that's the case, it seems enormous --

14        MR. ERICKSON:  That's not the impression that we

15   intended to convey, Your Honor.

16        THE COURT:  Okay.

17        MR. ERICKSON:  I have no knowledge of any reprimands

18   from regulatory authorities to LAN.  Our point was that the

19   request is so broad, you know, it could be requesting reprimand

20   by the United Arab Emirate government on a project that LAN did

21   which involved road construction.

22        THE COURT:  Well, I wouldn't consider that a reprimand

23   if a client said, "I don't like the asphalt you used."  That's

24   not a reprimand.  That's just a dispute, a contract dispute.

25        But, Mr. Connors, when you say "reprimand," do you

1    mean from a regulatory agency?  You say "regulatory reprimand."

2          It doesn't want whether a client liked your work or

3    not.

4          MR. ERICKSON:  No.  I said a reprimand from the

5    agency, the regulatory agency.

6          THE COURT:  Oh, I see.

7          MR. ERICKSON:  It's just, it's extremely overbroad.

8    We have not received any reprimands from the DEQ or the EPA

9    regarding work done in Flint.  If we're going to be asked to

10   look at additional jurisdictions, I would suggest that that be

11   limited in some way and that it be -- the question be

12   refashioned to relate to water quality issues at water plants.

13         THE COURT:  Mr. Connors, what's your response to that?

14   Or whoever wishes to respond.

15         MR. SCHNATZ:  Sure this is Jordan Connors.  I'll

16   respond briefly and then refer to Ms. Peaslee who will be

17   addressing the balance of these issues.  Just to respond,

18   that one would think that an engineering firm like LAN and

19   Lelovich Lou (ph) Company would have some way of organizing and

20   keeping track of their regulatory reprimands.  It would be very

21   surprising if there wasn't such a way.  And it seems like there

22   hasn't been any investigation done at all to determine what

23   regulatory reprimand, if any, has been issued.

24         So based on Mr. Erickson's comments, it doesn't seem

25   like this is particularly burdensome to do and we don't think

1   it needs to be rewritten.  I think it would be very relevant to

2   know the various times and issues related to any regulatory

3   reprimand that these defendants have received.

4           THE COURT:  And, Mr. Connors, do you think it's

5   relevant to know if there was an asphalt problem somewhere?

6           MR. CONNORS:  No.  It sounds like not for that

7   specific issue.  Not knowing what the regulatory reprimands

8   are, it's hard for us to parse, you know, what might be

9   relevant and what might not be relevant.  But it seems like

10  regulatory reprimand is severe enough, and one would think that

11  there would be few enough.  That it would be no problem to

12  collect them.  I would think they'd be organized in some way

13  for a company like that and provide that information in

14  discovery earlier.

15          MR. ERICKSON:  Your Honor, Philip Erickson again.

16          THE COURT:  Okay.

17          MR. ERICKSON:  It sounds like the argument is that

18  they want to reprimand whether they're potentially relevant or

19  not.

20          THE COURT:  Well, no he's saying he doesn't know

21  whether it's relevant.  If it turns out that it's about asphalt

22  and he's able to look at the file and determine that when LAN

23  receives a reprimand, it shreds it, well, that would be

24  relevant, potentially.  I'm not suggesting you would ever do

25  that.

1           MR. CONNORS:  Thank you.

2           THE COURT:  Why don't we do this:  Why don't we go

3    back seven years for all regulatory reprimands and if the

4    answer is you're unaware of any, then you'll submit that.

5           And with respect to Flint, it's not limited to DEQ or

6    EPA.  It could be MDHHS.  It could be Michigan Department of

7    Civil Rights.  It could be any regula- -- well, I don't know if

8    that's a regulatory agency.

9           But please don't limit yourself.  Any regulatory

10   agency that has reprimanded LAN over the last seven years

11   should be provided.

12          MR. CONNOR:  Your Honor, could we --

13          THE COURT:  Who is this?

14          MR. CONNOR:  This is Jordan Connor.  We go back seven

15   years prior to 2014?

16          THE COURT:  Exactly.  That's what I meant.  Seven

17   years prior to 2014.

18          MR. ERICKSON:  That seems broader than the original

19   question, I think.

20          THE COURT:  Is that Mr. Erickson?

21          MR. ERICKSON:  Yes, Your Honor.  I'm sorry.

22          THE COURT:  That's okay.  And everybody who is not

23   talking should put us on mute just to avoid background noise.

24          If it is, that's how it's going to have to be.

25          MR. ERICKSON:  So we're clear, seven years prior to

1   2014 would mean from 19 -- no.

2           THE COURT:  2007.

3           MR. ERICKSON:  2008, wouldn't it?  Beginning January

4   1, 2008.

5           THE COURT:  Let's do that, January 1, 2008.

6           MR. ERICKSON:  Okay.

7           THE COURT:  Now, Interrogatory Four seeks

8   identification of, quote, any public statements made by LAN

9   relating to LAN's work performed for the city of Flint; and

10  five, relating to condition, risks, safety of Flint's water.

11          Five is any steps, actions or procedures undertaken by

12  LAN to warn, advise, inform or otherwise provide information to

13  the residents of Flint regarding lead and other contaminants.

14          So what I understand the issue here is combined in

15  that Mr. Erickson you responded by saying, "See all of the

16  documents we've produced."

17          Is that what I'm understanding?

18          MR. ERICKSON:  It is, Your Honor and let me address

19  the issues.  The first thing I want to do is point out some --

20  and I'm not suggesting that these were intentional errors in

21  the submission of the plaintiffs.  And I want to be circumspect

22  in how I say this, but there are a number of errors in the

23  assertions that were made by plaintiffs regarding these issues.

24          First of all, the first one I think is just somewhat

25  misleading for the Court.  The plaintiffs provided only an

1    excerpted copy of our Answers to Interrogatories.

2              THE COURT:  Okay.

3              MR. ERICKSON:  And we cross-referenced to

4    interrogatory answer number two in our Interrogatory answers.

5    And I hope the Court has the ability to look at Exhibit A to

6    our submission.

7              THE COURT:  I do.  I absolutely do.

8              MR. ERICKSON:  Okay.  By excerpting it the way it was

9    done and providing only the responses to Interrogatories Four,

10   Five and Nine, the plaintiffs omitted -- and, again, I'm not

11   saying it was intentional.  But they omitted our answer to

12   Interrogatory Number Two, which cross references -- it's cross

13   referenced in our response to number five.  And the questions

14   are closely related.  Interrogatory number two asks LAN to

15   describe -- identify and describe any warnings, advisories or

16   other information provided by LAN to the City regarding the

17   water supply including but not limited to communications

18   involving lead, TTHM and water supply.

19             Our written response there in Exhibit A is a

20   seven-page single spaced response providing very detailed and

21   voluminous information about LAN's interactions with the City

22   on these issues, and referencing documents that are, you know,

23   in the record in the deposition proceedings.

24             The submission by the plaintiffs would suggest that we

25   were not forthcoming in our Answers to Interrogatories.  And I

1    would submit to the Court, Your Honor, if you take our

2    responses as a whole, we were extraordinarily forthcoming and

3    provided detailed responses to their questions.

4            THE COURT:  Okay.

5            MR. ERICKSON:  So I think that's, you know,

6    significant and something that the Court needs to be aware of.

7            THE COURT:  Thank you.

8            MR. ERICKSON:  I would say that Interrogatory Number

9    Five is closely related.  Interrogatory Number Five asks, you

10   know, "Any and all steps, actions or procedures taken by LAN to

11   warn, advise, et cetera, regarding the same issues -- lead,

12   TTHM or other contaminants."

13           So the response to number two is directly germane.

14   And number four asks about public statements.  And, again, you

15   know, the information that we provided to the City that's in

16   Interrogatory Number Two may well have informed public

17   statement's that the City made.

18           THE COURT:  Okay.  Let's see what is wrong from the

19   class plaintiffs.  Why is the response to Interrogatory Number

20   Two not instructive enough for you to know what the responses

21   are?

22           MS. PEASLEE:  Your Honor, this is Katherine Peaslee

23   for class plaintiffs.  And certainly the class is not trying to

24   be misleading in any way by not including an answer.  From our

25   perspective, it's a little bit besides the point that LAN has

1    cross referenced to interrogatory two.  We understand that

2    provides some relevant information.  What we are concerned

3    about is the fact that LAN has also responded to those

4    Interrogatories Four and Five by saying notwithstanding their

5    other objections, all of the statements that were made or the

6    responding information is contained in their document

7    production.

8         So in that sense they are relying on their document

9    production as additionally providing a wholesome answer, but

10   has not told us where in that production by Bates number so

11   that we can locate what it is they believe is responsive to

12   those interrogatories in addition to the information they

13   provided in Interrogatory Two, which, just looking at it now,

14   doesn't identify any documents by Bates numbers either.

15        So our concern is not that LAN has not provided any

16   answer at all, but the fact is they are both relying on Rule

17   33(d), which allows a reference to your production.  So they're

18   not complying with that rule because they haven't specified the

19   documents they're relying on for four and five.

20        THE COURT:  Mr. Erickson, is there anything else

21   besides your answer to number two that would make your answers

22   to four and five full and complete?  And then we'll get to the

23   Bates number.  We'll get to that.

24        MR. ERICKSON:  Yes.  I want to talk about the case law

25   and the outside positions that were made.  I am hearing a

1  different voice, Your Honor, that seems to be bleeding over

2  from somewhere else.

3          THE COURT:  I am, too.

4          Mr. Goodman, do you have us on mute?

5          Make sure you do.  I thought it sounded like your

6  voice.

7          MR. ERICKSON:  Thank you, Your Honor.  Your Honor,

8  then when I received the plaintiff's.

9      (Background conversation.)

10          THE COURT:  Mr. Goodman?  Mr. Goodman?

11          MR. GOODMAN:  Yes, Your Honor.

12          THE COURT:  Could you put us on mute?  We're hearing

13  your voice.

14          MR. GOODMAN:  Oh, I'm sorry.  I apologize.

15          THE COURT:  That's okay.

16          MR. GOODMAN:  I will.

17          THE COURT:  So, Your Honor, when I received their

18  submission, I pulled up and reviewed the advisory committee

19  notes regarding the issue.  And I believed the advisory

20  committee notes favor LAN's position.

21          What we're saying is, you know, we know there are

22  communications in the project file that relate to lead, that

23  relate to TTHM.  And it would be just as burdensome on us to go

24  through the project file and provide Bates number as it would

25  for the plaintiffs.

1          (Telephone rings.)

2          MR. ERICKSON:  I'm sorry.  That's a call that I'm

3    diverting.

4          THE COURT:  Okay.  Thank you.

5          MR. ERICKSON:  So in the cases that were cited by the

6    plaintiffs, plaintiffs really are not persuasive authority.  On

7    the Burdicki case, the request was for a corporate history and

8    a list of directors and officers.  Of course, the defendant

9    should be able to provide that without having to review the

10   records.  And so it's distinguishable on that basis.

11          In the sulphuric acid antitrust litigation case, the

12   request was for communications meetings and negotiations with

13   sulphuric acid suppliers and the Court found that it was not

14   clear that the records even contained the information sought.

15   And that's not the case here.

16          THE COURT:  Okay.  Mr. Erickson, tell me again -- tell

17   me which advisory committee note.  I want to look it up.

18          MR. ERICKSON:  It's the advisory committee note for

19   33(d) and it was cited by the plaintiffs in their submission.

20          THE COURT:  Oh, I see.

21          MR. ERICKSON:  And what it says is that where the

22   burden of ascertaining the information is substantially

23   similar, similar for both parties, then it's proper to use the

24   business rule, you know, U.S. 33(d) to provide the business

25   records.  It would be just as onerous for us to go back and

1  review those records and provide, you know, line by line Bates

2  numbers as it would be for the plaintiffs.

3  And the files of LAN are only -- I mean, it's a lot of

4  documents.  But it's 7,800 documents.  So it's not a million

5  documents or, you know, 100,000 documents.

6  And those documents are produced in folders.  And I'm

7  told by our ECR/ESI coordinator that those folders should be

8  transparent to the recipient so they can look through the

9  folders heading the same way we would.  And if they didn't

10 receive the folders for any reason, we can give them an index

11 of the folders with the Bates number in each folder.

12 THE COURT:  Okay.  Hold on just a minute.  I want to

13 review the advisory committee note myself.  So just a minute,

14 I'm going to put you on hold.

15 MR. ERICKSON:  Thank you.

16    (Momentarily off the record.)

17 THE COURT:  So Ms. Peaslee, I've read what

18 Mr. Erickson was pointing me to.  What is your response to

19 that?  I mean, the burden has to be similar and so on.  So what

20 is your response?

21 MS. PEASLEE:  Sure, Your Honor.  And I don't know if

22 you have any other note from various years.  I don't know if

23 you were looking at the 1980 amendment, which is the one that

24 accompanied when Rule 33(d) was added as an option.  And that

25 note, as you may have seen --

1          THE COURT:  Well, I was looking at the '06 amendment

2     that talks about electronically stored information with the

3     advent of that.  I'm pretty sure that's what I was looking at.

4          MS. PEASLEE:  Okay.  The 1980 amendment notes that

5     directing the interrogating party to a map of business records

6     is an abuse of the option under Rule 33(d) and the amendment

7     was added precisely to avoid this scenario where you have an

8     interrogatory that is responded to by saying go look at our

9     documents.

10          That's not the intention of including an option to

11     have a respondent's documents.  They need to be specifically

12     identified, which is what the cases that we included in our

13     submission held and there are certainly others that we couldn't

14     fit into one page.  With respect to the burden, we disagree

15     that the burden is equal for plaintiff and for LAN.  These are

16     statements that LAN made, information produced by LAN.  Their

17     ability to pinpoint that is necessarily going to be greater

18     than cross plaintiffs.

19          So, you know, what LAN considers responsive is

20     ultimately instructive, but that's part of their response.  And

21     the point of the Interrogatories, if it came down to this

22     information so that we can use it and have that available in

23     the depositions that are going on and will be going on shortly

24     of LAN witnesses.

25          So our response would be that they have not

1  sufficiently answered Interrogatories Four and Five under

2  33(d).

3          MR. ERICKSON:  Your Honor, this is Philip Erickson

4  again.  I do have some counterveiling cases that I would offer

5  to the Court in addition to the advisory committee notes.  Two

6  of them are from federal circuits.  One is from the district

7  court in New York State.

8          THE COURT:  Well, here's my concern is that you've

9  said your answer to four and five is contained in part in your

10 answer to number two and in part in the documents.  Is that

11 correct?

12         MR. ERICKSON:  Yes, Your Honor.  There are -- you

13 know, there are a lot of documents that relate to TTHM that are

14 in the business records and it would be very difficult and

15 onerous to go through and list every TTHM document.  And, you

16 know, there are some documents where that is discussed.

17 Particularly, in 2015, in the fall of 2015.  LAN was asked at

18 that time to do a phosphate additive equipment design.  And so

19 there are, you know, a number of documents that relate to lead

20 as well.  And, you know, we have described our position in

21 detail in number two.

22         By the way, we have agreed in discussions with

23 Mr. Connors and Ms. Peaslee to supplement our response to

24 Interrogatory Number Two because there are some additional

25 things that we would want to include and point out but, you

1    know, to have us go back through all of our business records

2    and, you know, give them line item, you know, Bates number for

3    every document that relates to TTHM and every document that

4    relates to lead and every document that relates to any other

5    contamination issue, you know, there was an E-coli issue that

6    LAN wasn't really involved with addressing, but there are

7    documents that relate to it.  It's just an onerous thing.

8              THE COURT:  Well, I agree that --

9              MS. PEASLEE:  Your Honor?

10             THE COURT:  Yes.

11             MS. PEASLEE:  I'm sorry, if I may.  This is

12   Ms. Peaslee.  We're not asking for identification of any

13   documents that relates to TTHM or any document that relates to

14   lead.  We're asking, you know, for the specific documents

15   listed in these, which are public statements made by LAN

16   related to work performed for the city of Flint and the water

17   treatment systems.  And Interrogatory Five steps, actions or

18   procedures undertaken by LAN to warn, advise or inform.  Those

19   are concrete things that are easier for LAN to identify than

20   for us.  It's not just anything --

21             THE COURT:  Yes.  I understand.  And having looked at

22   both the 1980 advisory committee notes and the 2006, yeah,

23   there's a balancing of burdens.  And if it's equal, you know,

24   versus more burdensome for one party or the other, then the

25   other party should do it.  So what I think I need to do here is

1    just split these in half and ask LAN to identify for

2    Interrogatory Four and class plaintiffs to do it for Five and

3    then both sides have some burden and it's shared.

4        The reason I think it's reasonable for LAN to do some

5    of this work is that your answer is look at response to number

6    two and our documents.  And without more it's difficult to know

7    what they're looking for in your documents.

8        If it was -- a response to number two is a

9    comprehensive response to this, then they may be able to say,

10   okay, Croft did this on such and such a date and you've said

11   that here in response number two.  Let's go search for his

12   communication on that date.  But because it's an "and," it

13   seems like there's just no way that plaintiffs would

14   necessarily know where to look.  So why don't we do this:  Why

15   don't you, LAN -- well, it's not so much a why don't you.

16       What I'll order is for you to designate the Bates

17   numbers for number four.  Plaintiffs can then understand how

18   you're doing this, what you consider responsive and they can

19   undertake that work for number five.

20       MR. CONNORS:  Your Honor?

21       THE COURT:  Yes.

22       MR. CONNORS:  Your Honor, this is Jordan Connors for

23   plaintiff.  I just have to respond in brief to that idea

24   because we have to strenuously object to that.  Interrogatory

25   Five asks LAN to identify and describe steps or procedures that

1   it took to warn the people in Flint of these dangers.  It's

2   class plaintiffs' allegation and our position in the lawsuit

3   that they failed to do that.  We are asking this interrogatory

4   so we can get on the record what LAN believed it did to warn

5   the people of Flint what the dangers were.

6           I wouldn't know how to go about identifying what steps

7   it did.  Our position is what it did was woefully inadequate.

8   And we need LAN on the record saying this is what we did so

9   that we can ask the LAN witnesses, "Well, what about this one?

10  What about this one?  What about this one?"

11          So I don't know how this Interrogatory could be -- I

12  wouldn't know the first way to start to answer that question

13  for LAN.

14          THE COURT:  If you get to pick -- if I'm going to

15  split the baby, so to speak here, and you get to pick which one

16  you want them to do and which one you will have to undertake,

17  would you rather they answer number five more completely than

18  number four?

19          MR. CONNORS:  Well, I mean, our position is if we have

20  30 interrogatories, well, we can ask them to answer questions

21  30 times.  If we have to answer one, I'd certainly pick four,

22  but I don't believe that makes sense under the Rule.

23          THE COURT:  I know.  But I think there is some

24  balancing here that needs to be done in terms of -- so let's

25  start with getting an answer to number five, a designation by

1    Bates numbers from LAN to number five, and let's just keep open

2    number four.  Do your best.  If you can't do it, come back to

3    me.  If you can't find the documents, come back to me.

4           MR. CONNORS:  To be clear, are you asking us to

5    provide some written answer to our own interrogatory?

6           THE COURT:  No.

7           MR. CONNORS:  Or just not get an answer from LAN?

8           THE COURT:  Just not get an answer from LAN.  In the

9    sense that not the answer with the Bates numbers.  They're

10   saying that's overly burdensome, the advisory committee notes

11   indicate that if it's burdensome to both, equally burdensome to

12   both sides, the provider may not need to do the designation and

13   so on.

14          MR. ERICKSON:  Your Honor, I'm willing to accept your

15   decision.  I'm troubled that the plaintiffs warrant your

16   decision.  And it seems like that you found that the burden is

17   equal.  And the case law says when the burden is equal --

18          THE COURT:  No.  I have not found that it is equal,

19   Because you say look at Interrogatory Number Two and all of our

20   documents.  So they have no idea where to look in your

21   documents.  So I find that it's not only burdensome to

22   plaintiffs, it's almost impossible for plaintiffs.

23          So that's -- but I'm willing to relieve you of some of

24   the burden because it is still -- you're still claiming burden.

25   So I'm willing to relieve you of some of that.  And that will

1  be on number four, but not on number five.

2          MR. ERICKSON:  Okay.  Thank you.

3          THE COURT:  And plaintiffs will take a look at number

4  four, see if they can locate them and they'll come back to me,

5  if they can't.  Because then it's not just a burden, it's just

6  simply an impossibility.

7          MR. ERICKSON:  The plaintiffs are to look at number

8  five now, I think, you've said.

9          THE COURT:  Yes.  No, I think, Mr. Connors just told

10 me if he had to pick his poison, he wants you to answer number

11 five.  Is that what you wanted, Mr. Connors?

12         MR. CONNORS:  Actually, our position --

13         THE COURT:  You want both?

14         MR. CONNORS:  Right.  We'd like to note our objection

15 for the record to this order.  If we have to pick, there's

16 certainly no way we can possibly identify the response to

17 Interrogatory Five.  So we would identify that one.

18         THE COURT:  Okay.

19         MR. CONNORS:  I can preview for you that we are not

20 going to be able to identify everything in response to

21 Interrogatory Four, but we will undertake an examination of

22 that interrogatory and bring it back, if necessary.

23         THE COURT:  Okay.

24         Now, number four, on the bellwether.

25         I have ...

1     MR. ERICKSON:  Your Honor, we still have to talk about

2  the additional requests for additional custodial searches.

3     THE COURT:  We do.  We do.

4     MR. ERICKSON:  I would like to make some preliminary

5  remarks about this, if I could.

6     THE COURT:  Mr. Erickson, yes.

7     MR. ERICKSON:  Thank you.  I want to point out that --

8  I want the Court to be aware and cognizant of the timing here.

9  See, we initially made our Answers to Interrogatories and our

10 responses to the request for production on or about July 3rd of

11 last year.  And the plaintiffs made some concerns about

12 discovery responses in September.  At that time -- and they

13 petitioned the Court and filed a submission with the Court to

14 put it on for one of these hearings, one of these telephone

15 hearings.  And I need to be careful, what I say next about why

16 it didn't continue.  But let me just say LAN raised concerns

17 Based upon the fact that settlement discussions were ongoing.

18     THE COURT:  I remember.

19     MR. ERICKSON:  And I don't want to say more, but at

20 that time the plaintiffs said, "You know what, we're taking

21 this off the docket."  And they communicated to us that we

22 didn't have to do anything further regarding those discovery

23 responses at that time, and they said that they may change

24 their mind later.  I'm not saying that they said, you know, for

25 all time, but they said at that time you don't need to do these

1    discovery responses.

2              So I want to point out to the Court that there's been

3    a five-month delay and these issues are being raised with the

4    Court now on the eve of the LAN depositions.

5              We have depositions scheduled beginning next week on

6    February 25th and 26th of probably the key witness for LAN,

7    which is whose name is Warren Green.  It's actually John Warren

8    Green but he goes by Warren Green.  So we don't want to be in

9    the position later of having the argument made that we need to

10   reopen depositions and that somehow LAN should be responsible

11   to pay costs for needing to reopen depositions.

12             So the argument was made earlier on this call by

13   plaintiff's counsel that Veolia didn't give them proper notice.

14   I'm not saying that's true, but I'm saying that that is not the

15   case here with LAN and we do not want to be in the position and

16   don't think we should be in the position of having to pay any

17   costs if any depositions were to be reopened for any reason.

18             THE COURT:  Okay.  I remember the scenario you have

19   reminded me of.  And so I appreciate that.  There won't be any

20   costs associated with reopening if this ultimately -- if these

21   document searches ultimately need to be done.

22             Here's the thing:  I remember our conversation about

23   this issue and I am concerned that the people who have been

24   identified certainly sound like relevant custodians of

25   records -- the chief corrosion engineer, the quality assurance,

1    quality control team members for Flint Water, you know, et

2    cetera.  And --

3              MR. ERICKSON:  Your Honor, let me ...

4              THE COURT:  Yes?

5              MR. ERICKSON:  I'm sorry.  I don't mean to cut off the

6    Court.  I would like to put this in the context, if I could?

7              THE COURT:  Okay.

8              MR. ERICKSON:  Okay.  Thank you, Your Honor.  We have

9    provided documents from the project file.  I've listed them in

10   my submissions so I'm not going to repeat them.

11             THE COURT:  I've got that.  I have that.

12             MR. ERICKSON:  We produced 93,500 E-mails and what is

13   important for the Court to know that that includes E-mails from

14   these additional custodians.

15             THE COURT:  I know.  And here's the thing --

16             MR. ERICKSON:  I have numbers.  There are thousands of

17   them.

18             THE COURT:  I know.  Plaintiffs are arguing that not

19   everybody is as disciplined as some of the people on the call

20   and that they don't all save every E-mail to a project file.

21             MR. ERICKSON:  Your Honor, that's not what's been

22   produced.  Let me explain, please.

23             THE COURT:  Go ahead.

24             MR. ERICKSON:  Okay.  The project file is the first

25   item.  So if you look at my submission ...

1          I need to get to it myself.

2          Item one refers to 7,835 documents in the project

3   file.

4          THE COURT:  Yes.

5          MR. ERICKSON:  So that's a file that you do have to

6   affirmatively put documents into.

7          THE COURT:  Okay.

8          MR. ERICKSON:  But when we produced the 93,536

9   E-mails -- by the way, these numbers don't include attachments.

10  These are E-mails and they may have multiple attachments.

11         We identified who we thought were the key priority

12  custodians and we identified seven.  There's really only four.

13  The key people that worked on this project were Warren Green,

14  Jeff Hansen, Samir Matta, Jeremy Nakashima.  But we, you know,

15  tried to be conservative and so we added a few more names.

16  Eric Brown and Steve Loma (ph) had, you know, fairly tangential

17  involvement in the project.

18         Jim Redding isn't even with LAN.  He's an employee of

19  Rowe.  But we included E-mails to and from him because, you

20  know, he worked pretty close with Ms. Lantine (ph) on some

21  things.

22         But it includes E-mails to and from these chief

23  custodians.  So I went and I asked our vendor to do a search

24  for the five names that have been identified by plaintiffs and

25  there are 6,000 E-mails from these other people.

1        Charles Lawrence, there's 454.  Ozzie Garza, 1,184.

2   Jason Warren, 1,519.  Bob Card over 2,000 --2,084.  Sam Lepore,

3   1,389.

4        And not only that -- but I mentioned earlier that

5   there were inaccuracies in the plaintiff's submission.  I want

6   to point out a couple that are really important to these

7   issues.  They say in their submission that we have not provided

8   other documents regarding Charles Lawrence.  That is not true.

9   I called Charles Lawrence after I talked to Mr. Connors and

10  Ms. Peaslee.  She said they maintained a file relating to the

11  Flint Water plant.  She sent the file to me on a thumb drive.

12  There were 245 documents.  The documents didn't even all relate

13  to work that he had done for LAN.  He included work from a

14  predecessor engineering company when he did work in the early

15  2000s, and we produced all of those documents to the

16  plaintiffs.  So there are additional documents that have been

17  produced for Mr. Lawrence.

18       With regard to Ozzie Garza and Sam Lepore, the same.

19  We went and we -- and this was done, you know, initially in the

20  case.  We scanned documents from Mr. Warren and Mr. Lepore.

21  Those scanned documents have been produced in discovery.  So,

22  you know, we've produced a substantial amount of documents from

23  these additional custodians that the plaintiffs identify.

24       And now I want to talk about another issue that -- the

25  fact that if the documents that were cited to by the plaintiffs

1    in their submission as examples of information that LAN people
2    were doing quality control, they're not accurate citations.  I
3    have both of the documents here in front of me that they cited
4    to.  They don't say what the plaintiff said they say.  One of
5    the documents is an EPA regulation.  That doesn't have anything
6    to do with anything that LAN did.
7         The other document doesn't mention any of these
8    witnesses.  But let's assume for the sake of discussion that
9    these people were somehow involved in quality control.  The
10   Court needs to understand that the projects that LAN did -- the
11   plaintiffs really complained about something that LAN -- they
12   assert LAN should have done and didn't do, which is to somehow
13   design a corrosion control system even though the City said
14   they weren't going to do it because the DEQ didn't require it,
15   but they think that LAN should have done it anyway.
16        The things that LAN did design are -- and bear with
17   me.  There are six of them.
18            THE COURT:  Okay.
19            MR. ERICKSON:  A liquid oxygen and liquid nitrogen
20   storage system.  We designed a variety of electrical work and I
21   won't get into the boring details, but it has nothing to do
22   with water quality.  We designed a --
23            THE COURT:  Mr. Erickson, excuse me.  I hate to cut
24   you off, but I think we're a little further off the limited
25   subject that needs to be discussed.

1          Let me ask you, if I understand something that you

2   said earlier first, because I want to not lose track of what

3   you said earlier.  What you're telling me both in your written

4   response that I received, I guess yesterday and in today's

5   call, just now, you're saying that you've already produced

6   the -- you've already done the search for Ozzie Garza and for

7   Sam Lepore?

8          MR. ERICKSON:  Your Honor, I think you may have

9   misunderstood what I said.  If I can clarify?

10          THE COURT:  Please.

11          MR. ERICKSON:  So what I asked our vendor to do this

12   morning was to do a search of the 95,000 E-mails that have

13   already been produced.

14          THE COURT:  Oh, I see.  Okay.

15          MR. ERICKSON:  So that's very different than having to

16   go back to the company --

17          THE COURT:  Oh, I understand.

18          MR. ERICKSON:  -- and a new search of E-mails

19   regarding new custodians.  And I would like to point out that

20   the Eastern District of Michigan model rule says that, you

21   know, there's a presumptive number of custodians that could be

22   reasonable and they offer the number 10.

23          And I understand that that's not binding on the Court

24   and I'm not even sure that Your Honor has adopted the rule.

25   But I want to point out that picking seven custodians was not

1    at all unreasonable here.  And there's no showing by the

2    plaintiffs that searching, going back and reinventing the wheel

3    and doing additional search for these custodians when we've

4    already produced 6,000 E-mails from them is likely to be

5    productive.

6              The point that we made to the plaintiffs and I have

7    asked the Court to consider is that people doing work on the

8    site -- on the Flint water plant for LAN were going to be

9    communicating with, really, the core group of people which is

10   Warren Green, Jeff Hansen, Samir Matta and Jeremy Nakashima.

11   And, you know, it's not likely that there is very many E-mails

12   at all that have not already been produced.  And there's no

13   showing of a substantial need.  And it would be expensive to go

14   back and do that work now.

15             THE COURT:  Okay.  Is Ms. Peaslee responding or --

16             MR. CONNORS:  This is Jordan Connors for class

17   plaintiffs.  I'll respond.

18             So Mr. Erickson described a lot of the documents that

19   LAN has produced.

20             THE COURT:  Yes.

21             MR. CONNORS:  And they have produced some documents.

22   They have produced some E-mails.

23             THE COURT:  Yes.  Do you remember why we sort of

24   tabled this for awhile.  But in that time have you gotten any

25   evidence or inkling even that there are additional documents

1   that were not saved to the file and, therefore, inclusive of

2   the 93,536 E-mails and so on?  Do you have anything showing

3   that might be the case?

4           MR. CONNORS:  Absolutely.  And let me add, we've spoke

5   about this issue in -- I believe it was September ...

6           THE COURT:  I think so.

7           MR. CONNORS:  2019.  And on that call Your Honor

8   agreed with plaintiffs and said that you thought that these

9   would be relevant and they should be produced.

10          THE COURT:  I did.

11          MR. CONNORS:  And there was some additional

12  discussion.  So we had made that showing in September.  But let

13  me say this:  We're talking about E-mails from relevant people,

14  like the chief corrosion engineer.  I have to say I have never

15  seen anyone take the position that for a relevant custodian

16  they shouldn't produce their emails because they were probably

17  sent to a list of who defense counsel thinks are the five key

18  people.

19          I mean, every lawsuit I have ever been involved with

20  people send E-mails all over the place.  We get some of the key

21  documents from the Veolia witnesses because they E-mail

22  themselves various outlines, which happens in every case or

23  they E-mail somebody else in these large companies about some

24  other issue and they mention Flint.  And we have no

25  transparency at all as to what these five relevant custodians

1    were E-mailing about, talking about.  We have explained why

2    they are relevant and there hasn't been -- I mean, I just heard

3    Mr. Erickson say that he doesn't believe these people are who

4    we say they are in our submission.  They've never mentioned

5    that in a meet and confer over the last several months.  We're

6    quite sure we have evidence to support why these people are

7    relevant and we can submit that if it hasn't been submitted

8    already.

9            But it would be grossly unfair to not allow us E-mail

10   discovery, basic E-mail discovery for these five custodians we

11   have identified as being relevant.  We need this discovery and

12   we cannot rely on defense counsels suggestion that while they

13   probably just E-mailed the people who we think are the key

14   people.  That's not what happens in reality.

15           THE COURT:  Well, I want you to --

16           MR. ERICKSON:  Your Honor, can I respond?  Because

17   there has been another misleading statement just made that I

18   need to clarify and clear it up.

19           THE COURT:  What is that?

20           MR. ERICKSON:  Thank you, Your Honor.  The references

21   made to E-mails to and from the chief corrosion engineer.

22   Mr. Connors is referring to Charles Lawrence.  At the time --

23   first of all, Charles Lawrence first became involved in doing

24   work for LAN at the Flint Water treatment plant in the fall of

25   2014.  Six months or so after the plant had started

1    distributing water to the public.  And he first became involved

2    in connection with the TTHM issue.

3         He has no involvement in doing any design work for LAN

4    in connection with this project.  He now does have the title

5    he's referenced, but that title, he didn't have that title

6    until much later after the relevant period here.  He was an

7    independent contractor at a separate engineering company.  And,

8    again, he has no involvement on the project for LAN or for

9    anybody else in 2013 and most of 2014 up until LAN retained him

10   as an independent contractor in the fall of 2014 to work on the

11   TTHM work.  He did bench scale testing in connection with the

12   TTHM work.

13        THE COURT:  Okay.

14        MR. ERICKSON:  He also did --

15        THE COURT:  Okay. Mr. Erickson.  Mr. Erickson.  Hold

16   on just a minute.  I'm going to put you on hold for just a.

17      (Momentarily off the record.)

18        THE COURT:  Okay, counsel.  I think what we need to do

19   here is to address this in part today.  And what I would ask

20   class plaintiffs to do is identify two of these custodians so

21   that we run a trial before engaging in all of them and take a

22   look and see if there are relevant documents that have not

23   already been produced.  I know that's burdensome and time

24   consuming, but that's the nature of the beast here.

25        So, Mr. Connors, do you know which two you would start

1    with?

2            MR. CONNORS:  Yes.

3            THE COURT:  And I'm not saying it won't happen for the

4    others or it will.  I'm just saying let's see how this company

5    handles these documents and whether you've already got these or

6    not.

7            MR. CONNORS:  Yes.  If we can only pick two, we would

8    pick Charles Lawrence and Ozzie Garza.

9            THE COURT:  And Mr. Erickson, you knew potentially the

10   universe of the number that would need to be reviewed for

11   those?

12           MR. ERICKSON:  Well, Your Honor, again, what I did

13   this morning was I asked our consultant to review.

14           THE COURT:  Oh, that's right.

15           MR. ERICKSON:  The 95,000 that have been already

16   produced to see how many hits there were for each of the five.

17           THE COURT:  Okay.  Never mind.

18           MR. ERICKSON:  So I don't think we're going to find

19   very many others, if any others, but, you know, we can check.

20   Now that's going to cost money, but, you know, I guess, so be

21   it, that's the Court's ruling.

22           THE COURT:  Yes.  These are difficult decisions and

23   they just -- we'll start with these and report back to me by

24   the March 11th conference.

25           THE COURT:  Okay.

1          MR. ERICKSON:  Okay.   Your Honor, thank you.

2          MR. CONNORS:  Your Honor, may I raise one point

3     related to this?

4          THE COURT:  It's Connors.  Yes, go ahead.

5          MR. CONNORS:  I'm sorry.  This is Jordan Connors for

6     class plaintiffs.  I am concerned about Your Honor's statement

7     regarding reopening LAN depositions.  This issue, unlike the

8     Veolia issue, LAN has provided notice that, you know, these

9     documents are outstanding and they're missing and LAN has not

10    produced any privileged log at all in the case but at least

11    they have given us notice that they have not done so and they

12    said they would do that this week.

13         So for those reasons I am very concerned there were

14    going to be a large number of documents relevant to the

15    deposition of Warren Green, which is next week.  I think it

16    would be warranted to postpone that deposition by maybe two

17    week, maybe three weeks so we can get these materials in

18    advance, considering Your Honor's statement that there would be

19    no -- LAN wouldn't have to pay the cost, which I think would be

20    substantial of deposing Mr. Green a second time.

21         THE COURT:  Okay.  I'm entirely okay with postponing

22    that deposition.

23         MR. ERICKSON:  Your Honor, this is Philip Erickson.

24    We're not going to argue about postponing Mr. Green, if the

25    plaintiffs want to do that.  But I am going to say it may be

1  difficult to reschedule him in the time frame they would like

2  to do so.  But maybe we would have to bump some other

3  depositions back.  The reason I say that is because the general

4  counsel for the company intends to attend these depositions and

5  so we have offered times when he's available and there are six

6  other LAN depositions which have been scheduled.

7         THE COURT:  Okay.

8         MR. ERICKSON:  The last two being the second week --

9         THE COURT:  Okay.

10         MR. ERICKSON -- or the first full week of April.  So

11  what I'm saying is the new date, there would have to be --

12         THE COURT:  Mr. Erickson.  Mr. Erickson, I think that

13  there was an outstanding request to push some dates back a

14  little bit by the class plaintiffs that was addressed at the

15  last status conference that I may consider revisiting and so

16  on.  So I think it will all work out if we adjourn the 25th and

17  26th.  But I appreciate knowing that it's going to be very

18  difficult.  So knowing that, Mr. Connors, do you still want to

19  adjourn it knowing the availability of the general counsel and

20  so on?

21         MR. ERICKSON:  Jordan, can we work to just push.  We

22  would like -- we have prepped Warren Green already.  I would

23  like him to testify and not wait until mid-April.  I think,

24  maybe, we can just kind of reschedule the depositions just

25  generally using the dates that we already have and if you'll

1  work with me on that, I'll work with you on that.

2          MR. CONNORS:  I appreciate that, Bill, and I think we

3  can do that.

4          So with that good faith representation, I think we

5  can -- it sounds like we can depose Mr. Green at least by the

6  end of March, which would be fine.

7          THE COURT:  Okay.  All right.  I think we're up to the

8  proposal for the bellwether plaintiffs' pool being reduced.

9  And I have a VNA proposal and then I have a multi-color

10 proposal that I think Mr. Stern submitted.  And here's my

11 thought:  Which is that if I understand the differences ...

12          Okay.  What is the blue?  The blue is defendant's.

13 But is it defendant's material that plaintiff's disagree with

14 or what?  What is it?

15          MR. ROGERS:  Well, no, Judge.

16          THE COURT:  Who is ...

17          MR. ROGERS:  Dave Rogers.  Your Honor, if you're

18 looking at the colored one.

19          THE COURT:  Yes.

20          MR. ROGERS:  The green is the language that Mr. Stern

21 asked to be added.  And the only additional language.

22 Everything else in the red and blue that you're looking at is

23 agreed upon.  And if you look at our -- the VNA proposal to

24 you.

25          THE COURT:  Yes.

1    MR. ROGERS:  Which does not have colors on it, the

2    last sentence of paragraph two is what we suggest.  So that's

3    the only area of disagreement.  We say that if the parties do

4    not agree to fewer depositions than 30, unless all parties

5    agree, that the 30 could be completed.  That's the only

6    difference.

7    THE COURT:  Okay.  I get it.

8    And I'm okay with raising it with the Court if you

9    can't agree.  Because I want to see these cases move forward

10   and I hope that you'll be able to agree if that's something

11   that makes sense.  If not, your proposal seems excellent to me

12   that all of you have agreed to in general.  So I appreciate it

13   a great deal?  Ultimately, what it looks like is that there's

14   going to be 16 different plaintiffs ultimately chosen.  I think

15   that's an excellent, excellent number.  I hope that we can go

16   with that, but if it ends up 15 because somebody gets terribly

17   ill or something unexpected happens, I want to have that

18   possibility there.

19   Which I think that would happen, you would all agree.

20   But just in the event you can't, I want to keep going.  So I'll

21   include the language that the party may raise the issue with

22   the Court, but the depositions would continue until it can be

23   addressed by the Court.

24   MR. ROGERS:  Thank you, Your Honor.  It's Dave Rogers

25   again for Veolia.  The one sentence that I wanted to direct

1    your attention to is the fourth paragraph from the colored ones

2    or the one that we submitted and this is something that we're

3    asking the Court to do.  That the Court shall inform the

4    parties by May 29th about how many bellwether cases will be

5    tried.  And that's important to us so that we can then go on to

6    the next paragraph and do the selection process of those that

7    would be tried.

8              Are you okay with that, Your Honor?

9              THE COURT:  I'm okay with that.  Absolutely.

10             MR. ROGERS:  Thank you.

11             THE COURT:  Okay.  This is great.  So what I think I

12   will do with this is add it to an amended case management order

13   that will be entered after the next status conference so that

14   any additional changes to the case management order can be all

15   incorporated at one time.

16             And then before we get to the Shekter Smith issue, one

17   thing I forgot to put on the late issued agenda.  We had a

18   little snafu with technical support getting this agenda on the

19   docket.

20             Is the issue of the transcripts from the state Court

21   testimony.  And I think that what -- when I brought that up at

22   the last status conference, some counsel for MDEQ defendants

23   and others who had been criminally charged said that they

24   thought that the protective order lasts in perpetuity or

25   something to that effect.  So what would be helpful to me is

1    getting some briefing on that.  Because I think it would be

2    enormously helpful to our case to have access to that sworn

3    testimony.

4         And so what -- if our next status conference is the

5    11th of March, can I get briefing from anyone who has -- I

6    mean, it's hard.  Because the criminal defense counsel are not

7    necessarily the same as plaintiff's or defendant's counsel in

8    our case.

9         But is there anyone on the phone with an interest

10   in -- who contends that those documents cannot be shared who

11   would want to brief this subject?

12        MR. RUSEK:  Judge, this is Alex Rusek for Howard

13   Croft.  In Mr. Croft's criminal case there's not a protective

14   order that was ever entered, but there is the kind of

15   concurrent issue that all the documents, my understanding and

16   the interviews that were conducted, were done pursuant to

17   investigative subpoenas, which have their own confidentiality

18   issues.  So I can file something with the Court to give more

19   background on that issue and my interactions with the attorney

20   general (ph) who is now in charge of the criminal prosecutions

21   to maybe get some of insight.  And I'd also provide some

22   briefing to address the protective orders in the other cases

23   even though they don't apply to Mr. Croft.

24        THE COURT:  Okay.  That would be very helpful.  Can

25   you do that by February 28th?

1        MR. RUSEK:  I'm actually going to Florida tomorrow for

2   a couple of days.

3        THE COURT:  That's good.

4        MR. RUSEK:  If I can have a little bit of extra time.

5        THE COURT:  Absolutely.

6        MR. PERKINS:  Well, Your Honor, I can say this much,

7   it would be a --

8        THE COURT:  I don't know who's talking.  I think it's

9   Todd Russell Perkins.

10        MR. PERKINS:  This is Todd Perkins.

11        THE COURT:  Okay.

12        MR. PERKINS:  This is Todd Perkins and I have been in

13   a similar situation with Alex Rusek with his client because we

14   both had clients who were criminally charged although nothing

15   has been recharged, but I think we have a similar issue, too.

16        THE COURT:  Well, why don't any briefs be submitted by

17   Tuesday, March 3rd for anyone whose client -- who has entered

18   into one of those protective orders and believes that there's a

19   legal prohibition on obtaining those transcripts.

20        MR. RUSEK:  Thank you, Judge.  I appreciate the couple

21   of extra days.

22        THE COURT:  And then any responses can be filed by the

23   10th if anyone wishes to respond.  So I'll have a couple of

24   hours to look at that.

25        Okay.  And then the last issue here is on Liane

1    Shekter Smith.  And what I want to do there is -- what I think

2    we need to do right now is these need to be dismissed from

3    cases that were filed after October 19th of 2018.  And

4    Mr. Stern's notice that that was filed on January 8th of 2020,

5    there's nothing that I -- I don't have jurisdiction in the

6    Walters case, it's on appeal, to do anything one way or

7    another.

8            So at this point the issue that Mr. Stern raises in

9    here of the statute being tolled from minors was never briefed

10   in the Walters case.  But I understand -- I don't know if I

11   know why, but ...

12           So I think what I'll do for now is put this issue on

13   the back burner, but she will be dismissed from cases filed

14   after October 19th of 2018.

15           MR. MORGAN:  Your Honor, this is Thad Morgan on behalf

16   of Liane Shekter Smith.  As the Court recalls, after the

17   Walters and Sirls decision, the only cases my client was in

18   were Gurton and Carthan, which is class action.  And then the

19   Court extended that to Marble and Brown.

20           So I guess my concern is as a practical matter how to

21   figure out which cases were filed timely and is that onus on

22   the individual liaison counsel to apprise me of that.  Because

23   I, frankly, have not tracked which ones were filed timely and

24   which ones were not.

25           THE COURT:  Let me put you on hold and see whether

1    that's something we know.  So hold on just a minute.

2        (Momentarily off the record.)

3            THE COURT:  Mr. Morgan?

4            MR. MORGAN:  Yes.

5            THE COURT:  We do have a spreadsheet at this time

6    where we can pretty easily figure that out.

7            MR. GOODMAN:  Your Honor, this is Bill Goodman on

8    behalf of the Marble plaintiffs.  Just for the record that

9    lawsuit was filed in September 2017 regarding a debt which

10   occurred in March of 2015.

11           THE COURT:  Okay.  I think what I should do is I have

12   another hearing starting in six minutes that I need to be ready

13   for.  So I'm not sure about Marble either when Mr. Morgan said

14   that.  So I just need to review my notes and so on.  So let's

15   just put this issue sort of the only thing I know right now is

16   for sure is that in the cases filed after October 19th, 2018,

17   the statute would have run.  But let me sort this all out and

18   we'll provide some clarity on the issue either in the agenda

19   for the March 11th status conference or before.

20           MR. STERN:  Your Honor, this is Cory stern.  I'm

21   sorry.  I'm in an airport.  So if it's loud, I apologize.

22           THE COURT:  That's okay.

23           MR. STERN:  I imagine depending on what that list

24   would consist of that were filed after the dates by which the

25   Court had the ...

```
1           That there very well may be in those cases minors,
2   infants, children.  And so how -- I mean, I guess, we could
3   just file something.  You know, a motion for reconsideration
4   post-dismissal if those cases are, in fact, dismissed unless
5   there was a way to get that prior to this.
6           THE COURT:  I see.  That's a good point.
7           Okay.  This is what we're going to do.  We're going to
8   put this issue on hold until I can research it a little bit
9   more about the minors.
10          MR. MORGAN:  Thank you, Your Honor.
11          THE COURT:  I don't know who's talking.
12          MR. MORGAN:  I'm sorry.  Thad Morgan for Liane Shekter
13  Smith.
14          THE COURT:  Okay.
15          MR. MORGAN:  I just want to make sure that there's a
16  next friend for all those minors to the extent that there are
17  cases that Mr. Stern is relating to.
18          MR. STERN:  This is Cory Stern.  There are no what?
19          THE COURT:  Next friends.
20          MR. MORGAN:  Next friends.  You know, a minor cannot
21  proceed on his or her own.
22          MR. STERN:  Well, in federal court every case has
23  been --
24          THE COURT:  Is that Mr. Stern?
25          MR. STERN:  Yeah.  I'm sorry.  This is Corey Stern.
```

1    In federal court from its constitutional claims that

2    are being raised, I don't think there's a necessity for an

3    appointment of next of friend.  But I've not seen a motion to

4    dismiss any single case before Your Honor on the basis that the

5    minor, who there are thousands who have filed cases against

6    various defendants, which can be identified by their initials

7    until this very moment, no one has raised the issue that those

8    cases should be dismissed based on any issues associated with

9    next of friend.

10           MR. MORGAN:  For the reason being, yes, Your Honor I

11   thought my client was out of all individual cases other than

12   Gurton.

13           THE COURT:  We'll take a look at this next friend and

14   minor issue and take it up at a later date.  We've run out of

15   time.

16           Thank you all very much.

17       (At 3:25 p.m., matter concluded.)

18                          -   -   -

19

20

21

22

23

24

25

```
1                    C   E   R   T   I   F   I   C   A   T   E

2

3            I, Darlene K. May, Official Court Reporter for the

4    United States District Court, Eastern District of Michigan, do

5    hereby certify that the foregoing is a true and correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.  I further certify

8    that the transcript fees and format comply with those

9    prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   March 6, 2020              /s/ Darlene K. May
     Date                       Darlene K. May, CSR, RPR, CRR, RMR
13                              Federal Official Court Reporter
                                Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25
```