# EXHIBIT A

CAMPBELL CONROY & O'NEIL
PROFESSIONAL CORPORATION



1 CONSTITUTION WHARF
SUITE 310
BOSTON, MA 02129
TEL: (617) 241 3000
FAX: (617) 241 5115

ALAINA N. DEVINE
(617) 241-3037
adevine@campbell-trial-lawyers.com

July 25, 2019

The Department of the Attorney General, State of Michigan
C/o Heather Meingast
3030 W. Grand Blvd., Ste 10-200
Cadillac Place, 10th Floor
Detroit, MI 48202

RE:    *In re* **Flint Water Cases/Subpoena to Produce Documents**

Dear Sir or Madam:

Enclosed please find a Subpoena to Produce Documents issued by parties in the *In re* Flint Water Cases in the U.S. District Court for the Eastern District of Michigan (Civil Action No.: 5:16- cv-10444).

Within five business days of the service of this initial subpoena, counsel for the remaining parties to the litigation may serve supplemental subpoenas upon you, requesting additional categories of documents not included in this initial subpoena. You should produce the documents requested by all initial and supplemental subpoenas in a single contemporaneous production provided that the production required by the initial subpoena and each supplemental subpoena shall be made upon counsel for each such requesting party that will then be distributed amongst all issuing attorneys of each subpoena.

Should you have any questions about the enclosed subpoena or the procedure concerning supplemental subpoenas, please contact me at the phone number or email address in the header of this letter. Additionally, should there be a cost associated with your response to this initial subpoena or any supplemental subpoenas, please send all invoices to the attention of the requesting party.

Very truly yours,

Alaina N. Devine

AND/ces
Enclosures

CONNECTICUT  •  FLORIDA  •  MAINE  •  MASSACHUSETTS  •  NEW HAMPSHIRE  •  NEW JERSEY  •  PENNSYLVANIA  •  RHODE ISLAND

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| In re Flint Water Litigation ) | |
| _____ ) | |
| *Plaintiff* ) | Civil Action No.  5:16-cv-10444 |
| v. ) | |
| _____ ) | |
| Gov. Richard Snyder, et al. ) | |
| *Defendant* ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: The Department of the Attorney General, State of Michigan, 3030 W. Grand Blvd., Ste 10-200, Cadillac Place, 10th Floor, Detroit, MI 48202

[x]  *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Schedule A form.

| Place: Campbell Conroy & O'Neil, P.C.<br>1 Constitution Wharf, Suite 310<br>Boston, MA 02129 | Date and Time:  45 days from service |
|---|---|

[ ]  *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  July 25, 2019

*DAVID J. WEAVER, CLERK OF COURT*

OR

_____          /s/ Alaina N. Devine
*Signature of Clerk or Deputy Clerk*          _____
                                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ , who issues or requests this subpoena, are:

See attached list of issuing attorneys

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: by email to Heather Meingast,

the Division Chief of the Civil Litigation, Employment & Elections Division per July 24, 2019 email from AAG Richard

Kuhl authorizing acceptance of service _____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____
_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date:    7/25/2019

_____
Alaina Devine
*Server's signature*

_____
Attorney Alaina Devine
*Printed name and title*

_____
One Constitution Wharf Suite 310, Boston, MA 02129
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In Re* Flint Water Cases                                       No. 5:16-cv-10444

HON. JUDITH E. LEVY

MAG. MONA K. MAJZOUB

_____

**SCHEDULE A TO SUBPOENA TO PRODUCE DOCUMENTS**

**TO:**      Department of Attorney General, State of Michigan
            G. Mennen Williams Building
            525 W. Ottawa Street
            P.O. Box 30212
            Lansing, MI 48909

## **DEFINITIONS**

Unless otherwise indicated, the following terms shall, for the purpose of these Requests, be defined as follows:

1. The terms "AAG Jamison" and "AAG Jamison's Affidavit" refer to Assistant Attorney General Eric Jamison and the affidavit testimony he provided to the Court in *People of the State of Michigan v Nicolas Leonard Lyon* 7th Circuit Court Case No. 18-43638-FH.

2. The term "AAG Hammoud" refers to Fadwa Hammoud, the employee in the Department of Attorney General holding the title "Solicitor General" who reports directly to Deputy Attorney General Kelly Keenan and who is currently the person in charge of all matters related to the criminal investigation of the City of Flint drinking water circumstances.

3. The term "Seipenko" refers to Jeff Seipenko, currently the chief investigator of the Attorney General's Flint investigative team, and a member of that team since its inception.

4. The term "MDEQ" means the Michigan Department of Environmental Quality, its officers, employees, and any other person acting on its behalf.

5. The term "City" means the City of Flint, its officers, employees, and any other person acting on its behalf.

6. The term "MDHHS" means the Michigan Department of Health and Human Services, including any person acting on its behalf.

7. The term "Governor" means the State of Michigan Governor and the officers and employees who comprise the Governor's executive staff and the departments constituting the executive branch of the state government.

8.  The term "Department of Attorney General" as the recipient of this subpoena and as applied to these requests refers to both the criminal and the civil side of the Department, unless stated otherwise. To the extent that a response or objection is given on behalf of the criminal side or the civil side of the Department, the response shall so state.

## REQUESTS

1. All documents demonstrating or evidencing the factual support for Solicitor General Hammoud's statement to the press that the Department of Attorney General's "grave concern" about the investigation and pursuit of evidence by the Office of the Special Prosecutor was validated after a complete evaluation. *See*, *e.g.*, https://www.arabamericannews.com/2019/06/22/solicitor-general-fadwa-hammoud-to-meet-flint-residents-expand-investigation

2. Each written, oral, electronic, or video statement made by any employee of the criminal side of the Department of  Attorney General to a court, public official, or member of the print or broadcast media regarding  the facts and circumstances of the Department of  Attorney General's compliance with its obligations regarding discovery in the criminal and civil actions arising out of the Flint Water Crisis.

3. All documents evidencing or supporting the factual averments made by AAG Hammoud, or her assistants on the criminal side of the Department, in briefs, filings, and oral arguments in criminal proceedings arising out of the Flint Water Crisis that state and federal employees (including employees of the Office of the Governor and the Department of Attorney General) suppressed, hid, or spoliated evidence.

4. All documents constituting communications between and among the Office of the Special Counsel, the U. S. Department of Justice, opposing counsel in civil litigation, outside counsel   representing individual state officers and employees (not represented by the Department of Attorney General) regarding the preservation, collection, review, and production of documents and other data associated with Flint Water, including which individuals to search, and which sources of data to search (as referenced in AAG Jamison's Affidavit in ¶'s 5, 15, 16, and 27).

5. All documents that demonstrate or evidence the preservation, collection, review, and production of documents and other data associated with the Flint Water Investigation (as referenced in AAG Jamison's Affidavit in ¶'s 5, 15, 16, and 27).

6. All hard drives and back-up copies of forensic images of computers and phone extractions of MDEQ staff (as referenced in AAG Jamison's Affidavit in ¶ 29) pertaining or relating to the facts and circumstances of the Flint Water Crisis. To the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents.

7. The documents obtained (or taken) from Stephen Busch and Michael Prysby or from their offices (as referenced in AAG Jamison's Affidavit in ¶ 30). To

the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents..

8. All documents, materials, and physical evidence taken or collected by Mr. Seipenko from the boxes referenced in AAG Jamison's Affidavit in ¶ 31.

9. The two-inch stack of papers (referenced in AAG Jamison's Affidavit in ¶ 33). To the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents.

10. The 491 hard copy documents, including hand-written notes, and electronic documents with hand-written marginal notes (as referenced in AAG Jamison's Affidavit in ¶ 35). To the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents.

11. The mobile devices belonging or assigned to Joseph Haas (Case No. 1703-022; iPhone IMEI 354455067515369) and Carrie Monosmith (Case No. 1701-0048; iPhone IMEI 3520130711225006) (as referenced in AAG Jamison's Affidavit in ¶'s 39 and 40) pertaining or relating to the facts and circumstances of the Flint Water Crisis.

12. All documents demonstrating or evidencing the efforts to obtain the encryption codes for the Haas and Monosmith iPhones (as referenced in AAG Jamison's Affidavit in ¶'s 39 and 40).

13. All documents demonstrating or evidencing "phones/wiped" (as referenced in AAG Jamison's Affidavit in ¶ 41).

14. All data and images on the hard drives from MDEQ staff, including Steven Busch, Michael Prysby, Liane Shekter-Smith, among others (as referenced in AAG Jamison's Affidavit in ¶ 42) responsive to the original subpoenas but not turned over. To the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents.

15. All documents sought by the Office of Special Counsel that were responsive to the original subpoenas but not turner over (as referenced in AAG Jamison's Affidavit in ¶ 43 and public statements by Solicitor General Hammoud).

16. All documents that demonstrate or evidence the complete explanation of the entire document identification, review, and production process (as referenced in AAG Jamison's Affidavit in ¶ 17, including footnote 1)

17. All documents that constitute the complete explanation of the entire document identification, review, and production process as discussed on the

hundreds or thousands of emails and phone calls (as referenced in AAG Jamison's Affidavit in ¶ 17, including footnote 1).

18. All data, messages, or extraction from the 17 mobile devices and Governor Rick Snyder's mobile device (as referenced in AAG Jamison's Affidavit in ¶ 21) relating or pertaining to the facts and circumstances of the Flint Water Crisis. To the extent that responsive documents were produced in discovery in the Flint Water Cases, the Department of Attorney General may provide the corresponding bates numbers in lieu of reproducing those documents.

19. The computers and devices seized by the Office of the Special Counsel and all inventories of documents and images contained therein (as referenced in AAG Jamison's Affidavit in ¶ 23) pertaining or relating to the facts and circumstances of the Flint Water Crisis.

20. All documents including organizational charts constituting reporting authorities and hierarchies of the Department of Attorney General from 2004 to the present, including the structure of DAG and the Environment, Natural Resources, and Agricultural Division (or its predecessors).

21. All communications between Special Assistant Attorney General Todd Flood and any attorney representing the individual state and city employees charged with crimes in conjunction with their acts and omissions related to the Flint Water Crisis, including document review protocols, document reviews, clams

of privilege, and potential or executed agreements on resolution of criminal claims through entry of change of pleas (or equivalent) or cooperation in other prosecutions.

22. All inventories of documents gathered from state and city entities, offices, or employees in conjunction with discovery and production of documents and other evidence in criminal cases or potential criminal cases against state and city employees.

23. All inventories of documents actually produced by or on behalf of Special Prosecutor Flood in conjunction with discovery and production of documents and other evidence in criminal cases against state and city employees.

24. All inventories of documents gathered by the Department of Attorney General after discharging Special Prosecutor Flood from state and city entities, offices, or employees in conjunction with discovery and production of documents and other evidence in criminal cases against state and city employees.

25. All inventories of documents gathered and actually produced by the Department of Attorney General after discharging Special Prosecutor Flood from state and city entities, offices, or employees in conjunction with discovery and production of documents and other evidence in criminal cases against state and city employees.

26. All physical evidence, including cell phones and other recording devices, gathered by the Department of Attorney General after discharging Special Prosecutor Flood from state and city entities, offices, or employees in conjunction with discovery and production of documents and other evidence in criminal cases against state and city employees.

27. All data, images, and recordings derived or downloaded from physical evidence, including cell phones and other recording devices, gathered by the Department of Attorney General after discharging Special Prosecutor Flood from state and city entities, offices, or employees in conjunction with discovery and production of documents and other evidence in criminal cases against state and city employees.

28. All affidavits and written (or audio recorded) statements made by (or taken from) employees of the criminal side of the Department of Attorney General setting forth the facts and circumstances of the Department of Attorney General's compliance with its obligations regarding discovery in the criminal and civil actions arising out of the Flint Water Crisis.

29. All manuals, tutorials, CLE handouts and program materials, and instructions (of any type) published by the Department of Attorney General establishing the rules and practices  for compliance with its obligations regarding

discovery in criminal and civil actions to which it represents the State of Michigan or any of its officials.

30. The retention agreement and all communications with the Varnum law firm regarding its representation of MDHHS (as referenced in AAG Jamison's Affidavit in ¶ 9).

31. The retention agreement and all communications with the Dykema law firm regarding its representation of MDEQ (as referenced in AAG Jamison's Affidavit in ¶ 10).

32. The retention agreement and all communications with the Warner Norcross and Judd law firm regarding its representation of the Office of the Governor and/or its employees including Governor Rick Snyder (as referenced in AAG Jamison's Affidavit in ¶ 11).

33. The retention agreements and all communications with the criminal defense law firms regarding its representation of state officers and employees (as referenced in AAG Jamison's Affidavit in ¶ 12).

34. All documents marked as exhibits in criminal preliminary examination hearings or as investigative reports, affidavits or attachments to filings that were filed in court in any of the Attorney General's criminal proceedings on behalf of the People of the State of Michigan that concern Flint Water, including the following judicial proceedings:

a.  People of the State of Michigan v Stephen Benjamin Busch;

b.  People of the State of Michigan v. Michael Prysby;

c.  People of the State of Michigan v. Liane Shekter-Smith;

d.  People of the State of Michigan v. Patrick Cook;

e.  People of the State of Michigan v. Nancy Ann Peeler;

f.  People of the State of Michigan v. Robert Lawrence Scott;

g.  People of the State of Michigan v. Nicolas Lyon;

h.  People of the State of Michigan v. Michael Glasgow;

i.  People of the State of Michigan v. Darnell Early;

j.  People of the State of Michigan v. Gerald Ambrose;

k.  People of the State of Michigan v. Howard Croft;

l.  People of the State of Michigan v. Daugherty Johnson;

m. People of the State of Michigan v. Eden Wells;

n.  People of the State of Michigan v. Adeam Rosenthal; and

o.  People of the State of Michigan v. Corinne Miller.

## AFFIDAVIT OF ERIC JAMISON

I, Eric Jamison, being first duly sworn, state as follows:

1.     I am employed by the Department of Attorney General as an Assistant Attorney General.

2.     This affidavit is based on my personal knowledge.

3.     If sworn as a witness, I can testify competently as to the facts stated herein.

4.     I have worked as a civil defense attorney in what is referred to as the Flint Water Litigation (Flint Water) since April of 2016 and have been the lead eDiscovery counsel since July 2016. In my capacity as eDiscovery counsel, I have directed, or been involved in, the preservation, collection, review, and production of documents and other data associated with Flint Water matters.

5.     During the course of my involvement with Flint Water matters, I was also regularly involved in communications with the Office of Special Counsel (OSC), previously led by Todd Flood, the U.S. Department of Justice, opposing counsel in civil litigation against the state, outside counsel to various state agencies, and outside counsel representing individual state officers and employees not represented by our office, regarding the preservation, collection, review, and production of documents and other data associated with Flint Water.

6.     On January 5, 2016, former Governor Snyder declared a state of emergency for Genesee County due to the drinking water situation in Flint. On January 15, 2016, the Department of Attorney General announced it was investigating the Flint Water Crisis, and later established the OSC to conduct the investigation.

7.     A conflict wall was established between OSC and the civil attorneys in the Department of Attorney General that represented state agencies. Subsequently, the Department of Justice, the U.S. House Committee on Oversight and Government Reform, and the Genesee County Prosecutor's Office also initiated investigations. Numerous civil suits were filed against various state agencies. Agencies were inundated with Freedom of Information Act requests seeking records related to Flint Water.

8.     After the OSC investigation started, it began issuing investigative subpoenas to state agencies and agency staff. Due to the unique circumstances presented by Flint Water, where there were simultaneous criminal and civil proceedings, and in light of longstanding policy that Assistant Attorneys General

1

would not represent state employees in proceedings related to criminal matters; DHHS, DEQ, Treasury, and the former Executive Office of the Governor, sought outside counsel to represent them in matters related to the criminal investigations.

9.      DHHS retained the Varnum law firm to represent them with respect to the criminal investigations.  Ron DeWaard was the lead attorney at Varnum in the representation of DHHS.

10.     MDEQ and Treasury retained the Dykema law firm to represent them with respect to the criminal investigations. Gary Gordon was the lead attorney at Dykema in the representation of MDEQ and Treasury.

11.     The former Governor's Office retained Warner Norcross and Judd to represent them with respect to the criminal investigations.  Charles Ash and Brian Lennon were the lead attorneys at Warner Norcross and Judd in the representation of the former Governor's Office.

12.     Adding an additional layer of complexity, numerous state employees being defended by our office in civil litigation were ultimately charged criminally by OSC.  The relevant state agencies retained criminal counsel for state employees that were charged criminally in the Flint Water matters.  The criminal defense counsel for the individual criminal defendants are separate and distinct from the outside counsel to the agency.  For example: Chip Chamberlain represents Nick Lyon, the former director of DHHS in the criminal proceedings (*People of the State of Michigan v Nicolas Leonard Lyon,* Case No: 18-43638-FH) but separate counsel, Ron DeWaard and the Varnum law firm, represent DHHS.

13.     The OSC issued broad investigative subpoenas to the former Governor, DHHS, and DEQ in June 2016.  (Ex A, Governor Subpoena; Ex B, DHHS Subpoena; Ex C, DEQ Subpoena.)

14.     Outside counsel for each of the agencies – Varnum, Dykema, and Warner Norcross and Judd – filed objections to the investigative subpoenas.  (Ex D, Governor's Objections to the Subpoena; Ex E, DHHS Objections to the Subpoena; Ex F, DEQ Objections to the Subpoena.)  One of the primary objections was that the subpoenas were overly broad and would have cost hundreds of thousands to millions of dollars to respond to, and it would have taken years to locate and produce all the possible information that was sought in the subpoenas.

15.     After the investigative subpoenas were served and objections were made, outside counsel for the former Governor's Office took the lead in negotiating with OSC regarding the response to the investigative subpoena.  Based upon information and belief, the agreement between OSC and outside counsel was that whatever process the former Governor's Office agreed to use to respond to the

2

investigative subpoena, DHHS and DEQ would follow a similar process to respond to their respective subpoenas.

16.     I participated in numerous meetings, phone conferences, and email exchanges with OSC and outside counsel during this period of negotiation. Our office did not take a position in these negotiations. We were involved to identify the potential sources of data, explain the process for collecting documents or data, and to advise what costs would be incurred by the state for the various approaches being discussed to respond to the subpoenas. Ultimately, OSC filed a motion to compel a response from the former Governor. An agreement was reached between OSC and the former Governor's outside counsel regarding how the subpoena would be responded to.

17.     Based upon information and belief, in general terms, the process that was agreed upon was that potentially relevant individuals were identified by each agency, then OSC had the opportunity to expand the list as needed; potential sources of data were identified (i.e. email accounts, network drives), then OSC had the opportunity to expand the sources of data searched. (Ex G, DeWaard email to OSC, June 7, 2017.)[1]

18.     Due to the breadth of the subpoenas and the vast amount of electronic data held by state agencies, the documents and data collected included millions of documents. After the document collection was completed, analytical tools were used to reduce the volume of data and identify documents that were sought in the subpoena. (e.g., de-duplication, email threading, and predictive coding.) The analytical tools used are widely accepted and standard approaches in matters involving millions of documents.

19.     The process used to identify documents sought in the subpoena was explained to OSC in detail. (Ex H, Stella email to OSC, May 10, 2017; Ex I, DeWaard email to OSC, Oct 18, 2017.) OSC was provided with DEQ's response to the investigative subpoena, which included a 15-page narrative explaining the entire process. (Ex H, Stella email to OSC, May 10, 2017.) It identified which individuals were searched and what sources of data was searched. I do not recall any specific objections by OSC to DEQ's response to the subpoena. The same information has been provided to Ms. Hammoud.

20.     Likewise, DHHS provided a similarly detailed explanation to OSC in October 2017. (Ex I, DeWaard email to OSC, Oct 18, 2017.) I do not recall any specific objections by OSC to DHHS's response to the subpoena. The same

---

[1] The emails used to explain the document production process are illustrative of the general process and are not intended to be a complete explanation of the entire document identification, review, and production process, which spanned several years and involved hundreds or thousands of emails and phone calls.

information has been provided to Ms. Hammoud.  The same documents provided to OSC through the investigation, have been produced to the U.S. Department of Justice, along with the detailed explanations about the process that was followed. (e.g., Ex J, DeWaard email to Reynolds, Oct 24, 2017.)  I am not aware of any objections by the Department of Justice regarding any of the document productions in Flint Water.

21.    With respect to mobile devices, OSC identified which custodians they sought data from, and outside counsel explained the proposed approach to handling mobile device data to OSC. (Ex K, DeWaard email to OSC, Nov 4, 2016.)  To the extent the data was accessible (i.e., the encryption passcode was known), certain categories of information were searched for Flint related information, as requested by OSC.  (Ex L, DeWaard email to OSC, Nov 16, 2016.)  OSC has been provided Flint related text messages or data from at least 17 mobile devices, which does not include the information from mobile devices from the former Governor's Office that was produced by Warner Norcross.

22.    OSC also issued separate subpoenas for cell phones and computers of specific individuals. (Ex M, Busch subpoena, May 13, 2016; Ex N, Smith subpoena, May 13, 2016.)

23.    OSC obtained a search warrant for computers, iPads, cell phones and other electronic media of specific individuals, which at least one computer was seized by OSC.  (Ex O, Peeler search warrant.)  After obtaining a search warrant for at least one mobile device and being alerted about the potential of attorney client communications on the mobile device, OSC directed our office to "stop downloading any materials and preparing documents for us pursuant to the search warrant." (Ex P, Flood email to Nelson, Feb 6, 2017.)

24.    I have reviewed the Plaintiff's Request for Stay, Case No. 18-43638-FH, that was filed in the Circuit Court for the 7th Judicial Circuit of Genesee County on Friday, April 26, 2019.

25.    In paragraph four of the motion for request to stay, it indicates that private law firms, including Chip Chamberlain who represents Nick Lyon in the criminal proceedings, provided direction to what are referred to as "the respondents" (which I understand to mean the civil Assistant Attorneys General that were required to work with the agencies outside counsel as the control point of the agencies' records).

26.    The "direction" allegedly provided relates to which documents should be produced in response to the investigative subpoenas issued to state agencies by OSC.  I did not receive direction from Chip Chamberlain, or any other individuals' criminal defense attorney regarding what to produce in response to the

investigative subpoenas directed to the state agencies. I am unaware of any direction given to my staff from Chip Chamberlain or any other individuals' criminal defense attorney regarding what to produce in response to the investigative subpoenas directed to the state agencies.

27. Instead, the agencies' outside counsel negotiated/communicated with OSC regarding which individuals to search, and which sources of data to search. (Ex G, DeWaard email to OSC, June 7, 2017.) I, and my staff, would then work with the agencies to collect the information and review it for privilege prior to production. In determining whether a document was related to the subpoena, we erred on the side of being over inclusive. I am confident that of hundreds of thousands of documents that were reviewed, we produced anything that was related in any way to Flint Water.

28. In paragraph four of the motion for request to stay, it states that there were phone extractions and other materials stored on a hard drive that were responsive to the original subpoenas but not turned over. By way of background, the materials stored in a state office building basement were brought to our attention on February 11, 2019, and Ms. Hammoud was immediately informed of the discovery of the potential evidence. A special agent took possession of the materials and stored them in an evidence room with restricted access.

29. I made an inquiry with two people who had personal knowledge about the history of the boxes. The first was Mike Marshall, a former police officer who had been employed by DEQ to manage its document collection and preservation protocol and who now works for the Michigan State Police. The second was Chris Christensen, a DTMB employee who arranged for the storage space for the boxes. I was told that the boxes contained two categories of information. The first category of information was hard drives with backup copies of forensic images of computers and phone extractions of DEQ staff involved in some way with Flint Water. Based on the information provided to me, it was my understanding that the original forensic images and phone extractions were maintained by DEQ in their data preservation room.

30. According to information provided to me, the second category of information was documents from Stephen Busch and Mike Prysby's offices. When Prsyby and Busch were placed on leave, two staff members from the Department of Attorney General reviewed the contents of both offices to identify any Flint Water related materials. Based upon information and belief, the Flint Water related information was turned over to our office in 2016. Anything from the offices that was not Flint Water related was placed in a box. The non-Flint Water related boxes of materials ended up in the basement of the state office building for storage. This explanation was provided to Ms. Hammoud. (Ex Q, Manning email to Hammoud,

Feb 13, 2019.) I had no personal knowledge at the time the boxes were discovered in February 2019 of what was contained in the boxes.

31.     Ms. Hammoud and her lead criminal investigator, Jeff Seipenko, were provided additional information about the boxes, which alerted them again to the existence of hard drives. (Ex R, Kuhl email to Hammoud, Feb 15, 2019.)  My understanding is that Mr. Seipenko came to look at the materials.  A couple of weeks later, we proposed to Ms. Hammoud that we review the documents again to verify that there were no Flint Water related documents in the boxes.

32.     The documents in the boxes were reviewed again and a summary was provided to Ms. Hammoud.  (Ex S, Manning email to Hammoud, March 6, 2019.) The summary explained that were some "Flint water related documents in the boxes.  According to Alex [an AAG that has worked on the Flint Water cases since October 2016] these appear to be copies of materials that have already been provided to OSC, USAO, Congressional committees, civil parties, etc.  The boxes will be held in the evidence room at the Williams Building until you decide if you want someone to review them."

33.     The Flint Water related documents identified in the boxes consisted of a stack of papers approximately two inches thick.  There was also a box of brochures that were mailed to Flint residents in 2017 about the drinking water but were returned as undeliverable. I have no personal knowledge of when the approximately two inches of Flint water related documents were placed in the storage room.

34.     There was no representation to OSC that each document had in fact been produced to OSC, only that they appear to have been produced.  I am not aware of a request from OSC to undertake such a review.  I am also unaware of any statement made to OSC that "the materials were simply duplicates of data that already had been turned over in response to investigative subpoenas."

35.     491 hard copy documents from Prsyby and Busch have been produced to OSC, which includes hand written notes, and printed electronic documents with hand written notes in the margins - the same types of documents that were contained in the recently discovered boxes.  There has been no document by document comparison of the two-inch stack of documents identified in the boxes and the 491 documents that were previously produced to OSC.

36.     There were no statements included in the summary about reviewing information contained on the hard drives, which requires specialized software to be able to review. (Ex S, Manning email to Hammoud, March 6, 2019.)

37.     Upon information and belief, it is my understanding that at some point after the summary was provided to Ms. Hammoud on March 6, 2019, Mr. Seipenko

requested access to the room to review the information and then seized the box containing the hard drives.

38.    Mr. Seipenko provided our office with an inventory list of what was contained in the boxes with the hard drives. (Ex T, Seipenko email to Kuhl, March 29, 2019.)

39.    The inventory list contains reference numbers that are associated with case numbers assigned by the IT staff that conduct computer imaging and mobile device extraction services.  The motion refers to a claim that attorneys with the Department told OSC that cell phone data for one state employee did not exist, but that Mr. Seipenko discovered on the hard drives he seized that it did exist.  With respect to item six on the inventory list, it is identified as Case No. 1703-0222 which was assigned to the mobile device extraction of Joseph Haas; and Case No. 1701-0048 which was assigned to the mobile device extraction of Carrie Monosmith.  Presumably one of those two individuals is the state employee to which the motion refers, but we cannot be certain because we do not have direct access to the data on the hard drives seized by Mr. Seipenko.  I am unaware of any specific request from OSC for information from either of the devices.

40.    In any event, the extractions that we do have for those two devices are encrypted, which means a full extraction cannot be completed and only very limited information from the mobile device is available.  The extraction that we have for Mr. Haas is for an iPhone, IMEI 354455067515369, and for Ms. Monosmith is for an iPhone, IMEI 3520130711225006.  Because the devices are encrypted, the text messages cannot be searched.

41.    The brief in support of the motion to stay mentions a list of names saved as a document titled "Phones/Wiped."  OSC has provided no information about the names of the individuals so we cannot determine whether the phones of these individuals were ever requested by OSC, or whether we have another copy of the phone extractions.

42.    The available information indicates that the other data on the hard drives are images of computers from various DEQ staff, including Steven Busch, Mike Prysby and Liane Shekter-Smith, among others.  OSC was asked on numerous occasions about what individuals they wanted computer images from – I am unaware of a substantive response.  (Ex U, Kuhl email to Dawson, June 16, 2016; Ex V, Kuhl email to Flood, Nov 1, 2016.)

43.    In paragraph five of the motion for request to stay, it indicates that there are millions of pages of documents that were responsive to the original subpoena but were not turned over. As explained above, there were negotiations between OSC and the agencies' outside counsel regarding which individuals would

be searched, and which data sources would be searched.  I am not personally aware of any sources of data that contains millions of pages of responsive information from agreed upon custodians or agreed upon sources of data that were not turned over to OSC.

44.     In paragraph eight of the motion for request to stay, it indicates that respondents produced documents in a non-searchable format.  It is unclear from the motion who *respondents* are in this portion of the motion, but to the extent "respondents" refer to the civil Assistant Attorneys General that processed the response to investigative subpoenas issued to the former Governor's Office, DHHS, and DEQ in accordance with agreements they reached with OSC – it is inaccurate that millions of pages of documents were produced in a "non-searchable format." The overwhelming majority of the documents were provided either in (a) native format, or (b) as TIFF images with the associated metadata, or (c) for certain small productions, they were produced in searchable PDF format. All three formats allow for easy searching.


Further, Affiant sayeth not.

ERIC JAMISON
Assistant Attorney General
Michigan Department of Attorney General

Date: May 1, 2019


Subscribed and sworn to before me
this 1st day of May 2019.


Lynne L. Walton
Notary Public

March 26 2024
My Commission Expires


LYNNE L. WALTON
NOTARY PUBLIC, STATE OF MI
COUNTY OF BARRY
MY COMMISSION EXPIRES Mar 26, 2026
ACTING IN COUNTY OF ___Ingham___

8

## <u>CERTIFICATE OF SERVICE</u>

I, Alaina N. Devine hereby certify that on July 25, 2019, the forgoing non-party documents-only subpoena was served electronically (via electronic mail) to the following counsel of record:

alexrusek@whitelawpllc.com
acollins@fosterswift.com
wpaul@fosterswift.com
andrew@aboodlaw.com
carrie@aboodlaw.com
awheeler@cityofflint.com
jdelaney@cityofflint.com
vcooper@cityofflint.com
akresch@1800lawfirm.com
bwolf718@msn.com
brivers@pittlawpc.com
rbell@pittlawpc.com
cmcgehee@pittlawpc.com
cbechill@pittlawpc.com
cbarbieri@fosterswift.com
lharroff@fosterswift.com
bush@bsplaw.com
hill@bsplaw.com
reiss@bsplaw.com
ckern@bernripka.com
cclare@clarkhill.com
cmarker@owdpc.com
mclark@owdpc.com
cjbenedetto@benedettolaw.com
cstern@levylaw.com
abarral@levylaw.com
avieux@levylaw.com
dweiss@levylaw.com
kshah@levylaw.com
cthompson@swappc.com
atoupin@swappc.com
shall@swappc.com
cynthia@cmlindseylaw.com
david.kent@dbr.com
caprice.corbett@dbr.com
wayne.mason@dbr.com
dhart@maddinhauser.com
csego@maddinhauser.com
david.shea@sadplaw.com
Ashley.shea@sadplaw.com
kelly.friel@sadplaw.com
Davidmeyerslaw@gmail.com
deblabelle@aol.com
anlyn.addis@gmail.com
betsyllewis@gmail.com

DGreenspan@blankrome.com
DBerger@blankrome.com
dclitigationdocketing@blankrome.com
RBrooks@blankrome.com
dhumphrey@bernllp.com
crobins@bernllp.com
jcappelli@bernllp.com
dgjonaj@weitzlux.com
zeinehlaw@gmail.com
eschaktman@bernllp.com
crobins@bernllp.com
jcappelli@bernllp.com
elevens@cohenmilstein.com
jweiner@cohenmilstein.com
eberezofsky@motleyrice.com
promano@eblawllc.com
shansel@motleyrice.com
bergf@butzel.com
haynes@butzel.com
murdoch@butzel.com
gstamatopoulos@weitzlux.com
JBroaddus@weitzlux.com
gmeihn@foleymansfield.com
sbreznai@foleymansfield.com
gregmair@owdpc.com
dana@owdpc.com
sheryl@owdpc.com
haslawpc@gmail.com
hunter@napolilaw.com
AMorgan@NapoliLaw.com
planciotti@napolilaw.com
bmacdonald@ccglawyers.com
enaylor@ccglawyers.com
fajenlaw@fajenmiller.com
jwb@burdickpc.com
dfh@burdickpc.com
jberger@clarkhill.com
jswetlic@clarkhill.com
jeblake@mcalpinepc.com
atschnatz@mcalpinelawfirm.com
mlmcalpine@mcalpinepc.com
nllietzau@mcalpinepc.com
jmoran@swappc.com
jweiner@cohenmilstein.com
anoronha@cohenmilstein.com

efilings@cohenmilstein.com
jessica.meeder@murphyfalcon.com
karyn.slavin@murphyfalcon.com
jprior@hmelegal.com
jbroaddus@weitzlux.com
jsawin@sawinlawyers.com
jmassey@masseygail.com
jloper@masseygail.com
jrabin@hallrender.com
gzellers@hallrender.com
jbolton@clarkhill.com
cgornbein@clarkhill.com
jconnors@susmangodfrey.com
mwimmer@susmangodfrey.com
jgalvin@gcdcwws.com
jhurwitz@goodmanhurwitz.com
lseale@goodmanhurwitz.com
kbeach@plunkettcooney.com
kjames@goodmanhurwitz.com
kaltman@lawampmmt.com
kaltman@excololaw.com
kcasey@excololaw.com
kkilby@mcgrawmorris.com
kpierson@cohenmilstein.com
kjackson@shrr.com
vkuhl@shrr.com
kurt@cndefenders.com
LJensen@hallrender.com
ksaur@hallrender.com
larry@tribelaw.com
msinkovich@excololaw.com
mbern@bernllp.com
abourke@bernllp.com
emarcowitz@bernllp.com
rsharp@bernllp.com
bettenhausenm@michigan.gov
HiarR@michigan.gov
manningp@michigan.gov
mnapoli@napolilaw.com
mlmcalpine@mcalpinepc.com
nllietzau@mcalpinepc.com
mark@cukerlaw.com
mary@cndefenders.com
lizzy@cndefenders.com
mmitchell@maddinhauser.com
pmajher@maddinhauser.com
mwise@foleymansfield.com
cosborn@foleymansfield.com
mperry@fraserlawfirm.com
dcoveart@fraserlawfirm.com

mgildner@sfplaw.com
lwhitney@sfplaw.com
mpattwell@clarkhill.com
jbolton@clarkhill.com
lmcpartlin@clarkhill.com
lpetrowsky@clarkhill.com
mpitt@pittlawpc.com
rbell@pittlawpc.com
williams@bsplaw.com
hill@bsplaw.com
reiss@bsplaw.com
mcaffe@aol.com
mcinneshp@aol.com
GambillN@michigan.gov
gibsonj16@michigan.gov
mitosinkaa@michigan.gov
nick.szokoly@murphyfalcon.com
erin.sofinowski@murphyfalcon.com
sara.rahmjoo@murphyfalcon.com
pnovak@weitzlux.com
gstamatopoulos@weitzlux.com
pgeske@mcgpc.com
perickson@plunkettcooney.com
lcushman@plunkettcooney.com
lrobbins@plunkettcooney.com
pgrashoff@shrr.com
vkuhl@shrr.com
rwalker@levylaw.com
kuhlr@michigan.gov
rkamenec@plunkettcooney.com
rmclaughlin@hmelegal.com
rsharp@bernllp.com
kchen@nrdc.org
sfletcher@thefletcherlawfirmpllc.com
klein@butzel.com
larson@butzel.com
sradner@excololaw.com
solomonradner@gmail.com
klane@mcgrawmorris.com
smorrissey@susmangodfrey.com
nkustok@susmangodfrey.com
shart@hmelegal.com
ahuller@hmelegal.com
ssmith@bdlaw.com
sburke@burkepllc.com
tbingman@tbingmanlaw.com
tmorgan@fraserlawfirm.com
lalfano@fraserlawfirm.com
tleopold@cohenmilstein.com
efilings@cohenmilstein.com

lcuomo@cohenmilstein.com
tmcgraw@mcgrawmorris.com
tweglarz@fiegerlaw.com
d.dezbor@fiegerlaw.com
j.fanson@fiegerlaw.com
m.duda@fiegerlaw.com
p.milman@fiegerlaw.com
tperkins@perkinslawgroup.net
scrawford@perkinslawgroup.net
Val@vlwlegal.com
trina@vlwlegal.com
Zena@vlwlegal.com
bgoodman@goodmanhurwitz.com
mail@goodmanhurwitz.com
hassan.murphy@murphyfalcon.com

joann.autry@murphyfalcon.com
karyn.slavin@murphyfalcon.com
wkim@cityofflint.com
jdelaney@cityofflint.com
vcooper@cityofflint.com
larsenz@michigan.gov
gibsonj16@michigan.gov
kpiper@owdpc.com
sruddockharris@weitzlux.com
lmandara@motleyrice.com
smonroe@bernllp.com
shimony@bgandg.com
cstritmatter@sfplaw.com
tsantinomateo@gmail.com
smonroe@bernllp.com

/s/ Alaina N. Devine
Alaina N. Devine

## ISSUING ATTORNEYS

/s/ Alaina N. Devine
Alaina N. Devine
James M. Campbell
Campbell Conroy & O'Neil, P.C.
1 Constitution Wharf, Suite 310
Boston, MA 02129
(617) 241-3000
adevine@campbell-trial-lawyers.com
jmcampbell@campbell-trial-lawyers.com
*Attorneys for Veolia North America, Inc.,
Veolia North America, LLC, and Veolia
Water North America Operating Services, LLC*


/s/ Paul F. Novak
Paul F. Novak
Weitz & Luxenberg, P.C.
3011 West Grand Blvd, Suite 2150
Detroit, MI 48202
(313) 800-4170
pnovak@weitzlux.com
*Attorney for Plaintiffs in Carthan*

/s/ Susan E. Smith
Susan E. Smith
Beveridge & Diamond PC
456 Montgomery Street, Suite 1800
San Francisco, MA 94104
(415) 262-4023
ssmith@bdlaw.com
*Attorney for McLaren Hospital*


/s/ Hunter Shkolnik
Hunter Shkolnik
Napoli Sckolnik PLLC
360 Lexington Avenue
11th Floor
New York, NY 10017
(212) 397-1000
hshkolnik@napoli.com
*Attorney for Class Plaintiffs*

EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* Flint Water Cases        No. 5:16-cv-10444

HON. JUDITH E. LEVY

MAG. MONA K. MAJZOUB

---

## DOCUMENT PRODUCTION PROTOCOL

### I. SCOPE

#### A. General

The procedures set forth in this Document Production Protocol (the "Order") shall govern the production of Documents in this above-captioned matter (the "Litigation"), unless otherwise agreed to in writing by the Parties or as ordered of the Court. To the extent that non-parties produce Documents in this case, the Parties agree to request that such non-parties adopt this Order.

#### B. Scope of Production

This Order does not address the scope of the Parties' productions.

#### C. Subsequent Orders and Modification

This Order shall not preclude subsequent agreements between the Parties relating to Documents, nor shall it preclude any Party from seeking an amendment or modification of this Order from the Court.

This Order may not be modified or amended except in writing signed by all Parties. Court approval is not required to modify

or amend this Order, provided that such modification or amendment is in writing signed by all Parties.

### D. Previously Produced Documents

The Parties agree that Documents that have previously been produced in the Litigation, or in other related litigation, need not be re-produced to be consistent with this Order so long as the earlier productions are consistent with the attached ESI protocol(s). This provision only applies to productions made prior to the entry of this Order.

### E. Confidentiality of Produced ESI

Nothing in this Order is intended to be inconsistent with the Stipulated Confidentiality Order that the Court has entered in this Litigation  (Dkt. 299), and where anything in this Order is inconsistent with the terms of the Confidentiality Order, the terms of the Confidentiality Order shall prevail.  If a document is produced subject to a claim that it is protected from disclosure under the Confidentiality Order, the word "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" shall be burned electronically on each page of such document or otherwise identified as such consistent with this Order and any other orders entered by this Court.

## II. DEFINITIONS

### A. "**Documents**" means "Documents" as defined in Federal Rule of Civil Procedure 34(a)(1)(A), and Electronically Stored Information, as defined below, and shall be interpreted in the broadest sense possible.

### B. "**Electronically stored information**" or "**ESI,**" as used herein, means and refers to computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB flash ("thumb") drives or other real or virtualized devices or media, as such

information is defined in Federal Rule of Civil Procedure 34(a)(1)(A).

**C.** **"Native Format"** means and refers to the format of ESI in which it was generated or as it is used by the Producing Party in the usual course of its business and in its regularly conducted activities.

**D.** **"Media"** means an object or device, including but not limited to a disc, tape, computer, drive, or other device, whether or not in the Producing Party's physical possession, on which data is or was stored.

**E.** **"Metadata"** means and refers to: (i) information embedded in a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file; and (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

**F.** **"OCR"** means and refers to an optical character recognition file which is created by software used in conjunction with a scanner that is capable of reading text-based Documents and making such Documents searchable using appropriate software.

**G.** **"Party"** or **"Parties"** means and refers to the named Plaintiffs and/or Defendants in the above-captioned matter. "Producing Party" refers to a Party (or non-party that avails itself of this Order) that produces Documents in this Litigation.

**H.** "**Redacted Document**" means any Document that contains a text box redaction over any portion of the Document, or contains other means to intentionally obscure any portion of the Document.

I.    **"Withheld document"** means any Document that is omitted from production due to privilege or non-responsiveness.

III.    MISCELLANEOUS

A.    **English Language**

To the extent any data exists in more than one language, the data shall be produced in English, if available.  If no English version of a document is available, the Producing Party does not have an obligation to produce an English translation of a document.

B.    **Cooperation**

The Parties shall, as necessary, meet and confer to exchange information regarding issues associated with any production of Documents.

C.    **Reservation of Rights**

Nothing contained herein is intended to create a precedent for, or to constitute a waiver or relinquishment of, any Party's objections or arguments pertaining to any potential future productions of Documents.

D.    **Relief from this Order**

Any Party may request that the Court modify or amend the terms of this Order by the filing of an appropriate motion. Prior to filing such a motion, the Party seeking such modification or amendment must first meet and confer with the relevant Parties.

E.    **Production Costs**

This Order does not address the costs of Document production and the Parties reserve their rights with respect to the allocation of those costs.

## IV.   TECHNICAL SPECIFICATIONS

### A.   Image Files

All Documents are to be produced as black and white images, unless otherwise addressed herein.

Black and white images are to be produced as Group IV, black and white  single page TIFF images with the file extension, .TIFF.

To the extent a Party requests that any ESI be produced in color, as opposed to black and white, the Parties shall meet and confer as to whether reproduction in color is necessary and appropriate.

Each image file is to be named with its corresponding production bates number.

### B.   Image File Formats

Microsoft Word documents will be imaged showing track changes and comments.

Microsoft PowerPoint files will be imaged showing notes in Notes Pages.

### C.   Native Files

When producing Documents in Native Format, the files are to be named with the bates number assigned to the Document and the confidentiality legend, if applicable.  For Example: Bates123456 – Confidential.XLSX

For each Native Format file produced, a TIFF image placeholder should be included.  The placeholder is to state, "This document has been produced in native format" and it should be endorsed with the confidentiality legend, if applicable, and bates number.

A text file must be provided for each native file.  If extracted text is not available, the text file should include a machine generated OCR.

Both the image and text file must be named with the bates number.

Documents that cannot be accurately TIFF-imaged must be produced in their Native Formats, unless otherwise agreed to between the Parties, or as required by this Order.  Such files include video and audio recording and database files.

All spreadsheets should be produced in their Native Format, except those that require redaction (the requirements of which are detailed below).

The Parties agree to work out a future protocol governing the use and format of Documents produced pursuant to this paragraph at trial, depositions, and hearings.

## D.    Hard Copy Paper Documents

Hard copy paper documents shall be produced as images files, and, to the extent reasonably practicable, produced in the manner in which those documents were kept in the ordinary course of business.  Where hard copy paper documents have "post-it notes," tabs, or other labels, such information shall be produced to the extent reasonably practicable.  The Producing Party will utilize reasonable best efforts to ensure that hard copy paper documents are produced in a manner that maintains the physical unitization of documents.

## E.    Proprietary Files

To the extent that Documents produced cannot be rendered or viewed without the use of proprietary third-party software, the Parties shall meet and confer to minimize any expense or burden associated with the production of such Documents in a reasonably usable format, including issues as may arise

with respect to obtaining access to any such software and operating manuals which are the property of a third-party.

## F. Extracted Text/OCR

Each produced Document will have a single text file, named for the production bates number. The text files will delivered as multi-page ASCII. The location of the text file for a document will be captured in the TextFileLink field.

For native files, extracted text is to be produced.

For any redacted Documents, a machine generated OCR text file from the redacted image is it to be provided, except that information which is redacted.

For any hard copy paper documents, a machine generated OCR text file is it to be provided.

## G. Metadata

Metadata fields associated with all Documents will be produced, as set forth below, except for Documents that do not include metadata, or the metadata is not machine extractable. For Redacted Documents, metadata fields must be produced, except those that disclose redacted information

Metadata should be provided in a .DAT file. The first line of the load file must include the field names. Each subsequent line will contain the fielded information for the Document. All .DAT files produced in this Litigation should contain the same fields in a consistent order.

This Order shall not be construed to affect whether information contained in the metadata produced shall be admissible evidence about the corresponding Document; rather, the Parties' positions with regard to admissibility shall be preserved.

## H.    Load File Specifications – Delimiters

The .DAT file will use the following delimiters for all Documents produced:

| Delimiter | Character | Function | ASCII Code |
|-----------|-----------|----------|------------|
| þ | Default | The field delimiter separates the load file columns | 254 |
| "\|" | Pipe | The text qualifier. Marks the beginning and end of each load file field. | 124 |
| ® | Newline | The delimiter that marks the end of a line of extracted or long text.  Concordance replaces all carriage returns or carriage return linefeed combinations with the newline code. | 174 |

Sample Concordance (.DAT) load file:
þProdBegBatesþþProdEndBatesþþProdBegAttachþþProdEndAttachþ
þGP0000001þþGP0000002þþþþ
þGP0000003þþGP0000057þþþþ

## I.    Load File Specifications – Production Fields

The following fields will be provided for all Documents produced.

| Field Name | Description | Applies To |
|---|---|---|
| ProdBegBates | Beginning bates number of all produced document | All Documents |
| ProdEndBates | Ending bates number of all produced documents | All Documents |
| ProdBegAttach | Beginning attachment number | All Documents |
| ProdEndAttach | Ending attachment number | All Documents |
| Confidential | Confidentiality designation | All Documents |
| NativeFileLink | Production path to native file | All Documents |
| TextFileLink | Production path to extracted text or OCR file | All Documents |

## J. Load File Specifications – Metadata Fields

A Producing Party shall produce the following metadata fields for Documents, all Microsoft Word documents ("EDOC") and/or all email ("Email"), to the extent the information is available, as specified below:

| Field Name | Description | Applies To |
|---|---|---|
| Author | Native file author | EDOC |
| File Name | Name of the application file | EDOC |
| DateCreated | Date file was created | EDOC |
| TimeCreated | Time file was created | EDOC |
| DateMod | Date file was last modified | EDOC |

| Field Name | Description | Applies To |
|---|---|---|
| TimeLastMod | Time file was modified | EDOC |
| To | Recipient(s) | Email |
| From | Sender | Email |
| CC | Carbon copy recipient(s) | Email |
| BCC | Blind carbon copy recipient(s) | Email |
| Subject | Subject line of the email | Email |
| Date Sent | Email sent date | Email |
| TimeSent | Email sent time | Email |
| Date Rec | Email received date | Email |
| TimeRcvd | Email received time | Email |
| Custodian | Individual in possession of the document or Mailbox. | All Documents |
| Other Custodian or dup custodian | ***In the event cross custodian de-duplication is employed | All Documents |
| Source | Physical location, computer or server from which the data was collected | All Documents |
| DocType | Type of file (Word, Excel, email, etc) | All Documents |
| DocExt | File extension of document | All Documents |
| Native File Size | Size of file in bytes | All Documents |
| Hash Value | MD5 Hash Value | All Documents |
| Confidentiality Designation | | All Documents |

| Field Name | Description | Applies To |
|---|---|---|
| Redacted | | All Documents |
| Withheld | Identifies any Family Member of a Document that is omitted from production | All Documents |
| Email Folder Path | | All Documents |
| Page Count | | All Documents |
| Conversation Index | | All Documents |

## K.  Deduplication

ESI will be deduplicated globally following industry-standard global deduplication algorithms.  An acceptable method, such as the MD5 hash format, shall be used for any deduplication.  Additional custodians who had a copy prior to deduplication, such as email recipients, copyees, or blind copyees, will be populated in the "DupCustodia" or "Other Custodian" metadata fields.

## L.  Document Families

Whenever a Document is produced, the entire corresponding family of Documents (i.e. parent and all children, the "Document Family," and individually a "Family Member") will be also produced.   If a Family Member is withheld for any reason, then that Document should be replaced by a placeholder identifying that it has been withheld. Document Families will be produced with a continuous bates range.  The Parties agree to meet and confer regarding any challenges to documents that are withheld from a document family as non-responsive.

Withholding non-responsive attachments cannot be used as a basis to challenge the completeness of a document for evidentiary purposes under FRE 106.

**M.    Email Threading**

For emails, in addition to de-duplication, email threading may be utilized. Threading allows emails that are wholly contained in a later, surviving email, with all of the recipients and attachments contained, to be identified and suppressed from production.  An email is only suppressed from production if 100% of the message body is contained, all addresses are included, and all attachments are included in a later email that is produced.

**N.    Voicemails, Text Messages and Smart Phone ESI**

For production of these forms of ESI, the Parties shall meet and confer regarding the scope of said production and the applicable custodians for whom an obligation to search and produce exists. Production requests for these forms of ESI shall identify the custodian, search terms, and timeframe. Indiscriminate terms, such as the Party's name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.   The Parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe.

**O.    Redactions and Logs**

A Producing Party shall disclose and describe the basis for every redaction in a Redacted Document.

The basis for all redactions shall be specified in the appropriate metadata field that corresponds to the Redacted Document.

In addition, for each redaction, a Producing Party must also: (a) include a text box describing the basis for the redaction

("Text Box Redactions") on the Redacted Document; or (b) produce a corresponding log that identifies and describes the basis for the redaction.

If a Party opts to utilize Text Box Redactions, the redactions on images shall be made with white boxes with black borders, and shall contain black text that describes the basis for the redaction, for example, "Attorney-Client Privilege," "Work Product Privilege," "PPI" (Protected Personal Information), "PHI" (Protected Health Information, or "NRI" (Non-Responsive Information). If a Party has more than one basis for a redaction, then the Text Box Redaction need only identify one basis, but all basis must be identified in the metadata.

Where some or all of the e-mail string is privileged, the Parties need only include one entry on the privilege log for the entire e-mail string and need not log each e-mail contained in the chain separately.

Documents that are to be produced in Native Format, but that require redactions, may be produced as TIFF images (as to spreadsheets, imaged unhiding hidden cells, rows, columns, or sheets),  with extracted text, with the relevant portions redacted, or in Native Format using a commercially available "native redaction" tool, or by producing a copy of the Native Format file with the relevant portions replaced with the mark "[REDACTED]"or a similar mark.  If modification of a Native Format file is required for redaction purposes, metadata information associated with that file should remain unchanged unless it also requires redaction.

## P.   De-Nisting of ESI

The Parties may remove operating system files and program files with the assistance of their respective information technology vendors or agents prior to conducting searches of data in accordance with the National Software Reference Library De-Nisting Process.

**Q.    Replacement Images**

In the event that an already produced Document or set of Documents has to be re-produced or a new load file or "overlay" is produced for any production, the new production shall always maintain the same bates number for any re-produced Documents, with the addition of the suffix "-R" at the end of the bates number.

**R.    Production of Databases and Other Structured Data**

Generally, databases should be produced in a mutually agreeable data exchange format, which may include production of reports generated from database rather than producing the entire database. To determine the data that is relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

|      |                                    |
|------|------------------------------------|
| i.   | Database Name                      |
| ii.  | Type of Database                   |
| iii. | Software Platform                  |
| iv.  | Software Version                   |
| v.   | Business Purpose                   |
| vi.  | Users                              |
| vii. | Size in Records                    |
| viii.| Size in Gigabytes                  |
| ix.  | A List of Standard Reports         |
| x.   | Database Owner or Administrator's Name |

Upon review of the list, the Parties agree to meet and confer regarding the data to be produced from each source, if any, and the form(s) of the production thereof.

## V.   PRODUCTION SPECIFICATIONS

### A.   All Deliveries

Productions may be delivered either via encrypted physical media or via secure electronic download, or as otherwise agreed by the Parties.

All file paths should be relative.

Data to be encrypted and the decryption key should be provided prior to the delivery of the physical media.

An electronic version of the cover letter should be included. The decryption key should not be contained in the cover letter accompanying the physical media.

### B.   Physical Delivery

Productions that are delivered via physical media should be self-contained and not require that multiple discs or drives be combined after delivery.

The disc or drive should be clearly labeled with the following information:

- Date of the production
- Producing Party
- Production Regarding
- Production Volume
- Bates Range
- Number of Records

### C.   Electronic Delivery

The production should be announced via e-mail and made available for immediate download upon receipt of the e-mail.

Delivery should be via a secure file transfer (SFT) system, or a password protected link. Productions made via insecure file transfer sites or sent via email may be rejected.

Electronic deliveries must remain downloadable for seven days after the production date or until the production has been downloaded and confirmed to be complete.

# EXHIBIT 1

# PREVIOUS ESI PROTOCOLS

# APPENDIX A

## Appendix A – ESI Protocol

**1.**    **Scope**.  The Parties agree that each producing Party is best situated to evaluate the procedures, methodologies, and technologies appropriate for preservation, collection, and review of their own paper documents and electronically stored information (together with paper documents, "**ESI**").   Accordingly, this Protocol shall govern only the actual production of paper documents and ESI and shall in no way affect the Parties' respective rights and obligations concerning the preservation, collection, and review of ESI.   All Parties preserve their attorney-client privileges and other privileges, and there is no intent by this Protocol, or the production of documents pursuant to this Protocol, to in any way waive or weaken these privileges.   Nothing in this Protocol shall limit the Parties' respective rights and obligations concerning confidential, proprietary or private information, with respect to which they may make such agreements or stipulations as they see fit, subject to applicable law.   All documents produced pursuant to this Protocol are fully protected and covered by the Parties' confidentiality agreements, and orders of the Court, as well as any clawback agreements, and protective order(s) of the Court effectuating the same.

**2.**    **Hard Copy Paper Documents**.   Hard copy paper documents shall be scanned and, to the extent reasonably practicable, produced in the manner in which those documents were kept in the ordinary course of business.   Where hard copy paper documents have "post-it notes," tabs, or other labels, the information on the label shall be scanned and produced to the extent reasonably practicable.   The Parties will utilize reasonable best efforts to ensure that hard copy scanned paper documents are produced in a manner that maintains the physical unitization of documents.

**3.**    **Images**.   Except as otherwise provided in paragraph 4, below, all documents that are produced will be produced as images.   Images will be produced as Single Page Group IV, 300 DPI, black and white TIFF images named as the beginning Bates number.   To the extent that a party believes that any ESI should be produced in color, as opposed to black and white, the parties shall meet and confer as to whether reproduction in color is necessary and appropriate.   Page level Bates numbers will be branded in the lower right of the image and additional confidentiality legends applied to the lower left (if applicable).    The following formatting will be applied to Microsoft Word, Excel, and PowerPoint documents:

   a.  Word documents will be imaged showing track changes and comments;

   b.  Excel files with redactions will be imaged un-hiding any hidden cells, rows, columns, or sheets; and

   c.  PowerPoint files will be imaged showing notes in Notes Pages.

If a Party determines in good faith that it needs a document, which has been produced as an image, to be produced in its native file format, the Party will submit a request for such native file to the producing Party, in writing, and the Parties will meet and confer in good faith to discuss the request. Such request to the producing Party shall include the Bates number of each imaged document that is requested in native file format.

**4. Native Files.** When available, native files will be produced for Excel documents that do not contain any redacted information. Native files will be produced for email messages (MSG format) unless: (1) the email message contains a redaction; (2) any attachment to the email message contains a redaction; or (3) the email contains a non-responsive attachment. Native files will be produced for all files that cannot be imaged (e.g. audio and video files). With the exception of email, when a native file is produced, the producing party will produce a placeholder (a single-page TIFF slip-sheet indicating that the native file was produced) along with the file itself in native format; and the name of the native file will be the Bates number of the corresponding slip-sheet. Email that is produced in native format will also include a TIFF image of the email as described in paragraph 3. The metadata load file that is included with a production shall include available native file link information for each native file that is produced.

**5. Metadata.** A standard Concordance delimited load file (.DAT), with field header information added as the first line of the file, will be provided with each production. The Parties are not required to produce metadata from any electronic document if metadata does not exist in the document or the metadata is not machine-extractable. Documents will be produced with related metadata (to the extent it exists) as described in Appendix B. DAT file delimiters:

      a. Column delimiter: Default is ¶ (ANSI 182)

      b. Quote: Default is þ (ANSI 254)

      c. Record delimiter: Default is ® (ANSI 174)

      d. Multi-value delimiter: Default is ; (ANSI 059)

For redacted documents, metadata fields must be produced only to the extent such fields will not disclose redacted information.

**6. Image Cross Reference.** A standard Opticon (.OPT) file will be provided with each production that contains imaged documents.

**7. Text.** Document level text files (.TXT) will be provided for each document produced. Text files will be named the first Bates number of the respective document. Extracted text will be provided when it exists for non-redacted documents. When extracted text is provided for an email, the email header

information must appear in the extracted text. OCR text will be provided for documents when no extracted text exists, when the document is redacted, and for all PDF documents. A text load file (.LST) will be provided to load the text from the .TXT files into a review platform.

**8. Encoding Format.** TXT, DAT, OPT, and LST files will be provided in ANSI encoding.

**9. Deduplication.** ESI will be deduplicated across custodians (i.e. global deduplication) following industry-standard deduplication algorithms. An acceptable method, such as the MD5 hash format, shall be used for any deduplication. Additional custodians who had a copy prior to deduplication, such as email recipients, copyees, or blind copyees, will be populated in the "DupCustodian_w_Orig" metadata field referenced in Appendix B.

**10. Document Families.** Whenever a document is produced, the entire corresponding family of documents (i.e. parent and all children) will be produced, except to the extent any member of the family is withheld because of privilege or confidentiality. Notwithstanding the foregoing, if an email message is produced in response to a discovery request or a subpoena, then non-responsive attachments to the email are not required to be produced. If a family member is withheld for any reason then that document should be replaced by a placeholder identifying that it has been withheld. Families of documents will be produced with a continuous Bates range. Child documents will refer to their corresponding parent document via the "Production Bates – Attach Begin" metadata field referenced in Appendix B.

**11. Email Threading.** For emails, in addition to de-duplication across custodians, thread de-duplication may be applied prior to production. Thread de-duplication allows emails that are wholly contained in a later, surviving email, with all of the recipients and attachments contained, to be identified and suppressed from production. An email is only removed from production if 100% of the message body is contained, all addresses are included, and all attachments are included in a later email that is produced. To facilitate a receiving Party's use of email threading:

  a. When extracted text is provided for an email, the email header information must appear in the extracted text; and

  b. The Conversation Topic Index and Parent ID metadata fields referenced in Appendix B must be provided for all emails produced as images.

**12. Voicemails, Text Messages, and Smartphone ESI.** Production requests for these forms of ESI shall only be propounded for specific issues, rather than general discovery. In addition, discovery of this information shall be phased and initially limited to three (3) custodians. Production requests for these forms of ESI

shall identify the custodian, search terms, and timeframe. Indiscriminate terms, such as the Party's name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction. The Parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe. Requests for additional custodians, search terms and timeframes shall only be discussed by the Parties after the initial phased production and only upon showing a distinct need.

**13.** **Redactions**. Redactions on images shall be made with white boxes and contain black text that reasonably describes the nature of the asserted privilege or confidential information such as, for example, "Attorney-Client Privilege," "Work Product Privilege," "PPI" (Protected Personal Information), "PHI" (Protected Health Information, or "NRI" (Non-Responsive Information). If a Party redacts a document based on more than one claim of privilege or confidentiality, then the text that appears on the redaction need only describe the nature of one of the claims of privilege or confidentiality, but the corresponding entry in a privilege log must state all claims of privilege and confidentiality. For example, and without limiting the foregoing, if a Party claims that redacted text is protected by both the attorney-client privilege and the work product privilege, then the text that appears on the redaction on the face of the document may state only "Attorney-Client Privilege," but the corresponding entry in a privilege log must state both "Attorney-Client Privilege" and "Work Product Privilege." In addition to redactions based on claims of privilege and confidentiality, the Parties may redact all non-responsive information.

**14.** **De-Nisting of ESI**. The Parties may remove operating system files and program files with the assistance of their respective information technology vendors or agents prior to conducting searches of data in accordance with the National Software Reference Library De-Nisting Process.

**15.** **Third-Party Software**. To the extent that documents produced cannot be rendered or viewed without the use of proprietary third-party software, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format, including issues as may arise with respect to obtaining access to any such software and operating manuals which are the property of a third party.

**16.** **No Waiver by Disclosure**.

      a. If a producing Party discloses information that the Party thereafter claims to be privileged or confidential ("**Disclosed Protected Information**"), the disclosure of the Disclosed Protected Information shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or confidentiality that the Party would otherwise be entitled to assert with respect to the Disclosed Protected Information and its

subject matter in this litigation, any investigation, or any other federal, state, or administrative proceeding.

b. The producing Party may assert in writing any privilege or claim of confidentiality with respect to the Disclosed Protected Information. The receiving Parties must—unless they contest the claim of privilege or confidentiality for each document in the Disclosed Protected Information—within five (5) business days of receipt of that writing, (i) return or destroy all copies of the Disclosed Protected Information, and (ii) sequester the Disclosed Protected Information and (iii) provide a written notification to the producing Party that all of the Disclosed Protected Information has been sequestered, returned or destroyed. Within five (5) business days of receipt of the notification that the Disclosed Protected Information has been sequestered, returned or destroyed, the producing Party must provide a privilege log with respect to the Disclosed Protected Information to the receiving Parties. The Parties may stipulate in writing to extend the time periods set forth in this sub-paragraph.

c. If a receiving Party contests the claim of privilege or confidentiality for Disclosed Protected Information, the receiving Party may not disclose any of the Disclosed Protected Information, except under seal to a court of law, until the resolution of the objection. Pending such resolution, the receiving Party must sequester the Disclosed Protected Information and not use the Disclosed Protected Information or disclose it to any person other than as required by law.

d. Disclosed Protected Information that is sought to be reclaimed by a producing Party shall not be used as grounds by any other Party or third party to argue that any waiver of privilege or protection has occurred by virtue of its production.

e. The producing Party retains the burden of establishing the privileged or protected nature of the Disclosed Protected Information.

**17.    Reservation of Rights**.  Nothing contained herein is intended to create a precedent for, or to constitute a waiver or relinquishment of, any Party's objections or arguments pertaining to any potential future productions of ESI.   Nothing contained herein constitutes a waiver of any Party's rights or obligations under any law, including but not limited to laws regarding any matter or information that is or may be claimed to be privileged, confidential, proprietary, or otherwise personal or private.

**18.    Entire Agreement/Modification**.    This Protocol contains the entire agreement of the Parties with respect to the production of ESI, and any statement, promise, or inducement made by either Party not set forth herein shall be of no effect, nor shall it be used in construing the terms of this Protocol.  This Protocol

may not be modified or amended except in writing signed by all Parties. Court approval is not required to modify or amend this Protocol, provided that such modification or amendment is in writing signed by all Parties.

**19.** **Relief from this Protocol**. Any Party may request relief from any obligation set forth in this Protocol. All such requests shall be in writing and submitted to the Court for consideration, with a copy of the request served to all Parties via email and U.S. mail. Any Party may oppose any request for relief by submitting a written opposition to the Court, with a copy of the opposition served to all Parties via email and U.S. mail within five (5) days of service of the request for relief.

**20.** **Cost Shifting**. Each Party expressly reserves the right to petition the Court to shift the cost of the production of ESI to the requesting Party.

###

# APPENDIX B

# Appendix B – Metadata Fields

| Field | Description |
|---|---|
| Production Volume | Production volume name. |
| Production – Begbates | Beginning bates number of document. |
| Production – Endbates | Ending bates number of document. |
| Production Bates – Attach Begin | Beginning bates number of attached documents. |
| Production Bates – Attach End | Ending bates number of attached documents. |
| MD5 Hash | MD5 hash value of native file. |
| Application | Program commonly used to access the record. |
| Extension | File extension. |
| File Name | File name without the file path. |
| Time Zone Field | Time zone at which record was collected. |
| File Size (bytes) | Size of file in kilobytes. |
| Relativity Image Count | Number of pages imaged. |
| Custodian | Person, device, or organization in possession of the record at the time of collection. |
| DupCustodian_w_Orig | Name(s) of custodian(s) with exact copy of file before deduplication. |
| Created Date | Date an edoc (loose file) was created. |
| Created Time | Time edoc (loose file) was created. |
| Last Modified Date | Date edoc (loose file) was last modified. |
| Last Modified Time | Time edoc (loose file) was last modified. |
| App Created Date | Date email attachment was created. |
| App Created Time | Time email attachment was created. |
| App Last Modified Date | Date email attachment was last modified. |
| App Last Modified Time | Time email attachment was last modified. |
| Subject | Subject field of email. |
| From (Name) | Sender of email. |
| Sent To | The "to" addressee(s) of email. |

Appendix B - 1

| Field | Description |
|---|---|
| CC | The carbon copy addressee(s) of email. |
| BCC | The blind carbon copy addressee(s) of email. |
| Sent Date | Date email was sent. |
| Sent Time | Time email was sent. |
| Received Date | Date email was received. |
| Received Time | Time email was received. |
| Conversation Topic Index (CTOPICINDEX) | Unique identifier assigned to email chain by Microsoft Outlook. |
| Parent ID | Unique identifier assigned to a child attachment's parent email. |
| Author | Last editor of edoc (attachments / loose files) either inputted manually by author or through a preference setting in file properties. |
| Title | Title of edoc (attachments / loose files) either inputted manually by last editor or through a preference setting in file properties. |
| Native File Link | This field will contain the full path on the production media to any native files being produced. |
| Internet Header | Section of the email message populated with source and destination information. It sometimes includes Sender IP Address, and Transit server information. Often includes Sender / Recipient, subject, date-stamps, message ID and more based on the originating Mail User Agent. |