## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 22, 2020

Mr. Samuel R. Bagenstos
Samuel Bagenstos
625 S. State Street
Suite LR 910
Ann Arbor, MI 48104

Mr. Charles Edward Barbieri
Foster, Swift, Collins & Smith
313 S. Washington Square
Lansing, MI 48933

Mr. Frederick A. Berg Jr.
Butzel Long
150 W. Jefferson Avenue
Suite 100
Detroit, MI 48226

Mr. Jay M. Berger
Clark Hill
500 Woodward Avenue
Suite 3500
Detroit, MI 48226

Ms. Margaret Bettenhausen
Office of the Attorney General of Michigan
P.O. Box 30755
Lansing, MI 48909

Mr. Jordan Seth Bolton
Clark Hill
151 S. Old Woodward Avenue
Suite 200
Birmingham, MI 48009

Mr. James William Burdick
Hertz Schram
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302

Mr. Christopher Bradley Clare
Clark Hill
1001 Pennsylvania Avenue, N.W.
Suite 1300, S.
Washington, DC 27713

Ms. Allison Marie Collins
Foster, Swift, Collins & Smith
313 S. Washington Square
Lansing, MI 48933

Mr. James A. Fajen
Fajen & Miller
3646 W. Liberty
Ann Arbor, MI 48103

Mr. Nathan A. Gambill
Office of the Attorney General of Michigan
P.O. Box 30755
Lansing, MI 48909

Mr. William H. Goodman
Goodman & Hurwitz
1394 E. Jefferson Avenue
Detroit, MI 48207

Mr. Philip A. Grashoff Jr.
Smith Haughey Rice & Roegge
100 Monroe Center, N.W.
Grand Rapids, MI 49503

Ms. Julie H. Hurwitz
Goodman, Hurwitz & James
1394 E. Jefferson Avenue
Detroit, MI 48207

Ms. Krista Aimee Jackson
Smith Haughey Rice & Roegge
100 Monroe Center, N.W.
Grand Rapids, MI 49503

Mr. William Young Kim
City of Flint
1101 S. Saginaw Street
Third Floor
Flint, MI 48502

Mr. Sheldon H. Klein
Butzel Long
41000 Woodward Avenue
Stoneridge West Building
Bloomfield Hills, MI 48304

Mr. Richard S. Kuhl
Office of the Attorney General
of Michigan
P.O. Box 30755
Lansing, MI 48909

Ms. Deborah A. LaBelle
Law Offices
221 N. Main Street, Suite 300
Ann Arbor, MI 48104-0000

Ms. Emmy L. Levens
Cohen, Milstein, Sellers & Toll
1100 New York Avenue, N.W.
Suite 500-W
Washington, DC 20005

Mr. Christopher James Marker
O'Neill, Wallace & Doyle
300 St. Andrews Road
Suite 302
Saginaw, MI 48605

Ms. Cary S. McGehee
Pitt, McGehee, Palmer & Rivers
117 W. Fourth Street
Suite 200
Royal Oak, MI 48067

Mr. David Wayne Meyers
Law Office
P.O. Box 88
Lexington, MI 48450

Mr. Thaddeus E. Morgan
Fraser Trebilcock
124 W. Allegan Street
Suite 1000
Lansing, MI 48933

Mr. Paul F. Novak
Weitz & Luxenberg
Fisher Building
3011 W. Grand Boulevard
Suite 2150
Detroit, MI 48202

Mr. Michael John Pattwell
Clark Hill
212 E. Cesar E. Chavez Avenue
Lansing, MI 48906

Mr. Todd Russell Perkins
Law Offices
615 Griswold Street
Suite 400
Detroit, MI 48226

Mr. Michael H. Perry
Fraser, Trebilcock, Davis & Dunlap
124 W. Allegan
Suite 1000
Lansing, MI 48933

Mr. Michael L Pitt
Pitt, McGehee, Palmer & Rivers
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067

Mr. Joseph E. Richotte
Butzel Long
41000 Woodward Avenue
Stoneridge West Building
Bloomfield Hills, MI 48304

Ms. Beth M. Rivers
Pitt, McGehee, Palmer & Rivers
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067

Mr. Alexander Stephen Rusek
White Law
2549 Jolly Road
Suite 340
Okemos, MI 48864

Mr. Gregory Stamatopoulos
Weitz & Luxenberg
719 Griswold
Suite 620
Detroit, MI 48226

Mr. Barry A. Wolf
503 S. Saginaw Street, Suite 1410
Flint, MI 48502

Mr. Edwar Ayoub Zeineh
2800 E. Grand River Avenue, Suite B
Lansing, MI 48912

      Re:    Case Nos. 19-1425/19-1472/19-1477/19-1533, *Luke Waid, et al v. Richard Snyder, et al*
            Originating Case No. : 5:16-cv-10444

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                      Yours very truly,

                      Deborah S. Hunt, Clerk

                      Cathryn Lovely
                      Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

IN RE: FLINT WATER CASES.

_____

LUKE WAID, Parent and Next-Friend of SR, a minor, et al.,

*Plaintiffs*,

ELNORA CARTHAN et al.,

*Plaintiffs-Appellees*,

*v.*

DARNELL EARLEY, GERALD AMBROSE, HOWARD CROFT, MICHAEL GLASGOW, DAUGHERTY JOHNSON, and CITY OF FLINT, MICHIGAN (19-1425); RICHARD DALE SNYDER, former Governor of Michigan, ANDY DILLON, former Treasurer of Michigan, and GRETCHEN WHITMER, present Governor of Michigan (19-1472); LIANE SHEKTER-SMITH, STEPHEN BUSCH, PATRICK COOK, MICHAEL PRYSBY, AND BRADLEY WURFEL (19-1477); and ADAM ROSENTHAL (19-1533),

*Defendants-Appellants*.

Nos. 19-1425/1472/1477/1533

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:16-cv-10444—Judith E. Levy, District Judge.

Argued:  April 27, 2020

Decided and Filed:  May 22, 2020

Before:  MERRITT, MOORE, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** William Y. Kim, CITY OF FLINT LAW DEPARTMENT, Flint, Michigan, for Appellant City of Flint, and Christopher J. Marker, O'NEIL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellant Glasgow in 19-1425. Margaret A. Bettenhausen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan for Appellants in 19-1472. Charles E. Barbieri, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, for Appellants in 19-1477. James A. Fajen, FAJEN AND MILLER, PLLC, Ann Arbor, Michigan, for Appellant in 19-1533. Samuel R. Bagenstos, Ann Arbor, Michigan, for Appellees. **ON BRIEF:** William Y. Kim, CITY OF FLINT LAW DEPARTMENT, Flint, Michigan, Frederick A. Berg, Jr., BUTZEL LONG, P.C., Detroit, Michigan, Sheldon H. Klein, Joseph E. Richotte, BUTZEL LONG, P.C., Bloomfield Hills, Michigan, Christopher J. Marker, O'NEIL, WALLACE & DOYLE, P.C., Saginaw, Michigan, Todd R. Perkins, THE PERKINS LAW GROUP PLLC, Detroit, Michigan, Alexander S. Rusek, WHITE LAW, PLLC, Okemos, Michigan, Barry A. Wolf, Flint, Michigan, Edwar A. Zeineh, LAW OFFICE OF EDWAR A. ZEINEH, Lansing, Michigan, for Appellants in 19-1425. Margaret A. Bettenhausen, Richard S. Kuhl, Nathan A. Gambill, Zachary C. Larsen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan for Appellants in 19-1472. Charles E. Barbieri, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, Michael J. Pattwell, Jay M. Berger, CLARK HILL PLC, Lansing, Michigan, Thaddeus E. Morgan, FRASER, TREBILCOCK, DAVIS & DUNLAP, Lansing, Michigan, Philip A. Grashoff, Jr., SMITH HAUGHEY RICE & ROEGGE, Grand Rapids, Michigan, for Appellants in 19-1477. James A. Fajen, FAJEN AND MILLER, PLLC, Ann Arbor, Michigan, James W. Burdick, BURDICK LAW, P.C., Bloomfield Hills, Michigan, for Appellant in 19-1533. Samuel R. Bagenstos, Ann Arbor, Michigan, for Appellees.

MOORE, J., delivered the opinion of the court in which MERRITT, J., joined. MURPHY, J. (pp. 39–45), delivered a separate opinion concurring in the judgment in part and dissenting in part.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. This is a case about the Flint Water Crisis. From 2014 to 2015, City of Flint and Michigan State officials caused, sustained, and covered up the poisoning of an entire community with lead- and *legionella*-contaminated water. The crisis started in April 2014 when the City began delivering Flint River water to its predominantly poor and African-American residents, knowing that it was not treated for corrosion. In a matter of weeks, Flint residents reported that there was something wrong with the way the water looked,

tasted, and smelled, and that it was causing rashes. In response, the City treated the water with additional chlorine—exacerbating the corrosion in the old water lines. The corrosion contaminated the water with hazardous levels of lead and caused an outbreak of Legionnaires' disease. State and City officials failed to stop the delivery of Flint River water and obstinately assured the public that the water was safe, when they knew it was not. Now, Flint residents can expect to see their children permanently developmentally stunted. It has been six years since the start of the crisis and corroded pipes still infect the water and poison the people of Flint. The question before us is whether these Defendants-Appellants allegedly responsible for the crisis are immune from suit.

This appeal arises out of a consolidated class action in the *In re Flint Water Cases* litigation. It follows from the denial of motions to dismiss certain defendants based on qualified and absolute immunity. The Plaintiffs-Appellees are individuals affected by the Flint Water Crisis.[1] The Defendants-Appellants are City and State officials and the City of Flint.[2] Plaintiffs-Appellees claim that City and State officials' deliberate indifference to their being poisoned violated their substantive due process right to bodily integrity, a constitutional claim we have already recognized in *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 933 (2020). Acknowledging that *Guertin* controls, Defendants-Appellants contend that their alleged individual conduct does not plausibly amount to a constitutional violation. Or, in the case of the City of Flint and Governor Whitmer,[3] that the Eleventh Amendment requires their dismissal from this action—an argument we rejected in prior appeals. *See Guertin*, 912 F.3d at 936; *Boler v. Earley*, 865 F.3d 391, 412–13 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1281 (2018).

---

[1] We use the term "Plaintiffs" when referring to all plaintiffs belonging to the putative class, and we use the term "Plaintiffs-Appellees" when referring solely to the plaintiffs that are party to this appeal.

[2] We use the term "Defendants" when referring to all named defendants, and we use the term "Defendants-Appellants" when referring solely to the defendants that are party to this appeal.

[3] Governor Whitmer was elected into office in January 2019 and continues to serve as Michigan's Governor at the time of this writing. For the sake of consistency with its earlier Flint Water decisions, the district court solely referred to Governor Snyder in its opinion, even where claims are made against the present Governor in her official capacity. R. 798 (Op. & Order at 8 n.4) (Page ID #21110).

We **AFFIRM** the district court's denial of the motions to dismiss with respect to every Defendant-Appellant except Treasurer Dillon. We **REMAND** for the district court to decide whether Dillon should be dismissed in light of its decision in *Brown v. Snyder (In re Flint Water Cases)*, No. 18-cv-10726, 2020 WL 1503256, at *9 (E.D. Mich. Mar. 27, 2020).

# I. BACKGROUND[4]

Plaintiffs allege that, from June 2013 through April 25, 2014, City and State officials created a public health crisis. R. 620-3 (Fourth Am. Compl. at 47–48, ¶ 133) (Page ID #17850–51). Officials "ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the [treatment plant] was not ready." *Id.* "By January 29, 2015, State officials understood that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system. Yet no action was taken to warn the public of the health crisis or to correct the harm." *Id.* at 81, ¶ 238 (Page ID #17884).[5] Accordingly, "the complaint alleges constitutional violations that occurred during two relevant periods: (1) the period leading up to the April 2014 switch to the Flint River, during which Defendants were callously indifferent to the facts showing that the water would be dangerous; and (2) the 18-month period from April 2014 to October 2015, during which Defendants were callously indifferent to the mounting evidence that the water was actually causing serious harm, including death." Appellees Br. at 4–5.

## A. The Switch to the Flint River

The City of Flint did not always receive its water from the Flint River. For decades, the City received clean water from Lake Huron through the Detroit Water and Sewerage Department ("DWSD"). R. 620-3 (Fourth Am. Compl. at 34–35, ¶¶ 86–91) (Page ID #17837–38). At some

---

[4] The facts are taken from Plaintiffs' Fourth Amended Complaint, as we take all factual allegations to be true at this stage. *See Guertin*, 912 F.3d at 916.

[5] Some Defendants-Appellants contend that they were not aware that the water was contaminated. They point out that Plaintiffs themselves allege that private engineering firms provided inaccurate information about water quality to government officials. *See* R. 620-3 (Fourth Am. Compl. at 51–80, ¶¶ 148–232) (Page ID #17854–83). But those allegations do not negate the separate allegations that City and State officials nevertheless had knowledge from other sources that the water was contaminated. Therefore, the role of private engineering firms is irrelevant at the motion to dismiss stage.

point, however, the City became concerned with the DWSD's cost and decided to look into alternative water sources. *Id.* at 35–37, ¶ 92 (Page ID #17838–40). In 2011, City officials had a study conducted to see if the Flint River could be used as a safe water source if it was processed through the old Flint Water Treatment Plant ("FWTP"). *Id.* at 33–34, ¶¶ 82–86 (Page ID #17836–37); *id.* at 36–37, ¶ 92 (Page ID #17839–40). The reports issued from the study concluded that Flint River water could meet regulatory requirements if properly treated—but that would require over $69 million in improvements to the FWTP, including improvements that would protect the water from corrosion. *Id.* at 36–37, ¶ 92 (Page ID #17839–40). For the moment, the City decided against switching to the Flint River as its primary drinking source. *Id.* at 37, ¶ 94 (Page ID #17840).

But by August 2012, the City was embroiled in a financial emergency, leading Governor Snyder to appoint Edward Kurtz as Emergency Manager for the City. *Id.* at 38–39, ¶ 101 (Page ID #17841–42). In Michigan, the State can appoint emergency managers to take over financially distressed cities, control their operations, and rein in spending. *See Guertin*, 912 F.3d at 939; R. 620-3 (Fourth Am. Compl. at 39, ¶ 102) (Page ID #17842). To carry out their mission, emergency managers are granted "broad powers" to "act for and in the place and stead of the governing body and the office of chief administrative officer of the local government." MICH. COMP. LAWS § 141.1549(2).

As Emergency Manager, Kurtz made a pitch to Governor Snyder and State Treasurer Andy Dillon that the City of Flint should switch to receiving water from an altogether new source, the Karegnondi Water Authority ("KWA"). R. 620-3 (Fourth Am. Compl. at 38–39, ¶ 101–02) (Page ID #17841–42). The DWSD, on the other hand, made its case to Snyder, Dillon, and Kurtz that its water was cheaper and more reliable. *Id.* at 39, ¶ 103 (Page ID #17842). Caught between competing offers, Dillon requested an independent assessment of cost effectiveness for each plan by the engineering firm of Tucker, Young, Jackson and Tull ("TYJT"). *Id.* at 39–40, ¶ 104 (Page ID #17842–43). In February 2013, TYJT informed Dillon that "it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD." *Id.* Accordingly, on March 17, 2013, Treasurer Dillon wrote to Governor Snyder that "the KWA representatives were misrepresenting

the benefits of the deal and that the '(r)eport that I got is that Flint should stay w DWSD.'" *Id.*
Then, on March 28, 2013, Dillon reversed course and emailed Snyder recommending that he
authorize the City of Flint's switch to the KWA, noting that Kurtz, the Mayor, and City Council
all supported that decision. *Id.* at 41, ¶ 107 (Page ID #17844). Even though the KWA was more
costly than the DWSD, the City would be able to borrow funds to pay its share of the project if it
obtained an Administrative Consent Order ("ACO") from a State Agency attesting to need due to
"fire, flood, or other calamity." *Id.* at 127, ¶¶ 375–76 (Page ID #17930).

      The Michigan Department of Environmental Quality ("MDEQ") ultimately backed the
interim plan, even though it knew "that the decision to switch the water source for Flint was not
based on a scientific assessment of the suitability of the Flint River water." *Id.* at 40–41, ¶ 106
(Page ID #17843–44). The MDEQ Deputy Director wrote, "[W]e are in a situation with
Emergency Financial Managers so it's entirely possible that they will be making decisions
relative to cost." *Id.* In March 2013, MDEQ officials, including Stephen Busch and Liane
Shekter-Smith, knew that "the use of Flint River water would pose increased health risks to the
public . . . , the triggering of additional regulatory requirements, and significant upgrades to the
Flint Water Treatment Plant." *Id.* at 40, ¶ 105 (Page ID #17843).

      In 2013, both the City of Flint and the City of Detroit were under State emergency
management. *Id.* at 42, ¶ 114 (Page ID #17845). As Governor, "Snyder was briefed on reports
from *both* Flint's and Detroit's emergency managers and issued directions to both managers as it
related to the transition" away from the DWSD. *Id.* Thus, "Governor Snyder was personally
involved in the decisional process which led to the transition from DWSD to the KWA." *Id.* On
April 4, 2013, Snyder's Chief of Staff emailed him, stating "(a)s you know, the Flint people have
requested Dillon's ok to break away from the DWSD." *Id.* at 43, ¶ 115 (Page ID #17846).
Snyder then instructed Dillon, Kurtz, Detroit's Emergency Manager, and other key players to
have the DWSD submit one last offer to the City of Flint. *Id.* The DWSD did so, Kurtz rejected
the offer, and Snyder "authorized Kurtz, through Department of Treasury officials, to enter into a
contractual relationship with KWA for the purpose of supplying water to Flint *beginning in mid-
year 2016 or 2017*." *Id.* at 43, ¶¶ 115–18 (Page ID #17846) (emphasis added). The City would
need to rely on a water source other than the KWA until then. "At the time the Governor

authorized Kurtz to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River," rather than the DWSD, "would be used as an interim source and that the use of the interim source had the backing of Snyder, Andy Dillon, and MDEQ Director Wyant." *Id.* at 44, ¶ 119 (Page ID #17847).

In June 2013, Dillon, Kurtz, and other key players developed the interim Flint River plan that would supply the City with water from April 25, 2014 until approximately December 2016. *Id.* at 44, ¶ 120 (Page ID #17847). A "critical part" of the interim plan was to upgrade the FWTP so that it could treat the Flint River water and then later treat water delivered through the KWA. *Id.* at 44, ¶ 122 (Page ID #17847). In September 2013, Governor Snyder appointed Darnell Earley as the City of Flint's new Emergency Manager. *Id.* at 45, ¶ 125 (Page ID #17848). Earley worked to ensure that the interim Flint River plan would not be displaced by a return to the DWSD, even as the FWTP "was deemed unready for service by several people involved with its management." *Id.* at 51, ¶ 147 (Page ID #17854).

In March 2014, MDEQ officials, led by Chief of the Office of Drinking Water and Municipal Assistance Liane Shekter-Smith, put the interim Flint River plan into motion by ensuring, at the Treasury's direction, that the City quickly obtain the necessary ACO so that the KWA would not need to stop construction. *See id.* at 45–46, ¶ 128 (Page ID #17848–49); *id.* at 130, ¶¶ 382–83 (Page ID #17933). The ACO "(i) required Flint to make use of the Flint Water Treatment Plant, (ii) attempted to prevent Flint from ever returning to the DWSD and (iii) mandated Flint to 'undertake the KWA public improvement project or undertake other public improvement projects to continue to use the Flint River . . . .'" *Id.* at 45–46, ¶ 128 (Page ID #17848–49). "After obtaining the ACO, Flint entered a Bond Purchase Agreement allowing it to borrow funds despite being in receivership so that the KWA could move on to the next phase of construction. Unfortunately, the Flint Water Treatment Plant was nowhere near ready to begin distributing water." *Id.* at 131, ¶ 384 (Page ID #17934).

On March 14, 2014, the associate director of the Governor's Office of Urban and Metropolitan Initiatives stated in an email to other members of Snyder's staff that the "expedited timeframe" for switching to Flint River water "is less than ideal and could lead to some big

potential disasters down the road." *Id.* at 45, ¶ 127 (Page ID #17848). His warning went unheeded, as plans stayed in motion.

On April 16, 2014—a week before the date set for the switch to the Flint River—Michael Glasgow, the City's water treatment plant laboratory and water quality supervisor, emailed MDEQ Water Quality Analyst Adam Rosenthal, ". . . it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . .  I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." *Id.* at 46, ¶ 129 (Page ID #17849). The next day, Glasgow informed the MDEQ that "the FWTP was not fit to begin operations and that 'management' was not listening to him." *Id.* On April 17, 2014, Glasgow wrote to MDEQ District Supervisor Stephen Busch and MDEQ District 11 (Flint) Engineer Michael Prysby,

> I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

*Id.* "Glasgow later told State investigators that he received pressure from superiors—particularly Defendants Johnson and Croft—to begin the switch to the Flint River." *Id.* at 47, ¶ 130 (Page ID #17850).

MDEQ Water Treatment Specialist Patrick Cook signed the permit that was the last necessary approval for use of the FWTP. *Id.* at 47, ¶ 132 (Page ID #17850).

**B.  Lead Poisoning and Legionnaires' Disease**

"On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and Glasgow had warned that the FWTP was not ready." *Id.* at 57, ¶ 164 (Page ID #17860). Flint River water had high chloride levels that, left untreated, would corrode the water pipes and cause lead to "leach into drinking water." *Id.* at 55, ¶ 161 (Page ID #17858). The MDEQ purportedly believed that it needed to collect data on the water for an entire year, in two consecutive six-month tests, before

it could treat the water for corrosion. *Id.* at 95–96, ¶ 290 (Page ID #17898–99). Prior to the switch, City and MDEQ officials "discussed optimization for lead," but "decided that having more data was advisable before implementing an optimization method." *Id.* at 55, ¶ 159 (Page ID #17858). Rather than delay the switch to the Flint River, the City began delivering *untreated* water to its residents.

Within weeks of the switch, residents reported to Shekter-Smith that there was something wrong with the smell, taste, and color of the water, and that it was causing rashes. *Id.* at 57, ¶¶ 165–66 (Page ID #17860). By June 2014, residents were reporting that "the water was making them ill." *Id.* at 57, ¶ 167 (Page ID #17860). The City and State did nothing. *Id.* "On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria." *Id.* at 57, ¶ 168 (Page ID #17860). In response, the City issued boil water advisories and treated the water with additional chlorine. *Id.* at 57–58, ¶¶ 168–69 (Page ID #17860–61). Chlorine, however, "as has been well known for decades," "preferentially reacts with the bare metal [in corroded pipes] instead of attacking solely bacteria." *Id.* at 57–58, ¶ 169 (Page ID #17860–61). Unsurprisingly, then, the bacterial problem did not abate—so the City added still more chlorine. *Id.* The water then tested high in total trihalomethanes ("TTHM"), a byproduct of chlorine interacting with metal, and a "red flag that the steel in the pipes had been laid bare," and that lead was leaching into the water. *Id.* at 58, ¶¶ 170–71 (Page ID #17861). Back in May 2014, MDEQ officials—including Busch, Prysby, and Rosenthal—knew that TTHM levels were above the EPA's maximum contaminant level but did nothing, even as residents raised concerns about the water. *Id.* at 58, ¶ 172 (Page ID #17861). From May 2014 to August 2015, the City sampled the water six times to test for corrosivity, and "[t]he sampling results all showed that the drinking water was very corrosive." *Id.* at 62, ¶ 187 (Page ID #17865).

In the summer of 2014, just "[a]s officials were beginning to assess the extent of Flint's TTHM problems, . . . the Michigan Department of Health and Human Services (MDHHS) reported an outbreak of Legionnaires' disease—another red flag." *Id.* at 58–59, ¶ 173 (Page ID #17861–62). Legionnaires' disease "is a severe form of pneumonia." *Id.* at 59, ¶ 174 (Page ID #17862). It infects people who inhale or consume water contaminated with *legionella* bacteria. *Id.* "Extensive studies of *legionella* have established that the pathogen enters the water supply

when the 'bio-film' protecting pipes is stripped away—which is exactly what happened when the River's corrosive water entered the City's pipes." *Id.* When a City officer informed Earley and his then-advisor Gerald Ambrose of the outbreak, Earley responded by "disclaiming any connection between the outbreak and Flint's water." *Id.* at 59, ¶ 175 (Page ID #17862). Earley stated that "the City's 'message' should be that the outbreak was 'an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve.'" *Id.*

In September 2014, MDHHS reported that "lead poisoning rates 'were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014.'" *Id.* at 59–60, ¶ 176 (Page ID #17862–63). And in early October 2014, officials realized that the bacterial contamination partly stemmed from the use of over-75-year-old cast iron pipes that comprised most of the City's water distribution system. *Id.* at 60, ¶ 177 (Page ID #17863). Still no action.

On October 13, 2014, General Motors stopped using Flint River water at its engine plant out of fear that the high levels of chloride would corrode its machinery. *Id.* at 60, ¶ 179 (Page ID #17863). The next day, a member of Governor Snyder's executive staff wrote to the team:

> Now we are getting comments about being lab rats in the media, which are going to be exacerbated when it comes out that after the boil water order, there were chemicals in the water that exceeded health-based water quality standards. I think we should ask the [Emergency Manager] to consider coming back to the Detroit system in full or in part as an interim solution to both the quality, and now the financial, problems that the current solution is causing.

*Id.* at 60–61, ¶ 180 (Page ID #17863–64). Snyder's legal counsel similarly stated that the Flint River water issues are "downright scary" and "advised that, '[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control.'" *Id.* at 61, ¶ 182 (Page ID #17864). The executive staff directed MDEQ officials to brief Earley on the water quality issues, *id.* at 60–61, ¶ 180 (Page ID #17863–64), but Earley refused to reconnect to the DWSD, *id.* at 61, ¶ 181 (Page ID #17864).

With their awareness of the dangers of Flint River water only increasing, officials nonetheless failed to disclose the risks to Flint Residents. *Id.* at 80, ¶ 235 (Page ID #17883). "On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion." *Id.* at 61–62, ¶ 183 (Page ID #17864–65). And the samples had not even been drawn from the highest risk homes. *Id.* In January 2015, State officials met to discuss the *legionella* problem. *Id.* at 80, ¶ 233 (Page ID #17883). Around that time, MDEQ Director of Communications Bradley Wurfel wrote in an email, "I don't want my director to say publicly that the water in Flint is safe until we get back the results of some county health department of epidemiological trace-back work on [the] 41 cases of Legionnaires' disease" diagnosed since the switch to the Flint River. *Id.* at 62, ¶ 184 (Page ID #17865).

On January 9, 2015, the University of Michigan turned off certain water fountains on its Flint campus because tests it conducted revealed high levels of lead. *Id.* at 62, ¶ 185 (Page ID #17865). "That same day, Earley," again, "refused to return to DWSD water." *Id.* at 62, ¶ 186 (Page ID #17865). A few days later, Earley resigned as Emergency Manager, and Governor Snyder appointed Gerald Ambrose in his stead. *Id.* at 80, ¶ 234 (Page ID #17883).

On January 21, 2015, State officials had water coolers discreetly installed in State buildings located in Flint, careful not to make their actions known to the public. *Id.* at 80, ¶ 235 (Page ID #17883). On January 27, 2015, the Genesee County Health Department ("GCHD") reported a likely "association between the spike in Legionnaires' disease reports and the onset of the use of Flint River water." *Id.* at 81, ¶ 237 (Page ID #17884). The City and State did nothing. *Id.* On January 29, 2015, the DWSD offered Emergency Manager Ambrose "an opportunity to purchase DWSD water at attractive rates . . . includ[ing] waiving the re-connection fee." *Id.* at 81, ¶ 239 (Page ID #17884). Ambrose refused. *Id.* "On February 17, 2015, Flint water users staged public demonstrations demanding that Flint reconnect with DWSD." *Id.* at 82, ¶ 243 (Page ID #17885). Ambrose again refused. *Id.*

## C.  The Coverup

With the crisis growing undeniable, City and State officials attempted to cover it up. They lied to the public and to regulators, and they took no action to protect the people of Flint. *Id*.

On February 26, 2015, Jennifer Crooks of the EPA followed up on a request from a Flint resident to test her water after she and her family became physically ill, developed rashes, and even experienced hair loss after drinking from the tap.  *Id.* at 81, ¶ 240 (Page ID #17884); *id.* at 82–83, ¶ 244 (Page ID #17885–86).  Crooks wrote to MDEQ and EPA officials that "the iron contamination was so high that the testing instrumentation could not measure it" and that the water tested for 104 parts per billion ("ppb") of lead, well over the 15 ppb regulatory maximum. *See id.* at 82–83, ¶ 244 (Page ID #17885–86).  Crooks further noted that, with two children under the age of three residing at the house, there were "[b]ig worries here."  *Id.*  This prompted another EPA employee, Miguel Del Toral, to wonder whether the City of Flint was implementing optimized corrosion control, and whether the high lead levels were isolated to that one family's neighborhood or were more widespread.  *See id.* at 83, ¶ 245 (Page ID #17886). The EPA shared its concerns with the MDEQ.  In response, MDEQ District Supervisor Stephen Busch lied and told Del Toral that the City was using corrosion control.  *Id.* at 83, ¶ 246 (Page ID #17886).

"Likewise, [City Utilities Administrator Daugherty] Johnson inhibited efforts by [GCHD] to obtain information about Flint's water through the Freedom of Information Act ("FOIA")." *Id.* at 83–84, ¶ 248 (Page ID #17886–87).  On January 27, 2015, GCHD requested water-testing information that would help it understand perceived water quality issues and the outbreak of Legionnaires' disease.  *See id.*  A week later, Johnson responded that he had not received the FOIA request but would fulfill it as soon as possible.  *Id.*  Yet, "by March 2015, GCHD still had not received the information they requested by FOIA."  *Id.*  The GCHD soon gathered that it was "being stonewalled."  *Id.* at 84, ¶ 250 (Page ID #17887).

By March 2015, Governor Snyder and other State officials knew "that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and

began discussing distributing water filters to Flint water users." *Id.* at 84, ¶ 249 (Page ID #17887).  Nevertheless, "these public officials took no action to warn or otherwise protect Plaintiffs and the Class, and continued to conceal from them and the public the true nature, extent, and severity of the public health crisis." *Id.*  The Governor's office's talking points included false statements that the City was practicing corrosion control consistent with federal protocols and that Flint's water was in compliance with federal lead and copper rules. *Id.* at 149–50, ¶ 419 (Page ID #17952–53).

On March 10, 2015, the GCHD wrote to Croft, Prysby, Ambrose, the mayor, and other City officials that the threat of *legionella* was serious and tied to Flint River water. *Id.* at 138, ¶ 401 (Page ID #17941).  The GCHD official noted that he had requested to meet with the water plant staff and MDEQ to discuss his concerns, but that the water plant staff did not respond and that the MDEQ declined. *Id.*  On March 12, 2015, Shekter-Smith emailed MDEQ employees that, "[w]hile the change in source may have created water quality conditions that could provide additional organic nutrient source to support *legionella* growth, there is no evidence or confirmation of *legionella* coming directly from the Water Treatment Plant or in the community water supply distribution system at this time." *Id.* at 85, ¶ 252 (Page ID #17888).  The next day, Shekter-Smith approved a response from Busch to the GCHD that stated the following:

- "conclusions that legionella is coming from the public water system without the presentations of any substantiating evidence from your epidemiologic investigations appears premature and prejudice toward that end;
- "[i]t is highly unlikely that legionella would be present in treated water coming from the City of Flint water treatment plan[t] given the treatment plant's use of ozone along with complete treatment and chlorine disinfect contact time to comply with federal surface water treatment rules for potable water;" and
- "there is no direct correlation that can be made to the presence of legionella."

*Id.* at 85–86, ¶ 253 (Page ID #17888–89).  "That same day, Wurfel wrote in an email to Snyder administration officials, 'Political flank cover out of the City of Flint today regarding the spike in Legionnaire cases. . . .  Also, area ministers put a shot over the bow last night . . . with a call for Snyder to declare a state of emergency there and somehow "fix" the water situation . . . .'" *Id.* at 86, ¶ 254 (Page ID #17889).

On March 25, 2015, the Flint City Council voted to re-connect to the DWSD. *Id.* at 86, ¶ 255 (Page ID #17889). Ambrose rejected their vote. *Id.*

On April 24, 2015, MDEQ Water Treatment Specialist Patrick Cook admitted in an email to Miguel Del Toral of the EPA that "Flint is currently not practicing corrosion control at the [F]WTP." *Id.* at 86–87, ¶ 257 (Page ID #17889–90). In the same email, however, Cook "misled the EPA regarding the necessity of using corrosion control in Flint after the switch," *id.* at 83, ¶ 247 (Page ID #17886), touting distorted water quality test results that showed that the water was within the regulatory limit of 15 ppb for lead, R. 735-3 (Cook Email at 2) (Page ID #20343).

On April 28, 2015, Governor Snyder's chief of staff told Snyder and other staff members that "[t]he water issue continues to be a danger flag." R. 620-3 (Fourth Am. Compl. at 87, ¶ 258) (Page ID #17890).

On June 24, 2015, Del Toral released an EPA report (the "Del Toral Report") warning of high lead levels in Flint water. *Id.* at 87, ¶ 259 (Page ID #17890). "On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed.

*Id.* He "further warned that the failure to inform Flint water users of the elevated lead levels was 'bordering on criminal neglect.'" *Id.* at 87, ¶ 260 (Page ID #17890). The Del Toral Report was shared with MDEQ officials Shekter-Smith, Cook, Busch, and Prysby. *Id.* at 87, ¶ 261 (Page ID #17890). State and City officials did nothing. *Id.* at 88, ¶ 262 (Page ID #17891).

On July 9, 2015, City Utilities Administrator Michael Glasgow emailed MDEQ Water Quality Analyst Adam Rosenthal the following "Key Points" in all caps:

1) Flint has lots of lead pipe, no corrosion control treatment, and has had no legitimate LCR testing for at least a year.

2) Amongst low income infants, breast feeding rates are lower, and formula use is higher. Many Flint[] residents cannot afford to flush due to higher water rates. They cannot afford bottled water. This is an unprecedented situation and EPA needs to take this seriously. Now.

    3)   We have one child with an elevated blood lead already . . . In fact, that is the only reason we know about any of the above.

    4)   MDEQ is still publicly insisting Flint water has tested safe, is safe, and that [F]lint has no violations of any sort.

*Id.* at 89, ¶ 267 (Page ID #17892).

"On July 10, 2015, MDEQ [Director of Communications] Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing 'any broad problem' with lead leaching into residential water." *Id.* at 88, ¶ 265 (Page ID #17891). Wurfel knowingly lied and assured parents in particular that "anyone who is concerned about lead in the drinking water can relax." *Id.*

On July 22, 2015, Governor Snyder's Chief of Staff wrote to the Director of MDHHS that residents' concerns were being "blown off" by the Defendants. *Id.* at 89, ¶ 268 (Page ID #17892). Around the same time, Snyder's Director of Urban Initiatives spoke to Snyder directly and "advised him of the growing concerns among Flint residents that they were being exposed to toxic levels of lead." *Id.* at 89, ¶ 269 (Page ID #17892).

On July 24, 2015, Wurfel publicly stated that "residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper." *Id.* at 89–90, ¶ 270 (Page ID #17892–93). But the sampling Wurfel referenced was "purposefully skewed . . . to minimize the crisis." *Id.* at 90, ¶ 271 (Page ID #17893). Glasgow would later confess that the MDEQ altered water quality reports by removing the highest lead levels—"we threw out bottles everywhere just to collect as many as we can, just to hit our number." *Id.*; *see also id.* at 91, ¶ 273 (Page ID #17894). Glasgow also "distort[ed] the City's water test results by instructing residents to run their water—or 'flush' it—before testing, and fail[ed] to obtain water from certain houses." *Id.* at 90–91, ¶ 272 (Page ID #17893–94). He claims that he skewed the samples at Busch's and Prysby's direction. *Id.* at 91, ¶ 273 (Page ID #17894).

When a July 2015 water quality report was altered to exclude some high lead levels, Rosenthal forwarded it on. *Id.* Rosenthal was investigated for "willful participation in the

manipulation of lead testing results and falsely report[ing] that the 90th percentile of the results for lead water testing was below the federal action level." *Id.*

In August 2015, Professor Marc Edwards from Virginia Tech publicly announced that the City of Flint was experiencing a major public health emergency. *Id.* at 91, ¶ 274 (Page ID #17894). Wurfel countered his announcement by stating that Professor Edwards and his team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly." *Id.* at 92, ¶ 275 (Page ID #17895).

In the summer of 2015, Dr. Mona Hanna-Attisha published her own study to alert Flint residents to the dangers of drinking Flint River water. *Id.* at 93, ¶ 279 (Page ID #17896). Dr. Hanna-Attisha's study showed a "spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014." *Id.* Although MDHHS had data of its own indicating a similar spike, *id.* at 92, ¶ 276 (Page ID #17895), Wurfel lied and stated on September 25, 2015, that "MDHHS officials have re-examined its blood lead level data and the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha," *id.* at 94, ¶ 283 (Page ID #17897). "On September 28, 2015, Wurfel stated publicly that the Flint water crisis was becoming 'near-hysteria' because of Dr. Hanna-Attisha's report. He said that he wouldn't call her reports 'irresponsible. I would call them unfortunate.' Wurfel finished his remarks that day by falsely stating that 'Flint's drinking water is safe in that it's meeting state and federal standards.'" *Id.* at 94, ¶ 284 (Page ID #17897).

Over a year into the crisis, on October 8, 2015, Governor Snyder finally ordered the City of Flint to reconnect with the DWSD. *Id.* at 95, ¶ 287 (Page ID #17898). The City made the switch on October 16, 2015. *Id.* at 95, ¶ 288 (Page ID #17898). On October 18, 2015, the Director of the MDEQ emailed Governor Snyder and admitted that failing to implement optimized corrosion control for an entire year while Flint residents were being poisoned was a mistake. *Id.* at 95–96, ¶ 290 (Page ID #17898–99). The Governor's own task force on the crisis reported in March 2016 that the Governor's office failed to act, or even to conduct a

comprehensive review of the water situation in Flint, in part because of cost. *Id.* at 150–51, ¶¶ 420–21 (Page ID #17953–54).

## D.  Aftershock

"Flint is currently in a state of crisis:  Mayor Karen Weaver declared a State of Emergency on December 14, 2015 and on January 4, 2016, the Genesee County Commissioners declared a State of Emergency." *Id.* at 96–97, ¶ 294 (Page ID #17899–17900).  Governor Snyder did the same on January 5, 2016, but chose not to disclose the threat of *legionella*. *Id.* at 97, ¶ 295 (Page ID #17900).  He disclosed that threat for the first time on January 13, 2016, on the same day that he activated the Michigan National Guard to assist the City of Flint. *Id.* at 97, ¶ 296 (Page ID #17900).

The water crisis has created persistent harms.  The effects of lead poisoning are "catastrophic," particularly for young children. *Id.* at 104–05, ¶ 314 (Page ID #17907–08).  "In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *Id.* (quoting EPA).  "[L]ead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. . . .  The neurological and behavioral effects of lead are believed to be irreversible." *Id.* at 105, ¶ 315 (Page ID #17908) (quoting World Health Organization).  In some cases, "ingestion of lead can cause seizures, coma and even death." *Id.* at 105, ¶ 316 (Page ID #17908) (quoting EPA).  In pregnant women, the fetus can be exposed to lead in the mother's body, causing reduced growth and premature birth. *Id.* at 105, ¶ 317 (Page ID #17908).  "Flint's children have suffered specific, measurable damages in the form of lost earning potential.  They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services, and related education assistance programs." *Id.* at 106–07, ¶ 322 (Page ID #17909–10).

In adults, lead exposure can damage cardiovascular, kidney, and reproductive functions. *Id.* at 107, ¶ 323 (Page ID #17910).  A recent study shows a drastic drop in fertility following the

water crisis. *Id.* at 107, ¶ 324 (Page ID #17910). "Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards." *Id.* at 107, ¶ 325 (Page ID #17910).

"Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply." *Id.* at 109, ¶ 331 (Page ID #17912). The same problem applies to home pipes and appliances—meaning that solely replacing municipal pipes will not fix the health crisis. *Id.* at 109–12, ¶¶ 332–40 (Page ID #17912–15); *id.* at 119, ¶ 359 (Page ID #17922). And because "the health effects of lead poisoning often go undetected for some time," there is a need for "ongoing medical monitoring[,] educational programs[, and] other remedial programs." *Id.* at 119–20, ¶ 360 (Page ID #17922–23). In many ways, the crisis has never ended.

## E. Procedural History

This case is a consolidated class action in the *In re Flint Water Cases* litigation. *See* R. 173 (Order Consolidating Cases) (Page ID #8072). The only claim before us on appeal is Plaintiffs-Appellants' 42 U.S.C. § 1983 substantive due process claim for deprivation of bodily integrity. The Putative Class includes Flint residents and businesses, but only Flint residents are parties to this appeal. The Defendants include City and State officials, the City of Flint, and private engineering firms, but only the government defendants are parties to this appeal.

Plaintiffs filed their First Amended Consolidated Class Action Complaint on September 29, 2017. R. 214 (1st Am. Compl.) (Page ID #8494). They filed a Second Amended Complaint on October 27, 2017. R. 238 (2d Am. Compl.) (Page ID #8737). Defendants then filed motions to dismiss under Rule 12 of the Federal Rules of Civil Procedure. *See* R. 273 (Mot. to Dismiss) (Page ID #9797); R. 274 (Mot. to Dismiss) (Page ID #9909); R. 276 (Mot. to Dismiss) (Page ID #9986); R. 277 (Mot. to Dismiss) (Page ID #10111); R. 278 (Mot. to Dismiss) (Page ID #10167); R. 279 (Mot. to Dismiss) (Page ID #10237); R. 281 (Mot. to Dismiss) (Page ID #10644); R. 282

(Mot. to Dismiss) (Page ID #10789); R. 283 (Mot. to Dismiss) (Page ID #10931); R. 294 (Mot. to Dismiss) (Page ID #11358). Before those motions were resolved, Plaintiffs filed a Third Amended Complaint on January 25, 2018. R. 349 (Third Am. Compl.) (Page ID #11759).

On August 1, 2018, the district court issued an opinion and order granting in part and denying in part the motions to dismiss. *Carthan v. Snyder (In re Flint Water Cases)*, 329 F. Supp. 3d 369 (E.D. Mich. 2018). Some Defendants appealed, while others filed motions for reconsideration. R. 560 (Mot. for Recons.) (Page ID #17043); R. 561 (Mot. for Recons.) (Page ID #17072); R. 570 (Notice of Appeal) (Page ID #17246); R. 573 (Notice of Appeal) (Page ID #17253); R. 575 (Notice of Appeal) (Page ID #17256); R. 579 (Notice of Appeal) (Page ID #17281); R. 589 (Notice of Appeal) (Page ID #17316). We declined to adjudicate the appeals until the district court resolved the motions for reconsideration. Notice of Abeyance, *Waid v. Snyder*, No. 18-1967, slip op. (6th Cir. Feb. 19, 2019). But before the district court could resolve those motions, Plaintiffs moved for leave to amend the Complaint, attaching a proposed Fourth Amended Complaint. R. 620 (Mot. for Leave to File Fourth Am. Compl.) (Page ID #17764).

To dispose of the essentially competing motions, the district court "adopted an unorthodox but necessary plan." R. 798 (Op. & Order at 5) (Page ID #21107).[6] The district court "interpreted plaintiffs' motion [for leave to amend the complaint] as a joint motion for relief from judgment and a motion for leave to file an amended complaint. Finding just cause, the Court vacated its August 1 decision on November 9, 2018, so that it could consider plaintiffs' motion for leave to amend." *Id.* Because there was significant overlap between the Third Amended Complaint and the proposed Fourth Amended Complaint, and because the standards for leave to amend and Rule 12 dismissal are substantively the same, the district court adjudicated all pending motions in a single opinion and order. *Id.* at 5–6 (Page ID #21107–08). Accordingly, the district court "issue[d] an omnibus opinion and order, adjudicating plaintiffs' motion for leave to file a fourth amended complaint, and, if successful, defendants' motions to dismiss it in a single decision." *Id.* (entered April 1, 2019). The district court granted Defendants-Appellants' motions to dismiss Plaintiffs' claims alleging § 1983 equal-protection

---

[6]We approved this approach in *Waid v. Snyder*, No. 18-1967, slip op. (6th Cir. Feb. 19, 2019) (order).

violations, § 1985(3) conspiracy, Michigan's Elliott Larsen Civil Rights Act ("ELCRA"), § 1983 state-created danger, and gross negligence. *Id.* at 128 (Page ID #21230). But the district court denied Defendants-Appellants' motions to dismiss Plaintiffs-Appellees' § 1983 bodily-integrity claim on the bases of qualified and absolute immunity.[7] *Id.* at 127 (Page ID #21229).

Plaintiffs filed a Motion for Reconsideration of the April 1 order on April 15, 2019, regarding certain claims not at issue on this appeal. R. 809 (Pls. Mot. for Recons.) (Page ID #21864). The district court disposed of that motion on June 11, 2019. R. 880 (Order Den. Pls. Mot. for Recons.) (Page ID #23632).

## II. JURISDICTION

Under the collateral order doctrine, we have jurisdiction over the City and State officials' interlocutory appeals of the district court's denial of qualified immunity to the extent they raise legal questions. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985); *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018). The collateral order doctrine also provides us with jurisdiction over the City of Flint's and Governor Whitmer's interlocutory appeals from the district court's denial of Eleventh Amendment sovereign immunity. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993). We accordingly have jurisdiction over each party's appeal. *See* 28 U.S.C. § 1291.

## III. DISCUSSION

Defendants-Appellants argue that they are immune from suit and that the district court should have granted their Rule 12(b)(6) motions to dismiss Plaintiffs-Appellees' § 1983 bodily-integrity claim. "Given this procedural posture, we construe the complaint in the light most favorable to plaintiffs, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in plaintiffs' favor." *Guertin*, 912 F.3d at 916. At the same time, Plaintiffs' factual allegations must state a plausible claim. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–58 (2007)).

---

[7]The district court granted motions to dismiss in favor of some Defendants, who accordingly are not a part of this appeal. R. 798 (Op. & Order at 128) (Page ID #21230). Additionally, Plaintiffs' *Monell* claim was not certified for interlocutory appeal. *Id.* at 109 (Page ID #21211).

Defendants-Appellants are City and State officials, sued in their individual capacities; the City of Flint; and Governor Whitmer, sued in her official capacity.  We have already decided key issues of law in this case that came up in separate appeals:

(1)   the creation and cover-up of the Flint Water Crisis violated Flint residents' substantive due process right to bodily integrity, *Guertin*, 912 F.3d at 921;

(2)   that right was clearly established at the time, *id.* at 934;

(3)   the City of Flint is not entitled to Eleventh Amendment immunity, even though it was under State Emergency Manager control during the crisis, *id.* at 936; and

(4)   a request for prospective injunctive relief in the form of compensatory education, medical monitoring, and evaluation services can be pursued against the current Governor in her official capacity under *Ex parte Young*, *Boler*, 865 F.3d at 412–13.

Some (but not all) Defendants-Appellants were parties to the *Guertin* appeal and were denied qualified immunity in that case.

## A.  Qualified Immunity

The Defendant-Appellant City and State officials argue that qualified immunity shields them from suit.  We review de novo a district court's decision to deny qualified immunity.  *See Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 871 (6th Cir. 2012). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted); *see also Guertin*, 912 F.3d at 917. Plaintiffs allege that Defendants-Appellants violated their substantive due process right to bodily integrity. R. 620-3 (Fourth Am. Compl. at 167–69, ¶¶ 463–70) (Page ID #17970–72).  Because Plaintiffs do not allege that Defendants-Appellants intended to harm them, Plaintiffs-Appellees must demonstrate that they acted with deliberate indifference.  *Guertin*, 912 F.3d at 926.  The district court found Plaintiffs' allegations sufficient to state a claim against Defendants-Appellants. R. 798 (Op. & Order at 100) (Page ID #21202).

In *Guertin*, we held that City and State officials' role in creating, sustaining, and covering up the Flint Water Crisis violated Flint residents' right to bodily integrity, *Guertin*, 912 F.3d at 921, and that this right was clearly established at the time, *id.* at 934.  The substantive due process clause of the Fourteenth Amendment protects against conscience-shocking deprivations of liberty.  *Id.* at 918.  Violating a person's bodily integrity is a grave deprivation of their liberty. *See id.* at 918–19.  The *Guertin* plaintiffs were deprived of their bodily integrity when government officials forcibly invaded their bodies by misleading them into consuming a life-threatening substance.  *Id.* at 920–22.  Once that hurdle is met, whether the alleged conduct amounts to deliberate indifference depends on the circumstances, including whether the defendants had time to deliberate, whether there was an involuntary relationship, and whether there was a legitimate government purpose.  *See id.* at 922–26.  Each of these factors weighed against the defendants in *Guertin*.  *Id.* at 925–26.  And what was true there is true here:  "the generally alleged conduct [i]s . . . egregious."  *Id.* at 925.

The parties agree that lead and *legionella* are life-threatening substances and that these contaminants spread to residents through the water supply.  R. 798 (Op. & Order at 43) (Page ID #21145).  Flint residents had no choice but to receive their water through the City's water plan. *See Guertin*, 912 F.3d at 925 (citing Flint City Charter § 4-203(A); Flint Code of Ord. §§ 46-7, 46-50(b), 46-51, 46-52).  On top of that, "various defendants' assurances of the water's potability hid the risks, turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination."  *Id.* at 925–26.  The Flint Water Crisis was a "predictable harm" set into motion by alleged decisions that "took place over a series of days, weeks, months, and years."  *See id.* at 925.  Given officials' ample time to deliberate, "this known risk cannot be excused on the basis of split-second decision making."  *See id.*  Worse, the officials stood their ground.  The crisis was undeniable, but they refused to switch the City back to clean water, or even to take the meager step of introducing corrosion control, or even to admit that the water was poisoned.  "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."  *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

No legitimate government purpose justifies the City and State officials' actions. *See Guertin*, 912 F.3d at 926. "[J]ealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community." *Id.* The question remains whether each Defendant-Appellant's alleged actions individually amount to deliberate indifference. *See id.*

To state a claim for bodily integrity, Plaintiffs-Appellees must demonstrate that the officials' actions "shock the conscience"—here, through deliberate indifference. *See Guertin*, 912 F.3d at 922, 926; *see also Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). The standard for deliberate indifference is subjective recklessness. *Guertin*, 912 F.3d at 926. "[P]laintiffs must show the government officials 'knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights.'" *Id.* (quoting *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014)).

Critically, this case comes to us at the motion to dismiss stage. The allegations in the Complaint must be taken as true. *Id.* at 916. Some judges of this court have even noted that, because the facts at this stage are yet undeveloped, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal quotation omitted). With these principles in mind, Plaintiffs-Appellees have plausibly alleged that Defendants-Appellants violated their right to bodily integrity.

### 1. City Officials

Defendant-Appellant City Officials include Emergency Managers Earley and Ambrose, Public Works Director Croft, and Utilities Administrators Glasgow and Johnson. The *Guertin* court described Earley, Ambrose, and Croft as "instrumental in creating the crisis." 912 F.3d at 926. We have not had the opportunity previously to address the conduct of Glasgow and Johnson.

All of the Defendant-Appellant City Officials argue that they are entitled to qualified immunity because they acted based on professional opinions from MDEQ officials and private engineering firms. *See Butz v. Economou*, 438 U.S. 478, 507 (1978) ("Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law."); Appellant Br. (19-1425) at 25, 27–29, 31–34. We have already held, however, that, "[t]o the extent these defendants claim 'mistakes in judgment' because they reasonably relied upon the opinions of Michigan Department of Environmental Quality (MDEQ) employees and professional engineering firms, those are facts to be fleshed out during discovery and are not appropriate to resolve at the motion-to-dismiss posture." *Guertin*, 912 F.3d at 927 (citation omitted). The same reasoning applies here. At this stage, we must credit Plaintiffs' allegation that the Defendant-Appellant City Officials had *independent* knowledge that the Flint River water was causing a public health crisis—regardless of what the MDEQ or the engineering firms reported.

### a. Earley

Darnell Earley was Emergency Manager for the City from September 2013 (prior to the crisis) to January 2015 (in the midst of the crisis). Earley forced the switch to Flint River water when he knew that the FWTP was not ready and that it was important that the water be treated. R. 620-3 (Fourth Am. Compl. at 51, ¶ 147) (Page ID #17854); *see also Guertin*, 912 F.3d at 927. Plaintiffs-Appellees also allege that Earley directed City officials to lie to the public and tell them that the Legionnaires' disease outbreak in the summer of 2014 "was 'an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve.'" R. 620-3 (Fourth Am. Compl. at 59, ¶ 175) (Page ID #17862). Even after he was briefed on water quality issues by the MDEQ in the fall of 2014, Earley refused to reconnect to the DWSD. *Id.* at 60–61, ¶¶ 180–81 (Page ID #17863–64). He again refused to reconnect to the DWSD in January 2015, when officials were aware of the lead and *legionella* problems and after the University of Michigan ceased use of Flint River drinking water because of lead contamination. *Id.* at 62, ¶¶ 185–86 (Page ID #17865). These actions plausibly demonstrate deliberate indifference to the crisis that would likely result.

### b. Ambrose

Gerald Ambrose took over as Emergency Manager for the City of Flint in January 2015 (in the midst of the crisis). Prior to that, he had served as Earley's advisor, and had been notified about the Legionnaires' disease outbreak in the summer of 2014. *Id.* at 59, ¶ 175 (Page ID #17862). Like Earley, he repeatedly refused to reconnect to the DWSD—showcasing an indifference that was "especially egregious" in light of the undeniable and worsening crisis. *See Guertin*, 912 F.3d at 927. After State officials installed water coolers in Flint offices and the GCHD reported that the outbreak of Legionnaires' likely was connected to the use of Flint River water, the DWSD offered Ambrose a deal for reconnecting in January 2015. R. 620-3 (Fourth Am. Compl. at 81, ¶ 239) (Page ID #17884). He refused. *Id.* In February 2015, Flint residents publicly demanded reconnecting to the DWSD, and he again refused. *Id.* at 82, ¶ 243 (Page ID #17885). In March 2015, the Flint City Council voted to re-connect to DWSD. *Id.* at 86, ¶ 255 (Page ID #17889). Ambrose rejected their vote. *Id.* City and State officials were well aware of the crisis by January 2015 and were under the scrutiny of the GCHD and the EPA by March 2015. Ambrose's staunch refusal to stop use of Flint River water in spite of what he knew plausibly demonstrates deliberate indifference to the crisis.

### c. Glasgow

Michael Glasgow was a City Utilities Administrator, and the City's water treatment plant laboratory and water quality supervisor. Prior to making the switch to the Flint River, he knew that the FWTP was not ready and that the City would be distributing contaminated water. *Id.* at 46, ¶ 129 (Page ID #17849). He tried to stop the switch from happening but nevertheless participated in the transition. *Id.* He later told State investigators that Croft and Johnson, who were his superiors, pressured him to make the switch. *Id.* at 47, ¶ 130 (Page ID #17850). Plaintiffs-Appellees concede that Glasgow's conduct in implementing the switch did not demonstrate deliberate indifference. *See* Oral Argument at 1:12:52–1:13:10.

What Plaintiffs-Appellees take issue with is Glasgow's later role in covering up the extent of lead contamination. In July 2015, Glasgow wrote to Rosenthal that "Flint has lots of lead pipe, no corrosion control treatment" and that "[t]his is an unprecedented situation and EPA

needs to take this seriously. Now." *Id.* at 89, ¶ 267 (Page ID #17892). Despite what he knew, he distorted water quality tests to downplay the extent of the lead contamination. *Id.* at 89–91, ¶¶ 270–72 (Page ID #17893–94). Glasgow claims that he did so at the direction of MDEQ officials Busch and Prysby. *Id.* at 91, ¶ 273 (Page ID #17894). But as Plaintiffs-Appellees point out, Busch and Prysby were MDEQ (not City) officials who, unlike Croft and Johnson, had no authority over him. The facts, when fully developed, ultimately might show that Glasgow truly was coerced into distorting the water quality tests, so that he cannot be said to have acted with deliberate indifference. But at this stage, the allegations plausibly support a reasonable inference that he did act with deliberate indifference when he helped to cover up the crisis.

### d. Croft

Howard Croft was Public Works Director for the City of Flint. Croft permitted the switch to the Flint River even though he knew that the FWTP was not prepared to deliver safe drinking water. *Id.* at 47, ¶ 130 (Page ID #17850); *see also Guertin*, 912 F.3d at 927. In fact, Glasgow stated that Croft pressured him to make the switch despite Glasgow's warnings. R. 620-3 (Fourth Am. Compl. at 47, ¶ 130) (Page ID #17850). Croft also knew from the GCHD that the Legionnaires' disease outbreak was connected to Flint River water, and he did nothing. *Id.* at 138, ¶ 401 (Page ID #17941). His alleged role in creating and failing to mitigate the crisis plausibly demonstrates deliberate indifference.

### e. Johnson

Daugherty Johnson was another City Utilities Administrator. Along with Croft, he purportedly pressured Glasgow to make the switch to the Flint River despite Glasgow's warnings. *Id.* at 47, ¶ 130 (Page ID #17850). He also stonewalled the GCHD's attempt to investigate Flint River water quality issues and the outbreak of Legionnaires' disease. *Id.* at 83–84, ¶¶ 248–50 (Page ID #17886–87). His alleged role in creating and covering up the crisis plausibly demonstrates deliberate indifference.

### 2.  MDEQ Officials

Defendant-Appellant MDEQ Officials include State agency employees who permitted the switch to the Flint River, distorted water quality tests, and resisted concerns from other agencies like the EPA and the GCHD regarding the quality of Flint River water.  In *Guertin*, we stated that the MDEQ Officials—there, Busch, Shekter-Smith, Prysby, and Wurfel—"played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water[,] . . . falsely assured the public that the water was safe[,] and attempted to refute assertions to the contrary."  912 F.3d at 927.  We have not had the opportunity previously to address the conduct of Rosenthal and Cook.

The MDEQ Officials argue that they decided not to use corrosion control based on a mistaken, but reasonable, interpretation of the EPA Lead and Copper Rule.  Appellant Br. (19-1477) at 3–4, 38, 45.  But as we stated in *Guertin*, "[t]o the extent these defendants made 'honest mistakes in judgment'—in law or fact—in interpreting and applying the Lead and Copper Rule, that defense is again best reserved for after discovery."  912 F.3d at 928 (citation omitted).  At this stage, we must accept the reasonable inference from Plaintiffs' allegations that, whatever the MDEQ's purported justifications for its actions, it rushed the switch to the Flint River knowing it would deliver contaminated water and that the decision-makers cared only about cost, not water quality.  Their purported defense also does not explain why they failed to treat the water after they came under the EPA's scrutiny, or why they lied to the EPA.

Plaintiffs-Appellees plausibly allege a constitutional violation for each Defendant-Appellant MDEQ Official for the reasons stated below.

### a.  Shekter-Smith

Liane Shekter-Smith was the MDEQ Chief of the Office of Drinking Water and Municipal Assistance.  Despite knowing that Flint River water presented health risks, *see* R. 620-3 (Fourth Am. Compl. at 40, ¶ 105) (Page ID #17843), she secured the necessary administrative consent order (or ACO) and rushed the switch to the Flint River before the FWTP was ready, *see id.* at 45–46, ¶ 128 (Page ID #17848–49).  When reports poured in from residents that something was wrong with the water and that it was making them ill, she did nothing.  *See id.* at 57, ¶¶ 165–

67 (Page ID #17860).  After privately suggesting that the water might be contaminated, *id.* at 85, ¶ 252 (Page ID #17888), she publicly combatted the GCHD's *legionella* analysis, *id.* at 85–86, ¶¶ 252–53 (Page ID #17888–89).  And she did nothing to mitigate the crisis even after the Del Toral Report blew the whistle on high lead levels in Flint's water.  *Id.* at 87–88, ¶¶ 259–62 (Page ID #17890–91).  Her alleged role in creating, failing to mitigate, and covering up the crisis plausibly demonstrates deliberate indifference.

### b.  Rosenthal

Adam Rosenthal was the MDEQ Water Quality Analyst.  He did not stop the switch to the Flint River in spite of Glasgow's warning that the FWTP was not ready.  *Id.* at 46, ¶ 129 (Page ID #17849).  He knew as early as May 2014 that the water contained high TTHM levels that were above regulation (and indicated lead contamination), and did nothing.  *Id.* at 58, ¶ 172 (Page ID #17861).  In July 2015, Glasgow wrote to him that "Flint has lots of lead pipe, no corrosion control treatment" and that "[t]his is an unprecedented situation and EPA needs to take this seriously.  Now."  *Id.* at 89, ¶ 267 (Page ID #17892).  Yet, Glasgow wrote, "MDEQ is still publicly insisting Flint water has tested safe, is safe, and that [F]lint has no violations of any sort."  *Id.*  Rosenthal, apparently unmoved, soon afterward distributed a distorted water quality report that was altered to exclude high lead levels.  *Id.* at 91, ¶ 273 (Page ID #17894).  He has also been accused of manipulating and falsely reporting the test results.  *Id.*  His alleged role in creating, failing to mitigate, and covering up the crisis plausibly demonstrates deliberate indifference.

### c.  Busch

Stephen Busch was the MDEQ District Supervisor.  Busch knew as early as March 2013 that Flint River water presented health risks and would require significant treatment, *id.* at 40, ¶ 105 (Page ID #17843), but he did not stop the switch to the Flint River even after Glasgow warned him that the FWTP was not ready, *id.* at 46, ¶ 129 (Page ID #17849); *see also Guertin*, 912 F.3d at 927.  When the MDEQ came under the EPA's scrutiny for lead contamination, Busch lied and told Del Toral that the City was using corrosion control.  R. 620-3 (Fourth Am. Compl. at 83, ¶ 246) (Page ID #17886); *see also Guertin*, 912 F.3d at 928.  Busch claims that he

did not lie and that, instead, he simply informed the EPA that the City had a corrosion control *program* in place, meaning that the City was monitoring the water without treating it. *See* Appellant Br. (19-1477) at 54. That is quibbling with the facts and asks us to do what we cannot at this stage—to view the allegations in the light most favorable to him. *See Guertin*, 912 F.3d at 916. Plaintiffs' allegation stands.

Busch also lied to the GCHD. He told them that the evidence did not support a connection between the outbreak of Legionnaires' disease and the switch to the Flint River. R. 620-3 (Fourth Am. Compl. at 85–86, ¶ 253) (Page ID #17888–89). And according to Glasgow, Busch directed him to distort water quality tests to exclude high results for lead contamination. *Id.* at 91, ¶ 273 (Page ID #17894). Busch's alleged role in creating, failing to mitigate, and covering up the crisis plausibly demonstrates deliberate indifference.

### d. Prysby

Michael Prysby worked under Busch as an MDEQ Engineer for District 11, which serviced the City of Flint. Along with Busch, he did not stop the switch to the Flint River in the face of Glasgow's warnings, *id.* at 46, ¶ 129 (Page ID #17849); *see also Guertin*, 912 F.3d at 927; he did nothing in response to the Del Toral Report, R. 620-3 (Fourth Am. Compl. at 87–88, ¶¶ 259–62) (Page ID #17890–91); and he purportedly directed Glasgow to distort water quality tests to exclude high results for lead contamination, *id.* at 91, ¶ 273 (Page ID #17894). His alleged role in creating, failing to mitigate, and covering up the crisis plausibly demonstrates deliberate indifference.

### e. Cook

Patrick Cook was the MDEQ Water Treatment Specialist. He signed the permit that was the last necessary approval for the (rushed) use of Flint River water and the FWTP. *Id.* at 47, ¶ 132 (Page ID #17850). Like other officials, he at first did nothing in response to the Del Toral Report. *Id.* at 87–88, ¶¶ 259–62 (Page ID #17890–91). Then, in April 2015, he admitted in an email to Del Toral that "Flint is currently not practicing corrosion control at the [F]WTP," *id.* at 86–87, ¶ 257 (Page ID #17889–90), after Busch had lied and told the EPA that the City was using corrosion control, *id.* at 83, ¶ 246 (Page ID #17886). In the same email, however, Cook

"misled the EPA regarding the necessity of using corrosion control in Flint after the switch." *Id.* at 83, ¶ 247 (Page ID #17886). Cook contends that the email itself renders Plaintiffs' reading of it implausible. Reply Br. (19-1477) at 6–7.

When a document attached to the complaint contradicts the allegations, the document trumps the allegations. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012). For a document to contradict the complaint, it must "utterly discredit" the allegations. *Cagayat v. United Collection Bureau, Inc.*, 952 F.3d 749, 755 (6th Cir. 2020) (quoting *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386–87 (6th Cir. 2017)). The email at issue here does not utterly discredit Plaintiffs' allegations. Though Cook admits at the start of the email that the City is not using corrosion control, he then states that there was and is no need to do so because the Flint River water's testing results were within the regulatory limit of 15 ppb for lead. R. 735-3 (Cook Email at 2) (Page ID #20343) ("The first round of samples after switch-over from DWSD . . . had 90th percentiles of 6 ppb for Lead . . . . The highest lead result out of the 20 [samples] received [from the second round of testing] thus far is 13 ppb."). Touting allegedly distorted water quality test results and false compliance plausibly was misleading. Therefore, the district court was right to credit Plaintiffs' allegations. Cook's alleged role in creating and covering up the crisis plausibly demonstrates deliberate indifference.[8]

### f. Wurfel

Bradley Wurfel was the MDEQ Director of Communications and was instrumental in the coverup. In the summer of 2015, as concerns and criticism reached their peak, he repeatedly lied to the public and assured them that Flint River water was safe. R. 620-3 (Fourth Am. Compl. at 88–90, ¶¶ 265–70) (Page ID #17891–93); *see also Guertin*, 912 F.3d at 928. He told parents that "anyone who is concerned about lead in the drinking water can relax." R. 620-3 (Fourth Am. Compl. at 88, ¶ 265) (Page ID #17891). He cited distorted water quality tests as evidence that

---

[8]Defendant Cook notified us that the district court dismissed him from a separate Flint Water Crisis case, *Brown v. Snyder (In re Flint Water Cases)*, No. 18-cv-10726, 2020 WL 1503256, at *12 (E.D. Mich. Mar. 27, 2020). He contends that his dismissal from *Brown* similarly warrants his dismissal here. We disagree. The district court in *Brown* dismissed Cook because his wrongful conduct occurred after the plaintiff's injury in that case. *Id.* at *10, 12. The plaintiff in *Brown* had died of Legionnaires' disease before Cook allegedly misled the EPA. *Id.* There is no similar timing issue in this case.

"residents of Flint do not need to worry about lead in their water supply." *Id.* at 89–90, ¶ 270 (Page ID #17892–93). He even attacked independent whistleblower reports by Professor Edwards and Dr. Hanna-Attisha that stated that the City of Flint was in the midst of a major public health emergency. He accused Professor Edwards of "quickly prov[ing] the theory [he] set out to prove" and decried the "near-hysteria" resulting from Dr. Hanna-Attisha's report. *Id.* at 92, ¶ 275 (Page ID #17895); *id.* at 94, ¶¶ 283–84 (Page ID #17897); *see also Guertin*, 912 F.3d at 928.

Wurfel asks us to consider the context and totality of the statements he made, but points to nothing that directly negates Plaintiffs' allegations. *See* Appellant Br. (19-1477) at 50–52. We will not view the allegations in the light most favorable to the defendant—and that is essentially what Wurfel asks us to do. *See Guertin*, 912 F.3d at 916. We also reject his attempt to reargue his position in *Guertin* that "mere" public statements cannot violate a person's right to bodily integrity. *See* Reply Br. (19-1477) at 11–13. The *Guertin* court concluded that public statements like those alleged here did amount to a constitutional violation. 912 F.3d at 929. That decision controls. Wurfel's alleged role in covering up the crisis plausibly demonstrates deliberate indifference.

### 3. State Officials

The Defendant-Appellant State Officials sued in their individual capacities are Governor Snyder and Treasurer Dillon. We have not had the opportunity previously to address their conduct. We hold that Plaintiffs-Appellees plausibly allege a constitutional violation as to Snyder, but we refrain from deciding this question for Dillon until the district court has an opportunity to reconsider in light of *Brown v. Snyder (In re Flint Water Cases)*, No. 18-cv-10726, 2020 WL 1503256, at *9 (E.D. Mich. Mar. 27, 2020).

#### a. Governor Snyder

Governor Snyder was in office for the entire relevant time period. He "was personally involved in the decisional process which led to the transition from DWSD to the KWA," *id.* at 42, ¶ 114 (Page ID #17845), having himself coordinated the switch, *id.* at 43, ¶ 115–18 (Page ID #17846). And he knew that the Flint River would serve as the City's interim water source until

the KWA went online. *Id.* at 44, ¶ 119 (Page ID #17847). Prior to the switch, a member of his staff warned him that it "could lead to some big potential disasters down the road." *See id.* at 45, ¶ 127 (Page ID #17848). In spite of that warning, Snyder did not stop the switch from going forward.

Soon after the switch, there was evidence of corrosion and accompanying lead and *legionella* contamination. *See id.* at 58–60, 62, ¶¶ 173, 177, 187 (Page ID #17861–63, 17865). On October 13, 2014, General Motors stopped using Flint River water at its engine plant out of fear that the water would corrode its machinery. *Id.* at 60, ¶ 179 (Page ID #17863). The next day, a member of Snyder's executive staff expressed concern with the reports coming out about the water's contamination and recommended that they ask the Emergency Manager to switch back to the DWSD "as an interim solution to both the quality, and now the financial, problems that the current solution is causing." *Id.* at 60–61, ¶ 180 (Page ID #17863–64). Snyder's legal counsel similarly stated that the dangers posed by Flint River water were "downright scary" and "advised that, '[t]hey should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control.'" *Id.* at 61, ¶ 182 (Page ID #17864). Snyder evidently was unmoved.

In January 2015, the University of Michigan turned off certain water fountains on its Flint campus after tests revealed high levels of lead contamination. *Id.* at 62, ¶ 185 (Page ID #17865). Around the same time, the GCHD reported a likely "association between the spike in Legionnaires' disease reports and the onset of the use of Flint River water." *Id.* at 81, ¶ 237 (Page ID #17884). Meanwhile, State officials had water coolers discreetly installed in State buildings located in Flint, without announcing their concerns to the public. *Id.* at 80, ¶ 235 (Page ID #17883). At some point in 2015, Snyder met with other government officials to discuss the serious threats posed by lead and *legionella* contamination, and his office even considered distributing water filters to protect Flint water users. *Id.* at 80, ¶ 233 (Page ID #17883); *id.* at 84, ¶ 249 (Page ID #17887). But ultimately Snyder did nothing.

In addition to public reports from whistleblowers, Snyder's own staff kept him personally apprised of the worsening crisis. In April 2015, Snyder's chief of staff emailed Snyder and other staff members that "[t]he water issue continues to be a danger flag." *Id.* at 87, ¶ 258 (Page ID

#17890).  Soon afterward, Snyder's Director of Urban Initiatives spoke to Snyder directly and "advised him of the growing concerns among Flint residents that they were being exposed to toxic levels of lead."  *Id.* at 89, ¶ 269 (Page ID #17892).  Nothing came of it.  All the while, Snyder kept the crisis under wraps and stood by as the public continued to be poisoned.  The Governor's own task force eventually would disclose that Snyder failed to act in part because of cost.  *Id.* at 150–51, ¶¶ 420–21 (Page ID #17953–54).

Finally, after more than a year into the crisis, Snyder relented and ordered the City of Flint to reconnect with the DWSD on October 8, 2015.  *Id.* at 95, ¶ 287 (Page ID #17898).  He declared a State of Emergency *three months later* on January 5, 2016, and disclosed the *legionella* problem on January 13, 2016.  *Id.* at 97, ¶¶ 295–96 (Page ID #17900).  "Without a state of emergency, plaintiffs were denied valuable resources that could have helped abate the harm that they were still suffering."  R. 798 (Op. & Order at 46–47) (Page ID #21148–49).

Snyder argues in the first instance that he is entitled to qualified immunity because he acted (or failed to act) in reliance on the MDEQ and engineering firms' assessments.  *See* Appellant Br. (19-1472) at 37–40.  Again, "those are facts to be fleshed out during discovery and are not appropriate to resolve at the motion-to-dismiss posture."  *Guertin*, 912 F.3d at 927 (citations omitted).  For the same reason, his defense that any alleged disinformation or inaction arose from legitimate disagreements over "the nature and extent of the problems and the appropriate solution" is misplaced at this stage.  *See* Reply Br. (19-1472) at 8–11.

We agree with the district court that the allegations against Governor Snyder are sufficient to state a claim for deliberate indifference.  *See* R. 798 (Op. & Order at 39–47) (Page ID #21141–49).  Unlike the executive defendants in *Guertin*, Snyder personally contributed to creating this crisis.  The executives that we decided should have been dismissed in *Guertin* were Wyant, the Director of the MDEQ; Lyon, the Director of the MDHHS; and Wells, the Chief Medical Executive of the MDHHS.  *Guertin*, 912 F.3d at 929–31.  Wyant may have been "aware of some of the issues arising with the water supply post-switch," but there were no plausible allegations that "Wyant personally made decisions regarding the water-source switch" or that "he personally engaged" in other conscience-shocking conduct.  *Id.* at 929.  As for Lyon and Wells, we noted that "[t]he complaint set[] forth no facts connecting Lyon and Wells to the switch to the

Flint River or the decision not to treat the water, and there [wa]s no allegation that they took any action causing plaintiffs to consume the lead-contaminated water." *Id.* at 929–30. All that the plaintiffs alleged was a general "fail[ure] to 'protect and notify the public' of the problems with Flint's water," rather than allege a particular action taken by Lyon or Wells that would demonstrate their deliberate indifference. *Id.* at 930.

Plaintiffs' allegations here demonstrate that Governor Snyder personally was aware that Flint River water was contaminated and that he personally made the decision to switch the City from the DWSD to Flint River water. The allegations demonstrate that Snyder personally understood not just from public reports, but from *his own staff*, that Flint residents were being poisoned. Plaintiffs' allegations demonstrate that Snyder downplayed the problem and delayed taking action to protect the people of Flint, first by refusing to switch back to the DWSD, then by failing to supply Flint residents with protective supplies, and finally by waiting three months after the City connected back to the DWSD to declare a state of emergency. Snyder's alleged role in creating, failing to mitigate, and covering up the crisis plausibly demonstrates deliberate indifference.[9]

### b. State Treasurer Dillon

Andy Dillon was Treasurer for the State of Michigan when the City was in the process of switching to Flint River water. Dillon was asked to assess the cost effectiveness of staying with the DWSD or switching to the KWA. *See id.* at 39–40, ¶ 104 (Page ID #17842–43). Dillon ultimately recommended to Snyder that the Governor authorize the City to switch to the KWA, after Dillon learned that the City could fund the switch with an ACO that would require use of Flint River water in the interim. *Id.* at 41, ¶ 107 (Page ID #17844). Dillon was part of the core team that developed the interim Flint River plan, *see id.* at 44, ¶ 119 (Page ID #17847), and he knew that the FWTP would need to undergo significant upgrades before it could treat the water

---

[9]We note, without passing judgment, that the district court dismissed Governor Snyder from the action in *Guertin*. *See Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2418007, at *24 (E.D. Mich. June 5, 2017). It did so because there were no plausible allegations in that case that Governor Snyder personally was involved in the decision-making process for using Flint River water. *Id.* The plaintiffs' theory in *Guertin* was that Snyder should be on the hook merely because he appointed the City Managers who helped to create and sustain the crisis. *Id.* The same cannot be said here, as Plaintiffs have alleged Snyder's personal actions and knowledge in great detail.

properly, *id.* at 44, ¶ 122 (Page ID #17847).  In spite of what he knew, the Treasury pressed the MDEQ to secure the ACO quickly, so that the switch to the Flint River would take place before the FWTP was ready.  *Id.* at 130, ¶ 383 (Page ID #17933).

Plaintiffs-Appellees ask that we remand for the district court to decide whether to dismiss Dillon from this case.  Defendants-Appellants do not protest that request.  After we accepted this appeal, the district court dismissed Dillon as a defendant in a separate Flint Water Crisis case, *Brown v. Snyder (In re Flint Water Cases)*, No. 18-cv-10726, 2020 WL 1503256, at *9 (E.D. Mich. Mar. 27, 2020).  The district court recently discovered that Dillon was not Treasurer at the time of the actual switch to Flint River water in April 2014.  *Id.* at *9 n.13.  In light of that, the district court found that Dillon did not have authority over the switch and, therefore, that he cannot be found liable.  *Id.*  Without passing judgment on that decision, we see no issue with Plaintiffs-Appellees' request that we remand for the district court to decide in the first instance whether to dismiss Dillon in light of that fact.  *See Lopez v. Foerster*, 791 F. App'x 582, 586 (6th Cir. 2019) ("Although we have jurisdiction to decide the qualified-immunity question, given the unique circumstances of this case, we remand to the district court to consider the issue in the first instance.").

**B.  Eleventh Amendment Immunity**

The City of Flint and Governor Whitmer argue that they are entitled to Eleventh Amendment sovereign immunity.  "Whether Eleventh Amendment sovereign immunity exists in any particular case is a question of constitutional law that we review *de novo*."  *Mingus v. Butler*, 591 F.3d 474, 481 (6th Cir. 2010).

The Eleventh Amendment generally bars suits against the State, but generally does not bar suits against cities.  U.S. CONST. amend. XI ("The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *see also S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978).  Two quirks of immunity doctrine are at play in this

appeal. The district court correctly concluded that precedent from prior Flint Water cases precludes the City's and Governor Whitmer's arguments in this case.

### 1. City of Flint

The City argues that it is entitled to Eleventh Amendment sovereign immunity because it was under State emergency management during the events leading up to and during the Flint Water Crisis. "Although municipalities typically do not enjoy sovereign immunity, 'arms of the state' do." Appellant Br. (19-1425) at 36; *Metcalf*, 506 U.S. at 144 ("[A] State and its 'arms' are, in effect, immune from suit in federal court."). We already foreclosed this argument in *Guertin*. The *Guertin* court held that the City was not acting as an arm of the State when it was under State emergency management and, accordingly, that it was not entitled to sovereign immunity. 912 F.3d at 936. The City acknowledges that *Guertin*'s holding is binding on this panel. Appellant Br. (19-1425) at 36 n.15. It makes its present argument "for the purpose of preserving the issue for further appeal," if any. *Id.* We accordingly note that the City has preserved its argument and that we abide by our decision in *Guertin*.

### 2. Governor Whitmer

Plaintiffs seek prospective injunctive relief against Governor Whitmer in her official capacity to combat the ongoing effects from the violation of their constitutional rights. They accordingly seek "[a]n injunctive order to remediate the harm caused by the Government Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Class members for a period of time deemed appropriate by the Court." R. 620-3 (Fourth Am. Compl. at 214) (Page ID #18017). They also seek "[a]ppointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, criminal and juvenile justice evaluations." *Id.*

Under Rule 25(d) of the Federal Rules of Civil Procedure, the successor to an officer sued in their official capacity is "automatically substituted as a party." FED. R. CIV. P. 25(d). When Whitmer succeeded Snyder in January 2019, she automatically became a party to this

action in her official capacity as Governor. Whitmer argues that she is entitled to sovereign immunity because Plaintiffs fail to plead a proper *Ex parte Young* claim against her.

The State generally is immune from suit, but *Ex parte Young* provides an exception for plaintiffs seeking prospective injunctive relief against State actors in their official capacity. 209 U.S. at 156; *S&M Brands*, 527 F.3d at 507. Plaintiffs originally pleaded their *Ex parte Young* claims against Governor Snyder, but since Governor Whitmer has taken office, they have not amended their Complaint to include allegations against her personally. Appellant Br. (19-1472) at 52–53. Whitmer argues that, because the alleged unconstitutional conduct occurred solely in the past, the pleadings are deficient to state a claim for prospective injunctive relief. Plaintiffs-Appellees point out that we rejected a similar argument by Governor Snyder in *Boler*, a previous Flint Water case. 865 F.3d at 412–14.

Plaintiffs-Appellees seek prospective injunctive relief to remediate the ongoing harms stemming from the Flint Water Crisis. This type of relief is proper under *Ex parte Young*. *See Milliken v. Bradley*, 433 U.S. 267, 290 (1977). In *Milliken*, the Supreme Court held that, under *Ex parte Young*, courts could order newly integrated schools to implement remedial education programs in order to combat the lasting effects of *de jure* school segregation. *Id.* "[T]he victims of Detroit's *de jure* segregated system will continue to experience the effects of segregation," the Court reasoned, "until such future time as the remedial programs can help dissipate *the continuing effects of past misconduct*." *Id.* (emphasis added). Like the remedial education programs at issue in *Milliken*, the remedial measures that Plaintiffs-Appellees request here "are plainly designed to wipe out continuing [harms] produced by" the unconstitutional acts of Defendants-Appellants. *See id.*[10]

---

[10]Defendants-Appellants argue that we should look to *Green v. Mansour*, 474 U.S. 64 (1985)—not *Milliken*—to decide this case. They rely upon the Supreme Court's statement in *Green* that the Eleventh Amendment permits suits against the State only "designed to prevent ongoing violations of federal law." *Id.* at 71. *Green* is not on point. There, the Supreme Court held that plaintiffs could not seek notice relief ancillary to a declaratory judgment under *Ex parte Young* that would, in effect, serve only to provide them with retroactive monetary relief. *See Green*, 474 U.S. at 73 ("The issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment."). *Green* did not confront the same issue that is involved in this case—whether remedial measures to combat the effects of past constitutional violations are available as a form of prospective injunctive relief under *Ex parte Young*.

What was true in *Boler* remains true today:  "Damage to the water pipes has been done, and has ongoing effects."  865 F.3d at 413.  The year-long corrosion of public and private water pipes continues to contaminate the water, and the prolonged and extreme exposure to lead—particularly in children and mothers—will leave lasting developmental effects.  *See supra* pp. 17–18.  Plaintiffs have alleged ongoing effects from constitutional violations, even if the conduct at issue occurred solely in the past.  *See Boler*, 865 F.3d at 413.  Moreover, Plaintiffs' requests for repairs, medical monitoring, educational programs, and criminal and juvenile justice evaluations are identical to those sought and upheld in *Boler*.  *See Boler*, 865 F.3d at 413.

Nevertheless, Whitmer argues, this case is different because she personally did not commit the initial constitutional violations and she is not alleged to be deliberately indifferent now.  That distinction makes no difference.  As Plaintiffs-Appellees aptly state, "[a]n official-capacity suit for prospective relief is simply the vehicle by which the state can be compelled to fix a constitutional violation" committed in the past that has continuing effects.  Appellees Br. at 82 (citing *Lewis v. Clarke*, 137 S. Ct. 1285, 1290–91 (2017)).  It does not matter what Whitmer *personally* did or did not do in the past, or even in the present.  "Injunctive relief is appropriate here, not because the defendants will be deliberately indifferent again in the future, but because the past deliberate indifference has continuing effects."  *Id.* at 83 (citing *Boler*, 865 F.3d at 413).  We conclude that the district court rightly rejected Whitmer's Eleventh Amendment argument.

## IV.  CONCLUSION

We **AFFIRM** the district court's denial of the motions to dismiss with respect to every Defendant-Appellant except Treasurer Dillon.  We **REMAND** for the district court to decide whether Dillon should be dismissed in light of its decision in *Brown v. Snyder (In re Flint Water Cases)*, No. 18-cv-10726, 2020 WL 1503256, at *9 (E.D. Mich. Mar. 27, 2020).

---

## CONCURRING IN THE JUDGMENT IN PART AND DISSENTING IN PART

---

MURPHY, J., concurring in the judgment in part and dissenting in part.  Like other cases that have reached our court, this case arises out of the tragedy known as the Flint water crisis.  *See Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019); *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017).  The district court held that the plaintiffs' complaint stated actionable claims against many government actors in Michigan.  *Carthan v. Snyder*, 384 F. Supp. 3d 802, 839–43, 857–61 (E.D. Mich. 2019).  These government actors have taken this immediate appeal on qualified-immunity grounds.  Yet our court recently allowed similar claims to proceed against many of the same actors.  *Guertin*, 912 F.3d at 926–32.  I joined Judge Kethledge's dissent from the denial of rehearing en banc in that case.  *Guertin v. Michigan*, 924 F.3d 309, 315 (6th Cir. 2019) (Kethledge, J., dissenting from the denial of rehearing en banc).  While "the sympathies of every decent person run entirely to the plaintiffs" in all of these cases, I did not believe that the complaint's allegations met the Supreme Court's high bar "for prying away an officer's qualified immunity"—even at the early motion-to-dismiss stage.  *Id.* at 315–16; *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865–69 (2017).

Now, however, *Guertin* is circuit law that we must faithfully follow.  And this case's similarities to *Guertin* are striking.  This case's plaintiffs?  Flint residents who allege serious harm from contaminated water, just as in *Guertin*.  Its defendants?  State and local actors, many of whom were defendants in *Guertin*.  The claim?  That these actors violated the same substantive-due-process right to bodily integrity at issue in *Guertin*.  The procedural posture?  An appeal from the denial of a motion to dismiss the complaint, just as in *Guertin*.  The allegations?  Largely the same as in *Guertin*—that government actors played various roles in switching Flint's water supply to a contaminated source and then in concealing the water's contaminated nature.  The defenses?  The same qualified-immunity and sovereign-immunity defenses from *Guertin* (and *Boler*).

What does this background mean for this case?  As an initial matter, I would have written the majority opinion "in a different key."  *Guertin*, 924 F.3d at 311 (Sutton, J., concurring in the

denial of rehearing en banc).  This appeal arises at the pleading stage.  We must assume that the complaint's allegations are true even though many remain hotly contested by the defendants.  If discovery ends up showing only negligence on their part, the defendants may raise their qualified-immunity defenses at the summary-judgment stage.  *See id.* at 315; *Guertin*, 912 F.3d at 935.  Still, I agree with most of my colleagues' conclusions.  Under *Guertin*, I agree that the substantive-due-process claims must proceed against the defendants from the City of Flint (Emergency Managers Gerald Ambrose and Darnell Earley, Director of Public Works Howard Croft, and Utility Administrators Michael Glasgow and Daugherty Johnson).  And I agree that the claims must proceed against the defendants from the Michigan Department of Environmental Quality (Stephen Busch, Patrick Cook, Michael Prysby, Adam Rosenthal, Liane Shekter-Smith, and Bradley Wurfel).  Yet I respectfully disagree with my colleagues over whether *Guertin* permits the claim against former Governor Rick Snyder, and I also would resolve the claim against former Treasurer Andy Dillon now.  I read *Guertin* as requiring us to reject the claims against Snyder and Dillon.

Keep in mind that the *Guertin* appeal involved twelve individual defendants, but our court allowed claims to proceed against only seven of them.  912 F.3d at 932.  *Guertin* noted that public actors infringe a due-process right to bodily integrity when they injure individuals through conduct that "shocks the conscience."  *Id.* at 918–24.  And it chose a deliberate-indifference test to measure whether the defendants' actions in that case shocked the conscience.  *Id.* at 926.  That test (which *Guertin* called a "particularly high hurdle") required the plaintiffs to plausibly allege that the defendants "knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights."  *Id.* (internal quotation marks omitted).  Importantly, *Guertin* then explained that it must apply this test to "each individual defendant's conduct" because public actors cannot be held vicariously liable for the conduct of others under 42 U.S.C. § 1983.  *Id.* at 926, 929.

Why did *Guertin* find this test met for some defendants but not for others?  As I read our opinion, it distinguished the actors with the most day-to-day involvement in allegedly causing the crisis (or in allegedly covering it up) from higher-level officials with more supervisory roles

or other employees with more tangential roles. *See id.* at 926–32; *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 680–84 (2009).

On the one hand, *Guertin* allowed claims against the City of Flint employees who were allegedly the "chief architects" of the switch to the Flint River and who made that change while knowing that the Flint water-treatment plant was not ready. 912 F.3d at 926. *Guertin* also allowed claims against the "front and center" employees in the Michigan Department of Environmental Quality who allegedly "authorized use of Flint River water with knowledge of its contaminants and then deceived others to hide the fact of contamination." *Id.* at 927.

On the other hand, *Guertin* rejected a claim against Daniel Wyant, the Director of the Michigan Department of Environmental Quality, who managed these employees and who was "aware of some of the issues" with the water after the transition. *Id.* at 929. The plaintiffs did not allege that he "personally made decisions regarding the water-source switch, nor [did] they allege he personally engaged in any other conduct that [we found] conscience-shocking." *Id.* Similarly, the court rejected claims against Nick Lyon, the Director of the Michigan Department of Health and Human Services, and another executive in his department. *Id.* at 929–30. While these actors allegedly knew of problems with the water and failed to warn the public, those allegations fell "well-short of conscience-shocking conduct[.]" *Id.* at 930. *Guertin* lastly dismissed claims against two other lower-level employees in that department even though they allegedly sought to hide evidence of the crisis. *Id.* at 931–32. *Guertin* reasoned that the failure to "blow the whistle" did not suffice to meet its deliberate-indifference test. *Id.* at 932.

Now apply these standards to the thirteen defendants sued in their personal capacities in this appeal. *Guertin* already denied qualified immunity to seven of them—three defendants with the city (Earley, Ambrose, and Croft) and four with the Michigan Department of Environmental Quality (Busch, Prysby, Shekter-Smith, and Wurfel). *See id.* at 926–29. The complaint in this case makes allegations against these defendants that are analogous to those in *Guertin*. So *Guertin* requires us to allow the claims to proceed against these defendants in this case too.

*Guertin* did not consider two other defendants with the Michigan Department of Environmental Quality (Cook and Rosenthal) and two other defendants with the City of Flint

(Glasgow and Johnson). But the complaint's allegations against these actors fit the profile of those that *Guertin* found to shock the conscience. As I read *Guertin*, the key conscience-shocking allegations against the relevant actors were that they knowingly authorized use of contaminated water and engaged in "lies" by "deceiv[ing] others to hide the fact of contamination." *Id.* at 929; *see id.* at 927. The complaint in this case asserts similar claims against Cook and Rosenthal. Cook is alleged to have intentionally misled the EPA about the need for corrosion control by knowingly providing the EPA with false information. Compl., R.620-3, PageID#17886. And Rosenthal is alleged to have "willful[ly] participat[ed] in the manipulation of lead testing results[.]" *Id.*, PageID#17894. Similarly, Glasgow allegedly participated in testing that "purposefully skewed the results to minimize the crisis," wrongly telling residents "to run their water—or 'flush' it—before testing[.]" *Id.*, PageID#17893–94. Finally, in the days before the switch to the Flint River water source, Johnson allegedly pressured Glasgow to complete the transition even though Glasgow told him that the Flint plant was not ready to safely operate. *Id.*, PageID#17849–50. Under *Guertin*, these allegations against these defendants are enough.

That leaves the claims against former Governor Snyder and Treasurer Dillon, neither of whom were addressed by *Guertin*. As I see it, both are entitled to qualified immunity under *Guertin*'s own logic. Start with the former governor. From a bird's-eye view, *Guertin* already dismissed two of Snyder's cabinet-level officials—Directors Wyant and Lyon—because it viewed them as too far removed from the conscience-shocking conduct. 912 F.3d at 929–32. If Snyder's *subordinates* were too far removed from the crisis to remain defendants, that fact should make us think twice before allowing claims to proceed against an official even further removed.

To be sure, we are reviewing a different complaint. But the new allegations against Snyder do not overcome the "particularly high hurdle" that *Guertin* set. *Id.* at 926. Those allegations fall into two general time periods—those before the April 2014 transition to the Flint River water source and those after it. The allegations for both time periods fail to establish an actionable claim.

Before the transition, the complaint at least alleges that Snyder took an action. Sometime in mid-2013, he allegedly approved the transition after subordinates and city officials recommended it to him. Compl., R.620-3, PageID#17842–46. But the complaint fails to plausibly allege facts suggesting that this approval was callously indifferent to a then-known risk of harm. *See Guertin*, 912 F.3d at 926. Indeed, the complaint itself identifies an earlier study suggesting that Flint River water *could* satisfy regulations if the Flint plant received $69 million in upgrades. Compl., R.620-3, PageID#17839–40. And it also suggests that the switch contemplated upgrades. *Id.*, PageID#17853–59. Nothing in these allegations takes this claim outside the usual rule that most "governmental policy choices come with risks attached to both of the competing options, and yet 'it is not a tort for government to govern' by picking one option over another." *Guertin*, 912 F.3d at 924–25 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005)).

In that respect, Snyder's sign-off is nothing like the conscience-shocking actions allegedly taken by the "chief architects" of the transition. *Id.* at 926. Much later in April 2014, some of those defendants allegedly forced the transition through despite full knowledge that the Flint water-treatment plant was not ready to safely operate. *Id.* Indeed, the complaint alleges that Glasgow initially refused to approve the change but was pressured to proceed anyway. Compl., R.620-3, PageID#17849–50. The complaint makes no equivalent allegations against Snyder. At most, it identifies a March 2014 email from someone in the governor's office sent "to several others in the governor's office" suggesting that the expedited time frame was "less than ideal and could lead to some big potential disasters down the road." *Id.*, PageID#17848. The complaint does not even allege that the governor saw this email. Regardless, *Guertin* held that a claim could not proceed against Director Wyant even though the complaint alleged that he "was aware of some of the issues arising with the water supply post-switch[.]" *Guertin*, 912 F.3d at 929. Even if Snyder did receive this email, it would establish no more than the general awareness of issues followed by inaction that *Guertin* found insufficient.

After the transition, the complaint alleges that Snyder was "aware of the health crisis" by early 2015, but failed to take any "corrective action" until October 2015 (when he ordered a return to the prior water source) and January 2016 (when he declared a state of emergency).

Compl., R.620-3, PageID#17885; *see id.*, PageID#17887, 17891, 17898–17900.  The complaint adds that "public assurances provided by members of his Administration that Flint's water was 'safe' were recklessly false, and caused or contributed to the poisoning of Flint's citizenry."  *Id.*, PageID#17904; *see Carthan*, 384 F. Supp. 3d at 841–43.

        In two ways, these allegations are similar to the allegations against Directors Wyant and Lyon that *Guertin* found insufficient.  *First*, the complaint asserts no well-pleaded allegations that Snyder himself deceived the public; instead, it raises generic claims of deception against his "Administration."  Compl., R.620-3, PageID#17904.  Yet, as with respect to Director Wyant in *Guertin*, even if "the conduct of individuals within his [chain of command] was constitutionally abhorrent, we may only hold [Snyder] accountable for his own conduct, not the misconduct of his subordinates."  *Guertin*, 912 F.3d at 929 (citing *Iqbal*, 556 U.S. at 676–77).  *Second*, the complaint alleges that Snyder knew of the problems and failed to disclose them to the public or to act sooner.  Yet, as with respect to Director Lyon in *Guertin*, an alleged "fail[ure] to 'protect and notify the public'" cannot state a claim because substantive due process "is a limitation only on government action."  *Id.* at 930.  I thus would grant Snyder qualified immunity and dismiss him from this suit.

        Turn to former Treasurer Dillon.  My colleagues remand the claim against him so that the district court may reconsider its earlier decision in light of a later decision granting him qualified immunity in a parallel case.  Yet my analysis concerning Governor Snyder requires me to find Dillon entitled to qualified immunity too.  The complaint's only allegations against Dillon are that he was involved in the mid-2013 negotiations that led to Snyder's approval to switch Flint's water source.  Compl., R.620-3, PageID#17842–44, 17847, 17851; *Carthan*, 384 F. Supp. 3d at 858.  As I explained for Snyder, that decision did not plausibly allege any deliberate indifference to a then-known risk of harm.  *See Guertin*, 912 F.3d at 924–25 (citing *Schroder*, 412 F.3d at 729).

\* \* \*

One final loose end: the two sovereign-immunity defenses. For these defenses too, I agree with my colleagues. *Guertin* forecloses the City of Flint's invocation of sovereign immunity. *See id.* at 936. And *Boler* forecloses Governor Gretchen Whitmer's contention that the plaintiffs may not seek injunctive relief (identical to the injunctive relief requested in *Boler*) against the governor in her official capacity. *See* 865 F.3d at 413.

All told, then, I respectfully concur in the judgment in part and dissent in part.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 19-1425/1472/1477/1533

IN RE: FLINT WATER CASES.
_____

LUKE WAID, Parent and Next-Friend of SR,
a minor; et al.,

      Plaintiffs,


ELNORA CARTHAN et al.,

      Plaintiffs - Appellees,

v.

DARNELL EARLEY, GERALD AMBROSE, HOWARD CROFT,
MICHAEL GLASGOW, DAUGHERTY JOHNSON, and CITY OF
FLINT, MICHIGAN (19-1425); RICHARD DALE SNYDER, former
Governor of Michigan, ANDY DILLON, former Treasurer of
Michigan, and GRETCHEN WHITMER, present Governor of
Michigan (19-1472); LIANE SHEKTER-SMITH, STEPHEN
BUSCH, PATRICK COOK, MICHAEL PRYSBY, and BRADLEY
WURFEL (19-1477); and ADAM ROSENTHAL (19-1533),

      Defendants - Appellants.

> **FILED**
> May 22, 2020
> DEBORAH S. HUNT, Clerk

Before:  MERRITT, MOORE, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of the motions
to dismiss are AFFIRMED with respect to every defendant except Andy Dillon whose case is
REMANDED to the district court to reconsider his dismissal in light of *Brown v. Snyder (In re Flint
Water Cases)*.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk