## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| Elnora Carthan, *et al.*,<br><br>                              Plaintiffs,<br><br>                  -v-<br><br>Rick Snyder, *et al.*,<br><br>                              Defendants. | Case No.: 5:16-cv-10444-JEL-MKM<br><br>Hon. Judith E. Levy<br>Magistrate Judge Mona K. Majzoub |

## CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

For the reasons stated in the attached Memorandum of support, Declaration of Theodore J. Leopold in Support of Class Plaintiffs' Motion, and supporting exhibits, Class Plaintiffs, through their counsel, move[1] the Court: (1) pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), for certification of the Class and Subclasses defined below; (2) for appointment of Plaintiffs listed herein as Class representatives; (3) for appointment of Interim Co-Lead Class Counsel Theodore J. Leopold and Michael L. Pitt as Co-Lead Class Counsel

---

[1] Pursuant to Local Rule 7.1, Class Plaintiffs sought consent in this motion from Defendants, but did not obtain consent.

pursuant to Federal Rule of Civil Procedure 23(g); and (4) appointment of the

Executive Committee[2] to serve the Class.

Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4),

Plaintiffs move to certify a class defined as:

> All current and former residents of the City of Flint who, for any period
> of time between April 25, 2014 and October 16, 2015, received
> drinking water supplied by the City of Flint regardless of whether the
> resident purchased the water from the City.

For this class, Plaintiffs seek damages relating to Class members' quality of

life, economic harms sustained as a result of averting behaviors, and overcharges on

Class members' water bills. Plaintiffs' Trial Plan, attached as an exhibit to the

Declaration of Theodore J. Leopold, sets forth a roadmap for how these claims could

be justly and efficiently tried along with the claims of the Subclasses defined below.

Plaintiffs also move for certification of three damages subclasses, all of whose

members are also members of the larger class, under Federal Rule of 23(b)(3)

defined as:

- **Minors Subclass:** all children who, during the period from May 1,
  2014 to January 5, 2016, were (a) in utero or between the ages of 0 to
  10 years old, (b) lived in an identified residence or attended an

---

[2] On October 26, 2017, the Court appointed Stephen E. Morrissey, Paul F. Novak, Esther Berezofsky, Peretz Bronstein, and Teresa A. Bingman as to serve as members of an Interim Executive Committee. ECF No. 234. Plaintiffs move for these interim appointments to be made formal pursuant to Federal Rule of Civil Procedure 23(g).

identified school or day care, and (c) were exposed through ingestion[3] to unfiltered Flint public water at such residence, school or day care for at least 14 days within a 90 day period;

- **Residential Property Subclass:** all persons and entities who, from April 25, 2014 to present, owned residential property within the City of Flint;

- **Business Subclass:** all persons and entities, who, as of April 25, 2014 owned and operated a business within the City of Flint.

As the Minors Subclass seeks injunctive relief in addition to damages, Class Plaintiffs also move for certification of the Minors Subclass under Federal Rule of Civil Procedure 23(b)(2).

Dated: June 30, 2020                            Respectfully submitted,

*/s/ Theodore J. Leopold*                        */s/ Michael L. Pitt*
Theodore J. Leopold                             Michael L. Pitt
**COHEN MILSTEIN SELLERS &**      Cary S. McGehee
**TOLL PLLC**                                     **PITT MCGEHEE PALMER &**
2925 PGA Boulevard                           **RIVERS, P.C.**
Suite 220                                             117 West 4th Street
Palm Beach Gardens, FL 33410           Suite 200

---

[3] "Exposed through ingestion to unfiltered public water" means the child (or their mother) was exposed to unfiltered tap water for at least 14 days during a 90 day period between May 1, 2014 and January 5, 2016, through any combination of the following ways:
(1) For childhood exposure: the child drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered Flint tap water;
(2) For *in utero* exposure, the mother drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water), and/or ate food prepared with unfiltered Flint tap water, while pregnant.

2

(561) 515-1400 Telephone
tleopold@cohenmilstein.com

Joseph M. Sellers
Kit A. Pierson
Emmy L. Levens
Jessica B. Weiner
Alison S. Deich
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
jsellers@cohenmilstein.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
jweiner@cohenmilstein.com
adeich@cohenmilstein.com

Vineet Bhatia
Shawn Raymond
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street
Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

Stephen Morrissey
Jordan Connors
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave.
Suite 3800
Seattle, WA 98101
(206) 516-3880 Telephone
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com

Royal Oak, MI 48067
(248) 398-9800 Telephone
mpitt@pittlawpc.com
cmcgehee@pittlawpc.com

Paul Novak (P39524)
Diana Gjonaj (P74637)
Gregory Stamatopoulos (P74199)
**WEITZ & LUXENBERG, P.C.**
3011 West Grand Boulevard
Suite 2150
Detroit, MI 48226
(313) 800-4170 Telephone
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Robin L. Greenwald
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
(212) 558-5500 Telephone
rgreenwald@weitzlux.com

Esther E. Berezofsky
**MOTLEY RICE LLC**
210 Lake Drive East
Suite 101
Cherry Hill, NJ 08002
(856) 667-0500 Telephone
eberezofsky@motleyrice.com

Teresa Caine Bingman (P56807)
**THE LAW OFFICES OF TERESA A. BINGMAN, PLLC**
120 N. Washington Square
Suite 327
Lansing, MI 48933
(877) 957-7077 Telephone
tbingman@tbingmanlaw.com

Peretz Bronstein
Shimon Yiftach
**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
60 East 42nd Street
Suite 4600
New York, NY 10165
(212) 697-6484 Telephone
peretz@bgandg.com
shimony@bgandg.com

Bradford M. Berry
Anson C. Asaka
**NAACP**
4805 Mt. Hope Dr.
Baltimore, MD 21215
(410) 580-5777 Telephone
bberry@naacpnet.org
aasaka@naacpnet.org

Kathryn P. Hoek
**SUSMAN GODFREY, L.L.P.**
1901 Avenue of the Stars
Suite 950
Los Angeles, CA 90067
(310) 789-3100 Telephone
khoek@susmangodfrey.com

Neal H. Weinfield
**THE DEDENDUM GROUP**
(312) 613-0800 Telephone
nhw@dedendumgroup.com

Cirilo Martinez (P65074)
**LAW OFFICE OF CIRILO
MARTINEZ, PLLC**
3010 Lovers Lane
Kalamazoo, MI 49001
(269) 342-1112 Telephone
martinez_cirilo@hotmail.com

William Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
**GOODMAN & HURWITZ PC**
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170 Telephone
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com

Deborah A. LaBelle (P31595)
**LAW OFFICES OF DEBORAH A.
LABELLE**
221 N. Main St.
Suite 300
Ann Arbor, MI 48104
(734) 996-5620 Telephone
deblabelle@aol.com

Trachelle C. Young (P63330)
**TRACHELLE C. YOUNG &
ASSOCIATES PLLC**
2501 N. Saginaw St.
Flint, MI 48505
(810) 239-6302 Telephone
trachelleyoung@gmail.com

Brian McKeen (P34123)
Claire Vergara (P77654)
**McKEEN & ASSOCIATES, PC**
645 Griswold Street
Suite 4200
Detroit, MI 48226
(313) 961-4400 Telephone
bjmckeen@mckeenassociates.com
cvergara@mckeenassociates.com

Cynthia M. Lindsey (P37575)

4

David J. Shea
**SHEA AIELLO, PLLC**
26100 American Drive
2nd Floor
Southfield, MI  48034
(248) 354-0224 Telephone
david.shea@sadplaw.com

Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
**MCALPINE PC**
3201 University Drive
Suite 100
Auburn Hills, MI  48326
(248) 373-3700 Telephone
mlmcalpine@mcalpinelawfirm.com
jeblake@mcalpinelawfirm.com

Shermane T. Sealey (P32851)
**CYNTHIA M. LINDSEY &
ASSOCIATES, PLLC**
8900 E. Jefferson Avenue
Suite 612
Detroit, MI 48214
(248) 766-0797 Telephone
cynthia@cmlindseylaw.com
shermane@cmlindseylaw.com

Andrew P. Abood (P43366)
**ABOOD LAW FIRM**
246 East Saginaw Street
Suite One
East Lansing, Michigan 48823
(517) 332-5900 Telephone
andrew@aboodlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above case were served via the ECF filing system on July 16, 2020.

Dated: July 16, 2020

*/s/ Jessica B. Weiner*
Jessica B. Weiner
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
jweiner@cohenmilstein.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Elnora Carthan, *et al.*,

Plaintiffs,

-v-

Rick Snyder, *et al.*,

Defendants.

Case No.: 5:16-cv-10444-JEL-MKM

Hon. Judith E. Levy
Magistrate Judge Mona K. Majzoub

# MEMORANDUM IN SUPPORT OF
# CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

CONCISE STATEMENT OF THE ISSUES PRESENTED ................................. xii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........................... xiii

I.     INTRODUCTION ......................................................................1

II.    STATEMENT OF FACTS ...........................................................5

       A.    The Government Defendants Demonstrated Deliberate Indifference
             Toward the Health and Safety of the People of Flint............................5

             1.    Former Governor Snyder Personally and
                   Meaningfully Participated in Decisions that Caused
                   and Prolonged the Flint Water Crisis..........................................7

             2.    The MDEQ Defendants Played a Critical Role in
                   Causing and Prolonging the Flint Water Crisis. ......................11

             3.    Emergency Managers Earley and Ambrose
                   Repeatedly Refused to Return Flint to Safe Water..................18

             4.    The City Defendants Demonstrated Deliberate
                   Indifference Towards the Safety and Well-Being of
                   Flint Residents...........................................................21

       B.    LAN and Veolia's Negligent Provision of Professional Engineering
             Services Contributed to the Flint Water Crisis. ..................................22

             1.    LAN's Professional Negligence in Advising Flint
                   Regarding the Use and Treatment of the Flint River
                   and Water Treatment Plant Contributed to the Crisis..............22

             2.    Veolia Wrongly and Negligently Deemed Flint's
                   Water Safe; Veolia's Professional Negligence
                   Prolonged and Worsened the Flint Water Crisis. .....................26

C.      Defendants' Misconduct Resulted in Class-Wide Harms..................30

III.    PROPOSED CLASS AND SUBCLASS DEFINITIONS ...........................31

IV.     ARGUMENT................................................................................33

        A.      The Class and Subclasses Satisfy the Requirements of Federal
                Rule of Civil Procedure 23(a). ...........................................35

                1.      The Class and Subclasses Meet the Numerosity
                        Requirement. .............................................................35

                2.      The Flint Water Crisis Presents Factual and Legal
                        Questions Common to the Class and Subclasses......................36

                3.      As Residents of Flint, the Named Plaintiffs' Claims
                        Are Typical of the Claims of the Class and
                        Subclasses. ...............................................................37

                4.      The Named Plaintiffs Will Fairly and Adequately
                        Protect the Interests of the Class................................42

                        a.      The Named Plaintiffs Have Common Interests With
                                the Class.........................................................42

                        b.      The Named Plaintiffs Will Vigorously Prosecute the
                                Case.................................................................43

                        c.      Class Counsel Will Fairly and Adequately Represent
                                the Class.........................................................45

        B.      Common Questions of Law and Fact Predominate. ...........................46

                1.      Common Evidence Will Establish Defendants'
                        Liability....................................................................49

                        a.      Common Evidence Will Establish the Misconduct of
                                the Government Defendants. ..........................................49

      b.    Common Evidence Establishes the Engineering
Defendants' Professional Negligence...........................51

    2.    Common Evidence Will Establish that Defendants'
Actions Harmed the Class.........................................................63

    3.    The Flint Water Crisis Caused Ongoing Harm That
Will Continue Into the Future.................................................70

    4.    Common Evidence Will Establish Class-Wide
Damages for the Proposed Subclasses....................................73

        a.    Damages Suffered by Members of the Minors Subclass
Will Be Established Using Evidence Common to the
Subclass. .........................................................................73

        b.    Common Evidence and Methodology Will Establish
Injuries Sustained by Residential Property Owners. .......77

        c.    Common Evidence and Methodology Will Establish
Injuries Sustained to Flint Businesses. ...........................78

C.    Class Certification Is Superior to Other Methods of Adjudication.....79

D.    The Court Should Certify A Rule 23(b)(2) Class to Remedy the
Ongoing Effects of the Flint Water Crisis Through Prospective
Programmatic Relief............................................................................85

    1.    Defendants Acted or Refused to Act on Grounds
Generally Applicable to the Class. ..........................................88

    2.    The Flint Water Crisis Will Have Continued,
Prolonged, and Devastating Effects on the People of
Flint. .......................................................................................89

    3.    A Single Injunction Would Provide Prospective Relief
to Each Member of the Class. ..................................................89

          4.      This Court May Certify Both a Rule 23(b)(2) Class for Injunctive Relief and a Rule 23(b)(3) Class for Monetary Damages. ...................................................94

   E.     Each Claim and Each Class Member Has Common Issues Suitable for Certification Under Rule 23(c)(4). ......................................................97

V. CONCLUSION ................................................................................100

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Almendares v. Palmer,*
222 F.R.D. 324 (N.D. Ohio 2004) ...................................................42

*In re Am. Med. Sys., Inc.,*
75 F.3d 1069 (6th Cir. 1996) ..........................................................37

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997).................................................................80, 81

*Auto Owners Ins. Co. v. Seils,*
871 N.W.2d 530 (Mich. App. 2015)................................................62

*Baby Neal ex rel. Kanter v. Casey,*
43 F.3d 48 (3d Cir. 1994) ...........................................88, 90, 91, 92

*Barfield v. Cook,*
No. 3:18-cv-1198 (MPS), 2019 WL 3562021
(D. Conn. Aug. 6, 2019) ................................................................54

*Barry v. Corrigan,*
79 F. Supp. 3d 712 (E.D. Mich. 2015) ...........................34, 35, 37, 88

*Beattie v. CenturyTel, Inc.,*
511 F.3d 554 (6th Cir. 2007) ....................................................60, 61

*Bentley v. Honeywell Int'l, Inc.,*
223 F.R.D. 471 (S.D. Ohio 2004).............................................76, 96

*Boggs v. Divested Atomic Corp.,*
141 F.R.D. 58 (S.D. Ohio 1991).....................................................76

*Boler v. Earley,*
865 F.3d 391 (6th Cir. 2017) ..........................................................94

*Braggs v. Dunn,*
317 F.R.D. 634 (M.D. Ala. 2016).............................................92, 93

*Busch v. Guertin,*
  140 S. Ct. 933 (2020) ............................................................49

*Cameron v. Bouchard,*
  Civil Case No. 20-10949, 2020 WL 2569868
  (E.D. Mich. May 21, 2020) ...............................................35, 41, 90

*In re Cardizem CD Antitrust Litig.,*
  200 F.R.D. 297 (E.D. Mich. 2001) .........................................80

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ.,*
  797 F.3d 426 (7th Cir. 2015) .................................................87

*City of Miami v. Wells Fargo & Co.,*
  923 F.3d 1260 (11th Cir. 2019) .............................................67

*Coleman v. Gen. Motors Acceptance Corp.,*
  296 F.3d 443 (6th Cir. 2002) .................................................93

*Collins v. Olin Corp.,*
  248 F.R.D. 95 (D. Conn. 2008) .........................................37, 62

*In re Corrugated Container Antitrust Litig.,*
  643 F.2d 195 (5th Cir. 1981) .................................................43

*D.S. ex rel. S.S. v. N.Y. City Dep't of Educ.,*
  255 F.R.D. 59 (E.D.N.Y. 2008) .............................................87

*Daffin v. Ford Motor Co.,*
  458 F.3d 549 (6th Cir. 2006) .................................................83

*Day v. NLO,*
  851 F. Supp. 869 (S.D. Ohio 1994) ........................................61

*Dearduff v. Washington,*
  330 F.R.D. 452 (E.D. Mich. 2019) .........................................87

*Deposit Guar. Nat'l Bank v. Roper,*
  445 U.S. 326 (1980) ..............................................................81

*In re Dry Max Pampers Litig.,*
  724 F.3d 713 (6th Cir. 2013) .................................................43

*Elliott v. Chi. Hous. Auth.*,
   No. 98 C 6307, 2000 WL 263730 (N.D. Ill. Feb. 28, 2000) .............................91

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).........................................................................................47

*Fagan v. City of Vineland*,
   22 F.3d 1283 (3d Cir. 1994) .............................................................................94

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   334 F.R.D. 96 (E.D. Mich. 2019) .....................................................................99

*In re Flint Water Cases*,
   Nos. 17-10164, 17-cv-10342, 2019 WL 3530874
   (E.D. Mich. Aug. 2, 2019) ...............................................................................49

*In re Flint Water Cases*,
   Nos. 19-1425/1472/1477/1533, 960 F.3d 303 (6th Cir. 2020)....................70, 85

*Floyd v. City of New York*,
   959 F. Supp. 2d 540 (S.D.N.Y. 2013) ..............................................................87

*Gibson v. Cty. of Washoe*,
   290 F.3d 1175 (9th Cir 2002) ...........................................................................94

*Gilkey v. Cent. Clearing Co.*,
   202 F.R.D. 515 (E.D. Mich. 2001) ...................................................................97

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
   672 F.3d 402 (6th Cir. 2012) ............................................................................93

*Guertin v. Michigan*,
   912 F 3d 907 (6th Cir. 2019) ............................................................................49

*Guertin v. Michigan*,
   No. 16-cv-12412, 2017 WL 2991768 (E.D. Mich. July 14, 2017) ...................52

*IUE-CWA v. Gen. Motors Corp.*,
   238 F.R.D. 583 (E.D. Mich. 2006) ...................................................................88

*Jackson's Five Star Catering, Inc. v. Beason*,
   No. 10-10010, 2012 WL 3205526 (E.D. Mich. July 26, 2012).........................45

*In re Katrina Canal Breaches Consol. Litig.*,
　　Civil Action No. 05-4182, 2007 WL 3245438
　　(E.D. La. Nov. 1, 2007) ................................................................. 67

*Kelly v. Montgomery Lynch & Assocs., Inc.*,
　　No. 1:07-CV-919, 2007 WL 4562913 (N.D. Ohio Dec. 19, 2007) ............. 95, 96

*Loweke v. Ann Arbor Ceiling & Partition Co.*,
　　809 N.W.2d 553 (Mich. 2011) ......................................................... 52

*Martin v. Behr Dayton Thermal Prods. LLC*,
　　896 F.3d 405 (6th Cir. 2018) ........................................ 97, 98, 99, 100

*McDonald v. Franklin Cty.*,
　　306 F.R.D. 548 (S.D. Ohio 2015) .................................................. 95, 96

*Milliken v. Bradley*,
　　433 U.S. 267 (1977) ...................................................................... 94

*In re Nat'l Prescription Opiate Litig.*,
　　332 F.R.D. 532 (N.D. Ohio 2019) ...................................................... 99

*Nicholson v. Williams*,
　　205 F.R.D. 92 (E.D.N.Y. 2001) .......................................................... 87

*Olden v. LaFarge Corp.*,
　　383 F.3d 495 (6th Cir. 2004) .................................... 61, 76, 95, 96

*Owen v. City of Independence*,
　　445 U.S. 622 (1980) ...................................................................... 94

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
　　654 F.3d 618 (6th Cir. 2011) .......................................................... 81

*In re Polyurethane Foam Antitrust Litig.*,
　　314 F.R.D. 226 (N.D. Ohio 2014) ...................................................... 67

*Powers v. Hamilton Cty. Pub. Def. Comm'n*,
　　501 F.3d 592 (6th Cir. 2007) ...................................................... 37, 83

*Rikos v. Procter & Gamble Co.*,
　　799 F.3d 497 (6th Cir. 2015) .......................................................... 34

*Sam M. ex rel. Elliott v. Carcieri*,
608 F.3d 77 (1st Cir. 2010) ...................................................................44

*Schechner v. Whirlpool Corp.*,
No. 2:16-cv-12409, 2019 WL 978934 (E.D. Mich. Feb. 28, 2019) ..................67

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ...............................................................61

*Senter v. Gen. Motors Corp.*,
532 F.2d 511 (6th Cir. 1976) ...............................................................88

*Smith v. Gen. Motors Corp.*,
1977 WL 831 (E.D. Mich. Mar. 3, 1977) ................................................35

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ...............................................................36

*Stepp v. Monsanto Research Corp.*,
No. 3:91cv468, 2012 WL 604328 (S.D. Ohio Feb. 24, 2012) ..........................76

*Sterling v. Velsicol Chem. Corp.*,
855 F.2d 1188 (6th Cir. 1988) ...................................................*passim*

*In re Storage Tech. Corp. Sec. Litig.*,
113 F.R.D. 113 (D. Colo. 1986) ...........................................................33

*Thomas v. Cook Cty. Sheriff's Dep't*,
604 F.3d 293 (7th Cir. 2010) ...............................................................94

*In re Tri-State Crematory Litig.*,
215 F.R.D. 660 (N.D. Ga. 2003) ..........................................................54

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) .......................................................................73

*United States v. Sanders*,
452 F. 3d 572 (6th Cir. 2006) ..............................................................49

*Vargas v. City of Philadelphia*,
783 F.3d 962 (3d Cir. 2015) ...............................................................49

*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) ...............................................................42

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ................................................................61

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................34, 51, 94, 95

*Webb v. City of Maplewood*,
    889 F.3d 483 (8th Cir. 2018) ...............................................................94

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ......................................................*passim*

*Widdis v. Marathon Petroleum Co.*,
    No. 13-cv-12925, 2014 WL 11444248
    (E.D. Mich. Nov. 18, 2014) .......................................................*passim*

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ...............................................................41

*Ex parte Young*,
    209 U.S. 123 (1908)...........................................................................94

## RULES

Fed. R. Civ. P. 16 .....................................................................................33

Fed. R. Civ. P. 23 ..............................................................................*passim*

## OTHER AUTHORITIES

7AA C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure*
    § 1778 (3d ed. 2005) ..........................................................................73

David F. Herr, *Annotated Manual for Complex Litigation* § 21.24 (4th
    ed. 2020) ..........................................................................................100

7AA Mary Kay Kane, *Federal Practice & Procedure* § 1790 (3d ed.
    2020) .................................................................................................98

1 William B. Rubenstein, *Newberg on Class Actions* § 3:75 (5th ed.
    2020) .................................................................................................46

x

2 William B. Rubenstein, *Newberg on Class Actions* § 4:40 (5th ed. 2020) ................................................................................................... 87

2 William B. Rubenstein, *Newberg on Class Actions* § 4:91 (5th ed. 2020) ................................................................................................... 98

## CONCISE STATEMENT OF THE ISSUES PRESENTED

1.     Should the Court, pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), certify a class of all current and former residents of the City of Flint who, for any period of time between April 25, 2014 and October 16, 2015, received drinking water supplied by the City of Flint regardless of whether the resident purchased the water from the City?

       Plaintiffs' Answer: Yes.

2.     Should the Court, pursuant to Federal Rule of Civil Procedure 23(b)(3), certify a damages subclass consisting of: all children who, during the period from May 1, 2014 to January 5, 2016, were (a) in utero or between the ages of 0 to 10 years old, (b) lived in an identified residence or attended an identified school or day care, and (c) were exposed through ingestion to unfiltered Flint public water at such residence, school or day care for at least 14 days within a 90 day period ("Minors Subclass")?

       Plaintiffs' Answer: Yes.

3.     Should the Court, pursuant to Federal Rule of Civil Procedure 23(b)(2), certify a subclass of minors, defined above as the "Minors Subclass," for purposes of seeking final injunctive relief?

       Plaintiffs' Answer: Yes.

4.     Should the Court, pursuant to Federal Rule of Civil Procedure 23(b)(3), certify a damages subclass defined as: all persons and entities who, from April 25, 2014 to present, owned residential property within the City of Flint ("Residential Property Subclass")?

       Plaintiffs' Answer: Yes.

5.     Should the Court, pursuant to Federal Rule of Civil Procedure 23(b)(3), certify a damages subclass consisting of, all persons and entities, who, as of April 25, 2014 owned and operated a business within the City of Flint "Business Subclass"?

       Plaintiffs' Answer: Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

- Federal Rule of Civil Procedure 23
- 1 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2020)
- *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016)
- *In re Flint Water Cases*, Nos. 19-1425/1472/1477/1533, 960 F.3d 303 (6th Cir. 2020)
- *Guertin v. Michigan*, 912 F 3d 907 (6th Cir. 2019)
- *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405 (6th Cir. 2018)
- *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017)
- *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015)
- *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012)
- *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012)
- *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004)
- *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002)
- *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994)
- *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)
- *Widdis v. Marathon Petroleum Co.*, No. 13-cv-12925, 2014 WL 11444248 (E.D. Mich. Nov. 18, 2014)

## I.    INTRODUCTION

Class Plaintiffs seek certification of a Class—as well as Subclasses of Minors, Residential Property Owners, and Business Owners—to obtain relief for tens of thousands of Flint residents who suffered injuries caused by the Flint Water Crisis. The tragic events that resulted in a community receiving unsafe water as well as the legal issues required to fairly assess Defendants' liability are common to all the victims of this Crisis, as are many issues related to damages. Perhaps most importantly, the injunctive relief critical to ensure that this community receives the necessary ongoing programmatic support is the type of relief that is quintessentially sought and provided on a class-wide basis. For these reasons, Class Plaintiffs believe that their motion for certification of a Class and Subclasses should be granted.

This case involves two types of liability claims: (1) claims against the Government Defendants[1] for violations of the right to bodily integrity guaranteed by the Due Process Clause of the Fourteenth Amendment; and (2) claims for

---

[1] The following Government Defendants are sued in their individual capacities: former Governor Rick Snyder; former Treasurer Andy Dillon; former MDEQ employees Bradley Wurfel, Liane Shekter-Smith, Adam Rosenthal, Stephen Busch, Patrick Cook, and Michael Prysby ("MDEQ Defendants"); former Emergency Managers Defendants Darnell Earley and Gerald Ambrose ("EM Defendants"); former City of Flint employees Howard Croft, Michael Glasgow, and Daugherty Johnson ("City Defendants"); the City of Flint is also sued under a *Monell* theory of liability and current Governor Gretchen Whitmer is sued in her official capacity.

professional negligence against two professional engineering firms, LAN and Veolia (collectively, the "Engineering Defendants").[2] These claims turn on evidence and legal and factual issues that are all common to the Class. The Government Defendants' decisions that contributed to the Flint Water Crisis did not vary from one Class member to another, but rather will stand or fall on whether the common class-wide evidence of each Government Defendant's conduct satisfies the elements of the substantive due process claim. Likewise, the liability of the Engineering Defendants will depend exclusively on the common evidence regarding the scope of their professional duties to Flint and its residents, and the common course of conduct underlying the gross deficiencies in the work they performed and failed to perform for the City of Flint. These questions of law and fact are all common to the Class, satisfying the 23(a)(2) commonality requirement.

For both the Government Defendants and the Engineering Defendants, the common evidence will show that their failure to address, or to recommend standard measures for addressing, the high level of corrosivity in Flint drinking water resulted in dangerous lead poisoning for tens of thousands of Flint children and created an unnecessary risk of exposure to *legionella* and other bacteria. It further harmed Flint

---

[2] Lockwood, Andrews & Newnam, Inc., Lockwood, Andrews & Newnam, P.C., and Leo A. Daly Company (collectively, "LAN") and Veolia North America, LLC, Veolia North America, Inc., and Veolia North America Operating Services, LLC (collectively, "Veolia").

residents' quality of life by disrupting their access to a reliable water supply. And it caused hundreds of millions of dollars in damage from diminished property values, damaged pipes, fixtures, and appliances, and lost business income.

Class Plaintiffs will establish causal injuries and their right to pursue class-wide relief through common evidence and common methodologies. For the Minors Subclass, Class Plaintiffs, relying on a team of highly qualified experts, proffer a class-wide methodology for establishing that the children in the proposed Subclass were exposed to lead as a result of Defendants' conduct and sustained injuries as a result. Damages to the Class and Residential Property and Business Subclasses also will be established through common evidence and common methodologies. Class Plaintiffs' expert witnesses have submitted reports showing that the Flint Water Crisis caused hundreds of millions of dollars in lost property values and has further necessitated hundreds of millions of dollars in replacement costs for pipes, fixtures, and appliances that were damaged by corrosive water and still contain dangerous lead. And for each person in the Class, the Flint Water Crisis disrupted access to a potable water supply for more than two years, causing significant damage and disruption to those individuals' quality of life, requiring them to purchase alternative sources of water to replace contaminated tap water, and forcing them to pay for water that was both undrinkable and that damaged the pipes, fixtures, and appliances in their homes.

Class Plaintiffs' experts have identified common methodologies for estimating all the categories of damages they are seeking. As all major factual and legal issues pertaining to liability, causation, and damages will be established using evidence that is common to the class, such common questions predominate over any individualized issues, warranting certification of a damages class under Federal Rule of Civil Procedure 23(b)(3).

Certifying the proposed Class and Subclasses would ensure Flint residents a viable mechanism for pursuing justice on their claims arising from the Flint Water Crisis. While some Flint residents with individual personal injuries have chosen to pursue individual litigation, thousands and thousands of children, property owners, and businesses have suffered injuries that will go unremedied absent certification of a class. Critically, only a class action could allow for the determination of common liability and damages issues without a need for thousands of individual trials spanning many years, ensuring that all the victims of this tragedy receive justice in a timely fashion. Certifying the proposed Class and Subclasses is superior to any alternative and provides the best mechanism for managing these cases towards a just conclusion. For these reasons, expounded upon more fully herein, the Court should certify the proposed Class and Subclasses.

## II.    STATEMENT OF FACTS[3]

Class Plaintiffs allege that misconduct on the part of two groups of Defendants—the Government Defendants and Engineering Defendants—caused the Flint Water Crisis.  While discovery is ongoing, a brief discussion of the evidence as it exists to date is provided below.

### A.    The Government Defendants Demonstrated Deliberate Indifference Toward the Health and Safety of the People of Flint.

The Flint Water Crisis resulted, in part, from the Government Defendants' reckless decisions to: (1) supply Flint citizens with dangerous drinking water sourced from the Flint River, (2) refuse to switch back to Detroit water in the face of clear evidence that the river water they provided was poisoning Flint, and (3) falsely proclaim[4] that the drinking water provided to Flint was safe when it was not.

---

[3] Unless otherwise noted, all exhibits referenced herein are exhibits to the Declaration of Theodore J. Leopold.

[4] Both former Governor Rick Snyder and former Attorney General Bill Schuette have acknowledged the fact that government officials made false statements assuring the citizens of Flint that their water was safe, when it wasn't. *See* Ex. 1, former Governor Rick Snyder's Opening Statement before the U.S. House of Representatives Committee on Oversight and Government Reform at 1, dated March 17, 2016 ("[T]he Department of Environmental Quality assured us that Flint's water was safe. It wasn't."); *see also* Ex. 2, Attorney General "Schuette Charges Six More in Flint Water Crisis" Attorney General Press Release at 6 ("The victims are real people, families who have been lied to by government officials and been treated as expendable.").

All the Government Defendants knew or should have known, at the time the decision was made to use the Flint River, that they were consigning Flint's citizenry to drinking from a hazardous, bacteria-laden water source. In 2012, the U.S. Environmental Protection Agency ("EPA") issued a Compliance Order against Flint for, among other things, its failure to address illicit discharges into its municipal storm water sewer system that fed into the river.[5] A 2012 Michigan Department of Environmental Quality ("MDEQ") Report found that the Flint River was impaired with PCB contaminants in fish, elevated *E. coli* bacteria and elevated phosphorus.[6] In 2013, millions of gallons of raw and/or partially treated sewage were dumped into the Flint River during a rainstorm that activated overflow events from Flint, and the upstream communities of Beecher and Genesee Townships and Lapeer County.[7]

More troubling, the Holloway Reservoir on the banks of the Flint River was relied upon to augment river flow for the Flint plant.[8] But in 2013, the Richfield Township landfill went bankrupt, leaving an unlined solid waste dump to discharge contaminated landfill leachate with elevated per- and polyfluoroalkyl substance

---

[5] Ex. 3, Aug-14-2019 EGLE0033952-69.

[6] Ex. 4, Muchmore Dep. Ex. 8.

[7] Ex. 5, Prsyby Dep. Ex. 74 at 23-26.

[8] Ex. 6, Busch Dep. Ex. 180 at Oct-7-2019 EGLE0058095, Oct-7-2019 EGLE0058098-9.

("PFAS") levels directly into the Reservoir.[9] Internal documents demonstrate that the Government Defendants ignored these important safety concerns, acknowledging only that the Flint River was of "poorer raw water quality."[10]

### 1. Former Governor Snyder Personally and Meaningfully Participated in Decisions that Caused and Prolonged the Flint Water Crisis.

Former Governor Snyder has admitted to Congress that the Flint Water Crisis was, "a failure of government at all levels: local, state, and federal officials"[11] and that he personally, as well as his administration, had "failed the people of Flint."[12] Governor Snyder admitted to Congress that there were "questions [he] should have asked" and "answers [he] should have demanded."[13] Governor Snyder accepted the findings of his own task force[14] which, he acknowledged in his deposition in this case, included a finding that the Flint Water Crisis constituted "environmental injustice."[15]

Evidence compiled to date shows that former Governor Snyder turned a blind

---

[9] Ex. 7, Prsyby Dep. Ex. 75 at 3; Ex. 8, Prsyby Dep. Ex. 76.

[10] Ex. 9, Busch Dep. Ex. 178 at Oct-7-2019 EGLE0058027.

[11] Ex. 124, Mar-23-2020 GOV0129358 at Mar-23-2020 GOV0129362.

[12] *Id.* at Mar-23-2020 GOV0129368.

[13] *Id.* at Mar-23-2020 GOV0129362.

[14] *Id.* at Mar-23-2020 GOV0129374

[15] Ex. 125, Snyder Rough Dep. Tr. at 82:2-9.

7

eye to the mounting crisis unfolding in Flint, needlessly prolonging Class members' suffering and exacerbating their injuries. For example, Governor Snyder's Chief of Staff, with whom the Governor was in regular communication, admitted that he, "could have acted more quickly on the ministers' complaints . . . ."[16] Indeed, despite continued efforts to hide behind the MDEQ's repeated assertions that the water was safe, Governor Snyder admitted to Congress that, "common sense"[17] was ignored and his Chief of Staff admitted in this case that it is, "common sense" that "brown water is not safe."[18]

From the very beginning, the decision to switch Flint's water source away from the City of Detroit's Water and Sewerage Department ("DWSD") occurred with the approval of Governor Snyder in a process riddled with internal conflicts.[19] Governor Snyder served as the senior decision maker with respect to Flint's water switch, and he knew at the time of the decision that DWSD had terminated its supply

---

[16] Ex. 126, Muchmore Dep. Tr. at 534:11-14.

[17] Ex. 124 at Mar-23-2020 GOV0129424 (Snyder testifying that, "[t]here should have been corrosion controls and common sense from day one. they were not there.").

[18] Ex. 126, Muchmore Dep. Tr. at 567:3-6.

[19] In an October 31, 2012 email to Governor Snyder, his media spokeswomen identified that the issue "sets up potential conflict between these two communities." Ex. 10, Muchmore Dep. Ex. 4 at Oct-7-2019 EGLE0166887.

contract, which left Flint's interim water supply source in jeopardy.[20] On March 28, 2013, Treasurer Dillon,[21] Snyder's Emergency Manager Ed Kurtz, MDEQ Director Dan Wyant and others met to discuss Flint's switch of water sources and the possible use of the Flint River.[22] At the meeting, Treasurer Dillon stated that he would "make up [his] mind and *recommend to [the] Governor*."[23] Dillon acknowledged that, in the instance of the water source switch, "Governor Snyder himself had to approve."[24]

---

[20] On April 17, 2013, after Treasurer Dillon had communicated the State's intent to approve Flint's migration off of DWSD water, DWSD responded by giving Flint notice of termination of its supply contract effective April 17, 2014. Ex. 11, AMBROSE0003757. On April 19, 2013, Governor Snyder convened a meeting with Treasurer Dillon, MDEQ Director Wyant, Emergency Managers Kurtz and Orr, and others. Ex. 12, Walling Dep. Ex. 59. Snyder directed his Emergency Managers to engage in an additional week of negotiations with a "drop dead date" of April 26, 2013. Ex. 13, Walling Dep. Ex. 60. Detroit submitted a "final offer" on April 24, 2013. Ex. 14, Walling Dep. Ex. 63; Ex. 17, Walling Dep. Tr. at 701:12-24. And Kurtz responded with a rejection of that offer on April 26, 2013. Ex. 15, COF_FED_0114990. By that date, the loss of an interim supply source was discussed at the meeting Governor Snyder convened on April 19, 2013. Ex. 17, Walling Dep. Tr. at 694:20-695:9.

[21] At this time, Class Plaintiffs will not address former Treasurer Andy Dillon's role pursuant to this Court's request that supplemental briefing occur from the parties on whether Dillon should be dismissed. Agenda for June 24, 2020 Status Conference at 2, June 17, 2020, ECF No. 1169.

[22] Ex. 16, Walling Dep. Ex. 62.

[23] *Id.* at COF_FED_0540996 (emphasis added).

[24] Ex. 17, Walling Dep. Tr. At 564:19-20; *see also* Ex. 125, Snyder Rough Dep. Tr. at 98:11-15 (admitting that he was involved in the decision-making process to switch water sources from DWSD water to the Karegnondi Water Authority ("KWA")).

And internal documents confirm that the process by which DWSD submitted a final proposal, which was rejected, all occurred "per the plan" that Governor Snyder put in place.[25]

On multiple instances after the water source switch occurred, Governor Snyder and his administration considered restoring Flint's connection to DWSD water which was known to be safe and potable. By October 2014, Governor Snyder had been briefed about the City's *E. coli* and total coliform bacteria exceedances[26] and General Motors had announced its departure from Flint water due to corrosivity concerns. Around this same time, Valerie Brader, one of the Governor's top environmental advisers expressed concern about media reports that the people of Flint were being treated like "laboratory rats"[27] and Michael Gadola, the Governor's Chief Legal Counsel, advised that Flint should reconnect with Detroit "before this thing gets too far out of control."[28] But Governor Snyder ignored these pleas from his own, most-senior advisors and was re-elected to office the following month.

Mounting evidence that Flint's water posed serious health risks continued to be provided to Governor Snyder and his administration, to no avail. In January 2015,

---

[25] *See, e.g.*, Ex. 18, Mar-23-2020 GOV0203612; Ex. 19, SOM0037482.

[26] Ex. 20, Muchmore Dep. Ex. 36; Ex. 21, 04-22-2016 SOM-KIDD 0002898.

[27] Ex. 22, Muchmore Dep. Ex. 39.

[28] *Id.* at COF_FED_0123640.

Flint Mayor Walling participated in a conference call with Governor Snyder and his Chief of Staff and asked to switch back to Detroit. They refused.[29] That same month, Governor Snyder's urban affairs adviser Harvey Hollins raised with the Governor the issue of lead exposure and the need to address it.[30] Indeed, it took more than nine months before Governor Snyder publicly acknowledged the problem and a full year before he declared a State of Emergency.  Instead, he turned a blind eye toward this and other troubling information to the detriment of an entire community.

### 2. The MDEQ Defendants Played a Critical Role in Causing and Prolonging the Flint Water Crisis.

The MDEQ Defendants were aware of the significant risks posed by the Flint River water, failed to properly regulate Flint's water source, repeatedly downplayed the risks, and continued to tell the public that the water was safe long after they had reason to believe it was not.

***Former MDEQ District Supervisor Stephen Busch.*** Busch knew as early as March 2013 that Flint River water presented health risks and would require significant treatment.[31] Even after Flint plant supervisor Michael Glasgow had

---

[29] Ex. 17, Walling Dep. Tr. at 782:20-783:6, 783:23-785:19.

[30] Ex. 24, SOM-AG-LYON_0000019 at 91:11-18, 92:13-93:17, Lyon Prelim. Examination Tr., 17T-1355-FY, Nov. 1, 2017.

[31] Ex. 23, Busch Dep. Tr. at 101:15-102:23; Ex. 25, Dec-16-2019 DHHS0196751.

warned MDEQ Officials, including Busch, Prysby, and Rosenthal, that the Flint Water Treatment Plant ("FWTP") was not ready on April 17, 2014, Busch did not take any action.[32] Busch admitted that "[c]ertainly DWSD was an alternative supply that could have been used [for Flint]" as an interim source.[33] However, the MDEQ gave the green light to begin processing raw Flint River water through the FWTP *without* the necessary use of orthophosphates, which, as Busch knew, was the corrosion control Flint had in place *prior* to the switch.[34] Busch further acknowledged that in January 2015,[35] he "was aware that there had been detectable levels of lead within the city of Flint's customer taps."[36] Despite this knowledge, when the MDEQ came under EPA scrutiny for lead contamination in early 2015, Busch e-mailed EPA employee Miguel Del Toral on February 27, 2015 that the City

---

[32] Ex. 26, COF_FED_0342353; Ex. 23, Busch Dep. Tr. at 132:6-8.

[33] Ex. 23, Busch Dep. Tr. at 412:17-18.

[34] Ex. 27, Glasgow Dep. Tr. at 481:1-5; Ex. 23, Busch Dep. Tr. at 227:3-6.

[35] Busch testified that people were "concerned about taste, odor, and color of the water, as well as the issue of the TTHM maximum contaminant level violation." Ex. 23, Busch Dep. Tr. at 75:10-14. He also confirmed that he was aware of consumer complaints made to the City of Flint, the State, the EPA and that Jim Henry, Environmental Health Director at the Genesee County Health Department was concerned about *legionella* at the time. *Id.* at 365:1-13.

[36] Ex. 23, Busch Dep. Tr. at 333:18-22.

was using corrosion control[37] when it was not.[38] Just a day before, Busch received

an e-mail from Jennifer Crooks at the EPA raising concerns that "there's actual

evidence that the water is leaching contaminants from the biofilms" and that "*[l]ead

is a good indication that other contaminants are also present in the tap water*."[39]

Two weeks later, Busch told the Genesee County Health Department ("GCHD") that

the "evidence" did not support a connection between the outbreak of Legionnaires'

disease and the switch to the Flint River.[40] And according to Glasgow, Busch and

Prysby directed him to distort water quality tests to exclude high results for lead

contamination.[41]

**Former Chief of Office of Drinking Water Liane Shekter-Smith.** Shekter-

Smith was similarly aware of the many dangers associated with Flint River water.

Prior to the switch, she knew that transitioning to Flint River water posed an

---

[37] Glasgow testified that he understood that the SDWA *required* Flint to have optimal corrosion control yet MDEQ Officials, including Prysby told him "*that we didn't need to add any corrosion control*, that they were going to wait and do two six-months' rounds of monitoring before it was decided." Ex. 27, Glasgow Dep. Tr. at 74:1-8 (emphasis added).

[38] Ex. 28, Glasgow Dep. Ex. 22 at Oct-7-2019 EGLE0126915.

[39] Ex. 29, Busch Dep. Ex. 185 (emphasis added).

[40] Ex. 30, Wurfel Dep. Ex. 47.

[41] Ex. 27, Glasgow Dep. Tr. at 162:4-6 ("On a conference call a few days after that report was submitted, [Busch and Prysby] asked me to remove that and one other [high lead] number.").

13

increased risk, and relayed this to her superiors.[42] Early on she received complaints from residents made to the MDEQ, the City, and the EPA that the water was discolored, not drinkable, smelled, and tasted odd.[43] Despite this, she praised Busch's response to GCHD regarding the unlikelihood that *legionella* was connected to the river water—but she did so *after* privately suggesting that the change in water source may have created conditions to support *legionella* growth.[44] She was included with the EPA correspondence in early 2015 identifying problems with the water.[45] By July 2015, Shekter-Smith, Busch, and MDEQ Director Dan Wyant had copies of a June 2015 report by Del Toral (hereinafter "Del Toral Report") raising concerns about widespread lead in Flint's water supply and the absence of corrosion control.[46]

***Former MDEQ Water Analyst Adam Rosenthal.*** As a water analyst for the MDEQ, Rosenthal admitted he was aware of the dangers of Flint's water prior to the switch. This caused him anxiety to the point he was ready to quit, and he was not

---

[42] Ex. 31, Shekter-Smith Dep. Ex. 5; Ex. 32, Shekter-Smith Rough Dep. Tr. at 36:6-38:14.

[43] Ex. 32, Shekter-Smith Rough Dep. Tr. at 62:18-64:21. By early 2015, she was aware of the boil water advisories, TTHM exceedances, GM's decision to stop using Flint River water, a *legionella* outbreak, and that at least one person had a rash from the water. Ex. 32, Shekter-Smith Rough Dep. Tr. at 73:3-74:6.

[44] *Compare* Ex. 33, Aug-14-2019 EGLE0277413; Ex. 30, Wurfel Dep. Ex. 47 at SOM-KIDD 0000344.

[45] Ex. 34, Aug-14-2019 EGLE0053950.

[46] Ex. 35, Wurfel Dep. Ex. 23; Ex. 36, 04-15-2016 SOM0008083.

surprised when complaints began to pour in.[47] He acknowledged that in early 2015 "everybody wanted to know about Flint and their lead" and that independent sources were telling the MDEQ there were serious problems with the water.[48] On July 9, 2015, Glasgow e-mailed Rosenthal warning that Flint had not done proper lead testing for at least a year and that "Flint has lots of lead pipe, no corrosion control treatment" and that "[t]his is an unprecedented situation [ ]."[49] In that same e-mail, Glasgow points out to Rosenthal that breast feeding rates are lower in Flint and formula usage requiring water is higher.[50] Demonstrating complete indifference to the situation, Rosenthal testified that he and Busch directed Glasgow to exclude two high lead samples from a monitoring report and he understood that the removal of those two samples would bring the City of Flint below actionable levels with respect to lead.[51]

---

[47] Ex. 37, Rosenthal Dep. Tr. at 340:10-18, 341:4-11.

[48] *Id.* at 234:3-21.

[49] Ex. 38, FLINT-DEQ_0002_0080 (capitalization omitted); Ex. 27, Glasgow Dep. Tr. at 319:18-23.

[50] Ex. 38, FLINT-DEQ_0002_0080.

[51] Ex. 37, Rosenthal Dep. Tr. at 134:14-24, 135:9-16.

***Former MDEQ Specialist for Community Drinking Water Unit Patrick Cook.*** Like his colleagues, Cook[52] did not stop the switch to the Flint River and was the official who signed the permit for the rushed use of the FWTP on behalf of Michael Prysby.[53] On April 24, 2015, Cook finally admitted in an email to Del Toral of the EPA that "Flint is currently not practicing corrosion control treatment at the [F]WTP;" however, in that same e-mail he indicated to the EPA that corrosion control may not be necessary in Flint after the switch.[54] Cook's admission contradicted Busch's prior response which indicated the City *was* employing corrosion control.[55] Subsequently, he too was in receipt of the Del Toral Report identifying concerns of widespread lead in Flint.[56]

***Former MDEQ District 11 Engineer Michael Prysby.*** Prysby worked under Busch as an MDEQ Engineer for District 11, which serviced the City of Flint. He did not stop the switch to the Flint River in the face of warnings from others, including Rosenthal who told Prysby that it "[was] a mistake" and that the executive

---

[52] As of this filing, Cook's deposition, and the depositions of many other Defendants and non-party witnesses, have not been completed. Accordingly, Class Plaintiffs reserve their right to supplement the record should the need arise.

[53] Ex. 41, 7-6-2016 SOM-Mason 00070645.

[54] Ex. 40, Bincsik Dep. Ex. 163 at 04-15-2016 SOM0007266.

[55] Ex. 28, Glasgow Dep. Ex. 22 at Oct-7-2019 EGLE0126915.

[56] Ex. 41, 6-6-2016 SOM-Mason 00046145-50.

16

branch "[was] overriding us."[57] On March 10, 2015, the GCHD wrote to Prysby, Busch, Ambrose, Croft, the mayor, and other City officials that the uptick of *legionella* was serious and corresponds to the timeframe of the switch of water sources.[58] A few weeks before this he informed the EPA he possessed a test indicating extremely high levels of lead in a resident's home.[59] Despite this, he and Busch directed Glasgow to distort water quality tests to exclude high results for lead contamination.[60]

**Former MDEQ Director of Communications Bradley Wurfel.** Wurfel played an active role assuring the public the water was safe when it was not while he and others at the MDEQ[61] were aware of significant risks—conduct that even former Governor Snyder admitted could be "viewed as indifference."[62] For example, in July 2015, after the EPA had warned MDEQ about elevated lead levels in Flint drinking water, and after he was in possession of the Del Toral report,

---

[57] Ex. 37, Rosenthal Dep. Tr. at 42:10-21.

[58] Ex. 30, Wurfel Dep. Ex. 47 at 04-22-2016 SOM-KIDD 0000345.

[59] Ex. 42, Rosenthal Dep. Ex. 16 at Oct-7-2019 EGLE0051053.

[60] Ex. 27, Glasgow Dep. Tr. at 162:4-6.

[61] With respect to his MDEQ briefings and reports to the media, Wurfel testified that his "top three sources of information for Flint water" were Busch, Prysby, and Shekter-Smith. Ex. 43, Wurfel Dep. Tr. at 66:9-22.

[62] Ex. 125, Snyder Rough Dep. Tr. at 65:20-21.

Wurfel advised on public radio that the Flint drinking water was safe, and was not causing "any broad problem" with lead and that people concerned about their water "can relax."[63] It was not until October 18, 2015, that Wurfel made on the record remarks on behalf of MDEQ Director Dan Wyant unequivocally admitting to the public that the MDEQ made a serious mistake in interpreting the Lead and Copper Rule ("LCR") putting them in danger.[64] MDEQ Defendants' role in creating, failing to mitigate, and covering up the crisis resulted in the poisoning of thousands. However, their denial of a crisis continues to this day.[65]

### 3. Emergency Managers Earley and Ambrose Repeatedly Refused to Return Flint to Safe Water.

***Former Emergency Manager Darnell Earley.*** Earley served as Emergency Manager of Flint from September 2013 to January 2015. After receiving notification regarding *legionella* contaminants in the water supply, he directed City officials to

---

[63] Ex. 43, Wurfel Dep. Tr. at 179:17-22, 184:1-4; Ex. 35, Wurfel Dep. Ex. 23.

[64] Ex. 44, Wurfel Dep. Ex. 68. Demonstrating indifference to the fact that their erroneous interpretation caused people to be harmed, Busch testified that he and Liane Shekter-Smith "disagreed that there was a mistake." Ex. 23, Busch Dep. Tr. at 390:16-18.

[65] Rosenthal testified on March 6, 2020 that he "[didn't] know" whether any children were hurt as a result of the exposure to the water from the Flint River. Ex. 37, Rosenthal Dep. Tr. at 332:1-8. Similarly, Busch testified that he "[didn't] know. It may be possible" that individuals were injured as a result of consuming water from the Flint River between April 2014 and the present. Ex. 23, Busch Dep. Tr. at 405:23-406:8.

report that a Legionnaires outbreak was "an internal issue at McLaren [Hospital] that they are working on with our assistance, not a Flint water problem that we are trying to resolve."[66] He also refused to reconnect to the DWSD, despite having received a forwarded e-mail from the Governor's Policy Advisor Valerie Brader detailing concerns.[67] Earley subsequently had a conversation with Brader and Governor Snyder's advisor Richard Baird regarding those concerns, yet he failed to recommend Flint should return to DWSD stating it would be "really expensive."[68] Again, in January 2015, after the DWSD made an offer to work with Earley to return, his policy was stay on the Flint River.[69]

    ***Former Emergency Manager Gerald Ambrose.*** Like his predecessor, Ambrose also had repeatedly refused to reconnect to the DWSD.[70] Prior to becoming Emergency Manager in January 2015, Ambrose had served as Earley's advisor, and had been notified about Legionnaires in the fall of 2014,[71] and by March of 2015

---

    [66] Ex. 45, Johnson Dep. Ex. 142 at COF_FED_0140171.

    [67] Ex. 46, Brader Dep. Ex. 11.

    [68] Ex. 47, Brader Dep. Tr. at 117:23-118:13.

    [69] Ex. 48, Ambrose Ex. 25; Ex. 49, Ambrose Dep. Tr. at 122:10-14.

    [70] *See* Ex. 50, Johnson Dep. Tr. at 355:3-11 (Johnson agreed that "switching back to Detroit water was something that was just not going to happen" was "certainly a statement made by Jerry Ambrose at times after we had switched over to the Flint River.").

    [71] Ex. 45, Johnson Dep. Ex. 142.

was included in the GCHD's e-mail suggesting the uptick in Legionnaires was connected to the water switch.[72] He also was aware that the FWTP required a series of improvements *prior* to its usage,[73] and attended a City Hall meeting with MDEQ officials in 2014 to discuss total trihalomethanes ("TTHMs") and *legionella*.[74] Despite this, Ambrose rejected the notion of reconnecting to DWSD in January 2015, stating, "Detroit is not in our plans at this time."[75]

Daugherty Johnson, Flint's former Utilities Administrator, testified that in February 2015 he made plans to reconnect to the DWSD, but Ambrose overruled him.[76] In March 2015, the Flint City Council voted to "do all things necessary" to re-connect to DWSD, but Ambrose again rejected their vote stating that it was "incomprehensible."[77] Even on his last day in office, on April 29, 2015, Ambrose entered into a loan agreement with the State *restricting* Flint's ability to return to DWSD without approval from Treasury.[78] His staunch refusal to switch back to safe water demonstrates his deliberate indifference to the people of Flint.

---

[72] Ex. 30, Wurfel Dep. Ex. 47 at 04-22-2016 SOM-KIDD 0000345.

[73] Ex. 51, Croft Dep. Ex. 23.

[74] Ex. 50, Johnson Dep. Tr. at 333:20-334:16, 335:6-15.

[75] Ex. 52, COF_FED_0227528; Ex. 49, Ambrose Dep. Tr. at 122:10-20.

[76] Ex. 50, Johnson Dep. Tr. at 74:8-20.

[77] Ex. 53, Ambrose Dep. Ex. 32.

[78] Ex. 49, Ambrose Dep. Tr. at 138:6-19.

### 4. The City Defendants Demonstrated Deliberate Indifference Towards the Safety and Well-Being of Flint Residents.

*Former Flint Director of Public Works Howard Croft.* Croft and Johnson ordered Glasgow to make the switch despite concerns, which they ignored.[79] Croft also knew from the GCHD that the Legionnaires' disease outbreak was possibly connected to Flint River water.[80] Croft testified that he was responsible for overseeing Johnson and Plant Supervisor Brent Wright, who were tasked by Kurtz to get the plant ready and manage the engineering firm LAN.[81]

*Former Flint Utilities Administrator Daugherty Johnson.* Johnson also was present at a meeting in the fall of 2014 where the issue of Legionnaires was brought to his attention by MDEQ officials.[82] Months later, in January 27, 2015, when GCHD requested water testing information that would help it understand perceived water quality issues and the outbreak of Legionnaires' disease, Daugherty failed to

---

[79] Ex. 27, Glasgow Dep. Tr. at 481:1-5 ("[J]ust reiterate what was told to me from my supervisors, Mr. Johnson, Mr. Croft, and I'm going to specifically say Mr. Croft, says, "We have approval from the DEQ. This is going to happen.").

[80] Ex. 30, Wurfel Dep. Ex. 47 at 04-22-2016 SOM-KIDD 0000345.

[81] Ex. 54, Croft Dep. Tr. at 74:18-75:13.

[82] Ex. 50, Johnson Dep. Tr. at 334:3-8.

furnish those public records.[83] As a result of this failure, criminal prosecutors brought criminal charges against Johnson to which he pleaded no contest.[84]

**Former Flint Utilities Administrator Michael Glasgow.** Glasgow stated that he could not stop the switch to make the plant operational despite warning it was not ready.[85] In July 2015, Glasgow wrote to Rosenthal warning that it was an unprecedented situation that required immediate attention.[86] Despite what he knew, Glasgow still altered water quality tests to downplay the extent of the lead contamination at MDEQ's behest.[87]

## B.   LAN and Veolia's Negligent Provision of Professional Engineering Services Contributed to the Flint Water Crisis.

### 1.   LAN's Professional Negligence in Advising Flint Regarding the Use and Treatment of the Flint River and Water Treatment Plant Contributed to the Crisis.

In 2013, LAN entered a contract with Flint to determine the steps the City needed to take to prepare for switching from its use of Lake Huron water treated by the DWSD to using Flint River water treated by the FWTP.[88] Under LAN's 2013

---

[83] *Id.* at 31:12-33:7.

[84] *Id.* at 31:22-33:7.

[85] Ex. 27, Glasgow Dep. Tr. at 238:2-6, 238:12-23, 480:7-12.

[86] Ex. 38, FLINT-DEQ_0002_0080; Ex. 27, Glasgow Dep. Tr. at 319:18-23.

[87] Ex. 27, Glasgow Dep. Tr. at 161:14-162:19.

[88] Ex. 55, Nakashima Dep. Ex. 2.

contract with Flint, LAN agreed to perform the engineering evaluations necessary to put the FWTP into full-service operation.[89]

In its response to the request for proposal for the Flint contract, LAN touted that it was part of LAD, with access to LAD's worldwide network of resources.[90] LAN's work assignments and progress on the Flint project were maintained and tracked on a LAD server.[91] LAD's responsibility for LAN's conduct will be based on this and other common evidence, including the evidence addressed by the Court in denying LAD's motion to dismiss for lack of personal jurisdiction.[92]

Switching water sources from Lake Huron to the more corrosive water from the Flint River represented a dramatic change in water chemistry and quality.[93] The Lake Huron water from DWSD that Flint had relied on for decades was treated with an orthophosphate-based corrosion control system and had consistently provided the City with safe, non-corrosive water; Flint River water, by contrast, contained high amounts of chlorides that contribute to corrosivity, and the FWTP did not have *any*

---

[89] *See id.* at LAN_FLINT_00187668.

[90] Ex. 55, Nakashima Dep. Ex. 2 at LAN_Flint_00187707. Leo A. Daly, III, the CEO and Chairman of LAD, also serves as the CEO and Chairman of LAN. Ex. 56, Nakashima Dep. Ex. 1.

[91] Ex. 57, Nakashima Dep. Ex. 11.

[92] *See* Op. & Order Denying in Part Leo A. Daly's Mot. to Dismiss for Lack of Personal Jurisdiction, Apr. 5, 2018, ECF No. 437.

[93] Ex. 58, Russell Report § 5.5.

corrosion control system in place at the time of the switch.[94]

Nonetheless, LAN did not measure the corrosivity of FWTP water, conduct a corrosion control optimization study, or advise the City that such a study was necessary to protect human health and property in the City.[95] Specifically hired by the City to identify what improvements were needed to deliver quality drinking water to Flint residents from the FWTP on a continuous basis, LAN utterly failed to identify either the existing corrosivity of the water or what was needed to address it.[96] As a result, with LAN's seal of approval, Flint began using Flint River water as a water source in April 2014.[97] Consistent with LAN's guidance, the City did not treat the water with corrosion control.[98] LAN inexplicably did not warn the City or its residents that the complete absence of corrosion control created a risk that corrosive water would cause property damage and harm human health throughout the City, including by lead poisoning resulting from damaged pipes.[99]

Based on water chemistry data available to LAN immediately before the City

---

[94] *Id.* §§ 5.2, 5.5.

[95] *Id.* §§ 8.1.1-8.1.2.

[96] *Id.* §§ 8.1.2-8.1.3.

[97] *Id.* § 8.1.5.

[98] *Id.* § 8.1.3.

[99] *Id.* § 8.1.5.

switched the FWTP, LAN could have conducted an industry-standard chloride-sulfate mass ratio ("CSMR") calculation to assess the corrosivity of the water.[100] Upon doing so, any reasonably competent engineer would have immediately recognized that the water was highly corrosive, presenting a substantial risk that lead would leach into the water supply and poison Flint residents, and that the highly corrosive water would cause substantial damage to pipes and fixtures served by the distribution system.[101] Yet, LAN did not calculate the CSMR or do anything else to assess the corrosivity of Flint's water, nor did it urge the City to do so.

Problems with water treated by the FWTP arose almost immediately. Mere weeks after switching water sources, Flint residents began to complain about the smell, taste, and color of Flint's drinking water.[102] A few months later, in August 2014, Flint's water tested above the regulatory limit for total coliform and E. coli bacteria, and in response the City increased the chlorine being added to the water.[103] Absent a corrosion control protocol, increased chlorine lead to an increase in disinfectant byproducts, including total TTHM levels.[104] As of late 2014, it was clear

---

[100] *Id.* § 7.3.

[101] *Id.* §§ 7.1, 8.1.

[102] *See, e.g.*, Ex. 27, Glasgow Dep. Tr. at 512:6-15; Ex. 59, Aug-14-2019 EGLE0007335 at Aug-14-2019 EGLE0007342.

[103] Ex. 60, COF_FED_0626254.

[104] Ex. 58, Russell Report § 4.1.

that Flint's TTHM levels would exceed regulatory limits.[105]

LAN continued to provide engineering services to Flint during this period, but never raised any red flags about the harms that would result from ongoing corrosion—initially the elevated TTHMs, and later lead poisoning and damage to pipes and fixtures—to the public or the City.[106] Instead, LAN suggested increasing the ferric chloride dosing,[107] which would further increase the water's corrosivity.[108]

**2. Veolia Wrongly and Negligently Deemed Flint's Water Safe; Veolia's Professional Negligence Prolonged and Worsened the Flint Water Crisis.**

In January 2015, Flint issued an Invitation to Bid for a "Water Quality Consultant" to help address problems stemming from its use of Flint River water.[109] The invitation explained that Flint was "seeking a consultant to review and evaluate the water treatment process and distribution system," as well as to "provide recommendations to maintain compliance with both state and federal agencies, and assist in implementing accepted recommendations."[110] Veolia responded with a bid

---

[105] Ex. 61, COF_FED_0024452 at COF_FED_0024453.

[106] *See, e.g.*, *id.* at COF_FED_0024455-57; Ex. 27, Glasgow Dep. Tr. at 542:18-543:6.

[107] *See* Ex. 27, Glasgow Dep. Tr. at 616:9-20.

[108] *See* Ex. 58, Russell Report §§ 4.1, 7.3, 7.1.6.

[109] Ex. 62, VWNAOS019282.

[110] *Id.* at VWNAOS019293.

that offered "a complete solution" to address both the "immediate reliability" of Flint's water system and its future "operational needs," and stated that "addressing the fundamental issues concerning water quality compliance and operational reliability" were "much more complex" than the approach outlined in Flint's Invitation to Bid.[111] Veolia presented itself as an experienced consultant that would provide a solution for Flint's water quality needs "now and into the future."[112]

The City accepted Veolia's response, and Veolia entered into a contract to "provide consulting services related to the Flint Water Treatment System updates for the City of Flint."[113] The contract defined the scope of Veolia's services as incorporating Veolia's Response to the Invitation to Bid.[114] Veolia's contractual scope of services was never amended.[115] Veolia repeatedly reaffirmed its broad scope of work pursuant to the messaging guidelines developed by its Communications team, which stated that Veolia would conduct a "top to bottom" review of Flint's water system to "determine the source of any problems that might

---

[111] Ex. 63, VWNAOS019339 at VWNAOS019340-43.

[112] *Id.* at VWNAOS019340-41.

[113] Ex. 64, VWNAOS006273 at VWNAOS006275.

[114] *Id.* at VWNAOS006277, VWNAOS006283.

[115] Ex. 65, Nicholas Dep. Tr. at 164:8-14.

be present in the way the city is treating water from the Flint River."[116]

Veolia's public references to having been hired to assess all aspects of Flint's water quality accord with its internal discussions, which depict Flint as a potential cash cow. Veolia would not usually take on a project like the one proposed by Flint "with out hope of something bigger,"[117] and in Flint, Veolia saw that something bigger: Veolia's Vice President of Business Development, Robert Nicholas described Flint as "a mini Detroit with lots of problems," and noted in an internal email that submitting a bid would give Veolia "a legit reason to look at everything they are doing."[118] Nicholas internally explained that "[t]he ultimate focus is not on the water problem but fixing the entire utility," and that it was a great possibility for a more lucrative contract in the future.[119]

Veolia not only failed to solve Flint's water quality problem, it exacerbated the situation by making the water quality far worse. Veolia never calculated the chloride to sulfite ratio for the water, which is a standard calculation and would have

---

[116] Ex. 66, VWNAOS005734 at VWNAOS005537; *see* Ex. 67, Rebecca Williams & Lindsey Smith, *Flint hires a water consulting firm, UM-Flint releases its own water test results*, Michigan Radio (Feb. 12, 2015); Ex. 68, VWNAOS018984.

[117] Ex. 69, VWNAOS001196.

[118] Ex. 70, VWNAOS006624.

[119] Ex. 71, VWNAOS004416.

28

demonstrated the need for immediate corrosion control.[120] And Veolia never included the need for corrosion control for lead in any of its reports or emphasized that immediate corrosion control was critical to protect public health, despite the fact that using orthophosphates to control for lead corrosion is a standard practice and its own engineer recognized at the time that for Flint it was a "must."[121] Veolia in fact advised that the City increase its dosage of ferric chloride—an action that would actually make corrosion worse.[122]

Internally Veolia recognized that the quickest and "best technical solution" to Flint's water problem was to switch back to purchasing water from DWSD, and that this might even be the "safest" solution for Flint.[123] But Veolia never recommended this switch. Rather than providing sounds engineering advice and ringing alarm bells

---

[120] *See* Ex. 58, Russell Report § 6.3; Ex. 27, Glasgow Dep. Tr. at 612:14-615:24, 627:18-628:18, 631:5-16; Ex. 72, Glasgow Dep. Ex. 76.

[121] *See* Ex. 73, VWNAOS038822 (Veolia's own internal notes recommend adding a "*poly/ortho phosphate blend for corrosion control*" and further state that "[d]ue to the TTHMs concern, the finished pH should not be too high (<8.5 in the summer) *and corrosion control is must.*"); *see* Ex. 74, Chen Dep. Tr. at 218:13-221:10, 229:4-24, 316:21-317:13, 199:23-201:3 (using corrosion control is part of "engineering best practices").

[122] Ex. 75, Gnagy Dep. Tr. at 288:14-290:7 (Veolia recommended that Flint double its ferric chloride dosage without assessing the effect of existing levels); *see also* Ex. 74, Chen Dep. Tr. at 328:8-329:8 (acknowledging that excess ferric chloride can cause lead and iron corrosion).

[123] Ex. 76, Chen Dep. Ex. 11 at VWNAOS081161; Ex. 74, Chen Dep. Tr. at 84:8-18, 86:5-8, 90:22-91:22, 171:3-12, 172:3-8.

about the dire threats to the people of Flint, Veolia provided misleading reassurance that the "water [was] safe."[124] Veolia similarly failed to inform the City of Flint that lead was a problem, despite Veolia's own internal recognition of that fact.[125] As Class Plaintiffs' experts and Veolia's own witnesses confirm, this conduct falls far short of a professional engineer's duty of care; and none of this relies on individualized evidence.

## C.    Defendants' Misconduct Resulted in Class-Wide Harms.

As a result of Defendants' misconduct, Class Plaintiffs have suffered devastating harm to their health, quality of life, property, and businesses. Minor children in Flint sustained injuries as a result of exposure to lead, including neurological and behavioral changes. Dr. Howard Hu, a noted medical and epidemiological expert, in consultation with experts in exposure assessment, geostatistics, and other environmental disciplines, opined that the children of Flint suffered sufficient lead exposure "such that each child will have sustained non-negligible impairment of their neurobehavioral development."[126] Flint residents who own property have seen their property values plummet as a result of the Flint Water

---

[124] Ex. 77, Nicholas Dep. Ex. 13 at 3, 5.

[125] Ex. 78, Nicholas Dep. Ex. 16; Ex. 79, Nicholas Dep. Ex. 17; Ex. 80, Nicholas Dep. Ex. 18.

[126] Ex. 81, Hu Decl. ¶ 9.3.

Crisis, and business owners in Flint have suffered lost profits. *See* Sections IV.B.2, IV.B.4.b, and IV.B.4.c, *infra*.

All residents in Flint lost the use and enjoyment of their homes and the ability to live in their homes without fear of drinking or using the tap water.[127] They all also have been harmed financially by paying high water bills for undrinkable water (all-the-while needing to purchase large quantities of bottled water), and incurring replacement costs for pipes, fixtures, and appliances that were damaged by corrosive water and still contain dangerous lead. *See* Sections IV.B.2, *infra*.

## III.   PROPOSED CLASS AND SUBCLASS DEFINITIONS

Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Class Plaintiffs seek certification of a class defined as:

> All current and former residents of the City of Flint who, for any period of time between April 25, 2014 and October 16, 2015, received drinking water supplied by the City of Flint regardless of whether the resident purchased the water from the City.

As explained more fully herein, for this class, Class Plaintiffs seek damages relating to Class members' quality of life, economic harms sustained as a result of averting behaviors, and overcharges on Class members' water bills. With the exception of those damages suffered by the Minors Subclass defined below,

---

[127] *See, e.g.*, Ex. 82, Kelso Dep. Tr. at 312:10 ("I don't trust what's in the water right now."); *id.* at 440:14-441:8 (testifying about things she can no longer do after the Water Crisis); *see also* Ex. 83, B. Davis Dep. Tr. at 121:16-125:24 (describing anxiety of bathing since the Water Crisis).

questions of causation and damages relating to Class members' personal injury damages would be bifurcated from liability issues for trial purposes. Class Plaintiffs attach as Exhibit 84 a proposed trial plan that provides a roadmap for how these claims could be justly and efficiently tried.

Class Plaintiffs also move for certification of three damages subclasses, all of whose members are also members of the larger class, under Federal Rule of 23(b)(3) defined as:

- ***Minors Subclass:*** all children who, during the period from May 1, 2014 to January 5, 2016, were (a) in utero or between the ages of 0 to 10 years old, (b) lived in an identified residence or attended an identified school or day care, and (c) were exposed through ingestion[128] to unfiltered Flint public water at such residence, school or day care for at least 14 days within a 90 day period;

- ***Residential Property Subclass:*** all persons and entities who, from April 25, 2014 to present, owned residential property within the City of Flint;

---

[128] "Exposed through ingestion to unfiltered public water" means the child (or their mother) was exposed to unfiltered tap water for at least 14 days during a 90-day period between May 1, 2014 and January 5, 2016, through any combination of the following ways:

(1) For childhood exposure: the child drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered Flint tap water;

(2) For *in utero* exposure, the mother drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water), and/or ate food prepared with unfiltered Flint tap water, while pregnant.

- **_Business Subclass:_** all persons and entities, who, as of April 25, 2014 owned and operated a business within the City of Flint.

Finally, as the Minors Subclass seeks injunctive relief in addition to damages, Class Plaintiffs move for certification of the Minors Subclass under Federal Rule of Civil Procedure 23(b)(2).

## IV.   ARGUMENT

Class certification is appropriate where, as here, "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." _In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig._, 722 F.3d 838, 850 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(a)). To certify a class under Rule 23(b)(3), the court must also find "'that the questions of law or fact common to class members predominate over any questions affecting only individual members' and that the class action is 'superior to other available methods' to adjudicate the controversy fairly and efficiently." _Id._ at 850-51 (quoting Fed. R. Civ. P. 23(b)(3)).

"The difficulties in class management which may arise are not grounds for refusing now to certify the class. . . . Management problems which may arise in both pre-trial and trial proceedings may be the subject of further action by the court under Rules 16, 23(d)(2) [now 23(d)(1)], 42(b), and 56(d) [now 56(a)]." _In re Storage_

*Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 119-20 (D. Colo. 1986). Rule 23(a) and

(b)'s requirements are satisfied for both the full Class of Flint residents and the

Subclasses.[129]

This case also is appropriate for certification of a class seeking injunctive

relief under Rule 23(b)(2) because the "defendant[s] ha[ve] acted or refused to act

on grounds generally applicable to the class" and "a single injunction or declaratory

judgment would provide relief to each member of the class." *Barry v. Corrigan*, 79

F. Supp. 3d 712, 733 (E.D. Mich. 2015) (Levy, J.) (quoting *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 360 (2011)), *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706 (6th

Cir. 2016).

---

[129] Membership in the Class and Subclasses is ascertainable through property or rental records, or through certification by Flint residents or guardians that they and/or their children lived in Flint and were exposed to the water during the Class Period. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 527 (6th Cir. 2015) (Certifying a class where "P & G could verify that a customer purchased Align by, for instance, requesting a signed statement from that customer's physician. Store receipts and affidavits can supplement these methods.").

A.    **The Class and Subclasses Satisfy the Requirements of Federal Rule of Civil Procedure 23(a).**

1.  **The Class and Subclasses Meet the Numerosity Requirement.**

According to the 2010 census, the population of Flint, Michigan exceeded 100,000 people,[130] including approximately 20,000 children under the age of 11.[131] More than 700 businesses in Flint "appear to have experienced clear declines in gross sales volume" since the onset of the Flint Water Crisis in 2014.[132] More than 30,000 single- and multi-family residential properties and more than 5,000 multi-family units were impacted by the Water Crisis and require remediation.[133] With so many affected Class members, the numerosity requirement is readily met in this case. *Cf., e.g.*, *Barry*, 79 F. Supp. 3d at 731 (numerosity satisfied where plaintiffs produced evidence of 4,562 class members).[134]

---

[130] *QuickFacts*, United States Census Bureau, https://www.census.gov/quick facts/fact/table/flintcitymichigan/PST040219.

[131] Ex. 85, Goovaerts Decl. ¶ 19.

[132] Ex. 86, Simons Report at 4-5.

[133] Ex. 87, Gamble Report ¶ 18.

[134] *See also Widdis v. Marathon Petroleum Co.*, No. 13-cv-12925, 2014 WL 11444248, at *5 (E.D. Mich. Nov. 18, 2014) (Levy, J.) (numerosity satisfied where, "[e]ven though they do not have an exact figure, plaintiffs have adequately shown that the proposed class may include dozens if not hundreds of members"); *Cameron v. Bouchard*, Civil Case No. 20-10949, 2020 WL 2569868, at *17 (E.D. Mich. May 21, 2020) *on reconsideration on other grounds*, No. CV 20-10949, 2020 WL 2615740 (E.D. Mich. May 22, 2020) (class of 220 sufficient to satisfy numerosity requirement), *on reconsideration on other grounds*, Civil Case No. 20-10949, 2020 WL 2615740 (E.D. Mich. May 22, 2020); *Smith v. Gen. Motors Corp.*, 1977 WL

35

## 2. The Flint Water Crisis Presents Factual and Legal Questions Common to the Class and Subclasses.

To satisfy the commonality requirement, the Sixth Circuit has held that "there need only be one question common to the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). In this case, multiple factual and legal questions common to the entire Class and all Subclasses, including, for example:

- whether the Government Defendants had the opportunity to reflect and deliberate before they acted or failed to act;

- whether the conduct of the Government Defendants directly and proximately caused the Flint water system to be contaminated with corrosive water, lead, and dangerous bacteria, and/or increased the risk of harm to the Class and/or Subclasses;

- whether the Engineering Defendants owed one or more duties to Class Plaintiffs, and the extent of those duties;

- whether the Engineering Defendants breached their duty or duties owed to Class Plaintiffs and whether any such breach was malicious, willful, and wanton as to disregard Class Plaintiffs' rights; and

- whether the Engineering Defendants' professional negligence directly and proximately caused the Flint water system to be contaminated with corrosive water, and thereby resulted in property damage to members of the Classes, harm to members of the Classes resulting from exposure to lead and dangerous bacteria, and/or increased the risk of harm to the Class and/or Subclasses.

These are precisely the types of questions that courts in this Circuit and others have found sufficient to satisfy the commonality requirement. *See, e.g.*, *Widdis*, 2014

---

831, at *5 (E.D. Mich. Mar. 3, 1977) ("[P]roposed classes with over thirty-five members have normally been certified providing that the other requirements for certification have been met.").

WL 11444248, at *5 (common questions in an environmental mass tort included whether an explosion was foreseeable, whether defendant took available precautions to prevent the explosion, and whether defendant or its negligence was the cause of an evacuation); *Collins v. Olin Corp.*, 248 F.R.D. 95, 101 (D. Conn. 2008) (The "course of conduct of [defendant] allegedly leading to the contamination of [plaintiffs'] properties" presented common question in class action seeking damages for that contamination). Thus, the commonality requirement is met in this case.

### 3. As Residents of Flint, the Named Plaintiffs' Claims Are Typical of the Claims of the Class and Subclasses.

The named Plaintiffs' claims are typical of the Class and Subclasses they seek to represent because they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members," and because the Class representatives' claims are "based on the same legal theor[ies]" as Class members' claims. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)); *see also Barry*, 79 F. Supp. 3d at 732 ("The Sixth Circuit has concluded a proposed class representative's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." (internal quotation marks and citation omitted)).

The proposed representatives for the Class include:

37

- ***Ms. Rhonda Kelso, on behalf of herself and her minor child, K.E.K.*** owns a home in Flint, where she has resided since the 1990s. Ex. 82, Kelso Dep. Tr. at 14:9-14. Ms. Kelso and her minor daughter drank Flint water until October 2014, *id.* at 17:21-18:3, and continued to cook, wash, and bathe with the water until March 2015, *id.* at 112:20-113:2. Ms. Kelso's home was tested for lead in August 2015 by researchers at Virginia Tech, who found elevated lead levels in her water. Ex. 88, Kelso Dep. Ex. 12. As a result of Defendants' actions, Ms. Kelso has suffered financial and property damage. *See, e.g.*, Ex. 82, Kelso Dep. Tr. at 70:2-19, 318:6-13, 365:4-6. She also suffered loss of use and enjoyment of her home, and testified that she still does not trust the Flint water supply. *See id.* at 441:6-8.

- ***Barbara and Darrell Davis*** are a married couple who live in Flint and have owned a home there since 2002. Ex. 83, B. Davis Dep. Tr. at 29:22-30:4. Mrs. Davis, an elementary school teacher, worked at two different schools in Flint during the Flint Water Crisis: Holmes, where she worked from approximately 2012 through approximately 2015, and Eisenhower, where she worked from approximately 2015 through her retirement on September 30, 2019. *Id.* at 17:22-19:3. At Holmes, she and her students drank the school's tap water. *Id.* at 19:6-21:4. Both schools' tap water tested positive for high levels of lead. Ex. 89. As a result of Defendants' actions, Mr. and Mrs. Davis lost the use and enjoyment of their home. *See, e.g.*, Ex. 83, B. Davis Dep. Tr. at 125:6-126:4; Ex. 90, D. Davis Tr. at 77:16-78:10. They were also forced to purchase bottled water and to this day continue to use bottled water in their home, including for bathing and washing clothes. Ex. 83, B. Davis Dep. Tr. at 104:11-105:21, 107:19-110:6; Ex. 90, D. Davis Dep. Tr. at 74:18-75:10.

The proposed representatives for the Residential Property Subclass are:

- ***Ms. Elnora Carthan*** owns a home in Flint, Ex. 91, Carthan Dep. Tr. 128:7-13, was a customer of the Flint water district throughout the Class Period, and regularly used and paid for water distributed by the City of Flint throughout the Class Period. *Id.* at 173:17-21. In August 2015, water tests showed that the water lead levels in Ms. Carthan's home vastly exceeded the maximum levels set forth by state and federal standards. Ex. 127, Carthan Dep. Ex. 3. As a result

of the Flint water crisis, Ms. Carthan suffered loss of use and enjoyment of her home and property damage, and suffered financially by being required to purchase bottled water. *See, e.g.*, *id.* at 170:22-171:1, 180:3-10, 174:4-9, 178:13-21, 180:3-10, 187:16-21, 18:16-18. Ms. Carthan testified that to this day, she does not trust the Flint water. *Id.* at 173:3-6.

- *Mr. David Munoz* has lived in Flint his entire life and has owned a home there since 1996. Ex. 92. Mr. Munoz used the water for bathing and washing dishes and clothes consistently throughout the class period. Ex. 93, Munoz Dep. Tr. at 104:15-21, 174:24-175:24. As a result of Defendants' actions, Mr. Munoz was not able to drink his tap water and had to purchase bottled water for drinking and cooking. *Id.* at 104:9-14. Mr. Munoz also suffered diminution in the value of his home and damage to appliances in his home. Ex. 92.

The proposed representatives for the Minors Subclass are:

- *Ms. Tiantha Williams* is acting on behalf of herself and her minor son, **T.W.**, who was born prematurely on December 15, 2015. Ex. 94, Williams Dep. Tr. at 255:21-256:2. Her son, T.W., is now four years old and suffers from some developmental delays. *Id.* at 82:22-83:19, 85:14-87:23.

- *Ms. Darnella Gaines*, on behalf of her minor child, **K.C.** is a 28-year old mother who resides in Flint.[135] Ms. Gaines' minor son, K.C., was born on July 26, 2011. From April 25, 2014 until approximately sometime in July 2015, Ms. Gaines and K.C. regularly used unfiltered water for drinking, cooking, bathing/showering, and clothes washing. After July 2015, Plaintiff continued to bathe, shower and wash clothes and dishes in unfiltered water. In addition to being exposed to high levels of lead during the timeframe that he consumed water, K.C. experienced hair loss and persistent skin rashes. As a direct and proximate result of Defendants' conduct, K.C. has experienced serious physical injury

---

[135] Concurrent with this motion, Class Plaintiffs have also filed a motion to add Ms. Gaines on behalf of her minor child, K.C., as a Class representative.

due to his exposure to the toxic water, including, but not limited to, heightened levels of lead in his blood.

The proposed representatives for the Business Subclass are:

- **Ms. Frances Gilcreast** is a partner of FG&S Investments, which owned several properties in Flint during the class period. Ex. 95. As a result of the Flint Water Crisis, FG&S's rental income fell dramatically. Ex. 96, Gilcreast Dep. Tr. at 85:8-86:8; *see also id.* at 63:16-17.

- **635 South Saginaw LLC** is the owner of the restaurant "Cork on Saginaw," which is located at 635 Saginaw Street in Flint Michigan. As the Flint Water crisis unfolded, Cork on Saginaw suffered a significant reduction in income due to the reluctance of restaurant patrons to purchase food and beverages at a restaurant located within the City of Flint that used Flint water.[136]

- Angelo's Coney Island was a long-standing Flint restaurant, and **Mr. Neil Helmkay** and his family owned and/or operated the restaurant under the name Angelo's Coney Island Palace, Inc. from June 2012 until its closure in 2018.  Ex. 97. Angelo's profits diminished after the Flint Water Crisis became public and the Flint location is no longer in business. *See, e.g.*, Ex. 98, Helmkay Dep. Tr. at 134: 9-24; 157:16-20; 185:18-24; 195:3-7. He also suffered property damage at Angelo's in Flint. *Id.* at 122:3-19, 218:18-219:10.

All members of the Class and Subclasses, including the proposed representatives, will need to prove the same wrongful conduct by Defendants to prove their claims. Defendants' liability "can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for

---

[136] Concurrent with this motion, Class Plaintiffs have also filed a motion to add 635 South Saginaw LLC as an additional business Class representative.

40

each of the plaintiffs" in the Class and Subclasses. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (certifying class where "each class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using the contaminated water"); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (affirming district court finding of typicality where "Plaintiffs allege both a single practice or course of conduct on the part of each Defendant . . . that gives rise to the claims of each class member and a single theory of liability"); *Cameron*, 2020 WL 2569868, at *18 (typicality satisfied where plaintiffs advanced "the same legal theory").

Additionally, the Subclass representatives' claims also are typical of the Subclasses they seek to represent. Ms. Carthan and Mr. Munoz, proposed representatives for the Residential Property Subclass, have been Flint residents and homeowners for the duration of the Class Period and have suffered property and economic damage as a result of the Flint Water Crisis. Ms. Gilcreast, Mr. Helmkay, and 635 South Saginaw LLC, proposed representatives for the Business Subclass, have owned businesses in Flint during the Class Period and have suffered business losses as a result of Defendants' actions. The children whose interests the proposed Minors Subclass representatives are asserting—Ms. Gains (on behalf of her child K.C.) and Ms. Williams (on behalf of her child T.W.)—have suffered elevated lead levels in their blood as a result of exposure to toxic Flint water. Each of these

proposed Subclass representatives have suffered damages typical of the respective Subclasses they seek to represent.

### 4. The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

The Sixth Circuit uses a "two-prong test to determine whether the class representatives will fairly and adequately protect the interests of the class under Rule 23(a)(4): 1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (internal quotation marks and citation omitted). "[O]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Id.* (citation omitted); *see also Almendares v. Palmer*, 222 F.R.D. 324, 333 (N.D. Ohio 2004) ("Arguments challenging the adequacy of class representatives should be viewed skeptically.").

### a. The Named Plaintiffs Have Common Interests With the Class.

The named Plaintiffs and members of the Class/Subclasses they seek to represent share common interests: they are all seeking to hold Defendants liable for the same misconduct. *See Vassalle*, 708 F.3d at 757 (class representatives "shared common interests with the unnamed class members" where "they all shared a desire to obtain both monetary and injunctive relief from [defendants]").

42

**b. The Named Plaintiffs Will Vigorously Prosecute the Case.**

The proposed Class and Subclass representatives have already shown their vigorous commitment to this litigation, spending considerable time and emotional labor responding to written discovery requests, meeting with counsel, and sitting for depositions.[137] They all understand and honor their obligations to the Class and Subclasses harmed by the Flint Water Crisis.

Moreover, the named Plaintiffs are not seeking to represent individuals with "antagonistic" interests. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) ("the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class" (citation omitted)). They are all seeking to hold Defendants accountable for the widespread harm they caused and are committed to achieving a recovery that would benefit the entire Class.[138] *See also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195,

---

[137] The two new proposed Subclass representatives are willing to do the same.

[138] *See, e.g.*, Ex. 82, Kelso Dep. Tr. at 323:3-4 (Ms. Kelso understands that she "respresent[s] my community and people who have like issues"); *id.* at 323:13-15 (Ms. Kelso understands her role as a class representative meant to "keep track of the - - the documents, the cases, the numbers, and who is involved"); Ex. 98, Helmkay Dep. Tr. at 9:20-22, 10:7, 25:4-7 (Mr. Helmkay understands that he is "[r]epresenting the businesses in the city of Flint because of the water crisis," and that he is participating in the case on behalf of "[a]ll businesses"); Ex. 91, Carthan Dep. Tr. at 18:16-18 (testifying that she would make an adequate class action representative "[b]ecause we all suffer from almost the same thing; property damage, health issues that we didn't have before"); Ex. 90, D. Davis Dep. Tr. at 13:13-18 (testifying that he understood that he was bringing this action on behalf himself and

208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." (citation omitted)). Likewise, the proposed Class and Subclass representatives are seeking the same relief as the groups of individuals they seek to represent. *See also*, *supra*, Section IV.A.3.

Finally, the guardians representing minors in this action—Tiantha Williams and Darnella Gaines—are fully committed to representing the interests of their children who have been named as plaintiffs in this matter, familiar with the litigation, understand why the named Plaintiffs seek relief, and are willing and able to pursue the case on behalf of their children's interests and the interests of other children in the Class and Minors Subclass.[139] *See Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 92 (1st Cir. 2010). As an additional measure of protection, Class Counsel also

---

other class members); Ex. 96, Gilcreast Dep. Tr. at 23:20-23 (explaining that as a class representative, she would represent "businesses all over the city of Flint"); Ex. 94, Williams Dep. Tr. at 91:6-10 (testifying that she would be speaking for everybody "like me [ ] [t]hat's been injured").

[139] *See, e.g.*, n.137; Ex. 82, Kelso Dep. Tr. at 323:11-15, 323:21-324:8 (Ms. Kelso testified that she reviewed the Complaint, was apprised of the litigation, and represented "[her] daughter, [and] children like her."); Ex. 94, Williams Dep. Tr. at 89:24-90:3, 91:23, 94:1-4 (Ms. Williams testified that she was identified as a representative, was sure many people had been injured, and it was her intention to represent individuals who used the water ).

seeks appointment of a *guardian ad litem* to represent absent minor Class members.

### c. Class Counsel Will Fairly and Adequately Represent the Class.

Class Counsel have vigorously prosecuted the interests of the class and subclasses, and therefore meet the standard of adequate counsel under Rule 23. *See Jackson's Five Star Catering, Inc. v. Beason*, No. 10-10010, 2012 WL 3205526, *2 n.2 (E.D. Mich. July 26, 2012).[140]

This Court has already found that Class Counsel satisfy the criteria for formal appointment as interim class counsel under Rule 23(g)(1)(A) when it granted Plaintiffs' joint motion for consolidation.[141] Subsequently, this Court has reevaluated Class Counsel's qualifications and contributions to the litigation twice, both times

---

[140] For more background on Class Counsel's qualifications and devotion to the vigorous prosecution of this litigation, Class Plaintiffs incorporate and refer the Court to their previous submissions regarding the appointment of Interim Co-Lead Class Counsel and Class Plaintiffs' Executive Committee. *See* Joint Mot. to Consolidate Cases, Appoint Interim Co-Lead Counsel, & Appoint Liaison Counsel for the Individual Actions, June 9, 2017, ECF 136; Statement of Submission Regarding the Interim Co-Lead Counsel's Duties, the Duties of Co-Liaison Counsel for the Individual Actions, & Creation of Pls.; Executive Committee for Proposed Class, Sept. 29, 2017, ECF 212; Application for Reappointment as Interim Co-Lead Class Counsel, Nov. 30, 2018, ECF 690; Application for Reappointment as Interim Co-Lead Counsel, Dec. 18, 2019, ECF 1019.

[141] *See* Order Consolidating Cases, July 27, 2017, ECF No. 173.

This Court has already appointed independent subclass settlement counsel in a manner that serves the interests of each of the subclasses and avoids the risks of any intraclass conflict. *See* Order Granting Class Pls.' Renewed Mot. in Part & Am. Court's Order Delineating Duties of Interim Co-Lead Class Counsel to Authorize Participation of Interim Settlement Counsel, Aug. 26, 2019, ECF No. 929.

choosing to reappoint Michael L. Pitt and Theodore J. Leopold as Interim Co-Lead Class Counsel.[142] Class Counsel have expended thousands of hours of work toward the prosecution of this case—attending over 60 depositions thus far with many more to come, reviewing over 500,000 documents, attending status conferences and hearings, propounding and responding to written discovery, and briefing a multitude of issues ranging from Defendants' motions to dismiss and Class Plaintiffs' amendment of the pleadings to qualified immunity and appellate issues—and are prepared to efficiently and aggressively proceed with the case until its conclusion.[143]

## B.    Common Questions of Law and Fact Predominate.

To certify a damages class under Federal Rule of Civil Procedure Rule 23(b)(3), Plaintiffs must show that common questions of law or fact predominate over individual questions. The predominance standard "is essentially a pragmatic one: '[w]hen common questions represent a significant aspect of the case they can be resolved for all members of the class in a single adjudication, there is a clear

---

[142] *See* Orders Reappointing Interim Individual Co-Liaison Counsel & Interim Co-Lead Class Counsel, Dec. 7, 2018 & Dec. 20, 2019, ECF Nos. 696, 1021.

[143] Furthermore, there is no conflict with counsel representing the proposed Subclasses. As a leading treatise has recognized, when multiple subclasses work together and are represented by the same attorneys, they can often "leverage a better settlement . . . due to a defendant's desire to obtain a global resolution." 1 William B. Rubenstein, *Newberg on Class Actions* § 3:75 (5th ed. 2020). The only time the Subclasses might have divergent interests is in allocating damages, but the Court has already prevented that potential conflict by appointing separate settlement counsel for each Subclass.

justification for handling the dispute on a representative rather than on an individual basis.'" *Widdis*, 2014 WL 11444248, at *7 (alteration in original) (citation omitted). Thus, "[c]ourts have frequently held that this merely requires a 'common nucleus of operative facts' . . . even though other important matters will have to be tried separately." *Id.* (citation omitted).

The Supreme Court has explained, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)). The question is not whether Plaintiffs are likely to succeed on the merits of their claims, but rather, whether their claims will be supported by common evidence at trial. *See, e.g.*, *In re Whirlpool*, 722 F.3d at 851-52 ("district courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits" (internal quotation marks and citation omitted)).

The Sixth Circuit has made clear that common questions may predominate in cases arising out of an environmental disaster. In *Sterling v. Velsicol Chemical Corp.*, the Sixth Circuit explained that "where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." 855 F.2d at 1196-97. Indeed, in

47

*Sterling*, a mass tort event presented exactly the sort of situation for which class action litigation served its fundamental purpose, as class treatment of plaintiffs' claims "avoided duplication of judicial effort and prevented separate actions from reaching inconsistent results with similar, if not identical, facts." *Id.* at 1197.

More recently, in *Widdis v. Marathon Petroleum Co.*, this Court certified a class of individuals forced to evacuate or remain in their homes as a consequence of an explosion and fire, and who additionally lost the use and enjoyment of their property for a period of time following the disaster, with a subclass consisting of property owners in the affected area and a subclass for non-owner occupants. 2014 WL 11444248, at *1. In finding that plaintiffs had satisfied Rule 23(b)(3)'s predominance requirement for their negligence claim, this Court explained that although the negligence claim would "require individualized proofs" regarding certain damages, those considerations were outweighed by common questions. *Id.* at *8. Those questions included (1) "the cause of the explosion,   [(2)] its foreseeability, and [(3)] precautions defendant could have taken to prevent the explosion," as well as "whether defendant or its alleged negligence [was] the legal cause of the evacuation, what chemicals were released, and how the weather conditions at the time of and following the explosion impacted how those chemicals spread throughout the evacuation zone" such that class treatment of plaintiffs' claims was warranted. *Id.* Precisely the same is true here.

48

1. **Common Evidence Will Establish Defendants' Liability**

   a. **Common Evidence Will Establish the Misconduct of the Government Defendants.**

Common evidence will establish Plaintiffs' substantive due process claim against the Government Defendants for violation of Plaintiffs' bodily integrity. "To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.'" *Guertin v. Michigan*, 912 F 3d 907, 922 (6th Cir. 2019) (quoting *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015)) (citing *United States v. Sanders,* 452 F. 3d 572, 577 n.4 (6th Cir. 2006)), *reh'g en banc denied*, 924 F.3d 309 (6th Cir. 2019), *cert. denied sub nom. City of Flint v. Guertin*, 140 S. Ct. 933 (2020) and *Busch v. Guertin*, 140 S. Ct. 933 (2020). Evidence that is common to the Class will demonstrate that Government Defendants acted in a manner that: (1) violated Plaintiffs' fundamental right to bodily integrity and (2) "shocks the conscience."

*First*, as to the violation of Plaintiffs' right to bodily integrity, "officials can violate an individual's bodily integrity by introducing life-threatening substances into that person's body without their consent." *In re Flint Water Cases*, Nos. 17-10164, 17-cv-10342, 2019 WL 3530874, at *14 (E.D. Mich. Aug. 2, 2019). Poisoning people with contaminated water squarely fits that bill. The Government Defendants' conduct resulted in class-wide exposure to elevated Total

Trihalomethanes, *E. Coli*, and *legionella* bacteria. Each of these substances may cause significant adverse health effects. As Dr. Bruce Lanphear, an expert on the health impacts of lead poisoning and the sources of lead exposure, explains, "Lead damages numerous organ systems and causes permanent, irreversible injuries to children's developing brains. Even at low levels of exposure, lead is harmful to both children and adults. In short, there is no safe level of exposure to lead."[144] In addition to lead, the switch to Flint River water also coincided with "one of the largest [outbreaks] of Legionellosis in the past decade."[145] And as Governor Snyder's Flint Water Advisory Task Force found, "Flint endured a series of water quality threats – from E coli contamination to high total trihalomethane (TTHM) levels - that could have been prevented."[146]

*Second*, Plaintiffs will demonstrate through common evidence that Government Defendants' conduct was conscience-shocking. The evidence at trial will demonstrate that, on multiple occasions, Government Defendants pressed forward with their water contamination operation in the face of multiple and repeated warning signs that their decisions posed a substantial risk of serious harm, that they were aware of or inferred such risks, and that they nonetheless proceeded with

---

[144] Ex. 99, Lanphear Decl. ¶ 23.

[145] Ex. 100, COF_FED_0676999 at COF_FED_0677026.

[146] *Id.* at 43.

callous disregard towards the rights of Flint's citizenry. Withholding this critical information from the public—while telling the public no problem existed—explains why the Government Defendants' roles in the Flint Water Crisis was so shocking that it became front-page news across the country and throughout the world.

Common evidence as to each Government Defendant will demonstrate their respective roles and decision-making responsibility regarding the Flint Water Crisis. Establishing the conduct of each Government Defendant and their consequent participation in creating this disaster requires no individualized proof, but instead will turn on evidence reflecting those Defendants' actions, decisions, and awareness of the harm they were causing during the relevant timeframe.

By establishing that the Government Defendants engaged in conduct that invaded the bodily integrity of the Plaintiffs in a conscious shocking manner, Plaintiffs will establish the Government Defendants' liability in a common manner. *See In re Whirlpool*, 722 F.3d at 855 ("Common proof will advance the litigation by resolving this issue 'in one stroke' for all members of the class." (quoting *Wal-Mart*, 564 U.S. at 350)).

### b. Common Evidence Establishes the Engineering Defendants' Professional Negligence.

Common evidence will also demonstrate the Engineering Defendants' professional negligence. Under Michigan law, a claim for negligence requires "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal

duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 556 (Mich. 2011). Additionally, "as against professional engineers," a claim for negligence "requires proof of simple negligence based on a breach of a professional standard of care." *Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2991768, at *2 (E.D. Mich. July 14, 2017) (citation omitted). Each of these elements will be established using class-wide evidence.

*First*, the existence and scope of the Engineering Defendants' duty is wholly subject to class-wide evidence. LAN and Veolia each owed a duty of care to the people and businesses of Flint based on the contracts they entered into with the City and the standards governing their work as professional engineers. LAN's 2013 contract with the City states that LAN "agrees to exercise independent judgment and to perform its duties under this contract in accordance with sounds professional practices."[147] It makes explicit that "[t]he City is relying upon the professional reputation, experience, certification, and ability" of LAN.[148] Veolia's contract with Flint contains an identical provision.[149]

---

[147] Ex. 55 at LAN_FLINT_00187657.

[148] *Id.*

[149] Ex. 101, Nicholas Dep. Ex. 7 at VWNAOS019331.

Plaintiffs' expert and professional engineer Dr. Larry Russell summarizes the standard of care for engineers as being "simple and straight forward, namely: ordinary and reasonable skill (care) usually exercised by one in the profession, on the same type or project, at the same time and in the same place, under similar circumstances and conditions."[150] As Plaintiffs' expert Dr. Paolo Gardoni explains, engineering codes of conduct promulgated by professional engineering associations and various governmental and non-governmental agencies together articulate the standard of care applicable to professional engineers.[151] Under the American Society of Civil Engineers (ASCE) Code of Ethics and the National Society of Professional Engineers (NSPE) Code of Ethics for Engineers—two of the most widely applied codes—the fundamental guiding principle behind all requirements and responsibilities of engineers is that "[e]ngineers must hold paramount the safety, health, and welfare of the public."[152] Professional engineers should "serve at all times the public interest," and "[p]rotecting the public from harm must prevail over business and political considerations."[153] Indeed, Defendants' own witnesses

---

[150] Ex. 58, Russell Report § 6.1.

[151] Ex. 102, Gardoni Report at 2-3.

[152] *Id.* at 3.

[153] *Id.* at 3-4.

acknowledge that engineers have a duty to place the safety, health, and welfare of the public before all else.[154]

Industry standards of care such as these are regularly treated as presenting common questions and should be so treated here. *Cf. Barfield v. Cook*, No. 3:18-cv-1198 (MPS), 2019 WL 3562021, at *10 (D. Conn. Aug. 6, 2019) (finding standard of care for medical treatment and whether that standard was met present common questions); *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 694 (N.D. Ga. 2003) (finding industry standard of care and whether defendants met that standard posed a common question).

---

[154] *See, e.g.*, Ex. 74, Chen Dep. Tr. at 23:19-24:13; *id.* at 25:11-21; Ex. 75, Gnagy Dep. Tr. at 34:9-19; Ex. 103, Luoma Dep. Tr. at 183:6-13, 185:16-186:1; Ex. 104, Nakashima Dep. Tr. at 36-43. Veolia's employees testified that their duties regarding Veolia's engineering work extend to communications with the public. Ex. 74, Chen Dep. Tr. at 27:23-28:6 (agreeing with his duty as a licensed engineer to not mislead the public); Ex. 65, Nicholas Dep. Tr. at 82:12-24 (acknowledging duty to be truthful and candid about known risks in public statements about Veolia's work). Veolia's witnesses further confirmed that Veolia has a duty to inform a client of the "best technical solution" to a given problem, Ex. 65, Nicholas Dep. Tr. at 83:10-18; Ex. 74, Chen Dep. Tr. at 84:21-85:1, and LAN's engineer confirmed that professional engineers are obligated to report it if their professional judgment is overruled in a manner that risks public health, Ex. 103, Luoma Dep. Tr. at 190:7-15. Likewise, one of LAN's engineers admitted that LAN agreed to perform its duties in accordance with sound professional practices. *Id.* at 89:22-90:10. He agreed that engineers shall hold paramount the safety, health, and welfare of the public. *Id.* at 183:6-13. And he confirmed that engineers should issue public statements only in an "objective and truthful manner." *Id.* at 183:19-23. He also acknowledged that engineers should recognize that the lives, safety, health, and welfare of the general public are dependent upon engineering judgments, decisions, and practices. *Id.* at 185:16-186:1; Ex. 104, Nakashima Dep. Tr. at 36-43.

*Second*, common evidence will show each of the Engineering Defendants breached their duty of care to the Class and Subclasses. While discovery is ongoing, common evidence demonstrates that LAN failed to identify corrosion control as an issue that needed to be addressed before commencing continuous operation of the FWTP; failed to advise a corrosion control optimization study prior to the switch in water sources; failed to identify a lack of corrosion control as a public health threat; failed to perform standard calculations that would have identified the presence of highly corrosive water in the Flint distribution system at the time of the switch; failed to warn the City of Flint or its residents of the harms to human health and property that would result from the distribution of highly corrosive water; failed to recommend an assessment of Flint River water corrosivity after the switch; and failed to identify ongoing corrosion even after numerous red flags should have alerted a competent engineer to the problem.[155] Each of these deficiencies will turn on evidence common to all Class members.

As Dr. Russell explains, LAN should have been aware that the Lead and Copper Rule (LCR) and standard engineering practices require that a corrosion control study be performed prior to allowing a switch from one water source to

---

[155] *See* Ex. 58, Russell Report §§ 8.1.1-8.1.5.

another.[156] Engineers working on water systems are responsible for being familiar with the applicable Federal and State regulations (including the LCR) and with good engineering practice.[157] Yet LAN's lead engineer on the Flint project, Warren Green, had a vastly outdated understanding of corrosion control that failed to comport with current engineering standards.[158]

As discussed by Dr. Gardoni, "engineers must hold paramount the safety, health, and welfare of the public."[159] Not only was it part of LAN's basic job as an engineer to identify that, absent corrosion control, using Flint River water would threaten residents' health, they had a professional responsibility to report the problem and require that it be addressed. Common evidence will show that nowhere in LAN's written reports did it identify the absence of corrosion control as a threat to both public health and residents' homes.[160] Additionally, LAN's recommendation

---

[156] *Id.* § 8.1.3.

[157] *Id.* §§ 7.5, 8.1.4.

[158] *Id.* § 8.1.4; Ex. 105, Schock Dep. Tr. at 71:4-15.

[159] Ex. 102, Gardoni Report at 3.

[160] Ex. 58, Russell Report § 8.1.2; *see* Ex. 106, COF_FED_0214303 (making no mention of corrosion control as necessary plant upgrade); Ex. 107, LAN_FLINT_00063901 at LAN_FLINT_00063909-12 (failing to call for a corrosion control study prior to water switch or require implementing corrosion control).

to increase ferric chloride dosing and its failure to conduct a root cause analysis exacerbated the risk posed by highly corrosive Flint River water.[161]

Similarly, common evidence similarly demonstrates that Veolia's conduct violated the standard of care and competence required of a professional engineer. Specifically, Veolia failed to perform standard calculations that would have alerted the City to the immediate need for corrosion control;[162] failed to include the need for corrosion control for lead in any of its reports;[163] failed to alert the City to a serious threat to public health and safety;[164] advised an increase in ferric chloride that would actually make corrosion worse;[165] and failed to advise that switching back to DWSD was the "best technical solution," and potentially "safest" solution for Flint.[166]

---

[161] Ex. 58, Russell Report §§ 6.4, 7.1.6, 7.3.

[162] *See* Ex. 58, Russell Report §§ 6.3, 8.2.2; Ex. 27, Glasgow Dep. Tr. at 612:14-615:24, 627:18-628:18, 631:5-16; Ex. 72, Glasgow Dep. Ex. 76.

[163] Ex. 108, Glasgow Dep. Ex. 77; Ex. 109, Glasgow Dep. Ex. 78; Ex. 110, Glasgow Dep. Ex. 79.

[164] *See, e.g.*, Ex. 27, Glasgow Dep. Tr. at 641:18-22; Ex. 58, Russell Report § 8.2.4.

[165] Ex. 75, Gnagy Dep. Tr. at 288:14-290:7; *see also* Ex. 74, Chen Dep. Tr. at 328:8-329:8.

[166] Ex. 76, Chen Dep. Ex. 11 at VWNAOS081161; Ex. 74, Chen Dep. Tr. 84:8-18, 86:5-8, 90:22-91:22, 171:3-12, 172:3-8.

Veolia compounded these failures by misleading the public regarding the water's safety.[167] Veolia similarly failed to inform the City of Flint that lead was a problem, despite Veolia's own internal recognition of that fact.[168] As Plaintiffs' experts and Veolia's own witnesses confirm—evidence that is universally common—this conduct falls far short of a professional engineer's duty of care.

Testimony from Veolia's Water Quality Subject Matter Expert ("SME") underscores Veolia's failure to meet professional engineering standards of care: Water Quality SME Depin Chen testified that telling the public "the water is safe" would be misleading if that statement were based only on the water meeting particular regulatory standards, because "safe" may mean the water is "pollutant, contaminant free, risk free," and "even [a] regulation . . . had some allowable, tolerable risks."[169] According to Chen, to tell the public "without any qualification" that the water is "absolute[ly] safe" was "not professional."[170] Yet Veolia told the

---

[167] *See* Ex. 77, Nicholas Dep. Ex. 13 at 3, 5.

[168] Ex. 78, Nicholas Dep. Ex. 16; Ex. 79, Nicholas Dep. Ex. 17; Ex. 80, Nicholas Dep. Ex. 18.

[169] Ex. 74, Chen Dep. Tr. at 78:5-79:8.

[170] *Id.* at 78:16-79:1, 79:11-22.

public the "water is safe," without qualification, not just once, but repeatedly over the course of a February 18, 2015 public townhall meeting.[171]

Contemporaneous documents show that, rather than prioritizing the health and safety of the public and allowing its work to be guided by the recommendations of its engineers, Veolia's marketing executives on its business development team ("BD") were "running the show."[172] BD had set its sights on "upselling" Flint to obtain a more lucrative Operations and Management ("O&M") contract—it had no incentive to help Flint address all of its water quality issues up front.[173]

As in *Widdis*, each of the considerations regarding whether LAN and Veolia breached the standard of care relies on evidence common to the Class. These include the cause of corrosive water conditions in the Flint water distribution system, its foreseeability, and precautions LAN and Veolia could and should have taken to

---

[171] Ex. 77, Nicholas Dep. Ex. 13 at 3, 5. Similarly, Chen included the use of an orthophosphate blend to control for lead corrosion in his draft recommendations to the lead Veolia engineer on the Flint project and testified that he would have expected that recommendation to be included in the final report. Ex. 74, Chen Dep. Tr. at 229:4-24. Yet, for reasons that no Veolia witness can explain, use of an orthophosphate blend was not recommended in any of Veolia's reports to the City of Flint.

[172] Ex. 111, VWNAOS006498; *see* Ex. 112, VWNAOS006511 (email between Veolia engineers emphasizing need to communicate returning to Detroit as "the best technical solution" and stating that "BD is driving this . . . . Not sure what BD is trying to sell").

[173] *See, e.g.*, Ex. 65, Nicholas Dep. Tr. at 90:6-91:16; Ex. 71, VWNAOS004416; Ex. 70, VWNAOS006624; Ex. 113, VWNAOS007634.

prevent the resulting harm to human health and property. They further include whether the Engineering Defendants or their alleged negligence is the legal cause of harm to people and property exposed to toxic water, what chemicals were or were not added to the water, and how chemical dosing affected corrosion levels. *See Widdis*, 2014 WL 11444248, at *8. Class treatment of Plaintiffs' claims is thus warranted.

*Third*, evidence common to the Class will demonstrate that Plaintiffs suffered damages in the form of harm to their health and quality of life, diminished property values, and damage to pipes, fixtures, and appliances within those properties. Based on ongoing discovery, common proof may also be used to establish additional class-wide damages based on expenditures on bottled water and payment of water bills for toxic water. *See generally* § IV.B.2, *infra*.

The inquiry on a motion for class certification does not ask whether the class is likely to prevail on a proffered damages theory, but rather whether a reliable method exists for proving damages across the class. *See, e.g.*, *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007) ("Rule 23 does not require a district court, in deciding whether to certify a class, to inquire into the merits of the plaintiff's suit."). As set forth in Plaintiffs' expert reports, *infra*, reliable methods exist for showing each of these categories of damages using evidence that applies class-wide within the proposed Subclasses. Class treatment of Plaintiffs' professional negligence claim

will thus avoid individualized inquiries and is the superior means of adjudicating what would otherwise be an inefficient and impractical number of separate suits.

Importantly, the Sixth Circuit has "never required a precise mathematical calculation of damages before deeming a class worthy of certification." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (citing *Olden v. LaFarge Corp.*, 383 F.3d 495, 508 (6th Cir. 2004)). Rather, the question at certification is whether common evidence will show damages to the class. *See Beattie*, 511 F.3d at 564. Thus, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)); *see Sterling*, 855 F.2d at 1197 ("[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."); *In re Whirlpool*, 722 F.3d at 854 ("'[n]o matter how individualized the issue of damages may be,' determination of damages 'may be reserved for individual treatment with the question of liability tried as a class action.'" (quoting *Sterling*, 855 F.2d at 1197)); *Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994) (certifying 23(b)(2) medical monitoring class and finding that differences in damages did not undermine cohesiveness).

*Finally,* proximate cause will be demonstrated using evidence that is common to the class.  Michigan law requires cause in fact, meaning "the harmful result would not have come about but for the defendant's conduct," and legal or proximate cause, the determination of which normally "requires examining the foreseeability of the consequences and whether the defendant should be held legally responsible for those consequences." *Auto Owners Ins. Co. v. Seils*, 871 N.W.2d 530, 545 (Mich. App. 2015) (alteration and citation omitted). Here, evidence that the failure to properly evaluate Flint's water system caused increased corrosion raises no individual questions. Similarly, but for the Engineering Defendants' failure to conduct a root cause analysis, it would have been apparent that the City's pipes were corroding and causing lead, *legionella*, and other contaminates to enter residents' homes at a much earlier date.[174] *Cf. Collins*, 248 F.R.D. at 104 (finding predominance requirement satisfied in toxic tort case because the defendant's "entire course of conduct and knowledge of its potential hazards is a common issue to the class, which courts have found to be sufficient even in cases where there are multiple possible sources of contamination").

Common evidence will similarly show that LAN and Veolia reasonably expected the City and the public to rely both upon their analysis of the water—which

---

[174] *See* Ex. 58, Russell Report § 6.4.

failed to address lead corrosion and recommended an increase in ferric chloride that would in fact make the problem worse—and their public statements of the water's safety. In short, both LAN and Veolia's liability for professional negligence will turn on evidence common to the Class such that common issues predominate under Rule 23(b)(3).

### 2. Common Evidence Will Establish that Defendants' Actions Harmed the Class.

The injuries caused by the Flint Water Crisis have been severe and substantial. The various types of harms sustained by Class and Subclass members include the following, all of which will be established using class- and subclass-wide evidence:

***Health and Quality of Life Damages and Payments for Contaminated Water.*** Plaintiffs' expert Professor David Keiser has also identified common methodologies for calculating other categories of damages. As Professor Keiser explains, there are common methodologies for calculating the impact of the Flint Water Crisis on morbidity, mortality, lost earnings, and the emotional and psychological impacts of the Water Crisis.[175] Additionally, Flint residents sustained damages by paying for contaminated water that had no value, and calculating those damages will be straightforward.[176]

---

[175] Ex. 114, Keiser Report at 24-28.

[176] *Id.* at 28-29.

*Personal Injuries.* Common evidence, including internal Defendant documents and expert testimony, will establish that Defendants' conduct caused physical injuries. When the City used Lake Huron water provided from the DWSD, Flint had all but eliminated lead in its drinking water.[177] But in a few short years, Flint transitioned from being a community where *no sampled house* (in 2008 and 2011) exhibited detectible levels of lead to a community where *every sampled house* exhibited detectible levels of lead (in August 2015).[178] Childhood blood levels increased by an average of 18% during that time, and the number of children with blood levels in excess of 5 micrograms doubled.[179] Flint's citizenry were confronted with multiple contaminants that posed an increased risk of adverse health consequences: *legionella*, TTHMs, *E. coli* bacteria, and lead. *See supra*, § II. Although the amount of personal injury damages will vary from one Class member to another and, for most Class members, will be proven at a subsequent phase of the litigation, the *fact* of personal injury damages can be shown on a common, class-wide basis, as can the aggregate damages for certain adverse health effects and emotional and psychological trauma discussed below.

---

[177] Ex. 116, Prsyby Dep. Ex. 82.

[178] Ex. 115, VATECH_00212274; Ex. 116, Prsyby Dep. Ex. 82; Ex. 117, Prysby Vol. III Rough Dep. Tr. 152:10-21, 153:2-16.

[179] Ex. 99, Lanphear Decl. ¶ 31.

64

*Averting Behavior Damages.* Professor Keiser has also identified a common methodology for calculating damages from averting behavior, namely, the purchase of bottled water, during the period after the switch to Flint River water but before the emergency declaration.[180] Professor Keiser's hedonic pricing model, which uses a hedonic regression analysis standard in economics, relies on common evidence to demonstrate class-wide damages to the Residential Property Subclass from diminished property value and increased spending on bottled water due to the Flint Water Crisis. Using city-wide data from the Zillow Transactional and Assessment Dataset (ZTRAX) compiled from county records and additional sources, Professor Keiser illustrates diminished property value and increased averting expenditures on a community basis.[181] Similarly, Professor Keiser has opined that with additional data, the same methodology can be used to quantify additional purchases resulting from disruption of a reliable water supply in the City of Flint.[182] Using these data to create statistical models allows for a consistent, comprehensive, contextualized

---

[180] As Professor Keiser explains, after the emergency declaration information about water quality became sufficiently widespread that the cost of averting behaviors would have been factored into home prices. Professor Keiser thus does not separately quantify averting behavior costs after the declaration. *See* Ex. 114, Keiser Report at 19, 24.

[181] *See* Ex. 114, Keiser Report at 44.

[182] *See id.* at 23-24; *see also id.* at 1 n.2, 56.

demonstration of the harm caused by Defendants that would be difficult to obtain by looking solely at an individual case.

In addition to the fact that homes throughout the City actually received this contaminated water, as information about the Flint Water Crisis became public and made headlines throughout the country, the knowledge of Flint properties as receiving contaminated water would similarly be common across the Class. Knowledge became most thoroughly disseminated when the Water Crisis was formally declared an emergency, and from that point on bottled water expenses would have been factored into home prices.[183] Prior to that date, however, Professor Keiser's model will be able to quantify class-wide damages from increased *spending* to avoid reliance on the toxic water coming out of taps in Flint using the community-wide data available.[184]

Professor Keiser's analysis demonstrates that by using statistical models to isolate the effect of changes in Flint's water quality on home prices and bottled water expenditures, diminished property value and averting behavior damages can be

---

[183] *See id.* at 2, 19-20, 22.

[184] *See id.* at 2, 24.

evaluated using evidence common to the Class and that the ability to do so renders

class treatment the superior method of adjudicating Plaintiffs' claims.[185]

   ***Property Damages to Pipes, Fixtures, and Appliances.*** The health impacts

and trauma of the Flint Water Crisis are immense. But the proposed Class members

also suffered economic damages. The plumbing throughout Flint (in residential and

commercial properties) has been severely damaged and will serve as a source of

ongoing lead contamination for years.[186] Residential systems in particular were

damaged by greatly accelerated corrosion of all components including piping,

valves, and faucets.[187] The only form of remediation, which ensures the prevention

---

[185] Regression models such as those used by Professor Keiser have repeatedly been affirmed as a standard means of reliably calculating damages across a class. *See, e.g.*, *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1284 (11th Cir. 2019) (substantial academic and legal literature "has discussed or employed hedonic regression analysis as a practicable and effective way of calculating impacts on real estate values" (collecting sources)), *judgment vacated on other ground*s, 140 S. Ct. 1259 (2020); *In re Katrina Canal Breaches Consol. Litig.*, Civil Action No. 05-4182, 2007 WL 3245438, at *13 (E.D. La. Nov. 1, 2007) (finding hedonic price modeling to be an appropriate means of calculating class-wide damages due to reduced property value); *Schechner v. Whirpool Corp.*, No. 2:16-cv-12409, 2019 WL 978934, at *5 (E.D. Mich. Feb. 28, 2019) (denying motion to exclude hedonic regression analysis offered in support of class certification); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 251 (N.D. Ohio 2014) (noting in the antitrust context that class plaintiffs' "Rule 23 burden with respect to impact does not require proof of 'identical damages' or 'common results,'" but rather "a method of proof, using evidence common to the class," that shows class-wide damages).

[186] *See* Ex. 58, Russell Report §§ 4.7-4.8, 6.3, 10.7.

[187] *Id.*

67

of future lead release as well as addresses the impacts of accelerated corrosion of the plumbing system, is "to conduct full replacement of these valves, fixtures, and piping."[188]

There are well over 37,000 homes in Flint that had pipes and fixtures permanently compromised that will necessitate re-plumbing.[189] Total replacement with new piping material will ensure the health and safety of the consuming public, including Class members, "reset the clock" on the value of Flint homes, and help restore customer confidence with Flint's drinking water system. Any failure to perform a complete re-plumbing will shift that financial burden to Class members. Those Class members will either have to replace all pipes and pay out-of-pocket, or realize that cost reduction in home values, since these plumbing issues must be disclosed pursuant to the Michigan Seller's Disclosure Act, MCL § 565.957(1), at the time of the sale.

Plaintiffs' experts Bruce Gamble and David Pogorilich provide an estimate for both the direct construction costs for repair/remediation and indirect pricing for

---

[188] *Id.* § 10.7. Simply replacing Class members' piping, appliances, and faucets without also replacing Flint's lead-lined water distribution system will not cure the problem. As evidenced by the situation with LeeAnn Walters, whose property had PVC piping, the lead from Flint's distribution system still resulted in lead tests that exceeded 100 ppb. As long as lead travels through Flint's distribution system, pipes, appliances, and/or faucets will need continuous replacement.

[189] Ex. 87, Gamble Report at 5.

alternative living expenses for these properties.[190] Gamble and Pogorilich rely on common evidence to the Class, starting with a single-family database sourced from the Genesee County Assessor's Office, and a multi-family database sourced from Costar, and independently confirmed by a third database.[191] The methodology for calculating remediation cost damages identified by Gamble and Pogorilich can be applied to all homes in Flint.

All of these calculations are based on published guidelines or databases as explained in the reports, and are applicable to all homes in the Class based on common characteristics and costs.

***Water Bills.*** Based on the results of ongoing discovery, common class-wide evidence also may be used to show additional damages to members of the Class, including the costs of paying for water that was both highly corrosive and poisoned.[192] Professor Keiser has identified a common methodology for determining the damages sustained by paying for contaminated water that had no value to, and indeed harmed, the Flint residents who purchased it. As set forth in Professor

---

[190] Ex. 87, Gamble Report ¶¶ 19-21; Ex. 118, Pogorilich Report ¶¶ 8-9.

[191] Ex. 87, Gamble Report ¶¶ 22-24; Ex. 118, Pogorilich Report ¶¶ 22-24.

[192] Ex. 114, Keiser Report at 28.

Keiser's report, calculating aggregate damages under this methodology will be straightforward once the data is available.[193]

### 3. The Flint Water Crisis Caused Ongoing Harm That Will Continue Into the Future.

As the Sixth Circuit recently acknowledged, "[i]n many ways, the [the Flint Water Crisis] . . . never ended." *In re Flint Water Cases*, Nos. 19-1425/1472/ 1477/1533, 960 F.3d 303, 321 (6th Cir. 2020). Indeed, the effects of the Water Crisis, particularly for Flint's children, are ongoing.

Early childhood exposure to lead is associated with an array of irreversible neuropsychological and developmental effects that will have a lifelong impact on Flint's children.[194] As a result of their exposure to lead contaminated water, Flint's children have sustained, among other harms, decrements to their IQ.[195] Going forward, they will suffer from diminished academic achievement, an increased risk of attention-related disorders, including, but not limited to, ADHD, and an increased risk of behavioral problems, such as impulse control, conduct disorders, neuropsychological development disorders, and diminished cognitive and

---

[193] *Id.*

[194] Ex. 119, Keating Decl. ¶¶ 16, 18, 26; Ex. 120, Ducatman Decl. ¶ 49; Ex. 99, Lanphear Decl. ¶ 28.

[195] Ex. 81, Hu Decl. ¶ 23; Ex. 99, Lanphear Decl. ¶ 26.

intellectual functioning.[196] Early childhood lead exposure is also associated with subsequent delinquent behavior.[197]

In addition to the devastating, lifelong neurodevelopmental damage to Flint's children, Defendants' actions also caused community trauma, which will have a profound impact on its residents for years to come. Community trauma is a collective experience of psychological trauma shared by a community exposed to overwhelming stressors that threaten the community's safety.[198] The Flint Water Crisis, during which residents were betrayed and harmed by the very institutions charged with protecting them, has become an internationally recognized exemplar of a community traumatized by an overwhelming stressor.[199] This trauma is exacerbated by the fact that Flint was a vulnerable community before the Crisis.[200]

The type of traumatic stressor experienced by the Flint community adversely affects the mental health of its residents, as well as the social fabric of the

---

[196] Ex. 119, Keating Decl. ¶ 18; Ex. 120, Ducatman Decl. ¶ 23; Ex. 99, Lanphear Decl. ¶¶ 26-28; Ex. 81, Hu Decl. ¶ 34.

[197] Ex. 119, Keating Decl. ¶ 18; Ex. 99, Lanphear Decl. ¶ 27.

[198] Ex. 121, Reicherter Decl. ¶ 16.

[199] *Id.* ¶ 37.

[200] *Id.*; *see also* Zahra Ahmad, *Flint again most impoverished city in the nation, new census data shows*, MLive (Sept. 17, 2018), *https://www.mlive.com/news/flint/index.ssf/2018/09/more_than_half_of_flints_chil d.html*.

community. This type of stressor detrimentally impacts the functioning of the social systems in the community, including, but not limited to families, neighborhoods, peer groups, schools, and hospitals.[201]

A community evaluation of the effects of the crisis on individuals revealed that Flint residents are experiencing mental and behavioral health issues, including depressed mood, anxiety, stress, sleep disturbances, difficulty with concentration, decreased appetites, emotional outbursts, and aggressiveness at rates far above national averages.[202] Moreover, a majority of Flint households surveyed reported at least one more behavioral health concern than they had before the public health emergency was announced and have experienced substantial stressors linked to the Water Crisis (e.g., compromised health, more complicated daily routines).[203] They also report fears about the safety of filtered and unfiltered water, concerns that the Water Crisis will never be fixed, and depressive symptoms and anxiety.[204]

---

[201] Ex. 121, Reicherter Decl. ¶ 21.

[202] *Community Assessment for Public Health Emergency Response (CASPER) After the Flint Water Crisis: May 17-19, 2016* ("CASPER Report"), Centers for Disease Control & Prevention, at 14, https://www.michigan.gov/documents/flintwater/CASPER_Report_540077_7.pdf; Ex. 121, Reicherter Decl. ¶¶ 43-44.

[203] CASPER Report at 5-6.

[204] *Id.* at 14; Ex. 121, Reicherter Decl. ¶ 45.

### 4. Common Evidence Will Establish Class-Wide Damages for the Proposed Subclasses.

The trauma and inconvenience of the Flint Water Crisis imposed extensive and pervasive damages on the Class as a whole resulting in class-wide damages that include monies owed for the harm to Class members' quality of life, overpayments on their water bills, and economic damages resulting from the costs of averting behaviors. As described in the preceding section, these types of damages were felt by all Class members and can be calculated using class-wide evidence. In addition to these class-wide damages, certain damages categories can be using class-wide evidence—these categories of damages have been separated into distinct Subclasses and the subclass-wide evidence is described below.

### a. Damages Suffered by Members of the Minors Subclass Will Be Established Using Evidence Common to the Subclass.

Class-wide evidence will demonstrate that Defendants' conduct caused elevated lead exposure in water, the ingestion of which caused common injuries to the children in the Minors Subclass. Certification of a subclass of children under Rule 23(b)(3) is appropriate to address the common issues of liability, causation, and injury. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citing 7AA C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 1778 (3d ed. 2005). These legal issues can and will be established using evidence, including expert evidence, that is common to all members of the Minors Subclass.

The opinions of Plaintiffs' experts Drs. Russell, Weisel, and Goovaerts establish the basic facts regarding Flint's corrosive water, the manner in which it leached lead into Flint's drinking water, and the Flint properties at which children would have been exposed to lead in the drinking water. Dr. Weisel, a tenured professor and Director of the graduate program in Exposure Science at Rutgers University, found, based on a review of the data and literature that, "the failure to use appropriate corrosion control treatment when the water source for Flint was switched on April 25, 2014 . . . [resulted] in soluble and particulate lead in the tap water in residences, day care centers and schools."[205] Dr. Weisel further determined that the identified properties in Flint would have increased lead in the water at the tap, resulting in increased lead exposure for members of the Minors Subclass.[206]

The relevant properties—residences, schools, and daycare centers where children were exposed to the increased lead—are identified by Plaintiffs' geospatial expert, Dr. Pierre Goovaerts. Dr. Goovaerts created a database of the residential properties in Flint that included: (1) properties that were constructed before 1986 (homes after that date may have less lead in their interior plumbing); (2) homes where laboratory tests confirmed levels of lead: and (3) schools and day care centers

---

[205] Ex. 122, Weisel Decl. ¶ 10, § IV.2; *see also* Ex. 58, Russell Report § 10.1 (presenting similar findings).

[206] Ex. 122, Weisel Decl. § IV.3.

with demonstrated lead.[207] Dr. Goovaerts's geospatial analysis supports Dr. Weisel's analysis which identifies those properties where increased concentrations of lead in the water—both Drs. Goovaerts's and Weisel's analyses present common evidence of the Minors Subclass members' injuries.

Next, Dr. Panos Georgopoulos, who holds Ph.D. and M.S. degrees in chemical engineering and is an expert in exposure science, biological dosimetry, and pharmacokinetics/toxicokinetics, opines that those young children exposed to lead-contaminated water at the addresses identified by Dr. Goovaerts would more likely than not have had elevated blood lead levels.[208] This too constitutes evidence common to the Minors Subclass. Dr. Georgopoulos' findings are based upon application of accepted scientific exposure models used to demonstrate the effect of water-derived lead consumption and its effect on corresponding levels of lead in blood for pregnant women and children.[209]

Finally, Drs. Howard Hu and Bruce Lanphear—internationally recognized experts concerning the effects of lead exposure upon children—each opine that the lead exposure caused injury to members of the Minors Subclass. Based upon the criteria developed for Class membership, the exposure assessment work performed

---

[207] Ex. 85, Goovaerts Decl. ¶ 20.

[208] Ex. 123, Georgopoulos Decl. at ¶¶ 11, 14.

[209] *Id.* ¶¶ 15-16.

by Drs. Weisel, Russell, Goovaerts, and Georgopoulos, and the scientific literature concerning the health effects of lead, Dr. Hu concludes that "exposure is of a sufficient duration and magnitude such that each child will have sustained non-negligible impairment of their neurobehavioral development."[210]

This proffered evidence of the injuries to young children from lead exposure is precisely the type of common evidence that the Sixth Circuit has found sufficient for class certification in both *Sterling*, 855 F.2d at 1196-97, and *Olden*, 383 F.3d at 508, each of which involved the exposure of a local community to toxic substances.

Like in *Sterling*, *Olden*, and numerous district court cases,[211] the Flint litigation involves the contamination of a local community with toxic substances arising out of a single course of conduct—namely, governmental and engineering misconduct that resulted in the contamination of an entire public water system and that exposed the City's residents to toxic substances for approximately a year and a

---

[210] Ex. 81, Hu Decl. ¶ 9(3).

[211] *See Stepp v. Monsanto Research Corp.*, No. 3:91cv468, 2012 WL 604328, at *9 (S.D. Ohio Feb. 24, 2012) (local community exposed to radiation from nuclear weapons facility; granting certification under Rule 23(b)(3)); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 485 (S.D. Ohio 2004) (local community's domestic water supply contaminated by toxic substances from Honeywell facility; granting certification under Rules 23(b)(2) and (b)(3)); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D. Ohio 1991) (local community exposed to radiation from uranium processing facility; finding that a class could be certified under 23(b)(3) because common issues predominated but granting certification under Rule 23(b)(1)(A) to avoid inconsistent adjudications).

half. Certification under Rule 23(b)(3) is appropriate because there are common questions of fact and law pertaining to Defendants' violation of the Subclass's constitutional right to bodily integrity, which predominate over questions affecting only individual members.

### b. Common Evidence and Methodology Will Establish Injuries Sustained by Residential Property Owners.

Plaintiffs' experts David Keiser, Gabriel Lade, and Peter Christensen (together, "Keiser") also analyzed hedonic home price damages to calculate damages to property owners in Flint. The hedonic housing price damages calculated by Keiser represent diminished property values in Flint resulting from the Flint Water Crisis.[212] A hedonic housing price model analyzes how housing markets respond to a variety of market changes, including changes in pollution exposure, and is a non-market valuation technique broadly accepted in economics.[213]

As Keiser explains, hedonic price models treat a marketed good, such as a house, as the sum of its attributes.[214] Under specific conditions, standard statistical models can be used to estimate the separate contribution of each attribute and the

---

[212] Ex. 114, Keiser Report at 1.

[213] *Id.* at 16-17, 21, & Table 1.

[214] *Id.* at 16.

effect of changes in a given attribute.[215] Applying this method, Keiser's model examines the contribution of changes in drinking water quality to the price for residential properties in Flint.[216]

Keiser's analysis finds that average housing values in Flint fell approximately 8% relative to control cities during the period between the switch to the Flint River and the first emergency crisis declarations (April 15, 2014 through September 30, 2015).[217] Keiser finds that prices fell a further 18% after the first Genesee County Public Health Emergency Declaration (October 1, 2015) through the end of mid-2017.[218] These changes are statistically significant and very unlikely to have occurred by chance.[219]

### c. Common Evidence and Methodology Will Establish Injuries Sustained to Flint Businesses.

The report provided by Plaintiffs' expert Dr. Robert Simons calculates the losses Flint businesses suffered as a result of the Water Crisis.[220] His analysis quantifies damages from reduction in profits and business interruption over the

---

[215] *See id.* at 16-19.

[216] *Id.* at 39-43.

[217] *Id.* at 45.

[218] *Id.*

[219] *Id.*

[220] Ex. 86, Simons Report at 11-13.

period from 2014 to 2018. Dr. Simons applies basic principles of income elasticity of demand and the best available data for businesses in Flint to calculate the decline in a subset of broad business categories.[221] He then compares this decline to economic activity both before the Flint Water Crisis, and to broader trends in control cities over the same period, in order to demonstrate the marginal decline resulting from the Water Crisis.[222]

Based on his analysis, Dr. Simons calculates that Flint businesses suffered a total loss of $89.6 million as a result of the Water Crisis.[223] As explained in Dr. Simons' report, there are at least four additional data sources that are not yet available but that he anticipates using to vet his result.[224]

## C.    Class Certification Is Superior to Other Methods of Adjudication.

"[A] class action is superior to other available methods for fairly and efficiently adjudicating the controversy" in this case. *See* Fed. R. Civ. P. 23(b)(3). The goal of this requirement is to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without

---

[221] *Id.* at 2.

[222] *Id.* at 2-3.

[223] *Id.* at 15.

[224] *Id.* at 13-14.

sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).[225]

Under Rule 23(b)(3), the court should consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Each of these factors weighs in favor of class certification here.

The first factor—the class members' interest in individually controlling the prosecution or defense of separate actions—weighs in favor of certifying the Class because identical relief is sought by all Class members. Further, any harmed individuals who wish to seek additional or alternative relief filed their own complaints, as evidenced by the Individual Cases. Those that remain in the Class have no interest in controlling their individual actions.

---

[225] *See also Sterling*, 855 F.2d at 1196 ("The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 326 (E.D. Mich. 2001) ("proceeding with this consolidated multi-district litigation as a class action will achieve economies of both the litigants' and the Court's time, efforts and expense").

Courts also have looked to the potential damages against the cost of an individual bringing his/her/its own litigation when reviewing the first factor. The Supreme Court has explained that litigation should be brought as a class action if individual suits would yield small recoveries, explaining "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (citation omitted).

For its part, the Sixth Circuit has noted that "the court should consider the value of individual damage awards, as small awards weigh in favor of class suits." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630-31 (6th Cir. 2011); *see also In re Whirlpool*, 722 F.3d at 861 ("Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery.") "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

Although each Class members' damages are significant, that number still pales in comparison to the cost of bringing an individual case against these well-funded and numerous Defendants. Just the cost of conducting depositions in this

case has been astronomical. When discovery is completed, it is likely that more than 100 depositions will have been taken. The cost to each Class member—if they brought their own case—to have an attorney prepare and conduct this many depositions would negate any benefit to bringing an individual action. It is likely that the litigation costs and attorney fees expended by proposed Class Counsel already conservatively number in the tens of millions of dollars. There is no reasonable way for each individual Plaintiff to justify such expenses even with the damages sustained in this case.[226] By pursuing a class action, injured parties can share those expenses and minimize duplication.

The analysis of the second factor—the extent and nature of any litigation concerning the controversy already begun by or against class members—also favors certification. Proposed Class Counsel have been litigating this case for nearly half a decade. This litigation has involved extensive motion practice, numerous appeals, and petitions for certiorari filed with the United States Supreme Court. The docket

---

[226] While there have been a large number of individual actions filed related to the Flint Water Crisis, the maintenance of those cases individually is only economically feasible because some counsel has been retained by hundreds or even thousands of individuals. In that way, the individual cases are operating much like class actions, amalgamating cases and pursuing common claims for damages for a large number of claimants. The existence of these individual cases does not weigh against the maintenance of this case as a class action. There are still tens of thousands of unrepresented individuals who would receive no recovery for their damages if a class action is not certified.

on this consolidated case shows over 1,100 filings and is rising daily. This case has been zealously litigated already, by a team of national and local firms on all sides. This history supports the superiority of this case proceeding as a class action.

Satisfaction of the third factor—the desirability or undesirability of concentrating the litigation of claims in a particular forum—indisputably favors certification. There is no other federal forum better equipped to preside over the Flint Water Crisis. The vast majority of the conduct by the Engineering Defendants and the Government Defendants occurred within this District and members of the Class live in Flint, Michigan. The advantages of concentrating the claims here is high.

The fourth factor—difficulties in managing a class action—also counsels in favor of certification. This Court has ably managed this case for over four years, and there is no reason to believe it will not continue to do so.

The number of issues common to the Class also favors class treatment as a superior method of adjudication. When a threshold issue is common to all class members, class litigation is greatly preferred. *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006) ("Permitting individual owners and lessees of 1999 or 2000 Villagers to litigate their cases is a vastly inferior method of adjudication when compared to determining threshold issues of contract interpretation that apply equally to the whole class."); *see also Powers*, 501 F.3d at 619 ("Cases alleging a single course of wrongful conduct are particularly well-suited to class

certification."); *Sterling*, 855 F.2d at 1197 (acknowledging an "increasingly insistent need" to certify class actions for lawsuits arising out of a "single course of conduct").

In addition, the ongoing pervasive harms suffered by all residents of Flint, and the relief required to mitigate these damages, provide compelling further justification that class action treatment is a superior method to adjudicate this case. As set forth more fully below, putative Class members have and continue to suffer severe effects from exposure to dangerous levels of lead. Class Counsel is pursuing injunctive relief on their behalf, and the broad programmatic remedies sought are best delivered on a class-wide basis, so that all affected members can receive the services they so desperately need. Time is critically important in lead poisoning cases, and waiting for thousands of individual cases to be resolved before adjudicating entitlement to programmatic relief harms tens of thousands of vulnerable residents of Flint. This factor adds further weight to the superiority of the class action method to fairly and efficiently adjudicate this case.

Class Plaintiffs propose a sequenced trial plan for the Minors Subclass that would initially try these common issues of liability, existence of a sustained injury, and entitlement to injunctive relief, including the medical expenses associated with neuropsychological exams needed to assess the extent of their individual injuries and programmatic relief needed to address community-wide harms. *See* Ex. 84, Trial Plan. Having established that the minor children were injured and entitled to

injunctive relief on a class-wide basis in the first phase of the proceedings, a subsequent phase of the proceedings would be devoted to establishing the specific amount of personal damages suffered by each child, the severity of which will differ for each Class member and will require individualized proceedings. Class Plaintiffs demonstrate in this submission why this phased approach is the superior method of adjudicating the claims of the Minor Children Subclass, would deliver appropriate medical attention to the children sooner, and avoid the risks of disparate treatment and outcomes that would arise under the alternative—adjudication of thousands of individual cases.

**D.     The Court Should Certify A Rule 23(b)(2) Class to Remedy the Ongoing Effects of the Flint Water Crisis Through Prospective Programmatic Relief.**

The devastating impact of the Water Crisis continues to reverberate throughout Flint. Its residents still struggle with the significant impact of being betrayed by the very agencies charged with protecting the community, which subjected residents to severe psychological trauma that continues today. The crisis also profoundly impacted Flint's most vulnerable residents, its children, who continue to struggle with the severe developmental and neuropsychological effects of lead exposure.  As aptly described by the Sixth Circuit: "[i]n many ways, the crisis has never ended." *In re Flint Water Cases*, 960 F.3d at 321. To address the ongoing

effects of the Crisis, the proposed Class and Minors Subclass seek injunctive relief mandating the following programmatic relief.

The establishment of a coordinating body designed to ensure the provision of ongoing access to programs and services designed to ameliorate the neurodevelopmental impacts of lead poisoning in for the Minors Subclass and the psychological trauma experienced by the Class as a whole. The coordinating body should have the ability to establish new programs, facilitate coordination among available programs, monitor efficacy, and insure that services both benefit the Class and Minors Subclass, but are not duplicative. The coordinating body should ensure that the following services are provided to the people of Flint:

- Diagnostic and assessment services for the Minors Subclass, including neuropsychological testing;

- Intervention and amelioration programs for the Minors Subclass, including physical and mental health services, nutritional services, and academic and educational support;

- Stress reduction and mental health community services for the Class, designed to reduce stress, treat mental health disorders, combat community trauma, and support individuals and families; and

- A registry of participation, expanding upon the existing Flint Registry, to track services and outcomes for the Class, while preserving individual privacy.[227]

---

[227] Ex. 120, Ducatman Decl. ¶ 51; Ex. 119, Keating Decl. ¶ 26.

Pursuant to Rule 23(b)(2), the Class and Minors Subclass should be certified for purposes of obtaining this critical programmatic relief.

Rule 23(b)(2) is intended for cases like this one, in which "litigants seek[] institutional change in the form of injunctive relief." *Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001); *see also, e.g.*, 2 William B. Rubenstein, *Newberg on Class Actions* § 4:40 (5th ed. 2020) (explaining that, "many (b)(2) class actions challenge government actions on *constitutional* grounds as well"); *Dearduff v. Washington*, 330 F.R.D. 452, 472 (E.D. Mich. 2019) (certifying several different classes, including a class for injunctive relief under Rule 23(b)(2) and noting that, "[h]istorically, Rule 23(b)(2) class actions have been used as a vehicle to vindicate civil rights violations" (citation omitted)).[228]

---

[228] *Chi. Teachers Union, Local No. 1 v. Board of Educ.*, 797 F.3d 426, 441-43 (7th Cir. 2015) (certifying Rule 23(b)(2) class where "plaintiffs sought a declaratory judgment that the Board's turnaround policies violated Title VII [on the basis of race] . . . and prospective injunctive relief including a moratorium on turnarounds and the appointment of a monitor to evaluate and oversee any new turnaround process"); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 667 (S.D.N.Y. 2013) (following certification of a Rule 23(b)(2) class, court held New York City Police Department's stop-and-frisk procedures unconstitutional and ordered "immediate changes to the NYPD's policies, a joint-remedial process to consider further reforms, and the appointment of an independent monitor to oversee compliance with the remedies ordered in this case"); *D.S. ex rel. S.S. v. N.Y. City Dep't of Educ.*, 255 F.R.D. 59, 68-69, 72-73 (E.D.N.Y. 2008) (certifying (b)(2) settlement class of minority students in New York high school, bringing constitutional claims and civil rights claims under § 1983, and approving a settlement that included the institution of new policies and practices as well as the appointment of a third-party monitor).

"Rule 23(b)(2) requires plaintiffs to show that defendant has acted or refused to act on grounds generally applicable to the class . . . [and] applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Barry*, 79 F. Supp. 3d at 733 (internal quotation marks and citation omitted). Certification under Rule 23(b)(2) is appropriate where "the common claim is susceptible to a single proof and subject to a single injunctive remedy." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 592 (E.D. Mich. 2006) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

In actions primarily seeking injunctive relief, the (b)(2) requirement is "almost automatically satisfied . . . ." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). "What is important is that the relief sought by the named plaintiffs should benefit the entire class." *Id.* at 59. The proposed Rule 23(b)(2) Class in the instant case undoubtedly meets these standards. As described in fuller detail below, this litigation readily meets the requirements of Rule 23(b)(2).

### 1. Defendants Acted or Refused to Act on Grounds Generally Applicable to the Class.

The Government Defendants each exposed Plaintiffs and the Class to drinking water contaminated with lead and other harmful substances. *See*, *supra*, Section II.A. The Engineering Defendants, likewise, upon learning of the release of lead and other contaminants into Flint's water supply, breached their duty to Plaintiffs and the Class to remediate, contain, and/or eliminate the contamination before it injured Plaintiffs

and the Class. *See*, *supra*, Section II.B. Defendants' conduct continues to have a profound impact on the people of Flint, thus necessitating the need for injunctive relief for the entire Class.

### 2. The Flint Water Crisis Will Have Continued, Prolonged, and Devastating Effects on the People of Flint.

The Flint Water Crisis will have prolonged and devastating effects on the people of Flint. Early childhood exposure to lead is associated with an array of irreversible neuropsychological and developmental effects that will have a lifelong impact on Flint's children.[229] And the actions and decisions responsible for the poisoning of Flint residents has also caused profound emotional, psychological community trauma.[230] As more fully delineated below, injunctive relief establishing a coordinating body to oversee, coordinate, identify, and fund prospective programmatic relief would serve to mitigate and ameliorate the ongoing effects of the Flint Water Crisis, and provide relief to each member of the Class.[231]

### 3. A Single Injunction Would Provide Prospective Relief to Each Member of the Class.

The creation of a coordinating body, with a Court-appointed Receiver/Monitor, to coordinate, oversee, identify, and fund new and existing

---

[229] Ex. 120, Ducatman Decl. ¶ 23; Ex. 119, Keating Decl. ¶¶ 13, 26; Ex. 99, Lanphear Decl. ¶ 28. *See also generally* Section IV.B.4.a.

[230] *See, supra*, Section IV.B.3.

[231] Ex. 120, Ducatman Decl. ¶ 49; Ex. 119, Keating Decl. ¶ 26.

programs and services designed to ameliorate the ongoing harms discussed above will provide relief to each member of the Injunctive Relief Class and Subclass. The coordinating body will ensure the provision of the following programs and services:

- Diagnostic and assessment services for the Minors Subclass, including neuropsychological testing;

- Intervention and amelioration programs for the Minors Subclass, including physical and mental health services, nutritional services, and academic and educational support;

- Stress reduction and mental health community services for the Class, designed to reduce stress, treat mental health disorders, combat community trauma and support individuals and families; and

- A registry of participation, expanding upon the existing Flint Registry, to track services and outcomes for the Class, while preserving individual privacy.[232]

Courts have routinely certified Rule 23(b)(2) classes designed to provide programmatic relief similar to that requested here. *See, e.g.*, *Baby Neal*, 43 F.3d at 53–54 (reversing denial of certification of a (b)(2) class of abused foster care children seeking broad programmatic reforms including, "medical and psychiatric treatment" programs and the implementation of procedures "to deal effectively with child abuse and neglect"); *Cameron*, 2020 WL 2569868, at *19 (certifying class and subclasses of prisoners seeking an injunction requiring officials to change policies and otherwise improve the conditions in county jail to prevent spread of COVID-

---

[232] Ex. 120, Ducatman Decl. ¶ 51; Ex. 119, Keating Decl. ¶ 26.

19); *Elliott v. Chi. Hous. Auth.*, No. 98 C 6307, 2000 WL 263730, at *3-15 (N.D. Ill. Feb. 28, 2000) (certifying a subclass of children who sought establishment of a court-supervised fund to pay for periodic examinations and neuropsychological testing to detect the onset of brain damage and/or cognitive deficits for children who with blood lead levels in excess of 10 mcg/dl.).

An injunction to oversee and consolidate programs providing prospective programmatic relief will provide relief to each member of the Class and Subclass. Each Class member will have access to programs which will provide diagnostic, evaluation, mitigation, and treatment services in order to ameliorate the ongoing harms caused by the Water Crisis.[233]

The programmatic relief sought here is similar to the programmatic reforms approved for class certification in *Baby Neal*. In *Baby Neal*, a putative class of abused foster care children sued the municipality charged with their care for violations of their constitutional rights. 43 F.3d at 52. The putative class sought broad programmatic reforms including but not limited to "medical and psychiatric treatment" programs and the implementation of "procedures, personnel, programs, and facilities that are necessary to deal effectively with child abuse and neglect." *Id.* at 53–54. In overturning the district court's denial of class certification, the Third

---

[233] Ex. 121, Reicherter Decl. ¶¶ 62-63; Ex. 119, Keating Decl. ¶ 26; Ex. 120, Ducatman Decl. ¶ 51.

Circuit held that proposed programmatic reforms were generally applicable to the class as a whole where:

> Plaintiffs have alleged that systemic failure cause[d] the [defendant] to violate various mandates under federal statutory and constitutional provisions. Because the children in the system are comparably subject to the injuries caused by this systemic failure, even if the extent of their individual injuries may be affected by their own individual circumstances, the challenge to the system constitutes a legal claim applicable to the class as a whole. An order forcing [defendant] to comply with their statutory and constitutional mandates would constitute relief generally applicable to the entire putative class. Indeed, the violations alleged here are precisely the kinds targeted by Rule 23(b)(2). The writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights.

*Baby Neal*, 43 F.3d at 64. Here, like *Baby Neal*, the proposed programmatic relief—including diagnostic, evaluation, mitigation, and intervention programs—will inure to the benefit of the entire Class and will provide prospective relief to ameliorate the ongoing harm/damage caused by the Flint Water Crisis.

Notably, while the prospective relief sought for a Rule 23(b)(2) class must provide relief to each member of the class, there is no requirement that "class-wide relief benefit each class member in precisely the same way." *Braggs v. Dunn*, 317 F.R.D. 634, 668 (M.D. Ala. 2016). In *Braggs*, a putative class of state prisoners brought suit against the State of Alabama for failure to provide adequate mental health services across the state's prison system. *Id.* at 639. While arguing that the plaintiffs' proposed reforms would not benefit the class as a whole, the defendants

asserted that "an alleged delay in care at [one prison] bear[ed] no relationship of any kind to allegedly insufficient staffing at [another prison], or allegedly insufficient intake procedures at [a third prison]." *Id.* at 668 (citation omitted). The court rejected this argument and certified the class, holding that "[f]undamentally, defendants err[ed] in forgetting that the language of Rule 23(b)(2) focuses on the nature of defendants' acts and omissions and the suitability of class-wide relief, and does not require that the class-wide relief benefit each class member in precisely the same way." *Id.* Accordingly, the fact that certain Class members may be eligible for more of the proposed services than others does not negatively impact certification where, as here, every Class member will benefit from the proposed injunctive relief.

Finally, class certification is appropriate under Rule 23(b)(2) because the Rule applies when the predominant relief sought is declaratory or injunctive in nature. *See Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446-47 (6th Cir. 2002); *see also Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012) (holding that certification of declaratory relief under Rule 23(b)(2) is permissible "even when the declaratory relief serves as a predicate for later monetary relief, which would be certified under Rule 23(b)(3)"). Defendants may attempt to oppose certification of a Rule 23(b)(2) class by portraying Plaintiffs' request for injunctive

relief as a request for money damages. The Sixth Circuit has already heard—and rejected—this argument. *Boler v. Earley*, 865 F.3d 391, 413 (6th Cir. 2017).[234]

### 4. This Court May Certify Both a Rule 23(b)(2) Class for Injunctive Relief and a Rule 23(b)(3) Class for Monetary Damages.

Plaintiffs properly seek certification of both a Rule 23(b)(2) Class for injunctive relief and a separately defined Rule 23(b)(3) Class for monetary damages. As the Supreme Court clarified in *Wal-Mart*, (b)(2) and (b)(3) provide distinct requirements for claims seeking different types of relief that are to be treated

---

[234] It is well-established that suits seeking prospective relief against the State for violations of constitutional rights are not barred by the Eleventh Amendment. *See Milliken v. Bradley*, 433 U.S. 267 (1977); *Ex parte Young*, 209 U.S. 123 (1908). It is equally well-established that for this injunctive relief request, there is no qualified immunity available to a governmental entity, *Owen v. City of Independence*, 445 U.S. 622 (1980), even if those individuals whose conduct contributed to the governmental "custom, policy or practice," acting in their individual capacities are protected from liability by qualified immunity. As the Supreme Court in *Owen* declared, "owing to the qualified immunity enjoyed by most government officials . . . many victims of [governmental] malfeasance would be left remediless if the [government] were also allowed to assert a good-faith defense." *Id.* at 651. Thus, a governmental entity may be found to have caused a constitutional violation without proof that any individual officer is liable for the violation. *See Webb v. City of Maplewood*, 889 F.3d 483, 487-88 (8th Cir. 2018); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *Gibson v. Cty. of Washoe*, 290 F.3d 1175 (9th Cir 2002) (overruled on other grounds by *Castro v. County of Los Angeles,* 833 F.3d 1060 (9th Cir. 2016)) (municipality may be liable even if liability cannot be ascribed to a single individual officer), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) (city may be liable for constitutional violation even where individual officers' conduct did not rise to level of constitutional wrong).

separately, not weighed against one another. 564 U.S. at 364 ("We fail to see why the Rule should be read to nullify [(b)(3)] protections whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction."). Indeed, the relief sought by the proposed Rule 23(b)(2) Class is limited to a single injunction mandating the creation of a coordinating body to create and oversee programs and services designed to provide relief to each member of the Class. Accordingly, the relief sought for the Rule 23(b)(2) Class does not include monetary claims. Indeed, claims for monetary compensation are sought only for the Rule 23(b)(3) Class, with the corresponding procedural protections of "predominance, superiority, mandatory notice, and the right to opt out" properly maintained. *Id.* at 362.

This Court therefore may certify both a Rule 23(b)(2) Class for prospective injunctive relief and a separate Rule 23(b)(3) Class for monetary damages. *See, e.g.*, *Olden*, 383 F.3d at 508-12 (affirming district court's certification of hybrid class under Rules 23(b)(2) and 23(b)(3), over defendant's objection that individualized damages would overwhelm plaintiffs' request for injunctive relief); *McDonald v. Franklin Cty.*, 306 F.R.D. 548, 560 (S.D. Ohio 2015) (certifying a "hybrid class" under Rules 23(b)(2) and 23(b)(3)); *Kelly v. Montgomery Lynch & Assocs., Inc.*, No. 1:07-CV-919, 2007 WL 4562913, at *6 (N.D. Ohio Dec. 19, 2007) (certifying a hybrid class under Rules 23(b)(2) and 23(b)(3) and finding defendant's argument

that "class members may not seek both money damages and equitable relief" to be "largely without merit"); *Bentley*, 223 F.R.D. at 474, 486 (certifying hybrid class under Rules 23(b)(2) and 23(b)(3) and rejecting the defendant's argument that injunctive relief is incidental to claims for monetary damages, as "[t]he named plaintiffs could have recovered their individual monetary damages . . . in individual lawsuits" and "[t]he fact that they are seeking to prosecute a class action is evidence of the importance they accord to obtaining class-wide injunctive relief").[235]

For the reasons stated above, the Court should certify a class pursuant to Fed. R. Civ. P. 23(b)(2) for prospective programmatic relief necessitated by the Flint Water Crisis.

---

[235] Notably, the language of Rule 23(b)(2) does not differentiate between prohibitive and affirmative injunctions. Rather, Rule 23(b)(2) simply states that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2). Cases in the Sixth Circuit certifying hybrid Rule 23(b)(2) and 23(b)(3) classes more often involve prohibitive injunctions. *See, e.g.*, *McDonald*, 306 F.R.D. at 560; *Kelly*, 2007 WL 4562913, at *6. Under the inclusive language of 23(b)(2), these cases nevertheless support certifying both 23(b)(2) and (3) classes where affirmative relief is sought; indeed, several cases certifying hybrid Rule 23(b)(2) and 23(b)(3) classes within the Circuit involve some form of affirmative injunctive relief. *See, e.g.*, *Olden*, 383 F.3d at 498 (requiring a medical monitoring program, repairs for any damage to the plaintiffs' property, and improvement in the operation of concrete plant to eliminate emissions); *Bentley*, 223 F.R.D. at 474, 486 (requiring the defendants to remediate the effects of previous releases of toxic chemicals).

**E.   Each Claim and Each Class Member Has Common Issues Suitable for Certification Under Rule 23(c)(4).**

Issues pertaining to Defendants' liability also qualify for certification under Federal Rule of Civil Procedure 23(c)(4). This subsection provides that "particular issues" may be resolved "as a class action." Fed. R. Civ. P. 23(c)(4). District courts may utilize "Rule 23(c)(4) even where predominance has not been satisfied for the cause of action as a whole." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 411 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019); *see also Gilkey v. Cent. Clearing Co.*, 202 F.R.D. 515, 531 (E.D. Mich. 2001) ("Rule 23(c)(4) allows a court to grant class action status only to particular issues.").

In *Behr*—the seminal case addressing issue class certification in the Sixth Circuit—the court affirmed the district court's decision to certify seven issues for class-wide resolution in a similar case involving stemming from defendants' alleged contamination of the groundwater. 896 F.3d at 408-09. The district court certified issues relating to each defendant's role in contaminating the ground water and then "stat[ed] that it would 'establish procedures by which the remaining individualized issues concerning fact-of-injury, proximate causation, and extent of damages can be resolved.'" *Id.* at 410 (citation omitted).

The Court explained that, "Rule 23(c)(4) contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method

97

of resolution." *Id.* at 413; *see also* 7AA Mary Kay Kane, *Federal Practice & Procedure* § 1790 (3d ed. 2020) (explaining subsection (c)(4) "may be used to designate appropriate classes or class issues at the certification stage" so that "the court can determine whether, as so designated, the other Rule 23 requirements are satisfied").

In assessing the appropriateness of certifying certain issues under this provision, the court first identifies the issue and then engages in a predominance analysis as it pertains to the issue in question. *Behr*, 896 F.3d at 413; *see also* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:91 (5th ed. 2020) (explaining that the majority of circuits, including the Sixth Circuit, interpret Rule 23(c)(4) as requiring only that, "common questions predominate over individuals ones merely in the *specific issues that are certified*").

As described in Section IV.B of this brief, common questions of law and fact predominate with regard to the claims of all Class and Subclass members. But even if that were not the case, the Court also has discretion to certify discrete issues that could be efficiently and effectively decided for the Class as a whole. *Behr*, 896 F.3d at 413. For example, as in *Behr*, issues relating to Defendants' role in contaminating Flint's drinking water in no way vary among Class members. Similarly, *all* of the misconduct alleged against the Government Defendants pertains to those Defendants' actions taken towards the community *as a whole*. Accordingly, factual

98

questions pertaining to qualified immunity may and should be decided on a class-wide basis. The same holds true for factual and legal questions pertaining to the Engineering Defendants' duty to the Class.

Many tens of thousands of Class members suffered injuries as a result of the Flint Water Crisis. It has taken years for this case to wind its way through motions to dismiss, multiple appeals, and complex discovery. To the extent any aspect of the case may be streamlined, efforts should be made to do so. This is precisely the reason courts have embraced issue certification in other water contamination cases. *Behr*, 896 F.3d at 413; *Mejdrech*, 319 F.3d at 911 (affirming class treatment in underground water contamination case to resolve common issue of defendant's liability in "one fell swoop").[236]

As the *Manual for Complex Litigation* explains, "[s]electively used, [issues classes] may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may

---

[236] *See also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 110 (E.D. Mich. 2019) (certifying an issue class as to several key issues relating to defendants' liability); *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532, 550 (N.D. Ohio 2019) (certifying certain issues for class-wide resolution under the Controlled Substances Act and reasoning that this was appropriate because these issues "need only be answered once because the answers apply in the same way" (citation omitted)), *appeals filed*, Nos. 19-4097, 19-4099 (6th Cir. Nov. 8, 2019).

be unmanageable as a class action." David F. Herr, *Annotated Manual for Complex Litigation* § 21.24 (4th ed. 2020). Likewise, in *Behr*, the court explained, "[r]esolving the issues in one fell swoop would conserve the resources of both the court and the parties." *Behr*, 896 F.3d at 416.

Accordingly, even if the Court decided that certain aspects of the claims in this matter are not appropriate for class-wide resolution, for those subsections of the Class for whom the Court does not choose to certify a damages class under 23(b)(3), the Court should certify an issues class to address issues pertaining to Defendants' liability as outlined in the proposed Trial Plan.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion.

Dated: June 30, 2020

Respectfully submitted,

*/s/ Theodore J. Leopold*
Theodore J. Leopold
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
2925 PGA Boulevard
Suite 220
Palm Beach Gardens, FL 33410
(561) 515-1400 Telephone
tleopold@cohenmilstein.com

Joseph M. Sellers
Kit A. Pierson
Emmy L. Levens
Jessica B. Weiner
Alison S. Deich
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
jsellers@cohenmilstein.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
jweiner@cohenmilstein.com
adeich@cohenmilstein.com

Vineet Bhatia
Shawn Raymond
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street
Suite 5100
Houston, TX 77002
(713) 651-3666 Telephone
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

*/s/ Michael L. Pitt*
Michael L. Pitt
Cary S. McGehee
**PITT MCGEHEE PALMER &
RIVERS, P.C.**
117 West 4th Street
Suite 200
Royal Oak, MI 48067
(248) 398-9800 Telephone
mpitt@pittlawpc.com
cmcgehee@pittlawpc.com

Paul Novak (P39524)
Diana Gjonaj (P74637)
Gregory Stamatopoulos (P74199)
**WEITZ & LUXENBERG, P.C.**
3011 West Grand Boulevard
Suite 2150
Detroit, MI 48226
(313) 800-4170 Telephone
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Robin L. Greenwald
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
(212) 558-5500 Telephone
rgreenwald@weitzlux.com

Esther E. Berezofsky
**MOTLEY RICE LLC**
210 Lake Drive East
Suite 101
Cherry Hill, NJ 08002
(856) 667-0500 Telephone

101

Stephen Morrissey
Jordan Connors
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave.
Suite 3800
Seattle, WA 98101
(206) 516-3880 Telephone
smorrissey@susmangodfrey.com
jconnors@susmangodfrey.com

Peretz Bronstein
Shimon Yiftach
**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
60 East 42nd Street
Suite 4600
New York, NY 10165
(212) 697-6484 Telephone
peretz@bgandg.com
shimony@bgandg.com

Bradford M. Berry
Anson C. Asaka
**NAACP**
4805 Mt. Hope Dr.
Baltimore, MD 21215
(410) 580-5777 Telephone
bberry@naacpnet.org
aasaka@naacpnet.org

Kathryn P. Hoek
**SUSMAN GODFREY, L.L.P.**
1901 Avenue of the Stars
Suite 950
Los Angeles, CA 90067
(310) 789-3100 Telephone
khoek@susmangodfrey.com

Neal H. Weinfield
**THE DEDENDUM GROUP**

eberezofsky@motleyrice.com

Teresa Caine Bingman (P56807)
**THE LAW OFFICES OF TERESA
A. BINGMAN, PLLC**
120 N. Washington Square
Suite 327
Lansing, MI 48933
(877) 957-7077 Telephone
tbingman@tbingmanlaw.com

William Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
**GOODMAN & HURWITZ PC**
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170 Telephone
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com

Deborah A. LaBelle (P31595)
**LAW OFFICES OF DEBORAH A.
LABELLE**
221 N. Main St.
Suite 300
Ann Arbor, MI 48104
(734) 996-5620 Telephone
deblabelle@aol.com

Trachelle C. Young (P63330)
**TRACHELLE C. YOUNG &
ASSOCIATES PLLC**
2501 N. Saginaw St.
Flint, MI 48505
(810) 239-6302 Telephone
trachelleyoung@gmail.com

Brian McKeen (P34123)

102

(312) 613-0800 Telephone
nhw@dedendumgroup.com

Cirilo Martinez (P65074)
**LAW OFFICE OF CIRILO
MARTINEZ, PLLC**
3010 Lovers Lane
Kalamazoo, MI 49001
(269) 342-1112 Telephone
martinez_cirilo@hotmail.com

David J. Shea
**SHEA AIELLO, PLLC**
26100 American Drive
2nd Floor
Southfield, MI  48034
(248) 354-0224 Telephone
david.shea@sadplaw.com

Mark L. McAlpine (P35583)
Jayson E. Blake (P56128)
**MCALPINE PC**
3201 University Drive
Suite 100
Auburn Hills, MI  48326
(248) 373-3700 Telephone
mlmcalpine@mcalpinelawfirm.com
jeblake@mcalpinelawfirm.com

Claire Vergara (P77654)
**McKEEN & ASSOCIATES, PC**
645 Griswold Street
Suite 4200
Detroit, MI 48226
(313) 961-4400 Telephone
bjmckeen@mckeenassociates.com
cvergara@mckeenassociates.com

Cynthia M. Lindsey (P37575)
Shermane T. Sealey (P32851)
**CYNTHIA M. LINDSEY &
ASSOCIATES, PLLC**
8900 E. Jefferson Avenue
Suite 612
Detroit, MI 48214
(248) 766-0797 Telephone
cynthia@cmlindseylaw.com
shermane@cmlindseylaw.com

Andrew P. Abood (P43366)
**ABOOD LAW FIRM**
246 East Saginaw Street
Suite One
East Lansing, Michigan 48823
(517) 332-5900 Telephone
andrew@aboodlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above case were served via the ECF filing system on July 16, 2020.

Dated: July 16, 2020

*/s/ Jessica B. Weiner*
Jessica B. Weiner
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
jweiner@cohenmilstein.com