```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF MICHIGAN
 2                           SOUTHERN DIVISION

 3
        In Re:  FLINT WATER CASES       Case No.  16-10444
 4     _____/

 5
                              EMERGENCY MOTION
 6            BEFORE THE HONORABLE JUDITH E. LEVY
                    UNITED STATES DISTRICT JUDGE
 7               GENESEE COUNTY CIRCUIT COURT JUDGE
          Virtual Hearing Via Zoom - Friday, October 2, 2020

 8

 9                         APPEARANCES IN ALPHABETICAL ORDER:

10                         Alaina Devine, Esq.
                           Campbell Conroy & O'Neil PC
11                         1 Constitution Wharf, Suite 310
                           Boston, Massachusetts 02129

12
                           William Young Kim, Esq.
13                         City of Flint
                           1101 South Saginaw Street, Third Floor
14                         Flint, Michigan 48502

15                         Patrick J. Lanciotti, Esq.
                           Napoli Shkolnik Law PLLC
16                         360 Lexington Avenue, 11th Floor
                           New York, New York 10017

17
                           Theodore J. Leopold, Esq.
18                         Cohen Milstein Sellers and Toll PLLC
                           2925 PGA Boulevard, Suite 200
19                         Palm Beach Gardens, Florida 33410

20                         Emmy L. Levens, Esq.
                           Cohen Milstein Sellers and Toll PLLC
21                         1100 New York Avenue, NW,
                           Suite 500, West Tower
22                         Washington, DC 20005

23                         Paul J. Napoli, Esq.
                           Napoli Shkolnik PLLC
24                         360 Lexington Avenue, 11th Floor
                           New York, New York 10017

25
```

```
 1   APPEARANCES (Continued):

 2                        Michael L. Pitt, Esq.
                          Pitt, McGehee, Palmer & Rivers, PC
 3                        117 West Fourth Street, Suite 200
                          Royal Oak, Michigan 48067-3804
 4
                          David M. Rogers, Esq.
 5                        Campbell Conroy & O'Neil, P.C.
                          1 Constitution Wharf, Suite 310
 6                        Boston, Massachusetts 02129

 7                        Alexander S. Rusek, Esq.
                          White Law PLLC
 8                        2400 Science Parkway, Suite 201
                          Okemos, Michigan 48864
 9
                          Hunter Shkolnik, Esq.
10                        Napoli Shkolnik Law PLLC
                          1301 Avenue of the Americas, 10th Floor
11                        New York, New York 10019

12                        Corey M. Stern, Esq.
                          Levy Konigsberg, LLP
13                        800 Third Avenue, Suite 11th Floor
                          New York, New York
14
                          Renner K. Walker, Esq.
15                        Levy Konigsberg, LLP
                          800 Third Avenue, Suite 11th Floor
16                        New York, New York 10022

17

18

19

20

21   REPORTED BY:         Darlene K. May, CSR, RPR, CRR, RMR
                          231 W. Lafayette Boulevard
22                        Detroit, Michigan 48226
                          (313) 234-2605
23

24

25
```

| | |
|---|---|
| 1 | <center>TABLE OF CONTENTS</center> |
| 2 | PROCEEDINGS: PAGE: |
| 3 | Court opened 4 |
| 4 | Proceedings 4 |
| 5 | Court Reporter's Certificate 33 |

TABLE OF CONTENTS

PROCEEDINGS:                                          PAGE:

  Court opened                                           4

  Proceedings                                            4

  Court Reporter's Certificate                          33

1          Friday, October 2, 2020

2          4:47 p.m.

3                    -- --- --

4          THE CLERK OF THE COURT:  Please rise.  The United

5    States District Court for the Eastern District of Michigan is

6    now in session.  The Honorable Judith E. Levy presiding.

7    Calling the Flint Water cases.

8          THE COURT:  Thank you.  And let me just go to the

9    docket where I have this brief.

10         Okay.  Well, I received a motion, I don't know, an

11   hour, an hour and half or hour ago or something, that is

12   entitled -- it's the co-liaison counsel's motion for a

13   protective order and it is related to five expert depositions.

14   The first of which is Monday at 9:00 a.m.  And so I decided

15   that the best approach that I could think of, because I didn't

16   want to just issue a decision one way or another without

17   hearing from the co-lead class counsel who, apparently, wish to

18   take these depositions or participate in them or have clients

19   participating or something like that, I thought the best thing

20   was to get us all together as quickly as possible before people

21   disburse for the weekend to another room in their house and see

22   if we could get this resolved, at least with respect to the

23   Monday deposition.  But I think this is the same issue that was

24   on the Tuesday agenda.

25              I have some scheduling issues going on next week, so

1  if we can address this, the Tuesday issue today, which is

2  Dr. Specht, S-p-e-c-h-t, that would make me very happy.  So

3  with all of those factors, I thought it would be best to

4  schedule something right away.

5          So, Mr. Walker, will you be speaking for co-liaison?

6          MR. STERN:  I will, Your Honor.  This is Corey Stern.

7          THE COURT:  All right.  Go ahead.  Then here's the

8  question:  You've already given me your motion, but what I

9  don't know about in the motion is what these individuals are

10 testifying to.  I know Dr. Krishnan is the neuropsychologist

11 that we've -- or psychiatrist, I'm not sure which, that we've

12 been talking about her evaluation and her data.  And I know

13 Dr. Specht is somebody who was going to be discussed on

14 Tuesday.  But can you tell me what the areas of expertise are

15 for these and if they are related to the two -- I guess it's

16 two of the four bellwether plaintiffs they're going to testify

17 about.  So I just want to know, generally, who they are and

18 what their testimony will relate to.

19         MR. STERN:  Okay.  No problem, Your Honor.

20         Dr. Krishnan is a neuropsychologist who evaluated each

21 of the four bellwether trial plaintiffs for cognitive deficits

22 and will be testifying about her perceptions, her conclusions,

23 her testing and the cognitive deficits that she may have found

24 through her testing and evaluations.

25         Dr. Specht is a Ph.D. and he deals with lead in bones

1  and he evaluated each of the four bellwether plaintiffs related

2  to the physical concentration of lead in their bones.

3          THE COURT:  Okay.

4          MR. STERN:  Dr. --

5          THE COURT:  Now, is his testimony -- it sounds like

6  Dr. Krishnan's testimony goes to damages.  Does it also go to

7  causation in general?

8          MR. STERN:  Neither of them go to causation.

9          THE COURT:  Okay.

10          MR. STERN:  Dr. Krishnan will testify:  "I did testing

11  and these were the results."

12          THE COURT:  Okay.

13          MR. STERN:  "I can't tell you why.  That's not my

14  expertise.  I could just tell you what I found."

15          Dr. Specht is not going to speak about causation.

16  Dr. Specht is going to speak about the physical attributes from

17  each of the children, four specific children.  Neither of them

18  is being called to testify globally about the population

19  incident.

20          THE COURT:  Okay.

21          MR. STERN:  It's just about these four children.

22          Dr. William Bithony is a pediatrician who specializes

23  in lead.  He used to run the Harvard lead clinic.  He has

24  evaluated each of the four children and will opine about

25  causation in conjunction with the reports from Dr. Specht and

1    Dr. Krishnan and he is not talking about causation, generally.

2    He's talking about causation for each of these four specific

3    children based on his experience and expertise in this area,

4    the research that he's done with regard to the water, the

5    interviews he's done with the parents and the families of these

6    individuals, his review of the reports from Dr. Krishnan and

7    Dr. Specht and he's the causation expert.

8              THE COURT:  Okay.

9              MR. STERN:  Dr. Crakes is an economist who will

10   testify about -- you know, he's not someone who physically

11   evaluates the children, but he takes the reports for each child

12   from Dr. Krishnan, Dr. Bithony and Dr. Specht and then uses an

13   economic analysis to determine potential lost earnings over the

14   course of their life.  So he'll be talking about their lost

15   earnings in conjunction with the medical findings of the other

16   three individuals.  And then Dr. Michaels is a toxicologist who

17   will testify specifically about the toxicology of lead in the

18   four individual bellwether trial plaintiffs

19             THE COURT:  Okay.  Thank you.  And then is it

20   Mr. Leopold or Mr. Pitt or somebody else who wants ...

21             MR. LEOPOLD:  Mike, do you want me to handle it or

22   will you handle it?

23             MR. PITT:  I can handle it, Your Honor.

24             THE COURT:  Yeah.  Let me start by asking you a

25   question.

1          MR. PITT:  Sure.

2          THE COURT:  Do you want to participate in all five of

3    the depositions or just some of them?  And by participate I

4    mean ask questions.

5          MR. PITT:  Well, just one, Your Honor.

6          THE COURT:  Which one?

7          MR. PITT:  Dr. Specht.

8          THE COURT:  Okay.

9          MR. PITT:  And the attorney --

10         THE COURT:  We'll get to Specht in a minute.  But,

11   Mr. Pitt, can we then -- I am sensitive to the fact that these

12   are four children and it's medical information about the four

13   children.  Do you have any objection to the relief that

14   Mr. Stern was seeking that clients and other members of the

15   public not attend these depositions?

16         I'm aware that sooner or later Mr. Stern will decide

17   who he's going to present as a witness at trial and some of

18   this testimony may come out at trial, but some may not.  He may

19   decide I'm not going to use this witness.  I will use this

20   witness.  So at this point if there's something I can do to

21   protect these children's health care records, I'm happy to do

22   that.

23         Ultimately, at trial we're not going to clear the

24   courtroom.  It will be a public trial and so on.  But do you

25   have any objection to either not attending the other four or

1   attending as an observer but not getting copies of the medical

2   records and not having your clients present?

3          MR. PITT:  Nope.  No problem at all, Judge.

4          THE COURT:  Okay.

5          MR. LEOPOLD:  Your Honor, this is Mr. Leopold.  I'm

6   sure the Court can appreciate, since we only had just a few

7   minutes.

8          THE COURT:  Right.

9          MR. LEOPOLD:  Mr. Pitt and myself have not had a

10  chance to even discuss any of these issues, other than globally

11  before -- not since the protective order came in.

12          I would think that in addition to Dr. Specht there may

13  be a few of these other experts that deal with the issue of

14  causation that we would also want to potentially ask questions

15  to based upon questioning from the defense of these experts.

16          THE COURT:  Okay.  And that is going to be

17  Mr. Bithony.

18          MR. LEOPOLD:  I believe I heard Mr. Stern say one

19  causation expert.  The last expert Mr. Stern talked about,

20  which was a toxicologist, I wasn't clear if that was myopically

21  focused on something related to the individual minors or some

22  aspect globally related to toxicological issues of lead in

23  minors.  I'm just not sure.

24          And without knowing how the defense, based upon their

25  notices, are going to address these issues, as I think Mr. Pitt

1    is going to talk about, they are pretty broad notices that they

2    intend to go into a lot of different issues.

3             THE COURT:  Okay.  So Mr. Stern said it was a

4    toxicologist related to lead in the four named plaintiffs.

5             MR. STERN:  All of the deponents, irrespective of what

6    VNA noticed in their deposition, are serving as experts for

7    these four individual plaintiffs.

8             THE COURT:  Right.  Here's what I'm sensitive to:

9    Back in July we had this discussion going in the other

10   direction where I think Mr. Shkolnik wished to take some -- ask

11   questions of class plaintiffs' experts and I think back at that

12   point -- and I may be misremembering -- I had said, you know,

13   he could have some limited slice because those experts are

14   testifying globally about causation or what liability -- or

15   whatever they're talking about.

16            But it could potentially effect individual's decisions

17   to either opt in or opt out -- or to opt out of a potential

18   class should there be one.  So it made sense to me that some

19   questions get to be asked because those experts are talking on

20   behalf of all of the people in Flint, all of the property in

21   Flint, all of the commercial entities in Flint.  And so I'm

22   trying to understand if this is different and it occurs to me

23   that it is.  And that these are directed towards four children

24   only and not towards the big picture.

25            But tell me about Dr. Specht, Mr. Pitt.

```
1          MR. PITT:  Yeah, sure.  So Dr. Specht is an expert in
2   X-ray fluorescence.  X-ray fluorescence, or called XRF, is a
3   technology where they use a very modest amount of X-ray
4   projected on to a child's bone and from that technology they
5   get a reading of lead within the bone structure.
6          THE COURT:  Okay.
7          MR. PITT:  He's a recognized expert in that
8   technology.  And the class counsel has two ...
9          First, I mean, the Court should know that we represent
10  hundreds of children.
11         THE COURT:  Right.
12         MR. PITT:  And so the technology that Dr. Specht is an
13  expert in --
14         THE COURT:  Well, when you say you represent hundreds
15  of children, we don't know what -- I'm deeply concerned.  I've
16  been very clear about this, about whether there can be a class
17  of minors and I'm trying to turn my attention to that to sort
18  out getting some briefing just on that issue, but I'm not quite
19  there yet.
20         But I don't care about that.  I mean --
21         MR. PITT:  I mean, for purposes of the settlement --
22  proposed settlement that the state --
23         THE COURT:  Oh, I see.  Okay.
24         MR. PITT:  -- negotiated we are representing hundreds
25  of children.
```

```
1              THE COURT:  Okay.  I got it.  Got it.

2              MR. PITT:  And so our interest is twofold with respect

3    to our clients, our children.  First in the settlement

4    documents there is a grid --

5              MR. STERN:  Michael, I would stop.

6              MR. SHKOLNIK:  Your Honor, I would object to this.

7              THE COURT:  Yes.  We're on the record.  There are no

8    attendees.  So everybody here is on the record.  But this

9    record -- this transcript can be purchased.

10             So what you're telling -- but you're telling me

11   that you represent many children and you want a chance to ask

12   Dr. Specht what?

13             MR. PITT:  What has developed, Your Honor, is that

14   when VNA put out the deposition notice, they asked Dr. Specht

15   to produce a comprehensive set of documents that relate to this

16   technology.  Not only the technology, but how he has developed

17   the protocols, the standard operating procedures, the test

18   results, global test results for Flint children, global test

19   results in general, how he calibrates his equipment, how he has

20   established various cutoff scores to determine if there's

21   actual lead in the phone, things of that nature.

22             THE COURT:  So you're telling me that Dr. Specht has

23   actually conducted his XRF on hundreds, if not thousands, of

24   Flint children?

25             MR. PITT:  I can't say that.  I don't know.  I don't
```

1   know the number.  I know there's multiple number of children.

2   There is some indication that he has been active in the

3   community performing tests.  And VNA is, of course, interested

4   in knowing what the results are and also the manner in which

5   Dr. Specht has been conducting the XRF tests.  So, you know,

6   there is that concern.

7        But there's also the concern that class counsel have

8   is that the claim against VNA for damages is still going to

9   be resolved through the adversarial process, be it eventually

10  at trial.  And what VNA can develop in the record in terms of

11  the XRF technology, whether or not it's a valid technology,

12  whether or not it's being used appropriately, what the results

13  have been, could have a tremendous impact on the outcome of the

14  trial that the plaintiffs will pursue against VNA.  So as long

15  as there is active litigation against VNA, we should be able to

16  help shape the testimony that's going to be used, that may

17  impact our clients.

18        THE COURT:  And are you calling Dr. Specht in your

19  case?

20        MR. PITT:  You know, we have not made that

21  determination.

22        THE COURT:  Because here's what I'm thinking:  Based

23  on what you're saying to me, what Mr. Stern has told me is he

24  has done some testing.  He's going to give the results on these

25  children.  He's not going to be going into causation and all

1  this.  He's going to be talking about what were the results.

2          And it sounds like, perhaps, VNA is going to attack

3  the test itself or something.  But from what you're saying,

4  you've got a tremendous volume of information you want to learn

5  from this man.  I think you need to set up a depo -- a notice

6  or ...

7          Well, he was on your side from what you're saying.

8          MR. PITT:  Well, I mean, so --

9          MR. SHKOLNIK:  Your Honor, can I say something here,

10 please?

11         THE COURT:  Sure.

12         MR. SHKOLNIK:  For the record, Hunter Shkolnik.

13         Dr. Specht is a retained expert in individual cases

14 hired by my law firm, first, as well as Corey's law firm.

15         THE COURT:  Okay.

16         MR. SHKOLNIK:  He's a private-hired expert.  Contrary

17 to what Mr. Pitt has said, he has not provided global opinions.

18 He is not testifying about, quote, the community.  He is only

19 testifying with respect to whatever clients he has examined for

20 me and now Corey's firm.  And is not a class expert, is not for

21 the community, is not -- that's just not accurate.

22         And we have a bellwether case with four individual

23 people that are going to trial and once his testimony is put

24 forward, if it's put forward at trial, it will be public

25 record.  If Mr. Pitt wishes to retain Dr. Specht, who is a

1    highly trained Harvard expert and -- and there's other ones.

2           They've written papers on this and they've contacted

3    these other experts.  If they want to hire them, that's what

4    they get to do.  They can do that.  This is not the way to do

5    it.

6           I mean, whether or not VNA chooses to cross-examine

7    these experts, they're all big boys and girls.  They can

8    cross-examine them and the experts are going to testify with

9    respect to the bellwether trials and the technology they

10   utilized.  And all those transcripts will become public, if we

11   go to trial.

12          As to the class, there are different issues.  The

13   issue is whether or not we are challenging a class in this case

14   and rather than ask to depose any of the experts they relied

15   upon secondarily -- because as challengers to a class, we would

16   probably have a right to do that.  This is two different issues

17   here.

18          THE COURT:  Yeah.

19          MR. SHKOLNIK:  That was the point I was making back in

20   July.

21          MR. LEOPOLD:  Your Honor, could I just briefly

22   respond?  I appreciate Hunter's comments and I, in some

23   semblance, you know, agree on the latter half of what he said.

24   Whether they had standing to object to the class, et cetera, is

25   a different issue for a later day.

1       But can I just address the first part of what he said?

2       THE COURT:  Sure.

3       MR. LEOPOLD:  Thank you.  The core issue is the issue

4  of methodology and the issue of *Daubert*-related issues.

5       THE COURT:  But you don't need to worry about

6  Mr. Stern and Mr. Shkolnik's expert.  That's going to be their

7  burden to bear.

8       MR. PITT:  Yeah.

9       MR. LEOPOLD:  But, Your Honor -- I'm sorry.

10       THE COURT:  You're trying to pump up Mr. Specht or

11  Dr. Specht.  They're going to have to do that.  If you're

12  worried that he might not pass muster to provide all this

13  valuable information about lead in the community, I think you

14  should -- I don't think it's going to hurt.  I think they are

15  qualified to defend their expert.

16       And, also, if a *Daubert* motion is filed challenging

17  Dr. Specht, I would -- and you want to weigh in as sort of a

18  amicus or something, saying this is very valuable or refutable

19  or whatever it is you're going to say, then that would be the

20  time to seek permission to file that in the individual case.

21  Because I don't think need to take their deposition --

22       MR. PITT:  Your Honor, Michael Pitt again.

23       THE COURT:  Yeah.

24       MR. PITT:  I mean, what Dr. Specht is going to say in

25  the deposition may have a direct impact on the viability of our

1    clients' claims.  So, I mean, as to who's retained the expert,

2    the fact he's going to express an opinion that may impact on

3    our clients' claims gives us standing to be at least present in

4    the deposition.

5              THE COURT:  That's what I was going to say.

6              MR. PITT:  And --

7              MR. STERN:  I totally disagree.

8              THE COURT:  Here's what I think we should do ...

9              And tell me, Mr. Stern, why I shouldn't do what

10   Mr. Pitt said.  I think this is your retained expert on behalf

11   of four individual clients testifying to their level of lead in

12   the bone and the technique to determine it and whether it's a

13   valid technique.

14             So would -- because Mr. Pitt -- I mean, I don't know

15   why you would spend your time this way, but you can always

16   order the transcript.  But I think that the data, the

17   information that relates to these minors should not be

18   distributed to everyone.  So I'm granting your motion with

19   respect to all five that the private medical records of these

20   individuals will not be distributed at this point.  If you

21   file -- you know, if you call these witnesses at trial, of

22   course, it will be public matter.  If you respond to a motion

23   for summary judgment, it will be public then.

24             But, Mr. Stern, do you have any objection to Mr. Pitt

25   observing in real-time?

1          MR. STERN:  I do.  I have an objection.  You know,

2     this is a little bit of why is the underlying data in what the

3     defendants are going to try and do to potentially *Daubert*

4     Dr. Specht different than what they're going to do to

5     Dr. Krishnan and her testing?  Why is it different than what

6     they're going to do with Dr. Bithony and his evaluation?

7          THE COURT:  Are you asking me?

8          MR. STERN:  I'm asking a little bit rhetorically.  The

9     reality is there's no difference between any of these experts.

10    They all have a bearing, potentially, under the argument that

11    Mr. Pitt just made as to whether their clients have viable

12    claims.  It's not just a bone expert.  It's the neuropsych and

13    the pediatrician and all of the experts we're using.

14          These doctors are going to be talking about children

15    who have not signed HIPPA releases for anybody but the

16    defendants to talk about or put into question their medical

17    records, to put into question the fact that maybe they've lost

18    IQ points.  That an economist is going to talk about based on

19    his --

20          THE COURT:  But he doesn't want all of them.  He only

21    wants Dr. Specht.

22          MR. STERN:  Dr. Specht is going to be talking about

23    private, protected health information.  If Mr. Pitt wants it,

24    he can potentially order the deposition and then we have to

25    fight that.  This is not intended -- these depositions are not

1  seminars for people to learn about things that they want to

2  educate themselves about.

3          THE COURT:  Right.

4          MR. STERN:  These are fact-finding depositions for the

5  defendants to determine whether their theories of their defense

6  are viable and how to attack the plaintiff's claims.  And what

7  this sounds like to me is that the class lawyers would like the

8  opportunity to attend a seminar to learn about a bone program

9  that they could find out with less intensive means by

10  contacting either this expert or other experts and determine

11  what a program would look like and what's the viability of that

12  program.

13          I just -- I don't -- I don't know how to explain when

14  I'm prepping a mom for her --

15          THE COURT:  But, Mr. Stern, he's not -- I'm not

16  considering giving Mr. Pitt an opportunity to ask questions.  I

17  don't see what the harm -- I don't ...

18          And, Mr. Pitt, what I don't want is for their medical

19  records to be turned over because you're present.  And because

20  I'm not at these depositions, are the documents sort of on the

21  screen the whole time or what?

22          MR. STERN:  They're exhibits.

23          MR. PITT:  Your Honor, I have no interest in these

24  medical records whatsoever.  I am concerned about the

25  technology and what VNA is going to say about the technology

1    and these --

2           THE COURT:  Then order the transcript.  That's how

3    you'll find out.

4           MR. PITT:  Well, Your Honor, I think we have a

5    right --

6           THE COURT:  This is Mr. Stern and Mr. Shkolnik's case.

7    It's not your case.

8           MR. PITT:  Except.  Except ...

9           THE COURT:  If you want to use Dr. Specht, then call

10   Dr. Specht.

11          MR. PITT:  This technology is imbedded in this case.

12   Like it or not, it is imbedded in this case.

13          THE COURT:  But then you're going to need somebody in

14   your case in chief to support it.  I don't know if he's the

15   only one that is out there doing it.  I doubt it, but I -- I

16   don't know anything about.

17          So here's what we'll do, because it sounds like it's

18   going to be very difficult not to participate, if that's what

19   you're there for is to ensure that this expert can survive a

20   *Daubert* challenge and VNA doesn't ask questions that somehow

21   upset the -- I don't really know.

22          So I think you just have to get your own expert on

23   this technology and work with them, learn the technology, sort

24   out the best way to defend it or whatever you want to do.

25          MR. PITT:  Your Honor.  Your Honor, the State of

```
1   Michigan has adopted this expert as part of the package that

2   we're --

3              MR. STERN:  I'm ...

4              THE COURT:  That's not --

5              MR. PITT:  -- dealing with.

6              THE COURT:  We're all talking at one time and Darlene

7   is only going to take me down when we're all talking at the

8   same time.

9              MR. LEOPOLD:  Your Honor, one of the things that we've

10  attempted to do, we've asked -- actually, it was the

11  recommendation of the Special Master, which we all -- which

12  Mr. Pitt and myself thought was a good way to get around the

13  issue of concern by Mr. Stern is to, off the record -- I guess

14  Mr. Stern, certainly, can be on the call.  And Hunter as well

15  would be fine.

16             Just to talk to the doctor because of his involvement

17  in other related issues.  And we were told by the Special

18  Master that Mr. Stern did not agree with that.

19             MR. STERN:  Your Honor ...

20             MR. LEOPOLD:  I'm sorry?

21             We're trying -- this is not an issue of any

22  gamesmanship.  It's just --

23             THE COURT:  You can call him up today, can't you?

24             MR. LEOPOLD:  No.  They've refused to allow us to talk

25  to him off the record.  That's what we've been wanting to do.
```

1    Per the Special Master, she suggested that as well.  We've been

2    told by Debbie that Corey Stern refused to do that.

3                MR. STERN:  Your Honor?

4                MR. SHKOLNIK:  If I can just say something.

5                THE COURT:  Time out.  Just a minute.  Mr. Stern

6    started talking first.

7                MR. SHKOLNIK:  I'm sorry.

8                MR. STERN:  Two things.  One, I asked Special Master

9    Greenspan if she actually recommended that and she said no.

10   She told me straight up that was not a recommendation that she

11   made.

12               Number two, everyone needs to recognize that there is

13   still, what I would consider, the most voluminous motion for

14   class certification that I have ever experienced in my practice

15   that is pending that involves thousands of my clients, all of

16   which are minors, that I oppose.  And while I would like to be

17   cordial and kind and respectful of the other plaintiffs' desire

18   to certify a class, I'm not going to facilitate anything that's

19   going to assist the certification of a class that I

20   fundamentally disagree with.

21               So if y'all want to call Dr. Specht and see if he'll

22   talk to you, I'm not his keeper.  I can't tell you not to call

23   him, but I can explain to him how I feel about it and know for

24   certain that he's not the only expert that deals in this type

25   of work.  And so if he was the only expert in the entire world

1    that dealt with this type of expertise, then I can understand

2    why it's so important for you to talk to him.  But the reality

3    is there is others who do this.  So call one of them.

4            MR. SHKOLNIK:  If I can just ask one point?  This is

5    Mr. Shkolnik.

6            THE COURT:  Yes.

7            Thank you, Mr. Stern.

8            MR. SHKOLNIK:  It's my understanding that one of the

9    authors of the research in this field is another doctor that

10   Mr. Pitt has reached out to or someone from the class group has

11   reached out to in this area.

12           So I know of just that one and there are major centers

13   in the country that do this that are available and there's a

14   lot of them willing to be hired as experts and charge

15   substantial sums to be experts in this litigation.

16           MR. LEOPOLD:  With all due respect, it's not an issue

17   of about hiring experts or paying experts.  I think everybody,

18   respectfully, understands that.  Those aren't the issues.  And,

19   Your Honor, we'll follow whatever the Court wants to do.

20           I think out of fairness what is being represented is

21   not the total picture, but we'll go with whatever the Court

22   wants to do.

23           THE COURT:  Yeah.  And the problem is the more I

24   listen, the more I really think that there would be nothing

25   productive by attending this deposition.  Because this is a

1    deep issue, whatever it is, and I'm not really understanding

2    it.  And part of the reason is that little tidbits about the

3    settlement have been provided, but I don't think I've got

4    anyone from the State even on here.  And it's also not proper

5    to do that at this point.  But I don't think any harm has been

6    committed or done.

7              But the fact is, it sounds like this is a very big

8    issue to the class.  And so it just cannot be accomplished at

9    the deposition that is being taken in anticipation of the four

10   bellwether plaintiffs' trial.

11             So at this point -- it's a deep issue.  It's something

12   between the State and the class or somebody's going to have to

13   work it out, how to defend this -- so it sounds like everybody

14   likes this technique except VNA or something like that.

15             MR. LEOPOLD:  Your Honor, may I ask a question?

16             THE COURT:  Sure.

17             MR. LEOPOLD:  Of Your Honor.  Because you referenced

18   it earlier and, of course, I certainly respect the Court's view

19   and understand the broader issues.

20             But just going back to what Your Honor ruled, I think

21   it was in July, where it was it wasn't Hunter, it was Corey

22   Stern who raised the issue about attending the depositions and

23   the Court gave an hour for him to depose all of the class

24   experts.  And in your order -- I forgot the page, but I read it

25   earlier this morning, the transcript -- where you said that is

1   fine and then class counsel will have the same opportunity.

2          Which experts will we be able to do that if it's not

3   these?

4          THE COURT:  Well, here's the situation to me:  You're

5   not seeking to take these other four, but ...

6          MR. LEOPOLD:  Well, there was one expert about

7   causation issues that dealt -- it sounds like would certainly

8   go with liability issues.  Without bothering the Court --

9          THE COURT:  The issue for me is the ones that I think

10  would be appropriate is if there are global liability experts.

11  If there are -- that will impact -- potentially impact more

12  than -- that are not testifying about someone's individual

13  medical condition.  So what we'll do -- and plus, the issue was

14  not fully before me when I said that.  And so it sounded like a

15  good thing to say at the time.

16         Because it didn't occur to me that -- I wasn't

17  thinking in the sense that there's going to be a neuropsych

18  testing of these four children and is it valid?  You know, I

19  wasn't thinking about that.

20         MR. LEOPOLD:  With all due respect ...

21         THE COURT:  Tell me which one you want to take.

22         MR. LEOPOLD:  Well, I was going to say two things.

23  With all due respect, we've had this motion for less than a

24  half hour.

25         THE COURT:  I know.

1     MR. LEOPOLD:  We haven't been able to brief it,

2  research it, none of those things.  So ...

3     But, again, we'll respect the Court's ruling.

4     THE COURT:  Yeah.

5     MR. LEOPOLD:  So I'm not sure that's in terms of

6  fairness is fair.  But that being said, Mr. Stern said the

7  issue of causation was what one of the experts was going to

8  testify.  My understanding of what he said -- and I may be

9  mistaken -- was not the issue of causation.  Yes, the child has

10 lead levels in his or her system, I understand that.

11     The issue is the expert was going to talk about, I

12 believe, in some semblance, of how did it get there?  What was

13 the process?  That is global for every child in this class or

14 the 5,000 or so that are signed up.

15     THE COURT:  Do you have a causation expert on lead?

16     MR. LEOPOLD:  Yes, we do.

17     THE COURT:  Okay.  So I don't know --

18     MR. LEOPOLD:  So does Mr. Stern in his taking our

19 experts.

20     THE COURT:  I know.

21     MR. LEOPOLD:  What's the difference is what I'm trying

22 to understand.

23     THE COURT:  Yeah.  I hear you.

24     MR. STERN:  If the --

25     THE COURT:  Stop.  Stop.

1          MR. LEOPOLD:  Please.  I would rather hear from the

2    Court.  Not you, please.

3          THE COURT:  Okay, people.

4          What is Dr. Bithony's -- well, doctor is a Ph.D.

5    Whoever it is.

6          MR. STERN:  November -- the beginning of November.

7          THE COURT:  Okay.  Then I'll allow Mr. Leopold, I hear

8    what you're saying, it seems unfair in some ways that I

9    convened this within an hour or two of getting this motion.  So

10   if you want to submit a one-page summary on Dr. Bithony, you

11   can both do that and we'll address it later in October.  Not on

12   Tuesday.  Because I don't have time.

13         MR. STERN:  Just before anybody spends the time on it.

14   I just want to clarify what I said.

15         THE COURT:  Okay.

16         MR. STERN:  Dr. Bithony will be testifying for Child A

17   about the cause Child A's cognitive deficits.  The cause of

18   Child B's cognitive deficits.  The cause of Child C and the

19   cause of Child D.  He's not talking about water systems or

20   about -- you know, he will say that, "I evaluated this child.

21   I met with the parents.  I understand that this child drank the

22   water up until March 15th, 2015.  I've looked at his medical

23   records.  I've looked at his academic records and in light of

24   my experience and training, in light of the cognitive deficits

25   reported by Dr. Krishnan and in light of my own evaluation of

1   this child, I believe that the cause of those

2   neuropsychological deficits was exposure to water."

3            That is the essence of that testimony.  That's not

4   global.  That's not the same as a global expert who is talking

5   about water systems and hydraulics and ...

6            THE COURT:  Well, I guess my issue is if this person

7   is going to do the seminar for the Court and the jury on all of

8   the ranges of what lead does to people, I could see

9   Mr. Leopold's point.

10            So is that what -- is Dr. Bithony going to tell us

11   this degree of lead causes this amount of cognitive --

12            MR. STERN:  No.

13            THE COURT:  Okay.  All right.

14            MR. LEOPOLD:  Is there an expert -- I'm assuming

15   whether it's a liability expert.  I don't know.  I'm assuming

16   they have some experts that will be dealing with those more

17   global issues.

18            MR. STERN:  Yes.

19            MR. LEOPOLD:  We have not been provided the experts'

20   reports because they have not allowed us to see them.  I'm not

21   sure what the secret is.

22            MR. STERN:  I'm not ...

23            MR. LEOPOLD:  Could I please just finish, Corey?

24            We haven't been allowed to see them.  We're all under

25   a protective order.  I'm not sure what the big secret is if the

1    defendants have seen them.  But if those liability expert

2    reports can be provided, we can provide a list to the Court and

3    then brief it appropriately for which depositions to attend.

4    If they need to redact something for whatever reason, it would

5    be individual information, which I wouldn't see how that would

6    happen on the lower liability issues.  I just think it's just

7    fair if that's what, you know, the Court has earlier ruled for

8    them, and the Court had said we're allowed to do that, and not

9    without any briefing or anything of that sort not being allowed

10   to go forward with it.

11          And without seeing the expert reports, at least on

12   liability issues, I would just think out of abundance of

13   fairness, we should at least be able to make a record on that

14   issue.

15          That's all, Your Honor.

16          MR. STERN:  I agree.  And I didn't include every

17   expert that we've named in our motion for a protective order.

18   I've only included those experts that are testifying about the

19   health of the children and actually evaluated the children or

20   utilized the evaluations of the children to give their opinion.

21   We have four or five other experts that you are welcome to

22   their reports.  We haven't hid them.  No one's even asked for

23   those reports.

24          THE COURT:  Okay.  Here's what we're going to do:  I'm

25   going to grant the motion.  I think our next discovery

1 | conference is October 21st.

2 |         And, Mr. Leopold, I'll permit you -- we'll put this

3 | issue of the next round of experts that the individuals are

4 | planning to have who are more in a sense --

5 |         Something just beeped here.  I don't know what it is.

6 |         In a sense, more global.  We'll put that issue on the

7 | agenda, if you all still want it on the agenda on the 21st.

8 | But you can certainly brief it.  If you need more than one page

9 | to discuss it, that's fine with me.

10 |         MR. LEOPOLD:  May I also ask ...

11 |         THE COURT:  But I want to ask that the clients not

12 | appoint the five depositions related to the children's health

13 | care.  Does anybody have a ...

14 |         Nobody has a problem with that.

15 |         MR. LEOPOLD:  Your Honor, may I just ask, at least on

16 | the record, for a copy of the reports for liabilities that

17 | Mr. Stern and Hunter were referring to so we can at least begin

18 | to evaluate those?

19 |         MR. SHKOLNIK:  Sure.

20 |         THE COURT:  Okay.  It's already been conveyed and

21 | agreed upon.

22 |         MR. ROGERS:  So ...

23 |         THE COURT:  Yeah, Mr. Rogers?

24 |         MR. ROGERS:  Yes, thank you, Your Honor.

25 |         MR. HUNTER:  Your Honor, before we get to the next

```
1    point, I have a another hearing starting in --
2              THE COURT:  Well, hold on, Mr. Shkolnik.  Mr. Rogers
3    was talking.
4              MR. ROGERS:  Yes, Your Honor.  In terms of clients
5    attending the deposition on Monday, for example, of
6    Dr. Krishnan, we have counsel for VNA who is a VNA employee who
7    is going to attend.  You know, that's appropriate, correct?
8              THE COURT:  That's appropriate.  I was talking about
9    community members.  So that is the neighbor or the teacher,
10   that just doesn't seem right.
11             MR. ROGERS:  Thank you.
12             THE COURT:  Unless it's going to be testimony at
13   trial.  But, absolutely, okay.
14             MR. ROGERS:  Thank you.
15             THE COURT:  So Mr. Shkolnik?
16             MR. SHKOLNIK:  Your Honor, I'm sorry to interrupt.  I
17   was just saying I had to leave because I have another emergency
18   court hearing on a different case at 5:30.  So I apologized.
19             THE COURT:  That's too many court hearings on Friday
20   at 5:00.
21             MR. SHKOLNIK:  On Friday, exactly.
22             THE COURT:  All right.  Good luck with that one.
23             MR. SHKOLNIK:  All right.  Have a good weekend,
24   everyone.
25             THE COURT:  So we're on the record and what I'll do is
```

1   enter a very simple order that says for the reasons set forth

2   on the record the motion is granted.

3          MR. STERN:  Thank you.

4          THE COURT:  So we'll do that.

5          And, Mr. Leopold, I assure you that we'll revisit this

6   on October 21st, if requested.  You'll have the list of

7   Mr. Stern's additional, more global experts, less focused on

8   the individuals' healthcare and you can decide whether you want

9   to attend or participate in those depositions.

10         MR. LEOPOLD:  Thank you, Your Honor.  I appreciate

11  that.

12         THE COURT:  Okay.  Thank you all.  Take care.  I hope

13  everybody takes a short, deep breath and continues to stay

14  healthy.

15      (At 5:30 p.m., matter concluded.)

16                    -    -    -

17

18

19

20

21

22

23

24

25

33

1        C  E  R  T  I  F  I  C  A  T  E

2

3            I, Darlene K. May, Official Court Reporter for the

4    United States District Court, Eastern District of Michigan, do

5    hereby certify that the foregoing is a true and correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.  I further certify

8    that the transcript fees and format comply with those

9    prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   October 3, 2020          /s/ Darlene K. May
     Date                     Darlene K. May, CSR, RPR, CRR, RMR
13                            Federal Official Court Reporter
                              Michigan License No. 6479

14

15

16

17

18

19

20

21

22

23

24

25