UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE FLINT WATER CASES

Civil Action File No.
5-16-CV-10444-JEL-MKM

**CO-LIAISON COUNSEL'S RESPONSE IN OPPOSITION TO THE ANDERSON PLAINTIFFS' MOTION FOR REMOVAL OF CURRENT LIAISON COUNSEL**

Co-Liaison Counsel submit this brief in opposition to the baseless motion brought by Valdemar Washington ( "Washington"), wherein he seeks their removal as Co-Liaison Counsel for individual plaintiffs. Washington's pleading is void of any factual or legal support to justify the remedy he seeks. Moreover, Washington's motion highlights a clear lack of understanding as to the ongoing litigation, and it prematurely passes judgment on a proposed landmark settlement with the State of Michigan, which might ultimately serve as a framework for additional settlements between thousands of plaintiffs and other defendants (to the potential benefit of Washington's clients).

Five years ago, it would have been difficult to imagine a proposed resolution of the type put forward by the State of Michigan. Even three years ago, before Judge Pamela Harwood and Senator Carl Levin were appointed by this Court as neutrals, such a proposal was difficult to conceive of.

We might never know the catalyst for Washington's motion, or whom or what inspired its filing, but the pleading's tenor is clearly rooted in a lack of understanding, masked as rage. One

can deduce that Washington feels unnecessarily left out of the mediation process, which is and has been governed by the appointed neutrals, with assistance from the Special Master.

Regardless of how Washington feels, such emotionally charged rhetoric and erroneous allegations, thrown publicly at individuals whom have done the opposite of earning it, should be met with swift and decisive action from the Court.[1] Washington's spurious contentions amount to an attempted indictment on our character, which is the fabric of our professional existence. Our hope is for the Court to recognize that we have abided by her various orders, the Michigan Rules of Professional Conduct, and that we have acted ethically, worked tirelessly and have followed the directives of the neutrals and the Special Master in our efforts toward a global settlement as Co-Liaison Counsel.

**Response to Washington's "Facts"**

Washington's motion is wrought with false statements. It is a raw reaction more than it is a supported position, and it advances no legitimate end. The motion should be denied in its entirety, and Washington should, at a minimum, be publicly admonished for making such a filing.

Because he cites no legal authority to support his motion, the most effective retort to Washington's pleading is an evaluation of the "facts" upon which he relies in asserting that Co-Liaison Counsel has not acted "fairly … in the interests of all parties and parties' counsel," and has not "kept other plaintiffs' counsel advised of the progress of the litigation[.]"[2]

[1] Co-Liaison Counsel submit that in light of the "Notice of Joinder/Concurrence in by Herbert Sanders" (EFC No. 1296 filed today, this Response should be deemed in opposition to the *Anderson Plaintiffs' Joinder*, and to the extent it adopts the spurious and false allegations contained within the Washington motion, similar sanctions should extend to Mr. Sanders ("Sanders").

[2] It is unclear what other counsel he references, but as the Special Master is well aware, Co-Liaison Counsel have reached out to all counsel, typically with her, and have attempted to answer all inquiries related to the settlement. To the extent an inquiry might run afoul of limitations set by the neutrals or the Special Master's guidance, those inquiries were redirected to the Special Master. Both Washington and Sanders had the benefit of this procedure.

1. *A "Legal Hotline" infomercial was played on TV 12 WJRT in Flint on Sunday October 18, 2020 between 5:30 pm and 6:00 pm, which was viewed by Attorney Valdemar L. Washington, a Flint resident.*

**RESPONSE**: True.

The infomercial aired on October 18, 2020, **two months after the proposed settlement was announced**. Nothing therein was false or misleading. Substantively, it conformed with all ethical requirements and guidance from the neutrals and the Special Master. Moreover, the information contained in the advertisement was consistent with prior advertising that has been airing for more than three years. As is the case with all advertisements, the goal of the infomercial was to cause unrepresented individuals to hire the attorneys who participated in it – namely Mr. Stern and Mr. Shkolnik.

2. *The infomercial was identified as a joint venture between Levy Konigsberg, LLP, and Napoli Shkolnik, PLLC.*

**RESPONSE**: True

See response to No. 1.

Washington does not identify what he believes is inappropriate about the joint venture to retain unrepresented Flint residents. It is clear Washington feels slighted by this fact, but it is unclear why it has any bearing on the underlying relief he seeks. Moreover, it is even more curious that he finds no fault nor addresses a similar relationship between Interim Co-Lead Counsel for the Putative Class and members of the Putative Class Plaintiffs Executive Committee who likewise are seeking to retain unrepresented Flint residents as clients.[3]

3. *Individual participants in the infomercial were Attorney Corey Stern, Attorney Hunter Shkolnik, and Hill Harper, Napoli Shkolnik's Executive Director.*

---

[3] https://www.facebook.com/events/2835782916688407/; https://www.flintwaterjustice.com/

**RESPONSE**: True.

See responses to Nos. 1 and 2.

It is unclear why Washington takes issue with the fact that Hill Harper is included in the advertising piece. Mr. Harper has been a public advocate in Flint as it relates to the water crisis for years before working with Napoli Shkolnik. There is nothing improper about his participation in the advertisement, nor the statements attributed to him.

4. *Attorney Shkolnik stated in the infomercial: "We have been appointed by the Court on behalf of the lawyers and the individual plaintiffs ..." Implying to viewers that only Napoli Shkolnik is qualified to represent them in this matter.*

**RESPONSE**: Washington suggests a false premise.

Mr. Shkolnik is correctly quoted. However, what Washington implies therefrom is false and not implied or suggested in the dialogue. Mr. Shkolnik's statement is accurate on its face, and removing him as Co-Liaison Counsel for making a true statement, in a permissible advertisement, is illogical.

5. *Attorney Stern stated in the infomercial: "... Parents over the next few months will be able to submit claims on behalf of their children and depending on what the evidence is about how the child was impacted by lead will dictate what type of resolution each child gets. The most damaged children in Flint are going to get the highest value resolution..."*

**RESPONSE**: True.

Mr. Stern is accurately quoted. His statements are consistent with the Terms of Settlement statement issued by the State of Michigan[4] and public statements issued by interim Co-Lead Class

[4] "All individuals who were minors in Flint at the time they were first exposed to Flint water during the *Exposure Period will be eligible to recover compensation without proof of personal injury, with larger amounts of compensation to those who can show personal injuries, blood or bone lead levels, or who lived in homes with lead service lines*" https://www.michigan.gov/documents/ag/Terms_of_Settlement_699810_7.pdf

Counsel.[5] Moreover, these statements are consistent with his public comments to this effect for two months prior thereto, beginning on August 20, 2020, to wit:

- *Associated Press – Michigan's Whitmer calls proposed $600 million settlement of Flint water crisis a step toward making amends:* https://www.marketwatch.com/story/michigan-reportedly-reaches-600-million-deal-in-flint-water-crisis-2020-08-19
- *US NEWS & World Report: Michigan to Pay $600 Million to Flint Water Crisis Victims:* https://www.usnews.com/news/us/articles/2020-08-20/michigan-to-pay-600-million-to-flint-water-crisis-victims-newspapers
- *DailyMailUK: Michigan agrees to pay $600 million to families affected by the Flint water crisis - setting aside 80% of the funds for minors, many who had high levels of lead in their blood:* https://www.dailymail.co.uk/news/article-8645691/Michigan-reaches-600M-deal-Flint-water-crisis.html
- *REUTERS: Michigan to pay $600 million to Flint water crisis victims:* https://www.reuters.com/article/us-usa-michigan-flint-water/michigan-to-pay-600-million-to-flint-water-crisis-victims-newspapers-idUSKCN25G0DQ
- *PEOPLE MAGAZINE: Erin Brockovich Speaks Out After Mich. Agrees to Pay $600M to Flint Water Victims: 'A Great Day':* https://people.com/human-interest/erin-brockovich-speaks-out-michigan-pay-600m-to-flint-water-crisis-victims/

[5] https://www.flintwaterjustice.com/settlement

- *The Daily Beast: An historic settlement announced Thursday came as both a welcome relief and a reminder that a water poisoning fiasco that hit communities of color will never really end:* https://www.thedailybeast.com/dollar600m-flint-water-poisoning-payout-cant-fix-racist-nightmare
- *KETV-7: Michigan reaches $600 million settlement in Flint water crisis:* https://www.ketv.com/article/michigan-reaches-dollar600-million-settlement-in-flint-water-crisis/33656623
- *PBS: Michigan will pay residents $600 million for Flint water crisis:* https://www.pbs.org/newshour/health/michigan-will-pay-residents-600-million-for-flint-water-crisis
- *WASHINGTON POST: Michigan to pay $600 million to victims of Flint contaminated-water crisis:* https://www.washingtonpost.com/national/michigan-to-pay-600-million-to-victims-of-flint-contaminated-water-crisis/2020/08/20/acf73dde-e2d9-11ea-b69b-64f7b0477ed4_story.html?variant=1
- *PBS Frontline: Michigan Reaches $600M Settlement in Flint Water Crisis Case:* https://www.pbs.org/wgbh/frontline/article/michigan-reaches-600m-settlement-in-flint-water-crisis-case/
- *The Wall Street Journal: Flint Residents to Get $600 Million From Michigan Over Lead-Tainted Water – Settlement helps resolve five-year legal fight over one of nation's worst public-health emergencies:* https://www.wsj.com/articles/flint-residents-to-get-600-million-from-michigan-over-lead-tainted-water-11597939434

- *Youngest Flint water crisis victims to get 80 percent of historic $600 million settlement:* https://www.mlive.com/news/flint/2020/08/youngest-flint-water-crisis-victims-to-get-80-percent-of-historic-600-million-settlement.html

Washington's assertions that this information was somehow proprietary, and that it was unveiled to the world as part of a subversive campaign to gain new clients on October 18, 2020 is false. Further, and as explained more fully below, Washington was privy to this information, in writing, specifically that compensation for children would and should be based on the severity of each child's harm. Moreover, Washington's position is belied by the State of Michigan's "Terms of Settlement" press release that has served as the backbone of all communications made by Co-Liaison Counsel and Interim Co-Lead Counsel for the Putative Class.

It is also worth noting that Washington has been present at virtually every hearing this Court has held since at least 2017, typically seating himself in the Court's jury box, where he has had a front row seat to Mr. Stern saying things on the record of this nature for four years, specifically that kids should be treated individually, and that their damages should be based on the merits of each of their claims.

Frankly, even if this information had not been made publicly available (which it was), wasn't sent to Washington directly via email (which it was), or wasn't contained in tens of public comments made by Mr. Stern (which it is), it is difficult to comprehend how it would not have been known intuitively by Washington. Perhaps he prefers a settlement wherein every individual in Flint receives the exact same compensation, regardless of whether they were physically harmed, had property damage, lost business earnings, or died, and regardless of their age. But in light of the fact that there has been ongoing mediation for more than two years, which Washington was well aware of, it seems unlikely that he really expected such a settlement. However, to the extent

his preference is that each of his clients be treated exactly the same, irrespective of their actual damages or whether they suffered any damage at all, he will have an opportunity to make those arguments, on the record, once the settlement is presented to the Court.

Finally, Mr. Stern has discussed settlement negotiations with Washington at numerous times throughout the process, even meeting with him in person, in New York, in October of 2018, and discussing the progress of negotiations at great length during the pandemic, specifically in May of 2020. The lawyers participating in negotiations were often (and today remain) constrained in what they are permitted to say about the settlement (for various reasons, at various times). But Mr. Stern has always been open and transparent with Washington about the negotiations and has always disclosed the full extent of what he has been permitted to divulge.

6. *Executive Director Harper stated in the infomercial: "One of the things that we have been doing is to use pioneering technology to do a lead bone test..."*

**RESPONSE**: True.

Mr. Harper is accurately quoted, and this is consistent with the extensive experience Mssrs. Stern and Shkolnik have in the field of lead poisoning litigation and the manner in which they have litigated their cases. To be clear, in August 2019, long before the proposed settlement, when Mr. Stern and Mr. Shkolnik began preparing in earnest for the first bellwether trials, they undertook to have their clients' scanned for bone lead levels. This is consistent with good practice when representing a lead poisoning victim. Further, this was a litigation decision and a strategy employed to that end, given the allegations that Flint residents were advised during the crisis that there was no need for children to get blood tested during their period of exposure. Thus, many children exposed to the water had low, if not non-detectable lead levels in their blood when they were finally tested – months after their exposure.

Mr. Stern and Mr. Shkolnik not only serve as Co-Liaison Counsel, but also represent thousands of individuals to whom they are obligated to pursue claims with vigilance. The fact that Washington is insulted that attorneys primarily prosecuting lead poisoning cases have been attempting to prove their claims, and that they would tout their work in an advertisement designed to separate them from other lawyers, is absurd. Washington also seems to miss the point that successful bellwether trials utilizing this accepted technology will likely help his clients.

Finally, everyone eligible for the settlement – including Washington's clients – will have the opportunity to evaluate the Master Settlement Agreement and make comments or arguments to the Court regarding its substance. Ultimately, if Washington truly believes the settlement is not in the best interests of his clients, they do not have to accept the settlement, and he/they can proceed with their claims outside of the settlement.

7. *Plaintiffs' counsel understands that bone lead testing is rare and only a limited number of practitioners in the country have the capability. Furthermore, to the knowledge of plaintiffs' counsel, no provisions have been made to make bone lead level testing available for all plaintiffs.*

**RESPONSE**: False.

Whether Washington is aware of bone lead testing technology is of no moment. Further, whether he has personally tried to access a scanning expert for his clients is also of no moment, and merely highlights his complacency as it relates to his clients. This technology is accepted in the field, and the State of Michigan's Terms of Settlement Sheet made public that bone lead testing is acceptable for the purposes of their proposed settlement on August 20, 2020. This is not a Co-Liaison Counsel secret, which Washington stumbled upon by way of watching the informercial. To the contrary, it is a publicly reported fact included in the State of Michigan's announcement of the settlement.

There is no basis for Washington's "understanding" that bone lead testing is "rare and only limited to a number of practitioners in the country," other than his own subjectivity. He has not stated who he has contacted in an effort to test his clients. He has not provided any support to show cost estimates for the testing. He has provided no information about his efforts to prove his clients' claims for lead poisoning or about any blockades he has faced for years in trying to do so.

Whether an attorney undertakes representation of one client, tens of clients (as Washington has), or thousands of clients, he has a responsibility to vigorously prosecute their cases. One would expect that Washington has created damage models for his clients, in light of the fact that there is no guarantee of a settlement, or that bellwether trials may not enhance or even yield a settlement. Either Washington's clients all have elevated blood levels such that bone scans would not be beneficial to proving their claims, or they do not, and he has created another proof methodology that doesn't include bone scans. It would be unusual and surprising if he instead has done nothing except wait for a settlement, with the hope that Mr. Stern or Mr. Shkolnik would provide the tools necessary to prove his clients' damages for him. What is most ironic here is that rather than be grateful that he has now been provided an alternative method to prove his clients' injuries as part of the proposed settlement, he chose instead to file this motion.

It also appears that Washington is conflating Mr. Stern's and Mr. Shkolnik's responsibilities to their own clients with their responsibilities as Co-Liaison Counsel. To be clear, Co-Liaison Counsel has taken their Court appointed positions seriously, expending thousands of hours toward the common benefit of all Flint Water Litigation plaintiffs. Mr. Stern having taken over sixty depositions for the benefit of all plaintiffs, and Mr. Stern and Mr. Shkolnik – on behalf of all plaintiffs – having paid millions of dollars for such things as purchasing transcripts; for the production and review of hundreds of thousands of documents; toward the retention of experts; for costs associated with mediation; travelling to and from hearings and mediation sessions; and

having expended thousands of hours drafting pleadings for the benefit of Washington's clients and others. Now asking them to prove Washington's clients' damages for him is too much, and not what is contemplated by the Court's order appointing them as Co-Liaison Counsel for individual plaintiffs.

At some point, attorneys must represent their own clients and prosecute their own clients' claims and cases.

For Washington to complain that a valid methodology of proving damages might be included in a settlement, which was negotiated by more than ten lawyers (not treasonously inserted by Mr. Stern and Mr. Shkolnik as Washington seems to suggest), simply because he didn't use the methodology, or think to use it, or doesn't know how to use it, is nonsensical.

8. *After viewing the infomercial Attorney Washington sent an email to the Court's law clerk seeking an answer to the question, is "bone lead testing" mentioned in, or a part of the Master Settlement Agreement?*

**RESPONSE**: True

It is curious that Washington is including an ex-parte communication that he initiated with the Court in a motion to have Co-Liaison Counsel removed for what he alleges is unethical behavior. To the extent such communication occurred, we would think Washington would have known better than to attempt to engage the Court in such a manner.

9. *The Court declined to respond to Attorney Washington's email since it was substantive in nature, and may have been viewed as ex-parte communication with the Court.*

**RESPONSE**: True

See response to No. 8.

10. *Attorney Washington sent an email to Attorney Stern and Attorney Shkolnik seeking an answer to his question, and was told that the Master Settlement Agreement was*

*secret/confidential and covered by an Escrow Agreement for which Special Master Greenspan was the Escrow Agent.*

**RESPONSE**: True, in part; false, in part.

The Master Settlement Agreement is being held in escrow under the auspices of the Special Master. It is not "secret" and Washington was never told that. Neither Mr. Stern nor Mr. Shkolnik used the word "secret" in their response to Washington. To be clear, the procedure referenced by Washington above, reflects the procedures that all counsel were directed to follow, to the extent an inquiry went further than the approved communications agreed to by the parties to the proposed settlement in August 2020.

Further, Exhibit 4 to the Master Settlement Agreement was made public on August 20, 2020, two months before the infomercial aired, and it was emailed **directly** to Washington, that same day, by Special Master Greenspan. It states, in part:

> All individuals who were minors in Flint at the time they were first exposed to Flint water during the Exposure Period will be eligible to recover compensation without proof of personal injury, with larger amounts of compensation to those who can show personal injuries, blood or **BONE LEAD LEVELS**, or who lived in homes with lead service lines. (Emphasis added.)

There is/was no secret that bone lead levels are part of the proposed settlement. Washington seemingly failed to read the document prior to making an ex-parte request to the Court; prior to asking Co-Liaison for the information; and prior to filing a motion rooted in alleged "secrecy."

The secret answer to the secret question was in his inbox all along.

11. *Special Master Greenspan agreed to a conference call on Friday October 23, 2020 at 7:00 pm, with six (6) attorneys who represent individual plaintiffs in the instant case, during which she was asked the same question, and declined to answer the original question regarding bone lead tests, citing the confidentiality provisions of the various documents, as well as the ongoing nature of negotiations.*

**RESPONSE**: We would defer to the Special Master as to the truth or accuracy of this comment. However, as we were instructed to do when an inquiry exceeded our authority, following our receipt of Washington's inquiry, which did in fact exceed our authority, we engaged the Special Master to attempt to resolve his grievance and believe that Special Master Greenspan has tried to resolve this matter within the limits of the escrow agreement's terms.

12. *Special Master Greenspan agreed to a follow-up conference call on Monday October 26, 2020 at 8:00 pm with the (8) attorneys who represent individual plaintiffs in the instant case, during which she confirmed that bone lead levels were a part of the Master Settlement Agreement.*

**RESPONSE**: We would defer to the Special Master as to the truth or accuracy of this comment. However, following our receipt of Washington's inquiry we engaged the Special Master to attempt to resolve his grievance and believe that Special Master Greenspan has tried to resolve this matter within the limits of the escrow agreement's terms.

13. *The joint venture infomercial soliciting new clients while in possession of confidential information not available to plaintiffs' counsel is in direct conflict with ECF 234 which required them to "Keep the other plaintiffs' counsel advised of the progress of the litigation and consult them about decisions significantly affecting their clients...," and "Generally act fairly, efficiently, and economically in the interests of all parties and parties' counsel..."*

**RESPONSE**: False.

The information Washington claims to be "confidential" is not. See Response to No. 10.

Washington had the information two months before the infomercial aired. He received it directly from the Special Master, and he was also privy to the public notification issued by the State of Michigan.

It should also be noted that Washington appears to have made no effort to advertise for new clients at any point prior to or since the announcement of the proposed settlement – not in print media, not on social media, not on the radio, not on television, and not by way of the internet, generally. Every attorney has the right to do so, including Washington, and many are and have been since before (and after) the announcement of the proposed settlement.[6]

14. *As a consequence of the actions of current co-liaison counsel other Plaintiffs' counsel are not be able to effectively represent and advise our clients due to the cloak of secrecy wielded by Co-Liaison Counsel and the Special Master.*

**RESPONSE**: False.

There is no secrecy. Exhibit 4 to the Master Settlement Agreement and the State of Michigan's press release contains significant information and was intended as a tool to assist attorneys, like Washington, in advising their clients at this stage, before the release of the Master Settlement Agreement. It was also intended to be instructive for lawyers: find your clients; get medical records; work up your cases.

15. *During the October 26, 2020 telephone conference Special Master Greenspan made an offer to the plaintiffs' counsel on the call to receive a copy of the "grid" that will be a part of the Master Settlement Agreement if they would sign a Non-Disclosure Agreement (NDA).*

**RESPONSE**: We would defer to the Special Master as to the truth or accuracy of this comment.

16. *Attorney Washington declined to sign the NDA, as to have signed such a document would have prevented him from filing the instant motion.*

---

[6] The Court is aware that the Flint Water Justice group, which is comprised of Interim Co-Lead Counsel for the Putative Class and the other members of the Court appointed Plaintiffs Executive Committee has been aggressively seeking to retain unrepresented children as a result of this proposed settlement.
https://www.facebook.com/events/2835782916688407/
https://www.flintwaterjustice.com/

**RESPONSE**: We would defer to the Special Master as to the truth or accuracy of this comment.

## CONCLUSION

The actions of Co-Liaison Counsel (as well as those of all participating parties to the settlement negotiations) have been closely monitored by the Special Master. Washington was so advised before filing this baseless motion. Nonetheless, he chose an outrageous course of action by filing the motion. Not only should Washington's motion be denied in its entirety, the Court should admonish him for placing such a pleading on the public record, and the Court should seriously consider sanctioning Washington for bringing the spurious motion.

Dated: October 28, 2020

Respectfully Submitted,

/s/ COREY M. STERN
Corey M. Stern (P80794)
**LEVY KONIGSBERG, LLP**
800 Third Avenue, 11th Floor
New York, New York 10022
(212)605-6298
(212)605-6290 (facsimile)
cstern@levylaw.com

/s/ HUNTER SHKOLNIK
Hunter Shkolnik
**NAPOLI SHKOLNIK**
Hato Rey, Puerto Rico 00918
(787)493-5088 Ext. 2007
hunter@napolilaw.com

**CERTIFICATE OF SERVICE**

I certify that on October 28, 2020, I electronically served the forgoing via E-mail to the parties registered with the Court's ECF system in this matter.

Respectfully Submitted,

/s/ COREY M. STERN
Corey M. Stern (P80794)
**LEVY KONIGSBERG, LLP**
800 Third Avenue, 11th Floor
New York, New York 10022
(212)605-6298
(212)605-6290 (facsimile)
cstern@levylaw.com