# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM (consolidated) |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |
| *Helen Chapman, et al.* | No. 5:18-cv-10679-MKM |
| *Plaintiffs* | |
| v. | |
| *City of Flint, et al.,* | |
| *Defendants* | |

**CHAPMAN PLAINTIFFS' RESPONSE TO JOINT MOTION TO ESTABLISH CLAIMS SETTLEMENT CLAIMS PROCEDURES AND ALLOCATION**

**INTRODUCTION**

Chapman plaintiffs and 1300 other individual plaintiffs[1] represented by the undersigned counsel are gravely concerned that the allocation of settlement proceeds being proposed would be unfair to the majority of individual plaintiffs

---

[1] A list of the adult plaintiffs we represent is attached as Exhibit "A" hereto.

because it will direct the bulk of the $641 million settlement to recipients of bone lead testing. The availability and circumstances of this testing remain shrouded in secrecy. To date, only clients of Liaison Counsel have received this testing. Aaron Specht PhD, who they have retained to oversee this testing, does not respond to inquiries from other law firms. Only two others in the United States do this testing, and neither can come to Flint.

Because the distribution of so much money will be dependent on bone lead testing, and access to bone lead testing is, at best, unknown, this court cannot assess the fairness of the settlement without a full and open hearing about the availability of bone lead testing to individual plaintiffs.[2] This hearing must be conducted soon, because the deadline for bone lead testing expires 90 days after preliminary approval.

## THE PROPOSED ALLOCATION

**The proposed allocation will direct the majority of funds to recipients of bone lead testing**

### The Proposed allocation for children

The proposed allocation directs 79.5% of the fund to children; 64.5% to

---

[2] Because it appears that individual plaintiffs are, by definition, excluded from the proposed class action settlement, we express no views on the class action dimensions of the settlement at this time.

children age 6 and under at time of first exposure, the remaining 15% to children up to the age of 18. ECF 1319-2 pp. 380-410. Within those age groups, money is allocated by category, with the highest payments generally going to those with the highest blood or bone lead test results.

For instance, among children 6 and under exposed before July 31, 2016, money is allocated as follows:

| Category | Age | Payment | Criteria 1 | Criteria 2 | Criteria 3 |
|---|---|---|---|---|---|
| 1 | 6 and under | 2x | Blood lead >10 | Bone lead >10 | N/A |
| 2 | 6 and under | 1.5x | Blood lead 5-9.9 | Bone lead 5-9.9 | Cognitive deficit determined by neuropsych and pediatrician X2 std. dev. |
| 3 | 6 and under | X | Blood lead 3-4.9 | Bone lead 3-4.9 | Cognitive deficit determined by neuropsych and pediatrician X 1 std. dev. |
| 4 | 6 and under | 0.5x | Blood lead 0.1-2.9 | Bone lead 0.1-2.9 | Formula fed infant |
| 5 | 6 and under | 0.2x | Lead service line | Lead in water >15 | N/A |
| 6 | 6 and under | 0.15x | Any exposure before 7/31/1996 | | |

*Id.*

For all categories, blood lead testing only counts if it occurred between May 16, 2014 and August 31, 2016. On the other hand, bone lead testing can be done ***today, and up to 90 days after the Preliminary Approval order***. *Id.*

A similar hierarchy exists, with payments in the same proportions to parallel categories in the other child age groups. *Id.* at. pp. 381-382, 393-394, 401-402.

The Third Report of the Special Master shows that only 2,947 out of 9402 children under 18 (as of 12/31/2014), or slightly over 30%, had blood lead testing. ECF 1105 at. pp. 11, 18. This means that about 70% of children can *only* qualify for the category 1 through **bone lead testing**.

Without blood or bone lead testing, a child can only qualify for categories 2 and 3 by undergoing a "full individual evaluation from a multidisciplinary team which ***shall include a board-certified pediatrician and neuropsychologist***." ECF 1319-2 at p. 384. This requirement cites to Michigan Administrative Rules for Special Education (MARSE) R. 340.1705, but MARSE requires neither a neuropsychologist nor a pediatrician. Cuker Dec. Ex. "1".

Indeed, the use of *either* a neuropsychologist *or* a pediatrician as part of a special education team is virtually unheard of in the Flint School District. *See* Declarations of Eraina Poole and Veronica Williams Latnie. Requiring **both** a pediatrician **and** a neuropsychologist creates an insurmountable barrier to qualifying for this category. According to the Special Master's Third Report, only 31 out of over 9,000 children have undergone *any* "cognitive function testing" whatsoever—let alone neuropsychological testing overseen by a pediatrician. ECF 1015 at p. 22. This means that children who were not blood lead tested before July

4

2016 cannot, as a practical matter, qualify for categories 1 through 3 unless they receive bone lead testing.

The next category—Category 4—pays 0.5x to children with blood or bone lead results as low as 0.1, and the same amount to documented formula fed infants. This means about 70% of children who were not formula fed infants during the period in question can only qualify for Category 4 through bone lead testing.

These first four categories ignore another metric for lead exposure— a finding that the home was connected to a lead service line or had test results showing lead in the water at or above 15 ppb, which first appears in Category 5. Without bone lead testing, these children receive only 0.2x.

This same structure repeats itself for the other age groups. *See* Categories 8 through 21, ECF 1319-2 at pages 393-409.

**The Proposed allocation for Adults**

The allocation proposed for adults exposed before July 31, 2016 can be summarized by the table below:

| Category | Age | Payment | Criteria 1 | Criteria 2 | Criteria 3 |
|---|---|---|---|---|---|
| 22 | Adults | 2AX | Blood lead >10 | Bone lead >10 | |
| 23 | Adults | AX | Blood lead 5-9.9 | Bone lead 5-9.9 | Serious physical injury with documented causation |
| 24 | Adults[3] | 0.5AX | N/A | N/A | Non-serious physical injury (such as skin rashes) with documented causation. |

*Id*. at 411-413. Adults exposed before July 31, 2016 who do not meet these criteria (and do not fit the criteria for miscarriage or Legionnaire's disease) default to the "property damage" category, which is capped at ***$1,000 per property***. *Id.* at 839-840.

The highest paying adult category, 22, pays "2AX" for a blood or bone lead reading at or above 10—***even without any evidence of injury.*** According to the Special Master's Third Report, only 1,659 of 15,738 adults, (age over 18 as of 12/31/2014) or slightly more than 10%, had any blood lead testing. ECF 1105 at pp. 11, 18. This means that about 90% of adults can only qualify for this category through bone lead testing.

The next category, 23, pays "AX" for adults with blood or bone lead between 5.0 and 9.9 who have ***no physical injury*** —the same amount it pays to

adults with devastating injuries like stroke, neuropathy and renal insufficiency which are medically attributed to their exposure to contaminated water.

Unlike children, adults receive no enhancement for drinking from the same lead service line as their children.

**Bone lead testing is unavailable to thousands of individual plaintiffs**

Bone lead testing by x-ray fluorescence (XRF) is only performed by three entities in the United States:

- Mt. Sinai Hospital and Dr. Andrew Todd have a stationary XRF machine; anyone wanting to be tested by Mt. Sinai would have to travel to New York City. This would be daunting enough for Flint residents without a pandemic. Cuker Dec ¶11.

- Dr. Linda Nie and her lab at Purdue have both a stationary and a portable XRF, but she is not available to provide testing on Flint residents (See email exchange with Dr Nie dated Nov. 23, 2020 Cuker Dec Ex 8.

- Finally, Dr Aaron Specht of Harvard has a portable XRF machine; he has been engaged by Liaison Counsel as an expert on their individual cases (See, e.g. ECF 1281). He has refused to respond to inquiries from other law firms. See, *e.g.*, Cuker Dec. Ex. 7.

Three weeks ago, one liaison counsel (Mr. Stern) advised the undersigned to "contact [Dr. Specht] directly and hire him." Cuker Dec. para. 9. The undersigned sent Dr. Specht three emails, but he failed to respond. Cuker Dec. Ex. 6.

Just yesterday the other liaison counsel (Mr. Napoli) offered to "try to get [your clients] some [testing] time" but has yet to allow the undesigned to directly communicate with Dr. Specht. Cuker Dec. para. 14. Consequently, bone lead

7

testing is not currently available to individual plaintiffs who do not go through Liaison Counsel.

**Without broader availability of bone lead testing, the proposed allocation is highly inequitable**

We agree that "there is nothing improper in [a settlement framework] that compensates people "in light of the strength of their claims." ECF# 1318 at page 34 (quoting *In re Oil Spill by Oil Rig Deepwater Horizon* 910 F. Supp. 2d 891, 957 (E.D. La. 2912). The metrics used to measure the strength of claims here, however, are inconsistent and inequitable.

Assume five children drawn from the group of 70% which were not blood tested before August 2016:

- Child A, who cannot get a bone lead test, but can prove she drank from a lead service line or a tap polluted with lead at 15 ppb, receives only 0.2x.

- Child B has a bone lead test result of 0.1—collects 0.5 x, 2.5 times what child A receives.

- Child C has a bone lead test result of 3.0—collects x, 5 times what child A receives.

- Child D has a bone lead test result of 5.0—collects x, which is 7.5 times what child A receives.

- Child E has a bone lead test result of 10—collects 2x, which is 10 times what child A receives.

In all likelihood, if any child drank who water from a lead service line or a tap

8

polluted with lead at 15 ppb were bone lead tested, her bone lead levels would be at least 0.1, and perhaps as high as 3.0, 5.0 or 10.0. But without access to bone lead testing, we will never know.

The inequities are even greater among adults. Although an injury to children can be presumed from lead exposure, and the bone lead it leaves behind, that is not true of adults. Indeed, bone lead levels of 5-10 and higher are common in adults. *Bone lead levels in an environmentally exposed elderly population in Shanghai, China*, Aaron J. Specht, et al., Science of the Total Environment 626 (2018) 96-98 (mean tibia bone lead of 4.9), Cuker Dec. Ex. "3"; *Cumulative exposure to lead in relation to cognitive function in older women*, Jennifer Weuve, et al., April 2009 Environmental Health Prospectives (Vol. 117, Issue 4) (mean tibia lead of 10.5), Cuker Dec. Ex. "1"; *Cumulative lead exposure is associated with reduced olfactory recognition performance in elderly men. The Normative Aging Study*, Rachel Grashow, et al., NeuroToxicology 49 (2015) 158-164 (mean tibia lead of 19.2), Cuker Dec. Ex. "2"; *Cumulative lead exposure in community-dwelling adults and fine motor function: Comparing standard and novel tasks in the VA Normative Aging Study*, Rachel Grashow, et al., NeuroToxicology 35 (2013) 154-161 (mean tibia lead of 16.3). Cuker Dec. Ex. "4"; *Factors influencing uncertainties of* in vivo *bone lead measurements using a $^{109}$Cd K X-ray fluorescence clover leaf geometry detector system*, Sepideh Behinaein, et al.

Environ. Sci: Processes Impacts, 2014, 16, 2742 (2014) (mean tibia levels from 4.11 in males to 4.7 in females), Cuker Dec. Ex. "5"; *Evaluation of a portable XRF device for in vivo quantification of lead in bone among a US population*, Zhang et al. Science of the Total Environment 20 January 2021 Vol 753, 142351 (mean tibia lead of 12.3) (Cuker Dec. Ex. "12").

Meanwhile, adults who can actually *prove* that whatever lead may be in their bodies came from Flint water -- because they drank water tested at over 15 ppb lead or from a lead service line -- receive no enhancement whatsoever.

Assume two adults, both age 65 in similar health. One has a bone lead of 10 and gets the highest amount of any adult. The other, who drank from a lead service line, but could not get a bone lead test—defaults to the property damage category and shares a maximum of $1,000 with the other residents at his property.

$1,000 per property is likely all that will be received by overwhelming majority of adults who cannot get bone lead testing or prove they suffered a physical illness due to exposure to water, even though their quality of life was destroyed by having to use bottled water for everything. These adults may have used bottled water to bathe—giving up showers while heating jugs of water or a stove and pouring it into a bathtub, or showered in less than three minutes to minimize their exposure to bacteria infested water, or regularly traveled to a relative's home out of town to shower or bathe. This adult—let's call her Sandra

Doe—will be relegated to the property damage class, forced to split a maximum of $1,000 per residence. Indeed, it is quite likely this will be pro-rated to well below the $1,000 maximum, since only 3% of the total or $19.2 million is available to these adults who will, no doubt, form the majority of claimants.

Meanwhile, the minority of adults who have access to bone lead testing can participate in a pool five times larger 15% of the total or—$96 million. If the number of plaintiffs in the injury pool is one fifth the number in the property damage pool, someone who had the identical experience as Sandra Doe—let's call her Sandra Day—but who was able to get bone lead testing, can easily receive 25 times more money.

There is simply no justification for paying Sandra Doe and Sandra Day such radically different amounts.

**The Opt-out provisions of the settlement agreement show that Bone lead test results correlate less with the strength of claims that lead service lines**

Does a positive bone lead test merit this enormous premium? Let's look at the "Opt out" provisions of the settlement. Settling defendants in mass and class cases typically reserve the right to "walk away" if a certain number of the strongest cases reject the settlement. The reasons are obvious: why pay hundreds of millions of dollars to settle claims if the strongest claims against you will not be settled? Certainly, if the defendants are willing to pay high premiums to people with bone

lead test results of 5 and above, they would not want those people to opt out of the settlement.

But that's not what the walk-away language provides. If only than 11 adults who lived in a residence with a lead service line, or had a lead in water result in excess of 15 request exclusion, Defendants can rescind the entire settlement agreement! ECF#1319-1 at pp. 63-64. Yet adults with lead service lines and/or lead in water levels of 15 ppb or above—the claims which the settling defendants are most afraid of—receive *no* enhancement!

Meanwhile, there is no limit on the number of people with high bone leads who can opt out—as long as it falls within the overall ceiling of 200. In other words, the Defendants actually value lead service line claims by adults more highly than bone lead claims—yet lead service line claims receive no premium in the settlement, while bone lead claims receive a proportionately enormous premium.

**The court should order a hearing to fully explore the availability of bone lead testing to participants in the settlement**

With so much riding on bone lead testing, the Court should conduct a thorough inquiry into its availability before making a final decision on the fairness of the settlement. This needs to be done as soon as possible, because the deadline for bone lead testing expires 90 days after the granting of preliminary approval. We need to know what arrangements Dr. Specht has made with Liaison Counsel, the number of testing slots currently available, how many technicians are

administering bone lead testing in Flint, what their qualifications are, what equipment they are using, at what facilities, at what cost.[3]

We also know nothing about the results of such testing so far. If there are only a limited number of testing slots available, each counsel will want to prioritize those clients most likely to test into the higher categories. How do bone lead test results compare with blood lead tests? How do bone lead tests of people exposed to lead service lines compare with tests on people not so exposed? How do bone lead test results in adults vary based age or gender? Providing the results (redacted to eliminate personal health information) would enable counsel to make an informed decision about which clients could most benefit from bone lead testing.

**CONCLUSION**

We respectfully request the Court order a hearing on the availability of bone lead testing to participants in the proposed settlement. The Court should direct Liaison Counsel to produce Aaron Specht PhD to testify at the hearing. Topics of Dr Specht's testimony should at least include:

- The availability of bone lead testing to Flint residents
- The facilities required and available to be used
- The number and type of devices available to be used

---

[3] To the extent Liaison Counsel advanced substantial fixed costs to set up Dr. Specht's bone lead testing facility in Flint, and the facility is made available to other plaintiffs, it may very well be appropriate to reimburse those costs as part of the common benefit cost assessment. *See e.g.* Master Settlement Agreement, ECF 1319-1 (anticipating a common benefit assessment out of the settlement proceeds).

- The number and qualifications of technicians administering the tests
- The fixed costs of the testing
- The incremental costs of each test

At least five days prior to the hearing, Liaison Counsel should produce to such other plaintiffs' counsel that express an interest in bone lead testing, results of bone lead testing conducted to date—with identities of plaintiffs redacted—but with other relevant information included, such as age, gender, prior blood lead test results, residence on a lead service line and any other information reasonably necessary to enable such other counsel to make an informed decision about the costs and benefits of bone lead testing for their individual clients.

CUKER LAW FIRM, LLC

Dated:  December 9, , 2020

By: */s/ Mark R. Cuker*
MARK R. CUKER, ESQ.
One Logan Square, Suite 1200
Philadelphia, PA  19103
(215) 531-8522
mark@cukerlaw.com

*Attorney for Chapman Plaintiffs*

14

**PROOF OF SERVICE**

The undersigned certifies that on December 9, 2020, a copy of the foregoing instrument was served upon the Court and the attorneys of record of all parties to the above cause by electronic filing of same to them at their respective business addresses as disclosed by the pleadings of record herein.  I declare that the statement above is true to the best of my information, knowledge and belief.

*/s/ Mark R. Cuker*
MARK R CUKER