## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ELNORA CARTHAN, et al., | | |
| | Plaintiffs, | |
| | | |
| v. | | Case No. 5:16-cv-10444-JEK-MKM |
| RICK SNYDER, et al., | | |
| | Defendants. | Hon. Judith E. Levy |
| | | Magistrate Judge Mona K. Majzoub |

_____

## DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION TO EXCLUDE THE TESTIMONY AND DECLARATION OF DR. ALAN DUCATMAN

Pursuant to Federal Rules of Evidence 402 and 702, Defendants Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively, VNA) move to exclude the testimony and declaration of Dr. Alan Ducatman.[1]  The Court should exclude Dr. Ducatman's testimony and declaration because they are not based on a reliable methodology and are not relevant to the class-certification issues.

_____

[1]  VNA submits this motion to exclude expert testimony in conjunction with its opposition to Plaintiffs' motion for class certification.  VNA reserves the right to raise additional objections to the testimony of Plaintiffs' experts if the Court grants class certification.

As Local Rule 7.1(a) requires, VNA conferred with Plaintiffs' counsel concerning this motion.  After VNA explained the nature and legal basis for the motion, Plaintiffs' counsel said that they would oppose it.

Respectfully submitted,

**CAMPBELL, CONROY & O'NEIL P.C.**

By: */s/ James M. Campbell*
James M. Campbell
Alaina N. Devine
One Constitution Wharf, Suite 310
Boston, MA 02129
(617) 241-3000
jmcampbell@campbell-trial-lawyers.com
adevine@campbell-trial-lawyers.com

**BUSH SEYFERTH PLLC**

By: */s/ Cheryl A. Bush*
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

*Attorneys for Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC*

Dated:  January 7, 2021

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELNORA CARTHAN, et al.,

                    Plaintiffs,

    v.

RICK SNYDER, et al.,

                    Defendants.

Case No. 5:16-cv-10444-JEK-MKM

Hon. Judith E. Levy
Magistrate Judge Mona K. Majzoub

_____

## DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY AND DECLARATION OF DR. ALAN DUCATMAN

## STATEMENT OF THE ISSUE PRESENTED

1.   Should the Court exclude the testimony and declaration of Dr. Alan Ducatman under Federal Rules of Evidence 402 and 702 because it is unreliable and not relevant?

   **VNA answers:**  "Yes."

   **Plaintiffs answer:**  "No."

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Comcast v. Behrend*, 569 U.S. 27 (2013)

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)

*Henry v. Dow Chem. Co.*, 473 Mich. 63 (2005)

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000)

Fed. R. Evid. 402

Fed. R. Evid. 702

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................2

LEGAL STANDARD...............................................................................5

ARGUMENT ...........................................................................................7

I.   Dr. Ducatman's Opinions Cannot Be Used For Their Intended Purpose As A Matter Of Michigan Law .....................................7

II.  Dr. Ducatman's Opinion That Flint Residents Require Programmatic Relief Is Not Based On A Reliable Methodology .............................8

III. Dr. Ducatman's Opinion That Flint Residents Require Additional Services Is Not Based On Reliable Data.........................................13

IV.  Dr. Ducatman's Methodology Does Not Attempt To Determine Programmatic Relief Necessary Because Of VNA, Or Even Due To The Flint Water Crisis Generally ................................................17

CONCLUSION ......................................................................................21

# INTRODUCTION

Dr. Alan Ducatman is a medical doctor and professor of public health who previously has been involved in establishing medical-monitoring programs. Dr. Ducatman does not provide any opinions about what harms were caused by the Flint water crisis. Instead, he relies on other experts' opinions to assume that residents of Flint were exposed to lead during the water crisis, and then he describes the programmatic services that he believes might be appropriate to address that exposure.

Plaintiffs offer Dr. Ducatman's opinion to try to establish a need for programmatic relief, including medical monitoring and testing of Flint residents, to discover and address injuries from the water crisis. Plaintiffs rely on that opinion to support their request for certification of an injunctive-relief class.

The Court should exclude Dr. Ducatman's opinions for four reasons. First, Plaintiffs are trying to use the opinion to obtain medical monitoring, so that they can discover injuries. But proof of actual injury is a necessary prerequisite for programmatic relief under Michigan law. Plaintiffs who have not proven an injury cannot use medical monitoring to find out whether they have an injury. So Dr. Ducatman's opinions cannot be used for their proffered purpose as a matter of Michigan law, and they thus are not relevant under Rules 402 and 702.

Second, Dr. Ducatman does not use any reliable methodology to come up with his opinions. Established criteria exist for determining when programmatic relief is appropriate in response to environmental mass torts. But Dr. Ducatman does not apply those criteria in light of the facts as they exist in Flint to reach his conclusion.

Third, Dr. Ducatman's opinions are not based on sufficient facts or data. He did not do the basic fact investigation necessary to assess the situation in Flint. He does not know what services already are available to Flint residents and thus cannot say what *additional* services he believes are necessary. He just says that he thinks Flint residents need more, better funded services. An expert's say-so, with no factual foundation, is not enough to satisfy *Daubert* or Rule 702.

Fourth, Dr. Ducatman's opinions do not fit Plaintiffs' theory of liability with respect to VNA. He bases his proposed remedies on opinions about harm that do not distinguish between harms attributable to VNA and harms from the Flint water crisis generally. His remedy would benefit many Flint residents with no claim against VNA, and others with no claim at all arising from the Flint water crisis. Thus, his opinions are not relevant under Rules 402 and 702.

The Court therefore should exclude Dr. Ducatman's opinions.

## BACKGROUND

Dr. Ducatman is a medical doctor who is currently a public-health professor emeritus at West Virginia University School of Public Health. Ducatman Decl. ¶ 3,

ECF No. 1208-134, PageID.37755 (Decl.).  He has created and participated in a variety of medical-monitoring programs.  *Id.* ¶¶ 7-8, PageID.37756-37759; Ex. 2, Ducatman Dep. Vol. 1, 67:5-68:8 (Dep.).  He has never provided consultation regarding lead contamination of a municipal water supply.  Dep. Vol. 1, 59:1-6.

Dr. Ducatman does not offer any opinions on what harms were caused by the Flint water crisis.  Dep. Vol. 1, 140:11-15.  Instead, he "rel[ies] on" and "defer[s] to" the reports of other experts (Dr. Howard Hu and Dr. Bruce Lanphear) on questions of "exposure" to lead and the "nature of harms caused by lead contamination in the Flint water."  Decl. ¶ 15, PageID.37761; *see* Hu Decl., ECF No. 1208-90, PageID.35874; Lanphear Decl., ECF No. 1208-108, PageID.36881. (Plaintiffs' experts only address harms from exposure to lead; they do not address other substances.)  Dr. Ducatman also defers to Dr. Daniel Keating's opinions about how to assess whether children have been harmed and on the educational and social interventions that injured children may need.  Decl. ¶ 15, PageID.37761; *see* Keating Decl., ECF No. 1208-133, PageID.37692.

Dr. Ducatman offers two "opinions on the need for programmatic relief, including, but not limited to, testing, evaluation, interventions, and treatment services for the residents of Flint."  Decl. ¶ 2, PageID.37755.  (Both opinions are largely duplicative of opinions offered by Dr. Keating.  *See* Keating Decl. ¶¶ 22-26, PageID.37706-37721.)

3

First, Dr. Ducatman opines that "Flint's children need ongoing medical and programmatic intervention." Decl. ¶ 43, PageID.37776 (style altered). He assumes that minors in Flint likely were harmed by exposure to lead through the drinking water. *Id.* ¶ 32, PageID.37770-37771. Based on that assumption, he opines that the following programmatic services are needed in Flint:

> a. Diagnostic and assessment services for Flint's children . . . ;
>
> b. Intervention and amelioration programs . . . including physical and mental health services, nutritional services, and academic and educational support;
>
> c. Stress reduction and mental health community and juvenile justice services designed to reduce stress and support individuals and families; and
>
> d. A registry of participation . . . to track services and outcomes . . . .

*Id.* ¶ 51, PageID.37780-37781. Dr. Ducatman's conclusion that those strategies should be implemented community-wide in Flint is not based on any independent analysis of data from Flint; he adopted it wholesale from the Flint Water Advisory Task Force Final Report. *Id.* ¶¶ 44-48, PageID.37777-37779.

Dr. Ducatman's second opinion is that "[a]n independent coordinating body with funding devoted to comprehensive oversight should be established to insure the quality, efficacy and accountability of the programmatic relief." Decl. ¶ 49, PageID.37779 (style altered). He states that this new "coordinating body" is necessary in Flint to "ensure the provision of ongoing, comprehensive

interventions," and that its functions should include "data collection and ongoing assessment of services." *Id*. ¶ 50, PageID.37780.

Dr. Ducatman does not cite any methodology or data supporting that assertion. Indeed, he acknowledges that "new community services . . . in response to the Flint Water Crisis" have already been established in Flint.  Decl. ¶ 49, PageID.37779-37780.  He nonetheless asserts that "there is a clear need for additional resources" because existing services are "underfunded, under-resourced, with little to no funded coordination among them."  *Id*.  His declaration contains no supporting data or factual investigation about the current level of services in Flint or why they are inadequate.

## LEGAL STANDARD

The Supreme Court has charged district courts with a "basic gatekeeping obligation" to ensure that expert testimony both is "relevant to the task at hand" and "rests on a reliable foundation."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993)).  A qualified expert may provide opinion testimony only if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *see* Fed. R. Evid. 401, 402.  Put another way, the sponsor of the expert testimony must establish that there is a "fit" between the proffered expert testimony and "an[] issue in the case."  *Daubert*, 509 U.S. at 591.

The expert opinion also must be reliable, meaning that it must be "based on sufficient facts or data," must be "the product of reliable principles and methods," and must be the result of the expert "reliably appl[ying] the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). The Supreme Court has identified four non-exclusive factors for courts to consider when deciding whether an expert's methodology "rests on a reliable foundation": (1) "whether a theory or technique can be or has been tested"; (2) "whether it has been subjected to peer review and publication"; (3) "whether a technique has a known or potential rate of error and the existence of standards controlling its operation"; and (4) "whether the theory or technique enjoys general acceptance in a relevant scientific community." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94).

In short, expert testimony must "rest[] on a reliable foundation and [be] relevant to the task at hand." *Daubert*, 509 U.S. at 597. As the proponent of the expert testimony, Plaintiffs bear the burden of establishing its admissibility by a preponderance of evidence. *Nelson*, 243 F.3d at 251. As explained in VNA's opposition to the motion for class certification, district courts should rule on *Daubert* challenges to expert testimony at the class-certification stage if the plaintiffs rely on that testimony to meet the Rule 23 requirements. *See, e.g.*, *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 691-92 (E.D. Mich. 2019).

## ARGUMENT

### I.   Dr. Ducatman's Opinions Cannot Be Used For Their Intended Purpose As A Matter Of Michigan Law

Dr. Ducatman's opinions have a fundamental problem right from the start:  As a matter of Michigan law, they cannot be used for the purpose offered.

Michigan law does not permit plaintiffs to obtain medical monitoring in order to establish actual injuries.  The Michigan Supreme Court has held that medical monitoring is available only if plaintiffs first demonstrate a "present physical injury." *Henry v. Dow Chem. Co.*, 473 Mich. 63, 72 (2005); *see Doe v. Henry Ford Health Sys.*, 305 Mich. App. 592, 601 (2014) (plaintiff cannot obtain damages for credit monitoring without proving "present injury to her credit or identity").  Michigan's "requirement of a present physical injury" is well-recognized "in the toxic tort context."  *Henry*, 473 Mich. at 72.  Mere "exposure" to a toxic substance is not enough to obtain medical monitoring; the plaintiff must show "actual or present injury." *Id.* at 77-78.

The programmatic relief proposed by Dr. Ducatman ignores that binding law.  The very point of Dr. Ducatman's program is to try to figure out whether Flint children have been injured.  He recommends "a robust diagnostic regime for lead exposed children in Flint."   Decl. ¶ 47, PageID.37779.   He opines that a programmatic remedy, including "[d]iagnostic and assessment services" such as "neuropsychological testing," must be put in place to determine *whether* individual

children have suffered any injury warranting intervention. *Id.* ¶ 51, PageID.37781; *see* Ex. 3, Thompson Report 12-13 (determination of whether a person requires mental health services is highly individualized). But Michigan law does not permit a plaintiff to obtain medical monitoring unless it is tailored to "redress actual or present injury." *Henry*, 473 Mich. at 78. Because Dr. Ducatman's program provides screening to *all* members of the minors subclass to examine whether any of them have been injured, it flunks that test.

Under Rules 702 and 402, expert opinions are not admissible when they relate exclusively to a theory of damages for which the plaintiff may not recover. *See, e.g.*, *Fredonia Farms, LLC v. Enridge Energy Partners, L.P.*, No. 1:12-cv-1005, 2014 WL 12469934, at *1 (W.D. Mich. July 18, 2014) (expert's opinions did "not relate to any issue in this case" because they concerned valuation of property-damage claims that the plaintiff could not pursue). Dr. Ducatman's opinions are about relief that is not available under Michigan law. They thus are not relevant and should be excluded.

## II. Dr. Ducatman's Opinion That Flint Residents Require Programmatic Relief Is Not Based On A Reliable Methodology

Dr. Ducatman's declaration is inadmissible under Rule 702 because he did not employ "reliable principles and methods" in reaching his conclusion that programmatic relief is necessary in Flint. Fed. R. Evid. 702(c).

Criteria exist for evaluating the appropriateness of programmatic relief like the screening and intervention programs advocated by Dr. Ducatman. For example, the Agency for Toxic Substances and Disease Registry (ATSDR), a part of the U.S. Department of Health and Human Services, has specified criteria for determining the appropriateness of a medical monitoring program to respond to an environmental injury. *See ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program Under CERCLA*, 60 Fed. Reg. 38,840 (July 28, 1995). Those criteria set guidelines for when medical monitoring is appropriate (for example, the type of injury must be sufficiently understood to permit screening, screening must improve health outcomes for the type of injury, and there must be a well-established and reliable screening process). *Id.* at 38,842; *see* Ex. 4, Weed Report 85-86, 89 (ATDSR criteria embody basic scientific principles for determining appropriateness of a medical monitoring program).

Although Dr. Ducatman invokes the criteria and mentions a couple of them, he does not systematically apply them in order to assess whether programmatic relief makes sense in Flint. *See* Decl. ¶¶ 39-41, PageID.37775 (citing criteria). And his own recounting of the facts raises questions about whether those criteria are met here—questions that Dr. Ducatman makes no effort to answer.

For instance, one of those criteria is that "the disease ha[s] a sufficiently high prevalence in the population." 60 Fed. Reg. at 38,842. Dr. Ducatman never

determined that lead-based injuries were sufficiently prevalent to justify medical monitoring. He cites pediatric guidance recommending "post poisoning event mitigation strategies" for children with blood lead levels "in the $\geq 5$ μg/dL [micrograms per deciliter] range." Decl. ¶ 33, PageID.37772. But he does not have data showing that any substantial portion of children in Flint have blood lead levels that high. Instead, he relies on Dr. Lanphear's report, which says that only 4.9% of Flint children had blood levels above 5 μg/dL during the water crisis. *Id*. ¶¶ 21, 31, PageID.37764, 36892. Because only a small fraction of Flint children experienced exposures at a level placing them at risk of developing lead-related injuries, Dr. Ducatman does not show that a key criterion for programmatic relief is satisfied.

Another ATDSR criterion is that "early detection through screening should be known to have an impact on the natural history of that disease process." 60 Fed. Reg. at 38,842; *see id.* at 38,841-38,842 (the type of injury must be "such that early detection and treatment . . . improves the prognosis of the disease, improves the quality of life of the individual, or is amenable to primary prevention"). As explained by VNA's epidemiology expert Douglas Weed, however, "there are no (zero) evidence-based recommendations to provide interventions to children with blood lead levels between 0 μg/dL and 14 μg/dL," even according to the authorities on which Dr. Ducatman relies. Ex. 4, Weed Report 89. Thus, Dr. Ducatman cannot show that another ATDSR criterion for programmatic relief is satisfied. *Id*.

Yet another ATDSR criterion is that there is an effective "screening test," one that "meets the requirements for . . . sensitivity, specificity, and acceptable cost," such as a low likelihood that the test will produce false negatives and false positives. 60 Fed. Reg. at 38,842.  That screening test must be evaluated for effectiveness based on "the number of individuals screened, the number of referrals made, and the number of conditions diagnosed." *Id*. at 38,843.  Yet Dr. Ducatman does not address the effectiveness of the screening or whether the screening would have an "acceptable cost." *Id*. at 38,842; *see* Victor E. Schwartz et al., *Medical Monitoring: The Right Way and the Wrong Way*, 70 Mo. L. Rev. 349, 349 (2005) ("[C]ost-benefit and risk-utility analyses must precede any implementation of a medical monitoring plan.").

Further, to determine whether a screening program would have an "acceptable cost," 60 Fed. Reg. at 38,842, Dr. Ducatman would have to consider whether existing programs (in addition to parents, teachers, doctors, and other community members) have already identified the children needing intervention.  The purpose of medical monitoring is "case-finding in order to refer individuals for further evaluation and, if appropriate, treatment." *Id.* at 38,841.  Dr. Ducatman did not evaluate whether, years after the Flint water crisis, there are still cases for his screening program to find.  Extensive resources already have been devoted to identifying and addressing health impacts from the Flint water crisis.  As Dr.

Ducatman explains, "a number of new community services (or expansion of existing services) arose in response to the Flint Water Crisis" that "provide needed assistance to the community."   Decl. ¶ 49, PageID.37779-37780.   For example, as Dr. Ducatman explains, the Neurodevelopmental Center of Excellence (NCE) run by the Genesee Health System received funding in 2018 to provide "neuropsychological evaluation for school-aged children exposed to lead during the Flint Water Crisis." *Id.* Ex. C at 1, PageID.37832.   Since 2018, the Flint Registry also has "assess[ed] service needs and connect[ed] the people of Flint to appropriate agencies and programs."   *Id.* Ex. C at 4, PageID.37835.

Dr. Ducatman does not show that the new diagnostic and intervention services he recommends will produce any additional, cost-justified benefit relative to the programs that already exist in Flint.   He offers the naked assertion that existing services are not sufficiently funded or resourced to address the ongoing impacts of the Flint water crisis.   Decl. ¶ 49, PageID.37780.   But as discussed below, he lacks data to support his assertion.   *See* pp. 13-17, *infra.*   Further, he does not review the capacity of existing programs, or predict the number of additional individuals who would be referred, screened, or diagnosed by the new programs he recommends, or estimate whether the cost of those programs would be justified in light of those predictions.   *See* 60 Fed. Reg. at 38,842-43.

For all of those reasons, Dr. Ducatman's opinion that Flint residents require programmatic relief does not have "a reliable basis in the knowledge and experience of [his] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). As the Supreme Court has emphasized, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is all Dr. Ducatman offers here: his own say-so. His opinion therefore is not sufficiently reliable and should be excluded under Rule 702.

## III. Dr. Ducatman's Opinion That Flint Residents Require Additional Services Is Not Based On Reliable Data

Dr. Ducatman opines that the existing services available in Flint are "largely underfunded, under-resourced, with little or no funded coordination between them," and that "there is a clear need for additional resources." Decl. ¶ 49, PageID.37780. But he admits that he does know enough about the resources that Flint currently has, or about what additional services may be required, to conclude that existing services are insufficient.

Dr. Ducatman is aware of the services available in Flint that have been either created or expanded in response to the Flint water crisis. Attached to his Declaration is an exhibit listing "Programs Currently Available to Flint Children To Ameliorate the Impact of the Water Crisis." Decl. Ex. C., PageID.37832-37840. That document

identifies the "programs and services" that are "currently in effect in the City of Flint" to address the Flint water crisis. *Id*. Ex. C at 1, PageID.37832. Those "programs and services" include:

- The NCE (Genesee neurodevelopment center), which "is tasked with screening and evaluating children for potential cognitive disabilities, using those assessments to determine needed services," Decl. Ex. C at 1-2, PageID.37832-37833;

- The Flint Registry, which is "a collaborative community participatory effort" with "the purpose of assessing service needs and connecting the people of Flint to appropriate agencies and programs to promote health, development and wellness," Decl. Ex. C at 4, PageID.37835;

- "School Nurses," who "provide children with physical health care while at school," "assist in accomplishing early diagnosis of behavioral disorders," and "provide ongoing feedback to NCE," Decl. Ex. C at 5, PageID.37836;

- "Youth Quest/Other After-School Programs," which "provide academic support, enrichment activities, physical fitness and healthy behaviors, nutrition education, youth development, and leadership skill building," Decl. Ex. C at 5, PageID.37836;

- "Tutors in Schools," who can "evaluate students for early markers of behavioral issues and/or developmental delays, provide them with academic support, and refer them to the [NCE]," Decl. Ex. C at 5, PageID.37836;

- "Stem Programs," which include "school-system affiliated entities" that provide "supplemental educational opportunities," Decl. Ex. C at 6, PageID.37837;

- "Community Nutritional Programs for exposed children and families," which "provide fresh food" to "lead exposed residents," Decl. Ex. C at 6, PageID.37837, and;

- "Medicaid Expansion," which "provides for medical service fees for anyone 21 or under, or pregnant, who was served by the Flint water system

14

and whose family income is 400 percent or less of the poverty level," Decl. Ex. C at 7, PageID.37838.

Dr. Ducatman says that these services are all inadequate, dismissing them as "largely underfunded" and "underresourced, with little to no funded coordination among them." Decl. ¶ 49, PageID. 37780. But he neither discusses these services in detail nor explains why the services collectively are insufficient.

When Dr. Ducatman was questioned at his deposition, it became clear that he did not do any real investigation of services in Flint to support his opinions. For example, he asserted that "children are not being screened at a rate that is timely." Dep. Vol. 1, 178:13-15. Yet when asked whether he knew what neurodevelopment screening is available to Flint children, he admitted, "I don't know." *Id.* at 188:3; *see id.* at 186:9-10 (admitting that he did not know "at a detailed level"). Other than screening, he struggled to identify what new or additional program is needed— instead, he simply repeated that "additional resources" are needed. *Id.* at 177:3. Similarly, when asked about school psychologists in Flint, he volunteered that the Flint school system does not have "all the services that are needed." *Id.* at Vol. 2, 362:15-16. But when asked how many school psychologists there are in Flint, he asserted: "I don't know. It's not going to be enough." *Id.* at 362:21-22. As for funding, he said only that "the data made clear that there are more resources needed, and I'll let others discuss how big that gap is." *Id.* at Vol. 1, 201:12-23. He could not quantify how many more dollars are needed in his view. *Id.* at 180:9-16.

15

The only "data" that Dr. Ducatman provides to support his opinion is a statement about the NCE (the Genesee neurodevelopment center) being underfunded.  Exhibit C to his declaration states that the NCE "appears to be understaffed and/or underfunded" because, "[o]f the 1,984 referrals to NCE within its first year, (Dec. '18-Dec. '19), the center evaluated 283 children."  Decl. Ex. C at 2, PageID.37833.  Dr. Ducatman based his "infer[ence]" that there is a "backlog" on a comparison between the number of referrals and the number of completed evaluations.  *Id.*  But the inference is speculative:  Many people referred for services do not ultimately arrange them or may seek help elsewhere.  In fact, Dr. Ducatman observes that nearly two-thirds of the people who "pre-enrolled" for the Flint Registry did not even complete their enrollment.  *Id.* Ex. C. at 4, PageID.37835. Moreover, the NCE may have determined that some people referred to the program did not need a full evaluation.  Even if there was a backlog at the NCE during the program's first year, Dr. Ducatman does not know what caused it, whether it persists, or whether more screening resources are needed.  In short, Dr. Ducatman failed sufficiently to investigate currently available resources before concluding that programmatic relief is needed.  *See also* Ex. 3, Thompson Report 11-12.

To meet the demands of Rule 702, "an expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d

797, 800-01 (6th Cir. 2000) (internal quotation marks omitted).   Neither Dr. Ducatman's declaration nor his deposition testimony identified reliable data to support his opinion that Flint needs additional services, and his opinion should be excluded on that basis.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (affirming exclusion of expert opinion because "[a]lthough data" on "additional variables was available to [the expert], he inexplicably did not find it necessary to include them in his calculation") (internal quotation marks omitted); *Lockridge v. Scripto-Tokai Corp.,* 2005 U.S. Dist. LEXIS 47962, at *60 (M.D. Tenn. Mar. 17, 2005) (excluding expert's testimony because he "failed to collect all available data prior to making his opinion, and in some instances, selectively disregarded pieces of data to the extent they conflicted with his hypothesis").

## IV.   Dr. Ducatman's Methodology Does Not Attempt To Determine Programmatic Relief Necessary Because Of VNA, Or Even Due To The Flint Water Crisis Generally

Dr. Ducatman's opinions also should be excluded because they do not fit any remedy that Plaintiffs are entitled to recover *from VNA*.  For expert testimony to meet the relevance requirement of Rule 702, there must be "a 'fit' between the inquiry in the case and the testimony."  *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).  As the Sixth Circuit has explained, that requires "a connection between the scientific research or test result being offered and the disputed factual

issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592).

That "fit" requirement applies when plaintiffs rely on expert testimony in an effort to show that they can prove damages on a class-wide basis. The U.S. Supreme Court made that point in the context of deciding whether a proposed class satisfied Rule 23(b)(3)'s predominance requirement. In *Comcast v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that a district court erred in certifying a class in an antitrust case based on the expert's testimony that damages could be established on a class-wide basis. *Id.* at 35-38. The problem, the Court explained, is that the expert calculated an aggregate amount of damages, but he did not "isolate damages resulting from any one theory of antitrust impact"—even though the district court had allowed the plaintiffs to proceed on only one of their four theories of antitrust impact. *Id*. at 31-32. That is, the expert's testimony was broader than the plaintiffs' theory of liability, so it could not be used to show that damages could be established using common proof.

Although the *Comcast* Court set out that rule in the context of the predominance requirement of Rule 23(b)(3), district courts have recognized that lack of fit also makes evidence inadmissible under Rules 402 and 702. *See, e.g.*, *Fredonia Farms*, 2014 WL 12469934, at *1 (expert's opinions concerning valuation of property-damage claims that the plaintiff could not pursue were inadmissible

18

because they did "not relate to any issue in this case"); *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 1:04-cv-1082, 2006 WL 1663357, at *5 (N.D. Ga. June 14, 2006), *aff'd*, 496 F.3d 1231 (11th Cir. 2007) (expert's opinions "would not assist the trier of fact" due to the expert's "inability or failure to allocate damages" between actionable and non-actionable conduct).

Just as in *Comcast*, Plaintiffs offer expert testimony proposing a remedy that does not "fit" their case against VNA.  In addition to "neuropsychological testing," Dr. Ducatman recommends that the Court require implementation of a broad range of social services for "the people of Flint," including "physical and mental health services," "nutritional services," "academic and educational support," "[s]tress reduction," and "mental health community and juvenile justice services."  Decl. ¶ 51, PageID.37780-37781.  But Dr. Ducatman offers no way to limit his proposed remedy to Flint residents who need services because they both suffer health effects resulting from exposure to Flint water during the water crisis and have a claim that their injury resulted from VNA's conduct.  To the contrary, the universe of Flint residents who would receive services through Dr. Ducatman's program is overbroad in at least three respects:  (1) it includes people with conditions that were not caused by lead; (2) it includes people who were adversely affected by lead exposure from sources other than Flint water, such as lead paint—which Dr. Ducatman admits is a leading cause of lead poisoning, Dep. Vol. 1, 98:4; and (3) it includes people who

could not have been injured by VNA's conduct because, among other things, some of them stopped using Flint water before VNA's engagement in Flint began in February 2015.

In this respect, Dr. Ducatman's opinions are analogous to those of the plaintiff's damages expert in *Comcast*.  As the Supreme Court explained in that case, "a model purporting to serve as evidence of damages" for purposes of class certification "must measure only those damages attributable to [the plaintiff's liability] theory." *Comcast*, 569 U.S. at 35.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* (internal quotation marks and citation omitted).  Here, as in *Comcast*, Dr. Ducatman "does not even attempt" to align his proposed remedy with Plaintiffs' theory of liability against VNA; he instead proposed a program to assist "the people of Flint" generally—whether or not their injuries arose from the Flint water crisis or VNA's conduct.  Decl. ¶ 51, PageID.37780-37781.  Accordingly, because his opinion about the appropriate remedy is incapable of "bridg[ing] the differences" between people to whom VNA could be liable and those to whom it cannot be liable, *Comcast*, 569 U.S. at 38, it fails Rule 702's "fit" requirement.

## CONCLUSION

The Court should exclude the testimony and declaration of Dr. Alan Ducatman.

Respectfully submitted,

**CAMPBELL, CONROY & O'NEIL P.C.**

By: */s/ James M. Campbell*
James M. Campbell
Alaina N. Devine
One Constitution Wharf, Suite 310
Boston, MA 02129
(617) 241-3000
jmcampbell@campbell-trial-lawyers.com
adevine@campbell-trial-lawyers.com

**BUSH SEYFERTH PLLC**

By: */s/ Cheryl A. Bush*
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

*Attorneys for Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC*

Dated:  January 7, 2021

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

Respectfully submitted,

*/s/ James M. Campbell*

Dated:  January 7, 2021