# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases,

No. 5:16-cv-10444
(consolidated)

Hon. Judith E. Levy
Mag. Mona K. Majzoub

_____

# CO-LIAISON COUNSEL'S OPPOSITION TO INTERIM CO-LEAD COUNSEL FOR THE PUTATIVE CLASS'S MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................5

**I.    The General Personal Injury Class Cannot Be Certified.** ..................6

   A. Personal Injury Cases Are Rarely Suitable For Class Certification. .........6

   B. The Personal Injury Class Action In This Case Cannot Satisfy
Commonality Or Predominance. ...............................................................9

      1.   The Proposed Class Presents Highly Individualized Questions..........9

      2.   Established Precedent Precludes Certification Of The Proposed
Class. ...........................................................................................21

      3.   Class Counsel's Attempt To Prove Individualized Issues Through
Statistical Evidence Is Improper. .....................................................31

      4.   Class Counsel's Concession That They Cannot Prove Damages On A
Class-Wide Basis Is Fatal To Their Ability To Show
Predominance. ................................................................................35

   C. The Class Cannot Meet The Typicality Requirement. ............................38

   D. The Class Cannot Meet The Adequacy Of Representation
Requirement. ........................................................................................41

      1.   The Variations Among Class Members' Injuries And Claims Within
The General Class Preclude Adequate Representation. ....................42

      2.   Class Counsel Suffer From Intractable Conflicts Of Interest. ..........45

      3.   Class Counsel Fail In Attempting To Defend Their Conflict Of
Interest. .........................................................................................50

   E. The Proposed Class Cannot Meet The Superiority Requirement. ...........53

   F. The Proposed Class Definition Is Overbroad. ......................................58

**II.   Certification Of A Minors Subclass Would Be Impermissible. .............61**

   A. The Class Ignores The Special Legal Protections Afforded To Minors
Under Michigan Law...............................................................................62

i

    B.  The Proposed Definition Of The Minors Subclass Fails The Ascertainability Requirement. .................................................................67

    C.  The Minors Subclass Cannot Meet The Commonality And Predominance Requirements Of Rule 23. .................................................................71

    D.  The Minors Subclass Does Not Meet The Requirements Of Typicality Or Adequacy Of Representation. .................................................................74

III.    **Property Damage And Business Damage Subclasses Should Not Be Certified. .................................................................77**

    A.  The Economic Claims Are Highly Individualized And Cannot Meet The Commonality Or Predominance Requirements. .................................77

    B.  The Economic Loss Subclasses Cannot Show Typicality Or Adequacy Of Representation. .................................................................84

IV.    **A Rule 23(b)(2) Class Should Not Be Certified. .................................86**

    A.  The Proposed Rule 23(b)(2) Class Cannot Meet The Requirements Of Rule 23(a). .................................................................87

    B.  The Proposed Class Is Not Authorized By Rule 23(b)(2). .....................91

    C.  The Proposed Rule 23(b)(2) Class Would Exceed The Limits Of The Judicial Role. .................................................................102

V.   A Limited "Issues" Class Should Not Be Certified Under Rule 23(c)(4) .................................................................105

CONCLUSION .................................................................113

CERTIFICATE OF SERVICE .................................................................113

TABLE OF AUTHORITIES

## Cases

*Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437 (D.N.J. 2009) ........................88

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................... passim

*American Express v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013) ................5

*American Sur. Co. v. Baldwin*, 287 U.S. 156 (1932) .............................................33

*Armitage v. Widoe*, 36 Mich. 124 (1877) .............................................................67

*Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ..............................98

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004) ................23, 30, 40, 95

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1999) ............................97

*Barry v. Corrigan*, 579 F.Supp.3d 712 (E.D. Mich. 2015) ....................................93

*Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003).........................37

*Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157 (S.D.N.Y. 2003) .........109, 110

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) .....................................................8

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017).......................................................19

*Bostick v. St. Jude Med., Inc.*, 2004 WL 3313614 (W.D. Tenn. Aug. 17, 2004)....40

*Bowden v. Hutzel Hosp.*, 652 N.W.2d 529 (Mich. Ct. App. 2002) ...................64, 65

*Boynton v. Wedgewood*, 78 N.W.2d 134 (Mich. 1956)..........................................66

*Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016) ...............................................95

*Califano v. Yamasaki*, 442 U.S. 682, (1979) ...........................................................5

*Cameron v. Bouchard*, No. 20-10949, 2020 WL 2569868
   (E.D. Mich. 2020) ..........................................................................................98, 99

*Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185 (5th
   Cir. 2010) ...........................................................................................................92

*Centley v. Honeywell Intern., Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004)...................93

*Cherokee Nation of Oklahoma v. U.S.*, 199 F.R.D. 357 (E.D. Ok. 2001)...............90

*Chicago Teachers Union, Local No. 1 v. Board of Educ.*, 797 F.3d 426
   (7th Cir. 2015)....................................................................................................94

*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) .........................................93

*Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002)...........92

*Colley v. Procter & Gamble Co.*, 2016 WL 5791658 (S.D. Ohio Oct. 4, 2016) ....26

*Combs v. Int'l Ins. Co.*, 354 F.3d 568 (6th Cir. 2004)..........................................105

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)....................................................36

*Corder v. Ford Motor Co.*, 283 F.R.D. 337 (W.D. Ky. 2012) ...............................26

*Crawford v. Honig*, 37 F.3d 485 (9th Cir. 1994)...................................................57

*Creech v. Emerson Electric Co.*, No. 15-cv-14, 2019 WL 1723716 (S.D. Ohio Apr. 18, 2019) ........................................................................................96

*Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116 (E.D.Pa.1989).........................112

*Dearduff v. Washington*, 330 F.R.D. 452 (E.D. Mich. 2019)................................94

*Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016)....................................87

*Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006) ........................................96

*Elliott v. Chicago Hous. Auth.*, No. 98 C 6307, 2000 WL 263730 (N.D. Ill. Feb. 28, 2000) ........................................................................................98

*Emig v. American Tobacco Co., Inc.*, 184 F.R.D. 379 (D. Kan. 1998)................111

*EQT Production*, 764 F.3d .......................................................................63, 68, 71

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) .......................10

*Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006).............83

*Freeman v. Delta Airlines, Inc.*, No. 15-cv-160, 2019 WL 2495471 (E.D. Ky. June 14, 2019) ........................................................................................96

*Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931)................108

*Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011)............................ passim

*Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838 (6th Cir. 2013) ..........................................................5

*Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973)...................................................57

*Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402 (6th Cir. 2012) ..........93

*Hansberry v. Lee*, 311 U.S. 32 (1940)...............................................................3, 56

*Harding v. Tambrands Inc.*, 165 F.R.D. 623 (D. Kan. 1996) ..............................111

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D.Ind.1995) .......................................27

*Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) .............................................................37

*In re "Agent Orange" Prod. Liab. Litig.* MDL No. 381, 818 F.2d 145 (2d Cir.1987) ...............................................................................................34, 112

*In re Am. Med. Sys., Inc.*, 75 F.3d at 1082 ......................................................40, 41

*In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996).............3, 5, 22

*In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*, 321 F.R.D. 430 (N.D. Ga. 2017)................................................................................110

*In re Baycol Products Litig.*, 218 F.R.D. 197 (D. Minn. 2003) ...........................110

*In re Cardinal Health, Inc. ERISA Litigation*, 225 F.R.D. 552 (S.D. Ohio 2005) ..49

*In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990)...........................................34

*In re Flint Water Cases*, 960 F.3d 303 (6th Cir. 2020) ........................13, 18, 43, 75

*In re Fosamax Products Liability Litigation*, 248 F.R.D. 389 n.8 (S.D.N.Y. 2008)8, 42

*In re Genetically Mod. Rice Litig.*, 251 F.R.D. 392 (E.D. Mo. 2008)..................110

*In re Katrina Canal Breaches Consolidated Litigation*, 258 F.R.D. 128 (E.D. La. 2009) ................................................................................................82

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) .................................................................................................48

*In re OnStar Contract Litigation*, 278 F.R.D. 352 (E.D. Mich. 2011)...................37

*In re Paxil Litig.*, 218 F.R.D. 242 (N.D. Cal. 2003)..............................................110

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 827 F.3d 223 (2d Cir. 2016)........................................................52, 88, 89

*In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995) ...........................108

*In re Smith Trust*, 745 N.W.2d 754, 756 (Mich. 2008) ...........................................77

*In re St. Jude Medical, Inc. Silzone Heart Valve Prods. Liab. Litig.*, No. 04-3117 (8th Cir. Oct. 12, 2005) .......................................................................97

*In re Welding Fume Products Liability Litig.*, 245 F.R.D. 279 (N.D. Ohio 2007) .40

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013)................................................................................27

*Jack Shaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.D. 183 (N.D. Ohio 1984) ................................................................................................50

*Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012) .................100

*Johnson v. BLC Lexington, SNF, LLC*, 2020 WL 3578342 (E.D. Ky. July 1, 2020) ................................................................................................59, 60

*Johnson v. Ethicon*, 2005 WL 3968820 (W. Va. Cir. Ct. 2005) ..............................8

*Jolly v. Eli Lilly & Co.*, 751 P.2d 923 (Cal. 1988) ..................................................7

*Jones v. Allercare, Inc.*, 203 F.R.D. 290 (N.D. Ohio 2001)..............................27, 40

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011).............92

*Kohn v. American Housing Foundation*, 178 F.R.D. 536 (D. Colo. 1998)...........111

*LeBeau v. United States*, 222 F.R.D. 613 (D.S.D. 2004) .......................................49

*Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000).............92

*Levell v. Monsanto Research Corp.*, 2005 WL 8161926 (S.D. Ohio Sept. 28, 2005) ................................................................................................27

*Lewis v. Casey*, 518 U.S. 343 (1996) ......................................................................59

*Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011).........................92

*Lindsey v. Normet*, 405 U.S. 56 (1972) ...................................................................33

*Luttrell v. Tamko Building Products, Inc.*, 2010 WL 716226 (W.D. Ky. Feb. 24, 2010) ................................................................................................26

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012)....................92, 100

*Martin v. Behr Dayton Thermal Prods. LLC,* 896 F.3d 405 (6th Cir. 2018), cert. denied, 139 S. Ct. 1319 (2019) ...............................................105, 109

v

*Mays v. Tennessee Valley Authority*, 274 F.R.D. 614 (E.D. Tenn. 2011)...............30

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).............34, 110

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004)...............................52

*Modern Holdings, LLC v. Corning, Inc.*, 2018 WL 1546355 (E.D. Ky. Mar. 29, 2018) ...........................................................................................................30

*Monreal v. Potter*, 367 F.3d 1224 (10th Cir. 2004) .............................................92

*Moore v. Margiotta*, 581 F. Supp. 649 (E.D. N.Y. 1984) .......................................50

*Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548 (E.D. Pa. 2010)............................49

*Neenan v. Carnival Corp.*, 199 F.R.D. 372 (S.D. Fla. 2001) .................................27

*Nevada-Martinez v. Ahmad*, 2016 WL 7888046 (E.D. Ky. June 17, 2016)...........69

*Noonan v. Indiana Gaming Co.*, 217 F.R.D. 392 (E.D. Ky. 2003) .........................27

*Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004) ...................................28, 93

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)............................................. passim

*Paroline v. United States*, 134 S. Ct. 1710 (2014) ...............................................32

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)...............................41, 57

*Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011).................22

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618 (6th Cir. 2011).......................................................6, 25, 53, 55

*Poli v. Nat'l Bank of Detroit*, 93 N.W.2d 925 (Mich. 1959).................................66

*Pueblo of Zuni v. United States*, 243 F.R.D. 436 (D.N.M. 2007) ..........................49

*Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011) .............10

*Reeb v. Ohio Dep't of Rehabilitation and Correction*, 435 F.3d 639 (6th Cir. 2006)....................................................................................................24

*Reilly v. Gould, Inc.*, 965 F. Supp. 588 (M.D. Pa. 1997) .................................26, 83

*Rhodes v. E.I du Pont de Nemours & Co.*, 253 F.R.D. 365 (S.D. W.Va. 2008) .....98

*Riffey v. Rauner*, 910 F.3d 314 (7th Cir. 2018) .......................................................37

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015).............................70

*Rink*, 203 F.R.D. ........................................................................................... passim

*Romberio v. Unumprovident Corp.*, 385 Fed. Appx. 423 (6th Cir. 2009)...................................................................38, 68, 87, 91

*Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715 (E.D. Pa. 2014) .........................110

*Royal Mile Co., Inc. v. UPMC*, 40 F. Supp. 3d 552 (W.D. Pa. 2014)....................37

*Royal Park Investments SA/NV v. Deutsche Bank National Trust Company*, 2018 WL 1750595 (S.D. N.Y. 2018) ...................................................................37

*Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77 (1st Cir. 2010)...............................65

*Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549 (N.D. Cal. 2015)..........49

*Sharp Farms v. Speaks*, 917 F.3d 276 (4th Cir. 2019) .............................................42

*Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597 (10th Cir. 2008) ................................................................................................101

*Smith v. YMVA of Benton Harbor/St. Joseph*, 550 N.W.2d 262 (Mich. Ct. App. 1996) ...................................................................................67

*Snow v. Atofina Chem., Inc.*, No. 01–72648, 2006 WL 1008002 (E.D. Mich. March 31, 2006) ............................................................... passim

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) .............24, 38, 75, 87

*State v. Homeside Lending, Inc.*, 826 A.2d 997 (Vt. 2003)....................................57

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006)..........26, 37

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) ....................29, 30

*Sullivan v. Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978)...50

*T.R. v. School District of Philadelphia*, No. 15-4782, 2019 WL 1745737 (E.D. Pa. Apr. 18, 2019) .................................................................................96

*Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281 (N.D. Ohio 2007)..........................110

*Thomas v. County of Los Angeles*, 703 Fed. Appx. 508 (9th Cir. 2017)................37

*Turner v. Grant County Detention Center*, 2008 WL 821895 (E.D. Ky. Mar. 26, 2008) .....................................................................................26

*Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222 (11th Cir. 1998).........................57

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) (Class Cert. Br. 73) ......................................................................................35, 58

*U.S. v. McGraw-Hill Companies, Inc.*, 2014 WL 1647385 (C.D. Cal. 2014).......109

*United States v. Armour & Co.*, 402 U.S. 673 (1971).............................................33

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ..........................42

*Valenzuela v. Union Pacific Railroad Co.*, No. CV-15-01092, 2017 WL 1398593 (D. Ariz. Apr. 19, 2017).......................................................110

*Van Gemert v. Boeing Co.*, 590 F.2d 433 (2d Cir. 1978), aff'd, 444 U.S. 472 (1980) ...........................................................................................................57

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013) .........................56

*W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 737 F. App'x 4575 (11th Cir. 2018)..............................................................................................41

*Walker v. Liggett Group, Inc.*, 175 F.R.D. 226 (S.D. Va. 1997)............................49

*Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................... passim

*Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir. 1974) ............................5

*Wheeler v. United Services Auto. Ass'n*, 2013 WL 4525312 (D. Alaska 2013) ......................................................................................8, 37

*Widdis v. Marathon Petroleum Co.*, No. 13-cv-12925, 2014 WL 11444248 (E.D. Mich. Nov. 18, 2014) ............................................................................23

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266 (7th Cir. 1998) .....57

*Woodman ex rel. Woodman v. Kera LLC*, 785 N.W.2d 1 (Mich. 2010)...........66, 67

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012).............10, 58, 68

*Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532 (6th Cir. 2012) ...........54

## Other Authorities

18 C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1783
(3d ed. 2020) ...................................................................................6, 56

2 Joseph M. McLaughlin, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE §
8:9, at 8–55 to 8–57 (3d ed.2006) ........................................................35

2 William B. Rubenstein, 2 NEWBERG ON CLASS ACTIONS § 4:62
(5th ed. 2020). ...............................................................7, 37, 49, 51

28 U.S.C. § 2072(b)................................................................................32, 62

385 Fed. Appx. 423, 432–33 (6th Cir. 2009) .........................................92

5 James W. Moore, et al., Moore's Federal Practice § 23.21[3]
(Matthew Bender, 3d ed. 1997) ............................................................68

6 NEWBERG ON CLASS ACTIONS § 18:35 (5th ed. 2020) .........................................57

7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL
PRACTICE AND PROCEDURE § 1779 (3d ed. 2010) ...............................54

Fed. R. Civ. P. 17(b)(3) .....................................................................63

https://www.michigan.gov/documents/flintwater/FlintServicesGuide_
642092_7.pdf ...............................................................................102

MCL 600.5851 ...................................................................................67

Moore's Federal Practice § 23.25[5] [e]...............................................48

## Rules

Mich. Ct. R. 2.420(B)(1) ...................................................................64

Mich. Ct. R. 2.420(B)(4)(a) ...............................................................64

Michigan Court Rule 2.420(B)........................................................63, 64

Rule 23(a) ..........................................................................................87

Rule 23(b)(2) .................................................................................. passim

Rule 23(c)(4) .................................................................................. passim

Rule 23(a)(4) ...............................................................................41, 50, 52

Rule 23(b)(3) .................................................................................. passim

## INTRODUCTION

This opposition to Class Plaintiffs' Motion for Class Certification ("Class Cert. Br.") is filed on behalf of individual plaintiffs, including thousands of children in Flint injured by contaminated water. As Interim Co-Lead Counsel for the Putative Class ("Class Counsel") acknowledge, "Flint's most vulnerable residents" are "its children." Class Cert. Br. 85. However, the proposed class action would shortchange all individual plaintiffs, including these children, deny them rights to which they are entitled under Michigan law, and interfere with their ability to secure adequate compensation for their injuries.

The proposed litigation class ("Litigation Class") is not a practicable way to resolve this litigation. In fact, it represents an impediment to a global resolution. Rule 23 does not permit certification of this gargantuan class, which encompasses highly individualized personal injury, property damage, and economic injury claims. According to Class Counsel, the "General Class" of personal injury claims and accompanying Subclasses potentially contain more than 100,000 individuals, including approximately 20,000 children under the age of 11, more than 700 businesses, more than 30,000 single- and multi-family residential properties, and more than 5,000 multi-family units. Class Cert. Br. 35. Class members present a wide range of particularized issues relating to their exposure, health histories, and

injuries, which would swamp any common issues. Resolving one class member's highly individualized claim would do very little towards resolving another's.

In fact, the many differences among claims creates a very real danger of unfair prejudice for absent class members. The two putative representatives for the Minors Litigation Subclass, for example, are (i) T.W., a minor born prematurely to Plaintiff Tiantha Williams, and (ii) K.C., a child of Plaintiff Darnella Gaines, who has experienced hair loss and persistent skin rashes. Class Cert. Br. 39. According to Class Counsel's trial plan (Ex. 84), they propose to try the issues of liability, causation, and injury for the Minors Litigation Subclass on a class-wide basis. But if Class Counsel take the claims of T.W. and K.C. to trial *and lose*—a scenario the Motion fails to analyze but which is necessary to determine the propriety of class certification—they would create the risk that defendants would seek to bar the claims of other children with completely different causes of action. Class Counsel offer no justification for imperiling the claim of an absent class member who would otherwise be able to show serious neurological and cognitive impairments from lead, on the basis of highly qualified expert medical testimony specific to him, merely because a jury in the class action might have found that T.W.'s premature birth was due to Plaintiff William's personal medical history or to inadequate prenatal care, rather than to lead poisoning. Such an outcome makes no sense. That is why a class

action in this context is not only impractical and a waste of judicial resources, but also dangerous to the interests of absent class members.

No court has ever certified a proposed Litigation Class like this, which would be the most sprawling and diverse personal injury class in one of the most complex actions in U.S. legal history. Certification of such a class is plainly foreclosed by the Supreme Court's decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), as well as by ample Sixth Circuit precedent. Indeed, the Court of Appeals has issued extraordinary writs to prevent much less ambitious class actions. For Example, the Sixth Circuit granted mandamus to vacate a class-certification order in a sprawling product liability class action in *In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996). The instant case would be much larger and more complex than anything the Sixth Circuit has ever seen.

There is little if any chance that the proposed Litigation Class would survive appellate review. Even if it did, any judgment the Litigation Class obtains would leave open the door to collateral attacks by absent class members, potentially years later, who could bring their own personal injury claims against the defendants under established precedent dating back to *Hansberry v. Lee*, 311 U.S. 32 (1940). Such plaintiffs could argue that they are not bound by the judgment because they were not adequately represented in this putative class. In particular, minors purportedly bound

3

by the Litigation Class's judgment similarly would be able to pursue their own collateral attacks upon reaching the age of majority.

Nor will the Litigation Class materially further the ultimate resolution of all the claims in this litigation; rather, the parties' Settlement Agreement (including its class component ("Settlement Class")), in conjunction with individual litigation prosecuted by individually represented plaintiffs best puts the Flint Water Crisis on a path toward ultimate resolution. The Settlement Agreement, like individual litigation, provides appropriate procedural mechanisms that preserve and protect the rights of absent plaintiffs—particularly children. However, the Litigation Class does not contemplate these kinds of procedural protections. To be clear, Co-Liaison Counsel supports the Settlement Agreement (including its Settlement Class), but any purported similarity between the Settlement Class and the Litigation Class is purely illusory.

In the final analysis, the proposed Litigation Class does not comply with the requirements of Rule 23, would make litigation and trial impracticable and dangerously unfair for absent plaintiffs, is unlikely to withstand appellate review, and is not the best approach to fully and fairly resolve the various claims in this litigation. Therefore, the motion for class certification should be denied.

4

# ARGUMENT

## Legal Standard For Certification

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (internal quotation marks and citations omitted). Rule 23 imposes "stringent requirements" that "in practice exclude most claims." *American Express v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2310 (2013).

The Court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 are satisfied. *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838, 851 (6th Cir. 2013), *cert. denied*, 571 U.S. 1196 (2014). A party seeking to certify a class bears the burden of establishing that certification is proper. *In re American Medical Sys.*, *Inc*., 75 F.3d at 1079. Further, a class action may not be approved simply "by virtue of its designation as such in the pleadings," nor may prospective class representatives simply rely upon "mere repetition of the language of Rule 23(a)" to support their motion. *Id*. Instead, an adequate basis for each prerequisite must be supported by the facts. *Weathers v. Peters Realty Corp*., 499 F.2d 1197, 1200 (6th Cir. 1974). "Given

the huge amount of judicial resources expended by class actions, particular care in their issuance is required. Hence the need for a 'rigorous analysis' by the district court as to all the requirements of Rule 23." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 629 (6th Cir. 2011), *cert. denied*, 565 U.S. 1261 (2012).

## I.     The General Personal Injury Class Cannot Be Certified.

### A.     Personal Injury Cases Are Rarely Suitable For Class Certification.

This case presents an extraordinarily complex mix of claims regarding physical and mental injuries, property losses, and economic harms involving potentially more than 100,000 class members. Even much simpler personal injury cases are ordinarily unsuitable for class certification because they raise highly individualized questions unsuitable for class treatment. Personal injury cases also involve a much stronger interest on the part of individual plaintiffs to control their own lawsuits. "[T]he Advisory Committee Note to the 1966 revision of Rule 23 suggested grave doubts as to the propriety and the utility of subdivision (b)(3) in mass-tort cases." 18 C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1783 (3d ed. 2020). The Advisory Committee notes warn that a mass occurrence affecting "numerous persons" is "not appropriate for a class action" where "significant questions, not only of damages but of liability and defenses of liability," would affect "individuals in different ways." Rule 23(b)(3), 1966 Adv.

6

Cmte. Notes. Thus, "certification of mass-tort claims" is "generally inappropriate." *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 1123 (Cal. 1988).

The United States Supreme Court sent a strong message as to unsuitability of certification of personal injury cases in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), where the Court invalidated an asbestos class action settlement designed "to achieve global settlement of current and future asbestos-related claims" by resolving thousands of personal injury claims. *Id.* at 597. The Court rejected pleas that the class action was necessary to achieve global peace and instead held that the class could not be certified under Rule 23(b)(3), even though at the time the federal judiciary was overwhelmed with asbestos claims. Two years later, in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Court again accepted review of, and again rejected certification of, an asbestos class action seeking personal injury damages. "Had there been any lingering doubt that the Court disfavored certification of personal injury money damage class actions in the mass tort setting, *Ortiz* laid that to rest. *Amchem* therefore stands for the proposition that common issues are generally unlikely to predominate in most mass tort cases where plaintiffs have sustained significant personal injuries." 2 William B. Rubenstein, 2 NEWBERG ON CLASS ACTIONS § 4:62 (5th ed. 2020).

*Amchem* "sharply curtailed the ability to certify a class action pursuant to Rule 23(b)(3) in the mass tort context." *Blyden v. Mancusi*, 186 F.3d 252, 270 (2d Cir.

1999). Few if any personal injury class actions have been certified over opposition and survived appeal in the federal system since *Amchem* and *Ortiz*. Instead, courts have widely recognized that "certain categories of cases, such as those involving 'significant personal injury damages,' are inappropriate for class actions because of the extent of the individualized damage evaluations necessary, which prevents them from meeting the predominance requirement of Rule 23(b)(3)." *Wheeler v. United Services Auto. Ass'n*, 2013 WL 4525312, *9 (D. Alaska 2013) (quoting *Newberg On Class Actions*). "[C]lass certification of claims for personal injury is extremely rare and many courts and commentators conclude that class certification in personal injury products liability cases, is almost never appropriate." *Johnson v. Ethicon*, 2005 WL 3968820, *6 (W. Va. Cir. Ct. 2005); *see also In re Fosamax Products Liability Litigation*, 248 F.R.D. 389, 396 n.8 (S.D.N.Y. 2008) (listing cases).

That principle applies even more strongly in cases (like this one) involving individuals, and most particularly children with long-term harms to their health. In *Amchem,* the Supreme Court held that asymptomatic class members who had been exposed to a harmful substance but who had not yet manifested physical harm could not be forced to make an opt-out decision: "Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." 521 U.S. at 628. The Court raised the question "whether class action notice

sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Id.* Notably, the Court struck down the class action settlement, even though it created a "back-end" opt-out, allowing some (but not all) class members to re-evaluate their decision to seek compensation through the settlement. The proposed Litigation Class here lacks even that safety valve.

The putative Litigation Class in this case is among the most sprawling, complex, and individualized class actions in history. There is no precedent justifying its certification.

### B.   The Personal Injury Litigation Class In This Case Cannot Satisfy Commonality Or Predominance.

#### 1.   The Proposed Litigation Class Presents Highly Individualized Questions.

In this case, the issues of exposure, injury, causation, and even each defendant's liability are individual rather than common questions. Thus, the proposed class cannot meet either the "commonality" requirement of Rule 23(a)(2) or the "predominance" requirement of Rule 23(b)(3).

Merely asserting "common questions" of fact or law cannot satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Any competently crafted class complaint literally raises common 'questions.'" *Id.* at 349 (citation omitted). Rather, Class Counsel must "demonstrate that the class members 'have suffered the same injury'" and demonstrate "the

capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 350 (citations omitted; emphasis in original).

"[T]he predominance criterion is far more demanding" than the commonality requirement. *Amchem*, 521 U.S. at 623–24. It requires courts to engage in a "rigorous" inquiry regarding "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id*. Such inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). Affirmative defenses also must be considered under Rule 23(b)(3) because they may create individual questions of fact or law that predominate over common questions, thereby precluding class certification. A class that raises "the likelihood that significant questions . . . of liability and defenses of liability" affect "individuals in different ways" does not comply with Rule 23. *Ortiz*, 527 U.S. at 844 n.20.

**Exposure is not a common question.** Class members were exposed to different amounts of contaminated water, at different times. Class members will need to establish the length of time they were residents in Flint during the Class Period (as well as length of time they may have resided outside of Flint during the Class Period, and whether this might have contributed to lead exposure). Class members will need to show that they consumed public water, rather than strictly bottled water, and defendants will also seek to determine whether the class members used public water for drinking, cooking, bathing, or other purposes, and whether they used a water filter. The amount of lead-contaminated water consumed will also be relevant.

The report of Class Counsel's expert Dr. Larry Russell (Ex. 58) illustrates the enormous variations in lead exposure among class members. Virginia Tech sampling in August 2015 found no detectable lead in 15% of first-draw samples, and nearly 25% of samples were below the regulatory action level of 15 micrograms per liter (or ppb). (Ex. 58, p. 19). In other homes, the Virginia Tech team found household lead concentrations as high as 13,200 micrograms per liter. (*Id.* at 60). The Russell report quoted the comment of Dr. Edwards of Virginia Tech that "[t]he results revealed marked differences in risks of Pb exposure from one consumer home to another." (*Id.* at 62). Dr. Russell noted differences among houses, including whether they had lead deposits in piping systems, lead lateral lines from water mains, lead

11

solder, and high lead brass valves and faucets, all of which in turn could affect lead levels in drinking water. (*Id.* at § 10.2).

Class Counsel's expert Dr. Clifford Weisel confirmed that, of the 268 homes sampled during the Flint water crisis, 15% did not have levels above the Minimum Reporting Level of 1 ppb in the first draw sample and that only 17% of those samples exceeded the EPA action level of 15 ppb. (Ex. 122, p. 24). He highlighted the individualized issues raised by measuring exposure to lead in water: "residential tap typically varies spatially (i.e. across locations within the city depending on the condition and type of service line, connectors, and indoor plumbing at each location an individual consumes tap water or item prepared with tap water); and temporally (i.e. over time - the course of a day, week, and month, because of flushing, water flow, local pipe and interior plumbing conditions)." (*Id.* ¶ 13). "The lead concentration in drinking water varies during a single day and across days within a single household. In addition, lead tap water concentrations varied among homes within Flint neighborhoods as a function of the type of service line, interior plumbing, and the water usage." (*Id.*, p. 18). "The amount of dissolved lead leached from fittings or pipes containing lead depends in part upon how long the water is stagnant, i.e. contacts fittings, solder, or pipes without moving, and the level of water corrosivity, while the particulate lead concentration is affected by the water corrosivity and water flow pattern." (*Id.*) "Lead exposure associated with drinking

12

water is a function of the lead water levels, how much lead is transferred to food cooked with the water, and the amount of water and beverages or food prepared with the water that is consumed." (*Id.*, p. 10). These factors provide bases for defendants to challenge exposure on a class-member-by-class-member basis.

Further, some class members shifted promptly to bottled water for drinking after the April 25, 2014 switchover to Flint River water, while others did not. Some used filter systems (of varying effectiveness), while others did not. Class Counsel's own expert, Professor David Keiser, explained that use of bottled waters and filters was "widespread" in Flint. (Ex. 114, p. 23). A government-sponsored "Safe Drinking Water" program of $150 million "paid for bottled water, water filter, and testing kit purchases and distribution." (*Id.* at 12). "Families reported stopping using tap water entirely and used bottled water for activities like bathing and cooking." (*Id.* at 24). Others, of course, did not.

**Injury is not a common question.**     The Sixth Circuit's prior decisions in this litigation recognize the wide range of injuries potentially caused by lead poisoning. As the Sixth Circuit has observed, "[i]n children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *In re Flint Water Cases*, 960 F.3d 303, 320 (6th Cir. 2020) (citation omitted). "[L]ead affects children's brain development resulting in reduced

13

intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment." *Id.* (citation omitted). In some cases, "ingestion of lead can cause seizures, coma and even death." *Id.* (citation omitted). "In pregnant women, the fetus can be exposed to lead in the mother's body, causing reduced growth and premature birth." *Id.* "In adults, lead exposure can damage cardiovascular, kidney, and reproductive functions." *Id*. (citation omitted). "A recent study shows a drastic drop in fertility following the water crisis." *Id*. All of these potential injuries will need to be assessed on a class-member-by-class-member basis.

In addition, lead is not the only pollutant at issue in this case. The Sixth Circuit identified other contaminants—besides lead—present in Flint water, including *legionella* bacteria and E. coli bacteria. *Id.* at 315. Plaintiffs cite numerous other contaminants, including PCBs, phosphorus, per-and polyfluoroalkly substances ("PFAS"), "raw and/or partially treated sewage," and other pollutants from "illicit discharges" into Flint's municipal storm water sewer system that fed into the river. Class Cert. Br. 6–7. All of these pollutants might have produced varying effects on Flint residents who drank Flint River water at different times, necessitating further individualized inquiries.

**Alternative causes create individualized questions.** Class Counsel's own evidence reveals that drinking water is not the only source of lead exposure. The

declaration of Class Counsel's expert Dr. Bruce Lanphear states that "[a]n individual's level of exposure to lead varies based on age and other factors." (Ex. 99, ¶ 17). "People who live in older homes and rental housing are also at increased risk for higher blood lead concentration, as are people who consume diets low in nutrients and calories." (*Id.* ¶ 22). Such factors create opportunities for defendants to argue that lead exposure from Flint River water is not the only potential cause of a particular class member's injury. In fact, Dr. Lanphear explains that "[t]he proportion of children in Flint with a blood lead > 5 μg/dL, as reported by Hanna-Attisha et al, increased from 2.4% to 4.9% when the City's water system began distributing water from the Flint River." (*Id.* ¶ 31). Thus, even prior to the Flint water crisis, 2.4% of children suffered from blood lead levels greater than 5 μg/dL— pointing to sources of lead exposure *other than* contaminated tap water from the Flint River and necessitating individualized inquiries on a class-member-by-class-member basis.

The problem of alternate causes is even more pronounced with Class Counsel's claim that the Flint water crisis has led to "quality of life" harms and "mental and behavioral health issues, including depressed mood, anxiety, stress, sleep disturbances, difficulty with concentration, decreased appetites, emotional outbursts, and aggressiveness." Class Cert. Br. 60, 72. Establishing a causal link between lead contamination and these wide-ranging phenomena (all of which have

15

multifarious causes) is impossible without individual inquiries. As Dr. Lanphear admits, "[m]any people in Flint already experience poor nutrition, poverty, and exposure to other toxic chemicals, like air pollution and tobacco smoke" and risk developing "behavioral problems, ADHD, and reduction in learning abilities." (Ex. 99, ¶ 30). Class Counsel describe Flint as "the most impoverished city in the nation." Class Cert. Br. 71 n.200. Class Counsel's expert Dr. Daryn Reicherter notes "several important measures of vulnerability in the Flint community that existed prior to the Flint Water Crisis. In 2015, 41.9% of the city's population was living below the federal poverty line, which is about three times the national rate. The median household income was $25,650, compared with $56,516 for the country as a whole. Additionally, Genesee County has exhibited the lowest health outcomes in the state of Michigan. It has also been ranked comparably low in terms of length of life, quality of life, and health behaviors. Flint has also had higher crime rates in the community with a crime index of 811, which is nearly three times the national average. The violent crime rate for the city was 849, a rate more than four times the national average." (Ex. 121, ¶ 38). As conceded by Class Counsel's expert Dr. Daniel Keating, "it could be argued that the existence of a pre-existing condition" means "that current neurodevelopmental impairment may not be fully attributable to lead exposure." (Ex. 119, ¶ 24(e)).

16

Moreover, many mental health and counseling programs have been established in Flint as a result of the water crisis, and defendants will no doubt argue that at least some class members are already receiving services to redress their injuries. As Dr. Keating notes, "[a] substantial number of new services or expansion of existing services arose in response to the Flint Water Crisis, addressing multiple types of assessment, intervention, and prevention efforts." (Ex. 119, ¶ 26(b)). These programs include activation of the Disaster Distress 24/7 hotline and a community hotline for immediate disaster crisis counselling, offering of crisis counseling to community members through Genesee Health System ("GHS"), provision of training on Psychological First Aid to staff and volunteers at GHS and community service agencies, application and award of an Emergency Response Grant from the Substance Abuse and Mental Health Services Administration ("SAMHSA"), $28 million in supplemental funds including $500,000 in emergency aid for crisis behavioral health services from the State of Michigan, request for expansion of Medicaid for those affected, expansion of the Head Start program, and creation of the Flint Community Resilience Group ("FCRG").[1]

**Liability is not a common question.** The respective defendants' conduct and liability is not uniform with respect to all class members. Class members will need

---

[1] Community Assessment for Public Health Emergency Response (CASPER) After the Flint Water Crisis: May 17-19, 2016 ("CASPER Report"), Centers for Disease Control & Prevention, at 4, https://www.michigan.gov/documents/flintwater/CASPER_Report_540077_7.pdf.

to establish on an individualized basis when they were exposed to Flint River water, and against which defendants they might have a claim.

The Sixth Circuit has found that the crisis was "set into motion by alleged decisions that 'took place over a series of days, weeks, months, and years.'" *In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020) (citation omitted). Class Counsel themselves refer to "multiple occasions" of wrongful action by Defendants and "repeated warning signs." Class Cert. Br. 50. The Class Period runs from the switchover to Flint River water on April 25, 2014 until the reconnection to the Detroit water system on October 16, 2015. Class members exposed at different times during this extended period will have claims against different defendants based on different theories of liability and will face different defenses. The situation here is far different from a case involving a single chemical spill on a single day by a single defendant. Rather, a class member suffering exposure at the beginning of the Class Period will have different claims available, against different defendants, than one exposed at the end of the Class Period. Thus, Class Counsel are entirely wrong in insisting that "[t]he Government Defendants' decisions that contributed to the Flint Water Crisis did not vary from one Class member to another." Class Cert. Br. 2.

The Class Period is punctuated by numerous events affecting class members' claims. As the Sixth Circuit has noted, "[t]he Defendants contend that they operated in accordance with the [Safe Drinking Water Act's] Lead and Copper Rule, which

18

requires a two-step process that begins with 'initial monitoring' over two separate six-month periods to determine if treatment is required. The first six-month period did not begin until June 2014." *Boler v. Earley*, 865 F.3d 391, 398 (6th Cir. 2017). Testing conducted in August and September 2014 detected coliform and E. coli bacteria in the water supply. *Id.* In October 2014, the water was linked to Legionnaire's disease. *Id.* In January 2015, the City issued a notice that the drinking water violated standards, but that it was safe to drink. *Id.* In February 2015, further water testing indicated high levels of contaminants such as lead and total trihalomethane. *Id.* According to the Defendants, the City conducted its two required rounds of sampling to determine lead levels, from July to December 2014 and January to June 2015, but the results did not exceed the SDWA Lead and Copper Rule's "action level." *Id.* In March 2015, the Flint City Council voted to reconnect with the Detroit water supply rather than continuing to use the Flint River, but the City government's vote was overruled by the Emergency Manager. *Id.*

Over the next few months, the City issued instructions to residents on their use of water, including advising them to "pre-flush" taps prior to use or to stop drinking the water altogether. *Id.* In June 2015, the EPA warned of high lead levels in the water. In response, officials provided consumers with water filters, which the Plaintiffs contend did not substantially improve the water quality and were incapable of filtering out known contaminants. Defendants take a different view. *Id.*

19

In short, the Flint crisis evolved over the course of several years, and each group of defendants in this litigation has asserted distinctive defenses that apply differently at different times. The City Defendants have argued that they acted on the advice and at the direction of the Michigan Department of Environmental Quality ("MDEQ") and in consultation with private expert advisors. The governmental defendants assert that they received different kinds of information at different times. For example, Defendant Nancy Peeler, a civil servant employee of the Michigan Department of Health and Human Services, did not receive test results of blood lead levels until July 2015. She has argued that she cannot be held liable to class members exposed before that time.

The private consultants also played different roles at different times. Plaintiffs assert that Lockwood, Andrews & Newnam, Inc. ("LAN") was negligent in providing professional engineering services to the City when it advised the City prior to the switch to the Flint River. In contrast, Plaintiffs argue that Veolia North America, LLC ("Veolia") was negligent in providing professional engineering services to the City in 2015 (after the switch to the Flint River), when the City was investigating concerns about water quality and determining how to respond. Hence, not every episode of governmental misconduct or engineering negligence will be a proximate cause of every class member's claim. Causation will need to be proven on an individualized basis.

20

Class Counsel's own tacit acknowledgement of the individualized issues presented is reflected in the eligibility criteria for the proposed personal injury sublasses, including the Minors Litigation Subclass, which requires a showing of lead exposure through ingestion of "*unfiltered* Flint public water" "for at least 14 days within a 90 day period." (emphasis added). This showing requires demonstration that the minor "drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered Flint tap water." If such showings are necessary to circumscribe the Minors Litigation Subclass, they are also important in demonstrating injury to adults. Quite plainly, proof of such activities is highly individualized.

### 2. Established Precedent Precludes Certification Of The Proposed Litigation Class.

In *Amchem,* the Supreme Court opined that "any overarching dispute about the health consequences" of exposure to a toxic substance "cannot satisfy the Rule 23(b)(3) predominance standard" and that "disparate questions undermin[e] class cohesion." 521 U.S. at 624. Just as the issues of the harmfulness of asbestos or the wrongfulness of defendants' conduct could not warrant certification in *Amchem*, so Class Counsel's proposed "common questions" in this case cannot override the individual characteristics of each class member. Class members here were exposed to different amounts of lead-contaminated water, for different periods of time, in

21

different ways, and for different reasons (according to different kinds of misconduct by different defendants, occurring at different phases of the crisis). Class members may have had alternate sources of lead exposure, and all will have their own unique medical histories. "Even if, as the plaintiffs claim," all claims relate to a common event—such as the switchover to Flint River water—"these similarities establish only that there is some factual overlap, not a predominant factual overlap among the claims." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 948 (6th Cir. 2011) (upholding denial of class certification for failure to meet predominance requirement).

The Sixth Circuit has strictly enforced the commonality and predominance requirements to deny class certification. Instructive here is *In re American Medical Systems,* where the Sixth Circuit held, in a personal injury case with a much smaller class than here, that individual proofs, which "vary from plaintiff to plaintiff," do not satisfy Rule 23(a) and that the failure to recognize the proofs' individualized nature "highlight[ed] the error" in certifying the class. 75 F.3d at 1081. The variations among class members in *American Medical Systems* echoed the variations here: "No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant." *Id.* at 1084–85. Moreover, the defendant's affirmative defenses "may

22

depend on facts peculiar to each plaintiff's case." *Id.* at 1085. Precisely the same is true here.

This Court certified a class in *Widdis v. Marathon Petroleum Co.*, No. 13-cv-12925, 2014 WL 11444248 (E.D. Mich. Nov. 18, 2014), which involved an explosion and fire and presented issues much simpler and more limited than this case. This Court noted that "[t]he individualized issues before the Court do not rise to the level of concern or complexity discussed by, for example, the Sixth Circuit in *Am. Med. Systs*." *Id*. at *9. Here, the issues are even more complex and more troubling than in *American Medical Systems.*

In *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004), the Sixth Circuit affirmed the denial of class certification for lack of commonality in an environmental contamination case by residents of a federal reservation previously containing nuclear facilities. The Court of Appeals explained that "[e]ven though liability issues may have been common to the putative class, by seeking medical monitoring and environmental cleanup of property, Plaintiffs have raised individualized issues. Each individual's claim was . . . proportional to his or her exposure to toxic emissions or waste," where some claims "depended on [plaintiffs'] period of residency . . . and levels of exposure," and "named plaintiffs who *already* have thyroid cancer have fundamentally different interests than those . . . who do not." *Id.* at 727–28.

23

In *Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc), the Sixth Circuit held that a putative class of salaried retirees could not establish the commonality or typicality requirements in a suit challenging General Motors' system-wide general policy that changed retirees' health benefits. The Court of Appeals explained that "[i]t is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation." *Id.* at 397. Although "the claims of all members of the purported class, both general retirees and early retirees, did share certain common issues"—for example, "[a]ll salaried retirees' health care benefits were governed by the same welfare plan, and the proper interpretation of the plan was at issue"—in the end "each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff," meaning that "class-wide relief was not appropriate." *Id.* at 397–98. The same is true here. The general issues identified by Class Counsel, such as the conduct of the Government Defendants or the negligence of the engineering firms (Class Cert. Br. 2), will not *drive* the litigation or *advance the resolution* of the litigation because in the end the claims will turn on the facts and circumstances specific to each class member.

In *Reeb v. Ohio Dep't of Rehabilitation and Correction*, 435 F.3d 639 (6th Cir. 2006), the Sixth Circuit reiterated that district courts must undertake a "rigorous

analysis" of the Rule 23 certification requirements and, "in order to find typicality and commonality, the precise nature of the various claims must be examined." *Id*. at 644. The Court of Appeals brushed aside the argument that, in an employment discrimination action, "the issue of whether the Defendant violated Title VII will be common to the class." *Id*. The Sixth Circuit explained that "this argument ignores the fact that the same general policy of discrimination can affect many different aspects of employment." *Id*. at 645. Again, precisely the same reasoning is applicable here. It is irrelevant whether "common evidence will establish the misconduct of the Government Defendants" (Class Cert. Br. 49) (quoting heading) or "common evidence establishes the Engineering Defendants' professional negligence" (*id*. at 51) (quoting heading); those are no more common issues than whether the employer in *Reeb* violated Title VII. *See also Pipefitters Local 636 Ins. Fund*, 654 F.3d at 629 (reversing class certification and explaining, "despite common issues, the issues actually certified would require individualized attention").

In denying class certification and finding the commonality requirement not met in a class action lead exposure against the owner of a battery crushing plant by residents of the area surrounding the plant, a district court trenchantly observed, "commonality does not exist here. True, all plaintiffs are said to have been exposed to lead emission from the site, but whether and to what extent the emissions are said

to have affected each class member is not common to all involved. Furthermore, assuming arguendo that the plaintiffs possess common claims which contain common issues of law or fact, such issues are altered or changed by the individual facts and situation of each plaintiff. This destroys anything common to the class."

*Reilly v. Gould, Inc.*, 965 F. Supp. 588, 598 (M.D. Pa. 1997).[2]

---

[2] *See also Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (affirming denial of class action of persons exposed to smoke from a fire at a chemical plant for failure to meet predominance: "The district court heard from experts who opined that the primary issues left to be resolved would turn on location, exposure, dose, susceptibility to illness, nature of symptoms, type and cost of medical treatment, and subsequent impact of illnesses on individuals. Moreover, in addition to the personal injury claims, separate types of proof would be necessary for the property damage, devaluation, and business loss claims. The district court observed that each plaintiff's claims will be highly individualized with respect to proximate causation, including individual issues of exposure, susceptibility to illness, and types of physical injuries. As a result, the district court found that 'individual issues surrounding exposure, dose, health effects, and damages will dominate at the trial.'"); *Colley v. Procter & Gamble Co.*, 2016 WL 5791658, *6 (S.D. Ohio Oct. 4, 2016) (denying certification of class of users of Old Spice deodorant: "The liability of individual class members will turn on the litany of specific factual inquiries, including whether and how class members were physically injured, how putative class members applied the product, the frequency of use, whether they use other products, [and] individual medical issues and sensitivities"); *Corder v. Ford Motor Co.*, 283 F.R.D. 337, 339–44 (W.D. Ky. 2012) (concluding that individual issues predominated in deceptive practices suit concerning sale of 2003 engine in 2004 model trucks when Kentucky statute at issue covered only sales for "personal, family, or household purposes" and hence each class members' claim would require individual analysis of whether putatively defective good was "for personal, family, or household purposes," even when other elements of claim were subject to resolution on a class-wide basis); *Luttrell v. Tamko Building Products, Inc.*, 2010 WL 716226, *4 (W.D. Ky. Feb. 24, 2010) (denying certification of proposed class of purchasers of defective shingles for failure to meet commonality requirement); *Turner v. Grant County Detention Center*, 2008 WL 821895, *16 (E.D. Ky. Mar. 26, 2008) (holding that constitutional claim by prison inmates based on "deliberate indifference" regarding medical treatment failed to state a common question: "Among the proposed class members, there is a broad variety of individual claims as to both liability and damages. And causation is not uniform among class members. Any harm allegedly suffered by a member of the class may be due to a number of individual factors . . . . Moreover, each Plaintiff would have to show a causative link between physical injuries suffered and that those injuries were caused by Defendants' conduct in failing to protect him."); *Snow v. Atofina Chem., Inc.*, No. 01–72648, 2006 WL 1008002, at *10 (E.D. Mich. March 31, 2006) ("each claim of personal injury will require individual proofs regarding: duration and level of exposure; the nature and extent of alleged injuries; causation, which will include an assessment of prior and

The precedent cited by Class Counsel is readily distinguishable. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013), on which Class Counsel heavily rely, was a breach of warranty, negligent design, and negligent failure to warn case that expressly *excluded* personal injury

---

current medical histories; and, damages. Therefore, this proposed class is unsuitable under either Rule 23(b)(3) or 23(c)(4)."); *Levell v. Monsanto Research Corp.*, 2005 WL 8161926, *6 (S.D. Ohio Sept. 28, 2005) (denying class certification for lack of commonality: "The Plaintiffs hope to certify classes composed of all the present and past employees of the Mound [nuclear weapons facility] who were, or may have been, exposed to dangerous radiation. They allege fraud on the basis of the Defendants' failure to inform them and putative class members of the hazards associated with their workplace and failure to inform them of test results indicating that they had been exposed to radiation, and, in addition, allege a claim of intentional infliction of emotional distress. Both causes of action depend on individualized proof, not just of damages, but on the liability issues as to each class member, as well. Because the claims of fraud and intentional infliction of emotional distress focus on such individualized proof, they are of a type typically inappropriate for class certification."); *Noonan v. Indiana Gaming Co.*, 217 F.R.D. 392, 397 (E.D. Ky. 2003) (denying class certification: "The wide variety in each individual's circumstances and the highly factual nature of their claims will prevent the court from resolving the case without an extensive inquiry into the situation of each plaintiff. It may be necessary for each member's treating physician to testify regarding the injuries, the treatment, and whether 'maximum medical improvement' has been attained."); *Jones v. Allercare, Inc*., 203 F.R.D. 290, 306 (N.D. Ohio 2001) (denying certification of personal injury and property damage class for injuries caused by application of carpet powder and spray to plaintiffs' carpeting and furniture: "the individual issues of proximate cause predominate in this case. Each plaintiff's claim is dependent on his or her sensitivity to the products and the nature of his or her exposure and alleged reaction."); *Neenan v. Carnival Corp*., 199 F.R.D. 372, 376 (S.D. Fla. 2001) (denying certification of class of passengers on a cruise ship when shipboard fire contaminated ship's water supply: "The Court's examination of these questions would necessitate an inquiry into . . . where the passenger stood in relation to the fire; whether the passenger returned to a cabin with fully operational toilets and water faucets or to a cabin with faulty toilets and water faucets; whether toilets were reinstated in the passenger's cabin; whether the water in the passenger's cabin was brown, cloudy, or clear; whether the passenger was compelled to drink bottled water; whether the passenger suffered from nausea as a result of Defendant's negligence; whether the passenger missed work as a result of Defendant's negligence; whether the passenger's property was damaged or lost in the process; and whether the passenger was disabled."); *Hurd v. Monsanto Co*., 164 F.R.D. 234, 240 (S.D.Ind.1995) ("Class certification is simply not appropriate where "causation in a personal injury case predicated on exposure to [a toxic substance] 'will necessarily be different for every person in the proposed class, based on each person's length of exposure to [the toxin], notice, pre-existing medical conditions and other factors.'") (citation omitted).

claims. *Id*. at 849. The *Whirlpool* court distinguished personal injury cases, where the Sixth Circuit has refused class certification, on the ground that such cases involve "the unique individual medical histories of the plaintiffs at issue," varying proof "concerning medical complications," and the potential that "individual injuries could be attributed to" alternative causes. *Id*. at 855. All those factors are present here and demonstrate that class certification is unavailable.

Importantly, much of the authority cited by Class Counsel predates the Supreme Court's 2011 class action decision in *Wal-Mart. Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), for example, upheld certification of a class action brought by homeowners against a single cement manufacturing plant. But the circumstances there were much simpler than in this case. The Sixth Circuit in *Olden* found that the defendant had failed to show that any individualized issues would arise as to liability or causation. Thus, while the defendant argued that other sources might emit toxins, the Court found that "the defendant does not allege that the toxins from these sources are indistinguishable from the toxins from Lafarge's plant," and "the defendant does not allege that these other sources produce significant amount of toxins relative to Lafarge, which admittedly is the nation's largest cement plant." *Id.* at 508. This case is much more complicated.

Indeed, in *Olden*, the Sixth Circuit expressly recognized the certification challenges presented by lead litigation. The Sixth Circuit opined that a 1997 denial

28

of class certification by the Eastern District of Pennsylvania was distinguishable because the district court "found that individual issues predominated. In large part, this was because the plaintiffs' major complaint was *lead poisoning*." 383 F.3d at 510 (emphasis added). The Sixth Circuit noted the presence of other sources of potential lead exposure, requiring a fact-finder "to consider what kind of paint was in each class member's home and the condition of that paint throughout the relevant period, as well as his or her driving and gasoline usage habits." *Id.* These are the kinds of individualized questions that doom the instant putative Litigation Class.

Other authority cited by Class Counsel predates the Supreme Court's class action decision in *Amchem.* In *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988), for example, the Court of Appeals held that certification of a relatively small class action resulting from water contamination (apparently under 100 class members) was not an abuse of discretion. The Sixth Circuit stressed the special circumstances that made a class action a potential tool in that case. But it pointedly warned: "In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy." *Id.* at 1197. The proposed Litigation Class in this case is

29

the kind of sprawling, highly individualized class about which the Sixth Circuit expressed reservations.

Tellingly, the Sixth Circuit found *Sterling* inapplicable in *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004), which involved a putative class action by the residents of a city located on a former federal reservation containing nuclear weapons manufacturing and research facilities, who sued federal officials and government contractors for personal injury claims allegedly resulting from emissions from the facilities. *Ball* thus involved the same type of defendants as this case. The Sixth Circuit explained that "there are multiple Defendants with presumably differing liability levels, if any. Accordingly, there is no 'single course of conduct.' Therefore, *Sterling* is distinguishable on its facts. Moreover, *Sterling* affirmed the class action certification, emphasizing the district court's discretion in making such decisions." *Id.* at 728. Not surprisingly, subsequent district court decisions have interpreted *Sterling v. Velsicol* far more narrowly than Class Counsel here.[3]

_____

[3] *See, e.g.*, *Modern Holdings, LLC v. Corning, Inc.*, 2018 WL 1546355, *7-8 (E.D. Ky. Mar. 29, 2018) (distinguishing *Sterling* and denying certification of environmental mass-tort lawsuit alleging that glass manufacturing plant released toxic chemicals: "This Court finds here significant individual issues that outnumber common issues, precluding the use of 'common answers' to further the case at trial, and barring certification of the proposed class. Perhaps chiefly problematic is that the named Plaintiffs have such an enormous variety of issues between them, each of which presents a unique question of both actual and proximate causation. . . . The Sixth Circuit decided *Sterling* nearly ten years prior to the Supreme Court issued the decision in *Amchem Prods., Inc.*, and nearly twenty years prior to the decision in *Wal-Mart v. Dukes*."); *Mays v. Tennessee Valley Authority*, 274 F.R.D. 614, 627-28 (E.D. Tenn. 2011) (denying class

30

### 3. Class Counsel's Attempt To Prove Individualized Issues for the Litigation Class Through Statistical Evidence Is Improper.

Class Counsel assert that they will be able to prove injury and damages on a class-wide basis through expert witnesses for the proposed Litigation Class. Class Cert. Br. 62–66. Similar arguments were made in rejected in *Amchem* and prior Sixth Circuit decisions denying class certification.

Class Counsel point to the report of Professor David Keiser to argue, erroneously, that they will able to prove injuries on a class-wide basis for the Litigation Class. In fact, his report confirms the opposite: There are wide variations among the various injuries suffered by Flint residents. For example, Professor Keiser opines that "[h]ealth impacts include, but are not limited to, increased morbidity and mortality, increased pharmaceutical and medical expenditures, emotional distress and psychological harm, and expected future medical expenses and lost wages due to cognitive and behavioral impacts of exposure." (Ex. 114, p. 1). "Morbidity

---

certification in class action arising from damages arising from dike failure and coal ash spill at TVA facilities and finding *Sterling* distinguishable: "Here, common issues of causation, such as what nondiscretionary conduct by TVA, if any, caused the dike failure and ash spill, do not predominate over the individualized issues of whether coal ash is or was present on each specific property, whether the presence of the coal ash on the specific property can be traced to TVA's nondiscretionary conduct, whether the coal ash has damaged each specific property, whether and how the coal ash affects the property owner's use and enjoyment of said property, and the amount of damages, if any, to each property and to each plaintiff."); *Snow v. Atofina Chemicals, Inc.*, 2006 WL 1008002, at *10 (E.D. Mich. Mar. 31, 2006) ("Unlike *Sterling*, in this case each claim of personal injury will require individual proofs regarding: duration and level of exposure; the nature and extent of alleged injuries; causation, which will include an assessment of prior and current medical histories; and, damages. Therefore, this proposed class is unsuitable under either Rule 23(b)(3) or 23(c)(4).").

includes all non-fatal health effects ranging from mild outcomes like headaches to serious illness such as cancer and congenital disabilities." *Id.* at 25. Class members experienced these harms on a highly individualized basis. Acknowledging that fact, Professor Keiser proposes to "*estimate*" the number of injuries (Ex. 114, p. 24) (emphasis added), not *prove* them, by calculating "the proportion of residents in Flint that suffered these impacts." *Id.* at 28. But knowing the aggregate increase in the statistically expected number of cancer cases in Flint (for example) will not identify *which* class members developed cancer caused by contaminated water. By Professor Keiser's own admission, only a certain percentage of cancer cases are attributable to Flint water, and his methodology offers no help to the critical task of identifying *which ones*.

Class Counsel's approach is precisely the kind of "Trial by Formula" that the Supreme Court soundly rejected in *Wal-Mart.* 564 U.S. at 367. There, the Supreme Court held that replacing individualized proof and defenses with statistical evidence violates the Rules Enabling Act because it "'abridge[s] … [a] substantive right'" by precluding the defendant from litigating its "defenses to individual claims." *Id.* (quoting 28 U.S.C. § 2072(b)). By relying on aggregate injuries and statistical evidence, Class Counsel seek to short-circuit a "bedrock principle" of due process that defendants may be held liable only for damages linked to their own misconduct. *Paroline v. United States*, 134 S. Ct. 1710, 1729 (2014). Even if Class Counsel could

somehow meet the plaintiffs' burden of proof through expert testimony relying on statistical methods—and they cannot—courts may not deprive defendants in a class action of the right to put on individualized evidence, to raise individualized defenses, and to receive a verdict on the individualized facts of each class member's claims. *See generally Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("'Due process requires that there be an opportunity to present every available defense.'") (quoting *American Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)); *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (a defendant's "right to litigate the issues raised" is "a right guaranteed to him by the Due Process Clause").

"Plaintiffs cannot substitute evidence of exposure of actual class members with evidence of hypothetical, composite persons in order to gain class certification." *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011). In *Gates*, the Third Circuit held that village residents failed to establish common questions in an action brought by residents of a village against a chemical plant, alleging contamination of drinking water and air pollution. In reasoning squarely applicable here, the Court of Appeals opined that "[t]he evidence here is not 'common' because it is not shared by all (possibly even most) individuals in the class. Averages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average." *Id.* "Attempts to meet the burden of proof using

33

modeling and assumptions that do not reflect the individual characteristics of class members have been met with skepticism." *Id.* In *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), for example, the Second Circuit rejected on due-process grounds a procedure in which "an initial estimate of the percentage of class members who were defrauded," along with an estimate of "the average loss for each plaintiff," would be used to determine the "total amount of damages suffered" by the class as a whole. *Id.* at 231. When "the mass aggregation of claims" is used "to mask the prevalence of individual issues," the court explained, "the right of defendants to challenge the allegations of individual plaintiffs is lost, resulting in a due process violation." *Id*. at 232. *See also In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) ("It is evident that these statistical estimates deal only with general causation, for population-based probability estimates do not speak to a probability of causation in any one case; the estimate of relative risk is a property of the studied population, not of an individual's case.") (internal quotation omitted; emphasis in original); *In re "Agent Orange" Prod. Liab. Liti*g. MDL No. 381, 818 F.2d 145, 165 (2d Cir.1987) (noting that "generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange ... appear to be inextricably intertwined" and expressing concern that if the class had been certified for trial "the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure"); *see also* 2 Joseph M.

McLaughlin, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 8:9, at 8–55 to 8–57 (3d ed.2006) ("Permitting a class to proceed with its suit without linking its proof to even a single class member would contravene the overwhelming authority recognizing the individualized nature of the causation inquiry in mass tort cases.").

Class Counsel cite *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) (Class Cert. Br. 73), but that case warns that "[w]hether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on 'the elements of the underlying cause of action.'" *Id.* at 1046. "The fairness and utility of statistical methods in contexts other than those presented here will depend on facts and circumstances particular to those cases." *Id.* at 1049. The circumstances of this case demonstrate that Class Counsel's attempt to proceed solely through statistical evidence is impermissible.

### 4.   Class Counsel's Concession That They Cannot Prove Damages On A Class-Wide Basis Is Fatal To Their Ability To Show Predominance As To The Proposed Litigation Class.

Moreover, there is a separate reason that the Litigation Class cannot meet predominance: Class Counsel acknowledge that "the amount of personal injury damages will vary from one Class member to another." Class Cert. Br. 64. They offer no method for proving such damages on a class-wide basis. Their proposed Trial Plan postpones personal injury damages to a largely undefined "Phase Three" involving unspecified proceedings "before a Special Master, a Court, or through a

claims administration proceeding." (Ex. 84). For the Minors Litigation Subclass, Class Counsel propose a "Phase Two" "adjudicative proceeding to litigate their entitlement to damages . . . before a Special Master," (*id.*), triggering the same predominance defect.

In short, common proof of damages is impossible here, and without it, the Litigation Class will devolve into tens of thousands of separate proceedings involving highly individualized damages inquiries. For the reasons stated above, each of these highly individualized damages inquiries will similarly involve individualized inquiries into the scope of which defendants are liable for which acts (over course of the lengthy Class Period), as well as which individualized alternative causes and affirmative defenses may preclude an award of damages for a specific plaintiff. Accordingly, the predominance requirement cannot be met.

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court reversed class certification for similar inability to prove damages on a class-wide basis: "[Plaintiffs'] model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, [plaintiffs] cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34. "*Comcast* thus holds that where a proposed Rule 23(b)(3) class involves individualized damages, the plaintiff must provide the district court with a method

that is capable of measuring damages on a classwide basis. Without such a method, *Comcast* instructs that the predominance requirement of Rule 23(b)(3) cannot be met, as '[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class.'" *Wheeler v. United Services Auto. Ass'n*, 2013 WL 4525312, *4 (D. Alaska 2013).[4]

---

[4] *See also Riffey v. Rauner*, 910 F.3d 314, 319 (7th Cir. 2018) (affirming district court's denial of class certification in dispute over refund of union fair-share fees where "the answer to the central question that remains—how much money each individual class member is entitled to recoup—is particularly ill-suited for class treatment, because it depends on a myriad of factors particular to each individual worker"); *Thomas v. County of Los Angeles*, 703 Fed. Appx. 508, 511 & n.1 (9th Cir. 2017) (affirming denial of class certification on predominance grounds in prison conditions case because "the damages suffered by individual class members were insufficiently similar to be established through representative testimony"); *Ibe v. Jones*, 836 F.3d 516, 531 (5th Cir. 2016) ("[I]ndividual damages issues predominated over the common issues of breach because [class members] incurred vastly different expenses, which would essentially necessitate mini-trials to adjudicate damages for each [class member]."); *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) ("[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class."); *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) ("Class treatment … may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation."); *Royal Park Investments SA/NV v. Deutsche Bank National Trust Company*, 2018 WL 1750595, at *15 (S.D. N.Y. 2018) (denying class certification because, inter alia, plaintiffs' "failure to establish that damages may be determined on a class-wide basis militates against certification"); *Royal Mile Co., Inc. v. UPMC*, 40 F. Supp. 3d 552, 585 (W.D. Pa. 2014) (holding, in antitrust case where consumers had substantially different "underwriting characteristics," that because inquiries into "individual damage calculations [would] inevitably overwhelm questions common to the class,'" predominance requirement was not met (quoting *Comcast*)); *In re OnStar Contract Litigation*, 278 F.R.D. 352, 380-86 (E.D. Mich. 2011) (denying certification for class of buyers and lessees of automobiles equipped with telematics equipment because of numerous individualized issues, including damages); 2 William B. Rubenstein, 2 NEWBERG ON CLASS ACTIONS § 4.54 (5th ed. 2020) ("Occasionally, a court will rule that where damages are not susceptible to formulaic calculation, individual damage evaluations will predominate over common liability issues. This is generally the rule with regard to the significant personal injury damages, and the predominance requirement therefore precludes certification in most mass tort personal injury cases[.]").

Class Counsel concede that the proposed Litigation Class will not be able to meet this standard, and therefore the Court should deny the motion for class certification.

### C.     The Litigation Class Cannot Meet The Typicality Requirement.

As the Sixth Circuit has explained, the "typicality" requirement of Rule 23(a)(3) demands that "[t]here must be some connection" "between the merits of each individual claim and the conduct affecting the class." *Romberio v. Unumprovident Corp*., 385 Fed. Appx. 423, 431 (6th Cir. 2009). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. Where, as here, there must be an "individualized assessment as to the" circumstances "affecting each and every class member," typicality cannot be established. *Romberio*, 385 Fed. Appx. at 432.

The testimony of the putative Litigation Class representatives confirms the individualized nature of their claims and demonstrates that the Litigation Class cannot meet the typicality requirement. For example:

Plaintiff Rhonda Kelso acts on behalf of herself and her minor child, K.E.K. Class Counsel do not describe the personal injuries suffered by Ms. Kelso and K.E.K., so there is no way of determining whether they are typical of the injuries suffered by other class members. Ms. Kelso testified that she stopped drinking Flint water in October 2014, long before the expiration of the Class Period. Class Cert.

Br. 38. Thus, she is not similarly situated to a class member who continued drinking Flint water throughout the Class Period, and potentially has a weaker claim than such a plaintiff. Further, the lead test performed at her home is dated December 8, 2015 (Ex. 88), which is outside the Class Period and gives rise to a defense against her claims which is unique to her.

Plaintiff Barbara Davis is an elementary school teacher and drank tap water at two different schools in Flint, both of which tested positive for lead. Class Cert. Br. 38. However, one of those schools was Eisenhower Elementary, where Ms. Davis moved in 2016 (outside the Class Period), and the test performed at that school was dated October 31, 2015 (also outside the Class Period). (Ex. 89). Accordingly, Ms. Davis' claim relies at least in part on evidence not available to other class members, because it arises outside the Class Period. Further, between 2014 and 2018, Ms. Davis spent two weeks per year in Tallulah, Louisiana, where she was exposed to contaminated water. (Ex. 89). These facts give rise to unique defenses specific to her.

Given the wide range of injuries caused by lead, these class representatives of the Litigation Class do not meet the typicality requirement. As noted in Part I-B-1, lead causes everything from infertility to neurological damage to death. The amount of injury is affected by the amount and length of exposure, which will vary from class member to class member. And Class Counsel cite numerous other

39

contaminants, such as *legionella* bacteria, that have injured class members. A class containing such a wide range of injuries and characteristics cannot meet the typicality requirement because it is impossible for a handful of representative plaintiffs to capture the full universe of individualized experiences and claims. *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 727–28 (6th Cir. 2004) (no typicality where "[e]ach individual's claim was . . . proportional to his or her exposure to toxic emissions or waste," where some claims "depended on [plaintiffs'] period of residency . . . and levels of exposure," and "named plaintiffs who *already* have thyroid cancer have fundamentally different interests than those . . . who do not"); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082 (district court's finding of typicality was error where plaintiffs used different models of a product and "each experienced a distinct difficulty").[5]

---

[5] *See also In re Welding Fume Products Liability Litig.*, 245 F.R.D. 279, 303 (N.D. Ohio 2007) (holding that welders' action alleging exposure to manganese fumes failed typicality requirement for class action certification: "Given the large size of the class, the differences in defendants' conduct, and the variable working environments in which all of the welder plaintiffs performed, each class member's claims involve so many distinct factual questions that class certification becomes inappropriate."). *Bostick v. St. Jude Med., Inc.*, 2004 WL 3313614, at *15 (W.D. Tenn. Aug. 17, 2004) (typicality and adequacy not met where injured named plaintiff sought to represent a proposed class of both injured and asymptomatic individuals); *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 300 (N.D. Ohio 2001) (finding typicality not met in personal injury case because "[e]ach plaintiff must individually prove that he or she experienced personal injuries and/or property damage which was proximately caused by the use of defendant's products. The named plaintiffs' claims are typical only if what is needed to prove them is the same as what is needed to prove the claims of the proposed class.").

### D.   The Litigation Class Cannot Meet The Adequacy Of Representation Requirement.

Rule 23(a)(4), which requires that "the representative parties ... fairly and adequately protect the interests of the class," "serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as the "competency and conflicts of class counsel." *Amchem Prods*., 521 U.S. at, 625, 626 n. 20. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

It is therefore "critical to accurately determine at certification whether potential conflicts of interest could adversely affect the ability of either class counsel or the class representatives to protect the interests of absent class members." *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 737 F. App'x 457, 465 (11th Cir. 2018). The Sixth Circuit has articulated a two-prong test to determine whether the class representatives will "fairly and adequately protect the interests of the class" under Rule 23(a)(4): "'(1) [T]he representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys., Inc*., 75 F.3d at 1083.

Here, the proposed Litigation Class cannot meet the adequacy of representation requirement for a variety of reasons.

41

1.    **The Variations Among Class Members' Injuries And Claims Within The Litigation Class Preclude Adequate Representation.**

The class members within the Litigation Class are simply too varied to be adequately represented by a small number of named plaintiffs. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods.*, 521 U.S. at 625–26. In no meaningful sense have the proposed Litigation Class representatives suffered the "same injury" as a child with severe neurological defects who will require a lifetime of medical care and support services, or a class member harmed by *legionella* bacteria (which none of the class representatives asserts as a claim), or class members who could not conceive due to lead poisoning, or class members who died from lead poisoning. All of these claims are different. *See Sharp Farms v. Speaks*, 917 F.3d 276, 297 (4th Cir. 2019) (finding adequacy of representation requirement not met where some class members "assert a fundamentally different interest and a different injury"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (named plaintiffs "may not be able to provide adequate representation for those who have suffered different injuries"); *In re Fosamax Products Liability Litigation*, 248 F.R.D. 389, 401 (S.D.N.Y. 2008) ("given the inherent differences in the claims of the class representatives from those of other class members," "it is possible that the class representatives would rely on arguments that are adverse to

42

the interests of other class members"); *Rink*, 203 F.R.D. at 663–64 (named plaintiffs complaining of "varied types and degrees of illness or injury as a result of exposure" could not adequately represent "not-yet-injured members").

One of the clearest conflicts is between (i) class members who have already suffered severe injuries as a result of contaminated water—death, severe neurological deficits, or infertility—and would therefore prefer to assert claims for maximum compensation as soon as possible, and (ii) class members who have suffered less severe injuries and hence favor smaller immediate payouts, in order to ensure sufficient compensation in the future, in case their injuries worsen.

The Sixth Circuit has noted that "the health effects of lead poisoning often go undetected for some time." *In re Flint Water Cases*, 960 F.3d at 321 (citation omitted). Class Counsel's own expert, Dr. Daniel Keating, described the health effects of lead as "prolonged," with continued "negative impact on mental health and problem behaviors later in life." (Ex. 119, ¶¶ 13–14). The problem of delayed or latent harms is particularly acute for children. Dr. Alan Ducatman (one of Class Counsel's experts) explains that "children suffering from lead poisoning often do not present outward symptoms." Ex. 120, ¶ 23. Another of Class Counsel's experts, Dr. Bruce Lanphear, explained that lead poisoning has a wide array of neuropsychological and developmental effects, many of which will not manifest themselves immediately. "Increased levels of lead in blood can result in lower IQs,

43

diminished academic achievement, increased risk of attention-related disorders, such as ADHD, and increased risk of problem behaviors, like conduct disorder." (Ex. 99, ¶ 26). "Blood lead levels of 10 μg/dL and lower are also associated with delayed onset of puberty, reduced growth, and impaired hearing." (*Id.*) "Childhood lead exposure can have lifelong effects. Children with elevated blood lead level may never reach the same peak cognitive ability later in life as children with less exposure to lead. There is some evidence that lead exposure is a risk factor for developing Alzheimer's disease." (*Id.* ¶ 28). "Lead exposure is a strong predictor of behaviors linked with criminality, including impulsivity, hyperactivity, and aggressive behaviors." (*Id.* ¶ 27). Mental health impacts are similarly delayed. Class Counsel's expert Dr. Daryn Reicherter observes that "the delay may range from months to years." (Ex. 121, ¶ 52). "For the community of Flint, a significant future concern will also be the potential of intergenerational transmission of trauma." (*Id.* ¶ 53).

Hence, the General Class suffers from the same conflict as the class in *Amchem*, where the Supreme Court expressed concern that "essential allocation decisions" favored some claimants over others and class members' interests were "not aligned." 521 U.S. at 626–27. In the Third Circuit's view, the 'most salient' divergence of interests separated plaintiffs already afflicted with an asbestos-related disease from plaintiffs without manifest injury (exposure-only plaintiffs). The latter would rationally want protection against inflation for distant recoveries[,] . . . sturdy

back-end opt-out rights and 'causation provisions that can keep pace with changing science and medicine.'" *Id.* at 610–11. "Already injured parties, in contrast, would care little about such provisions and would rationally trade them for higher current payouts. These and other adverse interests, the Court of Appeals carefully explained, strangles suggested that an undivided set of representatives could not adequately protect the discrete interests of both currently afflicted and exposure-only claimants." *Id.* at 611. The Supreme Court agreed, holding: "In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protection fund for the future." *Id.* at 626.

The same disabling conflict of interest is present here and prevents the proposed class from meeting the adequacy of representation requirement. Indeed, the conflict is particularly salient here in light of the finite resources available to resolve this litigation, which creates a very real danger that the interests of all class members will not be adequately represented.

###### 2. Class Counsel Suffer From Intractable Conflicts Of Interest As To The Litigation Class.

Class Counsel suffer from their own disqualifying conflict of interest. They propose to represent a sprawling "General Class" and a trio of enormous Subclasses simultaneously. Counsel seek to represent, all at the same time:

45

(1) the General Class of "[a]ll current and former residents of the City of Flint who, for any period of time between April 25, 2014 and October 16, 2015, received drinking water supplied by the City of Flint regardless of whether the resident purchased the water from the City."

(2) the Minors Litigation Subclass of all children in utero or between the ages of 0 to 10 who, during the period from May 1, 2014 to January 5, 2016, "were exposed through ingestion to unfiltered Flint public water at such residence, school or day care for at least 14 days within a 90 day period."

(3) a Residential Property Subclass consisting of all persons and entities who owned residential property in Flint from April 25, 2014 to the present.

(4) a Business Subclass comprising all persons and entities who owned and operated a business in Flint from April 25, 2014 to the present.

Hence, Class Counsel propose to represent different groups characterized by different criteria, different kinds of injuries, different claims, and different time periods, all competing for the same finite resources that will be available to resolve the wide variety of claims asserted in this case. For example, they propose to represent both the General Class (of adults) and the Minors Litigation Subclass as a part of the Litigation Class. Yet, curiously, they have imposed different eligibility criteria in the respective definitions of the General Litigation Class and the Minors Litigation Subclass. Anyone who received drinking water from Flint for any length

of time (even one day) during the Class Period is a member of the General Class. The Minors Litigation Subclass, in contrast, contains restrictive criteria requiring proof that a child ingested unfiltered public water for at least 14 days during a 90-day period, with added details qualifying what kind of proof is adequate. The disparity between the two definitions raises the question whether Class Counsel are treating adults and children equally, or whether they are trading off the interests of one against the other, by making it more difficult for children to qualify for membership in the Minors Litigation Subclass.

The same conflict is apparent with regard to the Residential Property Subclass and the Business Subclass. Class Counsel are proposing to represent, simultaneously, (i) personal injury plaintiffs who have suffered grievous harms from lead poisoning, and who face the prospect of a lifetime of medical care and support services, and (ii) property and business owners who seek compensation for economic losses. The two kinds of injuries are utterly incommensurable, and having the same set of attorneys decide which claims to pursue, how many resources to devote to the litigation of each, and how to design a trial strategy creates innumerable opportunities for conflicts of interest.

Recognizing the inevitability of such conflicts, the Supreme Court has held that "an attorney who represents another class against the same defendant may not serve as class counsel." *Ortiz*, 527 U.S. at 856 (citing Moore's Federal Practice §

47

23.25[5] [e]). In both *Ortiz* and *Amchem*, the Supreme Court insisted on sub-classes with separate representation "to eliminate conflicting interests of counsel," and condemned those classes because "[n]o such procedure was employed [t]here." *Ortiz*, 527 U.S. at 856; *see also Amchem*, 521 F.3d at 620. *Ortiz* cited the need for "subclasses under Rule 23(c)(4)(B), *with separate representation to eliminate conflicting interests of counsel*." 527 U.S. at 856 (emphasis added). Having the same counsel represent both the General Class and the Subclasses flies in the face of the Supreme Court's instruction.

Following *Ortiz* and *Amchem*, the clear rule is that, in any case involving subgroups with diverse interests, "*[o]nly* the creation of subclasses, *and the advocacy of an attorney representing each subclass*, can ensure that the interests of that particular subgroup are in fact adequately represented." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011) (emphasis added). Even if Litigation Class representatives themselves belonged to each group, and so had some incentive to look out for each group of claims, "[t]he selling out of one category of claim for another [wa]s not improbable." *Id.* To avoid that risk, each subgroup needed its own representative and its own separate counsel, so there was always someone who "advanced the strongest arguments in favor of [each category's] recovery"—a need for "independent counsel pressing its most compelling case." *Id.* at 253.

48

Courts have held that "[c]ounsel cannot represent different classes of plaintiffs with conflicting claims who are seeking recovery from a common pool of assets." *In re Cardinal Health, Inc. ERISA Litigation*, 225 F.R.D. 552, 557 (S.D. Ohio 2005) (denying counsel's motion for appointment as lead counsel when it sought to represent two separate classes). Blithe assurance that all class members share "a common interest in maximizing the limited fund available from Defendants" "is wholly insufficient to vitiate the very real, substantial conflicts among class members." *Walker v. Liggett Group, Inc*., 175 F.R.D. 226, 233 n.12 (S.D. Va. 1997); *see also Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549, 570 (N.D. Cal. 2015) ("courts have found counsel inadequate due to conflicts where 'the recovery of one group in one forum inherently conflicts with the recovery of the other'" (quoting NEWBERG ON CLASS ACTIONS)); *Mwantembe v. TD Bank, N.A*., 268 F.R.D. 548, 559 (E.D. Pa. 2010) (finding conflict where two different groups of class members were "competing for the same pot of money"); *Pueblo of Zuni v. United States*, 243 F.R.D. 436, 449 (D.N.M. 2007) (finding inadequate representation where Indian tribe was lead plaintiff in putative class action seeking damages for government's alleged failure to pay full contract amounts under contracts between the Indian tribes and the Indian Health Service (IHS), because limited governmental appropriations meant "that a higher award for one tribe could mean a lower award for others"); *LeBeau v. United States*, 222 F.R.D. 613, 618 (D.S.D. 2004) (finding

that attorney seeking to be appointed as co-counsel for the class failed the Rule 23(a)(4) adequacy requirement because counsel previously represented a group of litigants who were eligible to draw from the same judgment fund available to the class of plaintiffs in the case at issue); *Jack Shaw Pontiac, Inc. v. Cleveland Press Pub. Co*., 102 F.R.D. 183, 192 (N.D. Ohio 1984) (finding conflict when attorneys represented two different classes against a defunct defendant that had "finite" assets such that it was not "inconceivable that the amount sought [by the two classes] would exceed the total assets" of the defendants); *Moore v. Margiotta*, 581 F. Supp. 649, 652 (E.D. N.Y. 1984) ("It would be difficult to award the whole sum to both classes of plaintiffs. Clearly, at some point the two theories of recovery will cause an active conflict of interests between the two classes of plaintiffs."); *Sullivan v. Chase Inv. Services of Boston, Inc*., 79 F.R.D. 246, 258 (N.D. Cal. 1978) (same).

### 3. Class Counsel Fail In Attempting To Defend Their Conflict Of Interest Regarding the Litigation Class And Its Sub-Classes.

Class Counsel seek to brush aside these conflicts by arguing that the Court has already appointed independent subclass *settlement* counsel. Class Cert. Br. 45 n.141. But the role of these counsel is limited to *settlement.* The instant class certification motion seeks to certify the class for *litigation*, and *Amchem* teaches that the adequacy of representation requirement must be applied as though the case will be litigated. 521 U.S. at 619–22. In fact, for Class Counsel to imply that they do not intend to try

50

this case in class form would itself be a disqualifying admission, as it would substantially reduce whatever leverage they have with defendants.

Next, Class Counsel cite the Newberg treatise for the proposition that "when multiple subclasses work together and are represented by the same attorneys, they can often 'leverage a better settlement . . . due to a defendant's desire to obtain a global resolution.'" Class Cert. Br. 46 n.143 (quoting 1 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 3:75 (5th ed. 2020)). There are multiple problems with this argument.

First, it distorts the Newberg treatise's language, which includes the key caveat that representation of different groups is permissible only "so long as the litigants' interests are not inherently opposed" and cautions that "courts have found that class counsel cannot adequately represent two sets of claimants if, in limited fund situations, the recovery of one set will cut directly into those of another."[6] Second, Class Counsel's argument fails to explain why the same attorneys need to represent the class and subclasses in litigating and trying the case. Presumably the class and subclasses could work together even if they were separately represented. Third, Class Counsel fail to explain why a class action is necessary to achieve a

---

[6] The portion of the treatise cited by Class Counsel provides: "In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed. Indeed, courts have recognized that concurrent representation may enable counsel to leverage a better settlement for both sets of plaintiffs due to a defendant's desire to obtain a global resolution." 1 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 3:75 (5th ed. 2020).

"global resolution" as a result of trying the case. To the contrary: As is evident from the Settlement Agreement before the Court, a global resolution has been easier to achieve—and will continue to be easier to achieve—*without* the disruptive prospect of the sweeping Litigation Class proposed in Class Counsel's motion.

Moreover, Class Counsel's explicit focus on securing a global settlement proves our point: Class Counsel are highlighting the very risk against which Rule 23(a)(4) guards by seeking to present defendants with a way of achieving global peace without facing the threat of hard-fought individual lawsuits. "[C]lass actions are rife with potential conflicts of interest between class counsel and class members." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Would it be too cynical to speculate that what may be going on here is that class counsel wanted a settlement that would give them a generous fee . . . .?" *Id.* In pursuing their agenda, Class Counsel have an incentive to trade off some class members for others in order to achieve the "global deal" they claim to seek. Indeed, the Second Circuit warned of precisely that risk in vacating a multi-billion-dollar credit card class settlement: "Class counsel stood to gain enormously if they got the deal done." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 827 F.3d 223, 234 (2d Cir. 2016). "[W]hen 'the potential for gigantic fees' is within counsel's grasp for representation of one group of plaintiffs, but only if counsel resolves another group of plaintiffs' claims, a court cannot assume class

counsel adequately represented the latter group's interests." *Id.* That is precisely the risk here. Unitary representation of separate classes and subclasses as a part of the proposed Litigation Class in this case creates unacceptable incentives for Class Counsel to trade-off some plaintiffs against others in order to somehow reach a settlement.

The Settlement Agreement obviated these risks by involving separate sub-class settlement counsel as well as Co-Liaison Counsel for Individual Plaintiffs. The result was an agreement that not only avoided the kind of bad incentives for Class Counsel to trade off one group of the sprawling class against another, but also included key procedural safeguards to ensure that the various groups of plaintiffs are not shortchanged by Class Counsel's eagerness to get a deal done and secure a fee.

### E. The Proposed Litigation Class Cannot Meet The Superiority Requirement.

Rule 23(b)(3) requires that, to certify a class, this Court must find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Sixth Circuit has instructed that "[t]o determine whether a class action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action." *Pipefitters Local 636 Ins. Fund*, 654 F.3d at 630. "The district court should also compare other means of disposing of the suit to determine if a class action 'is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate

53

a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.'" *Id.* (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1779 (3d ed. 2010)). Possible alternatives to the proposed Litigation Class in Class Counsel's motion for class certification include "joinder, intervention, consolidation, a test case, and an administrative proceeding." *Id.* at 631 (citation omitted). "Additionally, the court should consider the value of individual damage awards . . . . . [W]hen individual class members have large stakes in the outcome and the ability to pursue a remedy alone, their individual interests weigh against a Rule 23(b)(3) action." *Id.* Here, all of those factors weigh against class certification.

First, the difficulties of managing a class action involving the Litigation Class will be enormous. The individualized questions will overwhelm any common issues and require this Court to devote substantial time and resources to a mammoth undertaking that, in the end, will achieve very little. "Where many individual inquiries are necessary, a class action is not a superior form of adjudication . . . ." *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532, 545 (6th Cir. 2012). Quite simply, the game is not worth the candle. In the *Pipefitters* case, for example, the Sixth Circuit held that a class action could not meet the superiority requirement, even when it would resolve a "central legal claim," because "the district court here would be required to conduct individualized inquiries" for "550 to 875 class members."

654 F.3d at 631. "Given the necessary number of individual inquiries, a class action cannot be a superior form of adjudication." *Id.* Here, of course, the number of required individualized inquiries for the Litigation Class would be *orders of magnitude* greater than in *Pipefitters*.

In addition, this proceeding involves high-value claims that can be prosecuted individually, as shown by the fact that many members of the putative Litigation Class are already separately represented. Class Counsel concede that "each Class members' [sic] damages are significant." Class Cert. Br. 81. In *Pipefitters*, the Sixth Circuit found that damages awards of $280,000 "are not the types of awards that would preclude individual class members from seeking relief through litigation." 654 F.3d at 632. Potential personal injury awards here are even larger. Coordinated proceedings among individually represented plaintiffs are entirely feasible in this proceeding—and in fact such coordination is already occurring in ongoing discovery. Given the close geographical proximity of potential plaintiffs to each other and to the Court, the high-profile nature of this case, and the number of plaintiffs already represented by counsel, the proposed Litigation Class is not necessary here.

Further, individual class members have an overriding interest in controlling the prosecution of separate actions. "Each plaintiff [in an action involving claims for personal injury and death] has a significant interest in individually controlling the

prosecution of [his case]"; each "ha[s] a substantial stake in making individual decisions on whether and when to settle." *Amchem*, 521 U.S. at 616 (citation omitted and brackets in original). "When personal-injury and death claims are involved, a strong feeling prevails that everyone enmeshed in the dispute should have his own day in court and be represented by a lawyer of his choice." 18 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1783 (3d ed. 2020). This principle is especially salient in this case. *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 758 (6th Cir. 2013) (holding that district court abused its discretion in certifying nationwide settlement class where "unnamed class members had an interest in individually controlling" litigation and "the likelihood that many members of the class will choose to bring individual lawsuits is not remote").

Finally, the proposed class action does not qualify as "superior" to individual litigation because of its inability to provide a definitive resolution of potential claims against the defendants. There is no way to be confident that a class action judgment will survive appeal by objectors or successfully prevent collateral attacks, potentially years from now. In *Hansberry v. Lee*, 311 U.S. 32 (1940), the Supreme Court entertained a collateral attack on an Illinois state court class action judgment that purported to bind the plaintiffs. The Court held that class action judgments can bind absent class members only where "the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly

represent the former in the prosecution of the litigation." *Id*. at 41. Under this principle, "[a] final judgment in a class action can bind absent class members only if it was rendered consistent with the requirements of due process. If an individual class member seeks to re-litigate the claims or issues resolved by a class action in later litigation and is met with the affirmative defense that her claims are precluded by the class judgment, she may therefore attempt to escape the binding effect of the class judgment by arguing that the judgment was rendered without due process. This is referred to as a 'collateral attack' on the judgment, as distinguished from an appeal, which is a 'direct attack' on the judgment." 6 NEWBERG ON CLASS ACTIONS § 18:35 (5th ed. 2020); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 805 (1985) ("[A] court adjudicating a dispute may not be able to predetermine the res judicata effect of its own judgment.").[7]

---

[7] The Second Circuit has warned that "[j]udgment in a class action is not secure from collateral attack unless the absentees were adequately and vigorously represented." *Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 n.15 (2d Cir. 1978), aff'd, 444 U.S. 472 (1980); *see also Gonzales v. Cassidy*, 474 F.2d 67, 74 (5th Cir. 1973) ("Due process of law would be violated for the judgment in a class suit to be res judicata to the absent members of a class unless the court applying res judicata can conclude that the class was adequately represented in the first suit."); *Williams v. Gen. Elec. Capital Auto Lease, Inc*., 159 F.3d 266, 269–70 (7th Cir. 1998) ("[A]fter the entry of final judgment, the unnamed class member can raise a collateral attack based on due process against the named representative's decision"); *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998) ("an absent class member may collaterally attack the prior judgment on the ground that to apply claim preclusion would deny him due process"); *Crawford v. Honig*, 37 F.3d 485, 488 (9th Cir. 1994) ("The district court properly determined that the Crawford plaintiffs' interests were not represented during the 1986 proceedings and that res judicata did not bar them from collaterally attacking the 1986 proceedings."); *State v. Homeside Lending, Inc*., 826 A.2d 997, 1016–17 (Vt. 2003) (collateral challenge in Vermont to Alabama settlement because opt-out notice to absent class members of action in Alabama did not comport with due process, as required to establish personal jurisdiction over absent Vermont class members, and

For all these reasons, individual actions rather than a fatal flawed class action are the superior means of resolving the Flint Water litigation.

### F.    The Proposed Litigation Class Definition Is Overbroad.

There is a further defect in the putative personal injury class: the proposed class definition of the General Class is impermissibly overbroad. It sweeps in "[a]ll current and former residents of the City of Flint who, for any period of time between April 25, 2014 and October 16, 2015, received drinking water supplied by the City of Flint regardless of whether the resident purchased the water from the City." That is exactly the problem—the class will encompass virtually everyone who lived, worked, or owned property or a business in Flint.[8] The same ascertainability defect applies to the definitions of the Residential Property Subclass and the Business Subclass.

The Sixth Circuit has held that a class must be "sufficiently defined" in order to be certified. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). Moreover, "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring); *see also Lewis v. Casey*, 518 U.S.

---

class representatives' and class attorneys' representation of Vermont class members in Alabama litigation was inadequate).

[8] Class Counsel assert that "[m]embership in the Class and Subclasses is ascertainable through property or rental records, or through certification by Flint residents or guardians that they and/or their children lived in Flint and were exposed to the water during the Class Period." Class Cert. Br. 34 n.129.

343, 349 (1996) (judiciary's role is limited "to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm").

Here, the proposed class is grossly "overinclusive" because it "would include those who potentially were not harmed." *Johnson v. BLC Lexington, SNF, LLC*, 2020 WL 3578342, *4 (E.D. Ky. July 1, 2020). For example, the General Class includes anyone who can certify that they "received" drinking water from Flint "for any period of time" (including a single day) between April 25, 2014 and October 16, 2015, even if they did not drink it or suffer any lead exposure. Thus, someone who "received" Flint water one time, on April 26, 2014, is a Class member. The Residential Property Subclass includes *all* persons who owned residential property in Flint from April 25, 2015 to the present, regardless of whether their property received lead-contaminated water. The Business Subclass includes every single "business" in Flint as of April 25, 2014, regardless of whether it received any lead-contaminated water.

Such overinclusiveness is not permissible. *See Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 659–60 (M.D. Fla. 2001) (denying class certification of proposed class of "exposed" individuals in geographic area); *Snow v. Atofina Chemicals, Inc.*, 2006 WL 1008002, at *6 (E.D. Mich. March 31, 2006) (denying certification of proposed subclass: "This broad definition invites limitless types of claims for injuries and

59

damages."); *see also Johnson v. BLC Lexington, SNF, LLC*, 2020 WL 3578342, at *4 (E.D. Ky. July 1, 2020) (class not ascertainable where overbroad definition included "those who potentially were not harmed" by the alleged fraud).

The court's analysis in *Rink* is instructive. There, the plaintiffs sought to certify a subclass of individuals who "were exposed" to an insecticide during a 17-month period, including both those "who claim to have suffered symptoms or reactions" and those "who have been asymptomatic despite exposure." 203 F.R.D. at 659. The court found that the subclass lacked ascertainability due to its "use of the term 'exposed'" without "further limiting language." *Id.* "As a practical matter, this definition can be read to include every breathing soul physically present in the geographic area" at the time of the chemical spraying, including members with "vastly different accounts of exposure with respect to the time, location, type, numbers of occurrences, and dose." *Id.* at 660. "Such a vague class definition portends significant manageability problems for the court." *Id.*

The contrast between the definitions of the General Litigation Class and the Minors Litigation Subclass is telling. The Minors Class definition requires a showing, inter alia, that a child was exposed through ingestion to unfiltered Flint public water for at least 14 days within a 90-day period. The definition of the General Class contains no such criterion. Further, the Class Period of the Minors Litigation Subclass commences on May 1, 2014 rather than April 25, 2014. Class Counsel's

own experts testified that exposure to lead would not have started immediately upon the switchover to Flint River water.[9] Thus, even the testimony of Class Counsel's own experts does not support the definition of the General Class. That definition is overbroad and improper.

## II.   Certification Of A Minors Litigation Subclass For Litigation Would Be Impermissible.

The injured children of Flint are the primary victims of the Flint water crisis. They have been failed by the very institutions meant to protect them. Many of them have severe and debilitating injuries, impairing them for the rest of their lives. Addressing their injuries should be the centerpiece of any judicial resolution. Instead, the instant Motion treats them as merely an ancillary element of the class action, as pawns as part of Class Counsel's efforts to deliver a package deal to Defendants. Class Counsel propose to represent the Minors Litigation Subclass in litigation at the same time they represent as many as 80,000 adults with personal injury claims, more than 700 businesses suing for economic losses, and the owners

---

[9] *See* Declaration of Dr. Clifford P. Weisel, Ex. 122, at 26-27 ("The time period that residents of Flint were exposed to lead due to the change in the water supply on April 25, 2014 would begin as soon as the water with higher corrosivity after it passed through service lines and interior plumbing of homes, schools, and day care facilities. This is because a new equilibrium associated with the initial leaching of lead is expected to begin when the corrosive water became stagnant in the pipes and interior plumbing for several hours. . . . For purposes of this report, the initial date when exposure is expected to have started is May 1, 2014, to allow for several days for the highly corrosive water to be distributed to homes within the distribution system. As indicated in the Deposition of Dr. Schock when discussing the Flint water system, if you stop pH adjustments the scale in the lead pipe reacts within hours to days and begins to decompose releasing lead into the water.").

of more than 30,000 single- and multi-family residential properties and 5,000 multi-family units suing for property losses. Class Cert. Br. 35.

Class Counsel would deny the proposed Minors Litigation Subclass the separate litigation counsel to which they are entitled under Rule 23 and principles of due process. Rule 23 and other legal principles prohibit these procedural shortcuts. Fundamentally, there is no need for a Litigation Class to represent the interests of the injured children of Flint. They are already represented by highly experienced and capable counsel, who have successfully tried many lead poisoning cases involving children. The proposed class would do nothing but obstruct the expeditious resolution of minors' claims.

The proposed Minors Litigation Subclass shares all the legal defects of the General Class involving personal injuries, as explained in Part I, *supra.* In addition, the Minors Litigation Subclass is impermissible for further reasons, as described below.

## A. Class Counsel Ignores The Special Legal Protections Afforded To Minors Under Michigan Law.

Michigan law entitles minors to a host of procedural and substantive protections that the proposed Minors Litigation Subclass does not provide. The proposed Litigation Class therefore violates the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see Wal-Mart*, 564 U.S. at 367; *Ortiz*, 527 U.S. at 845. In addition, the

62

Federal Rules of Civil Procedure provide that state law generally governs an individual's capacity to represent a minor. Fed. R. Civ. P. 17(b)(3) (stating that an individual's capacity to sue in a representative capacity is determined by "the law of the state where the court is located"). Accordingly, there is no authority in federal law for abrogating Michigan's legal protections for minors, as the proposed Minors Litigation Subclass purports to do. At a minimum, the Litigation Subclass's failure to provide adequate protection for the rights of minors means that the proposed Subclass cannot meet the superiority requirement of Rule 23(b)(3), because minors would be better off prosecuting their own individual actions. In assessing superiority, courts should "consider how the dominance of state law issues may affect the suitability of [the] litigation in a federal forum, and what state-law mechanisms may be available to resolve [the claims] as an alternative to a class action." *EQT Production*, 764 F.3d at 371 (remanding for further consideration of the superiority analysis). Here, proceeding as the proposed Litigation Class rather than in individual actions would be fundamentally unfair to the injured minors, who have significant interests in individually controlling the prosecution of their separate actions.

Michigan's long-standing protections of minors are manifested in both its procedural and substantive law. Michigan Court Rule 2.420(B) creates special procedural protections for minors in litigation that the proposed Minors Litigation

Subclass does not satisfy. In Michigan, where a cause of action is brought on behalf of a minor or legally incapacitated individual, Michigan Court Rule 2.420 provides "the procedure to be followed for the entry of a consent judgment, a settlement, or a dismissal pursuant to settlement." Mich. Ct. R. 2.420. This rule "seeks to protect an interested minor child's rights in settlement of a claim" by mandating the process by which those settlements can be approved. *Bowden v. Hutzel Hosp.*, 652 N.W.2d 529, 532 (Mich. Ct. App. 2002), *judgment modified, appeal denied in part*, 658 N.W.2d 483 (2003).

Pursuant to that rule, any settlement involving a minor or legally incapacitated individual "must be brought before the judge to whom the action is assigned, and the judge shall pass on the fairness of the proposal." Mich. Ct. R. 2.420(B). Additionally, for a claim for damages due to personal injury, "the minor or legally incapacitated individual shall appear in court personally to allow the judge an opportunity to observe the nature of the injury unless, for good cause, the judge excuses the minor's or legally incapacitated individual's presence, and the judge may require medical testimony, by deposition or in court, if not satisfied of the extent of the injury." Mich. Ct. R. 2.420(B)(1). For any settlement or judgment requiring payment of more than $5,000 to a minor, either immediately or in installments that exceed $5,000 in any single year, "a conservator must be appointed by the probate court before the entry of the judgment or dismissal." Mich. Ct. R. 2.420(B)(4)(a).

64

Michigan further protects children by requiring the appointment of a guardian ad litem where the minor's next friend or guardian "is a person who has made a claim in the same action and will share in the settlement or judgment of the minor." Mich. Ct. R. 2.420(B)(2); *Bowden*, 652 N.W.2d at 532 ("[T]he court 'must' appoint a guardian ad litem to represent the minor's legal interests and thus secure the minor's best interests during any and all proceedings.").

Here, pursuing the minors' claims through the Litigation Class would deprive them of Michigan's careful procedural safeguards. In the event of a class settlement, there would be no individual appearances by each minor with the attendant opportunity for the judge to observe the nature of the minor's injury and/or hear medical testimony about the extent of that injury. While Class Counsel seeks appointment of a guardian ad litem to represent absent minor Subclass members (Class Cert. Br. 45), that mechanism fails to provide the individualized protections to which minors are entitled under Michigan law. A single guardian ad litem cannot feasibly represent the diverse and individualized interests of a subclass consisting of as many as 20,000 children in full-scale litigation and trial. The very authority cited by Class Counsel reveals that minors are ordinarily entitled to their own guardians. *See Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 86 (1st Cir. 2010) ("The record shows that throughout the different custody and child welfare proceedings, each child was represented by court-appointed guardians ad litem or CASA Attorneys;

65

while some children were represented by five or six guardians throughout the course of several years.") (cited Class Cert. Br. 44).

The proposed Litigation Class fails to honor Michigan law's deep-rooted commitment to protect minors' rights. Under well-established Michigan common law, a minor lacks the capacity to contract and can later repudiate any agreement. *Woodman ex rel. Woodman v. Kera LLC*, 785 N.W.2d 1, 15 (Mich. 2010) ("Their contracts are not void but voidable."). Where a minor does contract, upon attaining majority, he or she may disaffirm it. *See Poli v. Nat'l Bank of Detroit*, 93 N.W.2d 925, 926 (Mich. 1959); *Boynton v. Wedgewood*, 78 N.W.2d 134, 135 (Mich. 1956). The Michigan legislature has also "affirmatively acted to protect and preserve minors' property interests," including the "ability to pursue and control the minor's own claim." *Woodman*, 785 N.W.2d at 13-14. MCL 600.5851, for example, tolls the period of limitations for a cause of action that accrued during minority and permits the minor "to bring his cause of action within one year of reaching majority." *Id.*

Michigan public policy so firmly protects minors' interests in their tort claims, that even parental action may not abrogate them. A minor's parent or other guardian lacks the capacity to contractually bind his or her minor ward, and therefore may not waive the child's tort claims. *Woodman*, 785 N.W.2d at 15 (holding liability waiver signed by parent unenforceable). "[A]s a general rule, a parent has no authority, merely by virtue of being a parent, to waive, release, or compromise claims by or

66

against the parent's child." *Smith v. YMVA of Benton Harbor/St. Joseph*, 550 N.W.2d 262, 263 (Mich. Ct. App. 1996) (reversing summary judgment to permit injured child who reached age of majority to bring action to recover, in contravention of released signed by parents when she was a minor).

The proposed Litigation Class would dispense with those protections. In place of Michigan's uniform bar against allowing adults (even parents) to bind minors in contract or waive tort claims, class counsel would install two parents (who themselves have claims in this action) and one guardian ad litem to act on behalf of thousands of children. Children who would normally have until a year beyond adulthood to bring their claims, MCL 600.5851, would be rushed into a host of decisions, including whether to object to the proposed class, whether to opt out, whether to intervene, and whether object to any settlement. As the Supreme Court of Michigan has cautioned, "The protection of infancy is a substantial one, and is not to be put aside and overcome by indirect methods." *Woodman*, 785 N.W.2d at 15 (quoting *Armitage v. Widoe*, 36 Mich. 124 (1877)). The proposed class certification here would do just that.

**B.     The Proposed Definition Of The Minors Litigation Subclass Fails The Ascertainability Requirement.**

The proposed Minors Litigation Subclass lacks ascertainability, a prerequisite for any class certification. "Rule 23 contains an implicit threshold requirement that the member of a proposed class be 'readily identifiable,'" known as the

"ascertainability" requirement. *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). A class cannot be certified unless a court can "readily identify the class members in reference to objective criteria." *Id.* Where class members cannot be identified without "extensive and individualized fact-finding" or "mini-trials," a class action is inappropriate. *Id.* "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (quoting 5 James W. Moore, et al., Moore's Federal Practice § 23.21[3] (Matthew Bender, 3d ed. 1997)). Where "the only way to distinguish between the two sets of individuals" inside and outside the class "is to engage in individualized fact-finding," "the need for such individualized fact-finding makes the district court's class definition unsatisfactory." *Romberio v. Unumprovident Corp.*, 385 Fed. Appx. 423, 431 (6th Cir. 2009).

The proposed Minors Litigation Subclass fails this test. The Subclass is defined as children who "lived in an identified residence or attended an identified school or day care" and "were exposed through ingestion to unfiltered Flint public water at such residence, school or day care for at least 14 days within a 90 day period." "Exposed through ingestion to unfiltered public water" means the child (or their mother) was exposed to unfiltered tap water for at least 14 days during a 90 day

68

period between May 1, 2014 and January 5, 2016, through any combination of the following ways:

> (1) For childhood exposure: the child drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered Flint tap water;
>
> (2) For in utero exposure, the mother drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water), and/or ate food prepared with unfiltered Flint tap water, while pregnant.

(Class Cert. Br. 32 n.128.)

The proposed Minors Litigation Subclass, by its very definition, requires individualized fact-finding to identify class members. Where factual inquiries are required to determine class membership, certification is improper. *See Nevada-Martinez v. Ahmad*, 2016 WL 7888046, at *4 (E.D. Ky. June 17, 2016) (striking class allegations where "determining membership in the class would essentially involve 'mini-hearing' for each potential member of the putative class"). In *Snow*, the court denied certification of a medical monitoring subclass in a chemical explosion case due to its "vague definition." 2006 WL 1008002, at *8. The court feared that "[b]efore even deciding whether a person qualifies as a potential claimant, it will be necessary, at a minimum, to determine: whether there was actual exposure; the length of exposure; and, the level of the exposure, considering various factors." *Id.*

The Minors Litigation Subclass proposed here would impermissibly require mini-hearings to determine membership. In addition to proving age and residency, each member would need to show actual "exposure" through his or her ingestion of unfiltered Flint tap water or foods prepared with unfiltered tap water, as well as a length of exposure of at least 14 days. (Class Cert. Br. 32 n.128.) The need for that individualized fact finding is not obviated by Class Counsel's assertion that membership "is ascertainable through property or rental records, or through certification by Flint residents or guardians that they and/or their children lived in Flint and were exposed to the water during the Class Period." (Class Cert. Br. 34 n.129.)

In proposing "certifications," Class Counsel relies on *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 527 (6th Cir. 2015), which is readily distinguishable. In *Rikos*, consumers of a nutritional product brought false advertising claims; none alleged any personal injury. The proposed class was clearly defined by objective criteria: "anyone who purchased [the product]" in five states. *Id.* at 526. Purchasers could be determined with reasonable accuracy by reviewing the manufacturer's internal data including online sales records, supplemented with receipts and affidavits. *Id.* Here, there is no such cache of objective data identifying minors who ingested tap water (or foods prepared with it) for 14 or more days. Thus, the "certifications" Class Counsel propose do not supplement objective data, but rather

stand alone and requiring the Court to adjudge the veracity of each. The ascertainability requirement precludes this Court from embarking on such an administratively infeasible endeavor.

Class Counsel's proposal to use property or rental records fairs no better. "[R]esolving ownership based on land records can be a complicated and individualized process." *EQT Production Co.*, 764 F.3d at 358 (class not sufficiently ascertainable). And, in any event, Minors Litigation Subclass membership could not be determined by reviewing property and rental records. Those records pertain only to residency, not to type or duration of "exposure." The adults listed on the property and rental records would need to be contacted individually to determine whether children lived at that address, those children's ages, and whether they believe the children were "exposed" to Flint tap water. After all that, the Court would still be faced with adjudicating in thousands of mini-trials whether the children so identified were in fact "exposed" according to the Minors Litigation Subclass definition.

### C.   The Minors Litigation Subclass Cannot Meet The Commonality And Predominance Requirements Of Rule 23.

The child-by-child inquiries necessary to apply the Minors Litigation Subclass definition confirms the highly individualized nature of the claims asserted by members of the Subclass. As shown in Part I-B-1, *supra*, the personal injury claims in this proceeding do not meet the commonality or predominance requirements of Rule 23 because exposure, injury, causation, and liability are not common questions.

All of these issues are even more individualized with respect to children. Minors who live in homes with lead paint, for example, present highly individualized questions regarding alternative sources of lead exposure. In addition, schools in Flint were not a uniform source of lead exposure. The declaration of Class Counsel's expert Dr. Pierre Goovaerts cites to testing results from Flint community schools conducted on October 2, 2015 by the Michigan Department of Environmental Quality revealing that, at three dozen sites tested, only 5 were at or above the EPA action level of 15 ppb and 3 showed no lead detected.[10] Again, Class Counsel's own evidence reveals individualized issues regarding lead exposure.

Class Counsel seek to overcome these legal defects by pointing to the declaration of Dr. Howard Hu, who opines that each child meeting the eligibility requirements of the Minors Litigation Subclass "will more likely than not have experienced increased lead exposure as a result of the Flint water crisis." (Ex. 81, ¶ 9.3). That testimony fails to take account of all the individualized questions previously noted. Indeed, Dr. Hu himself acknowledged that the Minors Litigation Subclass faces "several major challenges" because "'exposure' to water lead levels stemming from the Flint Water Crisis at the level of a typical residential tap can be

---

[10] Ex. 85, at 18 n.23 (citing Government of Michigan. Flint Community Schools Initial Screening Results (Oct. 2, 2015), available at
https://www.michigan.gov/documents/deq/Flint_Community_Schools_Testing_Results__Initial_Screen_502382_7.pdf).

expected to vary spatially (i.e. across locations within the city depending on the condition and type of service line, connectors, and indoor plumbing at each location an individual consumes tap water or item prepared with tap water); temporally (i.e. over time - the course of a day, week, and month, because of flushing, water flow, local pipe and interior plumbing conditions); and frequency of an individual's consumption of the tap water." (*Id.* ¶ 10). Dr. Hu examined a database of 24,173 tap water lead samples, collected between 11/19/2014 and 10/13/2016, and found that "[d]etectable levels of lead were found in 58.4% of non-vacant residential and commercial tax parcels that were sampled." (*Id.* at 18 n.3). Thus, the evidence presented by Dr. Hu indicates that exposure varied among class members.

Dr. Hu also admits that "[a]nother challenge is that even if an individual's level of exposure to tap water is known, that individual's internalized 'dose' of lead, i.e., amount of lead that would be absorbed from the gastrointestinal tract into blood that, in turn, would serve as the dose of lead to target organs such as the brain, can be expected to vary based on that individual's nutritional status (e.g., low dietary iron or calcium, or fasting, can increase the amount of lead absorbed from the gastrointestinal tract) as well as biological factors (e.g., an individual's age [infants absorb more lead from the gastrointestinal tract than adults], genetics, etc)." (*Id.* ¶ 10 (brackets in original)). Moreover, "a blood lead level by itself cannot inform

73

whether the lead came from absorption of lead from tap water vs. lead that had come from other sources (e.g., soil, paint, internal stores of lead in bone)." *Id.*

But even taking at face value Dr. Hu's statement about each child's lead exposure being "more likely than not," that statement merely establishes a plaintiff's initial burden to survive summary judgment. At trial, the defendants would be entitled to rebut injury and damages on a class-member-by-class-member basis. That right is firmly established under both Rule 23 and due process. *See* Part I-B-2, *supra.* Accordingly, the need for individualized inquiries into the specific circumstances of the many thousands of children who are members of the Minors Litigation Subclass prevents Class Counsel from meeting commonality and predominance.

### D.    The Minors Litigation Subclass Does Not Meet The Requirements Of Typicality Or Adequacy Of Representation.

Class counsel proposes that the Minors Litigation Subclass be represented by two parents of children who have suffered injury as a result of exposure to toxic Flint water. Given the breadth of the Minors Litigation Subclass, the representatives do not and cannot meet the typicality or adequacy of representation requirements.

Plaintiff Tiantha Williams is acting on behalf of herself and her minor son, T.W., who was born prematurely and is now four years old. Class Cert. Br. 39. The question whether lead caused his premature birth will be a specific question unique to T.W. and will be strongly affected by his mother's personal medical history. These

74

questions will not be typical of the claims of other minors alleging harms from lead exposure unrelated to premature birth.

Plaintiff Darnella Gaines is acting on behalf of her minor child, K.C. Ms. Gaines and K.C. used Flint water for drinking, cooking, bathing/showering, and clothes washing, although they stopped drinking it sometime in July 2015. Class Cert. Br. 39. K.C. has experienced hair loss and persistent skin rashes. *Id.* But whether K.C.'s injuries were caused by exposure to lead-contaminated Flint water will not prove that another class member's harms stemmed from the same lead poisoning.

As the Sixth Circuit has explained, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. Here, the claims of the Litigation Class representatives are so individualized that they will not resolve the claims of any other class members. Indeed, given the wide range of injuries that lead can cause in children, the representatives of the Minors Litigation Subclass are completely incapable of serving as an accurate barometer of the claims of other putative Minors Litigation Subclass members. As the Sixth Circuit has observed, "[i]n children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *In re Flint Water Cases*, 960 F.3d 303, 320

75

(6th Cir. 2020) (citation omitted). "[L]ead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment." *Id.* (citation omitted). In some cases, "ingestion of lead can cause seizures, coma and even death." *Id.* There is no typical plaintiff among a Litigation Subclass facing such a wide range of present and potential medical problems. Certainly, the representative plaintiffs proposed by Class Counsel do not assert the kind of health effects that other class members have suffered.

Nor can Class Counsel meet the adequacy of representation requirement. The Litigation Subclass includes all minors, from conception to age 10, who were exposed to Flint tap water. The Litigation Subclass includes children already afflicted with severe conditions requiring a lifetime of medical care, children who may develop a future ailment, and those who may never manifest adverse symptoms. Their interests are not aligned. Children presently suffering severe injuries may want to maximize payouts, while those who are currently manifesting less serious injuries may want money to be reserved for future payouts. No representatives can adequately represent the divergent interests of differently situated plaintiffs.

Nor can the same Class Counsel represent both the General Litigation Class and the Minors Litigation Subclass. As noted previously, in Part I-D-2, *supra*, such concurrent representation creates an insoluble conflict of interest.

76

III.    **Property Damage And Business Damage Litigation Subclasses Should Not Be Certified.**

Class Counsel also propose to represent Property Damage and Business Loss Litigation Subclasses. These putative Litigation Subclasses suffer from the same commonality, predominance, typicality, adequacy of representation, superiority, and ascertainability defects addressed in Part I, *supra*, with additional deficiencies to boot.

A.    **The Economic Claims Are Highly Individualized And Cannot Meet The Commonality Or Predominance Requirements.**

Each property or business presents highly individualized questions preventing a finding of commonality or predominance. It is a longstanding common-law principle that "real property is unique." *In re Smith Trust*, 745 N.W.2d 754, 756 (Mich. 2008). Each class member will need to show specific diminished property values. Each will need to negate possible alternative causes for each of the diminished property values. Moreover, each property has its own set of appliances, fixtures, and other kinds of personal property that could be damaged by lead, and each will need to show causation separately. Every resident of Flint will have purchased different amounts of bottled water or incurred other out-of-pocket costs due to the water crisis.

Every business is unique as well. It will have its own set of customers, who will respond to lead-contaminated water in different ways. For example, lead-

contaminated water may well have a strong impact on restaurants that serve food cooked with Flint water. But the effect will be different on clothing stores or other establishments that sell no consumables. Indeed, grocery stores may see their sales of bottled water increase, and hardware stores may see their sales of water testing kits increase.

Class Counsel's own expert testimony proves the highly individualized nature of the claims. Class Counsel's own expert, Professor Keiser, concludes that house values in Flint declined by 17–32% as a result of water contamination. (Ex. 114 at 45). But he does not opine that all houses declined in value by the same amount. Rather, he cautions that "[t]e individual single-family home estimates reflect the *average* lost value for homes sold in Flint over this period." (*Id.* at 50 (emphasis added)). Professor Keiser notes the variations within the class affecting property claims, such as "the extent of damages to the internal plumbing of homes." (Ex. 114 at 3). He also notes that the effects on home prices varied over time. "Except for a significant dip in 2015Q2, estimated home value losses are less than 10% [for the first three quarters following April 25, 2014]. Home values began a steady decline with the emergency crisis declarations in 2015Q4. By 2016Q3, home values stay at 28% to 30% lower compared to the control cities. There is a bounce back in 2017Q1, but then a steep decline again in 2017Q2." *Id*. at 46. Some class members may have sold their property during the Class Period; those who sold their houses at different

78

times experienced different amounts of loss. Computing damages for class members who did not sell their houses at all will need to account for a host of individualized factors, including changes in neighborhood patterns, plus recent events (such as COVID or the Great Recession of 2020), which Professor Keiser does not address.

Assessing property damages in Flint is especially complex because, in Professor Keiser's words, "Flint is unique. Economic and social conditions in Flint differ from many areas in the United States. Assessing damages due to the Flint drinking water contamination requires accounting for the uncommon economic baseline conditions and trends in the city." (Ex. 114, p. 14). "Where most U.S. cities saw stable growth in housing prices since the Great Recession, Flint saw steady declines." (*Id.* at 5). "Flint's housing market is unique even compared to other cities in its county, Genesee County. . . . [A]fter restricting home price data to those that sold for more than $25,000, the average home price in Flint was $54,000 lower than in Genesee County, while the median home sold for $45,000 less in Flint than in Genesee. According to the American Community Survey, Flint's housing vacancy rate was 21% compared to 8% across the rest of Genesee County in 2012." (*Id.*) Prior to the water crisis, Flint property values were already impaired by other social and economic causes. Many properties were not revenue-generating even prior to 2014. Defendants would no doubt seek to analyze any claims on a property-by-property basis.

Class Counsel also seek to recover damages for "expenditures on bottled water and payment of water bills," Class Cert. Br. 60, which will vary by class member. In addition, computing out-of-pocket financial losses from the water crisis would need to factor in, on an individualized basis, public assistance programs that have defrayed out-of-pocket expenditures by class members. Professor Keiser notes that "State and federal spending, as well as private donations, partially offset costs of the drinking water contamination for Flint residents." (Ex. 114, p. 14). "The most relevant categories are 'Safe Drinking Water' and 'Water Bill Credits.' The safe drinking water program paid for bottled water, water filter, and testing kit purchases and distribution. The program also contributed to Flint's pipeline replacement program and reconnection costs to DWSD. Spending on 'Safe Drinking Water' totaled over $150 million. The 'Water Bill Credits' reflect subsidies paid to residential and commercial users for their water bills through February 2017." (Ex. 114, p. 12). The program provided a 65% subsidy for residential users and a 20% subsidy for commercial users. Total payments exceeded $40 million. (*Id.* at 12 n.11).

With respect to business losses, any claims would need to bear in mind the fact that not all businesses were equally affected by the water crisis. Class Counsel's own expert Dr. Robert Simons explains that "[w]hen there is economic contraction, theory and past evidence from the recent great recession shows that not all types of retail and service enterprises are equally affected. (Ex. 86, at 2). In addition, the

80

claims would need to consider alternative causes for business decline, ranging from overall economic trends within Flint to mismanagement of individual businesses. Dr. Simons observes that "Flint's economy has been in slow decline for a number of decades." (Ex. 86, at 3). At the same time, business claims would need to factor in the effects of public programs in Flint, which have at least partially offset business losses. The State has provided a significant assistance program in Flint to provide economic development and job creation, among other services. (Ex. 114, p. 12 n.10). Robert Simons, one of Class Counsel's experts, notes that "government has spent over $100 million to offset the effects of lead in Flint's municipal water supply, and *these expenditures would offset any decrease in consumer expenditures in local businesses*." (Ex. 86, at 2 (emphasis added)).

Such individual variations have led numerous courts to deny certification of property damage and business loss class actions. In *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011), for example, the Third Circuit upheld the denial of certification of a property damage class brought by residents of a village against a chemical plant, alleging property loss as a result of contamination of drinking water and air pollution. The Court of Appeals found that "[a]lthough many aspects of [p]laintiffs' claims may be common questions," "resolution of those questions leaves significant and complex questions unanswered, including questions relating to causation of contamination, extent of contamination, fact of damages, and amount

81

of damages." *Id.* at 271 (citation omitted). This case involves a much more sprawling class and many more individualized issues.

In *Snow v. Atofina Chemicals, Inc.*, 2006 WL 1008002 (E.D. Mich. Mar. 31, 2006), the court denied certification of a class alleging property loss from chemicals emitted on July 14, 2001 during an explosion at defendant's facility: "To the extent that Plaintiffs intended to limit this class to those who have suffered a diminution in the market value of their real property, the Court finds that the Individual proofs required to establish such a claim predominate over any common issues of law or fact. Courts consistently decline to certify a class when individual issues of causation, injury and damage outnumber the common issues." *Id.* at *7. "[E]ach claimant would have to produce Individual proofs as to causation, actual injury and the amount of damages. For instance, each claimant would have to establish that there was a reduction in their property value; the extent of the reduction; and, that the reduction was caused by the accident, as opposed to a myriad of other potential causes." *Id.* at *8.

Similarly, in *In re Katrina Canal Breaches Consolidated Litigation*, 258 F.R.D. 128 (E.D. La. 2009), the court denied certification of a proposed class action for real-estate damage, business losses, and personal-property damage from flooding caused by a barge owned by defendant, which struck and breached a canal wall during Hurricane Katrina. The court noted that, even if expert testimony could be

82

used to develop a "mass appraisal" model for property losses, some properties would deserve "individual attention," and "analysts would presumably have to evaluate properties first to determine whether they are 'unique' enough, and then perform individualized assessments." *Id.* at 133. "Measuring business damages presents additional problems, including evaluating the loss of further intangible assets, such as customer goodwill. This Court would have to make individual assessments with regards to personal property," and "collecting the required data will be 'challenging and require considerable time and effort.'" *Id.* at 135 (citation omitted); *see also Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 305 n.70 (S.D. Ala. 2006) ("[A] property-by-property inquiry will unquestionably be necessary to determine whether that source and that pathway have any bearing on the experience of a particular property owner within the Proposed Class Area."); *Reilly v. Gould, Inc.*, 965 F. Supp. 588, 602 (M.D. Pa. 1997) (refusing to certify a property damage class and explaining that "it is the presence of additional individualized factors affecting individual plaintiffs which wreaks havoc on the notion that all plaintiffs' injuries have been caused solely by the defendant's actions").

The proposed Property Damage and Business Loss Litigation Subclasses cannot meet the standards for commonality or predominance.

**B.      The Economic Loss Litigation Subclasses Cannot Show Typicality Or Adequacy Of Representation.**

Nor can the proposed Property Damage and Business Loss Litigation Subclasses meet the requirements of typicality and adequacy of representation. As shown in Parts I-C and I-D, *supra*, those requirements cannot be satisfied where claims are varied and highly individualized. In such circumstances, the claims of absent class members do not rise and fall with the claims of class representatives. And when class members' claims differ substantially, the class lacks sufficient common interest to meet the adequacy of representation requirement.

The evidence submitted by Class Counsel in connection with the proposed representatives for the Residential Property Litigation Subclass shows that they do not meet the typicality requirement:

Plaintiff Elnora Carthan's lead test indicates that a 2-minute flushed sample showed only 1.3 micrograms per liter (1.3 ppb) of lead. (Ex. 127). This test result shows that flushing could have been a successful remediation strategy for her—a defense not necessarily applicable to other class members.

Plaintiff David Munoz seeks damages for diminution of the value of his home and damage to appliances, including a furnace, hot water heater, and faucets. (Ex. 92). But whether other Property Damage Litigation Subclass members suffered damage to their own appliances and plumbing fixtures will turn on an examination

of their individual homes; nothing about Mr. Munoz's claim will prove or disprove theirs.

Similarly, the evidence submitted by Class Counsel regarding the proposed representatives for the Business Loss Litigation Subclass highlights the individual nature of their claims:

Plaintiff Frances Gilcreast is a partner in an investment firm that owned properties in Flint during the Class Period. Yet, records show that several of the properties had no tenants as of January 2014 (Ex. 95), before the water crisis started, which suggests that defendants could raise unique causation defenses specific to Plaintiff Gilcreast's properties.

Class Counsel allege that Plaintiff 635 South Saginaw LLC "suffered a significant reduction in income due to the reluctance of restaurant patrons to purchase food and beverages at a restaurant located within the City of Flint that used Flint water." Class Cert. Br. 40. But Class Counsel do not explain how they will prove "the reluctance of restaurant patrons" to visit 635 South Saginaw LLC's restaurants except through individualized evidence. Nor do they explain how that evidence would apply class-wide; defendants would be able to argue that other businesses not serving food or drink are exempt from the factors motivating restaurant patrons.

Plaintiff Neil Helmkay, who operated Angelo's Coney Island restaurant, alleges that its profits diminished after the Flint Water crisis became public. Class Cert. Br. 40. Again, Class Counsel do not explain how that non-restaurant businesses would be affected in the same way or why that evidence would apply class-wide.

Class Counsel cannot meet the requirements for certifying the proposed property damage and business loss Subclasses.

## IV.    A Rule 23(b)(2) Litigation Class Should Not Be Certified.

Under Rule 23(b)(2), Class Counsel seek "[t]he establishment of a coordinating body designed to ensure the provision of ongoing access to programs and services designed to ameliorate the neurodevelopmental impacts of lead poisoning in for [sic] the Minors Litigation Subclass and the psychological trauma experienced by the Class as a whole." Class Cert. Br. 86. Class Counsel ask the Court to establish and supervise a wide array of social programs including "[d]iagnostic and testing services," "physical and mental health services, nutritional services, and academic and educational support," "[s]tress reduction and mental health community services," and a "registry of participation," with appropriate safeguards for "individual privacy." *Id.*

Class Counsel's extravagant proposal cannot meet the prerequisites for certification under Rule 23(b)(2) and exceeds the limits of the judicial authority granted by Article III.

86

### A.    The Proposed Rule 23(b)(2) Litigation Class Cannot Meet The Requirements Of Rule 23(a).

As shown in Part I, the proposed Litigation Class cannot satisfy the requirements for certification under Rule 23(a)—particularly commonality, typicality, and adequacy of representation—given the enormous variations among class members in terms of exposure, liability, causation, and injury. The Sixth Circuit has warned that ensuring class cohesiveness is vital in the Rule 23(b)(2) context:

> [C]ohesiveness, or homogeneity, is vital to Rule 23(b)(2) actions. . . . First, unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action. Thus, the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representative's claims present different individual issues than the claims of the absent members present. Second, the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently.

*Romberio v. Unumprovident Corp.*, 385 Fed. Appx. 423, 434 (6th Cir. 2009) (internal quotation marks, ellipses, and citation omitted). In *Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), the Court of Appeals vacated the certification of a Rule 23(b)(2) class for failure to meet the commonality and typicality requirements where "each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff." *Id.* at 398. That is precisely the situation here. *See also Ebert v. General Mills, Inc.*, 823 F.3d 472, 48–81 (8th Cir. 2016) (vacating

certification of Rule 23(b)(2) class of homeowners in CERCLA action for lack of cohesiveness where "the issue of liability and the relief sought... is, at bottom, highly individualized"); *Agostino v. Quest Diagnostics Inc*., 256 F.R.D. 437, 470 (D.N.J. 2009) (denying Rule 23(b)(2) certification where "various individual issues of fact and law destroy any modicum of cohesiveness among members of the Class").

In fact, the proposed Rule 23(b)(2) Litigation Class compounds the inadequate representation of both Class Counsel and Litigation representatives in two critical respects:

First, certifying both a Rule 23(b)(2) Litigation Class for prospective injunctive relief and a separate Rule 23(b)(3) Litigation Class for monetary damages would create an intractable conflict for Class Counsel due to competition between the classes for limited resources available from the defendants. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016), squarely addresses this issue and counsels that unitary representation is not permitted under these circumstances. In that case, in which merchants challenged Visa and Mastercard no-surcharging and honor-all-cards network rules, the class plaintiffs sought certification of two settlement classes with unitary counsel: a 23(b)(2) injunctive relief class and a 23(b)(3) damages class. *Id.* at 229. While the 23(b)(3) class would be eligible to receive up to $7.25 billion in monetary relief for past harm,

the 23(b)(2) class would obtain injunctive relief in the form of changes to the card issuers' network rules going forward. *Id.* Although the district court certified the proposed classes, the Second Circuit reversed on the basis of "fault lines [that] were glaring" and resulted in a "clear conflict" between the two classes. *Id.* at 233. "Problems arise when the (b)(2) and (b)(3) classes do not have independent counsel [and] seek distinct relief." *Id.* at 235.

The same reasoning applies here. In this case, the proposed Rule 23(b)(2) class seeks forward-looking, prospective relief, while the Rule 23(b)(3) class seeks compensation for past harm, just as in the *Payment Card Interchange Fee* case. Class Counsel cannot represent both classes.

Second, the panoply of programs sought by Class Counsel as part of the Rule 23(b)(2) Litigation Class would only create more conflicts of interest within the class. Class members would have divergent interests in what kinds of relief Class Counsel should seek, how vigorously Class Counsel should litigate each type of relief, and how the available funds should be divided up among the many kinds of services Class Counsel propose. The finite resources to be made available by this litigation will unavoidably be parceled out and divided among the various social services that Class Counsel propose, and they will be forced to make budgetary and funding choices that will favor some class members and disadvantage others.

Some class members (those currently not exhibiting severe symptoms of lead poisoning, for example) might favor more emphasis on diagnostic and testing services. Other class members might favor other kinds of social services to benefit those already suffering from lead poisoning. Adults without children might see little need for academic and educational support; parents would have a conflicting view. Class members with physical ailments would wish to emphasize physical health services, while those with primarily psychological injuries would want to pursue stress reduction and mental health services. Some might want to focus on community trauma and community-wide issues; others might prefer a focus on individual mental health.

Where, as here, limited resources are available to remedy class members' alleged injuries, these sorts of intra-class conflicts render class treatment inappropriate. *See Cherokee Nation of Oklahoma v. U.S.*, 199 F.R.D. 357, 365 (E.D. Ok. 2001) (denying class certification on 23(a) grounds in case challenging government's failure to pay full contract funding due to Indian tribes operating Indian Health Services programs pursuant to the Indian Self-Determination Act, where budget was finite and "as a result of one plaintiffs' claim less money for other tribes will be available"). Class Counsel would be inevitably conflicted in the implementation and operation of the programmatic relief they seek.

90

**B.      The Proposed Litigation Class Is Not Authorized By Rule 23(b)(2).**

The wide-ranging relief sought by Class Counsel is unavailable under Rule 23(b)(2). Although Class Counsel characterize their requested injunctions as "the type of relief that is quintessentially sought and provided on a class-wide basis," Class Cert. Br. 1, binding precedent demonstrates that the requested relief exceeds what is permissible under Rule 23(b)(2).

The Supreme Court has instructed that "Rule 23(b)(2) applies only when a *single* injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) (emphasis added). Rule 23(b)(2) requires "an *indivisible* injunction benefiting all its members at once." *Id.* at 362 (emphasis added). Class Counsel fail to meet that test. Here, they seek a long list of multifarious injunctive remedies, each benefiting certain segments of the Flint population to varying extents. Although Class Counsel seek to roll all the injunctive relief into a single judicial order, in no sense is the injunctive relief "indivisible," as required by *Wal-Mart*. 564 U.S. at 362.

As the Sixth Circuit observed in *Romberio v. Unumprovident Corp.*, "Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of

91

facts particular to any subset of the class nor require a remedy that differentiates materially among class members." 385 Fed. Appx. 423, 432–33 (6th Cir. 2009) (quoting *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000)); *see also id.* at 432 (the "defining characteristic" of a mandatory class under 23(b)(2) is "the homogeneity of the interests of the members of the class"); *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir. 2002) (explaining that Rule 23(b)(2)'s "requirements are designed to permit only those classes with homogeneous interests").[11]

That is why, as Class Counsel concede, relevant Rule 23(b)(2) cases in the Sixth Circuit "more often involve prohibitive injunctions," Class Cert. Br. 96 n.235, and the examples cited by Class Counsel of affirmative injunctive relief are much

---

[11] *See also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 846 (5th Cir. 2012) (vacating (b)(2) certification order because district court erred in finding "it irrelevant that some of the class's requested relief would not apply to every class member"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of all plaintiffs, class certification is typically not appropriate."); *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185, 200 (5th Cir. 2010) ("[F]orty percent of the class benefiting from an injunction is not sufficient to certify under (b)(2)."); *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004) (affirming denial of certification of 23(b)(2) class where "the variety of claims asserted in the Complaint do not lend themselves to the formulation of appropriate class-wide injunctive or declaratory relief"); *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 300 (D.D.C. 2011) (decertifying 23(b)(2) class because, inter alia, if plaintiffs prevailed, "each individual class member would be entitled to an individualized administrative review of his or her claimed entitlement to benefits" as opposed to a universal injunction against a challenged practice).

more modest than the omnibus social services programs proposed here.[12] Civil rights cases, or actions seeking "negative" or prohibitory injunctions to halt operation of unconstitutional laws or governmental policies, are the prototypical Rule 23(b)(2) actions. This case falls far outside that category.

In *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016), the Sixth Circuit examined the teaching of Wal-Mart. The Court of Appeals opined that "the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought," and "the purpose of a (b)(2) class is to provide relief through a single injunction or declaratory judgment." *Id.* at 542 (citation and internal quotation marks omitted). The Sixth Circuit found that a 23(b)(2) class was appropriate in *Cole*, because "the plaintiffs seek a single remedy: an injunction prohibiting the City from reenacting the Beale Street Sweep. As the district court observed, this injunction provides the sole remedy necessary to protect the affected class." *Id.*

Similarly, in *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 427-28 (6th Cir. 2012), the Sixth Circuit approved a Rule 23(b)(2) class action seeking a class-wide declaratory judgment as to the meaning of a contract. And in *Barry v. Corrigan*, 579 F.Supp.3d 712 (E.D. Mich. 2015) (Levy, J.), this Court recognized that, under *Wal-Mart*, Rule 23(b)(2) applies "only when a single injunction or

---

[12] Significantly, the cases on which Class Counsel rely also predated the Supreme Court's decision in *Wal-Mart*. *See* Class Cert. Br. 96, n. 235 (citing *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004); *Centley v. Honeywell Intern., Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004)).

declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id*. at 733 (quoting *Wal-Mart*). This Court opined that "[l]awsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to *a single injunctive remedy*." *Id.* (citation and internal quotation marks omitted; emphasis added). *Barry* involved a unitary prohibitory injunction enjoining the State from enforcing its fugitive felon policy to deny food assistance benefits without providing proper notice.

Numerous cases cited by Class Counsel prove the point. In *Dearduff v. Washington*, 330 F.R.D. 452 (E.D. Mich. 2019), which involved challenges to dental treatment provided by the Michigan Department of Corrections, the court gave two examples of "single injunctions" that would comport with *Wal-Mart*: "the Court could order that the wait time for urgent dental services be reduced to two days" or "the Court could order that the MDOC conduct probing and take intra-oral x-rays at intake and then every 2 years thereafter." *Id.* at 473–74. Similarly, in *Chicago Teachers Union, Local No. 1 v. Board of Educ.*, 797 F.3d 426 (7th Cir. 2015), the court noted that "the 23(b)(2) plaintiffs here seek *the same* declaratory and injunctive relief *for everyone*." *Id*. at 442 (emphasis added).

*Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016), relied on by Class Counsel for the proposition that class-wide relief benefit each class member in precisely the same way, actually counsels against certification in the instant matter. In that case, the plaintiffs sought an order proscribing certain policies and practices relating to the provision of mental health treatment in state prisons. *Id.* at 669. In granting certification, the court specifically held that the requested remedy "would be appropriate for everyone subjected to the substantial risk of harm plaintiffs claim." *Id.* at 668. Critically, the court explained that "the plaintiffs [we]re not seeking adjudication of demands for particular individualized treatment," and further observed that "a single injunction would not be appropriate if plaintiffs sought an order requiring that each named plaintiff be provided the specific forms of treatment he has been denied." *Id.* at 667–68.

Where, as here, Class Counsel seek individualized relief that renders a single class-wide injunction impracticable, courts routinely deny class certification under Rule 23(b)(2). For example, in *Ball v. Kasich*, 307 F. Supp. 3d 701, 718 (S.D. Ohio 2018), which involved a challenge to the state's institutionalization of people with intellectual and developmental disabilities, the district court denied certification of a proposed 23(b)(2) class seeking development and delivery of integrated residential, employment, and day services that would avoid unnecessary institutionalization. In that case, because some class members wanted community-

95

based services and others did not, and there was limited funding to go around, the court concluded that the class members had *competing* interests, as well as a lack of homogenous interests, and that therefore "the proposed class d[id] not suffer a uniform harm that can remedied with the same relief." *Id.* at 717–18; *see also Elizabeth M. v. Montenez*, 458 F.3d 779, 783 (8th Cir. 2006) (vacating certification of 23(b)(2) class of mental health patients where plaintiff class sought "sweeping injunctive relief which, if granted, would require the district court to mandate and monitor detailed programs governing nearly every facet of the State's operation of the three residential facilities"); *Creech v. Emerson Electric Co.*, No. 15-cv-14, 2019 WL 1723716, at * (S.D. Ohio Apr. 18, 2019) (denying 23(b)(2) certification for lack of cohesion where "the fractured nature and extent of the injuries suffered by the class members as a result of Defendants' alleged wrongdoing in this case does not lend itself to a 'one size fits all' injunctive remedy"); *Freeman v. Delta Airlines, Inc.*, No. 15-cv-160, 2019 WL 2495471, at *18 (E.D. Ky. June 14, 2019) (denying 23(b)(2) certification where requested injunctive relief would involve individual determinations and different injunctions for each member because "[t]here is not an injunction the Court could issue that would apply to 'the class as a whole.'"); *T.R. v. School District of Philadelphia*, No. 15-4782, 2019 WL 1745737, at *22 (E.D. Pa. Apr. 18, 2019) (rejecting proposed 23(2)(b) class where plaintiffs' requested

injunction "would merely establish a system for eventually providing individualized relief" as opposed to providing appropriate relief to the class as a whole).

Moreover, numerous courts have found medical monitoring[13] classes particularly ill-suited to Rule 23(b)(2) treatment because "they suffer from cohesion difficulties." *In re St. Jude Medical, Inc. Silzone Heart Valve Prods. Liab. Litig.*, No. 04-3117 (8th Cir. Oct. 12, 2005). For example, in *Barnes v. American Tobacco Co.*, the plaintiff class sought certification of a Rule 23(b)(2) medical monitoring class consisting of cigarette smokers. 161 F.3d 127 (3d Cir. 1999). The district court certified, and then decertified, the proposed class, and the Third Circuit affirmed, holding *inter alia* that "the requirement that each class member demonstrate the need for medical monitoring preclude[d] certification." *Id.* at 146. According to the *Barnes* court, in order to state a claim for medical monitoring, each class member must prove that the monitoring program he requires is "different from that normally recommended in the absence of exposure," and thus each plaintiff must prove the monitoring program that is prescribed for the general public and the monitoring program that would be prescribed for him. *Id.* (quotation and citation omitted). The latter must be proven on an individual basis because a plaintiff must present evidence about his individual history and subject himself to cross-examination about that

---

[13] As discussed *infra* at Part IV-C, medical monitoring is not even cognizable under Michigan law, and thus the diagnostic and testing aspects of Class Counsel's requested relief presents another insurmountable hurdle to class certification.

history. *Id.* These individual issues make Rule 23(b)(2) treatment inappropriate. *Id.*; *see also Gates v. Rohm & Hass Co.*, 655 F.3d 255, 269 (3d Cir. 2011) (affirming denial of class certification of Rule 23(b)(2) medical monitoring class for lack of cohesiveness); *Rhodes v. E.I du Pont de Nemours & Co*., 253 F.R.D. 365, 380 (S.D. W.Va. 2008) (denying certification under 23(b)(2) because determination as to each of element of medical monitoring for each class member would require an individualized inquiry)

Here, of course, Class Counsel seek much more than just medical monitoring, and cite to *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994), *Cameron v. Bouchard*, No. 20-10949, 2020 WL 2569868 (E.D. Mich. 2020), and *Elliott v. Chicago Hous. Auth.*, No. 98 C 6307, 2000 WL 263730 (N.D. Ill. Feb. 28, 2000), for the proposition that courts "routinely" certify Rule 23(b)(2) classes designed to provide individualized programmatic relief of the type requested in the instant case. A close examination of those cases belies Class Counsel's characterization, however. For example, the *Baby Neal* case, which preceded the Third Circuit's decision in *Barnes*, held that 23(b)(2) certification was appropriate because the district court in that case could "fashion *precise* orders to address specific, system-wide deficiencies" and thus "w[ould] *not* need to make individual, case-by-base determinations in order to assess liability or order relief." 43 F.3d at 64 (emphases added). Moreover, the *Baby Neal* decision is distinguishable in another important

respect: in contrast to this case (and *Barnes*), *Baby Neal* did not present the "individualized issues [that] can become overwhelming in actions involving long-term mass torts." *Barnes*, 161 F.3d at 142.

In *Elliott*, although the court approved medical monitoring—not a coordinating body designed to ensure the provision of a variety of social services, as requested here—it did not even address cohesion. 2000 WL 263730, at *15. And in *Cameron*, which was subsequently reversed on other grounds, the plaintiff class sought injunctive relief to "improve the conditions in the Jail" to reduce the spread of COVID-19, as well as early release for a medically-vulnerable subclass of inmates. 2020 WL 2569868, at *19. The request for improved conditions at the Jail—*e.g.*, enhanced availability of soap and cleaning supplies, better social distancing protocols, *etc.*—applied across the class equally and did not result in individualized injunctions of the sort requested here. As to the request for early release for the medically vulnerable subclass, the *Cameron* court even acknowledged that such relief "may not fit perfectly within Rule 23(b)(2) because the Court's injunction may not result in the same relief for every member of the subclass." *Id.*

Here, the requested individualized relief does not fit *at all* within Rule 23(b)(2), much less "[im]perfectly." That the Class Counsel here purport to seek "institutional change" that would "benefit the entire class," Class. Cert. Br. 87–88,

does not dictate otherwise, as acknowledged by numerous appellate courts faced with similarly broad 23(b)(2) classes.

In *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012), for example, the Seventh Circuit vacated certification of a 23(b)(2) class in which it was "not possible" to order final injunctive or corresponding declaratory relief on a class-wide basis. There, the district court had ordered a court-monitored system to identify disabled children who were delayed or denied entry into the special education process, implement individualized education plan meetings, and craft compensatory-education remedies. The Court held that the relief sought "d[id] not come close to satisfying Rule 23(b)(2)'s standard" because, among other things, it merely established "a system for eventually providing individualized relief, rather than, on its own, providing final relief to any class member." *Id.* at 499. Put differently, "superficially structur[ing] [a] case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only…." *Id.* at 499.

Similarly, in *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), the Fifth Circuit vacated a district court's certification of a 23(b)(2) class in a case alleging systemic deficiencies in Texas's administration of its long-term foster care

program. Among other things, the named plaintiffs in that case sought to convene "a special expert panel" to review individual cases and to implement appropriate remedial steps for the class members, including meeting the children's service needs. *Id.* at 847. The Fifth Circuit held that the requested relief, which effectively petitioned the district court to order the defendant to craft individualized "injunctive-type" relief, violated *Wal-Mart*, and that the proposed class thus lacked sufficient cohesion to proceed under Rule 23(b)(2). *Id.*

Finally, in *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597 (10th Cir. 2008), the Tenth Circuit affirmed the denial of certification of a 23(b)(2) class of inmates challenging the conditions for prisoners with mental health needs and seeking extensive affirmative injunctive relief, including the provision of "safe and appropriate" housing and "adequate" screening and precautions to avoid self-harm. *Id.* at 605. In an opinion authored by now-Justice Gorsuch, the court concluded that this relief was not amenable to class treatment because different injunctions would be required to establish the appropriate behavior toward different groups of class members. *Id.* The same result should obtain here.

*Wal-Mart* and its progeny are clear: individualized injunctions are not permissible under Rule 23(b)(2). Class Counsel's extravagant request exceeds the authority granted by Rule 23(b)(2) and should be rejected.

## C.    The Proposed Rule 23(b)(2) Litigation Class Would Exceed The Limits Of The Judicial Role.

The broad programmatic relief sought by Class Counsel is a form of social engineering that would exceed the limits of the judicial role and would divert from the judiciary's traditional responsibility of compensating individual victims. The proposed class asks this Court to play the role of a junior varsity social services agency in operating complex programs in parallel to (or perhaps even in competition with) programs established by the State of Michigan and the City of Flint. More than $450 million in federal and state aid to Flint has already been used to fund health, nutritional, educational, and other social services, in addition to water quality improvements and pipe replacement.[14]

The proposed class would enmesh the federal judiciary in making political and administrative decisions in how those services should be run. To our knowledge, no court has ever supervised such a vast array of social services, on the scale proposed here. The Supreme Court has cautioned that solutions to complex societal problems are best left to the political branches. *See, e.g., Amchem Products*, 521 U.S. at 629 (rejecting asbestos settlement and explaining that "Congress . . . has not adopted such a solution"); *Ortiz*, 527 U.S. at 821 ("[T]his [asbestos] litigation defies customary judicial administration and calls for national legislation.").

---

[14] *See* https://www.michigan.gov/documents/flintwater/FlintServicesGuide_642092_7.pdf.

That lesson is particularly salient here, given the need for local input and control. Class Counsel's own expert Dr. Keating warned that "[a]n unregulated scramble for resources obtained from the lawsuit would not be effective in delivering appropriate intervention and prevention services." (Ex. 119, ¶ 26(d)). Dr. Keating states that "[t]he principle of community control of intervention and prevention services is essential." (*Id*. ¶ 26(i)(2)). Class Counsel's expert Dr. Alan Ducatman opines that interventions "are more effective when they are seen by the participating community as a fundamental part of the community, and when the specific activities are acceptable to and valued by the community in need of the service." (Ex. 120, ¶ 48). Injunctive relief imposed and supervised by the Article III judiciary is antithetical to local control.

The *Erie* doctrine provides another important constraint on this Court's authority, because the programmatic relief sought by Class Counsel raises novel questions under Michigan law. State law provides that judicial relief is ordinarily limited to plaintiffs who manifest physical injuries from toxic substances like lead. Thus, the Michigan Supreme Court has declined to recognize a cause of action for medical monitoring, finding that an allegation of present physical injury is required to present a viable negligence claim under Michigan common law. *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 689 (Mich. 2005). Instead, the court has adopted the discovery rule, allowing injured plaintiffs to bring suit within three years of

103

manifesting physical harm from exposure to a toxic substance. Thus, individuals exposed to lead whose injuries have not yet manifested have the right under Michigan law to bring a cause of action when those injuries present themselves, within three years of the date they know or should have known of the physical harm.

In *Henry*, 173 plaintiffs alleged that a Dow plant had negligently released dioxin into the Tittabawassee flood plain, where plaintiffs, and putative class members, lived and worked. The court rejected a claim for medical monitoring based on the allegation "that defendant's negligence ha[d] created the risk of disease—that [plaintiffs] may at some indefinite time in the future develop disease or physical injury because of defendant's allegedly negligent release of dioxin." *Id.* Rather, the court held that "present harm to person or property is a necessary prerequisite to a negligence claim," *id.* at 690, and, as a result, the court declined to create "a program, funded by defendant and supervised by the court, to monitor the class and their representatives for possible future manifestations of dioxin-related disease." *Id.* at 686. The court specified, however, that its decision did "not hold that a party who actually contracts a dioxin-related disease w[ould] be foreclosed from recovery." *Id.* at 702. Rather, a person who "could show physical harm and causation . . . would be entitled to full compensation for the injury." *Id.* Under the "discovery rule," so long as "the injured person br[ought] an action within three years of the date he kn[ew]

or should have known of a dioxin-related injury, the statute of limitations would be satisfied." *Id.* (citing MCL 600.5805(10)).

In the instant matter, Plaintiffs seek not only medical monitoring, but a host of other services that are predicated on medical monitoring and thus likely precluded under *Henry*. A federal court should be extremely reluctant to confront unsettled questions of state law. It is well established that the role of a federal court sitting in diversity is to apply existing state law, and not to create or modify it. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (explaining that a federal court, sitting in diversity, has "a proper reluctance to speculate on any trends of state law" and "should be extremely cautious about adopting substantive innovation in state law").

For all these reasons, certification of the proposed Rule 23(b)(2) class would be impermissible.

## V.    A Limited "Issues" Class Should Not Be Certified Under Rule 23(c)(4).

Class Counsel also seek certification of a limited "issues" class pursuant to Rule 23(c)(4). That request should be denied.

In *Martin v. Behr Dayton Thermal Prods. LLC*, the Sixth Circuit explained that, even where predominance has not been satisfied for the cause of action as a whole, a court may certify issues under Rule 23(c)(4) "to retain a case's class character where common questions predominate within certain issues *and* where

class treatment of those issues is the superior method of resolution." 896 F.3d 405, 413 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019) (emphasis added). In this matter, a limited issues class action is not permissible within the parameters established by *Martin*.

In *Martin*, a groundwater contamination case, the Sixth Circuit affirmed the district court's certification seven discrete issues for treatment under Rule 23(c)(4). Before certifying the issue class, the district court had already rejected 23(b)(3) certification of liability-only classes because "individualized inquiries predominate[d] over the elements of causation and injury." *Id.* at 414. Thus, the seven issues certified under Rule 23(c)(4) were proposed in the alternative to the 23(b)(3) class, *id.* at 409, and, critically, "*d[id] not overlap* with actual injury or causation." *Id.* at 414 (emphasis added).

Here, in contrast, Class Counsel's proposed issue class suffers from the precise infirmities that the *Martin* court explicitly sought to avoid. Although Class Counsel's brief references the Court's authority under Rule 23(c)(4) to certify "discrete issues that could be efficiently and effectively decided for the Class as a whole," Class. Cert. Br. at 98, its trial plan proposes for Phase One a trial that would resolve the following issues pursuant to Rule 23(c)(4): liability for the Litigation Class and *all* subclasses; and "liability, causation, injury and class-wide damages" for the General Class. (Ex. 84 at 2). In other words, although their brief does not say

106

as much, Class Counsel apparently assume that, other than individual damages, all elements of the General Class's claims are suitable for class treatment under Rule 23(c)(4). As discussed extensively in Part I, *supra*, that assumption is a non-starter. Liability, exposure, causation, and injury are highly individualized issues that cannot be determined for the class as a whole.

If, on the other hand, Class Counsel mean to propose Rule 23(c)(4) certification as a way of abandoning their proposed Trial Plan (Ex. 84), that attempt also fails to comply with *Martin* and other precedent. Rule 23(c)(4) cannot be used to resolve class-wide the handful of vaguely defined questions that Class Counsel suggest might be appropriate as limited issues: "Defendants' role in contaminating Flint's drinking water," "all of the misconduct alleged against the Government Defendants," "questions pertaining to qualified immunity," and "factual and legal questions pertaining to the Engineering Defendants' duty to the class." Class Cert. Br. at 98–99.

First, common questions do not predominate, *even within the limited issues proposed by Class Counsel*. In *Martin*, which involved just 540 properties and two primary defendants, the court found that "resolving the [seven] certified issues will go a long way toward" "resolv[ing] the question of Defendants' liability either to the class as a whole or to any individual therein" and that a limited-issues class action "[wa]s the most efficient way of resolving the seven issues that the district court has

certified." 896 F.3d at 416. This case, in contrast, has upwards of 100,000 class members and an array of Governmental and Engineering Defendants, each of which engaged in different activity, at different times, and is subject to different standards of care vis-a-vis the putative class members. As shown in Part I-B-1, *supra*, liability is *not* a common question in this case, because the respective defendants' conduct and duty is not uniform with respect to all class members. In order to establish liability against a particular defendant, class members will need to establish on an individualized basis how and when they were exposed to Flint River water and which wrongful acts of which defendants were responsible for that exposure. Class Counsel seek to create an ad hoc mélange of a Litigation Class in which they can simply toss in all class members and all defendants, and ignore the individualized liability questions particular to each. That is not the why Rule 23 (or due process) works.[15]

---

[15] Because of the individualized issues that arise in deciding liability, a limited-issues class would raise significant issues under the Reexamination Clause of the Seventh Amendment, which provides that "no fact tried by a jury[] shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." *See Martin*, 896 F.3d at 416–17; *Gasoline Prods. Co. v. Champlin Refining Co*., 283 U.S. 494, 500 (1931). The risk of a Seventh Amendment violation is particularly acute under Class Counsel's proposal because the evidence necessary to address the issues they propose to address class-wide would overlap substantially with the evidence underlying the issues they propose to try individually. Given the interwoven nature of the issues and evidence, any second jury would be effectively re-examining the conclusions of the first. *See In re Rhone-Poulenc Rorer Inc*., 51 F.3d 1293, 1303 (7th Cir. 1995) (Posner, J.) (certification of a limited-issue class, with subsequent issues to be resolved by different jury, may violate the Seventh Amendment: "[t]he right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not

Second, although Class Counsel's brief appears to dispense with the superiority requirement vis-a-vis Rule 23(c)(4), *Martin* was clear: a district court must assess both predominance *and* superiority. *See Martin*, 896 F.3d at 413 ("[C]oncomitant application of Rule 23(b)(3)'s superiority requirement ensures that courts will not rely on issue certification where there exist only minor or insignificant common questions, but instead where the common questions render issue certification the superior method of resolution" and "[s]uperiority therefore functions as a backstop against inefficient use of Rule 23(c)(4).").

In this case, the limited issues identified by Class Counsel are precisely the kind of unhelpful questions that would not meaningfully advance the litigation. A trial on the Governmental Defendants' knowledge or on the Engineering Defendants' negligence in the abstract is unlikely to substantially aid resolution of the substantial issues on individualized exposure, liability, causation, and injury. When the enormous scope of this matter is viewed in combination with the number of individual trials that would still be required for individualized issues, it is clear that resolution of the limited issued identified by Class Counsel would barely make

---

reexamined by another finder of fact."), *cert. denied*, 516 U.S. 867 (1996); *see also U.S. v. McGraw-Hill Companies, Inc*., 2014 WL 1647385, *5 (C.D. Cal. 2014) (denying bifurcation because "interwoven issues cannot be separated without violating the Seventh Amendment"); *Benner v. Becton Dickinson & Co*., 214 F.R.D. 157, 174 (S.D.N.Y. 2003) (denying class certification where "bifurcation would violate the Seventh Amendment and prevent the class action from being the superior method of adjudication").

a dent in the resolution of the litigation. As one district court opined in denying

certification to a putative class of locomotive engineers injured by diesel exhaust:

"Plaintiffs admit that causation creates a 'myriad of individual issues' and therefore

seek to postpone inquiry into whether the pulmonary diseases allegedly suffered by

Plaintiffs are related to the diesel exhaust. But isn't that a very basic and underlying

purpose of this litigation? Ignoring the individual claims does not efficiently or

meaningfully advance, but rather complicates, this litigation." *Taylor v. CSX*

*Transp., Inc.*, 264 F.R.D. 281, 295 (N.D. Ohio 2007).[16]

---

[16] *See, e.g., Gates*, 655 F.3d at 274 (affirming denial of 23(c)(4) treatment where resolution of proposed issues was "unlikely to substantially aid resolution of the substantial issues on liability and causation"); *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) (holding that 23(c)(4) certification "would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages"); *In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.*, 321 F.R.D. 430, 447 (N.D. Ga. 2017) (noting that the plaintiffs' case for 23(c)(4) certification "collapse[d]" where certification of a common issues class would not dispose of a single case or eliminate the need for a single trial"); *Valenzuela v. Union Pacific Railroad Co.*, No. CV-15-01092, 2017 WL 1398593, at *4 (D. Ariz. Apr. 19, 2017) (concluding that 23(c)(4) certification would not materially advance the litigation where resolution of the three common issues would not establish the defendants' liability to any plaintiff); *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 738 (E.D. Pa. 2014) (denying 23(c)(4) certification where resolution of proposed issues were so inextricably intertwined with individual inquiries that certification would not materially advance the disposition of the litigation or increase the efficiency of the litigation "in any legally appropriate manner"); *In re Genetically Mod. Rice Litig.*, 251 F.R.D. 392, 400 (E.D. Mo. 2008) (denying 23(c)(4) certification where "a trial limited to common issues would not resolve any individual plaintiff's claims" and "would do little if anything to increase the efficiency of this litigation"); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 170 (S.D.N.Y. 2003) (holding that 23(c)(4) certification would not materially advance the litigation where substantial individual actions would still be required after the issues trial); *In re Baycol Products Litig.*, 218 F.R.D. 197, 209 (D. Minn. 2003) (holding that 23(c)(4) certification was not appropriate and would not materially advance the litigation where, *inter alia*, "individuals trials w[ould] still be required to determine issues of causation, damages, and applicable defenses"); *In re Paxil Litig.*, 218 F.R.D. 242, 249-50 (N.D. Cal. 2003) (declining to certify general causation class under 23(c)(4) because it would provide "few benefits…."); *Rink*, 203 F.R.D. at 672 (observing that 23(c)(4) certification "would only serve to lengthen and complicate the litigation given the number of separate trials that might follow"); *Emig v.*

Another district court denying certification of a proposed class cogently expressed concern about the dangers raised by posing such abstract liability questions to a jury. The court asked "whether it is appropriate or even meaningful to ask a jury to undertake an analysis to decide in the abstract that defendants are, say, guilty of negligence per se without knowing whether the alleged negligence caused any harm. Causation and damages are integral, indispensable parts of the question of liability. The fact that possible injury may result from some act or omission may give it some quality of wrongdoing, but that possibility is not sufficient to 'impose any liability or give rise to a cause of action.'" *Kohn v. American Housing Foundation*, 178 F.R.D. 536, 542 (D. Colo. 1998) (citation omitted). "It is understandable that plaintiffs seek the advantages created by certification, including dramatic improvement of chances of success and higher damage awards, but to confer that advantage without determining legally essential elements of liability does not comport with fairness or rational decision-making." *Id*. at 543. *See also Gates*, 655 F.3d at 274 ("The claims and issues here are complex and common issues do not easily separate from individual issues. . . . Given the inability to separate

---

*American Tobacco Co., Inc.*, 184 F.R.D. 379, 395 (D. Kan. 1998) (rejecting 23(c)(4) treatment of general causation because "the general causation questions of whether cigarettes cause the harms alleged by plaintiffs are invariably bound up in their claims that cigarettes cause their injuries" and thus adjudication of common issues "would not materially advance the litigation as a whole"); *Harding v. Tambrands Inc.*, 165 F.R.D. 623 (D. Kan. 1996) (denying 23(c)(4) certification where resolution of potentially common issues would not materially advance the litigation as a whole).

111

common issues from issues where individual characteristics may be determinative, the District Court did not abuse its discretion in refusing to certify a" Rule 23(c)(4) class); *In re Agent Orange Product Liab. Litig.*, 818 F.2d 145,165 (2d Cir. 1987) (explaining that determination of whether Agent Orange caused harm and to whom "is highly individualistic and depends upon the characteristics of individual plaintiffs (e.g., state of health, lifestyle) and the nature of their exposure to Agent Orange"); *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 671 ( M.D. Fla. 2001) (rejecting 23(c)(4) treatment of causation and harm because "the proof considerations underlying both issues appear entirely inseparable from consideration of the individual claimants"); *Davenport v. Gerber Prods. Co.*, 125 F.R.D. 116, 120 (E.D.Pa.1989) ("certification on the narrow issue [of duty] does not advance this litigation in light of the fact that virtually all of the issues related to liability would remain unresolved on an individual basis").

Class Counsel's proposed Rule 23(c)(4) limited-issues class fails both the predominance and superiority requirements articulated in *Martin* and thus cannot be certified.

## CONCLUSION

The motion to certify a Litigation Class should be denied.

Dated: January 13, 2021

Respectfully submitted,

**LEVY KONIGSBERG LLP**                    **NAPOLI SHKOLNIK LLP**

/s/ Corey M. Stern                         /s/ Hunter J. Shkolnik
Corey M. Stern                             Hunter J. Shkolnik
Renner K. Walker                           Paul J. Napoli
D. Alex Latanision                         Patrick J. Lanciotti
800 Third Ave., 11th Fl.                   360 Lexington Ave., 11th Fl.
New York, New York 10022                   New York, New York 10017
(212) 605-6298                             (787) 493-5088
cstern@levylaw.com                         hunter@napolilaw.com
rwalker@levylaw.com                        paul@napolilaw.com
alatanision@levylaw.com                    planciotti@napolilaw.com

**MASSEY & GAIL LLP**

/s/ Jonathan S. Massey
Jonathan S. Massey
The Wharf
100 Maine Ave. SW, Suite 450
Washington, DC 20024
(202) 652-4511
jmassey@masseygail.com

113

## CERTIFICATE OF SERVICE

I, Corey M. Stern, hereby certify that on January 13, 2021, the foregoing

document was served on all counsel of record via the court's ECF system.

*/s/ Corey M. Stern*
Corey M. Stern

114