**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In Re Flint Water Cases, ) | |
| ) | Case No.: 16-cv-10444-JEL-MKM |
| ) | (consolidated with 16-cv-11247) |
| ) | |
| ) | Hon. Judith E. Levy |
| _____) | |
| *Washington,* et al., ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| *City of Flint,* et al., ) | |
|     Defendants, ) | |

**WASHINGTON AND CHAPMAN PLAINTIFFS' MOTION TO EXTEND DEADLINE FOR OPT-OUTS, REGISTRATION AND OBJECTIONS BY SIXTY DAYS FROM MARCH 18, 2021**

NOW COME the *Washington* and *Chapman* Plaintiffs, by and through their attorneys, MARC J. BERN & PARTNERS, LLP, and CUKER LAW FIRM, who seek to move this Honorable Court to extend the March 29, 2021, deadline to opt-out, register and object to the proposed Amended Settlement Agreement ("MSA") (ECF 1394-2), as set by this Court's order of January 21, 2021 (ECF 1399), and in support thereof, state as follows:

For the reasons stated in the attached Memorandum of support, the *Washington* and *Chapman* Plaintiffs ("Plaintiffs") move this Honorable Court to extend the March 29, 2021, deadline to opt-out, register and object to the MSA by sixty days from March 18, 2021, which is Monday, May 17, 2021.

Plaintiffs seek an expedited hearing on this matter.

On March 23, 2021, Plaintiffs sought to address this matter through Co-Liaison counsel, who advised on March 24, 2021, that they would not seek concurrences regarding this motion or

file it. This was done under the order appointing them as liaison counsel (ECF 234), as highlighted by the Court at the February 24, 2021, conference. ECF 1440, Page ID.55690–91.

Plaintiffs therefore have sought concurrence in this motion and report as follows from those who have responded:

1. Co-Lead Class counsel supports the request for an extension of the Registration deadline. They will leave it up to the court to decide the merits of such an extension and if appropriate, how long.
2. Co-Liaison counsel oppose the motion.
3. Individual Plaintiffs Brown & Rodgers concur.
4. Anderson Plaintiffs concur.
5. Alexander Plaintiffs concur.
6. The State of Michigan opposes.
7. McLaren Hospital opposes.

WHEREFORE, the *Washington* and *Chapman* Plaintiffs, by and through their attorneys, MARC J. BERN & PARTNERS, LLP, and CUKER LAW FIRM, for the reasons stated in the attached memorandum, pray that this Honorable Court will GRANT their motion to extend the March 29, 2021, deadline to opt-out, register and object to the proposed Amended Settlement Agreement ("MSA") (ECF 1394-2), as set by this Court's order of January 21, 2021 (ECF 1399), and any other relief that is deemed just and proper.

Dated: March 24, 2021

Respectfully Submitted,

/s Stephen F. Monroe
Stephen F. Monroe (IL No. 6305823)
Marc J. Bern & Partners, LLP
225 West Washington Street, Suite 2200
Chicago, IL 60606
Phone: (312) 894-7941
Fax: (312) 873-4537

3

Email: smonroe@bernllp.com
*Attorneys for the Washington Plaintiffs*

/s Mark Cuker
Mark Cuker
Cuker Law Firm
130 N. 18th St.
One Logan Square
Philadelphia, PA 19103
Phone: (215) 531-8512
Email: mark@cukerlaw.com
*Attorney for the Chapman Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In Re Flint Water Cases, ) | |
| ) | Case No.: 16-cv-10444-JEL-MKM |
| ) | (consolidated with 16-cv-11247) |
| ) | |
| ) | Hon. Judith E. Levy |
| _____ ) | |
| *Washington,* et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| *City of Flint,* et al., ) | |
| Defendants, ) | |

## WASHINGTON AND CHAPMAN PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXTEND DEADLINE FOR REGISTRATION, OPT-OUTS AND OBJECTIONS BY SIXTY DAYS FROM MARCH 18, 2021

NOW COME the *Washington* and *Anderson* Plaintiffs ("Plaintiffs"), by and through their attorneys, MARC J. BERN & PARTNERS, LLP, and CUKER LAW FIRM and for their memorandum to move this Honorable Court pursuant to Federal Rule of Civil Procedure 6(b) to extend the March 29, 2021, deadlines to opt-out of, register under and object to the proposed Amended Settlement Agreement ("MSA") (ECF 1394-2), as set by this Court's order of January 21, 2021 (ECF 1399), and in support thereof, state as follows:

### CONCISE STATEMENT OF ISSUES UNDER LOCAL RULE 7.1(d)(2)

Whether this Honorable Court should find good cause exists under Federal Rule of Civil Procedure 6 for an extension of sixty days from March 18, 2021, to accommodate a sustained increase of public interest in registering, where, on that March 18 date, the Plaintiffs learned that an alternative bone scan site would be impossible, and confirmed a lack of transparency regarding the existing scan site.

## CONTROLLING AUTHORITY UNDER RULE 7.1(d)(2)

Rule 6(b) of the Federal Rules of Civil Procedure provides that a court may, "for good cause shown," extend a deadline if requested before the deadline expires. Fed. R. Civ. Pro. 6(b) (Lexis 2021). Courts of appeals review rulings on motions under Rule 6(b) for abuse of discretion. *Ott v. Fed. Home Loan Mortg. Corp.*, 535 Fed. Appx. 488, 489 (6th Cir. 2013). An abuse of discretion exists when "the reviewing court is convinced that a mistake has been made." *Stough v. Mayville Community Sch.*, 138 F.3d 612, 614 (6th Cir. 1998).

## INTRODUCTION

Good cause exists for an additional sixty days from March 18, 2021, to register citizens harmed by the Flint water crisis under the terms of the MSA or to object thereto because large amounts of new claimants are seeking to register, leaving little or no time to advise whether to object. Additionally, only a few days ago, in the midst of registration fever, the undersigned learned on March 18, 2021, that alternative bone scans would not be feasible, even if those devices were finally shown by qualified professionals to be safe for humans, something which has yet to occur. Because of the sudden and increasing response from the Flint public, and because a major category of damages is not going to be available to a large percentage of it— even if shown to be safe, additional time is needed to advise and to determine whether to object.

## BACKGROUND

On January 21, 2021, this Court entered an order (ECF 1399) granting preliminary approval to a partial settlement reached between the plaintiffs and defendants of the Flint Water Crisis cases, as those parties are defined in the MSA, ECF 1394-2; Page ID 54129, 54133. In that order, the Court set the deadline for registering to make claims under the MSA for March 29,

2

2021. ECF 1399 PageID. 54467–68. It also set the deadline for opting out, registering, and objecting to any part of the MSA for the same date. *Id*. The settlement totals $641.25 million.

As part of the MSA, "Grids" were created to delineate tiers of compensation based on proofs. ECF 1319-2. Under this scheme, 79.5% of monetary awards are for minors at the time of first exposure, with 64.5% of that reserved for those ages 0-6; 10% for ages 7-11; and 5% for ages 12–17. *Id*., PageID.40789. The highest tiers—that is, those that would award the highest monetary awards—are met either exclusively by blood or bone proofs, or as independent proofs with others, such as cognitive deficit evaluations, or documented personal injury. ECF 1394-2, PageID.40790–99; 40802–09; 40811–17; 40819–24. Regarding blood lead proofs, the grid categories limit them to those done between May 16, 2014, and August 31, 2016. *E.g.*, PageID.40790.

Regarding bone lead tests, the period is more expansive, ending April 21, 2021. *Compare*, *e.g.*, ECF 1319-2, PageID.40791 (indicating that bone scan results qualify if tests conducted no later than 90 days from entry of order granting preliminary approval) *with* ECF 1399 (the order granting preliminary approval, entered January 21, 2021); *but see id*., PageID.54467–68 (indicating that said order is not effective until January 27, 2021, but for purposes of the schedule outlined therein).

Critically, the amount any particular Claimant receives in the category they qualify for—which, if there are multiple, will be the one with the highest monetary award—depends upon the total number of qualifying claimants. ECF 1319-2, PageID.40789.

At the most recent status conference, held on February 24, 2021, the Special Master, Deborah Greenspan, provided the Court an update on submissions to the census. She stated that "in the last couple of weeks," there had been 430 new claims and 700 updates. ECF 1440,

3

PageID.55681. She stated that, in total, there were approximately 26,692 submissions. *Id*. Of those, 10,784 were children. *Id*. at PageID.55682. She stated that notice of the settlement began to be mailed on February 19, 2021, totaling 57,402 individual packages. *Id*. at PageID.55682. As of that date, 15,568 unique registrations had been made under the terms of the MSA and the Court's January 21, 2021, order. *Id*. at 55683. According to the United States Census Bureau's population estimate of Flint, Michigan as of July 1, 2019, the most recent data available on its website, the population was 95,538.[1]

With the deadline fast approaching, the response from the public has grown exponentially. In the past two weeks alone, the undersigned *Washington* counsel's law firm has scheduled over 100 appointments with citizens seeking to register, with dozens more seeking appointments for the remainder of this week and into the weekend. *See* Exhibits 1 and 2, Declarations of Sharon Ball Green and Tina Ball.

Additionally, a major qualifying proof for higher monetary awards—bone scan testing—is all but removed from the grid categories for thousands of citizens. On March 18, 2021, the undersigned learned that after meeting with two of the three people in the country qualified to administer these scans that there will be no bone scan testing for people not in the good graces of Co-Liaison Counsel—particularly Napoli Shkolnik, the firm operating the only site where this proof of damages is being offered. And this is impossible for clients represented by Marc Bern & Partners because it received a "cease and desist" email from Paul Napoli when attempts were made to schedule scans, efforts made before significant developments occurred questioning the safety and reliability of these scans.

---

[1] Figure accessed at the website for the United States' Census Bureau, https://www.census.gov/quickfacts/fact/table/flintcitymichigan/PST045219, accessed on March 24, 2021.

4

**ARGUMENT**

Under Rule 6(b), good cause exists to extend to May 17, 2021, the deadlines to register, opt-out and object under the terms of the MSA for three reasons: 1) the recent and substantial response from the Flint public indicates many citizens are only learning of the March 29, 2021, deadline now; 2) reviewing new claims at a late hour presents difficulties on how to proceed; and 3) a major method of proving damages to qualify for higher monetary awards—bone scan testing—is not available to many members the public, unless, as discussed below, one is in the good graces of the Napoli Shkolnik law firm, which is controlling—and sequestering—one of the only three qualified professionals in the country who can administer a qualifying scan, Dr. Aaron Specht.

Most troublingly, the device being used has been modified in such a way that has not been shown, by qualified professionals, to be safe. How the device was modified is not known, and cannot be replicated, partly—and significantly—because the manufacturer itself refuses to provide additional ones for this purpose. Without knowing this information, not only is the safety of the device impossible to assess, but consistency in results is also impossible to ensure from one device to the next, which is necessary for the creation of additional testing sites and for the comparisons of results. Together, these factors should provide cause for the requested extension. This memorandum discusses the first two reasons for this extension together; and the third reason in the second, and final, section.

1. <u>The influx of new claimants provides good cause for an extension</u>.

Based on contacts from the public, many potential registrants are only learning of the deadline now. In the past two weeks alone, over one hundred new residents had contacted the

5

*Washington* counsel to request an appointment to register for the March 29, 2021, deadline. Exs. 1, 2.

This sudden and voluminous response from the public is consistent with numbers presented by the Special Master at the last status conference and the population of Flint. Only one month ago, and nearly one month into the sixty-day registration period, only approximately 15,000 potential claimants had registered. ECF 1440, PageID.55683. And according to the most recent Special Master census submissions, under 27,000 unique submissions had been made. *Id*. at PageID.55681. With an approximate population of 95,000[2], an unmanageable influx of citizens seeking to register at the last minute is exceedingly possible—and seem to becoming true. With over 57,000 notice packages mailed starting on February 19, 2021, ECF 1440 at PageId. 55682, it's entirely conceivable that many residents are reviewing that paperwork only now.

This influx alone creates serious concerns regarding whether those members of the public who want to register can do so in time to comply with the registration deadline. This difficulty was exacerbated to an extent by winter storms in Houston, Texas, in February, which affected the serviceability of ARCHER Systems, LLC, as the Claims Administrator and QSF Administrator. *See* Exhibit 3, an email to Valdemar Washington from the project manager, Maria Riley, detailing those disruptions. Put together, there is an evident risk that many people who desire to register will miss the deadline.

Secondly, attorneys contacted by the public seeking to newly register are forced to quickly assess whether to register, opt-out, or register and object. This might lead to citizens

---

[2] According to the United States' Census Bureau website, https://www.census.gov/quickfacts/fact/table/flintcitymichigan/PST045219, accessed on March 23, 2021.

being turned away. Additional time is needed for them to properly assess newly found claimants, especially given the discovery that bone scans are all but eliminated from the settlement scheme for many Flint residents.

2. Recent developments regarding bone scan testing provide good cause for an extension.

Along with this sudden influx of Flint citizens seeking to register, new details learned last Thursday, March 18, 2021, regarding the possibility of safe bone scans present separate but significant difficulties. To date, the only option for registrants to obtain bone scanning is to go through a lawyer's office—Napoli Shkolnik. Co-Lead Class Counsel had previously attempted to address this availability problem by consulting with Drs. Andrew C. Todd, Ph.D., of Icahn School of Medicine at Mt. Sinai Hospital in New York, and Karl Jepsen, Ph.D., of the University of Michigan, the only other two professionals capable of similar methods.

On January 13, 2021, at a status conference, they provided what was at the time considered a positive update:

> [W]e have made some, I think, strong headway in making the . . . possibility of bone scanning [available] for the community generally that would be participating in the settlement of this matter. We're looking into that more and more and we believe that we have a good core group of doctors and local individuals associated with those doctors to do a widespread accessibility for the community.

(ECF No. 1397, PageID.54373). Again, this was significant because only one person in the country had developed the means to conduct portable bone scan testing on humans—Dr. Aaron Specht, who was performing them under the control of Napoli Shkolnik.

So significant was this possibility that this Court has addressed this on at least two other occasions—once in its January 21, 2021, order, as one reason to reject the *Chapman* plaintiffs' response to the motion for preliminary approval (ECF No. 1341), ECF No. 1399, Page ID.54457. In its order, the Court wrote that "[t]o the extent that the *Chapman* Plaintiffs' objection relates to

7

the *availability* of bone scans in the City of Flint, this objection may be rendered moot," citing the very remarks made by Co-Lead Class Counsel on January 13, 2021. *Id.* at PageID.54457–58 (emphasis added). Secondly, it discussed this possibility at the most recent status conference on February 24, 2021, when the Court stated that "[t]here is an effort underway to expand another bone scan—additional bone scanning. So let's see how it goes. I think it's too early to say that we need more time. If it comes to that, the demand is there." ECF No. 1440, PageID.55691–92.

Since that February 24, 2021, date, however, there have been developments questioning the safety and reliability of this method. On February 26, 2021, Dr. Lawrence Reynolds filed his objection, ECF No. 1436, outlining those concerns, and in the media, Dr. Mona Hanna-Attisha's recommended against having them[3]. *See* Exhibit 4, a copy of a news article titled, "Flint Pediatrician who blew the whistle on water crises won't recommend bond scans for kids," Fonger, Ron, MLive.com, published March 15, 2021. Additionally, Class Counsel filed a motion to suspend those scans, which was withdrawn without comment, ECF No. 1443. To date, the only comment on the safety of this potentially method has been from Co-Liaison counsel, the very lawyers administering these tests. ECF 1455. Up until March 18, 2021, the undersigned— and, imaginably, all others involved—were giving this method the benefit of the doubt and hoping that alternative scans would be made available and be transparent.

The concern for safety is real. After all, the portable device emits radiation, and there has been no information produced regarding how the device was modified. Dr. Hanna-Attisha, quoted in the above-cited article, put it strikingly:

---

[3] See MLive's news article on the development at
https://www.google.com/search?q=flint+doctor+aagainst+bone+scans&rlz=1C1GCEU_enUS846US846&oq=flint+doctor+aagainst+bone+scans&aqs=chrome..69i57.3154j0j9&sourceid=chrome&ie=UTF-8 (accessed March 23, 2021)

8

> For so long, the people of Flint have felt, you know, experimented on, and rightly so, and this is another example of this injustice . . . where something is being applied on them that is not tested, that has not been approved, and also (produces a massive underestimation of exposure.

Exhibit 4. While co-Liaison counsel have sought to dispel these concerns in their March 4, 2021, letter to the Court, it's difficult to imagine why a resident would take attorneys' words over those of Dr. Hanna-Attisha. Additionally, even if that letter were from a qualified professional like Dr. Specht himself, the lack of transparency regarding the particular device or devices being used remains.

This is especially true since it appears that any devices being used by Napoli Shkolnik were not registered until February 24, 2021. *See* Exhibit 5, a copy of the registration certificate for what appears to be the device being used. Radiation is a carcinogen, and for children, they are at heightened risk. Exhibit 6, *Pediatric Exposures to Ionizing Radiation: Carcinogenic Considerations*, Kutanzi, K, et al., Int. J. Environ. Res. Public Health 2016 Nov. 13(11): 1057. That a radiation-producing device seemingly was not registered until such a late date not only allows for the strong inference that it was being used on people before then, but also helps illustrate the lack of transparency regarding its use. And under the terms of the MSA, given how much money is available to minors who might obtain a high reading under this portable scan, it's conceivable that parents are forced to make impossible decisions with little or no information about the device itself.

On March 18, 2021, the lack of information necessary to assess the devices themselves and to replicate, if possible, the method, was underscored. On that date, the undersigned learned in a conference with Drs. Todd and Jepsen that any alternative testing is impossible; indeed, that it had never gotten off the ground. *See* Declaration of Stephen F. Monroe. Dr. Jepsen referred to an outline of steps detailing what would be needed to establish a separate, and safe, facility. *See*

9

Exhibit 7 a copy of those steps. They said during this meeting that they did not get beyond the first step because they never obtained the written details of Dr. Specht's protocol regarding how Dr. Specht customized the portable device being used on people. Ex. 7. According to Exhibit 7 alone, this first step was needed to be met before moving on to assessing safety (step 5) and consistency of results (step 13).

Regarding consistency, the doctors stated that consistency would be critical to any additional scanning method because results would have to be comparable to ensure fairness between claimants. *See* Monroe Declaration. Additionally, and strikingly, the doctors indicated that they were never able to obtain a device from the manufacturer that would be able to be modified because the manufacturer refused to provide one if it was going to be used on people. *Id*. In short, any benefit of the doubt regarding the safety of this method was extinguished, and the potential for any alternative site to be established, and shown to be safe, proven to be impossible.

Therefore, even if a showing of safety from qualified professionals were made, the inability of Drs. Todd and Jepsen to establish an alternative site means that thousands of registrants now have no way to obtain these scans, potentially closing them off from the most valuable categories on the settlement grid. These problems present a significant disadvantage to those who cannot get scans, especially if blood lead tests were not obtained. Conversely, those who have gotten these scans stand to receive, in essence, a windfall, because so many of potential registrants are cutout from the categories providing for the highest monetary awards. This means that those who do qualify for the highest awards—that is, the clients of Co-Liaison counsel, or those in their good graces, will receive far more money. Without any ability to assess the device, along with its reliability and consistency from one scan to the next, it's impossible to

know how equitably such large amounts of money are being distributed. And because it's become clear that such information will never be produced, and that no alternative scan site will be established and shown to be safe—critical facts learned March 18—good cause exists to extend these deadlines to determine whether to object.

This is especially true because Napoli Shkolnik has not made its site available on a basis fair to the public. On February 25, 2021, *Washington* counsel received a "Cease and Desist" email from Patrick Lanciotti, in which Paul Napoli threatened to involve the "authorities" if the *Washington* counsel attempted to schedule bone scans at this facility, for something which this Court, on February 24, 2021, *urged him to do*. *See* Exhibit 8, an email from Patrick Lanciotti *and* ECF No. 1440, Page ID.55690. This effort though occurred before facts were developed regarding safety concerns, as put forth by Dr. Lawrence Reynolds, in his objection (ECF No. 1436), Dr. Mona Hanna-Attisha's recommendation against having them, and the withdrawn motion by Class Counsel to suspend them (ECF 1443).

Additionally, the *Chapman* plaintiffs had similar difficulties. For instance, for them—who at the time were allowed to schedule scans, unlike the *Washington* plaintiffs—a limited amount of bone scan slots became available at the Napoli Shkolnik test site. The only availability was on Sundays between 1 and 3:45 PM. The remaining 6 days of the week, between 11 AM and 5 PM was devoted exclusively to testing the clients of liaison counsel. Available slots quickly filled up, and many people who wanted scans could not get them. *See* Mark Cuker Declaration.

Things got worse. Napoli made conflicting and misleading statements to people who went for testing; the Napoli website promised "free' bone testing, by people who went there were asked to sign a form which said it they might have to pay up to $500. Napoli had not registered a radiation-emitting machine, as required by Michigan law, until Feb 24, 2021; even after that, he

11

had only one license for two devices, so one device was still unregistered. The class notice never disclosed how difficult it would be to get a bone lead test, and the fact that there was no legal facility for bone lead testing in the entire State of Michigan. *Id*.

Clients of other attorneys who showed up at Napoli's office to be tested were given a form to sign which was not shown to their attorneys in advance. This *ex parte* communication with clients of other lawyers violated Michigan Ethics Rule 4.2. It was one of many violations. *Id*.

The disclosure which people were asked to sign was confusing and misleading. In one paragraph it said the method by which [the cost of the test] will be paid will be subject to a determination by the court." In another it said: "If I am represented by a law firm then my attorney will pay the cost of the bone test and report before receiving a copy of the bone test." See Group Exhibit 9, copies of consent forms, emails, and redacted consent forms. *Id*.

There is no transparency as to how the tests are being done or where the money to pay for them will go. Napoli told *Chapman* counsel that he wanted $500. He told another lawyer he wanted $350. Either number seems excessive; Each test takes only 3 minutes to run; Dr. Specht charges $200 per hour and can review multiple tests in an hour. If Napoli is making a profit on what he is charging other lawyers for these tests, he is also violating Ethics Rule 1.8.

Although Napoli sought a protective order against the disclosure of his own clients bone lead test information, he refused to assure the confidentiality of these bone lead results, and asked that persons undergoing the test waive allow him to see their results. At the same time, he allowed no direct access to Dr. Specht—everything must go through the Napoli firm. There is no way to audit the integrity or accuracy of the results being provided. Sine this dispute, all of the *Chapman* appointments have been cancelled.

12

## **CONCLUSION**

This Court therefore should find that good cause under Rule 6(b) exists to extend the March 29, 2021, deadline to May 17, 2021—sixty days from the March 18, 2021, conference with Drs. Todd and Jepsen—because the sudden and voluminous increase in public interest raises concerns that many people interested will not have time to register. While the undersigned cannot speak about the efforts of other lawyers in the face of the sudden increase, there's every reason to think that this difficulty is a common one. Additionally, given this influx, it will be difficult to assess whether objections are needed for those new people who seek to register. All of this is apart from the dispiriting developments of March 18 that has effectively created a lopsided scheme in favor of a limited few, and additional time is needed to assess whether to file objections based on these newly-learned facts.

Without this additional time, many of Flint residents could either be excluded from the partial settlement process all together, while others will not be able to properly assess how to proceed now that there will be no alternative scanning available, if shown to be safe.

WHEREFORE, for the reasons stated above, Individual *Washington* and *Chapman* Plaintiffs respectfully request that this Honorable Court grant an extension of sixty days, from March 18, 2021, to register and object under the terms of the MSA, and for any other relief that it deems just and adequate.

Dated: March 24, 2021                                        Respectfully Submitted,

/s Stephen F. Monroe
Stephen F. Monroe, IL#6305823
Marc J. Bern & Partners, LLP
225 West Washington Street, Suite 2200
Chicago, IL 60606
Phone: (312) 894-7941
Fax:   (312) 873-4537

13

Email: smonroe@bernllp.com

/s Mark Cuker
Mark Cuker
Cuker Law Firm
130 N. 18th St.
One Logan Square
Philadelphia, PA 19103
Phone: (215) 531-8512
Email: mark@cukerlaw.com
*Attorney for the Chapman Plaintiffs*

14

<u>PROOF OF SERVICE</u>

The undersigned certifies that on March 24, 2021, the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above case were served via the ECF filing system on that same date.

/s Stephen F. Monroe
_____
Stephen F. Monroe