**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| *In re* Flint Water Cases | No. 5:16-cv-10444-JEL-MKM |
| | Hon. Judith Levy |
| | Mag. Mona K. Majzoub |

**OBJECTION TO PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES**

# TABLE OF CONTENTS

Table of Contents.................................................................................................. ii

Table of Authorities ............................................................................................ iv

Introduction ......................................................................................................... 1

Argument.............................................................................................................. 2

I.    Objectors are class members and intend to appear through *pro bono* counsel at the fairness hearing.............................................................. 4

II.    The Court owes a fiduciary duty to unnamed class members............................. 5

III.    The Court should invite defendants to comment on the fee request. ................ 5

IV.    The fee request does not comply with Rule 23(h) procedurally. ......................... 6

    A.    Counsel does not and cannot say the amount of fees that will be awarded for common benefit work under the fee request........................ 7

    B.    Class members who file their own claims should not be penalized with higher common benefit fees than private counsel might have reasonably charged. ....................................................................... 8

    C.    The fee request fails to disclose how common benefit fees will be allocated through fee-sharing agreements, which Co-Liaison counsel correctly observed hinders the court's "obligation to conduct mass tort proceedings in a fair and efficient manner.".............. 11

V.    Plaintiffs' $202.76 million fee request violates Rule 23(h) substantively. .......... 12

    A.    31.6% is not a reasonable percentage of $642 million............................. 13

    B.    Plaintiffs ask the court to endorse a high ceiling on individual awards to pay tens of millions of dollars of without providing any detail whatsoever about the reasonableness of these fees........................ 17

    C.    Class and Liaison Counsel propose to pay themselves based on gross awards, which dampens incentives to control administration costs, and which may run afoul of Mich. Ct. R. 8.121(C). ....................... 18

VI.   A cross-check is necessary, and the poorly-documented claimed lodestar cannot be the basis of fees. .......................................................................................... 21

      A.   Co-Liaison Counsel swore under oath that non-common benefit work was misclassified, and the record does not show otherwise. ......... 22

      B.   The claimed lodestar includes wildly inflated rates from some firms. ..... 23

VII.  Plaintiffs have also failed to demonstrate the reasonableness of their costs. ................................................................................................................ 25

Conclusion ....................................................................................................................... 25

Certificate of Service ..................................................................................................... 28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*In re "Agent Orange" Prod. Liab. Litig.,*
    818 F.2d 216 (2d Cir. 1987) ...................................................................... 11

*In re Anthem, Inc. Data Breach Litig.,*
    2018 WL 11195115 (N.D. Cal. Feb. 2, 2018) ........................................ 11

*In re Anthem Inc. Data Breach Litig.,* 2018 WL 3960068,
    2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018) .......................... 16, 23

*Banas v. Volcano Corp.,*
    47 F. Supp. 3d 957 (N.D. Cal. 2014) ........................................................ 24

*Becerra-South v. Howroyd-Wright Empl. Agency, Inc.,* 2021 WL 606245,
    2021 U.S. Dist. LEXIS 14633 (C.D. Cal. Jan. 25, 2021) ...................................... 20

*Bowling v. Pfizer, Inc.,*
    102 F.3d 777 (6th Cir. 1996) ................................................................11, 14, 21

*In re Cardinal Health Inc. Secs. Litig.,*
    528 F. Supp. 2d 752 (S.D. Ohio 2007) .................................................... 20

*In re Cardizem CD Antitrust Litig.,*
    218 F.R.D. 508 (E.D. Mich. 2003) ........................................................... 15

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.,*
    424 F. Supp. 3d 456 (E.D. La. 2020) ....................................................... 14

*In re Citigroup Inc. Secs. Litig.,*
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................14, 23

*In re Citigroup Inc. Bond Litig.,*
    988 F. Supp. 2d 371 (S.D.N.Y. 2013) .............................................5, 13, 14

*Dial Corp. v. News Corp.,*
    317 F.R.D. 426 (S.D.N.Y. 2016) ............................................................. 24

*In re Diet Drugs Prods. Liab. Litig.,*
    401 F.3d 143 (3d Cir. 2005) ..................................................................... 11

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) .................................................................... 5, 16

*In re Facebook Biometric Info. Privacy Litig.*, No. 15-cv-03747-JD,
    2021 U.S. Dist. LEXIS 36801 (N.D. Cal. Feb. 26, 2021) ................................... 14

*Fraley v. Facebook, Inc.*,
    2014 WL 806072 (N.D. Cal. Feb. 27, 2014) ........................................................ 20

*Geier v. Sundquist*,
    372 F.3d 784 (6th Cir. 2004) ................................................................................. 10

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000) ..................................................................................... 5

*Hensley v. Eckerhart*,
    437 U.S. 424 (1983) ............................................................................................... 21

*In re Indymac Mortgage-Backed Secs. Litig.*,
    94 F. Supp. 3d 517 (S.D.N.Y. 2015) .................................................................... 14

*Keener v. Department of Army*,
    136 F.R.D. 140 (M.D. Tenn. 1991) ...................................................................... 21

*Kmiec v. Powerwave Tech.*,
    2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) ....................................................... 20

*McKenzie Constr., Inc. v. Maynard*,
    758 F.2d 97 (3d Cir. 1985) .................................................................................... 17

*McLaughlin v. IDT Energy*,
    2018 WL 3642627 (E.D.N.Y. July 30, 2018) ....................................................... 16

*In re Mercury Interactive Corp. Secs. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ......................................................................... 5, 6, 11

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................... 13

*In re Nat'l Prescription Opiate Litig.*,
    956 F.3d 838 (6th Cir. 2020) ................................................................................... 8

*In re Nat'l Prescription Opiate Litig.*,
    976 F.3d 664 (6th Cir. 2020) ................................................................................... 9

*New York State Teachers' Ret. Sys. v. GM Co.,*
   315 F.R.D. 226 (E.D. Mich. 2016)........................................................... 14

*In re NFL Players*, 2018 WL 1658808,
   2018 U.S. Dist. LEXIS 57792 (E.D. Pa. Apr. 5, 2018) ...............................8, 15-16

*In re Oil Spill*, 2012 WL 2236737,
   2012 U.S. Dist. LEXIS 83214 (E.D. La. Jun. 15, 2012)............................8, 15, 17

*In re Packaged Ice Antitrust Litig.,*
   2011 WL 6209188 (E.D. Mich. Dec. 13, 2011).................................................. 15

*Pearson v. NBTY, Inc.,*
   772 F.3d 778 (7th Cir. 2014)............................................................................... 19

*In re Polyurethane Foam Antitrust Litig.,*
   2016 U.S. Dist. LEXIS 156339 (N.D. Ohio. Oct. 24, 2016).............................. 25

*In re Polyurethane Foam Antitrust Litig.,*
   168 F. Supp. 3d 985 (N.D. Ohio. 2016).............................................................. 23

*Rawlings v. Prudential-Bache Properties, Inc.,*
   9 F.3d 513 (6th Cir. 1993)..................................................................................... 5

*In re Royal Ahold NV Secs. & ERISA Litig.,*
   461 F. Supp. 2d 383 (D. Md. 2006)..................................................................... 13

*Seijas v. Republic of Arg.,*
   2017 WL 1511352 (S.D.N.Y. Apr. 27, 2017)..................................................... 20

*Shane Grp., Inc. v. Blue Cross Blue Shield,*
   825 F.3d 299 (6th Cir. 2016)............................................................................... 24

*Stetson v. Grissom,*
   821 F.3d 1157 (9th Cir. 2016)............................................................................. 17

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.,*
   2004 U.S. Dist. LEXIS 8608 (S.D.N.Y. May 14, 2004) ................................19-20

*In re Telik, Inc. Sec. Litig.,*
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................. 24

*United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.,*
   732 F.2d 495 (6th Cir. 1984)............................................................................... 21

*United States ex rel. Palmer v. C&D Techs., Inc.*,
    2017 WL 1477123 (E.D. Pa. Apr. 25, 2017)........................................................ 24

*Virginia House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019) ................................................................................ 17

*In re Volkswagen & Audi Warranty Extension Litig.*,
    89 F. Supp. 3d 155 (D. Mass. 2015) ..................................................... 20

*Wells Fargo Sec. Litig.*,
    157 F.R.D. 467 (N.D. Cal. 1994) ......................................................... 20

## Rules and Statutes

Fed. R. Civ. P. 23(e)(5)(A).................................................................................. 4

Fed. R. Civ. P. 23(h)..............................................................3, 6, 9, 11, 12, 15, 17

Fed. R. Civ. P. 23(h)(1) ................................................................................. 9, 11

Fed. R. Civ. P. 23(h)(2) ..................................................................................... 17

Mich. Ct. R. 8.121(B) ........................................................................................ 3

Mich. Ct. R. 8.121(C) ...........................................................................3, 13, 18, 19

## Other Authorities

Theodore Eisenberg & Geoffrey P. Miller,
    *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*,
    7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010)....................................13-14

Federal Judicial Center,
    MANUAL FOR COMPLEX LITIGATION—FOURTH 188–89 (2004)....................... 14

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee
    Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) ................................. 14

# INTRODUCTION

Plaintiffs' fee motion ("Motion," ECF No. 1458) seeks up to $202.76 million, an extraordinary 31.6% of the common benefit fund. PageID.57192. The Motion includes scant detail about the claimed common benefit work, does not even estimate what the common benefit fees might amount to, and provides absolutely no evidence that ceding 27% of claimants' recovery to private attorneys for work sight unseen could possibly be fair to Flint residents who need this money to help them grapple with oft-debilitating, ruinous, and violent consequences of lead exposure for their entire lives. In megafund settlements of this size involving classes with wealthier shareholders or businesses, typical fee awards are in the 10 to 12% range, under half of what attorneys seek here.

The scant detail and undisclosed fee sharing behind the Motion were harshly condemned by none other than Co-Liaison Counsel (collectively "Liaison Counsel") and Co-Lead Class Counsel (collectively "Class Counsel") in this very litigation. Allowing firms to dole out common benefit work on the basis of undisclosed fee sharing agreements is indeed "detrimental to both the class and individual litigants." ECF No. 444-2 (Shkolnik Decl.), PageID.14140. Similarly, ceding money to attorneys based upon mass client sign-ups only advantages "the attorney who will garner a percentage of the award based on the retainer agreement." ECF No. 404 (Class Counsel's Motion for Replacement of Co-Liaison Counsel), PageID.13292. Class and Liaison Counsel were both right! But it appears they set aside their demands for rigor and scrutiny because they have jointly agreed to take more from claimants. The Court must act as a fiduciary to protect the interests of absent class members and Minors who, although not class members, realistically have no better chance to recover against the settling defendants than this partial settlement.

1

## ARGUMENT

Preliminarily, the Court should solicit defendants' response to the Motion, which is permitted if and only if the Court asks. *See* Settlement, PageID.54160.

Plaintiffs' Motion weds three distinct components of the fee request that total up to $202.8 million or 31.6% as Plaintiffs admit (ECF No. 1458, PageID.57192):

1. A Common Benefit Assessment ("CBA") on the whole fund at 6.33% for common benefit work performed at the directed of Class or Liaison Counsel for common benefit. *Id.*, PageID.57159.

2. A cap on contingency fees to individually-retained counsel ("IRC"): 27% for counsel retrained prior to July 16, 2020, and 10% if after this date. *Id.*, PageID.57160.

3. For unrepresented class members, an additional 27% assessment paid to Class and Liaison Counsel, and for claimants represented after July 16, an extra 17% assessment. *Id.*

The Hall Objectors only disagree with the *rates* proposed by the first two provisions, not their structure. Courts can appropriately assess common benefit fees to be paid evenly by all claimants, and the Court *should* cap IRC fees to avoid private windfalls on the backs of class members who are entitled to straightforward compensation under the Settlement. Objectors simply contend the cap should be lower.

But Objectors strenuously object to the very existence of the third category of assessments, which the Motion muddles with normal ("global") CBA assessments. For the sake of clarity, this objection will call the "common benefit" fees taxed *only* on unrepresented or late-represented class member awards "**Special Assessments**." These Special Assessments are based on the retention status and individual awards of thousands of claimants. Plaintiffs effectively seek an extra common benefit fee of unknown size. The Court cannot assure the fairness of an indeterminant fee award.

Moreover, the Special Assessments unfairly treat claimants in the settlement. None of the settlements cited by Plaintiffs include such a feature, and it strikes Hall

Objectors as unjustified and punitive to charge vastly higher "common benefit" assessments to claimants who navigate the claims process without counsel, or who do so with late-retained counsel like the Objectors. Effectively, the Special Assessments treat these claimants as if they had chosen to retain individual counsel, when in reality they obtained no such individual services.

The Hall Objectors further object to the Motion's request for the Court to delegate its Rule 23(h) duty by allowing these firms to apportion fees among themselves, in secret and without judicial involvement. Co-Liaison Counsel appropriately objected to this practice, but apparently now given comparable authority, they hold their tongue.

Independently, the fee request is simply excessive no matter how it gets allocated. In a class action settlement, a typical fee award for a $641.25 million fund would be about 10-12%. While this settlement is not strictly a class action settlement, Plaintiffs are incorrect that MDLs regularly approve fees this high. In other cases with IRC fee caps, many claimants never pay such fees because they need not retain an attorney, but here Plaintiffs propose to make unrepresented class members pay Special Assessments as if they had hired the most expensive attorneys available. Plaintiffs provide no data to suggest that a 27% would not provide a windfall to IRC. Finally, given the expenses yet to be paid in this case, Plaintiffs' 31.6% total fee request may not even comply with Mich. Ct. R. 8.121(B) & (C), which limits the ethical capture of attorneys' fees to one third *next expenses*, whereas Plaintiff's Motion seeks fees on gross amounts.

Plaintiff's submitted billing information is deficient for the purposed of lodestar check because does not allow class members to review claimed hours to ensure they were directed toward common benefit. That said, in its limited review CCAF determined that Napoli Shkolnik has claimed a large amount of billing—up to $11.4 million of its $16 million application—based on billing ~$40/hour contract attorneys as $500/hour "associates."

The repercussions of the fee award will echo for decades. While attorneys

deserve to be paid for their work, the Court's fiduciary duty to class members and Minor claimants requires a close look at the fee award, including hourly billing and fee sharing agreements that Liaison and Class Counsel does not disclose.

Fortunately, scrutiny of the fees need not hold up Settlement administration. Should the Court approve the underlying Settlement,[1] the Court may hold over the Motion to resolve a clearer picture of what the fee request actually entails. The administrator does not anticipate sending checks until early 2022. Formulating a just fee award need not delay justice to Flint residents.

## I. Objectors are class members and intend to appear through *pro bono* counsel at the fairness hearing.

As discussed in their attached declarations, Objectors Hall, Hempel, and Jankowiak (the "Hall Objectors") are members of the settlement class with standing to object. The Hall Objectors bring this objection through CCAF in good faith to protect the interests of the entire class under Rule 23(e)(5)(A). The Hall Objectors also object for the common benefit of non-class member claimants like their children. *See* Settlement, PageID.54184 ("Claimants" may object). Each Hall Objector adopts any other objections not inconsistent with this one.

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents the Hall Objectors *pro bono* and will not seek attorneys' fees for its work here. Declaration of Theodore H. Frank ¶ 34. Objections brought through CCAF's assistance have recovered over $200 million dollars for class members by persuading courts to reduce excessive fee requests or by driving settling parties to reach improved settlements. *Id.* ¶ 7. CCAF's M. Frank Bednarz intends to appear at the fairness hearing.

---

[1] The Hall Objectors take no position on approval of the underlying settlement. No evidence suggests that Class and Liaison Counsel did not have every incentive to maximize total recovery. They should be paid for their work—just not overpaid. *See* Declaration of M. Frank Bednarz ("Bednarz Decl."), ¶ 11.

## II.   The Court owes a fiduciary duty to unnamed class members.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of such absent class members. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (cleaned up). The fiduciary role is necessary because "[i]n class-action settlements, the adversarial process—or … 'hard fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). "The interest of class counsel in obtaining fees is adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). Encompassed within this fiduciary duty is "the Court's responsibility to avoid awarding plaintiffs' counsel a 'windfall' at the expense of the class—a special concern where 'the recovered fund runs into the multi-millions.'" *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (quoting *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000)).

## III.   The Court should invite defendants to comment on the fee request.

Under the Settlement, "Defendants will take no position with respect to any application … for an award of attorneys' fees, and reimbursement of costs"—"*Unless requested to do so by the Federal Court.*" PageID.54160 (emphasis added). The Court should make this request. While defendants sometimes do not have any incentive to scrutinize common fund fee requests, at least the Attorney General has indicated an interest in taking a formal position on the Motion. *See* Paul Egan, *Concerns mount over attorneys fees in Flint Water settlement. Here's why*, Detroit Free Press (Mar. 23, 2021) (quoting Dana Nessel: "For a case of this nature, and a settlement of that nature, is that a very high number? I would suggest it seems like it"), attached as Bednarz Ex. 1.

5

## IV. The fee request does not comply with Rule 23(h) procedurally.

Plaintiffs' Motion violates Rule 23(h) because neither it nor the Settlement identifies how the attorney fee award will be allocated among the plaintiffs' firms. Rule 23(h) authorizes the Court to award "reasonable" attorneys' fees only when notice of the fee request is "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h), (h)(1). It is not sufficient that class members are able to make "generalized arguments about the size of the total fee"; the notice must enable them to determine *which* attorneys seek *what* fees for *what* work. *Mercury Interactive.*, 618 F.3d at 994. The fee request fails to provide this basic information and thus undermines Rule 23(h)'s policy of "ensur[ing] that the district court, acting as a fiduciary for the class, is presented with adequate, and adequately-tested, information to evaluate the reasonableness of a proposed fee." *Id.*

There are several stark deficiencies in the fee request. *First*, because of the variable nature of Special Assessments, Plaintiffs cannot even provide an estimate of the amount of "common benefit" attorneys' fees their Motion would pay. The Court has been asked to agree to a "common benefit" fee award that could not be known for many months or even years because Special Assessments depend on *both* the representation status of claimants *and* their ultimate gross recoveries. Without knowing the actual common benefit fee being requested, the Court could not possibly know it to be reasonable.

*Second*, Special Assessments like Plaintiffs propose are a novel attempt to peculiarly disadvantage unrepresented claimants by robbing them of the advantages of a class action settlement. Through economies of scale, Class and Liaison Counsel have developed a settlement program that allows represented and unrepresented claimants to file claims with relative ease, and all claimants should pay equally for the substantial common benefit of this program. But unrepresented claimants ought not pay extra merely because they chose to forego the services and costs of an additional attorney;

they never contracted to pay such rates and ought to enjoy their common benefit at the same fee as represented claimants.

Third, the Motion fails to disclose fee sharing agreements among the firms, which Liaison counsel appropriately flagged as a cause for concern.

### A. Counsel does not and cannot say the amount of fees that will be awarded for common benefit work under the fee request.

The Motion seeks a global CBA of $40,591,125.00 (6.33% of the gross fund), but Special Assessments make the actual common benefit request impossible to ascertain and therefore evaluate.

First, Plaintiffs propose to also seek 27% common benefit from the 20.5% of the Qualified Settlement fund allocated to adults, property owners, businesses, and programmatic relief. PageID.57178. According to plaintiffs, this would work out to at most an additional $35.493,187.50 if none of the adult subclasses had retained counsel. PageID.57178.[2] But the amount will be significantly smaller because it appears many adult claimants *are* represented, judging by registrations reported by Liaison Counsel alone. ECF No. 1500. The exact amount cannot be determined because it depends on whether class members are entirely unrepresented or merely represented after July 16.

The proposed common benefit award becomes completely impossible to estimate when it comes to minor claimants who are registered without counsel or by counsel retained after July 16. Awards to Minors are intentionally the largest component of the Settlement, and the number of unrepresented and late-retained Minor claimants may result in dramatically larger common benefit awards thanks to the Special Assessments. For example, if 20% of the awards to Minors are unrepresented and 30% are registered by late-retained counsel, this would result in Special Assessments of over

---

[2] Plaintiffs' calculation appears to be an error or represent a difference in how Special Assessments are calculated compared to IRC fees. Bednarz Decl. ¶ 6.

$50 million—dwarfing the global CBA.[3]

No one could say what the "common benefit" fees in this case might be, because it depends on the representation status of claimants (undisclosed) and the amount these claimants ultimately receive, which will not be known for many months—and years in the case of the Future Minor Sub-Qualified Settlement Fund. The Hall Objectors respectfully submit that the Court cannot ensure the reasonableness of a fee award under Rule 23(h) when the size of the award is unknown and currently unknowable.

### B.   Class members who file their own claims should not be penalized with higher common benefit fees than private counsel might have reasonably charged.

Independently, the Hall Objectors object to the Special Assessments imposed on claimants and class members, who are effectively penalized for not retaining an attorney (or for retaining an attorney too late). Contrary to Plaintiffs, Special Assessments are **not** "consistent with the law and equitable principles," because all claimants do **not** "contribute an equal *pro rata* share to Plaintiffs' Counsel's fees." PageID.57160.

Objectors are unaware of any class action settlement with this kind of penalty. The closest antecedents to this Settlement—cases that at once resolved class and individual personal injury claims—are perhaps the BP oil spill and NFL concussion settlements. Individual attorneys' fees were capped in both cases, but in neither did the courts impose an extra assessment on unrepresented claimants. *See In re Oil Spill*, 2012 WL 2236737, 2012 U.S. Dist. LEXIS 83214 (E.D. La. Jun. 15, 2012); *In re NFL Players*, 2018 WL 1658808, 2018 U.S. Dist. LEXIS 57792 (E.D. Pa. Apr. 5, 2018). "MDLs are not some kind of judicial border country, where the rules are few and the law rarely makes an appearance." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 844 (6th Cir. 2020). Rule 23 too, "limits judicial inventiveness" and the inequitable Special

---

[3] $641.25 million x 0.9367 (after global assessment) x 0.795 (fund for minors) x ((0.27 x 0.2) + (0.17 x 0.3)) = $50.14 million.

Assessments proposed exceed the bounds of Rule 23(h). *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 672 (6th Cir. 2020) (internal quotation omitted).

The Special Assessments remove choice from class members and claimants, eliminating the key benefit of a large settlement program. Through economies of scale and uniformity of claim proofs, class settlements enable claimants to obtain fair compensation without requiring individual counsel. Three years ago, Theodore Leopold described the advantage of uniform resolution this way:

> Flint residents may in some cases be able to participate without the aid of an attorney. If a settlement is announced and a resident would like to retain an attorney there will be ample time for an individual to select counsel of their choice and with a fee arrangement which can be designed to meet the individual's needs.

ECF No. 479-4 (email from Leopold to Shkolnik), PageID.15163.

The fee request largely vitiates claimants' choice. Whether claimants made any choice at all, their award will be charged a 27% common benefit assessment—the same rate as if they had retained an attorney on a 33% contingency—and presumably also obtained the benefit of that attorney's services.

Plaintiffs offer two related excuses for the Special Assessments, but neither withstand scrutiny. First, Plaintiffs claim that they "fairly allocate[] [CBA fees] according to the extent of a particular Claimant's reliance on common benefit work." PageID.57174. Not so: every claimant relies on the common benefit the settlement embodies, which represented and unrepresented claimants alike rely on. Because of the common benefit, for example, Liaison Counsel can process thousands of registrations within a single day. ECF No. 1500, PageID.58203. The Special Assessment simply penalizes claimants who file claims themselves, and it does so at an even higher rate than some private attorneys would charge. While Napoli Shkolnik may have uniformly retained its clients at 33% fees (and even higher until Class Counsel flagged the problem), the record shows that at least some plaintiffs retained counsel at only 25%

of net (not gross) recovery in 2016. *See* ECF No. 444-6, PageID.14232 (Flint Class Action Legal Team retention agreement). Special Assessments actually make some claimants pay higher fees than if they had retained an attorney who did significant work!

Plaintiffs' second excuse is equally false: "every Claimant who recovers from the Fund will effectively pay these same percentage attorneys' fees, ensuring equal treatment of all Claimants." PageID.57164. As discussed, some retention agreements request less than 27%, so these claimants will fare better. Because CCAF represents Hall Objectors *pro bono*, their Special Assessment would "only" be 17%—less than the 27% charge that Plaintiffs hope to saddle on unrepresented claimants. Therefore, Hall Objectors might get 10% more than similarly-situated unrepresented claimants. And yet that is unjustifiably 17% more than the common benefit award paid by claimants who have retained individual representation through the entire case. Equitable fund awards should spread fees evenly, proportionately, and "with some exactitude to those benefitting." *Geier v. Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004).

The Special Assessments do not enhance the fee award, but they do blunt the incentives class members might otherwise have to avoid retaining counsel. Years ago, Class Counsel explained the problem of tacking high-fee retention agreements onto a class action settlement: "entering into additional individual retention agreements…could result in higher fees than individuals would pay if they remained in the proposed class [and is not] consistent with working towards the common benefit of the people of Flint." ECF No. 473, PageID.14904. Under their Motion, Plaintiff propose to "solve" this problem by imposing high fees on everyone as if they had retained an attorney, even if they deliberately saved those costs by expending their time and effort navigating the settlement claims process on their own. There is nothing equitable about gifting 27% of their recovery to class counsel.

**C.      The fee request fails to disclose how common benefit fees will be allocated through fee-sharing agreements, which Co-Liaison counsel correctly observed hinders the court's "obligation to conduct mass tort proceedings in a fair and efficient manner."**

Class counsel's fee request further violations Rule 23(h) because neither it nor the settlement agreement identifies how the attorney fee award will be allocated among the plaintiffs' firms. Rule 23(h) authorizes the Court to award "reasonable" attorneys' fees only when notice of the fee request is "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h), (h)(1). It is not sufficient that class members are able to make "generalized arguments about the size of the total fee"; the notice must enable them to determine *which* attorneys seek *what* fees for *what* work. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). "[A]s protector of class interests" tasked with "assuring reasonableness in the awarding of fees in equitable fund cases" the Court must oversee the division that class counsel intend "under a private fee sharing agreement." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987); *see also In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 (6th Cir. 1996) (upholding a district court's requirement of *in camera* disclosure of a fee sharing agreement).

Mr. Shkolnik explained this problem in its cross-motion to disqualify Class Counsel. Class Counsel "had entered secret side-fee deals; [and] Interim Counsel had agreements to assign work exclusively to those firms they had fee deals with." ECF No. 444-2, PageID. 14145. In response, Class Counsel *admitted the existence of fee sharing agreements*, but represented that they standard agreements to help control costs. ECF No. 473, PageID.14905-06. But this premise seems questionable in view Cohen Milstein's involvement in the *Anthem* litigation, where sprawling billing from 49 law firms, including firms intentionally excluded from leadership, caused Judge Koh to appoint a Special Master to investigate the detailed hourly billing. *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 11195115 (N.D. Cal. Feb. 2, 2018) (granting CCAF's motion).

In any event, as an expert retained by Napoli Shkolnik opined, undisclosed fee sharing agreements at least prevent the Court from overseeing common benefit fees awards, which might include *de facto* referral fees or other bonuses that did not serve common interests. "Finally, by hiding important information about common benefit work from judicial view—even if temporarily—private, undisclosed assessment and allocation agreements hinder a court's exercise of its authority and obligation to conduct mass tort proceedings in a fair and efficient manner." ECF No. 444-3, (Carroll Decl.) PageID.14182. "The existence, and extent, of the side fee deals, and percentages should have been disclosed to the Court and other parties when Messrs. Pitt and Leopold, and the other PEC members sought appointment to their respective positions." ECF No. 479, PageID.15149. The Objectors strongly agree.

Yet when the undersigned sought disclosure of precisely this information, Mr. Shkolnik declined to respond. Bednarz Decl. ¶ 12.

This violation of Rule 23(h) unfairly shields class counsel's fee request from scrutiny. The Hall Objections will shortly move for leave to exam the hourly billing and fee sharing agreements and reserve the right to supplement their objection following such review.

## V.    Plaintiffs' $202.76 million fee request violates Rule 23(h) substantively.

Class and Liaison Counsel sidestep the ambiguity of their common benefit portion of their fee request (*see* Section IV.A) by presenting their CBA, IRC fee cap, and Special Assessment proposal as if it were a request for a 31.6% fee award. Plaintiffs argue that overall fee awards fall "typically in the range of 32% to 35%. PageID.57183. In fact, the gross request—higher than some individual retention agreements struck six years ago—is a windfall for a settlement of this size, where economies of scale predict attorneys are better able to leverage the strength of common claims.

Finally, given the high administration costs yet to be paid in this case, Plaintiffs'

proposal quite possibly runs afoul of Mich. Ct. R. 8.121(C), which limits attorneys' fees to one third *net expenses* for personal injury claims. Plaintiffs' 31.6% request is at least close to the line. At minimum, the Court should cap IRC fees *net* of expenses and also forbid IRC from recovering costs from individuals without application to the Court.

### A.     31.6% is not a reasonable percentage of $642 million.

Counsel seek a total potential fee of $202.76 million, or $40.59 million (6.33% of $641.25 million) plus $162.17 million (27% of $600.66 million)—a total of 31.6% of the gross $641.25 million settlement fund. This is not a reasonable percentage; certainly not "less than the typical fee in comparable cases." ECF No. 1458, PageID.57183.

A reasonable percentage award should recognize economies of scale to prevent a windfall for plaintiffs' attorneys at the expense of the class. "It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998). Instead, high-dollar recoveries tend to be the result of class size and claim strength rather than attorney skill, ad, thus, "the percentage awarded ordinarily should decrease as the amount of the recovery rises, particularly in 'mega-fund' cases where the recovery is above $100 million." *In re Royal Ahold NV Secs. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006) (reducing award to 12%). Thus, "[i]n cases with exceptionally large common funds, courts often account for these economies of scale by awarding fees in the lower range." *In re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (cleaned up).

"The existence of a scaling effect—the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions. Plaintiffs' ability to aggregate into classes that reduce the percentage of recovery devoted to fees should be a hallmark of a well-functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J.

EMPIRICAL LEGAL STUD. 248, 263 (2010). "A 25% presumption is too big to be applied to common funds as large as this one" for that would "be the equivalent of a Willy Wonka golden ticket." *In re Facebook Biometric Info. Privacy Litig.*, No. 15-cv-03747-JD, 2021 U.S. Dist. LEXIS 36801, *33 (N.D. Cal. Feb. 26, 2021).

In accord with these principles and litigation realities, courts in this Circuit and others consistently reject fee requests in the range sought by class counsel in "mega-fund" cases involving recovery of over $100 million. In *Bowling*, for example, the Sixth Circuit affirmed an award of 10% of a $102.5 million common fund where the district court recognized "the economics of scale involved in a class action of this size suggested that an award of 20% of the fund, *i.e.*, $33 million, would be excessive." 102 F.3d 777, 780 (6th Cir. 1996).[4] Empirical research confirms that these awards are typical.[5]

---

[4] *See also Facebook Biometric*, 2021 U.S. Dist. LEXIS 36801 (declining to award 16.9% of $650M fund; awarding 15%); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 499-500 (E.D. La. 2020) (declining to award 30% of $248M; awarding 19%); *New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226, 244 (E.D. Mich. 2016) (awarding fees of 7% of $300M); *In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015) (declining to award 13% of $346M; awarding 8.2%); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (declining to award 16.5% of $590M; awarding 12%); *Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d at 373 (declining to award 20% of $730M; awarding 16%).

[5] The data show that in class actions "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010). In class actions in which the settlement equaled $500 million to $1 billion, the median fee award was 12.9% and the mean was 12.9%. *Id.* at 839. Other surveys support this analysis. *E.g.,* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 265 tbl.7 (2010) (mean award of 12% and median award of 10.2% for settlement recoveries greater than $175.5 million); *Facebook Biometric*, 2021 U.S. Dist. LEXIS 36801, at *37 (observing that in Professor William Rubenstein's dataset of cases ranging from $400 to $800 million, the mean award was 16% and the median award was 15.5%); Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION—FOURTH 188–89 (2004) (noting survey where

Plaintiffs cite only two class action precedents to support their 31.6% request. ECF No. 1458, PageID.57184 n.43. But neither supports this request, respectively granting fees of 26.5% of a $26M fund and 17% of an $80M fund. *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003). Indeed, the two cases show that the 30%+ request would be distended even if this case did not involve such a large recovery.

Non-class MDL mass tort precedent is not germane when evaluating whether a class fee request is reasonable under Rule 23(h). *Contra* Fee Mem. 26 n.40. One major reason difference is that class counsel here seek to obtain 27% of the recovery of unrepresented claimants who navigate the claims process on their own, and 17% of the recovery of all claimants who have retained an outside attorney to navigate that process. *See* Section IV.B, above). In an MDL, lead counsel may get a common benefit fee of 6% like that sought by counsel here, but they would get nothing more from individuals who decline to retain lead counsel on their own. Looking to an MDL model would thus deprive claimants of the benefit of economies of scale the class mechanism creates.

The two class-action MDLs that plaintiffs cite (ECF No. 1458, PageID.157175 n.22) confirm this structure. In *Oil Spill*, the court awarded class counsel common benefit fees of 4.3% of a $13 billion total class settlement value. 2016 WL 6215974, 2016 U.S. Dist. LEXIS 147378, *67 (E.D. La. Oct. 25, 2016). The caps that the *Oil Spill* court imposed on individual representations had no applicability to the recovery of claimants who had not retained an individual attorney. *In re Oil Spill*, 2012 WL 2236737, 2012 U.S. Dist. LEXIS 83214 (E.D. La. Jun. 15, 2012). Likewise, in *NFL Concussion*, the award awarded class counsel common benefit fees of 11% of a $982.2 million total class settlement value. 2018 WL 1658808, 2018 U.S. Dist. LEXIS 57792 (E.D. Pa. Apr. 5, 2018). The 22% cap that the *NFL Concussion* court imposed on "individually retained

"class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%").

plaintiffs' attorneys" had no applicability to the recovery of claimants who had not retained an individual attorney. *Id.* Class counsel here cannot be allowed to obtain a common benefit fee *and then* a significant percentage (27%) of unrepresented claimants' recovery on top of that. Such double-dipping is not only entirely novel, it's fundamentally destructive to the proper functioning of class actions and MDLs.

Other factors also demonstrate that the percentage requested is excessive. Plaintiffs claim that they "have assumed considerable risk…without no guarantee of recovery." ECF No. 1458, PageID.57186. Common sense dictates, however, that a major national scandal of the type involved here could only result in a sizable settlement. That so many firms were lining up to bring this case reflects this minimal risk. *See In re Anthem Inc. Data Breach Litig.*, 2018 WL 3960068, at *27 (N.D. Cal. Aug. 17, 2018) (lack of risk evidenced by "18 separate motions to serve as lead counsel in this action") (internal quotations and alterations omitted); *McLaughlin v. IDT Energy*, 2018 WL 3642627, at *20 (E.D.N.Y. July 30, 2018) (lack of risk "evidenced by the fact that plaintiffs' lawyers in three states filed separate actions"). Had there been competitive bidding for the lead counsel role, there is no reason to believe that the best fee bid would have exceeded 5-12% of an expected fund this large.

Plaintiffs also tout the "excellent result" achieved by the settlement. ECF No. 1458, PageID.57185. But there is no baseline from which $641.25 million can reasonably be adjudged or quantified, and the plaintiffs wisely do not attempt such a fictive exercise. *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) ("Cases are better decided on reality than on fiction.") (internal quotation omitted). The reality is that in a case like this, involving retrospective and prospective mass personal injury claims in addition to punitive liability, the best case recovery was essentially limitless. The result, while passable, does not justify an upward deviation in the fee in any case, least of all when that deviation would directly damage the pocketbooks of class members who have already suffered grievous injury at the hands of their government.

16

In sum, the relevant legal factors and empirical data counsel that a more appropriate fee award here is in the range of 10-12% of the fund on a percentage basis.

**B.     Plaintiffs ask the court to endorse a high ceiling on individual awards to pay tens of millions of dollars of without providing any detail whatsoever about the reasonableness of these fees.**

Plaintiffs' Motion appropriately proposes to cap contingency fees paid to independently-retained counsel (IRC), but 27% seems far too high under the circumstances. While the IRC fees are authorized under myriad private contracts and do not fall under Rule 23(h), the regulation of such fees falls within the "court's duty to monitor fee agreements." *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985). "[C]ourts must curb excessive or unreasonable fees to safeguard the public's perception of the courts and the legitimacy of the legal system's handing of massive MDLs and class actions. The way to curb such fees is with a cap." *In re NFL Players*, 2018 WL 1658808, 2018 U.S. Dist. LEXIS 57792, at *5. The supervisory role of the court is especially important because many class members are relatively unsophisticated and retained *en masse* by counsel.[6]

Plaintiffs provide no clue how much work has been involved in representing individual clients, and so no benchmark for the Court to evaluate whether 27% IRC fees would still represent an unfair windfall to attorneys who now have the straightforward task of registering and claiming under the Settlement. In fact, the only suggestion of this workload comes from Liaison Counsel's reports of having filed thousands of claims in batches in single days. ECF No. 1500. Of course, registration is

---

[6] Plaintiffs may argue that because the Hall Objectors will not pay any IRC fees, they have no standing to object to the 27% cap. Rule 23(h)(2), however, provides *bona fide* class members a "procedural vehicle" to object fee motions in the district court, without establishing standing independent of their class membership. *Stetson v. Grissom*, 821 F.3d 1157, 1163 (9th Cir. 2016). Class members need not "demonstrate standing" until they wish to "invok[e] a court's jurisdiction." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019).

just the first step of securing a claim, but the entire process requires straightforward ministerial work of securing documents to establish eligibility. After final approval, no risk of non-recovery remains, nor do burdens of proof for novel expert testimony like bone scanning, which would be tricky to use outside the context of settlement.

Due to the current lack of risk, Plaintiffs appropriately cap post-July 16 fees at an even lower threshold, but the changed circumstances affect all clients, including the thousands of clients for which private counsel had never even filed a claim. ECF No. 1319-2, PageID.41001-41216. Liaison Counsel could, for example, provide hours expended on individual cases, so that the Court or an appointed expert (as in *NFL Concussion*) could gauge the relative difficulty of winning the common benefit compared to the time spent on individual cases. This would provide some clue at least as to a reasonable ratio between the global CBA and a cap for IRC fees. Instead, Plaintiffs seek the Court's blessing for an unknown amount of fees to un unclear mixture of attorneys from an unknown amount of work.

### C. Class and Liaison Counsel propose to pay themselves based on gross awards, which dampens incentives to control administration costs, and which may run afoul of Mich. Ct. R. 8.121(C).

Plaintiff's Motion calls for a 6.33% fee on the *gross* settlement fund, and then for up to 27% to be assessed on the remaining *gross* fund (less only the fees deducted for the global CBA, ECF No. 1458, PageID.57183). This has the deleterious effect of making counsel relatively indifferent to the costs imposed by vendors in the case, and these costs may well cause attorneys' fees to exceed one third of *net* recovery.

That possibility would run afoul Mich. Ct. R. 8.121(C)(1), which limits attorneys' fees in claims for personal injury or wrongful death at one third, "computed on the net sum recovered after deducting from the amount recovered all disbursements properly chargeable to the enforcement of the claim or prosecution of the action." Plaintiffs admit that their fee award could total up to $202,769,021. PageID.57192. Fees in this

amount would exceed one-third of the *net* recovery if administrative and other costs exceed about $33 million.[7] This might well happen, especially if one considers the 4% commission that Forge Consulting can assess on likely hundreds of millions of dollars of class recovery to procure structured settlements. *See* Bednarz Decl. ¶ 31. Plaintiffs move for reimbursement of $7.2 million in common benefit costs, and based on the reported claims rate to date, the invoice for Archer Systems' setup and administration may exceed $14 million. *See* ECF No. 1394-16, PageID.54343 (fee schedule). It is unclear how much Epiq will invoice as notice administrator, and also uncertain how many lien resolutions will need to be processed by Archer Systems and Massive, which cost hundreds of dollars per resolution. PageID.54344. Considering these common costs alone, the record does not prove that requested fees will not exceed one-third of net recovery. Also, the proposed 27% fee cap does not appear to bar recovery of costs from individual plaintiffs. Under at least some retention agreements, these costs can be charged to clients *in addition to* attorneys' fees. *See* ECF No. 404-3 (Napoli Shkolnik PLLC retention agreement example of deducting costs after the attorneys' fee award, leaving class member with only 56.67% of recovery). Unless assessing individual costs is prohibited or the fee award significantly reduced, the violation of Mich. Ct. R. 8.121(C)(1) likely won't be a particularly close call.

Even aside from the Michigan Court Rule, awarding fees based on actual net class member recovery is a best practice. Many courts adhere to it, and the Seventh Circuit even compels it. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014). "In order to determine a reasonable fee for the services of counsel, it is necessary to understand what counsel has actually accomplished for their clients…. This can only be done when the expenses paid by the class are deducted from the gross settlement.." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, 2004 U.S. Dist. LEXIS 8608, at *20-*21 (S.D.N.Y.

---

[7] $202.76 million x 3 > $641.25 million (gross fund) - $33 million.

May 14, 2004). This method is "only commonsense." *Fraley v. Facebook, Inc.*, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014). Indeed, eminent professor Elizabeth Chamblee Burch, an expert in mass litigation said that it would preferable to award a fee "after various expenses are deducted." Egan, *supra.*, DETROIT FREE PRESS (Mar. 23, 2021), attached as Bednarz Ex. 1. "Applying lawyers' fee percentage to the net settlement amount, rather than the gross amount, provides an incentive to keep expenses down, she said." *Id.*

By contrast, if expenses are included in the denominator when calculating attorneys' fees, class counsel is being awarded a commission on those costs. There's no "principled reason to calculate a fee this way." *Becerra-South v. Howroyd-Wright Empl. Agency, Inc.*, 2021 WL 606245, 2021 U.S. Dist. LEXIS 14633, at *14 (C.D. Cal. Jan. 25, 2021) *accord Seijas v. Republic of Arg.*, 2017 WL 1511352, at *11 (S.D.N.Y. Apr. 27, 2017) ("no justification"); *Kmiec v. Powerwave Tech.*, 2016 WL 5938709, at *5 (C.D. Cal. Jul. 11, 2016) ("no principled reason"). "Counting administration fees as part of the settlement valuation for attorneys' fees purposes might also inadvertently incentivize the establishment of costly and inefficient administration procedures which would inflate the benefits valuation without increasing actual benefit for class members." *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 170 (D. Mass. 2015).

Conversely, when class counsel is paid *after* administration expenses are deducted, class counsel is incentivized to optimize settlement administration expenses *In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752, 771 (S.D. Ohio 2007). This also promotes judicial efficiency because when class counsel's incentives are aligned to optimize expenses, courts do not have to waste resources monitoring settlement administration expenses for cost overruns. "Put another way, incentives to minimize expenses and to allocate resources properly go much farther toward cost efficiency than can *post hoc* judicial review." *Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994).

## VI.   A cross-check is necessary, and the poorly-documented claimed lodestar cannot be the basis of fees.

Given the enormous size of the fund, a lodestar crosscheck becomes especially important. *Bowling*, 922 F. Supp. at 1280. But Plaintiffs provide insufficient documentation for the Court to conduct a crosscheck and they thus fail to meet their burden of justifying their requested fees. *See United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984) ("documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation"); *Keener v. Department of Army*, 136 F.R.D. 140, 147 (M.D. Tenn. 1991) ("At a minimum, the documentation offered by an attorney seeking an award of fees 'should identify the general subject matter of his time expenditures.'") (quoting *Hensley v. Eckerhart*, 437 U.S. 424, 461 n.12 (1983)).

Plaintiffs provide of the number of hours worked by timekeepers at 30 firms—except for Levy Konigsberg which only asserts that "more than 30,000 hours of time to the common benefit" was spent. ECF No. 1458-3, PageID.57227, -29 ("31,273 hours"). This is insufficient. Indeed, in *United Slate*, the Sixth Circuit declared that a district court "would do violence to its judicial obligations were it to accept the amounts claimed at their value" "where the documentation is inadequate." 732 F.2d at 502.

For this reason, Objectors intend to shortly move to inspect the hourly billing and expenses. However, Objectors can make two preliminary observations about the fee request. *First*, because Plaintiffs submit only hours claimed to be common benefit, they may be over-zealous in classifying work as common benefit, as Napoli Shkolnik alleged to have occurred in 2018. Without hourly descriptions, class members and claimants have no way to audit the common benefit time, which may include hours for individual benefit that are already compensated by IRC fees. *Second*, even with the scant billing provided, the rates claimed by Plaintiffs appear grossly inflated, particularly in

the case of Napoli Shkolnik, which bills contract attorneys paid no more than perhaps $50/hour uniformly at $500/hour.

### A.   Co-Liaison Counsel swore under oath that non-common benefit work was misclassified, and the record does not show otherwise.

Napoli Shkolnik earlier alleged that Class Counsel had assigned to various firms as common benefit work. In particular, they claimed that Class Counsel had assigned as "common benefit" a client solicitation project disguised as a mapping project. ECF No. 444, PageID.14114. Class Counsel denied that this ever occurred, but in reply Napoli Shkolnik described a relevant conversation and asserted that Messrs. Leopold and Stern could confirm that it had taken place. ECF No. 479, PageID.15151.

While the Court subsequently entered a Case Management Order ("CMO") to require the periodic submission of time to the Special Master, it appears to have simply made Class and Liaison Counsel each empowered to deem work as common benefit. ECF No. 507, PageID.15829. While the CMO also provided that quarterly reviews should occur, it appears that these were driven only by Class and Liaison Counsel themselves. PageID.15829 (disagreements to be raised with Court). Counsel likely had no incentive to scrutinize each other's claimed time because they "agreed *ex ante*" on a fee structure and percentages (Motion, PageID.57182), so the amount each side claimed as common benefit work could not have affected their side's bottom line.[8]

Second, neither Co-Liaison Counsel indicates that they have excluded time spent preparing for bellwether trials *after* this settlement was reached. While earlier preparation of bellwether cases likely helped precipitate this Settlement, post-settlement work on

---

[8] Previously, Hunter Shkolnik declared "It has been my unremitting position that class fees, common benefit fees, and/or lawyer compensation should not be discussed or considered until resolution of the litigation. … It is Co-Liaison Counsel's belief that these secretive agreements are detrimental to both the class and individual litigants, and it is Co-Liaison Counsel's efforts to put an end to these agreements that has led to the allegations of ethical violations by me." ECF No. 444-2, PageID.14140.

the cases is not a common benefit for *this settlement. Citigroup Secs.*, 965 F. Supp. 2d at 391-92 (eliminating post-settlement hours). Such time would only be a common benefit for the next round of settlements, if and when they occur.

> **B.   The claimed lodestar includes wildly inflated rates from some firms.**

Objectors have conducted only a preliminary review of the claimed common benefit billing in this case based on Plaintiffs sparse and poorly-formatted exhibits.[9]

Several declarations appear completely unreasonable. For example, the Napoli Shkolnik declaration lists 65 billers categorized as "A," which is supposed to mean "associate" according to their legend. ECF No. 1458-5, PageID.57277. All but one of these billers has been claimed at a rate of no less than $500/hour. But according to the firm's website, only 22 associates work at Napoli Shkolnik nationwide. Bednarz Decl. ¶ 18. Upon information and belief, most of the claimed "associates" to are *contract attorneys* that the firm hired hourly and paid at hours of perhaps $50/hour or less.

"As a general matter, contract attorneys are 'attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action,' whereas staff attorneys are 'non-partnership-track attorneys working on an hourly basis.'" *Anthem.*, 2018 WL 3960068, 2018 U.S. Dist. LEXIS 140137, at *124. "[T]here is absolutely no excuse for paying these temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes." *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1012-13 (N.D. Ohio. 2016) (cleaned up).

The best measure of the market rate is to review what *paying clients* are willing to

---

[9] This Court's Electronic Filing Policies and Procedures, requires PDFs to be "made text-searchable," but nearly every page containing tables of summary hours is *not* text searchable. *E.g.* PageID.57214, 57240, 57275. Other pages of the exhibits are correctly processed.

pay. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008). In today's legal market, corporate clients refuse to tolerate law firms treating document review projects as a profit center, or "a trough where herds of lawyers try to muscle their way to the front to quench their thirst without explanation and with no appreciation of moderation." *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). The best practice is to bill the contract attorneys at cost, because class counsel have not met their burden to prove the reasonableness of $350 or $500/hour. *See Wells Fargo & Co. S'holder Derivative Litig.*, 157 F.R.D. at 527-532 (using figure of "$42.50 per hour average they were actually paid" because plaintiffs didn't bear their burden to show a different market rate); *see also, e.g., Dial Corp. v. News Corp.*, 317 F.R.D. 426, 430 n.2 & 438 (S.D.N.Y. 2016) ($39/hour); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) ($47 to $59 per hour).

The children of Flint ought not be charged more than McDonald's or Exxon would be for contract attorneys—and certainly not ten times more.

It appears the firm has misclassified dozens of inexpensive temporary employees as $500/hour associates for the purpose of inflating their lodestar. All but a handful of the claimed associates appear to be contract attorneys, many of which appear to have online resumes expressly stating they work for UnitedLex, a well-known contract attorney vendor, not Napoli Shkolnik. Bednarz Decl. ¶¶ 19-24. It appears Napoli's claimed $16 million lodestar includes roughly $11 million in contract attorney time, or **68.75%** of their claimed lodestar. *Id.* ¶ 25. Ironically, Napoli Shkolnik faulted Cohen Milstein for employing "a large number of contract attorneys with a rate as high as $447 per hour" in the *Anthem* litigation. ECF No. 444, PageID.14131. Napoli has one-upped Cohen Milstein by apparently employing even more contract attorneys at a rate not less than $500/hour. Hall Objectors reserve the right, in future papers, to make additional arguments about the unreasonable hours and "Bentley rates" sought by lead counsel. *Shane Grp., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 310 (6th Cir. 2016).

The contrast with more reasonable Pitt billing rates shows the need to review fee sharing agreements and hourly billing from the claiming attorneys. ECF No. 1458-4, PageID.57240. If the Court were to simply slash the fee request by some amount, undiscovered fee sharing agreements might well disproportionately punish firms that submitted reasonable rates while rewarding firms that padded their bills.

## VII. Plaintiffs have also failed to demonstrate the reasonableness of their costs.

The Hall Objectors' upcoming motion will also seek detail about the expenses claimed. The class members and claimants in this settlement are being asked to cover $7.2 million in costs, so should be entitled to see what they are. *E.g. In re Polyurethane Foam Antitrust Litig.,* 2016 U.S. Dist. LEXIS 156339 (N.D. Ohio. Oct. 24, 2016) (no reimbursement where class counsel provided "no opportunity for [class member] review, comment, or objection"). Cohen Milstein and two other lead counsel recently submitted detailed billing and costs for a class action settlement with Facebook; there, plaintiffs' firms (not Cohen Milstein itself) sought reimbursement for two $5000 hotel rooms to cover a half-day mediation and a $1020.25 stay at a Detroit hotel. *See Adkins v. Facebook, Inc.,* No. 3:18-cv-05982, No. 323 at 24 (N.D. Cal. Mar. 8, 2021).

Why should the parents of children poisoned with lead have less right to inspect the detailed fees and costs than a multi-billion dollar social media platform? No legal or moral reason exists.

## CONCLUSION

The Court should deny fee approval until class counsel discloses hourly billing and fee sharing agreements amongst counsel, which have been admitted to exist. Even if the Court were to grant fees without that information, it should (1) substantially reduce the fee cap for IRC fees, and (2) bar the recovery of Special Assessments on unrepresented or lately-represented claimants.

Dated: March 29, 2020

/s/ M. Frank Bednarz
M. Frank Bednarz (IL ARDC No. 6299073)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1145 E. Hyde Park Blvd. Unit 3A
Chicago, IL 60615
Phone: 801-706-2690
Email: frank.bednarz@hlli.org

*Attorneys for Hall Objectors*

I, Raymond Hall, sign and date this written objection drafted by my attorneys as required by the Settlement Agreement. Dkt. 1394-2, PageID.54184.

3-28-2021

Date

Raymond Hall

I, Robert Hempel, sign and date this written objection drafted by my attorneys as required by the Settlement Agreement. Dkt. 1394-2, PageID.54184.

3-29-2021

Date

Robert Hempel

I, Ashley Jankowiak, sign and date this written objection drafted by my attorneys as required by the Settlement Agreement. Dkt. 1394-2, PageID.54184.

3/26/21

Date

Ashley Jankowiak

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on March 29, 2021, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ M. Frank Bednarz
M. Frank Bednarz