# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* Flint Water Cases | No. 5:16-cv-10444-JEL-MKM <br><br> Hon. Judith Levy <br><br> Mag. Mona K. Majzoub |

## DECLARATION OF THEODORE H. FRANK

I, Theodore H. Frank, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. My business address is Hamilton Lincoln Law Institute, 1629 K St. NW, Suite 300, Washington, DC 20006. My telephone number is (703) 203-3848. My email address is ted.frank@hlli.org.

3. Hamilton Lincoln Law Institute and its attorneys, including myself, represent class members Raymond Hall, Robert Hempel, and Ashley Jankowiak in this matter. These class members are among the several that have contacted us with the interest in objecting to the fee request, and these three have signed retention agreements, but I do not know if all three will be able to comply with the court's burdensome requirements to physically sign the objection we are preparing for them consistent with their work and travel schedules.

### Center for Class Action Fairness

4. I founded the non-profit Center for Class Action Fairness ("CCAF"), a 501(c)(3) non-profit public-interest law firm based out of Washington, DC, in 2009. In 2015, CCAF merged into the non-profit Competitive Enterprise Institute ("CEI") and

became a division within their law and litigation unit. In January 2019, CCAF became part of the Hamilton Lincoln Law Institute ("HLLI"), a new non-profit public-interest law firm founded in 2018.

5.   CCAF's mission is to litigate on behalf of class members, shareholders, and claimants against unfair fee requests and settlements. *See, e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (praising CCAF's work); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement") (rejecting settlement approval and certification). The Center has received national acclaim for its work. *See, e.g.*, Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. Times, Aug. 13, 2013 ("the leading critic of abusive class action settlements"); Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, Fortune, Dec. 15, 2015 ("the nation's most relentless warrior against class-action fee abuse"); The Editorial Board, *The Anthem Class-Action Con*, Wall St. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the *Anthem* data breach MDL).

6.   The Center has been successful, winning reversal or remand in over twenty federal appeals decided to date in courts of appeals and the Supreme Court. *E.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019); *Berni v. Barilla S.P.A*, 964 F.3d 141 (2d Cir. 2020); *Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *In re Lithium Ion Batteries Antitrust Litig.*, 777 Fed. Appx. 221 (9th Cir. 2019) (unpublished); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3d Cir. 2019); *In re EasySaver Rewards Litig.*, 906 F.3d 747 (9th Cir. 2018); *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re*

*Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015) (unpublished); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe Apple Power Adapter Litig.*, 571 Fed. Appx. 560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). While, like most experienced litigators, we have not won every appeal we have litigated, CCAF has won the majority of them.

7. CCAF has won more than $200 million dollars for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, Boston Globe (Dec. 17, 2016) (more than $100 million at time). *See also, e.g., McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing fees, and thus increasing class recovery, by more than $26 million to account for a "significantly overstated lodestar"); *In re Apple Inc. Sec. Litig.*, No. 5:06-cv-05208-JF, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) (parties nullify objection by eliminating *cy pres* and augmenting class fund by $2.5 million).

### Pre-empting *Ad Hominem* Attacks

8. In my experience, settling counsel often responds to CCAF objections by making a variety of *ad hominem* attacks, often wildly false. The vast majority of district court judges do not fall for such transparent and abusive tactics. In an effort to

anticipate such attacks and to avoid collateral litigation over a right to file a reply, I discuss and refute the most common *ad hominems* below. If the Court is inclined to disregard the *ad hominem* attacks, it can avoid these collateral disputes entirely and the discussion below will be irrelevant.

9. Class counsel often try to tar CCAF as "professional objectors," and then cite court opinions criticizing for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But this is not the non-profit CCAF's *modus operandi*, so the court opinions class counsel rely upon to tar CCAF are inapposite. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n. 150 (public interest groups are not professional objectors); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. The difference between a for-profit "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as myself has to triage dozens of requests for pro bono representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF objects to only a small fraction of the number of unfair class action settlements and fee requests it sees.

10. While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for

4

a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

11. In *In re Equifax, Inc. Customer Data Breach Litigation*, No. 17-md-2800-TWT (N.D. Ga.), the district court's approval order stated that I am a "serial objector" who objected merely to benefit myself or my attorney. It further accused me of making "misleading" statements about the settlement. The order did not cite any evidence or reason to support this finding, and I have reason to believe the court used this language only because it adopted nearly verbatim a proposed order that was submitted *ex parte* by plaintiffs' counsel, without exercising independent judgment to make these findings. Our appeal raising this issue is pending before the Eleventh Circuit as case no. 20-10249. The allegation made by the district court is false. Our objection in *Equifax* was meritorious, similar to successful objections we've made elsewhere that have won millions of dollars for class members, and supported on appeal by an amicus brief by a prominent plaintiffs' attorney that agreed with our analysis. I did not make any false or misleading statements about the settlement, and on appeal, plaintiffs failed to identify any false or misleading statements I made and admitted that I have never engaged in extortion.

12. In *Exum v. National Tire and Battery*, No. 9:19-cv-80121 (S.D. Fla.), one of HLLI's attorneys mistakenly misconstrued the release clause in the settlement agreement and filed an objection with an argument that relied on that erroneous reading. Once she became aware of the error, she withdraw that portion of the objection and has publicly expressed contrition and embarrassment that her work did not live up to the high standards she sets for herself. The district court issued an order to show cause why she should not be sanctioned, stating that the "false statements and

5

representations" "appear[] to be reckless or negligent." The court also referred to the HLLI attorney as a "serial" or "professional" objector but made no finding that she or any other HLLI attorney has ever withdrawn an objection in exchange for payment. HLLI filed a response to the order explaining that this error was made in good faith, with no intent to delay or otherwise interfere with the court proceedings and again expressing contrition. The court subsequently issued an order discharging the order to show cause in which it stated that "it is clear to the Court that [the HLLI attorney] does hold herself to high standards" and the court was "satisfied and impressed" by HLLI's "prompt and candid response." The court found that the HLLI attorney "did not engage in bad faith conduct and did not knowingly or intentionally make a false statement or misrepresentation to the Court."

13. CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it successfully initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *see generally* Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, Wall St. J., Dec. 7, 2016.

14. Before I joined CEI, I had a private practice unrelated to my non-profit work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Mr. Bandas was criticized by the Southern District of New York after I ceased to represent him, and class counsel in other cases often cites that language and attempts to attribute it to me. Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using language like "forced to disclose" and "secret." The sneering is false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal

6

work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas, and won both of them. There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services for a client. CCAF had no attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF.

15. Firms whose fees we have objected to have previously cited to *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While the *Wyeth* court did criticize our client's objection (after mischaracterizing the nature of that objection), it ultimately agreed with our client that class counsel's fee request was too high and reduced it by several million dollars to the benefit of shareholder class members.

16. Plaintiffs' attorneys frequently cite a decade-old case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in the Seventh and Ninth Circuits on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr. Frank's goals are policy-oriented as opposed to economic and self-

serving" and even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp. 2d at 813-17.

17. CCAF has no interest in pursuing "baseless objections," because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. We are confronted with many more opportunities to object (or appeal erroneous settlement approvals) than we have resources to use, and make painful decisions several times a year picking and choosing which cases to pursue, and even which issues to pursue within the case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair. This is especially true now that HLLI has expanded into successful litigation over other issues that our attorneys care about, such as freedom of speech and regulatory abuse. *See, e.g., Greenberg v. Haggerty*, No. 20-cv-3822, 2020 U.S. Dist. LEXIS 229731 (E.D. Pa. Dec. 8, 2020) (preliminarily enjoining rule of professional conduct that would chill free speech, which the defendant appealed but subsequently dismissed).

18. While I am often accused of being an "ideological objector," the ideology of CCAF's objections is merely the correct application of Rule 23 to ensure the fair treatment of class members. Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of any particular objection—has no basis in reality. I have been writing and speaking about class actions publicly for nearly a decade, including in testimony before state and federal legislative subcommittees, and I have never asked for an end to the class action device, just proposed reforms for ending the abuse of class actions and class-action settlements. That I oppose class action abuse no more means that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of

my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014 presentation in New York that was broadcast nationally on C-SPAN and in my briefing in *Frank v. Gaos*. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I was the putative class representative in a federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMOCorp., Inc.*, No. 4:17-cv-870 (E.D. Mo.).

19. On October 1, 2015, after consultation with its board of directors and its donors, CCAF merged with the much larger Competitive Enterprise Institute ("CEI"). Prior to its merger with CEI, CCAF never took or solicited money from corporate donors other than court-awarded attorneys' fees. CEI, which is much larger than CCAF, does take a percentage of its donations from corporate donors. As part of the merger agreement, I negotiated a commitment that CEI would not permit donors to interfere with CCAF's case selection or case management. In the event of a breach of this commitment, I was permitted to treat the breach as a constructive discharge entitling me to substantial severance pay. CCAF attorneys made several filings in several cases opposed by CEI donors.

20. CEI was willing to merge with CCAF because it supported CCAF's pro-consumer mission and success in challenging abusive class-action settlements and fee requests. But it is a large organization affiliated with dozens of scholars who take a variety of controversial positions. Neither I nor CCAF's clients agree with all of those positions, and they should not be ascribed to me, my clients, or this objection, any more

9

than my support for a Pigouvian carbon tax should be ascribed to CEI scholars who have publicly opposed that position.

21. CCAF has since left CEI, and is now part of the Hamilton Lincoln Law Institute, which receives no corporate funding. We did not consult any of our donors about our objection to this settlement.

22. Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibility of a fee award never factors into the Center's decision to accept a representation or object to an unfair class-action settlement or fee request.

23. Moreover, under federal non-profit law, attorney fees cannot be used to support more than 50% of our program expenses. None of our attorneys' salaries are tied to fee awards in any case, and all of our attorneys have salaries that are a fraction of what they could make in private practice. In any event, we are not seeking a fee in this case.

## Michigan Lawsuit Abuse Watch

24. I have known Robert Dorigo Jones since 2005. Jones is currently President of Michigan Lawsuit Abuse Watch (MiLAW), a group that has no financial or contractual relationship with CCAF.

25. Jones used to host an annual contest for wacky warning labels, and more than once I submitted entries for them. He interviewed me for his podcast in 2013, and he interviewed me for a video segment about warning-label issues that was broadcast on PBS in late 2011 or January 2012.

26. Because he knew my background in representing objectors to excessive class action fee awards, Jones called me about this case. He gave me some initial background of the litigation and asked questions, much like reporters often call me to ask for comment on class action settlements and closely related topics.

27. Jones also asked if we could help object to the fee request. I advised that we would first need to examine the fee motion and verify that the fees appeared to be excessive.

28. Moreover, I advised that we could only represent class members who had not previously retained counsel and who sincerely objected to the fee request. I explained that under no circumstances could we solicit anyone who had retained a lawyer.

29. To be clear, the objection does not depend on anything Jones conveyed to me or CCAF. My associate Frank Bednarz has independently researched all aspects of the case from the voluminous record. We independently determined that the Settlement is not a simple class action settlement, but also has characteristics of a mass-tort or MDL settlement. We determined that the fee motion appropriately includes a fee cap on independently retained counsel. Nevertheless, we concluded the relatively high cap on such fees and the opaque common benefit fee award (including what we call "Special Assessments" on unrepresented or late-represented class members) appears excessive and would disserve class members and non-class claimants alike.

30. We have no control over what Jones and MiLAW say. We have not paid nor do I intend to pay Jones, MiLAW, or anyone affiliated with him or MiLAW. Likewise, he and MiLAW have not paid me, CCAF, or anyone who works for CCAF, and have not offered or promised any payment. No contracts, written or otherwise, exist between Jones or MiLAW and CCAF or anyone who works for CCAF, including myself.

31. Jones has circulated press releases and done a number of interviews in various media concerning MiLAW's opposition to the fee request. For example, his group posted an online petition directed toward the Attorney General, asking her to oppose the fee request, posted at https://www.moreforflint.com/.

11

32. Jones is not an attorney, and he may have been imprecise in some of his communications. I and other CCAF attorneys do not agree with everything he has said regarding the Settlement, but we do agree that the fee motion before the Court requests fees that are too high and that the attorney general should not have agreed to refrain from commenting on the fee request.

33. Our representation of the Hall Objectors is completely *pro bono* and we will not move for fees in connection with the objection, nor will we deduct fees from their eventual rewards under the Settlement. We reserve the right to move for sanctions from opposing counsel if they entangle us with meritless diversions, but we will not move for a penny of fees from the common benefit fund or the awards due to any claimant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 28, 2021, in Houston, Texas.

_____
Theodore Frank