# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* Flint Water Cases | No. 5:16-cv-10444-JEL-MKM |
| | Hon. Judith Levy |
| | Mag. Mona K. Majzoub |

## DECLARATION OF M. FRANK BEDNARZ

I, M. Frank Bednarz, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. My business address is Hamilton Lincoln Law Institute, 1145 E. Hyde Park Blvd Unit 3A, Chicago, IL 60615. My telephone number is (801) 706-2690. My email address is frank.bednarz@hlli.org.

3. Hamilton Lincoln Law Institute and its attorneys, including myself, represent class members Raymond Hall, Robert Hempel, and Ashley Jankowiak ("Hall Objectors") in this matter.

### News Coverage

4. Attached as **Exhibit 1** is a true and correct copy of Paul Egan, *Concerns mount over attorneys fees in Flint Water settlement. Here's why*, DETROIT FREE PRESS (Mar. 23, 2021), printed from https://www.freep.com/story/news/local/michigan/flint-water-crisis/2021/03/23/concerns-mounting-over-requested-attorney-fees-flint-case/4753904001/. The article quotes both the Attorney General Dana Nessel opining on the fee request, and Prof. Elizabeth Chamblee Burch, one of the leading academics on mass tort and MDL settlements, "speaking about mass-tort settlements in general

and not the Flint case specifically." Attached as **Exhibit 2** is a true and correct copy of Michael Nafso, *Attorney addresses growing concerns over attorney fees in Flint water settlement*, ABC12 (Mar. 24, 2021), printed from: https://www.abc12.com/2021/03/25/attorney-addresses-growing-concerns-over-attorney-fees-in-flint-water-settlement/. This article notes support by Flint's Mayor, the City Council, local legislators, and the State House to provide Flint residents and opportunity to review billing and expenses. "[State Rep. John] Cherry and other Flint area members of the Michigan House are urging Judge Levy to limit attorney fees to ten percent of the settlement instead of more than thirty percent, and they adopted that resolution formally on Wednesday."

### Ambiguities in Plaintiffs' Motion

5.  Plaintiffs' motion does not say whether costs for individual plaintiffs may be recovered by their independently-retained counsel. Because the Motion is silent on the topic, Objectors assume that independently-retained counsel *can* deduct costs from their client's awards. Supporting this interpretation is the fact that some retention agreements expressly allow costs to drive down net recovery well below two-thirds (ECF No. 404-3) and the fact that a declaration apparently required for bone scanning contemplates that individually-retained attorneys might recoup that individual cost from the eventual award. ECF No. 1463, PageID.57613 ("I understand it is possible that the cost may be deducted from any settlement payment I receive."). However, some ambiguity exists, because the Motion also claims prominently that maximum total fee request is "less than the typical fee in comparable cases **and the one-third maximum amount permitted under Michigan law,** *see* **Mich. Ct. R. 8.121.**" PageID.57183 (emphasis added). As explained in the objection, compliance with Mich. Ct. R. 8.121 is already questionable just counting common costs, given that known costs will drive attorneys' fees *net* recovery (which Mich. Ct. R. 8.121(C) measures against) to very nearly equal and possibly exceed 33.3%. If individual attorneys are further allowed to take individual costs from their clients, it will not be a particularly close call—the

2

Motion would clearly exceed the limit. My best guess is that the Motion really does exceed the limit, but due to the ambiguity I've described it here and why I concluded that individual costs are not forbidden on top of the 27% IRC cap under the proposal. If I am mistaken, I apologize and Objectors withdraw this argument, but Co-Liaison Counsel (collectively "Liaison Counsel") and Co-Lead Class Counsel (collectively "Class Counsel") could have clearly precluded recovery of individual costs with a one-sentence statement in their 40-page Motion if that was their intent.

6. In the Motion, Plaintiffs say that what they call common benefit IRC fees from the subclass and programmatic portions of fund would total at most $35.493,187.50. PageID.57178. We have called these fees "Special Assessments" to distinguish them from the well-known uniform global CBA component of the Motion. Plaintiffs' calculation appears to be an error or possibly represent a difference in how Special Assessments are calculated compared to IRC fees. To the penny, $35.493,187.50 represents 27% of the 20.5% of the gross fund devoted to adult, property owner, business, and programmatic components of the settlement. PageID.40789. In other words, as written, Plaintiffs propose to take a full 33.33% of the gross fund from the subclasses and programmatic components of the settlement. But this is inconsistent with elsewhere Plaintiffs say that "27% amounts are assessed against only funds that remain after the 6.33% global CBA." PageID.57183 n.41. We have assumed that this a typographical or mathematic error in the motion, and that the Special Assessment would be net the 6.33% Global CBA as the IRC cap is said to work, the the correct maximum should be $33,281,961.92. If it was *not* a mistake, Plaintiffs should better describe how their proposal treats Special Assessments, and the Objectors reserve the right to supplement their objection accordingly.

7. It is unclear what Plaintiffs mean by their fee splitting proposal dividing special assessments as: "75% to Co-Lead Class Counsel and 25% to Co-Liaison Counsel for the 17% of the gross award for any … **Programmatic Relief awards to Claimants**

3

**retained by counsel on or after July 16, 2020.**" Motion, PageID.57166 (emphasis added). The programmatic portion of the Settlement does not seem to involve claimants at all, but "shall be pursuant to the terms and guidelines established in a separate Settlement Agreement between the Education Law Center, American Civil Liberties Union, Michigan Department of Education." Settlement, PageID.54150. We have assumed that this is a copy-paste error or some sort or vestigial prose from an undisclosed fee sharing agreement, and so we do not address it in the objection. But if fees for the programmatic portion of the Settlement *do* depend on how late Flint schools, or some other beneficiary, retained counsel, that's quite bizarre and Objectors reserve the right to further supplement their objection.

### Correspondence with Class and Liaison Counsel

8. Following my appearance in this case on March 22, I sent attorneys for the four Class and Liaison Counsel firms. A true and correct copy of the resulting email exchange is attached as **Exhibit 3** and a copy of the original letter itself is attached as **Exhibit 4**. In my letter, I requested:

> a. Copies of fee sharing agreements between any firms that stood to receive fees initially distributed to Class and Liaison Counsel, including the 30 firms that filed declaration in support of the fee application and any other firms who may not be disclosed. The question is worth asking. Well-known and practices plaintiffs' firms have agreed to divert millions of dollars to politically collected operatives as dubiously-legal "bare referral fees." *Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, No. 11-10230-MLW, 2018 U.S. Dist. LEXIS 217874, at *10 (D. Mass. Sep. 25, 2018). The disclosure of such agreements is recognized as best practice by none other than Napoli Shkolnik: "The existence, and extent, of the side fee deals, and percentages should have been disclosed to the Court and other parties when Messrs. Pitt and

4

Leopold, and the other PEC members sought appointment to their respective positions." ECF No. 479, PageID.15149.

    b. Detailed billing for the time claimed as common benefit work, and if a single database or spreadsheet of this work was not available, copies of the records sent to the Special Master pursuant to the Case Management Order regarding Time and Expense Procedures. ECF No. 507, PageID.15834.

    c. Figures for the number of children and adult class members who have retained attorneys, retained attorneys after July 16, 2020, and the balance of people who are thought to have never retained counsel. At the time, I had hoped that we might get a clearer picture of the magnitude of common benefits fees to be paid via "Special Assessments," but given the variability of claim value and the heavy weight toward non-class childrens' claims, I've come to believe it would be impossible to estimate before the claims process advances, and that this indeterminant fee request cannot be approved as reasonable. Objection at 2.

    9. After a reminder email, Mr. Leopold answered on March 24. A true and correct copy of the response letter is attached as **Exhibit 5**. It says in part: "the materials provided are sufficient for the Court to evaluate our request and make a final determination. However, as discussed in our Motion, should the Court request additional support, we will provide detailed time records for the Court to review in camera. ECF No. 1458 at 32 n.55. We do not plan to distribute these detailed records more broadly, as they include material protected by Attorney-Client Privilege and Work Product Protection." Realizing that Mr. Leopold answered my letter "we," without specifying who we spoke for, I sent a reply-all on March 25 "Could your or one of the other copied counsel confirm that this is the position of all four firms?" Ex. 3 at 3.

10. Twenty-five minutes later, Mr. Stern replied that "I've added Hunter Shkolnik" to the thread (although Mr. Shkolnik had been copied since my first message). Mr. Stern advised that he agreed with Mr. Leopold, and continued "I feel strongly, having reviewed your communications, that you have not actually read the settlement agreement. I do <u>not</u> believe you have any idea what this settlement says, how it is structured, and how money is paid or to whom. I think you found media pieces that support what you generally do, and your general narrative, and you decided to jump in." Ex. 3 at 2 (emphasis in original). To make his position clear, he added "I am offended by you" and "[t]here is nothing in the world more frustrating than a Monday Morning QB, a backseat driver, or someone who seeks to make their living or enhance their reputation critiquing someone else's efforts." *Id.*

11. I should say: I have read the settlement agreement. And I understand why he finds being second-guessed frustrating—I'd find it frustrating too, and I said so in reply. *Id.* at 2. I more than agree that attorneys should be commended for their work. In fact, they deserve to be paid when they create common benefit. This is the basis of attorneys' fee awards, and it's a sound one. My position is only that the absent class members and claimants deserve something too: they deserve not to overpay for their representation, especially when they are minors, poor, or not sophisticated in legal processes. Mr. Stern's declaration, for example, is astonishingly bare. ECF No. 1458-3. It's shorter than this declaration! It doesn't identify the people who apparently billed the 31,273 hours of work. Yet on this basis, his firm is seeking payment of some unknown share of half of common benefit fees, including both the 6.33% and unprecedent 17% Special Assessment that Plaintiffs seek to be assessed against my clients and their children. I understand Mr. Stern is not a class action attorney in this settlement, but his firm requesting money from all Flint claimants—represented, unrepresented, class members and children. If he worked for a corporation, they would scrutinize his bill. If he had won a judgment against a corporation liable to pay fees

6

under a fee-shifting statute, they would demand—and lawfully receive—detailed hours for the work claimed. My email inquiry is simply based on the notion that my clients, their kids, and the people like them—the people of Flint—have no less right to scrutinize the billing than a multinational corporation does. Mr. Stern says "Unless ordered by a court, I will provide you <u>nothing</u>." Ex. 3 at 2 (emphasis in original). Therefore, the Hall Objectors will shortly move the Court for such an order.

12. After agreeing with Mr. Stern that I would find the process frustrating, on March 25, I sought further clarity: "To avoid any ambiguity, does Mr. Shkolnik-who has been copied since my first email share this position?" To date, he has not responded. Ex. 3 at 1.

13. On March 26, Mr. Stern sent the last message on this chain: "While I have a sense of what Mr. Shkolnik's position likely he is, he and I are not monolithic, and I anticipate he will respond if/when and with what he feels is appropriate." *Id.*

### Rates Claimed by Class and Liaison Counsel

14. The declarations filed in support of the Plaintiffs' Motion were formatted in such a way so as to hinder efficient review of the time. In particular, they violate the Court's Electronic Filing Policies and Procedures, which requires PDFs to be "made text-searchable." Nearly every page containing tables of summary hours is not text searchable. *E.g.* PageID.57214, 57240, 57275. Other pages of the exhibits are correctly processed, leading me to infer this was a deliberate decision to make review more difficult.

15. While I can convert the tables to text using an "OCR" tool, this results in poorly-formatted text data not easily reconstructed into columns. Thus, it would be labor-intensive even to sort all of the claimed timekeeper time into to a single spreadsheet. In the Hall Objectors' forthcoming motion to examine the hourly billing, we will avoid this problem by requesting native production of the billing (as from a database or spreadsheet).

7

16. My clients have had limited time to file the objection and I have had limited time to analyze the fee request—especially given that Plaintiffs were allowed twelve extra days to file their fee motion, without a reciprocal extension to the objection deadline. ECF No. 1434. Therefore, the following should not be considered a comprehensive analysis even on the limited record Hall Objectors have before them.

17. The Shkolnik declaration (ECF No. 1458-5) lists a large number of billers, including 55 categorized as "A," which the declaration says stands for "associates." *Id.* at PageID.57275-77.

18. However, according to Napoli Shkolnik's website, only 22 associates appear to work at the firm nationwide, and this is including those with titles like "senior associate" and "practice chair." Attached as **Exhibit 6** is a true and correct copy of Napoli Shkolnik PLLC, *Our Attorneys* printed from: https://www.napolilaw.com/our-attorneys/

19. It appears most of the 55 "associates" are contract attorneys and not associates or even employees of the Napoli Shkolnik firm—or at least many of them are. Eight of them appear on Napoli Shkolnik's site: Lanciotti, P.; Findeis, A.; Fernandez, J.; Hulla, T.; O'Neil Mitchell;[1] Modiano, A.; Kunkle, T.;[2] and Shkolnik, R. *See* Ex. 6 at 3-5.

20. An additional four appear to work for NS PR Law Services LLC, a Puerto Rican affiliate firm: Odiot, C.; Nery, M.; Gigante, A. and Nigaglioni, E. That said, note

---

[1] No given name for Mr. or Ms. O'Neil Mitchell appears in the Shkolnik declaration, having apparently been cut off. ECF No. 1458-5, PageID.57276. I've counted this person as a potentially correctly-identified associate because the firm *does* list an associate with the family name "Mitchell." This could be a coincidence, however.

[2] Mr. Kunkle does not currently appear to be a Napoli associate, so does not show up in Ex. 6, but he has a LinkedIn profile and article archive on Napoli's site, indicating he was an associate, so he was correctly categorized.

8

that the last of these individuals is listed by the NS PR as a paralegal, not an associate. *See* https://nsprlaw.com/our-team/.

21. From what I could tell, none of the remaining 43 names appears to have entries on either Napoli Shkolnik's site or on the NS PR site. Perhaps others of these were former associates like T. Kunkle, but it appears that most of the balance have never worked for Napoli Shkolnik.

22. At least six of the attorneys appear to have LinkedIn profiles showing them to be "project attorneys" at UnitedLex, a well-known on-demand contract attorney staffing vendor. True and accurate LinkedIn PDF summaries for these attorneys are attached as **Exhibits 7-12**.

23. Likely many additional contract attorneys exist within the Shkolnik declaration, but these cannot be definitely proven. Mr. Shkolnik should file a corrected declaration that accurately identifies contract attorneys.

24. Prior to my employment with the Center for Class Action Fairness, I worked as a patent litigation associate at a large law firm, where I oversaw document review attorneys. In one case the contract attorneys were staffed by UnitedLex. My memory is that these were billed to my firm at rates of about $50/hour for attorneys who only spoke English. Contract attorney invoices were passed to clients as costs with no markup, which is the industry standard for legal work procured by sophisticated corporations. In fact, some corporations contract with vendors directly in order to obtain more favorable rate for volume.

25. The rate paid to contract attorneys is even lower. Attached as **Exhibit 13** is a true and correct copy of Glassdoor – UnitedLex Project Attorney Hourly Pay, printed form https://www.glassdoor.com/Hourly-Pay/UnitedLex-Project-Attorney-Hourly-Pay-E335998_D_KO10,26.htm?filter.employmentStatus=CONTRACT. This page shows that, based on 30 reports, the median salary of a UnitedLex "project attorney" is $25/hour.

9

26. Ignoring the 12 Napoli Shkolnik-connected timekeepers, the remaining 53 "associate" timekeepers are alleged to have billed $11,000,460 of the $16,001,596 lodestar claimed, and 22,001 of the claimed 29,411.1 hours. To be clear, I am not assuming that the rates for the 12 Napoli Shkolnik-connected timekeepers are appropriate, especially rates for Puerto Rican attorneys, and most especially the "associate" who is apparently a paralegal.

27. Assuming that Napoli Shkolnik paid $50/hour for these attorneys, a sophisticated corporation would have paid $1.1 million for this time—not the figure ten times greater that Napoli Shkolnik has submitted in its lodestar.

28. Levy Konigsberg submitted very little information about the common benefit time spent, except that it totals 31,273 hours. Dkt. 1458-3, PageID.57229.

29. Cohen Milstein also employed a number of contract and staff attorneys in their declaration at unreasonable rates between $375 and $500/hour. Dkt. 1458-2, PageID.57215. However, these attorneys are at least accurately identified as contract and staff attorneys. Additionally, the contract and staff attorney time constitutes a much smaller part of that firm's lodestar.

30. Lastly, on a quick inspection, the rates submitted by the Pitt firm appear more reasonable. For example, Pitt claims appropriate market rates for this district, such as a recent E.D. Michigan law clerk, Ms. Abdulrazzak, which Pitt billed at $250/hour. Dkt. 1458-4, PageID.57240. The contrast shows the need to review fee sharing agreements and hourly billing from the claiming attorneys. If the Court were to simply slash the fee request by some percentage, fee sharing agreements would almost certainly result in reducing payments to all firms *pro rata*. It would be more just to specifically reduce the fees awarded to firms that file misleading declarations.

31. Plaintiffs may seek to ignore fees that will be deducted from the settlement fund through the Settlement Planning Administrator, Forge Consulting. PageID.54167 ("Settlement Planning Administrator shall receive reasonable compensation for its

services as approved by the Federal Court."). Without explanation, Class and Liaison Counsel appear to have directed tens or hundreds of million dollars' worth of structured settlements to be funneled through this company. This occurs because every child claimant that receives more than $5000 from the fund must receive the award through (1) a Special Needs Trust, (2) a Settlement Preservation Trust, or (3) a Structured Settlement instrument rather than a lump sum. PageID.54191. All three of these options will be presented by Forge. As a result, a majority of settlement proceeds will be directed by Forge. This is a simple matter of math: 64.5% of the settlement is directed to children age 6 and younger exposed to lead. PageID.54146. While the Settlement provides a range of compensation for such children, there are at most perhaps 12,000 of them, implying an *average* award of perhaps $20,000. All the larger awards for children will require a trust or structured settlement—and of course awards for children are the lion's share of the settlement. Getting good rates on structured settlements is therefore paramount for the class. However, Forge Consulting "shall be compensated primarily from commissions paid by insurance entities for the placement of Structured Settlements." PageID.54167. Insurance companies that offer structured settlements generally pay 4% commissions on them. This is not a gift from insurers; commissions ultimately comes out of the money that insurers reckon they can afford pay beneficiaries. "Every settlement dollar that goes to a broker's commission is one less dollar funding future payments." Richard Risk, *Why Congress needs to reform structured settlements*, The Hill (May 22, 2017). Forge therefore stands to be paid millions from this Settlement, which entitles it to payment *even when class members select their own structured settlement broker*. PageID.54167. When considering costs in order to reckon the attorneys' fees *net* costs, the Court should be sure to include commissions Forge Consulting has special entitlement to under the Settlement.

32. I am aware of the extant controversy with respect to the alleged lack of availability of bone scanning. I reserve the right to supplement my clients' objections

11

with a further objection regarding availability should an impasse occur. More generally, the protectiveness Liaison Counsel exercises over bone scanning may be a consequence of the proposed fee structure, which largely compensates attorneys for the individual recoveries of their client rather than for creating class and claimant benefit in total. Individual recovery (and therefore fees for individually-retained counsel) are a zero-sum game under the proposed fee Motion. Thus, Liaison Counsel has an incentive to restrict access to bone scanning, because additional claims that qualify for more valuable categories dilute recovery to Liaison Counsel's own clients (and therefore Liaison Counsel's fees). A reasonable Rule 23(h) fee structure and methodology would not reward deviation from common interests.

### Statement Regarding Clients Required by Settlement

33. I have filed a notice of appearance for all three of the Hall Objectors (Raymond Hall, Robert Hempel, and Ashley Jankowiak).

34. I, and other HLLI attorneys, represent the Hall Objectors.

35. I have filed the Objection under Article XX of the Revised Settlement Agreement on behalf of the Hall Objectors. PageID.54184-85.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on March 29, 2021, in Chicago, Illinois.

*/s/ M. Frank Bednarz*
M. Frank Bednarz