# Bednarz Decl.

# EXHIBIT 1

# Detroit Free Press

FLINT WATER CRISIS

# Concerns mount over attorney fees in Flint water settlement. Here's why.

**Paul Egan** Detroit Free Press
Published 6:01 a.m. ET Mar. 23, 2021 | Updated 10:15 a.m. ET Mar. 23, 2021

LANSING – Legal fees of up to $202.8 million requested by plaintiffs' attorney for settling the Flint water crisis civil litigation have received most of the attention, but millions of dollars in other fees and expenses are expected to eat into what Flint residents will eventually receive.

How much those bills will amount to remains to be seen, but they are expected to far exceed the nearly $7.2 million in expenses requested by attorneys in the case.

Money will be paid to a special master, a claims administrator, a notice administrator, a lien resolution administrator, and a settlement planning administrator, to name a few.

**More:** Flint water crisis attorney fees: Who would get how much of the $203M, and why?

Meanwhile, opposition to the requested fees appears to be growing. State legislators from both parties have introduced a resolution opposing them. And even Attorney General Dana Nessel, who said she is barred under the settlement terms from opining on the fees, said last week the request seems high to her.

It will be up to U.S. District Judge Judith Levy to decide whether to grant them.

A law professor at the University of Georgia says settlement of mass-tort lawsuits like the $641.25-million Flint water case has grown into a huge and closely knit industry and can often involve cronyism and excessive fees.

"The rules are few and you can get away with a little bit more mischief" than in a class-action lawsuit, said Elizabeth Chamblee Burch, who is also the author of "Mass Tort Deals: Backroom Bargaining in Multidistrict Litigation."

Mass-tort lawsuits, which are common in product liability cases, can involve large numbers of individual plaintiffs who allegedly suffered different types and degrees of injury, while

class-actions suits, which must be certified by a judge, tend to treat all plaintiffs as one.

Both in terms of the lead attorneys and in terms of various private firms and individuals hired to administer the settlements, "there is a small cadre of folks who get appointed a bunch of times and there is very little transparency about how they are appointed," Burch said. "A lot of it is about who you know."

Burch stressed that she was speaking about mass-tort settlements in general and not the Flint case specifically.

In the Flint case, Levy selected highly regarded Michigan mediators/facilitators who are not part of the national mass-tort industry — former U.S. Sen. Carl Levin of Detroit and former Wayne County Chief Judge Pro Tem Pamela Harwood, who was raised in Flint and went to high school there. Levy, and not the attorneys in the case, also selected the special master, Deborah Greenspan of Washington, D.C., who "is not related to any party or counsel" in the case and has "no financial or other interest that would create a conflict of interest," according to court records. Her primary job is tracking attorney fees and expenses.

Nessel, whose office represented the state defendants in the case, told a legislative committee Tuesday she is barred under the terms of the settlement from weighing in on the reasonableness of the requested fees, but she doubts Levy will approve what the lawyers requested.

"For a case of this nature, and a settlement of that nature, is that a very high number? I would suggest it seems like it," Nessel said at the House Appropriations Subcommittee on General Government.

In other such cases, "what I normally see is they start with a really high number, knowing that they're never going to end up with that number, because the court ultimately makes a decision and generally cuts it down significantly."

On Thursday, Flint-area state representatives from both parties introduced a House resolution calling for rejection of the fee request.

"First and foremost, money from this settlement should go to Flint children and families who have had their lives forever changed by the decisions made during this crisis — not the out-of-state attorneys who capitalized on this tragic situation," said state Rep. David Martin, R-Davison, the main sponsor of a resolution supported by every state representative from Genesee County.

"The state must take action to ensure such a disproportionate amount of funds are not awarded to attorneys over residents."

Proposed attorney fees would consume about 32% of the total settlement. That percentage is in line with or slightly below standard contingency fees in civil lawsuits, but experts said it is a high percentage for a "mega-fund" class-action or mass-tort lawsuit, where fees are typically capped at lower percentages as the total size of the settlement goes up.

Burch said she prefers to see the attorneys' percentage applied to the amount of the settlement that remains after various expenses are deducted, rather than being applied to the total amount, as is proposed in the Flint case. Applying lawyers' fee percentage to the net settlement amount, rather than the gross amount, provides an incentive to keep expenses down, she said.

In court filing, lawyers seek up to $202.8M in fees from Flint water settlement

**More:** Judge vows to listen to Flint residents on proposed $600M-plus settlement

In her 2019 book, Burch wrote that "the system for handling mass torts can fail the very people it was meant to serve" because "backroom deals benefit all the regulars — plaintiffs' lawyers, defendants and even judges."

"For their work on behalf of the plaintiffs," Burch wrote, "judicially appointed lead lawyers receive hefty common-benefit fees … on top of the attorneys' fees from their own clients." Defendants "resolve litigation with what may be relatively minimal expense." Judges "clear their dockets and often receive favorable press and new high-profile cases.

Also, claims and settlement administrators (who often act a great deal like arbitrators) screen claims and dole out settlement funds — all for a price. The mass-tort system's private underbelly is vast, and the bargains are far-reaching."

In a study recently published in the Columbia Law Review co-authored by Margaret Williams of Johns Hopkins University, Burch acknowledged federal judges need assistance in such cases, but said it is best for them to use magistrate judges whenever possible, rather than special masters, because their salaries of about $200,000 a year are paid by the courts, not the parties involved in the cases.

Though U.S. Magistrate Judge Mona Majzoub is listed on the Flint docket, she retired at the end of 2019.

Levy appointed Greenspan as special master in July 2018, at a rate of $600 an hour, plus reimbursement for expenses such as accountants, auditors, and clerical help. Under the order, Greenspan was to submit monthly invoices, which were to be paid half by the plaintiffs' counsel and half by the defense counsel. Those invoices are not now part of the public court record, but are expected to face scrutiny in open court along with all expenses in the case.

In an exhibit to the March request for fees and expenses, Florida attorney Theodore Leopold, a co-lead class counsel, cited $926,343 in expenses for the special master and the two facilitators, without breaking down how much had been paid for each to date.

Greenspan, of the Blank Rome law firm, earlier served as the special master for a settlement program to distribute funds to more than 100,000 Vietnam veterans and as deputy special master for the Sept. 11 Victim Compensation Fund of 2001, according to her biography.

The four lead lawyers involved in the case are also veterans of major class-action and mass-tort cases. Michael Pitt, the only Michigan attorney among them, has been a speaker before the industry association Mass Torts Made Perfect, and "has handled complex employment litigation including nationwide class actions, group actions and multiple party cases on behalf of employees from the lowest to highest levels of many of the largest companies in the United States," according to his speaker biography.

Leopold, who, along with Pitt, is a "co-lead" attorney in the case, is also co-lead in a water contamination case involving the Cape Fear River in North Carolina, according to his law firm biography. Leopold also serves as lead counsel in class actions involving LensCrafters, Polaris ATV and GM, and in 2010 obtained a $131 million jury verdict against Ford Motor Co. in connection with a fatal 2001 rollover crash involving a Ford Explorer.

Hunter Shkolnik of Puerto Rico, one of two "co-liaison" attorneys in the Flint case, has also been a speaker at a Mass Torts Made Perfect event, and "leads the discovery and trial teams of various mass tort pharmaceutical and medical device litigations" at his firm, according to his speaker bio.

Corey Stern of New Yok, the other co-liaison lead attorney, has also been a speaker at a Mass Torts Made Perfect event and manages his firm's lead poisoning, medical malpractice and child advocacy department.

Many nonlegal private firms have been appointed to assist with the settlement. Burch said that in general, in the other cases she has looked at, such firms are recommended or chosen

by the case attorneys and it is not clear there is any competitive process with respect to proposals or fees.

That also appears to be the case in the Flint settlement, where court records show lead attorneys recommended the companies, though the companies' fees are also expected to be subject to scrutiny in open court.

In the Flint case, Archer Systems LLC was appointed as the claims administrator and QSF (Qualified Settlement Fund) administrator and was appointed to serve with a firm called Massive as the lien resolution administrator, to resolve situations in which creditors make claims against settlement proceeds.

In a fee schedule filed in the case, Archer Systems cited fees of between $11.8 million and $17.2 million for infrastructure and initialization, claims administration, and QSF administration, depending on how many claimants are ultimately involved. The company cited lien resolution fees of between $190 and $550 per lien.

Levy authorized a partial payment of $2.6 million to Archer on March 1.

Other private administrators to be paid in the case, all appointed by Levy after they were named in requests filed by plaintiffs' attorneys, include notice administrator Epiq Class Action and Claims Solutions, Inc., and settlement planning administrator Forge Consulting LLC.

Their proposed fees were not immediately available Monday.

Pitt and Leopold did not immediately respond Monday to questions about whether there was a comparison of service and fee proposals or any kind of competitive bidding prior to selecting the companies.

Flint's water crisis began when a state-appointed emergency manager switched the city's drinking water supply from Lake Huron water treated in Detroit to Flint River water treated at the Flint Water Treatment Plant. It was intended as a temporary, cost-saving measure, but turned out to be a disastrous mistake. The Michigan Department of Environmental Quality has acknowledged it failed to require needed corrosion-control chemicals as part of the water treatment process, resulting in lead leaching from pipes and fittings into the water system.

The state is paying $600 million of the settlement amount, with McLaren Hospitals and the city of Flint paying $20 million each and $1.25 million coming from Rowe Professional Services Co., which did engineering work related to the drinking water switch.

*Staff writer Dave Boucher contributed to this report.*

*Contact Paul Egan: 517-372-8660 or pegan@freepress.com. Follow him on Twitter @paulegan4.  Read more on Michigan politics and sign up for our elections newsletter.*

*Become a subscriber.*