# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| *In re* Flint Water Cases | No. 5:16-cv-10444-JEL-MKM |
| | Hon. Judith Levy |
| | Mag. Mona K. Majzoub |

## OBJECTION TO PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES

## TABLE OF CONTENTS

Contents

**INTRODUCTION** ................................................................. 1

    **I.**    **The Court Cannot Make a Common benefit Award without a full and detailed accounting of the time, effort and expense which purports to be related to the "Common Benefit"** ................................. 2

    **II.**    **Liaison Counsel Have Not Used their Authority and Access to Inside information for the Common Benefit, But to Line their own pockets** 5 **a. Bone Scans have not provided a common benefit and none of the time and expense Liaison Counsel spent on Bone scans can justify a common benefit award** ........................................................ 5

    **III.**    **Liaison Counsel have not acted for the common benefit, but only their selfish interests, by trying to suppress opposition to their self-serving tactics** ........................................................................ 8

    **IV.**    **The proposed 10% cap is not practical and runs counter to cases with fee caps, while ignoring the individual service available and the November 17, 2020, filing of the motion for preliminary approval…** 9

    **V.**    **The hourly rates for Law Clerks are Exorbitant** ............................... 15

**CONCUSION**………………………………………………………16

# TABLE OF AUTHORITIES

**Cases**

*Evans v. TIN, Inc.*, 2013 U.S. Dist. LEXIS 119599, 2013 WL 4501061 (E.D. La. August 21, 2013) ................................................................................................................ 13

*In re Bayou Sorrel Class Action*, 2006 U.S. Dist. LEXIS 80934 at * 23; 2006 WL 3230771 at *6 (W.D. La., Oct. 31, 2006) .................................................................. 11, 12

*In re Beverly Hills Fire Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986)..................................... 12

*In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407 (D. Wy. 1998) ......................................... 12

*In re Guidant*, 2008 U.S. Dist. LEXIS 65079 at *2008 WL 3896006 at *8–9 (Dist. Ct. Minn. Aug. 21, 2008) ................................................................................................ 11, 12

*In re Joint E&S Dist. Asbestos Litigation*, 878 F. Supp. 473 (S.D.N.Y. 1995) ................ 13

*In re Medtronic, Inc. Implantable Defibrillator Product Liability Litigation*, 2008 U.S. Dist. LEXIS 110214, 2008 WL 4861693 (D. Minn. Nov. 10, 2008) ............................ 12

*In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987) ............................ 12

*In re NFL Players*, 2018 U.S. Dist. LEXIS 57792 (E.D. Penn. April 5, 2018)10, 11, 14, 15

*In re Nuvaring*, 2018 WL 7271959 at *4, 2018 U.S. Dist. LEXIS 175299 at *145 (E.D. Mo. December 18, 2014)............................................................................................... 11

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 2012 U.S. Dist. LEXIS 83214, 2012 WL 2236737 (E.D. La. June 15, 2012).......................................... 13

*In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 U.S. Dist. LEXIS 20440, WL 780512 (E.D. Mich. Dec. 20, 1996) ........................................................................................... 12

*In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010).................................. 12

*In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006) ........................ 11

*Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016) ......................... 4

## INTRODUCTION

Liaison Counsel Napoli Shkolnik and Levy Konigsberg's fee motion (ECF No. 1458) seeks tens of millions of dollars for "common benefit work" without providing the underlying data needed to determine how much of their time and money was genuinely spent for "common benefit." Liaison Counsel represent thousands of individual clients. ECF # 1500 (stating Napoli Shkolnik had registered 9,987 clients for the settlement, and Levy Konigsberg had registered 6,191, as of March 25). Their fee petitions, however, make no effort to explain how they separated the work and expenses incurred in representing individual clients from their "common benefit work. Nor do permit the people who will pay for this common benefit—the attorneys who represent other individual plaintiffs and their clients—an opportunity to review the information they claim supports their motion. This Court should now allow these foxes to guard the chickencoop; Plaintiffs have a due process right to see the evidence of time and expense before they are ordered to pay for them.

Even worse, in many instances, Napoli Shkolnik and Levy Konigsberg have not acted for the common benefit of other individual claimants, but to line their own pockets at the latter's expense. They structured a settlement which pays uniquely large sums to people who underwent bone scans-which just happens to their—and

only their—clients. Because the sums to be paid are not fixed per types of claim, but vary according to the ratio of claimants and types of claims, every extra dollar paid to a Liaison Counsel client who qualifies for more money because of a bone scan is a dollar less available for other individual claimants. They perpetuated their monopoly on bone scans by refusing to disclose the critical protocols to distinguished academics who worked with Class Counsel to set up a parallel program, so that they remained the only game in town. Then, when they "graciously" made three hours on Sundays available for bone scanning others who are not their clients, they unilaterally cancelled the appointments of clients of firms who questioned the illegal and unethical conduct which accompanied these scans.

Finally, the proposed 10% fee cap on fees of individually retained counsel who entered into agreements after July 16, 2020, is unworkable and does not provide attorneys with compensation sufficient to give claimants the individualized attention they need to maximize their recoveries.

## I.  The Court Cannot Make a Common benefit Award without a full and detailed accounting of the time, effort and expense which purports to be related to the "Common Benefit"

The Common Benefit Order, ECF 507 makes it clear that common benefit time must be exactly that—of common benefit:

12.  Only time spent on matters common to all plaintiffs in the

Flint Water Cases ("Common Benefit Time") Will be considered in

determining fees.  No time spent on developing or processing any case

for an individual client/claimant will be considered except as approved

by Interim Co-Lead Class Counsel or Co-Liaison Counsel as work that

serves a common benefit.

The common benefit order, however, provides no mechanism by which the

individual plaintiffs and their attorneys, can review the detailed time and expense

records which will be taken out of their recovery. It states only that

> the Special Master, Interim Co-Lead Class Counsel, and Co-
> Liaison Counsel shall meet quarterly to review and audit all
> time and expense submissions. Should any dispute arise out of
> the quarterly audits, Interim Co-Lead Class Counsel and/or
> Co-Liaison Counsel shall immediately bring the issue before
> the Court for resolution."

*Id*. Para 11.

This is essentially allows Liaison Counsel and Class counsel (who also

represent individual claimants) to self-determine what is or is not common benefit

work. When the undersigned sought to review detailed time and expense records,

the request was denied. See email from Deborah Greenspan to Mark Cuker, March

15, 2021 Cuker Dec. Ex. 2. Similar requests addressed directly to Liaison Counsel

were either ignored or rejected.  *See* Cuker Dec. Exhibit 4. A request by counsel

for another group of objectors met the same fate. ECF 1548-7, 10 and 11.

The mere fact that detailed time records will be made available for court

review *in camera* is not sufficient to protect the rights of those who will have to

pay the bill.  Counsel for individual plaintiffs, and their clients, have a due process

right of notice and an opportunity to be heard at meaningful time and in

meaningful manner. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985);

*Fuentes v Shevin*, 407 U.S. 67 (1972)

With all due respect to the Court's role in reviewing the information, ours is

an adversary system, and the adversaries—who are actually paying the tens of

millions in fees and costs being sought—have every right to see a fully itemized

bill before they pay any part of it. The *Manual for Complex Litigation Sec.

14.223* states that if counsel's time and expense records are not submitted with the

motion, they should be submitted "[i]n advance of any fee-award hearing" and "in

manageable and comprehensible form." "As class members have a right to review

and object to a fee petition, *this information is critical in that analysis and ought

therefore to be disclosed* in conjunction with the filing of the motion and

dissemination of fee notice to the class." 5 Newberg on Class Actions 15:11

(emphasis added); *see also Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536,

546 (9th Cir. 2016) ("[T]he district court must allow Defendants access to the

timesheets, appropriately redacted to remove privileged information, so they can

inspect them and present whatever objections they might have concerning the

fairness and reasonableness of Plaintiffs' fee request."). *In re Anthem, Inc. Data

Breach Litig.*, No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 226119, at *82

(N.D. Cal. Mar. 16, 2018) (ordering Cohen Milstein (and others) to disclose hourly billing in the *Anthem* case).

**II.    Liaison Counsel Have Not Used their Authority and Access to Inside information for the Common Benefit, But to Line their own pockets**

**a.   Bone Scans have not provided a common benefit and none of the time and expense Liaison Counsel spent on Bone scans can justify a common benefit award**

The settlement is structured as a zero-sum game. There is a $600 million pie; the more claims made, the more pieces of the pie, the smaller each slice.

By now this Court is well aware that bone scans as a metric for recovery benefit only the individual clients of Liaison Counsel, and that clients of other law firms have been excluded from this testing. See Case # 5:18-cv-10679 ECF No 94 (Chapman Plaintiffs Response to Joint Motion to establish settlement Claims Procedures and allocation); ECF 1494 and attached declarations and exhibits. When each Liaison Counsel client gets a larger slice because of their unique access to bone scans, the other claimants get proportionately smaller slices. For that reason, bone scans are actually a common detriment to the other claimants.[1]

Notwithstanding these undeniable facts, Liaison counsel unabashedly seek a common benefit award for their "bone scan program:

---

[1] Of course, to the extent bone scanning raises safety, health and ethical issues, it is detriment common to those scanned as well.

- *Bone Scan Program*:  Napoli Shkolnik and Levy Konigsberg have made bond scans available to putative class members and individual claimants represented by attorneys.  Napoli Shkolnik and Levy Konigsberg are working closely with Co-Lead Class Counsel for the Putative Class and individual attorneys to schedule appointments for putative class members and represented individuals for settlement purposes.

ECF 1458-5.

Liaison Counsel claim that their private bone scan laboratory performs all testing "under standard protocols with a medical director overseeing the program to ensure compliance." ECF 1454-1. They also claim that the dose of radiation emitted by the bone scan device is "based on calibrations previously approved by IRBs (Institutional Review Boards) at Harvard and Purdue."  When Drs. Todd and Jepsen asked for this information to be disclosed so that they could set up a parallel bone scan program, they never received it. ECF 1497. And before their concerns regarding this novel method were discovered, Liaison Counsel was not "working closely" to schedule their clients, as they represent. Instead, they obstructed the process, or to demanded concessions like waiving HIPAA protection, insisted on payment of non-transparent fees, and required clients of other lawyers to sign documents that infringed on their attorney-client relationship. *See* ECF 1494-2, 1494-10, 1494-11

In reality, Napoli Shkolnik opened its private bone scan lab to the public for three hours on Sundays, but this, also, was hardly a "common benefit." Paul Napoli

6

demanded attorneys pay $500 per scan—no questions asked, without any transparency as to the actual costs. When one attorney questioned the propriety of this, Napoli cancelled the appointments for all of that firm's clients, and threatened to destroy the data of those clients who had already been tested. ECF 1494-2, 1494-11.

Consequently, bone scans do not provide any common benefit. Before they receive one penny in common benefit fees, Liaison Counsel should be required to disclose

- The itemized time they claim for their bone scan program

- The number of their clients who received bone scans

- The itemized expenses for the bone scans

- The numbers of putative class members and individual claimants represented by other attorneys who received bone scans at their facility

- The amounts which Liaison Counsel have charged or intend to charge those people, or their lawyers, for those bone scans with a detailed itemization of the basis for those charges

- The protocols and calibrations they claim to use at their [private bone scanning lab

### III.   Liaison Counsel have not acted for the common benefit, but only their selfish interests, by trying to suppress opposition to their self-serving tactics

Rather than truly working for the common benefit—by welcoming the transparency needed to give everyone confidence that the settlement was arrived at fairly, Liaison Counsel have sought to suppress information at every step. On October 2, 2020, Liaison Counsel filed a motion for protective order to prevent Class Counsel and others from obtaining information about the bone scan methodology which could be used to establish a parallel program.  ECF 1281. The Court granted the protective order ECF 1283, and, as a result, the following non-confidential information, highly relevant to the fairness of the settlement and the fee petition, remains hidden from public view:

- How many bone scans were conducted on clients of liaison counsel?

- When were these scans performed on Liaison Counsel's clients, i.e. how many were performed before the settlement was publicly announced, enabling Liaison Counsel to trade on their insider information?

- How much does Dr Specht charge per bone scan, and could his hourly rate possibly justify the $500 per bone scan charge which Napoli seeks to collect?

Liaison Counsel's war on transparency continued on October 19, 2020, when Corey Stern denied knowledge of settlement documents even though he unquestionably had already seen them. See declaration of Val Washington.

On February 26, 2021 Dr. Lawrence Reynolds, a distinguished Flint

pediatrician, filed a detailed and thoughtful set of objections to the proposed

settlement based on serious concerns about the safety, accuracy and unethical use of

bone scans under the proposed settlement. ECF 1436. Prompted by this objection,

Corey Stern reached out to Dr. Reynolds' attorney, Val Washington. Rather than

address the serious safety, health and ethical concerns raised by Dr. Reynolds, Stern

sought to punish Attorney Washington by threatening him with having to try a

bellwether case, even though none of his clients were in the bellwether pool:

> In light of how difficult it will now be to try bellwether cases – since you filed an affidavit from a physician essentially stating that all of my proofs for trial are invalid and unreliable, and since it appears you believe it's possible to try a lead poisoning case without any evidence of lead poisoning, I am considering asking the judge to permit you to try one of your cases first.
>
> But I wanted to make sure you're able and have the time before making the suggestion.

In short, the Court needs to fully, thoroughly and **publicly** air out the health,

safety and ethical issues raised by the bone scans and their disproportionate role in

the settlement.

### IV.    The proposed 10% cap is not practical and runs counter to cases with fee caps, while ignoring the individual service available and the November 17, 2020, filing of the motion for preliminary approval.

Petitioners' proposal to cap fees of Individually Retained Counsel ("IRC")

based on when they were retained is not workable. In *In re NFL Players*, 2018 U.S.

Dist. LEXIS 57792 (E.D. Penn. April 5, 2018), (the NFL concussion mass tort action), Professor William Rubenstein was appointed by Judge Anita Brody to serve as an expert witness on attorneys' fees (E.D. of Penn., 12-md-02323, ECF 8376) and in his reply in support of his report, he rejected this very scheme in favor of a 15% cap (which was ultimately rejected for 22%). (ECF 9571, 3 n.8.) In doing so, he cited two major concerns: 1) verification of the date of the initial retainer agreement and 2) the concern that many clients had changed lawyers over the years, leaving the initial lawyer with a potential lien on the ultimate recovery, creating an anomaly situation where one attorney gets his or her original one-third rate while the second lawyer has a contract at a lower rate. *Id*.

In this case, there would be a many more such anomalies. According to news reports, at least 45,000 Flint residents met the registration deadline on March 29. *See* Cuker Dec. Exhibit 3, *Over 45,000 sign up for $641M Flint water settlement, but final tally not ready*, The Detroit News, March 31, 2021That is about 20,000 more than the total number reported on the last census. Even without those additional registrants, the clients with duplicate representation in this case exceed the **total** registrants in *In re NFL Players*.  In *In re NFL Players*, the total submitted as of January 16, 2018 was 2,013 (E.D. of Penn., 2-md-02323, ECF 9571, 11). On February 24, 2021, Special Master Greenspan estimated that there were "about 3,000" potential duplicate retentions, which of course does not consider any

increase from the final registration deadline of March 29. (ECF 1440,

PageID.55681). The anomalies wrought by the arbitrary July 16 date will result in

anything other than considerable discord that will invite further litigation.

Second, the 10% cap runs counter to similar cases, such as *In re NFL*

*Players* and others. In cases cited by Petitioners, as well as others overlooked, 10%

represents the lowest figure of all. In *NFL Players*, for instance, the court rejected

Expert Witness Rubenstein's recommendation of 15%, finding that a fair number

accounting for even latecomer retentions was 22%. 2018 WL 1658808; 2018 U.S.

Dist. LEXIS 57792 at *11 (E.D. Penn. April 5, 2018). The 11% figure in *In re*

*Nuvaring*, 2018 WL 7271959 at *4, 2018 U.S. Dist. LEXIS 175299 at *145 (E.D.

Mo. December 18, 2014), was reached only after obtaining written *unanimous*

consent from all involved, providing little guidance in a case such as this. As for

the others cited by Petitioners, *In re Bayou Sorrel Class Action*, 2006 U.S. Dist.

LEXIS 80934 at * 23; 2006 WL 3230771 at *6 (W.D. La., Oct. 31, 2006), awarded

18% and *In re Guidant*, 2008 U.S. Dist. LEXIS 65079 at *2008 WL 3896006 at

*8–9 (Dist. Ct. Minn. Aug. 21, 2008), the lowest fee was 23.7%.

In ten other similar cases, the range is from 18% to as high as 33.5%. In six

cases with total fee caps, the effective IRC rates averaged among them was

23.69%: *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006)

(35% total fee cap; 33.5% IRC rate after 1.5% expense contribution); *In re MGM*

*Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987) (33.33% fee cap, granting 7% in steering committee fees, leaving 26.33% to IRPAs after 1.5% in expense contribution); *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) (32% cap, leaving "over 25%" after granting 6.5% fees to steering committee after 1% in expense contribution); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. 2008 U.S. Dist. LEXIS 65079; 2008 WL 3896006 (D. Minn. Aug. 21, 2008) (37.8% fee cap; 22.8% IRC cap); *In re Bayou Sorrel Class Action*, 2006 U.S. Dist. LEXIS 80924; 2006 WL 3230771 (W.D. La. Oct. 31, 2006) (36% total cap; with half going to IRCs, for a rate of 18%).

In seven cases with direct caps on IRCs, the average cap was 17.95%, but 27.8% when removing those setting the floor of 11%, 6.3% and 5%. In those three cases, *In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407 (D. Wy. 1998) (11%), *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986) (6.3%), and *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 U.S. Dist. LEXIS 20440, WL 780512 (E.D. Mich. Dec. 20, 1996), *Copley* and *Beverly Hills Fire* advanced through trial, while *In re Rio Hair Naturalizer* concerned a defendant with limited funds for settlement. In the other four, *In re Medtronic, Inc. Implantable Defibrillator Product Liability Litigation*, 2008 U.S. Dist. LEXIS 110214, 2008 WL 4861693 (D. Minn. Nov. 10, 2008), *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 2012 U.S. Dist. LEXIS 83214, 2012 WL 2236737 (E.D. La. June

15, 2012), *In re Joint E&S Dist. Asbestos Litigation*, 878 F. Supp. 473 (S.D.N.Y.

1995), and *Evans v. TIN, Inc.*, 2013 U.S. Dist. LEXIS 119599, 2013 WL 4501061

(E.D. La. August 21, 2013), set caps at 33.33%, 25%, 25%, and 20%, respectively.

 Furthermore, the ten percent cap is inadequate to compensate attorneys for

the  individualized service they provide to  Claimant who have IRCs. Proofs still

require individualized care, proofs, guidance, and legal expertise. Even Petitioners

acknowledge this, noting that the total amount of attorneys' fees "is yet to be

determined" because many under the Proposal will be paid only upon a "successful

recovery" by individual Claimants. (ECF 1458, PageID.57191). Furthermore, the

although the settlement resolved many disputed issues in the litigation, saving

IRC's significant work, the settlement also initiated a  battle over bone scans,

which actually created substantial additional work for IRC's seeking to protect

their clients.

 Finally, Petitioners argue that this 10% cap should apply to clients who

retain IRC on or after July 16, 2020. But they never explain why that date should

apply. Although the first public disclosure was made on August 20, 2020, Attorney

General Dana Nessel announced that most of the terms would not be available for

at least 45 days. See Cuker Dec. Exhibit 1, Michigan Department of Attorney

General Press Release of August 20, 2020. The major parts of the agreement,

including the Settlement Grid, which outlines how money will be allocated among

the claimants,  was not made public until November 17, 2020, with the filing of the

motion for preliminary approval, ECF No. 1318) with the Master Settlement

Agreement attached

And to the extent that IRC's may have learned of the terms before the

November 17 filing, IRCs were still prohibited from discussing the terms with

anyone, including clients. Therefore, any argument for any date other than

November 17, 2020, does not account for when this information could be weighed

and analyzed so that IRCs could determine how best to proceed.

And using this date would be consistent with recommendations in other

high-profile litigation. In *In Re NFL Players*, expert Rubenstein discussed in his

report (E.D. Penn. 12-md-02323, ECF 9526) three phases in the litigation that

reflected the risk involved for IRCs in that case, all three of them marked by actual

filings or events that significantly changed the course of the litigation (Phase 1, the

riskiest—where IRCs had been retained and the prospect of pursuing the entire

case was real; Phase 2, the MDL—where risk had decreased because proceedings

were now consolidated and the likelihood that any case would be remanded for

trial declined significantly; and Phase 3, the settlement—where the settlement was

announced in a formal filing August 29, 2013, and then in the order granting

preliminary approval in July 2014, meant the least risk). ECF 9526, 25–26. Note

that each one was defined by a discrete event, not an arbitrary date. Rubenstein

defined the phase with the least risk, phase 3, as commencing no earlier than the filing of a notice outlining the agreement's terms, and at the latest at when the court granted preliminary approval, which would, in this case, be January 21, 2021. Applying those criteria to this case, *if* any date should be selected, November 17, 2020, is the obvious choice.

More importantly, however, any use of an arbitrary date is unworkable for the same reasons cited in *In re NFL Players*.

### V.    The hourly rates for Law Clerks are Exorbitant

Other objectors have raised questions about the reasonableness of the hourly rates claimed by Liaison Counsel. ECF 1548 at 30-32. In their discussion, they contrast the rates sought by Liaison Counsel with the "more reasonable" rate submitted by the Pitt firm. ECF 1548-7 at para. 30. They note, for instance, that the $250 per hour rate submitted for Mr. Abdulrazzak is appropriate. *Id*. Mr. Abdulazzrak was admitted to the bar in 2013 and spent more than a year as "term clerk" for the Honorable Denise Page Hood. ECF No. 1458-4.

By contrast, at least two of the firms seeking a common benefit award. Motley Rice and Cohen Milstein, billed law clerks not even admitted to the bar at $300 per hour.

Motley Rice

| Professional | Position | Current Rate | Cumulative Hours | Cumulative Lodestar | |
|---|---|---|---|---|---|
| Aaron, Zoe | LC | $300.00 | 87.5 | $26,250.00 | 2 |

ECF 1458-25 at p.9

Cohen Milstein

| | | | | |
|---|---|---|---|---|
| Hannaway, James* | LC | $300 | 29.2 | $8,760.00 |

ECF 1458-2 at p. 12

If $250 is a reasonable hourly rate for an attorney admitted to the bar in 2013, the rate for a law clerk not yet admitted to the bar, and not licensed to practice law, should be substantially lower, not higher.

## CONCLUSION

The Court should require the production of detailed time and expense records necessary to evaluate the amount of work that was truly done for common benefit, as well as the requested information underlying the bone scan program which threatens to be a common detriment to claimants not represented by liaison counsel.

Respectfully submitted,

_____
MARK R. CUKER
*Counsel for Plaintiffs*

_____

[2] Zoe Aaron is the daughter of Motley Rice partner Esther Berezofsky, who took signed the fee declaration on behalf of Motley Rice.

/s Stephen F. Monroe

Stephen F. Monroe, IL#6305823
Marc J. Bern & Partners, LLP
Cook Co. Firm No. 61789
225 West Washington Street, Suite 2200
Chicago, IL 60606
Phone: (312) 894-7941
Fax:    (312) 873-4537
Email: smonroe@bernllp.com
*Attorneys for the Washington Plaintiffs*

17