# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |

## CHAPMAN PLAINTIFFS' MOTION TO REVIEW AND RESPOND TO HOURLY BILLING AND COSTS; AND FOR DISCOVERY OF BONE SCAN INFORMATION

For the reasons stated in the attached Memorandum of support, Chapman Plaintiffs move the court for an order requiring the disclosure of the following information:

- How many bone scans were conducted on clients of liaison counsel, compared to other claimants?

- When were these scans performed on Liaison Counsel's clients, e.g. how many scans were conducted before the x-ray emitting device was legally registered in Michigan on February 24, 2021? How many were performed before the settlement was publicly announced?

- The actual costs—including Dr. Specht's charges—incurred by Liaison Counsel for the bone scan tests of non-bellwether plaintiffs

- Detailed time and expense billing of Liaison Counsel Plaintiffs which are an essential part of their Fee Motion (ECF No. 1458);

- The protocols, standard operating procedures  and calibrations they claim to use at their private bone scanning lab

- Any fee sharing agreements between Liaison Counsel Napoli Shkolnik and Levy Konigsberg

- A description of what transpired during the 26 minutes off the record at the March 1, 2021 *ex parte* conference, which led Class Counsel to withdraw their "Motion for Immediate Suspension of the Use of Portable XRF Bone Scanning Test"  ECF No. 1446

And granting:

- Chapman Plaintiffs leave to respond in writing with a supplemental objection after reviewing these materials.

    Pursuant to Local Rule 7.1, the Chapman Plaintiffs conferenced with the parties to ascertain whether they might be consent in this motion.  Both Co-Liaison Counsel oppose the motion.  Settling Defendants State of Michigan and McLaren Hospital oppose the motion, Co-Lead Class Counsel Take no position, except they oppose discovery of detailed time records and fee sharing agreements.


Dated:  April 23, 2021                            */s/ Mark R. Cuker*
                                                          MARK R. CUKER

                                                          *Attorney for Chapman Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM<br><br>Hon. Judith E. Levy<br><br>Mag. Mona K. Majzoub |

## MEMORANDUM IN SUPPORT OF CHAPMAN PLAINTIFFS' MOTION TO REVIEW AND RESPOND TO HOURLY BILLING AND COSTS; AND FOR DISCOVERY OF BONE SCAN INFORMATION

## STATEMENT OF ISSUES PRESENTED

The issues presented in this Motion are:

1.  Whether this Court should order limited and expedited discovery to verify the extent to which the time and expense devoted to bone scanning in this case has been a common benefit. According to previously-filed affidavits, the safety of this method is uncertain, especially in children. Indeed, the manufacturer of the portable XRF device has refused to provide it for use on humans, and it is not clear how Liaison Counsel was able to obtain this device for use in this case. Because only Liaison Counsel has the device, only makes scanning available to non-clients on Sundays between 1 and 4 pm and refuses to scan clients of certain law firms,

i

many Claimants have no access to bone scans and those that do wonder if they should even try to be scanned, given the safety concerns. See, e.g.  ECF 1534-1538 (objections of Chapman Plaintiffs, expressing concerns about the suitability of portable XRF testing for use in humans) and ECF 1463 (Objections of Florlisa Fowler Stebbins noting that Napoli Shkolnik cancelled her appointment because she would not unconditionally agree to pay $500 for the test and waive her right to keep the results private).

Because of the reasonable suspicion cast on the "benefit" of bone scans the Court should order discovery on the following topics:

- The number of bone scans conducted on clients of liaison counsel and the number of scans performed on other claimants. This information should be readily available given that non-liaison counsel clients are only  scanned on Sundays, and only since Feb. 21, 2021;

- When was the first scan performed on non-bellwether plaintiffs, how many scans were performed by November 16, 2020, and then how many since that date;

- Detailed time and expense billing of Liaison Counsel Plaintiffs to disclose claimed hourly billing and costs, which are an essential part of their Fee Motion (ECF No. 1458);

- The protocols, standard operating procedures and calibrations they claim to use at their private bone scanning lab.

- Any fee sharing agreements between Liaison Counsel Napoli Shkolnik and Levy Konigsberg

- A description of what transpired during the 26 minutes off the record at the March 1, 2021 *ex parte* conference, which led Class Counsel to withdraw

their "Motion for Immediate Suspension of the Use of Portable XRF Bone Scanning Test"  ECF No. 1446

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Fed. R. Civ. P. 23(h)

*Manual for Complex Litigation Fourth § 21.643*

*International Union, United Auto., Aerospace, and Agr. Implement Workers*

*of America v. General Motors Corp.,* 497 F.3d 615, 635-36, 41 E. (6th Cir. 2007).

Fed. R. App. P. 10(c)

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ....................................................................... i

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 2

   1.     The Court Should Order Disclosure of Information Which Will Show Whether, and to What Extent, Bone Scans Can Justify a Common Benefit Award. .................. 2

   2.     The Court should also order production of detailed time and expense records and fee sharing agreements of Liaison Counsel. ........................................................... 11

   3.     The Court Should Order Counsel to Provide a Description of the Off-the-Record Conference which resulted in the Withdrawal of Class Counsel's Motion to Stay Bone Lead Testing ................................................................................................ 11

CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Cohen v. Young*, 127 F.2d 721 (6th Cir. 1942) ............................................................................. 9

*Girsh v. Jepson*, 521 F.2d 153 Fed. Sec. L. Rep. (CCH) P 95258, 20 Fed. R. Serv. 2d 1062 (3d Cir. 1975) ................................................................................................................................ 7

*Hershey v. ExxonMobil Oil Corp.*, 2012 WL 4758040, *1 (D. Kan. 2012) ................................... 8

*In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001) ...................................................................... 15

*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005) .............................. 7, 9

*In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 24, (D. D.C. 2001).................. 9

*Internation Union, United Auto., Aeorspace, and Agr. Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 41 E (6th Cir. 2007) ...................................................... 9

*Kowalczyk v. I.N.S.*, 245 F.3d 1143 (10th Cir. 2001) ................................................................... 8

*Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)................................. 8

*Nat'l Farmers Org., Inc. v. Oliver*, 530 F.2d 815 (8th Cir. 1976)......................................... 14, 16

*Pittsburgh v. Simmons*, 729 F.2d 953 (3rd Cir. 1984) ................................................................ 14

*Shane Group*, 825 F.3d at 305 .................................................................................................... 15

*U.S. v. Austin*, 954 F.3d 877 (6th Cir. 2020)......................................................................... 14, 15

**Rules**

Fed. R. App. P. 10(c) .................................................................................................................... 14

Fed. R. Civ. P. 23(h) ...................................................................................................................... 7

## INTRODUCTION

Liaison Counsel Napoli Shkolnik and Levy Konigsberg's fee motion (ECF No. 1458) seeks tens of millions of dollars for "common benefit work" based in part on the premise that the work they did in making bone scans a critical element of the settlement was actually for the "common benefit."  In fact, the underlying settlement which they have proffered does not provide a benefit common to all claimants but serves to Liaison Counsel's  pockets at the latter's expense by paying uniquely large sums to people who underwent bone scans, almost all  of whom are their own clients.  Because the sums to be paid are not fixed per types of claim, but vary according to the ratio of claimants and types of claims, every extra dollar paid to a Liaison Counsel client who qualifies for more money because of a bone scan is a dollar less available to other individual claimants.

Worse, the manufacturer of the bone scanning device used to drive this allocation of funds does not approve of its use on humans. Liaison Counsel took advantage of their position to secretly create a category for themselves; one in which the highest amounts are derived from a device which only they use, because the manufacturer refuses to make it not available to others.  Discovery is needed to shed more light on this topic.

In order to scrutinize whether the propose settlement unfairly benefits the clients of Liaison Counsel at the expense of others, and whether Liaison Counsel

are entitled to "common benefit fees" when their work primarily benefitted their own clients, and not others, this Court should require disclosure of information which shows whether and to what extent bone scans uniquely benefit the clients of Liaison Counsel, whether they were performed legally, what they cost, and whether they are safe and reliable.

## ARGUMENT

### 1. The Court Should Order Disclosure of Information Which Will Show Whether, and to What Extent, Bone Scans Can Justify a Common Benefit Award.

Bone Scans disproportionately control the distribution of funds in this case. Indeed, they are the tail wagging the $600 million settlement dog.  *See* Case No. 5:18-cv-10678 ECF 94 (Chapman Plaintiffs' Response to Joint Motion to Establish Settlement Claims Procedures and Allocation); ECF 1494 and attached exhibits. The highest payments go to people with bone or blood testing, but the Special Master has reported that about 90% of adults and 70% of children did not have their blood tested for lead.  ECF 1105 at pp. 11, 18.

By contrast, Liaison Counsel have tested bone lead for ▮▮▮▮▮▮▮ of their clients.  According to his deposition, as of October 15, 2020, Dr. Specht had

measured bone lead for ███ clients of Liaison Counsel.  Cuker Dec. Ex. C,

Specht depo at 138-140 (filed under seal.)[1]

 We have no direct evidence of how many Liaison Counsel clients have been

bone scanned since October 15, 2020, but the circumstantial evidence suggests it

must be in the thousands.  Beginning February 21, 2021, Napoli Shkolnik

purported to make bone lead testing available to non-client claimants on Sundays

between 1 p.m. and 4 p.m.  Cuker Dec./ Ex. A, Transcript of Feb. 24, 2021 hearing

at 19-24.  At that time, the Special Master stated that the Napoli facility could

accommodate up to 100 bone scans a day. *Id.*  This means that the Napoli Shkolnik

bone scan lab could have been scanning up to 100 clients a day, six days a week,

since October 15, 2020, if not much earlier.  *Id.* at 24.  By now, the total number of

Napoli Shkolnik clients scanned probably exceeds 5,000, but neither the court nor

the parties should have to guess.  In addition, Liaison Counsel should disclose  1)

how many non-bellwether plaintiffs were scanned before the August 20, 2020

announcement of the settlement, which would demonstrate  whether Liaison

---

[1] The fact that Liaison counsel scanned ████ of their clients before
October 2020 when their XRF device was not properly registered under Michigan
law until February 24, 2021 (ECF 1494-7) raises another concern:  how can a bone
scan that was performed in violation of the law serve as a basis for distributing the
State of Michigan's money in a court-approved settlement?

Counsel used inside knowledge to preemptively monopolize the bone scan method,

a critical metric for allocation of funds, and 2) how many more were scanned

before Liaison Counsel legally registered the radiation emitting device for use in

Michigan on February 24, 2021.

Disclosure of the number of scans performed for Liaison Counsel clients

compared to the total number is highly relevant to show not only whether they

have worked for the common benefit, but whether the settlement is fair overall.

Liaison counsel claim to represent about 16,000 clients between them.  ECF 1500.

This is less than a third of the estimated 50,000 registrants so far.  If,

hypothetically, Liaison Counsel clients make up 95% of those bone scanned, when

they are otherwise less than a third of the total, it would be highly probative to

show that their bone scan efforts were not a common benefit.

The number of bone scans, and the years of birth of those scanned, is also

relevant to show the critical role bone scans will play in directing settlement funds

to certain claimants.  Liaison Counsel, who negotiated it over a period of many

months, never advised other claimants' counsel that this novel method would be

such a critical path for so many to obtain the highest monetary awards. This

information did not become publicly available until the settlement grid was

disclosed in November 2020.  Even then, Liaison Counsel downplayed the

significance of bone scans, by arguing that "claimants have multiple opportunities to obtain compensation that do not involve the XRF scan."  ECF No. 1319-2.

If, in fact, the other categories are equally viable and attainable, why did Liaison Counsel arrange to bone scan *thousands* of their clients, especially if they did so  before any other claimant's counsel plaintiff could have known about this option?  Why did Liaison Counsel choose to expose their clients to ionizing radiation from an illegal device when they could qualify them through the other "multiple opportunities"?  *See* ECF 1494-4 through 6.

How did Napoli Shkolnik purchase three devices for use on humans, when, according to multiple sources, the manufacturer would not permit it?  Did other claimants counsel fail to set up their own program because they "sat on their hands"?  Or were Liaison Counsel only able to establish their program by cutting corners which Dr. Jepsen at University of Michigan and Dr. Todd at the Mt. Sinai School of Medicine refused to cut?  And did they cut these corners without fully informing the manufacturer of what they were doing?

Another reason bone scans might not justify a common benefit to Liaison Counsel is if Napoli Shkolnik is separately profiteering on the price it is charging for bone scans.  As the Court knows, Napoli Shkolnik refused to bone scan the clients of another law firm unless it received $500 for each scan.  ECF 1494-11.  Is

$500 a fair price?  There are statements in Dr. Specht's deposition which suggest that it is not.

Specht testified that his hourly rate for these tasks is $200.  Depo at 49.



The justification for Napoli Shkolnik's charge of $500 remains a mystery. The court should order complete disclosure of all Napoli Shkolnik costs in connection with bone scans in order to see whether Liaison Counsel is seeking to profit from bone scans.

Two exhibits to Dr. Specht's deposition, exhibits, Exs. 14 and 28, contain much of the information essential to evaluate whether and to what extent the bone scans either justify a common benefit fee award or undermine the fairness of the settlement:

To the extent Exhibit 14 contains personal health information, the names can be redacted; but the results themselves will show

███████████████████████████████████████

███   █████████████████████████████████

These exhibits are part of the discovery in the underlying case and should be promptly produced to objectors.  The *Manual on Complex Litigation* instructs that "[p]arties to the settlement agreement should generally provide access to discovery produced during the litigation phases of the class action (if any) as a means of facilitating appraisal of the strengths of the class positions on the merits.  *Manual for Complex Litigation, Fourth*, § 21.643; *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d Cir. 2005) (holding that "discovery may be appropriate . . . if the discovery conducted by lead counsel is not made available to objectors" (citing *Girsh v. Jepson*, 521 F.2d 153 157, Fed. Sec. L. Rep. (CCH) P 95258, 20 Fed. R. Serv. 2d 1062 (3d Cir. 1975))).  *See also* Fed. R. Civ. P. 23(h) advisory committee's note (2003) (stating, in the context of fee approvals, that in appropriate cases the court will permit an objector "discovery relevant to the objections").

A third reason why bone scans might not justify a common benefit award to Liaison Counsel, and would instead undermine the fairness of the settlement, would be if, in fact, they are neither safe nor reliable means of estimating previous lead exposure.  In defending bone scans against accusations made by objectors, Liaison Counsel represented that

- "the portable XRF uses the same methodologies as the stationary XRF to measure lead exposure".

- "the modifications applied here are consistent with modifications that have been done in studies conducted at Purdue University and Harvard University and have been approved for such use by several IRBs including at Harvard and Purdue"

- "Dr. Specht worked directly with the inventors of the portable XRF to customize the XRF calibrations specifically for these measurements as part of his validation work." This response should include all emails between Liaison Counsel and/or Dr. Specht and the manufacturer of the device

- "All testing is performed under standard protocols with a medical director overseeing the program to ensure compliance"

- There are hard copies of the "standard operating procedures" used by operators of the device

ECF 1454-1

Having made these representations to the Court, Liaison Counsel should be ordered to produce documentation supporting their statements. After all, objectors have a "due process right to present [their] challenge in a meaningful way," *Hershey v. ExxonMobil Oil Corp.*, 2012 WL 4758040, *1 (D. Kan. 2012) (citing *Kowalczyk v. I.N.S.*, 245 F.3d 1143, 1147 (10th Cir. 2001) (*quoting Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). *See also* Newberg on Class Actions § 11:57 (4th ed.) (emphasis added) ("[P]rior discovery … most probably will not supply the objector with the material necessary to support an attack on the proposed settlement" so "the objector must secure

evidence through *independent discovery*.”). Discovery is even more important in this case because “discovery conducted by lead counsel is not made available to objectors.” *In re Community Bank of Northern Virginia*, 418 F.3d 277, 316 (3d Cir. 2005).

The Court should, at a minimum allow discovery which will help it determine whether the settlement and the attendant attorneys fee request is fair, reasonable and adequate.  *See e.g. In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 24, 26, (D. D.C. 2001). “The exercise of discretion does not permit the court to disregard the substantive principles of law established for the protection of litigants.” *Cohen v. Young*, 127 F.2d 721, 726 (6th Cir. 1942) (finding abuse of discretion in denying objectors’ discovery into fairness of the settlement, which hinged on solvency of the defendant).

A colorable objection that the settlement is not fair justifies the discovery that would give objectors a full and fair opportunity to have their concerns heard. *International Union, United Auto.*, *Aerospace, and Agr. Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 635-36, 41 E (6th Cir. 2007). To date, there have been scores of objections filed, many of which include objections regarding these scans, their safety, and their availability. *See, e.g., among many others,* ECF Nos 1469, 1478, 1479, 1484, 1485, 1488, 1489, 1492, .1493; 1506–1515; 1534-1538; 1560, 563, 1564, 1574, 1611, 1618. Given how central this

method is for many to have an opportunity to receive higher awards, these objections are colorable and should provide a sufficient basis for discovery, given that the details and history surrounding this method have been concealed and opposed by Liaison counsel, a position which itself raises concerns—why oppose such details if this method is fair, reasonable, and adequate, let alone safe?

This Court cannot assess the fairness of the bone lead provisions of the settlement, and the fee petition which relies on it, without a thorough and *transparent* inquiry into whether these terms unfairly favor clients of Liaison Counsel and/or impose a testing requirement that is neither safe nor reliable. Accordingly, this court should order production of

- Exhibits 14 and 28 to the deposition of Aaron Specht

- All other documents evidencing costs which Liaison Counsel actually incurred in providing bone scans to claimants

- The number of bone scans performed on clients of Liaison Counsel, versus other claimants

- The dates on which bone scans were performed on non-bellwether clients of Liaison Counsel

- The results of bone scans, with the names of the subjects redacted, but their years of birth retained visible

- The following documents which relate to the following claims made by Liaison Counsel in ECF 1454-1, that

    a. "the portable XRF uses the same methodologies as a stationary XRF to measure lead exposure" Specifically, please produce any

documents which show 1) that the portable XRF measures lead in the same parts of the bone as a stationary XRF; 2) results of portable XRF testing are similar to results of stationary XRF testing.

b. "the modifications applied here are consistent with modifications that have been done in studies conducted at Purdue University and Harvard University and have been approved for such use by several IRBs, including at Harvard and Purdue"

c. "Dr. Specht worked directly with the inventors of the portable XRF to customize the XRF calibrations specifically for these measurements a part of his validation work." This response should include all emails between Liaison Counsel and/or Dr. Specht and the manufacturer of the device.

d. The "standard protocols" referenced in the first full paragraph of page 3 of this filing.

e. Hard copy of the "standard operating procedures" used by operators of the device.

**2. The Court should also order production of detailed time and expense records and fee sharing agreements of Liaison Counsel.**

Chapman Plaintiffs also join in the request of Hall objectors for the detailed time and expense records of Liaison Counsel, as well as any fee sharing agreements between them, for the reasons set forth therein. ECF No. 1586 at pp. 2-14, 16-20 and in Chapman Plaintiffs Opposition to the Fee Petition. ECF 1557.

**3. The Court Should Order Counsel to Provide a Description of the Off-the Record Conference which resulted in the Withdrawal of Class Counsel's Motion to Stay Bone Lead Testing**

On March 1, 2021, the Court held an *ex parte* hearing on Class Counsel's

"Motion for Immediate Suspension of the Use of Portable XRF Bone Scanning

11

Test" ECF No. 1446.  The undersigned counsel was given no advance notice of this hearing, nor opportunity to attend, nor was the hearing public.

The transcript of the hearing shows that the bulk of it was held off the record; the transcript contains a twenty-six minute gap between 6:11 p.m. and 6:37 p.m.  Cuker Dec. Ex. "B" at p. 8.  At the conclusion of the off the record conference, the Court announced, without further explanation, that "the motion must be withdrawn as noncompliant with the Court's practice guidelines as well as the duties of counsel." *Id.*  Shortly thereafter, the motion was withdrawn.

The motion made several key allegations:

- That the manufacturer of the device did not approve of its use on humans ECF No. 1443 at p. 8-9, 11.

- That the device had not been demonstrated safe for use on children *Id.* at 10.

- That Liaison Counsel had failed to produce any documentation showing that the portable XRF device could be lawfully used for the purposes of this settlement *Id.* at 2.

- That because of these concerns, the University of Michigan was unwilling to participate in such a program. *Id.* at 11.

Chapman objectors anticipate that Liaison Counsel will argue that the withdrawal of this motion is evidence that the underlying concerns expressed therein about safety and reliability of the portable XRF testing being employed by Napoli Shkolnik lack merit.  To the extent Liaison Counsel intend to make such

and argument, it is only fair that those present account for what transpired during this off-the-record conference.

An explanation should be forthcoming because each of the allegations made in the motion has since been corroborated.  Cuker Declaration Ex. 4 (email from Meghan Homes, in house counsel for the manufacturer, to Val Washington stating that, other than industrial uses, the device had only been sold for research uses to academic institutions subject to the supervision of an IRB); ECF # 1499-1 (Affidavit of Drs. Todd and Jepsen, stating in part that "written, detailed protocols used by Dr. Specht have not been received" and "the fact that the manufacturer is unwilling to stand behind the use of this device on humans would put undue liability on the part of us and our employers and potentially expose us to reputational damage which we are unwilling to accept"; ECF 1494-6 (M-Live article quoting Dr. Mona Hanna-Attisha as saying "bone scans are never a good idea for children.")

Against this background, the withdrawal of the motion after a 26 minute *ex parte* off the record conference is at best puzzling, and at worst, deeply disturbing. The attorneys excluded from participation in this *ex parte* conference represent

13

over 10, 000 claimants in this settlement.[2]  They have a due process right to know

what transpired in this conference. "Litigants and the public alike have a right to

access the records of a judicial proceeding." *U.S. v. Austin*, 954 F.3d 877, 879 (6th

Cir. 2020).

The Chapman Plaintiffs' potential appellate rights are stifled by the lack of a

transcript or recording of the hearing—assuming no recording exists. When a party

is "denied an opportunity to make a complete record on certain matters, review of

those matters on an ensuing appeal would be foreclosed since the court of appeals'

inquiry is limited to matters in the record." *Nat'l Farmers Org., Inc. v. Oliver*, 530

F.2d 815, 817-18 (8th Cir. 1976) (granting mandamus and ordering that district

court hold no further off-the-record proceedings if a party requests that the hearing

be recorded) (citing 28 U.S.C. § 753(b) (requiring that certain hearings be

transcribed verbatim by a court reporter)). Verbatim records provide "the best

protection for the litigants, the bar, and the bench at trial and on appeal" and

prevent appellate courts from "having to speculate upon what was said and the

manner in which an argument was made[.]" *Pittsburgh v. Simmons*, 729 F.2d 953,

955 (3rd Cir. 1984) (denying writ of mandamus that sought recusal of judge for

_____

[2] They include Cuker Law Firm, Bern LLP and  Valdemar L Washington PC.

holding off the record proceedings but noting that it "might well have voted to issue the writ" if the petitioner sought "a writ directing a verbatim transcription of the proceedings"); *see also* Fed. R. App. P. 10(c) ("the appellant may prepare a statement of the evidence or proceedings from the best available means" when a recording or transcript is unavailable).

The Chapman plaintiffs and the public at large is prejudiced because they do not know why the Class Counsel's seemingly well-founded motion was withdrawn. This has led to speculation about the safety of bone scanning. *See* Ron Fonger, *Attorneys pull request to stop bone lead testing in Flint water settlement without explanation* (Mar. 3, 2021), mlive.com at https://www.mlive.com/news/flint/2021/03/attorneys-pull-request-to-stop-bone-lead-testing-in-flint-water-settlement-without-explanation.html (quoting Dr. Reynolds: "This is a human rights violation. It is the Tuskegee experiment all over again"). Whether safe or not, the lack of transparency harms the public by causing a cloud to hang over the practice that might benefit individual claimants or hurt them by exposing Flint residents to unnecessarily ionizing radiation. The Chapman plaintiffs and public at large were also prejudiced by the lack of advance notice of the 6 pm hearing. Principles of openness should be observed "with particular strictness" in class and mass tort cases. *Shane Group*, 825 F.3d at 305 (quoting *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)). "The burden is a heavy one:

'Only the most compelling reasons can justify non-disclosure of judicial records.'" *Id*.

Accordingly, Chapman Plaintiffs are entitled to some reconstruction of the hearing. If the court reporter has an audiotape recording of the hearing, the Chapman Plaintiffs request that Court order it produced. *See Austin*, 954 F.3d at 879 (denying request for audiotape recording only where petitioner already had certified transcript of proceedings). If such a recording does not exist, the Court should at least order the second-best alternative: a reconstruction of the off-the-record portion of the hearing by those present. *See Nat'l Farmers*, 530 F.2d at 817-18 (holding that a judge's summary of off-the-record comments is inadequate); *Simmons*, 729 F.2d at 956 (noting that the only alternative to a verbatim transcript is "characterization in affidavits"). This needs to be put into the record so that the appellate court may be fully apprised of why this motion was withdrawn.

This motion and the hearing regarding it go to the heart of these issues, and all other parties—and the public—should be given a fair description of what happened. Accordingly, the court should order its production from the parties who were present.

## CONCLUSION

The Court should require Liaison Counsel to produce

- Exhibits 14 and 28 to the deposition of Aaron Specht

16

- All other documents evidencing costs which Liaison Counsel actually incurred in providing bone scans to claimants

- The number of bone scans performed on clients of Liaison Counsel, versus other claimants

- The dates on which bone scans were performed on non-bellwether clients of Liaison Counsel

- The results of bone scans, with the names of the subjects redacted, but their years of birth retained visible

- The documents which relate to the following claims, made by Liaison Counsel in ECF 1454-1 that

  1. "the portable XRF uses the same methodologies as the stationary XRF to measure lead exposure" Specifically, please produce any documents which show 1) that the portable XRF measures lead in the same parts of the bone as the stationary XRF; 2) results of portable XRF testing are similar to results of stationary XRF testing;

  2. "the modifications applied here are consistent with modifications that have been done in studies conducted at Purdue University and Harvard University and have bene approved for such use by several IRBs, including at Harvard and Purdue.

  3. "Dr. Specht worked directly with the inventors of the portable XRF to customize the XRF calibrations specifically for thes measurements as part of his validation work."  This response should include all emails between Liaison Counsel and/or Dr. Specht and the manufacturer of the device.

  4. The "standard protocols" referenced in the first full paragraph of page 3 of this filing.

  5. Hard copy of the "standard operating procedures" used by operators of the device.

17

6.  Detailed time and expense billing of Liaison Counsel Plaintiffs which are an essential part of their Fee Motion (ECF No. 1458);

7.  Any fee sharing agreements between Liaison Counsel Napoli Shkolnik and Levy Konigsberg

8.  A description of what transpired during the 26 minutes off the record at the March 1, 2021 *ex parte* conference, which led Class Counsel to withdraw their "Motion for Immediate Suspension of the Use of Portable XRF Bone Scanning Test" ECF No. 1446

Dated:  April 24, 2021

*/s/ Mark R. Cuker*
MARK R. CUKER
CUKER LAW FIRM
One Logan Square, Suite 1200
Philadelphia, PA  19103
(215) 531-8512
mark@cukerlaw.com

*Attorney for Chapman Plaintiffs*

18

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on April 24, 2021, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


*/s/ Mark R. Cuker*
MARK R. CUKER

19