# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

---

*In Re* Flint Water Cases,

No.: 5:16-cv-10444-JEL-MKM
(consolidated)

Hon. Judith E. Levy

Magistrate Mona K. Majzoub

---

## CO-LIAISON COUNSEL'S BRIEF IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED SETTLEMENT

Co-Liaison Counsel hereby submit this memorandum of law in support of Plaintiffs' Motion for Final Approval of Settlement, and in response to certain "objections[1]" to the extent they address issues related to the individual non-class claimants and that portion of the settlement. As explained more thoroughly herein, Co-Liaison Counsel respectfully requests that the Court enter a final order approving the Settlement and for such other and further relief the Court deems just and proper.

Dated: May 27, 2021

Respectfully submitted,

---

[1] Article XX of the Amended Master Settlement Agreement (AMSA) allows eligible claimants to file objections to the AMSA, however the AMSA provides only one option to those voicing objections *i.e.,* to not register. *See* Article XX.

**NAPOLI SHKOLNIK**                          **LEVY KONIGSBERG, LLP**

By: /s/ Hunter Shkolnik                       By: /s/ Corey M. Stern
Hunter J. Shkolnik, Esq.                      Corey M. Stern, Esq.
Paul Napoli, Esq.                             800 Third Avenue
270 Munoz Rivera Avenue                       Suite 11th Floor
Hato Rey, Puerto Rico 00918                   New York, NY, 10022
(833) 271-4502                                (212) 605-6200
hunter@nsprlaw.com                            cstern@levylaw.com
pnapoli@nsprlaw.com


Patrick Lanciotti, Esq.
360 Lexington Avenue, 11th Floor
New York, NY 10017
(212) 397-1000
planciotti@napolilaw.com


*Co-Liaison Counsel for Individual Plaintiffs*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

FACTUAL BACKGROUND ....................................................................2

ARGUMENT ........................................................................................5

  I.   SETTLING PARTIES HAVE MET THE WALK-AWAY PROVISIONS....5

 II.  THE OBJECTIONS OF THE INDIVIDUAL CLAIMANTS ARE
     WITHOUT MERIT ...........................................................................7

       A.    Objections to the Program are not motivated by facts.....................8

       B.    Objections to the Program have been addressed by Experts and
           Scientific Research.........................................................................9

CONCLUSION ...................................................................................14

## PRELIMINARY STATEMENT

Co-Liaison Counsel hereby submit this memorandum of law in support of Plaintiffs' Motion for Final Approval of the Settlement. As signatories to the AMSA Co-Liaison Counsel, firmly believe the settlement is fair, reasonable, and equitable. This Court should approve all aspects of this landmark settlement that closes a chapter in the Flint Water Crisis. The undersigned consider it important to separately address certain issues that are not class related.  This brief focuses on the individual components of the proposed Settlement and various filed objections.

Under the terms of the AMSA, the only basis to deny approve of the individual component of the settlement, *which accounts for* 85% of the total monies available under the AMSA, is if a Settling Defendant is able to exercise it's "walkaway rights". *See generally* Section 18. These "walkaway rights" can be exercised by the State of Michigan and the other Settling Defendants if there was a failure to meet various "Registration" thresholds. *Id.* Upon information and belief, and after extensive interaction with the Special Master and the Settlement Administrator, that except for the Legionella portion of the settlement as limited to Settling Defendant McLaren Hospital, the registration numbers far surpassed the required the walkaway trigger and, therefore, the non-class portion of the Settlement should be approved and become binding as to the remaining Settling Defendants.[2]

---

[2] As of this filing, ARCHER Systems, LLC has not completed its review of the registered claimant information as it pertains to persons listed on Exhibit 12 of the AMSA – those who have

## FACTUAL BACKGROUND

The Master Settlement Agreement ("MSA") was filed on November 17, 2020. ECF No. 1319-1. The Amended Master Settlement Agreement ("AMSA") was filed on January 15, 2021. ECF No. 1393-2. The Settlement Agreement is the product of the extensive mediation efforts in numerous sessions and communications over a period of more than two years. These efforts facilitated a prudent, fair, and reasonable resolution of vigorously litigated, factually, and legally complicated disputes, in the best interest of all individual plaintiffs.

The proposed Settlement establishes a hybrid structure that includes both a Class Action component and an individual ("non-class") traditional mass tort settlement that is triggered by a participation rate methodology. As this Court stated in the Opinion and Order Granting Preliminary Approval (ECF NO. 1399) (hereinafter the "Preliminary Approval Order"), "[t]he proposed settlement creates a comprehensive settlement program that will address all individually represented persons and all Minors (both represented and unrepresented.)" Preliminary Approval Order, ECF No. 1399, PageID.54400.

Final approval of an adult claimants' non-class personal injury lawsuit typically does not require final approval. However, due to the hybrid structure of the

---

submitted a notice of intention to file a claim under the Michigan Court of Claims Act, Mich. Comp. Laws § 600.6431. *See* MSA ¶ 18.1.2.

proposed Settlement which includes a class component and claims for Minors and LII, this Court found that "preliminary approval of certain aspects of the proposed settlement is both appropriate and necessary." Preliminary Approval Order, ECF No. 1399, PageID.54402. Claims will be evaluated on the same objective factors, including "as age, exposure to the water, test results, specific identified injuries, property ownership or lease, payment of water bills, and commercial losses." Preliminary Approval Order, ECF No. 1399, PageID.54400. Further, the hybrid structure calls for horizontal equity in that "compensation will be the same for similarly situated individuals and entities—regardless of whether they are represented, unrepresented, or are a member of the 'class.'" Preliminary Approval Order, ECF No. 1399, PageID.54400

Under the traditional mass tort component children and claimants who are represented by a private attorney under a valid Michigan Contingency Fee Contract were allowed to decide if they wish to voluntarily join into the mass tort settlement program by "registering" for inclusion. *See* AMSA ¶ XX. This section of the AMSA allowed registration for the following groups: (1) children, through their appropriate representatives, may directly register to participate in the Settlement, (2) certain Adults who retained counsel may proceed individually, and (3) Settlement Subclasses, defined in the Settlement Agreement, will allow Adults, property owners, and businesses in Flint to submit claims for relief. Among other provisions set forth in Plaintiffs' Motion for Preliminary Approval, the Master Settlement

3

Agreement also provides a process for the settlement of claims of Minors and Legally Incapacitated or Incompetent Individuals ("LII").

As the Court is aware, the Settlement seeks to provide relief to the Flint community for injuries stemming from exposure to hazardous water during the relevant time frame. Plaintiffs have reached an agreement to resolve claims against the State of Michigan and other Settling Defendants that would result in a Court-monitored Qualified Settlement Fund of more than $640 million. The Settlement provides for the establishing of several Sub-Qualified Settlement Funds for the benefit of individuals who were minor children at the time of the crisis and thus more susceptible to the hazards of lead exposure and related injury. Under the terms of the AMSA this comprises approximately 79.5% of the Settlement Amount after attorneys' fees and costs. AMSA ¶ 5.2. To be eligible for compensation, Minors must register and submit a claim. The registration and claims process is described more fully in Plaintiffs' Motion for Preliminary Approval. The Settlement does not deprive non-settling minors of the opportunity to continue to pursue claims. Thus, minors who do not register or submit a claim during the claims period are not parties to the settlement and do not release or relinquish potential claims against any of the Settling Defendants. *See* AMSA ¶ 6.1.

The Settlement also provides for a hybrid class component that provides for the resolution of claims made by Flint Adults, property owners, lessees, and persons legally responsible for the payment of water bills, and businesses, who will be

4

eligible to make claims from the compensation fund for personal injuries, and property and business damages. *Id*. ¶ 3.5. Those persons, who were represented by lawyers during the pendency of settlement negotiations – all of whom are listed in Exhibit 1 to the Settlement Agreement – were able to directly register to participate in the Settlement, while all others have been considered members of the Settlement Class and Subclasses.

## **ARGUMENT**

## I.    **SETTLING PARTIES HAVE MET THE WALK-AWAY PROVISIONS**

The AMSA provides each Settling Defendant with certain walk-away rights to rescind, terminate, or cancel the Settlement if certain provisions are not met. *See generally* AMSA, Article XVIII. The deadline to register into the Settlement was March 29, 2021. *See* Opinion and Order Granting Preliminary Approval, ECF No. 1399, PageID.54467. Since that time, 50,614 unique individuals have registered. *See* Notice of the Special Master Regarding Update on Registration Process for Amended Settlement Agreement (ECF No. 1790, PageID.64248). With respect to the non-class claims, below is a chart summarizing the circumstances under the AMSA that would permit the Settling Defendants to terminate the Settlement Agreement, and a summary of how the Individual Plaintiffs satisfied these provisions.[3]

---

[3] The AMSA provides the McLaren Defendants the "right to rescind, terminate, or cancel this Settlement Agreement as to the McLaren Defendants only if any of the persons listed on Exhibit 19 who allege exposure to Legionella at McLaren Flint Hospital during the period of April 25,

| Walk-Away Provision under AMSA | Registration Response |
|---|---|
| More than five (5) percent of the Individual Plaintiffs listed on Exhibit 1[4] fail to timely register and provide required information to participate as a Claimant in the Settlement Program. AMSA ¶ 18.1.1. | 2.95% have not registered |
| More than seven (7) percent of the persons listed on Exhibit 12, who have submitted a notice of intention to file a claim under the Michigan Court of Claims Act, Mich. Comp. Laws § 600.6431 alleging personal injury, property damage, or business economic loss as a result of exposure to water received from the Flint Water Treatment Plant, fail to timely register and provide required information to participate as a Claimant in the Settlement Program. AMSA ¶ 18.1.2. | ARCHER Systems, LLC is reviewing the registered claimant information |
| More than eight (8) percent of the persons listed on Exhibit 13, who have retained an attorney but have not filed claims in any court or filed a notice of intention to file a claim under the Michigan Court of Claims Act or the Federal Tort Claims Act alleging personal injury, property damage, or business economic loss as a result of exposure to water received from the Flint Water Treatment Plant or were legally liable for the payment of bills for such water fail to timely register and provide required information to participate as a Claimant in the Settlement Program. AMSA ¶ 18.1.3. | 4.14% have not registered |
| If fewer than 95% of the Minor Children, Minor Adolescent, and Minor Teens listed on the last Interim Report of the Special Master Regarding Data Compilation Based on Responses to the Amended Order Regarding Collection of Data, to be filed before the Federal Court enters the Preliminary Approval Orders relating to this Settlement Agreement register and provide required information to participate as a Claimant in the Settlement Program. AMSA ¶ 18.1.4. | 98.1% have registered |

---

2014 through December 31, 2018 fail to timely register and provide required information to participate as a Claimant in the Settlement Program." AMSA ¶ 18.2.

[4] ECF No. 1319-2, PageID.40413.

As outlined in the above chart, it appears that the Settling Parties have met the walk-away provisions as agreed upon in the AMSA. In fact, the massive outpouring of support as shown by the registration numbers in of themselves support the conclusion that this settlement was widely accepted by the Flint community. Over 50,000 individuals have determined that they want this settlement approved. Of equal if not greater import is that only a negligible number of "objections" were filed and of those many actually registered to participate in the settlement yet chose to voice "objections' to minor aspects of the settlement.

The Settlement should be approved as fair and reasonable as to the Individual Claimants because it provides settlement participants with valuable consideration and it was accepted by the overwhelming number of the eligible claimants who chose to register and to participate.

## II. THE OBJECTIONS OF THE INDIVIDUAL CLAIMANTS ARE WITHOUT MERIT

The objections filed against the Settlement do not warrant denial of final approval because they are without merit. The objections pertain mainly to the X-Ray Fluorescence bone lead testing program (hereinafter the "Program") implemented in Flint. On May 25, 2021, Co-Liaison Counsel filed its memorandum of law in opposition to the *Washington* and *Chapman* Plaintiffs' Motion to Extend the 90-Day Deadline regarding Bone Scanning and submission of medical linking reports (ECF. No. 1789) (hereinafter the "Co-Liaison Counsel's Response to Objections"). Co-

Liaison Counsel's Response to Objections details exactly why the *Hall*, *Washington,* and *Chapman* objections to the Program are without merit. Co-Liaison Counsel incorporate that submission herein. The relevant points are as follows:

### A. Objections to the Program are not motivated by facts.

Counsel for *Chapman* and *Washington*, in the above-mentioned Motion to Extend the 90-day Deadline (hereinafter the "Motion to Extend") objected to the Program as an excuse for their failures to adequately represent their clients. The Program was available to their clients during the period set by the Court's Preliminary Approval Order (ECF No. 1399), but they did not encourage their clients to participate in the Program by scheduling bone lead tests. Instead, they objected to the Program – their objections ranged from the need for more access to the Program, to the Program's safety and transparency, and the cost of the Program. None of their objections have been substantiated by facts and evidence, whether in the form of scientific research or expert declarations.

Objecting Counsel were aware, or should have been well aware, of the need to establish causation and damages in a complex environmental case such the Flint Water Crisis Litigation. They also should have been aware of the challenges involved in establishing causation and damages. Moreover, one of the Objecting Counsel told this Court on October 30, 2020 that he is no stranger to the testing and that he contacted Mt. Sinai in 2016 "to explore whether it's feasible to use it in Flint." (Dkt. No. 1312, p. 26, lines 22 to 25). All this points to the simple assertion that

objections to the Program are without merit. The objections are not based on facts, but rather a lack of preparedness and proper representation of their clients by the objectors. Several other lawyers' clients have successfully availed themselves of the Program. *See* Exhibit C, Exhibit D, and Exhibit F of the Opposition (ECF No. 1789). These are declarations from Attorneys Ben Crump, Ari Kresch, and Paul Napoli, all of whom represent several thousand plaintiffs in the Flint Water Crisis Litigation. They affirm that the Program was made available to their clients, and clients of other firms. Further, Attorneys Ben Crump and Ari Kresch investigated the Program. They concluded it is a safe and accurate method to test for exposure to lead and recommended them to 1000s of their clients.

Simply put, the objections to the Program are without merit and do not warrant denial of final approval.

### B.    Objections to the Program have been addressed by Experts and Scientific Research.

Co-Liaison Counsel's Response to Objections addresses objections to the Program by presenting the Court with affidavits and reports from relevant experts.

The Program was implemented under the leadership of Harvard University's Aaron Specht, PhD., and overseen by New York University's Medical Director Dr. Michael Weitzman. Dr. Aaron Specht is a research associate at the Harvard T.H. Chan School of Public Health in Boston, and he has dedicated his career to researching and developing application of a non-invasive X-ray Fluorescence

("XRF") technology to quantify lead in human bones. Aaron Specht has worked with the inventor of the XRF device to customize the device so it can be used safely on humans. The procedure and device are the same as that used in validation and research studies. It has been internally reviewed and approved at Purdue University and Harvard University. Dr. Specht explains that the Program is (1) not a research project because the sole purpose is to determine levels of lead exposures for litigation purposes, (2) scientific research proves that objections to the Program are false, and (3) the radiation dose associated with the test is significantly less than that associated with a common x-ray procedure and is "equivalent to 9 hours of natural background radiation sources which are unavoidable exposures to everyone." *See* Exhibit A, Affidavit of Dr. Aaron Specht.

The XRF device used in the Program does not need to be approved by the Food and Drug Administration ("FDA"), as confirmed by Michael Drues, PhD. Michael Drues is an independent regulatory consultant who has worked in the medical device industry for over 25 years. He has been involved in designing and testing a wide variety of medical devices and is familiar with their regulatory requirements. He is extremely well-versed in the FDA regulations pertaining to medical devices. After his review of the Program and the portable x-ray fluorescence device used, he concludes that the Program is not intended to diagnose or treat a medical condition., Therefore, the device does not need to be approved for use by the FDA. *See* Exhibit B, Expert Report by Michael Drues, Ph.D.

10

The American College of Obstetricians and Gynecologists recommends the use of diagnostic imaging procedures such as CT scans and x-rays during pregnancy, procedures which emit a much higher dose of radiation than does a bone lead test from the XRF device. *See* Exhibit A of Co-Liaison Counsel's Response to Objections, Declaration of William Bithoney, MD, FAAP (ECF No. 1789-2). Dr. Bithoney is a leading pediatrician with over thirty-five (35) years of experience, including academics and consulting positions pertaining to pediatrics. He explains that radiation exposure from the XRF bone lead test is negligible and the risk associated with the test is negligible. He states, "the radiation dose these children receive is less than what they would receive simply by taking a typical airplane ride, which exposes us to approximately 0.003 millisieverts per hour, or about 3.0 micro-sievert's per hour, approximately the same amount of exposure to radiation a child receives during the XRF bone test." ECF No. 1789-2, PageID.64065. His Declaration identifies a similar Program at Boston Children's Hospital – Nuclear Medicine and Molecular Imaging Program for bone scan tests on children, which is ensured to be safe. Based on his education and experience in pediatric medicine and health, he concludes that the Program is safe and an accurate means of measuring long-term lead exposure.

Professional radiation safety specialist and consultant Walt Cofer confirms that the Program implemented in Flint "conforms to applicable requirements of the Michigan radiation control regulations. The x-ray safety program is comprehensive

and applies best safety practices." ECF No. 1789-3, PageID.64100. Walt Cofer has over thirty (30) years of experience, including Sr. Health Physicist/Environmental Specialist at the Florida Department of Health, Bureau of Radiation Control Radioactive Materials. He is extremely well versed in radiation related regulations and confirms that (1) the Program conforms to the applicable regulations, (2) Dr. Specht has established the appropriate protocols and practices to ensure compliance, (3) the radiation dose associated with the test is within the approved limits and is so negligible that it is has to quantify the risk involved, and (4) overall, the program is a safe and compliant method of measuring long-term lead exposure. *See* Exhibit B of Co-Liaison Counsel's Objection, Declaration of Walt Cofer, ECF No. 1789-3.

Yuwonia Speights-Beaugard, a registered radiology technician who has worked at Hurley Medical Center as the Director of Radiological Services from 2015 to 2019 affirms that the Program is safe and an accurate means of measuring long term lead exposure. She visited Co-Liaison Counsel's Flint Center to observe the Program in operation. She confirmed that the Program followed best practices and the proper protocols when administering the test and that "all the protocols that would be followed at Hurley and the other places I worked for testing children and adults were followed at this facility." ECF No. 1789-6, PageID.64123. Ms. Speights-Beaugard further declared radiation dose emitted from the test was significantly less than what test-takers are exposed to, including children, from x-rays machines, CT

scans, and MRI scans. *See* Exhibit E of Co-Liaison Counsels Response to Objections, Declaration of Yuwonia Speights-Beaugard, ECF No. 1789-6.

Expert report from Jon Merz, Associate Professor in the Department of Medical Ethics & Health Policy at University of Pennsylvania explains how the Program does not comprise research or a clinical trial. He refutes objections made by Dr. Lawrence A. Reynold, particularly that the Program is not approved by any regulatory agency and that the Program comprises research. His report outlines what comprises research or a clinical trial and then explains how the Program does not fit into that description. "[I]t is my opinion that the Test Protocol is being implemented for the sole purpose of determining children's exposure for litigation settlement purposes and does not comprise research" he concluded. *See* Exhibit G of Co-Liaison Counsel's Response to Objections, Report of Jon Merz, ECF No. 1789-8, PageID.64190.

Reginald Davidson is the manager of Co-Liaison Counsel's Flint Center where the Program is operated. He oversees the day-to-day operations of the Center. Mr. Davidson declares that the staff administering the tests are registered nurses or certified nurse assistances who have been properly trained by Dr. Specht. The Center is compliant with all the required COVID-19 protocols relating to cleanliness and hygiene and is professionally cleaned periodically. Further, the Center is appropriately zoned to operate as an office or a clinic. *See* Exhibit H of Co-Liaison

13

Counsel's Response to Objections, Declaration of Reginald Davidson, ECF No. 1789-9, PageID.64195.

**<u>CONCLUSION</u>**

For the foregoing reasons, Co-Liaison Counsel respectfully requests this Court to enter an order approving Plaintiffs' Motion for Final Approval, and for such other and further relief the Court deems just and proper.

Dated: May 27, 2021                    Respectfully submitted,

By: /s/ Hunter Shkolnik               **LEVY KONIGSBERG, LLP**
Hunter J. Shkolnik, Esq.
Paul Napoli, Esq.                     By: /s/ Corey M. Stern
270 Munoz Rivera Avenue               Corey M. Stern, Esq.
Hato Rey, Puerto Rico 00918           800 Third Avenue
(833) 271-4502                        Suite 11th Floor
hunter@nsprlaw.com                    New York, NY, 10022
pnapoli@nsprlaw.com                   (212) 605-6200
                                      cstern@levylaw.com

Patrick Lanciotti, Esq.
360 Lexington Avenue, 11th Floor
New York, NY 10017
(212) 397-1000
planciotti@napolilaw.com

                                      *Co-Liaison Counsel for Individual*
                                      *Plaintiffs*

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2021, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing upon counsel of record.

Dated: May 27, 2021

_____/s/ Patrick J. Lanciotti_____