### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

*In re* Flint Water Cases,

No. 5:16-cv-10444
(consolidated)

Hon. Judith E. Levy
Mag. Mona K. Majzoub

_____

## CO-LIAISON COUNSEL'S RESPONSE IN OPPOSITION TO THE HALL OBJECTOR'S MOTION TO ATTEND FURTHER CONFERENCES WITH SETTLING COUNSEL AND FOR SETTLING PARTIES TO PROVIDE A DESCRIPTION OF NON-PUBLIC HEARINGS

Co-Liaison Counsel hereby submits its Opposition to the Hall Objectors' Motion to Attend Further Conferences with Settling Counsel and for Settling Parties to Provide a Description of Non-Public Hearings, and states as follows:

### INTRODUCTION

Mr. Bednarz first appeared in this case on or about March 22, 2021, roughly sixty-seven (67) days ago. (ECF Nos. 1481 & 1482). The first pleading filed on this docket occurred on February 8, 2016. (ECF No. 1). During the one-thousand nine-hundred and thirty-eight (1,938) days between the first filing and Mr. Bednarz's appearance, on a macro-level some notable events occurred:

(1)    Donald Trump was elected President;

(2)    Hurricane Harvey caused $125,000,000 in damage to the Gulf Coast;

(3)    The entire Brexit saga happened, beginning with a shocking vote, continuing through years of wrangling and negotiations under

       multiple Prime Ministers, and concluding at the end of 2020 when the transition period following the United Kingdom's departure from the European Union ended;

(4)    Donald Trump was impeached (twice);

(5)    Three major hurricanes (Harvey, Irma and Maria) struck Texas, Florida and Puerto Rico, over five devastating weeks;

(6)    Hurricane Michael became the first Category 5 hurricane to hit the United States since 1992;

(7)    The Chicago Cubs won its first World Series in 108 years;

(8)    Three Supreme Court Justices were nominated and confirmed;

(9)    There was a Global Pandemic;

(10)   The nation elected Joe Biden; and

(11)   There was an insurrection in Washington D.C. and an attack on the Capitol.

On a micro-level, there were 1480 filings on this docket. There were at least three (fully adjudicated) appeals to the Sixth Circuit regarding this litigation. More than one-hundred depositions were taken. More than $7,000,000.00 was spent by plaintiffs' counsel prosecuting Flint water cases. At least 20,000 individual Flint residents signed retainers with attorneys to prosecute individual claims related to the water crisis. Plaintiffs' counsel twice defeated motions to dismiss brought by the EPA, before two different Federal Judges, related to the water crisis. And more than two million documents were produced, read, evaluated, interpreted, and will surely form the foundation of the first bellwether trials scheduled for October 2021.

And, in a watershed moment for American history, a $641,000,000 settlement was negotiated over three years with multiple defendants. Emphatically, the Settlement in this case very well might mark the most significant win for environmental justice that has ever been had in this county through litigation. Ignoring that fact altogether, Mr. Bednarz is attempting to conjure reasons to destroy that landmark win (silently and shamelessly) in the name of Federalism, a purely ideological goal of an organization dedicated to changing laws across the country to **make it harder** for injured people (like the three Flint citizens Mr. Bednarz purports to represent) to come together in one way or another and vindicate their rights.

Like a wolf in sheep's clothing, Mr. Bednarz is attempting to derail the very settlement he claims should better benefit his clients. There were other options available—Mr. Bednarz could surely have submitted an amicus brief while the motion for preliminary approval of the settlement was pending—but he didn't elect to offer a helping hand to the Court. Instead, as he (and his ultra-conservative organization, the Hamilton Lincoln Law Institute) has done time after time, Mr. Bednarz masquerades as a "consumer protection" advocate, when the real mission is to deprive most injured people of a day in court altogether. Make no mistake, he is playing what he sees as a game of tort-reform wherever he can across the United States, irrespective of the real human beings (including his clients) left in his ideological wake.

So now, rather than responding to *Daubert* motions related to those bellwether trials (which, if successful, will greatly benefit all Flint residents maintaining claims against the trial defendants), or the companion motions for summary judgment, Liaison Counsel finds himself responding to a pleading, filed by a man who, during all years of this litigation, did not represent a single person in Flint, had likely never spent a day in Flint, and who had likely not read a single pleading associated with the Flint water crisis—a man who has the audacity to accuse both plaintiffs' and defense counsel of a conspiracy to commit a settlement, and who has attempted to disparage and shame a Federal Judge that has worked tirelessly in managing her entire docket, with great attention paid to this litigation.[1]

Beyond the substance of the motion, there is something intuitively wrong with a group of lawyers, who primarily stood on the sideline during the entirety of this litigation, led by a man who was not even in the stadium, arguing now they should be in meetings when for five years they chose not to participate in public hearings, despite many of them representing thousands of Flint residents.

But beyond intuition, the law does not support Mr. Bednarz's (or his minions') various contentions, and their motion should be denied in its entirety.

---

[1]     There are of course other lawyers who have joined Mr. Bednarz's motion. While they did have clients during the pendency of the litigation and throughout the events referenced herein, they put forward roughly the same amount of time and energy toward this litigation as Mr. Bednarz during that time. And they likely have no clue about his and his organization's true agenda.

4

## ARGUMENT

**I. THE COURT'S DECISION TO CONDUCT PERIODIC CONFERENCES WITH LEAD AND CO-LIAISON COUNSEL DOES NOT CONSTITUTE OR SANCTION *EX PARTE* COMMUNICATIONS.**

The Court may summarily dismiss Mr. Bednarz's arguments regarding *ex parte* communications because they are built on a faulty premise. Mr. Bednarz assumes as a matter of *a priori* truth that the conferences with the Court constitute *ex parte* communications, and then builds each of his arguments on that false premise.

But the conferences are not *ex parte* communications. By definition, an *ex parte* communication involves contact with the Court by one side of the case to the exclusion of the other. That has not and does not happen here. Counsel for both Plaintiffs and Defendants are present at these conferences. The Court does not meet with one side to the exclusion of the other. Furthermore, the Hall Objectors *are* represented in those conferences—by Interim Lead Counsel for the Putative Class Counsel as long as they remain class members; and Co-Liaison Counsel for Individual Plaintiffs if they opt out of the class. As discussed further below, the Court also acts a fiduciary for class members during conferences and has additionally taken the extraordinary and (to the undersigned's knowledge) virtually unprecedented measure of procedural equity in allowing a multi-day hearing for both objectors represented by counsel as well as *pro se* objectors to ventilate their

objections in open court, on the record.

The Hall Objectors' motion does not cite to a single case or provision of law that holds that meeting with *all* parties to a settlement constitutes a forbidden *ex parte* conference. The opposite, of course, is actually true. It is not uncommon for Court's to have conversations with appointed counsel off the record. The *Manual on Complex Litigation* is well aware that "[c]omplex litigation often involves numerous parties with common or similar interests but separate counsel," and that "[t]raditional procedures" "may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily." Federal Judicial Center, *Manual for Complex Litigation*, § 10.22, at 24 (4th ed. 2004). Among the "special procedures" the *Manual on Complex Litigation* embraces is "confidential discussions with the judge." *See id.*, § 13.13, at 170.

The *Manual for Complex* Litigation specifically endorses that procedure:

> On-the-record conferences will minimize later disagreements, particularly if the judge anticipates issuing oral directions or rulings. Many judges hold all conferences on the record, particularly where numerous attorneys are in the courtroom. Nevertheless, an informal off-the-record conference held in chambers or by telephone can sometimes be more productive; a reporter can later be brought in to record the results of the conference. (28 U.S.C. § 753(b) sets forth the requirements for recording various proceedings.) Rule 16 requires (and sound practice dictates) that all matters decided at pretrial conferences be memorialized on the record or in a written order. Counsel may be directed to submit proposed orders incorporating the court's oral rulings. (section 11.22).

*Id.* § 11.22, at 41. As this passage suggests, the *Manual on Complex Litigation*

6

intends for settlement discussions to be handled with care—precisely as this Court has consistently done throughout the litigation. But the key point is this: the *Manual on Complex Litigation*'s drafters did not write a lengthy and universally accepted set of guidance that would contravene the Canons of Judicial Conduct.

Correspondingly, Federal Rule of Civil Procedure 77(b) gives the Court the power to hold "[a]ny other act or proceeding [other than a trial on the merits] . . . in chambers." Fed. R. Civ. P. 77(b). Rule 77(b) "allows district judges the discretion to conduct proceedings in chambers, as long as the trial upon the merits is held in open court." *B.H. v. McDonald*, 49 F.3d 294, 297 (7th Cir. 1995).

The Court's broad discretion to conduct proceedings in chambers is well established. There is no "right to intrude uninvited into conferences at the bench and in chambers." *Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984); *see also United States v. Valenti,* 987 F.2d 708, 714 (11th Cir.) (affirming trial court's "traditional authority to conduct closed bench conferences"), *cert. denied*, 510 U.S. 907, (1993). After all, more than 40 years ago, Justice Brennan pointed out that nothing in the Supreme Court's jurisprudence "intimate[s] that judges are restricted in their ability to conduct conferences in chambers." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 598 n. 23 (1980) (Brennan, J., concurring); *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n. 25 (1982) (holding that a trial court has traditional authority to conduct in camera conferences).

7

Mr. Bednarz overlooks all of this and instead attempts to cherry pick individual lines and phrases from long cases in an effort to suggest the approbated "confidential discussions" as a part of settlement are always and categorically wrong. Mr. Bednarz's broad-brushing treatment of the cases he cites betrays the scant attention he has paid this litigation over the years.

For instance, he plucks a single sentence from the lengthy and highly distinguishable Third Circuit opinion, *see* Hall Objectors' Br. at 4–5 (citing *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 319 (3d Cir. 2005) ("*In re Cmty. Bank*"), as if the case offered categorical principles rather than nearly 50 Federal Reporter pages of fact- and case-specific analysis. Not to put too fine a point on it: Mr. Bednarz does not even try to compare this case to that one. Rather, Mr. Bednarz cites it as a foothold to strongly imply that instead of conscientiously overseeing one of the most complex civil litigations in American history, the Court has done something unethical.

But what is jaw-droppingly unfair is Mr. Bednarz's attempt to liken to anything at all about this case to anything at all about that case. *In re Community Bank* involved multiple errors and, as the appellate court recognized, a virtual abdication by the court of its duties. *See In re Cmty. Bank*, 418 F3d at 319. The essence of the problem, then, was not that some settlement conferences had been in chambers, but that the court didn't seriously exercise its judicial function or carry

out its judicial duties. It bears repeating for emphasis, of course, the nearly 50 pages of other errors in the case. Not so here.

More to the point, *In re Community Bank* actually shows how the conferences here are not *ex parte* conferences. The Third Circuit there understood that class counsel certainly has a duty to class members, but pointed out as a practical matter the district court acted as a "fiduciary" for those absent class members at conferences. *See id.* at 318–19. The task is undoubtedly a serious one, but the salient point is that it is *the district court*—and not an infinitely broad set of objectors and their counsel—that shoulders that burden. Unsurprisingly, the Third Circuit there did not order the district court on remand to begin inviting any objector and/or their counsel to participate in any conference. Nor does Mr. Bednarz point to any case from any court anywhere that marks such an unprecedented and expansive holding.

Not only does case law acknowledge the responsibilities of Interim Lead Counsel for the Putative Class and Co-Liaison Counsel for Individual Plaintiffs, but it makes sense as a matter of practice. Consider the effect of granting Mr. Bednarz the relief he seeks: It is not just Mr. Bednarz who will attend conferences, but other objecting plaintiffs' attorneys as well as, presumably, pro se objectors. Surely, Mr. Bednarz does not imagine that he can faithfully represent their interests as a sort of Objectors' Liaison Counsel. And what of the precedential value of this case for a class action suit with even more members, but perhaps smaller damages? Would

hundreds of objecting attorneys be permitted to flood a court's chambers? It bears recalling that Mr. Bednarz and his organization is devoted to an extreme manner of tort reform at any cost. *Cf. Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.).

The remainder of the Hall Objectors' cited authority is even less on point. For instance, *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) does not bear the slightest resemblance to the case. There, the Court met in secret with court-appointed experts to discuss the merits of the case. *Edgar*, 93 F.3d at 257–58. That practice marked an equivocal, bright-line departure from accepted practice, which can result in disqualification when a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." *See id.* at 258, 259–60; *see also* 28 U.S.C. § 455. A similar interest animates Canon 3A(4), *see Bradley v. Milliken*, 426 F. Supp. 929, 935 (E.D. Mich. 1977), which is presumably why Mr. Bednarz thinks *Edgar* has something to do with this case. Likewise, *In re Kensington Int'l, Ltd.*, involved hundreds of hours of true *ex parte* communications and meetings in which the court sought to gain knowledge of disputed, factual issues from the parties. 368 F.3d 289, 297–98 (3d Cir. 2004). But, as above, the settlement discussions and conferences with the parties here are simply not *ex parte* communications.

In short, what Mr. Bednarz calls "essentially *ex parte* conferences"[2] are nothing of the sort. Mr. Bednarz has not even alleged that something improper happened at the conferences; rather, his objections are to paper aspects of the Settlement. Nor has he alleged that the Court transgressed any particular boundary or has failed to discharge its fiduciary duty in any way.

Finally, as has consistently been the case throughout the litigation, the Hall Objectors (like the many other objectors who may have different priorities from Mr. Bednarz and the Hall Objectors) have a remedy available to them. They, of course, do not need to have bone scans taken to participate in the settlement, and they do not have to participate in the settlement at all if they so choose. Like any member of a putative and as-yet uncertified class, they retain the freedom to opt out of the class altogether and prove up their claims on their own terms. In doing so, they can attempt to negotiate settlements as they see fit with the various defendants. Consequently, the public interest that Mr. Bednarz imagines throughout his brief simply rings hollow.

## CONCLUSION

In sum, Mr. Bednarz's major premise is faulty, and the remainder of his arguments and demands upon the Court are unsound. There is accordingly no factual

---

[2]    Co-Liaison Counsel notes that Mr. Bednarz consistently stops short of actually calling the conferences "*ex parte*." This is telling—they aren't; and Mr. Bednarz's phrasing shows he knows it.

or legal basis to permit Mr. Bednarz to attend the Court's in-chambers conferences, and no reason to burden the parties—who are currently litigating the merits of this litigation in good faith (pertinently, at this point, lengthy and fact-intensive *Daubert* and summary judgment motions)—with undertaking a laborious and time-wasting effort of chronicling the entirely administrative conferences to date.

Dated: May 28, 2021

Respectfully submitted,

/s/ Corey M. Stern
Corey M. Stern
Renner K. Walker
LEVY KONIGSBERG LLP
605 Third Ave., 33rd Fl.
New York, New York 10158
T: (212) 605-6200
cstern@levylaw.com
rwalker@levylaw.com

/s/ Hunter J. Shkolnik
Hunter J. Shkolnik
Patrick J. Lanciotti
NAPOLI SHKOLNIK PLLC
270 Muñoz Rivera Ave., Suite 201
Hato Rey, Puerto Rico 00918
T: (787) 493-5088
hunter@napolilaw.com
planciotti@napolilaw.com

*Co-Liaison Counsel for Individual Plaintiffs*

12

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2021, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing upon counsel of record.

**LEVY KONIGSBERG, LLP**


/s/ COREY M. STERN
LEVY KONIGSBERG, LLP
605 Third Avenue, 33rd Floor
New York, New York 10158
(212) 605-6298
(212) 605-6290 (facsimile)
cstern@levylaw.com
www.levylaw.com