```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3

 4
            In Re   FLINT WATER CASES    Case No. 16-10444
 5

 6

 7   _____/

 8                    MOTION HEARING

 9
            BEFORE THE HONORABLE JUDITH E. LEVY
10             UNITED STATES DISTRICT JUDGE

11                    JUNE 2, 2021

12
                APPEARANCES IN ALPHABETICAL ORDER:
13
                Frederick A. Berg
14              Butzel Long
                150 West Jefferson, Suite 100
15              Detroit, Michigan 48226

16              Timothy S. Bishop
                Mayer Brown LLP
17              71 South Wacker Drive
                Chicago, Illinois 60606
18
                Jayson E. Blake
19              McAlpine PC
                3201 University Drive, Suite 100
20              Auburn Hills, Michigan 48326

21              James M. Campbell
                Campbell Conroy & O'Neil, P.C.
22              1 Constitution Wharf, Suite 310
                Boston, Massachusetts 02129
23
                Alaina N. Devine
24              Campbell Conroy & O'Neil, P.C.
                1 Constitution Wharf, Suite 310
25              Boston, Massachusetts 02129
```

```
 1                    Kristin Michele Dupre
                      Campbell Conroy & O'Neil, P.C.
 2                    1 Constitution Wharf, Suite 310
                      Boston, Massachusetts 02129
 3
                      Theodore J. Leopold
 4                    Cohen Milstein Sellers & Toll PLLC
                      11780 U.S. Highway One, Suite N500
 5                    Palm Beach Gardens, Florida 33408

 6                    Emmy L. Levens
                      Cohen Milstein Sellers & Toll PLLC
 7                    1100 New York Avenue, Northwestern
                      Suite 500, West Tower
 8                    Washington, District of Columbia 20005

 9                    Wayne Brian Mason
                      Faegre Drinker Biddle & Reath LLP
10                    1717 Main Street, Suite 5400
                      Dallas, Texas 75201
11
                      Stephen E. Morrissey
12                    Susman Godfrey L.L.P.
                      1201 Third Avenue, Suite 3800
13                    Seattle, Washingtno 98101

14                    Minh Nguyen-Dang
                      Mayer Brown LLP
15                    1999 K Street Northwest
                      Washington, District of Columbia 20006
16
                      Paul F. Novak
17                    Weitz & Luxenberg, P.C.
                      Fisher Building
18                    3011 West Grand Boulevard,
                      Suite 24th Floor
19                    Detroit, Michigan 48202

20                    Katherine M. Peaslee
                      Susman Godfrey L.L.P.
21                    1201 Third Avenue, Suite 3800
                      Seattle, Washington 98101
22
                      Michael L. Pitt
23                    Pitt McGehee Palmer Bonanni & Rivers PC
                      117 West Fourth Street, Suite 200
24                    Royal Oak, Michigan 48067

25
```

June 2, 2021

```
 1                        Mark R. Ter Molen
                          Mayer Brown LLP
 2                        71 South Wacker Drive
                          Chicago, Illinois 60606
 3
                          Susan Elizabeth Smith
 4                        Beveridge & Diamond, P.C.
                          1350 I Street Northwest
 5                        1900 N Street Northwest
                          Suite 100
 6                        Washington, District of Columbia 20036

 7                        Corey M. Stern
                          Levy Konigsberg, LLP
 8                        605 Third Avenue, Suite 33rd Floor
                          New York, New York 10158
 9
                          Renner Kincaid Walker
10                        Levy Konigsberg, LLP
                          800 Third Avenue, 11th Floor
11                        New York, New York 10022

12                        Jessica B. Weiner
                          Cohen Milstein Sellers & Toll PLLC
13                        1100 New York Avenue, Northwest
                          Washington, District of Columbia 20005
14
                          S. Vance Wittie
15                        Wayne Brian Mason
                          Faegre Drinker Biddle & Reath LLP
16                        1717 Main Street, Suite 5400
                          Dallas, Texas 75201
17
          Also Present:        Honorable Judge Joseph J. Farah
18
                          Deborah Greenspan, Special Master
19

20

21

22

23            To Obtain a Certified Transcript Contact:
                Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                   Federal Official Court Reporter
                        United States District Court
25          200 East Liberty Street - Ann Arbor, Michigan 48104
```

*In Re* Flint Water Cases - Case No. 16-10444

June 2, 2021

1                            **I N D E X**

2     MISCELLANY

3          Proceedings.................................5
           Certificate...............................113
4

Proceedings.................................5
Certificate...............................113

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **P R O C E E D I N G S**

2              THE CLERK:  The Court now calls the Flint Water

3    Cases.

4              THE COURT:  Thank you, Julie.  Well, welcome back

5    first to my court reporter, Jeseca Eddington.  I'm thrilled

6    that you're back from leave.  So it's great to have you with

7    us.  And welcome to everyone else who's either arguing the

8    motion today or observing our hearing.

9              This is the date and time for oral argument on the

10   plaintiffs' motion for class certification in the putative

11   class case against Veolia, which is also referred to as VNA,

12   and LAN.  They are two of the water engineering firms that

13   entered into municipal water consulting contracts with the

14   City of Flint.

15             Those contracts, of course, were related to the

16   switch from the Detroit Water and Sewerage Department to the

17   Flint River as a water source for the City of Flint back on

18   April 25th of 2014.

19             LAN advised the city at two different times.  Once

20   before the switch and once after.  And VNA's contract was

21   entered into after the switch to advise the city about the

22   water.

23             So let me start by making clear that this hearing is

24   separate from the motion that has recently been filed on

25   Friday for a final approval of the partial settlement.  And

```
 1    that particular vehicle, the partial settlement, does not

 2    include a class mechanism for minors.  But it does have a

 3    class mechanism for other claimants.

 4           With respect to minors, the partial settlement has a

 5    claims process that addresses the safeguards that Michigan law

 6    provides to children who have been harmed by the conduct of

 7    another person or entity.

 8           So I want to make sure I understand who's arguing.  I

 9    think Mr. Morrissey is arguing for plaintiffs.

10           Is that correct, Mr. Morrissey?

11           MR. MORRISSEY:  Your Honor, we've divided it up

12    amongst ourselves for particular components of it.  Ms. Levens

13    will be handling the first topic on the Court's agenda.  I'll

14    be handling the (b)(3) with the overall standard and property

15    damage.  Ms. Peaslee would address any questions the Court has

16    on the business subclass.  And --

17           MR. LEOPOLD:  Jessica Weiner --

18           MR. MORRISSEY:  And Ms. Weiner will address any

19    issues on the adequacy of [Inaudible].

20           THE COURT:  Okay.  Thank you.

21           And for VNA, is that you, Mr. Campbell, who will be

22    arguing?

23           MR. CAMPBELL:  No, Your Honor.  Good afternoon.  We

24    have Mr. Timothy Bishop who's with us who entered an

25    appearance last week.  He will be taking the lead in doing
```

1    most of the argument.  With him is Mr. Minh Nguyen-Dang, who

2    will be addressing the minor subclass issue.  And Mark Ter

3    Molen may also speak regarding if there are technical issues.

4    And Alaina Devine and I are here if we need anything else,

5    which I doubt we will.

6            THE COURT:  Okay.  Good.  Thank you.  And then for

7    LAN.

8            MR. MASON:  Yes, Your Honor.  Wayne Mason.  I'll try

9    to make it simpler for you.  My partner, Vance Wittie, will be

10   addressing the Court on all of the issues.  I'll be available

11   obviously to weigh in if the Court has questions or something

12   comes up.  But Vance Wittie will be addressing the Court on

13   behalf of the LAN defendants.

14           THE COURT:  Okay.  Well, thank you.  So we have some

15   new voices today, which is great.  I would know who you are if

16   the screens were all turned off and I heard most of your

17   voices.  And that's not a bad thing, but it's just true.  So

18   thank you for letting me know who will be arguing.

19           I've had the benefit of reading the initial motion,

20   which was filed now almost a year ago, the responses by the

21   various defendants, and an omnibus reply.  For those of you

22   who've not had this opportunity, there are about 600 pages of

23   briefing awaiting you.  I extended the 25-page limit for these

24   briefs and responses.  I also received responsive briefing

25   from Mr. Stern and Mr. Shkolnik and in opposition to the

1    motion for class certification.

2           So what I'll do -- and I will certainly allow them a

3    moment at the end if they believe that it is warranted to say

4    something on behalf of their clients if they wish to.  But I

5    think the main arguments are here by the folks who are both

6    plaintiffs and defendants in this case.

7           So I sent out late yesterday -- and I'm sorry it went

8    out so late -- an order in which I think it makes sense to me

9    to take this in.  And so I wanted to begin with certainly an

10   opening by plaintiffs.  This is your brief.  So please feel

11   free to make any general opening remarks.  And.

12          Then I'd like to move to a discussion of the master

13   class definition and we'll go from there.  But as we get to

14   each topic, I'll turn to the defendants for a response and

15   then provide time for a rebuttal.

16          So why don't we begin with whoever will be making

17   some opening remarks for the plaintiffs.

18          MS. LEVENS:  Thank you, your Honor.  I can do that

19   for the class.  Unless, Ted, would you like to say anything

20   again?

21          MR. LEOPOLD:  No.  I was just going to introduce you,

22   Emmy.  But Judge Levy is both aware of you and your talents.

23   That's why you're leading off this horse.

24          THE COURT:  Okay.  Go ahead.

25          MS. LEVENS:  Thank you, your Honor.

June 2, 2021

1          As described in our opening motion, class

2    certification is the most efficient and effective approach to

3    obtaining justice for the tens of thousands of Flint residents

4    and businesses harmed by the tragic and unnecessary

5    contamination of Flint's water supply but who have not chosen

6    to file their own suit.

7          More than five years have passed since the first

8    lawsuits in this case were filed.  And both Your Honor and

9    Judge Farah have recognized that it could be years before

10   Flint residents' individual cases could be brought to trial.

11   Class certification would allow the resolution of key

12   threshold liability questions for the broader class as well as

13   the resolution of additional issues related to the fact of

14   injury and damages with regard to the proposed subclasses.

15         As explained in Amchem, a case like this involving a

16   mass tort and repeated oftentimes by this circuit, the goal of

17   Rule 23 is to achieve the economies of time, effort, and

18   expense and promote the uniformity of decisions.

19         These are the precise goals that would be obtained by

20   certifying the class here.  In it's essence, Rule 23 is an

21   inquiry that seeks to access the extent to which class

22   members' claims can be proved with evidence that is common to

23   the class.  All that means is it's the exact same evidence for

24   everybody.

25         In granting preliminary approval of the proposed

1    settlement, this Court recognized that the basic -- the basic

2    practical predicate that gave rise to this Flint water crisis

3    at least with regard to the government defendants, it is the

4    same for each and every class member.

5            In addition to the claims that plaintiffs brought

6    against the government defendants, plaintiffs have also

7    alleged that LAN and Veolia engaged in a common course of

8    conduct that caused or prolonged the contamination of Flint's

9    water supply.  It is this common course of conduct that

10   constituted professional negligence and entitles the proposed

11   class to damages.

12           Plaintiffs have shown that several critical

13   components of this professional negligence claim can be proven

14   using evidence that is exactly the same for each and every

15   class member.

16           For example, plaintiffs can demonstrate the existence

17   and scope of LAN and Veolia's duty using common evidence.

18   That evidence is their contracts with the city as well as

19   testimony from our expert, Mr. Russell, who opined on what the

20   duty of care is for professional engineering -- for a

21   profession engineer.  As well as our expert, Dr. Gardoni, who

22   has opined that the engineering codes of conduct promulgated

23   by various government and non government agencies inform the

24   standard of care.

25           Veolia and LAN in their briefing and oftentimes

1    before this Court they have disputed many of our asserted

2    facts.  For example, at a recent hearing, LAN's counsel

3    repeated several times that in their opinion the codes of

4    professional conducts are simply aspirational and should not

5    be used to inform the duty of care.

6            That LAN and Veolia have argued a different version

7    of these facts, however, simply reaffirms the importance of

8    certification here.  Because regardless of whether the court

9    and jury agrees with Veolia and LAN or plaintiffs, that

10   decision as to duty will be the same for all class members.

11           This alone would be sufficient to satisfy Rule

12   23(a)'s commonality requirement.  But additional elements of

13   our claim can also be established using common evidence.  For

14   example, the issue of breach, which for the non lawyers out

15   there, is how plaintiffs demonstrate that LAN and Veolia have

16   engaged in professional negligence here.  All of the evidence

17   is common to the class.

18           Your Honor, did you have a question?

19           THE COURT:  Well, I guess I have a -- I do have a

20   question.  I think there's one issue that I think you're

21   addressing, which is common issues that go to duty and breach.

22   But in your opening remarks, you seem to imply that there

23   would be common evidence of causation.  And I want to

24   distinguish two types of causation that we'll be talking about

25   today.

 1          The first is whether the conduct of LAN and Veolia is

 2     alleged to have caused toxic water or continued the Flint

 3     water crisis.  And the second is whether that caused damages

 4     in individuals.

 5          So I think there are two ways in which we're going to

 6     use that word causation.  And I can see that there would be a

 7     common issue, common evidence on potentially on duty, whether

 8     that duty was broken or breached, and whether that breach

 9     caused or prolonged the Flint water crisis.

10          What I don't see is how there would be common

11     evidence.  I think the defendants have argued very strenuously

12     and in a way that I have not seen overcome in your briefing

13     that there would not be common evidence of causation for each

14     individual.  And they tell me in the briefing, and I'd like to

15     hear your response to this, that different individual homes

16     had different levels of lead potentially.  And some may have

17     had hopefully none at all, but many had some degree of lead.

18     And that would need to be looked at individually.

19          But then within the home, people stopped drinking the

20     water at a certain point.  Or some weren't drinking the water.

21     They were out of town.  They were otherwise using bottled

22     water or that sort of thing at a certain point.  And there are

23     a variety of other harms that people allege fecal coliform

24     infections, Legionella infections.  But that certainly didn't

25     impact everybody.

1          So tell me how there would be common evidence on the

2     issues of causation of damages.  Not causation of the water

3     crisis.

4          MS. LEVENS:  Yes, Your Honor.  And also as a preface

5     I'll say please jump in and interrupt me if you have a

6     question.  One semi-awkward aspect of this very tiny Zoom box

7     situation is that it's a little harder to tell.

8          As a baseline, class plaintiffs believe that the

9     critical issues of duty, breach, and causation as to the water

10    contamination are sufficiently meaningful.  That at the very

11    least the Court could certify those under 23(c)(4) and

12    bifurcate liability from issues of cause -- from certain

13    issues of causation and damages.  And that that would

14    materially advance the litigation.

15         Additionally, with regard to the second aspect of

16    your question, and the case law is a little strange but

17    Sterling and many other cases just like Your Honor recognize

18    that causation can often be separated into two components.

19    The general causation of the contamination event or the

20    propensity for contaminants to harm people as well as the

21    specific causation of harming individual class members.

22         THE COURT:  Right.  And that's what I'm interested

23    in.  How could that be a common question?

24         MS. LEVENS:  I will also let Mr. Morrissey speak on

25    this issue because it transcends some of the (b)(3)

June 2, 2021                                                14

1    predominance issues.  But class plaintiffs have proffered

2    expert testimony that shows using well accepted methodologies

3    that the contaminated water resulted in lead for all class

4    members and damaged all homes.  But I'll let Mr. Morrissey add

5    to that with regard to the specifics.

6           MR. MORRISSEY:  Yes, yes.

7           THE COURT:  Okay.  Let's just put the hold on that,

8    Mr. Morrissey.  Because I want to still go back to the class

9    definition for a moment, which is where we were starting.

10          Tell me how the class definition is not overbroad

11   with respect to VNA.  Their contract did not begin I think

12   they said until February 10th of 2015.  Your class definition

13   starts with the switch to the Flint water crisis in April of

14   2014.

15          How could that be proper with respect to VNA?

16          MS. LEVENS:  The class definition is proper with

17   respect to VNA because the timing with which they caused

18   damages to Flint only impacts the amount and allocation of

19   damages and responsibility.

20          So for example, plaintiffs have alleged that Veolia

21   engaged in a common course of conduct.  It is a fact question

22   as to what the exact date is upon which Veolia should be

23   deemed responsible for injuries caused by that conduct.  It

24   would be up to a jury --

25          THE COURT:  I'm sorry, Ms. Levens.  But what would be

1    the harm in having two different class definitions with

2    respect to two different defendants?  Which would eliminate

3    any confusion about the degree of responsibility for each of

4    the two defendants.

5         MS. LEVENS:  That would also be entirely acceptable

6    and is an easy fix under Rule 23.

7         An additional thing the Court could do is provide

8    guidance to the jury with respect to things like Veolia cannot

9    be held accountable for harms prior to a date and asking the

10   jury to allocate fault among whichever actors it believes to

11   be at fault before a certain date and to then engage in that

12   same process again after the date.

13        So I think the general process is the same.  And

14   there are a lot of tools that the Court can use to make sure

15   that there isn't any confusion.

16        THE COURT:  Okay.  And you've suggested that I should

17   create the new class definitions.  And I guess I would send

18   that back to you as the plaintiff is the master of their own

19   complaint.  And asking the Court to define or write a class

20   definition, I'm not sure that's helpful to me.  So if I

21   determine that I need a new class definition, I think what

22   I'll do is request additional briefing on what that would be.

23        MS. LEVENS:  Yes, Your Honor.

24        THE COURT:  Let me ask you this about the class.

25   Your master class is defined as all current and former

1    residents of the City of Flint who for any period of time

2    between April 25th of 2014 received drinking water supplied by

3    the City of Flint regardless of whether they paid for it.

4            What do you mean by received?  How do I know who's in

5    this and who's not?  If I drive through Flint, stop at a

6    restaurant, and drank coffee, did I receive water?

7            MS. LEVENS:  Yes, you would qualify as having

8    received water if you just had coffee.  You would not qualify

9    to be a member of any of the proposed damages subclasses.  The

10   word received is used in lieu of, for example, ingestion as a

11   minor subclass because it's meant to include both those

12   individuals who drank the water as well as the fact that this

13   water caused property damages to homes when it entered the

14   home.

15           THE COURT:  Okay.  So in the master class is a

16   23(c)(4) issues class only?

17           MS. LEVENS:  Correct, Your Honor.

18           THE COURT:  Okay.  If I -- after all is said and done

19   with the argument and my reading of the cases and so on, if I

20   determine that an issues class only is appropriate here, do

21   the minors -- do the subclasses for minors, property, and

22   business go away?

23           MS. LEVENS:  They do not automatically go away.

24   There are several different approaches that the Court could

25   take.  It could hold the request to certify those subclasses

June 2, 2021                                                    17

1    in abeyance because technically the Court need not consider

2    that until after a liability determination.  To the extent the

3    Court did not wish a liability determination with regard to

4    the broader class to bind any of the subclasses, they could

5    also be defined out of that broader subclass.

6          Or finally as a third option, the Court could both

7    certified the (c)(4) class as well as the damages classes.

8          Several of the circuit court opinions -- Whirlpool,

9    Olden, Sterling -- all of those contemplated the court

10   considering what would be the best procedure for addressing

11   individual causation and damages for a time after the trial on

12   liability.  So Your Honor would be well within her discretion

13   to take that same approach here.

14         THE COURT:  Okay.  Something else that I'm interested

15   in.  Your brief talked about averting behaviors that people

16   took such as buying bottled water.  Are you seeking damages

17   for people who did not -- let's say with respect to VNA, that

18   by December of 2014, let's say, or January, early January 2015

19   began drinking bottled water exclusively, are you seeking

20   damages for those people as to VNA?

21         MS. LEVENS:  With regard to individuals, no.  We have

22   described that those are damages that might be quantifiable on

23   a larger basis.  But they are not included in either any of

24   the 3 subclasses for which we are also seeking certification

25   of a damages class.

1         THE COURT:  Okay.  Now -- okay.  So defendants have

2   argued that the subclasses are broader than the master class

3   in terms of their definition.  So what -- because you've got

4   current and former residents in the master class.  But in the

5   subclasses, you could have people who have not lived in Flint

6   who may have attended a daycare, something like that.

7         So is that permissible to have subclasses that are

8   more inclusive than the master class?

9         MS. LEVENS:  Yes.  For clarity, to the extent the

10  Court only certified (c)(4) and held off on the question of

11  whether to certify the subclasses, we would ask for leave to

12  amend the larger class definition to be inclusive of all the

13  individuals within the subclasses just so that any liability

14  determination would be binding on all members.

15        But plaintiffs have actually done exactly what courts

16  and the rule want, which is make efforts to narrowly tailor

17  the subclasses to only those types of claims that we think the

18  fact of injury or in the case of property and business the

19  amount of injury could be determined on a class or

20  subclass-wide basis.

21        THE COURT:  Okay.  So the master class, is that --

22  I'm a little bit confused because the master class you've told

23  me is a 23(c)(4) issues class.

24        Are you seeking any damages for adults who ingested

25  the water?

1        MS. LEVENS:  No, Your Honor.  In the event of a

2   successful liability determination, adults would be able to

3   pursue their own damages.  But at this time -- and we could

4   discuss procedures for efficiently addressing any of those

5   claims.  But at this time we're not seeking damages for those

6   on a class-wide basis.

7        THE COURT:  Okay.  Then let's look at the definition

8   for residential property subclass.  I can't tell you how many

9   times I've read this.  And so I need you to answer this

10  question.  It says all persons and entities who from April 25,

11  2014 to present owned residential property.

12       Do they have to have owned it on April 25th or could

13  I have purchased something in 2016 in Flint and qualified?

14       MS. LEVENS:  I'll defer that to Mr. Morrissey.

15       THE COURT:  Mr. Morrissey.

16       MR. MORRISSEY:  You have to have owned it during the

17  crisis.  You could have bought it at some point after the

18  switch and before the switch back to Detroit water but not

19  subsequently.

20       THE COURT:  So doesn't that have to be amended then?

21  Because it says all person and entities who from April 25,

22  2014, to present.

23       How would I know if I'm in it or not if I bought

24  something in 2016?  And how would I know that if I bought

25  something in 2018 I'm not in it?  Because it just said I had

June 2, 2021

1    to own it at any time from the 25th of April 2014 until now.

2          MR. MORRISSEY:  That point is well taken, Your Honor,

3    and it's something that should be clarified in the notice

4    should that subclass be certified.

5          THE COURT:  Okay.  Because the business subclass I

6    think is clearer because it just says all persons and entities

7    who as of April 25th owned and operated a business.  So there

8    you're telling me if I purchased a business before the crisis

9    was known, let's say in March 2014, I'm out.

10          I can't collect damages, right?  Is that what you

11    meant?

12          MR. MORRISSEY:  If you purchased beforehand --

13          THE COURT:  Let's say I purchased my business, it's a

14    small restaurant --

15          MR. MORRISSEY:  Right.

16          THE COURT:  A month after the crisis began in April

17    25, 2014, your expert tells me my business would have lost

18    revenue.  But anyway, I'm not -- I can't be in your class the

19    way it's defined because I had to own the business as of the

20    day of the water switch, not a day after.

21          MR. MORRISSEY:  That point to you should be

22    clarified, Your Honor, in the notice that it would be anyone

23    who obtained a business -- owned it beforehand or acquired it

24    in that stub period between the beginning of the crisis -- the

25    switch and the end of the crisis, which I believe is a very

1    small number of any businesses.  Ms. Peaslee is speaking

2    directly to the business issues.

3          THE COURT:  Okay.  Mr. Morrissey, can you speak up

4    just a little bit when you speak?

5          MR. MORRISSEY:  Yes.

6          THE COURT:  Okay.  Thank you.

7          MR. MORRISSEY:  Thank you, your Honor.

8          THE COURT:  Okay.  Well, why don't -- is there

9    anything further, Ms. Levens, on the definition of the classes

10   that you're seeking that you'd like to address?

11         MS. LEVENS:  Not at this time unless Your Honor has

12   questions.  We're happy to move on or defer to defendants.

13         THE COURT:  Yeah.  I do have questions when we get to

14   what the appropriate issues would be that you're seeking to

15   have certified.  But in terms of the questions I had about

16   your general definition, I think I'm in good shape.

17         So why don't we move to -- will VNA respond next?

18         MR. BISHOP:  Yes, I'm ready to do that, Your Honor.

19         THE COURT:  Okay.  Thank you.

20         MR. BISHOP:  You know, as you've observed and I think

21   as we just heard Mr. Morrissey concede, these class

22   definitions are a mess.  And of course these are the class

23   definitions that we briefed and that plaintiffs' experts have

24   addressed.  So there's a problem.  There's a problem here.

25   And it's not either your obligation, as you have noted, or

June 2, 2021                                                         22

1    ours to rewrite their class definitions for them.

2         We don't think that any class should be certified

3    here.  So you know, it's certainly not our job to fill it with

4    what we see as deck chairs on the Titanic by addressing these

5    definitions.  But on their face, the proposed subclasses are

6    not subclasses.  They're not subclasses at all.  They're

7    separate classes.

8         By definition, a subclass has to be a subpart of a

9    larger class.  And I have not heard plaintiffs' point us to

10   any case, despite Ms. Levens' protestation that certifies as a

11   subclass something that is not a subpart of the class.

12        And the examples here, you've already pointed a lot

13   of them out, but the master class covers residents up to

14   October 16, 2015.  The minors class covers residents and

15   fetuses through January the 5th, 2016.  So a fetus in utero in

16   Flint on January the 4th, 2016 is a member of the minor class

17   but not the master class.  It's not a subclass.

18        A non -- I'm not exactly sure where we are after what

19   I've heard on what the nonresident, the property ownership

20   class is.  But as I read the language in the subclass

21   definition, a nonresident property owner who bought her

22   property in 2020 is a member of the property class but not of

23   the master class.

24        A nonresident who owned a Flint business on April the

25   25th, 2014, and sells it the next day is a member of the

1    business subclass but not the master class.  None of that

2    makes any sense.  I can go on with a lot of similar examples.

3    And Your Honor's clearly gotten this point from the questions

4    that you've asked.

5         But another inconsistency worth mentioning is that

6    the minors class begins on May 1st.  Because Dr. Weisel

7    testified that's when the effects from the switch to Flint

8    River water would kick in.  Not earlier.  Yet the other

9    classes begin on April 25th.  When according to plaintiffs on

10   expert, the effects of the switch would not yet be manifested.

11        THE COURT:  Let me ask you, Mr. Bishop, just going

12   back to what you said.  If plaintiffs fix this by adding to

13   the master class definition including all individuals and

14   entities in the subclasses, does that solve the problem?

15        MR. BISHOP:  No.  That's a morass, Your Honor.

16   That's a unmanageable morass to put different time limits and

17   different -- entirely different categories of plaintiffs and

18   damages into the same master class.  I just don't know what

19   that does to notice.

20        What's really going on here is you have eight

21   different classes.  You have four classes for VNA, four

22   classes for LAN.  The master class is really a separate adult

23   class.  You have eight classes which would require eight

24   notices.

25        I don't think a notice could be given that could

1    encompass a class that meshes together all of these categories

2    of claimants and claims.

3            THE COURT:  I don't see the notice issue as the

4    hurdle.  I hear what you're saying, that I think the class

5    definition needs work, but not just because it would be

6    difficult to community in a written notice.

7            MR. BISHOP:  Well it would be difficult to -- I mean,

8    it's going to create trouble difficulties, too.  I mean, I

9    don't want to downplay the difficulty of the notice.  I mean,

10   Shutts requires that the notice be truly informative of each

11   potential class member of what is going on and what their

12   options are.  And I think that would be difficult to do with

13   this morass of claims put in together.

14           I think this is really, as I say, eight different

15   classes requires eight sets of notice.  That's our position.

16           THE COURT:  Okay.  Thank you.  Let me go back,

17   Ms. Levens.  Do you have cases where courts have certified or

18   a Court of Appeals has confirmed the certification of

19   subclasses where the members of the subclass are not members

20   of the master class, which would be the case here?

21           MS. LEVENS:  I honestly don't know the answer to

22   that, Your Honor.  I will say though that this is largely a

23   distinction without a difference.  Because to certify a

24   subclass, each and every one of the elements for a larger

25   class must be satisfied.

1          So we're not trying to ask for any lesser burden with

2    regard to the subclasses.  If anything -- and admittedly there

3    are some things that could be ironed out.  But if anything I

4    think the additional information was intended to add clarity,

5    not take away from it.

6          I think a lot of the cases that are in similar

7    situations have actually done the exact opposite approach of

8    what plaintiffs took here and just gone with an incredibly

9    broad class definition and then taken as an assumption that

10   questions about things like dates and whatnot could be ironed

11   out in subsequent phases.

12         For example, even with a case like Whirlpool, you

13   know, that opinion talked about issues such as how they used

14   their washing machine and when and if Whirlpool provided

15   warranties with regard to the machine.  All of those are the

16   kind of things that might warrant breaking things out by dates

17   or adding additional clarification, but the court basically

18   decided to deal with those at a later stage.

19         So we are happy to make a motion to clarify this.

20   But I don't think that this is a distinction that should be

21   used to deny class relief here.

22         THE COURT:  Okay.  Let me also ask you a question

23   following up on your opening remarks.  You suggested, and it's

24   just sort of sinking in to me, that if I can only certify the

25   issues class for your master class that I should defer a

1    decision on subclasses as opposed to denying that.

2             Is that what you said?  On damages subclasses.

3             MS. LEVENS:  I don't believe I said should.  I think

4    I said could.

5             THE COURT:  Okay.

6             MS. LEVENS:  Our position is that you should certify

7    them right now.  I think, however, that Rule 23(d)'s statement

8    that Court can amend and alter class definition at any time

9    combined with the fact that several cases within this circuit

10   entirely deferred defining what the procedures would be for

11   addressing causation and damages make it so that the Court

12   could do that if it wanted.

13            THE COURT:  But why would a liability determination

14   make it any easier?  Why would that make causation proofs

15   common?  Causation as to individual damages.  Let's say I

16   certify six or seven of your issues, how does that make

17   anything more clear about causation of damages?

18            MS. LEVENS:  It doesn't.  And that is also why we

19   simultaneously moved for certification of the subclasses

20   because we believe that our expert evidence establishes that

21   now.  I will say though making that statement was more of an

22   efficiency concern.  To the extent a liability class were

23   certified and the class lost on liability, there really is no

24   need to get into these intricate questions of how we go about

25   mobilizing an affirmative liability verdict.  And so it's one

1    option at the Court's disposal.

2          THE COURT:  Okay.  Anything else, Mr. Bishop, right

3    now?  Or should I move to --

4          MR. BISHOP:  Yes, I'd like to address that, Your

5    Honor.  You can't just put off these questions about whether

6    the majority of the subclasses here, which are not really

7    subclasses, can be certified.

8          They're asking you to issue certify elements of the

9    main class for the purpose of moving along this litigation.

10   We don't think it will move along this litigation.  But it

11   becomes even clearer that it won't move it along if we don't

12   know if there are going to be any of these subclasses

13   certified down the line.

14         I think the plaintiffs have an obligation to supply

15   us with some definitions now that they think that they

16   actually want to certify and then we ought to look at those

17   and discuss those.  And we obviously don't believe that

18   anything should be certified.  But we are not making any

19   efficiency gains or moving along this case towards resolution

20   by certifying any issues when we don't know what cases those

21   will impact, whether there are going to be any classes down

22   the line that those would actually play a role in if they were

23   determined.  Thank you.

24         THE COURT:  Okay.  And Mr. Bishop, if I require

25   plaintiffs to submit or I create two master classes, one that

1    starts with VNA's entrance into Flint and one that starts with

2    LAN's contribution to what happened in Flint, would that

3    satisfy your protestations about the overbreadth of the master

4    class?

5            MR. BISHOP:  It would -- a class that started when we

6    submitted our initial report on the February 18th would deal

7    with that overbreadth problem.

8            THE COURT:  Okay.

9            MR. BISHOP:  Obviously it wouldn't deal with any of

10   the other issues that we've raised with regard to the

11   subclasses.  But we do think that at a bare minimum, there

12   should be a separate class for VNA that should start on

13   February the 18th.

14           THE COURT:  Okay.  Ms. Levens, would the 18th be the

15   right date from the plaintiffs' perspective?

16           MS. LEVENS:  Plaintiffs would be fine with that date.

17   Yes, Your Honor.

18           MR. MORRISSEY:  Your Honor, I believe the date should

19   be the date of the contract.

20           MS. LEVENS:  I assumed that was the date of the

21   contract.

22           THE COURT:  No, that's the date of the report.

23           MS. LEVENS:  Oh.  Excuse me.  It should be the day of

24   the contract.

25           THE COURT:  Why the date of the contract?  The date

1    the contract is entered into, VNA hasn't done or failed to do
2    anything that date.  Why isn't it when later when they issued
3    their report?
4        MR. MORRISSEY:  The date the contract was signed and
5    even beforehand, Veolia was on the scene in Flint and
6    beginning to do work.  Entering the weeks between when they
7    were retained and when the report was issued, the Veolia
8    engineers had opportunities to speak up and did not.
9        The handwritten notes from Mr. Gnagy, the lead
10   engineer for Veolia, in which he did not calculate the CSMR
11   that was available from the data right in front of him were
12   written in that intervening period for instance.
13       THE COURT:  Okay.  All right.  Well, that's good to
14   know.  Mr. Wittie.
15       MR. WITTIE:  Thank you, your Honor.  I think the sum
16   of what has been said here points out the critical importance
17   of getting these class definitions correct.
18       For example, it's clear that the subclass must be a
19   component of the principal class and be contained in it.
20   Because otherwise if you had, say, an issues trial has been
21   suggested and say there was a determination of non liability,
22   who would it be conclusive as to?
23       If there were members of the subclass who were not
24   members of the main class, then obviously there would be no
25   attempt then to certify the subclasses after the failure of

1    the main class issue trial.  And you would have a one-way opt

2    in at that point and people would simply deny that they were

3    members of the principal class.

4            So it's very vital that we have rigorous class

5    definitions which will tell us exactly whose claims are being,

6    you know, adjudicated at a particular time.

7            I know they're a gaping problem about the scope of

8    the definitions is the fact that nonnatural entities

9    presumably would not be defined as residents of the City of

10   Flint and therefore would not be included within the master

11   class but would be included potentially on the resident owner,

12   resident property owner's subclass and of course the business

13   subclass.  And that's going to be a significant problem with

14   the way that those classes are currently formulated.

15           THE COURT:  Okay.  What can you tell me about that,

16   Ms. Levens?  Should it say residents or entities?  No.

17           MS. LEVENS:  I actually think the solution to that

18   that we proposed was just to amend the broader class

19   definition to say and members of the proposed subclasses.

20   There was no intent to create a one way intervention problem.

21   And in fact the goal is quite the opposite to adjudicate

22   liability for all entities that have not chosen to bring their

23   own case and then to address how to identify damages for those

24   entities.

25           THE COURT:  Okay.  All right.  Anything further on

1    this question, Mr. Wittie?

2          MR. WITTIE:  Not on the definitional or question.

3    And I thought it best to reserve other arguments for other

4    times.

5          THE COURT:  Good.  Thank you.  Okay.  Well then why

6    don't we start with my concerns about a minor's class.  And as

7    you're all aware, the Court ordered supplemental briefing

8    after reading the opening motion for class certification.

9          I saw in that motion that you were seeking to certify

10   an opt-out class of minors.  And I had already done research

11   on that issue at least a year earlier trying to understand

12   what we were doing and what direction we were heading in.

13         And through that process, I was alerted to the

14   remarkable safeguards that exist in the State of Michigan for

15   minors who might have suffered tort injuries, personal

16   injuries and seek damages through litigation.  And I thought

17   that the opening brief only sort of covered it in a page or

18   two and I wanted to hear more about that.

19         So that issue has now been fully briefed by both

20   sides.

21         And who was going to cover that for plaintiffs?

22         MS. LEVENS:  I can address questions with regard to

23   that, Your Honor.

24         THE COURT:  Okay.  So here's the situation.  So we

25   have the Rules Enabling Act and Michigan law.

1          How does the combination of the Rules Enabling Act

2     and Michigan case law not prohibit me from certifying a (b)(3)

3     minors damages class?

4          We know that the Woodman case -- and here Judge

5     Farah, I'm so glad you're here because I'm calling upon

6     Michigan law.  The Woodman case tells us that lawsuit seeking

7     personal injury is a property right of a child.  It's a

8     substantive right of a child.  And it is therefore subjected

9     to a whole range of safeguards.

10         Even a parent can't just file a lawsuit on behalf of

11    a child without having the blessing of the Court as the next

12    friend.  And children have until one year after the age of

13    majority, until their 19th birthday, to determine whether they

14    want to sue for damages that happened up through their 18th

15    birthday.

16         The partial settlement, the master settlement

17    agreement does not create a class.  And what I saw,

18    Ms. Levens, in your reply brief was reference to the procedure

19    set forth in the MSA in the partial settlement.  But what you

20    didn't address in the reply brief is that that partial

21    settlement doesn't bind a minor to anything at this point.

22         They have until one year after the age of majority to

23    file a claim and we have what's called a future minors fund.

24    No one is required to sue or to make a decision about a suit

25    until that point in their life.

 1          So it's not helpful to me to say, well, you're

 2    working it out in the partial settlement.  So tell me how this

 3    does not violate the federal Rules Enabling Act and Michigan

 4    law.

 5          MS. LEVENS:  A couple of things there.  First of all,

 6    to the extent that minors do not have legal capacity to

 7    receive notice or exercise their right to opt out, I actually

 8    don't think those minors who did nothing would be bound to any

 9    of the determinations in this case.

10          I think with respect to minors who do participate and

11    ultimately submit claims, that we would want to make sure that

12    those minors did so on behalf of appropriately represented

13    next friends and guardians.  And the reference to the

14    settlement procedures is not to say that that satisfies this

15    here but rather to demonstrate that this can be efficiently

16    done on a very large scale basis.

17          THE COURT:  But you're suggesting that I think in a

18    75-day period or something -- I don't have the exact trial

19    plan that you submitted right here.  But what you're

20    suggesting for an opt-out class is that we would have a master

21    guardian ad litem and panel GALs who would go out and find all

22    these children during the notice period and then either

23    determine that they're going to participate or opt out.

24          But we're not sending anyone out in Flint to search

25    for children.  They found lawyers.  So there's a -- many

1    individual cases filed on behalf of children and we're

2    appointing next friends where appropriate.  But no one's going

3    out to search for these minors, which I think your trial plan

4    absolutely would require.  And I don't know how it could be

5    done.

6         MS. LEVENS:  We did not mean to require people to go

7    out and search for minors.  However, I will say that a lot of

8    the minors who registered to participate in the settlement,

9    they learned about it because we did have a very robust notice

10   program.  And we did reach out to alert those minors of their

11   rights.

12        I think that a concern here in our desire to protect

13   children, there's this hope of excluding them from everything.

14   And Veolia in its opposition brief references the fact that

15   the statute of limitations is tolled for children for a year

16   after they turn 18.

17        I think that it's important to recognize today

18   that -- just today, as we're addressing this procedural

19   motion, the sixth graders who were exposed to this

20   contaminated water, they're turning 18.  And they're applying

21   to college.  And they are applying for jobs.  And right now

22   unless they are also -- if they are excluded from a class,

23   unless they are also immediately filing their own lawsuits,

24   they lose their right to have justice here.  I think that --

25        THE COURT:  But those are big ifs.  I -- and what I'm

June 2, 2021

1    worried about is why wouldn't the minors who don't opt out be

2    bound?  That seems like a greater worry to me.

3          If what your concern is expressing is you want every

4    minor child who was exposed to lead tainted water during the

5    water crisis to have an option for recovery and you're looking

6    for the greatest vehicle to accomplish that, it seems to me

7    that the minors who don't opt out would be bound by an opt-out

8    class and would lose out entirely forever and for always.  And

9    those who are still minors wouldn't have a chance to file

10   their own lawsuit after they turn -- up until their 19th

11   birthday.

12         Why isn't that a bigger problem?

13         MS. LEVENS:  I think that in weighing those problems,

14   we regarded it to be a bigger problem of minors attempting to

15   adjudicate claims years in the future that -- after, frankly,

16   the evidence is stale.

17         I think to the extent the Court genuinely has

18   concerns about binding current minors, we can define them out

19   of the class.  But as a practical matter, their most likely

20   path to recovery is to proceed as an absent class member.  I

21   also --

22         THE COURT:  How can you define them out of your

23   subclass?  Wouldn't that be a failsafe class if you define the

24   class as people who are in the class -- who had damages --

25         MS. LEVENS:  The minor subclass actually is only

June 2, 2021                                          36

1    limited to younger children.  We don't propose a class-wide

2    method of damages for older children.  I think to the extent

3    that there is some space there between children who are 10 and

4    children for whom the statute of limitations have tolled, the

5    class definition could simply state all adult residents or

6    property owners who were exposed to the water.  And we could

7    define adults as to now as opposed to the time of the crisis.

8           THE COURT:  Okay.  All right.  That's interesting.

9    And then I guess we still have the question of -- well, going

10   back to what you said a moment ago that if a child who was a

11   minor at the time of the crisis and a minor at the time of

12   certification opts out or would not be bound somehow, that

13   they -- the evidence would become stale.

14          And if what I'm looking at at this point would be an

15   issues class, they wouldn't have to -- each one wouldn't have

16   to come into court and determine whether duty, breach, and

17   causation of toxic water had happened.  And their own evidence

18   seems to me could only get stronger in terms of what the

19   impact of the lead is individually when they prove their own

20   individual levels and harm that they suffered.

21          MS. LEVENS:  It's true that if we are successful on

22   liability that they would not have to establish those

23   elements.

24          THE COURT:  Okay.  So I'm -- the stale evidence issue

25   seems --

1          MS. LEVENS:  More relates to damages.

2          THE COURT:  Okay.

3          MS. LEVENS:  And so could be protected by simply

4     defining them out if that is a concern of the Court.

5          I do think, you know, Michigan law, the restatement,

6     they recognize that often fact of exposure and items like that

7     are proven using class wide or, excuse me, circumstantial

8     evidence.  Even for the minor subclass, that is children under

9     10, the additional elements that we are seeking to establish

10    as to them are more along the lines of fact of injury as

11    opposed to ultimate damages.

12         So I think even under our approach there is space for

13    children and there would be a need to establish procedures to

14    allow them to come forward, demonstrate their damages, and for

15    defendants to assert any affirmative defenses against those

16    specific children that they believe exist.

17         THE COURT:  Okay.  Let's talk for a minute about a

18    (b)(2) injunctive relief class with respect to minors.  And

19    what you've told me thus far was about damages that somehow

20    you're viewing this as a way of safeguarding a right of action

21    for minors.  And from my perspective, I don't think whether it

22    safeguards or not that Michigan law permits this, an opt-out

23    class for minors.  For damages purposes.

24         But let's look at injunctive relief.  Initially you

25    had four types of injunctive relief you were seeking.  And now

1   that this motion is with respect to only the engineering

2   defendants, as I understand it you're only seeking medical

3   monitoring for them.  Is that -- from them.

4          MS. LEVENS:  In terms of injunctive relief, yes, Your

5   Honor.

6          THE COURT:  Yeah.  So it's your position, I would

7   assume, that minors can sue on injunctive relief.  That

8   there's nothing in the rules enabling the act or Michigan law

9   that would prevent minors from seeking injunctive relief.

10         MS. LEVENS:  No.  Even under expansive rule of

11  whether substantive law versus procedure, the Michigan rules

12  are limited to the damages property interest, not something

13  like this, which is purely injunctive relief.

14         THE COURT:  Okay.  So you're looking at medical

15  monitoring only with respect is to VNA and LAN, correct?

16         MS. LEVENS:  Yes, Your Honor.

17         THE COURT:  Okay.  So I'm interested in how that's

18  not actually a damages request.  How is that injunctive relief

19  when LAN and -- ordinarily injunctive or equitable relief is

20  an affirmative -- you're going to do something differently.

21  Like in the foster care class action cases on behalf of minor

22  children, the foster care provider is going to provide food

23  and safety and protection for these children in their care.

24         So there's something affirmative actions that they're

25  doing.

1        How is medical monitoring not simply sort of damages

2    in another package?  Because wouldn't VNA and LAN just have to

3    contribute money to a medical monitoring fund?

4        MS. LEVENS:  No, Your Honor.  Simply because

5    injunctive relief costs money does not strip the relief of its

6    injunctive character.  While you're right that some injunctive

7    relief is, you know, telling a company not to do something,

8    others includes asking a defendant to affirmatively do

9    something.

10       And there are always as a practical matter costs to

11   that.  There is a cost to cleaning up a site or creating

12   something new.  And in Boler actually, the Sixth Circuit was

13   asked to opine on the injunctive character of medical

14   monitoring and found this to be sufficient.

15       THE COURT:  I looked back at Boler, and Boler -- the

16   Sixth Circuit -- I mean, I've looked back at that several

17   times in the motions to dismiss phase of Carthan and Walters

18   and Sirls.  There it was an Ex parte Young case against the

19   state.  The Sixth Circuit's pronouncement that medical

20   monitoring, I think it was along with other injunctive relief

21   qualified under Ex parte Young as forward looking.

22       Boler didn't decide that question with respect to LAN

23   or VNA, or did they?

24       MS. LEVENS:  No, Your Honor.  And I did not mean to

25   represent that they did.  We do think though that the analysis

1    would be exactly the same.  This is asking for an order

2    requiring LAN and Veolia to do something going forward in the

3    future and it will admittedly be a cost to them but that does

4    not mean that it does not qualify as injunctive relief.

5          THE COURT:  And so what would that -- what would this

6    medical monitoring look like?

7          MS. LEVENS:  Essentially the creation of a program to

8    allow different forms of testing for children assuming that we

9    had established that there is actual injury to children.

10          THE COURT:  Right.  Okay.  Let me ask you this, in

11    terms of (b)(2) classes, the Graddy, G-R-A-D-D-Y, versus Blue

12    Cross Blue Shield of Tennessee, states that the homogeneity of

13    the interest of the members of the class is mandatory.

14          And here the Graddy -- well, in that case, the Graddy

15    court had refused to certify a (b)(2) class of individuals

16    with autism spectrum disorder because they had such varied

17    problems.  And the treatment that they were seeking to have

18    paid for was going to be different for each person.  They may

19    need it, they may not need it.  They may need some of it and

20    not all of it.

21          So how is this not just like that?

22          MS. LEVENS:  Well, as a starting matter, I will say I

23    don't remember the Graddy case off the top of my head.

24          THE COURT:  That's okay.

25          MS. LEVENS:  But from your very helpful factual

June 2, 2021

1   summary, I will say that the medical monitoring requested here

2   would help all children to assess the exact extent of their

3   damages which would help them to then have individually

4   tailored programs.

5         Our experts have established that all of the children

6   were exposed to lead and that this causes damages.  But Your

7   Honor is right that what those are could be different for

8   different children.  And medical monitoring --

9         THE COURT:  This is injunctive relief.  This is not

10  damages relief.  It's -- I mean, we have to show that they

11  were damaged, but ...

12        MS. LEVENS:  Yes.  Well no, but the medical

13  monitoring helps with an assessment of the children to

14  determine the exact nature of their injury.  Which I think is

15  helpful on many levels including practical ones such as

16  behavioral therapy and educational modifications and things of

17  that nature.

18        THE COURT:  Okay.  All right.  Well, those were some

19  of the questions I have.  Let me look a little bit more.

20        You know another issue that the cases bring to my

21  attention is that injunctive relief in class cases needs -- is

22  only.  So if that's the only type of relief for a minor's

23  class, it has to be set -- it has to be the primary relief,

24  not secondary to monetary relief.

25        Now here we're talking about minors who would also

1    qualify for, potentially if liability is shown, for

2    significant money damages.

3          How would this injunctive relief be secondary to

4    money damages?

5          MS. LEVENS:  I think it would be secondary because it

6    would only be in the event that the Court declines to certify

7    a (b)(3) class of children.  I think a lot of that primary and

8    secondary language really grew out of Walmart in which the

9    fact that the plaintiffs were seeking both declaratory and

10   equitable relief, which results in money to children, that

11   that meant they needed to qualify for (b)(3) certification.

12         We have simultaneously asked for that and we think

13   the Court could grant it.  But in the event it did not, it

14   would not be using (b)(2) as a vehicle to inappropriately

15   certify and allow a damages claim for children.

16         You'll notice we're not seeking injunctive relief in

17   the form of paying for their college and sports cars and

18   things like that that would really be in lieu of damages here.

19   This is solely to create a program to help these children

20   going forward.

21         THE COURT:  So the purpose of the medical monitoring

22   is to ascertain damages.

23         MS. LEVENS:  Well, not just damages really.  The

24   extent of their injury and also what could be done to help

25   them going forward.

1          THE COURT:  Okay.  Okay.  Well, why don't I turn to

2     Mr. Campbell to tell me who is going to respond to this from

3     VNA, because I didn't write it down.

4          MR. CAMPBELL:  Sorry, Your Honor.  Mr. Minh

5     Nguyen-Dang is going to address the minor subclass.

6          THE COURT:  Thank you.

7          MR. NGUYEN-DANG:  Good afternoon, Your Honor.

8          As you have recognized correctly, there are

9     substantial protections under Michigan law for the claims of

10    minors.  And as you have recognized correctly, that means that

11    a (b)(3) class for damages simply wouldn't be feasible in this

12    case in a way that would protect the Michigan protections.

13    But there was a suggestion that a (b)(2) class might be

14    permissible because there might not be a Rules Enabling Act

15    problem with that.  And we're not sure that that's the case.

16         THE COURT:  I'm not sure it's the case either.  Yeah.

17    So tell me why not.

18         MR. NGUYEN-DANG:  So under the Michigan rules, it's

19    the claim itself that is the property of the minor.  And that

20    claim here is a claim for professional negligence.  Injunctive

21    relief is merely the remedy sought, one of the remedies sought

22    for that claim.  But the claim itself is still the same claim.

23         It's the same claim under (b)(3) as it would be under

24    (b)(2).  And that's the claim that is protected by the

25    Michigan protections as we've mentioned the individual

1    appointment of representatives, the statutory tolling of the

2    statute of limitations.  And so it doesn't seem to be that the

3    (b)(2) class is situated any differently than the (b)(3)

4    class.

5              At the end of the day, what plaintiffs are seeking is

6    some adjudication, the results of which would be binding on

7    minors.  And that is exactly --

8              THE COURT:  Mr. Nguyen-Dang, I've gone back and forth

9    on this, and I'm glad to hear your argument.  But I have to

10   think that the Michigan law would require injunctive relief.

11   If that were the sole purpose of a lawsuit with respect to

12   minors it would just be crazy.

13             Let's say the minor is 2 years old in a foster care

14   home that needs to be halted from doing a particular act and

15   required to do it differently in the future.  So that's the

16   injunction.  And it would make no sense to require the child

17   to be at any time up to 19 they can bring this case and follow

18   all of the procedural and substantive safeguards that personal

19   injury lawsuits allow, because the time period would have long

20   gone by for any meaningful relief.

21             So if that's what Michigan -- is that really what

22   Michigan law requires?

23             MR. NGUYEN-DANG:  In the situation that you describe,

24   Your Honor, you wouldn't need to do what you would need to do

25   here.  The situation you described is of classic injunctive

1    relief.  The plaintiff would be seeking an order that runs

2    against the foster system to do something differently.  That

3    would not require individual appointment for every single

4    minor because if one minor were to get that order --

5              THE COURT:  Right.

6              MR. NGUYEN-DANG:  -- it would apply to everybody.  So

7    you would only need to --

8              THE COURT:  I'm sorry.  For the injunctive relief,

9    would we need next friends appointed for the minors if this

10   injunctive relief is going to be citywide for anyone who was a

11   minor during the time period at issue?  And we'll figure out

12   whether it goes to 2016 or '15 or what.

13             But would we need next friends appointed?

14             MR. NGUYEN-DANG:  We would here.  Because as the

15   Court has already recognized, the character of the injunctive

16   relief or what plaintiffs are characterizing as injunctive

17   relief doesn't really feel like injunctive relief at all.

18             THE COURT:  Yea.

19             MR. NGUYEN-DANG:  Really it's an evidentiary

20   foundation for a later damages claim.  As Ms. Levens

21   explained, plaintiffs aren't actually seeking the ultimate

22   treatment for any plaintiff, they simply want to diagnose each

23   plaintiff or each member of this proposed subclass so that

24   then the proposed subclass could use that in a damages claim

25   in order to get the money or a second injunction that would

1    address their treatment needs.

2         So because of the highly individualized nature of

3    what it is that plaintiffs actually are seeking in this case,

4    this isn't truly injunctive relief.  It's really more, as the

5    Kartman case explains, an evidentiary foundation for damages.

6    That's governed by (b)(3), not (b)(2).  And so as we've all

7    agreed, the Michigan protections would apply in that case.

8         THE COURT:  Okay.  Anything else on this issue?

9         MR. NGUYEN-DANG:  There is one thing that Ms. Levens

10   brought up.  I just wasn't exactly sure exactly what she

11   meant, so I would appreciate the opportunity to clarify it.

12        THE COURT:  Sure.

13        MR. NGUYEN-DANG:  Which is this idea that somehow you

14   can have a class in which some members -- a class for minors

15   in which some members would not be bound somehow --

16        THE COURT:  I don't know how that works.

17        MR. NGUYEN-DANG:  Well, that seemed to sort of

18   completely defeat the purpose of a class action or at the very

19   least turn it into a type of opt-in litigation, which is,

20   again, not the point of a class action and is not permitted

21   under Rule 23.

22        There also was I think a concern about stale

23   evidence.  Now we're not really sure how or what that means in

24   the situation either.  All of the evidence as relates to what

25   VNA did, for instance, all of it has been collected.  People

June 2, 2021                                                              47

1    have -- all the documents have been produced.  All of the key

2    witnesses have been deposed.

3            So the evidence left, as Your Honor mentioned, would

4    be the evidence personal to each minor as to their injuries.

5    And as you mentioned, that would probably only get stronger

6    over time.  At the same time if there's any evidence going to

7    that such as blood lead levels or water lead levels, if they

8    don't exist now, they never will exist.  So it's not as though

9    there's any problem with that evidence either.

10           And I think there was a final concern about

11   safeguarding the rights of minors to bring their claims.

12   Those rights are safeguarded regardless.  If you are a minor,

13   the statute of limitations is tolled until you are 19.  If you

14   have already become an adult, were the class -- were the Court

15   to deny class certification, then under the American Pipe they

16   can bring those claims as adults.

17           So really there isn't any concern about any minor not

18   being able to have their day in court if they want to.

19           THE COURT:  The concern as I read it in plaintiffs'

20   materials was the fact that some have not done so thus far.

21   And so this would be a way to capture those individuals who

22   have for any variety of reasons not yet obtained counsel and

23   filed suit.

24           MR. NGUYEN-DANG:  It just seems to us that it is

25   unduly speculative to think that those people would not bring

1    a suit once they turn 18.

2              THE COURT:  Yeah.

3              MR. NGUYEN-DANG:  Perhaps they don't think they have

4    claims yet, but they might.  As you say, their claims might

5    develop.  At any rate, they have until when they turn 19 to do

6    so.  So it seems to us at this point it's just premature to

7    think that anybody who hasn't brought suit, it's for some

8    reason other than the fact that they might be waiting.  As the

9    lieu allowed them to.

10             As we discussed, the normal course in Michigan law is

11   for minors to turn 18 and then to decide to bring the cases

12   themselves.  If they haven't done so yet, they still could.

13             THE COURT:  Okay.  Thank you.  Mr. Wittie.

14             MR. WITTIE:  Thank you, your Honor.  I'd like to

15   return to some of the basic principles underlying (b)(2) and

16   (b)(3) classes.  In the Walmart case, the Supreme Court

17   clarified that any time that anything other than incidental

18   monetary relief as sought in a case, that the requirements of

19   (b)(3) have to be satisfied not simply the requirements of

20   (b)(2).

21             This is certainly a case where the plaintiffs seek

22   more than incidental monetary relief.  Even if you're only

23   considering the medical monitoring request, that in itself is

24   as far as we're concerned a claim for monetary relief

25   certainly from the perspective of the two defendants here

1    because all they're being asked to do is to pay money.

2              It is not a program that they're being asked to order

3    to be established.  It's not obviously a negative injunction.

4    The entire requirement would be satisfied for either defendant

5    by writing a check.  And that is, by definition, not

6    injunctive relief.

7              As the Third Circuit said in its Jaffee opinion back

8    in 1979, a plaintiff cannot transform a claim for damages into

9    an equitable claim by asking for an injunction that orders the

10   payment of money.  And that is the only order that the

11   plaintiffs are seeking with respect to these two defendants.

12             So there's no dodging the fact that the Court is

13   going to be having to look at (b)(3).  And if (b)(3) is the

14   determining subsection, then of course we run into all the

15   problems that the Court has identified.  And it's clear it

16   cannot be overcome in this case.

17             I certainly agree with Mr. Nguyen-Dang that the

18   property right here that we're talking about is the claim or

19   the cause of action that's involved.  And I think it's also

20   important here to recognize the medical monitoring in the

21   State of Michigan is available only as a form of essentially

22   future medical.

23             It's not a standalone cause of action.  It's

24   available only for those claimants for whom a completed tort

25   has already been proven and established.  And so there's no

1    getting around -- there's no use of the medical monitoring

2    remedy simply to find out that if you have a cause of action

3    or you have a claim.

4         Now I know that plaintiffs think that they can

5    establish by common evidence the fact that every member of

6    this very strangely defined minor subclass has got an injury.

7    But what they're forgetting in all of this and what must be

8    kept in mind is that the defendants get a turn too.

9         The defendants get to show by individual evidence, if

10   they can, that a particular member of this subclass has not

11   been injured at all or as a result of any of their actions.

12   And if they can establish that through individual evidence

13   then that particular child, that particular minor would not be

14   entitled to the medical monitoring remedy in the first place.

15        So you can't have a situation where you are giving

16   medical monitoring to someone you have not already established

17   has a legal right to a remedy by proving all of the elements

18   of a tort including causation and injury.

19        So in a lot of ways, the entire trial plan absolutely

20   puts the cart before the horse and essentially would deny the

21   defendants' due process rights to contest these matters on an

22   individual basis as the evidence clearly shows they would have

23   the -- the defendants would have the ability to do in this

24   case.

25        THE COURT:  Let me ask Ms. Levens to respond to that

1    particular argument.  And it stems from the Henry v Dow

2    Chemical Company case that says mere exposure to a toxic

3    substance and the increased risk of future harm does not

4    constitute an injury for tort purposes.  Rather it is a

5    present injury, not fear of an injury in the future that gives

6    rise to a cause of action under negligence theory.  And that's

7    a 2005 Michigan Supreme Court case.

8            MS. LEVENS:  Yes, Your Honor.  Plaintiffs in our

9    briefing recognize that we need to show a current actual

10   injury, not just the potential for a future injury.  Our

11   experts have established using accepted methodologies that all

12   children in Flint were exposed to lead and as a result were

13   damaged.

14           I also think regardless of whether or not the Court

15   certifies a (b)(3) class of minors, in the event that there is

16   a successful liability determination, defendants will have

17   their opportunity to bring forward individual defenses whether

18   it's against individual class members in some kind of

19   coordinated proceeding or as to any certified subclasses.

20           To the extent that a minor after that process would

21   be deemed to have not be injured or damaged, they would not

22   qualify to partake in the medical monitoring program.  So I

23   think that this is distinct in that way.

24           THE COURT:  Okay.  Thank you.

25           Is there anything else you wish to respond to from

1    Mr. Wittie or Mr. Nguyen-Dang?

2            MR. NOVAK:  May I speak for just a quick moment in an

3    additional response?

4            THE COURT:  Oh, Mr. Novak.

5            MR. NOVAK:  This is Paul Novak on behalf of class

6    plaintiffs.

7            THE COURT:  Sure.

8            MR. NOVAK:  To your question about Henry v Dow,

9    there's also a neurotoxicological difference between exposure

10   to lead in this instance and the exposure that was at issue in

11   Henry v Dow.

12           In that instance, dioxin may be carcinogenic and

13   cause cancer, but it does not cause cancer in everyone who has

14   been exposed to it.  And so the injury question is still

15   individualized.

16           Lead, on the other hand, the overwhelming scientific

17   literature demonstrates that there are really no children who,

18   when exposed to lead, are not injured in some fashion.  And so

19   I think that is an important factual and neurotoxicological

20   distinction between the current case and Henry v Dow.

21           THE COURT:  Thank you, Mr. Novak.

22           In other words it's something that plaintiffs have

23   said all the way through this case.  There's no safe level of

24   lead to be exposed to.  Okay.  Thank you.

25           MR. NGUYEN-DANG:  If I might respond to that, Your

1    Honor?

2           THE COURT:  Sure.

3           MR. NGUYEN-DANG:  Just a couple of thoughts.  The

4    first is, as you know, plaintiffs here, their case depends on

5    a series of experts.  And we have not actually completed the

6    briefing on those experts.  And we have challenged all of them

7    and we have explained in extensive details the flaws in their

8    methodologies.

9           THE COURT:  I'm aware of that.

10          MR. NGUYEN-DANG:  So to the extent the Court wishes

11   to certify any class that depends on those opinions, we would

12   have to complete that process first.

13          THE COURT:  Yes.  And I'm glad you reminded me of

14   that.  Because at the conclusion of our hearing today, I want

15   to talk about my thoughts on I think we have 12 remaining

16   Daubert motions challenging -- well, we had 14 challenging all

17   14 of plaintiffs' experts.  Two of those were addressed in a

18   hearing a couple of weeks ago and we have 12 left.

19          So my thought, I'll just put it out there right now

20   so you can think about it, is that for those that I don't

21   need, and this particular issue if I do think that a class is

22   appropriate for injunctive relief for medical monitoring, if I

23   do think Michigan law supports that, I would probably have to

24   rely on I think it's Dr. Hu, H-U.  In which case -- is that

25   the right person?

1            MR. NGUYEN-DANG:  Yes, Your Honor.  But then also the

2     chain of experts that lead up to Dr. Hu.  So Dr. Goovaerts,

3     Dr. Weisel.  There might be another -- Dr. Lanphear.

4            THE COURT:  Okay.  Good point.  So if I were to think

5     that that's the direction to go in, I would finish the

6     briefing on that and hold those hearings first.

7            And my thought is that if I don't go in the

8     direction, in that direction, then what I would do is deny as

9     moot the 12 motions and ask the parties to go back to the meet

10    and confer table to put together an amendment to our case

11    management order that would discuss when those would be

12    re-filed, if they're going to be used in later stage, and when

13    those would be addressed.

14           So I'll just put a placeholder to have you all

15    thinking about that.

16           MR. NGUYEN-DANG:  That makes sense, Your Honor.

17           THE COURT:  Good.

18           So Ms. Levens, was there anything further?  I think

19    Mr. Novak responded.

20           MS. LEVENS:  Mr. Novak did an able job, unless Your

21    Honor has questions.

22           THE COURT:  Not right now.

23           So what we'll do is take about a four or five minute

24    break.  So please don't log out and then we have to put you

25    back in.  You can turn your cameras and microphones off and

 1    we'll be back in five minutes.

 2                        (Brief Recess)

 3         THE COURT:  We're back on the record.  And we will be

 4    turning to whether a (b)(3) damages class can be certified.

 5         MR. MORRISSEY:  Your Honor, I'll be addressing that

 6    issue.

 7         THE COURT:  Okay.

 8         MR. MORRISSEY:  And if you'd be inclined to hear it

 9    I'd be happy to start with an overview argument before any

10    questions.

11         THE COURT:  Sure.

12         MR. MORRISSEY:  Defendant's opposition to the (b)(3)

13    damages class relies largely on a myth that classes are not

14    properly certifiable in mass tort cases.  There's a robust

15    body of case law both within the Sixth Circuit and across the

16    country that shows that assumption is false.

17              There are two paths that courts have taken within the

18    Sixth Circuit in cases like this one where the core liability

19    issues of duty, breach, causation are common.  One is the path

20    that the Sixth Circuit recently confirmed in Behr where the

21    court, the district court elected to certify a (c)(4) issue

22    class.

23              The other is the more common path recognized by

24    Whirlpool and Bentley and Sterling and other cases throughout

25    the country.  Certified a (b)(3) class allowing the case to

1    proceed through summary judgment and towards trial and a trial

2    whichever issues may be adjudicated collectively and then

3    allowing any individualized damage issues to be resolved in

4    subsequent proceedings.

5           This case falls into that second category with

6    respect to the property subclass for several reasons.

7           I think one case that's particularly instructive that

8    we cite in our case is the Cook v Rockwell International case

9    from Denver involving the Rocky Flats nuclear arsenal in the

10   Denver area.  That litigation went on for two decades.

11          There was a class trial at one point that resulted in

12   a verdict in a class action after trial that included

13   diminution and property value claims arising from exposure to

14   radioactive materials from that site that flowed into

15   surrounding areas.

16          That case went up to the Tenth Circuit.  The class

17   action decision at one point was decertified.  It was then

18   went back down to the district court.  It was then revised.

19   It went up to the Tenth Circuit which remanded with

20   instructions to reconsider class certification again.  And

21   while that decision was pending and the Court was considering

22   reinstating the verdict, the case settled.  Fortunately for

23   this case --

24          THE COURT:  Let's not talk about cases that take 20

25   years.

1          MR. MORRISSEY:  Hopefully we don't get there.  And

2     the reason we don't need to get there here is that we have a

3     robust damages model for the property class that calculates

4     damages in several methodological ways.

5          And it's predicated by -- and to go back to Your

6     Honor's question from the beginning of the day -- a common

7     evidence of exposure to highly corrosive water on a uniform

8     basis throughout the class area.  And that's from

9     Dr. Russell's report which has already survived a Daubert

10    motion.

11         And in this portions of his report was not even

12    subject to a Daubert motion.  At pages 13 and 68 to 72 of his

13    report, what Dr. Russell opines is that everyone in Flint was

14    as a result of these engineers' conduct exposed to highly

15    corrosive water that compromised pipes and fixtures.  And

16    based on that --

17         THE COURT:  Didn't we also learn in looking at that

18    briefing -- at that report and the briefing surrounding it

19    that every individual home had different type of solder,

20    different -- many had a variety of different types of pipes at

21    different points?  Is it not quite individualized for each

22    property?

23         MR. MORRISSEY:  There are some individual allocation

24    issues, which is common in any class action.

25         THE COURT:  Right.

June 2, 2021                                                  58

 1          MR. MORRISSEY:  That there are variations with

 2   respect to the amount of damages.  But there are methodologies

 3   here for calculating aggregate damages and then the amount

 4   that any particular person would put in for a claim would be

 5   the subject of a subsequent proceeding.

 6          And the key here is that every brass fixture up until

 7   2014, the beginning of this class period, there aren't homes

 8   in this period that were built after that.  If there were,

 9   they can't be more than a handful of homes built in Flint in

10   2014/2015.

11          Brass fixtures had high lead content up until 2014.

12   And every brass fixture in the community was subjected to

13   highly corrosive water that compromised its integrity.  And

14   the only way to address it is replace those in each and every

15   home.  Some homes also had lead solders.  Most of them did

16   because that was the case for all homes up until I believe

17   it's 1996.

18          So almost all of the homes in the class area also

19   have lead solders.  And then there's the 20 percent of homes

20   that further were serviced by lead service lines.  So we have

21   -- and that's the predicate for the Gamble/Pogorilich

22   class-wide damage model that requires replacement of pipes and

23   fixtures throughout the class area and provides the

24   methodology for calculating those damages.

25          That's one of the two categories of classified

1    damages.  The other is Professor Keiser.  Professor Keiser is

2    an economist who's done something that is very rare --

3          THE COURT:  Let me ask you -- let me just go back one

4    step to make sure I understand.  So what we're now talking

5    about is the subclass of property owners, residential property

6    subclass.  Tell me what the types of damages you're seeking

7    under that subclass are.

8          MR. MORRISSEY:  Yes.  The first category which I just

9    mentioned is those calculated by Mr. Gamble, which are

10   replacement of pipes and fixtures in homes throughout the

11   class area.  And he then quantifies that.  He's assisted by

12   Pogorilich who offers a separate opinion that categorizes the

13   cost of some of the categories of remediations that are

14   required.

15         The second category is based on Professor Kaiser's

16   regression analysis of the diminution and property values

17   throughout Flint which concludes based on a statistical

18   analysis that he actually conducted before we ever met him.

19   This is one of the -- certainly the only case in my experience

20   where I encountered an expert who'd done nearly all of the

21   work needed for his expert report before I ever contacted him.

22         He had -- this is something that Professor Keiser

23   along with his colleagues who are all Yale trained

24   economists -- Professors Christensen and Lade -- had studied

25   the economic impact of the water crisis on residential home

1     values in Flint comparing them to control cities that had

2     similar demographic and economic characteristics for the same

3     period.

4            And then quantifies, A, that each and every home was

5     impacted by the crisis.  And B, the amount of that damage.  He

6     does that on a class-wide basis.  He also opines that he could

7     in a rather straightforward fashion measure the amount people

8     paid out of pocket for water bills.  That's a third category

9     of damages.

10            So we have Professor Keiser and his opinion, which is

11    based on largely the existence of the Flint water crisis and

12    the question of whether defendant's professional negligence

13    caused it.

14            Then calculates harm on a class-wide basis to the

15    residential property subclass, the definition of which I guess

16    could be tweaked to clarify that it includes people who

17    purchased homes after April 2014 and before the end of the

18    crisis.  Those people are already subsumed within the

19    definition.  I wouldn't agree we Mr. Bishop's characterization

20    that it's some fundamental flaw in the proposal for our

21    certification of this class.  It's simply a tweak to the

22    notice language.

23            THE COURT:  So what I hear you arguing is that you

24    have powerful evidence in statistical form about the

25    diminution and value of Flint homes, the lack of value in the

1    water that individuals paid for.

2         But doesn't -- wouldn't this still require highly

3    individualized and particularized inquires and evidence

4    related to whether a particular home has a brass fixture or a

5    lead solder?  Why wouldn't that overpower the big picture?

6         MR. MORRISSEY:  I think the analogy could go to any

7    number of class actions where there are individualized damage

8    inquiries that would take place after trial, after the

9    polyurethane foam case that involved any direct and indirect

10   purchaser of polyurethane foam throughout the country.  The

11   auto parts class action in Detroit that involved every

12   conceivable component of an automobile and classes of direct

13   and indirect purchasers of those.  We do as much as they --

14        THE COURT:  But there we know that every plaintiff or

15   every claimant, every individual in that class was harmed by

16   polyurethane or whatever it is.  And here we know that the

17   lead was -- I mean, the water was corrosive.  We know there

18   were high lead levels.  But as I understand it, it was still

19   quite varied here.

20        So you're saying, well, this is just like the

21   polyurethane or having a bad part in my car because we know

22   there was harm and then I have to show in the auto parts or

23   the polyurethane was the harm was to me.

24        MR. MORRISSEY:  Based on -- the combination of

25   Russell and Gamble get you that each and every member of this

1    class needs the pipes and fixtures in their home replaced on a
2    class-wide basis.  And the aggregate amount of those damages
3    that allows you to proceed through trial on liability and
4    aggregate damages on a class-wide basis.
5           Of course if we get there, the defendants have
6    throughout claimed they did nothing wrong.  And presumably in
7    our case we'll bring a summary judgment motion at some point.
8    And if they prevail on that, we obviously don't get there.
9           THE COURT:  Well, you have a preview of that motion
10   because it's been filed in the bellwether cases by both
11   defendants.
12          MR. MORRISSEY:  Understood.  And we welcome the
13   opportunity to respond to such a motion in due course based on
14   the evidence throughout discovery.
15          THE COURT:  Okay.
16          MR. MORRISSEY:  But all of those issues through
17   summary judgment, through trial, through aggregate damages on
18   Gamble's methodology and on Keiser can be adjudicated on a
19   class-wide basis.
20          And sure, just as some purchaser of foam or some
21   independent car dealer may have more purchases than others and
22   some person might have a bigger house or a smaller house in
23   Flint, at the claims administration phase after aggravated
24   damages is when those allocation issues are proven up.  And
25   when the defendants will be able to, you know, put in

1        individualized defenses at that stage as well.

2                But there will be -- this is a case that as in the

3        Rockwell case, as in -- as the court suggested could be done

4        in Whirlpool, as in Olden, as in Bentley v Honeywell, as in a

5        host of cases, the case is suitable for certification as a

6        (b)(3) case.  For proceeding towards trial with as much of it

7        as possible for we believe proceeding through a trial on

8        aggregate damages before there's any need for any

9        individualized issue.

10               And it could well be that the case resolves itself as

11       most do one way or the other before you get to that claims

12       administration phase.

13               THE COURT:  Yeah.  But I can't assume that.

14               MR. MORRISSEY:  No, no.  But the question is what's

15       the most suitable and efficient way --

16               THE COURT:  Right.

17               MR. MORRISSEY:  -- for this case to proceed.

18               Is this superior to the alternative of no case at

19       all?  Or endless mini trials of relatively small property

20       claims?  Is this something that can be done in a common

21       class-wide fashion for the foreseeable future and likely

22       through trial?

23               And a trial that in this case based on the evidence

24       we've gathered and the evidence we would present at a trial,

25       we think this case can be tried efficiently as to the

1    defendants' conduct, the harm it caused, the aggregate damages

2    it caused to the class.

3          THE COURT:  And what about defendants have told me

4    that they have individualized defenses regarding intervening

5    causes, superseding causes of lead poisoning with respect to

6    individuals and their homes.

7          How would this not require mini trials in any event

8    so that those defenses can be heard with respect to individual

9    homes?

10         MR. MORRISSEY:  I haven't heard any individualized

11   defenses with respect to either corrosive water, anyone being

12   exposed to corrosive water, or even the amount of whether

13   corrosive water would result in lead contamination.

14         There has been a suggestion that there were periods

15   where the lead content and in Flint was fine in prior periods

16   before the crisis.  There's this sludge analysis that

17   Dr. Edwards does.  That's not a defense to the fact that there

18   was corrosive water during this period as a result of the

19   defendants' conduct that was sufficient to compromise these

20   pipes and fixtures such they need to be will replaced.

21         It's essentially an eggshell plaintiff defense that's

22   not tenable as a matter of tort law.  And whether that

23   eggshell plaintiff defense is tenable as a matter of tort law

24   is a question that may well be adjudicated on summary subject.

25   It's not a question that's ripe for consideration now or that

1    bears on whether the class should be certified.

2             THE COURT:  Okay.  Thank you.

3             And Mr. Campbell, who's responding on this issue?

4             MS. PEASLEE:  Your Honor, before --

5             MR. CAMPBELL:  Bishop is.

6             MS. PEASLEE:  Oh, I'm sorry.  I was just going to say

7    before you respond, if you have questions specific to the

8    business subclass, I'm happy to respond to those.  But I will

9    say that Mr. Morrissey has done a very able job with respect

10   to property.  And candidly I would expect your line of

11   questions for businesses to be very similar and our responses

12   are as well.  So I'm also happy to --

13            THE COURT:  Okay.  I'm glad you brought that up.

14   Because with regard to the business subclass, I think the

15   briefing was even more insistent or that there would be --

16   that some businesses suffered, some didn't suffer, some

17   suffered for a little while, recovered quickly, didn't

18   recover.  Some required water.  Some don't require water.

19            I mean, how does the business subclass not really

20   require mini trials as to causation of their damages?

21            MS. PEASLEE:  Sure Your Honor.  As we explained in

22   Professor Simons' report, as with the case with property, you

23   can assess the aggregate damages based on impact of the water

24   crisis.  And he does that by quantifying the effects of change

25   in consumer behavior for restaurants and other consumer

June 2, 2021

1   oriented sub factors.  And then once you --

2          THE COURT:  So a shoe store.  How's the shoe store

3   doing during the crisis?

4          MS. PEASLEE:  Your Honor, if what you mean by that is

5   why would a shoe store be impacted by the Flint water crisis.

6          THE COURT:  Yeah.

7          MS. PEASLEE:  If fewer people are coming to Flint

8   because Flint is now synonymous with poisonous water, then the

9   shoe store may very well be impacted by that.

10          But your point is taken that different sub sectors,

11   for instance a restaurant versus the shoe store, may not be

12   impacted in exactly the same amount, which is why Professor

13   Simons' report does look at sub sector by sub sector.

14   Restaurants and shoe stores would be sub sectors.

15          But taking that, then I think the point that Mr.

16   Morrissey made with respect to property and the fact that

17   certain businesses may have some preexisting factors that make

18   them more susceptible to harm is not a defense under Michigan

19   tort law to simply negating liability.

20          THE COURT:  Oh, absolutely not.  No.  I wasn't

21   thinking that.  I'm just looking at what's a superior method

22   and where are the common issues in terms of damages, whether

23   there are more individualized issues such that individual

24   lawsuits make more sense in this area or not.

25          Are there any ways in which we're materially advanced

1      on a damages by having a damages subclass or whether we still

2      would have to have the same amount of effort go into

3      individual determinations.

4            So I'm not doubting at all that with respect to

5      Mr. Morrissey's group of homeowners that there was serious

6      consequences for them or for your group of commercial

7      entities.  I'm not doubting that at all.  I'm only trying to

8      figure out what's permitted under the Rule 23 jurisprudence in

9      a situation like this where there are some highly

10     individualized determinations about causation.

11           But so that's where we are.  But thank you.  I'm glad

12     you spoke up.

13           MS. PEASLEE:  Thank you, your Honor.

14           THE COURT:  Yes.  Okay.

15           So where were we for a response?  That's Mr. Bishop.

16           MR. BISHOP:  Yes, Your Honor.  Thank you.

17           Obviously we agree with you, Your Honor, that we

18     don't think the case should get past summary judgment because

19     we don't think there's a duty here.  But were there to be a

20     trial, what Mr. Morrissey has described is a fantasy.

21           It's a fantasy because it assumes that his experts

22     are correct with their theories.  But we know that they're

23     not, all right.  Cause Dr. Gardoni did not even address injury

24     or causation.

25           And the Russell claim that all pipes and plumbing

1    were irreparably damaged has to be judged in the light of our

2    expert's contrary review.  Duquette and Gagnon.  And what she

3    stated was to review evidence of inspections of two class

4    representations, Davis and Kelso, and concluded that in

5    neither of those properties was there any significant damage

6    to the properties from corrosion or lead.

7          And we would be entitled under Lindsey and Normet,

8    which gives us a constitutional due process right to introduce

9    individualized evidence to rebut these expert claims.  We have

10   a right under the Rules Enabling Act not to be foreclosed in

11   our ability to present our defenses by the use of the class

12   action device to do that.  And we certainly would.  Because we

13   believe that these expert reports can be refuted by showing

14   that individual's, some did not suffer injury toward.

15         This is not a question just about damages.  This is a

16   question about fact of injury.  Some were not injured.  And

17   they were injured in different -- those who were injured were

18   injured in different amounts.  And it's --

19         THE COURT:  And I guess what we're talking about, Mr.

20   Bishop, is not adult personal injury.  And let's assume right

21   now that a damages subclass cannot be certified for minors.

22         MR. BISHOP:  Right.

23         THE COURT:  So now we're only looking at what

24   Mr. Morrissey and what Ms. Peaslee talked about.

25         MR. BISHOP:  And that is what our experts Duquette

June 2, 2021

1    and Gagnon did.  They reviewed evidence from inspection of two

2    class reps' homes, their properties.  And they concluded that

3    there was no damage to those properties.

4        And we will be entitled to repeat that exercise to

5    refute this claim that all properties were suffered injury and

6    that they all need to have their pipes replaced.  We don't

7    think that's the least bit plausible and nor do our experts.

8        I should just say, Your Honor, and just go back to a

9    point that you discussed with Mr. Nguyen-Dang earlier that the

10   plaintiffs' claims about property damage and business losses

11   depend on four experts.  Simons, Keiser, Pogorilich, and

12   Gamble that Mr. Morrissey has mentioned.

13       We haven't finished briefing the Dauberts on them.

14   We haven't had argument on the Dauberts.  You haven't decided

15   the Dauberts.  So no class -- no (b)(3) class on those two

16   classes can be certified.

17       But we don't think that there's any need to complete

18   those Dauberts in order to deny these (b)(3)s.  Because they

19   can be denied on the basis that causation, injury, and damages

20   are all highly individualized.  And the idea that this can all

21   be done in a few week trial depends on the fact --

22       THE COURT:  No one said a few weeks.

23       MR. BISHOP:  Well, I think plaintiffs have at some

24   point said that.  That we will be foreclosed from presenting

25   our individualized evidence.  When we do present that

June 2, 2021

1    individualized evidence, this becomes a highly unmanageable

2    trial and certainly not superior to the alternatives.

3          And the damages that are being alleged here are not

4    insignificant.  What the plaintiffs claim is that basically

5    you have to rip out all the plumbing and all the supply lines

6    to homes and to replace them.  Not an insignificant cost

7    presumably.  And they're claiming using some uniform formula

8    across 26 different types of business loss of revenues there.

9          I should talk about that evidence relating to lost

10   profits.  So that depends on Dr. Simons who selected these 26

11   industry sub sectors.  Our experts challenge that.  But

12   essentially what he's done is to look at their revenues and

13   say that anyone who's lost revenues, lost revenues as a result

14   of the crisis.

15         THE COURT:  Right.

16         MR. BISHOP:  And that's obviously wrong because one

17   of the named plaintiffs, 635 South Saginaw, did not lose

18   revenues but they claim that they're entitled to damages here.

19         Plaintiffs' response was to say that Dr. Simons could

20   supplement that analysis using business income statements.

21   What that proves I think is what is obvious here, which is

22   that a loss of revenues doesn't tell you anything about the

23   connection between the business's success or failure and the

24   Flint water crisis.

25         It shows that the analysis is individualized.  It

1   will depend on the overall economy.  It will depend -- in that
2   particular sector.  It will depend on the aptitude of the
3   particular business owner.  The fate of a business in the face
4   of a crisis cannot be determined when some formulaic fashion.
5   And we will be entitled to investigate as to each business
6   claimant, the reasons for any loss of revenue or profits that
7   they have suffered.
8           So I say allocation of fault here, which Your Honor
9   mentioned, is individualized as well.  Determining whether
10  VNA's conduct was a substantial factor in causing injury --
11          THE COURT:  But VNA can show that at trial.  You can
12  -- at trial you've already filed multiple nonparty notices of
13  fault.  And so you'll certainly be entitled to assign fault to
14  others at trial.
15          MR. BISHOP:  Yes.  But that will depend not just on
16  the relative conduct of others and the timing of that relative
17  conduct of others, but also the nature of the specific
18  injuries for the individual plaintiffs.  So it's not -- it's
19  individualized issue.
20          So what you have here is individualized issues in
21  which we're entitled to investigate at trial involving fact of
22  injury, causation, not what the sliver of causation that you
23  discussed earlier that we'll be talking about on the issues
24  class which we don't think can be certified there even.  But
25  real causation.  Causation in fact.  Proximate causation of

1    injury.  And damages and allocation of fault.

2           And you know it's telling that Mr. Morrissey's

3    example, he starts off with Rocky Flats, a case that twice

4    went on 23(f)s to the Tenth Circuit.  And this analogy to

5    Whirlpool is also telling.  Because this case is much more

6    like American Medical than it's like Whirlpool.

7           So Judge Stranch explained in Whirlpool that not only

8    were there common issues as to whether Whirlpool had a duty to

9    warn of the mold risk and whether it breached that duty, but

10   that the mold problems occurred regardless of the model of

11   washer and regardless of consumer laundry habits or remedial

12   efforts.

13          And so the injury and damages questions were common

14   to all of the consumers.  We would show here at trial that

15   that is not the case.  Our experts have shown that that is not

16   the case.

17          So we don't think that a (b)(3) class can be

18   certified on the say so of highly contested evidence from

19   experts who we think are wrong and the reputation of who will

20   take the form of experts on our side who analyze

21   individualized facts about the plumbing, about the supply

22   lines, about the value of the properties, which of course is

23   going to differ.

24          In fact, there is no injury to someone's whose

25   property, even if it was devalued, if they didn't try to

June 2, 2021                                                    73

1    monetize that property during the class period and if the

2    property returned to the full value later.  Valuation

3    questions have to be determined in the context of the broader

4    market on what is happening in the economy.  The features of

5    the particular property.

6              THE COURT:  Okay.

7              MR. BISHOP:  In those cases like Gates and Ebert do

8    not allow, in fact very rarely, a property classes certified

9    because of those valuation issues.

10             So you know, in American Medical, the defective

11   prosthetics varied from plaintiff to plaintiff and their

12   injury could be attributed to different actors, different

13   actions.  That's true with regard to both the property,

14   proposed property class and the business classes.  So we don't

15   think that a (b)(3) is appropriate for either of those.

16             And that since highly individualized inquiries will

17   dominate at any trial, that is more effective to treat these

18   on an individualized basis and have individual trials

19   particularly in the context which we'll talk about more when

20   we talk about issue passes of the existence of a robust

21   process already in place for individuals.

22             THE COURT:  Okay.  Thank you, Mr. Bishop.

23             Do we have any -- do we have Mr. Wittie?  Anything

24   you want to add?

25             MR. WITTIE:  Yes, Your Honor.  And I'll try to be

1    brief because I mostly agree with Mr. Bishop's statements and

2    I'll try not to repeat these, repeat what he has said.

3            I think it is important to conceptualize the things

4    we've been talking about back in terms of the Rule 23

5    requirements.  Plaintiffs believe that just because they have

6    produced, you know, what they call a common class-wide

7    evidence of injury, that that concludes the issue in their

8    favor as far as class certification is concerned.  But that's

9    an incorrect view of Rule 23.

10           It would if these experts' opinions were ultimately

11   deemed admissible by the Court or even accepted by the Court

12   as credible in terms of predominance.  It would not, you know,

13   determine the substantive issues in the case.

14           The defendants would still be entitled on an

15   individualized basis to show that a particular property was

16   not affected by the actions of the defendant with regard to

17   the Flint water crisis.  Would be entitled to show that, for

18   example, that previous water or lead spikes was the cause of

19   the property damage where property damage did, in fact, occur.

20           There are many other individualized assessments that

21   would be made at the pre damages stage.  And there's no way

22   consistent with due process that this can be done on any way

23   other than an individualized basis.

24           And the Court must recognize that when considering

25   whether the predominance requirement, which is as the Court is

1    aware is a qualitative requirement which basically requires

2    the Court to imagine how the trial of that particular claim

3    would actually be conducted in real life.

4            And that's what the Sandusky Wellness Center case of

5    the Sixth Circuit teaches us.  And that includes evidence

6    purely, you know, brought in on a defensive issue or to rebut

7    an issue like this upon which the plaintiffs have the burden

8    of proof as it was in, again, the Sandusky decision.  Those

9    have to be taken into account too both in determining whether

10   predominance and superiority exist.

11           Now here I think it's a legitimate question about

12   whether the plaintiffs have even shown that fact of damages is

13   a common issue that they have any common evidence of damages.

14   All they have is aggregate evidence of damages for both the

15   property value and business damages proposed subclasses.

16           THE COURT:  Well, I think they're saying that if we

17   have powerful evidence of aggregate damages, the individuals

18   that make up the aggregate must have suffered and there will

19   be a separate process to determine the allocation of any

20   damages award.  I think that's the way I'm seeing it.

21           MR. WITTIE:  Well, that would be an impermissible

22   inference.

23           THE COURT:  Well, possibly.

24           MR. WITTIE:  To state that simply because there was

25   some loss of business in Flint over a particular period of

1    time, and even if some of that loss of business could be

2    fairly attributable to the Flint water crisis, and even if

3    some of that were attributable to the defendants, then a

4    particular -- particular business's loss must therefore in

5    some degree have partaken of that aggregate loss.

6         That's a fluid recovery type theory that the courts

7    have routinely rejected in cases like this.  And I would point

8    the Court to the McLaughlin v American Tobacco case from the

9    Second Circuit that we have cited as well as other cases.

10        Now the types of cases where this kind of aggregate

11   award have been permitted are like in the antitrust field

12   where everyone has been harmed the same way.  If you purchased

13   a particular product, which was subject to an antitrust

14   violation, then every purchaser by definition, assuming they

15   meet the class definition, would have sustained some level of

16   harm and therefore you really only have a quantum issue by

17   definition.

18        But that's not necessarily true in a pollution type

19   situation or, you know, in a product situation where the

20   allegation is not simply risk of loss like in Whirlpool where

21   the risk itself lead to, you know, diminution of value of the

22   product relative to the value that the consumers paid for.

23        So it was an entirely different type of claim

24   altogether.  When we're looking at claims of this type, those

25   type of aggregate damages awards are generally not permitted

1    and we don't think could be allowed in this kind of case

2    consistent with due process.

3          Now with respect to the business subclass, I think

4    it's fair to say that, you know, it's going to depend entirely

5    on the kind of business that a person is doing.  One can

6    easily imagine a store doing --

7          THE COURT:  Well, the response to that is, well, we

8    had it broken down by general sectors of the economy.

9          MR. WITTIE:  That's true, Your Honor.  And I think

10   it's telling that those sub sectors don't even cover the

11   entire economy.  And therefore is a tacit acknowledgment that

12   some sectors wouldn't have sustained any loss at all.

13         But beyond that, you know, an individual store that

14   sold bottled water, say, or filtration systems, you know,

15   might have actually benefited from the Flint water crisis.

16   It's impossible to tell on a mass aggregated basis whether the

17   loss, even if we concede for the purposes of argument that

18   there was an aggregate overall loss was sustained by any

19   particular business.

20         There's simply no way of doing that without going

21   into, you know, the records of those particular businesses.

22   And if you have to do that in the individual cases, then

23   you've destroyed every efficiency advantage that the class

24   proposal would seek to foster and you've done no one any

25   favors.

1          THE COURT:  Okay.

2          MR. WITTIE:  Just one thing on the water bills.

3          THE COURT:  Sure.

4          MR. WITTIE:  Because nobody has really talked about

5    that very much.

6          THE COURT:  About what?

7          MR. WITTIE:  The water bills.

8          THE COURT:  Oh, the water bills, yeah.

9          MR. WITTIE:  The water bill theory.  You know, that

10   depends upon the assumption that the water that persons

11   acquired was completely valueless.

12         THE COURT:  Well, here's where your argument -- I

13   think we should stop where you started.  Here's where your

14   argument I think gets into some difficult territory.  Because

15   your brief suggested that the water that was received, the

16   lead tainted, fecal coliform tainted water that's alleged to

17   have gone into people's homes was not without value because

18   they used it.

19         And we live in a situation in the State of Michigan

20   where we don't have a choice over our municipal water supply.

21   So I can't say if I lived in Flint, I don't think I'll use

22   Flint water.  I think I'll use Ann Arbor water.

23         So you're suggesting that just because people

24   continued and didn't just have the water supply cut off to

25   their home that it must have provided them value?  And I

```
 1    just -- that's not the world I'm living in where you can just

 2    cut off the water and continue to live properly in our

 3    society.  It just doesn't happen.  So let's not go any further

 4    on that argument if that's the direction you're going in.  Is

 5    that -- that was in your brief.

 6          MR. WITTIE:  Well, that's not exactly the argument

 7    that is being made.

 8          THE COURT:  Okay.

 9          MR. WITTIE:  And I will say that having lost my water

10    supply as a result of the frequent storm down here in Texas a

11    few days ago, I'm certainly sympathetic to a loss of water

12    supplies and what that means to folks.  I don't mean to

13    downgrade that.  But the fact of the matter is that the water

14    was useable for certain purposes.  Hydration, lawn watering,

15    bathing, things like that.

16          THE COURT:  Well with respect to bathing, I mean,

17    people have reported, I mean, in the record that they had skin

18    irritations, loss of hair and so on.  So I think you are going

19    in the direction that I don't -- I think I've heard enough on

20    that particular subject, that the water was valuable because

21    it continued to flow.  So let's not -- let's not do -- go in

22    that direction.

23          So but thank you, Mr. Wittie.  I think there are

24    other issues that I appreciate that you elaborated on.

25          Now there's time for rebuttal but what I think would
```

June 2, 2021

1    be most helpful to me -- unless Mr. Morrissey or Ms. Peaslee

2    there's something you want to say.

3           MR. MORRISSEY:  There were a couple of points, if I

4    can cover into, Your Honor.

5           THE COURT:  Okay.

6           MR. MORRISSEY:  First I think Mr. Bishop's argument

7    elided over the Court's ruling on the Daubert motion with

8    respect to Mr. Russell, Dr. Russell.  And the fact that we

9    have evidence class wide of everyone receiving uniformly

10   corrosive water and impacting at least the faucets in every

11   home in the city.

12          THE COURT:  Yeah.  But I think Mr. Bishop is saying

13   you do have that evidence.  But that by the time it reached

14   individual homes, they each -- they were different from the

15   main line to their home and inside their home were different

16   utilities, different types of pipes in everyone's homes,

17   different types of solder.  And so on.

18          And so what I understood him to be saying is we don't

19   gain any efficiencies from certifying a class where we still

20   would causation with respect to individual homes and also

21   businesses would be so individualized.  Even though you know

22   big picture Russell and others are saying everyone was harmed

23   by this, we still have a big leap to go to how each one was

24   harmed.

25          MR. MORRISSEY:  To be fair, Your Honor, and

 1    incredibly straightforwardly, each and every home has faucets

 2    cost.  They cost a few hundred bucks to replace.  Mr. Gamble

 3    has calculated how much that is.  They all received highly

 4    corrosive water and their life span was shortened as a result

 5    of their --

 6          THE COURT:  But we're not talking about their life

 7    span.  You told me that.  We're talking about the damage to

 8    their property, not to them.

 9          MR. MORRISSEY:  No.  The life span of the faucets.

10          THE COURT:  Oh, okay.

11          MR. MORRISSEY:  As a result of their exposure to this

12    corrosive water, they need to be replaced to prevent future

13    leaking of lead into the homes.  That's Dr. Russell's opinion.

14    That's what the damage models calculated based on -- it's a

15    class-wide methodology based on proof of injury to each and

16    every class member which distinguishes it from the two cases

17    that counsel highlighted.

18          Gates, which involved air modeling over 34 years and

19    differences as to whether people were even exposed to this air

20    pollution.  Behr, which involves vapors emanating from a

21    lagoon and whether there was a dispute as to whether people

22    had been exposed to those vapors.

23          And American Medical, which I heard at least twice

24    during the argument, was the case involving penile implants

25    and differences as to whether how each and every surgeon

June 2, 2021                                                    82

1    implanted that highly individualized device.

2              THE COURT:  Okay.

3              MR. MORRISSEY:  That's not this case.  This is a case

4    with uniform exposure to highly corrosive water and a method

5    for calculating damages both by Professor Keiser, who finds

6    that each and every home had diminished property values and

7    Dr. Russell combined with Gamble and Pogorilich who find that

8    each and every home need their pipes and fixtures replaced.

9              THE COURT:  Okay.  This is very helpful.  That's why

10   we're having oral argument.

11             So why don't we move on now to the issue of our

12   (c)(4) issues class certification.

13             MS. PEASLEE:  Your Honor, may I just add one -- I

14   will be very brief.

15             THE COURT:  Sure.

16             MS. PEASLEE:  With respect to specifically the

17   business loss report, Mr. Bishop referenced that Mr. Simons

18   simply assumes all losses suffered by any business in Flint

19   are attributable to the water crisis.  You have our report and

20   our briefings, so I won't belabor this.  But that's not the

21   case.

22             He has compared them to other cities in Michigan as

23   well as to the greater Genesee County and applied a

24   significance factor test to that.  The other point that I

25   wanted to address was with respect to this idea that aggregate

1    damages are not permissible.  Mr. Wittie is completing

2    aggregate damages and fluid recovery.

3              McLaughlin dealt with fluid recover.  In that model,

4    any funds that were left over from specific claims would be

5    distributed on a cy-pres basis.  That's not what we're

6    proposing here.

7              THE COURT:  Right.

8              MS. PEASLEE:  In re Scrap Metal makes very clear that

9    sort of fluid recover is not permissible.  Aggregate damages

10   absolutely are a permissible calculation in class actions.

11             THE COURT:  Okay.  Yeah.  I've seen that.  Yeah.

12   Okay.  Thank you.

13             MS. PEASLEE:  Thank you, Your Honor.

14             THE COURT:  All right.  So going to the issue of a

15   (c)(4) issues class, let me -- who's arguing this for

16   plaintiffs?

17             MS. LEVENS:  I can address those questions, Your

18   Honor.

19             THE COURT:  Okay.  Thank you, Ms. Levens.

20             First of all, are the six issues that you've

21   identified in your briefing the issues that you think should

22   be certified?

23             MS. LEVENS:  Are you referring to the briefing in our

24   reply brief?

25             THE COURT:  Yes.

1          MS. LEVENS:  Yes, Your Honor.

2          THE COURT:  Okay.  And so here I understand you to be

3    saying that the evidence with respect to the first one, which

4    is what was the role of LAN, the role of Veolia in creating

5    the contamination of Flint's water supply, including their

6    involvement to switch to the Flint River as a water source,

7    refrain from using corrosion control, and then conceal

8    information, that with respect to that it would materially

9    advance the litigation.

10         It is common evidence that would be used for each and

11   every plaintiff in the case.  And that the same for your other

12   -- the next one is the standard of care, the scope of the duty

13   that's owed in a professional negligence case, the duty of

14   whether there was breach is number 3.  Number 4 is whether the

15   defendants' conduct caused the corrosive water, and the extent

16   to which other actors, what was their contribution with

17   respect to the corrosive water contributions.

18         Okay.  Let's look at number a 5.  Did the corrosive

19   water conditions caused by LAN and/or Veolia cause harm to

20   Flint residents properties and businesses?

21         So I'm sure we might have to rephrase that, you know,

22   if you find that there were corrosive water conditions caused

23   by LAN and Veolia.  But why isn't this -- let's assume right

24   now that I don't find a damages -- we're not going to have a

25   minor's class.  I can be pretty sure of that.  I'm going to

1    look carefully at the property and commercial loss subclasses

2    for damages.  But let's just assume for this argument that we

3    don't have that.

4             How does this not go directly into individual

5    causation?

6             MS. LEVENS:  I think that it leaves the door open for

7    individual causation to be addressed in subsequent hearings.

8    The purpose of including that is that, first of all, we do

9    believe we have classified common evidence of it.  And from

10   our perspective, the more issues that can be resolved on a

11   class-wide basis the better because it will --

12            THE COURT:  I know we have to avoid Seventh Amendment

13   reexamination issues.  And how doesn't that -- how does this

14   just not lead us right into a Seventh Amendment trap?

15            MS. LEVENS:  Plaintiffs would argue that whether or

16   not it could -- it caused harm to businesses, property, and

17   residents is distinct from whether the water caused harm to

18   any one specific business resident and property and that those

19   are distinct claims that could be tried separately.  But your

20   point is well taken, Your Honor.

21            MR. MORRISSEY:  Your Honor, if I may, since this

22   overlaps with the property issue.

23            THE COURT:  Sure.

24            MR. MORRISSEY:  I think if we cut down the brass

25   tacks of what the evidence would look like, Dr. Russell would

1    testify that water is highly corrosive.  It was distributed

2    throughout the city.  Each and every home that has a brass

3    fixture was impacted.  That would take place as an issue.  I

4    don't think that --

5            THE COURT:  But that's --

6            MR. MORRISSEY:  I don't think defendants' experts

7    even contest those aspects of Dr. Russell's opinions, that the

8    fact that corrosive water damages fixtures is not really

9    disputed by Mr. Duquette.  There's some dispute as to whether

10   the fixtures in particular homes were damaged.

11           Dr. Russell comes back and says that evidence

12   actually confirms what I said in the first place.  That's a

13   battle of experts that would take place on a class-wide basis.

14   There can then be individual damage issues of, you know, I

15   have a three-bedroom house or a four-bedroom house, I have six

16   faucets or two.  Those could be done in some subsequent

17   proceeding.  But there's a class-wide impact issue that would

18   be responsive to that question.

19           THE COURT:  Okay.  But I -- and how does that not

20   lend itself to a Seventh Amendment reexamination problem if

21   what we still will need to do, no matter what, is have a trial

22   that will look at individual causation?  Why wouldn't you be

23   retrying issue number 5?

24           And I'm 100 percent with you that simply using

25   similar evidence in an issues class in a later damages trial,

1     that's not a Seventh Amendment problem.  But retrying the

2     exact question would be a Seventh Amendment problem.  And when

3     you write this issue number 5 as cause harm to Flint

4     residents' property and businesses, that surely seems like

5     what you would prove in your damages trial.

6           MR. MORRISSEY:  In the subsequent damages trial you

7     would not need to reprove.  Assuming we got through trial.  We

8     established liability.  We established the water is corrosive.

9     We established that it impacts plumbing in any home that has

10    it, those issues would not be reexamined by a jury in a

11    subsequent trial assuming those individuals choose to have a

12    jury trial.

13          The question at that trial would be --

14          THE COURT:  But you've got question 6 --

15          MR. MORRISSEY:  -- do I have a brass fixture --

16          THE COURT:  Just a minute.  You've got question 6,

17    whether the engineering defendant's professional negligence

18    directly and proximately caused the Flint water system to be

19    contaminated with corrosive water and thereby result in

20    property damage to members of the classes.

21          MR. MORRISSEY:  That issue would be established on a

22    class-wide basis and wouldn't be reexamined at the individual

23    damages phase.  There's no need --

24          THE COURT:  Why do you need number 5 if you've got

25    number 6?  Why don't -- number 5 seems to me it just runs the

1    risk of causing a Seventh Amendment problem.

2         And do you have to use the terminology "caused harm"

3    as opposed to establishing that it's corrosive, that it

4    impacts brass pipes, or whatever you want in there, and then

5    the individuals will come in with their evidence of whether

6    they had brass fixtures and so on?

7         MR. MORRISSEY:  It gets you a class-wide finding of

8    fact of injury, which I think is helpful and advances the

9    litigation.  There could be offsets that would proven up on an

10   individualized basis.  There could be circumstances in a

11   particular home.  If someone, you know, remodeled their home

12   on their own, they might have an offset.

13        So there could be conceivably in that individual

14   phase some defense that would be put forward.  I'm speculating

15   because we haven't seen or heard of any of those that might

16   apply.

17        THE COURT:  Okay.

18        MR. MORRISSEY:  But having that fact of injury to

19   anyone who has lead soldered pipes and lead containing brass

20   fixtures which is, according to our experts, all or nearly

21   everyone in Flint established on a class-wide basis would

22   certainly streamline that subsequent phase and would not need

23   to be reexamined at any subsequent phase.

24        THE COURT:  Okay.  Anything else you want to say

25   about the -- it seems like we may want to hear from LAN and

1    VNA and then I can give you time to respond more broadly on

2    the issue class if you want.

3              MS. LEVENS:  That would be fine, Your Honor.

4              THE COURT:  Okay.  All right.  So Mr. Bishop.

5              MR. BISHOP:  Yes, Your Honor.  I'd like to spend some

6    time on the issue classes.  The problem in what we've heard,

7    it really goes back to the (b)(3) argument.  The problem with

8    what we've heard is it assumes that the expert evidence, the

9    plaintiffs have put in is correct and noncontestable and

10   establishes lots of different elements of cause.

11             That's not what a trial looks like.  What a trial

12   looks like is us contesting that using not only expert

13   evidence, which our experts say that Dr. Russell's theory is

14   incorrect.  And they say that based on individual

15   investigation of pipes in homes.

16             There is just -- it's fantasy to think that fact of

17   injury as to either of these subclasses is a common issue.

18   It's a highly individualized issue for the reasons that we've

19   discussed with (b)(3).  So from our perspective --

20             THE COURT:  Let me stop there.  I think that's an

21   important question and I don't want to lose sight of it.

22             So Ms. Levens, can you point me to a case similar to

23   ours, a mass contamination case in which a court has held that

24   fact of injury can be determined on a class-wide basis?

25             MS. LEVENS:  I think most opinions don't use that

June 2, 2021

1    language.  But Olden would be an example.  They certified an

2    entire liability class under (b)(3) and then reserved only

3    damages for subsequent proceedings.

4           That said, beyond the idea that the corrosive water

5    conditions would be harmful generally to homes, businesses,

6    and people, I do not think that any of the issues portend to

7    decide fact of injury especially as to personal injuries.

8           THE COURT:  Okay.  So you're saying none of these

9    questions try to establish that?  None of your six questions

10    try to establish personal injury or property damage?

11           MS. LEVENS:  Not for these.  They establish

12    foundational elements upon which those could be proven in

13    subsequent hearings.  And we believe that for the subclasses,

14    it could also be done.  But these proposed issue classes are

15    focused on duty, breach.  Causation adds to the contamination

16    event.  Foreseeability of harm.  Issues like that that really

17    do not vary at all among class members.

18           THE COURT:  Okay.  Okay.  Mr. Bishop, back to you.

19    Thank you.

20           MR. BISHOP:  Your Honor, the only causation, the

21    causation issue that you began by talking about, which is the

22    question as I understand it, of whether VNA's conduct resulted

23    in corrosive water remaining in the distribution system longer

24    than it would have otherwise, see, that is very different from

25    the questions of common but for causation and proximate

June 2, 2021

1      causation that are in this list that plaintiffs have provided.

2              But even that and the issues of duty and breach, and

3      because I assume this Court is going to decide the question of

4      duty as a matter of law in summary judgment, put that aside

5      and for practical purposes settle in all these other.  For

6      breach and that narrow causation that you talked about

7      previously, even for those, issue class certification is not a

8      superior or efficient way to proceed here.

9              THE COURT:  But why not?  I mean, how is -- how can

10     you distinguish this case from Behr v Martin?

11             MR. BISHOP:  I think cases have to be -- class cases

12     have to be looked at on their own set of facts.  And when you

13     look at the facts, the broad set of facts -- obviously they

14     are disputed.  But the broad set of facts here.  I think there

15     are four reasons why issue certification is not superior.  And

16     they all should be looked at in the context of the fact that

17     there's already a robust bellwether process in place.

18             And you know the first of these is that issue

19     certification is not going to make a material dent in

20     resolving any claim for any class member.  Highly

21     individualized, highly contested issues of causation, fact of

22     injury, damages and allocation of fault are going to remain to

23     be resolved and they make up the bulk of the litigation issue.

24     And no party --

25             THE COURT:  I mean, I don't know of any cases that

June 2, 2021                                                    92

1    say if there are common issues with common evidence and the

2    resolution of which would materially advance the class or the

3    litigation, that it has to solve the whole case.  I don't know

4    of any cases that say that.  And instead, you're looking at

5    one person who has all of these cases right now in addition to

6    Judge Farah.

7         And the idea that each individual would come forward

8    and prove the duty and breach and causation of the crisis and

9    then causation of their individual damages seems magnificently

10   inefficient.  And that if we can pluck off some of the duty

11   and breach issues and not go potentially based on the law to

12   causation of individual damages, it sure seems like that's a

13   material advancement for all of us.

14        MR. BISHOP:  Well I don't think so, Your Honor.  And

15   I think the differences in the cases that you're talking

16   about, that you don't have this robust alternative, that you

17   already have a set of cases that will proceed.  They'll go to

18   summary judgment.

19        If they get past summary judgment, there will be

20   trials initially of minors and then of adults that will

21   resolve all of these issues.  Not just the few issues that

22   we're talking about on issue certification.  They will resolve

23   all of the issues.  And that is what will drive these cases to

24   resolution.

25        No party is going to change its view on how to

1    resolve any of this litigation based on a class-wide

2    resolution of a few issues that do not determine liability,

3    let alone damages.  As a practical matter, what will drive a

4    resolution is the bellwether process that this Court is

5    overseeing.

6          Now I do want to address the Seventh Amendment issue

7    that you talked about, because that's an important one and it

8    does go as well to superiority.  Now we acknowledge that

9    Martin says you don't have to solve all of the Seventh

10   Amendment issues with a specific plan at this point.  But the

11   fact that there will be Seventh Amendment issues in risk of

12   jury confusion is something that should be taken into account

13   when you're considering the sufficiency and superiority of

14   issue classes.

15         Here there's clearly enough overlap in the facts

16   relevant to breach of duty and proximate cause.

17   Foreseeability, for one.  That if a jury -- a second jury is

18   instructed to assume breach based on a first jury's issue

19   determination, it could mistake its obligations when

20   considering causation.

21         And while there were judicial tools that can be used

22   to address the overlap, the fact that they have to be used and

23   the fact that they're complex and result in complex

24   instructions and verdict forms, that needs to be taken into

25   account.

1            THE COURT:  I would certainly take that into

2    consideration.  And what I found kind of interesting reading

3    those cases is that in every criminal trial, in every at least

4    slightly complicated criminal trial, there are confrontation

5    clause problems.  There are confession Brutant problems we

6    call it where a portion of a confession in a multi-defendant

7    case is admissible against one defendant and not against

8    others.

9            And we instruct juries all the time.  All that

10   evidence that you just heard, that defendant number 1 did it

11   and confessed to it and is now challenging it, just don't hold

12   that against his co-defendants even though he said he was with

13   them.

14           So you know, we ask juries to do very complicated

15   things all the time.  And we write jury instructions.  And the

16   Courts of Appeals have told us we have to trust that jurors

17   can actually get the job done.

18           And it doesn't matter if N equals 1, which is me.

19   But I have found that jurors ask very detailed questions if

20   they have the slightest question about an instruction.

21   They'll send a note and say what do you mean we can't look at

22   evidence because it was already decided by another jury?  Or

23   something like that.

24           So you've got to convince me that it couldn't be

25   managed.

1          MR. BISHOP:  No, I'm not saying it couldn't be

2     managed.  There's always room for error when you have that

3     sort of complex management and, you know, a wasted trial as a

4     result.  But the real problem here is that it has to be done

5     at all when the alternative is bellwether trials in which that

6     serious Seventh Amendment issue will arise.

7          What we're talking about is superiority.  We're not

8     talking here about a question of issue trials on the one hand

9     or bellwethers.  There will be bellwethers.  They're going to

10    start soon.  And they will resolve all liability and damages

11    issues, assuming that they get past summary judgment, which we

12    don't think they should, of course.

13         But they will resolve these cases in a way that

14    meaningfully provides information to the parties about how to

15    move forward.  There is an issue resolution will not do that.

16    And so the superiority question including the Seventh

17    Amendment issue, including the fact that we don't think that

18    resolving these issues will materially alter the litigation

19    burden on the part of the parties because this evidence is

20    going to have to be repeated.  All of that suggests that it's

21    not superior.

22         Let me talk a little bit about that point.  I mean,

23    the issue certification and litigation here would not change

24    the burden in the trials going forward.  I mean, they create

25    their own burdens because, you know, the limited effect of

96

 1    issue certification here is something that would have to be

 2    explained very clearly in the notice to class members so that

 3    they can weigh up what they would get from issue certification

 4    as opposed to alternatives, like individually proceeding.

 5          So you know, after doubts, a whole additional set of

 6    merits discovery, experts, Daubert motions, that would all be

 7    necessary to try the certified issues.  And then the certified

 8    issues are not going to make much of a dent and all that

 9    evidence will have to be repeated.

10          So a determination of breach, for example, is not

11    meaningfully going to shorten followup individual trials on

12    causation injury damages or allocation of fault.  The evidence

13    presented in an issues class trial would need to be repeated

14    in individual proceedings.

15          So example, in individual trials, the jury would need

16    to consider evidence of what VNA did, when it did it, and the

17    context of those actions relative to those the city, the

18    state, the other parties, the nonparties, to determine whether

19    VNA caused any class member any actual harm.  If so, to what

20    extent?  And to determine comparative fault.

21          So all of those facts about what VNA did, when it did

22    it, and the context in which it did it are facts that will be

23    presented in an issue class on breach.

24          THE COURT:  An issue class on breach.  But then it

25    won't need to be repeated in a damages class because either

1    the Court or the lawyers through stipulation would inform the

2    jurors of what has already been determined in terms of if a

3    liability finding comes back from an issues class trial, the

4    subsequent jurors in damages, individual damages cases would

5    be informed of that.

6             MR. BISHOP:  That's not how it would work, Your

7    Honor.

8             THE COURT:  No?

9             MR. BISHOP:  We're not talking about damages.  We're

10   talking about fact of injury, proximate causation, damages,

11   and allocation of fault.

12            And in order to make that determination, the fact

13   that a first jury has determined that there has been a breach

14   of the contract, which it will have determined by looking at

15   what we did, when we did it, and the context of those actions

16   in relation to the other actors here, that doesn't go.

17            That determination did not go to resolving fact of

18   injury causation or damages.  That evidence will have to be

19   repeated for the second jury.

20            There will be -- we don't think there will be any

21   reduction in the quantity of evidence that will have to be

22   placed before the second jury on these issues.  And so there

23   will be no efficiency saving in those second trials.

24            At the same time, the fact that that evidence needs

25   to be presented in the individual cases anyway is not going to

1    deter anyone from proceeding individually.  It's not going to

2    complicate those trials.  Because the relevant evidence has

3    been pulled already.  It's been mentioned.  All the documents

4    have been produced.  So we don't think that anyone is going to

5    decide not to proceed individually and bring an individual

6    action because they've got all that evidence available to

7    them.

8             So really an issues trial is redundant.  It's not

9    going to achieve a resolution of any issue that is going to

10   move this litigation forward towards a final conclusion.  It

11   is not going to resolve all of the issues of the bellwethers

12   will soon resolve that really will move things along.

13            It's going to create Seventh Amendment issues that

14   have to be dealt with and raise risks.  And it's not going to

15   materially alter the litigation burden on this Court or the

16   parties.  And that's true to breach and it's due to the -- and

17   it's true of the limited causation issue that you have

18   mentioned.

19            And the causation issue really exacerbates the

20   Seventh Amendment problems.  I mean, causation is tightly tied

21   to particularized injury claims, right?  And determining

22   whether VNA caused the harm will turn on facts about a person,

23   a property, a business that varied from claimant to claimant.

24            So dividing up issues of causation into the question

25   of whether conduct by VNA resulted in corrosive water

June 2, 2021                                                              99

```
 1    remaining in the system from other causation issues that

 2    relate to individual injury is going to result in a lot of

 3    complications in what the jury considers during the two

 4    proceedings.

 5          THE COURT:  Okay.  Thank you, Mr. Bishop.  Mr.

 6    Wittie, are you responding?

 7          MR. WITTIE:  Thank you, your Honor.  And I promise

 8    you I will be brief and I hope very pointed.

 9          I would like to drill into this causation question

10    from a slightly different angle, even from the Seventh Circuit

11    -- Seventh Amendment issue, although I think that's a very

12    important question, and that is the very real possibility that

13    upon hearing the evidence, the jury may come to the conclusion

14    that some members of the class were harmed by corrosive Flint

15    water in some way.  Property damage, you know, some health

16    effect, whatever.  But that others were not.  That there are

17    people on both sides of the fence potentially.

18          That would not be a very surprising conclusion for

19    the jury to draw.

20          Now what are we going to ask them?  Are we going to

21    ask them did every member of the class sustain this type of

22    injury?  If they say no because there are some uninjured

23    members of the class, what has that told us?  Almost nothing.

24    Only that not everybody is entitled to recover.  It would not

25    be conclusive as to the claim of any particular plaintiff.  I
```

June 2, 2021

```
 1    suppose --

 2              THE COURT:  Under which issue are we going -- look at

 3    the six issues.  And none of them have injury in fact or --

 4    well, we're not talking about personal injury damages.  We're

 5    talking about property and class right now only.  But under

 6    which one of these six issues does that become a problem?

 7              MR. WITTIE:  Well, I think the fifth or sixth issue.

 8    Because if you get a no answer to is everybody affected, then

 9    you achieve nothing.  If you get a -- and that's a possible.

10    A distinct possibility.

11              THE COURT:  Yeah.  I don't think we get -- I think

12    issue number 5 is a problem myself.  So let's take 5 out for a

13    minute.  Now tell me the answer to that question.

14              MR. WITTIE:  Well, the problem is you either have a

15    determination that just they're not class-wide damages which

16    doesn't preclude any particular individual from establishing

17    their damages.  They would be -- they would be a factfinding

18    that would not either affirm or deny any particularized

19    damages claim.

20              So at the end of the day in order to get to a money

21    damages judgment for any particular member of the class,

22    you're going to have to establish causation in a class -- in

23    an individual proceeding anyway.  There's no dodging the issue

24    of individualized causation through any of the proposed

25    causation findings here.
```

1           And if instead of doing any of the causation on a

2    class-wide basis, if you shunt it, all of it over to the

3    individual side and make everybody prove causation

4    individually, then it's very difficult to see how even a trial

5    on duty and breach is going to move the case forward at all.

6           Our contention that even a causation determination,

7    you still have so much differential results with regard to

8    injury and fact and of course quantum of loss that you, again,

9    haven't advanced the ball very far in any case.

10          But and if you're -- the Seventh Circuit emphasized

11   that to avoid these kind of reexamination clause problems you

12   have to carve at the joint, in their colorful phrase.  If you

13   begin to pick apart causation, you know, into various sub

14   causation issues, then the more you do that, the greater risk

15   you run of running into a reexamination problem.

16          And I think that that's what the proposal here is

17   really running a very serious risk of doing.  And so they're

18   really on the horns of a dilemma.  You can either shunt all of

19   causation into the individual side in which case clearly

20   there's no superiority.  Or you can begin to carve up

21   causation into little bitty sub issues and you run into a

22   reexamination issue, which in itself defeats superiority.  But

23   either way you don't have a viable way of proceeding.

24          THE COURT:  Okay.  Thank you.  I have a question,

25   Ms. Levens, about -- in your briefing in your initial motion

June 2, 2021

1    you talk about a question, an issue, that reads as follows.

2    "Whether the engineering defendants breached their duty or

3    duties owed to class plaintiffs and whether any such breach

4    was malicious, willful, and wanton as to disregard class

5    plaintiffs' rights."

6             Where does the malicious, willful, and wanton come

7    from in a professional negligence cause of action?

8             MS. LEVENS:  I don't think that a jury would need to

9    find that.  And I think that's why while it's an example of an

10   issue that could be certified on a class-wide basis, it's not

11   included in the list that's in our reply brief.

12            Did Your Honor have other questions or would you like

13   me to address the matters raised?

14            THE COURT:  No.  Go ahead and address the matters

15   raised.

16            MS. LEVENS:  No, it's fine.

17            Several points, Your Honor.  I think as a threshold

18   starting point, the idea that a binding liability

19   determination on duty and breach does not advance this

20   litigation is absurd.  And the Court need not take my word for

21   it.  All it needs to do is open up the summary judgment

22   motions that Veolia and LAN have filed in the bellwether

23   cases.  And they extensively litigate these issues.

24            I also think, second of all, as to causation, the

25   Sixth Circuit recognized in Sterling that causation can be

1       separated into general and specific.

2               Here the causation elements that the Court would ask

3       the jury to decide turn on whether or not Veolia and LAN's

4       conduct served in part to cause the contamination.  It would

5       also address the extent to which any other defendants or third

6       parties serve to cause the water contamination specifically.

7               In a subsequent proceeding, there would be

8       individual.  The Court could ask whether or not the

9       contamination itself harmed specific plaintiffs.

10              Now to decide whether or not this presents the

11      Seventh Circuit Amendment, the easiest way to think about this

12      is to start to think about what the witness lists would look

13      like for both proceedings.

14              Now for a class-wide liability trial that addressed

15      general causation, witnesses would include LAN employees,

16      Veolia employees, experts regarding breach.  It would also

17      include all of the witnesses that Veolia and LAN have listed

18      as other causes of this particular harm.

19              That jury would be asked to decide if LAN and Veolia

20      contributed to the harm.  And if so, what amount should be

21      attributed to them.

22              In the second individual proceeding, there would be

23      no need to call any of those witnesses to play that deposition

24      testimony, to hear from those experts.  You would only need to

25      talk to a very different variety of experts who would talk

June 2, 2021                                                    104

1    about whether the contamination itself harmed that particular

2    plaintiff.

3           That is also when defendants would have an

4    opportunity to say this contamination was not the cause of

5    these particular injuries.  It was something else.  It was

6    lead paint.  It was their house wasn't repaired correctly.

7    But none of the witnesses or exhibits that would be used to

8    establish those defenses would turn on the -- would overlap

9    with the evidence or witnesses called at the trial as to

10   general causation.

11          Deciding all of these issues now, their arguments

12   just now and in the briefing, Veolia and LAN really emphasize

13   how complicated these subsequent damages proceedings would be,

14   how time consuming.  All that means is that we all benefit if

15   we can limit those proceedings to just those matters that must

16   be decided on an individual basis.

17          With regard to the bellwether trials, I think one

18   problem here is the wrong assumption that it is one or the

19   other.  Bellwether trials can be useful in providing

20   information regarding the valuation of particular claims.  But

21   the preclusive effect of those holdings is far, far from

22   certain.

23          In diversity cases federal courts apply the

24   preclusion rules of the state court.  And to date Michigan

25   does not recognize non mutual estoppel which means it would be

June 2, 2021

 1    very uncertain if any aspect of those trials would be binding

 2    on future courts.  And even if the Court believed that that

 3    issue may be sort of tended towards they could be binding, the

 4    supreme court in Phillips Petroleum made clear that it is not

 5    up to the court in the initial decision to decide the future

 6    preclusive effect of that decision.

 7          Mr. Bishop and in Veolia's briefing suggests that

 8    bellwether trials could lead to a resolution of this entire

 9    matter.  And if that happens, that is wonderful.  But nothing

10    about certifying issue classes right now precludes that

11    eventuality.  However, denying certification of an issue class

12    now could very well deny tens of thousands of people an

13    opportunity to bring their claim.

14          I think -- and I think Your Honor might have

15    questions, so I'll pause after this.

16          THE COURT:  No, no, no.

17          MS. LEVENS:  I think it's useful to take a pause here

18    and look at the numbers.  Oftentimes in these arguments you

19    hear plaintiffs talking about how much these unnamed people

20    want to litigate this case and defendants saying it's not

21    necessary.  A handful of people can try the case.  And it's

22    hard to know which is correct.

23          But in this case we don't need to just imagine it.

24    We have actual numbers.  And if you look at the special

25    master's most recent census from April of 2020, you'll see

1    that 19,000 individuals have been retained but only 5,000 of

2    those plaintiffs have filed suit.  Less their be a concern

3    that only those who have retained counsel are interested in

4    proceeding.

5           From the most recent registration report as to the

6    settlement, more than 20,000 individuals registered for the

7    settlement showing at least some interest in proceeding here

8    but not controlling that litigation on their own.

9           THE COURT:  Yeah.  I don't know how valuable those

10    numbers are.  I hear what you're saying.  I would say that if

11    I were sitting where you're sitting.  But we also know there

12    was a statute of limitations problem with filing before this

13    decision was made.

14           We know that there are reasons that that -- those

15    numbers have played out the way that they have.  But I

16    certainly hear you.

17           MS. LEVENS:  I think that is where though not just

18    the census report but looking at the information from the

19    settlement, as to how many of tens of thousands of people

20    indicated an interest in proceeding but they had not retained

21    their own counsel.  There is interest out there.

22           Nothing about certifying this liability class

23    precludes any individual from having their day in court if

24    that is what they want.  But as defense counsel acknowledged,

25    these first bellwethers are only for minors.  It could be a

June 2, 2021

 1    few more years before we have bellwethers for property cases.

 2    There are adults, there are businesses.

 3            The extent to which the Court can use issue

 4    certification as one of several tools at its disposal to

 5    streamline this clearly shows this is a superior way of

 6    proceeding.

 7            THE COURT:  Okay.  Thank you.  Okay.

 8            I think we're -- we've covered a lot of territory.

 9    There's certainly other issues embedded in the briefs.  And

10    please know that I've read your briefs and I will return to

11    them before issuing a decision.

12            One question I have, Ms. Levens, is whether -- at the

13    beginning of the hearing we looked at the class definitions

14    and identified some problems with them.

15            Do plaintiffs want an opportunity to fashion a

16    different definition or do you think if I proceed towards

17    certification of some type of class, I should be the one to do

18    it?

19            MS. LEVENS:  Reading between these lines, Your Honor,

20    I think it might be useful to the Court if we were to submit a

21    revised definition now rather than waiting for an opinion.

22    And if that's so, we are more than happy to do so and request

23    that here.

24            THE COURT:  And then the issue becomes that, of

25    course, Mr. Bishop and with Mr. Wittie and their colleagues

June 2, 2021                                                    108

1    would want to respond to that.

2              MR. BISHOP:  We would, Your Honor.

3              THE COURT:  Yeah.  Okay.  Let me give it some thought

4    and I'll issue an order if I decide to go in that direction

5    and I would absolutely provide an opportunity to respond to

6    the definition.

7              MR. LEOPOLD:  Your Honor, if you intend to issue an

8    order, give us the timeframe when you would like for us to

9    provide it to the Court, we'll do it certainly on or before

10   that day.  And if there's any other issues that come up and

11   the Court wants to inquire as to additional questions, of

12   course we're fully ready to respond to anything you may have.

13             THE COURT:  Okay.  Thank you.  Okay.

14             So let's go back to two other things.  One is that

15   depending on how the decision goes, I would deny without

16   prejudice or as moot at this time the 12 remaining Daubert

17   motions.  Then there are concurrences and separate briefing

18   from LAN and Veolia.  All of that would be addressed.

19             I do intend to address a little bit further the

20   Dr. Russell and Dr. Gardoni issues that have been decided.

21   But I may include a little bit of information on that as well

22   just to provide a little more material.

23             And then I wanted to know -- Mr. Stern and Mr. Walker

24   and Mr. Shkolnik had filed a brief -- are there any brief

25   remarks that you want to make on behalf of your clients?

1      But I just note that your brief was remarkably

2   comprehensive and I learned a lot and I appreciated it a great

3   deal.  But I am cognizant of something that plaintiffs said in

4   their reply brief, which is that your clients are in

5   individual cases and you don't have class clients or potential

6   class clients I guess.  So I don't know that you necessarily

7   have standing, so to speak, to argue.

8      But if you want to say something, feel free to say

9   something relatively brief.

10      MR. STERN:  Your Honor, I believe Mr. Walker is going

11   to make a few brief comments.  And I would just note that

12   based on the master definition of the class, all of our

13   clients would fall into the class.

14      THE COURT:  Oh, okay.  Right.  I hear you.  Okay.  So

15   Mr. Walker.

16      MR. WALKER:  Yes, Your Honor.  I think just to the

17   extent that, you know, whether it's having standing or not.

18      THE COURT:  That's okay.

19      MR. WALKER:  It would probably be helpful to the

20   Court, of course, just to make a few points about -- I think

21   the most salient point is, you know, on the issues class.

22   That, you know, there's still predominance and superiority

23   inquiry that applies to an issues class.  And so, you know, I

24   think the bellwether trials, you know, sort of were discussed

25   by the other parties.

June 2, 2021                                                                    110

 1              I think one important point is that a bellwether

 2     trial, at least as it pertains to, of course, the minors, is

 3     that it's a full result as opposed to a partial result.  You

 4     know, the inquiry, you know, that sort of follows in Martin v

 5     Behr is does the, you know, issues class materially advance

 6     the litigation.

 7              And just to be clearly, frankly, the co-liaison

 8     counsels' clients and I think the most recent census report,

 9     the high confidence number for clients represented by Levy and

10     Napoli is about 16,000 plaintiffs.  We are going to opt out of

11     the class.  And there is well established precedent from the

12     Tenth and Seventh Circuits.  For example, Premier Mechanical

13     in the Seventh Circuit.

14              There's no, you know, the class isn't going to be

15     bound by any bellwether trial.  There's no res judicata there.

16     But there's also no res judicata the other way.  And so the

17     superior way to resolve these cases is to give the parties,

18     VNA and LAN and the plaintiffs, a complete result from which

19     they can base their settlement negotiations going forward.

20              You know, something that, I mean, at one point I

21     think that class counsel intimated that there's not a lot of

22     serious dispute about things like duty and breach.  And I

23     think reading the I think it's 110 pages or something like

24     that motion for summary judgment from VNA, I think there is.

25     But I think the more important point is that something that

June 2, 2021

111

1    results in thousands of individualized hearings following an

2    issues class trial does not materially advance the litigation

3    to a reasonable termination.

4           And you know the more than the Court tries to pack

5    into an issues class to make that a reasonable vehicle for

6    materially advancing the litigation, the closer and closer the

7    Court comes to potential Seventh Amendment issues.

8           At the risk of taking more of the Court's time, I

9    will cede my time and thank the Court for the opportunity.

10          THE COURT:  Sure.  Thank you.

11          MS. LEVENS:  Your Honor, if I'm extremely brief, may

12   I add two very short items?

13          THE COURT:  Sure.

14          MS. LEVENS:  We're not going to talk about standing.

15   Who cares?

16          First of all, there is an opt out right.  But to the

17   extent it makes things more streamlined, just like with the

18   proposed settlement class, people who have retained counsel or

19   filed suit could easily be excluded from the class.

20          Two, Mr. Walker and Mr. Stern, Napoli, they are

21   clearly zealous advocates for their clients.  I have had the

22   privilege of working with them through discover and with the

23   settlement for years now and I don't think anybody would

24   dispute that.

25          But I also think it's clear that they are looking out

June 2, 2021                                                    112

1    for their clients as they should.  I think here what we're

2    saying is there should be a vehicle for the tens of thousands

3    of other people who have not retained counsel to find

4    recovery.  And we think that there is a class solution for

5    that.

6          So it's been a long day.  Thank you for your time.  I

7    appreciate it.

8          THE COURT:  Thank you.  Thank you, all.

9          Just the briefing was very helpful.  And this

10   argument has been as well.  So I appreciate it a great deal.

11         So what I'll do is take the motion under advisement

12   and issue a written decision as soon as I can sort through all

13   of this.  And if I determine that it would be helpful to hear

14   from the plaintiffs about the class definition, if you believe

15   there are modifications needed, what those would be, along

16   with the response from defendants, I'll set forth a briefing

17   schedule for that.

18         So thank you, all, very much.  And I think we have

19   time set aside -- I shouldn't even say when.  On the 23rd of

20   June for discovery conference, if needed.  There are other

21   time slots.  But I won't try to say them now because I might

22   mess them up.

23         Judge Farah, anything you'd like to add to this?

24   Thank you for your enormous patience with us.

25         HONORABLE JUDGE FARAH:  Thank you, Judge Levy.  Fine

June 2, 2021

1    judicial job in handling very, very difficult issues

2    facilitated by extremely capable representation.

3           THE COURT:  Thank you.  Thank you.  Well, the next

4    big deal thing we have going on is we do have the motion for

5    final approval of the partial settlement in the fairness

6    hearing for the class portion of that on July 12th beginning

7    at 10:00 AM.

8           So there are some status conferences and so on

9    between now and then.  Thank you, all.  Take care.  Stay

10   healthy and vaccinated and I will see you all soon.  Bye.

11                     (Proceedings Concluded)

12              -          -          -

13

14            CERTIFICATE OF OFFICIAL COURT REPORTER

15       I, Jeseca C. Eddington, Federal Official Court

16   Reporter, do hereby certify the foregoing 113 pages are a true

17   and correct transcript of the above entitled proceedings.

18   /s/ JESECA C. EDDINGTON_____            6/14/2021
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date
19

20

21

22

23

24

25