# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM |
| | (consolidated) |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |
| *Helen Chapman, et al.,* | No. 5:18-cv-10679-JEL-MKM |
| *Plaintiffs,* | |
| *v* | |
| *Governor Richard D. Snyder, et al.,* | |
| *Defendants.* | |

## CHAPMAN PLAINTIFFS BRIEF IN OPPOSITION TO CO-LIAISON COUNSEL'S BRIEF IN SUPPORT OF FINAL APPROVAL OF THE PROPOSED SETTLEMENT

# Contents

INTRODUCTION..................................................................................1

FACTUAL BACKGROUND....................................................................2

    The Record at the Time of Preliminary Approval ...........................................2

    Efforts to Establish a Parallel Bone Scan Program Were Doomed to Fail....5

    The Napoli Shkolnik Bone Scan Program Was Untenable.............................8

    Information Sought and Revealed since the March 29 Objection Deadline11

    The Proposal does not treat members of the class equitably relevant to each other.......................................................................................................18

    The Safety, Legality and Reliability Concerns about the Bone scans Require the Court to Deny or Defer Final Approval .....................................22

CONCLUSION...................................................................................25

**Cases**

*American Trust Co. v. Michigan Trust Co*., 263 Mich. 337, 248 N.W. 829 (Mich. 1933) ...................................................................................................24

*Burns Clinic Medical Center, PC v. Vorenkamp*, 165 Mich. App. 224, 418 N.W.2d 393 (Mich. Ct. App. 1987)..............................................................24

*Franks v. Kroger Co.*, 649 F.2d 1216, (6th Cir. 1981), on reh'g, 670 F.2d 71, (6th Cir. 1982) ................................................................................ 20, 21

*Georgine v. Amchem Products Inc.*, 83 F 3d 610 (1996), affirmed, 521 US 591 (1997) ........................................................................... 1, 18, 19, 20

*In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 3 Fed. R. Evid. Serv. 992, 27 Fed. R. Serv. 2d 89 (7th Cir. 1979)...............................21

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 808, (3d Cir. 1995).......................................................20

*Mahoney v. Lincoln Brick Co*., 304 Mich. 694, 8 N.W.2d 883, (Mich. 1943)........24

*Michelson v. Voison*, 254 Mich. App. 691 (Mich. Ct. App. 2003).........................24

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, (7th Cir. 2004) .............................21

*Petruzzi's, Inc. v. Darling-Delaware Co., Inc*., 880 F. Supp. 292, 299, (M.D. Pa. 1995) .............................................................................................21

*Staton v. Boeing* Co., 327 F.3d 938, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003)......21

*Vassalle v. Midland Funding LLC*, 708 F.3d 747, 84 Fed. R. Serv. 3d 1578 (6th Cir. 2013) ......................................................................................20

*Williams v. Vukovich* 720 F 2d 909 (6th Cir. 1983).................................................24

**Rules**

F. R. Civ. P. 23 (e) (2) (d) ........................................................................................18

Every decade presents a few great cases that force the judicial system to choose between forging a solution to a major social problem on the one hand, and preserving its institutional values on the other. This is such a case.
*Georgine v. Amchem Products Inc.*, 83 F 3d 610, 617 (1996), affirmed, *Amchem Products Inc. v. Windsor* 521 US 591 (1997).

## INTRODUCTION

Chapman objectors acknowledge the desirability of bringing the Flint Water litigation to a conclusion. Given the duration of this case, the uncertainty of a trial on the merits and the outcome of future appeals, we do not dispute the reasonableness of the $600 million total sum offered by the State of Michigan.  But the settlement itself does no good unless its proceeds are allocated fairly and equitably. The allocation proposed here is unfair, unreasonable and inequitable in how it treats the claimants relative to each other.  It pays a high premium based on results of  bone scans which were unavailable to most claimants. The zero-sum nature of the settlement guarantees that every additional dollar paid to a claimant with a positive bone scan subtracts a dollar from a claimant without a bone scan.

The inaccessibility of the test is just the tip of the iceberg of the deficiencies in the bone scan program. We now know that bone scan program under which a majority of settlement funds are likely to be distributed

- Operated contrary to the warnings and instructions of the manufacturer of the scanning device, who did not want it to be used on humans

- Operated in violation of Michigan law from August 2019 through February 2021, scanning thousands of claimants with an unregistered device
- Issued reports which used the logos of two distinguished institutions—the Harvard School of Public Health and the NYU Grossman School of Medicine—without their approval
- Is at least arguably based on "junk science"

We seek not to destroy the settlement, but improve it. If the court disapproves the settlement the parties are duty bound to "negotiate in good faith to modify the terms of the Settlement Agreement in order to revive it." *Id*. Sec. 17.6 PageID 40388. It is with that goal in mind that we present our objections.

## FACTUAL BACKGROUND

### The Record at the Time of Preliminary Approval

Chapman Plaintiffs' December response to the motion for preliminary approval expressed concern about the dominant role which bone scans would play in determining the allocation of $600 million among Flint residents. We argued that the settlement was structured as a zero-sum game in which larger amounts for some plaintiffs would result in smaller amounts for other claimants and the highest payment for both children (2x, 2y or 2z depending on age group) and adults (2AX) was reserved for bone or blood lead readings of 10 or higher. But because 70% of children, and 90% of adults had **no** blood lead tests, bone lead would likely be the predominant method of qualifying. Similarly, the next two tiers of payments for children 1.5x and x, y or z depending on age group) were based on blood lead,

2

bone lead or a neuropsychological exam done under the supervision of a pediatrician. ECF # 1341, PageID 41815-41820. At the time of preliminary approval, only 31 out of 9,000 children had undergone *any* cognitive testing, let alone the neuropsychological testing overseen by a pediatrician required by the settlement grid. ECF 1015 at 22. By contrast, we now know that over 3.000 bone scans had been done by that date.    Cuker Dec Ex "A" (Veolia Daubert Motion) at 15 PageID 21600.

Cognitive testing is rare because neuropsychological exams are never done by the Flint schools, were only available through a single facility in Flint, the Neurodevelopmental Center for Excellence, and takes hours to conduct—compared with a three minute bone scan. ECF 1346.

For adults, the second highest payment of AX would go to those with bone or blood lead test results between 5 and 9.9 or those who could prove a serious physical injury was caused or exacerbated by exposure to Flint water. Since every bone lead study has shown that the average adult has bone lead of 5 or more, and most have shown the average adult over age 50 has bone lead of 10 or more, it would be far easier for an adult to qualify for the AX payment by getting a bone scan. ECF 1341 PageID 41822-41823.

Notwithstanding the critical role that bone scans would play in allocating hundreds of millions of dollars, at the time of preliminary approval, the record was

3

clear that the only way to get a bone scan in Flint was through Liaison Counsel, who had exclusive control over Aaron Specht PhD, the only person willing and able to perform bone scans in Flint. ECF 1341 at page Ids 41280-41281.

The court rejected Chapman Plaintiffs concerns about bone scans at that time, stating:

> There is nothing in the MSA that prohibits the Chapman Plaintiffs from pursuing the bone scan procedure that they decided to forego in 2016. ***
>
> To the extent that the Chapman Plaintiffs' objection relates to the availability of bone scans in the City of Flint, this objection may be rendered moot. Co-Lead Class Counsel stated on the record at the status conference held on January 13, 2021 that they are optimistic that they have located individuals who can, and appear to be willing to, provide bone scans in Flint to residents who would like such scans for purposes of the settlement:
>
> [W]e have made some, I think, strong headway in making the . . . possibility of bone scanning [available] for the community generally that would be participating in the settlement of this matter. We're looking into that more and more and we believe that we have a good core group of doctors and local individuals associated with those doctors to do a widespread [sic] accessibility for the community.

(ECF No. 1399, PageID.54457-54458.)

> Indeed, Co-Lead Class Counsel are working to set up a bone scan program, which would render this issue moot.

ECF 1399 Page ID 54457

4

**Efforts to Establish a Parallel Bone Scan Program Were Doomed to Fail**

At the time Preliminary Approval was being considered, Chapman Plaintiffs had not been informed that Co-Lead Class Counsel Mike Pitt had expressed similar reservations about the accessibility of bone scans, stating in an email to the Special Master dated November 16, 2020 (the date he signed the amended MSA and Grid)

> The Order Preliminarily Approving the settlement should require that all participants in the Settlement Program should have equal accessibility to award criteria including tests and evaluations which will enable the participant to secure an appropriate compensation award.

Originally filed as ECF 1786-5, PageID 64691, refiled as 1802-3, PageID 63889.

We now know the efforts of Co-lead Class Counsel to make bone scans widely available were doomed to fail. Co-Lead Class Counsel recruited Dr. Andy Todd, whose KXRF device and Mt. Sinai Hospital represents the "gold standard" for bone lead testing[1], and Dr. Karl Jepsen of the Orthopedic Department of the University of Michigan, to establish a second bone lead testing facility in Flint. ECF 1499-1.  Before they could get the facility up and running, they needed two things 1) the written detailed protocols and 2) the portable XRF analyzer manufactured by Thermo scientific which Dr. Specht had used to scan thousands of Flint residents. They got neither. Dr. Specht never produced the protocol and the manufacturer refused to sell the device for use on humans. *Id.*

---

[1] Cuker Dec. Ex. A, PageID 21593

5

The emails among Co-Lead Class Counsel, Dr. Jepsen and Thermo Scientific were produced by Thermo in response to a subpoena from Veolia, and they are attached as TSF00069-105, Ex. "B" to Cuker Declaration. As of February 23, 2021, Dr. Jepsen told Ted Leopold that Thermo would not customize the device for use on humans—in fact it had previously refused to do the same for Wayne State University. He continued

> If we did buy a device, then we would have to work with Specht himself to do the customization. We would then need to repeat all the safety oversight in order to use the device on humans. My institution would not allow me to conduct this work without a safety oversight plan.

Cuker Dec. Ex. B Thermo Production TSF00070-71.

Consequently, Drs. Todd and Jepsen informed Co-Lead Class Counsel that their

> attempt to establish a second bond lead assessment site has failed because we have not received written detailed protocols to replicate the existing assessment site, combined with challenges in purchasing XRF devices from a manufacturer that is not willing to confirm the device is acceptable for use on living humans. The fact that the manufacturer is unwilling to stand behind the use of this device on humans would put undue liability on the part of us and our employers, and would potentially expose us to reputational damage which we are unwilling to accept.

ECF 1499-1

On February 26, 2021, Lawrence Reynolds M.D., a distinguished Flint

pediatrician, who had been contacted by Co-Lead Class Counsel Michael Pitt about possibly assisting with the bone scan project, filed objections to the use of bone scans for the settlement. ECF #1436. Based on his personal research and review Dr. Reynolds stated, *inter alia* that 1) the manufacturer did not approve of its use on humans 2) the device was not registered with the State of Michigan as required by law 3) people undergoing bone scans were not being properly informed about its potential risks 4) its use did not follow FDA protocols and requirements and 5) the entire process was not being overseen by an Institutional Review Board or a medical doctor licensed in Michigan. *Id*. PageID 55025-55031.

Just three days later, on March 1, 2021, Co-Lead Class Counsel filed a motion to restrain XRF testing. ECF 1443. In that Motion Class Counsel echoed Dr. Reynolds' concerns that the device "***was never intended for use in evaluating humans.***" *Id*. PageID 55707 (emphasis original).

The same day that the Motion to Restrain was filed, the court called a conference to discuss it. Notwithstanding the interest they had expressed in the bone scan issue, neither Counsel for Reynolds nor Chapman was informed of the conference or invited to attend. In a 26 minute off the record discussion, the Court told Co-Lead Class Counsel that she considered the motion to violate the MSA, and that if Co-Lead Class Counsel wished to pursue the motion, he could withdraw as Co-Lead Class Counsel. He chose to withdraw the motion instead.

7

The substance of these off-the-record proceedings was not disclosed to

Chapman Counsel until the court's recent ruling, ECF 1830 PageID65301-65303[2]

In fact, before the Motion to Restrain was filed, Co-Lead Class Counsel, in emails

dated January 14 and February 3, 2021, told counsel for Chapman Plaintiffs of

"significant progress" in making sure bone scans "are reasonably accessible to all

Settlement Program claimants."   ECF 1820-1, PageID 64819-648120.

**The Napoli Shkolnik Bone Scan Program Was Untenable**

On Saturday February 20, 2021, around the same time that Thermo was

telling Dr. Jepsen it would not sell the portable XRF for use on humans, Special

Master Greenspan contacted counsel for Chapman plaintiffs to inform him that

---

[2] Had counsel for Chapman Plaintiffs been present, counsel would have argued that the motion did not violate the MSA, notwithstanding the obligation to "publicly support the approval and implementation of the settlement Program MSA para. 22.1.2, ECF No. 139402, PageID 51492, because that obligation is "subject to the Michigan Rules of Professional Conduct or any other applicable rules" and only requires such support "as appropriate". *Id.* To the extent Co-Lead Class Counsel learned of facts that, in their view, required the court to examine the suitability of Thermo Scientific bone scans for use in humans, their duty to their clients under the Michigan Rules of Professional Conduct could outweigh any duty to support the settlement contained in the MSA. For instance, disclosure of the information contained in the Motion to Restrain is at least arguably required by MI RPC 1.4 (duty to keep client reasonably informed) and the motion itself was prompted by concern for their clients' welfare required by MI RPC 1.7 (requiring lawyers to put their clients' interests above all else, including the lawyers own financial interests). In short, Co-Lead counsel have a duty of undivided loyalty to their clients, not the MSA, and to the extent the two may conflict, it is the duty to their clients which controls.

"the Napoli firm has advised me they have openings for people who are not their clients to schedule bone scans" on Sundays only between 1 and 4 PM. *Id*. at PageID 64820. Chapman counsel was able to schedule bone scan appointments for seven of his clients the very next day, and ultimately, over the next three weeks, scheduled well over 100 such appointments for his clients. *Id*. at PageID 64820-64828. In addition to the 7 appointments scheduled for February 21, over 20 more were made for February 28 and March 7. Napoli never responded to Chapman counsel's inquiry about which clients actually kept their bone scan appointments for February 28 and March 7. Then, after March 7, conflict arose between Chapman Counsel and the Napoli firm for the following reasons:

- Napoli required Chapman clients to sign a "consent form" without first showing the form to their counsel for his approval, in violation of MI RPC 4.2

- The form Napoli asked people asked people to sign was confusing and misleading. Although the Napoli website—on which the appointments were made—promised "free" bone testing (Cuker Dec Ex "C") the form stated in one place that the method for paying the cost of the test "will be subject to a determination by the court" while in another place, it required Chapman Counsel to pay Napoli $500 per scan before seeing the results

- There was no transparency about the actual cost of the scans. Napoli had previously told both Special Master Greenspan and Ted Leopold that he might do the tests for $350. Each test takes only 3 minutes to run, and Dr. Specht's hourly rate is $200, making even the $350 charge suspect.

- Although Liaison Counsel fiercely protested any release of their own clients' bone test results—even under a confidentiality order—(See,

9

> *e.g.* ECF # 1716) Napoli insisted that anyone undergoing bone scans at his facility waive their privacy rights  and allow Napoli law firm personnel to see their results.

ECF 1820-1 at PageID 64820-64828.

When Chapman counsel accused Napoli of violating RPC 4.2, Napoli threatened to destroy the data of Chapman counsel's *clients* who underwent bone testing, and cancel the remaining appointments unless the ethics allegation was withdrawn. When it was not, Napoli cancelled the remaining appointments, 54 in all. Special Master Greenspan was copied on all emails, but was unable to facilitate a resolution of the dispute. *Id.*

Among the Chapman plaintiffs who had appointments which were cancelled were the following objectors:

Lashonda Jones   ECF # 1538
Helen Chapman   ECF# 1537
Dorothy Chapman  ECF# 1536
Shamiya Chapman  ECF# 1534
Shirley Glover and her children J.S. and A.S. ECF # 1493
Trisha Walter ECF # 1492
Tommie Lowery and his children T.L, I.L.  and M.L. ECF# 1489
Linda and Earl Welche ECF# 1488
Rekiyah Williams and her children M.W., O.B., D.W. and D.W. ECF # 1484
Ashley Sublett and her children N.W., B.S., J.J. and K.L. ECF # 1479
Elizabeth Franklin and her children E.W. and E.W. ECF# 1478
Florlisa Stebbins ECF# 1463

Altogether 28 of the 32 Chapman objectors made bone scan appointments with Napoli, which Napoli unilaterally cancelled. Two other objectors, Albert and Sheila Harris, wanted to make appointments, but could not do so because their lawyer was blacklisted by Napoli. ECF # 1485.  Nadine Roberts objected on her own behalf and on behalf of her foster daughter D.J., because when she took her foster daughter to the Napoli facility she  was appalled at the way they facility was being run, with the personnel asking her D.J. to sign a legal document even though she was not of age, to refusing to give her a copy of what she signed, to the unprofessional appearance of the location and its personnel. ECF # 1471.

Because all these developments occurred less than three weeks before the March 29 objection deadline, Chapman counsel moved for additional times to file objections on behalf of the rest of the 54 clients whose appointments had been cancelled, as well as other clients, but this motion was denied. ECF 1494, 1505.

### Information Sought and Revealed since the March 29 Objection Deadline

On April 24, 2021, Chapman plaintiffs filed a motion to discover the following information relevant to an evaluation of the fairness of the settlement:

- The number of bone scans conducted on clients of liaison counsel compared to other claimants.

- When were these scans performed on Liaison Counsel's non-bellwether clients *e.g.* how many were conducted before the device was legally registered in Michigan in late February 2021? How many

11

were performed before the settlement grid was publicly released on November 16, 2020?

- The protocols, standard operating procedures and calibrations they claim to use at their private bone scanning lab.

ECF# 1710. [3]

This discovery motion  provoked a firestorm resulting from its inclusion of references to Dr. Specht's deposition, which the court had ordered destroyed because it contained confidential health information on children. Although the filing included no confidential health information on any child and was filed under seal regardless, co-Liaison Counsel Corey Stern filed an Order to show cause against Chapman counsel, which the court granted the same day it was filed, April 28, 2021. ECF # 1716, 1718. Chapman counsel filed his response to this order on April 30, explaining that, notwithstanding the earlier court order to destroy the transcripts, once it became clear that Dr. Specht's deposition was relevant to issues raised by Defendant Veolia in the class action, Mr. Stern had voluntarily turned over the transcripts to seven Plaintiffs Class Counsel, subject to the court's confidentiality, and that Chapman Counsel had strictly complied with the confidentiality order in his use of the deposition. ECF # 1720.

---

[3] Although Chapman Plaintiffs proposed that their discovery motion be heard before the Court decide the final approval motion, the Court elected to hear it on July 15, after the principal arguments made on final approval. ECF # 1836.

As a result of Chapman Counsel's April 30 filing, the Court held another off the record conference on May 3. Again, Chapman's Counsel was not informed of the conference or invited to attend.  This off the record conference resulted in two letters, one dated May 5 and the other May 13, 2021, written by Co-Lead Class Counsel Michael Pitt to the Court on the subject of bone scans, neither of which was provided to Chapman Counsel until weeks later.[4]

In his May 13 letter, Mr. Pitt stated that "under the protocols cited by Dr. Specht, as set forth in Co-Liaison Counsel's letter of March 5[5] and studies cited therein, the use of the XRF bone scan procedure can be used in a safe manner for both children and adults." ECF No 1789-5 PageID 64118. The May 13 letter was filed by Napoli Shkolnik as part of its May 26 opposition to Chapman and Washington Plaintiffs Motion to extend the bone scan deadline. *Id.*

Ironically, the day before Mr. Pitt's letter to the court, Thermo Scientific wrote to Napoli Shkolnik directly contradicting Mr. Pitt's statements, stating that it was not "safe and prudent" for use on humans and that "adequate assurances regarding safety" were "not present here" because the scanning is not supervised by an IRB of an academic institution. ECF # 1820 PageID64806. A similar letter

---

[4] The May 5 letter was inadvertently filed by mistake by Co-Liaison counsel Napoli Shkolnik on May 25, 2021, and then disappeared from the docket after that firm called the court. The May 5 letter only appears on the docket today because it was re-filed by Hall Objectors.  ECF No 1786-5, refiled as ECF No. 1802-3.
[5] ECF # 1455.

13

was sent to Mr. Pitt on May 21. *Id.*, PageID 64807.

Thermo's concerns-- that adequate assurances regarding safety were not present at the Napoli facility-- were borne out when Napoli's bone scan personnel nonchalantly radiated a woman 28 weeks pregnant. By comparison, Dr. Todd refuses to use his "gold standard" KXRF device on a pregnant woman, even though it emits less radiation than the pXRF. Cuker Dec Exs. D and E, Supplemental Dec of Florlisa Fowler Stebbins; Dec of Amber Stebbins

Thermo's letters came to light in a production of Thermo documents in response to its subpoena from Veolia. They were not the only eye-opening revelations. The documents also answered the mystery of how Napoli Shkolnik and Dr. Specht were able to procure the device for use on humans when the manufacturer refused to sell it to Class Counsel—or, for that matter, even Wayne State University—for the same purpose.  The answer was, quite simply, that Dr. Specht and Napoli Shkolnik did not tell the manufacturer they intended to use the device on humans. Instead, they stated that they were ███████████████████ ██████████████████. ECF 1825, PageID 65129.

This was not the last misrepresentation made in connection with the Specht-Napoli bone scan operation. The March 5 letter from Co-Liaison Counsel to Judge Levy stated that Dr. Specht's use of the portable XRF on humans had "been approved for such use by several IRBs, including Harvard and Purdue." ECF #

14

1455. In response to a subpoena from Defendant Veolia, however, Harvard repeatedly stated that it "is not aware of any approved IRB research involving the Device where Dr. Specht is a Principal Investigator or C-Principal Investigator." Cuker Dec Ex "F". Even though Harvard is not aware of the project, the logo of the Harvard School of Public Health is prominently displayed on the Bone Scan reports being sent out by Napoli Shkolnik. Cuker Dec Ex "G".[6]

On May 11, Defendant Veolia filed a motion to exclude the testimony and Report of Aaron Specht PhD. ECF # 343 in case 5:17-cv-10164, resubmitted here as Cuker Dec. Ex. "A". Veolia argued that the pXRF method is not a reliable methodology for measuring bone lead in children, that Dr. Specht's bone lead measurements have never been replicated, and have never been used to study bone lead in children in the United States. Veolia cited the deposition testimony of Howard Hu M.D., an expert witness for the class plaintiffs, who testified that he did not see the utility of bone lead testing for children because the measurement error "made it questionable to try to use that for any purpose on the Flint population. Cuker Dec Ex "I", ECF 343-16 Page ID 21762. Furthermore Dr. Hu—

---

[6] The logo of the NYU Grossman School of Medicine is displayed with equal prominence on the report. Although Dr. Michael Weitzman of NYU has been identified as "medical director" of the bone scanning project, he has never submitted a declaration on the subject. General Counsel for NYU has confirmed that Dr. Weitzman is not acting on behalf of NYU, and that the use of the NYU logo on the reports is inappropriate. Cuker Dec Ex. "H".

15

who had published 80 to 100 papers on bone lead, could not state what bone lead levels would be considered "elevated" because "there are no standards for bone lead levels in either children or adults." *Id*. PageID 21765. Yet the proposed settlement will pay multiples of money based on arbitrary bone lead benchmarks of 10 or greater, 5 to 9.9, and (for children) 3 to 4.9, even when there is no data to show that these results are actually "elevated."

Moreover, it is far from clear how the uncertainty factor affects the eligibility for payment. Dr. Specht's only study of Americans with the pXRF showed the average bone lead reading was 12.3—plus/minus 16.7 with an uncertainty factor ranging from 1.8 to 6.3, depending on the thickness of soft tissue overlying the tibia.  ECF 1341-2 PageID 41908. If the uncertainty factor is greater than the bone lead reading, how can anyone say there is lead in the bone at all?  Dr. Specht himself admits that



Specht depo Cuker Dec Ex at 133-134 "J" filed under seal.  Logically, if the uncertainty is greater than or equal to the bone lead reading, one cannot be confident about that reading.  Similarly, if someone has a bone lead reading of

16

10.0, even with a low end uncertainty factor of 1.8, can one be confident that the reading is really 10.0? Although Dr Specht testified that ████████████████████ ████████████████████████████████████████████████████ ██████████████████████, none of this information has been made available to the objectors or Flint residents. Cuker Dec Ex. "J" Specht depo at 287-288. The one example we have of a bone lead test report does not show the uncertainty.  Cuker Dec Ex "G".

### Chapman Plaintiffs Have the Right to Object Instead of Opting Out

Although Chapman objectors are not class members, and have no standing to object to the class action aspects of the settlement, the MSA requires the court approve the settlement for individual plaintiffs as fair, reasonable and adequate. MSA ECF 1319-1 Sec. 8.5 PageID 40359, and allows any Claimant—not just class members—to object to the settlement as long as that objector does not opt out. *Id*. Sec. 20.1  PageID 40392.  This effectively applies Rule 23 (e) (2) to the settlement, requiring the court approve it "only on finding that it is fair, reasonable and adequate after considering whether, *inter alia*, "the proposal treats class members equitable relative to each other." F. R. Civ. P. 23 (e) (2) (d). As with class opt-outs, "[t]he fact that disgruntled class members may opt out of the settlement class does not cure the deficiencies in the settlement." *Zimmerman v. Zwicker & Assocs., P.C.*, 2011 U.S. Dist. LEXIS 2161, at *23 (D.N.J. Jan. 10, 2011).

17

**The Proposal does not treat members of the class equitably relevant to each other**

*Georgine v. Amchem Products Inc.*, *supra* was an asbestos class action settlement which also had marked differences in how claimants were treated. In *Amchem*, Class Counsel settled their "inventories "of individual cases in a "side deal" of $200 million, while the class settlement paid similarly situated claimants far less. In responding to the argument that the class was not adequately represented because Class Counsel have brought a collusive action on behalf of the CCR defendants after having been paid over $200 million to settle their inventory of previously filed cases, the court stated:

> [W]e conclude that serious intra-class conflicts preclude this class from meeting the adequacy of representation requirement. The district court is certainly correct that "the members of the class are united in seeking the maximum possible recovery for their asbestos-related claims." But the settlement does more than simply provide a general recovery fund. Rather, it makes important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others. For example, under the settlement many kinds of claimants (e.g., those with asymptomatic pleural thickening) get no monetary award at all. The settlement makes no provision for medical monitoring or for payment for loss of consortium. The back-end opt out is limited to a few persons per year. The settlement relegates those who are unlucky enough to contract mesothelioma in ten or fifteen years to a modest recovery, whereas the average recovery of mesothelioma plaintiffs in the tort system runs into the millions of dollars. In short, the settlement makes numerous decisions on which of the interests of different

18

types of class members are at odds.

83 F 3d. at 630. (emphasis original)

Although the proposed settlement here purports to satisfy the dictates of *Amchem*, its salient features have all the characteristics of the same "inside job" that marred the *Amchem* settlement.  As with the "inventory plaintiffs" in the *Amchem* settlement, this settlement was structured to uniquely benefit the clients of Liaison counsel at the expense of other claimants. What else can one make of the fact that, as of October 15, 2020, before the settlement grid had even been released to the public, Liaison Counsel had already bone scanned over 3,000 of their clients? There was no reason for Liaison Counsel to bone scan anyone beyond the 13 bellwethers selected for trial—except that they knew the bone scan would be in the settlement, so they effectively cooked the books by getting a 3,000 client head start on everyone else.

If that wasn't bad enough, Liaison Counsel's monopoly on bone scans continued uninterrupted until February 21, after which they made bone scanning available to others on three hours every Sunday—a day of worship for many in Flint—while continuing to monopolize bone scans the other six days a week. Consequently, Liaison Counsel's clients had an overwhelming advantage in obtaining bone scans that they were effectively in the same position as the "inventory plaintiffs" in *Amchem*. Two households, living side by side on the same

19

street—with the same level of contamination in their water supply—will receive

drastically different amounts, not because of any difference in their injuries, but

because one had access to bone scans and the other did not.

Rule 23 does not countenance such disparities in treatment of similarly

situated claimants. *In re General Motors Corp. Pick-Up Truck Fuel Tank*

*Products Liability Litigation*, 55 F.3d 768, 808, (3d Cir. 1995) ("One sign that a

settlement may not be fair is that some segments of the class are treated differently

from others."). *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755, 84 Fed. R.

Serv. 3d 1578 (6th Cir. 2013) ("[I]n evaluating the fairness of a settlement we have

also looked to whether the settlement gives preferential treatment to the named

plaintiffs while only perfunctory relief to unnamed class members. We have held

that such inequities in treatment make a settlement unfair.") (citation omitted).

*Franks v. Kroger Co.*, 649 F.2d 1216, 1226,  (6th Cir. 1981), on reh'g, 670 F.2d

71,  (6th Cir. 1982) ("As appellants correctly argue, the 'preferred positions' of the

named plaintiffs should have signaled the district court of potential inequities in

this proposed settlement."), on reh'g, *Franks v. Kroger Co.*, 670 F.2d 71, (6th Cir.

1982) (vacating prior opinion on other grounds and reinstating settlement).

*Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 299, (M.D. Pa.

1995) (rejecting settlement in part because "[a]pproximately 50% of the class will

not receive any 'premium certificates,' but their claims against Moyer will be

discharged"). *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 782, (7th Cir. 2004)
(noting that "one of the classes, namely the pure information-sharing class,
received absolutely nothing, while surrendering all its members' claims against
Fleet" and ultimately concluding that because of multiple such "warning signs"
"the settlement cannot stand"); *In re General Motors Corp. Engine Interchange
Litigation*, 594 F.2d 1106, 1128, 3 Fed. R. Evid. Serv. 992, 27 Fed. R. Serv. 2d 89
(7th Cir. 1979) (rejecting settlement where "the agreement obligated GM to offer
payments to only part of the certified class"). *Staton v. Boeing* Co., 327 F.3d 938,
975–76, 55 Fed. R. Serv. 3d 1299 (9th Cir. 2003) (noting that higher payments to
individually identified recipients who are not class representatives cannot be
justified as incentive payments and must be supported by evidence that their claims
differ from other class members).

Liaison Counsel's main rebuttal to these objections—that Chapman Counsel
"did not encourage [his] clients to participate in the Program by scheduling bone
lead tests" ECF 1795 PageID 64880—is an outright lie. Most of the Chapman
objectors were actually scheduled for bone lead tests and their appointment was
cancelled because Liaison Counsel did not wish to account for the actual costs of
the tests and wanted Chapman Objectors to waive their right to confidentiality in
their test results. Chapman counsel's efforts to arrange for bone scans for his
clients are detailed at ECF 1820-1. PageID 64814-64820 and need not be repeated

21

here.  The testimonials of attorneys Ben Crump and Ari Kresch, relied upon by

Liaison Counsel, ring hollow because they are hardly impartial observers, both

have business relationship with Napoli Shkolnik in the Flint litigation. Cuker Dec

Ex. "K" (email from Ari Kresch stating that he worked with Napoli's office to

locate clients who had been lost to follow-up); Ex. "L" (announcing the opening of

a joint law office: Ben Crump Napoli Shkolnik); Ex. "M" (entry of appearance by

Ben Crump and Napoli Shkolnik in the same Flint Water Case).

### The Safety, Legality and Reliability Concerns about the Bone scans Require the Court to Deny or Defer Final Approval

 Chapman Objectors do not address the safety, health and ethical concerns

here because they are being addressed in the objections of Dr. Reynolds.  But the

safety, health and ethical concerns are a major cause of the lack of access to scans

which drove our original objections.  Concerns about safety effectively deny

access to those concerned, people like Helen, Dorothy and Shamiya Chapman and

Lashonda Jones, who would not undergo a bone scan until these concerns were

fully addressed (ECF # 1534, 1536, 1537, and 1538), pregnant women or women

of childbearing age who might be pregnant, and others who may have co-

morbidities or may be risk averse for other reasons.

The questionable legality of the bone scans, however, impacts not only

accessibility but the integrity of the Court's ruling.  MCL 333.5031 *et. seq*.

22

requires that radiation emitting machines be registered with the state. Using an

unregistered radiation machine is a misdemeanor.  MCL § 333.2262. The Napoli

facility had no certificate in effect until March 1, 2021, over a month after this

court granted preliminary approval. ECF# 1494-7. This the bone scan program

under which over 3,000 claimants may seek awards.  The only bone scan program

which has ever been available in Flint was illegal when the settlement was

announced in November 2020, illegal when preliminary approval was granted, and

illegal on February 26 when the class notice was sent out. Even after it obtained its

registration certificate, the Napoli facility has been plagued with regulatory

deficiencies and MIOSHA investigations. ECF # 1825 PageID 65129-65131.

Should the Court approve a settlement which distributes most of its money

based on bone scans performed in violation of state law, punishable by

misdemeanor? Class action settlements are not just matters of private contract.

"Judicial approval of a settlement agreement places the power and prestige of the

court behind the compromise struck by the parties.  Judicial approval may not be

obtained for an agreement which is illegal." *Williams v. Vukovich* 720 F 2d 909,

920 (6th Cir. 1983) (cites omitted). Although the settlement agreement is not illegal

by itself, can the court approve a settlement that allocates so much of its money

based on illegal bone scans?  The violation of the licensure statute, by itself,

establishes that the scans were illegal. *Michelson v. Voison*, 254 Mich. App. 691, 697 (Mich. Ct. App. 2003).

For the court to put its power and prestige behind a settlement which pays a large premium for illegal bone scans would violate public policy. *Burns Clinic Medical Center, PC v. Vorenkamp*, 165 Mich. App. 224, 226-227, 418 N.W.2d 393, 394-395 (Mich. Ct. App. 1987) (refusing to enforce illegal covenant not to compete); *Mahoney v. Lincoln Brick Co*., 304 Mich. 694, 706, 8 N.W.2d 883, 888 (Mich. 1943) ("Contracts contrary to public policy, that is those which tend to be injurious to the public or against the public good, are illegal and void, even though actual injury does not result therefrom."); "A contract made in violation of a statute is void and unenforceable. When plaintiff cannot establish its cause of action without relying upon an illegal contract, it cannot recover. The contract was of no force, effect, or efficacy." *American Trust Co. v. Michigan Trust Co*., 263 Mich. 337, 339, 248 N.W. 829, 830 (Mich. 1933).

Even if the Court finds the settlement otherwise meets the fairness criteria, it should defer a final ruling until after it decides Veolia's motion to exclude Dr. Specht. A final approval hearing is not the proper place to litigate Veolia's attack on the reliability of Dr. Specht's methodology.  But if Dr. Specht's methodology is so unreliable that this Court ultimately finds it is unworthy of consideration by a jury, how can the Court put its power and prestige behind a settlement which

24

allocates so much money based on an unreliable methodology?

**CONCLUSION**

For the foregoing reasons, the Motion for Final Approval should be denied, and the parties should be directed to negotiate in good faith to modify the terms of the Settlement Agreement in order to address the objections made here.

Dated: June 24, 2021                    */s/ Mark R. Cuker*
                                        MARK R. CUKER
                                        CUKER LAW FIRM, LLC
                                        One Logan Square, Suite 1200
                                        Philadelphia, PA 19103
                                        mark@cukerlaw.com