# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Opinion and Order Relates
To:

16-10444

_____/

**CORRECTED[1] OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CLASS PLAINTIFFS' MOTION TO CERTIFY CLASS [1207]; DENYING DEFENDANTS LAN'S AND VNA'S MOTIONS TO EXCLUDE THE EXPERT TESTIMONY AND REPORTS OF DR. LARRY RUSSELL [1382, 1388]; GRANTING IN PART AND DENYING IN PART DEFENDANTS LAN'S AND VNA'S MOTIONS TO EXCLUDE THE EXPERT TESTIMONY AND REPORTS OF DR. PAOLO GARDONI [1373, 1388]; AND DENYING AS MOOT DEFENDANTS LAN'S AND VNA'S MOTIONS TO EXCLUDE ALL OTHER EXPERT TESTIMONY AND REPORTS FOR THE PURPOSE OF CLASS CERTIFICATION [1371, 1372, 1374, 1376, 1377, 1378, 1379, 1380, <u>1381, 1383, 1384, 1385]</u>**

---

[1] Corrected only to add the following group to the list of those excluded from the Classes: "all persons and entities represented by Reporting Counsel as defined in the Amended Order Regarding the Collection of Claim Data (ECF No. 673, PageID.19490-19491) and reported as such on the census maintained by the Special Master, except those individuals reported to the Special Master solely by Class Counsel."

Before the Court is Class Plaintiffs' motion for class certification, in which they ask that the Court (1) certify, pursuant to Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4), a "Master" Issues Class and four Subclasses: a VNA Issues Subclass, a Minors Damages and Injunctive Subclass, a Residential Property Damages Subclass, and a Business Damages Subclass[2]; (2) appoint the named Plaintiffs as Class Representatives; (3) appoint, pursuant to Federal Rule of Civil Procedure 23(g), Interim Co-Lead Class Counsel ("Class Counsel") Theodore J. Leopold and Michael L. Pitt as Co-Lead Class Counsel; and (4) formally appoint, pursuant to Federal Rule Civil Procedure 23(g), Interim Executive Committee members Stephen E. Morrissey, Paul F. Novak, Esther Berezofsky, Peretz Bronstein, and Teresa A. Bingman to serve the Class. (ECF Nos. 1207, 1829.) Also before the Court are the *Daubert* motions filed by Defendants Veolia, LLC; Veolia, Inc.; and Veolia Water (collectively "VNA") and Lockwood, Andrews & Newnam, PC; Lockwood Andrews & Newnam, Inc.; and the Leo A. Daly Company (collectively

---

[2] Class Plaintiffs initially sought certification of three subclasses in their motion for class certification filed on July 16, 2020. (ECF No. 1207.) On June 14, 2021, Class Plaintiffs supplemented their motion with a request to additionally certify a proposed defendant-specific issues subclass. (ECF No. 1829.)

"LAN") seeking to exclude the expert testimony and reports of all experts relied upon by Class Plaintiffs in their motion for class certification. (ECF Nos. 1371, 1372, 1373, 1374, 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1384, 1385, 1386, 1388.)

For the reasons below, Class Plaintiffs' motion for class certification is GRANTED IN PART AND DENIED IN PART. The Court will not certify Class Plaintiffs' proposed "Master" Issues Class and four Subclasses. But the Court will certify, pursuant to Federal Rule of Civil Procedure 23(c)(4), two issues classes—a Multi-Defendant Issues Class and a LAN Issues Class—and nine questions for issues-class treatment. The Court will appoint Rhonda Kelso, on behalf of herself and her minor child, K.E.K., as well as Barbara and Darrell Davis, as named representatives for the Issues Classes. Pursuant to Federal Rule of Civil Procedure 23(g), the Court will appoint Theodore J. Leopold and Michael L. Pitt as Co-Lead Class Counsel and will appoint Interim Executive Committee members Stephen E. Morrissey, Paul F. Novak, Esther Berezofsky, Peretz Bronstein, and Teresa A. Bingman to serve the Multi-Defendant and LAN Issues Classes as members of the Executive Committee. LAN's and VNA's *Daubert* motions seeking to exclude the

3

expert testimony and reports of Dr. Larry Russell are DENIED, and those seeking to exclude the expert testimony and reports of Dr. Paolo Gardoni are GRANTED IN PART AND DENIED IN PART. The remaining *Daubert* motions are DENIED AS MOOT. Defendants LAN and VNA may refile those motions, if needed, prior to trial.

## Table of Contents

I.     **INTRODUCTION AND PROCEDURAL HISTORY**
II.    **BACKGROUND**
    A. General Background
    B. LAN's Conduct
    C. VNA's Conduct
III.   **LAW AND ANALYSIS**
    A. Note About this Class Certification and the Pending Parallel Class Settlement Proceedings
    B. Introduction to Class Certification
    C. Introduction to Class Definitions
    D. Certification of the Minors Damages and Injunctive Subclass is Impermissible Under Federal and Michigan Law
        i. Certification of the Rule 23(b)(3) Minors Damages Class is Impermissible
            1. Background
            2. Analysis
            3. Application
        ii. Certification of the Rule 23(b)(2) Minors Injunctive Class is Impermissible
    E. All Proposed Issues and Damages Classes Meet the Rule 23(a) Prerequisites to Class Certification
        i. Numerosity
        ii. Commonality
        iii. Typicality

      iv.  **Adequacy of Representation**
            1. **Common Interests**
            2. **Vigorous Prosecution**
  **F. None of the Proposed Rule 23(b)(3) Subclasses are Certifiable**
      i.  **Predominance**
      ii.  **Superiority**
      iii.  **Ascertainability**
  **G. Certification of the Rule 23(c)(4) Issues Classes**
      i.  **Introduction**
      ii.  **Analysis**
            1. **Predominance**
            2. **Superiority**
      iii.  **The Seventh Amendment's Reexamination Clause**
  **H.** *Daubert* **Motions**
      i.  **Drs. Larry Russell and Paolo Gardoni**
      ii.  **All Other Class Certification** *Daubert* **Motions**
**IV.  CONCLUSION**

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Class Plaintiffs in this case are thousands of children, property owners, business owners, and other individuals who allege that they were exposed to lead and other contaminants from the City of Flint's municipal water supply. Defendants in this case are two professional engineering firms that advised the City of Flint regarding its water supply at various points from 2011 through 2015. The events that resulted in the large-scale municipal water contamination of Flint, Michigan are now known

as the Flint Water Crisis.[3] In their lawsuits, putative class members allege that Defendants caused, prolonged, concealed, ignored, and/or downplayed the risks of Class Plaintiffs' exposure to the City's water, which injured Class Plaintiffs and damaged their property and commercial interests.

The Flint Water Cases have a complex procedural history. The cases fall into several broad categories, in both federal and state court, including individual cases, *legionella* cases, and putative class action cases initially filed in 2016—from which this request for class certification is an outgrowth. As the number of cases grew, the Court appointed Co-Liaison Counsel for the individual cases to coordinate between the various cases with individually represented counsel, and it appointed Interim Co-Lead Class Counsel to represent the interests of the putative class.

The Court has adjudicated scores of motions to dismiss in the Flint Water Cases, has issued hundreds of opinions and orders, and is very familiar with the factual allegations and the applicable law. Many of its

---

[3] Throughout this Opinion, the Court uses the term "the Crisis" or "the Flint Water Crisis" to refer to events that occurred after April 25, 2014, when the City of Flint began drawing water from the Flint River.

6

decisions have been appealed to the United States Court of Appeals for the Sixth Circuit and to the United States Supreme Court. This Court's decisions have largely been upheld on appeal.

The Court has also managed extensive discovery in these cases.[4] Over the years, the Court has conducted conferences to adjudicate discovery disputes at least once per month and is therefore familiar with the development of the factual record in these cases. As Class Plaintiffs stated at one time, discovery "has been substantial[,] including millions of pages of document production and review, the exchange of substantive written interrogatories, more than eighty[5] depositions, and extensive expert analysis." (ECF No. 1318, PageID.40267.) In sum, the Flint Water Cases are abundant, complex, and have been intensely litigated for the last several years.

Class Plaintiffs now seek certification of a "Master" Issues Class— as well as a VNA-specific Issues Subclass, a Damages and Injunctive Subclass consisting entirely of minors, and two separate Damages Subclasses consisting of residential property owners and business

---

[4] The most recent case management order ("CMO"), the Fifth Amended Case Management Order, was issued by the Court on September 8, 2020. (ECF No. 1255.)

[5] As of November 17, 2020.

7

owners, respectively—to pursue joint claims of professional negligence against the two engineering firms they allege are liable for the injuries they suffered from the Flint Water Crisis. Class Plaintiffs initially sued many individuals and entities, but this class certification motion involves only claims for professional negligence against LAN and VNA, two professional engineering firms, collectively referred to as "Defendants" or the "Engineering Defendants."[6] LAN performed work as a consultant related to the City's transition to the Flint River and continued to advise the City on water quality issues during the Crisis. VNA also performed water consultancy work, but only after the transition and for a limited time (from early January 2015 to March 2015).

Class Plaintiffs filed their motion for class certification on July 16, 2020. (ECF No. 1207.) The Individual Plaintiffs not seeking to be represented by the Class, as well as Defendants LAN and VNA,

---

[6] In their motion for class certification, Class Plaintiffs initially named Rowe Professional Services Company as one of the Engineering Defendants, and they included liability claims against numerous government entities and individuals (collectively "Government Defendants") alleging violations of the right to bodily integrity guaranteed by the Due Process Clause of the Fourteenth Amendment. (ECF No. 1207, PageID.34438.) But in light of the pending settlement proceedings involving these entities, (*see* ECF No. 1399), this Opinion and Order will address only Class Plaintiffs' claims against LAN and VNA.

responded in January 2021. (ECF Nos. 1392, 1369, 1390.) Class Plaintiffs replied on April 7, 2021. (ECF No. 1581.)

Class Plaintiffs rely on fourteen retained experts for their motion for class certification. Defendants LAN and VNA filed a combined total of fifteen *Daubert* motions seeking to exclude the testimony and reports of all of these experts. (ECF Nos. 1371, 1372, 1373, 1374, 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1384, 1385, 1388.) On May 19, 2021, the Court heard oral argument on the motions to exclude the testimony and reports of the two experts whose testimony impacts the pertinent liability portion of the class certification motion: Dr. Larry Russell and Dr. Paolo Gardoni. (ECF No. 1779.)

On June 2, 2021, the Court held a hearing on the class certification motion via video teleconference. (ECF No. 1828.) The Honorable Joseph J. Farah of Genesee County Circuit Court was also in attendance. During the hearing, Class Plaintiffs' counsel agreed that redefinition and clarification of the proposed "Master" Issues Class and four Subclasses was appropriate. (*See id.*; ECF No. 1811.) Accordingly, on June 4, 2021, the Court ordered Class Plaintiffs to submit amended class definitions, as well as to confirm whether they were seeking damages for a personal

9

injury class of adults.[7] (*Id.*) On June 14, 2021, Class Plaintiffs submitted their updated class definitions and clarified that they were not seeking personal injury damages for adults. (ECF No. 1829.) VNA responded on June 28, 2021. (ECF No. 1854.) LAN did not respond. Class Plaintiffs replied on July 6, 2021. (ECF No. 1873.)

For the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Class Plaintiffs' motion for class certification. The Court DENIES Defendants LAN's and VNA's motions to exclude the expert testimony and reports of Dr. Russell. The Court GRANTS IN PART AND DENIES IN PART LAN's and VNA's motions to exclude the expert testimony and reports of Dr. Gardoni. Finally, the Court DENIES AS MOOT the remaining *Daubert* motions, but Defendants LAN and VNA may refile those motions, if needed, prior to trial.

---

[7] This clarification was necessary because Class Plaintiffs included language in their motion for class certification implying that they were seeking personal injury damages for adults. For example, after defining the proposed "Master" Issues Class "pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4)," Class Plaintiffs stated that they "seek damages relating to Class members' quality of life." (ECF No. 1207, PageID.34418). The Court notes that class relief is available for adult personal injuries in the partial settlement agreement, (ECF No. 1319-1, PageID.40336–40337), which was negotiated by the same counsel and includes many of the same named Plaintiffs.

## II.   BACKGROUND

The background to the Flint Water Crisis has been set forth extensively in previous opinions issued by this Court. For the purpose of this Opinion and Order, the Court will first provide a general background of the events leading up to the Flint Water Crisis as laid out in a previous opinion and order issued in these cases. Second, the Court will discuss Engineering Defendants' conduct specifically as it relates to the Crisis and Class Plaintiffs' allegations regarding the harm done to them.

### A. General Background

The background below is excerpted from the Court's August 2019 Opinion and Order Granting in Part and Denying in Part Plaintiffs' Motion for Leave to File an Amended Master Complaint and Granting in Part and Denying in Part Defendants' Motions to Dismiss Plaintiffs' Amended Short-Form Complaints. *See In re Flint Water Cases*, No. 17-10342, 2019 WL 3530874 (E.D. Mich. Aug. 2, 2019) (hereinafter "*Walters*").

> *Flint's water supply history*. The City of Flint abuts the seventy-eight mile long Flint River. The City is one of the largest in Michigan and for much of the early twentieth century relied on the Flint River for its primary source of water. (Dkt. 185-2 at 74.) For this reason, the Flint Water

11

Treatment Plant (FWTP) was constructed in 1917 to treat the river's raw water. The FWTP enabled the City to safely distribute Flint River water to residents for use and consumption. (*Id.*)

Then, in 1964, the United States Geological Survey noted that the Flint River contained high levels of chloride. (*Id.*) Chloride reacts with trace metals found in river water to form certain salts, making the water corrosive and difficult to process. As a result of this problem and others, Flint eventually stopped drawing water from the Flint River. (*Id.*) Starting in 1967, the City began to purchase water under contract from the Detroit Water and Sewerage Department (DWSD). The DWSD water was drawn from Lake Huron and treated before delivery. There was therefore no need to treat it at the FWTP, and the facility was deactivated. (*Id.* at 74–75.)

In addition to purchasing water for its own customers, Flint also resold DWSD water to the GCDC [Genesee County Drain Commissioner]. The GCDC was responsible for the water supply to several municipalities within Genesee County, and it resold the water to those customers. (*Id.* at 75.) In accordance with this transaction, Flint and the GCDC entered into a contract in 1973. Flint promised to supply the GCDC with a sufficient quantity of water to meet its needs, and the GCDC committed to buying water from Flint so long as it met all regulatory standards. This contract was updated in 2003 and remained in effect leading up to the Crisis. (*Id.*)

*The formation of the Karegondi Water Authority.* For decades, this arrangement posed no problems. (*Id.* at 27.) But beginning in the 1990s, Flint and other Genesee County communities began to grow concerned about the increasing

cost of DWSD's water, and they commissioned studies to look at alternative sources. (*Id.* at 76.) The first of these was completed as early as 1992, but others followed. And more recently in 2009, LAN and Rowe completed a study which examined whether Flint and these communities should continue to buy water from DWSD, or whether they should construct a new pipeline to independently draw raw water from Lake Huron. (*Id.* at 76–77.)

Later that year, Flint and these other Genesee County communities formed the KWA [Karegondi Water Authority] to explore the possibility of constructing a new Lake Huron pipeline. (*Id.* at 27.) The KWA pipeline was projected to cost approximately $300 million to construct. And for its part, Flint would pay $85 million of that total and service about one third of the debt. (*Id.* at 27–28.) In addition, it would require treatment before being distributed to customers, because the water pumped from Lake Huron would be raw. (*Id.* at 28.) The long-since dormant FWTP would therefore need to be reactivated and upgraded to meet modern regulatory standards. (*Id.* at 34.) If the pipeline were constructed successfully, the KWA would manage the supply of raw Lake Huron water to KWA member entities which would then be responsible for treating and distributing it.

*Committing to the KWA pipeline project.* In 2011, a panel appointed by Governor [Richard] Snyder declared Flint to be in a state of financial emergency. As such, the panel recommended that an Emergency Manager be appointed to manage Flint's finances. Emergency managers may be appointed by the Governor of Michigan "to address a financial emergency within that local government." Mich. Comp. Laws § 141.1549(1). Pursuant to that recommendation, the

13

Governor appointed Edward Kurtz to the position. (*Id.* at 29.) This meant that Kurtz and his successors would "act for and in the place and stead of the governing body" of Flint. § 141.1549(2). This gave Kurtz broad control over municipal policymaking, *see id.*, subject only to the authority of Governor Snyder, *see* § 141.1549(3)(d), or the State Treasurer, *see* § 141.1549(8).

Consistent with his mandate, Kurtz began to evaluate the fiscal prudence of the KWA project. In November 2012, Kurtz wrote to the State Treasurer, Andrew Dillon, suggesting that Flint commit to the KWA pipeline because it would result in Flint saving money. (Dkt. 185-2 at 29.) This was an opinion shared by Jeffrey Wright, the Genesee County Drain Commissioner, CEO of the KWA, and a vocal opponent of the DWSD. (*Id.*)

The DWSD disagreed with Kurtz's evaluation. Throughout 2012, it presented cost studies to Kurtz, Wright, Dillon, and the Governor that refuted Kurtz's position. All of these studies demonstrated that from a cost and reliability standpoint, Flint was better off continuing to buy DWSD water rather than committing to the KWA pipeline. (*Id.*) Seeking additional input, Dillon commissioned an independent cost study. (*Id.* at 29–30.) In February 2013, this study concluded that it would be more economical for Flint to continue to purchase DWSD water on both a short and long-term basis. (*Id.* at 30.)

Throughout 2013, Flint continued to negotiate with the DWSD while weighing the benefits of the KWA pipeline project. In April, the DWSD presented a proposal that purported to save the City twenty percent over a thirty-year

period when compared to the KWA project. (*Id.* at 31.) This offer even got the attention of senior state officials, including Dillon, who wondered why Flint would proceed with the KWA pipeline in the face of such savings. (*Id.* at 31–32.)

Despite this, Flint continued to evaluate the KWA plan. Several KWA member communities had committed to the KWA pipeline by the spring of 2013. (*Id.* at 33.) But Wright believed that it would be difficult to finance the cost of the project without also obtaining Flint's participation and financial support. Wright therefore turned his attention to securing Flint's participation. He aggressively argued the case for Flint's involvement in the KWA to senior government officials and to the media, and he refuted claims that staying with DWSD water would be the economical choice for Flint. (*Id.*)

In March 2013, Dillon recommended to the Governor that Flint commit to the KWA project, despite Dillon recognizing that studies and the last DWSD proposal counseled against it from a cost perspective. (*Id.* at 30, 32–33.) In response, the Governor ordered the DWSD to submit a final proposal to continue as Flint's water supplier. As directed, the DWSD issued this final offer in April 2013, which Flint rejected. (*Id.* at 34.) And the Governor authorized Kurtz to bind Flint to the KWA project. (*Id.* at 34–35.)

Kurtz committed Flint to the KWA pipeline soon after. (*Id.* at 80–81.) The DWSD attempted to get Flint to reconsider. But when Flint declined, the DWSD gave notice that it would terminate its contract with Flint, effective one year from that date, in April 2014. (*Id.* at 81.) After that time, if Flint wanted to purchase water from DWSD, it would have to do so under

more expensive non-contract prices.

*Devising the interim plan.* The decision to commit to the KWA pipeline left Flint with a problem. The pipeline would not be ready until late 2016, maybe even early 2017 (*id.* at 35), meaning that Flint would have to identify an interim supply of water. It could continue to buy water from the DWSD on an ad-hoc basis at a non-contract price. (*Id.* at 137.) Alternatively, it could seek out a different source of water.

In June 2013, Dillon, Kurtz, Wright, and Flint's Mayor, Dayne Walling, devised a solution. (*Id.* at 36.) They decided to use the Flint River as an interim source of water rather than continuing to buy from the DWSD. A critical part of this interim plan was to shift funds that would have paid for the treated DWSD water to purchase the necessary upgrades for the FWTP in order for it to safely process the raw Flint River water. (*Id.*) The FWTP would need upgrading to process the water drawn from the eventual KWA pipeline from Lake Huron in any case, so this plan also served that wider purpose. However, the interim plan did not include a plan for how to implement the necessary FWTP upgrades and remediation. (*Id.* at 35–36.) These individuals knew that these details still needed to be worked out, as did the Governor. (*Id.*)

At the same time, it was widely known that the Flint River had been evaluated and rejected as a possible water source on prior occasions. (*Id.* at 36.) As far back as 1964, concerns had been raised about the river's chloride content. (*Id.* at 74.) And years of rock salt washing into the river from winter roads had exacerbated this problem, increasing the corrosive nature of the water. (*Id.* at 87.) In addition, a 2001 report by Michigan's

Department of Natural Resources noted that factories along the Flint River discharged their industrial waste into the river. (*Id.* at 76.) Unsurprisingly, the United States Geological Society, the MDEQ [Michigan Department of Environmental Quality], and the Flint Water Utilities Department had all reported that "the Flint River was a highly sensitive drinking water source that was susceptible to contamination." (*Id.*)

. . .

Prior to the development of the interim plan, government officials had openly expressed concern about using the Flint River as a water source. [In 2011, LAN and Rowe additionally cautioned against it after the City hired them to advise on the subject.] In March 2013, Stephen Busch, an MDEQ District Supervisor, sent an email to MDEQ Director Daniel Wyant expressing concern that the Flint River would "[p]ose an increased microbial risk to public health[,] . . . an increased risk of disinfection by-product exposure . . . [, and] trigger additional regulatory requirements." (*Id.* at 30–31.) He stated that the FWTP would require significant upgrades above and beyond those required to treat water drawn from Lake Huron. Busch recognized that any decision to use the Flint River as a water source would be primarily based on cost and not a scientific assessment of its suitability. (*Id.* at 32.) Using the Flint River as a water source presented a challenging proposition.

Nonetheless, the interim plan was put into action as a cost-cutting measure when compared with purchasing DWSD water at a non-contract price. (*Id.* at 81.) The planned transition date was April 2014, set to coincide with the termination of the DWSD agreement. (*Id.* at 84.) The interim

plan did not apply to the remainder of Genesee County, which would continue to purchase DWSD water. (*Id.* at 40–41.)

*Transitioning to the Flint River.* Shortly after the interim plan was devised, [the City re]hired LAN to provide advice on the transition to and use of the Flint River as a water source. (*Id.* at 81.) [City representatives, in conjunction with representatives from LAN, the GCDC, and MDEQ, determined that the Flint River was a viable water source; that any difficulties could be overcome; and that an April 2014 timeframe was feasible for the switch.]

. . .

As the April 2014 deadline approached, concerns began to surface about how ready the City was to begin drawing water from the Flint River. A senior official from the Governor's office warned the Governor that the transition timeframe was too rushed and that there was a possibility of something going wrong. (*Id.* at 37–38.) Moreover, Michael Glasgow, Flint's water treatment plant operator, informed the MDEQ that the FWTP was not fit to begin operations and that he was not ready to give his approval for it to begin active service. (*Id.* at 38–39.)

[Though the City was aware of potential corrosion issues during this time, no corrosion control measures were put in place to neutralize the chloride salts in the Flint River water.]

With these concerns hanging over the transition, the City submitted its application for MDEQ approval to make the switch to the Flint River on March 31, 2014. (*Id.* at 138.) This application proposed various capital projects that would take

18

at least two months to complete. (*Id.* at 140.) But just nine days after it was submitted, MDEQ employee Patrick Cook approved it and gave the switch the green light. (*Id.* at 138.) Under the direction of Emergency Manager Earley, Flint water users began receiving the river's water on April 25, 2014. (*Id.* at 40.)

*Effect on Flint's water infrastructure.* Most of Flint's water distribution pipelines are over seventy-five years old and constructed of cast iron.[8] (*Id.* at 91.) Cast iron pipes are subject to internal corrosion, which causes buildup on the pipe interior, leading to water quality issues, reduced flow, and even leakage. This process also results in the development of biofilms—layers of bacteria that attach to the interior of the pipe wall. (*Id.*) At the time the FWTP began drawing water from the Flint River, it was corrosive due to the increased presence of chloride salts, and it was not being treated to neutralize this property. (*Id.* at 87–88.) This resulted in the layer of internal buildup being stripped from the pipe. The biofilms went with it, releasing potentially harmful bacteria into the water supply. (*Id.* at 89.) The pipe metal was left exposed and lay open to the water's corrosive properties. (*Id.*)

In April 2014, a large percentage of Flint's exterior service lines were also many decades old,[9] and these were mostly made out of lead. (*Id.* at 92.) The corrosive water stripped the buildup from these pipes too. The exposed pipework began to leach lead and bacteria into the City's water. (*Id.*) Lead is toxic, and there is no safe level of exposure. Lead is particularly damaging to children because even low-level lead exposure can result in reduced intelligence, shortening of attention span, and increased antisocial behavior. (*Id.* at 111–12.)

*Initial warning signs.* Almost immediately following the transition, users began complaining about Flint's new water source. (*Id.* at 44.) The Governor's office began receiving customer grievances, and numerous press stories were written about Flint's water quality problems. (*Id.* at 44 n.4.)

In August 2014, Flint's water tested above the legal limits for total coliforms, including potentially fatal pathogens. (*Id.* at 89.) As a short-term solution, the City issued boil-water advisories that lasted into September. In an attempt to permanently address the issue, Flint officials began adding more chlorine to the water to kill the bacteria. (*Id.*)

Chlorine in water reacts with organic and inorganic matter, producing byproducts collectively referred to as trihalomethanes. (*Id.*) The EPA regulates several types of trihalomethanes in drinking water, and the collective concentration of these compounds is known as the Total Trihalomethanes (TTHM) count. However, chlorine reacts preferentially with metal. (*Id.* at 101.) So as the metal pipes were stripped bare, more and more chlorine was needed to neutralize the coliforms. The increased quantity of chlorine in turn raised the TTHM count. (*Id.* at 89.) The inability to treat coliforms such as *E. coli* with chlorine is indicative of a problem with pipe corrosion. (*Id.* at 103.) And the resulting high TTHM levels were an indicator of this underlying problem. (*Id.* at 89.) MDEQ officials Busch, Prysby, and Adam Rosenthal, a water quality analyst, were aware in May 2014 that TTHM levels were elevated and above regulatory mandated levels. (*Id.* at 89–90.)

The complaints continued to grow such that by October 2014,

Flint's water problems were under serious discussion in the Governor's office. (*Id.* at 44.) In addition, the MDHHS was notified of an outbreak of Legionnaires' disease, a deadly illness caused by *legionella* bacteria which can enter the water supply when biofilms are stripped from old metal piping. (*Id.* at 90.) Lead poisoning rates for the months of July, August, and September were also dramatically higher than usual for children living in Flint. Yet no government official took any action, despite suggestions by senior staff in the Governor's office that Flint should begin to purchase water from DWSD until water quality could be assured for Flint's residents. The fact that the Genesee County Health Department began to connect the increased incidence of *legionella* with Flint's water did nothing to activate a response. (*Id.* at 45 n.6.)

As the winter of 2014 drew nearer, a large customer with the ability to do so stopped using Flint's water. General Motors (GM) switched from the City of Flint water system to Flint Township's water (drawn from Lake Huron) for its Flint engine operations facility. (*Id.* at 45 n.7.) And while the MDEQ stated at this time that there was nothing unusual about the chloride content in Flint's water, GM cited corrosion concerns for its decision. (*Id.* at 45, 91.) The loss of GM as a customer resulted in an annual revenue loss for the City of $400,000. (*Id.* at 45 n.7.)

The import of GM's decision was not lost on senior members of Governor Snyder's staff who again suggested that Flint resume purchasing DWSD water. (*Id.* at 45.) But again, no action was taken. When Earley was directly briefed on the issue of GM's switch by the Governor's staff, he rejected the idea of reconnecting to DWSD water. (*Id.* at 46.) This was despite the fact that the Governor's own Chief of Staff

described the situation as "downright scary" and called for a return to DWSD "ASAP." (*Id.*)

The Crisis continued to develop. At the same time, water coolers were installed in Flint's state government buildings. This left MDEQ officials to discuss the optics of such a move, given the government's public message that Flint's water was safe for human consumption. (*Id.* at 47.) Additionally, the University of Michigan turned off certain drinking fountains located on its Flint campus because of high lead levels. (*Id.* at 92.) And test results began to show that Flint's water exceeded the regulatory standards governing lead levels in drinking water. (*Id.* at 91.)

*From warning signs to alarm bells.* In January 2015, Earley resigned and was replaced as Emergency Manager by Gerald Ambrose. (*Id.* at 47.) Around this time, state officials recognized that the problems with Flint's water were being caused by pipe corrosion. (*Id.* at 48 n.13.) The DWSD approached Ambrose and offered him the opportunity to purchase water at attractive rates and even offered to waive the reconnection fee. (*Id.* at 48–49.) But Ambrose rejected the proposal, even though there had been months of complaints that the water was discolored, foul smelling, bad tasting, and making families sick. (*Id.*) The Governor was briefed on the severity of the situation, but again, neither state nor local officials took any corrective action. (*Id.* at 49–50.)

In February 2015, in an effort to address the public health emergency, the City hired [VNA] and rehired LAN to review the City's water system. (*Id.* at 96.)

. . .

22

That same month, Flint residents began staging public demonstrations to demand a return to DWSD water and the Environmental Protection Agency (EPA) responded to complaints raised by Flint water users. (*Id.* at 49–50.) A resident, LeeAnne Walters, had complained of black sediment in her water. The EPA noted that the iron content of the water was so high that testing instruments could not measure it, concluded that the black sediment was lead, and began to inquire further. (*Id.*) As part of that investigation, MDEQ supervisor Busch falsely advised the EPA that Flint was using optimized corrosion control. The MDEQ dismissed the possibility of the black sediment being lead because, in the MDEQ's view, the complaint came from a resident whose house contained plastic plumbing. (*Id.* at 51 n.18.) It was not until April 2015 that the MDEQ admitted to the EPA that the FWTP had no corrosion control protocol in place. (*Id.* at 55.)

By March 2015, it was becoming clear that a major public health emergency existed. (*Id.* at 52.) Officials recognized that this probably included widespread lead poisoning and an increased risk of *legionella* exposure. The Governor and officials in his office discussed the possibility of distributing water filters to Flint residents, but they decided not to do so. (*Id.*) Instead, government officials continued to defend the decision to use the Flint River as an interim water source. (*Id.* at 52 n.20.) Moreover, officials began discrediting independent parties who were publishing data that showed elevated lead levels in Flint's water. (*Id.*) MDEQ officials continued to deny the link between Flint's water and *legionella*. (*Id.* at 53–54.) Emergency Manager Ambrose vetoed a Flint City Council vote to reconnect to DWSD water. (*Id.* at 54.)

As the summer began, the EPA continued to monitor the situation. In June 2015, the EPA prepared an internal memorandum titled "High Lead in Flint Michigan-Interim Report" and shared it with MDEQ staff. (*Id.* at 56.) In the words of one EPA employee, the government's response to the Crisis "border[ed] on criminal neglect." This did not prompt state or local officials to address the risk of harm faced by Flint's water users, even though the EPA began to speak publicly about the possible dangers. (*Id.*) Instead, government officials again denied that there was a problem. In July, MDEQ Communications Director Bradly Wurfel appeared on television and radio to deny that there was any problem with Flint's water, despite all evidence to the contrary. (*Id.* at 57, 59.) At the same time, the Governor was warned by his Chief of Staff that complaints about the water were being inappropriately "blown off" by government officials, yet the Governor continued to do nothing. (*Id.* at 58.)

As the summer drew to a close, the Crisis became impossible to deny. Private individuals such as Dr. [Mona] Hanna-Attisha, a Flint area pediatrician, began pointing out flaws with Flint's water quality testing procedures and speaking publicly about possible lead poisoning. Then, Professor Marc Edwards of Virginia Polytechnic Institute and State University determined in August 2015 that there was serious lead contamination and highlighted how the situation was being covered up. (*Id.* at 59–61.) In response, the MDEQ falsely stated that the MDHHS had reexamined blood lead level data and found nothing to affirm Dr. Hanna-Attisha's data. (*Id.* at 63–64.) Wurfel discredited Edwards and continued to assure the public that Flint's water was safe. (*Id.* 60–61, 63–64.) MDEQ officials Busch, Prysby, and Glasgow

subsequently conspired to alter water quality reports to remove the highest lead level test results. (*Id.* at 60–61.)

On October 8, 2015, the Governor publicly admitted that Flint's water supply was compromised and ordered the City to reconnect to the DWSD. This reconnection occurred on October 16. (*Id.* at 64.) On October 18, MDEQ Director Wyant admitted to the Governor that the FWTP had failed to implement corrosion control from the outset. (*Id.* at 65.) Wyant claimed that this was due to an incorrect understanding of the regulatory requirements. (*Id.*)

*Aftermath.* Although government officials at last publicly admitted the nature of the Crisis and ordered Flint to reconnect to DWSD water, the health threat did not dissipate. Flint's corroded water infrastructure continued to leach lead and bacteria into the water. The pipes, stripped bare by the Flint River's corrosive water, did not instantaneously regain their earlier protective film with the change in water. The dangers were still present. Yet government officials issued misleading statements that continued to downplay the risks of harm posed by Flint's water. (*Id.* at 67.) This was even so once Governor Snyder was informed in December 2015 that the risk posed by elevated lead levels and *legionella* was ongoing. (*Id.* at 66.) It was not until January 6, 2016, that the Governor publicly accepted that the risks due to lead exposure were still ongoing. (*Id.* at 67.) It then took him until January 13 to do the same for Legionnaires' disease, issuing a state of emergency in Flint and activating the Michigan National Guard to assist the City's residents. (*Id.*)

This was almost two years after the transition to the Flint River. The long delay between Governor Snyder publicly

25

admitting that the Crisis existed and declaring a state of emergency was at odds with how he handled disasters in other majority white Michigan communities, where he would typically issue states of emergencies within days following a disaster. (*Id.* at 150–56.)

_____

[8] Water distribution pipes transport treated drinking water to consumers. These pipes may be large in diameter, which supply entire towns, or they may be smaller pipes that branch off the larger ones to supply a particular street or group of buildings.

[9] An exterior service line connects a building to the main distribution pipelines.

*Id.* at *4–10.

## B. LAN's Conduct

In 2011, LAN entered into a contract with the City of Flint to help determine whether the Flint River could be used as a primary drinking source for the City. LAN initially

cautioned against it and warned that the dormant FWTP would require millions of dollars in upgrades in order to treat the raw river water safely.[] In addition, water from the river would require more effort to treat than water from the eventual KWA pipeline, which would draw from Lake Huron. LAN's analysis in particular noted a need to use chemicals to neutralize the river's corrosive properties.

*Id.* at *6.

26

Despite these early warnings, the City persisted in its goal to switch its water source. In 2013, LAN entered into another contract with the City to determine the steps the City needed to take to switch from using Lake Huron water—treated by DWSD—to using Flint River water treated by the FWTP. The stated purpose of the contract was to "rehabilitat[e] and improve[] the Flint Water Plant to provide water supply continuous service utilizing the Flint River as a water source." (ECF No. 1208-54, PageID.35336.) Pursuant to the contract, LAN agreed to "exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." (*Id.* at PageID.35330.) The contract provided that "the City [wa]s relying upon the professional reputation, experience, certification, and ability of [LAN]." (*Id.*)

In June 2013, LAN

> met with representatives from Flint, the GCDC, and the MDEQ. They discussed FWTP upgrades, water quality control, and the ability to meet the April 2014 deadline. The attendees determined that the Flint River was a viable water source. Although it would be more difficult to treat than other water sources, the parties believed that these difficulties could be overcome. In LAN's view, the April 2014 timeframe was feasible.

27

*Walters*, at *6.

While operating under this contract, LAN proposed a three-piece engineering project to put the FWTP into service using Flint River water. Pursuant to this project, LAN would: (1) test run the "treatment systems and hydraulic capacity" of the water plant; (2) prepare and submit an engineering planning report "to define the immediate and long term improvements using the Flint River as a source of water"; and (3) "fast track design of the immediate improvements for continuous operation and treatment of Flint River water." (ECF No. 1208-54, PageID.35341–35342.)

In its three-piece engineering project, LAN did not recommend a corrosion control study or suggest installation of a corrosion control chemical dosing program, despite the fact that the DWSD had undertaken corrosion control protocols. (*See* ECF No. 1208-67, PageID.35458–35459.) Mr. Warren Green, LAN's project lead engineer, internally recommended a corrosivity assessment for the treatment plant that would run from sixty to ninety days. However, according to Class Plaintiffs' water quality and corrosion mitigation expert, Dr. Larry Russell, "a meaningful study of this nature to stabilize the corrosion

treatment process would take two years [in order to] identif[y] the appropriate dose of corrosion control inhibitor (such as, orthophosphate) using pipe loop testing." (*Id.* at PageID.35456–35457 (quoting EPA representative Mr. Michael Schock ("So there's no hard and fast specific time frame, but by and large, in our experience, a couple years is a rough estimate of what it would really take to get a [corrosion control] study done. And the studies need to be done, and it's a well-known best practice in the corrosion control field before you make a treatment change that's significantly going to affect corrosion.")).) Ultimately, LAN, MDEQ, and Flint City officials "decided to wait for more data before implementing a corrosion control protocol. As a result, no corrosion control measures were put in place to neutralize the chloride salts present in the Flint River water." *Walters*, at *6.

Despite this initial decision to wait for more data—and with LAN's approval—the City began using Flint River water as a water source in April 2014 and did not undertake corrosion control. (*See* ECF No. 1208-67, PageID.35458.) Right after the switch, Flint residents began to complain about the smell, taste, and color of the new water. (*See, e.g.*, ECF No. 1208-68, PageID.35516.) By August 2014, Flint's water tested

29

above the regulatory limit for fecal coliform, including *E. coli*, and the City increased the water's chlorine levels in response. (*See* ECF No. 1208-69, PageID.35529–35530.) However, without a corrosion control protocol, increased chlorine resulted in an increase in disinfectant byproducts, including TTHM levels that exceeded federal regulatory guidelines. (*See* ECF Nos. 1208-67, PageID.35462; 1208-70, PageID.35559.) LAN provided engineering services to the City throughout this period and allegedly never raised red flags about the following harms that could result from ongoing corrosion: elevated TTHM levels, lead poisoning, and damage to pipes and fixtures controlled by the City and members of the public.

LAN's most significant recommendation to the City after the Crisis—in both its 2014 Action Plan regarding the subsequent TTHM issues and its February 2015 report after it was rehired to review the City's water system—was to increase ferric chloride dosing.[8] As Dr. Russell explains, "[t]he Flint River [already] contained high levels of chlorides resulting from both industrial and agricultural discharges, road salt used for winter ice management, and evaporation in Lake Holloway.

---

[8] VNA also made this recommendation. *See Walters*, at *8.

30

The use of ferric chloride as a coagulant further increased the concentrations of chlorides in the treated water." (ECF No. 1208-67, PageID.35420.) The increased chloride resulted in increased water acidity, which likely "worsened the corrosive nature of the City's water." *Walters*, at *8. Dr. Russell faults LAN for "fail[ing] to acknowledge any corrosion problems in the report [or] provide a strategy that included corrosion control." (*Id.* at PageID.35462.)

LAN disputes this characterization of its role. It argues in its class certification response brief, without referring to attachments or citing to the record, that it was "basically shut out from water quality decision-making," that it was "not asked to participate in a subsequent test run the City is believed to have conducted in September-October, 2013," and that it "was not asked to participate in any final test run in spring 2014, prior to distribution of water to the public. Nor was LAN consulted the following summer when the City began receiving complaints from residents regarding the color, odor, and taste of the water from the FWTP." (ECF No. 1390, PageID.53910.) LAN also argues that, pursuant

to the City's Change Orders No. 3, 4, and 5,[9] it was not "g[i]ve[n] responsibility for water quality." (*Id.*)

### C. VNA's Conduct

In January 2015, the City of Flint issued an invitation to bid for a "Water Quality Consultant" to help address problems stemming from Flint River water, explaining that Flint was "seeking a consultant to review and evaluate the water treatment process and distribution system," as well as to "provide recommendations to maintain compliance with both state and federal agencies, and assist in implementing accepted recommendations." (ECF No. 1208-71, PageID.35607–35608.)

VNA responded with a bid offering a "complete solution" to address both the "immediate reliability" of the City's water system and future "operational needs." (ECF No. 1208-72, PageID.35639–35642.) VNA's response stated that "addressing the fundamental issues concerning water quality compliance and operational reliability" would be "much more complex" than the approach initially outlined in the City's invitation to bid. (*Id.*) VNA indicated that it would "review[] and

---

[9] The Court could not readily identify these documents from the available record, and LAN did not attach, cite, or otherwise direct the Court to them.

evaluat[e] the City's water treatment process and distribution system"; "develop[] a report on the finding of the evaluation, with specific recommendations to maintain compliance with both State of Michigan and federal agencies"; and "assist[] the City in implementing accepted recommendations [which focus on] improv[ing] the overall process of treating and distributing water, including improvements to water quality until the implementation of the KWA project [] under which the City will be receiving and treating Lake Huron water." (*Id.* at PageID.35643.)

On February 4, 2015, VNA signed a contract with the City agreeing to "provide consulting services related to the Flint Water Treatment System updates for the City of Flint." (ECF No. 1208-73.) The contract defined the scope of VNA's services as incorporating VNA's response to the invitation to bid. (*Id.* at PageID.35680.) VNA agreed in its contract to conduct a "top to bottom" review of the City's water system to "determine the source of any problems that might be present in the way the [C]ity is treating water from the Flint River." (ECF No. 1208-75, PageID.35698.) VNA's contract was never amended.

A week after it was hired, VNA issued an interim report "indicating that Flint was in compliance with drinking water standards." *Walters*, at

33

*8. Around the same time, in a February 18, 2015 meeting with the City of Flint Public Works Committee, VNA's representative David Gattison reported that "[the City's] water is tested . . . more than 20,000 times annually. That is what is required by the state, and by federal. So that the guidelines are—are very strict . . . . It has been tested, and to this date we can say that the water . . . is safe—here in Flint." (ECF No. 1208-86, PageID.35774.)

Despite these public reassurances, there were multiple instances in which VNA internally recognized potential issues with the City's municipal water supply. For example:

- In a February 9, 2015 internal email, VNA's agent Mr. Robert Nichols wrote to Ms. Kelly Rossman-McKinney[10] that "[l]ead could be a problem based on the water. Part of what we will do is look at the water quality, testing and results for lots of different variables." (ECF No. 1208-87, PageID.35860.)

- A February 18, 2015 note handwritten by VNA's engineer Mr. Marvin Gnagy states that "corrosive water conditions exist discussed w/ plant staff and suggested potential issues with lead and copper monitoring in the future. Might need to balance ph and corrosion control with THM [sic] compliance issues." (ECF No. 1208-67, PageID.35464–35465.)

---

[10] Ms. Rossman-McKinney's email address identifies her as an employee of Truscott Rossman, which appears to be a strategic communications firm. (*See* ECF No. 1208-87, PageID.35860; *see also* www.truscottrossman.com.)

- VNA engineer Mr. Depin Chen acknowledged in an email toward the beginning of the project that "DWSD has just offered to reconnect the DWSD supply line to Flint with no strings attached (no re-connection fee, no long term contract). Many residents are asking to have the DWSD water back. . . . It seems that reconnecting to the DWSD for the next two years will be the best solution to satisfy the residents and activists." (*Id.* at PageID.35465.) In a later deposition, Mr. Chen defended his email recommendation as "the best technical solution." (*Id.*)

- VNA internally recognized, through its Director of Optimization Mr. Joseph Nasuta in a February 13, 2015 email to Mr. Gnagy, that "the quickest option and maybe safest option is to return to Detroit water. We can say we have not evaluated the costs of that option, if we have not, but we need to tell BD[11] that this **is an option** and quick to implement." (ECF No. 1208-85, PageID.35767 (emphasis in original).) Mr. Nasuta reiterated the urgency of communicating this option multiple times in the same email thread: "please in some form (report paragraph or email best) tell BD that returning to Detroit is an option . . . we need to be sure to tell them the obvious; there is a[] quick easy fix to this (even if it is not in the scope of work BD asked to look at). Let me know if you have questions, but we must get this message to the DB[12] group and let them decide." (*Id.*)

---

[11] The Court is unclear as to who or what BD is.

[12] The Court is unclear as to who or what DB is.

35

Despite VNA's internal recognition of potential issues with the City's municipal water supply, VNA allegedly failed to perform a number of tests and make a number of recommendations that would have more quickly confirmed to the public the existence of toxins in the City's water. Class Plaintiffs' expert Dr. Russell opines that VNA failed to inform the City in writing, and potentially at all, that even though MDEQ was not formally requiring corrosion control, the City was in violation of federal regulations requiring as much. (ECF No. 1208-67, PageID.35463.) Dr. Russell also faults VNA for failing to calculate the chloride to sulfite ratio for the water, which Dr. Russell says is standard and would demonstrate the need for immediate corrosion control. Dr. Russell additionally faults VNA for failing to include the need for lead corrosion control in any of its reports and failing to emphasize that corrosion control was critical to protect public health, even though VNA's engineers were aware that corrosion control was a "best practice" and that using orthophosphates to control for lead corrosion would be a "must" for the City. (*See* ECF No. 1207, PageID.34466; ECF No. 1208-83, PageID.35748–35749.)

VNA disputes the argument that it failed to make corrosion control recommendations. VNA's "final report" to the City recommended, at

36

internal priority level 2 after TTHM recommendations, "initiat[ing] discussions with the State on the addition of a corrosion control chemical," such as ".5 mg/L of phosphate." (ECF No. 1369-22, PageID.45824.) Ultimately, VNA recommended the addition of ferric chloride to help address the TTHM problem. But this "likely worsened the corrosive nature of the City's water by increasing the water's acidity." *Walters*, at *8.

There is evidence that VNA's failure to make the recommendations Dr. Russell believes it should have made was at least partially the result of City authorities intentionally prohibiting it from doing so.[13] VNA engineer Mr. Gnagy testified that the option of returning to the Detroit water supply was "taken off the table by the [C]ity." (ECF No. 1369-23, PageID.45832.) As a result, VNA engineers "didn't evaluate [this option] any further" and instead looked at "what it would take to treat the Flint

---

[13] There is additional evidence that the City was already aware of a corrosion control problem shortly after VNA arrived on the scene. Intracity emails from February 24, 2015 demonstrate that Michael Glasgow, manager of the FWTP, told the City that a lead sample from one Flint home—212 Browning—was "definitely a pressing issue here, and with this recent lead result and the previous iron results[ and] data to prove it . . . lead can be found in many plumbing features including faucets, but I worry if [the] service line is lead." (ECF No. 1369-25, PageID.45870.) The emails also discuss corrosion controls and adding phosphate to the [City's] water. (*See id.*)

River water to meet the THM [sic] conditions and to mitigate red water occurrences." (*Id.*) VNA representatives also assert that the City "deliberately withheld" from them elevated lead testing levels results, and instead provided VNA with "healthier" samples that VNA then tested and found, correctly, to be within the normal range for lead. (*See Id.* at PageID.458367–45843.)

## III.   LAW AND ANALYSIS

### A. Note About this Class Certification and the Pending Parallel Class Settlement Proceedings

As the Court has stated many times, the Flint Water Cases comprise a multi-faceted body of litigation involving multiple defendants, tens of thousands of individual as well as putative class plaintiffs, and numerous discrete legal issues. The class certification motion at issue here (ECF No. 1207) has proceeded alongside a motion for approval of a partial settlement (ECF No. 1318). The latter motion requests conditional certification of a settlement class and involves many of the parties initially named as defendants in the putative class action complaint, including the Government Defendants and Rowe. (*See* ECF No. 1318.) As of the issuance of this Opinion and Order, the Court has

granted the motion conditionally certifying the settlement class. (ECF No. 1399.)

The process of analyzing the putative class for settlement purposes is entirely separate from the process of analyzing the motion for class certification. However, the motion for class certification and the parallel class settlement proceedings involve many of the same or similar Plaintiffs. For this reason, the parties involved in the class certification motion draw certain comparisons between the two proceedings in arguing that the Court should rule one way or another on the class certification request because of its ruling in the partial class settlement context. These comparisons are largely unhelpful. The two proceedings involve different Defendants, different underlying legal issues, different class definitions, and different proposals for resolution of the Plaintiffs' varied claims. Additionally, though both proceedings involve analyzing the putative classes under Federal Rule of Civil Procedure 23(a) and (b), the Court applies Rule 23 differently in each proceeding—with more scrutiny as to some Rule 23 factors and less scrutiny as to others—due to the fundamentally distinct purposes of litigation and settlement classes. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 674 (6th Cir.

2020) (noting that the Rule 23(b)(3) analysis is more lax in settlement-only class certification proceedings because, in those cases, "a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial"); *see also Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 624 (E.D. Mich. 2020) ("The requirements for satisfying the adequate representation prerequisite for class certification are scrutinized more closely, not less, in cases involving a settlement class, as opposed to a class certified for trial, because the need for the adequacy of representation finding is particularly acute in settlement class situations.").

The Court will address the parties' specific comparisons in footnotes as they arise during the Rule 23 analysis of the class certification motion.

## B. Introduction to Class Certification

Pursuant to Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4), Class Plaintiffs move to certify a "Master" Issues Class and four Subclasses: an Issues Subclass and three Damages Subclasses, with one of the Damages Subclasses also seeking class-wide injunctive relief. (*See* ECF Nos. 1207, 1829.) Class Plaintiffs bear the burden of demonstrating

40

that class certification is proper. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). However, the Court is authorized to redefine the classes to provide narrower class-based relief when necessary to ensure that the "class is properly constituted." *See Powers v. Hamilton Cnty. Pub. Def. Com'n*, 501 F.3d 592, 618 (6th Cir. 2007).

As the Court will explain, Class Plaintiffs' proposed Damages and Injunctive Subclasses will not be certified because Class Plaintiffs cannot meet the Rule 23(b)(2) and (b)(3) requirements for class-wide damages and injunctive relief.[14] As the Court will further explain, Class Plaintiffs' proposed Issues Classes are certifiable under Rule 23(c)(4) but require redefinition. Accordingly, the Court will exercise its "broad discretion to modify class definitions" to redefine the proposed class definitions in order to certify two Issues Classes—a Multi-Defendant Issues Class and a LAN Issues Class—and nine questions that are appropriate for class treatment. *See id.*

Federal Rule of Civil Procedure 23 governs class certification. Class certification is "an exception to the usual rule that litigation is conducted

---

[14] Class Plaintiffs' proposed Minors Damages Subclass is additionally uncertifiable because doing so would violate Michigan law and the federal Rules Enabling Act.

41

by and on behalf of the individual named parties." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). In order to certify a class, and in a process "perhaps slightly more complicated than ordering from a restaurant menu," *In re FCA US LLC Monostable Elec. Gearshift Ltg.*, 334 F.R.D. 96, 104 (E.D. Mich. 2019), Class Plaintiffs must show that each proposed class meets the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one of the requirements of Rule 23(b), depending on the type of class-wide relief that Class Plaintiffs are seeking. *See* Fed. R. Civ. P. 23; *see In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). To recover class-wide damages as a "damages class" under Rule 23(b)(3), Class Plaintiffs must show that common issues in the lawsuit predominate over individualized ones and that a class action would be superior to other forms of litigation.[15] Fed. R. Civ. P. 23(b)(3).

---

[15] Rule 23(b)(3) sets forth four factors relevant to analyzing its predominance and superiority requirements:

    A) The class members' interests in individually controlling the prosecution or defense of separate actions;

    B) The extent and nature of any litigation concerning the controversy already begun by or against class members;

    C) The desirability of concentrating the litigation of the claims in the particular forum; and

To obtain injunctive relief as an "injunctive class" under Rule 23(b)(2), Class Plaintiffs must show that the proposed class is cohesive and seeks "final injunctive relief." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).

Rule 23 also permits certification of an issues class. Fed. R. Civ. P. 23(c)(4). Where a class cannot be certified to seek class-wide damages relief, certification of certain common *issues* within the class may be appropriate to "retain a case's character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 405 (6th Cir. 2018). Certification of an issues class is appropriate when "[r]esolving the issues in one fell swoop would conserve the resources of both the court and the parties" and will "materially advance the litigation." *Id.* at 416.

As a preliminary matter, while Class Plaintiffs do not demonstrate that their proposed classes are certifiable for damages or injunctive relief,

---

D) The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

43

there are discrete legal and factual issues apparent from the record that are "suitable subjects for class-wide adjudication." *See In re FCA*, 334 F.R.D. at 110. Accordingly, the Court will certify two Issues Classes and nine questions that are appropriate for class-wide treatment.

## C. Introduction to Class Definitions

"Although not specifically mentioned in Rule 23, the definition of the class is an essential prerequisite to maintaining a class action." *Lott v. Louisville Metro Gov't*, No. 19-cv-271, 2021 WL 1031008, at \*8 (W.D. Ky. Mar. 17, 2021) (internal citations omitted) (quoting *Adams v. Fed. Materials Co.*, No. 5-CV-90, 2006 WL 3772065, at \*3 (W.D. Ky. 2006)). In this case, the definitions for each proposed Class and Subclass have been debated and rewritten multiple times throughout this years-long litigation.[16] Class Plaintiffs' latest proposed definitions seek to certify a

---

[16] For example, Class Plaintiffs' first proposed definition included a single Class. That definition, submitted on March 7, 2016 was:

[A]ll persons in the City of Flint who have been harmed by Defendants' continuing violation of the Safe Drinking Water Act's requirement to operate and maintain optimal corrosion control treatment, 40 C.F.R. §§ 141.81-.82;

[A]ll persons in the City of Flint who have been harmed by Defendants' continuing violation of the Safe Drinking Water Act's requirement to notify customers of the individual results of tap water samples tested

"Master" Issues Class and four Subclasses: a VNA Issues Subclass, a

Minors Damages and Injunctive Subclass, a Residential Property

Damages Subclass, and a Business Damages Subclass. (ECF Nos. 1207;

1829.) Class Plaintiffs' proposed definitions are as follows:

### Master Issues Class (Rule 23(c)(4))

All persons and entities who, for any period of time between April 25, 2014 and January 5, 2016, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.

Exposure is defined to include ingestion (either through drinking or consuming foods prepared with drinking water) as well as any form of physical contact with the water (including contact with residential plumbing and other appliances as well as human contact by way of bathing).

---

for lead within 30 days after receiving the results, 40 C.F.R. § 141.85(d)(1), (d)(2);

[A]ll persons in the City of Flint who have tested positive for the presence of lead in their blood, since April 25, 2014;

[A]ll persons in the City of Flint who have experienced personal injury as a result of their exposure to elevated lead levels in Flint's drinking water supply, since April 25, 2014; and

[A]ll persons in the City of Flint who have owned or rented property in Flint[,] Michigan since April 25, 2014.

*McMillian v. Snyder*, Case No. 16-10796, ECF No. 1, PageID.45–46.

(ECF No. 1829, PageID.65281)

### VNA Issues Subclass (Rule (23(c)(4))

All persons and entities who, for any period of time between February 15, 2015 and January 5, 2016, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.

Exposure is defined to include ingestion (either through drinking or consuming foods prepared with drinking water) as well as any form of physical contact with the water (including contact with residential plumbing and other appliances as well as human contact by way of bathing).

(*Id.* at PageID.65283.)

### Residential Property Damages Subclass (Rule 23b)(3))

All persons and entities who owned residential property within the City of Flint at any time during the period from April 25, 2014 through December 14, 2015.

(*Id.* at PageID.65286.)

### Business Damages Subclass (Rule 23(b)(3))

All persons and entities who, as of April 25, 2014 owned and operated a business within the City of Flint that falls within one of the following North American Industry Classification System ("NAICS") codes: 812111, 812112, 812113, 812990, and 722511.

(*Id.* at PageID.65289.)

46

**Minors Damages and Injunctive Subclass (Rule 23(b)(2) and (b)(3))**

All children who, during the period from May 1, 2014 to January 5, 2016, were (a) *in utero* or between the ages of 0 to 10 years old, (b) lived in an identified residence or attended an identified school or day care, and (c) were exposed through ingestion to unfiltered Flint public water* at such residence, school, or day care for at least 14 days within a 90 day period. * "Exposed through ingestion to unfiltered Flint public water" means the child (or their mother) was exposed to unfiltered tap water for at least 14 days during a 90 day period between May 1, 2014 and January 5, 2016, through any combination of the following ways:

> (1) For childhood exposure: the child drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered tap water;

> (2) For *in utero* exposure, the mother drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water), and/or ate food prepared with unfiltered Flint tap water, while pregnant.

(ECF Nos. 1207, PageID.34418–34419; 1829, PageID.65285.)

**Exclusions**: Excluded from the classes are: (1) Defendants; (2) the judicial officers to whom this case is assigned in federal court, Genesee County Circuit Court, and the Michigan Court of Claims, as well as these officers' staff and immediate family members; (3) all persons and entities who timely and validly elect to opt out of the Issues Classes; and (4) all persons and entities represented by Reporting Counsel as defined in the Amended Order Regarding the Collection of Claim Data (ECF No. 673, PageID.19490-19491) and reported as such on the

census maintained by the Special Master, except those individuals reported to the Special Master solely by Class Counsel.

(ECF No. 1829, PageID.65281–65282.)

For the reasons set forth below in this Opinion and Order, all of Class Plaintiffs' proposed Subclasses are uncertifiable as a matter of law, and so the Court will not redefine them. However, the proposed Issues Classes are certifiable if redefined. Accordingly, with the benefit of multiple rounds of briefing and extensive oral argument on the subject of class definitions, and mindful of the Court's "obligation to create a new definition *sua sponte* if the parties' own proposals are not adequate or accurate," *Lott*, 2021 WL 1031008, at *8, the Court will redefine Class Plaintiffs' two proposed Issues Classes as follows:

**Multi-Defendant Issues Class (Rule 23(c)(4))**
All persons and entities who, for any period of time between February 4, 2015 and October 16, 2015, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.
* "Exposure" is defined to include ingestion (either through drinking or consuming foods prepared with the drinking water), bodily contact with the water (such as by way of bathing), and property contact with the water (through residential plumbing or other appliances).

* "Persons" is defined to include only those individuals who

48

have reached the age of majority as of the date of the class notice.

**LAN Issues Class (Rule 23(c)(4))**

All persons and entities who, for any period of time between April 25, 2014 and October 16, 2015, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.

\* "Exposure" is defined to include ingestion (either through drinking or consuming foods prepared with the drinking water), bodily contact with the water (such as by way of bathing), and property contact with the water (through residential plumbing or other appliances).

\* "Persons" is defined to include only those individuals who have reached the age of majority as of the date of the class notice.

The Court's definitions of the Multi-Defendant and LAN Issues Classes are based on Class Plaintiffs' latest proposed Issues Class definitions, (ECF No. 1829), but they are modified as follows: (1) there will be two Issues Classes to reflect Engineering Defendants' two different consulting timelines; (2) the Court modifies and clarifies Class Plaintiffs' proposed timelines for each Class; and (3) the Court modifies and clarifies Class Plaintiffs' definition of the word "exposure."

First, the Court certifies two Issues Classes that are substantively identical, but that represent the two different timelines in which each

49

Defendant was actively consulting on the City's water matters: LAN advised the City during the City's April 25, 2014 switch to the Flint River, whereas VNA did not begin its consulting relationship with the City until February 4, 2015. (*See* ECF No. 1208-73, PageID.35680.) Both parties then consulted simultaneously, on and off, through 2015. (*See* ECF Nos. 1208-67, PageID.35436; 1369-22, PageID.45813.) The parties have extensively disputed the best way in which to capture these two timelines, which overlap beginning in February 2015. Any class that were to include the entire proposed timeline—from April 25, 2014 to October 16, 2015—would be overbroad as to VNA because VNA could not possibly be liable as a consultant to the City for conduct that occurred from April 25, 2014 to February 3, 2015—before it arrived on the scene. To rectify this problem, Class Plaintiffs' most recent class definition suggests that the Court create a "Master" Issues Class beginning in April 2014 and a VNA-specific Issues Subclass beginning in February 2015, after the date of the proposed "Master" Issues Class. (ECF No. 1829, PageID.65281, 65283.) The Court declines this invitation because doing so would likely render some individuals members of the VNA Subclass— but not the Master Issues Class—obviating the purpose of a "master

class." Accordingly, though the Court is certifying two independent classes that contain a short temporal overlap, the undersigned believes that doing so—as opposed to managing the overlap by creating one "master" and one "sub" class—is the cleanest way to fulfill the Court's duty to capture the parties' arguments and "ensure that a certified class is properly constituted." *Powers*, 501 F.3d at 618 (modifying the class definition to avoid overbreadth and to "conform to the parties' arguments"); *see* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule"); Adv. Comm. Note to *id.* ("Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.").

Second, the Court amends the time period for the Multi-Defendant Issues Class to **February 4, 2015 through October 16, 2015**. As stated, the February 4, 2015 beginning date reflects the time by which both Defendants were unquestionably consulting on—and therefore potentially liable for—the Flint Water Crisis.[17] The October 16, 2015 end

---

[17] As noted, February 4, 2015 is the date that VNA signed a contract agreeing to "provide consulting services related to the Flint Water Treatment System updates for the City of Flint." (ECF No. 1208-73, PageID.35680.) LAN had already been

51

date reflects the time by which the City of Flint reconnected to the Detroit water source. The Court adopts this end date because it was consistently proposed by Class Plaintiffs until they submitted their Memorandum Regarding Updated Proposed Class Definitions, in which they recommend extending the "Master" Issues Class end date through January 5, 2016 for the sole reason that the "Master" Issues Class period would thereby match the end date of the proposed Minors Damages and Injunctive Subclass.[18] (ECF No. 1829, PageID.65281–65282.) Because

---

consulting on water matters prior to the City's switch from the Detroit water source to the Flint River on April 25, 2014. *Walters*, at *6.

[18] Class Plaintiffs do not explain why the Minors Subclass—and only the Minors Subclass—was originally set to end on January 5, 2016 while the other classes were scheduled to end on October 16, 2015. However, as VNA points out in its Memorandum Regarding [Class Plaintiffs'] Proposed Revised Class Definitions, at least one of Class Plaintiffs' experts provides some justification for this later date in his report. Dr. Howard Hu writes that

> extension of the exposure period beyond the October 16, 2015 date (the date Flint reconnected to Detroit water) is based on (a) the recognition that there would be a substantial delay in re-establishing the stable "passivation" layer that protects against the leaching of lead into water in Flint's water distribution system, as well as other factors (*see* expert declarations by Dr. Larry Russell and Dr. Clifford Weisel). The proposed eligibility period end date of January 5, 2016, coincides with the day that Governor Rick Snyder issued his emergency declaration.

(ECF No. 1208-90, PageID.35904.) (*See also* ECF No. 1208-136, PageID.37912 (Declaration of Clifford P. Weisel) ("The end date used for this report is January 5, 2016 when Governor Snyder declared a state of emergency in Genesee County

52

the Court declines to certify the Minors Subclass, *see infra* at 55, the Court adopts the time period that has been most consistently proposed by Class Plaintiffs for the "Master" Issues Class and applies it to the Multi-Defendant Issues Class.

Finally, the Court modifies Class Plaintiffs' updated definition of "exposure" that appears in the Multi-Defendant and LAN Issues Classes. Class Plaintiffs' most recent proposal defines "exposure" to include "any form of physical contact with the water (including contact with residential plumbing and other appliances as well as human contact by way of bathing)." (ECF No. 1829, PageID.65281.) Class Plaintiffs explain that this definition attempts to distinguish between *property* contact with water, resulting in property damage, and *bodily* contact with water, potentially resulting in personal injury. (ECF No. 1873, PageID.66165.)

---

warning residents about the dangerous levels of lead in their water. Nonetheless, elevated lead levels in the tap water of Flint were reported past the January 5, 2016 date, and individuals who continued to drink Flint water past that date would have confronted elevated levels of lead for an extended time period.").)

Class Plaintiffs' filings do not discuss this analysis of the January 5, 2016 date; VNA identified it buried within Class Plaintiffs' exhibits. Absent any argument from Class Plaintiffs themselves as to why the Court should prefer the January 5, 2016 end date—aside from their desire to lengthen the time period to match the uncertifiable Minors Subclass—the Court declines to extend the time period beyond what Class Plaintiffs originally proposed for the broadest Class.

To clarify this distinction, the Court modifies the definition of "exposure" to "include ingestion (either through drinking or consuming foods prepared with the drinking water), bodily contact with the water (such as by way of bathing), and property contact with the water (through residential plumbing or other appliances)."

The Court makes these three modifications to Class Plaintiffs' proposed definitions for clarity and in an effort to "be vigilant to ensure that a certified class is properly constituted." *Powers*, 501 F.3d at 619. Such modifications are within the Court's clear statutory authority. *See id; see also Kensu*, 2020 WL 1698662, at *9 ("The Court is mindful that Rule 23(c)(4) empowers courts to define an appropriate class, whether by accepting the proposed class, limiting the class to certain issues, or creating subclasses. Thus, the Court can amend Plaintiff's proposed definition to reflect the[] specific time periods as to each Defendant.")

In the sections that follow, the Court will first explain why the Minors Damages and Injunctive Subclass is uncertifiable as a matter of Michigan law pursuant to the Federal Rules Enabling Act. The Court will then explain why all remaining Classes meet Rule 23(a)'s prerequisites for class certification. Next, the Court will explain why all proposed

Damages Subclasses fail to meet Rule 23(b)(3)'s certification requirements. Finally, the Court will explain why the Multi-Defendant and LAN Issues Classes are certifiable pursuant to Rule 23(c)(4).

### D. Certification of the Minors Damages and Injunctive Subclass is Impermissible Under Federal and Michigan Law

Class Plaintiffs ask the Court to certify a Minors Damages and Injunctive Subclass encompassing "tens of thousands" of children under Federal Rule of Civil Procedure 23(b)(2) and (b)(3). (ECF No. 1207, PageID.34439.) Class Plaintiffs define this proposed Subclass as follows:

> [A]ll children who, during the period from May 1, 2014 to January 5, 2016, were (a) *in utero* or between the ages of 0 to 10 years old, (b) lived in an identified residence or attended an identified school or day care, and (c) were exposed through ingestion to unfiltered Flint public water* at such residence, school or day care for at least 14 days within a 90 day period.
>
> * "Exposed through ingestion to unfiltered Flint public water" means the child (or their mother) was exposed to unfiltered tap water for at least 14 days during a 90 day period between May 1, 2014 and January 5, 2016, through any combination of the following ways:
>
> > (1) For childhood exposure: the child drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water, including infant formula), and/or ate food prepared with unfiltered tap water;

> (2) For *in utero* exposure, the mother drank unfiltered Flint tap water (or beverages prepared with unfiltered tap water), and/or ate food prepared with unfiltered Flint tap water, while pregnant.

(*Id.* at PageID.34418–34419.) For the reasons set forth below, certification of the Minors Subclass as a Rule 23(b)(3) Damages Class is impermissible because doing so would violate federal and Michigan law. Additionally, certification of the Minors Subclass as a Rule 23(b)(2) injunctive class is impermissible because the primary relief sought is monetary and contradicts the purpose of the Rule 23(b)(2) class device.

### i. Certification of a Minors Rule (b)(3) Damages Class is Impermissible
#### 1. Background

On November 6, 2020, the Court ordered Class Plaintiffs to provide supplemental briefing on the following three issues related to the Minors Damages Subclass:

(1) The process by which A) Plaintiffs will locate each child; and B) the Court could appoint a legal guardian for each child in the class and minors[] subclass within the 75 days during which putative class members will be notified and have an opportunity to opt out;

(2) Whether it is legally feasible, as well as practically manageable, to bind the minors and absent minor class members to the outcome of the trial's liability phase; and

(3) Whether it is legally feasible, as well as practically manageable, to bind the minors and absent minor class members in an opt-out damages settlement class before the children reach the age of majority, should this class be certified and the action proceed to a point where the parties are considering settlement.

(ECF No. 1308, PageID.39855–39856.) Class Plaintiffs provided the requested briefing on November 20, 2020. (ECF No. 1327.) In January 2021, Defendants and Individual Plaintiffs addressed these issues in their responses to the motion for class certification. (ECF Nos. 1369, 1390, 1392.) Class Plaintiffs replied on April 7, 2021. (ECF No. 1581.)

## 2. Analysis

Certification of the Minors Damages Subclass is impermissible because it would violate the Rules Enabling Act, 28 U.S.C. § 2072(b), by abridging and/or modifying several substantive legal rights afforded to minors under Michigan law. Specifically, certification of the Minors Damages Subclass would unlawfully abridge the minors' right to an individual court-appointed representative, would impermissibly abridge their right to contract upon reaching the age of majority by seeking to bind them to an opt-out class, and would impermissibly waive the tort

57

claims of minors whose parents or representatives seek to settle the minors' claims on their behalf.

The Rules Enabling Act "provides that court-created procedural rules, such as Rule 23 of the Federal Rules of Civil Procedure, 'shall not abridge, enlarge, or modify any substantive right.'" *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1092 (6th Cir. 2016) (quoting 28 U.S.C. § 2072(b)) (assuming, without deciding, that a Kentucky statute's prohibition against class-action litigation is substantive for purposes of the Rules Enabling Act). Under the Rules Enabling Act, the Federal Rules of Civil Procedure do not apply where they abridge "[state procedural] rule[s that are] effectively part of the state substantive right." *Id.* (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 422 (2010)). A procedural rule is one that "undeniably regulate[s] only the process for enforcing [] rights," whereas a substantive rule "alter[s] the rights themselves, the available remedies, or the rules of decision by which the court adjudicate[s] either." *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 794 (6th Cir. 2016).

In Michigan, a minor's cause of action is the personal property of that minor. *See Woodman ex rel. Woodman v. Kera LLC*, 486 Mich. 228, 253 (2010). Michigan law provides several substantive protections of minors' rights to control their own claims. These protections can be organized into three categories: (1) protections regarding the minors' ability to bring the claim itself; (2) protections regarding claim settlements; and (3) protections regarding the minors' ability to abrogate a claim previously brought on their behalf upon reaching the age of majority. The protections are summarized below.

**Bringing a Claim**. In terms of bringing a claim, Michigan law protects a minor's right to personally "pursue and control" a claim by permitting the minor "to bring [their] cause of action within one year of reaching [the age of] majority." *Id.* at 253.  If a representative seeks to bring a claim on a minor's behalf before that minor reaches the age of majority, Michigan law requires close scrutiny of the minor's relationship to their representative: Under Michigan law, not even parents may bring a minor's claim on the minor's behalf without a court first formally appointing the parent as the minor's representative. *See Kilda v. Braman*, 278 Mich. App. 60, 71 (2008) (citing Mich. Ct. R. 2.201(E)(1)).

Where the minor's next friend or guardian "is a person who has made a claim in the same action and will share in the settlement or judgment of the minor," the Court must appoint a separate guardian ad litem to bring the claim on the minor's behalf. Mich. Ct. R. 2.420(b)(2); *see Bowden v. Hutzel Hosp.*, 252 Mich. App. 566, 573 (2002) ("[T]he court 'must' appoint a guardian ad litem to represent the minor's legal interests and thus secure the minor's best interests during any and all proceedings."). Even where a court has approved a representative for the minor, courts often require the minor's presence when adjudicating the claim. For personal injury claims, courts require the minor to "appear in court personally to allow the judge an opportunity to observe the nature of the injury," and the judge "may require medical testimony . . . if not satisfied of the extent of the injury." Mich. Ct. R. 2.420(B)(1)(a)–(b).

**Settling the Claim**. In terms of settling the claim, Michigan Court Rule 2.420 governs "settlements and judgments for minors and legally incapacitated individuals." This rule "seeks to protect an interested minor child's rights in settlement of a claim" by mandating the process by which those settlements can be approved. *Bowden*, 252 Mich. App. at 532. Parents and guardians may not settle a minor's claim without the

court first determining that the settlement is fair and in the best interests of the minor. *See Woodman*, 486 Mich. at 253 (citing Mich. Ct. R. 2.420); *see also O'Brien v. Loeb*, 229 Mich. 405, 408 (1924). For a claim for damages due to personal injury, the minor "shall appear in court personally to allow the judge an opportunity to observe the nature of the injury unless, for good cause, the judge excuses the minor's [] presence." Mich. Ct. R. 2.420(B)(1). For a settlement or judgment requiring payment of more than $5,000 to a minor, either immediately or in installments that exceed $5,000 in a single year, "a conservator must be appointed by the probate court before the entry of the judgment or dismissal." Mich. Ct. R. 2.420(B)(4)(a).

**Abrogating the Claim**. Finally, in terms of abrogating the claim, Michigan courts do not permit a minor's parents or guardians to "waive, release, or compromise claims" belonging to minors without explicit statutory permission or strict court oversight. *See, e.g.*, *McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.*, 428 Mich. 167, 192–93 (1987) (holding that the Medical Malpractice Arbitration Act changed the common-law rule prohibiting parents from waiving, releasing, or compromising claims in the specific context of arbitrating disputes that

61

arise out of prenatal care and childbirth); *see Smith v. YMCA of Benton Harbor/St. Joseph*, 216 Mich. App. 552, 554 (1996) ("[A]s a general rule, a parent has no authority, merely by virtue of being a parent, to waive, release, or compromise claims by or against the parent's child.") A minor's parent or guardian may not waive the minor's tort claims because the parent or guardian lacks the capacity to contractually bind the minor. *See Woodman*, 486 Mich. at 253 (holding liability waiver signed by parent unenforceable). While parents and guardians have no special ability to abrogate a minor's claim, Michigan courts hold that a minor lacks the capacity to contract and can later repudiate any agreement signed on their behalf upon reaching the age of majority. *Id.* at 255 ("[Minors'] contracts are not void but voidable."); *see also Everson v. Williams*, 328 Mich. App. 383, 394 (2019) (reiterating that "a parent is without authority to bind his child by contract" and that a deed signed by a child of eleven "can only be asserted against [the child] if she confirmed it after she reached the age of majority because it does not have a binding effect unless it is ratified"); *Smith*, 216 Mich. App. at 554 (reversing summary judgment to permit injured child who reached age of majority to bring action to recover, in contravention of released signed by parents when

62

she was a minor). Upon reaching the age of majority, a minor has one year to bring a claim for events that occurred prior to the minor turning eighteen years of age. Mich. Comp. Laws § 600.5851(1).

The Michigan Supreme Court has stated that "[t]hese statutes evince a public policy firmly at odds with . . . autonomous parental control over a minor's property rights . . . . The Legislature has consistently acted to preserve a minor's property interest in his tort claims, and nothing in Michigan's positive law indicates a legislative intent to . . . extend a parent's authority." *Woodman*, 486 Mich. at 254.

### 3. Application

Certification of the Minors Damages Subclass would violate the Rules Enabling Act by abridging substantive protections that Michigan law provides regarding the minors' ability to bring, settle, and abrogate their claims.[19]

First, Class Plaintiffs do not set forth a mechanism by which the Court may appoint an individual representative for each minor; nor do

---

[19] Though the Court discusses in detail the ways in which class certification would abridge Michigan substantive protections for the minors' abilities to potentially settle and later abrogate their claims, the Court notes that abridging claim-bringing protections alone is fatal to the certification of the Minors Damages Subclass under the Rules Enabling Act.

they explain how such appointments would be possible within the seventy-five days that Class Plaintiffs allot for the class notice and opt-out period. These failures prevent the Court—both legally and functionally—from complying with Michigan's substantive protections for minors' rights to their legal claims. As VNA notes in its opposition brief, in order to accomplish the task that Class Plaintiffs have set,

> [t]he Court would first need to solicit affidavits from each minor child's parents or guardians attesting that the child ingested unfiltered Flint water for 14 days within a 90-day period after VNA's initial report, and then determine the accuracy of each affidavit. Then the Court would need to determine the most suitable representative for each minor child and formally appoint that person.

> The Court could not feasibly complete those steps in 75 days or any other reasonable amount of time. It is not clear that the Court even could identify all of the members of the subclass in that time. Plaintiffs say that the minors subclass would number in the "tens of thousands." They suggest that there are records of the minors in Flint, but offer no evidence that the records are complete. More importantly, they offer no evidence that the records identify the parents or guardians of the minors, much less that the records identify which parent is authorized to make decisions for the child (in cases where the parents are unmarried, separated, or divorced). Even if the Court could use the records Plaintiffs cite to identify all of the minors, the Court would need to take additional steps to identify parents or guardians.

> The Court also could not appoint representatives for each minor in the time Plaintiffs propose. Assuming that parents would need 30 days to read the notice certifying the subclass and prepare their affidavits, the Court would have only 45 days to determine class membership and appoint representatives for each minor. Assuming that there are 20,000 minors, the Court would need to evaluate the claims of the minors at approximately a rate of one minor a minute, for eight hours a day, including weekends. That is unrealistic.

(ECF No. 1367, PageID.43795.) Rather than describing a method by which the Court could feasibly undertake this process in compliance with Michigan law, Class Plaintiffs instead argue that the Court is "unlikely" to need to appoint representatives for each minor "because Federal Rule of Civil Procedure 17(c)(1) authorizes certain representatives, including a general guardian such as a parent to sue on behalf of a minor without action from the court." (ECF No. 1327, PageID.41432.)

However, applying Rule 17(c)(1) in this case is inconsistent with several Michigan laws that protect minors' legal claims as personal property rights. *See Woodman*, 486 Mich. at 241 ("A right of action [in Michigan] is as much property as is a corporeal possession, and, in the case of a minor, is protected by the law in the same way and under the same securities."). For example, lack of court involvement in the appointment of representatives violates Michigan Court Rule 2.201(E),

65

which allows only a previously-appointed conservator or court-appointed "competent and responsible person to appear as next friend on [the minor's] behalf" to pursue a minor's claim. Mich. Ct. R. 2.201(E)(1)(a)– (b).

Class Plaintiffs next argue that the Court could forego individual appointments and instead "appoint a Master Guardian ad Litem as well as panels of approved guardians to represent the interests of Subclass Members who do not have an effective legal guardian . . . similar to the approach set forth in the Proposed Settlement to protect minors' rights." (ECF No. 1327, PageID.41433 (acknowledging that "[s]ome members of the proposed Minors Subclass will likely require appointment of a next friend or guardian to protect their interests").)

But appointing such guardian "panels" or a "Master" Guardian ad Litem in a litigation class context would also violate substantive Michigan law, which requires that the Court "shall" appoint the minor's consenting choice of next friend or guardian ad litem (if the minor is fourteen years of age or older), or the minor's next of kin or family friend (if the minor is under the age of fourteen), unless the Court finds the representative "unsuitable" in either case. Mich. Ct. R. 2.201(E)(2)(a)–

66

(b). Put another way, Michigan law requires the Court to perform an individualized assessment of every proposed representative of a minor's civil claim.[20] Michigan's longstanding protections of minors' claims are substantive in that they, unlike Federal Rule of Civil Procedure 17(c), entirely foreclose a representative's ability to bring a claim on behalf of a minor without an individualized inquiry into the "suitability" of the representative as it pertains to that particular claim. *See id.* Applying Federal Rule 17(c), rather than Michigan law, would alter both the scope of the minor's "right [itself]," as well as the "rule[] of decision by which the court adjudicate[s]" the right. *Stein*, 821 F.3d at 794. Accordingly, the Rules Enabling Act prohibits the Court from substituting Rule 17(c)'s

---

[20] As the Court discussed in its Preliminary Settlement Approval Order, the Proposed Settlement contains ample protections for minors' rights under Michigan law, and even goes so far as to "incorporate[] Michigan Court Rule 2.201(E), which sets forth the legal parameters applicable to proceedings involving a minor or incompetent person in Michigan." (ECF No. 1399, PageID.54414.) Additionally, the Proposed Settlement contains a future minors' fund for those who "failed for any reason to timely register for the Settlement Program"—preventing minors from being bound in an "opt-out" process like the proposed Minors Subclass at issue in this case. (*See* ECF No. 1319-1, PageID.40338.) In other words, there is no "minors class" in the Proposed Settlement—only a minors claims process that safeguards all relevant substantive and procedural rights under Michigan law.

67

claims-bringing procedures for Michigan's entrenched substantive protections.[21]

The Court's final question to Class Plaintiffs was whether it could bind minors to an opt-out settlement class should the parties reach such a point in the proceedings. But Class Plaintiffs do not substantively address the significant obstacle posed by Michigan's protections allowing minors to repudiate any agreement signed on their behalf upon reaching the age of majority. *See Woodman*, 486 Mich. at 236–37. To the contrary, Class Plaintiffs acknowledge that Michigan law protects children by

---

[21] Class Plaintiffs do not substantively respond to the question of whether their proposed procedures violate the Rules Enabling Act, noting only in a footnote that they are "not so sure" that

> Michigan's procedural requirements for children are substantive in nature . . . . The power of federal courts to determine, for example, who has capacity to sue is well-founded. Because processes exist to comply with Michigan's procedures in an efficient manner, however, Plaintiffs believe the parties and Court can refrain from a protracted discussion regarding the extent to which Michigan's protections are "substantive" or "procedural" in nature.

(ECF No. 1581, PageID.60922.) For the reasons set forth above, the Court concludes that minors' rights protections in Michigan are substantive in nature and that even if "processes exist to comply with Michigan's procedures in an efficient manner"—though the Court is not convinced of this—Class Plaintiffs have not shown that such procedures could also comply with the substantive protections embodied in Michigan law.

68

allowing parents to "contract on their child's behalf . . . but if the child, through the parents, wishes to avoid that contract, the parent's signature will not prevent it from doing so." (ECF No. 1327, PageID.41437 (quoting *Health Call of Detroit, Inc. v. Farmers Ins. Exch.*, No. 16-1345, 2017 WL 4005931, at *3 (E.D. Mich. Sept. 12, 2017)).) Class Plaintiffs also acknowledge that this aspect of Michigan law could "cast an unsettling shadow of uncertainty over any *contractual* resolution of minors' claims" and note only that this concern "counsel[s] in favor of supplemental procedures to buttress the appropriateness of any negotiated resolution." (*Id.* at PageID.41438 (emphasis in original).) In recognizing that contractual resolution will be accompanied by an "unsettling shadow of uncertainty," Class Plaintiffs have aptly summarized the Court's concern with any settlement as applied to the Minors Damages Subclass: "A settlement agreement is a contract." *Neely v. Miller Brewing Co., Inc.*, 25 F. App'x 370, 372 (6th Cir. 2002).

Class Plaintiffs have not demonstrated that the Court could certify a class of minors without violating the minors' substantive rights under Michigan law to bring, settle, and abrogate their own claims.

Accordingly, Rule 23(b)(3) certification of the Minors' Damages Subclass is impermissible.

### ii. Certification of a Minors Rule 23(b)(2) Injunctive Relief Class is Impermissible

Class Plaintiffs also seek certification for injunctive relief on behalf of the Minors Subclass pursuant to Rule 23(b)(2). (ECF No. 1207). Class Plaintiffs sought a host of injunctive remedies against all Defendants in their initial class certification motion, but they have since limited their request for injunctive relief to medical monitoring in light of the pending settlement proceedings with the Government Defendants. (ECF No. 1581, PageID.60926 ("Class Plaintiffs do not seek [relief that is broader than medical monitoring] from Engineering Defendants. Should litigation against the State, City, or other Government Defendants resume, Plaintiffs reserve the right to reinstate their request for broader injunctive relief against those Defendants.").) Specifically, Class Plaintiffs seek

> [t]he creation of a coordinating body, with a Court-appointed Receiver/Monitor, to coordinate, oversee, identify, and fund new and existing programs and services designed to ameliorate the ongoing harms [and] provide relief to each member of the Injunctive Relief Class and Subclass. The

coordinating body will ensure the provision of the following programs and services:

- Diagnostic and assessment services for the Minors Subclass, including neuropsychological testing;

- Intervention and amelioration programs for the Minors Subclass, including physical and mental health services, nutritional services, and academic and educational support;

- Stress reduction and mental health community services for the Class, designed to reduce stress, treat mental health disorders, combat community trauma and support individuals and families; and

- A registry of participation, expanding upon the existing Flint Registry, to track services and outcomes for the Class, while preserving individual privacy.

(ECF No. 1207, PageID.34526–34527.)

Class certification for injunctive relief is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This relief is not proper, however, when "the appropriate final relief relates exclusively or predominately to money damages." Adv. Comm. Note to *id.*

Injunctive relief is not appropriate in this case because Class Plaintiffs' request—that the Court order Engineering Defendants to fund a medical monitoring program—relates "exclusively or predominately to money damages."[22] *See id.* Under Class Plaintiffs' requested relief, Engineering Defendants would not be "enjoined" from acting, or ordered to act, in the traditional equitable sense. Instead, the sole remedy from Engineering Defendants' perspective would be to fund a program whose purpose—as counsel for Class Plaintiffs acknowledged at the class certification motion hearing—is to ultimately help ascertain individual "damages," as well as "[t]he extent of [Class Plaintiffs'] injury and also what could be done to help them going forward." (*See* ECF No. 1828, PageID.65207.) Class Plaintiffs' trial plan also acknowledges as much, noting that the individualized medical monitoring evaluations will serve as a basis for the concurrent Rule 23(b)(3) personal injury damages claims at a later phase of the trial. (*See* ECF No. 1208-93, PageID.36064–36065 ("For each member of the Minors Subclass, an adjudicative

---

[22] It seems unlikely that the concerns animating Michigan's protections for minors' claims apply to purely injunctive relief. *See Woodman*, 486 Mich. at 253 (noting that what belongs to the minor is the *cause of action* and the ultimate right to settle his or her own claim). However, because the Court denies certification of the Rule 23(b)(2) class on separate grounds, the Court need not analyze this issue further.

proceeding to litigate their entitlement to damages will be provided . . . the adjudicative proceeding will be phased *after* the provision of a neuropsychiatric evaluation as part of the injunctive relief provided to Minors Subclass members if they prevail in the Phase One trial.").)

The Sixth Circuit has not explicitly held that medical monitoring is appropriate Rule 23(b)(2) injunctive relief in the class certification context. Class Plaintiffs, however, argue that *Boler v. Early*—another case arising out of the Flint Water Crisis—is instructive here. In *Boler*, the Sixth Circuit held that Flint residents' claims against the State were not barred by sovereign immunity under the *Ex Parte Young* doctrine because the "monetary impact [was] ancillary, *i.e.*, not the primary purpose of the suit." 865 F.3d 391, 412 (6th Cir. 2017). The specific reasoning relied upon by Class Plaintiffs is the Sixth Circuit's commentary that the injunctive order "did not award money retroactively, but directed the state's conduct in the future." *Id.* In that case, the plaintiffs sought compensatory education, medical monitoring, and evaluation services from the State of Michigan defendants. *Id.* In analyzing the purpose of the plaintiffs' requested relief, the Sixth Circuit noted that

73

> what the Complaint seeks here [is] to direct the Governor's conduct in providing services to Plaintiffs affected by the Flint water crisis. The primary purpose of this relief is not to cost the State of Michigan money, but to provide relief to the Plaintiffs through compensatory education, medical monitoring, and evaluation services. A straightforward look at the Complaint shows that this relief is properly characterized as prospective.

*Id.* at 413.

*Boler* is not instructive here. First, and most importantly, *Boler* was not a Rule 23(b)(2) class certification case, and it therefore did not address the crucial issue of whether medical monitoring could be considered a class injunctive remedy when its explicit purpose is to support future damages claims. Second, *Boler* involved government defendants with an ongoing government-citizen relationship to the injured plaintiffs and whose conduct in relation to those citizens could be "directed [] in the future," whereas this case involves private Defendants whose only future contribution would be paying money into a medical monitoring fund and whose "future conduct" would not, and could not, otherwise be "directed." Indeed, both LAN's and VNA's contracts with the City ended in 2015. (*See* ECF Nos. 1208-67, PageID.35436; 1369-22, PageID.45813.)

Finally, even if *Boler* were a Rule 23(b)(2) class certification case and not an *Ex Parte Young* case, application of its reasoning would not support Class Plaintiffs' argument. The plaintiffs in *Boler* sought compensatory education and evaluation services in addition to medical monitoring. 865 F.3d at 413. In finding that the requested injunction properly "directed the state's conduct in the future," the Sixth Circuit likened the relief to "the Supreme Court['s] order enjoining a state to provide education programs as a way of redressing past racial discrimination." *Id.* In this case, however, Class Plaintiffs are not requesting that the Court order Engineering Defendants to provide forward-looking, broad programmatic relief to redress known damages; rather, Class Plaintiffs want the Court to order Engineering Defendants to fund a fact-finding medical program that—by Class Plaintiffs' own admission—seeks to identify prospective damages Class Plaintiffs may have suffered by diagnosing currently-unknown medical issues.[23]

---

[23] Class Plaintiffs also reference a Third Circuit case called *Baby Neal for and by Kanter v. Casey*, which involved a putative class of foster care children suing the municipality charged with their care for constitutional violations. 43 F.3d 48 (3d Cir. 1994). In *Baby Neal*, the putative class sought numerous programmatic reforms, including "medical and psychiatric treatment" and the implementation of "procedures, personnel, programs, and facilities that are necessary to deal effectively with child abuse and neglect." *Id.* at 52. Class Plaintiffs cite *Baby Neal* for the

The Sixth Circuit has not directly addressed this issue; however, courts in other circuits have held that similar requests for medical monitoring are not requests for injunctive relief and are actually requests for money damages to pay for the plaintiffs' diagnosis and/or treatment. *See Zinser v. Accufix Res. Inst.*, 253 F.3d 1180, 1196 (9th Cir. 2001) (holding that medical monitoring injunctive relief is "merely incidental to the primary claim for money damages" because plaintiffs sought "the

---

propositions that (1) the Rule 23(b)(2) requirement is "almost automatically satisfied" in cases primarily seeking injunctive relief; and (2) "like *Baby Neal*, the proposed programmatic relief—including diagnostic, evaluation, mitigation, and intervention programs—will inure to the benefit of the entire Class and will provide prospective relief to ameliorate the harm/damage caused by the Flint Water Crisis." (ECF No. 1207, PageID.34529.) However, even if *Baby Neal* was binding precedent, it would not be applicable to this case for a number of reasons. First, as discussed above, Class Plaintiffs are not primarily seeking injunctive relief, which is a major contrast to the plaintiffs in *Baby Neal. See* 43 F.3d at 64 (stating that "[t]he fact that plaintiffs in [*Baby Neal*] seek only injunctive and declaratory relief, not individual damages, further enhances the appropriateness of the class treatment"). Second, like *Boler v. Early*, 865 F.3d at 412, *Baby Neal* did not analyze the difference between a damages and an injunctive remedy, and instead reversed the district court's conclusion on a different Rule 23(b)(2) class certification requirement—that "the claims for relief were not generally applicable to the class." 43 F.3d at 64. *Baby Neal* therefore provides no guidance for distinguishing between damages and injunctive remedies, as the Court must do here. Finally, like *Boler*, the *Baby Neal* injunction mandated forward-looking, broad programmatic reforms beyond medical monitoring that sought to change the government defendants' behavior into the future, including "programs and facilities that are necessary to deal effectively with child abuse and neglect." *Id.* at 52. Such a request is in stark contrast to Class Plaintiffs' request for a monetary fund.

establishment of a reserve fund for past and future damages, compensation for future medical treatment, plus other compensatory and punitive damages"); *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995) (upholding the district court's ruling that "while plaintiffs' claims relating to medical monitoring, if brought by themselves, might constitute a proper basis for certifying this suit under Rule 23(b)(2)[,] . . . [this] relief is predominately money damages"); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 484 (E.D. Pa. 1997), *aff'd sub nom. Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) (stating that "[p]laintiffs' medical monitoring claim is merely a thinly disguised claim for future damages" and that "the overwhelming majority of the relief sought by plaintiffs in their entire complaint is monetary in nature").

The reasoning in these cases is persuasive. While some medical monitoring injunction requests may be appropriately forward-looking, the medical monitoring injunction as framed in this case is ancillary to the overarching goal of obtaining money damages for Class Plaintiffs.

Accordingly, the Court denies Rule 23(b)(2) certification of a Minors Subclass that seeks injunctive relief.[24]

### E. All Proposed Issues and Damages Classes Meet the Rule 23(a) Prerequisites to Class Certification

In order to certify an issues or damages class, Class Plaintiffs must first show that each proposed class meets the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). For the reasons set forth below, the Court finds that Class Plaintiffs have demonstrated that all proposed classes—the Multi-Defendant Issues Class, the LAN Issues Class, the Residential Property Damages Subclass, and the Business Damages Subclass—meet these requirements.[25]

#### i. Numerosity

To satisfy the numerosity requirement, Class Plaintiffs must demonstrate that the class is "so numerous that joinder of all members

---

[24] Defendants also argue that the Minors Subclass is insufficiently homogenous to render the requested injunctive relief appropriate. (*See, e.g.*, ECF No. 1369, PageID.45479–45480.) Because the Court denies certification on the grounds that the requested remedy relates predominately to money damages, the Court declines to address this issue.

[25] Because the Minors Damages and Injunctive Subclass is uncertifiable on separate grounds, *see supra* at 55, the Court will not analyze it here.

78

is impracticable." Fed. R. Civ. P. 23(a)(1). There are "no strict numerical test[s] for determining impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. Rather, numerosity "requires examination of the specific facts of each case and imposes no absolute limitations . . . . When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (quoting *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)).

Here, the proposed classes meet the numerosity requirement because they comprise thousands of individuals and hundreds of businesses in Flint, Michigan. *See Garner Prop. & Mgmt., LLC*, 333 F.R.D. at 622 ("[A] class of 40 or more members is sufficient to satisfy the numerosity requirement."); *Davidson v. Henkel*, 302 F.R.D. 427, 436 (E.D. Mich. 2014) (finding that numerosity is satisfied with a putative class of at least "between 21 and 40" members). Class Plaintiffs point to the 2010 Census indicating that the population of Flint, Michigan at that time exceeded 100,000 people, and the Court infers that the Flint population from 2014 through 2020 would be reasonably close to this number. (*See* ECF No. 1207, PageID.34472 (citing *QuickFacts*, United States Census Bureau (Apr. 1, 2010), https://perma.cc/7WS9-77ZV).)

Class Plaintiffs also provide an expert report prepared by regional planner Dr. Robert A. Simons concluding that approximately 700 business enterprises in Flint may have been detrimentally impacted by the Flint Water Crisis. (*See id.* (citing ECF No. 1208-97).) Finally, Class Plaintiffs provide an expert report prepared by real estate consultant Mr. R. Bruce Gamble concluding that more than 30,000 single- and multi-family residential properties, as well as more than 5,000 multi-family units, were impacted by the Water Crisis.[26] (*Id.* (citing ECF No. 1208-96).) The evidence does not suggest that the hundreds of individual lawsuits meaningfully detracts from either of these numbers.

No party contests Class Plaintiffs' satisfaction of the numerosity requirement. Considering the thousands of individuals who could comprise the Multi-Defendant and LAN Issues Classes and the Residential Property Damages Subclass, as well as the approximately 700 business that could comprise the Business Damages Subclass, Class

---

[26] The Court notes that VNA is currently seeking to exclude both Dr. Simons' and Mr. Gamble's expert testimony and reports through *Daubert* challenges. (ECF Nos. 1372, 1383.) The Court relies on the above-cited statistics that appear in these reports, which none of the opposing parties challenge, solely to determine that the numerosity requirement is met.

Plaintiffs have met the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1).

### ii. Commonality

To satisfy the commonality requirement, Class Plaintiffs must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Though the rule "speaks of 'questions' in the plural, [the Sixth Circuit has] said that there need only be *one* question common to the class." *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (emphasis added). However, this one question must represent "a common issue the resolution of which will advance the litigation." *Id.* The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

In their motion for class certification and subsequent reply, Class Plaintiffs assert that there are at least six questions common to all Classes that satisfy the commonality requirement:

(1) Did LAN and/or VNA owe a duty to [third parties] as a result of their contracts with the City and, if so, what was the scope of that duty? What is the applicable standard of care in a professional engineering case?

(2) Whether LAN and/or VNA breached their duty or duties owed to Class Plaintiffs by failing to provide appropriate advice to the City of Flint regarding treating the water, and whether any such breach was malicious, willful, and wanton as to disregard Class Plaintiffs' rights?

(3) What was the role of LAN and VNA in creating the contamination of Flint's water supply[,] including their involvement in the decisions to switch to the Flint River as a water source, refrain from using corrosion control at the Flint Water Treatment Plant ("FWTP"), and conceal information related to the safety of Flint's water supply?

(4) Did LAN and/or VNA's conduct cause corrosive water conditions in the Flint water distribution system? To what extent were other actors at fault for causing corrosive water conditions in the Flint water distribution system and how should fault be allocated among all those responsible?

(5) Did the corrosive water conditions caused by LAN and/or VNA cause harm to Flint residents, property, and businesses?

(6) Whether the Engineering Defendants' professional negligence directly and proximately caused the Flint water system to be contaminated with corrosive water, and thereby resulted in property damage to members of the Classes, harm to members of the Classes resulting from

82

exposure to lead and dangerous bacteria, and/or increased the risk of harm to the Class and/or Subclass?

(ECF Nos. 1207, PageID.34473; 1581, PageID.60799–60801.) As indicated above, the Court is intimately familiar with the factual and legal issues in this case after years of litigation. In finding commonality satisfied here, the Court need go no further than the first two questions raised: whether LAN and VNA owed a duty to third parties as a result of their contracts with the City of Flint, and whether certain actions—and failures to act—made as water consultants to the City constituted a breach of that duty.[27] The premise of this litigation as it pertains to

---

[27] For example, as to LAN, Class Plaintiffs allege as common factual issues that

> LAN should have been aware that the Lead and Copper Rule (LCR) and standard engineering practices require that a corrosion control study be performed prior to allowing a switch from one water source to another . . . . Not only was it part of LAN's basic job as an engineer to identify that, absent corrosion control, using Flint River water would threaten residents' health, they had a professional responsibility to report the problem and require that it be addressed.

(ECF No. 1207, PageID.34493–34494.) As to VNA, Class Plaintiffs allege that it

> failed to perform standard calculations that would have alerted the City to the immediate need for corrosion control; failed to include the need for corrosion control for lead in any of its reports; failed to alert the City to a serious threat to public health and safety; advised an increase in ferric chloride that would actually make corrosion worse; and failed to

Engineering Defendants is that they committed professional negligence by breaching a legal duty owed to Class Plaintiffs that proximately resulted in damages to class members. (*See* ECF No. 1207, PageID.34488–34489.) Accordingly, questions that determine the scope of LAN's and VNA's duty as a result of their contracts with the City—as well as their alleged breach of that duty through actions that impacted the contamination of the City's water supply—constitute "common issue[s] the resolution of which will advance the litigation." *See Sprague*, 133 F.3d at 397.

VNA, LAN, and Individual Plaintiffs argue that individual differences among the Class Plaintiffs' claims defeat commonality. (*See* ECF No. 1369, PageID.45432–45433 (VNA arguing that "the questions [Class] Plaintiffs identify are not common to the entire class" because "some members of the class left Flint or stopped using Flint water before VNA arrived in Flint [and] determining *which* class members have those

---

advise that switching back to DWSD was the "best technical solution," and potentially "safest" solution for Flint.

(*Id.* at PageID.34494.) These factual questions underpin the legal issues of duty, breach, and causation, and—at this stage of the proceedings—fairly represent issues common to the Classes as a whole.

84

claims would require individualized inquiries into each person's circumstances" (emphasis in original)); ECF No. 1390, PageID.53919–53920 (LAN arguing that "[a]t minimum, commonality requires that the class members have suffered the same injury [and n]ot every class member [in this case] alleges every form of injury"); ECF No. 1392, PageID.54004–54005 (Individual Plaintiffs arguing generally that Class Plaintiffs cannot meet the standard for commonality because they cannot demonstrate that they have "suffered the same injury" and "[d]issimilarities within the proposed class [] have the potential to impede the generation of common answers" (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350)).) But the commonality threshold is far lower than the opposing parties make it out to be. The Supreme Court recently clarified in *Wal-Mart Stores, Inc. v. Dukes* that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." 564 U.S. at 460. However, the Sixth Circuit instructs that this standard does not require either an inquiry into the merits of Class Plaintiffs' case or that their alleged injuries be *identical*. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) (concluding that *Wal-Mart*'s holding does not permit district courts to "engage in free-

ranging merits inquiries at the certification stage"). As the Sixth Circuit

explained in *Rikos v. Procter & Gamble Co.*,

> [w]hether the district court properly certified the class turns
> on whether Plaintiffs have shown, for purposes of Rule
> 23(a)(2), that they *can prove*—not that they have already
> shown—that all members of the class have suffered the "same
> injury." *Dukes*, 131 S. Ct. at 2551. The Supreme Court in
> *Dukes* did not hold that named class plaintiffs must prove at
> the class-certification stage that all or most class members
> were in fact injured to meet this requirement. Rather, the
> Court held that named plaintiffs must show that their claims
> "depend upon a common contention" that is "of such a nature
> that it is *capable* of classwide resolution—which means that
> determination of its truth or falsity *will* resolve an issue that
> is central to the validity of each one of the claims in one
> stroke." *Id.* (emphasis added). In other words, named
> plaintiffs must show that there is a common question that will
> yield a common answer for the class (to be resolved later at
> the merits stage), and that the common answer relates to the
> actual theory of liability in the case.

*Id.* at 505–06 (emphasis in original).

Here, the arguments made by VNA, LAN, and Individual Plaintiffs

about individual differences among Class Plaintiffs would require the

Court to engage in a broader merits-based inquiry regarding actual

injury at the commonality stage. But such an inquiry is not necessary at

this point in the analysis, which requires only that the Court find that

Class Plaintiffs demonstrate that "a common question will yield a common answer for the class" and that "the common answer relates to the actual theory of liability in the case." *Id.* at 505. Aspects of Class Plaintiffs' professional negligence claim related to duty, breach, and causation, as well as many of the underlying factual questions identified by Class Plaintiffs, could fairly generate a "common answer relat[ing] to the actual theory of liability in the case." *Id.* The existence of these common questions are therefore sufficient for the purpose of Rule 23(a)(2) commonality. There could not and would not be different factual findings in separate cases.

Accordingly, Class Plaintiffs have met the commonality requirement of Federal Rule of Civil Procedure 23(a)(2).

### iii.    Typicality

The typicality requirement of Rule 23(a) tends to "merge" with that rule's commonality requirement. *Id.* at 509 (quoting *Dukes*, 131 S. Ct. at 2551 n.5). To satisfy the typicality requirement, Class Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim is "typical" if "it arises from the same event or practice or course

of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007); *see also Sprague*, 133 F.3d at 399 ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."). Typicality does not require that the named plaintiffs' claims be identical to every claim within the broader class, but rather, that "the representative plaintiff's interests [] be *aligned* with those of the class." *Powers*, 501 F.3d at 618 (emphasis added).

In this case, the claims of the representatives of each proposed class—the Multi-Defendant and LAN Issues Classes, the Residential Property Damages Subclass, and the Business Damages Subclass—satisfy the typicality requirement because the representatives' claims (1) "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members"; and (2) are "based on the same legal theor[ies]" as other class members' claims. *See Beattie*, 511 F.3d at 561.

Specifically, the Multi-Defendant and LAN Issues Classes Representatives—Rhonda Kelso, on behalf of herself and her minor child,

K.E.K., and Barbara and Darrell Davis—are individuals or representatives of individuals who allege that they resided in Flint, Michigan and used the City's tap water to drink, cook, wash, and/or bathe during the relevant time period; and suffered financial and property damage as a result of Defendants' actions, including the loss of use and enjoyment of their homes. (*See* ECF No. 1207, PageID.34475.) These claims align with the claims of absent class members who, "for any period of time between April 25, 2014 and October 16, 2015 were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint." (*Id.* at PageID.34469.)

The Residential Property Damages Subclass Representatives— Elnora Carthan and David Munoz—are individuals who allege that they owned homes in Flint during the relevant time period, received water distributed by the City of Flint, and suffered diminished property and appliance values as a result of Defendants' actions. (*See id.* at PageID.34475–34476.) These claims align with the claims of absent Residential Property Damages Subclass members who "owned residential property within the City of Flint at any time during the period

from April 25, 2014 through December 14, 2015." (ECF No. 1829, PageID.65286.)

The Business Damages Subclass Representatives—635 South Saginaw LLC (a/k/a "Cork on Saginaw"), Frances Gilcreast, and Neil Helmkay—are all individuals or entities alleging that they owned at least one commercial property in Flint during the relevant period and that they suffered diminished profits due to the public's reticence to patronize Flint businesses as a result of Defendants' actions. (ECF No. 1207, PageID.34477.) These claims align with the claims of absent Business Damages Subclass members who, "as of April 25, 2014, owned and operated a business within the City of Flint that falls within one of the following North American Industry Classification System ('NAICS') codes: 812111, 812112, 812113, 812990, and 722511." (ECF No. 1829, PageID.65289.)

In arguing that Class Plaintiffs cannot show that the typicality requirement is met, VNA, LAN, and Individual Plaintiffs largely repeat their commonality arguments. (*See* ECF No. 1369, PageID.45434 (VNA arguing that "[b]ecause each plaintiff's claims depend heavily on individualized issues, the named plaintiffs' claims are not typical of the

absent class members' claims . . . . Here, there is no 'typical' Flint plaintiff."); ECF No. 1390, PageID.53920 (LAN repeating verbatim its argument that typicality and commonality both require class members to have suffered the "same injury"); ECF No. 1392, PageID.54034–54035 (Individual Plaintiffs arguing that, "[g]iven the wide range of injuries caused by lead, [certain] class representatives of the Litigation Class do not meet the typicality requirement . . . . A class containing such a wide range of injuries and characteristics cannot meet the typicality requirement because it is impossible for a handful of representative plaintiffs to capture the full universe of individualized experiences and claims.").) But the various individual differences they identify are insufficient to defeat typicality, especially where, as here, the Court is certifying two Issues Classes solely for the purpose of resolving issues that are common to these Classes. *See infra* at 118. The Sixth Circuit has made clear that typicality is not defeated, even if "the plaintiffs' claims would be subject to varied defenses," when as here, "[t]he plaintiffs' evidence appears to follow a pattern, [] the people they claim made the representations are largely the same people," and "the evidence var[ying] from plaintiff to plaintiff [does] not affect th[e] basic claim." *Bittinger v.*

*Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir. 1997) (dismissing individual factual differences among the plaintiffs because "the test for typicality, like commonality, is not demanding and does not require identicality").

In this case, each named Class Plaintiff allegedly relies upon the same course of conduct undertaken by Defendants in order to prove their claims. The Sixth Circuit found in a different case that these types of allegations are sufficient to sustain typicality at this stage of the proceedings. *See id.* at 885 ("Though the level of claimed injury may vary throughout the class[,] the basic injury asserted is the same . . . [and] those differences that exist [] can be dealt with through methods other than denial of class certification, at a later stage in the proceeding.").

Accordingly, because the class representatives' claims arise from the same course of Defendants' conduct as those of the putative class members, the Court finds that Class Plaintiffs have met the typicality requirement of Federal Rule of Civil Procedure 23(a)(3).

### iv. Adequacy of Representation

To satisfy the adequacy requirement, Class Plaintiffs must demonstrate that the class representatives "will fairly and adequately

protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two criteria for determining whether the representation of the class will be adequate: (1) the representatives must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524–25 (6th Cir. 1976). "Thus, the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Garner Prop. & Mgmt, LLC*, 333 F.R.D. at 624 (quoting *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013)).

## 1. Common Interests

The requirement of common interests is met here because the class representatives in this case all seek to "hold Defendants liable for the same misconduct." (ECF No. 1207, PageID.34479.) As set forth above, the interests of the representatives of each proposed Class and Subclass are common to those of the unnamed members. Therefore, the "common interests" requirement is satisfied. *See Senter*, 532 F.2d at 524–25.

In arguing that the proposed Class Representatives do not have interests common with the class members, the opposing parties refine and repeat their typicality and commonality arguments, but neither argument defeats adequacy. Specifically, VNA argues that "[t]he lack of typicality also means that the proposed class representatives are not adequate representatives of the absent class members." (ECF No. 1369, PageID.45437.) But here, the Court has found typicality met.

Individual Plaintiffs argue that the "class members within the Litigation Class are simply too varied to be adequately represented by a small number of named plaintiffs" and that a conflict of interest arises

> between (i) class members who have already suffered severe injuries as a result of contaminated water—death, severe neurological defects, or infertility—and would therefore prefer to assert claims for maximum compensation as soon as possible, and (ii) class members who have suffered less severe injuries and hence favor smaller immediate payouts, in order to ensure sufficient compensation in the future, in case their injuries worsen.

(ECF No. 1392, PageID.54037–54038.) For this proposition, Individual Plaintiffs rely on the Supreme Court's determination in *Amchem Products, Inc. v. Windsor* that "essential allocation decisions" defeated adequacy for the purposes of settlement when "the settling parties

[sought to] achieve[] a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." (*Id.* at PageID.54039–54040 (quoting 521 U.S. 591, 627 (1997)).)

However, the Supreme Court's adequacy concern in *Amchem* was largely that the settlement created *no* subclasses. *See* 521 U.S. at 627 ("[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of distinct subgroups." (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742–43 (2d. Cir. 1992))). There is no such concern in this case. Nor would the potential damages allocation concerns identified by Individual Plaintiffs impact certification of a Rule 23(c)(4) issues class, which does not seek damages on a class-wide basis.

### 2. Vigorous Prosecution

As to the second adequacy requirement, the Court concludes that the named Class Plaintiffs will, through qualified counsel, "vigorously prosecute the interests of the class." *Senter*, 532 F.2d at 524–25. The Court is familiar with the parties, class representatives, Interim Co-Lead

Class Counsel, and Interim Executive Committee members in this case through the previous five years of litigation described above. After initially appointing Theodore J. Leopold and Michael L. Pitt as Interim Co-Lead Class Counsel in July 2017, the Court reappointed them three times, in December 2018, December 2019, and December 2020. (ECF Nos. 696, 1021, 1306.) The Court is aware of Class Counsel's many thousands of hours of work expended in pursuit of Class Plaintiffs' claims and concludes that Class Counsel demonstrate the qualifications and experience necessary to adequately and fairly represent their clients in this case. The Court is confident that Class Counsel will vigorously prosecute the interests of the Classes.[28]

Individual Plaintiffs argue that "Class Counsel suffer from their own disqualifying conflict of interest." (ECF No. 1392, PageID.54041.) Specifically, Individual Plaintiffs argue that Class Counsel "propose to represent a sprawling 'General Class' and trio of enormous Subclasses simultaneously" and that these "different groups [are] characterized by

---

[28] The Court has recently raised concerns about Class Counsel regarding the proposed settlement. However, these concerns do not relate to Class Counsel's ability to adequately and fairly represent their clients in this action against the two Engineering Defendants and to vigorously prosecute the interest of the Issues Classses.

different criteria, different kinds of injuries, different claims, and different time periods, all competing for the same finite resources that will be available to resolve the wide variety of claims asserted in this case." (*Id.* (noting, for example, that there are "different eligibility criteria in the respective definitions of the [Proposed "Master" Issues] Class and the Minors [] Subclass" and wondering whether "the disparity between the two definitions [where "Master" Issues Class members may have received the City's drinking water for any length of time during the Class Period, whereas Minors Subclass members must have received water for at least 14 days during a 90 day period] raises the question [of] whether Class Counsel are treating adults and children equally, or whether they are trading off the interests of one against the other, by making it more difficult for children to qualify for membership in the Minors [] Subclass").) Moreover, Individual Plaintiffs cite the Supreme Court's decision in *Ortiz v. Fireboard Corp.* for the proposition that the same counsel cannot represent multiple classes due to the conflicting interests created by disparate class definitions and allocation claims. (*See id.* at PageID.54042–54043 (citing 527 U.S. 815, 856 (1999).)

Individual Plaintiffs' reliance on *Ortiz* is misplaced. As with *Amchem*, *Ortiz* involved certification of a master settlement class with no subclasses, and the adequacy concern revolved around a "deficienc[y]" in the "fairness of the distribution of the fund among class members" at the settlement stage. 527 U.S. at 855. In concluding that "a class divided between holders of present and future claims . . . requires division into homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel," the *Ortiz* Court explained that its rationale for such a requirement at the settlement stage was to "seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves." *Id.* at 855–56. Such a concern is inapplicable here, where the Court is certifying these Classes for trial only on specified liability issues.

Additionally, while Individual Plaintiffs are correct that Class Counsel propose to represent distinct classes in pursuit of a common recovery fund, such representation is common—and often encouraged—in class action proceedings:

> [O]nly client conflicts that are material and presently manifest—rather than merely trivial, speculative, or

contingent on the occurrence of a future event—will affect the adequacy of class counsel. . . . In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed. Indeed, courts have recognized that concurrent representation may enable counsel to leverage a better settlement for [all] sets of plaintiffs due to a defendant's desire to obtain a global resolution. Representing multiple clients in parallel proceedings will also benefit the class to the extent that class counsel gain useful legal and factual knowledge in pursuing the concurrent action.

William B. Rubinstein, *Newberg on Class Actions* § 3:75 (5th ed. 2020).

At this stage of the case, there is no indication that the class definitions alone render Class Counsel's interests "inherently opposed"—though Class Plaintiffs acknowledge that there could be a potential conflict in the future if the Court were to certify damages classes. (ECF No. 1581, PageID.60911.) Insofar as the Court is not certifying damages classes, however, *see infra* at 100, such a concern is speculative at this time and insufficient to defeat the adequacy requirement for certification of the proposed Classes.[29]

---

[29] Individual Plaintiffs also "speculate" that Class Counsel may be conflicted by the desire for "a settlement that would give them a generous fee." (ECF No. 1392, PageID.54047–54048 ("Unitary representation of separate classes and subclasses as a part of the proposed Litigation Class in this case creates unacceptable incentives

Accordingly, Class Plaintiffs have met the adequacy requirement of Federal Rule of Civil Procedure 23(a)(4) for purposes of class certification.

### F. None of the Proposed Rule 23(b)(3) Damages Subclasses are Certifiable

As previously discussed, Class Plaintiffs have demonstrated that all proposed classes meet the Rule 23(a) prerequisites to class certification. For Class Plaintiffs' proposed Damages Subclasses, the next step is to determine whether the Rule 23(b)(3) damages requirements are met. *See* Fed. R. Civ. P. 23(b)(3).

Class Plaintiffs' proposed remaining[30] Damages Subclasses are:

---

for Class Counsel to trade-off some plaintiffs against others in order to somehow reach a settlement.").) However, Individual Plaintiffs do not expound upon this speculation, and the Court is both unwilling and unable to rely upon it as a reason to find Class Counsel inadequate. The Sixth Circuit has repeatedly emphasized that, "[o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (quoting *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012)).

As to Individual Plaintiffs' concern about fair representation at the allocation and/or settlement phase: Should proceedings in this case reach the settlement stage, the Court will appoint subclass settlement counsel as it did for the partial settlement currently pending before the undersigned. (ECF No. 929.)

[30] Because the Minors Damages and Injunctive Subclass is uncertifiable on separate grounds, *see supra* at 55, the Court will not analyze it here.

### Residential Property Damages Subclass (Rule 23b)(3))
All persons and entities who owned residential property within the City of Flint at any time during the period from April 25, 2014 through December 14, 2015.

### Business Damages Subclass (Rule 23(b)(3))
All persons and entities who, as of April 25, 2014 owned and operated a business within the City of Flint that falls within one of the following North American Industry Classification System ("NAICS") codes: 812111, 812112, 812113, 812990, and 722511.

(ECF No. 1829, PageID.65286, 65289.)

Federal Rule of Civil Procedure 23(b)(3) authorizes class certification for damages when three requirements are met: first, common questions of law or fact must "predominate" in the litigation; second, collective action must be "superior" to other methods of adjudicating the claims; and third, plaintiffs must demonstrate that the class members are "ascertainable." *See* Fed. R. Civ. P. 23(b)(3); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017).

The predominance and superiority requirements are specifically enumerated in the federal rule, and their purpose is to ensure that courts certify only "those cases in which a class action would achieve economies

of time, effort, and expense, and promote[] uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23(b) Adv. Comm. Note. To this end,

> [i]n discerning whether a putative class meets the predominance inquiry, courts are to assess the legal or factual questions that qualify each class member's case as a genuine controversy, and assess whether those questions are subject to generalized proof, and thus applicable to the class as a whole. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question. The plaintiffs need not prove that every element can be established by classwide proof, but the key is to identify the substantive issues that will control the outcome.

*In re FCA*, 334 F.R.D. at 107 (quoting *Sandusky Wellness Ctr., LLC*, 863 F.3d at 466–68) (emphasis in original) (internal citations omitted).

The ascertainability requirement, on the other hand, is "implied" by the rule. *Sandusky Wellness Ctr., LLC*, 863 F.3d at 466. Under this requirement, Class Plaintiffs must show "that the members of the class [are] *capable* of specific enumeration." *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) (emphasis in original) (internal citations omitted). Such a showing is required for (b)(3) class certification because,

"unlike (b)(1) and (b)(2) classes, (b)(3) class members are entitled to notice and are able to opt-out of the class." *Id.* at 541.

In this case, Class Plaintiffs cannot demonstrate that their professional negligence cause of action as a whole is appropriate for Rule 23(b)(3) class certification for any of the proposed subclasses. Class Plaintiffs' professional negligence claim requires that they demonstrate that: (1) LAN and VNA owed a duty to Class Plaintiffs; (2) LAN and VNA breached that duty; (3) LAN's and VNA's breach was the but-for and proximate cause of harm to Class Plaintiffs; and (4) Class Plaintiffs suffered damages as a result. *See Haliw v. Sterling Heights*, 464 Mich. 297, 309–10 (2001). While the Court agrees with Class Plaintiffs that there are certain factual questions and threshold liability issues pertaining to professional negligence that are common to the proposed Classes as a whole—and that will be discussed in the section analyzing Rule 23(c)(4) issues class certification—individualized issues and defenses overwhelm the cause of action and defeat the predominance and superiority requirements, rendering Rule 23(b)(3) damages class certification improper. Because Class Plaintiffs can show neither

predominance nor superiority, the Court declines to address ascertainability.

### i. Predominance

To satisfy the predominance requirement, Class Plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011). In analyzing predominance, the Court must also consider affirmative individualized defenses that Defendants could put forward which could "affect[] the individuals in different ways." *See Ortiz*, 527 U.S. at 844 n.20 (citing Fed. R. 23(b)(3) Adv. Comm. Notes).

The Sixth Circuit has established that "substantial, individual inquiries to determine liability under [Class Plaintiffs'] theory of the case and class definition [] are incompatible with the predominance requirement of Rule 23(b)(3)." *Randleman*, 646 F.3d at 354. In *Randleman*, the court provided as an example of proper Rule 23(b)(3)

certification a deceptive billing practices case in which, "if the billing practices were deceptive, they would be deceptive for all class members." *Id.* Conversely, in *Randleman*, the Sixth Circuit upheld Rule 23(b)(3) decertification of a class because the district court could not determine class liability in one fell swoop. Instead, the determination required additional, highly individualized inquiry amounting to discrete consideration of each individual class member's case: "[t]he only way to resolve the[] particular claims [at issue was] to consider what [the defendant] knew about each individual transaction at the time it issued a policy by examining each individual transaction." *Id.*

There will be a great deal of individualized inquiry required at nearly every stage of legal analysis in this case. Accordingly, Class Plaintiffs cannot demonstrate that common questions predominate over individual questions such that any of their proposed Damages Subclasses are proper for Rule 23(b)(3) damages certification. As set forth below, the Court agrees with Class Plaintiffs that certain issues related to duty, breach, and causation—for example, the applicable standard of care in a professional engineering case, Engineering Defendants' professional relationship with the City of Flint and with individuals who had access

105

to its water supply, Engineering Defendants' internal recommendations to the City, the information and knowledge Engineering Defendants had or did not have at the time they made their recommendations to the City, and the impact that Engineering Defendants' actions had on corrosivity in the Flint municipal water supply—are best established through generalized sets of proof, apply to the Classes as a whole, and are therefore appropriate for issue-specific certification. But a far greater number of issues related to Defendants' overall liability can "only be determined on an individual basis." *Id.* at 353. Indeed, key questions related to most of the elements of Class Plaintiffs' professional negligence claim—duty, but-for and proximate causation, and harm—require individualized proof.

As to **duty**, should subsequent proceedings in this case determine that Defendants owed a duty to entities or individuals who consumed or otherwise were impacted by Flint's municipal water supply, class members would need to individually establish that they were members of that impacted group.

As to **causation**, both but-for and proximate causation will require numerous individualized proofs from class members and will in turn be

susceptible to numerous individualized defenses from Defendants. **But-for causation** requires demonstrating that Defendants' actions (as opposed to some other cause) resulted in damage. *See Haliw*, 464 Mich. at 310. Accordingly, each class member bringing a property damage claim would need to testify to individual household water access and use during the relevant time period. And each class member bringing an economic loss claim would need to testify to operations and performance of their business during the relevant time period and establish that the business lost profits as a result of Defendants' actions and not some other reason, to which Defendants could introduce their own evidence in response.[31]

**Proximate causation** requires "examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id.* Accordingly, class members would need to introduce individualized evidence demonstrating that Defendants' actions were a substantial factor contributing to their injury

---

[31] Were the Minors Damages and Injunctive Subclass not impermissible on other federal and state law grounds, each class member bringing a personal injury claim would need to submit proofs regarding their water exposure and introduce individual medical test results and/or property inspection results for the relevant time period. Defendants could respond to all of this evidence with their own individualized medical, property inspection, and expert evidence to establish that their actions were not the but-for cause of the individual alleged harm.

107

and that their injury was foreseeable. Defendants would then be permitted to introduce evidence related to numerous individualized defenses, including: that Defendants' actions were insubstantial compared to the actions of others and that other causes superseded Defendants' liability as to the individual class member. *See Ross v. Glaser*, 220 Mich. App. 183, 193 (1996).

As to **harm**, class members would need to demonstrate that they suffered a cognizable injury through business earnings and/or property records, to which Defendants could introduce individualized rebuttal evidence.

Class Plaintiffs' response to the prevalence of these individualized issues is repeated insistence that the "circumstances" of class members' exposure were "the same": the tainted water was "delivered to their taps" and "Class Plaintiffs' experts have explained the well-documented effects of such exposure." (ECF No. 1581, PageID.60837.) As set forth in the section of this Opinion discussing issues certification pursuant to Rule 23(c)(4), *see infra* at 118, the Court agrees with Class Plaintiffs that common evidence may appropriately establish aspects of the duty,

breach, and causation inquiries. For this reason, issue certification is appropriate in this case.

However, as Class Plaintiffs acknowledge, "statistics [cannot] mask individual issues." (*Id.*) This is the great difficulty in proceeding as a class in mass tort cases: while one tragic event may be the apparent genesis of harm for many individuals, questions related to that one common event are quickly outnumbered by "significant questions, not only of damages, but of liability and defense of liability, . . . affecting the individuals in different ways." 1 *McLaughlin on Class Actions* § 5:41 (17th ed. 2020). It is for this reason that "the overwhelming majority of post-*Amchem* decisions in federal and state court have rejected class certification in mass tort and related property damage cases irrespective of the claims asserted by plaintiffs." *Id.*

In this case, the overwhelming presence of individual issues in this case defeats the predominance requirement for class certification under Rule 23(b)(3). "While the need to prove damages or establish class membership on an individual basis is not fatal to class certification[,] . . . substantial, individual inquiries to determine liability under [Class Plaintiffs'] theory of the case and class definition [] are incompatible with

the predominance requirement of Rule 23(b)(3)." *Randleman*, 646 F.3d at 353–54.

### ii. Superiority

To satisfy the Rule 23(b) superiority requirement, Class Plaintiffs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Relevant factors in this inquiry include: (1) the interests of the class members in individually controlling separate actions; (2) the extent and nature of the litigation already begun by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties in managing a class action. *Id.*

In this case, the first three factors together weigh moderately in favor of certification of the proposed Rule 23(b)(3) Subclasses. However, as with the predominance element, the overwhelming number of individualized inquiries in this case—and the resulting manageability difficulties that would ensue—render the Rule 23(b)(3) class vehicle an inferior method for adjudicating this controversy.

The first factor—the class members' interests in individually controlling separate actions—is largely a wash. As the Court

110

acknowledged in the Preliminary Settlement Approval Order, at this point in the litigation, "individuals seeking individualized relief either already chose to file their own complaints or hire individual counsel to address their claims—as evidenced by the Individual Cases."[32] (ECF No. 1399, PageID.54448.) And as the Sixth Circuit noted in a different case, "any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(c)(2)(B)(v)." *In re Whirlpool Corp.*, 722 F.3d at 861. Additionally, while the high-value personal injury claims potentially at issue in this case are "not the types of awards that would preclude individual class members from seeking relief through litigation," *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 632 (6th Cir. 2011) (holding that individual damage awards exceeding $280,000 favor individual litigation), Class Plaintiffs have compellingly argued that, "[a]lthough each Class members' damages are significant, that number still pales in comparison to the cost

---

[32] In the Preliminary Settlement Approval Order, the Court found that this factor weighed in favor of certification "[f]or the purposes of settlement." (ECF No. 1399, PageID.54447.) Unlike in the class certification settlement context—where the guarantee of settlement recovery mitigates the presumption that class members are more likely to individually litigate high-value cases—there is no guarantee of recovery in this case, which adds a thumb on the scale against class certification for this factor.

111

of bringing an individual case against these well-funded and numerous Defendants."[33] (ECF No. 1207, PageID.34518–34519 (suggesting that the litigation costs and attorney fees expended by Class Counsel "already conservatively number in the tens of millions of dollars").) In short, at this stage in the proceedings—with class certification and individual cases having proceeded in parallel for five years—the Court finds that potential class members who are interested in vindicating their individual interests may do so by opting out of the proposed Rule 23(b)(3) Damages Subclass and that the potential costs of individual versus class litigation are a relative wash after years of parallel proceedings. Therefore, this factor neither helps nor hurts the case for superiority.

---

[33] VNA argues that "the incremental cost for any individual plaintiff to bring suit is lower than in a typical individual action" due to shared discovery "[u]nder the coordinated case management order" and simplified pleadings in individual cases. (ECF No. 1369, PageID.45451.) However, Class Plaintiffs point out that the maintenance of these individual cases may only be economically feasible "because some counsel ha[ve] been retained by hundreds or even thousands of individuals," and "[i]n that way, the individual cases are operating much like class actions, amalgamating cases and pursuing common claims for damages for a large number of claimants." (ECF No. 1207, PageID.34519.) Given one coordinated form of suit—class action—versus another—individual litigation with shared counsel under a comprehensive case management plan—the Court will not find superiority defeated by the mere fact that thousands of litigants have deemed each option to be attractive in this case.

Second, the extent and nature of class members' litigation in this case weighs in favor of certification. As Class Plaintiffs aptly stated, "[t]his is not a case in which individual plaintiffs have litigated the case for years and then putative Class Counsel swoops in and attempts to certify a class late in the proceedings." (ECF No. 1581, PageID.60889.) To the contrary, the current iteration of this case represents the consolidation of many, many lawsuits—some of which were initially conceived as individual suits and some of which were initially conceived as classes. As the Court has previously found, Class Representatives and Class Counsel have been litigating this case for over five years in a suit that has involved "extensive motion practice, numerous appeals, and petitions for certiorari filed with the United States Supreme Court. The docket on this consolidated case shows over [1,900][34] filings and is rising daily. In short, this case has been zealously litigated [as a prospective class action] already, by a team of national and local firms on all sides." (ECF No. 1399, PageID.54448.) While Engineering Defendants correctly point out that the individual actions in this case are closer to trial than the putative class action, this fact is not relevant to the superiority

---

[34] As of the date of this Opinion and Order.

inquiry. Rule 23(b)(3)(B) asks the Court to consider "the extent and nature of any litigation [] *already begun by class members*," and the extensive nature of the class litigation in this case weighs in favor of superiority being met.

The third factor—the desirability of concentrating the litigation in a particular forum—is also a wash. All federal and state litigation concerning the Flint Water Cases has been centralized in the Genesee County Circuit Court, the Michigan Court of Claims, or the Eastern District of Michigan. The cases will be concentrated in these fora regardless of whether the cases proceed individually or as a class action.

Finally, as to the manageability of the litigation, this fourth factor weighs heavily against class certification. For the reasons previously stated, individualized questions in this case overwhelm the common ones. "Where many individual inquiries are necessary, a class action is not a superior form of adjudication." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012). In *Pipefitters Local 636 Ins. Fund*, the Sixth Circuit found that a Rule 23(b)(3) damages class action did not meet the superiority requirement, even when it would resolve a "central legal claim," because "the district court [] would be required to conduct

individualized inquiries" for "550 to 875 class members." 654 F.3d at 631 (quoting approvingly the magistrate judge's determination that there was a "threshold factual issue specific to each and every class member, requiring the court to make so many individualized determinations as to proposed class members in order to determine ERISA fiduciary status, such that a class action could not be a superior form of adjudication" (internal citations omitted)). In a case such as this one with some common issues, but with enough individualized issues that proceedings will necessarily devolve into mini-trials regardless of the litigation vehicle, the question then becomes: What vehicle is most appropriate for resolution of the suit?

When considering the Rule 23(b)(3) superiority analysis, "[t]he district court should also compare other means of disposing of the suit to determine if a class action 'is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.'" *Id.* at 630 (quoting 7AA C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 1779 (3d ed. 2010)). Possible alternatives to the proposed litigation class include

"joinder, intervention, consolidation, a test case, and an administrative proceeding." *Id.* at 631 (internal citation omitted). In this case, there is an additional alternative to a Rule 23(b)(3) class, which is a Rule 23(c)(4) issues class that would resolve common issues and allow individual suits to then proceed as class members see fit to litigate them. *Cf. id.* at 631–32 (chiding the district court for failing to consider, in its Rule 23(b)(3) superiority analysis for a case with many individualized issues, a solution that would have resolved "the central legal issue" in such a way as to allow "other potential class members [to] then decide whether to pursue an individual suit").

Class Plaintiffs argue that, due to the procedures set forth in their three-phase trial plan, "managing a class action is no more cumbersome than pursuing the bellwether plan." (ECF No. 1581, PageID.60891.) However, Class Plaintiffs acknowledge that this trial plan is "dependent on the Court certifying the[ir] four" proposed Classes and Subclasses[35], which the Court cannot do. (*See id.* at PageID.60889.) The superior method for moving the litigation forward—certifying two Rule 23(c)(4)

---

[35] Now five, with the addition of the proposed VNA Issues Subclass. (*See* ECF No. 1829.)

issues classes, as discussed in the next section—better comports with Class Plaintiffs' reasoning regarding the manageability of trial than certifying multiple Rule 23(b)(3) damages classes:

> Arguably, Class Plaintiffs' trial plan is more manageable [than the bellwether trial process], because it will address the elements of duty, breach, and aspects of causation upfront for the entire Class, and those issues will be resolved for all parties in a single trial. In the bellwether cases, by contrast, these same elements will be addressed once for the children in the first bellwether and then again for the adults in the second bellwether.

(*Id.* at PageID.60891–60892.) Resolving the common issues in this case to streamline individual adjudications is precisely what Rule 23(c)(4) issues classes will accomplish. For the reasons discussed previously and in the next section, a Rule 23(b)(3) class action is not the superior method for adjudicating the claims at issue here.

### iii.    Ascertainability

In addition to the predominance and superiority requirements, "Rule 23(b)(3) classes must meet an implied ascertainability requirement." *Sandusky Wellness Ctr., LLC*, 863 F.3d at 466. Under this requirement, Class Plaintiffs must show "that the members of the class

[are] capable of specific enumeration." *Cole*, 839 F.3d at 542 (internal citations omitted).

Because Class Plaintiffs do not show that the proposed Rule 23(b)(3) Damages Subclasses meet either the predominance or superiority standards, the Court need not address the implied ascertainability requirement in concluding that it cannot certify Class Plaintiffs' proposed Damages Subclasses.

### G. Certification of the Rule 23(c)(4) Issues Classes

#### i. Introduction

As previously discussed, Class Plaintiffs have demonstrated that all proposed classes meet the Rule 23(a) prerequisites to class certification. For the proposed Issues Subclasses, the next step is to determine whether the Rule 23(c)(4) issues requirements are met. *See* Fed. R. Civ. P. 23(c)(4). The Court will additionally discuss, and dismiss, a potential Seventh Amendment concern—specific to Rule 23(c)(4) issues classes—that Defendants and Individual Plaintiffs raise in their briefing.

Issues classes derive from Federal Rule of Civil Procedure 23(c)(4), which is entitled "Particular Issues." This rule states that, "[w]hen appropriate, an action may be brought or maintained as a class action

with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Issue certification is appropriate "where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin*, 896 F.3d at 413.

Class Plaintiffs request that, should the Court "decide[] that certain aspects of the claims in this matter are not appropriate for class-wide resolution, for those subsections of the Class for whom the Court does not choose to certify a damages class under 23(b)(3), the Court should certify an issues class to address issues pertaining to Defendants' liability." (ECF No. 1207, PageID.34536–34537.) The two prospective Rule 23(c)(4) Issues Classes that the Court will consider for certification are:

**Multi-Defendant Issues Class**

All persons and entities who, for any period of time between February 4, 2015 and October 16, 2015, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.

\* "Exposure" is defined to include ingestion (either through drinking or consuming foods prepared with the drinking water), bodily contact with the water (such as by way of bathing), and property contact with the water (through residential plumbing or other appliances).

\* "Persons" is defined to include only those individuals who have reached the age of majority as of the date of the class

notice.

**<u>LAN Issues Subclass</u>**

All persons and entities who, for any period of time between April 25, 2014 and October 16, 2015, were exposed to or purchased drinking water supplied by the City of Flint, owned real property in the City of Flint, or owned or operated a business in the City of Flint.

* "Exposure" is defined to include ingestion (either through drinking or consuming foods prepared with the drinking water), bodily contact with the water (such as by way of bathing), and property contact with the water (through residential plumbing or other appliances).

* "Persons" is defined to include only those individuals who have reached the age of majority as of the date of the class notice.

Class Plaintiffs propose the following questions for certification as to the Issues Classes[36]:

**<u>Issue 1</u>**: Did Defendants' contracts with the City create a duty of care to third parties, and if so, what was the scope of that duty?

**<u>Issue 2</u>**: What is the applicable standard of care in a professional engineering case?

**<u>Issue 3</u>**: If Defendants' contracts created a duty of care to third parties, did Defendants breach that duty by failing to provide appropriate advice to the City of Flint regarding treating the water?

---

[36] Class Plaintiffs initially grouped some of these proposed questions together. The Court has separated each individual question and edited each one slightly for clarity.

**Issue 4**: Did Defendants' conduct cause corrosive water conditions in the Flint water distribution system?

**Issue 5**: What is Defendants' role in creating, exacerbating, and/or prolonging the contamination of the City's water supply, including their involvement in the decisions to switch to the Flint River as a water source, refrain from using corrosion control at the Flint Water Treatment Plant ("FTWP"), and conceal information related to the safety of the City's water supply?

**Issue 6**: Were the corrosive water conditions allegedly caused by Defendants capable of causing harm to Flint residents, property, and businesses?

**Issue 7**: To what extent were other actors at fault for causing corrosive water conditions in the City water distribution system, and how should fault be allocated among all those responsible?

**Issue 8**: Was it foreseeable to Defendants that their conduct would cause corrosive water conditions in the City water system?

**Issue 9**: What, if any, precautions should Defendants have taken to prevent the resulting harm to human health and property?

(ECF Nos. 1581, PageID.60799–60800; 1829, PageID.65285.)

For the following reasons, the Court certifies these nine questions for the Multi-Defendant and LAN Issues Classes. These questions address core issues related to the factual underpinnings of Defendants' involvement in the Flint Water Crisis and directly address aspects of duty, breach, and causation in Class Plaintiffs' professional negligence claim.

### ii. Analysis

In 2018, the Sixth Circuit issued a detailed opinion in *Martin v. Behr Dayton Thermal Products LLC* discussing the propriety of issues-class certification. Like Class Plaintiffs' case, *Martin* was a toxic tort class action. In *Martin*, individuals in an Ohio neighborhood alleged that defendants Chrysler, Behr, and Aramark slowly released carcinogenic chemicals into the groundwater through two separate plumes "over a period of many years while the[ defendants] operated their respective automotive and dry cleaning facilities." 896 F.3d at 408. The district court denied the plaintiffs' motion for class certification writ large under Federal Rule of Civil Procedure 23(b)(3) but certified seven issues for class treatment under Federal Rule of Civil Procedure 23(c)(4). The Sixth Circuit affirmed this decision. *Id.* The issues certified by the district court were:

> **Issue 1**: Each Defendant's role in creating the contamination within their respective Plumes, including their historical operations, disposal practices, and chemical usage;
>
> **Issue 2**: Whether or not it was foreseeable to Chrysler and Aramark that their improper handling and disposal of TCE and/or PCE could cause the Behr-DTP and Aramark Plumes, respectively, and subsequent injuries;

**Issue 3**: Whether Chrysler, Behr, and/or Aramark engaged in abnormally dangerous activities for which they are strictly liable;

**Issue 4**: Whether contamination from the Chrysler-Behr Facility underlies the Chrysler-Behr and Chrysler-Behr-Aramark Class Areas;

**Issue 5**: Whether contamination from the Aramark Facility underlies the Chrysler-Behr-Aramark Class Area;

**Issue 6**: Whether Chrysler and/or Aramark's contamination, and all three Defendants' inaction, caused class members to incur the potential for vapor intrusion; and

**Issue 7**: Whether Defendants negligently failed to investigate and remediate the contamination at and flowing from their respective Facilities.

*Id.* at 410. In holding that certification of these seven issues was proper, the Sixth Circuit endorsed what it referred to as the "broad view" of Rule 23(c)(4) issues-class certification, which entails "apply[ing] the Rule 23(b)(3) predominance and superiority prongs after common issues have been identified for class treatment under Rule 23(c)(4)." *Id.* at 411. In other words, the Sixth Circuit instructs that particular issues are appropriate for issues-class certification when they satisfy Rule 23(b)(3)'s predominance and superiority requirements. *Id.* at 413. Importantly, the broad view permits using Rule 23(c)(4) even where—as here—

"predominance has not been satisfied for the cause of action as a whole."[37]

*Id.* at 411. Further, "certification may remain 'proper' even if 'important matters' such as actual injury, causation, and damages will have to be tried separately." *Id.* at 415. Additionally, certification of certain issues may be appropriate even when "resolution of the certified issues will not resolve the question of Defendants' liability either to the class as a whole or to any individual therein" as long as "resolving the certified issues will go a long way toward doing so." *Id.* at 416.

Though *Martin* enshrines in Sixth Circuit jurisprudence the lowest existing threshold for issue-class certification, it also cautions that courts should not "rely on issue certification where there exist only minor or insignificant common questions, but instead where the common questions render issue certification the superior method of resolution." *Id.* at 413. To this end, class treatment of the certified issues should "materially advance the litigation." *Id.* at 416.

---

[37] The Sixth Circuit contrasted the broad view it adopted with two other interpretations of Rule 23(c)(4): (1) the "narrow view," which "prohibits issue classing if predominance has not been satisfied for the cause of action as a whole"; and (2) the "functional, superiority-like analysis," which declines to "adopt[] either the broad or the narrow view" and instead evaluates whether issue certification would "increase the efficiency of the litigation." *Martin*, 896 F.3d at 412.

For the following reasons, the nine issues proposed by Class Plaintiffs and identified above satisfy the Rule 23(b)(3) predominance and superiority standards and will materially advance Class Plaintiffs' litigation. Moreover, resolution of these issues will not create potential conflicts with the Seventh Amendment's Reexamination Clause, as Defendants and Individual Plaintiffs contend. Accordingly, Rule 23(c)(4) certification of the Multi-Defendant and LAN Issues Classes is appropriate.

## 1. Predominance

Rule 23(b)(3) predominance asks whether "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Sixth Circuit has explained how the predominance inquiry works in the context of issues certification:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in

> the action are common to the class and can be said to
> predominate, the action may be considered proper under Rule
> 23(b)(3) even though other important matters will have to be
> tried separately, such as damages or some affirmative
> defenses peculiar to some individual class members.

*Martin*, 896 F.3d at 414 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577
U.S. 442, 452 (2016)).

In *Martin*, the Sixth Circuit concluded that the district court's
certification of seven different class issues was appropriate because

> the district court certified only issues capable of resolution
> with generalized, class-wide proof. All seven of these issues
> are questions that need only be answered once because the
> answers apply in the same way to each property owner within
> the plumes. Expert evidence will be central to resolving these
> seven issues, [and s]uch evidence will bear on all of the
> property owners within each plume in the same way. In
> addition, issues 1, 2, 3, 6, and 7 turn on each Defendant's
> knowledge and conduct, which need only be established once
> for each plume.

*Id.* Similar reasoning holds true in this case. None of the nine proposed
questions require individualized inquiries as to any Class Plaintiffs, and
all questions may be resolved with common evidence.

Defendants and Individual Plaintiffs advance variations on the
argument that "common questions do not predominate [in this litigation],
even within the limited issues proposed by [Class Plaintiffs because] the

respective Defendants' conduct and duty is not uniform with respect to all class members." (*See, e.g.*, ECF No. 1392, PageID.54102.) While these parties are correct that Defendants' liability to Class Plaintiffs cannot be determined writ large because of individualized questions that predominate within the lawsuit, "predominance problems within a liability-only class do not automatically translate into predominance problems within an issue class." *Martin*, 896 F.3d at 415. Here, the nine issues to be certified carve out major aspects of Defendants' alleged duty, breach, and causation that "need only be answered once because the answers apply in the same way to each [class member]." *Id.* at 414. These issues involve other actors potentially contributing to the Flint Water Crisis; Defendants' knowledge; Defendants' relationship and conduct with the City of Flint; the corrosive water situation in the City municipal plumbing system; and core threshold legal questions bearing on third-party duties of care in professional negligence cases. For these specific nine issues, "[e]xpert evidence will be central to resolving the[m], [and s]uch evidence will bear on all [class members] in the same way." *Id.*

Accordingly, the predominance standard of Rule 23(b)(3) is satisfied as to the nine issues identified above.

## 2. Superiority

Rule 23(b)(3) superiority asks whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). It aims to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Martin*, 896 F.3d at 415 (quoting *Amchem*, 521 U.S. at 615). The Sixth Circuit explained in *Martin* how the superiority inquiry works in the context of issues certification:

> To determine whether a class action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action. The district court should also compare other means of disposing of the suit to determine if a class action is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court. Additionally, the court should consider the value of individual damage awards, as small awards weigh in favor of class suits.

*Id.* at 415–16 (quoting *Pipefitters Local 636 Ins. Fund*, 654 F.3d at 630–31). The Sixth Circuit also noted in *Martin* that the superiority inquiry permits "[c]ourts [to] consider the related nonexhaustive factors set forth

128

in Rule 23(b)(3) itself"—the class members' interests in individually controlling the case, the extent and nature of any relevant litigation already begun by class members, the desirability of concentrating the claims in a particular forum, and any likely difficulties in managing the class action—though the Sixth Circuit did not consider these factors in its own decision. *Id.* (citing Fed. R. Civ. P. 23(b)(3)).

Defendants and Individual Plaintiffs' primary argument opposing issues-based superiority is that an issues class would be "inefficient" and would not "meaningfully advance the litigation." Specifically, Individual Plaintiffs argue that

> [i]n this case, the limited issues identified by Class Counsel are precisely the kind of unhelpful questions that would not meaningfully advance the litigation. A trial on the Governmental Defendants' knowledge or on the Engineering Defendants' negligence in the abstract is unlikely to substantially aid resolution of the substantial issues on individualized exposure, liability, causation, and injury. When the enormous scope of this matter is viewed in combination with the number of individual trials that would still be required for individualized issues, it is clear that resolution of the limited issues identified by Class Counsel would barely make a dent in the resolution of the litigation.

(ECF No. 1392, PageID.54104–54105.) VNA also argues that an issues class is not the superior method of litigation because there would be

129

"evidentiary overlap between common and individual issues"[38] that would "more than offset any benefit from resolving the common issues [Class] Plaintiffs identify on a class-wide basis." (ECF No. 1367, PageID.43815.)

These arguments are unavailing. While Defendants and Individual Plaintiffs are correct that it is theoretically possible for some class-wide evidence to be duplicative of later evidence used to prove individualized issues, it is not clear that duplicative proofs alone render individualized litigation superior. This is particularly true when the class-wide issues need only be addressed *once*, as opposed to duplicating the common issues in every individualized case. The significant efficiency gains that will result from addressing class-wide issues only once more than satisfy the

---

[38] VNA provides the following example of possible evidentiary overlap:

> In a class trial, to prove breach, [Class] Plaintiffs' experts likely would testify that VNA should have given more forceful advice because VNA should have recognized that not doing so likely would result in increased damage to the Flint water system. Then, in an additional trial, to prove causation and for allocation of fault, [Class] Plaintiffs likely would present essentially the same evidence to argue that VNA's failure to give more forceful advice in fact resulted in increased damage to the Flint water system. Accordingly, there would be little, if any, efficiency gains from certifying an issue class in this case.

(ECF No. 1367, PageID.43815.)

standard set forth in *Martin*, in which the court squarely addressed VNA's and Individual Plaintiffs' concerns in this way:

> [R]esolution of the certified issues will not resolve the question of Defendants' liability either to the class as a whole or to any individual therein[, but] resolving the certified issues will go a long way toward doing so, and this is the most efficient way of resolving the [] issues that the district court has certified.
>
> . . .
>
> Even if the class members brought suit individually, the seven certified issues would need to be addressed in each of their cases. Resolving the issues in one fell swoop would conserve the resources of both the court and the parties. Class treatment of the seven certified issues will not resolve Defendants' liability entirely, but it will materially advance the litigation. The issue classes therefore satisfy Rule 23(b)(3)'s superiority requirement.

896 F.3d at 416.

The Rule 23(b)(3) superiority factors also weigh in favor of certifying the nine issues identified above. *See* Fed. R. Civ. P. 23(b)(3). As the Court previously explained, the first three factors—class members' interests in individually controlling separate actions, the extent and nature of class members' litigation in this case, and the desirability of concentrating the litigation in a particular forum—together weigh in favor of class certification. *See supra* at 110-14. The Court additionally

131

notes that class members' interests in individually controlling separate actions are lessened in the issues context because the issues to be certified do not in any way bear on individual circumstances, and issues resolution will still allow "everyone enmeshed in the dispute [to] have [their] own day in court and be represented by a lawyer of [their] choice" once issues common to the class have been resolved. 18 C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 1783 (3d ed. 2020).

As to the manageability factor, issues-based resolution of common claims will streamline litigation at both the class and individual levels by allowing the parties to dispute common, class-wide claims "in one fell swoop," which will "conserve the resources of both the court and the parties" and render the Rule 23(c)(4) class the most manageable vehicle for adjudicating these issues. *Martin*, 896 F.3d at 416.

Accordingly, the Rule 23(b)(3) requirement standard is satisfied as to the nine issues set forth above.

### iii.    The Seventh Amendment's Reexamination Clause

Defendants and Individual Plaintiffs argue that issues certification could create potential conflicts with the Reexamination Clause of the Seventh Amendment. The Reexamination Clause provides that "no fact

132

tried by a jury[] shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Sixth Circuit has explained that constitutional defenses to issues classes also "incorporate[] the Rules Enabling Act, which states that procedural rules like Rule 23 'shall not abridge, enlarge, or modify any substantive right.'" *Martin*, 896 F.3d at 416–17 (citing 28 U.S.C. § 2072(b)).

The *Manual for Complex Litigation* states that Rule 23(c)(4) classes may raise concerns under the Reexamination Clause because

> [a]n issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages. A bifurcated trial must adequately present to the jury applicable defenses and be solely a class trial on liability. There is a split of authority on whether the Seventh Amendment is violated by asking different juries to decide separate elements of a single claim.

*Manual for Complex Litigation*, Fourth, § 21.24. However, the Sixth Circuit has stated that, "if done properly, bifurcation [by issues class] will not raise any constitutional issues" so long as courts "divide issues between separate trials in such a way that the same issue is not reexamined by different juries." *Olden v. LaFarge Corp.*, 383 F.3d 495,

133

509 n.6 (6th Cir. 2004). The *Manual for Complex Litigation* and *Newberg on Class Actions* also advise that proper case management can allay many Seventh Amendment concerns. *See Manual for Complex Litigation*, Fourth, § 22.755 ("Unless the decision of the first jury will provide sufficient guidance to allow later juries to implement the first jury's formal findings without confusion or uncertainty, issues cannot be certified. Use of special verdict forms can provide the specificity necessary for instructing a second jury as to the aspects of the litigation previously resolved. The forms should clearly distinguish among the possible interpretations of the first jury's findings, to allow later juries to understand and apply those findings."); 2 *Newberg on Class Actions* § 4:92 (5th ed. 2010) ("[T]he Seventh Amendment does not seem to pose a significant obstacle to the use of issue classes, even in the mass tort context, so long as courts are careful to certify only those issues for class treatment that are sufficiently separable from individual issues so that trial of them alone may be had without injustice. This may be readily accomplished through the myriad case management tools at trial courts' disposal." (internal citations omitted)).

The parties' Seventh Amendment concern is best summarized by VNA, which argues that

> breach, causation, and allocation of fault will [result in the] same evidence [overlapping] at multiple phases of the same cause of action before different juries, presenting a significant danger of confusion, reexamination, or both . . . [There is also a] serious risk that the second jury would reexamine the findings of the first. [For example,] in finding breach, the first jury may have concluded that a reasonable engineer would have foreseen that the failure to recommend more forcefully that the City use corrosion controls would result in harm. The second jury then may revisit the issue in assessing whether VNA's failure proximately caused the particular plaintiff's harm, because proximate causation also depends on foreseeability of the harm. The second jury could conclude that VNA did not proximately cause the plaintiff's harm because the harm was not foreseeable—effectively overruling the first jury's conclusion that the harm was foreseeable, in violation of the Seventh Amendment.

(ECF No. 1369, PageID.45486.)

The Court agrees with the Sixth Circuit's finding that Seventh Amendment concerns are speculative at the class certification stage of the proceedings. In *Martin*, the Sixth Circuit addressed these concerns as follows:

> At [class certification], the district court has not formalized any procedures for resolving either the common issues or the remaining individualized inquiries. The certification decision

135

outlines one option, but the district court may ultimately find
that another procedure better facilitates the fair resolution of
Plaintiffs' claims. Because the district court has not settled on
a specific procedure, no constitutional infirmities exist at this
time.

896 F.3d at 417. Accordingly, the Seventh Amendment does not bar Rule

23(c)(4) issues certification. Mindful of the Sixth Circuit's guidance—as

well as conventional wisdom, *see Manual for Complex Litigation*, Fourth,

§ 22.755; 2 *Newburg on Class Actions* § 4:92 (5th ed. 2010)—that careful

trial management can allay Seventh Amendment reexamination

concerns, the Court intends to proceed with great care during trial. The

Court welcomes the participation of the parties in formulating trial

plans, jury instructions, and verdict forms that crystallize the applicable

issues and clarify those already decided.

## H. *Daubert* Motions

Class Plaintiffs rely on fourteen retained experts for their motion

for class certification. (ECF No. 1207.) Defendants LAN and VNA filed a

combined total of fifteen *Daubert* motions seeking to exclude all of them.

(ECF Nos. 1371, 1372, 1373, 1374, 1376, 1377, 1378, 1379, 1380, 1381,

1382, 1383, 1384, 1385, 1388.) On May 19, 2021, the Court heard oral

argument regarding Defendants' motions to exclude the testimony and

reports of the two Class Plaintiffs' experts whose testimony impacts the liability portion of the class certification motion: Dr. Larry Russell and Dr. Paolo Gardoni. (ECF Nos. 1373, 1382, 1386, 1388.) For the reasons set forth on the record at the May 19 hearing and in this Opinion and Order, the Court DENIES the *Daubert* motions as to Dr. Russell, (ECF Nos. 1382, 1388), GRANTS IN PART AND DENIES IN PART the *Daubert* motions as to Dr. Gardoni, (ECF Nos. 1373, 1388), and DENIES AS MOOT the remaining *Daubert* motions. (ECF Nos. 1371, 1372, 1374, 1376, 1377, 1378, 1379, 1380, 1381, 1383, 1384, 1385.)

### i. Drs. Larry Russell and Paolo Gardoni

For the reasons set forth on the record, all four *Daubert* motions pertaining to Drs. Russell and Gardoni are DENIED, with the exception of the following sentence in Dr. Gardoni's report that was STRICKEN as improper speculation: "VNA failed to disclose that it believed that lead was currently being released into the water supply [because] VNA understood that releasing this information publicly would compromise its opportunity to be awarded a lucrative long-term operating contract." (ECF No. 1208-114, PageID.37182.)

The Court set forth its reasoning on the record during the hearing and incorporates that reasoning herein; however, a summary of the key factors taken into consideration is included here: First, at this early stage of the proceedings, the Court is not performing its typical *Daubert* role of gatekeeping for a *jury*, but is instead determining whether the proposed experts will assist the *Court* in making a pure determination of law. Second, the Court is viewing the experts' testimony not as a factual referendum on the merits of Class Plaintiffs' case, but instead through the limited lens of whether the testimony and reports can be relied upon to establish that Class Plaintiffs' claims are proper for class adjudication.

As to the first point, the Court is mindful that the concerns animating traditional *Daubert* review—confusing the jury—do not exist when the Court is the sole trier of fact and law. The sole purpose of expert testimony is to "assist[] the trier." *See* Fed. R. Evid. 702 Adv. Comm. Notes. "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." *Id.* The Advisory Committee Notes to Federal Rule of Evidence 702 make clear that "rejection of expert testimony is the exception rather than the rule" and that "the trial court's

role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.*

There is no jury reviewing Class Plaintiffs' motion for class certification; the Court is the only audience for the parties' class certification arguments and their factual underpinnings. Accordingly, this stage of the proceedings is more akin to a bench trial than a jury trial, and the Sixth Circuit has determined that *Daubert* proceedings are "largely irrelevant" in a bench trial:

> In *Daubert*, the Supreme Court held that district courts must act as "gatekeepers" to protect juries from misleading or unreliable expert testimony by assessing the reliability of the expert's principles and methodologies used to reach the expert opinion or conclusion . . . [However, t]he "gatekeeper" doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial.

*Deal v. Hamilton Cnty. Bd. of Educ.*, 292 F.3d 840, 851–52 (6th Cir. 2004). Heeding this guidance, a court in this District recently denied a *Daubert* challenge prior to a bench trial, concluding that "both motions in limine and *Daubert* challenges are inapplicable to bench trials [because] a *Daubert* challenge is used to 'prevent the jury' from hearing unreliable scientific evidence." *League of Women Voters of Mich. v. Benson*, No. 17-14148, 2019 WL 8106155, at *1 (E.D. Mich. Jan. 15, 2019). "The proper

course of action for this Court, therefore, is to admit the evidence and then afford it whatever weight the Court deems appropriate." *Id.* (citing *Deal*, 392 F.3d at 852).

As to the second point, the Court is mindful that *Daubert* review at the class certification stage is limited to determining whether the experts' testimony and reports will assist the class certification inquiry. The recent case *In re FCA US LLC Monostable Elec. Gearshift Ltg.* is instructive on this point. In that case, the Honorable Judge David M. Lawson performed a full *Daubert* review at the class certification stage but "ke[pt] in mind . . . that the challenged testimony is not being offered to prove the merits of the plaintiffs' claims, but only to establish that the merits of those claims properly can be adjudicated by means of collective litigation." 382 F. Supp. 3d at 692 (denying both *Daubert* motions and emphasizing that it did so "through the lens of collective litigation").

As the Court made clear to the parties at oral argument, the "adversary system" has prevailed in the briefing for these *Daubert* motions. *See* Fed. R. Evid. 702 Adv. Comm. Notes. All parties submitted robust, helpful briefs, and Defendants have alerted the Court to the many flaws, as they see it, with the methodologies employed by Drs. Russell

and Gardoni. As to Dr. Russell, LAN and VNA believe that (1) his chloride-sulfate mass ratio opinion is an unreliable device of his own creation; and (2) his failure to personally visit Flint and to inspect its plumbing render many of his opinions speculative and unreliable. (ECF Nos. 1382, 1388.) As to Dr. Gardoni, LAN and VNA believe that his opinions are unreliable and speculative because (1) he is not qualified to offer his opinions regarding engineering ethics in a water-treatment case such as this one; (2) ethical opinions such as his are irrelevant to professional negligence cases such as this one; and (3) Dr. Gardoni blinded himself to evidence that did not support his position and "cherry-picked" ethical principles to bolster his conclusions. (*Id.*) LAN and VNA also express concern regarding the experts' reliance on one another's opinions in forming their own opinions regarding corrosion and ethical engineering. (*Id.*) The Court is familiar with Class Plaintiffs' responses to these arguments.

The Court extensively discussed, on the record, the reasons why it determined that the testimony and reports of Drs. Russell and Gardoni are sufficiently reliable to assist it in this class certification decision, with the exception of the one line stricken from Dr. Gardoni's report. The

Court has heard Defendants' concerns and has carefully proceeded with its evaluation of and reliance upon the experts' testimony and reports accordingly.

### ii. All Other Class Certification *Daubert* Motions

The remaining *Daubert* motions—regarding Class Plaintiffs' experts Dr. Alan Ducatman, Mr. R. Bruce Gamble, Dr. Panagiotis Georgopoulos, Dr. Pierre Goovaerts, Dr. Howard Hu, Dr. Daniel Keating, Dr. David Keiser, Dr. Bruce Lanphear, Mr. David A. Pogorilich, Dr. Daryn Reicherter, Dr. Robert Simons, and Dr. Clifford Weisel—seek to disqualify expert opinion testimony and reports offered in support of certification of Class Plaintiffs' proposed Minors Damages and Injunctive Subclass, Residential Property Damages Subclass, and Business Damages Subclass. Because the Court will not be certifying these Subclasses for the reasons previously set forth, and because the Court and does not rely on these experts in deciding class certification, Defendants' motions are DENIED AS MOOT. (ECF Nos. 1371, 1372, 1374, 1376, 1377, 1378, 1379, 1380, 1381, 1383, 1384, 1385.) Defendants LAN and VNA may revive their *Daubert* motions should Class Plaintiffs seek to rely on these experts at a later time.

142

## IV.   CONCLUSION

IT IS ORDERED that Class Plaintiffs' motion for class certification (ECF No. 1207) is GRANTED IN PART AND DENIED IN PART;

IT IS FURTHER ORDERED that  Rhonda Kelso, on behalf of herself and her minor child, K.E.K., as well as Barbara and Darrell Davis, are DESIGNATED as Representatives of the Multi-Defendant and LAN Issues Classes;

IT IS FURTHER ORDERED that the request to designate all other class representatives is DENIED;

IT IS FURTHER ORDERED that Theodore J. Leopold and Michael L. Pitt are appointed as Co-Lead Class Counsel pursuant to Federal Rule of Civil Procedure 23(g);

IT IS FURTHER ORDERED that Interim Executive Committee members Stephen E. Morrissey, Paul F. Novak, Esther Berezofsky, Peretz Bronstein, and Teresa A. Bingman are appointed to serve the Multi-Defendant and LAN Issues Classes as formal members of the Executive Committee pursuant to Federal Rule Civil Procedure 23(g);

IT IS FURTHER ORDERED that Defendants LAN's and VNA's *Daubert* motions as to Dr. Larry Russell (ECF Nos. 1382, 1388) are DENIED;

IT IS FURTHER ORDERED that Defendants LAN's and VNA's *Daubert* motions as to Dr. Paolo Gardoni (ECF Nos. 1373, 1388) are GRANTED IN PART AND DENIED IN PART; and

IT IS FURTHER ORDERED that the remaining *Daubert* motions filed by Defendants LAN and VNA (ECF Nos. 1371, 1372, 1374, 1376, 1377, 1378, 1379, 1380, 1381, 1383, 1384, 1385) are DENIED AS MOOT.

IT IS SO ORDERED.

Dated: August 12, 2021      s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                             United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 12, 2021.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager

144