# EXHIBIT A



**ROBERT E. HIRSHON**
*Frank G. Millard Professor from Practice*
*Special Counsel on Developments in the*
  *Legal Profession*

(734) 763-6002  Office
(734) 764-8309     Fax
rhirshon@umich.edu

July 7, 2021

Paul J. Napoli, Esq.
Napoli Shkolnik PLLC
400 Broadhollow Road #305
Melville, NY 11747

   Re:  <u>Expert Report</u>

Dear Paul:

  You have asked whether in my professional judgment, an attorney representing multiple clients in the so called "Flint Water Litigation" pending in the Michigan Courts may represent some parties who favor and other parties who object to a mediated settlement. My opinion is that the Michigan Rules of Professional Conduct (MRPC) 1.7 and 1.8 prevent such representation. You have also asked whether in my professional judgment, the MRPC limit the type or scope of arguments an attorney can make in opposing the Flint Water Litigation Mediated Settlement. My conclusion is that Michigan rules limit the types and scope of arguments an objector can make pursuant to MRPC 3.1 (Meritorious Claims and Contentions), Rule 3.2 (Expediting Litigation), Rule 3.3 (Candor Toward the Tribunal) and Rule 8.4 (Misconduct). The fact finder, however, should make that determination.

## I.  <u>My Background</u>

  I am the Frank G. Millard Professor from Practice and Special Counsel on Developments in the Legal Profession, at the University of Michigan Law School ("Law School"). At the Law School, I teach both basic and advanced courses on ethics and professional responsibility. I also teach a seminar on the business of lawyering. Further, I was the Law School's "Co-Director" of the State Bar of Michigan's Professionalism in Action Program presented at the Law School during 2015-2018. This Program was a half-day seminar developed by the Michigan State Bar. First-year law students at the Law School discussed hypotheticals based upon the Michigan Rules of Professional Conduct with experienced practitioners and judges. As Co-Director, I assisted in the drafting of these hypotheticals and attended to various administrative details. Additionally, I have volunteered my time to the Michigan Supreme Court Board of Law Examiners and provided them with comments and suggestions to the proposed ethics and professional responsibility questions and model answers for the Michigan Bar Examination.

  I am an Adjunct Professor at Peking University's School of Transnational Law in Shenzhen, China, and a Visiting Professor at Haim Striks School of Law in Israel. In both countries I teach courses on ethical dilemmas confronted by practitioners. Also, I am a consultant to a law

firm located in New England where I advise the firm on ethical and law practice management issues.

My legal experience includes thirty years of practice in the Portland, Maine law firm of Drummond, Woodsum & MacMahon. My management responsibilities at the firm included advising the firm's lawyers on their ethical responsibilities as described in the Maine Code, and, subsequently, the Maine Rules of Professional Responsibility. The Maine Rules are based upon the Model Rules adopted by the American Bar Association's House of Delegates.

Additionally, I served as the CEO of a 75 lawyer law firm and the COO of a 370 lawyer regional law firm, both headquartered in Portland, Oregon. In these firms, I confronted and assisted in the resolution of numerous ethical issues, most of which involved potential conflicts of interest.

As a result of my various positions as a practicing lawyer, law firm manager (CEO and COO), law school professor teaching ethics and law firm consultant, I have a substantial familiarity with the administration of the rules of professional conduct. I believe my familiarity with the practical application and administration of the rules of professional conduct, especially in Maine, Michigan and Oregon, is relevant to my ability to opine in this matter. The Michigan Rules relevant to this case are substantially similar to Maine's Rules, Oregon's Rules and the ABA's Model Rules.

During the period of time that I was a practicing lawyer, I was the President of the Maine Bar Association, the Maine Bar Foundation, and the American Bar Association ("ABA"). While serving as President of the ABA, I appointed a committee to revisit Model Rule of Professional Conduct 1.6 for consideration of possible amendments. The current version of Rule 1.6 is a result of this Committee's recommendations. Prior to serving as President, I was Chair of the ABA's Pro Bono Committee. I was the primary author of and floor manager for Model Rule 6.1.

As a former ABA President, I am a life-long member of the ABA's House of Delegates. I have personally participated in the debates which have amended numerous Model Rules.

Presently, I am a member of the American Law Institute, which drafts the various restatements including the Restatement of the Law Governing Lawyers. I am also a member of ABA's Standing Committee on Ethics and Professional Responsibility. This committee issues ethics opinions interpreting both the Model Rules of Professional Conduct and the Model Code of Judicial Conduct. Additionally, the Committee reviews and proposes amendments of the Model Rules to the ABA's House of Delegates. I am in the process, with others, of preparing amendments to Model Rules 1.4 and 5.5.

I have participated in several CLE panels and delivered numerous presentations focused on legal ethics and professional responsibility. I received a B.A. from the University of Michigan in 1970 as well as a J.D. in 1973, before returning to my home state of Maine to practice law.

## II.    Opinion

I have reviewed various pleadings filed in the case of Helen Chapman, et al. v. Governor Richard D. Snyder, et al., E.D. MI No 5:18-CV-10679. I have also reviewed various emails and correspondence exchanged with Attorney Mark R. Cuker, the Model Rules of Professional Responsibility (MRPR), the Michigan Rules of Professional Conduct (MRPC), case law, disciplinary opinions interpreting the MRPC and the MRPR, and the Opinion of Circuit Judge

2

Joseph J. Farah in the Flint Water Litigation, Case No. 17-108646-NO, which is attached hereto at Exhibit A.

The rules preventing conflicts of interest are fundamental to our system of justice. MRPC 1.7(a) provides:

(a)  A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1)  the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2)  each client consents after consultation.

As stated in the Comment to MRPC 1.7:

"Loyalty is an essential element in the lawyer's relationship to a client . . ..
As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent."

Under certain circumstances a client may consent to an attorney's conflict after "consultation." "Consultation" is a defined term under MRPC and requires that the client "appreciates the significance of the matter in question." MRPC 1.0. There is nothing in the record which allows me to determine whether Attorney Cuker has met the consultation requirements of MRPC 1.7. I attach Exhibits B and C as examples of the types of consent required by this rule. Even if he has met these requirements, however, it is clear that a conflict still exists under MRPC 1.7(a)(1), since objecting to this settlement flies in the face of the desire of at least one of Attorney Cuker's clients.

The Sixth Circuit Court of Appeals scrupulously enforces conflict of interest rules, especially when multiple representation is involved under MRPC 1.8. This rule provides in part:

1.8(g): A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or, in a criminal case, an aggregated agreement as to guilty or nolo contendere pleas, unless each client consents after consultation, including disclosure of the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.

See, In the Matter of Grand Jury Proceedings, 428 F. Supp. 273 (1976) where the Sixth Circuit Court of Appeals disqualified counsel engaged in multiple representation of witnesses before the Grand Jury.

See, also, El Camino Resources Ltd. V. Huntington National Bank, 623 F. Supp. 2d 863 (2007) where the U. S. District Court for the Western District of Michigan discussed the need to disqualify and indeed did disqualify attorneys engaged in adverse representation to current clients.

It should not be surprising that it is impossible for an attorney to argue on behalf of one client that the Court should approve the mediated settlement and on behalf of another client that the Court should reject the same mediated settlement. This situation creates a classic conflict of

interest. Moreover, under the rule there is no way that an attorney can reasonably believe that the joint representation will not be adverse to at least one client. MRPC 1.7(a)(1).

The American Bar Association and the State Bar of Michigan have also had occasion to examine the appropriateness of a lawyer representing clients who are offered aggregate settlements. ABA Formal Op. 06-438 (Exhibit D) recognizes the conflicts of interest inherent in aggregate settlements and underscores the additional disclosures which must be made by the attorney to their clients and the necessary consent.[1]

The Michigan Bar in State Bar of Michigan Ethics Opinions RI-108 (1991) (Exhibit E) requires an attorney to withdraw from representing all clients or at a minimum withdrawing from those clients who support the settlement. This was the same determination made by Judge Farah in his order dated June 10, 2020 (Exhibit A). Accordingly, Attorney Cuker's position of objecting to the settlement on behalf of certain clients and supporting the settlement on behalf of another client is completely untenable and a breach of MRPC 1.7 and 1.8.

Very truly yours,

Robert E. Hirshon

REH/prf
Attachments

---

[1] The ABA's Model Rule requires informed consent in writing. The Michigan Rule requires consent after consultation.

4

# EXHIBIT A

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

IN RE FLINT WATER LITIGATION

CASE NO. 17-108646-NO

JUDGE JOSEPH J. FARAH

Individually Filed
16-106199-NO
16-106517-NO
16-107681-NO
16-108271-NO
17-108688-NO
17-108773-NO
17-108886-NO
17-109337-NO
17-109338-NO
17-109339-NO
17-109340-NO
17-109493-NO
17-109557-NO
17-109854-NO
17-110226-NO
18-110423-NO
18-111193-NO
19-112331-NO
20-114059-NO

---

At a session of said Court held in the City of Flint,
County of Genesee, State of Michigan
on the _10th_ day of _June_____, 2020.

PRESENT: HONORABLE JOSEPH J. FARAH, CIRCUIT JUDGE

### ORDER REGARDING INDIVIDUAL LEGIONELLA MCLAREN PLAINTIFFS' RESPONSE TO CONFLICT ISSUES RAISED BY THE COURT

The Fieger Firm (Fieger) was told by the Court that, within 21 days of April 22, 2021, it was to advise the Court how it intended to resolve any potential conflict amongst Legionella clients where one of the firm's clients registered for the settlement with McLaren

1

and two dozen did not. The Court indicated a potential remedy was to remove Fieger from representation of all its clients on these claims, but the Court invited other remedies.

The Fieger position was succinctly stated on page 2 of their submission as follows:

> Because the terms of the McLaren settlement were drafted to ensure there would be no settlement, and to ensure McLaren would *always* retain (sic) the right to walk away, a conflict never did and does not, exist. In the alternative, if the Court determines that a conflict does exist, the conflict can be remedied by the client rescinding his registration, or, by having another lawyer take over the representation of the registered Fieger client. (emphasis in the original)

For decisional purposes, the Court summarizes the position as (1) there is no conflict; (2) if there is a conflict, McLaren (and the settlement language's walkaway provision) created the conflict; (3) the lone Fieger client who registered can "unregister," thereby alleviating the conflict and; (4) alternatively, the registered Fieger client will simply become represented by counsel other than Fieger to press their claim. The Court will discuss these contentions in turn, but first will articulate McLaren's position in response as embodied in their written submission.

McLaren challenges the Fieger assertion that McLaren had a dastardly hand of hidden control in the terms and that those terms were constructed so McLaren could walk away with alacrity. McLaren contends it had no such control, that the Master Settlement Agreement was constructed by numerous counsel, parties, and mediators in an effort to reach a consistent global resolution.

McLaren addresses the Fieger attacks on the propriety of the settlement itself by questioning the timeliness of such a claim. A hearing McLaren points out, has already been held before Judge Levy on the various positions voiced by counsel and Judge Levy preliminarily approved the Master Settlement Agreement five months ago. Such attacks, McLaren posits, on the terms of the Master Settlement Agreement—including its walk-away provision—are precluded. (Some question exists on precisely what bearing this has on the conflict issue before the Court).

McLaren, when responding to the Fieger proposed remedies, disputes that a registered claimant can simply "unregister" and therefore eliminate in this matter the perceived conflict. McLaren notes that no such provision exists in the Master Settlement Agreement.

Finally, McLaren leaves the alternative Fieger solution, i.e. to let the sole Fieger registered client obtain different counsel, to the Court.

Having considered the foregoing, the Court rules as follows:

2

A conflict does exist. Fieger pressing the position of the great majority of its clients impairs the position of the registered client because (1) it could prompt McLaren to walk away; (2) a walkaway hurts the registered client because is takes a certainty of collection to uncertainty, casts the amount into question, delays potential collection months and even years, and foists on the registered client significant, additional evidentiary burdens.

McLaren did not create the conflict. The Master Settlement Agreement—approved by Judge Levy—does not on its face create conflicts; the Fieger position does. Judge Levy's decision to preliminarily approve the Master Settlement Agreement must be given deference.

There is no provision to unregister.

The Court accepts the Fieger alternative proposal and the Fieger firm is removed as counsel for the one registered client.

IT IS SO ORDERED.

Date:  6/10/21

JOSEPH J. FARAH, CIRCUIT JUDGE

3

# EXHIBIT B



**NAPOLI**
**SHKOLNIK** PLLC
**ATTORNEYS AT LAW**

ATTORNEY CLIENT COMMUNICATION – DO NOT DISSEMINATE

[RESERVED]
[RESERVED]

*Re: Your Family's Flint Water Case*

Dear [CLIENT]:

We write to provide you with a further update regarding your case. First, our office has prepared a list frequently asked questions (FAQ) regarding the potential settlement. We encourage you to visit our website at www.Napolilaw.com/FlintFAQ and review the FAQ should you have any questions or would like to learn more about the proposed settlement.

Additionally, we would like to bring an important issue to your attention. As you now know, a partial settlement has been reached with the State of Michigan for $600 million, subject to approval by the Court. The partial settlement amount is known as an aggregate settlement. While the settlement has not yet been approved by the Court, it is intended to cover your claims as well as any other claims in the community. Because the partial settlement is still pending court-approval, there is likely to be additional claims regardless of what we do. With that said, we believe it is in your best interest that we represent as many other claims as possible, and assist as many other people in the community, since we are familiar the process and can help move it along quickly as opposed to other lawyers who are not familiar which may lead to unnecessary delays. While additional claims may dilute the recovery of individual claims, and possibly your claim, the fact is that these individuals will be entitled to participate in the process regardless and the most serious claims will be paid the highest amount. As such, if you do not agree with our position, you have the right to retain new counsel to advocate differently. If you do not want our firm to represent you, please sign the attached form and return to our office via the enclosed prepaid envelope or by email at flintteam@napolilaw.com.

Please review this matter carefully. If you have any questions that you would like our office to answer prior to reaching a decision on this issue, please let us know. Should you have any questions, please do not hesitate to contact our offices at (212) 397-1000 or by email at flintteam@napolilaw.com.

Very truly yours,

**NAPOLI SHKOLNIK, PLLC**

Hunter J. Shkolnik, Esq.

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM (consolidated)<br><br>Hon. Judith E. Levy<br><br>Mag. Mona K. Majzoub |

I, _____, under penalty of perjury, hereby affirms that the foregoing is true and correct:

1.    I currently reside at _____

2.    I have retained the law firm of Napoli Shkolnik PLLC ("Napoli Shkolnik") as my attorneys to investigate and pursue a case on my behalf as a result of my exposure to contaminated water in Flint, Michigan.

3.    I no longer want Napoli Shkolnik to represent me for my Flint lawsuit.


Dated: _____

                                    _____
                                    Sign Name


                                    _____
                                    Print Name

# EXHIBIT D

ABA Formal Op. 06-438

American Bar Association Formal Ethics Opinion 06-438

American Bar Association

## LAWYER PROPOSING TO MAKE OR ACCEPT AN AGGREGATE SETTLEMENT OR AGGREGATED AGREEMENT

February 10, 2006

Copyright (c) by the American Bar Association

*In seeking to obtain the informed consent of multiple clients to make or accept an offer of an aggregate settlement or aggregated agreement of their claims as required under Model Rule 1.8(g), a lawyer must advise each client of the total amount or result of the settlement or agreement, the amount and nature of every client's participation in the settlement or agreement, the fees and costs to be paid to the lawyer from the proceeds or by an opposing party or parties, and the method by which the costs are to be apportioned to each client.*

Unlike Model Rule 1.7 of the Model Rules of Professional Conduct [FN1] which is a general rule governing conflicts of interest relating to a lawyer's current clients, Rule 1.8 provides specific rules regarding eleven types of conflicts of interest. As noted throughout the comments to Rule 1.8, the rule supplements duties set forth in Rule 1.7. Each of Rule 1.8's subparagraphs (a) through (j) describes a different and specific circumstance in which a lawyer's self-interest might jeopardize the representation of a client. [FN2] This opinion considers the subject of aggregate settlements or aggregated agreements addressed in Rule 1.8(g). [FN3]

Rule 1.8 (g) pertains to the conflicts of interest that arise when a lawyer or law firm (collectively referred to as "lawyer") represents multiple clients, some or all of whose claims or defenses are to be resolved under a single proposal (in a civil case) or plea agreement (in a criminal case). In such situations, subparagraph (g) supplements Rule 1.7 by requiring an additional level of disclosure by the lawyer and by requiring that his clients' informed consent to the settlement be in writing.

As noted in Comment [13] to Rule 1.8, differences in the willingness of each represented client to make or accept an offer of settlement are among the risks that should be considered when a lawyer undertakes to represent multiple clients in matters where a settlement or plea agreement proposal could create a conflict among them. Rule 1.8(g) provides a focused application of Rule1.2(a), which protects a client's right in all circumstances to have the final say in deciding whether to accept or reject an offer of settlement or to enter a plea; Rule 1.6, which requires that the lawyer have his clients' consent to reveal information relating to his representation of each of them to all other clients affected by the aggregate settlement or plea agreement; and Rule 1.7, which requires consent of all affected clients when the representation of one or more of them will be materially limited by the lawyer's responsibilities to the others.

Because the terms "aggregate settlement" and "aggregated agreement" are not defined in the Model Rules of Professional Conduct, it first is necessary to explain those terms before identifying the disclosures required to satisfy Rule 1.8(g). An aggregate settlement or aggregated agreement occurs when two or more clients who are represented by the same lawyer together resolve their claims or defenses or pleas. It is not necessary that all of the lawyer's clients facing criminal charges, having claims against the same parties, or having defenses against the same claims, participate in the matter's resolution for it to be an aggregate settlement or aggregated agreement. The rule applies when any two or more clients consent to have their matters resolved together. [FN4]

The claims or defenses to be settled in an aggregate settlement or aggregated agreement may arise in the common representation of multiple parties in the same matter, for example, when damages are claimed by passengers on a bus that rolls

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

over, or by purchasers of a fraudulently issued stock, or when pleas are offered by criminal defendants alleged to be part of a drug ring. They also may arise in separate cases. For example, the rule would apply to claims for breach of warranties against a home builder brought by several home purchasers represented by the same lawyer, even though each claim is filed as a separate lawsuit and arises with respect to a different home, a different breach, and even a different subdivision. [FN5]

Aggregate settlements or aggregated agreements not only arise in a variety of situations, but they also may take a variety of forms. For example, a settlement offer may consist of a sum of money offered to or demanded by multiple clients with or without specifying the amount to be paid to or by each client. Aggregate settlements or aggregated agreements can occur both in the civil context, for example, when a claimant makes an offer to settle a claim for damages with two or more defendants, and in the criminal context, when, for example, a prosecutor accepts pleas from two or more criminal defendants as part of one agreement. [FN6]

Rule 1.8(g) deters lawyers from favoring one client over another in settlement negotiations by requiring that lawyers reveal to all clients information relevant to the proposed settlement. [FN7] That information empowers each client to withhold consent and thus prevent the lawyer from subordinating the interests of the client to those of another client or to those of the lawyer. [FN8] Rule 1.8(g) thereby supplements the lawyer's duties under Rule 1.2(a) to defer to his clients' roles as ultimate decision-makers concerning the objectives of the representation, and to abide by his clients' decisions whether to settle a matter. [FN9] In acknowledgment of the heightened conflicts risks encountered when multiple clients are represented in an aggregate settlement or aggregated agreement, Rule 1.8(g) also requires that the clients' consent to the settlement or agreement be in writing, a requirement more strict than that imposed in the general rule on conflicts, Rule 1.7. The lawyer's duty to make disclosures under Rule 1.8(g) reinforces the lawyer's duty under Rule 1.4 to provide information reasonably necessary to permit the client to decide to engage in the proposed settlement or agreement. [FN10]

In order to ensure a valid and informed consent to an aggregate settlement or aggregated agreement, Rule 1.8(g) requires a lawyer to disclose, at a minimum, [FN11] the following information to the clients for whom or to whom the settlement or agreement proposal is made:

    • The total amount of the aggregate settlement or the result of the aggregated agreement.

    • The existence and nature of all of the claims, defenses, or pleas involved in the aggregate settlement or aggregated agreement. [FN12]

    • The details of every other client's participation in the aggregate settlement or aggregated agreement, whether it be their settlement contributions, their settlement receipts, the resolution of their criminal charges, or any other contribution or receipt of something of value as a result of the aggregate resolution. For example, if one client is favored over the other(s) by receiving non-monetary remuneration, that fact must be disclosed to the other client(s).

    • The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties. [FN13]

    • The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them. [FN14]

These detailed disclosures must be made in the context of a specific offer or demand. Accordingly, the informed consent required by the rule generally cannot be obtained in advance of the formulation of such an offer or demand. [FN15]

If the information to be disclosed in complying with Rule 1.8(g) is protected by Rule 1.6, the lawyer first must obtain informed consent from all his clients to share confidential information among them. The best practice would be to obtain this consent at the outset of representation if possible, or at least to alert the clients that disclosure of confidential information might

be necessary in order to effectuate an aggregate settlement or aggregated agreement. [FN16] If the lawyer seeks permission to share confidential information among his clients, and receives that permission, he should explain to his clients that if a dispute arises between any of the clients subsequent to his sharing their confidential information, the attorney-client privilege may not be available for assertion by any of them against the other(s) on issues of commonly given advice. [FN17] Finally, in representations where the possibility of an aggregate settlement or aggregated agreement exists, clients should be advised of the risk that if the offer or demand requires the consent of all commonly-represented litigants, the failure of one or a few members of the group to consent to the settlement may result in the withdrawal of the offer or demand.

**Conclusion**

Rule 1.8(g) is a prophylactic rule designed to protect clients who are represented by the same lawyer and whose claims or defenses are jointly negotiated and resolved through settlement or by agreement. Unique and difficult conflicts between the clients and their lawyer, and between the clients themselves, are possible. By complying with Rule 1.8(g), the lawyer protects his clients and himself, and helps to assure the finality and enforceability of the aggregate settlement or agreement into which those clients have chosen to enter.

[FN1]. This opinion is based on the Model Rules of Professional Conduct as amended by the ABA House of Delegates in August 2003 and, to the extent indicated, the predecessor Model Code of Professional Responsibility of the American Bar Association. The laws, court rules, regulations, rules of professional conduct, and opinions promulgated in the individual jurisdictions are controlling.

[FN2]. See Annotated Model Rules of Professional Conduct 146 (5th ed. 2002).

[FN3]. Rule 1.8(g) states:

[FN4]. Rule 1.8(g) does not address obligations to other clients having such similar claims or defenses who are not included in the aggregate settlement or aggregated agreement. *See* Rule 1.7(a)(2).

[FN5]. Comment [13] to Rule 1.8 discusses subparagraph (g) in the context of common representation of multiple clients by a single lawyer. "Common representation" is discussed in Rule 1.7 Comments [29] through [33] solely in the context of the representation of multiple clients "in the same matter." Neither the rule nor its comment, however, explicitly restricts the application of Rule 1.8(g) to common representation of multiple clients in the same matter. Yet, as a practical matter, the more disparate the claims included in an aggregate settlement proposal, the more likely it is that the proposal will run afoul of other provisions of the Model Rules. For example, if a lawyer representing clients with factually and legally dissimilar claims receives an aggregate settlement proposal, the lawyer may find it difficult to obtain the informed consent of each of his clients to the disclosure of confidential client information necessary to satisfy Rule 1.8(g), including the consent required even to disclose the fact that one client's settlement is conditioned on another's. *See* discussion of Rule 1.6 *infra*. The lawyer also may find it more difficult to satisfy Rule 1.7, particularly Rules 1.7(a)(2) and 1.7(b)(1).

[FN6]. The requirements to be met when a lawyer undertakes such multiple representations in a criminal matter, and the implications of an accused's constitutional right to effective assistance of counsel, are beyond the scope of this opinion.

[FN7]. *See, e.g.*, In re Hoffman, 883 So.2d 425, 432 (La.), *reh'g denied* (2004) ("Once the joint representation ... commenced, ... respondent owed each of his clients an equal degree of loyalty, and he could not favor the interests of one client over another.")

[FN8]. One risk posed by aggregate settlements is that the lawyer may be motivated to settle a group of many claims and reap a substantial fee without the trouble of diligent development of the clients' claims. That is likely to be a greater risk in an aggregate settlement than in the settlement of an individual claim, as the sheer number of clients may make the potential fee much greater. As the Texas Court of Appeals stated:

[FN9]. Several courts have concluded that fee agreements that allowed for a settlement based upon a "majority vote" of the clients represented violated Rule 1.8(g). *See, e.g.*, The Tax Authority, Inc. v. Jackson Hewitt, Inc., 873 A. 2d 616, 627 (N.J.Super. Ct. App. Div.), *cert. granted*, 878 A.2d 855 (N.J. 2005) (applying New Jersey's Rule 1.8(g) which, at the time, was practically identical to the pre-2002 ABA Model Rule); Hayes v. Eagle-Picher Industries, Inc., 513 F.2d 892, 894-95 (10th Cir. 1975) (applying Kansas's version of Model Code DR 5-106). *Cf.*, Abbott v. Kidder Peabody & Co., 42 F. Supp. 2d 1046, 1050-51 (D. Colo. 1999) (applying Colorado's Rule 1.7(b) (2) and (c)).

[FN10]. *See, e.g.*, Quintero v. Jim Walter Homes, Inc., 709 S.W.2d 225, 229 (Tex. Ct. App. 1985, writ ref'd n.r.e.) (applying Model Code DR 5-106).

[FN11]. The unique facts and circumstances of any particular settlement may require additional disclosures other than those outlined here.

[FN12]. *See, e.g.*, State ex rel. Oklahoma Bar Ass'n v. Weeks, 897 P. 2d 246, 253 (Okla., Mar. 22, 1994) (interpreting DR 5-106).

[FN13]. *See, e.g.*, In re Hoffman, 883 So. 2d at 433 ("[D]uring the negotiation of the aggregate settlement, the lawyer must confer with all of his clients and fully disclose all details of the proposed settlement....") When the amounts of fees and costs to be paid to the lawyer as a result of the aggregate settlement are not yet determined at the time of the settlement, the lawyer will need to disclose to each of his clients the process by which those amounts will be established and who will pay them, and the amount he will be requesting to be paid. To the extent that the lawyer will receive compensation from someone other than each client, the lawyer will need to comply with the requirements of Rule 1.8(f).

[FN14]. For example, in cases where the clients are defendants with the same relative risk of an adverse judgment in a civil suit, or if the clients are plaintiffs with similar claims of ascertainable and equal or comparable value, then a sharing of the costs on a per capita basis may be appropriate. On the other hand, if the clients are plaintiffs who were injured to various degrees in a common accident, and are executing a contingency fee agreement where costs are not paid until a settlement is effectuated, a pro rata cost distribution may be more equitable. Best practices would include the details of the necessary disclosures in the writings signed by the clients.

[FN15]. *See, e.g.*, In re Hoffman, *supra* note 13 ("The requirement of informed consent cannot be avoided by obtaining client consent in advance to a future decision by the attorney or by a majority of the clients about the merits of an aggregate settlement.")

[FN16]. *See* Comment [13] to Rule 1.8, which states in pertinent part:

[FN17]. Rules 1.6(a) and 1.4. See also Rule 1.7 Comments [30] and [31] for further discussion of the subject of the treatment of confidential information in formulating and conducting a common representation.
ABA Formal Op. 06-438

---

End of Document                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

# RI-108

December 3, 1991

## SYLLABUS

**Where a lawyer's representation of two distinct clients in unrelated matters results in a consolidation of cases on appeal before the Supreme Court, and where the clients' positions are diametrically opposed and the lawyer, in advocating the best interests of one client, must necessarily advance an argument which would be hostile to the interests of the other client, the lawyer must withdraw from both representations.**

**References: MRPC 1.7, 8.4(c).**

## TEXT

A lawyer represents two separate and distinct clients in unrelated domestic relations cases as a result of appeals taken from decisions of the lower courts (one case already has reached the Supreme Court and leave to appeal has been filed in the second case), it is anticipated that the Supreme Court will assume jurisdiction of the second case, and may consolidate the two cases.

Although the clients and their cases are unrelated, the lawyer is faced with the duty to advocate and argue truly diametrically opposed and adverse positions. No matter what the ultimate decision is that may be arrived at by the Court, one client will succeed and the other will fail. There is not any apparent scenario which would permit a decision in which each client might prevail.

The lawyer asks whether it is proper for the lawyer to continue representation of the clients.

MRPC 1.7 states:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation.

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) the lawyer reasonably believes the representation will not be adversely affected; and

"(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

Authors Hazard and Hodes explain in *The Law of Lawyering*, Prentice Hall, 1991:

"The question is always whether the same lawyer may serve both clients loyally. At one end of the continuum of conflict situations are those where the lawyer may serve the respective clients without their individual consent because the transactions are quite distinct. At an intermediate point are situations where the lawyer may represent both clients only with the consent of each because the legal aspects of the transactions are substantially related and entail client interests that are adverse. At the other end of the continuum are

situations where concurrent representation is impermissible even with client consent, because the conflict is so intense that concurrent representation would entail an impaired relationship with one or more of the clients, making it unreasonable even to ask for their consent." pp 232-233.

When the lawyer undertook the representations, the matters were distinct and fit within the first type of situation described by Hazard and Hodes; client consent was not necessary. In trial courts, where the outcome has no precedential value to subsequent cases, a lawyer is not prevented from advocating to a tribunal a position contrary to that of another client, as long as that advocacy is not frivolous and the matters are not consolidated in one hearing before one adjudicator, MRPC 3.1.

It is not necessary to determine the exact point in time at which the representation of the client became "directly adverse" triggering MRPC 1.7(a), or "materially adverse" triggering MRPC 1.7(b), or when that adversity should have been apparent to the lawyer. We need only note on the facts provided, *i.e.*, that the cases are both before the Supreme Court, and that effective advocacy on behalf of one client would contravene the position of the other. Under those circumstances a disinterested lawyer could not reasonably conclude that the representation of the client would not be adversely affected. Client consent, therefore, would not vitiate the conflict. Nor may the lawyer withdraw from one case without withdrawing from the other.

We are told that the Supreme Court will grant leave to appeal in the second case and then may consolidate the two cases. The dilemma presented offers an excellent argument to the Court in opposition of any act of consolidation of the matters. However, should consolidation occur, as assumed by the inquiry, MRPC 1.7 clearly precludes the lawyer from representation in a situation that calls for the lawyer to advance an argument in behalf of one client that would be directly adverse to the interest of the second client being represented in the same proceeding.

Hazard and Hodes discuss a similar situation, as follows:

"Lawyer L represents a plaintiff in one case in a state court and a defendant in an unrelated civil case in the same court. By chance, an identical technical question arises in both cases as to whether removal to federal court is proper. L is thus forced into the position of arguing opposing side of the same legal questions to the same federal judge.

"This case presents another example of a 'positional' conflict of interest. The conflict is not 'direct,' because the two parties are not opposing each other in litigation, and have no dealings with each other except for sharing the same lawyer. Even though L will make different arguments to the same judge, these facts present a strong case for allowing the multiple representation . . . .

"In the present case, L can explain to both clients that powerful arguments exist on both sides, and that he can properly present the strongest case for each position, and then let the court decide. On that basis, the client-lawyer relationships may not be jeopardized. Without the fortuity of a single lawyer's involvement, all that either client could reasonably have expected was that the best argument be made. Consequently, the representation each will receive will not have suffered at all. Furthermore, since each client could expect that his position in the litigation would be opposed by counsel for the other side, neither client has been harmed.

"If the cases do not turn on a 'pure' question of law, but involve factual distinctions, the situation might be different, for L might then have to characterize the legal question differently, and so treat his clients unequally. It would also be different if the two clients frequently had occasion to litigate this question, and had a long-term interest in the way in which it was decided." *The Law of Lawyering*, pp 226.1-227.

In addition to duties to the respective clients, the lawyer has duties to the administration of justice, MRPC 8.4(c). At a consolidated hearing how could the court adequately question the lawyer about the inconsistent positions he takes? Does the court avoid giving advantage to the lawyer's clients by requiring the lawyer to file briefs and argue points before reviewing the arguments of opposing counsel, regardless of who is actually appellant or appellee? Adequate representation of both clients in such a setting would be impossible to attain.

Continued representation in the event of consolidation under the facts presented is not ethically permissible, and the lawyer must withdraw from both representations. In so holding we are aware that the clients suffer greatly by having their successful and apparently sufficiently competent legal representation removed at the Supreme Court level. We see no way that result can be ethically avoided.

Similar considerations are also raised in multiple representation before the Court of Appeals, in light of the Supreme Court's adoption of the rule that the first decision of a panel of the Court of Appeals binds the entire court. Supreme Court Administrative Order 1990-6, 436 Mich lxxxiv.