## Case Number:  16–cv–10444

**Disabled Pro Se - Concerned Flint Resident, Melvin Jones Jr.'s FRCP RULE 60 motion as to  Judge Levy's ORDER —— ECF Doc. # 2008:**

**From:**  Melvin Jones Jr. – pro se concerned [disabled, pauper Flint Resident]....(e.g. current address 1935 Hosler St. Flint, Michigan ph # 810–962–6225; email – meljonesjr@gmail.com)   Previous address: 829 Campbell St. Flint, Michigan 48507.

**Dear Judge Levy (district court),**

**Thank you for taking the time to consider my FRCP RULE 60 motion as to the district courts' [Judge Levy's] order, which is ECf Doc. # 2008…. which is NOT to be confused with my already filed request for reconsideration of Ecf Doc. # 2008.**

## FRCP Rule 60 Motion as to ECF doc. # 2008:

Ok, (again)  …I hope that it comes to NO surprise to the district court when [I] admit that [I] am somewhat intimidated to attempt to present the instant motion to the district court.

But I cannot avoid the FACT that my sincere religious belief is that ….I was "moved" by my late beloved mom, through Christ to attempt to speak up for myself…. Even [IF] I sound silly doing so.

That said, my request for reconsideration incorporates the attached "transcript document as to Plaintiffs' Attorney Corey

Stern" as if FULLY set forth herein, and I repeat such by reference also.

1.) The basis of my instant Frcp Rule 60 motion is based upon the FACT that at the time of the "Fairness Hearings" (e.g. provided that [my] disabling medical conditions, and my confusion as to Judge Levy's Ordre in related district court case # 21-cv-10937.... which gave rise to 6th Circuit Appeal # 21-1530 PREVENTED me from actual attendance of/ at the Fairness Hearings as to the Flint Water Crisis).... The attached "TRANSCRIPT" as to attorney Corey Stern (wherein admissions against self interest seem kind of obvious here).... Said transcript was NOT available to me, through diligence, AT THE TIME of the

*Fairness Hearings…. Although said INFORMATION and FACTUAL KNOWLEDGE was in possession of Attorney Corey Stern, specifically:*

2.) "*ADMISSIONS AGAINST SELF-INTEREST BY PLAINTIFFs' ATTORNEY COREY STERN:*

*"Now, for adults, and for older children, because their brains are formed, the science of how lead works its way into the brain and what it does once it's in the brain is quite different for an older person than one of the more vulnerable six and under, but it* <u>*can have negative effects on organs, and various internal organs within adults as well*</u>*….*

*"And then,* <u>*the federal judge got to appoint where she was appointing leadership and she probably either was drinking*</u> *with the state court judge or felt like she had no choice because he had already appointed me and she put me in a similar position as liaison counsel and federal court for individual plaintiffs.""*

3.) Here, the "out of court, but on the record" statements which are DIRECTLY damaging to the Flint Water Crisis MSA and ASA (collusion, misconduct of adverse party – the State of Michigan… in that the primarily BLACK ADULT Flint Water Crisis Claimants were literally

screwed-over by the State of Michigan and the Plaintiffs' Attorneys);

4.) And…. MORE TROUBLING, is that [according to attorney Corey Stern]….. the Federal Judge assigned to the Flint Water Crisis cases who appointed [him] to his (e.g. attorney Corey Stern's leadership role)….. which [yup], that is in FACT referring to Judge Levy…. so,

here —- per attorney Corey Stern, "<u>the federal judge got to appoint where she was appointing leadership and she probably either was drinking</u>"

5.) Wow —- lets just say, [IF] attorney Corey Stern is correct that Judge Levy was DRINKING while president on the bench and making decisions…. this is a VERY serious matter ….which [of course] MUST be

*made known to the district court [and] courtesy copied to the 6th Circuit Appeals Court !!!*

*So… [as best I can tell] —- the instant motion is correctly submitted (i.e. filed in the district court, case # 16-cv-10444) out of respect for the PUBLIC perception and PUBLIC trust of the Federal Judiciary; and to allow Judge Levy an OPPORTUNITY to address the matter set forth herein, and in the "transcript" as to attorney Corey Stern, which is affixed hereto.*

Also, I humbly ask the court to provide its order as to my instant MOTION FOR RECONSIDERATION … *IN LARGE PRINT, and that such be put in the most simplest terms possible for me ?*

*Which is to say... [IF] there was a way to make said order analogous to that of an "EBOOK" or pod cast such as what NRP radio has on their web-site where there is a listen button in the upper right hand corner of the news article.*

**Respectfully Submitted.**

Date:  December 5th, 2021

X_____.

Melvin Jones Jr. - disabled Pro Se concerned Flint Resident.

--------

**(continued on next page)**

*NOTE:  PLEASE FILE my REQUEST/ MOTION FOR  RECONSIDERATION, in the district court case # 16-cv-10444....*

*Because on a previous occasion.... Via email.... I was told by the 6th Circuit Court of Appeals that I MUST file my notice of appeal DIRECTLY to/ with the district court.   Thank you !*

# Attachment: Transcript



**(i)** COVID-19 Resources for Lawyers

AUG 25, 2021

# The Flint Water Crisis Edition: A Conversation with Lead Plaintiffs' Attorney Corey Stern

Jonathan Amarilio is joined by Corey Stern, lead counsel for the plaintiffs injured in the Flint, Michigan water crisis. Corey discusses the origins of the water crisis, the role citizen advocates played in seeking government accountability, and how he became involved in the case.

3:53 / 50:56

 Embed     Open Player

## LISTEN & SUBSCRIBE

 Apple

Stitcher

Spotify

Google

## SHARE EPISODE

Share        Share        Tweet

## FEATURED GUEST



## Corey Stern

Corey Stern is an advocate for the environment and children's' rights. He represents individuals who have been catastrophically injured, with...

## YOUR HOST



### Jonathan Amarilio

Jon Amarilio is a partner at Taft Stettinius & Hollister in Chicago. He represents individuals, small businesses, state and...

## EPISODE NOTES

In this edition, Jonathan Amarilio is joined by Corey Stern, lead counsel for the plaintiffs injured in the Flint, Michigan water crisis, including more than 2500 children who were lead poisoned by consuming water from the Flint River. Corey discusses the origins of the water crisis, the role citizen advocates played in seeking government accountability, and how he became involved in the case, eventually securing a $600 million settlement from the State of Michigan on behalf of his clients.

Special thanks to our sponsors, CourtFiling.net.

## Transcript

[Music]

**Jonathan Amarilio:** Hello everyone and welcome to CBA At The Bar podcast where we have unscripted conversations with our guests about legal news, topic, stories and whatever else strikes or fancy, I'm your host, Jonathan Amarilio of Taft Law and joining me as our guest today is Corey Stern and of Levi Konigsberg in New York. Corey is a lawyer and an advocate for the environment, particularly as it pertains to children's rights. He represents those who have been injured by lead poisoning among other things and is the lead counsel for all of those injured in the Flint Michigan Water Crisis of 2014, which

is what we'll be discussing with him here today. I don't think it's any exaggeration to say that Corey is a national leader in this field and we're lucky to have him join us. Corey, welcome to At The Bar.

**Corey Stern:** Thank you so much for having me. I appreciate it.

**Jonathan Amarilio:** It's our pleasure. This is a big and scary and depressing topic but I think we will hit at least the highlights today. I think our audience, Corey will remember most of the basics about what happened in Flint, but you know, with so many crises coming our way these days, I would probably be good to refresh them recollections and discuss just what happened in Flint seven years ago. So, it's my understanding that this all kind of started with a decision by the emergency manager of Flint to switch the source of Flint's water from the Great Lakes to the Flint River, right?

**Corey Stern:** Yeah. So there's a statute in Michigan that gives the governor of the state permission to appoint and emergency manager for any city that is financially in trouble and the city typically has it option to either go in a bankruptcy or to utilize the services of an emergency manager for a bunch of years before 2014 Flint was in that position and an emergency manager had been appointed by Governor Snyder and Flint was utilizing a contract with the Detroit Water and Sewage Department for water from lake here on for decades and they were paying about a million dollars a month for the water — from that water source. And one of the first decisions that the emergency manager made was to switch from the DWSD which was like here on water to same water source, but a different conglomerate callead the KWA. It was being built, however, and so it wasn't ready to actually service Flint. So you have Flint essentially becoming a free agent choosing another team, but that team is in part of the league yet. When the old Team DWSD found out that Flint was going to take its talents to a new team, they cancelead the contract, but Flint was stuck for a period of time without a water source, or they were going to be stuck without a water source. They had the option to either stay with DWSD or utilize the Flint River, and they made the decision to switch to the Flint River temporarily while the KWA the Karegnondi Water Authority was being built and it wasn't going to be ready for two or three years.

**Jonathan Amarilio:** I see. And that was problematic because the Flint River is highly polluted from local industry, right?

**Corey Stern:** It's problematic because beyond the pollution in the water — the water could have been used. The Flint River was a viable water source.

**Jonathan Amarilio:** Okay.

**Corey Stern:** But it would have required significant treatment from professionals for all of the bad stuff that existed in the water because it was a surface water source which means that the composition of the chemicals in the water changes often because of rains and storms and winds and so it's not that it couldn't be used, just if it was going to be used, it had to be used right and it wasn't.

**Jonathan Amarilio:** Right. As I understand it, started to become obvious, almost from day one, right? Which is completed, and the end of April, I think of 2014 and June, you have your first outbreak of Legionnaires disease tied to the water source, right?

**Corey Stern:** Yeah, but even before that, almost immediately people noticed discoloration in their water, foul smell coming from their water. There were water main breaks beyond

what would have normally been expected, which was the result of the water not being treated running through pipes that were generally made out of lead. So the signs were there, well before the Legionella outbreak in June of 2014. I'm not sure that anybody knew how to read the signs, but there were signs very early on.

**Jonathan Amarilio:** And then August 2014, the city issued a boil water advisory, which — if that's not a red flag, I don't know what it is.

**Corey Stern:** It's not just a red flag, but it's a bad decision because when you have pipes made out of lead and you have water that is flowing through the pipes that picking up lead as it flows through the pipes, boiling lead, infused water concentrates the lead in water. So, it has the opposite effect of what was intended. They issued a boil water advisory with the hope of protecting people and they were actually making it worse.

**Jonathan Amarilio:** Wow. And they knew as at least as early as what February 2014 that there was high levels of lead in the water?

(00:05:05)

**Corey Stern:** So, it was probably February of 2015 that you're referring to because that's potentially what they would say, but the reality is that they knew they weren't treating the water with corrosion control immediately. And any engineer that deals in water, any professional from the Michigan Department of

Environmental Quality or any other states quality control authority would know you have a surface water source, you have no corrosion control, you're going to have a major problem because there's lead pipes.

**Jonathan Amarilio:** Okay.

**Corey Stern:** Maybe it was February 2015 that there's documentation back and forth between various government officials that there's a problem. But the reality is they should have known before they ever flip the switch and they likely did no almost immediately.

**Jonathan Amarilio:** Right. And to that point, as early as September 2014, you have studies from Virginia Tech reporting 40% of Flint homes of elevated lead levels. You have a pediatrician at Hurley Medical Center releasing studies showing increased lead levels in children, right? This is September 2014, so just months after that switch.

**Corey Stern:** You have a bunch of people banging on pans and chests and yelling. This is bad. Scientists, physicians, some people even within the government trying to wave their arms say, and say, "Hey, we got an issue and nobody was really listening." I mean, it was more every time the report came out by somebody who was smart, the response was more damage control and spin than it was acknowleadgement of problem and fix.

**Jonathan Amarilio:** One of the things that I found so — I don't know, maybe the right word is galling, is that just a few months into this, the Flint City Council voted to reconnect to the Detroit Water System, right? And the emergency manager — this person who was imposed by then Governor Rick Snyder, vetoed that decision and kept them on the contaminated Flint River water.

**Corey Stern:** Yeah, so at all times when the emergency manager was in place, the City Council legitimately had no authority and so, there were oftentimes where the City Council would take votes. I mean, if one instance, when the emergency manager made the decision to switch, he had the City Council vote to support that decision, and they did. And years later, the state government oftentimes blame the City Council for the switch, because they voted for it, but the reality is, is it was a hollow vote and they could have voted to shoot the emergency manager. They could have voted to succeed from the state. There was nothing the City Council could have done that had any power whatsoever, because once the emergency manager had been appointed, all of their power was divested.

**Jonathan Amarilio:** Okay. So, the buck really stopped with him.

**Corey Stern:** Yeah. I mean, we'll to the extent the buck stops with him. There were plenty of people within the city who became aware or were aware that there was a problem with the water and they were not as forthright about that as they could have been, and in some instances even falsified test results that were taken to determine levels of lead. So, when I say, the City Council was divested of its power, I don't mean to insinuate that the city doesn't have any culpability for the crisis, but their culpability is in a result of the decision that was made as much as the city's culpability is based on their acts and inactions by individuals within the city.

**Jonathan Amarilio:** Okay. You hinted that the employees of the city, what they knew when they knew and that they were engaging in the cover-up and I want to come back to that maybe in the second segment a little later, but maybe this is a good point to just pause for a second and remind our audience about the health effects of lead to the human body, particularly of children. Why is this stuff so bad? What does it do to us and our kids?

**Corey Stern:** So, for children, especially children who were six-year-old or younger, they're the most vulnerable — and it's because their brains aren't formed and so when lead gets into the blood, it ultimately works its way into bone mass and muscle mass and tissue including the brain. It causes in a child's brain that's not yet formed, serious cognitive deficits, inability to read paragraph three without forgetting paragraphs one and two, ADHD almost on steroids, which comes with its own set of anger issues and frustration issues and when a child who inherently knows that he's capable of doing something academically or intelligently is stymied by something in his brain that he can't control or really understands why it's happening. The repercussions that result from the cognitive deficits last a lifetime. Now, for adults, and for older children, because their brains are formed, the science of how lead works its way into the brain and what it does once it's in the brain is quite different for an older person than one of the more vulnerable six and under, but it can have negative effects on organs, and various internal organs within adults as well.

(00:10:05)

**Jonathan Amarilio:** I stumblead across one article actually when I was researching this attributed part of the downfall of the Roman Empire to mass lead poisoning. The average Roman citizen 2000 years ago had lead levels 400 times higher than their Iron Age predecessors.

**Corey Stern:** Wow.

**Jonathan Amarilio:** Yeah. They actually used it as a sweetener in their wine. Maybe not the best idea.

**Corey Stern:** We probably all better off without the Roman Empire. So, maybe some good has come out of this science.

**Jonathan Amarilio:** So, let's go to the turning point here. This information is known. It's out there, people are complaining about the color of their water. There's studies indicating that the lead levels are dangerously high in the water. What was the turning point? What happened?

**Corey Stern:** I'm not sure there was a singular turning point. I think like any other significant change that needs to happen, it's kind of pressure upon pressure upon pressure upon pressure and I would attribute the majority of the shift to citizens who were advocating for themselves throughout the city. Parents of children who kept showing up at City Council meetings and kept showing up at the governor's office with jugs of water that look like urine and they just never stopped. They refused to stop and it got to be so loud and reach the highest level that it was impossible to ignore and ultimately a select committee was formed to evaluate the crisis and what it actually happened. The EPA despite its desire to not be involved in Flint had no choice but to step into Flint and really it was a parent advocate LeeAnne Walters who got in touch with individual from the Environmental Protection Agency named Miguel Del Toro. He was in Chicago. She was in Flint. She somehow got him on the phone and in his free time because she convinced him in such a compelling way that people were being poisoned in Flint. She convinced them to come to Flint on his own dime which he did. He did his own testing of her home and then some other homes and he realized this is a significant problem. And he tried to blow the whistle and wrote a memo to the EPA which was ignored. He was silenced. He was punished for going outside of his job duties to spend time in Flint, but it was because of the advocacy of Ms. Walters and others like her who just said, "I don't care if I'm poor. I don't care if I live in a community that's primarily black. I don't care if the governor is of a different party than I am and I don't care if they're telling me that everything's okay, because my instincts are, and my smell test and my taste test says something is terribly wrong" and she just refused to stop until someone could confirm that for her.

**Jonathan Amarilio:** But that took a long time, right? It was more than a year after the lead was first detected that the governor declared a state

of emergency?

**Corey Stern:** It took a long time because I think the people in the poorest communities, voices sound the softest and the lowest to the people with the most power, and it's not that it took her a long time or that it took Miguel Del Toro a long time or that it took any of the other concerned citizens a long time to say the things that needed to be said. It took a long time for the people in power to hear the things that were being said. And I think that if this had happened in West Bloomfield, Michigan or Carroll Gardens, Brooklyn or Ann Arbor, Michigan of places that maybe more affluent than Flint, the community leaders and the governmental leaders have more of the stake in those spaces because of campaign contributions and desires to get reelected and constituencies that look and sound and feel more like them, that their ears are always wider and the voices seemed a lot louder. So, the sad part is that it wasn't a product of it taking too long or very long for the people with voices to scream, it's just that their screams will kind of muted by the fact that their socioeconomic status didn't put them in a position where anybody in power actually heard them.

**Jonathan Amarilio:** And on that piece of wisdom, we probably should take our first break. We'll be right back.

[Music]

Getting legal malpractice insurance doesn't have to be complicated. Let CBA Insurance Agency do the heavy lifting for you. We shop to the top carriers to find the best rates. Get a free quote by visiting cbainsurance.org.

Do you have a legal matter that you need resolved but want to avoid the expense of going to court? The litigation process can be stressful and costly, but there's another solution, mediation. The Chicago Bar Association Mediation Service enables you to choose a qualified attorney mediator to help resolve your business or legal dispute efficiently and for a reasonable fee. All participating attorneys have been fully vetted by the Chicago Bar Association.

(00:15:00)

They have undergone an extensive training process to ensure that they provide the highest quality service and can guide you to an amicable resolution of your dispute. Call (312) 554-2040 or email mediation@chicagobar.org to get started with the Chicago Bar Association Mediation Service today.

[Music]

**Jonathan Amarilio:** And we're back. Corey, how do you first become aware of this case? How did you get involved?

**Corey Stern:** In late 2015, I got a phone call from a woman in Michigan. I was sitting in my office in New York and I've been handling lead poisoning cases for a long time, typically involving public housing cases and taint, not water. She probably did a Google Search and found me somehow and she called me. She told me the story that I genuinely thought was batshit crazy, water poisoned kids, Michigan. She was in a homeless shelter. I wasn't even licensed to practice law in Michigan. I think I spent maybe 20 minutes of my life in Michigan at some point in time. I told her that I probably couldn't help her. I wasn't licensed, but I would try and help her find someone who could, hang up with her for the next few days. I was just researching and kept finding these chatrooms and blogs about this thing that was happening in Michigan. I became really intrigued by it. My wife and secretary had started learning about it too, probably because of their proximity to me and they were like, "You need to get involved in this. Call the woman back" and begged to her to let me represent her and she laughed at me in light of the fact that I told her I wasn't licensed too. Hired me, Rachel Maddow was hosting a town hall in Flint that was invitation-only. I was not invited. I got on an airplane.

**Jonathan Amarilio:** Still sound a little bitter about that.

**Corey Stern:** No, I wouldn't – who the heck would invite me. I mean, I wouldn't have invited me, but you know, I didn't get invited, but I flew there on my own. I was dressed in a suit, try to get in, couldn't get in, went back to my car, put on — it was cold. I put on like a hoodie and jeans. I have some tattoos and I rolled up my sleeves and I put on a backwards baseball cap and the same woman at the desk who would not let me in without a ticket, like welcome me right in. I heard these community leaders telling parents in this auditorium of probably over a thousand people that their kids would be fine if they just ate more leafy greens and we got more school nurses and there was no need to get the kids tested and everything was going to be okay. And it was against everything that I had known about lead poisoning over the course of my career, my life, how I would treat my own kids. I came back to my office in New York ironically on the same flight as Rachel Maddow and convinced my partners that if we don't go there and do this, then we're kind of frauds because this I think is going to be the biggest lead poisoning story and scandal in our country's life as far as I knew

and if we were lead poisoning lawyers who were actually good at what we did, how do we not go there?

Started going every week from like Mondays through Thursdays or Fridays. I would talk at churches. I would meet with people at an office that we rented. I would talk at schools, literally any parent that would talk to me about this. I felt like I had to tell them what they heard at that town hall just wasn't accurate. I started out with those few clients, the children or the woman that called, that grew to like 25 and then it grew to like a hundred and then before I knew, we represented a thousand and then it became 2,500 and today we represent about 5,000 people. But it wasn't because of this mass advertising that a lot of law firms like mine sometimes do what is just boots-on-the-ground really pissed off. I can't believe this is happening and I can't believe that they're still lying to these people two years after this thing had actually happened, and we know the water is bad and I just kind of never left.

**Jonathan Amarilio:** So, you said it seem too crazy to be true. What did you mean by that?

**Corey Stern:** Because it was amazing to me that she was referencing something that happened in 2014 and that her kids were potentially still being poisoned in late 2015. I could understand how there could be lead in water. I could understand how there could be lead in taint, but if the New York City Department of Public Health knows that there's an apartment in the Bronx that has high levels of taint — lead and taint, I would expect that within days, the New York City Department of Public Health is going to be out at that apartment to remediate the taint because everyone knows that it's dangerous for kids.

**Jonathan Amarilio:** Right.

**Corey Stern:** It was very hard for me to believe that there were kids in Michigan a year-and-a-half or two years after a switch had apparently been made who were still being fed, bathed with and drinking bad water laced with lead.

**Jonathan Amarilio:** And you touched on this before, but Flint is primarily a black community, correct?

(00:20:00)

**Corey Stern:** So, earlier I talked about the socioeconomic composition of Flint, which is very poor, I think, Flint is somewhere between 60% and 70% are black community. Often those things go hand in hand, but there's been a lot of reports

in the media and a lot of community folks who feel like, this is a product of institutional racism and I agree, it is. I think, it is institutional racism, but I also feel strongly that to discredit how many white people have been affected by this crisis as well. It's a little disingenuous and it's because socioeconomically, they're in the same position as their black neighbors.

**Jonathan Amarilio:** So, you sign up thousands of clients eventually. How did the case progress?

**Corey Stern:** We initially filed individual cases for children on a case, by case, by case basis and state court against the private engineering companies. I really believed initially a theory of the case where — there's people that were hired to do this, there's people that were hired to consult on this, there's people way smarter than some of the folks in government to make the switch, to physically make the switch happen and how could they not have failed if this is what happened? We ultimately filed cases for about 1,200 children in state court on an individual case by case basis. Every single kid had his or her own complaint unless they were siblings, and then they were on the same complaint. When things started kicking up in federal court. Even though I wasn't always fond of the theories that were being put on the liability of the government, they were constitutionally based and some of them were novel and relatively imaginative. I was convinced by some lawyers in Michigan that it was probably plausible theories of liability there.

And so, we ended up filing cases again in federal court, more group pleadings, I mean, we filed 50 of them for all of our children and all of our clients. But then, we went to federal court and did that. So, we had cases pending in state court, cases pending in federal court. State court judge appointed leadership in the case, which was something I was wholly unfamiliar with. I had never applied to be lead counsel of anything on any committees. I know there's this mass tort world out there, but I had never lived in it, or visited it, or taken a flight to it. And for some reason, either because he got extremely intoxicated at a local Flint Bar or because there was nobody better. The state court judge appointed me as lead counsel. I'm sure it didn't hurt that I had 500 cases on file for a thousand kids as well, but I got along famously with him, as well as with the defense lawyers that he had appointed just very cordial and courteous and respectful. And then, the federal judge got to appoint where she was appointing leadership and she probably either was drinking with the state court judge or felt like she had no choice because he had already appointed me and she put me in a similar position as liaison counsel and federal court for individual plaintiffs.

So, I kind of feel like, I fell into two leadership positions that I really wasn't aiming for or even considering those Mondays and Wednesdays and Thursdays and Flint, when I was talking at the Timothy Avenue Baptist Church to people about lead, I didn't know that that's how this case would progress. I thought I'd have, like, a thousand cases on file and I would try them one by one and do discovery and factsheets and who knows what was going to happen. And then, it turned into more of a mass tort litigation in a more traditional sense than what I was accustomed to, but what many folks who probably listen to your show are more familiar with.

**Jonathan Amarilio:** Yeah. But you had to be thinking class action from day one with this level of exposure, right?

**Corey Stern:** I mean, I was opposed to class action from day one.

**Jonathan Amarilio:** Why?

**Corey Stern:** Well, I feel like kids are, I mean, I've always considered class actions to be a viable tool for litigating cases where you and me, we both buy a toaster oven on Amazon for 50 box and 10,000 other people buy the same toaster oven for the exact same price and it's all delivered at the exact same time. And when all of our toaster ovens arrive at our doorstep in our Amazon box and we go to use it, all of them are broken because of the same defect in the toaster oven. But in reality, kids aren't toaster ovens. And I have two sons, one is 12, one is 13 and if they were both lead poison based on the same quantity of lead at the same consumption rate over the same period of time. At their lives, they would be affected very differently because they're just different kids and academically intelligently their ability to read, to learn, just who they are as kids are different. And so, to treat them uniformly felt very wrong to me. It felt like it was commoditizing children in a way that I thought was really for toaster ovens and I kept thinking about times where I had siblings and cases in Brooklyn or the Bronx or wherever. And I would never have brought a class action on behalf of all the child residents of a particular building. Simply because they were all lead poisoned in the same place, because all of them would be drastically affected in very different ways.

(00:25:03)

So, I don't discourage class actions or think anything negative about the lawyers who have tried to proceed in this case on a class action basis. But when it came to the children, I didn't think it was fair to put them in a group that would

ultimately be treated verisimilarly, if not exactly the same, when all said and done.

**Jonathan Amarilio:** Okay, it's fair enough. So, you thought there would be problems with the damages model. But you did eventually settle it, right? There's a preliminary approval recently by the federal court for — is it 641 or 671 million?

**Corey Stern:** As of now, at 641, but if you know anybody that wants to put in 30 million, that extra 30 bunch of people that would be happy about. Yeah.

**Jonathan Amarilio:** Okay. So, here's why I asked that question. Because what you just said about people being happy or not happy about it and also being difficult to determine on an individual basis, the damages all these kids have suffered as a result of this. There is some opposition out there to the settlement, right?

**Corey Stern:** Yeah, there is, and listen, the settlement isn't perfect. It's a product of 40 lawyers over 3 years and 2 mediators and a special master sitting in rooms and pounding on each other to try and get various ingredients into the chili pot that everybody thinks would make it taste better. Some people like, some of the ingredients, some people like all the ingredients, some people like none of the ingredients, but it's a product of collaboration and not the imagination of one person. Eighty percent of the money is for kids or people who were kids during the crisis, and none of them are being treated as part of a class action.

**Jonathan Amarilio:** Okay.

**Corey Stern:** So, at least 80% of the settlement is earmarked for non-class claimants, non-class plaintiffs. And then, in addition, any individual who at any point has hired her own counsel to represent her individually, that person is not treated as part of a class action. So, the class component to the partial settlement is really those unrepresented adults who ultimately make claims. It's a very small fraction and my guess is it'll be less than 10% of the whole settlement. But to the extent that people are unhappy with the settlement, I don't begrudge anybody for the way they feel about it so. If it was my kid, I don't think there's enough money that anybody could ever pay me to make me feel like, oh, well, that made me whole or made my child whole. You can't make a child whole when you take something away from them that you can never give them back. It's just not possible.

So, people have their own feelings about it, some people feel that there should be money paid for decades of being treated the way Flint was treated during the Flint Water Crisis and it's hard to explain sometimes to a community that you're only being compensated for a short period of time and space, and you have to be able to, if you don't settle the case. Ultimately prove how you were injured in that you were injured. And it's very difficult, if not impossible, in many cases or claimant situations to show that X was caused by the water crisis or that Y was caused by the water crisis. And when I look at this settlement and I think about the difficulties improving damages and causation. Again, as a lawyer, thinking not as a concerned citizen in the middle of Flint, who's chugging bottles of water back and forth from churches to my house and what that meant to me in the middle of the winter and the snow and trying to cook with bottled water and bathe with bottled water and feed formula to my child made with bottled water. Those things are a part. There is no amount of money that's ever going to make anybody feel happy that they did that. But ultimately proving damages to a jury and surviving motions for summary judgment against state entities who are being accused of constitutional violations that have never really been brought successfully before against governmental entities. There's a legal standard, and then there's, like, a life standard.

**Jonathan Amarilio:** Right.

**Corey Stern:** I think people are disappointed by what they're getting because of the life standard. But if they really understood the legal standard, they probably feel a little bit better of that thing.

**Jonathan Amarilio:** So, there is more than just civil fallout from this case, right? A number of criminal charges were brought. Can you talk a little bit about that?

**Corey Stern:** Sure. So, again, I know enough about it to talk somewhat intelligently about it, but obviously, I'm not in the middle of the investigation, although the investigations are sort of parallel to each other, the civil investigations and the criminal. The criminal investigation began almost at the same time that I was in Flint, beginning to handle these cases and it was a Republican attorney general for the state who appointed someone who was considered a Republican appointee to lead the special prosecution. His name was Todd Flood. He did some incredible things in Michigan, getting a case bound over to the circuit court is like, getting a grand jury indictment of sorts, but it's a judge that's signing off kind of on probable cause to bring a case.

(00:30:00)

And he was able to at some point get involuntary manslaughter case against the government official bound over, meaning that he convinced the judge there was enough evidence to support that type of charge. And then, politics happen in life and new governor is elected, Gretchen Whitmer and the new attorney general was elected, Dana Nessel both Democrats. If I was able to vote Michigan, I likely would have voted for both of them but for whatever reason, and they have their reasons I guess that were stated where they thought the original investigation was sloppy and things were missed. They essentially dismissed all charges to begin a new investigation and only recently have began sort of recharging folks with crimes. And to their credit, they brought some serious charges against some individuals and they've brought some less serious charges against others. The most notorious of them were misdemeanor charges against former Governor Snyder and –

**Jonathan Amarilio:** What are the nature of those charges, Corey?

**Corey Stern:** You know, concealing information, dereliction of his governmental duties, things that would likely prevent him from ever being elected to public office again but he was probably already never going to get elected to public office again. Although, we've seen some come back stories in our country that are hard to believe and some first-time stories that are hard to believe. But they don't carry with them much more than what ultimately amount to a fine probably but they're ceremonial. I think in one respect, people from Flint are probably satisfied that he is being charged with the crime but there's plenty of people in Flint that feel like this is ridiculous. If you have enough evidence to say that he was criminally culpable for something that happen to me and my kids, how do you only charge him with a misdemeanor?

And again, people are dissatisfied with the amount of money and the settlement because on some level they don't understand how hard it is to prove an amount of money at trial, people can be critical of the criminal prosecution involved in the water crisis. And what the end result is what most of the people who are critical like me probably don't understand how the sausage is made and what needs to be proven for these charges. And I think ultimately most people are doing the best they can for the people although it doesn't always feel like that for them.

**Jonathan Amarilio:** So, let's bring it back to the people. It's my understanding that somewhere between six and 12,000 children who are exposed to lead. I know this is kind of a broad question but how are they doing now?

**Corey Stern:** Well, first off, I think is probably more like — I mean it maybe a 100,000 people that were exposed most probably somewhere in the nature of 15,000 to 20,000 children.

**Jonathan Amarilio:** Okay.

**Corey Stern:** I think on a very amorphous kind of level, I think people just have serious trust issues in the community of anybody that is empower and they rightfully should. You know, this should have never happened.

**Jonathan Amarilio:** Understandable.

**Corey Stern:** Right. So, anytime anything is said or has put out publicly about positive stuff that's — the pipes are no longer bad, the water is good, it's okay to drink. There are layers upon layers upon layers of skepticism because of whose messaging and what the message is in light of what the message was and who was messaging that. In terms of physical health, the children who were lead poisoned, there's no fix. There's not like my kids just came home from sleepaway camp and had a skin infection and he's taking an antibiotic and he's getting better, like there's a medicine he can take and I don't love that he has taken antibiotic but he's ultimately going to be okay, and his skins are going to clear up, and he'll probably go back next summer and do the whole thing again. You can't take an antibiotic for lead poisoning. You can't fix a kid's brain that's been permanently damaged. So, the effects of what's happened to these children will take years if not decades to truly understand in that community. It's an entire community of children that had the potential for one thing each of them for their own one thing and their potential will likely and necessarily end up not being met because of the way their brain will now function because they were poisoned.

So, what does that mean for them personally, individually? What does that mean socio-economically for them in the future? I've tried a number of lead poisoning cases where I felt like a jury was saying, "Well, this is just a poor black kid from Newark, what was he going to be anyway?" And I do not subscribe to that. I do not subscribe to the fact that you're a product of your environment and you'll never make anything. And so, to say, "Well, these kids weren't going to be anything anyway," is a complete disservice to them and to children everywhere because we all want to be judge on our own merits and climb out of our own holes and make our own futures for themselves. Their futures will never fully be realized because they were poisoned. Number two, infrastructure wise and from an economic standpoint, it's very difficult to imagine significant investments into

a community where people within the community still don't trust their water. So, if I'm going to start a Jersey Mike's or if I'm going to start a Crepe Shop, or I'm going start anything in an industry that requires water, why would I choose a city like Flint unless just economically it's so incentivized for me to start a business there so inexpensive for me too that it just makes good sense. It's not going to be high on people's list to go invest in Flint because there's still this trust. Nobody knows or feels like they know if the water is any good.

(00:35:22)

So, economically the community which was already in a bad place, they had emergency managers forever. They've been ravaged and it doesn't really look like there's a way to reinvest or to fix that. Flint has a very high retention rate to the extent there's such a thing in cities meaning people very rarely leave. So, you now have a community that is unlikely to have significant –

**Jonathan Amarilio:** That's probably they can't, right or reflects on socio-economic?

**Corey Stern:** In many ways we can't and they're also very proud. People are Flint strong. Those shirts and themes existed before the water crisis ever came. You know, people love the city of Flint. They love being from Flint. They're proud of it. But when you have a community of people that rarely leave and an economy that's going to suffer for decades because of what happened and the children in the community who don't leave will ultimately will be the workers in the community. But their likelihood of being successful academically which leads to economic opportunities is diminished because of lead. You have to invest some amount of money in this community and so when people who are discouraging folks from participating in the settlement or coming out against settlement as much as I respect what they think. Again, I take no issue with people who feel that way to somehow argue to me that in an investment of some portion of $640 million is in that community by way of the children who are going to get it in their pockets and have it invested in annuities or in the adults who are going to get it. I don't know another way in which that kind of money is put in the hands of people who will never leave the community to ultimately invest back in their community.

And again, this is a partial settlement. I mean people talk about it like this is it, it's over, the lawyers are leaving, I mean I filed lawsuits against three financial institutions after the settlement was reached for the bonding that occurred, that's a whole another podcast. But for the bonding that occurred that led to the

switch being possible. I've got cases pending against the environmental protection agency which is not a part of this settlement. The first four bellwether trials in this case are going to take place in late January or early February 2022, they're my cases. These are four children that I represented. They're against those private entities that I originally filed against in Genesee County because I thought the best area of the case was against them. So, there's the wrong impression I think of this being the end because it's not. And I think there's a little bit of a mischaracterization about the significance of $640 million, there's some portion thereof being invested back into the community.

**Jonathan Amarilio:** What do you hope to achieve with those other cases? I'd like you said they've run up on a little bit and I know that would be a great subject for a full other podcast. But just really quickly like what are you looking for there?

**Corey Stern:** I feel like there was like a bear in the woods and like a 100,000 people shot rifles at the bear and the bear died or the bear was significantly injured. And I think the easy narrative is that the government was at fault because the government is usually at fault when we're dealing with government functions. But the reality is, is a lot of people had guns and a lot of people pulled the trigger. And I just think there needs to be accountability amongst everyone involved and that you can't hide behind the government as a protection for your own misconduct. I look at every single person or every single entity that was involved in this crisis and potentially causing this crisis and each one of them like I could say to my kids, "This entity had one job and they fail." This entity had one job and they fail. The banks, all they had to do was due diligence or enough diligence to understand which they probably did that the Flint river was not a viable water source in the condition that was in and then the timeframe that it was about to be used. So, we shouldn't make bonds to support action that we know is going to hurt people. But there was a significant financial upside to making the bonds on the frontend that they were going to refund the backend and they did their own business analysis in the side, well, the money is too good so we're going to do it anyway. Hopefully people won't get that hurt.

The engineering firms that came in to do the initial work or to do the follow up work, you know they had a financial incentive to do the work in a certain way so that more business would come their way, if they did the initial work a certain way. And they had one job like do it right, be honest, don't be careless, don't be misleading. And so, the answer to the question in short which is hard for any lawyer to do especially me about something that I worked on for so many years, there just needs to be accountability. And I think that because there will never

be enough money for anyone of these kids, I want all of these people to pay more than the people before them. So, some people look at partial settlements and then we'll, whatever we get from the next groups, that's just gravy because we already go 640.

(00:40:02)

To me, 640 should be the gravy. I'm a vegan, but I'll say we've yet to get to the steak. Like to me, the private entities that did this as evidenced by the fact that they were the first group of people I filed against. I think they're the most culpable. Not because it's convenient for me to go to trial and say that now that we've settled with the government, but because if I hire a plumber to come to my house to do some plumbing and then somebody gets hurt at my house because the plumbing wasn't done right, yes, my house and maybe it's my job, but I hired a freaking plumber to come to the plumbing. Why is the plumber not at fault when the plumbing fails and these private engineering companies in the most basic terms were tasked with doing a switch that was going to be safe and evaluating the switch after the fact to determine if it was safe. If you can't rely on the professionals to tell you it was safe, it is safe and it was always safe, then who are you supposed to rely on? Accountability and a heck of a lot more money for the people who are mad and the ones that are happy about the amount that they're going to get from the sell.

**Jonathan Amarilio:** So you touched a little bit on the role that government played and all this. And like role the government can play which I think is a nice segue to the article that you recently wrote *'The Guardian'* which I read as a call to action. What was your message there?

**Corey Stern:** I think as lawyers, I'm always reacting to something bad that happened. People hire a lawyer because something bad has happened and they want to be compensated for the bad thing. And it feels to me the older I get and the more aware I become of government functionality, either because of the type of cases that I participate in or just because of taxes or whatever like I become more aware of what the government's function is and I feel like the fault in all of it is that everything is reactionary and not proactive. And so, I start looking at the water crisis, which has been my life for half a decade. And I don't ask myself like, how do I get involved in the next one so that I can help compensate people for their being hurt by something similar? But like, if I could have gone back in time and know then what I know now, how could I have made a significant difference or impact? And I really do think that many of these environmental problems come from infrastructure. Everybody in government

knows that there are lead pipes throughout the United States that are ticking time bombs for communities like what happened in Flint can happen to them. But there's not this or there hasn't been a significant enough passable, what do we do about that before it happens? Because we typically just do things about stuff after it happens, that's our business, that's being lawyers. Nobody has a lawyer to say, "Hey, I would like to hire you to prevent Flint from happening again. If Flint happens so how can you get me some money?"

And so, when I wrote that article, I genuinely was just thinking, if I were Joe Biden and I'm relatively moderate but progressive individual who believe in climate change and science, what can I do to make sure that Flint never happens? Because that's my little world, the Flint world. And how do I do it in a way that benefits the communities that I'm trying to help beyond just making sure something bad doesn't happen. And I just feel like hiring and training people within communities and paying them to do the labor required to prevent this from happening, it's like a win, win, win for everyone. I've met the people in Flint. I know what it takes to change pipes, to rip out pipes and to put new pipes in and how to apply the proper corrosion control utilizing various electronic systems that measure those types of things. There is no one I've met as an adult and some children in Flint who could not be trained in a significant way to knowhow to do those things. And if they could be paid to do them while simultaneously fixing a problem before it actually hurts anybody it just makes good sense to me.

Now, I've never been elected to public office. There's politics involved in everything. We can't even get an agreement on whether someone should have to wear a mask on an airplane or not. We fight over everything. There's literally — I could tell somebody who's from a different political party of me that the sky is blue, and they would argue with me that it's red some of my own family, but we've got to realize that Republican kids and Democratic kids and Black kids and White kids and Asian kids and Indian kids, any of them that drink lead tainted water are going to get brain damage from lead poison. It doesn't matter what color they are or what their parent's politics are, whether they believe in science or not, they're going to get lead poison. And if we could just think about kids as like the first — the first question we ask ourselves is what's best for the kids involved in this equation? Irrespective of politics, irrespective of red or blue, irrespective of geographically, what is the best answer if we were only looking at for the kids? I think if everyone asked that question on the front end, they would ultimately come to a more appropriate resolution to whatever the problem is. And I guess the point of that article was to try and bring some of this to the surface from the perspective of someone who has seen the problem on

the back end, wishing every single day that I could have done more about it on the front end.

(00:45:00)

And that's counterintuitive for what we do for a living. I mean, I only get paid when I win cases, and I only get cases when someone's been hurt and people only hurt when really bad stuff happens. But I'd rather be a shepherd somewhere in Italy or a waiter and know that all the people in the communities that I spent time and where my kids are living and ultimately where my grandkids will live, they're all safe when they drink water. Like I feel better about myself knowing that that has happened and I'm just waiting tables somewhere in Milan. Then I am about having to go into communities on an annual basis and file lawsuits against folks who never wanted to hurt kids. It's not like Governor Snyder was like, let's see how many children we can lead poison today. I cannot wait to lead poison all the children in Flint, nobody would say that. Nobody who's rational or sane would ever say that. And I think we just need to acknowledge that we have problems and find ways to fix them that don't involve lawyers all the time, that don't involve reaction but is rather proactive.

**Jonathan Amarilio:** That's a good place for us to take a break. We'll be right back with stranger and legal fiction.

[Music]

This episode of At The Bar is brought to you by courtfiling.net, your solution for filing in over 100 courts in the state of Illinois. Courtfiling.net provides a better e-filing experience focusing on speed and ease of use on the e-filing process. Courtfiling.net is affordable and offers 24/7 phone email and chat support. Visit us at courtfiling.net to receive 30 days unlimited free electronic filings and see why it's the best solution for your firm. Let courtfiling.net worry about your e-filing so you can get back to taking care of your clients.

[Music]

**Jonathan Amarilio:** And we're back with stranger and legal fiction. Corey, our audience knows the rules are pretty simple. I have researched strange laws somewhere in the United States, found one that is real, but probably shouldn't be because it is so strange, it's weird, it's wrong and then I've made another one up and I'm going to quiz you to see if you can distinguish strange legal fact from fiction. Are you ready to play?

**Corey Stern:** Sure.

**Jonathan Amarilio:** All right. So, I chose one from Michigan appropriately enough, and one from New York where you're based. Option number one, in Detroit, it is illegal to allow a pig to run free unless it has a ring in its nose, so that's option number one. Option two, in New York, it's illegal to put on a puppet show from a window of any private residence.

**Corey Stern:** I'm supposed to say which one is true and which one's false?

**Jonathan Amarilio:** Right. You practice in New York. You practice in Michigan now. So, I know there's a lot of pressure on you to get this right.

**Corey Stern:** But there's definitely one that's true and definitely one that's false, right?

**Jonathan Amarilio:** Correct.

**Corey Stern:** Yeah, the puppet show is true and the pig is false.

**Jonathan Amarilio:** Why do you say that?

**Corey Stern:** I mean, my right.

**Jonathan Amarilio:** Why do you say that? Our audience wants to understand your thinking process.

**Corey Stern:** So, my thinking is the puppet show thing in a private residence in New York could potentially cause accidents on the road since most residents is — if we're talking about the city are in the middle of places where there's cars that are going back and forth, and if someone were distracted by a puppet show it could cause significant harm on the roadways.

**Jonathan Amarilio:** Definitely thinking like a plaintiffs' lawyer.

**Corey Stern:** Yeah, I've been to enough — I've been to enough places in Michigan outside the Flint where I would not be shocked to see a pig running around with a ring in its nose. And so, it just makes more sense to me that — listen, there's parts of Michigan that you would think you were in rural Mississippi. And I think you want to make sure that like there's something about the pig that's trained or they're not going to destroy things. But pigs are super smart like the smartest animal, one of the smartest animals there is. I guess the only issue with that one is I'm not sure a pig would let you put a ring in its nose

because it's so smart, but it's better than turning a pig into bacon again as a vegan. I'm just going with the puppet show. I feel like public health wise puppet shows are bad on the streets of New York City.

**Jonathan Amarilio:** Well, that was a long journey, but it got you to the right destination. You're exactly right. Section 10-114 the New York City Code makes it illegal to put on a puppet show from a window of any private residence. I'm sure the members of Sesame Street and the Muppets will be pretty upset to hear that they're all criminals there.

**Corey Stern:** I've survived my whole life on guts and instinct, and that just boom.

**Jonathan Amarilio:** It serves you well here. Once again, I should add that the Michigan law that comes up in a lot of lists of weird laws. I even saw it being cited on legal blogs and law firm's websites as weird Michigan laws. But I could not find it anywhere in the Detroit City Code. It didn't come up in any west law searches. I think that is just a legal myth but if anyone in our audience can prove me wrong, I welcome to do so. That is going to be our show for today. Corey, thank you again for joining us, this has been a fascinating if disturbing and upsetting conversation. Please keep up the great work on behalf of the people of Flint and, well, I suppose everyone really.

**Corey Stern:** Honored to be with you. Thank you.

**Jonathan Amarilio:** I also want to thank our executive producer, Jen Burn of the CBA, as well as Adam Lockwood on sound and everyone at the Legal Talk Network family. Remember, you can follow us and send us comments, questions, episode ideas, or just troll us on Facebook, Instagram, and Twitter @CBAatthebar all one word. Please also rate us and leave us your feedback on Apple Podcasts, Google Play, Stitcher, or Spotify or wherever you download your podcast to help us get the word out, until next time for everyone here at the CBA, thank you for joining us, and we'll see you soon At The Bar.

[Music]

**Outro:** The views expressed by the participants of this program are their own and do not represent the views of nor are they endorsed by Legal Talk Network, its officers, directors, employees, agents, representatives, shareholders, and subsidiaries. None of the content should be considered legal advice. As always, consult a lawyer.

[Music]

Case 5:16-cv-10444-JEL-EAS ECF No. 2040, PageID.71320, Filed 12/06/21 Page 33 of 36

Podcast transcription by Tech-Synergy.com

BROUGHT TO YOU BY



✉ NEWSLETTER

Notify me when there's a new episode!

| Your Email | Subscribe |
|---|---|

EPISODE DETAILS

Published:   August 25, 2021

Podcast:    @theBar

Category:    Legal Entertainment , Legal News

PODCAST



@theBar

Young and young-ish lawyers have interesting and unscripted conversations with their guests about legal news, events, topics, stories and whatever else strikes our fancy.

## LISTEN & SUBSCRIBE

 Apple

 Stitcher

 Spotify

 Google

## RECENT EPISODES

**08/25/21**
### The Flint Water Crisis Edition: A Conversation with Lead Plaintiffs' Attorney Corey Stern

Jonathan Amarilio is joined by Corey Stern, lead counsel for the plaintiffs injured in the Flint, Michigan water crisis. Corey discusses the origins of…

**07/29/21**
### The #FreeBritney Edition

California probate attorney Justin Gold to discusses the conservatorship of Britney Spears.

**06/30/21**
### The Art of Shameless Self-Promotion Edition

In this edition, guest host Trisha Rich and co-host Jennifer Byrne are joined by public relations and legal marketing expert Debra Pickett of Page…

**05/26/21**
### The Dark Waters Edition: A Discussion with Environmental Attorney Rob Bilott

Rob Bilott sits down with host Jonathan Amarilio to discuss his struggle on behalf of tens of thousands of poisoned Ohio and West Virginia…

**04/15/21**
### The Speaking of Speakers Edition: A Discussion with Illinois' New House Speaker Emanuel "Chris" Welch

New Speaker of the Illinois House of Representatives Emanuel "Chris" Welch became the first Black lawmaker to hold the position. He joins the show...

**03/18/21**

**The Trial of the Chicago 7 Edition: Part 3 – Defendant John Froines**

Part 3 of The Trial of the Chicago 7, host Jonathan Amarilio and co-host Jennifer Byrne continue the conversation about the landmark trial with...

More Episodes ❯

## Legal Talk Network

Home

Podcasts

Blog

About

Sponsors

Contact

## Follow Us

Twitter

Facebook

Newsletter

LinkedIn

 iTunes

 RSS

## Email Notifications

Subscribe to our newsletter, and never miss another episode.

 Newsletter Signup

## Get the Mobile App

Listen to your favorite podcasts anywhere, anytime.

 iPhone          Android

© 2021 Legal Talk Network. All rights reserved. Terms of Use. Privacy Policy.