# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

| | |
|---|---|
| *In Re* Flint Water Cases, | No. 5:16-cv-10444-JEL-MKM |
| | (consolidated) |
| | Hon. Judith E. Levy |
| | Mag. Mona K. Majzoub |
| *Helen Chapman, et al.,* | No. 5:18-cv-10679-JEL-MKM |
| *Plaintiffs,* | |
| *v* | |
| *Governor Richard D. Snyder, et al.,* | |
| *Defendants.* | |

## Attorney Mark Cuker's Response to Co-Liaison Counsel's Motion to Disqualify

## I.     Introduction

This is the third time that proponents of the settlement have sought to suppress uncomfortable facts by threatening disqualification of attorneys who have the temerity to raise them.

On March 1, 2021, in response to a motion which raised serious concerns about bone scans being performed by Liaison Counsel Napoli Shkolnik, the Court threatened attorney Michael Pitt with disqualification. ECF 1864-1, PageID 66124. As a result, the motion was immediately withdrawn.

On May 3 and May 10, after Mr. Pitt allowed dissemination of a deposition of Dr. Aaron Specht which showed that the Napoli firm traded on its inside information about the settlement to conduct 3,000 bone scans of its clients before the settlement terms were even made public, the Court, at the behest of Liaison Counsel, again implicitly threatened Mr. Pitt with disqualification. *Id*. PageID 66129-66125; ECF # 1830 PageID 65304.

As the Sixth Circuit has already stated, these threats were improper.

> Respectfully, courts do not typically tell counsel what positions they must take…[C]ourts must diligently ensure that class counsel places the interests of absent class members over the interests in achieving settlement—***not the other way around***." *In re Hall*, 4 F. 4th 376, 379 (6th Cir. 2021) (emphasis added).

Now the Napoli firm moves to disqualify the Cuker Law Firm in retaliation for its filing an objection and a motion for reconsideration based on new evidence not available at the time of the final approval hearing.  This latest attempt to suppress the ugly truth underlying this settlement fails for at least three reasons.

First, the Napoli firm lacks standing to raise the conflict which it claims to exist. Standing is no mere formality—it is a requirement of Article III of the Constitution. "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017) (internal quotation omitted). The movants must demonstrate standing "for each form of relief that is sought". *Id.* Without standing this court has no authority to hear the motion.

Second, there is no conflict. Movant (and its expert) premise the purported conflict upon a divergence of interest between Cuker Law Firm's objecting and non-objecting clients.  ECF #2045, PageID 71145-71147. But there is no divergence. Every Cuker client's interest would be best served by replacing the current plan of allocation with a fairer, more equitable one that did not revolve around Liaison Counsel's bone scanning monopoly. There is no objective or subjective record evidence otherwise. Silence is not consent, and failing to file an objection is not an endorsement of the settlement. Indeed, the reason that so many of Cuker's client did not file objections was the onerous "wet signature" requirement that the settlement demanded of each objector.

To the extent that there is a conflict, the root of it was manufactured by the Napoli firm itself. The objections were triggered when Napoli cancelled the bone scan appointments of most *Chapman-Lowery* objectors and refused to allow appointments for the rest. At the same time, Napoli pushed for a settlement that

awards radically different amounts of money to otherwise similarly situated claimants based on that bone scan access. Having created any conflict, Liaison Counsel cannot disqualify counsel who object to it.

Third, disqualifying counsel for 980 registrants at this late date would be highly prejudicial to those claimants, who would have to seek new counsel. Proceedings would be brought to a halt until objectors retained new counsel, and that new counsel would need additional time to get up to speed on the issues in this case. Non-objecting claimants would also need to retain new counsel at a time when the 120 day claims filing period may begin soon; most of those claimants will only receive $1,000 in the settlement and may have difficulty finding counsel.

## II.     Argument

### A.     Napoli Shkolnik Lacks Standing to Bring this Motion

Having conducted thousands of radiation-emitting bone scans on Flint residents with an unregistered device in violation of Michigan law, having belatedly registered its device without informing MIOSHA of its use on humans, having scanned thousands of people without informing any of them they were being exposed to radiation and without the supervision of a physician licensed in Michigan—having done all of this while seeking up to $200 million in attorney's fees *plus* cost reimbursement of $500 per 3-minute bone scan—Napoli Shkolnik

now appoints itself ethics czar and seeks to disqualify *Chapman-Lowery* objectors'

counsel for complaining about its actions.

Make no mistake about it; this motion is not about ethics; it is about

suppressing facts which expose the bone scan aspects of this settlement to be—in

the words of class counsel—a "travesty."  It is about punitive retaliation for daring

to object—a continuation of Liaison counsel's efforts "to chill objections." *Bezdek*

*v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) (instructing district courts to

"be wary" of such efforts). Any doubt about this should be removed by Paul

Napoli's email, sent within 10 minutes of receiving the unredacted *Chapman-*

*Lowery* objectors' motion for reconsideration, that, as a result of this motion, he

would move to disqualify their counsel (hereafter "Objector's counsel") Cuker Dec

Ex. A.

The general rule is that only a current or former client has standing to move

for disqualification of counsel based on an alleged conflict of interest. *Standing of*

*Person, Other than Former Client, to Seek Disqualification of Attorney in Civil*

*Action*, 72 A.L.R. 6th 563 §2.  See, e.g., *In re Yarn Processing Patent Validity*

*Litigation,* 530 F.2d 83 , 88 (5th Cir.1976); *State Farm Mut. Auto. Ins. Co. v. Elite*

*Health Centers, Inc*., 2019 WL 2576360, 2019 U.S. Dist. LEXIS 104998, at *7-*9

(E.D. Mich. June 24, 2019) (citing *Dana Corp. v. Blue Cross & Blue Shield Mut.*

*of Northern Ohio*, 900 F.2d 882, 889 (6th Cir. 1990); *Willis v. First Bank Nat'l*

*Ass'n*, 1990 WL 155366 (6th Cir. Oct. 15, 1990) (unpublished); and *Frey v. Prior*,

1991 WL 253557 (6th Cir. Nov. 27, 1991) (unpublished)).

There are powerful reasons for this rule:

- "Motions to disqualify counsel made by nonclients are often made for tactical advantage and not for the resolution of any real conflict of interest."

- "In order to have standing, a litigant must assert the litigant's own legal rights and interests and cannot rest his or her claim on the legal rights or interests of third parties"

- "A nonclient litigant does not have standing to merely enforce a technical violation of the rules of professional conduct through a motion to disqualify"

- "Regardless of the contents of the applicable rules of attorney conduct, an attorney can have no sufficiently personal "injury in fact" based on the conflict status of his or her opposing counsel to move to disqualify that adversary"

72 A.L.R. 6th 563 §2.

All these reasons apply here.

Sixth Circuit courts follow this standing requirement. The court in

*Winchester v. Education Management Corp.*, 2010 WL 2521465 (W.D. Ky. Jun.

18, 2010) adopted this reasoning in denying the motion to disqualify. Noting that

"disqualification is a drastic measure which courts should be hesitant to impose

except when absolutely necessary," the court quoted at length from *In re Yarn*

*Processing*:

> To allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist. It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands. Courts do not generally examine the motives of a moving party in a disqualification motion. Once the preliminary showing is made by the former client, the motion must be granted regardless of whether the former client gains an advantage at the expense of his adversary. ***We are reluctant to extend this where the party receiving such an advantage has no right of his own which is invaded.***

*Winchester, supra, quoting* from 530 F.2d. 83, 90 (emphasis added).

The *Winchester* court concluded that the Sixth Circuit would follow this rule for two reasons: The test adopted by the Sixth Circuit in *Dana Corp. v. Blue Cross & Blue Shield Mut.,* 900 F.2d 882, 889 (6th Cir.1990) requires the existence of a past attorney-client relationship between the party seeking disqualification and the attorney it seeks to disqualify; and the Sixth Circuit itself in *Willis v. First Bank National Association* stated, "plaintiff's standing to assert opposing counsel's alleged conflict of interest is questionable at best," where plaintiff was a non-client litigant moving to disqualify opposing counsel. 916 F.2d 714, *1 (6th Cir.1990) (unpublished).

*White Family Companies Inc. v. Dayton Title Agency Inc.,* 284 B.R. 238, 244-245 (B. S.D. Ohio) (2002)  also followed this rule. In *White Family*, the court found standing to be a constitutional requirement, and concluded that the parties

moving for disqualification could not satisfy it:

> It is axiomatic that the irreducible constitutional minimum of standing contains three elements: first, plaintiff must have suffered an injury in fact, i.e., invasion of legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical; second, there must be causal connection between injury and conduct complained of, i.e., injury has to be fairly traceable to challenged action of defendant, and not result of independent action of some third party not before court; and third, it must be likely, as opposed to merely speculative, that injury will be redressed by favorable decision. *Zurich Ins. Co. v. Logitrans, Inc.,* 297 F.3d 528, 531 (6th Cir.2002). Herein, the Appellants have not demonstrated that they have suffered an injury in fact, as a result of the conflict of interest...

*Id*. at 245.

Other cases looking at conflicts in the class action context have consistently held that parties moving for disqualification lack standing unless they are current or former clients of the attorney they seek to disqualify. In *Blanchard v Ridgemark Financial Corp*., 175 F.R.D. 293 (N.D. Ill. 1997) counsel for the plaintiff class in a class action objected to a settlement reached between the defendant and the plaintiff class representative. Since Plaintiff's counsel represented the class representative, the defendant moved to disqualify, alleging a conflict of interest. Noting that none of plaintiff's counsel's clients had joined in the disqualification motion, the court ruled that the movant lacked standing to raise the disqualification issue. *Id*. at 306.

In *Andrew Farms v. Calcot Ltd* 2010 WL 4010146 (E.D. Cal.), a defendant

in a class action sought to disqualify Plaintiffs' counsel for representing members of a class with conflicting financial interests.  Notwithstanding the general rule which said that only current and former clients have standing to move for disqualification, the movant asserted standing because any settlement would be subject to attack based upon the undisclosed conflict of interest.  The court rejected this challenge stating that injury to a non-moving party is insufficient to confer standing on the movant. Rather, the movant "must show injury to itself as a result of any conflict of interest." *Id*. at * 4. "Any potential injury which might result from a future attack on the settlement due to the perceived conflict is too speculative to confer standing." *Id.*

Here, the only party moving to disqualify Objectors' Counsel in this motion is Co-Liaison Counsel Napoli Shkolnik. Since Napoli Shkolnik is not, and never has been, a client of Attorney Mark Cuker, it lacks the standing necessary to bring this motion.

### B. The Absence of Objections by Non-objecting Clients Does not Mean they Endorse the Settlement and does not Demonstrate a Conflict with Objecting Clients.

Napoli Shkolnik's motion is grounded on the bald assertion that there is a conflict between the objections made on behalf of 30 claimants[1]  and the over 900

---

[1] Although movant claims there were only 12 objections, a simple count of the ECF numbers listed shows 14 total objections on behalf of 30 claimants (excluding ECF

non-objecting clients because the latter "want the partial settlement to proceed."

ECF # 2045 PageId 71147.   Napoli offers no support for this statement, and none

of the non-objecting clients have joined this motion to disqualify.

Although Movant equates a failure to object with an endorsement of the

settlement, the reason that more people did not object is more likely due to the

court's refusal—at the urging of Napoli Shkolnik among others—to extend the

March 29 deadline for objections. ECF No. 1494, 1505.  As the motion to extend

explained, it did not become clear until March 18, 2021, that claimants represented

by objectors' counsel could not get bone scans done via the Napoli firm, and that

no alternative bone scan program would take place. *Id*. at PageID 58118-58123.

As a result of the denial of the motion to extend, all objections had to be filed by

March 29.

Another obstacle to timely objections was the ASA's requirement that each

objection must bear the wet signature of the objector, notwithstanding the

pandemic and resulting delays with the U.S. Mail. ECF No. 1549 PageID 60382.

By contrast, and unlike the usual rule in federal procedure under Rule 11, an

attorney's signature alone was deemed sufficient for registration and the

requirement of a wet signature for claim forms was later abandoned in favor of

---

# 1569, which was withdrawn in favor of ECF #1571, and 1557 which was not an
objection, but an opposition to a fee petition). ECF# 2045, PageID71145.

10

DocuSign. Not only is this "wet signature" requirement a burden, it is a burden that has been previously rejected as "unduly burdensome" on class members. *Arena v. Intuit Inc*., 2021 WL 834253, 2021 U.S. Dist. LEXIS 41994, at *35 (N.D. Cal. Mar. 5, 2021). It also runs contrary to Fed. R. Civ. P. 23(c)(2)(B)(iv), which provides that a class member "may enter an appearance through an attorney if the member so desires." And to 28 U.S.C. § 1654, which allows individuals to appear and conduct their cases through counsel. In combination with the putative ethical standard movants espouse, the "wet signature" requirement becomes a de facto bar on Cuker's clients objecting at all.

When this court denied the motion to extend, Judge Levy stated that she would hear the bone scan motions on their merits, notwithstanding the fact that the many others wishing to object would not be able to do so.  *Id.* at PageID 603286 ("I already have objections on bone scans. That is on my radar to be addressed.").

Now Napoli Shkolnik seeks to use the absence of objections from some clients to prevent the objections of others from being heard on their merits, by disqualifying objectors' counsel. This makes no sense. Failing to object is not an endorsement of the settlement. *See, e.g.,* Theodore Eisenberg & Geoffrey Miller*, Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 V and. L. Rev. 1529, 1561 (2004) ("Common sense indicates that apathy, not decision, is the basis for inaction."); Geoffrey P. Miller, *Rethinking*

*Certification and Notice in Opt-Out Class Actions*, 74 UMKC L. Rev. 637, 642

(2006) ("It boggles credibility to suggest that [absent class members] consent to

anything at all when they throw the class notice in the waste basket."); *Redman v.*

*Radioshack,* 768 F.3d 622, 628 (7th Cir. 2014) (calling it "naive" to believe that

silences equates to approval); Christopher R. Leslie, *The Significance of Silence:*

*Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73

(2007); *In re  GMC Pick-Up Truck Litigation*  55 F.3d 768, 812-13; (3d Cir. 1995);

Debra Lyn Bassett, *Class Action Silence*, 94 Boston U. L. Rev. 1781, 1799 (2014)

("Ascribing any meaning to silence in response to publication notice is

untenable"); Amanda Rose, *Cutting Class Action Agency Costs: Lessons from the*

*Public Company*, 54 U.C. Davis L. Rev. 337, 386 (2020) (" the absence of

objections is not properly interpreted as a signal of approval.")

    Movant's assumption that non-objection here constitutes an endorsement is

especially dubious in light of settlement terms which are highly unfavorable to

many, if not most, claimants.  For instance, under the current settlement terms, the

overwhelming majority of C*hapman -Lowery* plaintiffs are adults who will receive

total compensation of no more than $1,000 per property.  Cuker Dec at ⁋7.  Does

the court wish to conclude that, just because they failed to submit objections, adults

are satisfied with $1,000 per property?  Or that children who drank water from a

lead service line, but who have no blood or bone lead test, are content to receive 30% of what children with a blood or bone lead reading of 0.1 receive?

Finally, the implications of movant's conflict theory are staggering and reduce the theory to absurdity. Every year, many class actions involving tens or hundreds of millions of persons settle. *See, e.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019) (privacy claims against Google on behalf of 129 million Google users). Attorneys considering representing potential objectors in these cases don't have just one existing client, but hundreds or even more. Assume a law firm, which has hundreds of active clients, is approached by an objector with meritorious objections to the Google settlement. If the Movant's proposed ethical rule were correct, that firm could not represent that objector unless it also objected on behalf of all its other clients who are members of the Google settlement class.  The same rule would apply to every new settlement objection, forcing a firm to object on behalf of all of its clients who are members of a class, or none at all. This cannot be, and is not, the law.[2]

---

[2] Nor does the expert report of Robert Hirshon, establish a conflict. That report is based on two assumptions: that "objecting to the settlement flies in the face of the desire of at least one of Attorney Cuker's clients" and that Attorney Cuker has not met the consultation requirements of MRPC 1.7. ECF # 2045-, PageID 71154. Movant has offered no evidence to support either assumption, and the record actually supports the opposite conclusion. ECF#1904, PageID66687.

**C.  Having Created the Putative Conflict by Cancelling Bone Scan Appointments of Clients and Crafting a Settlement which Pays Similarly Situated Claimants Radically Different Amounts, Napoli Shkolnik Cannot suppress Objections by Moving to Disqualify Objectors' Counsel**

Napoli Shkolnik contends that a conflict exists because 38 of Objecting counsel's clients received bone scans.[3] This is wrong for several reasons.

First, objecting counsel has never contended that bone scans should not be **a** consideration for enhanced payments. Rather, Objectors' Counsel complains that the settlement is structured so that bone scans will inevitably be **the** main criteria for enhanced payments. This is because blood test results are only available for a minority of claimants, and the other criteria will be very difficult to meet.  ECF # 1837, PageID 65417-65419. The settlement would be more equitable—if more widely available criteria could be added for both children and adults so they receive the same enhancement as those who underwent bone scans.

Second, there is no evidence that the 38 *Chapman-Lowery* clients who underwent bone scans can actually use them to their benefit in litigation. Napoli has never produced the results of these scans, and in fact, threatened to destroy the data when he was not paid $500 per scan, and the subjects waive their privacy

---

[3] The foster daughter of one objector, Nadine Roberts, underwent a bone scan, but Ms. Roberts objected anyway, because she was disturbed by conditions at the Napoli Shkolnik bone scan facility. ECF # 1471.

rights and to allow Napoli Shkolnik to see their results. ECF#1839 PageID65245.

Without a showing by Napoli that the bone scan results for these 38 are available

and will be produced for a reasonable price, the court cannot conclude that these

scans would be of any benefit to the 38. Obviously, if Napoli destroyed the data,

the 38 cannot use the bone scans in the litigation. Even if the data still exists, the

results will have to deliver a benefit greater than the $500 cost to be of any use,

without considering the potential adverse effects of the loss of privacy rights. And

even this showing would not prove that the 38 would not be better off with a

different plan of allocation.

Moreover, after scanning 38 of objecting counsel's clients, Napoli then

cancelled the remaining 54 appointments which had been scheduled and refused to

schedule any more. Id. 28 of the 32 objectors had their appointments cancelled. Id.

at PageID 65245-65246.   Thus, it was Napoli himself that created the conflict

between the 38 scanned clients and the clients who objected because their

appointments were cancelled or refused.

Common sense dictates that an attorney cannot create a conflict for an

opponent and then move to disqualify that opponent based on the conflict the

moving attorney himself created. See, e.g., *Wheat v. United States* 486 US 153,

163 (1988) (courts should scrutinize for motions to disqualify for manufactured

conflicts); *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 CA4th 294, 302,

106 Cal. Rptr. 2d 906, 913 (denying motion to disqualify when conflict was created by movant); *Federal Home Loan Mortg. Corp. v. La Conchita Ranch Co.* (1998) 68 CA4th 856, 862-863, 80 Cal. Rptr. 2d 634, 638 (same).

Nor can Liaison Counsel create even more conflict by crafting a settlement which treats similarly situated claimants differently, and then move to disqualify counsel for those who object. Assume a mass action settlement which treats similarly situated claimants differently. Claimants whose last names begin with the letters "A" through "M" receive $2,000. Claimants whose last names begin with the letters "N" through "Z" receive $5,000. The settlement was negotiated by the N firm, which had an incentive to favor the second half of the alphabet because most of its clients have last names beginning with letters "N" through "Z". Attorney C has substantial numbers of clients with last names at both ends of the alphabet, and objects on behalf of clients "A" through "M".  Can the N firm move to disqualify attorney C because attorney C also had "N" through "Z" clients? Obviously not, because the N firm manufactured the conflict, lacks standing to raise the issue, and, in any event, the entire class is harmed by a proposed settlement that cannot satisfy Rule 23(e). "Intraclass equity" is a requirement under Rule 23, and thus pursuing it benefits all. *Ortiz v. Fibreboard*, 527 U.S. 815, 863 (1999).

That is exactly what is happening here. The settlement provides for a 0.5 share for children with blood and bone lead readings as low as 0.1.  Children with

16

no blood or bone lead readings, but who drank water with lead levels over 15 ppb—who certainly would have a blood or bone lead of 0.1 if they were tested, can receive only 0.2 shares. Because 70% of child claimants had no blood lead test results, these criteria hugely favor bone scan recipients—clients of the N firm. ECF # 2023 PageID 70363-70365.

The structure of the settlement also creates conflicts *within* families and households. Virtually every child claimant has an adult claimant as her parent or guardian. An adult can only qualify for an enhanced payment with a blood or bone lead test above 5.0 or a doctor's report connecting his disease to water exposure. Because 90% of adults had no blood lead test at all, and many of the remaining 10% had no blood lead test above 5.0, and because proving causation of a specific adult disease is so difficult, Napoli Shkolnik conducted bone scans on thousands of adult claimants. ECF# 1839 PageID65417-65418. Any adult over 50 is likely to have a bone lead reading above 5.0, while those excluded from bone scans would likely receive only a maximum of $1,000 per property –to be shared by all adults who own or lease that property.

Nonetheless, the same adults who are being unfairly limited to $1,000 recoveries may have children with elevated blood lead readings who may be entitled to substantial recoveries. There are separate pools of money for children and adults. Adults who are unhappy with the distribution of funds from the adult

17

pool and want to allocate the funds based on more widely available factors, would not be taking money away from their children, but just seeking a more equitable allocation among adults.  Movants would require an attorney who objects on behalf of adults to withdraw from representing the children of those very same adults.

Intra-family conflicts also occur because many families have more than one child, but, for one reason or another, not all children were tested for lead. Children are usually not tested for lead until they are at least nine months old, and there was no reason to test them regularly even after reaching that age. ECF 1436 PageID 55032. Thus, it is unlikely that any child born after Nov. 1, 2015—nine months before the July 31 cut-off date—will have a blood lead test. If that child has an older sibling who had a blood lead as low as 0.1, that will qualify the older sibling for 3.33 times more money than her younger sibling—even though both drank the same water! Yet movant would have this court disqualify a counsel who objects for the younger sibling.

###    D.    Conflicts Created by Settlement Terms Cannot Justify Disqualification of Objecting Counsel, Especially when Doing so Would Prejudice Claimants Who Would Be Deprived of their Chosen Counsel

Where, as here, a settlement is rife with intra-class conflicts,[4] an attorney should not be disqualified simply for objecting on behalf of some clients and not

---

[4] Although technically speaking the claimants here are not "class members", the class action analogy is appropriate because the Settlement agreement employs Rule

others.  *Bash v. Firstmark Standard Life Inc*. Co. 861 F. 2d 159 (7th Cir 1988). is

instructive. There, the same lawyer who negotiated the class settlement appealed

the order of final approval on behalf of two unnamed class members who objected

to it.  The court, per Posner, J., acknowledged that appealing counsel had been on

opposing sides of the same case, but still refused to disqualify him stating

> [C]onflicts of interest are built into the device of the class
> action, where a single lawyer may be representing a class
> consisting of thousands of persons not all of whom will
> have identical interests and views. Recognizing that strict
> application of rules on attorney conduct that were
> designed with simpler litigation in mind might make the
> class-action device unworkable in many cases, the courts
> insist that a serious conflict be shown before they will take
> remedial or disciplinary action. See, e.g., *In re Agent
> Orange Product Liability Litigation,* 800 F.2d 14, 18–20
> (2d Cir.1986); … Such a conflict has not been shown here.

*Id*. at 161.

Similarly in the *Agent Orange* case, settling class counsel moved two

disqualify two attorneys who were involved in negotiating the settlement, but

subsequently became disenchanted with it and appealed the order of final approval.

The Second Circuit stated that, in such situations, the court should not

automatically disqualify the lawyer, but instead conduct a balancing test, using the

following factors:

---

23's requirement that a settlement be fair, reasonable and adequate for the approval
of both the class and mass action aspects of the settlement. ASA Section 20.1

- Whether the counsel's representation of objectors would betray confidences of non-objecting clients

- The harm which objectors would suffer from being deprived of their chosen counsel after years of litigation, and the delay that would ensue by having to halt proceedings by giving them time to retain new counsel and for that counsel to become familiar with the issues in this case

- The ability of objectors to obtain new counsel in light of the relatively small amounts they would likely recover under the settlement as written. In *Agent Orange*, the average case would receive $850 in 1986 dollars led the court to conclude that the limited amount would likely make it difficult to obtain new counsel. *Agent Orange* at 19-20.

Applying those factors here, the motion to disqualify should be denied.

Movants do not suggest that Objectors' counsel has betrayed any client confidences; given the complexity of the settlement and the thousands of pages of documents relating to the bone scan issue, objectors would be prejudiced by having to finds a brand new lawyer, and their limited amounts in controversy--$1,000 (in 2022 dollars) per property for most adults, would make it difficult to obtain another lawyer. *See also Dana Corp.*, 900 F.2d at 889 (looking to whether "the attorney acquired confidential information from the party seeking disqualification").

See also *Blanchard v Ridgemark Financial Corp.*, *supra*, (refusing to disqualify attorney on motion of the party who manufactured the conflict by entering into an inappropriate settlement) ; *Andrew Farms v. Calcot Ltd, supra* at *4, (refusing to disqualify  in spite of conflicting financial interests among class

members, because of the prejudice to clients who would have to find replacement counsel with the willingness, skill and knowledge of" their chosen attorney.)

### E.     Objector's Counsel is not aligned with Veolia

Movant's claim that objector's counsel is somehow "aligned" with Defendant Veolia is nonsense. On the contrary, Objector's counsel has deliberately refused argue the merits of Veolia's Daubert motion, stating

> A final approval hearing is not the proper place to litigate Veolia's attack on the reliability of Dr. Specht's methodology.

ECF 1839 PageID 65439-65440.

Objectors simply asked "**if** Dr. Specht's methodology is so unreliable that this Court ultimately finds it is unworthy of consideration by a jury, how can the Court put its power and prestige behind a settlement which allocates so much money based on an unreliable methodology? *Id*. (emphasis added).

Asking difficult questions is not grounds for disqualification.

## III.   Conclusion

For the foregoing reasons. Napoli Shkolnik's motion to disqualify attorney Mark Cuker should be denied.

Dated:  December 20, 2021               */s/ Mark R. Cuker*
                                        MARK R. CUKER
                                        CUKER LAW FIRM
                                        One Logan Square, Suite 1200
                                        Philadelphia, PA  19103

(215) 531-8512
mark@cukerlaw.com

*Attorney for Chapman Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on December 20, 2021, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Mark R. Cuker*
MARK R. CUKER