# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Opinion and Order Relates To:
ALL CASES

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES [1458]; DENYING *HALL* OBJECTORS' MOTION TO REVIEW AND RESPOND TO HOURLY BILLING AND COSTS [1586]; AND DENYING THE *CHAPMAN/LOWERY* PLAINTIFFS' MOTION TO REVIEW AND RESPOND TO HOURLY BILLING AND COSTS [1710, 1722]

Before the Court is Plaintiffs' Motion for an Award of Attorney Fees

and Reimbursement of Expenses ("Fee and Expense Motion") made in

connection with the partial settlement in the Flint Water litigation.[1]

---

[1] The signatories to the Fee and Expense Motion are the following law firms and organizations: (1) Levy Konigsberg, LLP, (2) Napoli Shkolnik PLLC, (3) Cohen Milstein Sellers & Toll, PLLC, (4) Pitt McGee Palmer Bonanni & Rivers P.C., (5) Susman Godfrey, L.L.P., (6) Weitz & Luxenberg, P.C., (7) Bronstein, Gerwirtz & Grossman, LLC, (8) NAACP, (9) Motley Rice LLC, (10) The Law Offices of Teresa A. Bingman, PLLC, (11) Goodman & Hurwitz PC, (12) Law Offices of Deborah A. LaBelle, (13) The Dedendum Group, (14) Law Office of Cirilo Martinez, PLLC, (15) Shea Aiello, PLLC, (16) McAlpine PC, (17) Trachelle C. Young & Associates PLLC, (18) McKeen & Associates, PC, (19) Cynthia M. Lindsey & Associates, PLLC, and (20)

(ECF No. 1458.) Movants' request for fees and expenses arises from the fact that Co-Liaison Counsel for Individual Plaintiffs[2] and Co-Lead Class Counsel for the Settlement Class[3] (as well as Settlement Subclass Counsel, the law firms that have worked with and under the supervision of Co-Lead Class Counsel, and the Plaintiffs' Executive Committee (together with Co-Lead Class Counsel referred to as "Class Counsel")) successfully negotiated with Settling Defendants[4] and achieved a

---

Abood Law Firm. (ECF No. 1458, PageID.57145–57147.) The signatories to the Fee and Expense Motion are referred to herein as "Movants." There are additional individually-retained counsel for Plaintiffs who did not join in the motion. Together, Movants and non-movant Plaintiffs' counsel are referred to as "Plaintiffs' Counsel."

[2] Unless otherwise defined herein, capitalized terms in this Opinion and Order, such as "Co-Liaison Counsel," "Co-Lead Class Counsel," and "Settlement Class" have the same meanings as defined in the Amended Settlement Agreement ("ASA"). (*See* ECF No. 1394-2, PageID.54127–54138 (listing the definitions used in the ASA).)

[3] As stated in the ASA, Co-Liaison Counsel for Individual Plaintiffs ("Co-Liaison Counsel") means Corey M. Stern of Levy Konigsberg, LLP and Hunter Shkolnik of Napoli Shkolnik, PLLC. Co-Lead Counsel for the Settlement Class ("Co-Lead Class Counsel") means Theodore J. Leopold of Cohen Milstein Sellers & Toll PLLC and Michael L. Pitt of Pitt McGhee Palmer & Rivers, P.C.

Co-Liaison Counsel and Co-Lead Counsel are together referred to as Plaintiffs' Leadership Group or "PLG."

[4] "Settling Defendants" are: the State of Michigan and certain of its individual officials, which are collectively referred to as "State Defendants"; the City of Flint, certain of its City Emergency Managers and employees, collectively referred to as "City Defendants"; McLaren Health Care Corporation, McLaren Regional Medical Center, and McLaren Flint Hospital, collectively referred to as "McLaren Defendants"; and Rowe Professional Services Company, referred to as "Rowe."

$626.25 million partial settlement in the Flint Water Cases. The Court granted final approval to the partial settlement on November 10, 2021. *See In re Flint Water Cases*, --F. Supp. 3d. --, No. 5:16-cv-10444, 2021 WL 5237198 (E.D. Mich. Nov. 10, 2021) (the "Final Approval Opinion"). (ECF No. 2008.)

Thus far, Plaintiffs' Counsel have not been paid for their work or reimbursed for out-of-pocket expenses in the Flint Water Cases at all. Determining the appropriate fee award is a challenging task. As is common in settlements, Plaintiffs' Counsel's fees and costs will be deducted from the $626.25 million total settlement, and accordingly, every dollar awarded to the attorneys is a dollar less for the Claimants. Because of this, the Court must balance society's strong interest in paying lawyers for their work and encouraging counsel to accept similar engagements in the future with the important interest in maximizing the Claimants' Monetary Awards. These are just some of the many factors the Court must weigh in making this decision.

The structure of the proposal set forth in the Fee and Expense Motion is consistent with the fair and equitable design of the underlying settlement. Movants have proposed an arrangement whereby certain

3

amounts would be deducted from the $626.25 million settlement in a manner that provides for parity in recovery among similarly situated Claimants. Article V of the Amended Settlement Agreement ("ASA") indicates that the funds available for payment to Claimants is determined by deducting attorney fees, attorney expenses, and certain administrative fees from the settlement amount. (ECF No. 1394-2, PageID.54146.) The result is that every Claimant will effectively pay for Plaintiffs' Counsel's work in a manner that provides for parity in recovery among similarly situated Claimants regardless of whether the Claimant is a class member or an individual who is not a member of a class; a Minor or an Adult; an individual person or a business or property owner; and whether the individual is represented by counsel or not. This aspect of the proposal is simple, uniform, and well-designed to compensate Plaintiffs' Counsel for their work while also retaining parity, or equality, among Claimants who qualify for the same settlement Compensation Grid category.[5]

---

[5] Exhibit 8 to the ASA, entitled, "Flint Water Cases (FWC) Qualified Settlement Fund Categories, Monetary Awards, and Required Proofs Grid (11/11/20)" (referred to as the "Compensation Grid" (ECF No. 1319-2, PageID.40789–40831)) provides that "every Claimant in a certain Settlement Category receives an identical

Movants' proposal for compensating Plaintiffs' Counsel who have

worked on the litigation and settlement is intricate and nuanced.

Movants' proposal includes several components. All these components

will be described more thoroughly below. They are:

(1) A common benefit component, which, if awarded, would be
deducted from the $626.25 million settlement amount and then
divided among Co-Liaison Counsel and Co-Lead Class Counsel for
further subdivision and allocation to various firms under Article XI
of the ASA (*see* ECF No. 1394-2, PageID.54159–54160);

(2) A common benefit assessment on (a) the value of claims made
by Claimants who retained counsel soon before the settlement was
announced, and (b) on the value of claims made by unrepresented
minor Claimants, which would be divided between Co-Liaison and
Co-Lead Class Counsel for further subdivision and allocation to
various firms under Article XI of the ASA (*see id.*);

(3) A capped assessment awarded to Class Counsel only on:

(a) the value of certain resolved subclass claims;

(b) the Programmatic Relief Sub-Qualified Settlement Fund;
and

(c) claims involving an individual who was a Minor at the time
they retained Class Counsel;

(4) A proposed capped contingency fee on the value of the claims
awarded to an individual who is represented by an attorney
(referred to as Individually Retained Counsel ("IRC"), which
includes not only Co-Liaison Counsel but also objectors' counsel and
any other non-class counsel representing an individual client). The

---

amount of compensation as all other Claimants in that Category." *Final Approval
Opinion*, 2021 WL 5237198, at *8.

5

fee amount sought varies depending on the date the engagement began; and

(5) Expenses.

(*See* ECF No. 1458, PageID.57165–57166.)

For the reasons set forth below, the Court grants in part and denies in part the Fee and Expense Motion. The objections are granted in part and denied in part; specifically, the Unrepresented Objectors and the *Chapman/Lowery* Objections are granted in part and the *Hall* Objectors' and Plaintiff Brown's objections are denied. The motions for discovery are denied.

## TABLE OF CONTENTS

I.    BACKGROUND ....................................................................8
   A.   Judicial Oversight of Plaintiffs' Counsel's Time and Expenses ....9
   B.   Details of Plaintiffs' Counsel's Fee Proposal...............................15
      1.   The CBA Request ......................................................16
      2.   Class Counsel Fees: Capped Assessment Request ..................17
      3.   IRC: Capped Contingency Fee Request ...................................18
      4.   Other Principles Applicable to the Fee and Expense Motion ..19
   C.   Movants' Cost Reimbursement Request .....................................22
   D.   Filing of (1) Objections to the Fee and Expense Motion; and (2) the Discovery Motions................................................................23
   E.   Hearing on the Fee and Expense Motion....................................25
   F.   The Special Master's Written Report...........................................28
II.   APPLICABLE LAW .............................................................30
   A.   Applicable Law for Common Benefit Award Fee Request...........30

B.      Applicable Law for Class Counsel Fee Request............................33

C.      Applicable Law for IRC's Contingency Fee Adjustment.............34

D.      Applicable Law for Expense Request...........................................36

III.    ANALYSIS .........................................................................................37

A.      Expense Award ............................................................................37

B.      Fee Award Summary ...................................................................42

    1.    *Ramey* Factors .........................................................................48

      a.    Value of the Benefit Rendered ..............................................49

      b.    Society's Stake in Rewarding Attorneys ................................51

      c.    Services Rendered on a Contingency Fee Basis ....................53

      d.    Value of Services On An Hourly Basis..................................61

      e.    Complexity of the Litigation.................................................72

      f.    Counsel's Skill Level.............................................................73

      g.    Conclusion.............................................................................74

C.      Objections....................................................................................75

    1.    Unrepresented Objectors' Objections....................................76

    2.    The *Hall* Objectors' Objection ............................................80

    3.    The *Chapman/Lowery* Objectors' Objection...........................88

    4.    Brown's Objection.................................................................92

D.      The *Hall* and *Chapman/Lowery* Objectors' Discovery Motions..94

IV.     CONCLUSION ..................................................................................97

## I.   BACKGROUND

Plaintiffs' Counsel initiated the Flint Water Cases against Settling Defendants without any guarantee of recovery for their clients or compensation for their work. Many of the lawsuits were filed over five years ago and have been heavily litigated since then at great cost to Plaintiffs' Counsel. In the Fee and Expense Motion, Movants state that Class Counsel and Co-Liaison Counsel performed a total of 182,571 hours of common benefit work (which will be further explained below) through February 15, 2021. (ECF No. 1458, PageID.57172.) And certainly, much more work has been performed between then and now. For example, at the end of the day on March 8, 2021 (the date the Fee and Expense Motion was filed), there were 1458 docket entries in the main consolidated Flint Water Case, No. 5:16-cv-10444. Today, there are 2104 docket entries. This increase in the number of docket entries in a relatively short period of time illustrates the high volume and fast pace of this litigation.

The facts regarding the extensive settlement negotiations are discussed in the Final Approval Opinion. *See Final Approval Opinion*, 2021 WL 5237198, at *2–12. In the Final Approval Opinion, the Court described the many benefits of the settlement, including that it

eliminates the risks, delays, and costs of continuing litigation against the Settling Defendants through trial and provides for a substantial and guaranteed recovery for Claimants. It is, therefore, a positive and successful outcome for the tens of thousands of Claimants.

Additional facts regarding the Fee and Expense Motion are set forth below. These facts include the manner in which the Court and the Special Master have overseen Plaintiffs' Counsel's time and expenses (sometimes referred to as costs) while litigating these cases over many years, Movants' proposal in their Fee and Expense Motion, and the objections to the motion.

## A. Judicial Oversight of Plaintiffs' Counsel's Time and Expenses

As an initial matter, the Fee and Expense Motion involves a common benefit component. The general policy in the United States is to follow what is known as the "American Rule," which provides that litigants pay their own lawyers, regardless of who prevails. Common benefit, or common fund, cases are considered exceptions to the American Rule. A common fund is "[a] monetary amount recovered by a litigant or lawyer for the benefit of a group that includes others, the litigant or lawyer then being entitled to reasonable attorney's fees from the entire

amount." *Common Fund*, Black's Law Dictionary (11th ed. 2019). The Supreme Court has explained that common benefit awards have "deep roots in equity." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013). The Court has "'recognized consistently' that someone 'who recovers a common fund for the benefit of persons other than himself' is due 'a reasonable attorney's fee from the fund as [a] whole.'" *Id.* at 104 (citations omitted). In other words, common benefit awards are designed to "prevent freeloading" of other attorneys who did not perform as significant an amount of the work but still reap the benefits. *Id.* at 96. The Sixth Circuit has long-recognized the common benefit doctrine. *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1195 (6th Cir. 1974), *cert. denied*, 422 U.S. 1048 (1975).

It is a customary practice in complex litigation for the court to make an early determination as to how time and expenses for the common benefit will be accounted for, if in fact a common benefit award is later granted. *See* William B. Rubenstein, Newberg on Class Actions, *Common Benefit Fees— Procedures Governing Assessment and Award*, § 15:115 (5th ed. 2021) ("Newberg") (describing recurring general practices for addressing common benefit fees); *see also* David F. Herr, *Annotated*

*Manual for Complex Litigation* § 14.11 (4th ed. 2020). The Court did exactly this over three years ago.

On July 5, 2018, the Court appointed Deborah E. Greenspan as the Special Master in the Flint Water Litigation.[6] (ECF No. 524, PageID.16173.) The Special Master's responsibilities, among others, include "assist[ing] the Court with administration of time and expense and common benefit submissions [and] management of any census order the Court may enter." (*Id.* at PageID.16176.) In connection with time and expense and common benefit submissions, the Special Master has the authority to "employ such processes, and to request such evidence and information, in whatever form is appropriate, as will contribute to a fair and efficient resolution of such issues." (*Id.* at PageID.16177.)

On August 19, 2018, the Court issued a Case Management Order Regarding Time and Expense Procedures (the "Time and Expense Order"). (ECF No. 507.) The Time and Expense Order "provides standards and procedures for the reporting of time and expenses among

---

[6] The Order appointing Special Master Greenspan was later amended on July 31, 2018, but the amendments did not substantively change her duties. (*See* ECF No. 544.) On January 20, 2022, the Court issued an order regarding the Special Master's additional duties related to the settlement. (ECF No. 2096.)

plaintiffs' counsel." (*Id*. at PageID.15825.) The Time and Expense Order applies to any Participating Counsel[7] who later "seek[] an award of any attorneys' fees or expense reimbursement for work on matters common to and benefitting all plaintiffs in the Flint Water Cases ('common benefit work')." (*Id*. at PageID.15826.)

At a hearing held on July 15, 2021, Special Master Greenspan provided an oral report on her work performed pursuant to the Time and Expense Order. She explained that under the Time and Expense Order, Plaintiffs' Counsel were required to submit documentation of their time and expenses retroactively from the beginning of the litigation through July of 2018. The Special Master started receiving these submissions beginning in August of 2018. (ECF No. 1906, PageID.66886.) All submissions were required to be provided using a template. The template, which was later adjusted in spring of 2019, contained eighteen

---

[7] "Participating Counsel" is defined in the Time and Expense Order as "[a]ll counsel who have signed or are deemed to have signed the Participation Agreement." (ECF No. 507, PageID.15826.) The Participation Agreement governs how PLG will "develop[] discovery and work product that will be valuable in all proceedings and benefit all plaintiffs alleging injury caused by the Flint Water Crisis" (*id*. at PageID.15845), which is then shared with Participating Counsel "for the mutual benefit of their clients." (*Id*. at PageID.15845; *see id*. at PageID.15844–15852 (attaching the Participation Agreement to the Time and Expense Order).)

codes representing various types of legal services performed along with uniform expense codes. (*Id.* at PageID.66967.) Since August of 2018, the Special Master has been conducting a thorough review of all submissions contemporaneously. She requires law firms to address and resolve any questions that arise upon her review.

The Special Master explained at the July 15, 2021 hearing that in anticipation of the hearing, she performed a thorough review of the Fee and Expense Motion, which she compared to the Time and Expense Order submissions. (*Id.* at PageID.66890.) For the most part, she explained, the two were generally consistent. In the instances where they could not be reconciled, the Special Master required that the law firm that tendered the submission clarify it. Most of these discrepancies were, as described by the Special Master, *de minimis*. (*See id.* at PageID.66893.) Some examples of the types of clarifications she sought included: (1) a more detailed description of the legal services performed; (2) more information regarding attorneys' hourly rates; (3) conformity with the uniform template; and (4) corrections to missing dates. (*Id.* at PageID.66891–66892.)

13

In the summer of 2021, the Special Master consolidated all the Time and Expense Order data and provided it to the Court for *in camera* review. (*See* ECF No. 1776 (ordering the Special Master to provide data for *in camera* review); ECF No. 1826 (indicating the Special Master's compliance).) The Court carefully reviewed this material and discussed questions and concerns with the Special Master on several occasions.

Following the hearing on July 15, 2021, the Court asked the Special Master to prepare a written report regarding her work related to the Time and Expense Order and her effort to reconcile that data with the submissions that Movants provided in connection with the Fee and Expense Motion. The Court has conferred with the Special Master regularly throughout the time that the Special Master has conducted her work reconciling the data and preparing her written report. As set forth by the Special Master:

> At the Court's request, the Special Master met with the Court on several occasions to discuss the review process and to address questions regarding compilation of data and regarding individual time entries and expense items. The Special Master provided information in response to the Court's questions and further explained the procedures employed to reconcile the time and expense data and to confirm compliance with the requirements of the Court's order.

14

(ECF No. 2104, PageID.72032–72033)

Accordingly, the Court, with the meticulous assistance of the Special Master, has been collecting and analyzing Plaintiffs' Counsel's common benefit and time and expense submissions for years before the settlement was even a possibility. The Special Master has conducted a "very difficult task, given the large number" of attorneys submitting Time and Expense submissions. *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability*, 268 F. Supp. 2d 907, 928 (N.D. Ohio 2003) ("*In re Sulzer*"). The work performed by the Special Master and the Court has made the process of considering this motion much more efficient.

**B. Details of Plaintiffs' Counsel's Fee Proposal**

Article XI of the ASA provides that Plaintiffs' Counsel may seek reimbursement out of the $626.25 million settlement amount for:

> All expenses and fees, including but not limited to: attorneys' fees; past, current, or future litigation and administration expenses (including, but not limited to, experts, consultants, and guardians ad litem fees and expenses); and the costs of providing the Settlement Class Notice and Individual Notice. If the Federal Court establishes a common benefit fund, nothing in the Settlement Agreement precludes any attorney from applying to that common benefit fund for consideration that their work qualifies for an award of a common benefit fee. . . . The methodology for determining attorneys' fees and expenses for all aspects of the litigation, settlement and

15

implementation of the settlement shall be determined in accordance with a separately negotiated agreement, negotiated among Plaintiffs' Counsel, which shall be subject to the approval of the Federal Court.

(ECF No. 1394-2, PageID.54159–54160 (MSA ¶ 11.1).)

Movants' Fee and Expense Motion contains the following four components, which will be further detailed below:

(1) A Common Benefit Award ("CBA") request;

(2) A request for a capped assessment and percentage of the fund awarded to Class Counsel;

(3) A request for a capped contingency fee component awarded to IRC; and

(4) An expense reimbursement request.

## 1. The CBA Request

First, Movants ask that the Court award Plaintiffs' Leadership Group ("PLG") a CBA of 6.33% from the $626.25 million settlement amount. (ECF No. 1458, PageID.57159.) Second, Movants request that the Court award PLG a 17% CBA, which would be computed based on 17% of the aggregate value of the Monetary Awards for Claimants who retained counsel on or after July 16, 2020. (*Id.*) Third, Movants request that the Court award PLG a 17% CBA, which would be computed based

16

on 17% of the aggregate value of the Monetary Awards for Minor Claimants who were assisted by counsel on or after July 16, 2020. (*Id*. at PageID.57165.) And fourth, for any unrepresented Minor Claimant who does not retain their own counsel, Movants request a 27% CBA consisting of 27% of the aggregate value of those Minors' Monetary Awards.

Movants explain that all CBA sums would be divided between Co-Liaison Counsel and Co-Lead Class Counsel,[8] with Co-Lead Class Counsel further distributing among other Class Counsel and any other firms who submit a request that documents eligible common benefit work. (*See id*. at PageID.57166.)

### 2. Class Counsel Fees: Capped Assessment Request

The Fee and Expense Motion contemplates that Class Counsel's fees would be paid from a capped assessment of the gross value of certain types of claims. Specifically, Class Counsel seek 27% of the gross value of the following:

---

[8] The Fee and Expense Motion states that all CBA sums will be divided equally between Co-Lead Class Counsel and Co-Liaison Counsel (50/50), except for one category, which is split 75/25: "75% to Co-Lead Class counsel and 25% to Co-Liaison Counsel for the 17% of the gross award for any Adult, Property Damage, Business Economic or Programmatic Relief awards to claimants retained by counsel on or after July 16, 2020." (ECF No. 1458, PageID.57166.)

       a. All claims resolved through the Adult Exposure, Property Damage, and Business Economic Loss Subclasses; and

       b. The Programmatic Relief Fund.

(*See id.* at PageID.57165–57166.)

Additionally, Class Counsel seek 27% of the gross value of all claims involving a Minor who entered into a retainer with Class Counsel before July 16, 2020. Class Counsel further seek a fee of 10% of the gross value of awards to any Minor they assist or advocate for, whether retained or unretained, after July 16, 2020.[9] (*Id.* at PageID.57165.)

### 3. IRC: Capped Contingency Fee Request

Movants propose that the Court impose a capped contingency fee for all IRC. Specifically, Movants seek the following:

       a. 27% of the gross value— regardless of the amount set forth in the retainer agreement— of the Monetary Awards received by individuals who entered into retainer agreements with IRC before July 16, 2020;

       b. 10% of the gross value— regardless of the amount set forth in the retainer agreement— of the Monetary Awards received by

---

[9] Although there are other provisions in the Movants' proposal where the language "on or after July 16, 2020" appears, this provision states "after," not "on or after." (*See* ECF No. 1458, PageID.57165.)

individuals who entered into retainer agreements with counsel on or after July 16, 2020; and

c.  10% of the gross value of claims where counsel "assist[ed] and advocat[ed] for a Minor in submitting a claim, whether retained or unretained," if the assistance took place after July 16, 2020.[10]

(*Id.*)

## 4. Other Principles Applicable to the Fee and Expense Motion

As discussed above, under the ASA, the "net funds . . . available from the [$626.25 million settlement amount] for payment to Claimants" is "the [total settlement] amount . . . less expenses, costs, and attorney fees." (ECF No. 1394-2, PageID.54146.) Under Movants' proposal, the 27% portion of the fee award would be deducted from the $626.25 million settlement amount before Claimants receive their Monetary Awards; however, attorneys are not compensated before Claimants receive their awards. The Claims Administrator would then distribute the award among firms in the manner set forth in Article XI of the ASA as claims are paid out. Additionally, counsel request 27% of the value of the

---

[10] As with the similar provision in the Class Counsel portion of the proposal, the terminology in Movants' proposal is "after July 16, 2020," not "on or after." (*See* ECF No. 1458, PageID.57165.)

Programmatic Relief Fund for the benefit of Class Counsel only (again, further divided under Article XI of the ASA).

Movants explain that their proposal would ensure that there is parity between all Claimants. In other words, every Claimant pays the same effective fee, regardless of how the money is distributed among the lawyers. In this way, everyone in each of the ASA's Compensation Grid categories[11] will receive the same financial award— a feature of the proposal that is especially helpful where family members across town, neighbors, classmates, and co-workers may have similar claims and expect to have a similar outcome.[12]

Before the funds available to pay Claimants' Monetary Awards can be known, all relevant fees and costs, including Administrative Fees and

---

[11] *See Final Approval Opinion*, 2021 WL 5237198, at *5 (discussing and explaining the settlement categories and Compensation Grid in the ASA).

[12] Monetary Awards for Claimants within the same settlement Compensation Grid category would be identical under the structure Movants propose. However, in some cases, there may be a difference between Claimants in the same Compensation Grid category, for example, if a Claimant has any outstanding lien obligations that would be addressed by the lien administrator.

Costs,[13] would be deducted from the total settlement amount.[14] Then, the remaining total is allocated pursuant to section 5.3 of the ASA into the following sub-funds:

- Minor children age six or younger (the "Minor Child Sub-Qualified Settlement Fund") receive 64.5%;
- Minor children age seven to eleven (the "Minor Adolescent Sub-Qualified Settlement Fund") receive 10%;
- Minor children age twelve to seventeen (the "Minor Teen Sub-Qualified Settlement Fund") receive 5%;[15]
- Adults receive 15%;
- Property owners and renters receive 3%;
- Business owners and operators receive 0.5%; and

---

[13] "Administrative Fees and Costs," as the Court characterizes them, include the fees and costs of the Claims Administrator Archer Systems, LLC, the Lien Resolution Administrator, the Master Guardian Ad Litem, the two Panel Guardians Ad Litem, the QSF Administrator, Trust Counsel, and the Special Master.

[14] There is an exception to the facts stated here, which is for claims falling under Category 27B of the Compensation Grid. This category applies claims of Legionnaires' Death. (*See* ECF No. 1319-2, PageID.40825–40826.) Claimants who qualify for Category 27B Monetary Awards will receive a flat amount, which varies depending on the Claimants' age. (*Id.*) As set forth in footnote 5 of the Compensation Grid, these Monetary Awards are "gross dollar awards from which attorneys' fees and expenses owed by those Claimants will be deducted in an amount reviewed and approved by the Federal Court." (*Id.* at n.4.) The same principles as to the attorney fee percentages overall apply to Category 27B, but the process for Category 27B Claimants' awards differs from the process of awards to other Claimants.

[15] The category that is not included in this list is the Future Minor Claimants' Sub-Qualified Settlement Fund ("Future Minor Fund"), which receives a flat $35,000,000. (ECF No. 1394-2, PageID.54146.) The ASA explains that the $35,000,000 amount is proportionally deducted pro rata from the three Minor children categories (which are categorized by age: six and younger, seven to eleven, and twelve to seventeen).

- 2% is set aside for the Programmatic Relief portion of the settlement.

(*See* ECF No. 1394-2, PageID.54146–54147); *see Final Approval Opinion*, 2021 WL 5237198, at *7–8. As stated in the Final Approval Opinion, the actual amount of Monetary Awards in each category is not yet known:

> It is often the case in capped-fund settlements such as this one that the total amount of recovery will vary depending on how many people participate. There is simply no way to know the amount of any one individual's recovery in the Compensation Grid categories (except for Settlement Category 27B, which sets forth an exact amount of recovery for Legionnaires' death claims) until the total number of participants is known, the expenses have been paid for the administration of the settlement, and claims have been submitted and processed.

*Id.* at * 57. Claimants' Monetary Awards cannot be determined until after the claims process has been completed. The Claims Period began on January 12, 2022 (ECF No. 2078, PageID.71920 (indicating that the Claims Period would begin on January 12, 2022), and the deadline for submitting claims is May 12, 2022. (*Id.* at PageID.71921.)

## C.   Movants' Cost Reimbursement Request

The Fee and Expense Motion requests reimbursement for costs and expenses expended in connection with the litigation. (ECF No. 1458, PageID.57194.) Movants indicate that they seek $7,158,987.33. (*See id.*)

22

They explain that a significant amount of these expenses are due to the cost of retaining qualified experts in a variety of fields, including "civil and environmental engineering, chemical engineering, urban planning, human health, economics, and ethics." (*Id*. at PageID.57196.) The declarations of Co-Lead Class Counsel and Co-Liaison Counsel provide more detail regarding the components of this request. (*See* ECF Nos. 1458-2, 1458-3, 1458-4, 1458-5.)

### D. Filing of (1) Objections to the Fee and Expense Motion; and (2) the Discovery Motions

The deadline for filing objections to the ASA, including the request for attorney fees, was March 29, 2021. (ECF No. 1399, PageID.54467.) On that date, the *Hall* Objectors[16] filed objections to the Fee and Expense Motion. (ECF No. 1548.) Additionally, approximately 81 Unrepresented Objectors[17] timely filed objections. (ECF Nos. 1563–1565, 1568, 1570–1571, 1573–1574, 1603–1604, 1606–1607, 1609, 1611–1612, 1614, 1618–

---

[16] The "*Hall* Objectors" are Claimants Raymond Hall and his two minor children (ECF No. 1548-3), Robert Hempel and his one minor child (ECF No. 1548-4), and Ashley Jankowiak and her three minor children. (ECF No. 1548-5.)

[17] "Unrepresented Objectors" are individuals who are unrepresented by counsel and registered to participate in the settlement. *See Final Approval Opinion*, 2021 WL 5237198, at *10.

1619, 1621–1622, 1625, 1628, 1631–1633, 1636, 1638, 1641–1642, 1644–1647, 1649–1653, 1655–1657, 1660, 1662, 1665–1666, 1668, 1671, 1674–1675, 1678–1679, 1681–1682, 1686–1687, 1689–1690, 1692–1694, 1696–1698, 1701–1705, 1741–1743, 1746–1747, 1749, 1755, 1761, 1765, 1812–1813.)

On April 5, 2021, Plaintiff Brown[18] filed a response to the Fee and Expense Motion. (ECF No. 1556.) On April 6, 2021, the *Chapman/Lowery* Objectors[19] filed objections to the ASA, which included objections to the Fee and Expense Motion. (ECF No. 1562.) Although these two filings were docketed after the deadline for filing objections,

---

[18] Plaintiff Brown is the Estate of Odie Brown, whose case was brought by Cholyondya Brown as the daughter and personal representative of Odie Brown ("Brown").

[19] Attorney Mark Cuker, who represents just under 1,000 participants in the settlement, filed objections on behalf of eighteen of his clients. (*See* ECF No. 1904, PageID.66627 (setting forth that Mr. Cuker has approximately 980 clients registered in the settlement).) These objectors are referred to as the "*Chapman/Lowery* Objectors." (*See* ECF Nos. 1463, 1471 (correcting ECF No. 1469), 1484, 1485, 1488, 1489, 1492, 1493, 1534, 1436, 1537, 1538.)

On December 6, 2021, Co-Liaison Counsel Hunter Shkolnik filed a motion to disqualify Mr. Cuker based on this conflict of interest. (ECF No. 2045.) The Court will address that motion at a later date, and in the meantime, Mr. Cuker will continue to represent his clients and assist in filing their claims as appropriate.

the Court indicated at the July 15, 2021 hearing that it would address these objectors' arguments. (ECF No. 1906, PageID.66882.)

In addition, on April 9, 2021, the *Hall* Objectors filed a Motion to Review and Respond to Hourly Billing and Costs. (ECF No. 1586.) Then, on April 24, 2021, the *Chapman/Lowery* Objectors filed a Motion to Review and Respond to Hourly Billing and Costs. (ECF No. 1710 (rejected as non-conforming and re-filed as a motion to seal and sealed motion, ECF Nos. 1719, 1722).) (The *Hall* Objectors' and *Chapman/Lowery* Objectors' Motions are together referred to as the "Discovery Motions.")

Plaintiffs responded to all objections and to the Discovery Motions through their motion for final approval and memorandum in support (ECF Nos. 1794, 1795) and through their supplement to their motion for attorney fees and costs (ECF No. 1796).

### E. Hearing on the Fee and Expense Motion

The Court held a three-day fairness hearing on the motion for final approval, which included a full day on July 15, 2021 devoted to the Fee and Expense Motion. (*See* ECF Nos. 1904, 1905, 1906.) At the beginning of the hearing on July 15, 2021, Special Master Greenspan presented the Court with an oral report regarding her work conducted pursuant to the

25

Time and Expense Order, and on the Fee and Expense Motion, which is described in the above sections of this Opinion and Order. (*See* ECF No. 1906, PageID.66855.)

Next, Co-Liaison Counsel Corey Stern addressed the Court. (*Id*. at PageID.66900.) He emphasized that the settlement and ongoing litigation are not purely class action-based. Rather, a significant part of the Flint Water Cases involves non-class members who have retained IRC. Stern explained that in non-class action cases, an individual attorney typically enters into a retainer agreement with their client for a certain percentage of the judgment or settlement proceeds. In the majority of these cases, the Court would not review these fee arrangements or alter them.

Stern reported that during the settlement negotiations, the State Defendants demanded that parity exist among all Claimants, whether they be class or non-class. (*Id*. at PageID.66904.) As explained by Stern, "the State of Michigan, which put $600 million into the settlement, not only requested parity exist[] amongst individual claimants but demanded it and refused to settle the case unless we could guarantee them parity." (*Id*. at PageID.66903.) Therefore, Stern stated, PLG agreed that IRC

would seek an order adjusting their retainer agreements to create parity among all Claimants.

Co-Lead Class Counsel, Theodore Leopold and Michael Pitt, also addressed the Court on July 15, 2021. (*Id.* at PageID.66917, 66922.) Both attorneys reiterated the issue of parity in the settlement negotiations. Both discussed the amount of work undertaken by Plaintiffs' Counsel, particularly by PLG, in the litigation and in the settlement negotiations.

Next at the July 15, 2021 hearing, the Court heard from objectors' counsel. Attorney M. Frank Bednarz spoke on behalf of the *Hall* Objectors. Attorney Mark Cuker addressed the Court on behalf of the *Chapman/Lowery* Objectors. Attorney Todd Weglarz presented on behalf of Brown. The substance of these objections will be addressed in the Analysis section, below.[20]

After the objectors presented their positions and Movants responded, the Court heard argument on the Discovery Motions. Finally, attorney William Kim for the City of Flint Defendants addressed the Court regarding the Flint City Council's March 22, 2021 *Resolution*

---

[20] Additionally, attorney Valdemar Washington addressed the Court on July 15, 2021. However, his clients (the *Anderson* Plaintiffs) did not file an objection to the Fee and Expense Motion.

*Calling for Transparency in the Review of Attorney Fees and Reimbursement of Expenses for the Flint Water Litigation Settlement.* (*See* ECF No. 1555-1, PageID.60401.) In the resolution, the Flint City Council requested that this Court "retain a court-appointed expert or appoint a special master to assist in reviewing the motion." (*Id.*) Kim acknowledged that Special Master Greenspan has assisted the Court in reviewing the Fee and Expense Motion and stated that "we would like to thank the Court for having the special master assist the Court in resolving these issues." (ECF No. 1906, PageID.67101.)

### F. The Special Master's Written Report

The Special Master issued a written Report on Time and Expense Submissions of Plaintiffs' Firms Pursuant to the Order on Data Collection (the "Report"), which is attached hereto and incorporated into this Opinion and Order. (ECF No. 2104.) In the Report, the Special Master details the "procedures employed in establishing, tracking, maintain[ing], and verifying time and expense data submitted to [the Special Master] pursuant to the Time and Expense Order." (*Id.* at PageID.72012.) The Special Master also details the "additional analysis undertaken to reconcile these submissions with the petition for fees filed

28

by plaintiffs' counsel in connection with the partial settlement in these cases." (*Id.* at PageID.72013.)

In the first part of the Report, the Special Master discusses the requirements of the Time and Expense Order and her role in carrying out the duties listed in that Order. (*Id.* at PageID.72012–72018.) She discusses her initial review of the data submitted by Plaintiffs' Counsel of their time and expenses (*id.* at PageID.72018–72022), her review and compilation of that data (*id.* at PageID.72023–72027), the process of reconciling data submitted by Plaintiffs' Counsel pursuant to the Time and Expense Order submissions compared with the Fee and Expense Motion (*id.*), as well as her substantive review and findings after reviewing each and every time entry and expense submission from all Plaintiffs' Counsel's firms (*id.* at PageID.72028–72032). She also addresses computations of time and expenses after reconciliation and adjustments based on her review. (*Id.* at PageID.72032–72036.) The Special Master's Report and the findings contained in it are essential to the Court's analysis and conclusions in this Opinion and Order.

## II.   APPLICABLE LAW

Movants filed their motion under Federal Rule of Civil Procedure 54(d), which states in relevant part: "A claim for attorney's fees and related nontaxable expenses must be made by motion." Fed. R. Civ. P. 54(d)(2)(A).

As set forth above, there are four components to the Fee and Expense Motion. One part, the CBA request, is applicable to both class and non-class lawyers. The second and third parts are separately applicable to class or non-class lawyers, respectively. The fourth part is a request for expenses, which is applicable to both class and non-class lawyers. (*See* ECF Nos. 1458, 1796.) The applicable law for each component is set forth below.

### A. Applicable Law for Common Benefit Award Fee Request

The Fee and Expense Motion involves a CBA request. In Sixth Circuit common benefit cases, the standard for such an award is that it be "reasonable under the circumstances." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *see also In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 502 (E.D. Mich. 2008) ("*In re Delphi*").

30

There are two methods that district courts may apply in assessing the reasonableness under the circumstances: either the "lodestar or percentage of the fund" method. *Rawlings*, 9 F.3d at 517. Evaluation of the six "*Ramey* factors" assist the Court in choosing a method and in determining the overall reasonableness of the fee. *Ramey*, 508 F.2d at 1196. The *Ramey* factors are:

> 1) the value of the benefit rendered to the [settling class], 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.

*Id.*

When choosing the percentage of the fund method or lodestar method, each "has its respective advantages and drawbacks." *Rawlings*, 9 F.3d at 516. For example, advantages to the percentage of the fund method are that it is "easy to calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation." *Id.* Drawbacks, however, include that a percentage award "may also provide incentives to attorneys to settle for too low a recovery

31

because an early settlement provides them with a larger fee in terms of the time invested." *Id*.

On the other hand, the advantages to the lodestar method, which requires counsel to list the hours spent and rates charged, "provides greater accountability." *Id*. On the downside, use of the lodestar method is often "criticized for being too time-consuming of scarce judicial resources." *Id*. Another downside of the lodestar method is that it requires courts to "pore over time sheets, arrive at a reasonable hourly rate, and consider numerous factors in deciding whether to award a multiplier." *Id*. at 517–18.

Because of the benefits and drawbacks to both methods, district courts are permitted to select one method (*i.e.*, percentage of the fund) and use the other (*i.e.*, lodestar) as a cross-check. *See Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 500–01 (6th Cir. 2011). The percentage of the fund and lodestar cross-check combination can "ensure that each attorney who is awarded a common benefit fee receives a reasonable one— neither too large nor too small— in light of all the relevant circumstances." *In re Sulzer*, 268 F. Supp. 2d at 923. In determining which method to use— whether percentage of the fund,

lodestar, or the cross-check— the Court must include in its opinion "a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at the fee." *Gascho v. Global Fitness Holdings*, 822 F.3d 269, 279 (6th Cir. 2016) (citing *Rawlings*, 9 F.3d at 516).

### B. Applicable Law for Class Counsel Fee Request

An attorney fee award for achieving a settlement in a class action lawsuit requires Court approval under Federal Rule of Civil Procedure 23(h), which states:

> In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

> > (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

> > (2) A class member, or a party from whom payment is sought, may object to the motion.

> > (3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

Fed. R. Civ. P. 23(h).

To determine what is "reasonable" under Rule 23, courts in the Sixth Circuit apply the same analysis described in the above section. In other words, the district court must choose the percentage of the fund, lodestar, or cross-check method, and evaluate the *Ramey* factors. *See Van Horn*, 436 F. App'x at 497. District courts have "considerable latitude and discretion" in evaluating the reasonableness of a class fee request. *Ramey*, 508 F.2d at 1196.

### C. Applicable Law for IRC's Contingency Fee Adjustment

In most civil litigation, the plaintiffs and their attorneys enter into a contingency fee agreement at the time of the engagement. A contingency fee (or contingent fee) agreement is defined in Black's Law Dictionary as: "A fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court[;] Contingent fees are usu[ally] calculated as a percentage of the client's net recovery[.]" *Contingent Fee*, Black's Law Dictionary (11th ed. 2019). Contingency fee

34

agreements between an attorney and their client are matters of contract, which are governed by state law.

Michigan Court Rule 8.121 governs permissible contingency fees in personal injury and wrongful death cases in Michigan. Rule 8.121(A) states:

> In any claim or action for personal injury or wrongful death based upon the alleged conduct of another [. . .], in which an attorney enters into an agreement, expressed or implied, whereby the attorney's compensation is dependent or contingent in whole or in part upon successful prosecution or settlement or upon the amount of recovery, the receipt, retention, or sharing by such attorney, pursuant to agreement or otherwise, of compensation which is equal to or less than the fee stated in subrule (B) is deemed to be fair and reasonable.

Mich. Ct. R. 8.121(A). The referenced "subrule (B)" states: "The maximum allowable fee for the claims and actions referred to in subrule (A) *is one-third of the amount recovered*." Mich. Ct. R. 8.121(B) (emphasis added).

The Court is authorized to oversee contingency fee arrangements and make appropriate adjustments to them, particularly in complex litigation such as this. *See* 5 Newberg, *Common Benefit Fees— Procedures Governing Assessment and Award*, § 15.115 ("In some cases,

35

as part of the court's management of this fee issue, the court may . . . set a cap on the local lawyer's contingent fees.").

Particularly in cases involving a class action or mass tort settlement, the Court must give contingency fee agreements "special concern" and must "carefully consider[] the factors relevant to fair compensation." *In re Sulzer*, 290 F. Supp. 2d at 850. This is particularly true where the total fee amount "directly affect[s] the total amounts disbursed" to claimants of a settlement, which is the case here. *Id*. at 849.

### D. Applicable Law for Expense Request

Rule 23(h) permits a party in a class action to seek "reasonable attorney's fees and nontaxable costs" that are authorized "by the parties' agreement." Fed. R. Civ. P. 23(h). The Time and Expense Order sets forth the types of common benefit expenses that are generally considered reasonable, subject to review and approval of the Court. (*See* ECF No. 507 (defining held costs, shared costs, and other cost parameters).) The Fifth Amended Case Management Order also sets forth specific parameters for reasonable expenses, again subject to Court review and approval. (*See* ECF No. 1255.)

Additionally, "[u]nder the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003) ("*In re Cardizem*").

## III.      ANALYSIS

### A.  Expense Award

The Court will address the expense award first. At the time of filing the Fee and Expense Motion, Movants requested reimbursement of $7,158,758.23 in expenses. (ECF No. 1458, PageID.57194.) As set forth in the Report, some of the expense amounts that Movants submitted with the Fee and Expense Motion differed from what Plaintiffs' Counsel submitted to the Special Master pursuant to the Time and Expense Report, and these discrepancies have been reconciled by the Special Master as set forth in the Report. (*See* ECF Nos. 2104; 2104-1; 2104-2.) The total expenses after the Special Master's reconciliation process is $7,147,802.36. (ECF No. 2104-2, PageID.72043.)

"Expense awards are customary when litigants have created a common settlement fund for the benefit of a class." *In re Delphi*, 248 F.R.D. at 504. Here, the Time and Expense Order contemplated and set forth the parameters of costs for litigating these cases. Federal Rules of Civil Procedure 54(d)(1), 54(d)(2), and 23(h) contemplate recovery of costs at the conclusion of the lawsuit, or, in this case, at the conclusion of the claims period.

In the Time and Expense Order, the Court set forth specific parameters for expense reporting and documentation. (*See* ECF No. 507, PageID.15834.) The Court described characterization of costs as "held" or "shared."[21] *Id.* It restricted travel expenses, such as stating that for airfare, "[o]nly the price of a full coach fare seat will be reimbursed," and

---

[21] The Special Master's Report explains held and shared costs as follows:

Shared Costs are costs incurred for the common benefit of the Flint Water Cases as a whole. Costs related solely to an individual client are not "Shared Costs." *Id.* at ¶19, PageID.15834. Expenditures must be approved by Plaintiffs' Interim Co-Lead Class Counsel and/or Co-Liaison Counsel prior to being incurred and prior to payment. *Id.* at ¶28. Held Costs are costs "incurred by Participating Counsel that do not fall into the above Shared Costs categories but are incurred for the common benefit of all plaintiffs in this litigation. No specific client-related costs can be considered as Held Costs." *Id.* at ¶30, PageID.15837.

(ECF No. 2104, PageID.72015–72016.)

for hotels, "[l]uxury hotels will not be fully reimbursed, but will be reimbursed at the average available rate of a business hotel." (*Id.* at PageID.15839; *see also* ECF No. 2104, PageID.72017 (fn.2) (detailing the requirements for expense reporting).)

As set forth in the Report, "Interim Co-Lead Class Counsel along with certain of the firms comprising the Court appointed executive committee established a litigation fund." (ECF No. 2104, PageID.72018.) The fund has been used to pay for certain of the "Shared Costs" and each firm has tracked contributions to the fund, as detailed by the Declaration of Theodore J. Leopold, which is attached as an exhibit to the Fee and Expense Motion. (*Id.* (citing ECF No. 1458-2, PageID.57206–57213).)

With respect to the Special Master's review of expense submissions, the Report details the Special Master's initial review, the development of a set of "Reminders and Guidelines for Proper Time and Expense Submissions," the types of corrections and clarifications that the Special Master sought during the process, and the reconciliation process. (ECF No. 2104, PageID.72021–72022.) In conclusion, the Special Master's findings related to expenses are the following:

1. The submissions included detailed and appropriate descriptions of [. . .] the purpose of the expenses. The vast

39

majority of [. . .] expense charges contained sufficient explanation to understand the [. . .] expense being charged. As noted below, where such entries were not sufficient to evaluate the purpose of the [. . .] expense, the firms were notified and asked to provide clarification.

2.  [. . .]

3.  The Special Master identified a small number of [. . .] expense amounts that involved work performed for various of the cases filed against the EPA that are pending in a different court. All of those [. . .] expense entries have been removed from the compilation prepared by the Special Master. The firms affected have been notified that such time/expense entries have been removed from the Special Master's compilation.

4.  The Special Master reviewed all amounts charged for hotel, flights, and ground transportation. Consistent with the Time and Expense Order, travel expenses were incurred in connection with Court hearings, depositions, or meetings (including mediation sessions). All such expenses were charged at the appropriate rates and the hotels utilized comply with the terms of the Court's Time and Expense Order. The Special Master examined hotel and transportation expenses that appeared potentially excessive and determined— without exception— that the amounts at issue involved multiple day hotel stays (*i.e.* not a single night), hotel charge for multiple people, or rental of a conference room for meetings.

5.  The highest individual expense amounts are for fees paid to experts and consultants engaged by firms to assist both in developing the litigation (including assessment of

damages) and to assist in evaluating or providing advice about settlement options and approaches. The review did not reveal any excessive or inappropriate charges for such services. The expense entries were consistent with the progress and timing of the litigation and the settlement negotiation process.

6. [. . .]

7. [. . .]

8. The Special Master reviewed the [. . .] expense entries to assure that they were appropriately related to the overall litigation or settlement activities. Given the disagreements and objections related to the issue of the bone scan facility established in Flint, I reviewed the time and expense documentation to identify any entries related to this matter. [. . .] I did identify a single expense entry for a portion of the cost for the procurement of an XRF device. At the request of the plaintiff firm, that expense item has been removed from the expense compilation prepared by the Special Master. [. . .]

9. The Special Master reviewed the [. . .] expenses with particular attention to whether they related to the litigation of the four bellwether cases set to go to trial in February 2022. [. . .] With respect to expenses— the expense submissions do include costs for experts— but there were multiple expert submissions in connection with the settlement. I have not identified any of the expert fees included in the submissions as fees solely for the purposes of the bellwether trial.

(*Id.* at PageID.72028–72032.)

41

The Court has conducted its own review of the underlying data provided by the Special Master. It concludes that the expenses, as reconciled by the Special Master, are reasonable and well-documented. There are no objections to the expense request. Accordingly, the Court awards Movants reimbursement for the expenses, in the amount of $7,147,802.36. (*See* ECF No. 2104-2, PageID.72043–72045.)

As noted in the Report, consistent with the Time and Expense Order, firms have continued to submit time and expenses to the Special Master. The expense award set forth here does not preclude counsel from filing an additional motion regarding any reimbursement for additional reasonable costs expended between the time of the filing of the Fee and Expense Motion and the end of the Claims Period.

### B. Fee Award Summary

Based on a review of all the factors that are discussed in detail below, the Court grants in part and denies in part the attorney fee request. The Court grants a CBA award of 6.33% of the $626.25 million settlement amount. The Court adopts the basic structure of the fee proposal with the following changes: The aggregate amount that may be paid for fees and CBA (after the 6.33% CBA) shall be 25% (reduced from

27%). This percentage will be paid either in the form of fees or fees plus

CBA, further described below. As to fees:

- Fees will be capped at 25% for represented Plaintiffs who retained counsel before August 20, 2020,[22] and capped at 8% for counsel retained after that date.

- Counsel who assist Minors with claims after August 20, 2020 are entitled to a fee of 8%.

- Class fees will be set at 25% for the class portion of the settlement and at 10% for the Programmatic Relief component of the settlement.

    Each component of the award is described in more detail below.

### *The CBA*

    As to the CBA, the Court awards:

- A CBA of 6.33% of the $626.25 million settlement fund;

- A CBA of 17% of the value[23] of the amount awarded to Claimants who retained counsel after August 20, 2020;

---

[22] The reasons for the Court's decision to set the date of August 20, 2020 (rather than July 16, 2020 as Movants proposed) is explained in the portion of this Opinion and Order addressing objections.

[23] For clarity, the phrase "of the value" means that Plaintiffs' Counsel will be entitled to a CBA award that will be computed based on the value of the claims in each category, accounting for those with individual retainer agreements and further based on the date of those retainer agreements. This computation cannot occur until the eligible claimants are identified and categorized.

- A CBA of 17% of the value of the amount awarded to any Minor Claimant who was assisted by counsel after August 20, 2020; and

- A CBA of 25% of the value of the amount awarded to any unrepresented Minor Claimant who does not retain their own counsel.

The CBA awards are to be divided between Co-Liaison Counsel and Co-Lead Class Counsel, after which further disbursements and divisions would occur among the lawyers as set forth in the Fee and Expense Motion.

### *Class Counsel Fee Award*

Class Counsel's fee request is granted in part and denied in part. Co-Lead Class Counsel is awarded 25% of the value of the claims in the following two categories:

- The claims resolved through the Adult Exposure, Property Damage, and Business Economic Loss Subclasses; and

- The aggregate claims involving a Minor who retained Class Counsel (or an Executive Committee firm) before August 20, 2020.

Additionally, Class Counsel is awarded:

- 10% of the value of the Programmatic Relief Fund; and

- 8% of the aggregate value of the claims involving a Minor where Class Counsel assisted or was retained by the Minor after August 20, 2020.

44

## *IRC Fee Award*

IRC's fee request is granted in part and denied in part. IRC are awarded, regardless of any amount set forth in their retainer agreements:

- 25% of the value of the claims for Claimants that entered into retainer agreements with IRC before August 20, 2020;

- 8%[24] of the value of the claims for Claimants that entered into retainer agreements with IRC after August 20, 2020; and

- 8% of the value of the claims where IRC "assist[ed] and advocat[ed] for a Minor in submitting a claim, whether retained or unretained," if the assistance took place after August 20, 2020.

* * *

This portion of the Opinion and Order further explains and clarifies the method by which the total amount of attorney fees and costs awarded are calculated.

The total settlement amount is $626.25 million. *See Final Approval Opinion,* 2021 WL 5237198, at *1. The global 6.33% CBA award is therefore **$39,641,625**. Co-Lead Class Counsel and Co-Liaison Counsel

---

[24] Because the Court grants the 17% CBA request described above and desires to maintain equity among Claimants, the contingency fee award for counsel in this category is 8% of the value of those claims. This, when added together with the 17% CBA value set forth above, reaches the 25% maximum value stated above.

shall divide the $39,641,625 between them, after which further disbursements and divisions would occur among the lawyers. (ECF No. 1458, PageID.57165.) Deducting $39,641,625 from the $626,250,000 total settlement amount leaves **$586,608,375** remaining.

Next, expenses as well as Administrative Fees and Costs will be deducted from the $586,608,375. After this, the remaining amount shall be allocated into the percentage amounts set forth in Section 5.2 of the ASA for the purpose of computing and setting aside the $35 million Future Minor Fund[25] and the legionella death claims (as set forth in Category 27B of the Compensation Grid). Ten percent of the Programmatic Relief Fund shall be set aside as fees.

Then, the aggregate attorney fee/ CBA in the amount of 25% shall be calculated set aside as the attorney fee reserve for all components except for the Programmatic Relief Fund. The remaining amount shall be the net funds available to pay Claimants and shall be allocated as provided in Section 5.2 of the ASA.

---

[25] The Future Minor Fund shall be deducted from the gross allocation to the children's funds and set aside as a reserve.

The Court may issue an Order seeking an update from Movants and/or the Special Master after the Claims Period has ended and more is known about the number of eligible Claimants.

As discussed above, every Claimant in a particular Compensation Grid category will receive the same amount as all others in that category with the exception of Category 27B, which sets forth varying award amounts based on the Claimant's age. And, as stated in the Compensation Grid, the Monetary Awards for Claimants in Category 27B are "gross dollar awards from which attorneys' fees and expenses owed by those Claimants will be deducted." (ECF No. 1319-2, PageID.40825.)

* * *

Plaintiffs' Counsel achieved an extraordinary settlement in a case that has been intensely litigated for nearly six years. The fees awarded reflect their hard and persistent work. These fees are well-earned. Through this fee award, the Court has maintained the equitable structure of the settlement proposal itself and carried that equity over to the fee and cost award, such that there remains parity among Claimants in each Compensation Grid category.

47

The Court has reduced the total percentage that will be paid to attorneys from what was originally requested in the Fee and Expense Motion. It also changed the "order of operations" from what was sought to achieve a reasonable and fair result.

The Court has undertaken additional modifications to Movants' proposed allocation among attorneys in a manner it believes is fair, specifically, ordering that the greatest percentage award be for common benefit work, while adjusting the remainder accordingly so that the value of fees never exceeds 25% of that amount. This structure protects Claimants' compelling interest in receiving the highest Monetary Awards possible.

The Court's reasons for not granting Movants' request in full and its reasons for granting the request in part are explained in detail below.

### 1. *Ramey* Factors

As set forth above, the Court must undertake an independent analysis to determine the reasonableness of the fees for the CBA and Class Counsel award. The Court must choose the percentage of the fund, lodestar, or cross-check method to determine reasonableness. The Court examines the six *Ramey* factors in making its decision.

48

### a. Value of the Benefit Rendered

The first *Ramey* factor— the value of the benefit rendered to the settlement class— is "widely regard[ed]" as the "most important" factor. *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 764 (2007) ("*In re Cardinal Health*"). The *Ramey* court evaluated this factor in terms of the number of individuals affected by the underlying allegations and the total settlement reached. *See Ramey*, 508 F.2d at 1196–98; *see In re Cardinal Health*, 528 F. Supp. at 765 (evaluating, in its analysis of the first *Ramey* factor, the total settlement amount and noting its accomplishment due to being one of the largest settlements of its type ever reached in the Sixth Circuit).

Here, the $626.25 million settlement is record-breaking. The portion of the settlement paid by the State Defendants represents "one of the largest settlements in the State's history." *Final Approval Opinion*, 2021 WL 5237198, at *1. Additionally, over 50,000 individuals, property owners, and businesses who were affected by the Flint Water Crisis have registered to participate in the settlement out of an estimated population of under 100,000. *Id.* at *9. Moreover, as set forth in the Final Approval Opinion, the total number of objectors represents approximately 0.002%

49

of registrants and is "exceedingly small," which speaks to the value of the settlement. *See In re Sulzer*, 268 F. Supp. 2d at 930–31 (noting that the small number of objections to the settlement creates an "unusual and happy circumstance that may be attributed to the widespread belief . . . that the . . [settlement] provided benefits to the class of tremendous value"). This is an unquestionably successful outcome that provides a significant value to Claimants. Accordingly, this "outstanding recovery . . . weighs in favor of awarding the attorneys a higher percentage than the average award." *In re Cardinal Health*, 528 F. Supp. 2d at 765. The amount awarded here is not necessarily higher than average, but it is a substantial amount.

PLG undertook essentially all of the work prosecuting these cases. They were responsible for negotiating with Settling Defendants' counsel and achieving the settlement. The lawsuits brought by Class Counsel and IRC related to the Flint Water Crisis all sought monetary compensation, which is exactly what the settlement brings in the form of Monetary Awards. Because the Court has held regular and frequent conferences with PLG over the course of several years, the Court "has a detailed and specific understanding of both the work involved and the individuals who

50

did the work." *In re Sulzer*, 268 F. Supp. 2d at 934. Non-PLG counsel

benefitted tremendously from PLG's work, and the outcome is equally

successful for their clients. Moreover, PLG members who receive the CBA

will also receive either a Class Counsel fee award or a contingency fee

award in addition to the CBA. PLG achieved an extraordinary result and

one that required legal acumen, diligence, investigation, tireless

attendance to discovery, and multiple appeals. All of PLG's work entitles

them to a substantial fee award. Accordingly, the first *Ramey* factor

weighs in favor of granting the attorney fee award as requested.

### b. Society's Stake in Rewarding Attorneys

The next *Ramey* factor requires that the Court evaluate the policy

considerations of encouraging counsel to accept cases such as this one.

*See Ramey*, 508 F.2d at 1196. This factor also weighs in favor of awarding

counsel the fees requested. The interest in encouraging lawyers to bring

complicated cases, which likely will involve a multi-year commitment,

particularly where an entire community of people allege that they

suffered harm to their health, their property, and their businesses, is

significant. *See Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1282 (S.D. Oh.

1996) ("Clearly the global settlement negotiated by Counsel in this case

is providing benefits to a class of people who are very much in need of help.").

Moreover, those affected by the Flint Water Crisis do not all suffer from uniform types of injuries and losses, which makes the litigation more complicated. These cases involve a wide range of claims and legal theories, including "negligence, unjust enrichment, breach of contract, constitutional violations, and inverse condemnation." (ECF No. 1394-2, PageID.54124.) The cases were filed in this Court, in the State of Michigan Genesee County Circuit Court, and in the State of Michigan Court of Claims. (*Id.*) They have involved several appeals in both state and federal court, including the United States Supreme Court. (*Id.*) As stated in the Final Approval Opinion: "The claims in this litigation are, indeed, complex and many of the claims are novel. There are no other cases that the Court or the parties can look to that are on all fours with the claims in this litigation to assist them in predicting the outcome." *Final Approval Opinion*, 2021 WL 5237198, at *22.

Certainly, for some of the class Claimants, the option to hire their own lawyer and bring a lawsuit may have been an obstacle, particularly because "most individual claimants would lack the resources to litigate a

case of this magnitude, and individual recoveries are [] too small to justify the burden and expense of litigation." *In re Cardinal Health*, 528 F. Supp. 2d at 765. It is not clear that all recoveries in this case would have been too small; however, it is clear that the case would be complicated, time consuming, and require substantial resources, heavy reliance on experts, and sophisticated lawyers. Tens of thousands of individuals affected by the Flint Water Crisis did hire their own lawyers to represent them. Those lawyers, like the lawyers for the class, have spent a "significant commitment of time and expense" that some in the profession may be discouraged from undertaking. Indeed, the class and individual lawyers worked in tandem to conduct the discovery in these cases and negotiate the settlement achieved. There are "significant expenses, combined with the high degree of uncertainty of ultimate success." (ECF No. 1458, PageID.57187.) For these reasons, this factor weighs in favor of awarding the requested fee award.

### c. Services Rendered on a Contingency Fee Basis

The third *Ramey* factor— whether the lawyers' services were undertaken on a contingent fee basis—is also met. *See Ramey*, 508 F.2d at 1196. This factor "stands as a proxy for the risk that attorneys will not

recover compensation for the work they put into a case." *In re Cardinal Health*, 528 F. Supp. 2d at 766. The presence of a contingent fee arrangement is "an important factor in determining the fee award." *Stanley v. U.S. Steel Co.*, No. 04-74654, 2009 WL 4646647, at *3 (E.D. Mich. 2009).

It is well-established in the record that all the lawyers— both in the class and non-class cases— have engaged with this work on a contingency fee basis and have not yet received compensation of any kind. (*See* ECF No. 1458, PageID.57158.) Plaintiffs' counsel, and in particular PLG, retained experts, conducted abundant discovery, and made a substantial and significant outlay of time and expenses at the risk of nonrecovery.

As a general principle, which is applicable here, contingent fee arrangements present a genuine risk that counsel who brought and litigated these cases might not recoup their fees or costs in the end. As the Court discussed in the Final Approval Opinion, "[t]he complexity and volume of this litigation present significant risks and potentially great expense to all parties were the cases to be tried." *Final Approval Opinion*, 2021 WL 5237198, at *22. And, indeed, reaching a settlement at all was far from guaranteed. *See id.*

54

As stated above, Michigan law imposes a one-third cap on attorney fees in personal injury cases. *See* Mich. Ct. R. 8.121. Research indicates that, "[t]aken as a whole, the evidence suggests that one-third is the benchmark for privately negotiated contingent fees, but that significant variation up and occasional variation down exist as well." Eisenberg, Theodore and Miller, Geoffrey P., "Attorney Fees in Class Action Settlements: An Empirical Study" (2004), *Cornell Law Faculty Publications*, Paper 356, pp.35 ("Eisenberg and Miller") (http://scholarship.law.cornell.edu/facpub/356); s*ee also* Manual for Complex Litigation, Fourth § 14.121 (2004) (noting that most district courts select a percentage in the range from 25% to 30% of the fund). In this Circuit, awards are generally "within the 20-30% range." *In re Cardizem*, 218 F.R.D. at 532 (citing cases). This range cannot be viewed in a vacuum; it aggregates fee percentages for cases that vary greatly in their complexity, contentiousness, and have many other unique characteristics.

Yet, as Newberg puts it, the benchmarks of other cases need not receive too much weight by the Court:

> Comparison [to other cases] alone proves little more than that judges are path dependent: there is no obvious correlation

between the common benefit work in one case and another, and, in particular, no obvious correlation between how the quantity of that work (on a lodestar basis) relates to the aggregate value of the settlement in the case.

5 Newberg, *Attorney's Fees, Common Benefit Fees— Calculation Method* § 15:116. Since this case is not purely a class action case, purely class-based benchmarks are not applicable to IRC. Indeed, Movants have indicated that the "vast majority of these fees are for the non[-]class versus the class settlement." (ECF No. 1906, PageID.66922.) At most, the Court estimates that less than approximately 20.5% of the fee award applies to the class portion of the case.

As discussed, Movants' Fee and Expense Motion explains that their request was *less* than 31.6 of the total $626.25 million settlement fund. (ECF No. 1458, PageID.57183 ("Here, the 6.33% global CBA and additional fees capped at 27% of the remaining funds amount to a total maximum fee percentage of 31.6%, less than the typical fee in comparable cases and the one-third maximum amount permitted under Michigan law, see Mich. Ct. R. 8.121.").) Accordingly, the requested fees were not so far above the range of what is commonly sought as to render them outright unreasonable. This is a helpful data point which the Court carefully considered in determining the final award.

56

While the Court finds that the fee request is not unreasonable, the Court is mindful of the overall posture of this case and the oral and written remarks made by Unrepresented Objectors regarding their quest for compensation. The fee request—while not at all out of line—is too high in this context. Movants sought a fee award that resulted in a higher percentage of the overall settlement amount than what the Court awarded. While perhaps in line with awards in similar litigation, what they sought is too high in this case. PLG have earned a CBA of 6.33% of the total settlement. This percentage is well-below 1/3 of the full settlement fund and is reasonable, particularly because PLG will also receive an additional CBA and a Class Counsel or contingency fee award of up to 25% of the value of certain awards.

Non-PLG counsel also earn the same percentage contingency fee awards, as adjusted by the Court. The amount depends on whether they retained their clients before August 20, 2020. As set forth above, if they retained their clients before August 20, 2020, they will receive 25% of the

value of the clients' claims and, for clients retained after August 20, 2020, non-PLG counsel will receive 8% of the value of the clients' claims.[26]

Movants' original proposal was to pay non-PLG counsel 27% and 10%, respectively. These percentages are too great, and accordingly, the Court lowers them to 25% and 8%, respectively.[27] As to the "before August 20, 2020" group, 25% of the value of the claims is still significant and takes into account the fact that some non-PLG lawyers expended time filing their own lawsuits and that a few responded to motions to dismiss. However, in comparison to PLG, their time and effort was much less.

As to the "after August 20, 2020" group of late-retained non-PLG counsel, the settlement was announced publicly in August of 2020.[28] The

---

[26] Additionally, non-PLG counsel can receive 8% for assisting and advocating for Minors in submitting a claim, whether retained or unretained, if the assistance occurred after August 20, 2020.

[27] Again, non-PLG will receive the same fees and PLG. However, PLG will receive a CBA in addition.

[28] The Court acknowledges that Movants' choice of July 16, 2020— a date other than when the settlement was publicly announced— perhaps demonstrates that PLG did not attempt to benefit themselves with special knowledge of when the settlement would be announced. For example, if they had selected the settlement announcement date as the date for a reduced fee, they could be criticized because theoretically they could have rushed to sign up clients before the announcement. Regardless, the Court

reduction in the fee amount is appropriate because, once the settlement was announced, counsel did not have to undertake any litigation work or risk. This reduced amount applies to PLG as well as other counsel who did not participate in the litigation and settlement efforts.

The work of Eisenberg and Miller is helpful to the Court. Their study looked at now-older data collected from 1993–2002. *See* Eisenberg and Miller. The principles and patterns they identify, however, are still largely relevant. For example, they state:

> We find that the level of client recovery is by far the most important determinant of the attorney fee amount. A scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases. . . . The presence of high risk is associated with a higher fee, as is the presence of the case in federal rather than state court.

Eisenberg and Miller at pp.28. This principle applies here. In setting the fee at a reasonable amount, the Court has considered the level of client recovery. Additionally, the presence of higher risk, which is discussed above, justifies a higher overall award for PLG since they undertook this significantly complex work at a higher risk than non-PLG.

---

has decided to set the date of August 20, 2020 for the reasons stated below in the Objections section of this Opinion and Order.

The Court has more significantly reduced one aspect of the fee request: Class Counsel's request for 27% of the value of the Programmatic Relief Fund has been reduced to 10%. Unlike Claimants' individual Monetary Awards, which are more directly tied to PLG's negotiation involving their clients' actual recovery amounts, the Programmatic Relief Fund is set up to serve a particularly vulnerable population of special education students. As explained in the ASA, it is established to "enable local school districts and public school academies within the Genesee Intermediate School District to provide special education services for students who resided in the City of Flint during the Exposure Period and require such services." (ECF No. 1394-2, PageID.54149–54150.) The Programmatic Relief Fund is a relatively small fund compared to the portion of the total settlement amount allocated Claimants' Monetary Awards. The resources of this fund will be helpful to many children facing significant challenges, and the fees already awarded plus a lower fee applied to this fund provide appropriate compensation to counsel. A fee award of 10% of the value of the Programmatic Relief Fund rewards Class Counsel for obtaining this important relief but recognizes that this relief is an added benefit to

children, most or all of whom will be eligible for a Monetary Award upon which counsel will recover fees. Accordingly, this *Ramey* factor weighs in favor of granting the fee award as set forth by the Court.

### d. Value of Services On An Hourly Basis

The fourth *Ramey* factor requires the Court to examine the value of the attorneys' services on an hourly basis. *See Ramey*, 508 F.2d at 1196. Having already evaluated the contingency percentage of the fund request above, this factor acts as the lodestar cross-check. For the purposes of the lodestar cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.* (internal citations omitted). Even so, the lodestar hours were scrutinized by the Special Master and this Court.

With respect to Co-Lead Class Counsel (Leopold of the law firm Cohen Milstein Sellers & Toll PLLC and Pitt of the law firm Pitt McGhee Palmer Bonanni & Rivers, P.C.), the Court found in the Final Approval Opinion that these lawyers fairly and adequately represented the Settlement Class throughout the litigation. *Final Approval Opinion*, 2021 WL 5237198, at *22–23. The Court has carefully considered the declaration of Leopold, which was filed in support of the Fee and Expense

Motion. (ECF No. 1458-2.) The time and expense information attested to in the declaration is supported by both Leopold's personal knowledge and the Court's and Special Master's independent review and analysis of the underlying data. Pitt's declaration attached to the Fee and Expense Motion is equally compelling and has been verified by the Special Master and the Court after adjustments were made. (ECF No. 1458-4.)

With respect to Co-Liaison Counsel (Stern of the law firm Levy Konigsberg, LLP and Hunter Shkolnik of the law firm Napoli Shkolnik PLLC), the Court has carefully reviewed Stern's declaration, which was filed in support of the Fee and Expense Motion. (ECF No. 1458-3.) The time and expense information attested to in the declaration is supported by both Stern's personal knowledge and the Court's and Special Master's independent review of the Time and Expense submissions. Stern provided underlying data in support of his request to the Special Master and the Court *in camera* (*see id.* at PageID.57229), and a detailed review confirms the veracity of his attestation. Shkolnik's declaration presents equally compelling and verified information. (ECF No. 1458.)

Additionally, the declarations of Peretz Brownstein of the law firm Brownstein, Gewirtz & Grossman, LLC (*id.*), Cynthia M. Lindsey of

Cynthia M. Lindsey & Associates, PLLC (ECF No. 1458-9), Neal H. Weinfield of the law firm Dedendum Group LLC (ECF No. 1458-10), Vincent J. Ward of the law firm Freedman Boyd Hollander Goldberg Urias & Ward P.A. (ECF No. 1458-11), Julie H. Hurwitz of the law firm Goodman Hurwitz & James, P.C. (ECF No. 1458-12), Steven Hart of the law firm Hart McLaughlin & Eldridge, LLC (ECF No. 1458-13), Seth R. Lesser of the law firm Klafter Lesser LLP (ECF No. 1458-14), Cirilo Martinez of the Law Office of Cirilo Martinez, PLLC (ECF No. 1458-15), Deborah LaBelle of the Law Offices of Deborah LaBelle (ECF No. 1458-16), Teresa A. Caine Bingman of the Law Offices of Teresa A. Bingman (ECF No. 1458-17), Sarah R. London of the law firm Lieff Cabraser Heimann & Bernstein, LLP (ECF No. 1458-18), David Hart of the law firm Maddin Hauser Roth & Heller, P.C. (ECF No. 1458-19), Mark L. McAlpine of the law firm McAlpine PC (ECF No. 1458-20), Myles McGuire of the law firm McGuire Law, P.C. (ECF No. 1458-21), Sanford P. Dumain of the law firm Milberg Phillips Grossman LLP (ECF No. 1458-22), Scott Morgan of the law firm Morgan Law Firm, Ltd. (ECF No. 1458-23), Esther Berezofsky of the law firm Motley Rice LLC (ECF No. 1458-24), Dennis C. Reich of the law firm Reich and Binstock, LLP (ECF

No. 1458-25), Reed Colfax of the law firm Relman Colfax PLLC (ECF No. 1458-26), John Sawin of the law firm Sawin Law Ltd. (ECF No. 1458-28), David J. Shea of the law firm Shea Law Firm, PLLC (ECF No. 1458-29), Stephen E. Morrissey of the law firm Susman Godfrey L.L.P. (ECF No. 1458-30), and Paul F. Novak of the law firm Weitz & Luxenberg, P.C. (ECF No. 1458-31)[29] have all been painstakingly reviewed and verified by the Special Master and the Court. Time and expense records that were not correct were removed by the Special Master, and the data that underlies the declarations was reviewed and verified (or adjusted) to the extent set forth in the Special Master's Report.

These lawyers, collectively and individually, have substantial experience in complex litigation and with the types of claims brought in this case. Their declarations, along with the Time and Expense data, support the award of fees granted here.

The Special Master's Report provides an in-depth analysis of the time submissions pursuant to the Time and Expense Order and of the Special Master's reconciliation of the submissions with the Fee and

---

[29] Attorney Samuel R. Bagenstos was part of the original fee request. (ECF No. 1458-27.) However, he has since informed the Special Master that he does not seek fees for his work. (ECF No. 2104-1, PageID.72040; ECF No. 2104-2, PageID.72044.)

Expense Motion. (*See* ECF No. 2104.) Participating Counsel, as defined in the Time and Expense Order, have been submitting records to the Special Master since August 15, 2018, and have done so on the 15th of every month since. (*Id.* at PageID.72014–72015.) Pursuant to the Time and Expense Order, there are detailed requirements for time submissions:

> all counsel are to maintain a daily record of their time spent in connection with this litigation, indicating with specificity the date of task performed; name of the attorney/paralegal performing the task; law firm name; assignor of task; professional level of attorney performing the task; task code; description of task performed; hourly rate for the attorney/paralegal; and hours spent on the task in one tenth (0.1) hour increments. [. . .] Time submissions must also include a description of the activity sufficient to enable the Court to conduct an appropriate review of any application for fees.

(*Id.* at PageID.72015 (citing ECF No. 507, PageID.15834).)

After the Special Master's review of the initial submissions, she "requested adjustments to the format and requirements of the template to allow for more consistency in the records, and to assure that all requirements of the Time and Expense Order were included in the submissions. These adjustments included creating a separate certification statement tab, editing the 'code' columns so that only one

65

code could be selected per time or expense entry from a defined set of standard codes, and including a field for each professional's hourly rate."

(*Id*. at PageID.72019.) The Special Master

> established and maintains a database that tracks and compiles all time and expense submissions in excel format and also maintains files that preserve and track all written correspondence with Participating Counsel. The Special Master's records include every submission, and all corrections, updates, clarifications, and amendments to submissions. The Special Master's system tracks the date of each submission as well as the date of any supplemental submission for the same time period.

(*Id*. at PageID.72020.) These records are highly detailed. For example, the number of individual time entries exceed 100,000. (*Id*. at PageID.72020.)

As set forth in the Special Master's Report, the Special Master identified specific issues in the submissions, and she requested "corrections and clarifications as appropriate." (*Id*. at PageID.72022.) Some examples of the types of issues she identified include submissions without the appropriate time or expense code, entries that lacked specificity and could not be evaluated, entries that were duplicated, and "minor issues and technical errors." (*Id*. at PageID.72022.)

The Special Master's work reconciling the submissions with the Fee and Expense Motion has been comparably meticulous to her work implementing the Time and Expense Order. As stated above, the Court has reviewed *in camera* the Excel format time and expense records provided by the Special Master as part of this reconciliation. (*See* ECF No. 1826.) This has led to numerous discussions between the Court and the Special Master regarding the reconciliation process and the Special Master's work. Much of the Special Master's Report addresses in great detail the multi-stage reconciliation process that she has undertaken. (*See* ECF No. 2104.)

As set forth in the Report, the Special Master has made the following findings related to time submissions:

1. The submissions included detailed and appropriate descriptions of hours expended [. . . .] The vast majority of time entries [. . .] contained sufficient explanation to understand the task being undertaken by the timekeeper[.] As noted below, where such entries were not sufficient to evaluate the purpose of the time [. . .], the firms were notified and asked to provide clarification.

2. In some cases, the description of the work performed is not consistent with the task code. But as noted the time entries provided a detailed description of the work that is sufficient to assess the time for compliance with the Time and Expense Order. To the extent that a small number of

67

entries included a vague description, the Special Master was able to obtain clarification from the firms. The early time entries— dating from before the entry of the Time and Expense Order— contained, in some cases, multiple tasks combined in one time entry. But again, the descriptions were sufficient to identify the tasks and to evaluate the amount of time charged.

3. The Special Master identified a small number of time entries [. . .] that involved work performed for various of the cases filed against the EPA that are pending in a different court. All of those time entries [. . .] have been removed from the compilation prepared by the Special Master. The firms affected have been notified that such time/expense entries have been removed from the Special Master's compilation.

4. [. . .]

5. [. . .]

6. The Special Master identified duplicative time entries, including duplication of time for individual consultants providing technical services to more than one firm. The Special Master requested clarification from the firms and to the extent such entries in fact proved to be duplicative, they have been removed from the Special Master's compilation of time.

7. The Special Master reviewed time entries to determine whether the tasks were undertaken by the appropriate level of professional and that the time charged for tasks was not excessive. The Special Master obtained additional information from firms with respect to any questionable

time entries and based on the responses adjusted the amount of time or the rates applicable to the task as appropriate in the compilation prepared by the Special Master. The firms have been advised of and do not object to such adjustments.

8. The Special Master reviewed the time and expense entries to assure that they were appropriately related to the overall litigation or settlement activities. Given the disagreements and objections related to the issue of the bone scan facility established in Flint, I reviewed the time [. . .] documentation to identify any entries related to this matter. My review did not reveal any time entries involving time for setting up, managing, or operating any bone scan facility in Flint. [. . .]

9. The Special Master reviewed the time entries [. . .] with particular attention to whether they related to the litigation of the four bellwether cases set to go to trial in February 2022. I have compiled the time identifying bellwether tasks and found that 1.2% of the total time submitted by the Co-Liaison firms identified tasks specific to the bellwether trial and was incurred after November 2020 when the settlement was presented to the Court. [. . .]

(*Id.* at PageID.72028–72032.)

The Special Master's work has clearly been comprehensive. She and her staff worked for approximately 500 hours analyzing counsel's submissions before the July 2021 hearing and expended over 240 hours between then and the present. She included post-Fee and Expense

69

Motion time and expenses in her Report. (*Id.* at PageID.72035–72036.) Additionally, the Court has determined that the billings are at a reasonable rate under the circumstances of this case given counsel's experience level and the prevailing market rates in the geographic locations of counsel. "When determining a reasonable hourly rate, 'courts use as a guideline the prevailing market rate . . . that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Van Horn*, 436 F. App'x at 499–500 (*quoting Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 618 (6th Cir. 2007)). In making this determination, the Court relies not only on the parties' own submissions but also "awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Id.* at 500 (*quoting B & G Mining, Inc. v. Dir. Off. of Workers' Comp. Programs*, 522 F.3d 657, 664 (6th Cir. 2008)). Additionally, the Court and the Special Master have confirmed that the tasks were assigned appropriately by experience level and to the extent time entries indicated otherwise, the Special Master sought clarification and made appropriate adjustments.

70

The Appendices to the Special Master's Report show the computation of the total aggregate hours and expenses.[30] (ECF Nos. 2104-1, 2104-2.) The computation after reconciliation calculates a post-reconciliation lodestar that is higher than the computation Movants requested in the Fee and Expense Motion because the post-reconciliation lodestar includes time spent by one of the Co-Liaison Counsel firms that was not included in the Fee and Expense Motion and also because the post-reconciliation lodestar includes time spent by other attorneys that was inadvertently omitted from the Fee and Expense Motion. (ECF No. 2104, PageID.72026–72027.)

The Court evaluates the lodestar as a cross-check only, and not as the sole basis for the fee award. Yet the lodestar should not be dismissed outright. The lodestar reflects the fact that counsel has undertaken an enormous amount of work, which has resulted in a major accomplishment that is worthy of meaningful compensation. Additionally, "[b]y using both the lodestar method and the percentage of the fund method, the Court has ensured its fee awards are reasonable

---

[30] The figures set forth in the Appendices have been adjusted by counsel and the Special Master from the original 182,571 hours stated in Movants' brief. (*See* ECF No. 1458, PageID.57188.)

71

and appropriate both individually and in toto." *In re Sulzer*, 268 F. Supp. 2d at 923. Accordingly, the fourth *Ramey* factor, the lodestar cross-check, weighs in favor of granting the fee award as set forth by the Court.

### e. Complexity of the Litigation

The fifth *Ramey* factor— the complexity of the litigation— is another factor to evaluate when determining whether an attorney fee award is reasonable. *See In re Delphi*, 248 F.R.D. at 504. "The analysis of this factor is markedly similar to [the Court's] analysis of the third *Ramey* factor." *In re Cardinal Health*, 528 F. Supp. 2d at 768. Class actions are, in general, "inherently complex," *id.*, and this hybrid class and non-class litigation is no exception.

As discussed in the Final Approval Opinion, the nature of the litigation before, during, and after the settlement was reached has been demanding and challenging. There have been scores of motions to dismiss in these cases and the Court has issued hundreds of opinions and orders. Many of the Court's decisions have been appealed both to the United States Court of Appeals for the Sixth Circuit and to the United States Supreme Court. The Court is therefore very familiar with the complexity of the factual allegations and the applicable law that governs these cases.

72

Nothing about these cases or this settlement has been easy. Had this settlement not been reached, there can be little doubt that these cases would be litigated for many more years to come. The substantial time and expense of continuing litigation to trial, along with the fact that Plaintiffs' ultimate success at trial is far from certain, weigh in favor of finding the fee request reasonable. The fifth *Ramey* factor is therefore met.

### f. Counsel's Skill Level

The sixth *Ramey* factor requires the Court to consider both "the professional skill and standing of counsel" and also "the quality of opposing counsel." *In re Delphi*, 248 F.R.D. at 504. The Court has had many occasions over the years to evaluate and re-evaluate the skill and performance of all Plaintiffs' Counsel, in particular PLG, and has found their performance and professional skill to warrant this award of fees and costs. (*See, e.g.*, ECF Nos. 173, 696, 1021.) Counsel have worked carefully and diligently on behalf of their clients. Their perseverance and careful work through very exacting legal, factual, and procedural terrain weigh strongly in favor of granting the fee request.

73

Additionally, counsel for the Settling Defendants' have vigorously and skillfully represented their clients. *See In re Delphi*, 248 F.R.D. at 504 ("Here the Settling Defendants and their insurers are all represented by able counsel at some of the nation's most prestigious law firms. . . . The ability of Co-Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested."). Accordingly, the sixth *Ramey* factor weighs strongly in Plaintiffs' Counsel's favor.

### g. Conclusion

After evaluating all the *Ramey* factors, and in the Court's discretion, awarding the percentage of the fund award is reasonable under the circumstances of this litigation. The 6.33% CBA of the gross settlement amount is just and fair for the reasons stated. The additional award of a maximum of 25% of the value of certain claims (some of which is CBA, fees, or a combination of fees and CBA) and the manner and apportionment ordered above, is also warranted. And finally, the award to Class Counsel of 10% of the value of the Programmatic Relief Fund is appropriate.

Had the Court chosen to apply purely the lodestar method, it would have been unable to fairly apportion awards in the manner that the Court believes accounts for the roles and efforts of PLG, Class Counsel, and IRC. The total amount awarded is less than 1/3 of the total settlement amount. Indeed, it is even less than 31.33% (6.33% + 25%) because, other than the 6.33% CBA that is deducted from the gross settlement total, the remaining awards are determined after deducting the expense award and significant Administrative Fees and Costs in the sequencing set forth above.

For these reasons, the fee and expense award is fair, reasonable, and appropriate to compensate Plaintiffs' Counsel.

### C. Objections

As described above, the Court received objections from Unrepresented Objectors, the *Hall* Objectors, the *Chapman/Lowery* Objectors, and Plaintiff Brown. All objections are denied except that the Unrepresented Objectors and the *Chapman/Lowery* objections are granted in part for the reasons set forth below.

### 1. Unrepresented Objectors' Objections

The Court received 81 objections from Unrepresented Objectors. These objections state:

> Plaintiffs' attorneys are being paid too much and community residents are not receiving adequate compensation in view of the long-term harm the water crisis created. Plaintiffs' attorneys will receive much more compensation than the average adult in the settlement.

(ECF No. 1563, PageID.60569.)

A portion of these objections address the structure and organization of the ASA and the Compensation Grid. Arguments related to the structure and allocation of the settlement are rejected because, as stated in the Final Approval Opinion, the Court cannot unilaterally change the ASA to award a different total settlement amount or to otherwise edit the Compensation Grid. *See Final Approval Opinion*, 2021 WL 5237198, at *54 ("This Court cannot take a red pen to the ASA, nor will it, given that the ASA provides for a fair, reasonable, and adequate result."); *accord, Stanley*, 2008 WL 4225781, at *2 (Cohn, J.) (rejecting an objection and noting that, even if the Court could allocate the awards differently, "[n]o amount or method of allocation will satisfy every class member"). As set forth above, the Court neither determined the total settlement amount,

nor does it have the power to unilaterally change that amount. The settlement was reached at arm's length. (ECF No. 1885, PageID.66212 (attestation of the mediators that "in our view as mediators, the plaintiffs obtained the maximum amount of compensation that the settling defendants were able and willing to offer.")

The remainder of the objections regard the amount of the percentage of the fund sought in the Fee and Expense Motion, which the Court grants in part. Unrepresented Objectors believe the percentage sought is too high. As detailed above, the most important factor that the Court must consider in determining whether a fee award is reasonable is the value of the benefit obtained. *See In re Cardinal Health*, 528 F. Supp. 2d at 764. The value is measured by the fact that the attorneys obtained a settlement that fairly, adequately, and reasonably compensates over 50,000 individuals and entities for a range of complex injuries and effects stemming from the Flint Water Crisis. The Sixth Circuit instructs that the value of the benefit to the class is based "on the *total* relief class counsel makes available to *all* the class members." *Gascho*, 822 F.3d at 278 (emphasis added). Settlement Claimants benefit from the attorneys' work because they will receive a Monetary Award, rather than waiting

for years for a jury trial and final judgment. Certainly, "any award of damages after trial would be vastly diminished in value by the duration and expense of trial." *Final Approval Opinion*, 2021 WL 5237198, at *22. The value of the benefit obtained justifies the award. And ultimately, after evaluating all the *Ramey* factors, the Court awarded less than the requested fee.

Awarding fees to counsel necessarily reduces the amount available for Claimants' Monetary Awards. However, this is a common occurrence in every contingency fee case. This is the way the litigation system operates and it is standard. Plaintiffs' Counsel have earned and are deserving of reasonable compensation for their work. *See Rawlings*, 9 F.3d at 516 ("In this circuit, we require only that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances.").

It is true that that the total attorney fee award exceeds the potential Monetary Award of any one individual Claimant. However, this does not justify rejecting the entire fee and expense request. While the amount of an individual Claimant's recovery can be relevant to the amount awarded for attorney fees, it is "only one of many factors," and

the attorney fee award need not "be proportionate to the amount of damages" that an individual plaintiff actually recovers. *Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (holding that, in a civil rights litigation, the damage award recovered by a plaintiff and the attorney fee award need not be proportionate to be reasonable and fair); *see Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 802 (5th Cir. 2006) ("It remains true that there is no *per se* proportionality rule."); *see Fisher v. SD Prot., Inc.*, 948 F.3d 593, 603 (2d Cir. 2020) (indicating that a multi-million dollar securities class action case is an example of a type of case where proportionality might be relevant to overall fairness).

The Sixth Circuit has determined that fee awards are not "on [their] face unreasonable" if the fee award exceeds the recovery of an individual claimant. *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009); *see, e.g.*, *Allan v. Realcomp II, Ltd.*, No. 10-cv-14046, 2014 WL 12656718, at *2 (E.D. Mich. Sept 14, 2014) (finding that individual class settlement awards of approximately $500 per claimant is a "substantial" award and that a total attorney fee award of over $1 million dollars (or one-third of the fund) is reasonable).

79

Indeed, Unrepresented Objectors' argument compares apples to oranges: one cannot compare the overall total attorney fee award on one hand with an *individual* monetary award on the other. In terms of total amounts, the Court has awarded less than 31.33% of the total $626.25 million settlement amount for attorney fees. This is reasonable and well within the range approved by other courts. Moreover, it bears emphasizing that the fee award will be split among dozens of Plaintiffs' law firms (and hundreds of lawyers).

Accordingly, Unrepresented Objectors' objections are granted in part and denied in part.

## 2. The *Hall* Objectors' Objection

The *Hall* Objectors raise several points in their objection. (ECF No. 1548.) Their first argument is that the percentage of the fund sought "should be lower" overall. (*Id.* at PageID.60220.) From what the Court can discern, their second main argument regards the structure of the fee request. More specifically, *Hall* Objectors argue that the structure is unfair because individuals who did not hire attorneys to represent or assist them still pay Plaintiffs' Counsel. (*Id.*)

80

For context, the *Hall* Objectors' counsel did not file an appearance until March 22, 2021. Counsel's representation of his clients is limited to objecting to the Fee and Expense Motion, as opposed to representation throughout the litigation. The *Hall* Objectors' submission is somewhat confusing, and the Court has done its best to understand their arguments.[31] By the time of the July 15, 2021 hearing, the Court reasonably expected the points made in the objection would be presented in a clear manner that would permit the Court to fully consider and address them, but this did not occur. The *Hall* Objectors' presentation lasted well over three hours on July 15, 2021. (*See* ECF No. 1906.) During their arguments, the Court often sought clarification and asked counsel follow-up questions, frequently to no avail. (*See, e.g.*, ECF No. 1906,

---

[31] For example, *Hall* Objectors state one of their arguments as follows: "For unrepresented class members, an additional 27% paid to Class and Liaison Counsel, and for claimants represented after July 16, an extra 17% assessment." (ECF No. 1548, PageID.60220.) This characterization of Movants' proposal is inaccurate. Nowhere in the proposal do Movants request 27% plus an additional 17% in fees.

Perhaps the *Hall* Objectors intended to argue that there is a CBA of 27% for unrepresented children and 17% for those represented after July 16, 2020. But the *Hall* Objectors use the term "class member"— and there are no unrepresented class members. There is, however, a 27% fee requested for Class Counsel. Regardless, this inartfully explained argument is rejected.

PageID.66962–66968.) Regardless, the Court has done its best to identify the *Hall* Objectors' key points and address them.

At the outset, the *Hall* Objectors evidently misunderstand a basic premise of the settlement: it settles both class and non-class litigation. Rule 23 is applicable only to the class side of the request and not to the non-class side. Yet in several instances, the *Hall* Objectors' objection insists on applying Rule 23 to the non-class side. For example, the *Hall* Objectors make much of Co-Liaison Counsel Shkolnik's firm's (Napoli Shkolnik) lodestar figures. They argue that the firm "misclassified dozens of inexpensive temporary employees . . . for the purpose of inflating their lodestar." (ECF No. 1548, PageID.60242.) This argument is unsupported, and the implication that Co-Liaison Counsel fraudulently inflated their rates and hours is improperly raised. As set forth above, the Court and the Special Master have scrupulously combed through the data provided by Napoli Shkolnik (and all other Plaintiffs' firms seeking common benefit awards) for over three years. No evidence of trickery or of inflating rates, whatsoever, has been identified through this independent review. Moreover, Co-Liaison Counsel are counsel for the *non-class* Plaintiffs. The *Hall* Objectors' Rule 23-based arguments do

not apply to them. The *Hall* Objectors' arguments related to non-class counsel are therefore rejected.

The *Hall* Objectors' first main argument is that the overall percentage of the fund sought is too high. They argue that "[a] reasonable percentage award should recognize economies of scale to prevent a windfall for plaintiffs' attorneys at the expense of the class." (*Id.* at PageID.60231.) However, there is no evidence of a windfall in the award granted here. Setting aside the fact that the *Hall* Objectors again focus on the Fee and Expense Motion as though Rule 23 were applicable to its entirety, they also get the standard wrong. They complain that "Plaintiffs cite only two class action precedents to support their 31.6% request." (*Id.* at PageID.60233.) However, as set forth in the Analysis section above, comparison to other percentage of the fund awards is not the only driver for determining what is reasonable. All the *Ramey* factors apply, and perhaps the most significant factor is the value of the benefit rendered, not comparison to other cases. The Court therefore rejects the *Hall* Objectors' arguments. Although the total fee request was not unreasonable, the Court reduced the fee for different reasons, as set forth above.

The *Hall* Objectors' second main argument is that individuals who did not retain counsel or have the assistance of a lawyer should not have to pay for attorney fees and costs. From the *Hall* Objectors' perspective, unrepresented Claimants may have "deliberately saved those [attorney] costs by expending their time and effort navigating the settlement claims process on their own." (*Id.* at PageID.60228.) The *Hall* Objectors frame the fee and cost award as a deduction from individual Monetary Awards, which they argue is a method to "blunt the incentives class members might otherwise have to avoid retaining counsel." (*Id.*) This argument ignores the fact that *there would not be a settlement to participate in, at all*, but for the work of Plaintiffs' Counsel and, in particular, PLG. It is only fair that all of those who have benefitted from the work of PLG should pay for that work on the same basis. The Court does not view the fee structure proposed here as a way of creating incentives or disincentives for hiring counsel. Rather, the structure proposed by Movants and granted by the Court fairly compensates the lawyers and creates equity among Claimants. The compensation and structure are equitable, fair, and reasonable. Accordingly, this argument is rejected.

The *Hall* Objectors argue that counsel receiving CBA awards and either a contingent fee award or Class Counsel award are "double-dipping," which, the *Hall* Objectors state, is "entirely novel" and "fundamentally destructive to the proper functioning of class actions and MDLs." (*Id.* at PageID.60234.) The *Hall* Objectors do not support this argument, nor do they explain how a request that is significantly lower than the one-third statutory cap for contingency fee cases (indeed, lower than 31.33% of the total settlement) is so fundamentally destructive to class actions and MDLs.[32] On the other hand, Movants cite a good number of cases in support of their request in which courts have granted awards that are similar to— and higher than— the award Movants seek. (*See* ECF No. 1796, PageID.64537–64542.) *See, e.g., In re Sulzer*, 268 F. Supp. 2d at 930 (noting that "any common benefit fee applicants are already receiving contingent fee payments from their clients" and approving of that structure). Accordingly, the *Hall* Objectors' argument is rejected.

---

[32] Moreover, had there not been a class-based element to this litigation and settlement, the Court would not likely be tasked with reviewing the attorney fees at all. The fees would undoubtedly have been closer to one-third of the total settlement amount, which is significantly higher than what is being ordered here.

The *Hall* Objectors raise several other arguments in their objection, all of which are denied. For example, they object to "the [Fee and Expense] Motion's request for the Court to delegate its Rule 23(h) duty by allowing these firms to apportion fees among themselves, in secret and without judicial involvement." (ECF No. 1548, PageID.60221.) This, they argue, "violates Rule 23(h)," and they argue that they are entitled to know "*which* attorneys seek *what* fees for what work." (*Id.* at PageID.60224 (emphasis in original) (citing *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010)); (*see also id.* at PageID.60229.) This argument is rejected. The Sixth Circuit does not have case law similar to the Ninth Circuit on this subject. The Court has been provided with adequate information in the Fee and Expense Motion regarding how Plaintiffs' Counsel intend to sub-divide any award of fees granted by the Court. The level of detail sought by the *Hall* Objectors would not enhance or otherwise assist the Court in making its decision, nor does it make any difference to any Claimant since the fee structure contributes to the parity principles set forth in the ASA itself. The remaining points made by the *Hall* Objectors largely overlap with their Discovery Motion, which is addressed below.

The *Hall* Objectors argue that the Court should "invite defendants to comment on the fee request." (*Id.* at PageID.60223.) The ASA states: "Unless required to do so by the Federal Court, Defendants will take no position with respect to any application to the Federal Court by Co-Lead Class Counsel, Co-Liaison Counsel or counsel in the Related Lawsuits for an award of attorneys' fees, and reimbursement of costs and expenses incurred[.]" (ECF No. 1394-2, PageID.54160.) The Court has conducted its own careful and independent review of the Fee and Expense Motion, with the assistance of the Special Master. In the Court's discretion, it finds no need to seek further input from Settling Defendants on this topic. Accordingly, this request by the *Hall* Objectors is denied.

The *Hall* Objectors argue that Plaintiffs' percentage of the fund on the gross settlement should instead be "computed on the net sum." (*Id.* at PageID.60236–60237.) The *Hall* Objectors then go on to speculate as to the administrative fees and costs and cite numerical estimations that are not supported by facts. (*Id.* at PageID.60237–60238.) The Court has addressed and accounted for a fair and reasonable 'order of operations' for determining the fee award for the reasons and in the manner set forth above. Accordingly, these arguments are rejected.

Finally, as to the *Hall* Objectors' arguments that the Fee and Expense Motion violates both Rule 23's procedural and substantive requirements, these arguments are denied. Movants timely filed their Fee and Expense Motion by the deadline, thoroughly explained and detailed their proposal, and provided all the data— as required under the Time and Expense Order— in declarations attached to their motion and *in camera*. There are no violations of the Federal Rules of Civil Procedure here, and this argument is rejected.

The arguments in the *Hall* Objectors' objection are therefore denied.

### 3. The *Chapman/Lowery* Objectors' Objection

The *Chapman/Lowery* Objectors present three main points in their objection.[33] (ECF No. 1562.) First, they argue that they should be able to study the Time and Expense Order data and the data underlying the Fee and Expense Motion. Second, they argue that the CBA sought is too high,

---

[33] Perplexingly, attorney Valdemar Washington (the lawyer for the *Anderson* Plaintiffs, who are not objectors to the ASA or the Fee and Expense Motion) filed an affidavit in support of the *Chapman/Lowery* Objectors' objections. (ECF No. 1562-1.) As set forth above, the Court permitted argument from Washington on the July 15, 2021 hearing date even though none of his clients filed an objection based on attorney fees. (*See* ECF No. 1906.)

and they lodge several protestations to Co-Liaison Counsel's performance. Third, they argue that the July 16, 2021 date set forth in the proposal (which is the date set forth in the Fee and Expense Motion after which IRC's proposed fee would be reduced) is arbitrary and should instead be aligned with the date that the Motion for Preliminary Approval was filed on November 17, 2020. The first two points made in the *Chapman/Lowery* Objection are denied. The final argument is granted in part and denied in part for the reasons set forth below.

The *Chapman/Lowery* Objectors' first argument is that individual Plaintiffs and their attorneys should be afforded an opportunity "to review the detailed time and expense records." (*Id.* at PageID.60505.) Since this argument largely overlaps with the arguments made in the Discovery Motions, the Court will address this topic in the section of this Opinion and Order related to these Motions.

The *Chapman/Lowery* Objectors' second argument regards the percentage sought in Movants' common benefit request. (*Id.* at PageID.60507.) Like Unrepresented Objectors and the *Hall* Objectors, the *Chapman/Lowery* Objectors believe the amount sought is too high. Their main argument against the amount sought largely replicates the

89

substance of their bone lead testing-based objections to the ASA, which were denied. *See Final Approval Order*, 2021 WL 5237198, at *34–51. The objections related to bone lead testing assume that Co-Liaison Counsel submitted time and expense data for the bone lead testing program they initiated in the City of Flint. However, Co-Liaison Counsel have clarified that they did not. (ECF No. 1796, PageID.64566–64567.) The Special Master's and this Court's independent review confirm the same. (*See* ECF No. 2104, PageID.72031.) Accordingly, this argument is rejected.

Lastly, the *Chapman/Lowery* Objectors argue that the July 16, 2020 "cut-off" date should be adjusted to coincide with the date that the Preliminary Approval Motion was filed in November of 2020, and that the 10% fee for post-July 16, 2020 engagements is too low. (ECF No. 1562, PageID.60512.) The Court grants this portion of their objection in part and denies it in part.

As to the July 16, 2020 "cut-off" date, Mr. Cuker argued at the July 15, 2021 hearing that the date should be changed to November of 2020 because he personally did not know anything about the settlement until August 2020. He stated: "that's not very fair to me if I signed up someone

up [sic] on August 1 not knowing [the settlement would be announced soon after]." (ECF No. 1906, PageID.67057.) Mr. Cuker later confirmed that he signed up six clients after July 16, 2020 and before the settlement was announced.[34] (*See* ECF No. 1912.) The Court disagrees that Mr. Cuker was without notice that settlement negotiations were ongoing and progressing. The Court appointed facilitative mediators in January of 2018. (*See* ECF No. 324.) Mr. Cuker already had filed an appearance in this case in 2017 and would have received electronic notice of all filings after that, including notice of the facilitative mediator appointment. (*See* ECF No. 179.) Additionally, the record demonstrates that over the years, Co-Liaison Counsel kept IRC apprised of the fact that settlement negotiations were ongoing. (*See, e.g.*, ECF No. 1298.) Mr. Cuker admitted at a hearing that he chose not to attend hearings regularly in this litigation for "years" up until when the settlement was announced in November of 2020. (ECF No. 1312, PageID.39913–33914.) There has been no lack of transparency.

---

[34] Whether these six individuals are registered for the settlement is unknown. It is also not known whether Mr. Cuker filed lawsuits on behalf of these individuals such that he would incur the time and expense of preparing and filing a complaint and serving the proper documents on Defendants.

Despite this, the Court finds that it is reasonable to move the cut-off date for a reduced fee to August 20, 2020. It is logical that, on and after the date that the settlement was announced, "the risk of non-recovery, and therefore the contingent nature of counsel's work, dropped dramatically and ultimately disappeared." *Bowling*, 922 F. Supp. at 1282. As a result, Mr. Cuker may collect a 25% retainer for the clients who signed a retainer with him between July 16, 2020 and before August 20, 2020.

Accordingly, for these reasons, the *Chapman/Lowery* Objectors' objections are granted in part and denied in part.

### 4. Brown's Objection

Brown objected to the attorney fee motion. (ECF No. 1556.) Brown's Complaint alleges that Odie Brown died of Legionnaires' disease, which she contracted while hospitalized at Hurley Hospital and/or at McLaren Hospital. (*See* Case 5:18-cv-10726-JEL-MKM ECF No. 136, PageID.2030–2031.)

Brown's position is that, if the McLaren Defendants elect not to walk away from the settlement,[35] "Plaintiff Brown objects to Plaintiffs' request for a $1.26 Million CBA attorney fee on the McLaren share of the settlement. Unlike the settlement proceeds being paid by other settling Defendants, any McLaren paid settlement cannot be said to have resulted from common benefit work Plaintiffs conducted as to McLaren." (ECF No. 1556, PageID.60404.) The $1.26 million figure represents 6.33% of $20 million, which was McLaren's original contribution to the settlement. Therefore, the objection is to the 6.33% CBA request. Brown explains her position, stating that (1) McLaren Defendants are not class defendants; (2) McLaren Defendants have not been subjected to discovery; and (3) in the 80-plus depositions taken or defended by Plaintiffs' Counsel in these cases, Brown's counsel "attended and participated on sixty to seventy of those [depositions]" and was the only counsel "to ask questions about McLaren's involvement and role with the Legionella outbreak." (*Id.* at PageID.60405–60406.) Accordingly, the

---

[35] The McLaren Defendants elected to contribute $5 million to the settlement rather than exercise their walk-away rights. (*See* ECF No. 1996.)

argument goes, PLG should not be permitted to take a global CBA from McLaren's contribution.

Brown's objection is rejected. Brown did not register for the settlement and has no standing to object to it. Even if Brown had registered, there is no authority to support her position that she should be treated differently from any other Claimant who is settling claims against the McLaren Defendants, or that the McLaren Defendants' contribution to the total settlement fund should be treated differently than the contributions of any other Settling Defendant. The funds contributed by the Settling Defendants are to be placed in one Qualified Settlement Fund for the benefit of all Claimants. *Final Approval Opinion*, 2021 WL 5237198, at *6. In reaching its decision on final approval, the Court found that this structure is fair, adequate, and reasonable. *Id*. at *23–24. Accordingly, Brown's objection is denied.

### D. The *Hall* and *Chapman/Lowery* Objectors' Discovery Motions

The *Hall* and *Chapman/Lowery* Objectors both separately move to review and respond to hourly billing and costs. (ECF Nos. 1586, 1719.) First, they argue that they are entitled to inspect the attorneys' detailed hourly billing and cost records that have already been submitted to both

94

the Special Master and to the Court *in camera* . Second, they argue that they are entitled to discovery of fee-sharing agreements among the firms that will receive the CBA.

As an initial matter, the *Hall* and *Chapman/Lowery* Objectors have not cited any authority to support their argument that they have a right to inspect detailed fee and cost information. Indeed, at the hearing held on July 15, 2021, the *Hall* Objectors' counsel conceded that "the Sixth Circuit hasn't ruled on this particular issue[.]" (ECF No. 1906, PageID.66936.) Detailed fee and cost information has already been submitted to the Special Master and to the Court for independent *in camera* review. Additionally, the Court did not base its award purely on the lodestar. Rather, it applied the percentage of the fund method with a lodestar cross-check. The cross-check, however, is not required in the Sixth Circuit. Indeed, the Sixth Circuit has held that "the cross-check [i]s *optional*." *Van Horn*, 436 F. App'x at 501 (emphasis in original) (citing *Rawlings*, 9 F.3d at 516). Additionally, as set forth above, "[i]n contrast to employing the lodestar method in full, when using a lodestar cross-check, the hours documented by counsel need not be exhaustively

95

scrutinized by the district court." *In re Cardinal Health*, 528 F. Supp. 2d at 767.

Despite the optional nature of the cross-check and the standard in the Sixth Circuit that exhaustive scrutiny need not occur, the lodestar cross-check conducted by the Special Master and the Court has, indeed, been exhaustive. As set forth in the Special Master's Report, hundreds of hours of work have been expended scrutinizing, reconciling, reviewing, and re-reviewing this data. (*See* ECF No. 2104, PageID.72027, fn.7.)

As to their arguments that they are entitled to review fee-sharing agreements, the *Hall* and *Chapman/Lowery* Objectors again fail to provide authority in support of their request. Movants already described how they would divide the CBA award and costs among themselves in the Fee and Expense Motion.

Regarding the class-side of the case, Rule 23(e) requires only that counsel provide "a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e). This is satisfied by Movants' motion. Further inquiry and scrutiny by objectors is unnecessary. The way PLG have agreed to divide the funds has been adequately described and discovery of any such underlying agreement

would not change the outcome of the fee award or deductions ultimately taken from the *Hall* or *Chapman/Lowery* Objectors' Monetary Awards.

In sum, the Discovery Motions are denied.

## IV.   CONCLUSION

For the reasons set forth above, the Court orders as follows:

(a) An expense award in the amount of $7,147,802.36 is GRANTED;

(b) A CBA in the amount of $39,641,625, which is 6.33% of the total settlement amount, is hereby GRANTED;

(c) Additionally, the Court orders and awards as follows:

- A CBA of 17% of the value of the amount awarded to Claimants who were retained after August 20, 2020;

- A CBA of 17% of the value of the amount awarded to any Minor Claimant who was assisted by counsel after August 20, 2020; and

- A CBA of 25% of the value of the amount awarded to any unrepresented Minor Claimant who does not retain their own counsel.

- Class Counsel is awarded 25% of the value of the claims in the following two categories:

  - The claims resolved through the Adult Exposure, Property Damage, and Business Economic Loss Subclasses; and

  - The aggregate claims involving a Minor who retained Class Counsel before August 20, 2020.

- Class Counsel is awarded 10% of the value of the Programmatic Relief Fund;

- Class Counsel is awarded 8% of the aggregate value of the claims involving a Minor where Class Counsel assisted or retained the Minor after August 20, 2020;

- IRC are awarded:

  - 25% of the value of the claims for Claimants that entered into retainer agreements with IRC before August 20, 2020;

  - 8% of the value of the claims for Claimants that entered into retainer agreements with IRC after August 20, 2020; and

  - 8% of the value of the claims where IRC assisted and advocated for a Minor in submitting a claim, whether retained or unretained," if the assistance took place after August 20, 2020.

The Unrepresented Objectors' and the *Chapman/Lowery* Objectors' Objections are granted in part. *Hall* Objectors and Brown's Objections are denied. The *Hall* Objectors' and *Chapman/Lowery* Objectors' Discovery Motions are denied.

IT IS SO ORDERED.

Dated: February 4, 2022                    s/Judith E. Levy
Ann Arbor, Michigan                        JUDITH E. LEVY
                                           United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 4, 2022.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager

99