# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

ALL CASES

_____/

## OPINION AND ORDER GRANTING IN PART *CHAPMAN/LOWERY* OBJECTORS' MOTION FOR LEAVE TO FILE UNDER SEAL [2020], DENYING DR. LAWRENCE A. REYNOLDS' MOTION FOR RECONSIDERATION [2019], AND DENYING *CHAPMAN/LOWERY* OBJECTORS' MOTION FOR RECONSIDERATION [2023]

On November 10, 2021, the Court granted final approval of a partial settlement of the Flint Water Cases. *In re Flint Water Cases*, – F. Supp. 3d –, No. 5:16-cv-10444, 2021 WL 5237198 (E.D. Mich. Nov. 10, 2021) ("Final Approval Order"). (ECF No. 2008.) As stated in that Order, the settlement "involves tens of thousands of Minors,[1] Adults, individuals and entities who owned or leased residential property, and individuals

_____

[1] Unless otherwise defined herein, capitalized terms in this Opinion and Order have the same meaning as stated in the Amended Settlement Agreement ("ASA"). (ECF No. 1394-2.)

and entities who owned or operated a business, all of whom allege that they suffered losses and damages resulting from Defendants' roles in the Flint Water Crisis." *Id.* at *2. The Defendants participating in the settlement (the "Settling Defendants") include: the State of Michigan and its individual officials; the City of Flint, its City Emergency Managers, and several City employees; McLaren Health Care Corporation, McLaren Regional Medical Center, and McLaren Flint Hospital; and Rowe Professional Services Company. *See id.* at *3.

Movants are Dr. Lawrence A. Reynolds, M.D., FAAP ("Dr. Reynolds")[2] and the *Chapman/Lowery* Objectors.[3] Both Dr. Reynolds and the *Chapman/Lowery* Objectors filed objections to the Plaintiffs' motion for Final Approval of the settlement. (*See* ECF No. 1436 (Dr. Reynolds' objection); *see also* ECF Nos. 1463, 1471 (correcting ECF No. 1469), 1484,

---

[2] Dr. Reynolds was originally represented by attorney Valdemar Washington at the time he filed his objection. (ECF No. 1436.) Mr. Washington moved to withdraw as counsel for Dr. Reynolds on July 13, 2021. (ECF No. 1891.) The Court granted his motion on July 15, 2021. (ECF No. 1898.) Five days later, on July 20, 2021, attorney Jahmy Graham appeared on behalf of Dr. Reynolds and continues to represent him on his objections. (ECF No. 1900.)

[3] As explained in the Final Approval Order, the "*Chapman/Lowery* Objectors" are a group of individuals represented by attorney Mark Cuker, who represents just under 1,000 participants in the settlement and filed twelve objections on behalf of eighteen of his clients. *See Final Approval Order*, 2021 WL 5237198 at *10.

2

1485, 1488, 1489, 1492, 1493, 1534, 1436, 1537, and 1538 (*Chapman/Lowery* Objectors' objections).) The Court denied the objections. *See Final Approval Order*, 2021 WL 5237198 at \*34–\*60. Now, Dr. Reynolds and the *Chapman/Lowery* Objectors seek reconsideration of that decision. (ECF Nos. 2019, 2023). For the reasons set forth below, Dr. Reynolds' and the *Chapman/Lowery* Objectors' motions for reconsideration are denied.

The *Chapman/Lowery* Objectors moved to seal portions of their motion for reconsideration and an accompanying exhibit. (ECF No. 2020 (motion to seal); *see* ECF Nos. 2021, 2022 (sealed motion and exhibit).) For the reasons set forth below, the motion to seal is granted in part.

## I.  Legal Standard

### A. Motions to Seal

Eastern District of Michigan Local Rule 5.3 governs civil material filed under seal.[4] "There is a strong presumption in favor of open judicial records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d

---

[4] Under Eastern District of Michigan Local Rule 5.3, "the unredacted version may be filed under seal for the limited purpose of resolving the motion to seal without a prior court order." E.D. Mich. LR 5.3(b)(3)(A)(vi). The Court has reviewed the unredacted filings in making this decision.

299, 305 (6th Cir. 2016). A request to seal must be "narrowly tailored. . . in accord with applicable law." E.D. Mich. LR 5.3(b)(2).

The Court may grant a motion to seal "only upon a finding of a compelling reason why certain documents or portions thereof should be sealed." *Id*. at (b)(3)(B)(i). Even if no party objects to a motion to seal, the "district court that chooses to seal court records must set forth specific findings and conclusions 'which justify nondisclosure to the public.'" *Shane Grp.*, 925 F.3d at 306 (citing *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1176 (6th Cir. 1983)). The Court must make its decision based on the following three factors: "why the interests in support of nondisclosure are compelling, why the interests supporting access are less so, and why the seal itself is no broader than necessary[.]" *Id*. at 306 (citing *Brown & Williamson*, 710 F.2d at 1176).

### B. Motions for Reconsideration

To prevail on a motion for reconsideration under Eastern District of Michigan Local Rule 7.1(h)[5], a movant must "not only demonstrate a

---

[5] The Eastern District of Michigan amended Local Rule 7.1(h)—which governs motions for reconsideration—effective December 1, 2021. Both Dr. Reynolds and the *Chapman/Lowery* Objectors filed their motions for reconsideration before the effective date. Accordingly, the Court applies the rule that was in place at the time

palpable defect by which the court and the parties and other persons entitled to be heard on the motion have been misled but also show that correcting the defect will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3). "A palpable defect is a defect that is obvious, clear, unmistakable, manifest or plain." *Saade v. City of Detroit*, No. 19-cv-11440, 2019 WL 5586970 at *1, (E.D. Mich., Oct. 30, 2019) (quoting *Witzke v. Hiller*, 972 F. Supp. 426, 427 (E.D. Mich. 1997)). The "palpable defect" standard is consistent with the standard for amending or altering a judgment under Federal Rule of Civil Procedure 59(e), which requires "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006).

Motions for reconsideration should not be granted if they "merely present the same issues ruled upon by the court, either expressly or by reasonable implication," E.D. Mich. LR 7.1(h)(3), or if the "parties use ... a motion for reconsideration to raise new legal arguments that could have

---

that the filing was made. *See* Notice of Amendments to Local Rules, effective Dec. 1, 2021.
 (https://www.mied.uscourts.gov/PDFFIles/ntcProposedAmdDec2021.pdf)

been raised before a judgment was issued," *Roger Miller Music, Inc. v. Sony/ATV Publ'g*, 477 F.3d 383, 395 (6th Cir. 2007).

## II.   Analysis

### A. The *Chapman/Lowery* Objectors' Motion to Seal is Granted in Part

Under the standard set forth above, the *Chapman/Lowery* Objectors' motion for leave to file their motion under seal is granted in part. (ECF No. 2020.) The *Chapman/Lowery* Objectors argue that the portions of their brief and its accompanying exhibit "consists of documents produced by Harvard University in response to a subpoena from defendant Veolia North America ["VNA"] and which has been designated as 'Confidential' by Harvard University." (ECF No. 2020, PageID.70200.)

The sealed exhibit to the *Chapman/Lowery* Objectors' motion consists of 119 pages in total. Of these, 104 pages list names of individuals, their dates of birth, and what appears to be results of bone-lead level testing. Thirteen pages contain invoice and payment information related to Dr. Aaron Specht, who is one of Co-Liaison Counsel for Individual Plaintiffs' expert witnesses related to bone lead testing. Four pages contain e-mails regarding bone lead testing

6

equipment and one page contains e-mails related to the use of bone lead testing. The remaining two sealed pages are cover sheets.

As to factors one and two—why the interests in nondisclosure are compelling and why the interests supporting access are less so— the *Chapman/Lowery* Objectors have not set forth reasons for sealing the material other than that Harvard University designated the materials as confidential when produced to VNA.

The Court has independently reviewed the documents and determines that at this stage in the litigation it is appropriate to seal the 104 pages containing names, birth dates, and bone lead testing results. Personally identifiable and sensitive information such as this is appropriate to seal in certain circumstances. Here, it is not clear whether all the individuals listed are themselves plaintiffs in the Flint Water Cases where they have "chosen to place [personally identifying materials] in the court record," or if they are non-party private individuals whose privacy "is often one to take seriously." *Shane Grp.*, 825 F.3d at 308. Additionally, some of the people listed are minors. *See In re Flint Water Cases*, No. 16-cv-10444, 2020 WL 8671924 (E.D. Mich. Nov. 30, 2020) (granting motion to seal lists of individuals who may be minors). Sealing

7

this material is consistent with Federal Rule of Civil Procedure 5.2, which prohibits electronic filing of certain information, including a date of birth and the name of an individual known to be a minor. For these 104 pages, the interests of nondisclosure are more compelling than the interests supporting access, and accordingly the first two *Shane Group* factors are met.

As to the third *Shane Group* factor— why the seal itself is no broader than necessary— the 104 pages only contain a list of names, birthdates, and bone lead testing results. There is no other information and accordingly, it is appropriate to seal these pages in their entirety. The decision to seal this portion of the records is narrowly tailored to cover only the sensitive information. Accordingly, the third *Shane Group* Factor is satisfied for the 104 pages, which are, specifically, the following pages: ECF No. 2022 *SEALED*, PageID.70247–70351. These pages should remain sealed.

As to the remaining pages in ECF No. 2022, it is not evident on their face why Harvard University designated as confidential invoices, payment information, and emails related to Dr. Specht, bone lead testing equipment, and bone lead testing. (*Id.* at PageID.70234–70245.) No

parties (or non-parties, *i.e.* the producing entity Harvard University) have set forth reasons why these documents should remain sealed under the Confidentiality Order. (*See* ECF No. 1255-3, PageID.39394–39396.)

Despite this, a provisional seal is granted for these pages. **The Court extends the time for the producing party or other interested party to set forth reasons why these items should remain sealed to March 11, 2022.**[6] If no such requests are filed, the *Chapman/Lowery* Objectors are ordered to re-file these pages on the docket as provided in the Confidentiality Order.

In conclusion, the *Chapman/Lowery* Objectors' request to seal portions of its filings related to its motion for reconsideration is granted in part.

### B. Background Regarding Movants' Position as Non-Class Member Objectors

As set forth in the Final Approval Order, the ASA involves both class and non-class claims and cases. *See Final Approval Order*, 2021 WL 5237198 at *13. Both Dr. Reynolds and the *Chapman/Lowery* Objectors

---

[6] If Harvard University is not already aware of the *Chapman/Lowery* objectors' filing, the Court expects the manner of informing the producing party set forth in the Confidentiality Order will be followed.

9

are *non-class* participants to the settlement. Accordingly, the *Chapman/Lowery* Objectors' arguments that the Court's Final Approval Order does not conform with the fairness requirements of Federal Rule of Civil Procedure 23 (*e.g.* ECF No. 2021 *SEALED*, PageID.70231), which is applicable only to class cases and claims, does not align with their own circumstances. Instead, "[i]n non-class action cases, the parties may settle the case and stipulate to its dismissal without obtaining court approval. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii)." *Id.* But for the fact that the settlement involved class cases and claims as well as minor children, Court approval of the ASA would not have been required at all. Accordingly, the Court was not required to review and approve of the ASA as it relates to either of the movants.

The ASA, however, does not limit objections to class members only. Therefore, the Court accepted and considered movants' objections at that time and will evaluate their motions for reconsideration—though, it will not do so under Rule 23's standard as urged in the objections.

## C. Dr. Reynolds And The *Chapman/Lowery* Objectors' Arguments That The MIOSHA Documents Are "New Evidence" Necessitating A Different Result Are Denied

Both Dr. Reynolds and the *Chapman/Lowery* Objectors argue that the Court should reconsider its decision granting final approval because the result of the Special Master's Freedom of Information Act ("FOIA") request to the Michigan Department of Occupational Safety and Health Administration ("MIOSHA") constitutes newly discovered evidence that compels the Court to reach a different outcome. Their arguments are rejected for the reasons set forth below.

As background, the Special Master describes the MIOSHA FOIA material at issue in her filing entitled, *Notice of the Special Master Regarding Information Provided by the Michigan Occupational Safety and Health Administration* (the "Special Master's Notice") as follows:

> I submitted a request for the complete MIOSHA file involving Napoli Shkolnik, FAC-REG-21-03809, and Aaron Specht[7] through October 12, 2021, under the provisions of the

---

[7] The underlying facts regarding the bone lead level testing program established by the law firm Napoli Shkolnik PLLC under the leadership of Dr. Aaron Specht is described more thoroughly in the Final Approval Order. *See Final Approval Order*, 2021 WL 5237198 at \*35. In the Final Approval Order, the Court referred to Napoli Shkolnik PLLC's bone lead testing program as the "Napoli Program" and uses the same reference here. *Id.*

Michigan Freedom of Information Act (FOIA), 1976 PA 442, as amended MCL 15.231 *et seq.* ("FOIA Request"). The specific request was for:

> 1. All records, materials, communications, reports, orders, directives, and any other documents relating to the licensing and inspection of Facility defined as the office of Napoli Shkolnik Flint at 3163 Flushing Road, Flint, MI 48504, Facility Number: FAC-REG-21-03809 ("Napoli Facility"), and/or the use, licensing, and operation of a portable XRF device or devices at such Facility, by the Michigan Occupational Safety and Health Administration ("MIOSHA") and/or the Michigan Department of Labor and Economic Opportunity ("LEO"), excluding privileged documents;
>
> 2. All non-privileged statements made or issued by MIOSHA or LEO regarding the Facility, and/or the portable XRF device including their operation, and/or the inspection of the Facility or of the device(s);
>
> 3. All communications with (received from and/or sent to) the law firm Napoli Shkolnik, including but not limited to any of its officers, agents or representatives with respect to or related to the Facility and/or the request in paragraph 1; and
>
> 4. All communications with (received from and/or sent to) Aaron Specht, including but not limited to any of his officers, agents, colleagues, or representatives with respect to or related to the Facility and/or the request in paragraph 1.

(ECF No. 2007, PageID.68737–68738.)

12

The Special Master issued the above FOIA request at the Court's direction on approximately September 17, 2021. (*See* ECF No. 1963.) MIOSHA granted the Special Master's FOIA request in part and denied it in part. (*See* ECF No. 2007-2, PageID.68746–68747.) After she obtained the materials from MIOSHA, the Special Master reviewed them, prepared the Special Master's Notice, and filed the materials on the docket on November 10, 2021. (ECF No. 2007.) Later that same day, the Court issued the Final Approval Order. (ECF No. 2008.)

In the Final Approval Order, the Court stated at the end of its discussion related to MIOSHA:

> Due to delays beyond the control of the Special Master or this Court, the requested documents have only recently been made available to the Special Master. The Court may supplement this portion of the Opinion and Order after it receives and reviews the information obtained by the Special Master, if necessary.

*Final Approval Order,* 2021 WL 5237198 at *42.

Based on this portion of the Final Approval Order, Dr. Reynolds argues:

> As a threshold matter, the Court entered its ruling on this issue without having reviewed the documentation from MIOSHA related to its investigation or inspection of the use of the bone scan devices. . . At the very least, the Court should

13

reconsider the portion of its Order on this issue to include the findings from its review of the MIOSHA documentation.

(ECF No. 2019, PageID.70191–70192.) The Court rejects Dr. Reynolds' argument that it should have waited for the MIOSHA FOIA to be completed before issuing the Final Approval Order and further disagrees that reconsideration is necessary because there is no new information in the MIOSHA materials that suggests that the final approval was improper.

At the time the Court issued the Final Approval Order, the parties had fully briefed the motion for Final Approval, Objectors including Dr. Reynolds and the *Chapman/Lowery* Objectors had filed their objections and the Court held three full days of hearings where both Dr. Reynolds and the *Chapman/Lowery* Objectors were heard. The record as it related to the safety of bone scans was substantial by November 10, 2021. The Court need not have waited further, particularly where there were over 50,000 Claimants who had registered for the settlement already and were eager to learn whether the Court would grant it final approval.

On September 7, 2021, Dr. Reynolds filed a motion for leave to file a sur-reply. (ECF No. 1959.) In it, he asked the Court to consider the MIOSHA FOIA material and to consider a forthcoming deposition of an

employee of Thermo Fisher, which is the manufacturer of the pXRF handheld device used to conduct the bone lead testing in this case. (*See id.*, PageID.68164.) The Court denied Dr. Reynolds' motion, in part because the Court had already indicated that it would look at the "MIOSHA code and other materials related to Dr. Reynolds' objection" before making its decision on Final Approval. (ECF No. 1963, PageID.68431.) The Court did so, and by this Order, confirms that all of the MIOSHA material submitted both before and after the Final Approval decision was issued has been thoroughly reviewed by the Special Master and the Court. The Court concludes that nothing in the MIOSHA material provides grounds for changing the outcome of the Final Approval Order.

The Special Master's Report and exhibits thereto constitute over 800 pages of material. After reviewing the material, the Court concludes that it does not present anything new or contradictory to the record that was already before the Court at the time Final Approval was granted. Additionally, it is duplicative of facts already in the record, including several of the arguments made by Dr. Reynolds in support of his motion for leave to file a sur-reply. Specifically, the documents confirm what was

already placed in the record before Final Approval such as when the Napoli Program registered the pXRF device used to conduct bone lead testing. (*See* ECF No. 1959, PageID.68169.) The MIOSHA FOIA material provides some helpful details related to the MIOSHA inspection of the Napoli Program. For example, the MIOSHA FOIA material includes the procedures manual for conducting the testing and operating the facility (*see* ECF No. 2007-3, PageID.68772) as well as correspondence between the Napoli Program and MIOSHA during the inspection process. None of the material indicates that there were any safety concerns relevant to the Final Approval determination. The Court's rulings related to the MIOSHA material and Napoli Program remain unchanged and a supplement or amendment to the Court's Final Approval Order is unnecessary.

The *Chapman/Lowery* Objectors argue that the MIOSHA material demonstrates the following:

- The State of Michigan did not know that the Napoli firm was using the portable XRF scanners on human beings when it granted registrations for the devices on February 25, 2021.

- After MIOSHA conducted an inspection of the facility, it informed the Napoli firm that the facility did not comply with radiation safety standards for its workers and required them

16

to wear radiation monitors attached to their fingers or wrists, and required a supervisor to monitor workers and their radiation exposure. *See* ECF 2007-6, Page ID 668853-68856.

- MIOSHA also informed the Napoli firm of additional steps required to protect the health and safety of bone scan subjects, such as supervision of the scanning by a medical doctor licensed in Michigan, informing subjects about the radiation doses they were expected to receive, and modifications to the scanners that required continuous pressure so that radiation emissions could be stopped at any time and an automatic shutoff switch to prevent excess radiation exposure. *See* ECF 2007-6, Page ID 668853-68856

- Supervision by a licensed physician was required because MIOSHA's rules require a physician's supervision whenever X-ray procedures result in a dose greater than 1 mSv; the dosage administered here is 48.5 mSv. *Id.* Page ID 68845-68846.

- In addition, MIOSHA required the appointment of a Radiation Safety Supervisor, *Id.* Page ID 68853-68856.

- Violations of the radiation safety rules can be prosecuted in "criminal actions"; however, MIOSH[A] prefers to use a "collaborative, get-into-compliance approach." *Id* Page ID 69535-69536.

- Napoli did not even begin to implement the required changes until May 12, 2021. *Id.*, Page ID 68897-68899. This is well after the April 27, 2021 deadline for the completion of bone scans for purposes of the settlement. *See* ECF #1845 (denying motion to extend the April 27 deadline).

17

(ECF No. 2021 *SEALED*, PageID.70216–70217.)[8] The *Chapman/Lowery* Objectors' points do not provide any pertinent information or facts that were not already before the Court during the Final Approval process. At the time the Final Approval decision was issued, the fact that the Napoli Program utilized a pXRF device before registration with the State of Michigan was accomplished was also in the record. There is no evidence in the record, however, that MIOSHA must inspect a facility as a prelude to the registration of a device such as the pXRF. The *Chapman/Lowery* Objectors' implication that earlier registration of the device would have led to an earlier inspection is unsupported by the record. (*See* ECF No. 1959, PageID.68169.) Further, MIOSHA's public statement, discussed below, indicates that from its perspective, *there are no safety concerns* with the Napoli Program. The timing of the Napoli Program's registration of the pXRF device , though perhaps relevant to MIOSHA, does not implicate any of the issues before

---

[8] Although many of these citations are incorrect, (for example, "ECF 2007-6, PageID.668853–68856" cited by the *Chapman/Lowery* Objectors is not a recognized page range) the Court has done its best to identify which pages the *Chapman/Lowery* Objectors rely on.

this Court. *See, generally, Final Approval Order*, 2021 WL 5237198. The facts and record support final approval.

Additionally, the developments in the first round of Flint Water bellwether cases provide compelling support for the Court's ruling in the Final Approval Order and are entirely consistent with the prior record. (*See* Case No. 17-10164.) The Court has now reviewed an extensive record related to the pXRF bone lead testing process, safety, and efficacy as part of its consideration of a bellwether *Daubert* motion and a motion in limine. After reviewing the briefing and hearing oral argument on the bone lead testing with the p-XRF device, the Court found Dr. Specht's bone lead testing methods to be reliable and relevant in those cases. (*See* ECF No. 17-10444, ECF No. 447.) If the Court had been presented with facts that called into question its conclusions in the Final Approval Order, the Court would not have hesitated for a moment to amend or correct the Order. Nothing of the sort has arisen.

The Court and Special Master's review of the MIOSHA FOIA materials reveals that MIOSHA's statement summarizing its inspection procedures aligns with the Court's previous determination. MIOSHA's summary statement is as follows:

19

As an initial and general matter, *there was no indication from MIOSHA's inspections that an individual operating these machines or having the machine used on them was exposed to radiation at dangerous or unsafe levels.* MIOSHA's regulation of x-ray devices like the ones at issue is a collaborative one aimed at getting devices registered consistent with the applicable laws and rules. The rules require machines to be registered with MIOSHA, but they clearly say that a registration does not constitute an approval by MIOSHA for any particular activity. [. . .]

*It is true that MIOSHA may issue fines or pursue criminal actions if a person violates the rules. But as indicated on MIOSHA's website, it has been found to be more efficient to work with registrants to ensure the proper registration and the safe use of their x-ray machines without the need to issue civil penalties or pursue criminal action.* During the inspections at issue, *MIOSHA did not discover any facts that caused it to deviate from this collaborative, get-into-compliance approach.* Again, *MIOSHA did not conclude that an individual operating these machines or having the machine used on them was exposed to radiation at dangerous or unsafe levels.*

The use of these particular machines was novel, but MIOSHA's review and inspection of the machines and their use was consistent with its normal regulatory activities. *The novel nature of the machines did lead to more-than-typical communication with the registrant about the machines on topics like how they were being used, how much radiation they emitted, and ways that additional safeguards (or registration conditions) could be implemented. MIOSHA ultimately required additional safeguards but did not conclude that anyone was endangered by the use of the machines prior to the implementation of those additional safeguards.* For example,

20

MIOSHA immediately required the use of finger or wrist radiation monitors for employees because that is a requirement of an existing rule for users of handheld XRF units. For machine types and uses that are not specifically covered by its rules, MIOSHA will propose registration conditions for that specific use and will generally give registrants an opportunity to comment on the conditions. MIOSHA will consider a registrant's comments, but is not bound by them when ultimately issuing registration conditions.

*MIOSHA did not conclude that the registrant was being misleading about the amount of radiation being emitted.* [. . .]

*MIOSHA did not order that the machines stop being used following its initial visit to the facility because there were no indications that any individuals were being exposed to high or dangerous levels of radiation, and that course of action would not be consistent with MIOSHA's radiation safety regulation practices.* Generally, MIOSHA gives registrants time to take corrective action and, if necessary, MIOSHA may reinspect a facility to determine whether compliance was achieved. The aim here was to ensure compliance; not the issuance of orders to stop using the machines.

When it became aware of the use of these particular machines, MIOSHA took steps to ensure it acted promptly and in a manner consistent with its prior regulation of x-ray machines. The novel nature of the use of the machines caused MIOSHA to be deliberate in its review and inspections, which explains why the process was ongoing for several months.

Department of Labor and Economic Opportunity, *Information on Flint XRF Scanners*, https://www.michigan.gov/leo/0,5863,7-336-94422_11407_35791-567364--,00.html (emphasis added) [https://perma.cc/2UYC-26RV].

This summary of the MIOSHA inspection is consistent with the Court's review of the MIOSHA FOIA material and the Special Master's Notice. The MIOSHA statement repeats that *there is no indication that individuals were being exposed to high or unsafe levels of radiation*. It sets forth specific matters that were to be corrected by the Napoli Program, such as the use of finger and wrist bands and notes that *this correction does not mean that anyone was endangered before the corrections took place*. Accordingly, the position of Dr. Reynolds and the *Chapman/Lowery* Objectors that the MIOSHA documents demonstrate a palpable error in the Final Approval Order requiring a different outcome is without merit. Both Dr. Reynolds and the *Chapman/Lowery* Objectors' motions for reconsideration related to the MIOSHA documents are rejected.

### D. The Remainder of Dr. Reynolds' And The *Chapman/Lowery* Objectors' Arguments In Their Motions For Reconsideration Are Denied

#### 1. Reconsideration of The Court's Characterization of Thermo Fisher's Letter Is Unnecessary

Dr. Reynolds argues that the record does not support the Court's characterization of Thermo Fisher's motivations in its letter to the Napoli law firm. (ECF No. 2019, PageID.70188–70189.) This argument relates to the portion of the Final Approval Order where the Court set forth the full text of a May 12, 2021 letter to from Thermo Scientific, a manufacturer of hand-held pXRF devices, to Barbara Krohmer of the Napoli Shkolnik law firm. Dr. Reynolds takes issue with the portion of the Court's Order that states:

> The Court views the main purpose of this letter as an attempt by Thermo Fisher to shield itself from litigation that may arise, ironically, because of the safety-related accusations made by the objectors in this litigation. The letter does not "validate" Dr. Reynolds, "admonish" the Napoli Program, or do anything of the sort.

*Final Approval Order*, 2021 WL 5237198 at *37.

In his motion for reconsideration, Dr. Reynolds argues: "Ironically, the evidence in the record does not support the conclusion reached by the Court, and as such, at a minimum, the Court should revise its order to

23

exclude these conclusions." (ECF No. 2019, PageID.70189.) The Court declines to revise the Final Approval Order to eliminate the sentences as requested by Dr. Reynolds.

The *Chapman/Lowery* Objectors also disagree with this same portion of the Final Approval Order. (ECF No. 2021 *SEALED*, PageID.70218–70219.) They point to "identical concerns" that Thermo Fisher had about Dr. Specht's use of the hand-held pXRF device from December 2019. (*Id.* at PageID.70219.) Facts from 2019 could have been presented at the time that the *Chapman/Lowery* Objectors first objected in March 2021. (*See e.g.*, ECF No. 1463 (filed March 16, 2021).) Even so, the fact that Thermo Fisher may have communicated with Dr. Specht in 2019 does not affect the overall fairness of the ASA or the Court's approval of it. Accordingly, the Court rejects the *Chapman/Lowery* Objectors' arguments.

More important than whether the Court's characterization of Thermo Fisher's letter is correct is that this interpretation makes no difference to the outcome. The argument set forth by Objectors is that the pXRF device– as-sold out of the box– was not designed to be used on humans. As set forth in the Final Approval Order, the record shows that

the devices were customized for use on humans before bone lead tests were conducted, and that Thermo Fisher employees "knew that the devices would be modified for safety by Dr. Specht and others before they would ever be used on humans." *Final Approval Order*, 2021 WL 5237198 at *37 (discussing e-mails from Thermo Fisher representatives expressly regarding customization of the pXRF devices for bone lead testing). Additionally, MIOSHA's summary statement regarding the Napoli Program inspection noted that "there were no indications that any individuals were being exposed to high or dangerous levels of radiation, and that course of action would not be consistent with MIOSHA's radiation safety regulation practices." Department of Labor and Economic Opportunity, *Information on Flint XRF Scanners*, https://www.michigan.gov/leo/0,5863,7-336-94422_11407_35791-567364--,00.html [https://perma.cc/2UYC-26RV].

Objectors believe that, since here was an apparent violation of MIOSHA's registration timing requirements, as well as certain corrective actions that MIOSHA identified and the Napoli Program implemented, the outcome of the Final Approval decision should be changed. It is the

25

province of MIOSHA– not the Court– to address regulatory matters related to registration and to address corrective actions.

The *Chapman/Lowery* Objectors' argument that the Court is somehow a party to an illegal use of Thermo Fisher's device is baseless. MIOSHA did not fine or criminally charge Napoli Shkolnik, and the Court defers to MIOSHA to enforce its own regulations. Accordingly, these arguments are denied.

In sum, Thermo Fisher's letter regarding the pXRF handheld device does not change the Court's decision that the ASA is a fair, adequate, and reasonable outcome of the litigation.

> ### 2. The Court Need Not Have Delayed Issuing the Final Approval Order Until A Thermo-Fisher Deposition or Other Discovery Could Take Place

Dr. Reynolds argues:

a Thermo Fisher representative was scheduled to be deposed on September 2, 2021, but the deposition was postponed. The rescheduling of the deposition was forthcoming before the Order was issued. . . The Court issued its Order without the benefit of that direct and highly relevant testimony of Thermo Fisher.

(ECF No. 2019, PageID.70189.) It is unclear what the palpable error committed by the Court is alleged to be based on this argument. The

Court need not have waited on the scheduling or rescheduling of depositions of non-party representatives before issuing an order on a fully briefed and argued motion. Additionally, a deposition of a Thermo Fisher representative is not likely relevant because, as set forth in the Final Approval Order, the pXRF device is modified from what Thermo Fisher sells out of the box before it is used for bone lead scanning. The record shows that the modifications were made in accordance with the protocols used in prior studies, which were conducted with the full knowledge of Thermo Fisher. The Court did not base its opinion on an "incomplete record" as Dr. Reynolds suggests. (ECF No. 2019, PageID.70190.) Once again, the Court has reviewed extensive and voluminous briefs, expert reports, declarations of subclass counsel, and portions of extensive discovery that was taken before the settlement was achieved. The record is anything but incomplete, and all the evidence points to one conclusion – that Final Approval was and is appropriate in this case.

Dr. Reynolds similarly argues that the Court committed a palpable error because he did not have "a meaningful opportunity to develop additional evidence to the contrary[]" related to bone lead test safety. (ECF No. 2019, PageID.70196.) He states: "It is unclear how the Court

expected the objecting-Plaintiffs to obtain information regarding the bone scans and the conduct of the tests when initial motions filed to address the issue and halt testing were withdrawn and further discovery on the issue was not permitted." (*Id*.) For the same reasons set forth above, the Court rejects the argument that Dr. Reynolds and others could not have supported their objections with more facts at the time their objections were filed. There was nothing whatsoever barring Dr. Reynolds or anyone else from conducting discovery, hiring experts, or taking any other steps to support their objections. And in any event, the "withdrawn" motion remains on the docket to this day. (ECF No. 1443.) Dr. Reynolds may review it at any time.

Additionally, the Court rejects Dr. Reynolds' argument that the Court created an impossibility with the expectation that objectors should have facts and evidence in support of their arguments. (*See, generally id*., PageID.70195–70196.) But a party in litigation must obtain facts to support their arguments and positions in court. Indeed, Dr. Reynolds could have, for example, obtained expert testimony regarding radiation and/or pXRF bone lead testing, but he did not do so. Instead, as he admits, "[t]here is no evidence in the record to contradict the

28

documentation provided by Plaintiffs' counsel on the bone scans." (*Id*. at PageID.70196.) This argument is rejected.

### 3. Reconsideration of the Court's Decision Not to Hold an Evidentiary Hearing Related to the Napoli Program is Denied

Dr. Reynolds argues that the Court should have held an evidentiary hearing to allow him to present more evidence to support his claims. The Final Approval hearing was such an opportunity. At the Final Approval hearing, the parties clarified that Dr. Reynolds was heard as an individual and not as an expert witness. (*See* ECF No. 1904, PageID.66753.) On September 7, 2021, Dr. Reynolds filed a motion for leave to file a sur-reply, where he sought identical relief. (ECF No. 1959.) The Court denied his motion for the reasons set forth in its Order dated September 17, 2021. (ECF No. 1963.) If, by refreshing his request for an evidentiary hearing, Dr. Reynolds is seeking to have the Court reconsider that decision, it is untimely and it is denied.

### 4. The Remaining Arguments are Denied

The remainder of Dr. Reynolds' motion re-argues the points that he made in his objection. For example, Dr. Reynolds' reiterates his opposition to the Compensation Grid's method of providing a different

level of compensation depending on the amount of proof that a Claimant submits. In particular, he opposes the Compensation Grid's inclusion of bone lead testing as a method of proof. (ECF No. 2019, PageID.70184–71086.) Again, the Court can only approve or reject a settlement in its entirety. These arguments were all presented in his original filings and were thoroughly addressed in the Final Approval Order. *Final Approval Order*, 2021 WL 5237198 at *34–49. His arguments are also belied by the overwhelming acceptance of the settlement.

The *Chapman/Lowery* Objectors' argue that the Harvard University and Purdue University documents they cite are newly discovered evidence. (ECF No. 2021 *SEALED*, PageID.70216-70217.) Although some of these documents were not submitted to the Court earlier, they do not constitute new evidence that demonstrates a palpable error in the Final Approval Order. For example, the *Chapman/Lowery* Objectors disagree with the Court's comment that counsel's failure to contact Dr. Nie at Purdue University earlier may have played a role in Dr. Nie's rejection of counsel's request for her to conduct bone lead tests for over 1,000 people. (*Id*. at PageID.70224.) Objectors argue that, in fact, Co-Lead Class Counsel Theodore Leopold requested that Dr. Nie test

many of his clients in July 2020 – which was before the time frame that *Chapman/Lowery* Objectors' counsel approached her. (*Id.* at 70224–70225.) In other words, they argue that an earlier request to Dr. Nie would have been futile. This proves very little, if anything. The Flint Water litigation commenced in 2016. There is no reason that counsel could not have engaged an expert in the many years before the summer of 2020. While this information provides some additional facts that were not presented to the Court at the time of the Final Approval Order, they could have been presented earlier. They do not make a difference to the outcome in any event. The bottom line is that Dr. Nie could not do what was asked of her at the specific time it was asked either by the *Chapman/Lowery* Objectors or Co-Lead Class Counsel. This does not change the result of the Final Approval Order.

The *Chapman/Lowery* Objectors provide more details in their motion for reconsideration regarding their position on the Napoli Program's consent form and the cost of a scan performed at the Napoli Program. (ECF No. 2021 *SEALED*, PageID.70227–70231.) They argue that the documents produced by Harvard University in response to a VNA subpoena demonstrate that there were a large number of bone lead

31

tests conducted in total and that therefore, bone lead testing is the "predominant means by which claimants could qualify for an enhanced award." (*Id*. at PageID.70221.) This argument is rejected. The documents produced by Harvard University have nothing to do with the Napoli Program's consent form or $500 per scan charge.

The *Chapman/Lowery* Objectors have been taking the position that bone lead tests conducted by the Napoli Program are invalid due to Thermo Fisher and MIOSHA's purported positions and also that more tests should have been made available for themselves. They cannot have it both ways.

The record demonstrates that the Napoli Program began bone lead testing well before the settlement was achieved. The testing was pertinent to the litigation regardless of its later inclusion as one of many proofs set forth in the Compensation Grid. Accordingly, the Court rejects the underlying argument that the Napoli Program unfairly favored Napoli Shkolnik's clients. The bone lead testing results would have apparently been part of Plaintiffs' litigation proofs regardless of whether it was included in the ASA. Bone lead test results are most certainly a

part of the proofs in the first bellwether trial, which is currently ongoing. (*See* ECF No. 17-10444, ECF No. 447.)

## III.   Conclusion

In sum, the motions for reconsideration are denied for the reasons set forth above. Many, if not all, of the arguments made in the motions "present[] the same issues already ruled upon by the court." *See* E.D. Mich. L.R. 7.1(h)(3). *See Executive Ambulatory Surgical Cntr., LLC v. State Farm Mut. Auto. Ins. Co.*, 492 F. Supp. 3d 728, 736 (E.D. Mich. 2020). And all of the arguments made in the motions for reconsideration fail to identify "a palpable defect" that, if corrected "will result in a different disposition of the case."

IT IS SO ORDERED.

Dated: February 18, 2022    s/Judith E. Levy
Ann Arbor, Michigan     JUDITH E. LEVY
            United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 18, 2022.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager

34