*NOTICE  OF  APPEAL to the 6th Circuit Court of Appeals (and/ or) Permission to APPEAL ECF  Doc. # 2008, and # 2010 (and) whereby BOTH documents are dated within 30 DAYS hereto.... And Notice of Appeal of "announced attorney fee upcoming award" per FRAP Rule 3 and  FRAP Rule 4.... in Flint Water*
*Crisis Case # 16-cv-10444.*

Please note: that [I] Melvin Jones Jr. (e.g. current address 1935 Hosler St. Flint, Michigan ph # 810-962-6225; email - meljonesjr@gmail.com).... [am] the Pro Se Appellant in Appeal # 21-1530.

Please FILE my appeal (e.g. as the 6th Cir.) on previous occasion [VIA EMAIL] has specifically noted that {I}  MUST submit such DIRECTLY to the Detroit District Court.
Thank you,  Date: 11. 19. 2021

X_____

**Melvin Jones Jr. - disabled Flint Resident**

attachment - AA

# In the 6th Circuit Court of Appeals:

# APPEAL  #  ~~21-1530~~  TBD



*Disabled Jones' (8th and FINAL) Petition for permission to Appeal/ {e.g. permission to appeal per FRAP Rule 5; whereby the instant petition is being also made per (FRAP Rule 4, and FRAP 3)}.... As to the District Courts "announcement" of decision/ upcoming pertaining to Award of Flint Water Crisis Plaintiffs' Attorney Fees.*

In Re: Melvin Jones Jr. and/ or Pro Se Appellant, Melvin Jones Jr.    1935 Hosler St.
Flint, Michigan 48503 --- ph# 810-962-6225
Email: meljonesjr@gmail.com
(previous address: 829 Campbell St., Flint, Michigan 48507)

--------------

November 19th, 2021…

*[(8th (and) FINAL)]  petition for permission to Appeal)  FRAP RULE 5 Statement  ---- whereby for the instant document/ FRAP Rule 5 statement.....*

*Disabled Jones' 8th (and FINAL) Petition  {e.g. for permission to appeal per FRAP Rule 5; whereby the instant petition is being also made per (FRAP Rule 4, and FRAP 3)}.... As to the District Courts "announcement" of decision/ upcoming pertaining to Award of Flint Water Crisis Plaintiffs' Attorney Fees.*

## *But first, some very important context here is helpful:*

**AA.) ….so now here, we have "come full-circle, plus";    by this [I] shall explain with an all too familiar song.**

**BB.)  Artist: Michael Mc Donald
       Song: I gotta try**

*https://www.youtube.com/watch?v=aISUZP0_7o4*

**…"they say it's a hopeless fight….
But, I say I gotta try"**

## CC.)  <u>INTRODUCTION:</u>

*I, disabled Pro Se Appellant - Melvin Jones Jr., MUST additionally seek to appeal specific portion(s) of Ecf. Doc. # 2008 ---- because such literally relegate me (and) my status as to the Archer Claims Process "grid-matrix" ....such (sadly) diminishes my rights as a registrant and/ or claimant as to the Flint Water Crisis to that of a LAB-MONKEY (e.g. with specificity of and relating to the <u>commercial - industrial scrap</u>*

**_metal analyzer (X-Ray Bone Scan mess) put on by Napoli Law Firm and attorney Corey Stern._**

**DD.)   Which is to say,..... (see my affidavit affixed hereto) _I, Melvin Jones Jr., am a HUMAN  BEING_.**

**_Which ...now begs the question:_ Why are there residents (e.g. most likely MANY more than the district court/ Judge Levy is aware of) of the City of Flint who literally consider the FINAL settlement as to the Flint Water Crisis... a "SLAP IN (their) BLACK FACE" ....which (make NO mistake) the Flint Water Crisis was**

*literally CAUSED and PROLONGED and MADE WORSE by defendant THE STATE OF MICHIGAN)..... The answer is OBVIOUS, if one cares to look., ...but anyway......   Rule 23 Requirements. Federal Rule of Civil Procedure 23 permits settlement of class claims only with court approval. Fed. R. Civ. P. 23(e). Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co.,*

*327 F.3d 938, 952 (9th Cir. 2003). Thus, the Court's first task is to determine whether the settlement class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)..... In short, ....... (yes), here Judge Levy has MISCONSTRUED THE LAW/ misapplied the law, and thereby ALLOWED the ADULT residents of the City of Flint to be NOT properly considered pertaining to FRCP Rule 23 Class Certification, and as to the*

*CAFA. Simply put, Judge Levy in Ecf Doc. # 2008 has utterly FAILED to peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement.".*

*Here ---- Judge Levy in Ecf Doc. # 2008 ... [as best that I (diabled Jones can recall such when Colleen Connors - my informal caregiver read limited portions of Judge Levy's order which granted final approval of the Flint Water Crisis Settlement)]..... that "the court cannot/ will not take a red-pen to the compromise/ settlement".*

*But, here ....Judge Levy has (yet again) with vigor, misapplied the law.... Because the CAFA and FRCP Rule 23 MANDATE that the district court/ Judge Levy .... MUST (as a matter of LAW)....*

*The district court/ Judge Levy MUST, Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). Thus, the Court's first task is to*

determine whether the settlement class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

And, so.... what MUST be done.... that as a MATTER OF FAIRNESS, the primarily Black ADULT residents of the  CITY OF FLINT must be properly compensated and properly considered as to the settlement class.

Which is to say.... the State of Michigan (e.g. IF the district court

*had PROPERLY viewed the FACTS as to the City of Benton Harbor, Michigan ....(e.g. the state of Michigans' apparent blatant disregard for an 85% BLACK CITY being literally poisoned <u>FOR THREE YEARS.... (mind you) --- all the while during those 3 - years.... The State of Michigan BULL  SHIITED the district court/ Judge Levy about assertions of "putting their best foot forward"</u>.... WHEN IN FACT and THE LAW.... THE STATE OF MICHIGAN HAS SHOWN CLEARLY  THAT they (e.g. the State of Michigan place very little value on Black ADULTs'*

*lives).... And as such – – – the compromise/ Final Settlement Agreement [IS] in fact and LAW RACIST..... and DISCRIMINATORY AGAINST ADULT BLACKS.... and (as written) violates the purpose, spirit, and intent of the CAFA and FRCP Rule 23.....  Additionally, yet another (apparently RACIST [e.g. against BLACKS]).... Aspect of the compromise/ Final Settlement Agreement is that of the use of the COMMERCIAL – INDUSTRIAL SCRAP METAL ANALYZER (X–Ray Bone Scan mess, which was run by*

*Napoli Law Firm, et al.... (AND) attorney Corey Stern.....*

**.... which is to say; [I] disabled Pro Se Appellant, Melvin Jones Jr.... am very concerned that it is needed for me to submit this document: because,.... But (you) the reader MUST keep in mind that literally the COMMERCIAL/ INDUSTRIAL SCRAP METAL ANALYZER WHICH WAS USED BY NAPOLI LAW FIRM, et al., (and) ATTORNEY COREY STERN.... literally, the manufacturer (e.g. Thermo Scientific WARNS, that the commercial/ industrial 'hand-held' metal analyzer is <u>NOT</u> to be used on HUMAN BEINGS, and**

*NOT to be POINTED AT A HUMAN BEING (e.g. especially when the shutter is open/ in analyzer mode -- as I understand such).*

*Ok…. [let] me say that AGAIN !*

*the COMMERCIAL/ INDUSTRIAL SCRAP METAL ANALYZER WHICH WAS USED BY NAPOLI LAW FIRM, et al., (and) ATTORNEY COREY STERN…. literally, the manufacturer (e.g. Thermo Scientific WARNS, that the commercial/ industrial 'hand-held' metal analyzer is <u>NOT</u> to be used on HUMAN BEINGS, and NOT to be POINTED AT A HUMAN BEING.*

*Which, then, begs the question…..
Why did Napoli Law Firm, et al and
attorney Corey Stern use a device
on the residents of Flint (e.g. who
are/ were essentially their clients
[or] absent party/ absent class
members) ???*

*The answer is (I think simple)
GREED, and for MONEY…. And,
yes…. For the eventual ultimate
prize… notoriety and FAME (e.g.
think about how attorney Corey
Stern seemingly loves being in the
news, giving interviews and ….yes,
bragging !!!*

*Additionally, ….which is to say, first and foremost ----- attorney Corey Stern and Napoli Law Firm, et al…. did it to "defeat" Veolia North, Lan Engineering, THE FEDERAL EPA, and Wells Fargo Bank, et al. as to the "remaining portion" of the Flint Water Crisis Settlement.*

*For example, look very closely at the title of ECF Doc. # 2008, which is affixed hereto:*

*Ok, now looking @ the attached Exhibit labeled "safe for humans"....said MEDICAL DEVICE's United States PATENT.... [it] is NOW abundantly clear that (sadly) there*

*[IS] in law (e.g. see the attached Patent which arises from United States Law).... said patent is by the Palo Alto, California company VARIAN --- and such is literally an actual X-Ray device is which patented and used for the PRIMARY and only purpose of X-RAY procedures for HUMANS. ....yep, that means ....here, the Bull Shit collective of attorney Corey Stern, and Napoli Law Firm (along with the Bull Shit artists/ affiants noted in Ecf. Doc. # 2008 {e.g. as I listened to said ecf doc. # 2008 being read to me in limited portions by Colleen Connors (my informal caregiver)}..... the METAL x-ray analyzer made by*

***Thermo Scientific <u>without question</u> <u>(e.g. notwithstanding the apparent</u> <u>patent infringement issues as to</u> <u>such)..... DID NOT NEED TO BE</u> <u>USED IN THE FLINT WATER CRISIS</u> <u>MATTER (and) WAS PURPOSELY</u> <u>DONE, [I] think…. Such that some</u> <u>sort of "CANCER  CLUSTER"</u> <u>would be created by the Plaintiffs'</u> <u>Attorneys pertaining to the VEOLIA</u> <u>NORTH, and LAN Engineering (AND</u> <u>OTHER "flint water crisis" Lawsuits</u> (e.g. possibly even some sort of "medical monitoring event" regarding such would be requested by attorneys Corey Stern and Napoli Law Firm.   Also ---- Note: see my 1st, 2nd,***

## *3rd, and 4th permission to appeal for attachments relevant hereto.*

*Wow, where do I start ?*
*Should I begin this document with the FACT that disabled persons such as myself suffer a "special" kind of discrimination/ prejudice (e.g. which is completely separate from race discrimination of me being a Black person) ?*

*Should I start with how, it seems to me (especially the elderly, such as myself who are also disabled).... are literally made invisible by those in power (e.g. both democrats and republicans.... so before [we] get*

*started with the delusional "partisan" bull shit).... BOTH political parties do such ?*

*Which is to say…. Here (sadly) Judge Levy… in Orders Leading up to the* **<u>AWARD  OF  ATTORNEY FEES</u>…. clearly has literally put on blinders…. such that the district court in case # 16-cv-10444 as to the Flint Water Crisis has (with vigor) misapplied the law.**

**And, the Plaintiffs' Attorneys have (as the record in district court case (to include the "secret" off-the-record meetings/ hearings)... have acted in horrible and shocking**

*contravention of the 6th Circuit Court of Appeals' clear directive set forth in Mandamus # 21-2655.*

*Accordingly….. The attorney fee award MUST to "brought back to reality of LAW with relating to a DE NOVO REVIEW of the District Court record in Flint Water Crisis case # 16-cv-10444 as to comporting to the GOALS, and spirit and intent of the Class Action Fairness Act, and FRCP Rule 23, and the 6th Circuits' published law in mandamus # 21-2655)..... To an attorney fee award of MAX. $ 100,000,000.xx*

**1.)  The PRIMARY QUESTION(s) sought to be determined by the 6th Circuit Court of Appeals are as follows (e.g. with the permission to appeal being focused on Ecf Doc. # 2010 (and ostensibly Ecf Doc. # 2008) which [IS] affixed hereto;**

*(2.)  Alright…. So to the NON-BELIEVERS…. This wll sound strange and kinda of stupid, ….last night,, I prayed to God for an answer to Bless me with His grace and Favor a Guide Me in my decision about the Flint Water Crisis Settlement matters as a whole….., and*

*(3.)..... (no kidding here)...... I felt the presence of my mother, and here encouraging words, through Christ have been put on my heart….., and so*

*(4.) <u>I, Melvin Jones Jr. (although disabled and with vision disability and seriously mobility impaired and "episodic" communication - disability)…. MUST as I see it to be GODS WILL….. I</u>*

**_must and hereby give notice of appeal and_**
**_permission to appeal Ecf Doc. # 2008, and Ecf Doc._**
**_# 2010  (e.g. not permission to appeal the_**
**_ANNOUNCED upcoming attorney fee order (e.g._**
**_which grants the Plaintiffs' attorneys Fees),_**

(5.)... In short, "I can do all things
through Christ who Strengthens Me",
Philippians  4:13,

(6).... Simply put Judge Levy's
Order (Ecf Doc # 2008, as I recall
Colleen Connors reading such to me ---
i.e. very limited portions of such)...

(7).... Said Ecf Doc. # 2008
seems to literally BLINK  REALITY
of the actual financial desperation
of the residents of the City of Flint,
and (at some points…. Ecf Doc. #
2008) … IS LITERALLY
DELUSIONAL IN ITS LEGAL
ASSERTIONS  AND  TAKES
WHIMSICAL  and  FANCIFUL
DETACHMENT  FROM  NAPOLI
LAW FIRM's  own  words  in  a

*lawsuit related to the OPIOID  MESS WHICH AFFLICTS THE UNITED STATES…..  In short,    the Citizens of the City of Flint (e.g. AS TO THE APPOINTMENT SETTING PROCESS OF THE  x-RAY  BONE  SCAN MATTER   SIMPLY  DID    NOT HAVE  THE  INFORMATION,  nor, THE  MONETARY ABILITY, nor  THE ABILITY due to physical disability (and/ or impairment caused by Lead due to the Flint Water Crisis to (either in the LAW  or  in  REALITY in relation to the LAW ---- TO GIVEN (or have given)  INFORMED CONSENT, and as such, Judge Levy (e.g. in Ecf Doc. 2008, and Ecf Doc. # 2010…. has horribly misapplied the LAW).... additionally, what appears to me to be certainly critically IMPORTANT HERE…. Michigan law implies a covenant of good faith and fair dealing in every*

*contract. See Belle Isle Grill Corp. v. City of Detroit, 256 Mich. App. 463, 476 (2003) (citing Ulrich v. Fed. Land Bank of St. Paul, 192 Mich. App. 194, 197, (1991)); see also, Hammond v. United of Oakland, Inc., 193 Mich. App. 146, 151–52 (1992) ("It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.")…. which is to say, there is a VERY important QUESTION FOR THE 6th Circuit Court of Appeals to address, that is… Here, Disabled Pro Se Petitioner/ Appellant Melvin Jones Jr.'s rights to the "covenant" of fair dealing and good faith as to MSA*

*and the Plaintiffs' Attorneys (at a bare minimum) have been wrongly DEPRIVED… and thereby the MSA is NOT and CANNOT be deemed (e.g. as to this instant issue(s) presented here by Pro Se Disabled Melvin Jones Jr., as fair and reasonable….. Because the Plaintiffs' Attorneys (appear) to have WRONGLY remained silent in the face of <u>literally what appear to be</u> CLEAR LEGAL ERROR by Judge Levy re: Ecf Doc. # 2010; whereby NOW ...the "intermediate order/ what I can best describe as an interlocutory order" that being Ecf Doc #2008….. Whereby NOW <u>literally what to [ME] as a disabled person….. seem to be literally a MOUNTAIN of Clear Error by Judge Levy</u> that requires the Plaintiffs' Attorneys in their OVERALL fiduciary duty to me (e.g. disabled*

*absent party/ absent class member --- see for example 6th Circuit Mandamus # 21-2655) and the Plaintiffs' Attorneys DUTY to me which is "preempted" by the ADA (Americans with Disabilities Act) as to NOTICE REQUIREMENTS of the ACTUAL and CORRECT settlement amount, and my RIGHT TO (NOW) be heard @ a NEW series of "Fairness Hearings" re: the apparent NEW settlement amount of $ 626 million instead of the ORIGINAL noticed amount of $ 646 million {e.g. due process requirements of the CAFA and FRCP Rule 23 at a bare minimum},... AND,*

*(see the attachment Ecf Doc. # 2008 @ page # 124); which states…. "as well as any statements made by the [MIOSHA] as soon as they are available." (ECF No. 1963,*

*PageID.68431–68432.) Due to delays beyond the control of the Special Master or this Court, the requested documents have only recently been made available to the Special Master. The Court may supplement this portion of the Opinion and Order after it receives and reviews the information obtained by the Special Master, if necessary."*

*(A.) The riddle here is if the FINAL ORDER IS SUBJECT TO SUPPLEMENT by the district court ---- [is] # 2008 in LAW a "Final Order" ?*

*(B.) The answer is: NO… because as a matter of LAW, [a] final order is just that…. FINAL.   Regardless of what "title" Judge Levy has erroneously given [her] apparent "final - draft" of the intended to be edited upcoming "ACTUAL LEGALLY COGNIZABLE" in Law "final" approval of the Flint Water Crisis Settlement…. Ecf*

*Doc. # 2008 is NOT that (e.g. not a FINAL ORDER in LAW), and*

*(C.) As such, Judge Levy has misapplied the LAW (e.g. as best that I can tell as a disabled person here).... Which is certainly reversible - error… (e.g. mandates DE NOVO and sua sponte review of Ecf Doc. # 2010 (e.g. AND RELEVANT ORDERS LEADING UP TO AND GIVING RISE to Judge Levy's Order Ecf Doc # 2010…. by the 6th Circuit Court of Appeals)..... In effort to protect my due process rights as a disabled person per the CAFA and FRCP Rule 23 (i.e. at a bare minimum).*

*(D.) see the attached Gmail from my informal caregiver, Colleen Connors and attached Ecf Doc # 2010  which I received from via email (yesterday evening), and*

*(E.) I ask that the 6th Circuit Court on a sua sponte basis ---- LOOK to the entirety of Ecf Doc. # 201o…. [in the interest of Judicial Economy] to see [if] the actual "spirit and intent of the CAFA and FRCP Rule 23 are in the LAW met here…. With the following misapplication of LAW which led up to and gave rise to Ecf. Doc. # 2010;*

*(a.) affidavits which I heard mentioned as Colleen Connors (e.g. my informal caregiver) as limited portions of Ecf. Doc. # 2008…. which Judge Levy as a matter of LAW, erroneously relied upon as LEGAL OPINION…. is reversible error by Judge Levy (e.g. requires sua sponte and De Novo Review by the 6th Circuit Court of Appeals).... because said affidavits do in the instant of reaching a legal conclusion as to whether the AMSA comports to FRCP Rule 23 and/ or the*

*CAFA is a matter of LAW…. and as such, as affidavits are and amount to speculation, guessing, and assume LEGAL FACTS not in evidence, and are impermissible hearsay…. Especially given the LEGAL facts of the Federal EPA having issued an order against the State of Michigan in Benton Harbor, Michigan (e.g. and the State of Michigan having literally issued {e.g. as a LEGAL FACT} what appear to be improper/ discriminatory resolutions against the Plaintiffs' Attorneys [see the attached affixed hereto], which thereby;*

*(10.) Renders the State of Michigan Resolution which authorized the Flint Water Settlement to be ON ITS FACE, and in the LAW apparent race motivated discriminatory unconstitutional abuse of the legislative process (e.g. targeted*

*against the primarily Black African American City of Flint, Michigan (e.g. taking the LEGAL FACTS which are undisputed as to the Federal EPA's order issued against the State of Michigan, et al regarding the primarily Black African American City of Benton Harbor, Michigan),*  <u>*additionally,*</u>

*(9.)  The NEW and CORRECT settlement amount of $ 626 million dollars MUST be properly NOTICED per FRCP Rule 23 (and/ or) the CAFA…. and the related lawsuits as to VEOLIA NORTH, LAN Engineering, the Federal EPA, and Wells Fargo Bank, et al ….MUST as a matter of LAW (and such should have been done by Judge Levy as a MATTER of LAW ...PRIOR to issuance of interlocutory order/ Ecf Doc. # 2008…. which is one of the orders which gave rise to the order at*

*issue in my instant petition to appeal, Ecf Doc. # 2010),  <u>moreover,</u>*

*10.) Judge Levy ….(as I recall), which is to say ---- as I attempted to listen to Colleen Connors (e.g. my informal caregiver) read limited portions of Ecf Doc. # 2008 to me,..... as best that I can tell here as a disabled person, Judge Levy misapplied the LAW by failing to consider the TESTIMONY of (former) Mayor of the City of Flint (Dr. Karen Weaver).... who literally has FIRST HAND KNOWLEDGE and FIRST HAND OBSERVATION…. has repeatedly and consistently stated that the Flint Water Crisis Settlement is NOT fair, NOR adequate and that the Flint Water Crisis Settlement is tainted with systemic racism  (e.g. "a slap in the face" as I believe Dr. Karen Weaver has put it).... See for example, the attached news article in*

*support of my instant petition to appeal Ecf. Doc. # 2010.*

*14.)  Here…. very similar to the Napoli Law Firm, et al…. Arguments set forth in their participation in the OPIOID lawsuits…. The APPOINTMENT process (e.g. to include those who had appointments set, but canceled said appointments (e.g. such as MYSELF, disabled Pro Se Appellant, Melvin Jones Jr.) ---- DID NOT and COULD NOT HAVE GIVEN informed consent….. Which is to keep in mind that literally at the time that opioids were initially LEGALLY PRESCRIBED and APPROVED BY THE FEDERAL EPA….. the unsuspecting persons who actually took said opioid medical suffered AFTER SEVERAL YEARS  ...a horrible "opioid crisis"..... Here, simply put --- as currently written…. Ecf Doc. # 2008, is (sadly) Judge Levy's "OPIOID mess in the making as to*

*the Flint Water Crisis…* <u>**because it is simply TOO SOON TO TELL if in the LAW (as related to the opioid mess which wreaked horrible LONG TERM effects upon the United States) if informed consent as to SAFETY INFORMATION as to the APPOINTMENT SETTING PROCESS regarding the X-Ray Bones Scan matter as to the Napoli Law Firm and attorney Corey Stern is sound in the LAW.**</u>

**(15.) also, the Plaintiffs' attorneys have placed MONEY as to lining their own pockets over the interests of their clients and the ARCHER CLAIMS REGISTRANTS (e.g. such as myself) ….as such is reversible error.**

*(16.) Which is to say…. Here (sadly) Judge Levy… in Orders Leading up to the <u>AWARD OF ATTORNEY FEES</u>…. clearly has*

*literally put on blinders…. such that the district court in case # 16-cv-10444 as to the Flint Water Crisis has (with vigor) misapplied the law.*

*And, the Plaintiffs' Attorneys have (as the record in district court case (to include the "secret" off-the-record meetings/ hearings)... have acted in horrible and shocking contravention of the 6th Circuit Court of Appeals' clear directive set forth in Mandamus # 21-2655.*

*Accordingly….. The attorney fee award MUST to "brought back to reality of LAW with relating to a DE*

*NOVO REVIEW of the District Court record in Flint Water Crisis case # 16-cv-10444 as to comporting to the GOALS, and spirit and intent of the Class Action Fairness Act, and FRCP Rule 23, and the 6th Circuits' published law in mandamus # 21-2655)..... To an attorney fee award of MAX. $ 100,000,000.xx*

*(17.)  *  looking @ the attached Exhibit labeled "safe for  humans".... [it] is NOW abundantly clear that (sadly) there IS in law (e.g. see the attached Patent which arises from United States Law).... said patent is by the Palo Alto,*

*California company VARIAN --- and such is literally an actual X-Ray device is which patented and used for the PRIMARY and only purpose of X-RAY procedures for HUMANS.  ….yep, that means ….here, the Bull Shit collective of attorney Corey Stern, and Napoli Law Firm (along with the Bull Shit artists/ affiants noted in Ecf. Doc. # 2008 {e.g. as I listened to said ecf doc. # 2008 being read to me in limited portions by Colleen Connors (my informal caregiver)}..... the METAL x-ray analyzer made by Thermo Scientific <u>without question (e.g.</u>*

_**notwithstanding the apparent patent infringement issues as to such)..... DID NOT NEED TO BE USED IN THE FLINT WATER CRISIS MATTER (and) WAS PURPOSELY DONE, [I] think…. Such that some sort of "CANCER CLUSTER"  would be created by the Plaintiffs' Attorneys pertaining to the VEOLIA NORTH, and LAN Engineering (and other "flint water crisis" Lawsuits**_ (e.g. possibly even some sort of "medical monitoring event" regarding such would be requested by attorneys Corey Stern and Napoli Law Firm,

*(18.) Accordingly….. The attorney fee award MUST be "brought back to reality of LAW with relating to a DE NOVO REVIEW of the District Court record in Flint Water Crisis case # 16-cv-10444 as to comporting to the GOALS, and spirit and intent of the Class Action Fairness Act, and FRCP Rule 23, and the 6th Circuits' published law in mandamus # 21-2655)..... To an attorney fee award of MAX. $ 100,000,000.xx*

*How sad…..*
*the COMMERCIAL/ INDUSTRIAL SCRAP METAL ANALYZER WHICH WAS USED BY NAPOLI LAW FIRM,*

*et al., (and) ATTORNEY COREY STERN…. literally, the manufacturer (e.g. Thermo Scientific WARNS, that the commercial/ industrial 'hand-held' metal analyzer is __NOT__ to be used on HUMAN BEINGS, and NOT to be POINTED AT A HUMAN BEING.*

*Which, then, begs the question….. Why did Napoli Law Firm, et al and attorney Corey Stern use a device on the residents of Flint (e.g. who are/ were essentially their clients [or] absent party/ absent class members) ???*

*The answer is (I think simple) GREED, and for MONEY…. And,*

*yes…. For the eventual ultimate prize… notoriety and FAME (e.g. think about how attorney Corey Stern seemingly loves being in the news, giving interviews and ….yes, bragging !!!*

*Additionally, ….which is to say, first and foremost ----- attorney Corey Stern and Napoli Law Firm, et al…. did it to "defeat" Veolia North, Lan Engineering, THE FEDERAL EPA, and Wells Fargo Bank, et al. as to the "remaining portion" of the Flint Water Crisis Settlement… for example, look very closely at the title of ECF Doc. # 2008, which is affixed hereto.*

## *CONCLUSION:*

*Why are there residents (e.g. most likely MANY more than the district court/ Judge Levy is aware of) of the City of Flint consider the FINAL settlement as to the Flint Water Crisis which (make NO mistake) was literally CAUSED and PROLONGED and MADE WORSE by defendant THE STATE OF MICHIGAN).... well the answer here is ALSO the basis for the 6th, and 7th petition for permission to appeal ---- and that is this: Rule 23 Requirements. Federal Rule of Civil Procedure 23*

*permits settlement of class claims only with court approval. Fed. R. Civ. P. 23(e). Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). Thus, the Court's first task is to determine whether the settlement class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. See*

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)..... *In short, ....... (yes), here Judge Levy has MISCONSTRUED THE LAW/ misapplied the law, and thereby ALLOWED the ADULT residents of the City of Flint to be NOT properly considered pertaining to FRCP Rule 23 Class Certification, and as to the CAFA.   Simply put, Judge Levy in Ecf Doc. # 2008 has utterly FAILED to peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement.".*

Here – – – – *Judge Levy in Ecf Doc. # 2008 ... [as best that I (diabled Jones can recall such when Colleen Connors – my informal caregiver read limited portions of Judge Levy's order which granted final approval of the Flint Water Crisis Settlement)]..... that "the court cannot/ will not take a red-pen to the compromise/ settlement".*

*But, here ....Judge Levy has (yet again) with vigor, misapplied the law.... Because the CAFA and FRCP Rule 23 MANDATE that the district court/ Judge Levy .... MUST (as a matter of LAW)....*

*The district court/ Judge Levy MUST, Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). Thus, the Court's first task is to determine whether the settlement class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. See*

*Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).*

*And, so.... what MUST be done.... that as a MATTER OF FAIRNESS, the primarily Black ADULT residents of the  CITY OF FLINT must be properly compensated and properly considered as to the settlement class.*

*Which is to say.... the State of Michigan (e.g. IF the district court had PROPERLY viewed the FACTS as to the City of Benton Harbor, Michigan ....(e.g. the state of Michigans' apparent blatant disregard for an 85% BLACK CITY*

*being literally poisoned <u>FOR THREE YEARS.... (mind you) --- all the while during those 3 – years.... The State of Michigan BULL   SHIITED the district court/ Judge Levy about assertions of "putting their best foot forward"</u>.... WHEN IN FACT and THE LAW.... THE STATE OF MICHIGAN HAS SHOWN CLEARLY   THAT they (e.g. the State of Michigan place very little value on Black ADULTs' lives).... And as such --- the compromise/ Final Settlement Agreement [IS] in fact and LAW RACIST..... and DISCRIMINATORY AGAINST  ADULT  BLACKS.... and (as*

*written) violates the purpose, spirit, and intent of the CAFA  and FRCP Rule 23.....  Additionally, yet another (apparently RACIST [e.g. against BLACKS]).... Aspect of the compromise/ Final Settlement Agreement is that of the use of the COMMERCIAL – INDUSTRIAL SCRAP METAL ANALYZER (X–Ray Bone Scan mess, which was run by Napoli Law Firm, et al.... (AND) attorney Corey Stern.*

*<u>So to be clear:</u>*

**AA.) ….so now here, we have "come full-circle, plus";   by this [l] shall explain with an all too familiar song.**

**BB.)  Artist: Michael Mc Donald**
      **Song: I gotta try**

**https://www.youtube.com/watch?v=alSUZP0_7o4**

**…"they say it's a hopeless fight…. But, I say I gotta try"**

**CC.)  <u>INTRODUCTION:</u>**

*I, disabled Pro Se Appellant - Melvin Jones Jr., MUST additionally seek to appeal specific portion(s) of Ecf. Doc. # 2008 ---- because such literally relegate me (and) my status as to the Archer Claims Process "grid-matrix" ….such (sadly) diminishes my rights as a registrant and/ or claimant as to the Flint Water Crisis to that of a LAB-MONKEY (e.g. with specificity of and relating to the <u>commercial - industrial scrap metal analyzer (X-Ray Bone Scan mess) put on by Napoli Law Firm and attorney Corey Stern.</u>*

**DD.)   Which is to say,..... (see my affidavit affixed hereto) <u>I, Melvin Jones Jr., am a HUMAN  BEING</u>.**

**<u>Which ...now begs the question:</u> Why are there residents (e.g. most likely MANY more than the district court/ Judge Levy is aware of) of the City of Flint who literally consider the FINAL settlement as to the Flint Water Crisis... a "SLAP IN (their) BLACK FACE" ....which (make NO mistake) the Flint Water Crisis was literally CAUSED and PROLONGED and MADE WORSE by defendant THE STATE  OF  MICHIGAN)..... The**

*answer is OBVIOUS, if one cares to look., ...but anyway...... Rule 23 Requirements. Federal Rule of Civil Procedure 23 permits settlement of class claims only with court approval. Fed. R. Civ. P. 23(e). Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). Thus, the Court's first task is to determine whether the settlement*

*class satisfies the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)..... In short, ....... (yes), here Judge Levy has MISCONSTRUED THE LAW/ misapplied the law, and thereby ALLOWED the ADULT residents of the City of Flint to be NOT properly considered pertaining to FRCP Rule 23 Class Certification, and as to the CAFA.   Simply put, Judge Levy in Ecf Doc. # 2008 has utterly FAILED to peruse the proposed compromise to*

ratify both (1) the propriety of the certification and (2) the fairness of the settlement.".

Here - - - - Judge Levy in Ecf Doc. # 2008 ... [as best that I (diabled Jones can recall such when Colleen Connors – my informal caregiver read limited portions of Judge Levy's order which granted final approval of the Flint Water Crisis Settlement)]..... that "the court cannot/ will not take a red-pen to the compromise/ settlement".

But, here ....Judge Levy has (yet again) with vigor, misapplied the law.... Because the CAFA and FRCP

*Rule 23 MANDATE that the district court/ Judge Levy .... MUST (as a matter of LAW)....*

*The district court/ Judge Levy MUST, Where, as here, the parties settle their claims before the class has been certified, courts "must peruse the proposed compromise to ratify both (1) the propriety of the certification and (2) the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).*

*Here.... [I] am a HUMAN BEING in the eyes of GOD..... which means .....I am Blessed and CANNOT be a*

*LAB–MONKEY as the Plaintiffs' Attorneys, the State of Michigan and Ecf Doc. # 2008 {e.g. the compromise/ Flint water crisis Settlement seeks to relegate me to the status of a Black Lab Monkey for money.    And, NO.... my position on the matter will NOT change [IF] bananas are made part of the deal !*

*Respectfully Submitted, November 19th, 2021*

X_____

*Disabled, Pro Se Appellant/ Petitioner*
*(Melvin Jones Jr.)*

**Note: see my 1st, 2nd,  3rd, 4th, 5th, 6th and 7th Petition for permission to appeal for attachments WHICH HAVE ALREADY BEEN SUBMITTED TO THE APPEALS COURT.**

# IN THE 6th CIRCUIT COURT OF APPEALS

**APPEAL:** ~~21-1530, and~~   →TBD

*attachment BB*

Melvin Jones Jr. - Disabled Pro Se Appellant

1935 Hosler St.  Flint, Michigan 48503

{previous address:

829 Campbell St. Flint Michigan 48507}

**Ph # 810-962-6225**   Email: meljonesjr@gmail.com

# AFFIDAVIT  OF MELVIN JONES JR.... as to [me] Jones being a Human Being.

## *AFFIDAVIT:*

*I, Melvin Jones Jr., hereby declare that I am over the age of 18 years old.*

*And, that I am the Pro Se Appellant in 6th Circuit Appeal # 21-1530, and I having submitted (among other documents) a motion to intervene in 6th Circuit Mandamus: In Re: Veolia North # 21-103.*

*To the best of my information and knowledge....  I believe that [I] am a Child of God.*

*Additionally, while I did NOT observe my being born ....I believe that my mother was a HUMAN BEING,  further.... I believe that my father was a HUMAN BEING.*

*And, resultantly ....I, Melvin Jones Jr., (although to the best of my knowledge) ....I was literally born with congenital medical issues {i.e. which include serious vision impairments}.... I believe that my Race and Ethnicity is (primarily) Black African American.*

*Which is to say ---- I believe that Black African Americans are HUMAN BEINGS in the eyes of God.*

*Moreover, I have just recently read a passage (that I agree with) which states:*

*"On Feb. 1, 1960, four stools at a Woolworth's lunch counter in Greensboro, N.C., sparked national media attention and lead to hundreds of subsequent sit-ins across the country. The immediate and impactful influence that these four African-American students had on the non-violence movement during the civil rights era is frequently praised, particularly during Black History Month. However, the enormous personal stress that they likely experienced as they occupied those stools is less often considered. In honor of the four African-American*

*students and African-Americans across the diaspora, the Ethnicity and Health in America Series is raising awareness about the physiological and psychological impact of racism and discrimination as it relates to stress. The chronic condition of stress was selected because of its prevalence and impact on health within health disparity population groups (e.g., people of color), and their high association with many other chronic diseases."*

*I, Melvin Jones Jr., declare under penalty of perjury per 28 USC S. 1746.... That the foregoing is true and correct to the best of my recollection, personal belief, personal observation, understanding and information, and the attachments affixed hereto  are true and correct copies of the digital originals.*

*11-18-2021*   _____

*Melvin Jones Jr.,  Disabled Pro Se Appellant*

(see the attached supporting documents affixed hereto)



**Gmail** attachment-cc    Mel jones jr <meljonesjr@gmail.com>

---

# 21-1530..... Declaration from Disabled Pro Se Appellant, Melvin Jones jr..... (forward --- predictions)
1 message

---

**Mel jones jr** <meljonesjr@gmail.com>                                    Thu, Nov 18, 2021 at 11:54 PM
To: CA06_Temporary_Pro_Se_Efiling <CA06_Temporary_Pro_Se_Efiling@ca6.uscourts.gov>
Cc: Colleen Connors <cmcolleen4@gmail.com>, mel jones jr <meljonesjr@gmail.com>, tbishop@mayerbrown.com, jahmy.graham@nelsonmullins.com, jon@lehotskykeller.com, mskaller@levylaw.com, mmaimon@levylaw.com, mnguyen-dang@mayerbrown.com, Patrick Lanciotti <PLanciotti@napolilaw.com>, Amanda Trujillo <atrujillo@cityofflint.com>, wkim@cityofflint.com, bergf@butzel.com, klein@butzel.com, Flint Mayor <mayor@cityofflint.com>, Michigan Attorney General <miag@michigan.gov>, jmcampbell@campbell-trial-lawyers.com, bush@bsplaw.com, williams@bsplaw.com, "Alaina N." <adevine@campbell-trial-lawyers.com>, travis.gamble@faegredrinker.com, david.kent@faegredrinker.com, vance.wittie@faegredrinker.com, perickson@plunkettcooney.com, rkamenec@plunkettcooney.com, rstowers@plunkettcooney.com, Saulius <smikalonis@plunkettcooney.com>, wayne.mason@faegredrinker.com, Mel jones jr <Blessedami97@yahoo.com>, mel jones <meljr777@yahoo.com>, ctaylor@jonesday.com, lpgabel@jonesday.com, melindetroit <melindetroit@gmail.com>, Complaints Office 05 <ComplaintsOffice05@hud.gov>, tleopold@cohenmilstein.com, smorrissey@susmangodfrey.com, mpitt@pittlawpc.com, pnovak@weitzlux.com, tbingman@tbingmanlaw.com, eberezofsky@eblawllc.com, Val@vlwlegal.com, robinsonr11 <robinsonr11@michigan.gov>, "Pier (AG)" <KingP1@michigan.gov>, ted.frank@hlli.org, frank.bednarz@hlli.org, Corey <cstern@levylaw.com>, mark@cukerlaw.com, elevens@cohenmilstein.com, jdelorenzo@plunkettcooney.com, kuhlr@michigan.gov, bettenhausenm@michigan.gov, Regan.Michael@epa.gov, Newton.Cheryl@epa.gov, starfield.lawrence@epa.gov
Bcc: "Mel Jones Jr." <midcenturyatfirst@gmail.com>, Mel jones jr <Blessedami97@yahoo.com>, mel jones <meljr777@yahoo.com>

*APPEAL  # ~~21-1530~~....  TBD*

*11-19-2021*

## <u>Ok my forward predictions are these:</u>

*1.) I recently read an article wherein one of the Plaintiffs' attorneys noted "a continued search for justice" as to some Flint Residents.   And, I must admit.... at that point, I realized that (possibly) I have been bull-shitting myself into thinking that my appeal will aid the 6th Circuit Court in appreciating what one Flint*

*resident's perspective on the Flint Water Crisis., but in reality who am I kidding ?*

*2.) In truth, (although the State of Michigan is wrong as can be).... such is sadly the plight of Black's in America....,*

*3.) Which is to say ---- I once had a (previous) good friend who worked for a court in California tell me, that the LAW is as clear as mud !*

*4.) And, so.... with so many issues which face our nation ---- what is "Justice" ?*

*5.) Actually, I simply do NOT know.*

*6.) What I do know is that for literally all my life, I have had the Blessing and Favor of God upon me..... and, so to me (that is more than Justice)....*

*7.) So now to my predictions:*
*(a.) by the next census, the City of Flint will be at approx. 50,000 residents. Especially given the unavoidable fact that adults will be*

forced out of the City of Flint (e.g. especially when the district courts order # 2008) is ACTUALLY published in local news papers.
 Which is to say.... I believe most of all Flint is looking for FAIRNESS, which simply was NOT present in the FWC settlement process.  In short, the water rates alone are cost prohibitive for someone on a fixed income/ poor such as myself.

(b.) No matter how horrible the district court's document # 2008..... the residents of the City of Flint are soooo financially desperate that no one will actually care what is in the document !

c.) and in approx. 5 to 7 years.... eventual frustration will set in (e.g. AFTER) the money is spent from any claims awards.,

d.) And, (sadly) I will be faced with the FACT that I have a HUGE decision of should I even participate in a claims process which I know in my heart of hearts (e.g. silly sounding but the only words that I could think of)... is a grossly flawed process ...which is rife with unfairness for the residents of the City of Flint.... not to mention my recollection of the ENTIRE conversation with Patrick Lanciotti (e.g. which

*is to say.... most of what I recall Patrick telling me has in FACT occurred, ....said, but true).*

*~Mel*

11. 19. 2021

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

_____/

Judith E. Levy
United States District Judge

This Order Relates To:

ALL CASES

_____/

## OPINION AND ORDER GRANTING FINAL APPROVAL OF A PARTIAL SETTLEMENT, GRANTING CERTIFICATION OF A SETTLEMENT CLASS, GRANTING APPOINTMENT OF SETTLEMENT CLASS COUNSEL [1794], DENYING OBJECTIONS, AND ADOPTING THE REPORT AND RECOMMENDATION [2006]

Before the Court is a motion for final approval of a partial settlement that provides compensation to tens of thousands of people who were impacted by exposure to lead, *legionella*, and other contaminants from the City of Flint's municipal water supply system during the events now known as the Flint Water Crisis. The settlement resolves thousands of claims pending in this Court, the Genesee County Circuit Court, and the State of Michigan Court of Claims. The settlement involves both class action and non-class action lawsuits. The portion of the $626.25 million

settlement to be paid by the State of Michigan is one of the largest settlements in the State's history.[1]

The settlement reached here is a remarkable achievement for many reasons, not the least of which is that it sets forth a comprehensive compensation program and timeline that is consistent for *every* qualifying participant, regardless of whether they are members of a class or are non-class individuals represented by their own counsel. For the reasons set forth below, the objections to the settlement are denied, and final approval of the settlement is granted. Plaintiffs' motion for attorney fees will be addressed in a separate opinion and order.

---

[1] *See, e.g.*, Michigan S. Fiscal Agency, *FY 2018-19 Status of Lawsuits Involving the State of Michigan*, 4 (July 2020), https://www.senate.michigan.gov/sfa/publications/lawsuit/lawsuit_mostrecent.pdf [https://perma.cc/W3ZQ-X7RK] (showing, at Table 3, that the maximum settlement amount for all combined lawsuits against the State over a ten-year period did not exceed $76,308,820).

# Table of Contents

I.  BACKGROUND ..................................................................................... 6

   A.  The Negotiation Process ............................................................... 10

   B.  The Amended Settlement Agreement ("ASA") ............................ 16

   C.  Registration Forms and Objections Received by the March 29, 2021 Deadline ................................................................................... 27

   D.  Fairness Hearing ......................................................................... 32

   E.  Other Matters Post-Fairness Hearing ........................................ 36

II.  LEGAL STANDARD ........................................................................ 37

III.  DISCUSSION ................................................................................. 44

   A.  Non-Class Portion of the Settlement ......................................... 44

   B.  Class Plaintiffs' Portion of the Settlement ................................ 59

     1.  Likelihood of Success on the Merits ..................................... 60

     2.  Class Representatives and Class Counsel Representation ...... 64

     3.  Arm's Length Negotiations and No Evidence of Collusion or Fraud ............................................................................................ 65

     4.  Adequate Relief ..................................................................... 66

     5.  Whether Class Members Are Treated Equitably Relative to Each Other ................................................................................... 70

     6.  The Amount of Discovery Conducted ..................................... 72

     7.  Opinions of Class Counsel and Class Representatives and Reaction of Absent Class Members ................................................ 73

     8.  Public Interest ....................................................................... 76

     9.  Incentive Awards ................................................................... 76

   C.  Notice to the Class and Due Process .......................................... 78

   D.  Certification of the Settlement Class ......................................... 81

   E.  Appointment of Co-Lead Class Counsel and the Executive Committee as Class Counsel for Settlement Purposes ....................... 95

F.    Report and Recommendation on Late Registrants.......................96

IV.   OBJECTIONS...........................................................96

A.    Objections Based On Compensation Grid...................................98

1.    Objections Related to Bone Lead Level Testing........................98

a.    Objections to the Use of the Thermo Fisher Manufactured Hand-Held XRF Device on Humans ...........................................101

b.    Objections Regarding The Napoli Program's Regulatory Compliance and Legality..........................................................119

c.    Objections to XRF Bone Lead Level Testing Because It Has No Medical Purpose................................................................124

d.    Objections Arguing that the Napoli Program Constitutes an Undisclosed Research Project......................................................127

e.    Objections Claiming that Bone Lead Level Testing is the "Main Method" of Recovery Under the ASA...............................130

f.    Objections Asserting That Bone Lead Level Testing At Mt. Sinai and Purdue University Were Unavailable to Objectors...133

g.    Objections Related to the Unavailability for Non-Client Bone Lead Level Test Appointments with the Napoli Program.........138

h.    Objections Related to the Napoli Program's Requirement that Participants Sign a Liability Release.........................................143

i.    Objections Related to the $500 Cost of a Bone Lead Level Test with the Napoli Program..........................................................145

j.    Arguments Related to Bone Lead Level Testing Submitted After the March 29, 2021 Deadline for Filing Objections..........146

2.    Objection Related to Blood Lead Level Test Results..............148

3.    Objections to Cognitive Deficit Testing Settlement Category Requirements.......................................................................149

4.    Objection Related to the Miscarriages and Fetal Blood Lead Level Test Results Settlement Category.........................................154

5.    Objections to the Compensation Grid's Requirements of Proof of Galvanized Steel Service Lines.......................................................155

4

6. Objections Related to the Compensation Grid's Failure to Include Additional or Different Categories ..................................... 158

7. Objections Related to the Overall Allocation of Funds for Minors Versus Adults ....................................................... 160

8. Objections Related to the $1,000 "Cap" in the Compensation Grid for Property Owners and Renters ........................................ 162

9. Objections Arguing that the Overall Settlement is Unfair, Unreasonable, and Inadequate to Homeowners ............................ 163

B. Objections Related to the ASA's Requirements for Registration and Objections ...................................................... 165

1. Arguments that Registration Deadline Was Too Short ......... 165

2. Objection to Providing the Claims Administrator With PII for Registration Purposes ............................................... 166

3. Objection Arguing that, at the Time of Registration, Participants Did Not Know the Final Amount of their Monetary Award ................................................................... 167

4. Objections that Individual and Class Counsel Who Are Listed in Exhibit 17 of the ASA Did Not Represent Individual Objectors At the Fairness Hearing ................................................ 169

5. Objections related to Using Zoom to Communicate With their Attorneys ............................................................. 171

C. Objections Related to COVID-19 ............................................ 172

D. Objections to the Notice's Content ...................................... 173

E. Objections to Class Representative Payment ........................... 174

V. CONCLUSION ...................................................... 175

## I.  BACKGROUND

Plaintiffs are tens of thousands of Minors,[2] Adults, individuals and entities who owned or leased residential property, and individuals and entities who owned or operated a business, all of whom allege that they suffered losses and damages resulting from Defendants' roles in the Flint Water Crisis. The Defendants participating in the settlement (the "Settling Defendants") are not all of the Defendants involved in the Flint Water litigation, and accordingly, this settlement is only a partial settlement of the Flint Water cases.[3]

The Settling Defendants include: the State of Michigan and its individual officials, which are collectively referred to as the "State

---

[2] Unless otherwise defined, capitalized terms in this Opinion and Order, such as "Minor," have the same meaning as defined in the Amended Settlement Agreement. For reference, Minor is defined in the Amended Settlement Agreement as "any Claimant participating in the Settlement program that will be less than eighteen (18) years of age at the time an election is made by a Next Friend from the options on how a Monetary Award should be distributed as set forth in Paragraph 21.28 [of the Amended Settlement Agreement]." (ECF No. 1394-2, PageID.54132.)

[3] The remaining non-settling Defendants are engineering firms that provided services to the City during the Flint Water Crisis. Plaintiffs and these remaining Defendants continue to actively litigate, and the first bellwether trial is scheduled to begin in February 2022.

Defendants";[4] the City of Flint, its City Emergency Managers, and several City employees, collectively referred to as the City Defendants;[5] McLaren Health Care Corporation, McLaren Regional Medical Center, and McLaren Flint Hospital, collectively referred to as the McLaren Defendants; and Rowe Professional Services Company, referred to as Rowe.

The settlement reached between Plaintiffs and the Settling Defendants is in a document entitled the Amended Settlement Agreement ("ASA"). (ECF No. 1394-2.) The Court discussed the facts leading up to and resulting in the settlement in its January 21, 2021 Opinion and Order Granting Plaintiffs' Motion to Establish Settlement Claims Procedures and Allocation and for Preliminary Approval of Class Settlement Components. *See In re Flint Water Cases*, 499 F. Supp. 3d 399

---

[4] The State Defendants are: the State of Michigan, Michigan Department of Environmental Quality (now known as Michigan Department of Environment, Great Lakes, and Energy), Michigan Department of Health and Human Services, Michigan Department of Treasury, former Governor Richard D. Snyder, Governor Gretchen Whitmer, the Flint Receivership Transition Advisory Board, Lianne Shekter Smith, Daniel Wyant, Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Eden Wells, Nick Lyon, Nancy Peeler, Robert Scott, Adam Rosenthal, Dennis Muchmore, Kevin Clinton, Linda Dykema, and Andy Dillon.

[5] The City Defendants are: The City of Flint, Howard Croft, Michael Glasgow, Dayne Walling, Daugherty Johnson, Gerald Ambrose, Edward Kurtz, Darnell Earley, and Michael Brown.

(E.D. Mich. 2021) (the "Preliminary Approval Order"). The relevant facts from that Order are as follows:

> In January 2018, the Court appointed two mediators pursuant to E.D. Mich. Local Rule 16.4 – former United States Senator Carl Levin and former Wayne County Circuit Court Judge Pamela Harwood – to facilitate settlement discussions. (ECF No. 324, PageID.11687–11693.) In July 2018, under Federal Rule of Civil Procedure 53, the Court appointed Deborah E. Greenspan to serve as a Special Master to assist with certain pretrial matters and to manage aspects of the settlement process. (ECF No. 544, PageID.16581–16590.) Also, in September 2019, the Court appointed Subclass Settlement Counsel to represent six subclasses of Plaintiffs in settlement allocation discussions. (ECF No. 937, PageID.24430–24433.)

> Sen. Levin and Ret. Judge Harwood reported to the Court periodically regarding the status of settlement negotiations. Additionally, beginning in September 2018, Special Master Greenspan began collecting data regarding potential claimants across all Flint Water Cases. (ECF No. 519, PageID.15988; ECF No. 563, PageID.17097.) The primary purpose of the data collection was to understand the scope and nature of the claims, to facilitate and inform the parties' settlement discussions, and to develop a settlement structure. (ECF Nos. 614, 673.) Every forty-five days since December 28, 2018, counsel provided Special Master Greenspan with the Court-ordered data. (ECF No. 673.) Special Master Greenspan has filed three interim reports to the Court regarding the data. (ECF Nos. 772, 949, 1105.) She also collected Time and Expense Common Benefit Data. Data

collection is ongoing in light of the proposed settlement. (*See* ECF No. 1254.)

The negotiations on behalf of the Plaintiffs were conducted by Co-Liaison Counsel and Co-Lead Class Counsel appointed by the Court for this purpose, among other responsibilities. The Subclass Settlement Counsel later appointed by the Court participated in negotiations along with Co-Liaison Counsel over how to allocate any settlement funds among the various categories of claimants. These negotiations occurred under the auspices of the Court and the supervision of the Court-appointed Special Master.

In August of 2020, Plaintiffs and the State Defendants announced that they had reached an agreement to settle their claims for $600 million. In October of 2020, Plaintiffs and the City Defendants preliminarily agreed to a $20,000,000 settlement, which required approval from the Flint City Council on or before December 31, 2020. The Flint City Council voted to join the settlement on December 21, 2020. (ECF No. 1357, PageID.42106.) Plaintiffs and the McLaren Defendants also agreed to settle for $20 million, and Plaintiffs and Rowe agreed to settle for $1.25 million.

*Id*. at 411. Additional facts regarding the settlement are set forth below. These include details on the negotiation process, the terms of the ASA, the period after the Preliminary Approval Order was entered, the three-day final fairness hearing that began on July 12, 2021, and the registration and objections period.

## A. The Negotiation Process

Sen. Levin and Ret. Judge Harwood indicate in a declaration filed through Special Master Greenspan on July 11, 2021 that they devoted over 2,000 hours to mediating this case. (ECF No. 1885, PageID.66211–66213.) They conducted numerous telephonic and in-person meetings that were attended by up to fifty lawyers and client representatives.[6] (*Id.*) Both Sen. Levin and Ret. Judge Harwood attest that the aggregate settlement amounts were achieved "through lengthy arms-length negotiations in which, in our view as mediators, the plaintiffs obtained the maximum amount of compensation that the settling defendants were able and willing to offer." (*Id.* at PageID.66212.) The declaration concludes with Sen. Levin and Ret. Judge Harwood stating that "we support the settlement amount pending before the Court. We believe it is the product of informed, arms' length negotiations by the parties, represented by experienced and competent counsel, with due recognition

---

[6] Sen. Levin, who was the longest-serving United States Senator in the State of Michigan, died on July 29, 2021. His contribution to this case and to the settlement cannot be overstated. A footnote in a judicial opinion hardly seems enough to acknowledge and honor the loss of someone who made such a meaningful contribution to our country, our state, and to the resolution of this case. May he rest in peace.

10

of the complexity of the facts and legal issues in this litigation." (*Id.* at

PageID.66212–66213.)

At the final approval and fairness hearing in July 2021, Special

Master Greenspan provided an oral report to the Court detailing her

involvement in over two years of vigorous settlement negotiations. (*See*

ECF No. 1904, PageID.66658–66669.) She indicated that the mediators

became involved in the negotiations in January 2018 and that the parties

identified the types of claims and issues that they considered essential

requirements for an eventual settlement. (*Id.* at PageID.66659.) This

aspect of the negotiations lasted several months. It was not until October

2018 that the parties were ready to begin developing the structural

elements of the settlement with the assistance of the Special Master. (*Id.*)

This part of the negotiation process took more than two years. (*Id.*)

According to the Special Master, "the two-year period was not the result

of taking a lot of breaks in the negotiation process. It was that hard. The

negotiation was that complicated. There are many, many issues that had

to be resolved." (*Id.*)

During her oral report at the hearing, Special Master Greenspan

described thousands of hours, communications, meetings, drafts,

proposals, counterproposals, and compromises that all of the parties made throughout the entire negotiation process. (*Id.* at PageID.66659–66660.) She indicated that over fifty lawyers participated in the settlement discussions, and that the parties had "widely different views about a multitude of issues." (*Id.* at PageID.66660.) The Special Master stated that by April 2019, Plaintiffs and the State Defendants agreed to some basic settlement principles, but even then, both sides still had many more issues to resolve before reaching an agreement. (*Id.* at PageID.66662.)

The Special Master reported that after the basic elements of the agreement were identified, the parties began negotiations on what would become Exhibit 8 to the ASA, which is entitled the "Flint Water Cases (FWC) Qualified Settlement Fund Categories, Monetary Awards, and Required Proofs Grid (11/11/20)" (the "Compensation Grid"). (*Id.* (*see also* ECF No. 1319-2, PageID.40789).) The Special Master described the Compensation Grid negotiations as "very lengthy, very arduous, [and] very substantive." (*Id.* at PageID.66665.) For example, in late 2019, there were six subclass counsel negotiating the allocation and distribution of

12

funds on the class side of the settlement. (*Id*. at PageID.66663.) The subclass allocation negotiations continued into 2020. (*Id*.)

The settlement was announced to the public in August 2020, and, at that stage, the Compensation Grid was still not completely finalized. (*Id*.) The parties continued negotiating aspects of the Compensation Grid and other details between August and November 17, 2020, when the motion for preliminary approval was filed. (*Id*.) During those months, three additional Defendants (the City Defendants, the McLaren Defendants, and Rowe) joined the settlement.

Special Master Greenspan emphasized in her report that the settlement negotiations and ultimate agreement were "not dictated by any one party. This was not the product of one side or another determining what they thought would be the best settlement. This reflects a compromise. It reflects dedication to the process. It reflects extensive research and analysis and discussion. It reflects engagement of the parties." (*Id*. at PageID.66666.) She summed up the negotiations as follows:

> This may be one of the longest and most complicated settlement negotiations I've ever been involved in. It has been – and for several, several reasons including just the nature of the claims here and the nature of the parties involved. But I

13

think that the process was one that reflects exactly what you want to have in a settlement negotiation. It was arm's length. It was hard fought. And everyone made appropriate compromises in order to achieve what everyone believed was a correct, reasonable, and fair goal.

(*Id.* at PageID.66668.)

The Special Master also discussed the active role the State of Michigan played in the negotiations, which was echoed by Margaret Bettenhausen, counsel for the State Defendants, at the final fairness hearing. (ECF No. 1904, PageID.66543.) Bettenhausen stated that when negotiating settlements in large and complex litigation such as this, typically the Defendants' sole focus is on how much money they will pay; the Defendants often believe that after that amount is determined, their role ends. But in this case, the State Defendants "negotiated with literally dozens of different plaintiffs' attorneys for well over a year and many all day and late night face-to-face meetings . . . involve[ing] hundreds of hours and thousands of written, verbal follow-up . . . communications." (*Id.* at PageID.66544–66545.) Bettenhausen also noted that the State Defendants' "goal and interest in this settlement has never been just to pay money and walk away from the City of Flint. Very much the opposite." (*Id.* at PageID.66545.)

14

These sentiments are echoed by the sworn statements of appointed interim subclass settlement counsel. For example, Larry E. Coben, Interim Subclass Settlement Counsel for the Children's Injury Subclass, was appointed by the Court in August 2019 to negotiate on behalf of Minors. (ECF No. 929.) Coben, through Co-Lead Class Counsel, submitted a declaration in support of final approval of the settlement indicating that the negotiations he engaged in "with respect to how an aggregate settlement amount paid by the Settling Defendants would be allocated" were conducted at arm's length. (ECF No. 1319-5, PageID.41253–41254.) He states that in his independent determination, the ASA is "fair and in the best interests of the minors participating in the settlement." (*Id*. at PageID.41254.) Reed Colfax, Interim Subclass Settlement Counsel for Older Children's Injury (ages 7-17) Subclass, concurs. (ECF No. 1319-6.) As does Seth R. Lesser, Interim Subclass Settlement Counsel for a Future Manifesting Injury Subclass (ECF No. 1319-7), Sarah R. London, Interim Subclass Settlement Counsel for a Property Damage Subclass (ECF No. 1319-8), Dennis C. Reich, Interim Subclass Settlement Counsel for a Business Economic Loss Subclass (ECF No. 1319-9), and Vincent J. Ward, Interim Subclass Settlement

15

Counsel for an Adult Injury Subclass. (ECF No. 1319-10.) These individuals, representing separate subclass interests, all attest that the negotiations regarding the aggregate settlement amount and its allocation between the various proposed subclasses were vigorous, were conducted at arm's length, and achieved a fair result. (*See* ECF Nos. 1319-5, 1319-6, 1319-7, 1319-8, 1319-9, and 1319-10.)

### B. The Amended Settlement Agreement ("ASA")

The ASA contains provisions that apply to Minors, Legally Incapacitated Individuals ("LIIs"), Future Minor Claimants, Adults, property owners and renters, and business owners and operators. (ECF No. 1394-2.) In addition, the ASA addresses funding for Programmatic Relief, which will provide special education services for qualifying individuals.[7] (*Id.* at PageID.54149–54150.) The basic components of the ASA, as well as the processes and procedures that ensure multiple layers of oversight and integrity in the decisions made under the ASA, are discussed below.

---

[7] In its Preliminary Approval Order, the Court discussed in detail the ASA's terms and the provisions that apply to Minors, LIIs, and Future Minor Claimants, as well as the provisions that relate to Programmatic Relief. *See Preliminary Approval Order*, 499 F. Supp. 3d at 412–19.

16

The ASA provides that the Settling Defendants are to deposit their agreed-upon Settlement Amounts in the established FWC Qualified Settlement Fund. (*Id.* at PageID.54138–54140.) The State Defendants are obligated to pay $600,000,000; the Flint Defendants are obligated to pay $20,000,000; the McLaren Defendants are obligated to pay $5,000,000;[8] and Rowe is obligated to pay $1,250,000. (*Id.* at PageID.40338.)

The ASA appoints Archer Systems, LLC as the Claims Administrator. The Claims Administrator has many important roles, which include: (1) reviewing registration and claims submissions in a timely and accurate fashion; (2) setting up a secure database with claimant information; (3) coordinating and communicating with the parties; (4) providing monthly reports to counsel; and (5) establishing evidentiary review procedures to prevent fraud. (*Id.* at PageID.54160.) The Court oversees and retains jurisdiction over the Claims Administrator and may request reports or other information from the Claims Administrator at any time. (*Id.* at PageID.54163.)

---

[8] The McLaren Defendants' payment obligations are discussed further below.

The Special Master oversees various aspects of the settlement pursuant to the ASA. Her duties include: (1) consulting with the Claims Administrator and making decisions regarding registration and participation; (2) considering and deciding, in a timely fashion, any appeals taken by participants (which is discussed further below); and (3) handling any disputes that arise involving the ASA. (*Id*. at PageID.54163–54174.)

In addition, the ASA provides for a Settlement Planning Administrator ("SPA"). (*Id*. at PageID.54164–54165.) The SPA's role relates only to claims made by Minors. (*Id*.) The SPA is charged with ensuring the efficient and timely funding of Special Needs Trusts and Settlement Preservation Trusts and providing appropriate documentation of Structured Settlements. (*Id*.) The SPA is overseen and supervised by both the Master Guardian Ad Litem ("Master GAL") Miriam Wolock and the Special Master. (*Id*.) Accordingly, there are multiple levels of protection over the settlement funds and its administrators.

The ASA establishes a registration process. It requires all members of the Settlement Class and all Individual Plaintiffs who wish to

18

participate in the settlement to submit a Registration Form to the Claims Administrator no later than March 29, 2021. *See Preliminary Approval Order*, 499 F. Supp. 3d at 433 (indicating the deadline for registration). The ASA specifies a process and procedure for the Claims Administrator to follow after the registration period closes. The Claims Administrator must review the information and proofs provided on the Registration Forms and must consult with the Special Master on any discretionary decisions that need to be made during the review.[9] (ECF No. 1394-2, PageID.54150–54151.) The ASA also allows individuals who failed to submit all required information upon their initial registration to re-submit their materials. (*Id.* at PageID.54142.) Therefore, no one is excluded from participating in the settlement merely because they initially submit an incomplete or incorrect Registration Form.

The ASA provides that after the Claims Administrator has reviewed the Registration Forms, the Claims Administrator will post a

---

[9] Although the ASA states that the Claims Administrator must review every Registration Form within fourteen days of receipt (ECF No. 1394-2, PageID.54142), in practice, this process was much more complicated. The Special Master addressed this in a report regarding the status of registrations as of May 27, 2021 (ECF No. 1790, PageID.64246–64250) and again on October 27, 2021. (ECF No. 2005, PageID.68708–68717.)

19

list of "all persons and entities who have registered and been found eligible to participate as a Claimant in the Settlement Program." (*Id.*) The posting of this list triggers two events: first, it triggers the start of the Claims Process, and second, it triggers the Settling Defendants' Walk-Away Rights under the ASA. (*Id.*)

As to the Claims Process, eligible participants on the Claims Administrator's list are required to submit their Claim Materials to the Claims Administrator within a specified time.[10] (*Id.* at PageID.54141–54142.) The Claims Materials include the documents listed on the Claim Form (*see* ECF No. 1319-2, PageID.40740–40745), a fully executed Release (*see id.* at PageID.40784–40787, 41223–41227, 41248), and the applicable Lien Disclosure Form (*see id.* at PageID.40844–40846). (ECF No. 1394-2, PageID.54142–54143.) Claimants who deliver proper, complete, and fully executed Claim Materials by the deadline are eligible to receive a Monetary Award, as discussed further below. (*Id.*)

Regarding the Walk-Away Rights triggered by the Claims Administrator's posting of the eligible registrant list, each Settling

---

[10] Due to the delays reported by the Special Master, the deadline for submitting Claims Materials to the Claims Administrator set forth in the Preliminary Approval Order is inoperative.

Defendant has the right to "walk away" from the ASA in its sole discretion, but *only* for the reasons specified in the ASA, as applicable to each Settling Defendant. (*Id*. at PageID.54181–54182.) Settling Defendants have thirty days after the receipt of the final registrant list to exercise their right to walk away from the ASA. (*Id*. at PageID.54182.)

Once the Claims Process begins, the Claims Administrator's focus shifts to determining Monetary Awards. (*Id*. at PageID.54143–54149.) On the Claim Form, a Claimant may select the Settlement Category that they believe is applicable. (*Id*. at PageID.54143.) The FWC Qualified Settlement Fund is divided into six Sub-Qualified Settlement Funds which are:

- Minors six years old or younger on the date the individual was first exposed to Flint Water;

- Minors age seven to eleven years old on the date the individual was first exposed to Flint Water;

- Minors age twelve to seventeen years old on the date the individual was first exposed to Flint Water;

- Adults age eighteen and over on the date the individual was first exposed to Flint Water;

- Residential Property Owners/Renters; and

- Businesses that experienced property and economic losses.

21

(*Id.* at PageID.54146.)

The net funds[11] available from the FWC Qualified Settlement Fund

for payments to Claimants are allocated into the Sub-Qualified

Settlement Funds as follows:

- Minor children age six or younger (the "Minor Child Sub-Qualified Settlement Fund") receive 64.5% of the net funds;

- Minor children age seven to eleven (the "Minor Adolescent Sub-Qualified Settlement Fund") receive 10% of the net funds;

- Minor children age twelve to seventeen (the "Minor Teen Sub-Qualified Settlement Fund") receive 5% of the net funds;

- $35,000,000 of the net funds are set aside for Future Minor Plaintiffs, as described in the *Preliminary Approval Order*, 499 F. Supp. 3d at 417;

- Adults receive 15% of the net funds;

- Property owners and renters receive 3% of the net funds;

- Business owners and operators receive 0.5% of the net funds; and

- 2% of the net funds are set aside for the Programmatic Relief portion of the settlement, which was described in the *Preliminary Approval Order*, 499 F.Supp.3d at 417–18.

(*Id.*)

---

[11] The net funds are calculated by subtracting the costs, attorney fees, and expenses from the gross amount of money in the FWC Qualified Settlement Fund. (ECF No. 1394-2, PageID.54146.)

22

Accordingly, those who qualify as a Minor Child, Minor Adolescent, and Minor Teen under the ASA receive the largest proportion, or 79.5%, of the net funds.

There are thirty Settlement Categories presented in the Compensation Grid, which is attached to the ASA as Exhibit 8. (ECF No. 1319-2, PageID.40789–40831.) The Settlement Categories include: individuals of any age with lead levels in their blood or bone; Minor Children, Minor Adolescents, and Minor Teens with cognitive deficits; Minor Children who were born preterm or with a low birth weight; Minor Children who were formula fed; Minor Children, Minor Adolescents, and Minor Teens who lived in a residence with residential water with a specified level of lead or with lead or galvanized steel service lines; Minor Children, Minor Adolescents, and Minor Teens who were exposed to Flint Water during the Flint Water Crisis but have none of the proofs of exposure set forth above; Minor Children, Minor Adolescents, and Minor Teens who were exposed to Flint Water after July 31, 2016; Adults with serious personal injuries; Adults with physical injuries; Adults exposed to Flint Water after July 31, 2016 and with a lead level or physical injury; women who suffered from miscarriages; individuals who were diagnosed

23

with legionnaires disease, resulting in illness or death; individuals who owned or rented residential property; and businesses that suffered from property damage or economic loss. (*See* ECF No. 1319-2, PageID.40789–40831.) These Settlement Categories are discussed further below. Each one provides for a different level of compensation; however, all Claimants who qualify for the same Settlement Category are compensated under the Compensation Grid equally. In other words, every Claimant in a certain Settlement Category receives an identical amount of compensation as all other Claimants in that Category. But the actual compensation these Claimants receive may vary because each Claimant's outstanding liens (if any) are deducted from the individual award. (ECF No. 1394-2, PageID.54146–54147.) Liens are addressed separately below.

These Settlement Categories are the *only* distinction between Claimants' Monetary Awards in the ASA. Accordingly, individuals are treated the same in terms of their eligibility to qualify for a Settlement Category, regardless of whether they are represented by their own counsel or whether they are members of the Settlement Class proceeding with or without the assistance of a lawyer. Individuals who might

24

otherwise be barred from bringing a claim by the statute of limitations or statute of repose would not be barred from recovering under the ASA.

With respect to Liens, the ASA provides that Claimants are responsible for informing the Claims Administrator and the Lien Resolution Administrator of all known Liens with claims against their monetary award. (*Id.* at PageID.54172.) The Claims Administrator is authorized under the ASA to establish procedures and protocols to resolve certain liens on behalf of Claimants.[12] (*Id.*) In this way, the ASA streamlines the lien-satisfaction process and maximizes the possibility that Claimants' liens could be satisfied at a discount, which has been achieved in other settlements nationwide. *See, e.g., In re N.F.L. Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 367 (E.D. Pa. 2015) (noting similar programs where a lien satisfaction discount was negotiated in "the *Vioxx*, *Avandia*, *Zyprexa*, and *Deepwater Horizon* settlements").

The ASA provides for a reconsideration process for Claimants to undertake if they disagree with a decision by the Claims Administrator

---

[12] The State of Michigan has agreed not to pursue certain Medicaid liens incurred as a result of injuries caused from ingestion of Flint water during the relevant time period. (ECF No. 1394-2, PageID.54171.) This is potentially a significant benefit to many Claimants.

25

the Claims Administrator, such as the determination of their Settlement Category on the Compensation Grid. Participants in the reconsideration process may submit a Reconsideration Request and, if the dispute remains, they may submit an appeal to the Special Master. (ECF No. 1394-2, PageID.54168–54170.) In addition, the ASA sets forth a thorough dispute resolution procedure for disputes involving "the meaning of, compliance with, and/or implementation of the Settlement Agreement." (*Id*. at PageID.54170.) This dispute resolution procedure is the "exclusive mechanism to resolve disputes and disagreements arising under the Settlement Agreement." (*Id*. at PageID.54170–54171.)

In exchange for participating in the settlement, Claimants provide the Settling Defendants with Releases and Covenants Not to Sue ("Releases"). The Releases release the Settling Defendants from: (1) all claims, notices, demands, suits, and causes of action, known and unknown; (2) damages whenever incurred and liabilities of any nature, whatsoever; and (3) liability arising from the alleged acts or omissions of any of the Claimants plead in their complaints. (*Id*. at PageID.40384–40385.) Individuals who sign the Releases ("Releasors") agree not to initiate, continue, or help with any proceeding against the Settling

26

Defendants and agree not to challenge the validity of the Releases. Releasors acknowledge that they waive all future claims against the Settling Defendants. (*Id*. at PageID.54176–54177.) Further, the ASA separately provides that the Settling Defendants release one another from any claims they have now or in the future arising out of the Flint Water Crisis. (*Id*. at PageID.54177–54178.)

### C. Registration Forms and Objections Received by the March 29, 2021 Deadline

The Court issued its Preliminary Approval Order on January 21, 2021 and the Order took effect on January 27, 2021. *Preliminary Approval Order*, 499 F. Supp. 3d at 433. (*See* ECF No. 1399.) Since then, public response to the settlement has been overwhelmingly positive. Special Master Greenspan reported that over 85,000 Registration Forms were submitted to the Claims Administrator by the March 29, 2021 registration deadline and that at least 50,614 of those registrations are unique claims.[13] (ECF No. 1790, PageID.64248; *see also* ECF No. 1394-2,

---

[13] The Special Master is working with counsel to help to assure coordination among law firms that represent the same individual and to thereby avoid as much as possible duplicate claim submissions. The Claims Administrator will also be able to identify duplicate claimants once claim forms are submitted. It is likely that the number of unique registrants will exceed the previously reported number.

PageID.54141 (establishing the registration deadline in ¶ 3.12).) This is particularly remarkable because the City of Flint's population is estimated to be less than approximately 100,000, so this means that over half of the current population of Flint is participating in the settlement. *See Quick Facts Flint City, Michigan*, United States Census Bureau, https://www.census.gov/quickfacts/flintcitymichigan [https://perma.cc/6LQ6-4H76].

Pursuant to the ASA, the March 29, 2021 registration deadline is also the deadline for filing objections. *Preliminary Approval Order*, 499 F. Supp. 3d at 433. (*See also* ECF No. 1394-2, PageID.54184–54185.) As set forth in the ASA, a registered Claimant who does not submit a written request to be excluded from the Settlement Class is permitted to "present written objections, if any, explaining why he or she believes the Settlement Agreement should not be approved by the Federal Court as fair, reasonable, and adequate." (*Id.* at PageID.54184.)

The ASA imposes additional requirements for objections, including that objectors, whether represented by counsel or not: (1) file their written objection on the docket in this case no later than the March 29, 2021 deadline; (2) include in the objection a "detailed written statement"

explaining the basis of each objection, "as well as specific reasons, if any, for each such objection, including any evidence and legal authority the Claimant wishes to bring to the Federal Court's attention" (*id.*); (3) include in the objection "the Claimant's printed name, address, telephone number, and date of birth, [and] written evidence establishing that the objector is a Claimant" (*id.*); (4) submit any other supporting papers, materials, or briefs the Claimant wishes the Federal Court to consider when reviewing the objection" (*id.*); and (5) sign the objection themselves (not through their counsel). Under the ASA, individuals who fail to comply with these requirements waive and forfeit all rights to object to the settlement; however, it is up to the Court to determine whether any Claimants who fail to follow these procedures waive these rights. (*Id.* at PageID.54184–54185.)

The Court received 106 timely objections from registered individuals who are unrepresented by counsel ("Unrepresented Objectors").[14] There are counselled objections from only one attorney on

---

[14] Unrepresented Objectors were required to mail their objections to the Clerk of the Court for docketing. Due to the COVID-19 pandemic and delays in the U.S. Postal Service, the Court accepted all objections, even those postmarked after the March 29, 2021 deadline. The Court received and docketed twenty-three objections from self-represented individuals who were later verified as non-registrants to the

29

behalf of his clients.[15] Attorney Mark Cuker, who represents just under

1,000 participants in the settlement, filed twelve objections on behalf of

_____

settlement. (ECF Nos. 1561, 1566, 1567, 1602, 1617, 1626, 1627, 1640, 1648, 1654, 1658, 1659, 1667, 1672, 1683, 1691, 1706, 1750, 1752, 1753, 1757, 1758, 1759.) Accordingly, these objections need not be considered because they fail to meet the requirements than an objector be a registered Claimant.

The Court received and docketed thirteen objections that were later withdrawn by objectors' counsel. (See ECF No. 1767 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1763 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1748 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1639 (*withdrawn*, ECF No. 1805); ECF No. 1673 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1661 (*withdrawn*, ECF No. 1803); ECF No. 1688 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1680 (*withdrawn*, ECF No. 1879); ECF No. 1629 (*withdrawn*, ECF Nos. 1886, 1892); ECF No. 1616 (*withdrawn*, ECF No. 1804), ECF No. 1615 (*withdrawn*, ECF No. 1886); ECF No. 1560 (*withdrawn*, ECF No. 1882); ECF No. 1629 (*withdrawn*, ECF Nos. 1886, 1892).) Accordingly, these objections need not be considered.

The Court also received two additional objections from self-represented but unregistered, individuals. Unlike the previous twenty-three, however, by the time the two objections were received, the Court was able to verify that the objectors were not registered Claimants before they were docketed. Accordingly, those two objections were not docketed and will not be considered.

[15] There were originally three attorneys who filed objections on behalf of their clients. Attorney for the *Washington* Plaintiffs, Stephen Monroe, filed, and later withdrew, ten objections on behalf of his clients. (*See* ECF No. 1855 (withdrawing ECF No. 1506); ECF No. 1856 (withdrawing ECF No. 1507); ECF No. 1866 (withdrawing ECF No. 1508); ECF No. 1867 (amended notice withdrawing ECF No. 1509); ECF No. 1875 (withdrawing ECF No. 1510); ECF No. 1858 (withdrawing ECF No. 1511); ECF No. 1863 (withdrawing ECF No. 1512); ECF No. 1862 (withdrawing ECF No. 1513); ECF No. 1859 (withdrawing ECF No. 1514); and ECF No. 1874 (withdrawing ECF No. 1515).)

Additionally, Valdemar Washington filed one objection on behalf of one of his clients, Dr. Lawrence Reynolds. (*See* ECF Nos. 1436 (Objection), 1437 (Notice), 1444 (Notice), and 1445 (Certificate of Service).) Washington later withdrew from

30

eighteen of his clients. (*See* ECF No. 1904, PageID.66627 (stating that Cuker has approximately 980 clients registered in the settlement).) These objectors are referred to as the "*Chapman/Lowery* Objectors."[16] (*See* ECF Nos. 1463, 1471 (correcting ECF No. 1469), 1484, 1485, 1488, 1489, 1492, 1493, 1534, 1436, 1537, and 1538.)

Assuming that the final number of unique registrations is equal to or greater than the conservative estimate of 50,164, the total number of objectors represents approximately 0.002% of the unique registrants. Therefore, the total number of objectors to the ASA is exceedingly small in comparison to the overwhelming number of non-objecting participants. The substance of all objections will be discussed in Section IV below.

The Court also received several objections related to Plaintiffs' motion for attorney fees. These will be discussed in a separate opinion and order.

---

representing Dr. Reynolds, which is discussed further in footnote 17, below. (*See* ECF No. 1898 (Order granting ECF No. 1891).)

[16] The *Chapman/Lowery* objections overlap almost verbatim, and, accordingly, the Court cites to only one representative objection when discussing them.

31

## D. Fairness Hearing

On July 12, 13, and 15, 2021, the Court held a fairness hearing on the final approval motion and Plaintiffs' request for attorney fees and expenses. (ECF Nos. 1794, 1795, and ECF No. 1458 (*as supplemented by* ECF No. 1796).)

The Court held the hearing for two reasons: first, because part of the settlement is class-based, and Federal Rule of Civil Procedure 23(e) requires a hearing before deciding whether to approve a class-based settlement; second, because the largest portion of settlement funds is allocated to persons who are Minors and settlements with Minors require supervision. The standard for approval of a settlement under Rule 23 is set forth in greater detail below. In general, the fairness hearing permits the parties to "proffer sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 635 (6th Cir. 2007) (internal citations omitted). The hearing also permits the Court to hear from objectors to the settlement. *See id*.

32

The Court has "wide latitude" in determining the procedural safeguards of the hearing. *Id*. The Court "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasonable decision and need not endow objecting class members with the entire panoply of protections afforded by a full-blown trial on the merits." *Id*. (internal citations omitted). In this case, however, due to the complexity of the ASA and the objections, the Court did not limit the amount of time the parties had to make their presentations. The hearing lasted six hours and forty minutes on July 12, 2021, three hours and four minutes on July 13, 2021, and five hours and forty-four minutes on July 15, 2021.

On July 12, 2021, the Court heard arguments in support of final approval of the settlement from Co-Lead Class Counsel, Co-Liaison Counsel for Individual Plaintiffs, and counsel for the State Defendants. It received oral reports from Special Master Deborah Greenspan and the Master GAL Miriam Wolock. Master GAL Wolock also filed a written report. (ECF No. 1896.) Finally, the Court heard argument on counselled objections, which were presented by counsel for the *Chapman/Lowery*

Objectors and by Dr. Lawrence Reynolds.[17] The content of these objections and the Court's rulings on them are discussed below.

On July 13, 2021, the Court sat on the bench at the Genesee County Circuit Court in Flint, Michigan, along with Judge Joseph J. Farah of that court. Judge Farah presides over the Genesee County Circuit Court civil Flint Water Cases docket. Together, the Undersigned and Judge Farah heard from fifteen Unrepresented Objectors[18] (ECF No. 1905 (transcript)): (1) A.C. Dumas (ECF No. 1603 (written objection)); (2) Eric Mays (ECF No. 1686 (written objection)); (3) James Moore (ECF No. 1749 (written objection)); (4) Diane Fletcher (ECF No. 1684 (written objection)); (5) Claire McClinton (ECF No. 1696 (written objection)); (6) Chris Del Morone (ECF No. 1627 (written objection)); (7) Autrice Young (ECF No. 1694 (written objection, docketed under the name Autrice

---

[17] Dr. Reynolds' objection was originally filed through his then-counsel Valdemar Washington. As a result, argument on Dr. Reynolds' objection was scheduled to be heard on July 12, 2021, the date set aside for hearing counselled objections. Washington later withdrew his representation of Dr. Reynolds, but Dr. Reynolds remained on the July 12, 2021 hearing schedule, as set forth in the Court's hearing notice. (*See* ECF No. 1814, PageID.64773.)

[18] The Court served the hearing notice on all Unrepresented Objectors via U.S. Mail on June 4, 2021. (ECF No. 1814, PageID.64777.) The Notice contained specific instructions for Unrepresented Objectors who wished to speak at the hearing to sign up to be heard. (*Id*. at PageID.64774–64776.)

Battiste)); (8) Audrey Young-Muhammed (ECF No. 1693 (written objection)); (9) Freelon Threlkeld (ECF No. 1699 (written objection)); (10) Anita Smylor (ECF No. 1741 (written objection)); (11) Karen Weaver (ECF No. 1656 (written objection)); (12) Claudia Perkins-Milton (ECF No. 1604 (written objection)); (13) Deborah Holmes (ECF No. 1813 (written objection)); (14) Virginia Murphy (ECF No. 1766 (written objection)); and (15) Joelena Freeman (ECF No. 1652 (written objection)). The content of these objections (as well as the objections filed by the remaining Unrepresented Objectors who did not sign up to speak at the hearing) and the Court's rulings on them are discussed below.

At the end of the hearing on July 13, 2021, the Court heard from attorney Bettenhausen for the State Defendants. She briefly addressed the State of Michigan's inspection of the bone lead level testing office, which was established in Flint, Michigan, by the Napoli Shkolnik law firm. The Napoli Shkolnik bone lead level testing program is addressed in detail below in Section IV.

On July 15, 2021, the Court heard argument and objections regarding Plaintiffs' motion for attorney fees and expenses. Special Master Greenspan provided an oral report on the work she performed

pursuant to the Case Management Order Regarding Time and Expense Procedures. (*See* ECF No. 507.) Additionally, the Special Master submitted data obtained pursuant to that Order to the Court *in camera* in advance of the hearing and the Undersigned has spent a great many hours reviewing these submissions. The Court then heard a presentation from Co-Liaison Counsel regarding the motion for attorney fees, followed by presentations by counsel for the *Hall* Objectors, the *Chapman/Lowery* Objectors, the *Anderson* Plaintiffs, and Plaintiff Brown. (ECF No. 1814, PageID.64776–64777 (*see also* Text-Only Order (June 10, 2021)).) At the end of the hearing on July 15, 2021, the Court heard briefly from William Kim, counsel for the City Defendants. (ECF No. 1906, PageID.67101.) Kim reiterated to the Court that on Marcy 22, 2021 the City passed a Resolution Calling for Transparency in the Review of Attorney Fees and Reimbursement of Expenses for the Flint Water Litigation Settlement. (ECF No. 1555-1, PageID.60401.) The substance of the parties' positions are set forth in a separate opinion and order.

## E. Other Matters Post-Fairness Hearing

On October 20, 2022, the Court issued a Stipulated Order amending the ASA to allow the McLaren Defendants to waive their Walk-Away

36

Rights under Paragraph 18.2 in exchange for their continued participation as a Settling Party and allowing the McLaren Defendants' total contribution to the FWC Qualified Settlement Fund to be $5,000,000. The reasons for this amendment and for the stipulation are set forth in the Court's Opinion and Order Granting Plaintiffs', State Defendants', Rowe's and the McLaren Defendants' Stipulation. (*See* ECF Nos. 1993, 1996.)

## II. LEGAL STANDARD

As noted, the ASA resolves claims in class action and non-class action lawsuits. And in the non-class actions, Minors and LIIs, as defined under Michigan law, are parties. The Court plays a different role when a settlement is reached in each of these kinds of cases. In non-class action cases, the parties may settle the case and stipulate to its dismissal without obtaining court approval. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). But if Minors and LIIs are parties to a non-class action, as they are here, the Court has a duty to evaluate whether there are adequate protective measures in the settlement that comply with Michigan law to protect these individuals' rights. See, e.g., Mich. Ct. R. 2.201(E)(1)(6) (requiring that a "competent and reasonable person" be appointed as Next Friend

37

for Minors and LIIs); Mich. Ct. R. 5.125 and 2.420 (setting forth the State of Michigan's probate procedures applicable to Minors and LIIs). Meanwhile, claims in a class action "may be settled . . . or compromised only with the court's approval." Fed. R. Civ. P. 23(e).

Rule 23, which applies to class actions, provides that if a proposed settlement or compromise:

> would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3);[19] and

---

[19] Rule 23(e)(3) states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3).

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Sixth Circuit also lists factors to guide the Court's inquiry into whether a proposed class action settlement is fair, reasonable, and adequate.[20] They are:

(1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

---

[20] The Sixth Circuit set forth these factors in *International Union v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) before Rule 23(e) was amended in 2018 to codify many of the same factors. The Advisory Committee's note to this amendment states that:

The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.

Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 Amendments. Judges in the Eastern District of Michigan consider the Sixth Circuit factors in addition to the Rule 23 factors. Therefore, the Court will do the same.

*Int'l Union*, 497 F.3d at 631 (citations omitted). "Of the [*International Union*] factors, '[t]he most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.'" *Doe v. Déjà Vu Consulting, Inc.*, 925 F.3d 886, 894 (6th Cir. 2019) (*quoting Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011)).

In addition to the seven *International Union* factors, "in evaluating the fairness of a settlement, [the Sixth Circuit has] also looked to whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013). Inequities in treatment may "make a settlement unfair." *Id.*

The Court must determine whether the notice to the class satisfies due process. Due process "does not require the notice to set forth every ground on which class members might object to the settlement;" rather, "[a]ll that the notice must do is 'fairly apprise the prospective members of the class of the terms of the proposed settlement.'" *Vassalle*, 708 F.3d 747, 759 (6th Cir. 2007).

40

The Court must decide whether to certify the class for settlement purposes. To certify a class for settlement purposes, the Court must find that the class satisfies all of the requirements of Federal Rule of Civil Procedure 23(a) and one of the requirements of Rule 23(b). Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is impracticable;
>>
>> (2) there are questions of law or fact common to the class;
>>
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). And Rule 23(b) states:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

41

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

Federal Rule of Civil Procedure 23(g) requires a court certifying a class to appoint class counsel. The Court may only appoint an applicant that is "adequate under Rule 23(g)(1) and (4). Fed. R. Civ. P. 23(g)(2). Rule 23(g)(1) requires that the Court:

(A) must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;

> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> (iii) counsel's knowledge of the applicable law; and

> (iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h);[21] and

---

[21] Rule 23(h) states "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). It then describes the procedures that apply to the claim for an award, objections by class members, that a hearing may be held,

(E) may make further orders in connection with the appointment.

Fed. R. Civ. P. 23(g)(1). Rule 23(g)(4) states that "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Finally, when evaluating a proposed class action settlement, the Court must bear in mind "the federal policy favoring settlement of class actions." *Int'l Union*, 497 F.3d at 632; *see also* Albert Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("Newberg") ("By their very nature, because of the uncertainties of outcome, difficulties of proof, length of litigation, class action suits lend themselves readily to compromise.").

## III. DISCUSSION

### A. Non-Class Portion of the Settlement

Co-Liaison Counsel for Individual Plaintiffs filed a Brief in Support of Final Approval of the Proposed Settlement, in which they address the non-class portions of the settlement and request that the Court grant

---

and that the issues may be referred to a special master. *See* Fed. R. Civ. P. 23(h)(1)-(4).

final approval to the non-class portions of the ASA.[22] (ECF No. 1795.) As discussed, the ASA contains provisions related to Minors and LIIs, who are not part of a Settlement Class, and Michigan law requires the Court to evaluate those provisions. The non-class portion of the ASA also applies to represented adults. While the Court does not ordinarily need to review such settlements, the fact that all the represented adults are participating in the aggregate settlement is notable. The Court's approval of the allocation and Compensation Grid satisfies any issues that may pertain to the non-class participants. Final approval as to the non-class portions of the ASA is granted.

In the January 21, 2021 Preliminary Approval Order, the Court analyzed in detail the ASA's provisions related to Minors and LIIs and it granted preliminary approval of the ASA as it relates to these individuals. *See Preliminary Approval Order*, 499 F. Supp. 3d at 412–18. The ASA has not been altered in the interim. The Court therefore adopts and incorporates the following language from the Preliminary Approval

---

[22] In their brief, Co-Liaison Counsel for Individual Plaintiffs also respond to objections to the ASA, which will be addressed in Section IV of this Opinion and Order. (*See* ECF No. 1795, PageID.64479.)

Order granting preliminary approval to the portions of the ASA related to Minors and LIIs:

## A. Minors and LIIs

At the preliminary approval stage, the Court must review the MSA[23] to determine whether the processes and procedures related to Minors' and LIIs' claims are fair and in their best interests. As set forth above, Guardian Ad Litem Miriam Z. Wolock assisted in this review. Ms. Wolock provided an oral report to the Court and the parties at the hearing held on December 21, 2020. For the reasons set forth below, the Court concludes that the processes and procedures set forth in the MSA are fair and in the best interests of Minors and LIIs.

The provisions of the MSA applicable to Minors and LIIs are the following: (1) Article XXI of the MSA (ECF No. 1319-1, PageID.40393–40400 (as amended, ECF No. 1394-2, PageID.54185–54192)); (2) the Registration Form (ECF No. 1319-2, PageID.40757–40763 (as amended, ECF No. 1394-3, PageID.54214–54219)); (3) the Claim Form (ECF No. 1319-2, PageID.40740–40745 (as amended, ECF No. 1394-5, PageID.54231–54235)); (4) the monetary awards and proofs grid (ECF No. 1319-2, PageID.40789–40831); (5) the Case Management Order (ECF No. 1319-2, PageID.40848–40876 (as amended, ECF No. 1394-9, PageID.54286–54294)); (6) Plaintiffs' Fact Sheet (ECF No. 1319-2, PageID.40878–40897, 40899); (7) the Release by the Next Friend (ECF No. 1319-2, PageID.41223–41227); and (8) the Non-Participation Notice by Minors or LIIs (ECF No. 1319-2, PageID.41246).

## 1. Genesee County Circuit Court Assignment and Appointment of Next Friends

---

[23] In the Preliminary Approval Order, the Court referred to the Amended Settlement Agreement as the Master Settlement Agreement, or "MSA." They are the same document. (*See* ECF No. 1319-2, (as amended, ECF No. 1394-2).)

First, the MSA provides that the parties will file motions to permit the Genesee County Circuit Court, specifically Judge Farah, to exercise the power and jurisdiction of the probate court for the purposes of: (1) approving the types of individuals who can act as Next Friends on behalf of Minors and LIIs under the MSA; and (2) appointing a Master Guardian Ad Litem ("Master GAL") and two Panel Guardians Ad Litem ("Panel GAL") to supervise submissions by Next Friends on behalf of Minors and LIIs. (ECF No. 1319-1, PageID.40393.) This appointment would provide for consistency in state-court rulings on settlement-related matters. Moreover, Judge Farah, as a result of managing the Genesee County Flint Water docket, is familiar with the unique nature of the claims and parties, including those of Minors and LIIs.

The MSA provides parameters for those who may be authorized to act as Next Friends on behalf of Minors and LIIs. (*Id.*) The MSA defines both the qualifications and proofs required for this role. It incorporates Michigan Court Rule 2.201(E), which sets forth the legal parameters applicable to proceedings involving a minor or incompetent person in Michigan, including that the person acting as Next Friend be "competent and responsible." Mich. Ct. R. 2.201(E)(1)(b).

The MSA contains a proposed Registration Form that participants in the settlement, including Minors and LIIs, must complete within sixty days of the entry of an order granting preliminary approval. [fn 10] (*See* ECF No. 1319-1, PageID.40348–40353 (as amended, ECF No.1394-2, PageID.54140–54145).) Section 3 of the Registration Form, which is applicable only to Minors and LIIs, identifies the person submitting the form on behalf of a Minor or LII, and requires that the individual provide documents proving their relationship to the claimant. (ECF No. 1319-2, PageID.40759–40761.) The information sought in Section 3 of the Registration Form mirrors the requirements set forth in Michigan Court Rule 2.201. Also, the Claim Form contains

47

similar provisions and checkboxes to the Registration Form. (ECF No. 1319-2, PageID.40740–40745 (as amended, ECF No. 1394-3, PageID.54214–54219).)

> [fn 10] As set forth further below, this Order will be effective on January 27, 2021, and, because Sunday March 28, 2021 falls on a weekend, the sixty-day deadline is Monday[,] March 29, 2021.

Ms. Wolock concluded that the Registration Form has a "clear and understandable application to act as [N]ext [F]riend and defines a group of individuals who may serve in this capacity," and it "tracks all the requirements under Michigan law." (ECF No. 1363, PageID.42191.)

After the Registration Form is submitted, the MSA provides that the Claims Administrator must review and approve the qualifications of the Next Friend, within a specified time frame. (ECF No. 1319-1, PageID.40395–40396 (as amended, ECF No. 1394-2, PageID.54187–54188).) If the Next Friend does not meet the qualifications or has not submitted the appropriate proofs, the MSA sets forth a reconsideration and appeals process, which ultimately involves the Special Master issuing a written decision. (ECF No. 1319-1, PageID.40396 (as amended, ECF No. 1394-2, PageID.54188); ECF No. 1391-1, PageID.40378 (as amended, ECF No. 1394-2, PageID.54170).) These protections ensure that only authorized individuals may register and submit claims for Minors and LIIs, and minimize the opportunity for fraudulent claims to be submitted.

The MSA also provides for protections for Minors and LIIs who do not have a Next Friend. As Ms. Wolock explained,

> And why is this important? Because a particular minor or claimant might need a [N]ext [F]riend who doesn't neatly fall into the categories [contained in the Registration Form]. The upshot is [ ] that no potential claimant is deprived of an

48

appropriate representative in the course of this settlement.

(ECF No. 1363, PageID.42192.)

This protection for Minors and LIIs who do not have an appropriate representative also tracks Michigan Court Rule 2.201(E)(1)(b), which states, "If a minor or incompetent person does not have a conservator to represent the person as plaintiff, the court shall appoint a competent and responsible person to appear as next friend on his or her behalf." Accordingly, the MSA fairly protects Minors and LIIs who do not currently have a parent or court-appointed guardian at this time.

The MSA also covers situations where there is a dispute over who will act as Next Friend for a Minor or LII. (ECF No. 1319-1, PageID.40396 (as amended, ECF No. 1394-2, PageID.54188).) If this occurs, the MSA provides a clear procedure, involving independent review and assistance by the Master GAL, and, if not resolved by the Master GAL, by the Special Master. (*Id.*)

Ms. Wolock stated at the December 21, 2020 hearing that this process and the time frames for resolving such disputes constitute "a fair and efficient dispute resolution process." (ECF No. 1363, PageID.42192.)

Once an appropriate Next Friend is appointed for the Minor or LII, the Genesee County Circuit Court (or this Court) will supervise the Next Friend. (ECF No. 1319-1, PageID.40393–40394 (as amended, ECF No. [1394-2, PageID.]54185–54186).)

The establishment of jurisdiction over probate proceedings with the Genesee County Circuit Court, the procedures for appointing a Next Friend, and the procedures for resolving any Next Friend-related disputes are all thorough, clear, and designed to promote consistency. As Ms. Wolock explained,

the procedures set forth above for Next Friend appointments help facilitate "an appropriate financial recovery. [The plan is] prompt. It's cost effective. It's transparent and the administrative steps really help avoid a protracted and lengthy court proceeding. And so on this basis it's fair and in the best interest of the minors and [LIIs]." (ECF No. 1363, PageID.42193.)

## 2. Retention of Counsel

Another provision in the MSA that protects Minors and LIIs relates to the retention of counsel. Although Minors and LIIs are not required to retain a lawyer to obtain a monetary award under the settlement, the MSA provides that counsel, including Co-Lead Class and Co-Liaison Counsel, are authorized to assist Minors and LIIs to advise them of their rights and options under the MSA. (ECF No. 1319-1, PageID.40394–40395 (as amended, ECF No. 1394-2, PageID.54186–54187).) These provisions provide an additional option for Minors and LIIs to have a lawyer to assist them in their claim submission and determination of payment distribution.

## 3. Second Stage Approval Process

The MSA contains provisions outlining what is called the "Second Stage Approval Process," which includes added protections for Minors and LIIs. For example, the Claims Administrator must first certify that the Minor or LII is assigned the settlement category that will result in the highest monetary award possible for that individual. (ECF No. 1319-1, PageID.40396 (as amended, ECF No. 1394-2, PageID.54188).) Ms. Wolock indicated that this step "clearly benefits this population." (ECF No. 1363, PageID.42193.)

 The possible settlement categories are set forth in a settlement grid, which contains twenty-one categories devoted to individuals who were minors at the point of first exposure. [fn 11] While there are different allocations for

50

recovery in each of the twenty-one categories, the grid provides a settlement for *all* minors, regardless of whether they have any proof of an injury. (ECF No. 1319-2, PageID.40790–40818.) The grid provides for different settlement values based on objective factors such as the age of the child at first exposure, the evidence of lead exposure, and the evidence of cognitive impairment related to lead exposure.

> [fn 11] Seven of the twenty-one categories are devoted to Minors ages six and younger at the time of their first exposure, seven are devoted to Minors ages seven through eleven at the time of their first exposure, and the remaining seven apply to Minors ages twelve through seventeen at the time of their first exposure.

As explained by Special Master Greenspan at the hearing, the grid is set up in a manner such that, "People who were similarly situated would be treated in a similar way." (ECF No. 1363, PageID.42203.) This promotes fairness, particularly in litigation such as this where there are different levels of exposure and severity of injury. And Ms. Wolock succinctly stated,

> So the process set forth in the settlement grid or the required proof grid, I believe, promotes fairness in as much as it creates a very systematic approach for remedial relief based on objective criteria that are set forth in the grid. And each grid is accompanied by particular proofs that are required to be submitted. With the result that [M]inors and LIIs with comparable claims are intended to receive comparable awards. And I believe that this is a fair and consistent approach for similarly situated claimants.

(ECF No. 1363, PageID.42195.)

51

Another way in which the Second Stage Approval Process addresses Minors and LIIs is that it provides that the Claims Administrator must issue a second notice if a Next Friend rejects the settlement category or fails to respond within the prescribed deadlines. (ECF No. 1319-1, PageID.40397 (as amended, ECF No. 1394-2, PageID.54189).) This second-chance provision is an additional layer of fairness and protection for Minors and LIIs.

### 4. Release by Next Friend

Another key provision in the MSA related to Minors and LIIs is the Release by Next Friend. (ECF No. 1319-2, PageID.41223–41227.) Most importantly, the Release states that the Next Friend releases the Minor's and LII's Flint Water-related claims against the Settling Defendants only. (*Id.*) Agreement to a release of claims in exchange for a monetary award is at the core of any settlement. The release is clearly written and understandable, and is publicly available for Next Friends to review and to determine whether they wish to agree to its terms in exchange for a monetary award.

### 5. Reconsideration and Appeal

The MSA also provides a procedure if the Next Friend disagrees with the settlement category assigned by the Claims Administrator, or otherwise disagrees with an unfavorable notice. The MSA contains provisions for reconsideration, and if the issue is not resolved on reconsideration, the MSA provides for a process to submit an appeal to the Special Master. (ECF No. 1319-1, PageID.40398 (as amended, ECF No. 1394-2, PageID.54190).)

If a Minor or LII (1) is not represented by counsel, (2) receives an Adverse Notice, and (3) does not follow the processes and procedures set forth in the MSA for reconsideration and appeal, then there is an additional process for independent review of the settlement category assigned by the Claims

52

Administrator. In these circumstances, the Master GAL reviews the Adverse Notice to determine whether it is fair and reasonable. (*Id.*) If the Master GAL determines it is not fair and reasonable, they will send the claim back to the Claims Administrator for reevaluation. (*Id.*) If the Master GAL determines that it is fair and reasonable, then the Master GAL will state their determination in writing and forward the determination and the Adverse Notice to the Genesee County Circuit Court for further review and a final determination. (*Id.*) All final determinations are made by the Genesee County Circuit Court.

Ms. Wolock stated in regard to this process that "there are multiple layers of protection here for the minors and LIIs and I believe that these procedures provide multiple opportunities for a meaningful opportunity to be heard in a cost-effective, transparent and efficient manner." (ECF No. 1363, PageID.42195.)

## 6. Distribution of Monetary Award

The MSA contemplates three options for Minors and LIIs to receive distribution of their monetary award, if the award exceeds $5,000: (1) a special needs trust, (2) a settlement preservation trust, or (3) a structured settlement. (ECF No. 1319-1, PageID.40399–40400 (as amended, ECF No. 1394-2 PageID.54191–54192).)

Michigan Court Rule 2.420 governs the procedure to be followed for a settlement in a [N]ext [F]riend's action brought for a minor or LII. The rule states:

> If the settlement or judgment requires payment of more than $5,000 to the minor either immediately, or if the settlement or judgment is payable in installments that exceed $5,000 in any single year during minority, a conservator must be appointed by the probate court before the entry of the judgment or dismissal. The judgment or dismissal

53

must require that payment be made payable to the minor's conservator on behalf of the minor. The court shall not enter the judgment or dismissal until it receives written verification, on a form substantially in the form approved by the state court administrator, that the probate court has passed on the sufficiency of the bond of the conservator.

Mich. Ct. R. 2.420.

As Ms. Wolock indicated, these three options in the MSA "protect and preserve" the funds on behalf of the Minor and LII. (ECF No. 1363, PageID.42196.)

Relevant to this portion of the analysis is that, if a Minor or LII does not elect the structured settlement option for their distribution, then a Panel GAL, appointed by the Genesee County Circuit Court, is assigned to the Minor or LII. The Panel GAL's duty is to evaluate whether the settlement category and monetary award assigned by the Claims Administrator, and the distribution option selected by the Next Friend, is fair, reasonable, adequate, and in the best interests of the particular Minor or LII. If the Panel GAL agrees with the Claims Administrator's determination, then the Panel GAL presents their evaluation to the Genesee County Circuit Court for approval. (ECF No. 1319-1, PageID.40399 (as amended, ECF No. 1394-2, PageID.54191).)

If the Panel GAL or Genesee County Circuit Court determines that the settlement category, monetary award, or elected option to receive a monetary award is not fair, reasonable, adequate, or in the Minor or LII's best interests, the claim will be sent back for reevaluation to the Claims Administrator or Next Friend, and the process will repeat until the monetary award is approved by the Panel GAL and the Genesee County Circuit Court. (*Id.*) For these reasons, the process and procedure is fair and thorough.

The Court concludes that the MSA's three options for Minors and LIIs to receive monetary awards, as well as the multi-layered review processes, are fair and in the best interests of Minors and LIIs.

## 7. Future Minor Claimants

Another way in which the MSA is fair and in the best interests of Minors is that it does not compel Minors to submit claims immediately. While it may be in the best interests of most or all Minors to submit their claims at the earliest opportunity, the proposed settlement provides a fund for Future Minor Claimants. A portion of the aggregate settlement fund ($35 million) will be set aside to accommodate Minors who do not file their claims immediately or who do not finalize their claims. This means that individuals less than eighteen years of age on the date they first ingested Flint [W]ater (if ingested between April 25, 2014 and November 16, 2020), who failed to register or did not receive a Favorable Notice, can still participate in the settlement later on, before they turn nineteen years old, subject to available funds. (ECF No. 1319-1, PageID.40338[,] 40356–40357 (as amended, ECF No. 1394-2, PageID.54130[,] 54148–54150).)

As Ms. Wolock explained, the Future Minor Claimant provisions are "akin to a safe harbor provision so that a minor has up to age 19 to participate in a program and I believe that this safe harbor provision gives adequate assurance that the settlement will be as much as feasibly possible widely available to this group." (ECF No. 1363, PageID.42197–42198.) This safe-harbor provision is fair and in the best interests of Future Minor Claimants.

## 8. Programmatic Relief

The MSA includes a provision whereby a portion of the settlement would be used to enable the local school districts and public school academies within the Genesee Intermediate School District to provide special education services for

55

qualifying students who resided in the City of Flint during the April 25, 2014 through November 16, 2020 time period. These provisions apply whether or not the individuals receiving such services are also individual claimants under the MSA. This global provision provides an added education-based benefit to Minors.

## 9. Non-Participating Minors and LIIs

Minors and LIIs can also choose not to participate in the settlement. If they choose not to participate, there is a clear procedure in the MSA for them to follow if they wish to proceed with their lawsuits against the Settling Defendants. (ECF No. 1319-1, PageID.40398 (as amended, ECF No. 1394-2, PageID.54190).) This procedure includes agreeing to a Case Management Order ("CMO"), with an accompanying Plaintiff Fact Sheet, (ECF No. 1319-2, PageID.40848–40876 (as amended, ECF No. 1394, PageID.54286–54294); ECF No. 1319-2, PageID.40878–40897), and submitting a Notice of Intent Not to Participate. (ECF No. 1319-2, PageID.41246.) These documents are all publicly available for review. Minors and LIIs have the benefit of fully "weigh[ing] the cost benefit of . . . participating in this settlement or nonparticipation," and can make an "informed decision on how to proceed." ([ ] ECF No. 1363, PageID.42199.)

## 10. Conclusions Regarding Minors and LIIs

In sum, for the reasons set forth above, at this stage of the process, the MSA appears fair and in the best interests of Minors and LIIs. Ms. Wolock stated at the hearing, "My conclusion in the report today is that the processes and procedures set forth in the proposed agreement are fair to the [M]inors and LIIs. Because those procedures are fair, I also report to the Court that those fair procedures serve the best interest of the [M]inors and LIIs." (ECF No. 1363, PageID.42190–42191.) The Court agrees for all of the reasons set forth above. Accordingly, preliminary approval of the MSA as it relates to Minors and LIIs is granted.

*Id.*

As noted above, Master GAL Wolock provided the Court with an oral report during the final fairness hearing in July 2021. (*See* ECF No. 1904, PageID.66641–66653.) She discussed the steps that have been taken since the entry of the Preliminary Approval Order to protect Minors and LIIs who are participating in the settlement. (*Id.*) The Master GAL also filed a written report detailing, among other things, the processes and procedures for appointing Next Friends under the ASA and subsequent orders. (ECF No. 1896.)

The Master GAL addressed, in her oral and written reports, that this Court, and the Genesee County Circuit Court, oversaw the appointment of Next Friends for the purpose of registering over 2,500 children who are wards of the State for participation in the settlement. (*Id.* at PageID.66300.) This enormous undertaking required implementing a special outreach effort so that the necessary steps could be completed before the registration deadline. (*Id.*) This process was, as stated by the Master GAL, carried out in a "fair and favorable manner." (*Id.*)

The Master GAL's oral and written reports also addressed the protections in the ASA that apply to Future Minor Claimants, how the ASA's provisions protect the rights of Minors and LIIs throughout the Claims Process and the settlement distribution stages, and detailed the ASA's mechanism for an individual Minor to recover funds, which will not jeopardize the recipient's qualifications for Supplemental Social Security, Medicaid, and potentially other government benefits. These protections that maintain eligibility for these government benefits are an important factor in finding that the provisions of the ASA related to Minors and LIIs are fair and in their best interests.

Accordingly, for the reasons set forth in the Preliminary Approval Order and in the Master GAL's oral and written reports, the Court is satisfied that the provisions of the ASA relating to Minors and LIIs meet the requirements of Michigan law for protecting and safeguarding the rights of these vulnerable populations. Indeed, the steps Master GAL Wolock has taken in her role have already gone above and beyond Michigan law's requirements. This, too, weighs heavily in favor of final approval.

In sum, the Court is satisfied that the Individual, non-class components of the ASA that require Court approval are fair and in the best interests of Minors, LIIs and, though not required, the represented adults. Accordingly, final approval is granted as to the non-class components of the ASA.

## B. Class Plaintiffs' Portion of the Settlement

As discussed above, Federal Rule of Civil Procedure 23(e)(2) requires that the Court evaluate certain factors before the Court can find that a settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2)'s factors overlap with many of the Sixth Circuit's *International Union* factors for determining whether a class settlement is fair, reasonable, and adequate. *See Int'l Union*, 497 F.3d at 631. Because the Sixth Circuit indicates that the likelihood of success on the merits is the most important factor in this analysis, *see Déjà Vu Consulting*, 925 F.3d at 894, that factor will be addressed first. For the reasons set forth below, the Rule 23(e)(2) and Sixth Circuit factors weigh in favor of granting final approval.

## 1. Likelihood of Success on the Merits

The first factor the Court considers in evaluating whether the settlement is fair, reasonable, and adequate is Plaintiffs' likelihood of success on the merits. *See id.* at 894. This factor does not require the Court to "decide the merits of the case or resolve unsettled legal questions"; however, it recognizes that the Court cannot reasonably "judge the fairness of a proposed compromise" without "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Int'l Union*, 497 F.3d at 631. In evaluating this factor, the Court's

> task is not to decide whether one side is right or even whether one side has the better of these arguments. Otherwise, we would be compelled to defeat the purpose of a settlement in order to approve a settlement. The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement.

*Id.* at 632.

The parties themselves acknowledge in the ASA that the legal theories underlying the claims involved are numerous, including "negligence, unjust enrichment, breach of contract, constitutional

violations, and inverse condemnation." (ECF No. 1319-1, PageID.40332.)

The parties state in the ASA:

> After careful consideration, Plaintiffs, and their respective counsel, have concluded that it is in Plaintiffs' best interest to compromise and settle all Released Claims against the Released Parties for the consideration reflected in the terms and benefits of this Settlement Agreement. After arm's-length negotiations with counsel for [Settling] Defendants, including the efforts of the Mediators and Special Master, Plaintiffs have considered, among other things: (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for [Settling] Defendants to prevail on threshold issues and on the merits; and (4) the range of possible recovery, and have determined that this Settlement Agreement is fair, reasonable, adequate, and in the best interests of Plaintiffs.

(*Id*. at PageID.40333.) The Court has overseen the federal claims in this litigation for many years and has worked cooperatively with Genesee County Circuit Court Judge Joseph J. Farah regarding the state-court claims. The claims in this litigation are, indeed, complex and many of the claims are novel. There are no other cases that the Court or the parties can look to that are on all fours with the claims in this litigation to assist them in predicting the outcome.

61

In *Olden v. Gardner*, the Sixth Circuit reviewed the district court's decision to grant final approval of a settlement, specifically its findings on the "success on the merits" factor. 294 F. App'x 210 (6th Cir. 2008). The Sixth Circuit found that even a close call can weigh in favor of final approval.

In *Olden*, a group of individuals living in Alpena, Michigan, sued Lafarge Corporation because of pollution emitted by Lafarge's cement plant located in Alpena. *Id*. at 211. The court found that the plaintiffs' likelihood of success on the merits was not "especially good," because "[i]t would have been difficult to prove that any injuries suffered by the class members were caused by the Lafarge plant rather than one of several other industrial facilities in the area." *Id*. at 217. Still, the court found that this factor weighed in favor of approving settlement, but "only marginally." *Id*.

Unlike the parties in *Olden*, who did not conduct discovery before reaching a settlement, the parties here have engaged in extensive discovery before and during their settlement negotiations and are therefore in a better position to evaluate the risks of continuing on to trial. They are aware that they would face hurdles, particularly in

62

establishing causation. One need look no further than the extensive briefing in the first round of bellwether cases to see that litigating Plaintiffs' claims to trial will necessarily involve a hard-fought battle of experts. (*See, e.g.*, Case No. 17-10444, ECF Nos. 331, 334, 346.) Unlike *Olden*, Plaintiffs' chance for success on the merits here may be more than "marginal," but due to the complex and novel issues presented in this litigation, success is not a guarantee.

The Court is persuaded that the over-$600 million settlement is a fair and sensible resolution of the claims against the Settling Defendants. The complexity and volume of this litigation present significant risks and potentially great expense to all parties if the cases were to be tried. The Court finds that the "success on the merits" factor weighs in favor of final approval, and also that "even if this merits question favored one party over the other, the [Plaintiffs] still would have had ample reason to control the resolution of this dispute through negotiation today rather than litigation tomorrow." *Int'l Union*, 497 F.3d at 632. And any award of damages after trial would be vastly diminished in value by the duration and expense of trial. Accordingly, the settlement is a judicious result, and this factor weighs in favor of granting final approval.

63

## 2. Class Representatives and Class Counsel Representation

Rule 23(e)(2)(A) requires that the Court consider whether "the class representatives and class counsel have adequately represented the class" before approving the proposed settlement. Fed. R. Civ. P. 23(e)(2)(A). The Class Plaintiffs' briefs, and the Court's finding of adequate representation by class representatives and class counsel under Rule 23(a)(4) and Rule 23(g) in the Preliminary Approval Order are useful in the context of evaluating this Rule 23(e) factor. *See* 4 *Newberg* § 13:48 (5th ed. June 2021 update). Newberg instructs that "[t]he first of Rule 23(e)(2)'s two procedural concerns—that 'the class representatives and class counsel have adequately represented the class'—are redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively. Since the court either has certified a class or must do so for settlement purposes, it is unclear that this prong adds anything to that analysis." *Id.* (internal footnote omitted).

For the reasons discussed in the Preliminary Approval Order, the Class Representatives and Lead Counsel have adequately represented the Settling Class during this litigation and settlement. *Preliminary*

64

*Approval Order*, 499 F. Supp. 3d at 422–24. Accordingly, this factor weighs in favor of granting final approval.

### 3. Arm's Length Negotiations and No Evidence of Collusion or Fraud

Under Rule 23(e)(2)(B) and *International Union*, the Court must consider whether the negotiations were conducted at arm's length with no evidence of collusion or fraud. See. Fed. R. Civ. P. 23(e)(2)(B); *Int'l Union*, 497 F.3d at 631. "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *UAW v. Gen. Motors, Corp.*, 05-CV-73991-DT, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006) (Cleland, J.) (citing *Granada Inves., Inc. v. DWG Corp.*, 962 F.2d. 1203, 1205 (6th Cir. 1992)). No one has supplied the Court with any evidence, whatsoever, indicating the presence of collusion or fraud.

On the contrary, as set forth above, the settlement negotiations were ongoing for several years, were arm's length, were adversarial, and involved the assistance of third-party mediators and a Special Master. "[T]here appears to be no better evidence of [a truly adversarial bargaining process] than the presence of a neutral third party mediator[.]" 4 *Newberg* § 13:48 (5th ed. June 2021 update). The highly experienced mediators here, Sen. Levin and Ret. Judge Harwood,

provided ample protections in their roles. Additionally, the Special Master assisted the negotiations from a neutral standpoint and provided a thorough report at the July 12, 2021 hearing regarding the adversarial process throughout the negotiations. Accordingly, this factor weighs in favor of final approval.

### 4. Adequate Relief

Rule 23(e)(2)(C) requires the Court to consider whether the relief is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).[24]

Fed. R. Civ. P. 23(e)(2)(C). These sub-factors overlap with the *International Union* factors requiring that the Court evaluate the "complexity, expense, and likely duration of the litigation" and the "likelihood of success on the merits." *Int'l Union*, 497 F.3d at 631.

---

[24] Rule 23(e)(3) states "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal. Fed. R. Civ. P. 23(e)(3).

As to sub-factor one, the "cost, risks, and delay of trial and appeal," this sub-factor weighs in favor of a finding that the relief is fair, reasonable, and adequate for the reasons set forth in the Court's analysis of the likelihood of success on the merits in Section III(B)(1), above.

As to sub-factor two, the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," this factor also weighs in favor of finding that the relief is adequate. As discussed above, every Claimant who timely registers and qualifies for recovery under the ASA will receive an award that corresponds to their placement on the Compensation Grid. (*See* ECF No. 1394-2 PageID.54146.) The Compensation Grid provides detailed guidance on the compensable conditions, eligibility requirements, and proof required to achieve compensation. The criteria are objective, not subjective, and the Claims Administrator must abide by these guidelines. The use of objective criteria to determine settlement distribution is a hallmark of fairness. The ASA contains clear processes and procedures for individuals to register. (*See id*. at PageID.54140.) The ASA creates seven Sub-Qualified Settlement Funds, whose purpose is to receive net funds from the FWC Qualified Settlement Fund for distribution to

67

eligible Claimants. (*See id.* at PageID.54146.) And it sets forth a procedure for the settlement administrator, the Claims Administrator, to process and review registrations and claims, as well as procedures for reconsideration, appeal, and dispute resolution. (*See id.* at PageID.54144–54146, 54168–54171.)

Moreover, the ASA provides for efficient and timely methods for distributing Monetary Awards to Claimants. (*See id.* at PageID.54146–54148.) It contains additional protections, processes, and procedures for Minors and LIIs to receive Monetary Awards, as detailed by the Master GAL at the July 12, 2021 hearing and in her report. (*See* ECF No. 1896.) For all these reasons, this sub-factor weighs in favor of a finding that the relief is adequate.

Rule 23(e)(2)(C)'s third sub-factor requires the Court to evaluate the request for attorney fees, including the timing of the request. The Court is separately required to evaluate the reasonableness of the attorney fee request under Rule 23(h). That issue will be analyzed in a separate opinion and order. For the purposes of this sub-factor, however, the focus is on whether there are signs that "counsel sold out the class's

claims at a low value in return for [a] high fee." 4 *Newberg* § 13:54 (5th ed.) There are no such signs here.

As noted above, the settlement negotiations were conducted at arm's length with the added protections of neutral mediators, who are experienced enough to have noticed indicators if they were present. Additionally, there is no reason to find that the attorney fee award is too high.

As to the timing of the attorney fee award request, courts are to consider this to prevent situations in which the request for attorney fees is unknown and could upset the compensation to claimants at the time of final approval. The timing of the fee request in this case raises no such red flags. Counsel moved for an award of attorney fees on March 8, 2021. (ECF No. 1458.) Co-Lead Class Counsel filed their motion for final approval of the settlement on May 27, 2021. (ECF No. 1794.) Co-Liaison Counsel filed a memorandum in support of final approval on the same day. (ECF No. 1795.) Accordingly, the fee request has been known to participants of the settlement since before the motion for final approval was filed, thus providing them notice and an opportunity to object. And, indeed, there was plenty of time for several objectors to object to the fee

69

request between March 8, 2021 and the deadline for submitting objections on March 29, 2021. The Notice also addressed fees and was provided well in advance of the deadline. Thus, this sub-factor weighs in favor of finding the that the result of the settlement is adequate.

As to the fourth sub-factor, that the parties identify any agreements required to be identified under Rule 23(e)(3), the parties have persuasively represented to the Court that there are no agreements other than the ASA relevant to this sub-factor. (*See, e.g.,* ECF No. 1952, PageID.67995 (finding no evidence of so-called "side settlements" related to the ASA).) Thus, this sub-factor also weighs in favor of a finding that the settlement provides adequate relief. In sum, all the sub-factors set forth in Rule 23(e)(2)(C) weigh in favor of a finding that the relief provided by the ASA is adequate.

### 5. Whether Class Members Are Treated Equitably Relative to Each Other

The last Rule 23(e)(2) factor requires the Court to evaluate whether the settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Advisory Committee Notes to the 2018 amendment codifying this factor states that "[m]atters of concern [with respect to this factor] could include whether the apportionment of relief

among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e) Advisory Committee notes to 2018 amendment.

The ASA presents no such concerns. As aptly stated by Class Counsel in their motion for final approval, the ASA provides for "'horizontal equity' between similarly situated class claimants created by the categorical award grid[.]" (ECF No. 1794, PageID.64306.) And, importantly, the ASA treats individuals who are represented by their own lawyers are treated the same under the ASA as individuals who are members of the Settlement Class.

The fact that the Compensation Grid distinguishes between those with certain proofs does not raise concerns and does not change the analysis. Other class action settlements that provide for a "range of potential proof, tying the amount of relief to the amount and quality of evidence presented," have been approved by other district courts. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 157 (E.D. La 2013) ("*In re Deepwater Horizon*"); *see also In re Nat. Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 400–401 (E.D. Pa. 2015)

71

("*In re N.F.L.*"). Varying levels of proofs and awards are "tied to the reality of litigating; the greater the proof, the more likely a plaintiff will recover at trial." *In re Deepwater Horizon*, 295 F.R.D. at 157. Accordingly, this factor favors final approval.

### 6. The Amount of Discovery Conducted

*International Union* requires that the Court consider "the amount of discovery engaged in by the parties" in evaluating the fairness of the settlement. *Int'l Union*, 497 F.3d at 631. The Sixth Circuit, in *Olden v. Gardner*, instructs that class counsel negotiating a settlement without engaging in formal discovery, including failing to obtain expert opinions, can weigh against granting final approval of the settlement. 294 F. App'x at 218. "Obtaining expert opinions and engaging in formal discovery are usually essential to establishing a level playing field in the settlement arena because it enables the class counsel to develop the merits of their case." *Id.* (citing *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813–14 (3rd Cir. 1995).)

The circumstances presented here are the opposite of those in *Olden*, in which little to no discovery was conducted. As set forth in the Preliminary Approval Order, and above, discovery in the Flint Water

72

Cases has been substantial. *Preliminary Approval Order*, 499 F. Supp. 3d at 412. The Court has overseen the vigorous discovery process and has adjudicated discovery disputes at least once each month since 2019. *See id*. Accordingly, this factor weighs in favor of granting final approval.

7. **Opinions of Class Counsel and Class Representatives and Reaction of Absent Class Members**

In deciding whether the settlement is fair, reasonable, and adequate, the Court must look to "the opinions of class counsel and class representatives." *Int'l Union*, 497 F.3d at 631. "The judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight, and supports the fairness of the class settlement." *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) (internal citations omitted).

Co-Lead Class Counsel support the settlement and urge the Court to grant it final approval. Co-Lead Class Counsel are experienced and have demonstrated their commitment to their clients over the years of litigating the case. They have conducted significant discovery and engaged in vigorous motion practice. The Subclass Settlement Counsel appointed to represent six separate subclasses for allocation purposes

also endorse the ASA. (*See* ECF Nos. 1319-5, 1319-6, 1319-7, 1319-8, 1319-9, and 1319-10.) The Court is satisfied that Co-Lead Class and Subclass Settlement Counsel's endorsement of the settlement weighs in favor of granting final approval.

Likewise, and although not necessary for purposes of Rule 23, the fact that Co-Liaison Counsel for the Individual Plaintiffs support the settlement provides additional support for granting final approval. This is because this settlement applies to their clients' claims against the Settling Defendants. These counsel for individual clients determined that the settlement, including the allocation, the Compensation Grid, and the method of distribution is fair and acceptable to their clients. The number of individual Plaintiffs is in the thousands, and this lends strong support for the conclusion that the ASA is fair.

Moreover, the reaction of absent class members favors approval of the settlement. In evaluating this factor, "courts often cite to the absence of opt-outs as evidence in support of settlement approval." 4 Newberg §13:58 (5th ed. June 2021 update). As stated in Section I(C) above, over half of the City's estimated population registered to participate in the settlement, and only a very small percentage of the people in that group

74

objected to its terms. On October 25, 2021, Special Master Greenspan

provided a report indicating the number of individuals opting out of the

settlement, which is very small in proportion to the number of

registrants:

> A total of 195 opt-out forms were submitted timely (i.e.,
> received or postmarked on or before March 29, 2021). Of these
> timely opt-out forms, 30 were submitted by Individual
> Plaintiffs who are not counted as opt-outs under Article [XIX]
> of the ASA because they are not class members, and 14 of the
> forms do not meet the requirements of a valid opt-out under
> the ASA because the individual did not check the box
> confirming the desire to opt-out and/or did not sign the opt-
> out form.3 Of the remaining 151 individuals who submitted
> opt-out forms, 39 advised Class Counsel that they intended to
> participate in the settlement and completed the opt-out form
> by mistake. Of those 39 individuals, three advised that they
> were attempting to register for themselves and their spouse
> but mistakenly used the opt-out form and not the registration
> form. Some of these individuals also submitted a registration
> form and some completed the opt-out form believing it was in
> fact a registration form. After accounting for the
> circumstances above, there are 112 individuals or entities
> that timely completed the opt-out form as required and have
> indicated that they intended to opt-out of the settlement class.

(ECF No. 1998, PageID.68632–69633 (footnotes omitted).) This weighs

heavily in favor granting final approval of settlement, too.

75

## 8. Public Interest

Another factor the Court must consider in approving the settlement is whether granting final approval is in the public interest. *See Int'l Union*, 497 F.3d at 631. "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003).

Here, the public interest undoubtedly weighs in favor of granting final approval. To illustrate, the *Carthan* Plaintiffs filed this case in 2016 and have been waiting for relief for over five years. And, as Class Counsel notes, "achieving certainty of settlement is . . . in the public interest," given that the State Defendants and the City Defendants are public entities. (ECF No. 1794, PageID.64303.) Accordingly, this factor weighs in favor of granting the settlement final approval.

## 9. Incentive Awards

Along with the *International Union* factors, the Sixth Circuit factors requires the Court to carefully review incentive awards for the named plaintiffs. *See Vassalle v. Midland Funding LLC*, 708 F.3d. 747,

755 (6th Cir. 2013). The Sixth Circuit indicates that this analysis involves looking at "whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013) (quoting *Vassalle*, 708 F.3d at 755.) "Such inequities in treatment make a settlement unfair." *Id*.

In this case, there are no incentive awards that give preferential treatment to the class representatives. The ASA allows Class Counsel to seek an incentive award for each class representative, but they have not done so. As a result, the "class representatives are receiving the same amount [of money] as similarly situated members of the Flint community." (ECF No. 1794, PageID.64298.) This factor, therefore, weighs in favor of granting final approval.

For the reasons stated, and because "the federal policy favor[s] settlement of class actions," *Int'l Union*, 497 F.3d at 632, all of the Rule 23(e)(2) and Sixth Circuit factors weigh in favor of granting final approval.

## C. Notice to the Class and Due Process

To grant final approval, the Court must find that the Notice to the Class satisfies due process. Due process in this context "requires that notice to the class be 'reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Vassalle*, 708 F.3d at 759 (quoting *Int'l Union*, 497 F.3d at 629).

At the preliminary approval stage, the Court found that the Plaintiffs' Notice plan satisfied due process. The Court discussed this finding in the Preliminary Approval Order as follows:

> The Court has carefully examined Plaintiffs' prospective plan for [c]lass Notice, as well as the declaration of Cameron Azari, Director of Legal Notice for Hilsoft Notifications, which is the firm that assisted in designing this particular notice plan.[25] (ECF No. 1319-11, "Exhibit K.") The Court finds that the Settlement Agreement's plan for Class Notice is the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23(e)(1) of the Federal Rules of Civil Procedure. That plan is approved and adopted. The Court further finds that the Class Notice (attached to Plaintiffs' motion as Exhibit K), and the Claim Form included

---

[25] Hilsoft Notifications specializes in "designing, developing, analyzing and implementing large-scale legal notification plans. (ECF No. 1794, PageID.64337.) Hilsoft is a business unit of Epiq Class Action and Claims Solutions, Inc. (ECF No. 1794-3, PageID.64337.)

as part of the Class Notice, comply with Rules 23(e)(1) and
23(c)(2)(B) of the Federal Rules of Civil Procedure.

*Preliminary Approval Order*, 499 F. Supp. 3d at 426.

The Notice plan took effect on February 26, 2021. (*See* ECF No.
1399, PageID.54467.) Plaintiffs indicate that following that date, (1) a
"Long Form Notice packet [was] mailed to each Settlement Class member
for which Interim Co-Lead Class Counsel . . . determine[d] a likely
mailing address—a list of over 57,000 addresses—[and] over 90% of [the
mailings] resulted in successful delivery;" (2) notices were emailed "to
addresses that could be determined for Settlement Class members;" and
(3) the "Notice Administrator implemented a comprehensive media
notice campaign." (ECF No. 1794, PageID.64307–64308.) The media
campaign coupled with the mailing was intended to reach the relevant
audience in several ways and at several times so that the class members
would be fully informed about the settlement and the registration and
objection process.

The media campaign included publication in the local newspaper
(*The Flint Journal*); local digital banners on Facebook, Instagram, and
the Google Display Network; digital banners on these platforms for
broader geographic areas to account for Settlement Class members who

no longer in Michigan; television spots aired on six local stations and radio spots aired on ten local stations every day for two weeks in March 2021; banner notices and radio ads placed on Pandora and SoundCloud; and video ads placed on YouTube. (*Id*. at PageID.64308.) Additionally, as Plaintiffs point out, this settlement has received widespread media attention from major news outlets nationwide. (*Id*. at PageID.64309.)

Plaintiffs submitted an affidavit signed by Azari that details the implementation of the Notice plan. (ECF No. 1794-3, PageID.64337–64352.) The affidavit is bolstered by several documents attached to it, such as the declaration of Epiq Class Action and Claims Solutions, Inc.'s legal Notice Manager, Stephanie J. Fiereck. (*Id*.) Plaintiffs additionally provided the Court with copies and screen shots of the Notices themselves. (*Id*. at PageID.64353–64360.) Azari declared that Epiq "delivered individual notice to approximately 91.5% of the identified Settlement Class" and that the media notice brought the overall notice effort to "in excess of 95%." (*Id*. at PageID.64351.) The Court finds that the notice plan was implemented in an appropriate manner.

As set forth above, the Court previously approved the content of the Notice because it "fairly apprise[d] the prospective members of the class

of the terms of the proposed settlement so that class members [could] come to their own conclusions about whether the settlement serves their interests." *Vassalle*, 708 F.3d 759; *see also Preliminary Approval Order*, 499 F. Supp. 3d at 426. Nothing has changed with the content of the Notice since the Preliminary Approval Order was entered to alter that decision. In conclusion, the Court finds that the Notice Plan as implemented, and its content, satisfies due process.

## D. Certification of the Settlement Class

Class Plaintiffs seek certification of the Settlement Class, which is defined in Section 1.72 of the ASA as follows:

> [A]ll persons or entities who are or could be claiming personal injury, property damage, business economic loss, unjust enrichment, breach of contract, or seeking any other type of damage or relief because at any time during the Exposure Period [of April 25, 2014 [through] November 16, 2020] they: (1) were an Adult who owned or lived in a residence that received water from the Flint Water Treatment Plant or were legally liable for the payment of such water; (2) owned or operated a business including income earning real property and any other businesses that received water from the Flint Water Treatment Plant or were legally liable for the payment for such water; or (3) were an Adult during the Exposure Period and who ingested or came into contact with water received from the Flint Water Treatment Plant. [fn 12]

81

[fn 12] Excluded from the Settlement Class are: (1) Defendants; (2) the judicial officers to whom this case is assigned in federal court, Genesee County Circuit Court, and the Michigan Court of Claims, as well as these officers' staff and immediate family members; (3) all Individual Plaintiffs; and (4) all persons who timely and validly elect to opt out of the Settlement Class.

(ECF No. 1394-2, PageID.54135.) For the Court to certify a class for settlement purposes, the parties must show that the requirements of Federal Rule of Civil Procedure 23(a) and that one of the requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(a)-(b); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997) ("In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3).").

In the Preliminary Approval Order, the Court preliminarily approved certification of the Settlement Class because it found that the prerequisites of Rule 23(a), as well as the requirements of Rule 23(b)(3) were met. The relevant portion of the Order states:

For the reasons set forth below, the Court finds that Plaintiffs have preliminarily met the Rule 23(a) numerosity, commonality, typicality, and adequacy requirements.

**a.  Numerosity**

To satisfy the numerosity requirement, Plaintiffs must demonstrate that the settlement class is "so numerous that

joinder of all members is impracticable." Fed. R. Civ. P.
23(a)(1). There are "no strict numerical test[s] for determining
impracticability of joinder." *In re Am[.] Medical Sys., Inc.*, 75
F.3d 1069, 1079 (6th Cir. 1996). Rather, numerosity "requires
examination of the specific facts of each case and imposes no
absolute limitations . . . . When class size reaches substantial
proportions, however, the impracticability requirement is
usually satisfied by the numbers alone." *Id.* (quoting *Gen[.]
Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980)).

Here, the proposed class comprises a substantial portion of
the population of Flint, Michigan. *See Garner Prop. & Mgmt.,
LLC*, 333 F.R.D. at 622 ("[A] class of 40 or more members is
sufficient to satisfy the numerosity requirement."); *Davidson
v. Henkel*, 302 F.R.D. 427, 436 (E.D. Mich. 2014) (numerosity
is satisfied with a putative class of at least "between 21 and
40" members). Plaintiffs point to the 2010 census finding that
the population of Flint, Michigan at that time exceeded
100,000 people, and the Court infers the Flint population from
2014 through 2020 would be reasonably close to this number.
(ECF No. 1318, PageID.40300 (citing *QuickFacts*, United
States      Census      Bureau      (Apr.      1,      2010),
http://www.census.gov/quickfacts/fact/table/flintcitymichigan
/PST040219.).) Additionally, Plaintiffs point to an expert
report prepared by regional planner Dr. Robert A. Simons
concluding that approximately 700 business enterprises in
Flint may have been detrimentally impacted by the Flint
Water Crisis. (ECF No. 1208-95, PageID.36139–36140.) The
evidence does not suggest that the several hundred to several
thousand individual lawsuits meaningfully detracts from
either of these numbers.

Accordingly, between the 100,000+ individuals who could
comprise the personal exposure and property damage

subclasses, and the 700+ business[es] which could comprise the business economic loss subclass, Plaintiffs have met the numerosity requirement. Fed. R. Civ. P. 23(a)(1).

### b.   Commonality

To satisfy the commonality requirement, Plaintiffs must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Though the rule "speaks of 'questions' in the plural, [the Sixth Circuit has] said that there need only be *one* question common to the class." *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (emphasis added). However, this one question must represent "a common issue the resolution of which will advance the litigation." *Id.*

Plaintiffs have asserted that there are at least four common questions that satisfy the commonality requirement:

> 1)   Whether the State and City Defendants had the opportunity to reflect and deliberate before they acted or failed to act;

> 2)   Whether the conduct of the State and City Defendants directly and proximately caused the Flint water system to be contaminated with corrosive water, lead, and dangerous bacteria, and/or increased the risk of harm to the Class and/or Subclasses;

> 3)   Whether the implementation or execution of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the City of Flint violated Plaintiffs' fundamental liberty interest in bodily integrity; and

84

4)   Whether the actions of the Rowe and McLaren Defendants—who are not named in the Class Complaint but who are participating in the global settlement—violated Plaintiffs' rights.

(ECF No. 1318, PageID.40302.) After years of litigation, the Court is intimately familiar with the factual and legal issues in this case. For purposes of preliminary approval and conditional certification, the Court need go no further than the first issue raised: whether the State and City Defendants had the opportunity to reflect and deliberate before they acted or failed to act. The premise of this litigation as it pertains to the governmental defendants is that action or inaction of certain State and City officials resulted in (1) the decision to switch the source of Flint's water; and (2) a failure to address the consequent contamination of the water, which in turn lead to exposure and damage. The factual underpinnings that must be resolved in order to determine liability and damages to the governmental defendants are common to the class. There would not and could not be different factual findings in separate cases.

Thus, the first question constitutes "a common issue the resolution of which will advance the litigation." *See Sprague*, 133 F.3d at 397. Accordingly, Plaintiffs have met the commonality requirement. Fed. R. Civ. P. 23(a)(2).

**c.   Typicality**

To satisfy the typicality requirement, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim is "typical" if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*,

85

511 F.3d 554, 561 (6th Cir. 2007); *see also Sprague*, 133 F.3d at 399 ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.").

In this case, the representatives of each class—the Adult Exposure Subclass, the Property Damage Subclass, and the Business Economic Loss Subclass—satisfy the typicality requirement, because the representatives' claims (1) "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members"; and (2) are "based on the same legal theor[ies]" as other class members' claims." *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007).

Specifically, the Adult Exposure Subclass Representatives— Rhonda Kelso, Barbara and Darrell Davis, Tiantha Williams, and Michael Snyder—are individuals or representatives of individuals who allege that they resided in Flint, Michigan; ingested or came into contact with Flint tap water during the relevant time period; and suffered medical, financial, and/or emotional damages as a result of [the] Settling Defendants' actions. (*See* ECF No. 1318, PageID.40304–40305.) These claims align with absent Adult Exposure Subclass members who "ingested or came into contact with water received from the Flint Water Treatment Plant at any time during the Exposure Period and who are claiming or could claim a resulting personal injury." (ECF No. 1319-1, PageID.40335– 40336 (as amended, ECF No. 1394-2, PageID.54127–54128).)

The Property Damages Subclass Representatives—Elnora Carthan and David Munoz—are individuals who allege that they owned homes in Flint during the relevant time period, who received water from the Flint Treatment Water Plant, and who suffered diminished property and appliance values

86

as a result of [the] Settling Defendants' actions. (*See* ECF No. 1318, PageID.40305–40306.) These claims align with absent Property Damages Subclass members who "owned or were the lessee of a residential real property that received water from the Flint Water Treatment Plant, or were legally liable for the payment for such water, at any time during the Exposure Period." (ECF No. 1319-1, PageID.40341 (*as amended*, ECF No. 1394-2, PageID.54133).)

Finally, the Business Economic Loss Subclass Representatives—635 South Saginaw LLC (a/k/a "Cork on Saginaw"), Frances Gilcreast, and Neil Helmkay—are all individuals or entities who allege that they owned at least one commercial property in Flint during the relevant period, and who suffered diminished profits due to commercial reticence to patronize Flint businesses as a result of Settling Defendants' actions. (ECF No. 1318, PageID.40306.) These claims align with absent Business Economic Loss Subclass members who "owned or operated a business, including income earning real property and any other businesses, that received water from the Flint Water Treatment Plant at any time during the Exposure Period and who are claiming or could claim a resulting business economic loss." (ECF No. 1319-1, PageID.40336 (*as amended*, ECF No. 1394-2, PageID.54128).)

Because the named Plaintiffs' claims arise from the same course of [the] Settl[ing] Defendants' conduct as those of putative class members, the Court finds that Plaintiffs have met the typicality requirement for purposes of preliminary settlement certification. [fn 13]

> [fn 13] Plaintiffs also argue that the named minor plaintiffs, whose representatives participated in settlement negotiations, typify the claims of

87

> minors in this lawsuit. (ECF No. 1318, PageID.40306–40307.) However, because the portion of the settlement relating to minors is not a class settlement, the Court need not address these claims here.

Fed. R. Civ. P. 23(a)(3).

### d. Adequacy of Representation

To satisfy the adequacy requirement, Plaintiffs must demonstrate that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "There are two criteria for determining whether the representation of the class will be adequate: 1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524–25 (6th Cir. 1976). "Thus, the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Garner Prop. & Mgmt, LLC*, 333 F.R.D. at 624 (quoting *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013)).

The first adequacy requirement is easily met here: the named Plaintiffs in this case all seek to "hold [the] [Settling] Defendants liable for [damages arising out of] the same misconduct." (ECF No. 1318, PageID.40308.) The named Plaintiffs' interests are identical to those of the unnamed members of the class, and the "common interests" requirement is accordingly met. *See Senter*, 532 F.2d at 524–25.

As to the second adequacy requirement, the Court concludes that the named Plaintiffs will, through qualified counsel, "vigorously prosecute the interests of the class." *Id.* The Court has become very familiar with the parties, class representatives, and Co-Lead Class Counsel and Subclass Settlement Counsel in this case through the previous four years of litigation described above. Additionally, when the Court appointed the Subclass Settlement Counsel in August 2019, the Court found that counsel had "the qualifications and experience to adequately and fairly represent clients in this case" and that they were "active litigators [] in mass tort and other class actions [who] have all declared that they will devote the time and resources necessary to represent clients and work on apportionment issues in settlement discussions." (ECF No. 929, PageID.24354.) The Court concludes that Co-Lead Class Counsel, as well as Subclass Settlement Counsel—who have provided declarations supporting the allocation and attesting to its fairness—have lived up to their appointments in vigorously representing Plaintiffs through the litigation and settlement processes. The Court is confident that they will continue to vigorously prosecute the interests of the class.

Accordingly, Plaintiffs have met the adequacy requirement for purposes of preliminary settlement certification. Fed. R. Civ. P. 23(a)(4).

### 3. Plaintiffs Have Preliminarily Satisfied the Rule 23(b) Prerequisites

For the reasons below, the Court finds that Plaintiffs have preliminarily met the Rule 23(b) predominance, superiority, and ascertainability requirements. Fed. R. Civ. P. 23(b).

### a. Predominance

To satisfy the predominance requirement, Plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011).

At this stage, the analysis of the predominance requirement must account for the fact that this class is proposed for settlement purposes only and that the alleged wrongdoing arises out of a common set of facts. Courts have found that settlements "obviate[] the difficulties inherent in proving the elements of varied claims at trial," and consequently, "courts are more inclined to find the predominance test met in the settlement context." *Good v. W. Va. Am[.] Water Co.*, No. 14-1374, 2017 WL 2884535, at *12 (S.D.W.V. Jul[y] 6, 2017) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 304 & n.29 (3d Cir. 2011)).

In certain "mass tort accidents," plaintiffs may meet the predominance requirement even if "questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved . . . [such a finding] does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem[.] Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). This is because "[n]o matter how individualized the issue of damages may be . . . the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next," *id.*, and "[individualized] issues may be reserved for individual treatment with the question of liability tried as a class action."

90

*In re Whirlpool Corp.*, 722 F.3d at 854 (internal quotations omitted) (citing *id.*) ("When adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate."); *see also Good*, 2017 WL 2884535, at *12 (collecting cases in which courts found "predominance in the mass tort arena when a single common event or common cause gave rise to the claims of each class member").

This is one such mass tort accident. The common liability questions noted above satisfy the predominance requirement for settlement purposes. *See In re [NFL]*, 821 F.3d 410, 434 (3d Cir. 2016) (finding that [a] mass tort action "presented predominate factual questions regarding the NFL's knowledge and conduct as well as common scientific questions regarding causation"); *see also In re Whirlpool*, 722 F.3d at 854; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("[M]ass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement.").

Accordingly, Plaintiffs have met the predominance requirement for purposes of preliminary settlement certification. Fed. R. Civ. P. 23(b).

### b. Superiority

To satisfy the superiority requirement, Plaintiffs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Relevant factors in this inquiry include: (1) the interests of the class members in individually controlling separate actions; (2) the extent and nature of the litigation already begun by members of the class;

and (3) the desirability of concentrating the litigation in a particular forum. [fn 14]

> [fn 14] Plaintiffs also argue that the named minor plaintiffs, whose representatives participated in settlement negotiations, typify the claims of minors in this lawsuit. (ECF No. 1318, PageID.40306–40307.) However, because the portion of the settlement relating to minors is not a class settlement, the Court need not address these claims here.

For purposes of settlement, the Court finds that the three relevant 23(b)(3) factors weigh in favor of the superiority of class certification. First, the class members' interest in individually controlling the litigation weighs in favor of conditional class certification, because individuals seeking individualized relief either already chose to file their own complaints or hire individual counsel to address their claims—as evidenced by the Individual Cases—or may eventually seek exclusion from the settlement class. Nor, after four years of very expensive class discovery, would individualized litigation be economically preferable for those plaintiffs who have not already elected to file suit as individuals. *See In re Whirlpool*, 722 F.3d at 861 ("Use of the class method is warranted particularly [when] the cost of litigation would dwarf any potential recovery.").

Second, the extent and nature of class members' litigation in this case weighs in favor of certification. Class representatives and class counsel have been litigating this case for nearly five years in a suit that has involved "extensive motion practice, numerous appeals, and petitions for certiorari filed with the United States Supreme Court. The docket on this consolidated case shows over 1,100 filings and is rising daily.

[fn 15] This case has been zealously litigated already, by a team of national and local firms on all sides." (ECF No. 1207, PageID.34519–34520.) Such an extensive history supports the superiority of class certification for the defined adult class for the purpose of this settlement.

> [fn 15] With the entry of this Opinion and Order, that number has reached 1399 filings. (No. 16-10444.)

Finally, all federal litigation concerning the Flint Water Cases has been centralized in the Eastern District of Michigan, rendering this forum ideal for resolving the dispute.

Accordingly, Plaintiffs have met the superiority requirement for purposes of preliminary settlement certification. Fed. R. Civ. P. 23(b).

### c.    Ascertainability

In addition to the predominance and superiority requirements, "Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017). Under this requirement, Plaintiffs must show "that the members of the class [are] *capable* of specific enumeration." *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) (emphasis in original) (internal citations omitted). Such a showing is required for (b)(3) class certification because, "unlike (b)(1) and (b)(2) classes, (b)(3) class members are entitled to notice and are able to opt-out of the class." *Cole*, 839 F.3d. at 541. The ascertainability requirement is satisfied with "a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.*

93

Though Plaintiffs did not discuss the implied ascertainability requirement, the Court nevertheless concludes that the proposed class is sufficiently ascertainable to justify certification. Plaintiffs have argued in other motions that "[m]embership in the Class and Subclasses is ascertainable through property or rental records, or through certification by Flint residents or guardians that they and/or their children lived in Flint and were exposed to the water during the Class Period." (ECF No. 1207, PageID.34471.) The class definitions in this case are geographically circumscribed to one city in one state and are based on objective criteria, such as where an individual resided at a particular time or whether they owned or rented property.

Accordingly, Plaintiffs have met the ascertainability requirement for purposes of preliminary settlement certification. *Sandusky Wellness Ctr., LLC*, 863 F.3d at 466.

*Preliminary Approval Order*, 499 F. Supp. 3d at 420–26. The analysis in the Preliminary Approval Order applied the same Rule 23(a) and (b) standards that govern the analysis at the final approval stage Accordingly, the Court finds that Plaintiffs have met the requirements of Rule 23(a) and (b) for certifying a class for settlement purposes. The Settlement Class is certified.

94

## E. Appointment of Co-Lead Class Counsel and the Executive Committee as Class Counsel for Settlement Purposes

Under Federal Rule of Civil Procedure 23(g)(1), when the Court certifies a class, including for settlement, it "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Co-Lead Class Counsel requested appointment of themselves and the Executive Committee as Settlement Class Counsel in their motion for final approval. (ECF No. 1794, PageID.64259.)

Over the last four years, the Court has had the opportunity to evaluate and re-evaluate Co-Lead Class Counsel's qualifications and performance and has found both satisfactory. (*See, e.g.*, ECF Nos. 173, 696, 1021.) The Court reviewed Co-Lead Class Counsel's qualifications in the Preliminary Approval Order. *Preliminary Approval Order*, 499 F. Supp. 3d at 423. Based on that analysis, the Court appoints Interim Co-Lead Class Counsel and the Executive Committee as Settlement Counsel under Rule 23(g).[26]

---

[26] The Court recently issued an Opinion and Order in this case certifying two classes for litigation purposes. In that Order, the Court formally appointed Co-Lead Class Counsel and the Executive Committee as Class Counsel under Rule 23(g). The Court's analysis in that Order of the same Counsel's performance is relevant to the decision made here. *See In re Flint Water Cases*, No. 16-10444, 2021 WL 3887687

95

### F. Report and Recommendation on Late Registrants

On November 9, 2021, the Special Master filed a Report and Recommendation ("R&R") Regarding Late Registrants. (ECF No. 2006.) In it, she reported that 1,219 individuals submitted registrations after the March 29, 2021 deadline and she recommended that the Court permit "any registrant who registered on or before September 28, 2021 to participate in the settlement and that any such registration be considered timely." (*Id.* at PageID.68734.) The Special Master provided the R&R to the Settling Parties, and none objected to her recommendation. The Court has carefully reviewed the R&R and concurs in its reasoning and result. The R&R is adopted. Accordingly, any registration received on or before September 28, 2021 is considered timely.

## IV.  OBJECTIONS

As set forth above, the Court has received objections to the Settlement. Cuker filed twelve *Chapman/Lowery* objections on behalf of eighteen *Chapman/Lowery* Objectors. Additionally, there are 106

---

(E.D. Mich. Aug. 31, 2021), *appeal docketed*, No. 21-103 (6th Cir. Sept. 7, 2021). (ECF No. 1957.)

objections submitted by Unrepresented Objectors.[27] The Court will address these based on their subject matter, which include the following topics:

- Objections regarding the Compensation Grid, specifically related to:

    o bone lead level testing;

    o blood lead level testing;

    o cognitive impairment testing;

    o miscarriage fetal tissue testing;

    o proof of galvanized steel service lines;

    o the Compensation Grid's failure to include additional categories, such as a category addressing payment of water bills, costs of bottled water, medical costs, and loss of trust;

    o the overall allocation of funds for children versus adults and others;

    o the "cap" of $1,000 for property owners' and renters' recovery;

---

[27] All but two of the Unrepresented Objectors' objections were filed using a form that allowed the objector to check boxes next to pre-written objections. An Unrepresented Objector explained at the July 13, 2021 hearing that this form was created by a member of the Flint community. (*See* ECF No. 1905, PageID.66782.) The two Unrepresented Objectors who did not use the form are Dr. Reynolds (ECF No. 1436) and Diane Fletcher (ECF No. 1684). One Unrepresented Objector, Regina Nelms, did not sign her objections, which means that they failed to follow the required format set forth in the ASA. (*See* ECF No. 1707, PageID.61655 (unsigned form); *see also* ECF No. 1394-2, PageID.54184–54185 (ASA sections setting forth requirements for a valid objection).) However, since Nelms used the form objection described in this footnote, her objections have been lodged by other objectors so her objections will be considered and decided.

- Objections regarding the ASA's Registration and Objections Requirements, specifically that:

  o the registration deadline was too short;

  o individuals should not have to submit personally identifiable information ("PII") to participate in the settlement;

  o at the time of registering, participants have no way of knowing their final Monetary Award;

  o counsel who signed the ASA were, under the ASA's terms, prohibited from representing objectors;

  o some objectors were unable to use Zoom

- Objections related to the COVID-19 pandemic;

- Objections to the Notice of settlement's content;

- Objections related to Class Representatives' payments; and

- Objections to Plaintiffs' attorney fee request (which will be addressed in a separate opinion and order).

## A. Objections Based On Compensation Grid

### 1. Objections Related to Bone Lead Level Testing

The most common objection to the ASA relates to the inclusion of bone lead level testing[28] in the Compensation Grid. Both the *Chapman/Lowery* Objectors and Unrepresented Objectors set forth

---

[28] This is sometimes referred to on the record as "bone scanning" or "*in vivo* measurement of heavy metal exposure" or "XRF scanning." For consistency and clarity, the Court will refer to all such testing as "bone lead level testing" unless the Court is quoting from another source using a different name.

several arguments seeking to have the entire settlement rejected as unfair, unreasonable, and inadequate because of the use of bone lead level testing as a method for documenting lead exposure and determining what categories in the Compensation Grid an individual qualifies for.

As noted, the Compensation Grid includes thirty Settlement Categories, each of which provides for a different level of compensation depending on the amount of proof a Claimant submits. (ECF No. 1319-2, PageID.40789–40831.) Those Claimants with proofs that qualify them for a particular Settlement Category are treated identically to other Claimants in that same Category, creating horizontal equity among qualifying participants. Claimants with specific types of proofs can obtain a larger Monetary Award compared to those with little or no proof. As discussed above in Section I(B), similar compensation matrices in class action settlements have been approved by other courts nationwide, and this Court has carefully analyzed and approved of this structure in this case.

Co-Liaison Counsel Hunter Shkolnik and Paul Napoli, of the Napoli Shkolnik PLLC law firm, established a bone lead level testing program for their clients "under the leadership of Harvard University's Aaron

99

Specht [Ph.D.] and overseen by New York University's Medical Director Dr. Michael Weitzman." (the "Napoli Program"). (ECF No. 1789, PageID.64052.) The Napoli Program was established at Napoli Shkolnik's offices in Flint, Michigan. There, bone lead level testing is conducted using a piece of equipment known as a hand-held XRF device.

Most of the objections related to the safety and legality of bone lead level testing through the hand-held XRF device were first brought by Dr. Reynolds on February 26, 2021, through his then-counsel Valdemar Washington, who represents the *Anderson* Plaintiffs, who are a group of individual plaintiffs who did not object to the settlement. (ECF No. 1436.) Just days after Dr. Reynolds filed his objection, on March 1, 2021, Co-Lead Counsel filed a motion for the Immediate Suspension of the Use of Portable XRF Bone Scanning Tests (ECF No. 1443; ECF No. 1446 (corrected motion)), which they later withdrew. (ECF No. 1499.) This motion and Co-Lead Counsel's decision to withdraw it have been the subject of many motions and hearings, and the issues have been abundantly addressed and will not be addressed further here, other than to note that there are no issues presented in the now-withdrawn motion that have not been raised by other objectors to the ASA.

100

### a. Objections to the Use of the Thermo Fisher Manufactured Hand-Held XRF Device on Humans

*The Sources of the Safety-Related Objections*

Dr. Reynolds and other objectors to bone lead level testing at the Napoli Program contend that the hand-held XRF device is "an unapproved industrial device" and "is not designed to be used on human beings– at all." (ECF No. 1436, PageID.55026.) Dr. Reynolds notes that the manufacturer of the hand-held XRF device, Thermo Fisher (sometimes referred to as Thermo Scientific), indicates in its purchase materials that the device, as taken out of the box, should be pointed at a sample but "never at a person or a body part." (*Id*. at PageID.55027.) Dr. Reynolds argues that Dr. Specht's use of the Thermo Fisher hand-held XRF device on humans is therefore improper. But, as discussed below, Dr. Specht has modified the device so that it can be used safely on humans.

Following Dr. Reynolds' objection, many other objectors made similar objections, arguing that the hand-held XRF device used in the Napoli Program is unsafe. Some, but not all, of the fifty-four Unrepresented Objectors who objected to bone lead level testing because

they had not had an opportunity to obtain one (an objection which is addressed separately below) checked a box indicating that they objected to the Settlement because: "the bone lead test has not been approved by the FDA [Food and Drug Administration] for use in humans." (*See, e.g.*, ECF No. 1689, PageID.61583.) There has been no showing by the objectors that FDA approval is required for the test, and this is an otherwise undeveloped argument by Unrepresented Objectors. Indeed, the only evidence in the record on this issue is the affidavit of Michael Drues, Ph.D. (ECF No. 1795-3.) Dr. Drues has worked as a regulatory consultant in the medical device industry for over twenty-five years and is an internationally recognized expert on medical technologies and regulatory affairs. (*Id.* at PageID.64508.) Dr. Drues avers that "the XRF system does not need FDA clearance or approval when used to detect environmental lead exposure." (*Id.* at PageID.64509.) No evidence has been submitted to support the contrary. Accordingly, arguments related to the FDA are rejected. In considering Unrepresented Objectors' objections, the Court will set aside references to the FDA and will construe the objections as challenging the safety of the hand-held XRF device.

102

Additional arguments related to the safety and propriety of the hand-held XRF device were lodged by the *Chapman/Lowery* Objectors in their June 10, 2021 reply in support of the motion to extend the deadline for bone lead level testing (ECF No. 1820), which the Court denied on other grounds (ECF No. 1845). On June 24, 2021, The *Chapman/Lowery* Objectors filed a brief that included arguments related to bone lead level testing and safety. (ECF No. 1839.) The same day, *Anderson* Plaintiffs filed a brief in opposition to Co-Liaison Counsel's brief that reiterated many of the points made by Dr. Reynolds in his objection.[29] (ECF No. 1840.) Co-Liaison Counsel responded to the arguments related to the safety of bone lead level testing on several occasions. (*See* ECF Nos. 1455, 1789, 1795, 1895, 1897, 1923.) As noted above, the Court heard argument from Dr. Reynolds, counsel for the *Chapman/Lowery* Objectors, counsel

---

[29] Attorney Washington entitled this filing as the *Anderson* Plaintiffs' opposition to the motion for final approval. However, none of the *Anderson* Plaintiffs objected to the settlement. The only client Washington represented who filed objections to the ASA was Dr. Reynolds, whom he no longer represents.

The *Anderson* Plaintiffs arguably do not have standing to oppose the motion for final approval because they are non-objectors. Accordingly, the Court is not obligated to address the arguments made in the *Anderson* Plaintiffs' filing at all. However, given the seriousness of the allegations, the Court is addressing them in this Opinion and Order.

for the *Anderson* Plaintiffs, and Co-Liaison Plaintiffs at the hearing held on both July 12, and July 15, 2021. Dr. Reynolds filed additional safety-related objections on July 20 and 21, 2021. (ECF Nos. 1901, 1909, 1910.)

After careful consideration of the objections, responses, and the evidence in the record related to bone lead level testing safety, the Court denies these objections for the reasons below.

*Objectors' Position*

In his objection, Dr. Reynolds references a Thermo Scientific publication that is part of the purchase materials for a hand-held XRF device. The publication is entitled *XRF Technology in the Field: XRF Technology for Non-Scientists* that states that the hand-held XRF device, as sold out of the box, emits radiation "similar to the exposure received in a normal medical or dental X-ray." (ECF No. 1436-6, at PageID.55242) It also states, "care must be taken to always point a handheld XRF analyzer directly at the sample and *never at a person or a body part.*" (Id. emphasis added).)

However, the Napoli Program used the hand-held XRF device in a manner that is not at odds with the language that appears above. The device operated by the Napoli Program is not used as sold out of the box;

104

rather, the device is modified for safety purposes, as described in greater detail below.

Months after the March 29, 2021 deadline for filing objections had elapsed, on June 24, 2021, the *Anderson* Plaintiffs submitted a letter to the Court from Thermo Scientific addressed to Barbara Krohmer of Napoli Shkolnik. (ECF No. 1840-2, PageID.65635.) The letter, dated May 12, 2021, states as follows:

> Dear Ms. Krohmer:
>
> I write concerning a Niton™ XL3t 950 GOLDD+XRF analyzer (the "XL3t"), which the law firm of Napoli Shkolnik & Associates, PLLC ("Napoli") has rented from Thermo Scientific Portable Analytical Instruments Inc. ("Thermo Fisher"). We have recently learned that Napoli, working in conjunction with Dr. Aaron Specht, may have been using its XL3t in a manner inconsistent with the use for which Thermo Fisher markets the XL3t. Specifically, based on the limited information available to us concerning the ongoing Flint Michigan lead litigation (in which we understand Napoli to be acting as plaintiffs' counsel,) we believe that Napoli and/or Dr. Specht may have used the XL3t on human subjects, and in an effort to analyze said subjects' levels of lead exposure.
>
> As such, we write to advise you that Thermo Fisher has never marketed the XL3t for any *in vivo* diagnostic use (including, without limitation, any such use to measure bone lead levels in living persons,) nor have we sought or obtained FDA approval for such use. While we are aware of a limited number of occasions on which we have supported academic research

into the use of Thermo Fisher handheld XRF devices to measure bone lead, such research was, to our knowledge, approved by a university IRB [Institutional Review Board] in each instance. Your use of the XL3t does not appear to arise in the context of academic research, and we are not aware of any IRB approval for your activities.

As you are aware, in your rental agreement with Thermo Fisher, Napoli agreed to be "solely responsible for the safe and prudent operation of" the XL3t. The safety instructions contained in the XL3t User's Guide explicitly instruct all users to "[n]ever point your analyzer at yourself or anyone else when the shutter is open." All users are expected to abide by these safety instructions, except under specific circumstances (not present here) that create adequate assurances regarding safety. We further advise you that Thermo Fisher has not validated the safety of the XL3t when used in a manner inconsistent with its safety instructions.

We must respectfully request that you only use the XL3t instrument in a manner consistent with its product documentation. Should you have any questions regarding the proper and intended uses of the XL3t, please do not hesitate to reach out, and we will be happy to discuss them further.

Very truly yours,
Chloe Hansen-Toone
Vice President and General Manager

(ECF No. 1840-2, PageID.65635.)

The *Anderson* Plaintiffs argue that this letter demonstrates that the hand-held XRF device is unsafe, yet they have taken the letter's contents out of context and ignored facts related to the safety of the device

106

as modified. For example, Dr. Reynolds' former counsel argues on behalf of the *Anderson* Plaintiffs that this letter "validated" Dr. Reynolds' concerns. (ECF No. 1840, PageID.65619.) The *Chapman/Lowery* Objectors argue that this letter "warns against using the devices on living humans under the circumstances presented here and [the manufacturer] refuses to sell or lease the machines to anyone it suspects would use it on living humans when not done subject to approval by a university Institutional Review Board ('IRB')." (ECF No. 1901, PageID.66497.) In another related but tangential filing, the *Chapman/Lowery* Objectors argued that the letter: "admonished Napoli Shkolnik, stating that [the device] was not 'safe and prudent' for use on humans and that 'adequate assurances regarding safety' were 'not present here' because the scanning is not supervised by an IRB of an academic institution." (ECF No. 1820, PageID.64807.) These interpretations of the letter are all inaccurate. The letter is nothing more, or less, than what is stated above. The Court views the main purpose of this letter as an attempt by Thermo Fisher to shield itself from litigation that may arise, ironically, because of the safety-related accusations made by the objectors in this litigation.

107

The letter does not "validate" Dr. Reynolds, "admonish" the Napoli Program, or do anything of the sort.

Thermo Fisher's letter makes clear that it has never *marketed* the hand-held XRF device at issue for any *in vivo* diagnostic use such as bone lead level testing. "Market" is the key word. Indeed, Thermo Fisher is very aware of and has supported research using its hand-held device, when modified for use on humans, for many years. Thermo Fisher has worked with Dr. Specht in the past, is aware of his modifications to the hand-held XRF device for bone lead level testing in humans, including children, and has endorsed this work.

At the hearing on July 12, 2021, Co-Liaison Counsel presented the Court with sales orders between Thermo Scientific and Purdue University, demonstrating Thermo Fisher's awareness and involvement in providing hand-held XRF devices to Dr. Specht for human research purposes, that date back to 2012. (*See, e.g.*, ECF No. 1897-2, PageID.66388.) Counsel also presented to the Court with 2019 emails from Bob Gillette, a representative of Thermo Scientific, that expressly discuss the fact that Thermo Scientific hand-held XRF devices have been customized and sold to both Purdue University and Harvard University

for "measurements of Pb [lead] in bone." (ECF No. 1897-2, PageID.66389.) Gillette specifically states which model of the hand-held XRF devices, when customized, would be able to "safely make these measurements." (*Id*.) At no point do these communications show Thermo Fisher raising a red flag regarding the propriety of using the hand-held XRF device on humans. Instead, these communications show that Thermo Fisher knew that the devices would be modified for safety by Dr. Specht and others before they would ever be used on humans. And surely, Thermo Fisher must have been aware that these scientists published their research and specifically state that the research was conducted using hand-held XRF devices on humans to measure metal levels in bones. (*See, e.g., id*. at PageID.66411–66422.)

The May 12, 2021 Thermo Fisher letter to Napoli Shkolnik discusses an IRB (Institutional Review Board). As background, an IRB is "a committee of scientists/doctors and non-scientists whose charge is to oversee the safety and protection of human subjects in research studies. Governmental regulations and institutional policies exist to protect the rights and welfare, including privacy/confidentially rights, of all human research subjects." *Institutional Review Board*, *Boston University*

*Wheelock       College       of       Education       and       Development,*
https://www.bu.edu/wheelock/information-for-research/research-
handbook/pre-award-processes/institutional-review-board/
[https://perma.cc/54RP-8SYS]. Several studies involving the use of hand-
held XRF devices to measure heavy metal exposure on humans conducted
by Boston University were IRB-approved in 2017, 2018, and 2019. (*See*
ECF No. 1923-2, PageID.67258–67272.) IRB approval would not have
been given if the clinical research were not "conducted according to
corresponding federal regulations, state law, and IRB policies." BU
Research Support, *Institutional Review Board (IRB) Charles River IRB
Office.*  https://www.bu.edu/researchsupport/profile/institutional-review-
board-irb/ [https://perma.cc/KP2J-K24E]. Additionally, IRB approval has
been given to studies conducted at Purdue University and Harvard
University that used hand-held XRF devices to measure lead in human
bones. (*See, e.g.*, ECF No. 1897-2, PageID.66423–66434.)

To be clear, the Napoli Program is *not* a research project like the
studies done at Purdue, Harvard, and Boston University (and objections
arguing that research is being conducted will be addressed below). The
Napoli Program was established for settlement and litigation purposes

110

only. An IRB is not required for the Napoli Program to conduct bone lead level testing as part of the settlement in this litigation.[30] Co-Liaison Counsel have submitted enough evidence to support their position that the Napoli Program conducts tests in the same manner and to the same standards that the IRB-approved studies were conducted. Also, there is no evidence in the record, whatsoever, that the Napoli Program was operated in a manner that counters any of the IRB-approved bone lead level testing programs using a hand-held XRF device at Purdue University, Harvard University or Boston University. (*See, e.g.*, ECF No. 1455, PageID.57128.) Nor is there any evidence in the record that Thermo Fisher only sold devices upon proof of an IRB in the past; that is, until it learned of the objectors' position in this litigation and perhaps became concerned about being brought into a lawsuit related to the use of the device in this case.

---

[30] The *Chapman/Lowery* Objectors argue in their opposition to the motion for final approval that the process should be IRB approved. (ECF No. 1839, PageID.65413.) But beyond making this general assertion, they provide no support for their argument and it is rejected because the device was not used as part of a research study. Rather, it was used to quantify lead exposure for purposes of qualifying for Monetary Relief in the settlement.

*Radiation Levels Emitted by the Modified Hand-Held XRF Device*

Dr. Reynolds asserts that the modified hand-held XRF device exposes individuals to excessive radiation and is therefore unsafe. He argues that any level of radiation is a danger to human safety, particularly when not conducted for the purpose of a medical diagnosis or treatment. (*See* ECF No. 1904, PageID.66751–66752.) Dr. Reynolds indicated at the hearing on July 12, 2021 that the only circumstance in which he would find a bone lead level test to be acceptable is if the individual is "an adult who has had an occupational exposure to a toxic level and . . . ha[s] clinical symptoms." (*Id.* at PageID.66751.) However, even in this circumstance, Dr. Reynolds would not approve of the test being conducted with a hand-held XRF device.[31] (*Id.* at PageID.66752.)

As a preliminary matter, no one is required to get a bone lead level test – it is entirely voluntary. As further noted below, there is not a single recovery Settlement Category in the Compensation Grid that relies

---

[31] Dr. Reynolds' objection differentiates between the hand-held XRF device used by the Napoli Program and what he characterizes as "a **medical grade** XRF testing device" used at Mt. Sinai Hospital in New York City. (ECF No. 1436, PageID.55030 n.16 (emphasis in original).) This is not a distinction that is defined by Dr. Reynolds. Regardless, Dr. Specht has modified the hand-held XRF device for safe use on humans, and use of the device for this purpose has been IRB-approved many times.

exclusively on bone lead level testing to qualify for a Monetary Award in that Category. For those who do undertake a bone lead level test, however, the evidence in the record indicates that the level of radiation exposure is not an unreasonable or unsafe dose for humans.

Co-Liaison Counsel for Individual Plaintiffs submitted the affidavit of William G. Bithoney, M.D., FAAP. (ECF No. 1789-2.) Dr. Bithoney's background is in researching lead poisoning and its effects on children's health. (*Id.* at PageID.64042.) He has served as Chief Medical Officer ("CMO") for several health systems such as Mercy Hospital in Philadelphia, Pennsylvania and Conshohocken, Pennsylvania, and Sisters of Providence Health Systems of Massachusetts and Connecticut. (*Id.*). Although he is not a radiology specialist, he states that he is familiar with the portable hand-held XRF device and that in his work as the CMO of various health systems, he was "in charge, along with colleagues in radiology, of the safety of patients exposed to radiation in [the] radiology and radiation oncology divisions." (*Id.*) Further, Dr. Bithoney indicates that he has "studied the implementation of the [Napoli Program] and [has] read the research pertaining to this method of[] XRF scanning for bone testing for lead in children." (*Id.*)

113

Dr. Bithoney reviewed the objections to bone lead level testing due to safety concerns. He states that:

> [c]ompared to exposure from x-ray machines, CT scans, and MRI scans, the exposure to radiation from the XRF device is negligible and poses negligible risk to humans. To be exact, exposure to radiation from an XRF scan for bone testing of lead is measured at a dose of ~3.4 micro sieverts. In comparison, exposure to radiation from a standard chest x-ray is 100 micro sievert[s].

(*Id*. at PageID.64064.) In his opinion, "there is negligible risk of long-term or short-term effects from exposure to the [~3.4 micro sieverts] of radiation, which is negligible, in either adults or children." (*Id*.)

Dr. Bithoney explains that there are naturally occurring radioactive materials present around us, every day:

> Due to these varying sources of radiation all humans are exposed to approximately 2400 micro-sievert[]s (2.4 miliSvs) of radiation per annum. We receive approximately 6.5 micro-sievert[]s per day of radiation from ambient conditions (living and breathing). As noted, children of Flint undergoing XRF evaluation for lead level determination are exposed to approximately 3.4 microsievert[]s of additional radiation from the XRF scan for bone lead. Thus, the additional radiation exposure caused by the XRF bone lead test used to evaluate lead levels in these children is the equivalent of children simply living and breathing for 12 hours. The radiation dose these children receive is less than what they would receive simply by taking a typical airplane ride, which exposes us to

114

approximately 0.003 millisieverts per hour, or about 3.0 micro-sievert[]s per hour, approximately the same amount of exposure to radiation a child receives during the XRF bone lead test. The potential damage of this radiation dosage is in my opinion negligible[.]

(*Id*. at PageID.64064–60465.) Dr. Bithoney also testifies that "the XRF test poses negligible risk to a fetus" of a pregnant woman, if she were to have the test performed during pregnancy. (*Id*. at PageID.60466.) He indicates that the radiation exposure is "much less than that of exposure from CT scans, ultrasounds, or MRIs, which is said to be safe for pregnant women to undergo by the ACOG [American College of Obstetrics and Gynecology]." (*Id*.) No evidence has been submitted by any objector that challenges Dr. Bithoney's testimony.

Co-Liaison Counsel also submitted the affidavit of Walter Cofer, who is a radiation technology and safety specialist. (ECF No. 1789-3.) Cofer declares that he "disagrees with the [objectors'] assertions" that bone lead level testing occurring in the Napoli Program is "dangerous and a risk to the community," and he believes these claims are "false." (*Id*. at PageID.64097.) Cofer is a certified radiation specialist who has trained and worked in the field for over thirty years. (*Id*. at PageID.64098.) Specifically, he has worked as a consultant in developing radiation safety

115

programs, as well as auditing and revising existing programs, including

programs that use hand-held XRF devices. Cofer states that the:

> radiation safety program implemented in Flint conforms to
> the applicable requirements of the Michigan radiation control
> regulations. The x-ray safety program is comprehensive and
> applies best safety practices. The program's custom training
> addresses all required topics in an appropriate manner. The
> testing component of the training provides a legitimate means
> of demonstrating the operators' understanding of the
> radiation hazard, the safety measures in place, and their
> competence to use the equipment properly.

(*Id*. at PageID.64100.) Cofer concludes that:

> a. Dr. Specht's use of XRF technology for lead-in-bone testing
> has been approved for use by the Michigan radiation control
> program;[32]
>
> b. As the program's radiation safety officer, Dr. Specht has
> established appropriate work practices to ensure compliance
> pertaining to radiation dose limits and other regulatory
> requirements;
>
> c. The XRF testing in Flint to measure lead content in bones
> exposes the test-recipient to a negligible dose of radiation. The
> radiation exposure is so minimal that the risk involved is too
> low to be quantifiable; and

---

[32] As the Court understands it, the Michigan Radiation Safety Office ("RSO")
does not use the term "approve." However, no evidence has been presented that would
indicate that the RSO found that there are safety issues with the device as it has been
used.

> d. Based on my review of the XRF-based lead testing program in Flint, I am confident that the radiation safety program established by Dr. Specht provides a safe and compliant means of measuring long-term lead exposure, and I have no reservations regarding continued use of the test methodology.

(*Id.* at PageID.64101.) The objectors submitted no evidence to challenge Cofer's declaration.[33]

On March 5, 2021, Co-Liaison Counsel submitted a letter to the Court addressing public allegations in the media that the hand-held XRF device is unsafe. (ECF No. 1455.) The letter details the protocols used by the Napoli Program to ensure that the test is conducted safely. (*See id.* PageID.57129.)

In sum, the objections related to the safety of bone lead level testing at the Napoli Program are rejected. To the extent the objections challenge the safety of bone lead level testing at one of the other available sites for obtaining such a test, the objections are rejected as well.

---

[33] To clarify, the Court is not suggesting that the objectors or anyone else should have filed something along the lines of a reply brief to rebut the non-objectors' position. Rather, under Section 20.1 of the ASA, the objectors have the burden of persuasion in the first instance that the ASA should not be approved as fair, reasonable, and adequate. (*See* ECF No. 1394-2, PageID.54184.)

117

*Evidentiary Hearing Request*

In his objection, Dr. Reynolds seeks to have the Court "(1) appoint a neutral expert pursuant to Federal Rule of Evidence 706, and/or (2) hold an evidentiary hearing specifically on the efficacy and safety of the XRF device at issue in the [A]SA." (ECF No. 1901, PageID.66497.) The Court denies this request because it is unnecessary. Dr. Reynolds did not seek this relief until July 20, 2021, which was after the three-day fairness hearing had taken place. But even if he had made a timely request, an evidentiary hearing is not needed. The objections related to the safety of bone lead level testing and the use of the hand-held XRF device are entirely unsupported. On the contrary, there is an abundance of evidence that the tests were being carried out safely.

In the Sixth Circuit, district courts are not required to "conduct a full evidentiary hearing with live testimony and cross-examination before approving a settlement." *Int'l Union*, 497 F.3d at 636. Rather, the Court can use its "traditionally broad discretion over the evidence" in determining fairness. *Id*. A request for an evidentiary hearing may be granted if the objectors "can make a colorable claim that the settlement should not be approved," but that is not the case here. *Id*. at 635 (citing

*Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) ("To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process . . . [U]nless the objectors have made a clear and specific showing that vital material was ignored by the District Court[,] [t]here is no need for the District Court to hold an additional evidentiary hearing on the propriety of the settlement.") (internal quotation marks omitted)). Accordingly, Dr. Reynolds' request for an evidentiary hearing is denied.

### b. Objections Regarding The Napoli Program's Regulatory Compliance and Legality

The *Chapman/Lowery* Objectors and *Anderson* Plaintiffs argue that aspects of the Napoli Program violate the law. For the reasons below, the allegations regarding the Napoli Program's lack of regulatory compliance and legality are rejected.[34] When viewing the evidence in the record, these allegations are unfounded and, unfortunately, have likely had far-reaching consequences for participants in the settlement who

---

[34] Moreover, these objections are not sufficiently detailed and were not filed before the March 29, 2021 deadline for filing objections. Therefore, the objections and arguments are waived and the Court need not consider them. Due to the seriousness of the allegations, however, the Court will address aspects of them.

might have wished to obtain a bone lead level test, but were deterred by

counsel's unfounded claims that the Napoli Program was being conducted

in violation of the law.

Counsel for the *Chapman/Lowery* Objectors as well as counsel for

the *Anderson* Plaintiffs asserted at the hearing on July 12 and 15, 2021

that Napoli and/or the Napoli Program had committed a misdemeanor.

The statements made by counsel for the *Chapman/Lowery* Objectors to

the Court are as follows:

> MR. CUKER: [T]here's a legality issue. I found out to my
> astonishment that the clients I sent to be bone scanned on
> February 22 I believe were scanned by a device that was
> illegal because it wasn't registered in the State of Michigan.
>
> THE COURT: And tell me what authority do you have . . . that
> makes the process illegal? What do you mean – by illegal do
> you mean it's a crime?
>
> MR. CUKER: Yeah, it's a misdemeanor.
>
> THE COURT: Okay.
>
> MR. CUKER: It's a misdemeanor to use an unregistered
> radiation emitting device in the State of Michigan. I believe
> we cited the statute in our paper.

(ECF No. 1904, PageID.66708–66709.) The authority relied upon in the

briefing, however, does *not* support the claim that the sponsors of the

Napoli Program committed a crime. The statute Cuker cited states something else entirely.

In their Brief in Opposition to Co-Liaison Counsel's Brief In Support of Final Approval of the Proposed Settlement, the *Chapman/Lowery* Objectors cite to Mich. Comp. Laws § 333.2262 for the proposition that "[u]sing an unregistered radiation machine is a misdemeanor." (ECF No. 1838, PageID.65937–65938 (sealed)). However, § 333.2262 says nothing of the sort. Section 333.2262 authorizes the promulgation of "rules to adopt a schedule of monetary civil penalties . . ." as they relate to the administration of the State of Michigan Department of Public Health. The *Chapman/Lowery* Objectors' also cite to Mich. Comp. Laws § 333.5031. (ECF No. 1838, PageID.65397 (sealed).) This is a typographical error; §333.5031 does not exist.

In their opposition to the motion for final approval, the *Anderson* Plaintiffs argue that the Napoli Program violated the Michigan Administrative Code Rule 333.5037, violated 21 U.S.C. §§321(h) and

331,[35] and is involved in a "MIOSHA[36] Radiation Safety investigation."
(ECF No. 1840, PageID.65629–65630.) This last claim is a
mischaracterization, at best. MIOSHA never conducted an
"investigation;" rather, it conducted an *inspection* to "ensure that the use
of the XRF Scanner was done in accordance with MIOSHA's rules and
regulations."[37] Department of Labor and Economic Opportunity,
Information on Flint XRF Scanners,
https://www.michigan.gov/leo/0,5863,7-336-94422_11407_35791-
567364--,00.html [https://perma.cc/2UYC-26RV]. Following the
inspection, MIOHSA stated in a press release that media coverage of the
MIOSHA inspection, "unfortunately may have left some readers with the
misunderstanding that use of the XRF scanner exposed individuals to

---

[35] 21 U.S.C. § 321(h) contains the definition of the term "device" under the
federal Food, Drug, and Cosmetic Act. It is unclear how the definitions section of the
statute is (or could be) violated by the Napoli Program. 21 U.S.C. § 331 is a multi-
part statutory section containing dozens of acts that are prohibited under the same
statute. The *Anderson* Plaintiffs' arguments regarding this statute are cursory at best
and contain no supporting authority. They are rejected.

[36] The Michigan Occupational Safety and Health Administration ("MIOSHA")
is a division of the Michigan Department of Labor and Economic Opportunity.

[37] Washington's argument on July 15, 2021 indicates that MIOSHA's
inspection may have been initiated by a complaint from Dr. Reynolds. (*See* ECF No.
1906, PageID.67091.)

radiation at dangerous or unsafe levels, which is not accurate."[38] *Id*. It stated that "there was no indication from MIOSHA's inspections that an individual operating these machines or having the machine used on them was exposed to radiation at dangerous or unsafe levels." (*Id*.)

As to the *Anderson* Plaintiffs' argument that the Napoli Program is violating Michigan Administrative Code Rule 333.5037 and is therefore operating an unsafe or illegal program is similarly misguided. Rule 333.5037 focuses on registration of a device with the State of Michigan. Registration— the *Anderson* Plaintiffs' arguments notwithstanding— is an administrative matter, and not a matter of safety. Registration of a device with the state is in no way related to whether it is safe or authorized for a particular use.

On September 17, 2021, the Court ordered the Special Master "to obtain and file as part of the record for purposes of the Court's review of the settlement the complete file of the MIOSHA inspection of the pertinent facility (i.e. a full copy of the records that are referenced in Dr.

---

[38] The Court is aware of counter-accusations in the media by some objectors' counsel that, somehow, the State Defendants have influenced MIOSHA's conclusions in this regard. These accusations are not well taken. They are not founded in any facts, whatsoever. The Court assumes these baseless accusations were intended to create the spread of further misinformation and mistrust.

Reynolds' motion [to file a sur-reply in support of his original objection]) as well as any statements made by the [MIOSHA] as soon as they are available." (ECF No. 1963, PageID.68431–68432.) Due to delays beyond the control of the Special Master or this Court, the requested documents have only recently been made available to the Special Master. The Court may supplement this portion of the Opinion and Order after it receives and reviews the information obtained by the Special Master, if necessary.

### c. Objections to XRF Bone Lead Level Testing Because It Has No Medical Purpose

Dr. Reynolds argues in his objection that bone lead level testing (and, in particular, use of the hand-held XRF device utilized by the Napoli Program), "presents the risks of exposure to radiation *without the benefit of any information that would change the mitigation interventions for a lead poisoned adult or child*." (ECF No. 1436, PageID.55026–55027 (emphasis added).)

The inclusion of bone lead level testing in this case is for settlement purposes only and is *not* intended to provide a medical diagnosis.[39] Nor

---

[39] The parties have explained to the Court that the main methods of measuring lead levels in humans are through blood lead level tests, which must be conducted close in time to exposure, and bone lead levels, which need not be conducted in such close proximity. The Compensation Grid reflects this difference in time-period, where

is the bone lead level testing being performed for the purpose of "chang[ing] the mitigation interventions for a lead poisoned adult or child." (*Id*.) Instead, it is one method of determining an individual's potential recovery on the Compensation Grid, and nothing more. And, as stated above, no one is required to obtain a bone lead level test to qualify for recovery, and no one is disqualified for failing to obtain one. If an individual Claimant does not wish to obtain a bone lead level test for any reason, including because they believe it should also have a diagnostic benefit, then they need not obtain a bone lead level test. Accordingly, the objection that bone lead level testing should not be included in the ASA because it does not provide a medical benefit, and conversely, the position that a bone lead level test ought to provide a medical benefit for it to be included in the ASA, is rejected.

Tort cases commonly require proof of damages to qualify for various levels of compensation. Take, for example, the compensation grid in *In re N.F.L.* There, the settling parties agreed to a monetary award fund that

---

it provides that a blood lead level test must be conducted between May 16, 2014 and August 31, 2016, whereas a bone lead level test may occur between May 16, 2014 and "90 days after the date of the Preliminary Approval Order." (ECF No. 1319-2, PageID.40790–40791.)

provided cash awards for retired football players who had a "qualifying diagnosis." 307 F.R.D. at 366. The qualifying diagnoses entitled a retired player to substantial maximum awards depending on their diagnosis as defined in the settlement agreement. *Id.* at 366–67. Each settlement category had its own set of requirements that the claimants had to satisfy to qualify for compensation. The district court found "[t]he different maximum awards that Class Members receive for different Qualifying Diagnoses reflect the severity of the injury and symptoms suffered by each Retired Player." *Id.* at 378.

Similarly, in *In re Deepwater Horizon*, a different district court approved a settlement that was structured to include "standards of proof, levels of compensation, and conditions to be included in the [compensation grid] Matrix." 295 F.R.D. at 119. There, objectors objected to the various levels of recovery. The court rejected this objection because linking a class member's level of proof to their award is "entirely appropriate" and is "tied to the reality of litigating; the greater the proof, the more likely a plaintiff will recover at trial." *Id.* at 157–58.

Accordingly, there is nothing novel or fundamentally unfair about the ASA Compensation Grid's categorization of compensation for

126

Claimants based on their level of lead exposure. This objection is overruled.

> ### d. *Objections Arguing that the Napoli Program Constitutes an Undisclosed Research Project*

Dr. Reynolds also objects to the inclusion of bone lead level testing in the ASA because, he argues, it is "at best, unauthorized research." (ECF No. 1436, PageID.55026.) He argues that the attorneys in the case are "promoting" this "undisclosed research project" (*id.*), and he states: "I repeat in the strongest possible terms, my objection that the use of the portable XRF in any way to promote the settlement of this litigation, is an unauthorized/unsupervised research project, masquerading as an accepted medical procedure, as a condition for compensation to claimants." (*Id.* at PageID.55029.) This objection has absolutely no basis in fact.

Again, bone lead level testing is included in the ASA as one of many methods for determining an individual's potential recovery on the Compensation Grid. Co-Liaison Counsel's opposition to Dr. Reynolds' objection is supported by an affidavit signed by Jon Merz, who is an Associate Professor in the Department of Medical Ethics and Health

127

Policy at the University of Pennsylvania's Perelman School of Medicine. (ECF No. 1789-9.) Merz is also "a lawyer and social scientist with broad research interests in the ethics and conduct of science, including especially human subjects research and informed consent." (*Id*. at PageID.64185.) Merz, after reviewing documents relevant to the Napoli Program and reviewing Dr. Reynolds' objection, concludes: "It is clear from the Test Protocol that the bone lead level assessment is not being used for any purpose other than determining . . . exposures for litigation settlement purposes." (*Id*. at PageID.64186.) He states that the bone lead level testing protocol in this case "includes none of the attributes of research" and "in no way is designed to be research." (*Id*. at PageID.64188.)

Additionally, Dr. Specht, under whose leadership the Napoli Program was established, submitted an affidavit as to the research project arguments, which states:

> I understand there is an assertion being made that the current bone lead testing program that had already commenced should be considered a "research project." I disagree. The work in Flint does not currently meet the criteria for a research project. There is no generalizable knowledge being sought out and the measurements are currently only being used as a method in determining level of

lead exposure for litigation purposes and in accordance with an agreed settlement program. In order to be considered a research project, the project must have a definable research question. Currently, there is no question being answered by collecting measurements on the individuals for distribution of damages in this lawsuit.

(ECF No. 1795-2, PageID.64494.)

Dr. Reynolds submitted several supplemental filings, none of which contain any rebuttal evidence that the Napoli Program is conducting an undisclosed research project. (*See* ECF Nos. 1901, 1909, 1911, 1923, 1959.) Dr. Reynolds also spoke at the fairness hearing on July 12, 2021 but did not provide any evidence for his objection.[40] (ECF No. 1940.) Dr. Reynolds' assertion that the Napoli Program constitutes unauthorized and unsupervised research is not supported by any facts or evidence in the record. The record evidence indicates the opposite: that the program was not a research project. Accordingly, Dr. Reynolds' objection is denied. And further, the arguments set forth by Dr. Reynolds regarding Research Testing and Clinical Laboratory Improvement Amendments of 1988, which stem from the supposition that the Napoli Program is conducting

---

[40] When Dr. Reynolds presented his objection to the Court at the hearing on July 12, 2021, he did so as an individual community member and not as a medical expert sworn to give expert testimony. (*See* ECF No. 1904, PageID.66743.)

129

research, are also rejected. (ECF No. 1436, PageID.55029–55030.) As stated by Dr. Specht, "approval under the Clinical Laboratory Improvement Amendments of 1988 (CILA) is not necessary because the test is not used as a 'diagnosis, prevention, or treatment of any disease.' The sole purpose of the test is to quantify lead exposure." (ECF No. 1795-2, PageID.64494.)

### e. Objections Claiming that Bone Lead Level Testing is the "Main Method" of Recovery Under the ASA

The *Chapman/Lowery* Objectors argue that the Napoli Program did not make *enough* bone lead level testing appointments available to them, and therefore, the entire settlement is unfair.[41] These objections rely on the false premise that bone lead level testing is the "main" or "only" method to obtain recovery under the ASA. However, there is not a single Settlement Category on the Compensation Grid that requires bone lead level testing as its only qualification. Nor is there a requirement

---

[41] The *Chapman/Lowery* Objectors are individually represented Claimants and are not class members. Their standing to object is unclear, as it is not afforded to them under Rule 23(e)(5), which provides the procedure for class members to object to a class settlement proposal. The ASA, in Section 20.1, acknowledges non-class objections and therefore, they are addressed.

130

anywhere in the ASA that individuals must obtain a bone lead level test to qualify for recovery.

For example, Settlement Category 1 of the Compensation Grid, which contains the highest Monetary Award in the ASA, states the following requirements for qualification: (1) that the individual's age must have been six or younger at the time of their first exposure; (2) that the individual must have been exposed for at least twenty-one days during any thirty-day period between April 25, 2015 and July 31, 2016; (3) that the individual must have resided, dwelled, or attended school or day care in Flint, or have otherwise been exposed to Flint Water; and (4) that the individual obtained a blood lead level test during a certain time frame *or* a bone lead level test during a broader time frame, that demonstrates a certain level of lead. (*See, e.g.,* ECF No. 1319-2 at PageID.40790–40791.) Thus, an individual may qualify for Settlement Category 1 without having a bone lead level test, and conversely, an individual who undertook a bone lead level test might not qualify for Settlement Category 1 if they do not meet its other requirements listed in that Category.

Moreover, fully half of the categories on the Compensation Grid do not include bone lead level testing as a qualification *at all*. (*See, e.g.*, Categories 5–7, 12–14, 19–21, 24, 26–30, ECF No. 1319-2, PageID.40789–40831.) These categories on the Grid provides other qualifications for a Monetary Award, including results of blood lead level tests, cognitive tests, certain medical records, results of residential water lead level tests, copies of a lease or property ownership demonstrating residence, and more. (*Id*.) The Compensation Grid's inclusion of multiple options– including bone lead level testing– to qualify for various levels of recovery is a reasonable and responsible way of determining the appropriate relief for an individual.

Even if an individual were to obtain a bone lead level test, there is no guarantee that their results would place them into a higher Settlement Category on the Compensation Grid. Just as there were disparities in the level of exposure to Flint Water during the relevant time, there will be disparities in bone lead level test results. Accordingly, obtaining a bone lead level test is not a guarantee of higher recovery. This objection is overruled.

### f. *Objections Asserting That Bone Lead Level Testing At Mt. Sinai and Purdue University Were Unavailable to Objectors*

The *Chapman/Lowery* Objectors object to the settlement on the basis that two of the three sites for obtaining a bone lead level test in the United States– Mt. Sinai Hospital in New York City and Purdue University in West Lafayette, Indiana– were inaccessible to them. (*See* ECF No. 1463, PageID.57608.) The Court rejects these objections for the reasons below.

With regard to Mt. Sinai Hospital, the *Chapman/Lowery* Objectors argue that the settlement should be rejected because they find the prospect of travelling to New York City "daunting." (*Id*.) The Court disagrees. The notion that Flint residents would be "daunted" by travelling out of state to obtain a test that could potentially affect their recovery level is rejected.

The Court recognizes the possibility that out-of-state travel may impose some degree of hardship due to employment obligations, health issues, or any number of other valid reasons. However, the *Chapman/Lowery* Objectors do not make any such specific arguments. They only argue that travel is daunting, in general, for the people of Flint.

133

The *Chapman/Lowery* Objectors also argue that the pandemic played a role in further limiting the availability of bone lead level testing where they state that travel to New York City, "would be daunting enough for Flint residents without a pandemic." (*Id*.) This fails, too.

The *Chapman/Lowery* Objectors have not provided any support for, nor have they fully developed, this objection. The *Chapman/Lowery* Objectors' counsel, Cuker, was aware of the use of bone lead level testing in lead exposure cases long before the pandemic struck. He had a duty to develop his clients' cases with diligence, regardless of what terms would ultimately be included in a potential settlement, even if doing so required some financial outlay or risk on his part. Having the test conducted too soon would not have been an issue; bone lead level testing conducted as early as May 16, 2014 qualifies for purposes of the ASA. (*See* ECF No. 1319-2, PageID.40790–40791.) And indeed, COVID-19 was not declared to be a national emergency until March 13, 2020. *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, issued March 13, 2020. https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-

coronavirus-disease-covid-19-outbreak/ [ https://perma.cc/59VX-4EG9].

Accordingly, the Court rejects the argument that the COVID-19 pandemic is a reason to deny final approval.

With regard to Purdue University, the *Chapman / Lowery* Objectors argue that Dr. Linda Nie, who leads the Purdue bone lead level testing lab, is "not available" to perform tests on Flint residents. (ECF No. 1463, PageID.57608.) This argument is supported by an email exchange between Cuker and Dr. Nie. Cuker's communication, dated November 20, 2020, states:

> I am a lawyer representing about 1,300 residents of Flint. I know you have been approached by other attorneys for Flint residents about the fact that the lawsuit settlement being proposed provides for enhanced payments to Flint residents with bone lead test results. I would like to arrange for such testing for my clients. Is there any possibility we could make arrangements to do so with your lab, or anyone affiliated with your lab?
>
> If not, is there anyone you can recommend? Thanks for your time responding to this.

(ECF No. 1341-2, PageID.41895–41896.) Dr. Nie responded on November 23, 2020, stating:

> I am sorry to tell you that it cannot be done with my lab or anyone affiliated with my lab, because it is difficult to do it if it is not research related. As far as I know, there are only 3

135

labs in the US which have the capability to make bone lead testing, one is my lab (with both a stationary KXRF system and a portable XRF), one is my colleague's lab at Harvard (Dr. Aaron Specht, with a portable XRF), and one is at Mount Sinai (Dr. Andy Todd, with a stationary KXRF system).

I am sorry that I cannot be more helpful.

(*Id.* at PageID.41895.) The *Chapman/Lowery* Objectors argue that, based on this single email, bone lead level testing through Dr. Nie and Purdue University was foreclosed. The Court disagrees.

The *Chapman/Lowery* Objectors' counsel evidently failed to contact Dr. Nie earlier in the litigation. Perhaps if he had done so, there would have been a different outcome, or, at the very least, more time to explore other alternatives.[42] Cuker emailed Dr. Nie on November 20, 2020. However, he first appeared in the Flint Water litigation on August 28,

---

[42] Granted, Dr. Nie does not specifically state that she could or would have accommodated *Chapman/Lowery* Objectors' counsel's request if it had been made earlier. But common sense dictates that a professor and researcher at a major university such as Purdue University could not reasonably be expected to perform approximately 1,300 bone lead tests when the request was made just days before the end of classes in the fall 2020 academic calendar. *See* https://www.purdue.edu/registrar/documents/calendars/academicCalendars/academiCal_20-21.pdf [https://perma.cc/T25Y-4T82]. And, presumably, the *Chapman/Lowery* Objectors' counsel wanted all 1,300 clients' tests completed before the ASA's deadline for doing so, which was April 27, 2021. Further, the email suggests that Dr. Nie would want University approval to use the University's equipment and that process understandably would take some time. Another option that apparently was not explored was to bring another KXRF machine to Flint.

136

2017 in the *Carthan* case. (ECF No. 195.) He appeared in the Flint Water Case *Gulla v. Wells* on the same day. (Case No. 5:17-cv-10709, ECF No. 86, PageID.2422.) He filed a complaint on behalf of his individual clients in the case *Chapman v. Snyder* on February 27, 2018. (Case No. 5:18-cv-10679, ECF No. 1.) Therefore, Cuker was not new to the Flint Water Cases when he emailed Dr. Nie in late November 2020.

Nor was Cuker new to bone lead level testing in lead exposure cases. He told the Court at a hearing on October 30, 2020: "I am not a stranger to XRF testing. I did a *Daubert* hearing on XRF testing years ago." (ECF No. 1312, PageID.39915.) Court records from the Middle District of Pennsylvania in 1998 confirm that Cuker defended against a *Daubert* motion relating to bone lead level testing. *See Dombrowski v. Gould Elec. Inc.*, No. 3:98-cv-93-0120 (M.D. Pa.). (*See* ECF No. 1897-2, PageID.66399.) Thus, Cuker has known about the use of bone lead level testing in lead exposure litigation since at least 1998. It is inexplicable that, armed with knowledge of bone lead level testing's potential usefulness in lead exposure cases, he waited until the end of 2020 to contact Dr. Nie about setting up bone lead level testing appointments for his clients.

137

Cuker stated to the Court on October 30, 2020, that he contacted Dr. Todd at Mt. Sinai Hospital in 2016. (ECF No. 1312, PageID.39915 ("I got in touch with Mt. Sinai in early 2016 to explore whether it's feasible to use it in Flint.").) But he never explained the outcome of that communication. When he argues that Dr. Nie was not available, it is curious why he did not explore these (or other) bone lead level testing options at the same time that he contacted Mt. Sinai Hospital. The *Chapman/Lowery* Objectors' counsel's failure to contact other experts and set up a bone lead level testing program for his clients does not render the settlement unfair, unjust, or unreasonable.

Accordingly, the Court rejects the *Chapman/Lowery* Objectors' objections that bone lead level testing was not available at Mt. Sinai Hospital or Purdue University.

### g. Objections Related to the Unavailability for Non-Client Bone Lead Level Test Appointments with the Napoli Program

There is another option for obtaining a bone lead level test in the United States, which is through Dr. Specht's bone lead level testing program, either at Harvard University or through the Napoli Program. The *Chapman/Lowery* Objectors argue that Dr. Specht made himself

unavailable to them. They state that "Dr[.] Aaron Specht of Harvard has a portable XRF machine; he has been engaged by Liaison Counsel as an expert on their individual cases . . . . He has refused to respond to inquiries from other law firms. . . . ." (ECF No. 1463, PageID.57608.) These objectors ask the Court to reject the settlement because Co-Liaison Counsel, through the Napoli Program, "has a monopoly on bone lead testing in Flint" and made slots available to non-clients beginning on February 21, 2021 "only" on Sundays between 1:00 p.m. and 3:45 p.m. (*Id.* at PageID.57609; *see also* ECF No. 1897-1, PageID.66349.) Objectors argue that "[a]vailable slots quickly filled up, and many people who wanted scans could not get them." (*Id.*) These objections are rejected. Dr. Specht's methodology is set forth in his publications, which any other qualified expert could use. There is no monopoly here.

Co-Liaison Counsel was not obligated under the ASA or otherwise to offer bone lead level testing to non-Napoli clients through the Napoli Program.[43] Despite this, the Napoli Program did offer testing for non-

---

[43] Nor was Co-Liaison Counsel obligated to do so merely because of its appointment as Co-Liaison Counsel in this litigation. The *Chapman/Lowery* Objectors' counsel incorrectly conflated the role of appointed co-liaison counsel in complex litigation with the notion that they are somehow obligated to disclose to all

clients and many obtained tests. Between February 21, 2021 and April 25, 2021, the Napoli Program offered three hundred eighty-four time slots to non-clients. (ECF No. 1895-2, PageID.66293.) Of the three hundred eighty-four, only three hundred six appointments were made. And of the three hundred six, one hundred ninety-seven scans were completed, fourteen individuals declined, and ninety-five individuals did not show up for their scheduled time slot. (*Id.* at PageID.66294.) In fact,

---

other plaintiffs' counsel how they choose to develop their own cases, where he stated at the July 12, 2021 hearing:

> I just want to say one thing about the obligation of liaison counsel. No, they don't have to prepare my cases for me. They're supposed to tell me what's going on. They're supposed to keep us advised of the material developments in the litigation for the very reason Your Honor said. You can't have every lawyer at the seat of every table at every meeting. So they're supposed to keep us informed. All right. And the fact of the matter is, they were working on bone lead testing and scanning thousands of their clients beginning August 2019. We did not [kn]ow the significance of bone lead testing in the settlement until November 2020. That's all I have to say.

(ECF No. 1904, PageID.66739–66740.) And again, on July 15, he argued:

> So what did [Co-Liaison Counsel] do to protect the interest of my clients? What did my lawyers do for me in this case? Well, they knew with certainty, with a hundred per certainty in February of 2020 that bone scans would be a big issue on distributing money. They were scanning thousands of their clients. Hundreds of their clients every week. And didn't say a word about it to me.

(ECF No. 1906, PageID.67072.) These arguments are rejected. Every counsel has an independent obligation to diligently develop their own clients' cases, regardless of what others are doing.

140

thirty-eight of Cuker's clients obtained tests through the Napoli Program, two declined, and thirteen failed to show up for their time slots. Of all of the time slots that were reserved for counselled non-clients of Co-Liaison Counsel, Cuker's clients had the highest number of appointments, at fifty-three.

Non-clients of Co-Liaison Counsel who utilized the Napoli Program were represented by the following attorneys: Ben Crump (three scheduled tests), Cohen Milstein Sellers & Toll PLLC (twenty-eight scheduled tests), Cohen Milstein/Pitt McGee (seven scheduled tests), the Hamilton Lincoln Law Institute (five scheduled tests), Hertz Schram PC (two scheduled tests), Neal J. Wilensky PC (nine scheduled tests), Pitt, McGehee, Palmer, Bonanni & Rivers, P.C. (fifty-one scheduled tests), Trachelle C. Young & Associates (five scheduled tests), and Valdemar Washington (one scheduled test). (*Id*.) Forty-two unrepresented individuals scheduled tests with the Napoli Program. (*Id*.)

Two of the attorneys whose clients obtained tests through the Napoli Program, Ben Crump and Ari Kresh, attested that they were provided access to bone lead level tests through the Napoli Program and

that the tests were conducted in a professional manner. (ECF Nos. 1786-4, 1786-5.)

Indeed, the Napoli Program offered bone lead level testing slots to non-clients that went unused. Scarcity was not a problem in light of these numbers. This abundance of unfilled appointments defeats the Unrepresented Objectors' arguments that they were "not given an opportunity to have a bone lead scan test[.]" (*See, e.g.,* ECF No. 1660, PageID.61439.) These objections are denied.

More importantly, fifty-three of Cuker's clients scheduled tests, which undermines the *Chapman/Lowery* Objectors' arguments that testing through the Napoli Program was inaccessible. Further, as noted, there is nothing that prohibited others from seeking out other mechanisms to obtain bone lead testing. Accordingly, the *Chapman/Lowery* Objectors' objections that the Napoli Program was their only option for obtaining a bone lead level test, but that slots were limited and unavailable, is denied.

142

### h. Objections Related to the Napoli Program's Requirement that Participants Sign a Liability Release

The *Chapman/Lowery* Objectors who signed up to receive bone lead level testing at the Napoli Program argue that they should not have been required to sign a release of liability before the test was performed. (*See, e.g.*, ECF No. 1463, PageID.57609.) Specifically, they argue that "[t]he disclosure which people were asked to sign was confusing and misleading." (*Id.* at PageID.57610.) When counsel for the *Chapman/Lowery* Objectors complained to Napoli himself about the release, Napoli cancelled some of Cuker's clients' appointments. (*Id.*)

The Court will not deny final approval because non-clients of Napoli Shkolnik were asked to sign a release form before participating in the Napoli Program. A release is a standard practice and a reasonable condition to receiving a test on a site maintained by the Napoli Shkolnik or any other firm. No one was required to obtain a level lead test from the Napoli Program in the first place. The Napoli Program was not obligated to offer appointments to non-clients. Individuals who did not agree with the Napoli Program's liability release form had the option to

143

leave and refuse the test. The Napoli Program was not obligated to make tests available to individuals who refused to sign a release form.

It appears from the e-mails the *Chapman/Lowery* Objectors attached to his clients' objections that there were efforts made on both sides to modify the release to satisfy these objectors' concerns, which ended in an impasse. (*Id.* at PageID.57616–57630.) This dispute between the *Chapman/Lowery* Objectors' counsel and Napoli Shkolnik has little to do with whether final approval of the settlement should be granted or denied, and the Court will not reject the settlement on the basis that the *Chapman/Lowery* Objectors' counsel and Napoli Shkolnik could not agree on the content of the Napoli Program's release form, particularly when the *Chapman/Lowery* Objectors' counsel was threatening litigation over both the safety and availability of bone lead level testing. As this drama was unfolding, the Court's head was spinning. Moreover, thirty-eight of Cuker's clients evidently signed the release and obtained the test, so this objection lacks merit and this objection is rejected.

### i. Objections Related to the $500 Cost of a Bone Lead Level Test with the Napoli Program

The *Chapman/Lowery* Objectors who signed up for bone lead level testing with the Napoli Program indicate that their appointments were cancelled and that they "have since been informed that Mr. Napoli personally ordered my appointment cancelled, because I am a client of Mark Cuker, and that Mr. Cuker would not agree to pay $500—no questions asked—for the cost of the test." (*Id.* at PageID.57603.) These objectors argue that there is "no transparency" as to

> where the money to pay for [the tests] will go. Napoli told my lawyer he wanted $500. He told another lawyer he wanted $350. Either number seems excessive; [e]ach test takes only 3 minutes to run; Dr. Specht charges $200 per hour and can review multiple tests in an hour. If Napoli is making a profit on what he is charging other lawyers for these tests, he is also violating Ethics Rule 1.8.

(*Id.* at PageID.57610.) Their argument is that the settlement should be rejected because of the $500 cost of a bone lead level test.

Five hundred dollars is not an unreasonable amount of money for individuals represented by counsel other than Co-Liaison Counsel to pay for obtaining a bone lead level test through the Napoli Program. Napoli Shkolnik undertook the start-up work, including paying the initial costs

for the program and obtaining the necessary equipment. The firm employed staff including skilled nursing staff and an office manager. It rented office space in Flint, paid for cleaning services, and, significantly, it paid the fees and costs for Dr. Specht to obtain the bone lead level testing device(s) used at the facility, train individuals in how to conduct the tests, and interpret the test results. (*See* ECF No. 1789-9, PageID.64192, 64194, 64195.) Accordingly, as stated at the July 12, 2021 hearing, from the Court's perspective, $500 per test is not prohibitive and is not a reason to reject the settlement. (*See* ECF No. 1904, PageID.66603.) That some of the *Chapman/Lowery* Objectors refused to pay the $500 fee is also not a reason to reject the entire settlement. And, once again, thirty-eight of the *Chapman/Lowery* Objectors' counsel's clients evidently paid the $500 because they had tests performed through the Napoli Program. Accordingly, this objection is rejected.

### j. Arguments Related to Bone Lead Level Testing Submitted After the March 29, 2021 Deadline for Filing Objections

As set forth above, the deadline for objecting to the ASA was March 29, 2021. But on June 24, 2021, some counsel filed briefs opposing the motion for final approval that include objections to the settlement. (*See,*

146

*e.g.* ECF No. 1839.) To the extent that these briefs raise arguments that were not previously made by the objectors before the March 29, 2021 deadline, or that the Court has decided in its discretion to address herein, they are rejected.

For example, on June 24, 2021, the *Chapman/Lowery* Objectors' counsel filed an opposition brief that adopts and attaches as an exhibit non-settling Defendants Veolia North America, Inc., Veolia North America, LLC, and Veolia Water North America Operating Services, LLC's (together, "Veolia") *Daubert* motion to exclude the testimony of Dr. Specht. Veolia filed that motion on the docket in the bellwether cases on May 11, 2021. (ECF No. 1839-2, PageID.65444 (attaching Case No. 17-10164, ECF No. 343).) Veolia's motion was filed well after the March 29, 2021 deadline, and they were not mentioned in *Chapman/Lowery* Objectors' objections. The *Chapman/Lowery* Objectors' counsel's alliance with Veolia—whom his clients have ongoing litigation against—is troubling. Thirty-eight of *Chapman/Lowery* Objectors' counsel's clients obtained bone lead level tests that he now argues are both unsafe and unreliable. Those clients are in an unenviable position now that their

147

lawyer is siding with a non-settling Defendant. The arguments in the *Chapman/Lowery* Objectors' post-deadline brief are therefore rejected.

## 2. Objection Related to Blood Lead Level Test Results

Dr. Reynolds objects to the ASA's inclusion of blood lead level test results. (ECF No. 1436, PageID.55031–55037.) Dr. Reynolds states that these tests are not routinely ordered, "[u]nless there is an older toddler or child in the home with an elevated blood lead level or it is *known* that the water is contaminated with lead." (*Id*. at PageID.55032 (emphasis in original).) He acknowledges that Medicaid and the State of Michigan Department of Health and Human Services' Women, Infants and Children program ("WIC") recipients "must be screened for lead" through a blood lead level test but states that "[t]he notion that every child should be or should have been tested is incorrect . . . ." (*Id*. at PageID.55032–55033.) He indicates that when individuals in Flint did receive a blood lead level test, "their test results [we]re extremely low." (*Id*. at PageID.55034–55035.) Dr. Reynolds argues that there was no universal testing of all Flint residents and that the results of testing did not show higher blood lead levels because both the State and City Defendants "engaged in a cover up." (*Id*. at PageID.55035.)

These arguments are rejected. Blood lead level tests may not be universally administered to everyone, but that does not render the entire settlement unfair or unreasonable. Moreover, the fact that Medicaid and WIC require blood lead level testing means that individuals enrolled in those programs are more likely to have a blood lead level test that may be helpful to their recovery. This does not render the settlement unfair because there are other methods for showing lead poisoning.

As with bone lead level testing, there is no requirement that an individual have a blood lead level test to participate in the settlement; the failure to have obtained one during the relevant time frame does not shut anyone out of the settlement if they otherwise qualify for participation. Accordingly, this objection is rejected.

### 3. Objections to Cognitive Deficit Testing Settlement Category Requirements

Dr. Reynolds, the *Chapman/Lowery* Objectors and Several Unrepresented Objectors object to the inclusion of a "Cognitive Deficit" Settlement Category that appears in Categories 2 (applicable to Minors, ages 6 and younger), 3 (applicable to Minors, ages 6 and younger), 10 (applicable to Minors, ages 7–11), and 17 (applicable to Minors, ages 12–

149

17) on the Compensation Grid. The Cognitive Deficit category's requirements are in relevant part as follows:

(1) For at least 21 days during any 30-day period between April 25, 2014 and July 31, 2016;

(2) Resided, dwelled, or attended school or day care in Flint, or were otherwise exposed to Flint water; **and**

(3) Have a report documenting a full and individual evaluation dated after May 16, 2014, from a multidisciplinary evaluation team which shall include a board-certified pediatrician and neuropsychologist, and which report is based upon a neurocognitive or neuropsychological assessment battery of clinical, scientifically validated tests, including the Cambridge Neuropsychological Test Automated Battery (CANTAB), determining that the individual has a lead related cognitive impairment, caused after May 16, 2014, defined as: Cognitive impairment manifested during the individual's developmental period at ages 6 or younger,[44] and who was exposed to Flint water during that period, as determined through testing and the demonstration of all of the following behavioral characteristics: [Either] (i) development at a rate of 2.0 standard deviations or more below the mean as determined through an assessment of intellectual functioning domain; [or] (ii) scores approximately within the lowest six percentiles on a standardized test in reading and arithmetic

_____

[44] For Settlement Category 10, the age range in the corresponding section is 7–11, and on Settlement Category 17, the age range in the corresponding section is 12–17. (ECF No. 1319-2, PageID.40806, 40814.) For Categories 10 and 17, the finding under (i) is stated as 1 standard deviation or more below the mean rather than 2 standard deviations below the mean. (*Id.* at PageID.40796–40797, PageID.40805–40807 and PageID.40813–40815.)

150

(this requirement will not apply if the individual is not of an age, grade, or mental age appropriate for formal or standardized achievement tests). [Alternatively, a demonstration of any two of the following behavioral characteristics:] (iii) lack of normally accepted development primarily in the cognitive domain; (iv) impairment of adaptive behavior; and (v) impairment which adversely affects an individual's educational performance. [fn 2] The report determining that the individual has a cognitive impairment must be signed and verified as reliable and accurate by a Ph[.]D[.] and/or M.D. qualified to do so in the appropriate field of study. The above referenced CANTAB shall include cognitive end points from: the Reaction Time Test (RTI); the Spatial Memory Span Test (SSP); the Stockings of Cambridge Test of problem solving (SOC); and the Dimensional Shift Test (IED) of attentional control.

> [fn 2] Based upon, but adjusted, Michigan Administrative Rules for Special Education (MARSE) R 340.1705, Cognitive impairment; determination. Rule 5.

(ECF No. 1319-2, PageID.40792–40793 (emphasis in original); *as amended by* ECF No. 1941 (amended language of point (3) in brackets).)

Dr. Reynolds objects to the third requirement's specification that the evaluation team include both a board-certified pediatrician and a neuropsychologist. Dr. Reynolds argues that, when a child is evaluated for an Individualized Education Plan ("IEP") at school, the school district typically performs the testing required for the IEP. He argues that the ASA's requirements are too stringent in that they differ from those for an

IEP. (ECF No. 1436, PageID.55041–55042.) He additionally argues that the resources in Flint for obtaining the testing described in the ASA are limited. (*Id*. at PageID.55042–55044.)

The *Chapman/Lowery* Objectors similarly object, arguing that "[t]his testing requires 6 hours to complete and is only available in Flint at the Neurodevelopmental Center for Excellence, which has few, if any, appointments available." (ECF No. 1463, PageID.57065–57066.)

In addition, eighteen Unrepresented Objectors checked a checkbox on their objection form next to the following objections: "My child has not been given the opportunity to have a neuropsychological test to know if he/she has suffered a personal injury." (ECF Nos. 1621, 1631, 1632, 1636, 1641, 1642, 1652, 1653, 1655, 1660, 1668, 1670, 1678, 1681, 1682, 1689, 1692, 1694.)

In response to these objections, Class Plaintiffs argue that Minors are not part of the Settlement Class, so "the Court need not consider whether provisions specific to Minors satisfy Rule 23(e)." (ECF No. 1794, PageID.64302.) Class Plaintiffs are correct. The portions of the ASA applicable to Minors only– such as the Cognitive Deficit category in the

Compensation Grid– are not subject to Rule 23 approval. But even if they were, they are fair and reasonable.

There is no reason why the terms of the ASA should exactly mirror the terms of IEP qualifications under state and federal law, as Dr. Reynolds contends. Indeed, the requirements for qualifying in this Compensation Grid Category of the ASA may not be as high as an IEP under Michigan law. Moreover, there is nothing in the ASA that would prohibit a Claimant from submitting their IEP documentation, provided it contains the results required under the Compensation Grid. A settlement is a contract between the parties that can include terms that the parties negotiate and agree to, so long as it is fair.

Since the objections were filed, the Settling Parties stipulated to a revised definition of Cognitive Deficit that "clarif[ied]" some of the "confusion" over the requirements. (ECF No. 1941, PageID.67908.) The amendment revises the required behavioral characteristics for qualifying for compensation. The new definition lists the various types of tests that can be used and no longer requires that the submission show results on all five tests. (ECF No. 1941, PageID.67911–67912.) Among other things, the amendment gives the Claims Administrator, subject to the

supervision of the Special Master, the "discretion to obtain information" about tests that are not specifically identified in the ASA and to evaluate these tests for their compliance with the Compensation Grid. (*Id.* at PageID.67913.) The cognitive deficit testing objections are overruled.

### 4. Objection Related to the Miscarriages and Fetal Blood Lead Level Test Results Settlement Category

Dr. Reynolds objects to Settlement Category 26 of the ASA, which is entitled "Women Miscarriages". (ECF No. 1319-2, PageID.40824.) This category provides for additional funds for women who suffered a miscarriage during the relevant time and can demonstrate through a blood lead test that the "mother's or fetus' cord BLL [Blood Lead Level] of 5 mcg/dL or higher." (ECF No. 1319-2, PageID.40825.) Dr. Reynolds argues that doctors and other medical professionals do not typically perform blood lead level testing when a miscarriage occurs. (*See* ECF No. 1436, PageID.55037–55038.) He also notes that "[m]ore frequently than not, a woman suffers a miscarriage outside of a medical facility . . . . [and] they do not bring in the miscarried fetal material for testing." (*Id.* at PageID.55038.) Dr. Reynolds' objection is denied.

154

It is undisputed that most miscarriages occur outside medical facilities. Undoubtedly, the Settling Parties knew when they negotiated this term that some women who had a miscarriage during the relevant time did not obtain a blood lead level test on themselves, or on the fetal cord, after their miscarriage. But that does not render the settlement unfair and unreasonable. Those women who did not obtain such tests will be excluded from this specific Settlement Category, but they will not be excluded from the settlement entirely.

Moreover, it is possible that some women did obtain blood lead level testing related to a miscarriage, and those women may potentially receive a higher Monetary Award. It is fair and reasonable for the ASA to include this Settlement Category on the Compensation Grid. Accordingly, this objection is rejected.

### 5. Objections to the Compensation Grid's Requirements of Proof of Galvanized Steel Service Lines

Dr. Reynolds objects to the compensation categories that relate to individuals who lived at a residence with a lead or galvanized steel service line. (*Id*. at PageID.55035.) The Settlement Categories on the Compensation Grid, Categories 5, 12, and 19, require the following proof:

155

> <u>Residence with water lead level of 15 ppb or higher</u>:
>
> Water lead level test from: a laboratory certified by the State of Michigan; the list on the State of Michigan Flint Water Test Results website; the United States Environmental Protection Agency; or Virginia Polytechnic Institute and State University; with a result of 15 ppb or higher dated between May 16, 2015 and August 31, 2016.

(ECF No. 1319-2, PageID.40800 (underline in original).) Alternatively, the following proof can also be used to qualify for Settlement Categories 5, 12, and 19: "<u>Residence with lead or galvanized steel service lines ('LSL')</u>: City of Flint Report evidencing that Claimant's residence had a LSL at the time of exposure to Flint water between April 25, 2014 and July 31, 2016." (*Id.* at PageID.40800 (underline in original).)

Dr. Reynolds argues that final approval of the settlement should be denied because these proofs are "unfair." (ECF No. 1436, PageID.55035.) He states that Flint residents were told to "flush" their water systems. And further, he argues that if a person contacts the City to find out if they had a lead or galvanized steel service line, "they are given a form that allows city employees to come look at their property. Records were lost, inaccurate, or illegible." (*Id.* at PageID.55037.)

This objection reflects a misunderstanding of the terms of the settlement. Settlement Categories 5, 12, and 19 provide alternatives. An

individual who lived at a residence where there were lead service lines, but where they did not obtain a certified test result, or where the water may have been flushed resulting in an inaccurate result, can still qualify under these Settlement Categories. The ASA refers to a "City of Flint Report" that would evidence lead service lines. This is a report on the service line replacements that includes the address, date that the repair crews checked the lines, the composition of the lines, the action taken, and when the replacement was complete. The report is generally available and has been provided to the Claims Administrator. The Court is unaware of any facts supporting Dr. Reynolds' suggestion that settlement participants would need to have their property separately looked at by a City employee to qualify for these Settlement Categories. Accordingly, this objection is denied.

The *Chapman/Lowery* Objectors also object to an aspect of the ASA related to water service lines. They argue that the "first four [Settlement C]ategories ignore another metric for lead exposure—a finding that the home was connected to a lead service line or had test results showing lead in the water at or above 15 ppb, which first appears in Category 5." (ECF No. 1463, PageID.57606.) The first four Settlement Categories apply to

157

Minor Children, ages 6 and younger, and contain different criteria for qualification, including bone lead level testing, blood lead level testing, and cognitive deficit testing. The *Chapman/Lowery* Objectors rely on this argument in support of their position that obtaining bone lead level testing is the "only" way for children to receive higher funds in Settlement Categories 1–4. The Court has already rejected this argument. They are, in essence, asking the Court to re-write the criteria to include the Settlement Category 5 requirements in other Settlement Categories, which the Court declines to do.

As set forth above, the ASA and the Compensation Grid were negotiated at arm's length in an adversarial process, with the guidance of the Special Master. This Court cannot take a red pen to the ASA, nor will it, given that the ASA provides for a fair, reasonable, and adequate result.

### 6. Objections Related to the Compensation Grid's Failure to Include Additional or Different Categories

Eighty Unrepresented Objectors objected to the settlement because Compensation Grid does not include a category for water bill reimbursement. On the form objection that many used, the objection

states: "The proposed Settlement does not expressly include payment of water bills by the residents of the [C]ity of Flint during the period of April 25, 2014 to November 16, 2020." (ECF Nos.1563–1565, 1568, 1570, 1573, 1603–1607, 1609–1614, 1618–1623, 1625, 1627, 1631–1633, 1636, 1641, 1643–1645, 1647, 1649–1653, 1655, 1657, 1660, 1662, 1665, 1666, 1668, 1670–1671, 1674, 1676, 1678–1679, 1681–1682, 1685–1686, 1689–1690, 1692–1694, 1697–1703, 1707, 1741–1743, 1746, 1749, 1760, 1766, 1812–1813.) Similarly, some Unrepresented Objectors argued that the settlement does not consider additional categories such as the cost and time spent obtaining bottled water, the loss of trust in their elected representatives, and the replacement costs of water-related fixtures in their homes (for instance, hot water heaters and other appliances). These objections are denied.

The Settlement Categories and proofs included in the Compensation Grid are reasonable as they are written. They include residential property damage and business property damage and losses. As set forth in *In re N.F.L.*, "[a] settlement need not compensate every injury to be fair, especially where class members 'not satisfied with the benefits provided in the Settlement may opt out of the Settlement.'" 307

159

F.R.D. at 405 (citing *In re Deepwater Horizon*, 295 F.R.D. at 158 ("It is well established that parties can settle claims without providing compensation for every alleged injury . . . . Class Members not satisfied with the benefits provided in the Settlement may opt out of the Settlement.")). Accordingly, these objections are denied.

### 7. Objections Related to the Overall Allocation of Funds for Minors Versus Adults

Fifty-five Unrepresented Objectors objected to the settlement because they disagree with the Minors' allocation on the Compensation Grid. On the form objection that many used, the objection states: "The break-down to children is not adequate or fair, and the percentages for the age classifications appear to be arbitrary and capricious." (ECF Nos. 1563–1565, 1568–1580, 1604, 1611–1612, 1618–1619, 1621–1622, 1631–1632, 1636, 1641, 1646–1647, 1649, 1651–1653, 1655–1656, 1660, 1666, 1668, 1670–1671, 1678–1679, 1681–1682, 1685–1686, 1689, 1692–1695, 1697–1701, 1705, 1741–1743, 1746–1747, 1755, 1812.) The Unrepresented Objectors do not elaborate on this objection with sufficient detail for the Court to address it. It is not clear whether they think children in certain age groups and Settlement Categories should

be allocated more or less, or whether the reference is to Minors' allocation overall. It is not up to the Court to guess.

Regardless, however, the Court has analyzed the allocation for Minors, which represents 79.5% of the net settlement funds (not including Programmatic Relief and the Future Minor Claimant Fund). This distribution recognizes that those who were exposed to contaminated Flint Water at a younger age will experience the more harm than older people. The World Health Organization states: "Young children are particularly vulnerable to lead poisoning because they absorb 4–5 times as much ingested lead as adults from a given source." *Lead Poisoning and Health*, (Aug. 23, 2019) https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health [https://perma.cc/2X4P-MCMS]. It is fair, reasonable, and adequate to award a greater proportion of settlement funds to those who are most vulnerable to the effects of lead and other contaminants. Accordingly, this objection is denied.

161

### 8. Objections Related to the $1,000 "Cap" in the Compensation Grid for Property Owners and Renters

Ninety Unrepresented Objectors objected to the settlement because they believe the Compensation Grid's Residential Property Damage Category has a maximum recovery that is not enough. On the form objection that many used, the objection states: "The $1,000.00 cap to residents who own or rent residential property is too low, and does not take into consideration the payments of water bills, replacement of hot water heaters, installation of whole house filters and/or replacement of appliances due to corroded water." (ECF Nos. 1563–1565, 1568–1571, 1603–1604, 1606–1607, 1611–1614, 1618–1623, 1625, 1627–1628, 1631–1634, 1636, 1638, 1641–1647, 1649–1653, 1655–1656, 1660, 1662–1663, 1665–1666, 1668, 1670–1671, 1674–1676, 1678, 1681–1682, 1684, 1686–1687, 1689–1690, 1692–1694, 1696–1701, 1703, 1705, 1707, 1741–1743, 1746–1747, 1749, 1755, 1760–1761, 1765–1766, 1812–1813.) These objections are denied.

The underlying basis of these objections– that one aspect of the allocation is unfair– is rejected for similar reasons that the Court has stated. The settlement was negotiated at arm's length. Subclass Counsel

162

for property owners participated in the negotiations of the settlement and allocation of funds. (*See* ECF No. 1319-8 (affidavit of Sarah R. London, Interim Subclass Settlement Counsel for a Property Damage Subclass in which she attests to the "months of vigorous negotiation" between the parties, guided by mediators, to achieve the settlement).) Additionally, Co-Liaison Counsels' clients' participation in the settlement indicates that they found the allocation fair for their clients. No one is required to participate in this settlement if they are not in favor of its terms. If an individual believes they can successfully recover a higher amount from a jury, they could opt-out of the settlement and take their case to trial. Accordingly, this objection is denied.

### 9. Objections Arguing that the Overall Settlement is Unfair, Unreasonable, and Inadequate to Homeowners

Eighty-five Unrepresented Objectors objected to the settlement because they claim that the overall settlement is unfair to homeowners. On the form objection that many used, the objection states: "In light of the harm suffered by homeowners and the extent of Defendants' wrongdoing, the proposed settlement is not fair, reasonable, and/or adequate." (ECF Nos. 1563–1565, 1568, 1570–1574, 1603–1604, 1606–

163

1607, 1609, 1611–1612, 1614, 1618–1621, 1625, 1627–1628, 1631–1632, 1634, 1636, 1638, 1641–1642, 1645–1647, 1649, 1651–1653, 1655–1656, 1660, 1662–1663, 1665, 1666, 1668, 1670–1671, 1676–1678, 1681–1682, 1686–1687, 1689–1690, 1692–1694, 1696–1697, 1698–1703, 1705, 1707, 1741–1743, 1746–1747, 1749, 1755, 1761, 1766, 1812–1813.) This objection lacks specificity. It is a general statement that the Court interprets to mean that the total FWC Qualified Settlement Fund amount is too low. As stated by the mediators Sen. Levin and Ret. Judge Harwood, "the plaintiffs obtained the maximum amount of compensation that the settling defendants were able and willing to offer," and "represents a fair and practical resolution given the risks of prolonged litigation for so many." (ECF No. 1885, PageID.66212.) The objection is overruled.

As set forth above many times over, the record demonstrates that the negotiations took place at arm's length. It also demonstrates that two experienced mediators and the Special Master provided guidance to the parties during the negotiation process. If a homeowner believes that going to trial is a better option for a higher recovery, then they were free to opt-out of the settlement. However, for the reasons analyzed herein,

there are significant risks involved in going to trial for both sides and no guarantees of a greater recovery. Accordingly, this objection is denied.

## B. Objections Related to the ASA's Requirements for Registration and Objections

### 1. Arguments that Registration Deadline Was Too Short

Seventy-five Unrepresented Objectors objected to the settlement on the basis that the registration deadline was too short. On the form objection that many used, the objection states:

> The deadline registration period is too short and will exclude many Class members to be arbitrarily excluded due to their inability to submit the necessary paperwork to either opt-in or opt-out. The U.S. Mail has been slow due to COVID-19, and not all residents received the necessary paperwork within the 30-60 day period.

(ECF No. 1564–1565, 1568, 1570, 1573, 1603–1604, 1607, 1609, 1611, 1618–1623, 1627–1628, 1631–1633, 1636, 1638, 1641–1642, 1644–1647, 1649–1653, 1655, 1657, 1660, 1662, 1666, 1668, 1670, 1676–1679, 1681–1682, 1686, 1689–1690, 1692–1694, 1696–1703, 1705, 1707, 1741–1742, 1746–1747, 1749, 1755, 1761, 1766, 1812.) All the Unrepresented Objectors who lodged this objection, however, registered themselves for participation in the settlement on time. These objections are therefore

165

self-defeating. If the Court were to grant this objection, it would result in denying all of these timely registrants their recovery under the ASA.

But setting this aside, the Court denies the objection as moot. As set forth above, the Court adopted the R&R and has permitted late registrations.

### 2. Objection to Providing the Claims Administrator With PII for Registration Purposes

One Unrepresented Objector strenuously objected to providing personally identifiable information ("PII") to the Claims Administrator during the registration process. The objector stated:

> There was absolutely no need what so ever [sic] for the court, the attorneys nor anyone else or the institution to ask the individual class members for and/or to make a copy of their Social Security number, or their driver's license number. This discourages people and businesses to opt in. No taxes are being withheld. Has the Court or the attorneys heard of identity theft?

(ECF No. 1627, PageID.61264.) This objection is denied. The registration process does not overburden individuals, and it is reasonable. Requiring registrants to prove their identity protects the substantial amount of money in the FWC Qualified Settlement Fund from fraudulent claims. PII is also information that is necessary "to determine that the registrant

166

is a Class Member." *In re N.F.L.*, 307 F.R.D. at 415. The only entity that maintains the PII for registrants is the Claims Administrator, not the Court. Such information is not published publicly. A Social Security number for each participant is necessary for the lien procedures. The federal government requires that this information be provided to assure that all government liens due (if any) are paid. Accordingly, the Court denies this objection.

### 3. Objection Arguing that, at the Time of Registration, Participants Did Not Know the Final Amount of their Monetary Award

Seventy-eight Unrepresented Objectors objected to the settlement because their final Monetary Award was unknown at the time of registration. On the form objection that many used, the objection states: "I have no idea of an estimated amount of my recovery which prevents me from knowing whether or not this is a matter which I want to pursue. Further, I have not been explained how it was determined how much I am entitled to, and the basis for this determination." (ECF Nos. 1563–1565, 1568–1571, 1573, 1603–1604, 1606–1607, 1609, 1611, 1618–1619, 1621–1622, 1627–1628, 1631–1632, 1634, 1636, 1638, 1641–1642, 1644,–1647, 1649–1653, 1655–1656, 1660, 1662–1663, 1665–1666, 1668, 1670,

167

1675–1676, 1678–1679, 1681–1682, 1686, 1689–1690, 1692–1694, 1696–1703, 1705, 1707, 1741–1743, 1746–1747, 1749, 1755, 1761, 1766, 1813.) This objection is denied.

It is often the case in capped-fund settlements such as this one that the total amount of recovery will vary depending on how many people participate. There is simply no way to know the amount of any one individual's recovery in the Compensation Grid categories (except for Settlement Category 27B, which sets forth an exact amount of recovery for Legionnaires' death claims) until the total number of participants is known, the expenses have been paid for the administration of the settlement, and claims have been submitted and processed.

The presence of subclasses in the class portion of the ASA, however, provides for structural protection that ensured that the different groups of individuals were adequately represented in negotiations. The resulting settlement is one that does not have the typical "problems of 'splitting the settlement'" or potential conflicts of interest in the settlement negotiations that might have been present were subclass counsel not involved. *In re Warfin Sodium Antitrust Litig.*, 391 F.3d 516, 532–33 (3rd Cir. 2004) (citing *Davis v. Weir*, 497 F.2d 139, 147 (5th Cir. 1974)) (noting

that subclasses are generally utilized to eliminate antagonistic interests within a class). As set forth above, Subclass Counsel vigorously negotiated the interests of each subclass and the result is fair, reasonable and adequate. Accordingly, the Court rejects this objection.

### 4. Objections that Individual and Class Counsel Who Are Listed in Exhibit 17 of the ASA Did Not Represent Individual Objectors At the Fairness Hearing

Fifty Unrepresented Objectors objected to the settlement because: "The lawyers for the Class and Plaintiffs will not represent me in my Objection rights and Fairness Hearing to be held on July 12, 2021." (ECF No. 1563–1565, 1568, 1570, 1573, 1603, 1609, 1612, 1618, 1621–1622, 1628, 1631–1632, 1636, 1641, 1644–1646, 1649–1653, 1655–1657, 1660, 1662, 1670, 1674, 1678, 1681–1682, 1686, 1689, 1692–1694, 1696, 1698–1699, 1702–1703, 1705, 1742, 1746, 1755.) The objections are overruled.

The objections lack specificity and are open to several interpretations. One interpretation, which the Court will presume is what the objectors intended, is that a lawyer bound by Article XXII of the ASA may have declined to represent an Unrepresented Objector because doing so would create a potential conflict of interest.

169

Article XXII of the ASA, which provides that the lawyers listed in Exhibit 17 to the ASA (many of whom are signatories to the ASA) who represent any Plaintiffs are to "[r]ecommend to all of their clients that they register for and participate as a Claimant in the Settlement Program" and that the lawyers must "[p]ublicly support the approval of and implementation of the Settlement Program." (ECF No. 1394-2, PageID.54192.) A potential conflict arises when a lawyer represents both objectors and non-objectors because each seeks a different outcome. The objectors seek to have the entire settlement rejected whereas non-objectors want the settlement approved as written. A lawyer representing individuals who hold different positions could potentially be advancing opposing interests in a single piece of litigation. This is a conflict that is prohibited by the Michigan Rules of Professional Responsibility for attorneys.

Article XXII will not be disturbed because it is in line with the principles of basic contract law that signatories to a contract cannot act in ways that could potentially breach or contradict their agreement. It is also consistent with the Michigan Rules of Professional Conduct. Accordingly, the objections stating that lawyers for the Class and

170

Plaintiffs would not represent Unrepresented Objectors in their objections or at the fairness hearing are denied.

## 5. Objections related to Using Zoom to Communicate With their Attorneys

Forty-two Unrepresented Objectors checked a box on the objection form that states: "As an elderly person with insufficient skills to do zoom, I was not able to participate in the zoom meetings concerning the registration process, and allowing communications with attorneys." (ECF Nos. 1563–1564, 1568, 1570–1571, 1573, 1609, 1618, 1621–1622, 1627, 1631–1632, 1636, 1641–1642, 1644–1646, 1650–1651, 1655, 1660, 1662, 1666, 1668, 1670, 1674, 1677, 1679, 1686–1687, 1689, 1693, 1694, 1698, 1705, 1741, 1746–1747, 1761.) This objection is overruled because it does not raise a substantive issue concerning the ASA itself.

As discussed below with respect to the objections related to COVID-19, the fact that some individuals have difficulty using video teleconferencing does not render the entire settlement unfair. Zoom is not part of the settlement at all. The Court understands that some attorneys turned to video teleconferencing to communicate with their clients during the pandemic, but Zoom is not the only way in which an

individual may speak with their attorney and ask questions. Accordingly, the objection is overruled.

### C. Objections Related to COVID-19

Forty-five Unrepresented Objectors objected to the settlement because COVID-19 affected their ability to meet with their lawyers. On the form objection that many used, the objection states: "The COVID-19 pandemic shut down of business hindered me being able to meet with attorneys representing the Class. As a result of the office hours being almost none, I have had minimum contact with attorneys representing the Class or Plaintiffs." (ECF Nos. 1563–1565, 1568, 1570, 1611–1612, 1618, 1621–1623, 1631–1632, 1636, 1638, 1641–1642, 1645– 1647, 1649, 1652–1653, 1655, 1660, 1668, 1670, 1674, 1677–1679, 1681–1682, 1686– 1687, 1689, 1692–1694, 1698, 1705, 1746–1747, 1755, 1766.) Objections related to COVID-19 concerns are denied.

The objections related to COVID-19 concerns are not objections to the ASA or its terms. Rather, these objections relates to Unrepresented Objectors' relationship to Class Counsel and certain measures taken during the COVID-19 pandemic, neither of which is within the power of the Court to control. Nor do either of these issues relate to the fairness of

the settlement itself. There is nothing about the attorney-client relationship that could not have been fulfilled in a COVID-safe manner. Accordingly, this objection is overruled.

### D. Objections to the Notice's Content

Seventy-six Unrepresented Objectors objected to the settlement because they argue that the Notice is vague. On the form objection that many used, the objection states: "The Notice of Settlement is vague and the details have not been easily available for me to have an understanding of what I am being asked to agree to." (ECF No. 1563–1565, 1568, 1570, 1573, 1603–1604, 1606–1607, 1609, 1611–1612, 1618–1619, 1621–1623, 1627–1628, 1631–1633, 1636, 1638, 1641–1642, 1644–1647, 1649–1653, 1655–1656, 1660, 1662, 1666, 1668, 1670–1671, 1674, 1676–1679, 1689–1690, 1692–1694, 1696, 1698–1699, 1701–1703, 1705, 1741–1743, 1746–1747, 1749, 1761, 1766, 1812–1813.) This objection is denied.

The notice "clearly and concisely" states in "plain, easily understood language" the nature of the action; the class definition; the class claims, issues, or defenses; the class member's right to enter an appearance through an attorney; the right to be excluded from the class and the

timing related thereto; and the binding effect of a judgment. Fed. R. Civ. P. 23(c)(2)(B).

Unrepresented Objectors do not specify what aspects of the Notice are vague. The Notice explains the key elements of the ASA and class members' rights and options. (*See* ECF No. 1319-11, PageID.41353–41371.) The Notice provides a telephone number to call and website to visit if a recipient has questions about the Notice and the settlement. (*Id.*) Accordingly, the objections related to the content of the Notice are denied.

### E. Objections to Class Representative Payment

Seventy-one Unrepresented Objectors objected to the settlement because they believe that the Class Representatives are being paid too much. On the form objection that many used, the objection states: "Class representative (the lead plaintiff) is being paid too much and the community residents who suffered harm in not being able to utilize the water are being unreasonably compensated." (ECF Nos. 1563–1565, 1568, 1570–1571, 1573, 1603–1604, 1607, 1609, 1611–1612, 1618, 1619, 1621–1622, 1625, 1628, 1631–1633, 1636, 1638, 1641, 1644–1647, 1649–1651, 1653, 1655, 1657, 1660, 1662, 1666, 1668, 1670–1671, 1674, 1676, 1679, 1686–1687, 1689–1690, 1692–1694, 1696–1697, 1699–1703, 1705,

174

1741–1743, 1746–1747, 1749, 1755, 1766, 1812.) These objections are denied because, as discussed, Co-Lead Class Counsel did not seek an incentive award for the named Plaintiffs. (*See* ECF No. 1794, PageID.64298.)

## V.   CONCLUSION

In conclusion, the Court orders that:

1. The ASA (ECF No. 1394-2), including the Compensation Grid, is finally approved under Federal Rule of Civil Procedure 23(e) as fair, reasonable, and adequate.

2. The following Settlement Class and Subclasses are certified under Federal Rule of Civil Procedure 23(a) and (b)(3):

> **Settlement Class:** all persons or entities who are or could be claiming personal injury, property damage, business economic loss, unjust enrichment, breach of contract, or seeking any other type of damage or relief because at any time during the Exposure Period they: (1) were an Adult who owned or lived in a residence that received water from the Flint Water Treatment Plant or were legally liable for the payment of such water; (2) owned or operated a business including income earning real property and any other businesses, that received water from the Flint Water Treatment Plant or were legally liable for the payment for such water; or (3) were an Adult during the Exposure Period and who ingested or came into contact with water received from the Flint Water Treatment Plant.

Excluded from the Settlement Class are: (1) Defendants; (2) the judicial officers to whom this case is assigned in the Federal Court, Genesee County Circuit Court, and Court of Claims, their staff, and the members of their immediate families; (3) all Individual Plaintiffs; and (4) all persons who timely and validly elect to opt-out of the Settlement Class.

**Adult Exposure Subclass:** all persons who were Adults during the Exposure Period and who ingested or came into contact with water received from the Flint Water Treatment Plant at any time during the Exposure Period and who are claiming or could claim a resulting personal injury. All Adults listed on Exhibit 1 to the Settlement Agreement are excluded from this Subclass.

**Business Economic Loss Subclass:** all individuals or entities who owned or operated a business, including income earning real property and any other businesses, that received water from the Flint Water Treatment Plant at any time during the Exposure Period and who are claiming or could claim a resulting business economic loss. Excluded from the Business Economic Loss Subclass are all local, state, or federal government offices or entities and any individual or entity listed on Exhibit 1 to the Settlement Agreement.

**Property Damage Subclass:** all Adults or entities who owned or were the lessee of residential real property that received water from the Flint Water Treatment Plant, or were legally liable for the payment for such water, at any time during the Exposure Period. Excluded from the Property Damage Subclass are all local, state, or federal government entities which own real property and any individual or entity listed on Exhibit 1 to the Settlement Agreement.

176

3. The following individuals are appointed as Class Representatives for purposes of Settlement:

    a.    Rhonda Kelso, Barbara and Darrell Davis, Tiantha Williams, and Michael Snyder, as personal representative of the Estate of John Snyder, as representatives of the Adult Exposure Subclass;

    b.    Elnora Carthan and David Munoz as representatives of the Property Damage Subclass; and

    c.    635 South Saginaw LLC, Frances Gilcreast, and Neil Helmkay as representatives of the Business Economic Loss Subclass.

4. The firms previously appointed as Interim Co-Lead Counsel, Cohen Milstein Sellers & Toll PLLC, and Pitt, McGehee, Palmer, Bonanni & Rivers, P.C., and the Executive Committee, are appointed as Settlement Class Counsel under Federal Rule of Civil Procedure 23(g) to represent the Settlement Class and Subclasses.

5. Nothing in this Order should be construed as an abrogation of any immunity available to the State of Michigan or its officers, employees, or departments.

6. The non-class components of the ASA are approved.

7. All objections are denied.

177

8. This Opinion and Order prompts Individual Plaintiffs and Class

Members to file motion(s) related to final orders and judgments, as well

as issues unique to each group to implement the ASA as contemplated by

Article VIII.

**IT IS SO ORDERED.**

Dated: November 10, 2021          s/Judith E. Levy
Ann Arbor, Michigan               JUDITH E. LEVY
                                  United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon
counsel of record and any unrepresented parties via the Court's ECF System to their
respective email or First-Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on November 10, 2021.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager