```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3                          SOUTHERN DIVISION

 4

 5
             In Re   FLINT WATER CASES     Case No. 16-10444
 6

 7

 8    _____/

 9                        STATUS CONFERENCE

10
             BEFORE THE HONORABLE JUDITH E. LEVY
11               UNITED STATES DISTRICT JUDGE

12                     SEPTEMBER 14, 2022

13
                     APPEARANCES IN ALPHABETICAL ORDER:
14
                     Margaret A. Bettenhausen
15                   Michigan Department of Attorney General
                     525 West Ottawa Street, P.O. Box 30755
16                   Lansing, Michigan 48909

17                   Frederick A. Berg
                     Butzel Long
18                   150 West Jefferson, Suite 100
                     Detroit, Michigan 48226
19
                     James M. Campbell
20                   Campbell Conroy & O'Neil, P.C.
                     20 City Square, Suite 300
21                   Boston, Massachusetts 02129

22                   (Appearances continued on next page)

23
      To obtain a       Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24    certified          Federal Official Court Reporter
      transcript:        United States District Court
25                        200 East Liberty Street
                          Ann Arbor, Michigan 48104
```

```
 1                          Marcus Christian
                            Mayer Brown LLP
 2                          1999 K Street NW
                            Washington, District of Columbia 20006
 3
                            Alaina N. Devine
 4                          Campbell Conroy & O'Neil, P.C.
                            1 Constitution Wharf, Suite 310
 5                          Boston, Massachusetts 02129

 6                          Kristin Michele Dupre
                            Campbell Conroy & O'Neil, P.C.
 7                          1 Constitution Wharf, Suite 310
                            Boston, Massachusetts 02129
 8
                            Philip A. Erickson
 9                          Plunkett & Cooney
                            325 East Grand River Avenue, Suite 250
10                          East Lansing, Michigan 48823

11                          David C. Kent
                            Faegre Drinker Biddle Reath LLP
12                          1717 Main Street, Suite 5400
                            Dallas, Texas 75201
13
                            William Young Kim
14                          City of Flint
                            1101 South Saginaw Street, Third Floor
15                          Flint, Michigan 48502

16                          Patrick J. Lanciotti
                            360 Lexington Avenue, 11th Floor
17                          New York, NY 10017

18                          Theodore J. Leopold
                            Cohen Milstein Sellers & Toll PLLC
19                          11780 U.S. Highway One, Suite N500
                            Palm Beach Gardens, Florida 33408
20
                            Emmy L. Levens
21                          Cohen Milstein Sellers & Toll PLLC
                            1100 New York Avenue, NW, Suite 500
22                          Washington, DC 20005

23                          Wayne Brian Mason
                            Faegre Drinker Biddle & Reath LLP
24                          1717 Main Street, Suite 5400
                            Dallas, Texas 75201
25
```

```
 1                        Paul F. Novak
                         Weitz & Luxenberg, P.C.
 2                        Fisher Building
                         3011 West Grand Boulevard
 3                        Suite 24th Floor
                         Detroit, Michigan 48202
 4
                         Michael L. Pitt
 5                        Pitt, McGehee,
                         117 West Fourth Street, Suite 200
 6                        Royal Oak, Michigan 48067

 7                        Eric Rey
                         US Department of Justice, Civil Division
 8                        175 N Street, NE
                         Washington, District of Columbia 20002
 9
                         Susan Elizabeth Smith
10                        Beveridge & Diamond, P.C.
                         1350 I Street NW
11                        Washington, District of Columbia 20036

12                        Corey M. Stern
                         Levy Konigsberg, LLP
13                        605 Third Avenue, Suite 33rd Floor
                         New York, NY 10158
14
                         Mark R. Ter Molen
15                        Mayer Brown LLP
                         71 South Wacker Drive
16                        Chicago, Illinois 60606

17                        Michael L. Williams
                         US Department of Justice, Civil Division
18                        175 N Street, NE
                         Washington, District of Columbia 20002
19
        Also Present:    Deborah E. Greenspan, Special Master
20                        Blank Rome LLP
                         1825 Eye Street, N.W.
21                        Washington, District of Columbia 20006

22

23

24

25
```

September 14, 2022

1 **I N D E X**

2 WITNESSES                                                    PAGE

3   (None)

4

5

    EXHIBITS
6
    (None)
7

8

9   MISCELLANY

10   Proceedings..................................5
    Certificate.................................39
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  Okay.  Thank you, Leslie.  Well, welcome |
| 4 | to everyone who's on as a panelist and to those who are |
| 5 | attending and observing as well. |
| 6 | And we have at least a reasonably full agenda of |
| 7 | issues to get through so that we can continue pressing forward |
| 8 | with all of the litigation that is currently pending, which |
| 9 | includes now we have several cases heading one back to trial |
| 10 | and two or three others to trial.  So we have a lot of work to |
| 11 | do together.  And I'm looking forward to doing it as |
| 12 | productively as we can. |
| 13 | So my first question has already been answered.  What |
| 14 | happened to one VNA's lead counsel who went missing in the |
| 15 | last week?  And we found out that he got a new job and just |
| 16 | didn't let us know about that.  But soon we'll be getting a |
| 17 | motion to withdraw as counsel.  So I'm happy that he's doing |
| 18 | all right.  And apparently found something satisfying to do |
| 19 | other than this case.  As hard as that is to imagine. |
| 20 | So the first item on the agenda for today is to get a |
| 21 | report from our Special Master Deborah Greenspan.  And what |
| 22 | I've asked Ms. Greenspan to report on primarily today is the |
| 23 | status of the claims process and proceedings with the partial |
| 24 | settlement.  Because we are getting telephone calls and all |
| 25 | sorts of communications here at the court asking for more |

1    information on it.  And so I think it would be important for

2    all of us to hear from Deborah about where things stand.

3              So I will turn it over to you.

4              MS. GREENSPAN:  Thank you, Your Honor.

5              I'm going to start with just a bit of a recap.  I

6    submitted a report on the status of the settlement process on

7    August 5.  And in that report I noted that we had received or

8    the claims administrator had received about 43,000 individual

9    claim packages.

10             There's some -- there's going to be some duplications

11   within those claims submissions.  But that's the basic number

12   that we're working with right now.  And that the claims

13   administrator had reported that approximately 72 percent of

14   these claims seem to be asserting a personal injury claim.

15   The remainder asserted a property damage or business related

16   claim.  And that about 40 percent of the claimants are either

17   currently minors or were minors at the time of the water

18   crisis.

19             And again, that's preliminary information.  Because

20   until you review the entire claims package, you can't verify

21   the information.  And so there will probably be some

22   adjustments in those numbers as we go through the process.  So

23   today I'm going to give you a further update on where things

24   are.

25             One of the most important things to relay to everyone

```
 1    is the sheer volume of information that has been submitted to
 2    the claims administrator.  The claims administrator reports
 3    that they received nearly 2 million pages of supporting
 4    documents in the last few days of the claims period.  And
 5    that's about two thirds of the total documents received.  In
 6    total the claims administrator has about 2.7 million pages of
 7    documents.
 8          So what happens when you have this many documents to
 9    deal with, particularly when they come in in a short period of
10    time, there's a procedure for taking these documents and
11    putting them into a format so that they can be used by claims
12    reviewers to evaluate claims to determine the person's
13    eligibility to determine whether -- and where they fit in the
14    compensation categories.
15          So there's several steps for that process.  I don't
16    want to get into a lot of technical details and I don't think
17    that I'm the person to do that anyway.  But the first step is
18    really to just look at the submissions, correct corrupt data
19    and other things that the claims administrator sees in the
20    submissions so that they can then be managed and handled in
21    the process.
22          And then once that is done, there is a procedure for
23    converting data to an electronic format so that it is in the
24    claims administrator's system for reviewers to analyze.
25    There's several steps in that process that includes
```

1    normalizing the documents so that they're in the same format,

2    scanning them, QC -- doing quality control work on all that.

3            Categorizing the documents by type so that when a

4    claims reviewer picks up claim, the document is identified in

5    the system.  It's a birth certificate or it's a medical record

6    or whatever it is so that they don't start clicking through a

7    series of documents that are irrelevant to the point that

8    they're reviewing at that point in time.

9            There's then a data entry process and another quality

10   control component.  And then finally it's all uploaded into

11   what's called the claims hub.

12           This is a lot of technical information but it's

13   important to understand the amount of work that is required in

14   order to take all of this information and put it into a

15   useable format.

16           From an individual's perspective, submitted a claim

17   form and a couple of documents.  It doesn't seem that hard.

18   It's just the volume that turns this into a significant

19   process.

20           We have been told by the claims administrator that

21   they process about 40,000 pages a day in this process to get

22   it into the claims system.  They have 49 people working on the

23   data process and 10 people working on imagining documents.

24           So there's a significant staff of almost 60 people

25   doing this work.  They think -- they're still working on it.

September 14, 2022

```
 1    And the reason I'm telling you all this and telling everybody
 2    all of this is that it's still in process.  But they
 3    anticipate completing all of these procedures by the end of
 4    this month unless there's some unforeseen issue that arises.
 5    But that is their current projected timeline.
 6          Once that intake process is complete, then they can
 7    actually review all the claims.  And the reason you cannot
 8    review them before this is because you would pick up a claim
 9    and you would review it and you would say this document is
10    missing.  We can't approve this claim because there's a
11    missing document.  But if it's in the queue of all of these
12    documents that are waiting to be put into the system, that
13    will have been a waste of time to review the claim before the
14    documents are in.
15          So that review process is -- there's certainly been
16    some reviews that have occurred.  But in terms of the bulk of
17    claims that came in towards the end of the claims period, that
18    review process will start when these documents are all in the
19    system.
20          The next step -- and again, just to educate people,
21    there is a review team.  There's a couple of different
22    categories of reviewers.  They have different levels of
23    expertise and different assignments.  I'm not going to go into
24    the great details of all that.  But the adjudication review
25    team consists of 64 people.
```

 1          So there are 64 people who are out there reviewing
 2     claims.  The claims are divided up into -- these review staff
 3     are divided into different categories.  There's some that
 4     focus on medical records.  There's some that focus on
 5     different aspects of the claim.  There are certain ones that
 6     focus on a very important part of the process, which is
 7     determining whether a minor or a legally incapacitated
 8     individual has a qualified next friend or guardian that will
 9     enable them to proceed with their claim.
10          This is the part of the process where reviewers will
11     determine whether there's anything missing or whether there's
12     any deficiency in the claims.  The claims administrator will
13     review the claims, put the claim in the highest category for
14     which it qualifies.  And then categorize each claim so that
15     everybody will be informed about which category the claims
16     administrator has determined they qualified for.
17          The next step in our process is to send notice
18     letters to claimants.  So these are letters that the claimants
19     will receive or their lawyers will receive that will explain
20     whether the claim is approved or whether there's a deficiency
21     in the claim and what the deficiency is.
22          In some cases -- and we expect this will happen
23     probably fairly frequently -- a claim might be approved for a
24     category that is not the one that the claimant requested.  So
25     the notice letter will explain what happened and why that is

1    the manner in which the claim has been categorized.

2          So claimants will receive letters.  They will receive

3    information about whether their claim is accepted or whether

4    their claim needs some additional material or information in

5    order to qualify.

6          There are -- if a claimant receives a notice and

7    disagrees with it, there is a reconsideration process.  And

8    after that, there is an appeal process.  It's an

9    administrative appeal process.  So no one needs to be

10   concerned that if they get a letter that says your claim is

11   deficient that they don't have any further ability to do

12   anything.  They do have two additional options for proceeding

13   with their claim.

14         We -- in terms of timing, I can't give you an exact

15   timing timeframe when these letters will start to be sent.  It

16   will not be in September but it should be soon.  They will be

17   sent on a rolling basis.  That means the claims administrator

18   will not send all the letters at the same time on the same

19   day.  There will be a process for sending letters out in

20   batches.

21         So again, people should not be concerned if their

22   neighbor got a letter and they didn't.  There's will be coming

23   shortly.

24         So it's -- there's a lot of work going on and I know

25   it's not particularly visible to claimants right now.  And I

1   know, Your Honor, that you've mentioned that people have

2   called and tried to understand what's going on.

3              And what's going on is the tremendous volume of

4   material that's been submitted and a lot of steps in the

5   process to make sure that the claim is reviewed correctly and

6   that everything is accurate.  And that when people get their

7   notice letters, they have sufficient information to make sure

8   that the claimant knows what their status is and what they can

9   do next if they do not believe that the claim was correctly

10  adjudicated.

11             So I may have given a lot more numbers and technical

12  information than is normal.  But again, it's a pretty

13  significant process.

14             I also want to note -- and again, people are

15  obviously very concerned about this question.  It's going to

16  take a few more months for all of these steps to be completed.

17  The review, reconsideration, appeals process.  And as the

18  Court knows, there is also an appeal pending in the Sixth

19  Circuit.

20             So that is all a way of saying that it's unlikely

21  that money would be distributed in 2022.  And I know that's a

22  disappointment to everybody.  But hopefully some things will

23  start moving quickly and we'll be able to get to that stage in

24  the process in the very near future.

25             THE COURT:  No.  Thank you, very much, for that

1    report.  And I think the detail is important.  And it's

2    helpful to me to understand the volume of documentation that's

3    being submitted and the number of people going through all of

4    this.

5            And as Deborah just indicated, there's an appeal of

6    the entire settlement pending in the Sixth Circuit.  And as I

7    understand it, there's not a briefing schedule yet.  So I'd be

8    surprised if the case is fully briefed by the end of 2022.

9    But I'm not in charge there and maybe things will speed up in

10   the near future.

11           I want to add something to what Deborah just said,

12   which is that I read an Op-Ed, so just an opinion piece in the

13   Detroit News dated August 31 of 2022, that had three items in

14   it that I think need clarification in the event that

15   individuals in Flint or anywhere read that Op-Ed and might be

16   confused.

17           First, the article said that there's a previous judge

18   overseeing the case, Judith E. Levy.  Well, she is still the

19   judge on the case whether people like it or not.  So there's

20   no previous judge on the case.

21           The other thing is that this article indicated that

22   plaintiffs' counsel has already collected 200 million in

23   attorney fees, which of course is incorrect.  And I think that

24   could be very misleading to people to think that that had

25   happened before a penny has been paid to individuals who filed

1   claims.

2          And the amount would not be -- I don't know where

3   they got the 200 million.  I think this might have been a

4   guess or made up or an idea.  I don't know what it was.  But

5   it did make it into the Op-Ed.

6          And the third is that the opinion piece indicated

7   that claimants in Flint had collected $4,500 each from the

8   settlement.  And of course that's not true based on what

9   Deborah just said.  And I don't know where that number came

10  from.  And like the $200 million number may have also just

11  been a guess or an idea, a thought, something that occurred to

12  the author that made it into their piece.

13         So I think it's important to try to get the actual

14  facts made available to everyone.

15         So what I'd like to do is ask you, Deborah, if

16  following this status conference in the next day or so you

17  could write some clarification for the Archer.  Archer is the

18  entity that's processing all of these claims and will be

19  working from here on out on the claims process.

20         And so if individuals are contacting Archer saying

21  "Where's my $4,500," or whatever it is, if you could notify

22  Archer with some sort of statement about that correcting the

23  information that made it into the August 31 Detroit News Op-Ed

24  I would appreciate that.

25         MS. GREENSPAN:  Of course, Your Honor.  Thank you.

```
 1              THE COURT:  Okay.  Another thing I wanted to say
 2   related to the settlement is since our last status conference
 3   together, Judge Joseph Farah who was -- who is on the Genesee
 4   County Sixth Circuit has announced his departure from that
 5   court for a variety of complicated reasons, as I understand
 6   it.
 7              And I want to assure those of you who are working on
 8   the settlement, which has important activity in the Genesee
 9   County Circuit Court, that I've been in communication with the
10   state court administrative office, the State Court
11   Administrator Tom Boyd, and the current Chief Justice Bridget
12   McCormack to make sure we get someone appointed to cover these
13   issues that we need covered, which is really twofold.
14              It's the settlement issues where that person would
15   serve as a probate judge and the continuing litigation that's
16   pending in the state court.
17              So they're making good progress.  They will have an
18   announcement I think by the end of the month about the
19   progress they're making.  So that litigation will just be on
20   -- or that portion of the settlement and the litigation I
21   think sort of informally stayed until the end of this month.
22              So the next thing I wanted to cover is I see that we
23   have Mr. Williams and Mr. Rey I think I saw a moment ago from
24   the EPA, from the Department of Justice representing the
25   United States EPA.
```

1        MR. WILLIAMS:  Yes, Your Honor.  Good afternoon.

2        THE COURT:  Good afternoon.  I apologize to you and

3    to the plaintiffs on that case for the length of time it took

4    me to address your motion for interlocutory appeal.  I think

5    as you know there was -- there were other things going on in

6    our case that just made it nearly impossible to turn to that.

7        So finally that did get done.  I'm thrilled that I

8    was able to get that done.  And of course the motion was

9    denied, as you know.

10       And in docket entry the 2179 on the main docket of

11   our case, the EPA had asked for 30 days after my decision on

12   the interlocutory appeal to submit a proposed schedule.  I

13   would calculate that as Friday, October 7.

14       Is that what you have, Mr. Williams?

15       MR. WILLIAMS:  It is.  I think I was looking at it

16   was ECF 862 that might have been on the Walters' docket.  But

17   that is the same date.  October 7 would be 30 days.  And we

18   plan to meet and confer also with Mr. Stern to discuss the

19   FTCA cases.

20       THE COURT:  Exactly.

21       MR. WILLIAMS:  But we are on the same page on the

22   timing.  On this comment, there's no apology necessary on the

23   timing.  We understand what transpired on the docket.

24       THE COURT:  Okay.  Thank you.  So well, thank you.

25       I think we may have entered it on both dockets.  I'm

1    not sure.  Because we often have important events appear on

2    the 16-10444 docket so that everyone is aware of what's going

3    on.

4            The other thing that was in that entry -- I have it

5    as 2179 -- was that you would be picking eight plaintiffs.

6    Oh, this is for the Bellwether III.  I'm sorry.

7            I guess while I was searching around for what we were

8    doing with the EPA and how that schedule would be arrived at,

9    I recalled that I had ordered that for the Bellwether III

10   group, there would be eight plaintiffs selected.

11           So I just ask counsel on that part of the litigation

12   to come up with a process.  And you can follow exactly what we

13   did for Bellwether I to identify those eight plaintiffs and

14   report back as to how that's going.  So there's -- I don't

15   need a deadline for that at this point unless somebody thinks

16   it would be helpful.  Or if you've done it already, please let

17   me know.

18           MR. CAMPBELL:  Your Honor, this is James Campbell --

19           MR. WILLIAMS:  Your Honor, we certainly have not or

20   --

21           THE COURT:  Yeah, I'm aware you --

22           MR. WILLIAMS:  I'm sorry.  I didn't mean to --

23           THE COURT:  No, no.  You're fine.  Because I started

24   out focused on the EPA.  I'm aware you have it for the EPA.

25           MR. WILLIAMS:  I'm sorry.  I just wanted to mention

1    one quick thing.  I think it's closely related, Your Honor.

2    Just so we're on the same page you're on, the deadlines.  One

3    thing I did have on my agenda for today was to confirm the

4    date by when the United States would answer the Meeks

5    complaint.

6              THE COURT:  Yes.

7              MR. WILLIAMS:  Which was the operative complaint.

8    And I would suggest that we also use that same October 7

9    deadline by that date.  Certainly the United States could

10   answer that complaint.

11             I'm sorry if I changed topics.  I was thinking about

12   those dates.

13             THE COURT:  No.  I had written down answer, question

14   mark.  And I assumed you'd be following the rule.  So October

15   7 is an excellent date.  I think we really need to get that

16   litigation going in light of how long it has been pending and

17   how long it is since the events giving rise to it.  And I take

18   responsibility for that.

19             So I'm happy to hear that October 7 is a deadline you

20   can meet for filing the answer as well as a proposed agreed

21   upon schedule.

22             MR. CAMPBELL:  Your Honor?

23             THE COURT:  Yes.

24             MR. WILLIAMS:  I would just add, if I may, Your

25   Honor, one I think closely related idea.  I think it's worth

1    raising today before maybe you move on from the United States.

2            It is the case that we are proceeding with FTCA

3    bellwether plaintiffs before Judge Parker.  Fact discovery for

4    14 bellwether plaintiffs will be completed in December of

5    2022.  Dispositive motions, just to pick two deadlines, will

6    be filed by July of 2023.

7            So I understand that the Meeks motion was pending for

8    some time.  But just so Your Honor knows, with looking at the

9    larger Flint related docket, that -- those federal FTCA

10   bellwether plaintiffs are moving along before Judge Parker

11   under a detailed agreed upon schedule.

12           THE COURT:  Good.  Thank you.

13           MR. CAMPBELL:  Your Honor, this is James Campbell.

14           THE COURT:  Hi, Mr. Campbell.

15           MR. CAMPBELL:  Hello.  With regard to Bellwether III,

16   we have a group of 10 that are in the pool.  So we need to

17   essentially deselect two of the 10 to get to the 8.  And we

18   have not discussed that with Mr. Stern or Mr. Shkolnik as of

19   yet.  But certainly something that we can do readily.

20           THE COURT:  Okay.

21           MR. CAMPBELL:  I just wanted to -- Bellwether III.

22           THE COURT:  Good.  Thank you.  The next issue that I

23   have is that Ms. Devine on behalf of VNA submitted an issue

24   that was a little bit unclear to me what it is, but it has

25   something to do with class plaintiffs' witnesses.  Something

1    to do with discovery on the class case.

2         MR. CAMPBELL:  Yes, Your Honor.  This is, again,

3    James Campbell.  The issue that we asked be put on the docket

4    is this.  We had identified four fact witnesses that relate to

5    the class representatives.  People -- I can go through them

6    with more particularity.  But the bottom line is that these

7    are four fact witnesses that relate to the class

8    representatives having to do with where they live or plumbing

9    issues or other issues that came up in the depositions that we

10   took of the class representatives during the certification

11   phase.

12        And I think the issue is this, Your Honor, that there

13   seems -- there is some uncertainty that I think we all have

14   about the agreed to -- you know, what exactly is the line for

15   the class case regarding I guess I would say specific

16   causation type issues or individual issues or just in general.

17        THE COURT:  Oh, okay.

18        MR. CAMPBELL:  So and I think that -- I think all

19   sides are really not clear on that.  So what I would suggest

20   on this is that we -- you know, we've identified these.  If at

21   some point if the class case were to be tried and the class

22   were to prevail, then at some point in the future of the

23   individualized cases that might follow, these would be

24   relevant.

25        They may or may not be admissible in this class case

1    depending upon -- on the issues class case depending upon what

2    is or isn't an individualized issue.  So that's the basis of

3    it.  And I'm happy to go into some more detail.

4          But I think that what we need is perhaps some

5    guidance about what the class case would be.  And I don't

6    think this is the appropriate forum.  It might be that we set

7    something up in the near future to discuss that.

8          THE COURT:  Okay.  Let me say this.  I got out the

9    class notice just trying to sort of reorient my thought

10   process to the class case as well as the individual bellwether

11   process.

12         At the time of class certification I had certified

13   nine issues.  And looking at those, I'm not entirely sure

14   about issue 1 right now.  I think in some ways I've already

15   decided issue 1 in the Lee case.  And I don't know that it is

16   appropriate for a jury trial.  And there may be other issues

17   that could be sort of articulated a little more concisely or

18   combined even.

19         So I was going to suggest, not knowing what this

20   issue was, but that we do some kind of joint work together to

21   make sure we've got the correct issues that make sense in

22   light of the development of the litigation.

23         But setting that aside, in terms of the discovery

24   that from my perspective is appropriate now, it would not be

25   individualized damages discovery of did somebody have -- you

```
 1    mentioned plumbing.  Like did -- what were their service lines
 2    or did they have a hot water heater that was damaged or dish
 3    washer or something like that.  It would be the discovery when
 4    I look at the schedule which talks -- I think the schedule
 5    says merits discovery.
 6          The merits that I'm talking about are the issues, the
 7    merits of the pending trial and not the subsequent process,
 8    whatever it may be.  Individual trials or a claims process if
 9    there's a plaintiffs verdict.
10          So I don't want to see the parties spending their
11    time on individualized causation and individualized damages
12    when the issue here in number 6 is were the corrosive water
13    conditions allegedly caused by defendants capable of causing
14    harm to Flint residents, property, and businesses.  I don't
15    think you need to talk to the named plaintiffs and get their
16    medical records to see if it happened to them.  Because the
17    question is just whether it's capable of causing harm.
18          Does that help, Mr. Campbell?
19          MR. CAMPBELL:  It does help, Your Honor.  But just
20    taking it further.  What we want to avoid, Your Honor, is
21    this.  You know, we've identified this discovery.  We could
22    articulate how it -- the issues to be developed.  And I can --
23    they are factual issues that would be relevant to these
24    claims.  Now whether or not it actually ends up in the trial
25    of these issue classes, that's where we -- I have some
```

 1   confusion.

 2           I did the same thing with the nine issues.  I read

 3   them and had some questions about them.

 4           THE COURT:  I do, too.

 5           MR. CAMPBELL:  So what I want to avoid is this.  I

 6   don't want to get in a situation -- I don't think anyone wants

 7   to be in a situation where we come up to the trial and there

 8   are witnesses being called and there's a dispute about whether

 9   or not that belongs in the trial or not.  We need to have some

10   -- I'm hoping to have some definition of -- some precise

11   definition of that beforehand.

12           So if we do need to take the discovery, we can do

13   that.  If it's not going to be part of the trial, then we

14   don't have to worry about it.  And nobody wants to spend time

15   --

16           THE COURT:  My perspective, what I think you've

17   described very broadly -- I know there's a lot more detail,

18   I'm sure.  But from what you've described very broadly, it

19   does not sound to me that that is going to be a part of this

20   trial.  And you would not be foreclosed from taking that

21   discovery at a later date if there is a plaintiffs' verdict.

22           But Mr. Leopold, who's --

23           MR. LEOPOLD:  If I can just weigh in just for a

24   second on this issue and I appreciate Your Honor raising this

25   issue.  Because as Mr. Campbell has discussed, we've all sort

1    of been digesting the various issues that will be presented at

2    the time of trial.

3             Although clear to us, there are -- as Your Honor

4    began, there may be some legal issues that the Court will need

5    to decide, you know, number one, maybe, number two and things

6    of that sort.

7             But what I think would be of great help to the

8    parties is that the issue that is on the table now about

9    potential discovery that VNA wants to do is that before

10   anything gets done, to do as Your Honor suggested, it may be

11   having a half hour call with just the class counsel and

12   defense counsel and to address these particular issues in a

13   little bit greater detail so that we all have a understanding

14   mutually together on what the playing field is going to be for

15   the start of our trial.  Because I think that would be very

16   helpful.

17            And I say that because not only will it give us a

18   game plan and guidance on the trial and the issues to be

19   tried, but also, Your Honor, just to put on the table, we're

20   going to be requesting that the Court institute time limits on

21   the parties for this class trial because it's an issue only

22   trial.  We want to try to be as specific as we can.

23            So I think having that conference with Your Honor

24   would be quite helpful to all the parties.

25            THE COURT:  And thank you.  I think Mr. Novak was

1    also trying to speak?

2              MR. NOVAK:  Yes.  Thank you, Your Honor.

3              I think the guidance that you have already provided,

4    maybe if we go back and discuss this a little more with

5    Mr. Campbell and Ms. Devine will satisfy the parties that

6    these four depositions don't need to be taken.

7              I have an immediate timing concern.  There's

8    burdensome issues associated.  We're talking the approximately

9    85-year-old mother of class representative Rhonda Kelso.

10   She's in poor health.  I really don't see the relevancy of her

11   deposition.  Even if we were in that subsequent phase of the

12   proceedings.

13             But and I don't want to go through -- these are all

14   family relatives of class members that we're talking.

15             THE COURT:  Okay.

16             MR. NOVAK:  We don't intend to call any of these

17   witnesses at the issues trial.  And maybe we can discuss it

18   more between counsel.  But what I don't want to have happen is

19   a situation where there's still some insistence on their part

20   that, for instance, Ms. Chisholm, an 85-year-old woman, or one

21   of the other members, family members of the class

22   representatives who also has some health issues.

23             I'd really like to avoid -- cause right now we've got

24   dates late September, early October where if we -- if we don't

25   come to an understanding that these depositions can be tabled

```
 1    for now, that we at least have an opportunity to come back and
 2    discuss those burden and other issues with the Court.
 3              THE COURT:  Okay.
 4              MR. CAMPBELL:  And Your Honor?
 5              THE COURT:  Yeah.  Go ahead, Mr. Campbell.
 6              MR. CAMPBELL:  I interrupted you.
 7              I was just going to say that with regard to those
 8    issues, these were all noticed remotely by Zoom and to
 9    accommodate the witnesses as much as possible.  But I think I
10    agree with both Mr. Leopold and Mr. Novak that, you know, if
11    we had some time with Your Honor to focus the issues and
12    understand exactly what is in play and isn't, that would be
13    extremely helpful.
14              THE COURT:  What if we do this.  I think -- I mean,
15    I'm looking at issues 1 through 9.  I can't interestingly
16    imagine that you need any of the actual plaintiffs or their
17    family members or distant relatives or anything or near in
18    relatives to testify.  But of course I'm not counsel on the
19    case.
20              What if you meet and confer knowing that when the
21    schedule itself says completion of merits discovery, it
22    doesn't mean discovery related to the actual initial
23    complaint, which included damages, but it means discovery of
24    the nine issues.  And meet and confer and let me know by this
25    Friday.  I mean, you can talk this afternoon if there's a
```

1  moment whether the issue is resolved.

2          If it's not, you can send a joint email and we'll set

3  up a discovery dispute resolution process for it.

4          MR. CAMPBELL:  That's great, judge.

5          MR. LEOPOLD:  I think that would work, Your Honor,

6  for us to have that time together to address these.  I think

7  between the parties, we hopefully can at least get on the same

8  page and then apprise the Court where we all are at or what

9  and how the issue class trial would proceed.

10          THE COURT:  And I'm not yet at the point of sort of

11  scheduling the exact, you know, 8:30 to 2:00 with this, with

12  that.  I'm not quite at that point yet.  I will be soon.  But

13  I am interested in taking a look at the issues.

14          I have learned a great deal since issuing that

15  decision.  I've made the Lee decision, the summary judgment

16  decisions in Bellwether I that I think address issue 1 and

17  potentially others as legal issues that are not for a jury to

18  decide.

19          I would be very interested in talking with all of you

20  -- well, those of you on this case -- about whether we need to

21  condense or collapse some of these issues and/or eliminate

22  potentially number 1.

23          MR. CAMPBELL:  Your Honor, I think that's -- I was

24  going to suggest that.  I think Mr. Leopold agrees --

25          THE COURT:  Good.

1          MR. CAMPBELL:  -- that that would be very helpful.

2          THE COURT:  How should we do that?  We can --

3          MR. LEOPOLD:  Can I suggest, Your Honor,

4  Mr. Campbell, myself, and respective represents from both

5  sides and Mr. Mason get on a call.  Today is Wednesday.  If we

6  can have maybe until early next week.  Because I'm not sure

7  what everybody's schedules are like between now and the end of

8  business Friday.

9          THE COURT:  Sure.

10         MR. LEOPOLD:  Maybe by Tuesday we'll get back to the

11 Court.

12         THE COURT:  Yeah.  I would be available 2:00 PM on

13 Wednesday the 28th I think, unless Bill tells me I'm not

14 available then, to have a conference to discuss this.

15         MR. LEOPOLD:  Assuming, Your Honor, we -- the parties

16 at the end of the conversation have a general understanding

17 and agreement of the issues and/or consolidating some of the

18 issues, how would Your Honor like us to apprise you?  By an

19 email saying what we concluded or --

20         THE COURT:  How about a proposed stipulation as to

21 what the issues should be?

22         MR. LEOPOLD:  Thank you, Your Honor.

23         THE COURT:  If we can -- if you can do that, and then

24 I'll take a look at it.

25         MR. CAMPBELL:  Very good.  Thank you, Your Honor.

```
 1              THE COURT:  Okay.  Thank you.  I'm glad this issue
 2   came up.  Because it was percolating on my mind but I hadn't
 3   looked back at the issues in quite a while.
 4              MR. NOVAK:  Your Honor, if I may interject just one
 5   brief issue?
 6              THE COURT:  Yes.
 7              MR. NOVAK:  In addition to the depositions that were
 8   at issue, there was also some requested home inspections that
 9   Veolia had requested.  I'm not going to discuss those issues
10   substantively now.  I only would request that we have the same
11   understanding that we will make that also part of the meet and
12   confer in addition to these four depositions and report back
13   to the Court for either some type of resolution process or
14   simply report back that the issue is resolved.  But on the --
15              MR. CAMPBELL:  That's --
16              MR. NOVAK:  -- as the other one.
17              MR. CAMPBELL:  Excuse me, Paul.  That would be fine,
18   Your Honor.
19              I was going to -- I know that class counsel had
20   raised this issue.  But it wasn't something that we intended
21   to address today necessarily.  But we can certainly -- we will
22   do as you suggested.  And I think it will all go to this
23   notion of describing the case that we have.
24              THE COURT:  Right.
25              MR. STERN:  May I ask --
```

September 14, 2022

1          THE COURT:  Just it occurs to me that home

2    inspections don't seem relevant to the issues as they are.

3    But Mr. Stern, was that you?

4          MR. STERN:  I wasn't -- sorry, Your Honor.  I wasn't

5    sure if Mr. Novak was referring to home inspections or the

6    inspection of the treatment plant that there was an issue that

7    arose.  So if there's going to be a meet and confer about the

8    treatment plant issue, there's other parties besides class

9    plaintiffs who --

10         MR. LEOPOLD:  It's different, Mr. Stern.  These were

11   individual homes that VNA has requested to potentially

12   inspect.  That's what we're referring to.  But there is the

13   question I think its up for today, I may be incorrect, about

14   inspection of the water treatment facility.

15         MR. CAMPBELL:  Your Honor, if we could just step back

16   up to the home inspections and your comments about that

17   doesn't seem -- it doesn't seem like something we should be

18   doing.

19         THE COURT:  Yeah.

20         MR. CAMPBELL:  We just got a supplementation this

21   week from class counsel about, you know, just supplementing

22   discovery.  And in it, it appears that there was material

23   taken from at least one house, maybe another house, but some

24   pipes or perhaps some fixtures or material taken out of the

25   house that would seem to relate to expert issues and the like.

1          So we need to study what that is, how it affects, you

2     know, expert issues, and how it affects the class case.  So we

3     need to get a feel for or an understanding of what this is.

4          THE COURT:  Okay.  Yes.  Certainly if it relates to

5     an expert's testimony, that's a different thing.  And if the

6     expert is relevant to the case, that would change the

7     calculation and it would seem that the home inspection might

8     be sensible if that's what the expert did to prepare their

9     report.

10         So Mr. Campbell and Mr. Novak and Mr. Leopold, will

11    you add these home inspections to your meet and confer and

12    just explain your experts, if they -- okay.

13         MR. NOVAK:  We can do that.  I'll reserve comment on

14    the pipes for after we've had the meet and confer.

15         THE COURT:  Okay.  And let me also say that in

16    anticipation of my absence for a period of time, I had

17    expanded Deborah Greenspan's responsibilities or I don't know

18    that I'd -- I clarified that I want -- was seeking her help

19    with discovery disputes.  And I'm back.  And so I'm happy to

20    handle them.

21         If it gets to a point where we've got three cases

22    progressing to trial and it's just not possible to keep up

23    with all of them, I will once again turn to Ms. Greenspan for

24    her help, which is always very, very helpful to me.

25         So the other thing is, okay, I got a late request

```
 1    from Mr. Leopold who did not acknowledge that it was two days

 2    late.  I had set a deadline.  And I set deadlines for a

 3    purpose, which is that allows all of you -- there are 61

 4    people as panelists and 35 attending.

 5          It allows people to prepare, to make decisions about

 6    the use of their time, whether this is a hearing to attend or

 7    not attend and so on.  But without explaining why he submitted

 8    this late, Mr. Leopold asked me to add to this conference,

 9    quote, "VNA's unilateral notice to inspect the Flint Water

10    Treatment Plant."

11          So I have now learned that the potential date for the

12    inspection is September 22 and so on.  And so it does seem

13    like this is an issue we should deal with because I don't

14    anticipate having a conference before September 22.

15          But Mr. Leopold, if I could ask you to follow the

16    deadlines in the future.  And if you can't, let me know that

17    you're not doing it and that there's a reason.

18          MR. LEOPOLD:  I apologize, Your Honor.  I should have

19    put in the reason that notice of the inspection came quite

20    late.  And I knew we had this hearing.  We would not have the

21    opportunity to have it heard beforehand.  But I apologize and

22    will do so next time.

23          THE COURT:  Okay.  So I don't know anything about why

24    the unilateral notice -- tell me what the issue is,

25    Mr. Leopold.
```

1              MR. CAMPBELL:  Your Honor, if I may?  What we did is

2     following the bellwether trial where there was kind of

3     disparate pictures of this and that of the plant, we filed a

4     Rule 34, pursuant to the rules, notice of the inspection of

5     property.

6              And consistent with the way that we've had handled

7     everything and consistent with the Case Management Order, we

8     suggested that the date identified in the notice was subject

9     to change and discussion.  And certainly what we did was we

10    asked Mr. Berg on behalf of the City of Flint if there was an

11    objection to us doing that.  He said no.  He asked that we

12    proceed formally.  So we did that.

13             And whoever wants to attend is -- you know, there's

14    no issue.  We even -- we attached I think a Schedule A or

15    Exhibit A to the notice.  And it's just a visual walk through.

16    We anticipate -- you know, we estimated three hours.  Take

17    pictures, video.  No sound recording.  No interviews of

18    anybody.  But just to look at the plant as it currently

19    exists.

20             You know, clearly and obviously it's after the

21    issues.  But the plant's still there and there may be some

22    changes.  There may be things that aren't changed.  But that's

23    the reason is to just do a walk through, take pictures, take a

24    video.  And whoever wants to participate, we can do it at a

25    mutually convenient day and time.  And that's the issue.

1          MR. LEOPOLD:  If I may, Your Honor, just briefly

2     respond to that issue?

3          And I realize what Mr. Campbell wants to do.  But my

4     first reaction when I heard all of this is, first, in what

5     case or cases is this now going to be used?  Is this just for

6     the bellwether case?  Is it for the class case?

7          Also, once we start doing this, I'm assuming this is

8     being done for use of expert testimony for the most part.

9     Then we're going to get into, well, if his experts are going

10    to be there, do we have other party's experts now need to be

11    there.  Then we get into potentially supplemental reports on

12    some issues and then more depositions on other issues.  This

13    is just a revolving never ending round of discovery.

14         Mr. Campbell's right, this is post the incident, many

15    years now post the incident.  Why -- anything they film now or

16    photograph now would have no real relevance to what the

17    facility was, you know, several years ago.  Whether it's

18    changed or not.  They already have pictures that evidently

19    they used in the other trial.  If they want better pictures,

20    they should have done that, I guess, a while ago.

21         THE COURT:  I'm not sure about that.  Somebody will

22    have to file a motion in limine saying a video taken in

23    September of 2022 would not be relevant and then we'll deal

24    with that.  The taking of the video is all we're dealing with

25    now.

1           I do -- I would note that last month I read an
2     article in the newspaper.  We know I just discussed how
3     sometimes that's not fact checked.  But it did indicate that
4     $180 million in upgrades had been done to the plant.  I just
5     put that out there, Mr. Campbell.  $180 million in upgrades to
6     the Flint Water Treatment Plant in a recent period of time.
7           But that's all an issue for whatever trial
8     Mr. Campbell wants to bring this into.  What I'm trying to
9     figure out is your concern that this was unilateral notice.
10    We now know that if you want to be there or ask Mr. Campbell
11    to do it some other time so that you can.
12          Mr. Campbell, is this for an expert's report?
13          MR. CAMPBELL:  Your Honor, it's simply discovery at
14    this point.  There was -- I think the people involved in the
15    criminal cases did it maybe even during COVID.  And you know
16    the whole COVID restrictions, you know, put limits on what we
17    could do during that timeframe and gathering in public and all
18    of that.
19          So it is, in the first instance, to do a walk through
20    and to see what we can see.  And if there's something
21    relevant, we'll do it.  In terms of the expert issues,
22    particularly on the class since Mr. Leopold raised it, you
23    know, there is expert disclosure on the merits or for this
24    issues class.
25          The plaintiffs, to the extent there's something new

1   it comes up, I think it's October 14, and then there's a

2   deposition period.  And then there's a period for the

3   defendants to identify experts and depositions.  So that issue

4   is covered in the CMO.  And I guess I don't understand it.

5          But the purpose of it is, as you said, Judge, to look

6   at it, to take pictures, take a video.  And if anybody wants

7   to participate, that's fine or great.

8          THE COURT:  And Mr. Stern, you had said earlier you

9   had some issue to raise here as well.

10          MR. STERN:  I don't have an issue, Your Honor.  I

11   just wanted to note that if there was going to be a meet and

12   confer about the inspection when y'all were discussing the

13   class meet and confer on various class issues, if what was

14   being described as part of that was a discussion about this.

15          There are other parties who responded to

16   Mr. Campbell's notice indicating that they'd both like attend

17   and like to participate in any discussions including the

18   McLaren plaintiffs.  I believe it was Donald Dawson who said

19   he'd like to participate.  I'm sure that the state would want

20   to participate.  And perhaps Ms. Smith.  You know, whomever.

21   And so that was why I raised it.

22          But I don't have anything to add substantively to

23   what's already been discussed.

24          THE COURT:  Okay.  So Mr. Leopold, I'm not sure I'm

25   entirely clear on your objection.  Because there is the --

1    your motions in limine, there's -- do not need to be filed

2    until August 14 of 2023.

3              So if Campbell goes in there and Devine goes in there

4    and they shoot a video and put it on their exhibit list and

5    you want to say, look, $180 million -- this represents $180

6    million worth of change, then that's for you to file, for

7    sure, if that's your position.

8              But is your -- so are you -- I'm not here today to

9    deal with the admissibility of such a video that they might

10   shoot.

11             MR. LEOPOLD:  No, Your Honor.  I candidly didn't know

12   that there's been $180 million invested to upgrade the

13   facility due to the damage that had been done.  Certainly we

14   may really want to use that video ourselves if that's the case

15   and let the jury understand that due to the damages that

16   occurred, there's been that much money put into the facility.

17             But that being said, we have, I guess, more

18   clarification now.  I'm just a little fearful -- and I guess

19   this meet and confer about the issues will be helpful -- a

20   little fearful about just broad brushed sort of reopening all

21   discovery for the next year doing more and more discovery.

22   And that is a little bit of concern I think for all the

23   parties.  At least on the plaintiffs' side, both bellwether

24   and class.  But --

25             THE COURT:  Well, here's what I would suggest.  Take

1    a look at ECF 2195.  That sets the schedule in this -- in the

2    class trial.  And it sets the completion of remaining merits

3    discovery, meaning on the issues at October 4 of 2022.

4           So Mr. Campbell noticed this before that date and

5    then -- I mean, let's say you have a meet and confer and you

6    actually shoot the video on Halloween, that's okay if it's

7    agreed upon.

8           MR. LEOPOLD:  Right.  Not a problem.

9           THE COURT:  Okay.

10           MR. LEOPOLD:  But again, it goes -- which will be

11    clarified when we have our meet and confer as well about --

12           THE COURT:  Goes to what?

13           MR. LEOPOLD:  What may be relevant and not relevant

14    for moving forward.

15           THE COURT:  Yeah.  But now -- I mean, you don't have

16    to argue the relevance until August of the 2023.

17           MR. LEOPOLD:  I understand that, Your Honor.  That's

18    when we're going to have the trial.  What I'm referencing is

19    the parties may get a better feel by talking to one another

20    what is actually will be needed and not needed for purposes to

21    have trial.

22           THE COURT:  There you go.  That's very true.  Okay.

23    All right.

24           So is there anything else at this time?  Because I

25    had a follow up meeting with Bellwether I counsel that I

```
 1    wanted to have.  And we'll do that separately.  But anything

 2    else?

 3             MR. CAMPBELL:  Nothing from us, Your Honor.  Thank

 4    you, so much.

 5             THE COURT:  Okay.  All right.  Good to see everybody.

 6    And take care.

 7                      (Proceedings Concluded)

 8                 -           -           -

 9

10             CERTIFICATE OF OFFICIAL COURT REPORTER

11        I, Jeseca C. Eddington, Federal Official Court

12    Reporter, do hereby certify the foregoing 39 pages are a true

13    and correct transcript of the above entitled proceedings.

14    /s/ JESECA C. EDDINGTON_____        09/21/2022_
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR           Date
15

16

17

18

19

20

21

22

23

24

25
```