```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3

4
             In Re   FLINT WATER CASES     Case No. 16-10444
5

6

7     _____/

8                        STATUS CONFERENCE

9
                BEFORE THE HONORABLE JUDITH E. LEVY
10                 UNITED STATES DISTRICT JUDGE

11                       OCTOBER 26, 2022

12
                     APPEARANCES IN ALPHABETICAL ORDER
13
                     Frederick A. Berg
14                   Butzel Long
                     150 West Jefferson, Suite 100
15                   Detroit, MI 48226

16                   James M. Campbell
                     Campbell Conroy & O'Neil, P.C.
17                   20 City Square, Suite 300
                     Boston, MA 02129
18
                     Alaina N. Devine
19                   Campbell Conroy & O'Neil, P.C.
                     1 Constitution Wharf, Suite 310
20                   Boston, MA 02129

21
                     (Appearances continued on next page)
22

23
      To Obtain a      Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24    Certified           Federal Official Court Reporter
      Transcript           United States District Court
25    Contact:         200 East Liberty Street - Ann Arbor,
                                  Michigan 48104
```

```
 1                    Kristin Michele Dupre
                      Campbell Conroy and O'Neil PC
 2                    1 Constitution Wharf, Suite 310
                      Boston, MA 02129
 3
                      Philip A. Erickson
 4                    Plunkett & Cooney
                      325 E. Grand River Avenue, Suite 250
 5                    East Lansing, MI 48823

 6                    David C. Kent
                      Faegre Drinker Biddle Reath LLP
 7                    1717 Main St., Suite 5400
                      Dallas, TX 75201
 8
                      William Young Kim
 9                    City of Flint
                      1101 S. Saginaw Street, Third Floor
10                    Flint, MI 48502

11                    Patrick Lanciotti
                      Napoli Shkolnik PLLC
12                    360 Lexington Avenue, 11th Floor
                      New York, NY 10017
13
                      Theodore J. Leopold
14                    Cohen Milstein Sellers & Toll PLLC
                      11780 U.S. Highway One, Suite N500
15                    Palm Beach Gardens, FL 33408

16                    Emmy L. Levens
                      Cohen Milstein Sellers and Toll PLLC
17                    1100 New York Avenue, NW
                      Suite 500, West Tower
18                    Washington, DC 20005

19                    Stephen E. Morrissey
                      Susman Godfrey LLP
20                    401 Union Street, Suite 3000
                      Seattle, WA 98101
21
                      Christopher Charles Muha
22                    KaiserDillon PLLC
                      1099 14th Street NW
23                    Suite 8th Floor West
                      Washington, DC 20005
24

25
```

```
 1                          Minh Nguyen-Dang
                            Mayer Brown LLP
 2                          1999 K Street NW
                            Washington, DC 20006
 3
                            Paul F. Novak
 4                          Weitz & Luxenberg, P.C.
                            Fisher Building
 5                          3011 W. Grand Boulevard, 24th Floor
                            Detroit, MI 48202
 6
                            Michael A. Olsen
 7                          Mayer Brown LLP
                            71 S. Wacker Dr.
 8                          Chicago, IL 60606

 9                          Eric Rey
                            US Department of Justice
10                          Civil Division
                            175 N Street, NE
11                          Washington, DC 20002

12                          Hunter Shkolnik
                            Napoli Shkolnik PLLC
13                          1302 Avenida Ponce de Leon
                            Santurce, PR 00907
14
                            Susan Elizabeth Smith
15                          Beveridge & Diamond, P.C.
                            1350 I Street N.W.
16                          1900 N Street N.W., Suite 100
                            Washington, DC 20036
17
                            Corey M. Stern
18                          Levy Konigsberg, LLP
                            605 Third Avenue, Suite 33rd Floor
19                          New York, NY 10158

20                          Mark R. Ter Molen
                            Mayer Brown LLP
21                          71 S. Wacker Drive
                            Chicago, IL 60606
22
                            Michael Ray Williams
23                          WV Attorney General Office
                            1900 Kanawha Blvd. East Bldg 1 Rm 26E
24                          Charleston, WV 25305-0220

25
```

October 26, 2022

```
 1    Also Present:          Deborah E. Greenspan
                             Blank Rome LLP
 2                           1825 Eye Street, N.W.
                             Washington, DC 20006
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

October 26, 2022

```
 1                              I N D E X

 2        WITNESSES                                      PAGE

 3           (None)

 4

 5

 6

 7

 8        EXHIBITS

 9           (None)

10

11

12

13

14        MISCELLANY

15           Proceedings...................................6
             Certificate..................................52
16

17

18

19

20

21

22

23

24

25
```

| | **P R O C E E D I N G S** |
|---|---|
| 1 | |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  All right.  Well, thank you, all, for |
| 4 | being here.  And it's good to see everybody.  We have a pretty |
| 5 | full agenda for today, so I want to get started right away. |
| 6 | And the first item on the agenda is a report from |
| 7 | Deborah Greenspan who's the court-appointed neutral, also |
| 8 | known as special master in the case.  And so Debbie, if you're |
| 9 | ready to get started.  There you are.  Thank you. |
| 10 | MS. GREENSPAN:  Thank you, Your Honor. |
| 11 | I'm -- you've asked me to give a report on the status |
| 12 | of the settlement implementation.  This will be a brief |
| 13 | update. |
| 14 | I think the last time I gave a report, I had |
| 15 | mentioned how many millions of documents and pages of |
| 16 | documents had been submitted, many towards the end of the |
| 17 | settlement claims period and that it was going to take some |
| 18 | time for those to be what they called "digitized", basically |
| 19 | put into the system.  All scanned, all added into the |
| 20 | particular claims they belong to.  And the data entered into |
| 21 | the claims administration platform. |
| 22 | THE COURT:  You're muted all of a sudden. |
| 23 | MS. GREENSPAN:  Okay.  So what I wanted to report is |
| 24 | that the data is now all in the claims administration |
| 25 | platform.  All the documents are in as well.  What that means |

```
 1   is that it is now possible for the claims administrator to
 2   review all of the claims with the complete data.  In other
 3   words, you couldn't review them before you had all the data
 4   into the system.  They --
 5              THE COURT:  You've gone silent.
 6              MS. GREENSPAN:  Yeah, I just --
 7              THE COURT:  Okay.  I'm not going to touch my computer
 8   at all.  And know I would probably be somebody who would give
 9   a false confession because as soon as this happens, I'm just
10   convinced I did it, but.
11              MS. GREENSPAN:  Okay.  So what it means is that we
12   have all the data in the system.  The claims are now being
13   reviewed.  There was a holdup for a while while the data was
14   being input.  But they're now reviewing the claims.  And I
15   anticipate that that process will continue for some time.
16              The very next step is that when a claims reviewer --
17   when a group of claims are reviewed, there will be notices
18   sent to claimants.  We don't have -- I can't give you a date
19   at the moment when that will occur.  But when the notices do
20   go out, if somebody's claim is deficient, then the notices
21   will explain what that deficiency is and what has to be done
22   to cure it if it is a curable deficiency.  Some of them are
23   not.
24              But that is the next step in the process.  I'm
25   hopeful that we can get that moving pretty soon, but I cannot
```

1    give you a date at the moment.

2           I don't really have anything else to report today but

3    I'm happy to answer questions, Your Honor, if you have any.

4           THE COURT:  I don't think I do have any questions.

5    It sounds like a very voluminous process and I'm just glad

6    that it's continuing on.

7           And at this point my final approval of the settlement

8    is still on appeal at the Sixth Circuit.  So that's also a

9    part of this process that will need to get taken care of.  And

10   as far as I know there's not a briefing schedule yet in that.

11   So hopefully that will come about soon so that this entire

12   part of the case can move along in an efficient manner.

13          So unless anybody else has questions for Ms.

14   Greenspan.  Okay.

15          Well, let's move on to the second item.  And this

16   came from co-liaison counsel and it regards their deposition

17   notice of Veolia's chief communications officer, which is to

18   take place very soon, on November 2 of 2022.

19          And I was informed in the proposed agenda item that

20   VNA had an objection to this based on the timing of

21   Ms. Griffiths' employment.  And so I guess I should turn to

22   VNA first to find out if that's still the case and what the

23   timing issue is from your perspective.

24          MR. CAMPBELL:  So Your Honor, I hope my internet's

25   working here and that you can hear me.  I'm having some

1    sketchy connections.

2           THE COURT:  So am I for that matter.  So just start

3    waving if you don't hear me and I'll do the same if that

4    happens to you.

5           MR. CAMPBELL:  Your Honor, let me introduce you to

6    Michael Olsen.  He's going to be speaking for VNA through the

7    conference.  So he's from the Mayer firm in Chicago.

8           THE COURT:  Okay.  And I was going to do that.

9    Mr. Olsen, I was going to welcome you.  And I think we've got

10   Mr. Muha back for a second time.  So welcome to all of you.

11          MR. OLSEN:  Good afternoon, Your Honor.  Thanks and

12   it's a pleasure to.  And I will address Ms. Griffiths

13   specifically in one second.  I want to back up a little bit.

14          Plaintiffs' counsel is attempting to conduct some

15   pretty broad ranging public relations discovery.  They're

16   looking for over a half dozen additional depositions.  They've

17   issued a number of third party subpoenas, a number of

18   additional written document requests.

19          What we would ask from the court is permission to

20   file a motion for protective order to address the public

21   relations discovery more broadly rather than continue to do

22   this piecemeal because this is going to be an ongoing issue

23   with respect to a number of upcoming depositions.

24          Happy to address each of the issues on the agenda

25   today.  But I think it would be also efficient and helpful if

1   we could file that motion and maybe even do that in an

2   expedited briefing schedule.  We'd be prepared to file it

3   today so Your Honor can address this more broadly.

4          THE COURT:  Well, I sort of -- you know, I could tell

5   from these agenda items that there is discovery regarding

6   communications because there are two or three noted on the

7   agenda for today.  I was aware of the Chicago northern

8   district -- or Northern District of Illinois in Chicago

9   subpoena matter.

10          And I can tell you generally that the issues that I

11   believe are being explored here are of critical importance to

12   a fair and impartial trial being conducted in February.

13          And so I can just tell you generally that it -- there

14   are some serious allegations raised only at this point from my

15   perspective by a Detroit News article I think on September 8

16   by a reporter.  And so and then it was mentioned in some

17   briefing on the motions for sanctions.

18          So other than that, I have nothing further than what

19   a reporter says may or may not have happened and what some law

20   professors and some communications persons think about it.

21          So but the issue that was flagged in that article

22   from my perspective is very serious and worth the Court

23   knowing about.  So I can tell you that's my philosophy and I'd

24   like to get started dealing with the November 2 and November 4

25   depositions that are already scheduled.

1          So why don't you tell me about those.  Yes.

2          MR. OLSEN:  Your Honor, I'd be happy to.  My point

3   was simply there's going to be additional depositions where

4   we'll further disputes on and I thought it would be easier for

5   the parties and the Court just to address it.  I'm perfectly

6   happy to address each of the issues on the agenda today as

7   well.  I was just asking the Court's permission --

8          THE COURT:  Slow down a little, Mr. Olsen.  We're

9   still in court with a court reporter.

10         MR. OLSEN:  Sorry, Your Honor.  I'm absolutely about

11  to address each of the specific PR issues on the agenda today.

12  My point was simply there are a number of additional

13  depositions scheduled.  And rather than to keep coming back to

14  Your Honor to address each one separately, we were just

15  seeking permission to file a motion for protective order so we

16  can deal with all of these issues at one time.

17         THE COURT:  Well, let's get started because there may

18  be something that we can -- that can be generalized as a

19  result of what -- I don't know what your arguments are on

20  these two.  And we can go from there.

21         MR. OLSEN:  With respect to Ms. Griffiths, as Your

22  Honor knows, the Court set a presumptive cutoff of January

23  2017 for relevant discovery.  Ms. Griffiths is a current VNA

24  employee in communications.  She joined VNA in September of

25  2018, several years after any of the events related to the

1    Flint Water Crisis.

2          She has no personal knowledge about VNA's conduct in

3    Flint.  She had a very limited role in anything related to PR

4    with respect to the trial.  She certainly doesn't have any

5    personal knowledge with respect to any issues relate to any

6    claims or defenses in the ongoing Bellwether I retrial.

7    Didn't even start with the company after your presumptive

8    discovery deadline.

9          And so we think going to ask her questions beyond

10   that presumptive deadline simply is beyond the pale given that

11   we haven't done a number of PR depositions squarely related to

12   the issues that plaintiffs' lawyers want to explore here.  And

13   putting someone in a deposition chair who started after that

14   deadline doesn't make sense to us.

15          THE COURT:  Okay.  Mr. Stern, this is your subpoena,

16   correct?

17          MR. STERN:  Yes, Your Honor.

18          THE COURT:  And I assume that you're not asking

19   questions -- hoping to ask questions of Ms. Griffiths related

20   to the water conditions in Flint but rather related to the

21   digital media campaign that may or may not have been taking

22   place during the trial?

23          MR. STERN:  Correct.

24          THE COURT:  And so Mr. Olsen, from my perspective,

25   the 2017 deadline or date relates to facts and information

1    involving the water crisis itself and not the conduct of

2    lawyers and parties during the trial.  And even looking back

3    at the last trial, is Ms. Griffiths still the communications

4    officer?

5              MR. OLSEN:  She is still employed at VNA, yes.

6              THE COURT:  Okay.  Well, knowing what the issue is

7    now, now that you understand that Mr. Stern isn't looking for

8    whether she knew what Mr. Chen said or Mr. Gnagy said at any

9    given date, he's actually looking at whether VNA undertook a

10   digital media campaign to influence or improperly influence a

11   jury venire, but knowing that that's what he's looking for,

12   the January 2017 deadline has nothing to do with that.  So

13   that won't be helpful to this process.

14             And I think it is -- I mean, I will require that she

15   sit for the deposition.  If she knows nothing, it will be a

16   very short deposition.  She'll just say I don't know what

17   you're talking about.  I've never heard of that.  And that

18   will be the end of it.  And if she knows what's going on or

19   what did happen or is currently happening with respect to a

20   digital media campaign.

21             The allegation -- it's not an allegation.  But the

22   subject of the article suggested that VNA was geotargeting zip

23   codes that jurors drawn for the Eastern District of Michigan

24   Southern Division Ann Arbor divisional office would draw from.

25   That's a serious concern and I think it's one that warrants

1    being explored.  So that deposition will need to go forward on

2    November 2.

3              Tell me about the former communications manager Paul

4    Whitmore who's noticed for November 4.  I think there was an

5    indication that he had previously been deposed but now there

6    are new topics for exploration with him.

7              MR. OLSEN:  Correct, Your Honor.  Our issue with

8    respect to Mr. Whitmore's deposition is different.  He is a

9    former public relations person for VNA.  He left the company

10   prior to 2020.  And as you note, he was deposed over two days

11   in January 2020.

12             Your Case Management Order provides that he should be

13   deposed only once absent a showing of good cause.  In this

14   particular instance with respect to the issues as you have

15   framed them, plaintiffs indeed have asked Mr. Whitmore during

16   his deposition about VNA's crisis communications, talking

17   points in the 2016, 2017 timeframe about press release.

18             They asked Mr. Whitmore about the

19   VeoliaFlintFacts.com website.  They fully explored PR related

20   initiatives prior to January 2020.  He's been deposed already.

21   There's certainly not been a showing that there should be good

22   cause for a second deposition of Mr. Whitmore.

23             THE COURT:  Okay.  That's helpful to know.  Mr.

24   Stern, in light of the fact that he left by 2020 and the

25   issues you're focusing on took place in 2022, what would be

1    the new areas you want to ask him?

2            MR. STERN:  There was no -- thank you, Your Honor.

3            There was no inquiry to Mr. Whitmore as to

4    geotargeting, as to -- I don't think anybody in that

5    deposition would have on either side, certainly not from the

6    plaintiffs or from nonparties at fault or non Veolia folks in

7    that deposition, I don't think anybody could have imagined a

8    scenario where the Veolia Flint Facts website, which he was

9    instrumental in, had the capacity through various forms of

10   media and social media to actually target a potential venire

11   of jurors.

12           And so the inquiry would have been limited to

13   targeting geotargeting and the use of that website, which was

14   not something that anyone could have ever known about at the

15   time of his deposition.  I would never have imagined anything

16   like what was reported by the media after our bellwether trial

17   would have been the subject of an inquiry during his

18   deposition in 2020.

19           And so I would seek to depose him on the limited

20   areas of geotargeting.  I am content, if the Court would

21   permit it, to wait until after Ms. Griffiths' deposition and

22   some of the other depositions to see if there's actually a

23   need for it.

24           But to unilaterally say now in light of the

25   information that came out in that article in September of

1    2022, well, he's already been deposed about that and there's

2    nothing new to add, you can't depose somebody in 2020 about

3    something you find out about in 2022 even if they're related

4    tangentially.  So it's a request to ask him continuing

5    questions beyond what he was asked at his first deposition.

6              THE COURT:  Let's -- I'm going to take you up on that

7    offer to first conduct the deposition of Ms. Griffiths and

8    some of the other depositions and then go back.  And I would

9    ask that VNA, Mr. Olsen, that you strongly consider producing

10   him if Mr. Stern can say that there is some new area, a new

11   area that he simply didn't know about, couldn't have known

12   about during that timeframe when he was previously deposed.

13             So we'll just assume that it's not going forward on

14   November 4 but that it may very well in the future after some

15   additional discovery is accomplished on this issue.

16             And so now for Mr. DiCroce, D-i capital C-r-o-c-e.

17             MR. STERN:  Your Honor, I can just tell you that

18   Veolia has agreed to produce Mr. DiCroce.  But we're waiting

19   on a date from Veolia for his deposition.

20             THE COURT:  Okay.

21             MR. OLSEN:  That's correct, Your Honor.  We can take

22   that one off the table.

23             THE COURT:  Great.  Thank you.  Okay.

24             Now we have an issue number 5 which is plaintiffs'

25   counsel co-liaison counsels' objection to Veolia's planned

1    inspection of homes related to Bellwether III cases.  And here

2    I understand what you're objecting to, Mr. Stern, is that if

3    Veolia says your clients had no injuries, what is the point of

4    looking for lead paint because they didn't get exposed to

5    lead.

6            Is that what it is?

7            MR. STERN:  It is.  And the suggestion is not -- we

8    had a meet and confer about this.  And my suggestion is not --

9    or my position is not that they never get to inspect these

10   homes.  My position is is that every time they send an

11   inspector to one of these homes -- and there's a lot on this

12   list -- we have to send someone who is an inspector as well to

13   observe the inspection, on some level to conduct their own

14   inspection and just to make sure that our client's interests

15   are represented.  And that costs money.

16           And I don't have any reason to believe at this stage

17   that Veolia's opinions and their expert's opinions about these

18   8 or 10 bellwether kids is going to be any different than what

19   they forcefully and on some level successfully argued at the

20   first bellwether case.

21           So why not first make a determination about whether

22   these children are even injured from the perspective of

23   Veolia's numerous neuropsychological experts before putting

24   beyond just us through the rigor of hiring our own experts to

25   go with them on the inspections, but probably more importantly

```
 1    to put people out of their homes for a day, some of which
 2    aren't even parties to this litigation if and only if at the
 3    time of the trial Veolia's going to stand up and say that
 4    these kids aren't injured.  It just seems like a fool's errand
 5    and a waste of money.
 6              THE COURT:  Mr. Olsen?
 7              MR. OLSEN:  Yeah.  A few things, Your Honor.  This is
 8    what happened with respect to the Bellwether I plaintiffs.
 9    This has already begun to happen with respect to some of the
10    Bellwether III plaintiffs.  This is just a continuation and a
11    completion of that process.
12              I would make a few points.  One, we haven't taken any
13    position with respect to the Bellwether III plaintiffs' health
14    conditions.  That's what discovery is for.  We certainly will
15    take a position with respect to those health conditions after
16    this discovery is complete.  We have not yet --
17              THE COURT:  Do you have any objection to doing this
18    at a later point in the process?  If you determine that 10 of
19    the Bellwether III candidates have zero exposure to lead, what
20    would be the point of going into their homes for this --
21              MR. OLSEN:  There are a few points, Your Honor.
22    First, plaintiffs' expert specifically addressed this
23    question.  I'll give you an example.
24              THE COURT:  Okay.
25              MR. OLSEN:  Dr. Bithoney talks about doing an
```

1    extensive differential analysis where he conducted what he

2    describes as a significant effort to exclude all possible

3    causes of lead exposure other than the Flint River.  We're

4    entitled to evaluate and cross-examine plaintiffs' experts as

5    to whether or not they did do an extensive differential

6    analysis to exclude alternative causes.

7              And these type of inspections and third party

8    subpoenas that could have covered different sources of lead

9    that plaintiffs' experts may have ignored is directly relevant

10   to a cross-examination with respect to their credibility when

11   they say --

12                 (Stenographer clarification)

13             MR. OLSEN:  Alternative cause.  And when plaintiffs'

14   expert say that they've done an extensive differential

15   analysis and study to eliminate potential alternative causes,

16   if this discovery shows there were potential alternative

17   causes that they did not consider, that goes directly to a

18   cross-examination point with respect to their experts.

19             Similarly, Your Honor did limit in the first

20   bellwether trial our experts -- for example, Dr. Finley and

21   Dr. Weed -- in attempting to testify about potential

22   alternative causes because you concluded that they could not

23   testify that plaintiffs' exposure were, in fact, caused by

24   alternative sources other than Flint's water supply.

25             This discovery could enable our experts to evaluate

1    that very question and have the requisite foundation to offer

2    those opinions this time around.

3         Plaintiffs are certainly taking the position that

4    plaintiffs are injured in this case.  To the extent this

5    discovery demonstrates that there are alternative causes here

6    or potential alternative causes, we would use that information

7    most importantly to cross-examine plaintiffs' experts who have

8    taken a direct position on this very question and potentially

9    empower our experts to do the same.

10        Because the expert schedule is so tight and those

11   reports are due and those depositions are upcoming, we need to

12   conduct this discovery to know whether we can evaluate and

13   address those issues in the expert discovery.

14        THE COURT:  How many homes are there that you're

15   trying to get into?

16        MR. OLSEN:  I don't know how many are completed.

17   It's 10 total.  I don't know how many have already been done.

18   Now there are multiple addresses with respect to certain of

19   the plaintiffs.  So I don't know what the total number of

20   addresses are.  But it's 10 plaintiffs and it happens to be

21   whichever homes they have lived in in the past.

22        THE COURT:  All right.  Mr. Stern.  I mean, I think

23   Mr. Olsen makes some points here that in the exhaustive

24   litigation of this, you would like to spend eight hours in, I

25   don't know, probably 30 homes.  People move frequently and --

| | |
|---|---|
| 1 | MR. STERN:  Not suggesting, Your Honor, that they're |
| 2 | not entitled to do home inspections, but I think that we can |
| 3 | narrow the scope of what those inspections are intended for |
| 4 | when we first have the opinions of their experts as to whether |
| 5 | the kids are damaged at all.  There's a fundamental -- |
| 6 | THE COURT:  Let me interrupt.  Mr. Olsen, are you |
| 7 | saying you can't even produce that report unless you see |
| 8 | whether there is lead paint or something? |
| 9 | MR. OLSEN:  I'm saying two things.  First, |
| 10 | plaintiffs' experts have already opined on this and said |
| 11 | they've done an extensive differential analysis.  This |
| 12 | discovery, I think, will undermine their opinion and |
| 13 | credibility. |
| 14 | Secondly, you're right.  To the extent our experts |
| 15 | are going to offer opinions about potential alternative causes |
| 16 | and supply the foundation you found lacking in the first |
| 17 | trial, they need this discovery to evaluate that question. |
| 18 | MR. STERN:  If I may respond?  Two points, Your |
| 19 | Honor. |
| 20 | THE COURT:  Okay. |
| 21 | MR. STERN:  Number one, I don't believe our experts |
| 22 | have provided reports on these bellwether children.  We're |
| 23 | talking about Bellwether III not Bellwether I.  And Mr. Olsen |
| 24 | in the same way that I was just being criticized for making |
| 25 | assumptions about the position that VNA would take at |

1      Bellwether III trial, they're making assumptions about what

2      our experts are going to say about these 10 children as a

3      platform for why they should be able to inspect these homes.

4           Number two, Your Honor's ruling -- and I appreciate

5      that Mr. Olsen is new to the case.  Your rulings were not

6      because inspections had not been done.  Your rulings regarding

7      the foundational basis was more complex than that.  Your

8      rulings were premised on the fact that on the one hand

9      Dr. Finley and Dr. Weed were going to come in and testify that

10     the kids weren't injured.

11          But at the same time they were going to take the

12     position that if they were injured, their injuries were caused

13     by someone else.  And so there was no foundational lacking

14     factual basis for them to provide those opinions.  Your order,

15     if I read it correctly, was based on the inconsistencies of

16     their various opinions.

17          So again, I think that in order to streamline the

18     litigation to be more efficient in terms of everyone's time

19     and money, it would make sense to first figure out what

20     everyone's position is in terms of experts on the injuries

21     that these kids have or have not suffered and then make a

22     determination about whether inspections need to take place in

23     the homes.

24          You can't on the one hand say Bithoney and Krishnan

25     gave opinions for these 10 bellwether kids and so we're

```
 1    entitled to take these inspections, but on the other hand you
 2    haven't yet seen our experts and you don't know what they're
 3    going to say so you can't rely on what we did in the first
 4    bellwether case.
 5         They're relying on the first bellwether case to
 6    extrapolate what the opinions of Dr. Bithoney are going to be
 7    now.  But they refuse to acknowledge or even address their own
 8    experts' opinions as to these new kids.  I just think it's
 9    premature irrespective of what the order says on discovery.
10         THE COURT:  Mr. Olsen, why don't we do this.  I think
11    you're justified in your request to go into these homes.  But
12    I think it would be most valuable to you and to your client to
13    do it after you get plaintiffs' expert report.  If you need
14    additional time for your expert to incorporate these
15    inspections let me know.  But I'm not inclined to do it at
16    this point before you even see what plaintiffs' expert is
17    going to say about these 10 children.
18         MR. OLSEN:  Your Honor, we did just get plaintiffs'
19    expert reports I believe.  And I think they are doing similar
20    kind of analysis that we heard in Bellwether I.  It's the same
21    kind of conclusions that you heard testimony about in
22    Bellwether I.  So I think we are there already, Your Honor.
23         MR. STERN:  Mr. Olsen is mistaken.  Respectfully, the
24    reports that have been submitted -- we had a deadline of
25    October 21 to submit any new reports for the Bellwether I
```

1    retrial.  And what was served on the defendants were the

2    reports of Dr. Larry Russell as well as a supplemental report

3    from Dr. Bithoney and Dr. Krishnan that simply updated the

4    materials that they relied on in providing their opinions in

5    Bellwether I.

6           So that when Bellwether I retrial occurs, if they are

7    cross-examined about their reliance on certain materials, they

8    have new materials because now there was a new trial that just

9    took place.  So they read the deposition transcripts of

10   defendants' experts.  They watched some of the trial.

11          Those are all related to Bellwether I retrial.  There

12   has been nothing produced to defendants.  And again, I

13   understand Mr. Olsen just entered his opinion last week.

14   There's a lot of catching up to do.  But there has been

15   nothing served on Bellwether III as to any of those

16   individuals.

17          THE COURT:  Okay.  Thank you.

18          MR. TER MOLEN:  Your Honor, just to clarify, if I

19   may?

20          THE COURT:  Yes.

21          MR. TER MOLEN:  What we're talking about, Your Honor,

22   are -- this is going back a couple of years.  So I understand

23   there's lots of water under the bridge here for all of us.

24   And we actually did receive expert reports from the plaintiffs

25   for all 14 of the initial group.

October 26, 2022                                                    25

1          So we do have, as Mr. Olsen is saying, expert reports

2    for these other, other 10.  And Mr. Olsen is accurate in

3    describing.  I understand that we will be receiving additional

4    expert reports from plaintiffs or I assume we will --

5          THE COURT:  Yeah.  I think the Bellwether III expert

6    report cutoff is December 2 of 2022.  So let's just wait until

7    we get to that point and then you can begin to schedule these

8    inspections.

9          Now, what are the 75 -- on item 6, the 75 different

10   addresses related to Bellwether I and III that you're seeking

11   third party information on?  Well, Mr. Stern, will you

12   describe this a little bit more to me?

13         MR. STERN:  I've already told VNA.  This isn't going

14   to be a burden on us.  If they want -- they want to send

15   requests for lead paint inspections for 75 or so addresses --

16   I think it's actually closer to 80 -- where some of the

17   Bellwether I kids either lived, resided or spent time as well

18   as the Bellwether III kids.  I think it's the exact same issue

19   and it's way premature and I think its also contrary to what

20   their experts have said.

21         But these are -- this comes with no costs to my

22   client.  This comes with no cost to me.  And if their clients

23   wants to pay for records for 75 homes associated with both

24   Bellwether I and Bellwether III, I would rather them spend

25   that money paying people who are injured.  But I have long ago

1    realized that I'm not in control of the strings for VNA.  And

2    I think that if they want to spend money on it, then I've told

3    VNA that we will withdraw our objection and they should go get

4    it.

5            THE COURT:  Okay.  So Mr. Olsen, that's what you'll

6    do?  You'll go for these 80 different addresses and the

7    various lead paint inspections and so on?

8            MR. OLSEN:  Yes, Your Honor.

9            THE COURT:  Okay.  So number 7, let's see.  Here I

10   have an indication that plaintiffs' counsel intends to file a

11   motion to compel substantive responses from VNA related to

12   Bellwether III's first request to admit and the timing of

13   adjudication, oh, in light of the Bellwether III scheduling

14   order where I think we have a November 18, 2022, cutoff for

15   discovery.  Is that what it is?

16           MR. STERN:  Yes, Your Honor.  So it's twofold.  One,

17   we've met and conferred about this issue and there's not going

18   to be an agreement that Veolia respond more substantively to

19   these requests.

20           All of these requests, all of them, every single one

21   is in the vein as the subpoena that was served on Ms.

22   Griffiths as the subpoena that we were hoping to effectuate

23   related to Mr. DiCroce, which they've now agreed to produce,

24   and the gentleman who was already deposed who we're going to

25   put a pin in to see if there's any new information.  It's all

1    about the potential geotargeting public relations.

2          THE COURT:  Oh.

3          MR. STERN:  When we attempted in Chicago in the

4    Northern District of Illinois to execute a deposition and have

5    the deponent produce documents related to this issue, what the

6    Northern District of Illinois said very strongly was, one, you

7    can depose her.  You are permitted [Inaudible] the witness and

8    that's taking place in two weeks.

9          What the Court also said is that you have a direct

10   means to get information about this that's not from a

11   nonparty.  It's from Veolia.  And so as soon as the Court said

12   that, we served discovery on Veolia for documents and for

13   admissions.

14         And Veolia's argument is -- and this is why we have

15   to file the motion, is that it's not related to a claim or a

16   defense as Mr. Olsen previously said when it came to those

17   various depositions we discussed.

18         So part one is the substance of it, which they're not

19   going to respond is to and that's what the motion will entail.

20   And part two is there's no way the motion will be adjudicated

21   prior to the closure of Your Honor's schedule for November 18.

22   Because even if we were to file it by the end of this week,

23   which we're hoping to based on the timing to respond and the

24   ability to reply, that discovery will come after the deadline,

25   if at all.

```
 1              THE COURT:  Well, let me say, Mr. Olsen, I think
 2     you've heard my concern about this issue of the digital media
 3     campaign.  So knowing that, I would ask that you meet and
 4     confer a second time.  I read Judge Kim's lengthy minute
 5     order.  I just want you to know we're not allowed to do that
 6     here.  We can't write out our whole opinion in the docket.
 7     That would be so easy.  We'd just do it all the time.
 8              But I love that he just wrote that up in the docket
 9     and put it there and said, plaintiff, you've got to go to VNA
10     for this.  Not that it's not important and so on.  But you've
11     got to go to a party in the case before you burden nonparties
12     much or somewhat and so on.
13              So you've got Judge Kim on the one hand.  You've got
14     my remarks on the other hand.  And the fact is what we have
15     here is a very large and complicated piece of litigation.  We
16     don't just have Bellwether I, II, III, class, issues.  We
17     don't just have that.  We have one very big piece of
18     litigation that something of that nature could impact all of
19     that litigation that results in a jury trial.
20              And so I don't think -- first of all, I don't think a
21     November 18 discovery deadline needs to -- that's from my
22     perspective referencing fact and expert specific discovery
23     related to the Flint Water Crisis and not related to the
24     impaneling of a fair and impartial jury.
25              So I just would ask that you look -- I don't know
```

1    what are in these requests to admit.  But I ask that you look
2    at them and answer them as fully as you can.
3         MR. OLSEN:  Your Honor, we'll take your suggestion.
4    We'll take another look at the request to submit given what's
5    taken place in this conference.  I would note most of them
6    relate to things like advertisements for the website and not
7    geotargeting.  But we will take another look at them and have
8    another meet and confer on it.
9         I'll take one more shot at asking Your Honor whether
10   we could file a protective order on this issue globally
11   because there's going to be a lot of additional depositions
12   with varying degrees of relevance here related to the PR
13   issues.  But if you want to piecemeal, that's what we'll do.
14        THE COURT:  I think piecemeal will be more effective.
15   And with an eye towards producing the witnesses.  If they
16   don't know anything, they don't know anything.  And if they
17   do, this is an important area for all of us.  Not just me.
18        But we've got Mr. Leopold, Mr. Novak.  You know,
19   we've got other -- Mr. Shkolnik.  Other lawyers here who have
20   -- will be trying to impanel juries at a later date.  And all
21   of this matters to all of us.  And it matters to you, too.  So
22   you want this issue cleared up as well undoubtedly.
23        So now I have the deposition of Mr. Leo A. Daly.
24        MR. STERN:  I can stop up, Your Honor.  We've met and
25   conferred and we're working with LAN to figure this issue out

 1    and we can report back to the court in probably a week to 10

 2    days but it's nothing Your Honor needs to address.

 3              THE COURT:  Okay.  Thank you.  That's always good

 4    news.  Okay.  So number 9, Veolia's topic regarding updates on

 5    the Bellwether III plaintiff selection process.

 6              MR. OLSEN:  Yes, Your Honor.  I know you had asked

 7    about this in prior conferences.  So we just wanted to let you

 8    know that we had made a proposal with Mr. Stern about

 9    selection.  He responded that let's finish up some of this

10    discovery before we meet and confer and see if we can agree in

11    a process to select the bellwethers.  And that's what we'll

12    do.  And we will continue to meet and confer about it but we

13    wanted to give you an update that that's underway.

14              THE COURT:  Okay.  So that's underway.  And hopefully

15    I won't need to be overly involved in it.  And but if so, let

16    me know.  Then we have a general issue.  It says Veolia's

17    topic of Bellwether III discovery.

18              Is that the two issues that plaintiffs put on

19    earlier?

20              MR. OLSEN:  No.  That's our issue, Your Honor.  There

21    were a number of additional depositions that we need to

22    conduct prior to that November 18 cutoff that you referenced.

23    We met and conferred on some of this yesterday.  Mr. Stern and

24    some of his colleagues are attempting to get dates for some of

25    these depositions.  We are a little fearful that some of those

1   deps will go beyond November --

2          THE COURT:  Is Mr. Olsen going in and out for anybody

3   besides me?  Or is it just --

4          MR. STERN:  It did for me as well.

5          MR. OLSEN:  I apologize, Your Honor.  I guess my

6   internet is a little balky as well.

7          THE COURT:  That's okay.

8          MR. OLSEN:  So I'll start again.

9          THE COURT:  Okay.  Thank you.

10         MR. OLSEN:  There are a number of Bellwether III

11  depositions that need to be scheduled.  Mr. Stern and his

12  colleagues are working on getting dates for us.  We're a

13  little concerned that those dates may extend beyond the

14  November 18 discovery cutoff.  So we just were seeking some

15  clarity from the Court that to the extent we've identified the

16  deps and those deps extend past the cutout -- cutoff, that

17  we're permitted to finish the discovery that we've noticed

18  prior to the cutoff and we're working with Mr. Stern and his

19  colleagues to get dates for.

20         THE COURT:  Okay.  And Mr. Stern, you're working with

21  Mr. Olsen and his team?

22         MR. STERN:  And there's depositions taking place

23  every day of all of these individuals and witnesses.  Right

24  now Ms. Daly is in the middle of a deposition with counsel for

25  Veolia and LAN.  And so, yes, even if we -- yes.

| 1 | And there's some people that they've asked for that |
| 2 | aren't represented by counsel.  And I've told that to -- you |
| 3 | know, just because we represent a child doesn't necessarily |
| 4 | mean that we represent a family member who either hasn't seen |
| 5 | the child in years or is somehow related to the child whose |
| 6 | name came up in another deposition. |
| 7 | So to the extent we have any control over our own |
| 8 | clients, we're getting them dates.  And to the extent that we |
| 9 | don't represent them, we've let Ms. Devine and her team know |
| 10 | that they should take whatever action they believe is |
| 11 | necessary to compel the deposition of who are essentially |
| 12 | nonparties. |
| 13 | THE COURT:  Okay.  My internet says -- is sending me |
| 14 | messages that it's unstable.  So I'm just going to keep going |
| 15 | here.  Okay.  So thank you for raising the issue, Mr. Olsen. |
| 16 | And I'll just be aware of it -- November 30 at 1:00 PM. |
| 17 | (Technical difficulties) |
| 18 | (Stenographer clarification) |
| 19 | (Pause In Proceedings) |
| 20 | THE COURT:  Okay.  Hopefully I'm on a different |
| 21 | pathway now.  Okay. |
| 22 | So we're going to have our next status conference on |
| 23 | November 30 at 1:00 PM.  And that is a Wednesday.  And so if |
| 24 | some of these issues are still ongoing or need the Court's |
| 25 | attention, they can be discussed at that time.  But I know |

1      there's a discovery cutoff between now and then, so reach out

2      if you need to.

3              I want to move next to the eleventh issue, which is

4      Veolia's topic regarding the joint submission on certified

5      issues.  And I appreciate that you brought that to my

6      attention.

7              What happened is we had a five and a half, six month

8      trial, then I had a brief absence.  And I have been doing

9      everything humanly possible to focus on the 300 other cases I

10     have to get them in shape to go back into this trial.  So I

11     apologize for the delay in getting to this.

12             But I looked at your submission.  And as I understand

13     it, the certified issues 1 and 2, there's agreement between

14     both defendants and class plaintiffs.  And just for anybody

15     observing this, we're now moving into an issue regarding how

16     to define the issues that will be decided in the first class

17     trial.  There's agreement that issues number 1 and number 2

18     are questions of law for the court and not for the jury.

19             And so I agree.  I appreciate that the -- I've

20     learned a great deal about the case since making that decision

21     now I think two years ago almost.  So I absolutely agree that

22     those are questions for the Court.

23             How they are decided, there are a couple of options

24     for -- they can be decided on summary judgment if summary

25     judgment is filed.  If not, a motion in limine would be

October 26, 2022

1   appropriate.  Or just, you know, submit an issue that now is
2   the time we need to decide the issue of duty.
3          And here's what I can tell you.  The Lee decision,
4   the LAN, and the VNA summary judgment decisions required a
5   great deal of research and thought.  I don't see any reason
6   that I would deviate from that in this instance.  But if there
7   are certain proposed members of the class that you think
8   wouldn't be covered by the Lee decision in those two summary
9   judgment decisions, I have one billion percent confidence that
10  VNA and LAN will bring that to my attention.
11         So I don't think I need to come up with the
12  definition of -- the precise wording for issue.  You're going
13  to submit a brief to me saying there is no duty.  And to the
14  extent there is, this is what the duty is.  So those two are
15  now out.
16         On issue 3, I agree that we can write this in a more
17  concise manner.  And I would adopt I believe this is -- it may
18  be VNA and LAN's definition.  But it's, "Did either defendant
19  VNA or LAN breach their duty of care?"  Period.  So that will
20  be the first issue for the jury.
21         The next issue is going to be, "If a defendant, VNA
22  or LAN, breached its duty of care owed to class members, did
23  that breach contribute to causing or prolonging contaminated
24  water conditions in the Flint water distribution system?"  We
25  learned in the bellwether trial and in the Daubert motions

1    leading up to it that all water is corrosive.

2           So VNA and LAN had suggested unduly corrosive.

3    Unduly seemed a little bit like where does that start and

4    where does that stop and it's not a word that jurors probably

5    use regularly.  So I just substituted "contaminated water

6    conditions".  That covers legionella, lead, fecal coliform,

7    and all of the other contaminants.

8           And the next question is -- here's where the parties

9    disagree.  What I certified was duty -- which we know is a

10   legal question -- breach, and general causation.  That's what

11   the class opinion that the Court of Appeals did not disturb

12   addressed.

13          And so it's my opinion that -- the assistance that

14   the class vehicle provides is numerosity, commonality, all of

15   those things that these issues to the extent they can be

16   decided should be decided.  And so I think a general causation

17   question is -- can be decided.  So I have rewritten it to

18   "Were the contaminated water conditions capable of causing

19   harm to Flint residents, properties, property, and

20   businesses?"

21          But here's where I think it's important for class

22   plaintiffs to notify me and the defendants of what types of

23   harm your expert thinks can be caused by the contaminated

24   water conditions.  That way defendants are on notice.

25          And they raised with me, well, maybe there's a due

 1    process by an unnamed plaintiff who is going to say hangnails

 2    are a part of this or going to have something.  Or just

 3    something that like cataracts or something that we know isn't

 4    caused by this contaminated water, that they would have some

 5    due process issue.  But we can't evaluate that without knowing

 6    what types of harm your experts want to put forward.

 7            So I'll set up a briefing schedule after this to just

 8    know generally.  I don't need the expert report until it's

 9    due.  But I'd like to know generally and I think the

10    defendants should know generally what types of general

11    causation conditions you're going to raise.

12            Then the next one will be, "Did any nonparty breach a

13    duty of care owed to class members?  If yes, did that breach

14    contribute to causing or prolonging the contaminated water

15    conditions in the Flint water distribution system?"

16            Now here I guess there's still a question of whether

17    percentages make sense to be offered here.  I guess I didn't

18    address that in my own thinking.  Let me just look.

19            Tell me, Mr. Olsen, why didn't you want the

20    percentage of fault to be attributed at this stage?

21            MR. NGUYEN-DANG:  If I may handle that, Your Honor?

22            MR. OLSEN:  Yeah, go ahead.

23            THE COURT:  Oh, okay.  Hello.  How are you.

24            MR. NGUYEN-DANG:  Doing well.  Thank you.  Good

25    afternoon, Your Honor.

1          I think as we recognized during the first bellwether

2   trial, the percentage allocation of fault was individualized

3   or is individualized because it depends on the particular

4   circumstances of each person, their injury, their alleged

5   injuries, when they were exposed to water, so on and so forth.

6   And so in Bellwether I, we had -- the verdict form actually

7   passed for the jury to allocate fault for each plaintiff.

8          THE COURT:  It did.

9          MR. NGUYEN-DANG:  And so that indicates that the

10  ultimate allocation, percentage allocation, is not a common

11  issue.  And so we asked ourselves -- and this is something

12  where I think as you noted that the Sixth Circuit's got into

13  this, well is there something sort of before then that we

14  could try to do on a class-wide basis, an intermediate step

15  perhaps?  And we just don't think it's workable.

16          I mean, I think fundamentally the best we could come

17  up with is some sort of grid where you'd start say on April

18  2014.  And you'd say all right, between April 2014 and then

19  whatever the next important date is, here's the allocation of

20  fault for whatever injuries occurred during that period.  And

21  then you would sort of do that for every single period between

22  April 2014 and I guess the end of the crisis.

23          And those periods, they could be days apart, they

24  could be weeks apart, they could be months apart, that just

25  seemed really complicated for a jury to fill out.

```
1              THE COURT:  Yeah.

2              MR. NGUYEN-DANG:  And then for a second jury to go

3    and try to apply that grid to the circumstances of an

4    individual person, it just didn't seem like it was workable.

5    So that's why we thought that -- and we agree with your

6    position, right.  Anything that can be decided in a common

7    basis in an issue class trial, we should try to do that.  We

8    just didn't think that percentages was going to be feasible.

9              THE COURT:  I agree.  Because if, for instance,

10   somebody wasn't -- didn't live in Flint until close to the

11   time that VNA arrived, then something that the emergency

12   manager did at that time prior to that, I suppose it may

13   have -- the jury could find that it caused the problem that

14   they then interacted with.

15             But who's responding for plaintiffs, class

16   plaintiffs?

17             MR. LEOPOLD:  I am, Your Honor.  Ted Leopold for the

18   record.

19             THE COURT:  How do you -- respond to what

20   Mr. Nguyen-Dang just said, please.

21             MR. LEOPOLD:  The issue, I understand the issue and I

22   realize it's not an easy issue.  Alternatively I'm not sure

23   what the answer is other than doing this in the liability

24   phase.  I think by doing it in the --

25             THE COURT:  Well, this is the liability phase.
```

```
 1            MR. LEOPOLD:  Right.  But I understood
 2   Mr. Nguyen-Dang to talk about not doing it in the liability
 3   phase but perhaps the damage phase I guess.
 4            THE COURT:  Right.  Yeah.
 5            MR. LEOPOLD:  And doing it in the damage phase I
 6   think would even be more convoluted and difficult.  Because
 7   for a jury to determine comparative fault, if you will, that
 8   really goes to the issue on the liability side.  And those are
 9   going to be the facts that are going to be tried during the
10   issues only trial.
11            THE COURT:  Oh, I see.  So let me stop you.  I think
12   that's a really important point.
13            So Mr. Nguyen-Dang, how do we avoid what Mr. Leopold
14   is suggesting, which is that the damages phase would have to
15   retry liability all over again?
16            MR. NGUYEN-DANG:  I think it would be a much more
17   streamlined presentation.  I mean, the point -- the certified
18   or the -- sorry, the common questions would get us to which
19   universe of people are we even looking at, right.  Because
20   only those people to whom the issue jury -- sorry, the issue
21   class jury said yes to would even be considered.
22            And then I agree there would probably have to be some
23   presentation of evidence as to that person's conduct.  But it
24   could be targeted or streamlined to the circumstances of the
25   individual plaintiff.
```

```
 1              So for example, in the example that you gave, Your
 2    Honor, if we know that someone left Flint by a certain date,
 3    then we only really have to worry about the conduct up to that
 4    date, for instance, and we wouldn't have to worry about all
 5    the rest.
 6              I agree that it's not optimal.  But we just really
 7    didn't see path to avoiding -- to avoiding that sort of
 8    presentation altogether simply because ultimately the ultimate
 9    allegation needs to be individualized.
10              THE COURT:  Ms. Levens.
11              MS. LEVENS:  Your Honor, I just wanted to add one
12    thing.  I think this Sixth Circuit's decision on the 23(f)
13    petition provides some useful instruction here.  There they
14    talk about how some of these issues could essentially lay out
15    a timeline that would guide in deciding comparative fault and
16    possibly even identify water shed events caused by the
17    petitioners and third parties, which would then streamline
18    subsequent things by --
19                        (Technical difficulties)
20                        (Stenographer clarification)
21              THE COURT:  I can summarize.  What Ms. Levens said
22    when the audio was unavailable to the court reporter was that
23    the Sixth Circuit opinion on class certification can serve as
24    a guide for us that they instructed.  And I regret not
25    re-reading it this morning.  I re-read my own decision, but
```

1    not theirs.  That we may be able to sort out a timeframe

2    during which other parties -- the jury would determine that

3    other parties had responsibility.

4         So this is what I'm going to do.  I'm going to change

5    it because I think that's critical to do at this stage if we

6    possibly can.  So we're not writing the jury instruction right

7    now.  We'll have some time to do that.  But this time we'll

8    have that jury instruction before the opening statements.

9         And so I will include, "If, yes, what percentage of

10   fault is attributable to each nonparty?"  Plaintiffs have it,

11   "What percentage of fault is attributable to defendants?"  But

12   we want to know what role for City of Flint, what role for

13   MDEQ, and so on at this phase.  And I think what we have to do

14   is what Mr. Nguyen-Dang and Ms. Levens is sort of pointing to,

15   which is make sure that there's a timeframe.

16        Because Governor Snyder didn't know about certain --

17   there's only a certain date by which he's informed.  And I

18   don't know exactly what -- if that's true.  Never mind.  But

19   there are definitely people who worked in office as emergency

20   managers who can't be held responsible for the time period

21   before they were there.

22        So I think we'll be able to come up with a chart that

23   says our best estimate of when their reliability or

24   responsibility would start and end.  But to that end I want to

25   hear from defendants.

1          I'll set a briefing schedule now about which

2     nonparties.  You don't have to give me the percentage because

3     the evidence may change that.  But I want to know who, going

4     into this trial, you believe are the nonparties at fault.

5     Because then that permits everybody to prepare their opening

6     statement, their evidence and so on with that knowledge.

7          And then the last one were the harmful water

8     conditions in the Flint water distribution system a natural

9     and probable result of either VNA or LAN's breach.  So I don't

10    know if these are the right -- if this is the right order.  We

11    may want the nonparty issue after that.  But we have time to

12    figure out what order these should be in.

13         So that's -- I'm just issuing an oral decision in the

14    interest of expediting this process.  And it just changed.  So

15    that's what the issues will be.

16         And I want to add -- okay.  So we have the November

17    30 -- okay.  I received a motion this morning -- let me see

18    what it is called.  It is -- or last night.  Yesterday

19    sometime.  It's ECF number 988 in the 17-10164.  And it's

20    Veolia's motion to strike the expert reports of Dr. Larry

21    Russell and Dr. Edward Hoffman.

22         And here's what I can offer you on that.  I don't

23    need a response and I'm prepared -- I have read it and I'm

24    prepared to make a decision, which is as follows.  And

25    Mr. Olsen, let me -- I mean you're a complex litigation guy --

1    oh, no.  Jeseca's frozen again.

2              MADAM COURT REPORTER:  I'm here.

3              THE COURT:  Oh, ready to go?

4              MADAM COURT REPORTER:  I'm here, Judge.

5              THE COURT:  Oh, this must be a delayed -- I must

6    have -- that's a delayed -- okay.

7              Here's a situation.  We have a bellwether -- this

8    is -- I mean, I was mentioning earlier and we all know this.

9    This is a large piece of litigation.  What we're doing with

10   these bellwethers trials is trying to move a very large

11   boulder up a hill to figure out what is the likelihood of

12   success for plaintiffs' claims.  And if they are successful,

13   what is the type of damages that the jury will award.

14             Certainly you're absolutely correct with your motion

15   that this is a retrial of Bellwether I.  But we can't lose

16   sight of what we're trying to do.  We're not just trying to

17   retry Bellwether I all on its own just because that would be

18   an excellent exercise for all of us to undertake.  We're doing

19   it for a reason.  What is the reason?  The one that I just

20   said.

21             So the idea that the record -- I think they're out of

22   circuit cases -- that the record can't change on a retrial, I

23   don't -- that could apply in those courts in those circuits

24   for a criminal case, for example, where there's a hung jury.

25   But here we have a different purpose here.  We're not just

1    trying to -- we're trying to figure these cases out.

2         And we went -- I'm sure you are aware what we went

3    through to get Mr. Humann here.  I'm not doing that again.  He

4    has a right to move on with his life.  He signed up -- I don't

5    think he signed up for a life tenure position with plaintiffs.

6    He's gone.  We don't have him anymore.  So we're going to have

7    Dr. Russell because it will be of no value to moving the

8    litigation forward to not have somebody in that position.

9         And Dr. Hoffman as well.  Some weeks ago I asked

10   everybody to say do you need new people?  If so, who?  So that

11   I knew what was going to shift, what kind of Daubert practice

12   there would be so I could build that into the schedule.  And I

13   wouldn't have asked if you were all confined to the ones that

14   you had.

15        The other thing with Hoffman is I specifically didn't

16   let plaintiffs add him to Bellwether I because the request

17   came too close to the start of the trial for you to be able to

18   consider rebuttal testimony to his additional reports.  But we

19   have time.  We have time.  So your motion is denied for those

20   reasons.

21        MR. OLSEN:  Thank you, Your Honor.  And you're right,

22   I am a complex litigation guy.

23        THE COURT:  Yeah.

24        MR. OLSEN:  And I understand your point.  Our point

25   was simply you certainly, of course, have discretion to allow

1    new witnesses where appropriate.  But if you look at those

2    reports, this is -- plaintiffs are attempting to conduct a

3    fundamentally different trial than Bellwether I with

4    fundamentally broad reaching issues.  And that's not

5    consistent with the discretion that the Court typically has.

6          I agree and see this all the time where you get a new

7    witness because another witness cannot show up or you're

8    adding new evidence in a limited way.  But to dramatically do

9    a new trial as opposed to a retrial of Bellwether I does not

10   seem consistent with what the legal standards are.

11         THE COURT:  Well, I think it is consistent with what

12   we're trying to do is with the bellwether process.  I think it

13   is consistent.  And substituting Dr. Russell, who you've known

14   of this whole time because you already wrote a Daubert motion

15   two years ago to strike his testimony.  So it's no surprise to

16   Veolia.  And the Daubert -- it's already written.  You can

17   just, you know, put on a new date.

18         But and I'm just going ask you again, with the

19   Daubert motion practice -- and I'm not singling you out,

20   Mr. Olsen.  I appreciate meeting you and having your degree of

21   expertise brought to all of this with all of these experienced

22   lawyers.

23         But take a look at the decisions that I made in

24   Bellwether I.  Do not re-file -- if you want to just file a

25   notice that we adopt what we did in Bellwether I.  We

1    understand the Court's decision.  We're not going to ask you

2    to do it again.  Because we all -- we need to move this

3    process forward.  And we can't have extreme motion practice

4    which just paralyzes everyone, so.

5          MR. OLSEN:  Your Honor I hear you.  What I think we

6    intend to do is something like what you just suggested.

7          THE COURT:  Okay.

8          MR. OLSEN:  Which is make a filing that says we

9    understand Your Honor has ruled on the following things.  And

10   if you'd like to reconsider them, we'd be happy to argue them.

11   But just to make our record, we will probably file something

12   that just gets clarification that you're going to rule the

13   same way on the following issues.

14         THE COURT:  Okay.  Thank you.  Okay.  I think that's

15   all I had.  Is there anything --

16         MR. OLSEN:  Your Honor, I had one more issue just to

17   put on your radar.  Because you're right, that there's going

18   to be a lot of things going on between now and November 30.

19         As Mr. Stern noted, we got some supplemental expert

20   reports for Bellwether I that we just talked about.  And there

21   is some testing that's been done by Dr. Russell in particular

22   on some of the pipes and other plumbing fixtures.  And we have

23   asked for -- we don't think that was done appropriately.  We

24   weren't notified of any of that testing.

25         But before we are going to take any issue with

1    respect to it, we've asked to get that material that was

2    tested and any data or analysis.  We're trying to work that

3    through with plaintiffs' counsel.  They've said we're going to

4    get some information.  And so we're evaluating that in

5    realtime.  I'm just alerting that because of the deadlines we

6    may be coming back to Your Honor prior to the next status to

7    seek some relief.

8            THE COURT:  Okay.  Thank you.  Okay.  Anything else?

9            MR. NGUYEN-DANG:  One more thing, Your Honor, if I

10   may?

11           THE COURT:  Sure.

12           MR. NGUYEN-DANG:  This is related to something that

13   you just indicated about the Dauberts.  I just -- for purposes

14   of the Bellwether I retrial, could we also assume similarly

15   for Your Honor's motion in limine rulings and summary judgment

16   rulings that we should assume that you will adopt them all?

17   We may, of course, have to make a record about that.  But

18   we'll assume that you will adopt them all subject to if we ask

19   for reconsideration it will be on specific points or obviously

20   if the evidence has changed or something like that.

21           THE COURT:  Correct.  I think that's a very good

22   approach.

23           MR. NGUYEN-DANG:  Very good, Your Honor.  Thank you.

24           THE COURT:  Good.  And hopefully the Sixth Circuit

25   will have an opportunity to rule on the Fifth Amendment issue.

1    Maybe, maybe not.  We'll find out.  But I hope that they will.

2    Okay.

3              Well, thank you, all, for being here.  I appreciate

4    it.  And I'm sorry I was going to conduct a follow-up meeting.

5    But I am not able to do that.  So I'll get that scheduled.

6    That was going to be on just one or two additional details

7    about the retrial.

8              I have notes from it here.  And one of them was the

9    time limits I would be putting on the parties.  And what I

10   have done, just so that you know, I've gone back through the

11   record and determined that plaintiffs' case took about 138

12   hours.  And that includes cross-examination by defendants.

13   VNA's case in chief lasted 68 hours.  And LAN's 9 hours.

14   That's a total of 195 hours.

15             And I'm looking at focusing on getting this done in

16   under a total of 140 hours.  But of course the hours of

17   cross-examination during defendants' case and during

18   plaintiffs' case wouldn't count against the party doing the

19   direct exam.  So just know that I'm working on that and have

20   not yet gotten to where I want to with a little protocol of

21   how the whole thing will work.

22             MR. CAMPBELL:  Your Honor, this is James Campbell.  I

23   was wondering if you've given any thought to the trial day for

24   retrial.

25             THE COURT:  The February 23 date?

1          MR. CAMPBELL:  Yes.  The trial day.

2          THE COURT:  Oh, the trial day.  I have given a lot of

3    thought to it.  But I keep coming back to the same either 9:00

4    or 8:30 to 2:00.  But I'm hope.  Once we get a time slot to

5    talk informally, I'm open to ideas.

6          The problem is with a trial that lasts more than two

7    weeks, I have to have afternoon time to run the criminal

8    docket and the rest of the civil docket.  I'd love it if we

9    could get in here and work all day, but I don't know how I

10   cannot violate the speedy trial clock and do that, so.  But

11   please make recommendations when I do reschedule that meeting.

12         Which maybe what we'll do is we'll just do it on --

13   see the problem with November 30 is there's a criminal docket

14   in the afternoon.  But we'll figure out a time to get it

15   scheduled.

16         MR. SHKOLNIK:  Judge Levy.

17         THE COURT:  Yeah.

18         MR. SHKOLNIK:  This is Mr. Shkolnik.  It's been a

19   long time since I've had a chance to speak before you.

20         THE COURT:  Yeah.  Nice to see you.

21         MR. SHKOLNIK:  Regarding the idea of the stop clock

22   trial, recently in our opioid bellwether before Judge Polster,

23   he very effectively set a protocol in place for that

24   bellwether trial.  I think his was 50 per side if I'm not

25   mistaken.  But he had procedures regarding how the stop clock

1    works.  And it was -- it actually went faster than everyone

2    thought it would.  And it was very effective.  And he actually

3    has a protocol in place.  If you'd like, we'd be happy to

4    provide that.

5              THE COURT:  Could you?

6              MR. SHKOLNIK:  And there's a couple of others that

7    we've recently had.

8              THE COURT:  I talked to Judge Polster while the jury

9    was deliberating and he mentioned that but I didn't get his

10   protocol.  And I talked to Judge Breyer here in Detroit last

11   week about his opioid case.  But it was a bench trial.

12             MR. SHKOLNIK:  Yes.

13             THE COURT:  But he gave me some tips.  And I've got a

14   meeting set up with Judge Orrick to talk about his recent

15   concerns about his litigation of the JUUL smoking device.

16             MR. SHKOLNIK:  Yeah.  The one that just got put off.

17             THE COURT:  Yeah.

18             MR. SHKOLNIK:  I think there may have also been one

19   down in the 3M but I could be wrong on that one.  If it's okay

20   with the Court, we would get a copy of whichever orders are in

21   place and just submit them with everyone on notice so you can

22   see the alternatives that are out there.

23             THE COURT:  I'd love that.

24             MR. OLSEN:  We haven't done one in 3M yet, Hunter.

25             MR. SHKOLNIK:  Okay.

```
 1            MR. LEOPOLD:  Your Honor, could I just -- I'm sorry,
 2   Hunter.  I thought you were done.
 3            THE COURT:  Go ahead.
 4            MR. LEOPOLD:  Your Honor, just to clarify, I'm not
 5   sure I heard correctly because I may have wiped out a little
 6   bit on the computer.  But when you were talking about time for
 7   the bellwether trials, on cross-examination, at least in my
 8   experience doing it on a time basis, that counts against the
 9   party doing the cross-examination.
10            THE COURT:  Correct.
11            MR. LEOPOLD:  Was that your intent?
12            THE COURT:  Yeah.  Absolutely.
13            MR. LEOPOLD:  Thank you.
14            THE COURT:  Yeah.  Absolutely.  I don't know much
15   about sports.  But like I'm not going to allow someone to run
16   the clock or whatever they call it.  Run out the clock.
17            MR. LEOPOLD:  Very good.
18            THE COURT:  Okay.  All right.  Good to see everybody.
19   Take good care and I will see you soon.
20                     (Proceedings Concluded)
21                -          -          -
22
23
24
25
```

October 26, 2022                                                    52

1              <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2          I, Jeseca C. Eddington, Federal Official Court

3   Reporter, do hereby certify the foregoing 51 pages are a true

4   and correct transcript of the above entitled proceedings.

5   <u>/s/ JESECA C. EDDINGTON____</u>                 <u>11/04/2022</u>
    Jeseca C. Eddington, RDR, RMR, CRR, FCRR          Date
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25