```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3

 4
            In Re   FLINT WATER CASES      Case No. 16-10444
 5

 6

 7   _____/

 8                     STATUS CONFERENCE

 9
             BEFORE THE HONORABLE JUDITH E. LEVY
10               UNITED STATES DISTRICT JUDGE

11                    NOVEMBER 30, 2022

12
                   APPEARANCES IN ALPHABETICAL ORDER:
13
                   Frederick A. Berg
14                 Butzel Long
                   150 West Jefferson, Suite 100
15                 Detroit, MI 48226

16                 Jayson E. Blake
                   McAlpine PC
17                 3201 University Dr.
                   Suite 100
18                 Auburn Hills, MI 48326

19                 James M. Campbell
                   Campbell Conroy & O'Neil, P.C.
20                 20 City Square, Suite 300
                   Boston, MA 02129
21
                   (Appearances continued on next page)
22

23   To Obtain a   Jeseca C. Eddington, RDR, RMR, CRR, FCRR
     Certified        Federal Official Court Reporter
24   Transcript       United States District Court
     Contact:          200 East Liberty Street -
25                       Ann Arbor, Michigan 48104
```

1    Melanie P. Daly, I
     Levy Konigsberg, LLP
2    605 Third Ave
     Suite 33rd Floor
3    New York, NY 10158

4    Alaina N. Devine
     Campbell Conroy & O'Neil, P.C.
5    1 Constitution Wharf, Suite 310
     Boston, MA 02129
6
     Kristin Michele Dupre
7    Campbell Conroy and O'Neil PC
     1 Constitution Wharf, Suite 310
8    Boston, MA 02129

9    Philip A. Erickson
     Plunkett & Cooney
10   325 E. Grand River Avenue, Suite 250
     East Lansing, MI 48823
11
     Kelly Bain Kramer
12   Mayer Brown LLP
     1999 K Street NW
13   Washington, DC 20006

14   Patrick Lanciotti
     Napoli Shkolnik PLLC
15   360 Lexington Avenue, 11th Floor
     New York, NY 10017
16
     Theodore J. Leopold
17   Cohen Milstein Sellers & Toll PLLC
     11780 U.S. Highway One, Suite N500
18   Palm Beach Gardens, FL 33408

19   Michael A. Olsen
     Mayer Brown LLP
20   71 S. Wacker Dr.
     Chicago, IL 60606
21
     Eric Rey
22   US Department of Justice
     Civil Division
23   175 N Street, NE
     Washington, DC 20002
24

25

```
 1                          Susan Elizabeth Smith
                            Beveridge & Diamond, P.C.
 2                          1350 I Street N.W.
                            1900 N Street N.W., Suite 100
 3                          Washington, DC 20036

 4                          Corey M. Stern
                            Levy Konigsberg, LLP
 5                          605 Third Avenue, Suite 33rd Floor
                            New York, NY 10158
 6
                            Michael Ray Williams
 7                          WV Attorney General Office
                            1900 Kanawha Blvd. East Bldg 1 Rm 26E
 8                          Charleston, WV 25305-0220

 9      Also Present:       Deborah E. Greenspan
                            Blank Rome LLP
10                          1825 Eye Street, N.W.
                            Washington, DC 20006
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

**I N D E X**

WITNESSES                                                    PAGE

   (None)


EXHIBITS

   (None)


MISCELLANY

   Proceedings...................................5
   Certificate..................................34

November 30, 2022

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  Okay.  Thank you. |
| 4 | And we already have appearances taken down.  So we |
| 5 | can get right to our work together.  And we issued an agenda |
| 6 | for this status conference.  And as agendas go, it's |
| 7 | relatively short.  So hopefully we can work our way through |
| 8 | this material. |
| 9 | The first topic was one submitted by, I think, Mr. |
| 10 | Stern and his firm.  And it relates to VNA's opposition to |
| 11 | co-liaison counsel's notice of the deposition of Pierre |
| 12 | Farcot, who is a communications director and special advisor |
| 13 | to the chairman at Veolia.  And apparently he is responsible |
| 14 | for crisis communication. |
| 15 | And that deposition, I think, was scheduled for |
| 16 | today. |
| 17 | So let's see, Mr. Stern, did the deposition -- I |
| 18 | assume it didn't take place then? |
| 19 | MR. STERN:  No, Your Honor. |
| 20 | THE COURT:  Okay.  And is there anything more you |
| 21 | want to say?  I see that you're trying to take this |
| 22 | individual's deposition.  And it relates to our case. |
| 23 | MR. STERN:  So Mr. Farcot during the trial and prior |
| 24 | to the trial was employed by Veolia Environment SE.  That's |
| 25 | based on our research and investigation.  That's the French |

1    entity for Veolia.

2            He attended the trial almost every week.  Sat in the

3    back of the courtroom.  I believe he was there the day Your

4    Honor asked about the Twitter account.  And it turns out that

5    Mr. Farcot was the individual who was not only responsible

6    according to testimony from other VNA witnesses for the Veolia

7    Flint Facts website, the content on the website, the updates

8    to the content on the website, but also the Twitter account.

9            During the course of the deposition of Carrie

10   Griffiths, who is presently the communications director for

11   VNA, she described that prior to trial, there were two, in her

12   words, monumental events taking place at the same time.

13           One was the merger between Suez and Veolia, which the

14   Court is aware of based on the Richard Humann issues that

15   evolved throughout trial.  And the other monumental event was

16   the trial.

17           And according to the current communications director

18   for VNA, Veolia determined that the American company, VNA,

19   would handle all communications related to the merger, and

20   French -- the French company would handle everything related

21   to the trial.

22           So Mr. Farcot, based on my own attendance and

23   participation in the trial, was there.  It appears he was

24   Tweeting from the courtroom or outside the courtroom.  I

25   watched him interact repeatedly with not only attorneys for

1    Veolia but other individuals who were there for Veolia.

2           And when I noticed the deposition, I was told two

3    things by Mr. Kramer.  One is that he's no longer employed by

4    Veolia and that was like as of the date of the deposition.  He

5    just suddenly didn't work there anymore despite his LinkedIn

6    profile which he's active on.  I'm still showing he does as of

7    I think this morning or yesterday.

8           And two, even if he did, VNA and Veolia are not the

9    same thing and they have no control over him.  And so they've

10   pushed me to The Hague Convention.

11          The same is true as to item number 2 on Your Honor's

12   agenda, which is an individual by the name of Laurent Obadia.

13   He had previously been deposed.  This is the person who still

14   works for Veolia who Mr. Farcot actually worked under who was

15   in charge of Mr. Farcot's activities.

16          And even though he does work for Veolia, I have been

17   advised by counsel for VNA that they have no control over

18   Mr. Obadia and Mr. Obadia is not part of any entity that's a

19   part of this litigation.  And that again, I must go through

20   The Hague Convention in order to get both of these

21   individual's testimony.

22          So I'm not sure exactly what Your Honor can do, but

23   there's a dispute about the scope of what Your Honor has

24   permitted in terms of discovery and the import of the

25   information campaign that Veolia had undertaken prior to and

1    during the trial.

2            My impression is that Veolia believes that that's

3    only related to geotargeting.  And if there's no documents

4    that show geotargeting, the inquiry should end there.  And

5    that not only do these two individuals not work for VNA, one

6    of whom doesn't work for any Veolia entities, not only are

7    they in France, but I need to stop this process of doing

8    discovery because I have, according to them, what I need.

9            So that's the dispute.

10            THE COURT:  Okay.  And who is going to respond.

11    Would that be you, Mr. Kramer?

12            MR. OLSEN:  I'll respond, Your Honor.  Mike Olsen.

13    And there are a few problems with these two depositions.  And

14    let me start where Mr. Stern finished with respect to the

15    scope of discovery.

16            He's noticed and taken many depositions and gotten

17    many documents with respect to PR discovery.  During the

18    October status conference, Your Honor noted that this

19    discovery does not go to any claims or defenses in this case.

20            But rather you noted the Detroit News article that

21    had alleged that VNA may have geotargeted ads to potential

22    jurors or actual jurors.  And that that was a topic of

23    significant interest.  And you asked me to reconsider our

24    discovery position to enable Mr. Stern to address this

25    allegation that there was geotargeting with respect to the

1    jurors.

2         We took your admonition to heart and that's exactly

3    what we did.  We revised our request to admit responses.  We

4    revised our document responses to produce all of the Google

5    ads that were related to the advertisements that went out.

6    Google sponsored search does offer the ability to target

7    specific regions, states, zip codes.

8         The documents and the deposition testimony make clear

9    that VNA never utilized these geotargeting or geofencing

10   features.  We produced all of the ads to Mr. Stern and the

11   data that confirms that VNA never geotargeted or geofenced

12   these advertisements.

13        We've made people available for depositions.  In

14   Ms. Griffiths deposition, who you ordered us to produce, she

15   identified one additional person, Jace Connor, the Director of

16   Digital Communications, who we have agreed to make Mr. Connor

17   available for deposition to fully address this potential

18   geotargeting question.

19        But where we sit today is that not only does VNA

20   expressly deny ever geotargeting any ads in response to

21   anything, but we've produced all of that data.  We've produced

22   those documents.  And we produced witnesses and will produce

23   Mr. Connor who all are going to say and have said that there

24   was no geotargeting with respect to anything in any effort to

25   influence any potential jurors.

```
 1              Now Mr. Stern has modified what he's claiming is the
 2   need for this to I think what he's been calling a
 3   misinformation campaign.  And he's talking about Tweets and
 4   the Flint Facts website, both which happened after the jury
 5   was impaneled and the jury was instructed and ordered not to
 6   follow media.  But all of those Tweets and that website are
 7   public.
 8              If there's some particular Tweet or addition to the
 9   website that Mr. Stern thinks needs the Court's attention,
10   even though it has nothing to do with the claims or defenses
11   in this lawsuit, obviously feel free to bring it to the
12   Court's attention.
13              But we're now demanding additional witnesses that go
14   to this, quote, misinformation campaign close quote that has
15   nothing to do with the geotargeting issue.  In fact, Your
16   Honor already struck a third party subpoena related to this
17   very issue because you concluded that it went too far afield
18   and wasn't targeted to this geotargeting question.
19              Now with respect to these two particular witnesses
20   that we're talking about, Mr. Farcot has never worked for VNA.
21   He worked for VE, who's not a party to this lawsuit.  He left
22   as of September 30, 2022.  VNA has never had any control over
23   him.  They certainly do not have any control over him now.
24   Mr. Farcot resides in France.  He is not someone we can simply
25   produce for deposition.
```

```
 1              Now plaintiffs obviously can attempt to secure his
 2     deposition through The Hague Convention, but that's an issue
 3     for another day.  So at least with respect to Mr. Farcot --
 4     and I'll address Mr. Obadia in one second -- the substance of
 5     this has gone way far afield of the geotargeting issue.
 6              It's now general discovery related to a
 7     disinformation campaign that is -- that are related to Tweets
 8     and a website that is public.  And if Mr. Stern has issues
 9     with any of those Tweets, he can bring them to the Court's
10     attention.
11              THE COURT:  Well, Mr. Olsen, let's stop for just a
12     minute on Mr. Farcot.  Now that I know he's the individual who
13     was sitting just a little to the right of my line of sight for
14     a great many days of our six months in trial, is he in the
15     United States now?
16              MR. OLSEN:  He resides in France.
17              THE COURT:  I know.  But he resided in Ann Arbor for
18     a good number of weeks if not months during the trial.  And so
19     I'm just interested in do you know if he's in the United
20     States now?  Because he could be served while he's here.
21              MR. OLSEN:  As of the moment, I have no idea where
22     Mr. Farcot is at this moment.  My belief is he's probably in
23     France because that's where he lives, but I don't have any
24     idea where Mr. Farcot is at this moment.  We certainly don't
25     control him.
```

1          Now obviously, again, this has nothing to do with the

2    geotargeting.

3          THE COURT:  Well, let me say something about that.

4    Because I hear your argument that the discovery that I advised

5    you that I thought would be important to take in this case, I

6    focused on the digital media campaign that was identified in

7    the Detroit News article that I was interested in I think is

8    important to ensuring a fair trial.

9          And so my focus was certainly on whether individual

10   jurors who had been impaneled or jurors -- the zip codes for

11   jurors in the venire had been involved in some way in conduct

12   of that nature.  Or whether it's ongoing.  And we have three

13   or more trials scheduled still.  Well, I guess three.  That

14   are in line to be tried in this case.  So it matters what's

15   going on in an ongoing basis.

16         The Supreme Court case, Gentile v State Bar of

17   Florida, the 1991 case, has a quote that I think is worth

18   focusing on.  And it says few, if any, interest under the

19   constitution are more fundamental than the right to a fair

20   trial by impartial jurors and an outcome affected by

21   extrajudicial statements.

22         So in 1991, they weren't thinking of geotargeting,

23   but they talked about extrajudicial statements would violate

24   that fundamental right to a fair trial.  And so and that case

25   talked about First Amendment balances in limiting

 1   extrajudicial statements.

 2          And so I take to heart the Supreme Court's words

 3   there that it's not just a targeted campaign of some sort.

 4   But digital media can influence jurors.  And relevant to our

 5   work, we have a jury trial coming up now in October of 2023.

 6   And it matters to me that this be a fair impartial jury.  It

 7   matters to you.  It matters to everybody here.

 8          And so I think that the decision I made with respect

 9   to the subpoena of the Detroit News related to the Tiger Joyce

10   Op-Ed that was dramatically factually inaccurate on some

11   fundamental issues that I think could be very misleading for

12   potential registrants and claimants under the settlement.

13          I was deeply worried about that article going out and

14   causing confusion, hysteria, chaos in the settlement process.

15   That was something I was very worried about.

16          But that individual article coming from a media

17   outlet has a -- there's a different balance there than a

18   deposition of somebody who works for the -- is it for the

19   parent company of the VNA defendants in this case?

20          MR. OLSEN:  Well, he no longer works for that

21   company.

22          THE COURT:  Well, worked.  Past tense.  Thank you.

23          MR. OLSEN:  Worked.

24          And I would say two things in response, Your Honor.

25   The first substantively with respect to the scope of

1    discovery.  Now that we're past the geotargeting issue,

2    there's nothing secret about what VNA said during the trial or

3    since.  Plaintiffs have access to that website.  They have

4    access to all of the Tweets just like any member of the

5    public.

6              If there are any Tweets or postings that plaintiffs

7    think are improper, they should raise them with the Court.

8    But they haven't done that.

9              There's no evidence of any improper effort to

10   influence any jurors or potential jurors.  They simply claim

11   the right to broad discovery by using the words

12   "disinformation campaign" without identifying a single piece

13   of disinformation.  And are -- and I just don't think that's

14   proper.

15             There's been no showing that this discovery that

16   admittedly doesn't go to any claims or defenses in this case

17   should be ongoing for -- I agree with respect to the integrity

18   of the judicial process is important.  But there's no evidence

19   that that is even in question.

20             Now with respect to the two witnesses in particular,

21   VNA does not control these two witnesses.  Mr. Farcot doesn't

22   work for even the parent anymore.

23             THE COURT:  Okay.

24             MR. OLSEN:  And with respect to Mr. Obadia, I think

25   it's important to note he, again, does not work for VNA.  He

```
 1    is currently employed with VE.  But VNA cannot force him to
 2    appear in any event.
 3            It's important to note that Mr. Obadia was already
 4    deposed in this case.  Plaintiffs' counsel went through The
 5    Hague Convention to secure that deposition.
 6            THE COURT:  That wasn't Mr. Stern and it wasn't
 7    related to this issue.  If I recall, it was Mr. Leopold who
 8    brought it to the Court's attention on behalf of the class
 9    case.
10            MR. OLSEN:  Your Honor, when you say it wasn't
11    related to this issue, it was class plaintiffs.  And class
12    plaintiffs' justification for that deposition and I quote was,
13    "Mr. Obadia was a key witness because he played a central role
14    from Paris in coordinating Veolia's media campaign to spread
15    misinformation in order to shift blame publicly for its role
16    in causing the Flint Water Crisis."  Precisely --
17            THE COURT:  And when was that?  When did it take
18    place?
19            MR. OLSEN:  I don't remember the date of when it --
20            MR. STERN:  2018.
21            MR. OLSEN:  2018.  And so this is squarely the topic
22    that was part of his first --
23            THE COURT:  No, it's not.  2018, the trial hadn't
24    begun.
25            MR. OLSEN:  All right.  So again, substantively, no
```

```
 1    one is pointing to a single Tweet or a single thing on the

 2    website that's part of some disinformation campaign.

 3              THE COURT:  Well --

 4              MR. STERN:  Judge, may I clarify something?

 5              MR. OLSEN:  And just one more point.

 6              THE COURT:  Well, let me let Mr. Olsen finish.

 7              MR. OLSEN:  With respect to Mr. Obadia, again, we

 8    cannot force him.  He does not work at a party in this case.

 9    Just like Mr. Leopold did, if the Court decides at deposition

10    -- a second deposition of Mr. Obadia is appropriate,

11    plaintiffs would have to go through the same process that

12    class plaintiffs went through to conduct it through the

13    procedure set out in The Hague Convention.

14              THE COURT:  Okay.  Mr. Stern.

15              MR. STERN:  Just as an initial matter, we do not

16    agree or concede that there's no evidence of a geotargeted

17    campaign.

18              There's not a single person that we have deposed so

19    far who had anything to do on a day-to-day basis with

20    utilizing a Google advertisement campaign and how the

21    interaction between social media and driving people to a

22    website actually worked and who the people were that were

23    actually driven to that website.

24              Yes, Veolia produced a hundred documents, half of

25    which are unreadable.  We can't even see what they say.  But
```

1     we do not concede that there was not a geotargeted campaign.

2           Number two, Mr. Obadia is in constant contact with

3     VNA.  The witnesses have testified that on a monthly basis or

4     a semi-monthly basis, they meet with him and other members of

5     Veolia about the litigation, about the communications.

6           They were put in charge in France of all

7     communications during the trial.  And now it's very convenient

8     to say, well, we have nothing to do with them.  I mean,

9     they're their own entity.

10          So they were in trial every day with his red socks

11    sitting in the back while Your Honor asked about the Tweets

12    sending out Tweets.  It's not the Tweets themselves that are

13    the issue.

14          The issue is the utilization of social media to drive

15    potential jurors to a website that was being continuously

16    updated during the trial about facts during the trial that

17    were factually inaccurate.  We haven't even scratched the

18    surface of that.

19          And so it's a convenient thing for Mr. Olsen to say

20    we produced documents.  There's no geotargeting.  Your Honor

21    said back last month that the only interest she has in this is

22    whether certain zip codes were chosen.  And we've shown you

23    through documents that no zip codes were chosen.  So this is

24    done.  This is over.

25          It's not over.

```
 1              About Mr. Obadia.  I understand that they're saying
 2    Mr. Farcot no longer works for the company.  I don't believe
 3    that.  But I understand that's what they're saying and I
 4    understand that presently that is his status according to VNA.
 5              There is no dispute that Mr. Obadia still works for,
 6    in a very high role, Veolia.  There is no dispute that he
 7    communicates regularly with VNA about this litigation and
 8    about the trials.
 9              Yes, under the law, we need to go through The Hague
10    Convention.  But these folks are in touch with this man.  They
11    speak to him on a monthly basis.  You talk about gamesmanship,
12    about putting someone through the ringer.  I mean, just call
13    the guy --
14              THE COURT:  Let me ask Mr. Olsen.  Is somebody who
15    was in the position of Mr. Farcot or Farcot -- whatever it
16    is -- going to be at the next trial sitting in the back?
17              MR. OLSEN:  I don't have any idea, Your Honor.
18              THE COURT:  Okay.  Well, and will you sign a
19    certification that will be filed on the docket that Mr. Farcot
20    no longer has any affiliation with any VNA entities?
21              MR. OLSEN:  I don't know what affiliation.  I'll have
22    to talk to the company.  I know he no longer works for VE.
23    That's what I've been told.  I'm happy to -- I don't know if
24    he has some kind of consulting.  I don't know what his
25    arrangement is --
```

1          THE COURT:  Okay.  I'd like to know what his

2     arrangement is.

3          MR. OLSEN:  And one other note, I think Mr. Obadia

4     was deposed in 2021, not 2018.

5          THE COURT:  It may have been 2021 that it finally

6     took place, but that's still before the trial started.

7          MR. OLSEN:  And the other important thing to note,

8     Your Honor, is the one thing that Mr. Stern said that I agree

9     with, which is pursuant to the law, there are rules in place

10    as to how to obtain these depositions.

11          Class plaintiffs' counsel understood and followed

12    those rules with respect to Mr. Obadia.  And Mr. Stern says,

13    well, these Tweets that are so inaccurate and distorting, I

14    still haven't seen one that's inaccurate or distorting.  He

15    doesn't point to anything.  He just says the words.  And with

16    respect to --

17          THE COURT:  I have, Mr. Olsen.  I have read Tweets

18    from VeoliaFlintFacts.com or whatever it is that seem to me to

19    be distorting of what I heard in the testimony in the trial.

20          MR. OLSEN:  All right.

21          THE COURT:  I'll just tell you really frankly, it

22    disturbed me to see that.

23          MR. OLSEN:  And with respect to doing a second

24    deposition of Mr. Obadia, I think that it, put simply, we

25    agree what the law and the rules are.  Mr. Stern and I agree

1    what the law and the rules are to secure Mr. Obadia's second

2    deposition on almost on the identical topic.  And it's to go

3    through The Hague Convention.

4          THE COURT:  Okay.  So what I'll ask you to do is file

5    a certification on the docket with respect to Mr. Farcot and

6    his relationship with any Veolia entity and whether it exists

7    or not.  And if he no longer has a relationship, when did that

8    become effective?  When was he separated from the company?

9          I don't care about the reasons.  Just I'd like to

10   know when.

11         And if you had -- I often order entities to give the

12   last known address and so on to the opposing counsel so that

13   they can serve deposition notices.  So I don't need it to --

14   it can be redacted from the publicly filed notice.  But I do

15   want the forwarding address for Mr. Farcot to be provided to

16   Mr. Stern.

17         MR. STERN:  I have asked for that for two weeks.  And

18   every lawyer I've spoken to for Veolia refuses to provide that

19   information for me.  I understand the law.  I wish I didn't

20   have to go through it.  And if the shoe were on the other

21   foot, I would not make anybody jump through hoops of fire to

22   get a deposition that I think we're clearly entitled to.

23         Notwithstanding that -- understanding it, I asked for

24   the address.  And they essentially told me to go pound sand.

25         THE COURT:  Well, you could do that.  But you'll also

1    get the address through this avenue.

2              MR. STERN:   Thank you.

3              THE COURT:   And with respect to Mr. Obadia, you know,

4    Mr. Olsen, you can certainly require that Mr. Stern go through

5    The Hague Convention.   It looks like there's some time for

6    that process to take place.

7              But if you reconsider and are willing to communicate

8    with him, it seems that your team -- it was represented to me

9    that your team here in the United States at Veolia is in

10   regular communication with him.   He was in charge, it sounds

11   like, of the trial related digital media.

12             Do I have that wrong?   Am I correct about that?

13             MR. OLSEN:   I don't know that he was at the trial.

14   But he's certainly involved in Veolia's media efforts and PR

15   efforts.   That's true.

16             THE COURT:   Okay.

17             MR. OLSEN:   And I think -- I am not an expert in

18   French law, in The French Blocking Statute.   But I don't think

19   it's easy as we can just produce someone for deposition, which

20   is why it's always safer to follow the law and the rules and

21   go through The Hague Convention just as Mr. Leopold did for

22   his first deposition.

23             THE COURT:   Okay.   That's what we'll do.   But in the

24   meantime in your biweekly meetings or whatever it is that your

25   client has with Mr. Obadia, if he's in the United States or if

1    he's available and will make himself available, then I would

2    ask you to notify Mr. Stern.

3            I mean, the deposition will take place.  It's just a

4    matter of when.  And I do think that it's relevant to our case

5    for the reasons set forth by the Supreme Court in the Gentile

6    case.

7            It's not just geofencing or geotargeting that would

8    be a concern, but other extrajudicial statements and what the

9    purpose of them were.  So and how they were fashioned, what

10   was the goal, how was it being achieved, how are you studying

11   the return on the investment in this campaign, and that sort

12   of thing.

13           Mr. Olsen, Veolia North America provides water

14   consulting services and water management services.  Do I

15   understand -- throughout the United States.

16           MR. OLSEN:  They did.  I don't know how much they do

17   that in the United States today.  But they did and I think

18   they still do.

19           THE COURT:  Yeah.  And it's just curious to me this

20   digital media campaign to reach people such as myself.  I'm

21   not a municipal water manager.

22           What would be the point of trying to reach me with

23   this?

24           But there must have been a point.  And so we need to

25   understand what it was and whether it was designed to impact a

1     future jury panel or the already impaneled jury.

2             And I agree with you that we instructed the jurors

3     not to read any media, but there's still a lot to be

4     understood about how this worked.  Whether it was all that

5     easy for jurors to avoid these entries.

6             So I think, Mr. Stern, at this point you'd be

7     required to use The Hague Convention unless Mr. Olsen on

8     behalf of his client is willing to produce Mr. Obadia or

9     assist in producing Veolia -- VE's former employee Mr. Farcot.

10            MR. OLSEN:  I will ask or I'll try to get an answer

11    from Mr. Obadia if he's interested in appearing voluntarily.

12    But I suspect this is where we're going to be left, Your

13    Honor, which is Mr. Stern should go through the Hague.

14            THE COURT:  Okay.  Yes.

15            MR. STERN:  One last point I just want to note for

16    everybody is that as of a minute and a half ago, Mr. Farcot's

17    LinkedIn -- and again, LinkedIn is simply a social media tool.

18    But he's still employed, according to him, by VE, by Veolia.

19    And he's active on that site because he's continuously liking

20    posts from other Veolia employees since the time that it's

21    been represented he no longer works there and today.

22            So I understand they have no control over him.  I

23    understand they're saying he left.  I understand there's going

24    to be something filed.  But for anybody in the world who

25    wanted to find this person and wonder where he works and

```
 1    utilize LinkedIn for all of its purposes, as of today,
 2    according to him, he still works for Veolia.
 3              THE COURT:  Okay.  So Mr. Olsen, how much time do you
 4    need to file this certification?
 5              MR. OLSEN:  I can file it next week, Your Honor, if
 6    that's okay.
 7              THE COURT:  That would be great.  Let's have it by
 8    close of business on Wednesday of next week.
 9              MR. OLSEN:  Okay, Your Honor.
10              THE COURT:  So Wednesday, December 7.  Thank you.
11    Okay.
12              So Veolia submitted the topic, the status of
13    Bellwether II cases.  And I am pleased to report that we found
14    I think a May 2022 email suggesting some schedule for the
15    Bellwether II cases.  And that has not yet been entered but it
16    seems that some of the dates have come and gone.
17              So Mr. Olsen, what is your proposal here?
18              MR. OLSEN:  May 20, we submitted competing proposals
19    to the court and where I'm going to finish is suggesting we do
20    that again.  Just by way of background, as you know, this is
21    for adult plaintiffs alleging both personal injury and --
22                        (Technical difficulties)
23              THE COURT:  You're -- is it just me or can everyone
24    else hear Mr. Olsen?
25              MADAM COURT REPORTER:  No, I can't hear him.
```

November 30, 2022

```
 1                THE COURT:  Mr. Campbell, can you take over?
 2                MR. CAMPBELL:  I think so.  I hope -- I think what he
 3     was going to say is that we will, once again, submit revised
 4     proposals for the Bellwether II cases.  And try to schedule
 5     them.
 6                It seems, at least to me, that the target should be
 7     sometime after the anticipated end of Bellwether III, which is
 8     the next set of children cases.
 9                THE COURT:  Yeah.
10                MR. CAMPBELL:  But we'll get that to the Court.
11                THE COURT:  Okay.
12                MR. CAMPBELL:  And a lot of work was done when Your
13     Honor asked about the bellwether and the class schedules we
14     submitted, one for the Bellwether II as well.
15                THE COURT:  Good.  And I apologize for missing that.
16     The next time that you send us an email and you don't hear
17     from us within a week, just let us know.  Send another email.
18     Make a phone call.  Show up on a Zoom call and ask us about it
19     so that we don't lose track of anything.
20                MR. CAMPBELL:  Very good.
21                THE COURT:  Good.  So when should I expect to get
22     that proposal?  And I think I understand that the majority of
23     cases made belonged to Mr. Shkolnik and Mr. Napoli.  Do I have
24     that?
25                MR. CAMPBELL:  That's my understanding, Your Honor.
```

```
 1    I think it's -- it's not exclusively, but it's the vast
 2    majority.  So what I would suggest --
 3            THE COURT:  Are they on the call?  I don't see either
 4    of them.
 5            MR. CAMPBELL:  I don't see -- I'm only looking at
 6    partial screen.  So I don't see them.  But what I would
 7    suggest, Your Honor, is that we contact -- and we've been in
 8    contact with them about this.  Continue to get whatever the
 9    proposals are in the current form and get them to Your Honor
10    by, let's say, the end of next week.  Does that work?
11            THE COURT:  Sure.
12            MR. STERN:  Your Honor, I see Patrick Lanciotti on
13    the Zoom.  And he has like an emoji hand raised thing.  I
14    don't know how that works.  But he looks like he's here.
15            THE COURT:  Oh, there.  Mr. Lanciotti?
16            MR. LANCIOTTI:  Good afternoon, Your Honor.
17            THE COURT:  We can't see you but we just heard your
18    voice.
19            MR. LANCIOTTI:  Yes, I apologize.  I let Ms. Calhoun
20    know earlier I'm having some driver issues with my camera, so
21    I was unable to turn it on.  So I didn't want to be as a
22    panelist without my camera.
23            But I agree with what Mr. Campbell said.  We will
24    confer on the prior draft of the Bellwether II order and get
25    something to the court very shortly.
```

```
 1              THE COURT:  Okay.  Thank you.  And there was a
 2    request to postpone certain dates in the class trial.  And it
 3    was granted in part.  And I think we've already docketed the
 4    new schedule.
 5              We allowed a little extra time for summary judgment.
 6    But if we go any further, it will be too close to the date of
 7    the trial for me to do my end of that, making a decision and
 8    getting it written and issued.  So I hope that works for
 9    everybody.
10              And then the last issue here is VNA's dispute with
11    co-liaison counsel regarding certain data for plaintiffs'
12    expert, Dr. Specht.
13              MR. OLSEN:  Yes, Your Honor.  Can you hear me again?
14    I apologize.  I obviously got kicked out of the conference.
15              THE COURT:  Yes.
16              MR. OLSEN:  So on Dr. Specht, you know Dr. Specht
17    well.  In preparing for the BW1 retrial and then the
18    Bellwether III trial, we reviewed Dr. Specht's bone lead
19    measurements with our experts and realized that Dr. Specht had
20    failed to produce the algorithms and formulas he used to
21    generate the measurements.  His pXRF device does not simply
22    spit out a reading.  Instead, he developed algorithms and
23    formulas to take the raw data generated by the device and
24    filter out other factors and --
25              MADAM COURT REPORTER:  Excuse me, Mr. Olsen, can you
```

 1    slow down?

 2              THE COURT:  Yes.  Thank you.  He slowed way too far

 3    down and now he's frozen.

 4                        (Technical difficulties)

 5              THE COURT:  Mr. Campbell?

 6              MR. OLSEN:  -- stripped out of --

 7              THE COURT:  Oh, wait.  Mr. Olsen, you're freezing on

 8    and off.  So I'm just going to ask Mr. Campbell if you're up

 9    on this issue?

10              MR. CAMPBELL:  Your Honor, I am not up on the issue

11    to the extent that I can give you the chapter and verse that I

12    think Mr. Olsen was about to give you on some specifics of the

13    data.

14              The way that I would say it is this, there is certain

15    data that Dr. Specht collected and analyzed and used in his

16    publications and used as support or the basis on which he

17    developed his opinion.

18              THE COURT:  But Mr. Campbell, his opinions in his

19    academic journal articles or in our case?

20              MR. CAMPBELL:  I would say both, Your Honor.

21              THE COURT:  Okay.

22              MR. KENT:  The papers and then the papers used as the

23    basis from which the opinions are made.

24              THE COURT:  Right.

25              MR. CAMPBELL:  And we have identified, I think very

| | |
|---|---|
| 1 | precisely, datasets and analyses that have not been produced. |
| 2 | They should be available to Dr. Specht and that's what this |
| 3 | concerns. |
| 4 | To the extent that there is more to this, I have to |
| 5 | defer until Mr. Olsen returns because I did not study up on it |
| 6 | before. |
| 7 | THE COURT:  Okay.  I think he's back. |
| 8 | MR. OLSEN:  I'm sorry, Your Honor.  I keep getting |
| 9 | kicked out.  The issue is that he produced some data but the |
| 10 | algorithm -- |
| 11 | THE COURT:  And Mr. Olsen, let me do this.  Right |
| 12 | when you froze earlier, we were asking you to slow down. |
| 13 | MR. OLSEN:  Oh, okay.  I'm being quick, Your Honor, |
| 14 | just because I'm worried I'm going to get kicked out.  But I |
| 15 | will be slow.  Apparently the internet connection where I am |
| 16 | in Michigan is spotty. |
| 17 | But Dr. Specht used formulas and algorithms to |
| 18 | generate the measurements he's opining out.  And those |
| 19 | underlying formulas were stripped out of the data -- the |
| 20 | spreadsheets that we received.  And obviously Dr. Specht is |
| 21 | relying on those calculations in forming his opinions. |
| 22 | And we would like the ability -- because experts must |
| 23 | disclose the facts or data considered in forming those |
| 24 | opinions, we'd like the ability to essentially check his work |
| 25 | and get access to the formulation -- the underlying formulas |

1    and protocols that he used to do his calculations.

2              MR. STERN:  May I respond, Judge?

3              THE COURT:  Yes.

4              MR. STERN:  So as an initial matter, the request that

5    I received about -- and I am shocked that the lawyers for

6    Veolia are just not mentioning this.  The request that I

7    received for Dr. Specht's data related to Bellwether I kids.

8              This came on November 8, 2022, saying that in light

9    of the deposition that took place in 2020 related to the

10   Bellwether I kids, Veolia wanted certain things.  Three sets

11   of calibrations.  They want an Excel document to be produced

12   in original format with data and formulas.  They wanted

13   another document to be produced in original format with data

14   and formulas.  And then they want the written MATLAB language,

15   the code that he used in his creation of utilizing this

16   device.

17             As an initial matter, we haven't served anything

18   related to the Bellwether III cases.  And as everybody knows,

19   the Bellwether I case has been taken off of the Court's

20   calendar.

21             So to be spending time arguing over reports and

22   depositions that took place in 2020 related to a trial that

23   already happened and is not happening again, that's an

24   important fact to raise in bringing to the Court's attention

25   an issue like this.

1          With regard to the actual specific substance of what
2    Veolia is asking for, according to Dr. Specht, all of the
3    calibration documents that he has, they have.  He produced
4    them.  He says there is nothing that has not been produced.

5          In terms of the Shanghai children data, which Your
6    Honor might be familiar with in terms of his testimony, they
7    have all of the values and all of the other information
8    associated with that data are published and available in the
9    paper that he wrote about that study.  So there is nothing
10   missing there.

11         So really the only issue, even if they were entitled
12   to all of the stuff, our expert says they have it.  He has
13   nothing else.  And that's for Bellwether I, not Bellwether
14   III.

15         In terms of the code, I think Your Honor has already
16   said previously when it came to other litigants who were
17   trying to get to the heart of how he wrote code and what he
18   did that he didn't have to produce that, and so what he says
19   is this would essentially be asking him to give them a Ph.D.
20   in medical physics, that that's why they have experts to talk
21   about why he's doing wrong the things he's doing based on what
22   he has produced and based on his testimony.

23         So A, I think this is premature because they haven't
24   been provided anything for Bellwether III which is now what's
25   next in terms of a trial.  So they need to wait first to see

1    what he actually produces with his reports that are due in the

2    coming weeks.  And two --

3                THE COURT:  When are those reports due?

4                MR. STERN:  Well, they were originally -- we don't

5    know.  They were originally due I believe Friday.  And then

6    the parties proposed some small changes to the schedule and

7    provided that by email to Ms. Calhoun yesterday.

8                And so depending on how the Court, you know, decides

9    whether to permit this recalibration, no pun intended, of the

10   deadlines, they would then be due I think the first week of

11   January rather than the first week of December with no

12   alterations to the trial or any of the other more substantive

13   deadlines down the road.

14               THE COURT:  And not to get totally sidetracked --

15   we'll get back to Dr. Specht.

16               But Mr. Olsen, do you have any objection to the

17   proposed schedule that Mr. Stern and Ms. Daly submitted?

18               MR. OLSEN:  No objection to the proposed schedule,

19   Your Honor.

20               And Mr. Stern is right, this came up in the context

21   of the Bellwether I retrial.  The reason we're raising it is

22   unless they're not using Dr. Specht as a witness in Bellwether

23   III, we're firmly going to be at issue on this same topic.

24               And just substantively, if we want to have this same

25   fight in a month when we get the same information, I mean

1   plaintiffs have said they're not producing what we're looking

2   for.  Now I heard today that it doesn't exist.

3           But our experts tell us that they have reviewed all

4   of the data information that Dr. Specht provided and that

5   their underlying algorithms and formulas used to get those

6   conclusions that have not been provided.  And our expert

7   believes that their issues with how Dr. Specht did those

8   calculations.

9           But you cannot evaluate those calculations fully

10  without getting the underlying algorithms and formula and code

11  in terms of how they were done, which Dr. Specht obviously is

12  relying on to make his opinions.

13          THE COURT:  Why don't we do this, which is I'll adopt

14  the schedule that you all have submitted.  And see what is

15  produced.  And then I think I would benefit from a two- or

16  three-page summary of the -- exactly what you're looking for,

17  when you asked for it, what you got.

18          I don't want to see the documents myself.  I don't

19  want to read the code myself.  But I want a summary of what

20  your position is and what you say you need and you don't have.

21  And then Mr. Stern can respond.

22          MR. OLSEN:  No problem, Your Honor.  When we get the

23  report -- I assume we're going to get a report from

24  Dr. Specht -- and if there's anything new to produce, we'll

25  evaluate it and then we will make the submission you just

1   suggested, Judge Levy.

2        THE COURT:  Okay.  And I'm interested in whether

3   December 21 I can set aside for another status conference.

4   And we either will or won't have topics.  But at least the

5   time is reserved.

6        MR. STERN:  We'll always be available from plaintiffs

7   perspective if Your Honor schedules a conference.

8        MR. OLSEN:  That works for me, Your Honor.

9        THE COURT:  Good.  Okay.  Anything else at this time?

10       MR. ERICKSON:  No, Your Honor.

11       THE COURT:  Great.  Take care everyone.  And I'll see

12   you on the 21st.

13                    (Proceedings Concluded)

14              -         -         -

15

16            CERTIFICATE OF OFFICIAL COURT REPORTER

17       I, Jeseca C. Eddington, Federal Official Court

18   Reporter, do hereby certify the foregoing 34 pages are a true

19   and correct transcript of the above entitled proceedings.

20   /s/ JESECA C. EDDINGTON_____      12/2/2022_
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date

21

22

23

24

25