December 21, 2022                                                    1

```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MICHIGAN
 2                           SOUTHERN DIVISION

 3

 4
              In Re   FLINT WATER CASES      Case No. 16-10444
 5

 6

 7    _____/

 8                        STATUS CONFERENCE

 9
              BEFORE THE HONORABLE JUDITH E. LEVY
10               UNITED STATES DISTRICT JUDGE

11                       DECEMBER 21, 2022

12
                      APPEARANCES IN ALPHABETICAL ORDER
13
                      Frederick A. Berg
14                    Butzel Long
                      150 West Jefferson, Suite 100
15                    Detroit, MI 48226

16                    James M. Campbell
                      Campbell Conroy & O'Neil, P.C.
17                    20 City Square, Suite 300
                      Boston, MA 02129
18
                      Jordan W. Connors
19                    Susman Godfrey L.L.P.
                      1201 Third Avenue, Suite 3800
20                    Seattle, WA 98101

21
                      (Appearances continued on next page)
22

23                    Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                         Federal Official Court Reporter
24                       United States District Court
                         200 East Liberty Street -
25                        Ann Arbor, Michigan 48104
```

```
 1              Alaina N. Devine
                Campbell Conroy & O'Neil, P.C.
 2              1 Constitution Wharf, Suite 310
                Boston, MA 02129
 3
                Kristin Michele Dupre
 4              Campbell Conroy and O'Neil PC
                1 Constitution Wharf, Suite 310
 5              Boston, MA 02129

 6              Daniel Charles Eagles
                DOJ-Civ
 7              Environmental Tort Litigation Section
                175 N Street NE
 8              Washington, DC 20002

 9              Leslie M. Kroeger
                Cohen Milstein Sellers & Toll PLLC
10              11780 US Highway One
                Suite 500
11              Palm Beach Gardens, FL 33408

12              Patrick Lanciotti
                Napoli Shkolnik PLLC
13              360 Lexington Avenue, 11th Floor
                New York, NY 10017
14
                Theodore J. Leopold
15              Cohen Milstein Sellers & Toll PLLC
                11780 U.S. Highway One, Suite N500
16              Palm Beach Gardens, FL 33408

17              Wayne Brian Mason
                Faegre Drinker Biddle & Reath LLP
18              1717 Main St.
                Suite 5400
19              Dallas, TX 75201

20              Todd R. Mendel
                Barris, Sott,
21              333 W. Fort Street
                Suite 1200
22              Detroit, MI 48226

23              Michael A. Olsen
                Mayer Brown LLP
24              71 S. Wacker Dr.
                Chicago, IL 60606
25
```

December 21, 2022                                        3

```
 1                         Michael L. Pitt
                           Pitt, McGehee,
 2                         117 W. Fourth Street, Suite 200
                           Royal Oak, MI 48067
 3
                           Eric Rey
 4                         US Department of Justice
                           Civil Division
 5                         175 N Street, NE
                           Washington, DC 20002
 6
                           Susan Elizabeth Smith
 7                         Beveridge & Diamond, P.C.
                           1350 I Street N.W.
 8                         1900 N Street N.W., Suite 100
                           Washington, DC 20036
 9
                           Corey M. Stern
10                         Levy Konigsberg, LLP
                           605 Third Avenue, Suite 33rd Floor
11                         New York, NY 10158

12                         Mark R. Ter Molen
                           Mayer Brown LLP
13                         Illinois
                           71 S. Wacker Drive
14                         Chicago, IL 60606

15     Also Present:       Deborah E. Greenspan
                           Blank Rome LLP
16                         1825 Eye Street, N.W.
                           Washington, DC 20006
17

18

19

20

21

22

23            To Obtain a Certified Transcript Contact:
            Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24               Federal Official Court Reporter
                 United States District Court
25        200 East Liberty Street - Ann Arbor, Michigan 48104
```

December 21, 2022

1                          **I N D E X**

2     MISCELLANY

3              Proceedings.................................5
               Certificate................................41
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Calling the Flint Water Cases. |
| 3 | THE COURT:  Okay.  Well, I trust that Jeseca has |
| 4 | appearances, so we don't need to go through that drill. |
| 5 | And before we start with the regular agenda, I just |
| 6 | want to mention two things.  I got a proposed stipulated order |
| 7 | between the EPA and plaintiffs regarding I think in the Meeks |
| 8 | case regarding a motion to dismiss and a schedule that is |
| 9 | acceptable to me.  So if we haven't done it already today, we |
| 10 | will add a text order granting or agreeing with that proposed |
| 11 | stipulated order. |
| 12 | And the other thing that I want to just mention is |
| 13 | that I believe yesterday morning we were -- or midday -- |
| 14 | finalized a decision on a motion to seal and motion for |
| 15 | approval of infant or minor settlement in the Bellwether case |
| 16 | that related only to the LAN defendants. |
| 17 | That got finalized yesterday and the opinions are now |
| 18 | on the docket indicating that those settlements are fair and |
| 19 | in the best interest of those minor plaintiffs. |
| 20 | And the reason I bring that up now is that that will |
| 21 | impact the -- when the retrial for Bellwether I takes place. |
| 22 | And I think that had not been clear in the big picture, so I |
| 23 | just want to mention that. |
| 24 | Our next trial now will be the class trial that is |
| 25 | set to begin in October of 2023, not Bellwether I.  Because |

```
1    without LAN as a defendant, it is less of a Bellwether in the
2    sense of that word as a term of art.
3            So why don't we begin with a report from Debbie
4    Greenspan.
5            MS. GREENSPAN:  Thank you, Your Honor.
6            So this is a report on the status of the claims in
7    the claims process under the settlement agreement that we had,
8    the partial settlement agreement.  I've given a couple of
9    reports about that in the past just to kind of go over what I
10   said previously.
11           We have the claims deadline.  The deadline for
12   submission of claims was June 30, as everybody knows.  But as
13   I have previously reported, there were millions of documents
14   that were submitted that last week before the deadline.  And I
15   think I previously discussed on an earlier status conference
16   the fact that the -- in light of all of those documents, there
17   was a period of time that was required in order to put the
18   documents into a reviewable format and to get them all
19   electronically uploaded into the claims system.
20           So that has consumed a period of time that we
21   originally did not anticipate when thinking through the
22   timeline for the settlement process.
23           So since that had been completed, there has been an
24   ongoing process of reviewing claims and considering issues
25   that were raised by claims under review.  And I believe that
```

December 21, 2022

1    everybody recognizes at this point in time that it has taken

2    longer than we had initially anticipated to get through the

3    body of claims that we have.

4         So to date, nobody has received a notice yet.  And I

5    want to be clear about that because I have heard questions

6    from people asking whether the fact that they have not

7    received a notice means something.  Does it mean that their

8    claim is denied, for example?  That is not the case.  Nobody

9    has received a notice yet of any sort.  And people should not

10   be concerned about the fact that they haven't received

11   anything in writing from the claims administrator.

12        We have had -- we, meaning myself and parts of my

13   team have had conversations and discussions with the claims

14   administrator about the process and about ways in which to

15   improve the process and speed things up.  And I believe that

16   the administrator will be sending or is sending a letter out

17   to all claimants that they should be receiving in the next few

18   days.

19        Claimants will receive a letter either directly from

20   the administrator or from their counsel explaining that, you

21   know, we're recognizing that there's been delay and

22   understanding that people are concerned about that.  But that

23   there is a process underway right now to add resources and

24   reinforcements to the whole claims review procedure so that

25   things can move along more quickly.

December 21, 2022

```
 1              Having said that, I still think people should be
 2   prepared for it to take a few more months before all of the
 3   notices are distributed.  I can't give you a date right now,
 4   Your Honor.  But there is work underway to make sure that we
 5   get things expedited so that people can receive those as
 6   quickly as possible.
 7              THE COURT:  Deborah?
 8              MS. GREENSPAN:  Yes.
 9              THE COURT:  In any event, no money can be distributed
10   until the Sixth Circuit has reached a decision on the appeal
11   pending on the final approval of the partial settlement.  And
12   there are two different appeals at this time.
13              So I know that it's frustrating for everyone that it
14   takes time.  But I think it's worth remembering that under any
15   circumstances we have to wait or I would assume we have to
16   wait for that final approval.
17              MS. GREENSPAN:  So I think, Your Honor, that's an
18   important point.  I think it's also important to note because
19   I've heard questions and rumors to the contrary.
20              There's been no money paid out of this for the
21   attorneys, for example, at all, or for any claimant.  So there
22   is not yet any distribution of the settlement fund.  It is
23   still being held in the QSF account.
24              THE COURT:  And QSF is qualified --
25              MS. GREENSPAN:  Qualified settlement fund account.
```

December 21, 2022

```
1    So it's still being held in an account.  And so money is safe.
2    It's not going anywhere.  But nobody's been paid yet.  So
3    everybody should be reassured that they have not missed
4    anything.
5          That is really all I wanted to report on today.  It's
6    just that we were engaged in working to address the claims
7    process and to reassure people that if they've not heard
8    anything, it is not because there was something wrong.  It's
9    because we have not yet had the notices sent out.  Thank you.
10         THE COURT:  Okay.  Does anybody have any questions
11   for Deborah?  Okay.  Good.
12         Well, the next item is co-liaison counsels' request
13   to address VNA's filing, which is ECF number 2297 regarding
14   Pierre Farcot's location.
15         Would that be you, Mr. Stern?
16         MR. STERN:  Sorry.  Yes, Your Honor.
17         THE COURT:  Okay.  And I have that in front of me
18   where I had required VNA to identify whether this individual
19   still works for them, the date of his separation, and his last
20   known address.
21         VNA confirmed that he does not have any type of
22   current relationship, employment, consulting or otherwise with
23   VE or any other Veolia entity.  They provided his date of
24   separation.  And then they said that the GDPR would prohibit
25   them from providing his address.
```

1    I just happened to go on the internet a moment ago

2 just on, you know, Google for the GDPR.  And there, of course,

3 as I was thinking, there is an exception to when data can be

4 provided for a country subject to this, which is the UK or EU,

5 I guess.  And it is when there's a court order.

6    It's section -- Article 6 Section 1(c).  Processing

7 shall be lawful only if and to the extent that at least one of

8 the following applies and 1(c) reads processing is necessary

9 for compliance with the legal obligation to which the

10 controller is subject.

11    Now, of course, VNA's absolutely right.  There is not

12 currently a legal obligation.  And under the comments, there's

13 an example of what such a legal obligation might be.  And it

14 states a court order that may require you to process personal

15 data for a particular purpose qualifies as a legal obligation.

16    So go ahead, Mr. Stern.  I just wanted you to know

17 the research that I've done on this issue when it came in

18 before you begin your portion.

19    MR. STERN:  So Your Honor, thank you.

20    First and foremost, we looked at the same rule.  We

21 looked at the same exception.  And actually we're of the

22 belief that Your Honor did, in fact, order VNA to provide that

23 information.

24    We were also extremely concerned with the words

25 "inter alia".  There's a comment that we will not provide this

1    information based on what Your Honor just cited.  But there's

2    also the inter alia words which makes it appear like there's

3    other reasons as well that none of us have been informed

4    about.

5         And so before taking action in terms of filing a

6    motion with the court or seeking relief from the court, I was

7    hoping to get a better understanding from VNA about what the

8    universe of reasons is that they won't provide this

9    information.

10        Because I'll go file a motion pursuant to the statute

11   or the rule that VNA cited that Your Honor just referenced.

12   And the response in 20 days from my motion will be, well, it's

13   not just that.  As you notice -- as you see in the notice that

14   we filed with the Court, we said that for one of the reasons

15   was that.  But there are others.  And here are the reasons.

16        And this feels very much from our perspective like a

17   little bit of -- it's just no one's trying to help -- no one

18   from the VNA side feels like they're trying to be helpful when

19   it comes to getting this information as evident by filings

20   they've been making where they say that the information --

21   they maintain still the information isn't relevant even though

22   Your Honor, I believe, has stated now that it is relevant.

23        They're filing motions for protective orders citing

24   relevancy issues.  And their interpretation of testimony that

25   they've elicited from depositions.  Like at every stage of

1    this process in trying to make a determination about what's

2    happening during trial.  What's happening before trial and

3    what's happening during trial in terms of the potential to

4    reach jurors?

5            I would expect that that is an issue that is of as

6    much import to everyone at trial as it is to anybody else at

7    trial.  I'm not banging on the drum for the sake of having won

8    this argument.  But VNA filed a motion for sanctions for the

9    very -- you know, because of the integrity of the process.

10           And here we're doing without even accusing anybody of

11   anything -- I didn't write the article for the Detroit News.

12   I'm just trying to discover information to make sure the next

13   time my clients sit in front of Your Honor in front of a jury

14   they have a fair shot at it.

15           We're being stonewalled literally at every phase

16   other than we'll produce a low level guy who has the password

17   to a Google AdWords account that was set up in 2016.

18           THE COURT:  Well, let me find out what the inter alia

19   is.  Whoever is pronouncing this properly.  But it means among

20   other things.  So who's going to -- is that Mr. Olsen?

21           MR. OLSEN:  It is, Your Honor.  I'm happy to address

22   this.  I'm a little surprised by all of Mr. Stern's posturing.

23   Because if he was confused, he could have called me or anybody

24   on our team and he didn't.  But I'll answer the question.

25           THE COURT:  Okay.

1          MR. OLSEN:  So Mr. Farcot has never worked for VNA.

2     And VNA does not have any information about his personal

3     contact information, including his last known address.  VNA

4     asked VE --

5          THE COURT:  And so it doesn't have anything to do

6     with the GDPR.  It only has to do with you don't know this

7     man.

8          MR. OLSEN:  No.

9          THE COURT:  You've never heard of him.

10         MR. OLSEN:  Your Honor, I'll get to the GDPR.

11         THE COURT:  Okay.

12         MR. OLSEN:  VNA asked VE after the last status

13    conference for the information that Your Honor requested so

14    that VNA could provide the information Your Honor requested,

15    if VE could provide it to VNA.  We asked that question.  And

16    in response, we got the information that Your Honor noted in

17    terms of the separation date and there's no longer

18    affiliation.

19         And what VE told VNA is that because he's a former

20    employee and this is personal information, that that

21    information did fall within the EU's General Data Protection

22    Registration, GDPR.  They were not sure or convinced that the

23    exception would apply because VE is not a party here.

24         And the inter alia refers to there's also a French

25    criminal law, Article 22616 that they also believe prevents

```
 1   providing a former employee's personal information.

 2          So between the GDPR and 22616, VE was concerned that

 3   if they provided that former employee's personal information,

 4   they could subject themselves to either civil or criminal

 5   sanctions in France.  And so VE declined to provide VNA with

 6   that information.  And so that's why VNA and I have not

 7   provided it to the Court as you requested.

 8          So it's both the French criminal statute and the GDPR

 9   and the fact that VE is not a party here.  They were concerned

10   that, one, the exception, if the Court ordered it, may not

11   apply pursuant to the GDPR.  And additionally, that French

12   criminal law also prohibits them from providing the

13   information.  That's Article 22616.

14          MR. STERN:  Well, Judge --

15          THE COURT:  Just a minute.  I'm trying to find that

16   law and see if it's in English.  I'm sure it is somewhere.

17   But go ahead, Mr. Stern.

18          MR. STERN:  To the extent the argument is being made

19   that VE is not a party, these cases have been consolidated

20   with the Genesee County cases for quite sometime.  At least

21   for purposes of discovery.  Many of us have litigation and

22   lawsuits pending against VE.

23          Some of us entered into tolling agreements with VE

24   early on in the litigation in an effort to try and streamline

25   the litigation without having to deal with jurisdictional
```

1    issues associated with VE being a named defendant.

2          We recently informed VNA that we were withdrawing our

3    agreement within -- we had to provide 30 days notice of a

4    tolling agreement that we had.  And we sent communications to

5    Mr. Ter Molen who had previously negotiated the tolling

6    agreement that we intended now to pursue VE.

7          VE is a named defendant in many of these lawsuits.

8    But there are tolling agreements that have kept them from

9    actively participating, at least actively participating in a

10   way where we could all see them.

11         So I don't believe that that argument flies that

12   because they're not a party to the litigation they're not

13   subject to anything within the litigation.

14         But to the extent it does, close to 30 days ago we

15   informed Veolia of our intent to withdraw our agreement for

16   tolling and that we were going to seek the Court's permission

17   to either amend the master complaint to add VE, or just file a

18   separate complaint on behalf of all of our clients against VE

19   for whom the tolling statute actually -- the tolling agreement

20   actually applied.

21         THE COURT:  Okay.  Mr. Olsen, I have gone back to the

22   transcript.  And it was, in essence, an oral order.  I can

23   read the transcript to you but I think you have it or you can

24   get it.

25         MR. OLSEN:  I agree, Your Honor.  I agree.

1          THE COURT:  Okay.  So we agree that there's an order

2     that would get around the GDPR.  And you're saying you still

3     think Section 2216 of French criminal law would subject VE to

4     prosecution.

5          MR. OLSEN:  On the first point, my understanding was

6     you're ordering VNA to provide that information and VNA just

7     doesn't have it.  We've done what we can.  And yes, what VE

8     told VNA when we asked for the last known address was they

9     thought -- they weren't sure that that section of the GDPR

10    applied.

11         And additionally the 22616, potentially imposed

12    criminal sanctions are providing that kind of information.

13         THE COURT:  Okay.  Well, I -- you know, I'm no expert

14    in the GDPR.  I've had nothing that's come up under it until

15    this.  But I can tell you that the plain language of it a

16    court order may require you to process personal data for a

17    particular purpose.  And this also qualifies as a legal

18    obligation.  I can't think of anything more clear than that.

19    So and the order was to VNA, of course.

20         Tell me your argument that in response to what Mr.

21    Stern just said, that VE is a defendant in some of the Flint

22    water litigation that has been consolidated and -- go ahead.

23         MR. OLSEN:  My understanding with respect to Mr.

24    Stern's discovery and what this dispute was all about, and Mr.

25    Stern did have a tolling agreement with respect to not

1    pursuing VE because VE would have very legitimate personal

2    jurisdiction arguments as to why they shouldn't be in a

3    Michigan court with respect to those claims and to avoid that

4    flight sometimes ago before I was involved in the litigation.

5         So I can't give you chapter on verse.  The parties

6    agreed to a sterling agreement.  Mr. Stern's right.  He has

7    notified us that he may pursue direct claims against VE either

8    amending the complaint or bringing a lawsuit.  I assume we

9    would make those same jurisdictional arguments and potentially

10   others to dismiss those claims against VE.

11        But again, at least -- and I'm not an expert on

12   French criminal law either, Your Honor.  I'm just telling you

13   that I understood you to order VNA to provide that

14   information.  We tried to comply with that order by asking VE

15   for that information.

16        And what VE told us was that both GDPR, and they

17   weren't clear that exception applied given the status of the

18   tolling agreements and VE not being sued or named pursuant to

19   this discovery.  And Mr. Stern's clients.  And again that

20   French criminal statute.

21        And I admit I'm not an expert with respect to the

22   French criminal code, but that is what VE informed VNA that

23   they were concerned that that French criminal code could

24   impose them to criminal sanctions if they provided personal

25   information of a former employee.

1      THE COURT:  Okay.  So and I don't know that we

2  clearly discussed that this could be pursuant to a protective

3  order that it's for attorney eyes only.

4      Do you have any sense that VE would have a change in

5  its position if there was a very strict protective

6  confidentiality order?

7      MR. OLSEN:  So we -- VNA sent them a letter and they

8  got the response that I've informed you, Your Honor, today and

9  in our disclosure.  I don't know that they would have any

10  comfort with respect to getting around the criminal -- the

11  potential criminal imposition of sanctions.

12      But we're certainly -- VNA is certainly happy to ask

13  that question and get a response from VE with respect to

14  whether that changes their view.

15      THE COURT:  Okay.  Well, I'm going to be looking up

16  that criminal statute, see if I can find a copy of it in

17  English on Westlaw or something.

18      But I would ask that you do that and let them know

19  that I consider -- the fact that VE is part of the litigation

20  writ large, I think it's fair to enter an order that would

21  require them to provide this under a protective order.

22      I don't want Mr. Farcot's personal data out in the

23  universe anymore that are anybody else does.  And I think it's

24  purpose, as I understand it, is to serve notice of a

25  deposition, a subpoena for a deposition under The Hague

1    Convention.

2            So far all I can do is see it in French.  So I did

3    spend a little time in France when I was in high school, but I

4    can't read this.

5            MR. STERN:  Would it be possible --

6            MR. OLSEN:  So Your Honor I will take that to -- VNA

7    will let VE know what Your Honor has said at this conference.

8    And we will inform Mr. Stern quickly of -- as soon as we hear

9    from VE as to whether that changes their view as to GDPR and

10   the French criminal codes issue.

11           And in the meantime, if it does not, I assume Your

12   Honor will form a view with respect to that French criminal

13   code and we'll have another discussion about it.

14           THE COURT:  And I trust, Mr. Ols en, that you've read

15   the French criminal code.  Did you read it in English or in

16   French?

17           MR. OLSEN:  So I did not have it in English and I was

18   just informed in response from VE as to what their position

19   was.  And so I have not researched the French criminal code

20   question.  I can do that as well.

21           THE COURT:  Okay.  Well, I'll be trying to -- I mean,

22   it may be Google translate if I can't find it in English.  And

23   I don't think that's a reliable -- I'd rather not use that.

24   But if you have it in English, I'd like you to email it to Mr.

25   Stern and to my clerk, Leslie Calhoun.

```
 1            MR. STERN:  Your Honor --
 2            MR. OLSEN:  I don't have it.  But I can try to get
 3   it.
 4            THE COURT:  I mean, you're obviously going to get it.
 5            MR. OLSEN:  Right.
 6            THE COURT:  I mean, you have some due diligence here.
 7   Somebody says something says something in French and I'd think
 8   you want to know does it really say that, so.
 9            MR. OLSEN:  Your Honor, I agree.  I was just saying
10   when I get it I will do exactly what you said.
11            MR. STERN:  Can we please just find out again what
12   the exact code is since it was not in the notice?
13            THE COURT:  It's French criminal code section 22616.
14            MR. STERN:  Okay.  Thank you.
15            THE COURT:  And it exists in French.  And I'm sure
16   it's there in English as well.
17            MR. STERN:  Okay.
18            THE COURT:  Somewhere.  Okay.
19            So what we'll do is just hold this issue in abeyance
20   a little bit.  Mr. Olsen will communicate with his client, see
21   whether their position changes on the GDPR knowing that there
22   is a court order that they are in a global sense a part of
23   this litigation.  And that we're looking into -- and that
24   there would be a strict protective order in place regarding
25   any personal data about this individual.
```

 1          So the clock is ticking on holidays and so on and

 2     time off and I'm sensitive to that.  So I just ask that you do

 3     it as you're able to, but soon.

 4          MR. OLSEN:  No problem, Your Honor.

 5          THE COURT:  And then I'm sure we'll hear if there's a

 6     problem.  Okay.  Okay.

 7          So now we're on to Mr. Ferrara who has also left --

 8     discontinued his relationship with VNA.  And what is your

 9     request here, Mr. Stern?

10          MR. STERN:  Well, Your Honor, I placed this on the

11     agenda prior to Veolia filing a motion for protective order,

12     which I think was filed about two hours ago with regard to

13     Mr. Ferrara.

14          We met and conferred on this I think it was over two

15     weeks ago.  And I guess today was the day that the decision

16     was made to file the motion.  So I don't really know what I

17     could say at this point other than in our review of the motion

18     we -- we'll respond to the motion in kind and we'll respond to

19     the motion quickly.

20          And I have a feeling that this is just what we're

21     going to have to do at every phase of discovery.

22          We've served -- we filed a motion to compel certain

23     discovery responses.  We just received more discovery

24     responses that didn't produce anything.  So we'll be filing a

25     second motion to compel.

```
1              And we just filed -- we just served a third set of

2     discovery which will likely end up the same place that the

3     first two do.  They're for production of documents that VNA

4     just doesn't believe are relevant and just won't produce.

5              So I'm just going to keep going through motion

6     practice at this point.

7              THE COURT:  You know, that's certainly an option.

8     But I have a lot of concern about that being just unnecessary

9     in the sense of having everything fully briefed.

10             And we did have a discovery dispute protocol in place

11    where items were put on regular agenda slots or we had regular

12    hearings for discovery disputes.  And I think we really need

13    to return to that because no one has enough time in the day to

14    read all of the motions that would be filed, all of the

15    briefs.

16             And we need to get through this material in a fair

17    and reasonably fast way so that the cases can go forward.

18             So what -- I will be unavailable between December 29

19    and January 18.  But so the next conference that we have set

20    is for February 2 at 1:00 PM.  That will sort of be the

21    January conference.

22             And what I would ask is that these issues -- we

23    return to discovery dispute items being identified.  Two-page

24    summaries of what the issues are.  Those can all be filed on

25    the docket.
```

```
 1              I think VNA had some concern that we were resolving a
 2    number of things sort of in these on-the-record conferences
 3    but without the letters and so on being filed.  And I think
 4    that's a fair thing to have as a concern.  So we will -- we'll
 5    put those on the docket.
 6              But in order -- in lieu of a 25-page brief, a
 7    two-page single spaced summary of the issues will get me
 8    started.  If more is needed, I'll certainly authorize further
 9    briefing, so.
10              MR. STERN:  So we filed a motion to compel discovery
11    responses to requests for admissions and requests for
12    production of documents.  That has not yet been responded to
13    by VNA, but it's coming up probably within about a week to 10
14    days.
15              Their response, they just today filed the motion or
16    late last night filed the motion for protective order on
17    Mr. Ferrara.  Our response is due.
18              Does Your Honor want both parties to file their
19    respective responses to those two motions and --
20              THE COURT:  Yes.  I think -- thank you for bringing
21    that up.  Now that they're already on the docket, the opening
22    brief is there in all of its length.  So I think it's only
23    fair that in both instances there be responses that are of
24    equal -- an opportunity for the same number of pages.
25              MR. STERN:  Okay.
```

```
 1              THE COURT:  Okay.  So now we'll move on to the number
 2    of Bellwether II plaintiffs that will be subject to discovery.
 3              And I have here -- thank you, very much, for coming
 4    up with as much agreement as you did on the proposed
 5    Bellwether II schedule.  And the only issue that's outstanding
 6    is that VNA is seeking to have three times the number of
 7    potential plaintiffs involved with discovery and inspections
 8    and all of the things that go along with that.  And as
 9    plaintiffs.
10              So it starts out with plaintiffs and defendants
11    picking a certain number for the second pool of Bellwether
12    plaintiffs.  VNA seeks 30 and plaintiffs seek 10.
13              I have an explanation written here which is very
14    helpful and very clear.  And so you can certainly say what's
15    here in writing, but I think you've got it here.
16              MR. LANCIOTTI:  Your Honor?
17              THE COURT:  Yes.
18              MR. LANCIOTTI:  This is Patrick Lanciotti from Napoli
19    Shkolnik.
20              THE COURT:  Sure.
21              MR. LANCIOTTI:  Just to clarify the numbers I think
22    on the proposals --
23              THE COURT:  Yeah.
24              MR. LANCIOTTI:  -- it's 30 per side.  So it would --
25              THE COURT:  Right.  For a total of --
```

```
 1            MR. LANCIOTTI:  Yeah.  Okay.

 2            THE COURT:  Yeah.  For a total of 60.

 3            MR. LANCIOTTI:  And then 20.

 4            THE COURT:  Or 10 per side for a total of 20.

 5            MR. LANCIOTTI:  Okay.

 6            MR. OLSEN:  Your Honor, it's Mike Olsen.  You're

 7   right.  And then the other issue is so those plaintiffs would

 8   be subject to written discovery.  We say 60.  They say 20.

 9   And then reducing the pool further will be subject to further

10   discovery.  We say 20.  Plaintiffs' position is 8.

11            And just to very briefly --

12            THE COURT:  Sure.

13            MR. OLSEN:  -- provide why we think those numbers,

14   the 60 and 20, are necessary is when we're talking about the

15   Bellwether II plaintiffs, you're talking about a group who

16   allege personal injuries of more than a dozen, maybe close to

17   20 different types of personal injuries and various property

18   damage claims, various business loss claims.  A wide variety

19   of potential claims here.

20            And we think that if you limit it lower than what we

21   propose, 60 and 20, that we are simply not going to be able to

22   effectively get a legitimate group of potential bellwethers

23   that would be useful in moving the litigation forward because

24   there's such a wide variety of potential claims here that are

25   very different from each other.
```

```
 1              THE COURT:  Yeah.  I understand that.  That's exactly
 2    what was submitted in writing.
 3              And so the issue to me is that this work has to get
 4    done.  There are only so many people who can get it done, at
 5    least on the plaintiffs' side.  I understand that there are
 6    vastly more available resources on VNA's side.  And that's
 7    excellent for your client.  But we need to get it done and get
 8    this trial going when it is supposed to be heard.  And so I'm
 9    happy to increase it slightly from where plaintiffs are.
10              But I think the plaintiffs make an argument here that
11    this is not a test case they say of every possible personal
12    injury, property damage, or business lost fact scenario.  Or
13    we might as well just go in alphabetical order and just keep
14    having trials for the rest of all of our natural lives and
15    those who come after us.
16              But so we're not going to do that.  And so instead we
17    have to come up with something reasonable.  So I'll add --
18              MR. MASON:  Your Honor?
19              THE COURT:  Yes.
20              MR. MASON:  I apologize.  I had hoped I would not
21    been in a position to have to weigh in on this.  But since I
22    find myself still in the position of this being directly
23    impacting my client, my client does not have the resources
24    like VNA.
25              But putting that aside, I am concerned that the
```

1    disparity is too great between the ask and the response to the

2    plaintiffs.  And while you may not agree with VNA's position,

3    it's my experience that a larger pool is appropriate to funnel

4    down ultimately in.

5              And while it may not be quite as large as VNA

6    proposed, I would respectfully request that it be enlarged to

7    make sure that there is a broad enough representation that can

8    be made for fair selection ultimately.  Thank you.

9              THE COURT:  Thank you, Mr. Mason.

10             Here's an idea that while you were speaking that I

11   think is going to address what you're talking about.  What I'd

12   like you to do is create categories of damages and make sure

13   you have candidates in those categories.

14             It doesn't -- you don't need to have 30 -- well, a

15   total of 60.  But I'll add four from where the plaintiffs are.

16   But then if you pick -- so that would be -- that gives us a

17   total of 14.  So 7 and 7.

18             And then make -- but if it turns out that you have no

19   one with commercial loss or no one with property damage, we'll

20   go back to the drawing board.  What we really -- I mean, do

21   you hear what I'm saying is we need to be practical.  Try to

22   get, strive to get the variety that Mr. Olsen and Mr. Mason

23   are talking about.  But we can't be here for our whole natural

24   lives doing this, so.

25             MR. OLSEN:  So Your Honor, just to clarify, you're

```
 1    suggesting that you would further reduce it to not 20 or 8 but
 2    14.  And what would you start with?
 3               THE COURT:  That's what I --
 4               MR. OLSEN:  40?
 5               THE COURT:  Yes.  Exactly.
 6               MR. OLSEN:  All right.
 7               MR. LANCIOTTI:  So that would be 40 for pool 2, 20
 8    selections on each side, Your Honor?
 9               THE COURT:  Yeah.
10               MR. LANCIOTTI:  And Your Honor, if I can just be
11    briefly heard in response to Mr. Olsen and Mr. Mason.
12               THE COURT:  Oh, sure.
13               MR. LANCIOTTI:  In preparation for the conference, I
14    went through all the fact sheets that had been served to date.
15               And in terms of the personal injuries, I understand
16    Mr. Olsen and Mr. Mason are claiming that there's various
17    different injuries that the plaintiffs are claiming.  But at
18    least half of the fact sheets that the plaintiffs have
19    submitted claim one of three injuries.
20               So there's a lot of consistency.  And then there's
21    another large group that's just property damage, no personal
22    injury.  And the none of the fact sheets have claimed any
23    business loss.
24               So I understand what Your Honor has said and we'll go
25    back and try to create the categories.  But I think
```

1    realistically there's a lot of overlap between the claimants

2    in this category.

3           THE COURT:  It sounds like it's already done.

4           So Mr. Olsen, what is the problem if they -- if what

5    Mr. Lanciotti is saying is correct, what is the issue that

6    you're identifying?

7           MR. OLSEN:  Well, I think -- I think we're certainly

8    prepared to work within what you just said, 40 and 14.  The

9    issue in my experience is when we're dealing with pools of

10    potential plaintiffs getting to legitimate Bellwether

11    candidates, many plaintiffs fall through.  That process is not

12    either from the plaintiffs' perspective or the defendants'

13    perspective.  It's not always the defendants making that view.

14           THE COURT:  Okay.

15           MR. OLSEN:  Do not seem like appropriate Bellwether

16    candidates for they have case specific issues related to their

17    particular claims.

18           THE COURT:  Right.

19           MR. OLSEN:  And so more is typically better than

20    less.  But I heard what Your Honor said.  And 40 and 14 is

21    what we'll go through.

22           MR. MASON:  By way of analogy, Your Honor, it's like

23    picking a jury, having a big enough jury pool and funneling it

24    down.  And it's not just limited to the damages that

25    Mr. Lanciotti mentioned.  Thank you.

1      THE COURT:  No, I agree.  Sometimes people just have
2  personal issues that will prohibit them from participating
3  that are unexpected, unanticipated, unknown until you get to
4  know them.  So I don't disagree with that.  But okay.  We have
5  resolved that.
6      MR. LANCIOTTI:  So Your Honor, would you like for the
7  parties to prepare an amended Case Management Order to submit
8  to your law clerk?
9      THE COURT:  Yes.  And what I'd like you to do is file
10  it as a stipulated order.  And we will -- as a proposed order.
11  And we will fill in any additional dates that are still to be
12  determined, if we can.  But we can also add them as we get
13  closer.
14      MR. LANCIOTTI:  Very good.  Thank you.
15      THE COURT:  Okay.  Thank you.  And as of now, we've
16  got the trial date of September 10, 2024.  So I think we can
17  get most of the dates put in.  Okay.
18      Now we have something -- I do not know what it
19  relates to -- called VNA's privileged designation of a
20  particular document on their privilege log.
21      MR. OLSEN:  Your Honor, I might be able to take this
22  one off the table.
23      THE COURT:  Oh, please.
24      MR. OLSEN:  I've looked at this particular document.
25  And we are going to produce this document assuming it doesn't

1    turn into some larger waiver argument down the road about an

2    issue we haven't even talked about in the meet and confer.

3    But I've looked at the document.  We're going to produce the

4    document.  Hopefully that takes this issue off the table.

5              THE COURT:  I hope so, too.  Thank you.  And now

6    we're back to the limitations on Dr. Russell's deposition.

7              MR. CONNORS:  Yes, Your Honor.

8              THE COURT:  I feel like we talked to Dr. Russell

9    quite a lot but go right ahead.

10             MR. CONNORS:  Thank you, Your Honor.  This is Jordan

11   Connors for class plaintiffs.

12             So this is on the docket again for two reasons.  I'll

13   give you a very brief amount of background first.  Dr. Russell

14   was deposed already over two days on October 4 and 5 in 2020.

15   And the reason that Veolia has an opportunity to depose him

16   again is he has served two reports since that time.

17             One was a supplemental report in the class case and

18   the other was a report he served by Mr. Stern.  And that

19   report contains a very little amount of additional

20   supplementation.

21             We don't have any dispute that Veolia and defendants

22   should have an opportunity to depose Mr. Russell about any

23   opinions that have changed or are new since Veolia deposed him

24   already for two days.  Our concern is that Veolia is going to

25   use this as an opportunity to get another shot or a redo at

December 21, 2022

```
 1    their initial deposition.  And to take one day or two days to
 2    reexamine him to try to redo the testimony that they elicited
 3    before.
 4            And we have that concern for two reasons.  One, we
 5    asked Veolia if they would limit their examination to any
 6    opinions that have changed or are new.  And the response from
 7    Veolia's counsel was that they have no --
 8            THE COURT:  Uh-oh.  Can everybody hear?
 9            MR. OLSEN:  No, we lost him, Your Honor.  I'm just
10    glad it's not me this time.
11            THE COURT:  Didn't we already talk this through?
12            MR. TER MOLEN:  We did, Your Honor.
13            MR. OLSEN:  No, this is a different issue, Your
14    Honor.
15            THE COURT:  It's different?  Ter Molen can tell me.
16    He was the one talking about it last time, I think, right?
17            MR. LEOPOLD:  He was, Your Honor.  He's actually with
18    his family in Mexico doing this hearing.  So I think
19    something he was concerned about what happened just happened.
20            THE COURT:  That's okay.
21            MR. LEOPOLD:  But I think and Mr. Olsen can also
22    elaborate a little bit.
23            I think this is really -- we're just concerned that
24    we all stay on message as Your Honor has expressed today and
25    on various hearings.  We don't want to keep redoing things
```

```
 1    we've already done.  We just want to move forward.  And I
 2    think limiting Mr. Russell to just his new opinions or amended
 3    opinions, not going back to rehash his earlier testimony I
 4    think is the most prudent way to proceed.  And we're just
 5    concerned about that.
 6            MR. STERN:  I think that what Jordan was going to say
 7    though was that the response from counsel for VNA did not
 8    indicate that they would be limiting their questions to new
 9    opinions or changed opinions.  It was like we will try to do
10    something.  Jordan was prepared to say it.
11            But the second thing was that in a recent deposition
12    of one of their class experts, I think that the attorney for
13    VNA did the exact thing that we're trying to avoid.  And I'm
14    not speaking because I'm supposed to.  I'm only speaking
15    because Jordan dropped off.  But this isn't just a matter of
16    let's be cautious.  I think he had real substantive reasons as
17    to why he feels this might occur again.
18            And obviously he's not here, but I just wanted to
19    jump in and say that.
20            THE COURT:  Okay.  So -- yeah, go ahead, Mr. Ter
21    Molen.
22            MR. OLSEN:  I'll address it.
23            THE COURT:  Okay.  Go ahead.
24            MR. OLSEN:  Dr. Russell issued four experts report,
25    almost 500 pages of report.  It's true that he was deposed
```

1    once with respect to one of those four reports.  He's not been

2    deposed with respect to his three other reports.

3          We have discussed, as Your Honor points out,

4    Dr. Russell's deposition a number of times.  He was going to

5    offer opinions with respect to the Bellwether I retrial and

6    the class cases.  He is now going to offer opinions with

7    respect to the Bellwether III trials and the class cases.

8          Mr. Stern had asked that he believed that it made

9    sense to depose him only once with respect to both cases as

10   opposed to sitting for separate depositions with respect to

11   the two cases.  We agreed to that.

12         We also agreed to postpone that deposition until

13   after there was a site visit with respect to some pipe sample

14   inspections.  And then we agreed to proceed with that

15   deposition over two days.  Class counsel never objected to any

16   of that until much more recently.

17         And so our view is there are three reports that he's

18   never been asked about.  We're covering two different cases.

19   If we hadn't agreed to consolidate them, we'd be getting two

20   days in the ordinary course, and we've been doing two days

21   routinely.

22         There's hundreds of pages of reports that haven't

23   been covered.  We understand the point.  We do not intend to

24   ask questions that have already been asked.  But the only

25   reason we haven't simply said this is what we're going to ask

1    because obviously we're going to wait to the deposition to get

2    into our questions and his answers.

3            But also it's not so clear as to, okay, we're not

4    going to retread any questions and answers that were already

5    asked to try to get new or different answers.  On the other

6    hand, issues overlap between the three new reports that we

7    haven't asked him about and the old report.  So it's not so

8    clean to say that this topic is off limits or this topic is in

9    limits.

10           We don't intend to waste time.  We don't intend to

11   repeat stuff that's already been done.  But this is an expert

12   with massive disclosures, hundreds of pages of opinions that

13   he has not been testified about.  We agree to --

14           THE COURT:  Mr. Olsen?

15           MR. OLSEN:  Yes, ma'am.

16           THE COURT:  Mr. Olsen, on the hundreds of pages on

17   the three reports that he has not been deposed over, do those

18   reports import -- 75 pages are the same.  And then it reaches

19   page 76 and that gets to this individual plaintiff and a

20   conclusion about that or this location or whatever it is.

21           MR. OLSEN:  I don't know.  I know that I haven't

22   parsed how much is repetitive, how much is overlap.  I know

23   there are hundreds of pages in the new reports.  I haven't

24   parsed exactly.

25           But again, we don't intend to ask questions and

```
 1    answers that were asked in the first deposition.  But if we

 2    had done the two depositions separately, we certainly would

 3    have gotten two days if we hadn't agreed to consolidate it.

 4              THE COURT:  I hear you.

 5              MR. OLSEN:  And two days has been routine for these

 6    expert depositions.

 7              THE COURT:  Sure.

 8              MR. OLSEN:  Dr. Russell is a significant witness who

 9    has new opinions.

10              THE COURT:  I understand.  Let me ask you, when is

11    this deposition?  When are these two days?

12              MR. STERN:  28th and the 29th.

13              THE COURT:  Of December?

14              MR. STERN:  Yes, ma'am.

15              THE COURT:  Because what I'll -- what I think is

16    appropriate is to subject the witness to questions over new

17    material.  But to the extent one report imports data from the

18    original material that you've had for over two years, there's

19    just no basis to continue asking about that material.

20              I'll be available on the 28th if you're at the

21    deposition.  And there's a dispute over whether it's new

22    material or old material.  I'd be happy -- you'll have a court

23    reporter.  If you call me up, I'll get on the record.  I will

24    not be available on the 29th.  But we should be able to see

25    how it's going to develop on the 28th.
```

```
 1          MR. LEOPOLD:  And Your Honor, that is very reasonable
 2   and we appreciate you being available.  And I think, you know,
 3   that should work and keep everybody in line to focus on the
 4   new opinions and/or supplemental opinions.
 5          I would only ask -- and I know that historically had
 6   been two days of depositions, but there isn't a dramatic
 7   amount of new material.  And to subject him to two days, my
 8   only concern is it allows the defense additional time of two
 9   days to take this gentleman's deposition.  As oppose if we
10   limit it to seven or maybe even eight hours of one day, it
11   perhaps focuses them to ask questions directly on these new
12   reports.
13          MR. STERN:  Judge, if I just could add in terms of
14   this hundreds and hundreds of pages of material, I don't mean
15   to bore everybody speaking in analogies.  Like my favorite
16   book is Profiles in Courage.  It's 272 pages long.  It's been
17   published since the 1950s like 50 different times.
18          Every edition is the exact same except the foreword
19   in one of the editions was written by Robert Kennedy.  And the
20   foreword in another edition was written by Caroline Kennedy.
21   And So yeah, the first 12 pages of every book is a little
22   different because the foreword's been written differently.
23   But the 272 pages of the book, regardless of hard cover, soft
24   cover, when it was published, where it was published, it's the
25   exact same book.
```

```
 1              The same is true here.  To argue that there's 500
 2    pages of material and it's very dense and then to say, well,
 3    how much of that is overlapping and the answer is, well, I
 4    don't know.  I haven't dove into it yet.  I don't think that's
 5    a reasonable basis to provide two days of deposition when
 6    they've had the same book except for the foreword for two
 7    years.
 8              MR. OLSEN:  Your Honor, this is ridiculous.  I mean,
 9    the only reason this is an issue at all is because we agreed
10    to consolidate the deposition instead of doing it separately
11    --
12              MR. STERN:  No, the judge ordered it.
13              THE COURT:  No, no.
14              MR. OLSEN:  More importantly -- please don't
15    interrupt.  More importantly, as I just said, I take Your
16    Honor's instruction.  We do not intend to ask questions and
17    retread questions that have already been asked of this
18    witness.  You're going to be available.
19              THE COURT:  Sure.
20              MR. OLSEN:  And if we're doing that, Your Honor will
21    tell us not to do that.  But when we've been routinely doing
22    two days of depositions for experts -- and this is a critical
23    expert with lots of new opinions -- to somehow artificially
24    limit his testimony doesn't make any sense to me.
25              THE COURT:  Okay.  I'm not.  So what time in eastern
```

```
 1    time is this taking place?
 2              MR. TER MOLEN:  So Your Honor, because the witness is
 3    based in California.
 4              THE COURT:  Yes.
 5              MR. TER MOLEN:  As a courtesy to the witness, we've
 6    been calling at nine o'clock pacific time.  And that's the
 7    current plan.  But --
 8              THE COURT:  So noon to what time?
 9              MR. TER MOLEN:  Well, again we've set aside eight
10    hours, Your Honor.
11              THE COURT:  Okay.
12              MR. TER MOLEN:  So it would be 9:00 to 5:00 pacific.
13    And then unfortunately noon to 8:00 eastern.
14              THE COURT:  Okay.  So I'll hope that I don't need to
15    hear from you.  But if I do, I'll join the deposition.  And
16    what I would ask is that whoever is raising the objection have
17    the transcript from the first two days of deposition.  Let me
18    know that it was covered and by pointing to something in the
19    transcript.
20              And then I'll certainly hear a response from -- I
21    guess Mr. Olsen, are you taking the deposition?
22              MR. OLSEN:  I am not.  I think it will be Mr. Ter
23    Molen.
24              THE COURT:  Okay.
25              MR. OLSEN:  So Mr. Ter Molen will address anything
```

1    that comes up.

2           THE COURT:  Okay.  Great.  All right.

3           MR. LEOPOLD:  Your Honor, just one quick note on that

4    last issue is since you'll be away on the second day, should

5    the parties not be in agreement in terms of the questions

6    being asked -- in other words, not focused on the new as

7    opposed to going back and rehashing old -- is the magistrate

8    judge available or someone else to raise that issue?

9           THE COURT:  I have asked so much of Magistrate Judge

10   Grand.  And it is a holiday time period.  He has two school

11   age children.  I don't know if he'll be in town.

12          MR. LEOPOLD:  I'm just concerned on the second day.

13          THE COURT:  Yeah.  You know what, let me look.  I'll

14   be available after 3:00 PM pacific time.

15          MR. OLSEN:  To the extent there are any disputes,

16   they could reserve that for the afternoon and get Your Honor's

17   direction in the afternoon.  And either ask the questions or

18   not once they've gotten Your Honor's direction.

19          THE COURT:  Yeah.

20          MR. LEOPOLD:  Thank you, Your Honor.

21          THE COURT:  Okay.  Okay.  Well, I think that covers

22   our agenda, unless there's something I've forgotten or

23   omitted.  Okay.  Well, everybody please enjoy a little bit of

24   holiday cheer.  And we'll stay focused on making progress on

25   the case in the new year.

December 21, 2022

1          MR. MASON:  Happy holidays, Your Honor.

2                    (Proceedings Concluded)

3               -           -           -

4

5          CERTIFICATE OF OFFICIAL COURT REPORTER

6          I, Jeseca C. Eddington, Federal Official Court

7    Reporter, do hereby certify the foregoing 41 pages are a true

8    and correct transcript of the above entitled proceedings.

9    /s/ JESECA C. EDDINGTON_____          12-28-2022
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR     Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25