# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

Judith E. Levy
United States District Judge

Case No.: 16-10444

Colleen Connors

1935 Hosler Street

Flint, Michigan 48503

Email: CMColleen4@gmail.com

Phone #: 248-820-1076

### ***Emergency Ex Parte Motion to Intervene***

On January 4, 2023, I received an email from Amy Gigliotti at the Clerk's Office, 6th Circuit Court of Appeals, which states, in part, "You [Colleen Connors] have been enjoined from sending documents to this court via email." In the attachment to Ms. Gigliotti's email, appears the following sentence: "…caretaker [sic] Conners [sic] [is] hereby **ENJOINED** from using the e-fiing email box to file any further appeals, actions, or other pleadings… ." I am NOT advancing my Motion to Intervene on

anybody else's interest other than my own, Colleen Connors. I, Colleen Connors, have NOT in fact been enjoined from filing any documents as a Pro Se litigant in either the District Court or the 6th Circuit Court. **This purported enjoinment has a Jim Crow effect** because it attempts to prevent a White (of Hispanic/ Spanish ethnicity) person from associating with a Black person. Furthermore, **this purported enjoinment prevents me from filing documents** in either the District Court or the 6th Circuit Court in the event that I am not–at some point in the future–an informal caregiver of an African-American individual. In addition, this purported enjoinment prevents any other person(s) that may act in the role of informal caregiver for the African-American individual in question from filing documents in either the District Court or the 6th Circuit Court.

**This purported enjoinment is patently unfair and unconstitutional** on its face. It has the effect of forcing every potential caregiver in the United States to dissociate with a specific Black African American–as well as disallow every potential caregiver in the United States that chooses to associate with a specific Black African American from filing documents in either the District Court or the 6th Circuit Court. **This purported enjoinment is not an order that can stand** in the United States. As a citizen of the United States, I have a right to associate with any Black person that I so choose. The force and effect of this

**erroneous pronouncement of enjoinment** attempts to disallow me from being around and living in the same house as a Black African American. The Court's **erroneous allegation that I have been enjoined** only solidifies what is already known, i.e. that the Midwest is racist.

This filing, i.e. my Motion to Intervene, is important to me because my, Colleen Connors', Chapter 7 Bankruptcy and ultimate participation in the Flint Water Crisis (FWC) settlement depends upon it. My, Colleen Connors', Bankruptcy Case (No.: 22-30339-JDA) is still pending in United States Bankruptcy Court Eastern District of Michigan before Chapter 7 Trustee Collene K. Corcoran. Make no mistake that it is my, Colleen Connors' interest, and only my, Colleen Connors', interest that is at stake in this Motion to Intervene. A bankruptcy court scheduling order/status report issued on August 15, 2022 won't be fully finalized until August 15, 2024 because of the FWC settlement with me, Colleen Connors, being an ARCHER Systems Claimant. Any purported enjoinment that is erroneously allowed to stand will interfere with my, Colleen Connors', rights in my, Colleen Connnors', still open/yet to be closed bankruptcy case as well as interfere with my, Colleen Connors', rights to participate as an ARCHER Claimant in the Flint Water Crisis settlement.

* I am presenting an EMERGENCY and EX-PARTE motion to intervene as an interested party - and Flint Water Crisis Settlement (as to the MI EGLE, State of Michigan, and City of Flint, et al) ARCHER CLAIMS (FWC) Settlement Administrator, wherein I am a pro-se/individual claimant;

* I have a right to intervene as a matter of fact, law, and by the laws afforded to me under the United States Constitution (and) FRAP Rule and US Supreme Court LAW, "In United Airlines Inc. v. McDonald, 432 U.S. 385 (1977), for example, final judgment was entered in favor of the plaintiffs, who decided not to appeal the court's earlier denial of class certification. The Supreme Court allowed class members to intervene in order to appeal the denial of class certification because, "in view of all the circumstances," they moved "promptly after the entry of final judgment." Id. at 396. Although McDonald involved members of a class, the court noted that "[p]ost-judgment intervention for the purpose of appeal has been found to be timely even in litigation that is not representative in nature." Id. at 396 n. 16. In a frequently cited opinion, the 5th U.S. Circuit Court of Appeals in Stallworth v. Monsanto Co., 558 F.2d 257 (5th Cir. 1977), rejected any " 'absolute' measures of timeliness," noting that "whether the request for intervention came before or after the entry of judgment was of limited significance," and focused instead on whether intervention would "prejudice the

rights of the existing parties" or "substantially interfere with the orderly processes of the court." Id. at 266."

* And, NO party will experience prejudice NOR will GRANTING my motion to intervene interfere with the orderly processes of the Appeals Court.

* Moreover, my intervention WILL be very helpful to the appeals court in expeditious determination of the "consolidated" cases in the instant matter.

* For example --- I believe that although I (Colleen Connors) am NOT "classified" as disabled per Federal Disability Law[s]... I am however (I believe) a disabled person who is non-African American per the Americans with Disabilities Act. Additionally, since the year of approximately 2015 it has been needed for me to AID a disabled adult who is Black African American in obtaining [his] SSI welfare benefits wherein at the appeals-council level I literally was in the "capacity" of said disabled person's NON-attorney representative [e.g. in an UNPAID "role" of [his] informal caregiver].  Which is to say, by my observation and belief a great part of the Flint Water Crisis Settlement and issues of Attorney Fees and the $500.xx fee for 'XRF Bone Scans" are in FACT and

LAW disproportionately "unfair and seemingly" biased and discriminatory, to include creating an <u>unlawful "transfer"</u> of said Adult disabled persons' SSI funds <u>to Napoli Law Firm</u> (i.e. to include Napoli Attorney Patrick Lanciotti, which also wrongly benefited LK Law Firm) as to and against the Disabled Archer Claimants in general. <u>Which is to say, I believe that I know "facially apparent" disability discrimination when I, Colleen Connors see it</u>.

* I also respectfully request that [IF] the appeals (#22-1185, #22-1187, and #22-1605, as to FWC district court case #16-cv-10444 ) are somehow "untimely" as in being TOO EARLY filed prior to the FINAL JUDGEMENT of the district court, then PLEASE grant a dismissal of the pending 6th Circuit Court of Appeals as to the FWC settlement and/ or attorney fees thereto <u>WITHOUT prejudice</u>.

* Additionally, please consider that [IF] there is a remand to the district court and reduction of attorney fees ordered on mandate... please MAKE such a "published" opinion, whereby said REFUNDED attorney fees are rightfully returned to the ADULT archer claims - claimants with special consideration to person such as myself, Colleen Connors, who are adults with medical

conditions that are "covered" by the ADA (Americans with Disability Act).

 MORE IMPORTANTLY, it would unreasonably DELAY the pending appeals IF and for me to motion to intervene in the district court.

- I filed for bankruptcy in March 2022, and the impetus for this was the Flint Water Crisis.
- I have a $262 car payment due on January 11, 2023 and a $555.29 car insurance due on January 17, 2023. I do not have a total of $817.29 to make these upcoming payments. As a result, on January 10, 2022, I will most likely have to have my car voluntarily repossessed. It is important to note that the Michigan Unemployment Insurance Agency (UIA) has not decisioned my claim *that I filed over a year ago*–on December 19, 2021. If I am soon awarded the approximately $3,240 that I am rightfully owed, then I will be able to keep my car (and insurance policy). **I believe that the state of Michigan is purposely withholding my payment in retaliation for me speaking up in the Flint Water Cases.** It is also important to note that I was unable to pay the fee to retain a bankruptcy attorney, and so the fee was paid by a person who received welfare.

- The $500 fee for the XRF bone scans precluded a majority of Flint residents similarly situated as myself from meaningfully participating in the FWC settlement ON THE BASIS OF POVERTY and/ or LACK OF FUNDS.  Which then UNFAIRLY renders the FWC settlement as to attorney fees an ARBITRARY and CAPRICIOUS  determination which CANNOT be allowed to "stand", whereby such MUST be "REVERSED and REMANDED" by the 6th Circuit Court of Appeals.  To put this into context, $500 dollars is a fortune to me–as someone who is bankrupt, jobless, owes over $800 to keep my car (not to mention hundreds of thousands of dollars in student loans), and is **owed** over **$3,200 dollars from the Michigan UIA**.

- Please see the attached document in support of my instant request.

- ***REQUEST FOR ORAL ARGUMENT***:

- **Although uncommon, I Colleen Connors, must in this instance request ORAL ARGUMENT as a pro se intervenor, and so the question NOW is.... "Will [I] get an oral argument opportunity as to the consolidated appeals?"**

The short answer is, "Maybe, if I Colleen Connors, ask nicely." In most instances, both parties to an appeal have significant reasons to seek oral argument. For the appellant, even the most minimally involved client will have lived through a loss in the district court,

as well as the arduous process of drafting two complex appellate briefs. The appellant will be eager for the opportunity to have their story persuasively communicated to a distinguished panel of appellate judges. Former Minnesota Supreme Court Justice John Simonett was once asked if the appellant should ever waive oral argument. After reflecting on the question for a moment, he responded, "It's a lot like proposing marriage—I suppose you could do it just in writing." On the other hand, oral argument is the appellee's only chance to respond to the reply brief. Suffering a reversal will sting even more if the appellee declined to pursue the opportunity to speak directly to the court. The fact remains, however, that oral argument is, in some courts, going the way of the carrier pigeon. Federal circuit courts throughout the country are deciding cases without entertaining argument, and at staggering rates. While the reality remains that the opportunity for oral argument is dramatically decreasing, appellate lawyers (and by extension even PRO SE appellate folk like me) can maximize their chances by strategically and persuasively drafting a request for argument to both engage and persuade the behind-the-scene decision makers.  Additionally --- The answer is, more often than not, a number of years. Oral argument is increasingly becoming an endangered species, and in fact, federal appellate courts do not even recognize the right to oral argument in every case. See,

e.g. Toquero v. INS, 956 F.2d 193 (9th Cir. 1992) (oral argument not necessary to satisfy due process); NLRB v. Int'l Assoc. of Heat & Frost Insulators & Asbestos Workers, 476 F.2d 275 (3d Cir. 1973) (denial of oral argument under local rules neither violates due process nor Fed. R. App. P. 34). The Supreme Court has even weighed in, reasoning that "[c]ertainly the Constitution does not require oral argument in all cases…." FCC v. WJR, Goodwill Station, Inc., 337 U.S. 265, 276 (1949). Aside from the Supreme Court, oral argument is declining in the vast majority of federal jurisdictions. According to government statistics, the federal circuit courts of appeal decided cases on the merits after oral argument in just 18 percent of all cases. See Table B-1, U.S. Courts of Appeals—Cases Commenced, Terminated, and Pending, by Circuit and Nature of Proceeding, During the 12-Month Period Ending June 30, 2015. Oral argument is remarkably far less likely in the Fourth and Third Circuits, which decided cases after argument in just 8 percent and 10 percent of all cases, respectively. Id. Even the most engaged bench, the Seventh Circuit, decided cases after argument just over a third of the time. Id. Compare this to just five years ago, when the federal circuits decided cases on the merits after oral argument in 26 percent of all cases. See Table B-1, U.S. Courts of Appeals—Cases Commenced, Terminated, and Pending, by Circuit, During the 12-

Month Period Ending December 31, 2010. And 10 years ago, that figure was near 30 percent. See Table B-1, U.S. Courts of Appeals—Cases Commenced, Terminated, and Pending, by Circuit, During the 12-Month Period Ending December 31, 2005. As the federal circuits continue to shy away from entertaining oral argument, strict adherence to the rules and local procedures—in addition to persuasion, of course—becomes all the more important to an appellate attorney who wishes to engage an appellate panel in the courtroom.

Respectfully Submitted,

Signed _Colleen M. Connors_

Colleen Connors - Pro Se interested party/intervenor

Dated: _1/5/2023_

# THE NATIONAL LAW JOURNAL

DAILY UPDATES ON WWW.NLJ.COM    THE WEEKLY NEWSPAPER FOR THE LEGAL PROFESSION    MONDAY, JULY 14, 2008    ALM

## APPELLATE LAW

# Appellate Intervention

## By Aaron S. Bayer



### High court allowed intervention after judgment

**C**AN NEW PARTIES intervene after judgment has entered? Can an appeals court allow intervention or joinder of new parties when it determines that there was no jurisdiction from the outset of the litigation?

■ *Intervention to take an appeal.* Although intervention under Fed. R. Civ. P. 24 is not typically allowed after judgment (see C. Wright, A. Miller, M. Kane, Federal Practice and Procedure § 1916 at 561-63 (2007)), in certain circumstances it is frequently granted. "Post-judgment intervention is often permitted...where the prospective intervenor's interest did not arise until the appellate stage" and where "intervention would not unduly prejudice the existing parties." *Acree v. Republic of Iraq*, 370 F.3d 41, 50 (D.C. Cir. 2004).

The clearest example is intervention to take an appeal "where no existing party chooses to appeal the judgment of the trial court." *Acree*, 370 F.3d at 50; see Wright & Miller, § 1916, at 571-79. Intervention in this situation is often granted as of right under Rule 24(a). Though any intervention must be "timely" under Rule 24, courts "should be more reluctant to deny an intervention motion on grounds of timeliness if it is intervention as of right than if it is permissive intervention." *U.S. v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980). See also Wright & Miller, § 1916, at 531.

A motion to intervene is generally deemed to be "timely" if the person seeking to intervene in order to take an appeal acted promptly when it became clear that his interests were no longer protected and moved within the time period allowed for taking an appeal.

In *United Airlines Inc. v. McDonald*, 432 U.S. 385 (1977), for example, final judgment was entered in favor of the plaintiffs, who decided not to appeal the court's earlier denial of class certification.

The Supreme Court allowed class members to intervene in order to appeal the denial of class certification because, "in view of all the circumstances," they moved "promptly after the entry of final judgment." Id. at 396. Although *McDonald* involved members of a class, the court noted that "[p]ost-judgment intervention for the purpose of appeal has been found to be timely even in litigation that is not representative in nature." Id. at 396 n. 16.

In a frequently cited opinion, the 5th U.S. Circuit Court of Appeals in *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977), rejected any " 'absolute' measures of timeliness," noting that "whether the request for intervention came before or after the entry of judgment was of limited significance," and focused instead on whether intervention would "prejudice the rights of the existing parties" or "substantially interfere with the orderly processes of the court." Id. at 266. Using that

analysis, the court found timely an intervention motion filed by employees a few weeks after entry of a consent judgment that affected their employment rights. Id. at 267-69.

Similarly, in *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001), the court allowed tribal officers to intervene when the U.S. government had been representing their interests but decided not to appeal an adverse judgment. "Prior to the entry of judgment, the appellants[']...interests were adequately represented by the Government" and the " 'potential inadequacy of representation came into existence only at the appellate stage.' " Id. at 471. See *Acree*, 370 F.3d at 50 (allowing U.S. government to intervene two weeks after judgment where it caused no prejudice and the government's interest in appealing the court's jurisdiction over claims against Iraq raised important foreign policy concerns).

■ *Intervention during appeal.* Courts have also allowed parties to intervene while an appeal is pending when judicial economy, and often some other strong public interest, warrants it and there is no prejudice to other parties. In *Bates v. Jones*, 127 F.3d 870, 873-74 (9th Cir. 1997), for example, the 9th Circuit allowed 20 state legislators and voters to intervene on appeal as plaintiff-appellees in order to defend a judgment holding California's legislative term limits unconstitutional.

The court emphasized that the "need for uniformity" in upcoming elections warranted intervention to allow "as many parties as possible who seek to run for office contrary to the term limits provision of Proposition 140 to be bound by our decision." Id. at 872. In *Hurd v. Illinois Bell Tel. Co.*, 234 F.3d 942, 944 (7th Cir. 1956), the 7th Circuit allowed a member of a

**Aaron S. Bayer** *is the chairman of the appellate practice group at Wiggin and Dana of New Haven, Conn. He can be reached at abayer@wiggin.com.*

"spurious" class to intervene on appeal *during oral argument*, explaining that permissive intervention was warranted and it would not "in any way prejudice [the defendants'] rights." See also *Drywall Tapers & Pointers of Greater New York, Local Union 1974 of I.U.P.A.T., AFL-CIO v. Nastasi & Assocs. Inc.*, 488 F.3d 88, 94 (2d Cir. 2007) (recognizing "authority for granting a motion to intervene in the Court of Appeals").

In the alternative, appellate courts may remand to allow the district court to address a motion to intervene (e.g., *Hobson v. Hansen*, 44 F.R.D. 18, 21 (D.D.C. 1968) (D.C. Circuit held appeal in abeyance and remanded to allow district court to consider intervention motions filed during the appeal), or they may remand with directions to permit intervention (e. g., *Atkins v. State Bd. of Ed. of North Carolina*, 418 F.2d 874, 876 (4th Cir. 1969)).

Intervention can create unusual procedural thickets. In *Drywall*, for example, the parties settled the case and the district court entered judgment while a motion to intervene was pending. The party seeking to intervene then filed an appeal, depriving the district court of jurisdiction to act on the motion to intervene. The 2d Circuit was compelled to dismiss the appeal, because the would-be intervenor had not yet intervened and therefore was not a party. The 2d Circuit "cut through this appellate Catch-22" by remanding to the district court to rule on the intervention motion, making it clear that it could reinstate the appeal if intervention was granted. 488 F.3d at 95.

■ *Intervention when no jurisdiction exists*. The general rule, unsurprisingly, is that intervention cannot create jurisdiction where none exists (see *Wright & Miller*, § 1917), and an intervenor "will not be permitted to breathe life into a 'nonexistent' law suit" (*Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965)). But the rule is not absolute. Courts have recognized that, when the intervenor has an independent basis for jurisdiction and therefore could file a new suit, it may make sense to permit intervention in the existing suit if it will not prejudice other parties and if denying in-

tervention would require the parties to relitigate the same issues that have already been adjudicated.

In *Hackner v. Guaranty Trust Co. of New York*, 117 F.2d 95 (2d Cir. 1941), for example, the 2d Circuit held that the demands of the original plaintiffs could not be aggregated to satisfy the jurisdictional amount requirement and therefore there was never diversity jurisdiction.

> ■ Intervention during appeal may be permitted when judicial economy and some other strong public interest warrant it. ■

But the court permitted the claims of a plaintiff who had been added to the suit to go forward, to avoid "the delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are." Id. at 98. *Hackner* dealt with joinder of a party under Rule 21, but it is often cited in intervention cases for the principle it established. See, e.g., *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 95, 105 (2d Cir. 1990) (citing *Hackner* in permitting the district court on remand to consider claims of a party that had intervened, even though all of the original plaintiffs' claims were dismissed for lack of jurisdiction).

## Intervention in school desegregation cases

While judicial efficiency and fairness to the parties are the key factors, cases allowing intervention when jurisdiction is otherwise lacking often have other public policy concerns favoring intervention. School desegregation cases are a prime example. Recognizing the "intense interest of parents in the education of their children," the 4th Circuit allowed parents of schoolchildren to intervene in a desegregation case, even though the original

plaintiff lacked standing and therefore there never was jurisdiction over the action. *Atkins*, 418 F.2d at 876. See also *Fuller v. Volk*, 351 F.2d at 329 (dismissing claims of original plaintiffs in school desegregation case but remanding to determine if individuals seeking to intervene have an independent jurisdictional basis, to avoid the "senseless delay and expense" of a new suit).

■ *Rule 21 as an alternative to cure jurisdictional defects*. In related procedural contexts, courts have relied on the same principles—judicial economy and the absence of prejudice to other parties—to add or remove parties on appeal in order to cure a jurisdictional defect. The Supreme Court in *Mullaney v. Anderson*, 342 U.S. 415 (1952), allowed two new plaintiffs to be added under Rule 21, while the appeal was before the Supreme Court, when it became clear that the original plaintiffs lacked standing to maintain the suit. Noting that "Rule 21 will rarely come into play at this stage of a litigation," the court held that requiring the new plaintiffs to start over "would entail needless waste and runs counter to effective judicial administration." Id. at 417.

Appellate courts may also drop a dispensable party under Rule 21 in order to salvage jurisdiction. *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989). The court acknowledged that "[a]ppellate-level amendments to correct jurisdictional defects may not be the most intellectually satisfying approach," but "practicalities" sometimes warranted permitting such jurisdictional corrections on appeal. Id. at 836-37.

The driving force in cases involving jurisdictional repair on appeal, whether it be intervention under Rule 24 or joinder under Rule 21, seems to be the courts' willingness to focus on "practicalities" and to avoid compelling parties to relitigate a case that has already been adjudicated. ■

Reprinted with permission from the Monday, July 14, 2008 edition of THE NATIONAL LAW JOURNAL. © 2008 ALM Properties, Inc. All rights reserved. Further duplication without permission is prohibited. For information, contact 800.888.8300 or reprintscustomerservice@incisivemedia. com. ALM is now Incisive Media, www.incisivemedia.com. #005-07-08-0013