# EXHIBIT 2



## FACTS FROM THE COURTROOM

March 10, 2022

# Setting the record straight on Flint

## VNA will not let distortions of the facts go unchecked

The Flint Water Crisis was a massive failure of the government and we will not allow anyone to misrepresent the facts of this trial. During the trial, we'll be setting the record straight around any lies the plaintiff's trial attorneys share about VNA's role in Flint.

Earlier this week, in their opening statement, the plaintiff's trial attorneys already repeatedly lied and distorted the facts about VNA's role in Flint. Get the facts.



## Lie 1

**VNA was working for General Motors in October 2014 and, therefore, would have received a heads up that General Motors' Flint plant planned to stop using the water from the Flint River due to concerns around corrosivity.**

VNA has never worked with General Motors in Flint and none of its contracts with General Motors were related to drinking water. VNA had contracts with two General Motors plants in Pontiac and Lansing for wastewater treatment and reverse osmosis for heating and cooling.

The water treated for VNA's contracts with General Motors was not from the Flint River. Therefore, nothing in the handling of the water would have indicated a corrosive water problem in Flint.

At no point did VNA receive any notice, whether formally or informally, that there was an issue with corrosive water at General Motors in Flint. VNA learned of this news in the media, like everyone else did, when General Motors voiced concerns.

## Lie 2

### Business development concerns drove VNA's recommendations in Flint.

Business development considerations never dictated the course of VNA's engagement with the City of Flint and Business Development leaders never had operational control of the project.

VNA engineers exclusively made all recommendations to the City of Flint, based on their engineering judgment and that alone.

Notably, VNA offered continued assistance and help to the City of Flint after submitting their final report but officials chose to ignore all but one of their recommendations.

## Lie 3

### Business development considerations stopped VNA from recommending that the City of Flint return to Detroit Water.

VNA was repeatedly told by the City of Flint that returning to Detroit Water was not an option. Flint Emergency Manager Gerald Ambrose called it "incomprehensible" to return to Detroit Water.

These officials had already ruled out the option of returning to Detroit Water long before VNA arrived on the scene, and they failed to implement all but one of VNA's recommendations to treat the water for corrosivity.

## Lie 4

### VNA claimed the water was "safe" in a public meeting in February 2015.

This quote has been taken completely out of context and is a distortion of the facts. The full record of the meeting makes it clear that VNA warned that it had not conducted its own tests and only reviewed the test results collected by the City of Flint.

The test results provided to VNA by the City of Flint showed that the water was in compliance with State and Federal water quality standards.

A VNA official even gave a detailed description of what "safe" meant during the meeting and had a PowerPoint slide that said "safe = compliance with State and Federal standards and required testing".

VNA's engineers did not know the City of Flint had collected lead test results improperly and that the data was flawed.

## Lie 5

### VNA employee Rob Nicholas said that "lead could be a problem" in internal emails and then told the VNA team not to pass the information to Flint officials.

This email was taken completely out of context and the plaintiff's attorney is misrepresenting the facts and timeline of events. The email sent by Rob Nicholas was based on a news article published before VNA even entered Flint which showed high lead levels in one largely unused drinking fountain at the University of Michigan–Flint.

The email did prompt VNA to ask for test results because it indicated lead could be a problem in the water. VNA reviewed the lead and copper rule testing conducted by the City. Those test results showed compliance with State and Federal water standards.

## Lie 6

**VNA knew the Flint water was corrosive but assured the public the water was safe.**

Although the results provided by Flint officials showed no current problems with lead, VNA discussed corrosive water conditions that could result in lead issues in the future with City officials. The data the City of Flint provided VNA showed the Flint water was in compliance with State and Federal quality standards.

VNA also investigated the lead testing provided by the City and made recommendations to implement corrosion control.

After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing VNA's recommendations. VNA was told that the City itself was going to implement VNA's corrosion control recommendations, but the City never did.

## Lie 7

**VNA made the wrong decisions time after time and share blame in the Flint Water Crisis.**

The responsibility for the Flint Water Crisis rests with the government officials who decided to change Flint's water source to save money, failed to implement corrosion control treatment, took actions to prolong the crisis, and then acted to cover it up.

VNA did not cause the Flint Water Crisis, did not prolong it, and did not do anything to make it worse in any way. The Flint Water Crisis was a massive failure of Government at all levels.

Fault does not lie with VNA, but with the government officials who acted to save money at the expense of the health and well-being of Flint residents, lied to minimize the scale of the crisis, and deceived both the citizens of Flint and VNA.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→ Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America



FACTS FROM THE
COURTROOM

March 11, 2022

# The facts on VNA's recommendations to the city of Flint

**All of VNA's recommendations were ignored by the politicians and bureaucrats in charge of the City's water supply**

On March 9th, LAN engineer Warren Green testified that VNA made a series of recommendations to Flint officials on how to improve the City's water supply. When Green asked if LAN should implement two of VNA's recommendations, the City said they were looking into them. Despite asking multiple times, Green never received the go-ahead from Flint officials.

## THE FACTS ON VNA'S RECOMMENDATIONS TO THE CITY OF FLINT

- The City of Flint hired VNA 10 months after the crisis to conduct a one-week review of the operations of the Flint Water Treatment Plant and provide some advice to the City on how to help solve the significant problems caused by a cancer-causing chemical in the water called Trihalomethane (TTHM).

- Even though they were hamstrung with bad information, VNA gave good advice to the City of Flint. Their engineers analyzed the data and made a series of important recommendations on how to improve the water quality.

- These recommendations included operational changes, differences in water treatment regimens and chemical dosing, increased maintenance and increased training.

- In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose. The City of Flint never implemented that suggestion.

- With the exception of purchasing a filter, the City of Flint ignored all of VNA's other proposals and suggestions as to how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told that the City itself was going to implement VNA's corrosion control recommendations, but the City never did.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

The facts on VNA's recommendations to the city of Flint - Veolia Flint Facts

© 2023 - Veolia North America

 

## FACTS FROM THE COURTROOM

March 17, 2022

# VNA engineer Theping Chen's deposition: What you need to know

On March 16, 2022, VNA engineer Theping Chen's deposition was played in the courtroom. Here's what you need to know.

**The City refused to even consider a return to Detroit Water despite it being the easiest way to fix the water quality problem**

- Mr. Chen confirmed VNA was told by the City of Flint that returning to Detroit Water was not an option.

- Flint Emergency Manager Gerald Ambrose called it "incomprehensible" to switch water sources.

- Flint officials changed the City's water source to save money over the health and well-being of its residents. They had no intention of returning to Detroit Water because of the high cost of switching.

- VNA had no power to overrule the government officials who refused to return to Detroit Water.

**VNA was never asked to analyze for lead contamination in the Flint River water**

- Mr. Chen testified that VNA's scope of work was restricted to analyzing for a cancer-causing chemical (TTHM) and water aesthetic issues.

- The limited lead test results VNA received from Flint officials showed the water was in compliance with State and Federal regulations. The engineers had no reason to suspect the City had provided faulty lead testing data to them.

- Neither Mr. Chen nor VNA were aware of the high lead levels in the home of Flint resident LeeAnne Walters while working at the Flint plant.

**VNA nonetheless recommended corrosion control, anticipating potential lead problems due to the corrosive river water, as well as other important recommendations**

- VNA recommended the City work with its engineer to implement a corrosion control program to treat the water.

- With the exception of purchasing a filter, the City of Flint ignored all of VNA's other proposals and suggestions as to how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told that the City itself was going to implement VNA's corrosion control recommendations, but the City never did.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.

**Business development considerations never influenced VNA's recommendations to the City**

- Business development considerations never dictated the course of VNA's engagement with the City of Flint and Business Development leaders never had operational control of the project.





© 2023 – Veolia North America




## FACTS FROM THE COURTROOM

March 25, 2022

# Former VNA VP David Gadis' deposition – The facts

On March 23rd and 24th, former VNA Vice President David Gadis' deposition was played in the courtroom.

Mr. Gadis testified that VNA took on the Flint water project because the company wanted to help the people of Flint address the water crisis. Mr. Gadis was proud that VNA stepped up to help the community when no one else would – he even testified that he has family in Flint, but the Court decided to exclude this evidence. VNA was the only water contractor in the United States that submitted a bid to help Flint solve its water crisis.

Here are the facts:

Flint government officials failed to inform VNA that they were in possession of high lead level results

- Flint Mayor Dayne Walling, Emergency Manager Gerald Ambrose and officials from the Michigan Department of Environmental Quality and EPA all knew of the high lead levels in Flint resident LeeAnne Walters' tap water but chose not to inform VNA consultants or the public.

- Over the concerns of Flint residents, the City and Mayor insisted the water was safe.

- City officials provided VNA with data that showed the water was in compliance with Federal regulations on lead.

- Water analysis was not within VNA's scope of work, as determined by the City of Flint, and VNA had no way of knowing that Flint officials had provided them with faulty and incomplete data.

- VNA had no choice but to rely on the information the City provided since lead testing is not something a consultant like VNA can do from the plant as it requires testing at individual homes.

- Flint officials hid the truth about lead from VNA – just like they hid the truth from the residents of Flint.

VNA's scope of work was narrowly focused on a single, cancer causing chemical called TTHM

- The City of Flint hired VNA to conduct a one-week review of the operations of the Flint Water Treatment plant and address the problems caused by a cancer-causing chemical (TTHM) in the water and other water aesthetic issues.

- The City never asked VNA to look into lead contamination, nor did they give any indication to that they were in possession of high lead test results.

- Even though they were hamstrung with bad information, VNA gave good advice to the City of Flint. VNA engineers analyzed the data that they were provided and made a series of important recommendations on how to improve the water quality.

- The limited test results VNA received from Flint officials showed the water was in compliance with State and Federal regulations. The engineers had no reason to suspect the City provided faulty lead testing data to them.

- Nonetheless, VNA did identify that the water was corrosive, and therefore recommended corrosion control in their final report, anticipating potential lead problems could occur if corrosion was not addressed. This recommendation was ultimately ignored by the City of Flint – the only people with the power to act.

**The "water is safe" comment at the public meeting has been taken completely out of context**

- The full record of the meeting makes it clear VNA warned that it had not conducted its own tests and only reviewed the test results collected by the City.

- At the time, VNA had no reason to suspect that the City had hidden high lead test results from its engineers.

- The tests provided to VNA by City officials showed that the water was in compliance with State and Federal quality standards, which was the basis for VNA's use of the word "safe" when describing the water in the public meeting.

- Mr. Gadis personally drank Flint's tap water on the day of the presentation, believing that the City had provided VNA with accurate test results and that, according to those results, the water was safe.

- When people at that meeting asked about broader concerns about the water, VNA explained that its team had reviewed the data collected by the City and found that it was within legal limits.



**The "lead seems to be a problem" email has been similarly misconstrued by the plaintiffs' lawyers**

- VNA was responding to a news report regarding high lead levels found in a drinking fountain at the University of Michigan and the need for controlled and meaningful testing to evaluate the issue.

- VNA was beginning an internal discussion and assessment on the issue before expanding the conversation externally.

- In fact, it was this email, among other things, that prompted VNA to ask the City to provide them with their lead and copper rule testing

- VNA reviewed the testing conducted by the City of Flint, as well as all of the testing done at the University. The test results showed compliance with State and Federal water standards.



**Business development considerations never influenced VNA's recommendations to the City**

- VNA's engineers exclusively made any and all recommendations to the City of Flint

- Business development considerations never dictated the course of VNA's engagement in Flint and Business Development leaders never had operational control of the project.

- VNA Director Joseph Nasuta's comment that Veolia should "Not let BD make any technical calls" refers to the timing of the presentations to the City of Flint and not to the actual recommendations contained in the presentations.

- Indeed, Mr. Nasuta advised engineer Marvin Gnagy to develop and make recommendations based on his engineering judgement and that alone.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed

**The City refused to even consider a return to Detroit Water despite it being the easiest way to fix the water quality problem**

- The City of Flint made it clear to VNA that returning to Detroit Water was not an option.

- First Emergency Manager Gerald Ambrose called it "incomprehensible" to switch water sources

- Flint officials changed the City's water source to save money over the health and well-being of its residents.

- Despite the fact that DSWD offered to reconnect Flint to its water source with "no strings attached," Flint officials rejected that offer repeatedly. They had no intention of switching given the high cost that would be incurred.

- VNA had no power to overrule government officials who refused to return to Detroit Water.



VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.



 VEOLIA



## FACTS FROM THE COURTROOM

April 6, 2022

# Walling and Flint officials did not tell VNA of the high lead test results found in Flint

On March 31 and April 4-6, 2022, Former Flint Mayor Dayne Walling testified that, although he had been informed about dangerously high levels of lead in the tap water of Flint resident LeAnne Walters in early March 2015, he did not share this information with VNA. Even worse, when the EPA raised concerns about high lead levels in June 2015—several months after VNA had completed their work—Mayor Walling still did nothing to address the problem.

Here's what you need to know.

**Mayor Walling and Flint officials did not tell VNA of the high lead test results found in Flint resident LeeAnne Walters' home.**

Read the transcript:

Q. Okay. So [Leanne Walters] had a high lead test result, the family had a high lead test result that was seven times the limit. And when you learned that information, VNA was still working there, right?
A. Yes.
Q. And it was two weeks to the day after VNA signed its contract to do the work, correct?
A. Yes.
Q. And you didn't contact VNA to tell them about this result, did you?
A. I did not.
Q. You didn't contact Michael Glasgow [Flint Water Treatment Plant Supervisor] after Howard Croft [Flint Director of Public Works] briefed you about this lead result?
A. I recall communicating with just Mr. Howard Croft about it. So no to Glasgow.
Q. And you didn't go contact Ms. LeeAnne Walters after this, learning of this test result, did you?
A. I did not.
Q. You didn't contact the MDEQ [Michigan Department of Environmental Quality]?
A. I did not.
Q. And the gentleman you identified in the courtroom, Mr. Warren Green [LAN Engineer], you didn't contact him, did you?
A. I did not.
Q. You needed water advice from VNA, right?
A. Yes.
Q. But you didn't tell them on the very day you saw this email or in that time period that there was lead found at a resident's home, correct?
A. Correct.
Q. Did you tell Mr. Glasgow to make sure that Veolia was told about this lead test result?
A. No.
Q. Did you tell Mr. Bincsik [Flint Public Works Administrator] to make sure that Veolia was told about this lead test result?
A. No.
Q. Did you tell Mr. Croft to make sure that VNA was told?

*A. No.*
*Q. Did you tell Mr. Ambrose [Flint Emergency Manager]?*
*A. No. I don't recall asking or, you know, directing anyone to do that.*

- Upon learning of the news that there was a high lead result in the home of LeAnne Walters, Mayor Walling did not contact VNA, nor speak to key City and State officials about it, including Flint Water Department employee Michael Glasgow or members of the Michigan Department of Environmental Quality. Nor did he instruct anyone from the City of Flint to inform VNA of said test results.

- Even after the media inquired about the test results, Mayor Walling did not inform VNA, nor instruct anyone from the City to inform VNA of their existence.

- The article "Who Wants to Drink Flint's Water?", which plaintiffs presented as proof that VNA should have known about the problems with Ms. Walter's water, did not mention lead and was written and published before VNA had even submitted a proposal in response to Flint's RFP, let alone started to analyze the situation.

- The City never asked VNA to look into lead contamination, nor did they give any indication they were in possession of high lead test results.

- The limited test results VNA received from Flint officials showed the water was in compliance with State and Federal regulations. The engineers had no reason to suspect the City provided faulty lead testing data to them.

- Nonetheless, VNA did identify that the water was corrosive and therefore recommended corrosion control in their final report, anticipating potential lead problems could occur if corrosion was not addressed. This recommendation was ignored by Flint officials – the only people with the power to act.

## Mr. Walling never investigated the need for corrosion control — despite it being part of the original water system design developed by LAN and a key recommendation in VNA's report to the City

- City officials were aware of what corrosion control was and its necessity long before VNA arrived in Flint.

- Despite their firsthand knowledge of potential lead contamination in the City's aging infrastructure, City and State chose to ignore expert advice to install corrosion control from the beginning of the process of switching the City's water source and instead relied on a "wait and see" approach on the advice and endorsement of the MDEQ.

- Following VNA's presentation at the public meeting on February 18, 2015, during which VNA told the City that it was making corrosive water, the Mayor never asked Flint Emergency Manager Gerald Ambrose or Department of Public Works Director Howard Croft about the corrosive water conditions referenced at the meeting, despite the fact that he included VNA's comments in his hand-written notes from the meeting.

- After VNA issued its final report to the City on March 12, 2015, which recommended Flint implement corrosion control to treat the corrosive river water, the Mayor did not contact the City's engineer to learn more about corrosion treatment.

- At no time did the Mayor go to the Flint Water Treatment Plant to follow up on the corrosive water. Indeed, the Mayor made no effort to research what corrosion control was or ask VNA about the treatment.

- After reading EPA whistleblower Miguel Del Toral's report in June 2015, linking corrosion control to lead contamination, Mr. Walling still did not contact VNA to follow up on the corrosion control recommendation or consider a switch back to Detroit Water.

  Read the transcript:
  *Q. So when you saw this [EPA interim] report [in June 2015], you didn't go back to VNA and say, "I read your final report, and now the EPA is telling me that lead and corrosion control are connected," did you?*
  *A. I did not.*
  *Q. You didn't go to Warren Green and say, "You've done work for us. Is there a connection between corrosion control and lead," did you?*
  *A. No.*

Q. You didn't call the DEQ and ask them about the relationship between corrosion control and lead, did you?

A. I did not.

Q. And this was late June-early July, of 2015?

A. Yes. It was right around that time.

Q. Thank you. So when you testified yesterday, you said that you read the VNA report back and forth. And you testified that if they had mentioned the word "lead," you would have done something different, correct?

A. Yes.

Q. You said, "I guarantee you," didn't you?

A. Yes.

Q. The EPA, Miguel Del Toral put "lead" in his report, correct?

A. Yes.

Q. "Lead" occurs in this report, the word, more than 20 times; is it fair to say?

A. Yes.

Q. And at that time, you did not do anything to switch back to the DWSD, did you?

A. I didn't take any action towards DWSD at the time.

Q. You didn't even start studying whether it was plausible to return to the DWSD, did you?

A. Not at that time.

Q. Did you write the president at that time?

A. No.

Q. Did you write the governor at that time?

A. No. The governor came a little bit later.

Q. Months later, correct?

A. Um-hum.

Q. So as of early July, 2015, you had corrosion control, you had lead, you had a report saying that you had danger, correct?

A. Yes.

Q. And you had already seen at least one of your citizens, one of your constituents suffering — or with a high lead test result coming from the water in their home, correct?

A. Yes.

- Not until August 31, 2015 – almost six months after VNA issued its final report to the City – did Mayor Walling seek more information about corrosion control.


## Mayor Walling and City officials failed to take expedient action to treat the river water or consider a return to Detroit Water.

Read the transcript:

Q. Did there come a time when the city council decided to make a vote with respect to returning to the DWSD?
A: Yes.
Q. And what did they vote?
A. The city council voted to reconnect to DWSD. I don't recall the number, the for and against, but it was pretty strongly for.
Q. And at that point in time [March 2015], did you make a statement about returning?
A. Yes.
Q. And what was your statement?
A. My statement was that I was not in favor of reconnecting to Detroit. We had safe water that met the standards. And it was something that I thought deserved further examination and research.

- After learning of the high lead test result found in LeeAnne Walters' home, Mr. Walling never set up a formal meeting with Mr. Croft to discuss next steps, nor inquire about additional lead testing in Flint.

Read the transcript:

A. The conversation Mr. Croft and I were having were, like, informal.
Q. Informal?
A. Like he — like he — I'd grab him for a minute, and we'd sit down in my office. At this point, he's reporting to the city administrator, Natasha Henderson. So my primary information about this was coming from those brief conversations with Mr. Croft that I believe occurred about once a week.
Q. Okay. So at that point in time, you were getting informal information. You did not have a more important matter on your desk than the health and safety of Flint residents at that time; is that correct?
A. Ever. Correct, yes.
Q. And you were content to only have informal meetings with Mr. Croft at that point in time?
A. Well, each week I was hearing the — you know, the steps and the new information, and I believed the city was making good progress. I mean, it is something that I look back on. I question myself about it.

- During the inaugural meeting of the Technical Advisory Committee on March 4, 2015, comprised of City officials and water quality experts, Mr. Walling did not bring up Ms. Walters' high lead test results or the need to test more households in Flint – despite admitting this would have strengthened his understanding of the lead issue and the need to switch back to DSWD.

  Read the transcript here:
  Q. So at this meeting, you had quite an assembly of water expertise; is that fair to say?
  A. Yes.
  Q. And was that part of the purpose for this assembly?
  A. Yes. This was one of the steps that we were taking as a city engaging Veolia, creating a broad community water advisory committee and then this technical, kind of, you know, water treatment engineering. So these are people who have technical or work experience or credentials around water.
  Q. And the date of this email is Thursday, March 5 of 2015; is that correct?
  Q. So if this email sent on March 5 and refers to a meeting the prior day, this is approximately March 4 that the meeting occurred?
  A. Yes. I believe it did.
  Q. Okay. So tell me what you recall about the agenda for that meeting.
  A. I was — I was at that meeting to show that, you know, myself, and others — I mean, myself, the emergency manager were engaged and valued the contributions that these individuals [water experts]– you know, they're taking time. We had this meeting in this committee room, one of the committee rooms. The larger room for the city council. The door was open. You asked me about the agenda. Sorry. I'm trying to prompt my memory. Well, I know the Veolia presentation that's mentioned there in the attachments was a part of those discussions. I think there were some of the same points that had been shared with the Public Works Committee, as I recall. I don't — I don't remember more about an agenda. There probably were welcome and introductions. It's the first time these people were getting to know each other. I think we had a couple on conference call. Maybe there's another document. But I don't –
  Q. So this meeting occurred two days after that email from Ron Fonger about the lead, high lead test results?
  A. Yes.
  Q. It occurred two days after a discussion of conducting more tests to see if other homes had high lead content in the tap water, correct?
  A. Yes.
  Q. This was a good opportunity to talk about high lead test results. Would you agree?
  A. In retrospect, I very much agree.
  Q. But you didn't bring it up, did you?
  A. I did not.

- The Mayor admitted he was unaware of how many homes were tested in Flint following Walters' test result and never recalled asking Mr. Croft, or anyone else in City government, for this information.

- The Mayor never recalled asking or seeing specific results on lead testing until he received MDEQ's order to the City of Flint in October 2015 to add corrosion control.

- The Mayor remained steadfast in his opposition to switching back to DSWD as late as March 2015 because he trusted the water testing – even after the high lead test results found in LeeAnne Walters' home and at the University of Michigan.

- The return to Detroit Water was also repeatedly rejected by Flint officials, including Flint Emergency Manager Gerald Ambrose who told VNA it was "incomprehensible" to switch water sources.

## Mayor Walling and City officials ignored the vast majority of VNA's recommendations and never followed up with them to install corrosion control.

- In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose. The City of Flint never implemented that suggestion.

- With the exception of purchasing a filter, the City of Flint ignored all of VNA's other proposals and suggestions on how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told the City itself was going to implement VNA's corrosion control

recommendations, but the City never did.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded, and dismissed.

- Had the City implemented corrosion control at VNA's recommendation, the crisis could have been mitigated much sooner, with fewer victims.

## In sworn, 4,000-word testimony to the U.S. Congress in 2016, Mr. Walling excoriated Michigan State officials for making the decisions that caused and prolonged the water crisis.

- Mr. Walling affirmed that the State officials opted to switch the water source as a cost-saving measure, with little regard for the human consequence.

- His statement repeatedly points to the State's Emergency Managers and Governor Snyder, amongst others, for making the choice to switch Flint's water source and not taking mitigatory action sooner.

- The City's decision to ignore VNA's recommendations followed a pattern of negligence that led to and prolonged the crisis, leaving Flint residents to suffer as a result.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA

## FACTS FROM THE COURTROOM

April 12, 2022

# VNA engineer Marvin Gnagy's deposition: what you need to know

On April 6th, 7th, and 11th, VNA engineer Marvin Gnagy's deposition was played in the courtroom. Here's what you need to know.

From the moment VNA's one-week contract with the City of Flint was signed, City officials made it clear that VNA's job was to assess TTHM and water discoloration issues – not to consider a return to Detroit water.

- Mr. Gnagy testified that VNA's scope of work was restricted to analyzing for a cancer-causing chemical (TTHM) and water aesthetic issues.

- Despite this, Mr. Gnagy personally told former Emergency Manager Gerald Ambrose that switching back to Detroit water was an option, but Mr. Ambrose wasn't interested.

- Mr. Ambrose called a return to Detroit water "incomprehensible."

- Flint officials changed the City's water source to save money over the health and well-being of its residents. They had no intention of returning to Detroit Water because of the high cost of switching.

- VNA had no power to overrule the government officials who refused to return to Detroit Water.

VNA recognized that Flint's water could be corrosive, leading Mr. Gnagy to request the City of Flint provide its lead test results.

- Mr. Gnagy testified he told Flint Water Plant personnel and former Emergency Manager Gerald Ambrose that there were corrosive water conditions in the Flint River water, which could lead to lead issues in the future.

- When Mr. Gnagy told Mr. Ambrose that he was concerned about corrosivity, Mr. Ambrose told him to "stick to [his] scope if [he] want[ed] to get paid."

- Nevertheless, Mr. Gnagy requested all available lead testing results from the City, which showed that the water complied with all State and Federal regulations.

- VNA was never informed of the high lead test results from Flint resident LeeAnne Walters' home even though this information was known by the Mayor, MDEQ, the EPA, and other Flint officials who immediately recognized the problem, saying things like "WOW," "[d]id he find the lead!," and "big worries here."

- VNA had no reason to suspect the City withheld information about high lead levels at the home of LeeAnne Walters.

- VNA had no choice but to rely on the information the City provided since lead testing is not something a consultant like VNA can do from the plant as it requires testing at individual homes.

- If the City had told VNA they were getting lead samples while the company was onsite, Mr. Gnagy said he would have checked into what their data was and potentially discussed a contract scope change.

In its final report to the City of Flint, VNA made a series of important recommendations, including corrosion control.

- VNA recommended corrosion control in their final report, anticipating potential lead problems could occur if corrosion was not addressed.

- In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose. The City of Flint never implemented that suggestion.

- Except for purchasing a filter, the City of Flint ignored all of VNA's other recommendations as to how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told that the City itself was going to implement VNA's corrosion control recommendations, but the City never did.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 

## FACTS FROM THE COURTROOM

*April 13, 2022*

# Ms. Kelly's testimony confirms that government officials withheld critical information from the Flint community

On April 12th, Ms. Melinda Kelly testified in the courtroom. Ms. Kelly is the grandmother of plaintiff Emir Sherrod. Here's what you need to know.

While VNA was engaged in Flint, City officials discovered exceptionally high levels of lead in the tap water at the home of LeeAnne Walters. They withheld this information from VNA.

- In an email dated February 24, 2015 and sent to a number of Flint officials, Flint water plant operator Michael Glasgow wrote that he received results from LeeAnne Walters' home and that "the level of lead was 104 ppb."

- Mr. Glasgow's email went on to say, "the limit on lead is 15 ppb" and that, "there is definitely a pressing issue here."

- Approximately 30 minutes later, former Flint Water Distribution Supervisor Robert Bincsik replied that, "Marvin [Gnagy] from Veolia mentioned to me he thought we needed to add phosphate to our water to help prevent this."

- Mr. Gnagy confirmed that he said this to Mr. Bincsik on VNA's first day at the water treatment plant.

- Mr. Gnagy also confirmed that he interacted with Mr. Glasgow at the Flint water plant "on a daily basis," and yet Mr. Glasgow never told him about the high lead result.

- Nobody from Veolia was included in the email from Mr. Glasgow detailing Ms. Walters' high lead test results, and nobody from the City of Flint ever shared this critical information with VNA

Ms. Kelly's testimony confirmed that government officials repeatedly misled and withheld critical information from the Flint community regarding the safety of the water.

- Ms. Kelly testified that former Mayor of Flint Dayne Walling visited Ms. Kelly's home and told her that the water was safe.

- After his visit to her home, Ms. Kelly saw Mayor Walling and former Flint Director of Public Works Howard Croft explaining that the water was safe on the local news.

- Ms. Kelly stated that Mr. Croft had been her neighbor, and that he told her directly that the water was safe.

VNA had no way of knowing that City officials were lying to them and their own constituents about lead in Flint's tap water and had no power to fix the problem.

- VNA's one-week engagement in Flint specifically stipulated that they were to provide recommendations to address TTHMs, a cancer-causing chemical, and aesthetic concerns, including color.

- Almost immediately, VNA identified that the water was corrosive and requested the City's lead testing data, which showed the water to comply with state and federal standards.

- Still, VNA's experts recommended that the City add corrosion control to its treatment processes to avoid a lead problem in the future—a recommendation that was never implemented.

- Critically, Flint officials learned of a high lead result at the home of LeeAnne Walters while VNA was on the ground in Flint, and never alerted VNA.

- Government officials ignored all but one of VNA's recommendations and declined offers from VNA to assist with the implementation of its recommendations after its one-week engagement had concluded.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA                                                                                    

## FACTS FROM THE COURTROOM

April 15, 2022

# VNA VP Robert Nicholas' deposition: the facts

On April 12th, 13th, and 14th, former VNA Vice President of Business Development Robert Nicholas' deposition was played in the courtroom. Here are the facts:

Flint officials told VNA on multiple occasions that they were not interested in their opinion as to whether or not reconnecting to Detroit water was the best solution.

- Flint officials changed the City's water source from treated water from Detroit to untreated water from the Flint River 10 months prior to engaging VNA.

- The switch was made to save money over the health and well-being of Flint residents.

- VNA suggested at the onset of their engagement in Flint that a return to Detroit water would be the quickest solution, but City officials dismissed those suggestions.

- Former Flint Emergency Manager Gerald Ambrose called a return to Detroit water "incomprehensible."

All of the data that Flint officials provided to VNA showed the water was in compliance with state and federal standards.

- At a public meeting in February 2015, Mr. Nicholas stated that Flint's water was in compliance with State and Federal guidelines.

- The full record of the meeting makes clear that VNA warned it had not conducted its own tests and only reviewed the test results shared by the City of Flint.

- VNA also encouraged the public to alert the City about water issues they were experiencing and explained that the City would test the water at residents' homes at no charge.

VNA asked Flint officials to provide all relevant testing data to them and had no reason to believe that they would not.

- VNA had no choice but to rely on the City to provide data for water samples collected outside of the plant (i.e., from residents' homes and other locations).

- We know now that City officials withheld critical sampling data showing exceptionally high levels of lead found at the home of LeeAnne Walters.

- The City withheld this information from VNA even though VNA had specifically asked for relevant samples and even though VNA was on the ground in Flint when the City received Ms. Walters' high lead test result.

VNA followed up with Flint officials in April of 2015, after submitting their final report, to offer to assist in the implementation of their recommendations—their offer was rejected.

- VNA's final report to the City of Flint included over a dozen recommendations to improve the City's water treatment processes.

- One of those recommendations included corrosion control, which VNA labeled as the second highest priority behind quality control practices.

- VNA had every reason to believe that City officials would take VNA's recommendations seriously and followed up to see if there was anything they could do to help the City with implementation of VNA's recommendations.

- In response, Mr. Ambrose told VNA that they were managing implementation of their recommendations "in-house" and declined VNA's offer to assist.

- Earlier in the trial, LAN Engineer Warren Green told the Court that he asked City officials if they would like him to start work on VNA's recommendations, but never received the go-ahead.

- After VNA's offer to assist was rejected, VNA had no way to know that Flint officials had opted to ignore all but one of their recommendations—including the recommendation to add corrosion control.

**Mr. Nicholas' "lead seems to be a problem" email has been taken completely out of context and misrepresented by the plaintiffs' attorneys.**

- The email sent by Rob Nicholas was based on a news article published before VNA even entered Flint, which showed high lead levels in one drinking fountain at the University of Michigan-Flint.

- VNA was beginning an internal discussion and assessment on the issue with their technical team before expanding the conversation externally.

- In fact, it was this email, among other things, that prompted VNA to ask the City to provide them with their lead and copper rule testing.

- VNA reviewed the testing conducted by the City of Flint, as well as all of the testing done at the University.

- All test results provided to VNA showed compliance with State and Federal water standards.

**Business development considerations never influenced VNA's recommendations to the City.**

- Business development considerations never dictated the course of VNA's engagement with the City of Flint and Business Development leaders never had operational control of the project.

- VNA engineers exclusively made all recommendations to the City of Flint, based on their engineering judgment and that alone.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA



## FACTS FROM THE COURTROOM

*April 21, 2022*

# Gerald Ambrose refused to consider a return to Detroit Water even after residents reported getting sick

On April 19-20, 2022, Former Flint Emergency Manager Gerald Ambrose's deposition was played in court. Mr. Ambrose, who is now under indictment for his negligence, played a key role in approving the use of the Flint River as an interim water source for the City. He refused to consider a return to Detroit Water even after Flint residents reported getting sick from drinking and bathing in the contaminated river water.

Mr. Ambrose admitted he lied to Congress in 2016 when he told them he was unaware of lead issues in the Flint water during his tenure as Emergency Manager.

Rather than take the stand and answer questions in front of the jury about his role in the Flint Water Crisis, Mr. Ambrose pled the 5th Amendment. He has recently joined with other indicted government officials in expressing, through his lawyer, that he would sooner go to jail for contempt of court than take the stand if forced to testify.

Here is what else you need to know.

Flint officials failed to inform VNA that they had discovered exceptionally high lead levels in the home of Flint resident LeeAnne Walter in February 2015.

- Mr. Ambrose admitted that he knew about the high lead level samples found in Flint resident LeeAnne Walter's home but did not share these results with VNA or instruct anyone else from the City to do so.

- This follows testimony earlier in the trial from former Flint Mayor Dayne Walling who also admitted, on the stand, that he knew of the lead test results in February 2015 and did nothing to ensure that VNA would receive this critical information.

- Flint officials withheld Ms. Walter's lead samples from VNA even though VNA had specifically asked for all lead test results and even though VNA was on the ground in Flint when the City received Ms. Walter's results.

- All of the data that Flint officials provided to VNA showed the water was in compliance with State and Federal water standards, which was the basis for VNA's assessment that the water was safe.

- VNA had no choice but to rely on City officials to provide lead test results and had no reason to suspect the City would withhold this information.

Although VNA was not asked to examine the water for lead, VNA employees recognized early on that the water was corrosive and specifically asked City officials to provide data on lead test results.

- The City of Flint hired VNA to conduct a one-week review of the operations of the Flint Water Treatment plant and address the problems caused by a cancer-causing chemical (TTHM) in the water and other water aesthetic issues.

- The City never asked VNA to look into lead contamination, nor did they give any indication that they were concerned about lead, let alone in possession of high lead test results.

- VNA Engineer Marvin Gnagy testified in his deposition that he told Mr. Ambrose he was concerned about corrosivity, and that Mr. Ambrose's responded, "stick to your scope if you want to get paid."

- Nonetheless VNA requested the City provide data on its lead sampling tests and the data they provided showed that the water was within state and federal limits for lead.

- VNA recommended corrosion control in their final report to address the immediate aesthetic issues that City officials asked them to look into, and to prevent potential lead problems in the future.

- Ultimately, VNA's recommendation to add corrosion control was ignored, as were the rest of their recommendations with the exception of one.

**Flint officials refused to consider a return to Detroit Water and they made this clear to VNA on multiple occasions, starting on day one.**

- Mr. Ambrose had no interest in returning to Detroit Water no matter what VNA, or anybody else, recommended. He testified his primary goal was to save money, not the health and safety of its residents.

- Mr. Ambrose assisted his predecessor, former Emergency Manager Darnell Earley, in crafting a response to DWSD rejecting their offer to return to Detroit Water despite the water quality problems and the concerns of plant staff and residents.

- VNA was told by Mr. Ambrose and other Flint officials that returning to Detroit Water was not an option and Mr. Ambrose instructed VNA "not to be drawn into a discussion" on the history or merits of the switch from Detroit Water.

- More than a month after Flint officials learned of high lead test results at the home of LeeAnne Walters, Mr. Ambrose called the idea of switching back to Detroit water "incomprehensible" and claimed that the Flint water was "just as safe."

- VNA had no power to overrule the government officials who refused to return to Detroit Water.



**Flint officials instructed VNA to focus on what was needed, and what the costs would be, to bring the Flint water treatment plant into compliance with respect to TTHMs and red water issues.**

- Based on the data that the City provided to VNA, combined with their on-site analyses at the plant, VNA concluded that it would be possible to bring the plant into compliance.

- In their final report, VNA made a series of recommendations for the City to bring the Flint Water Treatment Plant into compliance based on their expert analysis.

- Had VNA determined that bringing the plant into compliance was not feasible, they would have said so in their report and recommended that Flint return to Detroit Water as the only option.

- VNA had no way to know that City officials had withheld critical information that would have significantly impacted their recommendations to the City.

**Flint officials ignored almost all of VNA's recommendations on how to treat the Flint River water.**

- In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose. The City of Flint never implemented that

suggestion.

- With the exception of purchasing a filter, the City of Flint ignored all of VNA's other proposals and suggestions as to how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told that the City itself was going to implement VNA's corrosion control recommendations but the City never did.

- Earlier in the trial, LAN Engineer Warren Green told the Court that he asked City officials if they wanted him to start work on VNA's recommendations, but never received the go-ahead.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.



VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 VEOLIA

## FACTS FROM THE COURTROOM

April 28, 2022

## Michael Glasgow testimony points to long pattern of negligence on behalf of Flint officials

On April 25-27, 2022, former Flint Water Treatment Operator Michael Glasgow took to the stand. His testimony pointed to a long pattern of malfeasance and negligence on behalf of City and State officials that both sparked and prolonged the Flint Water Crisis.

Key takeaways from his testimony include:

- Mr. Glasgow raised concerns about the treatment plant's ability to produce safe drinking water in the weeks prior to the switch from DWSD, and those concerns were dismissed by his superiors.

- Mr. Glasgow was well aware of the role of corrosion control in preventing lead contamination and did not need VNA or anybody else to explain this concept to him.

- Mr. Glasgow explained that he began to 'connect the dots' about a lead problem in Flint's drinking water in February 2015 after receiving exceptionally high results from the home of Ms. LeeAnne Walters.

- Despite his concerns, Mr. Glasgow reaffirmed that VNA was not provided Ms. Walters' lead sample results and, in fact, the results that were provided to VNA showed the water to be within state and federal standards.

- Mr. Glasgow was also aware that Flint's sampling procedure was not capturing the highest lead levels from the higher risk locations and, at the direction of the MDEQ, he deliberately altered the June 2015 Water Quality Report to remove the two highest lead readings.

Here's what else you need to know.

Flint officials chose not to install corrosion control treatment before switching to the Flint River despite their first-hand knowledge of potential lead contamination in the City's aging infrastructure.

- In anticipation of a switch to the Flint River, Mr. Glasgow met with MDEQ officials who told him the Plant did not need to use corrosion control measures.

- Instead, the MDEQ said that it would review Lead and Copper rule testing data for two six-month periods following the switch to the Flint River and reevaluate.

- Mr. Glasgow was surprised by this direction from the MDEQ, as he recognized that failure to add corrosion control could lead to lead problems.

- Mr. Glasgow testified that MDEQ later acknowledged that it made the wrong call when it said corrosion control was not required.

Despite Mr. Glasgow's concerns that the treatment plant was not ready, City and State officials pushed ahead with the switch in water source.

- Mr. Glasgow testified that Plant staff did not have adequate training on the equipment and that a 30-day test run revealed significant problems with the plant's operations.

- The City ignored one of LAN's key recommendations at the time, endorsed by Glasgow, to conduct a 60-to-90-day test to ensure the Plant could operate successfully.

- Mr. Glasgow made multiple requests of his superiors to delay the switch for 90-100 days to give him more time to prepare for the safe treatment of the water.

- In response to his pleas, former Public Works Director Howard Croft told Mr. Glasgow "We have to meet this deadline. No is not an answer or an option."

- Mr. Glasgow told MDEQ regulators in an email prior to the switch that he had serious concerns and that "if water is distributed from this plant in the next couple of weeks, it will be against my direction… I will reiterate this to management above me, but they seem to have their own agenda."

- MDEQ rubber stamped the switch despite Mr. Glasgow's concerns, and never responded to his email.

**Flint officials withheld test results showing exceptionally high levels of lead from VNA, even though VNA was actively engaged in Flint when the results were returned to City officials.**

- Mr. Glasgow testified he was aware of no contact between the City of Flint and VNA in response to the high lead levels found in LeeAnne Walters' home.

- Flint Mayor Dayne Walling, Emergency Manager Gerald Ambrose and officials from the MDEQ and EPA all knew of the high lead levels in Ms. Walters' tap water but did not inform VNA or the public, despite VNA's request that the City provide its consultants all relevant lead sampling data.

- The data that was provided to VNA showed the water to be in compliance with State and Federal regulations about lead.

- In the wake of the high lead result from Ms. Walters' home, Mr. Glasgow told LAN engineer Warren Green to start designing a phosphate feed system to add corrosion control to the plant's process because it would "likely" be needed.

- Flint officials overruled this suggestion and said the City would "cross that bridge when they got to it" at the end of the second round of Lead and Copper rule testing.

- For nearly a year and a half, the people with the power to fix this problem hid critical information and did nothing to address the water quality issues in Flint.

**The City of Flint altered data in their final report to the MDEQ and EPA in order to maintain compliance with Lead and Copper regulations.**

- Mr. Glasgow testified that Ms. Walterss high test result of 104 ppb prompted the EPA to ask the MDEQ for the City's Lead and Copper rule report.

- The MDEQ's Michael Prysby and Steven Busch instructed Mr. Glasgow to lower the required number of samples from 100 to 60 and remove the two high test results from the report, including the one from Ms. Walter's home, in order to show compliance with the Lead and Copper testing rule.

- Despite having a "hard time rationalizing" these instructions, Mr. Glasgow nevertheless deferred to the regulators at MDEQ.

**Flint officials ignored almost all of VNA's recommendations to the City, including the need for corrosion control.**

- Mr. Glasgow testified that it took him several weeks and multiple requests of his superiors before he was provided a copy of VNA's final report even though the report concerned water treatment issues that related to Mr. Glasgow's role at the Plant.

- With the exception of purchasing a filter, the City of Flint ignored all of VNA's recommendations as to how to improve the quality of the water, including the recommendation to add corrosion control.

- When VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing these recommendations. VNA was told the City itself was going to implement VNA's corrosion control recommendations, but the City never did.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 

## FACTS FROM THE COURTROOM

*April 29, 2022*

# Public health officials sound the alarm on Aaron Specht's junk science bone lead test

On April 27-28, Aaron Specht, Ph.D., an assistant professor at Purdue University, took to the stand.

Specht led a highly controversial program to test bone lead levels in Flint children using modified, hand-held devices (called pXRF). Originally manufactured for scrap metal recycling, mining and other industrial uses, these devices have never been approved or deemed safe for use on humans, much less children, and have not been proven to deliver reliable results.

Leading public health officials in Flint, including Dr. Mona Hanna-Attisha and Dr. Lawrence Reynolds, have sounded the alarm on Specht's testing program, which they believe has needlessly exposed children to high doses of potentially harmful radiation. The manufacturer of the device has also requested it not be used on Flint children, citing lack of FDA approval and safety concerns.

The use of this junk science with potentially harmful health consequences on the children of Flint is yet another example of the disrespect that continues to be shown to the people of Flint.

Here's what you need to know.

Specht is not a medical doctor, and his studies are questionable at best.

- Specht is not a medical doctor nor a toxicologist. He is not licensed to practice medicine or provide medical opinions.
- Specht did not receive institutional review board approval for the studies he conducted on Flint children and he has not published any papers regarding his findings.
- Specht's previous studies using the pXRF on humans were conducted in countries with a history of rampant corruption and human rights abuses, particularly of children, and far less rigorous health and safety regulations than the United States.
- Third-party experts have been unable to replicate Specht's testing because he has not shared his protocols with them, further underscoring the unreliability of his studies.
- For his testimony, Specht prepared slides using the Harvard logo and branding, however there is zero affiliation between Harvard and Specht's studies on Flint children.

Specht has been unable to show that pXRF devices accurately measure lead exposure in children.

- Specht's own peer-reviewed research has shown that these devices do not produce accurate bone lead measurements in children and have too high of an error rate to be reliable.
- Even if Specht's pXRF measurements were accurate, there is no established standard for what constitutes "elevated" bone lead levels as the CDC has never issued any recommendations or guidance on the subject.

- Moreover, Specht's measurements proclaim to measure bone lead accumulated over the course of an entire lifetime and, by his own admission, cannot trace lead exposure to specific time periods or sources.

**Numerous health experts have raised serious safety concerns over the use of the pXRF device on Flint children.**

- Dr. Mona Hanna-Attisha, the Flint pediatrician who first found elevated levels of lead in the blood of Flint children during the water crisis, has highlighted the unknown and potentially harmful radiation risks for children.

- Dr. Lawrence Reynolds, health advisor to Flint Mayor Sheldon Neeley, called the tests "a human rights violation…. The Tuskegee experiment all over again." Reynolds said the use of radiation outside of medical necessity is unethical and that the X-ray devices being used were not designed for this purpose.

- Dr. Reynolds told 7 Action News: "I've taken care of children in the Flint area for 29 years. And if you want to see a pediatrician get worked up, just abuse children. And this is abuse."

- The manufacturer of the device has itself requested that Specht stop using the device on Flint children due to safety concerns. In a letter to the Napoli Shkolnik law firm in May 2021, Thermo Fisher Scientific Vice President and General Manager Chloe Hansen-Toone explained that the "user's guide explicitly instruct all users to 'never point your analyzer at yourself or anyone else when the shutter is open.'"

- ABC News reported that a Flint woman who was 28 weeks pregnant was given a bone scan by the Napoli Shkolnik law firm, but said she was never asked whether she was pregnant.

**pXRF devices were never intended to be used on humans, much less children, and have never been approved for such use.**

- Thermo Fisher Scientific created portable XRF devices for use in mining and exploration, scrap metal recycling, and other industrial purposes.

- Thermo Fisher has vigorously protested Specht's use of its pXRF machines on Flint children, explaining that the devices were not designed to measure bone lead levels in people and only supported research on a "limited number of occasions" with universities. The research conducted at these universities has been limited to adult patients and human cadavers.

- The pXRF devices are not approved by the FDA or any other agency for use on humans as its safety and effectiveness has not been established.

- Blood lead is the universally accepted methodology for measuring lead exposure in humans and is also recommended by the Center for Disease Control (CDC). No other country is using pXRF to measure bone lead in people.

**Specht's studies of Flint children did not adhere to standard scientific protocols.**

- There is no scientific way to conclude that plaintiffs' bone lead levels are elevated because Specht did not test a control group of non-Flint children and therefore did not establish a baseline.

- Specht conceded that the reference value he used in his study of Flint children (10 μg/g) was derived purely from literature and based on studies of adults.

- Specht has not come up with any reference value for what bone lead levels in children would show a "persistent intense exposure."

**When questioning Specht, plaintiffs' attorneys relied heavily on confirmation of "scientific certainty," a controversial phrase that leading criminal justice groups have advocated against.**

- The phrase "scientific certainty" has no scientific origin and no scientific meaning.

- The National Commission on Forensic Science recommended that the phrase "degree of scientific certainty" no longer be used in courtrooms because it has no roots in science.

- The Innocence Project, which works to free the innocent and create fair, compassionate and equitable systems of justice, has called the phrase "misleading" and recommended it stop being used in courtrooms.



VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 VEOLIA

≡

## FACTS FROM THE COURTROOM

*May 9, 2022*

# VNA was powerless to intervene as City of Flint officials chose to ignore most recommendations

On May 4th, 5th, and 9th 2022, water resources engineer Richard Humann took the stand. Mr. Humann is a paid witness for the plaintiffs who, in his own report, found the Flint Water Crisis to be "a story of government failure, inaction, delay and environmental injustice." Mr. Humann also agreed, under oath, that VNA was powerless to intervene as City of Flint officials chose to ignore all but one of their recommendations.

Here is what you need to know.

Mr. Humann relied on remarkably little information when drafting his report.

- Mr. Humann never even read the contract between the City of Flint and VNA.

- Mr. Humann cited just one deposition in his report despite the hundreds of thousands of pages of written documents and testimony from all the individuals involved in the Flint Water Crisis.

- He never visited the City of Flint or toured the Flint Water Treatment Plant.

- He never spoke with anyone who worked for the Flint Department of Public Works or the Michigan Department of Environmental Quality.

- He also never spoke with anybody from VNA, and his report does not contain a single reference to any VNA employee.

Mr. Humann lacks an understanding of the basic facts related to the Flint Water Crisis.

- Mr. Humann did not know that the MDEQ told the City of Flint that it did not need to install corrosion control when the plant went online in April 2014.

- He also did not know that VNA recommended the addition of phosphate as a form of corrosion control to address potential lead problems, as confirmed by Robert Bincsik's February 2015 email.

- He did not consider the fact that lead levels recorded in December 2014 were below the action level – information that VNA relied upon when making its recommendations.

Mr. Humann's report failed to consider the fact that Flint officials withheld critical information about high lead levels from VNA and the public.

- Despite asking for all relevant lead testing data, VNA was never informed of the high lead test results from Flint resident LeeAnne Walter's home, even though this information was known by the Mayor, MDEQ, the EPA and other Flint officials.

- All the lead testing provided to VNA by Flint officials showed that the water was in compliance with all applicable State and Federal regulations.

- VNA had no choice but to rely on the information the City provided and had no reason to suspect the City withheld information about high lead levels in LeeAnne Walter's home.

**City and State officials caused the Flint Water Crisis when they chose to switch the City's water source to save money.**

- In an effort to save money, City and State officials decided to change Flint's water source from treated water from Detroit to untreated water from the Flint River.

- They ignored expert advice to conduct test runs at the Flint Water Treatment plant and to install corrosion control treatment before implementing the switch despite having first-hand knowledge of potential lead issues with the City's aging infrastructure.

- After it became clear that the water had serious problems, these same officials repeatedly refused to consider a return to Detroit Water – and specifically instructed VNA that they were uninterested in their opinion as to whether a return to Detroit would be the best solution.

- Flint Emergency Manager Gerald Ambrose specifically instructed VNA not to be "drawn into a discussion" on the history or merits of the switch from Detroit Water.

- For nearly a year and a half, the people with the power to fix this problem did nothing, even after the people of Flint protested the water's disgusting taste, smell, and color and reported becoming sick from drinking and bathing in the water.

**In their final report to the City of Flint, VNA made a series of important recommendations, including corrosion control—all but one of their recommendations were ignored.**

- VNA recommended implementing corrosion control, anticipating potential lead problems could occur if corrosion was not addressed.

- In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose. The City of Flint never implemented that suggestion.

- Except for purchasing a filter, the City of Flint ignored all of VNA's recommendations on how to improve the quality of the water.

- After VNA's work in Flint was complete, VNA followed up to see if the City wanted additional help implementing their recommendations. VNA was told that the City itself was going to implement VNA's recommendations, including corrosion control, but the City never did.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 **VEOLIA**                                                                                                                          

## FACTS FROM THE COURTROOM

*May 13, 2022*

# Mira Krishnan's unscientific neuropsychological review – What you need to know

On May 10-11, 2022, clinical psychologist Dr. Mira Krishnan took the stand. Dr. Krishnan was paid by plaintiffs' counsel to complete a neuropsychological review of each of the four plaintiffs, which showed all the plaintiffs' IQ, cognitive, and behavioral scores fell within the expected ranges for their respective ages and genders. Dr. Krishnan met each plaintiff one time, very briefly, in a law office rather than a medical setting in 2020. She has no baseline from which to compare each plaintiff's cognitive and behavioral abilities before and after the crisis, and therefore no way to measure cognitive or behavioral changes for each of the plaintiffs from before and after the Flint Water Crisis.

Dr. Krishnan's report also failed to consider other potential causes of mild behavioral or cognitive disorders, such as genetics and trauma.

Here's what you need to know.

Dr. Krishnan's diagnoses of the plaintiffs are not uncommon within the general population and her opinions significantly underestimate each plaintiffs' future potential.

- Dr. Krishnan's diagnoses include one instance of mild ADHD, one instance of mild mood disorder, and two instances of mild neurocognitive disorder—an overly broad term that is not a generally accepted diagnosis within psychiatry.

- Dr. Krishnan relied only on anecdotal evidence from her experience with her own clinical patients, not any scientific data or literature, to reach the conclusion that the plaintiffs were at increased risk of not graduating high school or college or engaging only in unskilled vocations.

- Dr. Krishnan's diagnoses are common in millions of children and, with the proper support, are not known to have a measurable impact on a child's future potential.

- One example of an exaggeration within Dr. Krishan's report is her opinion that, as a result of mild ADHD, one of the plaintiffs will have limited opportunities in the future. However, to reach this opinion, she relies on a single scientific study of children with "severe" ADHD which is inconsistent with her finding of "mild" ADHD.

Dr. Krishnan did not review important background information when making her diagnoses.

- Dr. Krishnan overemphasized the subjective complaints of the parents and plaintiffs when reaching her conclusions.

- She failed to properly weigh the medical and educational records of the four plaintiffs, which show the plaintiffs' alleged impairments have minimal-to-no impact on their studies and daily interactions.

- Dr. Krishnan also failed to appropriately weigh background information of plaintiffs' parents and siblings.

Dr. Krishnan has no baseline testing from which to compare her findings and therefore no way to measure cognitive or behavioral changes from before and after the Flint Water Crisis.

- Dr. Krishnan confirmed the plaintiffs had no medical treatment or diagnoses of any neuropsychological and cognitive issues prior to her examination of them.

- Since there was no prior testing, Dr. Krishnan had no baseline to use as a comparison when forming her conclusions.

- Dr. Krishnan has no way to know if plaintiffs' diagnoses were or were not the result of lead in Flint's water.

- Given the prevalence of her diagnoses amongst the general population, it is highly possible plaintiffs developed these mild conditions in the course of normal development.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America



FACTS FROM THE
COURTROOM

May 17, 2022

# Forensic economist Gary Crakes' opinions on Flint fail to consider critical factors

On May 16, 2022, Gary Crakes took the stand. Crakes is a forensic economist who was paid by plaintiffs' counsel to provide an opinion on potential economic damages they argue the plaintiffs will experience due to lead exposure. Crakes, a professional expert witness, testified that he has a longstanding business relationship with the plaintiffs' lawyers, having been retained by their firm in 75-80 prior cases on behalf of plaintiffs.

Crakes' analyses are purely hypothetical and based on the opinions of Dr. Krishnan, who was also paid by plaintiffs' counsel to conduct a psychiatric evaluation of the four plaintiffs, each of whom she met one time, very briefly, in a law office in Flint Michigan in 2020. Crakes' opinions fail to consider critical factors known to influence earnings potential, such as family history, geography, trauma, and other environmental factors. Crakes also fails to consider the impact of cost-effective and widely available interventions for mild neurocognitive disorders, such as ADHD, which affect millions of children and adults who lead full and productive lives.

Here's what you need to know.

Crakes' analysis relies solely on Dr. Krishnan's neuropsychological findings, yet he never spoke with Dr. Krishnan nor did he consider other highly relevant factors.

- Crakes never spoke with the plaintiffs or with Dr. Krishnan regarding her reports.

- He never reviewed the plaintiffs' medical records or deposition testimony, nor did he consult with other medical professionals regarding them.

- Crakes did not consider other pertinent information about the plaintiffs, such as their families or socioeconomic backgrounds, and assess how those factors could impact their future economic potential.

- Crakes never considered individual facts when reaching his conclusions, such as how the children are doing in school or if they are receiving support for the mild neurocognitive impairments Dr. Krishnan identified.

- The only two factors that Crakes considered in his analyses were gender and level of education.

Crakes assumes the plaintiffs cannot surmount the mild behavioral and cognitive deficits that Dr. Krishnan diagnosed.

- Crakes did not consider the widespread availability of interventions that are proven to help children and adults with mild neurocognitive disorders lead full and normal lives.

- He does not account for extra educational or social support that could help the children attain higher education.

- Crakes never performed any cost estimates for tutoring or other supplemental support the plaintiffs might receive, which are likely to be magnitudes less than his findings.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

➝  Visit our website

Twitter

Terms of Use

Contact

Forensic economist Gary Crakes' opinions on Flint fail to consider critical factors - Veolia Flint Facts

© 2023 – Veolia North America

 

## FACTS FROM THE COURTROOM

*May 27, 2022*

# Howard Croft ignored important warning signs showing Flint water was corrosive

On May 23-26, Howard Croft's deposition was played in court. Croft served as Director of the Flint Department of Public Works, which was responsible for the provision of safe drinking water in Flint, from December 2011 through November 2015, when he resigned.

In January 2021, Croft was criminally charged with two counts of willful neglect of duty for his role in the Flint Water Crisis.

Croft was involved in the decision to use the Flint River as an interim water drinking source, even though the Plant was not equipped to treat it, and he ignored important warning signs showing the water was corrosive following the switch from Detroit Water.

Here's what you need to know.

Mr. Croft failed to ensure the Flint Water Treatment Plant (FWTP) was ready to go online, pushing forward with the switch from Detroit Water and Sewage Department (DWSD) over the objections of Plant staff.

- Although Mr. Croft knew that Flint River was only ever intended to be a backup water source, he took no steps to analyze the water's chemistry before the switch or ascertain what impact the water would have on Flint's pipes and population. He admitted not knowing the composition of the service lines that provided water to residents in Flint.

- Mr. Croft could not recall any discussion at a June 2013 planning meeting at the Water Treatment Plant about what the City of Flint needed to do to meet the requirements or regulations of the Safe Water Drinking Act in terms of lead and copper testing, nor whether or not the water needed corrosion control to be safe.

- Mr. Croft never authorized any studies on these issues, nor did he reach out to officials at the MDEQ who offered to answer his technical questions concerning safety regulations for drinking water.

- Mr. Croft pressured FWTP employees to distribute drinking water to Flint residents even though the Water Quality Supervisor repeatedly warned Croft about the Plant's lack of staffing and resources and its inability to produce safe drinking water.

- In response to pleas from Flint Water Treatment Operator Michael Glasgow to delay the switch 90-100 days to give him more time to prepare for the safe treatment of water, Croft said, "We have to meet this deadline. No is not an answer or an option."

Following the switch to the Flint River, Mr. Croft ignored important warning signs about the corrosiveness of the water.

- When presented with a piece of lead service line pipe in October 2014 that had corroded due to the absence of phosphates in the water, Mr. Croft made no effort to escalate the concern to anyone above him.

- He did not instruct people under his supervision to find out if it was a system wide problem, nor did he contact the EPA regarding the issue. He testified he did not have the expertise to understand the problem even though it was his responsibility to oversee the provision of safe drinking water in Flint.

- Mr. Croft continued to assure the public that the Flint River water was high quality and complied with all state and Federal requirements even after he saw the corroded pipe and received hundreds of citizen complaints about the unusual color, taste and smell of the water.

- When Michael Glasgow informed Mr. Croft in February 2015 about the high lead levels in Flint's distribution system and the potential for more widespread lead issues, he failed to investigate further and informed his staff to quickly isolate the issue to a single home, if possible.

**Mr. Croft also withheld critical information about lead from the Flint Technical Water Advisory Committee and failed to adequately investigate the City's lead testing program.**

- Mr. Croft did not share the high lead level results from LeeAnne Walter's home with members of the TWAC, including VNA, even though the second round of testing happened just days before its inaugural meeting.

- He also did not disclose he had seen the corroded lead service line pipe in October 2014, which potentially indicated a system wide issue with lead.

- While Mr. Croft was aware of EPA whistleblower Miguel Del Toral's criticisms of the City's lead testing procedures, which he felt were causing deceptively low lead results, he never followed up with Mr. Del Toral or read his report.

- He also did not ask his direct reports at the Water Treatment Plant or anyone else in the Water Distribution Services Center how they were conducting lead testing and whether it was giving a false sense of security around actual lead levels.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶ Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA

FACTS FROM THE
COURTROOM

June 2, 2022

## Dr. Bithoney's testimony confirms that Flint Water Crisis was in full effect long before VNA ever arrived in Flint

On May 16, May 31 and June 1, 2022, the jury heard from Dr. William Bithoney, a paid witness for the plaintiffs with a long history of working for the plaintiffs' attorneys.

Dr. Bithoney has never met or interacted with any of the four plaintiffs. He reached his conclusions based on the reports of Dr. Mira Krishnan and Aaron Specht, whose bone lead scans have not been approved for use on humans and are the subject of significant controversy within the medical community.

Dr. Bithoney's primary conclusion is that exposure to lead caused the plaintiffs' mild neurocognitive disorders diagnosed by Dr. Krishnan, who spent a total of one hour with each plaintiff. Dr. Bithoney admitted on the stand that the children were exposed to lead from the Flint River water for nearly a year before VNA even arrived in the city, indicating that there is no plausible basis to conclude that VNA had any role in causing the plaintiffs' alleged injuries.

In fact, Dr. Bithoney's testimony further confirmed that the Flint Water Crisis was in full effect long before VNA ever arrived in Flint, and that government officials bear sole responsibility for the harm inflicted upon the people of Flint.

Here's what you need to know.

Dr. Bithoney relies on the dubious findings of Dr. Mira Krishnan and Aaron Specht in order to reach his conclusions.

- Despite acknowledging that blood lead testing is the "standard" for evaluating lead exposure, Dr. Bithoney relied on the controversial findings of the bone lead testing program run by Aaron Specht to conclude that the plaintiffs experienced significant lead exposure.

- The portable devices Specht used to measure plaintiffs' lead exposure were never intended to be used on humans and have not been approved by the FDA. Moreover, Specht's tests do not adhere to standard scientific protocols, have not been validated by third-party experts, and have a high error rate according to Specht's own research.

- Leading public health officials, including Flint Drs. Mona Hanna-Attisha and Lawrence Reynolds, have sounded the alarm on bone lead testing as unreliable and potentially harmful to humans, and especially children, due to exposure to high doses of radiation.

- Because he did not meet with any of the plaintiffs himself, Dr. Bithoney likewise relies on the diagnoses of Dr. Krishnan, who met with each plaintiff for a brief period in a law office – not a medical setting – in 2020.

- Dr. Krishnan's diagnoses are not uncommon within the general population, and she admitted on the stand that, because she only met plaintiffs in 2020 (more than six years after the crisis), she had no baseline from which to assess the plaintiffs before and after the Flint Water Crisis.

**Dr. Bithoney failed to consider alternative sources of lead exposure experienced by the plaintiffs.**

- Dr. Bithoney never investigated the plaintiffs' specific residential homes to determine alternative sources of lead exposure, such as paint, dust or soil.

- He also did not investigate any of the respective plaintiffs' pipe composition or water lead levels to determine the likelihood of them being exposed to enough lead to cause lasting harm.

- Dr. Bithoney admitted not having any information about the level of lead content in the tap water for any home associated with any particular plaintiff during the period where Flint was sourced by the Flint River.

**Neither Dr. Bithoney, nor the studies he relies upon, can show the plaintiffs' lead exposure level caused their alleged injuries**

- Dr. Bithoney admitted that none of the four plaintiffs had blood lead levels that would require further medical intervention. His reliance on bone lead measurements to prove injury is flawed because there is no benchmark identifying the relationship between bone lead levels and adverse health effects.

- Dr. Bithoney failed to offer any scientific basis for his opinion that low-level exposure to lead can cause the conditions diagnosed by Dr. Krishnan, such as mild ADHD, mild mood disorder, and mild neurocognitive disorder.

- He also never independently identified or diagnosed any conditions, cognitive deficits, or negative cognitive complications beyond those specifically identified by Dr. Krishnan.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America





FACTS FROM THE
COURTROOM
*June 8, 2022*

# Water analyst Adam Rosenthal knew Flint Water Treatment Plant was not ready to treat water

On June 1 and June 7, 2022, Adam Rosenthal's deposition was played in court. Rosenthal was an environmental water quality analyst at the Michigan Department of Environmental Quality (MDEQ), which fast-tracked Flint's plans to withdraw water from the Flint River and failed to require the City to add corrosion control to protect against lead contamination.

Mr. Rosenthal testified that he knew that the Flint Water Treatment Plant (FWTP) was not ready to treat the Flint River water, yet he did nothing to prevent the City from moving forward. Once the water crisis was in full swing, Rosenthal willfully manipulated lead testing results and forwarded an altered report to the EPA that excluded certain tests showing a high level of lead in Flint's water.

In 2016, Rosenthal was charged with misconduct in office, tampering with evidence, and conspiracy to tamper with evidence, and a misdemeanor charge of willful neglect of duty. He accepted a plea deal in 2017.

Here's what you need to know.

Rosenthal knew the FWTP was not ready to operate on a full-time basis but felt powerless to overrule Emergency Managers.

- Rosenthal testified that the MDEQ told the City they should not use the Flint River as a full-time water source but Flint officials overrode their recommendation due to cost savings.

- Rosenthal testified that the MDEQ considered the FWTP a neglected "mothball" plant that was not able to process safe drinking water on a full-time basis.

- Rosenthal was aware that testing leading up to the switch had gone poorly and was warned by Plant operator Michael Glasgow that the plant lacked adequate staffing and resources to handle the switch safely.

- Rosenthal testified that he believed "the emergency managers were in control of everything" and that state drinking water monitors were unable to challenge the decisions of the emergency managers appointed by former Governor Rick Snyder.

- Rosenthal recalled thinking "somebody needs to stop this – the governor needs to stop this" but did nothing to actually stop it.

The MDEQ failed to require the addition of corrosion control to Flint's water treatment processes and failed to adequately supervise the City's lead and copper testing program.

- Rosenthal never issued a violation notice to Flint even though the City frequently failed to provide testing information on time or give the MDEQ a full list of approved lead and copper testing site locations.

- Rosenthal was personally involved in the decision to omit the high lead levels from LeeAnne Walter's home that would have proved the City was in violation of lead and copper testing rule limits.

- The MDEQ gave approval to the City of Flint to begin operating the FWTP without the addition of corrosion control even though the MDEQ was well aware of Flint's aging infrastructure and the fact that it had been receiving water treated for corrosion control from DWSD prior to the switch.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 

## FACTS FROM THE
## COURTROOM

June 10, 2022

# Testimony – Flint City officials were unwilling to consider return to Detroit water

On June 7-8, 2022, William Fahey testified in court. Mr. Fahey is the Head of the Technical Group for Veolia North America. He provided technical support to VNA's engineers, including Marvin Gnagy and Thepin Chen, that were onsite at the Flint Water Treatment Plant (FWTP).

Fahey reiterated that VNA's engineers provided sound recommendations, including the addition of corrosion control, based on the information available to them, though they had no way to know that Flint officials withheld evidence of high lead content in the water. Ultimately, the City ignored all but one of VNA's recommendations. Fahey also confirmed that, although multiple members of VNA's team raised the prospect of returning to Detroit Water with City officials, those in charge made very clear that they were unwilling to consider the idea.

Here's what else you need to know.

VNA's work was limited to plant operations and directed solely by the City of Flint. VNA's directives did not include lead testing, which can only be done by collecting samples from peoples' homes.

- Mr. Fahey testified that VNA's scope of work was restricted to addressing a cancer-causing chemical called TTHM and other waster aesthetic issues.

- VNA's engineers asked for all available lead and copper testing data that the City had collected.

- VNA analyzed the data provided by the City, which showed that the water was in compliance with state and federal regulations. VNA had no way to know that, in fact, the City was in possession of high lead test results in Flint.

- Even though they were hamstrung with bad information, VNA gave good recommendations to the City of Flint.

- VNA had every reason to think Flint officials would do their job and take appropriate action, but instead all but one of their recommendations were ignored, disregarded and dismissed.

The City refused to even consider a return to Detroit Water even though it was clearly the quickest way to fix the water quality problem.

- Mr. Fahey testified that VNA's Rob Nicholas and Marvin Gnagy repeatedly raised the option of returning to Detroit Water to Emergency Manager Gerald Ambrose but Ambrose called it "incomprehensible."

- Flint officials had ruled out the option of returning to Detroit Water long before VNA arrived on the scene. They had no intention of going back to DWSD due to the money invested in their water plant to date and the high cost of buying water.

- VNA had no way to know that the City had no intention to implement their recommendations and no power to overrule the government officials who refused to return to Detroit Water.

Based on the information available to them, VNA engineers determined the Plant was capable of treating the Flint River water if the City implemented their recommendations.

- Mr. Fahey testified that Marvin Gnagy determined the Plant was capable of treating the water if the City was willing to make the necessary investments.

- In their final report to the City, VNA made a series of recommendations to treat the river water. This included work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose.

**Flint officials withheld evidence of a serious lead problem from VNA and the public.**

- VNA had no choice but to rely on the lead sample data provided to them by the City, which showed that the water was in compliance with state and federal standards for lead.

- VNA recognized that the water was corrosive, and that lead could be a problem in the future, which is why they recommended corrosion control.

- Had VNA known that Flint officials were already seeing evidence of a serious lead problem, this information would have heavily influenced their recommendations to the City.

- Without this critical information, VNA had no way to know that lead was already a problem in Flint and that, as such, it was urgent for the City to switch back to DWSD.

**Business development considerations never influenced VNA's recommendations to the City.**

- Mr. Fahey confirmed that VNA engineers exclusively made all recommendations to the City of Flint based on their engineering judgement and that alone.

- Business development considerations never dictated the course of VNA's engagement with the City of Flint and business development leaders never had operational control of the project.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America





## FACTS FROM THE COURTROOM

*June 10, 2022*

# Testimony – Officials knew there was a serious lead problem in Flint and withheld information

On June 8-9, VNA engineer Marvin Gnagy testified in court. Plaintiffs' attorneys did somersaults to distract from the fact that government officials, who are responsible for the Flint Water Crisis, knew there was a serious lead problem in Flint and withheld this information from both VNA and the public.

Here are the facts you need to know.

Fact 1 – Despite their limited scope, VNA recognized lead could be a problem and asked the City to provide all available test results.

VNA was hired more than a year after the crisis began, for a one-month project to address a cancer-causing chemical called TTHM and other water aesthetic issues.

When VNA expressed concern about water corrosivity, Emergency Manager Gerald Ambrose told them to "stick to [your] scope if [you] want to get paid."

VNA nevertheless requested all available lead and copper testing results from the City, and the information that was provided showed the water to be in compliance with state and federal standards.

VNA had no choice but to rely on the City to provide data on lead since lead testing is not something that can be done from the plant and must take place at individual homes.

Fact 2 – City officials became aware of a serious lead problem while VNA was working in Flint, but never shared this information with VNA.

VNA was never informed of the exceptionally high lead test results from Flint resident LeeAnne Walters' home, even though they had specifically requested all available lead test results.

Ms. Walters' high test result was known by the Mayor, the MDEQ, the EPA and other Flint officials, who immediately recognized the problem. None of them shared this information with VNA.

In addition to withholding this critical information from VNA, officials failed to inform the public of the issue.

Fact 3 – City officials refused to even consider a return to Detroit Water despite it being the easiest way to fix the water quality problem.

VNA was repeatedly told by the City of Flint that returning to Detroit Water was not an option.

Flint Emergency Manager Gerald Ambrose called it "incomprehensible" to return to Detroit Water and urged VNA "not to be drawn into a discussion" on the history or merits of the switch from Detroit Water.

Flint officials changed the City's water source to save money over the health and well-being of its residents. They had no intention of returning to Detroit Water because of the high cost of switching.

VNA had no power to overrule the government officials who refused to return to Detroit Water.

**Fact 4 – VNA made sound recommendations based on the information provided to them, including the addition of corrosion control.**

Based on the data that the City provided to VNA, combined with their on-site analyses at the plant, VNA made a series of recommendations for the City to bring the Plant into compliance based on their expert analysis.

VNA had no way to know that City officials had withheld critical information about lead in Flint's drinking water, which would have significantly impacted their recommendations to the City.

**Fact 5 – VNA's recommendations were based solely on the technical expertise of the engineers who worked on the ground in Flint.**

VNA engineers exclusively made all recommendations to the City of Flint, based on their engineering judgement and that alone.

Business development considerations never influenced the course of VNA's engagement with the City of Flint and business development leaders never had operational control of the project.

**Fact 6 – Flint officials ignored almost all of VNA's recommendations to the City, including the recommendation to add corrosion control.**

In their final report to the City, VNA urged Flint officials to work with the City's engineer and the MDEQ to evaluate the need for corrosion control and the use of phosphate for that purpose.

VNA followed up with City officials in April 2015 and was told that the City was proceeding in-house to implement their recommendations.

With the exception of purchasing a filter, the City of Flint ignored all of VNA's other recommendations, including the recommendation for a corrosion control study.

VNA had every reason to believe Flint officials would do their job and take appropriate action, but instead their recommendations were ignored, disregarded and dismissed.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 

## FACTS FROM THE COURTROOM

*June 14, 2022*

# Water supervisor Robert Bincsik: Flint Plant was in a state of disrepair at the time of the switch to the Flint River

On June 9 and June 13, 2022, Robert Bincsik testified in court. Mr. Bincsik was the Water Distribution and Sewer Maintenance Supervisor in Flint, responsible for the City's water distribution system. He worked closely with his counterpart, Mike Glasgow, who was responsible for the operation of the Flint Water Treatment Plant (FWTP). Both Bincsik and Glasgow vehemently opposed the City's decision to switch Flint's water source and raised concerns about the FWTP's ability to produce and distribute safe drinking water. However, their concerns were dismissed.

On the day Mayor Walling "flipped the switch" to the Flint River, Mr. Bincsik made a conscious decision to keep his distance from the Mayor and Department of Public Works Director Howard Croft. He told the jury that he did not want to be in videos showing the switch, or to participate in press conferences regarding the switch, because he rightly predicted that the switch had the potential to result in tragedy.

Here is what else you need to know.

VNA recommended the implementation of corrosion control to address potential issues with lead, but the City did not follow this recommendation.

- When he first learned of the high lead test result at LeeAnne Walters' home, Mr. Bincsik emailed City officials to say that Mr. Gnagy from VNA had suggested adding phosphates to Flint's water to address possible issues with lead.

- The recommendation to implement corrosion control treatment was also in VNA's final report to the City, although Mr. Bincsik was not provided a copy when it was first issued.

- Mr. Bincsik testified he thought it was odd that the City would seek pay for recommendations from VNA but not actually implement those recommendations.

- Mr. Bincsik also testified that he once asked Howard Croft if he thought it was odd that the City was not implementing VNA's recommendations, even though the City had paid VNA to make them, and Mr. Croft told him that he did not think that was odd at all.

At the time of the switch, the FWTP was damaged, old and far from being ready for an alternative water supply.

- Mr. Bincsik testified that the Plant was in a state of disrepair at the time of the switch to the Flint River, with 250 hydrants out of service, hundreds – if not thousands – of valves either broken or in an unknown condition and 400 water main breaks in 2013 and 2014 alone.

- He testified he warned Utilities Administrator Daugherty "Duffy" Johnson in 2013 that the water distribution system was in "terrible" repair and that "any number of tragedies caused from its failure are always lurking around the corner."

- Mr. Bincsik explained to Mr. Johnson that he did not have the resources to repair the distribution system and that the City needed to act "ASAP" to address these problems.

- Due in part to the City's poor financial condition, he testified that the City typically only did the minimum required by regulators when it came to its water supply.

**Flint officials pushed forward with the switch and resisted calls to return to Detroit Water.**

- Prior to the switch, Mr. Bincsik shared his concerns about the Plant with various officials, including Mayor Dayne Walling, Emergency Manager Gerald Ambrose, Mr. Croft and Mr. Johnson. He recalled an "unpleasant" conversation with Mr. Croft where he told him the Plant was not ready for operation, but Mr. Croft insisted on moving forward with the switch.

- He also testified that he met with Mr. Glasgow, prior to the switch, who showed him the email he had sent to the Michigan Department of Environmental Quality (MDEQ) objecting to the re-start of the Plant for full time operations.

- Mr. Bincsik said there was an overarching objective to keep the Plant running because it would save the City considerable money. This mandate did not change even after the City began receiving hundreds of citizen complaints about the taste, color and smell of their drinking water.

**The City did not have accurate records regarding the use of lead service lines or fittings in the water distribution system**

- Mr. Bincsik testified that he submitted a report to the State in 2013 that stated that 80% of the lead service lines were made of lead, but that this number was a "SWAG" – a scientific, wild-ass guess.

- He further stated that the City often had to rely on handwritten index cards from decades ago to try to determine the composition of a service line.

- After high lead levels were detected in Flint resident LeeAnne Walter's home, Mr. Croft told City engineers to check her neighbors but never authorized a system-wide review of lead service lines in Flint and never informed the City's consultant, VNA, of the results.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

Case 5:16-cv-10444-JEL-EAS   ECF No. 2325-2, PageID.75192   Filed 01/10/23   Page 56 of 86

1/10/23, 10:51 AM                    Dr. Gagnon: VNA's recommendations to the City of Flint were consistent with scientific knowledge - Veolia Flint Facts





## FACTS FROM THE COURTROOM

June 17, 2022

# Dr. Gagnon: VNA's recommendations to the City of Flint were consistent with scientific knowledge

On June 13, 14 and 16, 2022, Dr. Graham Gagnon testified in court. Dr. Gagnon is a civil engineering professor in the Department of Civil & Resource Engineering at Dalhousie University and an expert on drinking water quality and treatment. He has over 25 years of experience and has worked on drinking water research projects across Canada and the United States.

Dr. Gagnon's report studied the sources of lead in Flint's drinking water and found that the dissolution of pipe scale caused the majority of lead release in Flint, and that this elevation occurred after the water switch in April 2014 — well before VNA had even arrived in Flint. Dr. Gagnon further testified that VNA's recommendations to the City – including treatment practices for removal of organic matter and corrosion control – were consistent with scientific knowledge and would have addressed Flint's lead issues had they been implemented.

Here's what you need to know.

Flint's lead issue was primarily in the distribution system, not the Flint Water Treatment Plant (FWTP) where VNA's work occurred.

- Dr. Gagnon's report found that lead service lines were the predominate source of lead in Flint's drinking water, although just 16% of homes had lead service lines at the time of the switch to the Flint River.

- VNA recognized that water from the Flint River was corrosive, and therefore recommended corrosion control. However, VNA's work was limited to the operations of the plant.

- As a result, VNA had no choice but to rely on the City to provide relevant information about lead test results and other concerns related to the distribution system.

- VNA explicitly requested this information and had no reason to believe that they had been provided incomplete and faulty data.

A spike in lead release into Flint's drinking water occurred in the months following the City's switch in water sources in April 2014, well before VNA arrived in Flint.

- Dr. Gagnon concluded that the lead release in Flint came predominantly from the sloughing off of scale that had accumulated on lead service lines.

- The majority of this lead was released into Flint's treated tap water during the summer of 2014 and lead levels had significantly retreated by 2015.

- Dr. Gagnon also found that the Flint water had greater amounts of natural organic material (NOM) that can more easily dissolve lead into water and its removal was critical for effective corrosion control.

VNA's recommendations were consistent with scientific knowledge and would have addressed the lead issues in Flint had they been implemented.

- Dr. Gagnon testified that VNA's recommendations for minimizing NOM and implementing corrosion control treatment were appropriate and supported by scientific knowledge and industry best practices.

- Tragically, the same officials who hired VNA for their engineering expertise chose to ignore all but one of VNA's recommendations, including the recommendation to conduct a corrosion control study to address the issue of corrosive water and the potential for lead problems.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA 

## FACTS FROM THE COURTROOM

*June 17, 2022*

# Water supervisor Busch advised against VNA's recommendation to use corrosion control in Flint

On June 16, 2022, Stephen Busch testified in court. Mr. Busch was the water supervisor for District 8 (Lansing) at the Michigan Department of Environmental Quality (MDEQ) from 2012 to 2016. Despite being aware as early as 2012 that the Flint River was highly corrosive, he gave the approval to Flint officials to move forward with the water switch without the use of corrosion control treatment. Later, when Mr. Busch became aware of a pervasive lead problem in Flint, he still did not mandate corrosion control treatment and even advised against VNA's recommendation to do so, citing the Flint River as a temporary water source.

Mr. Busch was charged with involuntary manslaughter and other crimes related to the Flint Water Crisis. Charges were later dismissed by prosecutors in exchange for his cooperation in ongoing criminal investigations. To this day, however, not a single government official has been held accountable.

Here's what you need to know.

The MDEQ approved the City's plans to use the Flint River as an interim water source without requiring the use of corrosion control despite being aware that the Flint River was contaminated and highly corrosive.

- Mr. Busch knew the Flint River posed increased health and microbial risks and the Plant would need substantial upgrades and additional staff to treat it.

- He nevertheless approved the switch to the Flint River as an interim water source in 2014 without mandating corrosion control treatment.

- Neither the City, nor the MDEQ, ever studied the impact of the change in water chemistry on the distribution system prior to the switch or warned Flint residents of the risks of the switch in water sources.

Even after learning of a pervasive lead problem in Flint's water and receiving hundreds of citizen complaints, the MDEQ did nothing to intervene in the Flint Water Crisis.

- Mr. Busch continued to claim the water was "safe" despite significant evidence of elevated lead results, including at the University of Michigan and Flint resident LeeAnne Walter's home.

- In response to concerns from the EPA's Jennifer Crooks regarding exceptionally high lead levels discovered at the home of LeeAnne Walters in February 2015, Mr. Busch responded: "…the City is meeting the 90th percentile. Not sure why region 5 [EPA] sees this one sample as such a big deal."

- Later, when the EPA's Miguel del Toral raised concerns about the MDEQ's monitoring regime and Flint's lack of corrosion control, Mr. Busch said the second-guessing from the EPA was becoming "tiresome" and complained of "overreach."

- For months after VNA had completed its work in Flint, Mr. Busch and the MDEQ continued to ignore clear evidence of lead problems and refused to institute corrosion control since the Flint River was a temporary solution and it

would take too long to implement.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→   Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America





## FACTS FROM THE COURTROOM

June 22, 2022

# Forensic psychologist David Thompson's testimony – What you need to know

On June 21, 2022, the jury heard from Dr. David Thompson, a board-certified forensic psychologist with a specialty in child psychology. Dr. Thompson has more than 35 years of real-world experience evaluating, treating, and advocating for children.

Dr. Thompson was asked to conduct a thorough analysis and review of all of the notes, testing, and evaluation data conducted by plaintiffs' expert witness, Dr. Mira Krishnan, for each of the four plaintiffs. Upon completion of his work, Dr. Thompson found that all four plaintiffs have age-appropriate IQ and standardized test scores, their behaviors are in line with what he would expect from children of their ages, and there is no evidence of neurocognitive or behavioral impairments. According to Dr. Thompson, each plaintiff showed an individualized pattern of strengths and weaknesses that is consistent with the range of strengths and weaknesses seen in people generally.

Here's what you need to know.

All four plaintiffs have age-appropriate IQ and standardized test scores and appear to be doing well in school.

- Dr. Thompson testified that the plaintiffs' IQ scores are all in normal range (scoring between 91 – 103), which matches their real-world academic performances.

- While each child has relative strengths and weaknesses, their test results for reading, sentence comprehension and math are all within normal levels, with none reflecting scores more than one standard deviation below average.

None of the plaintiffs suffer from any cognitive deficits that would prevent them from a full and successful life.

- Dr. Thompson testified that the plaintiffs' test results do not show any cognitive deficits, such as problems with intellectual functioning, memory, planning, reasoning, or judgement.

- The data show that the children are doing reasonably well and there is no reason to believe that they will have difficulty graduating high school, being admitted to or graduating from college, or have negatively affected lifelong earnings potential.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.



→ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 **VEOLIA**



## FACTS FROM THE COURTROOM

*June 23, 2022*

## Testimony — EPA was aware of a serious lead problem unfolding in Flint by February 2015

On June 21 and 22, 2022, Jennifer Crooks' deposition was played in court. Ms. Crooks was the Program Manager for Michigan's Drinking Water Program at the Environmental Protection Agency (EPA) during the crisis in Flint. Her role was to ensure that Michigan had adequate resources and expertise to comply with the Safe Water Drinking Act.

Ms. Crooks' testimony confirmed that the EPA was aware of a serious lead problem unfolding in Flint by February 2015 and failed to take necessary measures to prevent the crisis from worsening. Her testimony also confirmed that the MDEQ repeatedly assured the EPA that Flint was implementing corrosion control treatment, even though the MDEQ knew this was true. Ultimately, Ms. Crooks' testimony demonstrated that the Flint Water Crisis was a catastrophic failure of government at every level—federal, state, and local.

Here's what you need to know.

The EPA and MDEQ ignored complaints from Flint residents about their drinking water quality for more than a year.

- Ms. Crooks testified that, beginning in mid-May 2014, she became aware of numerous citizen complaints about the water in Flint, including "rotten egg smell, swamp water smell [and] people developing rashes."

- She stated that she prepared and circulated a briefing document regarding the switch in 2014 that asserted the EPA had contacted MDEQ about numerous complaints the EPA had received about the City's water quality.

- Yet for more than a year, the officials in charge of the City's water supply failed to act on these citizen concerns and continued to reject a return to Detroit Water.

- When asked if the EPA had any discussions with the MDEQ about Flint returning to DWSD, Ms. Crooks testified that "their answer was: that's Flint's decision, not ours."

City and State officials failed to inform VNA or Flint residents about exceptionally high lead test results.

- Ms. Crooks testified that she began speaking with Ms. Walters about her water quality complaints in mid-January 2015.

- When she learned of Ms. Walters' high lead test results in February 2015, Ms. Crooks alerted Stephen Busch and Mike Prysby of the MDEQ, as well as her colleagues at the EPA, saying in an email: "Wow!!! Did he [Mr. Glasgow] find the LEAD! 104 ppb. She has 2 children under the age of 3... Big worries here."

- Even though VNA was on site at the Plant while the agencies were circulating and discussing these results, no one ever told VNA about them or informed the people of Flint.

The MDEQ initially told the EPA that Flint was using corrosion control and later claimed it was not required despite the clear evidence that the water was corrosive.

- Ms. Crooks testified that Mr. Busch initially told her that Flint had an optimized corrosion control program.

- Busch later admitted to Ms. Crooks that Flint was not practicing corrosion control treatment and that there were no additional requirements for the City of Flint based on the levels of lead and copper in the source water and the results of the lead and copper distribution monitoring – even after the results from LeeAnne Walters' home.

- Ms. Crooks testified that the MDEQ disagreed with the EPA's interpretation of the Lead and Copper Rule, claiming it was enough for Flint to conduct two rounds of lead and copper testing before it would consider requiring corrosion control measures.

**City and State officials ignored EPA whistleblower Miguel Del Toral's warnings on how the Flint was conducting lead and copper testing and even sought to block his report.**

- Ms. Crooks testified that Mr. Del Toral told MDEQ officials that the practice of instructing residents to run water for a few minutes before taking a sample—a practice known as pre-flushing—was likely to cause the results to understate the amount of lead in the water.

- She further testified that Mr. Del Toral warned the MDEQ that pre-flushing meant that the test results provided false assurance to residents about the safety of the water.

- When Mr. Del Toral raised this issue with the MDEQ's Liane Shekter-Smith, she told him the rules allowed pre-flushing and that the agency would not change its approach.

- Ms. Crooks testified that EPA management told her not to distribute Mr. Del Toral's report in the summer of 2015 because it was a draft that had not been finalized or reviewed by the agency. Del Toral's report wouldn't be finalized and made public for another five months.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 VEOLIA

≡

FACTS FROM THE
COURTROOM                                                    June 29, 2022

# Darnell Earley invokes his 5th Amendment right to avoid answering questions about Flint

On June 22 and 28, 2022, Darnell Earley's video deposition was played in court. Mr. Earley was appointed to serve as Emergency Manager in Flint from October 2013 to January 2015 by former Governor Rick Snyder. During this time, he oversaw the City's transition in water source from DWSD to the Flint River in April 2014.

Even though the Flint Water Treatment Plant (FWTP) was not prepared to distribute drinking water safely, Mr. Earley persisted in moving forward with the switch. Later, despite mounting evidence that the water was causing serious health problems for the people of Flint, Mr. Earley insisted that the water was safe and resisted calls to return to DWSD.

Rather than take the stand and answer questions in person in front of the jury, Mr. Earley invoked his Fifth Amendment right against self-incrimination. In March of 2022, he joined with other indicted government officials in expressing, through his lawyer, that he would sooner go to jail for contempt of court than answer questions if forced to testify.

Here's what you need to know.

Mr. Earley ignored evidence that the water was causing serious health problems and went to great lengths to mislead the public into believing the water was safe.

- Mr. Earley testified that by September 2014, just five months after the switch, he knew that the citizens of Flint had already lodged numerous complaints about their water.

- In October 2014, Mr. Earley asked the MDEQ to issue an "unequivocal statement" that the water was safe, saying that such a statement would "help us build public confidence and stronger communication on how we're responding to the challenges we encounter;" the MDEQ never issued such a statement.

Mr. Earley repeatedly refused to consider offers and suggestions to return to DWSD. His concern was on saving money not public health and safety.

- DWSD offered to continue supplying water to Flint beyond April 2014, but Mr. Earley rejected this offer without even discussing it with City officials.

- Mr. Earley testified that despite numerous complaints about the water quality and even after the City had been forced to issue boil water advisories in October and November 2014, he still never considered returning to Detroit.

- In January 2015, after the DWSD again offered to reconnect the City of Flint to its water supply, Mr. Earley testified that he did not respond to the offer and that switching back would not have been "feasible because the City didn't have any money."

Mr. Earley authorized the distribution of water from the FWTP even though he did nothing to personally make sure that the plant was ready to distribute water safely.

- Mr. Earley testified that he relied solely on the word of public works officials Howard Croft and Daugherty Johnson with regard to the readiness of the Flint Water Treatment Plant.

- Mr. Earley testified that he assumed it was safe to use the Flint River as an interim water source because the MDEQ approved it.

- When asked if he ever gave instructions to City personnel about what, as Emergency Manager, he would require them to do to ensure the safety of the water, Mr. Earley replied that he did not.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA 

## FACTS FROM THE COURTROOM

June 30, 2022

# Ethics expert – VNA met the standard of care in the performance of their duties

On June 28, VNA called Dr. William Bellamy to the stand. Dr. Bellamy has a Ph.D. in Civil/Environmental Engineering and has worked as a water treatment engineer for nearly half a century. In addition to his hands-on expertise, Dr. Bellamy is also an expert in engineering ethics.

Dr. Bellamy conducted a thorough review of every aspect of VNA's work in Flint, and his testimony directly refuted the opinion of plaintiffs' witness Richard Humann, who relied on remarkably little information when drafting his report. Dr. Bellamy found that VNA did indeed "meet the standard of care in the performance of their duties" in Flint and that VNA's recommendations to the City were appropriate based on the information they had at the time.

Here's what you need to know.

VNA was specifically asked *not* to evaluate the option of returning to Detroit water, as Flint officials were already well aware that a return to Detroit was an option.

- Dr. Bellamy testified that evaluating a return to DWSD was not part of VNA's contracted scope, and that because the City was already familiar with that option, it would have been a waste of resources for VNA to focus on DWSD in any capacity.

- Dr. Bellamy confirmed that VNA was asked to assess whether and how the Flint Water Treatment Plant (FWTP) could come into compliance with applicable regulations.

- Dr. Bellamy also confirmed that VNA was correct in determining, based on the information they were provided, that the FWTP could be brought into compliance with the recommendations outlined in their final report.

VNA had no choice but to rely on the City to provide all relevant compliance monitoring samples, which is standard practice for the type of assessment VNA was asked to conduct.

- Dr. Bellamy explained that compliance monitoring "requires a lot of work in the chain of custody" and that it is standard practice to rely on the utility to provide all of the compliance samples.

- Based on the limited scope of VNA's work, there was no possible way that VNA could have conducted its own compliance monitoring while in Flint.

VNA's recommendations were appropriate based on the information they were provided at the time, but the implementation of those recommendations were out of their control.

- Dr. Bellamy testified that VNA's recommendations were consistent with the standard of care.

- Dr. Bellamy testified that a corrosion control study, as recommended in VNA's final report, was the correct thing to do, and that it would not have been appropriate for VNA to be prescriptive before a study was completed.

- Dr. Bellamy testified that "implementation is up to the City in total unless [VNA] was later hired to assist with the implementation of treatment."

- In fact, shortly after submitting their final report, VNA submitted a proposal to assist with the implementation of their recommendations, but the City declined.

- Tragically, the City chose to ignore all but one of their recommendations to improve the quality of the water.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 

## FACTS FROM THE COURTROOM

*July 6, 2022*

# Michigan Department of Treasury rejected the possibility of Flint returning to Detroit water multiple times

On June 30 and July 5, Wayne Workman's video deposition was played in court. Mr. Workman worked for the Michigan Treasury Department during the Flint Water Crisis, where he was responsible for staffing and overseeing the State of Michigan's emergency manager program. In this role, Mr. Workman supervised Flint's emergency managers throughout the crisis and was involved in evaluating the option of returning Flint to DWSD as the crisis unfolded.

Mr. Workman's testimony confirmed that, even as evidence of lead in Flint's water continued to mount, neither the City of Flint nor the State of Michigan was willing to consider a return to DWSD under any circumstances.

Here's what you need to know.

The Michigan Department of Treasury rejected the possibility of Flint returning to DWSD multiple times throughout the crisis, including as late as September 2015.

- Mr. Workman testified that Treasury was primarily responsible for evaluating the possibility of Flint returning to DWSD, and that such a decision could not have been made without Treasury's approval.

- Treasury determined that reconnecting to DWSD was not a possibility due to Flint's inability to pay for the switch.

- As late as September 2015, Mr. Workman's supervisor Tom Saxton shared an evaluation of the financial pitfalls of returning to DWSD, explaining "I hope no one is still considering that option."

Mr. Workman testified that, even if VNA had formally recommended returning to DWSD, it would not have made any difference in Treasury's position.

- Mr. Workman's testimony showed that City and State officials rejected the idea of Flint returning to DWSD multiple times throughout the crisis due to costs.

- Even when presented with evidence that switching back to DWSD would help solve the City's water quality issues, Treasury still rejected the idea of a return.

- Mr. Workman testified that it was unlikely Treasury would have approved Flint returning to DWSD even if VNA recommended it because Flint simply did not have the cash to do so.

Mr. Workman's testimony further illustrated that the Flint Water Crisis was a catastrophic failure of government at every level.

- Flint's Emergency Managers reported to the Michigan Treasury Department which, in turn, reported to Gov. Snyder.

- Gov. Snyder set forth an agenda of cutting costs, regardless of the consequences, and the Treasury Department was responsible for helping to implement this agenda from a policy perspective.

- VNA made sound recommendations to the City of Flint based on all the information available to them, but they were powerless to overcome this perfect storm of failure and negligence from those in charge.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America

 VEOLIA



## FACTS FROM THE COURTROOM

*July 8, 2022*

# Dr. John Gaitanis warns against using bone lead tests as evidence: "no better than a coin flip"

On July 6, Dr. John Gaitanis, MD testified in court. Dr. Gaitanis is the Chief of Pediatric Neurology at Tufts Children's Hospital. He is a highly credentialed, practicing physician. Dr. Gaitanis is a graduate of Brown Medical School, he completed his fellowship at Beth Israel Deaconess Medical Center – a world-class teaching hospital of Harvard Medical School – and has 23 peer-reviewed publications and over 30 published chapters and abstracts within highly prestigious medical journals, including JAMA, the Journal of Child Neurology and Annals of Neurology.

Dr. Gaitanis has extensive experience working with and treating children with brain injuries. He has an acute understanding of the signs, symptoms, and causes of brain injury in children, including the ways in which exposure to lead can injure the brain in childhood.

After a careful review of all of the plaintiffs' medical records, as well as the findings of Drs. Krishnan and Bithoney, Dr. Gaitanis concluded that there is no evidence of brain injury in any of the four plaintiffs. Additionally, Dr. Gaitanis disputed Aaron Specht's reliance on bone lead scans using a pXRF device, which he said has no clinical significance and is no better than a coin flip.

Here's what you need to know.

There is no evidence of any medically significant lead exposure in any of the plaintiffs.

- Dr. Gaitanis testified that blood lead is the only accepted standard for measuring lead exposure in the medical community and that blood lead can stay elevated for months or years after exposure, particularly when there is chronic exposure.

- All four plaintiffs had blood lead levels well under the CDC's reference value at the time of their alleged exposure.

- Even taking into consideration that the CDC updated its reference value for lead in 2021, the plaintiffs blood levels are all still below the threshold.

The pXRF bone scan device that was used on the plaintiffs is not reliable in a clinical setting and carries no clinical significance.

- Dr. Gaitanis testified that the pXRF bone scan device developed and used by Aaron Specht "does not exist within any capacity within clinical medicine."

- Dr. Gaitanis stated that there is no hospital, clinic, or pediatric hospital in the country that uses the pXRF.

- Dr. Gaitanis affirmed that the non-portable, kXRF device is the "gold standard" in measuring bone lead and that kXRF measurements carry a strong correlation with blood lead levels—further validating the reliance on blood lead within the medical community.

- On the contrary, Dr. Gaitanis testified that pXRF measurements do not show a strong correlation with blood lead, calling the use of the device "no better than a coin flip or a roll of the dice."

**All four children have healthy brains and can be expected to meet their full potentials in life.**

- Dr. Gaitanis that all the clinical and qualitative evidence suggests that the plaintiffs all have perfectly healthy brains and that there is no evidence of cognitive impairment.

- Dr. Gaitanis explained that all four plaintiffs demonstrate age-appropriate academic performance, none have individualized plans in school, and no treating physician has diagnosed any plaintiff with a learning disability, cognitive impairment, ADHD, or mood disorder.

- Dr. Gaitanis based his assessment on the medical and school records of each of the plaintiffs and found that there is no evidence of an acquired brain injury in any of them.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶ Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

Officials rejected return to Detroit Water even after water quality issues were known in Flint - Veolia Flint Facts





FACTS FROM THE
COURTROOM

*July 8, 2022*

# Officials rejected return to Detroit Water even after water quality issues were known in Flint

On July 7, 2022, the jury heard from Susan McCormick, the former Director of the Detroit Water and Sewerage Department (DWSD) during the time of the Flint Water Crisis. Ms. McCormick was involved in negotiations with the City of Flint regarding a potential long-term water supply contract, which was rejected by government officials in favor of using the Flint River as an interim water source until the KWA pipeline could be built.

When the water quality issues in Flint become apparent, Ms. McCormick offered to reconnect the City of Flint to DWSD at no extra cost, which would have provided residents with reliable, safe, and high-quality drinking water immediately. Yet government officials rejected this offer even after knowing of the high lead levels found in Flint. It would take thousands more residents getting sick before the City finally agreed to return to Detroit Water.

Here is what you need to know.

Government officials rejected a return to Detroit Water even after the water quality issues were widely known in Flint.

- Upon learning of the issues in the press in 2015, Ms. McCormick sent a letter to Emergency Manager Darnell Early, copying Governor Snyder and the City Council, saying DWSD was "ready, willing and able" to resume service to the City at no extra charge or penalty.

- Ms. McCormick testified that DWSD could have easily and quickly reconnected Flint to Detroit Water as all the Department had to do was open the valves and conduct some limited flushing of the water.

- Ms. McCormick received a letter of disinterest following her offer and testified there were no further discussions or negotiations at the time.

Emergency Manager Gerald Ambrose sought to block Ms. McCormick from discussing the offer at a Flint City Council Meeting.

- Ms. McCormick testified that she received an invitation from a local Council member to attend a meeting in January 2015 regarding DWSD's offer to reconnect Flint.

- On her way to the meeting, Ms. McCormick received a call from Emergency Manager Gerald Ambrose telling her she would not be part of the meeting agenda.

- Ms. McCormick only decided to attend the meeting when the Council member called back to request she attend anyway.

- Upon arriving at the meeting, Ambrose again encouraged her to leave, but Ms. McCormick remained until she had the opportunity to speak towards the end of the meeting about DWSD's offer.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

Officials rejected return to Detroit Water even after water quality issues were known in Flint - Veolia Flint Facts

© 2023 – Veolia North America

 VEOLIA

FACTS FROM THE
COURTROOM

July 13, 2022

# Nancy Peeler pleads the 5th, refuses to answer questions on what she knew about Flint

On July 13, 2022, VNA called Nancy Peeler to the witness stand. Ms. Peeler was Director of the Maternal, Infant, and Early Childhood Home Visiting Program at the Michigan Department of Health and Human Services (MDHHS) during the Flint Water Crisis. In this role, Ms. Peeler had access to blood lead test results for children in Flint throughout the crisis but failed to identify and report a significant jump in lead levels, claiming that any change was attributed to normal, seasonal variation.

For her failure to properly address the rising blood lead levels of children in Flint following the switch in water source, Ms. Peeler faces two felony counts of misconduct in office and one misdemeanor count of willful neglect.

Rather than answer questions about what she knew and when she knew it, Ms. Peeler elected to invoke her Fifth Amendment right against self-incrimination. In doing so, she joins other government officials including former Governor Rick Snyder, former Flint Emergency Managers Darnell Earley and Gerald Ambrose, and former Flint Director of Public Works Howard Croft.

The following is a transcript of Ms. Peeler's exchange with VNA's counsel.

Q. Good morning, Ms. Peeler. From 2014 to 2015, you were a manager of MDHHS's Early Childhood Health section, where you also supervised the childhood lead poisoning prevention program or CLPPP, right?

A. On advice of counsel, I respectfully decline to answer based on the Fifth Amendment to the United States Constitution.

Q. And DHHS's duties include identifying and investigating potential public health threats, such as lead exposure in Michigan, correct?

A. On advice of counsel, I respectfully decline to answer based on the Fifth Amendment to the United States Constitution.

Q. Isn't it true that blood lead data for Michigan children was available to MDHHS throughout 2014 and 2015?

A. On advice of counsel, I respectfully decline to answer based on the Fifth Amendment to the United States Constitution.

Q. On July 22, 2015, MDHHS received a request from Governor Snyder's office to access whether children's blood lead levels in Flint had changed after the switch to the Flint River in April 2014. Isn't that true?

A. On advice of counsel, I respectfully decline to answer based on the Fifth Amendment to the United States Constitution.

Q. It is true that MDHHS could have analyzed the available blood lead data for Flint children before mid-2015, correct?

A. On advice of counsel, I respectfully decline to answer based on the Fifth Amendment to the United States Constitution.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶  Visit our website

Twitter

Terms of Use

Contact

Nancy Peeler pleads the 5th, refuses to answer questions on what she knew about Flint - Veolia Flint Facts

© 2023 – Veolia North America





## FACTS FROM THE COURTROOM

July 15, 2022

# Snyder's office was besieged by complaints just months after Flint water switch

On July 12, 2022, Dennis Muchmore testified in court. Muchmore served as Chief of Staff to Governor Snyder prior to and during the Flint Water Crisis. As Chief of Staff, he communicated with Snyder directly regarding Flint's water issues and informed him of the various water quality concerns as they arose, including the likelihood that the City's water contained lead.

Muchmore described the Governor's Office as besieged by complaints from Flint citizens, public health officials and activists within months following the switch in water source. He testified that immediately following the switch in water sources, residents began showing up to the Governor's office with jugs of dirty and discolored water and demanding answers.

Muchmore said that the problems were constant: "Every time we turned around there was some problem and a response and some problem and another response and some other problem." Yet despite all of the public furor, Governor Snyder refused to direct the Emergency Managers to take action or demand a return to Detroit Water. Muchmore admitted to Michigan Health Director Nick Lyon that people were "basically being blown off by us."

Here's what you need to know.

Governor Snyder and his executive team had the authority to intervene in Flint's decision-making by virtue of having placed the City under Emergency Management.

- As Governor, Rick Snyder appointed four Emergency Managers to run the City of Flint whose authority superseded that of local officials, stripping power away from the people and concentrating it tightly within the executive branch.

- Each Emergency Manager appointed by Governor Snyder in Flint was driven by financial concerns over the health and safety of the people who lived there.

- Governor Snyder also oversaw the various State government agencies that were involved in the water crisis, such as the Michigan Department of Environmental Quality (MDEQ), the Michigan Department of Health and Human Services (MDHHS), and the Department of the Treasury.

- Muchmore confirmed it was in the Governor's purview to demand more information from these agencies or investigate whether they were adequately performing their obligations.

Governor Snyder was aware that the Flint Water Treatment Plant was not ready to safely treat and distribute water from the Flint River but failed to intervene.

- Muchmore testified that, prior to the switch, Governor Snyder was made aware that the expedited timeline to operate the FWTP full time could lead to several potential disasters.

- Almost immediately after the switch, these concerns were validated when citizens began to complain about the taste, smell, and color of their drinking water.

- Muchmore testified that the Governor's Office was aware of the various red flags and water quality violations over the course of the crisis, including the Boil Water Advisories issued in October 2014, the TTHM violations in early 2015

and the evidence of elevated lead levels in July 2015.

For nearly a year and a half as the crisis unfolded, the MDEQ repeatedly insisted that the water was safe and that corrosion control treatment was not necessary, despite growing evidence that the water was corrosive and lead was becoming a problem.

- Muchmore testified that former MDEQ spokesperson Brad Wurfel said the residents of Flint did not need to worry about lead in their water and that the sampling conducted by the City did not indicate an imminent health threat from lead or copper.

- When presented with Marc Edward's data showing high lead levels in portable Flint water, Mr. Wurfel said the information was "pretty irresponsible" because it did not match with the MDEQ's claims at the time that the water and sampling criteria were fine.

- MDEQ Director Dan Wyant later admitted that the Agency made a mistake with their sampling protocol and optimized corrosion control should have been required from the beginning.

Despite the mounting evidence of problems with Flint's water, Governor Snyder refused to intervene to facilitate a reconnection to DWSD because it was cost prohibitive.

- Muchmore testified that members of the Governor's own staff, including Senior Policy Advisor Valerie Brader, begged the Governor to ask the Emergency Managers to returning to the Detroit System in full or as an interim solution until the water quality issues could be addressed.

- Yet the Governor's Office and the Treasury Department continued to say the cost of Detroit Water was too expensive for Flint and they had invested too much money into the KWA system to switch back.

- Governor Snyder did not take action to orchestrate or secure funding for Flint to reconnect to DWSD until September 2015, a year and a half after the water issues first surfaced in Flint.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 – Veolia North America

 VEOLIA

FACTS FROM THE
COURTROOM

July 15, 2022

# Author of Flint memo censored by EPA aligned with VNA on need for corrosion control

In late June and early July, Miguel Del Toral's deposition was played in court. Mr. Del Toral was a long-time employee of the United States Environmental Protection Agency (EPA) who helped expose the Flint Water Crisis. In June 2015, he authored EPA-memo-from-Miguel-Del-Toral-regarding-lead-testing.pdf">a memo warning of lead problems in Flint and the failure of the City and Michigan Department of Environmental Quality (MDEQ) to take appropriate action in response, but his report was censured by the EPA and not publicly released until six months later.

Mr. Del Toral testified that the Flint Water Crisis was caused by several factors, including the decision to switch to the more corrosive Flint River as a water supply, the presence of lead service lines in the distribution system, and, most importantly, the City's failure to practice corrosion control.  He agreed that the City experienced a "manmade disaster" by switching to the use of the Flint River without implementing appropriate treatment and monitoring.

Here's what you need to know

VNA's recommendations were aligned with Mr. Del Toral's conclusions about what should have happened in Flint and would have addressed the problems with Flint's water had they been implemented.

- Mr. Del Toral testified that it would have been inappropriate to add corrosion control chemicals without first undertaking a study, which is what VNA recommended.

- Mr. Del Toral testified that, prior to his deposition, he had not seen VNA's February 2015 report recommending the City of Flint add corrosion control or seen Robert Bincsik's email noting that "Marvin from Veolia" had suggested that the City add phosphates to the water to help prevent future lead problems.

- He also overlooked the language in VNA's final report to the City, recommending the City "contract with its engineer and initiate discussions with the State on the addition of a corrosion control chemical."

The MDEQ failed to mandate corrosion control upon the switch to the Flint River, as required by the Lead and Copper Rule.

- Mr. Del Toral testified that the MDEQ maintained a written policy requiring communities to maintain appropriate corrosion control treatment, but it did not follow this policy in Flint.

- Instead, the MDEQ allowed Flint to monitor lead and copper for two six-month periods before assessing the need for a corrosion control study, a decision that Mr. Del Toral called "insane."

- The MDEQ made this decision for cost-saving reasons, knowing that the Flint River would be an interim source and that any corrosion control needs would differ once Flint had switched permanently to the new KWA system.

- When Mr. Del Toral asked Stephen Busch of the MDEQ directly about corrosion control, Mr. Busch responded that Flint had an optimized corrosion control program even though he knew this was a lie.

The City's lead testing protocols were flawed, unreliable, and provided false assurances about the safety of the water in Flint.

- Mr. Del Toral testified that he grew concerned about the reliability of the City's lead testing protocols. He testified that the City could not focus its testing on sites with lead service lines because it did not know where lead service lines were located in Flint.

- Mr. Del Toral also stated that the City's practice of pre-flushing lines before conducting testing caused the tests to understate lead levels.

- When Mr. Del Toral voiced his concerns with the MDEQ's Liane Shekter-Smith, she told him the rules allowed pre-flushing and that the agency would not change its approach.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶   Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America





## FACTS FROM THE COURTROOM

July 15, 2022

# VNA had no role in causing, prolonging, or worsening the Flint water crisis

From May 27, 2022 – July 13, 2022, Veolia North America (VNA) presented their case in the Flint Water Crisis bellwether trial.

As the evidence in trial has shown, VNA had no role in causing, prolonging, or worsening the crisis. VNA was hired by the City of Flint in February 2015 – nearly a year into the crisis – to conduct a two-week analysis of operations at the Flint Water Treatment Plant (FWTP) and to develop a report on their findings and recommendations. Tragically for the people of Flint, VNA's recommendations were ignored by the politicians and bureaucrats in charge, who prioritized saving money over the health and well-being of Flint residents.

Worse still, Flint officials withheld critical information about exceptionally high levels of lead in the water of Flint residents while VNA was at the FWTP doing their analysis of plant operations. Withholding such vital information and ignoring VNA's recommendations was part of a long pattern of neglect by the people in charge of ensuring the safety of Flint's water.

Responsibility for the Flint Water Crisis rests squarely on the shoulders of these government officials – including Governor Snyder – who have gone to great lengths to avoid testifying in court and telling the truth to the people of Flint.

Here is what we learned over the last several weeks.

VNA did not cause any injury to the four plaintiffs, nor is there evidence these children sustained cognitive or behavioral impairments from lead exposure.

Dr. John Gaitanis, Chief of Pediatric Neurology at Tuft's Children's Hospital and a renowned expert on treating brain injuries in children, concluded that there is no evidence the plaintiffs experienced any medically significant lead exposure, nor do they have any brain injuries. All four children have healthy brains and can be expected to meet their full potential in life. Dr. Gaitanis also stated that the pXRF bone scan device developed and used by Aaron Specht to measure lead levels in children is not reliable in a clinical setting and no better than a coin toss.

Dr. David Thompson, a board-certified forensic psychologist with extensive experience evaluating and treating children, found that all four plaintiffs have age-appropriate IQ and standardized test scores, that their behaviors align with children of their ages and there is no evidence of neurocognitive or behavioral impairments. Dr. Thompson testified that all children are doing well in school and are likely to live full and successful lives.

Government officials sparked the crisis when they decided to switch Flint's Water source to save money without appropriate treatment.

Rick Snyder, Former Governor of Michigan, pleaded the Fifth to avoid testifying in court. In his deposition video, Snyder admitted that the Flint Water Crisis was a failure at all levels of government, including his own administration. Snyder appointed four Emergency Managers in Flint between 2011-2015, who made reckless decisions that helped bring on the crisis and make it worse. Governor Snyder had complete power and authority to direct these Emergency Managers to undertake actions that were necessary and proper to protect the health and safety of Flint residents and the authority to remove them

from their position at any time – but failed to do either. Despite all the warnings he received and concerns from Flint residents, Governor Snyder waited until October 2015, a full year after his staff made the recommendation to return to Detroit Water, to order the return to Lake Huron for drinking water.

**Darnell Earley**, Emergency Manager for Flint from 2013 – 2015, admitted he knew the FWTP was not prepared to provide safe drinking water, but still chose to move forward with the switch. Later, Mr. Early ignored evidence that the water was causing serious health problems in the City and went to great lengths to mislead the public into believing the water was safe while resisting calls to return to the Detroit Water and Sewerage Department (DWSD).

**Robert Bincsik**, Flint's Water Distribution and Sewer Maintenance Supervisor during the crisis, testified that the FWTP was in a state of disrepair at the time of the switch to the Flint River. Both Bincsik and his counterpart at the Plant, Mike Glasgow, vehemently opposed the City's decision to switch water sources and raised concerns about its ability to produce and distribute safe drinking water – concerns government officials repeatedly ignored. Mr. Bincsik said there was an overarching objective to keep the Plant running because it would save the City considerable money.

**Stephen Busch**, Water Supervisor for District 8 (Lansing) at the Michigan Department of Environmental Quality (MDEQ) from 2012 – 2016, approved moving forward with the water switch without implementing corrosion control treatment, despite knowing the Flint River was highly corrosive. Neither the City, nor the MDEQ, ever studied the impact of the change in water chemistry on the distribution system prior to the switch or warned Flint residents of the risk of the switch in water sources. Even after learning of a pervasive lead problem in Flint's water and receiving hundreds of citizen complaints, Mr. Busch still did not mandate corrosion control treatment and even advised against VNA's recommendation to do so since the Flint River was a temporary solution.

**Adam Rosenthal**, an environmental water quality analyst at the MDEQ, knew that the FWTP was not ready to treat the Flint River water, yet did nothing to prevent the City from moving forward. The MDEQ fast-tracked Flint's plants to withdraw water from the Flint River and did not mandate the addition of corrosion control to Flint's water treatment processes. The MDEQ failed to adequately supervise the City's lead and copper testing program and Rosenthal even manipulated lead testing results and forwarded an altered report to the EPA that excluded certain tests showing a high level of lead in Flint's water.

**Government officials were aware of the lead crisis in Flint but failed to share this information with VNA and took no action to address it.**

**Dennis Muchmore**, Chief of Staff to Governor Snyder during the crisis, described an office besieged by complaints from Flint citizens, public health officials and activists within months following the switch in water sources. Yet despite all public furor, Governor Snyder refused to direct the Flint's Emergency Managers to take action or demand a return to Detroit Water because it was cost prohibitive. The MDEQ meanwhile, continued to insist the water was safe and that corrosion control was not necessary, despite growing evidence that the water was corrosive and lead was becoming a problem.

**Howard Croft**, Director of the Flint Department of Public Works from 2011–2015, ignored important warning signs showing the water was corrosive following the switch from Detroit Water. Mr. Croft continued to assure the public that the Flint River water was high quality and complied with all State and Federal requirements even after he was presented with a piece of lead service line pipe that had corroded due to the absence of phosphates in the water. When informed of the high lead levels in Flint's distribution system and the potential for widespread lead issues, he failed to investigate further and informed his staff to quickly isolate the issue to a single home if possible.

**Jennifer Crooks**, Program Manager for Michigan's Drinking Water Program at the Environmental Protection Agency (EPA) during the crisis, stated that the EPA was aware of a serious lead problem unfolding in Flint by February 2015 and failed to take necessary measures to prevent the crisis from worsening. Her deposition confirmed that the MDEQ repeatedly assured the EPA that Flint was implementing corrosion control treatment, even though the MDEQ knew this was not true.

**Miguel Del Toral**, a regional groundwater regulations manager for the EPA and author of a whistleblower report that exposed the Flint Water crisis, expressed concerns about the lack of corrosion control treatment in Flint given the high number of lead service lines in the City. Mr. Del Toral told MDEQ officials that the City might have much higher lead levels that their compliance reports indicated due to problems with Flint's sampling methods, including pre-flushing before collecting samples in homes. Yet officials failed to change their methods and ignored his warnings for months.

**Nancy Peeler**, Director of the Maternal, Infant and Early Childhood Home Visiting Program at the Michigan Department of Health and Human Services (HHS) during the crisis, failed to identify and report a significant jump in blood lead levels in Flint children, claiming that any chance was attributed to normal, seasonal variation.

**Marvin Gnagy**, lead engineer for VNA on the Flint project, was never informed of the high lead level test results from Flint resident LeeAnne Walter's home, despite requesting all available lead and copper testing from the City and being on-site at the FWTP. Gnagy and VNA had no way to know that Flint officials had withheld this critical information, which would have significantly impacted their recommendations to the City. All the results VNA received showed the water to be in compliance with State and Federal standards.

Government officials further prolonged the crisis by refusing to even consider returning Flint to DWSD or implementing VNA's recommendations.

Susan McCormick, the former Director of DWSD during the crisis, testified that City and State officials rejected a return to Detroit Water even after the water quality issues were known in Flint. The City's Emergency Manager Gerald Ambrose even sought to block Ms. McCormick from discussing the offer at a Flint City Council Meeting, further delaying the return to Detroit Water.

Wayne Workman, who oversaw the State of Michigan's Emergency Manager program during the crisis, spoke of government officials' reluctance to return to Detroit Water even as evidence of lead in Flint's water continued to mount. He testified that even if VNA had formally recommended returning to DWSD, it would not have made any difference in the Treasury's position.

William Fahey, the Head of the Technical Group for VNA, said VNA engineers determined the Plant was capable of treating the Flint River water if the City implemented their recommendations. In their final report to the City, VNA made a series of important recommendations to treat the river water, which included working with the City's engineer and the MDEQ to evaluate the need for corrosion control treatment and the use of phosphate for that purpose. Instead, their recommendations were ignored, disregarded and dismissed.

VNA fulfilled its professional duties and made appropriate recommendations to the City of Flint – recommendations that were completely disregarded by those in charge.

Dr. William Bellamy, a water treatment engineer and expert in engineering ethics, conducted a thorough review of every aspect of VNA's work in Flint and concluded that their recommendations were appropriate based on the information they had at the time. VNA had no choice but to rely on the City to provide all relevant compliance monitoring samples, which is standard practice for the type of assessment VNA was asked to conduct. Dr. Bellamy also stated that the implementation of VNA's recommendations was out of their control, including the recommendation to use corrosion control to treat the River water.

Dr. Graham Gagnon, a civil engineering professor at Dalhousie University and an expert on drinking water quality and treatment, concluded that VNA's recommendations to the City, including treatment practices for removal of organic matter and corrosion control, were consistent with scientific knowledge and would have addressed Flint's lead issues had they been implemented. He asserted that Flint's lead issue was primarily in the distribution system, not the Flint Water Treatment Plant (FWTP) where VNA's work occurred.

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

⟶ Visit our website

Twitter

Terms of Use

Contact

© 2023 - Veolia North America



## FACTS FROM THE COURTROOM

August 11, 2022

# Official statement

On behalf of VNA, we want to thank all eight members of the jury for their dedication and commitment to public service over the last six months, and the thoroughness with which they have approached the facts and questions before them.

We are pleased to see that the meritless allegations of the plaintiffs' lawyers failed to convince the jury, which confirms what we have been saying all along: that the people of VNA did good work for the people of Flint.

We would have preferred a unanimous verdict and we believe that if the government officials responsible for the Flint Water Crisis, including Governor Snyder, had answered our questions instead of pleading the Fifth, the jury would have been in a better position to reach a unanimous verdict.

Today's mistrial shows that the plaintiffs' lawyers attempts to create a corporate scapegoat where none exists, while shielding the government officials who are truly responsible from facing justice, was a waste of time, energy, and money.

Responsibility for the Flint Water Crisis lies with these government officials who made the decision to switch Flint's water source to save money at the expense of residents' health and well-being, and who have so far escaped all accountability for their actions. That is clear to all who seek justice for the people of Flint and not just outsized legal payoffs.

The people of Flint have suffered deeply, and it is our collective responsibility — across government, the private sector, and the public — to work together to ensure that what happened in Flint never happens again, and to help the people of Flint get the justice they deserve.

---

VNA is a leader in optimized resource management. Our more than 8,000 North American employees tackle some of the toughest environmental and infrastructure challenges for cities and industry.

→ Visit our website

Twitter

Terms of Use

Contact

Official statement - Veolia Flint Facts

© 2023 – Veolia North America