# EXHIBIT 14

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION



         In Re    FLINT WATER CASES      Case No. 16-10444




        _____/

                        STATUS CONFERENCE


                BEFORE THE HONORABLE JUDITH E. LEVY
                    UNITED STATES DISTRICT JUDGE

                         NOVEMBER 30, 2022


                     APPEARANCES IN ALPHABETICAL ORDER:

                     Frederick A. Berg
                     Butzel Long
                     150 West Jefferson, Suite 100
                     Detroit, MI 48226

                     Jayson E. Blake
                     McAlpine PC
                     3201 University Dr.
                     Suite 100
                     Auburn Hills, MI 48326

                     James M. Campbell
                     Campbell Conroy & O'Neil, P.C.
                     20 City Square, Suite 300
                     Boston, MA 02129
```

(Appearances continued on next page)

To Obtain a          Jeseca C. Eddington, RDR, RMR, CRR, FCRR
Certified                 Federal Official Court Reporter
Transcript                  United States District Court
Contact:                     200 East Liberty Street -
                              Ann Arbor, Michigan 48104

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK: Calling the Flint Water Cases. |
| 3 | THE COURT: Okay. Thank you. |
| 4 | And we already have appearances taken down. So we |
| 5 | can get right to our work together. And we issued an agenda |
| 6 | for this status conference. And as agendas go, it's |
| 7 | relatively short. So hopefully we can work our way through |
| 8 | this material. |
| 9 | The first topic was one submitted by, I think, Mr. |
| 10 | Stern and his firm. And it relates to VNA's opposition to |
| 11 | co-liaison counsel's notice of the deposition of Pierre |
| 12 | Farcot, who is a communications director and special advisor |
| 13 | to the chairman at Veolia. And apparently he is responsible |
| 14 | for crisis communication. |
| 15 | And that deposition, I think, was scheduled for |
| 16 | today. |
| 17 | So let's see, Mr. Stern, did the deposition -- I |
| 18 | assume it didn't take place then? |
| 19 | MR. STERN: No, Your Honor. |
| 20 | THE COURT: Okay. And is there anything more you |
| 21 | want to say? I see that you're trying to take this |
| 22 | individual's deposition. And it relates to our case. |
| 23 | MR. STERN: So Mr. Farcot during the trial and prior |
| 24 | to the trial was employed by Veolia Environment SE. That's |
| 25 | based on our research and investigation. That's the French |

1     entity for Veolia.

2              He attended the trial almost every week.  Sat in the
3     back of the courtroom.  I believe he was there the day Your
4     Honor asked about the Twitter account.  And it turns out that
5     Mr. Farcot was the individual who was not only responsible
6     according to testimony from other VNA witnesses for the Veolia
7     Flint Facts website, the content on the website, the updates
8     to the content on the website, but also the Twitter account.

9              During the course of the deposition of Carrie
10    Griffiths, who is presently the communications director for
11    VNA, she described that prior to trial, there were two, in her
12    words, monumental events taking place at the same time.

13             One was the merger between Suez and Veolia, which the
14    Court is aware of based on the Richard Humann issues that
15    evolved throughout trial.  And the other monumental event was
16    the trial.

17             And according to the current communications director
18    for VNA, Veolia determined that the American company, VNA,
19    would handle all communications related to the merger, and
20    French -- the French company would handle everything related
21    to the trial.

22             So Mr. Farcot, based on my own attendance and
23    participation in the trial, was there.  It appears he was
24    Tweeting from the courtroom or outside the courtroom.  I
25    watched him interact repeatedly with not only attorneys for

1  Veolia but other individuals who were there for Veolia.

2          And when I noticed the deposition, I was told two
3  things by Mr. Kramer.  One is that he's no longer employed by
4  Veolia and that was like as of the date of the deposition.  He
5  just suddenly didn't work there anymore despite his LinkedIn
6  profile which he's active on.  I'm still showing he does as of
7  I think this morning or yesterday.

8          And two, even if he did, VNA and Veolia are not the
9  same thing and they have no control over him.  And so they've
10 pushed me to The Hague Convention.

11         The same is true as to item number 2 on Your Honor's
12 agenda, which is an individual by the name of Laurent Obadia.
13 He had previously been deposed.  This is the person who still
14 works for Veolia who Mr. Farcot actually worked under who was
15 in charge of Mr. Farcot's activities.

16         And even though he does work for Veolia, I have been
17 advised by counsel for VNA that they have no control over
18 Mr. Obadia and Mr. Obadia is not part of any entity that's a
19 part of this litigation.  And that again, I must go through
20 The Hague Convention in order to get both of these
21 individual's testimony.

22         So I'm not sure exactly what Your Honor can do, but
23 there's a dispute about the scope of what Your Honor has
24 permitted in terms of discovery and the import of the
25 information campaign that Veolia had undertaken prior to and

1 during the trial.

2 My impression is that Veolia believes that that's
3 only related to geotargeting. And if there's no documents
4 that show geotargeting, the inquiry should end there. And
5 that not only do these two individuals not work for VNA, one
6 of whom doesn't work for any Veolia entities, not only are
7 they in France, but I need to stop this process of doing
8 discovery because I have, according to them, what I need.

9 So that's the dispute.

10 THE COURT: Okay. And who is going to respond.
11 Would that be you, Mr. Kramer?

12 MR. OLSEN: I'll respond, Your Honor. Mike Olsen.
13 And there are a few problems with these two depositions. And
14 let me start where Mr. Stern finished with respect to the
15 scope of discovery.

16 He's noticed and taken many depositions and gotten
17 many documents with respect to PR discovery. During the
18 October status conference, Your Honor noted that this
19 discovery does not go to any claims or defenses in this case.

20 But rather you noted the Detroit News article that
21 had alleged that VNA may have geotargeted ads to potential
22 jurors or actual jurors. And that that was a topic of
23 significant interest. And you asked me to reconsider our
24 discovery position to enable Mr. Stern to address this
25 allegation that there was geotargeting with respect to the

1  jurors.

2       We took your admonition to heart and that's exactly
3  what we did.  We revised our request to admit responses.  We
4  revised our document responses to produce all of the Google
5  ads that were related to the advertisements that went out.
6  Google sponsored search does offer the ability to target
7  specific regions, states, zip codes.

8       The documents and the deposition testimony make clear
9  that VNA never utilized these geotargeting or geofencing
10 features.  We produced all of the ads to Mr. Stern and the
11 data that confirms that VNA never geotargeted or geofenced
12 these advertisements.

13      We've made people available for depositions.  In
14 Ms. Griffiths deposition, who you ordered us to produce, she
15 identified one additional person, Jace Connor, the Director of
16 Digital Communications, who we have agreed to make Mr. Connor
17 available for deposition to fully address this potential
18 geotargeting question.

19      But where we sit today is that not only does VNA
20 expressly deny ever geotargeting any ads in response to
21 anything, but we've produced all of that data.  We've produced
22 those documents.  And we produced witnesses and will produce
23 Mr. Connor who all are going to say and have said that there
24 was no geotargeting with respect to anything in any effort to
25 influence any potential jurors.

1          Now Mr. Stern has modified what he's claiming is the
2  need for this to I think what he's been calling a
3  misinformation campaign.  And he's talking about Tweets and
4  the Flint Facts website, both which happened after the jury
5  was impaneled and the jury was instructed and ordered not to
6  follow media.  But all of those Tweets and that website are
7  public.
8          If there's some particular Tweet or addition to the
9  website that Mr. Stern thinks needs the Court's attention,
10 even though it has nothing to do with the claims or defenses
11 in this lawsuit, obviously feel free to bring it to the
12 Court's attention.
13         But we're now demanding additional witnesses that go
14 to this, quote, misinformation campaign close quote that has
15 nothing to do with the geotargeting issue.  In fact, Your
16 Honor already struck a third party subpoena related to this
17 very issue because you concluded that it went too far afield
18 and wasn't targeted to this geotargeting question.
19         Now with respect to these two particular witnesses
20 that we're talking about, Mr. Farcot has never worked for VNA.
21 He worked for VE, who's not a party to this lawsuit.  He left
22 as of September 30, 2022.  VNA has never had any control over
23 him.  They certainly do not have any control over him now.
24 Mr. Farcot resides in France.  He is not someone we can simply
25 produce for deposition.

1    Now plaintiffs obviously can attempt to secure his
2    deposition through The Hague Convention, but that's an issue
3    for another day.  So at least with respect to Mr. Farcot --
4    and I'll address Mr. Obadia in one second -- the substance of
5    this has gone way far afield of the geotargeting issue.
6         It's now general discovery related to a
7    disinformation campaign that is -- that are related to Tweets
8    and a website that is public.  And if Mr. Stern has issues
9    with any of those Tweets, he can bring them to the Court's
10   attention.
11        THE COURT:  Well, Mr. Olsen, let's stop for just a
12   minute on Mr. Farcot.  Now that I know he's the individual who
13   was sitting just a little to the right of my line of sight for
14   a great many days of our six months in trial, is he in the
15   United States now?
16        MR. OLSEN:  He resides in France.
17        THE COURT:  I know.  But he resided in Ann Arbor for
18   a good number of weeks if not months during the trial.  And so
19   I'm just interested in do you know if he's in the United
20   States now?  Because he could be served while he's here.
21        MR. OLSEN:  As of the moment, I have no idea where
22   Mr. Farcot is at this moment.  My belief is he's probably in
23   France because that's where he lives, but I don't have any
24   idea where Mr. Farcot is at this moment.  We certainly don't
25   control him.

1                Now obviously, again, this has nothing to do with the
2    geotargeting.
3                THE COURT: Well, let me say something about that.
4    Because I hear your argument that the discovery that I advised
5    you that I thought would be important to take in this case, I
6    focused on the digital media campaign that was identified in
7    the Detroit News article that I was interested in I think is
8    important to ensuring a fair trial.
9                And so my focus was certainly on whether individual
10   jurors who had been impaneled or jurors -- the zip codes for
11   jurors in the venire had been involved in some way in conduct
12   of that nature. Or whether it's ongoing. And we have three
13   or more trials scheduled still. Well, I guess three. That
14   are in line to be tried in this case. So it matters what's
15   going on in an ongoing basis.
16               The Supreme Court case, Gentile v State Bar of
17   Florida, the 1991 case, has a quote that I think is worth
18   focusing on. And it says few, if any, interest under the
19   constitution are more fundamental than the right to a fair
20   trial by impartial jurors and an outcome affected by
21   extrajudicial statements.
22               So in 1991, they weren't thinking of geotargeting,
23   but they talked about extrajudicial statements would violate
24   that fundamental right to a fair trial. And so and that case
25   talked about First Amendment balances in limiting

1 extrajudicial statements.

2 And so I take to heart the Supreme Court's words
3 there that it's not just a targeted campaign of some sort.
4 But digital media can influence jurors. And relevant to our
5 work, we have a jury trial coming up now in October of 2023.
6 And it matters to me that this be a fair impartial jury. It
7 matters to you. It matters to everybody here.

8 And so I think that the decision I made with respect
9 to the subpoena of the Detroit News related to the Tiger Joyce
10 Op-Ed that was dramatically factually inaccurate on some
11 fundamental issues that I think could be very misleading for
12 potential registrants and claimants under the settlement.

13 I was deeply worried about that article going out and
14 causing confusion, hysteria, chaos in the settlement process.
15 That was something I was very worried about.

16 But that individual article coming from a media
17 outlet has a -- there's a different balance there than a
18 deposition of somebody who works for the -- is it for the
19 parent company of the VNA defendants in this case?

20 MR. OLSEN: Well, he no longer works for that
21 company.

22 THE COURT: Well, worked. Past tense. Thank you.

23 MR. OLSEN: Worked.

24 And I would say two things in response, Your Honor.
25 The first substantively with respect to the scope of

1  discovery. Now that we're past the geotargeting issue,
2  there's nothing secret about what VNA said during the trial or
3  since. Plaintiffs have access to that website. They have
4  access to all of the Tweets just like any member of the
5  public.
6       If there are any Tweets or postings that plaintiffs
7  think are improper, they should raise them with the Court.
8  But they haven't done that.
9       There's no evidence of any improper effort to
10 influence any jurors or potential jurors. They simply claim
11 the right to broad discovery by using the words
12 "disinformation campaign" without identifying a single piece
13 of disinformation. And are -- and I just don't think that's
14 proper.
15      There's been no showing that this discovery that
16 admittedly doesn't go to any claims or defenses in this case
17 should be ongoing for -- I agree with respect to the integrity
18 of the judicial process is important. But there's no evidence
19 that that is even in question.
20      Now with respect to the two witnesses in particular,
21 VNA does not control these two witnesses. Mr. Farcot doesn't
22 work for even the parent anymore.
23      THE COURT: Okay.
24      MR. OLSEN: And with respect to Mr. Obadia, I think
25 it's important to note he, again, does not work for VNA. He

1     is currently employed with VE.  But VNA cannot force him to
2     appear in any event.
3               It's important to note that Mr. Obadia was already
4     deposed in this case.  Plaintiffs' counsel went through The
5     Hague Convention to secure that deposition.
6               THE COURT:  That wasn't Mr. Stern and it wasn't
7     related to this issue.  If I recall, it was Mr. Leopold who
8     brought it to the Court's attention on behalf of the class
9     case.
10              MR. OLSEN:  Your Honor, when you say it wasn't
11    related to this issue, it was class plaintiffs.  And class
12    plaintiffs' justification for that deposition and I quote was,
13    "Mr. Obadia was a key witness because he played a central role
14    from Paris in coordinating Veolia's media campaign to spread
15    misinformation in order to shift blame publicly for its role
16    in causing the Flint Water Crisis."  Precisely --
17              THE COURT:  And when was that?  When did it take
18    place?
19              MR. OLSEN:  I don't remember the date of when it --
20              MR. STERN:  2018.
21              MR. OLSEN:  2018.  And so this is squarely the topic
22    that was part of his first --
23              THE COURT:  No, it's not.  2018, the trial hadn't
24    begun.
25              MR. OLSEN:  All right.  So again, substantively, no

1   one is pointing to a single Tweet or a single thing on the
2   website that's part of some disinformation campaign.
3            THE COURT:  Well --
4            MR. STERN:  Judge, may I clarify something?
5            MR. OLSEN:  And just one more point.
6            THE COURT:  Well, let me let Mr. Olsen finish.
7            MR. OLSEN:  With respect to Mr. Obadia, again, we
8   cannot force him.  He does not work at a party in this case.
9   Just like Mr. Leopold did, if the Court decides at deposition
10  -- a second deposition of Mr. Obadia is appropriate,
11  plaintiffs would have to go through the same process that
12  class plaintiffs went through to conduct it through the
13  procedure set out in The Hague Convention.
14           THE COURT:  Okay.  Mr. Stern.
15           MR. STERN:  Just as an initial matter, we do not
16  agree or concede that there's no evidence of a geotargeted
17  campaign.
18           There's not a single person that we have deposed so
19  far who had anything to do on a day-to-day basis with
20  utilizing a Google advertisement campaign and how the
21  interaction between social media and driving people to a
22  website actually worked and who the people were that were
23  actually driven to that website.
24           Yes, Veolia produced a hundred documents, half of
25  which are unreadable.  We can't even see what they say.  But

1  we do not concede that there was not a geotargeted campaign.
2          Number two, Mr. Obadia is in constant contact with
3  VNA.  The witnesses have testified that on a monthly basis or
4  a semi-monthly basis, they meet with him and other members of
5  Veolia about the litigation, about the communications.
6          They were put in charge in France of all
7  communications during the trial.  And now it's very convenient
8  to say, well, we have nothing to do with them.  I mean,
9  they're their own entity.
10         So they were in trial every day with his red socks
11 sitting in the back while Your Honor asked about the Tweets
12 sending out Tweets.  It's not the Tweets themselves that are
13 the issue.
14         The issue is the utilization of social media to drive
15 potential jurors to a website that was being continuously
16 updated during the trial about facts during the trial that
17 were factually inaccurate.  We haven't even scratched the
18 surface of that.
19         And so it's a convenient thing for Mr. Olsen to say
20 we produced documents.  There's no geotargeting.  Your Honor
21 said back last month that the only interest she has in this is
22 whether certain zip codes were chosen.  And we've shown you
23 through documents that no zip codes were chosen.  So this is
24 done.  This is over.
25         It's not over.

```
 1              About Mr. Obadia.  I understand that they're saying
 2   Mr. Farcot no longer works for the company.  I don't believe
 3   that.  But I understand that's what they're saying and I
 4   understand that presently that is his status according to VNA.
 5              There is no dispute that Mr. Obadia still works for,
 6   in a very high role, Veolia.  There is no dispute that he
 7   communicates regularly with VNA about this litigation and
 8   about the trials.
 9              Yes, under the law, we need to go through The Hague
10   Convention.  But these folks are in touch with this man.  They
11   speak to him on a monthly basis.  You talk about gamesmanship,
12   about putting someone through the ringer.  I mean, just call
13   the guy --
14              THE COURT:  Let me ask Mr. Olsen.  Is somebody who
15   was in the position of Mr. Farcot or Farcot -- whatever it
16   is -- going to be at the next trial sitting in the back?
17              MR. OLSEN:  I don't have any idea, Your Honor.
18              THE COURT:  Okay.  Well, and will you sign a
19   certification that will be filed on the docket that Mr. Farcot
20   no longer has any affiliation with any VNA entities?
21              MR. OLSEN:  I don't know what affiliation.  I'll have
22   to talk to the company.  I know he no longer works for VE.
23   That's what I've been told.  I'm happy to -- I don't know if
24   he has some kind of consulting.  I don't know what his
25   arrangement is --
```