# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE FLINT WATER LITIGATION | Case No. 5:16-cv-10444-JEL-MKM<br>Hon. Judith E. Levy |
| This Document Relates To:<br>*Bellwether III Cases* | Case No. 5:17-cv-11166-JEL-MKM<br>Case No. 5:17-cv-11165-JEL-MKM |

___

**DEFENDANTS VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S SUBMISSION REGARDING THE <u>PROTOCOL FOR RULE 35 EXAMINATIONS</u>**

### I. Introduction

The Bellwether 3 Plaintiffs seek damages for alleged neurological injuries. Plaintiffs' neuropsychology and developmental psychology experts have extensively examined each of the plaintiffs and interviewed each of the plaintiffs' parents and guardians. Other plaintiffs' experts also examined the plaintiffs or interviewed their parents and guardians. Plaintiffs' causation experts rely heavily on these examinations and interviews to opine that each of the plaintiffs has suffered neurological injuries attributable to lead. VNA's expert pediatric neurologist, Dr. Stephen Nelson, seeks to conduct a brief physical examination of each plaintiff and to interview the accompanying parents, guardians, or relatives, all of which is expected to take under 3 hours per plaintiff. Ex. 1, Protocol for Neurological Exam. Plaintiffs have objected on the basis that family members should not have to engage with the defense doctor because they have been deposed and that the examination is invasive and unnecessary. VNA is plainly entitled to conduct these examinations and interviews as proposed.

### II. Background

Collectively, plaintiffs' experts have conducted extensive examinations of each plaintiff and at least three interviews of relevant parents and guardians, according to their expert reports. Dr. Hoffman, a psychologist, conducted a psychological evaluation and interviewed each plaintiff in person. A parental guardian was present in the testing room during each evaluation by Dr. Hoffman, which VNA estimates to have taken between 3 and 4 hours. In addition, on separate dates, Dr. Hoffman interviewed each plaintiff's guardian at least once and administered several parent-oriented standardized measures concerning each plaintiff's adaptive, attentional, and emotional-behavioral functioning. Dr. Krishnan, a neuropsychologist, administered neuropsychological testing to each plaintiff that took between 3 and 4 hours. She also conducted clinical interviews with at least one parent, typically lasting for 60 to 90 minutes. Dr. Canfield, a developmental psychologist, administered neurocognitive testing to the four plaintiffs for whom he issued reports. Dr. Bithoney, a pediatrician, conducted a telephonic interview of at least one parent for each plaintiff. Michele Albers, a vocational rehabilitation counselor, submitted reports for four plaintiffs, which relied in part on clinical interviews she conducted of each plaintiff and plaintiff's mother lasting between 0.90 and 1.40 hours each. In addition, each plaintiff was subjected to bone lead testing under the supervision of Dr. Specht.

By contrast, VNA seeks to conduct a single, relatively brief neurologic examination of each plaintiff by pediatric neurologist Dr. Nelson per the attached protocol. Ex. 1. The neurologic examination is non-invasive. *Id*. Dr. Nelson also seeks to interview the adult family members who accompany plaintiffs to the examination. The examination and interview are expected to take a total of less than 3 hours for each plaintiff.

### III. Argument

Rule 35 allows physical and mental examinations when a party's physical or mental condition is "genuinely in controversy" and there is "good cause" for requiring a medical examination. *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). A plaintiff who seeks damages for a "mental or physical injury places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such

asserted injury." *Id.* at 119. Here, plaintiffs have plainly put their physical conditions at issue and there is indisputably good cause for ordering them to submit to examinations by the defense related to those conditions.

Courts' broad discretion under Rule 35 extends to the details, nature, and scope of any medical examinations. *Schlagenhauf*, 379 U.S. at 114-15 (Rule 35 is "to be accorded broad and liberal treatment"); *see also* 8B Fed. Prac. & Proc. Civ. § 2234 (3d ed.) ("The trial court has extensive discretion in determining the details of the examination."). In cases involving minor plaintiffs, courts have exercised their discretion under Rule 35 to order that parents or guardians attend minor plaintiffs' medical examinations and answer questions related to the examinations.[1] *Miller v. United States*, 2020 WL 13546422, at *2 (D. Haw. Jan. 3, 2020) ("[B]ecause I.M.M. is a minor, the Court finds that Defendant has shown good cause to require the Millers to cooperate in the examination . . . and to answer all questions regarding I.M.M.'s medical treatment and the Miller's observations of I.M.M."); *Dudys v. United States*, 2008 WL 11343105, at *2 (W.D. Wash. Nov. 18, 2008) (ordering the mother of minor plaintiff to answer questions at a medical examination regarding minor's medical history and holding that deposition testimony was not a substitute for examination and parental interview); *Cutting v. United States*, 2008 WL 5064267, at *2 (D. Colo. Nov. 24, 2008). As these courts have recognized, in cases involving minor children, it is often necessary that the examining doctors be afforded an opportunity to "ask questions as will enable them to formulate an intelligent opinion concerning the nature and extent of [a minor plaintiff's] injuries." *Dodd-Anderson v. Stevens*, 1993 WL 273373, at *2 (D. Kan. May 4, 1993).

Finally, in assessing whether medical examinations are warranted under Rule 35, courts have consistently rejected plaintiffs' arguments that medical examinations are unnecessary because defendants have access to other forms of discovery. Depositions, interrogatory responses, and medical records are no substitute for testing and examinations performed by professionals with the requisite training and expertise. *Dudys*, 2008 WL 11343105, at *2 (rejecting argument that opportunity to depose minor plaintiff's parents was sufficient substitute for parental interview regarding minor plaintiff's medical history). In addition, courts have held that limiting a defendant's expert to medical records or prior deposition testimony is inconsistent with Rule 35's goal of putting plaintiffs and defendants on an equal footing when, as in this case, plaintiff's experts have conducted and rely on their own examinations. *S.R. v. Kenton County Sherriff's Office*, 2018 WL 11420453, at *4 (E.D. Ky. Feb. 12, 2018) ("[W]here Plaintiffs have had up-to-date examinations, Defendant's mere access to Plaintiffs' medical records does not create an even playing field under the circumstances.").

Accordingly, VNA requests that Dr. Nelson be allowed to proceed with the proposed examinations and interviews.

---

[1] A small number of unpublished decisions, including one from this district, have refused to require minor plaintiffs' parents to provide medical histories for their children as part of a medical examination on the ground that Rule 35 authorizes courts only to require parties to attend medical examinations. *See, e.g., Gohl v. Livonia Pub. Schs.*, 2015 WL 1469749, at *6-*7 (E.D. Mich. Mar. 30, 2015). However, none of these cases are binding on this Court, and denying VNA's expert the ability to conduct interviews would create an uneven playing field with plaintiffs' experts.

Respectfully submitted,

| **CAMPBELL, CONROY & O'NEIL P.C.** | **BUSH SEYFERTH PLLC** |
|---|---|
| By: /s/ James M. Campbell<br>James M. Campbell<br>Alaina N. Devine<br>20 City Square, Suite 300<br>Boston, MA 02129<br>(617) 241-3000<br>jmcampbell@campbell-trial-lawyers.com<br>adevine@campbell-trial-lawyers.com | By: /s/ Cheryl A. Bush<br>Cheryl A. Bush (P37031)<br>100 W. Big Beaver Road, Suite 400<br>Troy, MI 48084<br>(248) 822-7800<br>bush@bsplaw.com |

*Attorneys for Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC*

Dated: March 6, 2023

4

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2023, I electronically filed this document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

By: /s/ James M. Campbell
James M. Campbell
jmcampbell@campbell-trial-lawyers.com

# Exhibit 1

# **PROTOCOL FOR NEUROLOGICAL EXAM**

The neurologic examination is non-invasive.

Initially, the exam will begin with a patient and family interview which will include a series of questions regarding history of present illness, past medical and surgical history, medications, family history, social history, development history, and review of systems. This will include detailed questions about any identified conditions, such as frequency, severity, aggravating and alleviating factors, treatments tried or considered, etc.

The physical examination will include assessment of head size, examination of the ears, nose, neck and throat, listening to the lungs and heart, palpating pulses, listening to and palpating the abdomen, assessing the skin for birthmarks, and doing a complete neurological examination.

The neurologic examination is typically divided into seven components: mental status/cognitive testing; cranial nerves; motor strength, tone, and bulk; sensation; coordination; reflexes; and gait (walking) and station/balance.

The assessments are accomplished with the use of tools such as a tuning fork, flashlight, reflex hammer, stethoscope, and ophthalmoscope. The entire visit is estimated to take 1-2 hours.

Specifically, the neurological exam will include:

Mental Status

The mental status or cognitive exam begins during the patient interview.  It will involve a brief assessment of language usage, chronology and recollection of events.  The exam may involve asking for orientation to time, place and person.  If there is disorientation or memory lapses, a mini mental status examination may be done.  This will assess further the patient's orientation, registration, attention, recall, language, repetition, complex commands, and visuospatial function.

Cranial Nerves Testing

Cranial nerve testing is the assessment of the nerves innervating structures within the head and neck.  These nerves include:

1.  Olfactory nerve (provides sense of smell);

II. Optic nerve (provides sight); testing would include testing pupil function with a light, assessing visual fields, and looking into the eye with an ophthalmoscope.

III, IV and VI – oculomotor, trochlear and abducens (grouped together as they provide function in the motion of the eye); assessed by asking the examinee to look in all directions.

V.  Trigeminal nerve (provides general sensory function to the face); assessed by asking the examinee to smile and close their eyes for example.

VII.  Facial nerve (provides motor innervation to the muscles of facial expression); assessed for light touch with the eyes closed.

VIII.  Vestibulocochlear nerve (responsible for hearing and vestibular function); assessed by tuning fork or finger rub.

IX.  Glossopharyngeal nerve (responsible for motor innervation of the pharynx muscles); assessed by palate movement.

X.  Vagus nerve (involved with motor output of the pharyngeal and soft palate muscles); assessed by palate movement.

XI.  Spinal accessory nerve (responsible for shoulder shrug and head turn);

XII.  Hypoglossal nerve (involved with movement of the tongue).

Motor Exam

This will first involve an inspection of the muscles and may involve palpation to assess for mass lesions or tenderness if present.

 The physical exam will also involve standard range of motion testing.  One set of the ROM tests will be passive where the examiner will move the extremities.  The next set of ROM tests will be active, where the patient is asked to move the extremities, head,
neck and back.  The movements will involve flexion, extension and rotation.

The motor exam will also assess muscle strength and will be conducted on both left and right sides of the body, all limbs, and will involve pulling, pushing movements as well as resistance to slight pressure by the examiner.

Sensory exam

The sensory exam involves the assessment of patient-reported symptoms that includes a diminished or exaggerated perception of sensation. Modalities tested include pain, temperature, vibration, and position sense.  Testing will or may involve the use of a tuning fork to test vibration, light touch, or assessment of position sense.  A piece of cotton or similar material may be used to assess for light touch.  The assessment for position sense can be done by testing the distal phalanx and asking the patient the position of the digit with eyes closed.

Gait

The assessment of a patient's gait can be as simple as watching the patient walk into the room or requesting the patient to walk forward and back and perhaps taking a few steps backward. Balance and strength could have further evaluation by asking the patient to walk on their tiptoes or heels and walking in tandem (the heel of the front foot touching the toe of the back foot in a straight line). Romberg is tested by having the patient stand with their eyes closed and feet together.

3

Deep Tendon Reflexes

The assessment of the deep tendon reflexes can be done by tapping a specific tendon with a reflex hammer and observing for a reflex muscle contraction.  The testing will be conducted by tapping the biceps, triceps, knees, and ankles.

Other reflexes include the Babinski reflex (stimulation of the lateral plantar aspect of the foot with the finger or reflex hammer).