EXHIBIT D



NEW ENGLAND LAW BOSTON

154 STUART STREET, BOSTON MA 02116 · 617.422.7459

**Expert Report of Lawrence Friedman**

*In re FLINT WATER CASES*

Civil Action No. 5:16-cv-10444-JEL-MKM (consolidated)

## I.     Qualifications

My name is Lawrence Friedman. I am a Professor of Law and tenured member of the faculty at New England Law | Boston. I have been teaching at New England Law since August 2004. Previously, I was a Visiting Assistant Professor of Law at Boston College Law School and, prior to that, a Climenko-Thayer Lecturer on Law at Harvard Law School. At New England Law, I have taught courses in constitutional law, state constitutional law, civil procedure, and administrative law. I have also been a faculty member in the summer program at the Irish Centre for Human Rights at the National University of Ireland, where I co-taught a course in separation of powers with the late U.S. Supreme Court Justice, Antonin Scalia.

I am the co-author, with Robert F. Williams, of the leading state constitutional law casebook, STATE CONSTITUTIONAL LAW: CASES AND MATERIALS, FIFTH EDITION (Carolina 2015); and the author of a constitutional law casebook, MODERN CONSTITUTIONAL LAW: CASES, PROBLEMS AND PRACTICE, SECOND EDITION (Wolters Kluwer 2019). My other books include THE NEW HAMPSHIRE STATE CONSTITUTION, SECOND EDITION (Oxford 2015); and, with Lynnea Thody, THE MASSACHUSETTS STATE CONSTITUTION (Oxford 2011). Beginning in January 2017, I assumed editorship of the Oxford University Press series, "The Oxford Commentaries on the State Constitutions of the United States." In this capacity I have edited volumes on the state constitutions of Wisconsin, Oklahoma, and Ohio. I have also published numerous articles on constitutional law and state constitutional law in a variety of professional journals, including, among others, the *Arkansas Law Review*, the *Duquesne Law Review*, the *Wayne Law Review*, and the *Penn State Law Review*.

I serve as a charter member of the U.S. State Constitutions Network, an organization that brings together researchers seeking to digitize and analyze records relating to state constitutional history in the United States. I also serve as a member of the Boston Bar Association and the *Boston Bar Journal* Board of Editors, and I am admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the District of Columbia Circuit, the U.S. Court of Appeals for the First Circuit, the U.S. District Court for the District of Massachusetts, and the Massachusetts state courts.

A copy of my current curriculum vitae is attached.

## II.     Purpose of This Report and Sources Consulted

David Rogers, Esq., of Campbell, Conroy & O'Neill, counsel for the defendant, Veolia North America, retained me to provide this expert report (the "Report"). I received $400 per hour for my work. I have not provided testimony in a deposition or at trial at any time within the last four years.

Specifically, counsel asked me to draft a report explaining the constitutional and statutory chains of authority of the various public actors and bodies in Michigan connected to the Flint water crisis in or around 2014 and 2015. This report is based upon my expertise in state and federal constitutional law, as well as my review of the Michigan Constitution and the federal and/or state statutes, regulations, and ordinances supplying the authority of federal, state and local actors and bodies to respond to and otherwise address the issues associated with the Flint water crisis in or around 2014 and 2015 (which I shall refer to as "the relevant time period"). In particular, I relied upon the following sources of information about governmental structures and relationships, as well as the events surrounding the Flint water crisis.

*Constitutional Authority*

- THE MICHIGAN CONSTITUTION OF 1963; and
- THE UNITED STATES CONSTITUTION.

  *Michigan Statutory and Regulatory Authority*

- The Home Rule City Act, MICH. COMP. LAWS § 117.1 et seq.;

- The Local Financial Stability and Choice Act of 2012, MICH. COMP. LAWS § 141.1541 et seq. (2012 Mich. Pub. Acts 436);

2

- The Michigan Public Health Code, MICH. COMP. LAWS § 333.1101 et seq.; and
- The Safe Drinking Water Act, MICH. COMP. LAWS § 325.1001 et seq. ("SDWA").

   *Federal Statutory and Regulatory Authority*

- Reorganization Plan No. 3 of 1970 (Environmental Protection Agency) § 1(b);
- 42 U.S.C. § 300 (Federal Safe Drinking Water Act); and
- 40 C.F.R. § 141 (National Primary Drinking Water Regulations).

   *Local Laws and Regulations*

- Flint, Michigan City Charter; and
- Flint, Michigan Code of Ordinances.

   *Legal authorities*

- Manuel Chavez et al., *Accountability and Transparency Diluted in the Flint Water Crisis: A Case of Institutional Implosion*, 12 NORTEAMÉRICA 11 (2017);

- John Engler et al., *Governor's Power to Control Agency Discretion*, 74 MICH. BAR J. 258 (1995);

- Susan P. Fino, THE MICHIGAN STATE CONSTITUTION (Oxford 2011);

- Cara Cunningham Warren, *An American Reset – Safe Water & A Workable Model of Federalism*, 27 DUKE ENVT. L. & POLICY FORUM 51 (2016);

- Kerina Wang, *How to make sense of government accountability*, blogs.worldbank.org, January 15, 2015, at https://blogs.worldbank.org/governance/how-make-sense-government-accountability; and

- Robert F. Williams, *Michigan State Constitutionalism: On the Front of the Last Wave*, 60 WAYNE L. REV. 1 (2014).

   *Reports*

- FLINT WATER ADVISORY TASK FORCE FINAL REPORT (March 2016);

- Peter J. Hammer, THE FLINT WATER CRISIS, KWA AND STRATEGIC-STRUCTURAL RACISM (July 2016);

- Office of the Auditor General, PERFORMANCE AUDIT REPORT: COMMUNITY AND NONCOMMUNITY WATER SUPPLIES OFFICE OF DRINKING WATER AND MUNICIPAL ASSISTANCE, DEPARTMENT OF ENVIRONMENTAL QUALITY (March 2016);

- U.S. Environmental Protection Agency Public Water System Supervision Program, REVIEW OF THE MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY DRINKING WATER PROGRAM FINAL REPORT (October 2017);

- University of Michigan School of Public Health, LEARNING FROM THE FLINT WATER CRISIS: PROTECTING THE PUBLIC'S HEALTH DURING A FINANCIAL EMERGENCY (January 2018);

- United States Government Accountability Office, REPORT TO CONGRESSIONAL REQUESTERS: K-12 EDUCATION, LEAD TESTING OF SCHOOL DRINKING WATER WOULD BENEFIT FROM IMPROVED FEDERAL GUIDELINES (July 2018); and

- U.S. Environmental Protection Agency Office of the Inspector General, MANAGEMENT WEAKNESSES DELAYED RESPONSE TO FLINT WATER CRISIS (July 2018).

### Documents

Contract for Emergency Manager Services (Edward Kurtz) (August 2012);

Contract for Emergency Manager Services (Darnell Earley) (October 2013); and

Contract for Emergency Manager Services and Oath of Office (Gerald Ambrose) (January 2015).

### Depositions

Deposition of Gerald Ambrose (Flint Emergency Manager, January – April 2015);

Deposition of Valerie Brader (State Deputy Legal Counsel and Senior Policy Advisor to the Governor, 2011-2015);

Deposition of Darnell Earley (Flint Emergency Manager, September 2013-January 2015);

Deposition of Kory J. Groetsch (Toxicology & Response Manager, Michigan Department of Health and Human Services, 2014-2017);

Deposition of Edward J. Kurtz (Flint Emergency Manager, August 2012 – July 2013); and

Deposition of Dayne Walling (Mayor of Flint, Michigan, 2009-2015).

## III.    Scope of Report

As noted above, this Report discusses the constitutional and statutory chains of authority of the various public actors and governmental bodies associated with the Flint

water crisis. The analysis is confined to the authority that these actors and governmental bodies possessed in the relevant time period—the analysis accordingly is retrospective, with matters addressed in the past tense. There are a variety of connections between the public actors and governmental bodies associated with the crisis, and it should be noted that each possessed a distinct authority in respect to the water quality issues the city of Flint faced, even when their respective authorities coincided. The scope of authority of each actor or body flowed directly from the constitutional, statutory, and local laws, creating the position or positions each actor or body occupied pursuant to these legal authorities.

At the same time, these actors and bodies generally were subject to some kind of accountability check, typically by an actor or body with superior or superintending authority. These accountability mechanisms helped to shape or define the limits of the authority of the actors or bodies in question. This report addresses, in a general way, these accountability checks in several (potentially overlapping) dimensions:

- "political accountability," pursuant to which appointed officials must answer to executive branch officials with policymaking responsibility;

- "bureaucratic accountability," pursuant to which agency managers are obliged to focus attention on the priorities of those at the top of the bureaucratic hierarchy; and

- "legal accountability," pursuant to which lawmakers can impose sanctions on administrators as a result of existing legal or contractual relationships.

*See* Kerina Wang, *How to make sense of government accountability*, blogs.worldbank.org, January 15, 2015, at https://blogs.worldbank.org/governance/how-make-sense-government-accountability.

This Report proceeds to analyze each public actor or body connected to the Flint water crisis in respect to two respects:

(1) the actual legal authority that an actor or body possessed under then-existing constitutional, statutory, or municipal law; and

(2) the actor or body's accountability—the ways in which that actor or body is formally accountable for its actions, to the extent accountability illuminates the boundaries of the authority the actor or body possessed.

5

The discussion of these aspects of each public actor or governmental body begins with the authority that flowed from the top of Michigan state government, pursuant to the state constitution, which defines the scope of the authority invested in their legislature and governor. It follows the lines of authority from the constitution through the statutory, regulatory, and local authority that created and/or enabled the various actors and bodies arranged below the office of the governor to take action in respect to the Flint water crisis. The Report further addresses the federal governmental bodies connected to the crisis and the ways in which federal authority intersected with state and local authority in respect to the management and regulation of Flint's water supply.

Here is an outline of the discussion that follows:

    (1) State-level constitutional actors or bodies:

        (a)    The Legislature

        (b)    The Governor

    (2) State-level statutory actors or bodies:

        (a)    Michigan Department of Environmental Quality

        (b)    Emergency Managers

        (c)    Michigan Department of Health & Human Services

    (3) County-level actors or bodies:

        The Genesee County Health Department

    (4) City-level actors or bodies:

        (a)    Mayor of Flint and Flint City Council

        (b)    Flint Department of Public Works

    (5) Federal-level actors or bodies:

        (a)    U.S. Environmental Protection Agency

        (b)    U.S. Department of Health & Human Services

**(1)    State-Level Constitutional Actors**

    **(a) The Legislature**

*Authority*

Article IV, Section 1 of the Michigan Constitution grants all of the state's legislative power to a legislature composed of a senate and a house of representatives, which must

6

act in concert to make law. The legislature possesses the "law-making power of a sovereign state." *Decher v. Vaughan*, 177 N.W. 388, 390 (Mich. 1920) (quotations omitted). The constitution specifically states, in Article IV, Section 51, that "[t]he public health and general welfare of the people of the state are hereby declared to be matters of primary public concern[]", and that the legislature "shall pass suitable laws for the protection and promotion of the public health."

Though the citizens of Michigan retain some authority to make law directly through the state constitution's provisions relating to initiatives and referendums, *see* MICH. CONST. Art. II, § 9. The point here is that many of the state-level actors and bodies involved in the Flint water crisis exercised authority or discretion that flowed to them directly from specific legislative enactments that served to define the bounds of their authority. Further, the legislature removed from oversight of its delegations of authority to other actors in state or local government. Notably, Article IV, Section I, of the state constitution permits the legislature to conduct investigations to aid it ability to enact appropriate legislation in furtherance of its police powers. *See* Opinion of the Attorney General, No. 4606, p. 106 (September 20, 1967) (noting that "[t]he legislature has ample authority to obtain information needed for proper discharge of [its constitutional] duty through its normal process of investigation").

*Accountability*

Senators and members of the house of representatives are accountable to their constituents through regular elections. Senators are elected from single member districts at the same time as the election of the governor and serve four-year terms. *See* MICH. CONST. Art. IV, § 2. Members of the house of representatives are elected from single member districts apportioned on the basis of population and serve two-year terms. *See* MICH. CONST. Art. IV, § 3.

*Conclusion*

• *Authority*: The Michigan Constitution assigns the state's legislature broad authority to enact laws in the interest of the health, safety, and welfare of Michigan residents.

• *Accountability*: Members of the legislature are accountable to their constituents through regular elections.

7

## (b) The Governor

*Authority*

Article V, Section 1 provides that Michigan's "executive power is vested in the governor." This authority has been described "as the power to carry out legislative policies enacted into law." Fino, THE MICHIGAN STATE CONSTITUTION 111 (Oxford 2011). Though executive power is vested in the governor, he or she does not act alone: the constitution provides that the state's administration shall consist of not more than 20 principal departments, "grouped as far as practicable according to major purposes." MICH. CONST. Art. V., § 2. The governor ultimately is responsible for managing the functions of "[a]ll executive and administrative offices, agencies and instrumentalities of the executive branch" that the state constitution permits the governor to organize. *Id.*

Michigan's governor commands vast resources and wields substantial discretion in respect to the operations of state government, including an authority to reorganize the executive branch that is the legislature's equal. *See Aguirre v. Dep't of Corrections*, 859 N.W.2d 267, 271-72 (Mich. Ct. App. 2014) (noting that "the constitutional convention and the ratifying public intended Article 5, § 2 to bestow upon the Governor considerable authority to reorganize the executive branch" (quotation omitted)). To appreciate the scope of this authority, compare it with that of the President of the United States, whose power under the U.S. Constitution to reorganize the major features of the executive branch is secondary to that of Congress. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. ___, ___ (2020) (opinion of Kagan, J.) (noting broad grant of constitutional authority to Congress "to establish and organize the Executive branch").

The framers of the Michigan Constitution left little room for doubt that they envisioned the state's governor as supervisor of nearly all of state government and its functions outside of the judiciary or the legislature. As one court put it, the state constitution's framers sought to give the governor "real control over the executive branch." *Michigan Farm Bureau v. Dep't of Environmental Quality*, 807 N.W.2d 866, 891 (Mich. 2011) (quotation omitted). Such control entails the "power and ability" of the governor "to manage the bureaucracy, to supervise the administrative agencies, and to influence those agencies' rulemaking decisions through his or her appointments and directives." *Id.*

The constitution provides the governor an arsenal of tools with which to carry out his or her vast supervisory responsibilities:

- *First*, Article V makes clear that the governor may exercise significant control over the individuals who are responsible for running the various principal departments of state government. Article V, Section 3, provides that the default head of each principal department "shall be a single executive" and, unless the constitution otherwise provides for their election or appointment, the governor can appoint that executive (with the advice and consent of the senate), and the person so appointed "shall serve at the pleasure of the governor." MICH. CONST. Art. V, § 3. When a board or commission heads a principal department, its members shall be appointed by the governor (with the advice and consent of the Senate) unless otherwise provided for in the constitution, with the terms of office and procedures for removal of the members defined either in the constitution or by the legislature. *Id.* Further, though under Section 21 of the constitution the secretary of state and attorney general are directly elected, when these offices become vacant they "shall be filled by appointment by the governor."

- *Second*, the constitution in Article V, Sections 8 and 9, provide the governor the authority to supervise each of the principal departments of government and the means with which to exercise this authority. MICH. CONST. Art. V, § 8 states: "Each principal department shall be under the supervision of the governor unless otherwise provided by this constitution." Section 8 also provides that the governor "shall transact all necessary business with the officers of government and may require information in writing from all executive and administrative state officers," including elected officers, "upon any subject relating to the duties of their respective offices." *Id.* The framers of the Michigan Constitution sought to aid the governor in the exercise of his or her supervisory responsibilities by keeping the heads of departments close: Article V, Section 9, provides that "[s]ingle executives heading principal departments and the chief executive officers of principal departments headed by boards or commissions shall keep their offices at the seat of government … except as otherwise provided by law. …"

- *Third*, the Michigan Constitution obligates the governor to manage and supervise the various public actors and bodies charged with ensuring that functioning of state government. Article V, Section 10, provides that "[t]he governor shall have [the] power

9

and it shall be his duty to inquire into the condition and administration of any public office and the acts of any public officer, elective or appointive." Further, the constitution allows the governor to "remove or suspend from office" any elective or appointive officer (other than members of the legislature or judiciary) "for gross neglect of duty or for corrupt conduct in office, or for any other misfeasance or malfeasance therein, … and shall report the reasons for such removal or suspension to the legislature." MICH. CONST. Art. V, § 10. Under Section 10, in other words, the governor may remove public officers for good cause. *Aguirre*, 859 N.W.2d at 272. Officers not accounted for in the constitution or by legislation serve at the pleasure of the governor.

There should be little doubt that the protection of public health is among the governor's responsibilities, including issues relating to basic necessities, like access to clean water. In 2012, for example, the Michigan Department of Environmental Quality ("MDEQ"), after due investigation into problems with the municipal water supply in the City of Highland Park, "determined that the waterworks system [wa]s not operated by the City in a manner adequate for the protection of public health." *In the Matter of Highland Park Water Treatment Plant*, RMD Order No. 399-04-12; Water Supply Serial Number 03140, at 2 (April 25, 2012) (Wyant, Director). MDEQ further ordered that the city "enter a contract for the purchase of potable water for its customers" within particular time frames or take corrective action to address the existing violations in its water system. *Id.* at 5, 6, 7, 8. Notably, MDEQ, after concluding that Highland Park's water system threatened the public health of the city's residents, brought the issue to the attention of Governor Rick Snyder (governor of Michigan during the relevant time period), and representatives of the Governor's office took action to ensure the City's continued access to clean water. *See* Deposition of Valerie Brader (State Deputy Legal Counsel and Senior Policy Advisor to the Governor, 2011-2015), 225-27. In respect to Flint, it was similarly understood by the city's emergency managers that the governor's office could intervene to direct that particular actions be taken. *See* Deposition of Walling at 769-70 (noting that it was the "understanding of Flint's emergency manager" that the governor "had the power and the authority to direct the emergency managers … so as to cause a certain outcome to occur").

*Accountability*

Following his or her election, the governor of Michigan is primarily accountable to the people; the governor will face re-election (at his or her option) after serving a four-year term. MICH. CONST. Art. V, § 21. As with all state-wide elective offices, the governor is limited to two terms. MICH. CONST. Art. V, § 30. This means that, in a governor's second term, a governor is no longer directly electorally accountable to the people. But, a governor also may be subject to "legal accountability," manifested by pressure brought to bear through legislative demands or inquiries, or adverse judicial rulings. Further, as with all state-wide officers, the governor also may be subject to impeachment and conviction by the legislature pursuant to Article XI, Section 7 of the state constitution.

*Conclusion*

• *Authority*: By nearly any measure, the Michigan Constitution assigns the state's governor broad supervisory authority over both the constitutionally and statutorily assigned functions of state government, and the conduct of the public officers responsible for those functions.

• *Accountability*: As one former Michigan chief executive observed, the governor "is ultimately held accountable by the public for the organization, efficient functioning, and interactions of the executive branch of government with the public." John Engler et al., *Governor's Power to Control Agency Discretion*, 74 MICH. B J. 258, 262 (1995).

## (2) State-level Statutory Actors

### (a) Michigan Department of Environmental Quality

*Authority*

The state legislature, through the Safe Drinking Water Act, MICH. COMP. LAWS § 325.1001 et seq. ("SDWA"), empowered the Michigan Department of Environmental Quality ("MDEQ") during the relevant time period to assume responsibility for ensuring "the long-term health of [the state's] public water supplies." *Id.*, § 325.1001a. In 2019, Michigan Governor Gretchen Whitmer authorized the reorganization of administrative responsibilities regarding such matters as water safety, resulting in a new department, the Department of Environment, Great Lakes and Energy, which absorbed MDEQ's portfolio

11

of responsibilities. *See* Michigan Executive Order 2019-6. As noted above, this Report refers to the department and its responsibilities pursuant to the SDWA as they existed in at the time of the Flint water crisis.

To ensure "the long-term health" of Michigan's public drinking water, the SDWA authorized MDEQ to develop safe drinking water standards and to enforce compliance through appropriate means, including permitting, monitoring, and advising public water suppliers. *See* MICH. COMP. LAWS §§ 325.1004(2), 1005(1)(b).

*Permitting*. In respect to permitting, MDEQ had the authority to issue permits for new water systems and alterations to existing systems. MICH. COMP. LAWS § 325.1004(2). Among the factors MDEQ had to consider in determining whether a permit should issue was the protection of public health in relation to drinking water. *Id*. Before granting a permit, MDEQ had to "evaluate the adequacy of the proposed system to protect public health by supplying water meeting the state drinking water standards..." MICH. COMP. LAWS § 325.1004(2); *see* MICH. COMP. LAWS § 325.1004(1)-(6); MICH. ADMIN. CODE R. 325.11305. Further, MDEQ was required to conduct a capacity assessment—essentially, a determination whether the public water supplier had sufficient technical, financial, and managerial capacity to be able to comply with the standards set for safe drinking water provision. MICH. COMP. LAWS §§ 325.1004, 1005.

*Monitoring and Advising*. Among its enforcement responsibilities, MDEQ was responsible for supplier compliance with monitoring and reporting requirements, including the sampling techniques and analytics processes utilized by suppliers. MICH. COMP. LAWS § 325.1005(1)(b); MICH. COMP. LAWS § 325.1007; MICH. ADMIN. CODE R. 325.10601 et seq. (Part 6: State Drinking Water Standards and Analytical Methods); R. 325.10701 et seq. (Part 7: Surveillance, Inspection, and Monitoring). MDEQ also enforced its statutory mandate through a laboratory certification program and by operating its own laboratory, 40 C.F.R. § 142.10(b)(3)-(4); MICH. COMP. LAWS §§ 325.1011, 1012; by conducting regular surveillance and inspections, 40 C.F.R. § 142.10(b)(2); MICH. ADMIN. CODE R. 325.10702, 10703; and by making reports to the federal Environmental Protection Agency ("EPA"), 40 C.F.R. § 142.15.

MDEQ could conduct capacity assessments of community, nontransient, and public water supplies. MICH. COMP. LAWS § 325.1003b(1)(a). MDEQ could conduct source

water assessments of public water supplies. MICH. COMP. LAWS § 325.1003b(b). Source water assessments establish the boundaries of water suppliers and monitor source water for the presence of contaminants that may affect the public health; the SDWA authorized MDEQ to determine the potential of water supplies to be subject to contaminants "to the extent practical." MICH. COMP. LAWS § 325.1002. Finally, MDEQ could enter facilities and business offices "used in the operation of a public water supply." MICH. COMP. LAWS § 325.1003b(1)(c).

MDEQ enjoyed broad investigative authority. Post-investigation, MDEQ could require that water suppliers make changes to their operations, MICH. COMP. LAWS §§ 325.1015(1), (2), and impose limitations on the use of a water supply until improvements or changes were implemented, MICH. COMP. LAWS § § 325.1015(4). To assist MDEQ in carrying out its various responsibilities, the legislature obligated public water supplies to "make available to the [MDEQ] records needed to conduct a capacity assessment or sources water assessment." MICH. COMP. LAWS § 325.1003b(2). MDEQ could levy administrative fines for the failure of suppliers to provide MDEQ with requested water samples, test results, or other relevant information. MICH. COMP. LAWS § 325.1007. Potentially, violations of the SDWA could qualify as misdemeanors, resulting in a daily fine or even the possibility of a year's imprisonment. MICH. COMP. LAWS § 325.1021.

In circumstances in which a threat to public health was detected, the SWDA authorized MDEQ to take such measures as it deemed necessary to protect public health. The SDWA permitted MDEQ, for example, to notify a supplier of the need to change its methods or practices regarding water service. MICH. COMP. LAWS § 325.1015. If MDEQ inspected a supplier and discovered its infrastructure to be "inadequate or so operated as to not adequately protect the public health," the statute authorized MDEQ, in its discretion, to order the supplier to make appropriate changes to its operations, subject to a 30-day period in which the supplier could request review. *Id.* In the case of imminent hazards to public health, MDEQ had the authority, without notice or hearing, to require such action as it deemed necessary to protect public health, including "appropriate action" to limit "water system expansion or limit water use" until such time as the supplier made "satisfactory improvements." *Id.*

13

MDEQ in the past utilized its authority to address deficient water systems that posed a threat to public health. As noted above, in 2012, MDEQ, after due investigation and accompanying efforts to work with the City of Highland Park regarding its water supply, took action to close the city's water treatment facility. In April of that year, MDEQ "determined that the waterworks system [wa]s not operated by the City in a manner adequate for the protection of public health." *In the Matter of Highland Park Water Treatment Plant*, RMD Order No. 399-04-12; Water Supply Serial Number 03140, at 2 (April 25, 2012) (Wyant, Director). MDEQ further ordered that the city "enter a contract for the purchase of potable water for its customers" within particular time frames or take corrective action to address the existing violations in its water system. *Id*. at 5, 6, 7, 8. Notably, MDEQ, after concluding that Highland Park's water system threatened public health, brought the issue to then-Governor Rick Snyder, and representatives of the Governor's office took action to ensure the City's residents would continue to have access to clean water. *See* Deposition of Valerie Brader (State Deputy Legal Counsel and Senior Policy Advisor to the Governor, 2011-2015), 225-27.

*Lead contamination.* Among the concerns the legislature expressly assigned to MDEQ, the department was responsible (pursuant to federal regulations) for preventing lead contamination in public water supplies by ensuring that suppliers used appropriate corrosion controls. 40 C.F.R. § 141.80(d)(2); 141.82(d). If a mandated corrosion control failed of its purpose, MDEQ was responsible for ensuring the supplier implemented suitable measures to address the potential for lead contamination in its water system. 40 C.F.R. §§ 141.83(b), 141.84(a), 141.85(a)-(b).

*Water treatment plan operation.* MDEQ ran a water treatment operator training and certification program. MICH. COMP. LAWS § 325.1009, Mich. Admin. Code R. 325.11901 *et seq*. Through the program, MDEQ trained and examined new operators and provided continuing education so operators could maintain their certification. MICH. COMP. LAWS § 325.1009(6), Mich. Admin Code R. 325.11901 *et seq*.

*MDEQ Operational Structure.* MDEQ was led by a director appointed by the governor, and its work was accomplished through divisions devoted to its particular statutorily assigned responsibilities, including implementation of the legislative directives contained in the SDWA. MICH. COMP. LAWS § 324.99921(B); Executive Reorganization

Order No. 2011-1. Dan Wyant was the director of MDEQ during the relevant time period. MDEQ's Office of Drinking Water and Municipal Assistance ("ODWMA") was primarily responsible for overseeing compliance with the community and noncommunity water supply requirements of the SDWA throughout the state. Mich. Admin. Code R. 325.10501 *et seq*. "Community water supplies" included those public water supplies that provided "year-round service to not fewer than 15 living units" or that regularly provided "year-round service to not fewer than 25 residents." Office of the Auditor General, PERFORMANCE AUDIT REPORT: COMMUNITY AND NONCOMMUNITY WATER SUPPLIES OFFICE OF DRINKING WATER AND MUNICIPAL ASSISTANCE, DEPARTMENT OF ENVIRONMENTAL QUALITY (March 2016), at 39. "Noncommunity water supplies" included those public water systems that provided service "on an average daily basis to 25 or more individuals or 15 or more service connections for not less than 60 days per year," but did not meet the criteria to be considered community water suppliers, including "places of employment, schools, hotels, restaurants, and campgrounds." *Id*. at 40. (These definitions, considered in terms of gallons rather than persons served, can be found at Mich. Admin. Code R. 325.10501 *et seq*.).

Compliance efforts included reviewing the sampling of water supplies collected on a set schedule by public water suppliers and taking appropriate action should samples contain contaminants. Mich. Admin Code R. 325.10601, *et seq*; Mich. Admin Code R. 325.10701, *et seq*. Such action could include notice to the public about the danger or orders to boil water as necessary until the issue had been appropriately addressed. Mich. Admin. Code R. 325.10401, *et seq*. In addition, ODWMA oversaw the operations and maintenance of community water supplies by conducting sanitary surveys at least every three years; the surveys entailed a comprehensive evaluation of the system to ascertain its ability to produce, treat, and distribute water to the communities served, with attention to operations and maintenance practices, to ensure compliance with the requirements of the SDWA and federal law. Mich. Admin. Code R. 325.10702, 325.10703. These reviews were designed to allow ODWMA to identify issues and ensure "the long-term health and safety of the drinking water supply." MICH. COMP. LAWS § 325.1001a. Local health departments were required to conduct sanitary surveys of noncommunity water supplies at least once every five years. Mich. Admin. Code R. 325.10702(3).

*Accountability*

MDEQ was subject to multiple kinds of accountability. It was "politically accountable": its director was appointed by the governor and presumably someone who shared the governor's policymaking concerns and priorities, and was answerable to the governor for the same. *See* MICH. CONST. Art. V, § 3 (providing that individual department heads shall be appointed by the governor with advice and consent of the senate, and serve at the pleasure of the governor). As noted above, the state constitution obligates the governor to manage and supervise the various public actors and bodies charged with ensuring that functioning of state government. Specifically, Article V, Section 8, places agencies under the governor's supervision, while Section 10 provides the governor the power, and makes it a duty, "to inquire into the condition and administration of any public office and the acts of any public officer, elective or appointive." Further, the constitution allows the governor to "remove or suspend from office" any elective or appointive officer (other than members of the legislature or judiciary) "for gross neglect of duty or for corrupt conduct in office, or for any other misfeasance or malfeasance therein, … and shall report the reasons for such removal or suspension to the legislature." MICH. CONST. Art. V, § 10.

Second, the staff and division managers at MDEQ were subject to "bureaucratic accountability": the various staff positions that comprised the ODWMA all answered, ultimately, to MDEQ's director, who set the priorities for the agency, consistent with MDEQ's purview under the SDWA and pursuant to the priorities and direction favored by the governor and the executive branch officials responsible for developing those priorities. Finally, MDEQ was subject to "legal accountability": its permitting and enforcement decisions were subject to administrative and judicial review. MICH. COMP. LAWS § 325.1015. As well, the legislature had the authority under Article IV, Section I, of the state constitution to investigate MDEQ's actions in respect to its various responsibilities under the SDWA. *See* Opinion of the Attorney General, No. 4606, p. 106 (September 20, 1967) (noting that "[t]he legislature has ample authority to obtain information needed for proper discharge of [its constitutional] duty through its normal process of investigation").

*Conclusion*

• *Authority*: MDEQ possessed wide authority, through permitting, monitoring, and enforcement powers, to implement the requirements of the SDWA and ensure the safety of public water supplies throughout Michigan.

• *Accountability*: MDEQ was accountable in various ways to the governor and the people of Michigan; and MDEQ staff, including ODWMA, were accountable to the agency's director and indirectly to the governor and the executive branch officials responsible for developing the agency's priorities within its statutory mandate.

**(b) Emergency Managers**

*Authority*

The state legislature, in the Local Financial Stability and Choice Act of 2012, MICH. COMP. LAWS § 141.1541 et seq. ("PA 436" or the "Act," with citations to the Act) created the position of "emergency manager." According to its Preamble, the Act seeks, among other things:

> to safeguard and assure the financial accountability of local units of government and school districts; to preserve the capacity of local units of government and school districts to provide or cause to be provided necessary services essential to the public health, safety, and welfare; to provide for review, management, planning, and control of the financial operation of local units of government and school districts and the provision of services by local units of government and school districts; to provide criteria to be used in determining the financial condition of local units of government and school districts; to authorize a declaration of the existence of a financial emergency within a local unit of government or school district; to prescribe remedial measures to address a financial emergency within a local unit of government or school district; to provide for a review and appeal process; to provide for the appointment and to prescribe the powers and duties of an emergency manager for a local unit of government or school district; to provide for the modification or termination of contracts under certain circumstances; to provide for the termination of a financial emergency within a local unit of government or

17

> school district; to provide a process by which a local unit of government
> or school district may file for bankruptcy; to prescribe the powers and
> duties of certain state agencies and officials and officials within local units
> of government and school districts; to provide for appropriations; and to
> repeal acts and parts of acts.

Pursuant to the Act, the State financial authority (the state treasurer) would conduct a preliminary review to ascertain whether a local government faced probable financial stress. *Id.*, § 4. Among the factors to be considered were: whether the local governing body has made a request for such an inquiry, failed to pay employee wages, or failed to timely file its annual financial report. *Id.*, § 4. A report discussing the factors that might indicate financial distress was prepared and presented to the local emergency financial assistance loan board, which then made a determination as to whether financial stress probably existed for the local government. *Id.*, § 4(2). Upon a finding of probable financial stress, the governor would appoint a review team to determine whether an actual financial emergency existed. *Id.*, § 4(3). That team would in turn submit its conclusion to the governor, based upon an evaluation of the statutory factors defining the existence of an actual financial emergency. *Id.*, § 5(3). The governor had the authority under the Act, in his or her "sole discretion," to determine that a financial emergency existed. *Id.*, § 6. The local government could select from among four options to address such an emergency, one of which was the appointment of an emergency manager ("EM"). *Id.*, § 7.

The Act granted emergency managers wide authority to fulfill the statutory goals. The Act stated that the EM:

> shall act for and in the place and stead of the governing body and the
> office of chief administrative officer of the local government. The [EM]
> shall have broad powers ... to rectify the financial emergency and to
> assure the fiscal accountability of the local government and the local
> government's capacity to provide or cause to be provided necessary
> governmental services essential to the public health, safety, and welfare.

*Id.*, § 9(2). The Act made clear that the EM's authority superseded that of "the governing body and the chief administrative officers," who could "not exercise any of the powers of

[their] offices except as may be specifically authorized in writing by the [EM] or as otherwise provided by [the] act and are subject to any conditions required by the [EM]." *Id.*, § 9(2).

The Act charged the EM with developing a financial operating plan for the local government, the goals of which included providing for all governmental operations, including payment of debt obligations, the modification or termination of contracts as needed (within the bounds of the law), and such other actions as the EM deemed necessary to address the financial emergency. *Id.*, § 11(1). The Act required the EM to submit the plan to the state treasurer and to the local governing body, and to periodically review and modify the plan as necessary, with appropriate notice to the state treasurer. *Id.*, § 11(2). The Act required the EM to hold a public information meeting on the plan, and makes clear that this requirement did not give the local governing body or the citizens themselves a veto over the EM's actions. *Id.*, § 11(4).

As for implementation of the plan, the Act stated that the EM would "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of [the] act." *Id.*, § 10(1). Further, any such order was "binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued." *Id.* Local government officials and their employees, agents, and contractors were obligated under the Act to take actions necessary and advisable to "maintain compliance with the financial and operating plan." *Id.* Indeed, should these individuals not carry out an EM's orders, or should they disrupt the EM's "ability to manage local government," the EM, in addition to whatever other remedies he or she possessed under the Act, could "prohibit the local elected or appointed official or employee, agent, or contractor ... from access to the local government's office facilities, electronic mail, and internal information systems." *Id.*, § 10(2).

The EM's authority under the Act extended to making, approving, or disapproving any appropriation, contract, expenditure or loan, as well as creating new local government positions. *Id.*, § 12(1)(g). The EM could "consolidate or eliminate departments of the local government," or transfer functions from one department to another and appoint, supervise, and, at his or her discretion, remove "administrators,

including heads of departments other than elected officials." *Id.*, § 12(1)(n). Further, the EM could sell, lease, and convey property, so long as the transaction posed no danger to health, safety, and welfare. *Id.*, § 12(1)(r). As well, the EM could enter into agreements "with other local governments, public bodies, or entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities." *Id.*, § 12(1)(y). The EM could "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of local government, whether elected or appointed, relating to the operation of the local government." *Id.*, § 12(1)(ee). To the extent that authorization could be seen as unclear, the Act states that "[t]he power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities." *Id.*

For their part, local elected and appointed officials and employees, agents, and contractors were required under the Act to "promptly and fully provide the assistance and information necessary and properly requested by the state financial authority, a review team, or the [EM] in the effectuation of their duties and powers and of the purposes of [the] act." *Id.*, § 27(1). The failure of any of local elected or appointed officials or employees, agents, or contractors to abide by this requirement would "be considered gross neglect of duty, which the review team or [EM] may report to the state financial authority and the attorney general." *Id.*, § 27(2).

The scope of the EM's authority in the relevant time period is also revealed in the contracts of the individuals appointed as Flint EMs. In the relevant time period, Edward Kurtz served as Flint EM from August 2012 to July 2013; Michael Brown from July to September 2013; Darnell Earley from September 2013 to January 2015; and Gerald Ambrose from January to April 2015. *See In re Flint Water Cases*, 384 F.Supp.3d 802, 825, 828 (E.D. Mich. 2019), *aff'd & remanded*, 960 F.3d 303 (6th Cir. 2020). Each individual entered into an agreements with the State of Michigan to serve as EM of city of Flint; the governor signed the contracts on behalf of the state. *See, e.g.*, Kurtz Contract, § 1.1 (naming parties to the contract); Brown Contract, § 1.1 (same); Earley Contract, § 1.1 (same); Ambrose Contract, § 1.1 (same). The contracts bound Kurtz, Brown, Early, and Ambrose, respectively, "to take appropriate action on behalf of the City and its residents." Kurtz Contract, Preamble; Brown Contract, Preamble; Earley Contract,

Preamble; Ambrose Contract, Preamble. Further, each contract expressly provided that the EM would "possess all the powers and duties authorized under the Act, including those specifically related to local governments." Kurtz Contract, § 1.3; Brown Contract, § 1.3 (same); Earley Contract, § 1.3 (same); Ambrose Contract, § 1.3 (same). Finally, Kurtz, Brown, Early, and Ambrose each took an oath to "faithfully discharge the duties of the office of Emergency Manager-City of Flint according to the best of [his] ability." *See, e.g., Brown Oath of Office, Ambrose Oath of Office.*

The practical effect of the statutory grant and contractual confirmation of an EM's authority was to give an EM nearly complete discretion to implement his or her financial and operating plan. It is not too much to say that an EM, once properly appointed and installed, supplanted all local governmental decision-making authority. The EM, during the pendency of a receivership, had the statutory power to do all that any elected or appointed local governing body might do, to the end of rectifying the financial emergency that precipitated the EM's appointment.

The only exception under the Act applied in circumstances in which an EM proposed to "sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government." Act, § 12(1)(r). The EM might do so, "provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government," if "the action, asset, or liability involves an amount of $50,000 or more," and only so long as the local governing body approved. Act, § 19(1) (referencing § 12(1)(r)).

The local governing body, however, did not enjoy a straight veto over an EM proposal to "sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government." Act, § 12(1)(r). Rather, the Act simply allowed the local governing body to submit an alternative proposal. The choice between the EM's proposal and the local governing body's proposal fell to the local emergency financial assistance loan board, with the EM implementing the board's selection. *Id.*, § 19(2). (Section 19(1) of the Act similarly required governing board approval, or local emergency financial assistance loan board reconciliation, when an EM

21

proposed to reject, modify, or terminate the terms of a collective bargaining agreement, *see id.*, § 12(1)(k); borrow money, *id.*, § 12(1)(u)), or "sell, assign, transfer, or otherwise use the assets of the school district to meet past or current obligations or assure the fiscal accountability of the school district," *id.*, § 14(d).)

Further, the Michigan Court of Appeals acknowledged that the authority granted the EM under the Act, though "broad" and "substantial," should not be understood to be "complete." *Kincaid v. Flint*, 874 N.W.2d 193, 203 (Mich. Ct. App. 2015). The *Kincaid* court concluded that "the Legislature did not delegate the power to ratify to an emergency manager," which, in the circumstances presented in that case, meant that the EM lacked the authority to ratify water and sewer cost increases he had not ordered. *See id.* at 200. These narrow exceptions to the EM's otherwise exclusive authority to take particular actions on behalf of a local government in receivership demonstrate the breadth of the power an EM enjoyed pursuant to the Act. Indeed, aside from the limited exceptions discussed here, by design it seems there was almost no aspect of local governance that the EM could not reach, control, or direct, in furtherance of returning financial stability to a local government.

The extent of the EM's expansive authority in practice may be seen in the determinations relating to the Flint water crisis during the relevant time period. It was Flint EM Kurtz who made the ultimate decision to rely upon the Flint River and to put the Flint Water Treatment Plant (WTP) into operation. *See Flint Water Advisory Task Force—Final Report* (March 2016), at 17 (timeline of key events in Flint water crisis). Later, it was Flint EM Ambrose who decided that Flint would not enter into a new arrangement for water supplied by Detroit Water & Sewage Department ("DWSD"), the supplier of water to the city prior to the relevant time period. Deposition of Ambrose at 122 (stating as "correct" that his "plan for the City's water supply was to remain using the Flint River and not return to DWSD"); 595-96 (stating that he declined to enter into negotiations for Flint to return to DWSD); *see* Deposition of Walling at 128-29 (confirming that EM Ambrose rejected proposal to return to DWSD on the basis of cost).

The statute also allowed for the creation, at the governor's discretion, of a receivership transition advisory board ("RTAB"). Section 23 of Act 436 provided that the governor, "[b]efore removing a local government from receivership" could "appoint a

22

receivership transition advisory board to monitor the affairs of the local government until receivership is terminated." Pursuant to the Act, an transition board could take a variety of actions to require the local government in receivership to take account of its financial situation, as well as enjoying the authority to approve proposed budges and budget amendments and "[p]erform any other duties assigned by the governor" at the time of its appointment. *Id.* § 23(5)(a)-(f).

At the end of the relevant time period, Governor Snyder appointed the City of Flint RTAB to succeed Ambrose's administration as EM. *See Oakes v. Weaver*, 331 F. Supp.3d 726, 729-30 (E.D. Mich. 2018) (discussing appointment of Flint RTAB). The Flint RTAB was prohibited from "revisit[ing] any Order that was implemented by the Emergency Manager during his or her term prior to one year after termination of the receivership," *id.* at 730, meaning the management decisions of EM Ambrose extended beyond his term of service. For example, during his term, Ambrose executed his authority to govern the affairs of the city by giving Natasha Henderson "full authority to direct and supervise the day-to-day operations of the city, including authority to direct the head of the Department of Public Works and manage the operations of the water system." *Concerned Pastors for Social Action v. Khouri*, 194 F. Supp.3d 589, 594 (E.D. Mich. 2016). In other words, Ambrose appointed an individual to manage the city's affairs, a role comparable to that contemplated by the city charter for the city's mayor; this determination could not be overturned, either through the democratic process or by the Flint RTAB. *See* Deposition of Gerald Ambrose at 329 (indicating agreement that the transition from emergency management would be through the mayor and "City Administrator").

*Accountability*

The Act created a number of mechanisms to ensure that a particular EM remained accountable for his or her actions, primarily through "political accountability" to the governor who appointed the EM. Perhaps most important among these mechanism was the statutory mandate that an EM "serve[s] at the pleasure of the governor." Act, § 9(3)(d). Section 9(6) further provided that the EM "shall continue in the capacity of an emergency manager":

23

(a) Until removed by the governor or the legislature as provided in subsection (3)(d). …

(b) Until the financial emergency is rectified.

(c) If the emergency manager has served for at least 18 months after his or her appointment under this act, the emergency manager may, by resolution, be removed by a 2/3 vote of the governing body of the local government. If the local government has a strong mayor, the resolution requires strong mayor approval before the emergency manager may be removed. Notwithstanding section 7(4), if the emergency manager is removed under this subsection and the local government has not previously breached a consent agreement under this act, the local government may within 10 days negotiate a consent agreement with the state treasurer. If a consent agreement is not agreed upon within 10 days, the local government shall proceed with the neutral evaluation process pursuant to section 25.

Note that a local government could not act to remove an EM until at least 18 months after his or her appointment, and that even a two-thirds vote to remove would not restore complete local government control.

The Act also ensured accountability through transparency—namely, through the requirement that an EM issue two kinds of reports. First, an EM had to submit quarterly reports to "to the state treasurer with respect to the financial condition of the local government in receivership, with … a copy to each state senator and state representative who represents that local government. In addition, each quarterly report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer." *Id.*, § 9(5). Second, an EM had to submit a report, beginning six months after his or her appointment, and every three months thereafter, to, among others, "the governor, the state treasurer, the senate majority leader, the speaker of the house of representatives, … and the clerk of the local government in receivership," and the EM must post this report "on the internet on the website of the local government." *Id.*, § 17. The Section 17 report had to contain the following:

24

(a) A description of each expenditure made, approved, or disapproved during the reporting period that has a cumulative value of $5,000.00 or more and the source of the funds.

(b) A list of each contract that the emergency manager awarded or approved with a cumulative value of $5,000.00 or more, including the purpose of the contract and the identity of the contractor.

(c) A description of each loan sought, approved, or disapproved during the reporting period that has a cumulative value of $5,000.00 or more and the proposed use of the funds.

(d) A description of any new position created or any vacancy in a position filled by the appointing authority.

(e) A description of any position that has been eliminated or from which an employee has been laid off.

(f) A copy of the contract with the emergency manager as provided in section 9(3)(e).

(g) The salary and benefits of the emergency manager.

(h) The financial and operating plan.

The reports the Act required the EM to submit and post thus allowed for review of the EM's actions by the governor and state treasurer, as well as the legislature and the general public. An EM, like all civil officers of the state, was also subject to legal accountability through legislative removal via impeachment and conviction pursuant to Article XI, Section 7, of the state constitution. *See Gulla v. State*, 2019 WL 320531 (Mich. Ct. App., Jan. 24, 2019) (agreeing that emergency managers are officers of the state).

Finally, the EM Contracts confirmed that the EM was subject to legal accountability by virtue of his or her contractual relationship with the state. The contracts expressly stated that the EM served "at the pleasure of the Governor" (except as described above in cases of impeachment and conviction by the legislature, or removal by the local government). *See, e.g.*, Earley Contract, § 9.1. Indeed, the governor, according to the terms of the Earley Contract, had "the power to rescind the appointment and terminate"

the agreement "at any time, and without cause, by issuing a Notice of Termination to the Emergency Manager." *Id.* The contract further obligated EMs to cooperate with governor and the state treasurer in carrying out his or her statutory responsibilities. *See* Earley Contract, § 1.3. The Michigan State Treasurers in the relevant period were Andy Dillon (2011-2013), R. Kevin Clinton (2013-2015), and Nick Khouri (2015-2018). As for the RTAB, by statute, its members served at "the pleasure of the governor." Act 436, § 23(3).

There should be little doubt that, in the relevant time period, it was understood that EMs ultimately would act at the direction of the governor, and that the governor had the authority to direct EMs to take particular actions. *See* Deposition of Walling at 769-70 (stating that it was the "understanding of Flint's emergency manager" that the governor "had the power and the authority to direct the emergency managers ... so as to cause a certain outcome to occur"); Deposition of Kurtz at 169 (acknowledging governor had authority to "interfere" in decision-making).

*Conclusion*

• *Authority*: With narrow exceptions, the Act assigned the EM broad authority to manage local governmental bodies in receivership, with the goal of securing financial stability as defined by the Act. RTABs enjoyed broad authority to oversee a local government's transition out of receivership and could be obligated to keep in place, for a period of time, orders issued by an outgoing EM.

• *Accountability*: An EM was accountable primarily to the governor; the legislature could seek to remove an EM directly through impeachment and conviction. The Act also required the EM to publish reports, which ensured that his or her actions were reasonably transparent. Members of the RTAB served at the pleasure of the governor.

### (c) Michigan Department of Health & Human Services

*Authority*

Michigan's Department of Health & Human Services ("HHS") was in the relevant time period primarily responsible for implementing the state's public health code and, in general, acting to protect the health of the people of Michigan. *See* MICH. COMP. LAWS § 333.1104(5). The legislature specifically charged HHS with the responsibility to "continually and diligently endeavor to prevent disease, prolong life, and promote the public health," MICH. COMP. LAWS § 333.2221(1), as well as the responsibility to

26

exercise "general supervision of the interests of the health and life of the people" of Michigan. *Id.*, § 333.2221(2)(a). To achieve these ends, HHS had the authority to regulate a variety of matters, including, for example, reporting requirements relating to potential lead contamination and diseases, both communicable and non-communicable, including Legionella. *See* MICH. COMP. LAWS § 333.2221(2)(b).

To address lead contamination, the legislature established the Childhood Lead Poisoning Prevention Program ("CLPPP") in 1998. Deposition of Groetsch at 41. Under the CLPPP, HHS sought to "minimize exposure of the general public to lead-based paint hazards," MICH. COMP. LAWS § 333.5474(1)(a), as well as to exposure to lead from any other source. *See* Deposition of Groetsch at 41. In the relevant time period, for instance, HHS required clinical laboratories and users of blood lead analyzers to report results directly to it. *See* Mich. Admin. Code R. 325.9083. Pursuant to the statutory authorization of a lead poisoning prevention program, HHS was obligated, upon the report of child blood lead level above 10 micrograms/deciliter, to reach out to the local health department, physician, or both, of the child, a responsibility that assumes analysis of the reported data by HHS sufficient to determine whether further action would be required. *See* MICH. COMP. LAWS § 333.5474(1)(c).

As noted above, HHS had the responsibility to protect the public health of the citizens of Michigan. In doing so, HHS was obligated to rely upon the collection and utilization of "vital and health statistics and provide for epidemiological and other research studies for the purpose of protecting public health." MICH. COMP. LAWS § 333.2221(2)(c); *see* Deposition of Groetsch at 38. In respect to Legionella, for example, HHS required physicians and laboratories to report to local health departments its confirmed or suspected presence, as well as unusual occurrences, outbreaks, or epidemics. *See* Mich. Admin. Code R. 325.173(1)-(6). The local health department was then required to report the same to HHS. Mich. Admin. Code R. 325.173 (18) –(21).

In addition to mandated reporting requirements regarding lead and Legionella (among numerous other diseases), the legislature empowered HHS to conduct investigations into potential public health threats—including threats of which HHS had notice through disease reporting requirements. Mich. Admin. Code R. 325.174; *see* Deposition of Groetsch at 39 (HHS had authority to make "investigations and inquiries as to the causes,

27

prevention, and control of environmental hazards, nuisances, and sources of illness").
This authority included investigation of, and inquiries into, incidents of lead exposure and
illnesses caused by lead exposure. Deposition of Groetsch at 39. In furtherance of its
investigatory power, HHS could secure a warrant to inspect any facility, incident, or
condition in the state to the extent necessary to identify the cause of a potential threat to
the public's health. *See* MICH. COMP. LAWS § 333.2241. Upon conducting an appropriate
investigation, HHS had the authority to take a number of different actions, including, for
example, issuing an order to immediately correct a dangerous or harmful condition. *Id.*, §
333.2251(1). HHS also could seek injunctive relief from a court. *Id.*, § 333.2255. Finally,
HHS had the authority to take over an investigation from a local health department if the
local department's investigation was inadequate, or if the local health department was
unwilling to conduct the necessary investigation. *Id.*, § 333.2235(3)(a).

The power of HHS to address public health threats involving lead contamination or
Legionella was complementary to the authority of MDEQ to regulate public water
suppliers, as discussed above. Indeed, the legislature made clear that the authority of
HHS to take action in respect to particular threats to public health could not be construed
as authority to engage in actions "otherwise delegated by state or federal law or rules to
another department of state government." *Id.* § 333.1114(1).

*Accountability*

Like MDEQ, HHS was subject to multiple kinds of accountability. First, it was
"politically accountable," as the director was appointed by the governor and, as with the
director of MDEQ, presumably shared the governor's policymaking concerns and
priorities, and was answerable to the governor for the same. *See* MICH. CONST. Art. V, §
3 (providing that individual department heads shall be appointed by the governor with
advice and consent of the senate, and serve at the pleasure of the governor). As discussed
above, the state constitution obligates the governor to manage and supervise the various
public actors and bodies charged with ensuring that functioning of state government.
Specifically, Article V, Section 8 places agencies under the governor's supervision, while
Section 10 provides the governor the power, and makes it a duty, "to inquire into the
condition and administration of any public office and the acts of any public officer,
elective or appointive." Further, the constitution allows the governor to "remove or

28

suspend from office" any elective or appointive officer (other than members of the legislature or judiciary) "for gross neglect of duty or for corrupt conduct in office, or for any other misfeasance or malfeasance therein, ... and shall report the reasons for such removal or suspension to the legislature." MICH. CONST. Art. V, § 10.

Second, HHS was subject to "bureaucratic accountability": the various employees responsible for carrying out HHS's statutory obligations answered to the agency's director, who presumably set the priorities for the agency pursuant to HHS's statutory mandate, as directed by the governor and policymaking officials in the executive branch. HHS was also subject to "legal accountability" to the extent its public health actions were subject to any kind of administrative or judicial review. MICH. COMP. LAWS § 333.1205. And, as with MDEQ, the legislature could, pursuant to Article IV, Section I of the state constitution, investigate actions undertaken by HHS in furtherance of its statutory mandate. *See* Opinion of the Attorney General, No. 4606, p. 106 (September 20, 1967) (stating that "[t]he legislature has ample authority to obtain information needed for proper discharge of [its constitutional] duty through its normal process of investigation").

<em>Conclusion</em>

- *Authority*: HHS possessed the authority, through its rulemaking, investigatory, and enforcement authority, to fulfill its statutory mandate to protect the health of the people of Michigan in respect to lead contamination and diseases like Legionalla.

- *Accountability*: HHS leadership was accountable to the governor and staff members were accountable to the agency's director and indirectly to the governor and the executive branch officials responsible for developing the agency's priorities within its statutory mandate.

### (3) County-level actors or bodies: the Genesee County Health Department

<em>Authority</em>

The Michigan Public Health Code authorized the creation of local departments of health for municipalities with populations greater than 750,000; municipalities with smaller populations would rely on the health departments of the county in which they were situated. MICH. COMP. LAWS § 333.2415. The Code authorized certain public health services to be assigned to local health departments, as specified by HHS. *See* MICH.

29

COMP. LAWS §§ 333.2433, 2435. Local health departments also exercised authority delegated to them by other state-wide agencies, like MDEQ, so long as that delegation was consistent with the Public Health Code. *See* MICH. COMP. LAWS § 333.2435(g) and (i). In the relevant time period, MDEQ had delegated to the Genesee County Health Department ("GCHD") the authority to regulate certain water supplies pursuant to the Genesee County Environmental Health Regulations, but not the public water supplies for which MDEQ was responsible. *See* Mich. Admin. Code R. 325.11305(3); Genesee Cnty. Health Reg. § 1.104, 4.000 et seq.

In respect to lead concentrations in water and children, local health departments like the GCHD exercised relatively limited authority. HHS and not local health departments had primary responsibility for monitoring blood lead reporting and collecting data about the same. As discussed more fully above, under the Public Health Code, blood lead test results across Michigan were required to be communicated to HHS, which had a mandate to report instances of elevated lead levels to the local health department (GCHD, in the case of Flint), the child's physician, or both. *See* MICH. COMP. LAWS § 333.5474(c)(1).

Local health departments like the GCHD nonetheless had significant responsibility in respect to the investigation of disease outbreaks, including Legionella. *See* Mich. Admin. Code R. 325.173 (18)-(21). The Public Health Code designated local health departments to receive disease reporting, and regulations required the local health departments to transmit such reports to the state within twenty-four hours for communicable diseases and three days for non-communicable diseases. Mich. Admin. Code R. 325.173.

In general, local health departments had an obligation under the law to take measures to prevent and control the spread of communicable diseases through a variety of means. *See* MICH. COMP. LAWS § 333.2433(1), (2). Local health departments possessed investigatory powers, and could seek investigative warrants or court orders in pursuit of information necessary to perform their assigned functions. *See* Mich. Admin. Code R. 325.174. HHS regulations permitted local health departments to obtain medical information in respect to "individuals who have designated conditions or other conditions of public health significance," in addition to information about individuals revealed through a department's investigation, and "any other information" that might have been relevant to an investigation. Mich. Admin. Code R. 325.174(2). Indeed, the local health

department's investigative authority extended to the inspection of "any matter, thing, premise, place, person, record, vehicle, incident, or event" in order to ascertain compliance with any regulations enforceable by the department. MICH. COMP. LAWS § 333.2446.

In addition to their investigative authority, local health departments could take specific actions to protect public health. A local health department could issue an imminent danger order, which would compel the correction of any condition or practice reasonably likely to cause death, disease, or serious physical harm. See MICH. COMP. LAWS § 333.2451. Under the Public Health Code, local health departments, like the GCHD, could issue orders to correct or abate nuisances, unsanitary conditions, or causes of illness. See MICH. COMP. LAWS § 333.2455. GCHD's regulations defined "nuisance" to include those conditions that could undermine the integrity of water supplies. *See* Genesee Cnty. Health Reg. § 1.012. Finally, the GCHD, pursuant to state law and county regulations, could have sought injunctive relief in court to restrain, prevent or correct conditions that might threaten public health. *See* MICH. COMP. LAWS § 333.2465(1); Genesee Cnty. Health Reg. § 1.117.

*Accountability*

GCHD was subject to multiple kinds of accountability. The agency's director, the Health Officer, was presumably selected to pursue the policies and goals endorsed by HHS within the parameters of the Public Health Code. MICH. COMP. LAWS §§ 333.2428, 333.2241. More importantly, the Health Officer was directly accountable to the Genesee County Board of Commissioners, which possessed the statutory authority to supervise the position. *See id.* If the Board had determined that the Health Officer had acted improperly or failed to take appropriate action in respect to a public health issue within the GCHD's purview, the Board could have insisted that the Health Officer take such action or, in the alternative, it could have sought to replace the Health Officer. *See id.*

Further, GCHD was subject to "bureaucratic accountability," as the various GCHD employees responsible for carrying out the agency's statutory and regulatory obligations were accountable to the agency's Health Officer, who presumably set the priorities for GCHD within the bounds established by the Public Health Code, in consultation with, or at the direction of, HHS. MICH. COMP. LAWS § 333.2241. Further, GCHD was subject to

"legal accountability" to the extent its particular public health actions were challenged through administrative or judicial review. And, as noted in respect to both MDEQ and HHD, the legislature could, pursuant to Article IV, Section I, of the state constitution, investigate actions undertaken by GCHD in furtherance. *See* Opinion of the Attorney General, No. 4606, p. 106 (September 20, 1967) (noting that "[t]he legislature has ample authority to obtain information needed for proper discharge of [its constitutional] duty through its normal process of investigation").

*Conclusion*

- *Authority*: GCHD possessed the authority, through its investigatory and enforcement authority, to fulfill its mandate to protect the health of the people of Genesee County, particularly in respect to preventing and controlling the spread of contagious diseases, like Legionella.

- *Accountability*: The GCHD's Health Officer was accountable to HHS and the Genesee County Board of Commissioners; staff members were accountable to the Health Officer, and indirectly to the HHS officials responsible for overseeing the work of local health departments under the Public Health Code.

### (4) City-level actors or bodies:

#### (a) Mayor of Flint and Flint City Council

*Authority*

The City of Flint's capacity to self-govern flowed from the Home Rule City Act. *See* MICH. COMP. LAWS § 117.1 et seq. In the relevant time period, Flint was governed by a city charter which was itself originally adopted in 1974. The charter created the positions of mayor and city councilor, each to serve a four-year term. Flint, Michigan City Charter §§ 4-102, 3-102. Pursuant to the charter, the mayor was responsible for running Flint's executive branch, including supervising the heads of departments. *Id.*, §§ 4-101, 4-201, 4-203. Further, the mayor possessed the specific authority to declare a state of emergency in the city, and could request a declaration of the same from the governor. *See* MICH. COMP. LAWS § 30.410(1)(b); Flint, Mich. Code of Ordinances § 14-17(a)(-(b).

The city's Department of Public Works fell under the mayor's supervision; the Flint Code of Ordinances expressly charged that department with the "operation, maintenance

32

and management of the water supply." Flint, Mich. Code of Ordinances § 46-7. The city accordingly qualified as a "public water supply" pursuant to the Michigan Safe Drinking Water Act—that is, "a waterworks system that provides water for drinking or household purposes to persons other than the supplier of the water." MICH. COMP. LAWS § 325.1002(p). As the owner of the water system, the city was obligated to run it according to federal and state standards pertaining to safe drinking water. *See, e.g.*, MICH. COMP. LAWS § 325.1006 (incorporating by reference "maximum contaminant levels for inorganic and organic chemicals" allowable in water supply). The charter authorized the mayor to propose not just the city's annual budget, but amendments necessary to address "a public emergency affecting life, health, property or the public peace." Flint, Michigan City Charter §§ 7-101, 7-104.

Pursuant to the City Charter, the Flint City Council was the city's legislative body, responsible for enacting ordinances that would ensure the community's "public peace, health and safety." Flint, Michigan City Charter § 3-309; *see also id* § 3-101. The charter allowed the City Council to promulgate emergency ordinances and to approve budget amendments proposed by the mayor as necessary to respond to a public emergency. Flint, Michigan City Charter § 3-306. The City Council also possessed the power to investigate matters related to city affairs or the conduct of a particular city department. Flint, Michigan City Charter §§ 3-205, 3-206.

As discussed above, under the state law authorizing emergency municipal management, a duly appointed emergency manager was required to "act for and in the place and stead of" an established city government, with the existing municipal government authorized to act only at the request and direction of the emergency manager. Act, § 9(2). Accordingly, the ordinary mechanisms of municipal government were effectively suspended during such time as an emergency manager was in place, as was the case in Flint during the relevant time period.

### Accountability

Absent emergency management, the mayor and members of the City Council were held accountable through regular elections every four years. Once an emergency manager was in place, mayors, city councilors, and city administrators and employees were also subject to "legal accountability," as they were obligated to work with the emergency

manager at his or her direction, and the failure to do so was arguably insubordination and a violation of the emergency manager statute. Act, § 10(2). For example, Flint EM Earley, during his term as EM, assigned to Mayor Walling responsibility for overseeing DPW. Deposition of Earley at 77. As the city remained under emergency management, Walling could only have been acting at the behest of the EM and was accordingly accountable to him. As noted above, moreover, in addition to directing the mayor to supervise certain municipal functions, EM Ambrose selected Henderson to direct and supervise the city's day-to-day operations as city administrator. *See Concerned Pastors for Social Action v. Khouri*, 194 F. Supp.3d at 594.

*Conclusion*

- *Authority*: During the relevant time period, the city of Flint was under the control of a duly-appointed emergency manager, which means neither the mayor nor the City Council possessed the authority to act to address the water crisis.

- *Accountability*: Because the city of Flint was under the control of a duly-appointed emergency manager, the ordinary mechanisms by which the mayor and City Council might be held accountable for their actions were not operative in the relevant sense—while elections would still be held, the citizens could not use those elections to hold their elected representatives accountable, as those representatives were disabled from performing the roles contemplated for them by the City Charter.

### (b) Flint Department of Public Works

*Authority*

The Flint City Charter named the Flint Department of Public Works ("DPW") as a required executive department. Flint, Michigan City Charter, § 4-203. As noted above, in the relevant time period, the charter expressly authorized the DPW to operate, maintain, and manage the city's public water supply. *See* Flint, Mich. Code of Ordinances § 46-7. Pursuant to the charter, the head of the DPW was a mayoral appointment, subject to approval by the City Council, and served at pleasure of the mayor. Flint, Michigan City Charter, § 4-203.

Among DPW's primary responsibilities as the operator of Flint's public water supply was to ensure compliance with all relevant state and federal laws related to the safety of public drinking water, including, for example, the provision of personnel certified to

34

operate the water system. *See* Mich. Admin. Code R. 325.11901-11903. Further, the law contemplated that DPW would work in consultation with MDEQ, and respond to MDEQ directives, regarding appropriate steps to prevent lead and copper corrosion, as well as the establishment of appropriate water supply monitoring plans. *See* Mich. Admin. Code R. 325.10710(4)(a)-(d). Such monitoring included an obligation on DPW to adhere to sampling protocols and analysis regarding potential contaminants. *See* MICH. COMP. LAWS § 325.1007(1) (mandating that water supplier collect samples and have them analyzed "in the state laboratory or a laboratory certified by the department or by the United States environmental protection agency for contaminants listed in the state drinking water standards, and … report the results of the analyses to the department in a timely manner ....").

When the monitoring in which DPW was obligated to engage under state law revealed elevated lead levels, the presence of other contaminants, or evidence indicating a waterborne disease outbreak, DPW had a legal obligation to notify the public. *See* Mich. Admin. Code R. 325.10401-10402. DPW also was also legally required to report to MDEQ the existence of a waterborne disease outbreak potentially attributable to the water system. *See* Mich. Admin. Code R. 325.10734(4).

### *Accountability*

DPW was accountable to MDEQ pursuant to the reporting and monitoring requirements imposed by state and federal laws and regulations. MICH. COMP. LAWS §§ 325.1003, 325.1007; *see* Mich. Admin. Code R. 325.10734(1)-(4). Absent emergency management, the Director of DPW was "politically accountable" to the mayor and City Council, while DPW's staff and personnel were "bureaucratically accountable" to the director of DPW. The director of DPW was accountable to the emergency manager upon his or her appointment, or to that person's designee. Upon the appointment of an emergency manager, all city administrators and employees were also subject to "legal accountability," as they were obligated to work with the emergency manager at his or her direction, *see Telford v. Roberts*, 2013 WL 2285531 (E.D. Mich.) (emergency managers "exempt from following the city charters, local ordinances and bylaws"), and the failure to do so was arguably insubordination and a violation of the emergency manager statute. Act, §§ 10(1), 10(2). Following EM Earley's assignment of responsibility for overseeing

35

DPW to Mayor Walling, *see* Deposition of Earley at 77, DPW would have been accountable to the EM through Walling, who acted at the direction of the EM and was accountable to him.

*Conclusion*

•   *Authority*: During the relevant time period, the DPW had the responsibility to ensure the city's water system complied with all relevant state and federal laws and regulations including, but not limited to, directives from MDEQ.

•   *Accountability*: To the extent the city of Flint was under the control of a duly-appointed emergency manager during the relevant time period, DPW was primarily accountable to that person or his or her designee, the mayor of Flint.

## (5) Federal-level actors or bodies:

### (a) U.S. Environmental Protection Agency

*Authority*

Congress charged the Environmental Protection Agency ("EPA") with protecting public health through the Safe Drinking Water Act (the "Federal SDWA"). 42 U.S.C. § 300f(8). In the relevant time period, EPA was responsible for establishing national drinking water standards, treatment techniques, and various monitoring requirements; among the potential hazards EPA sought to address were both lead and waterborne bacteria, like Legionella. *See* 42 U.S.C. § 300g-1. In addition to its standard-setting responsibilities, EPA was obliged to notify the public about issues that might affect the quality of drinking water. *See* 42 U.S.C. § 300g-3(b).

Pursuant to the regulatory structure under the Federal SDWA, states could take the primary enforcement role, so long as the state legislature enacted a law at least as protective as the federal statute. *See* 40 C.F.R. § 142(B) *et seq*. ("Part 142"). In the relevant time period, nearly every state, including Michigan, had been granted "primacy" in respect to enforcement of the Federal SWDA. *See* Flint Water Advisory Task Force Final Report at 49. To receive primacy status, the state had to demonstrate to EPA that it had enacted laws to implement the Federal SWDA at the state level and created an institutional infrastructure to monitor water quality. *See* 40 C.F.R. § 142.10. As discussed above, Michigan enacted its version of the SWDA in 1976, *see* MICH. COMP. LAWS §

36

325.1001 *et seq*., assigning to MDEQ the responsibility for carrying the implementation. *See id*., 325.1002(h).

EPA had to approve a state's operational plan pursuant to the Federal SWDA. *See* 42 U.S.C. § 300g-2(a). EPA also had ongoing responsibility for monitoring states and public water supplies. *See* 40 C.F.R. § 141 *et seq* (National Primary Drinking Water Regulations). For their part, primacy states were obligated to submit quarterly and annual reports to the regional EPA administrator. *See* 40 C.F.R. § 142.15. A failure to comply with this or any primacy obligation could have led the EPA administrator to begin proceedings to withdraw a state's primacy status, subject to a 30-day appeal period and the public hearing requirements of 40 C.F.R. §§ 142.13, 142.17. EPA regional administrators had discretion in overseeing a state's determinations regarding source treatment or corrosion control to mitigate lead and copper in a water supply. 40 C.F.R. § 142.19. The regional administrator first would have had to identify some failure by the state, such as the lack of appropriate response or abuse of discretion. *Id*. The regional administrator was permitted to "notify a State and the appropriate supplier of water" when the EPA found that the state had not complied with promulgated standards; the remedy was to provide "advice and technical assistance" the state as may have been appropriate to ensure compliance. 40 C.F.R. § 142.30. EPA could hold public hearings to gather information relevant to ensuring such compliance, and to make appropriate remedial recommendations. 40 C.F.R. § 142.32, 33. EPA also could inspect sites upon sending written notice, with a rationale for the intrusion, prior to entry. 40 C.F.R. § 142.34.

Further, Congress gave the EPA emergency powers, which would be triggered "upon receipt of information that a contaminant" was present or "likely to enter a public water system," and that the contaminant would "present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities" did not act "to protect the health of such persons." 42 U.S.C. § 300i. In these circumstances, the EPA administrator could take "such action" as necessary to protect the health and safety of the public. *Id*. The administrator was authorized to issue civil penalties for each day the violation continued. 42 U.S.C. § 300i(b).

37

smi

*Accountability*

The EPA was subject to several kinds of accountability. It was "politically accountable," as the administrator of the EPA was nominated and appointed by the President of the United States, with Senate approval. *See* Reorganization Plan No. 3 of 1970 (Environmental Protection Agency) § 1(b). As well, the staff and regional managers at the EPA were subject to "bureaucratic accountability," as they reported to regional administrators, who in turn reported to the administrator of the agency. Further, the EPA was subject to "legal accountability." The agency's decisions could be the subject of judicial review by a federal court pursuant to 42 U.S.C. § 300j-7. Judicial review in such instances likely would have been limited to a determination whether the agency's action was "arbitrary and capricious." *See W.R. Grace & Co. v. U.S. Environmental Protection Agency*, 261 F.3d 330, 338 (3d Cir. 2001). Under this standard, the EPA would have had to articulate a rational basis for its action to prevail, with the court affording the agency substantial latitude to act in the best interest of affected citizens. *See id.* The Federal SWDA also contained a citizen-suit provision, which allowed private actors to seek to enforce the agency's nondiscretionary obligations under the statutes it administered. *See* 42 U.S.C. § 300j-8. Finally, Congress had the authority under Article I of the U.S. Constitution to engage in oversight and investigation of the agencies administering the statutes it enacted. *See, e.g., McGrain v. Daugherty*, 273 U.S. 135, 177 (1927) (Congress can investigate matters "on which legislation could be had or would be materially aided by the information which the investigation was calculated to elicit").

*Conclusion*

- *Authority*: The EPA possessed wide authority, through permitting, monitoring, and enforcement powers, to implement the requirements of the Federal SWDA by supervising primacy states, like Michigan, in order to ensure the safety of public water supplies.

- *Accountability*: The EPA was accountable through its administrator to the President of the United States, and EPA staff were accountable to the agency's regional administrators and agency administrator for the accomplishment of its statutory responsibilities, and through the possibility of judicial review of, or citizen suits

challenging, agency action. Finally, the actions of the EPA could be the subject of congressional oversight and investigation.

### (b) U.S. Department of Health & Human Services

*Authority*

By statute, the United States Department of Health and Human Services ("USDHHS") in the relevant time period had the authority to work with states and municipalities to promote public health in various ways. *See* 42 U.S.C. § 243(a). Within USDHHS, the Centers for Disease Control ("CDC") was primarily responsible for rendering such assistance through an array of programs concerning such matters as lead poisoning and disease prevention, primarily at the invitation of a local health authority. *See* 42 U.S.C. §§ 247b-1, 247b-3, 247b-16. Though EPA had the authority to implement the commands of the Federal SDWA to prevent health hazards related to public drinking water supplies, in certain instances EPA had to consult with the CDC before taking particular actions—when, for example, it intended to release an interim rule directed toward a pressing threat to public health. *See* 42 U.S.C. § 300g-1(b)(1)(D).

In respect to surveillance and detection, the CDC was responsible for collecting disease incident reports and managing the National Notifiable Disease Surveillance System. *McDonnell v. First Unum Life Insurance Co.*, 2013 WL 39755941 (S.D.N.Y.). The CDC was obligated to act to aid state and local public health authorities when it identified a disease outbreak or similar public health threat, which could include reports of elevated blood lead levels or incidents of Legionella. *See* 42 U.S.C. § 243(a). In the event the CDC were to conclude that the response to such an outbreak or incident would not likely prevent the spread of a communicable disease across state lines, the CDC could intervene through a variety of means, including inspection, disinfection, or the elimination of the objects believed to be the source of infection. *See* 42 C.F.R. § 70.2. No federal mandate required CDC intervention in instances in which a communicable disease did not threaten to cross state lines or the state or local health authorities did not request the CDC's assistance. *See* 42 U.S.C. § 243(a) (no mandate to request CDC assistance).

In certain instances of disease outbreak, USDHHS had the authority to conclude that the particular circumstances presented a public health emergency. 42 U.S.C. § 247d. This

determination was within the discretion of the Secretary of Health and Human Services, and such a declaration of a public health emergency would have triggered the ability of USDHHS to investigate and intervene. *See* 42 U.S.C. § 247d(a). Such intervention could have included supplying funding, materiel, services, or personnel to support disease-related investigations or interventions. *See* 42 U.S.C. § 247d, 247d-7c.

### *Accountability*

USDHHS was subject to multiple kinds accountability. It was "politically accountable," as the secretary of the agency was nominated and appointed by the President of the United States, with Senate approval, serving at his or her pleasure and presumably was a manager who shared the President's policymaking concerns and priorities. As well, the staff of the agency, including that of the CDC, was subject to "bureaucratic accountability"; ultimately, they answered for their actions to their superiors in the chain of command, including the Secretary. USDHHS was also subject to "legal accountability." The agency's decisions could be the subject of judicial review by a federal court. *See* 42 U.S.C. § 263a(k). Further, as with EPA, Congress had the authority under Article I of the U.S. Constitution to engage in oversight and investigation of USDHHS implementation of its statutory responsibilities. *See, e.g., McGrain v. Daugherty*, 273 U.S. 135, 177 (1927) (Congress can investigate matters "on which legislation could be had or would be materially aided by the information which the investigation was calculated to elicit").

### *Conclusion*

- *Authority*: USDHHS possessed authority to work with state and local governments to address disease outbreaks, including surveillance and detection activities and, in certain circumstances, the declaration of a public health emergency.

- *Accountability*: USDHHS was accountable through its secretary to the President of the United States, and staff were accountable to the agency's secretary and senior staff through the chain of command, as well as the possibility of judicial review of its actions. Finally, the actions of USDHHS could be the subject of congressional oversight and investigation.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

November 11, 2020

Lawrence Friedman