```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3

 4
                 In Re   FLINT WATER CASES     Case No. 16-10444
 5

 6

 7   _____/

 8                       DISCOVERY CONFERENCE

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                       APRIL 19, 2023

12
                    APPEARANCES IN ALPHABETICAL ORDER:
13
                    James M. Campbell
14                  Campbell Conroy & O'Neil, P.C.
                    20 City Square, Suite 300
15                  Boston, MA 02129

16                  Melanie P Daly, I
                    Levy Konigsberg, LLP
17                  605 Third Ave, Suite 33rd Floor
                    New York, NY 10158
18
                    Alaina N. Devine
19                  Campbell Conroy & O'Neil, P.C.
                    1 Constitution Wharf, Suite 310
20                  Boston, MA 02129

21                  (Appearances continued on next page)

22

23          Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                    Federal Official Court Reporter
24                  United States District Court
                    200 East Liberty Street -
25                  Ann Arbor, Michigan 48104
```

April 19, 2023

```
 1                          Kristin Michele Dupre
                            Campbell Conroy and O'Neil PC
 2                          1 Constitution Wharf, Suite 310
                            Boston, MA 02129
 3
                            Philip A. Erickson
 4                          Plunkett & Cooney
                            325 E. Grand River Avenue, Suite 250
 5                          East Lansing, MI 48823

 6                          Patrick Lanciotti
                            Napoli Shkolnik PLLC
 7                          360 Lexington Avenue, 11th Floor
                            New York, NY 10017
 8
                            Emmy L. Levens
 9                          Cohen Milstein Sellers and Toll PLLC
                            1100 New York Avenue, NW
10                          Suite 500, West Tower
                            Washington, DC 20005
11
                            Michael A. Olsen
12                          Mayer Brown LLP
                            71 S. Wacker Drive
13                          Chicago, IL 60606

14                          Corey M. Stern
                            Levy Konigsberg, LLP
15                          605 Third Avenue, Suite 33rd Floor
                            New York, NY 10158
16
                            Mark R. Ter Molen
17                          Mayer Brown LLP
                            71 S. Wacker Drive
18                          Chicago, IL 60606

19                          Michael L. Williams
                            United States Department of Justice
20                          Civil Division, Torts Branch,
                            Environmental Tort Litigation
21                          175 N Street, N.E.
                            Washington, DC 20002
22

23
                     To Obtain a Certified Transcript Contact:
24              Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                        Federal Official Court Reporter
25                    United States District Court
            200 East Liberty Street - Ann Arbor, Michigan 48104
```

*In Re* Flint Water Cases - Case No. 16-10444

April 19, 2023

3

**I N D E X**

WITNESSES                                                          PAGE

  (None)




EXHIBITS

  (None)






MISCELLANY

  Proceedings.................................4
  Certificate................................29

*In Re* Flint Water Cases - Case No. 16-10444

April 19, 2023                                                     4

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  Calling the Flint Water Cases.
 3              THE COURT:  All right.  Well, Jeseca already has your
 4      appearances on the record.  So we will dispense with that
 5      formality.
 6              And we have an agenda with six things.  I'm hoping
 7      number 5 and 6 were resolved, but I didn't get word that they
 8      were.  So perhaps we'll need to go over those.
 9              But the first one is the individual plaintiffs'
10      request to address an issue related to a deposition of a
11      nonparty, Jennifer Vlach.
12              So would that be you, Mr. Stern?
13              MR. STERN:  Yes, Your Honor.  Corey Stern for the
14      plaintiff.  Good morning or good afternoon.
15              This started out with a deposition of
16      Jennifer Kaufmann.  You may recall, Your Honor, that there was
17      some briefing and Veolia had opposed the deposition.  And when
18      we went to take the deposition, it turned out that after all
19      of that briefing, after all of that back and forth, that
20      witness knew nothing about the Twitter account, knew nothing
21      about the advertisement campaign, and no one ever let us know
22      that.
23              And so she had mentioned a name of another Jennifer
24      from the same company.  Jennifer Vlach --
25                  (Technical difficulties)
```

| | |
|---|---|
| 1 | THE COURT:  Did Mr. Stern freeze for anybody else? |
| 2 | MR. OLSEN:  He did. |
| 3 | THE COURT:  Let's -- Ms. Daly, can you text him and |
| 4 | let him know? |
| 5 | MS. DALY:  Yes, Your Honor.  I was just about to do |
| 6 | that. |
| 7 | THE COURT:  Okay. |
| 8 | MS. DALY:  Let him know he's frozen. |
| 9 | MR. STERN:  Can y'all hear me? |
| 10 | MS. DALY:  Oh, there we go. |
| 11 | THE COURT:  Now we can. |
| 12 | MR. STERN:  Sorry.  I don't know where I left off, |
| 13 | but I've since been -- |
| 14 | THE COURT:  Yeah.  We last heard that there had been |
| 15 | some -- that you took Jennifer Kaufmann's deposition.  She |
| 16 | knew nothing about the Twitter account issue.  And that's all |
| 17 | we know. |
| 18 | MR. STERN:  And so she had mentioned the name of |
| 19 | another Jennifer who worked for the same company at the same |
| 20 | time.  And we sent a subpoena for her deposition. |
| 21 | I had asked the Veolia attorneys to confirm that this |
| 22 | was the right person so that I didn't spend or none of us |
| 23 | spent any time as we did on the Kaufmann deposition going down |
| 24 | a rabbit hole of somebody who had no knowledge. |
| 25 | And since that time, I've been contacted by a private |

 1    attorney for her who we were supposed to speak at noon today

 2    eastern time, but I did not hear from him.  And I think at

 3    this point it doesn't need to be addressed I guess by the

 4    Court right now because I'm going to wait to see what the

 5    private lawyer has to say about her knowledge.  But just

 6    trying --

 7          MR. OLSEN:  Your Honor, I think I can tell Mr. Stern

 8    what I think he's going to say, because we made the same

 9    inquiry that he did.  And just by --

10          THE COURT:  Okay.  Just a minute.  Then this is the

11    part where I'll say, "Okay.  Please do that."

12          MR. OLSEN:  Okay.  I -- and just to back up a little

13    bit, we did have a hearing on Ms. Kaufmann where I said on the

14    record that we didn't think Ms. Kaufmann had anything to do

15    with the PR issues.  So I don't know why there was confusion

16    about that.

17          But I'll say the same thing about this woman.  We --

18    I don't know this woman.  But we also had a discussion with

19    the attorney that she has hired.  And we've been informed that

20    she did some work with respect to the Suez merger and VNA's

21    Suez merger, but she did not have any involvement with Flint

22    or any of the issues related to Flint or PR related to Flint.

23          So I think we're going to end up in the same place

24    with Ms. Vlach and her lawyer can have that conversation with

25    Mr. Stern.  But that's what we know, so I suspect that's what

1   he's going to tell Mr. Stern as well.

2          THE COURT:  Do you know who does have the information

3   regarding --

4          MR. OLSEN:  So good question, Your Honor.

5          THE COURT:  Just a minute.

6          MR. OLSEN:  Sorry.

7          THE COURT:  Count to 3.  After I stop speaking, count

8   silently to 3 and then you start speaking.  That will be maybe

9   just a way of handling this.

10         So what we're looking at is -- what I understand Mr.

11  Stern to be concerned about is looking further into the what's

12  been called the dynamic search advertising feature, or

13  whatever it is that VNA was using, that he is concerned was

14  reaching jurors in Bellwether I and could reach jurors in

15  another -- either in our upcoming class case or a future

16  bellwether trial.

17         And so do you know who would know what was -- what

18  the nature of that advertising was at one of these companies?

19         MR. OLSEN:  So two things.  With respect to this

20  person that we've been talking about, the two Jennifers, that

21  came from Mr. Connor's deposition where he said he wasn't sure

22  about who this person was, didn't remember a name.  And

23  guessed at Jennifer.  So I don't know that there is such a

24  Jennifer.

25         But with respect to the question of the dynamic ads,

1    that issue came up after the geotargeting issue was put to bed

2    and we've produced documents, analytical data, other

3    information.

4         We even produced to Mr. Stern a declaration from an

5    expert in Google ads and social media who analyzed all of that

6    data and all of those documents and concluded that none of the

7    dynamic ads or the advertising were targeted in any way to

8    jurors or perspective jurors.  And we've provided the

9    advertising analytical data by zip code and other information

10   to demonstrate exactly that.

11        But I don't know who this person Mr. Connor referred

12   to in his deposition.  If there is a person, I don't know who

13   that is.

14        THE COURT:  Okay.  All right.  Well, it sounds like

15   for now Mr. Stern is going to speak with Jennifer number 2's

16   lawyer and try to find out what she knows, if anything.  And

17   then he'll go from there.

18        MR. STERN:  Your Honor, that's true.  But since

19   Mr. Olsen just made that very thorough statement, I think a

20   good question then to ask -- and I wasn't planning on even

21   arguing anything about this today.  I was just giving the

22   background about why the judge didn't -- why the Court didn't

23   need to address it.

24        But since Mr. Olsen just said all that, we know that

25   Actum is a company that engaged with Veolia and that someone

1    from Actum told someone from VNA when responding about the

2    Twitter account, quote, "That was us," quote.

3            And so maybe Mr. Olsen and his client could at least

4    tell us who at Actum played a role on behalf of VNA as part of

5    the VNA Flint facts Twitter handle.  Because someone at Veolia

6    knows who at Actum they were engaged with on this issue,

7    whether her name was Jennifer or Corey or Michael or whatever.

8    And so maybe that's the best question.

9            And there's no way that no one at Veolia knows who at

10   Actum was part of the account that dealt with Flint during the

11   Bellwether I trial.

12           THE COURT:  Well, here's what we'll do.  I'll ask

13   Mr. Olsen to have a conversation with you following this

14   hearing so that we don't all go through this process with the

15   two of you.

16           But Mr. Olsen, please, and Mr. Stern please discuss

17   that.  Because if there is somebody at this company called

18   Actum that Veolia is aware of, that would be the fastest way

19   to make progress on this issue.

20           So the second issue on the agenda is another one that

21   I think Mr. Stern submitted.  And it is regarding various

22   amended requests for production of documents that was issued

23   to VNA and requests for admission and Veolia's responses.

24           So tell me more about that, please.

25           MR. STERN:  So we've met and conferred about this on

1    numerous occasions.  And at the moment, I don't believe

2    there's anything for Your Honor to become involved with.

3            I do and I've told Veolia that we intended to at

4    least flag for Your Honor.  There is one issue that we

5    anticipate is going to be a part of this going forward.

6            And at some point Your Honor made the determination

7    that documents and information kept in the possession of the

8    Veolia entity's post January 2017 had no relevance to this

9    case and discover was limited to pre 2017 information.

10           We believe at this point that that date range not

11   just for the public relations part of this, but even for

12   Veolia's activities associated with what they did between 2015

13   and 2016, do have relevance.

14           We intend to seek documents.  And I don't want to get

15   into why, but there was testimony at trial at least -- I'll

16   give you a little background -- that at one point Veolia went

17   into crisis mode.  And there was testimony from at least one

18   Veolia employee that they did utilize either internal chat or

19   text messages.

20           You'll recall from trial that one of the large issues

21   was the LeeAnne Walters' residence and how nobody told Veolia

22   anything.  And there very well may be communications post

23   January 2017 as part of that crisis management that discusses

24   what people knew or didn't know about LeeAnne Walters even

25   though it's not within the time period that Your Honor deemed

1    to be relevant for purposes of discovery back in 2016 when

2    this issue first came up.

3            I think Veolia would like the opportunity, if this

4    does come up, to submit a one- or two-page letter brief.  And

5    obviously they should have every opportunity to present their

6    position on this as we would want every opportunity to present

7    ours.

8            But in -- as part of this issue about the ongoing

9    discovery, the first amended, second amended, third amended,

10   fourth amended, and the second request for admissions, that is

11   going to be an issue irrespective of what is produced.

12           And I just wanted to flag that for Your Honor.

13           THE COURT:  Okay.  Thank you.

14           Now there's an issue with VNA's privilege log.

15           MR. STERN:  We've not resolved it, but we have agreed

16   to not argue it today because there will be more information

17   provided from Veolia to the plaintiffs next week.

18           THE COURT:  Okay.  Thank you.

19           And now there is the issue of the proposed protective

20   order regarding Dr. Specht's MATLAB code.  And I received the

21   very short briefing or whatever we're going to call it on this

22   as well as the joint proposal for a protective order.

23           Is there anything further from plaintiffs that you

24   would like to provide, Mr. Stern?

25           MR. STERN:  No, Your Honor.

1          THE COURT:  Anything further, Mr. Olsen?

2          MR. OLSEN:  The only thing I would add, Your Honor,

3     is as you're aware, we agreed to a very robust protective

4     order.

5          The only two issues we have issue with is the wildly

6     exorbitant liquidated damages provision.  We looked far and

7     wide and found no precedent for such a thing.

8          We found a case, Sony Computer, talking about and

9     rejecting a smaller $50,000 liquidated damages provision

10    saying there's scant or no support for that.

11         We think imposing a liquidated damages provision on

12    jointly and severally against VNA and all active counsel of

13    record is ridiculous and unnecessary.

14         If there is -- there's never been a violation of the

15    protective order to date by VNA or anybody associated with

16    VNA.  And if that ever happened, the Court is well within its

17    power and ability to take appropriate action in imposing a

18    liquidated damage provision is unnecessary and as framed we

19    think ridiculous.

20         The only other issue we took was a declaration in

21    there or adding language declaring the code proprietary.  We

22    have no problem if the protective order says that Dr. Specht

23    or plaintiffs believe it's proprietary.  But we haven't even

24    seen the code.  And so we just didn't want to agree that this

25    is proprietary.

```
1              THE COURT:  Okay.  Well, let me say the following.

2         I'm starting with the issue of VNA's challenge to the

3    use of the word proprietary and confidential.  I've already

4    made a decision on that in past orders related to this

5    dispute.  And I have described the code as proprietary and

6    confidential and that wasn't challenged by VNA at the time.

7         I went back to Black's Law Dictionary to make sure I

8    understood what proprietary meant.  And according to Black's

9    dictionary, it simply means holding as property.  And when you

10   look back at what Dr. Specht has described with respect to

11   this code in his own declarations and so on, is he has

12   described it as proprietary.  And it's clearly confidential.

13   That's why we have this issue in the first place.

14        But he -- Dr. Specht himself stated that he has a --

15   "I hold the copyright over it as well because I developed this

16   MATLAB code."  So that sort of indicates that he -- that it's

17   proprietary.

18        And VNA, in your own briefing, you've indicated that

19   the Dr. Specht's device does not, quote, "spit out a bone lead

20   reading" but rather, quote, "he developed his own algorithms

21   and formulas to take the data generated by his device, filter

22   out other factors, and calculate a lead measurement.

23        So it seems that you've acknowledged that this is his

24   product that your expert couldn't repeat without getting his

25   code.  And so that's the whole dispute.
```

 1          So I have no problem with referring to it as

 2   proprietary and confidential.  So that language will stay in.

 3          The next issue, as I see it in here, is that it looks

 4   as if -- but maybe you're not concerned about this now -- on

 5   page 2 1B, that you did not want to insert the names of VNA

 6   counsel who will be signing the attachment here, that they

 7   will live -- counsel and/or expert.  You didn't want to insert

 8   the name in addition to Dr. Huber of those lawyers.

 9          And tell me why that is.

10          MR. OLSEN:  No, Your Honor.  We have no problem with

11   that.  We just said once we agree to a protective order and

12   know what it is, we'll provide the names.

13          THE COURT:  Okay.  Good.

14          MR. OLSEN:  And you're right it's going to be

15   Dr. Huber and a handful of lawyers working on the Specht

16   issue.

17          THE COURT:  Okay.  That's resolved.  So then we get

18   to this issue of liquidated damages which I see was to --

19   plaintiffs are seeking $40 million for either an intentional

20   or unintentional violation.  Or 50 percent of the fees paid to

21   VNA since January 1, 2016, related to the Flint Water Crisis.

22          That was a creative sort of effort there.  And what

23   I'll do here is take out the words "intentional and

24   unintentional".  And it will just say a violation of this

25   order may subject each attorney with -- those who have signed

1    the -- what's it called, Exhibit A, or anyone who violates it

2    -- you're going to figure out this language.  But it may

3    subject them to a fine to be determined by the Court.

4            So I just would need to tether the number to the

5    damage that's caused and to hear more about it at that time.

6            MR. OLSEN:  Okay, Your Honor.  We will draft it

7    accordingly.

8            THE COURT:  Okay.  Thank you.  So that will be the

9    solution there.  Okay.  Now --

10           MR. STERN:  Your Honor?

11           THE COURT:  Yes.

12           MR. STERN:  May I just ask one question.

13           THE COURT:  Sure.

14           MR. STERN:  Not about the part that you just

15   referenced.  But about the insertion of names part, which

16   Mr. Olsen said now there's no issue with.  I assume that those

17   names will be provided before the entry of the protective

18   order.

19           Because we've met and conferred about this on

20   numerous occasions with Mr. Ter Molen.  We've never met and

21   conferred about it with Mr. Olsen.  And this is the first time

22   that anyone has said there's no issue with this.  And it's

23   important to Dr. Specht to know who the individuals are that

24   are subject to this protective order prior to its entry.

25           So I just want to be clear that that will -- I want

1    to make sure that it's the Court's desire for that to happen

2    prior to entry.

3         MR. OLSEN:  Yes is the answer.  We will provide them

4    prior to entry --

5         THE COURT:  Well, he was actually addressing

6    myself about --

7         MR. OLSEN:  Okay.

8         THE COURT:  -- whether I wanted to see that.  And I

9    do because I -- it's to be -- it is so ordered at the bottom.

10   So I'll need it to be filled out, just as Mr. Olsen seemed to

11   be suggesting.

12        Is that your understanding, Mr. Olsen?

13        MR. OLSEN:  Yes.  And I think we said that to Mr.

14   Stern's colleague.  But yes is the answer.  We will provide

15   the names to go into the protective order.

16        THE COURT:  Okay.  Okay.  So now, Mr. Olsen, you have

17   a request to discuss Bellwether II, the pool of 40 potential

18   plaintiffs and their discovery responses, and the pool

19   reduction schedule.

20        MR. OLSEN:  I think we can take this off today's

21   agenda, Your Honor.

22        We have met and conferred with plaintiffs' counsel.

23   They've agreed there needs to be some supplemental discovery.

24   We are going to agree to amend the schedule for further

25   narrowing the pool until we get that discovery.  And we're

```
 1    meeting and conferring to have that amendment to provide to
 2    Your Honor.
 3            So assuming you don't have any objection to us so
 4    amending the schedule, we can take this off calendar for today
 5    and hopefully work it out.
 6            THE COURT:  Okay.  I don't have any problem with
 7    that.  Thank you.
 8            And now there's VNA's request to discuss class
 9    plaintiffs use of experts from the class certification stage
10    for the issues class trial I assume.
11            MR. OLSEN:  Yes, Your Honor.
12            And I'm not sure if this is resolved or not.  The
13    only reason we're raising this is there were a number of
14    experts.  Ducatman, Gamble, Gardoni, Goovaerts, Keating,
15    Lanphear, and Pogorilich who --
16            THE COURT:  Can you spell the last one?
17            MR. OLSEN:  P-o-g-o-r-i-l-i-c-h.
18            Who are used in connection with class certification
19    but not resubmitted for the trial.  And so we just were
20    looking for confirmation that they weren't going to be used at
21    trial so we didn't have to file Daubert motions with respect
22    to any of them.
23            Class plaintiffs' counsel got back to us saying that
24    with a possible exception of Gardoni, they did not think that
25    they would call and had no plan to call those witnesses at
```

1    trial but would let us know in advance of the Daubert date if

2    that changed.

3          And since the Daubert date is May 12, we're just

4    quickly approaching that.  And we certainly would prefer not

5    to address any of this if we don't need to.

6          So we're just trying to get some confirmation that

7    that is the case and these experts are off the table.  We

8    don't have to file those motions.

9          THE COURT:  Well, there's a couple of reasons you

10   don't have to file those motions.  But I -- someone can

11   respond in just a minute.

12         But I want to talk about the Daubert motion practice

13   in general.  I would urge you, Mr. Olsen, in the strongest

14   possible terms to read the case law on Daubert motions.

15         And in our last trial, VNA challenged each and every

16   one of plaintiffs' expert on all of the Daubert prongs.

17   You're not qualified.  This isn't science.  You know, the

18   whole thing.  It's not scientific.  And it wasn't successful.

19         There were one or two very small portions of expert

20   reports that -- where I agreed with your motion.  But not that

21   the person wasn't qualified to testify.  Just that they had

22   not provided an explanation for how they reached one or two

23   narrow parts of their conclusions.

24         So it's not helpful to me.  It's not helpful to your

25   client to put these -- throw these motions in here thinking,

1    oh, I know I'll preserve the record on appeal.  Certainly it

2    will be there on appeal that you've said all of this.  But if

3    you read the case law, it's not going to help your appeal.

4          So I just would urge you for the sake of all of us --

5    but I'm thinking of myself most right now -- that -- and I'm

6    sure this will have no impact so maybe I'll just stop right

7    there.

8          So it's a lot of work.  What happens with these

9    motions is there has to be a response.  Of course you file a

10   reply.  And then over here at the court, we have to do a lot

11   of work that would otherwise we would just hear this testimony

12   and along with the jury and I would be ruling on objections at

13   that time.

14         But I just urge you to think about that.

15         But is there a response from class plaintiffs'

16   counsel regarding whether Mr. Olsen's understanding of who

17   you're using from the certification stage is correct?

18         MR. OLSEN:  Ted, you're on mute.

19         MR. STERN:  Ted, you're on mute.

20         MR. LEOPOLD:  Thank you.  I'm sorry.

21         Good afternoon, Your Honor.  Ted Leopold, class

22   counsel, to address this issue.

23         Generally, Your Honor, we have tried to make it as

24   easy as we can.  And we have informed VNA's counsel that in

25   all likelihood, we will not be using six of these or seven or

 1    so of these experts.

 2            However, just along the lines of what you've just

 3    been saying, Your Honor, we're so far away from trial that

 4    it's a little bit hard with a lot of various issues still

 5    pending as Your Honor knows.  Summary judgment issues, the

 6    third party defendant issues that is going to have a strong

 7    indication on where or time-wise and witnesses that may or may

 8    not be needed.

 9            So all we ask for at this point in time we don't

10    intend to be using those experts.

11            However, as we move forward towards trial and of

12    course with sufficient amount of time so no one would be

13    prejudiced, clearly not VNA nor the Court, that if things

14    change based upon some rulings of the Court and some other

15    issues, that with appropriate timeliness, we would inform VNA

16    that one or more of these experts may be used and we can

17    address that issue at that time so that we don't take up the

18    Court's time and everybody else's commitments on replying to

19    these what in all likelihood may be irrelevant Daubert

20    motions.

21            THE COURT:  Here's -- thank you, Mr. Leopold.

22            Your indication that we're so far from the beginning

23    of trial is not -- I guess if you count seconds and

24    nanoseconds between now and October 3, there's a good number

25    of days in there.

```
 1              But I do want to let you know that following this
 2    hearing, I have asked Leslie Calhoun, my law clerk, to send
 3    the schedule.  I have filled in dates.  I have also changed a
 4    couple of the dates that have been agreed upon because I
 5    absolutely have to build in an opportunity to decide the many
 6    motions that will be forthcoming.
 7              It's all good and well for everybody to brief these
 8    issues.  But somebody has to read all of this briefing and
 9    entertain further argument and decide each of the motions.
10              So when Leslie sends that to all you this
11    afternoon -- and I've asked her to send it to bellwether
12    counsel or individual counsel as well, just so everybody sort
13    of knows what we're looking at -- I want you to pay very close
14    attention to the fact that I am indicating in this new
15    schedule that there will be no stipulation.  I will not
16    entertain motions for extension of time.
17              Just we'll never get to the finish line if I do.
18              I also won't entertain motions for extensions of page
19    limits that are otherwise set by the Eastern District of
20    Michigan local rules.  Because otherwise, I won't be able to
21    get through reading all of your motions.
22              What I'll have to do is stop.  I'll just stop at page
23    25 if it's a dispositive motion.  I'll just stop reading.  So
24    you might be submitting a lot more pages, but I just will not
25    be able to read them.  So I think you should have all your
```

```
 1          arguments in the pages that I'll read.
 2                  So I just draw that to your attention because I've
 3          written that in this new schedule.
 4                  So what will happen is she's going to email that to
 5          you so you can take a close look at it.  And we will have a
 6          discussion of it later in the month so that we all know what
 7          we're doing here and we can each do our part responsibly and
 8          carefully.
 9                  So is there anything else today?
10                  MR. OLSEN:  Your Honor, just to follow-up on that.  I
11          don't remember if it was Mr. Leopold or his colleague who had
12          suggested they would let us know well in advance of that May
13          12 Daubert deadline.  So I hope we can get an answer on those
14          experts in the next week or two.  And so just so we don't have
15          to --
16                  THE COURT:  The problem is -- I mean, I hear what Mr.
17          Leopold is saying, which is that the briefing on the nonparty
18          at fault issue is not going to be done in time for a decision
19          to be made prior to May 12.
20                  So Mr. Leopold, I would just be overly cautious in
21          letting VNA know who you think you're going to use.
22                  MR. LEOPOLD:  And I appreciate that, Your Honor.  And
23          we've done the best that we can at this point I guess the best
24          thing that we can do is at this point these individuals, again
25          depending on what happens between now and the May timeframe
```

1   when the Dauberts are due, we may know more and we can say

2   definitively that A, B, or C will be.

3          But at this point in time, we don't anticipate.  And

4   if we have to, of course, seek leave of court, I just want the

5   record to be clear that, you know, depending on what happens

6   in the near future, we may have to amend that and tell VNA we

7   need to add one or two people based upon what perhaps the

8   Court may rule or some other issues.

9          And we've -- that's about as best as we can do at

10  this point because we just don't have the full picture of

11  where we're going to be in maybe four to six weeks.

12          THE COURT:  Let me tell you this, I found your motion

13  to strike regarding the nonparty at fault or motion for

14  judgment as a matter of law.  I forget what you called it.  I

15  found it very interesting.  I'm looking forward to reading the

16  response.  But I can't say right now what the decision will

17  be.

18          So I think you should work on the assumption that as

19  of today, the nonparty at fault issue is in there.  I found it

20  interesting.  I found it to be compelling and thoughtful what

21  you submitted.

22          MR. LEOPOLD:  Thank you.

23          THE COURT:  But I haven't seen the response.  So

24  that's how this process works.  Something comes in, I think,

25  oh, so.

```
 1             What?

 2             MR. LEOPOLD:  And Your Honor, just to be crystal

 3    clear, not all of these experts that we potentially will not

 4    be calling address specifically third party related issues.

 5             THE COURT:  Okay.

 6             MR. LEOPOLD:  They're just a variety, as Your Honor

 7    is aware, a number of different issues that since -- and I

 8    realize we're not far from trial.  But in terms of actually

 9    figuring out who, what, and when are going to testify and what

10    issues, we just have some open ended issues over the next

11    several weeks that, depending on what may happen, can create a

12    potential where we may need to come back to the Court and say

13    this one individual may need to be added.

14             And we, of course, will work with VNA to do whatever

15    they want to do about those issues.  I'm not saying that's

16    going to happen.  We just don't want to be prejudiced by

17    saying today these seven people are not going to testify so

18    far ahead of trial.

19             THE COURT:  Okay.  But soon you'll have to say

20    because there's a May 12 cutoff that's not going the move, so.

21             MR. LEOPOLD:  Okay.

22             MR. OLSEN:  And maybe, Your Honor, maybe we can skin

23    this cat, as Mr. Leopold suggested, if there is one or two of

24    these seven experts that they have a different view on they'll

25    seek leave of court to add them, maybe we can -- this is
```

1    entirely up to you obviously, Your Honor.

2           But maybe we can reserve then if they add one or two

3    of these experts, maybe we then address that with a Daubert

4    motion or something so we don't have to file six or seven

5    motions now as opposed to later.

6           THE COURT:  Okay.  Well, let's just see how this

7    issue develops.

8           MR. LEOPOLD:  That's what we're trying to, I think

9    both Mike and myself, are trying to accomplish for Your Honor

10   is to.  In all likelihood, Judge, we're not going to be

11   calling these people.  So we don't want to say, yes, we're

12   going to call them and then have all this extra paperwork only

13   to be not prejudiced down the road.

14          So I think if the parties can work together -- and it

15   seems like VNA's counsel and us can do that.  Again, I don't

16   think it's going to be more than if it is even anybody else,

17   one or two people.

18          We just don't want to burden the Court as opposed to

19   saying since we don't know what we're going to do right now,

20   here's all six.  We're going to have them all testify and we

21   burden the Court with all the paper and things of that sort.

22   We're just trying to prevent that.

23          THE COURT:  And to be clear, I've read the Daubert

24   motions on most of the names I think you identified,

25   Mr. Olsen.  Because you already filed Daubert motions with the

 1    class certification motion even though I didn't decide most of
 2    them at that time, so.
 3              MR. OLSEN:  And it was a different standard applied
 4    at that time for class cert.
 5              THE COURT:  It was, yep.  Okey dokey.
 6              MR. STERN:  Your Honor?
 7              THE COURT:  Yes.
 8              MR. STERN:  Sorry.  This is Corey Stern.  I just
 9    wanted to apologize to the Court and to VNA.  I did get an
10    email on Monday from Mr. Ter Molen on that issue of the names
11    of attorneys wherein he said we will provide specific names as
12    appropriate once the Court has resolved the open issues.  And
13    I was wrong when I said that this is the first I've heard
14    that.  Because it was in an email from Mr. Ter Molen.  And I
15    would be remiss if I didn't just admit that.  And so I
16    apologize for misstating that.
17              I didn't misspeak because that's what I thought.  But
18    I got it wrong.  And that's on me.
19              THE COURT:  Okay.  Thank you.  All right.  Thank you,
20    all.
21              MR. CAMPBELL:  Your Honor?
22              THE COURT:  Yes.
23              MR. CAMPBELL:  This is James Campbell, Your Honor.  I
24    just had one issue on the Bellwether II.  And I just wanted to
25    be clear.

```
 1              Your Honor was kind enough to hear Mr. Olsen and Mr.
 2   Lanciotti on the schedule.  I just wanted to remind the Court
 3   that our selections for the Bellwether II cases I think are
 4   due next -- a week from Friday.  So I just didn't want to have
 5   -- you know, I think we're working together.
 6              We're going to agree to an extension if it's okay
 7   with Your Honor.  But given that that was an important date, I
 8   just wanted you to know that it's right on us, that date, that
 9   we would need more time for.
10              THE COURT:  That's okay.  Especially -- my
11   unwillingness to see extensions on dates relates right now to
12   the class trial.  So that will work just fine.
13              MR. CAMPBELL:  Thank you, Your Honor.
14              THE COURT:  Yeah.  Thank you.
15              MR. STERN:  Your Honor, one last question.
16              THE COURT:  Sure.
17              MR. STERN:  And if there is a change in the -- the
18   last time we met -- and I don't recall if it was a discovery
19   conference or if it was a full out status conference.  But
20   Your Honor commented or at least eluded to the fact that there
21   might be a change in the timing of the Bellwether III trial.
22              I'm not pushing on that issue, but it's
23   understandable that at this point the Court is focused heavily
24   on the class trial and the deadlines.  And I know there's been
25   some exchanges of time limits between the parties.
```

1           If, in fact, there's going to be a change to the

2     Bellwether III trial start date, you know, we have hotels

3     booked.  We have those kind of things.  Again not the Court's

4     main concern at this point.  But as soon as anyone knows, if

5     we can be informed, that would be very helpful for vendors,

6     for scheduling purposes and those types of things.

7           THE COURT:  Right.  Mr. Stern, no, that is on my

8     mind.  All of the above is on my mind.  Both the details for

9     counsel in the class trial as well as those for Bellwether

10    III.  I think you can assume that we can't start that trial in

11    mid-January.  Because with the holiday, Thanksgiving,

12    Christmas holiday, New Year's holiday, school holidays, I

13    don't know how we would be able to start it in January.

14          Partly because if we're going to use a jury

15    questionnaire, I have to bring those 200 jurors in, swear them

16    in to answer truthfully and accurately, and we'll be in the

17    middle of the class trial and I can't spend all day swearing

18    jurors in for several days in a row.  So just it's going to

19    have to be postponed.

20          MR. STERN:  Okay.

21          THE COURT:  Good.

22          MR. STERN:  Thank you, Judge.

23          THE COURT:  All right.  Well, thank you.  And for

24    Mr. Williams and Mr. Stern, I'm currently working on the

25    motion related to the FTCA adult plaintiffs or claimants.

```
 1              MR. WILLIAMS:  Thank you, Your Honor.  I appreciate
 2    that.
 3              THE COURT:  I'll get it to you as soon as I can.
 4              MR. STERN:  Thank you.
 5                        (Proceedings Concluded)
 6                    -         -         -
 7              CERTIFICATE OF OFFICIAL COURT REPORTER
 8         I, Jeseca C. Eddington, Federal Official Court
 9    Reporter, do hereby certify the foregoing 29 pages are a true
10    and correct transcript of the above entitled proceedings.
11    /s/ JESECA C. EDDINGTON                    04/22/2023
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```