```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3

 4
                  In Re   FLINT WATER CASES     Case No. 16-10444
 5

 6

 7    _____/

 8                       DISCOVERY CONFERENCE

 9
                 BEFORE THE HONORABLE JUDITH E. LEVY
10                  UNITED STATES DISTRICT JUDGE

11                         MAY 17, 2023

12
                    APPEARANCES IN ALPHABETICAL ORDER:
13
                    James M. Campbell
14                  Campbell Conroy & O'Neil, P.C.
                    20 City Square, Suite 300
15                  Boston, MA 02129

16                  Melanie P Daly, I
                    Levy Konigsberg, LLP
17                  605 Third Ave, Suite 33rd Floor
                    New York, NY 10158
18
                    Alaina N. Devine
19                  Campbell Conroy & O'Neil, P.C.
                    1 Constitution Wharf, Suite 310
20                  Boston, MA 02129

21                  (Appearances continued on next page)

22

23         Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                    Federal Official Court Reporter
24                   United States District Court
                     200 East Liberty Street -
25                   Ann Arbor, Michigan 48104
```

(Appearances continued on next page)

```
 1                        Kristin Michele Dupre
                          Campbell Conroy and O'Neil PC
 2                        1 Constitution Wharf, Suite 310
                          Boston, MA 02129
 3
                          Philip A. Erickson
 4                        Plunkett & Cooney
                          325 E. Grand River Avenue, Suite 250
 5                        East Lansing, MI 48823

 6                        Kelly Bain Kramer
                          Mayer Brown LLP
 7                        1999 K Street NW
                          Washington, DC 20006
 8
                          Emmy L. Levens
 9                        Cohen Milstein Sellers and Toll PLLC
                          1100 New York Avenue, NW
10                        Suite 500, West Tower
                          Washington, DC 20005
11
                          Michael A. Olsen
12                        Mayer Brown LLP
                          71 S. Wacker Drive
13                        Chicago, IL 60606

14                        Corey M. Stern
                          Levy Konigsberg, LLP
15                        605 Third Avenue, Suite 33rd Floor
                          New York, NY 10158
16
                          Mark R. Ter Molen
17                        Mayer Brown LLP
                          71 S. Wacker Drive
18                        Chicago, IL 60606

19                        Michael L. Williams
                          United States Department of Justice
20                        Civil Division, Torts Branch,
                          Environmental Tort Litigation
21                        175 N Street, N.E.
                          Washington, DC 20002
22
     Also Present:        Deborah E. Greenspan, Special Master
23                        Blank Rome LLP
                          1825 Eye Street, N.W.
24                        Washington, DC 20006

25
```

May 17, 2023

1                        **I N D E X**

2        <u>WITNESSES</u>                                        <u>PAGE</u>

3           (None)

4

5

6

7

8        <u>EXHIBITS</u>

9           (None)

10

11

12

13

14       <u>MISCELLANY</u>

15          Proceedings................................4
            Certificate...............................49
16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  Calling the Flint Water Cases.
 3           THE COURT:  Okay.  I think we have appearances
 4    already.  And this is the date and time we set for a discovery
 5    dispute resolution conference.
 6           I received three items on the agenda.  And I'd like
 7    to address the issues just a little bit differently than going
 8    1, 2, 3, and take a step back and try to sort out where we are
 9    in terms of the big picture of the bellwether plaintiffs'
10    discovery requests that are related to their concern that VNA
11    may have engaged in an improper advertising campaign related
12    to the Bellwether I jury.
13           And as I understand this issue, it first arose when
14    the Detroit News published an article that raised the specter
15    that VNA could have been engaged in an affirmative advertising
16    campaign designed to reach the jury venire and subsequently
17    the jurors who were selected to hear the case.  That's what an
18    article seemed to be setting forth as a possibility.
19           That article was published in September of 2022.  And
20    following that, Mr. Stern on behalf of bellwether plaintiffs,
21    Bellwether I plaintiffs, sent out a series of discovery
22    requests to learn what was actually happening with VNA's
23    advertising campaign.
24           And as I understand it from our various conferences
25    that have taken place, Mr. Stern has taken a number of
```

1    depositions thus far and has undertaken efforts to locate at

2    least two people he believes may have been involved if there

3    was an improper campaign.  Mr. Farcot in France, who no longer

4    works for the French parent company of Veolia or any Veolia

5    entity.  And Mr. Ferarra.

6           And Mr. Stern, did you ultimately take Mr. Ferarra's

7    deposition on this issue?

8           MR. STERN:  No, Judge.

9           THE COURT:  Okay.

10          MR. STERN:  I think Your Honor had ruled a few

11   conferences ago that at this stage we should wait on

12   Mr. Ferarra pending information from other witnesses.  And

13   then you issued an order to that effect in writing.

14          THE COURT:  Thank you.  Okay.  I didn't think you'd

15   taken it, but I thought maybe that one got away from me.  And

16   of course Mr. Ferarra is VNA's counsel, in-house counsel who

17   sat here in Ann Arbor and observed many, many of the days of

18   the six month Bellwether I jury trial.

19          MR. STERN:  He's since retired, I believe.

20          THE COURT:  Oh, he's retired.  Good for him.  I hope

21   he's enjoying it.

22          So there were also document requests and some

23   document productions from VNA and a great many objections to

24   both the documents and the depositions.

25          So here we are eight months later with disputes over

1    a privilege log that's over 300 pages long.  I don't consider

2    that unusual, but it's still a lengthy privilege log.  There

3    are pending four requests for production of documents that

4    have been amended and have amended responses.  And a number of

5    other conversations and issues that have come up during these

6    discovery dispute conferences and status conferences.

7           VNA has responded in a variety of ways.  And one is

8    with a declaration from Jason McDonald, a digital media

9    expert.  And specifically he professes to have some expertise

10   in how Google advertising works and submitted to plaintiffs on

11   March 15 his declaration and attachments wherein he has

12   analyzed the information that VNA provided to him regarding

13   their Google advertising efforts.

14          VNA has also lodged objections to the document

15   requests and other requests from Mr. Stern indicating that

16   what he is seeking is not relevant, is burdensome, is not

17   proportional to the needs of the case.  And that an order

18   requiring VNA to produce responses would violate the First

19   Amendment -- their First Amendment rights to commercial

20   speech.

21          So in other words, the general issue of whether

22   plaintiffs should be authorized to go further on this issue is

23   now appropriate for me to make a decision in a more

24   comprehensive way than I have thus far.

25          And so as I started to approach that issue and think

1   about how I would make that decision about does it make sense

2   to go further with this, I realized that there are a number of

3   things that I still don't know.  I have learned a lot in

4   reading the responses to the requests for production of

5   documents, in reading Mr. McDonald -- I don't think I can call

6   him professor because it looks like he taught a little bit.

7   But mostly he runs a company.

8          And but I found it very helpful to read what he

9   provided, to look at his attachments.  It says quite a bit.

10   And so I need to know more from plaintiffs at this point.  And

11   so what I've tried to do is figure out what do I need to know.

12          And the first thing I'd like to know is what, from

13   plaintiff's perspective, Mr. Stern -- and not to answer right

14   now unless you have the answers to all of these things.  But I

15   want to know what you think you've learned thus far that would

16   warrant further inquiry.

17          I think we know that the Detroit News article is just

18   that.  And that certain things that they suggested may not

19   have been happening, may have been happening and we don't know

20   it.

21          But I've seen nothing to indicate thus far that the

22   detailed way in which the Detroit News author thought that VNA

23   could reach jurors, the targeted geotargeting, and more

24   detailed targeting, according to Mr. McDonald, was not going

25   on at least through Google.  I don't know if there's other

1    ways to do it.  But at least through Google he's telling us

2    that it didn't happen in this case.

3            So the first thing I'd be very interested in knowing

4    is, thus far, what do you think you've learned that would

5    warrant further inquiry?

6            And the next thing I'm interested in knowing is where

7    -- where you think this effort that you've undertaken -- and I

8    don't fault you for undertaking it.  Because there is nothing

9    more sacred in the judicial system than the right to an

10   impartial jury.  And so that's what this whole process is

11   founded on and that's what we have to -- all of us have to

12   protect and have an eye, a vigilant eye on.

13           So I have no quarrel with undertaking this effort.

14   But at a certain point I need to know where it's going.

15           So what have you learned?  And based on what you've

16   learned -- I know your answer in part is, well, I want the

17   answers to all these requests for production of document.  I

18   want to take Farcot's deposition.  I want to take Ferarra's

19   deposition.  But I still want to know where this would go.

20           Let's say you take all of those depositions and

21   Mr. McDonald is wrong, still, where is it that -- what court

22   intervention would you be looking for?

23           And the reason I say that is that this relates to

24   conduct that's alleged to have happened in the past.  And the

25   Bellwether I, if there had been a defense verdict, I could see

1    a motion to set aside the verdict.  There was -- the process

2    was tainted if you were to find that that was the case.  But

3    there was no verdict.

4         And so perhaps there's a motion that you want some

5    other form of sanction.  I don't know what precisely.  But I'd

6    be interested in knowing what that would be.  And for both

7    plaintiff and VNA.

8         Because what this has raised is a very important

9    issue for all of us.  And that is to think about what

10   safeguards we should all be looked for for the Class trial and

11   the subsequent bellwether trials.  And I know as the judge I

12   look to -- you know, the jurors are sworn in.  I look to them

13   and I remind them on breaks and at the end of every day, blah,

14   blah, blah.  Don't look at any news reports.  Don't Google or

15   search for what's happening here in the trial.

16        But we know that jurors are human beings and that's

17   the beauty of it and the temptation is there.  And we don't

18   take their telephones.  We don't sequester them.

19        So I'm interested in hearing from both sides on what

20   you think we can do as we move forward to ensure that our

21   jurors only make their decision based on what they hear and

22   see in the courtroom that's admitted as evidence and

23   testimony.

24        So my thought on this is that I would pause the

25   responses to the discovery that's related to the digital media

1    process until I can get this bigger picture sort of report

2    or -- I don't want to call it a brief or a motion.  But a

3    report from Mr. Stern that VNA would have an opportunity to

4    respond to.  Because that sort of third area of what should we

5    all be doing to ensure a fair and impartial jury impacts

6    everybody equally.  Whatever went on doesn't matter for that

7    portion of what I'm requesting.

8         And so that's sort of my perspective having looked at

9    all of this on the digital media campaign.

10        And so Mr. Stern, I assume that you don't have a

11   response today on what you think you found so far.  But do you

12   -- I mean you've had Mr. McDonald's declaration for two

13   months.  And I don't know if you have retained a similar

14   expert to look at that information.

15        MR. STERN:  We have.  And we disagree fundamentally

16   with what it says.  I'm surprised that at this point based on

17   the declaration of a defense expert that that in and of itself

18   is dispositive of this issue.

19        THE COURT:  It's not.  Stop, stop.  Just a minute.

20        What I'm looking for is to sort out what to do going

21   forward.  I haven't made a decision about what to do.  But and

22   that's why I want to understand from your perspective what you

23   found.  And if you're working with somebody who can respond to

24   this declaration, what they think is wrong here.  Because I'm

25   certainly not an expert in this.  I just read this.

```
 1              MR. STERN:  So we're working with three experts, all
 2    of whom can respond to what from this declaration is
 3    inaccurate, is skewed in the way it's worded.  And we have
 4    been requesting a number of documents related to the fourth
 5    RPDs that would help us get to the bottom of that.  And we
 6    have been met with we don't have that.  That can't be found.
 7    We don't have the tools for that.  That's not as easy as your
 8    experts say it is.  Those type things.
 9              So you have on the one hand, yes, we've taken some
10    depositions.  The majority of the people we deposed, don't
11    have knowledge.  The people that we think do have knowledge,
12    we haven't been able to depose.
13              We have a deposition scheduled for June -- the middle
14    of June of an individual named Mr. McKeon, who is from Actum,
15    who was the third Actum person that we've subpoenaed.  The
16    first two were the wrong people.  And we had to go through a
17    process with Your Honor of people trying to not have the
18    deposition or just nobody has information about these people.
19    But on the day of at least one deposition, that was the day
20    that everybody seemed to find out that this person didn't have
21    information.
22              We wanted to depose Mr. Farcot.  Can't do that other
23    than through The Hague Convention.  We wanted to depose --
24              THE COURT:  Are you pursuing the Hague Convention?
25              MR. STERN:  We are but there's translations involved.
```

1   It's not as easy as just fill out a form and send it in.  So

2   what we've tried to do is before spending the time, money, and

3   energy on that is finding the right people here that are

4   actually subject to the jurisdiction of the Court or at least

5   subject to the jurisdiction of a court here where we could

6   pursue them that way.

7          So I'm happy to obviously provide answers to the

8   questions that Your Honor has posed.  I would like to have,

9   you know, 14 days or whatever Your Honor thinks to put in

10  writing.  I think the best way to address it would be by way

11  of a letter.  I don't know what the pleading would be other

12  than maybe a notice in response to a declaration.  But I'd

13  prefer to write a letter.

14         THE COURT:  Okay.

15         MR. STERN:  I think that --

16         THE COURT:  Tell me, in terms of Mr. McKeon, I'm

17  happy to have that go forward.  Because what I'm hearing you

18  say is that for your experts to respond to Mr. McDonald, you

19  need some additional information and I want your response to

20  be as comprehensive as possible.

21         So what do you have outstanding?  You have his

22  deposition.  Any other depositions?

23         MR. STERN:  No.

24         THE COURT:  Okay.  Then on the fourth request for

25  production of documents, you've asked in request number 1 for

1    all historical ad impressions and click through rates at the

2    state, metro, county, and zip code level for two different

3    Google ad products.  And VNA suggests that they responded to

4    this already.

5              So what is outstanding on that?

6              MR. STERN:  Sure.  So we have been back and forth.

7    And I don't say that in a -- I don't say that in a negative

8    way.  Just we've gone back and forth with Mr. Kramer about,

9    you know, what we think they still have that our experts say

10   we need.  And I'm just looking for the most recent

11   communication to them.

12             THE COURT:  Do you have all of the data that

13   Mr. McDonald used?

14             MR. STERN:  Yes.

15             THE COURT:  Okay.

16             MR. STERN:  But there's additional data that we don't

17   have.  And it's -- I mean, Your Honor --

18             THE COURT:  Because the response references a Bates

19   range that they have provided without waiving their objections

20   that were produced on March 15, 2023.

21             MR. STERN:  Correct.

22             So I could tell you from 30,000 feet why we believe

23   the affidavit declaration is insufficient.  Number one, it's

24   very nuanced in the words that are used and there's been this

25   like effort to really hone in on geotargeting and how

1    geotargeting is defined by an expert or by counsel for Veolia.

2            Every time there's an issue that comes up about --

3    between us about whether Your Honor said this or Your Honor

4    said that about First Amendment or about relevancy, the

5    fallback position and/or it's their position for defendants

6    is, well, when it comes to geotargeting, dot dot dot,

7    geotargeting dot dot dot.

8            But the reality is is that there's targeting and

9    there's geotargeting.  Google Dynamic ads in and of themselves

10   by definition cannot be used for what they define as

11   geotargeting.  But it can be used for targeting.

12           And there's subtle differences in the way that we're

13   wording this or that it's being presented to Your Honor where

14   only if we chose these words and chose these zip codes is that

15   considered geotargeting.  When in reality, choices to use

16   Dynamic ads can have the same effect but it's done through

17   Google rather than by the person who's selecting in and of

18   itself the words that are used.

19           Notwithstanding that, there is more information that

20   we believe Veolia has as part of its Google account that our

21   experts keep telling us they have to have, they must have.

22           So we transmitted back and forth very specific

23   requests.  Not that you'll find in the fourth RPDs because

24   we're like 10 iterations past what's included in those.  But

25   in emails and letters back and forth about what specifically

```
 1    we need from them that we think they have or we think they can
 2    create.
 3           And in response, we typically hear, well you're
 4    misunderstanding how this works.  We don't have this.  You
 5    can't create this.  It doesn't exist.
 6           So yes, we can provide you with what our experts say
 7    is deficient about that affidavit declaration.  We can provide
 8    Your Honor with what we believe is outstanding that is within
 9    the purview of the defendants that will help our experts be
10    more specific about what they need.  I can --
11           THE COURT:  Well, why don't you do that first.
12           MR. STERN:  Yeah.  Okay.
13           THE COURT:  Because I'd rather get a comprehensive
14    response and know what you believe is missing.
15           MR. STERN:  Okay.
16           THE COURT:  And then hear more globally of what you
17    think happened.  What you know thus far.
18           MR. STERN:  And to respond to Your Honor's query
19    about then what.
20           THE COURT:  Right.
21           MR. STERN:  You know, what do you want from this?  I
22    mean, we'll articulate it in writing.  But two things.  Most
23    importantly, most importantly from this day forward from the
24    day the trial ended forward, the first bellwether trial,
25    fundamentally believe that there are concerns on our end about
```

1   the fairness of a trial, if there's information that's out

2   there in the ether that can be gotten to juries that is

3   inappropriate information to be out there.

4          I respect and appreciate First Amendment rights.  I

5   also respect and appreciate people's rights to a fair trial.

6   And it's not fair for what are generally individuals who are

7   plaintiffs in this litigation and litigations like it.

8          Whether it's class plaintiffs.  Whether it's

9   individual bellwether plaintiffs from a community like Flint

10  or a community like Jackson or a community like Benton Harbor.

11  They cannot have a fair fight with corporations that have

12  unlimited money to spend on reaching the public and reaching

13  the jury pool in an effort -- if it's in an effort to

14  influence the jury.

15         Now, you know, a motion for sanctions was filed

16  months ago about me trying to influence the jury by making

17  comments to a news reporter, you know, subsequent to the

18  trial.  That's fine.  I understand there's a fine line between

19  advocating for your position and responding to inquires from

20  the media and defending yourself or prosecuting your claim in

21  the public.  Because this is a public case.

22         But it's another thing if either I or a defendant is

23  using the tools to reach jurors or a juror pool in a way that

24  makes it unfair and unconstitutional.  And so going forward,

25  if this happens, it would be helpful to know exactly what

1    happened and how so then the Court can craft a mechanism -- I

2    don't have an answer yet because I don't know exactly what

3    happened.

4            But then it would be helpful for the Court to be able

5    to implement something that would make sure that doesn't

6    happen again.

7            In terms of looking backwards at the bellwether

8    trial, I don't know what we would ask for.  But I do know that

9    our firm who prosecuted that case by itself for seven months

10   plus leading up to it spent significant money on a trial that

11   ended in a mistrial.  Whether we had won it, lost it, or a

12   mistrial, it cost significant amount of money.

13           And if that verdict was somehow influenced by

14   something that was not above board, then there's an

15   opportunity potentially to seek that money back for a trial

16   that we tried.

17           Now I'm not suggesting -- I've never said this

18   happened.  I never -- I've said that we want to explore

19   whether it happened.  And when it comes to the combination of

20   looking backward and looking forward, we can't know what to

21   ask for if we don't know what happened.

22           And more than anything, that's what this is about.

23   It's about the next trial and the trial after that and

24   ensuring that everything is above board and fair.

25           THE COURT:  Right.  Okay.  I appreciate that and

```
 1    that's what I want as well is for -- well, I want that the
 2    last trial was fair, but certainly that all future trials are
 3    as well.
 4              And so what I'm very interested in is after learning
 5    what limited universe or what you believe you need in response
 6    to Mr. McDonald for your experts to look at, then getting a
 7    report of what you know so far and what you think should be
 8    done in the future.  I mean, you'll make a motion if you think
 9    there's an appropriate motion for sanctions to be paid or
10    something.
11              MR. STERN:  I'm far more concerned -- far more
12    concerned prospectively --
13              THE COURT:  Me, too.
14              MR. STERN:  -- than retrospectively.  Like this is
15    not a kamikaze mission to be reimbursed for expenses.  This is
16    about protecting the fundamental right to a fair trial both
17    ways.  I would hope that if anyone on the other side suspected
18    me of trying to influence juries or a jury pool that they
19    would be undertaking the same discovery.  And in fact, they
20    did --
21              THE COURT:  They did.
22              MR. STERN:  Yeah.  So like the idea that this is
23    crazy --
24              THE COURT:  Nobody's saying that.
25              MR. STERN:  Not from Your Honor.  Not from Your
```

```
 1    Honor.  But we had a -- I take very serious -- I don't want to
 2    relitigate that motion.
 3          But you know, if someone files a motion for sanctions
 4    against me, mentions my name in it, you know, I've got future
 5    clients that are going to Google my name.  I've got future
 6    clients that are going to look up dockets that I've been a
 7    part of.  I've got clients that currently have other options
 8    in other cases besides me.
 9          And I take very, very seriously when someone accuses
10    me of wrongdoing.  And I know that they would not have done
11    that unless they took it seriously the right to a fair trial
12    prospectively and retroactively as I do.  And all we're trying
13    to do is to get there.
14          We've had conversations about -- you know, their
15    expert has provided an opinion.  We have yet to have an expert
16    provide an opinion that says someone has done something wrong
17    even in the one affidavit that I submitted in conjunction with
18    a response to a or a reply to a motion to compel.  I never
19    asked an expert to or had an expert say they did this.  The
20    expert simply educated me and hopefully the Court a little bit
21    about a specific issue.
22          THE COURT:  Right.
23          MR. STERN:  So again, I'll get off of that.  I will
24    say, though, that a lot of these requests are not about -- are
25    not just -- so there's two separate things here.  There's
```

1    the --

2              THE COURT:  Absolutely.

3              MR. STERN:  Okay.  All right.  Yeah.

4              THE COURT:  So let me --

5              MR. OLSEN:  Your Honor, may I respond?

6              THE COURT:  Sure.

7              MR. OLSEN:  Your Honor, I think the question you're

8    asking is an important one that needs to get addressed

9    whenever we get the submission from Mr. Stern.

10             As Mr. Stern says, as he sits here today after months

11   and months and months of this discovery where we have produced

12   a massive amount of data and analytical information, he's not

13   saying that any jurors were targeted.  And so if his experts,

14   the three of them, or anyone else has any evidence that VNA

15   did anything to target jurors, I'd like to see it.  We haven't

16   seen any evidence.

17             Instead we've produced Google reports showing where

18   and how the ads appear down to the zip code.  We produced

19   every user --

20             THE COURT:  I know that.  I have that.

21             MR. OLSEN:  -- string that triggered one of those

22   ads.  And at the end of the day, after you produce all of that

23   data, what the data shows as the declaration you referenced

24   explains, is that jurors weren't targeted.

25             I'll just give you one example.  If you look at those

1    ads and take Ann Arbor zip code, the zip code for the

2    courthouse, I think since the ads started running in 2016, I

3    think it's something like a total of 16 people clicked on one

4    of those ads.

5         By contrast, there's probably tens of thousands of

6    people in that zip code who have read or heard media accounts

7    regarding the Flint Water Crisis through MLive.com or others.

8    MLive has 3 million readers per month.

9         And so to suggest that there was some campaign to

10   target jurors without any evidence demonstrating that, we just

11   don't think makes any sense.  And so we think at this point,

12   you're exactly right.  Somebody needs to explain where the

13   evidence is that jurors were targeted.  Because I've seen

14   zero.

15        THE COURT:  And Mr. Olsen, there's sort of two -- I

16   think targeting might even be the wrong word at this point.

17   Because what I read from Mr. McDonald is that the use of that

18   did not happen in the Google advertising that VNA was

19   purchasing.

20        But I'm interested in -- we have a jury venire that

21   will be pulled from five counties surrounding Washtenaw County

22   where the Court is located.  And if a juror who learns that

23   they're being summonsed to fill out a questionnaire in the

24   Flint Water Case -- well, they wouldn't learn until they get

25   here.

```
 1            When you fill out that questionnaire, you're told not

 2    to Google -- not to do any search about the Flint Water

 3    Crisis.  But a family member does or they do.  I mean, they

 4    definitely are going to go home and know that they are a

 5    potential juror in the next trial.

 6            And if they -- if the area is then saturated in some

 7    way, not targeting them, but it's saturated, I would want to

 8    know that.  I'd want to sort out is that something that can be

 9    limited or should be limited or not consistent with commercial

10    speech rights.

11            MR. OLSEN:  And Your Honor, I think I agree as part

12    of the voir dire process in the Class trial and Bellwether

13    III.  We absolutely need to do that during pretrial screening

14    and voir dire.  Because the much, much, much more voluminous

15    media coverage of the water crisis than anything we're talking

16    about now certainly could have created biases in certain

17    potential jurors.

18            And I absolutely agree with Your Honor that that

19    should be part of the jury vetting process to whatever source,

20    whatever they're seeing about the water crisis.  To the extent

21    that created any biases, we should uncover them and address

22    them in the voir dire process.

23            But my point is simply the notion that VNA was

24    targeting or trying to improperly influence any jurors.

25    There's just zero evidence that happened.  It didn't happen.
```

1        And so at some point, this discovery, which doesn't

2   have anything to do with the claims or defenses in the case,

3   has to end.  But we will respond to whatever Mr. Stern submits

4   and we will take it from there.

5        MR. STERN:  I had a judge recently tell me, Mr.

6   Stern, you don't want to take defeat from the jaws of victory.

7   You know, I kept arguing something and he was clearly leaning

8   a different way.  And I would like now to -- it feels like

9   this is a good development for Veolia because Your Honor is

10  asking us to bring this to a head to a point where you have a

11  better understanding of what we need or what we don't have and

12  what the purpose of all this is and where we go from here.

13  And I appreciate that and will do it.

14       But when we're advocating for things and we use words

15  like months and months and months of discovery, much of the

16  months and months of discovery have been fighting over not

17  giving certain things.  When we talk about massive amounts of

18  documents, that's in the eye of the beholder.  I mean, they

19  haven't given us mass amounts of anything.

20       THE COURT:  Well, Mr. Stern, what I'm trying to do is

21  tell you what I need to sort this problem out.

22       MR. STERN:  Sure.

23       THE COURT:  A problem has been brought to my

24  attention.  An issue has been brought to my attention.  I

25  haven't made any decision about what happened or didn't

```
 1    happen.  But I've been able to figure out that I need an
 2    overview of where we are now.  That's how much I can figure
 3    out.
 4              MR. STERN:  Understood.
 5              THE COURT:  So what we'll start with is sort of a
 6    laser focus on what your experts need in response to
 7    Mr. McDonald.  And I think you've said it's generally in the
 8    fourth amended request for production.  But you've gotten
 9    beyond that.
10              So how much time do you need to submit that?
11              MR. STERN:  If we could have until -- I'm just
12    looking at my calendar.  I would say two weeks but I would
13    prefer to do it on a Monday.
14              THE COURT:  Okay.
15              MR. STERN:  Always, so I have the weekend.  So if
16    possible, can we have until Monday June 5?
17              THE COURT:  Sure.
18              MR. OLSEN:  And Your Honor, at least with respect to
19    one of those issues as Mr. Stern referenced, I think there's a
20    disconnect between our expert and his experts where our
21    experts tell us the information simply isn't available for a
22    period of time on the zip code data.  There may be another
23    issue where we also don't think the information is available.
24              And I think Mr. Stern's view is his experts are
25    telling him something different.  That the offer that we made
```

1    to Mr. Stern to the meet and confer I'll make now as well.  If
2    the experts -- and we can participate in facilitating this --
3    want to have a conversation where Mr. Stern's experts explain
4    why we think we can get data that we don't think we can, we'd
5    be happy to hear that.  And if we can get access to
6    information that we can't get, then we'll try to get it.
7           But what our expert is telling us is that some of the
8    additional requests that Mr. Stern has asked us for can't be
9    provided.  And to the extent that's wrong, we'd be happy to
10   hear why that's wrong.
11          THE COURT:  Okay.  So why don't we start with this,
12   which is that Mr. Stern will send those requests to you on the
13   5th.  And you'll respond by the 19th of June.
14          MR. OLSEN:  Okay.
15          THE COURT:  And then let me know at a certain point
16   that you've had a meet and confer following that if you need
17   court intervention on the request.
18          MR. STERN:  So I'm a little confused, Judge.  So are
19   you wanting -- are you wanting us to provide the Court with an
20   overview?  Or are you wanting us to provide everything we
21   believe we still need to the defendants?
22          THE COURT:  Starting with what you need first,
23   because I don't want an incomplete overview.
24          MR. STERN:  Okay.  Understood.
25          THE COURT:  I don't know when our next conference is

1   in July.  But for the first conference in July, I think it

2   might be the 12th.  I've got it -- at least I've got a hold on

3   the calendar for Wednesday July 12 at 1:00 PM.  I would be

4   happy to address anything that's outstanding at that point.

5   And if the experts can talk to each other, that often is very

6   helpful.

7           MR. STERN:  Your Honor, on July 12 I'm going to be

8   unavailable.  If it's possible to do the following week, I

9   would very much appreciate it.  It's the one week out of the

10  --

11          THE COURT:  No, that's fine.  The 19th I think is

12  available.  It is.

13          Mr. Olsen, that works for you?

14          MR. OLSEN:  I'm checking right now.  I think so, Your

15  Honor.  Just give me one moment.  I am available on the 19th.

16          THE COURT:  Okay.  We'll shoot for -- does that work

17  for you, the 19th does?  Mr. Stern, you started with that.

18          MR. STERN:  Yes.

19          THE COURT:  Okay.  So then we'll go from there.  And

20  if you don't need me to be involved in that, then just please.

21  It won't hurt my feelings.  I'll then use that time otherwise

22  and we can set a schedule for getting the overview and

23  response to that.  So but we'll take this one step at a time.

24          So the other issue that is on the agenda for today

25  relates to what I'm calling Bellwether I or Bellwether III

1    count -- well, Mr. Stern's request for production of documents

2    related to substantive evidence regarding the professional

3    negligence claims against VNA.  That he has indicated flowed

4    from information that was revealed at the trial that indicated

5    that there were potentially communications or evidence that

6    would have been dated after January of 2017.

7            Do I have that correct, Mr. Stern?

8            MR. STERN:  Yes, Your Honor.

9            THE COURT:  Okay.  And as I went through all of these

10   requests, there were footnotes particularly on the first

11   amended request.  And the footnotes would say that this

12   request is made based on evidence introduced at the Bellwether

13   I trial and is not exclusively related to and sometimes it

14   says if at all Veolia's digital advertising campaign.

15           So what I need to know, what would be helpful to me

16   is to know more about those requests.  There is no magic date

17   of January 2017 for when substantive evidence related to

18   professional negligence might have -- might exist.  So I think

19   we just clear that out of the recesses of our thought process

20   and get rid of that date at this point.

21           But I still need to have articulated the good cause

22   what is it that you're looking for.  Because those particular

23   requests are seeking -- let me just go to one.  Like, for

24   example, I'm just randomly -- I've gone to request number 33.

25   And this says that this request is based on evidence

1      introduced at Bellwether I and is not exclusively related to,

2      if at all, Veolia's digital media campaign.

3             But then it's seeking messages, chat logs, and emails

4      to or from Karine Rouge.  And it has 20 or so topics.  And VNA

5      indicates that she was not employed by VNA until February 23

6      of 2022.

7             So I'm not able to discern why this person would have

8      substantive evidence regarding professional negligence.

9             MR. STERN:  So first, Your Honor, as an initial

10     matter.  You're looking at the RPDs.

11            THE COURT:  Yes.

12            MR. STERN:  And the footnotes associated with that.

13     When it came to the post 2017, January 2017, there's a letter

14     that we sent to Veolia from May 5 that narrows even further

15     those requests.

16            THE COURT:  Okay.

17            MR. STERN:  And so they're substantially similar but

18     there's less of them.  And I'm not treating these and I've

19     explained to Veolia that it's not my intention for this to

20     serve as a request for production of documents.  This was in

21     line with Your Honor's direction last meeting where you said

22     to narrow it and to let them know what topics you're seeking.

23            I can go through each of these individuals but

24     probably don't need to.  But if you look at paragraph 1, it's

25     all text messages, chat logs, emails, or other communications

1    just like what you were reading from first RPDs and first

2    amended RPDs.

3             THE COURT:  Right.

4             MR. STERN:  I don't think there's any question about

5    Marvin Gnagy's knowledge of, you know, the work in Flint.  I

6    don't think there's any question about Rob Nicholas, about

7    Depin Chen, about David Gadis, about William Fahey, about

8    Joseph Nasuta.  Those were all people directly involved in the

9    project.

10            THE COURT:  Right.

11            MR. STERN:  Brian Clarke was obviously somebody with

12   information because he was going to be Veolia's first witness

13   that they were going to call to trial so he must have some

14   information.  And his name is on hundreds if not thousands of

15   documents.  And so I don't think there's an issue as to him.

16            When we get to Frederic Van Heems, he is the

17   president and CEO of Veolia.  But he has, I believe, worked

18   there as the director of their -- he's been there for a long

19   time.  And we know with certain --

20            THE COURT:  And when you say Veolia, you're talking

21   about the Veolia defendants in our litigation?

22            MR. STERN:  He is the president and CEO of Veolia

23   North America.

24            THE COURT:  Okay.

25            MR. STERN:  Now he has worked in the past at Veolia

1    Environment, which is the French company.  But now he is the

2    president and CEO of VNA.

3            THE COURT:  Okay.

4            MR. STERN:  More than anybody, I'm interested in him.

5    Because previously, as Your Honor has heard for months, Veolia

6    has no control over the French company.  Veolia can't compel

7    them to do anything.  There's criminal statutes that matter.

8            THE COURT:  Right.

9            MR. STERN:  But if this person now works for VNA and

10   currently has information about what was being communicated

11   within VNA in his role as president and CEO of Veolia North

12   America dating back to 2015, dating back to 2016, dating back

13   to 2018, I think it's completely acceptable to find out what

14   information he has now despite the fact that at that point in

15   time he was working for the French company.  At least that's

16   what we would put forward.

17           As to Denis Chesseron, he's the Executive Vice

18   President of Finance and Procurement.  But prior to that, he

19   was in Veolia's water division and became their Financial

20   Controller in 2012 and served as Deputy Financial Officer in

21   --

22           THE COURT:  Okay.

23           MR. STERN:  Yeah.

24           THE COURT:  Okay.  So VNA responds that these are not

25   encompassed in any document request previously served.  So I'm

```
 1    not concerned about that because you can put these in the form
 2    of a document request.  That's not my concern.
 3            Their second response is that you have not
 4    articulated good cause for reopening discovery.  And that's
 5    what I want.  I see the list here.  I understand now that this
 6    is narrowing the earlier ones at my request.  But I don't see
 7    the articulation of good cause other than it's based on
 8    Bellwether I trial.  And I think more is needed to articulate
 9    the cause.
10            MR. STERN:  Do you want me to try to do that now or
11    would you like me to put something further in writing?
12            THE COURT:  If you can do it now, we can make
13    progress here.
14            MR. STERN:  Sure.  So I will pull out -- I'll go down
15    the list A through L.  And we've had meet and confers about
16    this.
17            Obviously Veolia's work in Flint was the subject of
18    the Bellwether I trial and is the subject of the entire
19    litigation as it pertains to Veolia.  I could have more
20    narrowly described that as I did in B with Veolia's proposed
21    scope of work in Flint.
22            We know that there are documents that discuss the
23    scope of work up until January 1, 2017, because that was the
24    cutoff date that Veolia was operating under with regard to
25    producing anything to us.
```

```
 1              We also know that this was one of the major themes at
 2      trial.  It was one of the major concepts that Veolia's experts
 3      testified about and utilized as a foundational piece for their
 4      argument that Veolia did not violate the standard of care.
 5      Because in this instance, they were well within their scope of
 6      work.  And it would have been a violation to go outside the
 7      scope of work is what some of their experts have said.
 8              We also know now, based on documents that have been
 9      produced, that the defense strategy or strategies related to
10      the trial and related to what would be said publicly post
11      being sued first by the Attorney General's office and then by
12      a number of plaintiffs over the course of years was a scorched
13      earth strategy that was suggested by public relations folks
14      and adopted by Veolia.
15              That's not -- there's nothing wrong with that.
16      That's their right to take on whatever strategy they choose
17      that's in the best interests of their clients.
18              But if there are now communications that have
19      occurred subsequent to January 1, 2017, between or amongst any
20      of the folks referenced in the preceding paragraph about the
21      scope of work that contradicts what the defense has been since
22      the minute an answer was filed and since the minute the
23      website was established and throughout that period of time
24      including and through trial, we should have every opportunity
25      to see if Rob Nicholas or Depin Chen or David Gadis or Bill
```

1    Fahey or Joe Nasuta take issue with the idea that the scope of

2    work somehow limited what they were supposed to be doing when

3    it came to lead or red water or any of those things.

4          And we have not been privy to any documents about

5    what these individuals believe to be true about their scope of

6    work pretty much past the point where they got sued.

7          I'll move down to --

8          MR. OLSEN:  Your Honor, before --

9          THE COURT:  Let's get a response.

10         MR. OLSEN:  Yeah.  Before we hit all the topics,

11   we're making a different point.  And by the way, I disagree

12   entirely with Mr. Stern's characterization of -- I don't

13   really understand what strategy he's describing, but I don't

14   think that was accurate.

15         But in any event, my point isn't that the scope of

16   work that Flint -- that was going on in Flint for VNA is

17   relevant.  That's not my point.

18         My point is that Your Honor articulated to show good

19   cause that we were going to get narrowly tailored follow-up

20   requests based on things that were learned in the Bellwether I

21   trial where we thought there were additional documents or

22   communications related to relevant topics so we don't go

23   searches for things that there's no reason to think exists

24   five, six, seven, eight years later.

25         There has to be some proportionality in discovery.

1    So Mr. Stern used a couple of examples in the last hearing.

2    He said, well, there is testimony around crisis management and

3    I want to issue some follow-up requests with respect to crisis

4    management.  Or there was something with respect to

5    Ms. Walter's test results and I want to issue a follow-up

6    request with respect to that.

7        Well, we've asked throughout this meet and confer

8    process -- we don't think that's what the testimony was.  But

9    point to us, show us why you think that there's additional

10   documents that exist that are relevant to any of these topics.

11   And what we get is produce everything for the eight or nine

12   years after your work was done relating to these extremely

13   broad topics that you see in that letter.  And that violates a

14   proportionality requirements in discovery.

15       If there is a reason to think from the documents Mr.

16   Stern has seen or the testimony in Bellwether I that a

17   follow-up request from Gnagy or anyone else related to

18   Walters's test results based on something we saw in the

19   record, we're not saying we won't do that.

20       What we're objecting to is opening up discovery for

21   another six or seven years after your cutoff and eight or nine

22   plus years after all of the work was done when we have no

23   reason to think those are relevant documents for a host of

24   custodians many of whom didn't begin in the company until

25   years later.

1          That is a fishing expedition that is completely

2     disproportional to the needs of discovery.

3          THE COURT:  Okay.  I'm beginning to think that what

4     we should do is chop this in half.

5          Is what you're saying, Mr. Stern, that during the

6     trial you learned that following VNA's departure from Flint,

7     their work was done, they've left.  By now it's 2017.  People

8     are back at their offices sorting out the response.  That

9     something in that response that Mr. Gnagy, Nicholas, Chen,

10    Gadis, Fahey, and Nasuta who testified at trial, that there

11    may be documents from those trial witnesses that are

12    reflecting on their work in Flint or that would be relevant

13    for just those?  Let's not get to Van Heems and Chesseron.

14         MR. STERN:  Yes.  But I would also include Matt Demo

15    in that because he was the original person whose -- I believe

16    and Veolia can correct us if -- correct me if I'm wrong.  But

17    I think he was the individual who was the point person on the

18    Flint job or procured the Flint job from the business

19    development standpoint.

20         And then ultimately it was Rob Nicholas who did a

21    significant amount of work.  But he was instrumental in

22    obtaining the work is what I believe to be true.

23         THE COURT:  But he didn't do the work.  I mean, I

24    know you had a theory that, well, this was going to be an

25    upsell situation where they -- VNA would take a small contract

1   and then promote themselves through that work as potentially

2   being available to --

3           MR. STERN:  Right.

4           THE COURT:  -- come in and run.  But even -- okay.

5   Demo --

6           MR. STERN:  That's fine.  You can leave him out.

7           THE COURT:  I would leave him out right now.  Because

8   these are actual people who were witnesses and were present

9   for the work.  And it wouldn't -- I would have a level of

10  confidence that it's different from the other topic that we're

11  talking about right now.

12          I mean Carrie Griffiths and Karine Rouge, they're the

13  digital media people you're interested in, correct.

14          MR. STERN:  Carrie Griffiths is a public relations

15  person for Veolia.  And she's one of the few people I was able

16  to depose subsequent to the trial.  Karine Rouge was at trial.

17  She sat in the back of the courtroom and coughed and Your

18  Honor asked her about COVID.  And she had a very strong

19  interest in the trial as the newly appointed chief executive

20  officer for municipal water.

21          But respectfully, she is in a different category from

22  those of Depin Chen, David Gadis, Fahey, Nasuta, Nicholas.

23  Yeah.  I may have said him twice like I show his emails a lot.

24          THE COURT:  Okay.  Mr. Olsen, I'm inclined to grant

25  the request at this time for those individuals based on the

```
 1    articulation Mr. Stern has made.  Are there certain areas here
 2    that you think in the A through L?
 3              MR. OLSEN:  Well, I would take Mr. Stern up on his
 4    offer that he made today and at our meet and confer, that he
 5    would actually issue document requests.
 6              THE COURT:  Yes.
 7              MR. OLSEN:  With respect to those individuals.  We
 8    will object or not.  There may be certain things.  Certainly
 9    if they're narrowly tailored, there may be certain things we
10    can search for and provide.  If they're extremely broad, we'll
11    meet and confer and then bring that up to our attention where
12    we can articulate why we think some of it is or some of it
13    isn't appropriate.
14              THE COURT:  Okay.  Let's do that in a slightly
15    expedited without the full 30 days.  Because you've had this
16    issue percolating here for quite a while.
17              So Mr. Stern, when can you put these in a request for
18    production of documents?
19              MR. STERN:  By close of business Friday.
20              THE COURT:  Okay.  And then I'd like it if you can
21    respond by Wednesday May 31, Mr. Olsen.
22              MR. OLSEN:  Okay, Your Honor.
23              THE COURT:  That's a week and a half.  And then there
24    will be a meet and confer.  But please with an eye to what
25    you're saying, that if you can provide these documents, that's
```

1     just the way to go here.

2              You have lodged a lot of objections and you can lodge

3     them again.  But notwithstanding your objections, I would

4     encourage you to do what you can to provide these documents.

5     Remind me what you just said Mr. Chesseron's job is.

6              MR. STERN:  Sure.  I apologize.

7              THE COURT:  That's all right.

8              MR. STERN:  He is the Executive Vice President of

9     Finance and Procurement and the Chief Financial Officer right

10    now.  But in 2005, he joined Veolia's --

11             THE COURT:  2015.  Oh, you're saying he joined them

12    in '05?

13             MR. STERN:  In '05 he joined the water division and

14    then became the Financial Controller in 2012.  And was the

15    Deputy Financial Officer through 2020 and then was promoted.

16             MR. OLSEN:  And I don't believe was involved in any

17    of the underlying work in Flint.

18             THE COURT:  Do you have him involved, Mr. Stern, in

19    Flint?

20             MR. STERN:  I don't know.  I don't know if he is or

21    not.  I mean, I'm more than grateful --

22             THE COURT:  How about send an interrogatory asking if

23    he was involved.

24             MR. STERN:  Okay.  I'll do that for the others.

25             THE COURT:  For the others.

```
 1              MR. STERN:  But as to Matt Demo, I actually think
 2    there was some testimony at trial that he was present during
 3    the February 18 public meeting where there's a transcript and,
 4    you know, safe means safe whatever.  I could be wrong about
 5    that.  But I don't think he was just in at the beginning and
 6    had nothing to do with this and had no connection whatsoever
 7    to the project once it actually started.
 8              THE COURT:  Okay.  Then I'll include him with the
 9    first batch that you're going to put into a request for
10    production by Friday.
11              MR. STERN:  And just so I'm certain of who I'm
12    including, it's Mr. Gnagy, Nicholas, Chen, Gadis, Fahey,
13    Nasuta, Clarke, and Demo?
14              THE COURT:  Yes.
15              MR. STERN:  Okay.
16              THE COURT:  And we still have the issue of the
17    privilege logs.
18              MR. STERN:  May I ask one other thing about this
19    letter, Judge?
20              THE COURT:  Sure.
21              MR. STERN:  If you look at 2 through 6 on page 2, so
22    one of the -- one of the obligations pursuant to the Case
23    Management Order and the discovery protocol is to show
24    discovery that's being propounded not just to the parties
25    involved in the actual discovery, but to everybody else.
```

```
 1              And so a couple of these requests remain mine.  And
 2    there are other requests on here that were provided to me as
 3    in light of Your Honor's previous conference that I include as
 4    well.
 5              THE COURT:  Right.
 6              MR. STERN:  And so I do think that these can and
 7    should be included in the RPDs that are going to be issued.  I
 8    will concede as to item 2, Veolia counsel has represented to
 9    us prior to 2017 when these requests were made and subsequent
10    that there are no such documents.
11              THE COURT:  I saw that.
12              MR. STERN:  And I take them at their word.
13              THE COURT:  Yeah.
14              MR. STERN:  So that's not there.  But documents
15    related to the reestablishment of a passivation layer in
16    service lines, that is a new request.  But I don't think
17    there's a prerequisite for there having been a previous
18    request in order to request documents that now may be relevant
19    to the current or current Class trial or future bellwether
20    trial.  I guess they're both future trials.
21              Same with items 4, 5, 6, and I would at least ask the
22    Court permission to serve those requests.  Obviously Veolia
23    can and likely will lodge objections to those requests, you
24    know, just based on past experience and their obligations to
25    their client.  But I don't think there's anything that would
```

1    prohibit us from including those in the RPDs unless Your Honor
2    thinks that we should not.
3            THE COURT:  No.  And that's the whole point is that
4    you've articulated a basis for seeking this information.  And
5    it is a valid basis, so.
6            MR. STERN:  Okay.
7            THE COURT:  So no, they should not be self censored
8    out.
9            MR. STERN:  Okay.
10           THE COURT:  So turning to the privilege log, where
11   are we with that?
12           MR. STERN:  So as an initial matter, it should be
13   noted that these documents that have been designated as
14   privileged, not produced, or produced with redactions before
15   challenging it, these were all documents associated with
16   discovery that for the most part occurred before the
17   bellwether trial.
18           So this is not -- this is not some new -- granted,
19   we're challenging it now in advance of the next two trials.
20   But this is not new discovery.  So whatever the arguments have
21   been about, you know, it needs to be proportional, all those
22   things, this is discovery that was previous requested.
23           There are three -- and we provided the Court with our
24   initial letter to Veolia --
25           THE COURT:  Right.

1        MR. STERN:  -- that challenged, you know, sort of

2   three buckets of documents.  And then Veolia responded.  And I

3   included the email from Ms. Dupre to us, which was in response

4   to our email to them.

5        And number one, there are, we believe, a number of

6   documents that we've identified that are simply between people

7   who don't include lawyers that have been marked as privileged.

8   We believe that there are documents between lawyers -- between

9   individuals that do include -- that do include lawyers but

10  also include third parties which we believe would break the

11  privilege.

12       And we have not yet seen from Veolia, other than

13  they've provided us with 200 documents, 70 of which appear to

14  be un-redacted documents that we have not seen before.  And

15  then 130 or so additional documents that were heavily

16  redacted.

17       We don't know what they've done to determine what

18  they did produce and what they didn't produce.  We continue to

19  maintain the challenge that we have for all of the documents

20  as articulated in the letter.

21       I will concede that this issue of Bates numbering and

22  that there's groups of documents where we've only received a

23  few from the groups, that's no longer an issue.  That was a

24  mistake in terms of how an Excel spreadsheet was taken from

25  one party and transposed by another party.

1           But the same issues of privilege, the same legal
2    issues that were articulated in our communication to Veolia
3    and then their communication in response to us, those issues
4    still exist.
5           And we have no explanation or understanding as to how
6    a determination was made that a 1,700 or 1,500 documents, not
7    including duplicates, 200 were chosen to be produced either
8    with heavier redactions or in full, while 1,300 or 1,400 were
9    not.
10          And so we believe and I think Veolia is going to say
11   they'd like to brief it and they'd like to flesh out all the
12   legal issues with Your Honor, we think the legal issues are
13   laid out in the communications back and forth.  And at some
14   point in time based on experience and time, these documents
15   are likely going to need to be reviewed by somebody for the
16   purpose of determining whether these designations are
17   appropriate or are appropriate in full.
18          And I don't want to add more work to anyone's ledger.
19   I don't want to add more work to my own ledger.  But I don't
20   see a scenario where in light of the law that we've cited and
21   the challenges we've made, and in light of the limited
22   documents that have been produced, that in order to determine
23   this issue, the Court will have to see these documents to
24   understand why they're being challenged and to understand why
25   they continue to maintain certain privileges in conjunction

1    with those documents.

2         And so I would like to short circuit it and not get

3    into 30 days, 60 days, 90 days of briefing oral arguments.  I

4    know that the Class trial has been moved to February, despite

5    me wishing it wasn't.  I know that that means that the

6    Bellwether III trial is going to be moved, despite me wishing

7    it wasn't.

8         But we're still a lot closer to those trials than

9    most of us probably realize.  Because as someone who tried a

10   case in February, I remember what I was doing the May and June

11   before February and it was preparation for the trial in

12   February.

13        So the sooner we can get to a place where the Court

14   can see these documents, I think the better it is for both

15   parties to spend their time on some other things.

16        THE COURT:  Thank you.  Mr. Olsen.

17        MR. OLSEN:  Yes, Your Honor.  I think Mr. Stern is

18   suggesting we just dump over a thousand documents on the Court

19   for in camera review.  I think that we can probably do it a

20   little more efficiently than that.

21        As Mr. Stern just said, I think the chief substantive

22   issue where we disagree is that plaintiffs believe that if

23   there's a VNA document that may contain work product or

24   attorney-client privilege communications that goes to a third

25   party PR consultant, that that somehow waives or blows the

1   privilege and we don't agree.

2          And maybe we can brief that issue, get some guidance

3   from the Court, and then that may short circuit this debate

4   between VNA and Mr. Stern and his team before we dump over a

5   thousand documents on the Court for an in camera review.

6          THE COURT:  Well, here's an idea, which is that there

7   are categories of documents here in terms of at least what Mr.

8   Stern has raised.  He has indicated that there are documents

9   that he believes may not be privileged that are copied to a

10  lawyer, that are not for the purpose of legal advice.

11         There are documents that, like you just said, that

12  may have -- would otherwise be privileged that are sent to a

13  third party.

14         Is there a third category?

15         MR. STERN:  I think there's -- yes, there is.  So

16  there's --

17         THE COURT:  What was it?

18         MR. STERN:  I think Ms. Daly may be able to say it

19  better than me, but I'll try.  There are documents that do not

20  include lawyers.

21         THE COURT:  Right.  Okay.

22         MR. STERN:  Yeah.  There are documents that do

23  include lawyers but also include third parties.  And then

24  there are, I don't know, Melanie, what am I --

25         THE COURT:  There are documents with lawyers copied

```
 1   that are not seeking legal advice.
 2             MS. DALY:  Yes.
 3             MR. STERN:  Yes, exactly.
 4             THE COURT:  So what I'd like to do is get some
 5   representative samples of those submitted that I can just
 6   begin to take a look to get a sense of what are we talking
 7   about here.
 8             MR. OLSEN:  We can provide those to the Court, Your
 9   Honor.
10             THE COURT:  Okay.
11             MR. STERN:  I'm concerned about which ones are chosen
12   to be provided --
13             THE COURT:  Well, you're going to get to that.  We're
14   going to do the bellwether selection process.  So Mr. Stern
15   pick some and Mr. Olsen pick some and send them.
16             MR. STERN:  Okay.
17             THE COURT:  But I'd like them -- Mr. Olsen,
18   ultimately I think they should come from you.  Obviously they
19   have to.
20             MR. STERN:  Yeah.
21             THE COURT:  But I have to be able to read them.  So I
22   don't know what format these documents --
23             MR. OLSEN:  I suspect we -- I think it's just the
24   privilege issue and not any kind of proprietary issue.  So I
25   suspect we would give them to the Court in an un-redacted form
```

1    so you can review them.

2              THE COURT:  Okay.  So a PDF or something.

3              MR. OLSEN:  Yes.

4              THE COURT:  Okay.  And the issue of what would

5    otherwise be attorney work product or privilege that involves

6    an expert, I could use some kind of letter brief on that.

7              MR. OLSEN:  A third party or --

8              MR. STERN:  I think most of these that involve third

9    parties, the third party is a public relations group, not an

10   expert.

11             THE COURT:  Oh, okay.

12             MR. OLSEN:  And maybe we can just give you five pages

13   on that, Your Honor?

14             THE COURT:  Sure.  Do you want to give me some pages

15   on that, Mr. Stern?

16             MR. STERN:  Sure.  Are we doing single spaced, double

17   spaced?  I mean, five pages is fine.  I just want to make sure

18   we're on the same page.

19             THE COURT:  Yeah.

20             MR. STERN:  No pun intended.

21             THE COURT:  Mr. Olsen, do you want to set forth --

22             MR. OLSEN:  I'm not going to be the one writing it,

23   Your Honor, so I hate to handicap them.  But I don't know.

24   Five pages double spaced unless somebody sends me a nasty

25   email in the next 30 seconds.

```
 1              THE COURT:  Double spaced.  Let's do double spaced.
 2              MR. STERN:  14 point or 12 point?  Mike, what do you
 3    want?
 4              MR. OLSEN:  Why don't we go with 12 point, Corey.
 5              MR. STERN:  There you go.
 6              THE COURT:  There you go.  Okay.  All right.  And
 7    when can I expect to get that?
 8              MR. OLSEN:  Can I have two weeks, Your Honor?
 9              THE COURT:  Sure.
10              MR. STERN:  So in the meantime, you would like us to
11    provide a bellwether selection from each of the three buckets
12    for an in camera review while we work on the communications
13    related to this particular issue.  And how many from -- how
14    many documents would you like total for each bucket?
15              THE COURT:  Maybe 20 from each.  You each pick ten.
16              MR. STERN:  Okay.
17              THE COURT:  But I'm hoping not to get an email that
18    somebody says yes.  And that's one document.  Then the very
19    same email and someone else says no.
20              MR. STERN:  So for us, it's a little bit difficult
21    because we don't know what the documents say.
22              THE COURT:  Yeah, you won't know.  Right.
23              MR. STERN:  We just know how they've been described.
24    So we don't --
25              THE COURT:  And it's okay.  If I get email threads,
```

```
 1    that's fine.

 2             MR. STERN:  And do you want us to submit those or to

 3    provide -- do you want the Veolia defendants to provide those

 4    to you within that same period or sooner?  I don't think that

 5    would take nearly as long as --

 6             THE COURT:  Yeah.  Why don't you try to get those to

 7    me a week from today.

 8             MR. STERN:  No problem.

 9             THE COURT:  Okay.  Anything else at this time?  Okay.

10    Thank you, all.  Take care.

11                        (Proceedings Concluded)

12                   -              -              -

13

14              CERTIFICATE OF OFFICIAL COURT REPORTER

15        I, Jeseca C. Eddington, Federal Official Court

16    Reporter, do hereby certify the foregoing 49 pages are a true

17    and correct transcript of the above entitled proceedings.

18    /s/ JESECA C. EDDINGTON____                   05/19/2023
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR         Date
19

20

21

22

23

24

25
```