EXHIBIT 9

1          UNITED STATES DISTRICT COURT

           EASTERN DISTRICT OF MICHIGAN

2               SOUTHERN DIVISION

3    _____

4                                No. 5:16-cv-10444

     IN RE:  FLINT WATER CASES     Hon. Judith E. Levy

5                                Mag. Mona K. Majzoub

     _____

6

7

8

                   HIGHLY CONFIDENTIAL

9        VIDEOTAPED DEPOSITION OF MARVIN GNAGY

10                      VOLUME I

11             Thursday, December 12, 2019

                    at 9:05 a.m.

12

13

14   Taken at:  Weitz & Luxenberg PC

                3011 West Grand Boulevard, Suite 2100

15              Detroit, Michigan  48202

16

17

18

19

20

21   REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

22            GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24

Highly Confidential - Marvin Gnagy

```
 1   Mr. Nicholas; is that right?

 2          A.    I -- again, I don't recall who I

 3   sent it to.  It could have been Rob.  It could

 4   have been somebody else within the business

 5   department, business development -- excuse me.

 6   The business development department.

 7          Q.    Well, we can see from the e-mail

 8   chain at the top of the page that Mr. Nicholas

 9   got it, right?

10          A.    It appears to be so, yes.

11          Q.    You don't know if he got it from

12   you?

13          A.    He may have gotten it from other

14   sources as well.  I don't know.

15          Q.    All right.  You said the RFP

16   mentioned THM issues.

17                Do you know if it mentioned other

18   issues as well?

19          A.    I don't recall.  I haven't seen

20   the RFP for quite some time.

21          Q.    Who was your client on the Flint

22   project?

23          A.    Our client was the city of Flint,

24   Michigan.
```

Highly Confidential - Marvin Gnagy

```
 1          Q.    Would you agree that your job was

 2   to provide the city with the best technical

 3   advice you could?

 4          A.    Yes.

 5          Q.    And it was your job to provide the

 6   city with the best technical advice you could

 7   even if some individuals at the city didn't like

 8   it, wasn't it?

 9          A.    That's correct.

10          Q.    So if some individuals in the city

11   didn't want to switch back to Detroit water,

12   that wouldn't be a basis to not include the

13   possibility of switching back to Detroit in your

14   recommendations, would it?

15          A.    In the discussions of scope of

16   work, we were told not to include that.  We were

17   to look at THM issues and red water occurrences.

18          Q.    Again, that wasn't my question,

19   was it?

20          A.    I answered your question.

21          Q.    No, you didn't.

22                My question was:  So if some

23   individuals in the city didn't want to switch

24   back to Detroit water, that wouldn't be a basis
```

Highly Confidential - Marvin Gnagy

1   to not include the possibility of switching back

2   to Detroit in your recommendations, would it?

3   Yes or no?

4                MR. MCELVAINE:  Objection;

5        hypothetical.

6        Q.    You can answer.  Yes or no?

7        A.    We did raise those possibilities

8   with the city.

9        Q.    That was not my question.  My

10  question was:  The mere fact that one person or

11  two people or ten people in the city didn't want

12  to switch back to Detroit would not be a reason

13  to not include the possibility of switching back

14  to Detroit in your reports, would it?

15       A.    It wouldn't preclude me from

16  putting it in there, no, unless we were told to

17  eliminate it.

18       Q.    All right.  And we'll get to

19  whether and when you were told to eliminate it.

20  You don't need to jump ahead.  We'll cover a lot

21  of stuff today, okay, sir?

22                You understood the results of your

23  work would be communicated to the people of

24  Flint, didn't you?

Highly Confidential - Marvin Gnagy

```
1    doing a history project on the Flint utility, so

2    you can feel safe there.

3              Do you recall identifying any

4    other limitations on the scope of your work in

5    your presentations to the city?

6         A.   Just defining what we believed the

7    scope was, was to evaluate alternatives to help

8    reduce THMs and to help reduce red water

9    complaints.

10        Q.   And identify issues with water

11   quality in the treatment plant and distribution

12   system?

13        A.   Where they related to those two

14   subjects, yes.

15        Q.   Was there somewhere where it was

16   written down that your water quality work was

17   limited to those two subjects?

18        A.   I believe it was written in the

19   contract, yes.

20        Q.   What's your basis for that belief?

21        A.   It's written in the contract.

22        Q.   You read the contract?

23        A.   No.

24        Q.   So if you didn't read the
```

Highly Confidential - Marvin Gnagy

```
 1    contract, how do you know what's written in it?

 2           A.    That was what we were told by Rob

 3    Nicholas when we started the project.

 4           Q.    So Mr. Nicholas told you that the

 5    contract said you were limited to THMs and water

 6    color?

 7           A.    And -- I didn't hear the last part

 8    of that.

 9           Q.    Water color.

10           A.    Discolored water, yes.

11           Q.    When did Mr. Nicholas tell you

12    that?

13           A.    At the beginning of the project.

14           Q.    Was that by phone?

15           A.    I don't recall whether it was by

16    phone or whether it was when we got on site.

17           Q.    Do you recall whether anyone wrote

18    down this belief that the project was limited in

19    that way?

20           A.    I wrote it down in discussion we

21    had with the city.  I believe it was even before

22    the contract was signed.

23           Q.    Where did you write it down?

24           A.    In my notes.
```

Highly Confidential - Marvin Gnagy

```
 1            Q.    We'll get to your notes in a bit.

 2                  Who was responsible for making

 3    sure you had the right resources for

 4    accomplishing what you had agreed to do?

 5            A.    Well, that would have been Rob

 6    Nicholas and myself.

 7            Q.    And who was responsible for

 8    deciding when your work was done?

 9            A.    That determination would have been

10    made upon completion and submittal of the final

11    report to the city, which was part of our work

12    product.

13            Q.    And when you submitted that final

14    report, was there some process where you all sat

15    down and got on the phone and said, "This is a

16    good final report.  It covers everything we've

17    agreed to do"?

18            A.    There were reviews to make sure

19    that it included the recommendations and

20    alternatives, yes.

21            Q.    Who was involved in that?

22            A.    It would have been a number of

23    people.  I don't recall everybody that was

24    involved.  But it would have included myself,
```

Highly Confidential - Marvin Gnagy

```
 1   Rob, Depin Chen, likely people from corporate

 2   offices to review communications work and

 3   someone in the communications department.  May

 4   have included city personnel.

 5                      - - -

 6        (Gnagy Deposition Exhibit 2 marked.)

 7                      - - -

 8   BY MR. MORRISSEY:

 9        Q.    Exhibit 2 is a January 30, 2015

10   e-mail from you to Mr. Nasuta at 2:23 p.m.  The

11   e-mail begins referring to a "quick synopsis of

12   the project from Andy Rouse."  That's a

13   reference to the Camden project, right?

14        A.    That's correct.

15        Q.    And then in the second paragraph

16   you discuss Flint, and you say, "Flint became a

17   PPS type project in the RFP submittal (not sure

18   whose idea that was)."

19             Do you see that?

20        A.    Yes.

21        Q.    What's a PPS type project?

22        A.    That's the Peer Performance

23   Solutions, which is a consulting type service

24   that Veolia was doing at that time.
```

Highly Confidential - Marvin Gnagy

```
1    and would be far too expensive for the period of

2    time you're going to be on the Flint River."

3    Right?

4              A.    I did not make those assumptions,

5    no.

6              Q.    Okay.  We'll get to your technical

7    memo in a while then.

8                    Now, Mr. Chen reached the

9    conclusion that switching to Detroit would be a

10   quick and safe fix to the city's water problems,

11   didn't he?

12             A.    He put those thoughts in a memo,

13   yes.

14             Q.    Did you disagree with him?

15             A.    Don't necessarily disagree with

16   him, but there was no data or complete

17   evaluation to support that that is the option

18   that should be recommended.

19             Q.    Did you ever tell him you

20   disagreed with him?

21             A.    It wasn't a disagreement.  It was,

22   yeah, that is an alternative.  It's one

23   alternative of many.  We also had discussions

24   that, you know, the Flint River water can be
```

Highly Confidential - Marvin Gnagy

1   properly treated to provide safe drinking water

2   under the Safe Drinking Water Act and all the

3   requirements of monitoring and production.

4          Q.   None of your reports addressed the

5   possibility of switching back to Detroit,

6   correct?

7               MR. MCELVAINE:  Objection; asked

8        and answered.

9               You can answer again.

10         A.   Yes, we did not include that in

11  our reports.

12         Q.   You're not aware of any document

13  that excluded switching back to Detroit in any

14  amendment to the contract that was signed by the

15  parties, are you?

16         A.   No.  We were told that by the

17  client.

18         Q.   And you say that occurred at the

19  kickoff meeting?

20         A.   It occurred at the conference call

21  before we arrived on site.  I don't recall the

22  exact date.  It also occurred on the first day

23  of the on-site investigations.  There was

24  another issue that they also told us they did

Highly Confidential - Marvin Gnagy

```
 1    not want to consider, and that was looking at

 2    ammonia feed to produce chloramination.

 3            Q.    If you had concluded that treating

 4    these problems in the Flint River would cost a

 5    lot more than just switching back to Detroit,

 6    are you saying you wouldn't have needed to tell

 7    the city that?

 8            MR. MCELVAINE:  Objection.

 9            You can answer.

10    A.    We gave the city what we perceived

11    would be chemical treatment and solids handling

12    costs for treating the Flint River as well as

13    the KWA or whatever that reservoir water was

14    going to be, at least the data that we could

15    find on what that water quality might be.  It

16    did show that the KWA water would be cheaper to

17    treat; however, it also showed that the Flint

18    River water could be treated to provide adequate

19    drinking water to the citizens of Flint.

20            Q.    You understood it would cost

21    millions of dollars to implement the changes you

22    recommended, right?

23            A.    I'm aware there would be some

24    money that would have to be spent, yes.  I'm
```

Highly Confidential - Marvin Gnagy

```
 1   not -- I don't know how much.  We didn't

 2   evaluate that.

 3          Q.    And you didn't evaluate the

 4   relative costs of switching to Detroit versus

 5   staying in Flint and implementing your changes,

 6   did you?

 7          A.    No, we did not.

 8          Q.    You did not implement -- you

 9   didn't -- sorry.

10                You did not evaluate the relative

11   effectiveness of staying with Detroit versus

12   implementing some or all of the changes you

13   recommended, did you?

14                MR. MCELVAINE:  Objection.

15                You can answer.

16          A.    No, we didn't evaluate that.

17          Q.    You knew from the get-go that at

18   least some people from --

19          A.    Excuse me.

20          Q.    You knew that some people from the

21   city didn't want to address going back to

22   Detroit, right?

23                MR. MCELVAINE:  Hold on a second.

24                Okay.  You can answer.
```

Highly Confidential - Marvin Gnagy

```
 1              A.    The people that we had

 2    communications with indicated that that was

 3    their choice, yes.

 4              Q.    And who was that?

 5              A.    That would have been -- well, in

 6    the kickoff meeting, Howard Croft specifically

 7    told us that.

 8              Q.    Anyone else?

 9              A.    Jerry Ambrose told us that.

10              Q.    And they told you it would be too

11    expensive to go back to Detroit?

12              A.    I don't know.  We were told that

13    it would -- it was costing $12 million a year

14    more than using their own treatment plant, I

15    believe were the figures.  I don't know for

16    sure.

17              Q.    Did you believe you had any

18    obligation to advise the city if,

19    notwithstanding the cost concerns that these

20    individuals had expressed, you thought the best

21    technical solution was to go back to Detroit?

22                    MR. MCELVAINE:  Objection.

23                    You can answer.

24              A.    Again, I can't even say it's the
```

Highly Confidential - Marvin Gnagy

```
1    best technical solution.  It is one alternative.

2    It was taken off the table by the city.  We

3    didn't evaluate it any further.  We looked at

4    what it would take to treat the Flint River

5    water to meet the THM conditions and to mitigate

6    red water occurrences.

7         Q.    But your client is the city,

8    right?  It's not these individuals?

9         A.    That's correct.

10         Q.    So if you concluded that going

11   back to Detroit was the best technical solution,

12   you would have needed to tell the city that,

13   wouldn't you?

14         A.    We told --

15              MR. MCELVAINE:  Objection.

16              You can answer.

17         A.    We told the officials for the city

18   that that was a possibility.

19         Q.    So you did tell the officials it

20   was a possibility to go back to Detroit?

21         A.    I told them it was one

22   alternative.  I stated that the first day on

23   site.  I also told Mr. Ambrose, before the

24   public meeting, that that was an alternative.
```

Highly Confidential - Marvin Gnagy

1      Q.    But you didn't put it in any of

2   your reports?

3      A.    It is one alternative.

4      Q.    But you did not put it in any of

5   your reports?

6      A.    We did not put it in the reports.

7   We provided information to treat the Flint River

8   water to reduce THMs.

9      Q.    None of your reports addressed the

10   composition of the distribution system, correct?

11            MR. MCELVAINE:  I'm sorry?  One

12         second.

13            Objection.

14            You can answer.

15      A.    No, I believe we did state some

16   conditions of the distribution system as far as

17   oversized pipes, water age, possibly excess

18   storage and treatment tanks.  We knew of the

19   numerous main breaks that they had had.  They

20   had given us numbers for the previous year.  We

21   knew of the red water occurrences.  We knew of

22   the bacteria stuff that they had found in the

23   summer of 2014.  We knew that they had problems

24   with valves.  We knew they had problems with

Highly Confidential - Marvin Gnagy

```
1    hydrants.  They told us all of this.

2            Q.    But you didn't --

3            A.    And a lot of that information was

4    disclosed in the report and in the public

5    meeting.

6            Q.    So your reports addressed a whole

7    range of issues relating to the treatment plant

8    and the distribution system?

9            A.    Yes.

10           Q.    You didn't mention anywhere that a

11   significant portion of the distribution system

12   consisted of lead piping, correct?

13           A.    That's correct.

14           Q.    There were a lot of breakages in

15   the distribution system, right?

16           A.    As stated by the city, yes.

17           Q.    Sometimes as many as 14 a day?

18           A.    We did hear that number at one

19   point, that they had 14 in one day.

20           Q.    Did you ever recommend to the city

21   whether it should look into if corrosion was

22   contributing to the breakages?

23           A.    We had that discussion with Rob

24   Bincsik, and he said most of these were due to
```

Highly Confidential - Marvin Gnagy

```
 1            A.    I see that.

 2            Q.    And you responded, "No, I don't

 3    recall a document that suggested they go back to

 4    Detroit.  When we mentioned that, the emergency

 5    manager and city manager told us not to mention

 6    it again."

 7                  Right?

 8            A.    Yes.

 9            Q.    So you had two people that -- the

10    emergency manager and the city manager, as you

11    were recollecting this in January of 2016,

12    you're referring back to that original kickoff

13    meeting, right?

14            A.    No.  I'm referring to the meeting

15    with Mr. Ambrose before the public meeting.

16            Q.    All right.  So in the morning of

17    the 18th or afternoon of the 18th, they told you

18    not to mention it?

19            A.    Correct.

20            Q.    But you didn't document the fact

21    that the city had told you not to mention

22    something?

23            A.    No.

24            Q.    Is it your normal practice when
```

```
 1    some official at your client says, "Don't

 2    mention this thing," that you just do it?

 3            A.    No.

 4            Q.    I mean --

 5            A.    Again, I've already stated today

 6    that we evaluated that the Flint River was fully

 7    capable of providing drinking water meeting the

 8    drink -- the drinking water standards.

 9            Q.    Right.  But your boss' boss is

10    saying in 2016, "I thought I remember reading

11    somewhere where we recommended them to go back

12    to the original water source."

13            A.    He was mistaken.  There was no

14    document stating that.

15            Q.    But the -- and you correctly note

16    that in the first sentence, but the reason you

17    say there isn't such a document is that "the

18    emergency manager and city manager told us not

19    to mention it"?

20            A.    That's not the reason that's in

21    there.

22            Q.    That's the only reason you

23    mentioned there, right?

24            A.    No.  That's not why we didn't put
```

1    it in the report.  I just made a mention that

2    the emergency manager was very emphatic about

3    it.  The city told us numerous times, "We are

4    not going back to Detroit water.  We won't

5    consider it."

6           Q.    And your colleague, Mr. Chen, had

7    said in writing that it was the best technical

8    solution, correct?

9                 MR. MCELVAINE:  Objection.

10                You can answer.

11          A.    I've already answered that

12    question.

13          Q.    And just so we have it somewhere

14    within hours of the prior answer, the answer was

15    yes, he did have that opinion written down,

16    correct?

17                MR. MCELVAINE:  Objection.

18                You can answer.

19          A.    That's what he stated.  That's his

20    opinion without any substantial facts or

21    evaluation.

22          Q.    And Mr. Chen, like you, is a

23    professional engineer?

24                Sir, Mr. Chen, like you, is a

1   professional engineer?

2          A.    That's correct.

3          Q.    An expert in water quality?

4          A.    He has some experience and

5   expertise in water quality, yes.

6          Q.    And he's one of the two people

7   that Veolia assigned on the technical side to

8   address these issues, correct?

9          A.    That's correct.

10                       - - -

11       (Gnagy Deposition Exhibit 33 marked.)

12                       - - -

13  BY MR. MORRISSEY:

14         Q.    Exhibit 33 is dated January 21,

15  2016, 12:48 p.m.  This is an e-mail from

16  Mr. Hagerty in the middle of the page where he

17  writes to Mr. Nasuta, "Can you send me over

18  everything that we put together on Flint.  I

19  already have Marvin's technical report."

20               Nasuta then responds -- forwards

21  it to you.  It says, "Marvin, two things:  1),

22  do you have any documentation (e-mail, et

23  cetera) of you or Theping telling business

24  development that returning to Detroit water was

Highly Confidential - Marvin Gnagy

```
 1                    CERTIFICATE
 2
              I, Carol A. Kirk, a Registered Merit Reporter
 3    and Notary Public in and for the State of Michigan, duly
      commissioned and qualified, do hereby certify that the
 4    within-named MARVIN GNAGY was by me first duly sworn to
      testify to the truth, the whole truth, and nothing but
 5    the truth in the cause aforesaid; that the deposition
      then given by him was by me reduced to stenotype in the
 6    presence of said witness; that the foregoing is a true
      and correct transcript of the deposition so given by
 7    him; that the deposition was taken at the time and place
      in the caption specified and was completed without
 8    adjournment; and that I am in no way related to or
      employed by any attorney or party hereto or financially
 9    interested in the action; and I am not, nor is the court
      reporting firm with which I am affiliated, under a
10    contract as defined in Civil Rule 28(D).
11
12            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Dexter, Michigan
13    on this 27th day of December 2019.
14
15
16                    Carol A Kirk
                      _____
                      CAROL A. KIRK, RMR, CSR-9139
17                    NOTARY PUBLIC - STATE OF MICHIGAN
18    My Commission Expires:  August 19, 2022.
19                    - - -
20
21
22
23
24
```

Highly Confidential - Marvin Gnagy

```
 1              Q.     Did you have any discussions with

 2     anybody at the city about what type of final

 3     plant test run they conducted prior to

 4     distributing water to the public in either late

 5     2014 -- late April or early May of 2014?

 6              A.     Not on a test run.  Mr. Glasgow

 7     told us that they were given two weeks' notice

 8     to get the plant operating, and then they were

 9     going to be pushing water to the distribution

10     system.

11              Q.     I just want you to assume for

12     purposes of this next question that LAN was

13     asked to provide cost information to Raftelis

14     Financial as part of a rate study the city was

15     having done in the winter of 2014 -- late 2013,

16     early 2014.

17                     Do you have any awareness of that?

18     Is that something that anybody has ever told you

19     about?

20              A.     I can't recall specifically.  I do

21     remember something about a rate study that

22     Warren Green was telling us, and I thought that

23     he said LAN was conducting that or did conduct

24     that.  So you jogged my memory.  And I do
```

Highly Confidential - Marvin Gnagy

1  remember at least a statement that that was

2  being done, yes.

3          Q.    Okay.  So you recall that Warren

4  Green may have alluded to it in his

5  conversations with you?

6          A.    Yes.

7          Q.    Is Raftelis Financial a company

8  that you're familiar with?

9          A.    I am not.

10         Q.    Yesterday in your testimony you

11  indicated that you learned since you left Flint

12  that the city was aware of lead results in early

13  2015 that it did not share with you and Veolia,

14  correct?

15         A.    That's correct.

16         Q.    And in your testimony yesterday,

17  you referenced a test result from the Walters'

18  residence.

19               Do you remember that?

20         A.    I do.

21         Q.    Were there other test results that

22  you believe the city was aware of in early 2015

23  that it did not share with you and Veolia?

24         A.    I can't recall with the

Highly Confidential - Marvin Gnagy

1   information that I have looked at recently

2   whether there were other sites within the city

3   that U.S. EPA was investigating or not.  I do

4   know from other presentations about this event,

5   that there were lots of lead and copper samples

6   taken throughout the city that were elevated.

7           Q.    And it's your belief that the city

8   was withholding that information?

9           A.    I think they deliberately withheld

10  it from us, yes.

11          Q.    When you saw the test results from

12  U of M-Flint, you specifically asked the city

13  for their lead and copper test results, correct?

14          A.    I testified to that effect, that

15  we asked for lead and copper test results at

16  some point, yes.

17          Q.    Let's turn to Number 12.  Exhibit

18  Number 12 is Mr. Gnagy's notes from February 10,

19  2015.  And the page ending 100, there's a couple

20  slash marks, and then it says "Plant tour."

21              Do you see that?

22          A.    I do see that, yes.

23          Q.    So is it true that the -- on

24  February 10, there was initially a meeting, and

Highly Confidential - Marvin Ghagy

```
1    then that meeting was immediately followed by a

2    plant tour?

3           A.    Yes.

4           Q.    Okay.  And on this note as well,

5    you've listed who the attendees were from the

6    city and from LAN, correct?

7           A.    Yes.

8           Q.    And from LAN, the attendees were

9    Warren Green and Jeff Hanson, correct?

10          A.    Yes.

11          Q.    And then for the city, it was Mike

12   Glasgow, Howard Croft, Duffy Johnson, Matt

13   McFarland, Brent Wright, and Rob, and you put in

14   parentheses "from distribution"?

15          A.    Yes.  That would be Rob Bincsik.

16          Q.    Okay.  In the second line below

17   the names, there's a line that reads, "2003?

18   Plant upgrades."

19                Do you see that?

20          A.    Yes.

21          Q.    Is that a reference to somebody

22   providing you with a history of the upgrades

23   that were done in the early 2000s?

24          A.    To the best of my recollection,
```

Highly Confidential - Marvin Gnagy

```
1            A.    No, I had no problem with it.  I

2    just thought it was unusual given our previous

3    work histories.

4            Q.    Now, was Mr. Nicholas your boss on

5    this project, sir?

6            A.    He was not.

7            Q.    Could Mr. Nicholas overrule you on

8    any technical issues, sir?

9            A.    He could not.

10           Q.    Did you have an understanding of

11   the scope of work of Veolia at Flint?

12           A.    I did.

13           Q.    And how did you get that scope of

14   work, sir?

15           A.    It was defined by the city during

16   some communications, a conference call and at

17   the kickoff meeting at the water plant.

18           Q.    And what was your understanding as

19   to the scope of work, sir?

20           A.    To provide THM control

21   recommendations and to help with red water

22   complaints.

23           Q.    And were you aware of any

24   limitations put on the scope of work by the city
```

Highly Confidential - Marvin Gnagy

1  of Flint?

2          A.    We had been previously told that

3  they did not want to consider returning to

4  Detroit water as a source.  We were also told

5  they did not want to use ammonia to convert to

6  chloramines to help use THMs.

7          Q.    And you've identified some

8  exhibits.  There's a note -- a series of notes

9  that you have, Gnagy 5, where you have some

10  handwritten notes, correct?

11          A.    Yes, that's correct.

12          Q.    And do your notes from the

13  meetings that are referenced in there -- I think

14  there's one on 2/1/15 and another -- they're

15  conference calls, 2/1 and 2/2.  Do they

16  reference the two limitations that you just

17  mentioned to me, sir?

18          A.    Yes.  2/1, we were told they don't

19  want to use chloramination, which would be the

20  ammonia feed.  And 2/2 says they do not want to

21  return to a relationship with DWSD for water

22  source.

23          Q.    Put that aside for a minute, sir.

24                Could you find Exhibit 13, which

Highly Confidential - Marvin Ghagy

```
1    is a series of e-mails, sir.  Is there an e-mail

2    from Mr. Chen also referencing the kickoff phone

3    call?

4            A.    Yes.  It's in this document.

5            Q.    Can you please read to me the

6    first sentence that he has about the kickoff

7    phone call?

8            A.    "Some background information I am

9    aware of:  It was made clear by the city during

10   our first kickoff phone call that reconnecting

11   to DWSD as an interim method is not an option."

12           Q.    You can put that aside, sir.  And

13   does that reflect your recollection as well,

14   sir?

15           A.    Yes.  That's what I put in my

16   notes.

17           Q.    And did you have any subsequent

18   conversations with anybody from the city of

19   Flint about not returning to Detroit water?

20           A.    I had a conversation with

21   Mr. Ambrose before the public meeting that

22   returning to Detroit was an option.

23           Q.    So that's the public meeting on

24   February 18, 2015?
```

Highly Confidential - Marvin Ghagy

```
1            A.     I believe that was the date, yes.

2            Q.     And was it just you and

3     Mr. Ambrose in this conversation, sir?

4            A.     No.  There were other people in

5     the room.

6            Q.     Well, in the room versus in the

7     conversation?

8            A.     I can't say whether those people

9     were listening or not.

10           Q.     Okay.  And you've previously

11    identified the various people from the city and

12    from Veolia who were in the room?

13           A.     That's correct.

14           Q.     Okay.  Do you know of anybody that

15    actually overheard your conversation with

16    Mr. Ambrose?

17           A.     I do not.

18           Q.     Okay.  What did, first of all, you

19    say to Mr. Ambrose about returning to Detroit

20    water?

21           A.     I'm sorry.  I didn't understand.

22           Q.     Did you have any conversation with

23    Mr. Ambrose about returning to Detroit water on

24    February 18, 2015?
```

Highly Confidential - Marvin Gnagy

1        A.    Yes.  I informed him that it was

2    an option.

3        Q.    And what was his response, if any?

4        A.    He told me two words; "It's

5    incomprehensible."

6        Q.    Now, sir, you're aware that there

7    were some e-mails from Bill Fahey about the

8    option of returning to Detroit water, correct?

9        A.    Yes.  We had been through those

10   documents.

11       Q.    Okay.  In those documents, he said

12   at one point to make it known or put on record

13   with BD the option of returning to Detroit,

14   correct?

15       A.    Yes.

16       Q.    I'm paraphrasing.

17       A.    Something to that nature, yes.

18       Q.    Okay.  And did you discuss with BD

19   the option of returning to Detroit water?

20       A.    Yes, I did, as I was instructed.

21       Q.    Okay.  Who did you discuss it

22   with?

23       A.    Rob Nicholas, who was BD, who was

24   also serving as the project manager or

Highly Confidential - Marvin Gnagy

```
 1   coordinator.

 2          Q.    Okay.  And did you also bring it

 3   up with anybody with the city of Flint?

 4          A.    Other than Mr. Ambrose?

 5          Q.    No?

 6          A.    I don't recall.

 7          Q.    So Mr. Ambrose was the only one

 8   that you personally discussed it with, sir?

 9          A.    Yes.

10          Q.    Okay.  Now, sir, you're aware that

11   lead is an issue in this case, correct?

12          A.    That's correct.

13          Q.    Okay.  And have you reviewed any

14   lead data -- or did you review any lead data

15   while you were in Flint for this project?

16          A.    While we were engaged in the

17   project, yes.  We reviewed routine monitoring

18   data from the second half of 2014 that was

19   provided to us.  We also reviewed some data from

20   University of Michigan at Flint in some of their

21   campus buildings.

22          Q.    And what was your conclusion after

23   reviewing that data, sir?

24          A.    That the monitoring results
```

Highly Confidential - Marvin Gnagy

```
 1              all I have for you.  Thank you very

 2         much.

 3                        - - -

 4                RECROSS-EXAMINATION

 5    BY MR. MORRISSEY:

 6         Q.    Mr. Gnagy, I have a few questions

 7    for you.  I'll just take a few minutes more of

 8    your time.  Just to remind you -- there's been a

 9    lot of lawyers asking you questions over the

10    last couple days -- I'm Steve Morrissey.  I'm

11    representing the people of Flint, so I'm not

12    going to ask you questions about what other

13    defendants in this case did, like DEQ or state

14    officials.  I'm going to ask you about what you

15    did.

16              Now, can you get out Exhibit 13.

17    If you could hand it to me for a second, I can

18    direct you to a specific part.

19              Counsel asked you about the first

20    bullet point in Mr. Chen's 11:59 a.m. e-mail on

21    February 13, 2015.  Can you read the last bullet

22    point which appears where my thumb is right

23    there (indicating)?

24         A.    This section here you're referring
```

Highly Confidential - Marvin Gnagy

```
 1   to (indicating).

 2           Q.    Yeah.  Just read it out loud.

 3           A.    In the bullet point, it says, "Our

 4   scope includes recommendation for operation and

 5   process improvement.  There will be price tags

 6   associated with some of the process improvements

 7   which may aid the city to make decision if it

 8   wants to reconnect."

 9           Q.    All right.  Thank you.

10           You said you had a conversation

11   with Mr. Ambrose on the 18th about returning to

12   Detroit?

13           A.    Yes, I've stated that.

14           Q.    And his only response were two

15   words, "It's incomprehensible."  That's what you

16   said?

17           A.    That's what I said, yes.

18           Q.    You didn't make any record of that

19   conversation, did you?

20           A.    I had no paper and pencil at that

21   meeting.  No, I did not make a record.

22           Q.    You've had access to paper,

23   pencil, computers, phones, all kinds of things

24   by which you can record your memory over the
```

Highly Confidential - Marvin Gnagy

1    four years since that happened, haven't you?

2            A.    Yes.

3            Q.    You have never recorded that

4    conversation, have you?

5            A.    I have not.

6            Q.    All right.  Now, you were asked

7    some questions about Legionella.  You did not

8    ask Flint for any data or information relating

9    to Legionella, did you?

10           A.    I did not.

11           Q.    You did not do anything to

12   validate Flint's processes for avoiding

13   Legionella?

14           A.    I stated earlier that their CT

15   records showed compliance with the CT method,

16   and in there is included the Legionella.

17           Q.    Did you do anything to validate

18   whether those processes were being completed

19   properly?

20           A.    I did.

21           Q.    Okay.  Now, the problem of

22   corrosion in water distribution systems, it's

23   not new, is it?

24           A.    It is not new.