# EXHIBIT 2

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

   _____
3                                      : Civil Action No
                                       : 5:16-cv-10444
4  In re:  FLINT WATER CASES           :
                                       : Hon. Judith E. Levy
5  _____: Mag. Mona K. Majzoub
6
              STATE OF MICHIGAN
7     CIRCUIT COURT FOR THE 7TH JUDICIAL CIRCUIT
                 GENESEE COUNTY
8  _____
                                       :
9  In Re:  FLINT WATER LITIGATION      : No. 17-108646-N0
                                       : (this filing does
10 ATTORNEY GENERAL DANA NESSEL,       : NOT relate to all of
   on behalf of the People of the      : the cases - only
11 State of Michigan,                  : 16-107576-NM)
                                       :
12          Plaintiff,                 :
      v.                               : No. 16-107576-NM
13                                     : Hon. Joseph J. Farah
   VEOLIA NORTH AMERICA, INC.,         :
14 a Delaware Corporation, et al.,     : HIGHLY CONFIDENTIAL
                                       :
15          Defendants.                : VOLUME I
   _____:
16
              Tuesday, April 20, 2021
17
        Remote videotaped 30(b)(6)and 2.306(b)(2)
18
   deposition of JAY BRADER, conducted at the location
19
   of the witness in Houston, Texas, commencing at
20
   9:12 a.m., on the above date, before Carol A. Kirk,
21
   Registered Merit Reporter, Certified Shorthand
22
   Reporter, and Notary Public.
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com

```
 1    Andrews & Newnam about the topics in Exhibit 1?

 2         A.    Yes.

 3         Q.    Okay.  And you said you were the

 4    chief financial officer for Leo A. Daly Company.

 5               You're also a vice president; is

 6    that correct?

 7         A.    Yes.

 8         Q.    You've held those roles since

 9    April 2013; is that correct?

10         A.    Yes.

11         Q.    Is it true you generally work out

12    of the Omaha, Nebraska office for the Leo A.

13    Daly Company?

14         A.    Yes.

15               MR. GAMBLE:  Object to form.

16         Q.    You said you were in your office

17    in Houston.  Do you also have an office in

18    Houston, Texas?

19         A.    I'm at the LAN office in Houston,

20    Texas.

21         Q.    Do you have your own office in the

22    LAN office in Houston?

23         A.    No.  When I said "our office," I

24    meant the company, leased office space.
```

```
 1              Q.    Okay.  So typically you are based

 2    in Omaha, Nebraska, but you are in Houston at

 3    the Lockwood, Andrews & Newnam office for the

 4    purpose of this deposition; is that correct?

 5              A.    Yes.

 6              Q.    Is it correct you've been with the

 7    Leo A. Daly Company since 1986?

 8              A.    That's correct.

 9              Q.    Do you have any role with the

10    Lockwood, Andrews & Newnam company?

11                   MR. GAMBLE:  Objection; form.

12              A.    I'm part of the shared services

13    group that provides services to both operating

14    companies, the Leo A. Daly operating company and

15    the LAN operating company.

16              Q.    So do you supply chief financial

17    officer services for Lockwood, Andrews & Newnam?

18              A.    I do.

19              Q.    Okay.  I'd like to get into some

20    of the specific topics now, and I'd like to

21    start with the first three topics, which all

22    involve annual revenue income and profits for

23    the three defendants, LAD, LAN, Inc. and LAN,

24    P.C.
```

```
 1                    Do you see that?

 2         A.    I do.

 3         Q.    So for these topics, is it true

 4    your preparation consisted of asking

 5    Katie Whittaker to run some reports with

 6    accounting; is that right?

 7                    MR. GAMBLE:  Object to form.

 8         A.    Correct.

 9         Q.    And you verified that those

10    reports were accurate for passing them along to

11    plaintiffs' counsel; is that correct?

12         A.    Correct.

13         Q.    Okay.  So is it your understanding

14    that the office earnings reports that were

15    produced accurately describe the annual revenue

16    income and profits for the three defendant

17    entities for which you've been designated?

18                    MR. GAMBLE:  I'm going to object

19         to the form.

20                    You can answer.

21         A.    To be clear, there are no office

22    earnings reports for LAN, P.C.  But, otherwise,

23    for the other two entities, yes.

24         Q.    And why are there no office
```

```
 1   earning reports for LAN, P.C.?

 2          A.    LAN, P.C. is an entity used

 3   strictly to maintain a registration under a

 4   different kind of corporate organization in the

 5   State of Michigan.

 6          Q.    So is it true that that entity has

 7   no revenue income or profits?

 8          A.    Correct.

 9          Q.    Does LAN, P.C. have any

10   activities?

11                MR. GAMBLE:  Objection; form.

12          A.    I would say no.

13          Q.    Okay.  Is there anything at all

14   that LAN, P.C. does now?

15          A.    No.

16          Q.    When was LAN, P.C. created?

17          A.    I don't know the answer to that

18   question.

19          Q.    Who is the shareholder of LAN,

20   P.C.?

21                MR. GAMBLE:  Objection; form.

22          A.    I believe Joe Waterfield is the

23   member and shareholder.

24                           - - -
```

1          (Brader Deposition Exhibit 2 marked.)

2                        - - -

3    BY MR. CONNORS:

4          Q.    Okay.  I am now going to share

5    with you a document I'd like marked Exhibit 2.

6    Exhibit 2 is a collection of documents that were

7    produced by Leo A. Daly Company one week ago

8    today.

9                I have included in Exhibit 2 just

10   the documents that listed Leo A. Daly Company

11   under OpCo in the top left.

12               Do you see that portion of the

13   officer news report?

14         A.    I do.

15         Q.    What does it mean that Leo A. Daly

16   Company is listed under OpCo in the top left?

17         A.    That means that that is -- we have

18   two operating companies, Leo A. Daly Company and

19   LAN.  Leo A. Daly Company is the architectural

20   engineering arm that does -- easiest description

21   would be vertical projects.  They're usually

22   buildings, which is architecture and the

23   associated engineering that goes along with

24   buildings.

Highly Confidential - Jay Brader

```
 1              Q.    Okay.  And you said you have two
 2   operating companies.  The second one is
 3   Lockwood, Andrews & Newnam Inc.; is that right?
 4              A.    Yes.
 5              Q.    Okay.  So just for simplicity sake
 6   during this deposition, let's make sure we line
 7   up our terms.  So I'm going to refer to
 8   Lockwood, Andrews & Newnam, Inc. as either LAN,
 9   Inc., LAN, or Lockwood, Andrews & Newnam.
10              Does that make sense?
11              A.    Yes.
12              Q.    I might have some specific
13   questions about LAN, P.C. or Lockwood,
14   Andrews & Newnam, P.C., but if I have questions
15   about that, I'll specify P.C.
16              Does that make sense?
17              A.    Yes.
18              Q.    Okay.  And then the second
19   operating company that you mentioned is the
20   Leo A. Daly Company, and I'm going to refer to
21   Leo A. Daly Company either as LAD or Leo A. Daly
22   Company.
23              Does that make sense?
24              A.    Yes.
```

1          Q.    Okay.  So you said there are two

2    operating companies.  I think you said, "We have

3    two operating companies."  So who's the "we"?

4    Who has two operating companies?

5          A.    Well, in the bigger sense, the

6    company at large, and us -- those of us who are

7    in the shared services group and share ourselves

8    with both companies.  That's why I used the

9    plural "we."

10         Q.    Okay.  And does Leo A. Daly

11   Company sometimes refer to these as two separate

12   brands, one brand being Leo A. Daly Company and

13   the other brand being LAN?

14              MR. GAMBLE:  Objection; form.

15         A.    That term has been used.  Yes.

16         Q.    Okay.  So Exhibit 2 is just the

17   office earnings reports that have Leo A. Daly

18   Company listed in their operating company, and I

19   put them in chronological order beginning

20   with -- for the period 1/23/2010 to 2/28/2010,

21   and I can just scroll through them so you can

22   see.  So then it moves on and lists the next

23   consecutive year as you go through the document.

24              Do you see that?

```
 1   Leo A. Daly operating company," that would not

 2   include any fees billed received by Lockwood,

 3   Andrews & Newnam; is that correct?

 4        A.    Correct.  Those are all logged on

 5   the LAN operating company office earnings

 6   report.

 7        Q.    So the LAN figures are not a

 8   subset of the Leo A. Daly figures.  They are

 9   kept separately, and they are -- have been

10   produced in a separate set of earnings

11   statements.

12             Is that correct?

13        A.    Yes.  They are completely separate

14   and distinct.

15        Q.    Okay.  And fees billed, are

16   those -- is that money actually received from

17   clients as opposed to what you asked for from

18   clients?

19        A.    No.  It's --

20             MR. GAMBLE:  Object to the form.

21             THE WITNESS:  Sorry.  Sorry,

22        Travis.

23             MR. GAMBLE:  That's okay.  Go

24        ahead and answer.
```

```
1    do that.  But half of that time would go to

2    overhead because it's not a project that we're

3    being paid for.  And the half of the time that

4    they spent working on an architecture project

5    would be charged to direct labor.

6         Q.    Okay.  So let's just take an

7    example of you.  Do you bill time to projects?

8         A.    I do not.

9         Q.    So your salary would be included

10   in the overhead column for each year; is that

11   right?

12        A.    That is correct.

13        Q.    Okay.  And would your salary go to

14   the overhead column of the Leo A. Daly Company

15   or Lockwood, Andrews & Newnam?

16            MR. GAMBLE:  Objection; form.

17        A.    My salary goes into a pool of

18   costs that are in the shared services column

19   that is then allocated as overhead to both of

20   the operating companies based on their ratio of

21   direct labor for that year.

22        Q.    And is that process the same way

23   that LAD and LAN have accounted for that shared

24   services revenue going back to 2005?
```

```
 1   through on Exhibit 2?

 2        A.    Yes.

 3        Q.    And it's all using the same

 4   accounting software, correct?

 5        A.    Yes.

 6        Q.    And these different brands or

 7   companies, Leo A. Daly Company and Lockwood,

 8   Andrews & Newnam, Inc., they use the same shared

 9   bank account, correct?

10             MR. GAMBLE:  Objection; form.

11        A.    Not entirely true.

12        Q.    They don't use a shared bank

13   account?

14        A.    We have one bank account that's

15   shared.  We do have disbursements accounts that

16   are not shared.

17        Q.    Okay.  How many disbursement

18   accounts that are not shared are there?

19        A.    There are two accounts.

20        Q.    Let's take the first one first.

21             When was the first disbursement

22   account that is not shared created among the

23   companies Lockwood, Andrews & Newnam and Leo A.

24   Daly Company?
```

```
 1              A.     I do not have that information on

 2      the top of my head to verify all your figures.

 3              Q.     Okay.  Well, I've got all the

 4      earnings statements that LAD produced, and I've

 5      got the summary table in Exhibit 4.  What do you

 6      need to look at to answer that question?

 7              A.     Well, we would need to look at

 8      each one of them and verify that you put the

 9      numbers in there correctly.

10              Q.     Okay.  So let's look at each one

11      of them then.  In Exhibit 2, it looks like in

12      2010, Leo A. Daly Company lost more than

13      $10.8 million; is that right?

14              A.     Correct.

15              Q.     In 2011, Leo A. Daly Company lost

16      more than $3.5 million; is that right?

17              A.     Correct.

18              Q.     In 2012, Leo A. Daly Company lost

19      more than $7.6 million; is that right?

20              A.     Yes.

21              Q.     In 2013, negative profit of more

22      than $5.4 million, correct?

23              A.     Yes.

24              Q.     In the period ending 2014, a
```

```
 1   negative profit of more than $4 million,

 2   correct?

 3           A.    Yes.

 4           Q.    And the next year, a negative

 5   profit of negative $4 million, correct?

 6           A.    Yes.

 7           Q.    Okay.  In 2016, a profit of a

 8   little more than $3.3 million, correct?

 9           A.    Yep.

10           Q.    And in 2017, a profit of more than

11   $1.4 million; is that right?

12           A.    Yes.

13           Q.    The next year, the company lost

14   money again, more than $427,000, correct?

15           A.    Yes.

16           Q.    The next year, a profit of a

17   little more than $1.65 million, correct?

18           A.    Yes.

19           Q.    The next year, the company loses

20   $92,000 and some change, correct?

21           A.    Yes.

22           Q.    Okay.  So do you agree with me

23   that it looks like the Leo A. Daly Company had

24   lost money in more years than it's actually
```

Highly Confidential – Jay Brader

```
 1   achieved profits, correct?

 2        A.    Yes.

 3        Q.    And, indeed, over the course of

 4   the 11 years for which you provided earnings

 5   statements, Leo A. Daly Company has lost money,

 6   right?

 7              MR. GAMBLE:  Objection; form.

 8        A.    Yes.

 9        Q.    Has that raised alarm bells around

10   the company that you're engaging in this

11   enterprise with many architects and engineers

12   and offices but you're actually losing money?

13              MR. GAMBLE:  Objection; form.

14        A.    I don't understand the question.

15        Q.    Has anyone expressed concern about

16   losing all this money?

17              MR. GAMBLE:  Objection; form.

18        A.    Yes.

19        Q.    Has Leo A. Daly, III expressed

20   concern about all these negative profits year

21   after year?

22              MR. GAMBLE:  Objection; form.

23        A.    Yes.

24        Q.    Okay.  What has he said?
```

```
1              Q.    Okay.  And then there is

2     corresponding depreciation line item for all of

3     these items down lower in the spreadsheet on

4     page 2 and 3; is that right?

5              A.    Correct.

6              Q.    Okay.  So you've applied some

7     principles to depreciate the various assets that

8     you've included in the line items as you can see

9     on Exhibit 5, correct?

10             MR. GAMBLE:  Objection; form.

11             A.    Yes.

12             Q.    Okay.  And there is a total

13    closing balance in the bottom right of this

14    asset list.

15             Do you see that?

16             A.    Yes.

17             Q.    And it looks like it's

18    $2,476,078.63.  Is that right?

19             A.    Yes.

20             Q.    So what does that number

21    represent?

22             A.    It represents the relative book

23    value, the assets that LAN holds at this time or

24    at the end of February.
```

```
 1   categorization?

 2         A.    No.  It's the same kind of

 3   eligibility pattern.

 4         Q.    Are bonuses paid under the Leo A.

 5   Daly Company incentive compensation plan

 6   accounted for in the income statements that you

 7   produced in connection with this litigation?

 8              MR. GAMBLE:  Object to form.

 9         A.    Yes, they are.

10         Q.    You said yes?

11         A.    I said yes.

12         Q.    Okay.  And are these bonuses part

13   of the overhead costs that we talked about this

14   morning?

15         A.    Yes, they are.

16         Q.    And when Leo A. Daly Company --

17   well, strike that.

18              Are these bonuses paid out by

19   Leo A. Daly Company, or would they be paid out

20   by either Leo A. Daly Company or LAN?

21         A.    They're paid by either Leo A. Daly

22   or LAN depending upon where the employee is

23   assigned.

24         Q.    So if an employee is assigned to
```

1    LAN, it would be LAN and not Leo A. Daly that

2    would pay the bonus?

3             A.    Correct.

4             Q.    And that bonus payment would be

5    reflected on the LAN income statements that were

6    produced as opposed to the Leo A. Daly

7    statements?

8             A.    That's correct.

9             Q.    Okay.  From what bank account do

10   the payments flow?  You've mentioned three bank

11   accounts.  I'd like to know which one would pay

12   bonuses to LAN-assigned employees.

13            A.    LAN-assigned employees are paid

14   out of the LAN disbursement account.

15            Q.    Has that changed since 2017?

16            A.    No.

17            Q.    Has it changed since 2010?

18            A.    Well, as I mentioned, somewhere

19   around 2012 we changed banks and reorganized.  I

20   do not recall exactly how we had the accounts

21   organized under our prior bank.  I think it was

22   similar, though.

23            Q.    Okay.  And under "Eligibility,"

24   Exhibit 7 mentions that "It is expected that

```
1              The profit figures in those income

2   statements, those would be the same as the

3   earnings before income tax figures used to

4   calculate bonuses?

5         A.    Correct.

6         Q.    So in years when the Leo A. Daly

7   Company made no profit or made a negative

8   profit, there have been no bonuses paid under

9   the incentive compensation plan?

10             MR. GAMBLE:  Objection to form.

11        A.    That is correct, to those people

12  in that operating company.

13        Q.    So Leo A. Daly Company paid no

14  bonuses from 2010 to 2015?

15        A.    That is primarily true.  There are

16  bonuses paid for other reasons, retention, spot

17  bonuses, things like that.  But for the most

18  part, that's -- there weren't significant

19  incentive payments paid due to losses.

20        Q.    Okay.  On the other hand, during

21  some of those years, LAN made a profit, correct?

22        A.    Correct.

23        Q.    LAN would have paid 10 to

24  15 percent of its employees under the Exhibit 7
```

```
 1   incentive compensation plan in those years in

 2   which LAN made a profit, correct?

 3        A.    Correct.

 4        Q.    Okay.  Exhibit 8 is Bates-labeled

 5   LAN_Flint_226441, and it is titled Leo A. Daly

 6   Company Appointee Incentive Plan.

 7              Do you see that?

 8        A.    Yes, I do.

 9        Q.    What is Exhibit 8?

10        A.    It's a document that describes how

11   we're going to pay bonuses to people who are

12   appointees in the company who are not already a

13   part of the other incentive compensation plan.

14        Q.    Okay.  And it says under

15   Eligibility, "All appointees, associates, senior

16   associates, and vice presidents not

17   participating in other incentive compensation

18   plans will be eligible for the AIP."

19              Do you see that?

20        A.    Yes, I do.

21        Q.    Generally who are the appointees

22   who are not compensated under Exhibit 7?

23        A.    That's kind of a vague question.

24              I'll say that perhaps 35 to
```

```
 1    40 percent of our employees are appointees,

 2    associates, senior associates, or vice

 3    presidents.  If that's 40 percent, 10 to

 4    15 percent are in the ICP plan.

 5          Q.    Okay.  So the appointees, it's a

 6    broader group of employees; is that right?

 7          A.    That is correct.

 8          Q.    Okay.  And so they generally

 9    receive lower amounts in bonuses; is that right?

10               MR. GAMBLE:  Object to form.

11          A.    That is right.

12          Q.    I missed your answer.  Did you say

13    correct?

14          A.    Yes.

15          Q.    Does the appointee incentive plan

16    in Exhibit 8 apply to LAN-assigned employees?

17          A.    Yes, it does.

18          Q.    And are those bonuses paid out in

19    the same way, from an LAN disbursement account

20    that is retained by the same bank that the two

21    companies do their banking with?

22          A.    Yes.  The LAN profit portion of

23    that goes into this pool that's distributed to

24    LAN employees through the LAN disbursement
```

```
 1            A.     That is correct.

 2            Q.     Okay.  He says, "Effective

 3    March 1, 2004, the Lockwood, Andrews & Newnam,

 4    Inc. savings and investment plan was merged with

 5    and into the plan.  As a result, all of the

 6    accounts and assets of the Lockwood,

 7    Andrews & Newnam, Inc. savings and investment

 8    plan were transferred to the plan, and Lockwood,

 9    Andrews & Newnam, Inc. became a participating

10    employer of the plan."

11                   Do you see that?

12            A.     I do.

13            Q.     Okay.  Is that a true and accurate

14    statement about what happened in 2004 when the

15    LAN plan was merged into the Leo A. Daly plan?

16            A.     Yes, it is.

17            Q.     Okay.  So the employees assigned

18    to the LAN brand can take advantage of this

19    profit sharing 401(k) plan that is described in

20    Exhibit 9?

21            A.     Correct.

22                   MR. GAMBLE:  Objection; form,

23            foundation.

24            Q.     Okay.  And payments to those
```

```
 1   employees of LAN under this plan, do those

 2   payments come from LAN or the Leo A. Daly

 3   Company?

 4              MR. GAMBLE:  Objection; form,

 5        foundation.

 6        A.    The payments for LAN employees

 7   comes from LAN's disbursement account.  The

 8   payments for LAD employees comes from LAD's

 9   disbursement account.

10                  - - -

11     (Brader Deposition Exhibit 10 marked.)

12                  - - -

13   BY MR. CONNORS:

14        Q.    Okay.  Exhibit 10, another

15   document produced by Leo A. Daly Company a week

16   ago.  This one is Bates-labeled

17   LAN_Flint_226501, and it's titled "Leo A. Daly

18   Employee Handbook."

19              Do you see that?

20        A.    Yes.

21        Q.    Okay.  Does the Leo A. Daly --

22   well, strike that.  What is the Leo A. Daly

23   employee handbook?

24        A.    It describes general benefits and
```

Highly Confidential - Jay Brader

```
 1   expectations of conduct around employees.

 2            Q.    Does this Leo A. Daly handbook

 3   apply to employees who are assigned to LAN as

 4   well?

 5                  MR. GAMBLE:  Object to form.

 6            A.    Yes, it does.

 7            Q.    Okay.  Would LAN employees receive

 8   a copy of the Leo A. Daly handbook upon starting

 9   work for LAN?

10            A.    Yes.

11            Q.    Okay.  Another one of the topics

12   you've been designated on is topic 12, your

13   capital structure.

14                  Do you see that?

15            A.    Yes.

16            Q.    Okay.  What did you do to prepare

17   to testify on topic 12?

18            A.    Well, I think I'm relatively well

19   versed in our capital structure.  I did discuss

20   it with our counsel.

21            Q.    Okay.  What is the capital

22   structure of the Leo A. Daly Company?

23            A.    Mr. Daly owns all the shares of

24   stock in Leo A. Daly Company.
```

# Total Company Office Earnings

**Thursday, April 8, 2021**
**8:13:36 PM**

Leo A Daly / LAN

For the period 1/23/2010 - 2/28/2010

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 58,447,162 | 13,298,295 | 71,745,457 | 69,409,577 | 20,881,888 | 48,527,690 | 15,364,678 | 27,949,958 | 5,213,053 | 11% | 3.16 | 182% | -2,335,879 | 8,145 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 58,447,162 | 13,298,295 | 71,745,457 | 69,409,577 | 20,881,888 | 48,527,690 | 15,364,678 | 27,949,958 | 5,213,053 | 11% | 3.16 | 182% | -2,335,879 | 8,145 |

```
EXHIBIT

Brader 3
```
exhibitsticker.com

---

**v3.5.6.0 (Katie Whittaker) - Cost, Project Budgeting**

Page 1 of 1

Confidential

# Total Company Office Earnings

Thursday, April 8, 2021<br>8:11:37 PM

Leo A Daly / LAN  For the period 1/22/2011 - 2/28/2011

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 53,641,493 | 8,470,947 | 62,112,441 | 61,928,953 | 14,884,374 | 47,044,579 | 14,592,682 | 28,636,861 | 3,815,036 | 8% | 3.22 | 196% | -183,488 | -3,376,605 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 53,641,493 | 8,470,947 | 62,112,441 | 61,928,953 | 14,884,374 | 47,044,579 | 14,592,682 | 28,636,861 | 3,815,036 | 8% | 3.22 | 196% | -183,488 | -3,376,605 |

Confidential

LAN_FLINT_00226541

# Total Company Office Earnings

Thursday, April 8, 2021
8:14:59 PM

Leo A Daly / LAN                                          For the period 1/21/2012 - 2/29/2012

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 43,885,471 | 6,836,004 | 50,721,475 | 52,112,703 | 12,253,101 | 39,859,602 | 13,150,140 | 26,091,866 | 617,597 | 2% | 3.03 | 198% | 1,391,229 | -878,303 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 43,885,471 | 6,836,004 | 50,721,475 | 52,112,703 | 12,253,101 | 39,859,602 | 13,150,140 | 26,091,866 | 617,597 | 2% | 3.03 | 198% | 1,391,229 | -878,303 |

Confidential

LAN_FLINT_00226544

# Total Company Office Earnings

Thursday, April 8, 2021
8:10:59 PM

Leo A Daly / LAN                     For the period 1/19/2013 - 2/28/2013

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 51,362,103 | 26,088,927 | 77,451,030 | 79,614,202 | 35,145,938 | 44,468,264 | 14,058,160 | 26,839,584 | 3,570,519 | 8% | 3.16 | 191% | 2,163,172 | -1,043,200 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 51,362,103 | 26,088,927 | 77,451,030 | 79,614,202 | 35,145,938 | 44,468,264 | 14,058,160 | 26,839,584 | 3,570,519 | 8% | 3.16 | 191% | 2,163,172 | -1,043,200 |

Confidential                                                                                                                                    LAN_FLINT_00226543

# Total Company Office Earnings

Thursday, April 8, 2021
8:15:38 PM

Leo A Daly / LAN                    For the period 2/1/2014 - 2/28/2014

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 46,505,000 | 19,600,432 | 66,105,432 | 66,374,664 | 24,193,750 | 42,180,915 | 13,947,454 | 28,544,651 | -311,190 | -1% | 3.02 | 205% | 269,232 | 1,741,277 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 46,505,000 | 19,600,432 | 66,105,432 | 66,374,664 | 24,193,750 | 42,180,915 | 13,947,454 | 28,544,651 | -311,190 | -1% | 3.02 | 205% | 269,232 | 1,741,277 |

Confidential

LAN_FLINT_00226542

# Total Company Office Earnings

Thursday, April 8, 2021
8:10:18 PM

Leo A Daly / LAN                     For the period 1/30/2016 - 2/29/2016

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 59,347,299 | 8,865,757 | 68,076,307 | 69,071,691 | 19,190,638 | 49,881,053 | 16,978,363 | 30,517,266 | 2,385,423 | 5% | 2.94 | 180% | 995,383 | -1,085,133 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 59,347,299 | 8,865,757 | 68,076,307 | 69,071,691 | 19,190,638 | 49,881,053 | 16,978,363 | 30,517,266 | 2,385,423 | 5% | 2.94 | 180% | 995,383 | -1,085,133 |

Confidential

LAN_FLINT_00226548

# Total Company Office Earnings

Thursday, April 8, 2021
8:09:35 PM

Leo A Daly / LAN

For the period 1/28/2017 - 2/28/2017

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 66,619,815 | 5,817,042 | 72,458,035 | 68,004,040 | 22,556,644 | 45,447,395 | 17,029,542 | 32,597,457 | -4,179,603 | -9% | 2.67 | 191% | -4,453,995 | 2,648,180 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 66,619,815 | 5,817,042 | 72,458,035 | 68,004,040 | 22,556,644 | 45,447,395 | 17,029,542 | 32,597,457 | -4,179,603 | -9% | 2.67 | 191% | -4,453,995 | 2,648,180 |

Confidential

LAN_FLINT_00226546

# Total Company Office Earnings

Thursday, April 8, 2021
8:19:40 PM

Leo A Daly / LAN                                    For the period 1/27/2018 - 2/28/2018

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 74,204,501 | 4,371,506 | 78,580,076 | 73,476,307 | 21,581,252 | 51,895,056 | 16,884,546 | 33,551,106 | 1,459,404 | 3% | 3.07 | 199% | -5,103,769 | 218,865 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 74,204,501 | 4,371,506 | 78,580,076 | 73,476,307 | 21,581,252 | 51,895,056 | 16,884,546 | 33,551,106 | 1,459,404 | 3% | 3.07 | 199% | -5,103,769 | 218,865 |

v3.5.6.0 (Katie Whittaker) - Cost, Project Budgeting

Page 1 of 1

Confidential

LAN_FLINT_00226549

# Total Company Office Earnings

Leo A Daly / LAN                    For the period 1/26/2019 - 2/28/2019

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 75,425,838 | 7,140,593 | 82,605,357 | 84,996,762 | 23,794,541 | 61,202,221 | 18,831,565 | 35,671,182 | 6,699,474 | 11% | 3.25 | 189% | 2,391,405 | -34,723 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 75,425,838 | 7,140,593 | 82,605,357 | 84,996,762 | 23,794,541 | 61,202,221 | 18,831,565 | 35,671,182 | 6,699,474 | 11% | 3.25 | 189% | 2,391,405 | -34,723 |

Confidential

LAN_FLINT_00226547

# Total Company Office Earnings

Thursday, April 8, 2021
8:21:07 PM

Leo A Daly / LAN                                  For the period 1/25/2020 - 2/29/2020

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 71,551,833 | 6,443,384 | 78,046,464 | 76,707,023 | 22,652,264 | 54,054,758 | 18,395,591 | 35,659,854 | -686 | | 2.94 | 194% | -1,339,442 | -2,473,605 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 71,551,833 | 6,443,384 | 78,046,464 | 76,707,023 | 22,652,264 | 54,054,758 | 18,395,591 | 35,659,854 | -686 | | 2.94 | 194% | -1,339,442 | -2,473,605 |

---

Confidential

LAN_FLINT_00226551

# Total Company Office Earnings

Monday, April 19, 2021
4:25:21 PM

Leo A Daly / LAN                    For the period 1/31/2015 - 2/28/2015

| | Fees Billed | Reimb. Billed | Total Billed | Gross Revenue | ODCs | Net Revenue | Direct Labor | Overhead Amount | Profit | % of NFE | Eff. Mult. | OH Rate | Unbilled | A/R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OpCo: 01 LAN** | | | | | | | | | | | | | | |
| YTD | 58,943,079 | 9,944,246 | 68,887,324 | 65,292,967 | 20,392,684 | 44,900,283 | 15,754,810 | 25,977,543 | 3,167,931 | 7% | 2.85 | 165% | -3,594,357 | 4,888,800 |
| **Final Totals** | | | | | | | | | | | | | | |
| YTD | 58,943,079 | 9,944,246 | 68,887,324 | 65,292,967 | 20,392,684 | 44,900,283 | 15,754,810 | 25,977,543 | 3,167,931 | 7% | 2.85 | 165% | -3,594,357 | 4,888,800 |

**EXHIBIT**

**Brader 3A**

exhibitsticker.com

---

v3.5.6.0 (Katie Whittaker) - Cost, Project Budgeting

Page 1 of 1

| Source | Year Listed | Leo A Daly | | LAN | |
|---|---|---|---|---|---|
| | | Gross Revenue | Profit | Gross Revenue | Profit |
| Tabs 7, 35 | 2010 | $ 102,645,072 | $ (10,868,292) | $ 69,409,577 | $ 5,213,053 |
| Tabs 8, 31 | 2011 | $ 94,340,384 | $ (3,519,031) | $ 61,928,953 | $ 3,815,036 |
| Tabs 9, 34 | 2012 | $ 79,807,583 | $ (7,645,867) | $ 52,112,703 | $ 617,597 |
| Tabs 6, 33 | 2013 | $ 82,243,978 | $ (5,447,920) | $ 79,614,202 | $ 3,570,519 |
| Tabs 16, 32 | 2014 | $ 81,323,774 | $ (4,062,367) | $ 66,374,664 | $ (311,190) |
| Tab 10, X3A | 2015 | $ 74,360,422 | $ (4,026,532) | $ 65,292,967 | $ 3,167,931 |
| Tabs 13, 38 | 2016 | $ 90,961,338 | $ 3,386,105 | $ 69,071,691 | $ 2,385,423 |
| Tabs 15, 36 | 2017 | $ 91,611,860 | $ 1,451,329 | $ 68,004,040 | $ (4,179,603) |
| Tabs 11, 39 | 2018 | $ 91,327,953 | $ (427,837) | $ 73,476,307 | $ 1,459,404 |
| Tabs 14, 37 | 2019 | $ 95,579,292 | $ 1,655,113 | $ 84,996,762 | $ 6,699,474 |
| Tabs 12, 41 | 2020 | $ 92,785,866 | $ (92,043) | $ 76,707,023 | $ (686) |
| | Totals | $ 976,987,522 | $ (29,597,342) | $ 766,988,889 | $ 22,436,958 |

EXHIBIT

Brader 4

exhibitsticker.com

# Trial Balance

Leo A Daly / LAN

Friday, February 26, 2021
2:38:53 PM

Year-to-Date through 2/28/2021

| | | Opening Balance | Debits | Credits | Closing Balance |
|---|---|---:|---:|---:|---:|
| 126-AUS | Advances to Vendors - Austin | | | | |
| 126-HOU | Advances to Vendors - HOU Ofc | | | | |
| 126-LAN | Advances to Vendors - LAN ofcs | | | 12,596.20 | -12,596.20 |
| 126-SAT | Deposit - Lsehld Imprvmnts - SAT | | | | |
| 127-CCT | Deposit - Corpus Christi, TX Office-LAN | 200.00 | | | 200.00 |
| 127-CST | Deposit - College Station, TX LAN Office | 3,027.60 | | | 3,027.60 |
| 127-DRT | Deposit - LAN DART Apartment | | | | |
| 127-MCO | Deposit - Montgomery County Office | 3,202.50 | | | 3,202.50 |
| 127-MDW | Deposit - Midwest Office (LAN-Chicago) | 4,474.79 | | | 4,474.79 |
| 127-PEJ | Deposit-Jolly, P. E. - Dallas Apt 6/2008 | | | | |
| 127-SAC | Deposit - Sacramento Rent | | | | |
| 127-SAT | Deposit - San Antonio, TX LAN Office | 15,000.00 | | | 15,000.00 |
| 127-UMF | Deposit-Univ Michigan-Flint-LAN-MI offc | 170.00 | | | 170.00 |
| 143-LHO | Automobiles - LAN Houston | | | | |
| 144-AUS | Furniture/Fixtures - LAN Austin | 453,291.47 | 3,569.00 | 2,511.40 | 454,349.07 |
| 144-BRY | Furniture/Fixtures - LAN Bryan | 155,146.76 | | | 155,146.76 |
| 144-CAP | Furniture/Fixtures - LAN CAP Metro (AUS) | 48,271.12 | | | 48,271.12 |
| 144-COR | Furniture/Fixtures - LAN Corpus Christi | 7,415.61 | | | 7,415.61 |
| 144-DMG | Furniture/Fixtures - LAN Dallas Mgmt | 258,893.61 | | | 258,893.61 |
| 144-FAC | Furniture/Fixtures - LAN Facilities | | | | |
| 144-FLN | Furniture/Fixtures - LAN Flint, MI Ofc | 1,060.68 | | 1,060.68 | |
| 144-FTW | Furniture/Fixtures - LAN Fort Worth | 220,942.55 | | | 220,942.55 |
| 144-INF | Furniture/Fixtures - LAN Infrastructure | | | | |
| 144-LAN | Furniture/Fixtures - LAN STV ofc (DAL) | | | | |
| 144-LHO | Furniture/Fixtures - LAN Houston | 557,767.41 | | | 557,767.41 |
| 144-LRD | Furniture/Fixtures - LAN Laredo | | | | |
| 144-LSG | Furniture/Fixtures - LAN Lansing | 12,000.00 | | | 12,000.00 |
| 144-MCO | Furn/Fixtures- LAN Montomery Co (Conroe) | 17,405.52 | | | 17,405.52 |
| 144-MDW | Furniture/Fixtures - LAN Chicago | 102,158.45 | | | 102,158.45 |
| 144-NTE | Furniture/Fixtures - LAN Transit (NTE) | | | | |
| 144-SAN | Furniture/Fixtures - LAN San Marcos | 20,011.10 | | | 20,011.10 |
| 144-SAT | Furniture/Fixtures - LAN San Antonio | 423,781.42 | 93,900.85 | | 517,682.27 |
| 144-SJC | Furniture/Fixtures - LAN San Jose | 21,857.15 | | | 21,857.15 |
| 144-TRN | Furniture/Fixtures - LAN Transportation | | | | |
| 144-TST | Furniture/Fixtures - LAN Transit (TST) | | | | |
| 144-WAC | Furniture/Fixtures - LAN Waco | 9,847.97 | | | 9,847.97 |
| 145-AUS | Leasehold Improvemnts - LAN Austin | 1,127,078.70 | 257,467.72 | 2,621.15 | 1,381,925.27 |
| 145-BRY | Leasehold Improvemnts - LAN Bryan | 97,059.02 | | | 97,059.02 |
| 145-CAP | Leasehold Improvemnts - LAN CAP Metro | 36,426.09 | | | 36,426.09 |
| 145-CST | Leasehold Improvemnts - LAN College Stat | 10,699.69 | | 236.25 | 10,463.44 |
| 145-DMG | Leasehold Improvemnts - LAN Dallas Mgmt | 248,487.30 | | | 248,487.30 |
| 145-FAC | Leasehold Improvemnts - LAN Facilities | | | | |
| 145-FTW | Leasehold Improvemnts - LAN Fort Worth | 101,625.75 | | | 101,625.75 |
| 145-LHO | Leasehold Improvemnts - LAN Houston | 681,461.86 | | | 681,461.86 |
| 145-LPX | Leasehold Improvemnts - LAN Phoenix | | | | |
| 145-MCO | Lease Imprv- LAN Montomery Co (Conroe) | 9,863.41 | | | 9,863.41 |
| 145-MDW | Leasehold Improvements - LAN Chicago | 22,582.08 | 12,596.20 | 12,596.20 | 22,582.08 |
| 145-NOR | Leasehold Improvements - LAN Norman, OK | | | | |
| 145-SAN | Leasehold Improvements - LAN San Marcos | | | | |
| 145-SAT | Leasehold Improvemnts - LAN San Antonio | 109,816.69 | 652,784.39 | 94,063.24 | 668,537.84 |
| 145-SJC | Leasehold Improvemnts - LAN San Jose | | | | |
| 146-AUS | Computer Equip - LAN Austin | 314,314.45 | 22,590.77 | 56,869.91 | 280,035.31 |
| 146-BAY | Computer Equip - LAN Bayport, MI | 5,954.94 | | | 5,954.94 |
| 146-BRY | Computer Equip - LAN Bryan | 5,618.94 | | | 5,618.94 |
| 146-CAP | Computer Equip - LAN CAP Metro ofc (AUS) | 13,707.35 | | | 13,707.35 |

EXHIBIT

Brader 5

v7.6.760 (JBBRADER) -

Page 1 of 3

LAN_FLINT_00226498

| Trial Balance | | Year-to-Date through 2/28/2021 | | | Friday, February 26, 2021 2:38:53 PM |
|---|---|---|---|---|---|
| | | Opening Balance | Debits | Credits | Closing Balance |
| 146-CLR | Computer Equip - LAN Clearwater FL | 5,954.94 | | | 5,954.94 |
| 146-COR | Computer Equip - LAN Corpus Christie | 57,490.50 | 3,176.04 | | 60,666.54 |
| 146-CST | Computer Equip - LAN College Station | 39,222.54 | 2,278.66 | 7,788.57 | 33,712.63 |
| 146-DMG | Computer Equip - LAN Dallas Mgmt | 52,302.27 | | 17,626.20 | 34,676.07 |
| 146-ELP | Computer Equip - LAN El Paso | 6,772.05 | | | 6,772.05 |
| 146-FLN | Computer Equip - LAN Flint, MI | 21,262.25 | | 21,262.25 | |
| 146-FTW | Computer Equip - LAN Fort Worth | 146,787.75 | 4,899.16 | 12,840.43 | 138,846.48 |
| 146-ILD | Computer Equip - LAN Miami | | | | |
| 146-LHO | Computer Equip - LAN Houston | 1,831,111.06 | 79,877.29 | 243,334.42 | 1,667,653.93 |
| 146-LMI | Computer Equip - LAN Miami | 6,225.37 | | | 6,225.37 |
| 146-LPX | Computer Equip - LAN Phoenix | | | | |
| 146-LSG | Computer Equip - LAN Lansing | 38,074.56 | 2,278.66 | 2,251.77 | 38,101.45 |
| 146-MCO | Computer Equip - LAN Conroe | 44,580.69 | 7,935.95 | 2,228.48 | 50,288.16 |
| 146-MDW | Comp Equip - LAN Chicago | 115,432.54 | 6,728.88 | 25,085.08 | 97,076.34 |
| 146-MID | Computer Equip - LAN Midway Office | | | | |
| 146-MIL | Computer Equip - LAN Milpitas, CA office | 35,300.72 | | 4,020.50 | 31,280.22 |
| 146-OAK | Computer Equip - Oakland, CA LAN | 2,503.71 | | | 2,503.71 |
| 146-ORG | Computer Equip - LAN Orange | 28,095.76 | | | 28,095.76 |
| 146-SAC | Computer Equip - Sacramento LAN | 2,709.08 | | | 2,709.08 |
| 146-SAN | Computer Equip - LAN San Marcos | 52,341.92 | | 20,759.88 | 31,582.04 |
| 146-SAT | Computer Equip - LAN San Antonio | 134,070.24 | 22,633.41 | 14,249.44 | 142,454.21 |
| 146-SJC | Computer Equip - LAN San Jose | | 6,182.25 | | 6,182.25 |
| 146-STV | Computer Equip - LAN STV (Dallas) | | | | |
| 146-TEM | Computer Equip - LAN Temple Office | | | | |
| 146-TPA | Computer Equip - LAN Tampa | | | | |
| 146-WAC | Computer Equip - LAN Waco | 42,569.81 | 2,930.73 | 3,862.53 | 41,638.01 |
| 147-BRY | Eng Equipment - LAN Bryan | 20,703.00 | | | 20,703.00 |
| 147-DMG | Eng Equipment - LAN Dallas Mgmt | | | | |
| 147-LAN | Eng Equipment - LAN STV | | | | |
| 147-LHO | Eng Equipment - LAN Houston | | | | |
| 153-LHO | Accum Depr Autos-Houston | | | | |
| 154-AUS | Accum Depr Furn-Au | -354,342.51 | | 14,606.24 | -368,948.75 |
| 154-BRY | Accum Depr - Furn/Fix Bryan | -96,655.44 | | 8,559.70 | -105,215.14 |
| 154-CAP | Accum Depr - Furn/Fix Cap Metro | -48,271.12 | | | -48,271.12 |
| 154-COR | Accum Depr - LAN Corpus Christi Furnitur | -6,422.86 | | 661.83 | -7,084.69 |
| 154-DAL | Accum Dep - Furn/Fix DAL | -90,761.77 | | 29,083.66 | -119,845.43 |
| 154-DMG | Accum Depr Furn-Dal Mgmt | -258,893.61 | | | -258,893.61 |
| 154-FAC | Accum Depr - Furniture - FAC | | | | |
| 154-FLN | Accum Depr - Furn/Fix LAN Flint, MI Ofc | -1,060.68 | 1,060.68 | | |
| 154-FTW | Accum Dep- Furn/Fix- Ft Worth | -213,821.87 | | 1,294.67 | -215,116.54 |
| 154-HOU | Accum Depr - Furn/Fixtures Houston | -826.52 | | 1,416.89 | -2,243.41 |
| 154-INF | Depr Furniture - INF | | | | |
| 154-IXT | Accrum depr - Furn/Fixtures - IXT | | | | |
| 154-LAN | Accum Depr Off-Lan/STV | | | | |
| 154-LHO | Accum Depr Furn-Houston | -556,867.36 | | 900.05 | -557,767.41 |
| 154-LSG | Accum Depr - Furn/Fix LAN Lansing | -10,393.54 | | 1,070.97 | -11,464.51 |
| 154-MCO | Accum Depr - Furn/Fix Montomery Co | -13,521.97 | | 1,553.42 | -15,075.39 |
| 154-MDW | Accum Depr - Furn/Fix LAN Chicago | -84,320.51 | | 5,096.55 | -89,417.06 |
| 154-SAN | Accum Depr - Furn/Fix LAN San Marcos | -12,958.30 | | 2,269.25 | -15,227.55 |
| 154-SAT | Accum Depr Furn-SA | -285,135.94 | | 10,503.65 | -295,639.59 |
| 154-SJC | Accum Depr Furn-San Jose | -1,635.76 | | 3,122.44 | -4,758.20 |
| 154-TRN | Depr furniture - TRN | | | | |
| 154-TST | Depr furniture - TST | | | | |
| 154-WAC | Accum Depr - Furn/Fixtures Waco | -9,847.97 | | | -9,847.97 |
| 155-AUS | Accum Depr L/Hold-Austin | -258,462.26 | | 156,922.74 | -415,385.00 |
| 155-BRY | Accum Depr :/Hold BRYAN | -79,245.32 | | 6,680.13 | -85,925.45 |
| 155-CAP | Accum Depr- Leaseholds Cap Metro | -36,426.09 | | | -36,426.09 |
| 155-CST | Accum Dep - Lsehld Imprv - LAN College S | -373.69 | | 1,494.78 | -1,868.47 |

Confidential

LAN_FLINT_00226499

| Trial Balance | | Year-to-Date through 2/28/2021 | | | Friday, February 26, 2021 2:38:53 PM |
|---|---|---|---|---|---|
| | | **Opening Balance** | **Debits** | **Credits** | **Closing Balance** |
| 155-DMG | Accum Dep :/Hold-Dal Mgt | -248,487.30 | | | -248,487.30 |
| 155-FAC | Accum Dep - L/H Improvements - FAC | | | | |
| 155-FTW | Accum Dep-L/Hold Impvmts Ft Worth | -101,625.75 | | | -101,625.75 |
| 155-HOU | Accum Depr - Leasehold Imp Houston | | | | |
| 155-LHO | Accum Depr L/Hold-Houston | -650,002.89 | | 10,431.17 | -660,434.06 |
| 155-LPX | Accum Depr L/Hold-LAN PHX | | | | |
| 155-MCO | Accum Depr-Leasehld Imprv - Montomery Co | -6,985.85 | | 880.30 | -7,866.15 |
| 155-MDW | Accum Depr - Leasehold Imprvmnts LAN Chi | -16,178.17 | 897.21 | 2,726.90 | -18,007.86 |
| 155-NOR | Accum Depr - LeaseHld LAN Norman, OK | | | | |
| 155-SAT | Accum Depr L/Hold-SA | -85,706.74 | | 71,628.05 | -157,334.79 |
| 155-TRA | Accum. Depr.-Transp (SA) | | | | |
| 156-AUS | Accum Depr - Computers Austin | -200,371.04 | 56,869.91 | 39,319.07 | -182,820.20 |
| 156-BAY | Accum Dep- Computer Equip LAN Bayport | -5,954.94 | | | -5,954.94 |
| 156-BRY | Accum Depr - Computers BRYAN | -2,727.26 | | 889.73 | -3,616.99 |
| 156-CAP | Accum Depr Computer Equip CAP Metro | -13,707.35 | | | -13,707.35 |
| 156-CLR | Accum Depreciation - LAN Clearwater, FL | -5,954.94 | | | -5,954.94 |
| 156-COR | Accum-Computer - LAN Corpus Christi | -24,043.67 | | 9,857.71 | -33,901.38 |
| 156-CST | Accum Depr - Comptrs LAN College Station | -16,978.69 | 7,788.57 | 6,507.03 | -15,697.15 |
| 156-DMG | Accum Depr Comp-Dal Mgmt | -51,087.49 | 17,626.20 | 910.54 | -34,371.83 |
| 156-ELP | Accum Depr - Computers LAN ElPaso | -6,772.05 | | | -6,772.05 |
| 156-FLN | Accum Depr - LAN Flint, MI | -18,487.86 | 20,014.89 | 1,527.03 | |
| 156-FTW | Accum Depr - Computers FT Worth | -81,498.33 | 12,840.43 | 19,905.02 | -88,562.92 |
| 156-HOU | Accum Depr - Computers Houston | | 491.63 | 491.63 | |
| 156-ILD | Accum Depr Comp - ILD | | | | |
| 156-LAN | Accum Depr comp-Lan/Stv | | | | |
| 156-LHO | Accum Depr Comp-Houston | -1,461,832.86 | 242,334.23 | 129,863.75 | -1,349,362.38 |
| 156-LSG | Accum Depr - LAN Lansing | -22,897.78 | 2,251.77 | 4,791.83 | -25,437.84 |
| 156-MCO | Accum Depr Comp-Conroe | -39,927.81 | 2,228.48 | 4,178.81 | -41,878.14 |
| 156-MDW | Accum Depr - Computers LAN Chicago | -83,015.16 | 25,085.08 | 12,961.75 | -70,891.83 |
| 156-MIL | Accum Depr - LAN Milpitas,CA Office | -28,901.41 | 4,020.50 | 2,209.21 | -27,090.12 |
| 156-OAK | Accum Dep - Computer Equip - Oakland, CA | -2,071.07 | | 288.43 | -2,359.50 |
| 156-ORG | Accum Depr - Computers Austin | -14,985.71 | | 4,417.07 | -19,402.78 |
| 156-SAC | Accum Dep - Computer Equip - SAC | -1,914.06 | | 307.75 | -2,221.81 |
| 156-SAN | Accrum depr - Computers - SAN | -46,188.62 | 20,759.88 | 3,365.82 | -28,794.56 |
| 156-SAT | Accum Depr Comp-SA | -73,473.90 | 14,249.44 | 20,632.83 | -79,857.29 |
| 156-SJC | Accum Depr Comp-San Jose | | | 648.55 | -648.55 |
| 156-TEM | Accum Depr - Comp Equip LAN Temple Offic | | | | |
| 156-TPA | Accum Depr-Computer Equip-LAN Tampa | | | | |
| 156-WAC | Accum Depr - Computers Waco | -34,182.61 | 3,862.53 | 3,514.57 | -33,834.65 |
| 157-BRY | Accum Depr-Engineering Equip-Bryan | -20,703.00 | | | -20,703.00 |
| 157-DMG | Accum Depr EE-Dal Mgmt | | | | |
| 157-LAN | Accum Depr EE-Lan/Stv | | | | |
| 157-LHO | Accum Depr EE-Houston | | | | |
| **Final Totals** | | **2,017,223.34** | **1,614,211.39** | **1,155,356.10** | **2,476,078.63** |

Confidential

LAN_FLINT_00226500



EXHIBIT

Brader 10

# LEO A DALY

# EMPLOYEE HANDBOOK

Confidential

# EMPLOYEE HANDBOOK

Welcome to LEO A DALY

Since 1915, we have upheld the highest standard of quality in professional services provided to our clients. One of our values, "Excellence is the only acceptable standard" was developed more than 35 years ago. Excellence will continue to remain the standard by which we measure our performance in the years ahead.

"Excellence is the only acceptable standard" does not only apply to the service we provide our clients, but to our service to our employees. Attracting and retaining outstanding people is the key to our excellence. To ensure mutual success, we feel it is important that all employees understand our practices, policies, and procedures.

This Employee Handbook will familiarize you with the various aspects of working at LEO A DALY. We encourage you to use it as a resource for understanding your Company. It is a useful reference for all employees. If you have any questions, please do not hesitate to ask your supervisor, Operations, Business Group, or Office Director.

Please review this handbook carefully. Thank you for taking this step in learning about the Company and what is has to offer you. You, as an employee, are the essential ingredient in making "Excellence the only acceptable standard."

LAN_FLINT_00226502

# EMPLOYEE HANDBOOK



LEO A DALY Employees:

We recognize that our most valuable assets are our employees and our clients. Attracting and retaining outstanding people is the key to our success. To ensure mutual success, we feel it is important that all employees understand our practices, policies and procedures.

This Employee Handbook will familiarize you with the various aspects of working at LEO A DALY. We encourage you to use it as a resource for understanding the Company. We feel it will also be a useful reference document for all employees. If you have any questions, please do not hesitate to ask them of either your supervisor, Operations, Business Group, or Office Director.

Please give this handbook your careful consideration. Thank you for taking this step in learning about your Company, and what it has to offer to you, a valued employee.

Sincerely,

Leo A. Daly

Leo A. Daly III,
FAIA, RIBA Chairman and
President



## OUR VISION

LEO A DALY will be the recognized leader in the design and engineering of the built environment. Our work will reflect imagination and intelligence, creating exceptional solutions for our clients that enhance the quality of the human experience and the environment.

## ENDURING PRINCIPLES - "Excellence is the only acceptable standard"

- We listen to our clients and multiply the power of their ideas
- We maintain the highest standards of ethical and moral conduct We focus on performance and building trust
- We are committed to preserving and protecting the environment
- We promote creativity and innovation
- We are committed to excellence in design and engineering
- We are committed to being financially sound and a leader in business practices

## GOALS - Building for the Future

- Industry Leadership
- Design and Engineering Excellence
- Lasting Relationships
- Attracting and Investing in the Best People
- Strategic and Profitable Growth

LEO A DALY

Confidential

# TABLE OF CONTENTS

**Page No.**

HISTORY ......................................................................................... 1

I.     Introduction ......................................................................... 3

II.    At-Will Employment ............................................................ 3

III.   Equal Employment Opportunity ........................................ 3

IV.   Policy Against Harassment ................................................. 4

V.    Employee Privacy and Records .......................................... 5

VI.   Employment Categories .................................................... 5

      A.  Full- Time Employees ................................................... 6

      B.  Part-Time Employees ................................................... 6

      C.  Temporary .................................................................... 6

VII.  Employment Status ........................................................... 6

      A.  Exempt ......................................................................... 6

      B.  Non-Exempt ................................................................. 6

VIII. Hours of Work, Overtime and Payday

      A.  Hours of Work ............................................................. 6

      B.  Overtime Pay ............................................................... 6

          1. Overtime Definition and Pay Rates ..................... 6

          2. Workweek and Workday ....................................... 7

          3. Pre-Authorization .................................................. 7

          4. Timesheets ............................................................. 7

      C.  Place and Time for Payment of Wages ................... 7

          1.  Regular Paydays ................................................... 7

          2. Payment on Resignation or Termination ............ 7

**LEO A DALY**

IX.   Wage and Salary Administration ................................................................ 7

      A. Pay Review............................................................................................ 7

      B. Performance Review ............................................................................. 8

      C. Initial Evaluation Period........................................................................ 8

X.    Employee Benefits ..................................................................................... 8

      A.   Insurance  .......................................................................................... 8

           1. Major Medical, Dental and Vision ..................................................... 8

           2. Disability Income Insurance ............................................................. 8

           3. Term Life Insurance ......................................................................... 9

           4. Accidental Death and Dismemberment ............................................ 9

           5. Travel Accident Insurance................................................................ 9

           6. Workers' Compensation Insurance ................................................... 9

      B.   Social Security..................................................................................... 9

      C.   Flexible Benefits Plan .......................................................................... 9

      D.   Profit Sharing Pension Trust and 401(k) Plan .................................... 10

XI.   Holidays, Paid Time Off (PTO), Civic Duty ............................................... 10

      A.   Holidays ............................................................................................ 10

           1. Weekends...................................................................................... 10

           2. Eligibility ...................................................................................... 10

      B.   Paid Time Off (PTO) .......................................................................... 11

           1. Accrual of PTO .............................................................................. 11

           2. Part-Time and Temporary Employees ............................................. 11

           3. Maximum Accrual .......................................................................... 11

           4. Pay in Lieu of PTO......................................................................... 11

           5. PTO Accrual During Leaves of Absence .......................................... 11

           6. PTO Pay on Termination ................................................................ 11

LEO A DALY

Confidential

7. PTO Approval ........................................................................................ 11

8. PTO Advances ....................................................................................... 12

9. Holidays Occurring During PTO ............................................................ 12

10. PTO for Family Care and Medical Leave or for Personal Leave ............... 12

C.   PTO – Transition Provisions (PTOR) ....................................................... 12

D.   Civic Duty ............................................................................................. 13

1. Jury Duty and Election Board Duty ........................................................ 13

XII.   Leave of Absence (Unpaid) ........................................................................ 13

A.  Family Care and Medical Leave ............................................................. 13

1. Eligibility ............................................................................................. 13

2. Permissible Uses of Family Care and Medical Leave ............................... 13

3. Substitution of PTO for Family Care and Medical Leave ......................... 13

4. Amount of Leave  ................................................................................. 14

5. Effect on Benefits ................................................................................. 14

6. Procedure for Requesting Family Care and Medical Leave  ...................... 14
   a. Notice Requirements .......................................................................... 14
   b. Medical Certification .......................................................................... 15
7. Effect on Reinstatement ........................................................................ 15

B.  Personal Leave Without Pay ................................................................... 16

C.  Military Leave ....................................................................................... 16

D.  Effect on Benefits .................................................................................. 16

E.  Restoration of Position ........................................................................... 17

XIII.   Workplace Rules and Procedures ................................................................ 17

A.  Rules of Conduct and Discipline ............................................................ 17

1. Police ................................................................................................. 17

2. Honesty and Ethics .............................................................................. 17

3. Performance ........................................................................................ 18

4. Worksite Safety .................................................................................... 18

Confidential

5. Personal Conduct.......................................................................... 19

6. Discipline Procedure ................................................................... 19

B. Personnel Records ........................................................................ 20

C. Conflicts of Interest and Outside Employment ......................................... 20

D. No Smoking Policy ......................................................................... 21

E. Security and Confidential Information ................................................... 21

  1. Proprietary and Confidential Information ............................................ 21

  2. Obligations on Termination........................................................... 22

F. Company Computer Resources Police .................................................... 22

G. Drug-Free Workplace ..................................................................... 22

  1. Purpose of Guideline ................................................................. 22

  2. Definitions ........................................................................... 22

  3. Prohibited Conduct ................................................................... 23

  4. Alcohol ............................................................................... 23

  5. Illegal Drugs ......................................................................... 23

  6. Legal Drugs .......................................................................... 24

  7. Criminal Convictions ................................................................. 24

  8. Use of Legal Drugs.................................................................... 24

  9. Unregulated or Authorized Conduct................................................... 25

    a. Customary Use of Over-the-Counter Drugs...................................... 25
    b. Off-the-Job Conduct............................................................. 25
    c. Authorized Use of Alcohol ...................................................... 25

  10. Confidentiality...................................................................... 25

H. Termination ............................................................................... 25

  1. Voluntary Termination ................................................................ 25

  2. Involuntary Termination .............................................................. 25

  3. Termination Due to Reorganizations, Economics, or Lack of Work............. 26

LEO A DALY

Confidential

LAN_FLINT_00226508

XIV. Employee Development ............................................................................ 26

    A. Educational Assistance Program ...................................................... 26

    B. Professional Registrations ............................................................... 26

    C. Professional Society Memberships .................................................. 26

    D. Service Club Memberships .............................................................. 26

    E. Other Developmental Activity ......................................................... 26

XV. Service Awards ....................................................................................... 27

XVI. Miscellaneous ........................................................................................ 27

    A. Employment of Relatives ................................................................ 27

    B. Employee Referral Program ............................................................ 27

    C. Travel and Expense Accounts ......................................................... 27

    D. Exit Interviews ............................................................................... 27

    E. Relocation ...................................................................................... 27

    F. Violence in the Workplace ............................................................... 28

        1. Workplace Violence Defined ..................................................... 28

        2. Reporting ................................................................................ 28

        3. Investigation ........................................................................... 28

        4. Corrective Action and Discipline ............................................... 28

    G. Communication .............................................................................. 29

ATTACHMENT A ......................................................................................... A1

Definitions of "Serious Health Condition" for line 3 of the Certification of Health Care Provider Form

© 2007 - 2014 LEO A DALY

LEO A DALY

LAN_FLINT_00226509

## HISTORY

Shortly after opening his one- man Omaha, Nebraska, architectural office in 1915, Leo A. Daly, Sr. expressed his personal philosophy: *"An architectural firm, to be of maximum service to its clients, must embrace every phase of architecture, engineering and planning."*

Today, the LEO A DALY Company epitomizes Leo A. Daly, Sr.'s vision of an architectural firm. We are an international company which offers a full range of services in planning, architecture, engineering and interiors to private, institutional and governmental clients. Dedicated to professionalism, we now employ more than 950 design and technical individuals, who offer our multi-disciplinary expertise from offices worldwide.

During the Company's early years, we built a reputation with Omaha clients such as Creighton University, Woodmen of the World Life Insurance Society, and Boys Town. As we grew, larger commissions were undertaken. During the 1940s the Company added our structural, civil, mechanical and electrical engineering departments. A period of intense growth began during World War II, when we established strong relationships with the US government by responding to armed forces design assignments for airfields, camps and military bases. The peacetime economy which followed produced a construction boom during which the Company expanded significantly.

In 1949, encouraged by our growth, we opened our first branch office in St. Louis. In 1951, our first inter-disciplinary team, combining architects and engineers, was formed. This team format has continued as our basic organizational unit.

In 1950, we began work on our first projects to be built outside the continental United States. This work, for the US Navy in Alaska and the Aleutian Islands, soon stimulated the opening of our third office, in Seattle, Washington in the spring of 1951.

Leo A. Daly, Sr. died in 1952. His sons, schooled in architecture and professionally registered, assumed responsibility for the company. Under the leadership of Leo A. Daly, Jr., President of the Company, the San Francisco office was established in 1957 and a new headquarters was built in Omaha in 1959. This new corporate office served our expanding operations which, by 1960, had reached a force of more than 200 professional and support personnel.

Project opportunities during the 1960s allowed the Company to direct our design experience into projects for institutions, industry and commerce. During the 1960s, we opened our Washington, DC office (1964), established our Hong Kong office (1967) and opened our Los Angeles office when the firm of Allison, Rible, Robinson and Ziegler merged with LEO A DALY in 1969.

The energy-conscious decade of the 1970s provided new design challenges, LEO A DALY soon became leaders in the field of energy conservation for the built environment. An increase in commissions in the Middle East led us to establish a professional association with Saudi Consulting House, a branch of the Saudi Arabian government. We opened an operational office in Riyadh in 1979.

In 1981, the Honolulu firm of Alfred A. Yee and Associates became part of LEO A DALY. In addition to providing a Honolulu office, Yee's Singapore office enhanced our Far East presence, and enabled us to gain additional international experience through projects in Malaysia and Guam.

In 1981, Leo A. Daly, Jr.'s son, Leo A. Daly III became president of the Company. After joining the firm in 1964, the third Mr. Daly has served as Project Manager, Vice President, Senior Vice

Confidential

President and Director of International Operations. He has extended throughout the Company the high standards set by his father and grandfather, and he has made an aggressive commitment to global promotion of U.S. "Technical Excellence."

The LEO A DALY Company has received a Presidential Commendation for outstanding performance in encouraging international trade through the export of professional services. Mr. Daly's understanding of the unique complexities of international project development has led to the creation of several international business associations. These include an agreement on behalf of LEO A DALY Pacific Limited (Hong Kong) to associate with the China State Construction Engineering Corporation (CSCEC) for projects in the People's Republic of China, and the formation of Nihon-Daly, a professional association with a Tokyo-based international architectural, engineering and consulting services firm. The Nihon-Daly association was formed in 1983 to serve multi- national clients. To serve an expanding European market we opened our Madrid Office in 1988, and subsequently a second European office in Berlin in 1993. International project development has also led to the establishment of LEO A DALY Middle East, LLC, a 1995 joint venture, officed in Dubai, U.A.E.

Domestic and international growth since the mid-1980s has convinced us to open offices situated in areas where we may best serve our clients' needs. We now have offices in: Atlanta, Dallas, Honolulu, Omaha, Las Vegas, Los Angeles, Miami, Minneapolis, Phoenix, and Washington, DC and in foreign countries.

In 1991, the Company acquired Lockwood, Andrews & Newnam, Inc., an engineering and architectural services firm. In addition to its headquarters in Houston, LAN has offices in Dallas and San Antonio. LAN strengthened our presence in Texas and in the southwest US, and enhanced our ability to render engineering services for a wide range of assignments and projects.

The professional growth and advancement of beginning professionals into management responsibilities has contributed greatly to the success and expansion of LEO A DALY. We are optimistic that as we continue to grow, every employee will contribute to, and be a part of, this growth. Our employees are our future.

LEO A DALY

Confidential

LAN_FLINT_00226511

# I. INTRODUCTION

This LEO A DALY Company Employee Handbook has been written as a source of general information and is intended as an outline of our Company policies and employee benefit plans. Company policies are specifically defined in the LEO A DALY Policy Manual. Employee benefits are defined in legal documents such as insurance contracts, official plan texts, summary plan descriptions and trust documents. Upon enrollment in our group insurance plan(s), employees will receive Summary Plan Descriptions of these plans. Other plan documents are available for employee review by contacting your Office Director. The specific language of the Policy Manual and the plan documents govern Company policies and employee benefits, not the general wording of this handbook. Additionally, many of the practices contained in this handbook are supported by written policies which have been given to each Office Director.

The practices outlined in this handbook are not intended to restrict the personal rights of anyone, but rather are a means to provide a productive and safe work environment for all employees. We believe that employees' knowledge of LEO A DALY policies and procedures will be helpful in the performance of their job duties.

Because of the evolving nature of the employer-employee relationship and the opportunities and benefits that relationship provides, LEO A DALY reserves the right to change, suspend or terminate all or any of the employee benefit plans, policies, procedures or practices described in this handbook.

Any questions regarding this handbook should be discussed with your Supervisor or Office Director.

# II. AT-WILL EMPLOYMENT

The employment relationship between LEO A DALY and its employees may be terminated at any time, with or without cause and with or without prior notice, at the option of either the Company or the employee. Just as you have joined the Company voluntarily and may resign at any time, LEO A DALY may end the employment relationship whenever we believe it is in the Company's best interests, including (but not limited to) reorganization for economic or business conditions.

# III. EQUAL EMPLOYMENT OPPORTUNITY

It is, and will continue to be the policy of LEO A DALY to provide equal opportunity to all employees and applicants for employment without regard to race, color, religion, national origin, age (age 40 and over), gender, pregnancy, sexual orientation, gender identity and expression, disability, military status, genetic information or any other protected characteristics or status as established by law. Employment decisions shall be based upon objective standards for assessing an individual's qualifications as they relate to a particular job vacancy, thereby furthering the principle of equal employment opportunity.

LEO A DALY will offer equal employment opportunities for qualified individuals who may have a physical or mental disability, but who can still perform the essential functions of the job. This may require reasonable accommodation, if the accommodation does not cause the Company "undue hardship."

The Company will take appropriate action to ensure that the rights of individuals to file complaints, furnish information, or participate in an investigation, public hearing, or other activity related to equal employment opportunity laws will be respected and not interfered with in any manner.

Confidential

All employees are protected from coercion, intimidation, interference, or discrimination for opposing any employment practice made unlawful by federal, state or local law. Employees are also protected from coercion, intimidation, interference, or discrimination if the employee, in good faith, has made a charge, testified or participated in any manner, in an investigation, proceeding or hearing concerning an unlawful federal, state or local law.

## IV. POLICY AGAINST HARASSMENT

Leo A Daly is committed to providing a work environment that is free of discrimination and unlawful harassment. Unwelcome sexual advances, requests for sexual favors, sexual demands or other verbal, physical or visual conduct of a sexual nature and/or personally offensive behavior which interferes with an employee's work performance will constitute sexual harassment whenever:

> submission to the conduct is either an explicit or implicit term or condition of employment or any employment decision; or

> the conduct has the purpose or effect of unreasonably interfering with an affected person's work performance, or creating an intimidating, hostile or offensive work environment; or

Sexual harassment may take many forms including, but not limited to:

> Verbal:      Sexual innuendoes, suggestive comments, jokes of a sexual nature, graphic commentaries, sexual propositions or threats; or

> Non-verbal: Sexually suggestive objects, pictures or computer images, suggestive or insulting sounds, leering, whistling or obscene gestures; or

> Physical:      Unwanted physical contact, including touching, pinching, brushing against the body, coerced sexual contact or assault.

Harassment on the basis of any other protected characteristic or status is also strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual or their relatives, friends or associates because of their race, color, religion, national origin, age (age 40 and over), gender, pregnancy, sexual orientation, gender identity and expression, disability, military status, genetic information or any other characteristic or status protected by law and that: (i) has the purpose or effect of creating an intimidating, hostile or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities.

Leo A Daly prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action.

Harassment may be overt or subtle and may affect male or female employees. Sexual harassment will not be tolerated. Management will take immediate action to stop any type of harassment in the work place - whether it involves supervisors/ subordinates, co-workers or non- employees/employees in the work setting.

Confidential                LAN_FLINT_00226513

**PROCEDURE**

LEO A DALY strongly urges the reporting of all incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position. Employees who believe they have experienced conduct that they believe is contrary to LEO A DALY policy or who have concerns about such matters, should take the following steps:

  a.  If the conduct does not present an immediate threat, make it clear to the other party that the conduct is offensive and tell the party to stop the offending behavior. Document in writing the details of the incident and whether there were any witnesses to the behavior.
  b.  If the conduct does present an immediate threat or if the incidents do not stop, report the matter to your Supervisor, Office Director or to the Company's General Counsel. Again, document the details of the incident and note any witnesses.
      DO NOT ALLOW THE CONDUCT TO CONTINUE WITHOUT VOICING A COMPLAINT.

Complaints of harassment may be made orally or in writing to your Supervisor, Office Director, the Company's General Counsel, Human Resources, or through *THE NETWORK* at 855-607-8695 / reportlineweb.com/Leoadaly.  Allegations will promptly be investigated, will be kept confidential and will not be recorded in the personnel file of the individual filing the complaint. Individuals should not feel obligated to make this complaint known to their immediate supervisor before bringing the matter to the attention of one of the other designated individuals identified above. Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure.

Anyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment for cause.

# V.  EMPLOYEE PRIVACY AND RECORDS

LEO A DALY regards employee information as confidential and respects the need for protecting the privacy of each employee and applicant for employment. The Company does maintain a separate confidential file for each employee so that we can administer its planning and personnel functions; carry out the provisions of Company compensation and employee benefits programs; and satisfy government reporting requirements.

Employees may request access to their personnel file and may examine their file during regular business hours in the presence of a member of management.

*Electronic Mail*

The E-Mail system utilized by LEO A DALY Company and all information or messages sent, created or received on it are Company property. Therefore, employees do not have a personal privacy right to any matter created, received or sent via the Company E-Mail system.

The Company reserves the right to monitor the E-Mail system to assure that the system is being used only for Company purposes, and that only authorized employees are entering information into the E-Mail system.

LEO A DALY

Confidential

## VI. EMPLOYMENT CATEGORIES

### A. Full-Time Employees

An employee who works at least forty (40) hours per week, exclusive of meal breaks, on a regularly scheduled basis. Full- time employees are eligible for applicable employee benefits and performance appraisals.

### B. Part -Time Employees

An employee who works less than forty (40) hours per week or 2,080 hours per year, exclusive of meal breaks, on a regularly scheduled basis. Part-time employees are eligible for performance reviews and a limited employee benefit.

### C. Temporary

An employee whose duration of employment is limited to a definite number of hours, days, weeks or months. These employees are paid on an hourly basis and receive only those employee benefits required by law.

## VII. EMPLOYMENT STATUS

LEO A DALY employees are classified as Exempt or Non-Exempt, according to their exemption from, or coverage under the overtime provisions of the Federal Wage and Hour Law.

### A. Exempt

Exempt employees are classified as such if their job duties are exempt from the overtime provisions of the Federal Wage and Hour Law. Exempt employees are not eligible for overtime pay.

### B. Non-Exempt

Non-Exempt employees receive overtime pay in accordance with our overtime policy. Their compensation is calculated on an hourly basis.

## VIII. HOURS OF WORK, OVERTIME AND PAYDAY

### A. Hours of Work

The regularly scheduled work week for all full- time employees consists of forty (40) hours worked during the period beginning at 12:01 a.m. Saturday and ending at midnight the following Friday. LEO A DALY reserves the right to modify employees' starting and quitting times and number of hours worked.

### B. Overtime Pay

#### 1. Overtime Definition and Pay Rates

All non-exempt employees (full time, part time or temporary) who work more than forty (40) hours in one workweek will receive overtime compensation computed at the rate of 1-1/2 times the employee's regular rate of pay. If a holiday occurs during the workweek, overtime will be paid for hours recorded in excess of 40. If PTO is taken during the workweek, hours recorded in excess of 40 will be reduced by the hours of PTO taken before overtime, if any, is calculated.

### 2. Workweek and Workday

Unless otherwise provided, the workweek on which weekly overtime calculations will be based begins each Saturday at 12:01 a.m. and ends at midnight on Friday; and each workday on which daily overtime calculations will be based begins at midnight.

### 3. Pre -Authorization

Overtime pay for non-exempt employees must be approved in advance by the supervisor.

### 4. Timesheets

Employees are required to submit approved timesheets at the end of each pay period in order to receive their paychecks. In order to ensure accurate billing to our clients, all staff members must maintain daily time records through the electronic timesheet. You will receive training on how to maintain and print your timesheet during your first week of employment.

Time should be recorded to the nearest half-hour. Any time spent working on a project is logged as direct time (billable). Indirect (non-billable) time is not directly chargeable to a project and is considered overhead expense. It is extremely important that these reports are accurate so that costs can be properly allocated. The immediate supervisor is responsible for informing the employee of the appropriate project number to use when a task is assigned to the employee.

## C. Place and Time for Payment of Wages

### 1. Regular Paydays

All employees are paid on a bi-weekly basis on the Wednesday (approximately) following each two-week period. Each two-week pay period begins on a Saturday and continues through the Friday occurring fourteen (14) days thereafter. Overtime occurring during any pay period will be paid on the payday for that pay period.

You may have your pay directly deposited into your bank/savings and loan account through our ACH (Automated Clearing House) automatic electronic deposits system. Almost all employees use this method because of its safety, convenience and timely deposit of pay.

### 2. Payment on Resignation or Termination

A discharged employee will be paid in accordance with the laws of the state in which the employee works.

Upon termination, an employee's final paycheck will include payment for all wages due and not previously paid and for accrued but unused PTO time if employed for 90 days or more, minus authorized deductions.

# IX.   WAGE AND SALARY ADMINISTRATION

## A.   Pay Review

LEO A DALY strives to pay competitive wages as determined by the relevant labor market and the Company's profitability and financial position.

Annual salary surveys are conducted of similar companies to ascertain prevailing wages.

LEO A DALY

**B.     Performance Review**

In order to maintain fair and equitable relationships, the job responsibilities, performance and wages of each employee will be evaluated at least once per year. Newly-hired employees, recently promoted employees or employees whose performance needs improvement will be evaluated more frequently, on a schedule to be determined by their Supervisor or Office Director. All new employees will be reviewed at the end of their first six (6) months of employment so that they may be informed in a formal manner of their performance and progress. Performance reviews are intended to be a developmental tool and may, or may not, result in a change in the employee's salary or wage rate.

**C.     Initial Evaluation Period**

New employees must satisfactorily complete an initial evaluation period of not more than six months from hire date. This period allows employees time to gain experience in a position and to be trained for a specific job. The supervisor will review the performance of the new employee and discuss the employee's performance and areas for further development. During this time, the new employee and supervisor may decide if continued employment is desired.

# X.     EMPLOYEE BENEFITS

**A.     Insurance**

The following is a brief explanation of the Company's health and accident insurance benefits. For more detailed information, employees are urged to refer to the Group Insurance Plan booklet located on the Company Intranet site.

**1.     Major Medical, Dental and Vision**

LEO A DALY maintains group insurance benefits designed to make available to employees and their families comprehensive medical, dental, vision, long term disability and life insurance coverage. All full-time regular employees are eligible for group insurance coverage, and the cost of the coverage is shared by the employee and LEO A DALY Company. Coverage becomes effective 30 days after employee's hire date. Employees electing medical coverage will be responsible for a portion of the medical health cost according to the following categories:

Employee only
Employee plus one dependent
Employee plus two or more dependents

Company group insurance plans are provided to ensure that employees are not burdened with extreme medical or dental expenses, for in many cases the plans will cover a large portion of the total cost of treatment. Specific cost information is available from the Accounting Department in your office.

**2.     Disability Income Insurance and Benefit**

Full- time employees of LEO A DALY are eligible for long-term disability insurance benefits upon the completion of one month of continuous employment. LEO A DALY shares the cost of this coverage for full- time employees. This insurance is not available

LEO A DALY

to employees who are not U.S. citizens unless they are residing in the United States. The plan provides 60% of base pay less appropriate taxes to an employee who becomes continuously disabled for a period in excess of 60 days.

All employees of the Company enrolled for long-term disability insurance are eligible for short-term disability benefit. If you become totally disabled for over 30 consecutive days, this benefit will pay you a Monthly Income Benefit from the 30th day of disability until the 60th day of total disability, provided you are under the regular care of a licensed physician as a result of an accident or illness. In order to be eligible for this benefit you must have specifically elected to take long-term disability insurance. You are not charged any additional cost for the short-term disability benefit.

### 3. Term Life Insurance

LEO A DALY pays 100% of this insurance for full-time employees. The benefit payable under is an amount equal to 100% of your annual rate of basic earnings from the Company rounded to the next $1,000, but not more than $50,000. The amount will be revised annually on March 1 to conform to any salary changes during the previous year.

### 4. Accidental Death and Dismemberment

LEO A DALY pays 100% of this insurance for full- time employees. Coverage is equal to Term Life Insurance (see above).

### 5. Travel Accident Insurance

LEO A DALY pays 100% of this insurance for full-time employees. The travel accident policy insures all employees who are traveling on Company business. Benefit is up to $150,000 for loss of life.

### 6. Workers' Compensation Insurance

Workers' Compensation is a Company-paid insurance which provides benefits in the event an employee is injured on the job. All work-related injuries must be reported immediately to your supervisor and/or Accounting Office. Failure to do so may prevent you from receiving benefits for which you are eligible.

## B.   Social Security

OASDI (Old-Age, Survivors, and Disability Insurance Program), commonly referred to as Social Security, is financed by a payroll tax paid by you and the Company. You pay the tax through payroll deduction based on earnings and LEO A DALY matches this amount. The maximum amount of contribution is adjusted annually by the federal government.

## C.   Flexible Benefits Plan

LEO A DALY provides a Flexible Benefits Plan for the benefit of its employees. By opting for salary reduction, the Plan enables employees participating in the Company- sponsored Insurance Plans, Dependent Care and/or Health Care Spending Account Options(s) to pay the associated premiums and/or costs on a pre-tax basis. Benefit elections under the Flexible Benefits Plan are for the entire calendar year unless you have a qualifying change in family

Confidential

status. There is a three- month grace period for claiming reimbursement from your spending accounts for expenses incurred during the Plan year. For example, all claims for eligible expenses incurred in a calendar year must be received by AETNA by March 31 of the next succeeding calendar year.

**D.  Profit Sharing Pension Trust and 401(k) Plan**

LEO A DALY contributes 25% of its profits before federal income taxes directly into a trust fund from which benefits are paid to employees who meet eligibility requirements and upon retirement from the Company. Although there is no direct contribution by employees, the efforts of each employee have a direct impact on the profitability of the Company, which will, in turn, enhance their pension fund.

The Plan also includes a 401(k) option. As an employee, you may elect to defer a percentage of your gross pay before income tax is withheld and have it contributed to your 401(k) account. The Company matches a portion of the percentage of your gross pay which you contribute to your account.

A separate booklet describing the Employee's Profit Sharing Pension Trust Plan is available to all employees. This is located on the Company's intranet site. Although the Company reserves the right to amend or discontinue contributions to the Plan, it is our intention that the Plan shall be an on-going arrangement for the benefit of employees who make a career of their association with the LEO A DALY Company.

Rollovers: If you have an existing qualified retirement plan account with a prior employer or an eligible IRA, you may transfer or roll over that account into the LEO A DALY Plan on or after you become eligible to participate in the Plan. By doing so, you avoid current income tax liability on the amount rolled over.

## XI.  HOLIDAYS, PAID TIME OFF (PTO), CIVIC DUTY

**A.  Holidays**

LEO A DALY observes the following holidays and provides all full- time regular employees time off with pay at their normal base rate unless otherwise provided in this policy: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday after Thanksgiving, and Christmas Day. When Christmas Day and New Year's Day fall on a Tuesday, Wednesday, Thursday or Friday, the Company will recognize the following pre-holiday days with early dismissal as follows; Christmas Eve - 1/2 day early dismissal; New Year's Eve - 2 hour early dismissal.

### 1. Weekends

Holidays falling on a Saturday or Sunday are normally observed on the proceeding Friday or the following Monday, respectively. Holidays that occur during an employee's PTO are not to be counted as PTO days taken.

### 2. Eligibility

Part-time and temporary employees are not eligible for holiday benefits.

Confidential          LAN_FLINT_00226519

## B.    Paid Time Off (PTO)

LEO A DALY provides paid time off benefits to eligible employees to enable them to have flexibility in taking paid time off for rest, recreation, illness, vacation, bereavement, and personal needs. LEO A DALY believes this time is valuable for employees in order to enhance their productivity and to make their work experience with LEO A DALY personally satisfying. LEO A DALY also provides long-service employees with additional PTO benefits as years of service are accumulated.

### 1.    Accrual of PTO

All full-time employees are eligible for PTO benefits. Full-time employees begin accruing PTO benefits measured from the date of hire. PTO benefits can be taken as accrued.

During the first five (5) years of employment, PTO will be earned at the rate of fifteen (15) working days per year calculated from the date of employment. Beginning with the sixth (6th) year of employment, one additional working day per year will be earned until a maximum of twenty-five (25) working days per year is reached.

### 2.    Part -Time and Temporary Employees

Part-time and temporary employees are not eligible to earn PTO benefits.

### 3.    Maximum Accrual

PTO accruals may not exceed 480 hours per year. Once this maximum is reached, all further accruals will cease. PTO accruals will recommence after the employee has taken PTO and the employee's accrued hours have dropped below the 480 hour maximum.

### 4.    Pay in Lieu of PTO

No employee will receive pay in lieu of PTO except on the termination of their employment, as described below.

### 5.    PTO Accrual During Leaves of Absence

No PTO accrues during an unpaid leave of absence or while on disability salary continuation. PTO accruals recommence when the employee returns to work.

### 6.    PTO Pay on Termination

PTO hours will be paid as follows:

100% accrued and unused if employee has completed more than 90 days of service. 0% accrued and unused if employed less than 90 days.

### 7.    PTO Approval

When possible, PTO must be approved in advance by the employee's supervisor.

LEO A DALY

Confidential

### 8. PTO Advances

PTO may not be taken until it is earned. In the event that unearned PTO is taken by an employee, the amount of the unearned PTO taken will be deducted from the employee's future PTO accruals. If deductions from future accruals are not adequate to cover the unearned PTO taken, the Company shall also have the right to deduct the unearned PTO from the employee's pay.

### 9. Holidays Occurring During PTO

If an observed Company holiday (see guideline entitled "Holidays") occurs during an employee's scheduled PTO, no deduction from accrued PTO will be made for the holiday.

### 10. PTO for Family Care and Medical Leave or for Personal Leave

Employees who request family care or medical leave pursuant to LEO A DALY's Family Care and Medical Leave policy or request personal leave must first apply any available accrued PTO to their family or medical leave or personal leave.

## C. PTO - Transition Provisions (PTOR)

On September 1, 2002, employees started the new PTO system with an account consisting of their current vacation time balance. Recognizing the possibility that a serious health condition may occur to an employee following the implementation of this PTO policy and that there may not be a sufficient number of hours within the employee's PTO bank to accommodate this event, the following transition provisions were put in place for a period not to exceed 5 years.

1. A PTO Reserve (PTOR) is available to current employees with more than one year of service as of the implementation date of the PTO policy.

2. The number of days available for each current employee is equal to the number of full years of current service to LEO A DALY, not to exceed 20 days [e.g. 8 years of service result in a PTOR of 8 days (64 hours)]. Current service includes only the period of time since the employee's most recent date of hire. This number is calculated as of the implementation date of the PTO policy. No additional time can be added or earned after this date.

3. The PTOR is only available for a "serious health condition" and after the use of 5 consecutive days (40 hours) from the employee's PTO bank for that "serious health condition*".

4. Once the PTOR hours are exhausted, they will not be replenished. Remaining PTOR hours can be used for another "serious health condition*" as long as the requirements of paragraph 3 are met.

5. The PTOR is not considered a part of the employee's PTO bank and is not paid out upon termination of employment.

Confidential

6. Submitting an "Application for Family/Medical Leave" for a "serious health condition*" serves as the application for the use of the PTOR.

* For definitions of a "Serious Health Condition," see Attachment "A".

## D. Civic Duty

### 1. Jury Duty and Election Board Duty

Employees who are called upon to perform jury or election board duty are allowed the necessary time off from work to perform the required duties without loss of active employment status, provided the period off work does not exceed a reasonable period of time. Employees who appear or who are required to appear in civil or criminal court proceedings unrelated to the Company or the Company's business do not qualify for this type of leave. Employees will be paid their regular compensation for a period of up to one week while serving on jury or election board duty. Payment for any time beyond that will be subject to review on a case by case basis. A copy of the notice to serve on jury duty or proof of jury duty service should be attached to the timesheet. Employees are entitled to retain all compensation received for jury or election board duty and no deduction will be made from an employee's regular Company compensation for the reasonable period of time the employee may be absent from work for such duty.

# XII. LEAVE OF ABSENCE (UNPAID)

LEO A DALY provides family care and medical leave for up to 12 weeks per year in accordance with the federal Family and Medical Leave Act of 1993; disability leave as required to reasonably accommodate employees with a qualified disability under the Americans with Disabilities Act (ADA) or with a workplace injury; and leave for other legally required absences as set forth below.

## A. Family Care and Medical Leave

### 1. Eligibility

To be eligible for family care and medical leave, an employee must (1) have worked for LEO A DALY at least twelve (12) months prior to the date on which the leave is to commence; and (2) have worked at least 1,250 hours in the twelve (12) months preceding the leave.

### 2. Permissible Uses of Family Care and Medical Leave

"Family care leave" may be requested for (1) the birth or adoption of an employee's child; (2) the placement of a foster child with the employee; or (3) the serious health condition of an employee's child, spouse, or parent. "Medical leave" may be requested for an employee's own serious health condition. A "serious health condition" is one that requires either in-patient care in a medical facility or continuing treatment or supervision by a health-care provider.

### 3. Substitution of PTO for Family Care and Medical Leave

Employees are required to first substitute accrued PTO for all family care and medical leaves.

4. **Amount of Leave**

Provided all the conditions of this policy are met, an employee may take a maximum of 12 weeks of family care and medical leave in a rolling 12- month period measured backwards from the date the employee's leave commences. Parents who are both employed by LEO A DALY may take a maximum combined total of 12 weeks of family care leave in a 12-month period for the birth, adoption, or foster care of their child.

The substitution of PTO for family care or medical leave does not extend the total duration of family care and medical leave to which an employee is entitled to beyond 12 weeks in a 12- month period. For example, if an employee has accrued four weeks of unused PTO at the time of the request for family care or medical leave, that PTO will be substituted for the first four weeks of family care or medical leave, leaving up to eight additional weeks of unpaid leave.

Family care or medical leave for the employee's own serious health condition, or for the serious health condition of the employee's spouse, parent, or child, may be taken intermittently or on a reduced schedule where medically necessary. If leave is taken intermittently or on a reduced schedule, LEO A DALY retains the discretion to transfer the employee temporarily to an alternative position with equivalent pay and benefits which better accommodates the employee's leave schedule.

5. **Effect on Benefits**

During an employee's family care or medical leave, for up to a maximum of 12 weeks in a 12- month period, LEO A DALY shall continue to pay for the employee's participation in LEO A DALY's group health plans, to the same extent and under the same terms and conditions as would apply had the employee not taken leave.

Employees on family care and medical leave accrue employment benefits, such as PTO, or seniority only when PTO is being substituted for unpaid leave and only if the employee would otherwise be entitled to such accrual.

6. **Procedure for Requesting Family Care and Medical Leave**
   a. **Notice Requirements**
   Employees should notify LEO A DALY of their request for family care or medical leave as soon as they are aware of the need for such leave. For foreseeable events, if possible, the employee must provide 30 calendar days' advance notice to LEO A DALY of the need for family care or medical leave. For events that are unforeseeable 30 days in advance, but are not emergencies, the employee must notify LEO A DALY as soon as he or she learns of the need for the leave, ordinarily not later than one to two working days after the employee learns of the need for the leave. If the leave is requested in connection with a planned, non-emergency medical treatment, the employee may be requested to reschedule the treatment so as to minimize disruption of LEO A DALY's business.

   If an employee fails to provide the requisite 30-day advance notice for foreseeable events without any reasonable excuse for the delay, LEO A DALY reserves the right to delay the taking of the leave until at least 30 days after the date the employee provides notice of the need for family care or medical leave.

LAN_FLINT_00226523

All requests for family care or medical leave should include the anticipated date(s) and duration of the leave. Any requests for extensions of a family care or medical leave must be received at least five (5) working days before the date on which the employee was originally scheduled to return to work and must include the revised anticipated date(s) and duration of the family care or medical leave.

### b.     Medical Certification

Any request for medical leave for an employee's own serious health condition or for family care leave to care for a child, spouse, or parent with a serious health condition must be supported by medical certification from a health-care provider. For foreseeable leaves, employees must provide the required medical certification before the leave begins. When this is not possible, employees must provide the required certification within 15 calendar days after LEO A DALY's request for certification, unless it is not practicable under the circumstances to do so. Failure to provide the required medical certification may result in the denial of foreseeable leaves until such certification is provided. In the case of unforeseeable leaves, failure to provide the required medical certification within 15 days of being requested to do so may result in denial of the employee's continued leave. Any request for an extension of the leave also must be supported by an updated medical certification.

The medical certification for a child, spouse, or parent with a serious health condition shall include (a) the date on which the serious health condition commenced; (b) the probable duration of the condition; (c) the health-care provider's estimate of the amount of time needed for family care; (d) the health-care provider's assurance that the health-care condition warrants the participation of the employee to provide family care; and (e) in the case of intermittent or reduced schedule leave where medically necessary, the probable duration of such a schedule.

The medical certification for leave for the employee's own serious health condition shall include (a) the date on which the serious health condition commenced; (b) the probable duration of the condition; (c) a statement that, due to the serious health condition, the employee is unable to perform the functions of their position; and (d) in the case of intermittent leave or reduced schedule leave where medically necessary, the probable duration of such a schedule. In addition, the certification may, at the employee's option, identify the nature of the serious health condition involved. If LEO A DALY has reason to doubt the validity of the certification provided by the employee, LEO A DALY may require the employee to obtain a second opinion from a doctor of LEO A DALY's choosing at LEO A DALY's expense. If the employee's health-care provider and the doctor providing the second opinion do not agree, LEO A DALY may require a third opinion, also at LEO A DALY's expense, performed by a mutually agreeable doctor who will make a final determination. Before permitting the employee to return to work, LEO A DALY also may require the employee to provide medical certification that he or she is able to return to work.

### 7. Effect on Reinstatement

Employees returning from family care or medical leave are entitled to reinstatement to the same or comparable position consistent with applicable laws. LEO A DALY retains the right to deny reinstatement to employees who are among the highest paid ten percent (10%) of LEO A DALY's employees and whose reinstatement would cause substantial and grievous economic injury to LEO A DALY's operations.

LEO A DALY

**B.     Personal Leave Without Pay**

The Company recognizes that there may be times when an employee requires extended time off for personal reasons. Employees who are not qualified for the Family and Medical Leave Act leave or who have exhausted that leave may also be granted personal leave.

If an employee's absence from work cannot be counted as approved PTO, then such an absence is considered personal leave.

Request for leave must be submitted, in writing, to the immediate supervisor and approved by the Office/Operations Director.

Each request for a personal leave is considered individually, taking into consideration the employee's work record, attendance, length of service, the nature and duration of the request and the business needs and requirements of the Company.

Human Resources is responsible for developing a letter of agreement outlining the terms of the leave. This agreement will be signed by the employee and the Office/Operations Director.

A leave of absence may be extended by the Company upon application from the employee; provided such application is made prior to the expiration date of the original leave agreement. Such extensions will be approved by the Office/Operations Director.

**C.     Military Leave**

Employees who are members of the military reserve (active and inactive) or National Guard are allowed the necessary time off from work to perform the required duties without loss of active employment status, provided the period off work does not exceed two (2) consecutive weeks. The Company will pay the difference, if any, between the military pay received and the employee's base rate for hours which would have normally been worked during the period of service.

**D.     Effect on Benefits**

Employees are required to utilize all accrued PTO while on leave, except military leave which is optional. The utilization of accrued PTO will not extend leave beyond the 12 weeks allowed under the Family and Medical Leave Act.

Employees are not entitled to accrue PTO in lieu of any holidays that occur during any period of leave.

Employees will not lose any accumulated service and will continue to accrue continuous service during leaves. Where federal and state laws require, employees shall retain coverage under the group health plan at the same level and under the conditions for which coverage would have been provided if the employee had continued in employment continuously for the duration of the leave. Should the employee fail to return to work following Family and Medical Leave, the Company may recover the premium that has been paid for maintaining the employee's health plan coverage during any period of unpaid leave and will deduct such payment for any amounts due or owed by employee, including from employee's last paycheck.

Confidential                                                    LAN_FLINT_00226525

An employee is responsible for the continual payment of dependent health insurance premiums and any additional premiums paid by the employee.

**E.    Restoration of Position**

Employees returning from a leave of absence will be reinstated to their same job or to an equivalent job with equivalent status and pa y, as required by law. Employees returning from disability or family and medical leave must provide written certification, from their attending physician, of their ability to perform the functions of their job.

If the same job or one of equivalent status and pay is not available as a result of a reduction in force, the employee will be treated in the same manner as though he or she were not on leave at the time of the reduction in force.

If an employee fails to return to work at the conclusion of an approved leave of absence, including any extension of such leave, the employee will be considered to have voluntarily terminated employment.

# XIII. WORKPLACE RULES AND PROCEDURES

**A.    Rules of Conduct and Discipline**

### 1. Policy

As a service organization, LEO A DALY's image is the sum total of the behavior and appearance of every single one of its employees. We collectively embody and portray the quality service and the commitment to excellence for which the firm stands.

Employees are expected to observe certain standards of job performance, good conduct and appearance (employee attire needs to portray the conservative image valued by LEO A DALY and its clients). When performance, conduct or appearance does not meet Company standards, LEO A DALY will endeavor when it deems appropriate to provide the employee a reasonable opportunity to correct the deficiency. If, however, the employee fails to make the correction, he or she will be subject to discipline including termination.

The rules set forth below are intended to provide employees with fair notice of what is expected of them. Necessarily, however, such rules cannot identify every type of unacceptable conduct and performance. Therefore, employees should be aware that conduct not specifically listed below but which adversely affects or is otherwise detrimental to the interests of LEO A DALY, other employees, or clients, may also result in disciplinary action. Nothing in these rules is intended to modify the at-will nature of your employment with the Company.

### 2. Honesty and Ethics

- Giving or making false, incorrect or misleading information or statements, or representing or omitting facts to obtain or maintain employment.

- Falsification of any kind, including time sheets, expense statements or insurance

Confidential

claim forms.

- Abuse, misuse or deliberate destruction of Company or another employee's equipment or property.

- Misuse or removal from Company premises of employee lists, plans, drawings, prints, specifications, records or company confidential information of any nature without specific approval.

- Revealing Company confidential information or client's requirements or designs without prior approval of a supervisor.

- Committing harmful acts or making or publishing false, fictitious or malicious statements regarding any employee, Supervisor, the Company, or Company products and services.

- Unauthorized use of Company or another employee's equipment or property.

**3. Performance**

- Failure or refusal to abide by or support Company policies.

- Failure or refusal to do job assignments.

- Failure or refusal to obey instructions of Supervisor or committing other acts of insubordination.

- Excessive garnishments other than for child support. The Company will abide by the laws of the state in which the employee works to determine when garnishments may be considered "excessive" and subject to disciplinary action.

- Engaging in outside professional employment or situations resulting in conflicts of interest.

- Excessive tardiness.

- Excessive unexcused absences.

- Loitering or wasting Company time.

- Personal work on Company time.

- Sleeping during working hours.

- Stopping work before specified quitting time.

**4. Worksite Safety**

- Threatening, harassing, intimidating, coercing or interfering with other

Confidential

LAN_FLINT_00226527

employees or Supervisors.

- Possession of weapons or dangerous objects on Company premises.

- Disregard of common safety practices.

## 5. Personal Conduct

- Unprofessional dress habits specifically including clothing or accessories which display slogans or images which might be offensive to co-workers or the public.

- Creating or contributing to unsanitary conditions.

- Use of profane, obscene, derogatory or abusive language.

- Posting or removal of notices, signs or written or printed material in any form on bulletin boards on Company premises at any time without specific authorization.

- Unauthorized distribution of literature or written or printed material of any kind on Company premises.

- Organizational activities for any group on Company premises without proper authorization.

- Unauthorized soliciting or collecting on Company premises.

- Gambling on Company premises.

- Possession of alcoholic beverages or illegal drugs on Company premises.

- Use of alcoholic beverages or illegal drugs during work hours.

- Failure to submit to a drug test when requested by the Company.

- Failure to successfully treat substance abuse.

- Immoral conduct or indecency.

## 6. Discipline Procedure

Whenever an employee commits an offense warranting disciplinary action, the employee's Supervisor may begin disciplinary action in any of the following ways depending upon the seriousness of the situation:

a. Verbal warning may be used for minor offenses, especially if it is the first occurrence.

b. Written warning may be used for more serious offenses or repeated occurrences of minor offenses. A written warning should state the possible consequences of a

Confidential    LAN_FLINT_00226528

recurrence of the offense, and a copy of the warning will be placed in the employee's file for a specified period of time and a copy will be given to the employee.

c. Disciplinary suspension may be used for serious offenses or repeated occurrences of minor offenses. An employee may be suspended from work without pay for up to five (5) consecutive workdays. The disciplinary suspension must be documented; a copy of the suspension documentation will be placed in the employee's file and a copy will be given to the employee.

d. Discharge for cause is for serious offenses or repeated occurrences of other offenses. The discharge must be thoroughly documented; a copy of the suspension documentation will be placed in the employee's file and a copy will be given to the employee.

## B.     Personnel Records

The information in the employee's personnel file is permanent and confidential and must be kept up to date. The employee should inform the Accounting Department immediately whenever there are changes in personal data such as address, telephone number, marital status, number of dependents, and person(s) to notify in case of emergency.

## C.     Conflicts of Interest and Outside Employment

The company expects our employees to conduct business according to the highest ethical standards of conduct. Employees are expected to devote their best efforts to the interests of the Company. Business activities, employment or responsibilities outside of employment with LEO A DALY which present or appear to present any conflict of interest for the employee with regard to the employee's employment at, or ability to perform his or her work for LEO A DALY are strictly prohibited.

The Company recognizes the right of employees to engage in activities outside of their employment which are of a private nature and unrelated to our business. However, the employee must disclose any possible conflicts so that the Company may assess and prevent potential conflicts of interest from arising. A potential or actual conflict of interest occurs whenever an employee is in a position to influence a decision that may result in a personal gain for the employee or an immediate family member as a result of the Company's business dealings. The undertaking of outside work is usually not compatible with employment at LEO A DALY or with the efforts of the Company to provide excellence in services to clients. The Company therefore prohibits the use of Company office time, facilities, equipment, or supplies in the support of outside work.

Employees are required to obtain written approval from their supervisor before participating in outside work activities. Outside work activities will not be allowed when they;

- Prevent the employee from fully performing work for which they are employed at the Company, including overtime assignments;

- Involve organizations that are doing or seek to do business with the Company, including actual or potential vendors or clients; or

© 2007 - 2014 LEO A DALY

LEO A DALY

  ▪ Violate provisions of law or any other Company policy.

From time to time, Company employees may be required to work beyond their normally scheduled hours. Employees must perform this work when requested. In cases of conflict with any outside activity, the employee's obligations to the Company must be given priority. Employees are hired and continue in LEO A DALY's employ with the understanding that LEO A DALY is their primary employer and that other employment or commercial involvement which is in conflict with the business interests of LEO A DALY is strictly prohibited.

**D.  No Smoking Policy**

LEO A DALY is committed to providing a safe and healthy work environment for all its employees. As a Company, we recognize the health and environmental concerns associated with tobacco smoke. Therefore, smoking is prohibited in all work areas including common areas such as corridors, stairways and reception areas. This policy applies to all LEO A DALY sites and facilities/locations/automobiles. Employees are protected from retaliatory action or from being subjected to any adverse personal action for exercising or attempting to exercise their rights under the smoking policy.

**E.  Security and Confidential Information**

The security of employees, employee property, and Company property is of vital importance to LEO A DALY. All employees share responsibility to ensure that proper security is maintained.

   **1. Proprietary and Confidential Information**

   Company property includes not only tangible property, like desks and computers, but also intangible property such as information. Of particular importance are proprietary information and confidential information. Proprietary information includes all information obtained by Company employees during the course of their work. This Handbook, for example, contains proprietary information. Confidential information is any Company information that is not known generally to the public or the industry. Client lists, client files, personnel files, computer-printed reports, disks, CAD drawings, plots, financial and marketing data, and/or trade secrets are examples of confidential information.

   Given the nature of LEO A DALY's business, protecting proprietary and confidential information is of vital concern to LEO A DALY. This information is one of the most important assets of LEO A DALY. It enhances LEO A DALY's opportunities for future growth and indirectly adds to the job security of all employees.

   Employees must not use or disclose any proprietary or confidential information that they obtain during employment with LEO A DALY, except as required by their jobs. This obligation remains even after an employee's employment relationship with LEO A DALY ends. If an employee is in a position that gives him or her access to particularly sensitive information, the employee may be required to sign a written nondisclosure agreement. In addition, all employees must observe good security practices. They are expected to keep proprietary and confidential information secure from outside visitors and all other persons who do not have a legitimate reason to see or use such information.

   Company rules regarding document control, the restriction of access to areas of the

facility, and other such procedures must be strictly observed by each employee. Failure to adhere to Company policies regarding proprietary and confidential information will be considered grounds for discipline, including dismissal.

### 2. Obligations on Termination

On termination of employment, whether voluntary or involuntary, all Company documents and other tangible Company property in the employee's possession or control must be returned to LEO A DALY.

## F. Company Computer Resources Policy

Refer to the following internet address for this policy.

http://daly/Corporate/Policy/ComputerResourcePolicy.htm

## G. Drug-Free Workplace

### 1. Purpose of Guideline

It is the intent of LEO A DALY to maintain a workplace that is free of drugs and alcohol and to discourage drug and alcohol abuse by its employees. LEO A DALY has a vital interest in maintaining safe and efficient working conditions for its employees. Substance abuse is incompatible with health, safety, efficiency, and success at LEO A DALY. Employees who are under the influence of a drug or alcohol on the job compromise the Company's interests, endanger their own health and safety and the health and safety of others, and can cause a number of other work-related problems, including absenteeism and tardiness, substandard job performance, increased workloads for co-workers, behavior that disrupts other employees, delays in the completion of jobs, inferior quality in products or service, and disruption of customer relations.

To further LEO A DALY's interest in avoiding accidents, to promote and maintain safe and efficient working conditions for its employees, and to protect its business, property, equipment, and operations, the Company has established this Guideline concerning the use of alcohol and drugs. Notwithstanding the fact that all LEO A DALY employees are at will, as a condition of continued employment with LEO A DALY, each employee must abide by this Guideline.

### 2. Definitions

For purposes of this Guideline:

"Illegal drugs or other controlled substances" mean any drug or substance that (a) is not legally obtainable; or (b) has been legally obtained but is being used, sold or distributed unlawfully.

"Legal drug" means any drug, including any prescription drug or over-the-counter drug, that has been legally obtained and that is not unlawfully sold or distributed.

Confidential

"Abuse of any legal drug" means the use of any legal drug (a) for any purpose other than the purpose for which it was prescribed or manufactured; or (b) in a quantity, frequency, or manner that is contrary to the instructions or recommendations of the prescribing physician or manufacturer.

"Reasonable suspicion" includes a suspicion that is based on specific personal observations such as an employee's manner, disposition, muscular movement, appearance, behavior, speech or breath odor; information provided to management by an employee, by law enforcement officials, by a security service, or by other persons believed to be reliable; or a suspicion that is based on other surrounding circumstances.

"Possession" means that an employee has the substance on his or her person or otherwise under his or her control.

### 3.  Prohibited Conduct

The prohibitions of this section apply whenever the interests of LEO A DALY may be adversely affected, including any time the employee is:

On Company premises or at any Company workplace;

Conducting or performing Company business, regardless of location;

Operating or responsible for the operation, custody, or care of Company equipment or other property; or

Responsible for the safety of others.

### 4.  Alcohol

The following acts on Company premises or at any Company workplace are prohibited and subject an employee to discharge:

The use, possession, purchase, sale, manufacture, distribution, transportation, or dispensation of alcohol; or

Being under the influence of alcohol.

### 5.  Illegal Drugs

The following acts during Company time, on Company premises or at any Company workplace are prohibited and subject an employee to discharge:

The use, possession, purchase, sale, manufacture, distribution, transportation, or dispensation of any illegal drug or other controlled substance; or

Being under the influence of any illegal drug or other controlled substance.

© 2007 - 2014 LEO A DALY

LEO A DALY

Confidential

LAN_FLINT_00226532

6. **Legal Drugs**

The following acts on Company premises or at any Company workplace are prohibited and subject an employee to discharge:

The abuse of any legal drug;

The possession, purchase, sale, manufacture, distribution, transportation, or dispensation, of any legal drug in an unlawful manner; or

Working while impaired by the use of a legal drug whenever such impairment might:

- Endanger the safety of the employee or some other person;

- Pose a risk of significant damage to Company property or equipment ; or

- Substantially interfere with the employee's job performance or the efficient operation of LEO A DALY's business or equipment.

7. **Criminal Convictions**

Employees are required by this Guideline to notify LEO A DALY of any conviction under any criminal drug statute or law for a violation which occurred at any Company workplace or during any Company-related activity or event, no later than five (5) days after the date of any such conviction. When required by federal law, LEO A DALY will notify any federal agency with which it has a contract of any employee who has been convicted under a criminal drug statute for a violation occurring in any Company workplace.

8. **Use of Legal Drugs**

LEO A DALY recognizes that employees may, from time to time, be taking prescribed legal drugs that, when taken as prescribed or according to the manufacturer's instructions, may result in their impairment. Employees may not work while impaired by the use of legal drugs if the impairment might endanger the employee or any other person, pose a risk of significant damage to Company property, or substantially interfere with the employee's job performance. If an employee is so impaired by the appropriate use of legal drugs, he or she may not report to work. To accommodate the absence, the employee may use accrued PTO time. If PTO is not available, the employee will need to take time off without pay.

The employee may also contact their supervisor to determine whether or not he or she qualifies for an unpaid leave of absence, such as family care or medical leave. Nothing in this Guideline is intended to diminish LEO A DALY's commitment to employees and to reasonably accommodate qualified disabled employees who must take legal drugs because of their disability, provided that, with or without accommodations the employee can perform the essential functions of their position.

Confidential

LAN_FLINT_00226533

### 9. Unregulated or Authorized Conduct

#### a. Customary Use of Over-the -Counter Drugs

Nothing in this Guideline is intended to prohibit the customary and ordinary purchase, use, possession, or dispensation of over-the-counter drugs so long as that activity does not violate any law or result in an employee being impaired by the use of such drugs in violation of this Guideline.

#### b. Off-the -Job Conduct

This Guideline is not intended to regulate off-the-job conduct so long as the employee's off-the-job use of alcohol or drugs does not result in the employee being under the influence of or impaired by the use of alcohol or drugs in violation of this Guideline and/or any other policy in this handbook.

#### c. Authorized Use of Alcohol

LEO A DALY may provide alcohol for consumption at certain Company events such as social functions. Generally, the ordinary consumption of alcohol at these events will not violate this Guideline.

### 10. Confidentiality

Disclosures made by employees to Human Resources and/or Accounting personnel concerning their use of legal drugs will be treated confidentially and will not be revealed to managers or supervisors unless there is an important work- related reason to do so in order to determine whether it is advisable for the employee to continue working. Disclosures made by employees to Human Resources and/or Accounting personnel concerning their participation in any drug or alcohol rehabilitation program will be treated confidentially at the extent possible.

## H. Termination

### 1. Voluntary Termination

LEO A DALY will consider an employee to have voluntarily terminated his or her employment if an employee does any of the following:

Elects to resign from LEO A DALY;

Fails to return from a Company-approved leave of absence on the date specified by LEO A DALY; or

Fails to report for work without notice to LEO A DALY for three consecutive days.

### 2. Involuntary Termination

An employee may be terminated involuntarily for reasons that include poor performance, misconduct, or other violations of LEO A DALY's rules of conduct Not withstanding this list of conditions, and consistent with the at-will nature of the employment relationship, LEO A DALY reserves the right to discharge with or without cause and with or without prior notice.

Confidential

3. **Termination Due to Reorganizations, Economics, or Lack of Work**

From time to time, LEO A DALY may need to terminate an employee as a consequence of reorganizations, job elimination, economic downturns in business, or lack of work. Should the Company consider such termination necessary, LEO A DALY will attempt to provide all affected employees with advance notice when practical and will do so, required by law.

# XIV. EMPLOYEE DEVELOPMENT

LEO A DALY encourages employees to further their professional development and effectiveness on the job by offering financial assistance for work-related education, professional registrations, and memberships in service clubs and professional societies.

## A. Educational Assistance Program

Full- time regular employees who have been on the active payroll for a minimum of one (1) year and whose work performance is satisfactory are eligible for a reimbursement of fifty percent (50%) of the tuition costs and registration fees (to a maximum of $800 per semester per employee) for formal credit courses given at an accredited educational institution. A grade of "C" or better must be earned, and the course must be approved for tuition reimbursement before the employee enrolls in the course.

## B. Professional Registrations

The employee will be reimbursed for their initial license and the cost of examinations resulting in professional registration only if approval has been obtained prior to the examination and a passing score is earned. In addition, the employee will be reimbursed for all renewals of their first or sole license. The employee will also be reimbursed for any other registration and renewal expenses that the Company may ask the employee to acquire, including a NCARB or NCEES certificate. Prior approval will be obtained by the Operations/Business Group Director for these additional registrations and renewals.

## C. Professional Society Memberships

The employee may be reimbursed for national membership fees in the American Institute of Architects (AIA) and in other professional societies only if approval has been requested and obtained in advance.

## D. Service Club Membership

The Company will pay service club membership fees and luncheon expenses when Company business is pursued, provided the respective club does not discriminate in its memberships on the basis of race, color, religion, national origin, age (age 40 and over), gender, pregnancy, sexual orientation, gender identity and expression, disability, military status, genetic information or any other characteristic or status protected by law.

## E. Other Developmental Activity

Certain conferences, conventions and short courses may be approved for employee attendance. In those instances, LEO A DALY will pay 100 percent of the travel, if applicable,

LEO A DALY

Confidential

LAN_FLINT_00226535

and other expenses.

# XV. SERVICE AWARDS

An employee achieves eligibility for a service award by holding full-time or part-time status employment on the anniversary date of the first, fifth, tenth and succeeding 5-year increment periods of their service. Award ceremonies are held every two years.

# XVI. MISCELLANEOUS

**A.  Employment of Relatives**

The employment of spouses or immediate family members of employees will be limited to situations where work locations, reporting responsibilities and all other working conditions do not interfere with the efficiency or morale of the employee or other employees. "Immediate family" members include: spouse, child, parent, brother/sister, grandparent, grandchild, mother- in- law or father- in- law.

**B.  Employee Referral Program**

As a growing company, LEO A DALY encourages employees to refer qualified candidates to the firm and will award an employee a minimum of a $1000 payment when the employee's referred candidate is hired. The following guidelines must be met to receive the bonus payment:
See Policy V.H. for details on the guidelines to be met for payment of a referral fee.

**C.  Travel and Expense Accounts**

LEO A DALY will reimburse employees for reasonable expenses incurred for business travel or related business functions. Please refer to the LEO A DALY policy for information and answers to specific expense questions.

**D.  Exit Interviews**

Employees who leave LEO A DALY for any reason may be asked to participate in an exit interview. This interview is intended to permit terminating employees the opportunity to communicate their views regarding their work with LEO A DALY, including job duties, job training, job supervision, and job benefits. At the time of the interview, employees are expected to return all Company- furnished property, such as equipment, card keys, keys, project manuals and employee handbooks. Arrangements for clearing any outstanding debts with LEO A DALY and for receiving final pay also will be made at this time.

**E.  Relocation**

If authorized in advance, LEO A DALY may, in exceptional cases, at its discretion, pay for certain costs directly related to relocation when providing a moving allowance is necessary for an individual to accept employment with the Company. Moving allowances

**F.  Violence in the Workplace**

Confidential

LEO A DALY recognizes that workplace violence is a growing concern among employers and employees across the country. LEO A DALY strives to achieve a safe, violence- free workplace and strictly prohibits employees, consultants, clients, visitors, or anyone else on Company premises or engaging in a Company-related activity from behaving in a violent or threatening manner. As part of this policy, LEO A DALY seeks to prevent workplace violence before it begins and reserves the right to deal with behavior that suggests a tendency towards violence even prior to any violent behavior occurring.

LEO A DALY believes that prevention of workplace violence begins with recognition and awareness of potential early warning signs and has established procedures for responding to any situation that presents the possibility of violence.

### 1. Workplace Violence Defined

Workplace violence includes: Threats of any kind; Threatening, physically aggressive, or violent behavior, such as intimidation of or attempts to instill fear in others;

Other behavior that suggests a propensity toward violence, which can include belligerent speech, excessive arguing or swearing, sabotage or threats of sabotage of Company property, or a demonstrated pattern of refusal to follow Company policies and procedures;

Defacing Company property or causing physical damage to the facilities; or

With the exception of security personnel, bringing weapons or firearms of any kind on Company premises, in Company parking lots, or while conducting Company business.

### 2. Reporting

If any employee observes or becomes aware of any of the above- listed actions or behavior by an employee, client, visitor, or anyone else, he or she should notify the Office Operations Director immediately. Further, employees should notify Office Operations Director if any restraining order is in effect, or if a potentially violent non-work related situation exists that could result in violence in the workplace.

### 3. Investigation

All reports of workplace violence will be taken seriously and will be investigated promptly and thoroughly. In appropriate circumstances, LEO A DALY will inform the reporting individual of the results of the investigation. To the extent possible, LEO A DALY will maintain the confidentially of the reporting employee and of the investigation but may need to disclose results in appropriate circumstances, for example, in order to protect individual safety. LEO A DALY will not tolerate retaliation against any employee who reports workplace violence.

### 4. Corrective Action and Discipline

If LEO A DALY determines that workplace violence has occurred, LEO A DALY will take appropriate corrective action and will impose discipline on offending employees. The appropriate discipline will depend on the particular facts but may include written or oral warnings, probation, reassignment of responsibilities, suspension, or termination. If the violent behavior is that of a non-employee, LEO A DALY will take appropriate

Confidential

LAN_FLINT_00226537

corrective action in an attempt to ensure that such behavior is not repeated.

**G.      Communication**

LEO A DALY believes in open and honest communication. Employees are encouraged to ask questions and to stay informed about important business-related events. The Company uses a variety of formal and informal communication vehicles, none more powerful than an open door policy. Any time that you wish to discuss a business-related issue, feel free to do so with your supervisor, the next level of management or anyone in the Company in a position to respond to your questions. We want our employees to have well- informed options about all that is happening within the Company and we value your questions and concerns.

LEO A DALY

Confidential

## ATTACHMENT "A"

## Definitions of "Serious Health Condition"

A "Serious Health Condition" means an illness, injury, impairment, or physical or mental condition that involves one of the following:

**1.     Hospital Care**

Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.

**2.     Absence Plus Treatment**

A period of incapacity1 of more than three consecutive calendar days (including any subsequent treatment or period of incapacity1 relating to the same condition) that also involves:

a)  Treatment2 two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

b)  Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment3 under the supervision of the health care provider.

**3.     Pregnancy**

Any period of incapacity due to pregnancy, or for prenatal care.

**4.     Chronic Conditions Requiring Treatments**

A chronic condition which:
c)  Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

d)  Continues over an extended period of time (including recurring episodes of a single underlying condition); and

e)  May cause episodic rather than a continuing period of incapacity1 (e.g., asthma, diabetes, epilepsy, etc.).

**5.     Permanent/Long-term Conditions Requiring Supervision**

A period of incapacity[1] which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

© 2007 - 2014 LEO A DALY

A

LEO A DALY

6. **Multiple Treatments (Non-Chronic Conditions)**

Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either of restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity1 of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy, kidney disease (dialysis).

---

1. "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

2. Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

3. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medication such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

Confidential

LAN_FLINT_00226540