# EXHIBIT 1

Highly Confidential - Michael B. Glasgow

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4    _____

                              )

5                             )   Civil Action No.

                              )   5:16-cv-10444-JEL-MKM

6    In re:  FLINT WATER CASES )   (consolidated)

                              )

7                             )   Hon. Judith E. Levy

                              )   Mag. Mona K. Majzoub

8    _____)

9

10              HIGHLY CONFIDENTIAL

11   VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

12                 VOLUME I

13

14         Monday, February 24, 2020

15             at 9:05 a.m.

16

17   Taken at:  Butzel Long

              41000 Woodward Avenue

18            Bloomfield Hills, Michigan   48304

19

20

21

22   REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

23         GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

Highly Confidential - Michael B. Glasgow

```
 1          A.    Yes.

 2          Q.    What did you understand the Office

 3    of Drinking Water & Municipal Assistance to be?

 4          A.    Well, in a sense they kind of had

 5    a dual role as kind of a coach, but also kind of

 6    the police in my eyes.  You know, they were

 7    there to guide us along but make sure we were

 8    doing things correctly.

 9          Q.    Okay.  The title of the office was

10    Office of Drinking Water & Municipal Assistance.

11    It wasn't office of drinking water and

12    manipulations and avoidance, was it?

13                MS. COLLINS:  Objection; form.

14          A.    No.

15          Q.    Okay.  Mr. Prysby was a

16    professional engineer; was he not?

17          A.    Correct.

18          Q.    You were not?

19          A.    Correct.

20          Q.    And you are not today?

21          A.    Correct.

22          Q.    You've met Mr. Busch?

23          A.    Yes, I have.

24          Q.    He was a professional engineer,
```

Highly Confidential - Michael B. Glasgow

1          A.     Yes.

2          Q.     And that's something you would

3    come to know over the course of your lifetime,

4    that professional engineers have this duty and

5    responsibility to the general public for safety,

6    correct?

7                MS. COLLINS:  Objection; form.

8          A.     Yes.

9          Q.     And I don't mean to diminish your

10   knowledge and experience at all, Mr. Glasgow,

11   but when it came to your communications with

12   Prysby, Busch, Cook, and Shekter-Smith, the

13   Office of Drinking Water & Municipal Assistance,

14   they were the experts; were they not?

15               MS. COLLINS:  Objection to form.

16               MR. KUHL:  Object to form.

17         A.     In my eyes, they were, yes.

18         Q.     They were the people who knew or

19   should have known what the rules of the game

20   were?

21               MR. KUHL:  Objection; form.

22         Q.     Right?

23         A.     Yes.

24         Q.     They were the people that you and

1    circumstances pertinent to the processes and

2    equipment within the water treatment plant,

3    correct?

4          A.    Correct, yes.

5          Q.    It was not evaluating the

6    implications of utilizing the Flint River as a

7    raw water source on Mr. Bincsik's distribution

8    system, was it?

9          A.    No.

10         Q.    Okay.  That 30-day test run, was

11   that the longest test run that the water

12   treatment plant was ever put to prior to April

13   of 2014, to your knowledge?

14         A.    Yeah.  To my knowledge and my time

15   there, that was the longest.

16         Q.    You came to know LAN and Rowe; did

17   you not?

18         A.    Correct.  Yes.

19         Q.    And at LAN, the head guy, the lead

20   engineer, was Warren Green?

21         A.    Yes.

22         Q.    You came to know Warren Green?

23         A.    Absolutely, yep.

24         Q.    You came to respect him as an

```
 1    engineer?

 2            A.    Yes.

 3            Q.    You came to trust his -- both his

 4    knowledge and his advice and opinions?

 5            A.    Yes.

 6            Q.    Mr. Green advocated vehemently for

 7    at least a 90-day run of the water treatment

 8    plant before it was put in full operation,

 9    didn't he?

10            A.    Yes.

11                  MS. COLLINS:  Objection; form.

12            Q.    Mr. Green advocated vehemently for

13    the utilization of corrosion control treatment,

14    and specifically orthophosphate, prior to

15    implementation of the water treatment plant as a

16    full-time facility?

17                  MS. COLLINS:  Objection to form.

18                  (Reporter admonishment.)

19                  MR. CAMPBELL:  They don't like my

20            form.

21                  MR. KIM:  Objection as to

22            foundation.

23    BY MR. CAMPBELL:

24            Q.    Do you have the question?
```

1        A.     Yes, whether Warren Green was

2    stipulating the addition of corrosion control.

3    And that, I do not remember.

4        Q.    Okay.  You're clear that Mr. Green

5    wanted at least a 90-day operation of that plant

6    before it was put into full-time operation,

7    though?

8        A.     Yes, yes, because I was in

9    agreeance with him.  Yes.

10       Q.    Okay.  So you -- you were the only

11   F-1 licensed operator at the plant, right?

12       A.    Correct.  Yes.

13       Q.    And while Mr. Wright may have been

14   your titular supervisor, you really were the

15   decision-maker at the plant at that time; isn't

16   that so?

17            MR. MARKER:  Objection; form,

18            foundation.

19       A.    Yeah.  When it come to operation

20   of the treatment plant, I would say yes.

21       Q.    Mr. Wright actually had to defer

22   to you on those issues; did he not?

23       A.    Usually he would, yes.

24       Q.    So you, as the F-1 licensed

Highly Confidential - Michael B. Glasgow

1    operator, and Warren Green, the outside engineer

2    hired to use his knowledge and advice and give

3    advice, together you both wanted to run that

4    plant for at least 90 days?

5              A.    Yes.

6              Q.    What happened?

7              A.    Well, usually, number one -- and

8    it's one of the things in some of my other

9    testimony -- we were always a standby plant.  We

10   didn't have the staffing that we needed to.

11                  I mean, to run that 30 day test

12   run in July or August of '13 there, I basically

13   had to institute all my employees to work

14   16-hour days for 30 days.

15             Q.    Okay.

16             A.    So and after that, that was about

17   all we could do, and, yes -- I stressed numerous

18   times that we needed more staff and we needed

19   them in there earlier if we were going to --

20             Q.    To whom?

21             A.    To my superiors, Mr. Johnson,

22   Mr. Croft.

23             Q.    What was their response?

24             A.    "We're working on it.  We're

Highly Confidential – Michael B. Glasgow

1    chemical feed systems, the condition of them?

2         A.    Yeah, I know the chemical feed

3    systems that were going into the clarifier and

4    the softening process, they were -- they were

5    not really functional.  I remember running tubes

6    along the floor.  You know, we had some kind of

7    halfway fabbed polymer lines running to the

8    clarifiers when we first started.

9         Q.    I know you didn't utilize soda

10   ash, but did you have the capacity to use soda

11   ash?

12        A.    There was some old equipment

13   around there that we used prior to the '70s I

14   think when they softened and used water that

15   were there.  I had never seen them in operation

16   in my time there.

17        Q.    So you don't know whether they

18   were functional?

19        A.    I don't believe they were

20   functional.  I wouldn't have put any money on

21   it.

22        Q.    Was part of the flow bypassing the

23   coagulation basins?

24        A.    Yes, at times.

Highly Confidential - Michael B. Glasgow

1          Q.     And why would that be so?  What
2    was the reason for that?
3          A.     The reason for that is -- well, to
4    be honest, my reasoning is I didn't really want
5    to soften the water.  It was a headache.  And
6    with my untrained staff, topped by such a
7    dynamic process that changes was kind of a pain.
8               So we would bypass some of the
9    softening just in the event something happened
10   and we were still treating water and getting
11   water out.  But softening was mainly because I
12   didn't want to soften the water.
13         Q.     And you didn't want to soften
14   water why?
15         A.     For numerous reasons.  But number
16   one is my staff and the lime softening process
17   and the way our plant was set up was not -- not
18   ideal in my eyes.  Softening to me -- softening
19   the water is just an aesthetic.  There's no
20   regulations on that.  And I thought it would be
21   better for me and my staff if we didn't soften,
22   because in our prior test runs, we didn't
23   practice softening.  And on top of that, we
24   would send out hard water, which usually

Highly Confidential - Michael B. Glasgow

1          A.    I believe I told her to take that

2     without, but it's kind of hard for me to

3     remember now.

4          Q.    And then I think I mentioned to

5     you before that later test results showed lead

6     over 700 part per billion, and one taken by the

7     EPA over 13,000 parts per billion.

8               Do you remember that?  Do you

9     remember learning about that?

10         A.    Yes, I do.

11         Q.    Okay.  So eventually in the summer

12    when you're going to undertake monitoring,

13    you're going to produce results of monitoring

14    for lead and copper at the instruction of the

15    DEQ, you were told by Mr. Busch and Mr. Prysby

16    to remove the LeeAnne Walters' test results,

17    weren't you?

18               MS. COLLINS:  Objection; form and

19          foundation.

20         A.    Yes.  The original one of 104,

21    yes.

22         Q.    Okay.  Did that kind of raise an

23    eyebrow with you?

24         A.    A little bit, it did.  But then,

Highly Confidential - Michael B. Glasgow

1   again, I did know in the Lead and Copper Rules

2   that there's not supposed to be a point of use

3   filter or any filter on the system.

4        Q.    Well, that's what I'm getting to.

5   I can envision a regulator saying, "Don't

6   utilize test results for lead and copper on a

7   system that has a filter, because the lead and

8   copper results might be lower than you otherwise

9   would get if there were no filter."  Right?

10        A.    Correct.

11              MS. COLLINS:  Objection; form.

12              MR. KUHL:  Objection to form and

13        foundation.

14        Q.    Here you've got a filter in place

15   and the lead results are way out of whack.  Why

16   would you not include that in your lead and

17   copper test results or monitoring test results?

18              MR. KUHL:  Objection to form and

19        foundation.

20              MR. MARKER:  I'll join.

21        A.    I included it with my report when

22   I sent it.

23        Q.    Yeah, but Prysby and Busch nixed

24   it, right?

1    it, is there?

2              MR. KUHL:  Objection to form and

3         foundation.

4         Q.    You ended up believing that to be

5    so, correct?

6         A.    Yes.  Correct.

7         Q.    There was a lot of discussion in

8    the criminal court hearing about the Lead and

9    Copper Rule forms that you filled out?

10        A.    Yes.

11        Q.    Sort of a two-, three-, or

12   four-page form on the front -- on the first part

13   of which you were asked a question and had to

14   fill out a question as to whether or not all the

15   sites were Tier 1 sites, and you answered no?

16        A.    Correct.  Yes.

17        Q.    And then on the following pages,

18   you identified addressees of where the lead and

19   copper tests or sampling was done, and as to

20   each, you identified the plumbing as -- or the

21   service line as lead.

22              Do you remember that?

23        A.    Yes.  Yep.

24        Q.    That had -- those responses had no

Highly Confidential - Michael B. Glasgow

1    basis in fact, correct?

2              MR. MARKER:  Objection; form,

3         foundation.

4         A.    I did not have the information

5    necessary to verify all that.

6         Q.    And the whole point of that form

7    was to provide verifiable information to the

8    MDEQ, correct?

9              MR. MARKER:  Objection; form,

10        foundation.

11        A.    I would say yes.

12        Q.    Okay.  I gather you assumed that

13   the MDEQ, which was responsible for reviewing

14   those forms, would see the contradiction in

15   terms between page 1 and the back pages, right?

16        A.    Correct.  Yes.

17        Q.    That was your assumption?

18        A.    Correct.  Yes.

19        Q.    Was the first time that anybody

20   from the MDEQ raised with you that contradiction

21   in July of 2000- --- July 10th of 2015?

22        A.    I believe that issue might have

23   been raised earlier than that with Mr. Prysby.

24        Q.    Give me a date.

Highly Confidential - Michael B. Glasgow

```
 1          A.     I'm going to say somewhere around

 2    the LeeAnne Walters' time frame.

 3          Q.     Whoa.  Back in February and March

 4    of 2015?

 5          A.     Yes.

 6          Q.     Tell us -- I haven't seen those

 7    documents.  Tell us about how that came about.

 8          A.     Yeah, I'm trying to think.  I

 9    think that was when I first notified -- or

10    Mr. Prysby asked me a question in regards to our

11    standard list of -- pulled list of samples for

12    lead and copper monitoring, and asked me if

13    Ms. Walters was on that.

14                 And I said no, but now after her

15    results, that I was going to go look for the

16    problem areas and take samples from there so I

17    could really get an idea of what's going on.

18          Q.     How did that exchange lead you to

19    believe that Prysby was aware of the

20    contradiction between how you had filled out

21    page 1 of the form and the ultimate -- and the

22    follow-on pages.  Explain that to us.

23          A.     I just think in the midst of

24    conversation, I know I had reiterated to him the
```

Highly Confidential - Michael B. Glasgow

1    records, and the pulled list was not at my

2    disposal.  I had asked my supervisors for a list

3    back in early '14, knowing that we had to do

4    increased number of samples.

5                    So I reiterated that to

6    Mr. Johnson, Mr. Croft, and never received any

7    list of pulled addresses.

8                    So that's when I took it upon

9    myself just to collect samples wherever we could

10   get them.  Mr. Bincsik assured me, you know,

11   80 percent of the service lines are lead.  So

12   throw a dart, and you should be able to find

13   your spots.

14        Q.    It turns out that that's not so,

15   though, right?

16        A.    Yep.  Absolutely.

17        Q.    It turns out less than 30 percent

18   of the service lines are lead in Flint, right?

19              MR. KIM:  Objection as to form and

20              foundation.

21        Q.    You've learned that through the

22   Fast program?

23              MR. KIM:  Object to form and

24              foundation.

Highly Confidential - Michael B. Glasgow

```
 1           A.    Well, yeah.  I've been off for a
 2    long time, so I've been not privy to all that
 3    info.
 4           Q.    In any event, the data on Lead and
 5    Copper Rule reporting is unreliable, correct?
 6                 MR. MARKER:  Objection; form and
 7           foundation.
 8                 MR. KUHL:  Objection; form and
 9           foundation.
10           A.    I'll have to say correct.
11           Q.    If you can't identify the source
12    as a Tier 1 source, by definition that report is
13    of no consequence, right?
14                 MR. KUHL:  Objection to form.
15                 MR. MARKER:  I'll join.
16           A.    Correct.
17           Q.    What did Prysby do or say when you
18    confronted him with the fact that the data was
19    non-verifiable?
20           A.    It seems like he said, you know,
21    he'd talk with Busch, and they would discuss
22    this and get back with me.
23           Q.    Okay.  Was it Busch and Prysby in
24    the summer, in July of 2015, who decided that
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.     Do you see that?

 2          A.     Uh-huh.

 3          Q.     And that was your understanding as

 4    of May of 2013, that the switchover would be a

 5    basis or a way for the city of Flint to save a

 6    lot of money, correct?

 7          A.     Correct, yes.

 8          Q.     And, again, I think you said

 9    before, you also thought it could have been

10    leverage to try and get Detroit to lower their

11    water prices so you could stay with Detroit

12    water, correct?

13          A.     Correct, yes.

14          Q.     Did you have -- well, strike that.

15                 After -- in May of 2013, did you

16    have any understanding of what LAN's scope of

17    work might be on the Flint water treatment

18    plant?

19          A.     No, I really can't say I did, to

20    be honest with you.  I knew they were going to

21    be involved, but I never seen a statement of

22    scope of work or anything like that.

23          Q.     Did you have any understanding as

24    to whether their work would be with regard to
```

1    design and retrofitting the Flint water

2    treatment plant as opposed to water treatment

3    decisions or recommendations or

4    responsibilities?

5                   MR. MORRISSEY:  Objection to form.

6                   MR. KIM:  Objection as to form and

7              foundation.

8         A.    From my personal, I guess,

9    viewpoint, I would say it was more from a

10   retrofit and upgrade capacity.

11        Q.    Was it your understanding, just

12   based on the ultimate project, that the city was

13   going to maintain responsibility for water

14   treatment decisions as far as the chemicals, the

15   dosages, and how the water would be treated

16   coming from the Flint River?

17                  MR. KIM:  Objection as to form.

18                  MR. MORRISSEY:  Objection to form.

19        A.    I would have to answer that yes

20   with, I guess, input from members of LAN and

21   also the state and DEQ.

22        Q.    We talked a little bit before

23   about soda ash feed, and I think you testified

24   before that before the Flint water treatment

Highly Confidential - Michael B. Glasgow

1    not be doing for the city of Flint on the Flint

2    water treatment plant?

3          A.    No --

4                MR. MARKER:  Objection.

5          A.    -- I was not.

6          Q.    Were you involved in any meetings

7    with Duffy Johnson to discuss what LAN would or

8    would not be doing with regard to the project --

9    the Flint water treatment project in 2013?

10         A.    Not that I can recall, no.

11         Q.    Were you engaged in any

12   conversations or did you have any conversations

13   with the MDEQ in 2013 about what LAN's scope of

14   work would be?

15         A.    No, I can't say that I did.

16         Q.    And I think you said before that

17   at least in your mind, LAN's scope of work was

18   primarily related to retrofitting and design of

19   the Flint water treatment plant, correct?

20         A.    Correct.

21               MR. MORRISSEY:  Object to form.

22         Q.    And it was not necessarily with

23   regard to decisions on water treatment, water

24   quality, or dosages or chemicals that would be

```
 1          Q.    Are you familiar with the term
 2     "primacy"?
 3          A.    Yes.
 4          Q.    And what does that mean to you?
 5          A.    Well, let me think how I would
 6     describe it.  If they have -- whoever has
 7     primacy has, in effect, to me, the power to
 8     enforce some rules or dictate power and make
 9     decisions, I guess.  That's kind of a broad
10     definition, but they're the ones to enforce
11     things.
12          Q.    And did you understand that the
13     DEQ was the primacy agent with regard to the
14     water treatment decisions that related to the
15     Flint water treatment plant?
16          A.    Yes.
17                MR. KUHL:  Objection to form.
18                MR. SCHNATZ:  Objection to form.
19                MS. COLLINS:  Objection to form.
20          Q.    I think you previously described
21     in your testimony that the DEQ was kind of like
22     a coach and a cop; is that fair enough?
23          A.    Yeah, that's fair.
24          Q.    What did that exactly mean?
```

Highly Confidential - Michael B. Glasgow

1          A.    Well, they're there to help you

2    when you need it, but if you're not following

3    the procedure, they're there to slap you on the

4    hand if not.

5          Q.    Is it fair to say that the DEQ was

6    your primary resource when you had questions

7    about how to treat the water and the Flint water

8    treatment plant when you went online in April of

9    2014?

10         A.    Yes.

11         Q.    If you had disagreed with

12   something that the DEQ had instructed you to do

13   or not do, did you have any recourse or any

14   ability to appeal that type of a decision?

15              MS. COLLINS:  Objection; form.

16              MR. MORRISSEY:  Object to form.

17         A.    Not to my knowledge.

18         Q.    You just testified previously that

19   you always thought under the Lead and Copper

20   Rule phosphates or some form of corrosion

21   control would need to be included in the

22   finished water treatment process, correct?

23         A.    Correct, yes.

24         Q.    And if you disagreed -- well,

Highly Confidential - Michael B. Glasgow

```
 1            A.    No.
 2            Q.    Do you have any understanding of
 3   specifically what the scope of work was that was
 4   set forth in the final change order number 2
 5   when LAN was retained to do work on the Flint
 6   water treatment plant?
 7            A.    I do not.
 8            Q.    I think you were asked this
 9   before, but do you have any recollection of any
10   recommendations made by Warren Green -- well,
11   strike that.
12                 You recall that Warren Green
13   specifically made recommendations that there
14   would need to be additional plant test runs on
15   the Flint water treatment plant before water
16   should be distributed from the Flint water
17   treatment plant.
18                 You recall that?
19            A.    I do, yes.
20            Q.    And, in fact, do you recall when
21   those recommendations were made?
22            A.    I can't really recall when they
23   were made.  I would -- it seems like they would
24   be after our test run in July.
```

Highly Confidential - Michael B. Glasgow

```
 1          Q.    And the city never did a 60- to
 2   90-day plant test run, correct?
 3          A.    Correct.
 4          Q.    They never did any plant test run,
 5   prior to distributing water, where they
 6   evaluated the specific water characteristics and
 7   water quality coming from the plant before April
 8   of 2014 when the water went out?
 9                MR. MARKER:  Objection to form.
10                MR. KUHL:  Objection to form.
11          A.    I can't say that I do, no.
12          Q.    It would be important to do a
13   60-to-90 plant test run to evaluate the water
14   quality coming out of the plant before it was
15   distributed to the public, correct?
16          A.    Oh, absolutely, yes.
17          Q.    It would be extremely important to
18   understand how you were treating the water and
19   whether it was presenting any type of danger to
20   the public, correct?
21          A.    Correct, yes.
22          Q.    And despite those concerns, the
23   city never did it, correct?
24          A.    Correct.
```

1    had a couple upgrades that pertained to the KWA

2    water coming in that they would maybe be around

3    with later on.

4         Q.    So basically they weren't doing

5    anything, based on your understanding, as to the

6    operation of the plant with the Flint River

7    water, but they were still working on upgrades

8    for the KWA switchover, which was going to occur

9    two years later; is that your understanding?

10        A.    Correct, yeah.

11        Q.    Do you recall ever having

12   discussions with Warren Green about the water

13   quality results and the monthly operating

14   reports coming out of the Flint water treatment

15   plant after April of 2014?

16        A.    Not offhand, I do not.

17        Q.    And LAN didn't have any role

18   whatsoever in evaluating water quality and water

19   treatment after April of 2014, correct?

20             MR. KIM:  Objection as to form and

21        foundation.

22        A.    Not that I recall, no.

23        Q.    Did you ever have any -- well,

24   strike that.

Highly Confidential - Michael B. Glasgow

1          Q.    Okay.  You described the

2    relationship with the MDEQ and with their staff

3    as being like a coach and like cops.  Is that --

4    was that accurate?

5          A.    Yes.

6          Q.    And you saw them as being coaches

7    because they would provide advice, correct?

8          A.    Correct, yes.

9          Q.    Is there any other reasons why you

10   saw them as coaches?

11         A.    Well, yeah, I guess I could say --

12   when I think about it, I'm still laughing that I

13   used that description of it, but, yeah, they

14   would help, in my eyes, to interpret some of the

15   rules from the Safe Drinking Water Act, you

16   know.  I don't know, probably everybody in this

17   room has now seen the Safe Drinking Water Act.

18   Now it looks like one of these big binders.

19              But as with anything and, I guess,

20   law like you guys practice, there could be

21   different interpretations of items.  So I would

22   rely on them to help clarify things if I had

23   questions.

24         Q.    Okay.  And you also saw them to

Highly Confidential - Michael B. Glasgow

 1    have a role as cops.  Can you describe what you

 2    meant by that.

 3           A.    Yeah.  In that aspect it makes me

 4    think of violations or if there's rules we're

 5    not following, that they've stipulated to us

 6    they can, you know, bring a little discipline

 7    down on us in a sense.

 8           Q.    Okay.  Did you draw a distinction

 9    between those two roles in your view of the

10    MDEQ, or were they occurring simultaneously?

11                 MR. MARKER:  Object to the form.

12           Q.    Did you see that their role as --

13    let me rephrase.

14                 Did you see that their role as a

15    coach was distinct and separate from their role

16    as cops?

17           A.    Not particularly.  I would think

18    it was almost a combination.

19           Q.    Okay.  So as a combination, did

20    you feel that that -- that their suggestions

21    carried great weight?

22           A.    Yes, you could say that.

23           Q.    Did you view that -- their

24    suggestions as being optional?

Highly Confidential - Michael B. Glasgow

```
 1          A.    No, not whatsoever.  They -- well,

 2    when you're saying "suggestions," if something

 3    was brought across to me as a suggestion or

 4    recommended treatment practices, I took it -- I

 5    took it to heart, and I would try my best to

 6    institute it.

 7          Q.    Okay.  I'd like to address at

 8    least one more area here.

 9                In the fall of 2014, did you

10    become aware of Legionella issues anywhere in

11    the city of Flint?

12          A.    I did.

13          Q.    And where were those Legionella

14    issues occurring?

15          A.    At McLaren Hospital in Flint.

16          Q.    Okay.  How did you first become

17    aware of those issues?

18          A.    I was contacted by Liz Murphy, who

19    was, I think, an assistant to the emergency

20    manager -- I wasn't sure of her title -- in

21    regards to issues at McLaren Hospital, and

22    McLaren was having a little meeting about it,

23    and the city sent me to attend the meeting.

24          Q.    Okay.  And who was at this
```

Highly Confidential - Michael B. Glasgow

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4     _____

                                    )

5                                   )   Civil Action No.

                                    )   5:16-cv-10444-JEL-MKM

6     In re:  FLINT WATER CASES  )   (consolidated)

                                    )

7                                   )   Hon. Judith E. Levy

                                    )   Mag. Mona K. Majzoub

8     _____)

9

10              HIGHLY CONFIDENTIAL

11   VIDEOTAPED DEPOSITION OF MICHAEL B. GLASGOW

12                  VOLUME III

13

14         Wednesday, February 26, 2020

15                at 8:58 a.m.

16

17   Taken at:  Butzel Long

                41000 Woodward Avenue

18                Bloomfield Hills, Michigan   48304

19

20

21

22   REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139

23          GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

24                deps@golkow.com

Highly Confidential - Michael B. Glasgow

1          Q.    And if I recall correctly, you

2    gave testimony that there was instruction from

3    the MDEQ, specifically Mr. Prysby, who was the

4    engineer assigned to the city of Flint, your

5    engineer, that they were not going to be adding

6    phosphates to the water; you were not required

7    to add phosphates to the water; is that correct?

8               MR. MORRISSEY:  Objection to form.

9               MS. COLLINS:  Object to the form.

10              MR. KUHL:  Object to form; assumes

11         testimony.

12         A.    That is correct.

13         Q.    What is your understanding of

14   Mr. Prysby's role with respect to the city of

15   Flint?

16         A.    He was our MDEQ district engineer

17   assigned to oversee the city.

18         Q.    Thank you very much.

19              With respect to the decision not

20   to implement corrosion control treatment or add

21   phosphates to the water, do you know the reason

22   for that, as you sit here today?

23         A.    The reason is it was explained to

24   me their interpretation of the Safe Drinking