# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4

    ------------------------------)

 5                                ) Civil Action No.:

    IN RE:  FLINT WATER CASES      ) 5:16-cv-10444-JEL-MKM

 6                                ) (consolidated)

                                  )

 7                                ) Hon. Judith E. Levy

    ------------------------------)

 8

 9                       - - -

10    REMOTE VIDEOTAPED DEPOSITION OF NICOLE ALEXANDER

11                  October 27, 2022

12                    9:03 a.m.

13                       - - -

14

15          Remote videotaped deposition of NICOLE

16    ALEXANDER, commencing at 9:03 a.m., Thursday, October

17    27, 2022, before Juliana F. Zajicek, Registered

18    Professional Reporter, Certified Shorthand Reporter

19    and Certified Realtime Reporter.

20

21

22                       - - -

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24                 Deps@golkow.com
```

1    Q.    Okay.  And you are referring to the -- the

2    other area where you are referring to where, you know,

3    maybe Mr. Croft or Mr. Johnson stopping by is the

4    offices on the ground floor?

5    A.    Correct, yeah.

6    Q.    Okay.  Gotcha.  All right.

7          Emergency manager Darnell Earley, did you

8    see him around the plant in early 2014?

9    A.    I did not, no.

10   Q.    What about Dayne Walling who was the Mayor

11   and also the chairman of the KWA, did you see him

12   around the plant?

13   A.    No, I did not.

14   Q.    Okay.  The day-to-day management of the

15   plant, was that Mike Glasgow's deal?

16   MR. STERN:  Objection.

17   BY MR. RINGSTAD:

18   Q.    Let me ask a better question.

19         Was Mike Glasgow the one who managed the

20   plant day-to-day?

21   A.    Can you clarify "manage," I guess?

22   Q.    Yeah.  Was Mike Glasgow, in your

23   understanding in 2014, responsible for running the

24   plant daily?

1          MR. STERN:   Objection.

2     BY MR. RINGSTAD:

3          Q.    You can answer.   These objections are

4     interposed.   It is just an attorney thing, so.

5          A.    Oh, okay.

6               So it was kind of a weird situation

7     because Mike was the F1 holder, so he was responsible

8     for, like, reporting and making sure that, you know,

9     we were meeting all of the regulations, but he wasn't

10    the manager.   That was Brent.

11              So, like, Brent would have been

12    responsible for, like, budgetary things, personnel

13    things.   So it was kind of -- it was a really weird

14    situation because you don't generally have an F1 not

15    sitting as your head person.   So being the lab

16    supervisor, he was making the calls, I guess, for,

17    like, the treatment process, but he really, to my

18    knowledge, really wasn't involved too much with the,

19    like, budgetary stuff.   I know he was involved in all

20    of those meetings because he was the F1, but beyond

21    that I don't know how much power he had in those

22    meetings.   Like, I -- I wasn't in those meetings with

23    them, so I don't know.

24         Q.    Okay.

```
 1        A.    If that helps answer that question, I
 2  guess.
 3        Q.    It does.  I had the treatment processes in
 4  mind, if there were issues with treatment processes,
 5  is Mike Glasgow the guy people in the plant would go
 6  to?
 7        A.    Yes, yes.
 8        MR. CONNORS:  Object to form.  Object to form.
 9  BY MR. RINGSTAD:
10        Q.    Did Mr. Glasgow have hiring and firing
11  authority over plant operators?
12        MR. CONNORS:  Objection.
13  BY THE WITNESS:
14        A.    No.
15        MR. CONNORS:  Lacks foundation.
16  BY MR. RINGSTAD:
17        Q.    And you can answer.  These objections will
18  come up occasionally.
19        A.    Okay.  No, no, he did not.
20        Q.    Okay.  Did he have, to your understanding,
21  the power to decide which treatment processes would be
22  put in place in the plant?
23        MR. CONNORS:  Objection, lacks foundation, vague
24  and ambiguous.
```

```
 1        MR. STERN:  Objection.

 2        MR. RINGSTAD:  Okay.  You can just say

 3   "objection to form," that's been the case for like

 4   three years now.  So, and it just makes for a little

 5   bit of a cleaner record and a smoother day.

 6            An objection by one is of course objection

 7   by all for the rules that have been in place forever,

 8   so just a reminder to counsel.  But you can --

 9        MR. STERN:  If we can just -- if we can just --

10   if we can just address that for a second.

11        MR. CONNORS:  Well, I'm sure that the

12   objection --

13        MR. RINGSTAD:  No, let's just move on, Corey.

14   Let's move on.

15        MR. CONNORS:  No, you just put a statement on

16   the record.  We can respond to your statement on the

17   record.

18            Go ahead, Corey.  You can respond.  I'll

19   respond as well.

20        MR. RINGSTAD:  Okay.  Respond.  Respond, please.

21        MR. STERN:  When -- when --

22        MR. RINGSTAD:  Yeah, respond.

23        MR. STERN:  When counsel for Veolia claims that

24   an objection for one is an objection for all,
```

1   insinuating that something inappropriate was done, my

2   understanding is that Mr. Connors is on the West Coast

3   and I am on the East Coast, and I don't have any

4   expertise in telepathy or in mind reading, and so when

5   we simultaneously object, not only does it indicate

6   that it was a poor question because of the mileage

7   between us and our inability to read each other's

8   minds, but it also makes it difficult to know when the

9   other person is going to object.

10          And so, yes, while an objection for one is

11  an objection for all, simultaneous objections can't be

12  helped sometimes, espec- -- especially when a question

13  is asked in such a poor way without foundation.

14      MR. RINGSTAD:  Anything else?

15      MR. CONNORS:  I'll say we'll -- we'll do our

16  best.  It is hard sometimes on Zoom and sometimes we

17  talk over each other.

18      MR. RINGSTAD:  That's cool.

19      MR. CONNORS:  I understand you to say that if I

20  object to form I have got a broad objection to any

21  part of the question and I'm happy to object that way

22  based on what you said.

23      MR. RINGSTAD:  Yeah, that would be great.

24  Thanks.  And thanks, Mr. Connors and Mr. Stern.

```
 1   BY MR. RINGSTAD:

 2        Q.    Let's move on.

 3              So, again, to repeat the question, did

 4   Mr. Glasgow in 2014 have the power to decide which

 5   treatments the water plant was implementing to your

 6   understanding?

 7        MR. STERN:  Objection.

 8        MR. CONNORS:  Object to form.

 9   BY THE WITNESS:

10        A.    Yes, I -- I believe so, yes.

11   BY MR. RINGSTAD:

12        Q.    Okay.  So if a -- if a unit process was

13   desirable, Mr. Glasgow could have implemented it, is

14   that correct?

15        MR. STERN:  Objection.

16        MR. CONNORS:  Object to form.

17   BY THE WITNESS:

18        A.    I don't think he could have just

19   implemented it.  It would still have to go through the

20   processes of talking to, you know, Brent and then

21   going up to, like, the director level.  It -- it

22   probably would have had a lot to do with cost as well.

23   BY MR. RINGSTAD:

24        Q.    Okay.  So Mr. Glasgow, to your
```

```
 1   understanding, could -- he could recommend unit

 2   processes to be implemented or treatment changes to be

 3   implemented, but there was a budgetary process and

 4   there was -- there was higher review that he would

 5   need to go through, is that correct?

 6       A.    Correct.

 7       MR. STERN:  Objection; form.

 8   BY MR. RINGSTAD:

 9       Q.    All right.  So at some point, Nicole, you

10   and the water plant staff learned that Flint was going

11   to stop receiving treated water from the DWSD or I'll

12   just call it Detroit, is that correct?

13       MR. STERN:  Objection.

14   BY THE WITNESS:

15       A.    Correct.

16   BY MR. RINGSTAD:

17       Q.    Okay.  When did you first learn that?

18       A.    I -- I really don't recall exactly when.

19       Q.    Just can you give us a general timeframe

20   when you learned that?

21       A.    I mean, we had talked about having the

22   opportunity to do that for years.  I really don't

23   recall exactly when.  I don't remember if it was the

24   end of 2013 or early 2014.  I would -- I guess I
```

```
 1          MR. STERN:  Objection; form.

 2          MR. CONNORS:  Objection.

 3   BY MR. RINGSTAD:

 4          Q.    Okay.  And I think your answer was yes?

 5          A.    Yes.

 6          Q.    Okay.  And the water plant staff generally

 7   understood that any treatment that was implemented had

 8   to meet the Michigan Safe Drinking Water Act, is that

 9   correct?

10          MR. CONNORS:  Objection; form.

11   BY THE WITNESS:

12          A.    Correct.  Anything we did had to -- was

13   regulated by the Michigan Safe Drinking Water Act.

14   BY MR. RINGSTAD:

15          Q.    Okay.  And that would include Michigan

16   LCR, Lead and Copper Rule compliance, correct?

17          MR. CONNORS:  Objection.

18   BY THE WITNESS:

19          A.    Correct.

20   BY MR. RINGSTAD:

21          Q.    And one decision that had to be made under

22   the Michigan Lead and Copper Rule for a public water

23   system like Flint's was -- was how to provide

24   corrosion control, is that correct?
```

Nicole Alexander

```
 1       MR. STERN:  Objection to form.

 2       MR. CONNORS:  Objection.

 3   BY THE WITNESS:

 4       A.    Correct.

 5   BY MR. RINGSTAD:

 6       Q.    And that was the understanding of the --

 7   of the water plant staff at the time, correct?

 8       MR. CONNORS:  Objection; form.

 9   BY MR. RINGSTAD:

10       Q.    You can answer.

11       A.    It depends on the --

12       Q.    You can answer.

13       A.    It depends on the staff.

14       Q.    Okay.

15       A.    If you are very familiar with the -- you

16   know, with the regulations, like, I knew that that was

17   required, I'm sure that Mike knew that was required.

18   Would I say that our foreman or some of our operators

19   were under the understanding of that, maybe not.  You

20   know, they just dealt with for years and years just

21   distribution pressures.  They weren't really, you

22   know, very instrumental in the actual treatment

23   process, so would everybody that worked in the plant

24   think of that, probably not.
```

1      Q.    Okay.  That's fair.  I appreciate that.

2            You said you're sure that Mike knew that.

3  Why are you sure that Mike knew that?

4      MR. CONNORS:  Object to form.

5  BY THE WITNESS:

6      A.    Him and I had had conversations about the

7  treatment process.

8  BY MR. RINGSTAD:

9      Q.    Okay.  And in the conversations about

10  treatment processes, the issue of corrosion control

11  came up?

12      A.    Yes.

13      MR. STERN:  Objection.

14  BY MR. RINGSTAD:

15      Q.    And these were conversations that occurred

16  prior to the -- the switch, so to speak?

17      A.    Yes.

18      Q.    Okay.  And what were you and Mr. Glasgow

19  discussing in those conversations that you can recall

20  specifically?

21      A.    About corrosion control?

22      Q.    Yeah.

23      A.    I just questioned why we hadn't added a

24  phosphate system yet.

1      Q.     Okay.

2             And did -- did Mike have an answer for

3      that?

4      A.     He did.

5      Q.     And what was Mike or Mr. Glasgow's answer?

6      A.     His answer was that because we were -- the

7      water coming in from Detroit was not lime softened,

8      right, because the Lake Huron is already within the

9      ppm limit that we were looking for, so we never had

10     to -- they never had to soften for us for that, but

11     the hardness level coming in from the river was so

12     high that we would be using lime softening, so -- and

13     my understanding of this at the time wasn't as good as

14     it is now, obviously, because my roles there and here

15     are completely different, so I've learned a lot being

16     here, so now I understand more now what I didn't

17     understand then.

18     Q.     Sure.

19     A.     So the explanation that I recall, and this

20     may not be verbatim because this was almost ten years

21     ago, was that because we were adding lime now that we

22     had, like, a little bit of a buffer because the lime

23     should adhere to what we had in the phosphate already

24     in the -- in the system to create a layer, like a

1   crusty layer, so that way we had some time to get the

2   phosphate system in place, you know, before -- before

3   Karegnondi got in.  So we had some time in that

4   timeframe because of the lime softening.

5              So that was supposed to help.  And my

6   understanding is that's what he was told by DEQ in --

7   in their meetings and stuff when they were starting to

8   ramp up.

9       Q.    Okay.  So -- and I appreciate the -- the

10  comment that you made about, you know, what you know

11  now versus what you knew then.  What's helpful to us,

12  as best you can recall what Mr. Glasgow told you, if

13  it's not verbatim, indicate that, I think you did, and

14  also what your understanding was at the time.

15      A.    Correct.

16      Q.    So let me circle back to -- to your

17  testimony a little bit.

18              Am I understanding correctly that

19  Mr. Glasgow's explanation why phosphates would not be

20  added to Flint River water was that there were

21  existing phosphate scales in the system over which

22  carbonate deposition layer could be put because the

23  Flint River water was hard, is that correct?

24      MR. STERN:  Objection.

Nicole Alexander

```
1    BY THE WITNESS:

2        A.    Well, the lime -- the lime softening

3    process would, yes, because of the -- that portion of

4    the process, but Mr. Glasgow was also uncomfortable

5    with that explanation.  That wasn't something he was

6    very comfortable with either.  So that's why it became

7    a conversation between the two of us.

8    BY MR. RINGSTAD:

9        Q.    So is it correct to say that Mr. Glasgow

10   conveyed to you that lime softening would be corrosion

11   control for Flint using the Flint River water?

12       MR. CONNORS:  Objection.

13   BY THE WITNESS:

14       A.    I wouldn't say that he -- he conveyed it

15   as a corrosion control.  I think it was conveyed to

16   him that it was, like, it could help until we could

17   get corrosion control.

18   BY MR. RINGSTAD:

19       Q.    Okay.  So the idea was to use that

20   strategy to get to the KWA water, is that right?

21       MR. STERN:  Objection.

22   BY THE WITNESS:

23       A.    Not necessarily all of the way to KWA,

24   but, like, we had some time between that and KWA to
```

Nicole Alexander

1   get that done.  So I think the idea was that at some

2   point in those two years we get that system up and

3   running and get it moving before we ever got to KWA,

4   because obviously from the understanding I had then,

5   and this is my understanding of the conversation, was

6   that --

7   BY MR. RINGSTAD:

8       Q.    Sure.

9       A.    -- because KWA water was Lake Huron water

10  there would be no softening, and then so we would not

11  have that kind of buffer, I guess, anymore.  So it

12  wasn't, like, we could wait until it came in, but it

13  was, like, we have a little bit of time to get that in

14  between now and then, I guess.

15      Q.    Okay.  The plan was to eventually install

16  a phosphate feed though, is that right?

17      A.    Yes.  Yes.

18      MR. CONNORS:  Objection.

19      MR. STERN:  Objection.  We -- we -- if it's

20  possible to be able to just have a moment before the

21  answer so that if we have an objection we can place it

22  on the record, we would very much appreciate it.

23      MR. RINGSTAD:  Sure, yeah.

24  BY MR. RINGSTAD:

Nicole Alexander

```
 1        Q.    And -- and, Nicole, just to be clear,
 2   painfully clear, that's a request to you.  I'll try to
 3   make for a clean ending to the question and if you can
 4   just give a little pause, especially in light of
 5   the -- the technical issues that we have had this
 6   morning.
 7        A.    Okay.
 8        Q.    That would be appreciated by all,
 9   especially the court reporter, I'm sure.
10              Okay.  So let me -- let me get back to
11   that question.
12              The -- the plan, as you understood it from
13   talking to Mr. Glasgow, was that eventually phosphate
14   feed would be implemented for the City?
15        MR. CONNORS:  Objection.
16   BY THE WITNESS:
17        A.    Yes, correct.
18   BY MR. RINGSTAD:
19        Q.    Okay.  And did I understand correctly that
20   that phosphate feed may have -- well, the plan was not
21   specific, let's put it this way, about whether that
22   phosphate feed would be for treating Flint River water
23   or for KWA or Lake Huron water, is that correct?
24        MR. STERN:  Objection.
```

1   BY THE WITNESS:

2       A.    At that time I don't think that they had a

3   plan in place of exactly when, no.

4   BY MR. RINGSTAD:

5       Q.    Okay.  So it -- it could be that the

6   phosphate feed would be implemented in a year, in

7   which case it would likely be for Flint River water,

8   or it would be implemented in three years or two

9   years, in which case it would likely be for KWA water,

10  is that what you are saying?

11      MR. STERN:  Objection.

12      MR. CONNORS:  Objection.

13  BY THE WITNESS:

14      A.    The conversations we had were before we

15  ever started running the plant.  I don't know what the

16  actual plans were moving forward.  These were just my

17  concerns that I brought to him and my questioning to

18  him.

19  BY MR. RINGSTAD:

20      Q.    Okay.

21      A.    After that, we really never talked about,

22  like, when that system was going to be added, so I

23  have no idea, like, when that was going to possibly be

24  added or what they had planned in any of their --

Nicole Alexander

1   their meetings with the administrators, the directors,

2   you know, things like that.  That was just me

3   questioning him when we -- when -- before we actually

4   started running.

5       Q.   But you were aware from talking to

6   Mr. Glasgow that there was a plan for phosphate feed,

7   correct?

8       MR. STERN:  Objection.

9   BY THE WITNESS:

10      A.   Correct, yes.

11  BY MR. RINGSTAD:

12      Q.   And the plant staff, just generally

13  speaking, understood what it would take to implement

14  the phosphate feed, just in terms of the pumps and

15  chemical storage and that kind of thing, is that -- is

16  that fair?

17      MR. CONNORS:  Objection.

18      MR. STERN:  Objection.

19  BY THE WITNESS:

20      A.   I would say it would be fair if you're

21  talking about, like -- like uppers.  I don't know how

22  much attention the rest of the plant really paid to

23  that kind of stuff.

24  BY MR. RINGSTAD:

Nicole Alexander

```
 1        Q.    Okay.  Got it.

 2              And in 2014, early 2 -- 2014, was it your

 3   understanding that phosphate feed would be

 4   specifically for corrosion control?

 5        MR. CONNORS:  Objection.

 6        MR. STERN:  Objection.

 7   BY THE WITNESS:

 8        A.    Yes.

 9   BY MR. RINGSTAD:

10        Q.    Okay.  And was that Mr. Glasgow's

11   understanding as far as you could tell?

12        MR. STERN:  Objection.

13   BY THE WITNESS:

14        A.    I would assume, yes.

15   BY MR. RINGSTAD:

16        Q.    Okay.  And at that point, this is before

17   the switch to the Flint River, incoming Detroit water

18   was treated with phosphates, correct?

19        A.    Correct.

20        Q.    Okay.  And Mr. Glasgow, maybe others, were

21   tracking and monitoring phosphate levels for the City

22   of Flint, is that correct?

23        MR. STERN:  Objection.

24   BY THE WITNESS:
```

Nicole Alexander

1      A.    That -- yes, I did the testing for the

2   phosphates.

3   BY MR. RINGSTAD:

4      Q.    You did the testing for the phosphates,

5   okay.

6      A.    Yes, I did.

7      Q.    Okay.  So, and that was -- was that a

8   daily test that you did for phosphate levels for

9   incoming Detroit water?

10     A.    No.  Water quality monitoring for us, if I

11  remember correctly, was a quarterly.

12     Q.    Okay.

13     A.    Prior to running the Flint River.  That --

14  all of our sampling requirements changed when -- when

15  our water changed.

16     Q.    Okay.  All right.

17           And those -- those phosphate records

18  were -- were kept at the plant, is that correct?

19     A.    Yes.

20     Q.    Okay.

21     A.    And they should -- and I believe they were

22  sent to the DEQ as well.

23     Q.    Okay.  All right.

24           From your earlier comments, I gathered

1    that the water plant staff was aware that the use of

2    phosphates by Detroit water over the years would lead

3    to the development of phosphate based scales within

4    the distribution system.

5             Is that fair to say?

6        MR. CONNORS:  Objection.

7    BY THE WITNESS:

8        A.   I would hope so because they were

9    licensed, but I -- I wouldn't know for sure that the

10   rest of the plant had an understanding of that.

11   BY MR. RINGSTAD:

12       Q.   Right.  Were you aware of that in 2014?

13       A.   I was, yes.

14       MR. CONNORS:  Objection.

15   BY MR. RINGSTAD:

16       Q.   Okay.  Was Mr. Glasgow aware of it, to

17   your knowledge, it sounds like he was based on what

18   you said, but I just want to see what you have to say

19   about that?

20       MR. CONNORS:  Objection.

21       MR. STERN:  Object to form, move to strike.

22   BY MR. RINGSTAD:

23       Q.   You can answer.

24       A.   Yes, I would believe so, yes.

Nicole Alexander

```
 1        Q.    Okay.  Other than the conversation that
 2   you had with Mr. Glasgow where he, you know,
 3   referenced the -- the mechanism by which corrosion
 4   would be controlled, the overlay of carbonates on top
 5   of phosphate scales, did you ever hear Mr. Glasgow
 6   talk about, you know, phosphate-based scales or scale
 7   formation in the distribution system in that time
 8   period, 2014?
 9        MR. STERN:  Object to form.
10   BY THE WITNESS:
11        A.    No.
12        MR. STERN:  Move to strike.
13   BY THE WITNESS:
14        A.    No, I did not.
15        MR. RINGSTAD:  And, Counsel, this is a discovery
16   deposition, I mean, by all indications, so I don't
17   know that motions to strike are going to get you
18   anywhere, but that's okay.
19        MR. STERN:  Move to strike.
20        MR. CONNORS:  And just to clarify, when you say
21   "this is a discovery deposition," what -- what are you
22   saying exactly about the deposition?
23        MR. RINGSTAD:  Jordan, let's just -- just --
24   let's move on with the deposition, okay?
```

1       A.     I assumed so, yes.

2       Q.     Okay.  And why did you assume so?

3       A.     Because I knew that was part of water

4    treatment.  It was a test that I did on a regular --

5    you know, a regular quarterly basis, so I knew it was

6    important.

7       Q.     Okay.  So was that -- did that have

8    anything to do with the fact that Detroit had fed

9    phosphates or supplied water treatment with phosphates

10   over the years to Flint?

11      A.     Yes, and I also understood the Lead and

12   Copper Rule, so I understand what phosphate was for.

13      Q.     And your -- your expectation didn't have

14   anything -- or didn't have any basis, I should say, in

15   any -- any engineering studies or corrosion control

16   studies or anything like that, is that fair?

17      A.     Yeah, that's fair.  No, just from my

18   knowledge of Safe Drinking Water Act and my testing

19   background, really.

20      Q.     Okay.  All right.  I think you indicated

21   that the MDEQ communicated to water plant staff at

22   some point that the phosphate addition would not be

23   required for Flint, is that -- is that correct?

24      A.     No, I don't know that they indicated that

1    it would not be required for Flint.

2        Q.    Okay.

3        A.    From me and Mike's conversation it was

4    more you have a little bit of a buffer of a time, and

5    when I asked him where he got that from, my

6    recollection is that somebody told him he had a little

7    bit of time.  Never did I say that they just said we

8    didn't have to.

9        Q.    Okay.  Okay.  So your understanding of

10   what MDEQ had communicated was that it was not --

11   phosphates were not immediately required for Flint?

12       MR. STERN:  Objection.

13   BY MR. RINGSTAD:

14       Q.    Is that correct?

15       A.    Yeah, from my understanding.

16       Q.    Okay.

17       A.    I don't know that he used those words

18   exactly, but from -- that was the understanding I

19   gathered from our conversation.

20       Q.    Okay.  That's how you understood it at the

21   time.

22            Did you ever see any regulatory

23   communications from MDEQ regarding phosphates or lack

24   of phosphates for Flint?  Do you recall anything like

Nicole Alexander

1  off on annual.  About your inquiry of the effect of

2  treated flint river water on the distribution system,

3  I have heard different arguments.  Personally, I don't

4  believe it will have much effect.  It all depends on

5  our final water quality (mostly pH and alkalinity).

6  Most likely we will have scale-forming water, and this

7  may lead to lots of scale build up in the system."

8           And it goes on from there.

9           Do you see that?

10     A.    I do.

11     Q.    Do you recall having conversations with

12  Mr. Glasgow in late 2013 or early 2014 that he

13  believed that the water in the City of Flint would be

14  scale forming?

15     MR. STERN:  Objection.

16  BY THE WITNESS:

17     A.    I kind of -- I believe that goes back to

18  his and I conversation I referenced earlier in our

19  conversations when I asked him why we weren't adding

20  phosphate and he talked to me about, you know, lime

21  softening and how that would create a scale.

22           So this kind of follows up with those

23  conversations -- that conversation him and I had with

24  that because that was kind of where the mindset was.

1   BY MR. ERICKSON:

2       Q.   And based on your conversations with

3   Mr. Glasgow and your own understanding, did you

4   understand that in order for the water to be -- to be

5   scale forming, that the City would have to be doing

6   lime softening?

7       A.   Yes.

8       MR. STERN:  Objection.  I'd like a standing

9   objection as to any questions that would involve

10  expert testimony.

11      MR. ERICKSON:  I -- I don't have a problem with

12  the standing objection, but I just want to note that I

13  was just asking her for her understanding.

14      MR. STERN:  I hear you.  Experts have a lot of

15  understandings.

16  BY MR. ERICKSON:

17      Q.   Do you recall having any conversations

18  with Mr. Glasgow at any time in 2013 or 2014 about a

19  concern that the use of phosphates may, quote, lead to

20  lots of scale buildup in the system?

21      A.   The use of phosphates, no, I never had a

22  conversation like that.

23      Q.   The next sentence, which I didn't read

24  before, goes on to say:

Nicole Alexander

1    Mr. Rosenthal, he says that the City doesn't have to

2    monitor because they are not using phosphates,

3    correct?

4        A.    That's what I'm reading, yes.

5        Q.    Okay.  Earlier today I showed you an

6    exhibit from March of 2014 where Mr. Glasgow stated to

7    Mr. Hill that he was planning to use phosphates

8    corrosion -- for corrosion control.

9             Do you remember that?

10       A.    Yep.

11       Q.    Do you know what changed between March 26

12   and mid-June of 2014?

13       MR. STERN:  Objection; misstates testimony, it's

14   not the full picture.

15            Phil, there was trial testimony about

16   this.  Are you going to show her his trial testimony?

17       MR. ERICKSON:  Object to the speaking objection

18   and move to strike.

19   BY MR. ERICKSON:

20       Q.    Do you understand the question,

21   Ms. Alexander?

22       A.    You are basically asking me at what point

23   did Mike decide that we were adding phosphate?

24       Q.    My question is:  Do you know what changed

Nicole Alexander

1   between Mr. Glasgow's e-mail in March, late March

2   of 2014 and this e-mail in mid-June of 2014?

3        MR. STERN:  I object to the entire line of

4   questioning.  It misstates testimony, it assumes facts

5   that are not just -- it assumes facts contrary to the

6   evidence.

7        MR. CONNORS:  I join and I object to lack of

8   foundation.

9   BY MR. ERICKSON:

10       Q.   Ms. Alexander, do you understand the

11   question?

12       A.   You are basically asking me what changed

13   from his e-mail that he sent with his concerns or the

14   e-mail he sent to Mr. Hill saying that phosphates

15   would be added, to this e-mail stating that there is

16   no phosphates added, correct?

17       Q.   Correct, the latter -- the last thing you

18   said is what I intend to ask.

19       A.   Okay.  Right.

20       MR. CONNORS:  Same objections.

21   BY THE WITNESS:

22       A.   And again, there was never anything that

23   said that we were not ever going to add phosphates

24   again.  We had a delay and we knew that the phosphate

Nicole Alexander

1   system had to be in at some point before Karegnondi

2   because Karegnondi water would not be softened so

3   Karegnondi water would not have the same scaling

4   effect our Flint River water would have.

5           And as I stated earlier, I don't know what

6   the timeframe that was given to us or suggested would

7   be for that to happen.  So this is only a few months

8   after we started, so at that point obviously we were

9   not adding it yet, but I don't know when that

10  timeframe was that we were given to have to have it

11  in.  So if it's not there, you know, I just knew

12  before Karegnondi.

13      Q.   All right.  I --

14      MR. ERICKSON:  Well, you can go ahead and take

15  this exhibit down.  I'm almost done.  I have a few

16  more questions.

17          In -- well, you know what, let's put up

18  what was previously marked as Johnson 88.  It is an

19  e-mail from February of 2015.

20                  (WHEREUPON, a certain document was

21                   marked Nicole Alexander Deposition

22                   Exhibit No. 16, for identification,

23                   as of 10/27/2022.)

24  BY MR. ERICKSON: