# EXHIBIT 35

Highly Confidential - Daugherty Johnson

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION
3       _____
4                                    No. 5:16-cv-10444
        IN RE:   FLINT WATER CASES      Hon. Judith E. Levy
5                                        Mag. Mona K. Majzoub

        _____
6

        Elnora Carthan, et al.,
7

             Plaintiffs,
8

             vs.                          Civil Action No.
9                                         5:16-cv-10444-JEL-MKM

        Governor Rick Snyder,
10      et al.,

11           Defendants.

        _____
12

13

14

15

                          HIGHLY CONFIDENTIAL
16          VIDEOTAPED DEPOSITION OF DAUGHERTY JOHNSON
17                            VOLUME I
18                   Tuesday, December 17, 2019
                          at 9:09 a.m.
19

20      Taken at:  Butzel Long
                   41000 Woodward Avenue
21                 Bloomfield Hills, Michigan  48304
22      REPORTED BY:  CAROL A. KIRK, RMR/CSR-9139
23                  GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
24                      deps@golkow.com

```
 1           A.    That's what the report says, yes.

 2           Q.    Now, there was an engineering firm

 3   that the city was working with that we've been

 4   referring to as LAN, L-A-N.  It's an acronym to

 5   Lockwood, Andrews and something else.  I forget

 6   the last name.  But you're familiar with that

 7   company, right?

 8           A.    Yes.

 9           Q.    And it was the city's engineering

10   consultant for various things, including issues

11   related to water, drinking water and water

12   quality, right?

13           A.    Yes.

14           Q.    And as of the time that the

15   decision was made to use the Flint River as the

16   interim water source, isn't it true before the

17   2014 startup that LAN had suggested testing of

18   the system for 90, 60, 30 days before the system

19   was actually put online and the water from the

20   Flint River was used, right?

21                 MR. KUHL:  Objection to form.

22                 MR. ZEINEH:  Form, foundation.

23           A.    I recall some testing requests

24   that they had in their proposals, yes.
```

1    Q.    And was that done?

2    A.    No.

3    Q.    Why not?

4    A.    Time.

5    Q.    So the reason that LAN's

6    recommendation for testing the system to make

7    sure that it was safe before it went online was

8    you just didn't have enough time to do it?

9    A.    And we weren't required to do it.

10   Q.    What do you mean by that?

11   A.    The DEQ did not require us to run

12   those tests.

13   Q.    So are you saying that even though

14   the engineering firm recommended -- that the

15   city had hired and worked with recommended

16   testing before switching to the Flint River

17   water, the MDEQ officials told the city that

18   they didn't have to do it?

19        MR. KUHL:  Object to form.

20   Q.    Is that what happened?

21   A.    That's correct.

22   Q.    Who in the MDEQ told the city

23   that?  Which person?  Which official?

24   A.    I don't recall.

1        Q.     Do you have a specific

2   recollection of the topics or the issues that

3   were discussed during the June 2013 meeting with

4   the MDEQ and the other parties, including LAN

5   and the city?

6        A.     I recall discussing how that was

7   going to be designed, what regulatory input DEQ

8   was going to provide, and how often and how

9   fast, and then kind of the steps that needed to

10  be done to get the plant ready to treat the

11  Flint River water.

12       Q.     Was it predominantly discussions

13  about the Flint Water Treatment Plant and the

14  design and the construction improvements that

15  would need to be made in order to get the plant

16  up and running at that point?

17       A.     It was, yes.

18       Q.     Do you recall whether there were

19  any discussions about chemical treatment to the

20  Flint River water that would need to be

21  instituted in order to use it and deliver it to

22  the consumers of Flint?

23       A.     Yes, there was.

24       Q.     And what were those discussions

1    focusing on?

2         A.    Some disinfection questions, the

3    ozone system.  There was discussion about

4    corrosion control, but at the time, it didn't

5    register in my brain of anything.

6         Q.    I believe in your -- in the

7    preliminary examination, the criminal

8    proceedings, you testified that during that

9    particular meeting, there were discussions

10   specifically about corrosion control and

11   specifically about the use of orthophosphates as

12   a corrosion control measure.

13             Do you recall that?

14        A.    I do.

15        Q.    And I think you testified before

16   that during that meeting, LAN and Warren Green

17   specifically raised the issue of the need for

18   orthophosphates being incorporated or included

19   in any plan to utilize the Flint River as a

20   water source for the city of Flint?

21        A.    Yes.  That was discussed and

22   brought up, yes.

23        Q.    Do you recall what the MDEQ's

24   response or -- response to Mr. Green's comments

Highly Confidential - Daugherty Johnson

1    or recommendations were at that time?

2          A.    Yes.  My recollection was that

3    they didn't -- they didn't need to do that

4    initially until after the plant was running and

5    did a test sampling after the plant was

6    operational.

7          Q.    Okay.  So despite the fact that

8    Warren Green specifically recommended

9    orthophosphates and the need for it, the MDEQ

10   declined to do that until they had testing that

11   was completed?

12              Is that your understanding?

13              MR. KUHL:  Objection to form.

14         Q.    And what was the basis if you have

15   any understanding for the basis --

16              (Reporter clarification.)

17         A.    So my understanding was that, yes,

18   that was not required by the DEQ at that time

19   until after the plant was running, and then

20   there was a testing protocol that followed to

21   verify we needed it.

22         Q.    Do you have an understanding of

23   what the testing protocol was that the MDEQ was

24   referring to?

Highly Confidential - Daugherty Johnson

```
 1          A.    At the time I did not, no.

 2          Q.    Did you have any understanding as

 3   to whether that was their interpretation of the

 4   provisions or regulations of the Lead and Copper

 5   Rule?

 6          A.    That was my understanding, that

 7   they were telling us what that rule was.

 8          Q.    Did you have any discussions

 9   with -- or do you recall any discussions with

10   Warren Green prior to this June 2013 meeting

11   with the MDEQ and the city?

12          A.    I'm sure we did meet.  I don't

13   recall --

14                (Reporter clarification.)

15          A.    I'm sure we did meet, but I don't

16   recall specific conversations about -- prompt

17   about it.  I guess I don't recall every

18   conversation.

19          Q.    Do you recall having any

20   conversations with Warren Green or anybody from

21   LAN about corrosion control treatments or the

22   necessity of same before the June 2013 meeting?

23          A.    I don't recall that, no.

24          Q.    Do you recall if during the June
```

Highly Confidential - Daugherty Johnson

1    of 2013 meeting softening was discussed as far

2    as lime softening versus lime and soda ash

3    softening?

4              A.    There was.

5              Q.    And do you recall what the DEQ's

6    position was on that?

7              A.    That it was a secondary treatment

8    standard.  We didn't need to do it initially.

9    It was for aesthetic purposes.

10             Q.    And was that referencing only lime

11   softening or lime and soda ash softening

12   combined?

13             A.    I don't recall if it was both.  I

14   know it was lime for sure.

15             Q.    So it was your understanding at

16   least from talking to the DEQ that that was just

17   an aesthetic treatment process and it would have

18   nothing to do with the actual acidity of the

19   water itself or the pH?

20                   MR. KUHL:  Objection to form.

21             A.    That was my understanding, yes.

22             Q.    Do you recall Warren Green asking

23   the MDEQ during this June of 2013 meeting what

24   the basis was for its decision not to require

Highly Confidential - Daugherty Johnson

1   corrosion control treatment following the change

2   in water sources to the Flint River?

3          A.    Yes.  That was the discussion -- I

4   guess the -- I recall the response being --

5          Q.    When you talked before about

6   the --

7               MR. ZEINEH:  I'm sorry.  Do you

8         want an answer?

9          Q.    Oh, yes.

10          A.    So my understanding of that

11   conversation was that Warren asked about why

12   not, and the DEQ replied that there would be a

13   sampling protocol required that would determine

14   if we needed it or not.

15          Q.    Following the June 2013 meeting --

16   and when I say immediately following it, did you

17   have any discussions with Warren Green about the

18   DEQ's position on the softening issues?

19          A.    I don't recall, other than the

20   fact that, you know, it would -- it would have a

21   more polished product, but I don't recall

22   specifically what that chemical does.

23          Q.    And going back to that, you talked

24   about that your understanding that the softening

Highly Confidential - Daugherty Johnson

1   was that it was an aesthetic type of treatment,

2   correct?

3           A.    That was my understanding, yes,

4   based on the secondary treatment standard that

5   DEQ said it was.

6           Q.    And when you say "aesthetic," what

7   does that mean to you?

8           A.    Like the water being hard or soft

9   basically, like I guess described to me as

10  slippery or making your skin dry.

11          Q.    Did you have any understanding as

12  to whether that would impact the coloration or

13  the odor of the water itself?

14          A.    Not necessarily.  I didn't

15  understand it to be that way.

16          Q.    So that was just your

17  understanding of aesthetic as far as the feel of

18  it?

19          A.    Yes.

20          Q.    Following this June of 2013

21  meeting with the MDEQ, the city and LAN, among

22  others, do you recall having any specific

23  conversation with Warren Green about the need

24  for corrosion control or revisiting the issue of

1   corrosion control being needed to treat the

2   Flint River water?

3           A.   I don't recall any discussions

4   specifically about that.

5           Q.   If Warren Green has stated and

6   testified before that, in fact, he did talk to

7   you following this meeting and asked to revisit

8   the issue of corrosion control, you have no

9   reason to doubt that, correct?

10                  MR. KUHL:  Objection to form.

11                  MR. ZEINEH:  Concur.

12          A.   I do not.

13          Q.   You just don't recall?

14          A.   I just don't recall that

15   discussion.

16          Q.   We talked before that LAN and

17   others had recommended the use of some sort

18   of --

19                  MR. ZEINEH:  Hold on.  There's an

20          issue.

21                  THE COURT REPORTER:  Could we go

22          off the record?

23                  MR. GAMBLE:  Sure.

24                  THE VIDEOGRAPHER:  We're going off

Highly Confidential - Daugherty Johnson

1          the record.  The time is 11:13.

2                 (Recess taken.)

3                 THE VIDEOGRAPHER:  We're back on

4          the record at 11:15.

5    BY MR. GAMBLE:

6          Q.    Mr. Johnson, at some point in

7    2013, did you personally contact LAN to ask

8    about them providing input as to a rate study

9    that the city was conducting to assess rates on

10   their water customers?

11         A.    It's possible, but I don't recall

12   specifically.

13         Q.    Do you recall engaging any type of

14   third party -- Raftelis or some other

15   third-party consultant -- to specifically study

16   your rates and actually obtain and gather

17   information to provide a rate assessment for the

18   city?

19         A.    Yes.  We were working on that.

20         Q.    And do you recall when that

21   occurred?

22         A.    I do not.

23         Q.    If I could have you turn to

24   Exhibit 52 from Brent Wright's deposition, in

Highly Confidential - Daugherty Johnson

1    his notebook.

2         A.    Okay.

3         Q.    And if you'll look at the top page

4    of that, it appears to be an e-mail from Warren

5    Green to you, dated December 6 of 2013, that's

6    dealing with -- "Flint Treatment Cost" is the

7    subject.

8              Do you see that?

9         A.    I do.

10        Q.    And in it, Mr. Green references to

11   you that the information you requested is

12   attached.  He says, "This is partly based on

13   chemical supplier quotes, costs from other

14   utilities, and from other historical data from

15   the city of Flint cost.  Please let me know if

16   you have any questions."

17             Do you see that?

18        A.    Yes.

19        Q.    And attached are two what I'll

20   call charts that have costs or unit costs

21   associated with chemicals that would be utilized

22   and charged as part of the rate study in

23   utilizing the Flint River.

24             Do you see that?

Highly Confidential - Daugherty Johnson

```
 1          A.    Yes.

 2          Q.    And also for using Lake Huron

 3   water which is the second chart.

 4                Do you see that?

 5          A.    Yes.

 6          Q.    And why specifically were you

 7   consulting or asking Warren Green to gather this

 8   information for you?

 9          A.    Just to find out what the

10   operational costs of the plant were to determine

11   what the rates we were going to charge our

12   customers for all the services.

13          Q.    Do you recall specifically having

14   any conversations with Warren Green about the

15   rate study and the information he was gathering

16   other than the e-mail that we've just identified

17   and read?

18          A.    I don't specifically recall, but

19   we would have wanted to seek out the full costs

20   of that plant to run.

21          Q.    Do you specifically recall Warren

22   Green telling you when you asked about gathering

23   the information, that gathering this information

24   about chemicals and water treatment, at least at
```

Highly Confidential - Daugherty Johnson

1   this point, was outside the scope of LAN's work

2   or scope of duties under their contracts with

3   the city of Flint?

4           A.    I don't recall that discussion.

5           Q.    And in looking at the unit costs

6   for the Flint River with partial softening.

7                 Do you see that?  That's the

8   second page --

9           A.    Yes.

10          Q.    -- on that exhibit, Exhibit 52?

11          A.    Yes.

12          Q.    You see at the bottom where it

13  lists chemicals, one of the chemicals listed

14  specifically is phosphates, correct?

15          A.    Correct.

16          Q.    So at that point, then,

17  Warren Green provided that information back to

18  you that phosphates were at least anticipated

19  and recommended to be part of any type of water

20  treatment that the city was doing and charging

21  to the customers of the city of Flint?

22                MR. ZEINEH:  Objection; form,

23          foundation.

24          A.    Yes, this is listed as a chemical

```
 1   cost for the plant.

 2          Q.    And so you understood that

 3   phosphates were still a part of the equation as

 4   far as what was being recommended or what should

 5   be included within the water treatment of the

 6   Flint water -- or Flint River water?

 7                MR. ZEINEH:  Objection; form.

 8                MR. KUHL:  Objection to form.

 9          A.    Yes.  We knew this could be a cost

10   of the plant once they're operational.

11          Q.    And if you look back at the next

12   page, the unit costs for Lake Huron.

13          A.    I see it.

14          Q.    That also includes a listing for

15   the chemical phosphate, correct?

16          A.    This does.

17          Q.    And, again, phosphates, as you

18   said before, that's a corrosion control

19   treatment, correct?

20          A.    Correct.

21          Q.    And the purpose of gathering this

22   information again was to basically analyze the

23   rates that were being charged to residents of

24   the city of Flint who were purchasing water from
```

Highly Confidential - Daugherty Johnson

1    the city, correct?

2         A.    That was for the rate study, yes.

3         Q.    Do you have any understanding or

4    recollection as to whether the city actually

5    utilized these calculations, or at least these

6    estimates, in setting rates for the city of

7    Flint following your receipt of them in December

8    of 2013?

9         A.    I don't recall how they would have

10   been used, no.

11        Q.    Do you know if the residents of

12   the city of Flint who were consumers were being

13   charged for -- as part of the rates, for

14   phosphates to be included in the water treatment

15   process?

16        A.    They would have only been charged

17   for what was actually expended.

18        Q.    Okay.  But certainly what was

19   expended goes into what the end consumer pays,

20   correct?

21        A.    Correct.

22        Q.    So if phosphates were included as

23   part of that rate determination, it's possible

24   the public was actually paying for phosphates

Highly Confidential - Daugherty Johnson

```
 1   when they weren't receiving them, correct?

 2                  MR. ZEINEH:  Objection; form.

 3                  MR. KUHL:  Objection; form.

 4                  MR. ZEINEH:  Foundation.

 5        A.    No.  We would have based our costs

 6   on what we bought.  So if we bought phosphates,

 7   then we would have charged for phosphates.  If

 8   we didn't buy phosphates, we wouldn't have

 9   charged for them.

10        Q.    Mike Glasgow has testified earlier

11   that he said that phosphates were always a part

12   of the design of the Flint Water Treatment Plant

13   and the Flint Water Treatment Plant in

14   particular with the use of Flint River water as

15   its supplier.

16                  Do you agree with that?

17                  MR. KUHL:  Objection to form.

18        A.    I don't know what he would have

19   testified to, but it's certainly been a part of

20   the system.

21        Q.    Did you believe that phosphates

22   were always going to be a part of the design of

23   the Flint Water Treatment Plant and the upgrades

24   in 2013 before ultimately distributing water in
```

Highly Confidential - Daugherty Johnson

1    2014?

2         A.    I would not have known that.

3              MR. KUHL:  Objection to form.

4              MR. ERICKSON:  What was your

5         answer, sir?

6         A.    I would not have known that from a

7    technical standpoint, no.

8         Q.    With regard to the actual water

9    quality and treatment of the water from the

10   Flint River, it's fair to say that the DEQ

11   ultimately made the decisions as to how the

12   Flint River would be treated, correct?

13             MR. KUHL:  Objection to form.

14        A.    My understanding was DEQ told us

15   what had to be done, and we would have to do

16   that.

17        Q.    In other words, there wasn't some

18   outside governmental entity that was telling you

19   what you had to do, correct?

20        A.    No.  The government regulator was

21   the DEQ for us.

22        Q.    Do you understand the term

23   "primacy"?

24        A.    I do.

Highly Confidential - Daugherty Johnson

1      Q.    Did the DEQ have primacy in your

2   opinion as to the treatment of the Flint River

3   water and ultimately what was distributed to the

4   public?

5      A.    Yes, that was my understanding.

6      Q.    And LAN had raised the issue of

7   corrosion control with the MDEQ before, correct?

8      A.    Yes.

9      Q.    We had talked about the meeting

10  and having a discussion about it, correct?

11     A.    Yes.

12     Q.    Do you know if there were other

13  discussions between LAN and the DEQ about the

14  need for corrosion control treatment, in

15  particular phosphates?

16     A.    I don't know of any other.

17     Q.    And despite the recommendations

18  that LAN had made that you're aware of, the DEQ

19  never required the city to incorporate or

20  include phosphates in the treatment of the

21  water, correct?

22     A.    That is correct.

23     Q.    And the city didn't have the

24  ability to override the DEQ's decisions, did

Highly Confidential - Daugherty Johnson

```
 1    they?

 2                 MR. KUHL:  Objection to form.

 3         A.    We did not believe we had that

 4    authority.

 5                 MR. ERICKSON:  I didn't hear the

 6          response.

 7         A.    We did not believe we had that

 8    authority.

 9         Q.    Did you have any understanding as

10    to whether the city had any ability to appeal

11    any decision by the DEQ for not using corrosion

12    control treatments or phosphates in ultimately

13    treating river water from the Flint River?

14         A.    I did not know of any.

15         Q.    We talked before about the test

16    run that was part of the original LAN scope of

17    services.

18                 Do you recall that?

19         A.    Yes.

20         Q.    And, really, the two primary scope

21    of services that were initially discussed in May

22    of 2013 were conducting an initial plant test

23    run and then doing an engineering report.

24                 Do you recall that?
```

Highly Confidential - Daugherty Johnson

```
 1          A.     Correct.

 2          Q.     And I believe you testified that a

 3     test run was completed or was attempted in the

 4     summer of 2013, correct?

 5          A.     Correct.

 6          Q.     And do you recall the results of

 7     that initial test run?

 8          A.     They found some equipment not

 9     functional, and I think that was -- that was the

10     purpose of it, to find out what didn't work.

11          Q.     And, in fact, that test run was

12     terminated early on, correct?

13          A.     Yes.  It did not go the full

14     stretch.

15          Q.     The test run was initially planned

16     on, or at least was initially going to run for

17     at least a month, correct?

18          A.     I don't recall it being that long,

19     but it was -- I thought it was two weeks, but it

20     was a stretch.  Longer than they had run

21     previously.

22          Q.     And ultimately the processes and

23     the equipment broke down during the initial

24     plant test run; correct?
```

Highly Confidential - Daugherty Johnson

1          A.     That's correct.

2          Q.     And the purpose or part of the

3     purpose of that test run, at least your

4     understanding, was that so the city and LAN

5     could gather information about what worked, as

6     well as what treatment processes might be

7     necessary with regard to the Flint River water,

8     correct?

9          A.     That's correct.

10         Q.     And, in fact, LAN was not able to

11    even assess water quality during that period of

12    time because the facilities and the equipment

13    was so broken that it was incapable of getting

14    any type of useful information?

15              MR. ZEINEH:  Objection to form,

16         foundation.

17         A.     That, I don't know.  I guess

18    useful to us would have been "This doesn't work,

19    so we've got to fix that."  So there was useful

20    information gathered, but ...

21         Q.     But you understood as far as LAN's

22    second task, at least under their initial

23    contract with the city, providing an engineering

24    report, LAN was unable to provide any type of

```
 1   engineering report to the city of Flint after

 2   that test run because of the failures of the

 3   equipment, correct?

 4               MR. ZEINEH:  Objection; form,

 5         foundation.

 6         A.    I don't recall that, being that

 7   way.  I thought we did receive a report of what

 8   needed to be addressed.

 9         Q.    Okay.  As far as general about the

10   design itself or whatever improvements --

11         A.    Correct.

12         Q.    -- to your understanding?

13         A.    Correct.

14         Q.    If I could turn your attention to

15   discussions between the city and LAN following

16   this failed test run regarding LAN's work.

17   Okay?

18               As far as estimating costs to

19   upgrade or improve the plant so that it could

20   accept water from the Flint River and ultimately

21   from the KWA, do you recall what LAN's ultimate

22   estimate was?

23         A.    I don't recall specifically, but I

24   did participate in that.
```

Highly Confidential - Daugherty Johnson

```
1          Q.    So you have no recollection as to

2     the specific dollar amount that was recommended

3     or at least estimated by LAN to get the Flint

4     Water Treatment Plant up and running so that it

5     could accept water from either Flint River or

6     the KWA?

7          A.    I recall a couple ranges of

8     numbers.  $8 million to $20 million.

9          Q.    Do you recall initially there

10    being estimates as high as $49 million that

11    would be necessary to upgrade the Flint Water

12    Treatment Plant to accept water from the Flint

13    River?

14         A.    They were -- I recall there being

15    estimates that high for a multitude of asset

16    upgrades, some required for the Flint River --

17              (Reporter clarification.)

18         A.    Of asset upgrades, some for the

19    Flint River, some for storage, things like that.

20         Q.    And do you recall that ultimately

21    those numbers, or at least the estimates, were

22    whittled down to somewhere between $30 and $34

23    million?

24         A.    I don't recall those numbers.
```

Highly Confidential - Daugherty Johnson

1        Q.     Were you involved intimately in

2    the discussions of the costs or the estimated

3    costs associated with the Flint Water Treatment

4    Plant upgrades?

5        A.     I was.

6        Q.     Who else was involved in those

7    decisions?

8        A.     That would have been Howard,

9    Brent, Mike Glasgow, Warren, DEQ for the staff.

10       Q.     Who ultimately made the decision

11   on behalf of the city as to exactly what

12   upgrades or what costs would be incurred by the

13   city to improve the Flint Water Treatment Plant?

14            MR. ZEINEH:  Objection to form.

15       A.     The emergency manager had the

16   ultimate decision for expenses.

17       Q.     And who was that at the time in

18   roughly August of 2013?

19       A.     I believe it was Ed Kurtz at that

20   time.

21       Q.     Do you recall any internal

22   discussions in the city in mid August 2013 about

23   the fact that LAN's estimate for the cost of

24   upgrading the Flint Water Treatment Plant were

Highly Confidential - Daugherty Johnson

1   significantly higher than those that were

2   originally estimated by Wade Trim in Appendix 9

3   that we talked about before in the 2009 report?

4          A.    Yes.

5          Q.    And what were those discussions

6   centering on.  Do you have a recollection?

7          A.    I don't recall the specifics, but

8   there were discrepancies between the two

9   reports.

10         Q.    And do you have any understanding

11  or recollection as to what the discrepancies

12  were due to?

13         A.    I don't.

14         Q.    Were they potentially due to the

15  fact that the 2009 Wade Trim estimates were

16  relating strictly to upgrades to accept KWA

17  water as opposed to accepting both Flint River

18  water in the interim and KWA water?

19              MR. ZEINEH:  Object to form,

20         foundation.

21         A.    Yes, those would have been part of

22  it.

23         Q.    LAN provided a draft proposal to

24  the city in June of 2013 that listed a number of

Highly Confidential - Daugherty Johnson

1    recommendations or potential upgrades that would

2    be needed at the Flint Water Treatment Plant.

3              Do you recall seeing that?

4         A.   Yes.

5         Q.   We've talked about also there were

6    these definitions or scope documents that were

7    provided by LAN and also described the scope of

8    their anticipated work, correct?

9         A.   Yes.

10        Q.   In your preliminary examination, I

11   believe you testified that at some point, you

12   sat down with Mike Prysby and Steve Busch to go

13   through the documents, the LAN documents, to

14   specifically identify and narrow down or at

15   least limit the scope of the work that would be

16   done by LAN on the Flint Water Treatment Plant,

17   correct?

18        A.   Yes.

19             MR. KUHL:  Object to form.

20             MR. ZEINEH:  Object to form.

21        Q.   And with regard to your

22   preliminary exam testimony, I believe you

23   testified that ultimately when you went through

24   those documents, LAN's scope of services was

Highly Confidential - Daugherty Johnson

```
 1   narrowed down strictly to design and

 2   construction and improvements to the Flint Water

 3   Treatment Plant itself to accept Flint River

 4   water and KWA water, correct?

 5           A.    That's correct.

 6           Q.    They weren't specifically retained

 7   to do water testing or water quality testing,

 8   correct?

 9           A.    I believe some of the scope of

10   service was for that.

11           Q.    Okay.  Well, let's talk about

12   this.

13                 You testified in your preliminary

14   exam, you referred to having sat down with

15   Mr. Prysby and Busch and going through a

16   document.  Do you recall whether that was the

17   June 10th proposal that you went through with

18   Mr. Prysby and Busch to identify specifically

19   what LAN's scope would be on this particular

20   project?

21           A.    I don't recall exactly which one.

22           Q.    Well, let's turn to the June 10th

23   proposal, which is Kurtz Exhibit Number 3.  And

24   if you could turn to page 7 -- or pardon me.
```

1    Not page 7.  Page 6 of the document.  You'll see

2    "Scope of Services."

3            A.    6 or 7?

4            Q.    On page 6.

5            A.    Okay.  Yep.

6            Q.    And then there's a general

7    description in paragraph form of the scope of

8    services.  But the following page, page 7, it

9    starts listing the various tasks that LAN is

10   proposing to do.

11              Do you see that, Task 1?

12           A.    Yes.

13           Q.    And, again, Task 1 references a

14   plant test run.

15              Do you see that?

16           A.    Yes.

17           Q.    And Task 2 is an engineering plan

18   and report.  We've already discussed that that

19   was in the other scoping documents?

20           A.    Yes.

21           Q.    And Task 3 relates to design phase

22   services?

23           A.    Yes.

24           Q.    Was this the document that you

Highly Confidential - Daugherty Johnson

1   went through specifically with Mr. Prysby and

2   Busch to identify what it was that LAN would be

3   tasked with doing under its contract with the

4   city?

5           A.    Yes.

6           Q.    And do you recall specifically

7   what items were eliminated from LAN's scope from

8   this proposal?

9           A.    I don't recall specifically.  I

10  know there were several.

11          Q.    LAN wasn't at this particular

12  meeting with the MDEQ with Prysby and Busch

13  discussing the scope of services, correct?

14          A.    I don't believe so, no.

15          Q.    Do you recall when that meeting

16  occurred?

17          A.    I do not.

18          Q.    Do you know whether it occurred

19  shortly after LAN's proposal in June of 2013 was

20  provided to the city?

21          A.    It would have been after, yes.

22          Q.    And do you have any estimation as

23  to how far after the initial proposal was

24  submitted that the MDEQ and the city sat down

Highly Confidential - Daugherty Johnson

```
 1   and had this discussion about LAN's scope of

 2   work?

 3           A.    I don't recall.  I don't.

 4                 MR. GAMBLE:  Can we take a quick

 5           five-minute break?

 6                 MR. ZEINEH:  Sure.

 7                 THE VIDEOGRAPHER:  Off the record.

 8           The time is 11:34.

 9                 (Recess taken.)

10                 THE VIDEOGRAPHER:  We're back on

11           the record at 11:43.

12   BY MR. GAMBLE:

13           Q.    Mr. Johnson, we were talking

14   briefly before about your meeting with

15   Mr. Prysby and Mr. Busch about LAN's scope of

16   work.

17                 Do you recall that?

18           A.    Yes.

19           Q.    And my understanding is that you

20   were present at that meeting, correct?

21           A.    Yes.

22           Q.    Who else from the city was present

23   at that meeting with Mr. Busch and Mr. Prysby to

24   discuss LAN's scope of work?
```

Highly Confidential - Daugherty Johnson

```
 1          A.    I just recall that Mike and Brent
 2    were there, I believe.
 3          Q.    And LAN wasn't there, correct?
 4          A.    At one of the meetings, they were
 5    not there, no.
 6          Q.    When did -- do you have any
 7    recollection of when that meeting occurred?
 8          A.    I do not.  It was soon after this
 9    was developed.
10          Q.    Okay.  So it was soon after
11    June 10th of 2013?
12          A.    Yes.
13          Q.    And do you have any recollection
14    of where that meeting took place?
15          A.    I do not.
16          Q.    Earlier you testified about -- we
17    were asking about the decision to go to the
18    Flint River.  Ultimately do you have a
19    recollection of when the decision was made to
20    actually utilize the Flint River as an interim
21    water source while waiting on the KWA to be
22    completed?
23          A.    It would -- the emergency manager
24    would have made that decision after we decided
```

Highly Confidential - Daugherty Johnson

1    the scope of services that the city could

2    afford.

3          Q.    And do you recall when that was

4    generally?

5          A.    I do -- the goal would have been

6    established sometime in July maybe, but the

7    actual decision to make that happen sometime in

8    that summer.

9          Q.    And when you say "July," July of

10   2013 is what you're saying?

11         A.    Correct, yes.

12               MR. ZEINEH:  Could we hold off.

13         He's not mic'd.

14         Q.    And who was the emergency manager

15   in July of 2013?  Do you have a recollection?

16         A.    I believe it was Ed Kurtz.

17         Q.    And you don't know for sure who

18   made that decision, correct?

19         A.    It was Ed Kurtz's decision to make

20   that.

21         Q.    Okay.  So Ed Kurtz specifically

22   made the decision to switch?

23         A.    That we will be -- yes, that we're

24   going to -- we're going to be --

Highly Confidential - Daugherty Johnson

```
1              Q.    Go ahead.  I'm sorry.

2              A.    That we're going to engage these

3    services to make that our target goal, yes.

4              Q.    And did you have any

5    decision-making authority in that regard?

6              A.    I did not.

7              Q.    Okay.  So if Mr. Kurtz made the

8    decision, he ultimately left as emergency

9    manager in June -- or June 30th of 2013,

10   correct, or do you have any understanding of

11   that?

12             A.    Sometime around then, yes.

13             Q.    So the decision to switch to the

14   Flint River would have had to have been made

15   before that, correct?

16             A.    Correct.

17             Q.    If I could turn your attention to

18   Exhibit 49 in Brent Wright's deposition

19   exhibits.

20             A.    It's upside down.  Now it's really

21   upside down.  E-mail from Warren?

22             Q.    Correct.  And what's the date of

23   that?

24             A.    August 20, 2013.
```

Highly Confidential - Daugherty Johnson

```
1          Q.    And they're providing the city,

2    and in particular providing Brent Wright, with

3    another proposed scope of upgrades to the Flint

4    Water Treatment Plant; is that correct?

5          A.    Yes.

6          Q.    And, again, this would have been

7    after the June 2013 proposal that was made by

8    LAN that we've been discussing, correct?

9          A.    Correct.

10          Q.    And at least, as to your

11    recollection, was it the situation that LAN's

12    initial scope that was proposed in June of 2013

13    was slowly getting narrowed down to specific

14    tasks over the following months?

15          A.    Yes.

16          Q.    And that would have coincided with

17    the meetings that you were having with the DEQ,

18    with Mr. Prysby and Busch, as far as identifying

19    what the most important things were for LAN to

20    be doing with regard to designing construction

21    of improvements on the Flint Water Treatment

22    Plant, correct?

23               MR. KUHL:  Objection to form.

24          A.    Things that DEQ required to be
```

Highly Confidential - Daugherty Johnson

1    done to the plant, yes.

2         Q.    And you understood that, at least

3    with regard to this document, this, again,

4    proposed scope of upgrades that we're referring

5    to in 49, that this was still a work in process

6    as far as finalizing LAN's scope of the work

7    they would be doing on the Flint Water Treatment

8    Plant, correct?

9              MR. ZEINEH:  Object to form.

10        A.    That's correct.

11        Q.    If you look at the last page of

12   this particular proposed scope.  There's a

13   section that says, "Three other items to address

14   and finalize scope of work."

15             Do you see that?

16        A.    Yes.

17        Q.    Okay.  And it specifically

18   identifies things that have not yet been

19   determined or assigned for somebody to do; is

20   that fair?

21        A.    Yes.

22        Q.    One thing is options for handling

23   disposal of lime sludge from the softening

24   operations.  That's the first thing, correct?

Highly Confidential - Daugherty Johnson

```
 1           A.    Yes.

 2           Q.    The other thing is requirements

 3    for CT and enhanced treatment, correct?

 4           A.    Yes.

 5           Q.    The third is impacts of using the

 6    river as continuous supply quantity, and in

 7    particular, I'm noting quality monitoring of the

 8    river.

 9                 Do you see that?

10           A.    Yes.

11           Q.    And chemical storage options --

12           A.    Yes.

13           Q.    -- correct?

14                 So as of this date, those were

15    items that were still up in the air as to who

16    would be responsible for doing that, correct?

17           A.    Correct.

18           Q.    And ultimately the city took on

19    the second and third additional items for

20    requirements for CT and enhanced treatment,

21    correct?

22           A.    I don't know that, but that's --

23           Q.    Did the DEQ provide CT

24    calculations?
```

```
 1          A.    That was a more technical

 2   situation.  I don't know how those got

 3   calculated.

 4          Q.    Is that beyond your level of

 5   understanding?

 6          A.    Yes.

 7          Q.    Fair.  And as far as the impacts

 8   of using the river as a continuous water supply,

 9   quality water monitoring and the like, that

10   ultimately was left for the city to take over,

11   correct?

12          A.    Yes.

13          Q.    Okay.  So that wasn't something

14   that was ultimately assigned in the scope of

15   work to LAN, correct?

16          A.    I do not believe so, no.

17          Q.    Do you recall following --

18   ultimately the work that was completed on the

19   Flint Water Treatment Plant in preparation for

20   delivering Flint River water to consumers, did

21   the city ever conduct a 60- to 90-day plant test

22   run to assess the functioning of the plant as

23   well as the quality of the water that was being

24   distributed?
```

Highly Confidential - Daugherty Johnson

1        A.    Did not.

2        Q.    And, again, the city didn't do

3    that because the DEQ told them they didn't have

4    to do it, right?

5              MR. KUHL:  Objection to form.

6        A.    That is correct.

7        Q.    And during this time period, are

8    you aware of whether the city actually talked

9    with any of its suppliers, chemical suppliers,

10   about doing jar testing of water quality that

11   was coming from the Flint River?

12             MR. ZEINEH:  Objection; form,

13        foundation.

14       A.    I don't know of any specific

15   conversations about that.

16       Q.    Would Mike Glasgow be more

17   knowledgeable about what testing was being done

18   as far as water quality?

19       A.    Yes.

20             MR. GAMBLE:  Okay.  Mr. Johnson, I

21        appreciate your time.

22             We're going to reserve the

23        remainder of our time.

24             We'll pass the witness.

Highly Confidential - Daugherty Johnson

```
 1                   MR. ERICKSON:  Let's go off the

 2          record.

 3                   THE VIDEOGRAPHER:  We're going off

 4          the record.  The time is 11:51.

 5                   (Recess taken.)

 6                   THE VIDEOGRAPHER:  Back on the

 7          record.  The time is 11:52.

 8                        - - -

 9              CROSS-EXAMINATION

10   BY MR. THOMPSON:

11          Q.    Sir, my name is Craig Thompson.  I

12   represent Rowe Professional.

13                   Are you familiar with the company

14   Rowe Professional or sometimes called Rowe

15   Engineering?

16          A.    I am.

17          Q.    Okay.  I'm going to direct your

18   attention, if you could, to those exhibit

19   binders.  I believe it would be the Brent Wright

20   exhibit binder.  And if you could look at

21   Exhibit 45.

22                   And before I ask you anything on

23   this, counsel for LAN had some questions for you

24   about a meeting that took place in June of 2013.
```

Highly Confidential - Daugherty Johnson

1                    Do you recall those discussions?

2          A.    I do.

3          Q.    Okay.  And this appears to be

4    an -- Exhibit 45 appears to be a sign-in sheet

5    for a meeting that took place at the water

6    treatment plant, correct?

7          A.    Yes.

8          Q.    Let's see.  You're on that --

9    you're on that list, right?  Do you see your

10   name?

11         A.    Yes.

12         Q.    And it's -- the date on that is

13   June 26th of 2013?

14         A.    Yes.

15         Q.    Okay.  And then also you see all

16   these other individuals that are signed up on

17   this list.  Are those the names that you recall

18   counsel for LAN rattling off when they were

19   asking you who attended this meeting?

20         A.    Yes.

21         Q.    Okay.  And do you see the name Jim

22   Redding there --

23         A.    I do.

24         Q.    -- from Rowe?

Highly Confidential - Daugherty Johnson

```
 1                    Do you recall Mr. Redding being at

 2    that meeting?

 3           A.    I don't recall specifically.

 4           Q.    Do you know who Jim Redding is?

 5           A.    I think I could recognize him if I

 6    saw him.

 7           Q.    Okay.  Do you know what capacity

 8    Jim Redding was at this meeting, in what

 9    capacity he was there?

10           A.    I do not.

11           Q.    Okay.  Were you aware that LAN had

12    hired Rowe as a subconsultant --

13           A.    Yes.

14           Q.    -- in regards to the upgrades that

15    were being contemplated to the water treatment

16    plant in 2013?

17           A.    Yes.

18           Q.    And do you have an understanding

19    as to what role Rowe would play in that capacity

20    as a subconsultant to LAN?

21           A.    I don't recall what their scope

22    was supposed to be, but I know they're a sub of

23    theirs.

24           Q.    Okay.  Are you generally familiar
```

1   with the fact that they're a civil engineering

2   and surveying firm?

3        A.    Yes.

4        Q.    Okay.  Did you have an

5   understanding that they may be doing

6   surveying-type work, some pipe design, things

7   like that, in connection with the water

8   treatment plant?

9             MR. KUHL:  Objection.

10       A.    I don't recall specifically.

11       Q.    Is that something that you weren't

12  even involved in?

13       A.    Generally not.  I mean, who the

14  sub was of another contractor, I may not know.

15       Q.    Okay.  Do you have any reason to

16  believe that Rowe was being looked to by LAN or

17  anyone else as having some expertise in water

18  treatment?

19            MR. ZEINEH:  Objection; form,

20            foundation.

21       A.    No, not the treatment.

22       Q.    Okay.  And as far as this meeting

23  that took place on this date, if I recall your

24  earlier testimony, are you saying that it was at

1   that meeting that there was a discussion about

2   the utilization of corrosion controls?

3         A.   I believe that's about that time

4   frame, but I don't recall specifically.

5         Q.   And that's what I'm trying to get

6   at, is whether you have an actual -- like an

7   independent recollection of being in this

8   meeting and that being a topic that came up, in

9   other words, the utilization of corrosion

10  controls to treat the Flint River water?

11        A.   I don't recall the specific

12  meeting.  It seems like it was more development

13  of the plan when that discussion was, but I

14  don't recall specifically the sequencing.

15        Q.   Okay.  Do you have a recollection

16  of actually being in that meeting and what

17  different people said during that meeting?

18        A.   I don't.

19        Q.   Do you have a recollection of

20  anything that Jim Redding might have said during

21  that meeting?

22        A.   I do not.

23        Q.   Okay.  Do you take notes when

24  you're in a meeting?

Highly Confidential - Daugherty Johnson

```
1           A.    I generally don't.

2           Q.    Okay.  Have you ever gone back and

3    looked to see if you have any notes for what

4    took place during that meeting?

5           A.    I have not -- all my stuff I would

6    have kept would have been left with the city of

7    Flint when I left.

8           Q.    Okay.  So if you would have had

9    them, they would have still --

10          A.    Right.

11          Q.    -- still been there?

12          A.    Yeah.

13          Q.    Have you ever seen notes from you

14   in that meeting or any other meeting since you

15   left the city?

16          A.    Not since I left the city, no.

17          Q.    Okay.  What are you doing today?

18   Where are you employed?

19          A.    I work the Little Traverse Bay

20   Bands of Odawa Indians.

21               (Reporter clarification.)

22          A.    Little Traverse Bay Bands of Odawa

23   Indians.

24          Q.    In what capacity?
```

Highly Confidential - Daugherty Johnson

```
 1          A.    I'm the executive director.  It's

 2    governmental administration position.

 3          Q.    Okay.  Do you know who Rick

 4    Freeman is --

 5          A.    I do.

 6          Q.    -- at Rowe?

 7          A.    Yes.

 8          Q.    And had you had an opportunity to

 9    work with Rick Freeman in the past?

10          A.    Yes.

11          Q.    And in what type of -- on what

12    type of projects?

13          A.    Civil engineering projects, the

14    wastewater plant, some of our other facilities,

15    Third Avenue pump station, things like that.

16          Q.    Okay.  And that would be Rick

17    Freeman in his capacity as the acting city

18    engineer?

19          A.    Correct.

20          Q.    You're familiar with the fact that

21    Flint had a contract --

22          A.    Correct.  Yes.

23          Q.    -- with Rowe to serve as an acting

24    engineer, correct?
```

Highly Confidential - Daugherty Johnson

1      A.    Yes.

2      Q.    Okay.  Had you ever had an

3  experience or dealing with anyone from Rowe in

4  regards to the water treatment plant in their

5  capacity as a city engineer?

6            MR. ZEINEH:  Object on form.

7      A.    I don't recall any specific

8  discussions about that.

9      Q.    Okay.  In other words, do you have

10  any recollection of Rowe being engaged by the

11  city in its capacity as the city engineer or

12  acting city engineer to provide engineering

13  services at the water treatment plant?

14            MR. ZEINEH:  Objection; form.

15      Q.    Do you follow where I'm going with

16  this?

17      A.    I do, but I don't recall any

18  discussions about that.

19      Q.    Okay.  And, again, so like, for

20  example, at this June meeting that we had been

21  talking about, you didn't have any reason to

22  believe that Jim Redding was there in a capacity

23  as a city engineer --

24      A.    No.

1    Q.    -- for the city of Flint --

2    A.    No.

3    Q.    -- correct?

4    A.    Correct.

5    Q.    Okay.  You were aware that he was

6    acting or serving in the capacity as

7    subconsultant to LAN?

8    A.    That was my understanding.  And at

9    this time, I wouldn't have known what Rowe would

10   have been, I don't think.

11   Q.    Okay.  All right.  Do you have any

12   reason to believe that anyone looked to Rowe

13   Engineering for input or recommendations on

14   whether to utilize the Flint River on an interim

15   basis?

16   A.    Other than the previous reports

17   they participated in, no.

18   Q.    Okay.  And do those reports have

19   any reference at all to utilizing the river on

20   an interim basis, if you recall?

21   A.    I don't recall that, no.

22   Q.    Okay.  Do you have any

23   recollection of anyone looking to Rowe for

24   direction on how to treat the Flint River

Highly Confidential - Daugherty Johnson

1    water --

2           A.    No.

3           Q.    -- as it was being utilized on a

4    temporary basis?

5           A.    No.

6                 MR. ZEINEH:  Just let him ask the

7           full question.

8                 MR. THOMPSON:  I think that's all

9           I have.  Thank you.

10                THE VIDEOGRAPHER:  Should we go

11          off the record?

12                We're going to go off.  The time

13          is 12:00.

14                         - - -

15          Thereupon, at 12:00 p.m. a lunch

16          recess was taken until 1:00 p.m.

17                         - - -

18

19

20

21

22

23

24

Highly Confidential - Daugherty Johnson

```
 1                         Tuesday Afternoon Session

                           December 17, 2019

 2                         1:00 p.m.

 3                      - - -

 4              THE VIDEOGRAPHER:  We're back on

 5         the record.  The time is 1:00.

 6              MS. SMITH:  Could somebody help me

 7         out here in and get Exhibit -- was it 53

 8         from the Brent Wright deposition from

 9         that binder?

10              MR. ZEINEH:  So you know, the two

11         binders are in front of Mr. Johnson.  He

12         has access to them.

13              MS. SMITH:  Okay.  And I believe

14         it was -- 53 was the November 3rd

15         e-mail.

16              THE WITNESS:  The McLaren e-mail?

17              MR. ZEINEH:  Is that 53?

18              THE WITNESS:  Yeah.

19              MR. ZEINEH:  You're talking about

20         a McLaren Hospital e-mail?

21              MS. SMITH:  Yeah.

22              MR. ZEINEH:  November 3rd, '14, it

23         looks like.

24              MS. SMITH:  Yes.
```

Highly Confidential - Daugherty Johnson

```
 1              MR. ZEINEH:  Yes.  He has it in

 2         front of him.

 3              MS. SMITH:  Okay.  I want to make

 4         sure you have that in front of you

 5         before I start asking my questions.  But

 6         let me start the examination, and we'll

 7         eventually get to that document.

 8                   - - -

 9            CROSS-EXAMINATION

10  BY MS. SMITH:

11         Q.    Mr. Johnson, my name is Susan

12  Smith.  I'm an attorney.  I represent McLaren

13  Regional Medical Center in this litigation.

14              Are you able to hear me okay?

15         A.    I am.

16         Q.    Okay.  I missed the first segment

17  of your deposition because of a technical issue.

18              I want to make sure I understand

19  what your current employment situation is.

20         A.    I work for the Little Traverse Bay

21  Bands of Odawa Indians as the executive

22  director.

23         Q.    Okay.  And when did you start

24  working for that organization?
```

Highly Confidential - Daugherty Johnson

```
1          A.     April of 2015.

2          Q.     Sir, do you recall the last day

3    that you worked for the city of Flint?

4          A.     I do not.

5          Q.     And did you tender your

6    resignation, sir?

7          A.     I did.  Approximately --

8          Q.     And to whom -- to whom did you

9    tender your resignation?

10         A.     The human resources department and

11   the retirement office.  It's probably more

12   appropriate, the retirement office notification

13   as opposed to a letter of resignation.

14         Q.     Did you speak to anybody at the

15   water treatment plant about your decision to

16   resign before you tendered your resignation?

17         A.     I don't recall specifically, but

18   I'm sure I would have.

19         Q.     Okay.  Did you speak to the person

20   who was then the emergency manager?

21         A.     I did.

22         Q.     And who was the emergency manager

23   at the time?

24         A.     Jerry Ambrose.
```

1       Q.    And what -- please tell us the

2  nature of your discussion with Mr. Ambrose about

3  your decision to resign.  What did you tell him?

4            MR. ZEINEH:  I would just object

5            to the form of the question and

6            mischaracterizing what he said, his

7            statements about his ending of

8            employment.

9       Q.    Okay.  Mr. Johnson, my question

10  previously was whether you spoke to the

11  emergency manager about your decision to resign.

12  And I understood that you indicated that, yes,

13  you had spoken to Mr. Ambrose.

14            Did I misunderstand you?

15      A.    That's correct.

16      Q.    So it's correct that you spoke to

17  Mr. Ambrose about your decision to resign?

18      A.    That is correct.

19      Q.    Okay.  And what did you tell

20  Mr. Ambrose about your decision to resign?

21      A.    I told him that I received an

22  opportunity to work for my tribe, and I was

23  going to work up there.

24      Q.    During your employment with the

1   Flint Water Treatment Plant, did you have any

2   communication with a person -- any person you

3   understood to be affiliated with McLaren Flint

4   Hospital?

5           A.    I don't recall any conversations

6   with McLaren staff.

7           Q.    Okay.  Did you ever visit McLaren

8   Flint Hospital while you were employed at the

9   Flint Water Treatment Plant?

10          A.    I do not recall doing that, no.

11  Well, not in regards to that.  I had an employee

12  injured and he was taken there, and I went

13  there, but it was a separate situation.

14          Q.    Understood.  Right.  And let me

15  focus my questions.

16                Did you have any communication

17  with anybody at McLaren regarding the water

18  quality in Flint after April 2014?

19          A.    I did not.

20          Q.    Okay.  Sir, I understand you

21  terminated your employment -- you resigned from

22  your position with the city of Flint in April of

23  2015.

24                Did you participate in any

Highly Confidential - Daugherty Johnson

1   meetings related to Flint water quality issues

2   after your resignation?

3          A.    No.

4          Q.    I understand from the documents

5   we've seen that your e-mail address while you

6   were employed with the city of Flint was

7   djohnson@cityofflint.com; is that correct?

8          A.    Yes.

9          Q.    Did you have any access to that

10  e-mail account after your resignation?

11         A.    Not that I know of.  I didn't use

12  it any further.

13         Q.    Okay.  Did you have other e-mail

14  addresses during that period of time with whom

15  you corresponded with persons at the Flint Water

16  Treatment Plant?

17         A.    No.

18         Q.    Okay.  Did you have a cell phone

19  issued by the city of Flint?

20         A.    No.

21         Q.    Did you use your personal cell

22  phone at that time to communicate with your work

23  colleagues?

24         A.    Yes.

Highly Confidential - Daugherty Johnson

```
 1          Q.    And what was your -- do you recall

 2   your personal cell phone number in 2015?

 3          A.    Yes.

 4          Q.    And what was that?

 5          A.    It was 810-577-8906.

 6          Q.    You're here today for a deposition

 7   and you're under oath speaking to attorneys

 8   about Flint water quality issues.

 9                Sir, have you given any other

10   statements under oath concerning your work at

11   the Flint Water Treatment Plant in 2014 and

12   2015?

13          A.    I have.  I've been in a court

14   case.  I believe a preliminary exam would have

15   been under oath, I'm sure.

16          Q.    Okay.  So there was your testimony

17   at the preliminary exam proceeding.  Any other

18   statements under oath that you recall?

19          A.    I don't recall if they were all

20   under oath.

21          Q.    Okay.  Did you provide statements

22   to investigators related to your work at the

23   Flint Water Treatment Plant in 2014 to 2016?

24          A.    Yes, I did.
```

Highly Confidential - Daugherty Johnson

1          Q.    And could you tell me the names of

2    the persons to whom you spoke?

3          A.    I don't recall the dates that I

4    spoke to the investigators.  There would have

5    been none in '14, I don't believe.

6          Q.    Okay.  Let me ask you this:  Did

7    you speak to the Flint water advisory task

8    force?

9          A.    I don't know -- I don't know what

10   that is, actually.  Who's on that?

11         Q.    All right.  Why don't you tell me

12   what statements or investigators you recall

13   speaking to about your work at the water

14   treatment plant, setting aside your testimony in

15   the preliminary exam testimony?

16         A.    I spoke with -- the only one I

17   remember the name would be Jeff Sapinko.  He was

18   working, I think, for the state of Michigan, AG.

19         Q.    Okay.  Do you recall any other

20   meetings with investigators besides Mr. Sapinko?

21         A.    I do.

22         Q.    And what else do you recall?

23         A.    I met with Todd Flood, the special

24   prosecutor.

Highly Confidential - Daugherty Johnson

1      Q.     Anyone else?

2      A.     Not that I recall.

3      Q.     Okay.  And as I understand your

4   testimony from this morning, you were speaking

5   to Mr. Flood and Mr. Sapinko in part about the

6   basis for the criminal charges that were brought

7   against you; is that correct?

8      A.     Correct.

9      Q.     Okay.  And eventually there was a

10  plea agreement entered in that proceeding

11  related to communications with Mr. Jim Henry of

12  the Genesee County Health Department.

13         Do you recall that testimony from

14  this morning?

15     A.     Yes.

16     Q.     Okay.  And in Exhibit 84 that was

17  marked this morning, that was the plea

18  agreement, it refers to Mr. Henry's

19  investigation of health concerns.

20         Do you recall that?

21     A.     Yes.

22     Q.     Can you tell me, when did you

23  first learn about Mr. Henry's investigation of

24  health concerns related to Flint water?

Highly Confidential - Daugherty Johnson

```
1          A.    I don't recall the timeline.

2          Q.    Do you recall how you first

3    learned of Mr. Henry's investigation?

4          A.    My recollection is that Howard

5    Croft told me about it.

6          Q.    And as I understand your testimony

7    this morning, is Mr. Croft tasked you with

8    supplying documents to Mr. Henry in response to

9    the FOIA request.

10              Do you recall that?

11         A.    Yes.

12         Q.    Sir?

13         A.    Yes.

14         Q.    Okay.  And please tell us what

15   Mr. Croft asked you to do with regard to

16   Mr. Henry's FOIA request.

17         A.    My recollection was that he wanted

18   me to get with Rob Bincsik at the service center

19   and have them transmit those maps over to the

20   health department.

21         Q.    And I understand your testimony

22   this morning is your recollection was Mr. Henry

23   was seeking maps.  Do you recall Mr. Henry

24   requesting water testing data?
```

Highly Confidential - Daugherty Johnson

```
 1          A.    I don't recall that.

 2          Q.    Did you speak to anybody besides

 3   Mr. Croft regarding Mr. Henry's FOIA request?

 4          A.    I passed it on to the water

 5   service center, Rob Bincsik.

 6          Q.    Did you communicate directly with

 7   Mr. Henry about his request?

 8          A.    I don't recall talking with him

 9   about it.

10          Q.    Mr. Johnson, I'm going to ask you

11   to take a look at Exhibit 53 from the Brent

12   Wright deposition.

13              Sir, have you seen this document

14   before today?

15          A.    Giving it a read right now.

16          Q.    Okay.

17          A.    Are they the same thing three

18   times?

19          Q.    There's some duplication within

20   the document, yes.  Primarily there's a

21   November 3, 2014 e-mail exchange, and you're

22   listed as the recipient.

23              Do you see that?

24          A.    I do.  Yes, I see it.
```

Highly Confidential - Daugherty Johnson

```
 1              Q.    Okay.  And the first question is
 2    with respect to the substance of Mr. Glasgow's
 3    November 3, 2014 e-mail.  Your name is listed as
 4    a recipient.
 5                    Do you recall receiving this
 6    document?
 7              A.    I do, yes.
 8              Q.    Okay.  And at this point,
 9    November 3, 2014, were you aware of the
10    Legionella investigations?
11              A.    Vaguely I recall potentially,
12    but ...
13              Q.    What do you recall?
14              A.    I guess I kind of thought it was
15    all the same scenario.  See this -- I guess I'm
16    reflecting back on it.  It looks like this is an
17    October 30th discussion he's talking about, but
18    he says -- and in the body of it, there was a
19    couple weeks ago an investigation.
20              Q.    Okay.  So I want you to tell me
21    what you recall about the Legionella
22    investigation that you were aware of as of the
23    date of this e-mail, November 3, 2014.
24              A.    So my understanding was that
```

Highly Confidential - Daugherty Johnson

1    McLaren had reached out to the water plant or

2    Mike Glasgow, or got to Mike Glasgow at the

3    water plant, to bring their concerns and had

4    requested Mike's request for support in helping

5    find out what that problem was.

6         Q.    Okay.  Were you involved in any

7    communications with Mr. Glasgow or anybody else

8    at the water treatment plant about McLaren's

9    request?

10        A.    Yes.  Mike said he was going --

11        Q.    What was your involvement?

12        A.    So Mike said he was going there to

13   meet with them or had met with them, and that

14   was the support that he was going to provide.

15        Q.    So Mr. Glasgow told you he was

16   going to go to McLaren.  Was that before the

17   e-mail of November 3rd or after the e-mail of

18   November 3rd?

19        A.    I don't recall.

20        Q.    Okay.  If you could turn to the

21   next page of Exhibit 53 on November 3, 2014 at

22   3:52 p.m.  According to this document, you

23   replied to Mr. Glasgow, "Good job staying on top

24   of this from a city perspective as well as

Highly Confidential - Daugherty Johnson

```
 1   assisting McLaren with their issue.  Let us know

 2   if the health department gets the case maps

 3   done."

 4              Do you see that?

 5        A.    Yes.  Yes.

 6        Q.    Okay.  So help me understand.

 7   Mr. Glasgow told you he was going to McLaren to

 8   assist in response to their request for support;

 9   is that correct?

10        A.    Correct.

11        Q.    Did Mr. Glasgow go on his own

12   initiative, or was he directed to do that by

13   somebody at the Flint Water Treatment Plant?

14        A.    I believe he went on his own

15   initiative.  I think he got a call from McLaren.

16   And just as part of a customer outreach, they

17   went there to check it out.

18        Q.    Okay.  Did you talk to Mike about

19   his plans to go to McLaren?

20        A.    I don't recall.

21        Q.    And is it correct to say that this

22   e-mail of November 3rd is Mike reporting back

23   after his sight visit?

24        A.    Yes.
```

1    Q.   Okay.  Do you recall -- and in

2  your response, you tell him, "Good job staying

3  on top of this.  Let us know if the health

4  department gets the case maps done."

5           Do you know if -- did you ever

6  learn that the health department got their case

7  maps done?

8    A.   I do not know.

9    Q.   Okay.  Did you have any other

10  communication with Mike Glasgow about his

11  communications with McLaren or visit to McLaren?

12    A.   I don't recall any specific ones.

13    Q.   Okay.  Do you recall -- to your

14  knowledge, did the Flint -- did Mr. Henry ever

15  ask about testing Flint water for Legionella?

16    A.   I don't recall him talking with me

17  about that.

18    Q.   Do you recall him talking to

19  anybody at the Flint Water Treatment Plant about

20  that.

21    A.   I don't know.  No, I don't know

22  about that.

23    Q.   Okay.  Do you have any knowledge

24  concerning the Flint Water Treatment Plant

Highly Confidential - Daugherty Johnson

```
 1   soliciting a bid to a laboratory -- a bid

 2   request or a proposal request for Legionella

 3   testing in late 2014?

 4           A.    I don't recall that.

 5           Q.    All right.  Mr. Johnson, let me

 6   ask you this:  Did you speak to Mr. Croft --

 7   first of all, who is Howard Croft?

 8           A.    He was my --

 9           Q.    Who was Howard --

10           A.    He was DPW director, my

11   supervisor.

12           Q.    He was your supervisor?

13           A.    Yes.

14           Q.    Okay.  Did you ever speak to

15   Mr. Croft about any Legionella concerns with

16   Flint water?

17           A.    I don't recall specific dates, but

18   I'm sure we did discuss this -- this e-mail.

19           Q.    And did Mr. Croft give you any

20   instructions or directives concerning that

21   investigation?

22           A.    Not that I recall.  I mean, it

23   seemed like Mike was on it, and McLaren was

24   working on it.  We didn't really have any need
```

Highly Confidential - Daugherty Johnson

1    to get involved in it.

2         Q.    Okay.  Well, let me ask you this

3    way then:  You indicate that Mr. Glasgow was on

4    it.  Is it fair to say that from your

5    perspective as the utilities administrator,

6    Mike Glasgow was the primary Flint person with

7    respect to any Legionella-related issue?

8         A.    I guess I don't know if we had a

9    designated person for the point of contact.  He

10   was the person that McLaren contacted, and that

11   would have been something he would have done as

12   part of his water quality supervisor role.

13        Q.    Okay.  Did you have any role with

14   respect to Mike's investigation or Mike's work

15   on that issue?

16        A.    No.

17        Q.    Okay.  Did you communicate with

18   anybody at MDEQ concerning any Legionella issue

19   in Genesee County after April 2014?

20        A.    I don't recall that, no.

21        Q.    Okay.  Are you the person that

22   would have communicated with MDEQ about

23   bacterial contamination concerns --

24        A.    No.

Highly Confidential - Daugherty Johnson

1        Q.     -- in Flint water?

2        A.     No.

3        Q.     Okay.  Who would have been that --

4   who would have been in that role?

5        A.     Mike Glasgow is my understanding

6   of it.

7        Q.     Okay.  All right.  I'm going to

8   ask you a couple general questions then.

9               Do you know -- are you familiar

10  with the name Kelly Rossman-McKinney?

11       A.     No.

12       Q.     Okay.  Do you know of a consulting

13  firm known as Truscott Rossman?

14       A.     It doesn't ring a bell, no.

15       Q.     Are you able to tell me who Jason

16  Lorenz is, L-o-r-e-n-z?

17       A.     Yep.  He worked for the emergency

18  manager I think as like the media or press

19  adviser or something like that.  But he was

20  communications kind of person.

21       Q.     Okay.  Did you have any

22  interaction with Mr. Lorenz concerning his work

23  in communications?

24       A.     Yes.  If communications had to go

Highly Confidential - Daugherty Johnson

1  out, they went through his office, out to the

2  public, so to say.

3          Q.    Okay.  Did Mr. Lorenz consult with

4  you about the accuracy of statements that were

5  issued by his office?

6          A.    Yes.

7          Q.    Okay.  And who in your department

8  would have reviewed Mr. Lorenz's statements

9  about Flint water quality before they were

10  issued to the public?

11         A.    It would have been -- the actual

12  content or data would have come from the water

13  plant and come --

14         Q.    Well, the water plant is a -- the

15  water plant is a physical structure.

16               Who within the water plant would

17  have been involved in reviewing statements

18  before they were issued through Mr. Lorenz?

19         A.    Myself, Mike Glasgow, Brent Wright

20  may have all seen those kinds of things.

21         Q.    Okay.  Now, I'll indicate that

22  there were various press releases and statements

23  issued for Mr. Lorenz's office concerning the

24  safety of Flint water.

Highly Confidential - Daugherty Johnson

1             Do you -- are you familiar with

2    those assertions?

3             A.   Yes.  Some of them, yes.

4             Q.   Okay.  Do you know what, if

5    anything, was done to determine that the Flint

6    water was safe after April 2014 and before

7    October 2015?

8             MR. KUHL:  Objection to form.

9             A.   My understanding is the water

10   quality testing regimen was followed by the

11   water quality supervisor, and the DEQ standards

12   were passed down to him to make those tests, and

13   he performed those tests.

14            Q.   And the water quality supervisor

15   was Mr. Glasgow?

16            A.   Correct.

17            Q.   Okay.  Were you involved in any

18   discussions at the water treatment plant

19   concerning assertions that the Flint water was

20   safe?

21            A.   Yes.

22            Q.   And what was your involvement,

23   sir?

24            A.   I would ask -- I guess I would

Highly Confidential - Daugherty Johnson

1    categorize it we'd ask Mike if that's accurate,

2    make sure that we're meeting all the safety

3    standards that DEQ prescribed.

4         Q.   And when you say "safety

5    standards," are you referring to the drinking

6    water regulations?

7         A.   Yes.

8         Q.   Okay.  And do you have any -- I

9    understand that you don't have a technical

10   background; is that right?

11        A.   Correct.

12        Q.   Do you have any understanding of

13   the requirements of those safety standards?

14        A.   No, other than the requirements.

15   Some are requirements, some are suggestions, I

16   guess, the primary and second thing, but not

17   technical enough to perform a test.

18        Q.   Let me ask you this:  Did you have

19   any involvement in the laboratory processes at

20   the water treatment plant?

21        A.   No.

22        Q.   Who was the supervisor of the

23   laboratory at the water treatment plant --

24        A.   Mike Glasgow.

Highly Confidential - Daugherty Johnson

1        Q.      -- during that time?

2        A.      Mike Glasgow.

3        Q.      Okay.  Thank you.

4                In the period of April 2014 until

5    your resignation in April 2015, did you

6    communicate with anybody at the Michigan

7    Department of Health and Human Services?

8                MR. ZEINEH:  Objection as to form.

9        A.      Not that I recall.

10       Q.      During that same period,

11   April 2014 to the time of your resignation in

12   April 2015, did you have any communication with

13   members of the Genesee County Health Department

14   apart from the Mr. Henry?

15       A.      I don't recall anybody else.

16       Q.      Okay.  Sir, I understand you're

17   not a technical person.  Do you have any

18   understanding of the reasons for the

19   trihalomethane violation that was issued in

20   January of 2015?

21       A.      Other than it was outside of the

22   DEQ parameters.  That's the reason for the

23   violation.  It exceeded those levels.

24       Q.      Okay.  Were you involved in any

Highly Confidential - Daugherty Johnson

1    discussions about whether -- about the issuance

2    of a public notice of that violation?

3        A.    I was involved in that, yes.

4        Q.    Okay.  Was Ms. Rossman-McKinney

5    involved in those communications?

6        A.    I don't recall McKinney.

7        Q.    Okay.  Now, was that a decision

8    that the water treatment plant made to issue

9    that notice, or is it something that was

10   required by MDEQ?

11       A.    It was an MDEQ requirement to make

12   notice.

13       Q.    Okay.  And who were your primary

14   contacts at MDEQ?

15       A.    Steve Busch and Mike Prysby.

16       Q.    Did you -- did you have any direct

17   communications with Mr. Busch while you were

18   employed at that --

19       A.    I did.

20       Q.    Let me -- okay.

21             And how did you primarily

22   communicate with Mr. Busch?

23       A.    He may have been cc'd on e-mails.

24       Q.    Did you have any meetings with

Highly Confidential - Daugherty Johnson

1   Mr. Busch after April 2014?

2          A.    Yes.

3          Q.    Okay.  And where did those

4   meetings take place?

5          A.    They would have taken place at the

6   water plant generally or -- they may have been

7   at city hall once or twice, but the water plant

8   primarily.

9          Q.    All right.  How about Mr. Prysby?

10  Did you communicate directly with Mr. Prysby?

11         A.    Yes.

12         Q.    And did Mr. Prysby attend meetings

13  at the water treatment plant?

14         A.    Yes.

15         Q.    And do you recall any

16  communications with either Mr. Busch or

17  Mr. Prysby concerning Legionella or

18  Legionnaires' disease?

19         A.    I don't recall there being

20  meetings, but there could have been.

21         Q.    Okay.  Were you involved in the

22  preparation of any documents in response to

23  questions that had been asked about Flint water

24  quality?  There are many frequently asked

1   questions type documents.  Were you consulted

2   about those?

3          A.     Yes.

4          Q.     Okay.  And did you take steps to

5   ensure that the technical information in those

6   documents was accurate?

7          A.     I took the step of getting that

8   information from the technical experts, Mike

9   Glasgow.

10          Q.     Okay.  So you relied on Mike

11   Glasgow to confirm the accuracy of any technical

12   information in those frequently asked questions

13   document; is that correct?

14          A.     Correct.

15              MS. SMITH:  I'm going to reserve

16          the remainder of my time with this

17          witness.

18              Mr. Johnson, thank you.

19              THE WITNESS:  Thank you.

20              MR. STERN:  Could we get a time

21          check?

22              MS. SMITH:  For the record, that

23          was 30 minutes.  I'd like to reserve the

24          remainder of my time.

Highly Confidential - Daugherty Johnson

```
 1              MR. ERICKSON:  Are we off the

 2         record?  Let's go off the record.

 3              THE VIDEOGRAPHER:  We're going off

 4         the record.  The time is 1:30.

 5              (Recess taken.)

 6              THE VIDEOGRAPHER:  All right.

 7         We're back on the record at 1:39.

 8                    - - -

 9            CROSS-EXAMINATION

10   BY MR. ROBERTS:

11         Q.    Hello, Mr. Johnson.  My name is

12   Jared Roberts.  I represent -- or I'm asking

13   questions today on behalf of the parties we're

14   generally describing as the MDEQ employee

15   defendants.  That consists of Patrick Cook,

16   Stephen Busch, Liane Shekter Smith, and Michael

17   Prysby.  So if I make future references to the

18   MDEQ employee defendants, are you going

19   understand who I'm referencing?

20         A.    Yes.

21         Q.    Thank you.

22              First, just on your general recall

23   about interactions with some of these

24   defendants, have you ever had any interactions
```

Highly Confidential - Daugherty Johnson

1  with Patrick Cook?

2          A.    Limited.

3          Q.    Limited.

4                Can you describe what you recall

5  about your interactions with Mr. Cook?

6          A.    I believe he was at a meeting we

7  had one time at the water plant.

8          Q.    So you believe the meeting was at

9  the water plant.  Can you narrow it down to time

10 at all?

11         A.    I cannot.

12         Q.    Can you recall anything about the

13 subject matter of the meeting?

14         A.    I cannot.

15         Q.    Do you recall other people that

16 may have been there with Mr. Cook?

17         A.    Steve Busch and Mike Prysby.

18         Q.    Do you recall any specific

19 conversations that you had yourself with Patrick

20 Cook?

21         A.    No.

22         Q.    Do you recall ever having any

23 e-mails directly between yourself and Mr. Cook

24 or perhaps other people in that e-mail circle?

Highly Confidential - Daugherty Johnson

```
 1           A.    I don't recall any.  He could have
 2   been on some, though.
 3           Q.    Okay.  Are there any documents
 4   with respect to the Flint water quality that, as
 5   you sit here today, you can attribute to
 6   Mr. Cook?
 7           A.    No, not that I can recall any.
 8           Q.    Thank you.
 9                 Now, in terms of Liane Shekter
10   Smith, do you recognize that name?
11           A.    Only in hindsight now.
12           Q.    In hindsight, did you hear that
13   just from the names of the defendants in this
14   litigation?
15           A.    Yes.
16           Q.    I'm sorry.  I couldn't hear that,
17   sir.
18           A.    Yes.
19           Q.    All right.  Thank you.
20                 So is it safe to say that you
21   don't recall any meetings with Liane Shekter
22   Smith?
23           A.    I don't recall any, no.
24           Q.    Are there any -- as you sit here
```

Highly Confidential - Daugherty Johnson

1    today, are there any documents that you can

2    attribute to Liane Shekter Smith?

3            A.    Not that I recall.

4            Q.    Can you recall Liane Shekter Smith

5    ever directing your conduct in connection with

6    your role at the water treatment plant?

7            A.    No.

8            Q.    With respect to the meeting that

9    you testified about in June 2013, you mentioned

10   Mr. Busch was there and Mr. Prysby was there.

11               Do you recall that general

12   testimony?

13           A.    I do.

14               MR. ERICKSON:  Object to the form.

15           I think he talked about --

16           Q.    I believe you described that --

17               MR. ZEINEH:  Mr. Roberts, one

18           moment, please.

19               (Reporter clarification.)

20               MR. ERICKSON:  My objection was

21           object to the form.  I believe he

22           testified about more than one meeting in

23           June.

24               MR. ROBERTS:  Okay.  Maybe I can

Highly Confidential - Daugherty Johnson

1          straighten that out.  Just strike the

2          question.

3    BY MR. ROBERTS:

4          Q.    Mr. Johnson, you testified -- I

5    believe you described a meeting in June 2013 as

6    a, quote, first meeting that you had with the

7    DEQ.

8                Does that sound correct?

9          A.    Yeah, there was a first meeting,

10   but I don't -- what was the question?

11         Q.    The question was:  You described a

12   June 2013 meeting with the DEQ, and you

13   mentioned that Mr. Busch and Mr. Prysby were

14   present at that meeting, as you recall.

15               Does that sound correct?

16         A.    Yes.

17         Q.    I also recall that you testified

18   that that was the first meeting that you were

19   involved with with DEQ personnel.

20               Is that correct?

21               MR. GAMBLE:  Object to form.

22         A.    As I recall, yes.

23         Q.    And I believe you either directly

24   testified or by implication testified that --

1  well, let's see.

2          Do you recall whether Patrick Cook

3  would have been at that June 2013 meeting?

4          A.   That could be the one, yes.  There

5  were a lot of folks I didn't know there at that

6  meeting.

7          Q.   Now, you also testified that the

8  city did not do that 60- to 90-day test run, and

9  you stated that the DEQ said that the city

10  didn't have to.

11          Do you recall that testimony?

12          A.   I do.

13          Q.   Who at -- do you recall who at the

14  DEQ you would have discussed that with?

15          A.   It would have been in a meeting

16  with Mike Busch and Steve Prysby, but I -- or

17  Steve Busch and Mike Prysby.

18          Q.   Can you attribute that statement

19  to any particular individual?

20          A.   I cannot.

21          Q.   Now, in general -- I'm just going

22  to ask some general questions.  And, again, just

23  like the attorney who just spoke with you, I

24  missed the first couple minutes of your

Highly Confidential - Daugherty Johnson

```
1    deposition because we were sent briefly to the

2    wrong place.  So I don't mean to ask you things

3    that you've already testified to.

4                    However, just in general terms,

5    did you or your water plant colleagues request

6    assistance from MDEQ people once it became

7    apparent that there was a problem with the Flint

8    River water?

9            A.    I guess I don't know if requesting

10   assistance is appropriate.  They were in

11   communication with the DEQ from the start until

12   the whole time, is my understanding.

13           Q.    Did you -- in general terms, did

14   you find the MDEQ responsive to any requests you

15   may have made for information or assistance?

16           A.    Yes.

17           Q.    Do you recall, would your

18   department ask MDEQ people questions about water

19   quality issues or how to address or improve

20   them?

21           A.    Yes.

22           Q.    As you recall --

23           A.    As I recall.

24           Q.    -- were MDEQ employees generally
```

Highly Confidential - Daugherty Johnson

1   responsive to those questions?

2        A.    Yes.

3        Q.    Is it fair to say that the city of

4   Flint was required to comply with whatever water

5   quality standards may have been in place when it

6   was distributing water?

7        A.    Yes.

8        Q.    So is it fair to say that those

9   would be state standards, federal standards, or

10  both?

11       A.    My understanding is they were

12  federal standards enforced by the state.

13       Q.    And then -- and implemented by the

14  city of Flint; is that fair?

15       A.    Yeah.  The processes we were told

16  to run, we ran.

17       Q.    Do you recall any prior meetings

18  prior to June 2013 with MDEQ people at the Flint

19  Water Plant?

20       A.    I don't recall any specific ones,

21  but some of those could be out of sequence in my

22  memory.

23       Q.    Okay.  Was there ever a discussion

24  that you can recall that concerned using Flint

Highly Confidential - Daugherty Johnson

1    River water initially just to blend with KWA or

2    Detroit water initially?

3              A.    Yes.

4              Q.    Can you elaborate on that?  Where

5    does that fall in the general sequence of

6    possibilities or plans you were discussing,

7    please?

8              A.    I would -- it would be early on

9    before -- before deciding to even go with KWA, I

10   think.

11             Q.    And so the -- using some Flint

12   River water was discussed as a possible -- just

13   to blend or reduce the use of those outside

14   sources for some time?

15             A.    That's correct.

16             Q.    Would that have been a temporary

17   or stopgap type of measure?

18             A.    That would have been a cost-saving

19   measure.  It would have been ongoing probably.

20             Q.    So, in other words, one of the

21   possibilities if, for instance, the city went

22   with KWA, is that they would purchase from KWA

23   and perhaps blend in some Flint River water?

24             A.    That's correct, as well as the

1    city of Flint being on Detroit system and

2    blending with Detroit system.

3           Q.    Then did that blending -- what was

4    discussed, did that ever occur?

5           A.    That did not occur.

6           Q.    Do you recall either Mr. Prysby or

7    Mr. Busch either at that June 2013 meeting or

8    other times discussing additional treatment

9    requirements that might be necessary if the city

10   used the Flint River?

11          A.    Yes.

12          Q.    Would they have or you have

13   discussed changes or increases in microbial

14   risks?

15          A.    I don't know.  I assume so.  There

16   was disinfection questions.

17          Q.    There was different what

18   questions?  I'm sorry.

19          A.    Disinfection questions.  So I'm

20   assuming that applies to that.

21          Q.    So when you say different

22   "disinfection questions," to a layperson, that

23   would mean you need to do different things to

24   the water depending on the source; is that

1    correct?

2         A.    Correct.

3         Q.    And did you have to do more to it

4    with the Flint River than the Detroit or Lake

5    Huron source that were under discussion?

6         A.    That's my understanding, yes.

7         Q.    Were there discussions with MDEQ

8    employees regarding additional regulatory

9    requirements that might be triggered if Flint

10   water was used, Flint River water?

11        A.    Yes.

12        Q.    Can you expand on that at all?

13        A.    Some of it was technical talk, but

14   I recall them discussing some kind of bin

15   sampling or something that had to be done in

16   addition because of the Flint River being the

17   source, but I don't know what that term even

18   meant.

19        Q.    And did you say bin as b-i-n?

20        A.    That would be what I heard.

21        Q.    Okay.  So you're recalling that

22   Flint water would require an additional type of

23   sampling that you're saying is bin, b-i-n,

24   sampling, correct?

Highly Confidential - Daugherty Johnson

1          A.    From my limited technical

2    knowledge, that's what I heard.  That may be

3    totally inaccurate.  But my understanding was

4    there needed to be more sampling of the Flint

5    River and potentially more chemical addition to

6    the Flint River.

7          Q.    So the chemical addition -- so, in

8    other words, more enhancements to the water that

9    would be applied at the Flint Water Treatment

10   Plant?

11         A.    Yes.

12         Q.    And would that include softening?

13         A.    Yes.

14         Q.    Was there ever an issue discussed

15   with respect to Flint River water and its

16   turbidity?

17         A.    Yes.

18         Q.    What do you recall about that?

19         A.    Just that there was discussion

20   that the water would be more turbid.

21         Q.    And for laypeople, that means

22   cloudier?

23         A.    Yes.

24         Q.    And if the water is cloudier, does

Highly Confidential - Daugherty Johnson

1    that require more or enhanced treatment?

2           A.    It's my understanding, yes.

3           Q.    Was there ever a discussion

4    regarding -- I believe you may have testified to

5    this, and I don't want to put words in your

6    mouth.  But was there discussion concerning an

7    increased risk of the byproduct of the

8    disinfection process?

9           A.    I don't recall that prior to the

10   startup.  That was a situation we had after.

11          Q.    And so the references to those

12   TTHMs, is that a byproduct of a disinfection

13   process?

14          A.    Yes.

15          Q.    Are there others that you can

16   think of, or is that the only one that has come

17   up here?

18          A.    That's the only one I knew of.

19          Q.    So do you recall whether

20   discussion of TTHMs or other byproducts occurred

21   with the MDEQ employees before the switch to

22   Flint water?

23          A.    I don't recall any.

24          Q.    But you did testify that that

Highly Confidential - Daugherty Johnson

1    discussion did come up at some point, correct?

2          A.    Right.  We were -- we had a TTHM

3    violation.  That's when I recall learning what

4    that was.

5          Q.    And I believe you just indicated

6    that that was 2015 when you learned of the TTHM

7    violations?

8          A.    I don't know the exact dates.  I

9    thought it was before that, but ... I'm pretty

10   sure it was before.  I thought it was the summer

11   of '14 we had a TTHM violation.

12         Q.    Thank you.

13               Were you aware in 2013 and 2014

14   that the Flint Water Treatment Plant would be

15   required to meet standards regarding removing

16   viruses from the Flint River water such as the

17   Legionella?

18         A.    No.

19         Q.    And so before the switch, the

20   issue of Legionella was not something that you

21   recalled discussing within the water plant?

22         A.    Correct.

23         Q.    Were you aware that the water

24   treatment -- during that time frame, that's 2013

Highly Confidential - Daugherty Johnson

1    and 2014, were you aware that the water

2    treatment plant would have to basically maintain

3    a residual disinfectant concentration throughout

4    the distribution system?

5           A.    Yes.

6           Q.    Can you tell me what that means,

7    in your words?

8           A.    So my understanding of that was

9    they needed to add enough chlorine to be in the

10   system throughout the pipes throughout the city.

11   That's a set level.  I'm not sure what that

12   level was.

13          Q.    You, in your water plant, did you

14   understand that with the Flint -- that the Flint

15   Water Treatment Plant would be subject to a

16   different lead and copper monitoring program

17   with the Flint River water?

18          A.    I did not know what that was going

19   to be, no.

20          Q.    Well, that may be -- maybe I

21   didn't ask the question very well.

22                Were you aware that there was

23   going to have to be a different lead and copper

24   monitoring system as opposed to what exactly

Highly Confidential - Daugherty Johnson

1    would be different about it?  So I'll ask that

2    again.

3              Were you in 2013 and 2014 aware

4    that if the plant switched to the Flint River

5    water, it would be subject to a different lead

6    and copper monitoring system than, for example,

7    they had previously with Detroit?

8         A.    Yes.

9         Q.    But as you sit here today, do you

10   have any recall of what would be different about

11   it once it became Flint water?

12        A.    That we would have to do more

13   locations of samples is my recollection.

14        Q.    So that would mean just different

15   point sources throughout the city?

16        A.    Correct.  My understanding was

17   that we were sampling some number on Detroit

18   system.  And when we began our own system, we

19   would have to sample more locations.  So if

20   there was ten on Detroit, we would have sampled

21   100 on Flint or something.  I don't know the

22   numbers, though.

23        Q.    Okay.  And so if it was Flint,

24   they would do it by address, or were the

Highly Confidential - Daugherty Johnson

1    locations already there, or would they just say,

2    "We need ten times the number of samples"?

3          A.    I don't recall how -- and that

4    would have been directed to Mike Glasgow.

5          Q.    Okay.  And who would have been --

6    who would have come up with that number in terms

7    of how many more samples or their locations?

8    Was that Mr. Glasgow and Flint?

9          A.    No.  My understanding was the DEQ

10   told Mike what the sampling protocol had to be.

11         Q.    Okay.  Do you have any knowledge

12   of whether -- who or anybody coming up with the

13   specifics of where to actually take those tests?

14         A.    I do not.

15         Q.    Do you know who might know that?

16         A.    It would have been Mike and the

17   DEQ.  Mike Glasgow and the DEQ would have, I

18   assume.  That's an assumption, though.

19         Q.    Thank you.

20               Now, as you understand it, was the

21   city of Flint ultimately responsible for

22   deciding whether corrosion control would be

23   added as part of the treatment of the Flint

24   River water?

Highly Confidential - Daugherty Johnson

```
1           A.     That's not my understanding.

2           Q.     What is your understanding?

3           A.     That the DEQ would prescribe to us

4     what we had to do in accordance with the

5     drinking water standards, and that's what we

6     instructed the engineers to design and the

7     contractors to build.

8           Q.     And so because the DEQ wasn't

9     requiring at the time the corrosion control,

10    from your position you do not view that as city

11    of Flint's responsibility to have added it?

12          A.     Correct.

13          Q.     Do you recall the MDEQ ever

14    prohibiting the city of Flint from adding

15    corrosion control chemicals to the Flint water?

16          A.     I don't recall a prohibition about

17    it.

18          Q.     As you understand it, was Flint

19    free to make that decision if it chose?

20          A.     No.

21          Q.     Wasn't it -- weren't phosphates

22    sort of priced out in your utility price study

23    that you mentioned previously?

24                 MR. ZEINEH:  Object as to form,
```

1          foundation.

2          A.    They were, yes.  Yes, those costs

3    were built into some of the potential expenses.

4          Q.    And then somebody decided that

5    they weren't necessary, at least at the outset;

6    is that correct?

7          A.    Yeah.  We were informed by the DEQ

8    they were not necessary at the outset.

9          Q.    Then who within the city of Flint

10   decided at that point not to use the phosphates

11   or other corrosion control?

12              MR. ZEINEH:  Just object as to

13        form, foundation.

14         A.    I guess the decision was the DEQ's

15   not to use it.  I don't know if we could have

16   just added a chemical without that

17   authorization.

18         Q.    Well, you testified previously

19   that you were aware of Mr. Glasgow's staffing

20   concerns right when the plant would begin

21   operating with the Flint River water in April of

22   2014; is that correct?

23         A.    Yes.

24         Q.    Do you recall what you did to

1   respond to Mr. Glasgow's raising the staffing

2   concerns?

3          A.    Yes.  I informed him that we had

4   plenty of funding to cover the overtime that

5   would be necessary to cover those vacant shifts.

6          Q.    And so the initial response was

7   you would just have the people that you had work

8   overtime?

9          A.    Correct.

10         Q.    And then what was -- was that the

11   only response?

12         A.    Yes.

13         Q.    So was there ever any time where

14   the city of Flint was adding more people or

15   getting more certified operators?

16         A.    Yes.  That was an ongoing thing

17   from before his concern was voiced and after his

18   concern was voiced.

19         Q.    Do you have any knowledge about

20   whether the water treatment plant had enough

21   certified operators to satisfy state regulations

22   for full-time operation before the use of the

23   Flint River began?

24         A.    My understanding was that we did

Highly Confidential - Daugherty Johnson

1   have enough certified operators on staff.

2        Q.   Now, I understand you testified

3   that in general terms -- or you don't have a

4   highly technical background.  So if I ask you a

5   question that's more on the technical side, my

6   apologies.

7             But in the meantime, do you

8   understand or is it true that it is a common way

9   to reduce TTHMs by doing regular flushing and

10  decreasing water detention time in the system?

11            MR. ZEINEH:  I just object as to

12        form, foundation, and it calls for an

13        expert opinion.

14        A.   Yeah, I don't know if that's

15  common or not.  No.  Reducing the detention time

16  is a solution.

17        Q.   Explain reducing detention time

18  just in lay terms, if you can, please.

19        A.   Water not being in the

20  distribution system longer, so using more water.

21        Q.   And so this flushing operation, is

22  that something users do at the back end or at

23  the user end, or is this something that a water

24  treatment plant can itself do?

Highly Confidential - Daugherty Johnson

1          A.    I guess I don't understand who the

2     back end is.

3          Q.    Well, when I say "back end," say

4     I'm a homeowner and I live in the city of Flint

5     and I turn my tap on, water flows through the

6     pipes and presumably at least something, perhaps

7     my service line, if I run it long enough gets

8     flushed.

9               And so when people -- when I see

10    references to the term "flushing," I'm curious.

11    Is that something that can be done systemwide,

12    or does it just happen over time through end

13    users?

14               MR. STERN:  Object to form.

15               MR. ZEINEH:  Concur.

16         A.    Theoretically opening more faucets

17    would use more water, yes, which would reduce

18    the detention time.

19         Q.    Is there anything that the plant

20    itself can do that people would describe as

21    flushing?

22         A.    Opening the hydrants, that would

23    be one of their mechanisms.

24         Q.    Now, do you recall whether you

Highly Confidential - Daugherty Johnson

1    ever spoke with anybody at the MDEQ regarding

2    the Legionella issue?

3         A.   I don't recall specifics.  I'm

4    sure it would have come up.  I don't recall

5    specifically.

6         Q.   Do you think it would have been

7    around March 2015 when you -- I believe you

8    testified that that was when there was notice of

9    a violation.

10             MR. ZEINEH:  Just object as to

11        form, foundation.

12        A.   I don't recall, but I don't

13   believe I would have in 2015, in March 2015.

14        Q.   When do you think it might have

15   been?

16             MR. ZEINEH:  Again, form.

17        A.   Again, I don't remember any

18   specific conversations about Legionella with the

19   DEQ.

20        Q.   Do you recall any time when

21   anybody on the staff from LAN suggested to you

22   that the Flint Water Treatment Plant was not

23   producing safe drinking water?

24        A.   No.

Highly Confidential - Daugherty Johnson

1          Q.    Was there ever a time when any of

2     the staff from Veolia suggested to you that the

3     Flint Water Treatment Plant was not producing

4     safe drinking water?

5          A.    No.

6          Q.    Do you recall any times where any

7     of your staff at the Flint Water Treatment Plant

8     suggested to you that the plant was not

9     producing safe drinking water?

10         A.    No.

11              MR. THOMPSON:  Thank you.

12              We'll reserve the balance of our

13         time.  I have nothing further at this

14         time.

15              Thank you, Mr. Johnson.

16              THE VIDEOGRAPHER:  Go off?  Going

17         off the record, the time is 2:07.

18              (Recess taken.)

19              THE VIDEOGRAPHER:  We're back on

20         the record at 2:13.

21                      - - -

22                 CROSS-EXAMINATION

23     BY MR. KIM:

24         Q.    Good afternoon, Mr. Johnson.  My

Highly Confidential - Daugherty Johnson

1   name is Bill Kim.  I'm counsel for the city of

2   Flint.

3                Are you familiar with the term

4   "micromanagement"?

5        A.    Yes.

6        Q.    What does that term mean to you?

7        A.    Kind of oversupervising

8   subordinate employees.

9        Q.    What would be some specific

10  examples of micromanagement?

11       A.    Maybe telling them which way to

12  take a route around the block.

13       Q.    As a supervisor, do you believe

14  that you've ever -- you know, that you've

15  engaged in micromanaging your subordinates?

16       A.    Not as an initial step.

17       Q.    So not as an initial step.  Can

18  you expand on that?

19       A.    I guess if somebody is not doing

20  their job right, I may have to tell them exactly

21  how to do it right.

22       Q.    Okay.  Now, you've testified that

23  Brent Wright reported to you as the water

24  treatment plant manager; is that correct?

1          A.      Correct.

2          Q.      Did you ever have any reason to

3    doubt that Brent Wright was capable of doing his

4    job?

5          A.      No.

6          Q.      Did you have any reason to believe

7    that he needed extra supervision in doing his

8    job?

9          A.      No.

10         Q.      Okay.  Did Michael Glasgow report

11   to you?

12         A.      He reported on the chart to Brent,

13   but we talked at meetings together freely.  He

14   didn't have to go through Brent to talk to me.

15         Q.      Okay.  Did you have any reason to

16   believe that Mike Glasgow was unable to do his

17   job?

18         A.      No.

19         Q.      Did you believe that any

20   additional closer supervision was required in

21   his case?

22         A.      No.

23         Q.      As the utilities administrator,

24   did you regularly delegate tasks to your

Highly Confidential - Daugherty Johnson

1    subordinates?

2           A.    Yes.

3           Q.    Would you be -- would it be fair

4    to say that a large portion of your job involved

5    delegating tasks to your subordinates?

6           A.    Yes.

7           Q.    Earlier the counsel for LAN, I

8    guess, posited that Warren Green had stated that

9    he had -- he had had conversations with you

10   regarding corrosion control after the June --

11   the June 26 or June 29th meeting.

12                Do you recall that?

13          A.    I don't recall any specific

14   conversations.

15          Q.    Do you recall that counsel for LAN

16   asked you about that earlier today?

17          A.    Yes, yes.

18          Q.    And do you recall that you said

19   that you had no recollection and that you

20   couldn't think of any reason to contradict that

21   statement; is that --

22                MR. GAMBLE:  Objection to form.

23          Q.    Do you recall saying that you

24   couldn't find any reason to contradict that

Highly Confidential - Daugherty Johnson

1  statement?

2             MR. GAMBLE:  Objection.

3       A.    Yes, I had no reason.

4       Q.    Would it be fair to say that you

5  had no reason to contradict that statement

6  because you had no recollection of it at all?

7       A.    That's correct, I don't recall

8  that.

9       Q.    So it was equally as likely that

10  if you had no reason to contradict it, you also

11  have no reason to support it?

12             MR. GAMBLE:  Objection to form.

13       A.    That's correct.

14       Q.    Okay.  If you can -- I'd like to

15  have you take a look at what has been marked as

16  Exhibit Number 90.

17                   - - -

18     (Johnson Deposition Exhibit 90 marked.)

19                   - - -

20  BY MR. KIM:

21       Q.    I'm going to state that this is

22  a -- these are a series of questions and answers

23  drafted by Howard Croft, the director of the

24  Flint department of public works.  After you

Highly Confidential - Daugherty Johnson

1    review this, would you tell me if you have any

2    reason to doubt that statement.  This is Bates

3    number COF_FED_0030695.

4            A.    I guess I have no reason to doubt

5    it.  I don't recall it.

6            Q.    Do you recall -- now, this --

7    these questions and answers refer to a meeting

8    that was held on June 29, 2013 at the Flint

9    water plant involving interested parties,

10   including the city of Flint, Genesee County

11   drain commissioner, the Michigan Department of

12   Environmental Quality and Lockwood, Andrews &

13   Newnam.

14            Do you recall this meeting?

15            MR. GAMBLE:  Objection to form.

16   Objection; foundation.

17            A.    The June 29th meeting?

18            Q.    Yes.

19            A.    Yes.

20            Q.    Now, looking at the list of -- on

21   the first page, you can see a list of names in

22   the middle of that page.

23            A.    Yes.

24            Q.    Were all those persons present for

1    that meeting, to the best of your recollection?

2              MR. GAMBLE:  Objection;

3         foundation.

4         A.    I don't recall a Stephen Ashford,

5    but I don't know if he was there or not there.

6         Q.    Okay.  Were you present at this

7    meeting?

8         A.    Yes.

9         Q.    Okay.  Looking below that, you see

10   a list of topics that were for the agenda; "The

11   purpose and agenda of this meeting was to

12   determine the feasibility of the following

13   items."

14              Do you recall that being the

15   purpose and agenda of that meeting?

16              MR. GAMBLE:  Objection;

17         foundation.

18         A.    Yes.

19         Q.    I'm going to just go through the

20   list of determinations that are listed in here,

21   and I'm going -- and I want you to answer

22   whether or not that you agree that that was the

23   determination that was reached by -- at that

24   meeting.

Highly Confidential - Daugherty Johnson

1                    First, that the Flint River would

2    be more difficult to treat but is viable as a

3    source; is that a true statement?

4            A.    Is that somewhere in the document?

5    Is that somewhere in the document?

6            Q.    Starting right there (indicating).

7            A.    Got it.

8            Q.    What I'm asking is:  Do you recall

9    that statement being an accurate recollection or

10   accurate -- an accurate statement of the

11   determination that was reached at the June 29th

12   meeting?

13           A.    Yes.

14                 MR. GAMBLE:  Object to form.

15           Q.    So you recall at the June 29th

16   meeting, that the determination was made that

17   the Flint River would be more difficult to treat

18   but is viable as a source?

19           A.    Yes.

20           Q.    At that same meeting, was it --

21   was the determination reached that it was

22   possible to engineer and construct the upgrades

23   needed for the treatment process?

24           A.    Yes.

Highly Confidential - Daugherty Johnson

1          Q.    Number 3, the same question, was

2    that determination also reached at the June 29th

3    meeting?

4                MR. GAMBLE:  Objection; form.

5          A.    Yes.

6          Q.    Same question for number 4 on the

7    next page?

8          A.    Yes.  That was a conclusion met.

9          Q.    And number 5?

10         A.    Yes.

11         Q.    And number 6?

12               MR. GAMBLE:  Objection; form,

13         foundation.

14         A.    Yes.

15         Q.    Okay.  Now, do you recall that

16   there were any persons at that meeting who

17   disagreed with any of those conclusions?

18               MR. GAMBLE:  Objection; form,

19         foundation.

20         A.    No.

21         Q.    So there was no -- to the best of

22   your recollection, nobody who was present at

23   that meeting was dissenting or had a different

24   opinion as to any of those six conclusions?

Highly Confidential - Daugherty Johnson

```
 1         A.    That's correct.

 2                     - - -

 3     (Johnson Deposition Exhibit 91 marked.)

 4                     - - -

 5  BY MR. KIM:

 6         Q.    Okay.  If I can direct your

 7  attention to what has been marked as Exhibit 91.

 8  This was listed as produced as Croft -- I'm just

 9  going to go with 97 with a whole bunch of zeros

10  in front of it.

11              MR. KIM:  Does anybody object to

12         that description of this document?

13  BY MR. KIM:

14         Q.    This document -- does this

15  document appear to be an e-mail that you sent on

16  November 4, 2013?

17         A.    Let me give it a read here.

18         Q.    Do you need me to repeat the

19  question, Mr. Johnson?

20         A.    I'm still reading it.

21         Q.    Okay.

22         A.    Yes.

23         Q.    Okay.

24         A.    Go ahead.  Ask your question.
```

Highly Confidential - Daugherty Johnson

```
 1         Q.    So this -- you'd agree this
 2    document appears to be an e-mail that you sent
 3    on November 4, 2013?
 4         A.    Yes.
 5         Q.    And do you recall sending this
 6    e-mail?
 7         A.    I did send this e-mail, yes.  I
 8    don't know when.  Obviously the 4th, but ...
 9         Q.    Okay.  And you sent this e-mail to
10    Gerald Ambrose and Howard Croft?
11         A.    Yes.
12         Q.    And does this -- does this e-mail
13    express that the contract with LAN was "to check
14    the feasibility and develop the cost estimates
15    for necessary upgrades to make the water plant
16    our primary drinking water source"?
17         A.    That was the initial contract,
18    yes.
19         Q.    And is that -- does that
20    accurately reflect your understanding of their
21    contract at that time?
22         A.    Up until that point, yes.
23         Q.    And then did you understand --
24    then does the e-mail say that the change order
```

Highly Confidential - Daugherty Johnson

1    authorizes them to do the final design and

2    construction engineering?

3              A.    Yes.

4              Q.    And was that your understanding of

5    what the change order was going to -- was going

6    to provide for?

7              A.    Yes.

8              Q.    And as a -- would it be accurate

9    to state that this e-mail expresses your

10   confidence in LAN?

11             A.    Yes.

12             Q.    Did you have confidence in LAN's

13   capabilities?

14             A.    I did.

15             Q.    And that would be in the time

16   frame of November of 2013?

17             A.    Yes.

18             Q.    Between November of 2013 and April

19   of 2014, did you have any -- did you have any

20   reason to -- develop any reason to doubt their

21   professional capabilities?

22             A.    No.

23             Q.    Okay.  If I can direct your

24   attention to Brent Wright Exhibit Number 81 in

Highly Confidential - Daugherty Johnson

1    the Brent Wright binder.

2             Okay.  Mr. Johnson, would you

3    agree this exhibit appears to be the summary of

4    a meeting that was held on November 7, 2014?

5         A.    That's what's stated on it, yes.

6         Q.    And does it -- was this meeting

7    held at the -- does this summary refer to a

8    meeting that was held of the offices of LAN in

9    Okemos?

10        A.    Yes.

11        Q.    And does this summary list persons

12   there -- the people who were at this meeting?

13        A.    Yes.

14        Q.    And were you -- were you at this

15   meeting on November 7, 2014?

16        A.    Yes.

17        Q.    And if you'd take a look at the

18   people who are listed on the roster, do you

19   recall those individuals being at this meeting?

20        A.    Again, I don't recall Pat Cook

21   being there, but he could have been there.

22        Q.    Okay.  So you have memories of

23   Warren Green being there?

24        A.    Yes.

Highly Confidential - Daugherty Johnson

```
 1          Q.    Samir Matta?

 2          A.    Yes.

 3          Q.    Mike Prysby?

 4          A.    Yes.

 5          Q.    And Steve Busch?

 6          A.    Yes.

 7          Q.    Okay.  If you could skip ahead --

 8    let's see.  That would be the third page of the

 9    summary under the heading that's labeled

10    "Comments."

11                And the first sentence of the

12    comments reads, "DEQ representative Steve Busch

13    and Mike Prysby voiced satisfaction that we are

14    addressing all of the areas of concern."

15                Do you see that?

16          A.    Yes.

17          Q.    Does that match with your

18    recollections of the November 7th meeting?

19          A.    Yes.

20          Q.    Did the DEQ representatives

21    present express that there were any other

22    concerns that needed to be addressed?

23          A.    I don't recall any.

24          Q.    Did the LAN representatives at
```

Highly Confidential - Daugherty Johnson

```
 1   that meeting raise any issues of other issues

 2   that needed to be addressed?

 3          A.    I don't recall any other issues

 4   raised.

 5                      - - -

 6      (Johnson Deposition Exhibit 92 marked.)

 7                      - - -

 8   BY MR. KIM:

 9          Q.    Okay.  I'm going to now direct

10   your attention to the exhibit that's been marked

11   as Exhibit 92.

12                Would you agree that this is an

13   e-mail that was sent by Henry James to yourself

14   on February 6, 2015?

15          A.    Yes.

16          Q.    And does this e-mail concern the

17   FOIA request that was made by Mr. Henry?

18          A.    Yes.

19          Q.    And do you recall receiving this

20   e-mail?

21          A.    Yes.

22          Q.    Okay.  So was this the first time

23   that you were aware of the FOIA request from the

24   Genesee County Health Department?
```

Highly Confidential - Daugherty Johnson

1         A.    I don't recall the sequence of

2    that time, but there was a discussion between me

3    and Howard about a request.

4         Q.    So was this the first time that

5    you were aware of the request, or were you made

6    aware of that request prior to this e-mail?

7         A.    I don't recall the dates.

8         Q.    Okay.  Do you remember if the

9    Genesee County Health Department had

10   communicated with you about this FOIA request

11   prior to this e-mail?

12        A.    No.  Any communication would have

13   been through Mr. Henry or Howard.

14        Q.    Okay.  So do you recall receiving

15   any communications from Mr. Henry prior to this

16   e-mail?

17        A.    I don't.

18        Q.    And just to beat a dead horse, you

19   received this e-mail on February 6th; is that

20   correct?

21        A.    Yes.

22                    - - -

23      (Johnson Deposition Exhibit 93 marked.)

24                    - - -

Highly Confidential - Daugherty Johnson

```
 1   BY MR. KIM:

 2        Q.   Okay.  If I could direct your

 3   attention to Exhibit Number 93.

 4             Is this an e-mail from Rob -- does

 5   this appear to be an e-mail from Rob Bincsik to

 6   Mr. Henry?

 7        A.   Yes.

 8        Q.   And were you cc'd on this e-mail?

 9        A.   Yes.

10        Q.   And was this e-mail sent on

11   Monday, February 16th?

12        A.   Yes.

13        Q.   And was -- did this e-mail provide

14   a copy of the distribution system map that

15   the -- to Mr. Henry?

16        A.   Yes.  It says it was attached to

17   it.

18        Q.   If you'd like to review the whole

19   e-mail chain.

20             So was a distribution system map

21   provided to Mr. Henry on the 16th of February?

22        A.   Yes, it was.

23        Q.   And would that distribution system

24   map have been within the area of responsibility
```

Highly Confidential - Daugherty Johnson

1    of Robert Bincsik?

2           A.    Yes.

3           Q.    Would that map have been something

4    that you would have personally been responsible

5    for maintaining?

6           A.    No.

7                      - - -

8    (Johnson Deposition Exhibit 95 marked.)

9                      - - -

10   BY MR. KIM:

11          Q.    Okay.  If I could direct your

12   attention to what was marked as Exhibit 95.

13              MR. ERICKSON:  Did we skip 94?

14              MR. KIM:  We did skip 94, yes.

15                    - - -

16   (Johnson Deposition Exhibit 103 marked.)

17                    - - -

18   BY MR. KIM:

19          Q.    Now, I believe -- I didn't catch

20   what number this was assigned earlier, so I

21   apologize.  But this was an e-mail that was

22   referred to earlier regarding LeeAnne Walters'

23   residence at 212 Browning.

24              Do you -- do you recognize this

1          A.    Yes.

2          Q.    You don't know if there's other

3   types, right?

4          A.    Yeah.

5          Q.    Do you know if Veolia's

6   recommendation pertained to polyphosphates as

7   opposed to orthophosphates?

8          A.    I do not know.

9          Q.    Do you know if there's more than

10  one way to implement corrosion control

11  treatment?

12         A.    I do not know if there is.

13         Q.    Earlier you testified today that

14  DEQ didn't require Flint to undergo a 60- to

15  90-day test run prior to the water switch.

16              Do you recall that testimony?

17         A.    I do.

18         Q.    Do you recall if there is any

19  state or federal regulation that would require

20  Flint to undergo a 60- or 90-day test run of the

21  plant?

22              MR. NOVAK:  Objection.

23         A.    I don't know of any.

24         Q.    I believe you testified earlier