# EXHIBIT 22

Highly Confidential - Gerald Ambrose

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MICHIGAN

 3                      SOUTHERN DIVISION

 4

 5    ------------------------------) Civil Action No.:

 6    IN RE:   FLINT WATER CASES    ) 5:16-cv-10444-JEL-MKM

 7                                  ) (consolidated)

 8                                  )

 9                                  ) Hon. Judith E. Levy

10    ------------------------------) Mag. Mona K. Majzoub

11

12                     HIGHLY CONFIDENTIAL

13         VIDEOTAPED DEPOSITION OF GERALD AMBROSE

14

15                 Wednesday, June 10, 2020

16                         Volume 1

17

18       Remote oral deposition of GERALD AMBROSE,

19    conducted at the location of the witness in Lansing,

20    Michigan, commencing at approximately 9:07 a.m., on

21    the above date, before JULIANA F. ZAJICEK, a

22    Registered Professional Reporter, Certified Shorthand

23    Reporter, Certified Realtime Reporter and Notary

24    Public.
```

1  regulations were being followed at the drinking water

2  plant?

3      A.    I believe the role of the consultant was

4  to determine if the drinking water was meeting

5  established standards.

6      Q.    The -- there are, Mr. Ambrose, many public

7  statements you -- that were made either directly by

8  you or on documents issued under your name that

9  indicate that -- assurances to the public that the

10 drinking water was safe.  You've been asked some

11 questions about that today already, and I just want to

12 be sure I understand what you did to ensure that those

13 statements were accurate.

14           I could show you some of those documents,

15 but I think that we've been through some of those

16 today.

17     A.    So, I relied on the Director of Public

18 Works to assure that the reports were done timely and

19 accurately.

20     Q.    Well, I'm asking you specifically about

21 public statements that the drinking water was safe and

22 met all standards.

23     A.    Right.

24     Q.    Not simply the test reports and the

1  regulatory -- the -- the sampling reports and so forth

2  that were sent to DEQ, but more as a public-facing

3  statements that Flint's water was safe and met

4  standards.

5         What did you do to ensure that those

6  statements were accurate before you issued them to the

7  public?

8     A.   I was told repeatedly by not only the

9  Director of the Department of Public Works, but the

10 utilities director and some of the testing folks that

11 did the testing that the water was within standards.

12 I got reports from them, you know, on a regular basis.

13    Q.   How did those reports -- how were those

14 reports transmitted to you?

15    A.   I did not -- I -- those reports were the

16 responsibility -- the review of those reports were the

17 responsibility of the utilities director and the

18 Department -- the Director of the Department of Public

19 Works.

20    Q.   And who was the utilities director?

21    A.   Duffy Johnson.

22    Q.   I want to ask you about Mr. Hollins.  And,

23 again, forgive me for jumping around, but you had

24 mentioned that you did have some communications with

```
 1   Harvey Hollins with respect to Flint matters --
 2        A.    Okay.
 3        Q.    -- during your term as the emergency
 4   manager.  You understood Mr. Hollins to have a role in
 5   Governor Snyder's office, and I'll represent that he
 6   had a title that -- Director of Urban Initiatives or
 7   something of that nature.
 8              Could you tell us what the nature of your
 9   communications are -- were with Mr. Hollins as --
10   while you were emergency manager in Flint?
11        A.    Mr. Hollins had received, you know,
12   received complaints and concerns from various people
13   in Flint, and his goal was to assure that those
14   concerns were being addressed, and so he collected --
15   he would request information from me about what we
16   were doing and he requested at some point information
17   on, you know, why -- why the switch to the -- to KWA,
18   why the switch to the river, what would be the cost of
19   returning.
20        Q.    How did you communicate with Mr. Hollins?
21        A.    Generally by phone or by e-mail.
22        Q.    And what phones did you have available to
23   you when you were emergency financial manager?
24        A.    What?
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, JULIANA F. ZAJICEK, a Registered

 4   Professional Reporter, Certified Realtime Reporter,

 5   Certified Shorthand Reporter and Notary Public, do

 6   hereby certify that prior to the commencement of the

 7   examination of the witness herein, the witness was

 8   duly remotely sworn by me to testify to the truth, the

 9   whole truth and nothing but the truth.

10           I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15           I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21           IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 25th day of June, 2020.

23           [signature: Juliana F. Zajicek]

24           JULIANA F. ZAJICEK, RPR, CSR, CRR
```