```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4
              In Re   FLINT WATER CASES    Case No. 16-10444
 5

 6

 7   _____/

 8                       STATUS CONFERENCE

 9
              BEFORE THE HONORABLE JUDITH E. LEVY
10               UNITED STATES DISTRICT JUDGE

11                      JULY 19, 2023

12
                   APPEARANCES IN ALPHABETICAL ORDER
13
                   Frederick A. Berg
14                 Butzel Long
                   150 West Jefferson, Suite 100
15                 Detroit, MI 48226

16                 James M. Campbell
                   Campbell Conroy & O'Neil, P.C.
17                 20 City Square, Suite 300
                   Boston, MA 02129
18
                   Melanie P Daly, I
19                 Levy Konigsberg, LLP
                   605 Third Ave, Suite 33rd Floor
20                 New York, NY 10158

21                 (Appearances continued on next page)

22

23                 Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                   Federal Official Court Reporter
24                 United States District Court
                   200 East Liberty Street -
25                 Ann Arbor, Michigan 48104
```

1                    Alaina N. Devine
                     Campbell Conroy & O'Neil, P.C.
2                    1 Constitution Wharf, Suite 310
                     Boston, MA 02129
3
                     Kristin Michele Dupre
4                    Campbell Conroy and O'Neil PC
                     1 Constitution Wharf, Suite 310
5                    Boston, MA 02129

6                    Kelly Bain Kramer
                     Mayer Brown LLP
7                    1999 K Street NW
                     Washington, DC 20006
8
                     Patrick James Lanciotti
9                    Napoli Shkolnik Law PLLC
                     360 Lexington Avenue
10                   11th Floor
                     New York, NY 10017
11
                     Theodore J. Leopold
12                   Cohen Milstein Sellers & Toll PLLC
                     11780 U.S. Highway One, Suite N500
13                   Palm Beach Gardens, FL 33408

14                   Paul F. Novak
                     Weitz & Luxenberg, P.C.
15                   Fisher Building
                     3011 W. Grand Boulevard
16                   Suite 24th Floor
                     Detroit, MI 48202
17
                     Michael A. Olsen
18                   Mayer Brown LLP
                     71 S. Wacker Drive
19                   Chicago, IL 60606

20                   Corey M. Stern
                     Levy Konigsberg, LLP
21                   605 Third Avenue, Suite 33rd Floor
                     New York, NY 10158
22
                     Mark R. Ter Molen
23                   Mayer Brown LLP
                     71 S. Wacker Drive
24                   Chicago, IL 60606

25

```
 1                          Michael L. Williams
                            United States Department of Justice
 2                          Civil Division, Torts Branch,
                            Environmental Tort Litigation
 3                          175 N Street, N.E.
                            Washington, DC 20002
 4
          Also Present:     Deborah E. Greenspan, Special Master
 5                          Blank Rome LLP
                            1825 Eye Street, N.W.
 6                          Washington, DC 20006
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23              To Obtain a Certified Transcript Contact:
                Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                   Federal Official Court Reporter
                     United States District Court
25       200 East Liberty Street - Ann Arbor, Michigan 48104
```

1                                    **I N D E X**

2     <u>WITNESSES</u>                                                    <u>PAGE</u>

3        (None)

4

5

6

7

8     <u>EXHIBITS</u>

9        (None)

10

11

12

13

14    <u>MISCELLANY</u>

15       Proceedings.................................5
         Certificate................................50
16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2          THE CLERK:  Calling the Flint Water Cases.

3          THE COURT:  Great.  And I think Jeseca has all of the

4     appearances on the record, so we can dispense with that.

5          And this is the time we set aside for a status

6     conference in the ongoing Flint water litigation.  And I have

7     an agenda of four items.

8          And the first was Veolia's request to address the

9     Court regarding the outstanding Bellwether III home

10    inspections.  And at our conference on June 13, I think at

11    that time I learned that there were still two homes where two

12    of the Bellwether III plaintiffs had resided for several

13    years.  And VNA had made some efforts to gain access to those

14    homes for four-hour or longer than four-hour inspections.

15          And then in July 19, we had agreed that today would

16    be the day that we'd tried to invite the individuals who live

17    in those homes to discuss what their objection is and what

18    they need to know about the process.

19          And I think, Mr. Olsen, you were going to subpoena

20    them to be present.

21          MR. OLSEN:  Yes, Your Honor.  I'll just give you a

22    brief update.

23          THE COURT:  Brief.

24          MR. OLSEN:  As you just noted, we set this today to

25    try to encourage cooperation for these home inspections.  We

1    similarly had some difficulty serving them in person.  They

2    were avoiding that service.  But we did serve them at their

3    last and usual place of abode.

4         The good news is, one of the two homeowners did reach

5    out to us and suggested they were willing to do the home

6    inspection.  And we're coordinating with them to accomplish

7    that.

8         And what I would suggest, Your Honor, unless the

9    other homeowner, Montaria Brown [sp], has joined us, which I

10   suspect she hasn't, that we table this issue.  We will

11   continue our efforts.

12        But given the Court's comments last time and the

13   hesitancy to do anything more strident, I would suggest we

14   just leave this where it is.  We will continue our efforts.

15   And if we think we need to schedule something in the future to

16   get the Court's assistance, I would let you know.

17        THE COURT:  Okay.  And I'm looking now at the list of

18   attendees who are not on the screen.  And I don't see Montaria

19   Brown, but I want to just look one more time.  And I don't see

20   any telephone numbers or anything like that or unusual names

21   for who people might be.  We see that sometimes.  Cartoon

22   characters and things of that nature.  But I don't see that

23   today.

24        So I think that's a good approach and I'm glad that

25   you were able to meet with some success with at least one of

1   the individuals.

2          And so we'll just -- you'll continue to work on that.

3   And if you need my assistance, please let me know.

4          MR. OLSEN:  Okay, Your Honor.

5          THE COURT:  So next we have an ongoing issue that

6   we've all become a little bit familiar with.  Veolia has a

7   request to address the production of the MATLAB source code.

8          So what's going on there?

9          MR. OLSEN:  As you well know, we received a copy of

10  the code that we did not think was readable.  You gave

11  plaintiffs two options.  Either delivery a copy of that code

12  to your clerk who had some experience with MATLAB, or

13  coordinate a call between the two experts.

14         Mr. Stern thought that coordinating a call with the

15  two experts was the right way to go.  We had that call on June

16  28.  I think that call was productive.  Dr. Specht confirmed

17  that he had the unencrypted MATLAB code.  He could produce it.

18  He had previously produced a one-time file that could perform

19  the calculations but wouldn't show how those calculations were

20  performed.

21         Now despite that call on the 28th and the indication

22  that we could get a unencrypted readable source code,

23  plaintiffs' counsel has not yet or Dr. Specht has not yet

24  produced that code.  They have suggested that Dr. Specht isn't

25  available for deposition now until September.  And they are

  1    taking the position that they want to produce the code shortly
  2    before his deposition because they think we shouldn't have a
  3    lot of time in advance of the deposition with the code.
  4            Our view obviously is the Court originally compelled
  5    plaintiffs to prove this code on March 8, more than four
  6    months ago.  We negotiated a protective order that said as
  7    soon as we executed it we would get the code.
  8            We don't see any reason or any basis to withhold the
  9    code now.  In fact, once we get the code, we'll also need to
 10    verify whether Dr. Specht has provided sufficient raw data
 11    from his measurements to run the code and replicate those
 12    results.  So there could be follow-up back and forth even
 13    after we get the code.
 14            So we don't know why we don't have the code.  We
 15    think we should get the code immediately.
 16            THE COURT:  So tell me a little bit more about the
 17    conversation between your expert and Dr. Specht.
 18            MR. OLSEN:  I wasn't on the call.  But and
 19    Mr. Ter Molen can correct me if I'm wrong.  But my
 20    understanding is that Dr. Hubert and Dr. Specht talked and
 21    Dr. Specht suggested that, yes, that we did not get a copy of
 22    the code to the extent we were looking for a copy of the code
 23    to replicate all of his calculations.  And he could provide an
 24    unencrypted copy of the source code that would enable us to do
 25    that.

```
 1              THE COURT:  Okay.  So Mr. Stern or Ms. Daly, would
 2     you like to respond?
 3              MS. DALY:  Yes, Your Honor.  I'll respond.  So first,
 4     I just want to give a little bit more light on the call
 5     between Dr. Hubert and Dr. Specht because Mr. Ter Molen and
 6     myself had the opportunity to be on that call.  And the call
 7     was very productive, as Mr. Olsen said.  However, it didn't go
 8     exactly as he summarized.
 9              Dr. Hubert was very helpful and he explained to
10     Dr. Specht and all of us that the initial protective order and
11     the agreement, which the attorneys had drafted and the Court
12     entered, did not specify what it was that he exactly needed,
13     which he explained was -- and I don't -- I can't explain what
14     this means, but a source code.
15              So he explained that what Dr. Specht initially sent,
16     he was not able to open.  He was not able to use.  And then he
17     said what he needs is the source code.  And then he went on to
18     elaborate for Dr. Specht's benefit and all of our benefits
19     what that meant to him, what that would look like.  So it was
20     very helpful.  We learned a lot.
21              Dr. Specht agreed that he could edit or for lack of a
22     better word tinker with the format that he initially sent to
23     best meet what Dr. Hubert explained he needed.  And we have no
24     problem with Dr. Specht producing that.
25              I think that really this is a misunderstanding that
```

July 19, 2023

1    happened between lawyers drafting the agreement of what would

2    be exchanged versus experts who understand the technical

3    terms.

4         So that's the summary of what happened.

5         And then as to the deadlines, our position is not

6    that we want to delay or that the code should be produced only

7    a few days before the deposition.

8         Dr. Specht, since all of this has transpired, he has

9    some family events, some travel coming up in the summer.  Some

10   happy things.  He's getting married.  And traveling to Asia.

11   And I think his partner is from another part of the country.

12   So there's a lot of travel involved.  All that to say he won't

13   be available for a deposition until September -- mid

14   September.  September 25.

15        And we just want to keep the integrity of the initial

16   intervals contemplated by the scheduling order initially

17   submitted by the Court and the scheduling order which the

18   parties agreed to, specifically the May 25 scheduling order.

19   So we just don't think that it's fair for there to be an

20   extended interval of time between when the code and the

21   reports are produced, and when the deposition of Dr. Specht is

22   held, and then the following responsive defense expert

23   reports.

24        THE COURT:  Let me just interrupt and ask you what is

25   your plan right now for when you would turn over the source

1    code and the underlying data?

2         MS. DALY:  Yes, Your Honor.  We had sent the defense

3    counsel a proposed joint stipulation which contemplates that

4    we would submit the code September 15.  And then Dr. Specht

5    would be deposed between September 25 and the 29th.  And then

6    the defendants, you know, corresponding expert report would be

7    due October 9.

8         And that's -- that is keeping true to the 10 to

9    15-day intervals that we had all initially agreed to.

10        And I just would like to say one more thing.  In the

11   context of this, we have agreed to several deadline extensions

12   for the defense expert reports responding to our experts of

13   Dr. Hoffman, Dr. Krishnan.  We submitted to the defendants

14   those reports in February.

15        And our experts, our Group A experts, which again is

16   Dr. Krishnan, Dr. Hoffman, Dr. Russell, they've all been

17   deposed.  And since then we've been agreed to several 30-day

18   extensions, which we've had no problem with in the spirit of

19   good faith and also in light of the Court's comments that the

20   trial will be a little bit later than expected.

21        But as a result, the defense experts have really had

22   the advantage of having our expert reports and having their

23   depositions for much longer than was initially contemplated by

24   the scheduling order submitted by the Court.

25        So really our concern here is just to keep the

1    playing field level and not extrapolate on that advantage,

2    which the defense experts have already had.  And then to the

3    extent that --

4            THE COURT:  Tell me again, what is the origin of the

5    10 today -- 10 to 15-day lead time?

6            MS. DALY:  It was agreed to in a joint stipulation

7    that was entered on May 25.  It's docket number --

8            THE COURT:  Of this year?

9            MS. DALY:  -- 2479.

10           THE COURT:  Okay.  Docket number what?

11           MS. DALY:  2479.

12           THE COURT:  Okay.  So what's wrong with that,

13   Mr. Olsen?

14           MR. OLSEN:  It doesn't make any sense.

15           THE COURT:  Is it in that docket?  I have to log on

16   to the docket.  I usually get -- I'm almost there.

17           MS. DALY:  In that docket, we had the June 1 deadline

18   for submitting the code.  And then a following window for a

19   deposition that was June 12 to June 16.  And then the defense

20   corresponding expert report following that June 26.

21           THE COURT:  That's what I'm seeing as well.  So

22   what's wrong with that?

23           MR. OLSEN:  The reason those deadlines were set the

24   way those were set is we extended the deadlines to give us a

25   minimum amount of time to review the code because the code

1   hadn't been produced.

2            It wasn't because there's some integrity issue with

3   respect timing between preparation and review of the code and

4   the expert depositions.  The code was ordered to be produced

5   months ago.  They have the code.  In fact, they produced what

6   they called was a readable source code that wasn't.

7            THE COURT:  I understand.

8            MR. OLSEN:  The notion that we need to wait until a

9   couple weeks before the deposition to get the code, which is

10  supposed to have been produced four months ago and just wasn't

11  doesn't make any sense.  And we may have follow-up requests.

12  And we've seen how this has gone with respect to trying to get

13  relevant data.

14           To just say because we thought there was a minimum of

15  two weeks to read the code before means we shouldn't get the

16  code until two weeks before the dep doesn't make sense.

17           THE COURT:  Okay.  So what I'll do is ask Ms. Daly to

18  provide the code by September 5, the day after Labor Day.  And

19  that gives you about a month.  So Mr. -- Dr. Specht can take

20  care of his wedding and his family and get this to you all by

21  September 5, giving you just about a month.

22           So now we have the next item on the agenda, which is

23  Veolia's request to discuss the post January 2017 document

24  production and the materials Veolia, oh, has designated as

25  privileged.  Is --

1      MR. OLSEN:  Your Honor, I think this issue got

2   resolved in a meet and confer yesterday.  So we can skip this

3   one.

4      THE COURT:  I'm thrilled to hear that.  Okay.

5      So now let's look at the last item on our agenda,

6   which is issues related to plaintiffs' fourth amended request

7   for production as discussed at the May 17 conference.

8      And what I wanted to do -- I sent an email yesterday

9   that I wanted to start this agenda item by addressing the 60

10   documents that had been provided to me from among the 1,700

11   documents that Veolia had said or said were privileged.  So

12   why don't we begin there.

13      And so as everyone is aware, this is a dispute

14   between the individual plaintiffs' counsel, Corey Stern and

15   Melanie Daly, in this particular dispute, who were challenging

16   the privilege designations on those 1,700 documents that would

17   otherwise be responsive to plaintiffs' request for production

18   of documents.

19      So I asked to see 60 sample documents.  Thirty

20   selected by the plaintiffs, who, of course, had no idea what

21   were in the documents but they have the descriptions on a

22   privilege log.  And 30 selected by VNA.

23      Overall, as you know, the plaintiffs are challenging

24   the privilege designations on most of these documents because

25   they were provided to employees at two different public

 1    relations firms.  One of which I'm just going to refer to as
 2    Rasky.  It has a more complicated corporate name.  And the
 3    other I'll refer to as Mercury.
 4         And with respect to the attorney-client privilege
 5    assertion, plaintiffs generally argued that VNA had waived the
 6    privilege when they provided these documents to employees at
 7    one or more of these PR firms.
 8         And with respect to the attorney-client work product
 9    -- or the attorney work product privilege, plaintiffs argued
10    that the documents are likely not privileged in the first
11    place because their primary purpose or driving force -- and
12    that comes from case law -- behind their creation was a media
13    campaign and that they were not, in fact, created or related
14    to obtaining legal advice or created to -- in anticipation of
15    litigation or because of litigation for the attorney work
16    product privilege to apply.  And of course, VNA submitted and
17    filed a letter brief indicating that all of the documents are
18    privileged.
19         So I want to first invite plaintiffs to file your
20    letter brief on the docket just so that the full briefing is
21    there.  So that will be your choice, but I invite you to do
22    that.
23         And in order to make a decision and sort this out, I
24    look to the law of the state where the litigation is taking
25    place at the outset.  And here Michigan courts have not had

1    many opportunities to weigh in on whether the privilege is

2    waived when a client voluntarily shares otherwise

3    attorney-client privileged documents and/or work product

4    information with a third party PR firm.  And neither has the

5    Sixth Circuit had an opportunity to look at this in detail.

6          But that does not mean we're without guiding

7    principles.  Because these are well established privileges and

8    have been addressed by courts all over the country.

9          So I want to start by lying at the attorney-client

10   privilege assertion.  And here the Reed Dairy Farm v Consumers

11   Power Company, this is a Michigan Court of Appeals case from

12   1998, they set forth the scope of the attorney-client

13   privilege in Michigan as follows.

14         The attorney-client privilege attaches to direct

15   communications between a client and his attorney as well as

16   communications made through their respective agents.  The

17   scope of the attorney-client privilege is narrow, attaching

18   only to confidential communications by the client to his

19   advisor that are made for the purpose of obtaining legal

20   advice.

21         Where an attorney's client is an organization, which

22   is what we have here, the privilege extends to those

23   communications between attorneys and all agents or employees

24   of the organization authorized to speak on behalf of -- on its

25   behalf in relation to the subject matter of the communication.

1        So we know in Michigan the key case on how a court

2   should look at this in a company setting such as the one here

3   comes from the Leibel v General Motors Michigan Court of

4   Appeals case in 2002.  And Leibel is L-e-i-b-e-l.

5        And Michigan follows the case we all look to, the

6   Upjohn Supreme Court case to articulate viable principles

7   underlying the rule, such as the purpose is to encourage full

8   and frank communication between attorneys and clients and

9   thereby promote broader public interest, the broader public

10  interest of observance of the law and administration of

11  justice, and that sound legal advice or advocacy serves the

12  public need that such advice and that it relies upon the

13  lawyer being fully informed by the client.

14       We're reminded that waiver of privilege can present a

15  mixed question of law and fact.  And when analyzing whether a

16  waiver has occurred, the Leibel court instructs that, first,

17  the privilege is personal to the client and, therefore, only

18  the client can waive it.  And second, the privilege does not

19  arise by accident.

20       And Michigan follows a true waiver requirement where,

21  quote, unquote, "true waiver" is defined as an intentional

22  voluntary act which cannot arise by implication.  However, an

23  error of judgment where the person knows that privileged

24  information is being released but concludes that the privilege

25  will never less -- nevertheless survive will still destroy any

```
 1      privilege.
 2             Once otherwise privileged information is disclosed to
 3      a third party, or if an otherwise confidential communication
 4      is necessarily intended to be disclosed to a third party, the
 5      privilege is gone.
 6             So those are the general principles that I am
 7      applying on the attorney-client privilege.
 8             Looking to the work product privilege here, any
 9      notes, working papers, memoranda, similar materials prepared
10      by an attorney in anticipation of litigation are protected
11      from discovery.  And that still comes from the Leibel case.
12             And similar to Federal Rule of Civil Procedure 26
13      (b)(3), Michigan Court Rule 2.302(B)(3)(a) provides nearly
14      identical protections.  So Michigan courts generally find that
15      it's appropriate to rely on federal cases for guidance in
16      determining the scope of the work product document -- or work
17      product doctrine.  Let me grab a couple -- one of those cases.
18      Just a minute.
19             So this has been an interesting process to sort
20      through.  You can see that I have a lot here.  There we go.
21      He the primary -- when I look at the work product privilege,
22      what I'm looking at is what is the primary purpose?  What is
23      the driving force for the creation of the document or the
24      communication?  Does it relate to a legal strategy?  Or in our
25      case, plaintiffs suggest that the appropriate question is,
```

1    does it relate to a media strategy?

2         If it's the latter, the document was never attorney

3    work product in the first place, if it was created to further

4    a media strategy and not a legal strategy even if lawyers are

5    copied on the email or sent the email in the first instance.

6    And even if the subject line of the email says attorney work

7    product seeking legal advice in anticipation of litigation,

8    none of that matters.  What matters is what is the driving

9    force for the creation of the document.

10        So VNA has urged in your letter brief that I should

11   look to the case In re Copper Market Antitrust Litigation out

12   of the Southern District of New York for some direction.  And

13   that's with an excellent reason.  That case shares some of the

14   facts that are in common with our case.

15        There the Sumitomo Corporation was facing a scandal

16   of sorts after one of its division heads disclosed certain

17   things during a government investigation.  He then hired a PR

18   firm to handle the public relations consequences because the

19   Sumitomo Corporation was located in Japan and they wanted

20   media advice regarding western markets.

21        And ultimately the judge in that case ruled that the

22   communications that took place with the PR firm that related

23   to the litigation or were prepared in anticipation of

24   litigation were, in fact, protected by attorney-client

25   privilege and work product.  This was because the court

1     determined that the PR firm was essentially acting as an

2     employee of the party and, therefore, was within the group

3     that would be considered the client seeking legal advice or

4     that was in need of legal work product type documents.

5            But there's an important difference between that case

6     and our case.  In the In re Copper case, there was evidence

7     that the PR consultant was what was called the functional

8     equivalent of the client's employee.

9            For example, he was hired to consult intimately on a

10    commercial and retail development project before the

11    litigation was filed.  He was involved on a daily basis with

12    the client and would be the sole client representation at

13    meetings with potential tenants and with local officials.

14           There was no one else from the Sumitomo Corporation

15    present at that meeting -- at those meetings other than

16    someone from the PR firm.

17           In addition, it was determined by the court that he

18    possessed information that no one else at the company held.

19    And the court also held that there was no principle basis to

20    distinguish the consultant's role from that of an employee of

21    the client that was seeking legal advice.

22           Finally, the court found that the PR consultant was

23    the type of person with whom a lawyer would wish to confer

24    confidentially with in order to understand the reasons for

25    seeking representation and how that representation would

1      develop.

2             VNA also pointed me to the case Grand Canyon Skywalk

3      Development LLC v Cieslak, C-i-e-s-k-l-a-k [sic] for the

4      rationale behind considering a public relations firm as a

5      functional employee or critical part of a legal strategy team.

6             And here I think VNA argued in your letter that

7      employees of Rasky and Mercury were, in essence, part of the

8      VNA litigation team.

9             There's little doubt -- and now I turn to the -- to

10     what the court actually said in the Grand Canyon Skywalk case.

11     The court said, "There's little doubt that Scutari and

12     Cieslak" -- and those are the outside consultants -- "should

13     be treated as the functional equivalent of an employee of the

14     defendant or the client under the factors considered in the

15     many cases the court had looked at.

16            In its opposition to the motion to quash the

17     subpoena, Scutari and Cieslak indicated that they had been

18     hired by the tribe through their lawyers to protect the name

19     of the tribe and make it look more reasonable in the eyes of

20     the public.

21            They methodically walked through we'll call them S

22     and C.  They had gone through every provision of contracts

23     that the tribe had with Canyon Skywalk Development.  They had

24     focused on specific provisions and provided legal analysis

25     establishing who was responsible for a visitor center and

 1   certain portions of the litigation.

 2           And they not only -- it was determined by the court

 3   that they not only served as a gatekeeper to the tribe, but

 4   also as the law firm that reviewed and approved the

 5   communications and public relations agreement eventually

 6   entered into between the tribe and a third party plaintiff.

 7           So in that case, the consultant that's the third

 8   party that stands in the shoes that Rasky and Mercury do here

 9   was entire -- was used to review contracts and to determine

10   what the responsibility was of the actual party to the

11   litigation.

12           They undertook to provide general public relations

13   services beyond this legal dispute.  And they provided

14   confidential legal communications with the lawyers on the

15   case.  And there it was determined they were within the scope

16   of the attorney-client privilege.  And their communications

17   were protected from disclosure.  And there are a number of

18   other cases that were provided to me that I can go through.

19           But let me take a look at what the facts are that we

20   know right now about these 60 documents.  And as I mentioned

21   earlier, they are generally copied to Rasky and/or Mercury.

22   And so I asked -- having read a whole variety of cases, I

23   asked VNA to file a copy of the contract with these two

24   entities so I could understand whether they had become

25   functional, whether they were seconded to or whatever word we

1   want to use.  Whether they had become integrated into VNA's

2   legal team, defending it in this litigation.

3            And although VNA could not locate a signed copy of

4   those contracts and, in fact, could not locate any contract

5   with Mercury -- and we'll set that aside for a minute.

6            With Rasky, VNA was able to locate an unsigned copy

7   of the contract that you believe is the effective contract.

8   So I'm just going to set aside for a moment the fact that it

9   was unsigned.  I'm just not that concerned about that.

10  Because I trust that you would let me know if you didn't think

11  this had anything to do with the relationship between the

12  parties.

13           And the first thing I want to say about the contract

14  with Rasky is that it was signed and it was entered into after

15  the litigation that we're here talking about began.  So at the

16  time you wrote this contract, you being VNA, with Rasky, you

17  knew you were facing litigation.  It had been filed months

18  earlier in 2016.  Yet there's no mention of the word

19  litigation in the contract anywhere.

20           So as I understand it, Rasky -- and I'm assuming that

21  because we don't have a contract for Mercury, I'll just assume

22  a similar type of contract or a type of oral agreement was

23  entered into with Mercury.  And it's absolutely not for the

24  purposes of assisting in litigation, advising in litigation,

25  drafting litigation documents or anything of that nature.

1          I also looked -- it also has a scope of work.  And

2     there's going to be an hourly basis.  It's going to be 250

3     dollars per hour or whatever else is agreed upon.  And I think

4     ultimately there's a different fee here.

5          But in the scope of work, which I think is

6     critical -- when you look at all of the data breach litigation

7     and I think that -- I don't think either side pointed me to

8     too much of that litigation.  But there's a really helpful

9     case out of the -- two or three helpful cases out of the

10    Eastern District of Virginia.  And one of them is In re

11    Dominion Dental Service v Inc. Data Breach Litigation.

12         The reason this type of litigation is helpful is

13    because when a company has a data breach, they hire a forensic

14    expert.  They often hire a PR company so that the public knows

15    target.  I read the Target litigation, the Experian data

16    breach litigation.

17         And then the issue becomes were the communications

18    with those third parties protected or not.  And what the

19    courts look to in every instance is the scope of work.  What

20    were these consultants there to do?  And here the program name

21    is Flint Crisis Work and Proactive PR Support.

22         So there's nothing related to litigation there.  The

23    program overview, PR support related to the Flint media

24    crisis.  So here it's clear it's not the Flint litigation

25    crisis.  It's the media crisis that understandably your client

1    is concerned about its public reputation during this time

2    period.  So it says program overview is about the media

3    crisis, ongoing media relations support for proactive

4    visibility efforts.

5            So these two media companies are going to help VNA be

6    proactive, move forward with a positive image.  The scope of

7    work says crisis PR counsel in support related to Flint, media

8    relations, and content and message development.  It starts

9    September 1 of 2016 and can continue as needed.  And there's a

10   retainer and then had the hourly fee.

11           So the question becomes whether these employees,

12   despite the scope of work -- I'm willing to go beyond what

13   Dominion Dental Services instructs -- and that's

14   429 F.Supp.3d 190 -- and all of those cases to just let's look

15   at reality.

16           And here the nature of the litigation is about the

17   engineering services, a professional negligence case relating

18   to engineering services that related to water chemistry.

19           The Rasky and Mercury companies are not engineers.

20   They're not water professionals.  And they never represented

21   VNA at a substantive meeting about what its water consulting

22   or engineering work had included.  And there is nothing in the

23   statement of work that otherwise indicates they're serving as

24   a paralegal or consulting or legal strategy.

25           In some instances, they were told about we have three

1    options in one for how to respond to a judge's ruling on a

2    pending motion.  If we win, let's go with this statement.  If

3    we lose, let's go with this statement.  And then let's have a

4    proactive -- you know things of that nature.  But it's not in

5    no way were those media companies analyzing the pending

6    litigation to advise VNA on whether you're likely to win or

7    lose or some third thing, whatever that might be.

8         So I do not see anything in what's before me that

9    would indicate that these companies had become integrated into

10   VNA and were, in essence, working there.

11        The other thing that I've looked at is In re Signet

12   Jewelers Limited Securities Litigation.  And he let me tell

13   you a little bit about that.  Because it comes out the

14   opposite of the Copper Litigation.  It's another Southern

15   District of New York case, 2019.  Quite current.

16        The corporation there had hired two PR firms.  That's

17   similar.  Following the publication of articles accusing the

18   corporation of fraud.  There's no fraud allegation, but

19   negligence is the allegation here.  That counsel retained

20   these PR firms while the corporation faced, quote, a series of

21   media crises that plagued the company for several years.

22        Then Signet's management along with its in-house and

23   outside counsel and PR firms, quote, formed a strategic

24   communication strategy committee which convened to discuss

25   communications strategy to neutralize the climate of negative

1     and often inaccurate media coverage in light of the legal and

2     reputational risks facing the company.  And plaintiff moved to

3     compel those documents in the same manner as plaintiffs have

4     here.

5              The court conducted an in camera review of certain

6     exhibits containing various emails as well as the privilege

7     logs.  And after reviewing those communications, the court

8     held that, quote, "Nothing in the client's communications for

9     the former purpose constitutes the obtaining of advice or

10    justifies a privileged status."  The court mentioned that it

11    looked at -- it would have merited a privilege status if a PR

12    employee had been the functional equivalent of a Signet

13    employee.

14             Here VNA has a robust I think it's a vice president

15    level communications department.  Or two, if the PR firm had

16    been hired to perform a specific -- quote, specific litigation

17    task that the attorneys needed to accomplish in order to

18    advance their litigation.  And -- or if they had conducted a

19    media campaign in an effort to paint the target in a favorable

20    light so that the prosecutors -- this is related to a case the

21    court cited about grand jury subpoenas might feel less

22    pressure to indict.

23             But here, Rasky and Mercury are not trying to

24    influence the Court in what they're doing like the PR firm in

25    grand jury case.  They're trying to influence the public's

1    view of your client VNA.

2           So and because there in the Signet case, the court

3    reasoned that the PR firm did not fit into those categories

4    that the defendant had relied on and the documents were not

5    sent to or shared for the purpose of giving or obtaining legal

6    advice and, therefore, were not privileged.

7           So let me take a look at where that leaves us.  I

8    having looked at all of these documents with respect to 40 of

9    the 60 documents that were provided to me, VNA I find has

10   failed to meet its burden of showing that those documents were

11   either privileged in the first instance.

12          Because what the problem is as I read the documents,

13   a great many of those 40 documents are created for the purpose

14   of seeking -- or they're communicated with Mercury and Rasky

15   for the purpose of a media campaign and not related to the

16   litigation.  Now certainly the media campaign was desirable

17   because of ongoing litigation, but that didn't mean that

18   Mercury and Rasky were involved in the litigation.

19          So and let me -- so in the first instance, I don't

20   think those work product privileged documents were ever work

21   product.  And in the second instance with respect to the

22   attorney-client privilege, to the extent that VNA lawyers in

23   some instances and communication director copied Mercury and

24   Rasky, I think they waived the privilege.

25          That was not inadvertent.  It's very clear in the

1  email that they want Mercury and Rasky's expertise and

2  finessing the public message.

3         Now of the 20, I just want to make we're kind of

4  clear on what's going on here.  Of the 20 that I think are

5  privileged, 17 of those originated from VNA's selection and

6  three from plaintiffs' counsel.  If you're just sort of

7  keeping track of that level of detail.

8         And so what I think we need to do now is this is

9  essentially the decision that I've been able to make having

10 done the research, reviewed the documents, and sorted out who

11 all of the people are who are copied on the documents.

12        So what I would ask VNA to do is understand that the

13 rule that I'm announcing to you at this point is that the

14 documents that are part of a media campaign simply aren't

15 privileged.  Those need to be turned over of your 1,700.

16 Documents that are copied from in-house counsel or others to

17 Mercury and Rasky, the privilege is waived.

18        And what I could do is ask you to turn those

19 documents over in a reasonable -- there's a lot -- 1,700 is a

20 lot.  So I'll give you some time to go through those.  If you

21 think you would like the assistance of further in camera

22 review of the 1,600, whatever we've got, 30 left, I would

23 appoint -- I have some ideas about this.

24        I would appoint either Deborah Greenspan or I've

25 already appointed Mona Majzoub for the purpose -- former

1   Magistrate Judge Mona Majzoub for the purposes of working on

2   settlement issues.  She served our court as a hardworking

3   magistrate, looked at attorney-client privileged issues

4   constantly, and could jump in and work on this.

5           So I want to give you a chance to think about that

6   and see whether you think you need that assistance.  If we did

7   employ or use Special Master either Deborah and Mona Majzoub

8   or one or the other, I would require that VNA cover two thirds

9   of the cost of that and plaintiffs' counsel one third.  And I

10  base that only on the fact that 40 out of 60, two thirds of

11  the documents were not privileged in the first place or the

12  privilege was clearly waived.

13          I don't think this is a close call from my

14  perspective.  So it just seems fair that the plaintiffs

15  shouldn't bear a 50/50 percent of that cost if a special

16  master is needed.

17          So Mr. Olsen, how much -- how do you -- do you want

18  to take the first crack?

19          MR. OLSEN:  Can I make a couple of comments?  The

20  answer to your question will be yes, but a couple of comments.

21          With all due respect, Your Honor, I think you're

22  applying an extremely narrow reading of this issue that's not

23  consistent with the case law.  With respect to the functional

24  equivalence test, I certainly agree that's what most courts

25  use in evaluating this question.  But the courts are not

1    making that decision based on whether you have no PR

2    capabilities in the U.S., like you said in Sumitomo.  Or

3    whether there's no one who could provide that assistance.

4           I mean, if you look at GSK, which is one of the

5    leading cases in this, FPC v GSK.

6           THE COURT:  I did.

7           MR. OLSEN:  The way they describe it is the way most

8    of these cases describe it, which is are the third parties

9    working in the same manner as they did with full-time

10   employees.  Are they part of the team and working with

11   full-time PR employees in a similar way?

12          I don't think there's any way that you could conclude

13   that that isn't the case here where these third party PR

14   consultants were working in a very similar way as the

15   full-time PR people were working.

16          And the other point you made with respect to the fact

17   that these are PR people doing PR things and not providing or

18   assisting with providing legal advice in particular, I also

19   don't think that's at all the standard in this case law.

20          If you look at Sumitomo, which you talked about, or

21   In re Copper Antitrust Litigation, when you hire a PR firm to

22   do PR things, to deal with public relations problems following

23   the exposure of a scandal that gave rise to that very same

24   litigation, that court concluded when they're doing PR things,

25   not legal things, that there is no waiver when they're

1    consulting with lawyers to help understand those legal issues,

2    which is exactly the same thing that happened here.

3           Certainly these PR firms were hired to do PR things,

4    but that doesn't mean that there's a waiver or there was no

5    purpose with respect to a legal issue and it was fundamentally

6    a media campaign.  They clearly, if you look at those

7    documents that reviewed in camera, were working in connection

8    with the lawyers to understand the litigation and providing --

9    and working with those lawyers with respect to work product

10   and legal advice.

11          Having said that, I understand your direction.  And

12   yes, I think we need a little time to evaluate the implication

13   of this.  There are a couple of issues.  For example, the in

14   camera review documents you looked at were from 2016 and 2017.

15   There was a very -- a much more recent production of 2019

16   documents that relate to the guardian article, for example,

17   where I think the issues may be different with respect to a PR

18   firm.

19          But yeah, we need to go through and evaluate how many

20   of those 1,700 documents did copy PR firms on them and

21   evaluate whether we need additional guidance or help.  And we

22   take your suggestions and we will get back to you as soon as

23   we can get through those voluminous documents with respect to

24   what we think the next step should be.

25          THE COURT:  Okay.  How much time do you need to get

```
 1   back to me?

 2            MR. OLSEN:  Can we have three weeks?

 3            THE COURT:  Yeah.  And then what I would ask is that

 4   you have a meet and confer with Mr. Stern and Ms. Daly so that

 5   when you get back to the Court in three weeks, I would know

 6   what your plan is for producing the documents and whether you

 7   need the assistance of a third party.

 8            And if so, who you recommend that that third party

 9   be.  Aside from myself, which I don't think you would be

10   recommending anyway.  I don't think you're satisfied with the

11   outcome that's been reached so far.  So and I just don't have

12   the time to go through all of those.

13            So what -- so if you can get all of that done in the

14   next three weeks, that would be very good.  Where are we?

15   Today is the 19th.  So we're talking about August 9th.

16            MR. OLSEN:  Okay.

17            THE COURT:  Okay.  Good.

18            MR. OLSEN:  Your Honor, that isn't all of the issues

19   with respect to item 4.  I think --

20            THE COURT:  Oh, okay.  What else -- right.

21            MR. OLSEN:  We should probably talk about -- and

22   Ms. Daly can disagree, but I don't think she will.  With

23   respect to the PR --

24            THE COURT:  Well, let me just see whether Ms. Daly

25   and Mr. Stern have anything to say about the three-week period
```

 1    and this process that I've proposed.

 2             MR. STERN:  Your Honor, I don't have any issue -- we

 3    don't have any issue with the three weeks.  The process makes

 4    sense.  But I just would like a little bit of time to digest.

 5    You gave a very thorough ruling orally.  And you know, I just

 6    would like a little time to digest it.  I can't think of

 7    anything instinctively or off the top of my that is jumping

 8    out at me about it.  But we appreciate the thoroughness that

 9    the Court -- with which the Court conducted this evaluation.

10             And within the next three weeks, but certainly sooner

11    if there are any issues with the process described, we'll be

12    sure to let the Court know.  And Ms. Daly may have -- you

13    know, she may have thoughts from having heard this that I

14    didn't have, so.

15             THE COURT:  And let me add one thing that looking

16    back at my notes, the factors for the functional equivalent

17    that I had -- that I was reviewing when I was discussing the

18    Copper Litigation actually come from the Bieter case,

19    B-i-e-t-e-r, which the Copper Litigation court relied upon.

20    And that's B-i-e-t-e-r, 16 F.3d 929.

21             MR. STERN:  Your Honor, one thing that does jump --

22    thank you.  One thing that does jump out to me in -- to the

23    extent you've already reviewed 60 documents and have made a

24    decision on 40 of them, that they are not privileged --

25             THE COURT:  Or made a decision on all 20 of them -- I

1      mean, all 60 of them.

2              MR. STERN:  Right.

3              THE COURT:  Twenty of them were I think were

4      legitimately withheld as privileged.

5              MR. STERN:  Sure.  I'm curious about whether we can

6      now have those 40 since that would not require another review

7      by anybody since -- because we haven't seen any of these

8      documents.

9              THE COURT:  Right.

10             MR. STERN:  And the fact that 17 out of the 20 that

11     were privileged came from VNA, I may have some thoughts about

12     the division of payment to a special master.  But

13     notwithstanding any of that, you know, can we get the 40

14     immediately that have been submitted to the Court that Your

15     Honor has ruled are not privileged or protected in another

16     way?

17             THE COURT:  Sure.  I don't have any problem with

18     that.

19             MR. STERN:  Thank you.

20             THE COURT:  I'll just need to put it in an orderly

21     non scribbled fashion.

22             MR. STERN:  Understood.

23             THE COURT:  So we'll get it to you.

24             MR. STERN:  No problem.  Thank you.

25             THE COURT:  I mean, I'll get the list to Mr. Olsen

1    and he'll produce the documents to you.

2              MR. STERN:  Okay.  Thank you.

3              MS. DALY:  Your Honor --

4              MR. OLSEN:  So the only thing I was going to say is

5    with respect to this plaintiffs' fourth amended RP topic and

6    the PR discovery topic, and I take the privilege issue is

7    going to take some further time as you've just outlined.  But

8    other than that, I think we all agree based on the meet and

9    confer yesterday that there is no additional data or

10   information that plaintiffs are looking for with respect to

11   these issues.

12             And on the May 17 conference, you had suggested that

13   time had come for plaintiffs to demonstrate what they think

14   they've learned from these months and months and months of

15   discovery.  And whether there's anything they think is here

16   with respect to targeting jurors.  And what the Court should

17   do about it if they think so.

18             Obviously you've heard from me before.  I have a

19   fundamentally different view.  And I think all of this

20   discovery has demonstrated that not only was the Detroit News

21   article wrong, but there was absolutely no targeting.

22             But given that, I think we're in the same place with

23   respect to there are no outstanding document or data issues

24   with respect to this issue except for the PR stuff, which we

25   will proceed as you just directed, I think it's time for you

1    to set a deadline for Mr. Stern and Ms. Daly to get you

2    whatever their expert affidavit or whatever they want to

3    submit that outlines what their findings are.  Because this

4    should be over in terms of this PR discovery endeavor.

5          And I don't know if you want to hear about

6    Ms. Flotteron's deposition today.  That's another Actum

7    deponent that Mr. Stern has noticed up.  Now she doesn't have

8    any firsthand knowledge about the Flint Water Crisis.  Her

9    role was to watch the trial on Zoom and compose Tweets that

10   were posted to the Flint Facts Twitter account.

11         And Mr. McKeon was already deposed about those

12   issues.  And that deposition often strayed into a debate or an

13   argument about the merits of what was in the Tweets

14   substantively and what should or should not have been said,

15   which obviously doesn't have anything to do with whether or

16   not there was any targeting here.

17         So we don't think this should keep going absent what

18   you directed in May, which is plaintiffs' counsel showing or

19   making a showing as to what they've learned here so that you

20   can evaluate whether this should go any farther.

21         MR. STERN:  May I respond, Your Honor?

22         THE COURT:  Yes.

23         MR. STERN:  I always appreciate Mr. Olsen's advocacy.

24   I disagree with everything that he just said.

25         I disagree with the characterization of what Your

1    Honor said at the last hearing.  I disagree with his

2    description of what a witness that he doesn't represent may

3    say or what her knowledge is.  They don't have standing under

4    the law to object to this deposition.

5          We've met and conferred with her attorney who appears

6    willing to produce her for a deposition under certain caveats

7    and scope of the deposition.  I have a completely different

8    reading of having taken Mr. McKeon's deposition about what

9    this witness will testify about.

10         And the Twitter issue and the Dynamic ads issue and

11   all of those issues, while they are interrelated, they are not

12   exclusive of one another.

13         Your Honor asked during the trial if any of the

14   lawyers at trial knew about that Twitter account.  You asked

15   right in front of me.  I raised it.  It was very spontaneous.

16   And every one of them said no.  And yet we found out during

17   the deposition of Mr. McKeon that there were lawyers from at

18   least Mayer Brown who were integrally involved in providing

19   information to Actum to help produce the Tweets that were

20   being put out during the trial.

21         Mr. McKeon was a supervisor.  He was essentially the

22   manager of the team.  But he didn't remember a single Tweet

23   that he had composed himself or where the information had come

24   from.  And what we will ultimately be seeking as a result of

25   all of this primarily is prospective relief.

1          Mr. Leopold and Mr. Novak have a trial starting in
2    February along with Veolia.  To the extent that there was
3    anything that happened during the first bellwether trial that
4    the Court may find to not have been appropriate, it shouldn't
5    happen again in the next trial and it shouldn't happen in the
6    trial after that.
7          Notwithstanding that, we need some time -- they just
8    produced this morning the final tranche of documents that our
9    expert asked for with regard to doing a full accounting and
10   evaluation of what happened with the Dynamic ads.
11         Literally three hours ago, we got the production,
12   which is password protected, and we immediately sent it to
13   him.  So to say the time has come for us to show our cards and
14   to turn over our hand, maybe.  Probably.  But we should at
15   least have, first, the opportunity to review the most new
16   tranche of documents that just came our way this morning with
17   that regard.
18         Your Honor's had the affidavit of their expert for
19   two months now and have not seen anything yet from our expert.
20   So we'd like the opportunity for him to look at those
21   documents.  We would like to provide a declaration or an
22   affidavit from him to the extent he thinks that anything was
23   done was actually done inappropriately or with the purpose of
24   targeting jurors or the public at large.
25         So if three weeks was enough time to review the

```
1    issues associated with the privilege log, we'd ask for the
2    same amount of time for our expert to at least review the new
3    documents that came in.  We're happy to at that point in time
4    provide Your Honor with a report from him or an affidavit from
5    him to the extent that he has an opinion that differs from
6    Veolia's expert's opinion.
7              Again, I've never once said in one of these hearings,
8    in writing, anywhere, that Veolia tried to manipulate jurors
9    and the trial was subverted by that process.  I read an
10   article that I had no role in from the Detroit News that was
11   well --
12             THE COURT:  I understand.
13             MR. STERN:  So that's why we are with that.  So those
14   are two issues.  There's the Twitter issue and then there's
15   the Dynamic ads issue.
16             Now, if I may, there is an interplay between the
17   Twitter account and Dynamic ads.  And so they are obviously
18   related.  But for the next trial, if there are lawyers
19   participating in a Twitter account that's providing
20   information to the public that's false, that may be something
21   that we seek the Court's intervention on.  If there's a
22   Dynamic ads campaign that's either related to or independent
23   from --
24             THE COURT:  Okay.
25             MR. STERN:  Yeah.
```

```
 1              THE COURT:  Good.

 2              MR. LEOPOLD:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. LEOPOLD:  I don't mean to weigh into all of this

 5      because I know it's been primarily the personal injury case,

 6      bellwether case that Mr. Stern tried along with the

 7      defendants.  But I must say that what Mr. Stern said a moment

 8      ago --

 9              THE COURT:  I don't know -- okay.

10              MR. LEOPOLD:  I'm sorry?

11              THE COURT:  When you said the personal injury, you

12      mean -- I understood but --

13              MR. LEOPOLD:  The bellwether individual cases --

14              THE COURT:  Yeah.

15              MR. LEOPOLD:  -- that he tried where these issues,

16      you know, arose.  But what Mr. Stern said I think is very

17      important that moving forward for the next trials, not only

18      the information that has been discussed here today but just

19      looking still to this day, you know, they have these websites

20      up trying to hit the community that are extremely misleading

21      and are misquoting you, others.  I just think these are issues

22      that have to be addressed.

23              We're going to have to address them with the jury to

24      make sure that none of the jurors look at these websites that

25      are so misleading about, you know, lawyers -- bad lawyers in
```

1    this case and stealing the client's monies.  It's just very

2    bad things.  We have to address them at some point in time.

3              THE COURT:  Well, the only way that I address things

4    is when a motion is brought to me.  When an issue is

5    identified by a lawyer through a formal process of either

6    getting it on an agenda.  But ideally, I can't just in -- writ

7    large I can't just say, okay, everybody say nice things about

8    everybody.  I can't do that.  So what --

9              MR. LEOPOLD:  No.  We're past that stage, Your Honor.

10   But I do think we can raise it with a motion.  But all of

11   these issues are intertwined.

12             THE COURT:  Of course they are.

13             MR. LEOPOLD:  And they've been talked about for

14   months.

15             THE COURT:  But bring to my attention what are the

16   communications, who's making them, when are they -- where are

17   they, when are they.  Just tell me more.  That's all I'm

18   asking you to do.

19             MR. OLSEN:  Your Honor, I don't think we -- I agree

20   with Mr. Stern.  There's no reason we need to debate these

21   issues.  All I was asking for is what you were asking for in

22   May.

23             THE COURT:  Right.

24             MR. OLSEN:  Which he suggested he will do.

25             THE COURT:  Exactly.

```
 1              MR. OLSEN:  Which is if we're getting an expert
 2    affidavit or a statement or whatever, let's get it.  That's
 3    all I'm saying.
 4              THE COURT:  Good.
 5              MR. STERN:  So if I may?  What I anticipate doing,
 6    Your Honor, is providing that affidavit and I believe it would
 7    be followed with a motion to the -- I don't know what the
 8    affidavit's going to say.
 9              THE COURT:  Right.
10              MR. STERN:  So I can't tell you that I'm seeking
11    relief if nothing happened.  But I'd like to have the
12    opportunity to work with the expert to get his opinion.  If
13    there is an opinion that supports anything from that article
14    or anything that we believe now may have happened, that we
15    then have the opportunity to seek relief from the court,
16    primarily prospectively and perhaps retroactively depending on
17    what he says.
18              But again, I'm operating under the assumption that
19    everything that has happened has been above board and with the
20    hope that our expert comes to me and says nothing happened
21    here.  This was a wild goose chase.  You shouldn't have gone
22    on it.  I'm sorry you had to pay me money.  I'm glad I had the
23    opportunity to review it, but nothing happened.  Nothing would
24    make me happier than to hear that.  I swear to -- I swear on
25    everything holy.
```

```
 1            THE COURT:  Good.  Okay.  So what we'll do, this is a
 2   good plan then.  In three weeks on this issue, Mr. Stern and
 3   Ms. Daly will provide a summary of what your discovery has
 4   shown so far with respect to the Dynamic search ad, alleged
 5   campaign, Twitter and all of those issues.  If there is
 6   something you think you still need and anything that your
 7   expert can say so far that would convince me that this is
 8   worth continuing to pursue.
 9            And then if you have a motion, because you now have
10   an expert who can say something, I don't know, is that enough
11   time for your expert -- for you to draft your motion?
12            MR. STERN:  I think we probably need at least two
13   weeks once we get the report from our expert.
14            THE COURT:  Yeah.
15            MR. STERN:  And it may be that we can meet and confer
16   with Veolia and tell them what the report says and they may
17   agree to the relief that we would ultimately seek in a motion
18   and there might not be a need for a motion.
19            THE COURT:  Yeah.  Okay.
20            MR. STERN:  And with regard to Ms. Flotteron's
21   deposition, I firmly believe that it's necessary.  I don't
22   think Veolia has standing.  Her lawyer seems willing to
23   produce her.  It's a very limited scope.  And it's probably
24   the last deposition that I will have to take or we will have
25   to take related to the Twitter issue.
```

1        Because as you might recall, we were first told that

2   it was Pierre Farcot in France.  And then we were told that it

3   wasn't him.  And then we were told that it mate may have been

4   someone named Jennifer, and it wasn't that person.

5        So now we know exactly who sat at a computer and on

6   their phone and typed these Tweets.  No one that we have

7   talked to yet has done that.  This is probably the last

8   deponent that we would have to take to get to the bottom of

9   the Twitter account, which is part and parcel with what we

10  might ask for relief for going forward.

11       And obviously if her attorney wants to move to quash

12  the --

13       THE COURT:  And when is her deposition scheduled for?

14       MR. STERN:  It's August 5, I think.  Melanie, is that

15  right?

16       MS. DALY:  That's close.  August 8th and 9th now.

17       MR. STERN:  August 8th, yeah.

18       THE COURT:  Okay.  And I got an email from Ms. Devine

19  related to this.  Mr. Olsen, are you addressing it?

20       MR. OLSEN:  I'm not sure what the email is.  All I

21  know is we had a brief communication with her lawyer when they

22  were evaluating whether or not to move to quash that

23  deposition.  I don't know if they will or they won't.  This is

24  beyond the pale in terms of cumulative of all these issues

25  we've been dealing with for months and months and months.  I

```
 1    certainly wouldn't want this to be an excuse to delay the
 2    process you just outlined for getting a submission on what
 3    plaintiffs think they found here, if anything.  And if --
 4           THE COURT:  You're the first person CC'd on the
 5    email.
 6           MR. OLSEN:  Oh, I just don't know which email you're
 7    talking about.
 8           THE COURT:  Oh, okay.  I'm talking about Ms. Devine's
 9    email to Leslie Calhoun trying to get me to address it.
10           MR. OLSEN:  Where Ms. Devine suggested that that
11    shouldn't go forward.  I've already articulated that position
12    today.
13           THE COURT:  Okay.
14           MR. OLSEN:  I don't know if Actum's counsel or -- she
15    doesn't work at Actum anymore.  Whether her counsel's going to
16    move to quash or not.  I don't think absent the process you
17    just described, I would think see what Mr. Stern's expert and
18    Mr. Stern and Ms. Daly have to say and then you can evaluate
19    whether this dep is necessary.
20           MR. STERN:  Except the problem is --
21           THE COURT:  If Flotteron -- wait, how do we say her
22    name?
23           MR. STERN:  Flotteron.
24           THE COURT:  Flotteron.  If Flotteron isn't moving to
25    quash the subpoena for the deposition, let's just get it done.
```

```
 1    Then in three weeks we're going to find out whether we go any

 2    further with this subject.  And then that will be that.

 3              MR. STERN:  Thank you, Judge.

 4              THE COURT:  And Mr. Leopold, if on behalf of class

 5    plaintiffs you want to file -- make a filing or make a

 6    recommendation regarding media leading up to or statements

 7    leading up to the trial or during the trial, this next

 8    three-week period would be a good time for you to get that in

 9    as well unless something comes to your attention after that.

10              MR. LEOPOLD:  I appreciate that, Your Honor.  It is a

11    little bit -- as you can appreciate, a little bit different

12    dealing with the class issues because communicating with class

13    members is different than others.  But we will look at that

14    issue and perhaps file a motion.

15              THE COURT:  Yeah, it's different in terms of

16    plaintiffs' responsibility.  But I think the defendants, do

17    they -- they have the same --

18              MR. LEOPOLD:  Can't communicate with the class

19    members, Your Honor.

20              THE COURT:  No.  Of course not.  But they can -- they

21    can communicate in the world about --

22              MR. LEOPOLD:  Yeah.  That's --

23              THE COURT:  -- the existence of their company or

24    something like that.

25              MR. LEOPOLD:  Certainly, yes.  But I understand what
```

1    you're saying.  I think we're on the same wavelength.  What

2    they say, so long as it's hopefully accurate and appropriate.

3    What I see thus far has been a little bit out of the box.  But

4    we'll address the issue.

5              THE COURT:  Okay.

6              MR. LEOPOLD:  There's a lot of cases dealing with

7    these issues on class matters.

8              THE COURT:  Good.  Good.  Okay.

9              I did get an email regarding I think the July 25 slot

10   for a discovery conference regarding Veolia's response to

11   plaintiffs' fifth request for production of documents and

12   accompanying privilege assertions.

13             MR. STERN:  We have not yet conferred about it.

14             THE COURT:  Oh.

15             MR. STERN:  It wouldn't be right for you to talk now

16   -- for us -- obviously you should talk about whatever you

17   want.  But I don't think there's been an opportunity for us to

18   confer about it.

19             This ruling today may actually have implications on

20   those objections that we've now, you know, raised with Veolia.

21   So we're committed to continuing to work with them in light of

22   the Court's ruling and even prior to the Court's ruling to see

23   if there's a way that we can resolve it.

24             And we can let the Court know prior to -- I guess

25   it's a week from -- I guess it's a week from now.  But we have

1   not yet heard back from them regarding our communications

2   about the -- our perceived insufficiencies in their most

3   recent privilege log.

4           THE COURT:  Can you let us know before Monday?  I'm

5   just trying to schedule.

6           MR. STERN:  We're happy to let you know.  I would

7   just ask that if it's possible for the Veolia counsel to get

8   back with us, you know, sometime before noon Monday for a meet

9   and confer so we can make a determination about what the

10  position is there, then we'd be able to let the Court know.

11  But as of now, we believe the ball is in the Veolia's

12  defendant's court, so to speak.

13          MR. OLSEN:  That's fine, Your Honor.

14          THE COURT:  Okay.  Thank you.  All right.

15          Well, thanks very much.  And I'm not sure if I'll see

16  you on the 25th.  But the next conference is when, Leslie?

17  It's not on a Wednesday I think.

18          MR. STERN:  I think it's Tuesday.  The 25th is a

19  Tuesday if that's what you're referring to.

20          THE COURT:  Yeah, that one.  But what's the next

21  August?

22          THE CLERK:  Oh, we still are looking at the calendar

23  for August.

24          THE COURT:  What was that Leslie?

25          THE CLERK:  I said we need to still look at the

1    calendar.

2             THE COURT:  Oh, no wonder I can't find it.  Okay.

3    Good.  We'll do that.

4             Thank you everyone.  Take care.

5                     (Proceedings Concluded)

6                 -          -          -

7

8              CERTIFICATE OF OFFICIAL COURT REPORTER

9        I, Jeseca C. Eddington, Federal Official Court

10   Reporter, do hereby certify the foregoing 50 pages are a true

11   and correct transcript of the above entitled proceedings.

12   /s/ JESECA C. EDDINGTON____              07/25/2023
     Jeseca C. Eddington, RDR, RMR, CRR, FCRR        Date
13

14

15

16

17

18

19

20

21

22

23

24

25