# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF MICHIGAN

3                         SOUTHERN DIVISION

4    _____

5    In re FLINT WATER CASES

6                         Civil Action No. 5:16-cv-10444-JEL-MKM

7                         (consolidated)

8    _____

9

10

11

12   Pages 1 - 123

13

14

15

16        THE VIDEOTAPED DEPOSITION OF JACE W. CONNOR

17        Taken via Zoom

18        Commencing at 10:03 a.m.

19        Tuesday, December 13, 2022

20        Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR

21

22

23

24

1    APPEARANCES:

2    MR. COREY M. STERN

3    LEVY KONIGSBERG, LLP

4    800 Third Avenue, 11th Floor

5    New York, New York 10022

6    (212) 605-6200

7    cstern@levylaw.com

8          On behalf of the Individual Plaintiffs.

9

10   MR. TORY FINLEY

11   Faegre, Drinker, Biddle & Reath, LLP

12   Main Street, Suite 5400

13   Dallas, Texas  75201

14   (469) 357-2535

15   tory.finley@faegredrinker.com

16          Appearing on behalf of Defendants

17          Leo A. Daly Company and

18          Lockwood, Andrews & Newnam, Inc.

19

20

21

22

23

24

1    MS. ALAINA DEVINE

2    MS. KRISTIN DUPRE

3    Campbell Conroy & O'Neil, P.C.

4    1 Constitution Wharf, Suite 310

5    Boston, Massachusetts 02129

6    (617) 241-3037

7    adevine@Campbell-trial-lawyers.com

8    -and-

9    MR. KELLY B. KRAMER

10   MR. WILLIAM SINNOTT

11   Mayer Brown, LLP

12   1999 K Street, NW

13   Washington, DC 20006-1101

14   (202) 263-3000

15   -and-

16   MS. EMILIE VASSEUR

17   Mayer Brown, LLP

18   10 Avenue Hoche

19   Paris, France  75008

20   33 1 53 53 39 91

21        On behalf of Defendants Veolia Water North

22        America Operating Services, LLC, Veolia North

23        America, LLC, and Veolia North America, Inc.

24

1    ALSO PRESENT:  Maddie Cowell, videographer.

2                  Anthony Finizio, VNA in-house counsel.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    INDEX TO EXAMINATIONS

2

3    WITNESS                                    PAGE

4    JACE W. CONNOR

5      EXAMINATION BY MR. STERN                   8

6      EXAMINATION BY MR. KRAMER                 110

7      FURTHER EXAMINATION BY MR. STERN          121

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2       DEPOSITION EXHIBIT                                   PAGE

3        Exhibit No. 1     The Detroit News Article        84

4

5        (Exhibit attached.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Tuesday, December 13, 2022

2    About 10:03 a.m.

3                         *  *  *

4              VIDEOGRAPHER:  We are now on the

5         record.  My name is Maddie Cowell.  I'm a

6         videographer for Golkow Litigation

7         Services.  Today's date is December 13th,

8         2020, and the time is 10:03 a.m.  This

9         remote video deposition is being held in

10        the matter of Flint Water Cases,

11        CA No. 5:16-cv-10444-JEL-MKM consolidated.

12        The deponent is Jace W. Connor.

13             All parties to this deposition are

14        appearing remotely and have agreed to the

15        witness being sworn in remotely.  Due to

16        the nature of remote reporting, please

17        pause briefly before speaking to ensure

18        all parties are heard completely.  The

19        counsel will be noted on the stenographic

20        record.  The court reporter is Trisha

21        Cameron and will now swear in witness.

22                         *  *  *

23

24

1                    JACE W. CONNOR,

2                having been first duly sworn,

3              was examined and testified as follows:

4                        *   *   *

5                       EXAMINATION

6   BY MR. STERN:

7   Q.   Mr. Connor, my name is Corey Stern.  I'll be taking

8        your deposition today.  I represent a number of

9        individual plaintiffs.  When you just said I do to

10       the oath, it was very hard for me to hear you.  You

11       sounded like you were distant.  Would you mind just

12       saying your name for the record and where you're

13       presently sitting so that we can see if we can hear

14       you okay?

15  A.   Sure.  My name is Jace Connor, and I'm currently

16       sitting in the office -- Campbell's law offices.

17  Q.   Okay.  It's -- I don't know if anybody else is having

18       a hard time hearing, but you're very low.  I don't

19       know if y'all are together.  I don't --

20  A.   Yeah.  I mean, is anybody else having any issues

21       hearing me?

22            MR. FINLEY:  I think I'm hearing him

23       just fine.  I don't know if you could

24       scoot a little closer to the screen, but I

1          think I'm hearing you okay.

2                    THE WITNESS:  Okay.  Well, I can try

3          to --

4     BY MR. STERN:

5     Q.   We'll get started.  That's fine.  How are you

6          currently employed, sir?

7     A.   For Veolia North America.

8     Q.   In what capacity?

9     A.   I serve as the director of digital engagement.

10    Q.   And for how long have you served as the director of

11         digital engagement for Veolia North America?

12    A.   Five years.

13    Q.   Prior to serving in that role beginning five years

14         ago, did you work for Veolia North America in another

15         capacity?

16    A.   I did not.

17    Q.   So your first job with Veolia North America was as

18         director of digital engagement or whatever you just

19         said your title was.  Is that correct?

20    A.   Correct.

21    Q.   Have you ever been promoted during the five years

22         that you've worked for Veolia?

23    A.   No.

24    Q.   You presently report to Carrie Griffiths.  Is that

1     correct?

2              MR. KRAMER:  Object to form.  Go

3          ahead.

4              THE WITNESS:  That's correct.

5     BY MR. STERN:

6     Q.   And what is Ms. Griffiths' role with Veolia North

7          America?

8     A.   She serves as the chief communications officer.

9     Q.   Did she hire you directly?

10    A.   She did not.

11    Q.   Prior to reporting to Carrie Griffiths, was there

12         another individual at Veolia North America to whom

13         you reported?

14    A.   I did.

15    Q.   And who was that?

16    A.   Harrison Lee.

17    Q.   I'm sorry.  I could not hear his last name.  Could

18         you please say that again and spell his last name.

19    A.   Sure.  It's Lee, L-e-e.

20    Q.   And was Mr. Lee in the same role when you began

21         reporting to him as Ms. Griffiths is in today?

22    A.   He was not.

23    Q.   Okay.  What was his role at the time when you

24         reported to him?

1    A.   Senior vice president marketing.

2    Q.   And at what point in time did you stop reporting to

3         Mr. Lee and begin reporting to Ms. Griffiths?

4    A.   Roughly January or February of 2019.

5    Q.   And if you know, could you tell us what the reason

6         was why you began reporting to Ms. Griffiths instead

7         of Mr. Lee?

8    A.   There was a rework.  His position was modified,

9         changed.  Marketing was moved to underneath the

10        business units.  Communications maintained its core

11        function as corporate communications.  Prior to that,

12        there was a blend called marcom of marketing and

13        communications working together.

14             MR. STERN:  I am -- I'm not trying to

15             give anybody a hard time.  I'm having a

16             really hard time hearing the witness.

17             Kelly or -- you know, I understand that it

18             may be able to be taken down and reported,

19             but I'm just not hearing you well.  Is

20             there a microphone that you could just

21             either get a little closer to or move the

22             computer to?

23             MR. KRAMER:  He's right next to the

24             phone, like one foot.

1           MR. STERN:  Okay.  Well, I'm having a

2           hard time hearing him.  I don't -- yeah.

3           I'm not there present, but you are.  So

4           you probably can't notice it, Kelly.  But

5           I'll just keep going.

6    BY MR. STERN:

7    Q.   Did Mr. Lee stay on with Veolia North America after

8         you began reporting to Ms. Griffiths?

9    A.   No.

10   Q.   Was his -- was his employment with the company -- did

11        he cease to be employed by the company at that point

12        in time when you began reporting to Ms. Griffiths?

13   A.   Yes.

14   Q.   Was there anything specific about Mr. Lee that caused

15        his leaving the company, or was it simply a matter of

16        "reorg," as you put it a few minutes ago?

17           MR. KRAMER:  Objection.  Go ahead.

18           THE WITNESS:  Yeah.  I don't know.

19   BY MR. STERN:

20   Q.   Okay.  Prior to your employment with Veolia North

21        America five years ago, how were you employed?

22   A.   I worked for a tech start-up.

23   Q.   What company was that?

24   A.   G360.

1   Q.   And what was the impetus for you leaving G360 and

2        joining Veolia North America?

3   A.   Well, it was a start-up so funding comes and goes.  I

4        was looking for more stable opportunities.

5   Q.   Do you recall the date upon which you began working

6        for Veolia North America?

7   A.   October 14th, 2017.

8   Q.   At the time you began working for Veolia North

9        America on October 14th, 2017, what role did you

10       have, if any, as it relates to litigation against

11       Veolia North America arising out of the Flint water

12       crisis?

13  A.   None.

14  Q.   I took the deposition of Ms. Griffiths about --

15       sometime in the last 30 days, and she indicated that

16       you were the individual at Veolia North America who,

17       in her words, had the keys to the Google

18       advertisement account.  Is that true?

19  A.   That is.

20  Q.   Okay.  So when I asked you beginning in October 2017

21       what role you played, if any, regarding litigation

22       associated with the Flint water crisis and you said

23       none, does that mean that at that time, you were not

24       dealing with the Google advertisement campaign, or

1          does it mean that you do not consider the Google

2          advertisement campaign to be a part of your role when

3          it comes to litigation arising out of the Flint water

4          crisis?

5                    MR. KRAMER:  Objection.  Go ahead, if

6               you understand it.

7                    THE WITNESS:  Yeah.  I don't consider

8               it part of litigation.

9     BY MR. STERN:

10    Q.   Okay.  What do you consider it?

11                   MR. KRAMER:  Objection.  Go ahead.

12                   MR. STERN:  What's the objection?

13              Just so I can -- if we could stop for a

14              minute.  Kelly, just so I don't repeat any

15              issues that you're having with my

16              questions, what was your objection to that

17              question?

18                   MR. KRAMER:  I just didn't understand

19              the question.

20                   MR. STERN:  Madam court reporter, can

21              you read back the question.

22                   (Reporter read back.)

23                   MR. STERN:  Right.  And then he

24              responded.  Ma'am, if you don't mind

1          reading his answer to that question and

2          then the next question.

3               (Reporter read back.)

4               MR. STERN:  Okay.  I'm not sure what

5          the form objection was.

6    BY MR. STERN:

7    Q.   But did you understand that question, sir?  What do

8         you consider it?

9    A.   I consider it digital communications.

10   Q.   You consider it digital communications unrelated to

11        the litigation associated with the Flint water

12        crisis.  Is that correct?

13   A.   Perhaps my definition of litigation is different than

14        yours, but I'm not a lawyer.

15   Q.   So you consider -- explain again what you consider

16        it, the Google Ad campaign.

17   A.   I said I would classify it as digital communication.

18   Q.   Digital communication with whom?

19   A.   Customers, stakeholders, general public.

20   Q.   How many customers, if you know, does Veolia have in

21        the state of Michigan?

22   A.   I don't know the actual number.

23   Q.   Do you have any idea, any estimate of the number?  I

24        know you just said I don't know the actual number.

1      Do you have some sense of how many customers Veolia

2      has in Michigan?

3  A.  I know we have operations in most every state. I'd

4      have to look at an operations map to be able to give

5      you an exact number.

6  Q.  Customers you mentioned were part of the digital

7      communications. You also said stakeholders. Which

8      stakeholders? Who are the stakeholders?

9  A.  Well, a stakeholder can be a customer, right? Could

10      be a -- mostly a customer, existing customer. It

11      could be, you know, business decisionmakers,

12      prospects, things of that sort.

13  Q.  And then you mentioned the general public, correct?

14  A.  Correct.

15  Q.  When you refer to the general public, are you

16      referring to the general public in the world, the

17      general public in the United States, the general

18      public in Michigan? What are you referring to when

19      you use the term the general public?

20  A.  Well, in my capacity, my engagements are for the US

21      and Canada. So my general public is referencing

22      North America.

23  Q.  When you began working in October 2017 for Veolia

24      North America, was the website VeoliaFlintFacts.com

1     already established?

2   A.   It was.

3   Q.   Do you have any role today whatsoever in updating the

4        content of that website?

5   A.   I do not.

6   Q.   Okay.  At any point in time since you began your

7        employment with Veolia North America had you played

8        any role whatsoever in updating that website and the

9        content associated with that website?

10  A.   I did.

11  Q.   At what point in time was the first point in time in

12       which you had some role in updating the content of

13       VeoliaFlintFacts.com?

14  A.   2019 roughly around say November 2019.

15  Q.   How did it come to be that two years after you began

16       working for Veolia North America you began having a

17       role in updating the content associated with

18       VeoliaFlintFacts.com?

19  A.   Well, I guess I feel like that's two questions.

20       First part, in the two years since starting, there

21       was no need for me to update the site.  The second

22       question, the reason why I updated the site in 2019

23       was in response to an article that came out by The

24       Guardian in collaboration with MLive.

1   Q.   What was the substance of the article you're

2        referring to from 2019?

3   A.   I don't recall the exact specifics of the article.

4        There was -- I think I was aware that there was a

5        reporter comment.  We were -- you know, I was aware

6        that there was an article pending.  There was

7        disagreements, I believe, in terms of how that

8        article was framed.  We provided information to them.

9        They opted to not utilize that information.  And so I

10       updated the additional information on the Flint facts

11       website to ensure that our position was understood.

12  Q.   Did that article have to do with Rob Nicholas writing

13       certain things in his e-mails about lead appearing to

14       be a problem in Flint?

15  A.   There was an excerpt of that e-mail, yes, that I saw

16       and posted.

17  Q.   Were you ever -- were you ever provided with the

18       actual e-mail to look at?

19  A.   No.

20  Q.   Who specifically asked you to update the website

21       Veolia Flint Facts in or around November 2019?

22  A.   Carrie Griffiths.

23  Q.   Physically how did you go about updating the website

24       and its content?

1   A.   I'm sorry.  Did you say physically?

2   Q.   Yeah.  Technically, physically, how did you go about

3        actually doing it?

4   A.   Well, the site at that point had been what I

5        considered outdated from a technology perspective in

6        terms of accessibility.  So I redesigned the entire

7        VeoliaFlintFacts.com website to make it more

8        accessible, user friendly, in line with the standards

9        of usability, in addition to updating new content

10       that was relevant to the period of time.  I then

11       built that site statically.  So it was not integrated

12       into a content management system.  It was just an

13       easier deployment.  And then those files were

14       deployed to a web server on Amazon web servers.

15  Q.   When you -- when you say those files were deployed to

16       an Amazon web server, what exactly do you mean?

17  A.   Well, the website in order for it to be accessible

18       has to be hosted somewhere.  So Amazon web servers

19       provides a hosting environment.

20  Q.   Did you need log-in information in order to redesign

21       the website and update its content?

22  A.   No.  You need credentials to be able to transfer the

23       files to the server.  It's called FTP, file transfer

24       protocol.  You need to be at -- you need to have

1    credentials to access that server.

2  Q.  Prior to November 2019, did you have credentials to

3    update the server?

4  A.  Update the site?  Yes.

5  Q.  Okay.  Did you -- when did you receive those

6    credentials?

7  A.  During my onboarding in 2017 coming to the

8    organization I was replacing my predecessor, the

9    former director digital communications Matt Demo.  We

10   had a two-day knowledge transfer in which there was a

11   transfer of key accounts, account access, account

12   information, etcetera, so that I would be able to

13   continue to manage, maintain, develop as part of the

14   role and responsibilities of that position.

15  Q.  In addition to the credentials that you were provided

16   at that time, were you provided credentials or log-in

17   information for anything else associated with the

18   Flint water crisis?

19  A.  The Google Ad words account.

20  Q.  Just to make sure that I fully understand what your

21   testimony just was.  During a two-day period when

22   Mr. Demo or Demo was leaving the company and you were

23   coming into the company relieving his role and you

24   were taking on the role, you were provided with

1       credentials associated with both the website as well

2       as -- and by website, I mean VeoliaFlintFacts.com.

3       As well as the Google Ad words account.  Is that

4       correct?

5               MR. KRAMER:  Object to form.  Go

6           ahead.

7               THE WITNESS:  That is correct.

8   BY MR. STERN:

9   Q.  Okay.  When you were provided with the credentials

10      for the website, were you provided with any

11      background information as to when the website was

12      created or why?

13  A.  Yeah.  I was given a -- what I would consider a high

14      level overview of the material.

15  Q.  And you were provided a high level overview by whom?

16  A.  By Matt Demo.

17  Q.  Anybody else associated with that high level overview

18      that you were provided regarding the website?

19  A.  No.

20  Q.  Were you provided with the same type of overview

21      regarding the ad words campaign?

22  A.  I was.

23  Q.  Let's talk about the website first.  Please describe

24      the high level overview that you were told of by

1      Mr. Demo at that point in time.

2  A.  He asked if I was aware of the Flint Michigan water

3      crisis.  I acknowledged that I had some limited

4      understanding of it based off of media.  He explained

5      to me that Veolia North America had a limited

6      engagement regarding testing for a chemical compound

7      within the water, and because of that association,

8      we've been brought into litigation through the Flint

9      water crisis.

10         The purpose of the Veolia Flint Facts

11     website was to provide the facts from Veolia North

12     America's position in terms of exactly our role and

13     what we did do and what we did not do.  Likewise, the

14     ad words campaign existed to sponsor the visibility

15     of that site for people that would search for that

16     topic of interest.

17  Q.  In 2019, in November of 2019, when you for the first

18     time, in your words, updated new content and

19     redesigned the standards of usability associated with

20     the website, was that a static project that began and

21     ended at a particular time, or was it something that

22     continued over a period of time?

23         MR. KRAMER:  Objection.  Go ahead.

24         THE WITNESS:  It was very brief.  I

1          completed the task within, I would say,

2          four business days.

3    BY MR. STERN:

4    Q.    After that period of time, after the completion of

5          that task, was there ever another point in time when

6          you played any role whatsoever in either updating the

7          content of or redesigning the VeoliaFlintFacts.com

8          website?

9    A.    No.

10   Q.    Are you aware that at some point in time after that

11         project ended for you, someone added content to the

12         Veolia Flint Facts website?

13   A.    I am.

14   Q.    Okay.  From the point in time when your individual

15         project associated with that website ended, and I'm

16         talking about the four-day period when you completed

17         that task, from that point in time until today, who

18         are all of the individuals that you're aware of who

19         have played any role in updating the content of the

20         VeoliaFlintFacts.com website?

21   A.    Unfortunately, I don't have names.  I can only tell

22         you that I am aware of the third-party agency that

23         oversees the site.  It's called Reputation Squad,

24         based out of Paris, France.

1    Q.   How did you come to learn of the existence of

2         Reputation Squad out of Paris, France?

3    A.   So shortly after the redesign and response to The

4         Guardian article, I would say probably a few months

5         later in the new year I was notified that Reputation

6         Squad would be taking over the management,

7         maintenance, operations of Veolia Flint Facts

8         website.  The request came through from Reputation

9         Squad requesting access to the hosting server.  That

10        request then went silent as we endured the pandemic.

11        I heard nothing more of it until somewhere in 2022

12        when an e-mail -- another e-mail came through saying

13        okay, we, you know, we'd like to move forward on

14        this.  At which point, I transferred access,

15        initially transferred -- we transferred access over

16        to Reputation Squad so they could deploy their own

17        website.  And then for various logistical reasons, we

18        modified the DNS, which is a domain name server, to

19        point to their servers in Europe where they were able

20        to host their site locally.

21   Q.   Do you have documentation of both the request that

22        was made in 2020 as well as the communications

23        associated with that transfer in 2022?

24   A.   I mean, I would imagine that the e-mails exist.

1      We're talking years and tens of thousands of e-mails.

2      So I don't have them, you know, at the top of my

3      inbox, but I could try to locate them.

4              MR. STERN:  Mr. Kramer, I'm going to

5          make a formal request for all documents as

6          between Mr. Connors and anyone associated

7          with Reputation Squad related to the

8          transfer of credentials and/or access

9          and/or DNS servers related to the

10         VeoliaFlintFacts.com website.

11   BY MR. STERN:

12   Q.   Why, as far as you know, did Reputation Squad take

13       over that function?

14              MR. KRAMER:  Objection.  Go ahead, if

15         you know.

16              THE WITNESS:  Yeah.  I mean, I'd have

17         to speculate.  All I can say is that I run

18         a pretty lean team.  Resource allocation

19         is an issue.  If they wanted to do

20         anything more with it, you know, I'm

21         supporting 20 -- over 24 other digital

22         properties and social media channels.  So

23         it was kind of more of a relief for me.  I

24         didn't necessarily question why.

1    BY MR. STERN:

2    Q.   In 2019, you mentioned that the reason you were

3         tasked with updating the website was because of an

4         article that had run or was going to run by The

5         Guardian.  You recall telling me that?

6    A.   I do.

7    Q.   Okay.  At any point in time between November 2019 and

8         2022 when you actually transferred access to the

9         website to Reputation Squad, were any updates,

10        modifications, changes, or new content added to the

11        website?

12   A.   I'm sorry.  Can you -- maybe you could repeat that.

13        Are you asking if I modified anything during that

14        time?

15   Q.   Let's start with that.  Did you modify or make any

16        changes to the website during that time?

17   A.   No.

18   Q.   Okay.  Did anybody else have access to the website in

19        a way that would allow them to make modifications to

20        it during that time?

21   A.   Well, between 2019 -- or 2020 and '22 roughly, the

22        Reputation Squad had performed a comprehensive

23        redesign and redeployment of the Veolia Flint Facts

24        website.

1    Q.   Why was it in 2022, as far as you know -- or was

2         there an event in 2022 that you're aware of that

3         caused the Reputation Squad to reach out to you to

4         formalize that transfer?

5              MR. KRAMER:  Objection.  Go ahead, if

6         you know.

7              THE WITNESS:  Yeah.  I don't -- I

8         don't -- I kind of disengaged once the

9         transfer -- once I handed it off, I kind

10         of disengaged from the whole thing

11         because, like I said, I have -- I have a

12         lot of other responsibilities.

13   BY MR. STERN:

14   Q.   Have you had the opportunity to look since Reputation

15        Squad took over that website at the website?

16   A.   I did -- I did review the website once they had

17        announced or confirmed the transfer of ownership and

18        that it was deployed.  Of course I reviewed it to

19        ensure brand compliance.

20   Q.   In compliance with what?

21   A.   Well, one of the roles or responsibilities is brand

22        governance, ensuring that the brand is -- and it's

23        more of a visual brand governance, ensuring that

24        there's consistency in the representation of the

1    brand, making sure the logo is properly used, that

2    there's clear space, making sure the typography is

3    used, proper swatch palettes, etcetera.  So it's

4    really more of an aesthetic brand governance to

5    ensure consistency across all channels and platforms

6    as well as print material.

7  Q.  Ms. Griffiths told us during her deposition that

8    beginning in 2022, there were two significant events

9    that were affecting Veolia North America at the same

10   time, and I'll represent to you she explained that

11   one of those events was the merger with Suez and the

12   other event was the trial that was taking place in

13   Ann Arbor, Michigan.  Do you agree with what I just

14   described as her testimony?

15            MR. KRAMER:  Objection.

16            THE WITNESS:  Answer?

17            MR. KRAMER:  Yeah, you can answer.

18       Go ahead.

19            THE WITNESS:  So, one, I was very

20       much aware of the rebranding because I was

21       tasked with a large portion of that, of

22       overseeing and managing the physical

23       rebranding of another organization, not

24       just across digital but across physical

1          assets.  I can ensure you it was a very,

2          very large lift and occupied the majority

3          of my time and my team's.  In terms of a

4          pending trial, I wouldn't say that I was

5          very aware or engaged in what was or was

6          not going on regarding that matter.

7     BY MR. STERN:

8     Q.   Were you aware that a trial was either about to or,

9          in fact, taking place around that time?

10    A.   I would say yes, I was aware that there was a pending

11         trial.  In terms of dates, times, what the context of

12         it was, I had no specifics and really in all honesty

13         no interest.

14    Q.   Do you recall that you were aware that a trial,

15         despite your lack of interest in it, that a trial

16         involving VNA was taking place around the same time

17         that the rebranding that you were engaged in was

18         taking place?

19    A.   Yeah, I would say I was aware that there was.

20    Q.   In addition -- do you still have access, by the way,

21         or credentials associated with the website?

22    A.   I do not.

23    Q.   At what point in time did you cease to maintain

24         credentials associated with the website?

1          MR. KRAMER:  Objection.

2          THE WITNESS:  During the transfer of

3       ownership to Reputation Squad in early

4       2022.

5   BY MR. STERN:

6   Q.   So between 2020 when you were first contacted by

7        someone about the transfer to Reputation Squad and

8        when the transfer was actually completed in early

9        2022, you still maintained credentials to access the

10       website, correct?

11  A.   Correct.

12  Q.   At any point in time during that period between 2020

13       when you were first informed of Reputation Squad and

14       2022 when the full transfer had been completed, did

15       anyone, as far as you know, update the content of

16       that website?

17  A.   No.

18  Q.   Are you aware of whether anyone began updating the

19       content of that website once the transfer occurred in

20       2022 to Reputation Squad?

21  A.   I believe I already answered that.  Once

22       Reputation -- Reputation Squad redesigned the site on

23       their own, you know, outside of my purview.  And once

24       that site was ready for deployment, they requested

1    the transfer of ownership, and they deployed their

2    redesign.  So I don't know what their activities were

3    during that time.  All I know is the end result was a

4    new site that they now managed and maintained.

5  Q.  When is the last time you looked at the website?

6  A.  I can't recall.  Probably I haven't looked at it

7    since it was deployed to ensure that there was proper

8    brand governance in place in terms of, you know, the

9    treatment of the brand and probably haven't looked at

10   it since.

11  Q.  So in preparation for your deposition today, you

12   didn't take any time to review any content that had

13   been added to or was contained on the website.  Is

14   that correct?

15  A.  That's correct.

16  Q.  Okay.  Mr. Kramer is on the call, as is Ms. Dupre, as

17   is someone named Emily Vasseur.  I hope I didn't

18   destroy her name.  There's a number of people on

19   this -- on this deposition.  There's some 508 phone

20   numbers.  That may be y'all.  I'm not sure who that

21   is.

22        In preparation for this deposition, without

23   telling me exactly or anything about what you

24   discussed, did you meet with lawyers for VNA?

1                MR. KRAMER:  It's a yes, no question.

2                THE WITNESS:  Yes.

3   BY MR. STERN:

4   Q.  Okay.  Did you meet with lawyers associated with

5      Veolia Environnement SE?

6                MR. KRAMER:  Again, it's a yes, no,

7        if you know.

8                THE WITNESS:  I don't know what

9        subsidiary or division you're referencing.

10   BY MR. STERN:

11   Q.  Who did you meet with?

12                MR. KRAMER:  Just names.  No content.

13                THE WITNESS:  I honestly don't -- I

14        don't know everybody's full names.  So I

15        mean, I can -- you might have to piece

16        together who's who.  But, you know, Kelly,

17        Alaina, Kristin, William, and Brian.  I

18        might be missing some people.  I'm not

19        sure.

20   BY MR. STERN:

21   Q.  Do you still have access to the Google Ad campaign?

22   A.  I do.

23   Q.  And you first gained access to that back in 2017

24      during the transfer between Mr. Demo and yourself

1      regarding credentials and passwords, etcetera.  Is

2      that correct?

3   A.  Correct.

4   Q.  Beginning in November 2017, what has been your role

5      in conjunction with the Google advertisement

6      campaigns?

7   A.  Very limited.  Essentially maintaining the account

8      status to ensure that it's active.  That's primarily

9      it.  During the transfer of ownership and a high

10     level overview, the guidance given was that this was

11     a set it and forget it kind of a scenario.  It didn't

12     require intervention.  It didn't require any

13     optimizations or any maintenance to it, other than to

14     ensure that it was -- was active, and if necessary or

15     requested to report on metrics or engagement, provide

16     that.

17  Q.  Who made the -- beginning in November 2017 when you

18     were first given access to that account, who made the

19     decisions associated with budgets associated with the

20     advertising campaign?

21          MR. KRAMER:  Objection.  But go

22       ahead.

23          THE WITNESS:  I don't know.  I wasn't

24       there.

1    BY MR. STERN:

2    Q.   Was there anybody else at that time that you're aware

3         of who had access to the credentials associated with

4         the campaign?

5    A.   I don't know who else may or may not have had it.  I

6         know that after I took ownership, nobody else had it

7         except for, you know, one other team member.

8    Q.   And who was that?

9              MR. KRAMER:  I'm sorry.  Just to

10             interrupt here.  I think that there's just

11             a miscommunication about time periods

12             here.

13             MR. STERN:  I can't hear you, Kelly.

14             MR. KRAMER:  I'm sorry.  I think

15             there's just a miscommunication about time

16             periods here.  Just so I think Mr. Stern

17             is asking about the period when you were

18             here, and your answer was I don't know, I

19             wasn't here.  So I just wanted to clarify

20             that.

21             I don't know if it makes any

22             difference, Corey.  You can continue.  But

23             I just noticed being in the room that

24             there seems to be -- you guys were talking

1          past each other.  But go ahead.

2               MR. STERN:  Respectfully, I don't

3          think we were.

4     BY MR. STERN:

5     Q.   I was asking you, sir, that beginning in 2017 when

6          you were first given access to the advertisement

7          campaign through Google, was there anybody else who

8          also had access?  Do you -- can you answer that

9          question just so we're all clear?

10    A.   I mean, I would say years later.  I don't know the

11         exact date.  But I provided shared access with

12         William McFadden, he's a digital marketing manager,

13         for the purposes of other marketing activities,

14         not -- and he was not -- and he was well aware and

15         trained, because I trained him, that he was not to

16         touch the Flint facts campaign.

17    Q.   What is the Flint facts campaign?

18    A.   That's the Google Ad words account you were

19         referencing.

20    Q.   Who was responsible for selecting the words as part

21         of that campaign?

22    A.   I don't know.

23    Q.   You just know that you were not responsible, correct?

24    A.   Correct.

```
1    Q.  At any point in time, did you make any selections in

2        terms of keywords utilized for that campaign?

3    A.  No.

4    Q.  At any point in time, were you made aware of any

5        changes to keywords associated with that campaign?

6    A.  No.

7    Q.  Who was in charge of setting the budget for that

8        campaign?

9    A.  I don't know.  I think that's where the confusion

10       was.  I wasn't there at the time.  So I don't know

11       who set it.

12   Q.  Sitting here today, do you still have access to that

13       campaign?

14   A.  I do.  Sole access.

15   Q.  So Mr. McFadden no longer has access?

16   A.  Correct.

17   Q.  Are you aware of at what point in time VNA began

18       utilizing dynamic ads associated with the Google

19       advertisement campaign?

20   A.  That account was already configured with both static

21       and dynamic ads when I inherited it.

22   Q.  Are you familiar with how dynamic advertisements

23       through Google work?

24   A.  I am.
```

1    Q.   Okay.  Could you please explain based on your

2         experience how they work.

3    A.   Well, there's a couple of options.  Which one would

4         you like me to go over?

5    Q.   All of them.

6    A.   Okay.  Well, essentially there's an option for a

7         dynamic ad in which our ad words account is

8         configured where you can predefine variables, such as

9         titles, descriptions, landing page, and it can be a

10        couple of different titles and a couple of different

11        descriptions in the same ad.  And the dynamic nature

12        of it is that Google can change those titles and

13        descriptions that you provide based off of relevance

14        to the user's search to make it more relevant to

15        their query.  However, there's a lot of -- there's a

16        lot of prerequisites to it in terms of, you know, the

17        ad being approved for run based off that.

18             Another way of doing a dynamic ad is to

19        allow Google, which is very common, when starting

20        accounts is that provide Google with a landing page,

21        have Google index that page.  Based off of the

22        content of that page, Google will make

23        recommendations as to how you may or may not want to

24        position that relative to key terms.  However, you're

1    still responsible for creating the ad content in

2    terms of title and description.  And it goes through

3    the approval process.  Google does not make up stuff

4    for you or content for you, and they don't allow you

5    to misalign your content with a destination page.

6    Their goal is to provide the most relevant and

7    authoritative result relative to a user's search.

8    Q.   Any other ways besides those two that you just

9         described?

10   A.   That's pretty much the two -- those are the two

11        options when you're configuring an ad words account.

12   Q.   Are you aware of which or both of those two options

13        VNA undertook when it set up its dynamic

14        advertisement portion of the ad campaign?

15   A.   Yeah.  Our current configuration is to prefill a

16        dynamic ad with up to two options on title and

17        description and allow Google to determine which title

18        or description is more relevant to the user's

19        specific search based off of the key terms that are

20        being optimized for.

21   Q.   And optimization will change on Google's end as

22        content is added or removed or updated on the end of

23        the website, correct?

24   A.   No.

1    Q.   Okay.

2              MR. STERN:  What's that, sir?

3              MR. KRAMER:  I said objection.  But

4         go ahead.

5    BY MR. STERN:

6    Q.   So your testimony is that the updating of content has

7         no bearing whatsoever on the success or failure of a

8         dynamic ads campaign?

9    A.   Well, it does in a sense that if you don't have the

10        parity that's required between the ad and the

11        destination content, your ad will be disapproved or

12        suspended.

13   Q.   So then can you explain how updating the Veolia Flint

14        Facts website would bear on a dynamic ads campaign

15        run by VNA?

16             MR. KRAMER:  Objection.  Misstates

17        the testimony.  But you can go ahead and

18        explain, if you can.

19             THE WITNESS:  It wouldn't unless you

20        went in to modify the parameters of your

21        ad to pair with the content that was

22        modified on the website.  A brief example

23        I could give you is that as a byproduct of

24        the website being updated by Reputation

1          Squad, several ads were disallowed on the

2          ad words platform because that destination

3          page, for instance, was no longer

4          reachable because the URL structure was

5          modified.  So it requires going into the

6          ad words account and achieving parity

7          between that destination landing page.

8    BY MR. STERN:

9    Q.   How did you find out about what you just described in

10        terms of the URL and the lack of compatibility?

11   A.   Well, one of my functions is to provide management,

12        maintenance, and reporting.  So I'm regularly looking

13        at all of our assets and properties.  I get

14        notifications and alerts if something is wrong with

15        one of them.  So just in I would say my normal daily

16        activities at some point I recognized and saw that

17        certain ads had been taken offline due to activities

18        of Reputation Squad.

19   Q.   Did you track information related to the ad words

20        account about locations where ads were being viewed?

21   A.   Did I track?

22   Q.   Yeah.

23   A.   No, I didn't track.  I -- maybe I'm just a little

24        confused about what you're getting at.  But, you

1      know, do I have the capacity or the ability to report

2      on the patterns of the traffic?  Yes.  Do I track

3      those patterns or locations?  No.

4   Q.  Have you ever been asked to provide information about

5      those patterns to anybody within either VNA or any

6      Veolia entity?

7   A.  Well, I was asked once in five years.  This was

8      around the 2019 time period of updating in response

9      to The Guardian.  I was asked to provide insight into

10     the Google Ads to which I generated a metrics report

11     and provided a brief analysis on the activity of the

12     ads platform.

13  Q.  Do you receive -- do you routinely receive

14     information from Google regarding demographics of

15     individuals who have been reached by way of the

16     campaign?

17  A.  No.

18  Q.  Do you routinely receive information from Google

19     related to geographic location of individuals who

20     have been reached by way of the campaign?

21  A.  No.  Just to maybe clarify a few things.  The only

22     notification I get from Google is my ads are running

23     or my ads are not running due to, for instance,

24     funding.  Maybe a credit card has been declined.  So

1      I will get notified that your ads are no longer

2      running.  I have to go in and repair that funding.

3      Other than that, it is up to me to have to go in and

4      review the metrics.  Google doesn't send

5      notifications about your ad performance via e-mail.

6      You have to go into the platform, and you actually

7      have to work through those processes.

8   Q.  Have you ever been asked by anybody from VNA to go in

9      and go through those processes to provide information

10     about the success or failure of the campaign?

11          MR. KRAMER:  To be clear, that's a

12          question about have you ever been asked by

13          anyone other than the lawyers in

14          connection with the deposition.

15          THE WITNESS:  Just one reporting

16          incident that I just acknowledged in 2019.

17  BY MR. STERN:

18  Q.  And as far as you know, there's not one other person

19     at Veolia North America who has access to the Google

20     advertisement campaign?

21  A.  Currently, no.

22  Q.  Okay.  Is the only other person that you're aware of

23     since you began having access to the campaign who

24     also had access, is that the only other person is

1       William McFadden?

2   A.  I would say that's correct.  We've -- we have

3       multiple ad groups and campaigns through that

4       account, but I'm very protective of that because I

5       don't want anybody modifying.  You require a special

6       skill set to be able to access and work within those

7       campaigns.

8   Q.  Does anyone from Reputation Squad have access to the

9       Google campaign?

10  A.  No.

11  Q.  Does anyone in France have access to the Google

12      campaign?

13  A.  No.  And I have two-factor authentication set on it.

14      So, for instance, if somebody was to get the

15      credentials and attempt to access it, I would get a

16      notification on my phone that there's an attempted

17      access.  They would have to provide a token to

18      authenticate that access.

19  Q.  You became aware at some point -- did you become

20      aware at some point in time of the Twitter account

21      @VNAFlintFacts?

22  A.  I did.

23  Q.  When did you become aware of that account?

24  A.  I don't have the exact date, but I would say probably

1    roughly sometime this past summer.

2    Q.   Do you recall how you became aware of that account?

3    A.   So on my team I have my social media manager, he's

4         now the manager of digital engagement, Kevin O'Brien.

5         One of his tasks he's assigned with is overseeing,

6         monitoring, and managing our social media presence

7         across North America.  We have, which is an industry

8         standard, especially for an organization our size,

9         tools that we use for social listening, brand

10        mentions.  Part of that is to understand, for

11        instance, if somebody is representing the brand and

12        the organization in an unauthorized way.  So from

13        time to time we may get -- the platforms and these

14        tools may alert that the name is being used on

15        another social media channel, is this yours, is it

16        not.

17             So the Veolia Flint Facts website was -- it

18        triggered an alert from one of our tools, and my

19        social media manager brought it to my attention that

20        there was a Flint facts website -- a Flint facts

21        Twitter handle that was created and the question is

22        is this legitimate or was it not.

23    Q.   I just want to make sure I'm clear.  You said the

24        website triggered an alert.  Were you referring to

1       the Twitter account triggered an alert?

2   A.  Not the website.  The tools that -- toolsets that we

3       use.  I believe in this case it would be Factiva, or

4       it could have been ZeroFox, another brand protection

5       tool that most industries use to monitor the usage of

6       their brand.

7   Q.  I'm just trying to understand because to me your

8       testimony wasn't clear.  It may have been clear to

9       everybody else.

10          What exactly triggered the alert in the --

11      what exactly triggered the alert that you're

12      referring to?

13          MR. KRAMER:  Objection.  Go ahead.

14          THE WITNESS:  The use of the Veolia

15      Flint Facts Twitter handle name.

16  BY MR. STERN:

17  Q.  Okay.  Do you have documentation associated with that

18      alert?

19          MR. KRAMER:  Objection.

20          THE WITNESS:  I do not.  It was a

21      conversation amongst my team.

22  BY MR. STERN:

23  Q.  Well, how -- who was it at your team that brought to

24      your attention the alert?

1              MR. KRAMER:  Objection.  I don't

2         think he said there was an alert, Corey.

3              MR. STERN:  Yeah.  That was his -- I

4         didn't use that.  He used that word.

5              THE WITNESS:  I did use that word.

6         Alert, notification.  The tool ZeroFox or

7         Factiva will send a notification and alert

8         saying this name is being used, your brand

9         name is being used, is this legitimate, is

10        it not.

11             If it's a legitimate source, you

12        would add an exception.  You would

13        acknowledge within that platform this is

14        an accepted use, and it would move on.

15             And the point of these platforms is

16        so that you don't have infringement on

17        your trademark, on your brand name, or you

18        just don't have somebody creating a

19        fishing site saying, hey, I can accept

20        payments from, you know, Veolia water.

21   BY MR. STERN:

22   Q.   Understood.  I'm just trying to technically

23        understand -- I don't want to use a word that's not

24        appropriate.  You used the word alert.  I mean

1    nothing by it other than it was the word you used.

2    Technically how is that alert transmitted to VNA?

3  A.  Well, in this case, it would have gone to Kevin

4    O'Brien who manages and maintains our social media

5    properties.  He has an account with one of these

6    toolsets, whether it's ZeroFox or Factiva, and he

7    would have received the e-mail notification or alert,

8    however we want to frame it, saying that there's new

9    activity that we either are going to allow or

10   disallow.

11 Q.  Have you ever seen the actual e-mail or notification

12   in writing that Mr. O'Brien would have received

13   regarding the Twitter handle @VNAFlintFacts.com?

14        MR. KRAMER:  Objection.  Go ahead.

15        THE WITNESS:  I don't recall if he

16        forwarded me an e-mail of it or if -- I

17        believe my recollection was it was just a

18        conversation of, you know, it may have

19        been along the lines of ZeroFox says we

20        have a new Twitter handle.  Are you aware

21        of it?  Is this legitimate?  It was a very

22        brief conversation just internally to say

23        who owns this and is this something that

24        we need to intervene in or that somebody

1        else approved.

2             MR. KRAMER:  Corey, we're at the top

3        of the hour.  Is this a good spot for five

4        minutes?

5             MR. STERN:  Sure.

6             MR. KRAMER:  Thanks.

7             VIDEOGRAPHER:  The time is 11:00 a.m.

8        We're off the record.

9             (Recess taken.)

10            VIDEOGRAPHER:  The time is 11:08.  We

11        are back on the record.

12   BY MR. STERN:

13   Q.   Did Mr. O'Brien have any -- did Mr. O'Brien have any

14        role, as far as you know, regarding the content of

15        the VNA Flint facts Twitter handle?

16   A.   No.

17   Q.   When you discussed the alert or notification with

18        Mr. O'Brien, please describe that conversation to the

19        best of your recollection.

20   A.   So there's a new Twitter handle, Veolia Flint Facts.

21        Is that authorized, legitimate?  Do we know who's

22        running it or using it?  I think that was the extent

23        of the question.

24   Q.   And so Mr. O'Brien came to you and asked you that

1       question.  Is that correct?

2    A.  Yeah.  I think it was more of an FYI and, you know,

3        just wanting an acknowledgment that the source was

4        what we -- you know, that the source was a legitimate

5        source.

6    Q.  Prior to him coming to you with either the question

7        or the FYI, were you aware of the Twitter handle

8        @VNAFlintFacts?

9    A.  I was not.  And based off of our conversation, he was

10       not either.

11   Q.  Okay.  When exactly was that conversation?

12   A.  It was -- it was a blip in an entire year.  It was

13       sometime in the summertime.  It was literally a

14       two-minute conversation.

15   Q.  Okay.  What did you do in response to the question or

16       FYI from Mr. O'Brien regarding the Twitter handle?

17   A.  Just validate the source.  You know, this was an

18       authorized representative or an entity of Veolia, was

19       outside our purview.  At this point, it was approved

20       by Europe, or HQ we call them, headquarters.  So

21       validate that it was an authorized use and move on to

22       our regular scheduled program.

23   Q.  So VNA through you and Mr. O'Brien validated that

24       this Twitter account was an authorized use of the

1        company.  Is that correct?

2     A.  Correct.

3     Q.  How did you go about validating or how did he go

4        about validating the authorized use?

5     A.  Just an internal discussion.  You know, is this

6        authorized?  Are we aware of it?  Yes, it's

7        authorized.  Yes, we're aware of it.  Okay.

8     Q.  You mentioned that prior to him coming to you, you

9        were unaware of the Twitter account's existence, and

10       I believe you also said that your perception was that

11       Mr. O'Brien was unaware of the Twitter account's

12       existence until he got the alert.  How did you come

13       to learn that it was an authorized use?

14    A.  You know, there's information -- there's supplemental

15       information that's contained within the

16       notifications.  I think that there was some

17       identifying information in that, or maybe -- or it

18       was a question of other colleagues.  I can't recall.

19       I can't recall.  It was a very, very brief

20       conversation.

21    Q.  Do you recall conversations with anyone besides

22       Mr. O'Brien about the Twitter handle @VNAFlintFacts

23       around the time that he told you he had received a

24       notification or an alert?

1    A.    I may have had a conversation with Carrie Griffiths,

2          my manager.  We meet regularly.  I may have, you

3          know, on the topics of the day may have said, you

4          know, are you aware of this.  Yes, you're aware of

5          it.  Okay.  That's what we thought.

6                 MR. KRAMER:  Mr. Stern is looking for

7             facts.  You're saying things like I may

8             have, I may have, I may have.  That's not

9             that helpful.

10                THE WITNESS:  Okay.  Well, I

11            apologize.

12                MR. KRAMER:  Please be precise.  If

13            you don't know, please tell him you don't

14            know.

15   BY MR. STERN:

16   Q.    When you learned about the Twitter handle

17         @VNAFlintFacts, did you take the opportunity to

18         review that account?

19   A.    I did not.

20   Q.    At any point in time did you review any of the

21         content associated with the @VNAFlintFacts Twitter

22         handle?

23   A.    No.

24   Q.    Sitting here today, you've never looked at a single

1      tweet from that Twitter handle?

2  A.   100 percent no.

3  Q.   Did Mr. O'Brien express to you anything about the

4       content contained through the Twitter handle

5       @VNAFlintFacts at any point in time?

6  A.   No.

7  Q.   Did you come to learn -- you mentioned validating the

8       source earlier as part of your discussion related to

9       the account.  Did you ever determine the source of

10      the @VNAFlintFacts Twitter handle?

11 A.   What do you mean validate?

12 Q.   Okay.  So I asked you earlier what occurred once you

13      received a notification or an alert, and you said

14      that we needed to validate the source for purposes of

15      ensuring that the brand was using -- being used

16      correctly.  That was your -- something about your --

17 A.   Yeah.  Correct.  So first validation was that this

18      was a legitimate account through an authorized --

19      authorized by Veolia group or HQ.

20 Q.   Right.  And I'm asking you how did you determine that

21      it was an authorized use.

22 A.   I don't recall.  I don't recall if it was somebody

23      verbally telling me or other.

24 Q.   But you received that information from somewhere,

1          correct?

2     A.   Correct.  Otherwise, if I hadn't received that

3          information, we may have flagged it as an

4          illegitimate account and moved to take it down.

5     Q.   Was it common for you to receive information through

6          one of these tracking systems that provided either an

7          alert or a notification to determine the

8          authentication of a user?

9     A.   Very common.  I would -- yes, very common.

10    Q.   Okay.  Did you ever come to learn who the individual

11         was that was actually operating the

12         @VNAFlintFacts.com -- I'm sorry.  The @VNAFlintFacts

13         Twitter handle?

14              MR. KRAMER:  Objection.  Go ahead.

15              THE WITNESS:  I did.

16   BY MR. STERN:

17    Q.   Okay.  And who was it?

18    A.   Can we be -- I don't know if -- I want to be clear

19         and specific.  Are you asking about the account owner

20         versus the -- who is pushing out tweets on the

21         account because it kind of -- they could be two

22         different people.  So I don't know which one you're

23         asking me to answer.

24    Q.   Let's start with the account owner.  Do you know who

1    owns the account @VNAFlintFacts?

2    A.   I don't know who the official owner is, if it's

3         with -- whose e-mail it is that created the account.

4         I don't.

5    Q.   So in the notification that you received from the

6         monitoring company, you were not provided with any

7         information about who owned the account?

8              MR. KRAMER:  Objection.  You can

9         answer, if you know.

10             THE WITNESS:  I don't.  I didn't look

11        at the notification.

12   BY MR. STERN:

13   Q.   Okay.  Did you ever come to learn who the individual

14        or individuals are or were who were pushing out

15        tweets from that account?

16   A.   Yeah.  My understanding was it was Actum.

17   Q.   Come again?

18   A.   Actum.

19   Q.   Can you spell that, please.

20   A.   A-c-t-u-m.

21   Q.   What is Actum?

22   A.   Public relations firm.

23   Q.   So it was not, to your understanding, Pierre Farcot

24        who was tweeting from that account?

1   A.   No.

2   Q.   When did you learn it was Actum?

3   A.   Fairly recently.  I don't know the exact date, but I

4        would say recently.  It was --

5   Q.   Who was -- I'm sorry.  I interrupted you.  You tailed

6        off.

7   A.   That's okay.  It was fairly recently.  It was around

8        the time of The Detroit News article.

9   Q.   So if Ms. Griffiths testified that she believed

10       Pierre Farcot was responsible for the Twitter

11       account, you have reason to believe that that

12       information is incorrect?

13            MR. KRAMER:  Objection.  But go

14        ahead.

15            THE WITNESS:  I do.

16  BY MR. STERN:

17  Q.   Okay.  Who told you that it was Actum that was

18       operating the VNA Flint Facts Twitter account?

19  A.   Actum.

20  Q.   How did that conversation come to occur?

21  A.   Detroit News article came out.  I was contacted by

22       some colleagues to have a discussion about it.  I

23       made the comment about, you know, tweeting from this

24       Veolia Flint Facts channel, to which a representative

1      of Actum said that was us.

2   Q.  Prior to that communication, had you ever worked with

3      Actum before?

4   A.  Directly, no.

5   Q.  Had you ever had any communication with Actum before

6      in your role with VNA?

7   A.  Limited.  I've been on meetings and calls in which

8      they were present.

9   Q.  Any of those meetings or calls related to the Flint

10     water crisis?

11  A.  No.

12  Q.  So VNA engages Actum for multiple projects routinely?

13  A.  I would say that's accurate.

14  Q.  Okay.  On what projects that you're aware of is Actum

15     working for Veolia?

16         MR. KRAMER:  Objection.  But go

17      ahead.

18         THE WITNESS:  I mean, mostly like,

19      you know, maybe media buy planning, you

20      know, around, for instance, the merger and

21      the rebranding.  I crossed some paths with

22      Actum during that.  Maybe special events,

23      leading up to special events.  I may have

24      crossed paths with them on calls

1             regarding, you know, a conference or

2             something of that sort.

3    BY MR. STERN:

4    Q.   Do you know when Actum first became involved in

5         working with VNA or Veolia as it relates to the Flint

6         water crisis?

7    A.   No, I don't.

8    Q.   Was Actum first -- was Actum engaged in working with

9         VNA or Veolia on the Flint water crisis project prior

10        to you becoming hired by VNA?

11   A.   I don't know that.

12   Q.   Was there a primary contact at either VNA or Veolia

13        who worked with Actum?

14   A.   I don't know.  Surely there's -- somebody has their

15        contact information.  I don't directly engage with

16        them.

17   Q.   Do you know who does directly engage with them from

18        VNA or Veolia?

19   A.   Carrie Griffiths.

20   Q.   Was Ms. Griffiths a part of the conversation after

21        The Detroit News article or around the time of the

22        subject Detroit News article that you mentioned when

23        you were informed that Actum had been operating the

24        subject Twitter account?

1   A.   She was not.  She was out of the country.

2   Q.   Where was she?

3   A.   France.

4   Q.   Are you aware of whether she was in France on

5        business or for pleasure?

6   A.   Business.

7   Q.   Do you find it odd that you recall that she was in

8        France around that time but she couldn't remember one

9        instance when she went to France to meet with anyone

10       from Veolia France?

11            MR. KRAMER:  Objection.

12            THE WITNESS:  I don't know what your

13          conversations with her were.

14   BY MR. STERN:

15   Q.   Did you have the opportunity to read her transcript

16        prior to this deposition from her deposition from a

17        few weeks ago?

18   A.   I have not.

19   Q.   What is your understanding of Actum's present role as

20        it pertains to VNA and the Flint water crisis?

21            MR. KRAMER:  Objection.  But go

22          ahead.

23            THE WITNESS:  I don't have a -- I

24          don't have insight into what their role

1               is.

2    BY MR. STERN:

3    Q.    Do you have any insight into what their role was

4          during the first trial that began on February 15th,

5          2022, and ended on August 11th, 2022?

6    A.    I don't.  I wasn't even aware they were involved in

7          this until recently.

8    Q.    And by recently, you mean at or around the time The

9          Detroit News published the article referencing VNA's

10         digital advertising campaign.  Is that correct?

11   A.    Correct.

12   Q.    Who was responsible for updating the

13         VeoliaFlintFacts.com website to include information

14         live from the courtroom during the trial?

15   A.    I don't know.

16   Q.    What was the relationship between Reputation Squad

17         and Actum during the trial?

18   A.    I don't know.

19   Q.    Who hired Actum on behalf of VNA?

20                 MR. KRAMER:  Objection.

21                 THE WITNESS:  I don't know.

22   BY MR. STERN:

23   Q.    What was Pierre Farcot's role in digital advertising

24         during the first trial?

1              MR. KRAMER:  Objection.  Go ahead.

2              THE WITNESS:  I don't know.

3    BY MR. STERN:

4    Q.   Was he the primary point of contact with Actum during

5         the trial?

6    A.   Again, I really don't know.

7    Q.   Do you have contact information for Pierre Farcot?

8              MR. KRAMER:  Objection.

9              THE WITNESS:  I do not.  Other than

10        e-mail.

11             (Reporter clarification.)

12   BY MR. STERN:

13   Q.   You said other than an e-mail?

14   A.   His work -- well, the previous work e-mail.  But my

15        understanding is he's no longer with the

16        organization.  So I don't have a way to contact him.

17   Q.   How did that become your understanding?

18             MR. KRAMER:  I'm going to direct you

19        not to refer to conversations with

20        attorneys.  But if you have any

21        independent understanding of that, you're

22        free to say.

23             THE WITNESS:  Well, I don't.  I mean,

24        I don't understand the -- no.

1    BY MR. STERN:

2    Q.   Have you ever had any direct communication with

3         Pierre Farcot?

4    A.   I have.

5    Q.   If you can, let us know what your recollection is of

6         the first communication you've ever had with Pierre

7         Farcot.

8              MR. KRAMER:  Objection.  But go

9         ahead.

10             THE WITNESS:  My recollection of my

11        first interaction with him would be in

12        2019.

13   BY MR. STERN:

14   Q.   When in 2019?

15             MR. KRAMER:  Objection.  Go ahead.

16             THE WITNESS:  During the -- during

17        The Guardian event in which I referenced.

18   BY MR. STERN:

19   Q.   What do you recall about the substance of that

20        conversation?

21             MR. KRAMER:  Objection.  Go ahead.

22             THE WITNESS:  I didn't have a

23        conversation with him.  He was present in

24        a meeting.

1    BY MR. STERN:

2    Q.   Okay.  What was the substance of the meeting?

3    A.   I mentioned earlier that was the only time I was

4         asked to provide any information or report in terms

5         of the Google Ad words account.  So I provided a

6         metrics analysis on the performance of that account

7         in which he was in the room.

8    Q.   Did Mr. Farcot make any requests of you during that

9         meeting?

10                   MR. KRAMER:  Objection.  Go ahead.

11                   THE WITNESS:  No.

12   BY MR. STERN:

13   Q.   What was his role during that meeting?

14                   MR. KRAMER:  Objection.  Go ahead.

15                   THE WITNESS:  I don't know.

16   BY MR. STERN:

17   Q.   Who else was present during that meeting?

18                   MR. KRAMER:  Objection.  Go ahead.

19                   THE WITNESS:  I don't know names or

20             titles.  My direct manager was there,

21             Carrie Griffiths was there.  I don't

22             recall who else was there.  I know, you

23             know, she was there.  I recall Pierre was

24             there, and I don't know who else was

1          there.

2     BY MR. STERN:

3     Q.   Why is it that you recall specifically that Pierre

4          was there at a meeting three years ago as you sit

5          here today but cannot recollect anybody else that was

6          there besides Ms. Griffiths?

7               MR. KRAMER:  Objection.  Go ahead.

8               THE WITNESS:  Because I never saw

9          anybody else in that room again.

10    BY MR. STERN:

11    Q.   But you did see Pierre again?

12               MR. KRAMER:  Objection.

13               THE WITNESS:   I have.

14    BY MR. STERN:

15    Q.   Okay.  Was that meeting in person, or was it via some

16         electronic platform?

17               MR. KRAMER:  Objection.

18               THE WITNESS:  In person.

19    BY MR. STERN:

20    Q.   Was that meeting in France, or was it in the United

21         States?

22               MR. KRAMER:  Objection.

23               THE WITNESS:  United States.

24

1    BY MR. STERN:

2    Q.   Did it take place in Boston or somewhere in

3         Massachusetts or somewhere else?

4              MR. KRAMER:  Objection.

5              THE WITNESS:  Boston.

6    BY MR. STERN:

7    Q.   Was it your understanding that Mr. Farcot attended

8         that meeting or was in the United States for the sole

9         purpose of attending that meeting?

10             MR. KRAMER:  Objection.

11             THE WITNESS:  I don't know.

12   BY MR. STERN:

13   Q.   If the first time you were in a meeting and recall

14        being in the presence of Mr. Farcot was that meeting

15        in 2019, could you tell us when the last time you

16        were in the presence of Mr. Farcot --

17             MR. KRAMER:  Objection.

18   BY MR. STERN:

19   Q.   -- whether it was in person or digitally?

20             MR. KRAMER:  Same objection.

21             THE WITNESS:  Yeah.  Virtual --

22        virtual meeting at the -- along the timing

23        of The Detroit News article.

24

1    BY MR. STERN:

2    Q.   What role did he play in that meeting?

3              MR. KRAMER:  Objection.

4              THE WITNESS:  I don't -- I don't know

5         how you would classify the role.

6    BY MR. STERN:

7    Q.   Okay.  Tell me what he said during that meeting.

8         What did he say during that meeting?

9              MR. KRAMER:  Objection.  Go ahead.

10             THE WITNESS:  The topic of the

11        conversation was regarding the article by

12        perspective or understanding of -- helping

13        to explain what was factual or not factual

14        about the article.

15   BY MR. STERN:

16   Q.   What specifically do you recall Mr. Farcot saying

17        during that meeting?

18             MR. KRAMER:  Objection.  Go ahead.

19             THE WITNESS:  I don't know if I could

20        quote somebody specifically.  I don't

21        recall specifically what he'd say.

22   BY MR. STERN:

23   Q.   Okay.  To the best of your ability, how did the

24        article seem to affect Mr. Farcot who you were on a

1      call with about the article?

2              MR. KRAMER:  Objection.

3              THE WITNESS:  I don't know how he was

4          feeling.  The conversation was very brief.

5          He was one of, you know, a handful of

6          people on the call and was commenting or

7          responding to certain portions of the

8          article.

9   BY MR. STERN:

10  Q.   Where does he work now, Mr. Farcot?

11             MR. KRAMER:  Objection.

12             THE WITNESS:  No idea.

13  BY MR. STERN:

14  Q.   Well, why is he no longer working for a Veolia

15       entity?

16             MR. KRAMER:  Objection.

17             THE WITNESS:  I have no idea.

18  BY MR. STERN:

19  Q.   Have there been any discussions amongst your team as

20       to why he's no longer employed by a Veolia entity?

21             MR. KRAMER:  Objection.

22             THE WITNESS:  No.

23  BY MR. STERN:

24  Q.   Have you had any conversations with Ms. Griffiths

1        about Pierre Farcot?

2                    MR. KRAMER:  Objection.

3                    THE WITNESS:  No.

4    BY MR. STERN:

5    Q.   Have you had any conversations with Ms. Griffiths

6         about this deposition?

7    A.   No.

8    Q.   Ms. Griffiths testified that -- sorry.  If you just

9         give me a moment, I'm just looking for a name.

10            Have you played any role whatsoever in the

11        placement of opinion editorials in publications

12        around the country related to Veolia's role in any

13        projects?

14                    MR. KRAMER:  Objection.

15                    THE WITNESS:  No.

16   BY MR. STERN:

17   Q.   Who is Sally Darling?

18                    MR. KRAMER:  Objection.

19                    THE WITNESS:  Communications manager.

20   BY MR. STERN:

21   Q.   Does she still work for VNA?

22   A.   Yes.

23   Q.   Is she a part of your team?

24   A.   No.  Well, no.  My team is digital engagement.  We're

1        a function of corporate communications.  But that's

2        my team.  Communications managers are part of also

3        corporate communications.  So I guess it depends on

4        how broad of an umbrella you want to --

5   Q.   She does not report to you, Ms. Darling?

6   A.   No.

7   Q.   She reports to Ms. Griffiths.  Is that correct?

8              MR. KRAMER:  Objection.  Go ahead.

9              THE WITNESS:  I don't -- I don't

10        believe so.

11  BY MR. STERN:

12  Q.   Okay.  Do you know who she reports to?

13             MR. KRAMER:  Objection.

14             THE WITNESS:  I don't.  There's --

15        no.

16  BY MR. STERN:

17  Q.   Do you know Matt Burgard?

18  A.   I do.

19  Q.   What is his role, as far as you know, for VNA?

20             MR. KRAMER:  Objection.

21             THE WITNESS:  He's also a manager of

22        communications.

23  BY MR. STERN:

24  Q.   Are you aware of who he reports to at VNA?

1                    MR. KRAMER:  Objection.

2                    THE WITNESS:  I can't recall.

3    BY MR. STERN:

4    Q.   Who is Rich Henna?

5                    MR. KRAMER:  Objection.

6                    THE WITNESS:  I'm sorry.  Could you

7            repeat the name.

8    BY MR. STERN:

9    Q.   I think it's Rich Henna or Henner or Hennin.

10                   MR. KRAMER:  Same objection.

11                   THE WITNESS:  Do you want me to

12           correct the name, or do you want me to

13           acknowledge I know him?

14   BY MR. STERN:

15   Q.   Do you know who I'm referring to?

16   A.   I think you're referring to Rich Henning.  Yes, I do.

17   Q.   Okay.  Thank you.  And who is Rich Henning?

18                   MR. KRAMER:  Objection.

19                   THE WITNESS:  Senior vice president

20           communications.  I believe -- I believe

21           that that also, though, was in the

22           regulated utilities division.  He's part

23           of the acquisition merger with Suez.

24

1    BY MR. STERN:

2    Q.   Is he involved in communications, as far as you know?

3              MR. KRAMER:  Objection.

4              THE WITNESS:  Yes.

5    BY MR. STERN:

6    Q.   Do you know what role he plays in the placement of

7         opinion editorials in publications either around the

8         United States or around the world?

9              MR. KRAMER:  Objection.

10             THE WITNESS:  I don't.

11             MR. KRAMER:  Just for the record, if

12        you give me just a pause --

13             THE WITNESS:  Sure.

14             MR. KRAMER:  -- so the court reporter

15        doesn't have us talking over each other.

16   BY MR. STERN:

17   Q.   I don't want to give you the wrong name.  But do you

18        know someone named Courtney Medlin?

19   A.   The last name doesn't sound familiar.  I know a

20        couple of Courtneys.

21   Q.   Is there a Courtney that reports to Ms. Griffiths who

22        works in communications who you're aware of?

23             MR. KRAMER:  Objection.

24             THE WITNESS:  Yes.

1   BY MR. STERN:

2   Q.   You said yes?

3   A.   Yes.  Courtney Medlin.  Yes.  Sorry.  I didn't

4        understand the name.

5   Q.   Medlin.  Okay.  Do you know what her role is, if any,

6        regarding VNA and the Flint water crisis?

7                MR. KRAMER:  Objection.

8                THE WITNESS:  I don't.

9   BY MR. STERN:

10  Q.   Do you know if anyone at VNA played a role in the

11       placement of any opinion editorials at or around the

12       time of The Detroit News article we discussed

13       earlier?

14               MR. KRAMER:  Objection.

15               THE WITNESS:  I don't.

16  BY MR. STERN:

17  Q.   During the conversation that you were present for

18       involving Pierre Farcot and Carrie Griffiths related

19       to The Detroit News article were any suggestions made

20       about the placement of an op-ed in any publications

21       in the United States in response to that article?

22               MR. KRAMER:  Objection.

23               THE WITNESS:  First of all, I didn't

24           have a meeting with Carrie and Pierre

```
 1              regarding The Detroit News article.  There

 2              was a -- during the 2019 Guardian article

 3              Pierre and Carrie were in the same room.

 4              During The Detroit News one, I didn't --

 5              they weren't both in the room.  I met

 6              separately with Pierre and some other

 7              colleagues.  This is the first time that

 8              I'm hearing anything about an opinion

 9              piece, to be honest.

10    BY MR. STERN:

11    Q.   Okay.  That's fair.  Do you know why Pierre Farcot

12         was present in the courtroom for a significant amount

13         of days during the trial?

14              MR. KRAMER:  Objection.

15              THE WITNESS:  I don't.

16    BY MR. STERN:

17    Q.   Have you ever traveled to France to meet with anyone

18         from the Veolia France entity?

19    A.   No.

20    Q.   Did you participate in routine meetings with

21         individuals associated with the Veolia France entity?

22              MR. KRAMER:  Objection.

23              THE WITNESS:  No.

24
```

1    BY MR. STERN:

2    Q.   Sorry.  I'm just looking for a document.

3              Was there discussion during your meeting

4         that occurred with regard to The Detroit News article

5         about the VNA Flint Facts Twitter handle?

6    A.   Sorry.  Was there a discussion about the Twitter

7         feed?

8    Q.   Yes.

9    A.   There was -- I wouldn't say there was a discussion.

10        I'd say I made a comment.

11   Q.   What comment did you make?

12   A.   I believe my comment was along the lines of it

13        appeared to me that there was a tweet that had gone

14        out that got the attention of the judge.  I didn't

15        have any context.  So I was just talking about, you

16        know, that I heard this, so that's what it appeared

17        to me had occurred.  That's when I had heard Actum

18        say, well, that was us.

19   Q.   Do you recall who from Actum said that was us?

20   A.   I don't recall names.  I mean, I would -- I could

21        shoot out a thought, but it may not be accurate so

22        I'd rather not.

23   Q.   Was it a man or a woman?

24   A.   A woman.

1   Q.   How many individuals from Actum were a part of that

2        conversation when someone said that was us?

3   A.   I believe it was two from Actum.

4   Q.   Okay.  And do you know the names of both of those

5        people?

6   A.   I don't.

7   Q.   Okay.  Do you have -- strike that.  Was the other

8        individual a man or a woman?

9   A.   From Actum?

10  Q.   Let me ask it a different way.  I just asked you if

11       the person who said "that was us" was a man or a

12       woman, and you said it was a woman.  I asked you how

13       many individuals that you recall from Actum were

14       present during that meeting, and you said two.

15            And so my question is, besides the woman

16       who said "that was us," was the other person from

17       Actum, to the best of your recollection, a man or a

18       woman?

19  A.   Man.

20  Q.   Did you receive a calendar invite to participate in

21       that meeting?

22  A.   It was ad hoc.  I believe the invite came through

23       chat.

24  Q.   What do you mean by came through chat?

1    A.    Our organization utilizes Google services.   Google

2          Gmail, Google Chat, Google Hangouts or Meets,

3          etcetera.   So all authorized users on the Veolia

4          network have access to e-mail and chat one another,

5          etcetera.

6    Q.    The two individuals who were present, the man and the

7          woman, during that meeting, the one that discussed

8          The Detroit News article where someone said "that was

9          us," do you know where they were located at the time

10         of the meeting?

11   A.    I don't.

12   Q.    Do you know if they were in the United States?

13   A.    They didn't have an accent.   So I don't believe they

14         were foreign nationals, if that's what you're asking.

15   Q.    Well, the reason I ask is there's individuals in the

16         context of this case that are located in France, and

17         we've already discussed Mr. Farcot.   And there's

18         other individuals that are located in the United

19         States, and there's a number of third-party vendors

20         that information has been discussed in various

21         depositions about public relations.   And so I'm just

22         trying to determine whether these individuals from

23         Actum were on US soil at the time of this discussion

24         or if they were somewhere in Europe or somewhere

1       else.

2   A.  I understand.  I don't know where their locations

3       were.

4   Q.  Prior to that discussion regarding The Detroit News

5       article, had you ever met either or both of the

6       individuals who you believe were working for Actum?

7   A.  I certainly haven't met them in person.  I may have

8       crossed paths or, you know, one or more may have been

9       on a previous meeting or, you know, different

10      meeting, as I mentioned earlier, in which I, you

11      know, was aware of who Actum was because they might

12      have been on a similar -- on the same call.

13  Q.  Do you know the first name of the woman who

14      participated in that call from Actum?

15  A.  I believe her name was Jennifer.

16  Q.  Do you recall the first name of the gentleman who was

17      on that call from Actum?

18  A.  I don't.

19  Q.  Did you have the sense or hear directly during that

20      call or at any other time that individuals from Actum

21      were present in the courtroom during the trial in

22      Ann Arbor?

23              MR. KRAMER:  Objection.

24              THE WITNESS:  No, I didn't have that

1           sense.

2    BY MR. STERN:

3    Q.   Did you have a sense or understand directly from

4         anyone on that call how information got from the

5         trial to Actum?

6                   MR. KRAMER:  Objection.

7                   THE WITNESS:  I don't.

8    BY MR. STERN:

9    Q.   In light of the meetings that you've been a part of

10        related to the Twitter account related to the various

11        articles that we've discussed, do you have an idea of

12        how the information would have gotten from someone

13        associated with the trial to Actum?

14                  MR. KRAMER:  Objection.

15                  THE WITNESS:  I don't.  My -- this

16             conversation was about the article.  My

17             sense was they were probably -- I don't

18             know.  I guess I'd be speculating.  I just

19             know how I felt about it.

20   BY MR. STERN:

21   Q.   How did you feel about it?

22                  MR. KRAMER:  Objection.

23                  THE WITNESS:  About The Detroit News

24             article?

```
 1   BY MR. STERN:

 2   Q.   Well, you just said I just know how I felt about it,

 3        and so I'm trying to explore what you -- what you

 4        meant, what you were referring to, and how you felt.

 5   A.   Well, given that I was the one responsible for the ad

 6        words campaign, that article to me was incredibly

 7        misleading, it was inaccurate, and, you know, I took

 8        issue with it.  So my -- that's how I felt about it,

 9        and I wanted to make sure that anybody had the

10        accurate information about what it actually is, what

11        it does, and what it doesn't do.  So that's really

12        what I was focused on, and that's what I was feeling.

13        Anything else circling around that, I didn't have any

14        sense of it, and I certainly -- I kind of -- I mean,

15        I don't mean to be blunt, but I just -- I really

16        didn't care.  I mean, I cared about what I do.

17   Q.   Did you sense that whomever said "that was us," took

18        pride in the content of the Twitter handle

19        @VNAFlintFacts?

20              MR. KRAMER:  Objection.

21              THE WITNESS:  I didn't get that

22           sense.  I just felt like it was more of an

23           acknowledgment.

24
```

1    BY MR. STERN:

2    Q.   Do you believe that the woman who said that was

3         Jennifer Kaufmann?

4              MR. KRAMER:  Objection.

5              THE WITNESS:  I don't know the

6         individual's last name.  There's a lot of

7         Jennifers.

8    BY MR. STERN:

9    Q.   Would you recognize her face?

10             MR. KRAMER:  Objection.

11             THE WITNESS:  I don't know.  I really

12        don't know.

13   BY MR. STERN:

14   Q.   Okay.  I'm going to share my screen with you for a

15        moment.

16             MR. STERN:  For purposes of the court

17        reporter, I am just sharing the screen

18        that has a link

19        https://protect-us.mimecast.com/s/X1QgCR6BNDFpryoS96esj?domain

     =actumllc.com/.

20   BY MR. STERN

21   Q.   Sir, does this woman appear to be the woman who

22        participated in that call with you regarding The

23        Detroit News article?

24             MR. KRAMER:   Objection.

1              THE WITNESS:  I can't be certain.

2              People look different virtually versus a

3              head shot.

4    BY MR. STERN:

5    Q.   Okay.  Was there a discussion during that meeting

6         regarding The Detroit News article about any specific

7         tweets associated with the Twitter handle

8         @VNAFlintFacts?

9              MR. KRAMER:  Objection.

10             THE WITNESS:  No.

11   BY MR. STERN:

12   Q.   I thought you had already stated that there was a

13        discussion about a particular tweet that you said

14        drew the court's attention.  Do you recall that?

15             MR. KRAMER:  Objection.

16             THE WITNESS:  Yeah.  I stated it was

17             a comment that I made in the beginning of

18             the -- of the call.

19   BY MR. STERN:

20   Q.   What was the --

21   A.   The topic of the call was not about Twitter handles

22        or tweeting.  The topic of the call was claims of the

23        article and factual basis for it.

24   Q.   What was the specific tweet that you were referencing

1        that you made a comment about which you believe drew

2        the court's attention?

3                MR. KRAMER:  Objection.

4                THE WITNESS:  I didn't have context

5            to a specific tweet.  I'd had -- I'd heard

6            somebody reference that apparently there

7            was a tweet.  The judge saw it.  You know,

8            and it wasn't coming from my team and I

9            wasn't -- you know, back to previous

10           statements, I wasn't sure who was managing

11           that channel.  So I -- you know, when we

12           got on the call regarding this Detroit

13           News topic, I think it was just as we

14           were -- I was kind of waiting for people

15           to join.  I made the comment apparently

16           somebody made a tweet the judge saw, and

17           that's when I heard the acknowledgment

18           from an Actum rep.

19   BY MR. STERN:

20   Q.   Ms. Griffiths testified that in response to The

21        Detroit News article, and I'm paraphrasing, I'm not

22        quoting her, she believes that someone from VNA or

23        Veolia reached out to either the author of the

24        article or to the publication more generally asking

1          them to take action with regard to the article and

2          what was perceived to be inaccurate information.  Do

3          you know if that's true?

4     A.   I do.

5     Q.   Okay.  What do you know about that?

6               MR. KRAMER:  Objection.  Relevance.

7          But go ahead.

8               THE WITNESS:  A request to the editor

9          was sent saying this is grossly misleading

10         and infactual and, you know, so we

11         staunchly objected to it, which I agree

12         with 100 percent.

13    BY MR. STERN:

14    Q.   Ms. Griffiths testified that when it came to

15         technical aspects of the ad words campaign or any

16         type of Google advertisement campaign, when it came

17         to updating the website and content, when it came to

18         the Twitter handle, that she wasn't super familiar

19         with or familiar at all with how to do any of those

20         things and she certainly testified that she had no

21         role in those things.  Do you agree with that

22         statement that I just made paraphrasing her

23         testimony?

24              MR. KRAMER:  Objection to the extent

1           that it misstates the testimony.  But you

2           can answer the question.

3                   THE WITNESS:  That's accurate.

4                   That's why I have a job.

5     BY MR. STERN:

6     Q.   And is it fair then to -- I mean, did you participate

7          in whatever communication was sent to The Detroit

8          News regarding what you perceived or the company

9          perceived to be inaccurate information contained in

10         the article?

11                  MR. KRAMER:  Objection.  But go

12             ahead.

13                  THE WITNESS:  In what -- I don't know

14             in what capacity.  Yes.

15    BY MR. STERN:

16    Q.   Well, let's just break it down a little bit.  Do you

17         know if it was an e-mail or a letter or some other

18         type of communication that was sent by VNA or Veolia

19         to The Detroit News regarding what was perceived to

20         be inaccurate information in that article?

21                  MR. KRAMER:  Objection.  Go ahead.

22                  THE WITNESS:  I don't know the method

23             of delivery.  I believe it may have been

24             an e-mail.  I don't know.

1    BY MR. STERN:

2    Q.   Okay.  Did you see the communication before it went

3         to The Detroit News?

4                  MR. KRAMER:  Objection.

5                  THE WITNESS:  I did.

6    BY MR. STERN:

7    Q.   Okay.  Did you participate in drafting the

8         communication before it was sent to The Detroit News?

9                  MR. KRAMER:  Objection.

10                 THE WITNESS:  I did not.  I provided

11           a dataset.

12   BY MR. STERN:

13   Q.   Have you ever been in communication with someone

14        named Tarrah Cooper Wright?

15   A.   I have not.

16   Q.   Tarrah Cooper Wright, I'll represent to -- well,

17        let's just pull it up as an exhibit, if you give me

18        one second.  I'm going to share my screen with you

19        and I'm going to mark as Exhibit 1 to your deposition

20        The Detroit News article.

21                 (Exhibit No. 1 marked.)

22   BY MR. STERN:

23   Q.   Are you able to see this, sir?

24   A.   I am.

1    Q.   Do you see this paragraph -- do you need a minute to

2         look at the whole article, or can I ask you about

3         certain things in the article?

4    A.   No.  You can ask me.  It's fine.

5    Q.   Do you see this paragraph that says, in response to

6         the accusations over its ads, Veolia, a Boston-based

7         water services company and subsidiary of the

8         $30 billion French conglomerate Veolia, explained it

9         never targeted any specific state or region with them

10        for the Veolia Flint Facts website, according to

11        company spokeswoman Tarrah Cooper Wright.  Do you see

12        that?

13   A.   Yes, I can read that.

14             MR. KRAMER:  Corey, am I correct that

15        the highlighting is yours?

16             MR. STERN:  Yeah.  Yeah.  Yeah.  I

17        mean, the yellow highlighted I've

18        highlighted.  The blue that I just did on

19        the screen was just to point the witness'

20        attention to that particular paragraph.

21        Obviously the article didn't -- wasn't

22        published with highlighting.

23   BY MR. STERN:

24   Q.   Did you provide this information to Tarrah Cooper

1       Wright?

2   A.  No.  I don't even know who Tarrah Cooper Wright is.

3   Q.  Okay.

4   A.  I provided information regarding the claims.  Yeah.

5       Never targeted specific state or regions.  Yeah.  I

6       would qualify that.  I would be the one to validate

7       that.  I would be the one to say that's 100 percent

8       accurate.  We never targeted specific states or

9       region.  Here's the data.  Here's the configurations.

10      It's binary.  You can't argue with it.

11  Q.  And you've provided -- you've provided all documents

12      and information associated with the Google

13      advertisement campaign to attorneys for Veolia?

14              MR. KRAMER:  Objection.

15              THE WITNESS:  Correct.

16  BY MR. STERN:

17  Q.  And can you give me the universe of the information

18      that you provided?

19  A.  Sorry.  The what now?

20  Q.  If I were to log in to -- I'm sure I'll never have

21      the opportunity to.  But if I had the opportunity to

22      log in to the advertisement campaign through Google

23      that you have the credentials for that we talked

24      about earlier -- do you know what I'm referring to?

1    A.   I do, yep.

2    Q.   I'd be able to self generate a number of documents

3         based on what it is that I'm looking for.  Correct?

4    A.   Yes.  You can export reports, of course.

5    Q.   But you can -- you can build the report that you want

6         exported based on certain criteria, correct?

7    A.   You can create -- the options for filtering do exist

8         in terms of I only want to look at activity from this

9         time to this time or for this, you know, whatever

10        based off of whatever segment of data you're looking

11        at.  Yes, there's filter capabilities.  But it's

12        really more not filtering out but organizing.

13   Q.   All right.  But if you wanted to, for instance, you

14        could filter at any point in time, you know, how many

15        impressions there were for a particular website or

16        for a particular piece of the website based on

17        region, right?

18   A.   Are you asking if you asked me how many people saw

19        the ad in New Jersey, could I tell you what that data

20        is?

21   Q.   Yes.

22   A.   Correct.

23   Q.   And if I wanted to break it down by gender of the

24        user or the searcher, that could be done as well,

1       right?

2   A.  Yeah.  Correct.

3   Q.  It could be done based on the age of the user,

4       correct?

5   A.  Correct.  You're talking about the reporting?

6   Q.  Yes, sir.

7   A.  Correct.

8   Q.  It could be done -- the reporting could be done based

9       on age and gender if the person seeking that

10      information chose those options as part of the

11      report, correct?

12  A.  Yes.

13  Q.  It could be done based on all of those factors for

14      particular days or weeks or months if the person

15      choosing that part of the report so chose, correct?

16          MR. KRAMER:  Object to form.

17          THE WITNESS:  Correct.  You can

18      export reports for all time.  You can

19      export reports for a period of time.

20  BY MR. STERN:

21  Q.  And you can, if you wanted to, generate reports

22      associated with particular words that were chosen as

23      part of the campaign, correct?

24          MR. KRAMER:  Object to form.

1              THE WITNESS:  Could you clarify what

2          you mean by words of the campaign?

3    BY MR. STERN:

4    Q.   Sure.  So whoever launched the Google advertisement

5         campaign that we're talking about on behalf of VNA or

6         Veolia, for purposes of the ad words component of the

7         campaign, there would have to have been a choice of

8         words to use for particular searches, correct?

9    A.   Yeah.  Keywords.

10             MR. KRAMER:  Object to form.  Just

11         give me a second.

12             THE WITNESS:  Sorry.

13   BY MR. STERN:

14   Q.   And if you wanted to, you could generate information

15        associated with impressions based on particular

16        keywords at any particular time, correct?

17             MR. KRAMER:  Object to form.

18             THE WITNESS:  Yes.  That's what we

19         do.  We generate metrics reports and we

20         utilize the datasets to inform, you know,

21         analysis or effectiveness, etcetera.

22   BY MR. STERN:

23   Q.   When you provided information to someone in response

24        to The Detroit News article, who determined the

 1            criteria that you were using to generate that

 2            information?

 3                      MR. KRAMER:  Mr. Stern, just so we're

 4               clear here, you're talking about the

 5               response he gave.  This isn't the response

 6               to the lawyers.  This is the response to

 7               the conversation that you were talking

 8               about?

 9                      MR. STERN:  No.  Let me start over.

10   BY MR. STERN:

11   Q.   You generated some reports to somebody based on

12        information that was contained in that Detroit News

13        article, correct?

14                      MR. KRAMER:  Object to form.

15                      THE WITNESS:  Not some reports.  The

16               entire report.  All time.  All activities

17               since the beginning of the creation of

18               that account.  I said here is all

19               information.  This is fact.  This is

20               false.

21   BY MR. STERN:

22   Q.   Did you generate a report associated with impressions

23        amongst folks of different genders as part of that

24        report?

1             MR. KRAMER:  Objection.

2             THE WITNESS:  The level of

3        granularity of the report, it's very vast.

4        I would say that I have provided that

5        data.  I'm not sure -- it's a lot of

6        information.  But it's -- I'm certainly

7        happy to provide it, I guess.

8    BY MR. STERN:

9    Q.   How many pages was the report that you provided in

10        conjunction with The Detroit News article regarding

11        the advertisement campaign?

12             MR. KRAMER:  Objection.

13             THE WITNESS:  I don't know the page

14        count.

15   BY MR. STERN:

16   Q.   Was it in the thousands?

17             MR. KRAMER:  Objection.

18             THE WITNESS:  No.  Probably, you

19        know, 100 or 100 or a little over 100

20        maybe.

21   BY MR. STERN:

22   Q.   I meant to ask you earlier.  I know that Mr. Kramer

23        is there in the room with you.  I saw his hand to

24        your left I think a minute ago when you began

1    answering a question and he wanted to interject for a

2    moment.  Is there anybody else in the room with you

3    today?

4            MR. KRAMER:  Objection to the

5        characterization.  You can answer that

6        question.

7            THE WITNESS:  Yes, there is.

8    BY MR. STERN:

9    Q.   Okay.  Who else is in the room with you presently?

10   A.   Kristin.

11   Q.   Okay.

12   A.   And Kristin, I can't remember her last name.

13   Q.   Ms. Dupre?

14           MR. KRAMER:  That's correct.

15           THE WITNESS:  Correct.

16   BY MR. STERN:

17   Q.   So it's the three of you in the room at present?

18   A.   Correct.

19   Q.   At any point during this deposition, was anybody else

20       in the room with you besides Ms. Dupre and

21       Mr. Kramer?

22   A.   No.

23   Q.   Was it your sense that Mr. O'Brien was surprised when

24       he found out about the Twitter handle @VNAFlintFacts?

1          MR. KRAMER:  Objection.

2          THE WITNESS:  No.

3   BY MR. STERN:

4   Q.   Were you surprised when you found out about the

5        Twitter handle?

6   A.   No.

7   Q.   In the five years that you had worked for VNA prior

8        to finding out about that Twitter handle, had you

9        ever encountered any other Twitter handles quite like

10       that one?

11         MR. KRAMER:  Objection.

12         THE WITNESS:  I don't know what you

13      mean quite like that one.

14  BY MR. STERN:

15  Q.   Had you -- let me ask it a different way.  Were you

16       familiar with other VNA Twitter handles during the

17       five years that you've worked for VNA?

18  A.   Yeah.

19  Q.   Okay.  Have there been any other Twitter handles that

20       you are aware of that have directly addressed ongoing

21       litigation associated with VNA?

22  A.   No.

23  Q.   Did you ever have the opportunity to determine during

24       the Flint water crisis trial between February and

1      August 2022 how many impressions occurred as to the

2      Veolia Flint Facts website?

3              MR. KRAMER:  Objection.  You can

4          answer.

5              THE WITNESS:  Are you asking for the

6          data on the Flint facts website, or are

7          you asking for the data on the Google Ads

8          impressions and click through rate?

9   BY MR. STERN:

10  Q.   The website.

11  A.   I don't have the metrics analysis of the website.

12  Q.   Who does?

13  A.   Reputation Squad, I would imagine.

14  Q.   Did you have the opportunity to watch or listen to

15       any part of the trial between February 15th, 2022,

16       and August 11th, 2022?

17              MR. KRAMER:  Objection.

18              THE WITNESS:  I did not.

19  BY MR. STERN:

20  Q.   Do you know who --

21              MR. KRAMER:  You mean you didn't

22          watch, not that you didn't have the

23          opportunity.  It was on the web.  You

24          could have watched.

1               THE WITNESS:  Oh, yeah.  I did not

2          watch it.

3    BY MR. STERN:

4    Q.   That's what I meant.  I apologize.  It was a bad

5         question.  Obviously anybody who wanted to had the

6         opportunity to.  I meant did you watch or did you

7         listen.  And you answer is no, correct?

8    A.   Correct.  No.

9    Q.   Do you work in the same office as William Fahey?

10   A.   I do.

11   Q.   Do you know Mr. Fahey?

12   A.   Yeah, I know him.

13   Q.   Do you interact with him on a daily basis?

14   A.   No.

15   Q.   Do you interact with him on a weekly basis?

16   A.   Periodically cross paths in the lunch room.

17   Q.   Has Mr. Fahey ever participated with you in any

18        meetings related to the Veolia Flint Facts website?

19   A.   No.

20   Q.   Has Mr. Fahey ever participated in any meetings that

21        you've been a part of related to the @VNAFlintFacts

22        Twitter handle?

23   A.   No.

24   Q.   Do you know who Rob Nicholas is?

1    A.    Not personally, no.  I think I've heard -- I've heard

2          the name.

3    Q.    Do you know if Mr. Nicholas has ever participated in

4          any meetings that you've been a part of related to

5          the Veolia Flint Facts website?

6    A.    No.

7    Q.    Do you know if Mr. Nicholas has ever been present

8          during any meetings that you've been a part of

9          related to the @VNAFlintFacts Twitter handle?

10   A.    No.

11   Q.    Do you know who Marvin Gnagy is?

12   A.    Marvin Gnagy?

13   Q.    Yeah.

14   A.    Doesn't sound familiar.

15   Q.    What if I said Marvin Gnagy, G-n-a-g-y?

16   A.    No.  Doesn't ring a bell.

17   Q.    So in light of the fact that the name doesn't ring a

18         bell, is it fair to assume that you have no

19         recollection of Marvin Gnagy participating in any

20         meetings that you've been a part of related to the

21         VeoliaFlintFacts.com website?

22   A.    The question -- I don't?  I'm sorry.  I kind of got

23         confused there.

24   Q.    Sure.  I'll ask --

```
 1   A.   I don't know who he is.

 2   Q.   Let me ask it a little differently.  Do you have any

 3        recollection of a gentleman named Marvin Gnagy

 4        participating in any conversations you've been a part

 5        of about the Veolia Flint Facts website?

 6   A.   No.

 7   Q.   Do you recall anyone by the name of Marvin Gnagy

 8        being involved in any conversations you've had

 9        related to the @VNAFlintFacts Twitter handle?

10   A.   No.

11   Q.   Do you know who Depin or Theping Chen is?

12   A.   I don't.

13   Q.   Okay.

14             MR. KRAMER:  I don't want to

15        interrupt.  You can finish this line, if

16        you want.  But it's about -- we've gone a

17        little bit more than an hour again.  So if

18        you want to wrap this up, it would be a

19        good time for a break.

20             MR. STERN:  That's fine.  I don't

21        have much more, but I'm happy to take a

22        short break.

23             MR. KRAMER:  That's fine.  But if you

24        want to wrap up Chen, this line of
```

1          questioning, feel free.

2     BY MR. STERN:

3     Q.   Do you have any recollection of an individual named

4          Depin Chen participating in any conversations you've

5          been a part of about the Veolia Flint Facts website?

6     A.   No.

7     Q.   Do you have any recollection of an individual named

8          Depin Chen being a part of any conversations you've

9          been a part of related to the @VNAFlintFacts Twitter

10         handle?

11    A.   No.

12              MR. STERN:  Okay.  Kelly, do you want

13         to take until 12:20 and then come back?  I

14         don't think I have more than 20 minutes or

15         so after this.

16              MR. KRAMER:  Yeah.  That's fine.

17         12:20 works.

18              MR. STERN:  Thanks.

19              VIDEOGRAPHER:  The time is 12:12.  We

20         are off the record.

21              (Recess taken.)

22              VIDEOGRAPHER:  The time is 12:20.  We

23         are back on the record.

24

1              MR. STERN:  Madam court reporter, I'm

2         putting that exhibit in the chat box just

3         so you have it for when the deposition is

4         over.

5              THE REPORTER:  Thank you.

6              MR. STERN:  Sure.

7    BY MR. STERN:

8    Q.   Mr. Connor, are you familiar with someone named David

9         Gadis?

10   A.   No, I'm not.

11   Q.   Do you recall anybody by that name being present in

12        any discussions that you have had regarding the

13        Veolia Flint Facts website?

14   A.   No.

15   Q.   Are you familiar with anybody by that name being

16        present during any discussions you've had about the

17        @VNAFlintFacts Twitter handle?

18   A.   No.

19   Q.   Sorry.  Do you want to say something?

20   A.   I don't have any information about the Twitter

21        handle.  You keep asking me about Twitter.  I don't

22        have any information about it.  So I'm sorry.  I'm

23        just -- I'm a little --

24   Q.   Don't -- no reason to be sorry, and I'm not trying to

1  ask you about something that I know you don't know

2  about.  I just know that you were part of some

3  conversations about it, and so I'm just asking you

4  who the people were that may have been present during

5  those conversations.  Nothing specific about the

6  handle.  So I apologize to the extent that some of

7  these questions may be redundant or frustrating.

8    Have you ever met, as far as you can recall,

9  someone by the name of Jonathan Karush, K-a-r-u-s-h?

10 A. Not that I can recall.  It may be helpful if you can

11  assign like if you have the information of

12  departments, divisions, or companies.  You know, our

13  organization is 170,000 something employees and, you

14  know, lots of e-mails and everything over the years.

15  I can't -- unless it's somebody that I work with

16  regularly or on my team, my recollection of who's who

17  is not going to be valuable.

18 Q. Are you familiar with a public relations or a

19  strategic communications company named Rasky Baerlein

20  or Baerlein?

21 A. So I am familiar with an agency named Rasky that is

22  employed by VNA.

23 Q. Okay.  What -- what types of interactions have you

24  had with individuals from Rasky over the five years

1        that you've been employed by VNA?

2   A.   Well, Rasky is on regular recurring calls with the

3        communications teams as we discuss activities and

4        events regarding the brand, regarding internal and

5        external communications, and they play a role of

6        recommendations and thoughts regarding, you know,

7        maybe media outreach, events that are going on, you

8        know, ribbon cutting ceremonies, that kind of thing.

9        It's, you know, it's all very basic run of the mill

10       communications, PR relationship.

11  Q.   Are you aware of any role, if any, that Rasky has

12       played in communications related to the Flint water

13       crisis?

14  A.   None.

15  Q.   Say that again, sir.  I'm sorry.

16  A.   No.  None.

17  Q.   Okay.  Are you familiar with a company called

18       Mercury?

19  A.   I am.

20  Q.   What is your understanding of Mercury's relationship

21       with VNA?

22  A.   I mean, we had an engagement.  I don't believe we

23       still have an engagement with them.  I think there

24       was just -- I mean, I don't know if there is an

1    engagement, what its current capacity is.

2 Q. Are you aware of any specific work that Mercury has

3    done on behalf of VNA or any other Veolia entity with

4    regard to the Flint water crisis and litigation about

5    the Flint water crisis?

6 A. I am not.  Media relations and PR is not in my

7    purview.

8 Q. Besides Rasky, Mercury, and Actum, are you aware of

9    any other public relations type companies that Veolia

10    has a relationship with presently?

11     MR. KRAMER:  Objection.

12     THE WITNESS:  I am not.

13 BY MR. STERN:

14 Q. Do you have an understanding of why VNA requires or

15    decides to use the assistance of three different

16    public relations companies at any point in time?

17     MR. KRAMER:  Objection.

18     THE WITNESS:  I don't have insight

19    into the strategic planning of those

20    relationships.

21 BY MR. STERN:

22 Q. Are you aware of whether the French company Veolia

23    Environnement SE dictates that strategy for VNA?

24     MR. KRAMER:  Objection.

1          THE WITNESS:  I don't know that I'd

2          say I'm aware.  It's common knowledge

3          we're a subsidiary and the group will

4          probably, you know, provide some

5          governance and recommendations across the

6          zones.  So...

7     BY MR. STERN:

8     Q.   Do you have a sense of who was controlling the public

9          relations strategy during the Flint water crisis

10         trial that involved Veolia between February 2022 and

11         August 2022?

12         MR. KRAMER:  Objection.

13         THE WITNESS:  I don't -- I don't

14         know.

15    BY MR. STERN:

16    Q.   During the conversation that occurred between

17         individuals including you and someone from Actum

18         around the time that The Detroit News article was

19         being published or was published, do you recall

20         anyone commenting that there would be no more tweets

21         from the @VNAFlintFacts Twitter handle?

22         MR. KRAMER:  Objection.

23         THE WITNESS:  No.  Once again, no

24         visibility into this Twitter handle.

1    BY MR. STERN:

2    Q.   Do you know why there has been no content added to

3         the VeoliaFlintFacts.com website since the conclusion

4         of the trial?

5                   MR. KRAMER:  Objection.

6                   THE WITNESS:  I don't.

7    BY MR. STERN:

8    Q.   Do you know why there have been no more tweets sent

9         out from the Twitter handle @VNAFlintFacts since the

10        trial concluded?

11                  MR. KRAMER:  Objection.

12                  THE WITNESS:  I don't.  I don't

13             monitor these channels or that property.

14   BY MR. STERN:

15   Q.   Just give me one second.  I have one more company

16        that I want to ask you about.  Do you know an

17        individual named Steve Goudsmith?

18   A.   Steve Goudsmith.  Yes.

19   Q.   Who is Mr. Goudsmith?

20   A.   I'm a little unclear of his exact title.  I mean, I

21        don't know if he's SVP, VP.  But communications

22        manager for utilities, regulated water, utilities.

23        He's another new, relatively new employee that came

24        along with the acquisition of Suez.

1    Q.   Have you ever participated in any conversations that

2         included Mr. Goudsmith related to VNA's or Veolia's

3         role regarding the Flint water crisis?

4                   MR. KRAMER:  Objection.  Go ahead.

5                   THE WITNESS:  No.

6    BY MR. STERN:

7    Q.   Is Mr. Goudsmith's office located in New Jersey?

8                   MR. KRAMER:  Objection.

9                   THE WITNESS:  Yes.

10   BY MR. STERN:

11   Q.   Have you ever met Mr. Goudsmith?

12                  MR. KRAMER:  Objection.

13                  THE WITNESS:  I have.

14   BY MR. STERN:

15   Q.   On how many occasions have you met Mr. Goudsmith and

16        in what context?

17                  MR. KRAMER:  Objection.

18                  THE WITNESS:  In person twice.  Once

19          in New Jersey, once in Boston.

20   BY MR. STERN:

21   Q.   And what was the -- what was the context of each of

22        those meetings?

23                  MR. KRAMER:  Objection.

24                  THE WITNESS:  Business meetings

1          regarding various topics.

2     BY MR. STERN:

3     Q.   Did you ever -- were any -- did any of those topics

4          include the Flint water crisis?

5     A.   No.

6     Q.   What was your impression of Mr. Farcot in the

7          instances that you met him?

8               MR. KRAMER:  Objection.

9               THE WITNESS:  I'm sorry.  Can you

10         repeat that question?

11    BY MR. STERN:

12    Q.   What were your impressions, if you had any, of Pierre

13         Farcot during the meetings that you had with him?

14              MR. KRAMER:  Objection.

15              THE WITNESS:  I -- I don't think I

16         could say I have really any impression.

17         He's a colleague I interacted with, you

18         know, a handful of times over the course

19         of several years.  I wouldn't say that I

20         know his personality and baseline enough

21         to know something.  Just seemed like a

22         normal interaction to me.

23    BY MR. STERN:

24    Q.   Did anyone at Veolia within the company ever comment

1        to you at any point in time about either the

2        appropriateness or inappropriateness of the Twitter

3        account and its contents @VNAFlintFacts?

4                    MR. KRAMER:  Objection.

5                    THE WITNESS:  No.

6     BY MR. STERN:

7     Q.   Do you recall having a sense that anybody within VNA

8        at any point in time was troubled by the substance of

9        the tweets put out by @VNAFlintFacts?

10                   MR. KRAMER:  Objection.

11                   THE WITNESS:  No.

12    BY MR. STERN:

13    Q.   Did you ever have the sense that any of the public

14       relations individuals who you may have encountered

15       expressed anything related to trouble with the tweets

16       generated by @VNAFlintFacts?

17                   MR. KRAMER:  Objection.

18                   THE WITNESS:  No.

19    BY MR. STERN:

20    Q.   Were you ever on any calls or involved in any

21       meetings where anyone from Veolia or VNA expressed a

22       desire to shut down tweets from @VNAFlintFacts?

23                   MR. KRAMER:  Objection.

24                   THE WITNESS:  No.

1    BY MR. STERN:

2    Q.   Was there ever a discussion about the appropriateness

3         that you've been a part of of commenting on experts

4         testifying at trial by way of @VNAFlintFacts?

5              MR. KRAMER:  Objection.

6              THE WITNESS:  I've never been

7              involved in any conversations like that.

8              I think, you know -- I appreciate and

9              understand -- you know, we keep talking

10             about Twitter.  I keep on saying I don't

11             have knowledge of Twitter, of this Twitter

12             channel.  So I really want to maximize the

13             value I can provide during this time.

14   BY MR. STERN:

15   Q.   I appreciate that.  If you were -- and to that end,

16        if you were in my shoes and sought to find out as

17        much substantive information as I could about that

18        channel, in terms of how the tweets were generated,

19        who actually typed them out, where the information

20        related to each tweet came from, who would you ask?

21             MR. KRAMER:  Objection.

22             THE WITNESS:  Whoever ran that

23             channel.

24

1    BY MR. STERN:

2    Q.   I know specifically -- where would you start in terms

3         of who you would ask?

4                   MR. KRAMER:  Objection.

5                   THE WITNESS:  I mean, the only thing

6              I can say is whoever the owner and

7              operator of that channel is is the person

8              that you would want to talk to.

9    BY MR. STERN:

10   Q.   And based on your prior testimony, you're of the

11        belief that that is either Actum or someone within

12        the Actum organization, correct?

13                  MR. KRAMER:  Objection.

14                  THE WITNESS:  That's the only

15             information I have to go on at this point.

16   BY MR. STERN:

17   Q.   Those are the only questions that I have for you at

18        this time.  If others have questions for you, I may

19        have follow-up.  But if they don't, then I have

20        nothing further.  And I appreciate your time, and I

21        apologize for the circumstances.  I know that you're

22        busy and this is probably the last thing you wanted

23        to do.  So thanks for being here.

24   A.   Thank you.

```
1               MR. KRAMER:  Corey, is there anyone

2           else on for Plaintiffs?  I don't see it,

3           but I'm not as familiar with the case as

4           you.

5               MR. STERN:  No, not that I'm aware

6           of.

7               MR. KRAMER:  Okay.  Anyone for LAN?

8               MR. FINLEY:  I'm here for LAN, but I

9           don't have any questions at this point.

10                          EXAMINATION

11   BY MR. KRAMER:

12   Q.   Okay.  I just have a few questions, if you'd indulge

13        me.

14               Mr. Connor, my name is Kelly Kramer, and I

15        represent VNA.  I have a few questions for you about

16        your responsibilities.

17               Have you been responsible for VNA's Google

18        Ad words account since you joined the company in

19        2017?

20   A.   Yes.

21   Q.   Okay.  Were you the person who had primary

22        responsibility for managing that account since you

23        joined the company?

24   A.   Yes.
```

1    Q.   Are you the person who is most knowledgeable about

2         VNA's use of Google Ad words, its Google Ad words

3         account as it relates to the Flint water crisis?

4    A.   Correct.

5    Q.   Okay.  So focusing on that Google Ad words account.

6         Does Google advertising allow users to use geographic

7         and demographic targeting tools?

8    A.   Yes, they allow it.  It's the industry standard.

9    Q.   Okay.  And are you generally familiar with the

10        geographic and demographic targeting options that

11        Google makes available to users?

12   A.   Yes, I am.

13   Q.   Okay.  Are Google Ad word users able to target

14        advertising to particular states?

15   A.   Yes, you can target by state.

16   Q.   Okay.  Can you target advertising to particular

17        counties?

18   A.   Yes, counties too.

19   Q.   Okay.  Can you target advertising to particular ZIP

20        codes?

21   A.   Yep.

22   Q.   Can you target things like universities?

23   A.   Yes, you can.

24   Q.   Okay.  And, in fact, beyond the examples I just

1      talked about, are there a significant number of other

2      geographic targeting options available to Google Ad

3      word users?

4   A.   Yeah.  There's a lot more options.

5   Q.   Okay.  I'm focusing now on how VNA actually used the

6        Google Ad words product as it relates to Flint.  Did

7        VNA target its advertising to particular states?

8   A.   No.

9   Q.   Did VNA target its advertising to particular

10       counties?

11  A.   No, it did not.

12  Q.   Did it target particular ZIP codes?

13  A.   Nope.

14  Q.   Did it target particular universities?

15  A.   Absolutely not.

16  Q.   Okay.  And, in fact, beyond limiting the ads to the

17       United States and Canada, did VNA make use of any of

18       the geographic targeting options available on Google?

19  A.   No, we did not.

20  Q.   Okay.  Turning to demographics.  Are Google Ad word

21       users able to target advertising to particular user

22       demographics?

23  A.   Absolutely.

24  Q.   Okay.  So you could target men?

1   A.   Yeah.  That's -- absolutely.

2   Q.   Okay.  You could target people over 45?

3   A.   Yeah.  It's your target audience.  You can target

4        your audience for marketing and whatever purposes.

5        Sure.

6   Q.   You could target people whose incomes exceed say

7        $100,000?

8   A.   Correct.

9   Q.   And, in fact, beyond these examples, are there a

10       significant number of other demographic targeting

11       options that Google makes available to advertisers?

12  A.   A plethora of them.  Virtually any demographic with

13       the exception of race and religion.

14  Q.   Okay.  So focusing again on how VNA actually used the

15       Google Ad words product as it relates to Flint.  Did

16       VNA target its advertising to any particular

17       demographic?

18  A.   No, it did not.

19  Q.   Did it target men?

20  A.   No.

21  Q.   Did it target people over 45?

22  A.   Nope.

23  Q.   Okay.  Did VNA make any use whatsoever of any of the

24       demographic targeting options available on Google?

```
 1   A.   No, it didn't.

 2   Q.   Mr. Connor, are you generally familiar with how the

 3        Google Ad word program works?

 4   A.   I am.

 5   Q.   Okay.  What does a user need to do before he or she

 6        can possibly see one of these Google Ads?

 7   A.   What does the user have to do?

 8   Q.   Yeah.

 9   A.   The user has to search for a topic or a subject, a

10        service that relates to specific keywords of that ad

11        in order to trigger that ad to display.

12   Q.   Okay.  So if a user doesn't enter search terms,

13        keyword terms into Google, would they ever see any of

14        VNA's Google Ads?

15   A.   No.  Nope.

16   Q.   Is there any way that anyone would be served with one

17        of these VNA ads about Flint if they weren't actively

18        searching for information on Google?

19   A.   No.  It's not something you just stumble upon.  You

20        have to trigger an ad display through select

21        keywords.

22   Q.   Mr. Connor, are you generally familiar with VNA's

23        budget for the Google Ad words relating to Flint?

24   A.   Yep, I am.
```

```
 1   Q.   What was the daily budget for the advertising related

 2        to Flint?

 3   A.   It's set at $75 a day.

 4   Q.   Okay.  Based on your experience for an organization

 5        the size of Veolia, is $75 an ad day -- $75 a day ad

 6        purchase, is that substantial?

 7   A.   No.

 8                  MR. STERN:  Objection.

 9                  THE WITNESS:  No.  For an

10             organization the size of Veolia, that's

11             not a substantial spend.

12   BY MR. KRAMER:

13   Q.   Between 2017 and the present, did you ever increase

14        the budget above $75 a day?

15   A.   Absolutely not.

16   Q.   Mr. Connor, you were asked some questions about

17        Google's dynamic ad features.

18   A.   Uh-huh.

19   Q.   Okay.  Does Google offer its users a variety of

20        different dynamic ad features?

21   A.   Yes.  There's options.

22   Q.   Okay.  Which dynamic ad features, if any, did VNA

23        actually use in its advertising?

24   A.   The only dynamic option that's enabled is for
```

1       multi title, multi description, what we would call

2       variables.  And the intent is based off of a user's

3       search, the platform can display one or more of the

4       more relevant titles and descriptions relative to

5       that search.

6   Q.  Okay.  So at any point did VNA allow Google to change

7       the text, like to rewrite the headline or description

8       for any of its ads?

9   A.  No.  Google doesn't make up your descriptions or your

10      titles or write for you.

11  Q.  More broadly, did VNA utilize any sort of artificial

12      intelligence technology to change the text of its

13      advertising or to alter it based on user response?

14  A.  No.

15  Q.  Mr. Connor, how long have you been responsible for

16      managing the Google Ad words account?

17  A.  For Veolia North America, since I assumed the

18      position in 2017.

19  Q.  Okay.  During that time, did you ever expand the

20      number of keywords that VNA purchased?

21  A.  No.

22  Q.  Did you ever seek to ramp up the number of ads that

23      were displayed?

24  A.  No.

1    Q.   Did you pay much attention to these ads?

2    A.   No.

3    Q.   In your experience, did anyone at VNA pay attention

4         to these advertisements?

5    A.   I would say no.

6    Q.   In the five years that you managed the account, how

7         many times had anyone asked you for an analysis or

8         for metrics about how the ads are performing?

9    A.   One time in five years.

10   Q.   During those five years, did you take any steps to

11        improve the performance of the ads?

12   A.   No.

13   Q.   Did anyone ever ask you to improve the -- take steps

14        to improve the performance of the ads?

15   A.   No.

16   Q.   Mr. Connor, you were asked a few questions about The

17        Detroit News article that ran in September.

18        Mr. Stern showed you a copy of it as an exhibit.  Do

19        you recall that?

20   A.   I do.

21   Q.   Are you familiar with that article?

22   A.   I am.

23   Q.   Did you review it when it was published?

24   A.   I did.

1   Q.   Did you form any opinions as to whether the

2        allegations in the article were accurate?

3   A.   I absolutely did.

4   Q.   Okay.  And what opinions did you form about whether

5        those allegations are, in fact, accurate?

6   A.   Sorry.  Could you repeat that question.

7   Q.   Yeah.  What was your view?  Do you think that the

8        allegations in the article were accurate?

9   A.   I have to contain my language.  But it was -- it was

10       absolutely wrong, inaccurate.  It's -- I mean, I

11       could use all kinds of descriptors as to how I felt

12       when I saw it.  It was just -- it was misleading.  It

13       was false.  It was just beyond me that that level of

14       reporting, that I wasn't even -- usually you're given

15       an opportunity to comment on a report somebody's

16       going to write.  I mean, this was just -- it was --

17       I'm sorry.  It was just garbage to me.

18   Q.  Let me ask about specific allegations.  Did VNA ramp

19       up its digital advertising campaign in advance of

20       jury selection?

21   A.   Absolutely not.

22   Q.   Did VNA more than triple the number of keyword search

23       terms in Google in advance of jury selection?

24   A.   No.

1    Q.    Did VNA target any state?

2    A.    No.

3    Q.    Any region?

4    A.    No.

5    Q.    Any ZIP code?

6    A.    No.

7    Q.    Any radius?

8    A.    No.

9    Q.    Is it fair to say that you think the article overall

10         is completely false and misleading?

11   A.    100 percent.

12   Q.    Mr. Connor, I'd like to ask you just a couple of

13         questions about the audience of these ads.  You were

14         asked questions about who the ads were directed to by

15         Mr. Stern early.  Do you recall that?

16   A.    Yeah.  Uh-huh.

17   Q.    Based on your experience, who do you believe that VNA

18         was trying to reach with these ads?

19   A.    Well, anyone interested in the topic, I suppose.  You

20         know, but customers have questions.  Potential

21         clients have questions.  The general public might

22         have -- you know, be doing research or questions

23         about, you know, a certain topic or subject.  So I

24         think that that information, the intent is just that

```
 1          that information is available.

 2     Q.   Did anyone ever tell you that VNA was actually trying

 3          to reach jurors or potential jurors with these

 4          advertisements?

 5     A.   No.  Absolutely not.  Absolutely not.

 6     Q.   Did anyone ever hint or suggest that VNA was trying

 7          to reach jurors with this advertising?

 8     A.   No.  Nope.

 9     Q.   And based on everything you know about the

10          advertising from managing it for more than five

11          years, are you confident that VNA was not, in fact,

12          trying to influence jurors in any way, shape, or

13          form?

14               MR. STERN:  Objection.

15               THE WITNESS:  Can I answer that?

16     BY MR. KRAMER:

17     Q.   Yeah, you can answer.

18     A.   No.

19     Q.   Just to be clear, you're saying no, there was no

20          intent to influence jurors as far as you know?

21     A.   Regarding the ad words campaign and what we're

22          talking about?  No.  I mean, if somebody had come to

23          me and said can you target, tailor an ad, I

24          wouldn't -- I would have absolutely said no or would
```

```
1          have resigned.  I would have never done that.

2                     MR. KRAMER:  I have nothing else.

3                              FURTHER EXAMINATION

4     BY MR. STERN:

5     Q.   I have a couple of follow-ups for you, sir.  You were

6          not -- you were not in charge of updating the Veolia

7          Flint Facts website at any point in time prior to or

8          during the trial, correct?

9     A.   Correct.

10    Q.   Other than the one time in 2017 or earlier on before

11         the trial when you redesigned and made certain

12         changes to the website that you've already testified

13         about, right?

14    A.   Correct.  2019 was the last time.  Correct.

15    Q.   Right.  And you would agree with me that when it

16         comes to dynamic ads, Google automatically matches

17         URL pages relevant to search terms, right?

18                    MR. KRAMER:  Objection.

19                    THE WITNESS:  A URL has to be

20              provided in the ad.

21    BY MR. STERN:

22    Q.   Understood.  But Google automatically matches URL

23         pages that are relevant to search terms, correct?

24                    MR. KRAMER:  Objection.
```

1                    THE WITNESS:  If you enable that

2          option.

3    BY MR. STERN:

4    Q.   Okay.  And who was in charge of updating the Veolia

5          Flint Facts website during the trial?

6    A.   I don't know.  I know the designers and developers of

7          the site, as I already explained to you, and the

8          transfer of ownership to Reputation Squad.

9                    MR. STERN:  Okay.  I don't have any

10         further questions.

11                   MR. KRAMER:  Okay.  I think that's

12         it.

13                   VIDEOGRAPHER:  The time is 12:49.

14         We're off the record.

15               (Deposition concluded at 12:49 p.m.)

16                             *   *   *

17

18

19

20

21

22

23

24

```
 1                   CERTIFICATE OF NOTARY PUBLIC

 2      STATE OF MICHIGAN )

 3      COUNTY OF LENAWEE )

 4             I, Trisha Cameron, Certified Shorthand Reporter

 5      and Notary Public in and for the State of Michigan, do

 6      hereby certify that the witness whose attached

 7      deposition was taken before me in the above cause was

 8      first duly sworn or affirmed to testify to the truth,

 9      the whole truth, and nothing but the truth; that the

10      testimony contained herein was by me reduced to writing

11      in the presence of the witness by means of Stenography;

12      afterwards transcribed by means of computer-aided

13      transcription; and that the deposition is a true and

14      complete transcript of the testimony given by the

15      witness to the best of my ability.  I further certify I

16      am not connected by blood or marriage with any of the

17      parties, their attorneys or agents; that I am not an

18      employee of either of them; and that I am not

19      interested directly, indirectly, or financially in the

20      matter of controversy.

21                   _____

22             Trisha Cameron, RDR, RMR, CRR, RPR, CSR

23             Notary Public, Lenawee County, Michigan

24             My Commission Expires 5-24-24
```