## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

ALL CASES

_____/

## **ORDER**

Since early February 2024, the Court has been confronted with conduct that threatens the fair administration of justice in this litigation: a disruptive public relations campaign against Co-Liaison Counsel for Individual Plaintiffs Corey Stern. Based on what the Court has learned so far, the public relations campaign includes deceptive direct contacts with Flint residents (including represented parties and minor children), egregious press releases, a truck circling the courthouse broadcasting inflammatory messages, and a website dedicated to attacking Mr. Stern. After learning about the campaign, the Court held a hearing, issued several orders, and received multiple submissions. Based on the information the Court has gathered, it is now prepared to take initial

steps to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," *Link v. Wabash R. Co.*, 370 U.S. 626, 631 (1962), and to prevent further "abuses, oppression, and injustice," *Gumbel v. Pitkin*, 124 U.S. 131, 144 (1888).

## I.    Factual and Procedural Background

To understand this disturbing situation, the Court ordered various individuals and entities to produce information and documents for its consideration. The Court sets forth those orders below, as well as the responses and refusals to comply with the Court's orders.

### A. The Stage of the Litigation in January and February 2024

On May 3, 2023, the Court issued an amended scheduling order for the class action case. (ECF No. 2435.) The order specified that the trial against Defendants Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively, "VNA") would begin on February 13, 2024. (*Id.* at PageID.77434.)

On January 17 and 18, 2024—less than one month before the class trial was scheduled to start—the Court summoned jurors to complete a questionnaire at the Ann Arbor Federal Building, the planned location of

the trial. These jurors were subject to the Court's summons until March 15, 2024.

On January 22 and 23, 2024, the Court held hearings on the parties' motions in limine. During the hearing, the Court denied Class Plaintiffs' motion to prohibit "social and digital media advertising *as to the case's merits* solely in the counties in this judicial district from which jurors are summoned." (ECF No. 2707, PageID.88568 (emphasis in original).) Class Plaintiffs' motion arose from an ongoing dispute about VNA's use of social media during *Bellwether I*. (*See, e.g.*, ECF No. 2453.) In considering the motion, the Court asked VNA whether it planned to change its use of social media or advertising during the upcoming trial. (ECF No. 2820, PageID.93418.) VNA's counsel Kelly Kramer of Mayer Brown LLP, stated that he was "not aware of any change with respect to paid advertising at all" and that he was "not aware of any plans to tweak" VNA's approach to public relations about the case. (*Id.*) The Court denied the motion because it found that Class Plaintiffs' requested relief—a prohibition on certain social and digital media use—was not narrowly tailored. The Court also found that reasonable alternatives were available to avoid any prejudice from the limited digital media releases

that VNA represented would only appear in an internet feed if someone entered certain search terms. (*Id.* at PageID.93419–93421.) The Court cautioned, however, that it has "the power and the responsibility and authority to make sure that neither side's actions prejudice the jury. And so [the Court will] keep an eye on that throughout the case." (*Id.* at PageID.93421–93422.) The Court noted the use of gag orders in other cases and told the parties to keep the Court apprised about any developments that might threaten the fair administration of justice in this case. (*Id.* at PageID.93422 ("I would just ask that both sides bring to my attention . . . . if there are public statements being made specifically by lawyers that would impact the fair administration of justice . . . . and also by clients.").)

On January 29, 2024, Class Plaintiffs filed their Motion for Final Approval of Class Settlement with LAN[1] Defendants. (ECF No. 2827.) That same day, Class Plaintiffs and VNA informed the Court of a tentative settlement and their intention to seek a stay of the class trial, which had been scheduled to begin on February 13. That same morning,

---

[1] Leo A. Daly Company; Lockwood, Andrews & Newnam, Inc.; and Lockwood, Andrews & Newnam, P.C. (collectively "LAN").

VNA issued a press release that attacked Mr. Stern—a lawyer not involved in the class settlement.[2] (ECF No. 2842-3, PageID.94051.)

On February 1, 2024, Class Plaintiffs and VNA filed a stipulation to stay the class trial for forty-five days, (ECF No. 2828), which the Court granted. That day, VNA announced the settlement in a press release that again criticized Mr. Stern even though Mr. Stern and his clients were not involved in the class settlement with VNA whatsoever. *See Veolia North America Reaches $25 Million Settlement Agreement with Flint Water Litigation Class*, Veolia Flint Facts (Feb. 1, 2024), https://veoliaflintfacts.com/facts-court/veolia-north-america-reaches-25-million-settlement-agreement-with-flint-water-litigation-class/ [https://perma.cc/UN67-GUSU].

On February 6, 2024, the Court held an in-chambers conference with VNA's counsel and Co-Liaison Counsel for Individual Plaintiffs, including Mr. Stern, to discuss court-ordered mediation of the remaining

---

[2] The press release stated that recent discovery in the litigation was "a desperate attempt by plaintiffs' lawyer Corey Stern to lay blame for his loss in trial," apparently referring to the August 2022 mistrial in *Bellwether I*. (ECF No. 2842-3, PageID.94051.) The press release also accused Mr. Stern of a "shameful scheme to make as much money as possible off the Flint Water Crisis." (*Id.*)

non-class cases and to commence that process. The Court instructed the parties to engage in the mediation process in good faith.

## B. Contact with Represented Parties, Including a Minor Child

While the Court was holding the in-chambers conference on February 6, 2024, employees of Actum LLC ("Actum"), a public relations firm, were contacting Flint residents by phone and by direct messages on social media. Actum works for VNA, as well as its French parent company, Veolia Environnement S.A. ("VE"). (ECF No. 2855, PageID.94277–94278.) VNA has three written agreements with Actum, one of which dates to 2022 and relates to "political strategy and media relations services." (*Id.* at PageID.94277.) VE hired Actum through an oral agreement in October 2021, to provide "brand protection and public relations consulting on an as needed basis, including with respect to the Flint Water Cases," including to VE's subsidiary VNA. (ECF No. 2870, PageID.94428; ECF No. 2855, PageID.94278.)

Actum employees contacted a minor child and several Flint residents who are represented by counsel or are members of the certified class action in this litigation. These contacts—many if not all of which appear to have occurred on February 6, 2024—are discussed below.

6

Two Actum employees, Paul Persaud and Michael McKeon, called Arthur Woodson and asked to speak with Pastor Alfred Harris. (ECF No. 2855, PageID.94280.) Mr. Persaud and Mr. McKeon were "seeking comment about attorney Corey Stern, for an article [that either Mr. Persaud or Mr. McKeon] explained was being published by the New York Post." (ECF No. 2842-2, PageID.94048.) Mr. Woodson initially had the impression that he was being contacted directly by the *New York Post*, and he explained that the caller had the wrong number for Pastor Harris. (*Id.*) Mr. Woodson later realized that someone named Paul Persaud, who worked for Actum, had called him based on the caller ID and a "quick internet search." (*Id.*) Mr. Woodson called Mr. Persaud back, and Mr. Persaud mentioned a purportedly forthcoming *New York Post* article that would be critical of Mr. Stern. (*Id.* at PageID.94049.) Mr. Persaud indicated that "he was seeking Flint residents to comment for the story." (*Id.*) Mr. Woodson declined Mr. Persaud's invitation to comment on Mr. Stern and instead stated, among other things, that "Veolia is just trying to make [Mr. Stern] look bad." (*Id.*) One of the Actum employees then proceeded to discuss the Court's rulings, asserting that the Court had

rejected certain claims Mr. Stern had made that VNA "had geotargeted jurors [during the Bellwether I trial]." (ECF No. 2855, PageID.94280.)

Mr. Woodson was also contacted by a web-based broadcast, *Roland Martin Unfiltered*, to ask whether he would appear on an episode of the broadcast that he was told would address the ten-year anniversary of the Flint Water Crisis. (ECF No. 2845, PageID.94060.) He apparently chose not to appear on the broadcast. That episode, which aired February 7, 2024—more than two months before the ten-year anniversary of the crisis—discussed comments made by Mr. Stern on a podcast in 2018. After the February 7, 2024 *Roland Martin Unfiltered* episode aired, Actum issued a press release, which referenced the episode in what appears to be an attempt to stoke outrage against Mr. Stern. (*Id.* at PageID.94061, 94066.) Newspapers in the Eastern District of Michigan, as well as elsewhere, then covered Mr. Stern's 2018 comments.

Mr. Persaud and Mr. McKeon also called Bernadel Jefferson. They told her they were contacting her because the "New York Post was seeking comment for a potential story regarding Corey Stern's comments on a podcast." (ECF No. 2855, at PageID.94279.) They sent a recording of Mr. Stern's comments to Ms. Jefferson. (*Id.*)

In addition, Mr. Persaud left a message with Pastor Kevin Thompson, a client of Napoli Shkolnik, the law firm of Co-Liaison Counsel for Individual Plaintiffs Hunter Shkolnik. Mr. Persaud's message stated that "the New York Post was seeking comment for a potential story regarding Corey Stern's comments on a podcast." (*Id.* at PageID.94279–94280.) Pastor Thompson stated in a declaration that his church's staff "were [led] to believe [Mr. Persaud] was a reporter for the New York Post" and that he only learned of Mr. Persaud's role at Actum later. (ECF No. 2846-1, PageID.94070.) Pastor Thompson was "subsequently contacted as a follow up to Mr. Persaud's call" and invited to appear on the previously mentioned episode of *Roland Martin Unfiltered* where Pastor Thompson was unexpectedly asked about Mr. Stern's comments. (ECF No. 2845, PageID.94066; ECF No. 2846-1, PageID.94070–94071 ("I was then subsequently contacted as a follow up to Mr. Persaud's call to appear on a Podcast, again, to discuss my thoughts on the 10th anniversary of the Flint water crisis. I was not advised I was going to be asked about Mr[.] Stern or comments he made in the past.").)

Mr. Persaud called Pastor Alfred Harris but did not reach him and did not leave a message. (ECF No. 2855, PageID.94280.)

Ms. Rachel Noerdlinger, a different Actum employee, contacted a minor child who lives in Flint by Instagram Direct Messenger. (ECF No. 2845, PageID.94064.) Like Mr. Persaud and Mr. McKeon, Ms. Noerdlinger solicited comments for a supposed *New York Post* story about Mr. Stern. (*Id.*) In addition, she mentioned the upcoming *Roland Martin Unfiltered* broadcast and referenced earlier settlements in this litigation in her message. (*Id.*)

Late on February 6, 2024—the day of the Court's in-chambers conference and Actum's contacts with Flint residents—the Court first learned about the public relations campaign against Mr. Stern. Mr. Stern informed the Court about Actum's contacts with Flint residents in an email copied to VNA's counsel, which included a declaration from Mr. Woodson and a copy of the January 29, 2024 Veolia press release that included attacks against Mr. Stern. (ECF No. 2842-1.) Flint residents subsequently provided further letters and declarations to the Court in which they raised their concerns about the public relations campaign. (ECF Nos. 2840, 2842-2, 2845, 2846-1.) In an email sent to the Court on

February 11, 2024, Co-Liaison Counsel for Individual Plaintiffs Hunter Shkolnik expressed concern about the public relations campaign and requested a pause on the mediation the Court had ordered during the in-chambers meeting the previous week. (ECF No. 2843.) The Court granted Mr. Shkolnik's request to postpone the mediation due to the obstacles the public relations campaign against Mr. Stern had created for good-faith negotiations.

### C. The February 13, 2024 Hearing and the Truck

The Court became concerned that the public relations campaign against Mr. Stern was interfering with the fair administration of justice. Specifically, the Court considered the possible prejudicial impact of the campaign on the jury pool, pending settlements, and the relationship between Plaintiffs' counsel and their clients, among other issues. (ECF No. 2848, PageID.94082.) The Court was also concerned about whether counsel for VNA, VE, or Actum were involved in this conduct and, if so, whether they had violated their professional responsibilities. (*See* ECF No. 2837, PageID.94027.)

VNA did not to respond to any of the submissions from Plaintiffs' counsel and Flint residents. The Court then held a hearing on February

13, 2024, to address the Court's concerns identified above. (ECF No. 2837.)

During the hearing, the Court learned of a startling development: a truck was circling the Ann Arbor Federal Building where the hearing was taking place. While the Court conducted the hearing, the truck broadcasted attacks against Mr. Stern, quoting obscene language, maligning the settlements in this case, and providing a link to a website dedicated to criticizing Mr. Stern. (ECF No. 2848, PageID.94105–94106.) VNA's counsel Michael Olsen, also of Mayer Brown LLP, later informed the Court in his February 16, 2024 declaration that several Actum employees "were involved in the arrangement of the truck." (ECF No. 2855, PageID.94285.) Mr. Olsen also asserted that no lawyers or employees working on behalf of VNA or VE had any knowledge of the truck before the hearing. (*Id.*)

The Court has reason to believe that when Actum arranged the truck and the website, it acted within the scope of its agreements with VNA and VE, as their agent. (ECF No. 2857.) VNA and VE have never indicated otherwise. No one has asserted that Actum, a firm working on behalf of VNA and VE, performed this stunt pro bono. According to

12

Plaintiffs' counsel, the man driving the truck was being paid for his services. (ECF No. 2858-1, PageID.94303.) The Court, based on the record before it, thus attributes the hiring of the truck and the creation of the website to VNA, VE, and Actum.[3]

No one from VNA, VE, or Actum—nor anyone representing them— has explained the intention behind the truck and the website attacking Mr. Stern despite the Court ordering them to do so. (ECF No. 2868, PageID.94422.) Mr. Olsen stated in a declaration signed on February 26, 2024 that "to [his] knowledge, neither the truck nor the website served any litigation purpose." (ECF No. 2870, PageID.94429.) Without further explanation, it appears to the Court that the truck and the website were designed to create chaos in the litigation, to produce conflict between Individual Plaintiffs' counsel and their clients, and to undermine the two existing settlements in the case.

---

[3] While VE and Actum are not Defendants in this litigation, they have had substantial engagement with the proceedings. *See Helmac Prods. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 568 (E.D. Mich. 1993). Further, both VE and Actum were aware of the Court's inquiry into the public relations campaign. Mr. Olsen, who represents VNA, has informed the Court in multiple submissions that he is counsel for VE in this matter. (*See, e.g.*, ECF No. 2884.) VE instructed Actum to provide the Court with materials related to the public relations campaign, and Actum has been in regular contact with VNA and VNA's counsel as the Court's inquiry has unfolded. (ECF No. 2870, PageID.94427, 94432–94433.)

Plaintiffs' counsel Moshe Maimon raised an additional concerning allegation during the hearing on February 13, 2024:

> One year ago we learned that a private investigative firm name[d] Guidepost Solutions [] contacted personal and professional colleagues and acquaintances of Mr. Stern under the pretense of acting on behalf of, quote, a client looking to engage with [Mr. Stern] on a potential future project.

(ECF No. 2848, PageID.94110.) Mr. Maimon explained that "a simple search [by Mr. Stern's firm] revealed that Guidepost does not deal with the type of clients that [] Mr. Stern['s] [] firm represent[s]." (*Id.*) He indicated that this issue was not brought to the Court's attention earlier because he and his co-counsel "had no evidence at the time and [they] have no evidence today of a direct connection between Guidepost [Solutions] and VNA or defense counsel." (*Id.* at PageID.94111.) But Plaintiffs' counsel suspected these investigations by Guidepost Solutions were related to the campaign against Mr. Stern and therefore alerted the Court about them during the hearing. (*Id.*)

In his February 26, 2024 declaration, VNA's counsel Mr. Olsen subsequently stated:

> VNA and the outside lawyers for VE and VNA have no knowledge regarding the alleged retention of Guidepost Solutions. Similarly, VNA and the outside lawyers for VE and

14

VNA have no documents relating to the alleged retention of Guidepost Solutions.

(ECF No. 2870, PageID.94429.) VE and Actum have not responded to the allegations about Guidepost Solutions, and VE has not responded to the Court's request for any documents it has related to the allegations.

The Court has no reason to doubt Mr. Maimon's statement that this private investigation occurred. Such an investigation could have been a poorly-orchestrated and apparently unsuccessful attempt by VNA or VE to gather information to use against Mr. Stern.  This would certainly be consistent with VNA, VE, and Actum's campaign against Mr. Stern. It could also have been designed to intimidate Mr. Stern by making him aware he was being targeted. Thus far, VE and Actum have not come forward to disclaim responsibility for the investigation or to provide any substantive response to the Court regarding this issue.

### D. The Court's Orders Following the February 13, 2024 Hearing

Following the hearing on February 13, 2024, the Court issued three separate orders. It issued a February 13, 2024 order, (ECF No. 2847), a February 21, 2024 order, ((ECF No. 2862 (Original Order); ECF No. 2868

(Amended Order)[4]), and a March 5, 2024 order. (ECF No. 2877.) The first two orders required the production of information crucial to the Court's inquiry into the public relations campaign against Mr. Stern. The third order required the production of information related to VNA's assertion of privilege over some of the materials provided in response to the first two orders.

On February 13, 2024, the Court ordered counsel for VNA to answer a set of questions and to provide information about the role of VNA, VE, Actum, and all three entities' legal counsel in the campaign against Mr. Stern. (ECF No. 2847). VNA's counsel Mr. Olsen filed a responsive declaration on February 16, 2024. (ECF No. 2855.) In that declaration, Mr. Olsen explained the agreements between Actum (including its affiliates) and VNA, as well as the agreements between Actum and VE. (*Id.* at PageID.94277–94278.) Mr. Olsen also provided information about Actum's contacts with Flint residents and identified Actum's outside counsel, Ashlee N. Lin, who "communicated with Actum regarding some of its work relating to Mr. Stern's comments on the podcast." (*Id.* at PageID.94281.) Mr. Olsen's declaration states: "None of the lawyers from

---

[4] The amended order was issued on February 23, 2024.

VE; VNA; Mayer Brown LLP; or Campbell Conroy & O'Neil, P.C., had any communication with Actum regarding the matters that gave rise to the February 13, 2024, hearing." (*Id.*) In addition, the declaration states that the lawyers were unaware of the truck. (*Id.* at PageID.94285.)

On February 19, 2024, Plaintiffs submitted a letter in response to Mr. Olsen's declaration. (ECF No. 2858.) In that letter, Plaintiffs requested that the Court order VNA and its counsel to provide additional information. VNA then filed a responsive letter arguing that most of Plaintiffs' requests should be denied. (ECF No. 2859.) Plaintiffs responded to VNA's letter. (ECF No. 2861.)

On February 21, 2024, the Court ordered VNA, VE, and their counsel to submit a declaration and related information, including some of the information Plaintiffs requested in their February 19, 2024 letter. (ECF No. 2862 (Original Order); ECF No. 2868 (Amended Order).) The Court required that the following be provided "no later than 12:00 PM on Monday, February 26, 2024" (ECF No. 2868, PageID.94422):

> 1. Mr. Olsen's [February 16, 2024] declaration indicates that none of VNA's lawyers "had any communication with Actum regarding the matters" in this controversy. Did any of VNA or VE's lawyers have any communication with VNA or VE about public relations, including communication related to media

17

releases, publications, and any other media outreach related to Corey Stern from "late 2021" to the present? If so, provide the dates, times, and format of the communications, and the names of any attorneys involved. If any of the communications were in writing or recorded, provide those communications.

2. Provide the scope of the oral agreement between VE and Actum, LLC, and all invoices and communications about payment for services between Actum, LLC and VE or VNA from "late 2021," when VNA represents that Actum, LLC was formed, to the present.

3. Provide all information and materials responsive to Items 3, 5, 6, and 7 set forth in Plaintiffs' February 19, 2024 letter.[5] (ECF No. 2858-1, PageID.94301–94304.)

[5] The February 21, 2024 order incorporated the following requests made by Plaintiffs in their February 19, 2024 letter:

"[3] Plaintiffs . . . request the Court order Veolia, its counsel, and its agents to provide a sworn statement regarding who initiated contact as between them and [the *New York Post* reporter] about the alleged 'profile piece;' when and how Veolia, its counsel, and its agents discovered the 2018 comments; and require them to produce all communications and documents related thereto. . . .

[5] Plaintiffs . . . request the Court order Veolia, its counsel, and its agents to provide a sworn statement regarding any knowledge of any Guidepost [Solutions] investigation into Mr. Stern; and require them to produce all communications and documents related thereto. . . .

[6] Plaintiffs . . . request the Court order Veolia, its counsel, and its agents to provide a declaration as to what . . . purpose the truck and website served in advancing the litigation and legal themes related to

4. Provide all emails, letters, memoranda, voice-mail recordings, video teleconferencing recordings, text messages, and any attachments related to those communications between Mr. Kelly Kramer, counsel for VNA at Mayer Brown, and representatives of Actum, LLC, identified in Mr. Olsen's declaration. (ECF No. 2855, PageID.94282–PageID.94285.) If there is no record of any of these communications, then provide a summary of the content of the communications.

(ECF No. 2868, PageID.94422.) In its order, the Court allowed VNA and VE to designate responsive material as privileged and to provide it for *in camera* review and required that certain material be provided for *in camera* review. (*Id.* at PageID.94423–94424.)

In response to the Court's February 21, 2024 order, Mr. Olsen filed a declaration on February 26, 2024. (ECF No. 2870.) He also submitted an additional declaration and exhibits for *in camera* review. (*Id.* at

---

the defense of this case; what role each of these individuals played in this phase of Veolia's defense; with whom these individuals discussed these efforts; and to produce any and all communications, drafts or other documents related to the truck, and all communications and documents related to the creation and content of the subject website, including those regarding how it came down. . . .

[7] "Plaintiffs . . . request the Court order Veolia, its counsel, and its agents to provide a declaration as to who discussed, drafted, reviewed, and approved these press releases [attacking Mr. Stern], and to produce any and all communications, drafts or other documents related to them." (ECF No. 2858-1, PageID.94301–94304.)

PageID.94428.) In the publicly-filed declaration, Mr. Olsen stated that "VE has instructed Actum to provide materials responsive to the Court's order. Actum has not yet done so." (*Id.* at PageID.94427.) Over two months later, Actum has still not provided anything to the Court and has not explained its delay. Nor has it made an appearance before the Court, including through its counsel, Ms. Lin, whose name has come up repeatedly in discussions related to the campaign against Mr. Stern.

Additionally, VE has not complied with the Court's February 21 order despite the Court's instructions for it to do so. The Court's order explicitly encompassed VE, VE's relationship to Actum, and VE's role in the events at issue here. (ECF No. 2868, PageID.94422.) VE has played a central role in the public relations campaign being considered by the Court, and the Court has been clear and emphatic that VE must respond to the Court's order. (*See, e.g.*, ECF No. 2847, PageID.94072–94073.) A full response from VE is necessary for the Court to fully investigate the public relations campaign against Mr. Stern. Yet attached to Mr. Olsen's February 26, 2024 declaration is a declaration signed by a French lawyer, Noëlle Lenoir, in which she asserts that French and European Union ("EU") law prevent VE from complying with the Court's order. (ECF No.

2870-1.) Ms. Lenoir's declaration led to further submissions from the parties. Those submissions are discussed below in a different section of this order.

On March 5, 2024, the Court issued an order requiring VNA to submit certain information related to its privilege claims over material that VNA provided for *in camera* review in response to it February 21, 2024 order, including a privilege log. (ECF No. 2877.) VNA responded with a letter citing French professional secrecy requirements and requested permission to file a redacted version of a privilege log. (ECF No. 2885.)

## II.   Analysis

The Court addresses three issues. First, the Court must decide whether to apply domestic law or to follow the rules included in the Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention" or "Hague Convention"), 23 U.S.T. 2555, with respect to the Court's February 21 order requiring VE to produce evidence. Second, the Court must determine the appropriate response to Actum and Actum's counsel's role in this affair. Third, the Court must consider future remedies to protect the fair administration of

justice in this litigation if the public relations campaign against VNA's opposing counsel continues or escalates. These three issues are addressed below.

## A. Whether to Apply Domestic Law or the Hague Convention with Respect to the Court's February 21 Order Requiring VE to Produce Evidence

Relying upon French and EU law, VE has thus far chosen not to comply with the Court's February 21 order. As set forth above, this order required VE to produce information central to understanding its role in the public relations campaign against Mr. Stern. This recalcitrance has obstructed the Court's ability to gather necessary information about the campaign against Mr. Stern, slowed the Court's response, and taken up the Court's time. As set forth below, VE's refusal is not justified, and the Court will apply domestic law.

### i. The Submissions on French and EU Law Received from VNA, VE, and Plaintiffs

The Court has received multiple submissions from VNA, VE, and Individual Plaintiffs' counsel regarding the impact of French and EU law on the Court's February 21 order requiring VE to provide information.

In her declaration submitted by VNA, Ms. Lenoir states that VE cannot comply with the Court's order, because of "(i) the [French]

Blocking Statute . . . since it channels but does not prohibit the transfer of evidence abroad[], (ii) EU Data Protection rules, and (iii) the French rules on the legal privilege under which attorney-client communications are held." (ECF No. 2870-1, PageID.94436.) Ms. Lenoir asserts that the French Blocking Statute prohibits VE from transferring evidence to United States courts except through the mechanisms established by the Hague Evidence Convention. (*Id.* at PageID.94436–94437.) She asserts that VE faces a "significant" risk if it complies with the Court's order, because a French Ministry created in 2016 to "assist French companies receiving discovery/pre-trial discovery requests from foreign authorities or private parties" is obligated to refer violations of the Blocking Statute for prosecution. (*Id.* at PageID. 94437–94438.) Additionally, Ms. Lenoir states that EU Data Protection rules binds United States authorities under the

> "Purpose Limitation" principle, under which personal data *"should be collected for a specific purpose and subsequently used only insofar as this is not incompatible with the purpose of processing".* [sic] This means that, in order to respect data privacy, the transmission of the names of natural persons is only permissible where knowledge of such names is essential for the purpose of the request.

(*Id.* at PageID.94438 (emphasis in original).) She contends that "[p]recautions must be taken to comply" with this principle, but she provides no indication of what those precautions might be. (*Id.* at PageID.94439.) Nor does VNA or VE. Finally, Ms. Lenoir states that the French professional secrecy law, as applicable to attorney-client communications, covers "all correspondence, and exchanges of any nature whatsoever between VE and its lawyers admitted to practice in France." (*Id.*)

VNA and VE's counsel's February 26, 2024 declaration states that "VE is not opposed to responding [to the Court's order] pursuant to procedures that do not conflict with French law." (ECF No. 2870, PageID.94427.) But beyond arguing that the Court must follow the procedures of the Hague Convention, VE's position is unclear. VE does not indicate whether EU Data Protection rules or French professional secrecy law would prevent it from responding to the Court's order if the Court followed the Hague Convention's procedures. Ms. Lenoir's declaration and VNA's subsequent submissions related to French law also do not identify specific portions of the Court's order to which VE

24

objects, so VE appears to be asserting a blanket objection to compliance with the Court's order.

Mr. Shkolnik, Co-Liaison Counsel for Individual Plaintiffs, responded to VE and Ms. Lenoir on March 6, 2024. He argues that VE violated the Court's order and that "it borders on the absurd that these Defendants would seek to be absolved of their reprehensible conduct by simply funneling th[e] campaign [against Mr. Stern] through the French entity then seek to hide behind the French Blocking Statute to prevent this Court from meting out punishment." (ECF No. 2879-1, PageID.94809.) Mr. Shkolnik asserts that "there is no basis for VE's contention that, having chosen to run the smear campaign against Mr. Stern and engaging in direct communications with represented plaintiffs[] from France rather than through its subsidiaries operating in Michigan, it can now refuse to disclose the information sought by this Court based on its self-imposed predicament [because complying with the Court's order] would violate the French Blocking Statute." (*Id.* at PageID.94809.) Mr. Shkolnik requests that the Court set a deadline for VE to comply, after which sanctions would be imposed, potentially

including the imposition of a default judgment against VNA. (*Id.* at PageID.94810–94811.)

Mr. Shkolnik relies on a Supreme Court decision that indicates that a district court in the United States seeking evidence from a foreign entity is not obligated to employ the Hague Convention's procedures by default. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987). In that case, the Supreme Court held that "the [Hague] Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad." *Id.* at 536. The Supreme Court rejected the notion that the Hague Convention made U.S. courts subject to foreign judicial authorities. *Id.* at 539. Rather, the Hague Convention's procedures are "optional." *Id.* at 541. District courts are not obligated to use burdensome Letters of Request, which request that foreign authorities assist in obtaining evidence, and can use the Federal Rules of Civil Procedure instead, as well as, presumably, their inherent powers. *Id.* at 542.

On March 11, 2024, VE, through its counsel Mr. Olsen, responded to Mr. Shkolnik's letter. (ECF No. 2884.) According to VE, *Aerospatiale*

states that district courts "should evaluate on a case-by-case basis whether a litigant may compel discovery directly from a foreign corporation or whether the litigant should be required to use the Hague Convention process, taking into account the nature of the discovery sought and the interests of international comity." (ECF No. 2884, PageID.94848.) VE states that despite only enforcing the Blocking Statute a single time in 2007, France is now getting serious about enforcement; the French government issued guidance to French companies in 2019 on "strengthening the effectiveness of the French Evidence Law," and a decree that took effect in 2022 requires French companies to inform the government when they receive a request for evidence from a non-French court. (*Id.* at PageID.94849.) Attached to VE's response is a letter addressed to VE from the French government that is dated March 11, 2024 and that states that VE is bound by the French Blocking Statute. (ECF No. 2884-1.)

On March 14, 2024, Mr. Shkolnik responded to VE's March 11 letter. (ECF No. 2886.) In his response, he enumerates several points that he asserts are undisputed by VE, emphasizing that VE was on notice that its conduct could expose it to orders from the Court that would trigger

the French Blocking Statute. (ECF No. 2886-1, PageID.94870.) Essentially, his position is that VE had every reason to know that the Blocking Statute was in place and that the Court was going to exercise "vigilan[ce]" with respect to conduct that might prejudice the Court's proceedings. (ECF No. 2820, PageID.93423.) Mr. Shkolnik accuses VE of engaging in gamesmanship and urges the Court not to follow the Hague Convention, because "VE's current predicament is entirely of its own making, having embarked on this contemptuous path with [the] calculated goal of trying to hide behind the French statute while thumbing its nose at this Court." (ECF No. 2886-1, PageID.94870.) He reiterates his request that the Court impose a default judgment against VNA if VE continues to refuse to comply with the Court's order. (*Id.*)

VE responded to Mr. Shkolnik's March 14 letter by submitting a letter to the Court and another declaration from Ms. Lenoir on March 18, 2024. (ECF No. 2891.) VE defends its conduct as "entirely permissible" and states that "the underlying statements directly relate to the Flint water litigation and VE had no involvement in those statements." (*Id.* at PageID.94930.) The Court, however, rejects VE's denial of involvement in the campaign against Mr. Stern insofar as the statements to which VE

refers were made by VE's agent, Actum, while acting within the scope of its agreements with VE and VE's subsidiary, VNA. In its response, VE again states that it wants the Court to use the Hague Convention. VE notes that the Convention was previously implemented to secure deposition testimony from a VE employee at the request of Class Plaintiffs, though that was done over VNA's objections. *In re Flint Water Cases*, 5:16-cv-10444, 2020 WL 2097652 (E.D. Mich. May 1, 2020). VE asserts that the Hague Convention's procedures offer a "workable and available solution." (ECF No. 2891, PageID.94930.) Yet even if that claim were true (which is far from clear), VE has raised broad objections to complying with the Court's order under French and EU law, as the Court set forth above. That means that even if the Court followed the Hague Convention, it appears VE would still have broad objections to complying with the Court's order, which is far from a workable solution.

Ms. Lenoir's March 18 declaration submitted by VE analyzes possible consequences for VE if it violates French law. (ECF No. 2891-1.) She states that beyond potential fines, VE could face reputational damage, a criminal record, and civil liability. (*Id.*) Ms. Lenoir refers to possible consequences like the impact on the company's reputation with

29

foreign authorities and the possibility that, if VE finds itself in the same situation in the future and it violates French law, its managers could theoretically face incarceration. (*See id.* at PageID.94934.) Additionally, VE objects to Mr. Shkolnik's suggestion that VNA should face a default judgment due to VE's refusal to comply with the Court's order. (ECF No. 2891, PageID.94930–94931.) VE, without citing any authority, argues that if the Court imposed "*any* sanction here," such an imposition would impermissibly infringe on VE and VNA's First Amendment and "due-process rights to put on their defenses." (*Id.* at PageID.94931 (emphasis added).)

> ii. *The Applicable Comity Analysis Favors Applying Domestic Law and Requiring VE to Comply with the Court's February 21 Order to Produce Evidence*

The question before the Court is whether to apply domestic law or the Hague Convention. The burden is on the proponent of applying the optional procedures of the Hague Convention to persuade the Court to apply these procedures. *See Trueposition, Inc. v. LM Ericsson Tel. Co.*, No. 11–4574, 2012 WL 707012, at *3 (E.D. Pa. Mar. 6, 2012) (indicating that the procedures of the Hague Convention are optional and are available to facilitate gathering evidence).

Under *Aerospatiale*, this Court is not required to follow the Hague Convention's procedures. 482 U.S. at 541. District courts have discretion to determine whether to apply domestic law or the Hague Convention. *See Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 498 (N.D. Ill. 2021). In making this determination, the Court must consider foreign entities' concerns—including related to their own legal systems—about orders to produce evidence; the Court is not bound by these concerns, however. *Aerospatiale*, 482 U.S. at 546 ("American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication."); *United States v. First Nat'l Bank of Chi.*, 699 F.2d 341, 345 (7th Cir. 1983) ("The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production. Rather what is required is a sensitive balancing of the competing interests at stake." (cleaned up)). The Supreme Court noted in *Aerospatiale* that "[i]n many situations the Letter of Request procedure

authorized by the [Hague] Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than" domestic evidence procedures. *Aerospatiale,* 482 U.S. at 542.

Ultimately, the Supreme Court treats the question of whether to follow the Hague Convention's procedures as a matter of international comity, requiring a "particularized analysis of the respective interests of the foreign nation and the requesting nation." *Id.* at 543–44. The Supreme Court instructs that the comity analysis must consider the following factors:

> (1) the importance to the . . . litigation of the documents or other information requested;
> (2) the degree of specificity of the request;
> (3) whether the information originated in the United States;
> (4) the availability of alternative means of securing the information; and
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Id.* at 544 n.28 (quoting the Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c)).

The Sixth Circuit has also found that the Hague Convention is not an absolute constraint on district courts. In a case before the Sixth

32

Circuit, the defendants refused to comply with discovery requests based on the Hague Convention and their alleged risk of prosecution under French penal law. The Sixth Circuit determined that

> the district court's formulation of discovery procedures need not require conformity to the Hague Convention evidence procedures. Instead, the district court should scrutinize "the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. ——, 107 S.Ct. 2542, 2555–56, 96 L.Ed.2d 461 (1987).

*Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 452 n.6 (6th Cir. 1988), *abrogation on other grounds recognized by O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009). Notably, the Sixth Circuit did not mention the likelihood of enforcement of foreign law, which VE emphasizes so heavily.

VE does not come close to meeting its burden of persuading the Court that the *Aerospatiale* comity analysis favors employing the procedures of the Hague Convention. *See In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 305 (3d Cir. 2004). VE ignores the majority of the factors included in the comity analysis. Though VE mentions *Aerospatiale*, it focuses on the sovereign interest of France and

33

the likelihood that France will enforce its laws against VE. VE does not address, for instance, the importance of the evidence requested or whether noncompliance would undermine important interests of the United States, among other *Aerospatiale* factors. Not only that, but despite providing two declarations from a French lawyer, VE does not identify any examples of the French government enforcing its Blocking Statute in circumstances such as these—as opposed to providing advisory letters about when the law applies. Even if VE provided stronger evidence of enforcement, VE does not satisfy its burden to show that the Court should apply the Hague Convention, because the other factors in the comity analysis strongly favor applying domestic law. Accordingly, VE must comply with the Court's order.

In conducting its own analysis of the *Aerospatiale* factors, the Court finds that the factors weigh heavily against application of the Hague Convention. Regarding the first factor—the importance of the requested materials to the litigation—the documents and other information the Court ordered VE to produce are crucial to informing the Court's decisions about how to preserve the integrity of these proceedings. Therefore, this factor weighs against applying the Hague Convention. *See*

34

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992) (finding that this factor weighs against applying the Hague Convention when evidence is "not only relevant . . . , it is crucial"); *see also Inventus Power*, 339 F.R.D. at 501.

The second factor assesses the specificity of the request. Here, the Court's order is specific, clear, and limited. VE has raised various objections to complying, but none of these objections relate to the specificity of the Court's order. *See Richmark Corp.*, 959 F.2d at 1475 (finding that the second *Aerospatiale* factor weighs against applying the Hague Convention when the information sought is limited and specific rather than "generalized" and when the party from which information is sought "has not made this factor an issue"). Thus, the second *Aerospatiale* factor also weighs against applying the Hague Convention.

The third factor, whether the information originated in the United States, is not entirely clear. Some of the communications very likely involved domestic recipients. This factor is therefore neutral as to whether to apply the Hague Convention. *See Knight Cap. Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681, 690 (E.D. Mich. 2017).

The fourth factor is whether there are alternative means to secure the requested information. The Court is seeking to determine VE's role in the campaign against Mr. Stern. VNA and VE have suggested no other way for the Court to obtain the evidence it has ordered VE to provide, nor has Actum. In fact, though VE states that it "wishes to fully cooperate with the Court's inquiry and can do so consistent with [the French Blocking Statute] through the Hague Convention," (ECF No. 2891, PageID.94930), it also indicates that there are obstacles—beyond the French Blocking Statute—to providing the material the Court ordered it to submit. (ECF No. 2870-1, PageID.94436 (stating that VE "may not respond" due not just to the French Blocking Statute but due to other EU Data Protection rules and French rules on legal privileges, as well).) VE is therefore equivocal about whether it will fully comply *even if* the Court applies the Hague Convention. *See Salt River Project Agric. Improvement and Power Dist. v. Trench France SAS*, 303 F. Supp. 3d 1004, 1010 (D. Ariz. 2018) (deciding to apply the Hague Convention's procedures in part based on a party's assertion "without equivocation" that it would comply with an order that followed the Hague Convention's procedures). As a result, the fourth factor does not favor applying the Hague Convention.

Finally, the fifth factor requires the Court to "assess the interests of each nation in requiring or prohibiting disclosure[] and determine whether disclosure would 'affect important substantive policies or interests' of either [state]." *Richmark Corp.*, 959 F.2d at 1476 (citing *Restatement (Third) of Foreign Relations Law* § 442 comment c.). Some courts have recognized this factor as the most important one. *Id.*

As far as relevant French interests, the March 11 letter from the French government regarding the Court's order invokes "French interests in terms of respect for international law." (ECF No. 2884-1, PageID.94854.) American courts have also recognized the French interest in "controlling foreign access to information within its borders, and in protecting its citizens from foreign discovery practices it views as antithetical to the French legal culture." *Salt River*, 303 F. Supp. 3d at 1009 (cleaned up).

These French interests must be weighed chiefly against the United States' national interest in requiring the disclosure of evidence the Court has ordered to be produced.[6] The national interest implicated here is

---

[6] Frequently, the interests of the United States that courts must weigh are its interest in vindicating the interests of American plaintiffs and its interest in making

whether a United States court may—in a fully-informed manner—exercise "powers which cannot be dispensed with . . . , because they are necessary to the exercise of all others." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812). At stake in this case is whether the Court's exercise of its inherent, equitable powers is constrained—and potentially frustrated and delayed—by foreign statutes. That is, the United States has an interest in its courts' ability to carry out their functions, including

---

sure that both parties provide equal disclosure. *See Salt River*, 303 F. Supp. 3d at 1009. These two national interests are at issue here. But the key interests in this case are different than in the typical case where one party seeks discovery as part of an adversarial process. *See, e.g., Aerospatiale*, 482 U.S. at 524–25. As set forth above, this inquiry into the campaign against Mr. Stern is an exercise of the Court's inherent powers, which enable a court to manage its own affairs in an "orderly and expeditious" manner, *Link*, 370 U.S. at 631, and to prevent "abuses, oppression, and injustice." *Gumbel*, 124 U.S. at 144.

One of VE's submissions reveals confusion about the nature of the Court's inquiry into the campaign against Mr. Stern. VE states that it "respectfully requests that the Court require Plaintiffs to follow the Hague Convention process to obtain evidence from VE." (ECF No. 2884, PageID.94850.) The Court has explained repeatedly to the parties that the Court is addressing this public relations campaign under its inherent powers and that this inquiry conducted by the Court is not an adversarial discovery dispute between the Parties. (*See, e.g.*, ECF No. 2837, PageID.94028; ECF No. 2868, PageID.94421 n.1.) It is therefore not Plaintiffs' burden to "follow the Hague Convention." (ECF No. 2884, PageID.94850.) The core reason the Court is, regrettably, forced to conduct this inquiry is to ensure the fair administration of justice, a matter in which all parties have an interest. Plaintiffs are not seeking evidence from VE. Rather, the Court has ordered VE, VNA, and others to produce evidence so that the Court can make informed decisions about how to move this case forward in a fair, just, and expeditious manner.

by exercising their inherent powers to protect proceedings against disruptions, prejudice, and other misconduct. *See Chambers v. NASCO Inc.*, 501 U.S. 32, 43–45 (1991). That is a significant national interest, which outweighs the French national interest in controlling the flow of information outside France's borders. Thus, the fifth factor does not favor the application of the Hague Convention.

In sum, four out of five of the *Aerospatiale* factors weigh against applying the Hague Convention. The Court has considered the "special problems" VE claims it will face if required to comply with the Court's order, particularly due to the French Blocking Statute. But, as set forth above, the Court is not persuaded that foreign law is likely to be enforced against VE, nor does any threat of enforcement outweigh the importance of the factors the Court has considered in the comity analysis from *Aerospatiale*. Accordingly, the Court does not apply the Hague Convention and instead applies domestic law. Under domestic law, VE must comply with the Court's order. VE's refusal to do so is not justified.

Nor does the fact that VE is a non-party mean they can refuse to comply with the Court's order. The Court's inherent powers to enforce its orders extends to a non-party like VE, because VE is significantly

39

involved in this litigation. *Helmac Prods. Corp.*, 150 F.R.D. at 564–68; *see also Chambers*, 501 U.S. at 44 (holding that the inherent power to punish for contempt to enforce obedience to court orders "reaches both conduct before the court and that beyond the court's confines."). Based on the Court's extensive experience with this case, as well as its review of the record, including *in camera* submissions, the Court finds that there is a close connection between VE and this litigation—especially as pertains to this inquiry into the public relations campaign against Mr. Stern. And now VE and VNA have confirmed that VE hired Actum in part to work on behalf of VNA. (ECF No. 2870, PageID.94428; ECF No. 2855, PageID.94278.)

VE and VNA made a deliberate choice to hire Actum, the public relations firm that engaged in a campaign against VNA's opposing counsel, as revealed by the evidence reviewed by the Court *in camera*. Other evidence reviewed *in camera* demonstrates that VE must have known that Actum engaged in this campaign without any concern for how its actions would disrupt the litigation. The evidence also shows that VE became aware of the truck and the website attacking Mr. Stern and was informed about the Court's serious concerns about both things, but it

40

elected not to respond or to instruct its agent, Actum, to change its conduct.

VE takes the remarkable position that "its activities regarding Mr. Stern[]" were "appropriate." (ECF No. 2884, PageID.94848.) The Court disagrees. Hiring a public relations firm to engage in a concerted campaign against an attorney litigating against its subsidiary is not appropriate conduct, made even worse by the way the campaign has been carried out. There is no indication that VE considered whether the conduct it hired Actum to perform was detrimental to the integrity of this litigation. To the contrary, the evidence demonstrates a disregard for whether the campaign prejudiced or otherwise disrupted the Court's proceedings.

Because the comity analysis favors applying domestic law, the Court requires VE to comply with its order. (ECF No. 2868.) The deadline for VE to comply is May 20, 2024 at 12:00 PM.

### B. The Court's Response to Actum and Actum's Counsel

Actum, an agent of VNA and VE, has an important role in the campaign against Mr. Stern, as does Actum's counsel. The Court's findings regarding Actum's work on behalf of VNA and VE related to the

campaign are discussed below. Also discussed below are Actum's counsel's involvement in the campaign and counsel's possible violations of certain rules of professional conduct.

> i. *The Court's Findings Regarding Actum's Work on Behalf of VNA and VE Related to the Campaign*

Actum has issued press releases, contacted Flint residents (including represented parties and a minor child), hired a truck to circle the federal courthouse in Ann Arbor during a hearing that was attended by Flint residents, and created a website as part of VNA and VE's campaign against Mr. Stern.

The contacts with Flint residents were deceptive and improper. Arranging the truck and creating the website was inflammatory, egregious, and disruptive and, astoundingly, came in response to an inquiry into its contacts with Flint residents. Based on the Court's consideration of the evidence (provided both publicly and *in camera*), VNA and VE's campaign, executed by Actum, demonstrates, at best, a willful disregard for whether their actions might prejudice or interfere with these proceedings. At worst, the campaign demonstrates VNA, VE, and Actum's intent to prejudice or interfere with the proceedings.

42

Evidence reviewed by the Court *in camera* indicates that in January 2022 Actum proposed a plan to VE and VNA where Actum would engage in this sort of conduct on their behalf. At that time, Actum advocated attacking Plaintiffs' attorneys, including Leslie Kroeger, Co-Lead Class Counsel Theodore Leopold, Cary McGehee, Co-Lead Class Counsel Michael Pitt, and Co-Liaison Counsel for Individual Plaintiffs Hunter Shkolnik.[7]

---

[7] VNA provided the Court with Actum's proposal in an *in camera* submission. (*See* ECF No. 2885-2, PageID.94861.) Exhibit A to the submission contains an email dated January 27, 2022. Actum's proposal is attached to that email. The email's recipients include non-lawyers. VNA asserted attorney-client privilege over Actum's proposal, which it describes as a "[p]resentation regarding [a] proposed brand protection effort." (*Id.*) The Court finds, however, that the attorney-client privilege does not attach to the presentation itself.

Under Michigan law,

[t]he attorney-client privilege attaches to direct communication between a client and his attorney as well as communications made through their respective agents. *Grubbs v. K Mart Corp.*, 161 Mich. App. 584, 589, 411 N.W.2d 477 (1987). The scope of the attorney-client privilege is narrow, attaching only to confidential communications by the client to his advisor that are made for the purpose of obtaining legal advice. *Yates v. Keane*, 184 Mich. App. 80, 83, 457 N.W.2d 693 (1990).

*Reed Dairy Farm v. Consumers Power Co.*, 227 Mich. App. 614, 618–19 (1998).

Here, the document at issue is a proposal created by Actum, a public relations firm, for its clients, VE and VNA, for non-litigation purposes: public relations and media strategy. VNA acknowledges the document's non-litigation purposes in

43

Actum has not provided an explanation for any of its conduct aside from VNA's counsel's assertion that the truck and the website were not intended to further any permissible litigation strategy. (*See* ECF No. 2870, PageID.94429.)  It has not provided any materials to the Court, nor has it made any appearance or submission through its attorney or otherwise.

Actum cannot explain its lack of a response by claiming that it is unaware that the Court is inquiring into the public relations campaign.

---

describing the document as a "[p]resentation regarding [a] proposed brand protection effort." (ECF No. 2885-2, PageID.94861.) In other words, Actum's proposal is not a "confidential communication[] by [a] client to [its] advisor . . . made for the purpose of obtaining legal advice." *Reed Dairy Farm*, 227 Mich. App. at 618–19 Therefore, Actum's proposal is not covered by the attorney-client privilege, which is "narrow" in scope. *Id.* at 618.

Further, the Court has previously held that "sharing attorney-client privileged communications with [non-lawyers at] a public relations firm is a waiver of the privilege" when shared "for the purpose of public relations or media strategy." (ECF No. 2764, PageID.91995–91997 (citation omitted).) Even if Actum's proposal was somehow privileged, that privilege was waived because the proposal was shared "for the purpose of public relations or media strategy." (*Id.* at PageID.91997.) The proposal was shared with non-lawyers whose roles involve strategy and communications and who could not have provided legal advice in response to this non-litigation document. (ECF No. 2885-1, PageID.94858–94859.) As a result, there is no basis for the attorney-client privilege to attach to Actum's proposal.

Accordingly, VNA must provide Actum's proposal to opposing counsel as instructed below.

Mr. Olsen asserted in his February 26, 2024 declaration that "to facilitate the Court's inquiry, VE has instructed Actum to provide materials responsive to the Court's order. Actum has not yet done so." (*Id.* at PageID.94427.) Not only has Actum's client told it about the Court's inquiry into the public relations campaign, but the Court's review of the evidence also establishes that Actum is well-informed about this litigation, including the Court's inquiry into the campaign against opposing counsel. Actum's contacts with Mr. Kramer alone make that clear. (*See, e.g.*, *id.* at PageID.94429–94431.) Nonetheless, Actum has chosen not to provide the Court with any response.

The absence of an explanation from Actum forces the Court to draw its own conclusions. Based on the evidence before it, the Court concludes that the public relations campaign was intended to (1) harass and intimidate opposing counsel, (2) influence the jury pool and Plaintiffs' assessment of various pending settlements, (3) interfere with Plaintiffs' relationship with their attorneys, and (4) disrupt the orderly administration of this case. Actum's role in VE and VNA's campaign was absolutely contrary to the Court's fair administration of justice. The Court's review of certain evidence *in camera* makes clear that Actum,

operating with VNA and VE's approval, whether tacit or otherwise, is wholly unconcerned about the integrity of these proceedings.

The Court finds as follows regarding Actum's role in the campaign against Mr. Stern.

First, Actum's contacts with Flint residents, including represented parties, were improper and deceptive. The Actum employees did not disclose that they worked for a public relations firm, identify their relationship to VNA or VE, or explain their ties to this litigation. Instead, the employees misled multiple people, making them believe that they were being contacted by a reporter from the *New York Post*. (ECF No. 2842-2, PageID.94048 ("I initially thought the individual was a reporter for the New York Post[.]"); ECF No. 2846-1, PageID.94070 ("[W]e were [led] to believe this individual was a reporter for the New York Post.").) When he called Pastor Thompson, "Mr. Persaud did not state that he was a reporter for the New York Post" (ECF No. 2855, PageID.94280); however, what Mr. Persaud and other Actum employees did say to the individuals they contacted appears to have been calculated to make it difficult for the individuals to know that the person contacting them was working on behalf of VE and VNA. The Actum employees mentioned a

46

recognizable newspaper's name to Flint residents rather than the employees' affiliations with VNA, an adverse party in this litigation, and VE, VNA's parent company. That the Flint residents concluded they were being contacted by a *New York Post* reporter was logical.

As Mr. Woodson put it, he found it "strange that it was someone from a company [he] had not heard of, calling for a comment, rather than the reporter himself or someone else from the New York Post who was writing the story." (ECF No. 2842-2, PageID.94049.) Strange indeed. The obvious conclusion about this strangeness is that the Actum employees' approach to calling Flint residents was a deliberate attempt to obfuscate who was calling and why. Plaintiffs and other Flint residents should not be forced to investigate whether a party in this case—especially an adverse party—is trying to manipulate or deceive them.

The basis for this inquiry into the public relations campaign is, as the Court has explained, an exercise of the Court's inherent powers. (*See* ECF No. 2837, PageID.94028; ECF No. 2868, PageID.94421 n.1.) Additionally, under Federal Rule of Civil Procedure 23, "a court can control abusive communications of those—parties and nonparties alike—

who threaten or interfere with a class action." *Fox v. Saginaw Cnty.*, 35
F.4th 1042, 1047 (6th Cir. 2022). The Sixth Circuit explains:

> Abusive communications include anything related to the
> litigation that "pose[s] a serious threat to the fairness of the
> litigation process, the adequacy of representation, and the
> administration of justice generally." That could be sharing
> misleading information, misrepresenting the nature of the
> class action, or coercing prospective class members to opt out
> of a class.

*Id.* (cleaned up).

For the Court to properly exercise its control over abusive
communications under Rule 23, the Court must base any order

> on a *clear record* and *specific findings* that reflect a weighing
> of the need for a limitation and the potential interference with
> the rights of the parties that would occur if such an order is
> not [imposed]. [The record must show that] the actual or
> anticipated communications are or will be abusive in that
> they threaten the proper functioning of the litigation. . . .
> Examples of abusive communications are those that are false
> or misleading, contain material omissions, or are coercive or
> intimidating.

*Tolmasoff v. Gen. Motors*, No. 16-11747, 2016 WL 3548219 at *11 (E.D.
Mich. June 30, 2016) (cleaned up) (emphasis in original). Although a
hearing is not required prior to issuing an order, the Court in this case
has held a hearing and has considered multiple submissions related to

direct communications with represented parties. *See Allfeldt v. Carr*, 628 F. Supp. 1097, 1101 (N.D. Ohio 1985).

The Court determined above that the record demonstrates that Actum, communicating on behalf of VNA and VE, used misleading tactics when contacting represented parties and a minor who is a party in this litigation. Courts have made clear that "subterfuge and subversion constitute[] an intolerable affront to the authority of the district court to police class member contacts." *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985); *see also Perkins v. Benore Logistics Sys., Inc.*, No. 16-13717, 2017 WL 445603, at *4 (E.D. Mich. Feb. 2, 2017) (considering whether communications to class members "inform the recipient of the sender's identity and the purpose of the communication" when determining whether to restrain counsel from communicating with potential class members).

Actum has exhibited a "tendency to mislead" and to act with complete disregard for the impact of their actions on this litigation. *See Fox*, 35 F.4th at 1050. Beyond being misleading, Actum's communications are very likely to interfere with the relationship

49

between Plaintiffs and their counsel, presumably to benefit VNA, the opposing party.

On behalf of VNA and VE, Actum's employees contacted represented opposing parties about matters related to this litigation without authorization from the opposing party's attorney, failed to identify themselves as operating on behalf of an adverse party in this litigation, and contacted a minor with a claim in this litigation without authorization from their parent or guardian. Such abusive, misleading, and improper conduct has no place in this—or any—litigation and must cease immediately.

As to Actum's hiring of the truck and creation of the website, the Court has "the primary responsibility of ensuring that the judicial proceedings over which [it] presides are carried out with decorum and dispatch" and that they do not devolve into a "circus atmosphere." *CBS Inc. v. Young*, 522 F.2d 234, 241–42 (6th Cir. 1975). The Court cautions Actum and its employees that they must refrain from conduct that threatens the integrity of these proceedings, including by impeding the Court's ability to maintain decorum or by promoting a circus atmosphere.

ii.  *Actum's Counsel's Involvement in the Campaign and Counsel's Possible Violations of Certain Rules of Professional Conduct*

Actum is represented by attorney Ashlee N. Lin of Eisner, LLP. (ECF No. 2855, PageID.94281.) According to Mr. Olsen, Ms. Lin did not "direct[]" Actum's activities, but she "communicated with Actum regarding some of its work relating to Mr. Stern[]." (*Id.*)

This statement from Mr. Olsen raises as many questions as it answers about Ms. Lin's role in the campaign. The Court does not know, for instance, if Ms. Lin encouraged Actum to engage in conduct that posed a threat to the integrity of this litigation. Actum and Ms. Lin are in regular contact with VNA's counsel, particularly Mr. Kramer, apparently to track the litigation's progress. (*See* ECF No. 2870 (compiling numerous communications between VNA's counsel and Actum employees and Ms. Lin).) The Court finds that Actum and Ms. Lin are well-informed about the litigation and, as a result, they knew or should have known that Actum's conduct presented a risk to the fair administration of justice in this case. The Court also finds that Actum and Ms. Lin are aware of the Court's inquiry into the campaign against Mr. Stern, given that (1) VE instructed Actum to provide the Court with information, (*id.* at

PageID.94427), and (2) Ms. Lin communicated with VNA's counsel during the Court's inquiry. (*See, e.g.*, ECF No. 2855, PageID.94279; ECF No. 2870-20, PageID.94458.)

Ms. Lin is an active member of the State Bar of California, according to the State Bar of California's website. She is therefore bound by the California Rules of Professional Conduct.

California Rule of Professional Conduct 3.6(a) states:

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows[] or reasonably should know[] will (i) be disseminated by means of public communication and (ii) have a substantial[] likelihood of materially prejudicing an adjudicative proceeding in the matter.

Rules Prof. Conduct, rule 3.6(a). In addition, California Rule of Professional Conduct 8.4 states in relevant part:

> It is professional misconduct for a lawyer to:
>
> (a) violate these rules or the State Bar Act, knowingly[] assist, solicit, or induce another to do so, or do so through the acts of another;
>
> . . .

(c) engage in conduct involving dishonesty, fraud,[] deceit, or reckless or intentional misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice; . . . .

Rules Prof. Conduct, rule 8.4. For purposes of these rules, "know[]" or "knowingly" refers to "actual knowledge," which "may be inferred from [the] circumstances." Rules Prof. Conduct, rule 1.0.1(f). "[S]ubstantial" is defined as a "material matter of clear and weighty importance." Rules Prof. Conduct, rule 1.0.1(*l*).

Ms. Lin's conduct potentially violates Rules 3.6(a) and 8.4. The record reflects that Ms. Lin may have knowingly assisted with Actum's contact with Flint residents, "conduct involving dishonesty, . . . deceit, or reckless or intentional misrepresentation" that "is prejudicial to the administration of justice." Rules Prof. Conduct, rule 8.4. Insofar as Ms. Lin may have been involved with contacting Flint residents or in arranging the truck and website, she may have also assisted Actum in publicly disseminating extrajudicial statements that she knew or reasonably should have known would have "a substantial likelihood of materially prejudicing an adjudicative proceeding." Rules Prof. Conduct, rule 3.6(a). If Ms. Lin was involved in hiring a private investigator to use

53

fraudulent or deceptive means to investigate Plaintiffs' counsel in this case—along the lines of the investigation Plaintiff's counsel alerted the Court to during the February 13, 2024 hearing—that too, may constitute misconduct under the rules on Ms. Lin's part.

Accordingly, after May 20, 2024, the Court will refer Ms. Lin to the State Bar of California for it to consider whether she has violated her professional responsibilities under the applicable rules of professional conduct—unless cause is shown by May 20, 2024 at 12:00 PM that the referral is unwarranted.

### C. Future Remedies the Court Will Consider if the Campaign Continues or Escalates

VNA, VE, and Actum's public relations campaign against Plaintiffs' counsel campaign has already interfered with the Court's administration of the case. As set forth above, the campaign against Mr. Stern forced the Court to delay a mediation it had ordered. In addition, the Court has had to expend its own time and resources to address the campaign, including determining whether lawyers were involved in the campaign in violation of their professional responsibilities.

Further, the Court is concerned that the campaign is calculated to threaten fair procedures related to pending settlements, to intimidate

54

opposing counsel, to interfere with attorney-client relationships, and to generally foster tension and chaos in this litigation. The Court is also concerned about prejudice to the jury pool in Bellwether III, an upcoming trial involving seven children who are Individual Plaintiffs represented by Mr. Stern and Mr. Shkolnik (among others), scheduled to begin on October 8, 2024. (ECF No. 2919, PageID.98074.)

The Court sets forth its thinking regarding the available options should the public campaign against Mr. Stern continue to disrupt these proceedings.

As to prejudice to the jury pool, the Sixth Circuit and the Supreme Court have identified a variety of tools available to courts. *United States v. Ford*, 830 F.2d 596, 599 (6th Cir. 1987); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 563–64 (1976). The Court will remain vigilant regarding risks of prejudice to the jury pool as the trial approaches and will consider the available options as appropriate.

But the options presented in *Ford* and *Neb. Press Ass'n* that are designed to avoid juror bias do not address the Court's concerns about interference with the Court's administration of this case and about harassment and intimidation of opposing counsel. The Court must

55

therefore consider options other than those discussed in *Ford* and *Neb. Press Ass'n.*

One such option is an order limiting public statements that pose a threat to these proceedings. Such an order is "within the Court's prerogative to maintain appropriate decorum in the administration of justice and protect the rights of the litigants from prejudice." *Allfeldt*, 628 F. Supp. at 1101. The Sixth Circuit instructs that "before a trial [court] can limit defendants' [] exercise of first amendment rights of freedom of speech, the record must contain sufficient specific findings by the trial court establishing that defendants' [] conduct is a serious and imminent threat to the administration of justice." *CBS Inc.*, 522 F.2d at 239. In addition, a limitation on making public statements must be "narrowly tailored in an injunctive order" and directed to the "specific situation." *Ford*, 830 F.2d at 600.

The D.C. Circuit considered how to apply this strict standard in a case with some relevant similarities to this one: *United States v. Trump*, 88 F.4th 990 (D.C. Cir. 2023). In that case, former President Donald J. Trump was indicted for conspiring to overturn the 2020 presidential election. Mr. Trump "posted multiple statements on his social media

account attacking potential witnesses in the case, the judge, and the Special Counsel and his staff prosecuting the case." *Id.* at 996. Mr. Trump's social media activity led to specific threats against various individuals by his supporters. *Id.* at 997–99. The threats were part of a pattern of activity that had significantly impacted the lives of people subjected to Mr. Trump's attacks. *Id.* at 1010–12.

The trial court issued an order in response to concerns about influencing witnesses and, more relevantly to this case, "intimidating or harassing other trial participants." *Id.* at 1021. The D.C. Circuit affirmed the trial court's order to the extent the order prohibited the

> parties and their counsel from making or directing others to make public statements about—(1) counsel in the case other than the Special Counsel, (2) members of the court's staff and counsel's staffs, or (3) the family members of any counsel or staff member—if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is highly likely to result.

*Id.* The D.C. Circuit stated:

> Messages designed to generate alarm and dread, and to trigger extraordinary safety precautions, will necessarily hinder the trial process and slow the administration of justice. For example, trial personnel and participants will be

distracted or delayed by objectively reasonable concerns about their safety and that of their family members, as well as by having to devote time and resources to adopting safety measures or working with investigators.

Given the record in this case, the court had a duty to act proactively to prevent the creation of an atmosphere of fear or intimidation aimed at preventing trial participants and staff from performing their functions within the trial process. Just as a court is duty-bound to prevent a trial from devolving into a carnival, so too can it prevent trial participants and staff from having to operate under siege.

*Id.* at 1014 (cleaned up). The D.C. Circuit found that an order with a *mens rea* requirement was appropriate, because such a requirement avoided imposing self-censorship on Mr. Trump with respect to speech that did not threaten the proceedings or to speech that was merely a "bad mistake." *Id.* at 1026. Nonetheless, the order made Mr. Trump responsible for "the known consequences of his actions" when those consequences had a material impact on the case rather than just being "intemperate" or "rude." *Id.* at 1026–27.

There are, of course, important contrasts between this case and *Trump*. In *Trump*, there is a criminal prosecution related to electoral politics, undertaken by a high-ranking government special counsel working for the United States Department of Justice, involving a political

candidate who engaged in a pattern of social media activity leading to violent threats against multiple individuals. This case, in contrast, involves civil claims about the contamination of Flint's water supply and its impact on the city's residents. Private counsel, rather than the federal government, is litigating on behalf of Plaintiffs, and Defendants are large corporations rather than a former president. Instead of violent threats, the public relations campaign involves the intimidation and harassment opposing counsel.

While these contrasts are significant, the reasoning in *Trump* is still enlightening, insofar as that case addresses conduct that involves interference with the court, as well as intimidation and harassment. Conduct need not involve violence or violent threats to rise to the level of intimidation and harassment that interferes with the fair administration of justice. *See Meyer v. Kalanick*, 212 F. Supp. 3d 437, 443 (S.D.N.Y. 2016). Counsel should be able to sue a company without fearing they will be subject to egregious campaigns against them. *See id.* at 450. Attempts to damage the reputation and law practice of opposing counsel are far outside the boundaries of what is appropriate in adversarial litigation.

Further, courts must be able to order parties to engage mediation in good faith without the parties' agents undermining or delaying that process.

VNA, VE, and Actum's campaign's interference with these proceedings greatly concerns the Court; however, the interference has not reached the level seen in the *Trump* case. But extreme circumstances, such as those in the *Trump* case, need not transpire before the Court can act. *See Trump*, 88 F.4th at 1010–12; *Gedeon v. Frenchko*, No. 4:22-cv-441, 2022 WL 4356209 (N.D. Ohio Sep. 19, 2022) (imposing an order limiting speech under much less extreme circumstances than the circumstances in *Trump*). Yet at this point, the Court will not issue an order similar to the one the trial court issued in *Trump*. In line with the *Trump* trial court, the Court will continue to proceed deliberately and carefully, and it will issue an order limiting public speech in the future if warranted. *See Trump*, 88 F.4th at 1017–19 (describing the trial court issuing warnings, giving Mr. Trump an opportunity to voluntarily regulate his own speech to avoid threats to the integrity of the trial process, and considering other options before issuing an order limiting Mr. Trump's public speech).

In deciding whether to issue such an order in the future, the Court will balance First Amendment considerations with the fair and effective functioning of the trial process, remaining mindful of the Court's obligation to prevent this litigation from "devolving into a carnival" and from being hampered by outside influences. *See Trump*, 88 F.4th at 1002, 1004. The Court notes that before the *Trump* trial court issued its order, the court warned the parties "'to take special care in [their] public statements about th[e] case[,]' adding that it would 'take whatever measures are necessary to safeguard the integrity of the[] proceedings.'" *Id.* at 998. The Court has issued similar warnings in this case and does so again today. (ECF No. 2820, PageID.93421–93422.)

As this litigation proceeds, if the Parties (or their parent corporations or agents) engage in conduct intended to intimidate and harass or that otherwise interferes with the fairness of this litigation, the Court will consider whether to issue an order prohibiting all Parties, including their counsel, parent corporations, employees, and other agents, from making—or directing others to make—public statements about counsel if those statements are made (1) with the intent to materially interfere with—or to cause others to materially interfere

with—court proceedings, counsel's work, or counsel's relationship with their clients, or (2) with the knowledge that such interference is highly likely to result. *See Trump*, 88 F.4th at 996.

The Court may also impose sanctions—both for conduct that has occurred prior to the date of this order and for any future improper conduct. It notes that it has the inherent power to sanction lawyers, parties, and non-parties when appropriate. *See Helmac Prods. Corp.*, 150 F.R.D. at 568.

## III.  Conclusion

At worst, VNA, VE, and Actum intended to prejudice or interfere with this litigation. At best, they acted with willful disregard for whether their actions might prejudice or interfere with these proceedings. VNA, VE, and Actum undertook the public relations campaign while a jury was called for the class trial, while Plaintiffs were given notice of and the opportunity to object to a settlement, while another settlement was pending, and while the parties were about to begin a court-ordered mediation process in anticipation of an upcoming trial.

*Meyer v. Kalanick*, which has come up repeatedly in these proceedings, is a case where a defendant hired "unlicensed private

investigators to conduct secret personal background investigations." 212 F. Supp. 3d 437, 439 (S.D.N.Y. 2016). These investigators attempted to use deception to gather "derogatory information" about the plaintiff and counsel. *Id.* There, the defense attorneys shared information with plaintiff's counsel about the investigation and, eventually, resolved the plaintiff's requests for injunctive and monetary relief without the need for sanctions. *Id.* at 441, 448–51. VE, VNA, Actum, and their respective counsel have shown nothing like that "commendable" willingness to remedy this situation. *Id.* at 449. As Judge Rakoff put it in *Meyer*:

> Potential plaintiffs and their counsel need to know that they can sue companies they perceive to be violating the law without having lies told to their friends and colleagues so that their litigation adversaries can identify "derogatories." Further, the processes of justice before the Court require parties to conduct themselves in an ethical and responsible manner, and the conduct here fell far short of that standard.

*Id.* at 450. Engaging in systematic attacks on opposing counsel in a manner that disrupts the processes of justice falls short of the standards that litigants and their counsel must observe.

For the reasons set forth above, the Court ORDERS as follows:

First, the Court ORDERS VE to comply with the Court's order (ECF No. 2868) by May 20, 2024 at 12:00 PM. If VE does not comply by May 20, 2024 at 12:00 PM, the Court will impose appropriate sanctions.

Second, after May 20, 2024, the Court will refer Ms. Lin to the State Bar of California for it to consider whether she has violated her professional responsibilities under the applicable rules of professional conduct—unless cause is shown by May 20, 2024 at 12:00 PM that the referral is unwarranted.

Third, the Court ORDERS VNA to provide Actum's proposal—the email attachment within Exhibit A of VNA's *in camera* submission (ECF No. 2885-2, PageID.94861)—to opposing counsel no later than May 15, 2024 at 12:00 PM.

After the Court considers the responses and information it receives after the issuance of this order, the Court may issue further orders, as well as sanctions, to address the concerns identified by the Court in this order and to ensure the fair administration of justice.

IT IS SO ORDERED.

Dated: May 13, 2024                s/Judith E. Levy
Ann Arbor, Michigan                JUDITH E. LEVY
                                   United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 13, 2024.

s/William Barkholz
WILLIAM BARKHOLZ
