EXHIBIT 3

Page 1

```
 1        IN PRIVATE ARBITRATION
 2      BEFORE THE HON. GARY P. CARUSO
 3   - - - - - - - - - - - x
 4  PITTSBURGH WATER AND SEWER   :
 5  AUTHORITY,              :
 6       Claimant,       :  Cause No.
 7       v.           :  43-3010-0352
 8  VEOLIA WATER NORTH AMERICA   :
 9  NORTHEAST, LLC,         :
10       Respondent and     :
11       Counterclaimant.    :
12   - - - - - - - - - - - x
13
14      Deposition of VEOLIA WATER NORTH AMERICA
15          NORTHEAST, LLC,
16    By and through its Designated Representative
17           MARVIN GNAGY
18         Pittsburgh, Pennsylvania
19       Wednesday, December 6, 2017
20            9:28 a.m.
21
22
23  Job No.: 167523
24  Pages: 1 - 93
25  Reported By: Amelia Bowlen, FAPR, RDR, CRR, CRC
```

Page 2

```
 1     Deposition of MARVIN GNAGY, held at the offices
 2  of:
 3
 4
 5       PEPPER HAMILTON LLP
 6       50th Floor
 7       500 Grant Street
 8       Pittsburgh, Pennsylvania 15219
 9       (412)454-5000
10
11
12
13
14      Pursuant to notice, before Amelia Bowlen,
15  Registered Diplomate Reporter, Certified Realtime
16  Reporter, and Notary Public in and for the
17  Commonwealth of Pennsylvania.
18
19
20
21
22
23
24
25
```

Page 3

```
 1        A P P E A R A N C E S
 2  ON BEHALF OF THE CLAIMANT:
 3     JORDAN M. WEBSTER, ESQUIRE
 4     BUCHANAN INGERSOLL ROONEY PC
 5     One Oxford Centre, 20th Floor
 6     301 Grant Street
 7     Pittsburgh, Pennsylvania 15219
 8     (412)392-1667
 9
10  ON BEHALF OF THE RESPONDENT AND
11  COUNTERCLAIMANT:
12     ROBERT A. GALLAGHER, ESQUIRE
13     PEPPER HAMILTON LLP
14     500 Grant Street, 50th Floor
15     Pittsburgh, Pennsylvania 15219
16     (412)454-5000
17
18  ALSO PRESENT:
19     FRANCIS X. FERRARA, ESQUIRE
20     Veolia North America
21     Senior Vice President and Deputy
22     General Counsel
23     120 Water Street, Suite 212
24     North Andover, Massachusetts 01845
25     (978)725-0050
```

Page 4

```
 1         C O N T E N T S
 2
 3  EXAMINATION OF MARVIN GNAGY          PAGE
 4    By Mr. Webster            7
 5
 6
 7          E X H I B I T S
 8        (Attached to transcript.)
 9  GNAGY DEPOSITION EXHIBIT          PAGE
10  1  Objections and Responses to Claimant's   9
11     Notice of Deposition of Veolia Water
12     North America - Northeast, LLC
13  2  8/22/12 Memorandum Prepared by Marvin    11
14     Gnagy, Veolia 13455 - 13462
15  3  Compilation of 10 Weekly Summary of     16
16     Activities documents generated by
17     Marvin Gnagy
18  4  EPA National Primary Drinking Water     23
19     Regulations
20  5  6/17/14 - 6/18/14 E-mail chain between    30
21     Marvin Gnagy and Chris Westbrook,
22     Veolia 199043 - 199048
23  6  2/22/16 - 2/23/16 E-mail chain,       39
24     Veolia 201204 - 201208
25
```

Plaintiff Exhibit
3893-068

Page 5

```
1        E X H I B I T S   C O N T I N U E D
2  GNAGY DEPOSITION EXHIBIT              PAGE
3  7  2/25/16 - 2/26/16 E-mail chain,      46
4     Veolia 230513 - 230514
5  8  Packet of e-mail and reports,        52
6     Veolia 191104 - 191208
7  9  8/1/13 E-mail chain,                 54
8     Veolia 209237 - 209239
9  10 9/30/13 E-mail from Gina Cyprych,     59
10    Veolia 195727
11 11 PWSA 2013 Annual Drinking Water Quality  66
12    Report, Veolia 87514 - 87523
13 12 February 2013 Technical Memorandum,   81
14    Veolia 9379 - 9390
15 13 March 2013 Technical Memorandum,      83
16    Veolia 12192 - 12203
17 14 April 2013 Technical Memorandum       85
18 15 June 2013 Technical Memorandum,       88
19    Veolia 15323 - 15335
20 16 November 2013 Technical Memorandum,   88
21    Veolia 22784 - 22788
22 17 December 2013 Technical Memorandum,   88
23    Veolia 24049 - 24060
24
25
```

Page 6

```
1        E X H I B I T S   C O N T I N U E D
2  GNAGY DEPOSITION EXHIBIT              PAGE
3  18 April 2014 Technical Memorandum,      88
4     Veolia 246544 - 246548
5  19 May 2015 Technical Memorandum,        88
6     Veolia 34400 - 34404
```

Page 7

```
1              P R O C E E D I N G
2  Whereupon,
3              MARVIN GNAGY,
4  being first duly sworn or affirmed to testify to the
5  truth, the whole truth, and nothing but the truth,
6  was examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR THE CLAIMANT
8  BY MR. WEBSTER:
9    Q  Good morning.
10   A  Good morning.
11   Q  My name is Jordan Webster.  I'm one of the
12 attorneys representing the Pittsburgh Water and
13 Sewer Authority in an arbitration currently pending
14 between the PWSA and Veolia.
15     MR. GALLAGHER:  Jordan, I should note that
16 Mr. Gnagy has a pretty bad case of bronchitis, so if
17 he needs to take a break, I just ask for your
18 indulgence.
19     MR. WEBSTER:  Sure, absolutely.
20   Q  Some real quick ground rules.  Have you been
21 deposed before, sir?
22   A  Yes, I have.
23   Q  This is probably, then, repetitive in some
24 respects but a couple things.  All your answers need
25 to be verbal --
```

Page 8

```
1    A  Yes.
2    Q  -- so Amy here can take them down.  No
3  shrugs of the shoulders, shakes of the head.  I will
4  try to wait until you finish an answer before I
5  start my next question.  If you could wait until I
6  finish my question before you start your answer,
7  that will make her job much easier.
8      If at any point in time you do not
9  understand a question that I've asked, please let me
10 know, and I'll do my best to restate it or rephrase
11 it so that you and I are on the same page.  If you
12 proceed to answer a question that I've asked, I'm
13 going to assume that you understood what I was
14 talking about.  Is that okay?
15   A  That's fine.
16   Q  I understand you've got an illness here, but
17 are you taking any medication today or anything else
18 that may affect your ability to listen to my
19 question and give me your best answer?
20   A  I'm on prescription medication, but it
21 doesn't impair me from answering questions.
22   Q  Any questions?
23   A  I do not have any questions.
24   Q  If you need to take a break, just let me
25 know.  The only caveat is if I've asked a question,
```

Page 9

1  I'm going to ask you to answer the question before
2  we take a break.  Okay?
3      A  Understood.
4      (Gnagy Deposition Exhibit 1 was marked
5  for identification and is attached to the
6  transcript.)
7      Q  This is Exhibit 1 to your deposition.  Sir,
8  this a copy of objections and responses to a
9  deposition notice that your counsel, Mr. Gallagher,
10  provided to us.  If you turn to Page 2, Item 7, one
11  of the topics that we had asked Veolia to present a
12  witness to speak to on behalf of the company is
13  Number 7, PWSA's water treatment plant operations
14  including sourcing of chemicals.  Do you see where I
15  am?
16      A  Yes.
17      Q  And there was an objection, but then subject
18  to and without waiving that objection, or those
19  objections, Veolia designated you to address Topic
20  7.  Do you see that?
21      A  I do.
22      Q  And are you prepared today to speak to --
23  speak on behalf of Veolia as to Topic Number 7?
24      A  Yes, I am.
25      Q  You can set that aside.

Page 10

1      THE WITNESS:  Can you hear me?
2      THE REPORTER:  I can.  I'll let you know if
3  I can't.  Thank you.
4      Q  Mr. Gnagy, tell me a little bit about your
5  involvement on behalf of Veolia with PWSA.  When did
6  it start?
7      A  I believe it was August, about, 2012.
8      Q  Was there a particular purpose or objective
9  for you beginning in August of 2012?
10      A  I was designated as a technical resource for
11  water treatment operations.
12      Q  Did you have any role in preparing -- or any
13  role in Veolia's due diligence efforts before it
14  entered into a contract with PWSA?
15      A  I was not present during any due diligence
16  efforts, no.
17      Q  Okay.  Did you have -- separate and apart
18  from whether you were physically present in
19  Pittsburgh, did you have any role in reviewing
20  documents or any due diligence efforts otherwise?
21      A  I do not recall reviewing documents or
22  having any discussions before the contract was
23  signed, no.
24      Q  Okay.  Who asked you to come to Pittsburgh
25  in August -- I guess, who asked you to get involved

Page 11

1  with PWSA in about August of 2012?
2      A  I received a call from Denny Tulenson.
3      Q  Who is Mr. Tulenson?
4      A  I believe he was -- I don't know what his
5  official role was.
6      Q  Was he your boss?
7      A  No.
8      Q  Okay.
9      A  No.  He was -- he was officially in the
10  structuring department.
11      Q  Okay.
12      A  He may have had some involvement in the
13  development of the RFP.  I'm not sure.  That would
14  have been his job.
15      Q  What did he tell you when he called you?
16      A  Asked me to come in and meet with the plant
17  staff and do an initial assessment of treatment
18  plant operations and water quality.
19      Q  Okay.  You prepared a memorandum as a result
20  of that visit?
21      A  Yes, I did.
22      Q  Okay.
23      (Gnagy Deposition Exhibit 2 was marked
24  for identification and is attached to the
25  transcript.)

Page 12

1      Q  Sir, is this a copy of the memorandum you
2  prepared as a result of your visit to Pittsburgh in
3  August 2012?
4      A  It appears to be, yes.
5      Q  And it looks like you were in Pittsburgh for
6  two days or at least parts of two days?
7      A  That's what I remember, yes.
8      Q  Okay.  Did anybody from Veolia -- well, back
9  up.  Just generally describe for me what you did
10  while you were in Pittsburgh for parts of two days
11  in August of 2012.
12      A  First thing we did was requested and
13  received a plant tour of the plant and grounds, had
14  some discussion with the plant staff on how the
15  plant was operated, what chemicals they used, what
16  sequencing of the process they used, that kind of
17  thing.
18      Q  Okay.
19      A  Later that day, then, we had a face-to-face
20  meeting with Dr. States to discuss more details on
21  water quality and his process control.
22      Q  Okay, and you lay out in your memorandum
23  here, at least in a general sense, how PWSA was
24  treating the water it was processing at the time,
25  right?

Page 13

1   A  I wrote down either what I was told by the
2  plant staff or Dr. States or what I had physically
3  observed in using my experience.
4   Q  Okay.  So to the best that you could
5  discern, the way they were operating at the time is
6  what you put in your memo?
7   A  The best I could discern, yes.
8   Q  Okay.  After you -- back up a second.  Did
9  you visit PWSA in August of 2012 with the
10  expectation that you would be involved in this
11  project on a continuing basis?
12   A  That, I was not told.
13   Q  You were just asked to go out for a couple
14  days and do an assessment?
15   A  Yeah, I was asked to go out to do an
16  assessment of the plant and identify whether there
17  were any water quality issues or process things that
18  were not normal.
19   Q  Okay.
20   A  Or just to get a baseline of how the
21  operation was used to produce water.
22   Q  After you prepared this memo and submitted
23  it, I see, to Mr. Tulenson here, when was the next
24  time you became involved or your next involvement in
25  this project?

Page 14

1   A  I believe it was February of 2013.
2   Q  And what happened in February 2013?
3   A  I was asked to come in and start working on
4  some of the issues that had been identified.
5   Q  Any issues in particular?
6   A  THMs for one, membrane and plant operation,
7  number two.
8   Q  Who asked you to do that?
9   A  I don't recall.  It would have been some of
10  the Veolia staff on site.  I don't recall a specific
11  person.
12   Q  Was your involvement in the PWSA project --
13  well, I've seen memos from you, I think, that
14  continue all of the way into 2015.
15   A  Yes.
16   Q  Does that mesh with your recollection?
17   A  Yes.
18   Q  Were you involved on a regular basis?  Was
19  it case-by-case?  I mean, how would you describe
20  your involvement over, I guess, a three-plus-year
21  period?
22   A  I was involved approximately every two weeks
23  on site through a good portion of 2013.
24   Q  Through 2013?
25   A  Yes, and then through 2014, I don't remember

Page 15

1  exact time frames, but it might have been one trip a
2  month, and then in 2015, it was graduated down
3  further to maybe every two months.
4   Q  So it was more intensive early on and then
5  tailed off as the project progressed?
6   A  That's correct.
7   Q  Is there a reason that you were involved
8  more in 2013 than in 2014 and 2015?
9   A  That's what they requested of me.  I do know
10  that some of the issues had already been
11  investigated and corrective actions implemented
12  during 2013.
13   Q  Okay.
14   A  So some of the laundry list of items we
15  identified had already been completed.
16   Q  When you say you were on site every --
17  approximately every two weeks in 2013, did you
18  maintain calendars or anything like that that would
19  show you how often you were here?
20   A  I have weekly reports that I send to my
21  supervisor, yes, with how many hours.
22   Q  Okay.
23   A  There's likely information on my calendar as
24  well, dates that I would have been scheduled for
25  PWSA.

Page 16

1   Q  Did you keep -- when you refer to a
2  calendar, are you referring to an electronic
3  calendar in your Outlook account or is it a paper
4  copy?
5   A  It's actually a Google calendar.
6   Q  Okay.
7   A  We use Google for e-mail.
8   Q  I see.  Does it date back to 2012-2013?
9   A  I can't tell you how far it dates back.  I
10  do know it dates back quite aways.
11   Q  So if I asked you to go back and take a look
12  and see how often you were here or, I guess, print
13  out and produce those calendars to your counsel,
14  that's something you could, at least, look into?
15   A  I could.
16   Q  Okay.
17      (Gnagy Deposition Exhibit 3 was marked
18  for identification and is attached to the
19  transcript.)
20   Q  I'm showing you what's been marked as
21  Exhibit 3.  Are these the weekly summaries that you
22  mentioned a minute ago?
23   A  They appear to be, yes.
24   Q  Okay.  I will tell you that I collected
25  every weekly summary of yours I could find and

Page 17

1 compiled it into this single exhibit. I think there
2 are ten of them. Each of them has an entry that
3 relates to PWSA. My question, I think for you is,
4 if you were here every two weeks, why are there not
5 more of them?
6    A That I can't tell you. If you've only got
7 ten weekly summaries here, that's not the full list
8 of weekly summaries I provided over the time of this
9 period.
10    Q Is there a location, whether it's on your
11 own laptop or on a Veolia shared drive, where you
12 store your weekly summaries?
13    A I store them on my personal laptop, yes.
14    Q Okay. Has anybody asked you to collect
15 those and provide them to counsel in this case?
16    A I don't recall that they've asked for those,
17 no.
18    Q How far back do you store weekly summaries
19 on your laptop?
20    A I have weekly summaries back to my date of
21 hire in 2010.
22    Q Okay. I'd ask you to go back and collect
23 those, give them to counsel so they can review
24 anything that might pertain to this case and produce
25 them to us, okay?

Page 18

1    MR. GALLAGHER: Sure, that's no problem,
2 Jordan. We'll go back and look at what was
3 collected and what was produced, and then if there's
4 anything we've collected that wasn't produced, we'll
5 take a look at it, and if there's anything that
6 wasn't any collected, we'll talk to Mr. Gnagy and
7 get that to you.
8    MR. WEBSTER: Sure.
9    Q I'd like you to look at -- I'm probably
10 going to be referring to this on a number of
11 occasions today, but right now, the third summary
12 that I have here is one for the -- looks like a date
13 of March 8th, 2013. Do you see where I am?
14    A Yes, I do.
15    Q First of all, whose Mr. Nasuta?
16    A Joe Nasuta is my immediate supervisor.
17    Q Okay. What was your general purpose in
18 providing weekly summaries to Mr. Nasuta? Just to
19 let him know what you were doing?
20    A It's requested. Joe has to report to upper
21 management with where each of his employees are
22 working and what they're working on.
23    Q I see. Has it always been this way since
24 you started with Veolia?
25    A It's been this way since I started with them

Page 19

1 in 2010, yes.
2    Q On this particular weekly summary, turn to
3 the second page, Number 5. It says, Upcoming
4 Schedule Week of March 11, 2013, and then subpart A,
5 Pittsburgh, make travel arrangement for week of
6 March 18th and further memos and evaluations as part
7 of the increased workload at PWSA due to the
8 departure of one team member. Did I read that
9 correctly?
10    A Yes.
11    Q Who was the departing team member that you
12 were referring to?
13    A I believe that would have been Bob Martin.
14    Q Okay. How did his departure affect your
15 workload?
16    A Any of the initiatives that Bob was working
17 on were thrown into my schedule.
18    Q Was Bob a water treatment expert?
19    A He was a water specialist. I don't know
20 exactly what his background was.
21    Q Okay. Was he working with folks at the
22 treatment plant or in the lab at PWSA?
23    A I only know what he was working on as far as
24 initiatives. I don't know who he was working with.
25    Q What I'm trying to figure out is how your

Page 20

1 personal workload was impacted by his departure.
2 What was he doing that fell into your lap when he
3 left?
4    A A good part of it was the membrane plant
5 operation.
6    Q Okay. Anything else you can think of?
7    A Off the top of my head, I can't remember.
8    Q Okay.
9    A I do remember there were two or three things
10 that he was working on that were given to me.
11    Q Okay. So you mentioned when you visited
12 Veolia for the first -- or visited PWSA for the
13 first time in August of 2012 --
14    MR. GALLAGHER: I'm just glad I'm not the
15 only one that's done that. I think you may have
16 found me pretty good in the last one.
17    MR. WEBSTER: That's right.
18    Q You said you met with Dr. States back in
19 August, correct?
20    A That's correct.
21    Q There came a point in time when he was
22 reassigned within PWSA out of the treatment plant
23 and the lab into an office downtown, correct?
24    A As far as I remember, yes.
25    Q Okay. Do you know when that happened?

Page 21

1    A  I don't recall specific dates.
2    Q  Okay.
3    A  It may have been sometime early in 2013.
4    Q  Any chance this reference in your weekly
5  summary to a departed team member referred to the
6  reassignment of Dr. States in February of 2013?
7    A  I don't believe so, no.
8    Q  Why not?
9    A  I was never given any responsibilities that
10 Dr. States had.
11   Q  Okay.  Did you personally -- well, let me
12 rephrase that.  When Dr. States -- just before he
13 was reassigned, what was his position with PWSA?
14   A  I believe his title was director of water
15 production and water quality.  I don't know for
16 sure, but I believe that was what it was.
17   Q  Okay, and when he was reassigned, how was
18 that position filled?
19   A  Ron Duray was promoted to, I believe,
20 interim or deputy director, and Jay Kuchta was
21 promoted to -- again, I don't know the specific
22 title.  I think it was laboratory manager or water
23 quality manager.
24   Q  Did any -- did Veolia's work or workload
25 with PWSA increase in any respect when Dr. States

Page 22

1  was reassigned away from the treatment plant and the
2  lab to an office downtown?
3    A  Not that I recall.  Our workload was
4  consistent based on issues that we identified that
5  needed to be addressed.
6    Q  Okay, and your workload wasn't any different
7  personally when he left?
8    A  Only from the departure of Bob Martin and
9  having to pick up the things he was working on.
10   Q  What was your opinion of Mr. Duray?
11   A  I don't have an opinion of Mr. Duray.  I
12 didn't interface with him very much.
13   Q  What was your opinion of Dr. Kuchta,
14 K-u-c-h-t-a?
15   A  Again, I don't have an opinion of him.  They
16 were both long-time PWSA employees, both certified
17 staff, and I assume well-versed in the operation of
18 the plant since they'd been there so long.
19   Q  When you were in Pittsburgh working on this
20 project, who were you dealing with at PWSA?
21   A  It would be different people.  It would be
22 some people from the plant, some people from
23 engineering, some people from Veolia, some people
24 from Chester Engineers, some people from other
25 consultants that were there.

Page 23

1    Q  After Dr. States was reassigned, did you
2  have an opinion as to whether the management folks
3  at the plant, PWSA management folks at the plant, or
4  the lab were good, bad, strong, weak, anything like
5  that?
6    A  I didn't have an opinion, no.
7    Q  Sir, you're familiar with the lead and
8  copper rule?
9    A  Yes, I am.
10     (Gnagy Deposition Exhibit 4 was marked
11 for identification and is attached to the
12 transcript.)
13   Q  Exhibit 4, sir, is this a copy of the
14 federal regulations that contain the lead and copper
15 rule.  If you need to, take a look, obviously.
16   A  It appears to be Environmental Protection
17 Agency Part 141, possibly federal regulations, yes.
18   Q  How long have you been in the business, sir?
19   A  40 years.
20   Q  Okay.  I assume you've been at least
21 familiar with the lead and copper rule for a
22 relatively long period of time.
23   A  Since its development and establishment in
24 the '90s, yes.
25   Q  Okay.  Turn to Page 498 -- actually, it

Page 24

1  probably starts on 497, 497, Section 141.90,
2  reporting requirements.  Are you familiar with that
3  section, sir?
4    A  Yes, this appears to be the initial
5  reporting requirements that were established.
6    Q  If you turn to Page 498, I have a portion
7  there that's highlighted.  This is Section 141.90,
8  looks like it's Subsection (a)(3).  Do you see where
9  I am?
10   A  I see a highlighted section there, yes.
11 There's a 3 above it.
12   Q  And this subsection concerns either
13 additions of a new source or long-term change in
14 water treatment, among other things.  Do you see
15 where I am, third or fourth line there?
16   A  Yes, I see.
17   Q  And about halfway down in the highlighted
18 section, there's a sentence that starts with
19 examples.  Do you see where I am?  It says
20 examples --
21   A  Yes.
22   Q  Examples of long-term treatment changes
23 include the addition of a new treatment process or
24 modification of an existing treatment process.  Are
25 you with me?

Page 25

1    A  Yes.
2    Q  Okay, and then the next sentence reads,
3  examples of modifications include switching
4  secondary disinfectants, switching coagulants --
5  I'll cut out the parentheses -- and switching
6  corrosion inhibitor products.  Do you see where I
7  am?
8    A  I see that, yes.
9    Q  When Veolia started working with PWSA, it
10  was using soda ash to control corrosion, correct?
11    A  That's what we were told, yes.
12    Q  Okay, and in your tour of the plant back in
13  August of 2012, did you see for yourself how the
14  authority was using corrosion control products?
15    A  Yes.  They were using lime treatment up
16  front in coagulation and soda ash treatment, I
17  believe it was, into the clear well for pH and
18  alkalinity adjustment of finished water.
19    Q  Okay.
20    A  And then they had a backup caustic soda feed
21  for lime or for soda ash in the event that those
22  systems would fail.
23    Q  So if it was using soda ash in the clear
24  well, that's something that you saw back in August
25  of 2012?

Page 26

1    A  That's correct.
2    Q  And you actually made that -- you made a
3  mention of that in your due diligence memo as well,
4  I think, correct?  Page 4, third full paragraph,
5  very first line reads, soda ash is added to the
6  filtered water entering the clear well for pH
7  adjustment to pH 8.4 and final corrosion control.
8  Did I read that correctly?
9    A  That's what I wrote, and that's what we were
10  told --
11    Q  Right, and that's what you saw?
12    A  -- by the staff.
13    Q  And that's what you saw, correct?
14    A  I didn't physically see the soda ash going
15  into the water, no, but I did observe that the soda
16  ash machine was in operation that day, yes.
17    Q  Okay.  Would you agree with me that based
18  upon the section of the lead and copper rule that we
19  just reviewed, that a change from soda ash to
20  something else as PWSA's corrosion control chemical,
21  sort of, triggered this section of the lead and
22  copper rule?
23      MR. GALLAGHER:  Objection to the form.
24    Q  You can answer.
25    A  No, I don't agree.  In review of PWSA's

Page 27

1  permit and the feasibility study that Dr. States put
2  together, he noted in there that caustic soda was
3  used as a backup for lime feed or for soda ash feed
4  as needed during equipment failures, and that was
5  approved by the state.
6    Q  So your opinion -- you're aware that the
7  state has -- disagrees with your view, correct?
8    A  I'm aware that the state gave them a notice
9  of violation, yes.
10    Q  And you're aware the state has imposed a
11  civil penalty on PWSA because, in part, of a switch
12  from soda ash to caustic soda as a corrosion control
13  product without following the provisions of the lead
14  and copper rule?
15    A  I know they've imposed a fine, yes.  I don't
16  know what it was for.
17    Q  And a consent order that came out on this
18  issue came out about three weeks ago.  Have you seen
19  it?
20    A  I have not.
21    Q  You have not, okay.  But it's your view that
22  a change from soda ash to caustic soda as the
23  corrosion control chemical did not trigger the --
24  well, let me rephrase this.
25      If this Subsection 3 that we just reviewed

Page 28

1  is triggered, it means that PWSA or the water system
2  had to submit written documentation to the state
3  describing the change or addition, correct?
4      MR. GALLAGHER:  Object to the form.
5    Q  When he objects to the form, you can still
6  answer.
7    A  Understood.  Could you repeat that?
8    Q  Sure.  If you look at the subsection here,
9  end of the first sentence, which is a very long
10  sentence, talks about -- the earlier part of the
11  sentence talks about the addition of a new source or
12  a long-term change, and then about nine or ten lines
13  down, there's a phrase that starts with shall
14  submit.  Do you see where I am?
15    A  Shall submit written documentation to the
16  state.  Is that the phrase you're talking about?
17    Q  Right, describing the change or addition,
18  right?
19    A  Yes, I see it.
20    Q  So if any of the events preceding that
21  phrase occur, the water system has to submit written
22  documentation to the state describing the change or
23  addition, correct?
24    A  That's what it appears.
25    Q  That's what it says.

Page 29

1      MR. GALLAGHER:  Are you asking him to assume
2  that the switch from soda to caustic was a change in
3  the corrosion control?
4      MR. WEBSTER:  I'm not asking him to assume
5  anything.
6      MR. GALLAGHER:  I'm just trying to
7  understand what the question is.
8      MR. WEBSTER:  Well, if he doesn't understand
9  it, he can tell me.
10     Q  The next sentence says, the state must
11  review and approve the addition of a new source or a
12  long-term change in treatment before it is
13  implemented by the water system.  Did I read that
14  correctly?
15     A  Yes.
16     Q  And because you're familiar with the lead
17  and copper rule, you're familiar that that's one of
18  its requirements, right?
19     A  That's correct.
20     Q  All right.  You're aware, at least as you
21  sit here today, that at some point in time, PWSA
22  started using caustic soda instead of soda ash to
23  control corrosion, correct?
24     A  I believe it was to control pH and
25  alkalinity as part of their corrosion control

Page 30

1  treatment, yes.  I'm aware that they switched from
2  soda ash to caustic soda now.
3      Q  Just so I'm clear, it's your view sitting
4  here today that that change did not trigger
5  either -- or did not require PWSA to submit written
6  documentation to the state or did not require the
7  state to review and approve that change?
8      A  No, I do not.
9      MR. GALLAGHER:  Object to the form, sorry.
10     A  No, I do not.  Again, the feasibility study
11  clearly outlined that caustic soda was a backup feed
12  in case one of the other systems failed, and that
13  PWSA, everybody believed, had the right to use that
14  during times of equipment failure or for whatever
15  reason they needed to to maintain their permit
16  ranges for pH and alkalinity.
17     Q  Okay.
18     (Gnagy Deposition Exhibit 5 was marked
19  for identification and is attached to the
20  transcript.)
21     Q  Exhibit 5 is an e-mail chain involving
22  yourself and Christian Westbrook, right, who was a
23  water quality manager at PWSA?
24     A  At the time of these e-mails, yes.  Jay
25  Kuchta had retired, and Christian was promoted to

Page 31

1  his position.
2      Q  Okay, and these are in June of 2014, right,
3  this e-mail string?
4      A  It appears to be, yes.
5      Q  Second page of this e-mail, about halfway
6  down, there's a one-line e-mail on June 18, 2014 at
7  10:12 a.m.  Do you see where I am?
8      A  Yes.
9      Q  And in it Chris Westbrook writes, FWIW, we
10  switched from soda ash to caustic the week of
11  April 27, 2014.  Did I read that correctly?
12     A  Yes.
13     Q  Do you know what FWIW means?
14     A  For what it's worth, I believe.
15     Q  Had you been at the plant between April of
16  2014, the end of April 2014, and June 18th, 2014?
17     A  I couldn't say without looking at schedules.
18  No, I don't know for sure.
19     Q  Okay.  Let's see if we have a weekly summary
20  here for that time frame.  So you have a weekly
21  summary for May 30th, 2014.  That's bottom
22  right-hand corner, sir, last three digits are 771.
23  It's the second to last or third to the last one.
24     A  May 30th, correct.
25     Q  Right.

Page 32

1      A  Yes, I see it.
2      Q  Looks like you have 32 hours -- let me make
3  sure I'm reading this right.  Does the first page
4  here reflect that you spent 32 hours on the
5  Pittsburgh Water and Sewer Authority project this
6  week?
7      A  Yes.
8      Q  Okay.  Can you tell whether you were in
9  Pittsburgh that week?
10     A  It appears so, because I was conducting jar
11  tests and that would have been on site.
12     Q  Do you recall -- I don't see anything in
13  this summary that indicates, you know, what
14  corrosion control chemicals were being used, but do
15  you recall during that week you were here doing jar
16  testing, observing that caustic soda was being used
17  rather than soda ash?
18     A  No.  That was not something I typically
19  looked at.
20     Q  Okay.  From the end of April 2014 through
21  the last visit you had here, do you ever recall
22  seeing caustic soda being used as a corrosion
23  control -- as the corrosion control chemical instead
24  of soda ash?
25     A  I don't recall observing it, no.  There were

Page 33

1  numerous times throughout the year that the soda ash
2  machine or soda ash feed line would plug up and they
3  would have to request maintenance and cleaning on
4  it, and during those times, I was told, they would
5  switch to caustic soda as a backup, and that was
6  routine practice.
7     Q  Okay.  The e-mail that Mr. Westbrook sent to
8  you on June 18, 2014, did you do anything with that
9  information where he said we switched from soda ash
10 to caustic --
11    A  If you look at these e-mails, these e-mails
12 are discussing high pHs in Highland 1, possibly from
13 algae activity and the change in pH, and some of the
14 discussions that proceeded on that.  At that time,
15 we were using an algaecide that had soda ash in it
16 as one of the byproducts.  It was suspected at that
17 time that maybe the increase in pH was due to the
18 byproduct formation from algaecide, and this is the
19 way some of the discussions proceeded throughout
20 this whole e-mail chain.
21    Q  Okay.  So my question was:  When
22 Mr. Westbrook told you here June 18th, 2014 at 10:12
23 a.m. that the Authority had switched from soda ash
24 to caustic soda about six weeks prior, seven weeks
25 prior, did you do anything with that information?

Page 34

1     MR. GALLAGHER:  Asked and answered.
2     A  Again, this is all related to the high pH
3  levels at the Highland 1 reservoir that they were
4  experiencing --
5     Q  Did you ask Mr. Westbrook --
6     A  Hang on.  Let me finish.
7     Q  Sorry.
8     A  -- and the discussions revolving the use of
9  soda ash and was it, you know, concentrating in the
10 reservoir or was there some other reason.  He
11 informed me that, in fact, they had switched from
12 soda ash to caustic soda.  This appeared to me to be
13 one of their normal changes because of a feed system
14 malfunction, that he was saying, well, we're not
15 using soda ash at the plant right now.  We're using
16 caustic soda, telling me that this might have been
17 something that we should look at as far as the
18 change in pH.  So that's one of the things that we
19 looked at.
20    Q  So you read this to mean that they had
21 switched from soda ash to caustic as part of the
22 normal course because caustic was the backup?
23    A  That's correct.
24    Q  Does that strike you as unusual that they
25 had been using a backup for seven weeks?

Page 35

1     A  It does not.
2     Q  It does not?
3     A  It does not, with the maintenance activities
4  at the plant.  There were pieces of equipment out of
5  service for years --
6     Q  Okay.
7     A  -- waiting on either scheduling or parts or
8  some reason that they would be out of service.
9     Q  Did you ask Mr. Westbrook whether the switch
10 from soda ash to caustic soda that he refers to in
11 this e-mail was a switch that was permanent or
12 temporary?
13    A  I did not ask him.  I assumed it was their
14 routine temporary switch because the soda ash had
15 malfunctioned.
16    Q  Okay.  Do you know of anybody -- strike
17 that.  If you had asked Mr. Westbrook whether it was
18 a permanent or a temporary switch and he told you it
19 was permanent, do you think that would have
20 triggered any obligations to describe the change or
21 submit it for -- submit the change for approval
22 under the lead and copper rule?
23        MR. GALLAGHER:  Objection, calls for
24 speculation.
25    A  If it were considered a permanent switch,

Page 36

1  something that the staff had chosen to do -- again,
2  as far as we knew from their permit, they had the
3  right to use caustic soda as needed as corrosion
4  control treatment additive.
5        I probably would have at least had a
6  courtesy call to DEP informing them that either a
7  soda ash had failed for an extended period of time
8  and we had to go on caustic soda or we were
9  permanently switching to caustic soda, and then the
10 state would have had to determine whether it fell
11 under those rules and the rules of the State of
12 Pennsylvania.
13    Q  Okay.  Let's say that happened, and the
14 state said our interpretation of that is that's a
15 change that triggers this subsection of the lead and
16 copper rule.  You have to tell us what your change
17 is and submit it for approval.  How easily or how
18 difficult would it have been to switch back to soda
19 ash, at least in the meantime?  I mean, is that
20 something that takes a day?  Is that something that
21 takes three weeks?
22    A  It depends on the malfunction issue.
23    Q  Okay.
24    A  I never was given information on how long it
25 took to clean out the line or fix the feeder or fix

1 the soften water system. I just don't have any of
2 that information. It is possible that it would take
3 a period of time that would be relatively short to
4 put the soda ash machine and the feed system back in
5 operation.
6    Q And to be clear, do you have any knowledge
7 that the soda ash machine was or had malfunctioned
8 and was not operational at the time here in April,
9 May and June of 2014?
10    A I have no knowledge specifically that the
11 system had failed, no. I just assumed based on his
12 information, since we've been talking about soda
13 ash, he was letting me know that they were feeding
14 caustic soda.
15    Q If the system was operational on June 18th,
16 2014, and the decision was made to switch back to
17 soda ash, do you think that's something that would
18 have happened in a day or two if you have the
19 material on hand?
20    A Assuming both systems were fully functional,
21 it would just be simply turning off the caustic soda
22 feed system and turning on the soda ash feed system.
23    Q Did you ever have any conversations with
24 Glen Lijewski about -- in this time frame, 2014,
25 about PWSA making a permanent switch from soda ash

1 to caustic soda as a corrosion control product?
2    A No, I did not.
3    Q What about Jim Paprocki?
4    A I didn't have any conversations with any
5 PWSA staff about a permanent switch from soda ash to
6 caustic, no.
7    Q Did you receive feed reports?
8    A Feed reports?
9    Q Yeah, reports that would reflect which
10 chemicals were being used on a daily basis --
11    A I did not.
12    Q -- at PWSA?
13    A I did not.
14    MR. GALLAGHER: Let him finish his question
15 because she's typing it down, and it's tough for her
16 to get it down if you guys are talking over each
17 other.
18    Q Can you think of a single instance in the
19 three-plus years you were involved at PWSA in which
20 you asked for or received some report reflecting
21 what chemicals were being used at PWSA on a daily
22 basis?
23    A On a daily basis, no. Once in a while, I
24 would review annual usage, if there was an
25 initiative that we were looking at, particularly for

1 any potential inefficiencies. Particularly during
2 the jar testing, I was reviewing the ferric chloride
3 dosages to see if they were matching up with what
4 the jar test dosages were showing us, and made
5 adjustments accordingly based on the technical data
6 and the analytical data.
7    Q When did you become aware that DEP had
8 issued a notice of violation because of a change
9 that the PWSA had made from soda ash to caustic
10 soda?
11    A This would have been early 2016.
12    Q Okay.
13    (Gnagy Deposition Exhibit 6 was marked
14 for identification and is attached to the
15 transcript.)
16    Q Exhibit 6. Exhibit 6 is an e-mail exchange
17 involving, looks like, only -- or at least the top
18 three pages appear to be e-mails between and among
19 Veolia folks, yourself, Mr. Tolbert, Michael
20 Stephens, Robert Nicholas. Do you see where I am?
21    A Yes.
22    Q And you're discussing the notice of
23 violation that DEP had issued for the switch from
24 soda ash to caustic soda, correct?
25    A Correct.

1    Q Did you -- were you aware or is this the
2 first that you heard of the notice of violation?
3    A Yes, it is.
4    Q Top of Page 2 of this e-mail, there's an
5 e-mail from Mr. Nicholas. He says, good morning,
6 Marvin. Any idea what this is about? Do you see
7 where I am?
8    A I do.
9    Q And then you respond, bottom of Page 1,
10 said, according to the notice from DEP, PWSA did not
11 feed soda ash from 2016 to 2016. Is that a typo,
12 looks like?
13    A I didn't hear the question, I'm sorry.
14    Q I'm sorry. I was reading your e-mail to
15 you. The first couple lines of that e-mail read,
16 according to the notice from DEP, PWSA did not feed
17 soda ash, and then the time period you have here is
18 from 2016 to 2016. I assume that is a typo of some
19 sort.
20    A It appears to be a typo, yes.
21    Q Okay. Some time prior to 2016 to 2016 is
22 probably more accurate. Do you agree?
23    A Yes.
24    Q Okay, and is in violation of the corrosion
25 control technique. I know for a fact that PWSA did

Page 41

1  feed soda ash during that time.  Did I read that
2  correctly?
3      A  Yes.
4      Q  What was the basis of that statement?
5      A  I'm sorry?
6      Q  What was the basis of your statement that
7  you knew for a fact that PWSA did not -- or did feed
8  soda ash during that time?
9      A  I believe the notice said from 2014 to 2016.
10     Q  Okay.
11     A  If I remember correctly.  I had chemical
12  feed records for -- a summary of the annual feed
13  records for 2014 and did see that, in fact, they did
14  feed soda ash during several times throughout that
15  year as well as some caustic soda.
16     Q  Okay.  What was the context in which you had
17  obtained those feed records?
18     A  That would have been for some other
19  initiative that we were working on at that time --
20     Q  Okay.
21     A  -- where I needed to see the 2014 feed
22  records.
23     Q  Did PWSA in 2014 use soda ash -- well, let's
24  say prior to the switch.  Was it using soda ash just
25  in the clear well or was it using it elsewhere in

Page 42

1  the process also?
2      A  As far as I'm aware, the only soda ash feed
3  point is filtered water going to the clear well.
4      Q  The clear well, okay.  Let's assume your
5  statement here is correct and that PWSA did feed
6  soda ash during this time.  That's really not the
7  issue, is it?  The issue is whether there had been a
8  change from soda ash to something else?
9         So a better way of saying it is the fact
10  that they had fed soda ash at some point in time
11  over two years isn't really, particularly, relevant
12  to whether or not a change had been made, right?
13         MR. GALLAGHER:  Object to the form.
14     A  I'm not sure I understand your question.
15     Q  Okay.  Why did you think -- let me rephrase
16  that.  Did you think the -- at this time, did you
17  think the notice of violation or the basis of the
18  notice of violation that PWSA had received was
19  incorrect?
20     A  I believed it was incorrect, yes.
21     Q  Okay, and why did you believe it was
22  incorrect?
23     A  The permit does not specifically state which
24  chemicals to use for corrosion control treatment.
25  It only gives pH and alkalinity ranges for plant

Page 43

1  effluent water and distribution water quality.
2      Q  When did you review the permit that you just
3  referred to in your answer?
4      A  I was sent the permit during this time frame
5  that's in the e-mail string that you're referring
6  to.
7      Q  Had you seen it previous to February 2016?
8      A  I had not.
9      Q  That's not something that you reviewed back
10  in August of 2012?
11     A  No.
12     Q  Why not?
13     A  There was no need to.  It was stated to us
14  that they were using corrosion control treatment
15  using pH and alkalinity adjustment and that they
16  were in compliance with the lead and copper action
17  levels.
18     Q  Okay, and you didn't think it was necessary
19  to actually ask for a copy of the permit, whether
20  for background or double check or anything like
21  that?
22     A  I did not.  We were told the pH and
23  alkalinity ranges that they had operated under.
24     Q  Do you know if anybody at Veolia reviewed
25  the permit that you say you saw for the first time

Page 44

1  in February of 2016?
2      A  I can't say whether anybody reviewed it or
3  not.
4      Q  Moving up the first page of this e-mail
5  string, Mr. Nicholas says -- he responds to you and
6  says, thanks, and then you have a further response
7  later that day to Mr. Nicholas and Mr. Tolbert.  You
8  write, talk to Todd Adams.  Does that mean you had
9  referred -- or it means you had talked with him or
10  were you telling somebody to talk to him?
11     A  I had talked to Todd Adams, and I was asking
12  them to talk to Todd as well.
13     Q  Okay.  So you had talked to him that day?
14     A  In this specific time frame, one or two
15  days, yes.
16     Q  Okay.  Is the rest of -- is the rest of what
17  you say in this e-mail a summary of what Mr. Adams
18  had told you?
19     A  It appears to be, yes.
20     Q  So you continue to write, doesn't know much,
21  but apparently someone from PWSA told media they
22  were not feeding soda ash and media called DEP.  Do
23  you know who that someone was?
24     A  I do now.
25     Q  Mr. Good, right?

Page 45

1   A  Yes, that's correct.
2   Q  And then you say, Jim needs to demand feed
3  records and tap water quality for 2014 and 2015 from
4  his staff to show DEP they were not in violation.
5  Did I read that correctly?
6   A  Yes.
7   Q  What tap water quality documents for 2014 or
8  2015 do you think would reflect that PWSA was not in
9  violation?
10   A  Those would be the finished water pH and
11  alkalinity levels that were within the permit
12  requirements and the corrosion control treatment
13  that we were told they were operating under.
14   Q  Now, the feed records would show what they
15  were actually using, right?
16   A  Feed records?
17   Q  You refer to feed records here as well.
18   A  Yes.
19   Q  You say Jim needs to demand feed records.
20   A  DEP claimed they didn't feed soda ash during
21  a specific time frame, and I had records showing
22  that they did feed soda ash during that time frame.
23   Q  You also say, I don't need to be involved
24  from this point forward.  Do you see that?
25   A  Yes, I do.

Page 46

1   Q  Why did you say that?
2   A  We were no longer under contract and we had
3  other workloads to work on and felt that all they
4  had to do was show DEP that they complied with the
5  alkalinity and pH levels in their permit and there
6  was no violation.
7   Q  Did you feel like you had any responsibility
8  at this point in time to respond to the notice of
9  violation or address the DEP's allegations?
10   A  No, I did not.
11   Q  That's because the contract had expired?
12   A  We were no longer working for PWSA.
13   Q  Okay.
14      (Gnagy Deposition Exhibit 7 was marked
15  for identification and is attached to the
16  transcript.)
17   Q  Exhibit 7.  Deposition Exhibit 7 is another
18  e-mail string.  It appears to include yourself,
19  Mr. Stephens, Mr. Nicholas and Mr. Tolbert, dated
20  January -- excuse me, February 25th and 26th of
21  2016.  Do you recall receiving this or being
22  involved in this e-mail string?
23   A  I do.
24   Q  So in Mr. Stephens' e-mail to, I presume,
25  the three of you, which is here, bottom half of this

Page 47

1  first page, he outlines the timeline that, I guess,
2  the DEP apparently had assumed.  Do you see where I
3  am?
4   A  The dated February 25th section?
5   Q  Yeah.  There are three, sort of, bullet
6  points in this e-mail.  It says, the letter
7  basically identifies --
8   A  Yes, I see where you are.
9   Q  They say:  When they switched from soda ash
10  to caustic, November 2013; when they switched back
11  from soda ash due to pH fluctuation, December 2013;
12  and the switch back from caustic soda on April 29th,
13  2014 until now.  Did I read that correctly?
14   A  Yes.
15   Q  So in this e-mail, Mr. Stephens is saying --
16  well, let me ask that differently.  Did you
17  interpret or have any view when you read
18  Mr. Stephens' e-mail as to whether the switch in
19  April of 2014 from soda ash to caustic soda was
20  permanent or temporary?
21   A  At the time of this e-mail, I did not know
22  if it was permanent or temporary, no.
23   Q  The next paragraph in Mr. Stephens' e-mail
24  he writes, at this time Veolia is not at risk for
25  being held directly responsible for this violation,

Page 48

1  but we must be prepared for any possible
2  repercussions due to the fact that we were holding
3  the executive director and COO positions as these
4  issues arose.  Did I read that correctly?
5   A  That's what it says, yes.
6   Q  Were you the most senior -- let me ask it
7  this way.  I've seen the acronym SME on lot of
8  documents.  I understand it's a subject matter
9  expert.
10   A  That's correct.
11   Q  Okay.  Were you the senior subject matter
12  expert for Veolia on water production, water
13  quality, those sorts of issues on this project?
14   A  I was.
15   Q  Were there any other SMEs that Veolia
16  assigned to this project to deal with water
17  production or water quality issues?
18   A  No.
19   Q  Do you feel like -- when you were the senior
20  and the only Veolia subject matter expert on this --
21  on water treatment and water quality issues on this
22  project, what was the, sort of, the reporting
23  structure?  If there were issues at the plant, did
24  they deal with them through you?  Did they deal with
25  them on their own?  How did that all work?

Page 49

1    A  Throughout the project, we were asked to
2  identify areas where we could improve performance,
3  either in water production or in water quality.  And
4  through several document reviews, looking at
5  benchmarking analysis with other systems, we
6  identified a number of issues that probably needed
7  attention, and we would bring those to the Veolia
8  staff, and they would eventually be passed on to the
9  steering committee and the board as avenues that
10  needed to be investigated, and they would tell us
11  then what they wanted us to do out of that list.
12    Q  If it wasn't an initiative or an area for
13  improvement that Veolia had identified and then
14  worked up and presented to the steering committee or
15  to the board, what responsibility did Veolia have
16  for everyday operations at the plant or the lab?
17    MR. GALLAGHER:  Object to the form.
18    A  I believe our contract was management
19  oversight --
20    Q  Okay.
21    A  -- of the facilities.
22    Q  So you would agree or in your view, Veolia
23  had some oversight or management oversight
24  responsibilities for the plant and the lab?
25    MR. GALLAGHER:  Object to the form.

Page 50

1    A  We had management responsibilities over the
2  supervisors and managers that were at the plant,
3  yes.
4    Q  In practice, did Mr. Duray or
5  Dr. Kuchta -- did they communicate with you
6  regarding issues that were not part of an initiative
7  or an improvement project?
8    A  Yes.  They would bring issues that they were
9  observing to our attention, and nine times out of
10  ten, you know, a good part of the time, those were
11  worthwhile issues for investigating, and they were
12  put on the list as well.
13    MR. GALLAGHER:  Jordan, we've been going for
14  about an hour.  Do you mind if we take a quick
15  break?
16    MR. WEBSTER:  Sure.
17    (A recess was taken.)
18    Q  Sir, when you first visited PWSA in August
19  of 2012, did you ask anybody about lead and copper
20  rule testing and what PWSA's recent testing showed?
21    A  During the interview with Dr. States, yes, I
22  asked him a lot of water quality and regulatory
23  results.
24    Q  Okay.
25    A  One of which was lead and copper.

Page 51

1    Q  And what was the response?
2    A  They were in compliance.
3    Q  Okay.
4    A  And had a long history of compliance.
5    Q  Was there any further discussion about that
6  issue in your interview with Dr. States back in
7  August of '12?
8    A  No.  They were in compliance with several
9  rules, and those were just noted.
10    Q  Did you ask what he meant by in compliance?
11  Was he close, was he not close, that sort of stuff?
12    A  No.  Again, during that time frame,
13  compliance meant you met the rule.
14    Q  Okay.
15    A  And that was all that was necessary.
16    Q  Do you know -- so as part of that visit that
17  you made to PWSA, you didn't ask for any records
18  that would reflect lead and copper test results?
19    A  I don't recall at the time specifically
20  asking for some records.  Through the preparation
21  process, I did see an e-mail that someone sent me
22  2010 records.
23    Q  Do you know whether anyone at Veolia had
24  asked for lead and copper records as part of due
25  diligence?

Page 52

1    A  That, I don't know.
2    (Gnagy Deposition Exhibit 8 was marked
3  for identification and is attached to the
4  transcript.)
5    Q  Exhibit 8.  Is this the e-mail that you are
6  referring to?
7    A  I recall some of these results.  I do not
8  recall getting all of these copies of letters signed
9  by Dr. States.
10    Q  Okay.  The cover e-mail here is from Manshi
11  Low to you with copies to Bill Thompson, Dale
12  Pershing and Kareen Baker, correct?
13    A  It appears to be.
14    Q  She writes, Marvin, as requested, please
15  find three files as attached.  Had you requested
16  these files?
17    A  I did not.
18    Q  Why was she -- do you have any understanding
19  as to why she would have thought -- I mean, she
20  apparently thought you had requested them.
21    A  It appears somebody requested them, but I
22  don't recall -- I don't recall requesting lead and
23  copper results.
24    Q  Did you after you received these call
25  Ms. Low and say, I didn't ask for these, why are you

Page 53

1  sending them to me?
2     A  I did not.  I got a lot of information from
3  Manshi during the project.
4     Q  Who was Mr. Thompson?
5     A  Bill Thompson works for Veolia.
6     Q  In what capacity?
7     A  Out of the Pittsburgh office.  I believe he
8  is -- he manages part of our compliance group.
9     Q  Okay.  What about Mr. Pershing?
10    A  Dale Pershing works for -- did work for
11 Veolia under Bill Thompson.
12    Q  Here in Pittsburgh?
13    A  No.  Dale, I believe, is in -- was in
14 Indianapolis.
15    Q  And what about Kareen Baker?
16    A  Kareen Baker was a Veolia employee, lived in
17 California.  She's no longer with the company.  She
18 was doing part of the laboratory investigations.
19    Q  Did you speak with Mr. Thompson,
20 Mr. Pershing or Mr. Baker about the 2010 lead and
21 copper documents that are attached to this e-mail?
22    A  No, I did not.
23    Q  Did you do anything with this e-mail or the
24 attachments at all?
25    A  I looked through it to see what it was and

Page 54

1  saw that there were lead and copper results here,
2  but there's no indication of 90th percentile, and
3  they were in compliance with the rule, so I put it
4  aside and concentrated on more pressing issues.
5     Q  Okay.  What were the more pressing issues
6  you're referring to?
7     A  The trihalomethane, THM, issue was
8  paramount.
9     Q  Why was it paramount?
10    A  Because they were already getting high
11 locational averages throughout the city, looking at
12 possibly additional treatment in storage reservoirs
13 and the distribution system to reduce THMs.  They
14 weren't in violation, but they had received
15 operational evaluation level notices that if you
16 continue along this path, it's likely you're going
17 to have a violation of THMs.
18    Q  Trends were reflecting that they were headed
19 towards an evaluation?
20    A  Correct.
21    Q  And you thought that was a paramount issue
22 for you because you wanted to head that off before
23 it became a violation?
24    A  That's correct.
25       (Gnagy Deposition Exhibit 9 was marked

Page 55

1  for identification and is attached to the
2  transcript.)
3     Q  Exhibit 9.  Exhibit 9 is an e-mail exchange.
4  It looks like it is all on August 1st of 2013.  As
5  far as I can tell, it refers to a lab accreditation
6  issue.  Is that a fair summary?
7     A  It appears to be discussions about
8  accreditation to run THM analysis.
9     Q  Right, and Mr. Good in the middle of the
10 first page e-mails just you and says, can you
11 resolve tomorrow, and then his next sentence reads,
12 given the COA for the lab last year, how could this
13 have happened.  Did I read that correctly?
14    A  Yes.
15    Q  And your response to him says, you do
16 realized -- I think you meant realize, not realized.
17 You do realize we do not have a strong plant manager
18 out there, right?  Did I read that correctly?
19    A  You read it correctly, but you're out of
20 context.  You look at the time stamps, the e-mail
21 from Jim Good was at 4:36 p.m. on the 1st, and the
22 one you just read was 3:42 p.m. on the 1st.  It's a
23 separate e-mail on a separate issue.
24    Q  What's the separate issue?
25    A  I don't know.  I don't see the rest of the

Page 56

1  string here.
2     Q  Mr. Good was from California, right?
3     A  What's that?
4     Q  Mr. Good, he came from California, right?
5     A  Mr. Good was on site.
6     Q  But he was originally from California,
7  right?
8     A  That's correct, but he was on site through
9  the whole project.
10    Q  He travels for work, correct?  Did Mr. Good
11 travel for work when he was at PWSA?
12    A  He was here on site almost the entire time.
13 There were a few times that he traveled on weekends
14 to go home, yes.
15    Q  Do you travel for work?
16    A  I do, yes.
17    Q  Do you think it's possible that the time
18 stamp here is a result of being in different time
19 zones?
20    A  No.
21    Q  Okay.
22    A  I don't believe so.  Again, August 2013, Jim
23 Good would have been here in Pittsburgh in the
24 eastern time zone.
25    Q  Do you have any -- well, you know what, we

Page 57

1 can argue about that some other time.  As of
2 August 1, 2013, it was your view that PWSA did not
3 have a strong plant manager, correct?
4    A  I believe Ron Duray was not a strong plant
5 manager from the standpoint of progressing the
6 utility, no.
7    Q  Okay.
8    A  He was --
9    Q  That's who you were referring to here?
10    A  Yes.  He was --
11    MR. GALLAGHER:  Let him finish.
12    A  He was fully competent as a long-term PWSA
13 employee and certified operator, certified by the
14 state, as far as water treatment and distribution
15 operations.
16    Q  So what was his -- what was his shortcoming
17 in your view then?
18    A  I didn't feel he was going to be the
19 long-term plant manager to develop capital
20 improvement plans and to do master planning and to
21 do succession planning and those types of things.  I
22 didn't feel those were in his skill sets and with
23 his -- he was already beyond eligible retirement
24 age, and he likely would not do those duties since
25 he was so close to retirement.

Page 58

1    It had nothing to do with the routine
2 operation of the plant.  It was moving forward.
3    Q  Well, Mr. Good had asked you how this lack
4 of accreditation had occurred, and your response
5 is -- relates to the plant management.  I'm --
6    A  Again --
7    Q  I'm failing to connect how --
8    A  I'm failing to connect, sir, how this e-mail
9 corresponds to any of the rest of this string.
10    Q  So you were just voluntarily telling
11 Mr. Good that PWSA did not have a strong plant
12 manager out there?
13    A  I don't know where this section of the
14 e-mail string comes from.  I can't tell you.
15    Q  You know this is a document that Veolia
16 produced to us?
17    A  I understand, but I -- it's out of context.
18 Again, I can't tell you where this comes from.
19    Q  Well, you don't know it's out of context.
20 You just see the two different time stamps, right?
21    MR. GALLAGHER:  Objection to form.
22    A  I see different time stamps and --
23    Q  You don't have any knowledge as to how the
24 two different time stamps got --
25    A  No, I don't know.

Page 59

1    Q  You don't believe anybody manipulated this
2 document, do you?
3    A  I don't believe so, no.
4    Q  So you thought Mr. Duray was not a strong
5 plant manager in some respects?
6    MR. GALLAGHER:  Asked and answered.
7    Q  Right?
8    A  I've already answered that, sir.
9    Q  Okay.  You told me earlier this morning,
10 though, that you didn't have an opinion on people
11 who were managing the plant or the lab.  Do you
12 recall that?
13    MR. GALLAGHER:  I'm going to object on one
14 notion here that you're asking him his opinion.
15 He's here as a designee on behalf Veolia.  He's not
16 here as a fact witness, and I'm failing to
17 understand how his opinion about these individuals
18 is relevant in terms of his presence here as a
19 designee.
20    MR. WEBSTER:  I don't have to answer that.
21 You put your objection on the record.
22    (Gnagy Deposition Exhibit 10 was marked
23 for identification and is attached to the
24 transcript.)
25    Q  Exhibit 10.  Sir, I'm showing you what we've

Page 60

1 marked as Exhibit 10, I think, or 11 -- 10.  This is
2 an e-mail from Gina Cyprych to a number of folks.  I
3 will acknowledge you are not on it.
4    Here's my question for you.  Here on
5 September 30th of 2013, the last bullet point, Miss
6 Cyprych reports that the Authority had met all of
7 the requirements for triannual lead and copper.  See
8 where I am?
9    A  Yes, I do.
10    Q  Do you recall ever receiving the information
11 yourself that the Authority had met requirements for
12 the triannual lead and copper testing sometime
13 around, you know, September 30th of 2013?
14    A  I don't recall receiving any written notice.
15 I did have a conversation with the Veolia staff that
16 we had met lead and copper.
17    Q  Do you recall when that conversation would
18 have taken place?
19    A  Off the top of my head, no.
20    Q  Who would have -- who do you recall telling
21 you that in 2013 PWSA had met lead and copper rule
22 requirements?
23    A  It was in the regular staff meeting during
24 one of our plant visits, likely would have been Jim
25 Good reporting what Gina has in this.

Page 61

1    Q  The staff meeting, would that include only
2  Veolia folks or both Veolia and PWSA folks?
3    A  PWSA was not included in the Veolia staff
4  meetings, no.
5    Q  Okay, and what you recall is this report
6  being made during a Veolia staff meeting?
7    A  It was a verbal report that we had met --
8    Q  Sure.
9    A  -- THMs and lead and copper.
10   Q  Did Veolia ever ask for the actual 2013 lead
11  and copper test results?
12   A  I don't recall that Veolia did,
13  specifically.  I did at one point.
14   Q  When did you ask for the 2013 lead and
15  copper test results?
16   A  I don't remember the exact time frame.  It
17  would have been, maybe, February of 2015.
18   Q  Why did you ask for the 2013 test results in
19  approximately February of 2015?
20   A  I had heard a couple of times that they met
21  the lead and copper rule.  I was just curious to see
22  what the levels were.
23   Q  Why?  Why were you curious in February of
24  2015 to see the specifics?  Why then as opposed to
25  any point in time prior?

Page 62

1    A  We were already getting information from
2  U.S. EPA.  They had publicly announced that any
3  level of lead, they felt, was dangerous in drinking
4  water, and they had promised to review and revise,
5  as necessary, the lead and copper rule.  Some of
6  that information had been known at that time.  I was
7  just checking to see what our levels were and if
8  there was possibly any additional corrosion control
9  treatment adjustments that would have been needed
10  for the next round in 2016.
11   Q  When do you -- when did you first learn that
12  U.S. EPA was -- maybe I'm summarizing this
13  incorrectly, but you can tell me if I'm wrong.  That
14  U.S. EPA was reassessing the lead and copper rule?
15   A  I don't recall an exact date.  I mean, they
16  have made numerous changes to the lead and copper
17  rule since its initial promulgation in the '90s.
18   Q  Was it in 2014 that you recall hearing --
19   A  Don't recall.
20   Q  But it's that background that caused you to
21  ask for the 2013 results?
22   A  Yes.
23   Q  Did you ask for results for lead and copper
24  testing for any years prior to 2013?
25   A  I did not.

Page 63

1    Q  What did you see when you received the
2  results for 2013 lead and copper testing?
3    A  Well, what I was given was the raw data with
4  just lead and copper results on it.  There was no
5  indication of 90th percentile levels.
6    Q  Okay.  Who gave that data to you?
7    A  I believe it was Christian Westbrook.
8    Q  When he gave you the raw data, could you use
9  it to figure out the 90th percentile?
10   A  Yes, I could.
11   Q  Did you do that?
12   A  I did.
13   Q  What did you find?
14   A  The level was about 14.7.
15   Q  And what did that tell you?
16   A  It told me that it was a little too close to
17  the 15 action level for my opinion.
18   Q  Okay, and did you make any recommendations
19  or have any discussions because you thought that was
20  maybe a little too close for comfort?
21   A  Yes.  I told Scott Towler, our COO at that
22  time, that I'd gotten the lead and copper results,
23  and that the levels appeared to be too close to the
24  levels for my taste, and that maybe a review of the
25  corrosion control treatment should be done.

Page 64

1    Q  And did you have any conversations about the
2  2013 lead and copper results, other than the one
3  that you just described?  Did you talk to Mr. Good?
4  Did you talk to Mr. Tolbert?  Did you talk to people
5  at the plant, anything like that?
6    A  No, I told Mr. Towler what I found in the
7  2013 monitoring results.
8    Q  Did you have any follow-up discussions with
9  Mr. Towler about that?
10   A  I did not.
11   Q  Did Mr. Towler -- what was his response when
12  you told him that you had reviewed the results and
13  that there were -- you know, they were at 14.7 or so
14  and the action level was 15, right?  What was his
15  response?
16   A  He didn't give me a response.  He was headed
17  off to a meeting.
18   Q  Was this a verbal conversation?
19   A  Yes, it was.
20   Q  Was it documented in any way?
21   A  No.
22   Q  Did you ever follow up with him either in
23  person or by e-mail to say, you know, do you want to
24  talk about that again?  Should we talk about what
25  steps we can take, anything like that?

Page 65

1   A  No, I didn't follow up with him.  If it was
2  an issue, I would have been asked to investigate it.
3  PWSA staff were managing treatment and knew what the
4  levels were.  They didn't feel it was important
5  enough to notify me that the level was 14.7.
6   Q  Did you go back and look at -- well, let me
7  ask it this way.  As you sit here today, do you know
8  what the 90th percentile level was back in 2010?
9   A  Today, I do, yes.
10   Q  And, you know, I don't have the document in
11  front of you, but best recollection, what was that
12  number?
13   A  Around 10 parts per billion.
14   Q  Do you, as you sit here today, know what the
15  90th percentile number was in 2007?
16   A  I don't recall what that number was, no.
17   Q  Did you know at one time?
18   A  No.
19   Q  Okay.  So the scope of your knowledge as to
20  90th percentile levels for PWSA is limited to what
21  the reading was, what the level was, in 2010 and
22  what it was in 2013, right?
23   A  That's correct.
24   Q  So at least as between those two, you were
25  somewhere in the 10 range, and now you're at 14.7,

Page 66

1  right?
2   A  That's correct.
3   Q  When did you -- when did you learn of the
4  2010 90th percentile level?
5   A  In the preparation for the depositions.
6   Q  Okay.  So prior to that, you had no
7  knowledge?
8   A  I did not.
9    (Gnagy Deposition Exhibit 11 was marked
10  for identification and is attached to the
11  transcript.)
12   Q  This is 11.  Sir, I've shown you Exhibit 11.
13  This is the Pittsburgh Water and Sewer Authority
14  Annual Drinking Water Quality Report.  Simple
15  question for you to start with.  Have you ever seen
16  this document before?
17   A  In the preparation for depositions, yes.
18   Q  Prior to that, have you ever seen this
19  document?
20   A  No, sir.
21   Q  So, just so I'm -- make sure I'm clear.
22  Sometime around February of 2015, you thought to ask
23  for the 2013 lead and copper test results, right?
24   A  Correct.
25   Q  And the basis for that was what you knew was

Page 67

1  going on at U.S. EPA and maybe a heightened --
2  heightened focus on lead testing or on lead levels,
3  right?
4   A  Changes to the lead rule, yes.
5   Q  You said, I think, earlier, that there was
6  some view that any level of lead was at least
7  undesirable, right?
8   A  That's what EPA has stated, yes.
9   Q  Right.  And you received the test results,
10  and you calculated the 90th percentile at 14.7,
11  right?
12   A  Yes.
13   Q  And you raised that to Towler in a verbal
14  conversation, right?
15   A  Yes.
16   Q  And he never gets back to you, right?
17   A  I don't recall him bringing it up again, no.
18   Q  Where's Towler now, do you know?  Is he
19  still at Veolia?
20   A  He does not work for Veolia.
21   Q  Do you know where he is?
22   A  I believe he's with DeKalb County in
23  Georgia.
24   Q  Okay, doing what?
25   A  I don't know his exact title.

Page 68

1   Q  When was the last time you spoke with him?
2   A  Probably one of my last trips here in
3  Pittsburgh.
4   Q  Okay.  Do you know how long it's been since
5  he worked at Veolia?
6   A  I don't recall when.  What was the end of
7  our contract date, December 2015?
8   Q  February 2015, I think.
9   A  I don't know if he was there through
10  December or whether he left prior to that.
11   Q  Okay, and other than the conversation you
12  had with Mr. Towler sometime around February 2015,
13  you didn't express your -- let me ask it this way.
14  Were you concerned in any way about the lead and
15  copper, I guess, the 90th percentile level that you
16  calculated in February 2015?
17   A  I've already stated I thought it was a
18  little too close to the limits, but it was well
19  known at that time that you're either in compliance
20  or you're not.
21   Q  So would you say you were concerned or not
22  because of the relatively small difference between
23  where they were and what the actual number was?
24   A  I had some --
25    MR. GALLAGHER:  Object to the form.

Page 69

1   Q  You can answer.
2      WITNESS:  I didn't hear what you said.
3   Q  He objected to the form of the question.
4  You can answer.
5   A  I had some concern.  That's why I raised the
6  issue to Scott Towler.
7   Q  And despite the concern that you had, you
8  didn't mention it to Jim Good?
9   A  I did not.
10   Q  Did you have any discussions with people at
11  the plant as to how they were dealing with corrosion
12  control given the 2013 lead and copper test results?
13   A  I did not.
14   Q  Why not?
15   A  They know what the levels were and didn't
16  report that there was an issue to me.  All I knew is
17  that we were in compliance.
18   Q  So you're the senior, the only, Veolia
19  subject matter expert on this project for, at that
20  point, almost three years, and you have a concern,
21  and you mention it to one individual, and it dies on
22  the vine?
23      MR. GALLAGHER:  Object to the form.
24   Q  Is that fair?
25   A  I informed one person, and I was not

Page 70

1  notified to investigate any further.
2   Q  What was Scott Towler's background, do you
3  know?
4   A  I do not.
5   Q  Moving to some different -- other topics
6  here.  While Veolia was working with PWSA, did
7  Veolia recommend an increase in the dosage of ferric
8  chloride as part of the treatment process?
9   A  Yes.
10   Q  Why?
11   A  To help reduce organics and lower the THM
12  levels that we were experiencing in the distribution
13  system.
14   Q  What kind of impact -- did that
15  recommendation actually -- was it actually
16  implemented?
17   A  Yes, it was.
18   Q  What kind of impact did the increased dosage
19  of ferric chloride have on removal of organics and,
20  you said, also it had some effect on THMs?
21   A  We increased the percent removal
22  approximately 8 to 10% over historically practiced
23  levels.
24   Q  Percent removal of organics?
25   A  Of TOC, total organic carbon, which is a

Page 71

1  measure of organics.
2   Q  Okay.
3   A  We did see some reduction in THM results,
4  other than in the warmest temperature period, which
5  would have been the third quarter.
6   Q  Okay.  You say that you thought there was
7  about an 8% reduction -- 8% difference between
8  historical removal of organics and what occurred
9  after the increase in ferric chloride dosage.  Did I
10  hear that correctly?
11   A  Yes.
12   Q  Do you recall about, you know, where was it
13  historically and where was it after?
14   A  Yes, I have those numbers.  Traditionally,
15  they were averaging about 50%, somewhat less than
16  that at times.
17   Q  Okay.
18   A  And we took it up to around 58 or 59% with
19  the increase in ferric.
20   Q  Were you personally involved in the, sort
21  of, analysis or the evaluation of whether the
22  increased dosages of ferric chloride would result in
23  increased removal of organics?
24   A  Yes.
25   Q  Okay.  You did a technical memo on that?

Page 72

1   A  I don't recall.  There should be something
2  as related to jar testing --
3   Q  Mm-hmm, okay.
4   A  -- and the results that we obtained through
5  jar testing.
6   Q  Did you consider what impact increased
7  dosages of ferric chloride would have on the amount
8  of sludge produced, you know, in your analysis or
9  your jar testing, prior to implementing the
10  increase?
11   A  Yes.  We estimated a potential increase in
12  ferric chloride and what would happen with sludge
13  production.
14   Q  Okay, and when it was implemented, what
15  happened to sludge volumes or amounts?  I'm not sure
16  what the technical term is.
17   A  I don't recall.  I don't have those numbers.
18  I do know that they had a limit of sludge volume by
19  gallons that they were allowed to send to the sewer
20  system.
21   Q  To Alcosan?
22   A  Yes.
23   Q  And after dosages of ferric chloride were
24  increased, did the volumes or the gallons of sludge
25  that were sent to Alcosan, did they exceed the

Page 73

1  limit?
2      A  I was told they exceeded the limit one time
3  during a high turbidity event in the river, yes.
4      Q  Do you recall whether they exceeded that
5  limit any other time?
6      A  I was not told that they exceeded the limit
7  any other time, no.
8      Q  Did you -- when you were evaluating whether
9  to increase the dosage of ferric chloride, did you
10  consider the effect of that increased dosage on the
11  treatment equipment that was used by PWSA?
12      A  No.  The dosage wouldn't have any more or
13  less of an effect on plant equipment.  It was still
14  the same chemical.
15      Q  You're aware that there were some issues
16  with shear pins and bearings around the time the
17  ferric chloride dosages were increased?
18      A  That's an incorrect assumption, sir.
19      Q  Well, I didn't make any assumptions.  I just
20  said there were issues around the time the ferric
21  chloride was --
22      A  There were issues --
23      Q  Hold on.  Let me finish my question, sorry.
24  It's my understanding that around the time that
25  ferric chloride dosages were increased there were

Page 74

1  also some issues with shear pins and bearings
2  failing on some of the Authority's equipment,
3  correct?
4      A  I'm not aware of that.
5      Q  Okay.  What assumption did you think I was
6  making that you thought was incorrect?
7      A  That shear pin failures were a direct
8  correlation to the increase in feed rate, and it's
9  not correct.
10      Q  Why do you think it's not correct?
11      A  Because they always have shear pin failures.
12  That's what they're there for, to protect the
13  equipment.  It could be from high volumes of sludge
14  due to high turbidity.  It could be due to a number
15  of reasons.
16         It could be due to failure of another piece
17  of equipment.  It could be one of the paddles of the
18  sludge collector broke a bolt and had become lodged
19  and broke a shear pin.  There's a number of cases
20  where shear pins can be broken.
21      Q  So your view is, though there may have been
22  some temporal correlation there, there is no
23  causation?
24      A  I don't believe there is, no.
25      Q  Is that just your opinion or did you discuss

Page 75

1  it with anybody else at Veolia?
2      A  I didn't discuss it with anybody, no.
3      Q  Are you aware that Veolia received -- I
4  think they had an OpEx for sourcing of chemical?
5      A  Yes.
6      Q  And are you aware that part of that OpEx for
7  sourcing of chemicals included ferric chloride or
8  that ferric chloride was among the chemicals that --
9      A  It was in the list of treatment chemicals,
10  yes.
11      Q  Do you know how much Veolia was paid on the
12  sourcing of chemicals OpEx for ferric chloride?
13      A  I do not.
14      Q  While you were involved at PWSA, did you
15  also recommend some changes to the way PWSA
16  backwashed its filters?
17      A  Yes.
18      Q  What recommendations did you make?
19      A  That they were washing the filters way too
20  long and wasting water and money and that we could
21  achieve better performance by reducing the wash
22  rate.
23      Q  Okay.  Was that the only recommendation you
24  made?
25      A  No.  There were several things related to

Page 76

1  filters that we investigated and implemented during
2  the time I was there.
3      Q  Did you recommend increasing the number of
4  hours between backwashing while you were there?
5      A  We were investigating it --
6      Q  Okay.
7      A  -- as a possible initiative; however, DEP
8  wanted us to do particle count testing, if they
9  went beyond 100 hours, to prove that we could still
10  take care of suspended solid and microbials,
11  bacteria.
12      Q  So that was something that was, at least, a
13  thought, but it was not implemented?
14      A  It was tabled, yes.
15      Q  Okay, and then the recommendation that was
16  implemented or one of the recommendations that was
17  implemented was one that just used less water to
18  backwash each filter, right?
19      A  That's correct.
20      Q  How long had -- prior to Veolia being
21  involved, how long was PWSA backwashing its filters
22  for?
23      A  I don't recall exact numbers, 16 to
24  18 minutes.
25      Q  Okay, and did you have a view as to how

Page 77

1 long -- you know, how that time could be shortened?
2    A  Yes.  Through some investigation and
3 analysis of the filter beds, we determined that
4 about six minutes was sufficient.
5    Q  Okay, and the objective here was to save
6 money?
7    A  The objective was to get better cleaning of
8 the filters without wasting water.  They had --
9    Q  Okay.
10    A  Let me finish.  They had a very small waste
11 wash water holding tank that they had a discharge
12 permit if it overflowed to the river.  They would
13 not hold a number of backwashes if they got into
14 sequential backwashes.
15       So that was another issue that we were
16 looking at, if we could reduce the length of the
17 backwash, we would likely not overflow that waste
18 tank and have to go through analysis and permitting
19 and the hassle of all of the reporting and
20 management of that specific piece of equipment.
21    Q  Okay.  So that was one objective, and
22 another objective was also to save money, correct?
23 You use less water, you save money?
24    A  Yes.  Wash water costs money and chemicals
25 and electricity.

Page 78

1    Q  Right.  After -- and this initiative was one
2 that was actually implemented, correct?
3    A  That's correct.
4    Q  After this initiative was implemented, what
5 happened to levels of turbidity in the water?  Did
6 they start to increase?
7    A  We actually saw a decrease in turbidity.
8    Q  Were there instances in which PWSA employees
9 had to take filters out of service to backwash them
10 with additional amounts of water?
11    A  If they did, it was not reported to me.
12    Q  Did your analysis of this particular
13 initiative include any testing for pathogens?
14    A  It did not.
15    Q  Was that the issue that DEP had, you know,
16 when you went to them and said, we might increase
17 the number of hours between backwashes, and they had
18 a concern because they weren't sure how that would
19 affect how pathogens were filtered?
20    A  It wasn't necessarily a concern.  It's a
21 routine tool that's used.  If you want to change the
22 operation, these are some of the tests that they
23 requested that we do to check the particle counts,
24 because that correlates to suspended solids and
25 turbidity, and the size of the particles that are

Page 79

1 coming through the filters also relates to giardia
2 and the other one is crypto, which is short for
3 cryptosporidium.  Again, it's a routine operation
4 that's something that, you know, they requested that
5 we do, and we just never did get to it.
6    Q  Okay.  Back to the ferric chloride dosage,
7 that recommendation that it be increased.  When
8 Veolia analyzed that particular initiative, was
9 there any consideration given to how or if increases
10 in the amount of ferric chloride used would impact
11 lead levels?
12    A  No.  There was no analysis at that time.
13    Q  Why not?
14    A  It was used for THM control and organics
15 reduction.
16    Q  As you sit here today, do you have any view
17 as to whether increases in ferric chloride dosages
18 would impact or could impact lead levels?
19    A  I know today that significant changes in
20 coagulant type and sometimes in dosing can affect
21 lead solubilities.
22    Q  Okay.  Is that knowledge that you've
23 gathered between when you were making the
24 recommendation at PWSA and today?
25    A  Yes.

Page 80

1    Q  Okay.  How did you get that knowledge?
2    A  There was an EPA report, I believe, in 2016
3 about changes in coagulant dose and impacts on lead
4 solubility.
5    Q  Okay, and did that report address ferric
6 chloride specifically or did it just talk about
7 coagulants in general?
8    A  It was more coagulants in general.
9    Q  Is that one of the assertions that has been
10 made with respect to the issues they've faced in
11 Flint, increases in ferric chloride may have
12 affected lead levels?
13       MR. GALLAGHER:  Objection.  I believe that's
14 clearly outside of the scope of his designee topic,
15 which is the water treatment plant operation and
16 sourcing of chemicals.  I'm going to instruct him
17 not to answer any questions outside of that scope.
18    Q  Are you going to take your counsel's advice?
19    A  I don't think Flint has any bearing on this
20 particular project, no.
21    Q  Veolia did work in Flint, correct?
22       MR. GALLAGHER:  Objection.  Again, it's
23 outside the scope of the designee topic, and I'm
24 going to instruct the witness not to answer any
25 questions outside of that scope.

Page 81

1    MR. WEBSTER: I think I can tie it to this
2  lawsuit if you let me ask him a few preliminary
3  questions.
4    MR. GALLAGHER: Again, I think that it's
5  outside the scope of this notice, and I'm not sure
6  how it ties to the plant operations or sourcing of
7  chemicals.
8    MR. WEBSTER: So you're telling him not to
9  answer?
10   MR. GALLAGHER: Yes.
11   MR. WEBSTER: All right. For the record,
12 here are my questions, and we will, if we need to,
13 go to the arbitrator and ask him to instruct the
14 witness to answer.
15   My questions are: Veolia was involved in
16 Flint, correct? You were involved in Flint,
17 correct? And as part of Veolia's involvement in
18 Flint, one of the recommendations Veolia made was to
19 increase ferric chloride dosages, correct?
20   So those are at least the preliminary
21 questions and any follow-up that I would have would
22 depend on his answers, and for the record, I
23 disagree with the instruction not to answer, but
24 we'll not talk about that today.
25   (Gnagy Deposition Exhibit 12 was marked

Page 82

1  for identification and is attached to the
2  transcript.)
3    Q Exhibit 12. Sir, I've shown you what we've
4  marked as Exhibit 12. This appears to me to be a
5  technical memorandum that at least relates to an
6  evaluation of filtration and backwash operations for
7  PWSA that you conducted. Is that accurate?
8    A This appears to be that memo, yes.
9    Q Is this a memo that you prepared yourself?
10   A Yes.
11   Q Did anybody help you prepare this
12 memorandum?
13   A No.
14   Q Bottom left-hand corner, it says, PWSA OpEx
15 Backwash Production Memo, VWNA -- I understand
16 that's Veolia Water North America --
17   A That's correct.
18   Q -- technical direction group. That was the
19 group you were in?
20   A That's correct.
21   Q And it says for internal use only.
22   A That's correct.
23   Q Why was this for internal use only?
24   A It was a direction we were given on a lot of
25 these technical memos until it had been reviewed

Page 83

1  internally and could be distributed elsewhere.
2    Q Okay. Was there a version of this that was
3  distributed beyond some internal review that you're
4  aware of?
5    A I don't recall.
6    Q The very first paragraph of the memo, second
7  sentence says, this memo describes the evaluations
8  completed and potential reductions in wash water due
9  to adjustments in filter run times and/or backwash
10 procedures based on established filter optimization
11 techniques. Did I read that correctly?
12   A Yes.
13   Q That -- those potential initiatives were
14 both OpEx initiatives that were pursued on the PWSA
15 project, right?
16   A One of them was, and one was tabled.
17   Q The backwash -- the filter run times was the
18 one that was -- well, which one was -- so I
19 understand it, which one was tabled and which one
20 was implemented?
21   A Extending filter run times was tabled
22 pending further study. The backwash initiative was
23 implemented.
24   Q Okay.
25   (Gnagy Deposition Exhibit 13 was marked

Page 84

1  for identification and is attached to the
2  transcript.)
3    Q Sir, this a technical memorandum that I'm
4  assuming you prepared in March of 2013. Is that
5  correct?
6    A It appears to be, yes.
7    Q What was the purpose of this memorandum?
8    A This is a summary of the jar testing
9  evaluations and other chemical treatments that were
10 investigated to help reduce organics, or TOC, in
11 light of the THM issues that they were experiencing.
12   Q Is there an OpEx or a KPI that pertained to
13 these evaluations or that arose from these
14 evaluations?
15   A There was a treatment adjustment initiative,
16 yes.
17   Q Okay. Do you know whether that -- you
18 understand a KPI -- that there were KPIs and there
19 were OpExs on this project, right?
20   A Yes.
21   Q Did the treatment adjustments -- were they a
22 KPI or an OpEx?
23   A I don't think they were considered that. It
24 was just simple adjustments that were needed for
25 regulatory compliance.

Page 85

1    Q  So was this more management oversight
2  than --
3    A  I don't know if I would call it management
4  oversight.  It was in response to the high THMs.
5    Q  So it was -- and you described this earlier
6  as a trend that you all saw going in the wrong
7  direction and you were trying to head it off, right?
8    A  Yes.  The reports they had showed that they
9  had operational level exceedances in the third
10  quarter.
11    (Gnagy Deposition Exhibit 14 was marked
12  for identification and is attached to the
13  transcript.)
14    Q  I'm showing you what we marked as
15  Exhibit 14.  This is another one of your technical
16  memoranda that you prepared related to PWSA work,
17  correct?
18    A  It appears to be, yes.
19    Q  What was the purpose of this memoranda?
20    A  This was an investigation of chlorine
21  residual decay and prediction of water age in the
22  distribution system that would impact chlorine
23  residuals in the system.
24    Q  Did this relate to a potential KPI or OpEx?
25    A  I don't recall.

Page 86

1    Q  Okay.  Go back to your initial due diligence
2  memo, please.  This is the August 2012 memo.  Do you
3  have that?  I think it's Exhibit 2.
4    A  I have it.
5    Q  And starting on Page 6, you list some
6  technical opportunities that are identified either
7  as a KPI or an OpEx, correct?
8    A  Correct.
9    Q  Do any of the technical opportunities listed
10  in this section of your memo relate to the issue
11  that is the subject of your April 2013 technical
12  memo, Exhibit 14?
13    A  The chlorine residual decay is not included
14  in this list, but this is an initial list, and the
15  lists were evolving throughout the project.
16    Q  Okay.  What would the benefit, either the
17  savings realized or the revenue generated, what
18  would have resulted from any, you know, initiative
19  that arose out of this technical memo?
20    A  Out of the chlorine residual decay memo?
21    Q  Yeah.
22    A  I don't think there would be any financial
23  opportunities.  There would be efficiency
24  opportunities.
25    Q  Okay.

Page 87

1    A  The chlorine decay analysis was also used,
2  like I said, to help predict water age in the
3  system --
4    Q  Okay.
5    A  -- which was related to the THM issue.  It
6  was also related to the maintenance of chlorine
7  residuals in the distribution system.
8    Q  The KPI/OpEx -- I'm not sure exactly how to
9  read your August 2012 memo, but there's one at the
10  top of Page 7 that talks about installation of high
11  strength sodium hypochlorite generators.  Do you see
12  where I am?
13    A  Yes, yes.
14    Q  Any connection between that potential
15  opportunity and the technical memo I just showed
16  you?
17    A  No, they're separate.
18    Q  As a general proposition, what would cause
19  you to prepare a technical memoranda?
20    A  That is our procedure on anything that we
21  investigate.
22    Q  Okay.
23    A  Good or bad, we prepare a technical
24  memorandum.  If there's recommendations that come
25  out of it, then that can be used to further the

Page 88

1  implementation of the recommendations.
2    Q  Got ya.
3    A  Could I take a restroom break very quickly?
4    Q  You can.
5    (A recess was taken.)
6    (Gnagy Deposition Exhibits 15 through 19
7  were marked for identification and are attached
8  to the transcript.)
9    Q  Sir, I'm showing you what we've marked as
10  Exhibits 15 through 19.  Exhibit 15 is a technical
11  memoranda, June 2013, I believe, correct?
12    A  It appears to be, yes.
13    Q  What was the purpose of this technical
14  memoranda?
15    A  Looking at evaluation of the existing
16  storage tanks and water residence time as it related
17  to THM formation.
18    Q  Did this pertain to any potential KPI or
19  OpEx?
20    A  It was initially thought that it might.
21  However, during the training for implementation of
22  the treatment strategy with the staff, they noticed
23  that I had some incorrect information in the ferric
24  costs, and those were later adjusted showing that
25  there was no cost savings.

Page 89

1    Q  So here, last page of this memo, there's
2  proposed cost savings of about $343,000, right?
3    A  That's what it says, there, yes.
4    Q  And then later on you realized that those
5  savings -- however you calculated that, you missed
6  some information and there actually weren't the
7  savings?
8    A  I had been given incorrect information by
9  the PWSA staff, and we later found the error and
10  corrected it.
11    Q  Got ya.  Next Exhibit 16, November 2013
12  technical memo, correct?
13    A  Yes, it appears to be.
14    Q  What's the subject matter here?
15    A  This was a request from PWSA to take a look
16  at one filter that was giving them operating
17  difficulties.
18    Q  Okay.
19    A  We investigated it.  It had a buildup of
20  manganese in the media, and it was acid-cleaned to
21  remove the excess manganese and put back into
22  service, and it very quickly then came back to
23  normal operation.
24    Q  Any KPI or OpEx associated with this memo?
25    A  No.

Page 90

1    Q  Exhibit 17, a December 2013 technical memo,
2  correct?
3    A  It appears to be, yes.
4    Q  What is the general subject matter of this
5  memo?
6    A  This is some of the investigation as to the
7  operational evaluation level exceedances based on
8  more data collection and what possibly could be
9  leading to some of those issues.
10    Q  Any OpEx or KPI associated with this issue?
11    A  No.  This is just technical support for the
12  project.
13    Q  Exhibit 18.  This is an April 2014 memo.
14  Looks like it relates to an investigation on
15  alternative -- how do you pronounce that?
16    A  Algaecides.
17    Q  Algaecides, all right.  Does this pertain to
18  a KPI or OpEx?
19    A  I believe this one did result in some cost
20  savings.
21    Q  Okay, Exhibit 19.  This is a May 2015
22  technical memo.  First line says that you conducted
23  some bench scale testing of three ferric
24  chloride/polymer blended coagulants.  Do you see
25  that?

Page 91

1    A  Yes.
2    Q  Any OpEx or KPI associated with this issue?
3    A  No.  This was an investigation of different
4  coagulants from a chemical supplier that PWSA asked
5  me to evaluate for them.
6    Q  Last question.  What was the status of the
7  lime system at PWSA when you first became involved
8  in August of 2012?
9    A  I'm not sure what you're asking.
10    Q  All right.  Let me see if I can ask it in a
11  better way.
12        How was lime fed into the -- or how was lime
13  fed into the treatment process when you started in
14  2012, do you know?
15    A  Yes.  Lime was routed to -- excuse me, was
16  routed to one of the rapid mix chambers.
17    Q  What was the condition of the equipment at
18  the time you started in 2012?
19    A  I don't recall in 2012.  I later looked at
20  some issues that they were having.
21    Q  Was there an OpEx or at least a potential
22  OpEx to switch from, I guess, a granular form of
23  lime to liquid lime?
24    A  It wasn't an OpEx.  There were some
25  investigations on whether it would work or not.

Page 92

1    Q  What caused those investigations?  You know,
2  why were you investigating that issue?  Was it an
3  equipment issue or was it something else?
4    A  I received a question from the staff -- I
5  believe it was Paprocki and Lijewski -- if there
6  were any other lime products out there that would be
7  easier to feed, and I disclosed to them, yes, liquid
8  lime is an option; however, it should be
9  investigated, and, you know, it may or may not have
10  any cost savings, but it would be easier to feed
11  because it's simply a liquid chemical.  You don't
12  have to mix it with water.
13    Q  I could ask you many more questions, but I
14  think my time is up.
15        (At 11:40 a.m., the deposition was
16  concluded.)
17
18
19
20
21
22
23
24
25

Page 93

1     CERTIFICATE OF COURT REPORTER – NOTARY PUBLIC
2       I, Amelia Bowlen, Registered Diplomate Reporter
3  and Certified Realtime Reporter, the officer before
4  whom the foregoing deposition was taken, do hereby
5  certify that the foregoing transcript is a true and
6  correct record of the testimony given; that said
7  testimony was taken by me stenographically and
8  thereafter reduced to typewriting under my
9  direction; that reading and signing was not
10 requested; and that I am neither counsel for or
11 related to, nor employed by any of the parties to
12 this case and have interest, financial or otherwise,
13 in its outcome.
14     IN WITNESS WHEREOF, I have hereunto set my hand
15 and affixed my notarial seal this 7th day of
16 December, 2017.
17 My commission expires July 19, 2020.
18
19
20
21 _____
22 AMELIA BOWLEN, RDR, CRR
23 NOTARY PUBLIC IN AND FOR
24 THE COMMONWEALTH OF PENNSYLVANIA
25