```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3

 4
             In Re   FLINT WATER CASES     Case No. 16-10444
 5

 6

 7   _____/

 8                      MOTION HEARING

 9
             BEFORE THE HONORABLE JUDITH E. LEVY
10              UNITED STATES DISTRICT JUDGE

11                   SEPTEMBER 12, 2024

12
     APPEARANCES:
13
     For the          Corey M. Stern
14   Plaintiffs:      Levy Konigsberg, LLP
                      605 Third Avenue, Suite 33rd Floor
15                    New York, NY 10158

16                    Melanie P Daly, I
                      Levy Konigsberg, LLP
17                    605 Third Avenue, Suite 33rd Floor
                      New York, NY 10158
18
                      Christopher L. Schnieders
19                    Napoli Shkolnik
                      6731 W. 121st Street, Suite 201
20                    Overland Park, KS 66209

21
                      (Appearances continued on next page)
22

23                    Jeseca C. Eddington, RDR, RMR, CRR, FCRR
                         Federal Official Court Reporter
24                        United States District Court
                           200 East Liberty Street -
25                        Ann Arbor, Michigan 48104
```

```
 1                          Moshe Maimon
                            Levy Konigsberg, LLP
 2                          605 Third Avenue, Suite 33rd Floor
                            New York, NY 10158
 3
      For the               Michael A. Olsen
 4    Defendant:            Mayer Brown LLP
                            71 S. Wacker Dr.
 5                          Chicago, IL 60606

 6                          Mark R. Ter Molen
                            Mayer Brown LLP
 7                          71 S. Wacker Drive
                            Chicago, IL 60606
 8
                            Minh Nguyen-Dang
 9                          Mayer Brown LLP
                            1999 K Street NW
10                          Washington, DC 20006

11                          Gina Aiello
                            Mayer Brown LLP
12                          71 S. Wacker Drive
                            Chicago, IL 60606
13

14

15

16

17

18

19

20

21

22

23            To Obtain a Certified Transcript Contact:
              Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24                 Federal Official Court Reporter
                    United States District Court
25        200 East Liberty Street - Ann Arbor, Michigan 48104
```

September 12, 2024

```
 1                        I N D E X

 2        WITNESSES                               PAGE

 3          (None)

 4

 5

 6

 7

 8        EXHIBITS

 9          (None)

10

11

12

13

14        MISCELLANY

15          Proceedings.................................4
            Certificate...............................132
16

17

18

19

20

21

22

23

24

25
```

1                      **P R O C E E D I N G S**

2           THE CLERK:  Calling the Flint Water Cases.

3           THE COURT:  Thank you.  Could I have appearances

4     starting with the plaintiffs.

5           MR. STERN:  Good morning, your Honor.  Corey Stern --

6           THE COURT:  Good morning.

7           MR. STERN:  Corey Stern on behalf of the plaintiffs.

8           THE COURT:  Thank you.

9           MS. DALY:  Good morning, Your Honor.  Melanie Daly on

10    behalf of the plaintiffs.

11          MR. SCHNIEDERS:  Good morning, Your Honor.

12    Chris Schnieders on behalf of the plaintiffs.

13          THE COURT:  Thank you.

14          MR. MAIMON:  Good morning, your Honor.  Moshe Maimon

15    on behalf of the plaintiffs.

16          THE COURT:  Oh, hey.  Mr. Maimon back there.  All

17    right.  Thank you.

18          MR. OLSEN:  Good morning, Your Honor.  Mike Olsen on

19    behalf of VNA.

20          MR. TER MOLEN:  Good morning, Your Honor.

21    Mark Ter Molen on behalf of VNA.  Nice to see you again.

22          THE COURT:  Nice to see you again.  And you have some

23    people sitting on the bench ready to take over?

24          MR. NGUYEN-DANG:  Good morning, your Honor.

25    Minh Nguyen-Dang for VNA.

1          THE COURT:  Great.

2          MS. AIELLO:  And Gina Aiello.  Good morning, Your

3     Honor.  For the defendants as well.

4          THE COURT:  Okay.  All right.  Please be seated.

5               This is the time we set aside for hearings on quite a

6     number of motions in limine.  And so what I'd like to do is

7     work through them as best we can.  We'll take some breaks.

8               And then I have a list of sort of administrative

9     housekeeping type things to talk about regarding jury

10    selection, how the timing will work for the 90 and 95 hours of

11    testimony and things of that nature.

12          So why don't -- what I thought we'd do is work

13    through these in numerical order.

14          So the first one I have is ECF Number 3044, VNA's

15    motion to exclude testimony and documents related to public

16    relations efforts.  And it looks like there's some areas of

17    agreement in this series of motions, response, and reply.

18               If I'm correct, plaintiffs do not intend to introduce

19    evidence that might fall into the category of testimony and

20    documents about VNA's Google advertising purchases and

21    testimony and documents regarding Actum's conduct and proposed

22    public relations strategy.

23          Do I have that correct?

24          MR. STERN:  Yes, Your Honor.

25          THE COURT:  Okay.  So that's denied as moot.

September 12, 2024

1           And then we have testimony and documents about the
2     existence of the FlintFacts.com website.  Use of public
3     relations consultants.  Basically the website and the Twitter
4     public relations strategies, so and the public relations
5     defense arguments.
6           So Mr. Olsen, do you want to --
7           MR. OLSEN:  That will be me, Your Honor.
8           THE COURT:  Okay.
9           MR. OLSEN:  So as the Court is well aware, Veolia was
10    certainly involved in the media, like many other people were,
11    including some of the plaintiffs' lawyers.  There's nothing
12    wrong with that.  They have every right to defend themselves.
13    But has nothing to do with any of the issues that are or
14    should be part of this trial.
15          I think in the numerous discussions and arguments we
16    had about these various public relations topics over the
17    course of the discovery battles about it, I think the defense,
18    the plaintiffs, and the Court at one time or another have all
19    said this has nothing --
20          THE COURT:  Well, I'm aware -- I've read the briefs.
21    So what I want to do is go through in detail, not just in
22    broad stroke.  Because it's not helpful for a motion in limine
23    to be granted or denied in such broad strokes that no one
24    knows what can actually come in at trial.
25          Let's start with use of public relations consultants.

1    And here, I guess what I'll do is ask Mr. Stern first whether

2    plaintiffs intend to offer evidence in this category that VNA

3    hired a consultant.

4            MR. STERN:  Your Honor, is it okay if I --

5            THE COURT:  Yeah, please remain seated.  Thank you

6    for asking.  I appreciate that.

7            MR. STERN:  Yes.  The answer is yes to the extent

8    that Veolia -- Veolia has put on a vigorous defense in this

9    case in no small part related to the scope of their work.

10   Whether there was a Flint Water Crisis whether anybody was

11   hurt, let alone the seven bellwether children.

12           And despite our agreement as to documents related to

13   potential juror outreach or those type of things, whether it's

14   ad words or ad campaigns, the reality is is that some of the

15   documents that have been produced in conjunction with the most

16   recent discovery show that Veolia employees were provided with

17   strategic documents related to a defense that might be

18   plausible or palatable to a jury.

19           And yet within those documents, within edits to those

20   documents, within various backs and forth with those

21   documents, there are party admissions within those documents

22   that run contrary to the proposed strategy.  And so --

23           THE COURT:  Can you give me an example of one of

24   those documents?

25           Because this is my thoughts, Mr. Olsen, and Mr.

September 12, 2024

1   Stern, which is that generally, I don't think it would be

2   helpful to say isn't it true, Mr. Gnagy, that Veolia hired

3   Actum to be a PR consultant.  That won't make a fact that's

4   relevant to this case more or less likely.

5        However, if what Mr. Stern had just started talking

6   about, there's a document that Actum or any of the other

7   companies that VE and VNA used, if they had a draft, submitted

8   it to somebody with personal knowledge of the case, that

9   person then said -- X'd out something and said VNA recommended

10  orthophosphates or VNA thought the water was too toxic.  And

11  then that would be relevant.

12       So is it that type of document?

13       MR. STERN:  Yes, Judge.

14       THE COURT:  Okay.

15       MR. STERN:  It just -- and it goes to the broader --

16  not to argue broadly.  But it goes to the broader point that

17  what the motion seeks to exclude is so vague that it literally

18  encompasses anything that Veolia may argue is public

19  relations.  Such that if Your Honor were to rule in favor of

20  this motion and grant it, then we would be having arguments

21  and mini trials throughout the trial to prove to Your Honor

22  that it's not actually within the scope of what you've ruled

23  out.

24       And so as we've said, the fact that they have a PR

25  consultant is not evidence toward a claim or defense.

```
 1            THE COURT:  Okay.  So you agree that the use of PR
 2    consultants, the nature of the services, and the amount VNA
 3    and VE paid for those services, that's not relevant?  But a
 4    document that was reviewed by someone with personal knowledge
 5    is relevant?
 6            MR. STERN:  Absolutely.
 7            THE COURT:  Okay.  So then I think there's not a
 8    disagreement.  Because Olsen's brief said they're not going to
 9    try to exclude those types of documents that had someone with
10    personal knowledge marking them up and so on.
11            MR. STERN:  Just to go back to your last question
12    where you recited what they're seeking to have excluded.  It
13    might not be possible to show, for instance, that
14    William Fahey made comments on a document produced by a
15    PR consultant without explaining how the document was
16    generated.
17               But explaining how the document was generated that
18    was edited is not being asserted to prove a fact.  It's just
19    being asserted as context as to what someone with knowledge
20    was actually editing.
21               And so I don't want to -- I don't want to agree to
22    something that is a little more nuanced than that.  But
23    generally speaking, the fact that Veolia hired a PR
24    consultant, the fact that Veolia paid a PR consultant, that is
25    not -- we don't care.  That's not for the jury.
```

September 12, 2024

```
 1          But when there are a party admissions or at least --
 2   at least the credibility of Veolia's defense is at issue by
 3   way of those type comments, then there's no reason those
 4   documents would not be admitted.
 5          THE COURT:  Okay.  So this portion of Veolia's motion
 6   is denied as moot because there's not a controversy here.
 7   It's resolved.
 8          Now, moving on to the website and Twitter.
 9          MR. OLSEN:  Your Honor, can I just clarify what we
10   just agreed to?
11          THE COURT:  Yes, please do.
12          MR. OLSEN:  I think the nub of it is, I agree with
13   the way Your Honor stated it, that if Mr. Gnagy made comments
14   on a document or reviewed a document and weighed in, we don't
15   object to if somebody has personal knowledge and is involved
16   in that document.
17          If PR consultant X is making comments without
18   personal knowledge who wasn't on the ground, then that's out.
19          THE COURT:  Then there's no need -- that's out.
20   There's just no need for it.  If Ashley Lin -- I'm just
21   picking a name I know.  If she wrote a document sitting in
22   California and having no personal knowledge of anything but
23   wants to pitch a concept such as Ted Leopold and Cary McGehee
24   are stealing the plaintiffs' recovery, well, that's not going
25   to be helpful to the jury in this case.
```

 1          But if it's just what we discussed, somebody with

 2    personal knowledge, then Mr. Stern can say, what is that

 3    document?  Oh, this is a document generated by our PR company

 4    that we corrected or we edited.

 5          So you can absolutely -- the word PR will come in.

 6    And for context.

 7          MR. STERN:  One other -- one other instance where I

 8    think this may come up in the course of trial, just to be

 9    transparent.

10          There is some documents that have been generated by

11    various public relations companies that years later expert

12    reports and expert testimony on behalf of the Veolia

13    defendants seems to track.

14          And it might be helpful for us to cross an expert

15    with the basis of their opinions and at least ask them if you

16    had communications with or had the opportunity to review

17    various proposals in advance of providing your opinions to see

18    if they either align or if they influenced you at all.

19          THE COURT:  I think whether "if they influenced you

20    at all" would be relevant because then it would be that the

21    engineer is making a decision to be consistent with the PR as

22    opposed to being consistent with professional duty of care and

23    standard of care.

24          Do you have any objection to that?

25          MR. OLSEN:  I do, Your Honor.  The core problem with

1    that is if that question had been asked of an expert in

2    deposition and they relied upon those materials, then I would

3    agree with you.  That hasn't been established or even asked, I

4    don't believe, with any expert in this case.

5           THE COURT:  Well, you don't have to ask every

6    question in a deposition that you're going to ask at trial.

7           MR. OLSEN:  But it would be prejudicial to ask, look

8    at this PR document, essentially letting the jury hear the

9    substance of what's in a PR document without any foundation to

10   establish that an expert relied upon that document.

11          THE COURT:  Okay.  Then what we'll do, when it gets

12   to that point, let me know.  We'll be taking a break at some

13   point.  We'll do a little voir dire of the expert.  Have you

14   ever seen this document?  And if they have, then you can --

15   and did it have anything to do with your report?  Yes, no,

16   whatever.

17          Even -- as long as they've seen it, you can go ahead

18   and use it.  But we won't -- don't do it with the jury until

19   you've had that brief hearing.  Okay.

20          MR. OLSEN:  And then just one clarifying point, Your

21   Honor, if I may?  Again, just because an expert's seen a

22   document doesn't make it --

23          THE COURT:  No, but -- and let's make sure they saw

24   it before writing their report.

25          MR. OLSEN:  Maybe we cross that bridge when we come

1    to it.

2            THE COURT:  Yeah.  Let's cross that bridge should we

3    come to that bridge.  And we'll also ask them have you ever

4    seen this document and did you see it before you wrote your

5    report.  Because if they wrote the report first, well, maybe

6    the PR document lifted that language from the report.  We

7    don't know.

8            MR. STERN:  I mean, I understand what Your Honor's

9    saying, and that's a fair way to go about this.  But there's

10   also times where, in the course of preparing a report, there

11   are significant interactions with counsel and parties on

12   behalf of whom an expert is working.

13           And if I, for instance, have a public relations

14   document from our PR people, which we don't have, and it says

15   that there are hundreds of thousands of grams of lead in these

16   children's bones and I never showed the document to

17   Dr. Bithoney, but he is apprised of a document or he is

18   apprised of a defense or a claim that we're making where

19   there's hundreds of thousands of grams of lead in a child's

20   bone and he just parrots what I've told him or he just parrots

21   what came from a public relations' person, that's no worse or

22   better than having read the document itself and parroting that

23   language.

24           So I just -- again, I don't want to like -- what

25   you're saying, Your Honor, is completely acceptable.  And

 1   whether it is or not, it's Your Honor's rule.  But it may not

 2   be as nuanced and specific as "did you see this document"

 3   because the contents of the document could be transmitted in

 4   multiple ways without just showing them the document.

 5            THE COURT:  Are you talking about fact witnesses or

 6   experts?

 7            MR. STERN:  I mean, I think I'm talking about both.

 8   But in particular with experts, there is some language in

 9   reports that just is uncanny how --

10            THE COURT:  Okay.

11            MR. STERN:  -- specific it is to what we've seen in

12   some of the, quote, PR documents.

13            THE COURT:  And it could be that it's uncanny for a

14   good reason, that this is the absolute truth.

15            MR. STERN:  Yes.

16            THE COURT:  And so PR had it and the expert had it

17   and that's the best way to say it.  And it could be uncanny

18   for not so good reasons.  And then we'll find out about that

19   as well.

20            So in terms of the public relations defense

21   arguments generally, is there anything further we need to

22   discuss?

23            MR. OLSEN:  Well, I guess I, just to clarify, assume

24   because one of the other categories was the PR documents

25   themselves like --

September 12, 2024

```
 1          THE COURT:  Mr. Olsen, let me tell you only one time,
 2   which is that you have to speak into the microphone.  If you
 3   choose to go back like this, you just won't be on the record.
 4   And then I might dismiss you and ask that Ter Molen or
 5   somebody else handle it.
 6          Because you have a tendency to get super comfortable.
 7   I really love that you're so relaxed.  But bring the mic, get
 8   a little anxious here, and lean in towards the microphone.
 9   But an easier pro tip is move the microphone to you.  Okay.
10          Now you're going to practice.  Pick it up --
11          MR. OLSEN:  Your Honor, thank you.  I got it.
12          THE COURT:  I want you to actually do it.  Because we
13   have to get the -- I don't want Jeseca to struggle.
14          MR. OLSEN:  I understand.
15          THE COURT:  Okay.  Because if she struggles, I
16   struggle.  And then it doesn't work.  So thank you.
17          MR. OLSEN:  One point of clarification.  With respect
18   to the PR documents themselves -- press releases, draft press
19   releases -- I assume that's consistent with your previous
20   ruling.  Unless there's someone with personal knowledge on the
21   ground involved in that, that would be out.
22          THE COURT:  Correct.
23          MR. OLSEN:  Correct.
24          MR. STERN:  Unless, with respect, Your Honor, if
25   there are -- there are certain press releases that may quote
```

*In Re* Flint Water Cases - Case No. 16-10444

1   an employee.  And if an employee -- if Veolia, through press

2   release, makes an admission about something, then that's

3   an admission of a party opponent and it's absolutely

4   admissible.

5           So for instance, forget a press release, but let's

6   look at Veolia Flint Facts.  This is from either the website

7   or from the Twitter account.  This, arguably, is a PR document

8   because it's -- you know, there's testimony that it's created

9   by someone from public relations.  But it's under the guise of

10  Veolia.  It's got the Veolia emblem.

11          THE COURT:  Go ahead.

12          MR. STERN:  It says Veolia Flint Facts.  The People

13  of Flint have suffered deeply and it's our collective

14  responsibility across government, private sector, and the

15  public to work together to ensure that what happened in Flint

16  never happens again and to help the people of Flint get the

17  justice they deserve.

18          That's a comment from August 11 of I think 2022, but

19  it may have been later.  And to that end, there's going to be

20  testimony at trial from Veolia experts that there was no water

21  crisis.

22          There's going to be testimony at trial that the bio

23  solid study -- which we don't even think should be part of the

24  trial, but Your Honor has ruled that in certain ways it can

25  be -- that that proves, that shows that the levels of lead in

September 12, 2024

1   water were no worse or better in 2014 than they were in 2011

2   and that there is nothing to see here.

3          And so if the party upon -- if the party with whom is

4   making that argument to a jury at the same time is saying that

5   the people of Flint have suffered deeply and that everyone has

6   a responsibility, including Veolia, to work together to ensure

7   what happened in Flint never happens again, we should very

8   easily be able to be permitted to cross-examine someone who

9   says there was no Flint Water Crisis with the statement of a

10  party opponent that says that the people have suffered deeply.

11         How did they suffer if there was no crisis?

12         THE COURT:  Mr. Olsen.

13         MR. OLSEN:  That isn't a -- there's no factual

14  statement at issue in what Mr. Stern just read related to

15  anything that took place in Flint.  I'll say right now, I'm

16  going to talk about a government failure in Flint that led to

17  all kinds of issues as it related to the water in Flint after

18  the switch to the Flint River.  We're going to talk about a

19  colossal government failure that led to a crisis.

20         To say that, well, this document suggests Veolia has

21  some responsibility for that crisis, that's not what that

22  says.  And we're going to get into a debate.  And it's not

23  relevant.  There's no one from personal -- no one on the

24  ground.  We have the people on the ground.  We have the

25  experts.

1          Introducing a PR document from years later that

2     ambiguously talks about a government failure and a crisis and

3     the people of Flint deserve better would lead to --

4          THE COURT:  Okay.  Here's what I'm going to do.

5     There is obviously a dispute about what that Tweet means.  I

6     don't think it can be ruled as irrelevant to the issues in

7     this trial.

8          Veolia is making a statement that there was a crisis.

9     It's consistent with what the opening statement you're going

10    to give you're telling me.  You're going to tell this jury

11    there was a colossal failure.  The Tweet says there's a

12    colossal failure.

13         Mr. Stern can't cross-examine a witness on your

14    opening -- well, I guess -- no, because they'll be

15    sequestered, I assume.  So he needs a document to say in 2022,

16    VNA issued this Tweet and it says there's a colossal failure

17    and people were poisoned.  And your expert report says no one

18    was poisoned.  You know, something like that.

19         MR. OLSEN:  But Your Honor, that has to be tied up to

20    something.  I mean, introducing a document from somebody who

21    had nothing to do with any of the issues in the case that says

22    vaguely and ambiguously that he's going to then argument, well

23    look, VNA is accepting responsibility for this crisis.

24         THE COURT:  No, he's not going to say that.

25         MR. OLSEN:  That's essentially what he just

1    suggested.

2         THE COURT:  I won't allow him to say that VNA -- the

3    conclusion from the Tweet is that VNA caused the problem.  So

4    but I will allow it to be used in context.  And if in the

5    actual scenario it is not relevant or not appropriate, then

6    I'll prohibit it at that time.

7         MR. STERN:  Just to be clear, the word

8    "responsibility" that appears in here is not about Veolia or

9    anyone being responsible for the crisis.  What this -- what

10   this statement from Veolia says is that everyone has a

11   responsibility to work together to ensure that what happened

12   in Flint never happens again.  Without respect to who caused

13   it.

14        And so the parts of this that are important are "the

15   people of Flint have suffered deeply".  That is a statement

16   from a party.  Now I'm not trying to, you know, grasp a

17   successful thing out of, you know --

18        THE COURT:  No, it is.  It is a statement from VNA.

19        MR. STERN:  Yes.

20        MR. OLSEN:  But Your Honor, we have seven plaintiffs

21   here.  And whether or not they have suffered and how they have

22   suffered will be at the heart of this case.

23        THE COURT:  Right.

24        MR. OLSEN:  Saying the people of Flint have suffered

25   is not relevant to whether or not any of the seven plaintiffs

September 12, 2024

1    in this case have the injuries or not that they complain of

2    and what the cause of those injuries are.

3            And introducing a document suggesting the people of

4    Flint have suffered, which by implication is suggesting that

5    they have been caused harm, is absolutely more prejudicial

6    than probative.

7            THE COURT:  I think you have ample evidence that you

8    intend to introduce from your experts that these seven

9    individual bellwether plaintiffs were not injured.  And so

10   that will all come in.  And it's a statement from VNA and it's

11   consistent with what you've just told me your opening is going

12   to be.  So it can't possibly be more prejudicial than

13   probative --

14           MR. OLSEN:  Your Honor, part of it --

15           THE COURT:  -- if it's consistent with your

16   statement.

17           MR. OLSEN:  I'm sorry to interrupt you.

18           THE COURT:  That's okay.  Go ahead.

19           MR. OLSEN:  Part of it is consistent with my opening

20   that there was a government failure that led to a crisis.

21   Part of it, the point that Mr. Stern just focused on, that

22   "the people of Flint have suffered greatly", suggests that

23   that crisis caused the people of Flint harm.

24           That is what that document is being used to suggest

25   to the jury.  Whether or not we have experts to dispute

 1    whether these particular plaintiffs have been injured or not

 2    injured and what the cause of those injuries are is completely

 3    disconnected from a notion that some people in Flint were

 4    caused harm by this water crisis.

 5            And introducing a document that suggests that some

 6    people of Flint were caused harm in a trial of seven

 7    plaintiffs absolutely is trying to suggest that these seven

 8    plaintiffs were caused harm and VNA admits that in this

 9    statement.  And that is not -- that's not what that statement

10    does and it's more prejudicial than probative to admit it.

11            THE COURT:  Okay.  Thank you.  So the motion thus far

12    is denied in part as moot and in part denied without prejudice

13    to the existence of these areas that are still disputed.  That

14    in realtime during the trial, I'll see how it's coming in,

15    where it fits in, how it's being used.  And some of it may

16    still be excluded and others will not.

17            In terms of Actum's conduct, do plaintiffs have any

18    objection to how this ultimately played out in the briefing?

19            MR. STERN:  Again, it's very broad.  You know, Actum

20    may have created some of the Flint Facts documents that may

21    have been edited by Bill Fahey.  If what you're talking about

22    is --

23            THE COURT:  I'm talking about let's use the word "the

24    truck" for the general thing that we're talking about.  I

25    don't see relevance of that to any of the claims or defenses.

September 12, 2024                                                    22

1            MR. STERN:  I would not imagine a scenario where we

2    would try to introduce that as evidence about a claim or

3    defense.

4            THE COURT:  Okay.

5            MR. STERN:  Nor do we have any -- listen, it's -- I

6    wouldn't even know how to use it.  I don't even know how to

7    process it myself --

8            THE COURT:  I don't either.

9            MR. STERN:  -- like on a daily basis.  So no, we will

10   not be using that as evidence in this case.

11           THE COURT:  Okay.

12           MR. STERN:  Nor will we be using the placement of an

13   attack piece in the Detroit Free Press.  Nor will we be

14   introducing evidence of press releases --

15           THE COURT:  Okay.  So --

16           MR. STERN:  -- that call me and others, you know,

17   money hungry greedy SOBs.

18           THE COURT:  Yeah.  So that will be denied as moot,

19   that portion of it.  Okay.

20           So let's look at ECF Number 3046, which is VNA's

21   motion to exclude Dr. Russell's opinion that VNA's experts are

22   violating the law or breaching professional responsibilities

23   by offering expert testimony without a professional license.

24           And here, VNA makes an argument that Dr. Russell

25   would be testifying on an ultimate legal issue.  And if I

1    understand it, plaintiffs do not intend to elicit testimony

2    from Dr. Russell that the fact that VNA's engineers -- experts

3    are not licensed in Michigan, means they cannot testify.  I've

4    had a lot of negatives in there.

5         But do you know what I'm talking about, Mr. Stern?

6    You're not planning to say that, correct?

7         MR. STERN:  Fortunately, Ms. Daly is responding.

8         THE COURT:  Ms. Daly, are you planning to have your

9    witnesses -- Dr. Russell say that VNA's experts are not

10   qualified to testify because they're not licensed in Michigan?

11        MS. DALY:  Good morning.  Nice to see you in person.

12   No, we're not.

13        THE COURT:  Okay.

14        MS. DALY:  And Dr. Russell clarifies that in his

15   deposition.  He's not opining that they can't testify as

16   experts in Michigan.

17        THE COURT:  Okay.  So that's resolved.

18        MR. TER MOLEN:  Your Honor, could I -- Mark Ter Molen

19   on this one.

20        THE COURT:  Oh, hi.

21        MR. TER MOLEN:  If I could just clarify and if you

22   wanted to go on to some other part of that same motion, that's

23   fine.  But just with respect to that motion --

24        THE COURT:  Can you move the microphone closer also.

25        MR. TER MOLEN:  You bet.

September 12, 2024

1          THE COURT:  Thank you.

2          MR. TER MOLEN:  You bet.

3          Before the class trial, class counsel stipulated that

4    Dr. Russell was not going to offer opinions to the effect that

5    any of the VNA experts who are not licensed in a particular

6    state or not licensed at all as a professional engineer were

7    acting illegally or unethically.

8          And I just want to make sure because I don't believe

9    that Bellwether III plaintiff counsel have agreed to the same

10   stipulation.

11         THE COURT:  Let me ask.

12         MR. TER MOLEN:  Thank you.

13         THE COURT:  Do you agree to what Mr. Ter Molen just

14   said?

15         MS. DALY:  Yes and no, Your Honor.  I think it's --

16   we need to make a distinction here that of course we are not

17   going to have Dr. Russell say Mr. Crowe, Dr. Crowe cannot be

18   an expert in this case in Michigan because he does not have a

19   Michigan license.

20         THE COURT:  Good.

21         MS. DALY:  We agree that's a legal conclusion and

22   that's not at all what he says.

23         However, what he does say and it goes squarely to the

24   question of the credibility of these witnesses is, he's here

25   to talk about whether Veolia breached the standard of care.

September 12, 2024

1   The jury instructions will inform the jurors that that

2   standard is what would a reasonable engineer in the same

3   position in Flint, Michigan do.

4          Those are the words from the instruction we agreed to

5   last time.  And we're work shopping with the defendants on

6   that now.

7          Dr. Russell is explaining what Veolia did that

8   breached that duty.  Then Veolia has experts that call into

9   question the credibility of whether Dr. Russell is correct

10  that they breached that duty.

11         In response, Dr. Russell is entitled to question and

12  to point out the credibility of their criticisms by saying, "I

13  find it important to be registered in the states where I offer

14  expert opinions".

15         THE COURT:  And here's my question.  Is there

16  something about Dr. Russell's opinion or about VNA experts'

17  opinions that are specific to Michigan?  Or are they all using

18  national, professional, and ethical standards?

19         MS. DALY:  Well Dr. Russell -- the standard of care

20  that's outlined for the jurors is what would a reasonable

21  engineer that is acting in Michigan do.  And some of the

22  ethical codes that Dr. Russell points to have been adopted

23  specifically by Michigan.  Not every state adopted those

24  national codes of ethics.

25         And the fact that these engineers aren't licensed in

1    Michigan and some of them aren't licensed in the United States

2    at all is relevant to the credibility of their criticisms of

3    Dr. Russell's opinion as to whether Veolia breached the

4    standard of care when they were acting in Michigan.

5            THE COURT:  Okay.

6            MR. STERN:  And that's perfectly acceptable in terms

7    of questioning credibility.  And Veolia doesn't cite any cases

8    or support that says that that's not acceptable.

9            THE COURT:  Okay.  So Mr. Ter Molen, this is what I'm

10   inclined to allow.  Which is for Dr. Russell to state that

11   various states have rules regarding professional licensing.

12   Having a license permits somebody to offer engineering

13   services.  And to his knowledge, VNA experts lack such

14   professional licenses in the United States.

15           And then from there, the jury can conclude that's

16   just factual.  And in light of the jury instruction likely

17   saying what would a reasonable engineer in Flint, Michigan

18   have done, the jury can assess whether these experts would

19   know what a reasonable engineer in Michigan should have done.

20           So I don't think it's inflammatory.  It's factual.

21   And I think you would ask the same thing, are you a licensed

22   engineer in the United States.

23           MR. TER MOLEN:  So Your Honor, to respond, first, I

24   think you asked a question, is there anything that's Michigan

25   specific about these opinions.  I think the answer is no.  The

September 12, 2024                                                        27

 1   opinions of Dr. Russell and the VNA responding experts are all
 2   addressing and applying standard water treatment engineering
 3   processes and the ethical issues are not just a Michigan
 4   specific.  To specifically --
 5            THE COURT:  Yes.  But here's the situation, I'm
 6   granting your motion.  So they can't say this is illegal.
 7   They can't say it's unethical for them to testify without a
 8   license in the United States.  And they can't say it's
 9   disrespectful, because that's just not relevant to our case.
10            MR. TER MOLEN:  Yeah.
11            THE COURT:  But they can just say, are you licensed
12   in Michigan, are you licensed in the United States.  These are
13   the experts you chose and you had a good reason for them.  And
14   some of your experts I've heard before and they're terrific.
15   So that's --
16            MR. TER MOLEN:  Your Honor -- I don't want to
17   interrupt Your Honor.  Sorry.
18            THE COURT:  Go ahead.
19            MR. OLSEN:  I agree with the extent to the
20   questioning that you've identified.  I think I heard Your
21   Honor propose an instruction earlier.  I may have misheard
22   that.
23            So as long as we're avoiding any implication that
24   these individuals aren't qualified to offer -- should not be
25   allowing expert opinions --

September 12, 2024                                                    28

1         THE COURT:  No.

2         MR. TER MOLEN:  -- here that's fine.  Yes.

3         THE COURT:  The jury can conclude, ooh, that concerns

4    me that they're not Michigan or they cannot conclude that.

5    Whatever they want.

6         So the motion is essentially granted because the

7    disrespect, the illegal, and the unethical won't come in.  But

8    the fact that they're not licensed in the United States or

9    Michigan will come in, so maybe it's granted in part, denied

10   in part.

11        MR. TER MOLEN:  Thank you, Your Honor.

12        MS. DALY:  And I apologize, Your Honor.  Just to

13   clarify.  And Dr. Russell will be able to opine that?  This is

14   not limited to cross-examination by plaintiffs' counsel.

15        THE COURT:  Right.

16        MR. DALY:  Yes.

17        THE COURT:  Yes.

18        MS. DALY:  And he can specifically mention that

19   they're not licensed in the State of Michigan?

20        THE COURT:  Correct.

21        MS. DALY:  Thank you, Your Honor.  I appreciate the

22   clarification.

23        THE COURT:  Yeah.  Hold on.  Okay.

24        So the next one is ECF Number 3047, VNA's motion to

25   exclude evidence of Dr. Thompson's prior work on child sex

1    abuse cases and Dr. Robert McCaffrey's M-c-C-a-f-f-r-e-y's

2    prior work on death penalty cases.

3            MR. OLSEN:  Your Honor, I think you said you didn't

4    want argument on that one.

5            THE COURT:  Yeah.  But I'm going to issue an opinion.

6            MR. OLSEN:  Oh, okay.

7            THE COURT:  Because time is of the essence.  And

8    there's still a summary judgment, which I can assure you, the

9    outcome -- I mean, this is not all for nothing today.  Because

10   I plan to deny the motion for summary judgment, but I'm

11   putting some significant effort into --

12           VNA has raised some interesting criticisms of the

13   last round of summary judgment that is causing me to do some

14   good and interesting work on it.  So there's enough to do

15   without me sitting up there typing up reasoned opinions on all

16   this.

17           MR. OLSEN:  Fair enough.  I just thought you might be

18   looking for argument.

19           THE COURT:  No, no, no.  No argument.  But what I do

20   want to know is whether this is still a controversy.

21           MR. STERN:  Yes.

22           THE COURT:  Oh, it is.  Okay.  So the motion will be

23   granted because I don't see any way that it's not more

24   prejudicial than probative.  Because the probative value is so

25   low and the risk of a juror being confused or drawing improper

1    conclusions is at least meaningful.

2          So it's an expert's work on a single case is just --

3    it cannot possibly have significant probative value.  And none

4    of this shows that these experts are anti children.  So the

5    motion is -- this was VNA's motion.  Yes.  It's granted and

6    they have just shown no bias that can be drawn that they're

7    against children.

8          MR. STERN:  Judge Levy?

9          THE COURT:  Yes.

10         MR. STERN:  While -- if I may?  And I understand your

11   current ruling.  But when it comes to Dr. Thompson, he's

12   admitted that he's, I think, only testified in 30 plus cases

13   related to expert opinions associated with individuals who

14   have been accused of abuse or sexual misconduct with a child.

15   And that he has only testified on behalf of the criminal

16   defendants in those cases.

17         And that he has never once at any point in time in

18   providing any of those opinions seen, interviewed, or done an

19   analysis of an individual child.

20         THE COURT:  Let me just ask you this, has he ever

21   testified in any other case that's not a sex abuse case?

22         MR. STERN:  This one.

23         THE COURT:  Okay.  Then I think it's fair to say do

24   you testify on behalf of -- have you ever testified for a

25   plaintiff.  That's fair.  Because people always ask that.

1    Isn't it true you're always here helping the plaintiffs.

2    You're always here helping the defendants.

3         So we don't have to get into whether it's sex abuse

4    or something else.  But you can ask him whether he has ever

5    testified on behalf of a plaintiff before.  And when you say

6    plaintiff, say "someone who's bringing a case", because people

7    don't know who plaintiffs are.

8         MR. STERN:  In fairness to that point though, I

9    believe in every case that he's testified the, plaintiff in

10   the case has been the state of blank --

11        THE COURT:  That's okay.

12        MS. DALY:  Your Honor, I just want to ask one

13   clarification.

14        So something that we don't intend just to bring out,

15   "oh, you testify in sex abuse cases".  Boom, drop that on the

16   jury.  The point we're trying to make is a little more nuanced

17   than that.

18        At the last trial he explained that it is part of his

19   niche -- he used the word niche -- to testify in these types

20   of cases where he questions and criticizes the reliability of

21   the interview tactics of, in those cases, the victim of sex

22   abuse.

23        And so he says, well, perhaps there was someone else

24   in the room.  Well, they use suggestive questioning.  They

25   didn't consider other factors.  That category, that type of

1    criticism, is the exact type of criticism that he is offering

2    against Dr. Krishnan and Dr. Hoffman in their examination

3    techniques.  So the fact that his niche is to question --

4           THE COURT:  Okay.  You can ask him about that without

5    bringing in that these are sex abuse cases.

6           MR. STERN:  That's fine.

7           THE COURT:  Okay.

8           MR. STERN:  Could we bring in that it's in the

9    context of criminal proceedings to draw --

10          THE COURT:  No.  Just you testify on behalf of

11   defendants only, correct?  Yes.  And in all of your 30 cases,

12   you have the same criticism as you have here?  Yes.

13          MR. STERN:  And in all of those cases, the opposing

14   party to your client was a child.  Irrespective of --

15          THE COURT:  No.  Just as long as -- just to generally

16   get -- because there's no evidence that he hates children or

17   wants children to be abused or is indifferent to the neglect

18   and abuse of children.

19          So I think you can just say this is -- I think that's

20   a strong statement to say to a jury.  You've had 30 cases.

21   You criticize the plaintiff or the other side exactly how you

22   did this time, so.  Yeah.

23          He does say that his expertise is in child memory and

24   child forensic interviewing.  So it'll be clear.

25          MR. STERN:  I mean, I'm allowed to ask him --

September 12, 2024

1                THE COURT:  Yeah.  What's your expertise?

2                MR. STERN:  Okay.

3                THE COURT:  Children.  And you've testified in 30

4      previous cases?  Yes.

5                MR. STERN:  Okay.

6                THE COURT:  Okay.

7                MR. STERN:  Thank you.

8                THE COURT:  3048.  VNA's motion to admit factual

9      statements in the complaint relating to fault of other

10     previously named defendants.  Okay.

11               First of all, the complaint, the statements in the

12     complaint generally are not hearsay.  So we're not going to

13     talk about hearsay within hearsay because it's not hearsay.

14     It's just a party admission.

15               But the issue that I have is legal conclusions should

16     be excised from the complaint.

17               So my decision today is the same as it was in the

18     class case.  But so I want to hear about hearsay but we -- you

19     can call it hearsay within hearsay if you want.  But the

20     complaint itself is not the hearsay.

21               And I want to hear about legal conclusions and

22     whether we have an instruction to the jury because they'll be

23     mention then of all of these other defendants which we'll have

24     in the nonparty case throughout the trial.  I mean, there will

25     be all mentioned by VNA and potentially plaintiffs in the

1    opening.

2           So I am inclined to think we should have a jury

3    instruction about the parties that have settled.  And the

4    class plaintiffs' proposed jury instructions on this seems

5    very reasonable and appropriate.

6           So and the other thing is we are going to have jurors

7    who have sort of heard about a settlement.  They think this is

8    all resolved.  I think that's just confusing for them.  So

9    regardless of how this motion comes out, I think we need a

10   jury instruction that's essentially the one that class

11   plaintiffs and VNA had agreed to.

12          Mr. Olsen or Ter Molen, do you have any objection to

13   that?

14          MR. OLSEN:  I want to go back and look at -- I didn't

15   look at that instruction, class instruction on the settlement,

16   prior to this hearing, Your Honor.  So I'm not prepared to

17   speak to it at this moment.  But happy to look at that and let

18   you know if we have an issue with it.

19          THE COURT:  Okay.  It's very neutral.  It's in

20   ECF 2706, Page ID 88552.  2706, Page ID 88552.  So I want that

21   instruction in any event.

22          But do plaintiffs have any objection to that

23   instruction?

24          MR. STERN:  I haven't seen it, but I'm happy to look

25   at it.  I mean, I would normally say I'm sure that if the

September 12, 2024

```
 1      class agreed to it, it's fine.  But I probably wouldn't --
 2               THE COURT:  Yeah.  Take a look at it.  Because the
 3      other question I would have is whether you want me to give
 4      this instruction as a preliminary instructions.
 5               MR. STERN:  I mean, my instinct when you first
 6      brought this up a few moments ago was, yes, my hope would be
 7      that.  But at the same time, you know, if Veolia is permitted
 8      to read every single allegation -- and I know they're not
 9      going to be because some of it is -- requires some technical
10      expertise.
11               Some of it -- I mean, there's a number of reasons why
12      any particular paragraph may not be permitted to be read.
13      Whether that's for technical expertise or because it contains
14      legal conclusions or hearsay within hearsay, even though Your
15      Honor said you didn't want to talk through that --
16               THE COURT:  We can --
17               MR. STERN:  The reality is is that we would still
18      have certain objections if it's being used as evidence.
19               And if they're reading a paragraph, for instance,
20      that says Howard Croft is intentionally misled, you know, the
21      people of Flint into believing their water was safe.  Well,
22      there's actually no evidence in the record that actually
23      supports he intentionally misled anybody.
24               THE COURT:  Well, here's the problem.  It's a
25      statement of a party opponent, and so we don't look at
```

September 12, 2024

1    trustworthiness.  The trustworthy analysis comes in on whether

2    there's some residual exception to the hearsay rule or some

3    hearsay analysis.  But there isn't a hearsay analysis unless

4    there's hearsay within one of these statements.

5          MR. STERN:  But it's an allegation made by a

6    plaintiff upon information and belief.  It's --

7          THE COURT:  I understand that.  But the case law

8    doesn't discern between information and belief and a verified

9    complaint.

10         MR. STERN:  Okay.  Well, to the extent that a

11   paragraph like that comes in, I don't think the jury -- that

12   paragraph may come in depending on when Veolia intends to use

13   it on the third day of their case.

14         And if their case takes 95 hours to come in, then the

15   jury will be sitting with the idea that it is a fact that

16   Howard Croft misled the people of Flint because it's a

17   statement by a party opponent.  And likely have no idea that

18   Howard Croft was part of a settlement and the reason why he's

19   not here as a defendant.

20         Even if that allegation is true and Your Honor let's

21   it in, they need to know in realtime if something that

22   significant is not so prejudicial to the plaintiff that it

23   comes in, that in that moment Howard Croft is not here because

24   he settled.

25         THE COURT:  I'm inclined to give the instruction at

1    the beginning, after -- I -- there are two places I could give

2    it.  One is with the general instructions before opening.

3    Another is after opening.  Whenever.

4           But let me find out from Mr. Olsen.  I will require

5    that you read the complaint.  You can't just hand it to them.

6    Because people have different reading skills, different

7    reading comprehension issues.  And so you can't hand the

8    complaint to them.

9           So how do you intend to introduce it?

10          MR. OLSEN:  I would think we would publish it, Your

11   Honor.  We would read from it -- I mean, we have identified

12   the allegations we intend to use.

13          THE COURT:  Right.

14          MR. OLSEN:  Our intent.  We attempted to take out

15   legal conclusions from those allegations.

16          THE COURT:  I saw that.  But what I'm asking is who

17   is going to read it.

18          MR. OLSEN:  I would think we'd put it up on the

19   screen and one of us would read from the portions of the

20   complaint that we're intending to publish to the jury.  I

21   don't think all at once necessarily.  But over the course of

22   the trial, someone will be reading those to the jury as our

23   way of introducing that evidence.

24          MR. STERN:  Then why do we need 95 hours for the

25   defendant's to put on their case?  If they're going to read

```
 1    every allegation --
 2              THE COURT:  Well, because this is the state of the
 3    law.  In the Bellwether I, it took me completely by surprise
 4    one day when I was told we were going to have a dramatic
 5    reading of the complaint.  I have just never heard of that,
 6    never seen it.  But once I've had an opportunity to review the
 7    case law, this is what it says.  And I'm driven by the case
 8    law.
 9              So I'll tell you, Mr. Olsen, number one, you'll need
10    to pick a day when you're going to read the complaint.  It
11    might be good to save it for when a witness doesn't show up.
12    I'll leave that to you.  And then somebody will stand up and
13    read -- do the dramatic reading of the complaint.
14              You will have to go slowly.  You cannot power through
15    it.  Because it will be taken down verbatim.  So I just want
16    you to know that it has to be done in an orderly fashion and
17    in a careful fashion.
18              MR. STERN:  Judge Levy, we would --
19              MR. MAIMON:  Your Honor --
20              MR. STERN:  Before Mr. Maimon speaks.  I would also
21    ask then that it's important that the jury understands that
22    this is a master complaint.
23              THE COURT:  Yeah.  We'll say --
24              MR. STERN:  That this is a complaint that was drafted
25    on behalf of 30,000 plaintiffs.
```

```
 1              THE COURT:  I'll have some -- we'll have some
 2    instruction.  Now Mr. Olsen is going to read from the
 3    plaintiffs' lawsuit.  Remember I told you that there have been
 4    some settlements in this case.  And I can either re-read that
 5    instruction then.  And that this is a -- we can put the date
 6    that the lawsuit was filed or something before them.
 7              MR. STERN:  I would ask Your Honor to seriously
 8    consider -- and we would urge Your Honor that in specific
 9    paragraphs of this complaint that are read about prior
10    defendants in this case that the jury knows that that specific
11    defendant is no longer a part of this lawsuit because they
12    were either dismissed from the case as a result of a legal
13    analysis or they were dismissed from the case because they
14    settled.
15              It is completely prejudicial --
16              THE COURT:  Why don't you do this.  Write me a jury
17    instruction.  Exchange it with VNA first.  And then I'll
18    consider what that instruction should be.
19              But let's go back to the legal conclusions.  Because
20    even though, Mr. Olsen, you say you've tried to take out the
21    legal conclusions, plaintiff says that they still exist.  And
22    the hearsay also needs to be addressed.
23              And so what process can be deployed?  Because there's
24    a fairer number of those as I look at the chart.
25              MR. OLSEN:  If -- I mean, we've identified the
```

September 12, 2024                                                    40

```
 1    allegations we intend to use.  I'm happy if plaintiffs
 2    identify between now and the pretrial conference, for example,
 3    which allegations they think --
 4              THE COURT:  You did, didn't you?
 5              MR. STERN:  We have.
 6              THE COURT:  Yeah.  That's an exhibit.  Yeah.
 7              MR. OLSEN:  And so either we can take them one at a
 8    time or we can meet and confer about it.  Whatever process you
 9    would like to embark on.
10              THE COURT:  What process do you think should be
11    deployed?  I mean, I'm not prepared to go line by line today.
12    Although if we have time at the end of the day, we could
13    return to that.
14              MR. STERN:  I would rather not waste the Court's time
15    with that.
16              THE COURT:  Me, too.
17              MR. STERN:  And so we can confer.  I mean, we feel
18    confident that what we have claimed is legal conclusions is
19    legal conclusions.  And we're happy to discuss paragraph by
20    paragraph with Veolia defendants.
21              And if we can agree on some and pare it down, we're
22    happy -- I'm happy to submit to Your Honor the ones that can't
23    be agreed to and then you can make a determination on a
24    limited basis for those rather than going through one by one
25    now and wasting the Court's time.
```

September 12, 2024

1           THE COURT:  I would appreciate that.

2           MR. STERN:  And just to be clear, we also cross

3     designated allegations in the complaint that if it's going

4     to --

5           THE COURT:  Well, let's talk about that.  Because

6     what you're referring to is Rule 106.  And Rule 106 has been

7     amended since VNA -- well, not since you filed your response.

8     But VNA did not take it into consideration.

9           And it now says, "If a party introduces all or part

10    of a statement, an adverse party may require the introduction

11    at that time of any other part or any other statement that, in

12    fairness, ought to be considered at the same time."

13          Here's the new part.  "The adverse party may do so

14    over a hearsay objection."

15          So your argument to me in your briefing was that the

16    rule of completeness, that it was hearsay.  But lo and behold

17    it turns out that they may do so over a hearsay objection.

18    But it still has to be information that, in fairness, ought to

19    be considered at the same time.  So --

20          MR. STERN:  And I can explain to the Court why we

21    believe, in fairness, it ought to be considered.

22          THE COURT:  Why?

23          MR. STERN:  There's hundreds of allegations that are

24    going to be read to a jury from a master complaint, which

25    they've never seen, never heard of it.  Many of them have

 1     never even seen what a lawsuit is.  And by implication,

 2     reading all of the allegations about all of the defendants

 3     that the plaintiffs here have sued but omitting those

 4     allegations in the complaint about the very defendant that's

 5     sitting here at trial would be extremely prejudicial and

 6     misleading to a jury.

 7         They need to understand that at the same time that

 8     Howard Croft was sued and at the same time Dayne Walling was

 9     sued, Veolia was sued.  And any indication that --

10         THE COURT:  I think it's fair to say to the jury now

11     Mr. Olsen is going to read select paragraphs from plaintiffs'

12     lawsuit.  Let me remind you that the defendants he's talking

13     about have either settled the case or been dismissed.  And

14     that the lawsuit also includes allegations against VNA.

15     That's why they're here today.

16         MR. STERN:  What would -- I mean, it's not my -- I

17     don't want to insult you by questioning you.

18         I do not see the prejudice in reading the allegations

19     that plaintiffs have put forth against Veolia when they form

20     the very basis of the evidence that's going to come in at

21     trial.  There's nothing in those -- now if someone of those

22     claims have been -- had been dismissed or if they would

23     confuse a jury.

24         So for instance, I think there's some allegations in

25     the complaint that call for exemplary damages, which

1    ultimately were not permitted at trial, that could easily

2    confuse a jury who's going to then get directions at the end

3    of a trial or at the beginning of a trial about what specific

4    damages it is their job to either find have been suffered by

5    the plaintiffs or have not.

6            But at the same time, it is far more prejudicial to

7    read 400 paragraphs about defendants and not include the

8    paragraphs by Veolia.

9            THE COURT:  The problem with prejudicial is that

10   evidence is designed to be prejudicial.  It's only where it

11   would be improperly prejudicial where a jury could make a

12   decision on an improper basis because of the evidence.

13           But Mr. Olsen?

14           MR. OLSEN:  Your Honor, I think your suggestion is a

15   good one with respect to the adding to the instruction the

16   select portions of the complaint.

17           Just generally allowing plaintiffs to admit

18   allegations against VNA, for example, those would be hearsay.

19   To your point, to the extent there's a completeness issue, to

20   use Mr. Stern's example, if we introduce an allegation that

21   says Howard Croft misled the people about the preparedness of

22   the water treatment plant.

23           And the next paragraph in the complaint says, "but he

24   learned the next day" and that is necessary to inform the

25   completeness of the previous paragraph, then I would

September 12, 2024

1    understand the argument for that to be read.

2         But it has to be essential to making -- to clarifying

3    something that's incomplete or misleading in terms of what

4    we're reading.  It isn't just we want to introduce the

5    allegations against VNA because we think that's fair.  That

6    would be hearsay.

7         THE COURT:  But okay.  Mr. Stern, what I'd like to do

8    is have a jury instruction at the beginning that informs the

9    jury that these are seven plaintiffs against the VNA

10   defendants and that other defendants were sued and have

11   settled or been dismissed.

12        And what the sample instruction that I'm looking at

13   just talks about settlement.  It says, "The Flint Water Crisis

14   has been the subject of widespread publicity.  You should

15   decide this case based only on the evidence presented and the

16   instructions I give you."

17        It goes on and then it says, "You may be aware of

18   evidence of other proceedings and other litigation relating to

19   the Flint Water Crisis.  And of the fact that certain persons

20   and entities have entered into settlements relating to the

21   Flint Water Crisis.

22        "The fact and amount of those settlements is not

23   relevant to this claim.  This -- the only claim in this case

24   is plaintiffs' professional negligence claim against Veolia.

25   You should consider the conduct of persons and entities other

 1     than Veolia only to the extent the Court instructs you to do

 2     so.  You should not consider the fact and amount."

 3              And then I -- I think in terms of completeness, it

 4     would be worth at the time that Mr. Olsen plans to read the

 5     lawsuit, if I say, "Now Mr. Olsen is going to read from

 6     plaintiffs' lawsuit that was filed in 2017" -- I don't know

 7     when the amended master long form was filed.  But we'll find

 8     out.

 9              "And he's only reading select paragraphs that he has

10     decided to read.  And there are other paragraphs including

11     paragraphs that involve plaintiffs' allegations against

12     Veolia.  But he will not be reading those to you today."  And

13     that's all I'll say.

14              MR. STERN:  I would just ask that rather than saying

15     certain defendants have settled that it is imperative that --

16     they're putting -- the Veolia defendants intend for their

17     nonparties at fault to put very specific defendants on the

18     verdict sheet.

19              THE COURT:  Correct.

20              MR. STERN:  They intend to read very specific

21     allegations that were made upon information and belief prior

22     to discovery ever taking place.

23              Your Honor, is saying that the allegations against

24     Veolia that were filed at the same time cannot be read.  That

25     generally we're going to tell the jury that certain parties

 1    have settled.  And that is prejudicial in light of what

 2    they're going to be faced with on their verdict sheet.

 3            And so at a minimum, if that's how -- and I

 4    appreciate the class felt however the class felt.  But with

 5    respect, we're not the class.  And we believe that

 6    Howard Croft, it should be explained he settled.

 7    Dayne Walling, settled.  Governor Snyder, settled.

 8            THE COURT:  Okay.  Well, then put that in this

 9    instruction.

10            MR. STERN:  Okay.

11            THE COURT:  Pose it to Mr. Olsen.  See if you can

12    agree.

13            In the class plaintiffs' trial, VNA -- in the memo on

14    this, VNA agrees that the jury should be informed of the fact

15    of settlements.  So this is in our record.  Specifically.  And

16    consistent with class plaintiffs' position, the parties should

17    be able to reference and elicit testimony about the fact that

18    specific parties have settled their claims.

19            So this is where they're coming from.  And so I see a

20    lot of opportunity for this to be resolved.

21            MR. STERN:  May I just ask one more question about

22    admissions of party opponents and the basis for -- this is --

23    understanding Your Honor's ruling.  This is not about the

24    complaint.

25            THE COURT:  And I just want you to know I was reading

September 12, 2024                                    47

1    from ECF 2706, Page ID 88552.

2              MR. STERN:  So the same -- the same underlying basis

3    for Your Honor's decision as to why the defendants should be

4    and will be permitted to read certain party admissions from a

5    complaint would require that plaintiffs be permitted to read

6    party admissions from any document that we have --

7              THE COURT:  You can read party admissions.

8              MR. STERN:  Right.  And so we can literally go

9    through the VNA Flint Facts Twitter feed that are Veolia party

10   admissions.  And obviously Your Honor would have to look at

11   them one by one.  But to the extent they are a party

12   admission --

13             THE COURT:  No.  I mean, it has to be -- I think that

14   a complaint is different from just reading a document.  But

15   let's wait until that happens.  Tell me what it is when it

16   happens and we'll go -- we'll go from there.

17             MR. STERN:  Okay.

18             THE COURT:  Yeah.  So let's just discuss how we're

19   going to get resolved.  Because I won't allow legal

20   conclusions and I won't allow hearsay that's within the

21   complaint.

22             MR. STERN:  I mean --

23             MR. OLSEN:  Your Honor --

24             THE COURT:  How do you want to go about --

25             MR. OLSEN:  -- let me address your hearsay within

 1    hearsay point.

 2            THE COURT:  Okay.

 3            MR. OLSEN:  Because party admissions need not be

 4    based on personal knowledge.

 5            THE COURT:  Right.

 6            MR. OLSEN:  Courts absolutely admit party admissions

 7    that contain hearsay.

 8            THE COURT:  They do.  I agree.

 9            MR. OLSEN:  Okay.

10            THE COURT:  But if it's hearsay within hearsay, if

11    it's Howard Croft deliberately poisoned the people of Flint

12    then and Howard Croft was told by Dayne Walling that the

13    people of Flint like to drink this water.  I mean, then maybe

14    the Dayne Walling thing that Howard Croft said is hearsay.

15            Would you agree with that?

16            MR. OLSEN:  Well, it might be hearsay within hearsay.

17    My point is party admissions, because they're not based on --

18    the hearsay within hearsay exception is -- or rule is built on

19    the notion that because there's no personal knowledge, hearsay

20    within hearsay is inadmissible.

21            Party admissions need not be based on personal

22    knowledge.  And therefore, the hearsay within hearsay is the

23    same analysis as hearsay in the first place.

24            THE COURT:  Okay.  But you were relying on

25    out-of-circuit cases for that.  In the Sixth Circuit, I'm

 1    looking at Back B-a-c-k v Nestle USA Inc.  That's the case
 2    where the HR director told the affiant that, quote, he had
 3    been told by higher management that they were planning to get
 4    rid of the three oldest employees and highest paid team
 5    leaders.  The lawyer always hates when they come across that.
 6          The statement -- okay.  The Sixth Circuit said the
 7    statement from the HR director was admissible.  But they went
 8    on to consider whether the statement from higher management
 9    was admissible because each separate statement must either be
10    excluded from the hearsay definition or fall within a hearsay
11    exception.
12          So I think that's what applies here.  So I think
13    hearsay within these party opponent statements can -- does
14    need to be considered.
15          MR. STERN:  On a --
16          THE COURT:  Okay.  I'm sorry.  It was not out of
17    circuit.  But you've got an Eastern District of Michigan case
18    in 2010.  And a Seventh Circuit case.
19          So what I'd like you to do is at least let me know
20    which are the ones that are hearsay.
21          MR. OLSEN:  What I would suggest, Your Honor, is the
22    same process with the legal conclusions issue.  If plaintiffs
23    have identified, or if they haven't, if they identify any that
24    they are taking a hearsay within hearsay objection to, we'll
25    meet and confer on both points.  We'll see what we agree on.

1     And we'll submit to Your Honor any that we don't agree on.

2          THE COURT:  I think that's a good approach.

3          MR. STERN:  May I just point out one other issue in

4     the complaint that's separate and apart from this?

5          There are certain rulings that Your Honor has not yet

6     made but we anticipate Your Honor making.  For instance,

7     unless Your Honor's had a change of mind about the task force

8     report, there are allegations made in the complaint that are

9     about the task force report.

10         Now, that would be a complete violation of a motion

11    in limine where evidence of the task force report is not going

12    to be admitted because of the various reasons Your Honor's

13    already given.  And so you can't bootstrap or back channel

14    evidence about something that's already been deemed

15    impermissible at trial just because a plaintiff has made a

16    statement about it as a party opponent.

17         MR. OLSEN:  I would say, Your Honor, it depends what

18    we're talking about with respect to the statement.  If they

19    are -- if the complaint is alleging facts which the plaintiffs

20    had to have a well founded belief that the statements were

21    when they made those facts in the complaint, to the fact that

22    they came from the task force report would be irrelevant for

23    whether they're admissible.

24         If the statement in the complaint said the task force

25    found X, that would be different.

 1            THE COURT:  Yeah.

 2            MR. OLSEN:  And that --

 3            THE COURT:  So flag those for me as well.

 4            MR. STERN:  Thank you.

 5            THE COURT:  Because if it's the latter, what

 6   Mr. Olsen just said, I think it's not admissible.  If it's

 7   just a quote from the task force report, I'm ruling that

 8   that's potentially not trustworthy and so on or I shortly will

 9   be.  So just identify those for me as well if VNA's still

10   seeking to have them admitted.

11            MR. STERN:  Okay.

12            MADAM COURT REPORTER:  Mr. Stern, can you move the

13   microphone.

14            MR. STERN:  So sorry.

15            THE COURT:  And the reason -- just sometimes I find

16   that if I understand the reason for a rule, I can be

17   internalize it.  And Jeseca's taking this down through

18   headphones, not through what she hears in the room.  And the

19   headphones only pick up the microphone.  And it sort of tunes

20   out when one mic is on, others are off.  So you -- it's just

21   the only way it's going to work.

22            MR. STERN:  Got it.

23            THE COURT:  So okay.  So let's move on to the task

24   force, which is ECF 3052.

25            And here, I think I let you know that I did not need

September 12, 2024

1   additional oral argument.  But there is one new argument that

2   VNA has raised here.  And VNA suggests that I wrongly placed

3   the burden on VNA to prove that the reports are trustworthy as

4   opposed to having the burden on plaintiffs to show that they

5   are not trustworthy.

6          And the Sixth Circuit states in Bank of Lexington &

7   Trust Company v Vining-Sparks Securities Inc., that the rule

8   assumes responsibility -- admissibility in the first instance

9   but with ample provision for escape if sufficient negative

10  factors are present.  And that's a quote.

11         In light of this presumption of admissibility, the

12  party opposing the admission of the report must prove that the

13  report is not trustworthy.  And then that cites a variety of

14  cases, including Baker v Elcona E-l-c-o-n-a Homes Corporation.

15         So to clarify, my questions of VNA about the

16  trustworthy of the documents, I also had questions for

17  plaintiff regarding how the document was compiled, were not

18  intended to shift the burden to VNA.

19         So having considered this issue at least twice

20  before, having read and considered the submissions of the

21  parties again in Bellwether III, I find no reason to

22  reconsider my prior rulings.

23         And I would point you to Composites USA Inc. v United

24  Industries Inc., where it says most of the motions currently

25  pending in the instant case are simply renewals of the

September 12, 2024                                                          53

1    parties' respected positions an identical request for relief

2    in a previous case.  And the court's rulings on those motions

3    will be identical to its rulings on the same issues in the

4    previous case.

5           So that's the theory that applies here.  And to the

6    extent that one issue needed to be clarified, I have now

7    clarified it.  And --

8           MR. OLSEN:  Your Honor, I'm sorry to interrupt.

9           THE COURT:  Yes.

10          MR. OLSEN:  Are you referring to the argument we

11   had --

12          THE COURT:  Yeah.

13          MR. OLSEN:  -- on the class -- in the class case on

14   that motion when you say --

15          THE COURT:  The argument in the class case.

16          MR. OLSEN:  Okay.

17          THE COURT:  But we also had argument in Bellwether I

18   on the task force.

19          MR. OLSEN:  Can then I just note for the record one

20   significant difference here from when we argued this in the

21   class case and Your Honor was persuaded that it was more

22   prejudicial than probative is that in the class case they were

23   stipulating to liability for all of those nonparties at fault.

24   And therefore, I think Your Honor suggested it was less

25   probative and more prejudicial in that event.  Obviously we

September 12, 2024

 1     don't have that circumstance here.

 2          THE COURT:  Okay.  Thank you for sharing that

 3     information.

 4          So the motion is denied and the Court's prior rulings

 5     on the inadmissibility of the task force report and the EPA

 6     order will apply in this case.

 7          So now we are moving to -- and we will take a break

 8     -- but to ECF Number 3054, VNA's motion to exclude evidence

 9     about motive, intent, or mental state and about VNA employees'

10     personal feelings.  And ECF 3061.  I'm just going to go to

11     that as well right now.

12          And I have considered these issues in previous

13     hearings.  I've read your new submissions and reviewed the

14     decisions from the past arguments and briefing.  And

15     consistent with the Composites USA Inc. v United

16     Industries Inc., I don't find that there is any reason to

17     reconsider that.

18          So for the reasons set forth during oral argument on

19     January 23 of 2024, and the Court's related orders in

20     17-10164, which is ECF Number 658; and 17-10164, which is ECF

21     Number 606; as well as ECF 2824, the class opinion on this

22     issue, I am denying both of these motions and the prior

23     rulings will apply.  Okay.

24          Let's go a little longer.  So now we're up to 3055,

25     which is also 3053.  Some of these are sealed and some are

1    unsealed.  Oh, man.  And this one -- yeah, this will be a good

2    one to wrap up and take a break after.

3            Because this is the one plaintiffs' motion for an

4    order adopting certain previous in limine rulings from

5    Bellwether I in the issues class trial.  First area is all

6    evidence of unfiltered Flint water consumption by defendants,

7    government officials, and high profile individuals.

8            And here, my ruling is unchanged.  Because -- and I

9    just want to -- having looked at what was briefed this time,

10   the key issue for me is that if a 40, 50, 60, or 70-year-old

11   -- hello, Mr. Nguyen-Dang.  I missed that -- government

12   official chooses to drink water that they may know could

13   potentially have a toxin such as lead in it, it's very

14   different than whether they would bottle feed an infant baby

15   with the same water that they would drink.

16           And so I just see no reason to revisit.  I think

17   that's more prejudicial than probative.  But I don't think

18   it's probative of anything that an official -- an adult

19   official would take a sip of water from a drinking fountain or

20   otherwise during this time period.

21           So what I'd like to do is look -- talk about the

22   relevance of Dr. Schultz testifying that the pXRF are device

23   should have been reviewed by the FDA.  And my issue here is

24   I'm inclined to let him say that in the ordinary course, a

25   device that's going to be used to diagnose or treat an

1    individual for a medical condition would go through the FDA's

2    process.

3           I'm not -- he would not be allowed to say that this

4    means that it's an unsafe device.  But it means that it didn't

5    go through the rigors of FDA approval to show that it's been

6    accepted by the FDA as a reliable advice -- device.

7           So is that a ruling that is consistent with what VNA

8    is seeking?

9           MR. NGUYEN-DANG:  I think so, Your Honor.  Sorry.  I

10   think so, Your Honor.  I think just to clarify, I don't

11   believe Dr. Schultz affirmatively says that the bone scans are

12   unsafe.

13          THE COURT:  No, he doesn't.

14          MR. NGUYEN-DANG:  He does not say that.

15          THE COURT:  No.

16          MR. NGUYEN-DANG:  I think all he's trying to do is to

17   explain what FDA approval means and what the FDA would be

18   looking at.  That in order to give FDA approval, the FDA would

19   be considering the effectiveness of the device and balancing

20   that against potential risks.  And all he would be saying is

21   that that has not happened here.

22          THE COURT:  And I'm willing to let him testify that

23   FDA would look at the reliability of the device, and they

24   didn't look at the reliability of this device.  I think the

25   issue of safety veers into something that's both not relevant.

September 12, 2024

```
 1              Reliability is relevant to the cross-examination of
 2    Dr. Specht.  Safety is not relevant to whether he got an
 3    accurate reading.  And so I'm prepared to allow you to ask him
 4    if this had been submitted for FDA approval, would you have
 5    evaluated it for reliability?  Yes, I would have.  Did you
 6    evaluate it?  No, I didn't.
 7              But I think it is not relevant.  And because it has
 8    no relevance, it's also more prejudicial than probative to say
 9    we would have also reviewed it for safety.
10              MR. NGUYEN-DANG:  I think I -- well, I think we're
11    going to disagree with Your Honor on that one.
12              THE COURT:  Okay.
13              MR. NGUYEN-DANG:  But if that's Your Honor's ruling.
14              THE COURT:  It is my ruling.
15              MS. DALY:  And we'll agree, Your Honor.
16              THE COURT:  Okay.  That's what I got out of the
17    plaintiffs' briefing is that that's -- and I just don't see
18    the safety issue as being related to any of the claims or
19    defenses.
20              If I decide to declined a procedure or accept a
21    procedure that has risks, that's my business.  But it doesn't
22    go to what we need to know in this case is are those bone
23    scans reliable.  And so this would be one way they could be
24    shown to be reliable.  And it was not exercised by the
25    plaintiffs' expert.
```

1          So the safety just has nothing -- it's done.  The

2     bone scans are over.  They've been conducted.  So there's

3     nothing relevant to learn about whether they were safe or not.

4          MS. DALY:  Your Honor, just one point I wanted to

5     make.  We totally agree with your ruling.  But we would -- if

6     -- we would like to reserve the right to object at the time of

7     trial as to the cumulative nature of this testimony.

8          I think as we saw a few weeks ago, Veolia has a lot

9     of evidence that calls into question the reliability of

10    Dr. Specht's bone scan.  And so depending on when and how this

11    evidence might come in, I think there's a great chance that it

12    could be quite cumulative.

13         THE COURT:  I -- that's -- this is the beauty of time

14    limits.  Is if someone wants to accumulate limitless evidence

15    on Howard Croft and leave everybody else out of it, that's

16    their trial strategy.

17         At a certain point, I mean, it could just -- it could

18    just get too boring for all of us.  So I mean so some

19    cumulative -- I'm not prohibiting objections based on the

20    cumulative nature, but I think they'll be less important.  If

21    they choose to soak up their time on that, then that will be

22    their trial strategy.

23         But so just at the time if you think it's relevant,

24    you can certainly make that objection.  But we'll see.

25         So let's look at alternative sources of exposure.

1    Here, plaintiffs are asking that I apply the previous ruling

2    regarding Dr. Finley and Dr. Weed to the new experts

3    Dr. Banner, Benson, and Greenberg.  And as I understand it or

4    recall it, Finley and Weed were prohibited from talking about

5    alternative exposures to lead because they hadn't explored

6    alternative exposures to lead or included what they were in

7    their reports.  So there was no reason for them to testify

8    about it.

9         So I guess what -- tell me what these new experts

10   have opined about what the alternative exposures were.

11        MR. NGUYEN-DANG:  So Your Honor, just to be clear.

12        THE COURT:  Yeah.

13        MR. NGUYEN-DANG:  My understanding was that in

14   Bellwether I, you had testified that -- sorry.  You had ruled

15   that the plaintiff -- sorry.  That VNA's experts could not

16   testify that their injuries were caused by some alternative

17   source of lead but could criticize plaintiffs' experts for

18   failing to rule out other sources of lead --

19        THE COURT:  Correct, correct.

20        MR. NGUYEN-DANG:  -- in differential diagnosis.

21        THE COURT:  Right.

22        MR. NGUYEN-DANG:  So that remains --

23        THE COURT:  And that remains the ruling today.

24        MR. NGUYEN-DANG:  Right.  And so I'm not really sure

25   that --

1          THE COURT:  I don't think we have a disagreement

2     here.

3          MS. DALY:  No.  We're aligned, Your Honor.

4          THE COURT:  Okay.

5          MR. NGUYEN-DANG:  Yeah, I wasn't really sure that

6     there was anything in that --

7          THE COURT:  And we'll --

8          MR. NGUYEN-DANG:  And then you -- sorry.  If I may?

9          THE COURT:  Please.

10         MR. NGUYEN-DANG:  The only thing I wanted to clarify

11    I think it's footnote 7 of plaintiffs' reply brief, which

12    seems to suggest that a even criticizing a differential

13    diagnosis would run afoul of that ruling.  I just wanted to

14    clarify that that's not correct.

15         THE COURT:  It -- I will allow a criticism of the

16    differential diagnosis.

17         MR. NGUYEN-DANG:  Okay.  Thank you, Your Honor.

18         THE COURT:  Yeah.  So now we've got the family and

19    social factors.  And let me go -- I've got a -- I was looking

20    at Dr. Thompson's -- I've got to open it though -- report.

21         But in Bellwether I, I ruled that VNA's experts could

22    not say that plaintiffs are not injured.  But to the extent

23    they're not injured, the noninjury is because of social

24    factories -- factors.  Because that's just not a -- that's

25    just illogical.

1          But now we have the experts testifying, for instance,

2     Dr. Banner regarding J.N. says in conclusion, I find no

3     medical or scientific basis for concluding that lead caused or

4     contributed to any of the problems facing this child.

5          So and we have Dr. Benson -- I'm sorry --

6     Dr. Greenberg saying there is no evidence that, for example,

7     Y.A.L. sustained any medical harm resulting from the ingestion

8     of lead.  I don't know what's going on with Dr. Benson so I

9     need -- so we have the experts saying this differently.

10         So I guess what I need to know from plaintiffs --

11    well, let me just ask VNA -- these are your experts -- whether

12    you agree that each plaintiff was injured but you just

13    disagree about whether -- or has a mental, cognitive, or other

14    impairment.  You just disagree about whether lead causes it.

15         MR. NGUYEN-DANG:  I think that's true for some

16    plaintiffs, but not all.

17         THE COURT:  Tell me which ones.  And let me get my --

18    hold on.  I've got to get my list out.  Okay.  Go ahead.

19         MR. NGUYEN-DANG:  So I believe for G.B., C.D., and

20    J.N., our experts have testified that those plaintiffs either

21    have a mild impairment or a learning disability.

22         For the other plaintiffs, I think our experts have

23    testified that they do not think that those plaintiffs meet

24    the diagnostic criteria for the specific conditions that

25    plaintiffs' experts diagnose them with.  That said, you know

1    they have looked at, you know, the full panoply of test scores

2    and all of rest of it for each of those test scores.

3              THE COURT:  So for J.B., C.D., and J.N.?

4              MR. NGUYEN-DANG:  G.B.  Sorry.

5              THE COURT:  Oh, G.B.?  Okay.  That's right.  I'm just

6    getting to know these individuals.  I'll know them a lot

7    better soon.

8              But your experts say there is an impairment, but it's

9    not caused by lead.

10             MR. NGUYEN-DANG:  I believe that's correct.

11             THE COURT:  Okay.

12             MS. DALY:  Not all of the experts are aligned.  Your

13   Honor, there's a lot of experts, as we know, on the Veolia

14   side.  So for example, Dr. McCaffrey does, in fact, opine that

15   G.B., C.D., J.N. suffer from an injury.

16             However, Dr. Nelson, for example, only says C.D.  And

17   then the remaining experts, none -- say that none of the

18   children are injured.  Some of them specify none of them are

19   injured in the specific way that plaintiffs' experts say.  But

20   most of them say, similar to last time, they're not injured at

21   all.  They're perfectly fine.

22             I think the focus of this motion, if I may, is really

23   on these experts that talk about, yes, the child is injured.

24   But it's not lead and it's probably for -- it's probably the

25   fact that G.B. experienced death in her life.

```
 1              And Your Honor, the way I see it in Bellwether I,
 2      your ruling had kind of two parts.  And one of them said
 3      experts that are completely in contradiction that say the
 4      child's not hurt.  But if he or she is, it's this.  Not
 5      allowed.
 6              The second part of your ruling was to the extent that
 7      the expert's opinion is not completely contradictory and they
 8      do point to some other social or family factor, that opinion
 9      still needs to be reliable and based on sufficient evidence --
10              THE COURT:  Correct.
11              MS. DALY:  -- within 702.  And we know from Tamraz
12      from the Sixth Circuit that we're not going to let experts
13      speculate.
14              And so I think for us, the heart of the motion is on
15      these experts that are saying it's this family factor.  And
16      more -- even more specifically the fact that they're saying
17      it's more likely that the fact that G.B. witnessed a loss of a
18      family member, it's more likely that the fact that C.D. has
19      speech delay or that J.N. has an array of problems in his
20      life.
21              I mean for J.N., the expert essentially chronologs
22      [phonetic] a whole paragraph of horrible things that this
23      child has suffered.  And we don't feel that it's reliable or
24      supported.  And that's in line with the second part of Your
25      Honor's ruling.  For them to say it's more likely that it was
```

 1    these things than lead.

 2              THE COURT:  Okay.  So let's break this down.

 3              For those experts who do not think the plaintiffs are

 4    injured, they cannot offer an explanation for the noninjury.

 5    If they say somebody -- and I think there are four.  I'm not

 6    exactly clear because I've been trying to make Venn diagrams

 7    of who says the plaintiffs are injured and who says they

 8    aren't.

 9              But if your experts say they're not injured, they

10    can't say they're not injured because of the loss of a great

11    grandparent.  And if your experts say they are injured, but

12    it's more likely that it's because of chaos at home or

13    something, then I do need a reliable source for that.

14              But let's look at Dr. Thompson with G████████ B█████,

15    or G.B. --

16              MR. NGUYEN-DANG:  Your Honor, I'm sorry.

17              THE COURT:  Please.  Go ahead.

18              MR. NGUYEN-DANG:  I don't need to re-plow ground.  We

19    do urge you to reconsider the first part of your ruling.  We

20    just don't think that that is consistent with how expert

21    testimony can be used.

22              Experts -- you can't ask an expert assume this.  And

23    now what are your opinions based on that.  And so it would be

24    perfectly fine for us to have two experts, one of whom said

25    this plaintiff --

1        THE COURT:  If one of your experts says G.B. is

2   injured, that expert can talk about G.B.'s injury coming from

3   another source.

4        MR. NGUYEN-DANG:  But they don't have to say it.  You

5   can just assume that G.B. is injured in the way that

6   plaintiffs' experts have --

7        THE COURT:  You certainly could.  And I know that

8   hypothetical questions can be asked.  But if an expert is

9   clear that the person is not injured, it's simply not relevant

10  to ask that person a hypothetical question about the

11  individual.

12       It's speculative.  It's not -- and also it's not

13  helpful to the jury's process.

14       MR. TER MOLEN:  Your Honor, if I can just interject

15  briefly here?  If our experts obviously will be testifying

16  after plaintiffs' experts have testified.  So I would

17  respectfully submit that it's completely fair game to ask them

18  why is it you disagree with this diagnosis.  And as part of

19  that explanation --

20       THE COURT:  You can say I disagree with the diagnosis

21  because Judy Levy doesn't have ADHD.  I disagree.  These test

22  scores show she has got excellent attention and barely moves.

23       MR. TER MOLEN:  And as Your Honor knows, as we all

24  know from the first trial, Your Honor, much of the opinions as

25  to harm are based on various kinds of testing, particularly

1    psychological testing.  And one of the explanations our

2    experts may have for particular test results that plaintiffs'

3    experts relied on are other factors, other things that

4    happened in a particular plaintiffs' life that could explain

5    that test result.

6           And so they should be able to explain, well, you

7    know, the result on -- it's been too long.  I'm forgetting the

8    acronyms for the right tests.  But the results on these

9    particular tests could well be driven by these other events.

10          MS. DALY:  But that's not what they --

11          THE COURT:  Yeah.

12          MS. DALY:  That's not what they say.  They look at

13   the test results that Dr. Jourdan and Dr. Hoffman publish in

14   their reports.  And they say if you look at the way the

15   numbers came out, the children are okay.  Or Dr. Jourdan

16   didn't apply the entire battery that she was supposed to, but

17   the way that she interpreted the test results to mean an

18   injury is incorrect.

19          They don't break down the different parts of the test

20   and say, well, this child scored here on the attentive

21   schedule and that could be explained by an ailing grandparent.

22   I just think --

23          MR. NGUYEN-DANG:  With respect, I think it's a little

24   bit more nuanced than that.

25          THE COURT:  Okay.

```
 1          MR. NGUYEN-DANG:  I do believe, in fact, that they go
 2   through specific tests, specific subparts of tests and say the
 3   results of this one are within the average range.  This one is
 4   below the average range.  Altogether, this does not add up to
 5   the condition that plaintiffs' experts have testified.  But --
 6          THE COURT:  And that's fine.
 7          MR. NGUYEN-DANG:  But for specific -- but for -- you
 8   know, to explain to the jury why, well, this particular
 9   subtest, the range might be out I think.  And the testimony
10   is, you know, of the things that might affect the plaintiffs'
11   development, these things might matter more.
12          And I don't think that that's at all inconsistent
13   with the testimony that overall the plaintiff doesn't have the
14   condition that the plaintiffs' experts have diagnosed them
15   with.
16          THE COURT:  Okay.  Well, the decision is unchanged.
17   But you have new experts who do acknowledge that some of these
18   particular bellwether plaintiffs have impairments.  Where they
19   acknowledge that and they say it's not due to lead, they can
20   certainly offer reliable opinions about what it could be
21   related to.
22          So and you've talked about this interesting imagine
23   that a doctor has tested a patient for yellow fever.  That
24   doctor could testify the patient does not have yellow fever
25   but also say that, well, yellow fever comes from a mosquito.
```

September 12, 2024                                                68

```
 1    But this is a different situation where we're saying --
 2    because we absolutely know that yellow fever comes from the
 3    mosquito.
 4         But here we're saying plaintiff number 2 has mild
 5    cognitive impairment and oppositional defiant disorder.
 6    Something like that.  And the fact is the second part of that
 7    is what we need to get to now because there isn't a mosquito
 8    that causes these things automatically.
 9         And that's the fact that's at issue in this whole
10    case, is whether what causes these conditions and whether lead
11    was one of those causes.
12         And so the mosquito thing doesn't work for me because
13    it's not -- if I don't have oppositional defiant and I don't
14    have ADD, then hearing about a variety of ways that those
15    things can be obtained that are not reliable would not be
16    helpful.  But some of what you've offered is reliable and some
17    I think is questionable, so I think we need to talk about
18    that.
19         So okay.  Let me ask you this.  With respect to -- I
20    want to go back for a minute to Dr. Thompson and G -- G.B.
21         Do you plan to have Dr. Thompson testify about G.B.?
22         MR. NGUYEN-DANG:  Probably, Your Honor.
23         THE COURT:  Okay.  Because Dr. Thompson says that in
24    paragraph 9F, G          experienced significant losses
25    including the deaths of her great grandmother, her great
```

September 12, 2024                                                    69

1          grandfather, and some unidentified cousins.

2                 And then he cites a couple of studies that say that

3          interpersonal loss in childhood has been described as a

4          significant adverse life event and a risk factor for mental

5          health and social problems.  But GB isn't diagnosed with

6          mental health, depression, anxiety.  G.B. has different

7          diagnoses from that.

8                 And so also I hate to say this, but great

9          grandparents, if you're lucky enough to meet them, by

10         definition they're older people, and by definition they die.

11                I mean, is he going to testify that anybody who once

12         knew a great grandparent and learns of their death is going to

13         have a mental health and a social problem?  Because that --

14         I'm just questioning -- I haven't read the studies but I'm

15         like trying to use common sense.

16                MR. NGUYEN-DANG:  Well, surely, Your Honor, that

17         would depend on the relationship that the person had with the

18         relative.  I mean, in some situations, their relationship

19         might be close and in others it might be further apart.  I

20         don't think we can simply say because they were an old great

21         grandparent and old great grandparents die, that means that

22         there's not going to be an issue.

23                THE COURT:  No, there's certainly grief.  I mean,

24         there's certainly grief.  But he's testifying that it's going

25         to cause a mental health disorder.  And she's not diagnosed

1      with a mental health.

2             What is G.B.'s diagnosis?  It's mild cognitive

3      challenge.  So he doesn't list mild cognitive challenge.  He

4      lists mental health, which would be depression, anxiety, and

5      conduct disorder type things.  And that's -- and social

6      problems.  And that's not her diagnosis.  So I'm going to

7      prohibit him from testifying to things that aren't a part of

8      this case for G.B.

9             MR. NGUYEN-DANG:  Your Honor --

10            THE COURT:  Do you see what I'm saying?

11            MR. NGUYEN-DANG:  With respect, I think part of the

12     issue here is that we haven't had full Daubert briefing on

13     these issues and so it's a little difficult to just pull them

14     out here.

15            I think it seems like it would be something that

16     would be an area for cross to the extent to which mental

17     health and social problems and then there's additional

18     research on regarding adverse childhood experiences.

19            If those things -- as you say, we haven't read all

20     the studies.  If those things don't, in fact, encompass, you

21     know, couldn't even conceivably encompass what G.B. is

22     diagnosed with, then perhaps.  But I just don't know that I'm

23     ready here and now to make an argument on that.

24            THE COURT:  Well, the burden for this to offer this

25     testimony is with VNA.  Whether or not there's -- I mean, it's

1    coming in not in a Daubert setting.  But from what I can just

2    see in the written submissions for G.B., Dr. Thompson's

3    testimony that the loss of the grandparent and the

4    unidentified cousins, who she doesn't even know the names of,

5    would cause a disorder that she doesn't have.

6         So it's just not relevant to our case and I won't

7    allow that.  But that doesn't get us anywhere.  We've got a

8    lot of experts.  I mean, if we've got four experts and seven,

9    we've got 28 different things we have to decide.  And I'm

10   trying to come up with a rule that will apply to them.

11        Let me ask you, another one that just jumped out at

12   me that I'm interested is in hearing about.  Now, like

13   Dr. Greenberg says with respect to Y.A.L., that that

14   plaintiff -- there is no evidence that Y.A.L. sustained any

15   medical harm resulting from the ingestion of water in Flint.

16        So Dr. Greenberg can attack the test scores, the use

17   of this particular test or that test.  But Dr. Greenberg -- it

18   just won't be relevant to the jury to hear that other social

19   problems were going to impact Y.A.L.?

20        MR. NGUYEN-DANG:  I'm sorry , Your Honor.  I'm just

21   pulling up that report.

22        THE COURT:  He says it is not -- it is my medical and

23   toxicological opinion that Y.A.L. is not at any future

24   increased risk for the development of any neurological,

25   psychological, neuropsychological, psychiatric, or other

1    medically related injury due to ingestion and/or exposure to

2    water in Flint during this timeframe.

3            So if Y.A.L. had certain chaos at home or certain

4    stress at home, thank goodness Dr. Greenberg says Y.A.L.'s

5    life trajectory is very positive and suffering from no adverse

6    consequences from the Flint water.  And so --

7            MR. NGUYEN-DANG:  Right.  So Your Honor, he's

8    testifying that it's not because of the Flint water.  That

9    doesn't necessarily mean that there -- I mean, he's providing

10   -- sorry.  He's providing his opinions on what other issues

11   there might be that could be relevant to her -- to this

12   plaintiffs' development.

13           It's not the Flint water.  That's his opinion.  But I

14   don't see how that's inconsistent with additional testimony

15   about her development and the potential risk factors for

16   development.

17           THE COURT:  In light of the fact that you have four

18   experts per plaintiff, I -- it will -- it will not be helpful

19   to the jury to hear -- but Dr. Greenberg seems like a powerful

20   testimony that Y.A.L. is not injured by the Flint water.  And

21   that's what's relevant to the jury.

22           Is there an injury or is there not an injury?  He

23   says absolutely not an injury.

24           MR. NGUYEN-DANG:  He says that there's no injury from

25   the Flint water.  I mean I think that's a -- isn't that a --

          1          MS. DALY:  He doesn't say there's another injury

          2     though.

          3          THE COURT:  He also says there's just no injury.

          4          MS. DALY:  Yeah.

          5          THE COURT:  There's just no injury.  So he doesn't

          6     need to explain other injuries.  If Y.A.L. has anxiety,

          7     insomnia, they're not asking for damages for that.  They're

          8     asking for other types of damages.

          9          So if Dr. Greenberg wants to talk about, hey, Y.A.L.

         10     is suffering anxiety and insomnia that has nothing to do with

         11     Flint water.  The jury's going to say thank you for sharing

         12     but let's move on because our time is limited.

         13          But for those -- let me ask plaintiffs, does

         14     Dr. Benson express opinions about whether the seven bellwether

         15     plaintiffs were injured?  Do you know?

         16          MS. DALY:  Your Honor, I don't know off the top of my

         17     head.  But I can look right now.

         18          THE COURT:  But the same rule will apply.  But if

         19     Dr. Benson says in my expert opinion the plaintiffs have some

         20     injury but not from Flint water, then if she can say on a

         21     reliable basis that it's due to something else, that will be

         22     allowed.

         23          MR. STERN:  But we'll be able to explore the

         24     reliability of that basis at the time of the testimony to

         25     ensure that she's not just --

September 12, 2024                                      74

```
 1              THE COURT:  Yes.

 2              MR. STERN:  -- throwing, you know, paint at the wall.

 3              THE COURT:  There's also one that's inconsistent that

 4    I wanted to go over.  And I have it in my notes.  Oh, yeah.

 5              Why don't we do this, why don't we take a break now.

 6    I know we're in the middle of one motion, but it's a lengthy

 7    one.  And I think we're making good progress.

 8              MR. STERN:  What time would you like us back, Your

 9    Honor?

10              THE COURT:  How about 10 after 1:00.

11              MR. STERN:  10 after 1:00.

12              THE COURT:  Okay.  No problem.  I have to keep going.

13              MR. TER MOLEN:  Can you remind me, if we leave a

14    knapsack in the courtroom, is that --

15              THE COURT:  Nobody's coming in here.

16              MR. TER MOLEN:  Okay.  All right.  Thanks.

17              MR. STERN:  Your Honor, may I ask if you have an idea

18    in your own mind as to when we will be done today?

19              THE COURT:  Yes.  I have a absolute stop at 3:15.  I

20    have to be in the car out the door.

21              MR. STERN:  Okay.  Thank you.

22              MR. TER MOLEN:  Thank you.

23              THE COURT:  Yeah.  So we'll just keep powering

24    through.

25                              (Brief Recess)
```

1          THE COURT:  Okay.  So we're back on the record and

2    we're still on ECF Number 3055.  And I had a chance, during

3    our break, to think this through a little further.

4          So if VNA's experts have the view that a test score

5    is accurate or that plaintiffs have an injury of the type

6    alleged by the plaintiffs, then they can offer a theory of

7    what caused either those test scores or that injury so long as

8    it has a reliable basis.

9          And I'll determine on a case-by-case basis whether

10   the Koller report or whatever the report is is either reliable

11   or relevant to a particular plaintiff and that expert's

12   testimony.

13         So those decisions will be delayed until trial in

14   terms of whether VNA's experts have a reliable basis.  But by

15   and large, I imagine that they would.  They would have an

16   article that suggests that test scores or this diagnosis can

17   be caused or is more likely caused by something other than

18   lead.

19         So moving on to ECF Number 3056.  This is VNA's

20   motion to exclude evidence about claims in lawsuits that do

21   not involve the Flint Water Crisis.  And here, what I

22   understand you're asking me to do is look at a 404(b) analysis

23   for work done in Pittsburgh, not to work that I previously

24   ruled on relating to Plymouth.

25         MS. AIELLO:  Your Honor, I think our motion is a

September 12, 2024

1    little broader than that.  We're seeking to prohibit the

2    plaintiffs from referencing any other claims or lawsuits.

3    Pittsburgh is just essentially the one that was raised in the

4    opposition.

5             THE COURT:  Okay.  And so I'm assuming that

6    plaintiffs are not intending to use anything generally other

7    than Pittsburgh.

8             MR. STERN:  Correct, Your Honor.

9             THE COURT:  Okay.  So that's why I'm focused on

10   Pittsburgh.

11            Could you remind me of your name?

12            MS. AIELLO:  Gina Aiello.

13            THE COURT:  Gina Aiello?

14            MS. AIELLO:  Yes.

15            THE COURT:  Okay.  Great.  Thank you.  And okay.

16            So we're on to Pittsburgh.  And so would you like to

17   add anything to the briefing on this?

18            MS. AIELLO:  No.  We would just say, Your Honor,

19   that, you know, we think that there is no -- nothing new that

20   changes the analysis from Bellwether I with respect to

21   Pittsburgh.

22            Here, you know, I would just emphasize that there has

23   not been anything new that has come to light except plaintiffs

24   essentially rely entirely in their opposition on a 2018

25   article that was available to the Bellwether I plaintiffs.

```
 1              We would also say that they really haven't asserted
 2      any basis in the briefing to reference the fact that there was
 3      litigation related to the work done in Pittsburgh.  I think we
 4      would dispute that that -- you know, that work is relevant,
 5      you know, maybe potentially at all with respect to I think
 6      they said knowledge and opportunity given that word subject to
 7      an objective standard.
 8              But you know, even if that is the case, you know,
 9      there is no basis for them to reference the fact that we've --
10      that there was litigation related to the work done in
11      Pittsburgh.
12              THE COURT:  Okay.  So and who's arguing?
13              MR. STERN:  That would be me, Your Honor.
14              THE COURT:  Okay.  So Mr. Stern, the Pittsburgh
15      article was from 2018 before Bellwether I.  I don't know how
16      important that is.
17              But do you intend to bring to the jury's attention
18      claims or litigation involving VNA's work in Pittsburgh?
19              MR. STERN:  Yes.
20              THE COURT:  Okay.  And what would the relevance of
21      that be and how would that survive 404(b)?
22              MR. STERN:  The relevance is in the credibility of
23      Veolia's defense to the extent that in Pittsburgh litigation,
24      whether it ended in an arbitration or a settlement, however it
25      concluded, the fact is that they also created a website.  They
```

1    also had public relations consultants, they also put forward

2    the scope defense --

3         THE COURT:  But there's nothing -- there's nothing

4    illegal or even untoward about having a website or having a

5    public relations involvement in a company.

6         MR. STERN:  It just shows what their playbook is.

7    The substance --

8         THE COURT:  But that's not -- that playbook isn't in

9    violation of the law.  And it calls into question counsel's

10   credibility it seems to me, which is improper.

11        MR. STERN:  It calls into question defense counsel's

12   credibility?

13        THE COURT:  Yeah.  Because you're saying, ah, you're

14   just copying what was done in another litigation.  You're

15   doing something -- here's the thing.

16        There's -- as a matter of fact or law, when a company

17   gets sued, one of the first things I understand they do is

18   call a public relations or crisis management type outfit to

19   help them.  Because they're going to respond in the litigation

20   based on the allegations in the litigation, but they want

21   their reputation in the public's eye to be strong and there's

22   nothing illegal about that and it's not improper.

23        So simply saying in Flint they hired public relations

24   and in Pittsburgh they hired public relations doesn't make it

25   more or less likely that they engaged in professional

1   negligence.

2        MR. STERN:  It's not the fact that they hired public

3   relations, it's the fact that if the very defense that they

4   are putting on in a case was created by public relations.

5        It's one thing to have a public relations person say

6   you need to do this, this, and this to preserve your

7   reputation.  You need to get in the community and pass out

8   water.  We want to have you go on WCBS News Flint to talk

9   about the good work that Veolia does and that how tragic it is

10  that what happened to these folks in Flint and Veolia is not

11  going anywhere.  We're here to help the people of Flint.

12       It's another thing to have a defense which is called

13  into question in many of these documents by Veolia's own

14  employees become the very defense that exists in other cases

15  as a result of public relations.

16       The websites are identical.  The defenses are

17  identical.  And they're created by the same folks.

18       So while I understand Your Honor's ruling, you know,

19  to the extent that that's the ruling, it's not about calling

20  into question the motives or the ethics of the lawyers.  It's

21  not about calling into question the fact that there are public

22  relations consultants.

23       It's the substance of what those consultants are

24  providing in both litigations, which is a legal defense which

25  has been adopted by the defendant in both places.

1          THE COURT:  Okay.  So here's how I want -- I will

2    handle this, which is that plaintiffs can attempt to

3    demonstrate that VNA's defenses are baseless.  You can --

4    that's your job as the plaintiff.  Or that they're

5    contradicted by witnesses with personal knowledge of relevant

6    events.

7          However, when it gets to public relations, if a

8    public relations document from VNA includes an admission that

9    VNA's defenses are groundless, you can certainly use that.  Or

10   the opposite of what VNA believes.  If it's a party admission

11   and you've got a witness on the stand who says I reject all of

12   that or whatever, that would be relevant.

13         But your argument that VNA's legal strategy is a

14   public relations based strategy to me comes very close to an

15   attack on opposing counsel's truthfulness or credibility or

16   capacity to litigate the case.

17         And that's impermissible under United States v

18   Carter, the Sixth Amendment -- or Sixth Circuit case finding

19   that there's plain error where a court allows counsel to

20   attack opposing counsel's truthfulness.

21         And so -- so tell me what document are you going to

22   use about Pittsburgh and with what witness?

23         MR. STERN:  Well, I -- if it's a business record,

24   Your Honor, I don't think we have to specify who the witness

25   is because business records would be permissible under hearsay

September 12, 2024                                                                81

 1    exception.

 2                THE COURT:  But you still have to show it to somebody

 3    to admit it.

 4                MR. STERN:  Yeah.  We have to show it to somebody to

 5    admit it, but they don't can necessarily have to have personal

 6    knowledge of that document if it's a business record.

 7                If Bill Fahey says on the stand that -- Mr. Fahey, do

 8    you believe that -- do you believe that any level of lead is

 9    dangerous, and he says, no.  I'm sure lead levels are fine.

10    And then we show him a document created by a public relations

11    consultant where they say that low levels of lead are harmless

12    -- I'm paraphrasing.  I'm not --

13                THE COURT:  In the Pittsburgh case?

14                MR. STERN:  No, no.  I'm not there.  I'm not there

15    yet.  I mean, I'm just trying to answer the question.

16                THE COURT:  Okay.

17                MR. STERN:  And then I confront Mr. Fahey or we

18    confront Mr. Fahey with a document created by a public

19    relations person that says low levels of lead are not harmful

20    --

21                THE COURT:  But this is the motion to exclude

22    evidence about claims and lawsuits outside of Flint.

23                MR. STERN:  I'm getting there.

24                THE COURT:  Okay.

25                MR. STERN:  And Mr. Fahey in that very document says,

1    no, lead is a problem at any level and I disagree with this

2    statement.

3          And then on the Pittsburgh website, Veolia Pittsburgh

4    facts.  And I'm making it up.  That's not the actual website.

5          But imagine there's a Pittsburgh website that tracks

6    the exact same language from the document that Mr. Fahey has

7    been confronted with which he has disputed in his testimony as

8    a true statement but has now become the defense of Veolia, if

9    that's also their defense in Pittsburgh and there's engineers

10   saying that that is not a valid statement, then it comes in as

11   this is your playbook.

12         This goes to the credibility of your defense because

13   you raise it everywhere.  And even here, there's an employee

14   from Veolia that disagrees.

15         THE COURT:  But take an MDL -- the playbook issue

16   just -- it's not relevant.  Because if I'm an asbestos

17   company, I'm going to have a defense in Eastern District of

18   Michigan.  I'm going to take that playbook over to Northern

19   District of Ohio and Tennessee and Nevada.

20         And so it's not -- it is my defense.  And it's the

21   way I defend my company and there's nothing wrong with that.

22         So we'll wait for the exhibit.  But I'm just

23   cautioning you that anything that goes to questioning the

24   integrity or truthfulness of the lawyers is not going to come

25   in on either side.  And this whole idea of "that's your

September 12, 2024

 1    playbook, isn't it", I think is inflammatory and not -- you'll

 2    have to lay the foundation because the playbook has to be an

 3    improper playbook.  It can't be a legally permissible playbook

 4    to be referred to that way.

 5         So you're suggesting that the defense in Pittsburgh

 6    was improper.

 7         MR. STERN:  I'm suggesting that the defense in

 8    Pittsburgh mirrors the defense in Flint and the defense in

 9    Flint is improper based on contradictory statements from the

10    people on the ground versus people who were hired two to five

11    years later to create the defense for a lawsuit.

12         THE COURT:  Okay.  But I didn't hear that that was

13    also true in Pittsburgh.  So we can't have a trial of what

14    happened in Pittsburgh.

15         MR. STERN:  I'm not -- I'm not suggesting that.  And

16    if the time comes during trial where we believe a document

17    from Pittsburgh has some credibility, does not attack the

18    lawyers, and we seek to present it, we'll let Your Honor know

19    in advance before the jury sees it and then you can rule then.

20         THE COURT:  Okay.  But by and large, I'm prepared to

21    grant this motion because I haven't heard anything that you

22    have information you can show me that the Pittsburgh

23    litigation --

24         I'm totally with you that if Pittsburgh had acidic

25    water and VNA said in Pittsburgh related documents that -- or

1      in Flint related documents, hey, we know how to handle this

2      water because we handled Pittsburgh's water and it's a lot

3      like Flint River water.

4               MR. STERN:  But we have that here.

5               THE COURT:  Yeah.  So those things you can use.

6               MR. STERN:  Dr. Russell in his report says --

7               THE COURT:  Stop.

8               MR. STERN:  Okay.

9               THE COURT:  Those things you can use.  But saying

10     that this is the same playbook where they hire a public

11     relations outfit and then they say whatever they want to say,

12     that won't be permitted unless what the public relations

13     outfit told them to say is improper, unethical, illegal and

14     they went with it in Pittsburgh and they're going with it

15     here.

16              MR. STERN:  Understood.

17              MS. DALY:  Your Honor, just if I could clarify one

18     thing.  I think that when it comes to pointing out the pattern

19     and the playbook, the metaphor Your Honor used about, yes,

20     asbestos defendants, they are going to defend their products

21     the same way in every jurisdiction.  They're generally mostly

22     going to say there was no asbestos in the baby powder or

23     whatever.

24              In this case, a lot of the dispute about whether

25     Veolia was negligent comes down to what happened.  And as

```
 1        they've put into focus, what was the scope of their agreement.
 2        And so they've been very adamant through their experts and
 3        through their fact witnesses that our scope is clear, that our
 4        scope does not -- did not include issues such as lead.
 5             And the credibility of whether that is, in fact, the
 6        truth of whether that is, in fact, reflective of what their
 7        scope was and what they were expected or expecting to do in
 8        Flint is at issue.
 9             And by showing that there's a pattern of when there's
10        a situation where they're hired to help with a water problem,
11        a pattern where they, in the face of a lawsuit, respond with
12        it was outside of our scope, we think that that's relevant to
13        the credibility of the truth of whether or not something like
14        was this in their scope or not is.
15             Not necessarily implying that the lawyers are using a
16        playbook or having an incredible defense, but the fact that
17        there's a pattern of always making the same claim we think is
18        irrelevant.
19             THE COURT:  404(b) says --
20             MS. DALY:  Your Honor --
21             THE COURT:  -- that evidence of any other crime,
22        wrong, or act is not admissible to prove the person's
23        character in order to show that on a particular occasion the
24        person acted in accordance with a character unless you can use
25        it instead not to say you did it in Pittsburgh so you're doing
```

1    it here.

2           You can't do that unless you're proving motive,

3    opportunity, intent, preparation, plan, knowledge, identity,

4    and absence of mistake or lack of accident.

5           So I don't know exactly -- I don't know what happened

6    in Pittsburgh.  But was it toxic -- was it acidic water that

7    needed --

8           MR. STERN:  Yes.  Dr. Russell talks about it in his

9    report and his testimony.  He says Veolia had been working in

10   Pittsburgh since 2012 on the same basic issues as Flint.

11   Namely the impact of lead service laterals, water that was

12   corrosive to lead pipes and high lead containing fixtures and

13   high lead levels in their drinking water.

14          THE COURT:  Okay.

15          MS. AIELLO:  The reality though, Your Honor, if I

16   may?  Sorry.

17          THE COURT:  Sure.

18          MS. AIELLO:  Is it's not the same situation.  You

19   know, the argument as to whether something was in scope or was

20   not in scope depends on the contract.  And it's an entirely

21   different contract.

22          THE COURT:  Well, here's what I'm going to do.  I'll

23   deny the motion without prejudice.  But the point is you

24   cannot bring in the litigation in Pittsburgh.  We're not going

25   to determine whether that came out right or wrong or what the

September 12, 2024                                                    87

 1      jury or the arbitrator did there.

 2              And so the litigation in Pittsburgh will help -- not

 3      help us regarding the scope of the contract in Flint because

 4      we'd have to look at the contract in Pittsburgh.

 5              If that's how you want to use your appreciates 90

 6      hours, we'll have a full trial of what happened in Pittsburgh.

 7      But I'm not going -- we actually won't.  Because I'm really

 8      granting the motion.  However, you can -- if Dr. Russell says

 9      that Veolia -- was it Fahey and Gnagy?  Were they also in

10      Pittsburgh?

11              MR. STERN:  I believe Chen --

12              THE COURT:  Chen.  Depin.

13              MR. STERN:  I believe Chen was in Pittsburgh.  But

14      irrespective, you have a document that Your Honor's familiar

15      with from Bellwether I where Marvin Gnagy discusses at the

16      Flint Water Treatment Plant with someone by his own testimony

17      that corrosive conditions exist.  He writes in his own

18      handwriting on a document that corrosive conditions exist.

19              Beginning in 2012 or since 2012, Veolia was working

20      in Pittsburgh on very similar issues including high lead

21      containing fixtures, high lead levels in their drinking water,

22      and water that was corrosive.

23              Veolia claims in this case that they had no

24      obligation to utilize the word lead in their final report, in

25      their interim report, and it's outside the scope.

1              THE COURT:  Correct.

2              MR. STERN:  So Russell can testify --

3              THE COURT:  Yes.  This is a motion about claims and

4       litigation and we're not going to relitigate Pittsburgh here.

5              MR. STERN:  Understood.

6              THE COURT:  So that's the part, that is granted.  And

7       if those documents related to experience and understanding of

8       lead corrosive water conditions are relevant, then they'll

9       come in.

10             MR. STERN:  Okay.  Thank you.

11             THE COURT:  Okay.  So now we are on 3057.  This

12      relates to the plaintiffs' motion to include all evidence,

13      testimony, or reference to convictions, indictments, or

14      charges of city and other officials, state officials or

15      employees.  And I've read this material.  And it's

16      interesting.  It's on both sides subtle.

17             And here is what I think we should do.  Plaintiffs

18      have made an argument.  Or I guess Veolia originally -- I

19      don't know where it all started -- but made an argument in

20      Bellwether I that when somebody's facing an indictment, they

21      have a likelihood of bias in their testimony because they are

22      desperate to avoid criminal conviction or charges if it's just

23      pending that they could be indicted or charged criminally.

24             And so they have a high motivation to have their

25      testimony come out favorably.  And they might bias their

1          testimony towards themselves improperly.  I agree.

2               But here -- so to the extent we're going to play

3      video testimony that was taken under those circumstances, I'll

4      have an instruction about at the time of this -- similar to

5      what we did.  So and so was facing charges.  Those have all

6      been dismissed.  That's so yesterday.

7               And but for live testimony, it is now going -- they

8      will be testifying in 2024 about something that happened in

9      2014 -- '13, '14, and '15.  We'll be lucky if they can

10     remember anything at all.

11              But I think it's so speculative that they would bias

12     their live testimony to match their prior video testimony

13     because they would fear prosecution for perjury.  That's a

14     whole different thing than prosecution for a homicide crime or

15     neglect of duty and things like that.

16              Because every witness has prior sworn testimony in a

17     civil case or nearly every witness does and every witness

18     could face the possibility of a perjury prosecution.  So I

19     don't think there's any need for live testimony to have

20     instructions about the indictments.

21              MR. NGUYEN-DANG:  Your Honor, just on that point

22     though.  But what if they are then impeached with their

23     deposition testimony?  Wouldn't it, at that point, be relevant

24     for the jury to know the circumstances under which that

25     deposition testimony was given?

September 12, 2024

```
 1          THE COURT:  It depends on the impeachment.  Because
 2    if they come in here and testify more -- deny responsibility
 3    even more than they denied responsibility in their video
 4    depositions when they were facing criminal charges or the
 5    possibility of them, then the impeachment is proper.  I mean
 6    the jury -- the indictments aren't the motivation for today's
 7    testimony.
 8          Let's get a list though, who do you plan to have here
 9    live and who are you planning to bring in by video.  Because
10    all the people have to be here live who are within the Court's
11    jurisdiction.
12          MR. STERN:  Based on what we've been told that
13    everyone that was under the indictment is going to be here
14    live to the extent they're called.
15          THE COURT:  Okay.  Well, then we don't have a
16    problem.
17          MR. NGUYEN-DANG:  But Your Honor, to that point
18    though, if their live testimony is inconsistent in the other
19    way, then perhaps -- then wouldn't the bias, the motivation
20    that occurred during the deposition be relevant at that point?
21          THE COURT:  Wait.  Say that again.
22          MR. NGUYEN-DANG:  Well, you gave the example, Your
23    Honor, if the person's live testimony was more -- a more
24    emphatic denial, what if it goes the other way?
25          THE COURT:  Well, then we have to look at 403 and
```

1    whether indication of the -- or bringing to the jury's

2    attention that these individuals were criminally charged is

3    more prejudicial than probative.  Is it going to confuse the

4    jury?  Why aren't you in prison?  I mean, it's -- so I think

5    there are 403 concerns then.

6         MR. NGUYEN-DANG:  All we ask is that, you know, you

7    defer that to the appropriate time.  I think it's a little

8    hard to do this in the abstract now.

9         THE COURT:  I'm happy to do that.  You can re-raise

10   this issue as needed.

11        MR. STERN:  Well, in the same way Your Honor just

12   granted the motion regarding the Pittsburgh documents and said

13   you'd be willing to consider at the time, we would hope that

14   you will grant this motion that we have filed, and at the

15   appropriate time the defendants can try and raise it again in

16   light of the 403 arguments as well as what Your Honor has just

17   described.

18        THE COURT:  That's what we'll do.  Okay.  So good.

19   I'm glad we'll have everybody live because the jury really did

20   not care for what they called "TV days" the last time around.

21   Okay.

22        So ECF Number 3058, the plaintiffs' motion in limine

23   to preclude testimony, evidence, and argument regarding

24   Dr. Sample's association with the Expert Institute.

25        The ruling here is that apparently Dr. Sample lists

1    herself with the Expert Institute as being available to

2    provide expert testimony.  There's nothing wrong with doing

3    that.  And I can't imagine what prejudice that would bring up.

4         So what I will allow is for VNA to say, and have you

5    testified -- the things people always say.  Have you testified

6    before as an expert?  Yes, I have.  And this many times.  And

7    do you list yourself as available for further expert

8    testimony?  Yes, I do.  And do you list yourself with a

9    company called the Expert Institute?  Yes, I do.

10        Then that's the end of it.  There's nothing more to

11   be said.  It's a very boring motion because it just doesn't --

12   it doesn't matter whether -- I'm sorry to say that your motion

13   is boring.  But it doesn't matter.  Expert Institute, you can

14   call it anything you want to call it.

15        So that one is denied.  But VNA is limited in what --

16   there's nothing to it.  There's nothing -- it's not

17   interesting.  It's not going to help the jury to know anything

18   more than she's an expert.  She's interested in developing

19   that part of her professional portfolio and so she lists

20   herself.

21        MR. STERN:  And by that --

22        THE COURT:  If it goes further that that , I'll shut

23   it down.

24        MR. STERN:  And on the other side of that coin, when

25   the defense experts are also listed as participants in the

```
 1    Expert Institute, then we're also permitted to ask it the same

 2    way?

 3              THE COURT:  Yeah.  Yeah.

 4              MR. STERN:  Okay.  Thank you.

 5              THE COURT:  Absolutely.  Okay.

 6              Now we're on 3059, VNA's motion to exclude evidence

 7    and testimony about the NSPE case study referenced in

 8    Dr. Russell's report.  This is the capital B capital E capital

 9    R, BER case study.  And is it the board of ethics review?

10              MR. TER MOLEN:  It is, Your Honor.

11              THE COURT:  Yeah.  That's what BER is.  Okay.  All

12    right.

13              So in terms of relevance, I find that it is relevant

14    for the reasons that I've previously ruled.  And so I don't

15    want to hear arguments on relevance.  In terms of hearsay, I

16    understand that VNA says the hearsay -- the case study is

17    hearsay under Rule 802.  Plaintiffs respond to that.  And so

18    I'm happy to hear some argument on hearsay.

19              MR. TER MOLEN:  Sure, Your Honor.  So I think -- this

20    is Mark Ter Molen --

21              THE COURT:  Yes.

22              MR. TER MOLEN:  For the record at least, Your Honor,

23    the -- I believe plaintiffs' primary argument on hearsay is to

24    assert that the exception in 803(18) applies, statements,

25    learned treatises, periodicals, or pamphlets.
```

September 12, 2024

1              And we would submit that this opinion, Your Honor,

2     which is specifically stated as just offered as guidance put

3     together by a committee of individuals five years after the

4     events in Flint, in which I know Your Honor's aware, the

5     hypothetical that they're -- the hypothetical facts they're

6     applying are similar to Flint except that they are similar to

7     LAN's role in Flint as opposed to VNA's.  And so it -- clearly

8     the reason that Dr. Russell is --

9              THE COURT:  But you have LAN as your nonparty at

10    fault.  Just --

11             MR. TER MOLEN:  I understand.

12             THE COURT:  Okay.

13             MR. TER MOLEN:  I appreciate that.  Dr. Russell is

14    clear in saying he intends to offer this opinion as

15    instructional, which I understand to mean he's offering it for

16    the truth of the matter asserted.

17             And so clearly it fits squarely within the hearsay

18    definition.  It's not a learned treatise in any context.  I've

19    not seen any case law cited by plaintiffs which reflects a

20    court allowing a jury to hear anywhere of an ethics

21    interpretation that's allegedly related to the conduct of or

22    going to be purportedly related to the conduct of one of the

23    parties at trial.

24             And so we would respectfully submit that this opinion

25    is clearly hearsay.  It is not a learned treatise , does not

 1    fit into that 803(18) exception and should not be admitted.

 2            THE COURT:  Okay.  And I've taken another look at

 3    that and I think that it does fall under the 803(18)

 4    exception.  That rule requires that something be established

 5    as a reliable authority.

 6            And the Board of Ethical Review is a panel of

 7    engineering ethics experts that has served as the profession's

 8    guide through ethical dilemmas.  And the board consists of

 9    seven licensed members who are appointed by the NSPE

10    president.

11            Their purpose is to render impartial opinions

12    pertaining to the interpretation of their code of ethics,

13    develop materials, and conduct studies relating to ethics of

14    the engineering profession.  And it's being offered in the

15    context of a professional engineer's expert report.  And it is

16    presumably has been subject to the scrutiny of the process

17    that I just discussed of the members of the Board of Ethical

18    Review.

19            And so it conforms to the standards set forth In re

20    Welding Fume that it's presumably subject to that scrutiny and

21    would likely encourage accuracy.

22            MR. TER MOLEN:  Your Honor, I would just --

23            THE COURT:  That case, the Welding Fume case says

24    that the basis for this learned treatise exception to the

25    hearsay rule is that learned treatises usually have sufficient

1    assurances of trustworthiness to justify equating them with

2    the live testimony of an expert.

3            First, authors of treatises have no bias in any

4    particular case.  And that's what the NPSE [sic] says they

5    are.  They're not on one side or another.  And second, they're

6    acutely aware that their material will be read and evaluated

7    by others in their field and accordingly feel a strong

8    pressure to be accurate.

9            So the other thing is that Rule 703 says that if the

10   probative value substantially outweighs prejudicial effect,

11   something can be relied upon and used.  And it's sort of --

12   it's a different formula than Rule 403.

13           But here, you have every opportunity to say this

14   isn't the role that VNA had.  And you could actually use it to

15   your advantage in your case.  But that's not the basis of my

16   ruling and I'm not offering you legal advice.

17           MR. TER MOLEN:  Thank you, Your Honor.  If I can

18   briefly make one additional point.

19           THE COURT:  Sure.

20           MR. TER MOLEN:  And that is that what's different

21   about this opinion versus the learned treatise, the document

22   said I would submit are contemplated to be subject to the

23   learned treatise exemption in 803(18) is that here we have

24   what is just that, an opinion.  It's an opinion and it's an

25   opinion that really goes, as Dr. Russell has used it, to the

1    ultimate conclusion of the case.

2            Was VNA negligent?  Did they breach their ethical

3    duty?

4            And it's in contrast typical documents for 803(18)

5    are going to be documents or materials or studies that are

6    being used as a steppingstone, a basis for an expert to reach

7    an opinion.  Not to basically just reiterate the ultimate

8    opinion in and of itself.  And that's really what is happening

9    here.

10           And to your point on 703, I would submit that the

11   undue prejudice substantially outweighs any probative value.

12   Because again, this is an opinion that wasn't crafted until

13   five years after VNA had left Flint.

14           The facts are only for VNA's purposes loosely related

15   to Flint.  And yet as Dr. Russell is going to spend or has

16   spend his interpretation of it is going to be unduly

17   prejudicial to VNA.  Again, in sounding as if there is some

18   other expert board out there which has made a determination

19   that VNA breached their ethical duties.  And that's just not

20   accurate.

21           MS. DALY:  Your Honor --

22           THE COURT:  Yes.

23           MS. DALY:  I was going to respond briefly.

24           THE COURT:  Sure.

25           MS. DALY:  To the learned treatise point.  The fact

1    that it's, as Your Honor explained, educational material.

2    There are codes of ethics.  And then in practice, engineers

3    need to know how to use them.  So the BRE [sic] issues,

4    advisory opinions that explain how these codes of ethics

5    appear and are triggered in real life.  And the BRE says

6    itself that it's an educational material.

7           That's exactly the type of document that the learned

8    treatise exception contemplates.  And Veolia raises the point

9    that they need to be binding.  That's not the case.  The

10   Michigan courts themselves define learned treatise as

11   nonbinding documents.

12          Courts have admitted in the Sixth Circuit documents

13   like training videos as learned treatise.  So the fact that

14   it's an educational material meant to explain the way that the

15   code of ethics works, works towards the fact that it's a

16   learned treatise, not against it.

17          Then secondly, as to the 703 prejudice argument, the

18   fact that this is -- looks similar to what happened in Flint

19   and is not about Veolia, as Your Honor said, they can fully

20   raise that.

21          And during Bellwether I, we cross-examined,

22   Mr. Maimon cross-examined one of LAN's experts with this

23   document.  It was permitted over objection.  And the expert

24   did an excellent job of saying, well, wait a minute, this is a

25   hypothetical.  This isn't about LAN.  And there's no doubt

1     that Veolia's experts can do the same.  And we believe that

2     cures any potential prejudice that might happen.

3             THE COURT:  Okay.  And thank you for the argument on

4     both sides.  And the BER study I think does fall under the

5     803(18) exception.

6             And one of the additional reasons is that Veolia or

7     Mr. Ter Molen you've cited the Wright and Miller to argue that

8     the exception is really meant for medicines, science, and

9     those types of treatises.  But Wright and Miller states that

10    the rule initially included language about history, medicine,

11    or other science or art.  But that was eliminated because

12    there was no -- that meant no real restriction at all.

13            And so what I have to look at is whether this is from

14    a neutral body with the mission that had a process in place to

15    ensure that it wasn't putting some biased material out to be

16    adopted and used and studied.

17            And everything that I've learned about the Board of

18    Ethical Review is that it functions in the way that we would

19    want something that would be unbiased and reliable to

20    function.  And it's a longstanding body within an established

21    professional organization.  And is -- therefore, falls under

22    the exception.

23            So moving on to 3060, which is plaintiffs' motion in

24    limine to preclude Veolia from introducing expert reports and

25    deposition testimony of Dr. Russell as evidence in the

September 12, 2024

1    nonparty case.

2           Let's see.  So plaintiffs begin by arguing that the

3    evidence is inadmissible hearsay.  And VNA says there are many

4    exceptions and exclusions that apply, including that this is a

5    report that plaintiffs have adopted.  Okay.

6           So looking at whether rule of evidence 801(d)(2)

7    makes this not hearsay, the statement has to be offered

8    against a party -- party -- opposing party, I'm sorry.  And be

9    one the party manifested that it adopted or believed was made

10   by the person whom the party authorized to make the statement

11   or was made by the party's agent or employee.

12          And so here is where we are.  Which is that it

13   certainly appears to me that plaintiffs manifested an adoption

14   of the truth of Dr. Russell's report.

15          Who's arguing this?

16          MR. OLSEN:  I am for the defense.  Or do you want to

17   start with --

18          THE COURT:  Yeah.  Let's start --

19          MR. STERN:  I am.

20          THE COURT:  Okay.  So go ahead, Mr. Stern.

21          MR. STERN:  There's relevant case law that says that

22   the fact that a party -- by designating him as an expert and

23   by serving reports from him and providing deposition testimony

24   in and of itself does not mount to an adoptive admission.

25          There's case law both from the District of Delaware

September 12, 2024

```
1    as well as in the Eastern District of Michigan that says that
2    none of these actions are enough, however, to show that
3    plaintiffs adopted any specific statement in the expert
4    report.
5            Despite the fact that one party retained and paid for
6    the services of an expert witness, expert witnesses are
7    supposed to testify impartially in the sphere of their
8    expertise.
9            And so just the very fact that plaintiffs hired
10   Dr. Russell or that he testified about certain parts of
11   reports related to un -- you know, non Veolia defendants
12   previously doesn't turn them in to adoptive admissions.  And
13   so 801(d)(2)(B) is not met.  It's not an adoptive admission of
14   the party.
15           THE COURT:  Okay.
16           MR. OLSEN:  Would you like me to respond, Your Honor?
17           THE COURT:  Please.
18           MR. OLSEN:  So as you correctly noted, 801(d)(2)
19   provides three independent bases that would be a hearsay
20   exception.  The one that Mr. Stern just referenced to,
21   whether it's adopted or believed to be true.  And the answer
22   is yes.
23           When you offer an expert report and then have that
24   expert offer opinions at trial, the party has clearly
25   manifested that it adopted or believed this witness'
```

September 12, 2024

1    testimony.  It is an adoptive admission.  I think it meets,

2    by the way, each of those three standards or was made by a

3    person whom the party authorized to make a statement on the

4    subject.

5         Clearly Dr. Russell was a person that plaintiffs

6    authorized to make these statements in his expert report and

7    he was a party's agent.  And so I think each of those three

8    independent reasons is clearly met here.

9         The case law that Mr. Stern cites, primarily Kirk,

10   Kirk was dealing with a party seeking to introduce statements

11   from an expert in separate and unrelated litigation.  And they

12   were saying -- they addressed the agency point.  They did not

13   even address whether or not it was or was not an adoptive

14   admission in that case.

15        And the other cases that plaintiffs cite are citing

16   Kirk and typically dealing when you're -- when we're offering

17   the same party's expert report as opposed to the opposing

18   party's expert report.

19        So I think here, and there's case law in many of the

20   circuits that support this and have concluded that experts'

21   deposition and testimony are, in fact, adoptive admissions.  I

22   think it clearly means each of those independent bases to

23   declare it as non hearsay.

24        MR. STERN:  Judge Levy, the seven bellwether

25   plaintiffs didn't adopt those reports.  There's a separate

September 12, 2024

1    report in this case from Dr. Russell that has nothing to do

2    with LAN or the EPA or the State of Michigan.

3           So on the one hand, Veolia doesn't want the jury to

4    know about 30,000 claims and prior trials and other lawsuits.

5    But on the other hand, they want to place on these seven

6    plaintiffs as adoptive admissions reports from other cases.

7    The reports in this case have nothing to do with the other

8    defendants.

9           THE COURT:  So the report in Bellwether III claims --

10   contains no information about LAN or any other defendant.

11          MR. STERN:  It doesn't provide criticisms or opinions

12   about the violations of the standard of care.

13          THE COURT:  What was that?

14          MR. STERN:  It doesn't contain expert opinions

15   related to violations -- it does for LAN.  It does for LAN

16   because prior to LAN being dismissed from the case as a result

17   of the settlement, we were unaware.  And so he does include in

18   his initial report some things about LAN.

19          MR. OLSEN:  And it's broader than that.  It was made

20   by a person whom the party authorized to make a statement on

21   the subject or was made by a party's agent or employee within

22   the scope of that relationship.  It's not a specific statement

23   that's relevant.

24          And as to whether it was specifically adopted by this

25   particular plaintiff, the case law that plaintiff cited are

September 12, 2024

1       talking about reports in completely unrelated litigation.

2               There are a number of cases in various circuits --

3       and just the face of the rule itself makes clear that

4       Dr. Russell's opinions with respect to these nonparties at

5       fault fall within each of those.  I mean, we'd further say you

6       could go through it as prior inconsistent statements by simply

7       asking them those questions on a cross --

8               THE COURT:  Slow down.

9               MR. OLSEN:  Sorry.  I will, Your Honor.  Thank you.

10              You can simply ask him do you believe X on

11      cross-examination.  And if he says no, you can impeach him

12      with the very same statements.

13              I don't think we should have to go through that

14      process because they meet the standard that's outlined here in

15      Rule 801(d)(2).  But you get to the same place.

16              THE COURT:  Yeah.  I think in this case that the

17      decision in Mann M-a-n-n v Lincoln electrical company, a

18      Northern District of Ohio decision in 2010 found that if

19      someone is designated as an expert at the start of trial,

20      their prior statements are opposing party admissions under

21      802(d)(2)(C).

22              And so I think that he Dr. Russell's opinion comes in

23      with respect to LAN.  And that I also think in this regard

24      that the jury instruction regarding settlements is very

25      important and that it's only reasonable if you're going to

September 12, 2024

105

1    talk about his opinion regarding LAN that the jury understands

2    why they're not here.

3         And so they would need to know that LAN settled.  And

4    that's why they're not here.  So it cannot come in without

5    that context.

6         MR. OLSEN:  Your Honor, just to be clear, it's not

7    just LAN, it's also the EPA's offered opinions about the EPA.

8    We would make the same exact arguments.

9         THE COURT:  I -- you know, with respect to the EPA, I

10   looked at that under the residual exception to the hearsay

11   rule.  That's how you had presented it.

12        MR. OLSEN:  Or prior consistent statements through

13   impeachment on cross-examination.

14        MR. STERN:  But on cross-examination, if we don't ask

15   him about the EPA --

16        THE COURT:  Yeah.

17        MR. STERN:  -- there's nothing to cross him on --

18        THE COURT:  No.

19        MR. STERN:  -- and so there's nothing to impeach him

20   on.

21        THE COURT:  No, exactly.  So it could only come in

22   through the residual exception, so.

23        And so we'll just -- and EPA has not settled.  So

24   we'll let the jury know that there will be a separate --

25   there's a separate case involving the EPA that's not a part of

September 12, 2024

1      this case.

2              MR. OLSEN:  We'll work with other side on crafting

3      something, because the EPA's part of this case, but --

4              THE COURT:  Part of this case as your nonparty case.

5              MR. OLSEN:  Right.

6              THE COURT:  But it's not part of plaintiffs' case.

7              MR. OLSEN:  I agree.

8              THE COURT:  Okay.  3062, VNA's motion to prohibit

9      improper jury argument.  Is there anything outstanding in this

10     or is it resolved?

11             MR. STERN:  I mean, Your Honor dealt with this at the

12     Bellwether I trial.  And I think you may regret it, but you

13     sat through six and a half months of the Bellwether I trial

14     and none of the potential arguments that have been raised in

15     here were ever made by the plaintiffs during that case.

16             You know this is another kind of Corey Stern motion

17     about all the terrible, you know, things that I say or do from

18     their perspective in a deposition.

19             But to the extent that there's any issue about what

20     may or may not be said at trial, prohibiting such broad, you

21     know, making such a broad prohibition on something that's

22     never occurred before Your Honor in front of a jury just seems

23     honestly fairly ridiculous.

24             And as you did the last time, if you'd like me to go

25     through or our side to go through each of these things and

September 12, 2024

107

 1    swear on a bible that we're not going to do them --

 2          THE COURT:  No.  I'm just trying to figure out how to

 3    rule on it.  That's all.

 4          MR. STERN:  I mean, we have no intention of doing

 5    these things.

 6          THE COURT:  Okay.  And then on the whether VNA

 7    conspired with the city, that will be prohibited from being

 8    mentioned in opening.  If you have evidence that there was a

 9    conspiracy, you can certainly bring that evidence in.  But I'd

10    have to rule on that at the time that you have -- that you

11    present that.

12          And I do recall one improper closing argument.  I

13    believe that LAN argued that plaintiffs' counsel was going to

14    go into the parking lot and give high fives when they got

15    money.  And that is an improper attack on counsel.  And so I

16    will be very carefully listening for all of those types of

17    things.  So in terms of improper jury arguments, please

18    remember that is also improper.

19          So now we're on 3056, VNA's motion to exclude

20    evidence about claims and lawsuits that -- have we already

21    talked about this?

22          MR. STERN:  We did.

23          THE COURT:  We talked about this.  Not going to talk

24    about it again.  I promise you.  We're at 63.  3063.  Okay.

25          This is about VNA's motion to prohibit plaintiffs

September 12, 2024

1    from requesting a specific amount.

2           Mr. Stern, are you arguing?

3           MR. STERN:  It's my better half.

4           THE COURT:  You're arguing, Ms. Daly?

5           MS. DALY:  Yes, Your Honor.

6           THE COURT:  Okay.  Are plaintiffs planning to ask for

7    a sum certain?  Are you requesting to ask for a sum certain at

8    trial?

9           MS. DALY:  At this time, we're requesting to leave

10   the option open to make the decision before the closing.  And

11   the reason for that, Your Honor, is noneconomic damages, as

12   the courts in the circuit acknowledge, are hard to calculate.

13          And part of the evidence that goes into deciding

14   whether you're going to request a specific amount or a range

15   or something similar to what we did last time has to do with

16   the evidence that comes in at trial.  The evidence based on

17   the plaintiffs' parents, how they explain how the injuries are

18   impacting the children's lives.

19          So at this point, what we're requesting is for the

20   opportunity for the option to be open.  And the Sixth

21   Circuit --

22          THE COURT:  Do you have a single case that suggests

23   that that's proper?

24          MS. DALY:  Calaway v Schucker, the Sixth Circuit --

25   sorry.  The Western District of Tennessee from 2013 talks

September 12, 2024

109

```
 1    about how the Sixth Circuit has refused to put a blanket
 2    prohibition on allowing plaintiffs to suggest a sum or a per
 3    diem argument and explains that it's in Your Honor's province
 4    to permit such a thing as long as the Court feels that it
 5    would not result in a manifest injustice.  So it grants the
 6    Court a large discretion and --
 7          THE COURT:  But Calaway says that the court is to
 8    look at, one, the strength of the evidence of the defendant's
 9    liability and whether defendant contests either the nature and
10    character of plaintiffs' injuries or their permanent effect on
11    him both as to his earning capacity and his past, present, and
12    future pain and suffering.  And it is contested here.
13          MS. DALY:  You're exactly right that Calaway lists
14    those two factors.  However, the way that the case explains
15    those factors are not as a mandated rule for you must have
16    this and that.  It was giving examples of things that might
17    guide the Court to decide a manifest injustice.
18              And in that case, the court actually punted the
19    question to the end of the trial and said because it is so
20    dependent on the evidence that comes in, that will be a more
21    appropriate time to decide whether a specific amount or a
22    range would be appropriate.  And so --
23          THE COURT:  And how is this consistent with Federal
24    Rule of Civil Procedure 37 that requires you to provide this
25    evidence with a basis for the number?
```

```
 1            MS. DALY:  Yes, Your Honor.  So Rule 37 relates to

 2    the disclosures you're supposed to make in accordance with

 3    Rule 26, as I'm sure you know.  And the case law -- and this

 4    is, to be transparent, a very contested issue amongst

 5    circuits.

 6            But in the Sixth Circuit, the district court cases

 7    have decided that noneconomic damages are exempt from the Rule

 8    26 disclosure requirement for the very reason that it is very

 9    difficult to calculate those types of damages.  So we're not

10    going to put on parties the requirement that they give either

11    a calculation or an amount with the Rule 26 disclosures.

12            And the case law that we cited in our brief, five or

13    six cases, explains that these district courts have found that

14    those types of disclosures are exempt from Rule 26.

15            So that, hand in hand with Calaway and the Sixth

16    Circuit's case that Calaway cites which says that plaintiffs

17    are not prohibited from such a choice in the Sixth Circuit

18    and, that it's in the judge's wheelhouse to decide based on

19    the evidence that comes in.  That's the basis for our

20    request --

21            THE COURT:  Okay.

22            MS. DALY:  -- that you keep this open at this time,

23    Your Honor.

24            MS. AIELLO:  And Your Honor if I may respond?

25            THE COURT:  Yes.
```

1        MS. AIELLO:  So we are not -- plaintiffs' counsel

2    just talked about Rule 26.  I mean, I think the case law is

3    pretty clear that if you do not -- it's not saying that if you

4    don't disclose a computation for noneconomic damages that you

5    then can't seek them.  It's saying that you cannot not

6    disclose an amount and then also say an amount to the jury.

7    And so you know it's patently unfair.

8        You know, Your Honor has acknowledged, plaintiffs

9    have acknowledged that noneconomic damages are very hard to

10   calculate.  And even more strangely, they've actually said in

11   their briefing that -- that requiring a computation for

12   noneconomic damages defies logic.

13       And so you just -- I think you -- what the case law

14   is clear is that plaintiffs can't have it both ways.  They

15   can't say they can't give us a number because that would defy

16   logic and it's subjective.  And then also give a number to the

17   jury without giving us an opportunity to test the basis of

18   that and to at least have knowledge of it in discovery.

19       THE COURT:  Okay.  Here's what I will do here, which

20   is that if plaintiffs wish to disclose the amount that you'll

21   be asking for from the jury, you will need to do that before

22   trial with the basis for that.

23       And the basis can be the mother's testimony, the

24   father's testimony, the childcare provider's testimony.  It

25   can be that's the basis.  Because these are difficult things

September 12, 2024

```
 1    to calculate.  But the opposing party has a right to know what
 2    they're up against and what they're trying to show to the jury
 3    as well.
 4            So either disclose the calculation along with the
 5    basis for it -- and the basis doesn't have to be deposition
 6    page and line.  But generally speaking, who are the witnesses
 7    who will support this.
 8            And second of all, if you choose not to do that, then
 9    you would be prohibited from mentioning a sum certain to the
10    jury.  And these are hard decisions to make, but that's why
11    you're here.
12            MR. STERN:  Your Honor, may I ask just a quick
13    question about that?
14            THE COURT:  Yes.
15            MR. STERN:  If you'll recall during the Bellwether I
16    closing, Mr. Maimon, he -- he did the closing portion related
17    to damages.
18            And one of the things that Mr. Maimon did was not
19    suggest a sum certain, but rather put it in the hands of the
20    jury to say I don't know if it's $500,000.  I don't know if
21    it's a million dollars.  It's in the province of the jury to
22    decide and that's for you and you only to decide.
23            THE COURT:  And if that's what you want to do this
24    time, you have to tell --
25            MR. STERN:  Okay.
```

September 12, 2024

113

1          THE COURT:  -- VNA that that's what you want to do

2    and where you got the 500 or the 1 million.

3          MR. MAIMON:  If I can -- since I did it, Your Honor,

4    and may do it again.

5          THE COURT:  Yes.  But move the microphone.

6          MR. MAIMON:  I'd just like for clarification.

7          Obviously when a lawyer gives a closing argument, he

8    or she is bound by the record at trial.  Not what happened

9    before trial.  But is bound by the record at trial.

10         And therefore, sometimes the evidence comes in

11   differently at trial than I anticipate or the other side

12   anticipates, but still our argument in closing argument is

13   restricted to the trial record, not anything else.

14         And therefore, you may say, well, I thought I was

15   going to be able to ask for this because of an anticipated

16   testimony from a witness.  But the witness didn't give that

17   testimony.  And therefore I can't do this.  I have to do

18   something differently.  I think that this type of a motion and

19   this type of a requirement works against the obligations that

20   the lawyer has in giving a closing argument on the record.

21         THE COURT:  I think that's a very good point.  So

22   what I would do is give a starting number of what you think

23   the testimony will show now, which is all that Rule 26 and 37

24   ask of you.  And then if the testimony comes in stronger or

25   weaker, you'll adjust up and down from there.

September 12, 2024

1        MR. MAIMON:  Thank you, Your Honor.

2        THE COURT:  Yeah.

3        MS. AIELLO:  Your Honor, just to reiterate, you know,

4    the fact that we're not going to be getting a number

5    potentially until closing, I mean, there is no --

6        THE COURT:  No, you're going to get a number.  If

7    they want to use a number, you'll get it before the final --

8    it will be in the final pretrial order.  It has to be.

9        MS. AIELLO:  But the number could be exponentially

10   higher just depending on plaintiffs' counsels' interpretation

11   of how the evidence comes in?

12       THE COURT:  If the evidence comes in differently than

13   anticipated, then they'll update you soon thereafter, but

14   before the closing.

15       MR. MAIMON:  The only thing I don't want to face,

16   Your Honor, because we're going to be acting in good faith is

17   an argument that the number that we said pretrial is somehow

18   an adoptive admission of our client was they can then turn

19   around and say well the plaintiff was going to ask for this,

20   but now they're asking for something differently.

21       THE COURT:  No.

22       MR. MAIMON:  This is our attempt to --

23       THE COURT:  No.  Because before closing, if you're

24   going to update the number, you'll let opposing counsel know

25   what your updated number is.

September 12, 2024

1        MR. MAIMON:  Right.  We just don't want to have --

2        THE COURT:  No.

3        MR. MAIMON:  -- the original number --

4        THE COURT:  And they can't say here's the final

5   pretrial order and you said 2,000 in here.

6        MR. MAIMON:  Okay.  Thank you, Your Honor.

7        THE COURT:  Right, Ms. Aiello?

8        MS. AIELLO:  Yes, that's right.  I was just going to

9   say, you know, there is -- plaintiffs' counsel is not required

10  to give a number to the jury.  They don't have to.

11       THE COURT:  No, but they might want to.

12       MS. AIELLO:  Right.

13       THE COURT:  And that's their case.

14       MS. AIELLO:  But if they want to, then we should have

15  had an opportunity to test the basis for that.

16       THE COURT:  I just granted you that opportunity, if

17  I'm not mistaken.  So you've just --

18       MS. AIELLO:  And just to -- one more thing to say.

19  We -- they were supposed to give us that opportunity in

20  discovery --

21       THE COURT:  But I understand --

22       MS. AIELLO:  -- and we'll now be getting it either

23  right before trial or in the middle of it.

24       THE COURT:  Correct.  Thank you.  Okay.

25       So now we're on ECF Number 3064, VNA's motion to

1    prohibit plaintiffs during cross-examination of VNA's

2    witnesses from introducing other evidence that has not been

3    disclosed or authenticated.

4         There's reference to two items that were used over

5    the course of a six-month trial.  I don't know if those

6    documents are going to be used in this trial.  But I can't

7    make a blanket -- one of them I believed was very close to a

8    -- it was a CDC document, if I'm not mistaken.  Yes.  On blood

9    lead reference values.  And I allowed it in.  Okay.

10        Who knows if that was -- I took judicial notice that

11   it had come from that website.  Okay.  That might have been

12   right.  It might have been wrong.  And the fact that there's

13   an entire motion over these two exhibits is not helpful to our

14   process.

15        We're trying to get things done effectively and

16   efficiently and I just can't make a broad ruling like that.  I

17   don't know what might come up in this trial.  But are you

18   aware -- is it Mr. Ter Molen now?

19        MR. TER MOLEN:  It is, Your Honor.

20        THE COURT:  Yeah.

21        MR. TER MOLEN:  And I agree that this is a motion

22   that we would have preferred not to bring, but we did not get

23   agreement from plaintiffs' counsel on sort of what an

24   understanding is of the rule.  And so that's why we brought

25   this motion.

September 12, 2024

1    But the gist of it is, again, to avoid trial by

2  ambush, to have plaintiffs trying to bring in documents that,

3  for whatever reason, they didn't bring in during their case in

4  chief but which are clearly documents that if they want to

5  rely on them and have them admitted affirmatively as evidence,

6  they should have brought it in their case in chief as opposed

7  to trying to get it in through cross-examination.

8    THE COURT:  Okay.  So what I'll do --

9    MR. TER MOLEN:  So we'll certainly be able to --

10  sorry.  Go ahead.

11    THE COURT:  I'll ask the plaintiffs to include those

12  two documents in case you want to use them in your final

13  pretrial order list of exhibits.

14    MR. STERN:  I just want to note that both documents

15  that were cited by the defendants as the basis for their very

16  broad motion were used for purposes of impeachment, which is

17  an exception to the very rule that the Veolia defendants are

18  citing as to why nothing should be allowed.

19    And so it's not to back -- it's not to bootstrap

20  documents into a case that were not provided as part of the

21  case in chief or part of the pretrial order.  It's just to

22  impeach a witness that's on the stand, which is completely

23  permissible under the rules.

24    And if Your Honor were to go back and look at the

25  transcript, it would be noted during the portion of the trial

September 12, 2024

1   where they objected to those documents by Mr. Maimon on the

2   record that they were being used for impeachment.

3          THE COURT:  That's okay.  I don't want to relitigate

4   that.  Okay.

5          So the motion is denied without prejudice should

6   something come up that needs to be addressed during trial.

7          MR. TER MOLEN:  Thank you, Your Honor.

8          THE COURT:  Good.  So that concludes -- have I missed

9   any of the motions in limine?

10         MS. DALY:  No, Your Honor.

11         MR. OLSEN:  I don't think so, Your Honor.

12         THE COURT:  All right.  Good.

13         So let's talk briefly about some of the housekeeping

14   issues.  And the first is that the clerk's office has

15   instructed us that instead of picking a different case number

16   for trial docketing purposes, we should from here on out have

17   all bellwether trials on 16-10444 because the full record will

18   be there for appeal and we wouldn't want to ask the Sixth

19   Circuit to look at two dockets.

20         MR. STERN:  In fairness, I think that all of the

21   documents that were associated with Bellwether I were in

22   17-10164.

23         THE COURT:  Exactly.  They were but -- I'm not going

24   to have them all re-filed onto 10444.

25         MR. STERN:  Okay.

September 12, 2024

119

1          THE COURT:  And now all of these motions in limine

2     and experts are in 10444.  So we just decided to cut our

3     losses and put everything from here on out in Bellwether III

4     and so on to this docket.

5          MR. STERN:  Okay.

6          THE COURT:  So I wanted to talk about days off that

7     I'm aware of so far.  I might have mentioned these before, but

8     I want to mention them again, and find out if there are any

9     extraordinary days off that all of you need.  And days on.

10          So we'll start with jury instructions -- or jury

11     selection on October 8, 9, 10, 11.  Lawyers and clients at

12     8:30 in the morning.  The jury should be brought in close to

13     9.  And so we'll go 9:00 AM to 4:00 PM each of those days with

14     a lunch break.

15          October 15, we'll have 9:00 AM to 2:00 PM.  And if we

16     have a jury by then, I'll do those early instructions.  I

17     don't want opening to be split.  I want the opening to be on

18     the same day.  So we'll just take that day by day after that.

19          MR. STERN:  What was that day that you said until

20     2:00?

21          THE COURT:  The 15th only until 2:00.

22          MR. STERN:  Okay.

23          THE COURT:  I think that's a day I have to be at a

24     meeting in Detroit.  Let me just make sure.  Oh.  No, it's a

25     hearing.  Okay.

September 12, 2024

120

```
1              So my goal with would be that opening is two hours or
2       less.  Is that doable?  Or what are you requesting with
3       respect to opening?
4              MR. STERN:  Per side?
5              THE COURT:  Per side.
6              MR. STERN:  We can --
7              MR. MAIMON:  Does anyone know what you we did last
8       time.
9              THE COURT:  Jeseca might.
10             MADAM COURT REPORTER:  It was just over an hour for
11      everyone.
12             THE COURT:  Really?  Each side?
13             MADAM COURT REPORTER:  Yeah.  It was hovering right
14      around an hour.
15             MR. OLSEN:  I certainly can do it in two hours or
16      less, Your Honor.
17             MR. MAIMON:  Two hours is fine, Your Honor.
18             THE COURT:  Okay.  So we're then -- thanks, Jeseca.
19             We're seating 10 jurors.  Three peremptories for VNA
20      and six for plaintiff.
21             MR. OLSEN:  Why would there be a different number of
22      peremptories?
23             THE COURT:  They have seven parties and you have one.
24      Then the days off that I'm looking at -- let me get my
25      calendar.
```

1          MR. OLSEN:  Your Honor, can I --

2          THE COURT:  Yeah.

3          MR. OLSEN:  We had two defendants last time and they

4    had -- we had equal --

5          THE COURT:  And they had four.

6          MR. OLSEN:  And it was equal, wasn't it, in terms of

7    peremptories?

8          MR. STERN:  I think there were four defendants.  It

9    was equal because there were LAN and LAD.

10          THE COURT:  You had LAD and there was still a case

11    against LAD separate from LAN.  LAD -- I think there were

12    three defendants.  LAD, LAN, and VNA.

13          So trial -- so October 14 is Indigenous Day.  That --

14    and the Court's closed.  October 24.  I'm sorry.  What's

15    October -- yeah, October 14.  Is that -- the 24th, I'm not

16    available.  I'm inclined to cancel on election day so that

17    everybody can vote.

18          MR. STERN:  Is that the 11th?

19          THE COURT:  It's November 5.

20          MR. STERN:  November 5.

21          THE COURT:  Have you not heard we have an election

22    coming up?

23          MR. STERN:  I'm aware.

24          THE COURT:  Okay.

25          MR. STERN:  I just saw on your schedule November 11

September 12, 2024

1    and so --

2              THE COURT:  November 11 is Veterans Day.

3              MR. STERN:  Got you.

4              THE COURT:  Then November 27, 28, and 29, which is

5    Wednesday through Friday, for Thanksgiving.  And then

6    December 23 to January 2 would be days off for the holidays.

7    I can't see the point in bringing jurors back for a day or

8    two.  And then -- if necessary, January 20 is --

9              MR. STERN:  MLK.

10             THE COURT:  Is that MLK Day?  Yeah.  We're closed.

11             MR. STERN:  So the only date that's different from

12   what Mr. Mayer provided to us is the November 5 election?

13             THE COURT:  Right.  Okay.  So we have the protocol

14   for keeping track.  Each side is responsible for keeping track

15   of the number of hours.  90 for plaintiffs.  95 for

16   defendants.  You're not required to use them all.  And you

17   also cannot speak at double time to make it.  Okay.

18             And voir dire is excluded from that.  Motions that

19   are heard outside the jury's presence are excluded.  An

20   objection will stop the clock for the person who's brought the

21   witness in.  And it will start the clock for the opposing

22   side.

23             And the deposition objections, did we already send

24   you an email asking for the first three?

25             MR. STERN:  Yeah.  Yes, Your Honor.

September 12, 2024

123

```
1              THE COURT:  Do we know who the first three video?

2              MR. STERN:  We do.  So we're only using two video

3    depositions, Your Honor, for the entire -- as of now for the

4    trial.

5              THE COURT:  Okay.

6              MR. STERN:  One is Depin Chen and the other one is

7    David Gadis.  And I believe that Ms. Devine informed us this

8    morning, since you asked for three, that their first

9    deposition playing is Mr. --

10             MS. DALY:  Workman.  Mr. Workman.

11             MR. STERN:  Workman.  Wayne Workman.

12             THE COURT:  It's a riveting witness.  Okay.  Then

13   I'll start with those.  But what -- I'm not starting right

14   away because there's still decisions in this case and others

15   to be made.

16             And what I'll do is rule on them as I can, get them

17   back to you for editing.  If it looks like I'm going to get

18   backed up, I'll refer them to the Magistrate Judge

19   Elizabeth Stafford, for her to rule on them and provide them

20   to you.

21             MR. STERN:  Judge, I can tell you for Mr. Chen and

22   for Mr. Gadis, plaintiffs did not designate anything new that

23   was not ruled upon by Your Honor previously in the first

24   bellwether case.

25             THE COURT:  Okay.
```

September 12, 2024

124

```
1          MR. STERN:  And so, in fact, I think we may have
2    limited some of that testimony.  But at most, it's exactly
3    what was designated last time.
4          THE COURT:  Okay.  So now we just have to look at --
5    the final pretrial conference is when?  Does anybody know when
6    it is?
7          MS. DALY:  Currently the 23rd and the 24th is what
8    Your Honor had.
9          THE COURT:  And in light of the fact that we got
10   through these motions, I don't think we'll need more than a
11   couple of hours for it.  Are there -- is there -- do you
12   anticipate there being a lot to review?
13         MS. DALY:  You also set that time aside for the jury
14   instructions and the verdict form, so.
15         MR. STERN:  I think the majority of the content -- to
16   the extent there's, you know, mature expected contentiousness
17   about some of this, it's more about the jury instructions and
18   the verdict form than it is about the pretrial order other
19   than those two things.
20         THE COURT:  Okay.  And I'll be getting that on Monday
21   the 16th.
22         MR. OLSEN:  There could be other pretrial matters.  I
23   assume, I hope we're going to agree on things like time
24   periods for the witness disclosures and document disclosures.
25   But I assume we would raise those at the pretrial if we don't
```

September 12, 2024

```
 1    agree.  I can't imagine it will take a lot of time.

 2              On the complaint issue we decided the protocol with

 3    today.  I don't know if you'll want to take that up or do you

 4    want to rule without argument.  However you want to proceed.

 5    But with we could do that at that time, too.

 6              THE COURT:  Yeah.  I might.  I jus -- I'll have to

 7    look at it.  So we'll just keep those dates.  But that would

 8    be an in-person hearing on September 23.  Let's have it start

 9    -- does it help you flight-wise if we start at 11:00?

10              MR. STERN:  We've been coming in the night before.

11    So the earlier we start, we would prefer.  But if others

12    feel --

13              MR. OLSEN:  We'll be in the night before as well.

14              THE COURT:  Okay.  Then we'll do 10:30.  All right.

15    Anything else?

16              MR. OLSEN:  Your Honor --

17              MR. STERN:  May I ask one question about the pretrial

18    order?

19              THE COURT:  Yes.

20              MR. STERN:  There's been some back and forth about

21    the statement of the case.  We were trying to remember if --

22    is the statement of the case something that you read to the

23    jury?

24              THE COURT:  Yeah.

25              MR. STERN:  Okay.  That's what --
```

September 12, 2024

 1          THE COURT:  I just want to insert it in -- basically

 2    we already have it.  Because I'll read it -- the jurors are

 3    coming in, is it the 18th and 19th.  And I'll be reading it,

 4    the one that you've already given me.

 5          MR. STERN:  Which -- what did we --

 6          THE COURT:  It's a short statement of the case.  I've

 7    got it right upstairs on my desk.

 8          MR. MAIMON:  I think it's different than what goes --

 9    I think it's different than what goes into the final pretrial

10    order.  The final pretrial order is voluminous as far as--

11          THE COURT:  Yeah.

12          MR. MAIMON:  -- what the rule calls for as a

13    statement of the contentions of the parties.

14          THE COURT:  What the rule calls for.  You're right.

15    You're right.  So the statement of the case I've got is like

16    three sentences.

17          MR. STERN:  Yes.

18          MR. MAIMON:  Right.

19          THE COURT:  You know, I really don't understand why

20    it matters that much to have a voluminous thing in the final

21    pretrial.

22          MR. MAIMON:  It doesn't matter to us.  We just --

23          THE COURT:  It doesn't matter to me.

24          MR. OLSEN:  We just want to be clear they weren't

25    going to be read to the jury.

September 12, 2024

127

 1          THE COURT:  No.  And the other thing is when it says

 2    what are fact issues and what are legal issues, it's -- that's

 3    a hard thing to figure out.  So just put it wherever you want.

 4          MR. MAIMON:  Thank you, Your Honor.

 5          THE COURT:  I don't care.  You can just combine those

 6    and put issues of fact and law to be tried.

 7          MR. OLSEN:  One other issue for us, Your Honor.  I

 8    want to respectfully request you reconsider the imbalanced

 9    peremptories.

10          We have cases all the time with multiple parties.

11    Usually that works with the defendants having more parties and

12    the defendants share peremptories because their interests are

13    aligned.  And both sides have the same number of peremptories.

14          Here, clearly the seven bellwether plaintiffs'

15    interests are aligned.  And giving plaintiffs double the

16    peremptories than the defendant seems fundamentally unfair.

17          THE COURT:  Okay.  I'll give it some thought.  Thank

18    you.

19          MR. OLSEN:  Thank you.

20          THE COURT:  Anything else?

21          MR. TER MOLEN:  Your Honor, just briefly on some

22    maybe kind of mundane stuff.

23          THE COURT:  Sure.

24          MR. TER MOLEN:  That carryover from the last trial,

25    just I think we had a practice of agreeing that Thursday

September 12, 2024

```
 1    afternoon, the party who was going to be preceding the
 2    following week would identify the witnesses they plan to call
 3    for the following week.  I haven't had a chance to talk to
 4    plaintiffs' counsel.  But assume we'll follow the same
 5    process.  Just wanted to raise that.
 6              THE COURT:  I think those are the things you'll try
 7    to agree --
 8              MR. MAIMON:  I thought Mr. Olsen said we would
 9    discuss that.
10              THE COURT:  Yeah.
11              MR. TER MOLEN:  I'm sorry.  My bad.
12              THE COURT:  Yeah.
13              MR. TER MOLEN:  And just more in the purview of
14    the Court, Your Honor, is just the kind of the courtroom
15    protocol.
16              THE COURT:  Yes.
17              MR. TER MOLEN:  Here from the last trial, obviously
18    it was still sort of COVID and there were some processes in
19    place.
20              THE COURT:  Right.
21              MR. TER MOLEN:  But as far openings, allowed to
22    stand?
23              THE COURT:  Yes.
24              MR. TER MOLEN:  And with witnesses here, do you, just
25    protocol-wise, stand at a podium?
```

September 12, 2024

1           THE COURT:  Yes.

2           MR. TER MOLEN:  Okay.  Terrific.

3           THE COURT:  That's all agreeable.  You don't have to

4    do it, but you can if you want.  The podium moves.  And the

5    only thing you can't do is touch the jury box when you're in

6    the well of the courtroom because I consider that an extension

7    of the jury.  And that's about it.

8           MR. TER MOLEN:  Okay.  Thank you.

9           THE COURT:  Okay.

10          MR. OLSEN:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. MAIMON:  One or issue, and maybe this is

13   something, Your Honor, that we can discuss at the final

14   pretrial conference.  And it struck us when we were discussing

15   the trial, the last trial and then looking forward here.

16          One of the things that obviously is in the

17   instructions, both preliminary and then final, is the issue of

18   jury note taking.

19          THE COURT:  Right.

20          MR. MAIMON:  Last time we discussed, although we

21   didn't -- it didn't get into practice, the ability of jurors

22   to ask questions to submit questions.

23          THE COURT:  Right.

24          MR. MAIMON:  I think that one of the lessons that we

25   learned is that this is highly technical stuff and sometimes a

September 12, 2024

130

1    juror may not be clear about what a witness said or what a

2    word meant.  And I think that -- I would -- I think that we

3    would be in favor of allowing jurors to submit questions to

4    the Court for --

5           THE COURT:  That's what I'm going to do.  Thank you

6    for bringing that up.

7           Ever since that trial, I've had quite a few trials.

8    And in all of them, I have allowed the jurors to ask

9    questions.  And I create a piece of paper that they have to

10   put it on.  They have the case caption.  And then it says

11   question.  And I read an instruction to them saying that they

12   will be allowed to write a -- they cannot just put their hand

13   up and ask a question.

14          They can write it down.  But they should not pass

15   it forward to the law clerk or Bill or anyone until that

16   witness has had complete cross -- direct, cross, recross,

17   etcetera, redirect, etcetera, until that witness' testimony is

18   complete.

19          Then if they still have the question, pass it to me.

20   I'll read the question quietly to myself.  And if I think

21   asking it wouldn't violate -- I'll talk to the lawyers.  And

22   then I, alone, will make a decision about whether it can be

23   asked and that they should never blame the lawyers if the

24   question isn't asked.  Only blame me.

25          And what I've gotten, I don't know, maybe had seven

1    trials or something.  And I've gotten probably four questions.

2    One -- total.  One was a question of could we see Exhibit 248?

3    I couldn't see it.  Sure.  And we put it right back up.

4         A couple of questions were a little bit substantive.

5    The lawyers agreed all but one of them could be asked.  And I

6    didn't even have to consult the lawyers on the one I didn't

7    ask.

8         So it's actually been working really well.  And I

9    think it will help us in a case that is this long to know if

10   we are just entirely losing the jury.

11        So is there any objection to that protocol?

12        MR. OLSEN:  No, Your Honor.

13        THE COURT:  Okay.

14        MR. STERN:  We suggested it.

15        THE COURT:  And you just suggested it.  Good.

16        I think it keeps them engaged.  And I tell them

17   you're not obligated to ask a question and you shouldn't give

18   any more weight to the answer to a juror's question.  You

19   know, I say all that stuff.

20        There's a Michigan jury instruction on jury questions

21   and I just adapted it to our court.  Good.

22        I think that's it.

23        MR. STERN:  Thank you, Judge.

24        MR. OLSEN:  Thank you, Your Honor.

25        MS. DALY:  Thank you, Your Honor.

September 12, 2024

132

```
 1              MR. TER MOLEN:  Thank you, Your Honor.

 2              THE COURT:  Thank you all for being here.  Safe

 3      travels home.

 4              Nice to meet the new members here who I haven't met

 5      in person.

 6                      (Proceedings Concluded)

 7                  -           -           -

 8

 9              CERTIFICATE OF OFFICIAL COURT REPORTER

10          I, Jeseca C. Eddington, Federal Official Court

11      Reporter, do hereby certify the foregoing 132 pages are a true

12      and correct transcript of the above entitled proceedings.

13      /s/ JESECA C. EDDINGTON_____        09-17-2024_
        Jeseca C. Eddington, RDR, RMR, CRR, FCRR            Date
14

15

16

17

18

19

20

21

22

23

24

25
```