UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* Flint Water Cases.

_____/

Judith E. Levy
United States District Judge

This Order Relates To:

*Bellwether III Cases*

_____/

**JOINT FINAL PRE-TRIAL ORDER**

## TABLE OF CONTENTS

Page

I. JURISDICTION ............................................................................................. 1
II. PLAINTIFFS' CLAIMS ................................................................................ 1
III. DEFENDANTS' CLAIMS ............................................................................ 7
IV. STIPULATION OF FACTS ........................................................................ 11
V. ISSUES OF FACT AND LAW TO BE LITIGATED ................................ 12
VI. EVIDENCE PROBLEMS LIKELY TO ARISE AT TRIAL ........... 13
    A. Objections to Deposition Designations ................................. 13
    B. Objections to Exhibits ............................................................ 14
    C. Filed Motions in Limine ........................................................ 14
VII. WITNESSES ............................................................................................... 14
VIII. EXHIBITS .................................................................................................. 14
IX. DAMAGES .................................................................................................. 14
X. TRIAL .......................................................................................................... 15
XI. SETTLEMENT ........................................................................................... 16
XII. FILING OF TRIAL BRIEFS, FINDINGS, AND INSTRUCTIONS ............................................................................................. 16
XIII. JUROR COSTS .......................................................................................... 16

I. **JURISDICTION**

This Court has jurisdiction under 28 U.S.C. § 1367. Bellwether Plaintiffs (Plaintiffs) brought claims under 42 U.S.C. § 1983, for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, as well as claims under state law. This Court has federal-question jurisdiction over Plaintiffs' federal-law claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367, because those claims arise from the same case or controversy as the federal-law claims. No party contests the Court's jurisdiction.[1]

II. **PLAINTIFFS' CLAIMS**[2]

Plaintiffs assert professional negligence claims under Michigan state common law against one group of defendants: Veolia North

---

[1] The Court continues to have supplemental jurisdiction over Plaintiffs' state-law claims even though Plaintiffs have settled their federal-law claims. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999).

[2] Plaintiffs and VNA have provided their own statement of claims and/or defenses.

1

America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC (collectively "Veolia" or "VNA").

Plaintiffs are seven children who lived in Flint, Michigan during the public health crisis that has become known as the "Flint Water Crisis." The Flint Water Crisis began when the City of Flint's drinking water source was switched on April 25, 2014 from already-treated water from Lake Huron provided through the Detroit Water and Sewage Department ("DWSD") to water from the Flint River provided through the Flint Water Treatment Plant. Unlike Lake Huron Water, Flint River water was seriously corrosive (especially without the use of corrosion inhibiting orthophosphates) and caused lead to leach from the pipes, internal plumbing fixtures, and service lines into the public drinking water supply.

Each Plaintiff consumed and was exposed to lead contaminated water during the Flint Water Crisis for inclusive of the time from the switch to the Flint River in April of 2014 through the switch back to Lake Huron through the DWSD in October 2015.

The Veolia Defendants' Professional negligence contributed, prolonged, and worsened the crisis in many ways. In 2014, the Veolia

Defendants were engaged in a consulting relationship with DWSD and the State of Michigan. They had responded to a request to bid in April 2014 and after undertaking due diligence, submitted a bid to the DWSD in May 2014. They completed a final, comprehensive peer-reviewed report to the Governor's office in November 2014. As a part of that consulting relationship, the Veolia Defendants obtained key information about the DWSD water system, including Flint's prior and long-term purchasing of water from DWSD that was properly treated with corrosion inhibitors. During this same time, Veolia was retained as a consulting engineer by General Motors ("GM"). In October 2014 (at the same time that Veolia was analyzing the DWSD and preparing its Peer Review Report), GM stopped purchasing water from Flint because it was corroding auto parts, and Veolia was aware of this.

In January and February 2015, the Veolia Defendants began a consulting relationship directly with the City of Flint concerning its drinking water. Internal Emails show that key Veolia personnel understood that lead in Flint's water was in fact a problem but chose not to disclose it. Indeed, in a public meeting on February 25, 2015, which was covered by the press, high-level Veolia employees stood side by side

3

with City of Flint officials and proclaimed that Flint's drinking water was "safe."

Veolia already knew, however (and were discussing among themselves), that there was no corrosion inhibitor used to treat the Flint River water and that lead was therefore a problem throughout Flint's water system. They also knew that an immediate return to the DWSD was the quickest and best course of action. Again, Veolia chose not to disclose this, or to so inform the citizens of Flint when it publicly told them that their water was "safe." Moreover, when Veolia completed its report in March 2015, the word "lead" did not appear therein, and the need for utilization of a corrosion control at all was buried in a single paragraph, late in the report, and was only mentioned in the context of aesthetic concerns. A reasonable, similarly situated professional engineer would not have told the public that Flint's drinking water was "safe," but rather, would have stated publicly what they acknowledged privately (that lead was a problem in Flint's drinking water and that an immediate switch back to the DWSD was the best course of action), and would have clearly and strongly recommended employing a corrosion

4

inhibitor so as to avoid lead leaching into the public's drinking water and causing brain damage to the children ingesting it.

In addition to these errors, Veolia failed to meet their engineering duties in many other ways, including but not limited to, the following: failing to publicly identify the absence of corrosion control as a threat to human health; failing to identify enormous risks to human health and property posed by treating and distributing the Flint River water; failing to identify, calculate, or appreciate the significance of the CSMR results that showed that the treated Flint Water was highly corrosive to lead containing materials; failing to issue a "do not drink" warning to protect the citizens of Flint given then-current water conditions; downplaying the corrosion issues as "aesthetic issues" and failing to warn the City and its residents of substantial dangers; falsely minimizing its roles and responsibilities; failing to notify the MDEQ and City of its believe that it was a mistake to start operations of the FWTP without corrosion control; and by improperly placing its economic interests ahead of its obligations to safeguard the public.

In short, the need for corrosion inhibitors and the solution to Flint's drinking water problems by immediately returning to DWSD-provided

5

Lake Huron water was not only clear to Veolia when it first contracted with the City of Flint, but both were eminently feasible – as demonstrated by how quickly both were accomplished in October of 2015. Moreover, Veolia's own chief engineer has admitted under oath, that the decisions to a) publicly tell the citizens of Flint that their water was "safe", and b) remove the reference to lead in its final report, were based on <u>his</u> mistake in not realizing that he lacked full and complete data when making those determinations.

Despite this, and rather than accepting responsibility, Veolia used public relations tactics in order to evade responsibility and create a palatable version of "talking points" as to why their actions and in actions in Flint were justified and why their failures were not the cause (or even a cause) of the Flint Water Crisis.

Regardless, the Defendants' respective breaches of their duty of care were substantial contributing factors causing Plaintiffs to ingest and be exposed to lead-containing water and suffer lead poisoning. Plaintiffs' lead poisoning has caused brain damage that manifests as certain neurocognitive, psychological and emotional deficits, which will cause them to struggle academically and vocationally in the

6

future. Additionally, Plaintiffs injuries will more likely than not worsen as they grow older and continue to cause them to suffer mental anguish and severe emotional distress.

## III. DEFENDANTS' CLAIMS

VNA denies Plaintiffs claims.

In April 2014, in an ill-fated effort to cut costs, the City and State caused the Flint water crisis by switching Flint from Lake Huron water treated by the DWSD to Flint River water treated by the FWTP. FWTP staff had planned to include a corrosion-control chemical, but officials at the Michigan Department of Environmental Quality ("MDEQ"), the state regulator, told the City that it did not need to add corrosion-control chemicals to the water, and City officials instructed FWTP staff not to do anything that State officials did not require. The lack of a corrosion-control chemical caused a temporary increase in lead levels in drinking water in homes with lead service lines in the summer of 2014, because the changed water chemistry disrupted some of the "scale" on the inside of the pipes. Water lead levels returned to pre-switch levels once the water reached a new equilibrium. The effect was limited to the homes

7

and properties with lead service lines, because Flint's water mains did not contain lead.

In February 2015, the City of Flint engaged VNA for a brief consulting project. VNA's engagement was limited to making recommendations about water quality issues at the City's request, and the City specifically requested recommendations with regard to total trihalomethanes ("TTHMs"). The City expressly instructed VNA not to review the decision to switch to Flint River water. At no point did VNA operate or manage any part of the City's water treatment or distribution system. And VNA did not interact with Plaintiffs in any way; the City was VNA's sole client.

VNA did not commit professional negligence during its brief engagement in Flint. VNA did not have any knowledge of a lead problem in Flint water. VNA reviewed the City's lead sampling data, and found that the results were within federal and state requirements for drinking water. On the basis of those and other results provided by the City, all of which showed that the City's water was in compliance with federal and state standards, VNA stated that Flint's drinking water was "safe," which it expressly defined to mean in compliance with federal and state

8

standards. Nonetheless, because the lack of corrosion controls could result in lead problems in the future, VNA repeatedly recommended to the City that it work with its state regulator to add a corrosion-control chemical. In fact, VNA listed this as the second highest priority in its final report to the City.

Unbeknownst to VNA, the City, State, and Federal officials were aware of potential lead problems in Flint water and were suppressing that information. In February 2015, while VNA engineers were onsite at the FWTP, the City learned of elevated lead levels at the home of LeeAnne Walters. The City informed MDEQ and the United States Environmental Protection Agency ("EPA") of those results, but not VNA. No action was taken; on the contrary, in March 2015 the Emergency Manager specifically overruled the City Council's vote to return to Detroit water. In April 2015, after VNA left Flint, the EPA learned that Flint was not using corrosion controls; Miguel Del Toral of the EPA concluded, based on information not provided to VNA, that the City likely was violating federal drinking-water regulations. No action was taken. In June and July 2015, at MDEQ's direction, the City manipulated its lead testing results to remain within federal standards for lead. Further

9

investigation by Dr. Marc Edwards and Del Toral discovered that the City's sampling process was faulty, because the City was not sampling locations that were at higher risk for lead. No action was taken.

VNA also did not cause or contribute to Plaintiffs' alleged injuries. No Plaintiff has any evidence of exposure to elevated levels of lead or other contaminants in Flint water due to VNA. Most Plaintiffs' homes did not have lead service lines, and Plaintiffs either stopped or greatly reduced their consumption of unfiltered Flint water by the end of 2014, well before VNA arrived in Flint. Plaintiffs also cannot establish that the City, State, or Federal officials in charge and in control in Flint would have implemented corrosion controls or switched back to Detroit water any sooner than they did if only VNA had acted any differently or that, if they had done so, water lead levels would have decreased.

Further, any injuries Plaintiffs suffered due to exposure to Flint water were caused entirely by other actors, including but not limited to City, State, and Federal officials. In particular, the City of Flint and its Emergency Managers rushed the FWTP into full-time operation without implementing proper corrosion-control treatment. Emergency Managers, acting at the direction of the Governor's Office and

10

Department of Treasury, repeatedly rejected efforts to return the City of Flint to the DWSD throughout the crisis. The MDEQ failed to effectively enforce drinking water regulations and protect public health, including by not requiring corrosion-control treatment at the FWTP and instead misleading the EPA and the public about Flint's water-quality and lead issues. The MDHHS failed to investigate and respond to growing concerns over poor water quality and lead poisoning in Flint. The EPA delayed action in response to violations of the Lead and Copper Rule in Flint despite its knowledge of actual lead issues. The Governor's Office and Department of Treasury, which participated in the decision-making regarding the switch to the Flint River, continued for 18 months to place money and politics over public health, waiting until October 2015 to exercise the control they had all along to switch the City of Flint back to DWSD. At minimum, these and other actors bore a substantial share of the responsibility for causing Plaintiffs' alleged injuries. Any awards of damages against VNA would be reduced by the amount of fault attributable to these and other actors.

## IV.   STIPULATION OF FACTS

The parties have not stipulated to any facts.

11

## V. ISSUES OF FACT AND LAW TO BE LITIGATED

1. To the extent that the Court has not resolved the issue before trial, whether VNA or any person or entity listed in VNA's notice of nonparties at fault owed Plaintiffs a legally cognizable duty of care;

2. Whether VNA breached a professional duty of care owed to each or any of the Plaintiffs;

3. Whether VNA's breach of a professional duty of care was a proximate cause of any Plaintiff's injuries;[3]

4. The amount, if any, of each Plaintiff's damages from injuries caused by lead exposure from Flint water;

5. Whether any person or entity listed in VNA's notice of nonparties at fault breached a duty of care owed to each or any of the Plaintiffs;

---

[3] VNA maintains that to prove causation Plaintiffs must prove that VNA's alleged negligence was a but-for cause of Plaintiffs' alleged injuries, which includes factual issues such as whether government officials would have acted sooner than they did to address water-quality concerns if VNA had not allegedly been negligent. Plaintiffs object to listing those issues in this order. VNA agrees not to list the issues in this order without prejudice to its argument that Plaintiffs will be required to prove but-for causation, including those factual issues, at trial.

12

6. Whether the breach of a duty of care by any person or entity listed in VNA's notice of nonparties at fault was a proximate cause of any Plaintiff's injuries;

7. What percentage of fault should be allocated to any person or entity whose breach of a duty of care caused or contributed to causing any Plaintiffs' injuries; and

8. Any embedded issues of law or fact that may be included in the foregoing issues.

## VI. EVIDENCE PROBLEMS LIKELY TO ARISE AT TRIAL

### A. Objections to Deposition Designations

The parties' deposition designations, counter-designations, and objections to opposing parties' designations and counter-designations are due on September 16, 2024, and September 23, 2024. The Court will adopt its rulings to the deposition designations from the Bellwether I trial to the extent the same testimony has been designated for purposes of the forthcoming Bellwether III trial. The objections to newly-designated testimony await rulings by the Court.

### B. Objections to Exhibits

The parties continue to meet and confer regarding their respective exhibit lists and the anticipated exchange of electronic exhibits in accordance with the Court's Practice Guidelines.

### C. Filed Motions in Limine

The parties filed a number of motions in limine. The Court heard argument on the motions on September 12, 2024, and ruled on the motions from the bench.

## VII. WITNESSES

On September 16, 2024, the parties provided the Court with their witness lists by email. Plaintiffs' witness list is Exhibit A; VNA's witness list is Exhibit B.

## VIII. EXHIBITS

On September 16, 2024, the parties separately provided the Court with their exhibits lists by email. Plaintiffs' exhibit list is Exhibit C; VNA's exhibit list is Exhibit D.

## IX. DAMAGES

Plaintiffs seek compensatory damages including but not limited to lost earning capacity and emotional distress.

VNA disputes Plaintiffs' claimed damages, and disputes that any of Plaintiffs' claimed damages can be calculated from objective data.

## X. TRIAL

The parties request a jury trial. The Court has allocated 90 hours to Plaintiffs for trial, and 95 hours to VNA.[4] Those time limits apply to opening statements, examinations, objections made during examinations, and closing arguments. They do not include jury selection and other hearings outside the jury's presence. Both sides will be responsible for keeping track of time. The parties are expected to resolve any discrepancies between their timekeeping records. Any discrepancies that cannot be resolved by the parties will be resolved by the Court. The parties will provide joint weekly reports via email to the Court about how much time each side has used.

The parties do not stipulate to accept a less-than-unanimous verdict. The parties do not stipulate to a verdict of fewer than six jurors if jurors must be excused during the course of trial.

---

[4] The trial schedule will be Monday through Thursday from 8:30 am to 2:00 pm, with breaks from 10:00 am to 10:15 am and from 11:45 am to 12:30 pm.

15

## XI. SETTLEMENT

The parties have discussed and considered the possibility of settlement. Said discussions have been held by and among the respective counsel for the parties, as well as through a mediator, including through Miles Ruthberg, the mediator appointed by the Court. The parties are unable to resolve this case. The parties do not request that the Court schedule a settlement conference.

## XII. FILING OF TRIAL BRIEFS, FINDINGS, AND INSTRUCTIONS

Submission of Proposed Final Jury Instructions are due on September 16, 2024. Trial briefs are not to be filed absent further order of the Court.

## XIII. JUROR COSTS

Pursuant to Local Rule 16.2(f), the parties acknowledge that the Court may assess them with juror expenses under Local Rule 38.2.

16

Dated:  September 16, 2024                     Respectfully submitted,

| **LEVY KONIGSBERG LLP** | **MAYER BROWN LLP** |
|---|---|
| /s/ *Corey M. Stern* | /s/ *Michael A. Olsen* |
| Corey M. Stern | Michael A. Olsen |
| Moshe Maimon | 71 S. Wacker Drive |
| Melanie Daly | Chicago, IL 60606 |
| 605 Third Ave., 33rd Floor | (312) 701-7120 |
| New York, NY 10158 | molsen@mayerbrown.com |
| (212) 605-6200 | |
| cstern@levylaw.com | *Attorneys for Veolia Water North* |
| mmaimon@levylaw.com | *America Operating Services, LLC* |
| mdaly@levylaw.com | *Veolia North America, LLC, and* |
| | *Veolia North America, Inc.* |
| *Attorneys for Plaintiffs* | |

SO ORDERED.

Dated: September 23, 2024               s/Judith E. Levy
Ann Arbor, Michigan                          JUDITH E. LEVY
                                             United States District Judge

17