# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

_____/

This Order Relates To:

*Bellwether III Cases*

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART VEOLIA NORTH AMERICA, LLC, VEOLIA NORTH AMERICA, INC., AND VEOLIA WATER NORTH AMERICA OPERATING SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT [2922]

Before the Court is Veolia North America, LLC, Veolia North America, Inc., and Veolia Water North America Operating Services, LLC's (collectively, "VNA") motion for summary judgment on Bellwether III Plaintiffs' ("Plaintiffs" or "Bellwether III Plaintiffs") professional negligence claims. (ECF No. 2922.) Plaintiffs filed a response in opposition to the motion. (ECF No. 2987.) VNA replied. (ECF No. 3014.) For the reasons set forth below, VNA's motion is granted in part and denied in part.

## I.     Background

The background to the Flint Water Crisis[1] has been set forth extensively in previous opinions issued by this Court. Plaintiffs Y.A., E.A., G.B., C.D., R.E., J.N., and J.S. were all minor children at the time of the Flint Water Crisis. They were selected for this bellwether trial pursuant to the selection process set forth in the Fifth Amended Case Management Order. (ECF No. 1255.) Defendant is VNA, a professional engineering firm that advised the City of Flint regarding its water supply in 2015. Plaintiffs allege that VNA was professionally negligent, causing them injuries through exposure to lead in the drinking water in Flint.

The facts of the Flint Water Crisis, as alleged in the Class Complaint and relevant to this motion, are the following.

> On April 25, 2014, the City of Flint switched its residential water supply from the Detroit Water and Sew[er]age Department ("DWSD") to the Flint River. Flint River water is more difficult to treat than the Lake Huron water used by DWSD. Prior to the switch, the Flint Water Treatment Plant ("FWTP") was refurbished to treat Flint River water, but that refurbishment was inadequate. Because of inadequate water treatment, lead leached from plumbing into [] Flint's drinking

---

[1] Throughout this Opinion, the Court uses the phrase "the Flint Water Crisis" to refer to events that occurred after April 25, 2014, when the City of Flint began drawing water from the Flint River, which resulted in large-scale municipal water contamination in Flint, Michigan.

water. The City of Flint did not reconnect to the DWSD water system until October 16, 2015.

. . . .

In January of 2015, the City of Flint published a call for bids seeking a water engineer for the evaluation of "the City's efforts to improve the quality of drinking water provided by the City's utility system." VNA responded with a bid offering to do a full-scale water quality analysis. On February 10, the City of Flint formally engaged VNA to conduct a more limited water quality analysis. The focus of this analysis was on TTHMs,[2] but VNA also investigated other water quality issues. VNA's report did not warn the City of Flint that its drinking water was unsafe or that immediate corrosion control measures were necessary to prevent the leaching of lead. However, VNA did recommend corrosion control "as a way to minimize the amount of discolored water." VNA also recommended the addition of corrosion controls at a meeting with City and State of Michigan government officials on May 4, 2015. Meanwhile, the Michigan Department of Environmental Quality informed the City of Flint that the addition of corrosion controls was unnecessary. Ultimately, no corrosion controls were added to Flint River water.

Although the City of Flint had access to test results showing that Flint's drinking water contained dangerous amounts of lead, officials failed to turn those results over to VNA. VNA's engagement with the City of Flint ended on March 12, 2015, with the submission of its final report.

---

[2] Total Trihalomethanes (TTHMs) are disinfection byproducts that form when water is treated with chlorine.

*In re Flint Water Cases*, 579 F. Supp. 3d 971, 975–76 (E.D. Mich. 2022) ("*Bellwether I*") (internal citations omitted).

The Court denied VNA's motion to dismiss the claims of a plaintiff-delivery driver who alleged injuries from exposure to lead and *Legionella* bacteria in Flint. *In re Flint Water Cases*, No. 17-11726, 2021 WL 1178059 (E.D. Mich. Mar. 29, 2021). The Court also denied VNA's motion to reconsider the denial of its motion to dismiss and held that VNA owed a duty to that plaintiff. *In re Flint Water Cases*, No. 17-11726, 2021 WL 5237197, at *5 (E.D. Mich. Nov. 10, 2021) ("*Lee*").

In *Bellwether I*,[3] VNA sought summary judgment, which the Court granted in part and denied in part. 579 F. Supp. 3d at 992 ("Plaintiffs cannot establish that VNA owed them a duty in 2014, but they have put forward sufficient evidence to survive summary judgment on all the elements of their professional negligence claims arising out of VNA's 2015 conduct."). In the Flint Water Issues Class case,[4] VNA asked the

---

[3] The first bellwether trial, referred to as Bellwether I, involved four minor children's claims of professional negligence against VNA and another engineering Defendant, LAN.

[4] Pursuant to Rule 23(c)(4), the Court certified two issues classes, one of which involved claims of professional negligence against VNA. (*See* ECF No. 1957.)

Court to reconsider its summary judgment ruling in *Bellwether I*, but it "withdrew the motion based on the tentative settlement with Class Plaintiffs." (ECF No. 2922, PageID.98310.)

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

VNA makes three arguments in support of its motion for summary judgment: (1) VNA did not owe Plaintiffs a duty under Michigan's professional negligence standard; (2) VNA did not owe Plaintiffs the specific duties they allege; (3) and Plaintiffs cannot prove causation. (*See*

ECF No. 2922, PageID.98316–98317.) In the alternative, if the Court denies summary judgment, VNA seeks "partial summary judgment on its nonparty-at-fault defense," asking for a ruling that each of the nonparties at fault identified by VNA owed Plaintiffs a duty as a matter of law. (*Id.*)

### A.   VNA's Duty to Plaintiffs

VNA first asserts that it did not owe Plaintiffs a duty under Michigan professional negligence law. (*Id.* at PageID.98317–98327.) It argues that the Court was incorrect in *Lee* and in *Bellwether I,* and VNA owed no duty to those who allege they were harmed by its role in the Flint Water Crisis. VNA asserts that it owed no duty to Plaintiffs because Plaintiffs were not its clients. VNA also argues that the factors Michigan courts consider when "determining whether a legal duty should be imposed" do not support imposing a duty here. *See In re Certified Question*, 479 Mich. 498, 505 (2007) (setting forth the factors in the inquiry as including "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented" (citations omitted)). VNA claims Plaintiffs lack a relationship to it sufficient for VNA to owe them a duty under Michigan tort law. It

also argues that the harm at issue was not foreseeable and the burden on the defendant weighs against finding that VNA has a duty to Plaintiffs.

Plaintiffs respond that the Court has already addressed these arguments and found that VNA owed a duty of care to Plaintiffs, and the Court should reaffirm that decision. (ECF No. 2987, PageID.101118.) For the reasons set forth below, the Court rejects VNA's arguments and concludes that VNA owed a duty of care to Plaintiffs. However, the Court reaches this conclusion for somewhat different reasons than in its prior opinions.

i. *Duty Under Michigan Law and the Court's Previous Rulings*

To establish professional negligence under Michigan law, Plaintiffs must show that (1) VNA owed them a legal duty of care, (2) VNA breached that duty, (3) Plaintiffs were injured, and (4) VNA's breach caused Plaintiffs' injuries. *See, e.g., Henry v. Dow Chem. Co.*, 473 Mich. 63, 71–72 (2005). As the Michigan Supreme Court has emphasized, "there can be no tort liability unless [a] defendant[ ] owed a duty to [a] plaintiff." *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 660 (2012) (alterations in original) (internal citations omitted). Therefore, whether VNA owed a legal duty to Plaintiffs is a threshold question in this case.

7

In Michigan, there is no general duty to aid or render assistance to another. *Bellwether I*, 579 F. Supp. 3d at 978–79 (collecting citations that establish that this rule is deeply rooted in common law and—despite being criticized for its harshness—is applied consistently in most U.S. jurisdictions, including Michigan).[5] The Michigan Supreme Court has

---

[5] There are three exceptions to this general rule:

First, a duty of care—including a duty to rescue, warn, or protect—is imposed where there is a "special relationship" between the parties. *E.g., Bailey*, 494 Mich. at 604, 835 N.W.2d 413. For purposes of this duty, a special relationship exists "where one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Id.* (citing *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 499, 418 N.W.2d 381 (1988)). For instance, a landlord stands in this relationship to her tenants, as does an owner to her invitees. *Id.* . . . .

Second, there is a duty to provide affirmative protection from harms (or risks of harm) that a defendant herself has created. *E.g.* Restatement (Second) of Torts, § 314, comment (d). In other words, one may not place another in danger and then refuse to assist. . . .

Finally, where a defendant has power or control over a third party, there are situations where she may have a duty to prevent that third party from causing harm. Restatement (Second) of Torts § 315(a); *Reinert v. Dolezel*, 147 Mich. App. 149, 157, 383 N.W.2d 148 (1985). For instance, parents have a duty to prevent their children from causing harms. Restatement (Second) of Torts § 316.

*Bellwether I*, 579 F. Supp. 3d at 979–80. In *Bellwether I*, the Court found that none of these exceptions applied with respect to VNA's work in 2014 involving DWSD. *Id.* Because it now finds that VNA had a limited relationship to Plaintiffs sufficient to impose a duty, it does not reach the question of whether these exceptions apply.

8

also held, however, that "[e]very person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others." *Hill*, 492 Mich. at 660 (citing *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 165 (2011)). "Generally, the duty that arises when a person actively engages in certain conduct may arise from a statute, a contractual relationship, or by operation of the common law[.]" *Id.* at 660–61 (citing *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 95 (1992)).

When evaluating the factors for determining whether a defendant owes a plaintiff a duty (relationship between the parties, foreseeability, burden on the defendant, and nature of the risk), "Michigan . . . relies more on the relationship between the parties than foreseeability of harm when determining whether a duty exists." *In re Certified Question*, 479 Mich. at 514.

In *Bellwether I*, the Court set forth the concept of a relationship between the parties under Michigan common law as follows:

> [T]he required relationship need not be between the litigating parties. *In re Flint Water Cases*, No. 17-11726, 2021 WL 5237197, at *3–4 (E.D. Mich., Nov. 10, 2021) ("*Lee*"). Instead, those who undertake to perform a service for a third party thereby take on a duty to use ordinary care to avoid physical

9

harm to all foreseeable persons and property. *Id*. at *3 (collecting cases).

*Bellwether I*, 579 F. Supp. 3d at 978. In *Lee*, the Court held:

> To show the existence of a legal duty in this case, Plaintiff need only establish *either* that he had a relationship with VNA sufficient to give rise to a legal duty or that VNA had a relationship with a third party sufficient to give rise to a legal duty to third parties such as Plaintiff.

*Lee*, 2021 WL 5237197, at *4 (emphasis in original). As set forth below, the Court reevaluates these holdings here.

In *Lee* and *Bellwether I*, the Court applied the rules set forth above and held that VNA owed the plaintiffs a duty based on VNA's relationship to a party other than the plaintiffs. In *Lee*, it found that the undisputed contractual relationship between VNA and the City of Flint was a third-party relationship sufficient to give rise to VNA's duty to the plaintiff. *Id.* at *4–5. The Court held the same in *Bellwether I*, explaining, "VNA's undertaking for the City of Flint is sufficient to establish a duty to Plaintiffs because VNA is alleged to have negligently completed that undertaking, and the undertaking—evaluating Flint water quality—was foreseeably related to Plaintiffs' physical safety." 579 F. Supp. 3d at 982 (citing *Lee*, 2021 WL 5237197, at *3–4). Further, the Court held that the

10

relationship between VNA and Plaintiffs arises out of the common law principle that, once a party engages in the performance of an undertaking, that party has an obligation to use due care in that undertaking. *See Bellwether I*, 579 F. Supp. 3d at 982; *see also Leone v. BMI Refractory Svcs., Inc.*, 893 F.3d 359, 363 (6th Cir. 2018) (adopting the plaintiffs' position that there is a "long-established common law principle under which a party owes a duty of due care to a third party while performing on a contract.").

After considering its prior holdings and VNA's arguments on duty in this motion, the Court undertook additional analysis. Although the Court refines its analysis below, VNA's arguments do not provide a basis for a different outcome. VNA has a legal duty to Plaintiffs.

> ii. *Whether Plaintiffs' Claims Require Them to Have Been Clients of VNA*

VNA argues that "Plaintiffs were not VNA's clients, so . . . VNA did not owe them a duty of professional care." (ECF No. 2922, PageID.98318.) Michigan law does not support this argument.

Relying on the Michigan Court of Appeals' decision in *Saur v. Probes,* VNA asserts that "[i]n Michigan, a professional-services firm generally owes a duty of care in rendering services only to the 'person

11

who has contracted for such services.'" (*Id.* at PageID.98317 (quoting *Saur v. Probes,* 190 Mich. App. 636, 638 (1991).) *Saur* does not address what duty, if any, a professional owes to a third party and is largely inapplicable to this case (except in the most general sense that it is a case involving professional negligence).[6] Moreover, in asserting that "[p]rofessional malpractice involves the breach of a duty owed by one rendering professional services to a person who has contracted for such services[,]" the *Saur* court relied on *Rogers v. Horvath. Saur,* 190 Mich. App. at 638 (citing *Rogers v. Horvath*, 65 Mich. App. 644, 646–47 (1975)). Yet the relevant holding from *Rogers* was overruled in *Dyer v. Trachtman*, 470 Mich. 45, 50, 52–53, 55 (2004). In *Dyer* the Michigan

---

[6] In *Saur*, the plaintiff hired the defendant-psychiatrist, Dr. Lawrence Probes, for private consultations. *Saur,* 190 Mich. App. at 637. The plaintiff's wife subsequently petitioned the state probate court to involuntarily hospitalize the plaintiff for psychiatric treatment. *Id*. The court appointed another psychiatrist, Dr. Curt Cunningham, to conduct an examination in connection with the petition. *Id*. Dr. Cunningham contacted Dr. Probes, who allegedly disclosed communications the plaintiff made to him during their previous sessions. *Id*. After the probate court dismissed the petition, the plaintiff sued Dr. Probes for malpractice for providing privileged information to Dr. Cunningham. *Id*. After reviewing relevant Michigan statutes, the Michigan Court of Appeals held that, "[i]n light of a psychiatrist's ethical obligation to maintain patient confidences, as well as the state's interest in preserving its policy of protecting physician-patient confidences, . . . a legal duty does exist on the part of a psychiatrist not to disclose privileged communications." *Id*. at 639.

12

Supreme Court held that professional malpractice can be alleged even in the absence of a "traditional" doctor-patient relationship. *Id.* at 53, 55 (recognizing a limited professional relationship between an independent medical examiner and an examinee which "encompasse[d] a duty by the examiner to exercise care consistent with his professional training and expertise so as not to cause physical harm by negligently conducting the examination"). As a result, *Saur* does not support the blanket client-relationship requirement VNA proposes.

The four other cases on which VNA relies are similarly unpersuasive. (*See* ECF No. 2922, PageID.98317–98318.) Two of the four cases predate *Dyer* and are therefore not controlling to the extent they conflict with *Dyer*.[7] The two post-*Dyer* cases VNA cites also provide no

---

[7] Even if the Court set aside *Dyer*, these two cases do not support the general rule VNA proposes. In the first of these cases, *Atlanta International Insurance Co. v. Bell*, the Michigan Supreme Court stated that "principles of common-law negligence do not generally require imposition of third-party liability in the malpractice context." 438 Mich. 512, 515 (1991). The case squarely focused on "the tripartite relationship between insured, insurer, and defense counsel" and not on the general rule about professional liability VNA proposes. *See id.* at 519–20. Not only that, but the *Atlanta International Insurance* court ultimately applied the doctrine of equitable subrogation and allowed a non-client insurer to bring a malpractice action against the lawyer it retained for the insured. *Id.* at 516. That is, the Michigan Supreme Court allowed a non-client to bring a professional negligence claim. *Id.* at 523–24. Further, VNA's second pre-*Dyer* case, *Mieras v. DeBona*, also does not support VNA's position. *See* 452 Mich. 278, 290 (1996) ("[I]f a lawyer who prepares a will erroneously

13

support for its purported general rule. In *Roberts v. Salmi*, the court stated, "[c]ourts have recognized that a professional may be liable in malpractice to a third party for harms caused by his or her breach of the applicable standard of care notwithstanding the lack of a professional-client relationship with the third-party." 308 Mich. App. 605, 615 (2014) (citing *Dyer*, 470 Mich. at 51–54; *Mieras v. DeBona*, 452 Mich. 278, 290 (1996)). In *Sabbagh v. Hamilton Psychological Services, PLC*, the court considered whether a defendant-human resources firm had a relationship with the plaintiffs sufficient to impose a duty on them. 329 Mich. App. 324, 350 (2019). In refusing to impose a duty on the human resources firm, the *Sabbagh* court emphasized the tenuousness of the relationship between the defendant-human resources firm and the plaintiffs, as well as the lack of a professional-client relationship. *See id.*

---

is to be accountable for breach of the duty he owed his deceased client, the [non-client] beneficiaries of the will must be able to maintain an action."). In Justice Boyle's separate opinion in *Mieras* that VNA cites, the court expressly held "that beneficiaries named in a will may bring a tort-based cause of action against the attorney who drafted the will for negligent breach of the standard of care owed to the beneficiary by nature of the beneficiary's third-party beneficiary status." *Id.* at 308; *see also id.* at 299 ("By nature of the named beneficiaries' status as third-party beneficiaries of the contract between the attorney and the testator, the attorney also owes the beneficiaries a tort-based duty to draft the documents with the requisite standard of care.").

Additionally, the Michigan Court of Appeals found that the defendant-human resources firm could only be sued for ordinary negligence and not professional negligence, which is a further reason VNA's reliance on this portion of *Sabbagh* does not illuminate the requirements for a professional negligence claim. *Id.* at 694–95. A professional-client relationship is therefore not a prerequisite for Plaintiffs' professional negligence claims—though they must have a legally sufficient, non-tenuous relationship to VNA. None of the cases VNA cites support its argument that there is a general rule requiring a professional-client relationship between the parties before a duty of professional care arises.

### iii.    *The Relationship Factor*

VNA argues that the relationship between it and Plaintiffs is insufficient to support the imposition of a legal duty on VNA. It proposes that for Plaintiffs to bring their claims against VNA they must have what it terms a "direct relationship." That requirement, which VNA does not clearly define, is unsupported by Michigan law. Although Michigan law requires a relationship "between the parties," VNA's reading of that requirement is overly restrictive. As set forth below, Michigan law recognizes that professionals can have duties to non-clients like

15

Plaintiffs. Here, Plaintiffs have a limited relationship to VNA, and as a result, VNA has a limited duty to Plaintiffs.

a.   *VNA's Concept of a "Direct Relationship"*

VNA argues that there was no "direct relationship" between Plaintiffs and VNA, so VNA owes Plaintiffs no legal duty. (ECF No. 2922, PageID.98318.) But Michigan law does not support the restrictive relationship requirement VNA asserts the Court must apply.

In support of its "direct relationship" argument, VNA cites *Sabbagh*, a case in which the phrase "direct relationship" does not appear. *See Sabbagh v. Hamilton Psych. Servs. PLC*, 329 Mich. App. 324 (2019). The relevant portion of that case cited by VNA involves the City of Dearborn hiring a human resources company to select psychologists to perform evaluations on the plaintiffs. The Michigan Court of Appeals found that the relationship between the parties (the human resources company and the plaintiffs) was "too tenuous" to create a duty. *Id.* at 350. Below, the Court considers whether the relationship at issue here is too tenuous and concludes that it is not. It will not, however, apply the category of "directness" that VNA proposes, because Michigan law does not support doing so.

16

VNA's use of the phrase "direct relationship" does not have a clear meaning and is not used in the relevant cases, including those VNA cites. *See generally In re Certified Question*, 479 Mich. 498 (2007); *Roberts v. Salmi*, 308 Mich. App. 605 (2014). For example, in *Roberts*, the Michigan Court of Appeals used similar language to reject the position VNA takes here. In that case, the plaintiff-parents brought a claim against a counselor they hired to work with their child. *Roberts*, 308 Mich. App. at 608–10. The *Roberts* court explained that "the absence of a direct health professional-patient relationship between the professional and a third party harmed by the professional's treatment does not by itself preclude the imposition of a duty." *Id.* at 615. This holding suggests that a relationship between the parties can be an "indirect" professional relationship. Here, there is such an "indirect" relationship, where the City of Flint hired VNA to perform professional work for the benefit of Plaintiffs.

VNA sometimes uses "direct" to imply a spatially direct relationship. For instance, VNA argues that cases this Court relied upon in *Lee*, which involve contractor liability, involve the shared use of a common space, which VNA suggests is a direct relationship. (ECF No.

2922, PageID.98320–98321.) Relying on a provision of the Restatement (Second) of Torts, VNA argues that in these cases there is a direct relationship between the parties who were all "shared users of common space." (*Id.* at PageID.98321 (citing Restatement (Second) of Torts § 297(b) (1965)).) None of these cases cite to the Restatement. Not only that, but the Restatement does not directly include this purported "black-letter law" in its text[8]; VNA appears to indirectly derive this idea from examples discussed in the Restatement. (*See id.*) Even though sharing common space can, of course, provide a basis for relationships and duties, VNA does not show that sharing common space is a requirement for a relationship sufficient to impose a duty. For instance, the ruling in *Roberts* does not rely upon the parties sharing common space. VNA's concept of "shared user of common space" does not establish that a requirement of a "direct relationship" is present in Michigan law.

---

[8] "A negligent act may be one which involves an unreasonable risk of harm to another . . . (b) only if it is done without reasonable care, competence, preparation, or warning." Restatement (Second) of Torts § 297 (1965). The comments generally discuss examples involving driving on public roads, but they do not articulate the concept of "shared users of common space" that VNA attributes to the Restatement. Restatement (Second) of Torts § 297 cmt. a (1965).

18

Michigan law does not require that relationships sufficient to support a duty be "direct," either in the sense of being a direct professional relationship or a spatially proximate relationship.

### b.     *The Relationship "Between the Parties"*

By "direct relationship," VNA may mean that Michigan law requires that "the relationship [that provides the basis for a duty] must be between the plaintiff and the defendant." (ECF No. 2922, PageID.98319.) In making this point, VNA presses the Court to reject its prior holding that a relationship underlying a duty "need not always be between the defendant and the plaintiff bringing suit." *Lee*, 2021 WL 5237197, at *3. The Michigan Supreme Court has indeed discussed the relationship factor in the duty analysis as involving a "relationship between the parties." *In re Certified Question*, 479 Mich. at 507. In contrast, the Court held in *Lee* that "Plaintiff need only establish *either* that he had a relationship with VNA sufficient to give rise to a legal duty or that VNA had a relationship with a third party sufficient to give rise to a legal duty to third parties such as Plaintiff." 2021 WL 5237197, at *4. The Court relied upon several cases suggesting that Michigan law does not require the relationship to be between the defendant and the

19

plaintiff in a case: cases involving "special relationships," a line of cases about contractor liability, and *Buczkowski v. McKay*, 441 Mich. 96 (1992), which is one of the key precedents upon which *In re Certified Question* relies. While it is ultimately a close question, the Court now holds that a relationship between the plaintiff and defendant is required under Michigan law, though it is not as restrictive a requirement as VNA contends.

In critiquing the Court's previous opinions, VNA relies primarily on *In re Certified Question*. In that case, the Michigan Supreme Court held that for there to be a duty under Michigan tort law, there must be a relationship "between the parties." *In re Certified Question*, 479 at 508 ("Where there is no relationship between the parties, no duty can be imposed[.]"). VNA insists that "*Certified Question* . . . directly forecloses the view that the relevant relationship can be between the defendant and a third party." (ECF No. 2922, PageID.98320.)

Although *In re Certified Question* does refer to relationships between the parties as a condition of imposing a duty, the proper way to analyze such relationships is not as straightforward as VNA suggests.

There are cases where a "special relationship" that is not between the parties in the case grounds a duty between the defendant and the plaintiff.[9] Under Michigan law, the term "special relationship" encompasses common carrier-passenger, landlord-tenant, and other relationships where someone entrusts themselves to the protection and control of another person and loses the ability to protect themself. *Murdock v. Higgins*, 454 Mich. 46, 53, 55 n.11 (1997).

In *Murdock*, the Michigan Supreme Court held that a "duty to exercise reasonable care [can] arise[] from a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury." *Id*. at 53. A duty can therefore exist based on a special relationship that is *not* between the parties involved in a case (i.e. the plaintiff and the defendant). Instead, the relationship can be between the defendant and a third party who caused the injury but may not be a party to the case.

For example, in *Duvall v. Goldin*, a defendant-doctor had a special relationship with a patient who suffered from epileptic seizures. 139

---

[9] Here, the Court does not reach whether a special relationship exists between VNA and Plaintiffs.

21

Mich. App. 342 (1984). The defendant-doctor allegedly provided the patient with negligent treatment, which resulted in an automobile accident with a third party who sued the doctor for negligence. The defendant-doctor had a duty to the patient with whom he had a special relationship, but he also had a duty to the plaintiff who was a third party to that special relationship. *Id.* at 350–51; *see also Bearss v. Fazzini*, No. 347206, 2020 WL 3399571, at *2 (Mich. App. June 18, 2020) (discussing circumstances where special relationships may arise, including with respect to third parties, though finding no special relationship where the defendant texted and called someone they knew was driving and that driver struck the plaintiff). VNA therefore overstates how restrictive the requirement of a relationship between the parties is, as these special-relationship cases demonstrate.

The cases VNA refers to as contractor-liability cases do not support their position, either. In these Michigan Court of Appeals cases, there was a duty to the plaintiff, even though there was no discussion of the relationship between the defendant and the plaintiff, or the relationship was quite minimal. For example, in *Salveta v. Florence Cement Co., Inc.*, the plaintiff sued a contractor for failing to provide warnings or barriers

22

at their construction site, which led her to flip over her bicycle's handlebars when the sidewalk abruptly ended. No. 303067, 2012 WL 1890257, at *1 (Mich. App. May 24, 2012). There was a contractual relationship between the defendant and the Michigan Department of Transportation ("MDOT"). *Id.* The plaintiff was only related to the defendant insofar as they were using a public sidewalk that MDOT, a non-party to the case, had contracted with the defendant to excavate. *Id.* The Michigan Court of Appeals nonetheless rejected the conclusion that the "plaintiff failed to establish that defendant owed her a duty of care." *Id.* at *2. *Salveta* did not reach the holding that VNA urges this Court to adopt, finding instead that a government contractor owed a duty to the noncontracting third party, the bicyclist. Other cases hold that defendant-contractors have duties to noncontracting third parties. *See LaMeau ex rel. Crnkovich v. City of Royal Oak*, No. 289947, 2012 WL 3590043, at *4 (Mich. App. Aug. 21, 2012) ("[D]efendant had a common-law duty to noncontracting parties to use due care in its undertaking to construct a sidewalk, which encompassed a duty to avoid creating a new hazardous condition to third parties."); *see also Harper v. Ashgrove Apartments*, No. 345299, 2019 WL 4670180, at *7 (Mich. App. Sep. 24,

23

2019). These cases rely on the well-established "common-law duty to use due care in undertakings." *Loweke*, 489 Mich. at 170 (citations omitted).

The contractor-liability cases further demonstrate the lack of support for VNA's proposed "direct-relationship" requirement for imposing a duty on defendants. Michigan courts do not present these cases (involving things like incomplete or icy sidewalks) as exceptions to the strict rules about relationships that VNA suggests are in place. Instead, they analyze these cases as involving straightforward applications of common law duties. That is because VNA misinterprets the relationship factor in the duty analysis.

VNA's view is further complicated by cases like *Buczkowski v. McKay*, 441 Mich. 96 (1992). That case includes language about the required relationship for a duty to be imposed as being "between the parties," though it mainly considers how the defendant related to a customer who was their co-defendant in the suit. The opinion refers to that customer co-defendant as a "third party." *Buczkowski*, 441 Mich. at 103 ("Our ultimate decision turns on whether a sufficient relationship exists between a retailer and a third party to impose a duty under these circumstances."). Although the Michigan Supreme Court did not find a

duty in *Buczkowski*, that conclusion is based on an analysis of the relationship between a defendant-retailer and a customer, not the relationship between the defendant-retailer and the plaintiff whom the customer injured. *Buczkowski*, 441 Mich. at 103–9. If a "direct relationship" was required, as VNA argues, the Michigan Supreme Court could have simply said there was no relationship between the plaintiff and the defendant in *Buczkowski*. Instead, to determine the defendant's duty to plaintiff, the Court looked at a relationship between the defendant and a third party. Notably, *In re Certified Question* specifically relies upon *Buczkowski* in setting forth the requirement that there be a relationship between the parties. *Buczkowski* is not treated as an exception, but as a foundational case. *In re Certified Question*, 479 Mich. at 505–07.

Based on these special-relationship cases, contractor-liability cases, and *Buczkowski*, the Court previously rejected VNA's position and instead held that some relationship is necessary to impose a duty on a defendant, but it need not be between the parties involved in the case. *See Lee*, 2021 WL 5237197, at *3. It also interpreted some of the contractor-liability cases as involving no relationship between the

defendants and the plaintiffs, *In re Certified Question*, notwithstanding. *Id.* at \*3. But these analyses are in tension with the language of *In re Certified Question* that requires a relationship between the parties. For this reason, upon further consideration, the Court now finds that *In re Certified Question* requires a relationship between the parties, but it holds that this requirement is far less restrictive than VNA argues.

### c.   <u>The Relationship Requirement in Michigan Tort Law</u>

In considering the relationship factor of the duty analysis, Michigan law sets certain limits. *In re Certified Question* provides an example of those limits, which illustrates that the relationship between VNA and Plaintiffs favors imposing a duty on VNA.

In *In re Certified Question*, the court looked at "whether the social benefits of imposing that duty outweigh the social costs of imposing a duty." 479 Mich. at 515. In that case, while the court ultimately did not find there was a duty, it found that there was a relationship between the parties, albeit a "highly tenuous" one that was insufficient to impose a duty. *Id.* There, plaintiffs alleged a decedent "contracted mesothelioma from washing the work clothes of her stepfather, who worked for independent contractors hired by defendant to reline the interiors of blast

furnaces with materials that contained asbestos." *Id.* at 501. Despite two layers of separation between the defendant and the decedent (an independent contractor and the stepfather that contractor employed), there was a relationship between them. But it was a relatively weak one. Even then, the fact that the relationship was tenuous was not decisive, and the Court went on to consider the remaining factors before deciding whether to impose a duty. The lesson of *In re Certified Question* is that there must be a relationship between the parties, but it cannot involve multiple layers of separation and a weak connection between the parties in the case. The relationship can involve some separation between the parties, however. Michigan law recognizes both a relationship and a duty even when there is a third party standing between the defendant and the plaintiff, as in *Dyer*, 470 Mich. at 53–54 (finding a relationship and a duty between a physician-defendant who performs an independent medical examination (IME) on behalf of a third party and an examinee-plaintiff).

Here, there is at most one other party involved in the relationship between the parties, unlike the two layers of separation found in *In re Certified Question*. In this case, there are Plaintiffs, the City of Flint, and VNA. The City of Flint *connects* the two parties in the case rather than

separating them, because the City of Flint retained VNA to work on the public water system upon which Plaintiffs relied. *In re Certified Question*, in contrast, involved the defendant, an independent contractor, an employee of that contractor, and that employee's stepchild who only occasionally helped with the employee's laundry. 479 Mich. at 502–03, 515. Further, the independent contractor in *In re Certified Question* hired the employee not to benefit the plaintiff but to perform work that benefited the defendant (relining their blast furnaces). *Id.* at 503–4. Given these significant differences, *In re Certified Question* is consistent with Plaintiffs having a relationship to VNA.[10] To the contrary, VNA's

---

[10] Nor do the contractor-liability cases discussed above indicate that there is an insufficient relationship here. While the Court previously interpreted these cases as not requiring a relationship between the parties, they can more accurately be seen as involving a relationship sufficient to impose a duty, a point VNA emphasizes. (ECF No. 2922, PageID.98320–98321.) The contractor-liability cases involve plaintiffs who are the third party to contracts. *See, e.g.*, *Harper v. Ashgrove Apartments*, No. 345299, 2019 WL 4670180 (Mich. App., Sept. 24, 2019). In *Harper*, the plaintiff and the defendant had no contractual relationship; the plaintiff only saw that the defendant construction firm was doing work on the walkway leading to his apartment. The *Harper* court held that the defendant "had a common-law duty to use due care in its undertaking associated with the construction project at issue, which encompassed a duty to avoid creating a new hazardous condition to third parties." *Harper*, at *8; *see also Loweke*, 489 Mich. at 165 (setting forth that there is a "basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others") (quoting *Clark v. Dalman*, 379 Mich. 251, 261 (1967)).). As set forth above, the Court is unpersuaded by VNA's attempt to explain these cases based on its proposed category of relationships between "shared users of common space." The Michigan Court of Appeals relies upon the obligation to use due care during a voluntary undertaking and the relationship to third parties

relationship to Plaintiffs through its consulting work assessing the quality of the water system Plaintiffs used in the City of Flint is the sort of relationship that justifies "imposing a duty." *In re Certified Question*, 479 Mich. at 505; *see also Dyer*, 470 Mich. at 49.

### d. Limited Relationships and Professional Negligence Under Michigan Law

The fact that Plaintiffs assert a professional negligence claim against VNA is consistent with finding a relationship between the parties here. Michigan courts considering professional negligence claims have found that defendants have duties to third parties based on their engagement in a voluntary undertaking, often utilizing the idea of a limited relationship. *See, e.g., Roberts*, 308 Mich. App. at 628–29; *Dyer*, 470 Mich. at 50, 53–54. VNA had precisely this sort of limited relationship to Plaintiffs.

In *Roberts*, the Michigan Court of Appeals specifically invoked the idea of undertaking-based liability while imposing a limited duty on a

---

such an undertaking involves. *See id.* at 6–8. VNA's proposed rigid restrictions on when parties have a relationship sufficient to impose a duty under Michigan law are therefore unsupported.

professional. 308 Mich. App. at 615, 628–29.[11] There, a child's parents alleged that a counselor planted false memories in a child. *Id.* at 610–11. The court found that the counselor had a limited duty to the parents based on the limited relationship between the professional and the parents. *Id.* at 628–29.

Such limited relationships are key to a line of cases in Michigan courts, involving both professionals and non-professionals. *See Dyer*, 470 Mich. at 53–54 (finding a defendant-physician performing an independent medical examination (IME) had a limited duty to the plaintiff-examinee that permitted the plaintiff to bring a medical malpractice claim, despite not being in a "a traditional physician-patient relationship"); *Sabbagh*, 329 Mich. App. at 341–43 (applying *Dyer* and holding that psychologists conducting "pre-employment evaluation[s]" had a limited relationship to an examinee despite their lack of a traditional professional-client relationship); *Hill*, 492 Mich. at 662–64 (applying *Dyer* and holding that electrical appliance installers had a

---

[11] Notably, *Roberts* is explicitly not a "special relationship" case; it relies upon the voluntary undertaking in which the defendant engaged. 308 Mich. App. at 622 n.6 ("The cases involving the duty to act for another's benefit as a result of a special relationship are, therefore, inapposite.")

limited duty to a customer to properly install and deliver appliances, rather than duties involving an uncapped gas line that was unrelated to their voluntary undertaking). In some cases that involve a limited duty, the plaintiff is a third party to a professional relationship but is still owed a duty. *See Roberts*, 308 Mich. App. at 620–21 (involving the parents of a psychologist's patient). In other cases that involve a limited duty, a third party structures the relationship between the parties in a way that limits the scope of the professional duties owed to the plaintiff. *See Dyer*, 470 Mich. at 49 (involving a third party retaining a physician to examine someone who is not their patient for a purpose other than diagnosis or treatment); *Sabbagh*, 329 Mich. App. at 341 (involving a third party retaining psychologists to conduct a pre-employment evaluation of someone who is not their patient for a purpose other than diagnosis or treatment). In both types of cases, there is something other than a standard professional relationship between the parties, though there is nonetheless still a relationship. Such limited relationships are sufficient to impose limited duties. *See, e.g.*, *Dyer*, 470 Mich. at 55.

e.   _VNA's Limited Relationship to Plaintiffs_

Plaintiffs did not retain VNA and therefore their relationship to VNA is different than VNA's relationship to its client, the City of Flint. That does not mean that Plaintiffs had no relationship to VNA. Nor does it mean that their relationship is insufficient to support a finding that VNA had a duty to Plaintiffs. VNA has a limited relationship with Plaintiffs because of its voluntary undertaking: accepting a bid to do a water quality analysis and water quality presentation in Flint for the benefit of those who relied upon the Flint water system, including Plaintiffs. Because a limited professional relationship is present here, VNA's arguments related to the relationship factor of the duty analysis fail.

At the summary judgment stage, the Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." _Skousen_, 305 F.3d at 526 (citing _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986)). Insofar as VNA argues that their undertaking was so narrow that they had no relationship to Plaintiffs, the contracts and reports produced by VNA create a "genuine dispute . . . [of] material fact"

about whether there was a limited relationship between Plaintiffs and VNA in which VNA voluntarily undertook to evaluate and improve the City of Flint's overall water quality for the benefit of Plaintiffs. Fed. R. Civ. P. 56.

A limited relationship between a professional and a non-client third party is present when the professional's undertaking is "sufficiently connected" to that third party. *Roberts*, 308 Mich. App. at 616. VNA's work was intended to evaluate and improve a water system relied upon by Plaintiffs, as well as to communicate their findings to customers or users of Flint's water system. (*See* ECF No. 2922-3, PageID.98359 (contract defining the scope of VNA's work for the City, including a presentation of their findings to "stakeholders" and "communications with customers"); ECF No. 2922-6, PageID.98450 (VNA's Final Report about Flint water quality, describing VNA's work as a response to the City's request for "advice on what to do to ensure healthful drinking water for the community" and expressing a desire to "ensure safe drinking water for the city's customers").) Additionally, although VNA's report focused on TTHMs, its analysis went beyond that, noting that the focus of the report extended to "improv[ing] general water quality." (*Id.*

at PageID.98458.) VNA's voluntary undertaking here involved improving the general water quality in Flint, in large part for the benefit of customers and users of Flint's water system, including Plaintiffs. There is therefore a sufficient connection between VNA's work and Plaintiffs to find that they had a limited relationship.

By engaging in this voluntary undertaking, VNA had an "obligation to use due care, or to so govern [their] actions as not to unreasonably endanger the person or property of others." *Loweke*, 489 Mich. at 165 (quoting *Clark*, 379 Mich. at 261). The scope of that obligation to Plaintiffs is limited to the professional task they undertook: providing a water quality analysis that was in part aimed at providing the water system's users with safe and potable water.

VNA, of course, had a relationship to the City of Flint that included the full range of professional and contractual duties. The point of distinguishing limited relationships from full professional-client relationships is to recognize that professionals have different duties to their clients than they have to others. *See, e.g.*, *Dyer*, 470 Mich. at 49–50. For instance, suppose a municipal water authority hires an engineering firm to evaluate the sustainability and structural integrity of their

offices. If that firm fails to fulfill the standard of care for an engineer in this circumstance, damaging municipal property or causing other costs or harms, then the municipal client could file suit for professional negligence, while users of the water system could not. Absent details suggesting a sufficient connection to users of the water system (like facts indicating the public-facing nature of the project), such a project is not sufficiently connected to customers and users of the water supply. As a result, water system users and the engineering firm in this hypothetical example would not have the limited relationship Plaintiffs have to VNA.

Here, by contrast, the work being done was directed almost entirely for Plaintiffs' benefit and—they allege—it was done without due care in a manner that injured them. VNA's undertaking therefore created a limited relationship between the parties in this litigation. Because a limited relationship is present, the Court proceeds to consider the remaining factors set forth in *In re Certified Question*.

### iv.    The Foreseeability Factor

VNA argues that "the foreseeability factor also is absent here, and 'where the harm is not foreseeable, no duty can be imposed.'" (ECF No. 2922, PageID.98323 (quoting *In re Certified Question*, 479 Mich. at 509).)

To assess foreseeability, Michigan courts look at "whether or not a reasonable [person] could anticipate that a given event might occur under certain conditions" and that the event "must pose some sort of risk of injury to another person or his property." *Samson v. Saginaw Prof'l Bldg. Inc.*, 393 Mich. 393, 406 (1975). VNA argues that it "could not have reasonably foreseen Plaintiffs' alleged injuries because the City deliberately withheld critical data from VNA." (ECF No. 2922, PageID.98324.)

VNA made a similar argument in *Bellwether I*. There, the Court rejected VNA's argument, stating:

> To be sure, this withholding of information may well have been criminal conduct, which is ordinarily unforeseeable as a matter of law. *See, e.g., MacDonald v. PKT, Inc.*, 464 Mich. 322, 334–335, 628 N.W.2d 33 (2001). But Plaintiffs' expert witness opines that any reasonable engineer in VNA's position would have known that immediate corrosion control was necessary even without the test results the City withheld[.]

*Bellwether I*, 579 F. Supp. 3d at 982.

The Court rejects VNA's argument here for the same reason. As in *Bellwether I*, Plaintiffs contend that "even without the test results the City allegedly withheld, ample evidence demonstrates Veolia was on

notice that the harm to Flint residents flowing from Veolia's failure to act was inevitable." (ECF No. 2987, PageID.101128.) In support of this position, Plaintiffs rely on the testimony and report of Dr. Larry Russell, their expert in water quality assessments, corrosion mitigation, and the behavior of materials in drinking water.[12] (*Id.* at PageID.101128–101129.) Dr. Russell opines that, not only would a reasonable engineer in VNA's position have known that immediate corrosion control was necessary even without the test results the City purportedly withheld, but VNA's past engineering experiences likely made them aware that lead was a problem when it began its work. (*See id.* (citing Dr. Russell's report and other evidence).)

Dr. Russell's report includes the following opinions supporting Plaintiffs' position that a reasonable engineer in VNA's position would have known that immediate corrosion control was necessary:

(1)     The high chloride concentration in the Flint River was "well known prior to the switch to the Flint River in 2014 (USGS 1963)." (ECF No. 2987-2, PageID.101156.)

---

[12] VNA moved to challenge the admissibility of some of Dr. Russell's testimony, (ECF No. 2907), and the Court granted their motion in part and denied their motion in part. (ECF No. 2959.)

(2)   The increased corrosivity of Flint water "was obvious given the magnitude [of] increase in chlorides in a low alkalinity water (as was present after softening of the Flint River water) and the excessive red water (iron corrosion) reports throughout the City of Flint." (*Id.* at PageID.101157.)

(3)   Evidence of the Flint River's challenges with regard to treatment and corrosion control "dates back to at least the 1950's [sic] when the City previously operated on the Flint River." (*Id.* at PageID.101159.)

(4)   The Michigan Department of Natural Resources performed an assessment of the Flint River in 2001, which "identified that the Flint River had chlorides present." (*Id.* (citing Leonardi and Gruhn, 2001).) And "a simple reading of the existing reports and conducting a desktop analysis of the corrosiveness of the Flint River water would have indicated that there were high risks for corrosion with the treated Flint River." (*Id.* at PageID.101159–101160.)

(5)   The Chloride-Sulfate Mass Ratio ("CSMR") values "put the system at corrosion risk categories of *significant concern* to *serious concern* (Masten 2016)" and "[t]he data required to perform the CSMR calculation was readily available to the engineers of Veolia." (*Id.* at PageID.101156.)

(6)   There "were red flags related to the water quality including the presence of lead in the University of Michigan-Flint sampling data."[13] (*Id.* at PageID.101194.)

---

[13] In its reply brief, VNA acknowledges that it knew of water test results involving University of Michigan-Flint. (ECF No. 3014, PageID.101970.) VNA states that this knowledge "prompted VNA to ask for the City's lead-testing data." (*Id.*) However, it states that the data it received did not reveal problems with lead. (*Id.*)

Given the information available to VNA, there is a question of material fact as to whether the relevant events were foreseeable to an engineer exercising due care—regardless of any information the City withheld from VNA.

Further, the relevant events posed a risk of injury to Plaintiffs. *See Samson*, 393 Mich. at 405. Because "lead-poisoned water poses an unreasonable risk of harm to persons using and consuming the contaminated water," it is foreseeable that those who rely on a contaminated water system would be endangered by exposure to this contamination through their everyday water usage. *Nappier by Nappier v. Governor*, No. 344363, 2019 WL 1211469, at *7 (Mich. Ct. App. Mar. 14, 2019).

Plaintiffs have provided evidence that a reasonable engineer would have foreseen the danger to Plaintiffs from failing to adequately advise the City of Flint that improper water treatment was causing lead to leech into the City's drinking water source. Accordingly, the disputed evidence, which the Court must view in the light most favorable to Plaintiffs, demonstrates that the foreseeability factor favors holding that VNA owed Plaintiffs a duty.

### v.    The Burden on the Defendant Factor

Next, VNA argues that the factor related to the burden on the defendant does not support imposing a duty of care on VNA.[14] (ECF No. 2922, PageID.98324.) When evaluating this factor, the Michigan Supreme Court indicates that courts should consider "the consequences arising from such a duty for future cases." *In re Certified Question*, 479 Mich. at 516 n.17. It cautions that courts "cannot assess 'social benefits' and 'social costs' by considering only a 'particular' case or without considering other 'potential litigants.'" *Id.*

VNA asserts that imposing a duty in this case would have a tremendously negative effect on the consulting industry, and that "[f]ew, if any, consultants would be willing to provide services to government entities if those services exposed them to 'a potentially limitless pool of plaintiffs.'" (ECF No. 2922, PageID.98325 (quoting *In re Certified*

---

[14] VNA refers to the "public-policy factor" of the duty analysis. (ECF No. 2922, PageID.98324.) The Michigan Supreme Court holds that the analysis involves "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *In re Certified Question*, 479 Mich. at 525. The Court will therefore proceed in the manner indicated by the relevant caselaw and deal with the last two factors separately, analyzing burden on the defendant in this section and nature of the risk presented in the following one.

*Question*, 479 Mich. at 521).) The Court rejected similar arguments by

VNA in *Bellwether I*, stating:

> These are remarkable claims. The only duty being imposed in
> this case is the duty to take reasonable care to avoid
> foreseeable physical harms. It is hard to see how a duty to do
> one's job in a reasonably competent way could amount to the
> great burden VNA complains of. There is nothing new or
> extraordinary about this duty—indeed, as the Court
> explained in *Lee*, most states impose more expansive duties to
> prevent harm. *Lee*, at *2; *Huang v. The Bicycle Casino, Inc.*, 4
> Cal. App. 5th 329, 341, 208 Cal. Rptr. 3d 591 (2016)
> ("California law establishes the general duty of each person to
> exercise, in his or her activities, reasonable care for the safety
> of others.") (collecting cases and quoting Cal. Civ. Code §
> 1714(a)); *Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 536, 247
> N.W.2d 132 (1976) (everyone owes an obligation of due care to
> refrain from acts that will cause foreseeable harm) (citing *De
> Bauche v. Knott*, 69 Wis. 2d 119, 230 N.W.2d 158 (1975));
> *Turpen v. Granieri*, 133 Idaho 244, 247, 985 P.2d 669 (1999)
> ("every person . . . has a duty to exercise ordinary care to
> 'prevent unreasonable, foreseeable risks of harm to others.'")
> (quoting *Sharp v. W.H. Moore, Inc.*, 118 Idaho 297, 300, 796
> P.2d 506 (1990)).

*Bellwether I*, 579 F. Supp. 3d at 982–83.

To emphasize the "devastating effect" of imposing a duty of

professional care here, VNA offers a hypothetical involving a contractor

who performs "a nationwide IT project" for the federal government and,

as a result, might become "liable to all 328 million U.S. residents." (ECF

No. 2922, PageID.98324.) VNA's example, meant to suggest that the duty at issue here is too burdensome, is unavailing.

In offering this vague example,[15] VNA intends to argue that even the possibility of such liability would deter firms from taking on government contracts, regardless of the specific dangers to the public any particular contract might involve. But no nationwide expansion of liability is at issue here. Plaintiffs' allegations concern a circumscribed geographical area, involve physical injuries, relate to the specific professional responsibilities of an engineering firm, and arise from a contract formed in large part for Plaintiffs' benefit. The contemplated liability here goes no farther than that.

Further, it is unclear why a hypothetical federal government contractor—who voluntarily undertakes a project for the benefit of the American public and causes harm to every single individual in the United States—should be immunized from tort liability simply because they injured such a vast number of people. Perhaps VNA thinks it is obvious

---

[15] VNA fails to explain the purpose of this hypothetical project or how a project undertaken by the hypothetical IT contractor could endanger the persons and property of all 328 million people in the United States. VNA also does not explain how or why Michigan law would apply to all 328 million people in such a case.

that encouraging firms to contract with the federal government is such an important policy goal that requiring contractors to observe due care with respect to third parties is unjustifiably burdensome. Regardless, this possibility is not before the Court here, and the Court takes no position on the appropriate duty in VNA's hypothetical. VNA's example is vague and unilluminating, given that limitless liability is not under consideration. The Court has never held otherwise, nor does it to do so here.

VNA's hypothetical reflects the objections it raises about "a potentially limitless pool of plaintiffs." (ECF No. 2922, PageID.98325 (quoting *In re Certified Question*, 479 Mich. at 521).) The Michigan Supreme Court has previously addressed two circumstances that raised concerns about unlimited liability.

First, the court rejected "a cause of action based solely on exposure." *In re Certified Question*, 479 Mich. at 521 (quoting *Henry v. Dow Chemical Co.*, 473 Mich. 63, 83 (2005)). In *Henry v. Dow Chemical Co.*, the plaintiffs did not allege a present physical injury but instead claimed they "*may* at some indefinite time in the future develop disease or physical injury because of defendant's allegedly negligent release of

dioxin." 473 Mich. at 67 (emphasis in original). The court rejected the plaintiffs' attempt to circumvent the requirement that they allege a present physical injury. It explained that eliminating this limit on tort liability would have made it difficult to identify who possesses a claim of action, would increase the risk of fraud, and would "compromis[e] the judicial power" by eliminating "a clear standard by which judges can determine which plaintiffs have stated a valid claim, and which plaintiffs have not." *Id.* at 690–91. Second, the Michigan Supreme Court rejected "imposing a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner's property." *In re Certified Question*, 479 Mich. at 521. The court explained that the burden on the defendant in *In re Certified Question* was "extraordinarily onerous and unworkable" because it would have required defendants to protect every person who encountered the defendant's independent contractor's employees. *Id.* at 516. The rejected claims in *Henry* raised concerns about undefined future injuries, 473 Mich. at 67. The rejected claim in *In re Certified Question* raised concerns about a tenuous and indefinite relationship between the parties where the hazard at issue was not well understood at the time of exposure. 479 Mich. at 515–18, 525.

44

Nothing like the circumstances in *Henry* or *In re Certified Question* exist here. Plaintiffs allege defined, present physical injuries. The risks of lead exposure were far clearer and better understood during the time-period of the Flint Water Crisis than asbestos exposure through clothes-washing was during the mid-20th century. *See In re Certified Question*, 479 Mich. at 517–18. Further, Plaintiffs do not argue that VNA had the sort of obligations rejected in *In re Certified Question. Id.* at 521 (raising concerns about requiring landowners to take responsibility for anybody who encounters somebody who has been on the landowner's property). Plaintiffs do not claim, for instance that VNA should have monitored or controlled the contacts made by the agents of people or entities with whom it contracts. Nor do they assert that VNA has a duty to monitor or control the City of Flint, let alone its agents. Instead, Plaintiffs argue that engineering firms must exercise due care when voluntarily choosing to provide advice intended to evaluate and improve a public water system. It was no secret that Flint's public water system had users relying on it and that those users would be put at risk if exposed to certain contaminants. The scope of VNA's work in Flint, as set forth in its contract with the City, explicitly included communication with the

45

public. (*See* ECF No. 2922-3, PageID.98359.) The circumstances animating worries about a "potentially limitless pool of plaintiffs" in *In re Certified Question* are absent here. 479 Mich. at 521.

VNA next objects that "a consultant has no ability to force its clients to follow its advice, so the social benefit of imposing a duty on consultants is quite limited." (ECF No. 2922, PageID.98325.) If that were true, the law would not impose duties on doctors, lawyers, therapists, or many other professionals. None of these professionals can "force" their patients or clients to follow their advice. Nonetheless, members of these professions are obliged to exercise the ordinary care of a member of their profession, including sometimes with respect to third parties. *See, e.g.*, *Roberts*, 308 Mich. App. at 628–29 (imposing a limited duty on a therapist to a third party). VNA's duty here is not to control its client, who is indeed "free to accept, modify, or reject" VNA's advice, just like the clients of lawyers, doctors, therapists, and other professionals. (ECF No. 2922, PageID.98325.) VNA's duty was to render its advice with due care.

VNA's arguments ignore important aspects of the burden analysis under Michigan law, including considerations of who is "best equipped to be aware of . . . potential hazards." *Hill*, 492 Mich. at 670. In *Hill*, the

Michigan Supreme Court explained that homeowners were far better equipped to know the hazards in their own homes than appliance installers. *Id.* Unlike the appliance installers in *Hill*, engineering firms that consult with municipalities for the purpose of evaluating and improving water systems are well-equipped to identify and communicate dangers related to those water systems. That is precisely the job such firms voluntarily take on. While surely municipalities have obligations in such circumstances, if municipalities were fully equipped to perform such evaluations and improvements, presumably they would not contract with outside engineering consultants in the first place. That is because engineering consultants are particularly well-positioned to be aware of the sort of hazards at issue in this case, which weighs in favor of finding a duty.

VNA adds that the Court's *Bellwether I* decision "conflates *what* duty a professional owes with to *whom* that duty is owed." (ECF No. 2922, PageID.98325 (emphasis in original).) This argument is not persuasive. The Court has explicitly addressed the issue of whom a duty is owed to in its prior opinions. *Bellwether I*, 579 F. Supp. 3d at 982–83; *Lee*, 2021 WL 5237197, at *4. And the Court has already set forth here that

Michigan law supports imposing a duty on engineering firms to some noncontracting third parties. As a result, VNA's unsupported claim does not change the Court's analysis. The burden on defendant factor supports the conclusion that VNA had a duty to take due care with respect to the undertaking at issue here, including a duty with respect to Plaintiffs.

For the reasons set forth above, the Court rejects VNA's arguments related to this factor and concludes that the burden on the defendant supports the imposition of a duty.

### vi.    The Nature of the Risk Presented Factor

In its discussion of the burden on the defendant factor, VNA gestures at but does not fully address the fourth factor in the *In re Certified Question* analysis, the "nature of the risk presented." (ECF No. 2922, PageID.98324–98326 (analyzing the third and fourth factors together as the "public-policy factor"); *see also* ECF No. 3014, PageID.101970–101971.) VNA does not argue that this last factor weighs in its favor. And indeed, this factor weighs in favor of finding a duty. The nature of the risk from human consumption of and exposure to lead, *Legionella*, and fecal coliform is unquestionably serious. *See In re Certified Question*, 479 Mich. at 517 (finding that, given what is known

about asbestos exposure and the causal relationship between such exposure and mesothelioma, the nature of the risk in that case is serious and "suggests that a duty should be imposed" as to that prong of the analysis.) As in *In re Certified Question*, this fourth factor weighs in favor of finding a duty here. Accordingly, VNA's arguments that it had no duty to Plaintiffs fail.

As set forth above, all four factors in the duty analysis support VNA having a duty to Plaintiffs. Specifically, VNA had a limited duty to Plaintiffs to act with the "the skill and care ordinarily possessed and exercised by" a member of the engineering profession in its undertaking in the City of Flint. *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1, 21 (2002). First, VNA has a limited relationship to Plaintiffs, due to its voluntary undertaking of providing the City of Flint with advice as an engineering consultant. That undertaking involved investigating, attempting to improve, and communicating to the public about the water quality in Flint, in large part for Plaintiffs' benefit. Second, VNA could have foreseen the harm to Plaintiffs from failing to adequately advise the City of Flint about improperly treated Flint River water. Third, the burden on the defendant weighs in favor of imposing a

duty. This limited duty does not create limitless liability, despite VNA's assertions. In fact, an engineering firm in VNA's position is best equipped to be aware of hazards like those at issue here. Fourth, the very serious nature of the risks at issue in this case weigh in favor of imposing a duty on VNA. Accordingly, VNA had a limited duty to Plaintiffs to act with due care in evaluating and recommending improvements to the City of Flint's water system.

## B.    Specific Duties Identified by Dr. Russell

VNA argues that even if it owed Plaintiffs a duty of due care, it did not owe Plaintiffs the specific duties identified by Plaintiffs' expert Dr. Russell. Specifically, VNA interprets Dr. Russell as opining that VNA should have affirmatively protected Flint residents by insisting that the City: (1) add a corrosion-control chemical; or (2) return to using DWSD-treated water. (ECF No. 2922, PageID.98327.) VNA asserts that Plaintiffs are arguing VNA had a duty to protect them, which is not recognized by Michigan law. VNA's argument is based on a misreading of Michigan law and of Plaintiffs' position.

Plaintiffs' claims against VNA do not resemble the classic duty to protect, which involves failure to actively prevent harm. *See Williams v.*

50

*Cunningham Drug Stores, Inc.*, 429 Mich. 495, 499 (1988) ("there is no duty that obligates one person to aid or protect another"); *see also Union Pac. Ry. Co. v. Cappier*, 72 P. 281, 282 (Kan. 1903) (explaining there is no legal duty to protect that forbids "withholding relief from the suffering, . . . failure to respond to the calls of worthy charity, or . . . faltering in the bestowment of brotherly love on the unfortunate"). Plaintiffs do not assert that mere awareness of Flint's water problems or that the capacity to help obligated VNA to step in and warn the public. They also do not claim that VNA was obliged to protect them from risks that were unrelated to the VNA's voluntary undertaking in Flint. Rather, Plaintiffs' claim is that VNA, having affirmatively undertaken to provide advice intended to evaluate and improve the water in Flint, had an obligation to exercise due care with respect to those foreseeably harmed by its actions. (ECF No. 2987, PageID.101132 (explaining that Dr. Russell's opinions are about VNA's obligations "once [it had] undertak[en] to advise the City regarding its water quality in its capacity as a professional engineer").)

Despite the way Plaintiffs' position appears on its face, VNA argues that Plaintiffs are implicitly and improperly attempting to impose a duty

51

to protect upon it. It contends that Michigan common law recognizes only

"a duty to avoid *creating* a new risk of harm or *increasing* a pre-existing

risk of harm." (ECF No. 2922, PageID.98328 (emphasis in original).)

VNA's position is summarized in its reply brief:

> If VNA had "not engaged in the undertaking," nothing would
> have changed for Plaintiffs, so VNA did not "increase[] the
> risk of harm." *Myers v. United States*, 17 F.3d 890, 902–903
> (6th Cir. 1994). So no matter how Plaintiffs spin it, their
> theory is that VNA owed a duty to lower an existing risk of
> harm. That is a duty to protect, and it is invalid under
> Michigan law.

(ECF No. 3014, PageID.101972.) Because VNA believes it neither created

nor increased a risk of a hazard that impacted Plaintiffs, VNA argues

that it is not liable for the specific duties Plaintiffs suggest they are owed.

VNA's argument fails because the caselaw does not support VNA's

position and VNA misconstrues Plaintiffs' arguments.

### i.    *VNA's Misreading of Michigan Law*

VNA relies on the Sixth Circuit's decision in *Bennett v. MIS Corp.*,

607 F.3d 1076 (6th Cir. 2010) to argue that Plaintiffs must allege that

VNA created a new harm or increased the risk of an existing harm.[16] (*See*

---

[16] VNA also cites *Harper v. Ashgrove Apartments*, No. 345299, 2019 WL
4670180 (Mich. App. Sept. 24, 2019), as a case where Michigan law distinguishes
between a hazard created by the defendant and a defendant's failure to protect a

ECF No. 2922, PageID.98329.) *Bennett* involved Federal Aviation Administration (FAA) employees suing consultants hired by the FAA over allegedly "disastrous" mold remediation in a Detroit airport control tower storage area. F.3d at 1082 (quotation omitted).

*Bennett* relies on the Michigan Supreme Court's decision in *Fultz v. Union-Commerce Associates*, 470 Mich. 460 (2004). *See Bennett*, 607 F.3d at 1091–94. In *Fultz*, the court held that a snow removal contractor did not owe a duty to a noncontracting third party who slipped and fell in an icy parking lot the contractor failed to plow or salt. *See* 470 Mich. at 461, 469. The court explained that "the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie." *Id.* at 467. In *Bennett*, the Sixth Circuit explained that "the *Fultz* holding often functions to bar a third-party plaintiff from suing a contractor for its negligent performance."

---

plaintiff from a harm created by someone else. (ECF No. 2922, PageID.98329–98330.) The *Harper* court indicates that the defendant's active creation of a hazard supports the plaintiff's negligence claim. *Harper*, 2019 WL 4670180, at *8 ("Plaintiff is basing his negligence claim on an alleged hazard that [the defendant] actively created, not the failure to protect him from harm created by someone or something else."). *Harper* does not hold that a plaintiff *must* assert that a defendant created a hazard to bring a negligence claim, contrary to what VNA suggests.

*Bennett*, 607 F.3d at 1092. The *Bennett* court further noted that "Michigan and federal district courts sitting in diversity have concluded that there is no independent duty under *Fultz* when a plaintiff alleges a hazard that is the subject of the defendant's contractual obligations." *Id.* at 1094 (collecting cases). It stated that when considering claims from a noncontracting party, the "salient inquiry is whether plaintiffs' complaint avers that any defendant created a 'new hazard' that gave rise to a duty that was 'separate and distinct' from its contractual obligations." *Id.* at 1096.

VNA's reliance on *Bennett* is misplaced, because in *Loweke* the Michigan Supreme Court expressly rejected *"Bennett'*s overly broad reading of *Fultz*." *See Loweke*, 489 Mich. at 160 n.1. The *Loweke* court clarified that

> *Fultz* did not extinguish the simple idea that is embedded deep within the American common law of torts . . . : if one having assumed to act, does so negligently, then liability exists as to a third party for failure of the defendant to exercise care and skill in the performance itself.

*Id*. at 170–71 (alteration in original) (internal quotation marks and citations omitted). In *Loweke*, the Michigan Supreme Court also explained that "under *Fultz*, while the mere existence of a contractual

54

promise does not ordinarily provide a basis for a duty of care to a third party in tort, 'the existence of a contract [also] does not extinguish duties of care otherwise existing . . . .'" *Loweke*, 489 Mich. at 170 (alterations in original) (citations omitted).

Subsequent Sixth Circuit cases have recognized Michigan law's shift away from *Bennett*'s misreading of *Fultz*. *See, e.g.*, *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 840 (6th Cir. 2013) (discussing the importance of *Loweke* in correcting the misinterpretation of *Fultz*). In *Leone*, the Sixth Circuit instructs that the creation of a new hazard can trigger a duty to a noncontracting third party under Michigan law, but that is not "the *only* way that such a duty might arise." *Leone*, 893 F.3d at 363 (emphasis in original). Relying on *Loweke*, the *Leone* court also expressly recognized that such a duty may arise as a result of voluntary undertakings, as is alleged here. *See id.* (concluding that "Michigan law would recognize that [the defendant-contractor] owed [the plaintiff-employee] a duty 'separate and distinct' from its contractual obligations to [the employer]").

As set forth above, VNA's duty arises out of the operation of common law, which establishes that a professional with a limited

relationship to a third party owes them a duty to take reasonable care to avoid causing them foreseeable harms in carrying out a voluntary undertaking intended for that third party's benefit. When VNA undertook to evaluate and advise the City of Flint about improving the quality of Flint's water, it had a limited duty to Plaintiffs to take reasonable care. The Court will therefore not apply the "overly broad" approach from *Bennett* advocated by VNA. *Loweke*, 489 Mich. at 160 n.1.

### ii.    VNA's Misreading of Plaintiffs' Position

Beyond ignoring these developments in the caselaw, VNA's arguments fail because Plaintiffs in fact argue that VNA increased their risk of harm. Plaintiffs maintain that "Veolia's negligent provision of professional engineering services increased and prolonged their exposure to leaded water by delaying (1) the City's switch to the DWSD; (2) the City's acknowledgment of the serious health threat posed by its water; and (3) the use of appropriate corrosion control measures." (ECF No. 2987, PageID.101133.) Plaintiffs suggest that these delays increased their exposure to the contaminated water and, as a result, increased the negative impacts they experienced. (*Id.*)

VNA's response is, effectively, that their conduct made no difference to the Flint Water Crisis at all, because their voluntary undertaking had no impact on when the City and State would have acted to address the contaminated water. (ECF No. 3014, PageID.101972.) To support this point, VNA cites a case about a mine explosion in Tennessee, in which the mine lacked adequate ventilation for methane gas and the miners illegally lit a cigarette that ignited the gas and killed the plaintiff-miners, as well as others. *Myers v. United States*, 17 F.3d 890, 892–93 (6th Cir. 1994). The plaintiffs sued the federal government under the Federal Tort Claims Act, alleging it negligently failed to perform certain statutorily required duties related to mine safety. *Id.* at 893. The plaintiffs did not properly explain how the government inspectors increased the hazards in the mine, but the court surmised that "by failing to detect safety violations in the mine, the dangerous conditions were allowed to continue over time. Even though the risk was constant, plaintiffs seem to argue, the probability of harm increased with the passage of time." *Id.* at 902. The Sixth Circuit rejected that argument, because allowing a risk to persist is not enough to count as increasing a risk; there must involve some physical or material change. *Id.* at 902–03. It is only considered

increasing the risk if the defendant's choice to engage in an undertaking at all increases the risk; the increase cannot come solely from the fact that the defendant performed the undertaking negligently. *Id.* at 903. Delays can be one way that risk is increased, however. *See Sagan v. United States*, 342 F.3d 493, 498–500 (6th Cir. 2003) (denying summary judgment because there was a genuine dispute of material fact as to whether the risk of physical harm was increased by delaying a rescue).

Here, Plaintiffs allege that by VNA choosing to undertake the water evaluation and doing so negligently, VNA delayed a remedy to the Flint Water Crisis, which increased the hazards they faced. (*See* ECF No. 2987, PageID.101133.) That is different than simply allowing a potential, unrealized hazard to continue for a longer time, as occurred in *Myers*. Plaintiffs' claim is that the hazard was realized when they were exposed to contaminated water, and VNA increased their exposure by providing advice that prolonged the Crisis. (*Id.*) That did not merely allow risks to persist (as in *Myers*), but Plaintiffs assert that VNA's conduct created worse problems for Plaintiffs than would otherwise have occurred. (*Id.*) Plaintiffs' point is that because VNA chose to get involved and provide advice to the City of Flint, a hazardous situation became worse. There

was a physical or material change, as well, given that Plaintiffs suggest they were exposed to more contaminants than they otherwise would have been, causing them greater harm. These arguments undermine VNA's assertion that Plaintiffs are claiming VNA had a duty to protect them.[17]

Accordingly, the Court rejects VNA's arguments for interpreting Plaintiffs as arguing VNA owed them a duty to protect, and summary judgment is denied on this issue.

### C.    Causation

Next, VNA argues that "Plaintiffs cannot prove that VNA caused their claimed injuries from exposure to lead in Flint water." (ECF No. 2922, PageID.98331.) It argues that Plaintiffs "lack any evidence of how much lead they were exposed to from Flint water after February 2015," and are unable to show they were exposed to lead at a level that could

---

[17] VNA asserts that "[t]here is no evidence that VNA increased any risk of harm." (ECF No. 3014, PageID.101971–101972.) On the contrary, Plaintiffs provide sufficient evidence that VNA's conduct increased their risk of harm to avoid summary judgment. The parties dispute whether VNA could have conducted itself differently and avoided the delay that increased the harms to Plaintiffs. (*See* ECF No. 3014, PageID.101971–101972.) In *Bellwether I*, the Court considered evidence for and against the claim that if VNA had not been negligent, officials would have acted sooner. *See Bellwether I*, 579 F. Supp. 3d at 989–91 (setting forth evidence about whether VNA offering different advice would have made a difference and holding that summary judgment could not be granted "as to whether the City of Flint would have heeded a sufficiently urgent warning from VNA"). VNA's conclusory assertions do not justify departing from this holding, particularly in light of the other arguments and evidence from Plaintiffs set forth above.

59

have injured them "during the time relevant to [their claims against] VNA." (*Id.* at PageID.98331–98332.)

The Court has previously set forth the relevant legal standards regarding causation. *See Bellwether I*, 579 F. Supp. 3d at 985 (setting forth the relevant standards for but-for causation and proximate causation, as well as general and specific causation in a toxic torts context.) It has also explained that "Michigan law requires toxic torts plaintiffs to present evidence of 'the level of the toxi[n] . . . to which they were exposed.' *Powell-Murphy*, 333 Mich. App. at 251, 964 N.W.2d 50." *Id.* at 987 (alteration in original). However,

> while Michigan law requires that evidence of causation [] not [be] "mere speculation," it permits "reasonable inferences of causation" based on "circumstantial evidence." *Powell-Murphy*, 333 Mich. App. at 246, 964 N.W.2d 50 (citing *Skinner*, 445 Mich. at 162–63, 516 N.W.2d 475). Here, as in every other case, the Court must consider whether there is enough evidence to permit a reasonable jury to find in favor of Plaintiff—not whether Plaintiffs have brought an open-and-shut claim.

*Id.* at 987–88. The Sixth Circuit has also set forth that

> Michigan law . . . requires only that a plaintiff claiming negligence prove his or her case by a preponderance of the evidence, and does not require that a plaintiff alleging exposure to a harmful substance prove with certainty that he

> or she was exposed to a particular chemical. *See Liberty Mut. Ins. Co. v. Bay City, Water Dept.,* 367 Mich. 8, 116 N.W.2d 199, 200 (1962). Therefore, Plaintiffs may survive summary judgment if a reasonable jury could find that it is more likely than not that Defendants caused Plaintiffs to be exposed to a sufficient quantity of a hazardous substance capable of causing their injuries.

*Gass v. Marriott Hotel Servs.,* Inc, 558 F.3d 419, 431 (6th Cir. 2009). In *Bellwether I*, the Court denied summary judgment with respect to causation, holding that the Bellwether I plaintiffs were not required to prove their precise level of lead exposure but instead that their lead consumption during the relevant time-period could have caused or contributed to their claimed injuries. *Id.* at 989 (citation omitted).

VNA argues that Plaintiffs must offer evidence that the level of lead to which they were exposed after VNA began its undertaking in Flint caused or contributed to their alleged injuries. (ECF No. 2922, PageID.98332.) It asserts that Plaintiffs fail to offer such evidence, pointing to Plaintiffs' blood lead levels and their specific-causation experts' opinions. (*Id.* at PageID.98334–98336.) VNA also argues that Plaintiffs' bone lead levels were low in addition to being "meaningless" for reasons outlined in VNA's motion to exclude the opinions of Dr. Aaron

Specht, Plaintiffs' expert witness who measured Plaintiffs' bone lead levels. (ECF No. 2921, PageID.98174 n.7.[18])

As VNA acknowledges, the Court considered its arguments and denied summary judgment on causation in *Bellwether I*. (ECF No. 2922, PageID.98336.) In *Bellwether I*, the Court set forth the following evidence supporting the Bellwether I plaintiffs' exposure to lead in Flint water: testimony about where Bellwether I plaintiffs were exposed to lead in their drinking water, the "substantial amounts of lead" detected in their bones, the fact they were living in a city experiencing a lead pollution crisis in its water, and Dr. William Bithoney's expert testimony that "Flint water was the most likely source for the [Bellwether I plaintiffs'] exposure to lead." *Bellwether I*, 579 F. Supp. 3d at 986. With respect to their consumption of lead-polluted water in the year 2015 specifically, one plaintiff had attended a school where the water's lead levels were above the regulatory limit and others had circumstantial evidence about exposure to lead in 2015 based on lay and expert testimony. *Id.* at 987.

---

[18] The Court will cite the sealed version of VNA's motion for summary judgment, (ECF No. 2921), and the sealed version of Plaintiffs' response, (ECF No. 2986), as well as any accompanying sealed exhibits, only where necessary. It will otherwise cite the unsealed motions and attached exhibits.

Further, Bellwether I plaintiffs offered sufficient evidence that led exposure in 2015 contributed to their injuries. Because "blood lead levels of as little as 1 µg/dl are sufficient to cause intellectual harms," evidence of school exposures and the high levels of lead in Flint homes, coupled with expert testimony meant "a reasonable jury could find that in the eight-month period between VNA's arrival in Flint and Flint's return to DWSD, each [Bellwether I plaintiff] consumed sufficient lead to cause or contribute to their neurocognitive injuries." *Id.* at 989.

VNA is therefore incorrect to imply that they were denied summary judgment on this issue solely based on "evidence that a Plaintiff drank water outside his or her home." (ECF No. 2922, PageID.98336–98337.) The Court did, however, reject VNA's proposed "draconian evidentiary requirements" that were inconsistent with Michigan law. *Bellwether I*, 579 F. Supp. 3d at 988 (declining to require Bellwether I plaintiffs to "show not only how often each child drank water, but also 'what the concentrations of lead [were] in the water,' and 'how much of their water intake came from [their] schools'" (alterations in original)).

Plaintiffs respond to VNA's argument by asserting that in Bellwether III they provide the same sort of evidence that led the Court

to deny VNA's motion on this issue in Bellwether I: "(1) bone scan measurements showing that the children have thousands of micrograms in their bones; (2) estimates regarding lead absorption and peak blood lead; and (3) . . . literature showing lead causes neurocognitive harms at quantities as low as 1 mcg/dl of blood lead." (ECF No. 2987, PageID.101136.)

VNA's arguments about bone scan measurements fail. VNA asserts that Plaintiffs' bone lead levels do not indicate "persistent exposure." (ECF No. 2921, PageID.98174 n.7 (referencing 10 µg/g as the level that equates with persistent exposure).) However, the relevant legal question is whether there was *sufficient* exposure to cause or contribute to Plaintiffs' injuries. *Bellwether I*, 579 F. Supp. 3d at 989. VNA does not attempt to explain why persistent exposure to lead is the relevant level for determining whether Plaintiffs' exposure to lead was sufficient to cause their injuries. As set forth below, Plaintiffs provide evidence that a different exposure level would be sufficient. (*See* ECF No. 2987, PageID.101139 ("[B]lood lead levels of as little as 1 mcg/dl are sufficient to cause injury.").) Plaintiffs' bone lead levels therefore provide support for a reasonable jury's conclusion that they were exposed to lead at a level

64

sufficient to cause injury. (*See, e.g.*, ECF No. 2913-31, PageID.97441 (providing a Plaintiff's bone lead measurements, explaining that bone turnover rates indicate an even higher level of exposure than what was recorded, and concluding "there was a definitive, substantial exposure of lead during development, which would adversely impact health.").)

Next VNA argues that these measurements of lead in Plaintiffs' bones are meaningless, citing to its *Daubert* motion to exclude Dr. Specht's opinions. (ECF No. 2921, PageID.98174 n.7 (citing ECF No. 2916, PageID.97898).) The Court denied the relevant portion of VNA's motion on this issue and will not reconsider that ruling here. (ECF No. 3141.)

VNA also argues that because these measurements capture cumulative lead exposure, they "do not show that any Plaintiff suffered harmful exposure in 2015." (ECF No. 2921, PageID.98174 n.7.) On their own, these measurements do not establish lead exposure during the relevant period but coupled with the rest of the evidence set forth below, they form part of the basis for a reasonable jury to infer exposure in 2015. They provide direct evidence that Plaintiffs were exposed to lead.

Plaintiffs provide further evidence related to causation that precludes summary judgment on this issue. To demonstrate the amount of water Plaintiffs drank "*throughout* the crisis," (ECF No. 2987, PageID.101136 (emphasis in original)), Plaintiffs' expert Dr. Bithoney reports—based on testimony and interviews that "[a]ll of the children drank between 3 to 6 glasses of water per day on average, and most of the children drank between 4 and 6 glasses per day." (ECF No. 2986-1, PageID.100801.) Plaintiffs provide evidence that their families were unable to stop drinking Flint water or being exposed to it through other everyday household activities like cooking (ECF No. 2987, PageID.101137 (citing ECF Nos. 2986-3, 2986-4).) To demonstrate that the water Plaintiffs drank contained lead, they point to elevated lead levels in the community as a whole, citing a study of high lead levels in significant numbers of Flint homes. *See Bellwether I*, 579 F. Supp. 3d at 989 ("there is record evidence that at least 40% of homes in Flint had water with a lead content of over 5 ppb, and at least 10% of homes had water with a lead content of over 25 ppb. As Dr. Bithoney explained, that study likely underrepresented the true percentage of homes with dangerous lead concentrations in their tap water. And . . . each Plaintiff

66

likely consumed tap water both in their own home and elsewhere." (citations omitted)). Plaintiffs provide the same evidence here, as well as other data. (*See* ECF No. 2987, PageID.101138–101139; *see also* ECF No. 2986-5 (a report with geo-mapping data about lead exposure statistics in relationship to Plaintiffs' primary and secondary addresses).)

To demonstrate that Plaintiffs' levels of exposure were capable of causing their injuries, they rely on evidence that low levels of lead exposure are capable of causing injury. (*See, e.g.*, ECF No. 2986-2, PageID.100851–100855 (a portion of one of Dr. Bithoney's reports citing research about the association between low levels of lead exposure and a variety of conditions).) Dr. Bithoney explains that Plaintiffs' consumption of Flint water was sufficient to cause them to absorb significant amounts of lead:

> A toddler who daily consumes 1 liter (4 glasses) of Flint water with a lead content of 10ppb for approximately 3 months would have absorbed between 450 mcg and 900 mcg of lead. Children absorb between 50% and 100% of the lead they drink, which would have been dispersed over approximately 1.5 liters of blood before being deposited in the bones.

(ECF No. 2986-1, PageID.100801 (citing an Agency for Toxic Substances and Disease Registry report).) In *Bellwether I*, the Court set forth that

this level of exposure could quickly lead to blood lead levels that approached the toxicity threshold for lead. 579 F. Supp. 3d at 988–89.

This evidence precludes granting VNA's request for summary judgment with respect to causation. VNA is incorrect that Plaintiffs fail to offer evidence of sufficient exposure in 2015, or to imply that they only rely on a single study to meet their burden. (*See* ECF No. 3014, PageID.101973.) The evidence described above belies those assertions. Accordingly, because Plaintiffs offer evidence that their lead exposure while VNA was working in Flint in 2015 was sufficient to cause or contribute to their injuries, summary judgment is denied with respect to causation.

### D.    Non-Parties at Fault: Duties to Plaintiffs

VNA argues that the Court should grant it partial summary judgment on its non-party defense and find, "specifically, that each non-party owed Plaintiffs a cognizable legal duty." (ECF No. 2922, PageID.98337.)

In Bellwether I, VNA identified 36 entities related to its non-party at fault defense. (*See* No. 17-cv-10164, ECF No. 710, PageID.45744.) The Court held that the same duty applied to all 36 entities: "a duty to take

reasonable care in their undertakings to avoid foreseeable physical harm." (*Id.* at PageID.45738.) It held that the definition of reasonable care depended on the entity at issue. (*See id.* at PageID.45743.)

The rulings set forth above in this Opinion do not provide any reason to depart from the Court's prior ruling on this issue in Bellwether I. Plaintiffs do not provide any reasons not to grant this portion of VNA's motion either. Instead, they state that—for appeal purposes—they "reiterate and incorporate the arguments raised during Bellwether I on this point, but do not oppose the Court's application of its prior ruling." (ECF No. 2987, PageID.101118 n.1.) Accordingly, the Court's prior ruling on duty with respect to non-parties will apply and VNA's motion is granted in part.

## IV.   Conclusion

For the reasons set forth above, VNA's motion for summary judgment is granted in part and denied in part.

IT IS SO ORDERED.

Dated: October 1, 2024          s/Judith E. Levy
Ann Arbor, Michigan            JUDITH E. LEVY
                              United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 1, 2024.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager