UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* Flint Water Cases                           Hon. Judith E. Levy
                                                    United States District Judge

_____  /

MEEKS *et al*., v. UNITED STATES,
Case No. 16-cv-10444 / 19-13359

_____/


## MEEKS PLAINTIFFS' OPPOSITION TO USA'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF FACTS .................................................................. 2

ARGUMENT .................................................................................. 5

I.      PLAINTIFFS MEET THE PRIVATE LIABILITY REQUIREMENT ......... 5

    A.  The EPA undertook to render services to Plaintiffs and Plaintiffs'
negligence claims arise from that undertaking ........................................... 5

    B.  The EPA's conduct satisfies all three of the proximate cause alternatives . 7

       i.  Section 324A(a): The EPA increased the risk of harm to Flint citizens... 7

      ii.  Section 324A(b): The EPA undertook to perform a duty owed by another
to the Plaintiffs. ........................................................................ 11

     iii.  Section 324A(c): Plaintiffs, the MDEQ, and the City all relied on the
EPA to their detriment. ............................................................. 14

II.     THE MISREPRESENTATION EXCEPTION IS INAPPLICABLE .......... 17

III.   THE DISCRETIONARY FUNCTION EXCEPTION ("DFE") DOES NOT
APPLY TO THE EPA'S CONDUCT ........................................... 18

    A.  The Court appropriately defined the EPA's conduct ................................. 19

    B.  The challenged EPA conduct is non-discretionary as the SDWA, and the
EPA's own regulations, do not provide for discretion. ............................ 20

    C.  The EPA's conduct is not of the nature or quality that the discretionary
function exception protects. ..................................................... 24

       i.  The DEF's susceptibility analysis is not a toothless standard, as the USA
suggests. ............................................................................ 24

      ii.  The EPA's failure to timely intervene with §1414 or §1431 enforcement
is not susceptible to or justified by policy analysis. ............................... 26

     iii.  The EPA's decision not to notify the public of a known public health
hazard is not susceptible to or justified by policy analysis. .................... 31

iv.  The EPA's failure to timely and accurately handle and respond to citizen complaints about the health hazard is not susceptible to or justified by policy analysis............................................................................34

CONCLUSION .................................................................................36
CERTIFICATE OF SERVICE................................................................37

# TABLE OF AUTHORITIES

**Cases**

*A.O. Smith Corp. v. United States*, 774 F.3d 359 (6th Cir. 2014)....................25, 32

*Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023)........................................18, 22

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641 (6th Cir. 2015).................26, 32

*Am. Reliable Ins. Co. v. United States*, 106 F.4th 498 (6th Cir. 2024) ...................25

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017) ........................................................27

Bultema v. United States, 359 F.3d 379 (6th Cir. 2004)............................26, 31, 33

*Burgess v. United States*, 375 F. Supp. 3d 796 (E.D. Mich. 2019).................passim

*Burgess v. United States*, No. 17-11218, 2019 U.S. Dist. LEXIS 166069 (E.D.

  Mich. Sep. 27, 2019)..............................................................................................1

*Caplan v. United States*, 877 F.2d 1314 (6th Cir. 1989)....................................25, 31

*Catalano v. GWD Mgmt. Corp.*, No. CV 403-167, 2005 WL 5519861 (S.D. Ga.

  Mar. 30, 2005)......................................................................................................13

*City of Highland Park v. EPA*, No. 2:16-cv-13840, 2018 U.S. Dist. LEXIS 168565

  (E.D. Mich. Sep. 29, 2018) ..................................................................................23

*Dolan v. United States Postal Serv.*, 546 U.S. 481, 492, 126 S. Ct. 1252 (2006)...19

*Halsey v. Townsend Corp. of Ind.*, 20 F.4th 1222 (8th Cir. 2021).........................13

*Howell v. United States*, 932 F.2d 915 (11th Cir 1991) ................................8, 12, 13

*Hutchison v. Fitzgerald Equip*. Co., 910 F.3d 1016 (7th Cir. 2018)......................13

*In re FTCA Flint Water Cases*, No. 17-cv-11218, 2025 U.S.

  Dist. LEXIS 14970E.D. Mich. Jan. 28, 2025) ...........................................1, 20, 24

*In re FTCA Flint Water Cases*, No. 17-cv-11218, 2025 U.S. Dist. LEXIS185924

  (E.D. Mich. Sep. 22, 2025) ...........................................................................passim

*Kohl v. United States*, 699 F.3d 935 (6th Cir. 2012)............................19, 20, 25, 28

*Kush Muhammad v. United States*, No. 23-5195, 2023 U.S. App. LEXIS 33258

  (6th Cir. Dec. 13, 2023) .......................................................................................22

*Lyons v. Tenn. Valley Auth.*, 840 F.2d 17 (6th Cir. 1988)......................................25

*Maier v. Green Eyes, USA, Inc.*, 845 Fed. Appx. 869 (11th Cir. 2021)...................8

*Myers v. United States*, 17 F.3d 890 (6th Cir. 1994).......................................passim

*National Carriers, Inc. v. United States*, 755 F.2d 675 (8th Cir. 1985).................11

*Raymer v. United States*, 660 F.2d 1136 (6th Cir. 1981) ........................................8

*SRP ex rel ABunabba v. United States*, 675 F.3d 329 (3rd Cir. 2012)...................32

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*,
   467 U.S. 797 (1984)........................................................................................21

*Walters v. City of Flint (In re Flint Water Cases)*, 627 F. Supp. 3d 734 (E.D. Mich.
   2022) ........................................................................................................passim

*Walters v. Flint (In re Flint Water Cases)*, 482 F. Supp. 3d 601 (E.D. Mich. 2020)
   ...................................................................................................................passim

*Whisnant v. United States, 400* F.3d 1177 (9th Cir. 2005) ....................................27

**Statutes**

§ 1414(a)(1)(A) ........................................................................................................24

§1414 ...............................................................................................2, 26, 27, 29

§1431 ...............................................................................................2, 26, 27, 29

§324A(b) ...................................................................................................................13

14 C.F.R. §§ 91.163(a), 135.413 ..............................................................................13

42 U.S.C. § 300g-3(i) ...............................................................................................23

Section 324A(c)........................................................................................................14

**Other Authorities**

H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454 .............2, 27

Safe Drinking Water Act ("SDWA").................................................................passim

**INTRODUCTION**

The USEPA attempts to escape liability for its failures in the Flint Water Crisis by renewing subject matter jurisdiction arguments that the Eastern District of Michigan has consistently, and correctly, struck down.[1] This Court and Judge Parker have rejected these same arguments more than four times, ruling that Plaintiffs' claims: (i) satisfy the FTCA's private liability requirement; (ii) are not barred by the misrepresentation exception; and (iii) do not fall within the discretionary function exception. The USA reiterates these already rejected FTCA exceptions without raising any facts or arguments that establish that the Eastern District of Michigan's jurisprudence should be disturbed. Moreover, these arguments again fail because: (i) there is no dispute that the EPA negligently undertook a response to the Flint Water Crisis, (ii) the Plaintiffs' claims do not rest on misrepresentations, and (iii) the EPA flouted mandatory statutory duties in such an egregious way that it cannot be susceptible to policy analysis. Accordingly, the USA's motion must be denied.

---

[1] This Court and Judge Parker have rejected these arguments on the merits in denying motions to dismiss as well as motions for interlocutory appeal. *Burgess v. United States*, 375 F. Supp. 3d 796, 800 (E.D. Mich. 2019) (referred herein as "*Burgess April 2019*"); *Burgess v. United States*, No. 17-11218, 2019 U.S. Dist. LEXIS 166069 (E.D. Mich. Sep. 27, 2019) ("*Burgess Sept 2019*"); *Walters v. Flint (In re Flint Water Cases)*, 482 F. Supp. 3d 601, 607 (E.D. Mich. 2020) ("*Meeks 2020*"); *Walters v. City of Flint (In re Flint Water Cases)*, 627 F. Supp. 3d 734, 740 (E.D. Mich. 2022) ( "*Meeks 2022*"); *In re FTCA Flint Water Cases*, No. 17-cv-11218, 2025 U.S. Dist. LEXIS 14970, at *8 (E.D. Mich. Jan. 28, 2025) ("*Burgess Jan 2025*"); *In re FTCA Flint Water Cases*, No. 17-cv-11218, 2025 U.S. Dist. LEXIS185924, at *7 (E.D. Mich. Sep. 22, 2025) ("*Burgess Sept 2025*").

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the comprehensive factual background set forth by Judge Parker's 2019 decision and adopted by this Court's 2020 decision. Ex. 1 (Highlighted Order). In addition, Plaintiffs set forth the following:

The Safe Drinking Water Act ("SDWA") is the law that protects public drinking water supplies throughout the nation. Ex. 2 (2018 OIG Report) at 2. Under the SDWA, the EPA was permitted to, and did, grant the State of Michigan the authority to implement and enforce SDWA and its regulations, like the Lead and Copper Rule ("LCR"). *Id.* at 2. But in doing so, the EPA retained the vital responsibility of overseeing Michigan's Department of Environmental Quality ("MDEQ")'s implementation of the requirements of the SDWA. This oversight duty included the full responsibility investigate the MDEQ's implementation of the SDWA and LCR and to take independent enforcement action under §1414 and §1431 if the MDEQ was not fulfilling these requirements. This responsibility is meant to serve the SDWA's regime of assuring that water supply systems serving the public meet minimum national standards for the protection of public health. H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454, 6454.

When it comes to responding to the Flint Water Crisis, however, the EPA not only failed to fulfill those duties in contravention of what the SDWA mandates, but it undertook affirmative steps that prolonged and worsened Plaintiffs' exposure to

lead contaminated water. If properly enacted, enforcement under § 1414 and § 1431 would have resolved or at least mitigated the lead crisis by ensuring that the public was warned, that corrosion control was implemented promptly, and that the City immediately switch back to the less corrosive and treated DWSD water source.[2] Rather than take this mandated course, the EPA delayed enforcement at every corner, kept the public uninformed, ignored and inaccurately responded to citizen complaints raising concerns about the water, and issued an unnecessary memo that entertained the MDEQ's improper reading of the LCR, which the EPA knew to be false.[3]

Worse yet, the EPA engaged in this reckless conduct in the face of clear evidence that there was a dangerous health hazard that the MDEQ and City could not appreciate without oversight from the EPA. Not only was there a constant feed of evidence of a mounting dire public health crisis in 2014 and 2015 that the EPA ignored,[4] but the EPA also sat on the historical knowledge that it had approved

---

[2] The EPA's own guidance provides that the EPA could have ordered the switch back to DWSD. See 1991 Final Guidance on Emergency Authority under Section 1431 at 9 (can order "connecting to an existing PWS").

[3] Ex. 3 (Kaplan 2022 Dep) at 466:18-24; Ex. 4 (King Workpaper) at 5 ("The LCR can be confusing. But the irony is that this is one issue that wasn't."); Ex. 5 (Flint Water Advisory Task Force Report) at 52 ("EPA tolerated MDEQ's intransigence and issued [] a clarification on the LCR when no such clarification was needed.")

[4] Ex. 2 (2018 OIG Report) at 22–23 (listing warning signs that should have prompted EPA to take action); Ex. 6 (OIG Summary Workpaper of Risk Assessment) at 11–12 (same).

dangerous disinvestments in 2010[5] and ignored warnings about Michigan's laboratory practices in 2012,[6] which devastated the MDEQ's and City's ability to accurately diagnose and respond to a lead crisis.  In effect, the EPA ignored obvious warning signs and now asserts that keeping a good relationship with the state of Michigan, purported ambiguity in the LCR, and testing results showing compliance justify its conduct. Yet, all along, the EPA knew that MDEQ had no interest in following EPA's direction[7] or what the rule required, that the LCR was unambiguous, that there was a widespread lead problem, and that it had approved practices which rendered Michigan's compliance testing results highly unreliable.[8] Such reckless disregard certainly constitutes a negligent undertaking under the Good Samaritan doctrine and cannot be said to be susceptible to policy analysis under the discretionary function exception.

---

[5] Ex. 7 (OIG 2010 Michigan Data Verification Workpaper) at 2 ("EPA had documentation demonstrating that Michigan Drinking Water Program had serious deficiencies in meeting the requirements under the Safe Drinking Water Act.").

[6] Ex. 8 (Memo sent to Rita Bair) at 1–3 (outlining several issues with the EPA's and State of Michigan's lab certification program); Ex. 9 (Informant Z Workpaper) at 2–3 (concerns regarding Michigan's lab were ignored).

[7] Ex. 10 (Damato 2025 Dep) at 52:7-16 ("Michigan responded back to us, "We don't agree with your interpretation of the regulations. So we're going to basically do what we please, do what we want.").

[8] The disinvestments EPA had approved, "delayed identification of contamination, further prolonging consumer exposure to contamination." Ex. 2 (2018 OIG Report) at 18–19.

## ARGUMENT

## I.      PLAINTIFFS MEET THE PRIVATE LIABILITY REQUIREMENT

The USA reiterates its argument—for the fourth time—that Plaintiffs cannot meet the FTCA's private liability requirement because they cannot show that Michigan's Good Samaritan doctrine applies. To establish liability under the Good Samaritan doctrine, Plaintiffs must allege that: (1) the EPA undertook "to render services to another"; (2) the EPA negligently performed that undertaking; and (3) those actions proximately caused Plaintiffs' injuries. *Myers v. United States*, 17 F.3d 890, 902 (6th Cir. 1994). This Court and Judge Parker have thrice ruled that there is ample evidence to satisfy each factor of this test, and the USA has not put forth any arguments that justify overturning this controlling precedent.

### A.  The EPA undertook to render services to Plaintiffs and Plaintiffs' negligence claims arise from that undertaking.

The USA does not make any substantive arguments whatsoever regarding the first two factors of the test—undertaking and negligence in that undertaking. *See* ECF No. 3300, PageID.109113 at FN. 3.[9] Nor could they, as this Court and Judge Parker have already correctly ruled that these elements were met. Briefly, Judge

---

[9] In a footnote, the USA refers the Court to its arguments made in its most recent motion to Judge Parker, where the USA argued that the conduct must be specifically tied to negligence and that failures of the SDWA are not sufficient to impose liability. However, each of these exact arguments were thoroughly addressed and rejected by Judge Parker, *Burgess Sept 2025*, No. 17-cv-11218, 2025 LX 468908, at *38–43, as well as this this Court, *Meeks 2020,* 482 F. Supp. 3d at 618.

Parker and this Court ruled that the "EPA undertook to render services to Plaintiffs by **engaging in oversight**, including monitoring, of the State's and local water systems' compliance with the SDWA and by **responding directly to citizen complaints**." *Meeks 2020*, 482 F. Supp. 3d at 618 (quoting and agreeing with *Burgess April 2019*, 375 F. Supp. 3d at 818 (emphasis added); *see also Burgess Sept 2022*, No. 17-cv-11218, 2025 LX 468908, at *9 ("…[f]urther discovery has not revealed facts warranting a different conclusion than the one this Court reached before with respect to the FTCA's private-person liability requirement.").

In support of this ruling, both Courts cited numerous specific examples of the EPA's undertaking,[10] including, as noted most recently by Judge Parker, that in 2010, the EPA approved disinvestments which "waived [MDEQ's] obligation to obtain and provide to EPA timely water quality data." *Burgess Sept 2022*, No. 17-cv-11218, 2025 LX 468908, at *39. As to the negligence element, this Court ruled that "Plaintiffs have alleged sufficient facts to show that the EPA was negligent in its oversight and monitoring pursuant to the SDWA and in responding to citizen complaints." *Meeks 2020*, 482 F. Supp. 3d at 619; *see also Burgess Sept 2022*, No. 17-cv-11218, 2025 LX 468908, at *38 ("The record supports several specific undertakings by EPA under the broader categories of 'oversight' and 'monitoring,'

---

[10] For example, the EPA provided assurances about the safety of the water and responded to the MDEQ's lack of corrosion control and evidence of high lead levels.

and a reasonable fact finder could conclude that such undertakings were performed negligently."). Again, the USA does not assert any reasons whatsoever for disrupting these rulings, and therefore, they should stand.

### B. The EPA's conduct satisfies all three of the proximate cause alternatives.

As to the third factor —proximate cause— Plaintiffs need only show that *one* of the following exists: (a) the "failure to exercise reasonable care increase[d] the risk of . . . harm," (b) the undertaking was "to perform a duty owed by the other to the third person," or (c) the harm was suffered "because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965). This Court and Judge Parker both ruled that Plaintiffs have alleged facts supporting all three of the proximate cause alternatives, and the USA does not raise any arguments that warrant overturning those rulings.

> i.   Section 324A(a): The EPA increased the risk of harm to Flint citizens.

Looking at the increased risk of harm alternative, this Court ruled that Plaintiffs "plausibly alleged that they suffered increased harm because they relied on the EPA for oversight and intervention." *Meeks 2020*, 482 F. Supp. 3d at 621. The Court based this ruling on the facts that: 1) the EPA was aware of elevated lead levels in the water as early as June 2015, and every passing day they failed to act, lead levels continued to rise as did Plaintiffs' consumption of lead contaminated

water; and 2) the EPA encouraged further consumption of the water as a result of the misleading nature of their July 2015 public statement and responses to citizen complaints. *Id.* at 620–621.

The USA reargues that Section 324A(a) is not met here because, like the defendant in *Myers*,[11] the EPA did not cause "some physical change to the environment' that increased the Bellwether Plaintiffs' risk[.]'" ECF No. 3300, PageID.109115. The USA further argues that the Court's prior analysis, which distinguished *Myers*, should be discarded as contrary to law and fact.

But the Court's prior ruling is **not** contrary to law or fact. As the Court correctly ruled, *Myers* is inapposite because, unlike the mine inspectors who failed to detect a risk of harm, the EPA here ***did detect a risk*** of harm.  Even more importantly, the reason that the Sixth Circuit rejected the Plaintiffs' arguments in *Myers,* is that those Plaintiffs did "not explain how, or to what degree, the risk [] was increased"; and instead, only pointed to a risk that remained "constant." *Myers*, 17 F. 3d at 902. That is not the case here.[12]

---

[11] In *Myers*, the Sixth Circuit found that the alleged negligence of federal mine inspectors who failed to detect safety violations related to methane gas did not increase a risk of harm to the miners. 17 F.3d at 902.

[12] The same is true for the cases that the USA cites in support. *Raymer v. United States*, 660 F.2d 1136 (6th Cir. 1981) (safety violations involving miners' equipment were constant and not made worse due to the passage of time); *Howell v. United States*, 932 F.2d 915 (11th Cir 1991) (failure in inspections of contaminated airplane fuel did not change status quo or did not increase risk of harm from the status quo); *Maier v. Green Eyes, USA, Inc.*, 845 Fed. Appx. 869 (11th Cir. 2021)

Here, the EPA knew, at least by April 2015, that Flint residents were exposed to a year of water that lacked corrosion control, that high lead levels were being found in resident testing, and that increasingly high lead levels were inevitable. *See* Ex. 12 (Email from Del Toral, June 25, 2015). Yet, the EPA failed to properly and timely fulfill its obligations to ensure safe drinking water. This allowed the contamination to worsen and the harm to increase on a daily basis for more than eight months—from April 2015 to January 2016.[13] *See* Ex. 5 (Flint Water Advisory Task Force Report) at 51 ("EPA was not insistent or forceful enough to prompt MDEQ to require Flint to add CCT for almost three months after EPA was aware of its absence. This needlessly extended the time during which Flint residents were exposed to corrosive drinking water with potentially high levels of lead."); Ex. 13 (OIG Findings Outline Workpaper) at 6 ("Had formal enforcement action been taken sooner by the EPA Region 5 or headquarters, the human health impacts in Flint could have been mitigated.").

---

(record of a driver involved in a fatal action did not increase the risk of harm as no change occurred in the record). Here, it is indisputable that the pipes degraded, and lead contamination increased on a daily basis as did the harm to the physical and psychological health of the Plaintiffs. *See* Ex. 11 (Dr. Russell Report, July 11, 2025).

[13] The USA also ignores that this Court has already credited this distinction. *Meeks 2020*, 482 F.Supp.3d at 621 ("Every passing day that the EPA knew of the high lead levels in the water, but did not take appropriate action, resulted in increased contaminates being extracted from the water, pipes, hot water tanks and dishwashers and ultimately ingested, harming Plaintiffs and their property. The longer untreated water flows through pipes and into homes, the more the lead levels increase.").

This not only increased the risk that Plaintiffs would be exposed to lead, but it ensured that they would be exposed to a duration of lead exposure that would cause harm.[14] It also exacerbated the degradation of the lead service lines and interior plumbing in houses, which actually increased the levels of lead leaching into the public drinking water, and thus increased Plaintiffs' damages. *See* Ex. 11 (Dr. Russell Report, July 11, 2025).

The USA raises a factual dispute, alleging that the "EPA did not have information showing a SDWA violation or proving systemwide danger." ECF No. 3300, PageID.109115. But there is significant evidence to the contrary of this assertion. *See, e.g..,* Ex. 12 (Del Toral Email, June 25, 2015); Ex. 16 (2016 OIG Report) at 5 ("EPA Region 5 had sufficient information and the authority to issue an emergency order in June 2015, but did not"); Ex. 17 (McCarthy Congressional Testimony) at 14 (sufficient information of systemic lead problem by mid-summer 2015).

Additionally, the EPA took affirmative actions that increased the risk of harm to Plaintiffs. It issued inaccurate responses to citizen complaints, *see e.g.,* Ex. 18

---

[14] Plaintiffs' expert, Dr. Ryer-Powder explains that, using a conservative estimate, a child who weighed 45 pounds and drank 1 liter of Flint water with a lead content of 15 ppb daily for only 3 months would absorb enough lead to result in a blood lead concentration of 18 mg/dl. This is far beyond the BLL that has been documented as capable of causing harm by the EPA themselves as well as many other studies. *See* Ex. 14 (EPA ISA); *see, e.g.,* Ex. 15 (Lanphear Article).

(Hyde Letter, May 2015), as well as a misleading July 2015 public statement, Ex. 19 (Hedman Email, July 10, 2015), which increased the risk that citizens would continue to drink the water. The EPA also affirmatively worsened the crisis by waiving the MDEQ's requirement to obtain and provide to the EPA timely water parameter and reliable water quality reports by granting disinvestments and ignoring dangerous quality control lab practices. *See* Ex. 2 (2018 OIG Report) at 18–19; Ex. 9 (Informant Z Workpaper). By granting these disinvestments, the EPA fostered its own ignorance by allowing noncompliance with federally mandated rules and policies to continue since 2010, and waiving the obligation to submit required forms under the LCR intended to ensure proper testing for lead in the drinking water. *Id.* In fact, EPA's own expert testified that review of the data, including water quality reports, would have made it apparent that there was no corrosion control in violation of federal regulations as early as 2014. Ex. 20 (Lytle 2020 Dep) at 190:20–192:6.[15]

> ii.    Section 324A(b): The EPA undertook to perform a duty owed by another to the Plaintiffs.

As to the duty owed by third person alternative, this Court and Judge Parker have both ruled that based on the EPA's undertaking in testing, evaluating, water

---

[15] These actions are akin to conduct that the *Myers* Court indicated *could prove* liability. 17 F.3d at 903 n.15 (citing *National Carriers, Inc. v. United States*, 755 F.2d 675, 676 (8th Cir. 1985)— where an "FDA meat inspector, at the scene of a truck wreck, told workers not to bother separating meat contaminated by ditch water from unexposed meat, resulting in the entire load being condemned"——as "[a]n example of conduct which could prompt liability[.]") .

sample collection and analysis, as well as technical and supervisory services, "the fact finder could conclude that, during the Flint Water Crisis, EPA assumed the duties imposed by the SDWA to provide safe drinking water to the people of Flint, like Plaintiffs." *Burgess Sept 2022*, No. 17-cv-11218, 2025 LX 468908, at *49–50; *Meeks 2022*, 482 F.Supp.3d at 621–622.

The USA does not raise any new arguments, evidence, or reasons to disturb these rulings. At most, the USA alludes to disagreement with this Court's analysis which distinguished two cases where the courts found no duty (*Myers* and *Howell v. United States,* 932 F.2d 915, 919 (11th Cir. 1991)) by asserting that "the scope of EPA's potential enforcement powers under the SDWA . . . is not relevant to the inquiry *because* EPA did not in fact revoke primacy or otherwise supplant MDEQ prior to issuing the January 2016 Section 1431 Order." ECF No. 3300, PageID.109116 (emphasis added).

This argument is entirely without merit. The fact that the EPA did not revoke primacy is of no moment. And the cases cited by the USA support this. Both *Myers* and *Howell* focus on *the **intent of the statute or regulation***, rather than actions the government agency actually took or didn't take. In *Myers*, the Sixth Circuit found that § 324A(b) did not apply because the Mine Safety Act made clear that "Congress *intended that* the primary duty of ensuring safety would be on the mine owners and the miners." *Myers*, 17 F. 3d at 903 (citing 30 U.S.C. § 801(e) (emphasis added). In

*Howell*, the Eleventh Circuit held that 324A(b) did not apply because, "[w]hatever the FAA does or does not do, the Federal Aviation Regulations *assign* the chief responsibility for ensuring the airworthiness of an aircraft and its crew to the craft's owner, operator, or pilot." 932 F.2d at 919) (*citing* 14 C.F.R. §§ 91.163(a), 135.413) (emphasis added).

Here——as this Court and Judge Parker correctly pointed out——the *intent of* the SDWA is for the EPA to monitor the State and take some or all of the duties delegated under primacy when the state is not fulfilling its SDWA duties (as was the case in Flint). *See* Ex. 2 (2018 OIG Report) at 17 (stating that under the SDWA the EPA is "required to intervene when [S]tates do not fulfill their responsibilities[]"); *see also  Meeks 2020*, 482 F.Supp.3d at 622; *Burgess Sept 2025*, No. 17-cv-11218, 2025 U.S. Dist. LEXIS 185924 at *48–50.

The USA also reiterates its argument that the EPA merely assisted and supplemented the MDEQ's and City's duties.[16] But as this Court has already ruled,

---

[16] In support, the USA cites three out of circuit cases: *Hutchison v. Fitzgerald Equip*. Co., 910 F.3d 1016, 1024 (7th Cir. 2018); *Halsey v. Townsend Corp. of Ind.*, 20 F.4th 1222, 1230 (8th Cir. 2021); and *Catalano v. GWD Mgmt. Corp*., No. CV 403-167, 2005 WL 5519861, at *14 (S.D. Ga. Mar. 30, 2005). These cases are of no moment. *Catalano* and *Halsey* interpret §324A(b) under the specific state law of Georgia and Missouri, neither of which is at issue here. And in *Hutchison*, the Seventh Circuit ruled that §324A(b) was not satisfied in a forklift accident case, because the defendant did not have "the power, without [the third party's] authorization, to install the backup alarm or that [the defendant] did more than assist or supplement [third party's] daily control and maintenance of the forklift." 910 F. 3d at 1024. Here, the EPA had the authority to act without any authorization from

the EPA did far more than assist. For example, it responded to citizen complaints about the water; issued a press statement downplaying the public health crisis; responded to the elevated lead levels at Ms. Walters house; conducted independent investigations of citizens' lead levels in their homes; and offered technical assistance to manage the water quality issues in Flint. *In Re Flint Water Cases*, 482 F.Supp.3d at 622; *see also* Ex. 21 (Emergency Administrative Order) at ¶¶ 18; 37 64, 66.

   iii. <u>Section 324A(c): Plaintiffs, the MDEQ, and the City all relied on the EPA to their detriment.</u>

  As to the reliance alternative, this Court and Judge Parker have already ruled that Plaintiffs have alleged sufficient facts to plead reliance under the Good Samaritan doctrine. Briefly, the Courts found that Plaintiffs have demonstrated that they justifiably relied on the EPA to perform the duties it undertook, including to monitor, supervise, and enforce all federal regulations to ensure that their drinking water is safe in a non-negligent manner. Further, the Courts found that Plaintiffs relied on the government, including the EPA, to warn them of potential dangers and harms from water contaminated by lead. And that this reliance caused Plaintiffs to forego other remedies or precautions, such as not drinking of the contaminated water. *Meeks* 2020, 482 F. Supp. 3d at 623; *see also Burgess Sept 2025,* No. 17-cv-11218, 2025 U.S. Dist. LEXIS 185924, at 51–52; *Burgess April 2019*, 375 F. Supp.

---

the MDEQ or the City, and, as discussed *supra*, it did far more than merely assist or supplement the MDEQ or City's actions.

3d 796, at 818. The USA does not raise any reasons or new evidence to support revisiting these rulings. Instead, it reprocesses the same argument already rejected by both Courts: that none of the Bellwether Plaintiffs' parents communicated with the EPA regarding water complaints or relied on the EPA.

In support of this argument, the USA points to T.B., B.R., and M.S.'s fact sheets and the testimony of two of the three mothers, who assert that they did not communicate with the EPA.[17] In essence, the USA is asking the Court to reason that B.R., M.S., and T.B.'s mothers needed to directly communicate with a federal agency in order to rely on it for the services it provides. This argument is illogical and offensive. It asks the Court to ignore a germane reality: that the EPA is the agency responsible for "ensur[ing]] [] that Americans have clean air, land, and water," and that the Plaintiffs are in fact Americans who were consuming water in America. Ex. 22 (EPA Mission Statement).

Afterall, as Judge Parker recently ruled, "common sense supports a finding that the Bellwether Plaintiffs relied on EPA's undertakings even if they did not communicate directly with the agency or were unable to identify it as the federal entity protecting their drinking water." *Burgess Sept 2025*, No. 17-cv-11218, 2025 U.S. Dist. LEXIS 185924 at *51 (citing a string of cases holding same). The SDWA identifies EPA as the primary enforcer of federal safe drinking water standards. This

---

[17] B.R.'s mother was not asked any questions about the EPA at her deposition.

creates public reliance on a regime and agency that would keep their water safe. It is therefore logical that citizens would rely on that promise and continue to drink and use contaminated water until they are told otherwise. *Id.* at *50–51. This is both supported by logic and confirmed by the testimony of the children's mothers in this case. *See, e.g.,* USA Ex. AQ (ECF No. 3300-44, Trumbo 2025 Dep) at 195:22–196:6 (T.B.'s mother testifying that her understanding is that the EPA is meant to keep the water and air safe); USA Ex. AR (ECF No. 3300-45 (Sealey, 2025 Dep) at 252:16–21.

Moreover, as this Court and Judge Parker have recognized, Plaintiffs can also satisfy the reliance prong, by showing that the City and MDEQ detrimentally relied on the EPA. *Meeks* 2020, 482 F. Supp. 3d at 623 ("Plaintiffs have sufficiently alleged here that the MDEQ and the City of Flint detrimentally relied on the EPA, and that this reliance harmed Plaintiffs."). Here, there is no dispute that the MDEQ and the City of Flint relied on the EPA's inaction and technical assistance as a basis for assuring Plaintiffs that the water was safe, as well as forgoing other options such as implementing corrosion control and switching back to the DWSD earlier. *See* Ex. 23 (Walling 2020 Dep) at 260:2–261:18 (stating that he never requested an emergency declaration because it was his understanding based on conversations with Susan Hedman that the EPA and other government agencies "were working together to do [] everything they could on a short-term basis."); *id.* at 366:10–367:24 (Mayor

Walling waited for EPA to confirm or deny concerns raised in the Del Toral memo before alerting citizens); Ex. 24 (Walling Congressional Testimony) at 7 (agreeing that while he became aware of potential systematic problems in July 2015 he was waiting on EPA to determine whether or not those issues were in fact actually occurring before taking action); *see also* Ex. 25 (Hedman Email, October 2, 2015) at 2 (Headman stating, "it is clear (from statements during the press conference and my ongoing conversations with Director Wyant and Mayor Walling) that they are both counting on EPA to continue to provide technical assistance to implement the action plan[.]"); Ex. 26 (September 25, 2015 Lead Advisory) (telling citizens Flint is in full compliance with SDWA and noting that the City of Flint is "working with" the EPA to "improve the water system").

## II.    THE MISREPRESENTATION EXCEPTION IS INAPPLICABLE

The USA again asserts that the FTCA's misrepresentation exception bars Plaintiffs' claims related to EPA's communications regarding the safety of the water. This Court and Judge Parker have already struck down this argument three times, ruling that the misrepresentation exception is limited to commercial claims and thus does not apply to personal injury claims. The Courts further ruled that even if this exception is expanded beyond commercial claims, it is nevertheless inapplicable here, because misrepresentation is not the gravamen of Plaintiffs' claims. *Burgess April 2019,* 375 F. Supp. 3d at 817; *Meeks 2020,* 482 F.Supp.3d at 638-639; *Burgess*

17

*Sept 2025,* 375 F. Supp. 3d 796, at \*54–56. In fact, the most recent ruling by Judge Parker rejected the **exact arguments** that the USA are raises here. *Compare* 4:17-cv-11218-LVP-CI ECF No. 291, PageID.6946–6950 (USA Motion in *Burgess*)*, with* ECF No. 3300, PageID.109131–109132. Because the USA offers no new facts, arguments, or even alludes to a reason why any of these precedents should be overruled, the Courts' prior rulings should stand.

### III.   THE DISCRETIONARY FUNCTION EXCEPTION ("DFE") DOES NOT APPLY TO THE EPA'S CONDUCT

The EPA is entitled to immunity under the DFE "only if the complained-of actions are *both* discretionary and of the type the exception was designed to protect." *Abbott v. United States*, 78 F.4th 887, 900 (6th Cir. 2023) (internal quotation marks and citation omitted) (emphasis in original).[18] As this Court and Judge Parker have repeatedly held, that is not the case when it comes to the EPA's conduct (it's failure to take action under § 1414 and § 1431 and to properly notify the public and respond to citizen complaints) during the Flint Water Crisis.

Despite these prior rulings, the USA reiterates arguments already rejected by this Court and Judge Parker and asks the Court to broadly interpret the exception in such a way that would defeat the very purpose of the FTCA. *See Dolan v. United*

---

[18] "This test is conjunctive" …. "If the actions are either non-discretionary or discretionary but unprotected, the government is not entitled to sovereign immunity." *Abbott*, 78 F.4th at 900.

*States Postal Serv.*, 546 U.S. 481, 491–92 (2006) ("[U]nduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, [] which waives the Government's immunity from suit in sweeping language.") (cleaned up, internal quotation marks and citations omitted).

### A. The Court appropriately defined the EPA's conduct.

The USA asserts that the Court improperly defined the conduct at issue by adopting Plaintiffs' negligence allegations. This Court has not only considered this argument, but it has explicitly reconsidered its prior ruling on this basis and determined that the DFE still does not apply. *See Meeks 2022*, 627 F. Supp. 3d at 740 ("To the extent the EPA Order is inconsistent with that rule, it is reconsidered here. For the reasons set forth below, however, this does not ultimately change the analysis[.]"). Moreover, contrary to the USA's argument, this Court properly defined the conduct at issue as the Court correctly focused on the "governing administrative policy, rather than the negligence of a [the] particular [EPA] employee[s]" in determining whether the conduct was "mandatory for purposes of the discretionary function exception," *Kohl v. United States*, 699 F.3d 935, 942 (6th Cir. 2012) (internal quotation marks and citation omitted). *See Meeks 2020*, 482 F. Supp. 3d at 627–32 (focusing explicitly on the sections of the SDWA and not on the allegations

19

of negligence in its analysis). Nevertheless, even if the conduct is defined in the exact manner the USA demands, this Court and Judge Parker's rulings still apply.[19]

### B. The challenged EPA conduct is non-discretionary as the SDWA, and the EPA's own regulations, do not provide for discretion.

This Court and Judge Parker have both ruled that the EPA's failure to implement § 1414 enforcement was not discretionary as "[t]he plain text of the statute sets forth actions that the EPA must take, and Plaintiffs claim that the EPA did not take those actions." *Meeks 2020*, 482 F. Supp. 3d at 627–28; *Burgess Jan 2025*, No. 17-cv-11218, 2025 LX 145446 at *14–22.[20] Specifically, the Courts ruled that § 1414 makes EPA's enforcement responsibilities mandatory when it makes a finding of a violation of the SDWA or related regulations such as the LCR. 42 U.S.C. 300g-2; § 1414(a)(1)(A). *Id.*

The USA reasserts that its conduct related to § 1414 was discretionary because the threshold finding of non-compliance was not made by the people at EPA *with the correct status*. In support, the USA argues that although EPA staffers made a finding that Michigan was in violation of the SDWA for failing to have corrosion

---

[19] It is important to note, however, that the USA is not automatically entitled to have their conduct defined in the exact way it demands. *See Kohl*, 699 F.3d at 940–41 (ruling that the Governments characterization of the conduct at issue was "too extreme" and "tantamount to a contention that every decision at every level …. would be shielded from liability") (internal quotations omitted).

[20] This Court previously held that EPA's remaining conduct was discretionary. Plaintiffs incorporate by reference the arguments raised in ECF No. 305, PageID.9911–9916 related to § 1431.

control as early as April 2015,[21] this does not constitute a finding of non-compliance because it was not made by the EPA Administrator, the Regional Administrator (Susan Hedman), or the Water Division Director (Tinka Hyde).[22] This argument does not support a finding that § 1414 is discretionary under the DFE.

First, it is well settled that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984). Thus, the fact that the finding of non-compliance was made by employees who were of a lower rank than the Administrator should not automatically qualify the EPA's conduct related to § 1414 as discretionary.

Afterall, the decision to make a finding of non-compliance necessarily includes input from the staffers. Indeed, Susan Hedman testified that such a finding is made based on an investigation done by the Office of Enforcement and Compliance Assurance ("OECA"). *See* Ex. 29 (Hedman 2020 Dep) at 20:7–21:6.[23]

---

[21] However, Del Toral notified the State of the violation even earlier, in February 2015. Ex. 27 (Del Toral Email, February 27, 2015).

[22] The EPA refers to "the Administrator "or whom she designated Section 1414 authority to," but does not explain which individuals that includes. Per the EPA manual, enforcement authority is delegated from the EPA Administrator to the Regional Administrator and Water Division Director. Ex. 28 (OARM Delegations Manual and Region 5 Delegations Manual).

[23] The record also supports that Susan Hedman herself did "find" that the State of Michigan "[did] not comply with" several "applicable requirement[s]", §

The evidence shows that OECA determined that there was a violation by September 2015, at the latest. Ex. 4 (King Workpaper) at 4 ("They [Flint] violated the rule when they switched sources; everyone at that point all agreed: up to Tom Poy's level, maybe above."); Ex. 30 (Draft letter addressed to MDEQ informing staff of the LCR violation). In addition, the staff directly under Tinka Hyde were all in agreement that there was a violation by July 2015. *See* Ex. 31 (Del Toral 2020 Dep) at 729:7–18 (stating that by July 2015 the entire Ground Water Drinking Water Branch "had determined" and "were in agreement that there was a violation").

Moreover, importantly, if the EPA did not make a finding of non-compliance under § 1414(a)(1)(A), then the EPA is *certainly not* entitled to discretionary immunity. *See Abbott*, 78 F.4th at 901 ("If Park officials failed to conduct that assessment, they **are not** shielded by the discretionary-function exception") (citing *Myers*, 17 F. 3d at 895) (emphasis added); *see also Kush Muhammad v. United States*, No. 23-5195, 2023 U.S. App. LEXIS 33258, at *6 (6th Cir. Dec. 13, 2023) (summarizing the holding in *Abbott* as "holding that government officials are not

---

1414(a)(1)(A). She testified that she became aware on June 30, 2015 of the failure to maintain corrosion control and that she immediately provided notice to MDEQ that: "[Y]ou need to order corrosion control as soon as possible" and "you must issue the order to Flint to do corrosion control." Ex. 29 (Hedman 2020 Dep) at 39:20–40:3.

shielded by the discretionary-function exception if they fail to conduct an antecedent assessment required by relevant policy").[24]

And finally, as this Court has ruled, "the EPA would not be shielded from liability even if it had negligently determined that the Flint water system was in compliance." *Meeks 2022*, 627 F. Supp. 3d at 742. Like the inspectors from *Myers*, the EPA's failure to make a finding of the predicate condition is not shielded by the DFE because this determination was meant to be "the product of...objective criteria," rather than considerations of public policy. 17 F.3d at, 897–98. The plain language of the statute makes it evident that the predicate condition must be based on objective criteria, and not policy. It explicitly states that this is satisfied when there is a finding that the primacy agency "does not comply with any applicable requirement." § 1414(a)(1)(A). An applicable requirement is clearly defined as the regulations promulgated under the SDWA, including the LCR. *See* 42 U.S.C. § 300g-3(i). Thus, as soon as the EPA discovered that the State was not requiring optimized corrosion

---

[24] The USA asserts that "numerous courts" – including the Sixth Circuit – have held EPA has no mandatory duty to make findings under other similar statutes such as the Clean Air Act and the Clean Water Act. ECF No. 3300, PageID.109122. However, "[t]he Sixth Circuit has yet to address the precise issue [.]" *City of Highland Park v. EPA*, No. 2:16-cv-13840, 2018 U.S. Dist. LEXIS 168565, at *6 (E.D. Mich. Sep. 29, 2018). The USA further argues that enforcement decisions are presumed immune from judicial review, citing *Heckler v. Chaney*, 470 U.S. 821 (1985) and two cases from other circuits. But this exact argument has already been addressed in depth and rejected by this Court. *Meeks 2020*, 482 F. Supp. 3d 601, 629–31 (explaining that such a presumption was rebutted by the language in § 1414 as well as the legislative history of the SDWA).

control (as the LCR requires), the objective criteria for the finding of § 1414(a)(1)(A) was satisfied, and there were no "permissible" policy decisions to be made. *Myers, 17 F.3d* at, 897–98. Rather, the EPA was required to "determine compliance and, in the event of non-compliance, issue the mandatory citations and orders." *Id.*

### C. The EPA's conduct is not of the nature or quality that the discretionary function exception protects.

The USA reiterates the same arguments that this Court and Judge Parker already rejected in finding that the EPA's conduct is not of the nature or quality that Congress intended to shield from tort liability or that the DFE was meant to protect. *Burgess April 2019,* 375 F. Supp. 3d at, 814–16; *Meeks 2020*, 482 F. Supp. 3d at 627–28; *Meeks 2022*, 627 F. Supp. 3d at 742–43; *Burgess Jan 2025*, No. 17-cv-11218, 2025 LX 145446 at *14–22.[25] For the reasons set forth below, these arguments should once again be rejected.

> i.   <u>The DEF's susceptibility analysis is not a toothless standard, as the USA suggests.[26]</u>

The USA asserts that the challenged conduct need only be "theoretically susceptible to policy analysis" to be protected.  ECF No. 3300, PageID.109123

---

[25] Indeed, the USA's argument section is virtually identical to that raised to and rejected by Judge Parker. *Compare 4:17-cv-11218-LVP-CI ECF No. 262, PageID.5030–42, with* ECF No. 3300, PageID.109123 –PageID.109131

[26] *See S.R.P. v. United States*, 676 F.3d 329, 336 (3d Cir. 2012).

(citation omitted). But this argument oversimplifies the law as it completely overlooks the Supreme Court's direction that the challenged conduct must "***be grounded in the policy of the regulatory regime***." *United States v. Gaubert*, 499 U.S. 315, 325 & n.7 (1991) (emphasis added); *see also Kohl*, 699 F.3d at 943 ("[w]here an act 'cannot be said to be ***based on the purposes that the regulatory regime seeks to accomplish***,' the discretionary-function exception will not apply[,]" (quoting *Gaubert*, 499 U.S. at 325 n.7) (emphasis added).

This argument also ignores that the DFE analysis "depends on the facts of each case." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 369 (6th Cir. 2014). And that even when the Government makes a discretionary decision, "the agency must then proceed with care in the implementation of that decision." *Am. Reliable Ins. Co. v. United States*, 106 F.4th 498, 510–11 (6th Cir. 2024). Thus, once the EPA decided to undertake to address the situation in Flint, it was required to do so with care and in a non-negligent manner. *Id*. ("Under part two of the *Gaubert* test, once a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision.") (internal quotation marks and citation omitted); *Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir. 1989) (same); *Lyons v. Tenn. Valley Auth*., 840 F.2d 17 (6th Cir. 1988) (applying the following in a DFE case "immunity does not extend to protect it from liability under the Federal Tort Claims Act when the execution of

the responsibility undertaken was performed in a negligent way violative of the applicable tort law"). In other words, "government conduct 'does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act.'" *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 648–49 (6th Cir. 2015) (quoting *Bultema v. United States,* 359 F.3d 379, 383–85 (6th Cir. 2004)).

Here, the EPA undertook to help the State of Michigan. But their conduct—choosing to play nice with the State of Michigan and do nothing except mislead the public, in the face of continued safety hazards— cannot be said to be aligned with the purposes of the regulatory regime of the SDWA, and was performed in a negligent way, violative of applicable policy and tort law. Ex. 32 (OIG R2-Findings Outline) ("The EPA Region 5 failed to protect the citizens of Flint and serve as a last resort for oversight, as required by law.").

ii.   <u>The EPA's failure to timely intervene with §1414 or §1431<br>enforcement is not susceptible to or justified by policy analysis.</u>

As an initial matter, the EPA's conduct related to sections 1414 or 1431 is, on its face, not susceptible to policy analysis because it was based on scientific and professional judgment calls concerning the safety of the entire community of Flint. *See* Ex. 32 (OIG R2-Findings Outline) ("The information the EPA had in April 2015 met the two conditions required for an Emergency Order under Section 1431" and "had the information to issue an emergency order in Flint as early as June 2015, but

did not."); *Cf. Boler v. Earley*, 865 F.3d 391, 404 (6th Cir. 2017) (stating that the SDWA "statutory language also specifies" the "use of science in the EPA's decision making"). And, as this Court and Judge Parker have recognized, such "'matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy.'" *Meeks 2020*, 482 F. Supp. 3d 601, 634 (E.D. Mich. 2020) (quoting *Whisnant v. United States, 400* F.3d 1177, 1181–83 (9th Cir. 2005)).

Moreover, this challenged conduct—continued inaction in the face of an environmental crisis—is not grounded in, or permitted by, the policy of the regulatory regime of the SDWA. The SDWA was enacted "to assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454,6454. In furtherance of that statutory scheme, Congress already weighed policy considerations (like those now cited by the EPA) and directs when the EPA should intervene under § 1414 and § 1431.

Put simply, the policy regime of the SDWA is that EPA must act when the State fails to "assure that the water supply system … meet[s] minimum standards for protection of public health." *Id.*; Ex. 2 (2018 OIG Report) at 17 ("The EPA is empowered and required to intervene when states do not fulfill their responsibilities."). A failure to act in the face of evidence that the State has not only

not done that but created an environmental disaster is clearly inapposite to this regulatory regime. *See Kohl*, 699 F.3d at 943 ("Where an act 'cannot be said to be based on the purposes that the regulatory regime seeks to accomplish,' the discretionary-function exception will not apply.") (quoting *Gaubert*, 499 U.S. at 325 n.7).

This reasoning is consistent with both law and fact. In *Myers*, the Sixth Circuit ruled that when Congress has already weighed considerations and directed when an Agency should act in the face of noncompliance, the Agency's inaction cannot be viewed as a "permissible exercise of policy judgment." *Myers*, 17 F.3d at 898 (MSHA inspectors "not authorized to reweigh these interests on a case-by-case basis."). And the OIG concluded, "[t]he Flint water crisis demonstrates that public health is not protected when EPA regional staff—with multiple warning signs—do not use the agency's SDWA authorities in conjunction with EPA oversight tool." Ex. 2 (2018 OIG Report) at 26.

Moreover, it is telling that the OIG did not find that the EPA's actions were excusable based on the policy excuses that the USA now invents (that the EPA was not the primary regulator, that MDEQ should not be allowed to abdicate its regulatory responsibilities, that EPA's approach was the most expeditious way to proceed and a more confrontational approach would have slowed down progress, and that they lacked sufficient information). ECF No. 3300, PageID.109123–31.

Rather, the OIG identified the EPA Region 5's conduct as a result of inadequate oversight; inadequate workforce training; an external culture of participating in the State that blinded EPA from appropriate oversight; and a failure to understand its own regulatory tools. *See* Ex. 2 (2018 OIG Report); Ex. 16 (2016 OIG Report) at 8; and Ex. 13 (OIG Findings Outline Workpaper) at 6; Ex. 17 (McCarthy Congressional Testimony) at 29 ("Well, I wanted you to be all clear that the emergency order I issued in January was because of continued failure to address the issue… Were we late in getting it done? Yes. Are there consequences to that? Absolutely.").

Additionally, the USA's post hoc argument that any delay or deliberation regarding § 1414 and § 1431 enforcement was based on considerations of what would be most effective or to resolve an ambiguity in the LCR is belied by the testimony of those who were involved. EPA employees explained the delay was centered around the EPA's desire to juggle politics and avoid negative publicity, and there was no ambiguity in the LCR or need for a memo clarifying its requirements. *See* Ex. 10 (Damato 2025 Dep) at 141:7-12 (stating EPA did not act until "the bad publicity overrode [] went to headquarters" and "headquarters was more concerned about the national publicity that Flint was getting and the bad publicity that EPA was getting"), Ex. 33 (Pollins 2023 Dep) at 274:17–276:4 (explaining that the role of the EPA under the SDWA is to enforce the rules and protect human health without

regard to political fallout that may occur); Ex. 4 (King Workpaper) ("No one wanted to say Flint wasn't in compliance."); Ex. 34 (Denton Workpaper) ("The sad thing is that the regional staff kept trying to do the right thing…and they are not getting anything from their management."); Ex. 35 (OIG Summary Workpaper of Internal Control Activities and Monitoring) ("This was not a matter of lack of clarity. It was a matter of disagreement in part, and more important, MDEQ's failure to take appropriate actions when Region 5 consistently identified problems with Flint's water switch."); Ex. 36 (Pollins Workpaper) ("I look at that as a memo designed to cover Hedman's butt."…"I don't think there's ambiguity.").

Nor can it be credibly argued that the decisions related to whether or not to enact enforcement under § 1414 or § 1431 were policy driven. The evidence shows that the very same employees – who the USA now asserts were the only ones with delegated ability to make those judgment calls – did not even understand the EPA's enforcement powers. *See* Ex. 13 (OIG Findings Outline Workpaper) ("EPA Region 5 did not exercise SDWA authorities because officials did not view them as options for intervention."); Ex. 29 (Hedman 2020 Dep) at 271:18–272:8 (discussing the issuance of § 1414, "that would have been in the domain of OECA. That would not have been my bailiwick."); *id.* at 348:15–349:9 (explaining that 1431 was a multistep process); *but see* Ex. 33 (Pollins 2023 Dep) at 81:21–82:11; 250:11-23 (stating 1431

could have been issued in 24 hours and that when it came time to draft it in Flint, it only took four hours).

Failing to timely implement mandatory and necessary enforcement based on a misunderstanding of the statutes and a desire to keep politicians from getting involved is not a "deliberate or necessary result of a discretionary general policy" related to keeping the public safe, and therefore, the EPA's conduct falls outside the scope of the discretionary function exception. *Bultema*, 359 F.3d at 383 (6th Cir. 2004).

### iii. The EPA's decision not to notify the public of a known public health hazard is not susceptible to or justified by policy analysis.

The EPA's failure to warn citizens about a widespread lead problem cannot be deemed to be based on the purpose that the regulatory regime of the SDWA seeks to accomplish—— to "protect public health." This is especially true when the EPA was aware of a blatant and immediate safety hazard: a widespread lead contamination where children were being poisoned to a point of "criminal neglect." Ex. 12 (Del Toral Email, June 25, 2015); *see Caplan*, 877 F.2d at 1316 (the discretionary-function exception protected choosing a policy of deforestation, but did not protect negligence in implementing that policy by failing to warn about dangerous conditions created by unstable trees); *Montez v. United States*, 359 F.3d 392, 398 (6th Cir. 2004) ("[d]ecisions by prison officials to ignore specific and immediate threats against inmates are less likely to be the type of decision that can

31

be said to be grounded in the underlying policy of the BOP, which requires prison officials to provide for the safekeeping and protection of inmates."); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826, 845 (E.D. Tenn. 2019) (failing to warn employees about dangers of exposure to fly ash and telling workers it was safe to consume was not protected by the DFE because that conduct was "actively detrimental" to the purported policy aim of safety); *SRP ex rel ABunabba v. United States*, 675 F.3d 329, 340 n. 6 (3rd Cir. 2012) (failure to warn the public of a blatant safety hazard could not involve policy considerations).[27]

Similar to EPA's conduct under §1414 and §1431, the SDWA regulatory regime has already balanced policy considerations that relate to warning the public and left only professional and scientific judgments to be made. According to the EPA's own guidance, "[t]he Public Notification (PN) rule implements Section 1414(c) of the [SDWA], which requires EPA to establish regulations to require public water systems to provide public notification (PN) in certain specified situations." Ex. 37 (Public Notification Memorandum). Here, at a minimum, the Public Notification Rule required the City to notify the citizens of Flint as to the

---

[27] The USA asserts that failure to warn decisions are typically shielded as deemed to be susceptible to policy. However, as this Court has previously recognized, the Sixth Circuit has explicitly declined to endorse such a bright line rule. *Meeks 2020*, 482 F. Supp. 3d at 637 ("Yet the Sixth Circuit has also cautioned that to the extent that their 'opinions may be read to suggest that failure-to-warn claims categorically satisfy the discretionary function exception . . . we decline to endorse that position.'") (quoting *A.O. Smith Corp.*, 774 F.3d at 369).

treatment violation (failure to have corrosion control) as well as the potential for adverse health effects within 30 days of discovery of that violation in April 2015. 40 C.F.R. 141.203(b); 40 C.F.R. 141.205.[28] When the EPA saw that the City had failed to do that in May 2015, the statutory framework of "protec[ting] public health" and the policy of the Public Notification rule dictated that the EPA had to ensure that public notice was disseminated. The EPA's failure to issue a public notice to the people of Flint about the dangers of their water is not a particular act or omission that was required by the EPA's own policy of public notice. Rather, it was in violation of that policy. Thus, it cannot be deemed to be conduct that the DFE was meant to protect. *Bultema v. United States*, 359 F.3d 379, 385 (6th Cir. 2004) ("The alleged failure to direct Bultema to give a copy of his pass to unit management was a particular act or omission that was not required by the across-the-board bunk-bed policy, and indeed it was arguably in violation of that policy. It was therefore not protected by the discretionary function exception."); *id.* at 383 ("A fortiori, if a particular act violates a governmental policy, the act cannot be protected under the discretionary function exception by the fact that the violated policy itself was an exercise of a discretionary function.").

---

[28] According to Plaintiffs' expert, this notice should have gone out in 24 hours, as a failure to have corrosion control constitutes a Tier 1 violation. *See* Ex. 38 (Ms. Wu Expert Report, July 11, 2025) at 23.

Moreover, the USA's argument that the decision not to warn residents is excused by the constraints of the available data; the need to make the information understandable; and the need to prevent alarm are contrary to fact and logic. Ex. 39 at 3 (OIG Summary Workpaper of Hotlines and Citizen Complaints) ("EPA was aware of a serious water contamination issue early enough to act more aggressively to either formally require a public notice in April/May 2015, or issue an administrative order by June 2015 and then again in September/October 2015.").

    iv.    <u>The EPA's failure to timely and accurately handle and respond to citizen complaints about the health hazard is not susceptible to or justified by policy analysis.</u>

Failing to respond to citizen complaints in a timely and honest way is also not conduct that the DFE is designed to shield, nor is it aligned with the regulatory scheme of protection of public health. Within a month of the water switch, the EPA began receiving citizen complaints about the water. In fact, Jennifer Crooks reported that she had never received as many citizen complaints in her 27-year career with the EPA. Ex. 40 (Crooks 2020 Dep) at 43:23–44:8; 315:13–316:3. Despite this alarming situation, and the knowledge that there were elevated lead levels in Flint, Ex. 41 (Crooks Email, February 26, 2015), the EPA either failed to respond or delayed in responding for over a year. Ex. 39 (OIG Summary Workpaper of Hotlines and Citizen Complaints) at 3. When the EPA did respond, they did not do so in a manner that was aligned with protecting public health. Rather, they essentially told

citizens and the public at large that the water was safe. *See, e.g.,* Ex. 18 (Hyde Letter, May, 2015); Ex. 19 (Hedman Email, July 10, 2015).

Nor can it be said that this conduct is related to any other policy reason that the USA may now invent as the OIG determined that there was no policy behind such decisions. *See* Ex. 2 (2018 OIG Report) at 23 (EPA "did not have a system for cataloguing and responding to citizen complaints, nor did they use citizen complaints or the volume of calls as indicators of problems with Flint's water system.").

Overall, the EPA's decisions were actively detrimental to the overarching scheme of assuring that water supply systems serving the public meet minimum national standards for protection of public health. The EPA had knowledge that there was on ongoing environmental catastrophe as well as the tools to swiftly save an entire community from being exposed to life altering lead levels, yet it did nothing. This type of conduct is beyond the pale of reasonableness, and therefore, it cannot be excused by a hypothetical policy analysis— especially one that is belied by the facts before us.[29]

---

[29] As this Court has recognized, "there are some decisions that 'may pass a threshold of objective unreasonableness such that no reasonable observer would see them as susceptible to policy analysis.'" *Meeks* 2020, 482 F. Supp. 3d at 637 (quoting *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018)). The EPA's overall conduct in Flint is one of those cases.

## <u>CONCLUSION</u>

In light of the above, the EPA's attempt to evade responsibility for its actions and inactions in response to the Flint Water Crisis should be rejected again, and the USA's motion should be denied.

Dated: November 17, 2025                                Respectfully submitted,

<u>s/ *Melanie Daly*</u>
Melanie Daly
Moshe S. Maimon
Zach Roy
Levy Konigsberg, LLP
605 Third Avenue, 33rd Floor
New York, NY 10158
Phone: (212) 605-6200
Fax: (212) 605-6290
E-mail: mdaly@levylaw.com

***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I electronically filed this document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

**LEVY KONIGSBERG, LLP**

/s/ MELANIE DALY
Melanie Daly