## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

———————————————————/

This Order Relates To:

MEEKS *et al.*, v. UNITED STATES
Case No. 16-cv-10444

———————————————————/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT [3300]

Before the Court is Defendant the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment. (ECF No. 3300.) For the reasons set forth below, the motion is denied.

### I.    Background

This opinion concerns *Meeks v. United States* ("*Meeks*"). *Meeks* is one of the many cases that are collectively referred to as the Flint Water Cases. In *Meeks*, Flint residents sued the United States Environmental Protection Agency ("EPA") under the Federal Tort Claims Act ("FTCA"),

28 U.S.C. §§ 1346, 2671–2680. *Meeks* Plaintiffs T.B., B.R., and M.S. ("Plaintiffs") were all minor children at the time of the Flint Water Crisis. Plaintiffs allege that they were harmed by the EPA's negligent response to the Flint Water Crisis. Other Flint water FTCA cases, with different plaintiffs but similar claims, have been assigned to the Honorable Linda V. Parker and consolidated in *Burgess v. United States*, No. 17-cv-11218.

Currently before the Court is the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment. (ECF No. 3300.) The Court denied a prior motion by the United States to dismiss for lack of subject matter jurisdiction. *In re Flint Water Cases*, 482 F. Supp. 3d 601 (E.D. Mich. 2020) ("*EPA Order I*"). There, as here, the United States argued that the EPA's conduct (1) would not permit a finding of liability under Michigan law, (2) was protected by the misrepresentation exception, and (3) was protected by the discretionary function exception. The Court held that the EPA's alleged conduct (1) *would* permit a finding of liability under Michigan law, (2) was *not* protected by the misrepresentation exception, and (3) was *not* protected by the discretionary function exception. *Id.* at 615.

2

The Court also denied the United States' Motion for Certification of an Interlocutory Appeal. *In re Flint Water Cases*, 627 F. Supp. 3d 734 (E.D. Mich. 2022) ("*EPA Order II*"). Although the Court declined to certify an interlocutory appeal of *EPA Order I*, the Court did reconsider *EPA Order I* to the extent that it relied on the EPA's actual negligence to hold that the EPA's conduct was not shielded by the discretionary function exception. *Id.* at 740. The Court found, however, that reconsideration of that portion of *EPA Order I* did not ultimately change the Court's conclusion that the EPA's conduct was not protected by the discretionary function exception. *Id.*

Judge Parker has also denied multiple motions by the United States to dismiss for lack of subject matter jurisdiction. *Burgess v. United States*, 375 F. Supp. 3d 796 (E.D. Mich. 2019) ("*Burgess I*"); *In re FTCA Flint Water Cases*, No. 17-CV-11218, 2025 WL 322227 (E.D. Mich. Jan. 28, 2025) ("*Burgess II*"); *In re FTCA Flint Water Cases*, No. 17-CV-11218, 2025 WL 2700617 (E.D. Mich. Sept. 22, 2025) ("*Burgess III*"). Like this Court, Judge Parker found that the EPA's conduct (1) *would* permit a finding of liability under Michigan law, (2) was *not* protected by the

3

misrepresentation exception, and (3) was *not* protected by the discretionary function exception. *Burgess I*, 375 F. Supp. 3d at 817, 819.

In *Burgess II*, Judge Parker concluded that "the expanded record d[id] not warrant a different decision with respect to the applicability of the discretionary function exception." 2025 WL 322227, at *1. Similarly, in *Burgess III*, Judge Parker concluded that "further discovery ha[d] not revealed facts warranting a different conclusion than the one this Court reached before with respect to the FTCA's private-person liability requirement." 2025 WL 2700617, at *1. Nor had further discovery provided any "reason to disturb the Court's purely legal reasoning for finding the misrepresentation exception inapplicable." *Id*. Here, this Court reaches similar conclusions.

## II.   Facts

The following factual background is excerpted from Judge Parker's opinion in *Burgess I*, 375 F. Supp. 3d at 803–09. All of the evidence in *Burgess* is adopted here and therefore constitutes the record of this case. Neither party disputes the facts as set forth in *Burgess I. See EPA Order I*, 482 F. Supp. at 608. Because the factual background below is copied

from *Burgess*, all internal citations are accordingly from Case No. 17-cv-11218.

The SDWA [Safe Drinking Water Act ("SDWA")] was enacted in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185 (1974*), reprinted in* 1974 U.S.C.C.A.N. 6454, 6454. The statute authorizes the EPA "to establish Federal standards for protection from all harmful contaminants[] … applicable to all public water systems[.]" *Id.* at 6454-55. It also "establish[es] a joint Federal-State system for assuring compliance with th[o]se standards and for protecting underground sources of drinking water. *Id.* at 6455.

States adopting, among other things, drinking water regulations that are no less stringent than the national primary drinking water regulations are eligible to obtain primary enforcement authority [primacy] over their public water systems. 42 U.S.C. § 300g-2(a)(1). Michigan has obtained primacy and the Michigan Department of Environmental Quality ("MDEQ") thus has primary enforcement authority with respect to the State's water systems. *See Mays v. City of Flint*, 871 F.3d 437, 446 (6th Cir. 2017). As the Sixth Circuit has described it, "the MDEQ-EPA relationship is a model of cooperative federalism …." *Id.* at 447.

Nevertheless, the SDWA reserves the EPA's oversight and primacy States must periodically submit compliance reports to the EPA for that purpose. 42 U.S.C. §§ 300g-3, 300i; *see also* 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 141.90, 142.15, 142.19, 142.30 [. . .]

The EPA has ten regional offices, each of which is responsible for executing EPA programs within several States

5

and territories. "Region 5" serves six States, including Michigan, and a number of tribes. Congress has granted the EPA Administrator the authority to "delegate any of his functions under [the statute] (other than prescribing regulations) to any officer or employee of the Agency." 42 U.S.C. § 300j-9. The EPA Administrator has delegated his authority under Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. (Def's Mot. Exs. 66-68, ECF Nos. 41-7, 41-8, 41-9.) [. . .]

Flint owns and operates a public water system that provides drinking water to its nearly 100,000 citizens. Before April 2014, Flint purchased finished drinking water from the DWSD [Detroit Water and Sewage Department]. DWSD drew its water from Lake Huron and treated the water to control potential contaminants, including copper and lead levels.

In approximately late April 2014, Flint switched its water source from DWSD to the Flint River. The use of the Flint River as a water source was intended to be temporary, as Flint planned to connect to the Karegnondi Authority pipeline in 2016, which also draws its water from Lake Huron. (*See* Def.'s Mot. Ex. 43 at 1, ECF No. 40-3 at Pg ID 1349.) MDEQ and Flint did not, and were not required to, notify the EPA of the changing water sources for Flint. (Def.'s Mot. Ex. C at 37, ECF No. 37-3 at Pg ID 862.) The EPA does not approve such a switch in a primacy State. (*Id.* at 35, Pg ID 862; Ex. 15 at 2.) MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch. (Ex. 2 at 1, ECF No. 38-1; Ex. 3 at 2, ECF No. 38-2 at Pg ID 1142.) MDEQ interpreted the Lead and Copper Rule ("LCR") as allowing Flint to complete two consecutive six-month rounds of sampling prior to

6

determining what, if any corrosion control treatment was needed for the Flint River water. (*Id.* Ex. 20, ECF No. 39-3 at Pg ID 1206-07; Ex. 22 at 1-3, ECF No. 39-5 at Pg ID 1209-1211.) Its wrongful and damaging interpretation was later admitted by MDEQ Director Dan Wyant.

The Flint River provided inconsistent water quality because of elevated levels of organic matter. (*Id.* Ex. 35 at 1, ECF No. 39-18 at Pg ID 1313.) By August 2014, elevated levels of fecal coliform and E. coli bacteria were detected in the water and the MDEQ issued a "boil water advisory" instructing Flint residents to not drink the water. (Def.'s Mot. Ex. E at 66, ECF No. 37-5 at Pg ID 975; Pls.' Resp. Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.) A second E. coli exceedance occurred on September 5, 2014. (*Id.*) The City's use of chlorine to address bacteria exceedances led to another problem—high levels of total trihalomethane ("TTHM"), which poses health risks to consumers. (Pls.' Resp. Ex. 3, ECF No. 53-4 at Pg ID 1931; Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.)

Flint's residents immediately noticed the change in the quality of the water when the City switched its water source to the Flint River. Jennifer Crooks, Region 5's Michigan Program Manager for the Drinking Water Program, who was responsible for reviewing and responding to complaints from Michigan citizens on the agency's behalf, testified in this matter that she had never received as many citizen complaints since she began working for the EPA in 1987 than she did after the Flint water switch. (Def.'s Mot. Ex. E at 29, 30-32, ECF No. 37-5 at Pg ID 965-66.) When Region 5 received citizen complaints from Michigan residents, employees would discuss the issues with technical contacts, check for violations in the various databases, and contact the State person responsible for the water system and discuss the complaint. (*Id.* Ex. E at 24, 49, ECF No. 37-5 at Pg ID 964, 970; Ex. F at

33-34, ECF No. 37-6 at Pg ID 1018-19.) After Region 5's employees conducted background research and communicated with the State, they responded to citizens through emails, phone calls, and written letters. (*Id*. Ex. E at 36-37; *see also id*. Exs. 15, 16, 18.)

In its communications with Flint residents, the EPA indicated that MDEQ was working closely with the City "to ensure that the citizens of Flint are provided drinking water that meets health standards." (*See, e.g., id*. Ex. 15 at 1, ECF No. 58-14 at Pg ID 1184.) The EPA informed Flint's residents that "[t]he most recent laboratory analyses obtained from MDEQ of the City of Flint's drinking water indicate that almost all regulated contaminants meet State and Federal health standards, as required under the Federal and Michigan Safe Drinking Water Acts." (*Id*.) TTHMs pose a health risk for some sub-populations, such as the immune-compromised and pregnant women. (*See id*. Ex. 14 at Pg ID 1183.) Despite being aware of those risks (*see id*.), the EPA did not convey those risks in at least some of its communications with Flint residents. (*See id*. Exs. 15, 18.)

In early 2015, Flint citizen LeeAnn Walters contacted the EPA after receiving the test results of drinking water samples the City of Flint had collected from her home. (Def.'s Mot. Ex. 3 at 2-3, ECF No. 38-2 at Pg ID 1142-43.) Those results showed highly elevated lead and iron levels.[1] (*Id*.) Ms. Crooks from Region 5 sent an email to MDEQ the day after receiving the test results, documenting her concerns and requesting assistance in dealing with the high lead levels in the Walters' home. (*Id*. Ex. E at 69, ECF No. 37-5 at Pg ID 975.) MDEQ indicated in response that the lead was coming

---

[1] The LCR results from the Walters' home showed a level of 104 ppb for lead. (Pls.' Resp. Ex. 1 at 5, ECF No. 53-2 at Pg ID 1924). The regulatory limit is 15 ppb. (*Id*.)

from the home's plumbing, although Ms. Walters had indicated that all of the plumbing was plastic. (*Id.* Ex. 3 at 3, ECF No. 38-2 at Pg ID 1143.)

Ms. Crooks and Miguel Del Toral, Region 5's Regulations Manager for the Groundwater and Drinking Water Branch, were in subsequent communication with MDEQ and the City concerning Ms. Walters' situation and whether there was a more widespread lead issue. (*See* Pls.' Resp. Ex. 1, ECF No. 53-2.) In a February 26, 2015 email to MDEQ officials, Ms. Crooks stated that (1) Flint must have Optimized Corrosion Control Treatment ("OCCT"), (2) the test results for the Walters' home must "be included in with compliance calculation of the 90th percentile", and (3) the City cannot flush the system in advance of taking compliance samples. (*Id.* at 3-4, Pg ID 1921-22.) Mr. Del Toral, who had been copied on Ms. Crooks' email, sent a follow-up email to MDEQ on February 27, 2015, explaining his concerns about the lead situation and Flint's testing protocols. (*Id.* at 2-3, Pg ID 1920-21.) Mr. Del Toral conveyed that pre-flushing the tap before collecting testing samples "biases the results low by eliminating the highest lead values" and "provides false assurance to residents about the true lead levels in the water." (*Id.*) Mr. Del Toral suggested that MDEQ contact Region 5's "resident expert", Mike Schock, for help with compliance. (*Id.*) Ms. Crooks forwarded Mr. Schock's contact information to MDEQ the same day. (*Id.*)

On February 27, 2015, Stephen Busch from the MDEQ responded to Ms. Crooks' and Mr. Del Toral's emails, thanking them for their information and indicating: "[W]e will take it under consideration." (*Id.* at 1, Pg ID 1919.) Mr. Busch represented in the same email, among other things, that Flint "[h]as an Optimized Corrosion Control Program", "[c]onducts quarterly Water Quality Parameter monitoring at 25 sites

and has not had any unusual results[,]" and "[h]as never had a 90th percentile lead AL exceedance[.]" (*Id.*)

Region 5 visited the Walters' home on April 27 and May 6, 2015, to inspect the plumbing and conduct additional testing. (Def.'s Mot. Ex. 3 at 3, ECF No. 38-2 at Pg ID 1143.) Finding that the interior plumbing was primarily plastic, the EPA concluded that it was not the source of the high lead levels found in the water at the residence. (*Id.*) Shockingly, as Mr. Del Toral noted in an email to colleagues within Region 5, local officials were telling Flint residents that the source of the high lead was the home's internal plumbing. (Pls.' Resp. Ex. 2 at 5, ECF No. 53-3 at Pg ID 1929.)

During EPA's May 6 trip to the Walters' home, the service line to the residence was replaced and the EPA sent three portions of the extracted line for testing, which confirmed that a portion of the line was made of galvanized iron pipe. (*Id.*) The EPA's inspection of the remaining portion confirmed that the service line from the water main to the external shut-off valve was lead. (*Id.*) Region 5 collected water samples from other Flint residents' homes, which also showed noncompliant lead levels. (*Id.* at 4, Pg ID 1144.)

Meanwhile, on April 23, 2015, Mr. Del Toral sent an email to MDEQ asking: "What's Flint doing now (post Detroit) for corrosion control treatment?" (Pls.' Resp. Ex. 2 at 4, ECF No. 53-3 at Pg ID 1928.) MDEQ responded the following day, indicating that Flint is not practicing CCT and that the results of testing for two six-month periods indicated that no treatment was needed. (*Id.* at 3, Pg ID 1927.) Mr. Del Toral emailed MDEQ on April 25, 2015, expressing his concern regarding the lack of CCT following the water source switch considering the known corrosivity of the Flint River and the City's extensive lead service lines. (*Id.* at 1, Pg ID 1925.) Mr. Del Toral further reemphasized that the City's preflushing

10

ahead of compliance sampling may be distorting test results. (*Id.*) Mr. Del Toral expressed that "[g]iven the very high lead levels found at one home and the pre-flushing happening at Flint . . . the whole town may have much higher lead levels than the compliance results indicated …." (*Id.*)

In May and June 2015, EPA Region 5 staff continued to express concern to MDEQ and the City about increasing concentrations of lead in Flint's drinking water and the City's lack of corrosion control treatment and offered the EPA's expertise to move forward and rectify the water quality problems. (Def.'s Mot. Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Ex. 3 at 4, ECF No. 38-2 at Pg ID 1144; Pls.' Resp. Ex. 6 at 1, ECF No. 53-7 at Pg ID 1945.) During this period, Mr. Del Toral prepared the EPA's interim report on high lead levels in Flint's water system, which was circulated to his colleagues. In the report, Mr. Del Toral indicated that Flint was not including tests from homes showing high lead levels in its compliance sampling pool. (Pls.' Resp. Ex. 3 at 5, ECF No. 53-4 at Pg ID 1935.) He also expressed concern that this omission, as well as Flint's sampling procedures, conceal a more wide-spread problem with high lead levels throughout the City's water supply. (*Id.* at 2, Pg ID 1932.) As Mr. Del Toral further explained in an email to his colleagues:

> The widespread high lead is my judgment based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility. You will have high lead leaching into the water where you are doing nothing to mitigate that. We

11

don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places. The fact that their sampling is designed not to capture lead (everything is fine) does not negate our scientific understanding of what is going on. The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring it. …

(*Id.*, Ex. 5 at 3, ECF No. 53-6 at Pg ID 1942.)

Tinka Hyde, the Director of the Water Division for Region 5, convened a formal conference call with MDEQ management on July 21, 2015, to discuss the status of Flint's lead sampling results (including MDEQ's position on pre-flushing) and MDEQ's interpretation of the LCR, which conflicted with Region 5's interpretation. (Def.'s Mot. Ex. 20, ECF No. 39-3 at Pg ID 1206-07.) The EPA interpreted the rule as requiring a public water system to use optimal corrosion control treatment upon switching water sources. (*See id.* Ex C at 41-42, ECF No. 37-3 at Pg ID 863-64; Ex. 11 at 1-2, ECF No. 38-10 at Pg ID 1169-70.) MDEQ decided to treat Flint's change in water sources as a "new source" which would require OCCT only after monitoring reflects the need for treatment. (*See id.* Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.)

In preparation for the July 21, 2015 conference call between EPA and MDEQ, EPA drafted a "Briefing Paper" which reflects what EPA already knew about Flint's water crisis and state and local officials' response (or lack thereof) to that crisis. (*See* Pls.' Resp. Exs. 11, 22, ECF Nos. 53-8, 53-16.) This included the fact that Michigan was not requiring corrosion control in Flint. (*Id.*) It further reflects EPA's knowledge that Flint was not including in its testing the citizen requested samples where high-lead levels were detected—despite EPA's direction that they needed to be

12

included—and EPA's knowledge that Flint was "preflushing" lines before sampling—again, despite EPA's explanation of why this distorts testing. (*Id.*) These documents also reflects EPA[']s expectation that proper sampling would show high lead levels in the water supplied to Flint residents and a need for corrosion control. (*Id.*)

During the July 21, 2015 conference call, MDEQ requested an opinion from EPA headquarters to resolve the discrepancy in the LCR interpretation.[2] (*Id.*; *see also* Ex. C at 42, ECF No. 37-3 at Pg ID 864.) MDEQ nevertheless communicated a willingness "to initiate discussion with Flint sooner rather than later on corrosion control." (*Id.*, Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.) But MDEQ was unwilling to budge on its pre-flushing requirement until new regulations were issued, maintaining that the State's lead compliance sampling procedures comply with federal SDWA requirements and that pre-flushing instructions are not requirements but suggestions. (*Id.* at 2, Pg ID 1207.) Region 5 again offered the EPA's technical assistance. (*Id.* Ex. 20 at 1-2, ECF No. 39-3 at Pg ID 1206-07.)

On August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months. (Def.'s Mot. Ex. C at 52, ECF No. 37-3 at

---

[2] In response to this request, the EPA issued a policy memorandum on November 3, 2015, clarifying how the LCR should be interpreted on a prospective basis and agreeing with Region 5's interpretation. (Def.'s Resp. Ex. 31, ECF No. 39-14.) In the memo, EPA headquarters recognized that "the language of the LCR does not specifically discuss [the situation where a public water system disconnects from one source and begins distributing water from another source]" and "that there are differing possible interpretations of the LCR with respect to how the rule's optimal corrosion control treatment procedures apply to this situation ....." (*Id.* at 1, Pg ID 1290.)

13

Pg ID 866; Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Pls.'
Resp. Ex. 70 at 15, ECF No. 53-27 at Pg ID 2122.) During an
August 31, 2015 conference call between MDEQ and Region
5, the results of the second six-month (January-July 2015)
monitoring test results for Flint were discussed, which
reflected that corrosion control was needed. (Pls.' Resp. Ex. 70
at 15, ECF No. 53-27 at Pg ID 2122.) During this call, Region
5 discussed the need for outreach to Flint's citizens to reduce
their exposure to high lead levels in the drinking water and
reiterated the offer of technical assistance in implementing
corrosion control treatment. (Def.'s Mot. Ex. 32 at 3, ECF No.
39-15 at Pg ID 1294.) But Region 5 viewed MDEQ as having
the responsibility to alert the public as the primacy agency.
(*Id.* Ex. C at 109, ECF No. 37-3 at Pg ID 880).

Instead, as EPA's agents were well aware, City officials
continued to assure Flint residents that there was no
corrosivity issue and that MDEQ and the EPA found the City
in compliance with safe water standards. (Pls.' Resp. Ex. 47
at 3, ECF No. 53-22 at Pg ID 2059.) At the same time, the EPA
learned that pediatricians at Hurley Medical Center in Flint
had conducted a study which showed a rise in the blood lead
levels of Flint's children after the switch to the Flint River as
the City's water source. (*Id.* at 2-3, Pg ID 2058-59.) For
example, in the two zip codes where the highest level of lead
was found in the water, the EBL (elevated blood lead) levels
for infants less than fifteen months old rose from 1.5% to 4.4%.
(*Id.*) The rest of Flint had an increase from .6 to 1.1% for the
same age group. (*Id.*) There was no change, in comparison, for
non-Flint infants less than fifteen months old. (*Id.*) For
children less than five-years old, EBL levels rose from 2.1% to
4.0% throughout Flint and from 2.5% to 6.3% in the two most-
affected zip codes. (*Id.*)

14

On September 3, 2015, Flint's Mayor announced that the City would implement corrosion control treatment and invited EPA corrosion control experts to join the Flint Technical Advisory Committee ("TAC"). (Def.'s Mot. Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.) On October 7, 2015, the TAC recommended that MDEQ direct Flint to resume purchasing treated water from the DSWD, now called the Great Lakes Water Authority. (*Id.* Ex. G at 73, 75-76; ECF No. 37-3 at Pg ID 1078; Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.) On October 16, 2015, the EPA established the Flint Safe Drinking Water Task Force ("EPA Flint Task Force") to provide technical expertise to MDEQ and the City. (Ex. 32 at 4, ECF No. 39-15 at 1295.) On the same date, Flint switched back to purchasing finished water from Detroit.

Despite the switch, corrosion control treatment remained necessary because the corrosive Flint River water had eroded away the protective coatings in the system. (*See id.* Ex. G at 76, ECF No. 37-7 at Pg ID 1078, Ex. 32 at 5, ECF No. 39-15 at Pg ID 1296.) On November 25, 2015, and on subsequent dates, the EPA Flint Task Force requested information which was not being shared to assess the City's progress with corrosion control. (*Id.* Ex. 32 at 4-5, ECF No. 39-15 at Pg ID 1295.) Without the information, the EPA could not evaluate whether the contamination in the City's water system had been eradicated. (*Id.*) While the City began additional corrosion control treatment in early December 2015, the EPA was not assured that high levels of lead and other contaminants had been removed from the water system. (*Id.*)

On December 14, 2015, the City declared an emergency. On January 14, 2016, Michigan's Governor requested emergency disaster assistance. Two days later, President Obama declared a federal emergency in the City. On January

15

21, 2016, the EPA issued an emergency order pursuant to Section 1431 of the SDWA. (*Id*. Ex. 32, ECF No. 39-15 at Pg ID 1292-1309.) The EPA identified several reasons for issuing the order at that time, including continued "delays in responding to critical EPA recommendations and in implementing the actions necessary to reduce and minimize the presence of lead and other contaminants in the water supply" presently and moving forward. (*Id*. at 8 at Pg ID 1299.) Further, the EPA noted MDEQ's and the City's failure and continued failure to provide necessary information for the EPA, the EPA Flint Task Force and Flint citizens "to fully understand and respond promptly and adequately to the current deficiencies." (*Id*.) Additionally, the City viewed its switch back to Detroit water as temporary and planned to eventually move to untreated water from KWA. The EPA viewed the transition as posing "complex technical and managerial challenges … that have serious implications for drinking water safety and public health." (Pls.' Resp. Ex. 63 at 2, ECF No. 41-4 at Pg ID 1723.) The EPA was concerned that the City lacked the professional expertise and resources to manage the transition and carry out the recommended actions to safely manage the City's water system. (*Id*.; Def.'s Mot Ex. 32 at 8, ECF No. 39-15 at Pg ID 1299.)

On October 20, 2016, the EPA Office of Inspector General (OIG) issued a "Management Alert" in which it found that "Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015." (Pls.' Resp. Ex. 53 at 1, ECF No. 53-25 at Pg ID 2019.) The OIG indicated that "EPA's 1991 guidance on SDWA Section 1431 orders states that if state actions are deemed insufficient, the EPA can and should proceed with a SDWA Section 1431 order, and the EPA may use its emergency

authority if state action is not protecting the public in a timely manner." (*Id.*)

*Burgess I*, 375 F. Supp. 3d at 803–09.

## III.   Federal Tort Claims Act

Generally, sovereign immunity shields the United States from suit. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). The United States may, however, waive its sovereign immunity and consent to be sued. *Id.* Because "[s]overeign immunity is jurisdictional in nature," a court's jurisdiction to entertain a suit against the United States is defined by "the 'terms of [the United States'] consent to be sued.'" *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

The FTCA is a limited waiver of the United States' sovereign immunity, permitting plaintiffs to seek damages from the United States for certain torts committed by federal employees. *Brownback v. King*, 592 U.S. 209, 212 (2021) (citing *Meyer*, 510 U.S. at 475–76). Federal courts have jurisdiction over these claims so long as they are actionable under § 1346(b) of the FTCA. *Id.* A claim is actionable under § 1346(b) if it is: (1) against the United States, (2) for money damages, (3) for injury or loss of property, or personal injury or death, (4) caused by the negligent or wrongful act or omission of any employee of the Government, (5) while

17

acting within the scope of his or her office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Id.*

The FTCA's "broad waiver of sovereign immunity" is, however, subject to several exceptions listed in § 2680 of the FTCA. *Millbrook v. United States*, 569 U.S. 50, 52 (2013). Section 2680 explains that § 1346(b) "shall not apply to" the enumerated exceptions. 28 U.S.C. § 2680. Accordingly, the United States has not waived sovereign immunity as to—and district courts do not have jurisdiction over—any claim that falls within the thirteen enumerated exceptions. *Simmons v. Himmelreich*, 578 U.S. 621, 626 (2016).

Here, the United States contends that the Court lacks jurisdiction over Plaintiffs' claims. First, the United States argues that Plaintiffs' claims are not actionable under the FTCA because they do not meet § 1346(b)'s analogous private liability requirement—i.e., the requirement that "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674

18

(explaining that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances").

Second, the United States argues that even if Plaintiffs satisfied the analogous private liability requirement, the Court would lack jurisdiction because two of § 2680's enumerated exceptions apply. Specifically, the United States contends that the EPA's conduct falls within the discretionary function exception, which retains sovereign immunity where claims arise from "the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a). Insofar as Plaintiffs' claims arise from the EPA's communications during the Flint Water Crisis, the United States also argues that its sovereign immunity is retained under the misrepresentation exception. 28 U.S.C. § 2680(h).

## IV.   Standard of Review

Under Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." The "party who invokes the jurisdiction of a federal court must allege all facts necessary to give the court jurisdiction

19

of the subject matter." *Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) (quoting *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952)). Here, the burden is on Plaintiffs to allege facts that fall within the FTCA's waiver of sovereign immunity—meaning facts that facially fall both within § 1346(b) *and* outside of § 2680's enumerated exceptions. Once Plaintiffs succeed, however, the burden falls on the United States to prove the applicability of one or more of § 2680's exceptions. *Id.*

The United States moves to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) attack on subject-matter jurisdiction may be facial or factual. *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions the sufficiency of the pleadings and is treated like a Rule 12(b)(6) motion to dismiss—i.e., faced with a facial attack, the Court must take the allegations in the complaint as true. *Id.* A factual attack, on the other hand, "raises a factual controversy" and is analyzed under the Rule 12(b)(1) standard—i.e., faced with a factual attack, "no presumptive truthfulness applies," and the Court "must

20

weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Id.*

Here, the United States brings a factual attack on the Court's subject matter jurisdiction. (ECF No. 3300, PageID.109110.) In deciding a factual attack on subject matter jurisdiction, the Court "may consider factual matters outside the pleadings and resolve factual disputes." *Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Unlike a motion to dismiss under 12(b)(6), a motion to dismiss under 12(b)(1) is not converted to a motion for summary judgment simply because the Court considers matters outside the pleadings. *Rogers v. Stratton Industries*, Inc., 798 F.2d 913, 916 (6th Cir. 1986).

When jurisdictional issues are intertwined with the merits of a plaintiff's claims, however, it may be appropriate to treat a 12(b)(1) motion as a motion for summary judgment—i.e., it may be appropriate to review the motion under a Rule 56 standard rather than a 12(b)(1) standard. *See Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (explaining that if "an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the

21

district court should . . . 'deal with the objection as a direct attack on the merits of the plaintiff's claim'") (quoting *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)); *Wright v. United States*, No. 95-5175, 1996 WL 172119, at *4–5 (6th Cir. Apr. 11, 1996) (upholding a district court's decision to convert an FTCA discretionary function challenge into a motion for summary judgment because the jurisdictional question was interwoven with the merits of the plaintiffs' case).

Under a Rule 56 standard, unlike a 12(b)(1) standard, a court may not make credibility determinations or weigh the evidence. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Rather, a court must view the evidence, the facts, and any inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, under Rule 56, unlike Rule 12(b)(1), a court is not empowered to resolve factual disputes. *Rogers*, 798 F.2d at 915. Rather, a "court, upon finding genuine issues as to material facts, must deny the motion." *Id.* Applying a Rule 56 standard, where jurisdictional issues are intertwined with the merits, thus "provides a 'greater level of protection

22

to the plaintiff who in truth is facing a challenge to the validity of his claim.'" *Gentek Bldg. Prods.*, 491 F.3d at 330 (quoting *Garcia*, 104 F.3d at 1261).[3]

In FTCA claims, jurisdictional issues are often intertwined with the merits of a plaintiff's claim. *See, e.g.*, *Montez v. Dep't of the Navy*, 392 F.3d 147, 151 (5th Cir. 2004); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). In *EPA Order I*, the Court found that the United States' jurisdictional arguments were intertwined with the merits of Plaintiffs' claims. *EPA Order I*, 482 F. Supp. 3d at 616. Accordingly, the Court held that Plaintiffs must be afforded more procedural safeguards than review

---

[3] A Rule 12(b)(6) standard may also provide the requisite "level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim." *Gentek Bldg. Prods.*, 491 F.3d at 330. But where, as here, the parties have conducted discovery and rely on a substantial record outside of the pleadings, a Rule 56 standard makes the most sense. *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (explaining that a 12(b)(6) motion is converted to a Rule 56 motion "if either party submits additional materials 'outside the pleadings'"); *Sowders v. Scratch Fin., Inc.*, No. 3:23-CV-56, 2024 WL 519730, at *4 (S.D. Ohio Feb. 9, 2024) (finding, "*[a]t the pleading stage*," that an "intertwinement" of jurisdictional issues with the merits "requires courts to consider a party's factual challenge under Rule 12(b)(6)") (emphasis added); *Burgess II*, 2025 WL 2700617, at *2 (finding, where "*the parties already conducted discovery . . . and present materials outside the pleadings*," that jurisdictional questions intertwined with the merits are best analyzed under a Rule 56 standard) (emphasis added).

23

under 12(b)(1) affords, and the Court analyzed the United States' factual attacks on jurisdiction under a Rule 56 standard. *Id.*

Here, the United States does not deny that its analogous private liability and misrepresentation exception arguments are intertwined with the merits of Plaintiffs' claims and, therefore, appropriately analyzed under a Rule 56 standard. But the United States argues that a Rule 56 standard is inapplicable to the discretionary function analysis because the United States' discretionary function arguments are *not* intertwined with the merits of Plaintiffs' claims. (ECF No. 3300, PageID.109111.) Specifically, the United States contends that its discretionary function arguments cannot implicate the merits of Plaintiffs' negligence claims because negligence is irrelevant to the discretion function inquiry. (*Id.*).

It is true, as the Court acknowledged in *EPA Order II*, that whether the EPA was negligent is irrelevant to the question of whether its conduct was shielded by the discretionary function exception.[4] *EPA Order II*, 627

---

[4] On the other hand, it would be an overstatement to say that the EPA's alleged negligence is irrelevant to the discretionary function analysis in every sense. As the Ninth Circuit has explained, it is certainly true "that 'the question of *whether* the government was negligent is irrelevant to the applicability of the discretionary function exception.'" *Young v. United States*, 769 F.3d 1047, 1054 (9th Cir. 2014)

F. Supp. 3d at 740. It is also true that several courts have, for this reason, found that the discretionary function inquiry is not intertwined with the merits of a plaintiff's negligence claim. *See, e.g.*, *In re Steinle*, 835 F. Supp. 2d 437, 442 (N.D. Ohio 2011) (finding that the discretionary function analysis was not intertwined with the merits of the negligence action because the discretionary function analysis turned on whether the Coast Guard was authorized to exercise discretion and not whether it was negligent in exercising that discretion); *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 861 (4th Cir. 2016) (finding that the discretionary function analysis was not intertwined with the merits of the negligence claim because the discretionary function analysis turned on whether the FDA was authorized to exercise discretion and not whether it was negligent in exercising that discretion).

---

(emphasis in original) (quoting *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005)). This makes good sense, because conduct may be shielded by the discretionary function analysis even if it is negligent. *See* 28 U.S.C. § 2680(a) (explaining that the exception applies "whether or not the discretion involved be abused"). But "the question of *how* the government was negligent remains 'critical' to the discretionary function exception inquiry." *Young*, 769 F.3d at 1054 (emphasis added). This too makes good sense, because "determining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action." *Id.*

On the other hand, a great many other cases have found that the discretionary function analysis *is* intertwined with the merits of a plaintiff's claim. Some courts, including the Tenth Circuit, have found this to be true categorically. *See, e.g., Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000) ("We have stated, in a number of cases involving the discretionary function exception to the FTCA, that 'the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues.'") (quoting *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997)); *Garcia v. United States Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (explicitly acknowledging that "the question of negligence" is irrelevant to the discretionary function analysis and still finding the discretionary function analysis to be categorically intertwined with the merits of a case); *Donohue ex rel. Est. of Donohue v. United States*, No. 1:05 CV 175, 2006 WL 2990387, at *6 (S.D. Ohio Oct. 18, 2006) (explaining that "the jurisdictional question of whether the discretionary function exception applies to a claim brought under the FTCA is *necessarily* entwined with the merits of the case") (emphasis added).

26

Other courts have found the discretionary function analysis to be intertwined with the merits of a claim on a case-by-case basis. *See, e.g.*, *M.D.C.G. v. United States*, 511 F. Supp. 3d 782, 786 (S.D. Tex. 2021) (finding that the discretionary function analysis was intertwined with the merits of a negligence claim because it turned on facts that were also relevant to the negligence claim); *Rich v. United States*, 811 F.3d 140, 146 (4th Cir. 2015) (finding that the discretionary function analysis was intertwined with the merits of a negligence claim where a particular allegation was relevant to both the discretionary function analysis and the negligence claim); *S.R.P. v. United States*, 676 F.3d 329, 344 (3d Cir. 2012) (finding that the discretionary function analysis was intertwined with the merits of a negligence claim because "many of the same facts" were relevant to both the discretionary function analysis and the negligence claim); *Compagnie Mar. Marfret v. San Juan Bay Pilots Corp.*, 532 F. Supp. 2d 369, 374 (D.P.R. 2008) (finding that the discretionary function analysis was intertwined with the merits of a claim because analysis of whether the relevant statutes, regulations, and internal guidelines were discretionary also implicated questions of duty and breach).

27

Courts analyzing "intertwinement" on a case-by-case—as opposed to categorical—basis generally ask whether there is factual or evidentiary overlap between the jurisdictional analysis and the merits analysis. *See, e.g.*, *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (explaining that jurisdictional analysis is intertwined with the merits when "the question of jurisdiction is dependent on the resolution of factual issues going to the merits"); *S.R.P.*, 676 F.3d at 344 (explaining that jurisdictional analysis is intertwined with the merits when there are "overlapping issues of proof"); *Rich*, 811 F.3d at 147 (explaining that jurisdictional analysis is intertwined with the merits when it "require[s] the consideration of merits-based evidence"); *Walding v. United States*, 955 F. Supp. 2d 759, 770 (W.D. Tex. 2013) (explaining that discretionary function analysis is not necessarily intertwined with the merits, but becomes so if it "require[s] resolving disputed facts that overlap with the merits").

In *Gentek*, the Sixth Circuit adopted this factual-overlap approach to determining whether a jurisdictional issue is intertwined with the merits. *See Gentek Bldg. Prods.*, 491 F.3d at 330 (explaining that a jurisdictional issue is intertwined with the merits "when the facts

28

necessary to sustain jurisdiction . . . implicate the merits of the plaintiff's claim"). There, the Sixth Circuit determined that a disputed jurisdictional fact—whether a coating material sold by Sherwin-Williams was a "consumer product"—also went to the merits of the plaintiff's claim. *Id.* The Sixth Circuit took the same approach in an unpublished decision upholding a district court's determination that the discretionary function analysis was intertwined with the merits of the plaintiffs' claim. *See Wright*, 1996 WL 172119, at *3–5. There, the Sixth Circuit explained that a jurisdictional issue is intertwined with the merits of a claim when a "prerequisite [jurisdictional] fact or legal conclusion also relates to the merits of a plaintiff's case." *Id.* at *4. Applying that standard to the case, the Sixth Circuit found that "the jurisdictional question of whether [park] rangers violated the applicable regulations concerning dangerous trees is interwoven with the question of whether the rangers acted negligently." *Id.*

Accordingly, while the United States is correct in stating that the mere existence of negligence is irrelevant to the discretionary function analysis, the discretionary function analysis may, nevertheless, be relevant to the ultimate determination of negligence. In determining

whether the discretionary function analysis is intertwined with the merits of Plaintiffs' claim, the Court must ask whether disputed jurisdictional facts also relate to the merits of Plaintiffs' negligence claim.[5] Here, that is undoubtedly true. The United States' discretionary function arguments ask the Court to resolve a number of factual disputes that are also relevant to the ultimate question of the EPA's negligence.

For example, factual disputes remain regarding the nature and applicability of § 1414 of the SDWA and related rules and regulations. The United States argues that § 1414 is discretionary; Plaintiffs argue that it is not. (*See* ECF No. 3300, PageID.109121–109122; ECF No. 3354, PageID.110813–110817.) Plaintiffs argue that a Public Notification rule required the EPA to issue a public notice; the United States argues that it did not. (*See* ECF No. 3354, PageID.110825–110827; ECF No. 3379, PageID.111991.) As in *Wright*, the resolution of these disputes is also

---

[5] In addition to comporting with Sixth Circuit precedent, this approach has the virtue of reflecting the concerns that animate the "intertwinement" inquiry in the first place. As set forth above, courts convert 12(b)(1) motions to 12(b)(6) or Rule 56 motions in order to afford plaintiffs the procedural safeguards of a merits-based attack in cases where a jurisdictional attack implicates the merits. *See Gentek Bldg. Prods.*, 491 F.3d at 330. A jurisdictional attack surely implicates the merits if it asks a court to resolve factual disputes that are also relevant to the merits of a plaintiff's claim.

relevant to the EPA's alleged negligence. *See Wright*, 1996 WL 172119, at \*4; *see also Capt Chance, Inc. v. United States*, 506 F. Supp. 2d 1196, 1200 n.3 (M.D. Fla. 2007) (explaining that the determination of whether relevant statutes, regulations, and internal guidelines are discretionary necessarily implicates duty and breach); *Compagnie Mar. Marfret*, 532 F. Supp. 2d at 374 (same).

The parties also dispute the applicability of § 1414 of the SDWA. Plaintiffs argue that the EPA made the threshold finding of non-compliance that triggered mandatory duties under § 1414(a)(1)(A)–(B); the United States argues that it did not. (*See* ECF No. 3354, PageID.110813–110815; ECF No. 3379, PageID.111987–111988.) Resolution of this dispute implicates factual questions regarding the timing and nature of the EPA's knowledge. *See EPA Order I*, 482 F. Supp. 3d at 628–29. These questions are relevant to both the discretionary function analysis and the merits of Plaintiffs' negligence claim. *See, e.g.*, *Willett v. United States*, 24 F. Supp. 3d 1167, 1174 (M.D. Ala. 2014) (explaining that whether a VA hospital knew of prior sexual assaults by an employee was relevant to both the discretionary function analysis and the merits of the plaintiff's negligence claim); *Parker v. United States*, No.

CIV. 11-176-ART, 2012 WL 2414887, at *4 (E.D. Ky. June 26, 2012) (finding "whether officials knew about an imminent attack" to be relevant not only to the discretionary function analysis but also to "whether the officials were negligent at all"); *Perez v. United States*, No. 106CV0080, 2010 WL 3927628, at *3 (D.V.I. Oct. 1, 2010) (explaining that "the issue of the Government's knowledge of the risk of barracuda attacks is relevant to both the application of the discretionary function exception and the merits of Plaintiff's negligence claim").

For the reasons set forth above, the United States' discretionary function arguments, like its private analogous liability and misrepresentation exception arguments, are intertwined with the merits of Plaintiffs' claims. Accordingly, Plaintiffs must be afforded more procedural safeguards than review under 12(b)(1) affords. The Court will therefore analyze all three jurisdictional issues under the Rule 56 standard. Under that standard, the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "so long as 'the evidence is such that a reasonable jury could return a verdict for

the non-moving party.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir.2002)). In determining whether there is a genuine dispute of material fact, the Court is not permitted to make credibility determinations or weigh the evidence. *Bennett*, 410 F.3d at 817. Rather, as explained above, all facts, evidence, and reasonable inferences must be viewed in the light most favorable to the non-moving party. *Id.*

## V. Analysis

### A. Private Liability Requirement

A claim is actionable under § 1346(b) of the FTCA only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Under this analogous private liability requirement, a plaintiff must "demonstrate that federal officials committed a tort under applicable state law." *Martin v. United States*, 605 U.S. 395, 402 (2025) (citing *Brownback*, 592 U.S. at 218). In other words, state law, not the FTCA, is "the source of substantive liability." *Meyer*, 510 U.S. at 478. Here, where the EPA's alleged misconduct occurred in Michigan, Plaintiffs must "demonstrat[e] that

'[Michigan] would permit a cause of action for that misconduct to go forward.'" *Martin*, 605 U.S. at 409–10 (quoting *Carlson v. Green*, 446 U. S. 14, 23 (1980)).

Plaintiffs contend that Michigan's Good Samaritan doctrine would permit a cause of action for the EPA's alleged misconduct. Michigan courts recognize the Good Samaritan doctrine as described in the Restatement (Second) of Torts § 324A. *See Courtright v. Design Irrigation*, 534 N.W.2d 181, 182 (Mich. App. 1995); *but see Fultz v. Union-Com. Assocs.*, 683 N.W.2d 587, 590 (Mich. 2004) (noting that the breadth of § 324A is limited by Michigan case law). Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

34

Restatement (Second) of Torts § 324A (1965). Section 324A thus "establishes tort liability for a voluntary undertaking to render services for others where the services are negligently performed." *Callesen v. Grand Trunk W. R. Co.*, 437 N.W.2d 372, 379 (Mich. 1989). Here, to establish liability under § 324A, Plaintiffs must show that (1) the EPA undertook to render services to another; (2) the EPA was negligent in its undertaking; and (3) at least one of the three bases for liability in § 324A(a)–(c) is satisfied.[6] *Myers v. United States*, 17 F.3d 890, 902 (6th Cir. 1994).

In *EPA Order I*, the Court held that the Good Samaritan doctrine applied to the EPA's alleged conduct. *EPA Order I*, 482 F. Supp. 3d at

---

[6] This third and final element of a Good Samaritan claim is "is stated in the disjunctive." *Ray v. Transamerica Ins. Co.*, 208 N.W.2d 610, 615 (Mich. App. 1973). This means that proof of only one theory of liability—§ 324A(a), (b), *or* (c)—is necessary to recover. *Id.*

Section 324A(a), (b), and (c) are often understood as bases for finding proximate causation, although it not clear that Michigan courts have adopted this understanding of §324A(a)–(c). *See, e.g.*, *Good v. Ohio Edison Co.*, 149 F.3d 413, 420–21 (6th Cir. 1998) (treating §324A(a) and (c) as ways of establishing proximate causation); *Kirk v. United States*, 604 F. Supp. 1474, 1482 (D.N.H. 1985) (describing §324A(a)–(c) as "encompass[ing] the final element in the traditional negligence analysis, proximate causation"); *Blessing v. United States*, 447 F. Supp. 1160, 1193 (E.D. Pa. 1978) (explaining that "physical harm is proximately caused by negligent performance of an undertaking" if §324A(a), (b), or (c) is satisfied); *but see Myers v. United States*, 17 F.3d 890, 902 (6th Cir. 1994) (describing §324A(a)–(c) as "three alternative bases for the imposition of a duty").

35

617. Taking Plaintiffs' allegations as true, the Court found that (1) the EPA had voluntarily acted for the benefit of Flint's citizens; (2) the EPA was negligent in that undertaking; and (3) all three bases for liability in § 324A(a)–(c) were satisfied.[7] *Id.* at 617–24. Here, the United States renews its argument that Plaintiffs cannot establish any of the three bases for liability in § 324A(a)–(c).[8] Plaintiffs, on the other hand, contend that § 324A(a), (b), and (c) are all satisfied. The Court concludes that Plaintiffs have established a genuine dispute of material fact regarding the application of §§ 324A(a), (b), and (c).

---

[7] In related Flint water litigation alleging negligence on the part of the EPA, Judge Parker has also repeatedly found that at least one of § 324A's three bases for liability has been satisfied. In *Burgess I*, Judge Parker held that the plaintiffs' allegations satisfied § 324A(c). *Burgess I*, 375 F. Supp. 3d at 818. In *Burgess III*, Judge Parker concluded that a rational factfinder could find that § 324A(b) and (c) were satisfied. *Burgess III*, 2025 WL 2700617, at *13–15.

[8] The United States notes, in a footnote, that it continues to maintain Plaintiffs also cannot satisfy the first two pre-requisites to liability under § 324A: (1) a voluntary undertaking by the EPA, and (2) negligence in the performance of that undertaking. (ECF No. 3300, PageID.109113 n.51.) Nevertheless, the United States' briefing "assum[es], for the purposes of this motion only," that Plaintiffs can satisfy those pre-requisites. (ECF No. 3379, PageID.111981.) The United States directs the Court's attention—and dedicates the Good Samaritan doctrine portion of its briefing—to the third pre-requisite to liability under § 324A: satisfaction of § 324A(a), (b), or (c). Accordingly, the Court will not disturb its prior finding that Plaintiffs have adequately alleged (1) that the EPA voluntarily acted for the benefit of Flint's citizens, and (2) that the EPA was negligent in that undertaking. *See EPA Order I*, 482 F. Supp. 3d at 618–20.

36

### i.   Section 324A(a) – Increased Risk of Harm

Assuming the first two prerequisites of § 324A are met, § 324A(a) imposes liability on a defendant whose failure to exercise reasonable care increased the risk of harm to plaintiffs. The Sixth Circuit has held that "[t]he test is not whether the risk was increased over what it would have been if the defendant had not been negligent." *Myers*, 17 F.3d at 903. Rather, § 324A(a) applies only "if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Id.*

Here, Plaintiffs allege that the EPA's negligence increased the risk of harm to Plaintiffs. In response, the United States argues that the EPA's conduct did not increase Plaintiffs' risk of harm beyond what it would have been if the EPA had never engaged in the undertaking at all. In *EPA Order I*, faced with the same argument, the Court found that Plaintiffs had plausibly alleged that the EPA had increased their risk of harm over what it would have been if the EPA had never engaged in the relevant undertaking. *EPA Order I*, 482 F. Supp. 3d at 620–21.

There, the Court distinguished this case from *Myers*, where the Sixth Circuit held that the failure of federal mine inspectors to identify a safety hazard did not increase the decedent miners' risk of harm. *See*

37

*Myers*, 17 F.3d at 903. In *Myers*, the plaintiffs failed to "explain how, or to what degree, the risk of explosion was increased." *Id.* at 902. Importantly, the Sixth Circuit found that "the risk [of explosion] was constant." *Id.* Accordingly, the probability of harm did not increase with the passage of time, and the plaintiffs' allegation that mine inspectors allowed dangerous conditions to continue over time could not, by itself, bring the plaintiffs within § 324A(a). *Id.*

Here, in contrast, the dangers of consuming lead are *not* constant. The harm to Plaintiffs increased each day they were exposed to contaminated water. *See EPA Order I*, 482 F. Supp. 3d at 621. And unlike the plaintiffs in *Myers*, the *Meeks* Plaintiffs do not merely allege, without explanation, that a failure to discover dangerous conditions increased their risk of harm. Rather, Plaintiffs allege that the EPA *did* discover the water contamination in Flint, then took affirmative steps that increased the likelihood Flint's residents and visitors would continue to consume contaminated water. (*See* ECF No. 3354, PageID.110803–110804.)

In this sense, the EPA's alleged conduct resembles conduct that the Sixth Circuit has expressly indicated *would* support a finding of liability under § 324A(a). In *Myers*, the Sixth Circuit distinguished the mine

38

inspectors who failed to detect a safety violation (not liable under § 324A(a)) from an FDA meat inspector who, "at the scene of a truck wreck, told workers not to bother separating meat contaminated by ditch water from unexposed meat" (liable under § 324A(a)). *Myers*, 17 F.3d at 903 n.15 (citing *National Carriers, Inc. v. United States*, 755 F.2d 675, 676 (8th Cir. 1985)). To the extent that Plaintiffs allege the EPA affirmatively downplayed the dangers of water contamination in Flint, the EPA's conduct is much closer to that of the meat inspector in *National Carriers* than the mine inspectors in *Myers*.

Taken as true, Plaintiffs' allegations were thus sufficient to bring Plaintiffs within § 324A(a) under the 12(b)(6) standard. *See EPA Order I*, 482 F. Supp. 3d at 621. Here, the Court assesses Plaintiffs' claims under a Rule 56 standard, rather than a 12(b)(6) standard. Accordingly, the Court no longer simply accepts Plaintiffs' allegations as true. Instead, Plaintiffs must produce concrete evidence that would allow a rational factfinder to conclude the EPA's negligence increased the risk of harm to Plaintiffs. *See Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019). Taking the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have satisfied this standard.

A report by Plaintiffs' water quality assessment expert, Dr. Larry Russell, corroborates Plaintiffs' allegation that the dangers of lead exposure in Flint, unlike the risk of explosion in *Myers*, increased over time. (*See* ECF No. 3355-11, PageID.111182–111200.) In addition, an email from EPA Region 5 employee Miguel Del Toral supports a reasonable inference that the EPA was aware of systemic lead contamination in Flint by June 2015. (*See* ECF No. 3355-12.) Yet, in July 2015, EPA employees approved a statement to the press that could reasonably be read as downplaying the seriousness of the lead contamination in Flint. (*See* ECF No. 3355-19, PageID.11260 ("EPA continues to work closely with the Michigan Department of Environmental Quality and the City of Flint to ensure that Flint residents are provided with safe drinking water.").) A rational factfinder could find that, in so doing, the EPA took an affirmative step that increased the risk to Plaintiffs beyond what it would have been if the EPA had never engaged in the undertaking at all. Accordingly, Plaintiffs have established a material question of fact as to the applicability of § 324A(a).

## ii.   Section 324A(b) – Undertaking to Perform a Duty Owed to a Third Person

Section 324A(b) imposes liability on a defendant who "has undertaken to perform a duty owed by the other to the third person." Restatement § 324A(b). In *EPA Order I*, the Court found that Plaintiffs had plausibly alleged that the EPA—by, for example, testing and evaluating water samples and providing technical and supervisory services to the City of Flint—undertook to fulfill the duty owed to Plaintiffs by the MDEQ. *EPA Order I*, 482 F. Supp. 3d at 621–22.

There, the Court once again distinguished this case from *Myers*. In *Myers*, the Sixth Circuit found that the United States, in performing mine inspections, did not undertake to perform a duty owed to the decedent miners by the mining company. *Myers*, 17 F.3d at 903. The court explained that, under the Mine Safety and Health Act ("MSHA"), mine owners and miners retain "the primary duty of ensuring safety." *Id.* (citing 30 U.S.C. § 801(e)). Accordingly, federal mine inspections are intended to ensure that mine owners and miners comply with their duties, not to relieve them of those duties. *Id.*

The United States argues that the SDWA is like the MSHA because primacy States, like Michigan, retain the primary duty of ensuring

drinking water safety. (*See* ECF No. 3300, PageID.109116.) The Court previously explained that the SDWA differs from the MSHA in material ways. The SDWA establishes a framework of "cooperative federalism." *Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017); *see also* H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6455 (describing the SDWA as "establish[ing] a joint Federal-State system for assuring compliance with [federal drinking water] standards"). The EPA may delegate primary enforcement authority to a State, provided it applies and meets the requirements of § 1413. *See* 42 U.S.C. § 300g-2(a) (explaining that "a State has primary enforcement responsibility for public water systems during any period for which the Administrator determines . . . that such State" meets the listed criteria). But the EPA retains oversight and the authority to intervene in primacy States. *See* 42 U.S.C. §§ 300g-3(a)(1), 300i. And if a State no longer meets the requirements of § 1413, the EPA Administrator is directed "to withdraw primacy approval." 40 C.F.R. § 142.17(a)(2).

Here, the United States acknowledges "[t]he scope of EPA's potential enforcement powers under the SDWA," but argues that those powers are "not relevant to the Section 324A(b) inquiry because EPA did

42

not in fact revoke primacy or otherwise supplant MDEQ prior to issuing the January 2016 Section 1431 Order." (ECF No. 3300, PageID.109116.) The United States appears to misunderstand the Court's reasoning in *EPA Order I*. The EPA's potential enforcement powers are relevant because they fundamentally distinguish the structure and purpose of the SDWA from that of the MSHA and similar statutes.

The United States attempts to compare a scheme of cooperative federalism via delegated responsibility to schemes involving the purely supervisory regulation of private entities. *See Myers*, 17 F.3d at 903 (dealing with federal inspections of mines); *Howell v. United States*, 932 F.2d 915, 919 (11th Cir. 1991) (dealing with federal inspections of aircraft). Under the latter, the duty of ensuring mine (or aviation) safety belongs, in the first instance, to the mine (or aircraft) operators. Accordingly, there is a presumption that the United States does not, by conducting routine inspections, take on the responsibility of eliminating even obvious dangers.

Under the SDWA's cooperative federalism scheme, on the other hand, the duty of ensuring drinking water safety belongs, in the first instance, to the United States, although it may be delegated to States.

43

The intended structure is one of concurrent responsibility—the United States delegates enforcement authority but retains powers of oversight and intervention.[9] Accordingly, there is a presumption that the United States *will* sometimes take on the responsibility of eliminating drinking water dangers, even when a State has primacy. In fact, the statute expressly contemplates just that. *See, e.g.*, 42 U.S.C. §§ 300g-3(a)(1) (describing the EPA's obligations when a primacy State falls out of compliance), 300i (describing the EPA's emergency powers).

Because primacy States *and the United States* are responsible for drinking water safety, the United States may take on responsibility for drinking water safety that is otherwise delegated to a primacy State, and it may do so through actions short of revoking primacy altogether. That is precisely what Plaintiffs allege: By responding to residents' complaints, monitoring lead test results, independently investigating

---

[9] The EPA OIG has itself expressed precisely this understanding of the SDWA. (*See* ECF No. 3355-2, PageID.110931.) As described by the EPA OIG, the SDWA "assigns the EPA Administrator the ultimate authority to protect public health by setting and enforcing drinking water quality standards," but "allows the EPA to grant states the authority to implement and enforce SDWA regulations." (*Id.*) "[T]he EPA retains the responsibility for overseeing state implementation and federal enforcement authority," and is authorized "to request information, take independent enforcement actions, and revoke state primacy when states do not implement the SDWA with the stringency required by federal law." (*Id.*)

lead levels in homes, and offering technical assistance, the EPA undertook to perform a duty owed to Plaintiffs by the MDEQ. (ECF No. 3354, PageID.110807.) These allegations, taken as true, were sufficient to satisfy § 324A(b) under the 12(b)(6) standard. *See EPA Order I*, 482 F. Supp. 3d at 621–22.

Here, the Court concludes that Plaintiffs also satisfy § 324A(b) under the Rule 56 standard: A rational factfinder could conclude that the EPA assumed the MDEQ's duty to provide safe drinking water to Flint residents. The record shows that the EPA began responding to complaints from Flint residents shortly after the switch to the Flint River. (*See, e.g.*, ECF No. 3355-40, PageID.111476–111479; ECF No. 3355-2, PageID.110961; ECF No. 3355-18, PageID.111256.) The EPA also conducted investigations into lead levels in homes beginning in February of 2015.[10] (*See, e.g.*, ECF No. 3355-2, PageID.110962–110964; ECF No. 3355-5, PageID.111026.)

---

[10] EPA employee Miguel Del Toral repeatedly visited the home of Flint resident LeeAnne Walters to inspect plumbing, deliver sampling bottles, and collect piping samples after she reported high levels of lead in her drinking water on February 25, 2015. (*See* ECF No. 3355-5, PageID.111025; ECF No. 3355-2, PageID. 110962–110963.) Mr. Del Toral also collected samples from other homes and prepared a report on elevated lead levels in Flint's drinking water. (*See* ECF No. 3355-2, PageID.110963; ECF No. 3355-5, PageID.111027.) The United States contends that

The record also shows that the EPA offered Flint and the MDEQ technical expertise and guidance throughout the water crisis. (*See, e.g.*, ECF No. 3355-2, PageID.110962 (assigning an EPA expert to Flint's Technical Advisory Committee); ECF No. 3355-27, PageID.111394 (offering MDEQ technical support "dealing with lead"); ECF No. 3355-2, PageID.110964 (informing MDEQ that Flint likely needs CCT and that MDEQ should use the EPA's Office of Research and Development); ECF No. 3355-5, PageID.111028 (determining, in a conference call with MDEQ, that CCT is needed and delineating implementation steps); ECF No. 3355-2, PageID.110965 (establishing a Flint Safe Drinking Water Task Force to provide technical expertise); ECF No. 3355-2, PageID.110966 (providing technical comments on Flint's CCT plan)).

In addition, the EPA's own statement to the press could reasonably be read as confirming that the EPA had undertaken to ensure the safety of Flint's drinking water. As set forth previously, on July 10, 2015, EPA

---

"investigating Mrs. Walters' elevated lead levels . . . is not an undertaking owed to the Bellwether Plaintiffs or an action on which any Bellwether Plaintiff or their family relied." (ECF No. 3300, PageID.109117.) This argument ignores the purpose of the EPA's investigation, which was not—or at least not exclusively—to help Ms. Walters alone but "to determine whether the high lead levels at LeeAnne Walters's house represented an isolated or system-wide problem." (*See* ECF No. 3355-5, PageID.111057.)

46

employees approved a press statement indicating that the "EPA continues to work closely with the Michigan Department of Environmental Quality and the City of Flint to ensure that Flint residents are provided with safe drinking water." (ECF No. 3355-19, PageID.111260.) Viewing this record in the light most favorable to Plaintiffs, Plaintiffs have established a material question of fact as to the applicability of § 324A(b).

### iii.   Section 324A(c) – Reliance

Section 324A(c) imposes liability on a defendant when "harm is suffered because of reliance of the other or the third person upon the [defendant's] undertaking." Restatement § 324A(c). The rule allows for two possibilities: It is sufficient if "harm is suffered because of the reliance of the other for whom [the defendant] undertakes to render the services," *or* if harm is suffered because of the reliance of "the third person himself." *Id.* at cmt. e. Here, in other words, it is sufficient if the alleged harms occurred because either the MDEQ and the City of Flint *or* Plaintiffs relied on the EPA's undertaking.

The Sixth Circuit has indicated that reliance under § 324A(c) must be both detrimental and reasonable. *See Myers*, 17 F.3d at 903–04. To be

47

detrimental, "reliance must have induced either the [third person] or [the other] 'to forgo other remedies or precautions against the risk.'" *Id.* at 903. In other words, to satisfy § 324A(c), Plaintiffs must show that reliance on the EPA induced either Plaintiffs themselves or the MDEQ and the City of Flint to forgo other remedies or precautions. To be reasonable, reliance must be justified under the relevant statutory scheme. *See id.* at 904. Here, that means Plaintiffs must show that reliance on the EPA would be justified under the SDWA.

In *Myers*, the plaintiffs failed to allege that the miners or the mine operator had forgone remedies or precautions in reliance on federal inspectors. *Id.* at 903–04. Even if they had, however, their reliance would not have been reasonable. As the Sixth Circuit explained, miners and mine operators would not be justified if they relied on federal inspectors to ensure mine safety because the MSHA "ensure[s] that the primary responsibility for safety remains with the mine owners and miners." *Id.* at 904 (citing 30 U.S.C. § 801(3)).

As this Court explained in the context of § 324A(b), however, the SDWA fundamentally differs from the MSHA. The SDWA establishes a framework of cooperative federalism in which the EPA may delegate the

48

authority to enforce drinking water regulations while still retaining the ultimate responsibility for drinking water safety.[11] Accordingly, there is nothing unreasonable about relying on the EPA to ensure drinking water safety.

In *EPA Order I*, the Court found that Plaintiffs had plausibly alleged that the MDEQ and the City of Flint detrimentally and justifiably relied on the EPA, and that this reliance harmed Plaintiffs. *EPA Order I*, 482 F. Supp. 3d at 623. The Court also found that Plaintiffs had plausibly alleged that they themselves justifiably relied on the EPA to their detriment. *Id.* at 624. As the Court explained, given the EPA's active role in the water crisis, it was both reasonable for Plaintiffs to rely on the EPA and entirely plausible that they forwent remedies and precautions on the basis of that reliance.

Here, the United States contends that Plaintiffs cannot have relied on the EPA because, according to deposition testimony and questionnaires, "none of the Bellwether Plaintiffs' parents communicated

---

[11] As set forth previously, the EPA OIG has itself described the SDWA in precisely these terms, explaining that the SDWA "assigns the EPA Administrator the ultimate authority to protect public health by setting and enforcing drinking water quality standards," but "allows the EPA to grant states the authority to implement and enforce SDWA regulations." (See ECF No. 3355-2, PageID.110931.)

with EPA regarding water complaints."[12] (ECF No. 3300, PageID.109118.) In response, Plaintiffs argue that an individual need not "directly communicate with a federal agency in order to rely on it for the services it provides." (ECF No. 3354, PageID.110808.) The Court is inclined to agree with Plaintiffs. Nothing in the text of § 324A(c)—or relevant case law interpreting it—requires that Plaintiffs personally communicate with the EPA in order to rely on its undertaking.[13]

---

[12] In the cited questionnaires, "NO" has been checked in response to the question "Have you had any communications with EPA between April 25, 2014, and the filing of the administrative claim listed in Section II.1.f.?" (*See* ECF No. 3300-41, PageID.109597; ECF No. 3300-42, PageID.109602; ECF No. 3300-43, PageID.109607.) In the relevant deposition testimony, the mothers of two Plaintiffs indicate that they have not written letters or emails to the EPA or contacted anyone who works at the EPA. (*See* ECF No. 3300-44, PageID.109613–109614; ECF No. 3300-45, PageID.109619–109620.)

[13] Under *Myers*, of course, Plaintiffs' reliance must have been reasonable. But as explained in *Myers*, it would be unreasonable for miners to forgo precautions in reliance on federal inspectors because the primary responsibility for mine safety lies with mine owners and miners themselves—*not* because reasonable reliance requires the miners to personally communicate with inspectors. *See Myers*, 17 F.3d at 904. Here, it was reasonable for Plaintiffs to rely on the EPA's undertaking—whether or not Plaintiffs personally communicated with the EPA—because the SDWA assigns the EPA the ultimate responsibility to ensure drinking water safety.

In fact, the deposition testimony cited by the United States reflects this understanding of the EPA's role under the SDWA. The mothers of T.B. and M.S. were both asked if they were familiar with the EPA. (*See* ECF No. 3300-44, PageID.109613; ECF No. 3300-45, PageID.109619.) Both indicated that the EPA was responsible for drinking water. (*See* ECF No. 3300-44, PageID.109614; ECF No. 3300-45, PageID.109619.) One explained that the EPA are "the people that's supposed to make

50

The United States' stronger argument is that Plaintiffs fail to show *detrimental* reliance. As the United States points out, Plaintiffs "point to no record evidence" indicating that they forewent potential remedies or precautions in reliance on the EPA. (ECF No. 3379, PageID.111986.) Here, however, the nature of Plaintiffs' allegedly forgone precaution is relevant. Plaintiffs allege that reliance on the EPA "caused Plaintiffs to forgo . . . precautions, such as not drinking of the contaminated water." (ECF No. 3354, PageID.110807.) To find that Plaintiffs forewent a precaution in reliance on the EPA, then, a factfinder need only find that Plaintiffs drank tap water in Flint during the EPA's negligently performed undertaking. Because it is reasonable to infer that Plaintiffs drank at least some water during the relevant period, there is an issue of material fact as to whether Plaintiffs forewent precautions in reliance on the EPA.[14]

---

sure we're safe . . . like, if it's pollution in the air or water . . . they're supposed to act if something is not right with those." (ECF No. 3300-44, PageID.109613–109614.)

[14] In prior Flint water litigation, the Court faced a similar question regarding the sufficiency of evidence at the summary judgment stage. *See In re Flint Water Cases*, 579 F. Supp. 3d 971, 985–87 (E.D. Mich. 2022). There, a defendant argued that there was no record evidence that the plaintiffs "drank *any* Flint tap water in 2015." *Id.* at 985. The Court explained that "at summary judgment, the Court must view 'any inferences that may be drawn from the facts in the light most favorable to the nonmoving party.'" *Id.* at 986 (quoting *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95

In addition, a rational factfinder could conclude that the MDEQ and the City of Flint reasonably and detrimentally relied on the EPA, and that this reliance harmed Plaintiffs. Plaintiffs argue that the MDEQ and the City of Flint relied on the EPA's conduct and inaction as a basis for assuring Flint residents that their drinking water was safe, as well as forgoing other potential remedies or precautions.[15] (ECF No. 3354,

_____

F. App'x 132, 135 (6th Cir. 2004)). Accordingly, because it was reasonable to infer that the plaintiffs had drank at least some water during the relevant period, summary judgment was not appropriate. *Id.* at 986–87.

[15] In the Court's view, § 324A(c) is satisfied if, for example, the City forwent potential warnings to Flint residents because of reliance on the EPA's negligently performed undertaking. The United States, however, repeatedly suggests that the Plaintiffs must show "physical manifestation" of reliance. (*See* ECF No. 3300, PageID.109118; ECF No. 3379, PageID.111986.)

The United States appears to base this argument on *Myers*, which uses the language "physical manifestation of reliance" in an explanatory parenthetical accompanying a citation to *Howell v. United States*, an Eleventh Circuit case interpreting Georgia law. *See Myers*, 17 F.3d at 903 (citing *Howell v. United States*, 932 F.2d 915, 919 n.5 (11th Cir. 1991)). The Court does not find, as the United States seemingly suggests, that this single parenthetical reference makes a physical manifestation of reliance "Section 324A(c)'s touchstone." (*See* ECF No. 3379, PageID.111986.) Rather, the Sixth Circuit appears to treat *Howell's* reference to "physical manifestation" as one example of the more general requirement that reliance must be detrimental.

In fact, *Howell* itself does not treat "physical manifestation" as a requirement to show detrimental reliance. *Howell's* single reference to "physical manifestation" appears in a footnote in which the court explains how plaintiffs might have proven reliance on an FAA inspection *in the absence* of physical manifestations of reliance. *See Howell*, 932 F.2d at 919 n.5 (explaining that, under Georgia law, plaintiffs who "can point to no physical manifestations of reliance" must show "a more specific knowledge about the occurrence of the inspection" to prove reliance).

52

PageID.110809.) Record evidence supports this argument. In congressional testimony from March 11, 2016, for example, Flint Mayor Dayne Walling stated that he believed the EPA was providing a "double-check" on information regarding drinking water safety in Flint. (ECF No. 3355-24, PageID.111373.) Walling indicated that he explicitly asked EPA Regional Administrator Susan Hedman about Del Toral's internal memo regarding elevated lead levels in Flint. (*Id.*) In response, Hedman offered "reassurances about the review process," leading to "another missed opportunity to correct the problems sooner." (*Id.*)

Similarly, in a deposition taken in 2020, Walling testified that he understood the EPA to be in charge of enforcing federal environmental regulations and an authoritative source of information about the safety of drinking water in Flint. (ECF No. 3433-1, PageID.113401.) Walling explained that he was waiting for the EPA to either confirm or deny the concerns raised in Del Toral's memo. (*Id.* at PageID.113400.) In addition, Walling indicated that he never requested an emergency declaration because of assurances from Hedman "that everyone was doing what they could on a short-term basis." (*Id.* at PageID.11398–113399.)

The United States argues that Plaintiffs rely on "self-serving hindsight statements by former Mayor Walling that are insufficient to support their burden."[16] (ECF No. 3379, PageID.111986–111987.) Under Rule 56, however, "credibility judgments and weighing of the evidence are prohibited," and evidence must "be viewed in the light most favorable to the non-moving party." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In addition, Plaintiffs do not rely solely on after-the-fact testimony from Walling; Plaintiffs also point to statements from Hedman and Walling in September and October of 2015 that support reasonable inferences of detrimental reliance.

---

[16] Here too, the Court faced similar arguments in prior Flint water litigation. *See In re Flint Water Cases*, 579 F. Supp. 3d at 990–91. There, a defendant argued that testimony from Flint government officials—regarding actions the City would have taken with proper warnings from the defendant—was "self-serving, after-the-fact speculation." *Id.* at 990. Relying on Sixth Circuit precedent and "the unique factual circumstances of this failure to warn case," the Court found that the testimony was admissible under Rule 701 because it was "based on the witness' 'first-hand knowledge' of their own decision-making process." *Id.* (citing *Payne v. Novartis Pharmaceuticals Co.*, 767 F.3d 526 (6th Cir. 2014)). The Court explained that weighing the credibility of the testimony was a task properly left for the factfinder at trial. *Id.* at 991. Accordingly, the Court found that the testimony "raised a material question of fact as to whether the City of Flint would have heeded a sufficiently urgent warning from [the defendant]." *Id.*

54

In an email from October 2, 2015, Hedman expressly acknowledged the MDEQ and the City of Flint's reliance on the EPA, stating that "it is clear (from statements during the press conference and my ongoing conversations with [MDEQ] Director Wyant and Mayor Walling) that they are both counting on EPA to continue to provide technical assistance to implement the action plan." (ECF No. 3355-25, PageID.111379.) A Lead Advisory, issued by Walling on September 25, 2015, also reflects the City's reliance on the EPA, repeatedly explaining that "[t]he City of Flint continues working proactively with . . . the U.S. Environmental Protection Agency to improve the water system throughout the City." (ECF No. 3355-26, PageID.111391.)

The same September Lead Advisory supports a reasonable inference that the City forwent potential precautions and remedies on the basis of its reliance on the EPA. The Advisory encourages residents "to be aware of lead levels in drinking water" but explains that "[t]his message is meant as a precaution." (ECF No. 3355-26, PageID.111390.) The Advisory does not direct residents to cease consumption of tap water. Instead, it lists three "suggestions": flushing cold-water pipes for five minutes; using only water from the cold-water tap, "especially for making

baby formula"; and installing a water filter. (*Id.*) Ultimately, the Advisory reassures residents that "the City is in full compliance with the Federal Safe Drinking Water Act." (*Id.*)

Viewing this record in the light most favorable to Plaintiffs, a rational factfinder could find that the MDEQ and the City of Flint detrimentally relied on the EPA's negligently performed undertaking, and that this reliance harmed Plaintiffs. Accordingly, Plaintiffs have established a material question of fact as to the applicability of all three alternative bases for liability under § 324A. Because a rational factfinder could conclude that a similarly situated private individual would be liable under Michigan's Good Samaritan doctrine, summary judgment is not appropriate.

## B.    Discretionary Function Exception

The United States argues that even if the EPA's conduct satisfies the FTCA's analogous private liability requirement, that conduct is shielded by the "discretionary function exception." Under § 2680(a) of the FTCA, the Act's waiver of sovereign immunity does not apply to "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the

56

discretion involved be abused." 28 U.S.C. § 2680(a). This discretionary function exception is intended "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

The exception applies only to conduct that "involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). It will not apply when "conduct cannot appropriately be the product of judgment or choice" because "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Even when conduct involves an element of judgment or choice, however, "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* "[P]roperly construed," the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537.

Accordingly, the Supreme Court has set forth a two-part test to determine whether conduct is shielded by the discretionary function exception. *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). The "test is conjunctive"; the conduct at issue must satisfy both prongs to be

57

shielded by the discretionary function exception. *Abbott v. United States*, 78 F.4th 887, 900 (6th Cir. 2023). Under the first prong, a court must ask whether the challenged conduct was discretionary. If "the challenged act or omission violated a mandatory regulation or policy . . . the discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (internal citations omitted).

Under the second prong, even if the challenged conduct was discretionary, a court must ask whether the judgment involved "is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Conduct satisfies this second prong if it "can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325. The inquiry is objective rather than subjective. The question is not if policy analysis actually occurred; rather, the question is whether the judgments at issue were "theoretically susceptible to policy analysis." *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018) (citing *A.O. Smith Corp. v. United States*, 774 F.3d 359, 370 (6th Cir. 2014); *Myers*, 17 F.3d at 895).

58

In applying the discretionary function test, "the crucial first step is to determine exactly what conduct is at issue." *Rosebush*, 119 F.3d at 441 (citing *Autery v. United States*, 992 F.2d 1523, 1527–28 (11th Cir.1993)). Here, Plaintiffs challenge the EPA's "failure to take action under § 1414 and § 1431" of the SDWA and its failure "to properly notify the public and respond to citizen complaints." (ECF No. 3354, PageID.110811.) As the Court acknowledged in *EPA Order II*, however, the EPA's alleged negligence is irrelevant to the discretionary function analysis. *See EPA Order II*, 627 F. Supp. 3d at 740. The relevant question is whether the EPA was authorized to exercise discretion and not whether it was negligent in the exercise of that discretion. *See Myers*, 17 F.3d at 896 n.5.

The Court must therefore take care not to frame the relevant conduct in a way that "collapses the discretionary function inquiry into a question of whether the [EPA] was negligent." *See Rosebush*, 119 F.3d at 442. Accordingly, under the first prong of the discretionary function test, "[t]he relevant inquiry is whether the controlling statutes, regulations and administrative policies mandated that" the EPA "in any *specific* manner": (1) take action under § 1414 and § 1431 of the SDWA; (2) notify the public of the health risks posed by the Flint water; or (3) respond to

citizen's complaints regarding the Flint water. *See id.* If so, the discretionary function exception does not apply to the challenged conduct. If not, then under the second prong of the discretionary function test, the relevant inquiry is whether the challenged conduct "is the sort of conduct which the discretionary function exception was designed to shield." *See id.* at 443.

### i.    Prong One: Whether the Challenged Actions Were Discretionary

In *EPA Order I*, the Court held that the EPA's conduct pursuant to § 1431 of the SDWA and its choice of whether to warn and how to respond to citizen complaints were discretionary.[17] *EPA Order I*, 482 F. Supp. 3d at 626–27. As the Court explained, the plain language of § 1431 invites "an element of judgment or choice." *See Berkovitz*, 486 U.S. at 536. Upon receipt of information regarding a contaminant in drinking water, EPA

---

[17] Plaintiffs did not—and do not—argue that the EPA's decisions regarding whether to warn and how to respond to citizen complaints were nondiscretionary under prong one of the discretionary function test. *See EPA Order I*, 482 F. Supp. 3d at 626. Accordingly, the Court's analysis in *EPA Order I* focused on the EPA's conduct under § 1414 and § 1431 of the SDWA, which Plaintiffs *did* contend was nondiscretionary. The Court noted, however, that even if Plaintiffs *had* argued that decisions regarding whether to warn and how to respond to citizen complaints were nondiscretionary, the Court agreed with Judge Parker's conclusion in *Burgess I* that such conduct is discretionary for purposes of the first prong of the discretionary function test. *Id.* at 626 n.3; *see also Burgess I*, 375 F. Supp. 3d at 813–14, 816.

Administrators "*may* take such actions" as they "*may* deem necessary." 42 U.S.C. § 300i(a) (emphasis added). Such actions "*may* include (but shall not be limited to)" the issuing of orders necessary to protect public health or the commencement of a civil action for appropriate relief. *Id.* (emphasis added). Because § 1431 provides EPA Administrators with options that are not limited by Congress to a specific course of action, conduct pursuant to § 1431 satisfies prong one of the discretionary function test.

On the other hand, the Court found that the EPA's conduct pursuant to § 1414 of the SDWA does *not* satisfy prong one of the discretionary function test. *EPA Order I*, 482 F. Supp. 3d at 627–32. Unlike the plain language of § 1431, the plain language of § 1414 sets forth actions that the EPA must take. "*Whenever* the [EPA] Administrator finds" that a primacy State is not in compliance with a SDWA requirement, the Administrator "*shall* so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time." 42 U.S.C. § 300g-3(a)(1)(A) (emphasis added). And if a

61

State does not take appropriate action within thirty days of the EPA's notification of noncompliance, then the Administrator "*shall* issue an order under subsection (g) . . . or . . . commence a civil action under subsection (b)." U.S.C. § 300g-3(a)(1)(B) (emphasis added).

As the Court explained in *EPA Order I*, Congress' repeated use of the term "shall" distinguishes § 1414 from § 1431. Whereas § 1431 establishes a nonexhaustive list of actions that the EPA "may" take, § 1414 establishes actions that the EPA "shall" take. Generally, use of the word "shall" indicates a mandatory duty. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001). And while use of the word "shall" is not always conclusive, the Court found that the objectives and legislative history of the SDWA support a finding that § 1414 imposes mandatory duties. *See EPA Order I*, 482 F. Supp. 3d at 630–31.

It is possible, however, for duties to be mandatory and still involve "an element of judgment or choice." *See Berkovitz*, 486 U.S. at 536; *see also Montez v. United States*, 359 F.3d 392, 396 (6th Cir. 2004) (finding that a mandatory duty may still invite discretion if it "is of a general nature" and "does not specifically prescribe a course of action"). As the Court has acknowledged, this is true of § 1414(a)(1)(A), which directs the

Administrator to "provide such advice and technical assistance . . . as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time." 42 U.S.C. § 300g-3(a)(1)(A). Under § 1414(a)(1)(A), the Administrator has discretion to decide what advice and technical assistance is appropriate and when the water system may feasibly be brought into compliance.

The same is not true of § 1414(a)(1)(B). Once the EPA finds noncompliance with the SDWA and notifies the State, if the State does not take appropriate enforcement action within thirty days, § 1414(a)(1)(B) mandates that the EPA act in a "*specific* manner." *See Rosebush*, 119 F.3d at 442; *see also Myers*, 17 F.3d at 895–96 (finding an antecedent assessment to involve an element of judgment but explaining that, once that assessment has been made, "statues and regulations require the inspector to take some specific action or to choose from among a limited range of actions"). The Administrator must either "issue an order under subsection (g)" or "commence a civil action under subsection (b)." 42 U.S.C. § 1414(a)(1)(B). Accordingly, if the EPA found Flint's water system to be noncompliant and notified the MDEQ, the MDEQ's failure to take appropriate enforcement action within thirty days

63

required the EPA to either issue an order or commence a civil action. The EPA lacked any discretion to choose a third "option" not given by Congress. *See EPA Order I*, 482 F. Supp. 3d at 632.

Here, the United States renews its argument that all of the challenged conduct, including the EPA's conduct pursuant to § 1414, was discretionary.[18] Specifically, the United States contends that the EPA never made—and had no nondiscretionary duty to make—the threshold finding of noncompliance that would have triggered mandatory duties under § 1414. (ECF No. 3300, PageID.109121.) Conversely, Plaintiffs argue that the EPA made the threshold finding of noncompliance— possibly as early as February of 2015 and certainly by June or July of 2015. (ECF No. 3354, PageID.110813–110815.) Plaintiffs point, among other things, to Del Toral's February 2015 email informing the MDEQ that Flint must have OCCT in place (ECF No. 3355-27, PageID.111395); Hedman's deposition testimony that the MDEQ was told, following the

---

[18] Plaintiffs also renew, by reference to prior briefing, their argument that the EPA's conduct pursuant to § 1431, like its conduct pursuant to § 1414, was nondiscretionary. (ECF No. 3354, PageID.110813 n.20.) Because Plaintiffs present no new arguments regarding § 1431, however, the Court will not disturb its prior conclusion that § 1431 is discretionary under the first prong of the discretionary function test.

64

release of Del Toral's memo in June 2015, "you need to order corrosion control as soon as possible" (ECF No. 3355-29, PageID.111403–111404); and Del Toral's deposition testimony that the Ground Water Drinking Water Branch was "in agreement there was a violation" in July 2015. (ECF No. 3355-31, PageID.111413.)

In the United States' view, Plaintiffs mischaracterize informal staff opinions and negotiations as "findings." (ECF No. 3379, PageID.111987–111988.) The Court agrees—to a point. The EPA delegates the authority to make a finding and notification of noncompliance to Regional Administrators and, in the case of Region 5, the Water Division Director. (ECF No. 3355-28, PageID.111397, 111399.) At the time of the crisis, the Region 5 Administrator was Hedman, and the Water Division Director was Tinka Hyde. (ECF No. 3354, PageID.110814.) Accordingly, any finding and notification of noncompliance was presumably made by Hedman or Hyde. Thus, a rational factfinder could not conclude, for example, that a finding and notification occurred when Del Toral, a

65

Region 5 regulations manager, informed the MDEQ in February 2015 that Flint was required to have OCCT in place.[19]

On the other hand, Plaintiffs present evidence that by the summer of 2015, there was a broad consensus among EPA staff that Flint was violating the SDWA. (*See* ECF No. 3355-31, PageID.111413.) This evidence could support a reasonable inference that Hedman or Hyde had made a finding of noncompliance by July of 2015. Moreover, Hedman's own testimony could support a conclusion that Hedman made the requisite finding and notification of noncompliance in June or July. Hedman's testimony suggests that she read Del Toral's June 2015 memo, which identified multiple violations of the SDWA, and subsequently communicated with the MDEQ regarding Flint's noncompliance. (*See* ECF No. 3355-29, PageID.111403–111404.) A rational factfinder could conclude that Hedman issued a notification of noncompliance at that time, triggering the nondiscretionary duty to issue an order or commence

---

[19] It would be particularly unreasonable to conclude that a finding of noncompliance was made at this time because, by all accounts, the EPA was not actually certain that Flint had no corrosion control in place until April of 2015. (*See, e.g.*, ECF No. 3355-5, PageID.111026.)

a civil action when the MDEQ did not take appropriate enforcement action within thirty days.

Even if the EPA did make a threshold finding of noncompliance, however, the United States asks the Court to ignore the plain text of § 1414 and hold that the EPA has the discretion to decide whether and how to act following a finding of noncompliance. Relying on the Second Circuit case *Huntress v. United States*, the Fourth Circuit case *Blanco Ayala v. United States*, and the Supreme Court's decision in *Gaubert*, the United States suggests that enforcement decisions necessarily fall within the discretionary function exception. The United States explains that "[e]nforcement decisions—like whether to issue a Section 1414 order— are 'quintessential examples of governmental discretion.'" (ECF No. 3300, Page ID.109122 (quoting *Huntress v. United States*, 810 Fed. Appx. 74, 76 (2d Cir. 2020).) Accordingly, the United States argues that the EPA had the discretion to engage in "informal enforcement" rather than the actions mandated by § 1414(a)(1)(B). (*Id.* at PageID.3300 n.62 (citing *Gaubert*, 499 U.S. at 329–30).)

But *Huntress* does not support a finding that every agency enforcement decision is necessarily discretionary. There, the plaintiffs

67

challenged the conduct of an EPA agent in referring their Clean Water Act ("CWA") violations to the EPA's Criminal Investigation Division ("CID") for indictment. *See Huntress v. United States*, No. 18-CV-2974 (JPO), 2019 WL 1434572, at *4 (S.D.N.Y. Mar. 29, 2019). In the district court decision affirmed by the Second Circuit, the court explained that the agent's conduct involved "an element of judgment or choice" because no statute, regulation, or policy prescribed a specific course of action that the agent was required to follow in making a referral recommendation to the CID. *Id.* (quoting *Berkovitz*, 486 U.S. at 536–37). Conversely, if Congress *had* prescribed a specific course of action—as it has in § 1414(a)(1)(B)—then the agent's conduct would *not* have involved an element of judgment or choice.

The circumstances of *Blanco Ayala* are similar. There, the plaintiff was detained by Department of Homeland Security ("DHS") officers and sued the United States for wrongful investigation, arrest, and detention. *Blanco Ayala* v. United States, 982 F.3d 209, 212–13 (4th Cir. 2020). The Fourth Circuit found that the discretionary function exception applied, explaining that "[d]iscretion lies at the heart of the DHS law enforcement function." *Id.* at 215. The court's conclusion depended, however, on the

statutory language governing DHS investigations and arrests, which "explicitly underscored the discretion of law enforcement." *Id.* at 216 (citing 8 U.S.C. § 1357(a)(2)'s "reason to believe" standard and § 1226(a)'s language indicating that "an alien *may* be arrested and detained"). Accordingly, DHS officers, unlike the EPA under § 1414(a)(1)(B), operated in a statutory context that invited "an element of judgment or choice." *See Berkovitz*, 486 U.S. at 536.

Similarly, *Gaubert* does not support a finding that the EPA has the discretion to pursue "informal enforcement" in the face of specific statutory mandates. In *Gaubert*, the plaintiff argued that federal regulators lacked the discretion to take informal actions against a savings and loan association because the regulators did not institute the formal proceedings that relevant statutes provided for. In holding that regulators had the discretion to take informal actions, the Supreme Court explained that "nothing in the language or structure of the statutes . . . prevented the regulators from invoking less formal means of supervision" because there was "no statutory or regulatory mandate *which compelled the regulators to act in a particular way.*" *Gaubert*, 499 U.S. at 330 (emphasis added). In addition, a formal policy statement indicated that

69

"supervisory actions must be tailored to each case" and that "informal supervisory guidance and oversight is appropriate" in some circumstances. *Id.* at 330–31.

Here, in contrast, the SDWA *does* compel the EPA to act "in a particular way." *Id.* at 330. As set forth previously, upon a finding of noncompliance, the EPA "shall so notify the State and . . . public water system." 42 U.S.C. § 300g-3(a)(1)(A). And if the State has not commenced appropriate enforcement action within thirty days, the EPA "shall issue an order under subsection (g) . . . or . . . commence a civil action under subsection (b)." *Id.* § 300g-3(a)(1)(B). To the extent there is a presumption of innate "enforcement discretion," then, that presumption is overcome by the plain text of § 1414(a)(1)(B). Once the EPA has made a finding of noncompliance, the EPA's subsequent "conduct cannot appropriately be the product of judgment or choice" because the SDWA "specifically prescribes a course of action for [the EPA] to follow." *Berkovitz*, 486 U.S. at 536.

Accordingly, the EPA's conduct following a finding of noncompliance does not satisfy prong one of the discretionary function test. And here, Plaintiffs have established a material question of fact

70

regarding whether the EPA made a finding of noncompliance. Moreover, even if the EPA did not make a finding of noncompliance—and even if conduct under § 1414(a)(1)(B) did satisfy prong one of the discretionary function test—the discretionary function exception will not apply unless the EPA's conduct also satisfies prong two of the discretionary function test. *See Abbott*, 78 F.4th at 903 ("[T]he government is not shielded from liability unless both prongs of the discretionary-function test are satisfied."). Here, the Court concludes that none of the EPA's challenged conduct satisfies prong two.

> ii. **Prong Two: Whether the Challenged Actions Were Grounded in the Policy of the Regulatory Regime**

Under prong one of the discretionary function test, the Court asks if the challenged conduct "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. If so, under prong two, the Court asks "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id*. Because the exception was designed to "protect[] only governmental actions and decisions based on considerations of public policy," challenged conduct satisfies prong two only if it "involves the permissible exercise of policy judgment." *Id*. at 537.

71

In other words, to be shielded by the discretionary function exception, the challenged actions must "be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325.

When the challenged conduct satisfies prong one of the discretion function test, "[t]here is a 'strong presumption'" that prong two is satisfied as well. *A.O. Smith Corp. v. United States*, 774 F.3d 359, 365 (6th Cir. 2014). This presumption will, however, be rebutted "in many cases . . . because many acts performed by agency personnel—though they involve a significant degree of choice—are not grounded in regulatory policy and thus are not protected by the discretionary function exception." *Myers*, 17 F.3d at 896 (citing *Gaubert*, 499 U.S. at 325 n.7). The presumption does not wholly eliminate the United States' burden "to demonstrate that any consideration of 'political, social, or economic policy' . . . is, in fact, authorized by the regulatory scheme." *See id.* at 897.[20]

---

[20] As the Ninth Circuit has explained, although there is a presumption that discretionary actions are grounded in the policy of the regulatory regime, the government still bears the burden of showing "some support in the record that the decisions taken are 'susceptible' to policy analysis." *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008). If it were "sufficient for the government merely to waive the flag of policy as a cover for anything and everything it does that is

In *EPA Order I*, as here, the Court concluded that the EPA's alleged conduct pursuant to § 1431 of the SDWA, its choice of whether to warn, and its choice of how to respond to citizen complaints satisfied prong one of the discretionary function test because the challenged actions involved an element of judgment or choice. *EPA Order I*, 482 F. Supp. 3d at 626–27. Nevertheless, the Court found that the challenged actions did not satisfy prong two of the discretionary function test because they were not grounded in the policy of the regulatory regime. *Id.* at 632–38. The Court also found, as it does here, that the EPA's alleged conduct pursuant to § 1414 did *not* satisfy prong one of the discretionary function test because § 1414(a)(1)(B) specifically prescribed a course of conduct to be followed. *Id.* at 627–32. Even if the EPA did have discretion under § 1414(a)(1)(B), however, the Court concluded that the EPA's alleged conduct pursuant to § 1414 was not grounded in the policy of the regulatory regime. *Id.* at 633–36.

Here, the United States argues that all of the EPA's challenged conduct satisfies prong two of the discretionary function test because "the

---

discretionary in nature . . . then such an approach would swallow the [discretionary function test's] second prong." *Id.* at 1134–35.

record is replete with evidence" that policy analysis was "integral to EPA's decisions." (ECF No. 3300, PageID.109123.) The United States explains that "EPA decisionmakers in fact balanced several policy considerations in deciding whether, when, and how to exercise the agency's oversight authorities." (*Id.*) These considerations included, for example, how to most effectively reinstitute optimal corrosion control, the best use of Region 5's limited resources, and the need to maintain an effective relationship with the MDEQ and the City of Flint. (*Id.*)

To satisfy prong two, however, the EPA's challenged conduct must "involve[] the *permissible* exercise of policy judgment." *Berkovitz*, 486 U.S. at 537 (emphasis added). As the Sixth Circuit explained in *Myers*, if "choice is permitted" under prong one of the discretionary function test, the question under prong two is whether the relevant EPA employees were "*authorized* to make those choices on the basis of 'social, economic, or political policy.'" *Myers*, 17 F.3d at 895 (emphasis in original). In other words, were Region 5 employees "authorized to set public policy," or do they "merely implement, under objective criteria, the policy decisions of others?" *Id.* (citing *Berkovitz,* 486 U.S. at 537; *Gaubert*, 499 U.S. at 323). The inquiry requires "an objective evaluation of the discretion conferred

74

rather than a review of the actor's subjective method of choosing a course of action." *Id.* at 896 (citing *Gaubert*, 499 U.S. at 325).

The Sixth Circuit's analysis in *Myers* is instructive. There, plaintiffs alleged that federal inspectors "should have found, but *failed to find*, the existence of certain safety violations," leading to the plaintiffs' injuries. *Id.* (emphasis in original). The United States argued that the inspectors' safety assessments involved the permissible exercise of policy judgment. *Id.* at 896–97. The Sixth Circuit disagreed, explaining that neither the MSHA nor relevant regulations "authorize[d] mine safety inspectors to conduct their inspections on the basis of 'social, economic or political policy.'" *Id.* at 897.

The Sixth Circuit distinguished federal mine inspections from the agency conduct at issue in *Gaubert*. There, "the day-to-day oversight of a failing savings and loan" required a "*balancing* of interests"—the agency's "decisions were authorized to be made . . . based upon considerations of what was good for the public fisc and the industry as a whole, as well as what was good for the particular institution." *Id.* at 897–98 (emphasis in original) (citing *Gaubert*, 499 U.S. at 332). Under the MSHA, in contrast, "the balancing of the interests of the miners and the

75

mine owners, and the consideration of the most effective use of limited [agency] resources has been done, first by Congress and then, to a greater degree, by the Secretary of the Department of Labor in promulgating the various safety regulations." *Id.* at 898. Federal inspectors were "*not authorized* to reweigh these interests on a case-by-case basis." *Id.* (emphasis in original). Rather, inspectors were required "to determine compliance and, in the event of non-compliance, issue the mandatory citations and orders." *Id.*

Here, the governing regulatory regime is much closer to that in *Myers* than that in *Gaubert*. This is particularly true of the EPA's conduct pursuant to § 1414. Like the safety assessments of federal mine inspectors, a finding of noncompliance under § 1414 is "the product of . . . objective criteria" rather than "a matter of public policy." *Id.* at 897; *see also Berkovitz*, 486 U.S. at 545 (distinguishing between a determination that "involves the application of objective scientific standards" and one that "incorporates considerable 'policy judgment'"). The EPA's task, in assessing water-system compliance, is simply to determine whether a water system does or "does not comply with any applicable requirement"

of the SDWA.[21] 42 U.S.C. § 300g-3(a)(1)(A)(i). Nothing in the SDWA or related regulations authorizes the EPA to make that assessment "on the basis of 'social, economic or political policy.'" *Myers*, 17 F.3d at 897.

The United States does not deny that a finding of noncompliance under § 1414 is a matter of professional and scientific judgment, rather than policy judgment. The United States does argue, however, that the EPA lacked the information necessary to make a finding of noncompliance. (ECF No. 3300, PageID.109124–109126.) Plaintiffs, on the other hand, contend that the EPA *did* make—or, on the information before it, *should* have made—a finding of noncompliance. (ECF No. 3354, PageID.110813–110817.) As set forth previously, viewing the record in the light most favorable to Plaintiffs, there is a material question of fact regarding whether the EPA made a finding of noncompliance. *See supra* Section V.B.i. The same record certainly establishes a material question of fact regarding whether the EPA *should* have made a finding of

---

[21] It is clear that determinations of noncompliance are a matter of professional and scientific judgment, rather than policy judgment, when one considers what it means for a water system to "not comply with any applicable [SDWA] requirement." For example, a water system does not comply with an applicable SDWA requirement if it exceeds "maximum levels that limit the amount of . . . specified contaminants." *See Boler v. Earley*, 865 F.3d 391, 404 (6th Cir. 2017).

noncompliance. A rational factfinder could conclude, for example, that the EPA should have made a finding of noncompliance as early as April of 2015, when the EPA discovered that Flint did not have optimized corrosion control in place. (*See* ECF No. 3355-5, PageID.111026.)

The United States contends that even if the EPA had the information necessary to make a finding of noncompliance, any decision by the EPA regarding how to proceed was "susceptible to policy analysis." (ECF No. 3300, PageID.109126 (quoting *Jude*, 908 F.3d at 159).) By way of support, the United States argues that the EPA *did* engage in extensive policy analysis when considering whether to issue a formal § 1414 order or proceed "informally." (*Id.* at PageID.109124–109129.) As set forth previously, however, the relevant question is not whether the EPA *did* engage in policy analysis, it is whether EPA was *authorized* to. *Myers*, 17 F.3d at 895–96. And, as in *Myers*, "the government's argument relies too heavily on the presumption" that discretionary conduct is necessarily grounded in the policy of the regulatory regime, "and fails to demonstrate that any consideration of 'political, social or economic policy' . . . is, in fact, authorized by the regulatory scheme." *Id.* at 897.

78

Here, even if the Court were to find all of the EPA's § 1414 conduct to be discretionary under prong one of the discretionary function test, none of that conduct would be "susceptible to policy analysis" in the sense that the United States suggests. Section 1414 consists of a series of simple directives, applicable "*[w]henever* the Administrator finds" that a public water system is not complying with a SDWA requirement. 42 U.S.C. § 300g-3(a)(1)(A) (emphasis added). To the extent that it invites discretion, that discretion is aimed wholly at "bring[ing] the system into compliance with the requirement." *Id.* Unlike the regulatory scheme at issue in *Gaubert*, then, § 1414 does not invite the EPA to "balance" multiple and competing interests. Rather, as with the regulatory scheme at issue in *Myers*, all of the relevant interests have already been balanced by Congress.

The United States cites, for example, "federalism considerations" and the EPA's "limited resources" as among the "competing policy considerations . . . balanced" by the EPA. (ECF No. 3379, PageID.111990; ECF No. 3300, PageID.109123.) But, as Judge Parker explained in *Burgess I*, these are interests that Congress itself balanced when it gave States the ability to exercise primacy but "expressly directed the EPA to

79

intervene under specified conditions." *Burgess I*, 375 F. Supp. 3d at 815. Like the federal mine inspectors in *Myers*, EPA employees were "*not authorized* to reweigh these interests on a case-by-case basis," only "to determine compliance and, in the event of non-compliance, issue the mandatory citations and orders." *Myers*, 17 F.3d at 898 (emphasis in original). Accordingly, the EPA's conduct pursuant to § 1414 is not "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

Although it confers more discretion on the EPA than § 1414, the same is true of the EPA's conduct pursuant to § 1431. Under § 1431, the EPA is authorized to exercise emergency powers "upon receipt of information that a contaminant . . . is present in . . . a public water system . . . which may present an imminent and substantial endangerment to the health of persons . . . and that appropriate State and local authorities have not acted to protect the health of such persons." 42 U.S.C. § 300i(a). Like a finding of noncompliance under §1414, every threshold assessment under § 1431—whether a contaminant is present, whether it presents an imminent and substantial danger to public health, and whether State and local authorities have acted to protect public health—

80

is a "product of . . . objective criteria" rather than "a matter of public policy." *Myers*, 17 F.3d at 897.

Here, a rational factfinder could certainly conclude that the EPA had the information necessary to exercise § 1431 emergency powers long before its § 1431 order in January of 2016. In fact, the EPA OIG itself has concluded that EPA Region 5 had sufficient information to issue a § 1431 emergency order by June of 2015.[22] (ECF No. 3355-16, PageID.111242.)

---

[22] The United States has challenged the admissibility at trial of portions of the EPA OIG's 2016 and 2018 reports. (*See* ECF No. 3398, PageID.112268–112272.) Specifically, the United States argues that the reports, because they contain "post-incident policy recommendations," are subsequent remedial measures within the meaning of Federal Rule of Evidence 407. (*Id.* at PageID.112269.) Under Rule 407, evidence of subsequent remedial measures is inadmissible to prove negligence or culpable conduct, although it is admissible "for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407. The United States contends that Rule 407 requires exclusion of the reports' analyses and policy recommendations, but not the reports' "*factual* aspects." (ECF No. 3398, PageID.112271.)

The admissibility of the reports was not challenged in the United States' briefing on this motion, and the question of their admissibility at trial is currently set for oral argument. Pending resolution of this question, the Court notes that its disposition of this motion would be the same in the absence of the reports. In addition, to the extent that the Court cites the reports in this opinion, the Court notes that it largely cites those portions of the reports that the United States admits are admissible—"evidence related to the empirical facts of" the Flint Water Crisis. (*See* ECF No. 3398, PageID.112271–112272 (quoting *Harper v. Griggs*, No. CIV.A.04-260-C, 2006 WL 2604663, at *2 (W.D. Ky. Sept. 11, 2006).)

Here, while the Court cites to what is arguably analysis—rather than a purely factual determination—on the part of the EPA OIG, the Court does so because "the feasibility of precautionary measures" is disputed. *See* Fed. R. Evid. 407. The United

Of course, as the Court has acknowledged, the EPA's § 1431 powers involve an element of judgment—the Administrator "*may* take such actions as he *may* deem necessary in order to protect the health of such persons." 42 U.S.C. § 300i(a) (emphasis added). As with §1414, however, Congress has not invited the EPA to balance multiple and competing interests. To the contrary, Congress has made clear that the EPA's discretion is to be aimed wholly at "protect[ing] the health of persons who are or may be users of [the water] system." *Id.* Congress has not authorized "any consideration of 'political, social or economic policy.'" *Myers*, 17 F.3d at 897; *see also Whisnant*, 400 F.3d at 1181 ("[M]atters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy."). Accordingly, the EPA's discretion under § 1431 is not of the kind that Congress intended to shield from liability.

Similarly, the EPA's decisions regarding whether to warn Flint residents about the hazards of Flint's drinking water are not the types of

---

States argues that between June 24, 2015 and July 20, 2015, "the data that [Region 5] had was insufficient to issue an order" under § 1414 or § 1431. (ECF No. 3300, PageID.109126.) Accordingly, the United States disputes the feasibility of issuing a § 1414 enforcement order or a § 1431 emergency order at that time.

decisions that the discretionary function exception was designed to shield. It is true, as the United States points out, that the Sixth Circuit has found that the discretionary function exception "generally" applies to decisions regarding whether to warn of potential dangers. *See A.O. Smith*, 774 F.3d at 369. At the same time, however, the Sixth Circuit has declined to hold "that failure-to-warn claims categorically satisfy the discretionary function exception." *Id.* As the Sixth Circuit has explained, the discretionary function analysis is necessarily "*ad hoc,* and depends on the facts of each case." *Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) (citing *Chotin Transportation v. U.S.*, 819 F.2d 1342, 1346 (6th Cir. 1987)).

In *Abbott*, the Sixth Circuit affirmed that failure-to-warn claims are not categorically barred by the discretionary function exception but must be analyzed on a case-by-case basis. There, the plaintiffs sued the United States following an uncontrolled wildfire, alleging that their injuries were caused by the National Park Service's negligent failure to warn park neighbors. *Abbott*, 78 F.4th at 891, 893. The district court dismissed the plaintiffs' failure-to-warn claims on grounds unrelated to the discretionary function exception, but the Sixth Circuit vacated that

dismissal. *Id.* at 899. In remanding the case, the Sixth Circuit directed the district court to determine whether the discretionary function exception barred the failure-to-warn claims. *Id.* at 903. The Sixth Circuit indicated that the discretionary function exception would *not* apply if mandatory directives required the National Park Service to issue warnings, *or* if the decision not to issue warnings was not susceptible to policy analysis. *See id.*

Here, Plaintiffs argue that mandatory directives "dictated that the EPA had to ensure that public notice was disseminated." (ECF No. 3354, PageID.110826.) Specifically, Plaintiffs contend that the EPA's Public Notification rule required the City of Flint to notify residents of a treatment technique violation within thirty days of learning, in April of 2015, that it was required to implement corrosion control. (*Id.* at PageID.110825–110826 (citing 40 C.F.R. §§ 141.203(b), 141.205).) When the City failed to do so in May of 2015, Plaintiffs suggest that the EPA was required to act. (*Id.* at PageID.110826.)

On the other hand, the United States argues that the Public Notification rule is "inapplicable" because, prior to 2021, the rule imposed public notice requirements only on the water system operator and

84

primacy agency—here the City of Flint and the MDEQ—and not on the EPA. (ECF No. 3379, PageID.111991 (citing 40 C.F.R. §§ 141.201(a), 141.210(a)–(b) (as codified on July 1, 2020)).) The Court agrees that the relevant statutes and regulations, as written at the time of the Flint Water Crisis, imposed no specific obligation on the EPA itself to provide public notice of SDWA violations.[23]

The fact that no mandatory directive specifically required the EPA to issue a warning only shows, however, that the EPA's decision was discretionary under prong one of the discretionary function test. It does not show that the EPA's decision was "grounded in the policy of the regulatory regime" under prong two. *Gaubert*, 499 U.S. at 325. And here, the policy of the regulatory regime is plainly to provide public notice of SDWA violations, especially when those violations present a threat to public health. Subsection 1414(c) of the SDWA expressly requires that notice be provided "to the persons served by the system . . . of any failure on the part of the public water system to . . . comply with an applicable

---

[23] After the Flint Water Crisis, § 1414(c) of the SDWA was amended to include a requirement that the EPA Administrator issue public notice of a lead action level exceedance when the primacy State and water system operator have failed to do so. *See* 42 U.S.C. § 1414(c)(2)(D).

maximum contaminant level or treatment technique requirement of, or a testing procedure prescribed by, a national primary drinking water regulation; or . . . perform [required] monitoring." 42 U.S.C. § 300g-3(c)(1). Where a violation has the "potential to have serious adverse effects on human health," notice must be distributed within twenty-four hours and include an explanation of "the potential adverse effects on human health" and "the necessity of seeking alternative water supplies." *Id.* § 300g-3(c)(2)(C).

In addition, although § 1414(c) presumes that water system operators will provide notice of violations, Plaintiffs are correct in stating that the EPA itself is responsible for "ensur[ing] that public notice [i]s disseminated." (ECF No. 3354, PageID.110826.) Under § 1414(c)(2)(A), the EPA Administrator is tasked with promulgating regulations "prescrib[ing] the manner, frequency, form, and content for giving notice under [§ 1414(c)]." 42 U.S.C. § 300g-3(c)(2)(A). Pursuant to that authority, the EPA has passed detailed regulations governing the timing and content of public notice and the manner in which it must be presented. *See, e.g.*, 40 C.F.R. §§ 141.202–.205. And, as set forth previously, the EPA is required to intervene "[w]henever . . . any public

water system . . . does not comply with any applicable [SDWA] requirement"—including public notice requirements under § 1414(c). 42 U.S.C. § 300g-3(a)(1)(A).

Given this regulatory context, the EPA's failure to warn Flint residents of widespread lead contamination is not a decision that "can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325. The United States lists some policy considerations, such as "the need to make . . . information understandable," that might plausibly be balanced when considering *how* to warn the public. (ECF No. 3300, PageID.109130.) But the relevant inquiry is not whether the discretionary function exception would shield the EPA's decision regarding *how* to warn; it is whether the discretionary function exception shields the EPA's decision *not to warn at all*. *See Abbott*, 78 F.4th at 902 ("[H]ere the complaint does not concern how the Park provided notice of the Fire, but rather that it failed to provide *any* notice.").

Moreover, as the Court explained in *EPA Order I*, the exceptional circumstances of the Flint Water Crisis rendered any decision regarding whether to warn uniquely unsusceptible to policy analysis. *See EPA Order I*, 482 F. Supp. 3d at 637–38; *see also S.R.P. ex rel. Abunabba v.*

*United States*, 676 F.3d 329, 340 n.6 (3d Cir. 2012) (suggesting that a federal agency "could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations"); *Burgess I*, 375 F. Supp. 3d at 816 (explaining that it is impossible to "conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning"). While the United States suggests that the EPA was unaware that there was "a systemwide problem," a rational factfinder could conclude that the EPA was, by the summer of 2015, aware of widespread lead contamination in Flint.[24] (ECF No. 3300, PageID.109130.) Accordingly, the EPA's decision not to warn the public was not a decision "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

Finally, the EPA's decisions regarding how to respond to Flint resident's complaints were, for similar reasons, not of the kind that the

---

[24] On June 25, 2015, for example, Del Toral sent an email to Region 5 employees explaining "the painfully clear science" indicating "a widespread lead problem." (ECF No. 3355-12, PageID.111214.) The City's failure to "warn[] residents about the high lead," in Del Toral's view, "border[ed] on criminal neglect." (*Id.*)

discretionary function exception was designed to shield. At the time of the Flint Water Crisis, the SDWA did not require the EPA to respond to citizen complaints "in any *specific* manner."[25] *Rosebush*, 119 F.3d at 442. As set forth at length, however, the Act institutes a scheme of cooperative federalism in which the EPA has the ultimate responsibility to protect public health. *See supra* Section V.A.ii. In keeping with this responsibility, the Act establishes a general policy of intervention when primacy States and water system operators violate the Act and endanger water system users. *See, e.g.*, 42 U.S.C. §§ 300g-3, 300i. Even where the EPA has been granted discretion, this overarching policy choice by Congress bears on the extent to which the EPA's exercise of discretion "can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325.

Here too, the exceptional circumstances of the Flint Water Crisis are relevant. Shortly after the City of Flint switched its water source to the Flint River, Region 5 began to receive an unprecedented number of

---

[25] After the Flint Water Crisis, § 1414(c) of the SDWA was amended to include specific requirements for responding to individual households reporting elevated lead levels. *See* 42 U.S.C. § 1414(c)(5).

complaints from Flint residents. (*See* ECF No. 3355-40, PageID.111476–111479.) The complaints included indications of highly elevated lead levels in homes. *See Burgess I*, 375 F. Supp. 3d at 804. As the Court explained in *EPA Order I*, the circumstances faced by the EPA resemble those at issue in *In re FEMA Trailer Formaldehyde Products Liability Litigation*, another case concerning a federal agency's response to citizen complaints involving large-scale public health concerns. *See EPA Order I*, 482 F. Supp. 3d at 637.

There, Plaintiffs alleged that the Federal Emergency Management Agency ("FEMA") was negligent in its response to complaints of formaldehyde in the temporary housing provided after Hurricane Katrina. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 583 F. Supp. 2d 758, 767 (E.D. La. 2008), *aff'd in part sub nom. In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807 (5th Cir. 2013). FEMA argued that the discretionary function exception shielded its conduct from liability. *Id.* at 776. Specifically, FEMA insisted that its decisions regarding how to respond to trailer occupants' complaints were "susceptible to policy analysis" because it had to "weigh the significance of reports of formaldehyde fumes in trailers"

90

against competing interests, such as "the substantial cost incurred to purchase those trailers and the extremely limited availability of alternative emergency housing." *Id.*

The Eastern District of Louisiana held that FEMA's decisions regarding how to respond to trailer occupants' complaints were *not* susceptible to policy analysis. *Id.* at 786. The court explained that FEMA became aware of trailer occupants' formaldehyde concerns in mid-March of 2006. *Id.* While no specific directives governed FEMA's response to trailer occupants' complaints, FEMA officials' decisions to "stick[] their heads in the sand" and "minimize the actual extent of the problems" were at odds with FEMA's "general policies," which required the agency "to provide 'safe, secure, and sanitary' housing for eligible disaster victims." *Id.* at 782, 783. The court concluded that FEMA failed to show how—once it had adequate notice of potentially dangerous formaldehyde levels—its conduct "implicated political, social, or economic decisions of the sort that the discretionary function exception was designed to protect." *Id.* at 784.

The Court is persuaded that the same reasoning applies here. The EPA, like FEMA, was apparently inundated with citizen complaints. (ECF No. 3355-40, PageID.111476–111479.) By early 2015, these

91

complaints included documentation of elevated lead levels. *Burgess I*, 375 F. Supp. 3d at 804. By April 2015, the EPA was aware that Flint was not practicing corrosion control. *Id.* at 805. A rational factfinder could conclude that the EPA was aware that widespread lead contamination was likely by this time. And while no specific directives governed the EPA's response to citizen complaints, once the EPA was of potentially dangerous lead contamination, its decisions—to ignore complaints, delay responses, and assure residents that their drinking water was safe— were at odds with the SDWA's general policy of intervention in the face of primacy State failures. (*See, e.g.*, ECF No. 3355-18, PageID.111256.) The United States has failed to show how this conduct "implicated political, social, or economic decisions of the sort that the discretionary function exception was designed to protect." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 583 F. Supp. 2d at 784.

Because none of the EPA's challenged conduct "involve[d] the permissible exercise of policy analysis," none of its judgments were "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536–37. Accordingly, the discretionary function exception does not deprive the Court of jurisdiction, and the

United States' motion to dismiss for lack of subject matter jurisdiction on that ground is denied.

## C.    Misrepresentation Exception

The United States argues that the FTCA's "misrepresentation exception" bars Plaintiffs' claims insofar as they arise out of the EPA's alleged miscommunications. Under § 2680(h) of the FTCA, the Act's waiver of sovereign immunity does not apply to "[a]ny claim arising out of . . . misrepresentation." 28 U.S.C. § 2680(h). Traditionally, the misrepresentation exception has applied only to claims involving "the invasion of interests of a financial or commercial character, in the course of business dealings." *Block v. Neal*, 460 U.S. 289, 296 n.5 (1983) (citations and internal quotation marks omitted); *see also United States v. Neustadt*, 366 U.S. 696, 706–07 (1961) (explaining that Congress, in adopting § 2680(h), had in mind "the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation'").

In *EPA Order I*, the Court held that the misrepresentation exception does not bar Plaintiffs' claims because Plaintiffs do not allege that the EPA made any commercial or financial misrepresentations. *EPA Order I*, 482 F. Supp. 3d at 638. The Court acknowledged that the Sixth

Circuit had not yet decided whether the exception is limited to traditional misrepresentation claims. *Id.*; *but see Keir v. United States*, 853 F.2d 398, 411 (6th Cir. 1988) (noting the "general rule" that misrepresentation claims are confined to commercial settings and holding that the misrepresentation exception does not apply to medical malpractice claims). The Court explained, however, that other courts in this district had found that the misrepresentation exception does not apply when the misrepresentation is not commercial or financial in character. *EPA Order I*, 482 F. Supp. 3d at 638 (citing *Burgess I*, 375 F. Supp. 3d at 817; *Vogelaar v United States*, 665 F. Supp. 1295, 1304 (E.D. Mich. 1987)). In addition, the Court held that negligence, and not misrepresentation, was "the gravamen" of Plaintiffs' claims. *Id.* at 639 (quoting *Burgess I*, 375 F. Supp. 3d at 817).

Since the Court's ruling in *EPA Order I*, the Sixth Circuit decided *Abbott*. There, the United States moved to dismiss for lack of subject matter jurisdiction, arguing that the plaintiffs' failure-to-warn claims were barred by the misrepresentation exception. *Abbott*, 78 F.4th at 895. The district court held that the misrepresentation exception did not apply to the plaintiffs' allegations that the National Park Service negligently

94

failed to warn them of an uncontrolled wildfire. *Reed v. United States*, No. 3:18–CV–201, 2022 WL 601924, at \*7 (E.D. Tenn. Feb. 28, 2022). The court explained that "the misrepresentation exception to the FTCA is largely limited to commercial settings" and that "this case should not be a deviation from the normal application of the misrepresentation exception." *Id.* The Sixth Circuit agreed. *Abbott*, 78 F.4th at 903. Citing *Neustadt* for the principle that negligent conduct may involve an element of misrepresentation, the Sixth Circuit held that the plaintiffs' failure-to-warn claims sounded in negligence rather than misrepresentation. *Id.* (citing *Neustadt*, 366 U.S. at 711 n.26).[26]

In light of the Sixth Circuit's decision and its reliance on *Neustadt*, the Court affirms its prior holding that the misrepresentation exception does not bar Plaintiffs' claims. As in *Abbott*, Plaintiffs' allegations are properly understood as negligence claims, not misrepresentation claims. The essence of Plaintiffs' claims is "failure to use due care in a voluntary

---

[26] The *Neustadt* footnote cited by the Sixth Circuit explains that "many familiar forms of negligent conduct may be said to involve an element of 'misrepresentation,' in the generic sense of that word." *Neustadt*, 366 U.S. at 711 n.26. "[B]ut (s)o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has . . . been confined very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." *Id.* (internal quotation marks and citations omitted).

undertaking." *Neal v. Bergland*, 646 F.2d 1178, 1184 (6th Cir. 1981), *aff'd sub nom. Block*, 460 U.S. 289. The EPA's alleged misstatements are "not essential" to Plaintiffs' negligence claims. *Block*, 460 U.S. at 297; *see also Vogelaar*, 665 F. Supp. at 1305 ("The government may be liable under the FTCA for negligently performing operational tasks even if misrepresentations are 'collaterally involved.'"). Accordingly, the misrepresentation exception does not deprive the Court of jurisdiction, and the United States' motion to dismiss for lack of subject matter jurisdiction is denied.

## VI.   Conclusion

For the reasons set forth above, the Court DENIES the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment. (ECF No. 3300.)

IT IS SO ORDERED.

Dated: January 20, 2026          s/Judith E. Levy
Ann Arbor, Michigan              JUDITH E. LEVY
                                 United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 20, 2026.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager

97